**OUTTEN & GOLDEN LLP**
Adam T. Klein
Cara E. Greene
Jennifer L. Liu
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005

**LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP**
Kelly M. Dermody (*pro hac vice forthcoming*)
Anne B. Shaver (*pro hac vice forthcoming*)
Heather H. Wong (*pro hac vice forthcoming*)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

H. CRISTINA CHEN-OSTER; LISA PARISI; and
SHANNA ORLICH,

 Plaintiffs,

- against -

GOLDMAN, SACHS & CO. and THE GOLDMAN
SACHS GROUP, INC.,

 Defendants.

10 CV 6950

**CLASS ACTION
COMPLAINT
(Trial by Jury Demanded)**

Individual and Representative Plaintiffs H. Cristina Chen-Oster, Lisa Parisi, and Shanna

Orlich (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, allege,

upon personal knowledge as to themselves and upon information and belief as to other matters,

as follows:

## NATURE OF THE CLAIM

1.      This is a class action brought by female professionals of Defendant Goldman,

Sachs & Co. ("GS") and Defendant The Goldman Sachs Group, Inc. ("GS Group") (collectively,

"Goldman Sachs"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

2000e *et seq.* ("Title VII"); and the New York City Human Rights Law, Administrative Code of

the City of New York § 8-107 *et seq.* ("NYCHRL").

2.      Goldman Sachs is a global investment banking, securities and investment management firm.  The firm is famously secretive.  Until its IPO and conversion to a corporation in 1999, the firm operated as a partnership with relatively little public oversight and regulation. Its culture has been described as insular, and its employees intensely loyal.  The firm is also famously profitable.  In 2009, Goldman Sachs generated $45 billion in net revenues and $13 billion in net earnings.  Goldman Sachs credits its employees as "a major strength and principal reason" for its success on Wall Street.  And it pays them accordingly—in 2009, it spent $16 billion on employee compensation and benefits alone.

3.      Goldman Sachs has distributed the benefits of its enormous success unequally – systematically favoring male professionals at the expense of their female counterparts.  At nearly all levels of its management ranks, it has paid its female professionals less than similarly situated male professionals, even though they hold equivalent positions and perform the same or substantially similar work with similar or in some cases superior results.

4.      Goldman maintains policies and practices for promoting its employees that result in the disproportionate promotion of men over equally or more qualified women.  As a result, female professionals have been systematically circumvented and excluded from promotion opportunities that are routinely afforded to their male counterparts.

5.      The resulting underrepresentation of women in Goldman Sachs' management ranks is stark.  The number of women in management positions at Goldman Sachs dwindles as the level of management rises—from Associates, to Vice Presidents, to Managing Directors, to Partners, and finally to the firm's management committee and executive officers.  According to figures released by Goldman Sachs in 2009, women made up only 29% of the firm's Vice Presidents and 17% of Managing Directors.  According to 2008 figures, women were only 14% of its Partners.  Today, only 4 members of its 30-person management committee (roughly 13%)

2

are women.  Of its nine executive officers, only a single one is female; she co-heads the Legal

Department with the firm's other General Counsel, a man.

6.      Women at Goldman Sachs have received less compensation and have been

promoted less frequently than their male counterparts as a result of the firm's discriminatory

policies, patterns, and/or practices.  The violations of its female employees' rights are systemic,

are based upon company-wide policies and practices, and are the result of unchecked gender bias

that pervades Goldman Sachs' corporate culture.  They have not been isolated or exceptional

incidents, but rather the regular and predictable result of Goldman Sachs' company-wide policies

and practices.

7.      Specifically, Goldman Sachs gives its managers, the overwhelming majority of

whom are men, unchecked discretion to assign responsibilities, accounts, and projects to their

subordinates.  The end result is that managers, whether based on conscious or unexamined bias,

most often assign the most lucrative and promising opportunities, assignments, and "seats" to

men.  These more favorable business opportunities allow men at Goldman Sachs to produce

better results, which in turn earn them greater compensation and career advancement.

8.      Goldman Sachs also grants its managers unbridled discretion to allocate resources

among its employees, including but not limited to administrative support, training opportunities,

and informal mentoring.  Goldman Sachs managers exercise this discretion in an ad hoc and/or

subjective manner, without any formal oversight or procedure.  In practice, Goldman Sachs

managers exercise this discretion in a way that provides disproportionately greater resources to

their male subordinates than their female subordinates.  These policies, patterns and/or practices

have the effect of unfairly benefiting men at Goldman Sachs while depriving their female co-

workers of the same resources.  Such resource assignments may also give male employees the

impression of higher power and seniority that often becomes a self-fulfilling prophecy.  As a

result, men at Goldman Sachs are viewed more favorably, receive more compensation, and are more likely to be promoted.

9.     Goldman Sachs also has constructed and maintained a system for evaluating employees' performance that systematically discriminates against female professionals. Its performance review system permits unacceptable levels of subjectivity and bias that result in the systematic undervaluation of female employees' performance. This disparity between the evaluation of male and female employees further exacerbates the inequality between their respective compensation and opportunities for promotion.

10.     Furthermore, these policies, patterns, and/or practices are no accident. Rather, they are part and parcel of an outdated corporate culture. Goldman Sachs has intentionally implemented these company-wide policies and practices in order to pay their male employees more money than their female counterparts, and to promote them more frequently.

11.     These company-wide policies and practices, while facially neutral, have had an adverse impact on the compensation, promotion, and performance evaluations of female employees as compared to their male counterparts.

12.     Accordingly, in addition to bringing this action on their own behalf, Plaintiffs also bring this action on behalf of a class of similarly situated current and former female Associates, Vice Presidents, and Managing Directors employed by Goldman Sachs ("the Class"), in order to end Goldman Sachs' discriminatory policies and/or practices and to make the Class whole.

## PARTIES

### Plaintiffs

#### *H. Cristina Chen-Oster*

13.     Plaintiff H. Cristina Chen-Oster ("Chen-Oster") is a woman who lives in Monmouth County, in the State of New Jersey. She is a citizen of the United States.

14.     Chen-Oster was employed by Goldman Sachs from approximately March 1997 to March 2005 in New York, New York.

*Lisa Parisi*

15.     Plaintiff Lisa Parisi ("Parisi") is a woman who lives in Fulton County, in the State of Georgia.  She is a citizen of the United States.

16.     Parisi was employed by Goldman Sachs from approximately August 2001 to March 2006 in New York, New York, and from approximately March 2006 to November 2008 in Atlanta, Georgia.

*Shanna Orlich*

17.     Plaintiff Shanna Orlich ("Orlich") is a woman who lives in Hudson County, in the State of New Jersey.  She is a citizen of the United States.

18.     Orlich was employed by Goldman Sachs during the summer of 2006 and from approximately July 2007 to November 2008 in New York, New York.

**Defendants**

*Goldman, Sachs & Co.*

19.     Upon information and belief, Defendant Goldman, Sachs & Co. ("GS") is a limited partnership formed under the laws of the State of New York with a place of business within the City and County of New York at 200 West Street, New York, New York 10282.

20.     Upon information and belief, Defendant GS maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

21.     During all relevant times, Defendant GS was Plaintiffs' employer within the meaning of all applicable statutes.

22.     On information and belief, at all times pertinent hereto, Defendant GS has employed more than five hundred people.  GS is a wholly owned subsidiary of The Goldman Sachs Group, Inc.

*The Goldman Sachs Group, Inc.*

23.     Upon information and belief, Defendant The Goldman Sachs Group, Inc. ("GS Group") is a Delaware corporation doing business within New York County in the State of New York and maintains corporate headquarters within the City and County of New York at 200 West Street, New York, New York 10282.

24.     Upon information and belief, Defendant GS Group maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

25.     During all relevant times, Defendant GS Group was Plaintiffs' employer within the meaning of all applicable statutes.

26.     On information and belief, at all times pertinent hereto, Defendant GS Group has employed more than five hundred people.

## JURISDICTION AND VENUE

27.     This Court has original subject matter jurisdiction over the Title VII claims pursuant to 28 U.S.C. §§ 1331 and 1343, because they arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.

28.     This Court has original jurisdiction over the NYCHRL claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This is a putative class action in which: (1) there are 100 or more members in the Class; (2) at least some members of the proposed class have a different citizenship from at least one Defendant; and (3) the claims of the proposed class members exceed $5,000,000.00 in the aggregate.

29.     In addition, this Court has supplemental jurisdiction over the NYCHRL claims under 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

30.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3), because Defendants conduct business and can be found in this district and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and because the alleged unlawful employment practice was committed here, and employment records relevant to that practice are maintained and administered here.

31.     Plaintiffs have exhausted their administrative remedies and complied with all statutory prerequisites to their Title VII claims.  Chen-Oster filed a charge of gender discrimination and retaliation individually and on behalf of all similarly situated women employed by Goldman Sachs with the Equal Employment Opportunity Commission ("EEOC") on or about July 7, 2005.  Pursuant to the EEOC's worksharing agreement with the New York City Commission on Human Rights ("NYCCHR"), her charge is considered dually filed with the NYCCHR.  By notice dated June 15, 2010, the EEOC dismissed Chen-Oster's case and issued a Notice of Right to Sue.

32.     On or about January 7, 2010, Parisi filed a charge of gender discrimination and retaliation with the EEOC individually and on behalf of all others similarly situated.  Pursuant to the EEOC's worksharing agreement with the NYCCHR, her charge is considered dually filed with the NYCCHR.

33.     On or about January 12, 2010, Orlich filed a charge of gender discrimination and retaliation with the EEOC individually and on behalf of all others similarly situated.  Pursuant to

the EEOC's worksharing agreement with the NYCCHR, her charge is considered dually filed with the NYCCHR.

34.     Contemporaneously with the filing of this Complaint, Plaintiffs have mailed a copy to the New York City Commission of Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

35.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

36.     Goldman Sachs maintains uniform employment, compensation, and promotion policies throughout the United States.  Likewise, it cultivates and promotes a common corporate culture.  Indeed, Goldman Sachs prides itself on "instilling the Goldman Sachs culture" in all of its employees through initiation programs, training, seminars, and Goldman Sachs' "360-degree" performance review process.

37.     Goldman Sachs' offices throughout the country use a common organizational structure, organizing finance professionals as follows.  Entry-level employees, typically straight out of college, hold the position of Analyst.   Analysts can be promoted to Associate, which typically includes employees with two to five years of relevant experience and/or an MBA degree.  The next position to which Associates can be promoted is Vice President.  Above Vice Presidents are Managing Directors, and above Managing Directors are Partners.  Finally, at the top of Goldman's management hierarchy sits a 30-person management committee, which includes its nine executive officers.

38.     At the Associate, Vice President, and Managing Director levels, Goldman Sachs discriminates against women in (1) performance evaluations; (2) compensation; (3) promotions; (4) business opportunities; and (5) professional support, including but not limited to

administrative support, training, and mentoring.

**Performance Evaluations**

39.     Goldman Sachs employs uniform procedures for evaluating employee performance which systematically underrate female professionals relative to their similarly situated male peers.

40.     Upon information and belief, Goldman Sachs uses a "360-degree" employee review process, by which an employee's supervisors, co-workers, and subordinates review the employee's performance for the year.  Reviewers give the employee a numerical rating on a scale of 1 to 5, with 1 being the lowest score, and 5 being the highest.  Reviewers also write comments about the employee's performance.

41.     After the 360-degree review process is complete, Goldman Sachs uses a computer algorithm to adjust for the leniency and harshness of reviewers.  This adjustment produces the employee's "adjusted score," which supposedly determines the quartile in which the employee will be ranked.

42.     Goldman Sachs managers are able to unduly influence the 360-degree evaluation process by requesting or requiring which superior, co-workers, and subordinates will evaluate an employee.  Managers have the ability to add or remove a reviewer at their election.

43.     Moreover, even though the adjusted performance scores provide an initial quartile ranking, managers are then given wide discretion to place their employees into quartiles which are forced ranked (i.e., managers must assign an equal number of people to each quartile).  A manager can therefore move an employee to a higher or lower quartile based entirely on the manager's subjective feelings towards the employee and his or her peers.  Since there are only a given number of slots in the top quartile, managers' favoritism towards males means that these spots most often go to male employees.  It is these manager-determined quartile rankings that

determine employees' compensation.

44.     Together, Goldman Sachs' dual-track performance evaluation procedures systematically underrate female employees relative to male employees – that is, women, on average, receive lower 360-degree review scores, more negative reviews, and lower quartile rankings than men in similar positions who have delivered similar or worse objective performance.

**Compensation**

45.     Because female professionals at Goldman Sachs systematically receive fewer and less desirable business opportunities, less professional support, and more negative performance evaluations, they have fewer opportunities to earn similar levels of compensation than their male peers.  Accordingly, female Associates, Vice Presidents, and Managing Directors earn less, on average, than their similarly situated male peers.

46.     Goldman Sachs allows its managers unfettered discretion to determine how credit is allocated to employees who share assets, accounts, or responsibility for a particular business. This subjectivity favors male employees, who systematically receive more credit for generating revenues for the firm than their female co-workers.

47.     Goldman Sachs also employs uniform, secretive procedures for determining employees' compensation that introduce further gender bias into how it compensates its male and female professionals.  Goldman Sachs makes its compensation decisions inside a proverbial "black box" – it does not publish or even disclose set criteria by which it determines an employee's compensation.  Nor does Goldman Sachs inform the employee how it arrived at his or her amount of compensation.

48.     Upon information and belief, an employee's adjusted score and quartile ranking, which are based on managers' subjective preferences, are major determinants of compensation.

Goldman Sachs managers also have a wide amount of discretion in setting an employee's compensation, which allows and encourages them to take into account personal preferences, personal relationships, and conscious and unconscious bias in making compensation decisions. Moreover, managers have discretion to pay one employee in a given quartile more than another employee in that same quartile, with little external control or review.  Managers are simply given a total compensation pool for their team of employees and allowed to distribute it as they see fit.

49.    Associates, Vice Presidents, and Managing Directors typically receive a base salary as well as a year-end bonus.  In an average year, the year-end bonus can be many multiples of an employee's base salary.  Goldman Sachs refers to total compensation, which includes base salary and bonus, as "Per Annum Total Compensation," or "PATC."  Goldman Sachs' discriminatory compensation procedures have resulted in female professionals receiving lower PATC than their male peers for the same or substantially similar work.

50.    Moreover, these gender disparities in compensation permanently depress the earnings potential of female finance professionals.  Goldman Sachs compensates its finance professionals in each year as a percentage increase from their prior year's PATC.  Because an employee's PATC is linked to her past levels of compensation, each discriminatory compensation decision further widens the pay gap between male and female finance professionals at Goldman Sachs.  As a result of these discriminatory compensation policies and practices, female finance professionals at Goldman Sachs have earned less compensation during the liability period than their similarly situated male peers.

**Promotions**

51.    Goldman Sachs also employs opaque, and discriminatory procedures for selecting individuals for promotion.

52.    Goldman Sachs has no clear path nor any objective criteria for promotion to

Managing Director or Partner.  To receive a promotion from Vice President to Managing Director, a Managing Director or Partner must nominate you, and the firm must approve the promotion.  Similarly, Managing Directors must be nominated by a Partner to be eligible for a promotion, and the firm must decide to approve it.

53.    Goldman Sachs managers enjoy extremely broad discretion in choosing who to nominate for a promotion and the promotion process functions as a tap on the shoulder.  Its managers select individuals based on personal preferences, personal relationships, and subjective and biased views of their aptitude and performance.  Upon information and belief, promotions at Goldman Sachs are intensely political and require the careful cultivation of relationships with key decision-makers within the firm, the vast majority of whom are male.  As a result, Goldman Sachs nominates and promotes an overwhelmingly disproportionate number of men, and passes over equally or more qualified women.

**Business Opportunities**

54.    Goldman Sachs discriminates against female Associates, Vice Presidents, and Managing Directors by giving its managers, the overwhelming majority of whom are male, unchecked discretion to assign responsibilities, accounts, and projects to their subordinates.  As a result, whether based on conscious or unexamined bias, managers entrust their most plum opportunities to their male subordinates, and assign their less lucrative and less promising opportunities to their female subordinates.

55.    Goldman Sachs also has allowed and promoted gender stereotyping by permitting managers to assign less desirable tasks to female employees.  Women at Goldman Sachs are often asked to take on responsibility for training junior employees, but then penalized for diverting their attention away from generating revenues for the firm.  Men are asked to train junior employees less frequently, and when they do take on such duties, they are rewarded rather

than penalized for their efforts.  Managers at Goldman Sachs frequently also ask female professionals to perform low-level administrative and clerical tasks without demanding the same tasks from male professionals.

56.     Goldman Sachs also discriminates against its female employees by denying them opportunities to move laterally into other areas of the firm.  Although Goldman Sachs has a formal requirement that job openings for lateral moves be posted for two weeks prior to being filled, in practice,  managers, the majority of whom are male, pre-select the candidates and the posting is merely a formality.  On information and belief, Goldman Sachs transfers an overwhelmingly disproportionate number of men into the most lucrative positions, and passes over equally or more qualified women.

57.     These gender disparities in the allocation of business opportunities at Goldman Sachs result in similar disparities in performance evaluations, compensation, and promotions.  Because women receive fewer and less lucrative opportunities than their male counterparts, it is more difficult for them to achieve the same level of performance.  As a result, female financial professionals systematically receive worse performance evaluations, lower compensation, and fewer promotions.

**Professional Support**

58.     Goldman Sachs also discriminates against female Associates, Vice Presidents, and Managing Directors by delegating broad discretion to its mostly male managers to determine the amount of professional support their subordinates receive.  As a result, managers at Goldman Sachs provide their female subordinates with less administrative support than their similarly situated male peers.  For example, female professionals at Goldman Sachs receive fewer junior employees to assist them with their work.

59.     Female Associates, Vice Presidents, and Managing Directors also receive less

training and mentorship than similarly situated men in the same positions.  Goldman Sachs

managers disproportionately select male professionals to be paired with more senior mentors, to

receive hands-on training, and to be included in social events where they have access to or

visibility among senior management.  In many areas, Goldman Sachs also discriminates against

female finance professionals in seating assignments.  For example, on trading floors, Goldman

Sachs often places women at the periphery while seating similarly situated or more junior males

near the center of the floor.  Men thus have more access to the most senior managers who

regularly sit in the middle of the floor, and are able to cultivate relationships with them more

easily.  Women lack this same access and face greater difficulties in cultivating the same

relationships.

**Conclusion**

60.     Accordingly, Chen-Oster, Parisi, and Orlich bring this class action on behalf of

themselves individually and all similarly situated female Associates, Vice Presidents, and

Managing Directors in the United States.  This action seeks to end Goldman Sachs'

discriminatory policies, patterns, and/or practices and retaliation, and to make the Class whole by

requesting the following remedies: injunctive relief to remedy systemic sex discrimination; an

award of back pay and front pay; compensatory and punitive damages; and attorneys' fees.

## CLASS ACTION ALLEGATIONS

61.     Plaintiffs bring this Class Action pursuant to Federal Rules of Civil

Procedure 23(a), (b)(2), and (b)(3) on behalf of a Class of all female financial-services

employees who are at the Associate, Vice President, and Managing Director corporate level and

employed by Goldman, Sachs & Co. Inc. and its predecessors; and The Goldman Sachs Group,

Inc. and its predecessors; in the United States at any time from September 10, 2004 through the

resolution of this action for claims under Title VII.  Plaintiffs reserve the right to amend the

definition of the Class based on discovery or legal developments.

62.     Plaintiffs also bring this Class Action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of Class of all female financial-services employees who are at the Associate, Vice President, and Managing Director corporate level and employed by Goldman, Sachs & Co. Inc. and its predecessors; and The Goldman Sachs Group, Inc. and its predecessors; in the City of New York at any time from July 7, 2002 through the resolution of this action for claims under the NYCHRL. Plaintiffs reserve the right to amend the definition of the Class based on discovery or legal developments.

63.     All Plaintiffs are members of the Classes they seek to represent.

64.     The members of the Class identified herein are so numerous that joinder of all members is impracticable. As of December 2009, Goldman Sachs employs approximately 32,500 employees worldwide and approximately 18,900 in its Americas region (North and South America). Although Plaintiffs do not know the precise number of female financial-services employees at the Associate, Vice President, and Managing Director levels at Goldman Sachs, the number is far greater than can be feasibly addressed through joinder.

65.     There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members. Common questions include, among others:

(a)     whether Goldman Sachs' policies or practices discriminate against female Associates, Vice Presidents, and Managing Directors;

(b)     whether Goldman Sachs has failed to implement policies and procedures to prevent retaliation against employees who challenge perceived gender bias in the workplace, has failed to address complaints, and has failed to conduct proper investigations;

(c)     whether Goldman Sachs' policies and practices violate Title VII and/or the NYCHRL; and

(d)     whether equitable remedies, injunctive relief, compensatory damages, and punitive damages for the Class are warranted.

66.     The Representative Plaintiffs' claims are typical of the claims of the Class.

67.     The Representative Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

68.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Goldman Sachs has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole.  The Class Members are entitled to injunctive relief to end Goldman Sachs' common, uniform, unfair, and discriminatory policies and practices.

69.     Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The Class Members have been damaged and are entitled to recovery as a result of Goldman Sachs' common, uniform, unfair, and discriminatory policies and practices.  Goldman Sachs has computerized account data, payroll data, and personnel data that will make calculation of damages for specific Class Members relatively simple.  The propriety and amount of punitive damages are based on Goldman Sachs' conduct, making these issues common to the Class.

## CLAIMS OF REPRESENTATIVE PLAINTIFFS

### H. Cristina Chen-Oster

70.     In March 1997, Plaintiff H. Cristina Chen-Oster began working for Goldman

Sachs in the firm's Convertible Bonds Department, in the position of senior convertible bond salesperson.  Goldman did not give her a title initially, despite the fact that Chen-Oster had held the title of Vice President for the same function with her previous employer.  In June 1997, Goldman promoted Chen-Oster to Vice President from having no title.  This was Chen-Oster's only promotion at Goldman Sachs during her eight-year tenure at the firm.

71.     During her employment, Goldman Sachs repeatedly denied Chen-Oster business opportunities, training and mentorship, and other terms and conditions of employment which it made available to similarly situated males.  Additionally, throughout Chen-Oster's tenure at the firm, Goldman Sachs consistently reviewed her performance more harshly than it did similarly performing males, paid her less in base compensation and bonuses than it paid similarly situated men, and promoted equally or less qualified men instead of her to positions she was qualified to hold.

72.     In late 1997, Chen-Oster's direct supervisor, a male Managing Director, took away Chen-Oster's fastest growing account base — convertible bond arbitrage accounts – and transferred them to the firm's London desk.  A male Associate who was also a convertible bond salesperson had the same account base as Chen-Oster did, and had also shared with her responsibility for some of the same arbitrage accounts.  Her supervisor permitted the male Associate to continue covering the arbitrage accounts, but did not allow Chen-Oster to keep her coverage of the accounts, even though, as a Vice President, she was more senior than the male Associate.

73.     In the fiscal year ending in November 1997, Chen-Oster earned significant revenues for Goldman Sachs.  Nonetheless, Goldman Sachs paid her less that year than similarly situated males in her department who had generated less revenues.  For example, upon information and belief, Goldman Sachs paid another male salesperson in the Convertible Bonds

Department who had also been promoted to Vice President in June 1997 approximately 50% more than it paid Chen-Oster, even though this male salesperson had generated less revenues in both that year and the previous year.

74.     In early 1998, Chen-Oster's supervisor asked her to train a newly hired male Associate and to introduce him to her clients, telling her that she would be evaluated and rewarded based on how well she trained him.  Chen-Oster invested significant time and energy on training the new male Associate, which she did well, and acted as a team player in sharing her client relationships with him.

75.     Despite her training efforts and strong sales performance, Goldman Sachs again paid Chen-Oster less in 1998 than it paid similarly situated men in her department.  For example, the same male salesperson who had received more compensation than Chen-Oster in 1997 again received approximately 50% higher compensation than her in 1998, even though he again had generated less revenue that year, and had not shouldered the burden of training a new Associate.

76.     In 1998, Goldman Sachs promoted the male colleague who had been allowed to continue covering the arbitrage accounts to Vice President.

77.     In or around May 1999, Chen-Oster told her supervisor about an incident which had occurred in 1997, shortly after she joined Goldman Sachs.  In the fall of 1997, Goldman Sachs sponsored a dinner for a male employee who had just been promoted to Managing Director.  Part of the evening took place at Scores, a topless bar, and all employees in the group were encouraged to join.  At the end of the evening, a married male Associate in her group insisted that he escort her to her boyfriend's apartment building a few blocks away.  In the hallway outside the apartment, the male colleague surprised Chen-Oster by pinning her against a wall, kissing and groping her, and attempting to engage in a sexual act with her.  Chen-Oster did not invite or welcome the attempt, and had to physically defend herself.  The next morning, the

male colleague apologized profusely to Chen-Oster and asked her not to say anything about the incident to anyone.  On the same day, the male colleague also told his supervisor what had happened the night before.  This supervisor was also Chen-Oster's supervisor.  The supervisor and the male colleague had been friends and sat next to each other on the trading floor.  The male colleague was also the same Associate who her supervisor had permitted to continue covering the arbitrage accounts in late 1997, and who had been promoted to Vice President in 1998.  Chen-Oster later learned that her male colleague had told their supervisor about the incident on the morning after it occurred.

78.     After reporting the 1997 incident to her supervisor, Chen-Oster began to experience increased hostility and marginalization at the firm.  In mid-1999, Goldman Sachs took away some of her job duties and responsibilities, including responsibility for new Asian deal allocations in the United States and for giving feedback on new deal pricing prior to new deal announcements.  Chen-Oster had been managing new Asian deal allocations successfully in the United States for the previous two years.

79.     At the end of 1999, Goldman Sachs again paid Chen-Oster less than it paid similarly situated men in her department.  For example, upon information and belief, the male salesperson who had received more compensation than her in 1997 and 1998 again received over 50% more compensation than her in 1999.  The male colleague involved in the 1997 incident also received over 50% more compensation than Chen-Oster, despite having been promoted to Vice President one year after Chen-Oster had been promoted.  Both men had generated greater revenues in 1999 than Chen-Oster, but the difference resulted primarily from Chen-Oster's supervisor removing higher production accounts from her coverage, but not removing any accounts from either of the two similarly situated men in her department, and giving major new accounts to the men.

80.     In 2000, her supervisor rearranged seating assignments on the convertible bonds trading floor.  In the trading world, seat assignments near the senior manager are highly coveted, as they signify people's rank and help them cultivate relationships with the most senior managers in the group.  In the rearrangement, Chen-Oster's supervisor moved her to the seat farthest from him among all of the salespeople in the convertible bond department.  In contrast, the supervisor placed the male colleague involved in the 1997 incident and the male Associate who Chen-Oster had trained – both of whom were more junior than her – near the center of the seating scheme where the supervisor sat.

81.     Goldman Sachs also restricted Chen-Oster's supervisory responsibilities. Goldman Sachs excluded her from delivering performance reviews and compensation numbers to the male Associate whom she had trained, even though employees with similar seniority typically performed this role with Associates they had trained.  Goldman Sachs similarly excluded her from delivering performance reviews to her direct subordinate by scheduling the review for the day before Chen-Oster returned from her honeymoon, which was highly unusual and which even her direct subordinate perceived as strange.  Instead, two male salespersons gave Chen-Oster's direct subordinate the performance review.  Typically, performance reviews are delayed for days or even weeks so that an employee's direct supervisor can participate.

82.     In or about October 2000, Goldman Sachs promoted two male salespersons in her department to Managing Director:  the salesperson who had consistently received higher compensation than Chen-Oster even in years in which he generated fewer revenues, and the male colleague involved in the 1997 incident.  Both of these men were friends of Chen-Oster's direct supervisor.

83.     At the end of 2000, both men who had been promoted to Managing Director received at least 100% more in compensation than Chen-Oster.

84.     In January 2001, Chen-Oster spoke to her supervisor and another Managing
Director, both men, to ask for opportunities to advance her career.  She indicated to them that her
assigned area of business, Southeast Asian and Japanese convertible bonds, was low on her
supervisor's priority list since her fastest growing accounts, the convertible arbitrage accounts,
had been taken away from her.  Neither Managing Director offered her any help.

85.     In March 2001, Chen-Oster told her supervisor that the women in the Convertible
Bonds Department felt that Goldman Sachs did not treat them equally and that several of them
felt uncomfortable with the sexist banter that regularly occurred on the trading floor.

86.     In March 2001, her supervisor announced that the male salesperson that had
received higher compensation than Chen-Oster in the past, now a Managing Director, would be
Chen-Oster's direct supervisor.  This new supervisor had previously undermined and denigrated
Chen-Oster in front of others when they had been peers, and he continued to do so as her
manager.  In addition, the male colleague involved in the 1997 incident was made the sole head
of U.S. convertible bond sales, effectively making him Chen-Oster's indirect supervisor.

87.     In July 2001, Chen-Oster conducted an analysis of her business area and
concluded that the area was small and had few prospects for growth since it had been
restructured to remove large accounts and those that had significant growth potential.  She spoke
with her new supervisor in an attempt to obtain more promising market opportunities, but the
new supervisor instead directed her to continue working on her existing accounts.

88.     In late 2001, Chen-Oster's previous supervisor and new supervisor assigned the
male salesperson who Chen-Oster had trained to assess a new market opportunity involving
high-yield, distressed convertible bonds.  Even though Chen-Oster was more qualified to take on
the opportunity and had asked her supervisors for greater business opportunities, her supervisors
intentionally excluded her from the project, even telling a Financial Analyst who worked directly

for Chen-Oster not to inform Chen-Oster of the project.  When Chen-Oster finally learned of the project and asked her new supervisor why she was never offered the opportunity, he responded that his opinion was that the male salesperson whom she had trained was better suited for the opportunity.

89.     In March 2002, Chen-Oster's subordinate, a Financial Analyst, transferred to London, leaving her without any dedicated support.  Instead of finding a new Financial Analyst to support Chen-Oster, Goldman Sachs assigned her a more junior Sales Assistant, who worked only a fraction of his time with her.  During the same period, the other male salespeople in the Convertible Bonds Department continued to have a dedicated Analyst to support them, in addition to a Sales Assistant.

90.     In June 2002, Chen-Oster's new supervisor replaced nearly half of the individuals on Chen-Oster's peer review list with employees in Europe who are known to give their peers lower scores, as is the typical practice in Europe.  Moreover, because these employees were located in Europe, they had little familiarity with Chen-Oster and her performance.  One of the people designated as her reviewer was a male salesperson who had no clients in common with Chen-Oster and whom her new supervisor knew had sent racially offensive emails around the group, including one entitled, "Learn Chinese in 5 Minutes," which included statements such as "Our meeting is scheduled for next week . . . Wai Yu Cum Nao?" and "Great . . . Fu Kin Su Pah."  Chen-Oster is Chinese.

91.     Following this change to her peer review list, Chen-Oster submitted a written complaint to her new supervisor and one of Goldman Sachs' Leadership and Diversity Managers.

92.     Shortly afterward, Goldman Sachs asked Chen-Oster to transfer to a marketing position in a newly formed group, Synthetic Convertibles.  The new position was effectively a

demotion, because Chen-Oster would be reporting to another Vice President, also a woman, instead of to a Managing Director for the first time in her entire five year tenure at the firm. Nonetheless, Chen-Oster agreed to transfer to try to escape the discrimination she was experiencing.

93.     In 2002, Goldman Sachs promoted the male colleague who had been involved in the 1997 incident from Managing Director to Partner.  Goldman Sachs did not promote Chen-Oster or the female Vice President who was Chen-Oster's supervisor to Managing Director.

94.     At the end of 2002, Chen-Oster again received significantly less compensation than her similarly situated male peers.  The male Associate whom she had trained, for example, earned significantly more in compensation than Chen-Oster, despite having generated fewer gross sales credits than she had in that year.

95.     From March to July 2003, Chen-Oster took maternity leave.

96.     At the end of 2003, Goldman Sachs again paid Chen-Oster less than her similarly situated male peers.  For example, the male salesperson she had once trained received substantially greater compensation than she did for 2003.

97.     From July to November 2004, Chen-Oster again took maternity leave.  When she returned, Goldman Sachs removed her former accounts and failed to provide her with any meaningful responsibilities or accounts.  Goldman Sachs also moved Chen-Oster's seat from the trading floor to a location among the administrative assistants, all of whom were female.  Upon information and belief, Chen-Oster was the only Vice President-level professional who had been assigned to sit among support staff.  The seating arrangement also had the effect of removing Chen-Oster from the visibility of managers and creating the perception that she was a junior person.

98.     In December 2004, Chen-Oster again received less compensation than her

similarly situated male peers, including but not limited to the male salesperson she had trained.

99.     In February 2005, Goldman Sachs relocated Chen-Oster to a sales group which was known by managers to have lower average compensation than the convertible bonds sales group at Goldman Sachs. In this new group, her supervising Partner, a male, assigned her less favorable accounts than he assigned to male employees.

100.    The inferior business opportunities and treatment that Goldman Sachs gave Chen-Oster relative to her similarly situated male peers severely impacted her career growth and compensation at Goldman Sachs. After being promoted to Vice President, Chen-Oster was never promoted again. Between 1997 and 2004, her compensation increased by only 27%, far lower than comparable males. While Chen-Oster's career growth stagnated, the male colleague involved in the 1997 incident was promoted to Managing Director and finally Partner. Over the same period, he saw his compensation increase by more than 400%.

101.    Throughout Chen-Oster's employment, Goldman Sachs also discriminated against her by reviewing her performance more negatively than her similarly situated male peers. Although she received good 360 degree scores from her peers, these scores nevertheless did not fully reflect her contributions to the firm. Moreover, although they provided her with regular positive feedback, her supervisors reviewed her more negatively than her similarly situated male peers in their private evaluations of her, as is evidenced by the fact that she repeatedly received less compensation than male peers who had underperformed her.

102.    On March 10, 2005, Chen-Oster resigned due to the consistent and systematic discrimination she had suffered over her eight years at Goldman Sachs.

103.    On or about July 6, 2005, Chen-Oster filed a charge of gender discrimination and

retaliation with the EEOC and on June 22, 2010, she received a Notice of Right to Sue.[1]

**Lisa Parisi**

104.    In August 2001, Plaintiff Lisa Parisi began working for Goldman Sachs as a Vice President in the firm's asset management division, Goldman Sachs Asset Management ("GSAM"). In 2003, Goldman Sachs promoted Parisi to Managing Director in the Value Group. This was Parisi's only promotion at Goldman Sachs in her seven-year tenure at the firm.

105.    During her employment, Goldman Sachs repeatedly denied Parisi business opportunities, training and mentorship, and other terms and conditions of employment which it made available to similarly situated males. Additionally, Goldman Sachs consistently reviewed her performance more harshly than it did similarly performing males, paid her less in total compensation than it paid similarly situated men, and promoted equally or less qualified men instead of her to positions she was qualified to hold.

106.    At Goldman Sachs, Parisi was a top performer and consistently outperformed the industry. Her job as a portfolio manager required her to work on several portfolios, each of which had a benchmark. During her tenure at Goldman Sachs, Parisi achieved or surpassed each of these benchmarks. Parisi also consistently generated strong returns on both "long" investments and more difficult "short" investments. She was one of the few people in her group at Goldman Sachs who generated profits on such "short" investments.

107.    Despite her objective record of superior performance, Goldman Sachs paid her less than similarly situated men throughout her career at Goldman Sachs. For example, a male employee who began at Goldman Sachs around the same time as Parisi experienced the same growth in assets under management as Parisi – from approximately $4 billion in 2001 to between $40 and $50 billion in 2007. This similarly situated man, however, received compensation much

---

[1] Chen-Oster's attorneys received a copy of her Notice of Right to Sue from the EEOC on June 18, 2010.

higher than Parisi. From 2001 to 2007, his compensation doubled. In contrast, Parisi's compensation dropped 60% from 2005 to 2007 despite her continued high performance and similar assets under management. Other male employees with whom Parisi worked also received larger increases in their compensation than Parisi did.

108. When Parisi asked her superiors why Goldman Sachs had lowered her compensation, her supervising Partner told her that, while her objective performance numbers were good, the Small Cap Group of which she was a member did not outperform. However, the other two senior members of her team, both men, did not suffer any decline in compensation. In fact, they both received an increase in compensation. Parisi's supervising Partner also stated that Goldman lowered her compensation because her 360-degree review scores had declined. After hearing this, Parisi spoke to her colleagues, all of whom confirmed that they had not had any negative experiences with her.

109. During Parisi's entire tenure as a Goldman Sachs Managing Director, similarly situated male Managing Directors received significantly higher increases in total compensation than her.

110. In 2006, Parisi requested a relocation to Atlanta so that she could be closer to her fiancé and his school-age children. Goldman Sachs readily approved her request. In or around March 2006, she moved to Atlanta, paying her own relocation expenses, which is not typical for employees being transferred to other offices. Following her move, Parisi continued to be a top performer at Goldman Sachs.

111. While Parisi had previously received uniformly positive reviews, Goldman Sachs began evaluating her harshly in 2006. Goldman Sachs claimed that Parisi's support staff had negative experiences with her. When Parisi approached her support staff, analysts, and the head trader to inquire about these purported negative experiences, however, they refuted Goldman

Sachs' claims and confirmed that none of them had had any negative experiences with her.

112.     In 2006, Parisi's supervising Partner informed her that Goldman Sachs intended to take retail industry stock investments away from her.  The Partner did not give Parisi a reason for taking away these investments.  When Parisi's colleagues learned about these plans, they expressed shock.  Several of them praised her as one of the best retail stock pickers in the industry.  Parisi brought the issue to the attention of the head of her group and pointed out that she had made significant profits for Goldman Sachs in the retail sector.  Only then did Goldman Sachs allow her to keep her coverage of the retail sector.  Parisi learned from a colleague that her supervising Partner wanted to take her retail investments away from her because the Partner wanted to give them to a male Vice President who had just joined the Value Group.

113.     As Parisi's work situation became untenable, she approached her supervising Partner in November 2007 and expressed an interest in receiving a separation agreement.  She did not receive one.  Instead, in November 2008, Goldman Sachs terminated Parisi's employment.

114.     On or about January 6, 2010, Parisi filed a charge of gender discrimination and retaliation with the EEOC and the New York State Division of Human Rights.  Parisi's charge is attached to this Complaint as Exhibit 2 and is incorporated by reference.  Parisi is requesting a Notice of Right to Sue from the EEOC, to which she is entitled.

**Shanna Orlich**

115.     Plaintiff Shanna Orlich first began working for Goldman Sachs as a Summer Associate in 2006 while a student in the JD/MBA program at Columbia University.  As a Summer Associate, Orlich did rotations in several trading departments of Goldman.  After graduation, Orlich returned to Goldman Sachs in July 2007 and began working as an Associate in the Capital Structure Franchise Trading ("CSFT") Group, a unit within the firm's Fixed

Income, Currencies, and Commodities ("FICC") Division.

116.    During her employment, Goldman Sachs repeatedly denied Orlich business opportunities, training and mentorship, and other terms and conditions of employment which it made available to similarly situated males.  Additionally, throughout Orlich's tenure at the firm, Goldman Sachs consistently reviewed her performance more harshly than it did similarly performing males, paid her less in bonuses than it paid similarly situated men, and promoted equally or less qualified men instead of her to positions she was qualified to hold.

117.    At the time Orlich joined the CSFT group, the group consisted of 12 employees – 10 male and 2 female, including herself.

118.    In her first performance review, in December 2007, Orlich's direct supervisor, a male Managing Director, gave her only positive feedback and praise for the work she had done to date.

119.    Nonetheless, Goldman Sachs gave Orlich fewer opportunities to become a junior trader than it gave similarly situated males.  Although Orlich joined Goldman to be a trader, when she arrived at the CSFT desk, her direct supervisor told her that there was no trading seat available, and that she would have to rotate with traders and serve as a desk analyst, a less desirable position.

120.    However, at the same time Goldman Sachs hired Orlich, it also hired a man who had been Orlich's business school classmate.  Goldman Sachs' managers often challenged this male classmate to do push-up contests on the trading floor.  When he arrived at Goldman Sachs, Goldman Sachs allowed him to start directly as a trader in the High Yield group.

121.    In October 2007, Orlich's male Managing Director, who was responsible for both the High Yield and CSFT groups, decided to take on a junior trading partner in CSFT.  He offered the position to Orlich's male classmate but not to Orlich, even though she was a member

of the CSFT desk and Orlich's male classmate was not.

122.    Around the same time Orlich was hired, Goldman Sachs also hired a male Analyst directly from college. Even though the new Analyst was junior to her, Goldman Sachs allowed him to begin working as a trader in the CSFT group immediately.

123.    In December 2007, Orlich complained to her direct supervisor that she had not been put in a trading seat. She pointed out to him that her male classmate and the new Analyst were already trading. When Orlich pressed him for a reason why she had not been put in a trading seat, he replied that she did not have enough experience in trading. However, Orlich's male classmate, like her, did not have any trading experience prior to his summer internship at Goldman in 2006. Likewise, the new Analyst also did not have any trading experience prior to his summer internship at Goldman in 2006. Nevertheless, Goldman Sachs readily placed her two male colleagues in trading positions, despite their lack of experience.

124.    As a desk analyst, Orlich essentially had no defined role and had to work on whatever assignments her superiors asked her to do. While her male classmate and the male Analyst received hands-on training and mentorship, Orlich was professionally and socially isolated in her role and did not receive similar levels of support, training, or mentorship from her managers.

125.    In January 2008, Orlich spoke to a more senior female trader about not having opportunities to trade. After this conversation, her direct supervisor agreed to assign her to a junior trader role with a male trader in CSFT. Days later, her direct supervisor left Goldman Sachs. In April 2008, the male trader to whom Orlich had been assigned also left the firm. After the male trader's departure, Goldman Sachs did not assign Orlich a new trading partner. As a result, she continued to have no opportunities to trade.

126.    In July 2008, Orlich reached out to a male Managing Director of Sales to

complain that she did not have a trading partner and was not being given an opportunity to trade. The male Managing Director expressed surprise that Orlich had been hired to be a trader and told Orlich that he did not see her as the "right fit" to be a trader. He also told her that he saw her as an analyst, even though he had told a male colleague of hers that taking the analyst position would not be a good career move. He further told Orlich that because he had not hired her, he did not view her as his responsibility.

127.    Orlich then reached out to other members of Goldman Sachs' senior management team. A senior male Partner told Orlich to be a "team player" and to stay in the analyst role.

128.    After Orlich's direct supervisor, who was also her male classmate's trading partner, left Goldman Sachs, Orlich's male classmate also reached out to the same senior male Partner. When Orlich's male classmate sought his help, the senior male Partner assigned her male classmate to be a junior trader with a highly successful trader in High Yield.

129.    Throughout her employment at Goldman Sachs, Orlich worked in an environment in which her colleagues did not treat her and other women with the same respect that they gave to their male peers. This was true for work assignments and for social outings where relationships between managers and employees were cemented.

130.    For example, Goldman organized frequent golf outings and other social events to which female employees, including Orlich, were not invited. On one occasion, a senior analyst on the CSFT desk asked every male person in Orlich's department and in neighboring groups to be his partner at a golf outing, including individuals more junior to Orlich. However, he did not ask Orlich, the only female on the fixed income side of the CSFT trading desk. Orlich has played golf since childhood and also played varsity golf for her high school team.

131.    Orlich also learned of a golf outing attended by approximately 80 Goldman Sachs employees, only one of whom was a female employee. Orlich was told that she was not invited

because she was too junior, but she later learned that several male analysts straight out of college attended the outing.

132.    Orlich's superiors at Goldman Sachs also asked her to perform clerical and administrative work that they did not give to male Associates, or even to male Analysts. For example, a senior male analyst on the CSFT desk often gave her demeaning and menial assignments, such as setting up his blackberry, making photocopies, and answering calls from his wife. Similarly situated male Associates and even more junior male analysts were not asked to perform such work.

133.    During Orlich's employment, Goldman Sachs also discriminated against her by reviewing her performance more negatively than her similarly situated male peers. For example, Orlich worked long hours during her employment and was often the first person to arrive at the office and the last person to leave. Nevertheless, a senior male analyst to whom Orlich reported criticized her for not working hard enough. In mid-2008, Orlich was given performance review scores which penalized her for being given an undefined role as a desk analyst and for not having had opportunities to develop trading expertise. However, Orlich never received a formal review from any of her superiors.

134.    These disparities in the business opportunities and treatment that Goldman gave to Orlich's male peers but denied to her severely impacted her career growth and compensation at Goldman Sachs. In November 2008, Goldman Sachs terminated Orlich's employment.

135.    On or about January 7, 2010, Orlich filed a charge of gender discrimination and retaliation with the EEOC and the New York State Division of Human Rights. Orlich's charge is attached to this Complaint as Exhibit 3 and is incorporated by reference. Orlich is requesting a Notice of Right to Sue from the EEOC, to which she is entitled.

## CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF**
**Intentional Discrimination**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*)**
**(On Behalf of All Plaintiffs and the Class)**

136.    Plaintiffs incorporate the preceding paragraphs as alleged above.

137.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Class they represent.  Plaintiffs have timely filed charges with the EEOC and have thus exhausted their administrative remedies.

138.    Goldman Sachs has engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against its female Associates, Vice Presidents, and Managing Directors.  Goldman Sachs has intentionally discriminated against Plaintiffs and the Class in violation of Title VII by, among other things:

    (a)    Delegating unchecked and standardless discretion to its mostly male managers to allocate business opportunities and professional support, review the performance of their subordinates, determine employees' compensation, and select individuals for promotion;

    (b)    Fostering a corporate culture which excludes women, undervalues their aptitude and performance, and discounts their professional contributions; and

    (c)    Failing and refusing to take reasonable and adequate steps to prevent and correct instances of discrimination.

139.    These company-wide policies are intended to and do have the effect of:

    (a)    Denying Plaintiffs and Class Members business opportunities because of their gender;

    (b)    Compensating them less because of their gender;

    (c)    Failing to promote them because of their gender;

    (d)    Evaluating their performance more negatively because of their gender;

(e)    Offering them less administrative support, training, and mentorship because of their gender; and

(f)    Providing them with inferior terms and conditions of employment because of their gender.

140.    The discriminatory acts that constitute Goldman Sachs' pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

141.    As a direct result of Goldman Sachs' discriminatory policies and/or practices as described above, Plaintiffs and the Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

142.    The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by 42 U.S.C. §§ 2000e *et seq.*

143.    Plaintiffs request relief as hereinafter described.

## SECOND CLAIM FOR RELIEF
### Disparate Impact Discrimination
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*)**
**(On Behalf of All Plaintiffs and the Class)**

144.    Plaintiffs incorporate the preceding paragraphs as alleged above.

145.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Class they represent. Plaintiffs have timely filed charges with the EEOC and have thus exhausted their administrative remedies.

146.    Goldman Sachs' delegation of unchecked and standardless discretion to its overwhelmingly male managers to distribute business opportunities, determine levels of professional support, evaluate employee performance, set compensation, and select individuals for promotion, and determine other terms and conditions of employment have an adverse impact on female Associates, Vice Presidents, and Managing Directors in violation of Title VII and are not, and cannot be, justified by business necessity. Even if such system and/or policies could be

justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

147.   Goldman Sachs' company-wide policies, patterns, and/or practices of determining compensation and eligibility for promotion based on subjective criteria applied by predominantly male reviewers also have an adverse impact on female Associates, Vice Presidents, and Managing Directors in violation of Title VII and are not, and cannot be, justified by business necessity.  Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

148.   Goldman Sachs has maintained these discriminatory policies, patterns, and/or practices both within and outside the liability period in this case.

149.   As a direct result of Goldman Sachs' discriminatory policies and/or practices as described above, Plaintiffs and the Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

150.   The foregoing policies, patterns, and/or practices have an unlawful disparate impact on women in violation of 42 U.S.C. §§ 2000e *et seq.*

151.   Plaintiffs request relief as hereinafter described.

**THIRD CLAIM FOR RELIEF**
**Intentional Discrimination**
**(NYCHRL, New York City Administrative Code § 8-107 *et seq.*)**
**(On Behalf of All Plaintiffs and the Class)**

152.   Plaintiffs incorporate the preceding paragraphs as alleged above.

153.   This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Class they represent.

154.   Goldman Sachs has engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against its female Associates, Vice Presidents,

and Managing Directors.  Goldman Sachs has intentionally discriminated against Plaintiffs and

the Class in violation of the NYCHRL by, among other things:

(a)     Delegating unchecked and standardless discretion to its mostly male
        managers to allocate business opportunities and professional support,
        review the performance of their subordinates, determine employees'
        compensation, and select individuals for promotion;

(b)     Fostering a corporate culture which excludes women, undervalues their
        aptitude and performance, and discounts their professional contributions;
        and

(c)     Failing and refusing to take reasonable and adequate steps to prevent and
        correct instances of discrimination.

155.    These company-wide policies are intended to and do have the effect of:

(a)     Denying Plaintiffs and Class Members business opportunities because of
        their gender;

(b)     Compensating them less because of their gender;

(c)     Failing to promote them because of their gender;

(d)     Evaluating their performance more negatively because of their gender;

(e)     Offering them less administrative support, training, and mentorship
        because of their gender; and

(f)     Providing them with inferior terms and conditions of employment because
        of their gender.

156.    The discriminatory acts that constitute Goldman Sachs' pattern and/or practice of

discrimination has occurred both within and outside the liability period in this case.

157.    Goldman Sachs has set and/or maintained these discriminatory policies, patterns,

and/or practices during the liability period within the City of New York, and the discriminatory

policies, patterns, and/or practices have had a discriminatory impact on female employees of

Goldman Sachs within the City of New York.

158.    As a direct result of Goldman Sachs' discriminatory policies and/or practices as

described above, Plaintiffs and the Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

159.    The foregoing conduct constitutes illegal, intentional discrimination prohibited by the Administrative Code of the City of New York § 8-107 *et seq.*

160.    Plaintiffs request relief as hereinafter described.

**FOURTH CLAIM FOR RELIEF**
**Disparate Impact Discrimination**
**(NYCHRL, New York City Administrative Code § 8-107 *et seq.*)**
**(On Behalf of All Plaintiffs and the Class)**

161.    Plaintiffs incorporate the preceding paragraphs as alleged above.

162.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Class they represent.

163.    Goldman Sachs' delegation of unchecked and standardless discretion to its overwhelmingly male managers to distribute business opportunities, determine levels of professional support, evaluate employee performance, set compensation, and select individuals for promotion, and determine other terms and conditions of employment have an adverse impact on female Associates, Vice Presidents, and Managing Directors in violation of Title VII and are not, and cannot be, justified by business necessity. Even if such system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

164.    Goldman Sachs' company-wide policies, patterns, and/or practices of determining compensation and eligibility for promotion based on subjective criteria applied by predominantly male reviewers also have an adverse impact on female Associates, Vice Presidents, and Managing Directors in violation of Title VII and are not, and cannot be, justified by business necessity. Even if such system and/or policies could be justified by business necessity, less

discriminatory alternatives exist and would equally serve any alleged necessity.

165.    Goldman Sachs has maintained these discriminatory policies, patterns, and/or practices both within and outside the liability period in this case.

166.    Goldman Sachs has set and/or maintained these discriminatory policies, patterns, and/or practices during the liability period within the City of New York and the discriminatory policies, patterns, and/or practices have had a discriminatory impact on female employees of Goldman Sachs within the City of New York.

167.    As a direct result of Goldman Sachs' discriminatory policies and/or practices as described above, Plaintiffs and the Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

168.    The foregoing conduct constitutes illegal discrimination prohibited by the Administrative Code of the City of New York § 8-107 *et seq.*

169.    Plaintiffs request relief as hereinafter described.

### FIFTH CLAIM FOR RELIEF
#### Retaliation
#### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*)
#### (On Behalf of All Plaintiffs Individually)

170.    Plaintiffs incorporate the preceding paragraphs as alleged above.

171.    This Claim is brought by Plaintiffs Chen-Oster, Parisi, and Orlich individually. Plaintiffs have timely filed charges with the EEOC alleging retaliation claims and have thus exhausted their administrative remedies.

172.    Plaintiffs engaged in protected activities, including making internal complaints of unlawful discrimination and filing charges with the EEOC and NYSDHR complaining of Goldman Sachs' discriminatory policies and practices.

173.    Goldman Sachs took adverse actions against the Plaintiffs with the purpose of

retaliating against them because of their participation in protected activities, and Plaintiffs suffered damages as a result of that conduct.

174.    Plaintiffs request relief as hereinafter described.

## SIXTH CLAIM FOR RELIEF
### Retaliation
**(NYCHRL, New York City Administrative Code § 8-107 *et seq.*)**
<u>**(On Behalf of All Plaintiffs Individually)**</u>

175.    Plaintiffs incorporate the preceding paragraphs as alleged above.

176.    This Claim is brought by Plaintiffs Chen-Oster, Parisi, and Orlich individually.

177.    Plaintiffs engaged in protected activities, including making internal complaints of unlawful discrimination and filing charges with the EEOC and NYSDHR complaining of Goldman Sachs' discriminatory policies and practices.

178.    Goldman Sachs took adverse actions against the Plaintiffs with the purpose of retaliating against them because of their participation in protected activities, and Plaintiffs suffered damages as a result of that conduct.

179.    Plaintiffs request relief as hereinafter described.

## SEVENTH CLAIM FOR RELIEF
### Pregnancy Discrimination
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k))**
<u>**(On Behalf of Plaintiff Chen-Oster Individually)**</u>

180.    Plaintiff Chen-Oster incorporates the preceding paragraphs as alleged above.

181.    This Claim is brought by Plaintiff Chen-Oster individually.

182.    Goldman Sachs has discriminated against Chen-Oster in the terms and conditions of their employment on the basis of their status as pregnant women and as women with children, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, specifically the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k).

183.   Goldman Sachs knew that its actions constituted unlawful discrimination and showed willful and/or reckless disregard for Chen-Oster's statutorily protected rights.

184.   As a direct result of Goldman Sachs' discriminatory policies and/or practices as described above, Chen-Oster has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

185.   Plaintiff Chen-Oster requests relief as hereinafter described.

### EIGHTH CLAIM FOR RELIEF
**Pregnancy Discrimination**
**(NYCHRL, New York City Administrative Code § 8-107 *et seq.*)**
**(On Behalf of Plaintiff Chen-Oster Individually)**

186.   Plaintiff Chen-Oster incorporate the preceding paragraphs as alleged above.

187.   This Claim is brought by Plaintiff Chen-Oster individually.

188.   Goldman Sachs has discriminated against Chen-Oster in the terms and conditions of their employment on the basis of their status as pregnant women and as women with children, in violation of the Administrative Code of the City of New York § 8-107 *et seq.*

189.   Goldman Sachs knew that its actions constituted unlawful discrimination and showed willful and/or reckless disregard for Chen-Oster's statutorily protected rights.

190.   Goldman Sachs engaged in the discriminatory conduct alleged above during the liability period within the City of New York.

191.   As a direct result of Goldman Sachs' discriminatory policies and/or practices as described above, Chen-Oster has suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

192.   Plaintiff Chen-Oster requests relief as hereinafter described.

### ALLEGATIONS REGARDING RELIEF

193.   Plaintiffs and the Classes they seek to represent have no plain, adequate, or

complete remedy at law to redress the wrongs alleged herein, and the injunctive relief they seek in this action is the only means of securing complete and adequate relief. Plaintiffs and the Classes they seek to represent are now suffering, and will continue to suffer, irreparable injury from Goldman Sachs' discriminatory acts and omissions.

194.    Goldman Sachs' actions have caused and continue to cause Plaintiffs and all Class Members substantial losses in earnings and other employment benefits.

195.    In addition, Plaintiffs and Class Members suffer and continue to suffer emotional distress, humiliation, embarrassment, and anguish, all to their damage in an amount according to proof.

196.    Goldman Sachs performed the acts herein alleged with malice or reckless indifference. Plaintiffs and Class Members are thus entitled to recover punitive damages in an amount according to proof.

## PRAYER FOR RELIEF

197.    WHEREFORE, Plaintiffs and the Class pray for relief as follows:

(a)    Certification of the case as a class action on behalf of the proposed Classes;

(b)    Designation of Representative Plaintiffs H. Cristina Chen-Oster, Lisa Parisi, and Shanna Orlich as representatives of the Classes;

(c)    Designation of Representative Plaintiffs' counsel of record as Class Counsel;

(d)    A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. §§ 2000e, *et seq.*; and the Administrative Code of the City of New York § 8-107 *et seq.*;

(e)    A preliminary and permanent injunction against Goldman Sachs and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns, and/or practices that discriminate against Plaintiffs or the Class because of their gender or participation in this lawsuit;

(f)    An order that Goldman Sachs institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender, and that it eradicate the effects of their past and present unlawful employment practices;

(g)    An order requiring Goldman Sachs to develop and institute objective standards for assigning job opportunities, determining of pay, and making promotion decisions;

(h)    An order appointing a monitor to ensure that Goldman Sachs complies with the injunction provisions of any decree that the Court orders;

(i)    An order retaining jurisdiction over this action to ensure that Goldman Sachs complies with such a decree;

(j)    An order restoring Plaintiffs and Class Members to their rightful positions at Goldman Sachs, or in lieu of reinstatements, an order for front pay benefits;

(k)    Back pay (including interest and benefits) for the Representative Plaintiffs and Class Members;

(l)    All damages sustained as a result of Goldman Sachs' conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof;

(m)    Exemplary and punitive damages in an amount commensurate with Goldman Sachs' ability to pay and to deter future conduct;

(n)    Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(o)    Pre-judgment and post-judgment interest, as provided by law; and

(p)    Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

198.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action.

Dated: New York, New York
      September 15, 2010

By: _____
          Adam T. Klein

OUTTEN & GOLDEN LLP
Adam T. Klein
Cara E. Greene
Jennifer L. Liu
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000
Facsimile:   (212) 977-4005

LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP
Kelly M. Dermody *(pro hac vice forthcoming)*
Anne B. Shaver *(pro hac vice forthcoming)*
Heather H. Wong *(pro hac vice forthcoming)*
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

*Attorneys for Plaintiffs and the Putative Class*

EXHIBIT 1

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☐ EEOC | |

_____ and EEOC

*State or local Agency, if any*

| NAME (*Indicate Mr., Ms., Mrs.*) | HOME TELEPHONE (*Include Area Code*) |
|---|---|
| H. Cristina Chen-Oster | ▉▉▉▉▉▉ |

| STREET ADDRESS ▉▉▉▉▉▉ | CITY, STATE & ZIP CODE | DATE OF BIRTH |
|---|---|---|

NAME OF THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (*Include Area Code*) |
|---|---|---|
| Goldman, Sachs & Co. | Over 20,000 | 212-902-1000 |

| STREET ADDRESS   CITY, STATE, AND ZIP CODE | COUNTY |
|---|---|
| 1 New York Plaza, 50th Fl.   New York, NY 10004 | New York |

| NAME | TELEPHONE NUMBER (*Include Area Code*) |
|---|---|

| STREET ADDRESS   CITY, STATE, ZIP CODE | COUNTY |
|---|---|

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ AGE<br>☒ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER<br>(specify) | EARLIEST (adea/epa)   LATEST (ALL)<br>March 10, 2005 |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet (s)):

Please see attached statement.

| I want this charge filed with both the EEOC and the State or local Agency, If any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | *NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| *[signature]* | SIGNATURE OF COMPLAINANT |
| Date 7/7/05   Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)<br>7/7/05 |

EEOC FORM 5 (Test 10/94)

MELANIE L. CRISTOL
Notary Public, State of New York
No. 01CR6119348
Qualified in New York County
Commission Expires November 29, 2008

The particulars are:

1.  My name is H. Cristina Chen-Oster. I was born on March 29, 1971.

2.  From March 3, 1997 to March 10, 2005, I was an employee in the Equities Division of Goldman, Sachs & Co. ("Goldman"). I worked as a senior international convertible bond salesperson from March 1997 to September 2002 and as a senior synthetics convertible marketer from September 2002 to July 2004. I was promoted to Vice President in June 1997; that was my only promotion at Goldman.

3.  Goldman discriminated against me on the basis of my gender with respect to pay, promotion, and other terms and conditions of employment; this included discrimination based on my pregnancy. Goldman retaliated against me when I complained about this discrimination.

4.  This pattern of discrimination and retaliation began after a Goldman employee - a senior salesperson in my group and a friend of my manager at the time assaulted me in the fall of 1997.

5.  The discrimination, harassment and retaliation included, but was not limited to, the following:

    (a) Throughout my career at Goldman, I was paid less than similarly-situated men, I was initially not given any formal evaluation unlike similarly-situated men and was later evaluated more harshly than similarly-situated men, I was treated less favorably regarding promotions than similarly-situated men, and I was given less favorable account assignments than similarly-situated men.

    (b) When I reported the sexual assault in May 1999 to my manager, the Partner in charge of the global convertible group, he advised me not to pursue the matter with Employee Relations.

    (c) After I eventually disclosed the sexual assault to Human Resources, my performance evaluators and evaluations were manipulated so that I received artificially negative reviews, and my seat assignment was such that I was physically isolated from members of my desk and cut off from the flow of information.

    (d) I took maternity leaves from about March 24, 2003 to about July 23, 2003 and from about July 6, 2004 to about November 5, 2004. After my return in about November 2004, Goldman provided me with no meaningful responsibilities and I was given no accounts -- not even those that I had handled before my maternity leave. In addition, my seat was moved to a

location among the administrative assistants. Upon information and belief, no male Vice President level professional has ever been assigned a seat among a group of administrative staff in the Equities Division. The group of administrative staff was all female.

(e) On about February 18, 2005, after having spent three months without any substantive assignments or position, I was given no choice but to take a much lesser-valued job in U.S. Research Sales. While I was told I could continue to seek another position within Goldman on my own time, I was simultaneously told that there were no other positions available for me. As a result, I involuntarily accepted the position. Over the next few weeks, I was given basic account assignments that were far less favorable than accounts given to similarly-situated men.

6.     On March 10, 2005, I resigned from Goldman because of the discrimination and retaliation.

7.     I seek compensation from Goldman Sachs for the discrimination and retaliation, including compensation for lost earnings, pain and suffering, and attorney's fees.

8.     I file this charge on behalf of myself and other similarly-situated women at Goldman Sachs.

Supplement of EEOC Charge
of
H. Cristina Chen-Oster

STATE OF NEW YORK           )
                            ) ss:
COUNTY OF NEW YORK          )

**H. Cristina Chen-Oster**, being duly sworn, deposes and says:

1. My name is Cristina Chen-Oster. I was born on March 29, 1971.

2. From March 3, 1997 to March 10, 2005, I was an employee in the Equities Division of Goldman, Sachs & Co. ("Goldman"). I worked as a senior international convertible bond salesperson from March 1997 to September 2002 and as a senior synthetics convertible marketer from September 2002 to July 2004. I was promoted to Vice President in June 1997; that was my only promotion at Goldman.

3. Goldman discriminated against me on the basis of my gender throughout my employment with respect to pay, promotion, and other terms and conditions of employment; this included discrimination based on my pregnancy. Goldman also retaliated against me because I complained of the discrimination.

4. This pattern of discrimination and retaliation began after a Goldman employee, ███████ ███████, sexually assaulted me in the fall of 1997. Mr. ███████ was a senior salesperson on the U.S. convertible bond desk and a close friend of my manager at the time, ███████████, who was also the most senior Managing Director on the convertible bond desk. Mr. ███ remained my manager until about August 1999. Thereafter, Mr. ███████ continued to be involved in decisions and discussions surrounding my performance evaluations, supervision, compensation and promotion.

5. While Mr. ███ routinely provided my male peers informal career support and an annual performance evaluation, Mr. ███ gave me only minimal, informal feedback in 1997 and 1998. All feedback from Mr. ███ and my peers during this period was positive and included phrases from Mr. ███ such as "best hire I ever made" in about July 1997, before the sexual assault.

6. In the months following Mr. ███████████'s assault, Mr. ███ took away my fastest growing account base (specifically, convertible bond arbitrage accounts) and transferred it to Goldman's London desk without any notice or explanation. Although Mr. ███████████ had the same account base and shared responsibility with me for some of these accounts, Mr. ███ permitted Mr. ███████ to continue covering all of his arbitrage accounts, including those that I had been directed to transfer to London coverage. This change severely restricted my professional growth but gave Mr.

 an opportunity to advance his career more quickly. For instance, from 1997 to 2004, my compensation increased by 27%. Upon information and belief, during this same period, Mr. █████████'s compensation increased by more than 400%. He was promoted to Vice President in 1998 (one year after my promotion to Vice President), Managing Director in 2000, and Partner in 2002.

7. After the 1997 assault, I was forced to deal with Mr. █████████'s regular and unchecked disparagement of my contributions to the business. Whenever I spoke at group meetings, Mr. ████████ would hold side conversations and laugh with another salesperson on our desk, ████████, who was his friend and who became my boss in 2001. I was frequently one of a few women – if not the only woman – at these meetings of twenty to thirty people. Mr. ████████ and Mr. █████ did not engage in such behavior when men spoke during the meetings. Their conduct towards me undermined my credibility and signalled to my peers that my views were not important.

8. At the end of 1997, I was paid $375,000, which was significantly less than similarly-situated men, including those I had out-performed. At the time, I was responsible for all international convertible bond sales to U.S. accounts. Under my direction, this business generated $15.3 million in gross sales credits in 1997. Upon information and belief, Mr. ████████'s compensation for 1997 was approximately 50% more than mine, even though Mr. █████ had generated fewer sales credits than I had and had produced only $7 million in gross sales credits the year before. Goldman continued to pay me less than my male counterparts in the ensuing years, notwithstanding my comparable or superior performance. See ¶¶11, 19, 25, 37, 47, 49, and 53.

9. In late 1997 and early 1998, I organized a conference that was held in February 1998 on "Emerging Markets" and which drew more than 200 attendees, including Goldman employees, corporate clients, and investors. I was highly praised for my initiative and success with the conference, and no other convertible bond salesperson undertook such efforts again until several years later. Nevertheless, I received no additional job responsibilities, no significant monetary remuneration, and no promotion in 1998.

10. In early 1998, Mr. █████ asked me to train a newly hired male Associate, ████████, to market European convertible bonds to U.S. accounts. This area was widely expected to be the largest and fastest-growing regional segment of the international convertible bond business due to the launch of the Euro currency in January 1999. Despite my seniority, seven-years of finance experience, and leadership in the international convertible bond business in the U.S., Mr. █████ directed me to treat Mr. ████████ as a "partner." Mr. █████ further informed me that I would be evaluated and rewarded by how well I trained Mr. ████████, whose background was in management consulting and who had never before worked in finance. I trained and taught Mr. ████████ well, and we as a team generated $17.6 million in gross sales credits in 1998.

11. Despite my various accomplishments in 1998, my compensation for the year was $475,000, significantly less than that of similarly-situated men. Upon information and belief, Goldman paid Mr. ████████ at least 50% more, despite Mr. █████'s record of

2

fewer gross sales credits. Mr. ▮▮▮ also did not train anyone that year, as he was still developing his knowledge of the U.S. convertible market and his client relationships.

12. In May 1999, I had several conversations with Mr. ▮▮▮ about the possibility of transferring to Goldman's Menlo Park office. By then, I was frustrated by how my managers and predominantly male peers undervalued my work, even though I was a high producer on our sales desk. I believed I would have greater opportunities for career advancement and compensation in the Menlo Park office in a private wealth management role, where I would be compensated by a defined commission rate instead of subjective salary plus bonus scheme in my institutional sales job.

13. Initially, Mr. ▮▮▮ said he was surprised by my request to transfer and did not support my move. On about May 26, 1999, Mr. ▮▮▮ asked me to stay at least until February 2000. During this conversation, I told Mr. ▮▮▮ that Mr. ▮▮▮▮▮ had sexually assaulted me in the fall of 1997. To my amazement, Mr. ▮▮▮ said that Mr. ▮▮▮▮▮ had already told him about the assault, though not the victim's identity. Mr. ▮▮▮ said that now that I had reported the attack, he was obligated to inform Employee Relations about the assault. However, at the same time, Mr. ▮▮▮ told me not to pursue an internal investigation by Goldman into the assault and strongly recommended that I seek outside counseling instead.

14. After I informed Mr. ▮▮▮ of Mr. ▮▮▮▮▮'s assault, Mr. ▮▮▮ stopped insisting that I stay in New York and, even though he knew I had not finalized any transfer, began acting as though I was on my way out. By late June 1999, he began urging Mr. ▮▮▮▮, who previously had expressed interest in transferring with me to Menlo Park, to stay in New York and continue working with the convertible bonds group. Although I was still the senior salesperson in charge of the international convertible bond sales business to U.S. outright accounts and Mr. ▮▮▮▮ was only a second-year Associate, Mr. ▮▮▮ also began talking to Mr. ▮▮▮ about replacing me as the head of this business and about recruiting additional support for Mr. ▮▮▮.

15. I was apprehensive about trusting Mr. ▮▮▮ after he told me that he had known about Mr. ▮▮▮▮'s assault for months and after he advised me not to pursue the matter with Employee Relations. However, Mr. ▮▮▮ was one of the most senior Partners at Goldman, and I was hesitant to go against his word and reputation, especially since the perpetrator was his friend. In addition, from 1997 until 2002, Mr. ▮▮▮ was responsible for determining compensation levels for everyone on the global convertible bond team, including mine. Mr. ▮▮▮ retired in November 2002, but continued to be involved with Goldman as an advisor.

16. When I met with Employee Relations in July 1999 to discuss Mr. ▮▮▮▮▮'s assault, I asked several times whether Mr. ▮▮▮ would be told what I said if I mentioned his name. When the Employee Relations representative indicated yes, I stated only that Mr. ▮▮▮▮▮ had engaged in very inappropriate behavior that would have led to rape, had I not fought him off.

3

17. In the weeks after my meeting with Employee Relations, ██████████ replaced Mr. ████ as my manager. (Mr. ██████ was a Managing Director in London who reported to Mr. ████.) In addition, a significant portion of my job responsibilities was gradually siphoned away; I was no longer responsible for determining new Asian deal allocations in the U.S. nor for giving feedback on new deal pricing prior to new deal announcements, tasks I regularly undertook before I had reported the sexual assault.

18. In about August 1999, two and a half years after my start at Goldman, I received my first performance evaluation. The evaluation was delivered by Mr. ████ and Mr. ██████████, a Managing Director in charge of U.S. convertible bond trading. My peer review score summary was 3.83 out of a maximum score of 5.00. I was told that although my score was within the average range, it would likely have been higher had I not been reviewed by European employees, who culturally tend to give lower scores.

19. At the end of 1999, I was paid $650,000. Upon information and belief, my male colleagues, Mr. ████████ and Mr. ██████████, each received at least 50% more than I did in 1999. Although their sales credits for U.S. convertible sales may have been higher than mine, this difference was partly the result of Mr. ████ removing higher yield accounts from my coverage, but not making a comparable change in the accounts covered by Mr. ████████ and Mr. ████████.

20. In early 2000, Mr. ████ rearranged our seat assignments. Seat assignments were changed infrequently and signified a person's rank on the desk. Seats closest to the desk manager and in the center of the group were most coveted, since they enabled an individual to build relationships with senior managers, gave individuals direct access to information, and allowed greater involvement in the overall business.

21. With the new seating arrangement in 2000, Mr. ████ moved me to the seat farthest from him among the convertible bond salespeople, even though I co-covered accounts with other salespeople at our desk and it would have made sense to place me closer to the center. In contrast, Mr. ████ assigned Mr. ██████████ to a seat near him and placed Mr. ████████, who was still an Associate and my subordinate, near the center of the seating scheme.

22. While Mr. ████ and others on the desk helped Mr. ████████ advance at Goldman, they restricted my supervisory responsibilities over him considerably after I had trained him and introduced him to my clients. I was excluded from co-delivering performance reviews and annual compensation numbers, even though senior professionals like myself typically had this role with respect to associates they had trained. I was further excluded from assessing Mr. ████████'s candidacy for Financial Analyst Training Program Manager, despite my substantive knowledge of his abilities and the significant addition to Mr. ████████'s job responsibilities this position entailed.

23. In about September 2000, Mr. ████ and Mr. ████████ delivered my performance review. I received a score of 3.53 out of 5.0, and 9 out of 12 reviewers ranked me among the top 50% of my peers. In spite of my performance, I was not promoted in 2000. In contrast,

two of my male peers, Mr. ████ and Mr. ████████, were promoted to Managing Director in about October 2000.

24. My supervisory responsibilities were also undercut with regard to my Financial Analyst, ████████. In December 2000, one day before my scheduled return from my honeymoon, Mr. ███████ and Mr. ███████ met with Ms. ████ to deliver her performance review without my input. I raised the issue of my exclusion with Mr. ████, but he dismissed my complaint, simply stating that Mr. ████████ probably had his reasons for doing so and could do as he wished as Managing Director.

25. My compensation for 2000 was $800,000. Upon information and belief, Mr. ████████ and Mr. ████████ each received at least 100% more.

26. In January 2001, I spoke to Mr. ████ and Mr. ████ about opportunities for career advancement at Goldman. I stated that my assigned area of business, Southeast Asian and Japanese convertible bonds, was of low priority in the overall business strategy of the convertible bond desk since Goldman's emphasis was on U.S. and European convertible bond sales. In addition, my fastest growing accounts, the convertible arbitrage accounts, had been taken away from me despite their significant growth while under my coverage. I asked specifically what I needed to do to advance my career, but Mr. ████ and Mr. ████ gave me only vague responses. Neither Mr. ████ nor Mr. ████ took any tangible action to address my concerns.

27. I regularly raised the issues of inequitable treatment towards women on the convertible bond desk. On about March 9, 2001, I spoke again to Mr. ████ about the poor treatment of women, including myself, in the convertible bonds sales group. I informed him that several women who worked in the London convertibles desk were uncomfortable with the sexist banter that regularly occurred in the workplace. I also reported to Mr. ████ that ████████, a Managing Director, had repeatedly brushed up against me, stood within an uncomfortably close range, and had expressed personal interest in dating me. Mr. ████ thanked me for raising these issues with him, but took no discernible action, and the work environment did not change after this conversation.

28. On about March 15, 2001, Mr. ████ announced that Mr. ████ was moving to a new position and would be replaced by Mr. ████. I would now be reporting directly to Mr. ████, Mr. ████████'s friend and my former peer who I had outperformed in sales when we had begun our careers at Goldman. Mr. ████ also announced that Mr. ████████ would be the sole head of U.S. convertible bond sales, effectively making him my indirect supervisor. By this time, Mr. ████ had known about Mr. ████████'s assault on me for nearly two years. This reporting line created a negative and hostile work environment, in which I would face extreme difficulty in advancing at the firm.

29. Once Mr. ████ became my manager, he continued to undermine me in front of others, just as he and Mr. ████████ had when we were peers. From 2001 through 2002, as my direct manager, Mr. ████ regularly denigrated my performance during our London

5

convertible bond sales desk meetings when I was not present, regardless of my actual performance levels.

30. In July 2001, I completed a market analysis of the business area for which I was responsible. The analysis indicated that this area was very small and had little prospect for growth. I shared these conclusions with Mr. ███████ in yet another attempt to obtain more promising market opportunities. However, Mr. ███████ only directed me to continue working on my existing accounts.

31. I also shared the results with Mr. ████, asking him to transfer me to a different position. Like Mr. ████████, Mr. ████ did not respond to my request.

32. Despite my clear indication to Mr. ████ and Mr. ███████ that I sought greater work responsibilities and avenues for career growth, I was not given such opportunities when they arose, even though I was qualified. In contrast, between 1999 and 2002, my managers appointed at least three men to the position of Financial Analyst Manager – ██████████, ████████, and ██████████ – despite my credentials, avowed interest in such work, and positive peer reviews.

33. In the fall of 2001, Mr. ███████ delivered my annual performance review. My score had increased from the previous year to 3.63 out of 5.0.

34. About one month later, I met with someone in Employee Relations to discuss another job opening at Goldman. Among other things, I discussed the unfavorable treatment of women on the convertible bond desk and the fact that Mr. ████ had directed me not to encourage Goldman to investigate Mr. ██████████'s sexual assault on me.

35. While none of my managers had responded affirmatively to my requests for greater business opportunities at Goldman, a few weeks after my meeting with Employee Relations, Mr. ████████ and Mr. ████ assigned Mr. ███████ to a "secret" project that involved assessing whether high-yield, distressed convertible bonds provided a viable market opportunity. To complete this project, Mr. ███████ enlisted the assistance of Ms. ████ without consulting me, even though she was the Financial Analyst assigned to support my team. Furthermore, Mr. ███████ told Ms. ████ specifically that she was not to discuss this project with me, even though she reported to me. As a result, I was the only member of our team who did not know about this project.

36. The results of this secret analysis gave Mr. ███████ the chance to work with high-yield, distressed convertible bonds, tapping a market potential of $20 million, even though I was clearly more qualified for such work. I had three years of relevant work experience in fixed-income sales, while Mr. ███████ had none. Most of the business contacts Mr. ██████ had in this field were those that I had given him during his training. When I asked Mr. ███████ why I was not offered this opportunity in light of my superior qualifications and experience, Mr. ███████ stated only that Mr. ███████ was somehow better-suited.

37. In December 2001, I was paid $450,000 - a 44% drop from the previous year.

38. In about March 2002, Ms. ███ transferred to London, leaving me without any dedicated support, unlike my male counterparts. Every salesperson was typically assigned one Financial Analyst who was responsible for analyzing trade ideas, tracking trades, answering client calls, and executing trades. Although my business had doubled from 2001 levels, instead of giving me a new Financial Analyst, Mr. ███████ and ██████ ██████████, head of Global Convertible Bond Trading, allowed only one Sales Assistant to spend 10% of his time helping me. Sales Assistants were junior to Financial Analysts and were normally involved in more administrative tasks, such as answering phones and booking trades.

39. Consequently, for the rest of 2002, I worked more hours than anyone else on my desk. I came into the office nearly every weekend and occasionally arrived alone at 2:00 a.m. to sell new international convertible bond deals. In contrast, within about a month of Ms. ███'s departure, Mr. ████████ was assigned a new Associate, ███████████, to support him in his new convertible bond business. Associates are typically recent business school graduates and are therefore more senior than Financial Analysts, who generally are recent college graduates.

40. With Ms. ███'s departure, my seat was surrounded by six empty desks, sending the message that my work was not valued and distancing me from the flow of information about the convertible bond business. Mr. ████████ and Mr. ███████████ did not change my seat, even after I made repeated requests to be seated closer to the one Sales Assistant who had been permitted to support me (albeit on a limited basis). I was also one of the few professional women left in convertible bond sales at Goldman offices world-wide.

41. In March 2002, Mr. ███████████ presented an overview for U.S. Convertible Sales to the convertible bond desk. I was the only convertible bond salesperson in the U.S. whose name did not appear in the presentation, despite my coverage of U.S. convertible clients for convertible products.

42. Since there were so few women in the convertible bond group, I became involved with the Women's Network. In the fall of 2001, I was asked to co-head the Leadership and Development Committee within the Women's Network in the Equities Division. We organized a full day Women's Leadership Conference held on about May 3, 2002 for a group of female Vice Presidents in the division. My managers, including Mr. ████████, were aware of my work with the Women's Network.

43. In about June 2002, Mr. ████████ replaced nearly half of the 15 individuals on my peer review list who had substantive knowledge of my work, with people who had little familiarity with me. Almost all of the new reviewers worked in Europe and generally give lower average scores, as is typical in Europe. Performance reviews were not usually conducted by individuals who worked in a different geographic location. Thus, by making these changes, Mr. ██████ effectively lowered my quantitative performance review from the previous year. Following this change, I submitted a written complaint to

Mr. ████. On about August 23, 2002, I also spoke to ████████, the Leadership and Diversity Manager of the Equities Division about Mr. ████'s changes to my review and about the overall discriminatory and hostile work environment towards women at our desk. I also provided Mr. ████ with a copy of the complaint I had given to Mr. ████.

44. Within about one week, Mr. ████████ asked me to transfer to a senior marketing position with Synthetic Convertibles and report to ████████, who had less seniority than me as she had been promoted to Vice President two years after me. This marketing position was a clear demotion from my previous job in both structure and substance.

45. I requested that Ms. ████ and I co-head the Synthetics Convertibles group together, since (a) Ms. ████ was my peer, if not my junior; (b) Ms. ████ would be out on maternity leave within the month and the group would need a manager in her absence; (c) I had significant experience training and managing small groups; and (d) many other small groups in the Equities Division were managed by two people. However, Mr. ████████, who was a rising Managing Director in the Equities Division with senior management aspirations, persuaded me to accept the lesser position and promised to become my mentor. Though we ostensibly set up monthly lunches to discuss my career, over the next two and a half years, Mr. ████████ and I met approximately three times for such talks.

46. In about September 2002, Mr. ████████ and Mr. ████████ delivered my annual performance review. I received a rating of 3.4 out of 5.0 overall, which was the same as the overall team mean. Mr. ████████ and Mr. ████████ emphasized that this quantitative score was lower than would be expected, given the more positive comments I received in the qualitative part of my review.

47. In December 2002, I was paid the same as the year before ($450,000), even though I had dramatically increased my business from 2001 levels in spite of having lost the full-time support of two professionals. Upon information and belief, Mr. ████████ performed worse yet was paid significantly more than me. I generated $9.5 million in sales credits from Jan 2002 through August 2002 ($12.7 million annualized for the fiscal year) when I transferred to synthetic convertibles, largely on my own, compared to Mr. ████, who generated, as a team together with Mr. ████████, $11.75 million in sales credits for the 2002 fiscal year.

48. I took maternity leave from about March 24, 2003 to about July 23, 2003. After my return in about August 2003, Ms. ████ delivered my performance review. I received a score of 3.88 out of 5.0.

49. In December 2003, I was paid $475,000. Upon information and belief, Mr. ████████ received substantially greater compensation than me for 2003.

50. I took maternity leave from about July 6, 2004 to about November 5, 2004. After my return in about November 2004, Goldman provided me with no meaningful

responsibilities or accounts. I was not even permitted to cover the accounts I had handled before my maternity leave, even though Mr. ████████ had stated numerous times that I had successfully grown the synthetic convertible business and performed well with those accounts.

51. In addition, one month before I returned from maternity leave, my seat was moved to a location among the administrative assistants, and I remained seated there until about December 2004. I was the only Vice President-level professional at that time who was assigned a seat among support staff. Upon information and belief, no male Vice President-level professional in the Equities Division has ever been made to sit among administrative staff. The group of administrative staff was all female.

52. Ms. ██████ and ████████████, my temporary manager, delivered my performance review on about October 29, 2004. My score was 3.92 out of 5.0, and I was told that my ratings placed me firmly in the second quartile of my peers.

53. Nevertheless, in December 2004, I was paid $475,000, the same as the previous year. My compensation level remained stagnant despite 40% growth in our business from 2003 levels (an increase that surpassed our revenue targets) and despite 60% annualized growth in our business during the four months I led the group during my manager's maternity leave. Additionally, my pay for 2004 did not track that of employees in the Equities Division generally, for whom compensation levels had increased by about 20% on average. Upon information and belief, Mr. ██████'s compensation for 2004 was substantially greater than mine.

54. On about February 4, 2005, after I had waited about three months for Goldman to assign me any substantive work, ████████████, the head of U.S. Sales and a Partner, gave me a much lesser-valued job in U.S. Research Sales.

55. On February 18, 2005, Mr. ████████ gave me basic account assignments that were far less favorable than accounts given to similarly-situated men (male Vice Presidents of comparable professional history who transferred into U.S. Research Sales, with no sales experience specifically in U.S. Research Sales). Although Mr. ████████ said I could continue to seek another position within Goldman on my own time, he also cautioned that there were no other positions available for me. As a result Mr. ████████ essentially gave me no choice but to take the much-lesser valued job in U.S. Research Sales, and I involuntarily accepted the position. On February 25, 2005, ████████████, a Partner in U.S. Research Sales, gave me my remaining account assignments. These were again far less favorable than the assignments given to male employees with even less finance experience than me.

56. By February 2005, most of the women who had worked on the convertible bond desk in all of Goldman's offices globally had transferred within the firm or had left Goldman altogether. Many of these women had moved or resigned because of their frustration with working in a male-dominated environment, where women were treated less favorably than their male peers, regardless of performance. Upon information and belief,

the global convertible bond desk has never had a female managing director. The most senior female on the global convertible bond desk in March 2005 was ███████ - a single, 29-year old, second-year Vice President.

57. On March 10, 2005, I resigned from Goldman because of the discrimination and retaliation to which I was subjected on account of my gender.

58. I seek compensation from Goldman for the discrimination and retaliation, including compensation for lost earnings, pain and suffering, and attorneys' fees.

59. I file this charge on behalf of myself and other similarly-situated women at Goldman.

60. Based upon the above, I charge Goldman, Sachs & Co. with discriminating against me because of my gender and retaliating against me, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as well as the New York State and City Human Rights Laws, N.Y. Exec. L. §§ 290 et seq. and N.Y.C. Admin. Code §§ 8-101 et seq. respectively.

Dated: July 7, 2005
      New York, New York

Sworn to me on this
7 day of July, 2005

Notary Public

                                      H. Cristina Chen-Oster

...ANIE L. CRISTOL
...blic, State of New York
01CR6119348
...New York County
...ovember 29, 20___

MELANIE L. CRISTOL
Notary Public, State of New York
No. 01CR6119348
Qualified in New York County
Commission Expires November 29, 20__

10

EEOC Form 161-B (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: **Christina Chen-Oster** ███████████████ | From: **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 160-2005-03069 | **Lawrence M. Angelo,**<br>**Investigator** | **(212) 336-3763** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice;** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☒ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*

**Spencer H. Lewis, Jr.,**
**Director**

June 15-eh, 2010

*(Date Mailed)*

Enclosures(s)

cc: **GOLDMAN SACHS & CO.**
**1 New York Plaza**
**50th Floor**
**New York, NY 10004**

Cara Greene, Esq.
Outten & Golden, LLP
3 Park Avenue, 29th Floor
New York, NY 10016

EXHIBIT 2

Lisa Parisi EEOC Charge (final).doc                                      Page 1 of 4

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA  ☒ EEOC | |

NEW YORK STATE DIVISION OF HUMAN RIGHTS

*State or local Agency, if any*

RECEIVED
JAN 1 3 2010
EEOC-NYDO-CRT|U

| NAME (indicate Mr., Ms. or Mrs.) | HOME TELEPHONE (include area code) |
|---|---|
| Ms. Lisa Parisi | ▆▆▆▆▆▆ |
| STREET ADDRESS  CITY, STATE AND ZIP CODE | DATE OF BIRTH |
| ▆▆▆▆▆▆▆▆▆▆ | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, OR STATE OR LOCAL GOVERNMENT AGENCY THAT I BELIEVE DISCRIMINATED AGAINST ME OR OTHERS. (If more than one, list under PARTICULARS below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (include area code) |
|---|---|---|
| Goldman, Sachs & Co. | Over 20,000 | (212) 902-1000 |
| STREET ADDRESS  CITY, STATE AND ZIP CODE | | COUNTY |
| 32 Old Slip        New York, NY 10005 | | New York |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN  ☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER (specify) | *EARLIEST  LATEST*  November 2008   ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

Please see attached statement.

| ☒ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedure. | NOTARY - (When necessary for State and Local Requirements) *Frances C. Dorfman*  I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.  Jan 6, 2010        *Lisa L Parisi*  Date    Charging Party (signature) | SIGNATURE OF COMPLAINANT *Lisa L Parisi*  SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE 6th day of January (Day, month, and year) |

Lisa Parisi
Charge of Discrimination

The Particulars Are (continued):

## I.  OVERVIEW OF ALLEGATIONS

1.     I am female.  This sex discrimination charge is filed on behalf of myself, Lisa
       Parisi, and all others similarly situated.  Like other female professionals at
       Goldman, Sachs & Co. ("Goldman"), I have been harmed by a continuing pattern
       and practice or policy of discrimination with respect to pay, promotion, and other
       terms and conditions of employment in violation of Title VII of the Civil Rights
       Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., as well as the New York
       State and City Human Rights Laws, N.Y. Exec. L. §§ 290 et seq. and NYC
       Admin. Code §§ 8-101 et seq. respectively.  Goldman retaliated against and
       terminated me and other females who complained about this discrimination.

## II.  WORK HISTORY

2.     I was hired by Goldman in or around 2001.  Since November 2003, Goldman
       employed me as a Managing Director in the Value Group.  In recent years, I
       focused primarily on the retail industry's stock investments.  During my tenure at
       Goldman, I was a top performer and consistently outperformed the industry.  My
       job required me to work on several portfolios, each of which had a benchmark.
       During my tenure at Goldman, I achieved or surpassed each of these benchmarks.
       I consistently made money on both long-term investments and more-difficult,
       short-side investments.  I was one of the few people in my group at Goldman who
       made money on such short-side investments.

3.     My objective performance record has been consistent with high praise.

## III.  DISCRIMINATION

Compensation

4.     Goldman paid me less than similarly situated males throughout my career at
       Goldman.  For example, a male employee who began at Goldman around the
       same time as me experienced a similar rise in assets under management – from
       approximately $4 billion in 2001 to between $40 and $50 billion in 2007.  This
       similarly situated male, however, received compensation much higher than me.
       From 2001 to 2007, his compensation doubled.  My compensation, in contrast,
       dropped 60% from 2005 to 2007 despite my continued high performance and
       similar assets under management.  During my final year at Goldman, I received
       only a base salary without any bonus.

5.     When I asked why Goldman lowered my salary, my supervising partner told me
       that, while my objective performance numbers were good, the Small Cap Group

of which I was a member did not outperform. The other two senior members of my team, however, did not suffer any decline in salary. In fact, they received an increase in salary. My supervising partner also stated that Goldman lowered my compensation because my scores on Goldman's subjective 360 review declined. But, my colleagues refuted my supervising partner's claims and confirmed that none of them had any negative experiences with me.

6.     During my entire tenure as a Goldman Sachs Managing Director, similarly situated males received significantly higher base compensation and bonuses than me.

Promotion

7.     Goldman treated me less favorably regarding promotions than similarly situated men. There is no clear path or any objective criteria for promotion to partner at Goldman. Rather, to receive a promotion from managing director to partner at Goldman, a current partner must nominate you and the company must approve the promotion. When a partner position came open, Goldman nominated and promoted a male managing director with several years less experience than me. Prior to receiving this promotion, this male managing director also had significantly less experience than other managing directors in the team.

Hostile Work Environment/Family Responsibility Discrimination

8.     In my experience with Goldman, male Goldman employees who start families receive higher pay and better treatment than women who start families.

9.     In 2006, I requested that Goldman allow me to relocate to Atlanta to be closer to my fiancé and his school-age children. I moved to Atlanta in or around March of 2006. I paid my own expenses to relocate and travel to New York for business. Following my move to Atlanta, I continued to be a top performer at Goldman.

10.    While I had previously received uniformly positive reviews, Goldman began evaluating me negatively in 2006. Goldman claimed that my support staff had negative experiences with me. When I approached my support staff to inquire about these purported issues, however, the support staff refuted Goldman's claims and confirmed that none of them had any negative experiences with me.

11.    Also in 2006, my supervising partner approached me to inform me that Goldman planned to take the retail industry's stock investments away from me. When my colleagues heard this news, they expressed shock. Several of them, including the junior male managing director that Goldman had promoted, praised me as one of the best retail stock pickers in the industry. I brought this issue to the attention of the head of my group and pointed out that I made large amounts of money for Goldman in retail. Only then did Goldman decide to keep me on the retail industry's stock investments.

<u>Retaliation</u>

12.   When I have brought the repeated instances of discrimination to Goldman's attention, the company has not acted to remedy the situation, but instead has retaliated against me by reviewing me negatively, lowering my compensation, and threatening to take me off of retail. Goldman further retaliated against me by terminating me.

<u>Termination</u>

13.   As my work situation had become untenable, I approached my supervising partner in November 2007 and stated that, while I did not intend to resign, I hoped that we could negotiate a mutual separation agreement. Goldman agreed to discuss a mutual separation agreement with me. My supervising partner then asked me to remain at Goldman through the first quarter of 2008. While Goldman terminated several employees in early 2008, Goldman did not terminate me and did not follow up with my request. In November 2008, Goldman sent me a termination notice due to a mass reduction in force (RIF).

## IV.   CLASS CLAIMS

14.   It is my understanding and belief that Goldman has engaged in a continuing pattern and practice of discrimination based on sex against female Managing Directors, Vice Presidents, and Associates with respect to compensation, business allocations, promotions, and other terms and conditions of employment in Goldman facilities nationally. Goldman implements this pattern and practice of discrimination through subjective and unvalidated criteria in evaluating the distribution of benefits and opportunities, including base compensation, bonus amounts, promotions, and other terms and conditions of employment. Goldman also retaliates against women and disproportionately selects females for reductions in force.

I swear under penalty of perjury that I have read the above charge and that it is true and correct to the best of my knowledge, information and belief. This charge is not intended to be exhaustive, but is representative of the treatment to which Goldman has subjected me.

822236.1

EXHIBIT 3

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA<br>■ EEOC | |

New York State Division of Human Rights and EEOC
*State or local Agency, if any*

| NAME (indicate Mr., Ms. or Mrs.)<br><br>Ms. Shanna Orlich | HOME TELEPHONE (include area code)<br>████████████ |
|---|---|
| STREET ADDRESS          CITY, STATE AND ZIP CODE<br>██████     ████████ | DATE OF BIRTH<br>████████ |

NAME OF THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

| NAME<br><br>Goldman, Sachs & Co. | NUMBER OF EMPLOYEES, MEMBERS<br><br>Over 14,000 | TELEPHONE (include area code)<br><br>(212) 902-1000 |
|---|---|---|
| STREET ADDRESS          CITY, STATE AND ZIP CODE<br><br>1 New York Plaza     New York, NY 10004 | | COUNTY<br><br>New York |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE<br>EARLIEST          LATEST |
|---|---|
| ☐ RACE   ☐ COLOR   ■ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN<br><br>■ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (specify) | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

Please see attached statement.

| ■  i want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedure. | NOTARY - (When necessary for State and Local Requirements)<br><br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Shanna Orlich*<br>1/7/09 10<br>Date          Charging Party (signature) | SIGNATURE OF COMPLAINANT<br><br>*Shanna Orlich*<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year)<br>1-7-2010 |

EDDIE A. ZAKARIAN
Notary Public - New Jersey
My Commission Expires June 7, 2011

Shanna Orlich
Charge of Discrimination

The Particulars Are:

## I.     OVERVIEW OF ALLEGATIONS

1.     This sex discrimination charge is filed on behalf of myself, Shanna Orlich, and others similarly situated. Like other female professionals at Goldman, Sachs & Co. ("Goldman"), I have been harmed by a continuing policy, pattern or practice of sex discrimination with respect to pay, promotion, and other terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., as well as the New York State and City Human Rights Laws, N.Y. Exec. L. §§ 290 et seq. and NYC Admin. Code §§ 8-101 et seq. respectively. Goldman retaliated against me and other females who complained about discrimination and terminated my employment.

## II.    WORK HISTORY

2.     I began working at Goldman as a Summer Associate in the summer of 2006 while a student in the JD/MBA program at Columbia University. As a Summer Associate, I did rotations in several trading departments of Goldman. In August 2006, Goldman offered me a full-time position for the following year, and I accepted. I graduated from Columbia in 2007 and began working at Goldman in the summer of 2007. After completing training, I began as an Associate in the Capital Structure Franchise Trading ("CSFT") group in October 2007.

3.     My first and only performance review at Goldman was overwhelmingly positive. In November 2007, I met with my direct supervisor, ██████████ who was head of both the CSFT and High Yield desks. In my review, he gave me only positive feedback and praise for the work I had done to date.

## III.   DISCRIMINATION

Promotion/Work Assignments

4.     At the time I joined Goldman Sachs in 2007, the CFST group was comprised of 2 females, including myself, and 10 males.

5.     Goldman gave me fewer opportunities to become a junior trader than it gave similarly situated males. Although I joined Goldman to be a trader, when I arrived at the CSFT desk, Mr. █████ told me there was no trading seat available and that I would have to rotate with traders and serve as a desk analyst. However, Goldman also hired my business school classmate, ███████, who started directly as a trader in the High Yield group. Mr. █████ was a former Navy Seal, and Goldman's management team often challenged him to do push-up contests on the trading floor and to engage in other displays of masculinity.

6.    When Mr. ████████decided to take on a junior trading partner in CSFT, he offered the position to Mr. ████████, even though Mr. ████████was not even a member of the CSFT.

7.    When I complained to Mr. ██████and asked why I had not been put in a trading seat, Mr. ██████told me that I did not have enough experience in trading. Mr. ████████did not have any trading experience prior to his summer internship at Goldman in 2006.

8.    Around the same time I was hired, Goldman also hired ████████████████ directly from college. Even though Mr. ████████was junior to me, Goldman allowed Mr. ████████to begin working as a trader in the CSFT group immediately. Mr. ████████did not have any trading experience prior to his summer internship at Goldman in 2006.

9.    In January 2008, after I complained to a more senior female trader, Mr. ████████ agreed to assign me to be a junior trader with ████████████. Days later, Mr. ████████left the firm. In April 2008, Mr. ████████also left the firm. After Mr. ████████'s departure, Goldman did not assign me a new trading partner, and as a result, I did not have the opportunity to trade.

10.   In July 2008, I reached out to ████████████, the Managing Director of Sales, to complain that I had no trading partner and was not being given an opportunity to trade. Mr. ████████expressed surprise that Mr. ████████had hired me to trade and told me that he did not see me as the "right fit" for a trader. He told me that he saw me as an analyst, and that he had told a male colleague of mine who was interested in the analyst position that it would not be a good choice for him because it would not be a good career move. He also said that because he had not hired me, he did not view me as his responsibility.

11.   I also reached out to other members of Goldman's senior management with my concerns. One of these was ████████████, a senior Partner. Mr. ████████told me to stay put in the analyst role and to be a "team player," and that changes were coming to the group and not to worry. Mr. ████████also reached out to Mr. ████████after Mr. ████████, his trading partner, left the firm. Mr. ████████ assigned Mr. ████████to be a junior trader with a highly successful trader in High Yield.

12.   Although the CSFT desk has an executive assistant, I was often asked by more senior males to perform clerical and administrative work not given to other male Associates. For example, ████████████, a more senior Analyst on the CSFT desk, often gave me demeaning and menial assignments, such as setting up his blackberry, making photocopies, and answering calls from his wife. Similarly-situated male Associates and more junior male Analysts were not asked to perform such work.

Hostile Work Environment

13. Goldman permits an environment to flourish that excludes and is hostile to women. For example, in December 2007, a male Managing Director hired female escorts to attend Goldman's Distressed Sales/CSFT holiday party. The female escorts arrived wearing short black skirts, strapless tops, and Santa hats and socialized with male guests during the event.

14. Goldman also organized frequent golf outings and other social events to which female employees were not invited. On one occasion, Mr. ▮▮▮▮▮ asked every male person in my department and in neighboring groups to be his partner at a golf outing, including individuals more junior to me. However, he did not ask me, the only female on the fixed income side of the CSFT trading desk. I have played golf since childhood and also played varsity golf for my high school team.

15. I also learned of a golf outing attended by approximately 80 Goldman employees, only one of which was a female employee. I was told that I was not invited because I was too junior, but I later learned that several male analysts straight out of college attended the outing.

Retaliation

16. When I brought the repeated instances of gender discrimination to Goldman's attention, the company did not act to remedy the situation. Instead, Goldman retaliated against me by failing to give me advancement opportunities and then by terminating my employment.

Termination/Compensation

17. In November 2008, Goldman sent me a termination notice due to a mass reduction in force (RIF). Males who were similarly-situated to me or more junior to me were not selected for the RIF, including Mr. ▮▮▮▮▮ and Mr. ▮▮▮▮▮.

18. In 2008, Goldman paid me less than similarly-situated males. At the time I was terminated, Goldman did not pay me a bonus, even though I had worked for almost the entire year, and the amount of my severance package was based upon my base salary rate for 2008.

Family Responsibility Discrimination

19. At the time Goldman terminated my employment, I was three months pregnant. Although I did not publicly announce that I was pregnant, I made conspicuous changes to my behavior, such as not drinking at work events as I had in the past. One week before Goldman terminated my employment, I spoke to the executive assistant to the Partners of the High Yield, CSFT, and Investment Grade groups. She told me that she had seen the list of people to be terminated as part of the RIF, and that I was not on the list. I told her that I was pregnant, and she responded that she had thought that I was pregnant based on my behavior. This conversation occurred on the trading floor. One week later, Goldman terminated my employment.

20.     After Goldman terminated my employment, an HR representative from Goldman
called me to ask if I wanted to work in a temporary position for less pay. When I
told the HR representative that I was pregnant and that I would need maternity
leave during the period that they needed someone for the temporary position, the
HR representative responded that "that would be a problem." Later, the HR
representative called to ask me to disregard those comments and to go ahead and
interview for the temporary position if I was interested in it.

## IV.    CLASS CLAIMS

21.     It is my understanding and belief that Goldman has engaged in a continuing
pattern and practice of discrimination based on sex against female Managing
Directors, Vice Presidents, and Associates with respect to compensation, business
allocations, promotions, and other terms and conditions of employment in
Goldman facilities nationally. Goldman implements this pattern and practice of
discrimination through subjective and unvalidated criteria in evaluating the
distribution of opportunities and benefits, including base compensation, bonus
amounts, promotions, and other terms and conditions of employment. Goldman
also retaliates against women and disproportionately selects females for
reductions in force.

I swear under penalty of perjury that I have read the above charge and that it is true and correct
to the best of my knowledge, information and belief. This charge is not intended to be
exhaustive, but is representative of the treatment to which Goldman has subjected me.