EXHIBIT A



# MEMORANDUM

| | |
|---|---|
| **TO:** | Lisa L. Parisi |
| **FROM:** | Gregory K. Palm<br>Esta E. Stecher<br>James B. McHugh |
| **DATE:** | November 4, 2003 |
| **RE:** | Managing Director Appointment |

In connection with your appointment as a Managing Director, you are required to enter into an employment agreement and shareholders' agreement.

The enclosed employment agreement is substantially identical to the agreement signed by all Managing Directors (except that the duration of the noncompetition and nonsolicitation covenants is longer for certain Managing Directors than the 90-day duration of those covenants in the enclosed agreements).

Similarly, all of the Managing Directors have signed the attached shareholders' agreement. A description of the shareholders' agreement is also enclosed.

**On or before November 17**th, please sign and return in the enclosed envelope one copy of the employment agreement and the counterpart signature page of the shareholders' agreement, retaining the other documents for your records.

If you have any questions about the enclosed documents, please call Jim McHugh at (212) 902-5738.

The Goldman Sachs Group, Inc. | 85 Broad Street | New York, New York 10004
Tel: 212-902-5904

Henry M. Paulson, Jr.
Chairman
Chief Executive Officer

Goldman
Sachs

November 4, 2003

**Personal and Confidential**

Lisa L. Parisi
Goldman, Sachs & Co.
32 Old Slip, 24th Floor
New York, NY 10005

Dear Lisa:

We are writing to set forth certain terms and conditions of your employment as a Managing Director of a subsidiary or affiliate of The Goldman Sachs Group, Inc. ("*GS*") (collectively with its subsidiaries and affiliates, and its and their predecessors and successors, the "*Firm*"). Certain capitalized terms are defined in Section 3 hereof.

1. <u>**Employment**</u>

There will be no set term of employment, and your employment will be at will, subject to the terms and conditions of this Agreement. You or the Firm may terminate your employment at any time for any reason or no reason by giving not less than 90 days prior written notice of termination; provided however, that the Firm may elect to place you on paid leave for all or any part of such 90-day period; and provided further that no advance notice need be given by the Firm to you in connection with your termination for Cause or Extended Absence.

During the Employment Period: (i) you will have such duties and responsibilities as the Firm may from time to time determine; (ii) you will devote your entire working time, labor, skill and energies to the business and affairs of the Firm; (iii) you will be paid the base salary separately communicated to you and such bonuses in such amount and in the form of cash and/or equity-based awards, in each case as the Firm may determine in its sole discretion; and (iv) you will be entitled to participate in the Firm's benefit plans and compensatory programs as the Firm may determine in its sole discretion, under the terms and conditions thereof.

## 2.    Confidentiality, Non-Competition and Other Covenants

In the course of your involvement in the activities of the Firm or otherwise, you have obtained or may obtain confidential information concerning the Firm's businesses, strategies, operations, financial affairs, organizational and personnel matters (including Employment Related Matters), policies, procedures and other non-public matters or confidential information concerning such matters about third parties. Such information ("*Confidential Information*") may have been or be provided in written or electronic form or orally. In consideration of, and as a condition to, continued access to Confidential Information, and without prejudice to or limitation on any other confidentiality obligations imposed by agreement or by law, you hereby undertake to use and protect Confidential Information in accordance with any restrictions placed on its use or disclosure. Without limiting the foregoing, except as authorized by the Firm, you may not disclose or allow disclosure of (a) any Confidential Information, or of any information derived therefrom, in whatever form, to any person unless such person is a director, officer, employee, attorney or agent of the Firm and, in your reasonable good faith judgment, has a need to know the Confidential Information or information derived therefrom in furtherance of the business of the Firm or (b) any information (whether or not Confidential Information) concerning the Firm (including, without limitation, with respect to its businesses, strategies, operations, financial affairs, organizational and personnel matters, policies and procedures), its present or former partners, directors, officers, employees, agents or clients to any reporter, author, producer or similar person or entity or take any other action likely to result in such information being made available to the general public in any form, including books, articles or writings of any other kind, as well as film, videotape, audio tape or any other medium. Without limiting the foregoing, the existence of, and any information concerning, any dispute between you and the Firm shall constitute Confidential Information except that you may, after giving them notice of this provision, disclose information concerning such dispute to the arbitrator or court that is considering such dispute and to your legal counsel (provided that such counsel agrees not to disclose any such information other than as necessary to the prosecution or defense of the dispute). Nothing herein shall limit any right or obligation under applicable law to provide truthful information to judicial, regulatory, administrative or other governmental authorities. You further agree that you will not use, or take any action likely to result in the use of, any of the Firm's names or any abbreviation thereof in connection with any publication to the general public in any medium. You further understand and agree that, while employed by the Firm, you will not disclose or use without authorization any information concerning persons or entities other than the Firm that is confidential or proprietary to them, nor will you use information in any manner that would constitute a violation of any undertaking or agreement with a prior employer or a third party.

You will not make any oral or written negative, derogatory or disparaging statement (whether or not such statement legally constitutes libel or slander about the Firm, about any termination of your employment, or about any of the Firm's present or former partners, managing directors, employees, officers, directors, shareholders or agents.

In view of your importance to the Firm, you hereby agree that the Firm would likely suffer significant harm from your competing with the Firm during the Coverage Period.

2

Accordingly, you hereby agree that you will not, without the written consent of GS, during the Coverage Period:

    (1)    form, or acquire a 5% or greater equity ownership, voting or profit participation interest in, any Competitive Enterprise; or

    (2)    associate (including, but not limited to, association as an officer, employee, partner, director, consultant, agent or advisor) with any Competitive Enterprise and in connection with such association engage in, or directly or indirectly manage or supervise personnel engaged in, any activity

        i.  which is similar or substantially related to any activity in which you were engaged, in whole or in part, at the Firm,

        ii.  for which you had direct or indirect managerial or supervisory responsibility at the Firm, or

        iii.  which calls for the application of the same or similar specialized knowledge or skills as those utilized by you in your activities with the Firm,

at any time during the one-year period immediately prior to termination of your employment, and, in any such case, irrespective of the purpose of the activity or whether the activity is or was in furtherance of advisory, agency, proprietary or fiduciary business of either the Firm or the Competitive Enterprise.

(By way of example only, this provision precludes an "advisory" investment banker from joining a leveraged-buyout firm, a research analyst from becoming a proprietary trader or joining a hedge fund, or an information systems professional from joining a management or other consulting firm and providing information technology consulting services or advice to any Competitive Enterprise, in each case without the written consent of GS.)

You hereby agree that during the Coverage Period, you will not, in any manner, directly or indirectly, (1) Solicit a Client to transact business with a Competitive Enterprise or to reduce or refrain from doing any business with the Firm, or (2) interfere with or damage (or attempt to interfere with or damage) any relationship between the Firm and a Client.

You hereby agree that during the Coverage Period, you will not, in any manner, directly or indirectly, Solicit any person who is an employee of the Firm to resign from the Firm or to apply for or accept employment with any Competitive Enterprise.

If your employment under this Agreement is terminated by you or the Firm, you will take all actions and do all things during the Coverage Period as may be reasonably requested by the Firm from time to time to maintain for the Firm the business, goodwill, and business relationships with any of the Firm's clients with whom you worked during the term of your

P000004

employment. In addition, prior to accepting employment with any other person or entity during the Coverage Period, you will provide any prospective employer with written notice of the provisions of Section 2 of this Agreement with a copy delivered simultaneously to GS.

You also agree that you will cooperate with the Firm (and its counsel, if applicable) in connection with any investigation, administrative proceeding, litigation or client matter relating to any matter that occurred during your employment in which you were involved or of which you have knowledge.

You will be required to enter into a Shareholders' Agreement to which all Managing Directors are a party and which will, among other things, include restrictions on the transfer and voting of GS shares. You represent that, while an employee of the Firm, you have duly and accurately filed all required tax returns in respect of your income and agree that you will do so in the future and will certify to that effect to the Firm, on a form specified by the Firm, from time to time if requested to do so.

Your covenants as outlined in the preceding paragraphs of this Section 2 are from time to time referred to in this Agreement as the *"Covenants."* If any of the Covenants is held by a court of competent jurisdiction to be invalid, illegal or unenforceable (whether in whole or in part), such Covenant will be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining such Covenants will not be affected thereby; provided, however, that if any of such Covenants is held by a court of competent jurisdiction to be invalid, illegal or unenforceable because it exceeds the maximum time period such court determines is acceptable to permit such provision to be enforceable, such Covenant will be deemed to be modified to the minimum extent necessary to modify such time period in order to make such provision enforceable hereunder.

You understand that the provisions of the Covenants may limit your ability to earn a livelihood in a business similar to the business of the Firm.

You acknowledge that a violation on your part of any of the Covenants would cause immeasurable and irreparable damage to the Firm. Accordingly, you agree that the Firm will be entitled to injunctive relief in any court of competent jurisdiction for any actual or threatened violation of any of the Covenants in addition to any other remedies it may have.

3.    **Certain Definitions**

As used herein, the following terms have the following meanings:

*"Cause"* means (i) your conviction, whether following trial or by plea of guilty or *nolo contendere* (or similar plea), in a criminal proceeding (A) on a misdemeanor charge involving fraud, false statements or misleading omissions, wrongful taking, embezzlement, bribery, forgery, counterfeiting or extortion or (B) on a felony charge or (C) on an equivalent charge to those in clauses (A) and (B) in jurisdictions which do not use those designations; (ii) your engaging in any conduct which constitutes an employment disqualification under applicable

4

laws (including statutory disqualification as defined under the Securities Exchange Act of 1934, as amended); (iii) your willful failure to perform your duties to the Firm; (iv) your violation of any securities or commodities laws, any rules or regulations issued pursuant to such laws, or the rules and regulations of any securities or commodities exchange or association of which GS or any of its subsidiaries or affiliates is a member; (v) your breach of this Agreement or any other written agreement between you and the Firm; (vi) your violation of any Firm policy concerning hedging or confidential or proprietary information, or your material violation of any other Firm policy as in effect from time to time; (vii) your engaging in any act or making any statement which impairs, impugns, denigrates, disparages or negatively reflects upon the name, reputation or business interests of the Firm; or (viii) your engaging in any conduct detrimental to the Firm.

"*Client*" means any client or prospective client of the Firm to whom you provided services, or for whom you transacted business, or whose identity became known to you in connection with your relationship with or employment by the Firm.

"*Competitive Enterprise*" means a business enterprise that (1) engages in any activity, or (2) owns or controls a significant interest in any entity that engages in any activity, that, in either case, competes anywhere with any activity in which the Firm is engaged. The activities covered by the previous sentence include, without limitation, financial services such as investment banking, public or private finance, lending, financial advisory services, private investing (for anyone other than you and members of your family), merchant banking, asset or hedge fund management, insurance or reinsurance underwriting or brokerage, property management, or securities, futures, commodities, energy, derivatives or currency brokerage, sales, lending, custody, clearance, settlement or trading.

"*Coverage Period*" means the period beginning with the effective date of your appointment as a Managing Director of the Firm and ending 90 days after the date of delivery of the written notice of termination of your employment or any earlier date as agreed by you and the Firm.

"*Date of Termination*" means: (i) if your employment is terminated by the Firm for Cause or Extended Absence, the date of the Firm's delivery of written notice of termination, (ii) if your employment is terminated by the Firm other than for Cause or Extended Absence, the date that is 90 days after the Firm's delivery of written notice of termination or any earlier date as agreed by you and the Firm, or (iii) if your employment is terminated by you, the date that is 90 days after your delivery of written notice of termination or any earlier date as determined by the Firm in its sole discretion.

"*Employment Period*" means the period beginning with the effective date of your appointment as a Managing Director of the Firm and ending with your Date of Termination.

"*Employment Related Matters*" means matters arising out of or relating to or concerning this Agreement, your hire by or employment with the Firm or the termination thereof, or otherwise concerning any rights, obligations or other aspects of your employment relationship in respect of the Firm.

P000006

"*Extended Absence*" means your absence from employment for at least 180 days in any 12-month period as a result of your incapacity due to mental or physical illness, as determined by the Firm.

"*Solicit*" means any direct or indirect communication of any kind whatsoever, regardless of by whom initiated, inviting, advising, encouraging or requesting any person or entity, in any manner, to take or refrain from taking any action.

4.   **Arbitration**

Subject to Section 5, any dispute, controversy or claim arising out of or based upon or relating to Employment Related Matters will be finally settled by arbitration in New York City before, and in accordance with the rules then obtaining of, the New York Stock Exchange, Inc. ("*NYSE*") or if the matter is not arbitrable before the NYSE, the National Association of Securities Dealers ("*NASD*"). If both the NYSE and the NASD decline to arbitrate the matter, the matter will be arbitrated before the American Arbitration Association ("*AAA*") in accordance with the commercial arbitration rules of the AAA. You agree that any arbitration decision and/or award will be final and binding upon the parties and may be entered as a judgment in any appropriate court.

5.   **Injunctive Relief, Choice of Forum, Submission to Jurisdiction and Choice of Law**

Notwithstanding Section 4, and in addition to its right to submit any dispute or controversy to arbitration, the Firm may bring an action or special proceeding in the state or federal court of competent jurisdiction sitting in the City of New York, whether or not an arbitration proceeding has theretofore been or is ever initiated, for the purpose of temporarily, preliminarily, or permanently enforcing the provisions of the Covenants or to enforce an arbitration award, and you (i) expressly consent to the application of this Section 5 to any such action or proceeding, (ii) agree that proof will not be required that monetary damages for breach of the provisions of the Covenants would be difficult to calculate and that remedies at law would be inadequate and (iii) irrevocably appoint the General Counsel of GS as your agent for service of process, who shall promptly advise you of any such service.

**THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE CITY OF NEW YORK OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO EMPLOYMENT RELATED MATTERS (AS DEFINED HEREIN) WHICH IS NOT OTHERWISE ARBITRATED OR RESOLVED ACCORDING TO THE PROVISIONS OF SECTION 4 OF THIS AGREEMENT.** This includes any suit, action or proceeding to compel arbitration or to enforce an arbitration award. The parties acknowledge that the forum designated by this Section 5 has a reasonable relation to this Agreement, and to the parties' relationship with one another.

P000007

The agreement by you and the Firm as to this forum is independent of the law that may be applied in the action, and you and the Firm agree to this forum even if the forum may under applicable law choose to apply non-forum law. You and the Firm hereby waive, to the fullest extent permitted by applicable law, any objection which you or the Firm now or hereafter have to personal jurisdiction or to the laying of venue of any such suit, action or proceeding brought in such court. You and the Firm undertake not to commence any action arising out of or relating to this Agreement, including any post-employment Employment Related Matters, in a forum other than a forum described in this Section or Section 4. You and the Firm agree that, to the fullest extent permitted by applicable law, a final and non-appealable judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon the parties.

**THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO PRINCIPLES OF CONFLICT OF LAWS.**

--------------------------------------------------------------------------------

This Agreement represents the entire understanding of the parties with respect to the matters set forth herein; provided however, that your employment will also be subject to various Firm policies and guidelines, including those stated in the applicable Employee Handbook as amended from time to time. Except as provided in the preceding sentence, your rights and obligations under any prior agreement with the Firm shall be unaffected hereby. In the event of any conflict between the provisions of this letter and the provisions of the applicable Employee Handbook or any prior agreement with the Firm, the provisions of this letter will prevail. The obligations set forth herein will survive, and remain binding and enforceable, notwithstanding any termination of your employment and any settlement of the financial rights and obligations arising from your employment. Notices hereunder shall be delivered to the Firm at its principal executive office directed to the attention of GS's General Counsel, and to you at your last address appearing in the Firm's employment records. This Agreement may not be amended or modified otherwise than by a written agreement executed by the parties hereto or their respective successors or legal representatives.

You may not assign your rights and obligations hereunder without the prior written consent of GS and any such assignment by you in violation of this Agreement shall be void. This Agreement shall inure to the benefit of and be binding upon the Firm and its successors and assigns. The captions of this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

P000008

If the foregoing is in accordance with your understanding, kindly confirm your acceptance and agreement by signing and returning the enclosed duplicate of this letter which will thereupon constitute an agreement between us.

Very truly yours,

THE GOLDMAN SACHS GROUP, INC.

By: _____
                Henry M. Paulson, Jr.

Agreed to and accepted as of
the date of this letter:

_____
Lisa L. Parisi

P000009

## SHAREHOLDERS' AGREEMENT

This Shareholders' Agreement (this "Agreement"), among The Goldman Sachs Group, Inc., a Delaware corporation ("GS Inc."), and the Covered Persons listed on Appendix A hereto, as such Appendix A may be amended from time to time pursuant to the provisions hereof.

### WITNESSETH:

**WHEREAS**, the Covered Persons are beneficial owners of shares of Common Stock, par value $0.01 per share, of GS Inc. (the "Common Stock").

**WHEREAS**, the Covered Persons desire to address herein certain relationships among themselves with respect to the voting and disposition of their shares of Common Stock and various other matters and desire to give to the Shareholders' Committee (hereinafter defined) the power to enforce their agreements with respect thereto.

**NOW, THEREFORE**, in consideration of the premises and of the mutual agreements, covenants and provisions herein contained, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS AND OTHER MATTERS

Section 1.1   **Definitions**.  The following words and phrases as used herein shall have the following meanings, except as otherwise expressly provided or unless the context otherwise requires:

(a)   A Covered Person "**acquires**" Covered Shares when such Covered Person first acquires beneficial ownership over such Covered Shares.

(b)   This "**Agreement**" shall have the meaning ascribed to such term in the Recitals.

(c)   A "**beneficial owner**" of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise has or shares:  (i) voting power, which includes the power to vote, or to direct the voting of, such security and/or (ii) investment power, which includes the power to dispose, or to direct the disposition of, such security, but for purposes of this Agreement a person shall not be deemed a beneficial owner of (A) Common Stock solely by virtue of the application of Exchange Act Rule 13d-3(d) or Exchange Act Rule 13d-5 as in effect on the date hereof (B) Common Stock solely by virtue of the possession of the legal right to vote securities under applicable state or other law (such as by proxy or power of attorney) or (C) Common Stock held of record by a "private foundation" subject to the requirements of Section 509 of the Code.  "**Beneficially own**" and "**beneficial ownership**" shall have correlative meanings.

(d)  "**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the applicable rulings and regulations thereunder.

(e)  "**Common Stock**" shall have the meaning ascribed to such term in the Recitals.

(f)  "**Company**" shall mean GS Inc., together with its Subsidiaries.

(g)  "**Continuing Provisions**" shall have the meaning ascribed to such term in Section 7.1(b).

(h)  "**Covered Persons**" shall mean those persons from time to time listed on Appendix A hereto, and all persons who may become parties to this Agreement and whose name is required to be listed on Appendix A hereto, in each case in accordance with the terms hereof.

(i)  A Covered Person's "**Covered Shares**" shall mean any shares of Common Stock acquired from the Company by such Covered Person and beneficially owned by such Covered Person at the time in question, but shall not include (i) Common Stock beneficially owned as a result of (A) an acquisition, directly or indirectly, from the Company in an underwritten public offering or (B) conversion of securities convertible into Common Stock, where beneficial ownership of the convertible securities was acquired in a transaction described in clause (A) above, (ii) Excluded Shares (as defined in the Plan of Incorporation), (iii) any other Common Stock excluded from the definition of Covered Shares by action of the Board of Directors of GS Inc. prior to the IPO Date or (iv) any other Common Stock acquired under a deferred compensation or employee benefit plan and excluded from the definition of Covered Shares by action of the Board of Directors of GS Inc. and the Shareholders' Committee after the IPO Date.  "**Covered Shares**" shall also include the securities that are defined to be "**Covered Shares**" in Section 6.4.

(j)  The term "**employee**" shall mean any person employed by the Company who receives compensation, other than a person receiving compensation in the nature of a consulting fee, a pension or a retainer.

(k)  "**Employee Covered Person**" shall mean a Covered Person who is an employee of the Company at the time in question.

P000011

(l)   "**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended to date and as further amended from time to time.

(m)  A reference to an "**Exchange Act Rule**" shall mean such rule or regulation of the Securities and Exchange Commission under the Exchange Act, as in effect from time to time or as replaced by a successor rule thereto.

(n)  "**General Transfer Restrictions**" shall have the meaning ascribed to such term in Section 2.2 hereof.

(o)  "**GS Inc.**" shall have the meaning ascribed to such term in the Recitals.

(p)  "**IPO Date**" shall mean the closing date of the initial public offering of the Common Stock.

(q)  "**Permitted Basket Transaction**" shall mean the purchase or sale of, or the establishment of a long or short position in, a basket or index of securities (or of a derivative financial instrument with respect to a basket or index of securities) that includes securities of GS Inc., in each case if such purchase, sale or establishment is permitted under the Company's policy on hedging with respect to securities of GS Inc. as announced from time to time.

(r)   A "**person**" shall include, as applicable, any individual, estate, trust, corporation, partnership, limited liability company, unlimited liability company, foundation, association or other entity.

(s)  "**Plan of Incorporation**" shall mean the plan for the incorporation and reorganization of the business of The Goldman Sachs Group, L.P. approved by the Schedule II Limited Partners thereof on March 8, 1999, as amended from time to time.

(t)   "**PLP Transfer Restrictions**" shall have the meaning ascribed to such term in Section 2.1 hereof.

(u)  "**Preliminary Vote**" shall have the meaning ascribed to such term in Section 4.1 hereof.

(v)  "**Restricted Person**" shall mean any person that is not (i) a Covered Person or (ii) a director, officer or employee of the Company acting in such person's capacity as a director, officer or employee; provided, however, that for purposes of Section 6.1(c) only, the term "Restricted Person" shall not include Sumitomo Bank Capital Markets, Inc. and/or Kamehameha Activities Association to the extent that either or both of such parties are

–3–

included in such group solely by virtue of their being parties to Voting Agreements, each dated as of April 30, 1999, with GS Inc., as amended from time to time.

(w) "**Shareholders' Committee**" shall mean the body constituted to administer the terms and provisions of this Agreement pursuant to Article V hereof.

(x) "**Sole Beneficial Owner**" shall mean a person who is the beneficial owner of Covered Shares, who does not share beneficial ownership of such Covered Shares with any other person (other than pursuant to this Agreement or applicable community property laws) and who is the only person (other than pursuant to applicable community property laws) with a direct economic interest in the Covered Shares. An economic interest of the Company as pledgee shall be disregarded for this purpose.

(y) "**Subsidiary**" shall mean any person in which GS Inc. owns, directly or indirectly, a majority of the equity economic or voting ownership interest.

(z) "**The Goldman Sachs Defined Contribution Plan**" shall mean The Goldman Sachs Defined Contribution Plan adopted by the Board of Directors of GS Inc. on May 7, 1999, as amended or supplemented from time to time, and any successors to such Plan.

(aa) "**Transfer**" shall mean any sale, transfer, pledge, hypothecation or other disposition, whether direct or indirect, whether or not for value, and shall include any disposition of the economic or other risks of ownership of Common Stock, including short sales of securities of GS Inc., option transactions (whether physical or cash settled) with respect to securities of GS Inc., use of equity or other derivative financial instruments relating to securities of GS Inc. and other hedging arrangements with respect to securities of GS Inc., in each such case other than Permitted Basket Transactions. Notwithstanding the foregoing, bona fide pledges of Common Stock approved by GS Inc. and foreclosures pursuant thereto shall not constitute Transfers within the meaning of this definition.

(bb) "**Transfer Restrictions**" shall mean the General Transfer Restrictions and the PLP Transfer Restrictions.

(cc) "**vote**" shall include actions taken or proposed to be taken by written consent.

(dd) "**Voted Covered Shares**" shall have the meaning ascribed to such term in Section 4.2(a).

(ee) "**Voting Interests**" shall have the meaning ascribed to such term in Section 4.1 hereof.

P000013

Section 1.2  **Gender**.  For the purposes of this Agreement, the words "he," "his" or "himself" shall be interpreted to include the masculine, feminine and corporate, other entity or trust form.

# ARTICLE II
## LIMITATIONS ON TRANSFER OF SHARES

Section 2.1  **General**.  Each Covered Person agrees that such Covered Person shall not Transfer any Covered Shares beneficially owned by such Covered Person, except in accordance with all of the following: (a) the terms of this Agreement, (b) the restrictions on transferability of Common Stock contained in the Plan of Incorporation (the "PLP Transfer Restrictions"), if applicable, and (c) the terms of any other contract or agreement with the Company or other undertaking by which such Covered Person is bound and to which such Covered Shares are subject.

Section 2.2  **General Transfer Restrictions**.  Each Covered Person agrees that for so long as such Covered Person is an Employee Covered Person such Covered Person shall at all times be the Sole Beneficial Owner of at least that number of Covered Shares which equals 25% of the aggregate number of Covered Shares (a) beneficially owned by such Covered Person at the time such Covered Person became a Covered Person and (b) beneficial ownership of which is acquired by such Covered Person thereafter, with no reduction in such aggregate number for Covered Shares disposed of by such Covered Person (the "General Transfer Restrictions").  For purposes of this Section 2.2 only, Covered Shares held by the trust underlying The Goldman Sachs Defined Contribution Plan and allocated to a Covered Person shall not be deemed to be beneficially owned by such Covered Person until such Covered Shares are distributed to such Covered Person in accordance with the terms of The Goldman Sachs Defined Contribution Plan.  For purposes of this Section 2.2 only, when a delivery of Covered Shares is made by GS Inc. or by the trustee of the trust underlying The Goldman Sachs Defined Contribution Plan to a Covered Person net of Covered Shares to be withheld for tax purposes or to be paid for the receipt of such delivered Covered Shares, the recipient of such delivered number of Covered Shares shall be treated as if such Covered Person acquired the total (gross) number of Covered Shares to be delivered before giving effect to any such withholding or payment.

Section 2.3  **Compliance with Certain Restrictions**.

(a)  Each Covered Person agrees that, with respect to all Common Stock beneficially owned by such Covered Person, such Covered Person shall comply with the restrictions on transfer imposed by Section 6(e) of the Underwriting Agreement, dated as of May 3, 1999, among GS Inc. and the several underwriters named therein, whether or not said Section refers to such Covered Person by name.

P000014

(b)   Each Employee Covered Person agrees that, with respect to all Common Stock beneficially owned by such Employee Covered Person, and each Covered Person who is not an Employee Covered Person agrees that, with respect to all Covered Shares beneficially owned by such Covered Person which could not then be Transferred without contravening the PLP Transfer Restrictions, at the request of GS Inc. such Covered Person shall comply with any future restrictions on transfer imposed by or with the consent of GS Inc. from time to time in connection with any future offerings of securities of GS Inc., whether by GS Inc. or by any securityholder of GS Inc. and whether or not such restrictions on transfer refer to such Covered Person by name.

(c)   Each Employee Covered Person agrees that, with respect to all Common Stock beneficially owned by such Employee Covered Person, such Employee Covered Person will comply with any restrictions imposed by the Company from time to time to enable the Company or any party to an agreement with the Company to account for a business combination by the pooling of interests method.

Section 2.4   **Holding of Covered Shares in Custody and in Nominee Name; Legend on Certificates; Entry of Stop Transfer Orders**.

(a)   Each Covered Person understands and agrees that all Covered Shares beneficially owned by each Employee Covered Person and all Covered Shares which could not then be Transferred without contravening the PLP Transfer Restrictions beneficially owned by each Covered Person who is not an Employee Covered Person (in each case other than Covered Shares held of record by a trustee in a compensation or benefit plan administered by the Company and other Covered Shares that have been pledged to the Company to secure the performance of such Covered Person's obligations under any agreement with the Company) shall be registered in the name of a nominee for such Covered Person and shall be held in the custody of a custodian until otherwise determined by the Shareholders' Committee or the Board of Directors of GS Inc. or until such time as such Covered Shares are released pursuant to Section 2.4(e) or Section 2.4(f) hereof (whichever occurs first), and each Covered Person agrees to assign, endorse and register for transfer into such nominee name or deliver to such custodian any such Covered Shares which are not so registered or so held, as the case may be.  The form of the custody agreement and the identity of the custodian and nominee must be satisfactory in form and substance to the Shareholders' Committee and GS Inc.

(b)   Whenever the nominee holder shall receive any dividend or other distribution upon any Covered Shares other than in Covered Shares, the Shareholders' Committee will give or cause to be given notice or direction to the applicable nominee and/or custodian referred to in paragraph (a) to permit the prompt distribution of such dividend or distribution to the beneficial owner of such Covered Shares, net of any tax withholding amounts required to be withheld by the nominee, unless the distribution of such dividend or distribution is

–6–

restricted by the terms of another agreement between the Covered Person and the Company known to the Shareholders' Committee.

(c)   Each Covered Person understands and agrees that any outstanding certificate representing Covered Shares beneficially owned by an Employee Covered Person or representing Covered Shares which could not then be Transferred without contravening the PLP Transfer Restrictions beneficially owned by a Covered Person who is not an Employee Covered Person, and any agreement or other instrument evidencing restricted stock units, options or other rights to receive or acquire Covered Shares beneficially owned by such Covered Person, may bear a legend noted conspicuously on each such certificate, agreement or other instrument reading substantially as follows:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF EITHER OR BOTH OF A SHAREHOLDERS' AGREEMENT AMONG THE GOLDMAN SACHS GROUP, INC. ("GS INC.") AND THE PERSONS NAMED THEREIN AND A PLAN OF INCORPORATION OF THE GOLDMAN SACHS GROUP, L.P., COPIES OF WHICH ARE ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF GS INC. AND WHICH, AMONG OTHER MATTERS, PLACE RESTRICTIONS ON THE DISPOSITION AND VOTING OF SUCH SECURITIES.   THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY BE SOLD, EXCHANGED, TRANSFERRED, ASSIGNED, PLEDGED, PARTICIPATED, HYPOTHECATED OR OTHERWISE DISPOSED OF ONLY IN ACCORDANCE THEREWITH."**

(d)   Each Covered Person agrees and consents to the entry of stop transfer orders against the transfer of Covered Shares subject to Transfer Restrictions except in compliance with this Agreement.

(e)   The Shareholders' Committee shall develop procedures for releasing all Covered Shares of each Covered Person who is not an Employee Covered Person which could then be Transferred without contravening any Transfer Restrictions to or at the direction of such Covered Person free and clear of all restrictions and legends described in this Section 2.4.

(f)   The Shareholders' Committee shall also develop procedures for releasing (free and clear of all restrictions and legends described in this Section 2.4) a specified number of Covered Shares of an Employee Covered Person upon the request of any Covered Person and to or at the direction of such Employee Covered Person, provided that such request is accompanied by a certificate of such requesting Covered Person (i) indicating such requesting Covered Person's intention to Transfer promptly such specified number of Covered Shares and (ii) establishing that such specified number of Covered Shares are then

P000016

permitted to be Transferred without contravening any Transfer Restrictions (which evidence must be satisfactory to the Shareholders' Committee).

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF THE PARTIES

Each Covered Person severally represents and warrants for himself that:

(a)  Such Covered Person has (and with respect to Covered Shares to be acquired, will have) good, valid and marketable title to the Covered Shares, free and clear of any pledge, lien, security interest, charge, claim, equity or encumbrance of any kind, other than pursuant to this Agreement, the Plan of Incorporation or another agreement with the Company by which such Covered Person is bound and to which the Covered Shares are subject; and

(b)  (if the Covered Person is other than a natural person, with respect to subsections (i) through (x), and if the Covered Person is a natural person, with respect to subsections (iv) through (x) only): (i) such Covered Person is duly organized and validly existing in good standing under the laws of the jurisdiction of such Covered Person's formation; (ii) such Covered Person has full right, power and authority to enter into and perform this Agreement; (iii) the execution and delivery of this Agreement and the performance of the transactions contemplated herein have been duly authorized, and no further proceedings on the part of such Covered Person are necessary to authorize the execution, delivery and performance of this Agreement; and this Agreement has been duly executed by such Covered Person; (iv) the person signing this Agreement on behalf of such Covered Person has been duly authorized by such Covered Person to do so; (v) this Agreement constitutes the legal, valid and binding obligation of such Covered Person, enforceable against such Covered Person in accordance with its terms (subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles); (vi) neither the execution and delivery of this Agreement by such Covered Person nor the consummation of the transactions contemplated herein conflicts with or results in a breach of any of the terms, conditions or provisions of any agreement or instrument to which such Covered Person is a party or by which the assets of such Covered Person are bound (including without limitation the organizational documents of such Covered Person, if such Covered Person is other than a natural person), or constitutes a default under any of the foregoing, or violates any law or regulation; (vii) such Covered Person has obtained all authorizations, consents, approvals and clearances of all courts, governmental agencies and authorities, and any other person, if any (including the spouse of such Covered Person with respect to the interest of such spouse in the Covered Shares of such Covered Person if the consent of such spouse is required), required to permit such Covered Person to enter into this Agreement and to

–8–

consummate the transactions contemplated herein; (viii) there are no actions, suits or proceedings pending, or, to the knowledge of such Covered Person, threatened against or affecting such Covered Person or such Covered Person's assets in any court or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality which, if adversely determined, would impair the ability of such Covered Person to perform this Agreement; (ix) the performance of this Agreement will not violate any order, writ, injunction, decree or demand of any court or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality to which such Covered Person is subject; and (x) no statement, representation or warranty made by such Covered Person in this Agreement, nor any information provided by such Covered Person for inclusion in a report filed pursuant to Section 6.3 hereof. or in a registration statement filed by GS Inc. contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements, representations or warranties contained herein or information provided therein not misleading.

Each Covered Person severally agrees for himself that the foregoing provision of this Article III shall be a continuing representation and covenant of such Covered Person during the period that such person shall be a Covered Person and shares of Common Stock of such person shall be Covered Shares, and such Covered Person shall take all actions as shall from time to time be necessary to cure any breach or violation and to obtain any authorizations, consents, approvals and clearances in order that such representations shall be true and correct during the foregoing period.

## ARTICLE IV
## VOTING AGREEMENT

Section 4.1 **Preliminary Vote of Covered Persons**.  Prior to any vote of the stockholders of GS Inc. there shall be a separate, preliminary vote, on each matter upon which a stockholder vote is proposed to be taken (each, a "Preliminary Vote"), of the Covered Shares beneficially owned by (a) through December 31, 2000, all Covered Persons, and (b) on and after January 1, 2001, the Employee Covered Persons (including in both clause (a) and (b) and for the purpose of this Article IV shares of Common Stock held by the trust underlying The Goldman Sachs Defined Contribution Plan and allocated to Covered Persons (in the case of clause (a)) and Employee Covered Persons (in the case of clause (b)) who are participants therein) (such Covered Shares at any such time, the "Voting Interests").  The Preliminary Vote shall be conducted pursuant to procedures established by the Shareholders' Committee.

P000018

Section 4.2   **Voting of the Voting Interests**.

(a)  Other than in elections of directors, every Covered Share beneficially owned by an Employee Covered Person, every Covered Share which could not then be Transferred without contravening the PLP Transfer Restrictions beneficially owned by any Covered Person who is not an Employee Covered Person and every Covered Share held by the trust underlying The Goldman Sachs Defined Contribution Plan and allocated to a Covered Person (collectively, the "Voted Covered Shares") shall be voted in accordance with the vote of the majority of the votes cast on the matter in question by the Voting Interests in the Preliminary Vote.

(b)  In elections of directors, every Voted Covered Share shall be voted in favor of the election of those persons, equal in number to the number of such positions to be filled, receiving the highest numbers of votes cast by the Voting Interests in the Preliminary Vote.

Section 4.3   **Irrevocable Proxy and Power of Attorney**.

(a)  By his signature hereto, each Covered Person hereby gives the Shareholders' Committee, with full power of substitution and resubstitution, an irrevocable proxy to vote or otherwise act with respect to all of the Covered Person's Voted Covered Shares, as fully, to the same extent and with the same effect as such Covered Person might or could do under any applicable laws or regulations governing the rights and powers of stockholders of a Delaware corporation and (i) directs that such proxy shall be voted in connection with such matters as are the subject of a Preliminary Vote as provided in this Agreement — in accordance with such Preliminary Vote, (ii) authorizes the holder of such proxy to vote on such other matters as may come before a meeting of stockholders of GS Inc. or any adjournment thereof and as are related, directly or indirectly, to the matter which was the subject of the Preliminary Vote — as the aforementioned persons see fit in their discretion but in a manner consistent with the Preliminary Vote, and (iii) authorizes the holder of such proxy to vote on such other matters as may come before a meeting of stockholders of GS Inc. or any adjournment thereof (including matters related to adjournment thereof) — as the aforementioned persons see fit in their discretion but not to cast any vote under this clause (iii) which is inconsistent with the Preliminary Vote or which would achieve an outcome that would frustrate the intent of the Preliminary Vote. Each such Covered Person hereby affirms that this proxy is given as a term of this Agreement and as such is coupled with an interest and is irrevocable. It is further understood and agreed by each such Covered Person that this proxy may be exercised by the aforementioned persons with respect to all Voted Covered Shares of such Covered Person for the period beginning on the date hereof and ending on the date this Agreement shall have been terminated pursuant to Section 7.1(a) hereof.

P000019

(b)   By his signature hereto, each Covered Person appoints the Shareholders' Committee, with full power of substitution and resubstitution, his true and lawful attorney-in-fact to direct, in accordance with the provisions of this Article IV, the voting of any Voted Covered Shares held of record by any other person but beneficially owned by such Covered Person (including Voted Covered Shares held by the trust underlying The Goldman Sachs Defined Contribution Plan and allocated to such Covered Person), granting to such attorneys, and each of them, full power and authority to do and perform each and every act and thing whatsoever that such attorney or attorneys may deem necessary, advisable or appropriate to carry out fully the intent of Section 4.2 and Section 4.3(a) as such Covered Person might or could do personally, hereby ratifying and confirming all acts and things that such attorney or attorneys may do or cause to be done by virtue of this power of attorney.  It is understood and agreed by each such Covered Person that this appointment, empowerment and authorization may be exercised by the aforementioned persons with respect to all Voted Covered Shares of such Covered Person, and held of record by another person, for the period beginning on the date hereof and ending on the date this Agreement shall have been terminated pursuant to Section 7.1(a) hereof.

## ARTICLE V
## SHAREHOLDERS' COMMITTEE

Section 5.1   **Constituency**.  The Shareholders' Committee shall at any time consist of each of those individuals who are both Employee Covered Persons and members of the Board of Directors of GS Inc. and who agree to serve as members of the Shareholders' Committee.

Section 5.2   **Additional Members**.  If there are less than three individuals who are both Employee Covered Persons and members of the Board of Directors of GS Inc. and who agree to serve as members of the Shareholders' Committee, the Shareholders' Committee shall consist of each such individual plus such additional individuals who are Employee Covered Persons and who are selected pursuant to procedures established by the Shareholders' Committee as shall assure a Shareholders' Committee of not less than three members who are Employee Covered Persons.

Section 5.3   **Determinations of and Actions by the Shareholders' Committee**.

(a)   All determinations necessary or advisable under this Agreement (including determinations of beneficial ownership) shall be made by the Shareholders' Committee, whose determinations shall be final and binding.   The Shareholders' Committee's determinations under this Agreement and the Plan of Incorporation and actions (including waivers) hereunder and thereunder need not be uniform and may be made selectively among Covered Persons (whether or not such Covered Persons are similarly situated).

P000020

(b)    Each Covered Person recognizes and agrees that the members of the Shareholders' Committee in acting hereunder shall at all times be acting in their individual capacities and not as directors or officers of the Company and in so acting or failing to act shall not have any fiduciary duties to the Covered Persons as a member of the Shareholders' Committee by virtue of the fact that one or more of such members may also be serving as a director or officer of the Company or otherwise.

(c)    The Shareholders' Committee shall act through a majority vote of its members and such actions may be taken in person at a meeting or by a written instrument signed by all of the members.

Section 5.4    **Certain Obligations of the Shareholders' Committee**.    The Shareholders' Committee shall be obligated (a) to attend as proxy, or cause a person designated by it and acting as lawful proxy to attend as proxy, each meeting of the stockholders of GS Inc. and to vote or to cause such designee to vote the Covered Shares over which it has the power to vote in accordance with the results of the Preliminary Vote as set forth in Section 4.2, and (b) to develop procedures governing Preliminary Votes and other votes and actions to be taken pursuant to this Agreement.

# ARTICLE VI
## OTHER AGREEMENTS OF THE PARTIES

Section 6.1    **Standstill Provisions**.    Each Covered Person agrees that such Covered Person shall not, directly or indirectly, alone or in concert with any other person, (a) make, or in any way participate in, any "solicitation" of "proxies" (as such terms are defined in Exchange Act Rule 14a-1) relating to any securities of the Company to or with any Restricted Person; (b) deposit any Covered Shares in a voting trust or subject any Covered Shares to any voting agreement or arrangement that includes as a party any Restricted Person; (c) form, join or in any way participate in a group (as contemplated by Exchange Act Rule 13d-5(b)) with respect to any securities of the Company (or any securities the ownership of which would make the owner thereof a beneficial owner of securities of the Company (for this purpose as determined by Exchange Act Rule 13d-3 and Exchange Act Rule 13d-5)) that includes as a party any Restricted Person; (d) make any announcement subject to Exchange Act Rule 14a-1(l)(2)(iv) to any Restricted Person; (e) initiate or propose any "shareholder proposal" subject to Exchange Act Rule 14a-8; (f) together with any Restricted Person, make any offer or proposal to acquire any securities or assets of GS Inc. or any of its Subsidiaries or solicit or propose to effect or negotiate any form of business combination, restructuring, recapitalization or other extraordinary transaction involving, or any change in control of, GS Inc., its Subsidiaries or any of their respective securities or assets; (g) together with any Restricted Person, seek the removal of any directors or a change in the composition or size of the board of directors of GS Inc.; (h) together with any Restricted Person, in any way participate in a call

P000021

for any special meeting of the stockholders of GS Inc.; or (i) assist, advise or encourage any person with respect to, or seek to do, any of the foregoing.

Section 6.2  **Expenses**.

(a)  GS Inc. shall be responsible for all expenses of the members of the Shareholders' Committee incurred in the operation and administration of this Agreement, including expenses of proxy solicitation for and tabulation of the Preliminary Vote, expenses incurred in preparing appropriate filings and correspondence with the Securities and Exchange Commission, lawyers', accountants', agents', consultants', experts', investment banking and other professionals' fees, expenses incurred in enforcing the provisions of this Agreement, expenses incurred in maintaining any necessary or appropriate books and records relating to this Agreement and expenses incurred in the preparation of amendments to and waivers of provisions of this Agreement.

(b)  Each Covered Person shall be responsible for all expenses of such Covered Person incurred in connection with the compliance by such Covered Person with his obligations under this Agreement, including expenses incurred by the Shareholders' Committee or GS Inc. in enforcing the provisions of this Agreement relating to such obligations.

Section 6.3  **Filing of Schedule 13D or 13G**.

(a)  In the event that a Covered Person is required to file a report of beneficial ownership on Schedule 13D or 13G with respect to the Covered Shares beneficially owned by him (for this purpose as determined by Exchange Act Rule 13d-3 and Exchange Act Rule 13d-5), such Covered Person agrees that, unless otherwise directed by the Shareholders' Committee, such Covered Person will not file a separate such report, but will file a report together with the other Covered Persons, containing the information required by the Exchange Act, and such Covered Person understands and agrees that such report shall be filed on his behalf by the Shareholders' Committee or any member thereof.  Such Covered Person shall cooperate fully with the other Covered Persons and the Shareholders' Committee to achieve the timely filing of any such report and any amendments thereto as may be required, and such Covered Person agrees that any information concerning such Covered Person which such Covered Person furnishes in connection with the preparation and filing of such report will be complete and accurate.

(b)  By his signature hereto, each Covered Person appoints the Shareholders' Committee and each member thereof, with full power of substitution and resubstitution, his true and lawful attorney-in-fact to execute such reports and any and all amendments thereto and to file such reports with all exhibits thereto and other documents in connection therewith with the Securities and Exchange Commission, granting to such attorneys, and each of them,

–13–

full power and authority to do and perform each and every act and thing whatsoever that such attorney or attorneys may deem necessary, advisable or appropriate to carry out fully the intent of this Section 6.3 as such Covered Person might or could do personally, hereby ratifying and confirming all acts and things that such attorney or attorneys may do or cause to be done by virtue of this power of attorney. Each Covered Person hereby further designates such attorneys as such Covered Person's agents authorized to receive notices and communications with respect to such reports and any amendments thereto. It is understood and agreed by each such Covered Person that this appointment, empowerment and authorization may be exercised by the aforementioned persons for the period beginning on the date hereof and ending on the date such Covered Person is no longer subject to the provisions of this Agreement (and shall extend thereafter for such time as is required to reflect that such Covered Person is no longer a party to this Agreement).

Section 6.4   **Adjustment upon Changes in Capitalization; Adjustments upon Changes of Control; Representatives, Successors and Assigns**.

(a)   In the event of any change in the outstanding Common Stock by reason of stock dividends, stock splits, reverse stock splits, spin-offs, split-ups, recapitalizations, combinations, exchanges of shares and the like, the term "Covered Shares" shall refer to and include the securities received or resulting therefrom, but only to the extent such securities are received in exchange for or in respect of Covered Shares. Upon the occurrence of any event described in the immediately preceding sentence, the Shareholders' Committee shall make such adjustments to or interpretations of the restrictions of Section 2.2 (and, if it so determines, any other provisions hereof) as it shall deem necessary or desirable to carry out the intent of such provision(s). If the Shareholders' Committee deems it desirable, any such adjustments may take effect from the record date, the "when issued trading date", the "ex dividend date" or another appropriate date.

(b)   In the event of any business combination, restructuring, recapitalization or other extraordinary transaction involving GS Inc., its Subsidiaries or any of their respective securities or assets as a result of which the Covered Persons shall hold voting securities of a person other than GS Inc., the Covered Persons agree that this Agreement shall also continue in full force and effect with respect to such voting securities of such other person formerly representing or distributed in respect of Covered Shares of GS Inc., and the terms "Covered Shares," "Common Stock" and "Voting Interests," and "GS Inc." and "Company," shall refer to such voting securities formerly representing or distributed in respect of Covered Shares of GS Inc. and such person, respectively. Upon the occurrence of any event described in the immediately preceding sentence, the Shareholders' Committee shall make such adjustments to or interpretations of the restrictions of Section 2.2 (and, if it so determines, any other provisions hereof) as it shall deem necessary or desirable to carry out the intent of such provision(s). If the Shareholders' Committee deems it desirable, any such adjustments may take effect from the record date or another appropriate date.

P000023

(c)   This Agreement shall be binding upon and inure to the benefit of the respective legatees, legal representatives, successors and assigns of the Covered Persons (and GS Inc. in the event of a transaction described in Section 6.4(b) hereof); provided, however, that a Covered Person may not assign this Agreement or any of his rights or obligations hereunder without the prior written consent of GS Inc., and any assignment without such consent by a Covered Person shall be void; and provided further that no assignment of this Agreement by GS Inc. or to a successor of GS Inc. (by operation of law or otherwise) shall be valid unless such assignment is made to a person which succeeds to the business of GS Inc. substantially as an entirety.

Section 6.5   **Further Assurances**.  Each Covered Person agrees to execute such additional documents and take such further action as may be reasonably necessary to effect the provisions of this Agreement.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1   **Term of the Agreement; Termination of Certain Provisions**.

(a)   The term of this Agreement shall continue until the first to occur of January 1, 2050 and such time as this Agreement is terminated by the affirmative vote of not less than 66⅔% of the outstanding Voting Interests.  If this Agreement is terminated prior to the expiration or termination of the restrictions on transfer referred to in Section 2.3(a), such restrictions on transfer shall continue to apply in accordance with the provisions of Section 6(e) of the Underwriting Agreement referred to in Section 2.3(a) unless waived or terminated as provided in said Underwriting Agreement.  If this Agreement is terminated prior to the expiration or termination of the PLP Transfer Restrictions, the PLP Transfer Restrictions shall continue to apply in accordance with the provisions of the Plan of Incorporation unless waived or terminated as provided in the Plan of Incorporation.

(b)   Unless this Agreement is theretofore terminated pursuant to Section 7.1(a) hereof, any Covered Person who ceases to be an employee for any reason other than death shall no longer be bound by the provisions of Section 2.2 and Section 6.1 hereof (unless such Covered Person is subject to the PLP Transfer Restrictions in which case Section 6.1 shall continue to apply until December 31, 2000) but shall be bound by all other provisions of this Agreement until such time as such Covered Person holds all Covered Shares free from PLP Transfer Restrictions. Thereafter, such Covered Person shall no longer be bound by the provisions of this Agreement (other than Sections 5.3, 6.2, 6.3, 6.5, 7.4, 7.5, 7.6, 7.8, 7.10 and 7.11 (the "Continuing Provisions")), and such Covered Person's name shall be removed from Appendix A to this Agreement.

–15–

(c)  Unless this Agreement is theretofore terminated pursuant to Section 7.1(a) hereof, the estate of any Covered Person who ceases to be an employee by reason of death or any Covered Person who ceases to be an employee for any reason other than death and who subsequently dies shall from and after the date of such death be bound only by the restrictions on transfer imposed by Section 2.3(a) hereof and the Continuing Provisions; and upon the expiration of the restrictions in Section 2.3(a), the estate of such Covered Person shall no longer be bound by the provisions of this Agreement (other than the Continuing Provisions), and such Covered Person's name shall be removed from Appendix A to this Agreement.

Section 7.2  **Amendments**.

(a)  Except as provided in this Section 7.2, provisions of this Agreement may be amended only by the affirmative vote of a majority of the outstanding Voting Interests.

(b)  This Section 7.2(b), Section 7.1(a) and Section 7.3(a)(i) may be amended only by the affirmative vote of 66⅔% of the outstanding Voting Interests.  Any amendment of any other provision of this Agreement that would have the effect, in connection with a tender or exchange offer by any person other than the Company as to which the Board of Directors of GS Inc. is recommending rejection, of permitting Transfers which would not be permitted by the terms of this Agreement as theretofore in effect shall also require the affirmative vote of 66⅔% of the outstanding Voting Interests.

(c)  This Section 7.2(c), Article V, Section 7.3(b) and any other provision the amendment (or addition) of which has the effect of materially changing the rights or obligations of the Shareholders' Committee hereunder may be amended (or added) either (i) with the approval of the Shareholders' Committee and the affirmative vote of a majority of the Voting Interests or (ii) by the affirmative vote of 66⅔% of the outstanding Voting Interests.

(d)  In addition to any other vote or approval that may be required under this Section 7.2, any amendment to the General Transfer Restrictions that would make such General Transfer Restrictions materially more onerous to a Covered Person will not be enforceable against that Covered Person unless that Covered Person has consented to such amendment.

(e)  In addition to any other vote or approval that may be required under this Section 7.2, any amendment of this Agreement that has the effect of changing the obligations of GS Inc. hereunder to make such obligations materially more onerous to GS Inc. shall require the approval of GS Inc.

–16–

(f)   In addition to any other vote or approval that may be required under this Section 7.2, any amendment that has the effect of amending the provisions of Section 2.3(a), 2.3(b) or 2.3(c) shall require the approval of GS Inc.

(g)   Each Covered Person understands that it is intended that each managing director of the Company will be a Covered Person under this Agreement or will become a Covered Person upon his appointment to such position, and each Covered Person further understands that from time to time certain other persons may become Covered Persons and certain Covered Persons will cease to be bound by the provisions of this Agreement pursuant to the terms hereof.  Accordingly, this Agreement may be amended by action of the Shareholders' Committee from time to time and without the approval of any other person, but solely for the purposes of (i) adding to Appendix A such persons as shall be made party to this Agreement pursuant to the terms hereof or shall (A) be appointed managing directors of the Company and (B) execute a counterpart of the signature page of this Agreement, such addition to be effective as of the time of such action or appointment and (ii) removing from Appendix A such persons as shall cease to be bound by the provisions of this Agreement pursuant to Sections 7.1(b) or (c) hereof, which additions and removals shall be given effect from time to time by appropriate changes to Appendix A.

Section 7.3   **Waivers**.  The Transfer Restrictions and the other provisions of this Agreement may be waived only as provided in this Section 7.3.

(a)   The holders of  the outstanding Voting Interests may waive the Transfer Restrictions and the other provisions of this Agreement without the consent of any other person as follows:

(i)   The Transfer Restrictions may be waived, in connection with any tender or exchange offer by any person other than the Company as to which the Board of Directors of GS Inc. is recommending rejection at the time of such waiver, only by the affirmative vote of 66⅔% of the outstanding Voting Interests;

(ii)   The Transfer Restrictions may be waived, in connection with any tender or exchange offer by any person other than the Company as to which the Board of Directors of GS Inc. is recommending acceptance or is not making any recommendation with respect to acceptance at the time of such waiver, only by the affirmative vote of a majority of the outstanding Voting Interests;

(iii)   The Transfer Restrictions may be waived, in connection with any tender or exchange offer by the Company, by the affirmative vote of a majority of the outstanding Voting Interests;

–17–

(iv)    In all circumstances other than those set forth in Section 7.3(a)(i), (ii) and (iii), the provisions of this Agreement may be waived only by the affirmative vote of a majority of the outstanding Voting Interests; provided, however, that the holders of the outstanding Voting Interests may not waive the provisions of this Agreement in the circumstances set forth in Section 7.3(b); and

(v)    In addition to any other action that may be required under this Section 7.3(a), any waiver that has the effect of waiving the provisions of Section 2.3(a), 2.3(b) or 2.3(c) shall require the approval of GS Inc.

(b)  The Shareholders' Committee may waive the Transfer Restrictions and the other provisions of this Agreement without the consent of any other person as follows:

(i)    The Shareholders' Committee may waive the Transfer Restrictions and the other provisions of this Agreement to permit: (A) Covered Persons to participate as sellers in underwritten public offerings of, and stock repurchase programs and tender offers by GS Inc. for, Common Stock; (B) Transfers of Covered Shares to organizations described in Section 501(c)(3) of the Code, including gifts to "private foundations" subject to the requirements of Section 509 of the Code; (C) Transfers of Covered Shares held in employee benefit plans of the Company either generally or in particular situations; and (D) particular Covered Persons or all Covered Persons to Transfer Covered Shares in particular situations (such as Transfers to family members, partnerships or trusts), but not generally (provided that in each of (A) through (D), waivers of the restrictions imposed by Section 2.3(a), 2.3(b) and 2.3(c) shall also require the prior written consent of GS Inc.);

(ii)    The Shareholders' Committee may waive the PLP Transfer Restrictions in all circumstances other than in connection with a tender or exchange offer by any person other than the Company; and

(iii)    The Shareholders' Committee may waive any or all of the Transfer Restrictions and the other provisions of this Agreement with respect to Covered Shares owned by a person at the time the person becomes a managing director of the Company or acquired by the person in connection with such person's becoming a managing director of the Company; provided that such person was not an employee of the Company prior to the granting of such waiver by the Shareholders' Committee.

(c)   GS Inc. agrees that the PLP Transfer Restrictions shall be deemed to be waived under the Plan of Incorporation if they are waived as provided in this Agreement.

(d)   In connection with any waiver granted under this Agreement, the Shareholders' Committee or the holders of the percentage of Voting Interests required for the waiver, as the case may be, may impose such conditions as they determine on the granting of such waivers.

(e)   The failure of the Company or the Shareholders' Committee at any time or times to require performance of any provision of this Agreement shall in no manner affect the rights at a later time to enforce the same.  No waiver by the Company or the Shareholders' Committee of the breach of any term contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such breach or the breach of any other term of this Agreement.

Section 7.4   **GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.**

Section 7.5   **Resolution of Disputes.**

(a)   The Shareholders' Committee shall have the sole and exclusive power to enforce the provisions of this Agreement.  The Shareholders' Committee may in its sole discretion request GS Inc. to conduct such enforcement, and GS Inc. agrees to conduct such enforcement as requested and directed by the Shareholders' Committee.

(b)   Without diminishing the finality and conclusive effect of any determination by the Shareholders' Committee of any matter under this Agreement which is provided herein to be determined or proposed by the Shareholders' Committee (and subject to the provisions of paragraphs (c) and (d) hereof), any dispute, controversy or claim arising out of or relating to or concerning the provisions of this Agreement shall be finally settled by arbitration in New York City before, and in accordance with the rules then obtaining of, the New York Stock Exchange, Inc. ("NYSE"), or if  the NYSE declines to arbitrate the matter, the American Arbitration Association ("AAA") in accordance with the commercial arbitration rules of the AAA.

(c)   Notwithstanding the provisions of paragraph (b), and in addition to its right to submit any dispute or controversy to arbitration, the Shareholders' Committee may bring, or may cause GS Inc. to bring, on behalf of the Shareholders' Committee or on behalf of one or more Covered Persons, an action or special proceeding in a state or federal court of competent jurisdiction sitting in the State of Delaware, whether or not an arbitration

–19–

proceeding has theretofore been or is ever initiated, for the purpose of temporarily, preliminarily or permanently enforcing the provisions of this Agreement and, for the purposes of this paragraph (c), each Covered Person (i) expressly consents to the application of paragraph (d) to any such action or proceeding, (ii) agrees that proof shall not be required that monetary damages for breach of the provisions of this Agreement would be difficult to calculate and that remedies at law would be inadequate and (iii) irrevocably appoints each General Counsel of GS Inc., c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 as such Covered Person's agent for service of process in connection with any such action or proceeding, who shall promptly advise such Covered Person of any such service of process.

(d) (i) EACH COVERED PERSON HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE STATE OF DELAWARE OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO OR CONCERNING THIS AGREEMENT THAT IS NOT OTHERWISE ARBITRATED ACCORDING TO THE PROVISIONS OF PARAGRAPH (b) HEREOF. This includes any suit, action or proceeding to compel arbitration or to enforce an arbitration award. The parties acknowledge that the forum designated by this paragraph (d) has a reasonable relation to this Agreement, and to the parties' relationship with one another. Notwithstanding the foregoing, nothing herein shall preclude the Shareholders' Committee or GS Inc. from bringing any action or proceeding in any other court for the purpose of enforcing the provisions of this Section 7.5.

(ii) The agreement of the parties as to forum is independent of the law that may be applied in the action, and they each agree to such forum even if the forum may under applicable law choose to apply non-forum law. The parties hereby waive, to the fullest extent permitted by applicable law, any objection which they now or hereafter may have to personal jurisdiction or to the laying of venue of any such suit, action or proceeding brought in any court referred to in paragraph (d)(i). The parties undertake not to commence any action arising out of or relating to or concerning this Agreement in any forum other than a forum described in paragraph (d)(i). The parties agree that, to the fullest extent permitted by applicable law, a final and non-appealable judgment in any such suit, action or proceeding in any such court shall be conclusive and binding upon the parties.

Section 7.6  **Relationship of Parties**. The terms of this Agreement are intended not to create a separate entity for U.S. federal income tax purposes, and nothing in this Agreement shall be read to create any partnership, joint venture or separate entity among the parties or to create any trust or other fiduciary relationship between them.

–20–

Section 7.7  **Notices**.

(a)  Any communication, demand or notice to be given hereunder will be duly given (and shall be deemed to be received) when delivered in writing by hand or first class mail or by telecopy to a party at its address as indicated below:

If to a Covered Person,

> c/o The Goldman Sachs Group, Inc.
> 85 Broad Street
> New York, New York 10004
> Telecopy:  (212) 902-3876
> Attention:  General Counsel;

If to the Shareholders' Committee, at

> Shareholders' Committee under the Shareholders' Agreement,
>   dated May 7, 1999
> c/o The Goldman Sachs Group, Inc.
> 85 Broad Street
> New York, New York 10004
> Telecopy: (212) 902-3876
> Attention:  General Counsel;

and

If to GS Inc., at

> The Goldman Sachs Group, Inc.
> 85 Broad Street
> New York, New York 10004
> Telecopy: (212) 902-3876
> Attention: General Counsel.

GS Inc. shall be responsible for notifying each Covered Person of the receipt of a communication, demand or notice under this Agreement relevant to such Covered Person at the address of such Covered Person then in the records of GS Inc. (and each Covered Person shall notify GS Inc. of any change in such address for communications, demands and notices).

(b)  Unless otherwise provided to the contrary herein, any notice which is required to be given in writing pursuant to the terms of this Agreement may be given by telecopy.

P000030

Section 7.8  **Severability**.  If any provision of this Agreement is finally held to be invalid, illegal or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired and (b) the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 7.9  **Right to Determine Tender Confidentially**.  In connection with any tender or exchange offer for all or any portion of the outstanding Common Stock, subject to compliance with all applicable restrictions on Transfer in this Agreement, the Plan of Incorporation or any other agreement with GS Inc., each Covered Person will have the right to determine confidentially whether such Covered Person's Covered Shares will be tendered in such tender or exchange offer.

Section 7.10  **No Third-Party Rights**.  Nothing expressed or referred to in this Agreement will be construed to give any person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

Section 7.11  **Section Headings**.  The headings of sections in this Agreement are provided for convenience only and will not affect its construction or interpretation.

Section 7.12  **Execution in Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.

P000031

**IN WITNESS WHEREOF**, the parties hereto have duly executed or caused to be duly executed this Agreement as of the dates indicated.

THE GOLDMAN SACHS GROUP, INC.


By: /s/Robert J. Katz
Name: Robert J. Katz
Title:   Executive Vice President


Dated : May 7, 1999

P000032

## COUNTERPART

## SHAREHOLDERS' AGREEMENT

By execution and delivery of this counterpart of the Shareholders' Agreement, dated as of May 7, 1999, among The Goldman Sachs Group, Inc., and the Covered Persons listed on Appendix A thereto, as amended from time to time (the "Shareholders' Agreement"), the undersigned agrees to be bound by all of the provisions of the Shareholders' Agreement, effective as of the date on which the undersigned becomes a Managing Director of The Goldman Sachs Group, Inc. or any of its Subsidiaries, with Appendix A to the Shareholders' Agreement to be amended to reflect the designation of the undersigned as a party thereto.  Capitalized terms not defined herein have the meanings attributable to them in the Shareholders' Agreement.


Dated: _____          _____

                                        Name:

## Shareholders' Agreement

### Persons and Shares Covered

Each profit participating limited partner, other than Sumitomo Bank Capital Markets, Inc. and Kamehameha Activities Association, and each other person who is or becomes a managing director on the date of the consummation of the offerings or thereafter will be a party to the shareholders' agreement. After the consummation of the offerings, not less than 281,000,000 shares of common stock will be subject to the shareholders' agreement.

The shares covered by the shareholders' agreement will include generally all shares of common stock acquired from Goldman Sachs by a party to the shareholders' agreement, including:

- any shares of common stock received by the managing directors who were profit participating limited partners pursuant to the incorporation transactions, except for certain shares that aggregate less than 140,000 shares;

- any shares of common stock received from the defined contribution plan;

- any shares of common stock received pursuant to the restricted stock units awarded to employees based on a formula, the restricted stock units awarded on a discretionary basis or the options to purchase shares of common stock awarded on a discretionary basis; and

- unless otherwise determined by our board of directors and the Shareholders' Committee referred to below, any shares of common stock received from Goldman Sachs through any other employee compensation, benefit or similar plan.

Shares of common stock purchased in the open market or in a subsequent underwritten public offering will not be subject to the shareholders' agreement. The Shareholders' Committee may also exclude from the application of all or part of the shareholders'

agreement all or any portion of the common stock acquired by a managing director who is a new employee of Goldman Sachs.

### Transfer Restrictions

Each party to the shareholders' agreement will agree, among other things, to:

- have beneficial ownership while he or she is a managing director of at least 25% of the cumulative number of his or her shares that are beneficially owned or acquired, and are or become subject to the shareholders' agreement; and

- comply with the underwriters' 180-day lock-up arrangement described under ''Underwriting''.

The profit participating limited partners, other than Sumitomo Bank Capital Markets, Inc. and Kamehameha Activities Association, will be subject to additional restrictions on their ability to transfer shares received in connection with the incorporation transactions described under ''— Incorporation and Related Transactions — Incorporation Transactions''. Under these additional restrictions, each of these persons has agreed that he or she will not transfer any of these shares, other than up to 140,000 shares in the aggregate that will be excluded from these restrictions, until the third anniversary of the date of the consummation of the offerings. These restrictions will lapse in equal installments on each of the third, fourth and fifth anniversaries of the date of the consummation of the offerings.

All transfer restrictions applicable to a party to the shareholders' agreement, except for the underwriters' 180-day lock-up, terminate upon death.

### Waivers

Except in the case of a third-party tender or exchange offer, the additional transfer restrictions applicable to profit participating limited partners, other than Sumitomo Bank Capital Markets, Inc. and Kamehameha Activities Association, may be waived or terminated at any time by the Shareholders' Committee. The Shareholders' Committee also has the power to waive the other transfer restrictions

to permit parties to the shareholders' agreement to:

- participate as sellers in underwritten public offerings of common stock and tender and exchange offers and share repurchase programs by Goldman Sachs;
- transfer shares to charities, including charitable foundations;
- transfer shares held in employee benefit plans; and
- transfer shares in specific transactions (for example, to immediate family members and trusts) or circumstances.

In the case of a third-party tender or exchange offer, all transfer restrictions may be waived or terminated:

- if our board of directors is recommending acceptance or is not making any recommendation with respect to acceptance of the tender or exchange offer, by a majority of the voting interests referred to below; or
- if our board of directors is recommending rejection of the tender or exchange offer, by 66⅔% of the outstanding voting interests referred to below.

In the case of a tender or exchange offer by Goldman Sachs, a majority of the outstanding voting interests may also elect to waive or terminate the transfer restrictions.

In any event, the underwriters' 180-day lock-up may not be waived without the consent of the underwriters.

## Voting

Prior to any vote of the shareholders of Goldman Sachs, the shareholders' agreement requires a separate, preliminary vote of the voting interests on each matter upon which a vote of the shareholders is proposed to be taken. Each share subject to the shareholders' agreement will be voted in accordance with the majority of the votes cast by the voting interests in the preliminary vote. In elections of directors, each share subject to the shareholders' agreement will be voted in favor of the election of those persons receiving the highest numbers of votes cast by the voting interests in the preliminary vote. Prior to January 1, 2001, "voting interests" means all shares that are subject to the sharehold-

ers' agreement. Thereafter, "voting interests" means all shares subject to the shareholders' agreement held by all managing directors.

### Other Restrictions

The shareholders' agreement also prevents the persons subject to the shareholders' agreement from engaging in the following activities relating to any securities of Goldman Sachs with any person who is not a person subject to the shareholders' agreement or a director or employee of Goldman Sachs:

- participating in a proxy solicitation;
- depositing any shares subject to the shareholders' agreement in a voting trust or subjecting any of these shares to any voting agreement or arrangement;
- forming, joining or in any way participating in a "group"; or
- proposing certain transactions with Goldman Sachs or seeking the removal of any of our directors or any change in the composition of our board of directors.

### Term, Amendment and Continuation

The shareholders' agreement is to continue in effect until the earlier of January 1, 2050 and the time it is terminated by the vote of 66⅔% of the outstanding voting interests referred to above. The additional transfer restrictions applicable to profit participating limited partners, other than Sumitomo Bank Capital Markets, Inc. and Kamehameha Activities Association, will not terminate upon the expiration or termination of the shareholders' agreement unless previously waived or terminated or unless subsequently waived or terminated by our board of directors. The shareholders' agreement may generally be amended at any time by a majority of the outstanding voting interests referred to above.

Unless otherwise terminated, in the event of any transaction in which a third party succeeds to the business of Goldman Sachs and in which persons subject to the shareholders' agreement hold securities of the third party, the shareholders' agreement will remain in full force and effect as to the securities of the third party, and the third party shall succeed to the rights and obliga-

tions of Goldman Sachs under the shareholders' agreement.

### Information Regarding the Shareholders' Committee

The terms and provisions of the shareholders' agreement will be administered by the Shareholders' Committee. The Shareholders' Committee will initially consist of the persons subject to the shareholders' agreement who are both employees of Goldman Sachs and members of our board of directors. It is possible that over time all or a majority of the members of the Shareholders' Committee will not be members of our board of directors.

Members of the Shareholders' Committee are entitled to indemnification from Goldman Sachs in their capacities as members of the Shareholders' Committee as described under "Description of Capital Stock — Limitation of Liability and Indemnification Matters".

# COUNTERPART

## SHAREHOLDERS' AGREEMENT

By execution and delivery of this counterpart of the Shareholders' Agreement, dated as of May 7, 1999, among The Goldman Sachs Group, Inc., and the Covered Persons listed on Appendix A thereto, as amended from time to time (the "Shareholders' Agreement"), the undersigned agrees to be bound by all of the provisions of the Shareholders' Agreement, effective as of the date on which the undersigned becomes a Managing Director of The Goldman Sachs Group, Inc. or any of its Subsidiaries, with Appendix A to the Shareholders' Agreement to be amended to reflect the designation of the undersigned as a party thereto. Capitalized terms not defined herein have the meanings attributable to them in the Shareholders' Agreement.

Dated: *Nov. 9, 2003*

*Lisa L Parisi*

Lisa L. Parisi