1clnceha                          Argument

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   H. CHRISTINA CHEN-OSTER, et
    al.,
4
                     Defendants,
5
             v.                          10 CV 6950 (LBS)
6
    GOLDMAN SACHS & CO., et al.,
7
                     Defendants.
8
    ------------------------------x
9                                        New York, N.Y.
                                         December 21, 2011
10                                       10:00 a.m.

11  Before:

12                       HON. LEONARD B. SAND,

13                                        District Judge

14                            APPEARANCES

15  OUTTEN GOLDEN LLP
         Attorneys for Plaintiffs
16  CYRUS E. DUGGER
    ADAM T. KLEIN
17
    LIEFF CABRASER HEIMANN & BERNSTEIN LLP
18       Attorneys for Plaintiffs
    KELLY DERMODY
19
    SULLIVAN AND CROMWELL LLP
20       Attorneys for Defendants
    THEODORE OTTO ROGERS, JR.
21
    PAUL HASTINGS LLP
22       Attorneys for Defendants
    BARBARA B. BROWN
23  CARSON H. SULLIVAN

24

25

1clnceha                        Argument

```
 1          (Case called)

 2          (In open court)

 3          THE COURT:  I will hear from the movant.  Let me tell

 4   you that there is a factual issue which I would like the

 5   parties to address.  The defendants state that the EEOC

 6   investigation was limited to the department in which Chen-Oster

 7   was employed, and they didn't investigate anything else.

 8          The plaintiffs state that, pursuant to Chen-Oster's

 9   request, the investigation conducted by the EEOC extended

10   beyond Chen-Oster's area of employment, and the documents were

11   furnished to the defendants.  I am looking at page 3 of the

12   plaintiff's memorandum in response.

13          Who's right?  Are we going to have an argument over --

14          MS. BROWN:  Your Honor, may it please the Court, I

15   believe there is no question that the investigation was

16   confined to those three groups.  If I may, anticipating this

17   question, I have pulled out the relevant documents.

18          THE COURT:  Yes.

19          MS. BROWN:  May I hand those up to the Court and

20   counsel?

21          If you look at tab 3, your Honor, which is the tab

22   that has to do with this issue --

23          THE COURT:  Tab 3?

24          MS. BROWN:  Tab 3.  It's getting to the back of the

25   book.  The Dukes argument is up front there.  But we will get
```

1clnceha                          Argument

1    to that later.  If you look at tab 3, starting with the charge

2    itself, and here we have her charge under 3A, as you can, see

3    she talks about working as a convertible bond --

4              THE COURT:  I know what the initial charge was.

5              MS. BROWN:  All right.

6              THE COURT:  There is language that each side can

7    quote.

8              MS. BROWN:  Then if you look at tab D.

9              THE COURT:  Tab?

10             MS. BROWN:  D.

11             THE COURT:  Tab?

12             MS. BROWN:  3D.  It is a letter to Mr. Rogers from the

13   EEOC.

14             THE COURT:  Yes.

15             MS. BROWN:  You see the first part there they are

16   asking just how data is kept.  But if you look at what they are

17   actually asking for on the third page of this letter, they are

18   talking only about the groups at the bottom of the page, the

19   number of employees in research shares, convertible sales,

20   derivative sales.

21             The next page, No. 9, convertible bonds; No. 13,

22   convertible bonds; No. 14, synthetic convertibles, which was a

23   group she was in for about a year or so after convertible

24   bonds.

25             No. 15 on the next page, convertible bonds; 16,

1    convertible bonds, and so forth.  That is all that is asked

2    for.  All these personnel files that are asked for are people

3    in convertible bonds.

4              THE COURT:  Bear with me a moment.  I am looking at

5    page 3 of the plaintiffs' memorandum.

6              MS. BROWN:  Let me look at that.

7              Well, your Honor, the items that are listed at the

8    bottom of page 3 --

9              THE COURT:  Yes.

10             MS. BROWN:  -- are what I would call classic items

11   that are asked for by the EEOC even in individual cases.  They

12   want to know if an employer has complaints of harassment and so

13   forth.

14             The March 2007, if you look back it's at tab C here, I

15   believe -- let's see where it is.  It was followed up with an

16   e-mail that says very clearly that what they are referring to

17   here is employees who work in convertible bonds only.  Then,

18   No. 3, they talk about the June 2008 letter, your Honor.

19             THE COURT:  Yes.

20             MS. BROWN:  Let's look at that.  The March 2007 letter

21   is tab E.

22             THE COURT:  Yes.

23             MS. BROWN:  Then if you look under tab F, the

24   spreadsheet that's referenced in tab E on the second page says,

25   "I have attached a spreadsheet with names of and basic

1    information concerning women who were employed by GS in its

2    convertibles group in either London or the U.S."

3          That is the reference that they always come back to

4    and that she always was referring to in her communications with

5    the agency.

6          Then the third item that they reference -- I don't

7    mean to rush you, your Honor -- the June 2008 letter that they

8    refer to on page 3.

9          THE COURT:  Yes.

10         MS. BROWN:  That's right behind tab G.  Look there.

11   She talks under No. 1 about people in the convertible bond

12   sales group.  If you turn over to the next page she says

13   herself, "We should define my peers as all convertible

14   salespeople both in London as well as in the U.S. for years '97

15   to 2005."

16         She herself defined the group as no broader than

17   convertible sales.  The most that the EEOC ever asked about was

18   that group and then the group that she was going to join before

19   she quit, research sales.

20         But there is nothing broader here.  On the third page

21   of this June 2008 letter, where she talks about a list of

22   similarly situated employees, which is the line in the charge

23   that they are trying to hold all of this together with, the

24   list was all people in convertible sales.

25         Then the EEOC's follow-up behind tab H is looking at

1    seating charts for the convertible bond sales group.

2              So that was the focus of everything.  The other sort

3    of background information or information that might pertain to

4    her individual claim of harassment never ever went broader than

5    those groups.

6              I would also add, your Honor, the plaintiffs never

7    answered this argument in any briefing that we did, and the

8    reason is because they can't.

9              THE COURT:  Well, they are answering in this

10   memorandum, right?

11             MS. BROWN:  They didn't answer it in the memorandum

12   with respect to these groups.  What they are saying is that the

13   line means something more than her individually.

14             But the reality is the documents that they have cited

15   here, which are a tiny bit, these do not give a sense of what

16   the EEOC was really asking Goldman Sachs for over the years.

17   The ones I have given you are the ones that they were pursuing.

18   As you can see, the harassment one pertains to her individual

19   claim.  Similarly situated by that definition would be people

20   who have been assaulted and believe they had been retaliated

21   against.

22             The June 2008 that they very selectively cite from

23   here, when they talk about females dropping off as they rose in

24   the ranks, the letter itself says in convertible sales.  She

25   defined it herself that way.  The case law is very clear.

1clnceha                          Argument

 1   Similarly situated means people who are under the same

 2   supervision and who are similar in terms of the circumstances

 3   of their employment.  That's all she ever meant, if she meant

 4   anything by that line.

 5        So we believe that there is -- the case law in the

 6   Second Circuit, as your Honor knows, says you have to look at

 7   the facts, and even if you go beyond the charge, which has this

 8   one vague line in it at the end of this long --

 9        THE COURT:  There is a great difference between the

10   pleading requirements in this context and what you would have

11   in a lawsuit.  The question is whether there is enough to put

12   Goldman Sachs and the EEOC on notice.

13        MS. BROWN:  Exactly.

14        THE COURT:  That is a different standard than you

15   would have if this were a contract claim.

16        MS. BROWN:  Well, true, your Honor.  But the courts

17   have been very clear that you have to look at, when there is no

18   EEOC investigation you look at the language of the charge.

19   Obviously here there is nothing there except this very vague

20   phrase at the end of a long individual charge.

21        Here we had an investigation.  So we know what the

22   EEOC looked at, and what they looked at and what she told the

23   EEOC to look at was convertible bonds, and then this group that

24   she was going to join.  Goldman Sachs would have had no notice

25   whatsoever that she was talking about anything but her

1   departments and the places where she had worked.

2           The people she compared herself to, if we look in that

3   June 2008 letter, the people that she is talking about who were

4   supposedly similarly situated were two men who worked with her

5   in her department.  And the list of women that were supposedly

6   similarly situated were in her department.

7           She is saying, my peers are people similarly situated

8   or the women in the convertible bonds department.  There was

9   never a request for information about all the women on other

10  desks or about the equities section of the firm or even about

11  the securities division of the firm, never mind the whole firm.

12          The only thing that was ever asked for and looked

13  into, if we are talking about the actual investigation, not a

14  stray comment that she may have made to the agency, the only

15  thing that was looked into was that set of people in

16  convertible bonds.  Then they asked at the end about research

17  sales, which is where she was supposed to go.

18          But that seems to me, your Honor, conclusive that this

19  investigation was confined to those groups, and it never ever

20  got any broader than that.  Goldman Sachs never had any notice

21  of anything broader.

22          Of course it didn't see most of this information at

23  the time anyway.  But even if you look at what was conveyed to

24  the agency, every communication from her and from her counsel

25  is convertible bonds.

1clnceha                          Argument

1          THE COURT:  All right.  What else do you want to tell

2     me?

3          MS. BROWN:  Would you like to hear from plaintiff's

4     counsel on that?

5          THE COURT:  Excuse me.

6          MS. BROWN:  Would you like to hear from plaintiff's

7     counsel on that issue?

8          THE COURT:  Yes.

9          MS. BROWN:  Let's do that, your Honor.  If I may, we

10    will argue the other aspects of the motions separately.

11         MR. KLEIN:  Thank you, your Honor.

12         A couple of framing points about this discussion.

13    One, the original class charge was filed on behalf of Christina

14    Chen-Oster relating to her own individual Title VII claim and

15    also to alert the EEOC of a class action allegation using the

16    words similarly situated women.

17         There are distinct issues, one relating to the

18    individual circumstances surrounding Ms. Chen-Oster's

19    individual Title VII claim, the other relating to a broader

20    class allegation that was filed in June of 2005.  The purpose

21    of that is to alert the EEOC that the issues that are

22    identified in the charge relate not just to Ms. Chen-Oster's

23    individual claim but that of a larger class, of similarly

24    situated women.  The inquiry can't at that point, what effort

25    or what investigation arose during the many years the EEOC had

1clnceha                         Argument

1    the charge and was actively investigating it, just to make the

2    point, this would create an endless quagmire.  In essence, the

3    EEOC investigator would become a fact witness.  You would have

4    to ask them what their state of mind was in terms of their

5    investigation, what information they obtained, what other

6    charges existed for the entire national inventory.  Were there

7    other similar charges filed in your San Francisco office and

8    elsewhere.

9              It would create essentially a second collateral

10   litigation not relating to the particulars of Chen-Oster's

11   individual claim, but the constellation of information the EEOC

12   could have obtained or did obtain over the some five years from

13   the time that the charge was filed to the time the notice of

14   right to sue was finally issued.  Strikingly, that is not the

15   standard under controlling Second Circuit authority.  The

16   Tolliver v. Xerox decision makes it clear that if there is

17   information that would alert the EEOC -- alert the EEOC, not

18   defendant -- alert the EEOC that there are broader issues

19   implicated by the class charge, that is sufficient to exhaust.

20             In essence, what the defendant is arguing is that back

21   in June of 2005, six years before the case was filed, or five

22   years, Ms. Chen-Oster should have known the proper class

23   definition of the complaint that would ultimately be filed in

24   federal court.

25             That is an impossible standard.  It would essentially

1clnceha                      Argument

 1   require everyone to essentially elaborate on a class charge,

 2   the four corners of the eventual complaint that is filed years

 3   later.

 4            THE COURT:  The purpose of informing the EEOC, not the

 5   defendant of the scope of the charge, do you want to elaborate

 6   what the purpose of that is?

 7            MR. KLEIN:  Yes, your Honor.

 8            Judge Francis cited to a number of decisions that

 9   speak to that issue in his decision.  He cites to the Second

10   Circuit has held that the EEOC charge need not specify that the

11   claimant purports to represent a class or others similarly

12   situated as long as it alerts the EEOC that more is alleged

13   than an isolated act of discrimination --

14            THE COURT:  What are you reading from?

15            MR. KLEIN:  This is Magistrate Francis' decision on

16   this issue that is now the subject of the objection.  He

17   elaborates quite clearly that Second Circuit authority

18   concludes that the question is whether the EEOC was alerted to

19   the issues and whether conciliation could take place.

20            But this is a concept in a vacuum in a way.  The

21   reality is that many times the EEOC doesn't do an

22   investigation.  There was no conciliation because there was

23   never a cause determination made by the EEOC.  We don't know

24   what the eventual outcome would have been of this

25   investigation.  It's likely probable that in evaluating

1    compensation and promotion information that the defendant never

2    provided to the EEOC they would have concluded that there was a

3    broad claim that could be brought not just with respect to

4    Ms. Chen-Oster in her own individual circumstances but relating

5    to the entire company in terms of gender discrimination.  It's

6    a hypothetical.  We don't know the answer to that.

7           But the standard itself speaks to this question of

8    conciliation between the EEOC and the defendant.  That didn't

9    happen here, because there was never a point where the EEOC

10   made a determination.  We don't know what they were thinking.

11   Ms. Brown points out that they requested information.  We don't

12   know if it was provided.

13          There is nothing in the record on that point.  We

14   don't know if there are other charging parties that filed

15   similar claims.  We don't know whether there was other

16   independent information or other agencies that would have

17   provided additional information or insight into the scope of

18   the class.

19          What we have is a charge of discrimination filed in

20   2005 that outlines the individual circumstances and claims of

21   Ms. Chen-Oster and also categorically states that it is on

22   behalf of similarly situated women, which under Second Circuit

23   authority is sufficient to put the EEOC on notice that the

24   scope of the charge doesn't just relate to Ms. Chen-Oster but

25   relates to a class of women.  At that point there is no

1   investigation, there is no way to know necessarily what the

2   scope would be.

3          The defendant seizes on the fact that Ms. Chen-Oster

4   was focusing on her own individual claims in terms of the EEOC

5   investigation and ignores the fact that there is language in

6   the charge that clearly identifies a class claim, and that is

7   sufficient under Second Circuit authority.

8          THE COURT:  All right.  I think Ms. Brown was in mid

9   argument.

10          MS. BROWN:  Just a few brief points, your Honor.

11          Mr. Klein was representing Ms. Chen-Oster.  He allowed

12   this to sit at the EEOC for five years before asking for a

13   right to sue.  They did an investigation in this case.  It's

14   not hypothetical what they were looking for.  The reason it

15   didn't go any broader than convertible sales is because they

16   and their client never raised anything broader than that.

17          So what he is doing now, he never mentions convertible

18   sales, he's running away from the whole investigation.  What

19   he's saying is that one little line in the charge is enough to

20   put the defendant on notice of a nationwide class of all

21   revenue professionals.  He slurred right over --

22          THE COURT:  It is a serious line.  It isn't a casual

23   line.  I am sure anybody reading her charge would be aware of

24   her language with respect to others similarly situated and that

25   the suit is being brought on their behalf as well.  That is

1  explicitly in what she submitted to the EEOC.

2             MS. BROWN:  Yes, your Honor.

3             But two things:  First, we have to define similarly

4  situated.  When we look at the case law that Mr. Klein was

5  citing, it says there are two purposes to this charge.  It has

6  to alert the EEOC, but it has to provide sufficient notice to

7  the employer to explore conciliation with the affected group.

8  There is no definition in this of who the affected group is.

9  How do we figure that out now?  We look at case law about

10  similarly situated --

11             THE COURT:  There is language in her charge suggesting

12  it is a widespread practice, is there not?  How the women drop

13  off and how the --

14             MS. BROWN:  But women that she's referring to when she

15  writes to the agency are only the ones in her group.  Since

16  there was an investigation here, all this hypothesizing about

17  contacting other agencies and so forth doesn't make any sense.

18  This is what the agency read her phrase similarly situated to

19  mean.  The women who were not promoted were in convertible

20  bonds.

21             THE COURT:  The agency --

22             MS. BROWN:  Because they -- excuse me.  I don't want

23  to interrupt you, your Honor.

24             THE COURT:  Well, I don't understand your last

25  statement that the agency understood her to mean.

1clnceha                        Argument

1          MS. BROWN:  The EEOC understood similarly situated to

2     mean convertible bonds, because the women who she says weren't

3     promoted in the list she gave them were all in convertible

4     bonds.  So they asked Goldman Sachs to explain all of these

5     facts that I read you from the letter that, the investigative

6     request that the EEOC sent to Goldman Sachs was about the women

7     in convertible bonds.  Those were the items in their two

8     information requests to Goldman Sachs, which were the ones

9     behind tab D and tab H.  Those were how they defined similarly

10    situated.  So the notice to the agency was, if there are

11    similarly situated women, here's who they are.

12          It's not just the agency.  We can see about her

13    thinking because what she told the agency to ask for was just

14    the people in the groups where she had worked.  So we have here

15    a definition of similarly situated that is confined to those

16    groups.  That's the only reasonable that to say that the notice

17    to the EEOC and Goldman Sachs consisted of.  It never consisted

18    of anything broader than that.  So that's how the two entities

19    that are critical to this question of notice read that charge.

20          The EEOC in its information requests over years, never

21    broader than those groups, and Goldman Sachs never responded,

22    of course, to anything broader than those groups and would have

23    had no reason to think she was pursuing this on behalf of

24    anyone else.

25          Under the case law the combination of the vague phrase

1    in the charge and the definition that was given to it by the

2    two entities where the policies --

3            THE COURT:  What are you referring to when you say the

4    vague phrase.

5            MS. BROWN:  Similarly situated.  I mean that phrase

6    isn't defined.  So we look to how the EEOC and Goldman Sachs

7    defined it, because those are the entities that had to have

8    notice of what she was claiming and adequate notice of the

9    group that was affected so that they would reasonably

10   conciliate.  Goldman Sachs would have had no idea from this

11   charge and this investigation that every professional in the

12   firm was a group that they had to focus on based on this

13   charge.  It just never, never is in the record, and they

14   concede it basically.

15           MR. KLEIN:  May I respond briefly.

16           THE COURT:  Are you finished?

17           MS. BROWN:  Yes, your Honor.

18           THE COURT:  Yes.

19           MR. KLEIN:  The problem with Ms. Brown's argument is

20   that it's complete conjecture.  We don't know what the EEOC

21   investigation is.  There is nothing in the record from the

22   EEOC.  What we have, what Ms. Brown cites are to requests for

23   information that to my knowledge they never responded to.

24   Moreover, they are focusing --

25           THE COURT:  Requests to whom?

1          MR. KLEIN:  The EEOC submitted requests for

2    information to Goldman Sachs relating to Ms. Chen-Oster's

3    individual claim.  We don't know what happened.  What we have

4    in the record are letters going back and forth.  But that isn't

5    the scope of the investigation.  Nor do we know what the EEOC's

6    intent was in terms of investigating it, because they never

7    concluded the investigation.

8          There was no conciliation because there was never a

9    cause determination.  And, critically, Ms. Brown focuses on

10   Ms. Chen-Oster's charge, but there may have been, in fact,

11   likely were other charges during the same time frame that

12   related to the same types of information.

13         In candor, the EEOC took too long, was inadequately

14   prepared to deal with the issues, the investigation rather

15   relating to those charges and ultimately did not issue a cause

16   determination after five years.

17         Now Ms. Brown is using that as a form of judo, if you

18   like, to essentially say to us too bad.  The EEOC didn't do

19   their job.  Now you are stuck with whatever investigation we

20   think we can surmise from a very limited record.

21         I would submit to your Honor if that is the actual

22   inquiry, and we say it isn't and I think the case law is clear

23   on that, where is the evidence that would support that?  There

24   is no one here, there is nothing in the record from the EEOC on

25   this.  Again, to make a more general point, this would create a

1    literal quagmire.  In essence, every time there is a class

2    action under Title VII, part of the record would be an

3    exhaustive development of the fact record in terms of the scope

4    of the EEOC investigation.

5            To make the point, my client, Ms. Chen-Oster, was

6    interviewed by the EEOC investigator.  That is not in the

7    record.  We don't know what else the investigators did in

8    furtherance of this investigation.  What we have are snippets.

9    That is not enough of a record to make any kind of sense out of

10   and certainly not a grounds to deny the right to bring a class

11   action when the charge itself was explicit, that it was filed

12   on behalf of other similarly situated women.

13           THE COURT:  OK.

14           MS. BROWN:  Your Honor, I hate to prolong this, but I

15   think this is pure sophistry here.  The question is what did

16   Ms. Chen-Oster mean when she said similarly situated in the

17   charge.  That is a matter of looking at what she and her

18   counsel told the agency it meant.

19           In those letters that the agency accepted and gave

20   notice of to Goldman Sachs, she said, My peers are the women in

21   the convertible bonds department.  She said the similarly

22   situated men, using that word, who got paid more than I did

23   were my two colleagues in convertible bonds.  We don't have to

24   get into a quagmire here.

25           THE COURT:  Is there not other language about how the

1    women drop out and --

2            MS. BROWN:  Your Honor, let's look at that women drop

3    out.  It is a reference to the women in convertible bonds.

4    When she talks about the women dropping off and not being

5    promoted, it is a reference to convertible bonds.  She is not

6    talking anything broader than that.  Here we go, the letter

7    under tab G.

8            She talks about females dropped off as they rose in

9    rank.  Then she says, she goes on and talks about analysts to

10   VP.  This data demonstrates there were three point five times

11   hired or promoted to VP than women during this period within

12   the convertible bond sales groups.  And the men had 40 percent

13   more time at the firm.

14           THE COURT:  Then look at the next sentence.

15           MS. BROWN:  Yes.

16           THE COURT:  All the men were employed approximately 40

17   percent more time at the firm.

18           MS. BROWN:  Right.  Those are the men in the

19   convertible bonds department who had more experience at the

20   firm.  Then she goes over in the next one about routine

21   promotions.  She goes right into the seven female VPs in

22   convertible bonds, the 24 male VPs, and she references there

23   they have eight-year greater employment, and the women had more

24   than these years of tenure.  She is talking all about that

25   group of people.

1clnceha                     Argument

1          The headings may be what they are, but the facts --

2     which is what we are looking at here, what did she tell the

3     agency this group was -- she said right there on the next page,

4     We should define my peers as all convertible salespeople both

5     in London as well as in the U.S.  How can we say that the EEOC

6     or Goldman Sachs were put on notice of a definition different

7     from what she herself said.  That is the scope of the similarly

8     situated group here.  Thank you.

9          MR. KLEIN:  30 seconds, your Honor.  I don't mean to

10    prolong this, but I just --

11         THE COURT:  I am looking at the clock.  30 seconds.

12         MR. KLEIN:  I appreciate the indulgence.  Just to make

13    the point, if you look at the same document, your Honor pointed

14    it out, it speaks to the general issue of a large class of

15    similarly situated women, "Females drop off as they rose in

16    ranks.  Men are routinely promoted over women who had

17    comparable or greater experience.  Fewer female VPs remain at

18    Goldman."

19         There are general statements, and then specific

20    illustrations borne by Ms. Chen-Oster's personal experience,

21    which is exactly what you would expect, that the charging party

22    would focus on her own individual circumstance to illustrate a

23    large point.

24         Thank you, your Honor.

25         THE COURT:  I am going to reserve decision.  I

1    appreciate it if counsel would order the transcript of this

2    argument.

3              Decision is reserved.

4              MS. BROWN:  Thank you, your Honor.

5              May it please the Court, we have another motion before

6    your Honor.

7              THE COURT:  What is the other motion?

8              MS. BROWN:  Your Honor, the other motion is our motion

9    to strike the class allegations in the complaint based on the

10   <u>Wal-Mart v. Dukes</u> case.

11             THE COURT:  Right.

12             MS. BROWN:  And to grant summary judgment on the

13   disparate impact claims, because nowhere in the charges are the

14   facts that would challenge a neutral practice.

15             THE COURT:  Have you made that as a formal motion?

16             MS. BROWN:  Yes, your Honor.  It's been on file since

17   the summer.

18             THE COURT:  It has since the summer.  You want to

19   argue it now?

20             MS. BROWN:  Well, if your Honor has not read the

21   pleadings or isn't prepared for it, I would request your

22   indulgence to argue it another day.

23             THE COURT:  Yes.

24             MS. BROWN:  It is a very important motion in our view.

25             THE COURT:  All right.  It's been fully submitted how

1    long?

2            MS. BROWN:  It's been fully submitted, your Honor, I

3    believe it was August, the last brief.  Let me just check.

4            October 11, your Honor.  Time flies fast, but, yes,

5    October 11 was the reply brief in support of our motion.

6            THE COURT:  We will set it down for argument sometime

7    in the near future.

8            MS. BROWN:  Thank you very much.

9            MR. KLEIN:  Thank you, your Honor.

10           THE COURT:  I think what happened is it's probably in

11   a file which is headed Chen-Oster, etc.

12           (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25