**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; LISA PARISI; and SHANNA ORLICH, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | No. 10 Civ. 6950 (LBS) (JCF) |
| -against- | |
| GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
<u>MOTION TO COMPEL DISCOVERY OF DATA AND DOCUMENTS</u>**

**Outten & Golden LLP**
Adam T. Klein
Cyrus E. Dugger
Jennifer L. Liu
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

**Lieff Cabraser Heimann & Bernstein, LLP**
Kelly M. Dermody (admitted *pro hac vice*)
Anne B. Shaver (admitted *pro hac vice*)
Alison M. Stocking (admitted *pro hac vice*)
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000

Rachel Geman
250 Hudson St., 8th Floor
New York, New York 10013
Telephone (212) 355-9500

*Attorneys for Plaintiffs and the Putative Class*

972623.7

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................... 1

II.     PROCEDURAL HISTORY.................................................................................... 2

III.    LEGAL STANDARD.............................................................................................. 5

IV.     ARGUMENT ........................................................................................................... 6

      A.      The Court Should Compel Goldman Sachs To Produce Core
           Personnel Data For The Alleged Class Period............................................ 6

           1.      The Data Sought is Relevant............................................... 6

           2.      Goldman Sachs Cannot Show that the Data is not
                Reasonably Accessible Because of Undue Burden or Cost........... 9

                a.      PeopleSoft - 2004 to Present Database ........................... 10

                b.      PeopleSoft - 2002 to 2004 Database............................... 13

                c.      Compensation Review System ........................................ 14

                 d.      Firmwide Review System - 2003 to the Present.............. 14

                e.      Performance Review Data - 2002 .................................... 16

                f.      MD Selection Database.................................................... 16

            3.      Even if Goldman Sachs Could Establish Burden, Good
                Cause Exists for this Data. ............................................. 18

      B.      The Court Should Compel Goldman Sachs To Produce Documents
           From July 2000 To The Present....................................................... 20

             1.      The Document Discovery is Relevant. ....................................... 20

            2.      Goldman Sachs Cannot Show that the Documents are not
                Reasonably Accessible Because of Undue Burden or Cost......... 21

            3.      Even if Goldman Sachs Could Establish Burden, Good
                Cause Exists for the Documents. ................................................. 23

   V.      CONCLUSION................................................................................................ 23

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Arista Records LLC v. Usenet.com, Inc.*,
   608 F. Supp. 2d 409 (S.D.N.Y. 2009)...................................................................... 18

*Avillan v. Digital Equip. Corp.*,
   No. 91 Civ. 8594, 1994 WL 198771 (S.D.N.Y. May 17, 1994)............................. 9

*Bell v. Lockheed Martin Corp.*,
   270 F.R.D. 186 (D.N.J. 2010)...................................................................... 8, 17, 19

*Caridad v. Metro-N. Commuter R.R.*,
   191 F.3d 283 (2d Cir. 1999)......................................................................... 6

*Cartel Asset Mgmt. v. Ocwen Fin. Corp.*,
   No. 01 Civ. 1644, 2010 WL 502721 (D. Colo. Feb. 8, 2010) ............................... 5

*During v. City Univ. of N.Y.*,
   No. 05 Civ. 6992, 2006 WL 2192843 (S.D.N.Y. Aug. 1, 2006) ......................... 5

*E.E.O.C. v. Morgan Stanley & Co., Inc.*,
   206 F. Supp. 2d 559 (S.D.N.Y. 2002) ...................................................... 19

*Easterling v. Conn. Dept. of Corr.*,
   278 F.R.D. 41 (D. Conn. 2011)................................................................. 8, 19

*EEOC v. Carrols Corp.*,
   215 F.R.D. 46 (N.D.N.Y 2003)................................................................. 8

*Flanagan v. Travelers Ins. Co.*,
   111 F.R.D. 42 (W.D.N.Y. 1986)............................................................... 9

*Fletcher v. Atex, Inc.*,
   156 F.R.D. 45 (S.D.N.Y. 1994) ................................................................. 6

*Gutierrez v. Johnson & Johnson, Inc.*,
   No. 01 Civ. 5302, 2002 U.S. Dist. LEXIS 15418 (D.N.J. Aug. 12, 2002) ......... 7, 8

*Hazelwood Sch. Dist. v. United States*,
   433 U.S. 299 (1977)................................................................................... 7

*Hollander v. Am. Cyanamid Co.*,
   895 F.2d 80 (2d Cir. 1990)......................................................................... 20

*In re "Agent Orange" Prod. Liability Litig.*,
   821 F.2d 139 (2d Cir. 1987)....................................................................... 6

*In re Initial Public Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ........................................................................ 19

*In re Veeco Instruments, Inc. Sec. Lit.*,
   No. 05 Civ. 1595, 2007 WL 983987 (S.D.N.Y. Apr. 2, 2007)........................... 19

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977).................................................................................... 7

972623.7

TABLE OF AUTHORITIES
(continued)

Page

*Lineen v. Metcalf & Eddy, Inc.,*
   No. 96 Civ. 2718, 1997 WL 73763 (S.D.N.Y. Feb. 21, 1997) ............................................ 9

*Loeffler v. Staten Island Univ. Hosp.,*
   582 F.3d 268 (2d Cir. 2009) ............................................................................................. 7

*Mikron Indus., Inc. v. Hurd Windows & Doors, Inc.,*
   No. 07 Civ. 532, 2008 WL 1805727 (W.D. Wash. April 21, 2008) .................................. 10

*O'Bar v. Lowe's Home Ctrs., Inc.,*
   No. 04 Civ. 19, 2007 WL 1299180 (W.D.N.C. May 2, 2007) ........................................... 10

*Rowe Enter., Inc. v. William Morris Agency, Inc.,*
   205 F.R.D. 421 (S.D.N.Y. 2002) ........................................................................... 6, 19, 22

*Runyan v. Sybase, Inc.,*
   No. 93 Civ. 0368, 993 WL 377062 (E.D. Pa. Sept. 16, 1993) ........................................... 9

*Schartz v. Unified Sch. Dist. No. 512,*
   No. 95 Civ. 2491, 1996 WL 741384 (D. Kan. Dec. 18, 1996) ........................................... 5

*Seattle Times Co. v. Rhinehart,*
   467 U.S. 20 (1984) ........................................................................................................... 5

*Smith v. Xerox Corp.,*
   196 F.3d 358 (2d Cir. 1999) ............................................................................................. 7

*Spieker v. Quest Cherokee, LLC,*
   No. 07 Civ. 1225, 2009 WL 2168892 (D. Kan. July 21, 2009) ....................................... 10

*Starbucks Corp. v. ADT Sec. Servs., Inc.,*
   No. 08 Civ. 900, 2009 WL 4730798 (W.D. Wash. April 30, 2009) .............................. 17, 22

*United States v. City of N.Y.,*
   276 F.R.D. 22 (E.D.N.Y. 2011) ........................................................................................ 8

*Vuona v. Merrill Lynch & Co., Inc.,*
   No. 10 Civ. 6529, 2011 WL 5553709 (S.D.N.Y. Nov. 15, 2011) ..................................... 20

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011) ......................................................................................... 2, 3, 7, 19

*Wards Cove Packing Co. v. Atonio,*
   490 U.S. 642 (1989) ......................................................................................................... 9

*Wynne v. McCormick & Schmicks's Seafood Rests., Inc.,*
   No. 06 Civ. 3153, 2006 U.S. Dist. LEXIS 88989 (N.D. Cal. Nov. 28, 2006) ...................... 8

*Zubulake v. UBS Warburg LLC,*
   217 F.R.D. 317 (S.D.N.Y. 2003) ........................................................................... 17, 20, 23

## STATUTES

Civil Rights Act of 1964
   Title VII ................................................................................................................ passim

New York City Human Rights Law ................................................................................ 1, 7, 21

-iii-

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**RULES**

Federal Rules of Civil Procedure
Rule 23 ................................................................................................................. 19
Rule 26(b)(2)(B) ........................................................................................... passim
Rule 26(b)(2)(C) ..................................................................................... 5, 18, 23
Rule 26(b)(2)(C)(ii) ............................................................................................ 18
Rule 26(b)(2)(C)(iii) ........................................................................................... 19
Rule 30(b)(6) ...................................................................................................... 23
Rule 37.2 ............................................................................................... 3, 4, 6, 21

**TREATISES**

11 Sedona Conf. J. 265 (2010) ........................................................................... 19

## I.    <u>INTRODUCTION</u>

Plaintiffs seek to compel the production of the following discovery for Goldman Sachs' revenue-producing divisions only:[1] (1) the readily-accessible computerized compensation, promotion, and performance-evaluation data from 2002 (the start of the class period); and (2) non-data documents responsive to Plaintiffs' Requests for Production from July 7, 2000, including policy and complaint documents.[2]  This discovery is critical for Plaintiffs to develop their class certification record and prove the merits of their gender discrimination claims against Goldman Sachs.

As an initial matter, Goldman Sachs has resisted producing standard class action discovery throughout this litigation, first repeatedly (and unsuccessfully) objecting to discovery corresponding to the alleged class definition on various procedural grounds and now interposing baseless objections about relevance and unsupported assertions about undue burden.  Goldman Sachs' positions are meritless.

Employment discrimination class actions largely rise and fall on a statistical regression analysis of the impact of the challenged practices (here, compensation, promotion, and evaluation for a narrow class of employees).  It has been well-established for decades that full data discovery is necessary to perform this analysis.  Goldman Sachs' assertions of undue burden, which it made for the first time in response to Plaintiffs' letter to the Court on this dispute (16 months into the negotiations over the scope of the data production), are grossly exaggerated.  In fact, Goldman Sachs' own database-related witnesses admit that they failed to

---

[1] The revenue-producing divisions are Securities, Investment Banking, Investment Management, and Merchant Banking.  The class includes all female financial-services employees of Goldman Sachs at the Associate, Vice-President, or Managing Director level.

[2] The class period runs from September 10, 2004 for the claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and July 7, 2002 for claims under the New York City Human Rights Law ("NYCHRL").

investigate standard methods to produce the data more easily and cheaply, including but not limited to exporting the databases without incurring elective redaction expenses and employing extraordinary quality-control measures.  Goldman Sachs has asserted broad and imprecise time estimates, padded with unnecessary steps and including time that requires no human involvement.  There is no credible evidence that the highly relevant personnel data is too burdensome to produce.

Goldman Sachs' position on document discovery is also without basis.  Plaintiffs here seek critical discovery going to the heart of the case, *e.g.*, regarding Goldman Sachs' challenged policies (including their content and how they are developed, implemented, modified, monitored, and interpreted), and complaints by women about problems at the company (among other key categories).  While Goldman Sachs appears to recognize the appropriateness of producing such documents, it refuses to do so for the entire class period, offering only production for a time period starting years *after* the beginning of the class period.  The documents Plaintiffs seek are highly relevant, consistent with the standards in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). Goldman Sachs has shown no undue burden that would arise from producing them.

Plaintiffs have made substantial good-faith efforts to resolve these disputes without judicial assistance.  Although the parties have made progress on other disputes, these two central disputes remain and must be resolved in order for the case to move forward.

## II.    PROCEDURAL HISTORY

Plaintiffs filed their Complaint on September 16, 2010.  Dkt. No. 5.  Since that time, Goldman Sachs has made repeated unsuccessful attempts to dismiss or narrow the claims.[3]  Most

---

[3] *See* Dkt. Nos. 23, 59, 73, 120 (Goldman Sachs' motion to compel arbitration, and the orders denying the motion, denying the motion to reconsider, and Judge Sand's affirmance of the

recently, Goldman Sachs filed two separate motions to dismiss the class allegations in the

Complaint.  First, Goldman Sachs filed a motion to strike the class allegations of named Plaintiff

Cristina Chen-Oster based on an alleged failure to exhaust her class claims at the administrative

level.  Dkt. No. 66.  On September 29, 2011, this Court issued a report and recommendation

denying Goldman Sachs' motion.  Dkt. No. 105.  Judge Sand affirmed.  Dkt. No. 133.

Second, Goldman Sachs filed a motion to strike all of the class allegations in the

Complaint based on the Supreme Court's decision in *Dukes*, 131 S. Ct. 2541, and for partial

summary judgment on Plaintiffs' Title VII disparate impact claim.  Dkt. No. 82.  Plaintiffs filed

their First Amended Complaint on September 19, 2011 (Dkt. No. 104), and Goldman Sachs re-

filed their motion as to the First Amended Complaint.  Dkt. No. 98.  This Court issued a report

and recommendation denying Goldman Sachs' motion to strike and for partial summary

judgment on January 19, 2012.  Dkt. No. 134.  Goldman Sachs objected to the report and

recommendation, and Judge Sand has set oral argument on the motion for May 22, 2012.

In June 2011, the parties submitted Rule 37.2 letters to this Court regarding Plaintiffs'

request for substantially the same class discovery sought in the instant motion to compel.  *See*

Declaration of Anne B. Shaver ("Shaver Decl."), Ex. A (June 13, 2011 Theodore O. Rogers

Letter); *id.*, Ex. B (June 21, 2011 Adam T. Klein Letter).  Notably, Goldman Sachs did not raise

any argument as to burden at that time.  Shaver Decl., Ex. A.

At the time the Court received these letters, Goldman Sachs' motions to limit the scope of

the case were still pending.  Consequently, on October 4, 2011, this Court ordered a partial stay

of class discovery:

---

denial); Second Circuit Dkt. No. 126 (Goldman Sachs' pending appeal of Judge Sand's ruling to
the Second Circuit).

> Until the ability of plaintiffs Parisi and Chen-Oster to assert class claims is finally
> determined, class discovery shall be limited to the period after January 1, 2007, to
> the Securities Division, and to the positions of Associate and Vice President.

Dkt. No. 109.  For purposes of the issues in this motion, Plaintiffs respectfully submit that the

stay is no longer in effect because this Court and Judge Sand have rejected Goldman Sachs'

motions to strike Plaintiff Chen-Oster's class claims.  Dkt. Nos. 105 and 133.[4]

Accordingly, Plaintiffs initiated meet and confer efforts with Goldman Sachs, which were

unsuccessful.  On February 15, 2012, Plaintiffs sent a Rule 37.2 Letter to this Court requesting a

pre-motion conference.  *See* Shaver Decl., Ex. C (February 15, 2012 Adam T. Klein Letter).

Goldman Sachs responded on February 29, 2012, asserting for the first time that the data

discovery sought by Plaintiffs is not reasonably accessible because of undue burden.  *See* Shaver

Decl., Ex. D (February 29, 2012 Barbara B. Brown Letter).  Plaintiffs sent a reply letter on

March 7, 2012, noting among other things that Goldman Sachs' cost and burden estimates were

unsupported.  *See* Shaver Decl., Ex. E (March 7, 2012 Adam T. Klein Letter).  Goldman Sachs

replied with a letter to this Court on April 3, 2012, attaching the affidavits of two Vice Presidents

purporting to have "personal knowledge" of Goldman Sachs' database systems, in support of

their February 29, 2012 letter.  *See* Shaver Decl., Ex. F (April 3, 2012 Barbara B. Brown Letter,

with Exhibit A (Affidavit of Cathy Obradovich) ("Obradovich Affidavit") and Exhibit B

(Affidavit of Ankur Pathak ("Pathak Affidavit"))).

The parties met in chambers for a pre-motion conference on April 4, 2012, whereupon

the Court ordered Plaintiffs to file a motion to compel and permitted Plaintiffs to depose the

Goldman Sachs affiants.  The depositions occurred on April 18 and 19, 2012, and this motion

---

[4] While Plaintiff Parisi's ability to prosecute her claims remains on appeal, discovery on the
remaining Plaintiffs' claims is now ripe.

follows.  *See* Shaver Decl., Ex. G (Deposition Transcript of Cathy Obradovich ("Obradovich

Dep.")); Ex. H, (Deposition Transcript of Ankur Pathak ("Pathak Dep.")).

## III.    <u>LEGAL STANDARD</u>

Plaintiffs bring this motion pursuant to Federal Rule of Civil Procedure 26(b), which

provides that "the Court may order discovery of any matter relevant to the subject matter

involved in the action."  On a motion to compel discovery, "the party from whom the discovery

is sought must show that the information is not reasonably accessible because of undue burden or

cost.  If that showing is made, the court may nonetheless order discovery from such sources if

the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C)."  Fed. R.

Civ. P. 26(b)(2)(B).

In resolving this motion "[t]he trial court is in the best position to weigh fairly the

competing needs and interests of parties affected by discovery" and "Rule 26 confers broad

discretion [on the Court] to weigh discovery matters."  *During v. City Univ. of N.Y.*, No. 05 Civ.

6992, 2006 WL 2192843, at *4 (S.D.N.Y. Aug. 1, 2006) (quotations omitted) (quoting *Seattle

Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984)).

The analysis proceeds in three stages.  First, Plaintiffs must show that the discovery

sought is relevant.  Second, Goldman Sachs must show that the discovery is not reasonably

accessible because of undue burden or cost.  If, and only if, Goldman Sachs meets its burden on

the second step, Plaintiffs may still prevail if they can show good cause for the discovery.  Fed.

R. Civ. P. 26(b)(2)(B).

"The discovery process necessarily imposes burdens on a responding party."  *Cartel

Asset Mgmt. v. Ocwen Fin. Corp.*, No. 01 Civ. 1644, 2010 WL 502721, at *10 (D. Colo. Feb. 8,

2010); *Schartz v. Unified Sch. Dist. No. 512,* No. 95 Civ. 2491, 1996 WL 741384, *2 (D. Kan.

Dec. 18, 1996) ("[d]iscovery, by its very nature, is inherently burdensome to some extent" and

the operative question "is whether the discovery *unduly burdens*.") (emphasis added).  However,

the party seeking to invoke the protections of Rule 26(b)(2)(B) bears the burden of persuasion.

*Fletcher v. Atex, Inc.,* 156 F.R.D. 45, 54 (S.D.N.Y. 1994) (citing *In re "Agent Orange" Prod.*

*Liability Litig.,* 821 F.2d 139, 145 (2d Cir. 1987) ("[I]f a party resists production on the basis of

claimed undue burden, it must establish the factual basis for the assertion through competent

evidence.").

IV.    **ARGUMENT**

As Plaintiffs argued in their Rule 37.2 letters to this Court, the scope of class discovery -

both data and documents - should cover the four revenue-generating divisions in the alleged class

and should span from 2002 (the start of the class period) for the data production and from July 7,

2000 for the non-email based document discovery.[5]  *See* Shaver Decl., Ex. C, at 3-8.  Documents

and data from which Plaintiffs may derive statistical and other evidence regarding workforce

composition, promotion, and compensation are plainly necessary for certification of the

nationwide class alleged and to prove the merits of Plaintiffs' claims.

A.    **The Court Should Compel Goldman Sachs To Produce Core Personnel Data**
       **For The Alleged Class Period.**

1.    **The Data Sought is Relevant.**

Statistical analysis based on personnel data is not only relevant, but critical, to both class

certification and merits in a Title VII class action.  *Caridad v. Metro-N. Commuter R.R.*,

191 F.3d 283, 292 (2d Cir. 1999) ("[S]ignificant statistical disparities are relevant to determining

---

[5] The parties have already committed to a "best practices" meet and confer to identify
appropriate email custodians and "sampling" word searches in order to focus email discovery on
those areas most likely to lead to relevant material and to minimize the burden on Goldman
Sachs.  *See, e.g.*, *Rowe Enter., Inc. v. William Morris Agency, Inc.,* 205 F.R.D. 421,
430 (S.D.N.Y. 2002) (Francis, J.) (recognizing value of sampling where large volumes of
marginally relevant, cumulative email traffic for a small percentage of useful discovery).  Highly
relevant personnel databases are distinct from discovery of the more marginally relevant emails
among custodians.  No disputes solely about email-focused discovery have yet arisen here.

whether the challenged employment practice has a class-wide impact.") (*abrogated on other grounds by Dukes*, 131 S. Ct. 2541); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977) ("Our cases make it unmistakably clear that [s]tatistical analyses have served and will continue to serve an important role in cases in which the existence of discrimination is a disputed issue.") (quotation marks and citations omitted); *id.* at 340, n.20 ("In many cases, the only available avenue of proof is the use of racial statistics . . . .") (internal quotation marks omitted); *see also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.") (citing *Teamsters*, 431 U.S. at 339).[6]

The statistical analysis in a Title VII class action requires data for the entire putative class. By definition, none of it is duplicative. The data is relevant *in the aggregate* to perform the applicable analyses to show patterns of statistically significant shortfalls or effects of challenged policies. *See, e.g., Gutierrez v. Johnson & Johnson, Inc.*, No. 01 Civ. 5302, 2002 U.S. Dist. LEXIS 15418, *13-14 (D.N.J. Aug. 12, 2002) (finding that "often a pattern of discrimination will only be apparent when enough data is analyzed and that because of the concept of statistical power, 'disaggregating' of data by business unit, type of job, or other fragments may serve only to mask violations of the law that actually exist," and rejecting defendant's attempt to "artificially limit the data available to plaintiffs" because broader discovery "will present a more complete and reliable picture of the effects of J & J's practices."); *Smith v. Xerox Corp.,* 196 F.3d 358, 368-69 (2d Cir. 1999) (court cannot rely on "statistics based on a sub-set of work-groups," because "[i]n any large population a subset can be chosen that will

---

[6] This discovery is also relevant to Plaintiffs' claims under the New York City Human Rights Law. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) ("Interpretations of New York state or federal statutes [establish] a floor below which the City's Human Rights law cannot fall.")

make it appear as though the complained of practice produced a disparate impact. Yet, when the entire group is analyzed any observed differential may disappear.") (*overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006)).

The employment discrimination cases in which courts have required the production of personnel data, or more commonly that reflect that defendants have produced such data (as defendants do not usually dispute producing standard personnel data), are legion. *See e.g., Easterling v. Conn. Dep't. of Corr.*, 278 F.R.D. 41, 46 (D. Conn. 2011) ("liability in [pattern-or-practice disparate treatment and disparate impact] actions is established via *class-wide*, statistical proof.") (citing *United States v. City of N.Y.,* 276 F.R.D. 22, 35 (E.D.N.Y. 2011)) (emphasis added); *Gutierrez*, 2002 U.S. Dist. LEXIS 15418 at *10-11 ("In employment discrimination cases, Courts generally grant wide latitude to a plaintiff or plaintiffs who seek to conduct company wide discovery. The relevant issue for many Courts in considering whether to allow company-wide or otherwise expanded discovery is the extent to which the case involves a common employment policy or practice."); *Bell v. Lockheed Martin Corp.*, 270 F.R.D. 186, 191 (D.N.J. 2010) (ordering company-wide data production and noting that "[i]n the context of Title VII cases, 'courts have been cautioned not to impose unnecessary limitations on discovery . . .'") (citations omitted); *Wynne v. McCormick & Schmicks's Seafood Rests., Inc.*, No. 06 Civ. 3153, 2006 U.S. Dist. LEXIS 88989, *4 (N.D. Cal. Nov. 28, 2006) (granting motion to compel company-wide human resources data in Title VII case, and holding that "the court is aware of no[authority] for the proposition that defendants can dictate the means of discovery that the plaintiffs must use."); *EEOC v. Carrols Corp.*, 215 F.R.D. 46, 54-55 (N.D.N.Y 2003) (rejecting defendant's argument that its production of several years of its human resources database was sufficient to allow plaintiff to prosecute its claims, and ordering defendant to produce "the

complete data" sought by plaintiffs); *Lineen v. Metcalf & Eddy, Inc.,* No. 96 Civ. 2718, 1997 WL

73763, *4 (S.D.N.Y. Feb. 21, 1997) (ordering production of defendant's parent and affiliate

company termination records and noting "[t]he Supreme Court has instructed that plaintiffs in

employment discrimination lawsuits may employ 'liberal civil discovery rules' to obtain 'broad

access to employer's records' in order to generate a statistical analysis to show the disparate

impact of an employer's personnel policies.") (citing *Wards Cove Packing Co. v. Atonio*, 490

U.S. 642, 657 (1989)); *Avillan v. Digital Equip. Corp.,* No. 91 Civ. 8594, 1994 WL 198771, *3-6

(S.D.N.Y. May 17, 1994) (rejecting defendant's attempt to limit discovery to plaintiff's work

unit and ordering production of employee records from all Manhattan offices); *Flanagan v.

Travelers Ins. Co.,* 111 F.R.D. 42, 45-47 (W.D.N.Y. 1986) (rejecting defendant's attempt to limit

the scope of discovery to the plaintiff's work unit and job classification); *Runyan v. Sybase, Inc.,*

No. 93 Civ. 0368, 993 WL 377062, *2-3 (E.D. Pa. Sept. 16, 1993) (ordering discovery of

statistical data regarding employees outside the plaintiff's work unit).  Such authority should be

followed here.

**2.    Goldman Sachs Cannot Show that the Data is not Reasonably Accessible Because of Undue Burden or Cost.**

Goldman Sachs' arguments as to why the data is not reasonably accessible due to undue

burden do not hold up in light of the deposition testimony of their affiants.  Generally, the

witnesses did not have personal knowledge of the assertions in the affidavits,[7] and had spent

little time consulting those with the specific relevant knowledge in creating their affidavits or in

preparing to testify as to the accuracy of their contents.  *See* Pathak Dep. at 7:9-13 (testifying that

he spent forty minutes talking to colleagues to prepare his affidavit) and 61:16-19, 89:9-13

---

[7] Neither Ms. Obradovich nor Mr. Pathak are programmers or themselves perform data extraction.  *See* Obradovich Dep. at 72:18-21, 74:7-9, 140:9-142:22; Pathak Dep. at 49:18-50:3.

(testifying that he did not obtain, or seek to obtain, breakdowns on the broad time estimates in his affidavit); Obradovich Dep. at 21:21-22:2 (did not speak with the vendor that houses the actual data); *id.* at 53:9-14 (did not ask whether the employee who came up with the time estimates for PeopleSoft data extractions had run any test or sample queries to inform his estimates). As to each specific database at issue, the testimony shows that Goldman Sachs has provided unreliable time and cost estimates, and has not investigated whether less burdensome alternative methods exist. *See* §§ IV.A.2.a.-f., *infra*. Accordingly, Goldman Sachs' undue burden argument should be given little credence. *See O'Bar v. Lowe's Home Ctrs., Inc.*, No. 04 Civ. 19, 2007 WL 1299180, *5 n. 6 (W.D.N.C. May 2, 2007) ("party asserting that [electronically stored information] is not reasonably accessible should be prepared to specify *facts that support its contention*") (emphasis in original); *Spieker v. Quest Cherokee, LLC,* No. 07 Civ. 1225, 2009 WL 2168892, at *4 (D. Kan. July 21, 2009) ("[C]ourt . . . not persuaded that defendant has carried its burden of showing that the discovery is not reasonably accessible because of undue burden or cost" as "defendant's cost estimates are greatly exaggerated in an attempt to fall within the parameters of Rule 26(b)(2)(B).") (internal quotation marks omitted); *Mikron Indus., Inc. v. Hurd Windows & Doors, Inc.*, No. 07 Civ. 532, 2008 WL 1805727, at *2 (W.D. Wash. April 21, 2008) ("[D]efendants offer little evidence beyond a cost estimate and conclusory characterizations of their ESI as 'inaccessible.'").

###### a.    PeopleSoft - 2004 to Present Database

Goldman Sachs estimates that it would take between 90 to 150 hours to extract the data Plaintiffs have requested from the current PeopleSoft database. Obradovich Affidavit, ¶ 5. However, this estimate does not survive under scrutiny. First, the affidavit attributes a large part of the purported burden of producing PeopleSoft data to the fact that "Goldman Sachs has just two key staff members who have the knowledge and skills necessary to extract data from the

PeopleSoft database." *Id.*, ¶ 3.  However, Goldman Sachs failed to disclose that the current

version of the database is housed with a large vendor, Aon Hewitt, which would be the principle

source of information about extraction of data.[8]  Obradovich Dep. at 12:2-15 ("We actually

outsourced our HR service center to Hewitt.  And are now using their PeopleSoft software.").

Even though Ms. Obradovich admitted that Aon Hewitt employees have more familiarity with

Goldman's current PeopleSoft database, and expertise in PeopleSoft in general, neither she nor

anyone else contacted Aon Hewitt to inquire about having them extract this data.  *Id.* at 21:21-

22:2; 59:24-61:14.  When asked why not, she stated it was because Goldman has in-house

employees trained to do the data extraction; notably, she named five separate individuals, not just

the two on which she based her original time estimate.[9]  *Id.* at 22:3-15.

Second, the time estimate is based on a methodology for data extraction that a Goldman

employee, Venkat Yerra, uses in his regular course of duties.  Obradovich Dep. at 61:2-9.  This

process, as described by Ms. Obradovich, involves manually dragging and dropping data fields

in a reporting tool called Query Studio.  *Id.* at 48:13-24.  However, neither Ms. Obradovich nor

anyone else she interviewed in preparation for her affidavit or deposition had considered whether

it would be possible to automate the population of the desired data fields and bypass the end-user

drag and drop function, simply because "that's not a familiar process for us."  *Id.* at 59:10-19.

---

[8] Aon Hewitt employs 62,000 people working in more than 120 countries.
http://www.aon.com/about-aon/company-overview.jsp (last viewed on May 2, 2012).

[9] Similarly, her affidavit states that it would be "entirely unworkable" for Goldman to hire
temporary consultants to assist with this project due to the complexity of the database, and
estimates that it would cost at least $80,000 to do so.  Obradovich Affidavit, ¶¶ 4, 16.  However,
in her deposition, she testified that Goldman already hires consultants to work with the
PeopleSoft database.  Obradovich Dep. at 20:9-22.  Moreover, the cost estimate was based on the
rates of a *specialty* temporary agency, but she did not ask for an estimate from Aon Hewitt, who
she admitted has consultants already familiar with this specific database.  *Id.* at 97:11-98:3; 99:8-
22.

Similarly, neither she nor her staff bothered to ask the PeopleSoft experts at Aon Hewitt whether they had a more efficient way to extract the data:

> Q: Did you make any effort to determine whether it would be a more expeditious way to achieve the same result, such as a custom script or exporting data as an example?
>
> A: No. I reached out to [Goldman Sachs employee] Venkat [Yerra] and asked him how he would handle this based on the way he works with this data.
>
> Q: Do you know whether Venkat spoke to anyone at Hewitt or consulted with a PeopleSoft expert in response to your request for information?
>
> A: He did not.

*Id*. at 61:2-61:14. Thus, the 90 to 150 hour estimate for data extraction is based on only one of many possible methods, does not account for the likelihood that Aon Hewitt could contribute to the process in a way that substantially alleviates the cost and burden on Goldman, and is overall totally uninformed and unreliable. Moreover, Ms. Obradovich acknowledged that the estimate includes computer processing time ("run time"), during which no human work is required. *Id*. at 91:10-12. She could not say how much of the estimated 90 to 150 hour data extraction time would constitute computer-only run time. *Id*. at 91:13-92:10.

Finally, Goldman Sachs estimates that it would have to spend another 40 to 80 hours to perform a quality check of the data.[10] Obradovich Affidavit, ¶ 7. Ms. Obradovich testified that this estimate is entirely allocated to "bug fixes" in the possibly unnecessary Query Studio reporting tool. Obradovich Dep. at 68:2-14; 70:15-23; 93:20-94:4. However, she admitted that she had not had any personal experience with bug fixes in Query Studio. *Id*., 67:21-25. She also

---

[10] Plaintiffs do not insist, *and applicable analysis in no way requires*, that the data sets are free from any and all errors. Errors may be negligible, may pertain to irrelevant fields, and/or may have no impact on the analysis performed. The parties can most productively address particular issues with data - if they arise at all - through efficient, informal discussions following the initial production. "Quality control" is not a monolithic, all-or-nothing concept in data analysis (or in any other context), and the appropriate level is tied to the needs of a particular project.

did not speak with anybody at Aon Hewitt about bug fixes or quality control methods, even though part of the process would involve Aon Hewitt as the "source system." *Id*. at 68:16-19; 69:17-70:7. Thus, the estimate for the quality control step is similarly uninformed and unreliable.

### b.    PeopleSoft - 2002 to 2004 Database

Goldman Sachs' assertions that pulling data from the older PeopleSoft database would be even more difficult and burdensome than the current database are likewise unsupported by the evidence. Goldman Sachs' first stated reason - that the old version has less organization data - suggests that it would in fact be less burdensome to produce; in any event, Goldman Sachs does not explain why this would make it harder. Obradovich Affidavit, ¶ 8. Next, Goldman Sachs states that it did not migrate information regarding former employees to the new system. *Id*. But as Ms. Obradovich clarified, Goldman <u>did</u> migrate the data of employees who were active as of the date of the transition. Obradovich Dep. at 37:15-38:5. Therefore, it is possible that the only data that would be necessary to pull from the older system is that of employees who were active as of 2002, but terminated prior to September 2004. *Id*. at 42:17-43:10. Finally, Goldman Sachs asserts that the data in the old system is not stored in the same format as the new system, and estimates that it would take 160 to 240 hours of work to make the two compatible. Obradovich Affidavit, ¶ 8. Plaintiffs would readily accept a general data export of the period 2002 to 2004 without this purportedly time intensive re-formatting, allowing our own experts to make sense of the old data vis a vis the new data as needed to perform an analysis. In fact, Plaintiffs would prefer to have the "old" data in its native version, as Ms. Obradovich was unable to articulate the differences between the information contained in the databases. Obradovich Dep. at 42:7-14 ("Those are specifics I do not know."). Unfortunately, Ms. Obradovich did not know whether either of the PeopleSoft databases could be simply downloaded or exported in full because she

failed to consult with anyone who had actual first-hand knowledge of that answer. *Id*. at 55:18-20; 56:16-20; 79:17-80:16.

### c.    Compensation Review System

Goldman Sachs estimates that it would take a minimum of 40 hours to extract the requested data from the CRS database, and another 240 hours to quality check this data. Obradovich Affidavit, ¶¶ 17-18. However, Ms. Obradovich could not justify either of these estimates. As to the time for data extraction, she did not know what steps the 40 hours was intended to cover, nor whether it included computer-only run time. Obradovich Dep. at 105:11-106:3. Similarly, she could not explain the 240 hour estimate for the quality check. *Id*. at 143:5-19. She explained that it was someone else's estimate, and admitted that she has not personally queried or tested the database. *Id*. at 140:11-22; 142:8-22.

In addition, Ms. Obradovich testified that her team extracts data from CRS at the end of each year and saves it in a "compensation payment file." Obradovich Dep. at 110:3-9. Though she did not know whether this file identifies gender, it does contain unique employee identifiers that could be matched with PeopleSoft data identifying gender. *Id.* at 111:4-21. If need be, Ms. Obradovich estimated that it would take only four hours to match this gender information to the compensation data. *Id.* at 113:4-22. The net effect of this testimony demonstrates that Ms. Obradovich's estimates are essentially worst-case scenarios, and that less burdensome alternatives to providing Plaintiffs with the requested data exist, but Goldman Sachs failed to explore them.

### d.    Firmwide Review System - 2003 to the Present

Mr. Pathak's testimony on the FRS database was dominated by what he did not know, including: (1) basic information about the makeup of the database (Pathak Dep. at 27:5-29:2, 31:16-32:6); (2) whether Goldman could simply export the entire database or how long that

would take (*id.* at 51:5-53:6; 63:10-12); (3) how long it would take to write the relevant code to perform the extraction as requested (*id.*. at 49:18-50:22); (4) whether the estimates he presented in his affidavit included run time (*id.* at 54:15-21); (5) if the data was on or could be placed on a backup file (*id.* at 62:10-25); (6) whether there was a year-end compilation created for the data (*id.* at 63:18-64:06); and (7) whether his estimates on quality control work involved exclusive dedication to the task or incorporated the additional unrelated tasks Goldman personnel were generally expected to do at the same time on other matters (*id.* at 64:22-65:14).  This testimony is clearly an insufficient basis to support a finding of undue burden.

In addition, Mr. Pathak's estimates are unreliable because they are not based on his personal knowledge.  *See* Pathak Dep. at 49:18-51:12.  As a result, he could not explain the breakdown of the time required for the separate steps identified in his affidavit.  *Id*. at 52:3-53:6, 54:15-55:19, 56:13-22, 89:9-19.  Mr. Pathak also conceded that Goldman Sachs has previously done extractions at the divisional level, *id*. at 44:5-10, and could not represent that the entire data file could not be pulled or otherwise simply provided to Plaintiffs.  *Id.*. at 51:05-52:13; 63:10-12.

Notably, Goldman Sachs' estimate that it would require five days to quality check this data is imprecise and inflated.  Pathak Affidavit, ¶ 5.  Mr. Pathak testified that a number of the quality control measures described in his affidavit are duplicative of the data extraction process and do not add anything to the end result.  Pathak Dep. at 68:18-69:16; 105:2-23.  He estimated that the duplicative work accounted for one-half to a full day of the five day estimate; in addition, the "sample check," which he characterized as "cosmetic," accounted for another several hours on top of that.  *Id*. at 68:18-69:16.  Moreover, he was unsure whether the calculations assumed employees would be completely dedicated to the task or simultaneously doing other work.  *Id*. at 56:13-22.  Finally, some of the steps described can just as easily be

performed by Plaintiffs.  For example, Mr. Pathak testified that one of the quality control measures his team performs on the FRS database is to compare the average review scores to a hard copy document that Goldman already maintains with the same information.  *Id.* at 72:18-25.

### e.  Performance Review Data - 2002

Goldman Sachs estimates that it would take four additional days of work to extract the 2002 performance review data, but this estimate is not reliable.  Pathak Affidavit, ¶ 8.  Mr. Pathak did not have any personal knowledge to inform this estimate, nor had he taken steps to investigate it.  Pathak Dep. at 79:24-80:22; 83:22-84:15.  For example, he was unable to explain how the migration of 2002 data to the new FRS system occurred and what information was actually migrated.  *Id.* at 28:16-29:2.  Nor did he know whether any Goldman personnel had surveyed the 2002 data to determine what was available.  *Id.* at 40:14-41:25.  Finally, Mr. Pathak did not know where the 2002 data was physically stored or who would have that knowledge.  *Id.* at 43:08-43:17.

### f.  MD Selection Database

Mr. Pathak's testimony concerning the MD Selection System was similarly dominated by what he did *not* know, including (1) what general types of data fields existed in the system (Pathak Dep. at 22:24-23:04); (2) the type of database involved (*id.* at 87:12-15); (3) how many employees (or data points) were covered by Plaintiffs' requests (*id.* at 90:12-23, 91:11-20);[11] (4) the breakdown of the time estimate set forth in his affidavit (*id.* at 89:09-13); and (5) whether the estimates were based on exclusive dedication to the task or incorporated other unrelated tasks the IT staff would simultaneously be expected to carry out.  *Id.* at 89:09-19.  This uninformed

---

[11] Notably, Mr. Pathak testified that the time estimates were unaffected by size of the requests. Pathak Dep. at 92:23-94:05.

testimony demonstrates the information was not based on his personal knowledge, and is, in any event, insufficient to support a finding of undue burden.

Additionally, Mr. Pathak and his team did not know how to query this database, and he acknowledged that the purported quality control he claimed to be necessary did not require familiarity with the database or the data extraction itself.  Pathak Dep. at 128:16-129:6; 134:20-24.

In summary, Plaintiffs respectfully submit that Goldman Sachs has not met its burden to show that the requested data is not reasonably accessible because of undue burden or cost as to any of the four databases presently in use or their predecessor databases or other places where the information was electronically stored.  Other courts have declined to find an undue burden and have ordered class-wide data discovery under similar circumstances.  *See Bell*, 270 F.R.D. at 193 ("Defendant's assertion that responding to Plaintiff's discovery requests would impose an undue burden on Defendant . . .[and that] . . . Defendant purportedly spent more than $1.6 million in responding to discovery requests" did not "excuse Defendant from producing any further discovery.");  *Zubulake v. UBS Warburg LLC,* 217 F.R.D. 317 (S.D.N.Y. 2003) (holding, after evaluation of defendant's computer systems and burden arguments, that "Zubulake is entitled to discovery of the requested e-mails so long as they are relevant to her claims, which they clearly are," and the only question was whether cost-shifting was appropriate); *Starbucks Corp. v. ADT Sec. Servs., Inc.*, No. 08 Civ. 900, 2009 WL 4730798, *4-6 (W.D. Wash. April 30, 2009) (rejecting testimony that use of vendor to produce emails would be impossible and that production of electronic discovery would take 284 days and cost up to $834,285, and ordering production of electronic discovery).  However, should the Court disagree, Plaintiffs can nonetheless demonstrate good cause for the discovery.

**3.**    **Even if Goldman Sachs Could Establish Burden, Good Cause Exists for this Data.**

Even where a party is able to show that information requested in discovery is not reasonably accessible because of undue burden or cost, a court may nonetheless order discovery from such sources if the requesting party shows good cause. *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 432 n.33 (S.D.N.Y. 2009); Rule 26(b)(2)(B). The factors the Court must consider regarding good cause include whether:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering:
>
> > (a)  the needs of the case;
> > (b)  the amount in controversy
> > (c)  the parties' resources
> > (d)  the importance of the issues at stake in the action, and
> > (e)  the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).

Plaintiffs readily establish good cause in light of these factors. First, the discovery sought is not unreasonably cumulative or duplicative; in fact, it is entirely unique. Similarly, not only can this data not "be obtained from some other source that is more convenient, less burdensome, or less expensive," it cannot be obtained from *any* other source other than Goldman Sachs' electronic systems.

Second, Plaintiffs have not had "ample opportunity to obtain the information by discovery in the action." *See* Rule 26(b)(2)(C)(ii). Instead, Goldman Sachs has unilaterally withheld the majority of class discovery.

Third, the benefits of the data for Plaintiffs' claims (and Goldman Sachs' ability to disprove them), as well as to the resolution of class issues in this matter, significantly eclipse any burden on Goldman Sachs. Plaintiffs' ability to satisfy Rule 23 and to prove the merits of their claims will largely rise or fall based on the information provided by Goldman Sachs' data. *See Easterling*, 278 F.R.D. at 46; *EEOC v. Morgan Stanley & Co., Inc.*, 206 F. Supp. 2d 559, 563 (S.D.N.Y. 2002). As this Court recognized at the April 4, 2012 conference, this is especially true after the Supreme Court's decision in *Dukes*, 131 S. Ct. 2541. *See also In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) (allowing courts to look at the merits to resolve a disputed Rule 23 issue in determining class certification and underscoring the importance of presenting a robust record at class certification). In fact, one of the issues raised in *Dukes* was the reliability of Plaintiffs' statistical analysis in the context of satisfying the requirements of Rule 23. *Dukes*, 131 S. Ct. at 2555. Thus, "the importance of the discovery in resolving the issues" cannot be overstated. Rule 26(b)(2)(C)(iii).[12]

Under Rule 26(b)(2)(B), "a court may order a party to engage in a burdensome and costly production if the information sought is extremely relevant to the case and is unavailable elsewhere," as is the case here. *See* 11 Sedona Conf. J. 265, 294 (2010). Courts do not hesitate to find good cause when such a showing has been made. *See Bell,* 270 F.R.D. at 192-93 (compelling discovery of statistical information in pattern-or-practice case where such information was "necessary to determine whether promotion disparities exist."); *id. at* 194 (cost of discovery by itself did not excuse defendant from producing it); *In re Veeco Instruments, Inc. Sec. Lit.,* No. 05 Civ. 1595, 2007 WL 983987, *1 (S.D.N.Y. Apr. 2, 2007) (finding good cause

---

[12] Both parties benefit from access to this data. *See Rowe Enter., Inc.,* 205 F.R.D. at 431 (costs to defendant for production would be appropriate if "there were a universe of data that either party might be able to use to support its position: *for example, hiring or promotion statistics in an employment discrimination case*") (emphasis added).

where electronic discovery "could constitute important relevant evidence and [is] reasonably calculated to lead to admissible evidence" and "[is not] reasonably available from any other easily accessed sources").

As to the remaining sub-factors, Plaintiffs note that Goldman Sachs' resources clearly outmatch their own.  Moreover, the total amount in controversy, while currently unknown, is at least tens of millions of dollars and potentially substantially more.  *See Zubulake*, 216 F.R.D. at 288 ("Assuming this to be a multi-million dollar case, the cost of restoration is surely not 'significantly disproportionate' to the projected value of this case.").  Plaintiffs have met their burden.

### B.    The Court Should Compel Goldman Sachs To Produce Documents From July 2000 To The Present.

#### 1.    The Document Discovery is Relevant.

Among other key categories, Plaintiffs seek documents related to Goldman Sachs' promotion, compensation, and evaluation systems, as well as complaint-related documents concerning female employees, which are at the heart of this case.  In addition to the written policies and complaints, Plaintiffs seek information regarding how and why the challenged policies have been developed, implemented, and interpreted.  This discovery is directly relevant to Plaintiffs' allegations that these uniform policies and practices discriminate against female professionals.  *See Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir. 1990) ("Evidence relating to company-wide practices may reveal patterns of discrimination against a group of employees."); *Vuona v. Merrill Lynch & Co., Inc.*, No. 10 Civ. 6529, 2011 WL 5553709, at *3 (S.D.N.Y. Nov. 15, 2011) (in employment discrimination cases courts favor "liberal civil discovery rules" that provide plaintiffs "broad access to employers' records").  Because of the

foundational nature of the challenged policies and complaints to this litigation, Plaintiffs seek

document information for the period two years prior to the Class period and forward.

> 2. **Goldman Sachs Cannot Show that the Documents are not Reasonably Accessible Because of Undue Burden or Cost.**

Goldman Sachs' Rule 37.2 letter proposed production of documents from 2005 to the

present, a year after the start of the Title VII class period and three full years *after* the start of the

NYCHRL class period, even though, on information and belief, all or virtually all of the class is

covered by the New York City law. *See* Shaver Decl., Ex. D. at 9-10.[13]  Goldman Sachs has

shown no undue burden unique to the pre-2005 time period.

In addition, Goldman Sachs' two proffered reasons why production of class-wide

documents for the entire class period would be unduly burdensome are entirely unpersuasive.

First, Goldman Sachs asserts that it will have to consult with a large number of custodians to find

responsive documents, and that broadening the temporal scope of discovery increases the

number of custodians. *Id.*, p.6.  Goldman Sachs estimates that across four revenue divisions,

over 200 individuals should be on the custodian list. *Id.* at 6, fn. 8.  This estimate is entirely

without support, and ignores the fact that the parties have not yet negotiated a custodian list (as

Goldman is even now still producing basic organizational charts and employee information).

Moreover, the number says nothing about burden; for instance, the personnel involved in policy

development and drafting, or charged with collecting and investigating complaints, is likely very

small.  Goldman Sachs may send a mass email to 200 custodians and have an actual conversation

with just 20 or fewer.  Goldman Sachs' argument also assumes that there were entirely different

---

[13] With the scope of the EEOC charge having been resolved, Goldman Sachs appears not to contest Plaintiffs' request for document production from all four revenue generating divisions, but instead to focus on the temporal scope.  *See* Shaver Decl., Ex. D at 4.

custodians from before and after the arbitrary date of 2005, another very unlikely assertion without any support.

Second, Goldman Sachs argues that responding to Plaintiffs' document requests would be unduly burdensome because Goldman Sachs' systems do not purge emails.  Shaver Decl., Ex. D at 7.  As an initial matter, this argument seems to assume a dispute that has not yet arisen, as the parties are still discussing email production and the real issue in dispute is core policy and complaint-type documents relevant to the claims in this case.[14]  Regardless, Goldman Sachs' reference to the large size of named Plaintiffs Chen-Oster and Orlich's email boxes as an illustration of the burden here is misleading.  The magnitude of those email productions reflects the total size of the email boxes, and not the narrower result after search terms (still in development) have been applied.  In addition, the fact that Goldman Sachs' systems do not purge emails may weigh against burden, since every email "has been maintained in a central journaling system (not on backup tapes) since 2003."  *Id*.  Accordingly, Goldman Sachs will not have the added expense and burden of searching backup tapes, since they can simply give their vendor access to the centralized system.  Moreover, in recognition of the burden of searching backup tapes for the pre-2003 period, Plaintiffs have already agreed to limit their request for email communications to 2003 forward, except for certain key custodians.

Given appropriate custodians and the use of either search terms or predictive coding, the burden to Goldman Sachs will be entirely reasonable, and there is no reason for an arbitrary 2005 cutoff that would severely prejudice Plaintiffs' ability to prove their claims for the class period.

---

[14] Many of the documents may not require email searching at all, such as those stored in shared drives or other centralized locations, including, *e.g.*, agendas or documents provided or created by those centralized personnel with authority to update the policies or monitor their implementation, complaints, and others.  Goldman Sachs has no basis to refuse to produce such documents on the grounds of its objection to email searches.

It is "difficult to [believe] that the ESI sought in this case is 'not reasonably accessible' in light of the fact that the [systems at issue continue] to be used by defendant's personnel." *Starbucks Corp.*, 2009 WL 4730798, at *6; *cf. Rowe,* 205 F.R.D. at 430 (noting "if a party maintains electronic data for the purpose of utilizing it in connection with current activities, it may be expected to respond to discovery requests at its own expense . . . the guiding principle is that "information which is stored, used, or transmitted in new forms should be available through discovery with the same openness as traditional forms.") (internal quotation marks omitted); *Zubulake,* 217 F.R.D. at 322 (noting *Rowe* and also observing "a good deal of accessible data may be retained, though not in the ordinary course of business" and where data is "inadvertently retained" "*as long as the data is accessible, it must be produced*") (emphasis added).

Plaintiffs will continue to negotiate in good faith over particular categories of documents, and Goldman Sachs can still raise arguments as to particular categories as they become ripe, but Goldman Sachs has not shown that the fact that a document is from pre-2005 in itself makes its production burdensome.

### 3.    Even if Goldman Sachs Could Establish Burden, Good Cause Exists for the Documents.

Plaintiffs readily establish good cause in light of the Rule 26(b)(2)(C) factors.  First, the discovery sought is not unreasonably cumulative or duplicative.  Goldman Sachs' compensation, promotion, and performance evaluation policies may have evolved over time, and each complaint is a unique record.  Plaintiffs must understand the nature of the policies, and their implementation, and must have access to complaint evidence throughout the class period, in order to prove their claims.  Second, as with the personnel data, Plaintiffs have not had ample opportunity to obtain the information through discovery because Goldman Sachs has unilaterally withheld the majority of class discovery, including Rule 30(b)(6) witnesses.  Third, the benefits

for Plaintiffs' claims, as well as to the resolution of class issues in this matter, significantly

eclipse any burden on Goldman Sachs.  These policies and records are at the heart of Plaintiffs'

case, and are necessary for Plaintiffs to demonstrate commonality and predominance.

## V.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court order

Goldman Sachs to produce, for the Securities, Investment Banking, Investment Management,

and Merchant Banking Divisions: (1) Goldman Sachs' compensation, promotion, and

performance-evaluation data files from 2002 through the resolution of this lawsuit; and (2) and

documents responsive to Plaintiffs' Requests for Production from July 7, 2000 through the

resolution of this lawsuit unless this category is modified by agreement of the parties or further

Court order.

Dated: New York, New York
         May 2, 2012                    By:    Respectfully submitted,

                                               /s/ Adam T. Klein_____
                                               Adam T. Klein

                                               OUTTEN & GOLDEN LLP
                                               Adam T. Klein
                                               Cyrus E. Dugger
                                               Jennifer L. Liu
                                               3 Park Avenue, 29th Floor
                                               New York, New York 10016
                                               Telephone:  (212) 245-1000
                                               Facsimile:  (212) 977-4005

                                               LIEFF CABRASER HEIMANN & BERNSTEIN,
                                               LLP
                                               Kelly M. Dermody (*admitted pro hac vice*)
                                               Anne B. Shaver (*admitted pro hac vice*)
                                               Alison M. Stocking (*admitted pro hac vice*)
                                               275 Battery Street, 29th Floor
                                               San Francisco, CA 94111-3339
                                               Telephone:  (415) 956-1000
                                               Facsimile:  (415) 956-1008

LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
Rachel Geman
250 Hudson St., 8th Floor
New York, New York 10013
Telephone (212) 355-9500

*Attorneys for Plaintiffs and the Putative Class*