# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; LISA PARISI; and SHANNA ORLICH, <br><br> Plaintiffs, <br><br> vs. <br><br> GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC. <br><br> Defendants. | <u>**10-Civ. 6950 (LBS) (JCF)**</u> <br><br><br> <u>**ORAL ARGUMENT REQUESTED**</u> |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY OF DATA AND DOCUMENTS

PAUL HASTINGS LLP
75 East 55th Street
New York, New York 10022-3205
(212) 318-6000

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Defendants*
Goldman, Sachs & Co. and
The Goldman Sachs Group, Inc.

**TABLE OF CONTENTS**

<b>Page</b>

INTRODUCTION .................................................................................................... 1

BRIEF FACTUAL BACKGROUND.......................................................................... 4

ARGUMENT .......................................................................................................... 5

I.    The Burden of Expansive Data Discovery Must Be Viewed in Light of the
      Supreme Court's Decision in *Wal-Mart* ........................................................ 5

II.   In the Alternative, Should this Court Consider Plaintiffs' Motion At This Time,
      And Should The Suggestion Of Phased Discovery Be Rejected, Plaintiffs' Motion
      To Compel Data Must Nevertheless Be Denied ............................................ 9

      A.    If The Phased Discovery Approach Were Rejected, Goldman Sachs Has
            Outlined a Scope of Data Production That, Although Burdensome and
            Unnecessary At This Time, Would Be Far More Reasonable Than
            Plaintiffs' Overreaching Demands ...................................................... 10

            1.    PeopleSoft Data ...................................................................... 10

            2.    Total Cost Reconciliation Reports ........................................... 10

            3.    FRS database........................................................................... 11

            4.    MD Selection Data ................................................................... 11

      B.    The Burden Imposed By Producing Any Additional Data Would Far
            Outweigh Any Benefit To Plaintiffs ................................................... 11

      C.    There Are No Viable Shortcuts to Alleviate the Substantial Burden
            Imposed By Plaintiffs' Additional Data Requests ............................... 14

            1.    Goldman Sachs' estimates of burden are valid and appropriate ..... 14

                  a.    Producing all data from the beginning of the "current"
                        PeopleSoft database will be burdensome and time-
                        consuming ................................................................... 14

                  b.    Extracting data from Goldman Sachs' earlier PeopleSoft
                        database would be even more burdensome and labor-
                        intensive ...................................................................... 16

                  c.    Producing data from CRS is burdensome, time-consuming,
                        and unnecessary .......................................................... 17

                  d.    2002 feedback process data is not in FRS and is not
                        complete ...................................................................... 18

            2.    Plaintiffs' suggestion of "exporting" all data is not feasible, would
                  not save time, and would only lead to more disputes ............... 18

            3.    "Sampling" is not a feasible option either ............................... 19

      D.    Plaintiffs Cannot Establish "Good Cause" For Demanding Additional Data ...... 20

# TABLE OF CONTENTS
(continued)

**Page**

III.   Plaintiffs Have No Basis For Filing A Motion To Compel With Respect To
       Document Discovery ................................................................................ 21

    A.   Goldman Sachs Has Produced or Agreed to Produce Responsive
            Documents ...................................................................................... 21

    B.   Producing Additional Documents Increases the Burden on Goldman Sachs
            Substantially With Little or No Added Benefit to Plaintiffs............................. 23

    C.   There is No Current Dispute Over E-Mail Discovery and There is Nothing
            to Compel on That Issue .................................................................... 24

IV.    CONCLUSION............................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bell v. Lockheed Martin Corp.*,
    270 F.R.D. 186 (D.N.J. 2010)................................................................7

*Bell v. Lockheed Martin Corp.*,
    2011 WL 6256978 (D.N.J. Dec. 14, 2011)........................................7, 8

*Cronas v. Willis Group Holdings Ltd.*,
    2008 WL 4548861 (S.D.N.Y. Oct. 8, 2008)....................................13, 23

*Easterling v. Conn. Dep't of Corr.*,
    278 F.R.D. 41 (D. Conn. 2011)............................................................8

*EEOC v. Supervalu, Inc.*,
    2010 WL 5071196 (N.D. Ill. Dec. 7, 2010)..........................................12

*General Steel Domestic Sales, LLC v. Chumley*,
    2011 WL 2415715 (D. Colo. June 15, 2011)........................................20

*I-Med Pharma Inc. v. BioMatrix, Inc.*,
    2011 WL 6140658 (D.N.J. Dec. 9, 2011)..............................................25

*In re Countrywide Fin. Mortg. Lending Practices Litig.*,
    2011 WL 4862174 (W.D. Ky. Oct. 13, 2011) ........................................6

*In re Wells Fargo Res. Mortg. Lending Discrim. Litig.*,
    2011 WL 3903117 (N.D. Cal. Sept. 6, 2011) ......................................6, 7

*National Org. for Women v. Sperry Rand Corp.*,
    88 F.R.D. 272 (D. Conn. 1980)............................................................24

*Rodriguez v. Nat'l City Bank*,
    277 F.R.D. 148 (E.D. Pa. 2011)............................................................7

*Rodriguez-Torres v. Government Development Bank of Puerto Rico*,
    265 F.R.D. 40 (D.P.R. 2010) ........................................................12, 13

*Thermal Design, Inc. v. Guardian Bldg. Prods., Inc.*,
    2011 WL 1527025 (E.D. Wis. Apr. 20, 2011)......................................12

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ................................................................................ passim

*Windisch v. Hometown Health Plan, Inc.*,
  2012 WL 115670 (D. Nev. Jan. 13, 2012) ........................................................7, 13

**RULES**

Fed. R. Civ. P.
  23(a) ...........................................................................................................1, 3, 8
  23(b) ...................................................................................................................8
  23(c) ...................................................................................................................8
  26(b)(2) ............................................................................................................20
  26(b)(2)(B) .................................................................................................11, 24
  26(b)(2)(C) .......................................................................................................24
  26(b)(2)(C)(iii) ...........................................................................................11, 20
  30(b)(6) ..............................................................................................................6

**OTHER AUTHORITIES**

Sedona Conference Database Principles: *Addressing the Preservation and Production of
  Databases and Database Information in Civil Litigation* (Mar. 2011) ...........................11, 12

Sedona Principles: *Best Practices Recommendations & Principles for Addressing
  Electronic Document Production* (2d ed. June 2007)...............................................13

William Hamilton, *Sampling Helps Keep Relevance Relevant,* 37 No. 4 Litig.
  (Summer 2011) ...........................................................................................19, 20

## INTRODUCTION

Plaintiffs' claim that Goldman Sachs has "resisted producing standard class action discovery throughout this litigation" (Plaintiffs' Motion to Compel at 1 (Docket No. 146)) is neither fair nor accurate.  In fact, Goldman Sachs has produced well over 100,000 pages of the sorts of documents that are particularly pertinent to class certification issues, such as organizational charts, policy documents, training materials, job descriptions and review forms, in addition to personnel documents and emails related to Plaintiffs Chen-Oster and Orlich.  The inflammatory rhetoric in Plaintiffs' Motion to Compel is no doubt intended to mask two critical facts: as Goldman Sachs pointed out in its February 29, 2012 letter to this Court and at the Pre-Motion Conference on April 4, 2012, 1) the legal landscape with respect to class action discovery has changed dramatically since the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), and 2) Plaintiffs' Motion to Compel is still premature.

First, though Plaintiffs do all they can to downplay the importance of the *Wal-Mart* decision, that decision undeniably clarified the law affecting class certification and discovery.  As the Supreme Court explained, if plaintiffs cannot identify a "common mode of exercising discretion that pervades the entire company," they can never satisfy the requirements of Rule 23(a).  131 S. Ct. at 2554-55.[1]  Goldman Sachs has already produced thousands of pages of documents relating to this issue.

Second, Goldman Sachs' motion to strike (Docket No. 98) *has not yet been finally decided*. Goldman Sachs filed objections to this Court's Report and Recommendation that the Motion be

---

[1] Here, Goldman Sachs originally moved to strike Plaintiffs' allegations because the Complaint, on its face and at its core challenged the exact sort of subjective decision-making the Supreme Court said cannot be the basis for the commonality needed to maintain a broad class action suit. (See Docket Nos. 100 and 101).  Plaintiffs' response was to file a re-worked, wordsmithed Amended Complaint that made substantively meaningless changes, e.g., removing phrases such as "unacceptable levels of subjectivity" and replaced them with allegations claiming a lack of "objective measures."  Compare Compl. ¶ 9 with Am. Compl. ¶ 7.

denied. (Docket No. 114). Judge Sand heard argument on May 22, 2012 and reserved ruling on the motion. If he were to agree with Goldman Sachs that Plaintiffs' class action allegations must be stricken in light of the *Wal-Mart* decision, the present discovery disputes would become largely moot.[2] Alternatively, and as Judge Sand noted pointedly during the May 22 argument, even if he were to agree that the motion to strike was premature, there is still a very real possibility that a phased approach to discovery would be be appropriate here:

> Isn't there a procedure which would split the difference, that is, suppose the Court agreed with the magistrate that this is premature because there has been no discovery and said, therefore the motion is denied because we agree with Magistrate Judge Francis that the plaintiffs are entitled to discovery on the sole issue of whether there is any aspect of the procedures which take the case out of *Wal-Mart*, that discovery would be limited to a very brief period of time and that would be the sole area of question, then what would happen, what would happen if they would strike out because the inferences which you're drawing from this is all there is, there isn't any more; your task in defending that outcome in the appellate court would be a much simpler, easier one, and the case would go away.
>
> …
>
> If I were to agree with Judge Francis that the motion is premature because there has not been discovery, would you be amenable to a subject matter timetable … geared to the defendant's principle contention that the *Wal-Mart* holding precludes the case and permit that issue to be the subject of a new application by the plaintiffs to the magistrate rather than go through a great deal of other matters which might become irrelevant?

*See* Hr'g Tr. 6:20-7:8; 14:9-11; 14:15-19, May 22, 2012.

Although Goldman Sachs believes that Plaintiffs' class allegations should be stricken at this juncture, Judge Sand's suggestion of a phased approach to class-related discovery is entirely consistent with the Supreme Court's guidance in *Wal-Mart*, as well as with the categories of

---

[2] Additionally, though Plaintiffs fault Goldman Sachs for its reluctance to produce *ten years* worth of data and *twelve years* worth of documents related to each of the four separate revenue producing divisions, there can be no question that this Court's October 4, 2011 Order limiting discovery to a three-year period and to the Securities Division is still in effect until Judge Sand rules on the Motion to Strike. *See* Docket No. 109.

discovery Goldman Sachs has produced to date. Judge Sand's idea is not only pragmatic, it is consistent with what other courts are doing in light of *Wal-Mart*. A phased approach would not deprive Plaintiffs of any discovery to which they might ultimately be entitled; it would simply establish a reasonable order of producing and considering that discovery. If Plaintiffs cannot clear the hurdle of demonstrating a common practice that is more than a legally ineffective quarrel with the subjective decisions of a diverse group of managers, there is no reason to go any further. Statistical data cannot substitute for the demonstration of a common practice.[3] As the Court explained in *Wal-Mart*, even if Plaintiffs could show a disparity that their experts claim was sex-based, that would not suffice if there is nothing more than managerial discretion to tie individualized claims together.[4]

Should Judge Sand order or endorse a phased approach, the Court need not address – at least at this stage – the enormous burden imposed by Plaintiffs' unreasonable demand for *ten years* of personnel data from four separate divisions and five separate databases. If the huge

---

[3] Goldman Sachs by no means concedes the existence of statistical disparities (as Plaintiffs accuse in their March 7, 2012 letter to this Court at 2-3), but the reality is that, as *Wal-Mart* expressly holds, if the policies and practices about which Plaintiffs purport to complain are, at their core, policies or practices based on delegated discretion to first or second level managers, a disparity cannot satisfy Rule 23(a) as a matter of law. 131 S. Ct. at 2555.

[4] The Supreme Court's language could not be clearer:

- "Even if they are taken at face value, these studies are insufficient to establish that respondents' theory can be proved on a classwide basis." *Id.*

- "As Judge Ikuta observed in her dissent, '[i]nformation about disparities at the regional and national level does not establish the existence of disparities at individual stores, let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level.'" *Id.* (citation omitted).

- "Even if [statistical proof] established (as it does not) a pay or promotion pattern that differs from the nationwide figures or the regional figures in *all* of Wal-Mart's 3,400 stores, that would still not demonstrate that commonality of issue exists." *Id.*

- "Merely showing that Wal-Mart's policy of discretion has produced an overall sex-based disparity does not suffice." *Id.* at 2556.

burden associated with data production and interpretation can be deferred pending a decision on whether a "phase 2" is justified, this will in fact benefit *both* parties, by avoiding hundreds of thousands of dollars in expert fees.  Furthermore, it will serve the interests of judicial economy by helping avoid dueling *Daubert* motions over the work of the parties' labor economists and/or statisticians.[5]  Accordingly, Goldman Sachs respectfully asks this Court to wait to decide Plaintiffs' Motion until after Judge Sand rules on the Motion to Strike.  Goldman Sachs also believes Judge Sand's idea regarding phased discovery deserves serious consideration as an efficient and reasonable approach to discovery in light of the *Wal-Mart* decision, in the event of denial of the motion to strike.

However, even if the Court denies the motion to strike and ultimately rejects the notion of phased discovery, as Goldman Sachs pointed out in the correspondence leading up to the April 4, 2012 pre-motion conference and at the conference, Plaintiffs' Motion to Compel should still be denied.  Goldman Sachs has outlined reasonable data and discovery parameters to Plaintiffs which would result in the production of extensive data and documents.  Plaintiffs have unreasonably rejected all suggestions and reflexively demanded "all data" back to 2002 and "all documents" back to 2000 – for divisions in which no Plaintiff ever worked.  The burden imposed by such requests far outweighs any limited benefit to Plaintiffs.

## BRIEF FACTUAL BACKGROUND

This putative class action was brought by three named Plaintiffs, two of whom worked during their employment at Goldman Sachs only in the Firm's Securities Division, and the other of whom worked exclusively in the Investment Management Division.  *See* Am. Compl. ¶¶ 67, 89, 101, 112.  They purport to represent all female Associates, Vice Presidents and Managing

---

[5] At a minimum, "phase 1" discovery regarding the practices and policies at issue may serve to focus and limit the scope of "phase 2," thus reducing the ultimate burden on both parties.

Directors in four of the Firm's revenue generating divisions – Securities, Investment Banking, Investment Management, and Merchant Banking (the "four revenue divisions").  Am. Compl. ¶ 10.  Plaintiff Cristina Chen-Oster worked as a sales person in the Convertible Sales Department in the Equities unit of the *Securities Division* throughout almost all of her employment with Goldman Sachs from 1997 until March, 2005.  *Id.* ¶ 67; *see also* Exhibit 1 to Pls.' Am. Compl.  Plaintiff Shanna Orlich worked as a summer intern at the Firm in 2006 and then as an Associate in the Capital Structure Franchise Trading Department within the Fixed Income, Currencies, and Commodities ("FICC") unit of the *Securities Division* from mid-2007 until November, 2008 when her employment was terminated.  Am. Compl. ¶¶ 112, 131.  Plaintiff Lisa Parisi joined the Firm as a Vice President in the Investment Management Division and was subsequently promoted to Extended Managing Director ("EMD") in that division.[6]  Am. Compl. ¶ 101.  Her employment was terminated in 2008.  *Id.* ¶ 110.

## ARGUMENT

### I.   THE BURDEN OF EXPANSIVE DATA DISCOVERY MUST BE VIEWED IN LIGHT OF THE SUPREME COURT'S DECISION IN *WAL-MART*

Plaintiffs' Motion to Compel exalts statistical evidence far beyond what is justified in the case law; according to Plaintiffs, it is not only "critical," it is the basis upon which "discrimination class actions largely rise and fall." Pls.' Br. at 1.  The cases on which Plaintiffs rely, however, are outdated and inapplicable.  Though Plaintiffs try hard to downplay the similarities between their allegations and those made in the *Wal-Mart* case, the Supreme Court's direction is clear: the key inquiry in cases involving subjective decision-making by many managers is whether the plaintiffs

---

[6] The parties have agreed to stay discovery with respect to the Managing Director position until Defendants' motion to compel arbitration of Plaintiff Parisi's claims is resolved.  Goldman Sachs has agreed that it will provide discovery related to the process for promotions from Vice President to EMD in the four revenue divisions in the meanwhile.

can identify a common mode of exercising discretion that applies commonly across the class. This Court has made the same observation: "[t]he operative question is whether the plaintiffs can identify 'a common mode of exercising discretion that pervades the entire company.'"  Report and Recommendation at 12-13 (citing *Wal-Mart*, 131 S. Ct. at 2554-55) (Docket No. 134).  Even if a motion to strike all class allegations is ruled premature, Plaintiffs must still overcome this hurdle before delving into a full-blown fishing expedition.  Judge Sand's idea of phased discovery is therefore an approach Goldman Sachs urges this Court to consider.

The concept of a first phase of class discovery focused on policies and practices, discerned through documents and Rule 30(b)(6) depositions may seem novel, but only because *Wal-mart* was decided *just last year*.  Though the procedural posture of the cases applying the decision since then has varied, the message has been consistent.  Broad statistical discovery, and the burdens associated with it, is not necessary for a threshhold determination on commonality.

For example, in *In re Countrywide Fin. Mortg. Lending Practices Litig.*, 2011 WL 4862174 (W.D. Ky. Oct. 13, 2011), the plaintiffs relied on data from Countrywide to offer statistical analyses that purported to show that minorities paid more for Countrywide mortgage loans than whites with similar risk characteristics.  *Id.* at *2.  The court found this data and the statistical analyses irrelevant to the issue of class certification, which the court held required a showing of "a common direction or common method of exercising discretion."  *Id.* at *4.  Indeed, the *Countrywide* court specifically noted the sea change effected by the *Wal-Mart* decision, one which Plaintiffs simply refuse to acknowledge:

> Although certification of this type of class was more debatable pre-*Wal-Mart*, the Supreme Court has explained that Rule 23(a) commonality requires more than what Plaintiffs have demonstrated here.

*Id.* at *4.  Similarly, in *In re Wells Fargo Res. Mortg. Lending Discrim. Litig.*, 2011 WL 3903117, at *3-4 (N.D. Cal. Sept. 6, 2011), the court found commonality lacking even though the plaintiffs claimed to have a more comprehensive statistical analysis than did the plaintiffs in *Wal-Mart*:

> As the Supreme Court held in [*Wal-Mart*], however, even if the statistical evidence offered therein had shown a pattern of disparity "in *all* of Wal-Mart's 3,400 stores," such statistical proof would fail, because "[m]erely showing that [a defendant's] policy of discretion has produced an overall … disparity does not suffice" to demonstrate commonality for purposes of Rule 23(a).

*Id*. at *4 (citations omitted); *see also Rodriguez v. Nat'l City Bank*, 277 F.R.D. 148, 155 (E.D. Pa. 2011) (refusing to find commonality despite statistical evidence reflecting disparities, in light of *Wal-Mart*); *Windisch v. Hometown Health Plan, Inc.*, 2012 WL 115670, at *12 (D. Nev. Jan. 13, 2012) (refusing to re-open discovery to allow plaintiff to obtain data from defendant for purposes of trying to certify a class).

Likewise, in *Bell v. Lockheed Martin Corp.*, 2011 WL 6256978 (D.N.J. Dec. 14, 2011), the court held that the plaintiffs were unable to "establish the existence of a common question for the proposed class."  *Id.* at *8.  The court did not consider *any* statistical evidence proffered by the plaintiffs.  In their Motion, Plaintiffs misleadingly cite from an early discovery ruling in the *Bell* case.  *See* Pls.' Br. at 8, 17 (citing *Bell v. Lockheed Martin Corp.*, 270 F.R.D. 186 (D.N.J. 2010)). In the earlier *Bell* decision cited by Plaintiffs, the court required the production of company-wide data and noted that "'courts have been cautioned not to impose unnecessary limitations on discovery.'" *See id*. at 191.  The court also rejected the defendant's arguments regarding the burden of producing the requested data.  *Id*. at 193 (cited by Plaintiffs at page 17 of their Brief).

However, that pre-*Wal-Mart* discovery ruling became irrelevant when the *Bell* court issued its December 2011 (post-*Wal-Mart*) decision refusing to certify a class.  The later decision demonstrates how *unnecessary* expansive data is to the question of class certification after *Wal-Mart*.  In its later decision, the *Bell* court *did not consider* statistical evidence and held it was

unnecessary to the determination of whether class certification was appropriate.   Indeed, although the *Bell* plaintiffs continued to claim that they were entitled to additional discovery, the *Bell* court denied their request.   In light of *Wal-Mart*, the *Bell* court noted that "[e]xhaustive discovery is *not required* prior to an adjudication of Plaintiffs' claims."   2011 WL 6256978, at *8 (emphasis added).   Plaintiffs cannot identify any authority to the contrary.   Indeed, their entire (nearly four-page) argument regarding the purported relevance of the data they seek is based almost exclusively on *pre-Wal-Mart* case law.   *See* Pls.' Br. at 6-9.[7]

Plaintiffs' singular focus on highly burdensome statistical data is misplaced.   Plaintiffs have not identified any central direction to exercise discretion in the same way, which applies across the four revenue divisions, multiple business units and departments, and hundreds of different desks they seek to certify.   This showing does not depend on – and cannot be based on – statistical data.   Instead, what Plaintiffs must first do is take depositions of Firm witnesses to ascertain how managers across these disparate groups actually make compensation, promotion, and feedback decisions, and how they exercise their discretion in doing so.   If Plaintiffs can show that there is in fact a common method of exercising discretion that applies across the four divisions, then they can proceed.   But their blanket demand for all data at this stage in the litigation puts the cart well before the horse in the post-*Wal-Mart* world of class certification discovery.

---

[7] Indeed, Plaintiffs cite only one post-*Wal-Mart* case in making their relevance argument.   That case, however, addresses issues under Rule 23(b) and (c), not commonality under Rule 23(a).   *See Easterling v. Conn. Dep't of Corr.*, 278 F.R.D. 41 (D. Conn. 2011).   Further, *Easterling* involves a challenge to *a physical fitness test*, rather than allegations of subjective decision-making by many different managers.   *Id.* at 44.   *Easterling* does not address, much less provide support for, a claim that statistical evidence is relevant *after Wal-Mart* to establishing commonality in a case involving allegations of subjective decision-making.

**II.    IN THE ALTERNATIVE, SHOULD THIS COURT CONSIDER PLAINTIFFS'
MOTION AT THIS TIME, AND SHOULD THE SUGGESTION OF PHASED
DISCOVERY BE REJECTED, PLAINTIFFS' MOTION TO COMPEL DATA
MUST NEVERTHELESS BE DENIED**

While the motion to strike was pending, Goldman Sachs made use of the intervening

months to negotiate in good faith with Plaintiffs regarding their staggering discovery demands.[8]

*Plaintiffs have rejected every offer of data compromise presented by Defendants.*  Rather than

delve into these unreasonable demands at this juncture, if the motion to strike is denied, Goldman

Sachs hopes that Judge Sand will endorse the phased approach he suggested during the May 22

hearing.  Phased discovery has the potential to avoid the significant costs and burden detailed

below (or to at least narrow the issues for a more focused later stage of discovery).  Goldman

Sachs therefore suggests that data demands and compromises be tabled for the moment and

addressed *if, and only if,* Plaintiffs satisfy the first phase of class discovery.

If, however, this phased approach is rejected, Goldman Sachs has already delineated

parameters for production which, although still extremely burdensome, at least would avoid the

undue burden that Plaintiffs' demands would inflict.  Plaintiffs have no basis for seeking any data

beyond what is set forth below.  The burden of doing more far outweighs the minimal benefit, if

any, to Plaintiffs.

---

[8] Goldman Sachs has been extremely accommodating in response to Plaintiffs' overreaching
discovery demands.  The Firm arranged for informal in-person meetings between Plaintiffs'
counsel and internal experts on each of the databases at issue.  The parties met to discuss the
PeopleSoft Data Systems ("PDS") on May 24, 2011, to discuss the Compensation
Recommendation System ("CRS") on June 21, 2011, and to discuss the Firmwide Review System
("FRS") on November 22, 2011.  These meetings were intended to provide Plaintiffs with
information (and sample data reports) from each of the databases. The parties also participated in
lengthy meet and confer discussions and Goldman Sachs has made continued efforts to engage
with Plaintiffs regarding a reasonable compromise on data and discovery issues.

A. **If The Phased Discovery Approach Were Rejected, Goldman Sachs Has Outlined a Scope of Data Production That, Although Burdensome and Unnecessary At This Time, Would Be Far More Reasonable Than Plaintiffs' Overreaching Demands**

1. ***PeopleSoft Data.*** PeopleSoft is Goldman Sachs' primary Human Resources database. Goldman Sachs would be in a position to produce the following from its PeopleSoft database:

- From January 1, 2007-December 2011 for Associates and Vice Presidents in the entire Securities Division (Plaintiff Orlich worked in the FICC unit of the Securities Division);

- From January 1, 2007-December 2011 for Associates and Vice Presidents in the Investment Management Division (in which Plaintiff Parisi worked);

- Back to July, 2002 for the two groups within the Securities Division in which Plaintiff Chen-Oster worked or was slated to work, Convertible Sales (including Convertible Bonds and Synthetic Convertibles) and Equities Research.

*See* Brown Decl., Ex. 1 (Feb. 29, 2012 letter from B. Brown). This data covers the divisions in which the named Plaintiffs ever worked and provides more than five full years of data for Plaintiffs to analyze.

2. ***Total Cost Reconciliation Reports.*** Goldman Sachs would also be in a position to produce electronic year-end Total Cost Reconciliation ("TCR") files for the relevant population in Securities and IMD, from December 2005 (which is as far back as those reports go) through December 2011. These TCR files are maintained on a yearly basis and reflect the results of the year-end compensation review process, including the year-end "Per Annum Total Compensation" ("PATC") for Goldman Sachs employees and the various elements that make up the PATC. *See* Brown Decl., Ex. 2 (Cathy Obradovich Deposition ("Obradovich Dep.")) 116:15-17; 117:15-17. Goldman Sachs informally produced to Plaintiffs a list of the data fields on the TCR files on April 24, 2012, and has offered to explain those fields to Plaintiffs' counsel.

3.    ***FRS database.***  FRS is the database that includes data on Goldman Sachs'

360 evaluation process.  This database contains data going back to 2003 but no earlier.  In the

event that there is no phased discovery, Goldman Sachs would be in a position to provide FRS

data for Associates and Vice Presidents in Securities and IMD, from 2003-2011.

4.    ***MD Selection Data.***  Goldman Sachs also has data that tracks information

pertinent to the consideration and selection of Vice Presidents for promotion to the EMD position.

If the phased approach to discovery is rejected, Goldman Sachs would be in a position to provide

data regarding MD selections, consistent with its other data proposals.

**B.    The Burden Imposed By Producing Any Additional Data Would Far
Outweigh Any Benefit To Plaintiffs**

Plaintiffs have to date rejected Goldman Sachs' reasonable data proposals.  However, even

if data were relevant at this stage of the litigation, which it is not, discovery should nevertheless be

limited where the burden outweighs the benefit.  Indeed, Rule 26 provides that a court *must* limit

discovery when "the burden or expense of the proposed discovery outweighs its likely benefit,

considering the needs of the case, the amount in controversy, the parties' resources, the

importance of the issues at stake in the action, and the importance of the discovery in resolving the

issues."  Fed. R. Civ. P. 26(b)(2)(C)(iii).

With respect to electronically-stored information, the Federal Rules of Civil Procedure

provide that: "[a] party need not provide discovery of electronically-stored information from

sources that the party identifies as not reasonably accessible because of undue burden or cost."

Fed. R. Civ. P. 26(b)(2)(B).  Contrary to Plaintiffs' assertions, the fact that electronically stored

information is maintained on "live" or "active" databases does not mean that such information is

"reasonably accessible."  As stated in the Sedona Conference Database Principles, "the fact that a

database is in active use does not automatically mean that the data is easy and inexpensive to

produce in litigation[;] [w]hether a database is active or in legacy status does not determine its

accessibility." *See* The Sedona Conference Database Principles: *Addressing the Preservation and Production of Databases and Database Information in Civil Litigation*, Public Comment Version, at 29-30 (Mar. 2011). Burden is a key part of the "reasonably accessible" calculation and must be considered. *See Thermal Design, Inc. v. Guardian Bldg. Prods., Inc.,* 2011 WL 1527025, at *1 (E.D. Wis. Apr. 20, 2011) ("Even if the information sought is relevant or reasonably calculated to lead to the discovery of admissible evidence, [Defendants do not] explain why the extensive amount of information [they] seek is of such importance that it justifies imposing an extreme burden on [Plaintiff].").

In *EEOC v. Supervalu, Inc.*, 2010 WL 5071196 (N.D. Ill. Dec. 7, 2010), the court denied the EEOC's motion to compel a portion of the defendant's human resources database. The EEOC had claimed that the defendant's PeopleSoft database included data relevant to its alleged systemic ADA claims against the defendant. Defendants responded that providing such data would be burdensome. In addressing the issue, the court found:

> Moreover, even if such data could be generated, plaintiff has not established that the purported relevance or benefit of the information outweighs the burden or expense in producing it. See Fed. R. Civ. P. 26(b)(2)(C). Defendants contend that, to pull the information sought by the EEOC's narrowed request, *defendants' technology personnel would need at least one week to write the code necessary to pull such data from defendants' current database, and likely a longer period of time to write such code for defendants' legacy databases*. . . . [T]his Court is not required to order defendants to expend significant resources in responding to an indisputably burdensome request of likely limited benefit . . . ."

*Id.* at *8 (emphasis added). In light of this burden, the court denied plaintiff's motion to compel. Similarly, in *Rodriguez-Torres v. Government Development Bank of Puerto Rico*, 265 F.R.D. 40 (D.P.R. 2010), the court found the costs and time necessary to produce electronically stored information were too high, rendering the information not reasonably accessible:

> [T]he Court determines that the ESI requested is not reasonably accessible because of the undue burden and cost. The Court finds

> that $35,000 is too high of a cost for the production of the requested
> ESI in this type of action. . . .  As such, the Court determines that the
> ESI requested is not reasonably accessible.

*Id.* at 44; *see also Windisch*, 2012 WL 115670, at *11-12 (denying plaintiff's request for data

where defendant estimated the production would cost approximately $62,000 plus attorneys' fees

and costs and burden on defendant's staff); *Cronas v. Willis Group Holdings Ltd.*, 2008 WL

4548861, at *2 (S.D.N.Y. Oct. 8, 2008) (denying extensive discovery in case where plaintiffs

challenged centralized employment practices; finding "[t]o the extent that nationwide discovery is

remotely relevant to plaintiffs' claims, the burden of production outweighs its likely benefit").

Substantial burden is measured in both monetary and non-monetary terms.  *See* The

Sedona Principles:  *Best Practices Recommendations & Principles for Addressing Electronic*

*Document Production* (2d ed. June 2007):

> Costs cannot be calculated solely in terms of the expense of
> computer technicians to retrieve the data but must factor in other
> litigation costs, including the interruption and disruption of routine
> business processes and the costs of reviewing the information.
> Moreover, burdens on information technology personnel and the
> resources required to review documents for relevance, privilege,
> confidentiality, and privacy should be considered in any calculus of
> whether to allow discovery, and, if so, under what terms.  In
> addition, the non-monetary costs (such as the invasion of privacy
> rights, risks to business and legal confidences, and risks to
> privileges) should be considered.

*Id.* at 17.  As set forth below, the additional burden on Goldman Sachs – beyond the significant

burden  associated with Goldman Sachs' data proposals – is excessive and unjustified.

**C.    There Are No Viable Shortcuts to Alleviate the Substantial Burden Imposed
        By Plaintiffs' Additional Data Requests**

Goldman Sachs has provided estimates of the amount of time and effort it would take to

produce the data Plaintiffs seek – both the materials that Goldman Sachs would be in a position to

provide and the extra data Plaintiffs seek in their Motion.  Plaintiffs challenge these estimates and

argue there must be an "automatic" way to extract this data.  However, they ignore the reality of

what it takes to provide extensive data, in a reliable and accurate manner, from multiple different databases.

       1.     ***Goldman Sachs' estimates of burden are valid and appropriate***

          a.    **Producing all data from the beginning of the "current"**
                    **PeopleSoft database will be burdensome and time-consuming**

Goldman Sachs moved to an entirely new version of PeopleSoft in September, 2004.  It includes data on current or former employees who were employed in one of the relevant positions at any time since that date.  A predecessor database contains data on the limited population of former employees who worked in a relevant position only between July, 2002 and September, 2004.  *See* Brown Decl., Ex. 3 (Affidavit of Cathy Obradovich ("Obradovich Aff.")) at ¶ 2. Goldman Sachs' internal PeopleSoft experts have estimated that it would take between 90 and 150 hours to extract data back to the beginning of the "current" PeopleSoft database (approximately September, 2004).  *See id*. ¶ 5.  Extracting this data is no easy feat.  It requires using a tool called Query Studio,  *see* Brown Decl. Ex. 2 Obradovich Dep. at 48:13-24, to put together a query to extract data by manually dragging and dropping specific data fields.  Ms. Obradovich testified that it would require *six different queries* just to identify the relevant population employed since 2004:

> You have to do a query that gives you the starting population, which would be all of those employees active as of September 2004.  You would then have to write a query for all the employees who were active as of 12/31/2011.  You would then have to do another query for all of the new hires hired during the period 9/1/2004 through 12/31/2011.  You would have to write the next query on the terminations during that same period.  You would also have to write a query on transfers in.  And then a query on transfers out. You would have to combine all of that population to determine the requested population.

*See* Brown Decl., Ex. 2 Obradovich Dep. at 63:10-64:2.  Performing a standard quality check or "QC review" of this data to ensure its accuracy would require another 40 to 80 hours of dedicated time.  *See* Brown Decl., Ex. 3 Obradovich Aff. ¶6.

Plaintiffs take issue with these estimates because they claim that the outside vendor who houses the PeopleSoft data for Goldman could perform the tasks more quickly. *See* Pls.' Br. at 10-13. However, whether Goldman Sachs consulted with an outside vendor, Hewitt Associates LLC ("Aon Hewitt"), about how it would do a data extraction in no way undermines the estimates provided by Goldman Sachs' internal experts. These are the people most familiar with Goldman Sachs' version of PeopleSoft, who work with that system on a daily basis. They are the ones responsible for writing queries and extracting data from the PeopleSoft database.

Moreover, Aon Hewitt could not perform the data extraction any more quickly or efficiently. *See* Brown Decl., Ex. 4 (Decl. of Vishali Chandramouli ("Chandramouli Decl.")), ¶ 5. Instead of Query Studio, Aon Hewitt personnel would instead write SQL query scripts to pull data. *Id*. ¶ 8. Further, Aon Hewitt does not store many of the necessary data elements in a straight-forward format but in "calculated" fields, which would require the use of complex sub-queries to obtain the necessary data. *Id*. ¶ 8a. Also, Aon Hewitt archives organization data after a year (e.g., prior to 2011) in a separate database. *Id*. ¶ 8b. Data for Goldman Sachs' 16 organization level data elements is spread across tables, each of which ranges from 5 million to 50 million rows of information. *Id*. The data extraction would not be any easier or more efficient if performed by Aon Hewitt.

Plaintiffs also take issue with the 40 to 80 hours that Goldman Sachs estimates would be necessary to perform a quality check of the extracted data. Plaintiffs have no reasoned basis for taking issue with this estimate. To the extent they suggest that a quality control review is not necessary, they fail to provide any support for this assertion, and it defies credulity. Any data to be provided in this case and relied upon by both parties' experts should be reviewed for accuracy before it is produced. This review must take place then; otherwise, the parties will simply end up in messy – and costly – disputes down the road when or if errors are discovered. As Ms.

Obradovich testified: "It's our practice within our team to always conduct a quality control review before we provide any data to anyone within the firm."  *See* Brown Decl., Ex. 2 Obradovich Dep. at 65:16-19.  Further, even if Aon Hewitt did the data extraction, it would still need to be quality checked.  *See* Brown Decl., Ex. 4 Chandramouli Decl. ¶ 8.  This process could not be done any faster by Aon Hewitt personnel.  *Id.*

###    b.    Extracting data from Goldman Sachs' earlier PeopleSoft database would be even more burdensome and labor-intensive

The process for extracting PeopleSoft covering individuals who worked in the relevant positions only between July, 2002 and September, 2004 is even more burdensome and time-consuming because this earlier data is maintained on an "older" PeopleSoft system.  Goldman Sachs' internal experts have estimated that pulling, preparing, and performing a quality-control review of this data would take between 200-320 hours of dedicated time from one of the two Goldman Sachs' staff members who could perform this work.  *See* Brown Decl., Ex. 3 Obradovich Aff. ¶ 11.  One of them would have to write computer code to create new queries to pull the requested information because the Query Studio extraction tool that is available for the current PeopleSoft database is not available for this earlier system.  *See* Brown Decl., Ex. 2 Obradovich Dep. at 72:13-17.  Ms. Obradovich testified that this data extraction would take double the time of the extraction from the "current" PeopleSoft system.  *See id.* at 73:13-20.  The basis for this estimate is "[t]he amount of information.  It's a blank screen.  You have to type every word of the language in to create the query."  *Id.* at 73:23-74:2.

Once the queries are developed and run against the database, Goldman Sachs staff members would have to analyze the data to ensure that the proper population was identified and pull the requested data for the relevant population from various data tables.  *See* Brown Decl., Ex. 3 Obradovich Aff. ¶ 9.  Then, staff members would have to perform a labor-intensive quality

control review of the data extracts, which is estimated to take approximately 40-80 hours. *Id.* ¶ 10.

There is no basis for the imposition of this burden or the production of class-wide data from this earlier database.

### c.    Producing data from CRS is burdensome, time-consuming, and unnecessary

The Compensation Recommendation System ("CRS") is a database that tracks the results of the annual year-end compensation review process. Extracting data from this system would be extremely burdensome and time-consuming, for which there is no justification in light of Goldman Sachs' offer to provide the TCR reports summarizing the results of the yearly compensation review process.

Goldman Sachs' internal experts estimate that it would take a minimum of 40 hours to extract the requested data from CRS for the relevant population, after the employee IDs for that population have been identified during the PeopleSoft extraction. *See* Brown Decl., Ex. 3 Obradovich Aff. ¶ 17. However, because of the nature of the CRS database, the bulk of time and effort associated with this request relates to the necessary QC review of any data pulled. The proprietary CRS data is not maintained in a user-friendly format, and must be manually reviewed and checked after being extracted. *See id.* ¶ 18. Goldman Sachs' internal experts have estimated that it would take 240 hours by multiple people to conduct and complete this QC review. *See id.*

Plaintiffs claim that these estimates are "essentially worst-case scenarios," *see* Pls.' Br. at 14, but Goldman Sachs is certainly justified in providing conservative estimates when it comes to extracting extensive data from a complex system. In any event, there is no need to require Goldman Sachs to incur the burden and expense associated with this 240 hours of work, as Goldman Sachs has already offered to produce the TCR reports as part of its data proposals.

Producing these pre-existing TCR reports would be significantly less onerous – and far more efficient – than a data extraction from CRS.

### d.    2002 feedback process data is not in FRS and is not complete

Plaintiffs also demand the production of 2002 feedback process data, even though Goldman Sachs has explained that such data is not contained in the FRS database, is not complete, only exists for a portion of one of the four revenue divisions, and may not be entirely accurate. *See* Brown Decl., Ex. 3 (Affidavit of Ankur Pathak ("Pathak Aff.")) ¶ 3.  Goldman Sachs has estimated that it would take four days of work just to extract this 2002 data. *Id.* ¶ 8.  Because the Firm does not possess, and so far has not been able to locate hard-copy collections of the source documents for this data, it would not even be able to perform a normal QC review on this data. *Id.* ¶ 8.  Plaintiffs do not explain how they could make use of data that may not be complete.  Without the source documents Plaintiffs will not know what the data means nor how it could be used. Plaintiffs' argument reduces quite simply to "data exists, so we must have it."

### 2.    *Plaintiffs' suggestion of "exporting" all data is not feasible, would not save time, and would only lead to more disputes*

Plaintiffs' primary response to Goldman Sachs' evidence of burden is to suggest that there must be some sort of "automat[ic]" export process for each of these different databases that would bypass all of this work.  *See* Pls.' Br. at 11, 13.[9]  They are wrong.  This suggested approach is not feasible and would be unlikely to save cost.  Goldman Sachs' databases are relational databases that consist of hundreds of different tables.  Exporting data from each data table would result in many hundreds of spreadsheets.  This would not amount to a usable database.  In order to create a reliable database, an internal expert would need to expend significant time and effort to: (1) relate

---

[9] To the extent Plaintiffs claim that Goldman Sachs should just mirror or copy its entire databases and provide them with copies of those systems, this suggestion is utterly untenable.  A "database dump" would be highly invasive and far beyond what is relevant or appropriate to class certification.  This is not a reasonable proposal and deserves no serious discussion.

elements in one data table to elements in other data tables to create the data fields needed for a database, and (2) delete or extract from each of these hundreds of separate spreadsheets data fields that are not relevant to this matter. *See* Brown Decl., Ex. 4 Chandramouli Decl. ¶ 11; *see also* Brown Decl., Ex. 5 (May 21, 2012 Weirich letter to Klein).

Deciding how to use or interpret the exported data on hundreds of individual spreadsheets would likely fall to the parties' experts. These experts, whose services generally come at great expense, would have to figure out how to interconnect the data on hundreds of individual spreadsheets. Each party's expert will likely have his or own methodology to do so. This will lead to further disputes over data inaccuracies and/or discrepancies. In other words, as Goldman Sachs has explained to Plaintiffs, using exported data does not save any cost or burden; it just defers a large part of that burden to the expert phase of discovery. *See* Brown Decl., Ex. 5 (May 21, 2012 Weirich letter to Klein). This approach is not even remotely a workable solution.

### 3. *"Sampling" is not a feasible option either*

Notably, Plaintiffs do not refer to sampling of the database in their Motion. Goldman Sachs has considered the feasibility of this option after the parties' April 4, 2012 Pre-Motion Conference. The varying characteristics of the employees, the businesses, and the personnel decision-making at issue in this case mean that standard sampling is not a reliable method of studying the data. Statistical sampling involves using a defined and representative sample of data and using that data set to draw reasonable inferences about the rest of the data. *See, e.g.*, William Hamilton, *Sampling Helps Keep Relevance Relevant*, 37 No. 4 Litig. at 5 (Summer 2011). Sampling requires a homogeneous population so that conclusions drawn from the sample dataset can be extrapolated to the entire population covered by the data:

> Sampling in e-discovery does the same thing. We locate an ESI volume (population) that is reasonably homogeneous for sampling – for example, the sales staff support manager's data – to see if the

> rest of the ESI is worth looking at.  *The sample has to be random and the population homogeneous*.

*See id.* at 6 (emphasis added).  In a population the size of the four revenue divisions, in many widely differing lines of work, with individuals in jobs ranging from trading to sales to investment banking, often in highly specialized markets, the factors that drive success and the criteria by which performance is measured vary widely.  The factors that must be considered in any reliable comparison of employees in this collection of roles are such that a random sample will not produce a meaningful analysis.

### D.    Plaintiffs Cannot Establish "Good Cause" For Demanding Additional Data

Nor can Plaintiffs establish "good cause" for demanding any additional data.  Plaintiffs acknowledge that one of the factors a court must consider in evaluating "good cause" is whether "the burden or expense of the proposed discovery outweighs its likely benefit[.]"  *See* Pls.' Br. at 18; Rule 26(b)(2)(C)(iii); *see also General Steel Domestic Sales, LLC v. Chumley*, 2011 WL 2415715, at *3 (D. Colo. June 15, 2011) ("In light of the burden and cost set forth above, the Court finds that Defendants have not shown good cause for ordering production of the audio recordings.  'Even if the information sought is relevant . . . .  [Defendants do not] explain why the extensive amount of information [they] seek is of such importance that it justifies imposing an extreme burden on [Plaintiff].'") (citation omitted and alterations in original).

Plaintiffs cannot possibly argue that the data Goldman Sachs would be in a position to provide in the event that phased discovery is rejected would somehow be insufficient or inadequate.  *See* Fed. R. Civ. P. 26(b)(2) 2006 advisory committee's note ("In many circumstances the requesting party should obtain and evaluate the information from such sources before insisting that the responding party search and produce information contained on sources that are not reasonably accessible.").  In other words, there is no "good cause" here.

### III.    PLAINTIFFS HAVE NO BASIS FOR FILING A MOTION TO COMPEL WITH RESPECT TO DOCUMENT DISCOVERY

Plaintiffs also seek to compel documents related to Goldman Sachs' "promotion, compensation, and evaluation systems, as well as complaint-related documents," *see* Pls.' Br. at 20, yet Goldman Sachs would be willing to produce most of the documents and information Plaintiffs seek.

#### A.    Goldman Sachs Has Produced or Agreed to Produce Responsive Documents

Goldman Sachs has already produced well over 100,000 pages of documents, many of which relate to or reflect compensation, promotion, and evaluation policies and processes. Goldman Sachs has also agreed to search for and produce additional documents if they exist, including:

- Documents concerning how and/or why compensation practices were adopted in the four revenue divisions;

- Additional policy documents related to its 360 evaluation process;

- Additional policy documents, training materials and guidelines related to terms of employment, maternity leave, human resources training, and leadership acceleration;

- Additional policy and/or process documents related to promotions to EMD;

- Information related to internal complaints by women in the relevant population in the four revenue divisions concerning gender bias in compensation, evaluation, or promotion; and

- Goldman Sachs has also agreed to create and provide to Plaintiffs an index of any lawsuits and external administrative complaints concerning allegations of gender bias in compensation, evaluation or promotion with respect to Associates or VPs in the four revenue divisions, or pertaining to promotion to EMD.

*See* Brown Decl., Ex. 1 (Feb. 29, 2012 letter from Brown).

Based on Plaintiffs' Motion, the primary dispute between the parties on this issue appears to relate to the time period covered by the production.  Plaintiffs seek documents back to 2000 and

falsely claim that Goldman Sachs limited its document production back to 2005. However, as

Goldman Sachs specifically explained in its February 29, 2012 letter to this Court:

> Goldman Sachs has agreed to produce a significant amount of
> documents for the over-seven-year period dating back to January
> 2005. Goldman Sachs also agreed that, to the extent that responsive
> documents are located – *even dating back to 2000* – during the
> search for hard copy documents in the possession of individual
> employees, it would gather and produce them.

*See id.* at 4 (emphasis in original). In other words, Goldman Sachs has *offered a reasonable*

*approach* to the production of these documents, including the production of relevant documents

back to 2000. Given the large number of custodians Goldman Sachs will have to communicate

with in order to locate what it has already agreed to produce (Goldman Sachs has previously

estimated that it would need to contact approximately 200 custodians), the agreement to produce

documents back to 2000 as it locates them means that Goldman Sachs would already be

conducting an extensive search for documents for the time period Plaintiffs request.[10] Goldman

Sachs happy to hear that Plaintiffs believe that sending a "mass email to 200 custodians" will

satisfy Defendants' discovery obligations, and that Plaintiffs are open to the concepts behind

predictive coding, *see* Pls.' Br. at 21-22, but this only highlights the lack of any current cognizable

dispute; negotiations as to custodians and collection methods *have not taken place.*[11]

---

[10] Even Plaintiffs acknowledge the prematurity of their motion regarding documents when they
admit that the parties have "not yet negotiated a custodian list." Pls.' Br. at 21. This is precisely
why Goldman Sachs is not able to provide a more definite estimate. However, placing the blame
on Goldman Sachs for "even now still producing basic organizational charts and employee
information" is both misleading and unfair. Plaintiffs ignore the still-in-effect discovery limitation
(*see* Docket No. 109), as well as the fact that Goldman Sachs produced organizational materials
related to the Securities Division *over a year ago*. Furthermore, despite the discovery limitation,
Goldman Sachs produced documents showing the organizational structure of the other three
divisions over two months ago.

[11] Even Plaintiffs acknowledge the prematurity of their motion regarding documents when they
admit that the parties have "not yet negotiated a custodian list." Pls.' Br. at 21. This is precisely
why Goldman Sachs is not able to provide a more definite estimate. However, placing the blame
on Goldman Sachs for "even now still producing basic organizational charts and employee

In other words, it is unclear what exactly Plaintiffs are seeking to compel. Their generic request for all documents back to 2000 – without responding to Goldman Sachs' reasonable position – has all the hallmarks of a "fishing expedition." *See Cronas*, 2008 WL 4548861, at \*2 ("the proverbial 'fishing expedition,' [is] not an appropriate use of discovery"; rejecting plaintiffs' discovery requests for compensation and promotion-related documents when requested discovery would have cost defendant hundreds of thousands of dollars to produce).

### B.    Producing Additional Documents Increases the Burden on Goldman Sachs Substantially With Little or No Added Benefit to Plaintiffs

Plaintiffs vastly underestimate – or dismiss altogether – the very real and substantial burden imposed by their unrelenting discovery demands. The costs incurred to locate and produce the documents produced already are substantial. At this stage, without further discussion between the parties, the costs associated with their additional demands are impossible to estimate. But it is important for Plaintiffs to recognize that the costs not only include client, attorney and paralegal time in locating the documents, but also vendor ingestion fees, storage fees, and TIFFing fees, as well as fees for the attorney time to review the documents and for a privilege review.

To the extent Plaintiffs insist on every conceivable document that in any way touches upon compensation, promotion, or evaluation from anyone in the Firm, generated at any time since 2000, such a request is patently unreasonable and would be practically impossible to satisfy. This undifferentiated "demand for everything" is precisely what the discovery limits in Rule 26(b)(2)(B) and (C) of the Federal Rules of Civil Procedure were designed to avoid. *See National Org. for Women v. Sperry Rand Corp.*, 88 F.R.D. 272, 276 (D. Conn. 1980) (explaining that by

---

information" is both misleading and unfair. Plaintiffs ignore the still-in-effect discovery limitation (*see* Docket No. 109), as well as the fact that Goldman Sachs produced organizational materials related to the Securities Division *over a year ago*. Furthermore, despite the discovery limitation, Goldman Sachs produced documents showing the organizational structure of the other three divisions over two months ago.

imposing discovery limits, courts avoid "unnecessary magnification of cost and effort" that unwarranted class-based discovery would impose).

### C.    There is No Current Dispute Over E-Mail Discovery and There is Nothing to Compel on That Issue

Plaintiffs acknowledge that the parties are still conferring about the best practices to identify appropriate e-mail custodians and sampling word searches in order to focus e-mail discovery. Indeed, Plaintiffs recognize that "no disputes solely about email-focused discovery have yet arisen here." Pls.' Br. at 6, n.5. Thus, there is nothing to compel at this juncture. Indeed, the parties have not even discussed the parameters of any e-mail production (other than that regarding the emails of Plaintiffs Chen-Oster and Orlich, which have been produced). Plaintiffs have not identified a list of custodians for an e-mail search, nor have the parties discussed or agreed upon relevant search terms for any broader e-mail searches. Plaintiffs' entire argument regarding e-mail production (see Pls.' Br. at 22-23) is premature.

Nevertheless, to the extent Plaintiffs purport to seek e-mails back to 2003, they must understand that such an expansive e-mail production would indeed be a massive – and cumbersome – undertaking.[12] As an example of the sheer volume of emails, *Plaintiffs Chen-Oster's and Orlich's mailboxes together consisted of 39.99 Gigabytes of data.* Using a conservative estimate of 75,000 pages per gigabyte demonstrates the magnitude of what is involved here. This is just *two custodians, contributing nearly 3 million pages of email*; the vendor fees alone (ingestion, culling, storage) for a large group of custodians will be incredibly high.[13] Even more troubling is the fact that the costs of attorney review time for such a large

---

[12] Plaintiffs have agreed to "limit their request for email communications to 2003 forward, except for certain key custodians." *See* Pls.' Br. at 22.

[13] Though Goldman Sachs provided this information regarding the sizes of Plaintiffs Chen-Oster's and Orlich's mailboxes in its February 29 letter for reference only, contrary to Plaintiffs' accusations in their Motion, *see* Pls.' Br. at 22, Goldman Sachs also provided information

group of custodians, coupled with a review of all the hard copy documents that must be collected, will be prohibitively expensive. *See, e.g., I-Med Pharma Inc. v. BioMatrix, Inc.,* 2011 WL 6140658, at *5 (D.N.J. Dec. 9, 2011) (refusing to compel discovery that would entail a privilege review of millions of documents).

Plaintiffs are attempting to compartmentalize their discovery demands so that the burdens of data and email discovery will not be considered together.  However, these burdens are real and substantial.  In any event, the issue of email discovery will have to be deferred until an actual dispute has crystallized; seeking a broad ruling unmoored to specific custodians or searches is utterly premature and has no basis.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Goldman Sachs respectfully requests that the Court reserve judgment until Judge Sand has delivered his opinion regarding the outstanding Motion to Strike or, in the alternative deny Plaintiffs' Motion to Compel.

Dated:  May 30, 2012            PAUL HASTINGS LLP
New York, New York

By:  _____/s/Barbara B. Brown_____
BARBARA B. BROWN *(admitted pro hac vice)*
ZACHARY D. FASMAN
C. GEOFFREY WEIRICH *(admitted pro hac vice)*
75 East 55th Street
New York, New York  10022
(212) 318-6000
barbarabrown@paulhastings.com
zacharyfasman@paulhastings.com
geoffweirich@paulhastings.com

---

regarding the considerable size of the results *after Plaintiffs' search terms were run.  See* Brown Decl., Ex. 1 (Feb. 29, 2012 letter from Brown) n.10.

SULLIVAN & CROMWELL LLP
THEODORE O. ROGERS, JR.
SUHANA S. HAN
125 Broad Street
New York, New York  10004
(212) 558-4000
rogerst@sullcrom.com
hans@sullcrom.com

Attorneys for Defendants
GOLDMAN, SACHS & CO. and
THE GOLDMAN SACHS GROUP, INC.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; LISA PARISI; and SHANNA ORLICH, | |
| Plaintiffs, | 10 Civ. 6950 (LBS) (JCF) |
| vs. | **CERTIFICATE OF SERVICE** |
| GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC. | |
| Defendants. | |

I hereby certify that on May 30, 2012, I caused a copy of the foregoing Defendants' Response in Opposition to Plaintiffs' Motion to Compel Discovery of Data and Documents to be served by the Court's ECF system on:

Adam T. Klein
Cyrus E. Dugger
Jennifer L. Liu
OUTTEN & GOLDEN, LLP
3 Park Avenue, 29th Floor
New York, New York 10016
*Attorneys for Plaintiffs*

Kelly M. Dermody
Anne B. Shaver
Alison M. Stocking
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
*Attorneys for Plaintiffs*

Dated: New York, New York
May 30, 2012                    By: _____/s/ Barbara B. Brown_____
                                        BARBARA B. BROWN