# EXHIBIT 1

# PAUL
# HASTINGS

1(202) 551-1717
barbarabrown@paulhastings.com

February 29, 2012                                                           21166.00050

**BY HAND**

The Hon. James C. Francis
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:     ***Chen-Oster, et al. v. Goldman, Sachs & Co., et al.***
        **No. 10 Civ. 6950 (LBS) (JCF)**

Dear Judge Francis:

On behalf of Defendants Goldman, Sachs & Co. and The Goldman Sachs Group, Inc. ("Goldman Sachs"), we write in response to Plaintiffs' letter to Your Honor, dated February 15, 2012, requesting a pre-motion conference. We would be happy to attend a conference, at Your Honor's convenience. As we describe below and can discuss at such a conference, Plaintiffs' complaints about discovery are not well-founded. Goldman Sachs has actively engaged with Plaintiffs in an effort to come to an agreement on a reasonable scope of discovery related to class certification issues. Goldman Sachs already produced a large amount of discovery and has offered to produce a huge additional volume of materials, dating back at least seven years, and covering all four of the revenue-producing divisions as to which they seek class certification. Defendants' counsel conservatively estimate that this discovery ultimately could result in the production of roughly one million pages of documents currently maintained in either electronic or hard-copy form,[1] and possibly several times that amount.

Unfortunately, Plaintiffs persist in demanding that the firm search for and produce at this class-certification stage a huge array of electronic and hard-copy documents that they believe conceivably may exist in the files of hundreds of employees in each business unit and on each desk in those four revenue divisions, for a period of twelve years rather than seven. As described in detail below, the expanded time frame alone will hugely increase the burden to Goldman Sachs, well beyond the broad discovery to which Goldman Sachs otherwise is willing to agree.

The burden created by Plaintiffs' time-span demands is multiplied further by the rather breathtaking range of the discovery requests upon which Plaintiffs insist. As just one example, Plaintiffs demand that Goldman Sachs search comprehensively, not just for policy and procedure documents or communications from the individuals responsible for design and implementation of the personnel processes at issue in the case, as Defendants have agreed to do, but also for any minutes or notes taken by any attendee at any informal meetings that may conceivably have occurred over this span of more than a decade, at which one of these processes may have been discussed.

The cost and burden of the discovery demanded by Plaintiffs is wholly disproportionate to the value it could offer with respect to the class certification issues in the case. Indeed, the broad scope Plaintiffs request could likely require Goldman Sachs to approach hundreds of employees whose files would not

---

[1] The volume of documents reviewed, of course, will likely be several times this amount.

PAUL
_____
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 2


otherwise need to be searched at this stage, and to review for responsiveness many millions of additional documents. That disproportionate burden is not warranted, and Goldman Sachs will ask Your Honor to reject Plaintiffs' request for those reasons.

## I.      INTRODUCTION

At the outset, we must note that we regret that Plaintiffs chose to raise these issues with Your Honor while we were in continuing discussions with them, and without prior notice to us. We had a lengthy discussion on January 26 with Plaintiffs, followed up by a letter of February 2, 2012 (attached hereto as Exhibit 1), in which we described a broad range of offered compromises and expressly contemplated further discussions on particular demands by Plaintiffs.[2] Rather than engaging in those further discussions, Plaintiffs chose instead to burden Your Honor with these issues.

We did not stop engaging with Plaintiffs when they submitted their premature letter to Your Honor on February 15. Indeed, in a letter last week (attached hereto as Exhibit 2), Goldman Sachs reviewed each of 37 separate categories of document demands by Plaintiffs, noting agreement on many points. In a telephonic meet and confer meeting two days ago, we further narrowed the areas of disagreement between us. We also agreed to provide additional information or reconsider our position on a number of matters. The net result is that we may have at most one or two specific document requests on which we disagree, other than with respect to the general time frame and scope issues mentioned above. In short, had Plaintiffs not prematurely submitted their pre-motion letter, many, if not most of the disagreements could have been worked out without having to impose on the Court.

Much of Plaintiffs' letter to Your Honor consists of inflammatory rhetoric that does not help resolve the discovery issues we have been trying to settle. For example, Plaintiffs' suggestion that Goldman Sachs has "failed to acknowledge" Judge Sand's ruling as to the exhaustion of Plaintiff Chen-Oster's class claims is simply not correct. Goldman Sachs is not trying to re-litigate Judge Sand's decision, nor is it ignoring any ruling by the Court. Goldman Sachs is merely trying to engage with Plaintiffs concerning the extreme burden of their demands. Neither Your Honor nor Judge Sand has at any time ruled that the finding that Plaintiff Chen-Oster's charge allows her to assert claims on behalf of "similarly situated" persons requires Goldman Sachs to search for, locate and produce virtually every piece of paper (including meeting minutes and hand written notes) or data generated at Goldman Sachs over a *twelve year* period concerning every professional employee in a revenue-generating position. Yet that is what Plaintiffs continue to seek.

The crux of Goldman Sachs' concern here is burden and its disproportion to possible value at this class certification stage. As described below, and as we can demonstrate further when we appear before Your Honor, the burden and expense involved here is immense. Goldman Sachs has already produced almost 100,000 pages of documents related to Plaintiffs Chen-Oster and Orlich, and to personnel processes and practices applicable to the Securities Division within which they worked.[3] It has agreed to produce

---

[2] *See* Exhibit 1, at p. 2: "We look forward to hearing from you in response to our proposal regarding these issues. *After that, we will provide a detailed response to the other individual requests discussed in your letter of January 27.*" (emphasis added).

[3] Your Honor's October 4, 2011 Order stated that, "[u]ntil the ability of plaintiffs Parisi and Chen-Oster to assert class claims is finally determined, class discovery shall be limited to the period after January 1, 2007, to the Securities Division, and to the positions of Associate and Vice President." (*See* Docket No.

PAUL
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 3

materials from the other three revenue divisions named in Plaintiffs' Amended Complaint, notwithstanding that neither one of them ever worked in those divisions.[4]  The documents and data Goldman Sachs has offered to produce are *more than sufficient* to allow Plaintiffs to try to support their class allegations.

## II.    BRIEF BACKGROUND

This putative class action was brought by only three named plaintiffs, two of whom worked their entire time at Goldman Sachs in the firm's Securities Division, and the other of whom worked exclusively within the Investment Management Division.  They purport to represent all female Associates, Vice Presidents and Managing Directors in four of the firm's revenue generating divisions – Securities, Investment Banking, Investment Management, and Merchant Banking (the "four revenue divisions").

Cristina Chen-Oster worked as a sales person in one department, the Convertible Sales Department, in the Equities unit of the Securities Division throughout almost all of her employment with Goldman Sachs. She was in the Equities unit during her entire employment.  She joined the firm in 1997 and resigned in March 2005.

Shanna Orlich worked as a summer intern at the firm in 2006 and then as an Associate in the Capital Structure Franchise Trading Department, within the Fixed Income, Currencies, and Commodities ("FICC") unit of the Securities Division, from mid 2007 until November 2008, when her employment was terminated.

Lisa Parisi worked exclusively within the Investment Management Division.  She joined the firm as a Vice President and was subsequently promoted to Extended Managing Director ("EMD").[5]  Her employment was terminated in 2008.

---

109.)  Plaintiffs inaccurately claim that the "self-limiting conditions" of that Order have been met.  In fact, Goldman Sachs has filed objections related to its Motion to Strike All Class Allegations in Plaintiffs' First Amended Complaint and for Partial Summary Judgment as to Plaintiffs' Disparate Impact Claim Under Title VII (*see* Docket No. 135), and has appealed to the Second Circuit the denial of its Motion to Stay Plaintiff Parisi's Claims and Compel Individual Arbitration.  However, even if Goldman Sachs' objections and appeal are denied, at no time has this Court condoned the sweeping discovery Plaintiffs now seek.

[4] As Your Honor recognized, the Court's conclusion that Plaintiff Chen-Oster exhausted her administrative remedies on behalf of other Goldman Sachs employees "does not define the scope of the class claims that Ms. Chen-Oster may bring."  *Chen-Oster v. Goldman, Sachs & Co.*, No. 10-6950 (LBS) (JCF), 2011 WL 6372786, at *4 n.2 (S.D.N.Y. Sept. 29, 2011).

[5] As Plaintiffs note in footnote 1 of their February 15 letter, the parties have agreed to stay discovery with respect to the Managing Director position until the issue of the scope of Plaintiff Parisi's arbitration commitment with the firm is resolved.  Goldman Sachs has agreed that it will provide discovery related to the process for promotions from Vice President to EMD in the four revenue divisions.

PAUL
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 4


III.    **PLAINTIFFS' DOCUMENT DISCOVERY DEMANDS**

   A.    **Goldman Sachs Has Already Agreed To Produce a Vast Range Of Documents, Going Back As Far As 2000**

Plaintiffs' First Set of Requests for Production of Documents demanded discovery regarding all Associates, Vice Presidents, EMDs, and PMDs[6] in all of Goldman Sachs' business divisions for the period of July 7, 2000 to the present, covering all manner of topics.  In response, as stated above, Defendants have **already produced almost 100,000 pages of documents**.

Additionally, and in an effort to resolve the discovery disputes, Goldman Sachs has agreed to produce a significant amount of documents for the over-seven-year period dating back to January 2005.  Goldman Sachs also agreed that, to the extent that responsive documents are located – *even dating back to 2000* – during the search for hard copy documents in the possession of individual employees, it would gather and produce them.  This is a far cry from "entirely reject[ing]" Plaintiffs' positions.  Goldman Sachs has agreed to search for and produce the following additional documents if they exist:[7]

- Organizational charts for all four revenue divisions.

- Job descriptions for Associates and Vice Presidents in the other three revenue divisions, and pre-2007 job descriptions for Associates and Vice Presidents in all four revenue divisions.

- Documents that contain self-critical reviews, studies or audits related to the number of female Associates, Vice Presidents or EMDs in the four revenue divisions.

- Documents concerning how and/or why compensation practices were adopted in the four revenue divisions.

- Any additional policy documents related to its 360 degree review process, the process by which colleagues provide feedback regarding an employee.  (Again, Goldman Sachs has produced already hundreds and hundreds of pages of such documents dated 2007 and forward.)

---

[6]  Though Plaintiffs sometimes refer generally to "Managing Directors," it is important to understand the difference between EMDs and Partners.  Partners at Goldman Sachs hold the title of Participating Managing Director ("PMD").  PMD is the corporate job title held by the firm's most senior leaders.  Not only do Partners have arbitration agreements, but none of the named Plaintiffs held the position of Partner.  For these reasons, Goldman Sachs objects to providing discovery as to its Partners.  Plaintiffs appear willing to reconsider their insistence on this discovery if they are provided with evidence that Vice Presidents may be promoted only to the EMD position, and not directly to the PMD position, as is the case.  Indeed, the process of promotion to PMD is less frequent and completely separate from the process of promotion to EMD, and many EMDs remain in that status for their entire careers with Goldman Sachs.

[7]  Goldman Sachs already has produced thousands of pages of documents related to these topics, consistent with the Court's prior limitation of discovery to the period from 2007 on in the Securities Division, but has now agreed to expand its search to include pre-2007 materials and materials that might exist in the other three revenue divisions.

PAUL
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 5

- Additional policy documents, training materials and guidelines related to terms of employment, maternity leave, human resources training, and leadership acceleration.

- Documents concerning gender-related initiatives at the recruiting and hiring stages.

- Exit interview information.

- Additional policy and/or process documents related to promotions to EMD.

- EEO-1 reports and the firm's affirmative action plans to the extent they pertain to data on gender composition of jobs in the four revenue divisions at the Associate, VP or EMD level.

- Any additional documents related to internal complaints related to gender, including the process for raising complaints.

- Information related to complaints by women in the four revenue divisions concerning gender bias in compensation, evaluation, or promotion.

- Goldman Sachs has agreed to create and provide to Plaintiffs an index of any lawsuits and external administrative complaints concerning allegations of gender bias in compensation, evaluation or promotion with respect to Associates or VPs in the four revenue divisions, or pertaining to promotion to EMD.

This list is not exhaustive. A more complete description of the documents that Goldman Sachs has agreed to produce is included in our February 21 letter to Plaintiffs' counsel (See Ex. 2); see also letter from A. Shaver to B. Brown, dated January 27, 2012 (attached hereto as Exhibit 3).

In addition to the categories listed above, Goldman Sachs has also made it clear to Plaintiffs' counsel that it will work with them to determine a reasonable number of custodians from whom it will search for a reasonable set of email search terms. Goldman Sachs has already – at great expense – produced thousands and thousands of emails related to Plaintiffs Chen-Oster and Orlich.

Not content with this expansive scope of discovery and with seven years of documentary material, Plaintiffs continue to demand even more. One of the most egregious examples is their request for all minutes and informal notes from any and all meetings over the past twelve years in which certain personnel policies or processes were discussed. Goldman Sachs has agreed to work with key individuals who are responsible for dissemination of current policy and process documents relating to performance, pay and promotions, and to the extent we learn about formal meetings in which notes were taken or presentations made, even back to 2000, we will conduct a reasonable search for those documents. Similarly, with respect to studies concerning gender and performance evaluations, compensation or assignments, Goldman Sachs has agreed to search for documents concerning studies pertaining to the four revenue divisions conducted by formal groups at the firm, and if we locate responsive documents created by informal groups as we are searching for other documents, we have agreed to produce them.

**PAUL**
**HASTINGS**

The Hon. James C. Francis
February 29, 2012
Page 6

**B.      The Broad Range Of Documents Goldman Sachs Has Already Agreed To Produce Is More Than Reasonable**

*1.      Courts limit discovery when its burden outweighs its benefit*

Courts routinely limit discovery when the burden on the producing party outweighs the benefit to the other party.  Fed. R. Civ. P. 26(b)(2)(C)(iii) (allowing courts to limit discovery when "the burden or expense of the proposed discovery outweighs its likely benefit"); *Cronas v. Willis Group Holdings Ltd.*, No. 06 Civ. 15295 (GEL), 2008 WL 4548861, at *2 (S.D.N.Y. Oct. 8, 2008) ("the proverbial 'fishing expedition,' [is] not an appropriate use of discovery"; rejecting plaintiffs' discovery requests for compensation and promotion-related documents when requested discovery would have cost defendant hundreds of thousands of dollars to produce); *National Org. for Women v. Sperry Rand Corp.*, 88 F.R.D. 272, 275-77 (D. Conn. 1980) (explaining that by imposing discovery limits, courts avoid "unnecessary magnification of cost and effort" that unwarranted class-based discovery would impose; "Discovery is not to be used as a weapon."); *see also Garcia v. Tyson Foods, Inc.*, No. 06-2198 (JWL) (DJW), 2010 WL 5392660, at *8-14 (D. Kan. Dec. 21, 2010) (denying plaintiffs' motion to compel additional discovery of ESI where defendants had already produced more than 14,000 ESI documents from the hard drives of 33 identified custodians at a cost of over $500,000).

The astronomical discovery burden Plaintiffs seek to impose on Goldman Sachs is precisely what Rule 26 and the case law aim to prevent.  As discussed above, Goldman Sachs has already agreed to search for and produce documents back to 2005, and back to 2000 if it locates such documents while searching individual custodians' files.  Given the large number of custodians Goldman Sachs will have to communicate with in order to locate what it has already agreed to produce, the agreement to produce documents back to 2000 as it locates them means that Goldman Sachs will be conducting an extensive search for documents all the way back to 2000.[8]

Thus, the significant amount of document discovery that Goldman Sachs has already agreed to produce is more than reasonable – and already places an extraordinarily high burden on Goldman Sachs. Plaintiffs demand that Goldman Sachs search for and produce essentially every piece of paper related to discussions concerning compensation or promotion decisions, or to gender, or to many other broad topics, created by anyone at the firm for a 12-year period is entirely unreasonable.  Forcing the firm to search for and produce more than it has agreed to do would place on Goldman Sachs an enormous burden vastly disproportionate to any conceivable benefit to Plaintiffs.  This demand is a fishing expedition, something courts have refused to allow plaintiffs to do.  *Cronas*, 2008 WL 4548861, at *2.

*2.      The undue burden of the search demanded by Plaintiffs*

Collection of the documents and data that Plaintiffs demand would present an undue burden for Goldman Sachs.  For example, Plaintiffs demand notes and other documents from any informal or formal meeting that occurred, over a 12-year period, at which gender and topics such as compensation were discussed. Goldman Sachs has agreed to search for and produce documents from formal meetings of certain groups

---

[8] It is impossible at this stage to provide an exact number of custodians because information learned during the document collection process inevitably leads to the discovery of additional individuals who should be on the list; however, Goldman Sachs estimates, conservatively, that the number – across the four revenue divisions – will likely be well over 200.

PAUL
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 7

within the firm, such as diversity task forces. Further, Goldman Sachs has agreed to produce other such documents to the extent we locate them while reviewing the hard copy documents of individual employees. However, fully meeting Plaintiffs' unreasonable demand would be practically impossible. Goldman Sachs would have to attempt to determine all formal and informal meetings that occurred over a 12-year period in four separate divisions, each of which contain thousands of employees. Goldman Sachs would then have to determine everyone who participated in each of those meetings, and then would have to attempt to search those individuals' hard copy and electronic documents – for a 12-year period. Such searches will take months or longer and would entail huge expense; at best Plaintiffs can only speculate that such a process would turn up any relevant documents, let alone ones helpful to Plaintiffs' case.

The documents that Goldman Sachs has already agreed to produce create a substantial burden in and of themselves, and the almost 100,000 pages of documents that Goldman Sachs has produced to date is just a small portion of what it has agreed to produce during the recent meet-and-confer efforts. The costs incurred to locate and produce the documents produced already are substantial. These costs not only include client, attorney and paralegal time in locating the documents, but also vendor ingestion fees, storage fees, and TIFFing fees,[9] as well as fees for the attorney time to review the documents and for a privilege review.

The burden will only increase as Goldman Sachs expands its search outside of the Securities Division, and as Plaintiffs cooperate in reaching agreed-upon search terms and custodians pursuant to which Goldman Sachs will review emails beyond those related to Plaintiffs Chen-Oster and Orlich. As Goldman Sachs has explained to Plaintiffs' counsel, costs related to reviewing and producing emails will be particularly high in this case because Goldman Sachs' systems, after 2003, do not purge emails. Unlike most companies that have relatively short 30- to 90-day email retention periods (which are expanded only when a litigation hold is issued), *every* email sent from or received by *every* Goldman Sachs employee has been maintained in a central journaling system (not on backup tapes) since 2003.

As an example of the sheer volume of emails, **Plaintiffs Chen-Oster's and Orlich's mailboxes together consisted of 39.99 Gigabytes of data**. Using a conservative estimate of 75,000 pages per gigabyte demonstrates the magnitude of what is involved here. This is just *two custodians, contributing nearly 3 million pages of email*; the vendor fees alone (ingestion, culling, storage) for a large group of custodians will be incredibly high. Even more troubling is the fact that the costs of attorney review time for such a large group of custodians, coupled with a review of all the hard copy documents that must be collected, will be prohibitively expensive.[10] *See, e.g., I-Med Pharma Inc. v. BioMatrix, Inc.,* Civ. No. 03-3677 (DRD),

_____

[9] Before Goldman Sachs can review documents, it must first have a vendor process the documents into a form that can be searched and reviewed. The vendor must then import the documents into a review database to run search terms. Additionally, before it can produce documents, Goldman Sachs must pay a vendor to put the documents in a form that can be produced as Plaintiffs demanded; for example, the vendor must put the documents into TIFF and searchable OCR format, Bates-number the documents, and put the associated metadata into a form that Plaintiffs can use. Vendors charge hundreds of dollars per GB for most of these tasks (and a per-page fee for certain of the tasks).

[10] Plaintiffs' proposed search terms were extraordinarily broad; even after running them (which is, of course, after all of the data has been ingested), Goldman Sachs was left with 15.15 Gigabytes of data. To put in perspective how burdensome this volume of documents is from a review standpoint (aside from vendor fees), on average, one document reviewer can review approximately 300-400 documents (which

PAUL
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 8

2011 WL 6140658 (D.N.J. Dec. 9, 2011) (refusing to compel discovery that would entail a privilege review of millions of documents).

This is precisely the type of situation in which courts should – and indeed must – place limits on discovery, to protect defendants from "the proverbial fishing expedition." *Cronas*, 2008 WL 4548861, at *2.

> 3.    *None of Plaintiffs' arguments suggests a contrary result*

Plaintiffs cannot establish entitlement to additional documents. For example, Plaintiffs incorrectly argue that the Lilly Ledbetter Fair Pay Act ("Fair Pay Act") entitles them to more documents than Goldman Sachs has already agreed to produce. As the name suggests, however, the Fair Pay Act applies to Plaintiffs' Title VII compensation claims (42 U.S.C. § 2000e-5(e)(3)(B)) – and not to other aspects of employment about which Plaintiffs demand documents, including performance evaluations, promotions, business opportunities, and professional support. The Act does not dictate the appropriate scope of discovery, and the cases Plaintiffs cite to support this Fair Pay Act argument were *not* rulings on the scope of discovery. It is also significant that the liability period under Plaintiff Chen-Oster's *Title VII claims* dates back only to September 2004.

Plaintiffs also contend that evidence of practices back to 2000, two years before the liability period for Plaintiffs' claims under New York law, is directly relevant to the existence of such practices during the liability period. Ignoring the fact that Goldman Sachs has already agreed to produce documents as far back as 2000 if it locates them, Plaintiffs cite a series of cases that simply do not support the proposition that Plaintiffs are entitled to yet more documents. In *James v. Newspaper Agency Corp.*, 591 F.2d 579, 582 (10th Cir. 1979), for instance, the plaintiff sought records for an eight-year period, and from two departments. The court limited discovery to the one department in which the plaintiff worked, and confined discovery to the four-year period of time from 1969 to 1973. *Id.* Notably, "the gravamen of [plaintiff's] complaint was that when the assistant credit manager retired [in 1969,] she failed to be promoted to his position." *Id.* Therefore, events in 1969 were directly relevant to the plaintiff's claims. Even more significant, *James* did not involve anything like the number of documents at issue here, so the court did not address the burden a defendant such as Goldman Sachs faces in a case like this one. Similarly, in other cases Plaintiffs cite, the defendant did not show undue burden. *See Khan v. Sanofi-Synthelabo, Inc.*, No. 01Civ14123, 2002 WL 31720528, at *4 (S.D.N.Y. Dec. 3, 2002) (noting that court would have limited discovery if an actual burden was shown: "the Court was willing to entertain limitations on this discovery (including temporal limitations) based on actual burden, but none has been adequately demonstrated"); *EEOC v. Kansas City S. Ry.*, 195 F.R.D. 678, 680 (D. Kan. 2000) (noting that defendant failed to show undue burden in that particular case). Goldman Sachs will demonstrate, with declarations or other evidence, the extreme burden it faces.

Perhaps most untenable is Plaintiffs' reliance on *Concerned Citizens of Belle Haven v. Belle Haven Club*, 223 F.R.D. 39, 42-43 (D. Conn. 2004), and Plaintiffs' suggestion that a thirty-year discovery period is no

---

generally equates to 1,800 to 2,400 pages) in a day – meaning that even an incredibly large team of document reviewers would likely need many months or even years to review everything that Plaintiffs demand. For example, even based on the outside range of this estimated speed of review, it could potentially take one document reviewer approximately a month to review one Gigabyte of data.

PAUL
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 9


problem at all. In Concerned Citizens, a discrimination suit against a private club, the discovery plaintiffs sought was far more limited and vastly less burdensome than what Plaintiffs seek here. It is not sensible to say that Concerned Citizens is relevant to this case – where full compliance with Plaintiffs' unreasonable demands would require Goldman Sachs to spend many months, and many hundreds of thousands of dollars, to search for, review and produce the documents of hundreds of custodians for a 12-year period.

In their letter, Plaintiffs say they are "only" seeking ten years of data and "only" twelve years of documents. Plaintiffs willfully ignore the extraordinarily high burden that their discovery demands place on Goldman Sachs. Perhaps that is why Plaintiffs cite so many irrelevant cases that do not concern unduly burdensome discovery. Goldman Sachs has already agreed to undertake a very sizable burden of production and objects to the immense additional burden Plaintiffs seek to impose.

## IV.    PLAINTIFFS' DEMANDS FOR DATABASES

### A.    Goldman Sachs Has Already Agreed To Produce A Significant Amount Of Data

In addition to the documents it has agreed to produce, Goldman Sachs has already agreed to produce electronic personnel data:

- Back to July 2, 2002[11] for the two groups within the Securities Division in which Plaintiff Chen-Oster worked or was slated to work, Convertible Sales (including Convertible Bonds and Synthetic Convertibles) and Equities Research, and

---

[11] Although Plaintiffs argue that the liability period for their New York claims dates back to July 7, 2002 because they claim Plaintiff Chen-Oster's charge tolled the statute of limitations under the NYCHRL, the Second Circuit has never so ruled, and there is conflicting district court case law on this point. Although some district courts have allowed such tolling, several courts have held otherwise. See Strachova v. Metro. Museum of Art, No. 98 Civ. 8505, 1999 WL 566305, n.1 (S.D.N.Y. Aug. 3, 1999) ("Even assuming the applicable statute of limitations is three years as under the New York Human Rights law, that statute of limitations would bar plaintiff's action as three years had elapsed between plaintiff's termination . . . and plaintiff's commencement of this action . . . . This is the case even though plaintiff filed an EEOC charge on June 5, 1998, exactly three years after her termination."), aff'd, 208 F.3d 204 (2d Cir. 2000); Gilani v. Nat'l Ass'n of Sec. Dealers, Inc., No. 96 CV 8070, 1997 WL 473383, at *10 n.5 (S.D.N.Y. Aug. 19, 1997) ("Filing an EEOC charge does not toll a New York Human Rights claim."); see also Kearney v. Abn Amro Inc., No. 04 CV 06885, 2006 WL 2354819, at *4 (S.D.N.Y. Aug. 10, 2006) (questioning whether tolling was permissible because "[f]or reasons unknown to Plaintiff or this Court, the NYSDHR or the NYCDHR never received Plaintiff's charge" and further explaining that state or local proceedings are not deemed to have been commenced until the date EEOC charge is mailed or hand delivered by EEOC) (internal citations omitted). Even the cases Plaintiffs cite indicate that this is not a settled issue. See, e.g., Wilson v. N. Y. City Police Dept., No. 09 Civ. 2632, 2011 WL 1215031, at *14 (S.D.N.Y. Feb. 4, 2011) (in language conspicuously missing from Plaintiffs' letter, noting that "the Second Circuit has yet to definitively opine on the issue of whether the filing of the charge with the EEOC serves to automatically toll the statute of limitations on claims asserted under ... NYCHRL"; case involved individual plaintiff), adopted by, 2011 WL 1215735 (S.D.N.Y. Mar. 25, 2011); Esposito v. Deutsche Bank AG, No. 07 Civ. 6722, 2008 WL 5233590, at *5 (S.D.N.Y. Dec. 16, 2008) (same).

PAUL
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 10

- Back to January 1, 2007 for the rest of the Securities Division and the Investment Management Division (in which Plaintiff Parisi worked).[12]

Nevertheless, Plaintiffs now demand an even more overreaching amount of data, for all four revenue divisions back to July 2, 2002. Case law simply does not support this demand, and its burden on Goldman Sachs outweighs any potential benefit to Plaintiffs, particularly at the class certification stage.

As set forth above, courts limit discovery when the burden on the producing party outweighs the benefit to the other party. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii) (courts may limit discovery when "the burden or expense of the proposed discovery outweighs its likely benefit"); *see also Ulyanenko v. Met. Life Ins. Co.*, 275 F.R.D. 179, 184 (S.D.N.Y. 2011) (denying plaintiff's request for data when it would require defendant to manually review 25,000 claims files not readily accessible or electronically searchable, a process that defendant claimed could potentially take years). By imposing these limits, courts have avoided the "unnecessary magnification of cost and effort" that unwarranted class-based discovery would impose.[13] *Sperry Rand*, 88 F.R.D. at 275-76.

**B.    The Burden Of Plaintiffs' Demands Outweighs The Potential Benefit**

*1.    The burden of Plaintiffs' data demands is extraordinarily high*

Producing the full complement of database information requested by Plaintiffs, for the expansive time period they have requested, would impose a large burden on Goldman Sachs. As set forth in detail below, Goldman Sachs conservatively estimates that providing all of the electronic database information requested by Plaintiffs would require *at least* 96 "person days" of work by dedicated Goldman personnel; a more likely estimate is more than 130 days.[14] The cost and burden of performing this work would be significant, not just in terms of the time and resources expended in writing programs, running queries, extracting data, and doing manual QC reviews in order to provide the data reliably, but also in terms of

---

[12] Weighing the burden and attempting to compromise with Plaintiffs regarding data, Goldman Sachs offered to produce personnel data concerning evaluations, promotion, and compensation for Associates and Vice Presidents in the four revenue divisions for January 1, 2005 to present, and for the former Equities Division since January 1, 2002 – even though Plaintiffs were not entitled to such a wide range of data. (Ex. 2.) Plaintiffs have apparently declined this offer.

[13] In cases in which discrimination is alleged on both an individual and a class-wide basis, plaintiffs are permitted to conduct discovery that is sufficiently broad to provide plaintiffs a realistic opportunity to meet the requirements of Federal Rule of Civil Procedure 23 ("Rule 23"). *Nat'l Org. for Women v. Sperry Rand Corp.*, 88 F.R.D. 272, 277 (D. Conn. 1980). Before obtaining class-wide discovery, however, "the plaintiff bears the burden of advancing a prima facie showing that the class action requirements of Fed. R. Civ. P. 23 are satisfied or that discovery is likely to produce substantiation of the class allegations." *Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985).

[14] Goldman Sachs has consulted the responsible individuals and asked that they provide realistic estimates of the time that would be required if they focused solely upon these tasks during their regular working time.

PAUL
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 11

the resources that would have to be diverted from other operational functions and projects in order to allow valuable personnel to devote at least 19 weeks of their focused working time – and probably significantly more – to satisfying these requests.

These costs and resources are independent from – and in addition to – the necessary costs and expenses incurred by outside experts needed to process and analyze the data pulled in connection with this request. A conservative estimate of the external expert fees and expenses for processing and analyzing the data covered by Plaintiffs' data request (1/1/02-12/31/11) would be approximately $750,000.

Below is a description of the effort required for each of four separate databases implicated by Plaintiffs' expansive data request.[15]

## PeopleSoft

PeopleSoft is Goldman Sachs' primary Human Resources database. The firm moved to an entirely new version of PeopleSoft in September 2004, effectively resulting in a separate database for the earlier data. As noted below, the information in the predecessor database, although in the possession of Goldman Sachs, is not readily translatable to the current database, and producing information from this predecessor version entails a separate set of steps and efforts. Accordingly, a data request encompassing the 2002-2011 time period must be broken down into two separate requests reflecting these two different systems.

Given the complexity of its historical data and databases, Goldman Sachs has just two key staff members who have the knowledge and skills necessary to conduct this data project. Given all the day-to-day operations of the firm that require work by these same individuals, it would be necessary to have one of those staff members remain dedicated to accomplishing as much of the regular work as he could. Even so, having the remaining individual dedicate his time exclusively to responding to these data requests would impose a significant burden and detrimental impact on other critical operations and projects.

### September 2004 to December 2011 Data

According to the firm's internal advisors familiar with the PeopleSoft databases, a "best case" estimate for pulling PeopleSoft data for all employees who worked as Associates or Vice Presidents in "R" jobs (revenue generating) in the four revenue divisions from September 2004 to December 31, 2011, for the numerous fields previously identified to Plaintiffs,[16] would entail 90 to 150 hours of dedicated time,

---

[15] Certain information provided below regarding Goldman Sachs' databases is confidential and proprietary; for this reason, Goldman Sachs respectfully requests that this letter be treated as confidential and not be placed on the Court's ECF system.

[16] Although Goldman Sachs has not yet produced database information per se to Plaintiffs, Goldman Sachs has for many months cooperated with Plaintiffs in the preliminary work of describing to Plaintiffs the data tables, and the data fields in each table, which Goldman Sachs believes conceivably may be pertinent to the issues in this case. Counsel for Goldman Sachs met in person with counsel for Plaintiffs with respect to these issues, and discussed those PeopleSoft data fields in detail on May 24, 2011. The parties met and discussed similar issues with respect to the Compensation Recommendation System ("CRS") on June 21, 2011, and regarding the Firmwide Review System ("FRS") on November 22, 2011.

PAUL
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 12

(assuming no interruptions) by the presumably dedicated Goldman IT staff member described above. This involves extensive programming necessary to create queries to properly specify the population of current and former employees to be included in the extracted population, and the data fields to be extracted, analyzing the filtered data to arrange it in the requested format, and addressing any unexpected issues related to data covering the period between September 2004 and December 2006.[17]

This estimate reflects only the time required to pull the data itself. Performing a standard quality check or "QC review" of this data, to ensure its accuracy and reliability, would require another 40 to 80 hours of dedicated time by one of the same two individuals.

Thus, the estimated minimum amount of time it will require from a dedicated staff member with the necessary PeopleSoft expertise to produce the requested data just from the current PeopleSoft database – covering data from September 2004 to December 2011 – is 130 hours. A more likely estimate is 230 hours; if significant unexpected issues arise the actual investment of time to get a reliable data extract may be even higher.

<u>January 2002 to August 2004 Data</u>

Pulling data from this earlier time period is a much more involved and difficult process. Prior to September 2004, when Goldman Sachs changed to the newer version of PeopleSoft, the data system retained far less organizational data regarding the firm's employees. Moreover, at the time of the PeopleSoft transition, Goldman Sachs did not migrate information regarding former employees to the new PeopleSoft data structure. Further, given the constantly changing organizational structure of the revenue divisions at the department and desk level, it is remarkably difficult to identify detailed organizational information for employees in this earlier data period, and even then the organizational groupings and structure in this earlier data cannot be translated or matched up in the database with the organizational structure used after late 2004.

In order to pull this earlier data, Goldman Sachs would have to do the programming to create new queries that will function with the old PeopleSoft 7.5 database; it would not work just to duplicate the programming necessary for the queries from the more recent database. Once those queries are developed and run against the database, it would be necessary to analyze the data to ensure that the proper population was identified, and to create additional queries to pull the requested data on this population into an extract from the various data tables, including the transactional data tables, education data tables, prior work

---

To facilitate these discussions, Goldman Sachs provided to Plaintiffs sample employee records, as Plaintiffs had requested.

[17] This estimate, in fact, involves a "streamlined" project; Goldman Sachs already has done hundreds of hours of work in order to get ready for the possible production of data from this current PeopleSoft system for the period since January 1, 2007, which Goldman Sachs offered to produce by agreement quite some time ago. Even with all this preparatory work invested, however, it will still be a major undertaking to prepare and produce this data from the currently operative system once the parameters of any production are ultimately resolved. The volume of additional work will disproportionately involve efforts related to any data covering the period from September 2004 to December 2006 that is to be produced, as this preliminary "streamlining" work has not been done with respect to issues that may arise concerning that portion of the data.

# PAUL
# HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 13

data tables, etc. Goldman Sachs estimates that these efforts will require 160 to 240 hours of dedicated work by one of the two staff members who have the necessary skills, knowledge and expertise.

Performing the QC review of this older data would be more time intensive as well – likely requiring an additional 40 to 80 hours of his dedicated time.

Thus, the best available estimate is that pulling, preparing and QC-checking for this earlier data request would entail a total of approximately 200 to 320 hours of dedicated time of one of the two individuals described above, while the other staff member keeps things working on a day-to-day basis. This is in addition to the estimated 130 to 230 hours of this same individual's time necessary to obtain data from the time period between September 2004 and December 2011. If the PeopleSoft data is not limited to the period since September of 2004, Goldman Sachs will have to dedicate one of these two individuals to the litigation for somewhere between roughly 8 and 14 weeks, leaving only one of these two staff members during that time to address all operational issues, database maintenance, and ongoing projects.

## Compensation Recommendation System

Goldman Sachs' Compensation Recommendation System ("CRS") is a database that tracks the results of the annual year-end compensation review process. It would take a minimum of 40 hours just to pull data for the four Revenue Divisions for employees who worked as Associates or Vice Presidents, in "R" jobs from January 1, 2002 to December 31, 2011 (for the fields previously identified to Plaintiffs). However, because of the nature of the CRS database, the bulk of time and effort associated with this request relates to the necessary QC review of any data pulled.

The CRS data is not maintained in a user-friendly format, and must be manually reviewed and checked after being extracted from the database. The steps involved in reviewing extracted CRS data therefore require an extraordinary amount of effort and resources. The data extract will consist of thousands of rows, dozens of columns, resulting in more than two million data cells that require validation. Additionally, employee records will appear across multiple rows, requiring further time devoted to data reorganization and cleaning. Given the lack of automated validation queries or systems in place, staff members must be pulled from ongoing work and dedicated to reviewing this information. Staff members will need to go through every record and field to ensure data is correct and research any discrepancies to ensure anything that may seem like an anomaly can be explained. The fact that staff members were not at the firm going back to 2002 will also add to the complexity and difficulty in validating all information. Certain elements of compensation also may be related to a particular group of individuals or programs that that no longer exist, further requiring more due diligence and research to validate.

Goldman's internal advisors estimate that it would take at least 240 hours of work by multiple people (at least three dedicated staff members) to conduct and complete this QC review, which is required before any data could be provided.

Thus, the estimate for the entire CRS data pull and review would be a minimum of 280 hours of dedicated time.

## Firmwide Review System

The Firmwide Review System ("FRS") database was not created until 2003, so there is no data at all in this database prior to January 1, 2003. The Talent Assessment Group ("TAG"), which maintains the FRS

# PAUL
# HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 14

and any other centralized performance review records from 2003 onward, also possesses some electronic performance review data from 2002 for the Equities portion of what is now the Securities Division, although it is unclear whether this data is complete; moreover, TAG does not have any information regarding the behaviors or rating scales used by Equities in 2002 in creating these records.[18] Moreover, TAG does not have any electronic or hard-copy records relating to 2002 performance reviews in the Fixed Income, Currency and Commodities ("FICC") portion of what is now the Securities Division, or in the other three revenue divisions.

### 2003-2011 Data

It would take approximately 5 to 10 full days of work for the Goldman Sachs IT team that supports the FRS system to put together the 2003 to 2011 FRS data for Associates and Vice Presidents in the four revenue divisions, in "R" positions, for the fields previously identified to Plaintiffs. This process involves writing queries directed toward extracting the specific population and data fields required, reviewing and confirming the accuracy of the code, extracting the data, and performing a sample check on the extracted data to ensure it is properly formatted, etc. The FRS team themselves would then need to expend approximately 5 additional days to perform a QC review, in which they would compare the extracted data to available hard-copy/PDF documents to confirm that information was accurately extracted, was not inadvertently truncated, etc.

### 2002 Data

As noted, FRS goes back only to 2003, and TAG has electronic data for 2002 related only to the Equities portion of what is now the Securities Division. In order to extract this limited data from the system then in use, it would take Goldman Sachs IT personnel approximately 4 additional days of work. Moreover, because TAG does not possess, and so far has not been able to locate hard-copy collections of 2002 Equities source documents, it would not be able to perform a normal QC review on this data.

Thus, providing electronic performance review database information to Plaintiffs regarding the 2003 to 2011 period would require the investment of approximately 10 to 15 days of time from IT and FRS personnel. If the very limited Equities 2002 data is added in, the estimate increases to 14 to 19 days.

**EMD Selection Database**

Goldman Sachs also has a database that tracks information pertinent to the consideration and selection of Vice Presidents for promotion to the EMD position. Data is contained in this database throughout the period since January 1, 2002. Once the parties arrive at a specification of the fields to be produced, and the population to be covered, Goldman Sachs IT estimates that it will take 4 to 5 full days of work to produce the data extract, involving the same tasks described above regarding the FRS data. The TAG team would then need 2 or 3 days of work to perform a standard QC review. If the QC review identified any systemic problems in the data extraction, however, these estimates would need to be increased.

---

[18] These foundational 2002 records also have not yet been located through inquiries to HCM officials in Equities.

# PAUL
# HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 15


2.       *The benefit to Plaintiffs of additional data is low*

As demonstrated above, the burden of producing *ten years* worth of data from multiple databases is extremely high.  The benefit to Plaintiffs, on the other hand, is low.  Plaintiffs cannot rely on data – and they certainly do not need all of the data they are demanding – to attempt to demonstrate that they satisfy the requirements of Federal Rule of Civil Procedure 23.  In *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541 (2011), the United States Supreme Court explained that even statistics showing disparities "are insufficient to establish respondents' theory can be proved on a classwide basis" because a disparity in one department or division does not "raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions" by individual managers.  As a result, Rule 23(a)'s commonality requirement is not met by statistical disparities.  In fact, *Dukes* held that "even if [statistical proof] established ... a pattern ... in all of Wal-Mart's 3,400 stores, that would still not demonstrate that commonality of issues exist" because the statistics would not address the reasons for individual managers' decisions.  *Id.* at 2555.

Thus, even if Goldman Sachs is put to the immense burden of producing all of the data for ten years from every database, and even if that data showed statistical disparities, the benefit to Plaintiffs certainly would not outweigh the burden because the Supreme Court has expressly held that statistical disparities are not enough to meet Plaintiffs' class certification burden.

Lower courts following *Dukes* have denied class certification where the plaintiffs could not show a common policy, even if they showed statistical disparities.  For example, in *Bell v. Lockheed Martin Corp.*, No. 08-6292, 2011 U.S. Dist. LEXIS 143657, at *23 (D.N.J. Dec. 14, 2011), the court rejected the plaintiffs' evidence, including statistical evidence of disparate impact, as insufficient to establish commonality, when plaintiffs failed to rebut the presumptive reasonableness of defendant's policies:

> Plaintiffs intend to conduct a regression analysis to demonstrate the disparate impact of Lockheed's policies on gender during employment decisions.... Because Plaintiffs' claimed statistical ... proofs are substantially the same as the proofs rejected by the *Dukes* Court, the Court holds that Plaintiffs are unable to establish the existence of a common question for the proposed class.

*Id.* at *23-24.

Following *Dukes*, courts have been particularly unwilling to accept statistical disparities as evidence of commonality when numerous decision-makers make the allegedly discriminatory decisions. [19]  In *Rodriguez v. Nat'l City Bank*, 277 F.R.D. 148, 155 (E.D. Pa. 2011), for example, the court refused to find commonality, despite statistical disparities.  *Rodriguez* involved claims by minority applicants for home mortgage loans who claimed that they were discriminated against when they sought mortgages from the defendant.  The court noted that "there were many loan officers that were involved in using discretion that created the alleged discrimination."  *Id.* at 155.  The court noted that in *Dukes*, "the Supreme Court found the fact that it was entirely possible that some supervisors engaged in discrimination while others did not

---

[19] Also, it is important that the statistical discovery provided (or ordered) in these cases was underway prior to the *Dukes* decision.  Though Plaintiffs are loathe to admit or accept it, there is no question that *Dukes* has changed the class action legal landscape dramatically.

PAUL
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 16

to show that plaintiffs were 'unable to show' that each plaintiff's claims 'will in fact depend on the answers to common questions.'" *Id.* (quoting *Dukes*, 131 S.Ct. at 2554).

In *Rodriguez*, the plaintiffs tried to distinguish *Dukes* by arguing that their regression analysis "eliminated the possibility that discretion was exercised based on appropriate, credit-related considerations." *Id.* The court rejected that argument because the regression analysis did not account for factors *actually* considered by loan officers – instead, the analysis only accounted for considerations that the plaintiffs came up with to include in the analysis. *Id.* The court explained that "the fact that each loan officer would likely proffer different reasoning for how she applied her discretion to loan applications ... supports the conclusion that the issues involved in the case will differ based on which loan officer each Plaintiff received her loan from. This also comports with the Supreme Court's finding in *Dukes* that 'even if [the statistical proof] established ... a pattern ... in all of Wal-Mart's 3,400 stores, that would still not demonstrate commonality of issues exists.'" *Id.* (quoting *Dukes*, 131 S.Ct. at 2555).

Likewise, in *In re Wells Fargo Residential Mortgage Lending Discrimination Litig.*, No. 08-MD-01930 (MMC), 2011 WL 3903117, at *3-4 (N.D. Cal. Sept. 6, 2011), the court relied heavily on *Dukes* to conclude that commonality did not exist, despite statistical disparities, in another case involving minority applicants for loans. Despite that statistical disparity, the *Wells Fargo* court concluded that "the numerous potential differences among prospective borrowers, both as to their stated goals and needs as well as their individual circumstances, such as creditworthiness, may bear on the determinations made by the loan officers and brokers across the country cannot, at least on the showing made here, be determined on a class-wide basis.... In short, as the Supreme Court recognized in *Dukes*, where persons who are afforded discretion exercise that discretion differently, commonality is not established." *Id.* at *4. That conclusion is the same, the *Wells Fargo* court explained, even though the plaintiffs claimed to have a more comprehensive statistical analysis than did the plaintiffs in *Dukes*:

> Plaintiffs' remaining argument is that *Dukes* is distinguishable because, according to plaintiffs, the statistical analysis on which they rely is "more comprehensive and specific to the actual decision making process at issue." As the Supreme Court held in *Dukes*, however, even if the statistical evidence offered therein showed a pattern of disparity "in *all* of Wal-Mart's stores," such statistical proof would fail, because "[m]erely showing that [a defendant's] policy of discretion has produced an overall ... disparity does not suffice" to demonstrate commonality for purposes of Rule 23(a).

*Id.* (citations omitted); *see also In re Countrywide Financial Mortgage Lending Practices Litigation*, No. 08-MD-1974, 2011 U.S. Dist. LEXIS 118695 (W.D. Ky. Oct. 13, 2011) (denying certification of a disparate impact claim challenging defendant's subjective, discretionary policies despite expert's finding of statistical disparity; court noted that plaintiffs' statistical proof did not establish that each class member suffered a common injury or identify a common mode of exercising discretion); *Windisch v. Hometown Health Plan, Inc.*, No. 08-cv-664 (RCJ) (WGC), 2012 WL 115670, at *12 (D. Nev. Jan. 13, 2012) (refusing to reopen discovery to allow plaintiff to obtain data from defendant for purposes of trying to certify a

PAUL
HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 17

class).  Significantly, the cases that Plaintiffs cite to expand the scope of discovery were decided before *Dukes*.[20]

As in the above cases, this action involves individual decisions by numerous managers in each of the four revenue divisions.[21]  As a result, Plaintiffs cannot rely on statistical data to obtain class certification – and at most can only speculate that the data will help their case in some way.  In fact, based on *Dukes*, Goldman Sachs would be justified in refusing to produce any data at all at this stage.  Nonetheless, that is not the position Goldman Sachs has taken; it has offered to produce a *substantial* amount of data, which is *more than enough* for Plaintiffs to use in their attempt to carry their burden of persuasion at the class certification stage, particularly in light of *Dukes*.

Plaintiffs will have policy documents (and in fact all of the documents set forth in Section II.A above).  They will have emails from a reasonable group of custodians.  They will take 30(b)(6) and other depositions, and they will have the opportunity for their experts to opine as to whether they believe there is a common policy of discrimination that serves as the "glue" that binds thousands of discretionary decisions by individual managers together.  *See Dukes*, 131 S. Ct. at 2552.  If Plaintiffs can make this

_____

[20] The cases Plaintiffs cite are not only pre-*Dukes* decisions, they do not support Plaintiffs' arguments.  For example, in *Khan v. Sanofi-Synthelabo, Inc.*, No. 01 Civ. 11423, 2002 WL 31720528, at *4 (S.D.N.Y. Dec. 3, 2002), the court stressed that it would have restricted discovery if an actual burden was shown: "[T]he Court was willing to entertain limitations on this discovery … based on actual burden, but none has been adequately demonstrated."  In this case, Goldman Sachs can demonstrate significant burden.  Another case on which Plaintiffs rely, *Avagliano v. Sumitomo Shoji Am., Inc.*, 103 F.R.D. 562, 578-79 (S.D.N.Y. 1984), involved a class certification motion, and therefore the court did not address discovery – let alone the wide-ranging, overly broad, and highly burdensome discovery demanded by Plaintiffs here.  In *Wynne v. McCormick & Schmick's Seafood Rests., Inc.*, No. 06-3153, 2006 WL 3422226, at *1-2 (N.D. Cal. Nov. 28, 2006), the court *restricted* what discovery it allowed outside of the plaintiff's area, and denied numerous discovery requests, including documents related to daily work assignments and EEO-1 reports.  In contrast, Goldman Sachs has already agreed to produce documents from divisions other than those in which Plaintiffs worked (including EEO-1 reports), and is merely seeking reasonable limits to that discovery, which *Wynne* indicates are appropriate.  Further, *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir. 1990), does not help Plaintiffs.  As pointed out in *Rodger v. Elec. Data Sys.*, 155 F.R.D. 537, 539 (E.D.N.C. 1994), "in the *Hollander* case, there was no indication … that the facility in which the plaintiff worked exercised independent decision-making authority."  In this case, not only are Goldman Sachs' divisions operated independently from one another, the employment actions of which Plaintiffs complain were based on decisions, not by the divisions, but by individual managers in those divisions.  *See also Beckmann v. CBS, Inc.*, 192 F.R.D. 608, 813-17 (D. Minn. 2000) (limiting class certified to only 71 women who held the same position and worked in same department as named plaintiffs).

[21] As Your Honor explained, "[t]he operative question is whether the plaintiffs can identify 'a common mode of exercising discretion that pervades the entire company.'"  Report and Recommendation [Docket No. 134] at 13 (citing *Dukes*, 131 S. Ct. at 2554-55).  "It is unclear from the pleadings along the extent to which any of [Goldman Sachs'] practices contribute to a common mode of exercising discretion by Goldman Sachs' manager.  Nonetheless, with further discovery, the plaintiffs may be able to show that the combination of some or all of these practices meets the requirements of Rule 23(a)(2), even in light of the gloss provided by *Dukes*.  As a result, Goldman Sachs' motion to strike all class allegations cannot be granted *at this early stage*." *Id. (emphasis added)*.

# PAUL
# HASTINGS

The Hon. James C. Francis
February 29, 2012
Page 18

showing and a case is certified, they will have the opportunity to analyze the rest of the data. But at this stage, particularly in light of *Dukes,* imposing the immense burden of producing ten years of data from multiple databases across four separate divisions, rather than the reasonably limited data Goldman Sachs proposes to provide, is simply unfair.

## V.    CONCLUSION

Based on the above, Goldman Sachs asks the Court to deny Plaintiffs' request for additional documents and data beyond what Goldman Sachs has already agreed to produce. Goldman Sachs is available for a conference at the Court's convenience.

Respectfully submitted,

*Barbara B. Brown/g*

Barbara Berish Brown
of PAUL HASTINGS LLP

cc:    Adam T. Klein, Esq.
       Kelly M. Dermody, Esq.
       Theodore O. Rogers, Jr., Esq.
       Suhana Han, Esq.
       C. Geoffrey Weirich, Esq.
       Carson H. Sullivan, Esq.

EXHIBIT 1

# PAUL
# HASTINGS

1(202) 551-1717
barbarabrown@paulhastings.com

February 2, 2012                                                                         21166-00050

**VIA E-MAIL**

Adam T. Klein, Esq.
Outten & Golden LLP
3 Park Avenue
29th Floor
New York NY 10016

Kelly M. Dermody, Esq.
Lieff, Cabraser, Heimann & Bernstein LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111

Re:     Chen-Oster et al. v. Goldman Sachs

Dear Adam and Kelly:

This responds to your letter of January 27, 2012 concerning the outstanding discovery requests that we discussed during our meet and confer call.

As we said during the call, we do not believe that discovery should be as broad as you contend. The Judge's holding that Ms. Chen-Oster's charge was not an individual one but was filed on behalf of others did not define the proper scope of class certification discovery, nor did it define the scope of the putative class encompassed by her charge. As we noted during our conference call, Magistrate Francis expressly noted this distinction in his opinion.

If we are required to litigate these issues, we expect to take the position that discovery going back to 2002 should be limited to Convertible Sales (including Convertible Bonds and Synthetic Convertibles) and Equities Research. These groups, which are all part of the former Equities Division (now a part of the Securities Division), are the groups in which Ms. Chen-Oster worked or was slated to work. As such, we will produce available data for Convertible Bonds, Synthetic Convertibles and Equities Research back to 2002. We also expect to take the position in any litigation of these issues that data regarding the remainder of Securities, and the Investment Management Division should be provided only from January 1, 2007 on – which encompasses five full years – and that because of the limited scope of the named plaintiffs' experience there should be no data produced regarding the Investment Banking or Merchant Banking divisions.

If we are able to arrive at an agreement on all issues regarding the scope of discovery and avoid litigation, however, we are prepared to provide personnel data concerning evaluations, promotion, and compensation for Associates and Vice Presidents in all of the four Revenue Divisions identified in Plaintiffs' First Amended Complaint since January 1, 2005, and for the former Equities Division in its entirety since January 1, 2002.

With respect to this proposal, we believe that production of data from January 1, 2005 for all groups other than those implicated by Ms. Chen-Oster's charge is broader than should be achievable if we litigate the matter fully. Seven years of information for all groups, plus *ten years* for Equities suffices to provide you

# PAUL
# HASTINGS

Adam T. Klein, Esq.
Kelly M. Dermody, Esq.
February 2, 2012
Page 2

with sufficient data to try to support your class allegations, without prejudice to your ability to seek more should you succeed in having a class certified.

With respect to other types of discovery, which you reference in footnote one of your letter, we very much disagree about the proper scope of such hard copy or electronic discovery. In another of your letters you said that you were going to identify email custodians from whom you would like us to collect material, and you mentioned on our call that you will likely provide proposed search terms to use in reviewing that material. We have yet to receive the list of names or search terms, but we are open to discussion once we receive them. We believe that the burden of searching for and reviewing these non-data types of materials may well outweigh the value of doing so, and we reserve all of our objections to discovery of this magnitude, particularly before there is any determination whether a class is properly certified in this case and if so, its scope. We will respond to you about that when we have narrowed the areas of disagreement between us.

Before we respond specifically to each of the points in your letter as to specific requests, we do have to decide, however, about collection and review of process documents, meeting minutes and notes related to proposed policy and process changes and the like. Our view is that searching for all minutes and notes from years prior to 2007 is excessively burdensome and disproportionate to the likely benefit. These processes have been in place, with minor changes, over the time frame from 2002 to the present, but having to go back and look for documents pertaining to every possible meeting more than eight years ago does not seem appropriate to us. This is particularly the case because even if such minutes or notes existed, they would likely be housed off site. Locating such documents would be extremely time consuming and would be, in many respects, like looking for a needle in a haystack. It would require us, literally, to canvass records and old files kept by hundreds of individuals who might conceivably have been involved in such meetings or discussions. Indeed, the chances that many potential note or minute-takers are no longer with the firm are very high given how far the request goes back. That said, we will work with key individuals who are responsible for dissemination of current policy and process documents relating to performance, pay and promotions, and to the extent we learn about formal meetings in which notes were taken or presentations made, even back to 2002, we will endeavor to conduct a reasonable search for those documents. We believe this is a reasonable approach that adequately weighs the burden and the benefit.

We look forward to hearing from you in response to our proposal regarding these issues. After that, we will provide a detailed response to the other individual requests discussed in your letter of January 27.

Very truly yours,

Barbara Berish Brown
of PAUL HASTINGS LLP

cc:    Theodore Rogers, Jr.
       Geoff Weirich
       Carson Sullivan

LEGAL_US_E # 96681182.1

# EXHIBIT 2

# PAUL
# HASTINGS

1(202) 551-1717
barbarabrown@paulhastings.com

February 21, 2012                                                    21166-00050

**VIA E-MAIL**

Anne B. Shaver, Esq.
Lieff Cabraser Heimann & Bernstein
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339

Re:    Chen-Oster et al. v. Goldman Sachs

Dear Anne:

As I said in my February 2 letter, and again in my email of February 15, we have been working to put together a comprehensive response to your January 27 letter.  We were very surprised that you did not wait for this or alert us before sending your letter to Magistrate Judge Francis, since it was planned that the parties would have at least one more meeting to discuss our positions and attempt to resolve any differences without the Court's intervention.

Before addressing each of the individual requests, I want again to reiterate the extreme burden Plaintiffs seek to place on Defendants with Plaintiffs' discovery demands.  Your demand that Defendants search, locate and produce hard copy and electronic documents going back *twelve years* is unfair and unnecessary, and we look forward to discussing this issue with Magistrate Judge Francis.  That said, we are willing to compromise in many respects as to categories of documents.  To the extent that documents are maintained in a systematic or centralized fashion, either in a hard copy filing system or electronically, we will agree to search for documents in the four revenue divisions named in Plaintiffs' Amended Complaint (the "four revenue divisions") back *seven years*, to 2005.  However, if we locate older documents that fall into the categories below, even back to 2000, while we are searching for hard copy documents in the possession of individual employees, we will gather and produce them if responsive. We believe this plan, and our proposals set forth below, are more than reasonable and will allow Plaintiffs more than ample discovery at the class certification stage.  Our positions, which track the order of your January 27 letter, are as follows:

1.  We agree with your summary.  We have already produced many of the documents that were provided to the EEOC, including position statements and exhibits. Although we believe that the documents are equally available to Plaintiffs through a FOIA request, we will produce to Plaintiffs everything, including data, that was provided to the EEOC relating to Ms. Chen-Oster and Ms. Orlich.

2.  We agreed that we will produce documents of the same type we have already produced for the Securities Division for the other three revenue divisions, if they exist.  We will produce them in unredacted form as to operations in the United States,[1] although we do not see the point of having names on these documents when your stated goal is to ascertain how the firm is organized. We object to producing telephone directories, or what you call "employee directories."  You are not entitled to lists of all employee names and we do not see how directories bear any relationship to organizational structure.

---

[1] To the extent names are included on any of the documents produced, we will continue to redact such information related to individuals outside the United States as well as individuals who do not work in one of the four revenue divisions.

# PAUL
# HASTINGS

Anne B. Shaver, Esq.
February 21, 2012
Page 2

3.  As you know, and as Adam mentioned during our call, manager and co-manager information will be reflected in the FRS database.  We explained that to locate other documents showing reporting relationships on a desk or in a small group going back years and years would be inordinately burdensome as these are not created or maintained on a centralized basis, or frankly, on any organized basis at all.  However, if we come across such documents while searching for other materials, we will produce them.  We see no value in a broad search for such documents, however, because even if a chart was created at one point in time, those affiliations are loose and change frequently, and we do not see their value here, particularly when you will receive information of this sort electronically.

4.  We will expand our search for job descriptions for Associates and Vice Presidents in the other three revenue divisions.  We will conduct a reasonable search for job descriptions, including pre-2007 job descriptions, and will produce them if they exist and are reasonably accessible.

5.  As set forth in our February 2 letter, we agree that the parties were negotiating a separate production plan regarding data; it appears now that you do not wish to continue our dialogue.

6.  The representation rates of employees, by gender, will be apparent in the data.  However, we will conduct a good faith search for documents that, as you have clarified, contain self-critical reviews, studies or audits related to the number of female Associates, Vice Presidents or EMDs in the four revenue divisions.  As we have discussed, we cannot commit to producing notes or minutes from every meeting in which representation rates may have been discussed, but we do commit to searching for any non-privileged summaries, presentations, reports or similar documents that are reasonably accessible.

7.  We agree that we will look for documents concerning how and/or why compensation practices were adopted in the four revenue divisions.  If we are able to locate documents describing changes in the principles governing compensation or quartiling in these divisions, we will produce them.  We will also produce any guidelines relating to quartiling.  The burden of searching for individual manager quartile proposals *far* outweighs the value of that information.  The manager quartiles are, as you know, contained in the data.  If you have a question about a specific individual or even a specific desk during a particular time period, however, we will enter into a discussion with you and endeavor to search for manager quartiling information that is not, as you say, captured by the final data output.

8.  We agree with your summary.

9.  It is difficult to respond to Request 9 given all of the different topics covered in that request.  Assignments, as you know are addressed elsewhere.  As to the other topics listed in this request, we will agree to search for and produce policy documents, training materials and guidelines, to the extent they exist.  Consistent with what we have said above in response to Request 7, we will look for documents describing changes in principles governing compensation.  We have already agreed to work with key individuals who are responsible for dissemination of current policy and process documents relating to performance, pay and promotions, and to the extent we learn about formal meetings in which notes were taken or presentations made, even back to 2002, we will endeavor to conduct a reasonable search for those documents.  In response to your latest letter, we clarify that to the extent we learn of other individuals who were responsible for older policy or process documents covering any portion of the period since 2000, if they are still employed by the firm, we will also inquire of them as to the existence of formal meetings or presentations.  Of course, we anticipate starting with individuals who are responsible for the current policy or process documents.

10.  We agree with your summary.

# PAUL
# HASTINGS

Anne B. Shaver, Esq.
February 21, 2012
Page 3

11.  With respect to studies concerning gender and performance evaluations, compensation or assignments, we agree to search for them if they pertain to the four revenue divisions and were conducted by formal groups at the firm such as diversity-related task forces or groups within HCM. Whether informal groups around the firm have looked at their own data or circumstances we do not know, but it would be extremely burdensome to search for such materials.  That said, if we come across such documents as we are searching for other documents, we will produce them.

12 -14.  We agree with your summaries.

15.  We agree to search for and produce documents concerning gender-related initiatives at the recruiting and hiring stages.  We do not agree to produce data about hiring.  We think that such data is entirely irrelevant to the issues in the case and will only serve to create more expense and burden.

16.  We did not state that Goldman Sachs does not maintain records of reimbursement for corporate expenses; we did state that the burden of searching for and producing such documents seems to us to greatly outweigh any possible relevance to the issues in the case.  Please let us know if there is any particular issue you want us to look into with respect to expense reimbursement.

17.  We agree with your summary.

18-21. We agree with your summary and note that if there are generally applicable documents concerning how to complete and score reviews and how to quartile individuals, as well as concerning the manner in which review scores and/or quartiles are used, we will produce them.  We also note, however, that we have produced already hundreds and hundreds of pages of documents related to the review process.

22.  We agree with your summary.

23.  It appears we are in agreement that this request will be limited to documents related to promotions to EMD, as opposed to Vice President.  We have produced numerous documents related to the cross-ruffing process, and we will continue to conduct a reasonable search for additional policy and/or process documents.  As we have stated, we simply cannot commit to searching for minutes or notes from every meeting where promotion processes were discussed; however, if we come across such documents while searching for other documents, we will produce them.

24.  We can confirm that no systematic or centralized system for maintaining seating charts or assignments exists.  If you have specific questions on this topic, please let us know.

25.  We can confirm that no systematic or centralized records of assignment of analysts and other support staff allocation are kept; these are decisions made at the individual manager or desk level.

26.  We agree with your summary.

27.  We will produce the EEO-1s that correspond to the scope of discovery to which we ultimately agree or are ordered to adopt.  We will produce the workforce analysis and other sections of the affirmative action plans to the extent they pertain to data on gender composition of jobs in the four revenue divisions at the Associate, VP or EMD level.  We do not believe there are any findings of issues pertaining to gender resulting from any OFCCP evaluation of these divisions at any Goldman Sachs office since 2002; we are double checking and will confirm this is the case.

28.  We agree with your summary and will arrange for a separate meet and confer if needed.

# PAUL
# HASTINGS

Anne B. Shaver, Esq.
February 21, 2012
Page 4

29 and 30.  We will produce documents concerning the complaint process to the extent we have not already done so.  With respect to complaints by women in the four revenue divisions concerning gender bias in compensation, evaluation, or promotion, we will produce such information with names redacted.

31 and 38.  I do not believe we agreed to provide an index of all lawsuits and administrative complaints, but we are willing to do so with respect to suits or proceedings concerning allegations of gender bias in compensation, evaluation or promotion with respect to Associates or VPs in the four revenue divisions, or pertaining to promotion to EMD.

32.  We will look into whether gender issues of the type you describe in this request were considered at meetings of formal groups such as the Board of Directors or the Diversity Task Force. · We agreed that we will not search for small group meetings that might have taken place informally.

33.  We agree with your summary and to the extent responsive documents are discovered, they will be produced.

35. We are following up on this request as agreed.

36.  We agree with your summary.

37.  We agree with your summary.

Our agreement to search for and produce documents in any of the above categories does not waive any objections we have to overall scope in terms of division and time frame, nor to specific objections we have made to Plaintiffs' requests – including objections based on the attorney/client privilege or work product doctrine – or will make to additional discovery in any of these categories.  Please let me know if you would like to talk further about our positions.

Very truly yours,

Barbara Berish Brown
of PAUL HASTINGS LLP

cc:     Adam Klein
        Kelly Dermody
        Theodore Rogers, Jr.
        Suhana Han
        Geoff Weirich
        Carson Sullivan

LEGAL_US_E # 96915804

EXHIBIT 3

**Lieff
Cabraser
Heimann&
Bernstein**
Attorneys at Law

Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
t 415.956.1000
f 415.956.1008

January 27, 2012

<u>**VIA ELECTRONIC AND U.S. MAIL**</u>

Barbara B. Brown, Esq.
Geoff Weirich, Esq.
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, DC 20005

Theodore O. Rogers, Jr., Esq.
Sullivan and Cromwell, LLP
125 Broad Street
New York, NY 10004

RE:    *Chen-Oster, et al. v. Goldman, Sachs & Co., et al.,* No. 10 Civ. 6950 (LBS)

Counsel:

I write to follow up on our January 26, 2012 meet and confer call. We discussed the scope of class discovery in light of Judge Sand's January 10, 2012 ruling regarding Ms. Chen-Oster's class charge, as well as Defendants' responses to certain of Plaintiffs' Requests for Production of Documents.

**Scope of Class Discovery**

In light of Judge Sand's January 10, 2012 order denying Defendants' motion to strike Ms. Chen-Oster's class allegations, Plaintiffs stated our position that we are now entitled to discovery on the allegations of the complaint (other than as subject to the proposed stipulation regarding named Plaintiff Lisa Parisi). Accordingly, we believe discovery should proceed as to the Securities, Investment Banking, Investment Management, and Merchant Banking divisions of Goldman Sachs from July 2000 to the present.[1] Defendants did not

---

[1] Plaintiffs have offered to compromise the time period for the production of personnel, compensation, and related data, with that production running from 2002 through 2011, with the understanding that such data will need to be supplemented for subsequent years as the case progresses. Plaintiffs believe that most other categories of documents should be produced from
*Footnote continued on next page*

Counsel
January 27, 2012
Page 2

articulate a position on the current scope of discovery in light of the Court's ruling, but instead proposed producing data from 2005 or 2006 to December, 2010. Plaintiffs rejected this proposal.

As Plaintiffs pointed out, Plaintiffs attempted several times to negotiate the temporal scope of discovery so as to avoid motion practice, but Defendants refused. At this point, Defendants have now thoroughly tested the allegations of the complaint, and the complaint has been upheld on several occasions. Given the long passage of time since Plaintiffs' discovery requests have been propounded, and Plaintiffs' exhaustive production of documents and their cooperation in facilitating Defendants' completion of all named Plaintiff depositions, Plaintiffs are concerned by Defendants' continued resistance to producing class discovery for the time period and scope of the class alleged. Plaintiffs have requested that Defendants set forth their position on the scope of discovery as soon as possible, and Defendants agreed to do so by the middle of next week. If the parties cannot agree, Plaintiffs will seek Court intervention.

Please be advised that nothing in this correspondence, nor our willingness to discuss any proposals, serves to waive our rights to seek the full temporal and divisional scope of class discovery to which we are entitled, and we reserve our rights as to these documents.

**Plaintiffs' Requests for Production**

Request Number 1: You agreed to produce the materials that you gave to the EEOC in relation to the charges filed by the named Plaintiffs. We will notify you if we wish to see any of the underlying data used to generate those materials.

Request Number 2: You agreed to produce documents sufficient to show how Goldman Sachs identifies itself across offices, regions, units, and/or divisions -- including unredacted versions of the organizational charts already produced. We also repeated that we seek employee directories. Please let us know your position as soon as possible.

Request Number 3: You represented that Goldman Sachs does not maintain documents showing "all" reporting relationships among Associates, Vice Presidents, Managing Directors, and Partners. We asked that, even if no document exists showing all such relationships, you produce documents that show the organizational relationships among a subset of Associates, Vice Presidents, Managing Directors, and/or Partners (such as a particular unit, desk, or account), to the extent such exists. Please let us know your position as soon as possible.

---

*Footnote continued from previous page*
2000 to the present. If you have specific proposals about narrowing that temporal scope for any type of document, please let us know the proposal and the basis so we may consider it promptly.

Counsel
January 27, 2012
Page 3

Request Number 4:  You agreed to produce job descriptions from outside the Securities division and to supplement your production with pre-2007 materials.

Request Number 5:  The parties are negotiating a separate production plan regarding this data.

Request Number 6:  You suggested that the information sought by this Request would be covered by the data from Goldman Sachs' database, to be produced pursuant to Request Number 5.  We clarified that the Request also seeks any documents wherein Goldman Sachs tracks this data itself, including any informational or self-critical reviews, studies, or audits.  Please let us know your position as soon as possible.

Request Number 7:  You suggested that the information sought by this Request would be covered by the data from Goldman Sachs' database, to be produced pursuant to Request Number 5.  We clarified that the Request also seeks any other documents that are part of the compensation determination process not captured by the final data output, including, but not limited to, information reflecting how and/or why the compensation system was adopted, instructions or guidance regarding quartiling, and/or quartiling spreadsheets that show placement of employees between quartiles.  Please let us know your position as soon as possible.

Request Number 8:  You agreed to confirm that there is no additional form filled out by a supervisor during the 360 degree review process that has not been produced.  You also agreed to produce supplemental documents, consistent with the scope of class discovery as ultimately agreed to by the parties or ordered by the Court.

Request Number 9:  We clarified that, in addition to seeking the policies described in this Request, we also seek information as to how/why these policies were adopted (such as minutes from meetings where these policies were discussed or formulated and/or drafts of the policies prior to their adoption in final form).  You agreed to investigate the availability of such discovery for the process of adopting the compensation, promotion, and performance evaluation systems at issue in the case.

Request Number 10:  You stated that Goldman Sachs does not maintain records of work assignments in any systematized or centralized fashion.  We reserved the right to seek discovery on this for individuals as it becomes relevant.

Request Number 11:  You stated that you understood the relevance of this Request.  Please let us know if you will *not* be producing any responsive documents, as soon as possible.

Request Number 12:  You confirmed that there is no common or centralized documentation showing client or account re-assignments after an employee leaves Goldman Sachs.  We reserved the right to seek discovery on this for individuals as it becomes relevant.

Counsel
January 27, 2012
Page 4

      **Request Number 13:**  You indicated that you have produced substantial training documents and will supplement consistent with the scope of the class discovery in the case.  We agreed to review your production and re-visit our concerns about production in the future, if necessary.  *By agreeing to a reasonable phasing of priorities, Plaintiffs do not waive their right to seek discovery on this, or any other, topic so handled in the future.*

      **Request Number 14:**  You stated that Goldman Sachs does not maintain records of client meetings or business trips in any systematized or centralized fashion.  We reserved the right to seek discovery on this for individuals as it becomes relevant.

      **Request Number 15:**  We clarified that this Request seeks documents pertaining to any gender-related initiative or data collection around hiring.  Please let us know your position as soon as possible.

      **Request Number 16:**  You stated that Goldman Sachs does not maintain records of reimbursement for corporate expenses in any systematized or centralized fashion.  We reserved the right to seek discovery on this for individuals as it becomes relevant.

      **Request Number 17:**  Like Request 13, you indicated that you have produced substantial HR training documents and will supplement consistent with the scope of the class discovery in the case.  We agreed to review your production and re-visit our concerns about production in the future, if necessary.  *By agreeing to a reasonable phasing of priorities, Plaintiffs do not waive their right to seek discovery on this, or any other, topic so handled in the future.*

      **Request Numbers 18-21:**  You agreed to produce the 360 degree reviews, including self-reviews, consistent with the scope of class discovery as ultimately agreed to by the parties or ordered by the Court.  Plaintiffs also seek documents evidencing guidance, training, and/or instruction about the review process, including how to complete, score, and/or adjust reviews; how reviews are to be used by supervisors; the forced ranking and/or the quartiling system; and/or the purpose for which the forced ranking and/or quartile systems are to be used.

      **Request Number 22:**  You agreed to produce the exit interviews described in this Request, within the scope of class discovery as ultimately agreed to by the parties or ordered by the Court.

      **Request Number 23:**  We stated that we would discuss this Request and follow up.  We will agree to withdraw this Request as to promotions to Vice President.

      **Request Number 24:**  You agreed to confirm whether Goldman Sachs maintains records of seating assignments in any systematized or centralized fashion.  Please let us know as soon as possible.  If not, we reserve the right to seek discovery on this for individuals as it becomes relevant.

Counsel
January 27, 2012
Page 5

Request Number 25: You agreed to confirm whether Goldman Sachs maintains records of analyst and other support staff allocation in any systematized or centralized fashion. Please let us know as soon as possible. If not, we reserve the right to seek discovery on this for individuals as it becomes relevant.

Request Number 26: You refused to produce documents responsive to this Request. Plaintiffs disagree that Defendants may withhold this production, but will defer this to a later point in the case after other higher-priority matters have been resolved. *By agreeing to a reasonable phasing of priorities, Plaintiffs do not waive their right to seek discovery on this, or any other, topic so handled in the future.*

Request Number 27: You agreed to produce EEO-1's, and stated that you will investigate whether any reports relating to gender exist in connection with the OFCCP or other agencies. Please let us know the results of your investigation as soon as possible.

Request Number 28: You agreed to investigate what documents exist regarding Affirmative Action Plans, the Diversity Task Force, and/or the Goldman Sachs Annual People Survey. The parties agreed that if the survey contains a large number of irrelevant topics, we would meet and confer to see if a redacted production would be appropriate.

Request Numbers 29 and 30: You agreed to supplement production regarding the complaint process for the class time period. You stated that you would consider producing the actual employee complaints described in these Requests. Please let us know your position as soon as possible.

Request Number 31: You agreed to produce an index of lawsuits or administrative complaints described in this Request. We stated that we seek the actual administrative charges, complaints, or counter-claims that relate to gender. Prior to receiving this information, Plaintiffs are as of yet unable to determine whether they will seek additional materials related to those matters. Plaintiffs reserve all rights to do so. Please let us know your position as soon as possible.

Request Number 32: You agreed to investigate whether there have been meetings at Goldman Sachs where the topics listed in this Request are on the agenda. We would request that you please note that the items listed are not in quotations. Thus, if an agenda item falls within a topic area (e.g. the status of female employees) but does not use exactly the same exact phrase (e.g., "how women are doing at Goldman Sachs" instead of "the status of female employees"), that you still produce it. Please let us know the results of your investigation as soon as possible.

Request Number 33: You stated that you have not located any responsive documents. To the extent that you discover responsive documents exist, please produce them.

Counsel
January 27, 2012
Page 6

Request Number 35: You stated that you would follow up on this Request. Please do so as soon as possible.

Request Number 36: The parties agreed to put this Request on hold unless and until Defendants assert that the passage of time has made documents unavailable or inaccessible.

Request Number 37: You refused to produce documents responsive to this Request. Plaintiffs disagree that Defendants may withhold this production, but will defer this to a later point in the case after other higher-priority matters have been resolved. *By agreeing to a reasonable phasing of priorities, Plaintiffs do not waive their right to seek discovery on this, or any other, topic so handled in the future.*

Request Number 38: You agreed to produce an index sufficient to identify the lawsuits or administrative complaints described in this Request. We stated that we want the actual charges, complaints, and/or counter-claims that relate to gender; however, we agreed to meet and confer on whether all pleadings in any given case are necessary. Please let us know your position as soon as possible.

\*        \*        \*

Thank you for meeting and conferring with us on these issues. We look forward to receiving your position on the scope of discovery next week.

Very truly yours,

Anne B. Shaver

cc by e-mail only:        Plaintiffs' Counsel

960699.1