# EXHIBIT 3

# PAUL
# HASTINGS

April 3, 2012                                                                                                    21166.00050

**BY HAND**

The Hon. James C. Francis
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

   Re:   *Chen-Oster, et al. v. Goldman, Sachs & Co., et al.*
         **No. 10 Civ. 6950 (LBS) (JCF)**

Dear Judge Francis:

   In anticipation of the upcoming pre-motion conference on April 4, 2012, and in response to Plaintiffs' letter of March 7th, Defendants Goldman, Sachs & Co. and The Goldman Sachs Group, Inc. ("Defendants" or "Goldman Sachs") write to clarify several of the issues raised in Plaintiffs' letter. We look forward to the opportunity to discuss these matters with Your Honor later this week and, pursuant to Local Rule 37.2, to submit additional briefing or evidentiary materials as may be appropriate.

   Although Plaintiffs suggest otherwise in their letter, Defendants have followed appropriate protocol in presenting the discovery burden issues before the Court in response to Plaintiffs' initial submission. Rule 37.2 prohibits the filing of a motion to compel discovery "unless counsel for the moving party has first requested an informal conference with the Court by letter and such request has either been denied or the discovery dispute has not been resolved as a consequence of such a conference." Nothing in this Rule requires the opponent of a proposed motion to submit in advance of the pre-motion conference all admissible evidence that would pertain to the ultimate motion Plaintiffs may be permitted to file. Nevertheless, Goldman Sachs has gathered some of the evidence that supports its position, which is attached to this letter as Exhibits A and B.[1] Defendants look forward to addressing any remaining concerns the Court may have in appropriate post-conference submissions, if necessary.

   Furthermore, although Defendants welcome the opportunity to discuss relevant case law during our upcoming conference, we believe it is important to point out here that many of the cases Plaintiffs have included in their March 7, 2012 letter are cited out of context, or are inapt in light of the U.S. Supreme Court's decision in *Wal-Mart, Inc. v. Dukes*, 131 S. Ct. 2541

---

[1] Certain information discussed in this letter, and in the accompanying exhibits, regarding Goldman Sachs' databases is confidential and proprietary. Goldman Sachs respectfully requests that this letter be treated as confidential and not be placed on the Court's ECF system.

# PAUL
# HASTINGS

The Hon. James C. Francis
April 3, 2012
Page 2

(2011).[2] Plaintiffs' cases are readily distinguishable and often are mischaracterized. Plaintiffs' parentheticals are particularly misleading.

> ➤ Plaintiffs' citation of *Starbucks Corp. v. ADT Sec. Servs., Inc.*, No. 08 Civ. 900 (JCC), 2009 WL 4730798, at *5 (W.D. Wash. Apr. 30, 2009), is misleading. The court did not reject as "not burdensome" costs in excess of $800,000, but rather rejected the defendant's calculation of those costs, which the court placed at under $50,000, based upon extensive evidentiary submissions and a finding that defendant's witness on burden "simply is not credible."

> ➤ Similarly, in *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, No. 01 Civ. 1644 (REB) (CBS), 2010 WL 502721, at *12-13 (D. Colo. Feb. 8, 2010), the court reached no conclusion about burden because defendant had failed to produce appropriate evidence to support the claim of burden. That is not the case here, where Defendants have explained the burden in detail in their letter to the Court and in the attached sworn statements from the appropriate employees.

> ➤ *Bardouille v. Goldman Sachs & Co.*, No. 10 Civ. 4285 (S.D.N.Y May 27, 2010), has absolutely nothing to do with the case at hand, and the Complaint filed against Goldman Sachs in that now-dismissed action is not competent evidence in any event. The IT work allegedly being performed by the temporary employees identified in the plaintiffs' allegations in that Complaint involved a very different skill set than the very specialized skills and knowledge specific to Goldman Sachs that would be required to extract all of the data Plaintiffs request. *See* Exhibit A, Affidavit of Cathy Obradovich, ¶¶ 4, 15-16.

> ➤ Similarly, none of the cases that Plaintiffs cite for the proposition that Goldman Sachs need not conduct a "quality check" of its data actually supports that contention. *Santiago v. Miles*, 121 F.R.D. 636, 638-40 (W.D.N.Y. 1988), held that certain computer-generated reports containing selected raw data were protected as attorney work product, but that plaintiffs could request the production of the underlying, unprocessed computer data; the case had nothing to do with whether standard quality control checks should be performed before data is produced for possible use in litigation. Similarly, *Wilfong v. Rent-A-Center, Inc.*, No. 00 Civ. 680 (DRH), 2001 WL 35695551, at *3 (S.D. Ill. Mar. 14, 2001), did not involve the quality check question, but rather whether plaintiffs

---

[2] Plaintiffs' suggestion that Goldman Sachs has conceded the existence of "significant disparities between men and women in compensation and promotional opportunities,' Plaintiffs' March 7, 2012 Letter, at 2-3, is a fanciful and disingenuous interpretation of Defendants' letter. As clearly indicated, the point of Defendants' argument is that even if there were such disparities, it would not suffice to advance Plaintiffs' doomed effort to certify a class under the standards announced in *Dukes*. *See* Defendants' Feb. 15, 2012 letter, at p. 15.

# PAUL
# HASTINGS

The Hon. James C. Francis
April 3, 2012
Page 3

could be limited to "defendant's select compilation of data," which is not the issue here.

It is also important to note that Defendants do not resist production of statistical data altogether, but ask only that the Court limit the scope of the data to be produced so that the burden to Goldman Sachs in reliably extracting that data and delivering it to Plaintiffs is appropriately minimized, particularly in light of the very limited usefulness of that data for class certification purposes following *Dukes*. The various pre-*Dukes* discovery decisions Plaintiffs cite, of course, fail to consider the pertinence of the underlying data or documents sought in light of the *Dukes* Court's controlling pronouncements about the proper application of Rule 23. They could not have done so; they were decided well before the *Dukes* decision.

Plaintiffs also oversimplify the law when they contend that the Court should not weigh the burden Goldman Sachs would incur in producing an extract of the personnel data created prior to September 2004 simply because that data is still mounted on a "live" system rather than contained on storage tapes. The proper analysis under Rule 26(b)(2)(B) and (C), following the 2006 post-*Zubulake* amendments to Rule 26, not only provides that a party may identify sources of electronically stored information as "not reasonably accessible because of undue burden or cost," but also requires the Court, when considering a motion to compel, to review the burdensomeness of producing the data, and provides that the Court "must limit" such discovery if "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C)(iii).

> ➤ The Advisory Notes to Rule 26(b)(2) acknowledge that "[i]nformation systems are designed to provide ready access to information used in regular ongoing activities," but also "may be designed so as to provide ready access to information that is not regularly used." *Id*. The Notes further point out, however, that "a system may retain information on sources that are accessible only by incurring substantial burdens or costs. Subparagraph (B) is added to regulate discovery from such sources." *Id*.

> ➤ The Advisory Notes also state that "in many cases the responding party will be able to produce information from reasonably accessible sources that will fully satisfy the parties' discovery needs. *In many circumstances the requesting party should obtain and evaluate the information from such sources before insisting that the responding party search and produce information contained on sources that are not reasonably accessible.*" *Id*. (emphasis added).

> ➤ *The Sedona Conference Database Principles: Addressing the Preservation and Production of Databases and Database Information in Civil Litigation*, March 2011 Public Comment Version, states that "the fact that a database is in active use does not automatically mean that the data is easy and inexpensive to produce in litigation," and "[w]hether a database is active or in legacy status does

# PAUL
# HASTINGS

The Hon. James C. Francis
April 3, 2012
Page 4

> not determine its accessibility. . . . The same challenges (e.g., limited export functionality, poor data consistency, a limited-feature search engine) may occur in producing data from a database currently in use as in one that is no longer active." *Id.* at 29-30 (emphasis added).

For these reasons, as well as those set forth in our letter dated February 29, 2012, and those that we look forward to discussing with Your Honor on Wednesday, April 4th, Goldman Sachs believes that Plaintiffs' request for leave to submit a motion to compel discovery should be denied.

Respectfully submitted,

*Barbara Brown/se*

Barbara Berish Brown
of PAUL HASTINGS LLP

Enclosures
cc:   Adam T. Klein, Esq. (via email)
      Kelly M. Dermody, Esq. (via email)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; LISA PARISI; and SHANNA ORLICH,<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>vs.<br><br>GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.<br><br>　　　　　　　　　　　　Defendants. | 10 Civ. 6950 (LBS) (JCF) |

## AFFIDAVIT OF CATHY OBRADOVICH

I, Cathy Obradovich, hereby affirm under oath that the following is true and correct:

1.　My name is Cathy Obradovich. I am over 18 years old and am competent to make this statement. I am a Vice President in the Compensation Group of Goldman, Sachs & Co. ("Goldman Sachs"). My team includes the staff members who maintain and oversee the PeopleSoft and Compensation Recommendation System ("CRS") databases. This affidavit is based on my personal knowledge and information provided to me by my team members, on whom I regularly rely in performing my work for Goldman Sachs.

### PeopleSoft Database

2.　PeopleSoft is Goldman Sachs' primary Human Resources database. In September 2004, we moved to a new version of PeopleSoft, which effectively resulted in the creation of two PeopleSoft databases: one containing data collected in September 2004 and before ("the Earlier Database"), and one containing data created after September 2004 ("the Current Database"). Although Goldman Sachs still maintains and possesses the data from the

Earlier Database, the data from this system is not readily translatable to the Current Database. Producing this earlier data would entail an entirely separate collection effort from the effort necessary to collect data from the Current Database.

3. Extracting data from either of the PeopleSoft databases is a detailed and difficult process. Goldman Sachs has just two key staff members who have the knowledge and skills necessary to extract data from the PeopleSoft database. Given all the day-to-day operations of the firm that require work by these same individuals, it would be necessary to have one of those staff members remain dedicated to accomplishing as much of the regular work as he could. Even so, having the remaining individual dedicate his time exclusively to extracting data and responding to data requests for the litigation would impose a significant burden and detrimental impact on our other critical operations and projects.

4. I understand that Plaintiffs in this litigation have suggested that we should be able to accomplish the necessary work by hiring temporary "consultants" who have general expertise in utilizing the PeopleSoft system. As set forth in more detail below, in my opinion such an approach would be entirely unworkable, totally aside from the out-of-pocket costs involved. I came to Goldman Sachs laterally approximately two years ago, and have observed first-hand just how idiosyncratic the Goldman Sachs PeopleSoft databases are. I have observed personally the difficulties that any company faces when hiring external IT consultants to conduct major data extractions in a reliably accurate fashion, and those difficulties would be exacerbated here by the intricacies of the Goldman Sachs systems. I do not believe that any material amount of the time of the two key IT staff members would be saved by hiring external consultants, as they would be the very people who would have to train the consultants, constantly respond to inquiries from them, and supervise their work to ensure accuracy.

### Pulling PeopleSoft Data from September 2004-December 2011

5. I understand that the plaintiffs in this case have requested PeopleSoft data, inter alia, for all employees who worked in revenue-producing jobs as Associates or Vice Presidents in the four revenue divisions from September 2004 to December 31, 2011 – the period covered by the Current Database – for the very large array of data fields previously identified to plaintiffs. I have discussed this extensive data request with my team. Based on their input, I have determined that a "best case" estimate for extracting this data is that it would require 90 to 150 hours of dedicated time (assuming no interruptions) by a dedicated Goldman Sachs staff member. Pulling this data would require our team to engage in extensive programming to create queries to properly specify the population of current and former employees to be included in the extracted population, and the data fields to be extracted. We would then have to analyze the filtered data to arrange it in the requested format, and then address any unexpected issues related to extracting the data covering this period.

6. This "best case" estimate reflects only the time required to pull the data itself. Performing a standard quality check or "QC review" of this data, to ensure its accuracy and reliability, would require another 40 to 80 hours of dedicated time by one of the same two staff members on our team.

7. Thus, the estimated minimum amount of time it will require from a dedicated staff member with the necessary PeopleSoft expertise to produce the requested data just from the September 2004 to December 2011 period would be 130 hours. Based upon my experience and that of my team members, however, I have found that projects seldom can be accomplished in the "best case" estimated time frame. A more likely estimate of time, in my opinion, is 230 hours. Also, if significant unexpected issues arise, it may take even longer to get a reliable data extract covering this time period.

## Pulling PeopleSoft Data from January 2002-August 2004

8.  I understand that Plaintiffs' counsel have also requested data from January 2002 through August 2004. Extracting PeopleSoft data from the Earlier Database (covering data from that period) would be a much more involved, difficult, and costly process (in terms of resource expenditure and allocation), and even then the data could not be readily translated into a format that matches up with the more current data. First of all, the Earlier Database retained far less organizational data regarding firm employees than the Current Database. Second, at the time of the PeopleSoft transition, we did not migrate information regarding former employees to the new PeopleSoft data structure. Third, given the constantly changing organizational structure of the revenue divisions at the department and desk level, it would be remarkably difficult to try and identify detailed organizational information for employees in this earlier data period, and even then the organizational groupings and structure in this earlier data cannot be translated or matched up in the database with the organizational structure used after late 2004.

9.  Pulling this older data would require multiple steps. First, a dedicated staff member would have to do the programming to create entirely new queries that will function with the PeopleSoft 7.5 system used in the Earlier Database; we could not just duplicate the programming necessary for the queries from the more recent database. Then, once those queries are developed and run against the Earlier Database, we would have to analyze the data to ensure that the proper population was identified, and create additional queries to pull the requested data on this population into an extract from the various data tables, including the transactional data tables, education data tables, prior work data tables, etc. Based upon information from my team, my best estimate is that these efforts would require 160 to 240 hours of dedicated work.

10.  Performing the QC review of this older data would also be very time intensive. My best estimate is that this would require an additional 40 to 80 hours of dedicated time by one of our staff members.

11.  Thus, our best available estimate is that pulling, preparing and QC-checking this earlier data would entail approximately 200 to 320 hours of dedicated time by one of our two staff members who has the expertise to handle the request. This would require our other staff member with PeopleSoft expertise to manage all day-to-day requests relating to this database firmwide.

12.  This estimate would be in addition to the estimated 130 to 230 hours of this same staff member's time necessary to extract data from the September 2004-December 2011 time period contained in the Current Database.

13.  In other words, if our team is asked to extract PeopleSoft data from both the Current Database and the Earlier Databases, going back to include the period between January 2002 and September 2004, our team will have to devote a dedicated staff member to the project for somewhere between roughly 8 and 14 weeks. This would leave us with only one staff member with PeopleSoft expertise to address all operational issues, database maintenance, and ongoing projects. This would impose a significant burden on our team.

14.  Unfortunately, there is no way for another Goldman Sachs employee to step in and take over these functions. Our team responds to and addresses complicated database inquiries and only someone intimately familiar with the Goldman Sachs PeopleSoft database can handle these functions. A staff member from another team or group will not have the PeopleSoft expertise or the familiarity with our reporting functions and the types of requests we receive from our internal customers to fill in for one of our staff members.

15. Nor can we efficiently "outsource" the extraction of data from our systems, especially with respect to the PeopleSoft data in the Earlier Database, to an outside vendor or contractor. Because there are fields and tables in the Earlier Database that are not used or compatible with our current system, extracting the earlier data must be done by someone with detailed institutional knowledge of Goldman and its systems. In addition to the 4 to 5 months of training that would be necessary to deal with extracting the data in the Current System, the additional training one of our staff members would have to conduct to transfer the level of added knowledge and information necessary to enable someone outside Goldman Sachs to extract this earlier data would itself require at least another month of dedicated time; the fields and tables in the PeopleSoft system in the Earlier Database are not named or stored in an intuitive format, and thus, someone generally familiar with relational databases like PeopleSoft would not be able to understand how Goldman used, organized, and stored this data without significant technical assistance from one of our staff members. All told, our team estimates that it would take at least five to six months for an outside vendor or contractor to: (1) gain the level of institutional knowledge necessary to extract pre-September 2004 PeopleSoft data from the Earlier Database, and the later data from the Current Database, and (2) perform the actual data extraction and review; during much of this time one of the two appropriately skilled Goldman Sachs IT team members who otherwise would be extracting the data themselves would be heavily absorbed in training, supervising and checking the work of those vendors or contractors.

16. We estimate that a specialty temporary agency with contractors having the necessary PeopleSoft skills to take on this lengthy project would charge approximately $100-135 per hour for the services of such a contractor. Thus, assuming Goldman Sachs were to utilize such an agency, and could find such a consultant, and further that the consultant remained on the

project without interruption or early termination after being trained, the out-of-pocket costs would be at least $80,000. In addition, however, Goldman Sachs would still have to bear the loss of a very substantial amount of the internal expert's time throughout this five-to-six-month period.

### Compensation Recommendation System

17. Goldman Sachs' Compensation Recommendation System ("CRS") is a database that tracks the results of the annual year-end compensation review process. Based on information from my team, I estimate that it would take a minimum of 40 hours just to pull data from this database for the four Revenue Divisions, for employees who worked as Associates or Vice Presidents, in "R" (revenue-generating) jobs from January 1, 2002 to December 31, 2011 (for the fields previously identified to plaintiffs).

18. However, it would take considerably more time and effort to do a QC review of any data extracted from the CRS database. This is because the CRS data is not maintained in a user-friendly format; someone from the CRS team must manually review and check all data that is pulled from the database. The steps involved in this QC process would require an extraordinary amount of effort and resources. The data extract from CRS will consist of thousands of rows, dozens of columns, resulting in more than two million data cells that require validation. Additionally, employee records will appear across multiple rows, requiring further time devoted to data reorganization and cleaning. Given the lack of automated validation queries or systems in place, staff members from the CRS team would have to be pulled from ongoing work and dedicated to doing a manual review of this data. This review would require team members to go through every record and field to ensure that data is correct and research any discrepancies in order to explain anomalies. Many of our team members were not at the firm going back to 2002, which will make it all the more difficult to validate this data. Also, certain

elements of compensation may be related to a particular group of individuals or programs that that no longer exist at the firm, which will require even more diligence and work to validate. Based upon information provided by our CRS team, I estimate that it would take at least 240 hours of work, spread across at least three dedicated team members, to conduct and complete this QC review.

19. In total, my best estimate is that in order to extract data from the CRS database and do the necessary manual QC review would take a minimum of 280 hours of dedicated time.

I declare under penalty of perjury that the foregoing is true and correct.

*Cathy Obradovich*

Cathy Obradovich
(28 U.S.C. § 1746)

LEGAL_US_E # 97595675.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; LISA PARISI; and SHANNA ORLICH,<br><br>                              Plaintiffs,<br><br>                  vs.<br><br>GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.<br><br>                              Defendants. | 10 Civ. 6950 (LBS) (JCF)<br><br>**CERTIFICATE OF SERVICE** |

        I hereby certify that on April 3, 2012, I caused a copy of the Affidavit of Cathy Obradovich to be served by electronic mail on:

Adam T. Klein
OUTTEN & GOLDEN, LLP
3 Park Avenue, 29th Floor
New York, New York 10016
ATK@outtengolden.com
*Attorneys for Plaintiffs*

Kelly M. Dermody
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
kdermody@lchb.com
*Attorneys for Plaintiffs*

Dated: New York, New York
         April 3, 2012

By: _____
      Erin E. LaRuffa

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

H. CRISTINA CHEN-OSTER; LISA PARISI; and
SHANNA ORLICH,

                        Plaintiffs,

vs.

GOLDMAN, SACHS & CO. and THE GOLDMAN
SACHS GROUP, INC.

                        Defendants.

10 Civ. 6950 (LBS) (JCF)

---

## AFFIDAVIT OF ANKUR PATHAK

I, Ankur Pathak, hereby affirm under oath that the following is true and correct:

1.     My name is Ankur Pathak. I am over 18 years old and am competent to make this statement. I am a Vice President within the Talent Assessment Group ("TAG") at Goldman, Sachs & Co. ("Goldman Sachs"). Along with other members of TAG, I maintain and oversee Goldman Sachs' Firmwide Review System ("FRS"). This affidavit is based on my personal knowledge and information provided to me by other TAG members and members of our IT team, on whom I routinely rely in performing my job responsibilities.

2.     FRS is the database that contains ratings, comments and results from Goldman Sachs' 360 review process. The FRS database was not created until 2003, so there is no data stored in this database prior to January 1, 2003.

3.     Although it is not part of the FRS database, TAG does possess some limited electronic performance review data from 2002, solely for the Equities portion of what is now the Securities Division. However, we are not sure whether this data is complete. Also, we in TAG

do not have any information regarding the behaviors or rating scales used by Equities in 2002 in creating these records. TAG does not possess any performance review data for 2002 for any of the other revenue divisions or business units.

### 2003-2011 FRS Data

4. The time estimates set forth in this declaration are my best estimates, based on information known personally to me or provided to me by other members of my team and/or the IT staff members supporting my team. Based upon this information, I estimate that it would take approximately five to ten full days of work for IT staff members to extract data from the FRS database (for the fields previously identified to Plaintiffs in November 2011) relating to the 360 degree review process from 2003 to 2011. Gathering this data would involve writing queries directed toward extracting the specific population and data fields required, reviewing and confirming the accuracy of the code, extracting the data, and performing a sample check on the extracted data to ensure it is properly formatted, etc.

5. TAG staff members would then need to expend approximately five additional days to perform a quality control ("QC") review, in which we would have to compare the extracted data to available hard-copy/PDF documents to confirm that information was accurately extracted, was not inadvertently truncated, etc., because the data extraction process sometimes results in such problems.

6. In sum, providing FRS data from the 2003 to 2011 period (for the four revenue divisions, "R" (revenue generating) positions only, for the fields previously identified to Plaintiffs, would require approximately ten to fifteen days of dedicated time from IT and FRS team members.

7.  It would not make sense to try to outsource this data extraction and review to an outside vendor or contractor because the FRS is an in-house database unique to Goldman. There is no way an outside vendor or contractor could learn about this database and perform the data extraction and review in less time than we have estimated for our staff members to perform this work.

### 2002 Data

8.  In order to extract the limited data TAG possesses that was in use in 2002 in the Equities portion of what is now the Securities Division, my best estimate, based on information from Goldman Sachs IT personnel, is that it would take them approximately four additional days of work. This would increase the estimate for FRS and IT team members to fourteen to nineteen days. Moreover, because TAG does not possess hard-copy collections of 2002 Equities source documents, we could not perform the necessary QC review on this data.

### MD Selection Database

9.  Goldman Sachs also has a database that tracks information pertinent to the consideration and selection of Vice Presidents for promotion to the EMD position. Data is contained in this database from January 1, 2002-forward. Based upon information from our IT team, my best estimate is that it will take four to five full days of work to produce a data extract from this database, which would involve the same tasks described above regarding the FRS database. The TAG team would then need two or three days of work to perform a standard QC review of this data. If the QC review identified any systemic problems in the data extraction, however, these estimates would need to be increased.

I declare under penalty of perjury that the foregoing is true and correct.

3/30/12
Date

[signature]
Ankur Pathak
(28 U.S.C. § 1746)

LEGAL_US_E # 97195691.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

H. CRISTINA CHEN-OSTER; LISA PARISI; and
SHANNA ORLICH,

                    Plaintiffs,

vs.

GOLDMAN, SACHS & CO. and THE GOLDMAN
SACHS GROUP, INC.

                    Defendants.

10 Civ. 6950 (LBS) (JCF)

**CERTIFICATE OF SERVICE**

---

      I hereby certify that on April 3, 2012, I caused a copy of the Affidavit of Ankur Pathak to be served by electronic mail on:

      Adam T. Klein
      OUTTEN & GOLDEN, LLP
      3 Park Avenue, 29th Floor
      New York, New York 10016
      ATK@outtengolden.com
      *Attorneys for Plaintiffs*

      Kelly M. Dermody
      LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
      275 Battery Street, 29th Floor
      San Francisco, CA 94111-3339
      kdermody@lchb.com
      *Attorneys for Plaintiffs*

Dated: New York, New York
       April 3, 2012

By: _____
      Erin E. LaRuffa