# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------X

H. CRISTINA CHEN-OSTER; LISA PARISI; and SHANNA ORLICH,

Plaintiffs,

10-CV-06950(LBS)

VS.

GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,

Defendants.

--------------------------------X

VIDEOTAPED DEPOSITION

OF

WAYNE CASCIO

New York, New York

Saturday, November 16, 2013

Reported by:
AYLETTE GONZALEZ, CLR, RPR
JOB NO. 67857

WAYNE CASCIO (11/16/13)

A. But sure, people who are on the cusp and, you know, without having to have rigid boundaries, that does give you some flexibility to move a person up or down.

Q. From now on, if Counsel objects in a way that my question has been so egregious that she needs to instruct you not to answer the question, she'll do that.

A. All right.

Q. Otherwise, the objection is just for the record and you can go ahead and answer the question as best you can.

But as I said, if you think you need more information to answer the question, let me know.

So have you written about the benefits and problems with a forced distribution system?

A. Sure.

Q. And have you come out four square against forced distribution systems?

A. No, I have not.

Q. I'd like you to -- earlier, we were discussing what you do when you're not doing

WAYNE CASCIO (11/16/13)

this. And you said that you are teaching a full load, correct?

A. Correct.

Q. If you sent a student to write a paper about forced distributions in evaluation systems and they came back with one that discussed only the research, the articles that identified problems and didn't acknowledge the utility and the benefits of a forced distribution, what kind of grade would that student get?

MS. GEMAN: Objection.

A. I think you need to be realistic. At least what I've tried to do in my own writing is to presents a balanced perspective.

Q. And if you were serving as a jury member for one of the peer review journals, you indicated that you had done that in the past, and an article was submitted for publication that similarly refused to or failed to acknowledge the positives in a forced distribution system, what would your recommendation be?

A. Usually would point that out.

WAYNE CASCIO (11/16/13)

Q. And suggest maybe some revisions?

A. Possibly, sure.

Q. Is there anything in your report that I'm missing where you point out the positives or the research that has been done that shows the positives of a forced distribution system?

A. Sure, yes. There's a paper by Steve Bates that was in the Human Resource Magazine --

Q. Is that the one that's listed in the footnote number three?

A. Let me see. Yes, sir. Yep.

Q. And what did Mr. Bates conclude?

A. I think he was trying to present a more balanced perspective.

Q. I don't see any reference to the -- to the benefits of that system in your report though. You cite to Mr. Bates?

A. Yes.

Q. Or Dr. Bates. I don't know.

A. Mr. Bates, yes.

Q. But I don't see any acknowledgment of the strengths of the system in your report.

WAYNE CASCIO (11/16/13)

MS. GEMAN: Is that a question?

Q. Am I missing it?

A. Yes, I don't think I ever said that forced ranking shouldn't be used. I don't think I ever said that. I don't think I -- I think I said that there was just a lot, you know, it was a controversial issue. It's a controversial topic. It has generated a lot of academic commentary on both sides. I don't think anywhere in this report I ever said don't use forced ranking. I mean, that's a decision up to the company. That's its prerogative.

Q. You also perform consulting services for employers on their employment systems, do you not, the human resources systems?

A. Correct, yes.

Q. Have you ever recommended one that had a forced distribution system that they eliminated?

A. No, I've never been asked to do that.

Q. Okay. Have you -- have you ever

recommended that an employer adopt a forced distribution system of any sort?

A. Absolutely.

Q. Okay. In the next paragraph, we're talking now about the 360-degree performance review system.

A. Is this paragraph 24?

Q. 25. I'm sorry; I've moved on to 25.

A. Okay.

Q. You note one recent critique which expresses some degree of skepticism about the utility of multi-rater systems. Do you share that skepticism?

A. I think they can be very, very valuable for some purposes. When I say I'm scepticism, I don't through the baby out with the bath water. I don't ever say you should use 360 systems. They can be very, very valuable. What I was trying to reflect was current thinking in the field about 360 systems.

Q. Is current thinking in the field that they're less useful and even problematic?

A. Under certain circumstances, they can be. And, you know, an obvious reason -- an obvious reason for that is that you get feedback from very different sources and that a manager, usually the immediate manager, is ally the person that has to convey the results of the 360 feedback. And sometimes, it's pretty hard to integrate all of that feedback into coherent themes when people might have had very, very different perspective and commentary about an individual's performance.

Q. Let's talk a little bit about the purpose the multi-rater design, the 360 design.

As I understand it, the purpose is to obtain feedback on the subject employee from a variety of different constituencies that may have seen the employee perform -- doing different tasks or doing the same tasks in a different context so that you get a better rounded view of the employee's performance; is that right?

A. Yes, sir.

Q. And so, if you're -- and I think

later in the report, we'll probably talk about this at some point, you say that the perception of an individual of the subject employee's performance can vary depending on the viewer's perspective, right?

A. Yes, sir.

Q. So, that if I'm the individual's manager or the individual's manager's manager, I may have a different perspective of that individual than a subordinate of the subject employee?

A. Correct.

Q. Even in the same context, seeing the same behavior.

A. Correct; sure.

Q. All of that is valuable input, isn't it?

A. Absolutely.

Q. And your concern is that the system needs to be designed sensitively so that there's a mechanism for identifying and understanding disparate impressions of an employee doing the same tasks; is that correct?

A. It's far more than that.

Q. Tell me what I've left out.

A. The key issue for me and this -- there's two issues. One of them is I tried to -- I had a citation in here from probably the leading textbook on compensation, 2013 textbook that says today, 360s are not used very much for compensation purposes. Heavily used for developmental purposes, to help people get better. So, I was just trying to reflect current practice in that it's not wrong to use it for -- let me be clear; it's not wrong to use it for compensation purposes. It's just that very few companies are doing that now.

And so, my concern was -- was really, you know, the purpose of the 360 and I'm not saying it's wrong to use it for compensation purposes, let's be clear about that, but the major considerations, major concern that I have is the lack of the requirement for a uniform composition of the rater group.

Q. Okay. Let's talk about that.

WAYNE CASCIO (11/16/13)

A. I guess.

Q. Both a J.D. and Ph.D.

Dr. Malos comments that the absence of all of these safeguards is generally in our favor; is that correct?

A. Where does he say that?

Q. Starting on -- there are no page numbers on this. Just above the table, under the heading "Cases involving procedural aspects of performance evaluation" -- or "performance appraisal," a sentence that starts on that page?

A. Okay, I see it.

Q. Continues over to the next.

A. I see it.

Q. Very oddly formatted?

A. Seems like there's some text missing or something.

Q. I think it ends here and continues over to here.

MS. GEMAN: Are you asking him if that's what the sentence says?

A. Oh, I see, okay.

MS. GEMAN: I'm sorry, what's the



WAYNE CASCIO (11/16/13)

question?

Q. You see the sentence I'm referring to?

A. Yes.

Q. Is that consistent with your understanding?

MS. GEMAN: Objection; calls for a legal conclusion.

A. In the part where he says "the absence of such safeguards"?

Q. Yes.

A. Generally, has not been fatal to the employer, yes, I think it says what it what -- the document speaks for itself.

Q. I'm asking whether that's a conclusion that you agree or disagree with?

MS. GEMAN: Same objection.

A. He reviewed the case law, I didn't, you know.

Q. Well, I mean you've written articles about the case law and its application in this field, haven't you?

A. Of course, but the case law changes every year.



WAYNE CASCIO (11/16/13)

Q. Is it your understanding of the case law, however recent it is, that that statement is true?

MS. GEMAN: Objection.

A. I would just say based the case law that he analyzed or that he reviewed, this is his conclusion, I don't have any reason to doubt it.

Q. Okay. So did you select the three items that appear at the end of paragraph 55 from the list that Dr. Malos had?

A. These were -- these were three items that I felt were deficiencies in the system, okay.

Q. Well, actually the prior sentence says that researchers have identified several safeguards and then you identify just three of them there?

A. Correct.

Q. They happen to be the three that you found deficient at Goldman Sachs?

A. Sure.

Q. You don't identify any of the factors that you found to be present,



WAYNE CASCIO (11/16/13)

satisfied?

A. I didn't list the whole nine, the list of nine.

Q. Do you have an expert opinion to offer in this case, that failing to give employees access to review their appraisal results has a disparate impact on women?

MS. GEMAN: Objection.

A. I do not.

Q. Do you have an expert opinion to offer in this case that failing to provide thorough and consistent documentation across raters, that includes specific examples of performance based on personal knowledge, has a disparate impact on women?

MS. GEMAN: Objection.

A. I can't say that that caused any disparate impact, that's for sure.

Q. Number three, do you offer here an expert opinion that the item here, there must be a system to detect potentially discriminatory effects or abuses of the overall system resulted in gender differences in compensation or evaluation at Goldman

WAYNE CASCIO (11/16/13)

the way to do it. That we know for sure. A lot of research on that. Forced distributions are antithetical to teamwork and cooperation.

Q. 360 is a pretty good tool to foster teamwork, isn't it?

A. Yes, sir, yes.

Q. So, the problem you're identifying here is within group rather than across groups, you're concerned about individuals who are either in high-performing groups that get stuck at the bottom or at low-performing groups that unfairly get bumped up to the top?

A. Yes, sir.

Q. That problem is ameliorated the larger the group gets, correct?

A. Well, it's all -- yes, but -- I mean yes, that's true, but there are limits and, you know, as far as ranking goes, we have a lot of evidence to indicate that once a group exceeds about 10 to 15 people, it's just not possible for managers to rank them reliably.

Q. Do you have an expert opinion to offer in this case on the size of the groups

WAYNE CASCIO (11/16/13)

at Goldman Sachs?

A. No, sir, I don't.

Q. Let's talk a little bit about potential.

A. Okay.

Q. This is paragraph 63. It's actually in several places. We talked at the very beginning of the day about the understood meaning of the term similarly situated in your field; is there a similarly understood term of a meaning potential in your field?

A. I don't believe that's true. Cases where I've used it in my own work, it's typically with reference to some specific outcome, so for example, if a firm was doing a downsizing and one of the factors that is being considered is the potential people have to help the firm reach its strategic objectives, it's very clear with respect to objective 1, 2 and 3, people are rated against each one of those to determine what potential means in that context.

Q. So, in your experience, it's quite common for employers to rate employees on

WAYNE CASCIO (11/16/13)

potential; isn't that right?

A. It's been a very difficult -- it's very difficult. I've had experience with this over the years in a variety of context and my experience with -- there's nothing wrong with trying to rate potential, but I think you need to be clear about what you or a firm, an organization needs to be clear about what it means by potential, can it anchor it to any specific outcomes. And that's why I was using the example of the downsizing and I can anchor that specifically to strategic objectives that the firm was trying to hit in the next three to five years.

Q. In paragraph 33, you say that there's no standard definition of potential; is it your suggestion that there should be one definition of potential that would be used for all of the employees being rated?

A. There is no standard definition of potential, that's true, and potential could mean different things in different context and I was trying to say that just as with any other factor that people are being rated on,

WAYNE CASCIO (11/16/13)

there's got to be clear definition of it and it's got to be anchored in some way, such as the ability to hit strategic objectives in three to five years, that's not the only way, but it's one way.

Potential has been a very -- it's a slippery concept. It's hard to get your arms around it. It's kind of the sort of thing where frequently people will say I'll know it when I see it kind of thing.

Q. That's not the case here though?

A. I don't know if it's the case here. It's not defined. I mean, it's defined as some indicators, but that's it.

Q. Well, I'm looking again at Exhibit 4, page 355, it's the one "Manager's toolkit".

A. Okay. I see it.

Q. Okay.

A. Yes.

Q. There's a relatively -- to my eyes, looks a relatively extensive definition of potential there, maybe you could tell me what's lacking, what would you add?

WAYNE CASCIO (11/16/13)

Q. Do any of them --

MS. GEMAN: I'm sorry. I was going to say I think we've been going more than an hour.

MR. MOLLEN: Yes, I will in just a moment, very shortly.

Q. Do any of the employers with whom you consult produce that kind of statistical rabbit trail for individuals to reconstruct after the fact?

MS. GEMAN: Objection; argumentative.

A. Frequently particularly in --

Q. I'm sorry, I am interrupting you and I apologize for this but I meant to qualify that. I know you do a lot of public sector work. I'm only interested in private sector employers.

A. I was going to say particularly in downsizing decisions, that kind of information is very important.

Q. Okay. So a couple of times, you've referred to the use of potential in a downsizing context; when potential is used as

WAYNE CASCIO (11/16/13)

an evaluative element outside of a downsizing context, as part of the routinized evaluation process, are you familiar with any employer who does what you suggest they should do with it?

A. No. All I can say is that in this case, I mean my only point was that in this case, we simply can't tell how much weight potential carried and ultimately assigning a quartile. We don't know, because there was such apparent variability in how individual managers interpreted potential, we don't know what they had in mind.

Q. Aren't there downsides to sharing potential information with employees?

A. That comes up all the time in the leadership succession issue and the question is you can have -- it's certainly appropriate to share information about potential, but not to promise a specific job.

Q. But aren't there problems that you generate by telling somebody this is how we view your potential?

MS. GEMAN: Asked and answered.

WAYNE CASCIO (11/16/13)

A. I think it's actually the reverse and I mean, I have lots of examples of companies that didn't tell people that -- particularly, I'm thinking of one in particular, high powered women, that they thought that these women had a future at the place and when they contacted them a year later after they had left, something like 90 percent of the women said nobody ever told us, we thought we had a future. So sharing that information seems to me to be pretty good management practice.

Q. When you've got employees who are doing high quality work in their current jobs, but your view is that they're unlikely to take on larger roles in the future, if you communicated to them, don't you think you increase your turnover?

A. I think it depends on how you frame it. There's a lot of people who don't want to move up, happy doing what they're doing. Technical specialist, for example, many of them don't want to go into general management and they're delighted that people recognize

WAYNE CASCIO (11/16/13)

the value that they had and the jobs that they're currently doing.

So it's not that they don't have -- they may not have potential for higher level jobs, because they don't want it, but they've got great potential in the jobs that they're currently in. They want you to be around for a long time.

MR. MOLLEN: Why don't we go ahead and take a break.

THE VIDEOGRAPHER: 2:26. We're off the record.

(Whereupon, an off-the-record discussion was held.)

THE VIDEOGRAPHER: The time is 2:58 p.m. We're on the record.

BY MR. MOLLEN:

Q. All right. Dr. Cascio, if you'd look back at paragraph 55. This is where you identify the three elements of procedural justice that you found lacking?

A. Yes, sir.

Q. Are you offering an expert opinion that the absence of any one of those items

WAYNE CASCIO (11/16/13)

would have -- would result in gender bias or gender differences?

A. I am not.

MS. GEMAN: Objection.

A. I am not.

Q. Now, earlier, remember we had the exchange of Goldman Sachs tells the employees they're in one of three buckets as opposed to the quartile. And as I understand it, you said that the difference between three and four wasn't material. Your concern was that when it's communicated, that there actually is some sort of more fulsome communication with the employee?

A. Can I just ask you a clarification?

Q. Sure.

A. Because you said the three buckets, would this be the manager's statement about lower, higher --

Q. Yes. I think it's paragraph 36 in your report. 35, 36, somewhere around there. Yes. Yes. It's 35G1i.

A. Okay. Good. Yes.

Q. Before I ask you that question, let

WAYNE CASCIO (11/16/13)

me go back to the prior one, just because I think I asked it inartfully.

I asked you whether the absence of one of the three protections that you identified in paragraph 55 would result in gender bias, whether you were offering an expert opinion in that and you said no.

Would the absence of all three of those, are you offering an expert opinion that the absence of all three of those would have resulted in gender differences at Goldman Sachs?

MS. GEMAN: Objection.

A. I mean we can't say that -- you know, just as the original source that you cited said that, you know, absence of one or more of these is not fatal for an employer, so you really can't say. What we can say is good practice would include these. It may have reduced impact. We just don't know.

Q. So, now I'm on 35G1i and you see there where the question was about communicating performance quartile. The answer was generally that's not shared, but we

WAYNE CASCIO (11/16/13)

tell them at par, below par, above par; you see that?

A. I see it.

MS. GEMAN: Objection; misstates the document.

Q. So, now we're going to move, when we have that exchange, my recollection is that your concern wasn't about the difference between communicating three buckets versus four, which I think you said was not a material difference, but you were concerned that the communication might not be as robust or as full about the employee's -- why they were placed there; is that right?

MS. GEMAN: Objection.

A. My concern was that some employees get that communication and others don't. It was one aspect, yes, okay.

Q. And then was there substantive aspect about what was communicated or maybe I misunderstood you?

A. No, I mean the point that I was making --

MS. GEMAN: Sorry. Objection;

WAYNE CASCIO (11/16/13)

misstates -- misstates facts, misstates the document, about what was communicated.

Q. Okay. You can answer.

A. What I was objecting to was the fact that on an ad hoc basis, some people may get that, that information. If you're asked what quartile am I in, this is how you answer, all right. And the deposition testimony indicated that's certainly not true across the board in all cases, for all individuals. And my point simply is if some individuals get this information and other people don't, that's one potential problem right there because that's inconsistent treatment of people and secondly, if the manager doesn't have to communicate this information to an employee unless asked directly, if you don't have to communicate it, you don't have to defend it and the employee doesn't have an opportunity to question it or to offer additional information that might change the manager's view.

Q. When you -- when you determined

WAYNE CASCIO (11/16/13)

Q. You -- earlier you said that Dr. Farber gave you some tables, that you received some tables --

MS. GEMAN: Misstates testimony.

Q. -- from Dr. Farber, am I right about that?

MS. GEMAN: Misstates testimony.

A. I did receive several tables from him.

Q. Are the tables -- do you know whether the tables that you received from him are the ones that are in his final report?

A. I believe they are.

Q. In your examination of the record in this case, did you find any evidence that suggested that the policies and practices that we've been discussing here today were implemented or designed by Goldman Sachs with an intent to discriminate against women?

MS. GEMAN: Objection; calls for a legal conclusion, compound, vague.

A. I mean it does call for a legal conclusion and my layperson's conclusion is that they were not.

WAYNE CASCIO (11/16/13)

Q. Okay.

A. They were not.

MR. MOLLEN: That's all I have.

MS. GEMAN: Did you say you wanted to -- I believe Dr. Cascio told us during the break that there's something he wanted to clarify.

A. Just a couple of things I wanted to clarify. One of them was the example you gave me of the -- and I'm trying to remember the specifics, but it was the MIT technical specialist, right, versus somebody else who's working in a managerial capacity and servicing high level managers; all I wanted to say was that I interpreted the technical specialist to be somebody who's an IT and not in a revenue producing job and that that's why I suggested that those are not similarly situated.

Q. Okay. Okay. Was that the only --

A. Yes, that was the only.

Q. -- clarification?

A. That's the only thing I had.

Q. I'm trying to remember the hypothetical, that was a long time ago.

WAYNE CASCIO (11/16/13)

A. I know it was. I know.

MS. PALUMBO: Why don't we take five minutes and we'll be back.

THE VIDEOGRAPHER: The time is 4:08 p.m. We're off the record.

(Whereupon, an off-the-record discussion was held.)

THE VIDEOGRAPHER: The time is 4:22 p.m. We're on the record.

MR. MOLLEN: I'm done. We have no further questions.

THE WITNESS: Did you have a question for me?

MS. GEMAN: Did you want to clarify something? I'm confused now about where we --

MR. MOLLEN: The state of play currently is that Dr. Cascio corrected what he believed to be an erroneous answer and we went and looked at the transcript. We don't believe we have any follow-up on that. As far as we're concerned, we're done.

MR. KLEIN: He was going to

WAYNE CASCIO (11/16/13)

supplement his answer to the last point about the policies and practices, not discriminating.

THE WITNESS: Yes, I mean, I don't want to use a legal term, but facially neutral, they seemed that way on their face, seemed neutral and not designed to single out either gender, special treatment. The only point I would make is it's the effects of those policies year after year after year that compound, the effects in terms of compensation recommendations and it's the underpayment year after year after year that compounds, that leads to pretty serious state of inequity by the end of year ten or something.

BY MR. MOLLEN:

Q. And those year after year disparities are the disparities identified by Dr. Farber, correct?

A. Correct, yes, sir.

MR. MOLLEN: We're done.

MR. KLEIN: Okay, perfect.