# EXHIBIT 4

```
 1

 2        IN THE UNITED STATES DISTRICT COURT

 3       FOR THE SOUTHERN DISTRICT OF NEW YORK

 4    ---------------------------------X
      H. CRISTINA CHEN-OSTER; LISA
 5    PARISI; and SHANNA ORLICH,

 6                   Plaintiffs,
                                     10-CV-06950(LBS)
 7              VS.

 8    GOLDMAN, SACHS & CO. and THE
      GOLDMAN SACHS GROUP, INC.,
 9
                     Defendants.
10    ---------------------------------X

11

12            VIDEOTAPED DEPOSITION

13                      OF

14            CRISTINA CHEN-OSTER

15              New York, New York

16          Thursday, December 8, 2011

17

18

19    Reported by:
      AYLETTE GONZALEZ, CLR
20    JOB NO. 43151

21

22

23

24

25
```



CRISTINA CHEN-OSTER - 12/8/11

**Page 38**

REDACTED FILED UNDER SEAL

**Page 39**

REDACTED FILED UNDER SEAL

**Page 40**

REDACTED FILED UNDER SEAL

**Page 41**

REDACTED FILED UNDER SEAL

    Q.  But she certainly has never worked
at Goldman Sachs to your knowledge?
    A.  To my knowledge, she has not worked
for Goldman Sachs.
    Q.  We're going to hand you two
documents which we'll mark as Exhibits 47 and
48.
        MR. ROGERS:  This is Exhibit 47.
I'm handing a copy to Plaintiff's
Counsel.
        (Defendant's Deposition Exhibit
47, document bearing Bates label
GS0000168, marked for identification,
as of this date.)
        MR. ROGERS:  This is 48.  And I'll
hand a copy to Plaintiff's Counsel of
Exhibit 48.
        (Defendant's Deposition Exhibit

Page 42

CRISTINA CHEN-OSTER-12/8/11

48, document bearing Bates label GS0000134, marked for identification, as of this date.)
Q. Before we get to that, you mentioned this ▮▮▮▮, I should ask, I suppose, what did she tell you about her own recording of conversations?
A. She told me that she had made recordings in order to have her own record of conversations.
Q. Did anyone else prior to the time you began surreptitiously taping people at Goldman Sachs tell you that they had taped conversation?
A. Not that I can remember.
Q. All right. If you look at Defendant's Deposition Exhibit 47 and 48, could you tell me whether those are documents that bear your signature?
A. Yes.
Q. All right. So let's look at Exhibit 47, this was your signed acknowledgment dated March 3, 1997 that you received a current copy of the U.S. version of

Page 43

CRISTINA CHEN-OSTER-12/8/11

Goldman Sachs employee handbook including descriptions of personnel policies and benefits; isn't it?
A. Yes.
Q. And it was signed by ▮▮▮▮, who was your direct supervisor at the time; isn't that correct?
A. No.
Q. I'll break it down then. It was signed by ▮▮▮▮; was it not?
A. No.
Q. All right. Is that someone else's handwritten reference to him as your supervisor?
A. Yes.
Q. My mistake, excuse me. But this does bear your signature; does it not?
A. Yes.
Q. Is that your handwriting that did ▮▮▮▮ and also your own name?
A. Yes.
Q. Okay. So, you filled out everything that's on this document, correct, that's in handwriting?

Page 44

CRISTINA CHEN-OSTER-12/8/11

A. Yes.
Q. Look at Defendant's Deposition Exhibit 48. Is that your signature on this document?
A. Yes.
Q. And this is a November 1999 acknowledgment by you of having received the firm's U.S. employee handbook in updated form; is it not?
A. November 18, 1999.
Q. That's when you signed it, yes?
A. Yes.
Q. By signing it, you acknowledged receipt of an updated copy of the handbook; did you not?
A. Yes.
Q. And you see the bold language there saying, "It's very important that you read the handbook, especially since many sections are new or revised," goes on to say, "The handbook provides important information about your entitlements and obligations as an employee. Please sign below to indicate that you have received the handbook and will comply with all

Page 45

CRISTINA CHEN-OSTER-12/8/11

handbook policies and procedures therein as amended from time to time."
And you signed below that statement; did you not?
A. Yes.
MR. ROGERS: I'd like to mark as Exhibit 49, a document bearing production numbers GS-99133 through GS-99136 and then with a page GS-99197, which is an excerpt of the handbook. I'm handing a copy to Plaintiff's Counsel.
(Defendant's Deposition Exhibit 49, document bearing Bates label GS0099133 through GS0099136 and GS0099197, marked for identification, as of this date.)
Q. Similar to Exhibit 44, Ms. Chen-Oster, Defendant's Deposition Exhibit 49 contains certain pages from the 1999 version of the Goldman Sachs employee handbook U.S.
Would you turn to the last page which does bear production number GS-99197.

Page 102

CRISTINA CHEN-OSTER-12/8/11
1
2   A.  Yes.  This is the 1999 one.
3   Q.  This is the 1999 version.  And
4  we're going to be getting to what went on in
5  1999.
6-25  REDACTED FILED UNDER SEAL

Page 103

REDACTED FILED UNDER SEAL

Page 104

REDACTED FILED UNDER SEAL

Page 105

REDACTED FILED UNDER SEAL

27 (Pages 102 to 105)

Page 130

CRISTINA CHEN-OSTER-12/8/11

1
2    REDACTED FILED UNDER SEAL
3
4
5
6
7
8
9
10
11
12
13      Q.  Do you recall a time in May of
14  1999, which is a year and a half after the
15  time that you were at Scores, when you sought
16  a transfer to Menlo Park, California?
17      A.  Yes.
18      Q.  And at the time you sought to
19  transfer there with ▓▓▓▓▓▓?
20      A.  ▓▓▓▓▓▓.
21      Q.  Isn't that right?
22      A.  Yes.
23      Q.  And who is ▓▓▓▓▓▓?
24      A.  He was an associate who joined the
25  firm in 1997 from business school, who worked

Page 131

CRISTINA CHEN-OSTER-12/8/11

with me selling international convertible
bonds.
    Q.  And what was your reason for
wanting to move to Menlo Park?
    A.  Twofold.  Number one, I didn't feel
very comfortable working on that team.  Number
two, I thought opportunities would be better
there than the opportunities for me in
international convertible bonds given that
many of the clients that were the highest
growth clients had been moved to the London
office.
    Q.  When you say clients were moved to
the London office, what do you mean by that?
    A.  The client coverage of those
clients were transferred to London sales
people.
    Q.  Who did you speak to about moving
to Menlo Park?
    A.  I don't remember all the people I
spoke to, but I spoke to ▓▓▓▓▓▓.  I
spoke to ▓▓▓▓▓▓.  I think I had spoken to
▓▓▓▓▓▓ as well.
    Q.  Who's ▓▓▓▓▓▓?

Page 132

CRISTINA CHEN-OSTER-12/8/11

    A.  He was a convertible salesperson in
the New York office who worked in the
California office for some time.  And I think
he came back, but I don't remember all the
details.
    Q.  Were you -- was your intent in
talking to ▓▓▓▓▓▓ to talk about
California or to talk about how your work
might interact with each other if you moved
out there or something different?
    A.  I think it was to learn about his
experience.  And then we met with the heads of
the Menlo Park office, but I don't remember
the names of the people who we met with.
    Q.  Did you go out there or did you
meet them when they were visiting?
    A.  We went out there.
    Q.  Now, what happened in the end as to
the potential transfer to Menlo Park?
    A.  We were not given the opportunity
to transfer.
    Q.  Did ▓▓▓▓▓▓ tell you that he did
not approve the transfer?
    A.  I think what he said was that it

Page 133

CRISTINA CHEN-OSTER-12/8/11

was something to the effect of, you know, we
could go, but he would just request that we
stay for some period of time to help with the
transition.
    Q.  Then how it was that it did not
happen, the move, that is?
    A.  We were simply not given a job
offer.
    Q.  From whom?
    A.  From the Menlo Park office.
    Q.  So, in other words the Menlo Park
office would have had to agreed to have you
come; is that right?
    A.  Yes.
    Q.  And they chose not to agree?
    A.  Yes.
    Q.  And this was all -- this all took
place around May of 1999, correct?
    A.  Around that period of time.
    Q.  Now --
    A.  Yeah, a few months, it happened
over the course of, I think, a couple of
months, so.
    Q.  Also around that time, you

Case 1:10-cv-06950-AT-RWL   Document 265-4   Filed 07/25/14   Page 8 of 20

Page 138

CRISTINA CHEN-OSTER-12/8/11

REDACTED FILED UNDER SEAL

Page 139

REDACTED FILED UNDER SEAL

Page 140

REDACTED FILED UNDER SEAL

Page 141

REDACTED FILED UNDER SEAL

16  anything you might have said about a Morgan
17  Stanley issue?
18     A.  Yes, I mean, I think I asked who
19  would get this info, because I was concerned
20  about providing much details if it was going
21  to go back to ████████ after he had
22  suggested that I not make a big deal about it.
23     Q.  But again, he is the one who
24  referred you to this person; isn't he?
25     A.  Right, but at the same time he



Page 336

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
H. CRISTINA CHEN-OSTER; LISA
PARISI; and SHANNA ORLICH,

           Plaintiffs,

                  10-CV-06950(LBS)

    VS.

GOLDMAN, SACHS & CO. and THE
GOLDMAN SACHS GROUP, INC.,

           Defendants.
----------------------------------X

        VOLUME II
    VIDEOTAPED DEPOSITION
          OF
    CRISTINA CHEN-OSTER
    New York, New York
  Friday, December 9, 2011

Reported by:
AYLETTE GONZALEZ, CLR
JOB NO. 42152

Page 413

CRISTINA CHEN-OSTER-12/9/11

Q. What facts do you have to support the allegation that Goldman Sachs gives managers unchecked discretion to assign responsibilities, accounts and projects?
A. No check or balance system was ever communicated to employees. It was not communicated how these responsibilities, accounts and projects were delegated. And by virtue of what the result was, I saw that the most lucrative and promising opportunities, assignments, and seats did go to men.
Q. Well, what specific instances of a manager using unchecked discretion to do any of these things can you tell me about?
A. ▅▅▅▅ gave ▅▅▅▅▅ the project to work on looking at the high yield distressed convertible opportunity without discussing with me and I am the senior person on that team.
Q. And the responsibility he or the opportunity he gave there was to a woman, wasn't it? He gave ▅▅▅▅▅ an opportunity?
MS. DERMODY: Object to form.

Page 414

CRISTINA CHEN-OSTER-12/9/11

A. But it was an unchecked discretion to give that to her.
Q. Didn't you have --
A. That's -- my point is that it's unchecked discretion, not that it was given to a woman.
Q. Didn't you have unchecked discretion to give ▅▅▅▅▅ an assignment?
MS. DERMODY: Object to form.
A. No, I would tell ▅. We would consult as a team. We worked together.
Q. No one told you and ▅ that ▅ could give ▅▅▅▅ an assignment without talking to you, but you couldn't give her an assignment without talking to him; did they?
A. This is a project, not a small assignment. There's a big difference.
Q. I don't really -- that wasn't the point of the question.
The question, Ms. Chen-Oster, is you are trying, as I understand it, trying to say that ▅▅▅▅▅ had more discretion to give ▅▅▅ projects than you did?
A. Absolutely. Because she listened

Page 415

CRISTINA CHEN-OSTER-12/9/11

to him when he said, do not share this information with Cristina Chen-Oster.
Q. You could have done the same thing; couldn't you?
MS. DERMODY: Object to form.
A. No, I would not have done that.
Q. It's not a question of whether you would not have done it. What I'm saying is, Goldman Sachs did not instruct ▅ and you that one or the other of you had more discretion with respect to assigning ▅▅▅▅; did it?
A. My point is it's unchecked. So if I did it, that would have been unchecked as well.
Q. Right.
A. So the point is, it's unchecked discretion. And the majority are men, the managers, that's my --
Q. So, you're agreeing --
A. That's the point here.
Q. Okay. So you're agreeing with me you had unchecked discretion with respect to ▅▅▅▅, yes?

Page 416

CRISTINA CHEN-OSTER-12/9/11

A. I believe the point here is that there is unchecked discretion by managers and the majority of managers are men.
Q. So, let me just ask my question. You had unchecked discretion with respect to ▅▅▅▅, your subordinate; is that right?
A. As a manager, I had unchecked discretion with ▅▅▅ as well.
Q. So --
A. But I happen to be a woman, agreed, but the majority of managers are men. I continue to state that point.
Q. So, your concern is managers have unchecked discretion and to your estimation more men are managers than women; is that right?
A. That is correct.
Q. Now give me examples of unchecked discretion that your managers exercised that you believe was discriminatory.
A. Okay. Account assignments.
Q. Who exercised unchecked discretion with respect to account assignments that you believe was discriminatory toward you?

```
                                        Page 417
 1         CRISTINA CHEN-OSTER-12/9/11
 2      A.   Toward me, when the accounts were
 3   moved -- the hedge accounts were moved to
 4   London at the beginning of 1998.
 5      Q.   And who did that?
 6      A.   ▆▆▆▆▆▆▆▆  communicated that to
 7   me.  Whether it was him to who did that, I
 8   don't know.  It could have been in
 9   collaboration with others such as ▆▆▆▆▆▆
10   ▆▆▆▆▆▆  or others at the firm.  It could
11   have been many managers talking together, but
12   it was ▆▆▆▆▆▆▆▆ who communicated that to
13   me.
14      Q.   But you said that managers had
15   unchecked discretion, did ▆▆▆▆▆▆  have
16   unchecked discretion to provide --
17      A.   He did.  He did.  He did.
18      Q.   What other --
19      A.   But he could have spoken to others
20   about it, but he had unchecked discretion.
21      Q.   What other examples of unchecked
22   discretion by your managers are you claiming
23   was discriminatory toward you?
24      A.   Well, I just told you about that.
25   I've also discussed ▆▆▆▆▆▆▆▆  having
```

```
                                        Page 418
 1         CRISTINA CHEN-OSTER-12/9/11
 2   unchecked discretion in London in assigning
 3   account coverage there.  For instance, there
 4   was a woman in the London sales desk who lost
 5   her accounts to other men.
 6      Q.   And who is that?
 7      A.   ▆▆▆▆▆▆▆▆ .
 8      Q.   ▆▆▆▆▆▆▆▆ ?
 9      A.   Yes.
10      Q.   And you say that ▆▆▆▆▆▆▆▆ was
11   responsible?
12           MS. DERMODY:  Object to form.
13      A.   It was either -- I don't remember
14   if it was ▆▆▆▆▆▆▆▆ or ▆▆▆▆▆▆▆▆ .  It
15   was one of the two.
16      Q.   What accounts were they; do you
17   know?
18      A.   I don't remember the names of the
19   accounts.
20      Q.   Do you know the circumstances under
21   which the coverage was changed?
22      A.   I don't know all the details.
23      Q.   Did ▆▆▆▆▆▆▆▆ mention this to you?
24      A.   Yes, she did.
25      Q.   And what did she say?
```

```
                                        Page 419
 1         CRISTINA CHEN-OSTER-12/9/11
 2      A.   She said she lost her accounts to
 3   other men on the desk.
 4      Q.   And did she say ▆▆▆▆▆▆▆▆ had done
 5   that or ▆▆▆▆▆▆▆▆ ?
 6      A.   One of the two.  The manager at the
 7   time, but I just don't remember at this point
 8   who exactly that manager was.
 9      Q.   What other examples of unchecked
10   discretion are you aware of that you are
11   claiming in this case was discriminatory
12   towards you?
13      A.   As new hedge fund accounts
14   developed over time, because there was a
15   growth in the hedge fund universe, I was asked
16   to move those to London.  And eventually, I
17   said that some of these just don't make any
18   sense whatsoever, because some of these
19   accounts don't want coverage out of London.
20   They work New York hours.
21      Q.   And who did you say that to?
22      A.   I believe it was ▆▆▆▆▆▆▆▆ .
23      Q.   And what did ▆▆▆▆▆▆▆▆ respond?
24      A.   At that time, he -- I believe he
25   said some of them had to be moved and
```

```
                                        Page 420
 1         CRISTINA CHEN-OSTER-12/9/11
 2   eventually I was able to grow some of those
 3   myself in New York.
 4      Q.   What do you mean by that?  So in
 5   other words, they weren't moved?
 6      A.   Some of them I found and they just
 7   didn't want to move.  So yes, some of them I
 8   was able to keep, but most of them I was asked
 9   to move.
10      Q.   And ▆▆▆▆▆▆▆▆ made that decision?
11      A.   Yes.
12           MS. DERMODY:  Object to form.
13      Q.   Do you have other facts to support
14   your allegation that the exercise by your
15   managers of unchecked discretion was
16   discriminatory toward you?
17      A.   The main ones were the hedge funds.
18   And those happened in '98 and again later.
19      Q.   Again later, what do you mean?
20      A.   What I just mentioned to you with
21   ▆▆▆▆▆▆▆▆ , the hedge accounts, so.  But
22   there have been numerous other examples with
23   other managers, such as with ▆▆▆▆▆▆▆▆ .
24   So when people left, the accounts mostly went
25   to other men.  And there were certainly women
```

Page 421

CRISTINA CHEN-OSTER-12/9/11

2  who were more than qualified to take on those
3  new accounts.
4     Q.  In what area are you talking about?
5     A.  New York Institutional research
6  sales.
7     Q.  That's the group that you were
8  discussing going into at or about the time you
9  resigned, yes?
10    A.  That's right.
11    Q.  And what specific account
12 assignments are you aware of that you believe
13 were discriminatorily assigned?
14    A.  To me specifically?
15    Q.  No.
16    A.  Actually, you were asking about
17 managers to me specifically, so yes, so --
18    Q.  You changed it to ▓▓▓▓▓▓
19 generally.  So it's a general question.
20    A.  So I don't know the specific
21 accounts.  I've just heard that there are --
22 there have been women who have done well with
23 their accounts who have not been given the
24 opportunity to take on additional accounts or
25 change, who have either grown their accounts

Page 422

CRISTINA CHEN-OSTER-12/9/11

2  considerably or have established, you know,
3  consistent No. 1, No. 2 market share, such as
4  ▓▓▓▓▓▓ and ▓▓▓▓▓▓.
5     Q.  Did ▓▓▓▓▓▓ complain to you
6  about account assignments?
7     A.  Indirectly, I think it was more she
8  felt that she couldn't move upwards because
9  she had reached her peak with accounts and she
10 wasn't getting accounts, so it wasn't like
11 this account didn't go to her kind of
12 conversation.
13    Q.  Did ▓▓▓▓▓▓ tell you that
14 she believed that she had been discriminated
15 against based on her sex as opposed to just
16 stating a concern?
17    A.  She did not use those words.
18    Q.  She did not?
19    A.  Use those words.  But others have
20 alluded to that in respect to ▓▓▓▓▓▓,
21 because she was not part of the boys club that
22 ▓▓▓▓▓▓ was a part of.
23    Q.  Well, let me ask you just to
24 clarify.  ▓▓▓▓▓▓ has never said to
25 you that she felt she was discriminated

Page 423

CRISTINA CHEN-OSTER-12/9/11

2  against based on her sex; is that correct?
3     A.  She did not use those words.
4     Q.  You say others have said something
5  where they think that there was a problem.
6  Who?
7     A.  ▓▓▓▓▓▓.
8     Q.  What did ▓▓▓▓▓▓ say to you?
9     A.  ▓▓▓▓▓▓ said that she did not
10 have enough accounts to cover and that her
11 attribution was too low.
12    Q.  When you say "she" do you mean
13 ▓▓▓▓▓▓?
14    A.  No, "she" meaning ▓▓▓▓▓▓.
15    Q.  I'm sorry.  We'll get to
16 ▓▓▓▓▓▓.  You had said ▓▓▓▓▓▓ had not
17 ever used the words that she had been
18 discriminated against, others had said
19 something generally?
20    A.  Oh okay.
21    Q.  So, I was trying to ask you who
22 specifically told you that he or she believed
23 that ▓▓▓▓▓▓ had been discriminated
24 against?
25    A.  ▓▓▓▓▓▓ and ▓▓▓▓▓▓.

Page 424

CRISTINA CHEN-OSTER-12/9/11

2     Q.  And what did -- ▓▓▓▓▓▓ you
3  were friendly with?
4     A.  How do you define friendly?
5     Q.  Whatever word you use.  If you
6  can't define friendly -- or if you can't use
7  the word friendly, we'll go on.
8     A.  I wouldn't say we're friendly.  We
9  speak and we're -- we had a good working
10 relationship.
11    Q.  And what did ▓▓▓▓▓▓ say to you
12 about ▓▓▓▓▓▓?
13    A.  She said that she was a star
14 performer, that she had the top market share
15 with all her clients and that she knew that
16 she could not be promoted because she would
17 not have the support of ▓▓▓▓▓▓, who was
18 a guys' guy.
19    Q.  So, ▓▓▓▓▓▓ told that you she
20 believed that ▓▓▓▓▓▓ was being
21 discriminated against by ▓▓▓▓▓▓?
22    A.  Correct.
23    Q.  Is this in one of the conversations
24 you surreptitiously taped with ▓▓▓▓▓▓?
25 Do you remember whether you had your tape

Page 433

1    CRISTINA CHEN-OSTER-12/9/11
2    Q. Mortgage-backed securities is one
3    that's in the news these days.
4    A. But how long did that exist before
5    it was shut down?
6    Q. Well, it was doing well for a
7    while.
8    A. Right, but how long did it exist
9    before it got shut down?
10   Q. Do you think a firm has to keep a
11   business open for a certain amount of period
12   of time no matter how much it loses money or
13   how unpromising it is as an obligation towards
14   the employees it's assigned there?
15       MS. DERMODY: Object to form.
16   A. I'm not saying that. I'm not
17   saying that.
18   Q. How about the municipals business.
19   A lot of firms exited that.
20   A. And how long did they have that
21   before they exited it?
22   Q. So, what is it about the timing
23   that you believe is discriminatory? I don't
24   understand.
25   A. It was a short period of time. It

Page 434

1    CRISTINA CHEN-OSTER-12/9/11
2    was fourth quarter September of '02 until the
3    middle of '04. So it was less than it was a
4    year and three-quarters.
5    Q. You think that's a short period of
6    time for a firm to make a business move and
7    then decide it isn't working out and change,
8    shift gears?
9        MS. DERMODY: Object to form.
10   A. Give me an example of something
11   that was started and shut down in terms of a
12   full business area in shorter than that period
13   of time.
14   Q. I'm asking the questions here.
15   A. Yes.
16   Q. Maybe some other time.
17       Now, did you ever tell anyone that
18   you thought that the construction and then the
19   disbanding of the convertible synthetics
20   business was a discriminatory action directed
21   toward you and others?
22   A. Yes.
23   Q. Who?
24   A. I believe I spoke to ▉▉▉▉▉▉▉▉,
25   ▉▉▉▉▉ and ▉▉▉▉▉▉.

Page 435

1    CRISTINA CHEN-OSTER-12/9/11
2    Q. By the way, ▉▉▉▉▉▉▉▉ was your
3    supervisor in synthetics, your manager; wasn't
4    she?
5    A. She was.
6    Q. Didn't she have unchecked
7    discretion as to you?
8    A. She did, but she was one of just a
9    few female managers.
10   Q. Well, I won't get into numbers with
11   you right now. She was a female manager of
12   yours; wasn't she?
13   A. She was.
14   Q. And it wasn't discriminatory of the
15   firm to make her your manager; was it?
16   A. It wasn't discriminatory, but it
17   was discriminatory to not give her the
18   opportunity to grow that business more than a
19   year and three-quarters.
20   Q. Now, take a look at paragraph 6 of
21   the Complaint, please.
22       In this paragraph it says in the
23   first sentence, "Women at Goldman Sachs have
24   received less compensation and have been
25   promoted less frequently than their male

Page 436

1    CRISTINA CHEN-OSTER-12/9/11
2    counterparts as a result of the firm's
3    discriminatory policies, patterns and/or
4    practices." And then it goes on to talk
5    about -- more about company wide policies and
6    practices -- "and are the result of unchecked
7    gender bias that pervades Goldman Sachs's
8    corporate culture."
9        What is the corporate culture
10   you're referring to that you believe is
11   pervaded by gender bias?
12   A. Well, as I --
13   Q. You're smiling. Why are you
14   smiling?
15   A. Because as I did raise my hand, I
16   mean, I do believe it's a boys' club. I do
17   believe it's a culture and I know I said that
18   certain people were culture carriers, but it's
19   a culture that values power and so people tend
20   to gravitate to the power and the power tends
21   to be among the men who give the power and
22   responsibilities, opportunities, et cetera, to
23   other men.
24   Q. And then the power is given to the
25   managers to exercise unchecked discretion; is

Page 437

CRISTINA CHEN-OSTER-12/9/11

that the way it works?
    MS. DERMODY: Object to form.
    A.  That's right.
    Q.  Is there any writing of this culture that you're referring to that you're aware of?
    A.  No, it's an observation. Culture is an observation and embodies a lot of aspects. It's how people communicate to each other. It's how people treat each other. It's how people are situated.
    Q.  Tell me about [redacted]. You mentioned that you spoke to her.
    A.  Um-hum.
    Q.  What did [redacted] tell you about any -- any belief that she'd been discriminated against?
    A.  She believed she was underpaid relative to her peers.
    Q.  Where did she work?
    A.  Where does she work?
    Q.  No. In what area did she work at the firm?
    A.  She was in synthetic convertible

Page 438

CRISTINA CHEN-OSTER-12/9/11

sales with me.
    Q.  She work with you in synthetic convertible sales. All right. And what did she tell you?
    A.  She told me that her pay was lower than her peers and that her promotion was delayed by a year to vice-president, unlike some of her peers, because of some technicality that was cited, but which I believe certain men were able to get by despite that technicality. And she said that [redacted] had told her that he was surprised that her pay was so low relative to her production and performance, and that [redacted] had said to [redacted], that's okay, she'll be fine with that number.
    Q.  Did she believe [redacted] had discriminated against her? Did she tell you that?
    A.  She told me that, yes.
    Q.  I'm sorry, she told that you she believed [redacted] had discriminated against her?
    A.  Oh, no. She told me what I just

Page 439

CRISTINA CHEN-OSTER-12/9/11

told you.
    Q.  You she told you about the episode you just described?
    A.  Correct.
    Q.  Did she tell you that she believed that [redacted] had discriminated against her?
    A.  I don't think she said that [redacted] discriminated against her, but she felt that she was being discriminated against without saying a name.
    Q.  Was she working in synthetics convertibles at the time that she had this happen that you're referring to?
    A.  I don't know if she was in convertibles or structured equity. She moved around a couple of times between two desks. So I don't know exactly where she was.
    Q.  All right. So she was in equities between structured and what was the other one you said?
    A.  Convertible bonds sales, because they kept moving her back and forth. So I don't know where she was at that specific time.

Page 440

CRISTINA CHEN-OSTER-12/9/11

    Q.  You went from convertible bonds sales to synthetic convertibles, correct?
    A.  Yes.
    Q.  And during that time, because that time encompasses from, what, 1997 to 2005, right?
    A.  Which part?
    Q.  The time that you were in convertible bonds and synthetic convertibles?
    A.  Right. Between the two. My entire gear career at Goldman Sachs was 1997 to 2005, correct.
    Q.  And your entire career, besides the last two weeks that we talked about that you did some work at U.S. research sales, was either in convertible bonds or synthetic convertibles, correct?
    A.  Correct.
    Q.  Where did [redacted] work during any of those years?
    A.  I think she worked solely in synthetic convertible sales and then moved to convertibles in 2004.
    Q.  And [redacted], at the time she

Page 473

CRISTINA CHEN-OSTER-12/9/11

1
2  you worked; have you?
3     A.   When you mean outside my area, how
4  do you define area?
5     Q.   Have you seen a performance review
6  created for a Goldman Sachs employee other
7  than your performance reviews?
8     A.   You mean filling out a performance
9  review?
10    Q.   The forms?
11    A.   Yes, I have.
12    Q.   And what forms have you seen other
13 than the ones that were your own performance
14 reviews?
15    A.   For equity capital management and
16 for private wealth management.
17    Q.   Where did you --
18    A.   Or maybe it was IMD.
19    Q.   How did you come to see the equity
20 capital management and the IMD forms?
21    A.   Because I was, I think, solicited
22 for a review for someone in the equity capital
23 management area.
24    Q.   So, you saw the form that you
25 filled out as a reviewer?

Page 474

CRISTINA CHEN-OSTER-12/9/11

1
2     A.   Yes.
3     Q.   And maybe my question wasn't
4  distinct enough.
5     A.   Oh, sorry.
6     Q.   Have you seen the actual
7  performance review forms that are the
8  compilation of comments, other than the ones
9  that you -- that were provided for you?
10    A.   Well, prior to discovery I had
11 never seen the -- physically seen, I mean
12 there were selective numbers that were given
13 to me, but I had never physically seen the
14 summary performance review for me.  So for
15 instance, that's why I was very surprised when
16 I saw that [redacted] had reviewed me in, I
17 think, 2002, when I saw that yesterday, when
18 he was not on my list.  I mean, I would have
19 thought that that would have been separate or
20 I would have seen that in the system.
21        I realize that yesterday -- I think
22 I did misspeak.  I think I did give one
23 performance review once, because when I was
24 thinking back last night, I think that I did
25 give a performance review to [redacted] in

Page 475

CRISTINA CHEN-OSTER-12/9/11

1
2  2001, because she worked with us from 2000 to
3  2000 -- early 2002.  And it would have made
4  sense for me to have given her a review in
5  2001, so I missed the 2001.
6     Q.   Right, but back to the question
7  which is --
8     A.   Have I seen that?
9     Q.   Yes.
10    A.   So --
11    Q.   Have you seen review materials for
12 employees other than yourself?
13    A.   So I think I saw a summary review
14 of [redacted].
15    Q.   Okay.  And [redacted], of course,
16 was in your group?
17    A.   Right.
18    Q.   So, you don't know the extent to
19 which in other divisions of Goldman Sachs the
20 metrics or the form may be different; do you?
21         MS. DERMODY:  Object to form.
22    A.   I didn't fill out for others, but I
23 was under the impression that the firm was
24 making 360 review process similar for
25 everyone, but I haven't seen.

Page 476

CRISTINA CHEN-OSTER-12/9/11

1
2     Q.   You don't know; do you?
3     A.   I have not seen it, no.
4     Q.   And in your testimony a little bit
5  before about averages and how one person can
6  skew averages, in fact, even in your own
7  reviews, isn't it correct that in the metrics
8  section the manager sees the individual's
9  metrics in addition to just an average for all
10 reviewers?
11    A.   That's right.
12    Q.   So the manager can see if there's
13 an outlier?
14    A.   Right, but also the point is that
15 the manager has unchecked discretion as to
16 what he prioritizes and notices and what he
17 ignores.  There's so much information and he
18 has complete discretion to pick out this, to
19 pick out this, to pick out this, to pick out a
20 comment that may be completely irrelevant and
21 blow that out of proportion and weight that as
22 more important than the actual production of
23 the employee or to, you know, choose a metric
24 that may be creativity where there's no real
25 way to gauge.  How do -- how do you define one

Page 485

CRISTINA CHEN-OSTER-12/9/11

1
2  more important of the factors are for that
3  particular job?
4       MS. DERMODY: Object as to form.
5    A.  No, I don't agree.  It's -- I don't
6  agree that it's the manager -- what was the
7  statement you said?
8    Q.  I took your last response to
9  essentially be saying, job by job it depends
10  on the job what the more important factors may
11  be.  And you said, for example, in sales
12  commercial effectiveness may be the most
13  important, but there might be other jobs where
14  creativity is more important, say a computer
15  expert who's supposed to write code or
16  something like that?
17    A.  Right.
18    Q.  Isn't it appropriate to have the
19  manager, who knows the job function he or she
20  is managing, in communicating the review, make
21  the judgment as to which are the more
22  important factors?
23       MS. DERMODY: Object as to form.
24    A.  I disagree, because I think that
25  there should be a standard practice because

Page 486

CRISTINA CHEN-OSTER-12/9/11

1
2  there aren't that many job functions.  I think
3  sales is pretty much the same across different
4  products.  It's just sales.  It's sales of
5  convertibles, sales of research, sales of
6  mortgage backed securities, sales of
7  commodities, sales of FX.  It's still sales.
8  So that job function should have the same sort
9  of criteria in terms of metrics.
10    Q.  So if you're --
11    A.  For trading across the different --
12  I'm sorry to interrupt -- products should
13  similarly be the same.  I think that it really
14  should be based upon more job function, which
15  is consistent across the securities division
16  and should be consistent across the various
17  other divisions as well.
18    Q.  So, in your perfect job -- in your
19  perfect performance system, you would have the
20  employer dictate to the manager exactly the
21  job by job what are the more important factors
22  and which are the less important factors job
23  by job?
24    A.  Yes, I do think it's important to
25  have guidelines for the managers to follow.

Page 487

CRISTINA CHEN-OSTER-12/9/11

1
2    Q.  And you would not give the manager
3  any discretion in how to give the review?
4       MS. DERMODY: Object as to form.
5    A.  I would give guidelines.  The
6  manager can follow the guidelines, but they
7  should have stronger guidelines, as well as
8  guidelines for the managers as to how they
9  select who the reviewers are for each
10  employee.
11    Q.  Well, now we've had a conversation
12  about selection of reviewers.  You, in 2002, I
13  believe it was, had a dialogue with your
14  managers about your reviewer list.  And you
15  had the first cut of selecting your reviewers;
16  didn't you?
17       MS. DERMODY: Object as to form.
18    A.  I had the first cut in terms of
19  selecting.
20    Q.  And don't you believe it
21  appropriate for management to review those
22  individuals selected by the subject of the
23  review as the people to give the review?
24       MS. DERMODY: Object as to form.
25    A.  Yes, I agree that it's appropriate

Page 488

CRISTINA CHEN-OSTER-12/9/11

1
2  for the manager to review that, but I also
3  think that it's appropriate for the employee
4  to know if something has been changed without
5  having the employee having the burden to go
6  back to the system and having to check and
7  notice that a change has been made.  It should
8  be a collaborative effort, but also there
9  should be guidelines that both the employee
10  and the managers follow, not just the
11  managers.  I think the employees should follow
12  that as well.
13    Q.  Let me ask you back to where we
14  started after lunch.  Why is it that you say
15  that a system that gives the manager the
16  discretion to communicate the review to the
17  employee as to how that employee has done that
18  year is discriminatory?
19    A.  I believe that a system that a
20  manager communicates to the employee is
21  discriminatory if there are aspects of the
22  review that the employee does not see as part
23  of his or her record.
24    Q.  Why is it discriminatory?
25    A.  Because the manager has unbridled

Page 489

1      CRISTINA CHEN-OSTER-12/9/11
2  discretion to choose metrics, to choose
3  comments, to choose where those comments and
4  metrics come from.
5       Q.  And you're assuming the manager is
6  going to discriminate?
7       A.  I'm not assuming the manager is
8  going to discriminate, but I think the impact
9  has been discriminatory.  I think that from
10 what I've heard, that, in general, women are
11 systematically reviewed more negatively than
12 men in terms of the quantitative scores and in
13 terms of the comments.
14      Q.  And your belief is that the grant
15 of discretion to managers is intentionally
16 done to discriminate against women?
17         MS. DERMODY:  Object to form.
18      A.  I don't think that the performance
19 review system was designed to be
20 discriminatory, but I think that the impact
21 and the practice has resulted in a
22 discriminatory result.
23      Q.  Let's turn to paragraph 46 of the
24 Complaint.  It's on page 10, paragraph 46.
25         In paragraph 46 you allege that

Page 490

1      CRISTINA CHEN-OSTER-12/9/11
2  "Goldman Sachs allows its managers unfettered
3  discretion to determine how credit is
4  allocated to employees who share assets,
5  accounts or responsibilities for a particular
6  business.  This subjectivity favors male
7  employees what systematically receive more
8  credit for generating revenues for the firm
9  than their female co-workers."
10      A.  Okay.
11      Q.  Who are the managers who determine
12 how credit is allocated to employees?
13      A.  Well, the way that I interpret
14 credit to mean here is compensation.  And I
15 can site one example and there's probably many
16 more, but what comes to mind as an actually
17 perfect example for this is that on the
18 convertibles desk, which I'm probably closest
19 to,             and                had a
20 client co-coverage relationship.  Everything
21 was supposed to be equal-equal.  They covered
22 the exact same accounts for the U.S.
23 convertible bonds.  They both worked either a
24 three or four-day week, I forgot which, but I
25 think it was mostly a three-day week, with one

Page 491

1      CRISTINA CHEN-OSTER-12/9/11
2  overlapping day.  I think that's the way it
3  worked.  And yet even though they both had
4  well over ten years of experience, many, many
5  years of experience,
6  compensation was less than that of
7         .
8       Q.  What do you know -- how do you know
9  what his compensation was?
10      A.  I don't know.  I just know on a
11 relative basis based upon what she's told me.
12      Q.  You're stating what you heard from
13         ?
14      A.  Yes.
15      Q.  All right.  Did you have --
16      A.  And I'm sorry.  One more thing to
17 add.  And also credit I would interpret to say
18 credit in terms of recognition.  And so she
19 would tell me about situations whereby she may
20 talk to a client about a trade and just
21 because the trade actually transacted on the
22 day that       happened to be in the office
23 that day, that he would get full credit or
24 recognition for that trade, you know, in terms
25 of acknowledgment, not necessarily sales

Page 492

1      CRISTINA CHEN-OSTER-12/9/11
2  credit, by people even though it's --
3  everything is a team effort and she started
4  that idea generation with the client.
5       Q.  Well, you're talking about a
6  situation with two people sharing a job with a
7  day overlap and credit if something happens
8  when one person is in the office or the other?
9       A.  Right, but this is how I read this,
10 determine how credit is allocated.
11      Q.  In your area, was anyone -- any
12 manager determining credit in a way that you
13 believe was discriminatorily affecting you?
14      A.  Yes.
15      Q.  Tell me what.
16      A.  I was asked to train              as
17 my partner, even though he was just coming out
18 of business school in 1998 with no financial
19 work experience.  And I had already been
20 working for seven years in the industry.  And
21 he was given the opportunity to work with the
22 same accounts in the U.S. for the European
23 convertible business, which was a higher
24 growth area, given the advent of the Euro just
25 the upcoming year in 1999.  And in fact, the

Page 553

1     CRISTINA CHEN-OSTER-12/9/11
2  a leave of up to four months fully paid,
3  correct?
4     A.  That is correct.
5     Q.  What is it about that, the firm's
6  policies with respect to pregnancy that you
7  believe is discriminatory?
8     A.  I believe that the firm has a legal
9  obligation by the FMLA to provide a woman with
10 an equivalent job upon her return from
11 maternity leave.
12    Q.  And do you believe in your
13 circumstance that duty was not complied with?
14    A.  I do.
15    Q.  In what respect?
16    A.  In the respect that when I returned
17 from my maternity leave, my seat was moved,
18 such that it was in an area surrounded by
19 administrative assistants.  And I did not have
20 a specific job to do or group to belong to
21 when I returned from maternity leave.
22    Q.  And what you're referring to is the
23 disbanding of the synthetic convertible group;
24 isn't that right?
25    A.  That is correct.

Page 554

1     CRISTINA CHEN-OSTER-12/9/11
2     Q.  And that decision to disband the
3  group took place, I think you said on kind of
4  a rolling basis beginning while you were out,
5  correct?
6     A.  That is correct.
7     Q.  And it affected four individuals,
8  not just you alone, correct?
9     A.  That is correct.
10    Q.  And the seat that you said you were
11 given you were in only for ten working days in
12 November; isn't that correct?
13    A.  The seat that I returned to?
14    Q.  Um-hum.
15    A.  I don't think so.
16    Q.  You came back on November 10;
17 didn't you?
18    A.  I came back November 10th.  I
19 don't -- I thought, but I could be mistaken,
20 it was closer to the beginning of December
21 when they changed my seat.
22    Q.  All right.  You came back
23 November 10 and your seat was changed
24 December 1, yes?
25    A.  Um-hum.

Page 555

1     CRISTINA CHEN-OSTER-12/9/11
2     Q.  But you took a week's vacation
3  between November 10 and December 1; didn't
4  you?
5        MS. DERMODY:  Object to form.
6     A.  I don't remember that.
7     Q.  Assuming you did take a week's
8  vacation and assuming there's Thanksgiving and
9  the weekends days, isn't it fair to estimate
10 that there were approximately ten working days
11 that your seat was in the location that you're
12 complaining about?
13       MS. DERMODY:  Object to form.
14    A.  Yes, that's correct, then, if those
15 are the way that you define it, then the seat
16 I would have had would have been ten days in
17 that seat in the days that I was in the
18 office.  However, I think that it could have
19 happened indefinitely had I not complained.
20 They would not have changed the seat if I did
21 not complain about it.
22    Q.  Turning back now from the pregnancy
23 part of this policies you identified, you
24 identified promotion, performance reviews
25 assignment, resources, and pregnancy.  Are

Page 556

1     CRISTINA CHEN-OSTER-12/9/11
2  there any -- we, of course, marked early in
3  the deposition the firm's equal opportunities
4  policy against discrimination.
5        Are there any written firm policies
6  of which you're aware that instruct
7  individuals to discriminate against women
8  based on their sex?
9     A.  No, I'm not aware of any -- any
10 written policies that instruct anyone to
11 discriminate women on the basis of pregnancy.
12    Q.  And the policies you're referring
13 to here are policies or practices that are
14 unwritten; isn't that right?
15    A.  So when I say practices, yes, I
16 mean the practice of having this happen
17 unchecked, because the fact that it happened
18 should not be acceptable.
19    Q.  So, for example, would the
20 performance reviews you're referring to, what
21 you testified to earlier about managers having
22 unchecked discretion to decide which review
23 comments to give to the individual?
24    A.  Do I view that as discriminatory?
25    Q.  Um-hum.

Page 557

CRISTINA CHEN-OSTER-12/9/11

2  A. Yes, I view as discriminatory, as
3  it pertains to performance reviews, the fact
4  that managers can selectively choose comments
5  and metrics and quantitative measures to
6  communicate in only a verbal manner to the
7  employees, as -- as well as the fact that they
8  can select the reviewers, as well as the fact
9  that the employees cannot see the comments and
10 the scores or the manager's comments, as well
11 as the fact that the metrics are not defined
12 all as discriminatory.
13    Q. And that's the policy with respect
14 to policy or practice with respect to
15 performance reviews that you're complaining
16 about?
17    A. That's the practice that I see.
18 What -- yes.
19    Q. What is the policy -- and the
20 policy or practice concerning promotion that
21 you're complaining about, is that what you
22 referred to earlier with respect to the
23 vice-president promotion policy?
24       MS. DERMODY: Object to form.
25    Q. Practice, I should say.

Page 558

CRISTINA CHEN-OSTER-12/9/11

2       MS. DERMODY: Excuse me. Object
3  to form.
4     Q. All right. Let me say, what is --
5  where do you find the company policy with
6  respect to promotion that you're saying is
7  discriminatory?
8        MS. DERMODY: Object to form.
9     A. The discriminatory practice of
10 promotion, I see as -- as it pertains to
11 promotion, is not showing the promotion
12 criteria and sharing that broadly so that
13 employees can try to achieve those criteria,
14 and also, the process by which managers have
15 full discretion to choose who they nominate
16 for promotion.
17    Q. So, what you're saying is that in
18 the absence of criteria, managers have
19 discretion and you think that's
20 discriminatory; is that correct?
21       MS. DERMODY: Object to form. And
22 I also object to the line of --
23       MR. ROGERS: I object to speaking
24 objection. You've objected to form.
25       MS. DERMODY: I'm going to talk.

Page 559

CRISTINA CHEN-OSTER-12/9/11

2  Excuse me.
3        MR. ROGERS: Well, it's improper.
4        MS. DERMODY: I'm going to talk.
5  I'm going to make an objection to this
6  entire line of questioning to one
7  Complaint and another Complaint
8  eliciting facts supporting allegations
9  and asking the witness the very same
10 information. This is not a memory
11 test. These questions have all been
12 asked and answered. You're wasting
13 precious time. If we were at trial
14 this would all be inadmissible and
15 improper. So I'm going to interpose
16 an objection. You can answer the
17 question, but I want that on the
18 record.
19    A. Can I --
20       MR. ROGERS: I beg you to abide by
21 the standards that apply to
22 depositions and stop the speaking
23 objections.
24    Q. Please go ahead.
25    A. Can I state that what I've said

Page 560

CRISTINA CHEN-OSTER-12/9/11

2  before as it pertains to the previous
3  complaint, I reiterate now.
4        MR. ROGERS: See what I mean?
5  This is exactly the reason why what
6  you're doing is improper, but the
7  witness has picked up the cue and
8  we'll move on.
9        MS. DERMODY: The fact that you
10 have ignored the evidentiary rules is
11 something that's the subject of proper
12 objection. And the fact that I
13 allowed testimony, I think, was
14 indulgent. It was a proper objection
15 and the fact that you're causing the
16 witness to engage in a memory test, I
17 think, is very inappropriate.
18    Q. Let's continue. What was the
19 question I asked before the long speaking
20 objection.
21       (Whereupon, the referred to
22 question was read back by the
23 Reporter.)
24    A. Oh, I'm sorry.
25    Q. That's the question.