# EXHIBIT 6

Page 1

```
 1           CONFIDENTIAL - HENRY S. FARBER
 2        IN THE UNITED STATES DISTRICT COURT
 3        FOR THE SOUTHERN DISTRICT OF NEW YORK
 4     ----------------------------------X
       H. CRISTINA CHEN-OSTER; LISA
 5     PARISI; and SHANNA ORLICH,
 6                    Plaintiffs,
                                       10-CV-06950(LBS)
 7              VS.
 8     GOLDMAN, SACHS & CO. and THE
       GOLDMAN SACHS GROUP, INC.,
 9
                      Defendants.
10     ----------------------------------X
11
               **C O N F I D E N T I A L**
12
13            VIDEOTAPED DEPOSITION
14                     OF
15             HENRY S. FARBER
16           New York, New York
17         Tuesday, November 19, 2013
18
19
20
21
22
23  Reported by:
24  AYLETTE GONZALEZ, CLR, RPR
25     JOB NO. 68152
```

Page 74

CONFIDENTIAL - HENRY S. FARBER

A. I think it's -- I think it's firm-wide recommendation system. The R -- again, the Rs are a little fuzzy for me.

Q. Okay. And did you -- do you remember looking at any PeopleSoft data in this case?

A. I did not personally look at the PeopleSoft data.

Q. You didn't personally look at any of the data is what I'm understanding?

A. Well, I did --

MR. KLEIN: Objection.

A. Let me -- that's not true.

Q. Okay.

A. I did not look at any of the raw data. I -- I asked my staff to create usable extracts from the raw data that we could use for analysis. And at that point, I looked at the data.

Q. And the -- the list -- the files that are listed here under "Electronic data" above the entries we've just been discussing, the ones that end with a ".do" --

A. Yes.

Page 75

CONFIDENTIAL - HENRY S. FARBER

Q. -- those are the instructions to the computer in the Stata program; is that correct?

A. Yes.

Q. So these are the -- these are the step-by-step instructions that your staff instructed, if you will, the -- the system to perform in order to create the data sets that you were going to -- or that they were going to use in the analyses, correct?

MR. KLEIN: Objection.

A. No. These are the instructions for the computer -- for the program Stata to do -- many of them are doing -- and some of them are doing data preparation, some of them are doing analysis.

Q. And as you understand it, is this the full list of the computer instructions; by "this," I mean, page 2 of Appendix B to Exhibit 2, the full list of programming instructions that you used or that underlay your -- your analyses?

A. What I can say is, I asked my staff to include in the backup all of the command

Page 76

CONFIDENTIAL - HENRY S. FARBER

files that we used in creating the data and running the analysis. And I do not have the -- personally since I didn't write the programs or create the databases, I can't as I sit here -- you know, I'd have to rely on my staff; the answer would be yes, these are the programs, but I can't verify that for you.

Q. Okay. And conversely, you wouldn't be able to tell me whether various other kinds of data were available in the materials produced to Plaintiffs' counsel that were not utilized in your studies; is that fair?

MR. KLEIN: Objection.

Q. In other words --

A. There's a lot of negatives in there.

Q. That's true.

You're aware that the -- that something on the order of 2,000 fields from CRS were produced to Plaintiffs' counsel in the case, are you not?

A. I do not know how many fields.

Q. You're aware certainly that the fields that are listed on Appendix B are a

Page 77

CONFIDENTIAL - HENRY S. FARBER

subset of the entire production of CRS data fields that were provided to Plaintiffs' counsel and thus to you, are you not?

A. I didn't know that, no.

Q. Okay. So you didn't look through any other data than what is listed on Appendix B in order to decide whether there were data elements that would be useful to you; is that right?

A. My staff did. I did not personally.

Q. Okay. And I'm not limiting that to CRS; I'm -- that would be accurate with respect to all of the databases that were produced by Goldman Sachs in this case, correct?

A. As I'm saying that my staff were the people under my instructions knew what I was looking for because I instructed them so went through the databases and pulled what -- what they felt was the rel- -- were the relevant fields. That's true of all the databases.

Q. Now, for the total compensation

20 (Pages 74 to 77)

Page 78

CONFIDENTIAL - HENRY S. FARBER

element that you study, I noticed in your report you said that you used a table and you annualized it. Do you remember that?
  A. Yes.
  Q. Okay. Now are you aware -- so that was a field called "total compensation for equity." Do you remember that being the name of it?
  A. No.
  Q. Okay. Are you aware that there is a field that was provided to Plaintiffs' counsel called PATC that gives the annual amount of total compensation set for a particular individual?
  A. I don't know the fields by name.
  Q. Okay. But if you were looking to see what somebody's annual compensation was without the need to annualize it, you would want to look at a measure of the PATC that was set for that individual as of your snapshot date, wouldn't you?
     MR. KLEIN: Objection.
  A. I'm not sure we're using the term "annualize" in the same way.

Page 79

CONFIDENTIAL - HENRY S. FARBER

  Q. Okay. Tell me what -- how you used it.
  A. We -- we may have used the PATC, I don't know. What I -- the annualization is to solve a relatively small problem in the data and it's not something that you could get from a field, I don't think, in the data that was provided.
     The idea is that if someone is working only part year, perhaps because they're on unpaid leave for part of the year, so imagine they're on unpaid leave for six months and got paid $100,000 for the six months they did work and nothing for the other six months, they're going to show up in the data as earning $100,000 from Goldman. And because what we're trying to do is ask what would full-time annual compensation look like, we would double the hundred thousand to 200,000 to convert it to an annual basis. And that's what I meant by annualizing the data.
  Q. And what I'm saying is, were you aware that there's a field that would have $200,000 as the entry for that individual

Page 80

CONFIDENTIAL - HENRY S. FARBER

because that is the PATC set for that individual as of your snapshot date, whether they actually were paid all of it or not?
     MR. KLEIN: Objection.
  A. I was not aware of that.
  Q. Okay. Let -- let me -- if -- so if -- suppose somebody came to Goldman Sachs midyear and you then had your -- the -- the compensation element you're -- you're describing, you would multiply that by two in order to get their annual salary; is that right?
  A. What we were trying to do was -- we -- we never tried to get their annual salary; we were looking at annual compensation.
  Q. All right.
  A. So what we would -- we would do is, look at the actual -- what -- the idea was to look at the actual compensation paid to the individual in the year, and that -- and then inflate that to what it would have been had they been there the entire year.
  Q. Are you aware that if many -- that

Page 81

CONFIDENTIAL - HENRY S. FARBER

many laterals who came midyear received what are called either sign-on or make-whole bonuses?
  A. I understood there was some of that.
  Q. And so if you took what the individual earned in six months, that would include that make-whole bonus, correct?
  A. I'd have to -- I'd have to check how we coded that. I don't know the answer to that as I sit here.
  Q. But will you agree with me that, assume that the compensation element that was used in your study merely took the total compensation that the person was paid in the year, including a sign-on or make-whole bonus, just assume that for now; and if you doubled that, you would be inflating their pay beyond what they would have made in a year, correct?
     MR. KLEIN: Objection.
  A. I don't know how to answer that. I would have to look at the circumstances and check -- and take a look at the data before I could answer that question.

Page 102

CONFIDENTIAL - HENRY S. FARBER

model is identify those factors that were used by the company or that are proxies for factors taken into account by the company that explain pay for the employees in question?

MR. KLEIN: Objection.

A. I never think of it as factors used by the company. Peoples' pay is determined by the company, by the labor market and so on, and we -- we have a model of pay determination that's well accepted in labor economics that will -- will tell you that pay is a function of productivity of the workers that's often indicated by their skill level.

So we control for education; we control for type of job people do; we control for, broadly speaking, what their business unit does and so on; where they're located. And those are the factors that wind up determining pay in a market setting.

Q. Okay. When you use the word "business unit" there, were you using it as a term of art as applicable to Goldman Sachs?

A. Yes, I suppose I was.

Q. Okay. So you understood that the

Page 103

CONFIDENTIAL - HENRY S. FARBER

business unit was the level at which compensation recommendations and decisions were made?

A. Well, I think I was less interested in that as -- than I was in the fact that the different divisions of Goldman Sachs had people performing somewhat different functions and you want to control in your model for the kinds of functions people are doing.

Q. Are you aware -- you didn't control for any organizational structure or organizational subgroup other than -- other than division; is that right?

A. I'm not sure what you mean by "organizational subgroup" or "division."

Q. Well, you said you controlled for division in order to -- to capture different types of work. And what I'm asking you is, you didn't control, for example, for department or desk or business unit?

A. I didn't control for department, desk or business unit, but I did control for variable, quote, job ID, which is the type -- you know, is essentially the type of job a

Page 104

CONFIDENTIAL - HENRY S. FARBER

person's doing. So it wasn't just division, there's another variable in there, I think it's called job ID.

Q. I think it's affirmative action plan job group; does that sound right?

A. I don't know about the affirmative action plan, but it could be job group. Could be.

Q. Were you aware that those were the affirmative action plan job groups?

A. No.

Q. And you're aware that affirmative action plan job groups aren't used for compensation purposes; isn't that right?

MR. KLEIN: Objection.

A. I'm not aware of that.

Q. You're -- you're not familiar with the OFCCP regulations on what an affirmative action plan job group is meant to represent?

A. That's correct.

Q. Okay. And you're not familiar with the OFCCP guidance on how employees are to be grouped for studying compensation either, are you, or are you?

Page 105

CONFIDENTIAL - HENRY S. FARBER

MR. KLEIN: Objection.

A. No, I'm not.

Q. Okay. So if I told you that the OFCCP guidance during the years in question here advised employers to create something called similarly situated employee groups based on the way that compensation decision-making is actually made at the firm in question, would you have any reason to disagree with that?

A. I -- I honestly don't know anything about that.

Q. All right. Now, you wouldn't use the same model in terms of the factors you put into it for every employer, would you?

A. Well, every employer wouldn't have five -- it wouldn't have divisions in the same way or -- or job groups. You have -- no, I wouldn't.

Q. You have to look at how the jobs differ from one another at the given employer in order to decide how to group the employees, correct?

A. Well, how to group the employees is

Page 110

CONFIDENTIAL - HENRY S. FARBER
  Q. Well, in other words, what the list of affirmative action plan job groups is and what they -- how they're described?
  A. My understanding actually of the job groups is, I never really had a satisfactory -- I never really -- never managed to find a satisfactory description of what the job groups actually were. They were numeric codes, but I don't -- I couldn't tell you what any code was.
  Q. Okay. And did you ask anybody to try to get that information for you?
  A. Yes.
  Q. And what was the answer?
  A. Couldn't get anymore information.
  Q. Who told you that?
  A. I asked my staff.
  Q. And you didn't rule out the use of any particular affirmative action job group that you found in the data, did you, as being inapplicable to this group of people?
  A. I'm not sure what you mean. The people were selected because they were in the class, so I don't know -- they're all assigned

Page 111

CONFIDENTIAL - HENRY S. FARBER
to a job group, and I don't know what it would mean to say that a job group was inapplicable.
  Q. Well, suppose somebody in the class moved out of a revenue-producing position in a revenue division during the time frame you were studying them; did you remove them from the data for the years they were not in those revenue-producing positions?
  A. That was the plan. I'd have to check the code to make sure that that happened. But the idea would be that people would only be in there for years they were in revenue-producing units.
  Q. So if you had looked at the affirmative action plan job group and seen that some of the job group codes that you used said non-revenue producing, then that would have told you that they were mistakes?
  A. As I said, I don't have the -- my translation of the job group codes to know that.
  Q. Okay. Did you look at the data to see whether there were any other elements that described type of work that you might use

Page 112

CONFIDENTIAL - HENRY S. FARBER
instead of the affirmative action plan job groups?
  A. To my knowledge, we did not find such a field, whether -- I certainly did not see one.
  Q. Are you familiar with a field called division function?
  A. No.
  Q. And so -- so you didn't consider whether to use division function as a better or an additional descriptor of type of work?
  A. No.
  Q. And are you familiar with the levels of positions in PeopleSoft, such as Level 6, 7, 8, 9?
  A. No.
  Q. And so I'm gathering you didn't ask a question about whether that would have properly or more effectively categorized people into type of work in affirmative action plan job group, correct?
  A. I'm always -- in doing -- I will say this: I tend in my work not to use things like job level in the sense that that often is

Page 113

CONFIDENTIAL - HENRY S. FARBER
really -- in organizations I've seen, people are put into job levels in order to pay them the compensation you want to pay them.
  So my instinct would be -- I'd have to know more about what that variable is, but my instinct would be that's a potentially tainted variable and I wouldn't want to categorize people that way.
  Q. If -- if -- if -- if I told you to assume that level at Goldman Sachs doesn't bear any relationship to particular levels of compensation, but rather to levels of responsibility or management function, you would then want to look into it at least to see whether it --
  A. I'd take a little bit of a look, sure.
  Q. Okay. And did you ever control for whether somebody in the investment management division was either in private wealth management or in GSAM, Goldman Sachs Asset Management?
  A. We did not make that distinction.
  Q. And you didn't exclude from your

## Page 122

CONFIDENTIAL - HENRY S. FARBER

MR. KLEIN: Objection.

A. Well, first what I would want to do is explore what the variable was, what it meant and so on before I try to put it -- which I do with all my data before I put it in the model.

Q. And if you discovered that it was a measure that was used for all the employees in a particular group or performing a particular function, then you would want to include that in your model, correct?

MR. KLEIN: Objection.

A. No, I didn't -- not a particular group of performing a particular function. But for my -- the population as a whole that I'm interested in, I can't just have a productivity measure for some subset of them.

What I've got to do is say, okay, for my group as a whole -- and this is why it's often very difficult to get a productivity measure you can use because you've got people performing different functions and the same productivity measure isn't relevant for -- and some of them may not

## Page 123

CONFIDENTIAL - HENRY S. FARBER

have a productivity measure available; and as a result, you can't really use that productivity measure.

Q. But you could certainly extract the population that has the same productivity measure and study that to see if that explains differences in pay, correct?

MR. KLEIN: Objection.

A. I -- if you were interested in the pay difference in that subgroup, you -- that would be an analysis one could do. I don't know how informative it would be, but it wouldn't help with the -- the population-wide question.

Q. Well, obviously it would depend how large that subgroup was relative to the whole population, correct?

MR. KLEIN: Objection.

A. I don't know.

Q. Okay.

MS. BROWN: Let's take a break here because we're running out of tape.

THE VIDEOGRAPHER: The time is

## Page 124

CONFIDENTIAL - HENRY S. FARBER

11:57 a.m., and this completes Tape No. 1 of the videotaped deposition of Dr. Henry Farber.

(Whereupon, an off-the-record discussion was held.)

THE VIDEOGRAPHER: The time is 12:23 p.m., and this begins Tape No. 2 of the videotaped deposition of Dr. Henry Farber.

BY MS. BROWN:

Q. Dr. Farber, if I could draw your attention to page 2 of your report; again, that's Exhibit 2, Paragraph 5 contains the -- the issues that you were asked to study in this case, correct?

A. Yes.

Q. Okay. And you're not offering any opinion on anything other than the topics in that paragraph, correct?

A. That's correct.

Q. Okay. Now, you're -- when were you asked to study promotions from 2004 through 2008 -- or really selections made in 2003 through 2007, were you told why that period

## Page 125

CONFIDENTIAL - HENRY S. FARBER

was truncated as compared to the other studies you were looking at?

A. No.

Q. Did you ask?

A. No.

Q. You're not -- you're not aware of any change in the promotion process at Goldman Sachs in 2008, are you, that would lead to a decision to drop those later years?

A. No, I did not look at anything after the relevant period.

Q. Well, the relevant period; that is to say, the period that counsel set for you to examine?

A. Correct.

Q. Okay. What is the education of -- of Mr. Ashmore, the educational qualifications?

MR. KLEIN: I'm going to object. Is there a particular point to this question?

MS. BROWN: Yeah. He's done a great deal of the work in this, and I'm entitled to know what his

Page 134

CONFIDENTIAL - HENRY S. FARBER

they provide some for some of the workers. And whether they're comparable or not, I couldn't tell, I didn't study them that closely. I knew there wasn't enough for me -- for my purposes.

Q. And why didn't you decide to study the subset of employees for whom there was production data separately from the others?

MR. KLEIN: Objection.

A. Because I was interested in a measure of the pay difference at the class-wide level, and I wasn't -- I didn't want to be involved in doing an analysis for a subgroup that I couldn't then say, okay, I can now do the same thing for the rest of the...

Q. So your methodology here was to put the entire population into one equation, correct?

A. Yes.

Q. Okay. So you didn't do any separate models by division, did you?

A. That's correct, I did not do any separate models by division.

Q. And you didn't do any separate

Page 135

CONFIDENTIAL - HENRY S. FARBER

models by year, did you?

A. That is correct.

Q. And you didn't do any separate models by vice presidents or associates, correct?

A. That's correct.

Q. Now, it's -- there are standard statistical tests that you can perform to see if pooling a large population is appropriate; isn't that right?

A. There are tests you can perform to see whether the structure of the model differs significantly across groups.

Q. And one of those tests is called a Chow test, correct?

A. Yes.

Q. Or an F-test?

A. Yes.

Q. You didn't perform either of those in this case, did you?

A. There are some F-tests that were performed. I didn't -- I mean, I did some F-tests, I don't -- I need you to rephrase the question more precise.

Page 136

CONFIDENTIAL - HENRY S. FARBER

Q. Well, did you perform a Chow test to detect differences, potential differences within the group that would make a pooled approach inappropriate?

MR. KLEIN: Objection.

A. Pooled by what?

Q. Pooled the entire population in one regression.

A. As oppo -- you have to -- I need you to state --

Q. Did you -- did you -- did you perform a Chow test, let's just start with that?

A. No.

Q. Okay. Now you said you performed an F-test?

A. Yes.

Q. And what did that test?

A. There's an F-test you can per- -- every time you run a regression, you perform an F-test simply to say whether the variables included in the regression have significant explanatory power.

Q. But that doesn't necessarily

Page 137

CONFIDENTIAL - HENRY S. FARBER

indicate whether it's appropriate to -- to analyze the entire population together or whether there's such variability within subgroups that you need to study them separately?

MR. KLEIN: Objection.

A. That's correct.

Q. Okay. So you didn't perform any tests that would tell you that, correct, whether --

A. That's correct.

Q. -- whether -- okay.

Just to be clear, you didn't perform any tests to tell you whether it was appropriate or inappropriate to study this entire population together?

A. As opposed to?

Q. As opposed to breaking it by division, year, status?

A. That's correct.

Q. Okay. Now on affirmative action plan job groups, you had testified earlier that you did not have an understanding of what those specific groups were, correct?

Page 138

1       CONFIDENTIAL - HENRY S. FARBER
2       A.  That's correct.
3       Q.  Okay.  And you're not aware of any
4   testimony in the record or any documents in
5   the record that suggests that affirmative
6   action plan job groups are used or connected
7   in any way to compensation setting at Goldman
8   Sachs, are you?
9       A.  That's correct.
10      Q.  Okay.
11          MS. BROWN:  Why don't we take a
12  lunch break at this point.
13          THE VIDEOGRAPHER:  The time is
14  12:37 p.m.  We are off the record.
15          (Whereupon, an off-the-record
16  discussion was held.)
17          (Luncheon break taken.)
18
19
20
21
22
23
24
25

Page 139

1       CONFIDENTIAL - HENRY S. FARBER
2              AFTERNOON SESSION
3
4           (Time noted:  1:48 p.m.)
5
6           THE VIDEOGRAPHER:  The time is
7   1:48 p.m., and we are back on the
8   record.
9   H E N R Y  S.  F A R B E R, resumed and
10  testified as follows:
11  EXAMINATION BY (Cont'd.)
12  MS. BROWN:
13      Q.  Dr. Farber --
14      A.  Can I -- I did a little checking at
15  lunch.  I just want to -- simply about
16  Appendix B and was it a complete list of the
17  data we used.  And so, I checked with my staff
18  over lunch and it is, so there's really
19  nothing to worry about that.
20      Q.  Okay.  Anything else you checked on
21  or want to correct?
22      A.  No.
23      Q.  Or reaffirm?
24          Let me turn your attention to page
25  24 in your report, paragraph 64, the

Page 140

1       CONFIDENTIAL - HENRY S. FARBER
2   discussion of promotion.
3           We talked a little bit earlier
4   about the fact that you did not analyze
5   promotion decisions made in 2008 and
6   thereafter, correct?
7       A.  Correct.
8       Q.  And that the process, as you
9   understand it, didn't change at that point in
10  time or you don't personally know that it did,
11  correct?
12      A.  I don't know whether the process
13  changed or not.
14      Q.  So, you're not actually studying a
15  particular process or practice with respect to
16  promotions, you're just looking at the bottom
17  line results; is that right?
18          MR. KLEIN:  Objection.
19      A.  What I'm doing is asking the
20  question of whether women were as likely or
21  less likely than men to be promoted from
22  associate to vice-president over that period.
23  I'm sorry, from vice president to managing
24  director.  I apologize.
25      Q.  Understood, but there's no specific

Page 141

1       CONFIDENTIAL - HENRY S. FARBER
2   process that you're actually analyzing?
3       A.  No.
4           MR. KLEIN:  Objection.
5       A.  It is not a process analysis.
6       Q.  Okay.  Now, the statistical model
7   you use in this section is a probit model,
8   correct?
9       A.  Correct.
10      Q.  Now, that's analogous to a
11  regression model except that you're looking at
12  a discreet outcome such as a promotion,
13  correct?
14      A.  I don't know if I would use the
15  word, "analogous."  It's a different
16  procedure.  And that was called a maximum
17  likelihood procedure.  And it is appropriate
18  for models where the outcome is a discreet
19  variable.
20      Q.  But -- but similar to a regression,
21  you can put factors into the model that might
22  explain the results for the population so that
23  you're comparing people who are similarly
24  situated with respect to the likelihood of
25  receiving that outcome, right?

Page 162

CONFIDENTIAL - HENRY S. FARBER

Q. So, you were assuming that the entire group was the same and you were not interested in looking at any factors that might differentiate subsets of that group from one another in terms of either how they're compensation is set or the factors that influence their pay, correct?

MR. KLEIN: Objection.

A. No. As I said, my model includes measures that control for where the worker is situated in the firm and it controls for variation across workers in many factors; time at Goldman Sachs. In some of the models, performance, you know, quartiling and so on. Frankly, the quartiling variables take account of a lot of this in terms of, you know, where the worker is situated in the firm and how they're doing and what they're producing even.

Q. In what way does the quartile that you studied take account of what employees are producing?

A. Well, the point is that the -- the criteria that are used -- the criteria that are used, as I understand it to assign workers

Page 163

CONFIDENTIAL - HENRY S. FARBER

to quartiles, you know, include things like contribution to the firm. And as a result, that's a -- that's a measure of worker performance.

Q. So, suppose you were asked to study wage differences in a real estate sales office and the actual agents got commissions and the people who worked in the office and -- and spoke to prospective sellers or buyers were not on commissions.

If you were studying pay in that group, you would not, based on what you've said right here, you would not put commissions into that model any different than salary; is that right?

MR. KLEIN: Objection.

A. I don't know how to understand -- you're asking me now to come up with a hypothetical of how -- you know, to respond to a hypothetical analysis for a group of workers I've never thought about. I don't think I can do that sitting here.

Q. But what you're telling me is that, at least in the Goldman Sachs population, you

Page 164

CONFIDENTIAL - HENRY S. FARBER

did not look for questions that might or factors that might illuminate differences among subgroups, you only looked at ones that you believe were common to the entire group; is that right?

MR. KLEIN: Objection.

A. I looked at -- I included factors in the model that I could measure for all members of the group that -- that were relevant.

Q. And if -- you read testimony that managers looked at production data in deciding the compensation, the individuals for whom that data exists, correct?

A. I read that managers considered how, you know, the contribution of the worker confirmed performance and the worker's potential and other factors, yes.

Q. But you also saw that they considered the actual business results in terms of the production numbers of the type that were made available to you, correct?

A. Depending on -- maybe for those workers for whom such numbers were available,

Page 165

CONFIDENTIAL - HENRY S. FARBER

but there are many workers for whom those numbers are not relevant.

Q. Did you look, for example, in the securities division to see what percentage in that division of individuals had production numbers?

A. No.

Q. And had it been a substantial percentage, would you have considered running a separate analysis for that division?

A. No. I told you I did not -- I did not consider running separate analyses for different subgroups of workers. I just did not consider that.

Q. And you wouldn't -- there's no percentage, short of a hundred percent, that you were interested in looking at in terms of whether there were measures that applied to a subset of the employees, correct?

Isn't that what you just said?

A. Not quite, no. For example, when I move from my analysis, my first analysis of compensation to the analysis of compensation that includes the performance measures, I lose

Page 174

1    CONFIDENTIAL - HENRY S. FARBER
2  getting at. So, someone graduates from high
3  school and one person decides to enlist in the
4  Army and another person decides to work at
5  McDonald's?
6      Q. Let's talk about here. What about
7  people making a choice about the types of jobs
8  that they want to work in?
9      A. That would certainly would be
10 related to their pay, yes.
11     Q. And in -- you're aware of studies,
12 are you not, about gender differences in job
13 choice?
14     A. I'm aware of studies of gender
15 differences in job holding.
16     Q. And you?
17     A. It's an open question as to how
18 much of that is choice and how much of that is
19 -- is opportunities available to people.
20     Q. And you didn't do any study at
21 Goldman Sachs of gender differences in job
22 type or in function that the employees are
23 performing, did you?
24     A. That's correct.
25     Q. Now, you're also aware that there's

Page 175

1    CONFIDENTIAL - HENRY S. FARBER
2  evidence that women leave jobs more regularly
3  than men for personal reasons; isn't that
4  right?
5      A. I'm aware that men change jobs more
6  than women.
7      Q. Did you -- did you realize that you
8  had access in the data that was provided to
9  you to exit interview surveys of employees
10 leaving Goldman Sachs?
11     A. I was not.
12     Q. Okay. And you would want to look
13 at those to see what the reasons were that
14 people reported their -- their departures from
15 the firm, wouldn't you?
16     MR. KLEIN: Objection.
17     A. For what purpose?
18     Q. Well, wouldn't you agree with me
19 that people who leave either to pursue
20 education or for family reasons might well
21 have been working less hard in the period of
22 time before they depart than people who leave
23 to get a better job, for example, or be paid
24 more?
25     A. I have no idea.

Page 176

1    CONFIDENTIAL - HENRY S. FARBER
2      Q. You've never seen any general --
3      A. My experience with women, frankly,
4  that they're more consciousness than men. So
5  I could just as well spin a theory that goes
6  the other way, that women work hard to the
7  last minute. The man gets another job, he
8  says, I'm going to kiss it off for the last
9  month. It could go either way. I honestly --
10 you know, I'm not studying the exits. I don't
11 know why I would look at the exit interviews.
12     Q. And you didn't look at any
13 statistics about people transferring out of
14 revenue producing jobs into administrative
15 jobs, did you?
16     A. I did not.
17     Q. Okay. And that would be something
18 you might want to see if you were looking at
19 whether, on average, women, more than men,
20 were -- were leaving jobs where they had to
21 produce revenue?
22     MR. KLEIN: Objection.
23     A. I'm not studying exit from jobs, so
24 I don't know why I would -- why I would
25 undertake this whole line of analysis.

Page 177

1    CONFIDENTIAL - HENRY S. FARBER
2      Q. Well, you're aware of studies in
3  the labor market, generally, that men work
4  more hours a week than women, aren't you?
5      A. Women are more likely to work
6  part-time than men. I know that.
7      Q. But even for full-time employees,
8  you're aware of the literature that men work
9  more hours per week than women; is that right?
10     A. I've actually not seen that
11 literature. It wouldn't surprise me that that
12 was the result. I'm moment quarreling with
13 you, just, I have not seen that myself.
14     Q. And you don't have any knowledge
15 about how hard or how many hours people are
16 putting in to job-related activities at
17 Goldman Sachs, do you?
18     A. At home -- oh, at Goldman Sachs.
19     Q. At Goldman Sachs.
20     A. No, I don't.
21     Q. Okay. You didn't do any taint
22 analysis of any of the processes or criteria
23 that are used at Goldman Sachs to set
24 compensation or make promotion decisions, did
25 you?

Page 202

1  CONFIDENTIAL - HENRY S. FARBER
2       MR. KLEIN: Objection.
3       A. I'm saying that's simply a
4  characteristic of the world we live in.
5       Q. Now, in your -- by doing your model
6  with the entire population together, you are
7  assuming that there -- there's only one affect
8  for each variable that operates for all the
9  employees on average, correct?
10      A. That's correct.
11      Q. Now, if you separated employees
12 into separate equations, then those variables
13 would have different effects based on the
14 return, if you will, that that variable
15 provides on pay, correct?
16      A. I would say if I estimated separate
17 models for different subgroups, I would get
18 different estimates for the coefficients, yes.
19      Q. Let's talk about tenure. If a year
20 of tenure is worth more or less depending on,
21 for example, whether you're a vice-president
22 or an associate, then pooling them together
23 will give you almost -- will muddle the affect
24 of that variable, correct?
25      MR. KLEIN: Objection.

Page 203

1  CONFIDENTIAL - HENRY S. FARBER
2       Q. For any one individual.
3       A. It will tell you something about
4  the average affect.
5       Q. But in other words, if two groups
6  differ in terms of the impact of the affect on
7  pay of the variable, putting them together in
8  one equation will somewhat overstate or
9  understate the value of that variable for a
10 set -- a subset of the population, correct?
11      MR. KLEIN: Objection.
12      A. It could.
13      Q. Okay. Now -- so that here, for
14 example, if you had two people, one of whom
15 was a trader for whom years of service was not
16 particularly relevant to pay because that
17 person had the skill or the aptitude for
18 trading and you have someone else whose a vice
19 -- whose an employee in investment banking,
20 for example, where increased tenure and
21 seniority on the team gives you opportunities
22 for clients, contact that you wouldn't have
23 when you were junior. And you put those two
24 together in one equation, you would be looking
25 at the value of tenure for the two of them

Page 204

1  CONFIDENTIAL - HENRY S. FARBER
2  together, right? You would get one return?
3       A. Yes.
4       Q. And that might grossly misstate the
5  value of tenure for the trader versus the
6  banker, couldn't it?
7       A. It could misstate it.
8       Q. Let me show you what we have -- and
9  you didn't check here by running any equations
10 on separate subsets of the entire population
11 whether you were misstating the affect of any
12 of your variables on substantial subsets of
13 the group, did you?
14      A. I did not estimate a model on
15 subsets.
16      Q. Let me show you what we're going to
17 mark Exhibit 12.
18         (Farber Exhibit 12, Stata Command
19      File, marked for identification, as of
20      this date.)
21 BY MS. BROWN:
22      Q. Dr. Farber do you recognize what we
23 marked as Exhibit 12?
24      A. This is one of the do files that I
25 provided.

Page 205

1  CONFIDENTIAL - HENRY S. FARBER
2       Q. And if you look at the bottom of
3  the second page, where it says, "keep employee
4  I.D."?
5       A. Yes.
6       Q. And do you see in there that job
7  code description is there?
8       A. Yes.
9       Q. And also division function
10 description?
11      A. Yes.
12      Q. And also department and department
13 description?
14      A. Yes.
15      Q. Do you have any explanation for why
16 you put these factors into the data set that
17 you created and then never used them?
18      MR. KLEIN: Objection.
19      A. Let me look and see what this -- I
20 don't have a detailed explanation. I think I
21 simply felt that the specification -- the
22 specification that I was using was a good
23 specification. I didn't want to -- you know,
24 we have -- which variables -- we're talking
25 about division? No, job code.

Page 226

1  CONFIDENTIAL - HENRY S. FARBER
2  mean separate studies?
3    A.  No, I did not.
4    Q.  And you understand that most of the
5  maternity leaves are, in fact, paid leaves,
6  correct?
7    A.  Yes.
8    Q.  Okay.  So, you're not making any
9  opinions about how Goldman Sachs treats women
10 taking maternity leave with respects to pay?
11   A.  That's correct.
12   Q.  Let me go back a little bit to
13 paragraph 16 again where you described
14 earnings.
15       I think you'd already described to
16 me how the employee compensation is set, but
17 let me just ask you when you say it's set
18 through common firm-wide processes, what's
19 your basis for that -- that understanding or
20 for that statement?
21   A.  Well, I think basically at the
22 end -- you know, it comes from reading -- you
23 know, reading the depositions and so on and
24 figuring out that recommendations for salaries
25 come, of course, from a lower level, but

Page 227

1  CONFIDENTIAL - HENRY S. FARBER
2  they're all reviewed through some common --
3  through some process at higher levels.
4    Q.  But what is it that made you
5  believe that that was common across -- that
6  process was common across this group?
7    A.  Simply because the review is at a
8  high level which makes it common because
9  there's a common high level in the firm.
10 That's the way I think about it.
11   Q.  You never actually -- I think we
12 discussed before; you never looked at what
13 decisions were either changed or modified in
14 any way after they were made by the first
15 level managers, did you?
16   A.  That's correct.
17   Q.  Okay.  And that's the full
18 understanding that led to your -- that's all
19 the facts that led to that sentence in your
20 report?
21   A.  Yes.
22   Q.  If you did a study by business unit
23 and year and you saw wide variability in the
24 results for gender, would that undermine your
25 confidence and the opinions that you've drawn

Page 228

1  CONFIDENTIAL - HENRY S. FARBER
2  about compensation?
3        MR. KLEIN:  Objection.
4    A.  Repeat the question, please.
5    Q.  Sure.  If you did a compensation
6  study by business unit and you -- and year and
7  you found wide variability in the results for
8  gender, assuming you had groups large enough
9  to study, would that undermine your confidence
10 that there's a common pattern across the
11 group?
12       MR. KLEIN:  Objection.
13   A.  I'm not sure I understand what you
14 mean by business unit.
15   Q.  Business unit is an organizational
16 level at which the budgets are allocated for
17 compensation setting.  So --
18   A.  Can you give me an example?
19   Q.  Sure.  America's One sales.
20   A.  Okay.  That doesn't help.
21       The answer is I'd have to look at
22 it, but probably -- probably not.  When you
23 break the sample up into small pieces, you're
24 going to get a lot of variability in the
25 estimates.  That comes from the fact that as

Page 229

1  CONFIDENTIAL - HENRY S. FARBER
2  the sample gets smaller, the -- the random
3  component because the tail that wags the dog.
4        And what you really want to do --
5  and as a result, you're going to get a lot of
6  imprecision and it's going to look like
7  results are quite different.  And it doesn't
8  shake my confidence in what the overall affect
9  might be -- overall average affect might be.
10   Q.  But you didn't -- I think you've
11 said this, you didn't do any studies to see
12 whether there were business units large enough
13 to study that would have led you to modify
14 your opinion about whether there is a gender
15 difference here across the whole group?
16       MR. KLEIN:  Objection.
17   A.  I did not.  As I've said, I did not
18 do analysis of smaller groups.
19   Q.  Okay.  Now, in paragraph 22, you
20 say that there was a change in 2009 that
21 allowed employees who took a leave of absence
22 to count toward the division distribution --
23   A.  Yes.
24   Q.  -- of quartile, correct?
25   A.  Yes.

Page 270

1      CONFIDENTIAL - HENRY S. FARBER
2   hypothetical that there were a finite number
3   of promotions, that would be true, you'd have
4   to reallocate the promotions that's you saw.
5      Q.  And if you did that, the benchmark
6   against you -- against which you would be
7   assessing whether women had received the share
8   of promotions to which you believe they're
9   entitled would be -- have be to adjusted,
10  wouldn't it?
11     A.  I'm not sure what you mean by
12  benchmark.
13     Q.  In other words, the percentage that
14  derives your number of 20 would actually have
15  to be adjusted if you had to reallocate some
16  of the male promotions to women?
17     A.  Well, I would start by the
18  observation that my reading of the record is
19  that there's not necessarily a defined number
20  of promotions to managing director.  And --
21  but the -- the specifics of your question is
22  if you held the number of promotions constant
23  at -- I'm sorry, I don't have -- I can't do
24  the arithmetic, but if you multiply -- if
25  someone has a calculator -- 6,128 by .0568,

Page 271

1      CONFIDENTIAL - HENRY S. FARBER
2   which is the promotion rate for men times the
3   number of observations for men, that gives you
4   the actual number of promotions for men.  And
5   then added the 68 promotions for women and
6   then allocated them at the same rate for men
7   and women roughly or, you know, use --
8   adjusted the model that way because six --
9   roughly 6 percent of 6,000 is 360 promotions.
10  Figure 360ish promotions for men, I'm just
11  guessing, plus 68 promotions for women is
12  about 425 promotions in all.
13          I wouldn't have to adjust my
14  benchmark expected promotions for women down
15  very much because most of the promotions are
16  going to men in the first place.  So, in other
17  words, in order to not -- in other words, only
18  -- I would -- how would I get it?
19          About a fifth of the promotions go
20  to women now.  No, less than that.  A sixth of
21  the promotions go to women.
22          In the real world, a sixth of the
23  promotions went to women.  There were about
24  350 motions to men and 68 promotions to women.
25  So about -- I know Mike can do arithmetic so

Page 272

1      CONFIDENTIAL - HENRY S. FARBER
2   I'm watching him.
3          And so, about a sixth of the
4   promotions go to women which would lead me to
5   believe you would have adjust the shortfall by
6   about three to four months, but not by very
7   much.
8      Q.  And you don't know what that would
9   do to the T-statistic, do you?
10     A.  I don't believe it would change the
11  T-statistic at all.
12     Q.  But you haven't run that analysis,
13  have you?
14     A.  No, I'm not making a -- a
15  theoretically econometric argument that I
16  don't think it changes the T-statistic.  But I
17  would have to do the analysis, you're right.
18     Q.  Back in paragraph 26 where you're
19  describing promotions, you do say that Goldman
20  decides how many people each division may
21  promote each year and finalizes the list in
22  conversation with the division leaders.  So
23  that whoever was writing this background for
24  you --
25     A.  Which page?

Page 273

1      CONFIDENTIAL - HENRY S. FARBER
2      Q.  Page 10, paragraph 26.  You
3   understand that there is a set number that --
4   that each --
5      A.  Yes.  What I don't know if there's
6   any interaction between the list themselves
7   and the number of promotions that Goldman
8   decides to make.  In other words, it doesn't
9   -- it doesn't say here that Goldman first
10  decides how many people they want to promote
11  and then goes through the whole tapping on the
12  shoulder and crossruffing process and then
13  just promotes the people that they say.  They
14  may, in fact, adjust the total number of
15  managing directors they want to create after
16  they see what the list looked like.
17     Q.  And --
18     A.  I don't know.
19     Q.  And this is all total speculation
20  on your part, correct?
21     A.  Not all of it.  Just that one
22  little piece of it.
23     Q.  Let me -- let me just say you keep
24  using the phrase, "tap on shoulder."  By that
25  you mean nomination.  Nomination website,