# EXHIBIT 8

```
                                                                  Page 1
 1

 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------------X
     H. CRISTINA CHEN-OSTER; LISA PARISI; and
 4   SHANNA ORLICH,

 5                                 PLAINTIFFS,

 6          -against-

 7

     GOLDMAN, SACHS & COMPANY and THE GOLDMAN SACHS
 8   GROUP, INC.,

 9
                                   DEFENDANTS.
10
     Civil Action No.
11   10-CV-06950(LBS)
     ------------------------------------------X
12

13                    CONFIDENTIAL
14       VIDEOTAPED DEPOSITION OF ALLISON GAMBA
15              New York, New York
16           Wednesday, June 18, 2014
17

18

19

20

21   Reported by:
22   Rebecca Schaumloffel, RPR, CLR
23   Job No: 81046
24

25
```

Page 18

```
 1              A. GAMBA
 2   your recollection.
 3       A.   Are you asking before I created
 4   the Declaration or after?
 5       Q.   At any point in time.
 6       A.   Yes.
 7       Q.   What were those documents that
 8   you reviewed that refreshed your
 9   recollection?
10       A.   Performance reviews.
11       Q.   For which years?
12       A.   2003 through 2013.
13       Q.   By performance reviews, you're
14   talking about your own performance reviews?
15       A.   Yes.
16       Q.   So you reviewed copies of your
17   own performance reviews?
18       A.   Yes.
19       Q.   Did you receive attributed
20   reviews?
21       A.   I am not understanding what that
22   is.
23       Q.   In the performance reviews that
24   you received, in addition to the numerical
25   scores, there were substantive comments,
```

Page 19

```
 1              A. GAMBA
 2   correct?
 3       A.   Yes.
 4       Q.   And were those substantive
 5   comments attributed to a particular reviewer?
 6       A.   Yes.
 7       Q.   Did you review any other
 8   documents that refreshed your recollection?
 9       A.   No.
10       Q.   Do you keep a file of documents
11   relating to this litigation?
12       A.   No.
13       Q.   Have you -- aside from your
14   counsel, have you spoken to anybody else
15   about your deposition?
16       A.   No.
17       Q.   Aside from counsel, have you
18   spoken to anybody else about the pending
19   litigation?
20       A.   No.
21       Q.   So I want to talk a little bit
22   about your background now.  You previously
23   worked at SLK?
24       A.   Can I just interrupt for one
25   second?
```

Page 20

```
 1              A. GAMBA
 2       I just realized that I misspoke
 3   on my last statement.  I did speak to my
 4   current manager about the fact that I was
 5   coming today due to the fact that I did need
 6   to leave work on a day that was difficult for
 7   me to get off.
 8       Q.   Understood.  And is was your
 9   current manager?
10       A.   
11       Q.   Aside from advising him that you
12   were not going to be available for work, did
13   you discuss the substance of the litigation
14   at all?
15       A.   I discussed what it was relating
16   to because I didn't feel that it would be
17   truthful if it ever came back currently that
18   I work at Goldman Sachs.  I was a little
19   concerned about how it would appear if I was
20   deceptive.
21       Q.   When was this discussion with
22   
23       A.   Approximately two weeks ago.
24       Q.   What did you say to 
25       A.   I told him that I was making a
```

Page 21

```
 1              A. GAMBA
 2   statement in reference to what had gone on in
 3   2007 that he was also involved in.
 4       Q.   What did -- what, if anything,
 5   did         say?
 6       A.   He said, I understand.  Good
 7   luck.  And that was it.  Anything you need,
 8   you know, I will help you with.
 9       Q.   When you said the -- what had
10   gone on in 2007 that he was also involved in?
11   What did you mean by that?
12       A.   I meant the incident that I had
13   with              in 2007 that there was a
14   record in human resources about.  Which is
15   the whole reason why I was contacted in the
16   first place.
17       Q.   So in response to your disclosure
18   that you were submitting a Declaration in
19   support of the gender discrimination lawsuit,
20   would it be fair to say that            was
21   supportive of your decision to testify
22   against the firm?
23           MS. GREENE:  Objection.
24           You can answer.  You can answer.
25       A.   I would say he was supportive of
```

Page 22

1          A. GAMBA
2  my taking a day off in order to do this.
3      Q.  So he didn't discourage you in
4  any way?
5      A.  No.
6      Q.  And he even, I think you said
7  earlier, offered to help if you needed
8  anything?
9      A.  That's correct.
10     Q.  You also testified earlier that
11 you were a little concerned about how it
12 would appear if I was deceptive.  What did
13 you mean by that?
14     A.  What I meant was because he was
15 actually involved in the complaint in 2007,
16 that I felt as though there was a chance he
17 would find out that I did this.  And going
18 forward, he is still my manager and I believe
19 in honesty.  I didn't want that to affect our
20 relationship.
21     Q.  Based upon [redacted]
22 response, is it fair to say that your
23 decision to submit a Declaration in this
24 litigation will not adversely affect your
25 working relationship with [redacted]

Page 23

1          A. GAMBA
2      MS. GREENE:  Objection.
3      A.  Based on his response I can only
4  assume it won't, but I don't really have
5  anything further than that.
6      Q.  But nothing he said indicates to
7  you that there will be an issue going
8  forward, correct?
9      A.  That's correct.
10     Q.  And when you said earlier that he
11 was actually involved in the complaint, we
12 will talk about this a little bit later, just
13 to be clear, the complaint wasn't launched
14 against [redacted] correct?
15     A.  No.
16     Q.  So aside from [redacted] is
17 there anybody else you discussed either the
18 litigation or the fact that you submitted a
19 Declaration?
20     A.  Just my husband.
21     Q.  Did you discuss the nature of the
22 litigation or the claims with your husband?
23     MS. GREENE:  Objection.  The
24 content of her discussions with her
25 husband is protected by the spousal

Page 24

1          A. GAMBA
2      privilege.  So I will instruct the
3      witness not to answer that question.
4      Q.  It is just a yes or no.  Not
5  asking for the substance.
6      A.  Yes.
7      Q.  Let's talk about your employment
8  previously with SLK.  You started initially
9  with SLK, correct?
10     A.  Yes.
11     Q.  And then Goldman Sachs acquired
12 SLK, I believe, around October of 2000?
13     A.  That's correct.  2001.
14     MS. GREENE:  Just for the
15     clarity of the record, can we give the
16     full name of SLK?
17     Q.  Sorry, Spear Leeds Kellogg.  And
18 when Goldman Sachs -- sorry, just for
19 purposes of the record, I will refer to Spear
20 Leeds Kellogg as SLK, if that's okay, Miss
21 Gamba.
22     A.  That's okay.
23     Q.  So when Goldman Sachs acquired
24 SLK, you became a Goldman Sachs employee,
25 correct?

Page 25

1          A. GAMBA
2      A.  That's correct.
3      Q.  And when Goldman Sachs acquired
4  SLK, the business that you were in at SLK
5  became a part of Goldman Sachs, correct?
6      A.  That's correct.
7      Q.  And that business unit eventually
8  became known as the NYSE specialist, correct?
9      A.  No, that's not correct.  At the
10 time in 2000, I was working on the American
11 Stock Exchange in what we called the AMEX ETF
12 department, the exchange traded fund.
13     Q.  So you started off at SLK as part
14 of the ETF trader fund?
15     A.  No, in 2000, I worked with them.
16 I started off in SLK in a trader training
17 program.  It was a one-year program.  I was
18 in it for two months and I was hired into
19 AMEX, American Stock Exchange Options.  I
20 then transferred, in approximately 1999, I
21 started up with the AMEX ETF department.
22     Q.  And then from the AMEX ETF
23 department, you then moved to another
24 department?
25     A.  Yes.  First I moved to another

Page 102

```
1              A. GAMBA
2    change to your reviewer list, correct?
3        A.   That's correct.
4        Q.   Do you believe in 2008 you
5    suffered gender discrimination as a result of
6    a change in the reviewer list?
7        A.   No.
8        Q.   Let's talk about 2009.  You agree
9    with me that there was no change to your
10   reviewer list, correct?
11       A.   That's correct.
12       Q.   Do you believe in 2009 you
13   suffered gender discrimination as a result of
14   the reviewer list being changed?
15       A.   No.
16       Q.   So is it fair to say that you're
17   claim linking a change in the reviewer list
18   to gender discrimination is for the year
19   2010?
20       A.   That's correct.
21       Q.   Any other year?
22       A.   Really 2010.  I just -- I see
23   that it started and I saw it happened again
24   in another year.  I feel like 2010 was really
25   the year that that's where it was linked to
```

Page 103

```
1              A. GAMBA
2    that.
3        Q.   But when you were up for managing
4    director in 2009, you already had taken your
5    first maternity leave; is that correct?
6        A.   That's correct.
7        Q.   So for the year 2009, which --
8    for which you had already taken a maternity
9    leave, you don't believe for that period
10   there is any discrimination with respect to
11   the reviewer list, correct?
12       A.   No.
13       Q.   And for 2010, again, you don't
14   know whether men had their reviewer list
15   changed, correct?
16       A.   Correct.
17       Q.   And, in fact, you testified
18   earlier that in 2010, nobody from your
19   business unit was promoted to managing
20   director, correct?
21       A.   That's correct.
22       Q.   So the basis for your gender
23   discrimination claim with respect to 2010 is
24   based on the fact that even though nobody
25   else made managing director, you also did not
```

Page 104

```
1              A. GAMBA
2    make managing director after having taken a
3    second maternity leave?
4            MS. GREENE:  Objection.
5        A.   Yes, that's part of it.  I also
6    wasn't nominated that year after I was told
7    the year before to just continue doing what I
8    was doing and it's just a matter of time.
9        Q.   And you testified earlier that
10   you had two conversations.  So you mentioned
11   the first one in 2008 with [redacted]  Was
12   the second one also in 2009 with [redacted]?
13       A.   Yes.
14       Q.   And when you had that discussion
15   with him, with respect to your prospects for
16   making managing director, did you understand
17   that he was guaranteeing you a promotion?
18       A.   No.  I didn't understand it as a
19   guarantee.  I understood it as long as my
20   performance continued the way it was, that he
21   would nominate me.  That he would -- there
22   was a plan to seek promotion.
23       Q.   You testified earlier about the
24   hybrid marketplace.  Do you recall that
25   testimony?
```

Page 105

```
1              A. GAMBA
2        A.   Correct.
3        Q.   Is it fair to say that in 2010,
4    your department had substantially been
5    downsized by that period?
6        A.   That's correct.
7        Q.   And do you think that the
8    performance of a particular business should
9    bear on whether an individual is promoted?
10       A.   I think --
11           MS. GREENE:  Objection.
12       A.   I think that it does.  I also
13   think that we were downsizing our units since
14   2006 well before I was being promoted.  And
15   the only thing that I knew about the
16   promotion process was from [redacted]  And
17   the reason why he kept putting in that
18   statement, Goldman promotes in good and bad
19   years, was directly related to the
20   performance of our unit.  Our unit was on a
21   downside -- on a down swing from 2006 on.
22   And my understanding of that conversation was
23   that that didn't affect or shouldn't affect
24   me getting recognized for the talents that I
25   had and for the performance I had.
```

Page 106

A. GAMBA
2  Q. In 2010, are you aware of anybody
3  being nominated for managing director?
4  A. In my department?
5  Q. Yes.
6  A. No.
7  Q. In fact, nobody was nominated for
8  managing director in 2010, correct?
9  A. From my department?
10  Q. Yes.
11  A. That's correct.
12  Q. So the fact that nobody, not a
13  man, not you, was nominated for managing
14  director, does that, in your view, bear on
15  whether that decision was based on gender
16  discrimination?
17  A. No because I was the last person
18  they were planning on promoting in the near
19  future as far as I was told. It is -- I was
20  the only one on the team. I was the only one
21  in that position. And they weren't looking
22  -- there wasn't any other prospects that were
23  doing anything different and moving their
24  career in that direction. I was told I was
25  the last one.

Page 107

A. GAMBA
2  Q. Sorry; you were told -- you were
3  told that you were the last person who would
4  be nominated for managing director?
5  A. That they were -- yes, they
6  weren't planning on nominating any time soon
7  because nobody else in our department was
8  performing anywhere near management status.
9  Q. Who told you you would be the
10  last person to be nominated as managing
11  director?
12  MS. GREENE: Objection.
13  A. I can't remember anybody
14  specific. It was just in conversation. It
15  was just something that was known. I was the
16  only one on that track at the time.
17  Q. And when -- when were you told
18  that you would be the last one to be
19  nominated?
20  A. Again, around that time. Between
21  2009, 2010.
22  Q. But you don't remember who said
23  that to you?
24  A. I remember in 2007, during that
25  conversation with ▮▮▮▮▮▮▮▮▮ he told

Page 108

A. GAMBA
2  me that ▮▮▮▮▮▮▮▮▮ and I were going to
3  be nominated and he would probably get
4  through first and that then they would try
5  and get me through. And that was all --
6  those were the only prospects they were
7  looking at.
8  Q. That was in 2007, correct?
9  A. Correct.
10  Q. What about after that, were you
11  ever told that you would be nominated?
12  A. Not specifically told. It was
13  just an understanding.
14  Q. What do you mean, an
15  understanding?
16  A. I was the only person, again, who
17  was running the team. I was the only person
18  in the manager meetings. I was the only
19  person doing the job anyway. There wasn't
20  really anybody else who was even looked at as
21  management material.
22  Q. But nobody told you after 2007
23  that you would be nominated again, correct?
24  MS. GREENE: Objection.
25  A. Nobody told me specifically.

Page 109

A. GAMBA
2  ▮▮▮▮▮▮▮ told me in that meeting, when I
3  asked him what do I need to do in order to
4  get it next year, he said just keep doing
5  what you are doing. It is only a matter of
6  time. And he told me to seek out other
7  managing directors in other departments in
8  order to get my name out there.
9  So no, he never told me I am
10  going to nominate you next year. But he told
11  me a path to help myself. So it was an
12  assumption that I had to do work on my end
13  and the nomination would be there. I was
14  definitely led to believe that I was going to
15  be nominated that year. And I was really
16  surprised and embarrassed that I had wasted
17  all of that time going out and going to
18  dinners and meeting people in order to just
19  not even get a nomination.
20  Q. So you testified earlier that you
21  were led to believe in 2008, by ▮▮▮▮▮▮
22  that you would be nominated managing director
23  because he encouraged you to network and
24  speak to people outside of the department?
25  MS. GREENE: Objection.

Page 110

A. GAMBA
A. That was in 2009 when he told me to seek people outside the department. 2008, he just told me to continue doing what I was doing.
Q. So based upon your discussion with ▮ in 2009 where he encouraged you to meet people outside of the department, based on that discussion, you believed him to say that you would definitely be nominated for managing director?
A. Correct.
Q. Are you aware, Miss Gamba, that in 2007, there were ▮ people in NYSE specialists business unit and by 2010, the work force was cut to ▮?
A. ▮ people?
Q. Sorry; ▮ people.
A. Yes.
Q. And that was cut to ▮?
A. I don't know the exact numbers, but I know we were significantly downsized. So yes, that would make sense.
Q. Are you also aware in 2010 while there were ▮ people in the business unit,

Page 111

A. GAMBA
there were seven managing directors?
A. Yes.
Q. So in light of the significant reduction in workforce and the high number of managing directors relative to the size of the department, do you think that you were discriminated against based on the basis of gender when you were not nominated for managing director in 2010?
MS. GREENE: Objection.
A. I don't think one thing has to do with the other. I think the way I understood the way the rest of Goldman worked, the limited experience I had through the women's network, first introduction I had was to a woman on the ETF desk who was part of two managing directors and a team of four. So I didn't really feel as though that mattered.
Q. This ETF desk, did you have an understanding of whether that business was shrinking or was it a growth business?
A. No, I had no recollection. I know that the entire trading business, securities business, had been going

Page 112

A. GAMBA
electronic for everybody. So I can only assume that they would have gone through a similar situation that we were. But I don't know if it was to the extent or not.
Q. So you don't know specifics about that business, how much profit it was generating, for example?
A. No.
Q. And you don't know whether there was some plan in place for growth to take advantage, for example, of some sort of area to develop further? You don't know any of that?
A. I do not.
Q. Just to make sure the record is clear, so with respect to the reviewer list, your claim relates to the year 2010, correct?
A. Correct.
MS. GREENE: Objection.
Q. And in support of that claim, with respect to 2010, that's based on the fact that you believed that you were promised a promotion to -- sorry; you were promised a nomination to extend to managing director?

Page 113

A. GAMBA
MS. GREENE: Objection.
A. I don't believe I was promised a nomination. I wasn't told any different. I was told that the same process was going to go on the next year and they were going to continue -- my assumption was they were going to continue to seek nomination due to the fact that I wasn't told otherwise. I was told to actively seek other people to promote myself. So those words weren't specifically spoken to me, but it was -- I think a pretty relevant assumption given what was spoken to me which was go out and try and push yourself throughout the firm and get to know as many people as possible.
Q. So based on that assumption that being asked to meet as many people as possible indicates that you would be nominated to managing director, how is it that the fact that neither you nor anybody else in your group was nominated evidence of gender discrimination?
A. I was -- I was the only one that was nominated in 2009 also. Again, going