# EXHIBIT 9

## 2 of 2

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 9 - TRANSCRIPT OF THE DEPOSITION OF JESSICA KUNG
DATED JULY 31, 2013
(PAGES 70-109)**

**FILED UNDER SEAL**

Case 1:10-cv-06950-AT-RWL   Document 265-12   Filed 07/25/14   Page 3 of 17

Deposition of Jessica Kung, 30(b)(6)    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 110

suggested a minimal bonus and I can't recall the exact years, but typically in more challenging years that would be a guidance we would give.

Q. If I wanted to know what the specific guidance was on this topic for each year, where would I go to find it?

A. One place to look would be in the e-mails.

Q. How about for years in which IMD did not send launch e-mails?

A. In years where IMD did not send launch e-mails it may have been verbal conversations when we launched the process with the business units.

MS. SHAVER: This is a good time to take a break.

(Luncheon recess taken at 12:45 p.m.)

Page 111

A F T E R N O O N   S E S S I O N
(Time Noted: 1:20 p.m.)

J E S S I C A   K U N G, resumed and testified as follows:

CONTINUED EXAMINATION
BY MS. SHAVER:

Q. Welcome back. We were talking this morning about the compensation process in IMD and you were describing to me some of the steps that the division goes through. I think we left off where IBD may receive some guidance back from the firm wide group, do you recall that?

MS. SULLIVAN: Objection vague.

A. Yes, we left it off where IMD submitted its round one results to the firm and may have received additional guidance or instructions from the firm.

Q. So what's the next step in the process?

A. So the next step in the process is once we receive any additional guidance we

Page 112

would look to finalize our recommendations and submit it for round two.

Q. What's involved in finalizing your recommendations?

A. To the extent that we receive more money or less money, we would go through a similar process again where if additional monies need to be are given to us or if money is taken away from us and the firm doesn't specify in which businesses that needs to occur, our CFO team would revisit the budget allocations to the best units and the business units would have an opportunity to revise recommendations in order to meet that new budget.

Q. Does that opportunity to revise extend to compensation managers underneath the business units?

A. It does.

Q. Does the compensation committee hold a round two meeting?

A. The compensation committee does meet again to review the round two recommendations. It's not typically in the same format as the round one recommendations

Page 113

meaning business units don't come and formally present again.

Q. Are there any other ways in which the format is different than the round one meetings?

A. The main difference is it's not a formal presentation by the business units to the compensation committee.

Q. Are there times when the compensation committee has asked business unit leaders to come and present at the round two meeting?

A. To the extent that budgets and numbers change for businesses, the compensation committee will engage again in a dialogue with the business unit heads to understand their thought process and philosophy and where they have made changes, but it may not necessarily be in a room face-to-face type meeting.

Q. How else might that dialogue take place?

A. It could take place over the phone.

Q. Could it take place over

Case 1:10-cv-06950-AT-RWL   Document 265-12   Filed 07/25/14   Page 4 of 17

Deposition of Jessica Kung, 30(b)(6)                                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 114

1  e-mail?
2      A.   I cannot recall instances where
3  that's happened over e-mail.
4      Q.   Any other ways?
5      A.   Nothing that I can recall at
6  the moment.
7      Q.   Either by phone or in a
8  face-to-face meeting?
9      A.   Right.
10     Q.   Does HCM IMD prepare the same
11 set of materials for the round two meetings
12 for the round one meeting?
13     A.   We prepare a similar set of
14 materials.  We don't reproduce and I'm
15 looking at the 2010 materials.  As an example,
16 we don't reproduce the P&L, the financial
17 package because that stays the same, but in
18 terms of the other summaries and rosters we
19 will refresh those as needed for the new
20 results.
21     Q.   What's the next step after that
22 second compensation committee meeting?
23     A.   Assuming no more adjustments
24 are needed we're done with compensation.  The
25 numbers are finalized.  We submit those to

Page 115

1  the firm.
2      Q.   Do you submit them to firm
3  side?
4      A.   Firm side comp, yes.
5      Q.   Does the management committee,
6  the firm wide management committee review
7  those numbers?
8      A.   My understanding is that they
9  will review the updated numbers.
10     Q.   Has IMD ever had a third round
11 in the comp process?
12     A.   It's unusual for us to have a
13 third round, but we have had third round
14 before.
15     Q.   Do you recall in which years
16 you had third rounds?
17     A.   We have had third rounds on a
18 couple of occasions and compensation is a
19 very iterative process so in some years it's
20 difficult to clearly delineate what's round
21 two and what's round three because you might
22 feel that there is a round 2A or round 2B or
23 round 2C as recommendations continue to
24 iterate.  As far as the specific years, I
25 would say that the more challenging years

Page 116

1  were the years where we had more iterations
2  and a higher likelihood of having a round
3  three so thinking back possibly 2008, around
4  that time.
5      Q.   Just to be sure we are using
6  the same terminology, when you say round
7  three, are you referring to an iteration
8  subsequent to submitting round two numbers to
9  firm wide comp?
10     A.   Yes.
11     Q.   As distinguished from round 2A
12 or 2B that would be before you submit to firm
13 wide comp?
14     A.   That's right.
15     Q.   Why have you tended to have --
16 strike that.  Why is there a higher
17 likelihood of having a round three in more
18 challenging years?
19     A.   We would have a round three in
20 response to even more additional guidance
21 from the firm once they have reviewed our
22 macro results.  In more challenging years as
23 the firm's performance continues -- as the
24 firm continues to get more data points on
25 performance both at the Goldman level as well

Page 117

1  as IMD level, there is a possibility that
2  they may give updated guidance meaning giving
3  us more money or asking us to take away even
4  more than what we did during round two.
5      Q.   Other than giving more money or
6  less money to IMD, are you aware of any other
7  reasons for round three?
8      A.   I'm not.
9      Q.   We've been talking about the
10 compensation process and I'd like to shift
11 focus a little bit to compensation decisions.
12 I'd like to focus for now on the time period
13 from 2002 to 2010, okay?
14     Q.   This has been previously marked
15 as Exhibit 132.  Do you recognize this
16 document?
17     A.   Let me take a moment to scan
18 it.
19         MS. SHAVER: I'll note for the
20     record that the numbers are
21     consecutive, but it does appear that
22     they were produced out of order, but
23     we have chosen to put the exhibit in
24     the correction order of the Bates
25     number.

Case 1:10-cv-06950-AT-RWL   Document 265-12   Filed 07/25/14   Page 5 of 17

Deposition of Jessica Kung, 30(b)(6)   CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 118

1  Q.  Do you recognize this document?
2  A.  I do recognize parts of this
3  document, yes.
4  Q.  Can you tell me what it is?
5  A.  My understanding is that this
6  document is from 2006 and my understanding is
7  also that it's a firm wide document and it
8  talks about a firm wide change in moving from
9  a so-called compensation quartile or quartile
10 that was primarily used for compensation to a
11 quartile that in this year was called manager
12 performance rating.
13 Q.  Was it called manager
14 performance rank?
15 A.  Manager performance rank.
16 Q.  Was this document distributed
17 to employees in IMD?
18 A.  I do not believe this was
19 distributed to all employees in IMD.
20 Q.  Was it distributed to any
21 employees in IMD?
22 A.  I don't believe so.
23 Q.  Does the policy change
24 described in this document apply to IMD?
25     MS. SULLIVAN: Objection vague.

Page 119

1  A.  At a practical level it didn't
2  change how IMD did its quartiling process or
3  what was called the MPR process in this year.
4  Q.  Is that because IMD already did
5  that?
6  A.  Yes, in the sense that
7  performance potential was always considered
8  as factors into the quartile or manager
9  performance rank and quartile was not used in
10 the formulaic way that's described in this
11 document for compensation.
12 Q.  In 2006 did IMD use the manager
13 performance rank instead of manager quartile?
14 A.  Yes, essentially it was the
15 manager quartile, it was just called the
16 manager performance rank.
17 Q.  In previous years it had been
18 called the quartile and in 2006 it was called
19 a rank, but it's the same thing; is that
20 fair?
21 A.  Yes, so previously it was
22 called quartile, then it became manager
23 performance rank or MPR and then we changed
24 back to quartiling, but it was the same
25 process.

Page 120

1  Q.  Was that change back in 2008?
2  A.  The change from MPR back to
3  quartiling?
4  Q.  Yes.
5  A.  That sounds about right.
6  Q.  Is it your understanding that
7  this document the manager guidelines set
8  forth in this document are meant to apply
9  firm wide?
10 A.  Given that this is a firm wide
11 document at a high level, this is meant to
12 apply to all divisions in the firm, but of
13 course divisions will have their own nuances
14 as well.
15 Q.  Do you know who's the author of
16 this document?
17 A.  I believe it would be the
18 talent assessment group.
19 Q.  Do you know which employees in
20 investment management if any would have
21 received and reviewed this document?
22 A.  I'm not sure, but if we did
23 distribute this document to employees in IMD,
24 it would have gone to our managers who were
25 involved in the process.

Page 121

1  Q.  Could you please take a look at
2  what's the third page of the document Bates
3  marked 122589?
4  A.  Sure.
5  Q.  Entitled guidelines for
6  compensation proposals, you with me?
7  A.  I'm with you.
8  Q.  It reads the compensation
9  proposal for each individual should reflect
10 and then it sets forth four bullet points.
11 Could you read those to yourself, please?
12 A.  Okay.
13 Q.  Is it true in IMD that these
14 four factors are considered in manager's
15 compensation proposals?
16 A.  It's true.
17 Q.  How do managers ascertain P&L
18 impact in IMD?
19 A.  So as I said before, managers
20 in the business receive regular reporting
21 both from their own business unit reporting
22 management teams as well as from our CFO team
23 so they have this information readily
24 available throughout the year and during comp
25 as well.

Case 1:10-cv-06950-AT-RWL   Document 265-12   Filed 07/25/14   Page 6 of 17

Deposition of Jessica Kung, 30(b)(6)                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 122

1  Q. By this information you mean
2  P&L impact?
3  A. Yes and other financial
4  metrics.
5  Q. In what form do the managers
6  receive regular reporting?
7  A. They receive it by e-mail from
8  our CFO team. They also receive regular
9  reporting from their own business teams. As
10 to the nature of that format, it varies from
11 business to business.
12 Q. Apart from receiving these
13 reports from their team or from the CFO team,
14 are managers able to go and look up this
15 information at their own election and again I
16 want to focus on the time period 2002 to
17 2010?
18 A. Given that these metrics would
19 be critical to running one's business, they
20 would be able to access this information on
21 an as needed basis.
22 Q. Where was that information
23 stored?
24 A. Each business will have its own
25 way of storing their information whether it's

Page 123

REDACTED FILED UNDER SEAL

Page 124

REDACTED FILED UNDER SEAL

Page 125

REDACTED FILED UNDER SEAL

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 9 - TRANSCRIPT OF THE DEPOSITION OF JESSICA KUNG
DATED JULY 31, 2013
(PAGES 126-153)**

**FILED UNDER SEAL**

Case 1:10-cv-06950-AT-RWL   Document 265-12   Filed 07/25/14   Page 8 of 17

Deposition of Jessica Kung, 30(b)(6) — CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 154

REDACTED FILED UNDER SEAL

Page 155

REDACTED FILED UNDER SEAL

Page 156

1 Q. Outside of the compensation
2 process that you described this morning, are
3 there any other checks and balances on
4 whether managers have considered the proper
5 factors in coming up with compensation
6 recommendations?
7     MS. SULLIVAN: Same objection
8 vague.
9 A. The checks and balances I
10 described pertain and occur during the
11 compensation process.
12 Q. Nothing apart from what you
13 already described?
14 A. Not that I can think of at this
15 time.
16 Q. At the end of Exhibit 132 you
17 see a heading that reads 2006 monitoring
18 process, do you see that, on the page Bates
19 stamped 122590?
20 A. Yes, I see the page.
21 Q. Do you see the heading 2006
22 monitoring process at the bottom?
23 A. Yes.
24 Q. Did IMD provide information to
25 the Goldman Sachs legal department in

Page 157

1 connection with this process?
2     MS. SULLIVAN: I'll allow the
3     witness to answer yes or no.
4 A. The individuals on the HCM team
5 who do data reporting provided information to
6 the legal department in connection with this
7 review.
8 Q. In what years?
9 A. My understanding is that this
10 review happens every year.
11 Q. Is that true from 2002 to the
12 present?
13 A. Yes, I believe so.
14 Q. If you wanted to, would you be
15 able to view the information that the data
16 reporting team provided to the legal
17 department in connection with this review?
18     MS. SULLIVAN: Objection vague.
19 A. My understanding is that
20 information and those materials are
21 privileged so for me personally to the extent
22 I was involved in that review from a business
23 partner perspective I could see the
24 information, otherwise if I wanted to see the
25 specific reports I would need to make sure

Case 1:10-cv-06950-AT-RWL   Document 265-12   Filed 07/25/14   Page 9 of 17

Deposition of Jessica Kung, 30(b)(6)  CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 158

1  that others were comfortable with it.
2     Q.   What is the independent review
3  process referred to here?
4         MS. SULLIVAN: We are getting
5     into privileged questions here so if
6     you can rephrase the question she can
7     answer a yes or no.  Are you trying to
8     get at the questions that the judge
9     has -- the diversity object discussion
10    that we have been having separate from
11    this deposition?
12        MS. DERMODY: This is a
13    document to your managers, right, and
14    it describes a process that cannot
15    possibly be privileged going out to
16    your managers so presumably you have a
17    witness who can testify to what the
18    process is.  It's outside the
19    privilege of that process.
20        MS. SULLIVAN: No, there is a
21    statement here that by no way means
22    that what the legal team does is not
23    privileged so she can answer to the
24    extent that the judge issued an
25    opinion she can answer some yes or no

Page 159

1  questions, but we will not get into
2  the review that the legal department
3  does.
4         MS. HAN: For the record, there
5     is a process in place.  The result is
6     not privileged, the content of that
7     review is privileged.
8         MS. SHAVER: We haven't even
9     established that the witness is saying
10    this is reviewing to that privileged
11    process.
12        MS. SULLIVAN: You can ask her
13    that and she can say yes or no.
14    Q.   What's the independent review
15 process?
16    A.   **The process that's described**
17 **here is referring to that privileged process**
18 **that I mentioned earlier which focuses on**
19 **women and historically under represented**
20 **groups.**
21    Q.   What was the purpose of the
22 independent review process?
23        MS. SULLIVAN: Objection.
24    That's privileged.  You've already
25    actually got information on that

Page 160

1  separate and apart from this
2  deposition and she's not going to
3  testify about that process.
4         MS. SHAVER: Are you
5     instructing the witness not to answer?
6         MS. SULLIVAN: Yes.  You can
7     ask her if there was -- you can ask
8     her if it's her understanding that
9     that occurred, she can say yes or no.
10    You cannot get into what the legal
11    privileged process was.
12        MS. SHAVER: I can get you on
13    the record that you are instructing
14    the witness not to answer so let's
15    move forward.
16        MS. SULLIVAN: Sure.
17    Q.   What data does IMD provide to
18 the legal department in connection with this
19 independent review process?
20        MS. SULLIVAN: That's
21    privileged.  She's not going to answer
22    that question.
23    Q.   As a result of this process,
24 were any compensation decisions in IMD
25 changed?

Page 161

1         MS. SULLIVAN: Objection vague.
2     A.   Compensation decisions can be
3  changed as a result of the process, but after
4  this review by legal their role is really to
5  ask any questions they may have and discuss
6  that with the managers and the business so
7  it's a conversation rather than legal having
8  a specific view on a specific employee and
9  changing that without the businesses
10 knowledge or agreement.
11    Q.   Are you aware of any instances
12 in which compensation decisions have been
13 changed as a result of this review process?
14        MS. SULLIVAN: Objection, asked
15    and answered.
16    A.   As I stated before, I'm aware
17 of changes that have resulted from this
18 process.
19    Q.   How many?
20    A.   **I would say that in every year**
21 **it's quite rare and if we do have changes, it**
22 **would only be a handful of individuals.  Of**
23 **course that varies from year to year.**
24    Q.   When you say handful, do you
25 mean more than ten?

Case 1:10-cv-06950-AT-RWL   Document 265-12   Filed 07/25/14   Page 10 of 17

Deposition of Jessica Kung, 30(b)(6)     CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 162

1     MS. SULLIVAN: Objection.
2     A.   It's difficult to recall
3 specific numbers going back during all of
4 those years, but I would say a handful
5 meaning fewer than ten.
6     Q.   Are you aware of any year in
7 which there were more than ten changes as a
8 result of this process?
9     MS. SULLIVAN: Objection vague.
10     A.   Not that I can recall.
11     Q.   How about changes to manager
12 performance rank or manager performance
13 quartile if it's called that, are you aware
14 of any instances in which there has been
15 changes to manager performance quartile as a
16 result of this review process?
17     MS. SULLIVAN: Objection vague.
18     A.   Similar to what I said for
19 compensation also holds true for just call it
20 quartiling for ease. Legal has an
21 opportunity to ask questions and engage in a
22 dialogue with the business managers after
23 their review and changes may come out of it,
24 but again, it's not legal making the change
25 without their knowledge and agreement, it's a

Page 163

1 discussion.
2     MS. SULLIVAN: I don't want to
3     get into any more about the
4     discussions so I'll ask the witness to
5     stop there.
6     Q.   Are you aware of any instances
7 where changes have been made to manager
8 quartiles as a result of this review process?
9     **A.   I am aware.**
10     Q.   How many instances?
11     MS. SULLIVAN: Objection vague.
12     A.   Similar to what I said for
13 compensation. They are relatively rare and
14 the numbers vary from year to year, but I
15 would say a handful fewer than ten.
16     Q.   Each year?
17     **A.   Yes.**
18     Q.   Do you know if any notes are
19 kept regarding this independent review
20 process?
21     MS. SULLIVAN: I'll ask the
22     witness not to answer that question.
23     It's a privileged process. Notes that
24     may be kept may be kept by attorneys.
25     She's not to testify about that.

Page 164

1     MS. DERMODY: The existence of
2 notes itself is not privileged so if
3 there are documents --
4     MS. SULLIVAN: If there are
5 documents kept by lawyers, we're not
6 going to discuss it.
7     MS. DERMODY: If there are
8 documents that are kept, you can
9 assert that the contents cannot be
10 disclosed, but there's no privilege to
11 the creation of a document.
12     MS. SULLIVAN: She can answer
13 yes or no. She will not answer
14 anything about whether the lawyer are
15 keeping notes. If you want to clarify
16 your question about other documents,
17 she can answer that question, but I
18 want to make sure the record is clear
19 she's not testifying about any notes
20 the lawyers may have kept.
21     Q.   In the meetings that take place
22 between legal and the division in connection
23 with this independent review process, are
24 there any notes generated during those
25 meetings?

Page 165

REDACTED FILED UNDER SEAL

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 9 - TRANSCRIPT OF THE DEPOSITION OF JESSICA KUNG
DATED JULY 31, 2013
(PAGES 166-189)**

**FILED UNDER SEAL**

Case 1:10-cv-06950-AT-RWL   Document 265-12   Filed 07/25/14   Page 12 of 17

Deposition of Jessica Kung, 30(b)(6)                                CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 190

REDACTED FILED UNDER SEAL

25  MS. SULLIVAN: Objection vague.

Page 191

1  A.  Can you rephrase the question?
2  Q.  Does IMD provide managers with
3  any training on how to evaluate specialized
4  contributions to people processes?
5  **A.  HCM flags specialized**
6  **contributions to people processes to managers**
7  **so in the examples I gave where it relates to**
8  **an employee being a diversity champion or a**
9  **recruiting champion or someone whose**
10 **committed a significant amount of time to one**
11 **of our training programs, we HCM will post**
12 **the manager and often times the business head**
13 **as well on the amount of time they**
14 **contributed outside of their quote unquote**
15 **day job.**
16 Q.  How does HCM flag specialized
17 contributions?
18 **A.  We e-mail the managers to let**
19 **them know.**
20 Q.  Are you aware of any training
21 that's provided to managers on how to
22 evaluate this criteria specialized
23 contributions?
24        MS. SULLIVAN: Objection, asked
25     and answered.

Page 192

1  A.  Aside from HCM proactively
2  flagging by e-mailing managers where
3  individuals have made significant
4  contributions, there is no metric or roster
5  that lists specialized contributions that I'm
6  aware of or training.
7  Q.  Is there any training provided
8  to managers in HCM on how to weigh these
9  various factors, these four square bullet
10 points in this document against each other?
11       MS. SULLIVAN: Objection vague.
12 A.  Managers know that all four of
13 these are important factors to consider when
14 thinking about compensation.  They also
15 understand that the factors will have
16 different weights depending on the business
17 or department in question.  For example, if
18 you have a small business that's very
19 strategic and growing, one might argue that
20 the indispensability or risk of losing the
21 individual, you know, on balance relative to
22 the other factors may weigh more heavily so
23 as far as whether we have specific
24 percentages adding up to 100 for each of
25 these four bullets, it would be challenging

Page 193

1  for us to give specific weights to all four
2  factors to all of our businesses which are
3  all very different among themselves and
4  within themselves.
5  Q.  Are you aware of any trainings
6  for managers on that topic, on the topic of
7  how to weigh these various factors?
8        MS. SULLIVAN: Objection, asked
9     and answered.
10 A.  As I've said before, our
11 managers are very experienced and well versed
12 and should they have any questions about what
13 they should consider or how they should
14 consider these factors, there is resources
15 for them whether that's HCM or other managers
16 or their business heads.
17 Q.  Are there any trainings
18 available to them?
19       MS. SULLIVAN: Objection vague.
20 A.  Because as I said before this
21 is so nuanced for each business or even
22 within a business it would be -- we feel that
23 guidance is best coming from other managers
24 in the business, the business head or even
25 HCM so as far as a specific training that

Case 1:10-cv-06950-AT-RWL   Document 265-12   Filed 07/25/14   Page 13 of 17

Deposition of Jessica Kung, 30(b)(6)                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 194

1  points to how you should rate or how you
2  should weigh each of these four factors, I
3  can't think of any at the time.
4      Q.   These were firm wide and IMD
5  factors, correct?
6          MS. SULLIVAN: Objection vague.
7      It's unclear from the question as
8      asked.
9      Q.   On the page that's marked
10 122589, the first bullet point that reads the
11 compensation proposal should -- for each
12 individual should reflect and it lists a
13 number of factors, do you see that?
14     A.   Yes.
15     Q.   Those apply -- the factors
16 listed are P&L impact in the current year,
17 indispensability of/risk of losing the
18 individual, recent significant increase in
19 responsibility and specialized contribution
20 e.g. to diversity training recruiting in
21 current year, those apply both firm wide and
22 in IMD, correct?
23     A.   **This is a firm wide document so**
24 **this would apply firm wide.  It does apply to**
25 **IMD as well, but these are very high level**

Page 195

1  **bullet points and what it actually means to**
2  **the businesses and IMD will be different.**
3      Q.   Is that true back to 2002?
4      A.   **Yes, that would be true back to**
5  **2002.**
6      Q.   Just to clarify the record, is
7  it true that these factors apply to IMD back
8  to 2002?
9          MS. SULLIVAN: Just so the
10     record is clear, are you referring to
11     the factors on this page or the four
12     bullets you just read?
13         MS. SHAVER: Both.
14     A.   Yes, it applies to IMD back to
15 2002.
16     Q.   Were there other division wide
17 factors for IMD beyond those listed here on
18 this page that I just read?
19         MS. SULLIVAN: I'm sorry, just
20     so it's clear the ones you read are
21     the ones listed on the page because
22     there's more than you read.
23     Q.   Were there other division wide
24 factors for IMD beyond P&L impact in the
25 current year, indispensability of/risk of

Page 196

REDACTED FILED UNDER SEAL

Page 197

REDACTED FILED UNDER SEAL

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 9 - TRANSCRIPT OF THE DEPOSITION OF JESSICA KUNG
DATED JULY 31, 2013
(PAGES 198-221)**

**FILED UNDER SEAL**

Case 1:10-cv-06950-AT-RWL   Document 265-12   Filed 07/25/14   Page 15 of 17

Deposition of Jessica Kung, 30(b)(6)   CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 222
REDACTED FILED UNDER SEAL

Page 223
REDACTED FILED UNDER SEAL

Page 224
REDACTED FILED UNDER SEAL

Page 225

    MS. SHAVER: Exhibit 223.
    (Plaintiff's Exhibit 223,
IMD Inherent Risk Document,
marked for Identification.)
Q.  Is Exhibit 223 appendix B to
Exhibit 213, the IMD inherent risk document?
A.  Yes, it is.
Q.  Were any of these appendices
distributed to managers in IMD?
A.  **Not that I'm aware of.**
    MS. SHAVER: This will be the
next exhibit 224.
    (Plaintiff's Exhibit 2214,
Roster, marked for Identification.)
Q.  Do you recognize Exhibit 224?
    MS. SULLIVAN: They are marked
as attorneys eyes only several of
these so the testimony around them
would be -- also we'll designate that
as attorneys eyes only as well.
A.  Yes, I do recognize the
exhibit.
Q.  What is it?
A.  **This is a roster for self
sustaining or commissioned PWA's as of 2011.**

Case 1:10-cv-06950-AT-RWL   Document 265-12   Filed 07/25/14   Page 16 of 17

Deposition of Jessica Kung, 30(b)(6)                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 226

1  It lists their -- actually this doesn't
2  appear to be all of our PWA's but some in New
3  York and some in Atlanta, their team member,
4  their title and the AGC's or adjusted gross
5  credits for the calendar year 2011.
6      Q.   This applies just to
7  commissioned employees?
8      A.   It applies just to commissioned
9  employees.
10     Q.   Can you please turn back to
11 Exhibit 214, the divisional metrics chart.
12 Some of the questions I'm going to ask you
13 will sound familiar because I asked them
14 about an earlier time period and now I need
15 to ask them about the time period 2011 to the
16 present?
17     A.   Okay.
18     Q.   So my first question is whether
19 managers are given any training on how to
20 weight the various metrics that apply to
21 their businesses?
22     A.   So as I said before in my
23 response the approach that was taken in the
24 earlier time period that we talked about
25 still applies in the current time period.

Page 227

1      Q.   Thank you.  Is there any way to
2  tell which metrics managers have relied on in
3  determining their compensation
4  recommendations?
5          MS. SULLIVAN: Objection vague.
6      A.   Can you rephrase?
7      Q.   So, for example, if a business
8  unit leader wanted to ascertain which metrics
9  a manager relied on in determining
10 compensation proposal, would there be any way
11 for the business unit leader to do so?
12         MS. SULLIVAN: Same objection.
13     A.   The business unit leader has
14 conversations with managers after they make
15 their initial recommendation and part of that
16 discussion is to understand how managers
17 arrived at those numbers so through that
18 discussion the business unit leader would
19 understand what factors were taken into
20 consideration and whether any were weighted
21 more heavily than another depending on the
22 business and its priorities.
23     Q.   Is there any way to do so
24 without asking the manager orally?
25     A.   From the business heads

Page 228

REDACTED FILED UNDER SEAL

Page 229

REDACTED FILED UNDER SEAL

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 9 - TRANSCRIPT OF THE DEPOSITION OF JESSICA KUNG
DATED JULY 31, 2013
(PAGES 230-261)**

**FILED UNDER SEAL**