# EXHIBIT 14

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF NEW YORK

 3   H. CHRISTINA CHEN-OSTER;     )
     LISA PARISI; and SHANNA      )
 4   ORLICH,                      ) Case No.
                                  ) 10 Civ 6950
 5              Plaintiffs,       ) (LBS)(JCF)
                                  )
 6         vs.                    )
                                  ) VOLUME I
 7   GOLDMAN, SACHS & CO. and     )
     THE GOLDMAN SACHS GROUP,     )
 8   INC.,                        )
                Defendants.       )
 9   ----------------------------)

10

11

12

13           VIDEOTAPED DEPOSITION OF

14              SHANNA N. ORLICH

15             New York, New York

16           Monday, July 11, 2011

17

18

19

20

21

22

23   Reported by:

24   MAYLEEN CINTRÓN, RMR, CRR, CLR

25   JOB NO. 39750
```

Page 10

- S. ORLICH -

Q. Let me, maybe, reverse the order of that.

As we, of course, will get to, you left Goldman Sachs approximately November 2008; is that right?

A. Yes.

Q. And at that time, where were you -- where were you living?

A. West New York, New Jersey.

Q. And did you move thereafter?

A. I'm sorry. To Weehawken?

Q. No. Where was your next move?

A. I lived in West New York, New Jersey, and then moved to Weehawken, New Jersey.

Q. Fine.

MR. ROGERS: I'm going to ask the court reporter to mark a document bearing production numbers GS224 as Defendants' Deposition Exhibit 1.

And I'm handing a copy to your counsel. Actually, I'll hand two copies.

(Defendants' Deposition Exhibit 1,

Page 11

- S. ORLICH -

Résumé, GS0000224, marked for identification, as of this date.)

MR. ROGERS: Could you hand the exhibit to the witness, please?

(Reporter complying.)

Q. Ms. Orlich, is Deposition Exhibit 1 a copy of a résumé that you prepared?

A. Yes.

Q. And was this a résumé that was prepared before you joined Goldman Sachs as a summer associate?

A. Yes.

Q. Now, the résumé shows you went to Arizona State University and graduated in 2003. And is that correct?

A. Yes.

Q. You then went to Columbia Business School and Columbia University School of Law, graduating with an MBA/JD degree in 2007; is that correct?

A. Yes.

Q. You -- is the listing in Defendants' Deposition Exhibit 1 of your

Page 12

- S. ORLICH -

experience, an accurate listing of your work experience up through the summer of 2005?

(Witness reviewing document.)

A. Yes.

Q. And then in the summer of 2006 you worked as a summer associate at Goldman Sachs; is that correct?

A. Yes.

Q. You received a job offer to join Goldman Sachs as a full-time employee beginning in 2007; is that correct?

A. Yes.

Q. All right. So, up 'til the time that you joined -- let me withdraw that.

Goldman Sachs was your first full-time job, was it not?

A. Yes.

Q. And Goldman Sachs was the first financial institution for which you had ever worked, is it not?

A. Yes.

Q. Now, we'll now -- I'll now ask that this document be marked as Defendants' Deposition Exhibit 2. And I'll hand a copy

Page 13

- S. ORLICH -

to your counsel. It bears production numbers GS222 through 223.

(Defendants' Deposition Exhibit 2, 2/3/06 letter to Shanna Bowman from Goldman, Sachs & Co., GS0000222-223, marked for identification, as of this date.)

Q. Now, Ms. Orlich, Defendants' Deposition Exhibit 2 is a copy of a letter you received from Goldman Sachs in February 2006 offering you a summer associate position for the summer of 2006, is it not?

A. Yes.

Q. Do you recall -- let me withdraw that.

Could you describe for me the interview process that preceded the offer that you received from Goldman Sachs to join as a summer associate in 2006?

A. The process started with a series of informational interviews at Goldman Sachs; followed by an interview on campus at Columbia; followed by an interview day at Goldman Sachs; upon which I was interviewed.

4 (Pages 10 to 13)

Page 46

- S. ORLICH -

1
2  employment which had an offer of a one-time
3  sign-on bonus of ▆▆▆ and then it was
4  revised by this letter to increase the
5  sign-on to ▆?
6      A. No.
7      Q. Okay. Well, let's do it. I just
8  want to be sure we're on the same track here.
9      That's...
10     MR. ROGERS: Okay. Let's have
11     marked as Defendants' Deposition
12     Exhibit 6 a document which bears
13     production numbers GS216 and 217, and
14     I'm handing copies to Plaintiffs'
15     counsel.
16     (Defendants' Deposition Exhibit 6,
17     8/28/06 offer letter to Shanna Bowman
18     GS0000216-217, marked for
19     identification, as of this date.)
20     Q. If you look at Defendants'
21  Deposition Exhibit 6, Ms. Orlich, this is an
22  August 28, 2006 letter offering employment on
23  a full-time basis to you, is it not?
24     A. Yes.
25     Q. If you look on the third

Page 47

- S. ORLICH -

1
2  paragraph, it says you will receive a
3  one-time sign-on bonus of ▆▆▆ as opposed
4  to Dep -- Defendants' Deposition Exhibit 5,
5  the revised version from October, which says
6  ▆▆▆.
7      Do you remember that the firm
8  increased the sign-on bonus that you were
9  paid, or that you were offered?
10     A. I see that, yes.
11     Q. Do you know how that came about;
12  did you negotiate an increase?
13     A. No.
14     Q. Was the pay offered to incoming
15  associates with graduate degrees such as
16  yours, essentially lockstep for all coming
17  in?
18     A. To my knowledge, yes.
19     Q. So, it was your understanding, was
20  it not, that the increase of the sign-on
21  bonus would have been a decision that Goldman
22  Sachs made and applied to all of its entering
23  associates?
24     A. That would have been my
25  understanding.

Page 48

- S. ORLICH -

1
2      Q. Was it your understanding that
3  when you joined as a full-time associate,
4  your salary and your bonus arrangements were
5  the same as your peers who were also joining
6  at the same time, from the same experience
7  level?
8      A. Yes.
9      Q. So that men and women were being
10 offered the same amount; is that correct?
11     A. Yes.
12     Q. During the summer that you worked
13 at Goldman Sachs, was it your understanding
14 that your compensation was at the same amount
15 as your fellow summer associates of the same
16 experience?
17     A. Yes.
18     Q. So the summer associates of the
19 same experience with you, men and women, were
20 paid the same amount?
21     A. Yes. All students in the summer
22 associate program from the MBA programs were
23 paid the same, yes.
24     Q. In your rotations that you did
25 while you were a summer associate, did you

Page 49

- S. ORLICH -

1
2  rotate with other summer associates, or were
3  you sort of alone rotating through while
4  others were alone rotating in other areas? I
5  hope that makes sense.
6      A. To my recollection, we would be on
7  our specific desk alone in each rotation,
8  although there may be another summer
9  associate in the Sales Division of the same
10 group, for example, and one in Trading.
11     Q. Understood. So, because these
12 areas had sales components, as well as
13 trading components, as well as research
14 components?
15     A. It depended on the group.
16     Q. While you were -- withdrawn.
17     How was the rotations set? I
18 mean, who -- who made the decisions as to
19 where you rotated and when during the summer?
20     A. I don't know who would make all
21 the decisions. Certainly HR was involved, as
22 well as potentially managers of desks.
23     Q. Was there an overall coordinator
24 of the summer associates in the Fixed space?
25     A. There was an overall coordinator

Page 82

```
1             - S. ORLICH -
2    your full-time employment at Goldman Sachs.
3         Back to First Principles.  You
4    were assigned to the CSFT desk, were you not?
5         A.  Yes.
6         Q.  And the fact that you were an
7    associate within the Equities area was
8    consistent with you being within CSFT because
9    that was a mixed Equities and FICC desk, was
10   it not?
11        A.  Yes.
12        Q.  High Yield Distressed Trading, by
13   contrast, was a FICC desk, was it not?
14        A.  I'm not sure High Yield Distressed
15   Trading existed at that point.  There was
16   High Yield Trading, but the Distressed had
17   become part of CSFT.
18        Q.  Then let me ask it differently.
19            High Yield Trading was a FICC
20   function, was it not?
21        A.  Yes.
22        Q.  Now, we had spoken awhile back
23   about Defendants' Deposition Exhibit 4, which
24   was the e-mail when you were describing
25   potentially being hired by [redacted] for
```

Page 83

```
1             - S. ORLICH -
2    CSFT.
3             And in that e-mail you referred
4    that, "They are hoping for two spots, one of
5    which they need an analyst for and the second
6    would be for me as a desk analyst."
7             The first reference to the
8    "analyst," did an analyst begin on the CSFT
9    desk at or about the same time that you
10   began?
11        A.  Yes.
12        Q.  And who was that?
13        A.  [redacted]
14        Q.  And as an analyst, as the word was
15   used in Exhibit 4, he was at a lower level
16   position from you, was he not?
17        A.  As title, yes.
18        Q.  Yes.  Title.  Title is a good way
19   to put it.
20            So his title as analyst was below
21   your title as associate?
22        A.  Yes.
23        Q.  All right.
24            Now, as to your function, when you
25   joined in September, the plan was to start,
```

Page 84

```
1             - S. ORLICH -
2    or at least train for a while, in the desk
3    analyst role, was it not?
4         A.  As of this e-mail?  Yes.
5         Q.  No.  I'm talking now as of
6    September 2007.
7         A.  No.
8         Q.  The plan was not to start, or at
9    least train for a while, in the desk analyst
10   role as of September 2007?
11        A.  No.
12        Q.  All right.
13            MR. ROGERS:  Let's have this
14        document marked as Defendants'
15        Deposition Exhibit 11.  And Defendants'
16        Deposition Exhibit 11 bears production
17        numbers GS19208 and GS19209.  I'm
18        handing copies to Plaintiffs' counsel.
19            (Defendants' Deposition
20        Exhibit 11, 9/28/07 e-mail from [redacted]
21        [redacted] to Shanna Orlich,
22        GS0019208-209, marked for
23        identification, as of this date.)
24        Q.  Before we get there.  You
25   mentioned [redacted] who was in your
```

Page 85

```
1             - S. ORLICH -
2    training program, was she not?
3         A.  Yes.
4         Q.  And you were friendly with
5    [redacted], were you not?
6         A.  Yes.
7         Q.  Could you look at Defendants'
8    Deposition Exhibit 11?  This is a chain of
9    e-mails between [redacted] and you on
10   September 28, 2007.
11            September 28, 2007 was fairly
12   shortly after you began on the CSFT desk, was
13   it not?
14        A.  Yes.
15        Q.  Now, if you look at the top of the
16   second page, [redacted] says to you,
17   "I'm still coming to terms with the fact that
18   I'm a banker."
19            And then if you come to the first
20   page, at the bottom of it, your response
21   says, among other things, "If it makes you
22   feel any better, the female trader on CSFT is
23   a former banker (by way of being the desk
24   analyst)."
25            And who were you referring to when
```

```
 1           IN THE UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3   H. CHRISTINA CHEN-OSTER;    )
     LISA PARISI; and SHANNA     )
 4   ORLICH,                     ) Case No.
                                 ) 10 Civ 6950
 5              Plaintiffs,      ) (LBS)(JCF)
                                 )
 6          vs.                  )
                                 ) VOLUME II
 7   GOLDMAN, SACHS & CO. and    )
     THE GOLDMAN SACHS GROUP,    )
 8   INC.,                       )
                Defendants.      )
 9   ----------------------------)

10

11

12

13

14        CONTINUED VIDEOTAPED DEPOSITION

15                     OF

16             SHANNA N. ORLICH

17            New York, New York

18          Tuesday, July 12, 2011

19

20

21

22

23   Reported by:

24   MAYLEEN CINTRÓN, RMR, CRR, CLR

25   JOB NO. 39751
```

Page 457

```
 1                - S. ORLICH -
 2   [REDACTED] as of July of 2008, as having
 3   been extensive?
 4        MS. GREENE: Objection.
 5        A. As I said, I had only been working
 6   with him a couple of months.
 7        Q. Let's, in a few minutes, cover a
 8   different topic, and then we can break for
 9   lunch and we will wrap up after lunch.
10             When you were informed of the
11   termination of your employment, who did it?
12   Let me -- I'm sorry. I don't want to keep
13   backing into questions.
14             Who informed you of the decision
15   that the firm had made to terminate your
16   employment?
17        A. [REDACTED]
18        Q. Did he do it in person?
19        A. Yes, he did.
20        Q. On the day that you -- your
21   employment ended, was the employment of
22   others ended?
23        A. I don't know.
24        Q. It was your understanding, wasn't
25   it, that in November 2008, at the time -- at
```

Page 458

```
 1                - S. ORLICH -
 2   or about the time your employment was
 3   terminated, the employment of many other
 4   individuals were employed -- was terminated
 5   as part of a layoff?
 6        A. I don't know all the
 7   circumstances. I think what you're getting
 8   at is: I believe others were laid-off, but I
 9   don't know for certain what that was.
10        Q. But what I'm also getting at is
11   that the -- the event of your termination was
12   in conjunction with the terminations of the
13   employment of a good number of other
14   employees as a result of a layoff?
15        MS. GREENE: Objection.
16        A. I don't know what the
17   circumstances of the termination were.
18             I mean, certainly, within my
19   group, we were very busy and business was
20   good, so I don't know if layoff -- I don't
21   know the circumstances.
22        Q. All right. You will recall that
23   yesterday we marked an e-mail conversation
24   you had with your mother-in-law --
25        A. Uh-huh.
```

Page 459

```
 1                - S. ORLICH -
 2        Q. -- where you, in October, noted
 3   that there was word around that there was
 4   going to be a 10 percent layoff at Goldman
 5   Sachs. Do you remember that?
 6        A. Okay.
 7        Q. When your employment was late --
 8   let -- was ended in November 2008, what did
 9   [REDACTED] say to you?
10        A. I don't remember.
11        Q. Do you remember -- I'm sorry. You
12   don't have any recollection of what he said
13   to you?
14        A. I don't remember.
15        Q. All right. Where did the
16   termination meeting take place?
17        A. It was in an office on a different
18   floor from the trading floor. But other than
19   that, I don't know.
20        Q. Now, after your employment was
21   terminated, you wrote an e-mail to an
22   employee representative named [REDACTED]
23   Do you remember that?
24        A. No.
25        MR. ROGERS: All right. Let's
```

Page 460

```
 1                - S. ORLICH -
 2   look at Tab 83.
 3        Let's mark this as Exhibit 39.
 4   I'm sorry. I'm sorry. 38.
 5        THE REPORTER: 39.
 6        MR. ROGERS: 39.
 7        MR. MARGOLIS: I have 38.
 8        THE REPORTER: It's 39.
 9        MR. ROGERS: It's 39.
10        MR. MARGOLIS: 39?
11        MR. ROGERS: Yes. And I'm
12   providing copies to Plaintiffs'
13   counsel. Sorry.
14        MS. GREENE: That's okay.
15        (Defendants' Deposition Exhibit
16   39, 11/13-14/08 e-mail chain to/from
17   [REDACTED] and Shanna Orlich,
18   GS0037712-37713, marked for
19   identification, as of this date.)
20        A. Can I have a minute to review it?
21        Q. Certainly.
22             (Witness reviewing document.)
23        A. Okay.
24        Q. Defendants' Deposition Exhibit 39,
25   which I realize I didn't note the production
```

```
                                                        Page 509
 1               - S. ORLICH -
 2      A.  Uh-huh.
 3      Q.  With respect to promotion, you
 4  were hired in the title of associate in 2007,
 5  and your employment ended a little over a
 6  year after.
 7          You had not been there long enough
 8  to be eligible for consideration to promotion
 9  to the title of vice president, had you?
10      A.  I don't know what the parameters
11  are for a promotion to vice president.
12      Q.  Now, looking back at
13  Paragraph 147, there's reference to "company-
14  wide policies patterns and/or practices."
15          You have discussed with me the
16  performance review process, and your views of
17  it.
18          Leaving that aside, what other
19  company-wide policies, patterns, or practices
20  are you alleging in this Complaint are
21  discriminatory or have a discriminatory
22  effect?
23          MS. GREENE:  Objection.  You can
24      answer.
25      A.  It's a very broad question, so
```

```
                                                        Page 510
 1               - S. ORLICH -
 2  I'll do my best to address at least part of
 3  it.  Goldman had -- let me just organize my
 4  thoughts here.
 5          For example, with the business
 6  practices that were discriminatory, I think
 7  we've talked a little bit about how I came
 8  into the firm and my time there, and whether
 9  my role was trading, or analyst, or how that,
10  you know, functioned.
11          And, you know, that's a perfect
12  example of a business practice where other
13  males who entered at the same time were
14  immediately put into the trading roles that
15  they were hired to do, and came -- and coming
16  with that, were the mentorships that came
17  with it, the exposure to clients, the ability
18  to learn the trading skills, etcetera.  I
19  mean, again, it's not exhaustive.
20          And all of those were things that
21  weren't afforded to me.  And, certainly, that
22  was a business practice that I would -- that
23  I saw was discriminatory.
24          I saw lots of women being put in a
25  more research analyst role or sales role,
```

```
                                                        Page 511
 1               - S. ORLICH -
 2  despite wanting trading, which would
 3  ultimately affect their career advancement;
 4  would affect compensation, would affect
 5  business opportunities, and often would then
 6  affect employment, continued employment or
 7  termination.
 8          I think just looking at my own
 9  case, with no defined role or opportunity as
10  a trader, I was ultimately terminated in
11  2008.
12          And -- again, the question is very
13  broad.  So I know that's just one answer,
14  speaking at length.
15      Q.  What is the corporate policy that
16  you claim affects the Class adversely because
17  of the sex?
18          MS. GREENE:  Objection.
19      A.  Well, again, one company-wide
20  policy we've spoken of is the 360 review, and
21  how that impacts women in a disparate manner.
22          The discretion that managers have
23  over someone's incoming career, they can be
24  placed or not placed in a role that will
25  affect them long-term, career wise:
```

```
                                                        Page 512
 1               - S. ORLICH -
 2  compensation, continued employment, business
 3  opportunities.
 4          You know, again, looking at the
 5  patterns we see here, we've spoken at length
 6  about my approaching [redacted]
 7          You know, upon [redacted]
 8  departure, [redacted] also approached
 9  [redacted]  And [redacted] told me that
10  when he talked to [redacted] he said to
11  him, you know, "What's going on?  Things
12  are -- you know, the desk is -- is a little
13  bit of upheaval, [redacted] has left."
14          And [redacted] said, "What do you
15  want to do?"  He said, "I want to trade, and
16  I want to trade with the new star that's
17  coming in, [redacted]  And [redacted] said,
18  "Done."  And from that day forward,
19  [redacted] was [redacted] junior trader and
20  all the opportunities it afforded him.
21          When I approached [redacted]  I
22  was told to be a "team player," to "wait it
23  out," "we'll see what happens," and then I
24  was terminated.
25          And just seeing the disparate
```