# EXHIBIT 16

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF NEW YORK

3    ----------------------------------------X
     H. CRISTINA CHEN-OSTER; LISA PARISI;

4    and SHANNA ORLICH,

5                        Plaintiffs,

6        - against -

7    GOLDMAN, SACHS & CO. and THE GOLDMAN

8    SACHS GROUP, INC.,

9                        Defendants.

10   CASE NO.: 10-cv-06950 (LBS)(JCF)
     ----------------------------------------X

11

12       * * * C O N F I D E N T I A L * * *

13

14                    250 Hudson Street

15                    New York, New York

16                    July 10, 2013

17                    9:40 a.m.

18

19       DEPOSITION of CAROLINE HELLER SBERLOTI,

20   pursuant to 30(b)(6) Notice, before Sophie

21   Nolan, RPR, a Shorthand Reporter and Notary

22   Public within and for the State of New York.

23

24

25

Case 1:10-cv-06950-AT-RWL   Document 265-26   Filed 07/25/14   Page 3 of 38

Deposition of Caroline Heller Sberloti                                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 2

1  A P P E A R A N C E S:

2

3  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

4  Attorneys for the Plaintiffs

5      250 Hudson Street

6      New York, New York  10013

7  BY:  RACHEL GEMAN, ESQ.

8      PHONE    212-355-9500

9      FAX      212-355-9592

10     E-MAIL  rgeman@lchb.com

11

12 OUTTEN & GOLDEN, LLP

13 Attorneys for Plaintiffs

14     3 Park Avenue New York, New York  10016

15 BY:  CYRUS E. DUGGER, ESQ.

16     PHONE    212-245-1000

17     FAX      646-509-2060

18     E-MAIL  cdugger@outtengolden.com

19

20

21

22

23

24

25

Page 3

1  A P P E A R A N C E S:  (Cont'd)

2

3  SULLIVAN & CROMWELL, LLP

4  Attorneys for Defendants

5      125 Broad Street

6      New York, New York  10004

7  BY:  SUHANA S. HAN, ESQ.

8      PHONE    212-558-4647

9      FAX      212-558-3588

10     E-MAIL  hans@sullcrom.com

11

12 PAUL HASTINGS, LLP

13 Attorneys for Defendants

14     875 15th Street, N.W.

15     Washington, DC 20005

16 BY:  CARSON H. SULLIVAN, ESQ.

17     PHONE    202-551-1809

18     FAX      202-551-0209

19     E-MAIL  carsonsullivan@paulhastings.com

20

21 ALSO PRESENT:

22     MARTIN L. SCHMELKIN, ESQ.

23

24

25

Page 4

REDACTED FILED UNDER SEAL

Page 5

REDACTED FILED UNDER SEAL

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 16 – TRANSCRIPT OF THE DEPOSITION OF CAROLINE HELLER SBERLOTI
DATED JULY 10, 2013
(PAGES 6-17)**

**FILED UNDER SEAL**

Deposition of Caroline Heller Sberloti                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 18



REDACTED FILED UNDER SEAL

Page 19

1  Q.    What is her title?
2  A.    Global head of HR, global business
3  partner for the Securities Division.
4  Q.    And you're co-head of the
5  generalist business partners for Securities
6  around the world?
7  A.    Yes.
8  Q.    Okay. Is there someone who's in
9  charge of America?
10  A.    No.
11  Q.    And how was what she does different
12  from what you do?
13       MS. SULLIVAN: Objection, vague.
14  Q.    Do you know what I mean? It sounds
15  like it's similar titles.
16       MS. SULLIVAN: Who are we talking
17  about?
18       MS. GEMAN: Linda Fox.
19  A.    So, the generalist function looks
20  after a series of things including promotion
21  compensation. There are other HCM functions
22  like recruiting and training that also run roll
23  into Linda that I don't have responsibility
24  for.
25  Q.    Understood. And do you have direct

Page 20

1  reports presently?
2  A.    Yes.
3  Q.    How many?
4  A.    I have two direct reports.
5  Q.    Okay. Who are they?
6  A.    Stephanie Morris and Iona Stevens.
7  Q.    Have you had any others in the
8  period 2008 through the present, any other
9  direct reports?
10  A.    I think those have been my direct
11  reports during that period.
12  Q.    What in your present position are
13  your duties and responsibilities relating to
14  promotions within the Securities Division --
15       MS. SULLIVAN: Objection.
16  Q.    -- from vice president to managing
17  director?
18  A.    I helped facilitate the process for
19  the Securities Division.
20  Q.    Meaning what?
21  A.    So, there are timelines and
22  procedures that have to get done in order to
23  have people be promoted and we help facilitate
24  those for the Securities Division.
25  Q.    And do you have similar duties in

Page 21

1  connection with compensation of associates and
2  vice presidents in the Securities Division?
3  A.    Yes, I help facilitate the process
4  for the -- the compensation process for the
5  Securities Division.
6  Q.    And I just want to clarify
7  something just to make it explicit. As you saw
8  from the complaint, we are only interested in
9  U.S. employees. And so my questions today are,
10  even if I ask about Securities, which has a
11  global component, I'm interested in U.S.-based
12  associates and vice presidents in the
13  Securities Division, including the predecessor
14  divisions like you mentioned earlier from 2000
15  to the present.
16  A.    Okay.
17  Q.    Okay, thank you. And to circle
18  back on something, it sounds like the first
19  time you had duties and responsibilities
20  relating to those topics that I just listed was
21  2005?
22  A.    Yes.
23  Q.    Okay. To prepare for this
24  deposition, what did you do to familiarize
25  yourself with those compensation, performance

Page 22

1 review and promotion topics for the time period
2 before 2005?
3          MS. SULLIVAN:  I'm just going to
4     object to the extent that shes already
5     testified that she met with counsel and
6     anything during those meetings is
7     privileged.
8     A.     I would say most of my knowledge
9 between the period of 2002 to 2005 comes from
10 the experience I've had during my current
11 capacity and in asking about how we used to do
12 things and understand it.  So I feel familiar
13 with those topics despite having become
14 involved in 2005.
15     Q.     And do you have any knowledge of
16 those topics for the period 2000 through 2002?
17          MS. SULLIVAN:  Objection, vague.
18     A.     Again, it would be consistent with
19 my knowledge of sort of 2002 to 2005.
20     Q.     Okay.  Fair enough.  I understand
21 you weren't working directly relating to
22 compensation, performance evaluation and
23 promotion, but you do have knowledge of those
24 processes in the Securities Division between
25 2000 and 2005?

Page 23

1     A.     Yes, more familiar post 2005, but I
2 understand.
3     Q.     Okay.
4          MS. SULLIVAN:  Okay.  Counsel, the
5     liability period is 2002.  I understand
6     your position and I'm sure you understand
7     ours, but I just wanted to make that clear.
8     Q.     And are you related to the global
9 division head David Heller?
10     A.     No relation.
11     Q.     Okay.  So I'd like to talk about
12 division-specific committees for a minute.
13          For how long has there been a
14 Securities Division-specific compensation
15 committee?
16     A.     The entire period.
17     Q.     Okay.  Have the duties and
18 functions of that committee changed materially
19 from the period 2000 to the present?
20          MS. SULLIVAN:  Objection, vague.
21     A.     No.
22     Q.     Can you describe what the
23 Securities Division compensation committee
24 does?
25          MS. SULLIVAN:  Same objection,

Page 24

1 vague.
2     A.     They review the compensation --
3 sorry.  They review the compensation decisions
4 made by the managers and typically discuss the
5 overall environment and business performance of
6 each business unit within the Securities
7 Division.
8     Q.     And where in the compensation
9 process does the compensation committee discuss
10 the overall environment and business
11 performance of the units?
12     A.     So, after individual managers
13 within the business units have come up with
14 their initial recommendations, the compensation
15 committee meets to review them.
16     Q.     And in that context the discussions
17 occur about the business environment?
18     A.     Yes.  To clarify, there are also
19 conversations about the business environment
20 and prior to that, prior to individual
21 recommendations being submitted.
22     Q.     So let's start with discussions
23 after recommendations are submitted.  Are these
24 discussions that the committee members have
25 among themselves or with the managers?

Page 25

1          MS. SULLIVAN:  Objection, vague.
2     A.     Can you clarify what you mean?
3     Q.     Yes.  So after the round one
4 proposals by the managers are submitted, does
5 the compensation committee meet with the
6 managers to discuss the business environment or
7 is it just a meeting among the members of the
8 committee?
9          MS. SULLIVAN:  Same objection.
10     A.     Managers come in to present to the
11 comp. committee.
12     Q.     Okay.  And do these discussions
13 inform round two recommendations?
14     A.     Sometimes.
15     Q.     Okay.  For what other purpose, if
16 any, are the discussions about the business
17 environment?
18     A.     To understand the thought process
19 and method by which the managers made their
20 recommendations.
21     Q.     And is this for the intention of
22 approving or disapproving the recommendations?
23          MS. SULLIVAN:  Objection, vague.
24     A.     No, it's for the intention of
25 discussing and asking for consensus-building

Page 26

1   around decision making.
2       Q.     And does the compensation committee
3   have to sign off on individual compensation
4   recommendations?
5           MS. SULLIVAN:  Same objection,
6   vague.
7       A.     Compensation decisions are made by
8   the managers.  The compensation committee will
9   discuss a handful of folks, but they don't
10  discuss large numbers of individuals and so
11  there's no sign-off process.  It's a dialogue
12  between the managers and the compensation
13  committee.
14      Q.     But if there's a disagreement
15  between managers and the comp. committee, who
16  has final say over an individual's
17  compensation?
18          MS. SULLIVAN:  Objection, vague.
19      A.     Disagreements are not -- it's
20  typically a consensus-driven conversation where
21  folks talk about what the best outcome for the
22  business is.
23      Q.     In connection with individual
24  recommendations?
25      **A.     Or overall budgets given to the**

Page 27

1   **business.**
2       Q.     Ultimately does the committee sign
3   off on all the finalized PATC of each
4   individual in the division?
5           MS. SULLIVAN:  Objection, vague.
6       A.     There's thousands of employees so
7   there's no sign off on individual compensation
8   by the committee.
9       Q.     Is there sort of a sign off on the
10  finalized proposal?
11      **A.     Sign off is not the word I would**
12  **use.  There was an agreement that we were going**
13  **to submit these as the round one**
14  **recommendations for the people of the**
15  **Securities Division, but there's not a review**
16  **of each individual person's compensation.**
17      Q.     To whom are the round one
18  recommendations submitted?
19      **A.     They're submitted in the system to**
20  **the firm-wide comp. team, but that's an**
21  **administrative process.**
22      Q.     is there always a round two?
23      **A.     There's typically a round two, yes.**
24      Q.     Okay.  And then what happens in
25  round two?

Page 28

1       **A.     The firm at the -- the firm may**
2   **give additional budget or take budget away from**
3   **the Securities Division based on aggregate**
4   **compensation numbers.**
5       Q.     Between the period of 2000 and the
6   present, is there any other reason other than
7   the firm-wide decision to add or remove from
8   the budget that round two recommendations are
9   different from round one recommendations?
10      **A.     If a manager sees individual**
11  **performance has changed, so there may be**
12  **employees who make or lose money during that**
13  **window or whose performance has gotten better**
14  **or worse.**
15      Q.     And what is the process for a
16  manager to change a proposal based on
17  individual performance in between the two
18  rounds?
19      **A.     So, when we open round two, we'll**
20  **tell managers that they have a window of time**
21  **to make a change, and the change has to be**
22  **within their budget.**
23      Q.     So adding to one means taking away
24  from someone else and vice versa?
25          MS. SULLIVAN:  Objection.

Page 29

1       Q.     Unless there's more aggregate money
2   given; is that right?
3       **A.     Yes.**
4       Q.     So what documents reflect the
5   changes that are performance-based in between
6   the first and second rounds?
7           MS. SULLIVAN:  Objection, vague.
8       A.     All of that information is in CRS.
9       Q.     And when there's money given by the
10  firm or money taken a way, is it typically --
11  but for the specific people whose performance
12  has changed between the round periods, is it
13  expected that there are pro rata increases or
14  reductions?
15          MS. SULLIVAN:  Objection, vague.
16      Q.     Do you understand my question?
17      **A.     No.**
18      Q.     Let's just say that everyone was
19  going to be paid $100 and the firm announces
20  that twice as much money is available.  Would
21  it be the case then that everybody gets $200 or
22  some people would get $300 and some people
23  would stay at 100?
24          MS. SULLIVAN:  Objection, vague and
25  it's an incomplete hypothetical.



Page 30

Page 31

Page 32

REDACTED FILED UNDER SEAL

Page 33

1 that describe how managers are supposed to make
2 compensation decisions between the round one
3 and round two?
4          MS. SULLIVAN:  Objection, vague.
5     A.     Managers should make compensation
6 decisions based on individual performance and
7 the performance of the business unit consistent
8 across rounds.  There's not a difference
9 between round two and round one.
10    Q.     So the governing policies and
11 documents would be the general compensation and
12 performance review documents?
13          MS. SULLIVAN:  Objection.  You're
14    mischaracterizing her testimony.
15    A.     Managers make decisions based on
16 individual performance, firm performance at all
17 points in the compensation process.
18    Q.     So there's no difference in the
19 policies between round one and round two?
20          MS. SULLIVAN:  Objection, again
21    misstating her testimony.
22    A.     Managers don't use different kinds
23 of information to make their assessments in
24 round two than they did in round one.
25    Q.     And can compensation proposals be

Page 34

1  submitted to the firm without consensus by the
2  compensation committee and the managers?
3           MS. SULLIVAN:  Objection, vague.
4      A.    Can you clarify what you mean?
5      Q.    Yeah, you said before that once
6  there's consensus between the managers and the
7  compensation committee, that the proposals are
8  submitted to the firm; correct?
9           MS. SULLIVAN:  Objection,
10 mischaracterizing her testimony.
11     A.    The compensation committee meets
12 and then the information is submitted through
13 the CRS system to the firm.
14     Q.    All right.  Can the information be
15 submitted to the CRS system without the
16 compensation committee first meeting?
17     **A.    It is actually in the CRS system**
18 **before they meet, but then any edits that**
19 **happen before the official firm deadline are**
20 **also submitted to the system.**
21     Q.    No, I'm asking a different question
22 which is you said earlier that the compensation
23 committee meets.  You described a consensus
24 process and then you described how the
25 information is then sent on to the firm.

Page 35

1           Do you remember that testimony?
2      **A.    Yes.**
3      Q.    Okay.  Does the compensation
4  committee have to meet before that material is
5  sent to the firm?
6      **A.    Yes, they meet before it's sent to**
7  **the firm.**
8      Q.    And is that consensus process that
9  you described required before the information
10 is sent on?
11     **A.    The consensus process happens**
12 **before it's sent on, yes.**
13     Q.    Okay.  So it's not the case where
14 the managers can just send it on without the
15 first meeting of the compensation committee?
16          MS. SULLIVAN:  Objection, vague.
17     A.    The compensation committee and the
18 managers have a consensus meeting at the
19 committee and then it's submitted.
20     Q.    Are there any kick out flags or red
21 flags that would cause the compensation
22 committee at round one to look at an
23 individual's compensation recommendation?
24          MS. SULLIVAN:  Objection, vague.
25     A.    Can you explain what you mean?

Page 36

1      Q.    Sure.  Is there any reason that
2  would prompt the compensation committee to look
3  at a particular compensation recommendation in
4  round one?
5           MS. SULLIVAN:  Same objection.
6      A.    We would look at individuals based
7  on quartile or based on production information
8  to determine that the compensation
9  recommendations looked appropriate.
10     Q.    And what guidelines or policies
11 exist to determine what's appropriate?
12          MS. SULLIVAN:  Objection, vague.
13     A.    The -- can you explain what you
14 mean?
15     Q.    Yeah, you just said that you'd look
16 at the quartiling and the performance
17 information to make sure that compensation was
18 appropriate.  And what guidelines define what's
19 appropriate, if any?
20     **A.    The committees, similar to what the**
21 **managers would also do in their individual**
22 **business units, would look for any potential,**
23 **to use your word, outliers.  So anyone with a**
24 **lower quartile and an increase in PATC or**
25 **people with lower or negative production, so**

Page 37

1  things that looked --
2      Q.    Are the outliers listed?  Do you
3  know what I mean?  Is there a document that
4  says, here are the following reasons why we
5  would take a harder look at a particular
6  recommendation?
7      **A.    At the compensation committee**
8  **meeting, there will be some we call them**
9  **potentially screens for individuals like that.**
10     Q.    Who creates the screens?
11     **A.    The business would -- the business**
12 **leadership would help us identify what screens**
13 **they were interested in and we -- the**
14 **Securities HCM would help them run the reports**
15 **and make them available.**
16     Q.    What are those reports called?
17     **A.    There's not necessarily a formal**
18 **name, but there are comp. reports available at**
19 **the comp. committee.**
20          MS. GEMAN:  Have those been
21 produced?
22          MS. SULLIVAN:  They've been
23 produced with the sample comp. books that
24 we provided.
25          MS. GEMAN:  Those were the hard

Page 38

1  copy binders?
2      MS. SULLIVAN:  Yes, they were hard
3  copy binders.
4      Q.     So if something is an outlier,
5  what's the process for determining whether that
6  outlier is appropriate?
7      MS. SULLIVAN:  Objection, vague.
8      Q.     You've described the process by
9  which outliers are identified and I'm now
10  asking about the process by which outliers are
11  investigated.
12      **A.     So, a conversation would happen**
13  **between the managers and the comp. committee**
14  **about how the decision was made.**
15      Q.     Okay.
16      **A.     And a consensus would be reached if**
17  **it -- you know, as to what the appropriate**
18  **number was.**
19      Q.     Are there any documents that
20  reflect that discussion process?
21      MS. SULLIVAN:  Objection, vague.
22      A.     All of the changes are recorded in
23  CRS.
24      Q.     But are there any -- to my
25  understanding, CRS reflects the actual numbers.

Page 39

1  I'm asking if there's any documents that
2  reflects the discussion that contextualizes
3  that despite an outlier, the number might stay
4  the same or change?
5      **A.     There's not a document of the**
6  **discussion, but there are -- the metrics that**
7  **would have played into the discussion are**
8  **available.  So, production information, risk**
9  **information, all the business metrics that**
10  **would play into that discussion or individual**
11  **performance metrics, that would play into that**
12  **discussion are available.**
13      Q.     That raises a good question.  You
14  said that the comp. committee has quartiling
15  information at the -- at its disposal and
16  production information.  By "quartile," do you
17  mean the manager quartiling?
18      **A.     They do have quartile information**
19  **at their disposal.**
20      Q.     Okay.  And has manager quartiling
21  been happening in the Securities Division since
22  2000, to your knowledge?
23      **A.     Since 2002, I feel very comfortable**
24  **saying yes.**
25      Q.     Okay.  Are there any screens that

Page 40

1  are a function of the 360 review as distinct
2  from the manager quartile?
3      MS. SULLIVAN:  Objection, vague.
4      A.     The scores are present so the score
5  information and the quartile information is
6  present and there are screens run about
7  quartile information.
8      Q.     Right.  My question was different.
9  Are the screens run about 360 review?
10      MS. SULLIVAN:  Objection, asked and
11  answered.
12      A.     It's all available and you would
13  see juxtaposing scores so the opportunity to
14  ask the question is there.
15      Q.     No, I'm asking a different
16  question.  Is there a specific screen for
17  outliers based on anything about the 360 review
18  as distinct from the manager quartile?
19      **A.     The 360 review is one of the key**
20  **factors in determining the manager quartiles.**
21  **So, the dichotomy may not be important, but a**
22  **large portion of what drives the manager**
23  **quartile is the 360 review.**
24      Q.     I'm asking a different question.
25      Is there a screen that flags a

Page 41

1  potential outlier that uses as an input the 360
2  review?
3      MS. SULLIVAN:  Objection.
4      Q.     That's a different question from
5  what ultimately goes into the manager quartile.
6      MS. SULLIVAN:  She's answered the
7  question.
8      A.     The HCM team for securities does
9  not produce a report between those two things,
10  but those two items are available in the
11  reports that are visible to the compensation
12  committee and the managers so all of that
13  information is available.
14      Q.     Again a different question.
15      At any point between 2000 and the
16  present, has the 360 review score been one of
17  the screens that would highlight an outlier?
18      MS. SULLIVAN:  Same objection.
19      Q.     To your knowledge.
20      MS. SULLIVAN:  Asked and answered.
21      A.     The 360 review is present on the
22  information that the comp. committee and the
23  managers are able to review so it can be used
24  as a discussion point and a factor.
25      Q.     Different question.  I'm asking

Page 42

1 specifically about the yearly screens that
2 isolate outliers. You said earlier that you
3 gave examples of outliers could exist if
4 there's discrepancy between comp. and the
5 quartile or comp. and production information.
6       I'm asking has there ever been a
7 screen indicating an outlier if there's a
8 discrepancy between comp. and the 360 review?
9       MS. SULLIVAN: Objection, asked and
10 answered. We're going through the same
11 thing over and over again.
12       MS. GEMAN: I need to get an answer
13 to my questions.
14       A.    So, it's used in a screen and that
15 they're available on the individuals who are in
16 the comp. book and managers are able to
17 review -- managers and the compensation
18 committee are able to review both the 360
19 information side by side with the quartile
20 information.
21       Q.    Again, I'm asking about the
22 isolation of outliers. Has the 360 review
23 score ever been on the screen for the isolation
24 of outliers as distinct from overall
25 information being available in the meetings?

Page 43

1       MS. SULLIVAN: Again, asked and
2 answered. And I just have to object to the
3 vagueness of the screen and the screen --
4 whatever you're -- you just said "on the
5 screen." So I'm not clear as to what your
6 definition of "screen" is.
7       MS. GEMAN: Folks, this isn't that
8 complicated.
9       Q.    You said there are screens every
10 year that explicitly list situations that
11 isolate outliers.
12       A.    So, I said that the business will
13 ask for certain information that they're
14 interested in --
15       Q.    Yes.
16       A.    -- related to some comp. reports.
17 In addition to those comp. reports, there are
18 also factors and data that's available on every
19 single person. All of it acts as screens or
20 information or factors or metrics that are used
21 in determining if folks are paid appropriately
22 and if the proper factors have been taken into
23 account. So 360 is available.
24       Q.    Let's ask about the comp. reports.
25 At any point have the 360 reviews been part of

Page 44

1 the comp. reports?
2       MS. SULLIVAN: Objection, vague.
3       Q.    You know what I mean, to isolate
4 outliers.
5       A.    Every page in the comp. reports
6 with individuals listed has their 360 scores so
7 they're on all the comp. reports.
8       Q.    Different question. Let me try to
9 ask it again.
10       MS. GEMAN: I don't think these
11 screens have been produced. Carson, you
12 can tell me if they are because then
13 obviously I can just show the witness the
14 document.
15       Q.    But I'm interested in the specific
16 circumstances that prompt a flag as a potential
17 outlier and you gave a couple of examples
18 earlier; for example, if the quartile
19 information differs in a certain respect from
20 the proposed compensation. You gave another
21 example of production differing from proposed
22 compensation.
23       I'm asking if there's any other
24 examples in the period from 2002 to the present
25 of a discrepancy that would explicitly flag an

Page 45

1 outlier.
2       MS. SULLIVAN: And for the record,
3 counsel, I just want to object that it's
4 asked and answered, but also your use of
5 the word "screen" is vague in that you're
6 assuming that there's some sort of document
7 that is a screen.
8       MS. GEMAN: Well, the witness has
9 testified there's specific -- a list of
10 things that --
11       MS. SULLIVAN: That's
12 mischaracterizing her testimony.
13       Q.    You can answer.
14       A.    So, I have not personally been
15 involved in producing a report that compares
16 360 scores to quartiles. However, where I
17 disagree with the characterization of what I'm
18 saying is that on each of the reports that are
19 available where we review compensation
20 information, those items are present and
21 they're available for discussion and managers
22 would look at 360 and quartile next to each
23 other in having a discussion.
24       Q.    Have you personally produced a
25 report or know of a report that explicitly

Page 46

1  compares 360 to comp.?
2      MS. SULLIVAN: Objection, vague.
3  Are you talking about for what process?
4  For --
5      Q.  The same one. You said before you
6  hadn't seen one that explicitly compared 360 to
7  quartile. So I'm just asking the same
8  question.
9      A.  To clarify that statement, the
10  pages we looked at have 360 and quartile. So
11  by virtue of the fact that the pages that we
12  look at have 360 and quartile, they're
13  compared. But I have not run a screen
14  personally, screen to use your word, of looking
15  at outliers of quartile versus 360. I
16  personally have not run those.
17      Q.  Do you have any knowledge that
18  anyone else has run those?
19      MS. SULLIVAN: Objection, vague.
20  Again, Counsel, just for the record you're
21  discussing this during this process, the
22  compensation meetings?
23      MS. GEMAN: Is that a question?
24      MS. SULLIVAN: Yes.
25      MS. GEMAN: Yes.

Page 47

1      MS. SULLIVAN: You need to clarify
2  the question.
3      MS. GEMAN: We've been talking
4  about the duties and functions of the comp.
5  committee.
6      MS. SULLIVAN: I understand, but
7  you have to be specific.
8      Q.  And have you personally been
9  involved in producing a report that compares
10  360 scores to compensation?
11      MS. SULLIVAN: Same objection,
12  vague as to time frame.
13      A.  The 360 scores and the quartile
14  scores are on the reports that I've been
15  involved in producing, yes.
16      Q.  Have you been involved in producing
17  a report that compares 360 to compensation
18  whether or not 360 is also on a report that
19  compares to other things?
20      MS. SULLIVAN: Same objection as to
21  time frame, scope.
22      A.  By virtue of 360 and quartile, both
23  being on the page, and the reason I keep
24  reiterating this is because they come up as
25  discussions and there are discussions about

Page 48

1  them in comparison to each other based on them
2  both being on the page.
3      + MS. GEMAN: Move to strike as not
4  being responsive.
5      Counsel, we'd ask for production of
6  comp. reports if we don't already have all
7  of them and also for the documents that
8  reflect the indicators for outliers of the
9  Securities Division compensation committee
10  meetings each year.
11      Q.  You may have said this before
12  Ms. Heller, but who creates -- who on the
13  business side creates what the potential
14  outliers are?
15      MS. SULLIVAN: Objection.
16      Q.  I know you may have answered this
17  before, but if you could tell me again.
18      MS. SULLIVAN: Objection, vague.
19      Q.  You know, who decides on what comp.
20  reports should be run and what materials are in
21  them?
22      A.  That would be a discussion we'd
23  have with the chief operating officer, chief
24  financial officer of the Securities Division.
25      Q.  Are any comp. reports run typically

Page 49

1  after round two? We've been discussing about
2  round one.
3      A.  Yes, we would produce some comp.
4  reports for round two.
5      Q.  Okay. What types of comp. reports
6  are produced for round two?
7      A.  Similar to what was produced for
8  round one and if there were any -- yeah,
9  similar to what was produced for round one.
10      Q.  Okay. And to your knowledge does
11  the comp. committee look at diversity
12  information in the rounds process?
13      MS. SULLIVAN: Objection, vague.
14      A.  Can you clarify what you mean by
15  "diversity"?
16      Q.  Sure, sure. Does the committee
17  look at whether there is -- you know, for
18  example more women than men are negatively
19  impacted by the rounds process, for example?
20      MS. SULLIVAN: Objection, vague.
21      A.  Can you clarify specifically what
22  you mean?
23      Q.  Sure. Does the committee look
24  generally at whether the comp. process is fair
25  to women?

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 16 – TRANSCRIPT OF THE DEPOSITION OF CAROLINE HELLER SBERLOTI
DATED JULY 10, 2013
(PAGES 50-53)**

**FILED UNDER SEAL**

Deposition of Caroline Heller Sberloti                                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 54



REDACTED FILED UNDER SEAL

Page 56

you just asked?

Q.    Sure.  Does anybody, to your
knowledge, monitor the compensation decisions
in the Securities Division to gauge whether
women have been treated fairly in the process?

MS. SULLIVAN:  Same objection.
It's vague.  It's been asked and answered.

A.    So, with regard to that specific
question, I believe we're talking about a
privileged process.

Q.    If you can answer yes or no, go
ahead.

MS. SULLIVAN:  You can answer yes
or no, but if there's anything else that's
regarding a privileged process, we're going
to cut it off right there.

A.    So, I believe the Employment Law
Group is involved in that process.

Q.    Have you had any involvement
personally in that process?

MS. SULLIVAN:  I'm going to
instruct the witness not to answer about
your involvement with the Employment Law
Group.

Q.    You can answer yes or no.

Page 55

REDACTED FILED UNDER SEAL

Page 57

MS. SULLIVAN:  You can answer yes
or no and that's it.

A.    Yes.

MS. SULLIVAN:  Counsel we've been
going for about an hour, so we'd like to
take a break.

MS. GEMAN:  Sure.

(Recess taken.)

Q.    So, to back up a little bit, who in
addition to the -- who presently is on the
comp. committee by position?

A.    They're the individuals who run the
various business units.

Q.    As well as certain HCM personnel?

MS. SULLIVAN:  Objection,
mischaracterizing her testimony.

A.    The individuals who run the
business units sit on the comp. committee.  The
division heads also sit on the comp. committee.
The COO sits on the comp. committee and the
CFO.  Linda Fox, or whoever the head of HR is,
was present and other members of HCM might be
in the room for -- as well as the finance team
to help, you know, answer questions.

Q.    But they're not members?

Deposition of Caroline Heller Sberloti                                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 58

1     A.     No.
2     Q.     Okay.  Has the composition of who's
3  on the comp. committee by position as distinct
4  from the individual names changed in the period
5  2000 to the present?
6     A.     Can you clarify by position as
7  distinct from --
8     Q.     Obviously I'm sure there's been
9  some turnover in actual people, but I'm asking
10 has it been the case since 2000 that the comp.
11 committee for Securities consists of the heads
12 of business units, the division heads, the COO,
13 the CFO and the head of HCM for the Securities
14 Division?
15    A.     So --
16        MS. SULLIVAN:  Objection,
17 mischaracterizing the testimony.
18    A.     There was a period of time that
19 was -- there was a FICC committee and an
20 equities committee and actually even after the
21 divisions came together, there has been periods
22 of time when there was a FICC committee and an
23 equities committee, not a combined Securities
24 comp. committee but the individuals running the
25 business units would be the people on the

Page 60

REDACTED FILED UNDER SEAL

Page 59

REDACTED FILED UNDER SEAL

Page 61

REDACTED FILED UNDER SEAL

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 16 – TRANSCRIPT OF THE DEPOSITION OF CAROLINE HELLER SBERLOTI
DATED JULY 10, 2013
(PAGES 62-77)**

**FILED UNDER SEAL**

Page 78

1    MS. SULLIVAN:  Objection, vague.
2    A.    So, for traders, production would
3  refer to their P&L and for salespeople it would
4  refer to sales credits.
5    Q.    What about for strategists or
6  researchers?
7    A.    Some of those groups don't have any
8  production associated with their names.
9    Q.    And would you say about what --
10  about what percent of the Securities Division
11  employees at the associate and VP level are
12  sales or traders?
13    A.    Can you clarify what you mean?
14    Q.    Sure.  Of the associate level and
15  vice president level employees in the
16  Securities Division, about what percent are in
17  sales or trading positions as distinct from
18  strategy or research positions?
19    MS. SULLIVAN:  I'm going to object
20  as vague and compound.
21    A.    I'm going to ballpark it, 70
22  percent.
23    Q.    And of the remaining approximately
24  30 percent, would you say, how are they
25  divided?

Page 79

1    A.    Maybe 20 percent in -- or 15
2  percent in strats and 5 percent in prime
3  brokerage kind of roles, 5 percent in
4  management or administration.
5    Q.    And for those in prime brokerage
6  roles, what's the key performance metric, if
7  any?
8    A.    So some of the -- this is where it
9  gets complicated.  Some of the prime brokerage
10  folks are salespeople, so they would have sales
11  credits.  Some of them are securities lending
12  traders so they would have trading and then a
13  smaller subset would fall into groups such as
14  capital introductions or other things where
15  they wouldn't have a specific P&L metrics.
16    Q.    Would they have any performance
17  metrics?
18    A.    Everybody has the 360 review and
19  the manager quartile and then there would be
20  metrics that a business could decide to look
21  at.  So in terms of -- you know, as an example,
22  capital introductions is a business where you
23  introduce investors to hedge funds looking to
24  raise money.  So they would evaluate the
25  quality of their relationships or the feedback

Page 80

1  they've gotten from clients or different
2  business metrics like those.  We didn't cover
3  investing which would be another bucket.  So if
4  you want to slice a small percentage off the 70
5  and put those into investing roles, and those
6  people would also have P&L information.
7    Q.    That's revenue-producing
8  information?
9    A.    Yes.
10    Q.    Okay.  We'll come back to that.  Is
11  the executive committee, the
12  executive/compensation committee, the committee
13  that handles promotions from the vice president
14  at the MD level?
15    MS. SULLIVAN:  Objection, vague.
16    A.    The promotions from vice president
17  to MD are not, I guess, handled by a committee.
18    Q.    Okay.
19    A.    The -- there's a process.
20    Q.    Is there any promotions committee?
21    A.    There's a cross-ruffing team.
22    Q.    And does the executive committee
23  address or have responsibility for the
24  performance, the FRS system or the performance
25  evaluation?

Page 81

1    MS. SULLIVAN:  Objection, vague.
2    A.    HCM facilitates the process of FRS.
3  I'm not sure -- can you clarify what you mean
4  if they have responsibility for the system?
5    Q.    Well, I can ask the question a
6  different way.  Are there any Securities
7  Division-specific policies relating to the
8  firm-wide review system?
9    MS. SULLIVAN:  Objection, vague.
10    A.    So there are nuances, small nuances
11  in the FRS system that can vary by division and
12  I don't think we'd get those approved at the
13  executive committee level.  We might discuss
14  them with the COO or other business heads to
15  get a feeling, but there's not a formal process
16  for the executive committee or compensation
17  committee to get involved in the system details
18  of FRS.
19    Q.    And even beyond, literally, the
20  system like who inputs what and what the
21  screens look like or what have you, is the
22  executive committee in the Securities Division
23  involved in setting policy for performance
24  reviews?
25    MS. SULLIVAN:  Objection, vague.

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 16 – TRANSCRIPT OF THE DEPOSITION OF CAROLINE HELLER SBERLOTI
DATED JULY 10, 2013
(PAGES 82-101)**

**FILED UNDER SEAL**

Deposition of Caroline Heller Sberloti — CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 102

REDACTED FILED UNDER SEAL

Page 104

REDACTED FILED UNDER SEAL

Page 103

REDACTED FILED UNDER SEAL

Page 105

person's forward or ability to do other things.

Q.    And has the company conducted any more formalized or systematic studies about the extent to which managers' predictions about potential are borne out?

MS. SULLIVAN:  Objection, vague.

A.    So, the success of a manager, right, or an individual unit kind of speaks for itself.  If a manager does a good job in identifying high-potential talent, how good a job they're doing as a manager, how good those individuals are doing that they identified as high potential would all demonstrate that a business or a manager or set of managers are doing a good job --

Q.    I guess --

A.    **-- assessing the right things.**

Q.    Other than things that you considered to speak for themselves, have there been any specific studies, to your knowledge, that Goldman Sachs either firm-wide or at the division level has conducted to look at manager's use of potential as a metric in quartiling?

MS. SULLIVAN:  Objection, vague and

Page 106

1  asked and answered.
2      A.    Again, I think it -- -- I do think
3  it sort of speaks for itself that the manager's
4  ability to be a good manager, to identify and
5  develop talent and to build businesses does
6  speak for itself when those businesses or those
7  individuals are successful, and not always
8  specific analysis, but I think it bears itself
9  out in the performances of those businesses or
10 those individuals.
11     Q.    At any point between 2000 and the
12 present, have there been requirements in the
13 Securities Division that limit the extent to
14 which a quartile rank can deviate from the 360
15 review?
16         MS. SULLIVAN:  Objection, vague.
17     A.    So, per our previous conversation,
18 there are -- that information is all present
19 when people are making quartiling or pay
20 decisions, so they would beg a question.  It
21 would be a factor, people would consider it.
22     Q.    But have there been any kind of
23 formal requirements about the degree to which a
24 quartile rank can differ from the performance
25 reviews?

Page 107

1         MS. SULLIVAN:  Objection, vague.
2      A.    I'm not aware of any specific
3  guidelines that we put out.  I'm aware that
4  those things were available and considered
5  during the time that quartiles were set or pay
6  was set.
7      Q.    So after the meeting with the
8  business unit leaders the quartiles are set; is
9  that right?  Or, I'm sorry, you said they were
10 set going into the meeting?
11     **A.    Which meeting?**
12     Q.    The meeting at which the quartile
13 decisions are discussed, you know, the meetings
14 at which the quartiling files are generated
15 for.
16     **A.    Sure.  They'll decide on a quartile**
17 **there.**
18     Q.    Coming out of that meeting?
19     **A.    Yes.**
20     Q.    And under what circumstances can
21 the quartile rank be changed?
22         MS. SULLIVAN:  Objection, vague.
23     A.    So, if a business head disagrees
24 with the assessment of somebody's performance,
25 he or she can discuss it with the manager again

Page 108

1  and revisit it.  If an overall business unit
2  wasn't as disciplined in thinking about its
3  buckets, it may go back and suggest -- you
4  know, the leader may go back and suggest that
5  they revisit in certain pockets because they
6  weren't as disciplined as in other pockets.
7      Q.    By that you mean they didn't
8  properly bucket so you might have 26 percent in
9  one?
10     **A.    Exactly.**
11     Q.    And so just so I understand though,
12 what documents, if any, reflect changes in the
13 quartile rank from before the quartiling
14 meeting and after it?
15         MS. SULLIVAN:  Objection, vague.
16     A.    The quartiling document we provide
17 doesn't have quartiles.  It's just a list of
18 people have to quartile and what they give back
19 to us would have the quartiles.
20     Q.    And so then those quartiles would
21 be input?
22     **A.    Into CRS.**
23     Q.    And if those quartiles are changed
24 the CRS reflects that?
25     **A.    Exactly.**

Page 109

REDACTED FILED UNDER SEAL

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 16 – TRANSCRIPT OF THE DEPOSITION OF CAROLINE HELLER SBERLOTI
DATED JULY 10, 2013
(PAGES 110-125)**

**FILED UNDER SEAL**

Deposition of Caroline Heller Sberloti

CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 126



REDACTED FILED UNDER SEAL

Page 128

'06.

Q.     Was there guidance given in this year, 2009, about how managers were to factor in individual performance in making compensation recommendations?

MS. SULLIVAN:  Objection, vague.

A.     The guidance about making and factoring in individual performance is consistent every single year.  It should always be factored in and, you know, firm performance, business performance, individual performance, are always factors.

Q.     Okay.  So the reference to "no specific guidance is limited to the business allocation" --

**A.     Guidance in the context of this e-mail means allocation.  We won't give you a dollar amount.**

Q.     And other than the fact that in, I guess at least one year, there was no business amount given, can you think of other changes to the round one compensation recommendations between 2000 and 2012?

MS. SULLIVAN:  Objection, vague.

A.     What kind of differences?

Page 127

**A.     I honestly don't -- I don't recall for each individual year.  Most often there are allocations given by business unit.  So most often it would not be bottoms up.  I hear this is pretty unusual, but there may have been other occasions when it was bottoms up.**

Q.     Was it sort of an experiment to see if it worked?

**A.     I think in the case of 2009, given the very strong performance of the firm and the robust competitive market environment they thought there would be a lot of information value in hearing from managers what they felt they needed to pay their people.**

Q.     Do you know for years '10, '11 and '12 were they bottom up exercises?

**A.     '10, '11 and '12 were all business allocations dollar amounts given to all businesses.**

Q.     And I assume 2008 was an allocation year?

**A.     Yes.**

Q.     Do you remember about 2007 and 2006?

**A.     I don't specifically recall '07 and**

Page 129

Q.     You know, differences in inputs, for example.  Differences in how managers were to make compensation recommendations.

**A.     So, the firm performance, business unit performance, individual performance has always been consistent.  Business metric and individual metric have always been the important inputs and that's consistent.**

Q.     And before the formalization in 2011 or so, what documents, if any, in the Securities Division set forth the performance metrics?

MS. SULLIVAN:  Objection, vague.

A.     Could you clarify what you mean?

Q.     Well, you just used -- business metric and individual metric have always been important inputs and that's consistent.  So can you clarify what you mean by "individual metric"?

**A.     So, the quartile and the review data has always been available to the managers and the business information, production information, et cetera has always been available to the managers.**

Q.     So what do you mean by "business

Case 1:10-cv-06950-AT-RWL   Document 265-26   Filed 07/25/14   Page 23 of 38

Deposition of Caroline Heller Sberloti                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 130

1  information has always been available to the
2  managers"?
3     **A.     Production information by**
4  **individual as well as business information**
5  **about how a business performs, so how a**
6  **business unit performed over a business cycle,**
7  **the relevant information you'd use to run a**
8  **business.**
9     Q.     And when you say the business unit
10  information was available to the manager, it
11  was made available in what form; CRS, was it in
12  a separate memo, something else?
13        MS. SULLIVAN:  Objection, vague and
14     asked and answered.
15     A.     Production information for
16  individuals?
17     Q.     No, I'm talking about the business
18  aspect.
19     **A.     So, the business metrics or**
20  **information I was talking about includes**
21  **production information like P&L for an**
22  **individual, that would have been available to**
23  **the managers that is housed in CRS and also the**
24  **franchise managers have it in a host of**
25  **different places.**

Page 132

REDACTED FILED UNDER SEAL

Page 131

REDACTED FILED UNDER SEAL

Page 133

REDACTED FILED UNDER SEAL

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 16 – TRANSCRIPT OF THE DEPOSITION OF CAROLINE HELLER SBERLOTI
DATED JULY 10, 2013
(PAGES 134-157)**


**FILED UNDER SEAL**

Page 158

1  Q.    And some of them might be factored
2  into the performance review?
3  A.    Can you --
4  Q.    If a manager wants to understand
5  how to quantify difficulty of seat, to use an
6  example we talked about before, what material
7  explain to him or her how to do that?
8      MS. SULLIVAN:  Objection, vague.
9  Q.    If you turn to the next page, I'm
10 continuing down the individual metrics.
11 **A.    Yes, sorry.**
12 Q.    That's fine.
13 **A.    So under the "Other Considerations"**
14 **bucket, there's a comment on difficulty of**
15 **seat.  Managers who make compensation**
16 **recommendations sit closely -- you know, have**
17 **an intimate knowledge of what people are**
18 **working on and intimate understanding of the**
19 **difficulty of the seat.**
20     **So -- and depending on your role,**
21 **there would be a number of different factors**
22 **that would be relevant for difficulty of seat.**
23 **If you're a salesperson versus a trader versus**
24 **a strat, the things that made your seat**
25 **particularly difficult would be different.**

Page 159

1  Q.    Are there documents that set forth
2  those different factors and how to weigh them,
3  if you know?
4      MS. SULLIVAN:  Objection, asked and
5  answered, vague.
6  A.    All the metrics that are relevant
7  are available.  The determination of which ones
8  you would consider would be based on your role
9  or your seat or your manager's understanding of
10 what you worked on that year.
11 Q.    And do you know if there's any
12 document that sets forth specifically what
13 difficulty of seat is?
14     MS. SULLIVAN:  Same objection.
15 A.    I think difficulty of seat is an
16 understood concept.  It's not particularly
17 complicated.
18 Q.    So the answer is you don't know of
19 specific materials that explicitly lay that
20 out?
21 **A.    This is a written material that**
22 **says it should be -- that it's another**
23 **consideration.**
24 Q.    No, I'm asking about materials that
25 describe how to assess the difficulty.

Page 160

1  **A.    And I guess I'm saying that the**
2  **assessment of the difficulty of seat is --**
3  **depends based on the individual's role and on**
4  **this document there are a number of metrics**
5  **that would be relevant depending on your role**
6  **that would contribute to the difficulty of**
7  **seat.**
8  Q.    But no separate document that sets
9  forth those metrics specifically?
10 **A.    Not separate from those other**
11 **things I just described.**
12 Q.    Before 2011, were there any -- does
13 this refresh your recollection as to whether
14 any documents existed before 2011 that formally
15 defined the key metrics?
16     MS. SULLIVAN:  Objection, vague,
17     asked and answered.
18 A.    Does what --
19 Q.    Does this document, which contains
20 definitions of key metrics, refresh your
21 recollection as to whether there were previous
22 documents that contained written definitions of
23 the metrics as were used before 2011?
24 **A.    So, the metrics were documented**
25 **before 2011.  They existed places and they were**

Page 161

1  **present at the meetings we discussed where**
2  **compensation decisions were made.  This**
3  **document memorializes the practice that**
4  **existed, so the metrics existed and were**
5  **documented.**
6      **I'm not necessarily familiar with a**
7  **document that laid out the definitions of the**
8  **metrics, but the metrics were provided and**
9  **documented.**
10 Q.    So you'd never seen a document
11 actually defining them until -- until 2011?
12     MS. SULLIVAN:  Objection, asked and
13     answered.
14 A.    I may have seen documents where
15 metrics were discussed or included in relation
16 to compensation decisions, but not a list of
17 definitions.
18 Q.    Okay.  And has there been any
19 enhanced monitoring since 2011 to look at how
20 managers are applying these metrics in making
21 compensation decisions?
22     MS. SULLIVAN:  Objection, vague.
23 A.    The practice remains consistent and
24 the discussion around the metrics continues to
25 happen.  The key difference is it's been

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 16 - TRANSCRIPT OF THE DEPOSITION OF CAROLINE HELLER SBERLOTI
DATED JULY 10, 2013
(PAGES 162-201)**

**FILED UNDER SEAL**

Deposition of Caroline Heller Sberloti                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 202

REDACTED FILED UNDER SEAL

Page 204

Q.    So can people go directly from vice
president to PMD?

A.    No.

Q.    So talking only then about the
promotion from vice president to EMD or MD.  So
you said it starts when the business unit heads
are asked for a list of candidates by HCM?

A.    Yes.

Q.    What happens next?

A.    They'll come back to us -- they'll
meet with their manager similar to the process
we described with quartiling and with comp.
They'll talk to the managers in their business
unit and come up with a list of candidates.

Q.    Are there any limits on how many
candidates they're permitted to have on their
list?

A.    So, there's some discussion at the
executive committee level where all of these
business unit heads will be present, just about
being thoughtful and disciplined on how many
people you put up and thinking about the
percent of your population that should be a
managing director, but there's not express
limits by business units set.

Page 203

career development.

Q.    Can you outline for me at a high
level how the promotion process in the
Securities Division from vice president to
managing director?

A.    Sure.

MS. SULLIVAN:  That was a little
bit of an incomplete question so I'm just
going to object on vagueness.

Q.    Can you outline for me at a high
level the promotion process in the Securities
Division from vice president to managing
director?

A.    The business unit heads are asked
for a list of candidates.  It's kind of the
first step.

Q.    Asked by whom?

A.    By divisional HCMs, by my team.

Q.    And in the Securities Division do
you have extended managing director or
participating managing director?

A.    So, extended managing directors we
refer to as managing directors or EMDs and then
partners or participating managing directors
are the same thing.

Page 205

Q.    And are there written documents
that accompany your request to the -- "your"
meaning HCMs request to the business unit
leaders that contain those guidelines on number
of candidates?

A.    We don't have guidelines on number
of candidates.

Q.    I mean, what you've just outlined
about being thoughtful.

MS. SULLIVAN:  Objection, vague.

A.    There's no document sent to
managers with guidelines on numbers.

Q.    And the communication for the list
of candidates, is that a written communication?

A.    It may vary, but it could come in
the form of writing in asking for names backed
by a deadline.

Q.    And so then you said the business
unit leaders meet with the managers to come up
with a list of candidates, and then what
happens?

A.    That list of candidates will be
submitted to my team, Securities Division HCM.

Q.    Are there any minimum eligibility
requirements for candidates, like for example

Page 206

1  you had to have been a VP for X years?
2      A.    For the Securities Division it's
3  around typically two years is the minimum.
4      Q.    Is that guideline written?
5      A.    I don't believe so.
6      Q.    How do you know it's two years?
7      A.    I've been involved -- just based on
8  my involvement in the process.  We look at --
9  when the names come back, we'd look at VP or
10 look at all of those things and then we'd --
11     Q.    What other things would you look
12 at -- well, let me rephrase.  Are there other
13 minimum qualifications for nomination other
14 than having been a VP for two years?
15     A.    The other -- there's not minimum
16 requirements.  The criteria of things we're
17 interested in are people who demonstrate good,
18 strong commercial productivity, leadership
19 culture and values.  We would look at your
20 quartile.
21     Q.    That's helpful, but I want to be
22 clear.  I'm asking specifically about are
23 there -- other than having been a VP for two
24 years, are there other minimum qualifications?
25     A.    No.

Page 207

1      Q.    Okay.  So you get your list -- HCM
2  gets the lists from the business units and then
3  what happens?
4      A.    HCM will review the list at an
5  aggregate level and share it with the executive
6  committee at an aggregate level.
7      Q.    What do you mean by, at an
8  aggregate level?  You'll combine all the lists?
9      A.    We'll combine all the lists into
10 one and we'll share some high level stats.
11     Q.    High level stats about each
12 candidate?
13     A.    That information might be in the
14 backdrop which would include quartile, but the
15 main stats that they'd be thinking about were
16 aggregate stats.  So how many candidates by
17 business unit or how many candidates this year
18 versus last year total for the division and we
19 would also look at gender.
20     Q.    So that information would be
21 provided to the executive committee, the list
22 of names and the high level stats?
23     A.    Yes.
24     Q.    Is anything else provided to the
25 executive committee at that point?

Page 208

1      A.    Nothing besides what I referenced
2  comes to mind.
3      Q.    Okay.  So then what happens?
4      A.    The executive committee would have
5  a discussion about if the aggregate information
6  looked appropriate for the division.  So do we
7  want to be considering more or less candidates
8  overall than last year, does any business unit
9  have more or less candidates than they did the
10 year before, that the percent of managing
11 directors already looked very high in their
12 business unit, did they lose a lot of managing
13 directors or hire a lot of managing directors
14 in the past year and we would also look at
15 gender and diversity in that overlay.
16     Q.    So what do you mean by the overlay
17 between gender and diversity?
18     A.    Are you just asking what I mean by
19 what I said?
20     Q.    Yeah.
21     A.    We'd look at the number -- the
22 percent of women on the cross-ruffing list and
23 see -- we'd like it to be consistent or
24 increasing over time.
25     Q.    So, the steps as you've outlined so

Page 209

1  far have they been consistent from 2000 to
2  2012?
3      A.    I believe so, yes.
4      Q.    Okay.  Will the HCM provide any of
5  its own annotation to the executive committee
6  about the statistics?
7          MS. SULLIVAN:  Objection, vague.
8      Q.    In addition to providing the high
9  level stats, do you characterize them or say,
10 you know, hey FYI, we have fewer women than
11 last year as a percentage of overall or
12 anything like that, or more women, whatever?
13     A.    It would be evident from the stats
14 and there's a high degree of focus from
15 business leaders on those stats.  So I think
16 there's a universal agreement that that's what
17 we're -- you know, we all have the same goal.
18     Q.    Was there -- if you know, how did
19 it come about that the gender information was
20 included in these high level stats along with
21 related statistics about women's participation
22 at the MD level?
23     A.    Can you clarify that?
24     Q.    Yeah, I mean, how did it come about
25 that this gender information was included among

Deposition of Caroline Heller Sberloti                                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 210

1 these small number of high level stats provided
2 to the executive committee?
3     A.    So, I think diversity is a firm
4 business, you know, firm business principle.
5 It's important to the senior leadership of the
6 firm and of the division.  So it's a relevant
7 consideration as we try and increase the number
8 of women in leadership.
9     Q.    Who decided to start including
10 women -- gender information in these high level
11 stats?  Do you know, was it the Securities
12 Division or the firm?
13     A.    I would assume it's the Securities
14 Division because the firm doesn't inform the
15 stats that we prepare.
16     Q.    And do the documents that HCM
17 presents to the executive committee, you know,
18 the list and the high level stats, do those
19 have a name?
20     A.    No.  I mean it would be the -- no.
21     Q.    And then what happens?
22     A.    If the executive committee has any
23 feedback related to the stuff we discussed
24 about too many candidates this year versus last
25 year, not enough, too many by business units,

Page 211

1 they'd give that feedback to the business units
2 in the room and they would go back and meet
3 with their business managers and make some
4 changes to the list which would get submitted
5 to us again in HCM.
6     Q.    And do you know if those
7 discussions within the executive committee
8 about the initial list, are those written?
9     A.    They're not documented, no.
10     Q.    So do any documents come out of
11 those meetings?
12     A.    No, they just look at the documents
13 we provide.
14     Q.    Okay.  And, so, the next thing --
15 then the business unit leaders meet with their
16 managers and then a new list is provided to
17 HCM?
18     A.    Yes.
19     Q.    And then what happens?
20     A.    Whatever deadline is set by the
21 firm, we'll submit our list of candidates to
22 the firm.
23         (Recess taken.)
24     Q.    When we last left off, you
25 testified that HCM then submitted the candidate

Page 212

1 list to the firm.  To whom at the firm?
2     A.    Within HCM that's a Talent
3 Assessment Group.
4     Q.    What happens there?
5     A.    The -- if you backtrack a little
6 bit, before we submit -- before we collate and
7 submit the candidate list, the divisions pick a
8 cross-ruffing team in Securities.  We have one
9 FICC team and one Equities team.
10     Q.    So you pick the teams at the same
11 time that you're gathering the list to send to
12 TAG, Talent Assessment Group?
13     A.    Typically we pick the cross-ruffing
14 list before we collate the candidates.  Maybe I
15 should have said that first.
16     Q.    So the list that you submit to TAG
17 is both a list of candidates and a list of
18 cross-ruffers?
19     A.    And I believe we typically submit
20 the cross-ruffers before we submit the
21 candidates.
22     Q.    So that the number of candidates --
23 you put forward every candidate that came out
24 of the second round essentially.  The list of
25 candidates doesn't go back to the executive

Page 213

1 committee?
2         MS. SULLIVAN:  Objection, vague.
3     A.    They'll see it, but there's usually
4 only one turn.
5     Q.    And so the list of -- so the list
6 of candidates are sent to TAG.  Previous to
7 that, HCM has sent a cross-ruffing team for
8 FICC and for Equities to TAG?
9     A.    And then cross-ruffer list is
10 decided on with HCM and the division heads and
11 the executive committee.  So it's an executive
12 decision who the cross-ruffers will be.
13     Q.    Is that a separate meeting than the
14 one that lists the list of candidates?
15     A.    Yes.
16     Q.    Which meeting happens first, the
17 meeting about the candidates or the meeting
18 about the cross-ruffers?
19     A.    The meeting about the
20 cross-ruffers.
21     Q.    And could you please describe who
22 the cross-ruffers are in terms of their
23 functions?
24         MS. SULLIVAN:  Vague.
25     Q.    What is the meaning of

Page 214

1  cross-ruffing in the Securities Division?
2      A.    It's the group of
3  selected cross-ruffers undergo to evaluate the
4  candidates put forth for managing director.
5      Q.    The cross-ruffers are those with
6  responsibility for evaluating the candidates
7  for promotion?
8      A.    Yes.
9      Q.    And what are the criteria to select
10  the cross-ruffers?
11      A.    So, in the Securities Division, we
12  consider managing directors or partners. We're
13  typically looking at people who haven't done it
14  in the past two years because it's a big time
15  commitment. You should be high performing and
16  then we look for a diversified mix on the team
17  across region, function, gender, background.
18      Q.    And is there someone who has
19  responsibility to put together an initial list
20  of proposed cross-ruffers that gets discussed
21  at those meetings with the executive committee
22  and the business unit leaders?
23      A.    HCM, my team, would put together an
24  initial long list. We'd probably -- in that
25  process we'd take suggestions from a lot of

Page 215

1  difference business heads and franchise
2  managers. We'd share the long list with the
3  COO and the division heads and get their
4  reaction.
5      Q.    And how many cross-ruffers are
6  there for each division within Securities?
7      A.    Somewhere between 10 and 13 between
8  the division. That's global so it would depend
9  on how many people are in the Americas.
10      Q.    About how many?
11      A.    Six.
12      Q.    And do the people in the Americas
13  cross-ruff the U.S. candidates or is it --
14      A.    No, it's a global process.
15      Q.    So you'd be cross-ruffed by
16  everybody?
17          MS. SULLIVAN: Objection.
18      Q.    In other words, you the candidate
19  for the MD position would -- in the FICC
20  division, would be cross-ruffed by all 13 of
21  those people?
22      A.    We typically assign a subset of the
23  candidates to an individual cross-ruffer, but
24  you're not assigned based on your region.
25      Q.    So now the TAG has the

Page 216

1  cross-ruffing list and the candidate list.
2  What happens then?
3      A.    The Securities Division
4  cross-ruffers would begin meeting. The FICC
5  teams and Equities teams meet separately.
6      Q.    Does the TAG have any discretion in
7  changing the cross-ruffing list or changing the
8  candidate list?
9      A.    I can't think of examples of --
10  well, TAG doesn't have any discretion. They
11  may share it with the head of HR or other
12  people for the whole firm. I can't think of
13  examples where the candidate list has been
14  changed. They may make additional suggestions
15  to who's on the cross-ruffing team.
16      Q.    Do you know based on what criteria
17  they used to make additional suggestions on the
18  cross-ruffing team?
19      A.    Typically based on regional or
20  diversity or business representation, so to
21  ensure a diversified representation of people
22  on the cross-ruffing teams.
23      Q.    And can you think of specific
24  examples where it's been communicated to
25  Securities by the firm that there should be

Page 217

1  more gender diversity in the cross-ruffing
2  team?
3          MS. SULLIVAN: Objection, vague.
4      A.    I cannot.
5      Q.    I assume there's been no
6  communication that there should be less gender
7  diversity?
8      A.    I'm certain that that has not been
9  the case. But we -- I can speak from the
10  period 2005 to present, there have been --
11  we've ensured gender diversity and ethnic
12  diversity on the teams.
13      Q.    In the same way that you prepare
14  materials about the candidates for the meeting
15  with the executive committee, does HCM prepare
16  materials about the long list of cross-ruffers
17  for the executive committee?
18          MS. SULLIVAN: Objection, vague.
19      A.    We would definitely have a list of
20  people because it's such a short list, I'm not
21  sure how many statistics we would prepare, but
22  they would see a roster of names.
23      Q.    Do they see anything other than
24  name?
25      A.    They would see region, business

Deposition of Caroline Heller Sberloti                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 218

1  unit, function MD
2      Q.    Title and gender?
3      A.    They would know the gender of the
4  individuals.
5      Q.    All right.  So then you said the
6  cross-ruffer teams meet?
7      A.    Yes.
8      Q.    And so then what happens then?
9      A.    The FICC teams and Equity teams
10  meet separately.  We've assigned the captain.
11  Each team has a captain.  The captain, in
12  conjunction with HCM, would assign candidates
13  to individuals cross-ruffers.
14      Q.    And then what happens?
15      A.    The cross-ruffers would conduct
16  interviews on the candidates that are assigned
17  to them with the managing directors and
18  partners that have interaction with that
19  candidate and knowledge of their activities.
20      Q.    And they don't interview the
21  candidate him or herself; correct?
22      A.    Correct.
23      Q.    Are there any guidelines or
24  template questions that the cross-ruffers use
25  in their interviews with the managing directors

Page 219

1  and partners who have worked with a candidate?
2          MS. SULLIVAN:  Objection, vague.
3      A.    The cross-ruffers attend a
4  cross-ruffing best practices workshop and they
5  also use a questionnaire.
6      Q.    And the cross-ruffing best
7  practices workshop is the TAG sponsored
8  workshop; correct?
9      A.    Correct.  We also have a Securities
10  Division, like, kickoff meeting with each team
11  where the captain and HCM would talk about best
12  practices that are more specific to Securities.
13      Q.    Are there written documents that
14  are associated with that Securities Division
15  meeting, either materials provided to the
16  attendees or generated by the meeting?
17      A.    We would share the questionnaire
18  form and we would -- that would sort of talk
19  about the criteria because they're consistent
20  with the questions you ask.  There's some other
21  administrative stuff that we'd help with, like
22  I think we have a guide for how your assistant
23  should schedule your meetings, things along
24  those lines.
25      Q.    And who makes the questionnaire,

Page 220

1  the Securities Division or the firm-wide?
2      A.    There used to be a Securities
3  Division-specific questionnaire.  There's now a
4  firm-wide questionnaire, but the detail and
5  nuance you would collect would be really
6  specific to Securities.  We also provide for
7  Security specific information on the
8  candidates.
9      Q.    Is that information conveyed during
10  the kickoff meeting?
11      A.    Or subsequent meetings depending on
12  timing.
13      Q.    And, so, when did the firm-wide
14  questionnaire come into effect?
15      A.    I want to say 2010, 2011.  I'm not
16  sure.
17          MS. GEMAN:  Counsel, do you know if
18  you've produced the division specific
19  questionnaire and the firm-wide
20  questionnaire.
21          MS. SULLIVAN:  I'd have to check.
22      + MS. SULLIVAN:  We'd ask for the
23  production of those materials if they
24  haven't already been produced.  And also
25  for the packet of materials given by HCM to

Page 221

1  the executive committee in connection with
2  the candidates?
3          MS. SULLIVAN:  I don't know that
4  there was testimony on a packet of
5  materials, but I can look back at the
6  transcript.
7          MS. GEMAN:  Yeah.  I mean, there
8  was a discussion of names plus high level
9  statistics.
10      Q.    Do you have a flavor for what --
11  how long is the questionnaire?
12      A.    I believe it's two pages.
13      Q.    Are the cross-ruffers given any
14  training about interviewing techniques?
15      A.    They're told things like the
16  information you discuss is confidential.  You
17  should be probing.  Much of that would be
18  discussed at the cross-ruffing best practices
19  workshop.
20      Q.    Is that attended by people across
21  divisions?
22      A.    Yes.
23      Q.    Okay.  And then what happens?  So
24  there's the kickoff meeting, the cross-ruffers
25  are given the questionnaire and either at that

1  meeting or subsequent meeting they're given
2  production information.  What other information
3  are the cross-ruffers given about the
4  candidates?
5      **A.      They're given their quartile and**
6  **their 360 review for the past two years.**
7      Q.      And over what period of time is
8  production information given?
9      **A.      I believe they're given the prior**
10  **year and year-to-date for that year.**
11     Q.      Okay.  And what about comp.
12  information?
13     **A.      No comp. information.**
14     Q.      For the employees -- for the vice
15  presidents in the Securities Division who don't
16  have production information like the strats, is
17  anything given in its place?
18     **A.      We also give a role description as**
19  **collected from the manager and some managers**
20  **may include in that role description discussion**
21  **about their contribution to the -- their**
22  **contribution to the P&L of the given unit.**
23     Q.      But there's no metric or
24  productivity metric automatically given like
25  desk performance or something?

REDACTED FILED UNDER SEAL

REDACTED FILED UNDER SEAL

REDACTED FILED UNDER SEAL

 CONFIDENTIAL

Deposition of Caroline Heller Sberloti                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 226

REDACTED FILED UNDER SEAL

Page 228

1 make a recommendation of where they would draw
2 the line.
3     Q.    So what criteria informs where they
4 would draw the line; is it the business needs
5 of how many MDs or at what level is somebody
6 just not ready?
7         MS. SULLIVAN:  Objection, vague and
8   compound.
9     Q.    Or something else?
10     A.    There would be a number of factors
11 that inform their decision.  A lot of it would
12 be based on the quality of the candidates and
13 at what point they thought the line should be
14 drawn.
15     Q.    And if somebody is passed over one
16 year, are they automatically considered the
17 next or do they have to be renominated?
18     A.    They are often reconsidered but
19 they would have to be renominated.
20     Q.    What information, if any, is the
21 executive office provided about the candidates?
22     A.    So the cross-ruffers provide the
23 list of candidates ranked 1 through N and then
24 they also provide a one-page summary on each
25 individual candidate.

Page 227

1     Q.    And then what happens?
2     A.    And the cross-ruffing team shared
3 their views with the executive office at the
4 meeting.
5     Q.    And then who makes the division?
6     A.    The next step in the process is
7 that the division heads would meet with the
8 executive office -- I guess the -- if I take a
9 step back, the cross-ruffing team's information
10 is also shared with the Securities Division
11 executive committee and the division heads
12 within the division.
13     Q.    And then what happens?
14     A.    The executive committee and the
15 division heads would think about if there's any
16 places where they may have a different view
17 from the cross-ruffing team.
18     Q.    Different view on ranking?
19     A.    Ranking or how many candidates they
20 would propose promoting or on the ranking.
21     Q.    So do the cross-ruffers -- when you
22 say 1 to N, I assume N was the number of people
23 being cross-ruffed?
24     A.    Typically they rank them 1 to N and
25 they might also -- they're usually asked to

Page 229

1     Q.    You said following the meeting with
2 the executive office, the executive office
3 might have input as to whether there should be
4 fewer candidates or what the right number of
5 promotions there should be?
6         MS. SULLIVAN:  Objection misstates
7   prior testimony.
8     A.    I think I said the executive
9 committee.  So, the Securities Division heads
10 and executive committee review what the
11 cross-ruffers came up with.  That's at the
12 divisional level and they may have a
13 slightly -- they may have some suggested
14 changes or differences from where the
15 cross-ruffing team came out.
16     Q.    Just to clarify, the cross-ruffers
17 will list people 1 to N where the line
18 should be drawn.  And then is there a meeting
19 with the executive office of the firm and the
20 division heads?
21     A.    The cross-ruffers meet with the
22 executive office of the firm.
23     Q.    Yes.
24     A.    Separate from that, the division
25 heads and the executive committee of the

Page 230

1  division will review the cross-ruffing findings
2  and may make -- you know, have their own
3  thoughts about what their view would be.
4      Q.    And then are those communicated to
5  the executive office as well?
6      A.    Then there's another meeting with
7  the division heads and the executive office at
8  which they'd look at the cross-ruffing rankings
9  and the division head's potential tweaks.
10     Q.    And then what happens?
11     A.    Then a consensus is drawn as to
12 where they would -- who they would promote.
13     Q.    And who has final decision making
14 authority over where to draw the line?  I
15 understand they try to reach a consensus,
16 but --
17         MS. SULLIVAN:  Objection, vague.
18     A.    So, the -- typically the division
19 heads would have the best view on the right
20 business decision for their division and they
21 would communicate that to the executive office.
22     Q.    And does the executive office
23 typically follow the suggestion of the division
24 heads?
25     A.    They typically follow the

Page 231

1  suggestion.  There may be instances in which
2  they raise other thoughts.
3      Q.    Do the division heads submit their
4  own rankings?
5      A.    Yes.  It's called the division head
6  list, but that is typically a cross-ruffer list
7  with a handful of changes.
8      Q.    Okay.  So they're sort of edits or
9  tweaks to the cross-ruffer list as their own
10 list?
11     A.    Yes.
12     Q.    And the division heads, is that the
13 COO and the CFO?
14     A.    No, the actual division heads.
15     Q.    Okay.  And then the executive
16 office you said typically follows the division
17 head's suggestion, and then the process is
18 done, the candidates are announced?
19     A.    Yes.
20     Q.    That process you just described you
21 mentioned one change in 2010 was there was --
22 went from being a Securities questionnaire to a
23 firm-wide questionnaire.  Have there been any
24 other changes to that process between 2000 and
25 2012?

Page 232

1      A.    Changes to which part of the
2  process?
3      Q.    Any of those processes.
4      A.    So, there was a candidate
5  collection tool that used to be used years ago.
6  I couldn't tell you what year we stopped using
7  it.  There was a web-based tool where all
8  managing directors could enter candidates.  We
9  found that to be a pretty cumbersome,
10 inefficient process and our managing directors
11 weren't so tech savvy.  So a lot of them didn't
12 use the web-based tool at the time.
13         So we switched to divisional HCM
14 team collecting the nominations.  That would be
15 another substantive administration change.
16     Q.    It went from having the MDs collect
17 the nominations to the HCM collecting the
18 nominations?
19     A.    And -- it went from MDs entering
20 nominations into a website.
21     Q.    I see.
22     A.    The same process had still happened
23 after that where HCM looked at the nominations,
24 collected nominations from the business heads,
25 collated the list.  All of that still happened,

Page 233

1  it's just that there was an initial process
2  whereby MDs could enter names into a website.
3  That yielded not a robust set of nominations
4  and people -- it was really ad hoc who used the
5  system so we stopped using it.
6      Q.    So what happened in its place?
7      A.    The managing directors have
8  conversations with their business unit heads to
9  submit names at a meeting.
10     Q.    And I mean there's a couple of
11 changes there, right?  One is that whether it
12 went to a web or to the business unit head.
13 But does the business unit head have
14 substantive input?
15         MS. SULLIVAN:  Objection, vague.
16     A.    That was consistent before and
17 after.
18     Q.    I see, okay.  So it was still the
19 case before that the MDs would still meet with
20 the business unit heads to discuss the
21 candidates, the difference is that rather than
22 having the MDs also enter the names into a
23 web-based system, they would communicate them
24 to the business unit leaders who would in turn
25 communicate them to the HCM?

Deposition of Caroline Heller Sberloti                        CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 234

1    A.   Yes.  So, the business unit heads
2  still met with the MDs, still collated the
3  list.  They'll submit it to HCM.  There was
4  just that other system.
5    Q.   It's a nonsubstantive change?
6    A.   Yes.
7    Q.   Any other change in the process
8  that you can think of?
9    A.   None that come to mind.
10   Q.   And do you know if there's any
11 reviewing or monitoring of the nomination
12 process to make sure that the -- I understand
13 that when the names are submitted there's an
14 examination of the regional and diversity
15 considerations.  Is there any examination of
16 the people who aren't nominated?
17       MS. SULLIVAN:  Objection, vague.
18   A.   Can you clarify what you mean?
19   Q.   Yeah, does anybody in the
20 Securities Division or, to your knowledge, at
21 the firm do any monitoring of the promotions
22 process to see if people are getting repeatedly
23 passed over?
24   A.   So, if there were folks that we
25 discussed in any of our career development

Page 235

1  forms or pipeline discussions that weren't
2  nominated, HCM or the business heads could
3  probe as to why.  So, I've done some of that
4  probing myself.
5        And, similarly, employees who feel
6  that they've been passed over for some reason,
7  similar with any other issues that they have,
8  they can raise issues or concerns to HCM.
9    Q.   And for how long has it been the
10 case that HCM has been using pipeline and other
11 data to make suggestions or raise questions
12 about why some people may not have been
13 nominated?
14   A.   I would think the whole period.
15   Q.   Okay.  And do you have -- has HCM,
16 someone in HCM, had discussions like that every
17 year?
18   A.   I would think so.
19   Q.   Do you know, have those discussions
20 always resulted in the person getting nominated
21 who originally had not been nominated?
22   A.   It depends on the situation.  I
23 would say often when I've had the conversation,
24 a manager would typically have a very good
25 reason as to why a person was not included.

Page 236

REDACTED FILED UNDER SEAL

Page 237

REDACTED FILED UNDER SEAL

Deposition of Caroline Heller Sberloti                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 238



REDACTED FILED UNDER SEAL

---

Page 240

but are some candidates cross-ruffed in-depth
versus given a so-called quick pass?
         MS. SULLIVAN:  Objection, vague.
    A.    Cross-ruffing is a pretty thorough
process.  I can't think of any examples where
anybody was given a quick pass.  Candidates
should be -- there should be serious
consideration paid to anyone who's on that
list.
         That may vary from division to
division, but in secures if you're on that list
you're getting cross-ruffed thoroughly.
         (Recess taken.)
    Q.    I want to make sure the record is
clear of executive office versus executive
committee.  I believe you testified that there
are -- that the cross-ruffers present to the
executive office and then at a similar time the
cross-ruffers present to the executive
committee of the Securities Division?
    A.    Yes.
    Q.    Okay.  And then there's a
subsequent meeting with the executive office?
    **A.    A subsequent meeting with the**
**executive office and the division heads.**

---

Page 239

REDACTED FILED UNDER SEAL

---

Page 241

    Q.    And the division heads, okay.  And
that's the final meeting?
    **A.    Yes.**
    Q.    I'm not sure I understood which
list of candidates is reviewed at that final
meeting.  Is it the list that the division
heads have edited of the ranked candidates or
the original ranking list?
    **A.    Both.**
    Q.    They have both lists?
    **A.    Both lists.**
    Q.    Okay.  And --
    **A.    And the executive office had**
**already seen the cross-ruffing list anyway when**
**the cross-ruffers come to meet with them.**
    Q.    Right.
    **A.    But present at the meeting with the**
**division head are both lists.**
    Q.    And who has final decision making
authority on number of slots; was it the
division heads or the executive office?
    **A.    Similar to the other processes**
**we've discussed, there's a consensus building**
**about the business and the need across the**
**firm, across the -- you know.**

Deposition of Caroline Heller Sberloti                                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

| Page 242 | Page 244 |
|---|---|

Page 242

1    Q.     Absent ability to reach consensus,
2  who was the -- if you know, who was the final
3  say?
4           MS. SULLIVAN:  Objection, vague.
5    A.     The executive office will largely
6  agree with the division head list.  If there
7  are any tweaks or changes, it would be very
8  really minor.  They tend to revolve then around
9  more firm-wide issues outside the division
10  heads' scopes.  So that might be based on
11  region, things like that.
12   Q.     When you say they tend to revolve
13  then around more firm-wide issues, the "they"
14  is the executive office or the changes?
15   **A.     The "they," the issues that would**
16  **make a change from the division head list.**
17   Q.     And the division head list includes
18  not only the ranking, but the number of slots?
19   **A.     Yes.**
20   Q.     Okay.  And who are the division
21  heads presently for Securities?
22   **A.     Isabel Ealet.**
23   Q.     I beg your pardon, I mean division
24  heads for the U.S. Securities.
25   **A.     So we don't have any U.S. division**

Page 244

REDACTED FILED UNDER SEAL

Page 243

REDACTED FILED UNDER SEAL

Page 245

REDACTED FILED UNDER SEAL

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 16 - TRANSCRIPT OF THE DEPOSITION OF CAROLINE HELLER SBERLOTI
DATED JULY 10, 2013
(PAGES 246-258)**

**FILED UNDER SEAL**