# EXHIBIT 16A

Case 1:10-cv-06950-AT-RWL   Document 265-27   Filed 07/25/14   Page 2 of 11

Deposition of Caroline Heller Sberloti, Volume II                CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

```
 1   IN THE UNITED STATES DISTRICT COURT
 2   FOR THE SOUTHERN DISTRICT OF NEW YORK
     ------------------------------------------X
 3   H. CRISTINA CHEN-OSTER; LISA PARISI;
 4   and SHANNA ORLICH,
 5                    Plaintiffs,
 6       - against -
 7   GOLDMAN, SACHS & CO. and THE GOLDMAN
 8   SACHS GROUP, INC.,
 9                    Defendants.
10   CASE NO.: 10-cv-06950 (LBS)(JCF)
     ------------------------------------------X
11
12       * * * C O N F I D E N T I A L * * *
13
14                250 Hudson Street
15                New York, New York
16                July 11, 2013
17                9:10 a.m.
18
19       CONTINUED DEPOSITION of CAROLINE HELLER
20   SBERLOTI, pursuant to 30(b)(6) Notice, before
21   Sophie Nolan, RPR, a Shorthand Reporter and
22   Notary Public within and for the State of New
23   York.
24
25
```

Case 1:10-cv-06950-AT-RWL   Document 265-27   Filed 07/25/14   Page 3 of 11

Deposition of Caroline Heller Sberloti, Volume II                CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 260

APPEARANCES:

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Attorneys for the Plaintiffs
    250 Hudson Street
    New York, New York  10013
BY: RACHEL GEMAN, ESQ.
    PHONE   212-355-9500
    FAX     212-355-9592
    E-MAIL  rgeman@lchb.com

SULLIVAN & CROMWELL, LLP
Attorneys for Defendants
    125 Broad Street
    New York, New York  10004
BY: SUHANA S. HAN, ESQ.
    PHONE   212-558-4647
    FAX     212-558-3588
    E-MAIL  hans@sullcrom.com

Page 261

APPEARANCES (Cont'd):

PAUL HASTINGS, LLP
Attorneys for Defendants
    875 15th Street, N.W.
    Washington, DC 20005
BY: CARSON H. SULLIVAN, ESQ.
    PHONE   202-551-1809
    FAX     202-551-0209
    E-MAIL  carsonsullivan@paulhastings.com

ALSO PRESENT:
    MARTIN L. SCHMELKIN, ESQ.

Page 262

REDACTED FILED UNDER SEAL

Page 263

------------ E X H I B I T S (Cont'd) ------------
PLAINTIFF'S   DESCRIPTION                    FOR I.D.
Exhibit 206   Document Bates stamped            336
              GS 0109353 through
              GS 0109365
Exhibit 207   Document Bates stamped            380
              GS 0122587 through
              GS 0122588
Exhibit 208   Document Bates stamped            385
              GS 0109366 through
              GS 0109367

              (EXHIBITS TO BE PRODUCED)

Case 1:10-cv-06950-AT-RWL   Document 265-27   Filed 07/25/14   Page 4 of 11

Deposition of Caroline Heller Sberloti, Volume II                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 264

C A R O L I N E   H E L L E R   S B E R L O T I,
   recalled as a witness, having been
   previously duly sworn, was examined and
   testified as follows:
CONTINUED EXAMINATION
BY MS. GEMAN:
   Q.   Good morning. So thank you for coming back today. My name is still Rachel Geman. Did you do any further preparation for the deposition?
   A.   I have not.
   Q.   And you're aware that you're still testifying under oath?
   A.   I am.
   Q.   And all the same rules from yesterday still apply. I'm entitled to your best recollection.
   A.   Yes.
   Q.   Okay. I'd like to talk a little bit about the performance systems. Can you describe for me at a high level the performance review process in the Securities Division at Goldman Sachs for the time period? Well, let's start with the present process.
        MS. SULLIVAN: Objection, vague.

Page 265

   A.   The performance review process is run out of the FRS system. Employees are asked to select reviewers and their managers approve their reviewer lists.
   Q.   So, let's start with that. How many -- have those two steps been consistent from the time period 2000 to the present?
   A.   I believe so, but 2005 to the present is the period I'm most comfortable with.
   Q.   Who would have information about the review process for the period 2000 to 2005?
   A.   I'm trying to think about that. It could be people from the Talent Assessment Group.
   Q.   They would have knowledge about the Securities Division?
   A.   They would have knowledge about the system, I guess if we're talking about the Securities Division process. I'm just trying to think of who the right person would be, Joe Spiro.
   Q.   Is he with the company still?
   A.   I believe so.
   Q.   S-P-I-R-O?

Page 266

   A.   Yes.
   Q.   Do you know what his position was in that time period?
   A.   He had a position similar to mine.
   Q.   And do you have knowledge about whether the Securities Division in that 2000 to 2005 time period followed the firm-wide processes in connection with firm-wide review?
        MS. SULLIVAN: Objection, vague.
   A.   I believe during that time -- I'm not certain. I don't know that there was a firm wide standard process or if it was all divisional during that time.
   Q.   Between that -- I'm talking only about 2000 to 2005, was there a 360 review during each of those years?
   A.   In Securities, there was a 360 review.
   Q.   Okay. And you said yesterday that there was quartiling in each of those years.
   A.   Yes.
   Q.   Okay.
   A.   To the best of my recollection.
   Q.   And you also said yesterday that at no point was there manager ranking separate

Page 267

from the quartiling. In other words, like a top down or bottom up ranking of everybody.
   A.   Can you explain that?
   Q.   Sure. Did the managers -- let's say they had ten employees in the relevant peer group to rank them 1 through 10?
   A.   Not that I'm aware of, no.
   Q.   Going back to my earlier question for at least the time period 2005 to the present, were those two steps that you outlined consistent, namely you'd begin by opening up the FRS system and the first step is that employees select reviewers and then managers would approve the review list?
   A.   Yes, employees select reviewers and the managers approve the list.
   Q.   And has it been the case throughout the time period that managers can add or remove names?
   A.   Typically, the way the process would work is an employee would discuss the list with the manager in advance and come to an agreement and then hit submit. So that's typically how I've seen it work, managers and employees have a discussion.

Case 1:10-cv-06950-AT-RWL   Document 265-27   Filed 07/25/14   Page 5 of 11

Deposition of Caroline Heller Sberloti, Volume II                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 268

1  Q.    But do managers have the authority
2  to add or remove names if they choose?
3  A.    Managers can add or remove names,
4  but the way in practice that typically happens
5  is via a discussion.
6  Q.    Okay.  And the -- how many names
7  approximately are the employees supposed to
8  select?
9  A.    That's moved around over time, but
10 varied between eight and twelve.  There was a
11 time period that I actually think was prior to
12 2005 that it was unlimited.  You know what, I'm
13 not entirely certain.  There was -- the average
14 would probably be eight to twelve.
15       I do remember prior to 2005 there
16 being, like, even more people on folks' lists.
17 I don't know if those were solicited or
18 unsolicited.
19 Q.    And is there -- within the list are
20 there any divisions like priority reviews,
21 non-priority reviews?
22 A.    I believe there's an ability for
23 the reviewer -- I'm sorry, for the reviewee to
24 designate if somebody's priority or not
25 priority, but I believe the only impact that

Page 269

1  has is that the person writing the review
2  understands that the reviewer considers you --
3  the reviewee considers you a priority or not.
4  There's no other designation associated with
5  it.
6  Q.    All right.  And has it been the
7  case that the manager, the employee's direct
8  manager is always on the list?
9  A.    Yes, to the best of my knowledge.
10 Q.    And then what happens?  So the
11 employees select reviewers, the managers
12 approve the list, you know, along with any
13 additions or deletions and then the
14 solicitation for the review is sent out to the
15 list?
16 A.    Once the manager and the employee
17 have agreed on the list, the review writing
18 period will commence.  When employees can log
19 in and ask to see who they're to review and
20 they write reviews on those individuals during
21 the review writing period.
22 Q.    And what documents reflect what the
23 initial and final lists are?
24       MS. SULLIVAN:  Objection, vague.
25 Q.    Are there documents that reflect

Page 270

REDACTED FILED UNDER SEAL

Page 271

REDACTED FILED UNDER SEAL

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 16A - TRANSCRIPT OF THE DEPOSITION OF CAROLINE HELLER SBERLOTI
DATED JULY 11, 2013
(PAGES 272-283)**

**FILED UNDER SEAL**

Case 1:10-cv-06950-AT-RWL   Document 265-27   Filed 07/25/14   Page 7 of 11

Deposition of Caroline Heller Sberloti, Volume II          CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 284

REDACTED FILED UNDER SEAL

Page 285

REDACTED FILED UNDER SEAL

Page 286

REDACTED FILED UNDER SEAL

Page 287

A. I don't know.
Q. Do you know if 2007 was the first time ELG started reviewing the 360 reviews?
A. I don't know.
Q. Are you personally involved in the process by which ELG reviews 360 reviews?
A. No.
Q. Are you personally involved in any process in which ELG reviews quartiles?
   MS. SULLIVAN: I'm just going to object to the extent that this is treading on privileged ground. She can answer yes or no and leave it at that.
A. Yes.
Q. Do you know if ELG was involved in quartiling reviews before 2007? It's a yes or no question.
A. I don't know.
Q. Do you know that ELG has been involved in quartile reviews since 2007?
   MS. SULLIVAN: Again, same objection. She can answer yes or no.
A. I don't know.
Q. And do you have an understanding of how many -- how many points are on the scale in

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 16A - TRANSCRIPT OF THE DEPOSITION OF CAROLINE HELLER SBERLOTI
DATED JULY 11, 2013
(PAGES 288-319)**

**FILED UNDER SEAL**

Case 1:10-cv-06950-AT-RWL   Document 265-27   Filed 07/25/14   Page 9 of 11

Deposition of Caroline Heller Sberloti, Volume II                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 320

1  into CRS?
2    A.   At the close of the meeting the
3  quartiles are sent back to my team, Securities
4  HCM, typically by spreadsheet and our team
5  would load them into CRS.
6    Q.   Do you do anything other than load
7  them? In other words, do you make any
8  substantive assessment of the quartile?
9    A.   We aggregate the quartiles to make
10 sure business units properly bucketed folks.
11   Q.   Is the only purpose for which you
12 look at the quartile information to make sure
13 that percentages match?
14        MS. SULLIVAN:  Objection, vague.
15   A.   The main purpose we look at the
16 quartiling information is to make sure that we
17 have reached a distribution by business unit,
18 region, title.
19   Q.   I thought you said before that the
20 bucketing was titled within the business unit?
21   A.   Yes.
22   Q.   What is the relevance of region and
23 title?
24   A.   So, as mentioned before, some
25 business units are global and some are not. So

Page 321

1  it's possible that your regions could look
2  askew even if people were titled properly by
3  business unit and title.
4    Q.   So everyone within a region is --
5  there should be bucketing within a region as
6  well? I just don't understand the relevance of
7  region?
8    A.   Well, we'd like to be regionally
9  sensitive and, so, we would look to see if
10 there were any pockets in any regions that
11 looked off. It typically doesn't happen.
12 Given the size of our population, each region
13 is normally not an issue, but you asked if we
14 look at or what we look at.
15   Q.   So one thing you look at that's
16 sort of the simplest thing is to make sure that
17 within the required procedure, namely title
18 within business unit, that the percentages are
19 correct; is that right?
20   A.   Yes.
21   Q.   You also look at, I think you said,
22 region and title.
23   A.   So overall title.
24   Q.   So you'd look at sort of all the
25 vice presidents, for example, and to see if

Page 322

1  there -- is there a requirement that they have
2  to fit strictly into the quartiles or is it
3  just supposed to be approximate?
4         MS. SULLIVAN:  Objection, vague and
5   compound.
6    A.   All of it is approximate in that
7  there's soft edges. From yesterday one of the
8  questions was if it's 26 percent would we make
9  somebody come down to 25 percent, we probably
10 would not.
11        There's soft edges on the
12 quartiling buckets, but we look to see that by
13 title, by business unit, by region we're
14 generally in line.
15   Q.   But just to be clear, the actual
16 requirement is to make the buckets within
17 business unit and title and the hope is that
18 because the population is large enough that
19 this would result in a situation where everyone
20 in the same title across business units
21 approximates the percentages; is that correct?
22   A.   Yes, and then we aggregate the
23 information and look at it.
24   Q.   Right. And if it's -- but there's
25 no -- as long as -- is it correct that as long

Page 323

1  as it approximately matches across title, then
2  there's no cause to revisit the quartiling; is
3  that correct?
4         MS. SULLIVAN:  Objection, vague.
5    A.   If the -- if that review
6  approximates the pickets we're looking for,
7  then there's no reason to circle back.
8    Q.   And just to clarify, there's no --
9  this may seem obvious to you, but there's no
10 actual requirement to bucket between title; you
11 just want to have sort of a crosscheck of the
12 bucketing across titles to approximate the
13 bucketing by title within business unit?
14        MS. SULLIVAN:  Objection, vague.
15   A.   There is a requirement to quartile
16 by title within business unit.
17   Q.   Right and if that results in
18 overall quartiling within title, then that's a
19 useful crosscheck but if it's a little bit
20 soft-edged as you say, that doesn't require a
21 revisitation of the underlying bucket so long
22 as those buckets are appropriate?
23        MS. SULLIVAN:  Objection, vague.
24   A.   Soft edges that come close to what
25 we're looking for are sufficient.

Case 1:10-cv-06950-AT-RWL   Document 265-27   Filed 07/25/14   Page 10 of 11

Deposition of Caroline Heller Sberloti, Volume II                    CHEN-OSTER, et al. vs. GOLDMAN SACHS, et al.

Page 324

1  Q. And similarly for region, your
2  expectation is that if there's been appropriate
3  bucketing by business unit within title, then
4  the regional distribution among quartiles will
5  approximate the basic percentages; is that
6  right?
7      MS. SULLIVAN: Objection, vague.
8      Also, I just want to note that the region
9      at issue in this case is obviously Americas
10     and specifically U.S.
11 A. So it should fall out to the
12 buckets that we're looking for and we review
13 the aggregate information just as a check.
14 Q. And if it does not -- if the United
15 States is not falling into the appropriate
16 quartiles, what -- under what circumstances
17 would you revisit the underlying quartile
18 decisions by title within business unit?
19     MS. SULLIVAN: Objection, vague.
20 A. We look at the aggregate
21 information and again soft edges are acceptable
22 and typically the information would fall within
23 the appropriate change.
24 Q. And, so, whose decision is it about
25 what crosses over into the inappropriate range?

Page 325

REDACTED FILED UNDER SEAL

Page 326

REDACTED FILED UNDER SEAL

Page 327

REDACTED FILED UNDER SEAL

**DECLARATION OF THEODORE O. ROGERS, JR.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

**EXHIBIT 16A - TRANSCRIPT OF THE DEPOSITION OF CAROLINE HELLER SBERLOTI
DATED JULY 11, 2013
(PAGES 328-397)**

**FILED UNDER SEAL**