# EXHIBIT 17

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x
H. CRISTINA CHEN-OSTER; LISA
PARISI; and SHANNA ORLICH,
                 Plaintiffs,
  -against-              Civil Action No.
GOLDMAN, SACHS & CO. and THE     10-CV-06950(LBS)
GOLDMAN SACHS GROUP, INC.,
                Defendants.
-----------------------------------------x

VIDEOTAPED DEPOSITION OF:
DENISE L. SHELLEY
Thursday, June 19, 2014
New York, New York
11:07 a.m. - 3:10 p.m.

Reported in stenotype by:
---- Rich Germosen, CCR, CRCR, CRR, RMR ----
NCRA & NJ Certified Realtime Reporter
NCRA Realtime Systems Administrator
Job No. 81047

TSG Reporting - Worldwide    877-702-9580

Page 26

DENISE L. SHELLEY / 06.19.14

1
2  A.  No.
3  Q.  Okay.  And your first year of
4  payment was based on the guarantee that you're
5  recruiter negotiated for you; correct?
6  A.  Correct.
7  Q.  Okay.  Who was your manager when
8  you were in program trading?
9  A.  At first it was ▮▮▮▮▮▮▮▮▮▮
10 and then he was moved to another group and then it
11 was ▮▮▮▮▮▮▮.
12 Q.  Who was the person that hired you?
13 A.  ▮▮▮▮▮▮.
14 Q.  And did you interview with ▮▮▮▮?
15 A.  I did.
16 Q.  Okay.  Do you have any claims
17 against ▮▮▮▮▮?
18     MS. SHAVER:  Object to form.
19 A.  No.
20 Q.  And you were making -- when you
21 were hired by Goldman Sachs and given that
22 guarantee, you were making a good deal less at SAC
23 Capital; correct?
24 A.  I wouldn't say a good deal less,
25 but less.

Page 27

DENISE L. SHELLEY / 06.19.14

1
2  Q.  Do you recall about how much?
3  ▮▮▮▮▮▮▮▮▮▮▮
4     MS. SULLIVAN:  I'm going to mark
5  this as an Exhibit 413.
6     (Whereupon, two-page document dated
7  July 13, 2005, bearing Bates stamps GS0373295 and
8  GS0373296, is received and marked as Shelley
9  Exhibit 413 for Identification.)
10    COURT REPORTER:  413.
11    THE WITNESS:  Thanks.
12 BY MS. SULLIVAN:
13 Q.  Do you recognize Exhibit 413 as
14 your Goldman Sachs offer letter?
15 A.  Yes.
16 Q.  And that's your signature there on
17 the back page?
18 A.  Yes.
19 Q.  And just for the record I'm not
20 going to say it every time, but when we see your
21 signature or your name it was always Fiacco during
22 your Goldman Sachs employment; correct?
23 A.  Yes.
24 Q.  Down at the bottom of this page do
25 you see where it says, Your employment will also

Page 28

DENISE L. SHELLEY / 06.19.14

1
2  be subject to various Goldman Sachs policies and
3  procedures including those contained on HR
4  WorkWays and in the applicable employee handbook?
5  A.  Yes.
6  Q.  So you understood that there were
7  policies and procedures that you could review in
8  the handbook or on the intranet?
9  A.  Yes.
10 Q.  Okay.  And I'm going to show you
11 Exhibit 414.
12    (Whereupon, one-page document
13 entitled first day acknowledgment for GS
14 employees, bearing Bates stamp GS0373294, is
15 received and marked as Shelley Exhibit 414 for
16 Identification.)
17    COURT REPORTER:  414.
18    THE WITNESS:  Thank you.
19 BY MS. SULLIVAN:
20 Q.  Take a minute to look at this.
21 This is first Day Acknowledgment for Goldman Sachs
22 Employees.  That's your signature there dated
23 August 22nd, 2005; correct?
24 A.  Yes.
25 Q.  And this also confirms that you

Page 29

DENISE L. SHELLEY / 06.19.14

1
2  have access to HR WorkWays and that there are
3  policies in the employee handbook; correct?
4     MS. SHAVER:  Objection.  The
5  document speaks for itself.
6  A.  Yes.
7  Q.  And you -- by signing below you
8  agreed that you would familiarize yourself with
9  the firm's policies and procedures in effect at
10 the time during your employment and agree to abide
11 by all policies announced by the firm; correct?
12 A.  Yes.
13    MS. SHAVER:  Same objection.
14 Q.  And so did you do what you stated
15 you would?  You reviewed the policies and
16 procedures?
17    MS. SHAVER:  Object to form.
18 A.  Yes.
19 Q.  Did you do that on the intranet or
20 did you have a hard copy of the handbook?
21 A.  It's hard for me to recall.  I
22 probably had a hard copy.
23 Q.  Okay.
24    MS. SULLIVAN:  I'm going to mark
25 this -- do you know what, we should use this from

8 (Pages 26 to 29)

Page 62

DENISE L. SHELLEY / 06.19.14

 2  MS. SHAVER: Okay.
 3  THE VIDEOGRAPHER: The time is
 4  12:07 p.m.
 5  We're going off the record.
 6  (Whereupon, a short recess is
 7  taken.)
 8  THE VIDEOGRAPHER: Stand by,
 9  please.
10  The time is 12:25 p.m.
11  We're back on the record with tape
12  labeled 2.
13  BY MS. SULLIVAN:
14  Q. Okay, back on the record.
15  Ms. Shelley, we just took a break.
16  Do you have any answers that you'd like to change
17  or clarify from before the break?
18  A. No.
19  Q. Okay. I wanted to clarify one
20  thing. When you were hired, [redacted] was a
21  vice-president already; wasn't he?
22  A. I can't recall, but, yeah, it's
23  possible.
24  Q. So in 2006, and you can refresh
25  your recollection if you need to look at this

Page 63

DENISE L. SHELLEY / 06.19.14

 2  document --
 3  A. Uh-huh.
 4  Q. -- you were not promoted until the
 5  end of 2006 to be a vice-president; correct?
 6  A. Correct.
 7  Q. And [redacted] as stated in here was
 8  already a vice-president; correct?
 9  MS. SHAVER: Objection. The
10  document speaks for itself.
11  A. Yes.
12  Q. So does that refresh your
13  recollection --
14  A. Yes.
15  Q. -- that [redacted] was a
16  vice-president?
17  A. Yes.
18  Q. -- at the time you were hired?
19  A. Okay, yes.
20  Q. And for that first year while you
21  were an associate?
22  A. Yes.
23  Q. On the front of this document,
24  Exhibit 417, you have two other co-managers listed
25  there, [redacted] and [redacted]. Did you

Page 64

DENISE L. SHELLEY / 06.19.14

 2  work with [redacted] and [redacted]
 3  MS. SHAVER: Objection. Compound.
 4  A. Not closely. I mean [redacted] was, you
 5  know, in like a higher level role, so I mean I
 6  didn't really work with him and, to be honest, I
 7  don't know who [redacted] is.
 8  Q. So your first line manager though
 9  in 2006 was [redacted]?
10  A. Yes.
11  Q. And if I told that you [redacted]
12  [redacted] had a high-up role in the strats
13  organization, that wouldn't ring a bell?
14  A. I'm sure she did because that's the
15  chain, but I don't remember her.
16  Q. Okay. So in our timeline though
17  and according to your resume on Exhibit 412 you
18  were -- after receiving this review, which is
19  Exhibit 417, you were promoted to vice-president;
20  correct?
21  A. I was promoted after this -- I
22  can't remember exactly. The reason I was promoted
23  is because [redacted], who I moved to work
24  under, recognized that I had already satisfied the
25  criteria for promotion to vice-president.

Page 65

DENISE L. SHELLEY / 06.19.14

 2  Q. So [redacted] worked to get you
 3  that title change?
 4  A. Yes.
 5  Q. You don't believe that [redacted]
 6  discriminated against you in doing that, do you?
 7  A. No.
 8  Q. You don't believe that -- you don't
 9  have any allegations of gender discrimination
10  against [redacted], do you?
11  A. No.
12  Q. He was a managing director?
13  A. Yes.
14  Q. In strats?
15  A. No.
16  Q. Okay. What role was [redacted]
17  in?
18  A. He was on the head of the
19  quantitative trading desk.
20  Q. And so he was more of a second or
21  third level in your reporting line?
22  A. No. So what happened was I was
23  working on the portfolio trading desk and I was
24  working on a project in conjunction with [redacted]
25  [redacted] group and so at the time of finishing

17 (Pages 62 to 65)

Page 66

DENISE L. SHELLEY / 06.19.14

2 that project [redacted] asked me to come join
3 their group.
4  Q.  And this is when you moved to
5 quantitative trading?
6  A.  Yes.
7  Q.  And did you consider that to be a
8 good opportunity for you?
9  A.  I did, yes.
10  Q.  Okay.
11   MS. SULLIVAN:  Let's mark
12 Exhibit 418.
13   (Whereupon, multipage document
14 entitled Equities Individual Review Book, bearing
15 Bates stamps GS0373722 through GS0373746, is
16 received and marked as Shelley Exhibit 418 for
17 Identification.)
18   COURT REPORTER:  418.
19 BY MS. SULLIVAN:
20  Q.  Ms. Shelley, this is a copy of your
21 review, your 360 review from 2007.
22   Do you see that?
23  A.  Yes.
24  Q.  Is this when you were in the
25 quantitative trading group?

Page 67

DENISE L. SHELLEY / 06.19.14

2  A.  So I was in the quantitative
3 trading group for a portion of the year.  [redacted]
4 [redacted] resigned from the firm and at the time
5 [redacted] asked me to move over to algorithmic
6 trading.
7  Q.  I see.  So in 2007 essentially you
8 moved over for the good opportunity in
9 quantitative trading with [redacted]?
10  A.  Yes.
11  Q.  About how long were you there?
12  A.  It looks like about six months.
13  Q.  And then [redacted] left the
14 firm?
15  A.  Yes.
16  Q.  And you moved into the GSAT
17 execution desk?
18  A.  Yes.
19  Q.  With [redacted]?
20  A.  Yes.
21  Q.  You don't have any claims against
22 [redacted], do you?
23   MS. SHAVER:  Object to form.
24  A.  No.
25  Q.  Okay.  And you were -- were you

Page 68

DENISE L. SHELLEY / 06.19.14

2 happy about the move to the GSAT execution desk?
3  A.  Happy?  I was not happy that [redacted]
4 [redacted] left the firm, but I was happy to have
5 found a home.
6  Q.  Did the quantitative trading group
7 dissolve when he left, when [redacted] left?
8  A.  No.
9  Q.  But it was restructured?
10  A.  It was restructured.
11  Q.  Okay.  So then [redacted] became
12 your manager?
13  A.  Yes.
14  Q.  And you reported up to [redacted]?
15  A.  Yes.
16  Q.  And [redacted] -- you don't have any
17 allegations of gender discrimination against
18 [redacted], do you?
19   MS. SHAVER:  Object to form.
20  A.  No.
21  Q.  And then if you look at this
22 document, Exhibit 418, at the pages ending in
23 3736, this is sort of a summary of what happened;
24 correct?
25  A.  Uh-huh.

Page 69

DENISE L. SHELLEY / 06.19.14

2  Q.  When --
3  A.  Yes.
4  Q.  And you've stated here [redacted]
5 [redacted] resigned from the firm and [redacted]
6 asked you to join the GSET financial engineering
7 team; correct?
8  A.  Yes.
9  Q.  And so you've listed here your
10 accomplishments while in QT, quantitative trading,
11 and then on the next page your accomplishments
12 while in GSET; correct?
13  A.  Correct.
14  Q.  Did you -- and we would be here all
15 day if we went through all of these
16 accomplishments as listed, but do you feel that
17 you were denied opportunities while working for
18 [redacted] in QT?
19   MS. SHAVER:  Object to form.
20  A.  I don't feel I was denied
21 opportunities, no.
22  Q.  And for 2007 were you satisfied
23 with your compensation?
24   MS. SHAVER:  Object to form.
25 Compound.

Page 74

DENISE L. SHELLEY / 06.19.14

1  were unfairly paid more?
2      MS. SHAVER: Object to form.
3      A. I believe my compensation was on
4  the low end. I believe that from talking to other
5  strats, and I do know that people were paid ▮,
6  ▮, numbers that I wasn't able to reach and at
7  the same level that I was.
8      Q. How do you know these people were
9  at the same level as you? Sorry, let me rephrase
10 that.
11     What do you mean when you say the
12 same level?
13     A. I mean the same number of years out
14 of a Ph.D. program, same number of years employed
15 in a financial firm.
16     Q. Do you have any firsthand knowledge
17 of how those employees were reviewed or viewed by
18 their managers?
19     MS. SHAVER: Objection. Lacks
20 foundation.
21     A. No, I don't know how anyone else
22 was reviewed.
23     Q. And who were these people that you
24 believe were unfairly paid more than you in 2007?

Page 75

DENISE L. SHELLEY / 06.19.14

1      A. One example that comes to mind is
2  ▮. I believe he even had less time
3  working in a financial firm than I did.
4      Q. What is your understanding of what
5  ▮ made in 2007?
6      A. My understanding was that he made
7  ▮.
8      Q. And you don't have any firsthand
9  knowledge of that other than what he told you, do
10 you?
11     MS. SHAVER: Object to form.
12     A. I mean I don't know the difference
13 between firsthand and -- can you clarify.
14     Q. You weren't involved in the
15 decision to set his compensation; were you?
16     A. No.
17     Q. You didn't talk to his managers
18 about what they awarded him as far as compensation
19 in 2007; did you?
20     A. No.
21     Q. Do you believe, and take the time
22 you need, do you believe that your 2007 review,
23 360 review was discriminatory?
24     A. I believe that there are a couple

Page 76

DENISE L. SHELLEY / 06.19.14

1  of examples. ▮, for example.
2      Q. Okay. Point me to where you're
3  looking.
4      A. I'm looking on 3740 and also 3744.
5      Q. You believe that ▮ acted
6  with a discriminatory animus when he wrote that
7  Denise Fiacco has been a member of the GSAT
8  financial engineering team since approximately
9  March 2006. Over the past five months Denise has
10 displayed strong quantitative skills with her
11 study of additional liquidity, facilitation for
12 GSAT orders. Specifically she has effectively
13 leveraged her previous experience with intraday
14 event studies in statistical arbitrage and program
15 trading to assist the GSAT desk in assessing the
16 impact of algorithmic orders. For this project
17 Denise has taken primary responsibility for ALF
18 analysis and development from conceptualization to
19 near implementation while coordinating efforts
20 between the GSAT and USPT trading desks. In
21 addition, Denise has displayed the ability to
22 learn cipher code and bindings through
23 co-development of Star/Navigator to integrate
24 SonarPOV into the routing logic.

Page 77

DENISE L. SHELLEY / 06.19.14

1      You believe that that statement
2  shows discriminatory animus by ▮?
3      MS. SHAVER: Object to form.
4      A. I don't believe that statement, but
5  if you go back to 3732, the scores that ▮
6  gave me are quite low, especially in judgment,
7  problem solving and teamwork. So the scores do
8  not agree with his statement.
9      Q. What page was that again?
10     A. 3732.
11     Q. Do you have any knowledge as to how
12 your direct managers considered ▮'
13 scores?
14     A. I do not.
15     Q. And, in fact, your direct managers
16 gave you very positive feedback that year, didn't
17 they?
18     MS. SHAVER: Object to form. Vague
19 and ambiguous.
20     A. I mean, yes.
21     Q. ▮ on Page ending in 3739
22 writes: Bright. Understands trading and
23 programming, a huge plus. Good communicator and
24 networks well with other product business leaders.

20 (Pages 74 to 77)

```
                                                    Page 94
 1           DENISE L. SHELLEY / 06.19.14
 2           MS. SHAVER:  Object to form.
 3      A.   I don't believe so.
 4      Q.   Okay.  At some point do you know
 5 about when           left the firm?
 6      A.   Let's see.  I mean we start reviews
 7 probably in I want to say August or September and
 8 he was gone before my review was given to me which
 9 is in January so somewhere between August and
10 January.
11      Q.   And who became your new direct
12 supervisor?
13      A.   Initially I didn't have one.
14 kind of filled the gap, but I didn't really -- I
15 didn't really know who my direct manager was.
16      Q.   Do you believe that
17 discriminated against you because of your gender?
18      A.   I believe that on
19 team there was definitely a boy's club.  There was
20                                           and
21 these guys were extremely tight.  They went out
22 together every night.  They, you know, went
23 drinking.  You know, just spent a lot of time
24 together.  So I do feel as if it was hard to break
25 into that dynamic and be part -- feel really like
```

```
                                                    Page 95
 1           DENISE L. SHELLEY / 06.19.14
 2 part of the team.
 3      Q.   And this occurred only on
 4 team?
 5      A.   No.  This occurred on a lot of
 6 teams in the firm.
 7      Q.   But not on              team?
 8      A.                team was really the
 9 GSAT desk.  There wasn't so much of a boys' club.
10 It was more of, let's say, "Let's not rock the
11 boat and do too much work" kind of mentality.
12      Q.   Okay.  Let's go back to the men
13 that you just mentioned that you claim were part
14 of the boys' club on          team.
15      A.   Uh-huh.
16      Q.   I just want to make sure I have
17 their names correctly and probably our court
18 reporter does too.
19           There is      ?
20      A.           .  Everyone refers to
21 him as    .
22      Q.   And              ?
23      A.
24      Q.   And?
25      A.
```

```
                                                    Page 96
 1           DENISE L. SHELLEY / 06.19.14
 2      Q.   What's that last one?
 3      A.
 4      Q.   And none of them would have been
 5 your reviewers for 2008, correct, because you
 6 weren't -- you were still on the other team at
 7 that point; correct?
 8      A.   I think, no,         was a
 9 reviewer as is      as was
10      Q.   Okay.  And they were all peers to
11 you?
12      A.   Yes.
13      Q.   Vice-presidents or associates?
14      A.   Vice-presidents.
15      Q.   They would have been
16 vice-presidents if they were your peers.  Okay.
17           Other than having these men that
18 worked for            , was there -- do you
19 believe            discriminated against you
20 because you were a woman?
21           MS. SHAVER:  Object to form.
22      A.   I believe he wasn't 100 percent
23 inclusive and he led a culture that wasn't
24 inclusive.
25      Q.   Do you believe that he evaluated
```

```
                                                    Page 97
 1           DENISE L. SHELLEY / 06.19.14
 2 your performance unfairly?
 3           MS. SHAVER:  In 2008?
 4           MS. SULLIVAN:  At any time?
 5      A.   I believe that he oftentimes
 6 referred to me as emotional, passionate which were
 7 actually all of the qualities that I would ascribe
 8 to     , but somehow with me that was a negative
 9 thing whereas with       it was a positive.
10      Q.   So in 2008, and I'm directing your
11 attention to the page ending in 3767 when
12              said that you were passionate and
13 deeply entrenched in the business and, quote, gets
14 it, unquote, truly understands the business, the
15 tech and the client base, is a successful strat
16 who is hands-on and provides quick results without
17 much guidance, very self-sufficient, do you have a
18 problem with that review?
19           MS. SHAVER:  Object to form.
20      A.   I don't, but I was never -- this
21 review was not communicated to me in this manner.
22 This particular review was given to me by
23       and             .  And the basic
24 highlights of the review were that I was overly
25 passionate, too emotional and too vocal.
```

Page 106

DENISE L. SHELLEY / 06.19.14

1  Q. What about in 2008?
2  A. I don't have any direct knowledge
3  of other people's compensation in 2008.
4  Q. Were you excited to have [redacted]
5  [redacted] become your manager?
6  A. Yes.
7  Q. You knew her from before; correct?
8  A. Yes.
9  Q. She was some sort of mentor or
10 contact that you'd had though not reporting
11 directly to her; correct?
12     MS. SHAVER: Object to form.
13 A. A contact, yes.
14 Q. But it didn't go so well with
15 [redacted], did it?
16 A. No.
17     MS. SULLIVAN: I'm going to show
18 you what we will mark as Exhibit 420.
19     (Whereupon, one-page document
20 bearing Bates stamp GS018555, is received and
21 marked as Shelley Exhibit 420 for Identification.)
22     COURT REPORTER: 420.
23 BY MS. SULLIVAN:
24 Q. Ms. Shelley, this document has been

Page 107

DENISE L. SHELLEY / 06.19.14

1  produced to your counsel and is a summary of the
2  exit interview that you had upon resigning from
3  Goldman Sachs.
4     Do you recall having a discussion
5  regarding your departure from Goldman Sachs?
6  A. Yes.
7  Q. Take a minute to read this and let
8  me know if it is an accurate summary of the
9  feedback that you provided upon your resignation
10 from Goldman Sachs.
11 A. Can you repeat the question again?
12 Sorry.
13 Q. Sure. I had said to take a minute
14 to read the document and then let me know if it's
15 an accurate summary of the feedback that you
16 provided upon your resignation from Goldman Sachs,
17 and what I mean is in your exit interview.
18 A. Okay. I don't remember entirely
19 what I said in my exit interview because it was a
20 long time ago, but I'm assuming that this is at
21 least representative.
22 Q. Okay. What happened, and I don't
23 mean to ask such a broad question, but what
24 happened with [redacted]? Why did the

Page 108

DENISE L. SHELLEY / 06.19.14

1  management relationship not work?
2     MS. SHAVER: Object to form.
3  A. I -- well, it's a hard question to
4  answer. Initially, as I said, I was very excited
5  to be reporting to [redacted], especially another
6  female strategist. There were not that many
7  female strategists in the firm so it was kind of
8  an exciting opportunity for me. However, when she
9  started I felt that she excluded me from very
10 important conversations with other members of the
11 team and there were two other, like, lead members
12 of the strats team in GSET.
13    They were [redacted] and [redacted]
14 [redacted], and we were supposed to have regular
15 meetings, like all four of us, and oftentimes I
16 was excluded and she began to tell me to stop
17 doing certain work and to stop focusing on certain
18 clients. Essentially I was being told to stop
19 doing almost everything I was doing until she
20 could evaluate what was important and that was
21 very frustrating for me. And then I was, on top
22 of that, asked to define and create my role and
23 provide her with a business plan and things that I
24 thought weren't asked for by other people. So I

Page 109

DENISE L. SHELLEY / 06.19.14

1  did feel quite singled out.
2     On top of that, as a strat, [redacted]
3  and [redacted] together decided that you
4  should become a sales strat which is a different
5  subgroup within the strategies organization, and
6  that I should focus most of my efforts on sales
7  and I kind of reluctantly agreed to that because I
8  didn't -- is not something I really wanted to do
9  to be quite honest.
10 Q. And how long were you a sales
11 strat?
12 A. I guess for the remaining several
13 months that I was at Goldman.
14 Q. In 2009?
15 A. Yes.
16 Q. So you were -- you mentioned that
17 [redacted] asked you to create a business plan?
18 A. Yes.
19 Q. And you don't know if she asked
20 other people to create business plans?
21 A. I know she did not ask other people
22 to create business plans.
23 Q. Do you believe that she was
24 singling you out because you were a woman?

```
                                                    Page 118
 1           DENISE L. SHELLEY / 06.19.14
 2   teams, but the last team was the worst you had
 3   ever experienced, is that -- do you recall stating
 4   that?
 5       A.   I don't recall -- I mean I didn't
 6   write this document so I'm not exactly sure if
 7   this is what I said.
 8       Q.   Okay.  Were you ever -- did you
 9   ever feel pressure to go to strip clubs when you
10   were at Goldman Sachs?
11       A.   No.
12       Q.   Did you ever witness or hear about
13   others going to strip clubs at Goldman Sachs?
14       A.   Yes, I heard about it.
15       Q.   And what did you hear and when was
16   it?
17       A.   I heard that essentially if a
18   client wants to go to a strip club you take the
19   client to a strip club.  You do whatever you need
20   to do to get the business.
21       Q.   Did            tell you that?
22       A.   No.  I think I just -- I can't say
23   exactly who told me that, but I do know that that
24   was a general understanding.
25       Q.   You're not aware of any of your
```

```
                                                    Page 119
 1           DENISE L. SHELLEY / 06.19.14
 2   teammates taking clients to strip clubs, are you?
 3       A.   I'm not aware of any incidents that
 4   I can comment upon.
 5       Q.   Was there anything else about
 6              that we haven't discussed that led
 7   you to, 1, want to resign from Goldman Sachs and,
 8   2, just feel that she wasn't a good manager?
 9       A.   I mean it was a bigger -- like I
10   said,          was involved in the decision of
11   bringing      over to be my manager.
12   was taking a larger role in the GSET organization
13   and the whole thing made me very uncomfortable.
14       Q.   Why?
15           MS. SHAVER:  Object to form.
16       A.   Why did it make me uncomfortable?
17       Q.   Yes.
18       A.   Because I didn't think that
19        had -- I didn't think that he really had the
20   career interest of other strategists as his top
21   priority.
22       Q.   How do you know that he was
23   involved --
24       A.   Because I spoke to him on the
25   phone.
```

```
                                                    Page 120
 1           DENISE L. SHELLEY / 06.19.14
 2       Q.   Okay.  Just let me finish just so
 3   we get -- it's okay.
 4           How do you know that he was
 5   involved in the decision to bring       over to
 6   be a manager in GSET?
 7       A.   Because I know that he and      had
 8   conversations about it and I also spoke to him
 9   about it on the phone.
10       Q.   So he told you he was involved?
11       A.   Yes.
12       Q.             was also involved?
13       A.   Yes.
14       Q.             was also involved?
15       A.   Yes.
16       Q.   And probably              ?
17       A.   I mean was she involved in the
18   decision to bring herself over?  I guess she was
19   involved in knowing that she was going to be
20   transitioned.
21       Q.   Was there anything else about
22              management of you that you felt
23   was poor management or other cause for concern
24   that led you to resign?
25       A.   I mean my entire role that I was
```

```
                                                    Page 121
 1           DENISE L. SHELLEY / 06.19.14
 2   doing prior to her arriving in GSET was taken away
 3   from me.  So in my opinion there was really
 4   nothing for me to do.
 5       Q.   And you were aware that there was
 6   major restructuring going on in GSET, aren't you?
 7           MS. SHAVER:  Object to form.
 8       A.   I don't know about major
 9   restructuring.          was let go.
10   was let go.      remained as the sole leader of
11   GSET and      was brought over and      played a
12   big role in all of those decisions.
13       Q.   But again, your understanding of
14        role is based on what he told you; correct?
15       A.   Yes, and also on phone calls he was
16   on with     when I was in      office that I
17   heard.
18       Q.        wasn't in GSET though, was he?
19       A.   No.
20       Q.   Did you have your job, your next
21   job lined up when you resigned from Goldman Sachs?
22       A.   No.
23       Q.   After you gave your exit interview
24   summary or exit interview interview, someone from
25   employee relations affirmatively reached out to
```

Page 138

```
 1        DENISE L. SHELLEY / 06.19.14
 2        Do you see that?  This is
 3   Exhibit 423.
 4       A.   Yes.
 5       Q.   You were becoming a leader in the
 6   Women's Network, weren't you, at the time you
 7   resigned?
 8       A.   I don't know if I would say a
 9   leader.  I mean I was a member of the Steering
10   Committee.
11       Q.   You were also the communications
12   liaison; correct?
13       A.   I was when I -- yes, when I first
14   joined the firm, I think the first year.
15       Q.   Wasn't that actually in 2008, late
16   2008 that you became the communications liaison?
17       A.   I can't recall exactly when it was.
18       Q.   I'll show you another --
19            MS. SULLIVAN:  425.
20            (Whereupon, two-page document not
21   bearing Bates stamps, is received and marked as
22   Shelley Exhibit 425 for Identification.)
23            COURT REPORTER:  425.
24   BY MS. SULLIVAN:
25       Q.   You can take a minute --
```

Page 139

```
 1        DENISE L. SHELLEY / 06.19.14
 2            MS. SHAVER:  Same objection to the
 3   extent this document was not previously produced.
 4       Q.   Take a minute.  It's a very short
 5   document.  I'm happy to wait while you read it.
 6            MS. SULLIVAN:  It's actually, Anne,
 7   just to refresh her recollection on the timing.
 8            MS. SHAVER:  Yeah, that's fine.  I
 9   mean this document is not sensitive.  I'm not
10   going to make a big stink about it, but the
11   general principle that you guys are using exhibits
12   in deposition that haven't been produced in the
13   litigation is totally improper.
14            MS. SULLIVAN:  Well, I disagree,
15   but I don't think there is anything controversial
16   about this one.
17       Q.   You've looked at it?
18       A.   Yes.
19       Q.   And does this refresh your
20   recollection as to the timing?
21       A.   I'm still looking for my name in
22   this.
23       Q.   At the top there, this is an e-mail
24   to you from              .  There is obviously a
25   link that's not live that he says communications
```

Page 140

```
 1        DENISE L. SHELLEY / 06.19.14
 2   liaison very impressive.  Do you recall that you
 3   were the communications liaison?
 4       A.   I do, but I think I was actually
 5   the communications liaison well before this.
 6       Q.   Okay.
 7       A.   I think this was just a
 8   continuation of the same.
 9       Q.   Okay.  So prior to September of
10   2008?
11       A.   Yes.
12       Q.   Who is              ?
13       A.              is a salesperson in
14   the GSET.
15       Q.   Okay.  And you're aware that the
16   Women's Network is not a policy-making body;
17   correct?
18            MS. SHAVER:  Object to form.  Vague
19   and ambiguous.
20       A.   When you say policy, like it
21   doesn't create the policies for the firm?
22       Q.   Right.  It doesn't?
23       A.   Yeah, I don't believe it does.
24       Q.   Would you disagree that one of its
25   missions is retaining talent and developing female
```

Page 141

```
 1        DENISE L. SHELLEY / 06.19.14
 2   leaders within the firm as stated in Exhibit 425?
 3       A.   I'm trying to look for that
 4   statement.
 5       Q.   Sort of right in the middle.
 6       A.   Oh, retaining talent, developing
 7   female leaders within the firm.  I don't know if
 8   that's part of their mission statement, but, yes,
 9   I mean that's the rule they believe they play.
10       Q.   And did you have a role on any of
11   the four subcommittees for the Securities Women's
12   Network -- Securities Division Women's Network,
13   the Market Watch Subcommittee, the Leadership
14   Subcommittee, the Networking Subcommittee or the
15   Career Solutions Subcommittee?
16       A.   I can't recall exactly.  I think I
17   was communications liaison which means I spanned
18   all the committees.
19       Q.   So can you provide any insight or
20   testimony as to the events that were held by the
21   Market Watch Subcommittee, the Leadership
22   Subcommittee, the Networking Subcommittee or the
23   Career Solutions Subcommittee?
24            MS. SHAVER:  Objection.  Compound.
25   Ambiguous as to time.
```

```
                                                  Page 142
 1         DENISE L. SHELLEY / 06.19.14
 2      Q.   In 2008 or 2009?
 3      A.   It's hard to remember exactly what
 4   the events were.  I mean there were a lot of
 5   events.  That was one of the main things the
 6   Women's Network did was host multiple events
 7   throughout the year.
 8      Q.   And do you think that hosting
 9   events -- are you implying that there is something
10   wrong with hosting events for women to network and
11   meet other senior leaders?
12      A.   No, that was not implied.
13      Q.   Okay.  You can tell me if I've got
14   this wrong, but in Paragraph 18 of your statement
15   you seem to imply that the mentoring program was,
16   well, actually you've stated, "Poorly defined and
17   only involved limited ad hoc meetings with a
18   female mentor."
19           Is that your testimony here today?
20      A.   Yes.
21      Q.   So when you were asked to be a
22   mentor were you an ineffective mentor?
23      A.   I think I became more friendly with
24   my mentee, so I don't know what it means to be an
25   effective mentor, but in my experience with my
```

```
                                                  Page 143
 1         DENISE L. SHELLEY / 06.19.14
 2   mentor I don't even really remember her and I
 3   think I met with her twice.
 4      Q.   So your testimony here today is
 5   that you did not develop a close relationship with
 6   ▇▇▇▇▇▇?
 7      A.   I did develop a good relationship
 8   with ▇▇▇▇
 9      Q.   And you met with her well more than
10   twice?
11      A.   Yes, I'm talking about my mentor.
12      Q.   She was your mentor, wasn't she?
13      A.   I was --
14      Q.   Mentee, mentee.
15      A.   Yeah, I was her mentor.
16      Q.   You were her mentor and you were a
17   good mentor?
18      A.   I thought so, I mean.
19      Q.   So in that regard the mentoring
20   program that set ▇▇▇▇▇ up with you did a
21   great service to ▇▇▇▇▇, didn't it?
22           MS. SHAVER:  Object to form.
23      A.   I mean I don't know what service it
24   did.  Like I said, we became friendly and we both
25   liked triathlons.  So we ended up doing a lot of
```

```
                                                  Page 144
 1         DENISE L. SHELLEY / 06.19.14
 2   triathlon training together.  I don't know that it
 3   actually propelled either one of our careers.
 4      Q.   But it gave her the opportunity to
 5   get to know you and you were more senior to her at
 6   the time; correct?
 7      A.   Yes.
 8      Q.   And you had a mentor?
 9      A.   Yes.
10      Q.   And who was your mentor?
11      A.   That's something I've been trying
12   to recall.  I met with her I think once or twice
13   and I can't recall her name although the only name
14   that I can come up with, and it's a guess, is
15   ▇▇▇▇▇▇▇▇.
16      Q.   Okay.  And do you -- so don't let
17   me put words in your mouth, but you and ▇▇▇▇
18   didn't really have a connection, didn't meet a lot
19   of times; is that correct?
20      A.   Yes, I didn't think she had a lot
21   of time for me.
22      Q.   Okay.  But the fact that the
23   firm -- that the securities division had a
24   mentoring program and set people up with mentor,
25   more senior women in the division, do you fault
```

```
                                                  Page 145
 1         DENISE L. SHELLEY / 06.19.14
 2   them for that because you and ▇▇▇▇▇▇ didn't
 3   have a lot of time to meet?
 4           MS. SHAVER:  Objection.
 5   Argumentative.  Mischaracterizing the testimony.
 6           MS. SULLIVAN:  That's not
 7   argumentative.
 8      A.   I don't fault them for that.  I'm
 9   just saying that the program didn't really address
10   the issues within the firm, I guess some of the
11   things that I think that the Women's Network
12   should have been focused on.
13      Q.   So in your opinion the Women's
14   Network wasn't focused on the right things?
15      A.   I think it was too busy trying to
16   be commercially effective rather than to be
17   effective in helping women get paid and promoted.
18      Q.   So you think women trying to
19   network and be more commercially effective is not
20   a lofty goal for the Women's Network?
21           MS. SHAVER:  Objection.  Misstates
22   testimony.
23      A.   I think it shouldn't be the only
24   goal.
25      Q.   Okay.  We talked about the four
```