UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

H. CRISTINA CHEN-OSTER; LISA PARISI; and
SHANNA ORLICH,

                                 Plaintiffs,

                v.

GOLDMAN, SACHS & CO. and THE GOLDMAN
SACHS GROUP, INC.,

                                 Defendants.

---------------------------------------------------------------- x

10 Civ. 6950 (AT) (JCF)

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION
## TO EXCLUDE EXPERT TESTIMONY OF DAVID L. YERMACK

Barbara B. Brown (admitted pro hac vice)
Neal D. Mollen (admitted pro hac vice)
Carson H. Sullivan (admitted pro hac vice)
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC  20005

Robert J. Giuffra, Jr.
Theodore O. Rogers, Jr.
Robin D. Fessel
Suhana S. Han
Jeffrey B. Wall
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Defendants,*
*Goldman, Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

August 15, 2014

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND.................................................................................3

    A.    Dr. Yermack's Purported "Rebuttal" Opinions ......................................3

    B.    Dr. Yermack's Qualifications ..................................................................4

ARGUMENT ..........................................................................................................5

    A.    Dr. Yermack's Testimony Will Not Assist the Court................................5

    B.    Dr. Yermack Has No Relevant Expertise To Offer His Purported
        "Opinions." ...............................................................................................6

    C.    Dr. Yermack's Testimony Is Not "Based on Sufficient Facts or Data." .................7

    D.    Dr. Yermack's Other Testimony Should Also Be Excluded. ................................13

CONCLUSION.......................................................................................................16

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Amorgianos* v. *Nat'l R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002) ...................................................................................8

*Fiataruolo* v. *United States,*
    8 F.3d 930 (2d Cir. 1993) .......................................................................................5

*Ho Myung Moolsan, Co.* v. *Manitou Mineral Water, Inc.,*
    No. 07 Civ. 07483(RJH), 2010 WL 4892646 (S.D.N.Y. Dec. 2, 2010)...............5, 7

*In re Puda Coal Sec. Inc., Litig.,*
    ___ F. Supp. 2d ___, 2014 WL 2915880 (S.D.N.Y. 2014) .....................................8

*Koppell* v. *New York State Bd. of Elections,*
    97 F. Supp. 2d 477 (S.D.N.Y. 2000) ......................................................................9

*Pfeiffer* v. *Lewis County,*
    308 F. Supp. 2d 88 (N.D.N.Y. 2004)....................................................................6, 7

*Playtex Prods., Inc.* v. *Procter & Gamble Co.,*
    No. 02 Civ. 8046(WHP), 2003 WL 21242769 (S.D.N.Y. May 28, 2003) ...............9

*United States* v. *Amuso,*
    21 F.3d 1251 (2d Cir. 1994) ...................................................................................6

*United States* v. *Mejia,*
    545 F.3d 179 (2d Cir. 2008) ...................................................................................5

*United States* v. *Mulder,*
    273 F.3d 91 (2d Cir. 2001) ......................................................................................6

**Other Authorities**

Fed. R. Evid. 702 ...........................................................................................................*passim*

## PRELIMINARY STATEMENT

To try to certify their unprecedented Title VII class, Plaintiffs ask the Court to expunge the true facts and instead to rely on their expert's speculation. Specifically, Plaintiffs urge the Court to exclude the direct testimony of 18 Goldman Sachs managers making clear that putative class members held a wide variety of different positions within 140 different business units (the "Business Units"). Then, Plaintiffs offer the unfounded and unreliable speculation of Dr. David L. Yermack that literally hundreds of different positions within Goldman Sachs are "fungible," even though he has no direct knowledge of any aspect of those Business Units or the job functions within them. (Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Reply") at 13–14.)

Plaintiffs claim that Dr. Yermack is a rebuttal expert retained to respond to the opinions of Goldman Sachs' compensation expert, Michael P. Curran, who, with over thirty years of direct experience, is an expert on compensation in the financial industry, including pay packages for lateral hires. (*See* Rebuttal Report of David L. Yermack dated January 28, 2014 ("Yermack Report") at 3 ¶ 12.)[1] But Mr. Curran did not opine about the nature of various positions within Goldman Sachs or any other facts about the inner workings of the Firm; Goldman Sachs has established those facts through the testimony of Firm professionals competent to testify about those matters. Rather, Mr. Curran's testimony concerns general aspects of the financial services industry—the industry in which Goldman Sachs competes for professional talent—such as the need to pay significant premiums to hire professionals laterally.[2]

---

[1] The Yermack Report is attached as Exhibit A to the accompanying Declaration of Robin D. Fessel. The Transcript of the Deposition of David L. Yermack taken on February 25, 2014 ("Yermack Dep.") is attached as Exhibit B to that declaration.

[2] Plaintiffs have moved to strike Mr. Curran's testimony. Goldman Sachs will respond separately to that motion.

In their reply brief, Plaintiffs do not cite Dr. Yermack's testimony merely to rebut Dr. Curran's opinions, but rather to urge the Court to treat Dr. Yermack's opinions as record evidence about positions held by putative class members within Goldman Sachs.

The Court should exclude Dr. Yermack's speculation about the positions and skills of the putative class members for three independent reasons:

*First*, the Court should not permit an "expert" who admittedly has no first-hand knowledge of Goldman Sachs' 140 Business Units, much less about the positions held by professionals within those Units, to testify that those positions are somehow "fungible." This is a question of fact, and the Court can evaluate the evidence on its own without expert testimony of any sort.

*Second*, even if expert opinions on the subjects of job functions and skills at Goldman Sachs would be helpful to the Court, Dr. Yermack has no relevant expertise to offer. He is an academic who studies corporate governance and executive compensation. He has never worked at Goldman Sachs or any other financial services firm, and he has no other "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, that would allow him to opine on the nature of positions within Goldman Sachs or the skills needed to perform those jobs.

*Third*, contrary to Federal Rule of Evidence 702(b), Dr. Yermack's testimony is not "based on sufficient facts or data" to support his opinions. Dr. Yermack has conducted no research about the diversity of positions and skills held by putative class members within 140 Business Units within Goldman Sachs. In fact, he has reviewed no data at all about those positions. Instead, he rests his opinions on what he says unspecified students supposedly told him about entry-level positions within unspecified financial services firms and other purely anecdotal information.

In addition to offering inadmissible opinions about the positions held by putative class members, Dr. Yermack's report—which Plaintiffs have submitted in its entirety—offers other unsupported opinions purportedly responding to Mr. Curran's opinions, including about the lateral hiring of professionals. Just as Dr. Yermack has neither the expertise nor "sufficient facts [and] data" to opine as to jobs and skills at Goldman Sachs, he has no expertise or facts qualifying him to render an opinion about lateral hiring or any of the other matters concerning the financial services industry about which Mr. Curran opines, and Dr. Yermack's opinions about those subjects also should be stricken.

## FACTUAL BACKGROUND

### A.    Dr. Yermack's Purported "Rebuttal" Opinions

To justify their submission of Dr. Yermack's report, Plaintiffs claim that he is responding to Mr. Curran's opinions. (*See* Yermack Report at 3 ¶ 12.) Mr. Curran, who is a Director of Towers Watson, a global leader in compensation consulting, has consulted with financial industry firms on compensation matters for more than thirty years. (Expert Report of Michael P. Curran, dated December 11, 2013 ("Curran Report") at 2–3 ¶¶ 1–7.)[3] Mr. Curran provides testimony concerning compensation in the financial services industry generally, including the need to pay substantial premiums to hire professionals laterally and the fact that different jobs command different premiums depending on the market at the time of hire. (*See id.* at 4 ¶ 13.) Mr. Curran offered no opinion about facts at Goldman Sachs, and Goldman Sachs has not offered Mr. Curran's opinions to prove such facts. Rather, Mr. Curran's opinions are relevant to, among other things, the market for professional talent in which Goldman Sachs competes.

---

[3]    The Curran Report is attached as Exhibit C to the accompanying Declaration of Robin D. Fessel.

In their reply brief, Plaintiffs rely on Dr. Yermack's testimony not to rebut Mr. Curran's opinions, but for an entirely different purpose. Specifically, Plaintiffs rely on Dr. Yermack's testimony to support their factual proposition that the positions held by the putative class members were all "fungible." Plaintiffs claim that the positions Associates and Vice Presidents hold in the financial services industry vary little because "these positions often involve very similar tasks and serve identical customer bases" and because the professionals holding those positions "have a common set of skills." (Reply at 13–14, 16 (citing Yermack Report at 5 ¶ 20, 6 ¶ 23).) As shown below, Dr. Yermack has no basis to offer such opinions, and the first-hand testimony by Goldman Sachs managers demonstrates that Dr. Yermack's speculation is contradicted by the facts.

**B.      Dr. Yermack's Qualifications**

A career academic, Dr. Yermack has been a Professor of Finance at New York University's Stern School of Business since 1994, when he completed a Ph.D. in business economics. (*See* Yermack Report, Curriculum Vitae at 1.) Dr. Yermack has done no research concerning the nature of jobs in the financial services industry, compensation for those jobs or any of the other matters on which he purports to opine. Rather, as he describes in his *curriculum vitae*, his research has been related to "[c]orporate finance; executive compensation; executive stock options; boards of directors; corporate governance; law and economics; sports economics; finance and fashion." (*Id.* at 1.) Nor has Dr. Yermack authored any publications concerning any of the subjects on which he offers opinions here.

Dr. Yermack lists among his qualifications that "[f]rom time to time [he has] been asked to provide consulting advice on compensation issues, on both a formal and informal basis." (Yermack Report at 2 ¶ 6.) At deposition, however, Dr. Yermack testified that he had had only two consulting engagements relating to the financial services industry, one engagement each

with the New York Stock Exchange and Fannie Mae on matters unrelated to any issue in this case. (Yermack Dep. at 48:23–51:8.) And, finally, Dr. Yermack claims that he has "relevant experience as a financial journalist . . ." (Yermack Report at 2 ¶ 6), but he acknowledged that his experience in this regard amounts to nothing more than "cover[ing] finances as a beat reporter" for his college newspaper and a summer job for the Wall Street Journal (Yermack Dep. at 47:3–22).

## ARGUMENT

### THE COURT SHOULD EXCLUDE DR. YERMACK'S SPECULATIVE AND UNSUPPORTED "EXPERT" OPINIONS.

### A. Dr. Yermack's Testimony Will Not Assist the Court.

The Federal Rules of Evidence permit expert testimony only if the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact at issue." Fed. R. Evid. 702(a). The Rules "were not designed to open the door for the admission of all sorts of expert opinions thereby trespassing on the province of . . . the trial court." *Fiataruolo* v. *United States*, 8 F.3d 930, 941 (2d Cir. 1993). The Rules do not permit "the illegitimate and impermissible substitution of expert opinion for factual evidence"; rather, expert testimony "must be limited to those issues where [specialized] knowledge is appropriate." *See United States* v. *Mejia*, 545 F.3d 179, 190 (2d Cir. 2008). "Testimony is properly characterized as expert only if it concerns matters that the [trier of fact] is not capable of understanding on his or her own." *Ho Myung Moolsan, Co.* v. *Manitou Mineral Water, Inc.*, No. 07 Civ. 07483(RJH), 2010 WL 4892646, at *5 (S.D.N.Y. Dec. 2, 2010) (citation omitted).

The Court does not need to hear expert testimony on the extent to which putative class members in 140 Business Units held a variety of different positions requiring different

skills.  Rather, those matters can be—and, in fact, have been—demonstrated by Goldman Sachs, but not Plaintiffs, through documents and testimony by fact witnesses.  The Court needs no expert assistance to understand this evidence.  As the court held in *Pfeiffer* v. *Lewis County,* 308 F. Supp. 2d 88 (N.D.N.Y. 2004), "[t]here is nothing complicated about the evidence . . . such that it would be helpful to the trier of fact to have assistance from an 'expert.'" *Id.* at 96.  As with the testimony excluded in *Pfeiffer*, Dr. Yermack's testimony "would not be helpful to the trier of fact," who "is perfectly capable, on [his] own, to evaluate . . . [the] jobs [at issue]." *Id.*

The Second Circuit has made clear that "[a] district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses." *United States* v. *Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994).  Thus, "the district court should not admit testimony that is directed solely to lay matters which a [fact finder] is capable of understanding and deciding without the expert's help." *United States* v. *Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (internal quotation marks omitted). *See also Pfeiffer*, 308 F. Supp. 2d at 98 ("The trier of fact is perfectly capable, without assistance, of reviewing and comparing the various job descriptions and analyzing any evidence concerning the actual job functions of the [positions at issue] and to formulate its own conclusions concerning the similarity (or dissimilarity) of these positions.").

**B.**     **Dr. Yermack Has No Relevant Expertise To Offer His Purported "Opinions."**

Even on subjects warranting expert testimony, Federal Rule of Evidence 702 imposes the threshold requirement that the purported expert be "qualified . . . by knowledge, skill, experience, training, or education" to provide relevant testimony.  Dr. Yermack has no experience, let alone expertise, concerning the nature of varied jobs held and functions performed by the members of the putative class.  In fact, he has no expertise at all relating to the

nuts and bolts of the wide variety of jobs at Goldman Sachs, or at any other firm in the financial industry.

Dr. Yermack's teaching provides no basis for his opinions. As Dr. Yermack testified, he teaches a course called Restructuring Firms and Industries, which focuses on conflicts of interest among stakeholders in business enterprises and "various incentive systems and sometimes legal rules and other things [that] are used to bring those incentives back into line." (Yermack Dep. at 37:14–38:5.)

Similarly, Dr. Yermack's academic research in such areas as corporate finance, executive stock options and sports economics does not support his opinions here. Dr. Yermack lists in his *curriculum vitae* more than twenty-five publications he has authored, but none give him any expertise to opine about jobs within Goldman Sachs. Rather, his publications concern such topics—irrelevant here—as "Shareholder Voting and Corporate Governance," "Investor Reactions to CEOs' Inside Debt Incentives," and "Golden Handshakes: Separation Pay for Retired and Dismissed CEOs." (*See* Yermack Report, Curriculum Vitae, at 2–4.)

Because Dr. Yermack's expertise has no relevance to the matters about which he purports to opine, the Court should exclude his testimony. "[A]n expert witness is prohibited from testifying on matters beyond the scope of [his] expertise . . . ." *Ho Myung Moolsan, Co.*, 2010 WL 4892646, at *7; *see also Pfeiffer*, 308 F. Supp. 2d at 97 n.5 (excluding testimony concerning similarities between jobs where expert had acknowledged that she was "not specifically educated on" the positions in question).

## C.    Dr. Yermack's Testimony Is Not "Based on Sufficient Facts or Data."

Even if there were a need for expert testimony as to the nature of positions and skills at Goldman Sachs, and even if Dr. Yermack had relevant expertise on those matters, Dr. Yermack's opinions would be inadmissible because they are not "based on sufficient facts or

data." *See In re Puda Coal Sec. Inc., Litig.*, ___ F. Supp. 2d ___, 2014 WL 2915880, at \*14–\*15 (S.D.N.Y. 2014) (citing Fed. R. Evid. 702(b)); *see also Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("[T]he district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.").

Dr. Yermack admitted that he had "done no study of the diversity of jobs at Goldman Sachs." (Yermack Dep. at 100:24–101:3.)  He stated in his report that his opinions concerning jobs and skills were based on his "experience as an educator and researcher." (Yermack Report at 5 ¶ 20.)  But at his deposition Dr. Yermack confirmed that the only knowledge he has about the diversity of positions in the financial services industry and the diversity of skills used in that work is based on *anecdotes* he recalls hearing, largely from his *students*.  And even those anecdotes were limited to *entry level positions*, which are not relevant here.  Specifically, when asked to describe the experience as an educator that he believes qualifies him to testify about jobs and skills in the financial services industry, Dr. Yermack stated:  "I teach many students who take these jobs and either are *candidates interviewing* for them or maybe *newly hired* and then they communicate with me directly about what their role and responsibilities are." (Yermack Dep. at 62:13–24 (emphases added).)

As for Dr. Yermack's claim that he has relevant "research" experience, his deposition testimony confirmed that, in fact, he has done no research whatsoever on the matters about which he purports to testify.  Rather, his purported "research" consists of second-hand anecdotes he recalls hearing at academic conferences, none of which he could even recall:

> Q: Have you done any research on . . . the diversity of jobs in the financial services industry?
>
> A: Well, as I mentioned in my earlier answers, I've considered this question and heard about this question over the course of twenty years

in teaching, working with some of these organizations and talking with
regulators and colleagues in various research forums such as
conferences and meetings and so forth.

Q:   You've talked specifically about the diversity of jobs in the financial
services industry?

A:   From time to time, yes.

Q:   Do you remember any specific occasion?

A:   No, this would have been some time in the past, you know, certainly
not that would be fresh in my memory.

(Yermack Dep. at 68:18–69:13.)

Dr. Yermack's conversations with unidentified students who had unidentified jobs

at unidentified firms—or with unidentified colleagues at unidentified academic conferences at

some unidentified time—do not support his opinions about jobs at Goldman Sachs. *See Playtex*

*Prods., Inc.* v. *Procter & Gamble Co.*, No. 02 Civ. 8046(WHP), 2003 WL 21242769, at *10

(S.D.N.Y. May 28, 2003) (excluding expert medical testimony "based on 'anecdotal

conversations' [the expert] ha[d] had with some patients, and not on any survey or scientific

study"); *Koppell* v. *New York State Bd. of Elections*, 97 F. Supp. 2d 477, 481 (S.D.N.Y. 2000)

(excluding expert testimony where expert's "explanations in each instance [we]re largely

anecdotal").

Moreover, even if hearsay anecdotes could form a proper basis for an expert

opinion, Dr. Yermack's conversations were not even on any relevant topic.  The putative class

consists of professionals who on average were employed at Goldman Sachs or other firms for

more than █ years, with some Vice Presidents having ████████████.[4]  These are mid-

---

[4]  ████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████.

to-upper level professional positions; as Dr. Yermack testified, his discussions with students

concerned *entry-level* positions:

> Q: So the information that [students are] imparting to you is information
> that they have gleaned from interviews or initial contacts with the
> firm; right?
>
> A: Yeah. Many of these firms will visit campus and make presentations
> to the students who are interested in applying and the firms themselves
> make an effort to communicate this information very directly to the
> school. Not only through contact with students, but also through the
> career office and sometimes even interacting with the faculty.
>
> So we get a lot of opportunities to hear from the different companies
> themselves what it is that they're looking for in the preparation of the
> students, what skills they want, what responsibilities these people
> would take on *initially* and so forth.

(Yermack Dep. at 63:24–64:17 (emphasis added).)  And, when asked to explain his statement

that all of the putative class members' jobs are similar, Dr. Yermack again made clear that he

was considering only very junior professionals:

> If you are working, for instance, as a junior analyst in equities
> versus a junior analyst in fixed income, you're basically
> studying securities where investors receive cash flows and to
> value those securities you would discount those cash flows at
> an appropriate risk adjusted rate of return . . . .

(Yermack Dep. at 91:3–22.)

The extent to which the work of first-year analysts does or does not vary has

nothing to do with the skills and job requirements of professionals in more senior positions.

Indeed, Dr. Yermack acknowledged that "[p]articular associates or vice-presidents in a financial

services firm concentrate on different products" (Yermack Dep. at 106:4–7), and that their

specialization increases as they progress in their careers; professionals become "less likely . . . to

transfer to a different business unit because the degree of unique knowledge for that product line

becomes more and more important . . ." (*id.* at 93:19–94:7).  This is simply common sense.

-10-

Moreover, the record evidence makes clear that the impressions that Dr. Yermack claims to have developed from second-hand anecdotes are wrong.  In support of his claim that Associates and Vice Presidents in the financial services industry "often [perform] very similar tasks and serve identical customer bases" (Yermack Report at 6 ¶ 23), Dr. Yermack offers two examples:  "For instance, the underwriting of municipal bonds is not materially different from the underwriting of corporate bonds, and many investment products are sold to the same base of institutional investor customers such as insurance companies and pension funds." (*Id.*)  Not only do Dr. Yermack's examples ignore the great variety of other positions held by members of the putative class—he erroneously presumes that anyone who can underwrite a municipal bond offering also can write a trading algorithm—but also he is simply wrong in asserting that all underwritings are the same, and that all professionals involved in selling products to institutional clients do the same work.  The declarations Goldman Sachs has submitted—many of which Plaintiffs seek to exclude—confirm that Dr. Yermack has no understanding of the variation of professionals within the putative class.[5]

The declaration of Susan Benz, an Extended Managing Director ("EMD") in the Public Sector & Infrastructure ("PSI") Business Unit within the Financing Group in the Firm's Investment Banking Division ("IBD"), belies Dr. Yermack's assertions concerning underwritings.  As Ms. Benz testified, there are, in fact, very significant differences among different types of underwritings:

> Because not-for-profit companies and governmental entities issue tax-exempt bonds, they are governed heavily by tax regulations with which PSI bankers must be familiar.  For example, PSI bankers must understand the rule against arbitrage, or the ability to obtain tax-exempt bond proceeds and

---

[5]    A full set of the declarations was submitted to the Court on July 3, 2014 with Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification.

> invest the funds in higher yielding taxable securities, resulting in a profit. These rules generally do not apply to clients covered by other areas of the Firm.

(Declaration of Susan Benz at 2 ¶ 6; 4 ¶ 11.)

Similarly, other declarations demonstrate that Dr. Yermack is wrong in suggesting that class members all serve "identical" client bases. For example, the Leveraged Finance Business Unit in IBD works with private equity firms. (*See* Declaration of Craig Packer at 3 ¶ 7.) By contrast, the Financial Institutions Group ("FIG") within IBD serves institutional clients, and even within FIG different bankers serve different kinds of clients. As Celeste Guth testified, FIG clients include "banks, insurance companies, asset management firms, financial technology companies and specialty finance institutions." (*See* Declaration of Celeste Guth at 2 ¶ 4.) FIG bankers working with each category of client need "different skills and expertise." (*Id.* at 3 ¶ 9.) For example, "[s]ince asset management firms and financial technology companies are generally permitted to have more debt on their balance sheets than are banks and insurance companies, FIG bankers in the asset management and financial technology sectors need to know more about leveraged finance, and tend to interact more with the leveraged finance team." (*See id.* at 3–4 ¶ 11.) In the Firm's Investment Management Division, many professionals in Private Wealth Management work with individual clients. (*See, e.g.*, Declaration of Megan Taylor at 1 ¶ 3.) And, the Principal Strategic Investment Business Unit in Securities has no external clients at all; rather, this Unit generates revenue by making strategic investments with the Firm's capital. (*See* Declaration of Darren Cohen at 1–2 ¶ 3.)

Moreover, even where different professionals serve the same client base, there is substantial variation in the work those professionals do. For example, in the Commodities Business Unit within the Fixed Income, Currency and Commodities Sub-Division of the Securities Division, many corporate sales representatives dedicate themselves to a "single

-12-

commodity, such as power or coal." (*See* Declaration of Donald Casturo at 2 ¶ 6.) The current Commodities sales representative focusing on coal, for instance, "is a geologist and an engineer by training. He worked in the coal industry for 20 years before joining Goldman Sachs, and both owned and operated power plants that consumed coal. His experience is critical to his ability to work with that commodity today." (*See id.* at 3 ¶ 7.)

### D.     Dr. Yermack's Other Testimony Should Also Be Excluded.

Although Plaintiffs' reply brief cites Dr. Yermack's report only for his inadmissible opinions concerning jobs and skills in the financial services industry, Plaintiffs submitted Dr. Yermack's entire report with their reply, and his report includes a number of additional opinions purporting to respond to Mr. Curran. Those opinions should be stricken as well, because Dr. Yermack has neither the expertise to render them nor "sufficient facts or data" to justify those opinions. *See* Fed. R. Evid. 702(b).

For example, Dr. Yermack takes issue with some of Mr. Curran's opinions concerning lateral hiring of professionals in the financial services industry. (Yermack Report at 9 ¶ 32–11 ¶ 35.) Based on his years of experience in the industry, Mr. Curran testified that even though firms generally prefer to promote and transfer from within when they can, lateral hiring often is necessary for such reasons as to start a new business or to offer a new product. (Curran Report at 9 ¶ 25.) As Mr. Curran has explained, "[r]ecruiting of external talent can thus be critical to filling open positions or starting new product areas." (*Id.*) Based on his years of experience, Mr. Curran testifies that firms typically need to pay significant compensation premiums to attract professionals with established and profitable businesses at other firms in order to induce those professionals to move. (*See id.* at 10 ¶ 28.)[6]

---

[6]     As Goldman Sachs' expert statistician has testified, fundamental statistical tests confirm that professionals hired laterally must be analyzed separately for statistical purposes. (*See*

While Dr. Yermack agrees with much of Mr. Curran's testimony concerning lateral hiring, he purports to rebut some aspects of that testimony. (Yermack Report at 10 ¶ 34.) But Dr. Yermack's deposition testimony confirms that he has neither the expertise nor "sufficient facts or data" to offer an opinion on anything having to do with lateral hiring in the financial services industry; rather, he once again seeks to rely on second-hand anecdotes from "conversations," with alumni, students and others. When asked at deposition whether he had "done any research on the subject of lateral hiring in the financial services industry," Dr. Yermack responded:

> Again, I would want to know more precisely what you mean by research. I've not published an academic paper on this, but it's an issue that is a constant topic of conversation among not only alumni and students, but also among regulators and academics.

(Yermack Dep. at 120:6–16.) And Dr. Yermack admits that he has no basis at all to disagree with Mr. Curran's statement that in order to induce professionals to move laterally "[p]remiums of 25% of an employee's annual compensation are typical, and higher premiums are not uncommon." (Yermack Dep. at 121:6–14.)

Dr. Yermack suggests that lateral hiring is rare below the Managing Director level. (Yermack Report at 10 ¶ 34.) But he offers *no facts* to support this claim, and the record contradicts it: more than 25% of the Associates and almost 35% of the Vice Presidents in the putative class came to Goldman Sachs laterally.[7] Dr. Yermack cites a single article to support his assertions concerning lateral movement of professionals, but that article is limited to investment banking professionals and does not rest on anything resembling rigorous research.

---

Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification at 30.)

[7]    These figures are derived from Tables 4, 5, 6, and 9 in the Expert Report of Dr. Michael P. Ward, dated July 3, 2014.

Indeed, the authors relied entirely on a survey of news reports, making, as the authors themselves recognize, their results unreliable, because lateral moves by senior professionals tend to attract greater news coverage.  The authors based their comments on a "hand-collect[ed]" sample from a single magazine, Investment Dealer's Digest, which contains a section that "discusses movement of *key personnel* within the investment community."  (*See* Daniel Bradley, Hyung-Suk Choi & Jonathan Clarke, *Working for the Enemy?  The Impact of Investment Bankers on Deal Flow*, Feb. 4, 2009, *available at* www.ssrn.com/abstract=1095305 ("Bradley, Choi & Clarke") at 6–7 (emphasis added).)  The authors "acknowledge that [Investment Dealer's Digest] does not contain the full population of banker switches and therefore sample selection bias may be a concern. . . .  Our analysis suggests that IDD reports on key personnel changes, *which also explains the lack of observations at the director level or lower*."  (Bradley, Choi & Clarke at 7 n.8 (emphasis added).)

       The other opinions Dr. Yermack offers are equally unreliable.  For instance, while Dr. Yermack takes issue with Mr. Curran's testimony concerning the substantial variation in compensation from job to job and even between individuals with similar jobs because of differences in individual productivity (Yermack Report at 7 ¶¶ 26–27, 12 ¶ 39), Dr. Yermack has no basis for those opinions either.  At deposition, Dr. Yermack claimed to have relevant expertise because he has "researched broadly about principles of compensation . . . ."  (Yermack Dep. at 29:4–17.)  But research concerning general principles—for example, aligning executive pay with shareholder interests—gives Dr. Yermack no expertise to opine on the diversity of positions held by professionals within Goldman Sachs.

## CONCLUSION

Plaintiffs have the burden to prove commonality through competent evidence. They cannot meet that burden by substituting Dr. Yermack's inadmissible "expert" opinions for the first-hand testimony of Goldman Sachs' witnesses and the relevant documents. Nor can Plaintiffs introduce Dr. Yermack's other opinions, which he has neither the expertise nor the facts to support. For the foregoing reasons, the Court should strike Dr. Yermack's report in its entirety.

Respectfully,

*Theodore O. Rogers, Jr. /BDN*

Barbara B. Brown *(admitted pro hac vice)*          Robert J. Giuffra, Jr.
Neal D. Mollen *(admitted pro hac vice)*            Theodore O. Rogers, Jr.
Carson H. Sullivan *(admitted pro hac vice)*        Robin D. Fessel
PAUL HASTINGS LLP                                   Suhana S. Han
875 15th Street, NW                                 Jeffrey B. Wall
Washington, DC  20005                               SULLIVAN & CROMWELL LLP
                                                    125 Broad Street
                                                    New York, New York 10004
                                                    (212) 558-4000

*Attorneys for Defendants,*
*Goldman, Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

August 15, 2014