UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

H. CRISTINA CHEN-OSTER; LISA PARISI;
and SHANNA ORLICH, on behalf of
themselves and all others similarly situated,

           Plaintiffs,

           -against-

GOLDMAN SACHS & CO.  and THE
GOLDMAN SACHS GROUP, INC.,

           Defendants.

No. 10 Civ. 6950 (AT) (JCF)

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. DAVID L. YERMACK

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................. 1

II.    RELEVANT FACTUAL BACKGROUND ........................................... 2

      A.     Dr. Yermack's Effective and Systematic Rebuttal of Each and Every One of Goldman's Proffered Expert's Flawed Opinions. ............... 2

      B.     Dr. Yermack's Extensive and Impressive Qualifications Render Him Quintessentially Suited to Respond to Mr. Curran. ........................... 5

            1.     Dr. Yermack's Backround and Experience. ................................. 5

            2.     Dr. Yermack's Specific Knowledge of Goldman. ......................... 8

III.   ARGUMENT ...................................................................... 9

      A.     Expert Testimony Is Admissible If It Helps To Establish the Requirements of Rule 23. .......................................................... 9

      B.     Goldman's Specific Criticisms of Dr. Yermack Are Without Merit. ....... 11

            1.     Dr. Yermack's Rebuttal of Mr. Curran's Flawed Opinions on Purported Variability (and Other Topics) Will Assist the Court. ...................................................................... 11

            2.     Dr. Yermack Is Eminently Qualified to Rebut Mr. Curran's Vague Opinions About the Financial Services Industry.............. 13

            3.     Dr. Yermack's Testimony Is Based Upon Sufficient Facts, and Goldman's Argument Otherwise Is Simply an Improper Rehash of its Failed Class Certification Defenses. ...... 15

            4.     Dr. Yermack's Rebuttal to Mr. Curran's Opinions About Lateral Hiring is Appropriate..................................................... 18

IV.    CONCLUSION................................................................... 18

# TABLE OF AUTHORITIES

**Page**

CASES

*Amorgianos v. Amtrak,*
  303 F.3d 256 (2d Cir. 2002) ............................................................................... 10, 16

*Dandong v. Pinnacle Performance Ltd.,*
  No. 10 Civ. 8086, 2013 U.S. Dist. LEXIS 150259 (S.D.N.Y. Oct. 17, 2013) ........................ 10

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993) .......................................................................................... passim

*Emig v. Electrolux Home Prods.,*
  No. 06-4791 KMK, 2008 U.S. Dist. LEXIS 68811 (S.D.N.Y. Sept. 10, 2008) ...................... 13

*Ernst v. City of Chicago,*
  No. 08-4370, 2014 U.S. Dist. LEXIS 61586 (N.D. Ill. May 5, 2014) .................................. 16

*Ho Myung Moolsan, Co. v. Manitou Mineral Water, Inc.,*
  No. 07 Civ. 07483 RJH, 2010 U.S. Dist. LEXIS 127869 (S.D.N.Y. Dec. 2, 2010) ................ 15

*In re NYSE Specialists Sec. Litig.,*
  260 F.R.D. 55 (S.D.N.Y. 2009) ............................................................................. 10

*In re Puda Coal Secs., Inc.,*
  No. 11-cv-2598 KBF, 2014 U.S. Dist. LEXIS 83138 (S.D.N.Y. June 17, 2014) ............. 10, 16

*In re Visa Check/Mastermoney Antitrust Litig.,*
  192 F.R.D. 68 (S.D.N.Y. 2000) ............................................................................. 10

*In re Zyprexa Prods. Liab. Litig.,*
  489 F. Supp. 2d 230 (E.D.N.Y. 2007) .................................................................... 13

*Koppell v. New York State Bd. of Elections,*
  97 F. Supp. 2d 477 (S.D.N.Y. 2000) ...................................................................... 17

*Nimely v. City of New York,*
  414 F.3d 381 (2d Cir. 2005) ................................................................................... 9

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
  691 F. Supp. 2d 448 (S.D.N.Y. 2010) .......................................................... 11, 12, 13

*Pfeiffer v. Lewis County,*
  308 F. Supp. 2d 88 (N.D.N.Y. 2004) .............................................................. 11, 15

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Playtex Prods., Inc. v. P&G Co.*,
  No. 02-cv-8046 WHP, 2003 U.S. Dist. LEXIS 8913 (S.D.N.Y. May 28, 2003). .................... 17

*United States v. Amuso*,
  21 F.3d 1251 (2d Cir. 1994) ........................................................................................ 12

*United States v. Brown*,
  776 F.2d 397 (2d Cir. 1985) ................................................................................... 11, 13

*United States v. Locascio*,
  6 F.3d 924 (2d Cir. 1993) ........................................................................................... 12

*United States v. Mulder*,
  273 F.3d 91 (2d Cir. 2001) ......................................................................................... 12

*Valentin v. New York City*,
  No. 94-cv-3911, 1997 U.S. Dist. LEXIS 24059 (E.D.N.Y. Sept. 9, 1997) ............................ 16

**RULES**

Fed. R. Evid. 401 ...................................................................................................... 9

Fed. R. Evid. 702 ...................................................................................................... 13

Fed. R. Evid. 702,
  Advisory Committee Notes ........................................................................................ 10

1191390.2

## I.      __INTRODUCTION__

Defendants Goldman, Sachs & Co. and The Goldman Sachs Group, Inc. ("Goldman")' s motion to exclude the testimony of Plaintiffs' expert Dr. David L. Yermack is meritless, improper, and should be denied for the reasons below.[1]

Dr. Yermack is a highly credentialed professor of finance at New York University's Stern School of Business, with decades of relevant experience relating to the financial services industry in various capacities.  These include work with the Federal Reserve, consulting and training experience in financial services companies and with the government, extensive peer-reviewed scholarship on compensation and other subjects, editorial positions on top journals, teaching, and research on financial services companies.  Goldman's challenge to Dr. Yermack's qualifications ignores or mischaracterizes Dr. Yermack's experiences and background, and takes an overly-narrow view of qualifications that is not supported by the law of this Circuit.

Dr. Yermack has applied his impressive and relevant qualifications to thoroughly and effectively rebut the opinions of Goldman's own proffered expert Michael P. Curran, a management consultant.  The scope of Dr. Yermack's rebuttal report was co-extensive with Mr. Curran's.  Accordingly, Goldman's argument that the topic of jobs in the financial services industry is inappropriate for an expert opinion such as Dr. Yermack's is curious, suggesting Goldman's disavowal of its own expert on this issue, Mr. Curran, as much as anything else. Regardless, Goldman's challenge to the scope of Dr. Yermack's opinions is misplaced because responding to another expert is the basic function of a rebuttal report.

---

[1] The Rebuttal Report of David L. Yermack, Expert Witness for Plaintiffs ("Yermack Report"), is attached as Exhibit A to the Declaration of Anne B. Shaver in Response to Defendants' Motion to Exclude Expert Testimony of David L. Yermack ("Shaver Declaration").

Goldman's potpourri of other arguments simply has nothing do with *Daubert*.  Instead, Goldman again improperly tries to re-argue class certification (including lengthy regurgitation of the declarations of its proposed fact witnesses) and/or quibble with Dr. Yermack on the merits. Goldman's motion should be denied as without merit and stricken to the extent it is improper sur-reply on class certification.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   Dr. Yermack Systematically Rebuts Each of Mr. Curran's Flawed Opinions.

Dr. Yermack submitted his Report in response to Goldman's proffered expert, Michael Curran, a director at the management consulting firm Towers Watson.  Mr. Curran offered opinions relating to compensation, lateral hiring, and purported job and compensation variability in the financial services industry as a whole.  As Plaintiffs' Motion to Exclude Expert Testimony of Michael P. Curran [Dkt. No. 305] demonstrates, Mr. Curran's principal opinions are methodologically unsound, and his report merely contains generalized opinions that are irrelevant and/or that do not assist the Court.  Moreover, Mr. Curran's opinions are also misleading and vague.  Thus, Dr. Yermack—as is appropriate and typical in rebuttal analysis— responded to, and demonstrated the problems with, each of Mr. Curran's opinions.

First, Dr. Yermack explains that Mr. Curran's opinions about the purported variety of jobs within the financial services industry are flawed and inapplicable to lower-level professional positions.  Dr. Yermack explains that individuals at the level of Class members in this case (employees promoted from entry-level positions out of college or coming straight from business school, and the next level up from these positions) tend to have common sets of skills and job tasks, that specialization occurs at higher levels, that many firms cross-train their employees and engage in internal transfers, and that most financial services firms have similar organizations and tend to offer the same products and services.  Yermack Report, at ¶¶ 19-25.  Notably, these

opinions are strongly corroborated by the evidence on class certification.  *See* Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification [Dkt. No. 310] at 13-16 (describing, among other things, how frequently employees simply transfer from one area to another as an empirical matter, testimony about common skills and common products and services, and evidence about the unstable nature of the business units).

Second, with respect to Mr. Curran's opinions on the purported variation in compensation, Dr. Yermack notes that the sole data on which Mr. Curran relied contradicts Mr. Curran's own point, in that "the data appear to be quite stable.  The ratio between sales and trader annual compensation (obtained by dividing one number by the other) lies between 0.98 and 1.15 for the eight cells shown, with a standard deviation of 0.05."  Yermack Report, at ¶ 27. Dr. Yermack also examines additional data that, along with what Mr. Curran presents, confirms that the pay of associates and vice president-level employees is "far less variable than the pay of more senior employees."  Yermack Report, at ¶ 31.  Dr. Yermack also discusses how Mr. Curran overlooks the competition for promotion in his attempted analysis of the reward system within the financial services industry.  Yermack Report, at ¶¶ 26-31.

Third, Dr. Yermack discusses Mr. Curran's opinions about the impact of lateral hiring on compensation.  As an initial matter, it bears emphasis that lateral hiring does not have a meaningful impact on the statistical results in the case.  Dr. Henry S. Farber, Plaintiffs' statistical expert, uses lateral status as one of many regression-controlled factors and finds that even after controlling for this and other facts, there is a statistically significant difference in pay between men and women, in both the Associate and Vice President levels.  *See, e.g.*, Expert Report of Henry S. Farber, February 17, 2014 [Dkt. No. 259], ¶ 7.  Because Goldman nevertheless ascribes such importance to this issue in its motion, Plaintiffs note that Dr. Yermack in fact reveals

*multiple* problems with Mr. Curran's opinions about lateral hiring.  Yermack Report, at ¶¶ 32-35. These include Mr. Curran's lack of data; his questionable and unexplained conflation of the act of lateral hiring (it occurs) with the characteristics of the people being laterally hired; Mr. Curran's failure to differentiate the irrelevant lateral recruiting of senior staff (where data shows most movement occurs) from recruiting of junior-level associates and vice presidents; and Mr. Curran's failure to recognize the myriad specific ways in which his assumptions about lateral hiring are not relevant to Goldman.

Fourth, Dr. Yermack observes that Mr. Curran's opinions about manager discretion in compensation (and implicitly about lack of transparency) are out of step with guidance from regulators like the Federal Reserve, and belied in part by Mr. Curran's own statements elsewhere in his report.  Yermack Report, at ¶¶ 36-39.

Fifth, Dr. Yermack (with the benefit of broader and deeper experience than Mr. Curran's, as discussed in the next section) demonstrates how Mr. Curran's assertion about the purportedly unique need for precision in setting compensation in the financial services industry is wrong. Specifically, Dr. Yermack explains that "personnel expense represents a key metric in numerous industries, including some of those cited by Mr. Curran" and that "generally it is important in every industry for which human capital represents a potential competitive advantage at a firm." Yermack Report at ¶ 42; *id.* at ¶¶ 43-45 (discussing specifics of the other industries identified by Mr.Curran).

Overall, Dr. Yermack concludes that "Mr. Curran's opinions are not adequately supported and/or not appropriately applied to Goldman Sachs employees at the associate and vice president level."  Yermack Report, at ¶ 47.

Through this motion, as discussed more specifically below, Goldman now seeks to resuscitate or at least reframe Mr. Curran by minimizing—and altering—the scope of his testimony.  Rather than presenting Mr. Curran as a broad expert on supposed job and compensation variability, compensation practices, and management practices, Goldman asserts that Mr. Curran is simply (and apparently only) providing some background on the industry in which Goldman Sachs competes for professional talent.  Br. at 1, 3.  Yet having directed its proffered expert to opine on a broad range of topics, Goldman cannot now limit the scope of rebuttal through lawyer characterization of the opinions.  Dr. Yermack is entitled to respond, and has done so consistent with Mr. Curran's opinions.

> **B.**    **Dr. Yermack's Extensive and Impressive Qualifications Render Him More Than Suited to Respond to Mr. Curran.**

> **1.**    **Dr. Yermack's Backround and Experience.**

Goldman's treatment of Dr. Yermack's qualifications is misleading and wrong. Dr. Yermack is a professor of finance at New York University's Stern School of Business with decades of multi-faceted practical, research, academic, and professional experience in the financial services industry.  Yermack Report, ¶ 2.[2]  As an initial matter, he holds a Ph.D. in Business Economics from Harvard University, as well as a Bachelor of Economics, M.B.A., J.D., and Master of Business Economics from Harvard.  *Id*.  Dr. Yermack's Ph.D. dissertation was written in the area of management compensation, his main area of research specialization. *Id*., ¶ 3.  Among other things, he studies executive stock options and equity compensation of managers in public corporations, encompassing incentive pay generally, as well as the

---

[2] *See, e.g.,* Dr. Yermack's curriculum vitae, attached thereto.

compensation of any financial services professional who is compensated in part with equity, as Class members are here.  Yermack Dep. at 13:3-12.[3]

Dr. Yermack's expertise in the area of compensation of Associate and Vice-President-level employees in financial services is unquestionable.  As he explained, "I have been trained as a professional researcher in the fields of labor economics and management compensation.  I've published scholarly articles in this area.  I've taught many students and worked with the regulators in this area and I follow the industry very closely in my capacity as a professor of finance at New York University."  Yermack Dep. at 9:16-23.  Notably, Dr. Yermack has published over twenty-five peer -reviewed articles in the top academic journals in Finance, Economics, and Accounting, many of them based on data sets that include financial services firms and discuss compensation issues relevant to financial services.  Yermack Report, ¶ 3; Yermack Dep. at 21:22-22:8.

Dr. Yermack also serves on the editorial boards of five leading finance journals, all of which have published articles on compensation in the financial services industry in recent years. Yermack Report, ¶ 4; Yermack Dep. at 17:8-16.  He is currently a Faculty Research Associate at the National Bureau of Economic Research, which serves as a focal point for the distribution of current research in economics and finance, and in this capacity he both publishes his research and attends presentations of other scholar's research as well.  Yermack Dep. at 19:18-21:4.  In addition, Dr. Yermack participates regularly in the leading academic conferences in his field, and in the past three years he has given two keynote addresses on the topic of compensation in the financial services industry.  Yermack Report, ¶ 4; Yermack Dep. at 32:4-24.

---

[3] The excerpts of the February 25, 2014 Deposition of David L. Yermack are attached as Exhibit B to the Shaver Declaration.

Dr. Yermack's expertise includes both how financial services professionals are compensated and the nature, duties, and required skills of their jobs.  Dr. Yermack has held recurring appointments for over eleven years as a visiting scholar at the Federal Reserve Banks of New York and Philadelphia.  Yermack Report, ¶ 4; Yermack Dep. at 26:21-27:5.[4]  These appointments have entailed discussions with the research staff of the Federal Reserve about the topics in the Report, including the fungible skills of lower-level professional employees.  Yermack Dep. at 79:4-81:6.  Dr. Yermack has also consulted on compensation issues for two financial services firms,[5] as well as the Securities and Exchange Commission and the Justice Department.  *Id.* at 48:23-50:12; Yermack Report, ¶ 6.

   Each year at New York University, Dr. Yermack teaches a foundational course to between 600 and 800 students who are seeking to work in the financial services industry.  Yermack Report, ¶ 5.  The course surveys a broad range of transactions common in business, including mergers and acquisitions, recapitalization, spin-offs, and equity carve-outs.  Yermack Dep. at 38:18-13.  In recent years, his course has highlighted the restructuring of the financial services industry in response to the financial crisis, as a way to "connect students very directly with issues that they're likely to face when they graduate."  *Id.* at 38:14-24.

Dr. Yermack notes that many of his students work in financial services firms in New York, and "come back to me with questions about their work that are maybe relevant to what

---

[4] "Typically you will spend a day there three, four, five times a year and while you're there you may present a seminar of your research and attend their seminars and you'll meet directly with the research staff there and discuss very often policy issues and work that they're doing within the Federal Reserve itself.  They have sort of a floating roster of forty or fifty academics from the leading business schools . . .  they use them as an outside resource to essentially bring expertise to bear on some of [the] work that they do."  *Id.*

[5] Goldman's assertion that these consulting positions were "unrelated to any issue in this case" is false.  Def. Br. at 5.  Dr. Yermack was retained in each instance precisely because of his expertise in compensation in order to offer advice on compensation issues facing these firms.  Yermack Dep. at 48:23-50:12.

they learned in my course and they supply me with information as well[.]"  *Id.* at 40:3-10.

However, such conversations are by no means the only or primary source of knowledge he has

about the types of positions held in the financial services industry, as Goldman misleadingly

asserts.  Def.  Br. at 8.  In fact, in addition to his decades of research on the industry, Dr.

Yermack has also taught training programs for newly hired analysts and associates in leading

Wall Street investment banks, including both "basic financial analysis and techniques that are

universal throughout the industry" as well as "specific transactions."  *Id.*; Yermack Dep. at 46:5-

20.  In his appointments with the Federal Reserve, and in connection with discussing regulatory

issues relating to compensation with research staff at the Federal Reserve, Dr. Yermack has

explicitly discussed "the commonality of the organization of many of these [financial services]

institutions . . .  [and] the roles and qualifications and the duties of the people from one

organization to another."  *Id.* at 63:7-14.

Finally, early in his career, Dr. Yermack also developed relevant experience as a financial

journalist (including working for the Wall Street Journal covering business and financial news)

and working as a management consultant.  Yermack Dep. at 46:25-47:22.

## 2.    Dr. Yermack's Specific Knowledge of Goldman.

Goldman's characterization of Dr. Yermack's experience with Goldman is also

misleading.[6]  In response to questions at deposition, Dr. Yermack described how, in almost

twenty years of teaching, he has built a network of thousands of alumni, many of whom work in

New York financial services firms, including Goldman Sachs.  Yermack Dep. at 39:9-40:1;

---

[6] Again consistent with and directly responsive to Mr. Curran's opinions, which Goldman now effectively admits have nothing to do with Goldman itself, Dr. Yermack's report was about the financial services industry.  Thus, while Dr. Yermack's Goldman-specific knowledge is at least equal to (and contextually richer than) Mr. Curran's, Goldman's emphasis on Goldman-specific knowledge is a red herring given Mr. Curran's focus, as discussed below.

55:14-56:3.  Former students have provided him with ideas for research papers based on current hot industry topics, as well as with data sets to use in such research.  *Id.* at 40:11-41:11; 43:8-18.  Moreover, alumni have shared with him information about their job duties, their compensation packages, and competition for and criteria relating to hiring and promotion.  *Id.* at 42:5-43:7; 62:20-24 ("they communicate with me directly about what their roles and responsibilities are").  Far from ad hoc and superficial anecdotes, Dr. Yermack testified that these "firsthand contacts with people who work in the industry or who are hoping to work in the industry" have "contribute[d] to the expertise that I have."  *Id.* at 41:24-42:4.

## III.    ARGUMENT

Goldman's arguments are unsupported factually and legally.  Indeed, much of its argument section has nothing to do with *Daubert*.  Goldman's motion to exclude should be denied and its improper attempt to use an expert brief to re-argue class certification in violation of Court-ordered page limits should be rejected.

### A.    Expert Testimony Is Admissible If It Helps To Establish the Requirements of Rule 23.

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions[.]"  *Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993)).  While *Daubert* requires that an expert's testimony "both rest[ ] on a reliable foundation and [be] relevant to the task at hand[,]" with regard to exclusion based on relevance, "[t]he Rule's basic standard of relevance … is a liberal one."  *Daubert*, 509 U.S. at 587, 597.  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.

As the Advisory Committee to the Federal Rules of Evidence notes, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee Notes. This is because "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002). As the Supreme Court has explained, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

When a motion to exclude expert testimony is made at the class certification stage, the *Daubert* standard applies but the "inquiry is limited to whether or not the [expert reports] are admissible to establish the requirements of Rule 23." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 66 (S.D.N.Y. 2009). "The question is not … whether a jury at trial should be permitted to rely on the expert's report to find facts as to liability, but rather whether the Court may utilize it in deciding whether the requisites of Rule 23 have been met." *Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2013 U.S. Dist. LEXIS 150259, at *41-42 (S.D.N.Y. Oct. 17, 2013) (brackets omitted) (citing *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 77 (S.D.N.Y. 2000) (internal quotations and alterations omitted)).

Dr. Yermack's rebuttal report handily meets these standards. *See In re Puda Coal Secs., Inc.*, No. 11-cv-2598 KBF, 2014 U.S. Dist. LEXIS 83138, at *51 (S.D.N.Y. June 17, 2014) ("Of course, a plaintiff himself may proffer [expert] rebuttal evidence to counter [expert] evidence offered by a defendant to defeat the plaintiff's claim.").

**B.      Goldman's Criticisms of Dr. Yermack Are Without Merit.**

**1.      Dr. Yermack's Rebuttal of Mr. Curran's Flawed Opinions on Purported Variability (and Other Topics) Will Assist the Court.**

If the Court considers Mr. Curran's testimony in deciding class certification rather than excluding it (as Plaintiffs separately advocate), Dr. Yermack's testimony will assist the Court. Goldman's argument that Dr. Yermack's opinions about purported job duty variation improperly intrude on the trier of fact is disingenuous.  Dr. Yermack was responding to Mr. Curran's opinions on this very topic.

In addition, Goldman misstates the relevant standard: experts do not intrude on the province of a trier of fact simply by rendering opinions relating to *subjects* also broadly addressed by fact witnesses; they do so if the *opinions themselves* are just fact opinions dressed up as expert opinions (which is not the case here).  *See, e.g., Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 462 (S.D.N.Y. 2010) (admitting expert report summarizing hedge fund documents because "these documents are studded with complex terminology, and a lay juror may well have difficulty understanding their meaning without the aid of expert testimony"); *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (holding that because undercover officer "knew a good deal more about street narcotics deals in Harlem than did the jurors," his testimony regarding a pattern of conduct often found in narcotics cases would assist the jury).  Dr. Yermack is particularly familiar with a subject outside the province of a fact witness, *i.e.*, the skills used and required to be possessed by junior-level professionals in financial services.  This testimony is admissible, certainly to the same extent as Mr. Curran's.  And, Goldman has not argued, and could not credibly argue, otherwise.

Goldman's case law also does not support its argument.  *Pfeiffer v. Lewis County*, 308 F. Supp. 2d 88 (N.D.N.Y. 2004), explained that expert opinions on subjects that "may be helpful" to the trier of fact are admissible.  *Id.***Error! Bookmark not defined.** at 97.  The *Pfeiffer* court allowed expert testimony on the employer's compensation processes (or lack thereof) relating to internal equity, because that topic "likely is not within the ordinary purview of lay triers of fact", while at the same time, and unremarkably, rejecting testimony simply comparing two correction officer jobs based on job descriptions.  *Id.* at 96-97.  Here, and similar to *Pension Committee* discussed above, Dr. Yermack's testimony regarding the similar financial instruments used by Class members and their  job duties and skills related to same is proper expert testimony.  Yermack Report, ¶ 23.[7]

Goldman's reliance on *United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) for the proposition that Dr. Yermack is somehow only responding to fact testimony (again whitewashing defense expert Mr. Curran out of the picture) is also misplaced.  *Amuso* dealt with the specific issue—particular to criminal cases and inapposite here—of avoiding law enforcement imprimatur to government witnesses.  The court cautioned that testimony from a law enforcement official that corroborates the facts of a lay witness may create an improper implication that the expert believes the government witness to be credible and the defendant to

---

[7] Goldman's reliance on *United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001) is unavailing for the same reason.  In *Mulder*, the court rejected the argument that the expert testimony should be excluded because it simply covered the same subjects that juries might think they understand without expert help.  "Labor coalitions and their goals are not well known or commonly understood.  Nor are their history and tactics.  We have upheld expert testimony on the structure and tactics of the Mafia, *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993), and, by virtue of television, best selling novels, and the movies, the Mafia is far better known to the general public than are labor coalitions.  Defendants do not contend - nor could they - that the average citizen knows much about minority representation in the construction trades."  *Id.* at 101-102.  The same is true with respect to aspects of financial service industry job duties and skills.

be guilty.  *Id.* at 1263.  Nowhere did the court articulate or endorse a broad rule that expert

testimony is always improper if it corroborates testimony given by fact witnesses.  In addition,

Plaintiffs have the right to use expert testimony to challenge the statements of Goldman's fact

witnesses—which are inherently unreliable for the reasons set forth in Plaintiffs' reply brief

[Dkt. No. 310 at 41].

2. <strong><u>Dr. Yermack Is Eminently Qualified to Rebut Mr. Curran's Generic<br/>Opinions About the Financial Services Industry.</u></strong>

As described above, Goldman's attacks on Dr. Yermack's qualifications to respond to

Mr. Curran's vague opinions on the purported variation of jobs in the financial services industry

are misplaced.  Goldman ignores that an expert can be qualified based on experience, and

ignores or mischaracterizes the specific, highly relevant, multi-faceted experience Dr. Yermack

has acquired through his experience as an academic, researcher, and consultant, and his

involvement with regulators.

An expert witness must be "qualified as an expert by knowledge, skill, experience,

training, or education[.]"  Fed. R. Evid. 702.  "Courts within the Second Circuit have 'liberally

construed expert qualification requirements.'"  *Pension Comm.*, 691 F. Supp. 2d at 457 (citing

*Brown*, 776 F.2d at 400 ("The words 'qualified as an expert by knowledge, skill, experience,

training or education' must be read in light of the liberalizing purpose of the Rule[.]")).  An

expert can be qualified by general knowledge of or experience in an industry, even if he has not

previously studied the exact issue presented in the case.  *See Emig v. Electrolux Home Prods.*,

No. 06-4791 KMK, 2008 U.S. Dist. LEXIS 68811, at *17 (S.D.N.Y. Sept. 10, 2008) ("[G]iven

the liberality with which courts approach the issue of expert qualifications, [the expert]'s vast

experience evaluating and drafting assembly instructions in general qualifies him to testify as an

expert on the adequacy of assembly instructions in this case, even if he does not have significant

experience in the particular area of consumer instructions.") (collecting cases); *In re Zyprexa*

*Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and

experiential qualifications in a general field closely related to the subject matter in question, the

court will not exclude testimony solely on the ground that the witness lacks expertise in the

specialized areas that are directly pertinent.").

Here, Dr. Yermack is unquestionably qualified to respond to Mr. Curran and address

issues of the jobs held in the financial services industry.  He has spent almost twenty years at

NYU preparing students to enter into such jobs, and he testified that part of the utility of his

alumni network is that it keeps him current on the types of issues students will tackle when they

enter the workforce.  Yermack Dep. at 39:4-40:10.  In addition, he has been hired by leading

Wall Street investment banks to train analysts and associates in "basic financial analysis and

techniques that are universal throughout the industry" as well as "specific transactions."  *Id.* at

46:5-20.  He could not be successful in either of these teaching/consulting capacities without

expertise in financial services jobs, and the skills needed to perform them.

Dr. Yermack's relevant experience on the so-called diversity of jobs at financial services

firms also includes "how I've often discussed these issues with regulators, read widely about it in

the news media and research reports and I've encountered this information not only in face-to-

face conversations with people, but in a variety of written and research conference settings and

orders.  It's an issue that one hears constantly about in my line of work."  *Id.* at 103:7-16; Section

II(B)(1) above.  For example, as he described, "the Fed has tried very hard to organize people

into groups that permit them to make inquiries about things like risk taking and the incentive

structures that are in place and they've not found this terribly difficult.  They found that the data

they're met with from different companies is reasonably comparable and that, as I state in the

report, the specialization really is at higher levels.  At lower levels you have people who have common skills and who are likely to move around .  .  .".  Yermack Dep. at 79:8-18.

Given Dr. Yermack's manifest qualifications and expertise in the areas on which he opined (*i.e.*, the areas on which Mr. Curran opined), Goldman's cases are completely inapposite. In *Ho Myung Moolsan, Co. v. Manitou Mineral Water, Inc.*, No. 07 Civ. 07483 RJH, 2010 U.S. Dist. LEXIS 127869 (S.D.N.Y. Dec. 2, 2010), the court excluded expert testimony on issues that were irrelevant to the opinions he was retained to provide.  Goldman has never argued that Dr. Yermack's opinions suffer from the same alleged default—nor could it.

Goldman also relies on dicta from *Pfeiffer*, *supra*, 308 F. Supp. 2d 88.  In a footnote, that court noted that the portion of the expert report on the different stress factors involved in the two jobs "also raises reliability issues" because the expert's conclusion was "based upon conjecture and surmise."  308 F. Supp. 2d at 97, n.5.  The expert report stated that although she was not specifically educated in the dangers associated with the jobs, it appeared to her that they were more or less equivalent overall, with no foundation for the statement.  *Id.*  By contrast, here Dr. Yermack has particular specialized knowledge about the nature of jobs within the financial services industry, and the opinions set forth in his report are supported by his decades of experience working in his field.

> **3.      Dr. Yermack's Testimony Is Based Upon Sufficient Facts, and Goldman's Argument Otherwise Is Simply an Improper Rehash of its Failed Class Certification Defenses.**

In arguing that Dr. Yermack's testimony about the absence of meaningful job duty variation is not based on sufficient facts about Goldman Sachs itself, Goldman duplicates its failed qualifications argument; pretends Mr. Curran's report (which was not about Goldman) does not exist; mischaracterizes Dr. Yermack's knowledge of Goldman; and, most concerning, presents totally improper additional argument in opposition to class certification, having nothing

-15-

to do with *Daubert,* in violation of the Court's August 12, 2014 order forbidding further

submissions. *See* Dkt. No. 300

This Court has been clear that Goldman is entitled to *no* further sur-reply, and Goldman's

attempt to present additional argument dressed as an attack on Plaintiffs' expert (in which

Goldman does not even try to tether its arguments to *Daubert* analysis) should be rejected.

Pages 11-13 of Goldman's brief, in which Goldman essentially reargues its class certification

opposition and delves into its fact evidence, should be stricken.

As an initial matter, even focusing on the slice (a small slice of his overall expertise), of

Dr. Yermack's experience springing from his decades of targeted conversations with alumni in

the financial industry, some at Goldman, Dr. Yermack's reliance on information about financial

services jobs and jobs at Goldman learned from students and colleagues is appropriate in this

context.  "Experts need not have firsthand knowledge to testify on a given issue if it is of a type

reasonably relied on by experts in the field." *Valentin v. New York City*, No. 94-cv-3911, 1997

U.S. Dist. LEXIS 24059, at *69-70 (E.D.N.Y. Sept. 9, 1997) (expert report of former police

officer turned sociology professor was admissible as to "code of silence" in police ranks where

opinions rested on anecdotal observations and conversations during his tenure as an officer, as

well as conversations at conferences on policing).  In addition, "[t]he mere fact that an expert's

opinions are not based on formal studies does not make the opinions inadmissible." *Id.* at *70;

*see also Ernst v. City of Chicago*, No. 08-4370, 2014 U.S. Dist. LEXIS 61586, at *14 (N.D.  Ill.

May 5, 2014) (denying motion to exclude testimony of exercise physiologist where expert "did

not simply offer his *ipse dixit*; rather, he linked his assertion to what he has seen and experienced

in his work in the field over the years").

Goldman cites no case supporting the flawed notion that Dr. Yermack lacks sufficient facts, instead citing only a case setting forth the general proposition that the Court is a gatekeeper, *see Amorgianos*, 303 F.3d at 256, and another case where the expert admittedly had no knowledge of the issue at hand (namely, the standard of care applicable to auditors conducting an audit of a U.S. registered company), *see In re Puda Coal Secs., Inc.*, 2014 U.S. Dist. LEXIS 83138, at *51. Goldman also points to two cases where expert testimony was excluded on the inapposite grounds that the expert lacked expertise in the subject area, *Koppell v. New York State Bd. of Elections*, 97 F. Supp. 2d 477 (S.D.N.Y. 2000) or relied *solely* on anecdotal conversations, *Playtex Prods., Inc. v. P&G Co.*, No. 02-cv-8046 WHP, 2003 U.S. Dist. LEXIS 8913 (S.D.N.Y. May 28, 2003). Here, by contrast, Dr. Yermack has ample expertise derived from both academic study and from practice, and he relied not on *ad hoc* anecdotes that he happened to hear about from time to time, as in *Playtex*, but on deliberately cultivated information used to inform his course material and his research. His report also cites to specific articles, as well as survey data from financial services professionals. Goldman's arguments are without merit.[8]

More concerning, Goldman devotes most of this section to selectively quoting its own self-serving manager witnesses, expressly admitting its objective is to show that Dr. Yermack's opinions are "wrong." Goldman Br. at 12. Tellingly, this section of Goldman's brief cites *no* legal authority, applies *no* principles of *Daubert*, and simply and unabashedly repeats class certification arguments and Goldman's defense to the pending motion to strike these very

---

[8] Goldman's alternative argument that Dr. Yermack is only familiar with analyst positions is incorrect. Def. Br. at 10. One deposition excerpt Goldman cited in purported reliance on this assertion was about *post*-business school hires, Yermack Dep. at 63:24-64:17, and the other simply mentioned junior analysts *as one example*. Yermack Dep. at 91:1-92:2.

witnesses.  Goldman's brazen violation of the Court's order is improper and this section of its brief should be stricken.[9]

### 4. Dr. Yermack's Rebuttal to Mr. Curran's Opinions About Lateral Hiring is Appropriate.

Goldman makes another improper merits argument that (in its view) Dr. Yermack's opinions about lateral hiring are wrong.  This is not a basis to exclude.  Moreover, the record Goldman points to (and the entire record) are actually consistent with Dr. Yermack's opinions.

As an initial matter, even controlling for lateral hiring, statistically significant pay differences exist.  Thus, to the extent Goldman is implying that the existence of lateral hiring is a justification for pay differences, this is wrong.  Moreover, Goldman's assertion in its brief of the percent of lateral hires at Goldman in Class positions entirely supports Dr. Yermack's observation that Goldman is an attractive firm for laterals (possibly allowing Goldman to pay lower premiums); in no way contradicts Dr. Yermack's observation that there is more lateral movement at the managing director level generally than at lower levels; and does not speak to whether laterally-hired individuals actively sought work at Goldman or whether they were recruited.

Finally, Goldman also argues that Dr. Yermack lacks sufficient facts (and challenges the persuasiveness of some of Dr. Yermack's authority), but does not attempt to square this position with its earlier proffering of Mr. Curran (who himself made no study of lateral hiring at Goldman) on this same topic.

## IV. CONCLUSION

For the reasons set forth above, Goldman's motion should be denied.

---

[9] While beyond the scope of this brief, it is notable that despite attempting to show as many specific issues as possible, Goldman's high-level manager witnesses cannot help but corroborate the very points Dr. Yermack has made about the need for core competency with basic financial tools and other required generic skills.

Dated:  September 8, 2014                    Respectfully submitted,

                                            LIEFF CABRASER HEIMANN &
                                            BERNSTEIN, LLP

                                            By: _____
                                                     Rachel Geman

                                            Rachel Geman
                                            LIEFF CABRASER HEIMANN &
                                            BERNSTEIN, LLP
                                            250 Hudson Street, 8th Floor
                                            New York, NY  10013
                                            Telephone:  (212) 355-9500
                                            Facsimile:  (212) 355-9592

                                            Kelly M. Dermody (*admitted pro hac vice*)
                                            Anne B. Shaver (*admitted pro hac vice*)
                                            LIEFF CABRASER HEIMANN &
                                            BERNSTEIN, LLP
                                            275 Battery Street, 29th Floor
                                            San Francisco, CA  94111-3339
                                            Telephone:  (415) 956-1000
                                            Facsimile:   (415) 956-1008

                                            Adam T. Klein
                                            Cara E. Greene
                                            Melissa L. Stewart
                                            OUTTEN & GOLDEN LLP
                                            3 Park Avenue, 29th Floor
                                            New York, NY  10016
                                            Telephone:  (212) 245-1000
                                            Facsimile:   (212) 977-4005

                                            Paul Mollica
                                            OUTTEN & GOLDEN LLP
                                            203 North LaSalle Street, Suite 2100
                                            Chicago, IL  60601
                                            Telephone:  (312) 924-4888
                                            Facsimile:  (646) 509-2075

                                            *Attorneys for Plaintiffs and the Putative Class*

1191390.2