# Exhibit A

2014 WL 4746130
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

REED CONSTRUCTION DATA INC., Plaintiff,
v.
The McGRAW–HILL COMPANIES, INC.,
John Does One through Five, and John
Doe Entities One through Five, Defendants.

No. 09–CV–8578 (JPO).
|
Signed Sept. 24, 2014.

*OPINION AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** Plaintiff Reed Construction Data, Inc. ("Reed") brought this action against Defendants McGraw–Hill Companies, Inc., ("McGraw–Hill"), five unidentified natural persons, and five unidentified entities, [1] claiming violations of the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A), the Sherman Antitrust Act, 15 U.S.C. § 2, and various state law torts. Reed alleges that McGraw–Hill surreptitiously accessed Reed's database service and used that access to generate false or misleading product comparisons that it distributed to prospective Reed customers. McGraw–Hill has moved for summary judgment and has moved to exclude the testimony of Reed's expert witness, Dr. Frederick Warren–Boulton. The Court conducted a twoday *Daubert* hearing on the admissibility of that testimony on July 30 and 31, 2014.

For the reasons that follow, McGraw–Hill's motion to exclude is granted, and its motion for summary judgment is granted in part and denied in part.

**I. Background**
The parties are in the business of providing construction product information ("CPI"). CPI began at the turn of the century with written newsletters that provided information on construction projects so that subscribers-ordinarily those in the building trades-could bid for jobs. *See F.W. Dodge Co. v. Construction. Info. Co.,* 183 Mass. 62, 66 N.E. 204 (1903). Today, CPI services are nationwide searchable databases that can filter projects based on the user's preferences. For example, a user can search for library projects in Topeka,

Kansas, worth more than three million dollars, that need plumbing in the next two months. The CPI service will collect all the projects meeting those specifications and provide plans, bidding information, and contact information for the planner, architect, or general contractor on the job. Reed and McGraw–Hill each sell CPI subscriptions at the national, state, and local levels. McGraw–Hill's service is called the "Dodge Network." Reed's is called "Connect." At the national level, Reed and McGraw–Hill are the only two services in the market.

CPI customers generally prefer a service that lists more projects to one that lists fewer projects, all else being equal. The parties, knowing this, compete vigorously over who has the most projects in its database. They also endeavor to protect the information in their databases from unauthorized use. The user agreements that Reed's and McGraw–Hill's customers must sign limit the permissible uses of the information in the database, which do not include creating comparisons with competing CPI providers.

Around 2004, McGraw–Hill began to access Reed Connect for two purposes. First, McGraw–Hill wanted to create comparisons that it believed would be favorable to its Dodge Network. To do this, it needed to know how many projects were listed on Reed Connect. Second, McGraw–Hill wanted to be aware of changes in the marketplace and ensure that Reed was not listing significant projects that it had missed. To do this, McGraw–Hill needed to know what projects Reed was listing. McGraw–Hill endeavored to conceal that it was subscribing to Reed Connect. McGraw–Hill paid consultants-referred to internally as "spies"-to subscribe to Reed Connect. The consultants would create fake entities to subscribe to Reed Connect and would sometimes falsely claim that those entities were associated with actual builders and contractors. McGraw–Hill paid these consultants in cash and personal checks drawn on the McGraw–Hill credit union and listed the expenses on its books as "Stationery and Supplies," or "Magazines and Books." Ultimately, McGraw–Hill spent $3.45 million on consultants' accessing Reed Connect.

**\*2** Once it had access to Reed Connect, McGraw–Hill hired GFK Roper Public Affairs & Media, Inc., ("Roper") to generate product comparisons. Roper advertised itself as an independent entity evaluating the two services. But, according to Reed, Roper did little more than send someone to sit in a room and watch a McGraw–Hill employee run searches on the two services. Roper made no effort to ensure that the two searches were fairly comparable. For example,

Case 1:10-cv-06950-AT-JCF   Document 339-1   Filed 10/19/14   Page 3 of 27

Reed Constr. Data Inc. v. McGraw-Hill Companies, Inc., --- F.Supp.3d ---- (2014)
2014 WL 4746130

McGraw–Hill actually used one of its other (presumably superior) products in the tests but said that it had used the Dodge Network. Further, the searches were selected so as to emphasize McGraw–Hill's strengths and minimize those of Reed. Because Reed had superior listings for projects worth under $1 million, McGraw–Hill limited the comparisons in the Roper Reports to projects worth more than $1 million. Similarly, McGraw–Hill ran the searches so as to capture projects that needed to be completed expeditiously-these projects are called "ASAPs"-in its database but not to capture them in Reed's database. These comparisons resulted in a report in which McGraw–Hill boasted "71% more planning projects, 78% more bidding projects, and 71 % more digitized plans and specifications."(Plaintiff's Exhibit 484 at 33.) Ultimately, Reed had its own expert analyze the data, and came to the conclusion that the Roper reports were biased in McGraw–Hill's favor.

While McGraw–Hill was distributing the Roper reports, it was also conducting ad hoc comparisons of the two services in response to questions from customers. According to Reed, McGraw–Hill issued 1,235 unique ad hoc comparisons based on its unauthorized access to Reed Connect. When customers wanted to compare the services, McGraw–Hill frequently advised them to search for a particular project in both services, knowing all the while that the suggested project would be found only in the Dodge Network. McGraw–Hill also issued a number of state and local comparisons of the two products that were generally similar to the Roper reports in both content and methodology. At the same time, McGraw–Hill touted a five-to-one advantage in "exclusive" projects-those that McGraw–Hill covered but Reed did not-in its communications with customers, particularly large customers. In reality, Reed contends, the true ratio was closer to 2.6–to–one.

On at least a few occasions, McGraw–Hill used its access to Reed Connect to find new projects. Reed describes this as "stealing." (Dkt. No. 156, Plaintiff's Memorandum of Law at 35 [hereinafter "Plaintiff's Memorandum"].) McGraw–Hill describes it as "isolated potential violations of McGraw–Hill's rules in which McGraw–Hill may have used Reed Connect to obtain a source of project leads."(Dkt. No. 150, Defendant's Memorandum of Law, at 15 n. 6 [hereinafter "Defendant's Memorandum"].) McGraw Hill claims that it had "strict rules" (*id.*) in place to regulate the use of its illicitly obtained Reed Connect access. (These rules were, fittingly, called the "Roper Rules.") The parties agree that McGraw–Hill broke

these rules at least a few times and used its access to Reed Connect for purposes other than generating comparisons.

**\*3** Reed brought suit against McGraw–Hill in 2009, pressing its current claims as well as claims under the Racketeering–Influenced and Corrupt Organizations Act (RICO). Judge Sweet dismissed the RICO claims, but allowed the remaining claims to proceed. [2] During the motion to dismiss stage, Reed alleged that no fewer than 231 customers reported noticing the Roper Reports and were influenced by their contents. Discovery has not borne out that claim. Reed can now point to one customer declaration showing that the Roper Reports influenced purchasing decisions. [3] In addition to arguing that it was injured by losing customers, Reed now claims that it was injured because it was forced to price its services lower than it otherwise would have absent McGraw–Hill's misconduct. In support of this damages theory, Reed offers the testimony of Dr. Frederick Warren–Boulton. McGraw–Hill has moved to strike that testimony under Federal Rule of Evidence 702.

## II. Motion to Exclude Dr. Warren–Boulton's Testimony

Reed has retained Dr. Warren–Boulton to answer four questions related to this case. First, is there a distinct *national* market for CPI sufficient to trigger § 2 of the Sherman Act? 15 U.S.C. § 2. Second, did McGraw–Hill exercise power in that market? Third, did McGraw–Hill's misconduct allow it to keep its market power? And, finally, did McGraw–Hill's misconduct damage Reed? The parties refer to Dr. Warren–Boulton's answers to the first three questions as his "liability opinion" [4] and his answer to the final question as his "damages opinion."

### A. Regression Analysis

To support both his liability and damages opinions, Dr. Warren–Boulton conducted statistical regression analyses of Reed's and McGraw–Hill's pricing and service data. A brief overview of regression analysis may be helpful. The basic regression method is simple: isolate the effect of one variable (the "independent variable") on another variable (the "dependent variable") by holding all other potentially relevant variables (the "control variables") constant. By controlling for other factors that might influence the dependent variable, one "regresses" the influence of the independent variable on the dependent variable. The number associated with that influence is called a "coefficient."

Imagine, for example, that one wanted to isolate the effect of location on the price of an apartment. One would start by comparing the prices of apartments (the dependent variable) of the same size, with the same number of bathrooms, amenities, etc. (the control variables), across different locations (the independent variable). Regression analysis formalizes that method by solving an equation of the dependent variables with the independent and control variables for the linear [5] function that best fits the data. To visualize this, the regression model finds the line [6] that best fits a plot of the data points. The spaces between the line and the actual data points are called "residuals."

**\*4** Once the line is found, the analyst must test the validity of the results. To do this, analysts run a series of mathematically complicated tests to answer two uncomplicated questions: (1) How well do the data fit the model? And (2) are the residuals (the spaces between the data points and the regression line) significantly correlated with any of the control variables or the independent variable? To simplify: if the answer to (1) is "not well," the analyst has a problem of statistical significance; if the answer to (2) is yes, she has probably omitted an important variable from her model.

The fundamental goal of regression analysis is to convert an observation of correlation (*e.g.,* apartments in Manhattan cost more than those in Queens) into a statement of causation (apartments in Manhattan cost more than those in Queens *because* they are in Manhattan, not because they are larger or more luxuriously appointed). Models called "residual models" attempt to do this by controlling for every observable variable that might have an effect on the dependent variable and seeing if the *residuals* are significantly correlated with an explanatory variable. Dr. Warren–Boulton's is a residual model.

**B. Dr. Warren Boulton's Method**

Dr. Warren–Boulton was charged with determining whether McGraw Hill's "misconduct" damaged Reed. Reed has already conceded, based on the evidence following extensive discovery, that only a handful of individual customers relied on McGraw-Hill's allegedly false product comparisons. However, Warren–Boulton found what he calls a "price effect." He hypothesized that customers paid more for McGraw–Hill's service than they otherwise would have because of McGraw-Hill's misconduct. He further hypothesized that the amount of McGraw-Hill's gain was the

amount of Reed's loss-that where McGraw–Hill's prices were inflated, Reed's were deflated.

To isolate the price effects of McGraw-Hill's misconduct, Warren–Boulton proposed a "benchmark" model, which is a form of residual model where unobservable data (misconduct, in this case) is extrapolated by comparing observable data to a known benchmark statistic. WarrenBoulton's benchmark model compares the parties' prices for *national* services during the relevant period with the parties' prices for *local* services during the relevant period. He calls the ratio of national to local pricing (for each party) the "price index ratio."

To make the benchmark model work, Warren–Boulton assumes that national pricing is affected by McGraw–Hill's misconduct significantly more than local pricing is and that the effects of McGraw–Hill's misconduct will grow weaker over time (because the misconduct ceased in approximately 2008). The data are indexed to a fixed time in 2013 by which WarrenBoulton assumes that the effects of McGraw–Hill's misconduct will have fully dissipated. Under Warren–Boulton's model, then, if the difference between each party's price index declines over the relevant period, and that decline cannot be attributed to any other observable factor, then there is proof that McGraw-Hill's malfeasance worked a price effect. The parties have likened this expected effect to a funnel: at the start of the misconduct, the gap between the price indices is wide; by the end, it has narrowed to nothing.

**\*5** To test his hypothesis, Warren–Boulton constructed two [7] regression models that control for as many relevant variables as he could think of and measure (what kind of service was being provided, the coverage area, the relevant markets, etc.) and seek to isolate the effect of the length of time since the relevant period began (the independent variable) on the price index ratios (the dependent variable). Time is measured by a variable indicating each quarter since the relevant period began. If the coefficients associated with the quarterly variables are significant and negative, Dr. Warren–Boulton's hypothesis would be confirmed. Controlling for everything else, Dr. Warren–Boulton could claim strong statistical proof for the "funnel" theory of damages.

**C. Regression Analysis under Rule 702**

The admission of expert evidence is governed by Federal Rule of Evidence 702, which codified the Supreme Court's

Reed Constr. Data Inc. v. McGraw-Hill Companies, Inc., --- F.Supp.3d ---- (2014)

2014 WL 4746130

holding in *Daubert v. Merrell–Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The rule charges district courts with determining whether (1) "scientific, technical, or other specialized knowledge will assist the trier of fact," (2) the expert is qualified "by knowledge, skill, experience, training, or education" to testify on that subject, (3) the expert's proffered testimony is grounded on "sufficient facts or data," (4) that testimony is the product of "reliable principles and methods," and (5) the expert "applies the principles and methods reliably to the facts of the case." *See also Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston,* 853 F.Supp.2d 181, 186 (D.Mass.2012), *aff'd sub nom. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC,* 752 F.3d 82 (1st Cir.2014). Courts consider several factors in determining whether testimony is sufficiently scientific to be admissible, including "whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline." *Bricklayers,* 752 F.3d at 91 (internal citations omitted). The burden is on the proponent of the expert's testimony to prove that it is admissible. *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir.1998) ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable."). But "the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

The Court's task under *Daubert* is to determine whether the proffered methodology constitutes "good science" and, therefore, whether it produces "scientific ... knowledge." *Daubert,* 509 U.S. at 593; FED.R.EVID. 702. Scientific knowledge is different from ordinary knowledge. *See* KARL POPPER, THE LOGIC OF SCIENTIFIC DISCOVERY (1934). And knowledge is different from other classes of belief. *Cf.* Bertrand Russell, *On Denoting,* 14 MIND 479, 479–93 (1905). The standard, then, is formally higher than the standard that prevailed before *Daubert,* which required only that the offered testimony be the result of a method that was generally accepted in the relevant analytical community. *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923). But *Daubert* also opened new avenues for scientific evidence to be admitted. Some "good science" has not yet been accepted by the relevant community. The mere fact that experts would

reject the proffered testimony-indeed, the mere fact that *most* experts would reject the proffered testimony-is alone insufficient to render that testimony inadmissible. *See, e.g.,* 3 MUELLER & KIRKPATRICK, FEDERAL EVIDENCE § 33:6–8 (3d ed.2007). The Court must independently serve as the "gatekeeper" for the finder of fact and is left with the "heavy task" of "occasionally ... reject[ing] expert testimony because it was not derived by the scientific method." *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1316 (9th Cir.1995) (Kozinski, J.) [hereinafter *"Daubert II"], on remand from Daubert,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

**\*6** Courts, though, must not determine the credibility of the expert's proffered testimony or compare two experts for the purpose of determining which of them is correct. Rather, *Daubert* and Rule 702 instruct courts to exclude only testimony that is unscientific or unlikely to assist the trier of fact in the determination of a relevant issue. *E.g., Ruiz– Troche v. Pepsi Cola of Puerto Rico Bottling Co.,* 161 F.3d 77, 81 (1st Cir.1998). Strictly speaking, one need not have certainty to have knowledge. *Daubert II,* 43 F.3d at 1316; *see also* Don Herzog, *Cute Prickly Critter with Presbyopia,* 110 MICH. L.REV. 953, 957 (2012) (reviewing RONALD DWORKIN, JUSTICE FOR HEDGEHOGS (2011)). The possibility of mistake need only be tolerable, not remote. Within that tolerable range, disputes over competing expert opinions are to be resolved by the trier of fact. Outside it, courts exclude the testimony.

In the context of regression analysis testimony, some (slightly) more specific standards have emerged in the case law. Questions about the admissibility of regression analyses often arise in two kinds of cases: (1) securities fraud actions in which the plaintiff needs to prove loss causation using stock-price data, and (2) employment discrimination cases in which the plaintiff needs to prove disparate impact or disparate treatment using employment data. *E.g., Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (employment discrimination); *Bickerstaff v. Vassar College,* 196 F.3d 435, 440 (2d Cir.1999) (discrimination); *Koger v. Reno,* 98 F.3d 631, 637 (D.C.Cir.1996) (discrimination); *Sobel v. Yeshiva Univ.,* 839 F.2d 18, 20 (2d Cir.1988) (discrimination); *Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 593 (2d Cir.1986) (discrimination); *Morgan v. Harris Trust & Savings Bank,* 867 F.2d 1023, 1028 (7th Cir.1989) (discrimination); *Allen v. Seidman,* 881 F.2d 375, 378 (7th Cir.1989) (discrimination); *Bricklayers,* 752 F.3d at 91 (securities); *In re Xerox Corp. Sec. Litig.,* 746 F.Supp.2d

Case 1:10-cv-06950-AT-JCF Document 339-1 Filed 10/19/14 Page 6 of 27

Reed Const. Data Inc. v. McGraw-Hill Companies, Inc., --- F.Supp.3d ---- (2014)

2014 WL 4746130

402, 411 (D.Conn.2010) (securities); *Gordon Partners v. Blumenthal,* 02–CV–7377, 2007 WL 431864 (S.D.N.Y. Feb.9, 2007), *rep. and rec. adopted,* 02–CV–7377, 2007 WL 1438753 (S.D.N.Y. May 16, 2007), *aff'd,*293 F. App'x 815 (2d Cir.2008) (securities); *see also S.E.C. v. Razmilovic,* 738 F.3d 14, 34 (2d Cir.2013), *as amended* (Nov. 26, 2013), *cert. denied,* ––– U.S. ––––, 134 S.Ct. 1564, 188 L.Ed.2d 561 (2014) (evaluating credibility of regression experts at bench trial on a securities fraud action). The securities cases provide guidance on (1) permissible methods to select the relevant time periods in which to observe the data and (2) the general limits of subjectivity in regression analysis. *E.g., Bricklayers,* 752 F.3d at 87–89. The employment discrimination cases provide guidance on which control variables are necessary for a regression analysis to be admissible. *E.g.,Bickerstaff,* 196 F.3d at 450.

First, to be admissible, a regression analysis must examine an appropriate selection of data. When constructing a benchmark statistic, the regression analyst may not "cherry-pick" the time-frame or data points so as to make her ultimate conclusion stronger. *Bricklayers,* 752 F.3d at 89 (internal citations omitted). Rather, some passably scientific analysis must undergird the selection of the frame of reference. Ordinarily, in the securities cases at least, the observation dates are selected by looking to the underlying facts of the case: when did the relevant events occur and cease to occur? *Id.* The *Bricklayers* case is instructive. There, the plaintiffs' expert was retained to determine whether alleged misconduct had artificially inflated the price of the defendant's securities. To do this, the expert needed to test the volatility of the defendants' stock price on days when allegedly false or corrective disclosures were made. These days are called "event days." *Id.* But instead of choosing dates with reference to the facts of the case itself, the analyst cherry-picked the most volatile dates in order to make the defendants' disclosures seem more important than they were. *Id.* at 92. The First Circuit concluded that this was impermissible.

**\*7** Second, to be admissible, a regression analysis must be the product of a consistently followed methodology. Some believe that statistics is more an art than a science. *Cf.* Mark Twain, *Chapters from My Autobiography,* 186 N. AMERICAN REV. 161, 166 (1907) (expressing the view that there are "three kinds of lies: lies, damned lies, and statistics"). But for the purposes of *Daubert,* the practice of the art must yield to predictable and justifiable methodology. Again, *Bricklayers* is instructive. There, the regression analyst needed to create a benchmark model of defendants'

stock prices against which to measure the volatility of the prices on the event days. But when he constructed that background model, he excluded any day on which *any* news came out about the defendants' business that could have had an effect on the stock price-as opposed to days on which allegedly corrective news came out. The district court found this to be impermissible cherry-picking as well: there was no valid reason to exclude days on which news that was not the subject of the suit was revealed. *Id.* But the appellate court disagreed. *Id.* at 93–94. It held that because the plaintiffs had presented learned scholarship supporting the proposition that the price of stock can be unusually volatile on days when material news is released, it was fair for plaintiffs' expert to exclude those days. Whether his methodology unfairly singled out the days on which allegedly false or corrective disclosures were made was a matter for the jury to decide. *Id.*

Finally, to be admissible, a regression analysis must control for the "major factors" that might influence the dependent variable. *Bazemore,* 478 U.S. at 400.[8] But, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility."*Id.* Thus, a regression that excludes "major" variables is inadmissible while a regression that excludes other potentially important ones may not be. *Bickerstaff* is instructive on this point. There, the plaintiff sued the defendant-a college at which she was a professor-for failing to promote her because of her race and gender.*Bickerstaff,* 196 F.3d at 440. In an effort to prove that the defendant's non-discriminatory justification was false, plaintiff offered a regression analysis that purported to show a connection between salaries and race among the college's faculty. The regression, though, failed to control for variations in teaching evaluations and duration of service. *Id.* at 449. Because these were two of the most important features upon which the college made salary decisions, their omission was fatal to the analysis. *Id.* Contrast this result with *Bazemore.*There, a regression analysis of salary data in a discrimination case was admissible even though it failed to control for county-to-county differences in salary amounts and yearly salary increases.*Bazemore,* 478 U.S. at 400. Whether those omissions impermissibly biased the results was a matter for the jury to decide.

### D. Problems with Dr. Warren Boulton's Method

**\*8** This Court held a *Daubert* hearing at which Dr. Warren–Boulton testified about his regression analysis and the opinions he derived from it. In rebuttal, McGraw-Hill called Dr. Sumanth Addanki to examine Dr. Warren–Boulton's work

Case 1:10-cv-06950-AT-JCF   Document 339-1   Filed 10/19/14   Page 7 of 27

Reed Const. Data Inc. v. McGraw-Hill Companies, Inc., --- F.Supp.3d ---- (2014)
2014 WL 4746130

and opine on its potential flaws. Neither party challenges the qualifications of the other's expert. Reed has not challenged Dr. Addanki's testimony under Rule 702. The Court turns to its assessment of whether Dr. WarrenBoulton's regression analysis is admissible under Rule 702.

### 1. Model Design

McGraw–Hill objects to Dr. Warren–Boulton's model design in two respects. Both objections concern whether-assuming Dr. Warren–Boulton's statistical methodology is correct-the results stand for what he claims they do. First, McGraw–Hill objects to the use of local pricing data as a baseline statistic. Second, McGraw–Hill objects to Dr. Warren–Boulton's assumption that the market for CPI might manifest a price effect without any noticeable quantity effect.

Dr. Warren–Boulton's model is premised on the theory that McGraw–Hill's misconduct would create a gap in the price indices that begins at the start of the misconduct and gradually narrows as the misconduct recedes into the past. This, in turn, is based on the assumption that McGraw–Hill's misconduct worked its ill effects almost exclusively in the market for national CPI. McGraw–Hill argues that this assumption is inconsistent with the evidence in the case and with Dr. Warren–Boulton's other findings. Dr. Warren–Boulton's liability opinion concludes that the national market for CPI is a distinct one and is, therefore, subject to myriad different market forces, any one of which could be the cause of the narrowing gap that Dr. Warren–Boulton attributes to McGraw–Hill's misconduct. Indeed, during his testimony he acknowledged that "Reed presumably has been becoming a more effective competitor. And so you've got increasing competition in the national market. But not necessarily in the local market because the local market has always been competitive."(Dkt. No. 213, *Daubert* Hearing Transcript at 231 [hereinafter "Hearing Transcript."].) If this is true-and the evidence suggests that it is—McGraw-Hill would be forced to cut its national prices but not its local prices. This would adequately explain the narrowing gap without the presence of any misconduct.

In his declaration in support of Reed's position, Dr. Warren–Boulton responds to the criticism that local pricing is an inappropriate baseline statistic by arguing that if misconduct had an effect on both national and local prices, his model would *underestimate* damages because the baseline against which they are measured would be declining. The problem with this argument is that it is not responsive to McGraw–Hill's concerns. McGraw–Hill is principally concerned

that another unobserved variable-increased competition-can explain the narrowing gap. Dr. Warren–Boulton has not answered this concern-a significant one that, coupled with other flaws in his methodology discussed below, renders the model inadmissible under *Daubert*.

**\*9** Second, McGraw-Hill takes issue with a consequence of Dr. Warren–Boulton's model. This argument takes the form of a *reductio ad absurdum:* if Dr. Warren–Boulton's conclusion is true, it leads to another conclusion that must be false and, therefore, Dr. Warren–Boulton's conclusion must be false. *E.g.,*LEIGH S. CAUMAN, FIRST–ORDER LOGIC: AN INTRODUCTION 36 (1998). Specifically, Dr. Warren–Boulton finds a price effect without any corresponding quantity effect: that is, he finds that the misconduct differentially affected the *prices* that customers were willing to pay for each of the two competitors' services, but had no effect on *how much* customers chose one over the other. This goes against standard microeconomic theory, which predicts that in almost all markets, an increase in the price of a good leads to a decrease in the quantity of that good the market demands. *E.g.,*ROGER A. ARNOLD, MICROECONOMICS 139 (2010). The types of goods for which this prediction does not hold true are perfectly inelastic goods, Giffen goods, and Veblen goods. Perfectly inelastic goods are defined by the fact that people will buy the same quantity regardless of their price. (Oxygen would be one, if it were for sale .) *Id.* Giffen goods are low-quality goods for which an upward change in price produces an upward change in quantity demanded because consumers can no longer afford superior goods. (If the price of bread goes up, those with very little money might buy more of it because they can no longer afford meat.) ALFRED MARSHALL, PRINCIPLES OF ECONOMICS (1895). [9] And Veblen goods are those characterized by conspicuous consumption. (People buy Maserati cars and Rolex watches *because* they are expensive.) THORSTEIN VEBLEN, THE THEORY OF THE LEISURE CLASS: AN ECONOMIC STUDY OF INSTITUTIONS (1912). Reed has not argued that CPI fits into any of these categories. So, absent a contrary explanation, the reductio holds and suggests that Dr. Warren–Boulton's conclusion is flawed.

Dr. Warren–Boulton responded to this objection by noting that the CPI market is characterized by negotiated prices. That is, there is no price set in advance by the seller; each CPI subscription is negotiated individually. This, Dr. Warren–Boulton testified, means that one could reasonably expect a price effect without a quantity effect because the price each consumer is willing to pay is a function of the price of the

competing product and the relative value of the competing product and the negotiated product. [10] Thus, Warren–Boulton asserts, as the perceived values of each product change, the prices will precisely change in lockstep, thereby eliminating any corresponding quantity effect. But this response fails to consider that the companies providing the services are not infinitely flexible in their price negotiations. The price that a consumer is willing to pay for Reed may well be less than the price Reed is willing to sell its service for. If that is the case, the consumer will switch to McGraw–Hill if (and only if) McGraw–Hill is willing to sell its CPI subscription at a price less than what the consumer is willing to pay. As the relative value of McGraw–Hill's service increases and Reed's declines, Warren–Boulton's model predicts that the relative prices will follow the relative values, *increasing* the number of consumers likely to switch services. In order to accommodate the lack of a quantity effect, then, Warren–Boulton must be assuming that the range of acceptable prices for the vast majority of consumers is exceeded by the range of acceptable prices for the service providers. But there is no evidence to support that unstated assumption and no logical reason to suspect it would be true. Dr. Warren–Boulton has offered no reason to believe that the market for CPI services manifests these unusual economic characteristics-a conclusion that flows inexorably from his model. Thus, this problem remains persuasive and contributes to a finding that Warren–Boulton's analysis is inadmissible under *Daubert*.

## 2. Omitted Variable Bias

**\*10** Omitted-variable problems-as the name suggests-arise when important control variables are left out of the model. Imagine trying to calculate the effect of location on the price of an apartment without considering the size of the apartments in the sample. One might end up with what looks like a correlation between location and price, but the result would be meaningless because the entire effect could just as easily be explained by the fact that larger apartments are concentrated in certain locations. McGraw–Hill argues that Warren–Boulton's first model (the one that omitted construction volume data) suffers from this flaw because construction volume data-which is a measurement of the overall amount of construction spending in the nationwide economy-could explain the declining gap between national and local prices.

Regression analyses are admissible even where they omit important variables so long as they account for the "major variables" affecting a given analysis. *Bazemore v. Friday,* 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986). But it is the "proponent who must establish that the major factors have been accounted for in a regression analysis." *Freeland v. AT & T Corp.,* 238 F.R.D. 130, 145 (S.D.N.Y.2006).

To rebut the contention that construction volume is an essential variable, Warren–Boulton claims that it could theoretically have effects in two opposite directions. On the one hand, demand for CPI services might go up when construction goes down because companies are desperate for business. On the other hand, demand might go down because construction companies have less cash on hand and fewer projects to hunt for.

McGraw–Hill offers two objections to this reasoning. First, it goes against generally accepted statistical practice. Statisticians do not ordinarily exclude a variable merely because its effect could be ambiguous. McGraw–Hill's expert, Dr. Addanki, describes the problem: "When I don't know what the effect of a variable is going to be, to leave it out is to elevate ignorance to arrogance."(Hrg. Tr. at 77.) Second, McGraw–Hill notes that there are very good reasons to believe that construction-volume data will have a significantly larger effect on the national market than on the local market-namely, that national firms (which, presumably, are the only customers in the market for national CPI) were hit harder by the 2008 recession than were state and local firms. Finally, the Court notes that Warren–Boulton concedes that the price indices are highly negatively correlated with the construction-volume data, indicating that it has an effect and that the effect is significant and negative. These three observations are sufficient to show that construction-volume data is a "major" variable under prevailing case law, and, therefore, its omission is fatal to Dr. Warren–Boulton's first model.

## 3. Multicollinearity

Dr. Warren–Boulton added construction volume data to his model in response to McGraw–Hill's contention that it might be causing the result that Dr. Warren–Boulton attributes to McGraw–Hill's misconduct. But when Dr. Warren–Boulton added construction volume data to his model, a new problem arose: multicollinearity.

**\*11** Multicollinearity problems typically arise when the independent variable is correlated with one of the control variables. If the control variables move together with the independent variable, it becomes impossible to isolate the effect of the independent variable on the dependent

variable-which, after all, is the goal of regression analysis. The multicollinearity problem manifests itself through low statistical significance of the independent variables. Because of the correlation between the explanatory variables, there is insufficient variation in the data set to produce statistically significant results.

When Warren–Boulton added national construction volume to his regression analysis, he ran into a severe multicollinearity problem. It turns out that construction volume is highly correlated with both the independent and dependent variables. When construction volume is added to the model, the explanatory power of the quarterly time variables plummets. This, McGraw–Hill contends, is fatal to the model. McGraw–Hill argues that the effect captured by Warren–Boulton's model is really due to the construction-volume data, not McGraw–Hill's misconduct.

Warren–Boulton responds by arguing that the effect cannot be due to the national construction-volume data because when that data is analyzed alone on its own it produces bizarre results. When considered alone, construction volume has positive effects on McGraw–Hill national prices and negative effects on McGraw–Hill local prices-but it has the reverse effects in both categories for Reed prices. Thus, Warren–Boulton argues, the price effect cannot be explained by construction volume-and that means it is explained by McGraw–Hill's malfeasance.

This explanation alone is insufficient because many other things-for which Dr. Warren–Boulton did not control when he individually assessed the effect of construction volume-could have created this effect. Perhaps, for example, Reed improved its products in a few important markets while McGraw–Hill did not. Further, Warren–Boulton seems to be relying on the assumption that an economic downturn would have a similar effect on local and national prices for CPI. But one would expect national firms-which are probably the only customers interested in national CPI data-to be hit harder by national downturns than local firms. Similarly, if construction volume is really having no effect-as Warren–Boulton must conclude in order to avoid the consequences of multicollinearity-why is it so well correlated with the dependent variables in the first place? These concerns are significant and contribute to the Court's conclusion that Dr. Warren–Boulton's method is inadmissible under Rule 702.

**4. Statistical Insignificance**

McGraw–Hill also objects that Dr. Warren–Boulton's models are not statistically significant to any reasonable degree and that this alone ought to doom his regression analysis. Specifically, McGraw–Hill contends that Dr. Warren–Boulton's *second* model-the one in which he included construction-volume data-produces no statistically significant result for the quarterly time variables.

**\*12** To the extent that McGraw–Hill's objections on this point center on model two, they are duplicative of its objections based on multicollinearity. The lack of statistical significance in model two arises only because of the addition of construction-volume data, which was the source of the multicollinearity problem. Thus, without the construction-volume data, the analysis does not suffer from a problem of statistical significance. McGraw–Hill's concerns about multicollinearity are addressed above. And to the extent that McGraw–Hill's objections center on Dr. Warren–Boulton's calculation of the price indices themselves, the objections are unavailing. There was some confusion at the *Daubert* hearing about which model was actually Dr. Warren–Boulton's "first." In order to construct the price indices themselves, Dr. Warren–Boulton ran regressions on the pricing data for the purpose of controlling for the quantity and the quality of the data purchased in each CPI subscription. McGraw–Hill argued that these statistics *themselves* were flawed because Dr. Warren–Boulton did not control for construction-volume data when calculating them. But the price indices focus only on what the prices of the services were, not what caused them to move. To answer that question, Dr. Warren–Boulton needed to control for factors internal to the products themselves. Logically, construction-volume data has no relevance to that question. These objections are not persuasive and do not contribute to the Court's finding that Dr. Warren–Boulton's testimony is inadmissible under Rule 702.

**5. Pooling**

McGraw–Hill objects to Warren–Boulton's choice to combine national and local pricing data in his regressions. Combining data in this way is called "pooling." McGraw–Hill argues that under prevailing statistical methodology, pooling is inappropriate because Warren–Boulton's own assumptions suggest that national and local prices react differently to the important factors he seeks to measure and because the data indicate that the two markets are different in important ways.

Pooling problems arise when data from meaningfully different categories are combined together in a regression analysis. This would be like trying to calculate the effect

of location on the price of an apartment by combining New York, Chicago, and Topeka. There are several tests for pooling problems, but many statisticians rely on the Chow test. [11] *See, e.g.,* Gregory C. Chow, *Tests of Equality Between Sets of Coefficients in Two Linear Regressions,* 28 ECONOMETRICA 591, 591–605 (1960). This test uses a mathematically complicated formula [12] to determine whether the independent variables have significantly different effects on two or more subsets of the data. Dr. Warren–Boulton testified that his model unequivocally failed the Chow test under any sensible statistical methodology. But, he claims that the Chow test merely indicates a "safe harbor": if one's model passes the Chow test, pooling is safe, but if one's model does not pass the Chow test, one must appeal to common sense to determine whether pooling is safe. (Hrg. Tr. at 82–83.) To support this reading of the Chow test, Dr. Warren–Boulton points to two scholarly articles in which analysts sought to examine the effect of cigarette pricing on cigarette consumption throughout the United States. Those analysts ultimately decided to pool the data from all fifty states even though the data failed the Chow test. McGraw–Hill counters that these articles are not on point. In the articles, the analysts were not trying to compare national data with state-level data-which is exactly what Dr. Warren–Boulton is trying to do here. McGraw–Hill has persuasively distinguished these articles on that ground.

**\*13** Nonetheless, Warren–Boulton counters this objection by noting that the number of national observations is comparatively low and that the risk of manipulation from pooling the data is small. On his view, national and local data should similarly respond to changes in the *control* variables, even if they manifest significantly different responses to the independent variable. Similarly, Warren–Boulton claims that the unpooled data lead to "economically nonsensical" results. (Hrg. Tr. at 107.) At the *Daubert* hearing, Dr. Warren–Boulton said that his decision to pool the data was based on the fact that the unpooled data lead to results that violated his "prior expectations." (Hr'g Trans. at 87 .) McGraw–Hill's rebuttal expert, on the other hand, ran the regression analysis with the unpooled data and claims simply to have reached the opposite result that Warren–Boulton did-running the regressions on the data sets separately, Dr. Addanki claims to have found no damages at all.

The issue with Dr. Warren–Boulton's two responses is that they do not rest on qualities of his expertise. Warren–Boulton is, by training, an economist and an econometrician. He is qualified to opine only on areas within the scope

of those fields. Ultimately, Dr. Warren–Boulton decided to pool the data because "it made sense to do it this way."(Dr. Warren–Boulton Deposition Trans. 948:17–22.) He ultimately conceded that his prior expectation is "not sufficient to justify [his] decision to pool."(Hrg. Tr. at 128.) He similarly conceded that there is no solid statistical reason for his decision to pool the data either (*id.* at 245), and responded to McGraw–Hill's objections on the point by noting that "[t]here is no computer program that will let you answer this; it requires someone to look at it and use judgment."(*Id.*) This might be true, and there certainly is no reason to believe that Dr. Warren–Boulton's judgment is anything other than perfectly sensible from a common-sense perspective. The problem is that he cannot offer any methodological explanation for why his judgment came out the way it did. *See, e.g., Bricklayers,* 752 F.3d at 87–89. And that judgment completely alters the conclusions of the model: had he made a different reasonable judgment, the results would be the opposite of what they were. This is insufficiently "scientific" to be admissible under Rule 702.

## 6. Robustness

The final concern with Dr. Warren–Boulton's methodology ties in with the penultimate one: it is too manipulable to qualify as "scientific" within the meaning of Rule 702. This concern takes its most persuasive form in its criticism of Dr. Warren–Boulton's choice of the end dates for his data sets. In creating a benchmark model, Dr. Warren–Boulton must compare the price index ratios to a fixed point in time when, he supposes, the effects of McGraw–Hill's misconduct will have fully dissipated. Dr. Warren–Boulton concedes that this time frame is, more or less, arbitrary. That alone is not necessarily a fatal problem because, indeed, some judgment is called for in any statistical model, and so long as the model is robust with respect to different choices of arbitrary points, there is no pressing issue. But here the choice of the enddate for the observations in Dr. Warren–Boulton's analysis has an outcome-determinative effect. Dr. Addanki recreated Dr. Warren–Boulton's model but changed the end-dates-keeping them well within the range that Dr. Warren–Boulton described as "very conservative"-and found that it yielded no damages. (*Compare* Defendant's Exhibit 7, at 31, *with* Warren Boulton Declaration, at ¶¶ 37–38.)

**\*14** Generally, issues such as the choice of a reasonable time-frame in which to examine data are issues of the expert's credibility that ought to be decided by the jury. *See Bazemore,* 478 U.S. at 400. But where, as here, very minor changes in arbitrarily selected model parameters can entirely alter the

Case 1:10-cv-06950-AT-JCF Document 339-1 Filed 10/19/14 Page 11 of 27

Reed Const. Data Inc. v. McGraw-Hill Companies, Inc., --- F.Supp.3d ---- (2014)
2014 WL 4746130

model's conclusions, that model is insufficiently robust to withstand the scrutiny of Rule 702. Scientific conclusions cannot depend upon the arbitrary choice of parameters. Dr. Warren–Boulton's choice of parameters was insufficiently methodological to be admissible under *Daubert*.

### E. Conclusion

Reed, as the proponent of the expert testimony, must establish by a preponderance of the evidence that Dr. Warren–Boulton's testimony is admissible under Rule 702. *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir.1998). Given the problems discussed above, Reed has not met this burden. Therefore, McGraw–Hill's motion to exclude Dr. Warren–Boulton's testimony is granted, and the Court will not consider his testimony when evaluating McGrawHill's motion for summary judgment.

### III. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A fact is material if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and a dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The initial burden of a movant on summary judgment is to provide evidence on each element of her claim or defense illustrating her entitlement to relief. *Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). If the movant meets this initial burden of production, the non-moving party must then identify specific facts demonstrating a genuine issue for trial. FED. R. CIV. P. 56(f). The court views all evidence "in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in its favor." *Anderson,* 447 U.S. at 250–51. A motion for summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (citation omitted). But the non-moving party cannot rely upon mere "conclusory statements, conjecture, or speculation" to meet its burden. *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) (citing *Matsushita,* 475 U.S. at 587).

### IV. Lanham Act

Reed has brought claims under Section 43(a) of the Lanham Act, which provides a cause of action against

> [a]ny person who ... uses in commerce ... any ... false or misleading description ... or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

**\*15** 15 U.S.C. § 1125(a)(l). Two theories of recovery are available to plaintiffs under the Lanham Act. *Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 153 (2d Cir.2007). First, plaintiffs can argue that an advertisement is literally false. *See Johnson & Johnson v. GAC Int'l, Inc.,* 862 F.2d 975, 977 (2d Cir.1988). If an advertisement is literally false, consumer deception is presumed and "the court may grant relief without reference to the advertisement's actual impact on the buying public." *Time Warner,* 497 F.3d at 153 (internal quotation marks and citations omitted). Alternatively, plaintiffs can argue that the advertisement, while literally true (or at least not literally false), is likely to mislead or confuse consumers. *Id.* To recover under this second theory, plaintiffs must show, using extrinsic evidence, that the misleading statement in fact misled consumers. [13] If the deception was willful, consumer confusion is presumed. *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation,* 926 F.2d 134, 140 (2d Cir.1991). The burden then shifts to the defendants, who must offer evidence that consumers were not, in fact, confused. *Id.*

Under either theory, plaintiffs must prove that the statement was "material [ ]" to consumers and "involved an inherent ... quality of the product." *Nat'l Basketball Ass'n v. Motorola, Inc. .,* 105 F.3d 841, 855 (2d Cir.1997). They also must prove that that the statement constitutes "advertising and promotion" within the meaning of the Lanham Act. *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 58 (2d Cir.2002).

Reed alleges the following false or misleading statements:

- •*Roper's Involvement:* The six Roper Reports stated that Roper "oversaw the entire comparison process" and

Case 1:10-cv-06950-AT-JCF Document 339-1 Filed 10/19/14 Page 12 of 27

Reed Const. Data Inc. v. McGraw-Hill Companies, Inc., --- F.Supp.3d ---- (2014)

2014 WL 4746130

"ensured that comparable categories were used in the comparison."Reed claims that "a jury could conclude ... that Roper's involvement was a sham."(Plaintiff's Memorandum, at 47.)

•*Roper Report Comparisons:* The Roper Reports overstated the number of projects in McGraw Hill's database as compared to Reed's database. Specifically, (1) one Roper Report compared Reed's database to Dataline, one of McGraw–Hill's other projects, rather than Dodge Network; (2) McGraw Hill excluded some of Reed's utilities projects in their comparisons; (3) McGraw Hill double-counted some of its own projects; (4) McGraw Hill included its own ASAP projects while excluding Reed's ASAP projects from the comparisons; and (5) McGraw Hill selected search criteria that were designed to highlight its relative strengths. Reed claims that items 1, 3, and 4 were literally false while 2 and 5 produced misleading project counts. (Defendant's Memorandum, at 49–50.)

•*Ad Hoc Comparisons:* McGraw Hill provided ad hoc comparisons of search results from McGraw Hill's and Reed's databases. Reed alleges that these ad hoc comparisons replicated the methodological flaws in the Roper Reports (detailed above) and thus were literally false.

**\*16** •*Stale Executive Briefs:* From 2008 through 2012, McGraw Hill published Executive Briefs which printed Roper Report comparisons from 2007 despite the availability of less favorable comparisons from 2008. Reed claims that this staleness conveyed a "false and misleading impression." (Plaintiff's Memorandum, at 50.)

•*Claims of Exclusivity:* Occasionally, McGraw Hill informed customers that it had exclusive access to projects that were actually also available on Reed Connect. McGraw Hill further claimed that it knew about these exclusives because of customer tips rather than because of its own illegal access. Reed alleges that both the statement of exclusivity and the description of provenance were literally false.

•*Claimed Project Ratios:* McGraw Hill informed customers that it had a 5:1 advantage over Reed's database in exclusive projects and a 3:1 advantage in all projects. Reed claims that these statements were literally false.

## A. Advertising

As a preliminary matter, the Court must determine whether the challenged statements constitute "advertising and promotion" within the meaning of the Lanham Act. The Second Circuit has adopted a three-part inquiry for determining what constitutes "advertising or promotion." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 58 (2d Cir.2002). Under the *Fendi* test, "the contested representations must be [ 1 ] commercial speech; ... [2] made for the purpose of influencing consumers to buy defendant's goods or services; and, [3] ... disseminated sufficiently to the relevant purchasing public."*Id.* at 56 (quoting and partially adopting the test from *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics,* 859 F.Supp. 1521, 1536 (S.D.N.Y.1994) (Sand, J.)). Here, the first two issues are not contested. McGraw Hill argues only that some of the misrepresentations described above, when considered in isolation, were not disseminated widely enough to satisfy *Fendi.*

Before the Court can consider whether the statements were sufficiently distributed, it must answer a preliminary question: are the statements to be considered together or in isolation? The ad hoc comparisons, for example, were distributed to many different customers, sometimes one at a time. Calling a single customer is not "advertising or promotion" within the meaning of *Fendi,* so if the comparisons are considered one by one, many will not make the cut. McGrawHill argues that the Court should look at the statements one by one, while Reed argues that the Court should consider the statements as part of an overall campaign of publicity.

Courts assessing Lanham Act claims are to consider an allegedly false "advertisement ... in its entirety," *Avis Rent A Car Sys., Inc. v. Hertz Corp.,* 782 F.2d 381, 385 (2d Cir.1986) (Friendly, J.), and should "not ... engage in disputatious dissection." *Id.* In this case, though, the question is whether a series of individual statements to customers constitutes one "advertisement"-that should not be disputatiously dissected-or a series of advertisements for which dissection is appropriate. "Level of generality is destiny in interpretive disputes...."*Thomas More Law Ctr. v. Obama,* 651 F.3d 529, 560 (6th Cir.2011) (Sutton, J., concurring), *abrogated by Nat'l Federation of Independent Businesses v. Sebelius,* —— U.S. ——, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). Here, the Court must decide a sensible level of generality at which to assess the challenged statements.

**\*17** McGraw Hill cites *Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1385 (5th Cir.1996) to support its position that the Court ought to consider each statement separately. There, however, the Fifth Circuit held that "presentation materials ... specifically developed to target ... independent bottlers [14] and convince them, based on comparative statistics, to switch from 7UP to Sprite,"*id.,* were "advertising" for Lanham Act purposes. Coca–Cola had presented the materials to eleven bottlers in separate presentations; the presentation in its entirety may only have been shown to *two* bottlers. Nonetheless, the "presentation" was advertising. The court appeared to consider the presentation as a whole and evaluated the total number of people to whom it was presented. *Id.* at 1386. This case, therefore, does not support McGraw–Hill's piecemeal approach.

Similarly, in *Gordon & Breach*—an influential opinion relied upon by several circuit courts in formulating their tests for what constitutes advertisement-Judge Sand described an allegedly misleading advertising and promotional campaign comprising several elements. 859 F.Supp. 1521. As in this case, the plaintiff alleged that the defendant published a misleading comparison between two competitors and falsely claimed that it was an independent survey. In addition to the survey itself, the plaintiff challenged collateral uses of the survey results, such as a press release, a letter to the editor of a relevant trade publication, and individual comments to customers. After identifying the various elements of the campaign, the court distinguished between those elements that were properly deemed "commercial" speech and those elements that warranted heightened First Amendment protection as "protected editorial speech on a topic of public significance."*Id.* at 1544. While the court separated constitutionally distinct categories of speech, it did not advocate further atomizing elements of the promotional campaign. Instead, on the matter of distribution, the court cited the oft-repeated refrain that "the level of circulation required to constitute advertising and promotion will undeniably vary from industry to industry and from case to case."*Id.* at 1535 (internal quotations marks and citations omitted). It did not distinguish between the individual instances of allegedly false communication. Neither will this Court.

Therefore, the question is whether, *taken as a whole,* McGraw–Hill's efforts constituted "advertising" within the meaning of the Lanham Act. The Act's "reach is broader than merely the classic advertising campaign."*Gordon & Breach,* 859 F.Supp. at 1534 (internal quotation marks and citations omitted). But it does not extend to "statements in oral conversations by an individual sales representative to an individual customer...."*Licata & Co. v. Goldberg,* 812 F.Supp. 403, 408 (S.D.N.Y.1993). Here, McGraw–Hill tried to convince customers of the superiority of its service through a *series of individual conversations.*

**\*18** Unlike the individual conversations in *Licata,* the ad hoc comparisons at issue in this case were an undisputed part of a broader campaign to compete with Reed and to tout the supposed advantages of the Dodge Network over Reed Connect. In that context, what would ordinarily seem like individual conversations take on added significance. There is evidence that McGrawHill management directed individual salespeople to disseminate several of the allegedly false or misleading statements. (*E.g.,* Plaintiffs Exhibit's 512–518.) There is little difference between this and a traditional advertising campaign in either purpose or effect. The purpose is to win customers from a competitor on a large scale and the effect-assuming there is one-is the same. As in *Gordon & Breach,* the mere fact that the promotional campaign took the form of individual conversations does not mean that it is not advertising when taken as a whole. Taken together, McGraw–Hill's statements are advertising within the meaning of the Lanham Act.

**B. Falsity**

As previously mentioned, a statement can be "false" for Lanham Act purposes in two ways: it can be "literally false, *i.e.,* false on its face," or it can be implicitly false because it is "mislead[ing]." *DIRECTV,* 497 F.3d at 153. The difference between the two classes of falsity is the comparison that each invites. A determination of literal falsity invites a comparison "between the statement and ... reality," while a determination of implicit falsity invites a comparison between the "impression on the listener" and reality. *Id.* (quoting *Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 229 (2d Cir.1999)). Statements are to be read in context, *id.* at 158, which has led the Second Circuit to adopt what other circuits have called the "false by necessary implication" doctrine. *Id.* (citing, *inter alia, Scotts Co. v. United Industrial Corp.,* 315 F.3d 264, 274 (4th Cir.2002)). Under this doctrine, a statement can be *literally* false even if it is not literally false within the ordinary legal meaning of the word "literal," [15] when, "considered in context, the words or images ... necessarily imply a false message."*Id.* But that message must be "unambiguous" to be considered literally false. *Id.* (quoting *Novartis Consumer Health, Inc. v. Johnson*

*& Johnson–Merck Pharm. Co.,* 290 F.3d 578, 586–87 (3d Cir.2002)).

This is a fine distinction. A statement is, of course, literally false if it is (strictly speaking) literally false, but if it is not (strictly speaking) literally false, it can either be "literally false" for Lanham Act purposes if it unambiguously conveys a message and that message conflicts with reality, or it can be implicitly false if it conveys an "impression"-to a substantial portion of listeners-that conflicts with reality. *Id.* at 153.

### 1. Literal Falsity

Whether a statement is literally false is, generally speaking, a matter of fact. *See Clorox Co. P.R. v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 34 (1st Cir.2000). Reed alleges six categories of literally false statements, which are described above. Each is addressed in turn.

### i. Roper's Involvement

**\*19** The Roper Reports represented that Roper, an "independent" firm, "oversaw the entire comparison process [and] ensured that comparable categories were used" to evaluate the competing services. (Plaintiff's Exhibits 329–334.) McGraw–Hill similarly represented that the reports were "independent," "objective," "audited," and "unbiased." (Plaintiff's Memorandum, at 18 & n. 101.) Roper's "project director" for five of the six Roper Reports testified at his deposition that he made sure that the searches conducted were "worded similarly." (*Id.* at 20–21 & 106–13.) But the same project director told a colleague that McGraw–Hill paid Roper "just to say we oversaw the whole process."(*Id.* at 19, 21, & nn. 103, 115.) He similarly testified that he "did not know if he ever even knew the names of Connect or Network" and "did not know if [the searches were conducted] using Network or Dataline, another McGraw–Hill service."(*Id.* at 19.) Reed argues that a reasonable jury could conclude, from the evidence presented, that "Roper's involvement was a sham." (Plaintiff's Memorandum, at 47.) If the jury reached that conclusion, Reed argues, it could also conclude that the statements listed above conveyed the message that Roper's involvement was not a sham. This, Reed contends, is literally false.

McGraw–Hill responds by pointing out that the McGraw–Hill employee who conducted the comparisons testified that Roper "verified the numbers," "made sure that they were not being misrecorded," and "ensured that the comparisons were run in similar ways and that one search mirrored another

search."(Defendant's Reply, at 5.) Similarly, McGraw–Hill notes that "Roper looked at the categories being searched to ensure that if 'we had education, they had education,' and 'if we had medical, they had medical.' " (*Id.* at 6 (citing Major Trans. 250:23–251:19).) McGraw–Hill represents that this evidence is uncontroverted and that it establishes the literal truth of the statements.

But Reed does controvert this testimony. Reed offers testimony from the Roper employee who supposedly "oversaw" the comparisons that he only made sure the comparisons were "worded similarly," and that McGraw–Hill paid Roper "just to say we oversaw the whole process."(Plaintiff's Memorandum, at 19, 21, & nn. 103, 115.) A reasonable juror could conclude from this testimony that the Roper reports were not "independent," that Roper did not "overs[ee]" them, and that they were not "objective," "audited," and "unbiased." (*Id.* at 19, 21, & nn. 103, 115.) On summary judgment, where Reed is entitled to all reasonable inferences a jury could draw from the facts it has presented, there is a genuine dispute as to whether these statements are literally false.

### ii. Roper Report and Ad Hoc Comparisons

Next, Reed alleges that many of the statements in the Roper Reports and ad hoc comparisons were literally false. Specifically, Reed identifies three problems with the Roper Reports (which were replicated in the ad hoc comparisons) that lead to literally false statements. First, at least one Roper Report compared Reed Connect to a different database, Dataline, instead of McGraw–Hill's Dodge Network database; second, McGraw–Hill double-counted some of its own projects; and, finally, McGraw–Hill included its own ASAP projects while excluding Reed's ASAP projects from the comparisons. (Plaintiff's Memorandum, at 49–50.)

**\*20** McGraw–Hill responds to the first allegation of falsity (that it used Dataline instead of Dodge Network) by noting that the report in question stated that the comparisons were based on "F.W. Dodge electronic listings," which would include Dataline listings. (Defendant's Reply, at 11.) Reed counters by offering evidence that McGraw–Hill employees used Dataline because they knew that, at the time, it was superior to Dodge Network. But McGraw–Hill's knowledge of differences between the two products is not the question. Instead, the question is whether the statement that the comparisons were made using "F.W. Dodge electronic listings" was *literally* false-that is, were the comparisons actually conducted using F.W. Dodge electronic listings?

In other words, did the "F.W. Dodge electronic listings" include Dataline? Neither party has offered evidence-beyond the statement itself-to evaluate whether Dataline is an "F.W. Dodge electronic listing." Because, at trial, the burden of proving falsity would be on Reed, and there is no evidence regarding whether "F.W. Dodge electronic listings" properly included Dataline, no reasonable juror could conclude that the statement was literally false.

McGraw–Hill responds to Reed's second allegation of falsity (double-counting) by noting that the Dodge Network would list some projects that proceeded along dual tracks as multiple projects rather than one project and that this is a perfectly sensible way to count. (Defendant's Reply, at 9.) McGraw–Hill offers the hypothetical example of a school district seeking asbestos removal at a school while simultaneously seeking plans to build a new wing to the school. (*Id.* at 10.) This would be listed as two projects in the Dodge Network but as only one in Reed Connect. Reed argues that this is false because the Roper Reports purported to list the total number of *projects,* rather than the total number of *reports,* in each database service. (Plaintiff's Memorandum of Law, at 49.) But Reed has not put forward any evidence that the word "projects" in this context would be false when compared to a database that lists each "report" for the same institution as a different "project." Consequently, a reasonable juror could not conclude that Reed has met its burden of proving falsity.

McGraw–Hill responds to Reed's final allegation of falsity (omitting ASAP projects) by noting that the searches underlying the Roper Reports *did* include projects whose "bid dates" were "ASAP." (Defendant's Reply, at 9.) Reed responds that its expert, Sonya Kwon, opined that McGraw–Hill did not include ASAP projects in its comparison searches because Reed lists ASAP projects by simply leaving the bid-date field blank. (Plaintiff's Exhibits 432–33, at 876.) McGraw–Hill responds that ASAP projects were left out of Reed's counts because of an error in *Reed* 's search algorithm. (Presumably this "error" is Reed's failure to include a field for projects with unspecified bid-dates.) Kwon, McGraw–Hill argues, was able to identify additional ASAP projects only after "deconstructing the Reed Connect database and correcting Reed's error...." (Defendant's Reply, at 9.) Kwon states that she "added [ASAP projects] back in to [*sic* ] the project counts" using the "back-end databases [that] support both companies' user interfaces."(Declaration of Sonya Kwon, at ¶¶ 30–31.) Thus, it seems undisputed that a search for projects whose bid-date was "ASAP" would yield certain results in the Dodge Network but not in Reed Connect,

but it is disputed whether this was due to Reed's "error" or McGraw-Hill's deception. Regardless, Reed has not offered any evidence that the statement that both comparisons were based on searches for projects whose bid-date was listed as "ASAP" was false. As such, no reasonable juror could conclude that Reed met its burden to prove that the statement was literally false.

### iii. Stale Executive Briefs

**\*21** Reed next alleges that McGraw–Hill released an "Executive Brief" between 2008 and 2012 in which it claimed to cite data from a "recent" comparison of Reed Connect and Dodge Network. The "recent" comparison was from 2007. But the executive briefs did not claim to use the *most* recent comparison available; they only claimed to use a "recent" one. Thus, the statement that the briefs cited a "recent" comparison is not false unless five year-old data is not "recent." But words like "recent" are subject to a range of reasonable interpretations. And the Lanham Act does not require that comparisons listed as recent be based on the most current available data. *Federal Express Corp. v. United Parcel Serv., Inc.,* 765 F.Supp.2d 1011, 1021 (W.D.Tenn.2010) (statement that FedEx was "just ranked" the most reliable parcel carrier was not literally false even though the most recent available data suggested that it was not the most reliable). No reasonable juror could conclude that Reed has met its burden of proving that the statements in the executive briefs were literally false.

### iv. Claims of Exclusivity

Reed also claims that McGraw–Hill falsely told some customers on a few occasions that particular projects were available only on the Dodge Network when, in fact, they were also available on Reed Connect. (Plaintiff's Memorandum, at 50.) Reed also contends that McGrawHill falsely told customers that it learned of the exclusives from customer tips when it really learned of them from its illicit access to Reed Connect. McGraw–Hill responds to this allegation by contending that Reed's only evidence that these projects were available in Reed Connect came from searches performed *after* the customer conversations took place. (Defendant's Reply, at 12.) This, McGraw–Hill argues, means that Reed has offered no evidence that these claims of exclusivity were false when made. While Reed's evidence is weak and circumstantial, it is still evidence. Neither party has briefed the issue of how much time elapsed between the time that McGraw–Hill claimed exclusivity and the time that Reed's analyst searched for the purportedly exclusive projects. But,

on at least one occasion, the evidence suggests that Reed searched its database the day after McGraw–Hill told a customer that seven projects were exclusive to its service. (Plaintiff's Exhibit 494–95 .) Reed found six out of the seven purportedly exclusive projects. A reasonable juror could conclude from such evidence that McGraw–Hill's statement of exclusivity was literally false when made.

*v. Claimed Project Ratios*

Finally, Reed claims that McGraw–Hill often reported that it had a 5:1 ratio over Reed in exclusive projects and a 3:1 ratio over all competitors in all projects. (Plaintiff's Memorandum, at 51.) Reed contends that this was literally false because the testimony of its expert, Sonya Kwon, as well as McGraw–Hill's own internal data, indicate that its advantage in projects was substantially less than 5:1 and 3:1 in these categories. McGraw–Hill counters that these ratios simply are not false. It claims that Reed's estimate of the true ratio was created using comparisons other than the ones to which McGraw–Hill was referring when it touted these ratios. McGraw–Hill contends that Reed has offered "no evidence regarding how these ratios were calculated or why they are false."(Defendant's Reply, at 12.) Indeed, Reed has not presented any evidence of how these ratios were arrived at. Instead, Reed has presented plenty of evidence that McGraw–Hill's employees did not know how the ratios were calculated when they distributed them. (*E .g.,* Plaintiff's Exhibits 535–37.) The state of the evidence, then, is as follows: we know that other calculations, of contested accuracy, show significantly lower advantages for McGraw–Hill than the ratios it touted, but we do not know how it calculated those ratios. Construing that evidence in Reed's favor, a reasonable juror could conclude that the 5:1/3:1 ratios were false because other studies suggested significantly lower numbers.

*vi. Summary of Literal Falsity*

 **\*22** The following statements survive McGraw–Hill's motion for summary judgment as potentially literally false: (1) the statements about Roper's involvement, (2) the statements touting exclusives to certain individual customers, and (3) the statements about the 5:1 and 3:1 project ratios. As to each of these sets of statements, a reasonable juror could conclude that they are literally false. Therefore, consumer deception is presumed. *See Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 153 (2d Cir.2007). The remaining statements are misleading at worst and, therefore, Reed will have to offer evidence sufficient to persuade a reasonable jury that consumers were, in fact, confused

by them, *id.,* or that McGraw–Hill was egregiously and deliberately deceptive. *E.g., Resource Developers, Inc. v. The Statue of Liberty–Ellis Island Foundation,* 926 F.2d 134, 140 (2d Cir.1991).

**2. Implicit Falsity**

To sustain a Lanham Act claim on a theory of implicit falsity, a plaintiff must put forth evidence that consumers were, in fact, confused by the allegedly misleading statement. This burden does not apply to statements for which Reed has met its burden of proving literal falsity or where Reed proves intentional deception. *Id.* All that remains, apart from materiality, is whether Reed has put forward sufficient evidence of consumer confusion or intentional deception for the remaining statements. For the reasons that follow, it has not.

*i. Intentional Deception*

Reed points to three pieces of evidence to support its argument that McGraw–Hill engaged in deliberate deception. [16] First, it notes that McGraw–Hill spent a lot of money getting access to Reed Connect and generating the Roper Reports. (Plaintiff's Memorandum, at 53.) Next, it observes that McGraw–Hill conducted its comparisons at points in time when they would be most advantageous to McGraw–Hill and "crafted search queries designed to maximize the McGraw–Hill projects counted while minimizing the projects counted for Reed."(*Id.*) Finally, it points out that McGraw–Hill convinced consumers that the Roper Reports were independent when, in reality, Roper's involvement was "a complete sham." (*Id.*) This evidence is insufficient to survive summary judgment because no reasonable juror could draw the conclusion that McGraw–Hill *deliberately* deceived its customers. Perhaps the evidence is sufficient to support a conclusion that McGraw–Hill was reckless with regard to the possibility that consumers would be confused by its statements, but this is not enough. Therefore, Reed will have to adduce evidence of consumer confusion.

*ii. Consumer Confusion*

In its papers, Reed points to the declaration of Pat McCoy to support its argument that consumers were confused by McGraw–Hill's allegedly misleading statements. [17] (Plaintiff's Exhibits 441–43 .) In light of McGraw–Hill's overwhelming evidence that consumers were not, in fact, misled by these statements, the McCoy

declaration is insufficient to allow any reasonable juror to conclude that Reed has proven that a substantial number of consumers were misled by the challenged statements.

**\*23** Ordinarily, consumer confusion is demonstrated through customer surveys, but this is not a hard-and-fast requirement. To sustain a claim under the misleadingly-false theory of the Lanham Act, a plaintiff need only show-using whatever evidence-that a substantial number of consumers were, in fact, confused by the allegedly misleading statement. *E.g.,* *McNeilab, Inc. v. American Home Products Corp.,* 501 F.Supp. 517, 525 (S.D.N.Y.1980). There is no specific numerical threshold to qualify as "substantial" for purposes of the Lanham Act. But numbers in the handfuls-pulled from markets in the tens of thousands-have repeatedly been held insufficient. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 269 F.3d 114, 124 (2d Cir.2001) (citing and quoting *C.L.A .S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985) (two alleged instances of actual confusion insufficient to establish confusion especially "when contrasted to the hundreds of thousands of [defendant's] magazines sold over the years"); *Door Sys. Inc. v. Pro–Line Door Sys., Inc.,* 83 F.3d 169, 173 (7th Cir.1996) (stating that "plaintiff's evidence that two consumers (out of how many thousands?) may have been misled cannot by itself be thought to create a contestable issue of likelihood of confusion"); *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.,* 22 F.3d 1527, 1535 (10th Cir.1994) ("De minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding the likelihood of confusion[.]").)

Here, Reed points to one customer out of a national market that both parties concede contains at least 70,000 customers. And McGraw–Hill raises a counterargument to the value of Reed's evidence. McGraw–Hill notes that another declarant, Lee Martin, said that Mr. McCoy did not actually make the purchasing decisions at his company and that McCoy does not claim otherwise. (Defendant's Exhibit 32 (Martin Tr. 32:6–25).) A reasonable juror could conclude that McCoy's declaration offered evidence of *confusion,* even if he was not ultimately responsible for the purchasing decision. But the fact that the only person allegedly misled by McGraw–Hill's statements was not actually a decisionmaker at his company goes to the weight a reasonable juror would give his testimony.

A declaration from one customer in a market of this size is insufficient, particularly when compared to McGraw–Hill's

evidence that consumers were not confused, and considering the fact that the declaration was from a non-decisionmaker at his company. (Defendant's Reply, at 15 (citing, *inter alia,* Defendant's Rule 56.1 Statement, at ¶¶ 269–77; Defendant's Exhibits 90 (Thomas Tr. 63:12–19), 4 (Welch Tr. 36:9–37:23), 5 (Chester Tr. 71:20–72:12), 11 (Franklin Tr. 22: 14–18), 12 (Roach Tr. 23:24–24:4), 92 (Dodge Tr. 25:20–25), 91 (Bowman Tr. 42:10–43: 17), 124 (Borglum Tr. 30:3–15), 132 (Martin Tr. 32:6–25), and 125 (Sloan Tr. 38:4–39:7)).) No reasonable juror faced with this evidence could conclude that a substantial number of consumers were misled by McGraw–Hill's statements.

## C. "Materiality"

**\*24** Reed's claims under the misleadingly-false theory of the Lanham Act have failed for lack of consumer confusion. Thus, the only statements whose materiality must be considered are those that are potentially literally false (that is, those statements as to which there is a genuine dispute as to literal falsity). They are (1) the statements about Roper's involvement, (2) the statements touting exclusives to certain individual customers, and (3) the statements about the 5:1 and 3:1 project ratios. For the reasons that follow, no reasonable juror could conclude that any of these statements is material.

The parties disagree on the appropriate legal standard to apply to questions of materiality. Reed argues that materiality is satisfied if a statement "misrepresents an inherent quality or characteristic of a product."(Plaintiff's Memorandum, at 54.) McGraw Hill counters that this is necessary but not sufficient because "plaintiff must *also* prove that the ... statement is likely to influence purchasing decisions."(Defendant's Memorandum, at 13 (emphasis in original).)

In 1974, the Second Circuit held that statements must relate to an "inherent quality or characteristic of defendant's product" to be actionable under the Lanham Act. *Fur Info. & Fashion Council, Inc. v. E.F. Timme & Son, Inc.,* 501 F.2d 1048, 1051 (2d Cir.1974). The plaintiff in that case, an association of furriers, sued a manufacturer of fake furs over television ads that promoted fake furs with dramatic and emotionally compelling pleas to protect tigers and leopards. There was no dispute that the ads accurately described defendant's products as cheaper fake furs. *Id.* at 1049. The plaintiffs instead sought relief based on the misleading "innuendoes ... in the TV ads regarding [poaching of] tigers and leopards."*Id.* at 1051. At the time, leopard—and tiger-printed fur was dyed from the pelts of other animals because the importation of leopard and tiger pelts had already been prohibited by the

Endangered Species Conservation Act. Although the ads carried "the false implication that buying defendant's products would save tigers and leopards," the court dismissed the case because there were "no false descriptions or representations concerning defendant's goods" and "Section 43(a) ... was intended to apply only to misrepresentations relating to the inherent qualities of defendant's own goods."*Id.* The Circuit sought to avoid "flood[ing] the federal courts with claims that an advertiser had misrepresented the social desirability of its products or disparaged the ecological sensitivity of its competitors ."*Id.* at 1052. Under this standard, misrepresentations about the quality of one database vis-à-vis another unquestionably relate to Defendant McGraw–Hill's goods. But the standard has evolved, so the analysis does not end here.

In *Vidal Sassoon, Inc. v. Bristol–Myers Co.,* the defendant was sued over an advertisement for "its shampoo product, 'Body on Tap,' so named because of its high beer content."661 F.2d 272, 273 (2d Cir.1981). Faced with the challenging task of promoting beer shampoo, the advertisers focused not on the product itself, but on the results of placebo tests in which customers allegedly preferred the defendant's shampoo to the plaintiff's competing product. After reflecting on the "delicate task[ ] ... of [applying] the legislative mandate of a prior generation to novel circumstances created by a culture grown more complex," the Circuit concluded that Section 43(a) applied even though the "misstatements concern[ed] the test results and the manner in which the tests were conducted, not the 'inherent quality,' " of the shampoo.*Id.* at 277. While the court signaled a shift toward evaluating statements' impact on consumer purchases, it retained the language of "inherent quality." *Id.* at 278 (arguing that because "the intent and total effect of the advertisements were to lead consumers into believing that Body on Tap was competitively superior, surely [this was] a representation regarding its "inherent quality.")

 **\*25** This shift continued in *National Basketball Association v. Motorola, Inc.,* a case referenced by both Reed and McGraw Hill as the leading case on materiality. 105 F.3d 841, 855 (2d Cir.1997). In describing the evolving standard, that court repeated the "inherent quality" language but concluded that the "requirement is essentially one of materiality."*Id.* at 855. The Lanham Act claim was dismissed because "[t]he inaccuracy in the statements would not influence consumers."*Id.* at 855. Although the Second Circuit ultimately adopted a belt-andsuspenders approach, employing both the language of "inherent quality"

and "materiality," the court equated its standard with standards that use only a consumer-impact-focused model of materiality. *Id.* (describing consumer-impact-focused materiality standards in the Third Circuit, Fifth Circuit, and D.C. Circuit before concluding that "on the present facts ... the complained-of statements are not material *and* do not misrepresent an inherent quality or characteristic of the product.") (emphasis added). Therefore, although at least part of McGraw Hill's campaign focused on the quality of the databases qua databases, the Court must also ask whether these campaigns materially influenced consumers' purchasing decisions.

Reed has not presented sufficient evidence of materiality to survive summary judgment for the same reason it has not presented sufficient evidence to sustain its claim of consumer confusion. At worst, one customer relied on McGraw–Hill's misrepresentations when making purchasing decisions. Every other customer testified that the Roper Reports and ad hoc comparisons were immaterial. Thus, even if a presumption of materiality applied under *Resource Developers,* 926 F.2d at 140–and it does not-McGraw-Hill has amply rebutted that presumption. Because, after much discovery, only one consumer has testified that he was influenced by McGraw–Hill's statements, no reasonable juror could conclude that those statements were material to consumers' purchasing decisions.

### D. Conclusion

For the foregoing reasons, McGraw–Hill's motion for summary judgment on Reed's claims under Section 43(a) of the Lanham Act is granted.

### V. Antitrust

McGraw Hill seeks summary judgment on Reed's claims that McGraw Hill's disparaging advertisement constituted monopolization and attempted monopolization in violation of Section 2 of the Sherman Act. The parties do not contest most of the elements of a Sherman Act claim. (*See* Plaintiff's Memorandum, at 61.) Instead, McGraw–Hill argues that its conduct could not have had more than a *de minimis* effect on competition. In the Second Circuit, "a plaintiff asserting a monopolization claim based on misleading advertising must overcome a presumption that the effect on competition of such a practice was *de minimis"* and therefore insufficient to sustain an antitrust action. *National Association of Pharm. Mfrs., Inc. v. Ayerst Labs.,* 850 F.2d 904, 916 (2d Cir.1988).

Case 1:10-cv-06950-AT-JCF   Document 339-1   Filed 10/19/14   Page 19 of 27

Reed Const. Data Inc. v. McGraw-Hill Companies, Inc., --- F.Supp.3d ---- (2014)
2014 WL 4746130

The first question is whether the *Ayerst* presumption applies; the second is whether Reed has rebutted it.

## A. Legal Standard for Antitrust Claims: The *De Minimis* Presumption

**\*26** Under *Ayerst,* courts must presume that false or misleading statements in the marketplace had a *de minimis* effect on competition unless the plaintiff can show that the challenged statements were

> [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals."

*Ayerst,* 850 F.2d at 916. Reed argues that the de minimis presumption should not apply for two reasons: (1) the Roper Reports trigger special rules for third-party advertising, and (2) an exception should exist for markets with only two competitors. A close reading of Ayerst forecloses both of these arguments.

Reed cites two district court cases in the Ninth Circuit that suggest that the *de minimis* presumption does not apply where third-party advertisers are involved. *See Prime Healthcare Servs.v.SEIU,* No. 11–CV–02652, 2012 WL 3778348, at \*10 (S.D.Cal. Aug. 30, 2012) (holding that where a third-party presence increases the likelihood that customers will rely upon disparaging advertising, the presumption does not apply); *TYRSport Inc. v. Warnaco Swimwear Inc.,* 679 F.Supp.2d 1120, 1132 (C.D.Cal.2009) (same). Courts in the Second Circuit have not followed suit. Here, the likelihood that disparaging advertising will induce customer reliance is one prong in the six-factor test for rebutting the *de minimis* presumption. *Ayerst,* 850 F.2d at 916. The need to create exceptions to the presumption may be greater in the Ninth Circuit, where the presumption is stronger, and an increased likelihood of customer reliance is not in itself sufficient to rebut the presumption, no matter how deceptively the reliance is induced. *See Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.,* 108 F.3d 1147, 1152 (9th Cir.1997) (holding that plaintiffs must satisfy each prong of a sixfactor test to rebut the de minimis presumption).

In any event, in this Circuit, the *de minimis* presumption applies to third-party disparagement claims. The plaintiff in *Ayerst* raised a third-party disparagement claim that the Circuit subjected to the *de minimis* presumption. 850 F.2d at 917 n. 4 ("Summary judgment may be appropriate ... if discovery indicates that this [allegedly third-party] 'advertising' does not overcome the *de minimis* presumption."). This suggests that the *de minimis* presumption operates against third-party disparagement as well.

Reed next argues that the *de minimis* presumption does not apply to markets in which there are only two competitors. It cites a case from the District of Minnesota in support. *See InsigniaSys. v. NewsAm.Mktg. InStore, Inc.,* 661 F.Supp.2d 1039, 1061 (D.Minn.2009). But the Eighth Circuit has never adopted the *Ayerst* presumption and employs a different framework for analyzing disparagement cases. *Compare Ayerst,* 850 F.2d 904 (establishing a presumption with a six-factor test for rebuttal), *with Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.,* 623 F.2d 1255, 1264 (8th Cir.1980) (affirming a Special Master's finding that where an ad campaign was false, deceptive and misleading, induced reliance, and caused injury to a competitor, that campaign was an unfair restraint of trade).*Insignia Systems* is therefore inapposite.

**\*27** In the Second Circuit, the *de minimis* presumption applies where there are only two firms in the relevant market and one of them is dominant.*Ayerst* presented a scenario where a dominant monopolist published allegedly disparaging statements against a new market entrant. There is no basis under the law of this Circuit to exempt Reed's claims from the *de minimis* presumption. Accordingly, the Court applies the presumption in this case.

Before applying the factors, this Court must first consider the strength of the presumption. The Ninth Circuit has held that Plaintiffs "must satisfy all six elements to overcome the *de minimis* presumption,"*Am. Prof'l Testing Serv.,* 108 F.3d at 1152, but the Second Circuit has not addressed this issue, *see, e.g., Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.,* 323 F.3d 366, 371 n. 6 (6th Cir.2003) (discussing *Ayerst* and noting that "it is unclear whether [the court] thought each requirement was mandatory.").*Ayerst* itself suggests that plaintiffs do not need to win on every factor in order to rebut the presumption. The case was presented to the court as a motion to dismiss that had been converted into a motion for summary judgment. The Circuit noted that further discovery may have substantiated

the plaintiff's claim that certain advertising "was clearly false, clearly material, ... clearly likely to induce reasonable reliance ... [and] not readily susceptible of neutralization or other offset" (factors 1, 2, 3, and 6), but expressed skepticism that the plaintiff could prevail on the remaining factors. 850 F.2d at 916–17. With regard to the fifth factor (prolonged periods of time), the Circuit went so far as to note that the disparaging representations "could only have been made ... for [a] short period of time...."*Id.* at 917. The Circuit's willingness to let the case proceed in light of this recognition suggests that the *de minimis* presumption can be rebutted even if the plaintiff cannot win on all six factors.

Ultimately, the *de minimis* presumption and the *Ayerst* test simply guide an inquiry that was in place before *Ayerst:* whether a disparaging advertisement is so deceptive as to constitute anticompetitive exclusionary conduct. *E.g., Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 286 (2d Cir.1979) ("A monopolist is not forbidden to publicize its product unless the extent of this activity is so unwarranted by competitive exigencies as to constitute an entry barrier."). The presumption formalizes the understanding that "[i]solated business torts, such as falsely disparaging another's product, do not typically rise to the level of a Section 2 violation unless there is a harm to competition itself."*Podiatric Physicians,* 323 F.3d at 372.

## B. The *Ayerst* Factors

With the *de minimis* presumption in place, the Court now evaluates whether Reed succeeds in rebutting the presumption that no cognizable antitrust injury occurred.

### 1. Clear Falsity

 **\*28**  To overcome the *Ayerst* presumption, a plaintiff must prove that the challenged statements were "clearly false...." *Ayerst,* 850 F.2d at 916. Plaintiff has offered sufficient evidence that three statements were literally false. They are (1) the statements about Roper's involvement, (2) the statements touting exclusives to certain individual customers, and (3) the statements about the 5:1 and 3:1 project ratios.

Literal falsity and "clear" falsity cannot be read to mean the same thing. To survive the *Ayerst* presumption, a plaintiff must do more than prove that the challenged statement is literally false; otherwise the word "clear[ ]" in *Ayerst* would be meaningless. This leaves the question: what does "clear" mean here? Epistemologically speaking, falsity is an absolute: a statement is either false or it is not. But the level

of justification of one's belief in a statement's falsity can vary by degree. Thus, while a statement is either false or it is not, it can be more or less "clearly" false, as measured by how much thought or effort one has to put into determining its veracity or how confident one is in its falsity-or, put another way, how obvious or apparent its falsity is in light of the statement itself and its relationship to the state of the world.

On this understanding, each of the challenged statements is a close call. With regard to Roper's involvement, a reasonable person could believe that it was not a sham, given that a Roper employee was present during the challenged comparisons and made sure that the individual search terms used were comparable. To believe otherwise takes, at the very least, a substantial number of inferential steps and yields a low level of confidence. With regard to the ad hoc comparisons, a reasonable person could conclude from the evidence that, upon learning that McGraw–Hill was touting exclusive projects that Reed did not have in its database, Reed scurried to add them, and, therefore, the claim of exclusivity was true when made. Finally, with regard to the claims about the 5:1 and 3:1 ratios, there is no evidence in the record regarding how those ratios were constructed. It is reasonable to believe that McGraw–Hill's as-yet-unknown methodology produced accurate results. Therefore, the evidence is insufficient to show that the challenged statements were clearly false.

### 2. Clear Materiality

Reed has not shown that any of the false statements was material. It follows that Reed cannot show that any of them was clearly material.

### 3. Clear Likelihood to Induce Reasonable Reliance

Reed has not pointed to any admissible evidence, other than the McCoy declaration, to show that any consumers relied on McGraw–Hill's alleged misstatements. (Plaintiff's Memorandum, at 72 .) Given the weakness of that evidence, as discussed above, Reed has not shown any likelihood-let alone a clear one-that the challenged statements would induce reasonable reliance.

### 4. Buyers without Knowledge

 **\*29**  Reed and McGraw–Hill argue over how to evaluate the relevant buyers' knowledge. Specifically, knowledge of what? Reed argues that because its customers lacked knowledge of complex data and statistical analysis they were unable to discern the accuracy of McGraw–Hill's claims and,

Case 1:10-cv-06950-AT-JCF   Document 339-1   Filed 10/19/14   Page 21 of 27

Reed Const. Data Inc. v. McGraw-Hill Companies, Inc., --- F.Supp.3d ---- (2014)
2014 WL 4746130

therefore, lacked "knowledge" for *Ayerst purposes. 850 F.2d at 916.* McGraw–Hill argues that "[t]he subject matter of the representations here had nothing to do with structured data analysis [and instead] had everything to do with the quantity of projects in the systems meeting the stated parameters of the Roper Report or other comparisons."(Defendant's Reply, at 25.) McGraw–Hill has the better of this argument. The purpose of the knowledge question is whether the relevant buying public is likely to be unable to competently evaluate the veracity of the challenged statements when making purchasing decisions. Here, buyers do not need a degree in statistics to count how many projects of a given type, value, and location appear in either service. That is the relevant question to the buyers, and McGraw–Hill cites evidence in the record that plenty of buyers conducted their own analyses when deciding which service to purchase. (Defendant's Exhibits 90, 120, 4, 5, and 11, (Thomas Tr. 28:3–17), (Welch Tr. 27:21–28:3), (Chester Tr. 52:13–24), (Franklin Tr. 17:13–19).)

**5. Prolonged Exposure**

The parties agree that the exposure in this case was prolonged.

**6. Neutralization**

Reed argues that McGraw–Hill's statements were not susceptible to neutralization because they "were not empirical facts about [Reed Connect] that could easily be disproven...." (Plaintiff's Memorandum, at 75.) Further, Reed argues that McGraw–Hill endeavored to keep some of the comparisons from Reed, making it difficult, if not impossible, to counter the statements. (*Id.* (citing Plaintiff's Exhibits 319– 320, 70).)

Neither of these arguments is persuasive. First, the challenged statements here were simple sums of how many projects were in each database. They were eminently "empirical facts." Second, there is ample uncontested evidence in the record that Reed knew about-and, therefore, could have countered-McGraw–Hill's comparisons. (*E.g.,* Defendant's Reply, at 38.)

**C. Conclusion**

Reed has successfully shown only one of the six *Ayerst* factors. Accordingly, the presumption that McGraw–Hill's conduct had a *de minimis* effect on competition holds, and McGraw–Hill is entitled to summary judgment on its antitrust claims.

**VI. State Law Claims**

Reed alleges six common-law claims against McGraw– Hill: (1) fraud, (2) misappropriation of trade secrets, (3) misappropriation of confidential information, (4) unfair competition, (5) tortious interference with contractual relations, and (6) unjust enrichment. The parties dispute which law applies-Georgia or New York-and the merits of each of the alleged torts. For the reasons that follow, Reed's unfair competition claim survives but the rest do not.

**A. Choice of Law**

**\*30** As a preliminary matter, the Court must determine which law governs each claim at issue in this case. A federal court sitting in diversity applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). This Court sits in the State of New York, and so its conflict rules apply.

**1. Waiver**

Reed argues that McGraw–Hill waived its argument that Georgia law applies because it did not raise it until its third amended answer, which was filed more than four years after the start of the litigation, after resolution of a motion to dismiss and after the close of fact discovery. McGraw–Hill responds by arguing that because Reed cannot show prejudice from the delay, Reed's waiver argument must fail. (Defendant's Reply, at 27 (citing *S & L Vitamins, Inc. v. Australian Gold, Inc.,* 521 F.Supp.2d 188, 213 (E.D.N.Y.2007).). [18]

A party can waive a choice-of-law argument. *E.g., Lott v. Levitt,* 556 F.3d 564, 568 (7th Cir.2009) (Evans, J.)."Courts, though, do not generally hold the choice-of- law determination to have been waived until a late stage in litigation, such as at the point of making of summary judgment motions."*Wultz v. Bank of China Ltd.,* 811 F.Supp.2d 841, 845 (S.D.N.Y.2011), *opinion withdrawn on reconsideration,*865 F.Supp.2d 425 (S.D.N.Y.2012). What constitutes a "late stage" is somewhat flexible. *Id.* (citing and quoting *Santalucia v. Sebright Transp., Inc.,* 232 F.3d 293 (2d Cir.2000) (finding waiver when adjudicating fee dispute after the settlement of an underlying suit); *Tehran–Berkeley Civil & Envtl. Engineers v. Tippetts–Abbett–McCarthyStratton,* 888 F.2d 239 (2d Cir.1989) (finding waiver on appeal for the second time); *Int'l Bus. Machines Corp. v. Liberty Mut. Fire Ins. Co.,* 303 F.3d 419 (2d Cir.2002) (finding waiver during appeal from summary judgment); *Bluestein & Sander*

*v. Chicago Ins. Co.,* 276 F.3d 119 (2d Cir.2002) (finding waiver during appeal from summary judgment); *Larsen v. A.C. Carpenter, Inc.,* 620 F.Supp. 1084 (E.D.N.Y.1985) (finding waiver in bench trial opinion).

Reed argues that McGraw–Hill missed the late-stage cutoff because it waited until after the close of fact discovery to raise its choice-of-law defense. McGraw–Hill, citing two cases about the waiver of affirmative defenses generally, counters that prejudice should be the core of the inquiry. *See S & L Vitamins, Inc.,* 521 F.Supp.2d at 213, and *Heisler v. Toyota Motor Credit Corp.,* 884 F.Supp. 128, 132 n. 4 (S.D.N.Y.1995). Generally, the close of discovery is the point after which additional factual issues ought not to be raised absent compelling circumstances justifying tardiness. (*See* Dkt. No. 200 (precluding Brennan and Ross declarations because they were submitted after the close of fact discovery).) But where, as here, the issue to be raised is purely legal, and where, as here, the party seeking to enforce waiver does not argue or show that it has been prejudiced by the late argument, the close of fact discovery loses its crucial importance. The Court holds, therefore, that McGraw–Hill has not waived its argument that Georgia law applies.

## 2. New York Choice–of–Law Rules

 **\*31** In tort actions, New York courts apply the substantive law of the jurisdiction that has the most significant interest in "the specific issue raised in the litigation."*Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 196, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) (quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963)). In determining the interests of a jurisdiction in a particular tort, New York courts assess whether the state laws in conflict are primarily "conduct regulating" or "loss allocating." *Padula v. Lilarn Props. Corp.,* 84 N.Y.2d 519, 522, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994). Conduct-regulating rules are those "governing conduct to prevent injuries from occurring," while loss allocating rules "are those which prohibit, assign, or limit liability after the tort occurs...."*Id.* Compare *Cacciola v. Selco Balers, Inc.,* 127 F.Supp.2d 175, 184 (E.D.N.Y.2001) (causes of action involving the duty and standard of care applicable to manufacturers, are, for choice of law purposes, conduct-regulating), *with Armstead v. Nat'l R.R. Passenger Corp.,* 954 F.Supp. 111, 113 (S.D.N.Y.1997) (determination of whether to apply Virginia's contributory negligence or New York's comparative negligence rule is primarily loss allocating, because both "rules significantly encourage plaintiffs to exercise due care" and "the primary

difference is in how loss will be allocated after the tort occurs"). [19]

If the laws at issue are primarily conduct-regulating, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."*Cooney v. Osgood Mach.,* 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993). If they are loss allocating, the so-called *"Neumeier* rules" apply. *See Neumeier v. Kuehner,* 31 N.Y.2d 121, 129, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972).*Neumeier* holds that if the parties are co-domiciliaries, the law of their common domicile will presumptively apply. If they are not, the law of the place where the tort occurred will presumptively apply. Only "where it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants,"*id.* at 128, 335 N.Y.S.2d 64, 286 N.E.2d 454, will the presumptive rules not apply.

Crucially, New York courts do not necessarily apply the law of just one state to a tort case. Rather, they asses the governing law issue-by-issue. *Babcock v. Jackson,* 12 N.Y.2d at 484, 240 N.Y.S.2d 743, 191 N.E.2d 279 ("[T]here is no reason why all issues arising out of a tort claim must be resolved by reference to the law of the same jurisdiction."). Therefore, the Court will proceed tort-by-tort, deciding first whether the relevant rules are conduct-regulating or loss-allocating, second where the relevant tort is alleged to have occurred, third what the competing interests are with respect to each tort, and finally whether McGraw–Hill is entitled to summary judgment under the governing law.

## B. Fraud

 **\*32** Reed alleges that McGraw–Hill defrauded it by falsely representing that Lewin and Lorenz-the "consultants" McGraw–Hill hired to access Reed Connect-were not McGraw–Hill employees. Reed alleges that it relied on this material falsehood to its detriment: specifically, that it lost customers because of McGraw–Hill's illicit access to Reed Connect. The mechanism by which Reed claims to have lost these customers is a bit murky, but it seems to be, in essence, the allegedly misleading advertising McGraw–Hill produced using its illicit access to Reed Connect. (Plaintiff's Memorandum, at 89.)

To determine whether the competing rules at issue here are conduct-regulating or loss-allocating, the Court must first look to what the competing rules actually are. The only relevant difference between Georgia and New York fraud claims involves the Georgia Trade Secrets Act ("GTSA"), which will be discussed in greater detail below. Among other things, this act channels common-law claims that rest on a theory of misappropriation of trade secrets, however pleaded, into a single statutory tort claim. *See* GA.CODE ANN . § 10–1–767(a). The Act, thus, preempts fraud claims that are based on a trade secrets theory. *See* *Robbins v. Supermarket Equip. Sales, LLC,* 290 Ga. 462, 465, 722 S.E.2d 55 (2012). McGraw–Hill argues that this means the rule is loss-allocating: conceding that a tort has occurred, Georgia would bar recovery on a trade secrets theory unless the plaintiff can meet the GTSA's exacting standards for secrecy, while New York would let the claim proceed as ordinary fraud. Reed, on the other hand, argues that the conflict concerns fraud, which is generally a conduct-regulating doctrine. (Plaintiff's Memorandum, at 78 (citing *Seipel v. Jenkens & Gilchrist, P. C.,* 341 F.Supp.2d 363, 377 (S.D.N.Y.2004)).)

The parties, it seems, dispute the level of generality at which the Court is to assess whether a rule is conduct-regulating or loss-allocating. In keeping with their atomistic approach to choice-of-law issues, New York courts look to "the law of the jurisdiction which has the strongest interest in the resolution of *the particular issue presented.*" *Babcock,* 12 N.Y.2d at 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (emphasis added). Thus, on the issue of the applicability of the GTSA-the only relevant difference between Georgia and New York fraud to which the parties point-the conflict is loss-allocating. The law of the place of the tort will, therefore, presumptively apply. [20] *Cooney,* 81 N.Y.2d at 72, 595 N.Y.S.2d 919, 612 N.E.2d 277.

The question, then, is where the fraud occurred. McGraw–Hill's consultants purchased subscriptions over the phone. They were in New York; Reed's representatives were in Georgia. Generally, New York courts find the "locus" of a tort to be the place where the "last event necessary" to render the defendant liable occurs. *See* *Schultz,* 65 N.Y.2d at 195, 491 N.Y.S.2d 90, 480 N.E.2d 679. In this case, that would be Georgia, where the plaintiffs are alleged to have relied on the consultants' misstatements. But, under the Restatement Second approach-which, Reed correctly points out, is "for all practical purposes identical to" the New York conflicts rules-cases involving fraud are ordinarily governed by "the principal location of the defendant's conduct...." *Compare*

*A.A.M. v. J.L.R.C.,* 840 F.Supp.2d 624, 633 (E.D.N.Y.2012), *with* RESTATEMENT (2D) OF CONFLICT OF LAWS § 145 (cmt.f). Because New York is the principal location of McGrawHill's conduct, New York law applies to the fraud claim.

**\*33** Under New York law, a fraud plaintiff "must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996). The principal issue here is injury. New York law requires that the alleged losses stemming from a fraud "be the direct, immediate, and proximate result of the misrepresentation," *Kregos v. Assoc. Press,* 3 F.3d 656, 665 (2d Cir.1993), and that those losses be independent of other causes, *id.* Here, Reed alleges lost profits due to lost customers stemming from McGraw–Hill's misleading advertisement, which, Reed contends, was the result of fraud. This stretches "direct, immediate, and proximate" beyond what those words will bear. Further, these losses are not independent of Reed's myriad other state and federal claims. Reed alleges no other damages resulting from McGraw–Hill's fraudulent conduct. Therefore, McGraw–Hill is entitled to summary judgment on Reed's fraud claims.

## C. Trade Secrets and Misappropriation of Confidential Information

Reed alleges that McGraw–Hill misappropriated its trade secrets in violation of the GTSA and New York trade secrets law, whichever applies. [21] McGraw–Hill contends that the construction project information listed in Reed Connect was not "secret" within the meaning of either the GTSA or New York trade secrets law. The Court need not decide whether Georgia or New York law applies to the trade secrets claim because on the critical issue here-secrecy-the laws of the relevant jurisdictions come to the same result: Reed's CPI is not secret.

Though the laws of New York and Georgia differ with respect to trade secrets-Georgia has enacted a version of the Uniform Trade Secrets Act while New York maintains the common-law doctrine of trade secrets-both states require that the misappropriated information be *secret* in order to qualify for trade-secrets protection. *Compare* *LinkCo, Inc. v. Fujitsu Ltd.,* 230 F.Supp.2d 492, 498–99 (S.D.N.Y.2002) (describing

New York standard for secrecy), *with Robbins v. Supermarket Equip. Sales, LLC,* 290 Ga. 462, 464, 722 S.E.2d 55 (2012) (noting that the GTSA requires that parties "take reasonable efforts to maintain ... secrecy.").

It is clear that under New York law, which is more permissive than Georgia law, Reed's CPI lost its trade-secrets status-if it ever had any-when Reed gave out free trial subscriptions unaccompanied by any contractual restrictions on their use. *See LinkCo.,* 230 F.Supp.2d at 498–99 (citing and quoting *Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1177 (2d Cir.1993) (finding that hotel room design concept was not a trade secret because it would be publicly disclosed once the hotel room was built, marketed and occupied), *abrogated on other grounds by Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368 (2d Cir.2000); *Speciner v. Reynolds Metals Co.,* 279 F.2d 337, 337–38 (2d Cir.1960) (finding that a window design was not a trade secret where the features "were readily apparent from a casual inspection of the plaintiff's window which was available on the open market"); *Blank v. Pollack,* 916 F.Supp. 165, 175 (N.D.N.Y.1996) (finding a window crank not to be a trade secret because it is "a device, that upon marketing and sale is open to public inspection of all of its features"); *Eagle Comtronics, Inc. v. Pico, Inc.,* 89 A.D.2d 803, 453 N.Y.S.2d 470, 472 (App. Div. 4th Dep't 1982) (finding no trade secret when "any secrecy in the design of the trap was lost when it was placed upon the market").) Reed concedes that it gave out trial subscriptions without any restrictions. Therefore, Reed's CPI is not a protected trade secret within the meaning of either Georgia or New York law.[22]

**D. Tortious Interference**

 **\*34**  Reed claims that McGraw–Hill tortiously interfered with its prospective economic advantage by luring customers to Dodge Network with misleading advertisements. Reed concedes that its claim is preempted under the GTSA if Georgia law applies, but argues that New York law properly applies because the conflicting rules are conduct regulating and the place of the misconduct was New York. The Court need not decide whose law applies to this claim because even under the law of New York the claims clearly cannot succeed. Under New York law, to sustain a claim of tortious interference with prospective economic advantage, a plaintiff must prove that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and

(4) the defendant's acts injured the relationship."*Catskill Development, LLC v. Park Place Entertainment Corp.,* 547 F.3d 115, 132 (2d Cir.2008).

Reed cannot prove that McGraw-Hill's actions injured its business relationship with customers. Patrick McCoy is the only person who has offered competent evidence that he relied on and was misled by McGraw-Hill's advertisements. But he did not make the decision to purchase CPI services at his company, as discussed above. As such, while his declaration *may* be evidence of consumer confusion, it is not evidence that McGraw-Hill actually injured Reed's contractual relations. Because Reed has not offered any evidence of injury, its tortious interference claim cannot survive summary judgment under the law of New York. And it is preempted under the law of Georgia. Therefore, McGraw-Hill is entitled to summary judgment on Reed's tortious interference claim.

**E. Unjust Enrichment**

Reed alleges that McGraw-Hill was unjustly enriched by "[McGraw-Hill's] use of false comparisons." (Plaintiff's Memorandum, at 88 (citing *Sandrino v. Michaelson Assocs., LLC,* 10–CV–7897, 2012 WL 5851135 (S.D.N.Y. Nov.19, 2012).) McGraw–Hill argues that it is entitled to summary judgment on this claim because Reed cannot show that McGraw-Hill took anything of value when it released the allegedly false comparisons. Because McGraw-Hill did not gain any customers that would have been Reed's but for McGraw-Hill's misconduct, it argues, McGraw-Hill was not unjustly enriched at Reed's expense and, therefore, Reed is not entitled to restitution. The undisputed evidence suggests that the only customer Reed allegedly "lost" because of McGraw–Hill's misconduct-McCoy-did not, in fact, make the decision to purchase a Dodge Network subscription. Accordingly, Reed has not offered any evidence that it lost customers because of McGraw-Hill's misconduct and therefore cannot sustain a claim of unjust enrichment.

**E. Unfair Competition**

McGraw–Hill concedes that on "two or three isolated" occasions, McGraw–Hill employees used project leads that they acquired through their illicit access to Reed Connect in their own database. (Defendant's Memorandum, at 15 n. 6.) Reed argues that McGraw–Hill committed the tort of unfair competition by misappropriating its "labors and expenditures ... with some element of bad faith."(Plaintiff's Memorandum, at 86 (quoting *Saratoga Vichy Spring Co.*

*v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980).) McGraw–Hill responds by arguing that (1) the infractions were *de minimis,* (2) Reed did it too,[23] and (3) under Georgia law-which McGraw–Hill contends should apply-the tort of unfair competition does not exist.

**\*35** The first question is which law governs. The Georgia Supreme Court has never explicitly recognized a tort of unfair competition. The New York Court of Appeals, on the other hand, has developed a rich and flexible doctrine of unfair competition. The conflict between these two laws, then, is conduct regulating: in Georgia certain behavior does not subject an actor to tort liability while in New York the same behavior would. So the question becomes where the tort was committed. Here, McGraw–Hill accessed Reed's database in Georgia from New York and incorporated the spoils into the Dodge Network in New York. As with the tort of fraud, with respect to unfair competition, the principal locus of the defendant's conduct is ordinarily the controlling contact. *See* RESTATEMENT (2D) OF CONFLICT OF LAWS § 145 (cmt.f). Therefore, New York law will apply.

The tort of unfair competition has its principal genesis in a 1918 Supreme Court case decided under federal common law. *See International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). The International News Service ("INS"), using telegraph technology, had devised a series of methods by which it could sell news that was actually collected by the Associated Press ("AP").*Id.* For example, INS had its employees in New York read AP newswires and send them via telegraph to the INS bureau in Los Angeles-where, "since in speed the telegraph and telephone easily outstrip the rotation of the earth,"*id.* at 238, it would be three hours earlier. INS would publish the news as its own. The Supreme Court held that because "permitting indiscriminate publication by anybody and everybody for purposes of profit in competition with the news-gatherer ... would render publication profit-less," the newsgatherer enjoys a right in "quasi-property" against republication by other news services. *Id.* at 242.

*INS* has come under criticism in the 96 years since it was decided, chiefly on the ground that it is duplicative of copyright law. *See* RICHARD EPSTEIN, TORTS (9th ed.2008) (citing *Cheney Bros. v. Doris Silk Corp.,* 35 F.2d 279, 280 (2d Cir.1929) (Hand, J.)). Indeed, in certain cases large portions of New York's unfair competition jurisprudence are preempted by the federal Copyright Act. *See National Basketball Association v. Motorola, Inc.,*

105 F.3d 841 (2d Cir.1997). But the State of New York has nonetheless maintained a vigorous unfair competition jurisprudence. *See Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcast Systems, Inc.,* 672 F.2d 1095, 1105 (2d Cir.1982) ("New York courts have noted the 'incalculable variety' of illegal practice falling within the unfair competition rubric ... calling it a 'broad and flexible doctrine.' ") (internal citations omitted). Under New York law, business people are protected from "all forms of commercial immorality, the confines of which are marked only by the 'conscience, justice and equity of common-law judges.' " *LinkCo.,* 230 F.Supp.2d at 501 (citing and quoting *Demetriades v. Kaufmann,* 698 F.Supp. 521, 525 (S.D.N.Y.1988)).

**\*36** The tort of unfair competition (via misappropriation) under New York law specifically requires proof that the defendant took something in which the plaintiff enjoyed a property right. *See Roy Export,* 672 F.2d at 1105; *see also Dow Jones & Co. v. International Sec. Exch. Inc.,* 451 F.3d 295, 302 n. 8 (2d Cir.2006). The plaintiff must also prove that "defendant's use of the information constitutes free-riding on the plaintiff's efforts."*NBA,* 105 F.3d at 845. McGrawHill argues that it did not commit the tort of unfair competition because Reed does not enjoy a property interest in its project *counts.*McGraw–Hill then inexplicably declares that there is "no evidence that [McGraw–Hill] ever misappropriated [Reed's] underlying data...." (Defendant's Memorandum, at 83.) To support this statement, McGraw–Hill cites page 15 of its memorandum of law. (*Id.* (citing Defendant's Memorandum, at 14–15).) But on page 15 of its memorandum, McGraw–Hill *concedes* that it did, in fact, misappropriate Reed's project leads on "two or three isolated" occasions. (*Id.* at 15 n. 6.) McGraw–Hill is correct that the re-publication of publicly available project counts does not constitute unfair competition. *See NBA,* 105 F.3d at 853. But because Reed is accusing it of actually taking the underlying data in Reed Connect, McGrawHill's argument is beside the point.

Wherever the confines of the capacious tort of unfair competition may lie, McGrawHill's conduct here falls within them. Here, McGraw–Hill used phony entities to surreptitiously subscribe to Reed's database service, then took the projects it found there and added them to its own database. The project listings are the parties' stock in trade. *Compare INS,* 248 U.S. at 236. Reed has a property interest-or at least a "quasi" property interest, *id.*-in its project leads. When McGraw–Hill took those leads and incorporated them into

its own service-and it does not dispute that it did this on some occasions-it "free r[ode]" on the significant effort Reed expends to collect projects. Compare *NBA*, 105 F.3d at 845. That McGraw–Hill's conduct may not have caused significant damage, or may not have been widespread, is not dispositive at this stage of the litigation. Reed has offered sufficient evidence to survive summary judgment on this claim.

### V. Statutes of Limitations

McGraw–Hill argues that a one-year statute of limitations applies to Reed's unfair competition claim because "[t]he crux of Reed's unfair competition claim is that [McGraw–Hill] used the Roper Report and other allegedly misleading marketing pieces to influence customers' purchasing decisions."(Defendant's Memorandum, at 89.) That is not the crux of the surviving unfair competition claim. Rather, McGraw–Hill's misappropriation of project leads is the crux of the misappropriation claim. A claim on that theory, in New York, is governed by a three-year statute of limitations. *See Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.,* 297 F.Supp.2d 463, 491 (N.D.N.Y.2003). Reed's evidence suggests that the alleged misappropriation took place in 2008, within two years of the filing of the complaint in this action. Reed's unfair competition claim survives the statute of limitations.

### VI. Conclusion

**\*37** For the foregoing reasons, McGraw–Hill's motion to exclude the testimony of Dr. Frederick Warren–Boulton is GRANTED, and McGraw–Hill's motion for summary judgment is GRANTED in part and DENIED in part. Summary judgment is granted in favor of McGrawHill on all of Reed's remaining claims with the exception of Reed's unfair competition claim.

The Clerk of the Court is directed to close the motions at docket numbers 149 and 168.

SO ORDERED.

Footnotes

1    Because Reed has failed to identify or serve the John Doe natural persons and the John Doe entities, the claims against those Defendants are dismissed for failure to prosecute.

2    On September 30, 2011, this case was transferred to the undersigned. (Dkt. No. 79.)

3    Reed also offers two more declarations (by Alyssianne Curry Brennan and Jeremy Ross) to support its case, but the Court has previously precluded those declarations. (Dkt. No. 200.) They will not be considered.

4    Because the Court ultimately concludes that Reed's antitrust claims cannot succeed for other reasons, the Court assumes without deciding that Dr. Warren–Boulton's liability opinion is admissible under Rule 702.

5    Specifically, the ordinary least-squares (OLS) method of linear regression solves for a linear equation that minimizes the sum of the squared residuals. Regression analysis is not restricted to linear models and many other methods of calculating the optimal coefficients exist. Because Dr. Warren–Boulton used only OLS linear methods, the Court will use "regression analysis" to mean "OLS linear regression."

6    One can visualize a line only in three-dimensional space. (Maybe fourif time is considered a dimension. *E.g.* Mark Heller, *Temporal Parts of Four–Dimensional Objects,* 46 PHIL. STUDS. 323 (1993).) More precisely, then, a regression analysis plots the hyperplane that best fits the data points in $n$-dimensional space, where $n$ is the sum of the independent, dependent, and control variables. The Court will spare the reader this distinction and refer to the hyperplane as a "line."

7    In his first model, Dr. Warren–Boulton did not include the overall volume of construction activity in the economy. In response to criticism from McGraw–Hill, Dr. Warren–Boulton added this variable to his second model, which is otherwise identical to the first.

8    *Bazemore* was decided before *Daubert.*Nonetheless, the Second Circuit has relied on it since. *E.g., Bickerstaff,* 196 F.3d 435.

9    While scholars have been unable to pinpoint a passage in Robert Giffen's writing in which he explains the concept of what is now known as a "Giffen" good, Alfred Marshall attributes the concept to him. ALFRED MARSHALL, PRINCIPLES OF ECONOMICS 208 (1895) ("As Mr. Giffen has pointed out, a rise in the price of bread makes so large a drain on the resources of the poorer labouring families and raises so much the marginal utility of money to them, that they are forced to curtail their consumption of meat and the more expensive farinaceous foods: and, bread being still the cheapest food which they can get and will take, they consume more, and not less of it.")

10    Formally, PWGraw–Hill = PReed + (VWGraw Hill—VReed), where P and V are the price and value of each good, respectively. (Plaintiff's Exhibit 16.)

11    Dr. Warren–Boulton does not argue that his model passes any competing test, so the Court will discuss only the Chow test.

**12**

$$(S_c-(S_1+S_2))/k$$

Specifically, the Chow statistic takes the form of 

_____

where $S_c$, $S_1$, and $S_2$ are

$$(S_1+S_2)/(N_1+N_2-2k)$$

the sum of squared residuals from the combined data, the first group, and the second group, respectively; N is the number of observations in each group; and $k$ is the number of variables in the regression.

**13** Plaintiffs need only prove "a likelihood of confusion among customers" to enjoin an allegedly deceptive ad campaign, but they "must introduce evidence of *actual* consumer confusion" to recover damages from the same under the Lanham Act. *Res. Developers, Inc. v. Statue of Liberty–Ellis Island Found., Inc.,* 926 F.2d 134, 139 (2d Cir.1991) (emphasis added). Here the heightened standard applies because Reed seeks damages.

**14** The independent bottlers are the relevant consumers in this industry. The two companies in *SevenUp* each sold syrup to independent bottlers who combined it with carbonated water and sweetener to produce the canned sodas. *Seven–Up,* 86 F.3d at 1384.

**15** *E.g.,*BLACK'S LAW DICTIONARY 1017 (9th ed. 2009) ("According to expressed language.").

**16** Reed, in fact, leaves out the requirement that the deception be "egregious" as well. *See Resource Developers,* 926 F.2d at 140 (citations omitted). The Court does not reach this issue, though, because Reed has not put forth sufficient evidence to support its argument that McGrawHill engaged in deliberate deception.

**17** They also argue that Dr. Warren–Boulton's price-effect theory supports this claim but, because Dr. Warren–Boulton's testimony has been excluded under Rule 702, it will not be considered here.

**18** McGraw–Hill also argues that the Court has already rejected Reed's argument. It contends that by granting leave to file a third amended answer containing the choice-of-law allegation, the Court implicitly held that McGraw–Hill had not waived the argument. This argument is without merit. The Court, in granting leave to amend, did not rule on the law that governs Reed's tort claims and did not implicitly or otherwise rule that McGraw–Hill had preserved its choice-of law argument.

**19** A long-simmering academic dispute bubbles just under the surface of this question-that is, what is the purpose of tort law after all? *Compare, e.g.,* Ronald Coase, *The Problem of Social Cost,* 3 J.L. & ECON. 1 (1960), *and* Richard Posner, *A Theory of Negligence,* 1 J. LEGAL STUDS. 29 (1972), *with* Ernest Weinrib, *The Gains and Losses of Corrective Justice,* 44 DUKE L.J. 277, 290 (1994) ("[O]ne cannot justify tort liability by reference to the need both to deter actors and to compensate sufferers."), *and* Jules Coleman, *The Economic Structure of Tort Law,* 97 YALE L.J. 1233 (1988), *and* Scott Hershovitz, *Two Models of Tort (and Takings),* 92 VIRGINIA L.REV. 1147 (2006).*See generally* Glanville Williams, *The Aims of the Law of Tort,* 4 J. CURRENT. L. PROBS.. 137 (1951); John Gardner, *What is Tort Law For? Part One: The Place of Corrective Justice,* Oxford Legal Studs. Research Paper No. 1/2010, *available at* http:// ssrn.com/abstract=1538342. Thankfully, the New York Court of Appeals has adopted a methodology that obviates the need for this Court to delve too deeply into the cauldron.

**20** The parties do not dispute their respective domiciles. Reed is a Georgia domiciliary. McGraw–Hill is a New York domiciliary.

**21** Reed also argues that McGraw–Hill is judicially estopped from arguing that Reed's project leads are not trade secrets because McGraw–Hill's predecessor in this business, the F.W. Dodge Company, argued that its services were trade secrets in a pair of cases decided in the early twentieth century. *See F.W. Dodge Co. v. Construction Information Co.,* 183 Mass. 62, 66 N.E. 204 (Mass.1903); *F.W. Dodge Corp. v. Comstock,* 140 Misc. 105, 109, 251 N.Y.S. 172 (N.Y. Sup.Ct., Erie Cnty.1931). Judicial estoppel prevents parties from asserting legal positions that are "clearly inconsistent" with earlier positions. *See DeRosa v. National Envelope Corp.,* 595 F.3d 99, 103 (2d Cir.2010); *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Reed's argument is unavailing because McGraw–Hill does not argue in the instant case that CPI cannot ever be a trade secret, only that Reed's CPI is not secret because Reed gave away free trials without a user agreement. (*See* Defendant's Reply, at 32.) This position is not inconsistent with arguing that CPI is a trade secret when it is sold subject to a confidentiality agreement.

**22** Reed also contends that McGraw–Hill misappropriated its "methodologies and business practices associated with acquiring, entering, analyzing, categorizing, tracking, presenting, searching, and managing construction project data."(Plaintiff's Memorandum, at 83.) Because McGraw–Hill had access only to information that a consumer with a free trial had, this contention does not save its trade secrets claim. Even if its "methodologies" are trade secrets, Reed has put forward no evidence that McGraw–Hill misappropriated them. Reed's contention here, however, is helpful to its unfair competition claim, which is discussed below.

**23** (*See* Defendant's Exhibits 79–82.) McGraw–Hill's counterclaims are not at issue on this motion and it has not raised the defense of unclean hands (which would not apply here anyway) so this contention is irrelevant.

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.