UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

H. CRISTINA CHEN-OSTER; LISA PARISI; and SHANNA ORLICH, on behalf of themselves and all others similarly situated,

Plaintiffs,

- against -

GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,

Defendants.

10 Civ. 6950 (AT) (JCF)

REPORT AND RECOMMENDATION

TO THE HONORABLE ANALISA TORRES, U.S.D.J.:

The plaintiffs in this case allege that Goldman, Sachs & Co. and The Goldman Sachs Group, Inc. (collectively, "Goldman Sachs" or the "defendants"), by whom they were formerly employed, engage in a pattern of gender discrimination against female professional employees in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. The plaintiffs now move for certification of a class consisting of:

> All female Associates and Vice Presidents who have worked in Goldman Sachs' Investment Banking, Investment Management, and/or Securities Divisions in the United States at any time from September 10, 2004 to present, and in New York City from July 7, 2002 to the present.

(Memorandum in Support of Plaintiffs' Motion for Class Certification ("Pl. Memo.") at 34). They seek to certify the class

for purposes of injunctive and declaratory relief pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure and for monetary damages pursuant to Rule 23(b)(3). In the alternative, the plaintiffs seek certification of a class pursuant to Rule 23(c)(4) only for the purpose of establishing liability. For the reasons set forth below, I recommend that the motion be denied.[1]

Background

The facts set forth here are limited to those relevant to determination of the class certification motion. Where the parties contest any material facts, those disputes will be resolved in the analysis that follows.

A. Individual Plaintiffs

H. Cristina Chen-Oster and Shanna Orlich seek to represent the proposed class.[2] Ms. Chen-Oster worked in Goldman Sachs' New York office in the Equities Area of the Securities Division from March 1997 until March 2005, first in the Convertible Sales Business Unit and later in U.S. Research Sales. (Declaration of H. Cristina Chen-Oster dated Feb. 18, 2014 ("Chen-Oster Decl."), ¶ 3;

[1] This Report and Recommendation should be considered together with the Memorandum and Order filed today in which I address the parties' motions to exclude certain evidence submitted in connection with the class certification motion.

[2] The claims of a third plaintiff, Lisa Parisi, are subject to an arbitration agreement. See Parisi v. Goldman, Sachs & Co., 710 F.3d 483 (2d Cir. 2013).

Deposition of H. Cristina Chen-Oster ("Chen-Oster Dep."), excerpts attached as Exh. 4 to Declaration of Theodore O. Rogers, Jr. dated July 3, 2014 ("Rogers Decl."), at 440). She held the title of Vice President from June 1997 until she left the firm eight years later. (Chen-Oster Decl., ¶ 3). Ms. Chen-Oster contends that during her tenure, she was denied compensation as well as promotion from Vice President to Managing Director on the basis of her gender. (Chen-Oster Decl., ¶ 4). Indeed, she maintains that she did not resign willingly from the firm, but was constructively terminated. (Chen-Oster Decl., ¶ 3). She is currently a Managing Director at Deutsche Bank. (Chen-Oster Decl., ¶ 16; Tr. at 113).[3]

Ms. Orlich first worked at Goldman Sachs as a Summer Associate in 2006. (Declaration of Shanna Orlich dated Feb. 16, 2014 ("Orlich Decl."), ¶ 2). In July 2007, she was hired as an Associate in the Securities Division and worked there until she was laid off in November 2008. (Orlich Decl., ¶ 3; Deposition of Shanna Orlich ("Orlich Dep."), excerpts attached as Exh. 14 to Rogers Decl., at 457-58). Ms. Orlich contends that she was denied compensation because of her gender and that she was terminated in retaliation for having complained about gender discrimination. (Orlich Decl., ¶¶ 8, 11).

---

[3] "Tr." refers to the transcript of the hearing on class certification held on October 22 and 23, 2014.

B. Class Claims

The plaintiffs claim that, like the individual named plaintiffs, the women who make up the putative class have been discriminated against in promotion and compensation on the basis of their gender. (First Amended Class Action Complaint ("FAC"), ¶¶ 3-6, 43-51). According to the plaintiffs, this occurs in several ways. First, the plaintiffs maintain that Goldman Sachs' facially neutral evaluation policies have a disparate impact on women. (FAC, ¶¶ 7, 9, 37-42). The two specific policies at issue, known as the "360 review" and "quartiling," will be discussed in detail hereafter. Second, the plaintiffs allege that Goldman Sachs has intentionally adopted these policies in order to disadvantage women. (FAC, ¶ 8). And, finally, the plaintiffs assert that a "corporate culture" of bias favoring men (and undermining women) exists at Goldman Sachs, fostering a pattern of discrimination. (FAC, ¶¶ 8, 52-56, 126-129).

C. The Structure of Goldman Sachs

Three of Goldman Sachs' four revenue-generating divisions contain members of the proposed class. The Securities Division consists of two subdivisions: Fixed Income, Currencies and Commodities ("FICC") and Equities. Employees in this division conduct transactions in stocks, options, futures, interest rate products, credit products, mortgages, currencies, and commodities.

(Deposition of Rodney Miller, excerpts attached as Exh. 13 to Rogers Decl., at 50-53, 58-59; Declaration of Marie Louise Kirk dated July 2, 2014 ("Kirk Decl."), ¶ 3; Declaration of John Levene dated June 30, 2014 ("Levene Decl."), ¶¶ 2, 4). The Investment Banking Division is divided between Classic Banking and Financing. In Classic Banking, employees specialize in particular industries, advising the directors and managers of Goldman's clients on strategic matters such as mergers, debt offerings, and equity offerings. (Declaration of Susan Benz dated July 3, 2014, ¶¶ 3, 10; Declaration of Craig Packer dated July 2, 2014 ("Packer Decl."), ¶¶ 3-4). Employees in Financing are responsible for specific financing transactions such as the issuance of leveraged financing, structured financing, or equity. (Packer Decl., ¶ 3). Finally, the Investment Management Division also has two subdivisions: Private Wealth Management ("PWM") and Goldman Sachs Asset Management ("GSAM"). PWM provides wealth advisory and investment management services to high net-worth individuals and certain foundations and endowments (Declaration of Megan Taylor dated June 30, 2014 ("Taylor Decl."), ¶ 3), while GSAM manages asset funds for institutional and PWM clients (Declaration of James McNamara dated June 30, 2014, ¶ 3).

Within each division there are myriad smaller business units that specialize in particular activities. These units have evolved

over time, sometimes numbering less than 100 and at other times more than double that number. (Tr. at 218). The units also vary in size, with some as small as five or fewer employees. (Tr. at 218). The diversity of the business units' activities can be illustrated with a few examples. In the FICC Strats Business Unit, employees deal with technical, quantitative problems and questions posed by clients across a broad range of products. (Kirk Decl., ¶¶ 4-5). The Sales and Relationship Management Department within the Prime Brokerage Business Unit in the Securities Division, by contrast, is responsible for generating business, as by "prospecting" for new hedge fund clients. (Levene Decl., ¶¶ 4, 6). Employees on the Syndicate Desk of the Leveraged Finance Business Unit within the Investment Banking Division make decisions about the marketing, pricing, and distribution of leveraged finance products. (Packer Decl., ¶¶ 7, 11).

D. Personnel Policies

1. Employee Evaluations

a. 360 Reviews

Goldman Sachs utilizes two related processes for evaluating employees. The first is the annual "360 review". Every Goldman Sachs professional proposes between eight and twelve evaluators, who may be internal clients, subordinates, peers, or senior colleagues who have recently worked with her. (Deposition of

Jessica Kung ("Kung Dep."), attached as Exhs. 9 and 9A to Rogers Decl., at 280-81; Deposition of Caroline Heller Sberloti ("Heller Dep."), attached as Exhs. 16 and 16A to Rogers Decl., at 265-70). The professional's supervisor reviews the list of suggested evaluators and may modify it, typically after consultation with the employee. (Kung Dep. at 281-85; Heller Dep. at 268). The evaluators who are ultimately selected then rate the employee across a range of categories using a numerical scale. (Kung Dep. at 290-91). For example, in one year, all Goldman Sachs professionals were evaluated on the basis of technical skills, communications skills, judgment, problem solving, team work, compliance, diversity, leadership, overall commercial effectiveness, and overall professional performance. (Kung Dep. at 305-07). The employee's direct manager collects the information from the evaluators in a "feedback book" and creates a manager summary that also includes his or her own assessment of the employee. (Kung Dep. at 279-80, 289-90). The 360 review process was used across each of Goldman Sachs' divisions throughout the class period, though the functional definition of any particular category varied, depending on the types of skills most relevant to any particular business unit. (Heller Dep. at 271-72; Deposition of Bruce Larson, attached as Exh. 11 to Rogers Decl., at 169-70).

b. Manager Quartiling

The second evaluation tool utilized across the divisions of Goldman Sachs is manager quartiling.[4] Every year, the manager of each business unit is required to rank each of his or her employees by placing them in one of five categories based on the manager's evaluation of the employee's "performance, contribution and potential relative to: (1) expectations for that individual's level of experience and position; and (2) that individual's peers." (Guidelines for the Manager Performance Rank ("Ranking Guidelines"), attached as part of Exh. 10C to Rogers Decl., at 1; see also Manager Performance Rating Toolkit ("Toolkit"), attached as Exh. 10B to Rogers Decl., at 3-4; Kung Dep. at 316-17).[5] The manager is directed to assign the top 25% of his or her employees to Quartile 1, the next 25% to Quartile 2, the next 25% to Quartile 3, the next 15% to Quartile 4, and the bottom 10% to Quartile 5. (Kung Dep. at 316-18).[6] "Rankings should approximate a forced

[4] Manager quartiling, which will be further described, is distinct from performance quartiling, which is a ranking of employees based exclusively on the numerical average of their 360 reviews.

[5] Goldman Sachs utilizes the terms "quartile" and "quartiling" notwithstanding the fact that the evaluation template consists of five, rather than four, categories.

[6] Previously, the manager had discretion whether and how to distribute employees from the 25th to the 75th percentiles between Quartiles 2 and 3. (Toolkit at 4; Kung Dep. II at 318-19).

distribution over the entire division, but need not be exact. (For example, Rank 1 may be applied somewhat loosely to cover 23-27% of the population.)" (Ranking Guidelines at 1). In assessing employees, the manager is supposed to consider 360 review data, the quality of the employee's performance, long-term commercial impact or contribution, technical and functional expertise, potential to assume greater responsibility, leadership and management skills, and diversity and citizenship-related activities. (Ranking Guideline at 1; Toolkit at 3). There is no formula dictating how these factors are to be weighted relative to one another (Deposition of David Landman ("Landman Dep."), attached as Exh. 10A to Rogers Decl., at 37-38), and an employee's quartile ranking can deviate from the ranking that might be expected based on the 360 review alone (Landman Dep. at 26-28; Kung Dep. at 320-23; Larson Dep. at 187). A manager's tentative ranking is subject to adjustment at the division level and by Human Capital Management, Goldman Sachs' human resources department. (Heller Dep. at 314-27; Larson Dep. at 70, 187-88). These modifications may be triggered by discrepancies between 360 review scores and the initial quartiling, by the desire to enforce the quartile distribution to prevent "grade inflation," or by other considerations. (Heller Dep. at 320-21; Kung Dep. at 322, 332; Larson Dep. at 161-62, 187-88).

2. Compensation

Professionals at Goldman Sachs generally receive a salary and a year-end bonus,[7] with the bonus frequently being the largest component of compensation. (Deposition of Mehling, excerpts attached as Exh. 12 to Rogers Decl., at 226-27). The process of setting annual employee compensation begins with the firmwide compensation committee allocating a budget to each of Goldman Sachs' divisions. (Kung Dep. at 56-57; Larson Dep. at 60). Division management, generally each division's Chief Operating Officer and Chief Financial Officer, further allocates the available funding among the division's business units, based on their relative performance and contribution during the previous year. (Kung Dep. at 57-59; Larson Dep. at 61). Each manager then recommends compensation for specific employees. (Kung Dep. at 58-59; Larson Dep. at 61).

These recommendations then work their way back up the chain. The manager's proposals are reviewed by the business unit head. (Kung Dep. at 59-60). To the extent that the business unit manager has any concerns with the recommendations, he or she will discuss

[7] Some professionals, notably Private Wealth Advisors ("PWAs") within the Private Wealth Management Subdivision of the Investment Management Division, are paid entirely by commission. (Taylor Decl., ¶ 9). PWAs have discretion to provide supplemental compensation to members of their team who do not work on commission. (Taylor Decl., ¶ 11).

them with the managers and attempt to reach consensus, though the business unit manager would make the final determination. (Kung Dep. at 59-62). The business unit leader recommendations are reviewed, in turn, by a compensation committee within the division. (Kung Dep. at 64-67; Heller Dep. at 24; Larson Dep. at 62-63). Finally, each division's compensation recommendations are forwarded to the firmwide compensation committee. (Kung Dep. at 68-70; Larson Dep. at 63). Because the budget changes over time and because an employee's performance may fluctuate, there are generally at least two rounds of compensation setting in any annual cycle. (Heller Dep. at 27-32; Larson Dep. at 66-67; Kung Dep. at 111-13, 115).

3. Promotion

Promotion from Vice President to Managing Director at Goldman Sachs is accomplished through a process known as "cross-ruffing." (Kung Dep. at 398; Heller Dep. at 80; Larson Dep. at 227). At the initial step, each business unit head, in consultation with other managers, develops a list of candidates for promotion; there is no application process as such (Larson Dep. at 227; Kung Dep. at 414-15, 432-33; Heller Dep. at 203-04), and there are no formal qualifications for promotion other than that, at least in the Securities Division, the candidate generally must have served as a Vice President for a minimum of two years. (Heller Dep. at 205-

06). The list is then submitted to the division heads and the chief operating officer of the division for review, often with some ranking to indicate which candidates are seen as priorities for promotion. (Kung Dep. at 415-18, Larson Dep. at 227-32; Heller Dep. at 205-08). During this review, additional candidates may be added to the list, some may be deleted, and the priority order may be changed. (Kung Dep at 417-21; Larson Dep. at 232-35). Consideration of candidates who are low on the list may be deferred until the next promotion cycle. (Kung Dep. at 418). The final list is then submitted for the cross-ruffing process.

"Cross-ruffers" are Managing Directors who evaluate the candidates for promotion. A list of proposed cross-ruffers is initially generated by the head of the Human Capital Division within each operating division. (Larson Dep. at 235). After the division heads approve a list of proposed cross-ruffers, it is submitted to the firmwide talent assessment group. (Larson Dep. at 240). The cross-ruffers are then trained in their responsibilities by the talent assessment group and by someone within the relevant operating division, such as the head of Human Capital Management for that division, as well as a cross-ruffing team captain who has previously participated in the process. (Larson Dep. at 241-42; Heller Dep. at 219). Each cross-ruffer is then assigned to a number of candidates outside of his or her own business unit.

(Larson Dep. at 242-43; Kung Dep. at 439-40). The cross-ruffer interviews approximately a dozen persons familiar with each candidate, such as managers, peers, and internal clients. (Heller Dep. at 218, 224; Larson Dep. at 244; Kung Dep. at 440-42). The cross-ruffers utilize standard templates or questionnaires to frame their inquiries and record their findings. (Larson Dep. at 245; Kung Dep. at 442-43; Heller Dep. at 218-20). Once the interview process is completed, all of the cross-ruffers within a division, together with the cross-ruffing captain and the head of Human Capital Management for the division, develop a rank-ordered list of candidates. (Larson Dep. at 244-45; Heller Dep. at 226; Kung Dep. at 448). That list is then submitted to the firmwide talent assessment group and the division heads. (Larson Dep. at 245-46; Heller Dep. at 226; Kung Dep. II at 448-49). The division heads also submit their own ranking lists to the talent assessment group. (Larson Dep. at 246-47; Heller Dep. at 227, 229-30; Kung Dep. at 449-50, 453). The cross-ruffing captain and the division heads then meet with the subcommittee of the firm’s management committee responsible for promotions in order to explain the rationale for their respective rankings. (Larson Dep. at 247-48; Heller Dep. at 230-31, 241). Ultimately, the division heads submit a final ranked list of candidates for the approval of the firm’s management committee. (Larson Dep. at 248; Heller Dep. at 242; Kung Dep. at

454). That committee then determines how many candidates from the list will be promoted in any given year. (Larson Dep. at 248-50).

Legal Framework

A. Title VII

Certain requirements for class certification, including the elements of commonality, typicality, and predominance, can only be assessed in light of the substantive law governing a case. In this instance, the plaintiffs assert claims of both disparate impact and disparate treatment under Title VII.

The core provision of Title VII states that:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1). Under a disparate impact theory of liability, a plaintiff may prevail by demonstrating that the employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Thus, Title VII prohibits some employment practices "that are not intended to discriminate but in fact have a disproportionately adverse effect" on a protected class. Ricci v. DeStefano, 557 U.S. 557, 577 (2009). To prove disparate impact discrimination, a plaintiff must

"(1) 'identify a specific employment practice' or policy, Malave v. Potter, 320 F.3d 321, 326 (2d Cir. 2003); '(2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two.' Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 160 (2d Cir. 2001)[, abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes, __ U.S. __, 131 S. Ct. 2541 (2011)]." Chin v. Port Authority of New York & New Jersey, 685 F.3d 135, 151 (2d Cir. 2012). Disparity and causation are often proven by means of statistical analysis.

> The statistics must reveal that the disparity is substantial or significant, and must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity. To rebut a plaintiff's statistics, a defendant may introduce evidence showing that either no statistical disparity in fact exists or the challenged practice did not cause the disparity.

Id. (internal quotation marks and citations omitted). Alternatively, an employer can defeat the plaintiff's prima facie case by demonstrating that the challenged practice or policy is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A)(i). Even if the employer demonstrates business necessity, however, "plaintiffs may still succeed if they show that the employer has refused to adopt an available alternative employment practice that would reduce the level of disparate impact while still serving the employer's

legitimate needs." Houser v. Pritzker, 28 F. Supp. 3d 222, 234-35 (S.D.N.Y. 2014) (citing 42 U.S.C. § 2000e-2(k)(1)(A)(ii), (k)(1)(C)).

If the evidence establishes a disparate impact violation of Title VII, an individual seeking relief "need only show that he or she suffered an adverse employment action 'and therefore was a potential victim of the proved [] discrimination.'" Robinson, 267 F.3d at 159 (quoting International Brotherhood of Teamsters v. United States, 431 U.S. 324, 362 (1977)). The burden then shifts to the employer to show that there were legitimate reasons for the adverse action. Chin, 685 F.3d at 151. If the employer fails to carry that burden, "the employee is entitled to individualized relief, which may include back pay, front pay, and compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, [or] other nonpecuniary losses." Id. at 151-52 (internal quotation marks and citations omitted) (alteration in original).

In contrast to disparate impact, where the employer's practice or policy is facially neutral, a disparate treatment claim is based on the allegation that the defendant engaged in intentional discrimination. In order to establish a prima facie case of disparate treatment, a plaintiff must show "'(1) that he belonged to a protected class; (2) that he was qualified for the position he

held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" Id. at 151 (quoting Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004)). The burden then shifts to the employer to offer a legitimate, nondiscriminatory basis for the adverse action. Id. Ultimately, the plaintiff must prove that the defendant's employment decision was based in whole or in part on intentional discrimination. Id.

In a disparate treatment class action (though not in an individual case), the plaintiffs may present evidence based on "pattern-or-practice." Id. at 148-49. In order to establish a prima facie case using this method, the plaintiffs "need not initially show discrimination against any particular present or prospective employee." United States v. City of New York, 717 F.3d 72, 84 (2d Cir. 2013). Rather, they "must make a prima facie showing of a pervasive policy of intentional discrimination." Id. As in a disparate impact case, statistics play an important role in establishing a pattern or practice of disparate treatment, see Hazelwood School District v. United States, 433 U.S. 299, 307-08 (1977) (holding that "gross statistical disparities" may be sufficient for prima facie proof of pattern or practice of discrimination), but "instances of discrimination against particular employees are [also] relevant to show a policy of

intentional discrimination," City of New York, 717 F.3d at 84. As in an individual disparate treatment case, if the plaintiff class makes out a prima facie case, the burden then shifts to the employer, but in a pattern or practice case, that burden is to proffer "'a nondiscriminatory explanation for the apparently discriminatory result.'" Id. (quoting Teamsters, 431 U.S. at 360 n.46). If the defendant comes forward with such an explanation, the burden shifts back to the plaintiffs to prove the ultimate fact at issue: that intentional discrimination was the defendant's "standard operating procedure." Teamsters, 431 U.S. at 336; see City of New York, 717 F.3d at 87. The defendant may attempt to counter the plaintiffs' statistical evidence with its own quantitative analysis or with non-statistical proof such as adherence to an affirmative action program. City of New York, 717 F.3d at 86-87.

If liability is established in a pattern-or-practice case, a presumption arises that "any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." Teamsters, 431 U.S. at 362; accord City of New York, 717 F.3d at 87-88. Thus, as to any individual class member's claim for relief, "the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." Teamsters,

431 U.S. at 362. The presumption that any individual employment decision was the result of a pervasive policy of discrimination is thus a rebuttable inference. Dukes, __ U.S. at __, 131 S. Ct. at 2552 n.7.

B. Class Certification

In order to be certified, a proposed class must generally meet all of the standards of Rule 23(a) and then satisfy the requirements of one of the three categories in Rule 23(b).

1. Rule 23(a)

As set forth in Rule 23(a), the prerequisites for any class action are that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The plaintiffs bear the burden of demonstrating numerosity, but "they need not present a precise calculation of the number of class members, and a court may rely on reasonable inferences from available facts in drawing its conclusion." Houser, 28 F. Supp. 3d at 241 (internal quotations marks and citation omitted); accord McIntire v. China MediaExpress Holdings, Inc., 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014). Numerosity is presumed where the proposed class includes more than 40 members. Consolidated Rail Corp. v.

Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995); Shepard v. Rhea, No. 12 Civ. 7220, 2014 WL 5801415, at *4 (S.D.N.Y. Nov. 7, 2014).

"[A]n issue is common to the class when it is susceptible to generalized, class-wide proof." In re Nassau County Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006). Accordingly, a court must determine whether the class members' claims "will in fact depend on the answers to common questions," Dukes, __ U.S. at __, 131 S. Ct. at 2554, and whether a class action is likely to "generate common answers apt to drive the resolution of the litigation," id. at __, 131 S. Ct. at 2551. (internal quotation marks and citation omitted). In the context of employment discrimination, the commonality requirement will be met if the class members' claims

> depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Id. at __, 131 S. Ct. at 2551. However, "for purposes of Rule 23(a)(2) even a single common question will do." Id. at __, 131 S. Ct. at 2556 (internal quotation marks, citation, and alteration omitted).

"Typicality requires that the claims or defenses of the class representatives be typical of the claims and defenses of the class

members. This requirement is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Brown v. Kelly, 609 F.3d 467, 475 (2d Cir. 2010) (internal quotation marks and citation omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux v. Celani, 987 F.2d 931, 936-37 (2d Cir. 1993).

Finally, "adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Securities Corp., 222 F.3d 52, 60 (2d Cir. 2000). Furthermore, the "class representative must . . . possess the same interest and suffer the same injury as the class members." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625-26 (1997) (internal quotation marks omitted).

The requirements of commonality, typicality, and adequacy of representation tend to merge with one another and "serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and

the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Id. at 626 n.20 (internal quotation marks and citation omitted).

2. Rule 23(b)

The plaintiffs here propose certification of an injunctive class pursuant to Rule 23(b)(2) and a damages class under Rule 23(b)(3).

A 23(b)(2) class is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The fundamental characteristic of a class properly certified under Rule 23(b)(2) is 'the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" Houser, 28 F. Supp. 3d at 249 (quoting Dukes, __ U.S. at __, 131 S. Ct. at 2557). Civil rights cases alleging class-based discrimination are "prime examples" of the type of case properly certified under Rule 23(b)(2). Amchem, 521 U.S. at 614.

Rule 23(b)(3) provides for certification of classes that seek individualized relief such as back pay or compensatory damages.

Consistent with the potentially greater variability in the interests of members of a 23(b)(3) class, class members must be provided with notice of the pendency of the litigation and an opportunity to exclude themselves from it. Fed. R. Civ. P. 23(c)(2)(B). In addition to satisfying the requirements of Rule 23(a), certification under Rule 23(b)(3) requires that common questions "predominate over any questions affecting only individual members," and class resolution must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In assessing the predominance and superiority of class treatment, courts must consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

3. Rule 23(c)(4)

Finally, even where it is inappropriate to certify a class exclusively under Rule 23(b)(2) or 23(b)(3), a court may certify a class for particular issues under Rule 23(c)(4). Nassau County

Strip Search Cases, 461 F.3d at 221. This frequently entails creating a "hybrid" class, certifying claims for declaratory and injunctive relief under Rule 23(b)(2) and damages claims under Rule 23(b)(3). See Robinson, 267 F.3d at 162 n.7; Gulino v. Board of Education, 907 F. Supp. 2d 492, 505-06 (S.D.N.Y. 2012); Jones v. Ford Motor Credit Co., No. 00 Civ. 8330, 2005 WL 743213, at *19-20 (S.D.N.Y. March 31, 2005).

4. Burden of Proof

"[P]laintiffs wishing to proceed through a class action must actually prove -- not simply plead -- that their proposed class satisfies each requirement of Rule 23." Halliburton Co. v. Erica P. John Fund, Inc., __ U.S. __, __, 134 S. Ct. 2398, 2412 (2014) (emphasis in original). Accordingly, a court must engage in a "rigorous analysis" to ascertain whether the prerequisites for certification have been met, and that analysis "will entail some overlap with the merits of the plaintiff's underlying claim." Dukes, __ U.S. at __, 131 S. Ct. at 2551.

Discussion

A. Rule 23(a)

1. Numerosity

The plaintiffs calculate that there are approximately 1,762 members of the putative class (Expert Report of Henry S. Farber In Connection with Chen-Oster v. Goldman Sachs dated Feb. 17, 2014

("Farber Report"), attached as Exh. 8 to Declaration of Barbara B. Brown dated June 13, 2014 ("Brown Decl."), Table 1), a number that Goldman Sachs does not dispute. Joinder of all class members would plainly be impracticable, and the numerosity requirement of Rule 23(a)(1) is therefore met.

2. Commonality

a. Disparate Impact

"[E]ven a single common question will do" to satisfy the commonality requirement of Rule 23(a)(2). Dukes, __ U.S. at __, 131 U.S. at 2556 (internal quotation marks, citation, and alterations omitted). Here, there is such a question: whether the evaluation processes utilized by Goldman Sachs -- 360 review and quartiling -- have a discriminatory impact on women.

The Supreme Court's discussion in Dukes of its earlier decision in General Telephone Co. of Southwest v. Falcon, 457 U.S. 147 (1982), is particularly instructive:

> This Court's opinion in Falcon describes how the commonality issue must be approached. There an employee who claimed that he was deliberately denied a promotion on account of race obtained certification of a class comprising all employees wrongfully denied promotions and all applicants wrongfully denied jobs. 457 U.S. at 152. We rejected that composite class for lack of commonality and typicality, explaining:
>
> > Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion [or higher pay] on discriminatory grounds, and his otherwise unsupported

> allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claim will share common questions of law or fact and that the individual's claim will be typical of the class claims. Id. at 157–158.

> Falcon suggested two ways in which that conceptual gap might be bridged. First, if the employer "used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a)." Id. at 159 n. 15. Second, "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes." Ibid.

Dukes, __ U.S. at __, 131 S. Ct. at 2552-53.

In Dukes, the Court also observed that

> in resolving an individual's Title VII claim, the crux of the inquiry is the reason for a particular employment decision. Here [the plaintiffs] wish to sue about literally millions of employment decisions at once. Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question why was I disfavored.

Id. at __, 131 S. Ct. at 2552 (internal quotation marks and citation omitted). In this case, the 360 review and quartiling procedures provide the "glue" that was absent in Dukes and link together the otherwise disparate decisions with respect to

compensation and promotion at Goldman Sachs. There is no dispute that each of the class members was subject to these processes. Rather, Goldman Sachs contends that there is no link between these evaluation devices and any common injury to the class members, as illustrated by the fact that, in many business units, women received increased compensation or promotions at a higher rate than men. (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Def. Memo.") at 32; Expert Report of Michael P. Ward, Ph.D. in the Matter of Chen-Oster et al. vs. Goldman, Sachs & Co. and The Goldman Sachs Group, Inc. dated July 3, 2014 ("Ward Report") at 2, 5, 6 & App. A).

In a disparate impact case, however, it is not the plaintiffs' obligation to show that every class member suffered an identical injury as the result of a policy with a discriminatory impact. To be sure, in some instances that will be the case. For example, if a test that is biased against African-Americans, say, is used as a filter such that no one who receives less than a particular score is promoted, then the class of African-Americans who failed the test will all have been injured in the same manner and will present a common question appropriate for class treatment. See, e.g., Gulino v. New York State Education Department, 460 F.3d 361, 369 (2d Cir. 2006) (challenging test required for teaching certification).

Yet class treatment is no less appropriate where the same test is used not as an absolute screen, but as merely one factor in determining which employees receive a benefit. See Waisome v. Port Authority of New York and New Jersey, 948 F.2d 1370, 1377-78 (2d Cir. 1991) (finding potential disparate impact claim where "candidates's scores on the [allegedly biased] test were factored into the composite scores that were then used to compute a candidate's rank on the [e]ligibility [l]ist"); cf. McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 488-89 (7th Cir. 2012) (approving class certification for disparate impact claims where plaintiffs challenged employer's teaming and account distribution policies, even though managers maintained "a measure of discretion" regarding implementation of policies). Of course, the manifestations of the test's bias may not be as obvious in this circumstance because some supervisors may give little or no weight to the biased scores while others rely heavily on them. As a result, some employees who do poorly on the test may get promoted while others who do well may not. But that does not undermine the fact that the alleged bias of the test is a common issue, nor does it call into question the appropriateness of enjoining use of the test if disparate impact is proven.

Here, the plaintiffs have demonstrated that the 360 review and quartiling programs are used across the putative class. Their

statistical expert, Dr. Henry S. Farber, has presented evidence that gender bias causes women to score less well than men in both types of evaluations. Dr. Farber utilized multiple regression and probit analyses, and his models controlled for such factors as division, education, experience at Goldman Sachs, experience prior to joining the firm, job grouping, and whether the individual was hired laterally. (Farber Report, ¶¶ 53, 63, 68, 84). Dr. Farber found that women Associates and Vice Presidents were scored significantly lower than otherwise similar men on the 360 review. (Farber Report, ¶¶ 69-70 & Tables 14, 15). Similarly, he found that female Associates and female Vice Presidents were, respectively, 7.1 percentage points and 4.5 percentage points less likely than their male counterparts to be placed in the top quartile. (Farber Report, ¶¶ 63-65 & Tables 10, 11).

Dr. Farber conducted similar analyses of earnings and promotion. Again, he controlled for a range of factors. He did not, however, initially use the "performance" measures -- the 360 review scores and the quartile rankings -- as predictive variables, because he considered them potentially "tainted." (Farber Report, ¶ 49; Expert Rebuttal Report of Henry S. Farber dated July 29, 2014 ("Farber Rebuttal Report"), ¶ 28). In other words, he believed that since the results of 360 reviews and quartiling may themselves be affected by gender bias, those results should not be used as

explanatory variables in a model designed to measure the impact of discrimination. (Farber Rebuttal Report, ¶ 28). Dr. Farber calculated that, taking account of the other factors he considered, female Associates earn 7.6% less than their male counterparts, while female Vice Presidents earn 21.4% less than comparable males, with both differences being statistically significant. (Farber Report ¶¶ 55-56 & Tables 6, 7). Similarly, he found that while the expected rate of promotion from Vice President to Managing Partner was 5.12% for women, the actual rate was 3.96%, resulting in a shortfall of 19 promotions for women, compared to what would be expected if women were promoted according to the same model as men; again this was a statistically significant difference. (Farber Report, ¶ 89 & Table 20).

In response to the concern that he improperly omitted performance measures from his model, Dr. Farber performed alternative calculations in which, notwithstanding his misgivings, he included 360 review scores and quartiling results among his predictive variables. (Farber Report, ¶¶ 73-75; Farber Rebuttal Report, ¶ 29). His sample was somewhat more restricted than in his initial model because complete performance data was not available for all employees. (Farber Report, ¶¶ 71-72, 74, 76). Dr. Farber found that, after including both performance measures, female Associates earn 3.3% less than their male counterparts, while

female Vice Presidents earn 16.9% less than comparable males. (Farber Report ¶¶ 77, 79 & Tables 16, 17). While these differentials are less than those in the model omitting performance variables, they remain statistically significant. (Farber Report, ¶¶ 77, 79; Farber Rebuttal Report, ¶ 29).

Goldman Sachs maintains that Dr. Farber's analysis is flawed because it aggregates data for employees from many different business units within the firm. The defendants' statistical expert observed that "Dr. Farber's regression models combine large numbers of very dissimilar employees: employees hired laterally and those promoted internally into their positions; those who work in different Divisions; and those who serve in different functions." (Ward Report at 9). The validity of this criticism depends upon the question the model purports to answer. See Ellis v. Costco Wholesale Corp., 285 F.R.D. 492, 523 (N.D. Cal. 2012) (crediting model that did not break data down by region because "unlike in Dukes, here Plaintiffs' statistical analysis conforms to the level of decision for the challenged practices, including the adoption of the many companywide policies"). In that respect, it is perfectly appropriate for the model to include data across business units when it is being used to explore the impact of a firm-wide policy such as 360 review or quartiling.

The plaintiffs have thus met their burden of demonstrating the

existence of common issues of law and fact.

b. Disparate Treatment

Determination of the appropriateness of class certification is necessarily claim-specific. See Bolin v. Sears, Roebuck & Co., 231 F.3d 970, 976 (5th Cir. 2000) ("Certification on a claim-by-claim, rather than holistic, basis is necessary to preserve the efficiencies of the class action device without sacrificing the procedural protections it affords to unnamed class members."); Karhu v. Vital Pharmaceuticals, Inc., No. 13-60768-CIV, 2014 WL 815253, at *6 (S.D. Fla. March 3, 2014) (assessing predominance on claim-by-claim basis); Ellis, 285 F.R.D. at 510 (analyzing commonality separately for disparate impact and disparate treatment claims). Thus, while the commonality requirement is satisfied with respect to the plaintiffs' disparate impact claim, their disparate treatment claims must be separately assessed.

One of those claims flows directly from the disparate impact analysis. The plaintiffs contend that Goldman Sachs is aware of the discriminatory impact of the 360 review and quartiling processes, but nevertheless directs its managers to continue to rely on these instruments in making compensation and promotion decisions. (Pl. Memo. at 5). According to the plaintiffs, this is intentional disparate treatment. The issues underlying this claim therefore include those common to the class in the disparate impact

discussion, and thus satisfy the commonality requirement.

The plaintiffs also advance a disparate treatment claim that is not as directly related to Goldman Sachs' performance measures. They contend that Goldman Sachs maintains a "boys' club" atmosphere, characterized by such things as a focus on sports and drinking. (Pl. Memo. at 20-22). Further, the plaintiffs argue that Goldman Sachs condones the sexualization of women at the firm (Pl. Memo. at 22-25) and retaliates against women who complain of harassment or discrimination (Pl. Memo. at 32-34). With respect to each of these assertions, the plaintiffs have proffered substantial evidence. Of course, in any large organization, there will be some, perhaps many, instances of discriminatory conduct, whether by supervisors or by co-workers, and Goldman Sachs has presented evidence that it takes steps to counteract instances of gender bias. But this is not the stage at which to decide whether there is in fact a pattern of pervasive discrimination at Goldman Sachs. It is enough for purposes of assessing commonality that the plaintiffs have submitted significant evidence in support of their claims.

3. Typicality

The named plaintiffs, Ms. Chen-Oster and Ms. Orlich, were evaluated pursuant to the 360 review and quartiling procedures. Nevertheless, Goldman Sachs maintains that Ms. Orlich is not

typical of other class members because, as a junior Associate, she "was paid in lockstep with others of her tenure" and was not yet eligible to be considered for promotion. (Def. Memo. at 63-64). Similarly, Goldman Sachs contends that Ms. Chen-Oster cannot represent the class because she asserts a unique retaliation claim. (Def. Memo. at 64). These arguments are not persuasive.

"'Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding.'" In re Platinum and Palladium Commodities Litigation, No. 10 Civ. 3617, 2014 WL 3500655, at *9 (S.D.N.Y. July 15, 2014) (quoting Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 155 (S.D.N.Y. 2002)). Thus, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux, 987 F.2d at 936–37. Here, the fact that Ms. Orlich may not have been injured to the same extent as some other class members does not diminish her ability to serve as class representative; she was evaluated by the same challenged processes as all class members, and, at a minimum, her annual bonus was set as a result of those processes. Nor does Ms. Chen-Oster's retaliation claim render her atypical of the class. See Spencer v.

No Parking Today, Inc., No. 12 Civ. 6323, 2013 WL 1040052, at *19 (S.D.N.Y. March 15, 2013). Accordingly, the typicality requirement is satisfied.

4. Adequacy

Goldman Sachs does not challenge the ability of plaintiffs' counsel to represent the class adequately. It does, however, contend that Ms. Chen-Oster is not an adequate class representative because her deposition testimony is "in direct conflict with the claims that she seeks to litigate on behalf of the class." (Def. Memo. at 64). In particular, she testified that she believed that Goldman Sachs' processes are characterized by unbridled management discretion (Chen-Oster Dep. at 436-37, 556-57), while the plaintiffs assert in their papers that discretion is constrained in ways that promote discrimination. This discrepancy is a matter of semantic shading and, in any event, there will be ample evidence from a host of sources concerning the extent of manager discretion.

The plaintiffs, then, meet all of the requirements of Rule 23(a).

B. Rule 23(b)(2)

In a prior determination in this case, the Honorable Leonard B. Sand, U.S.D.J., determined that, because the named plaintiffs are not currently employed by Goldman Sachs, "Dukes forecloses certification under 23(b)(2)," despite the plaintiffs' claim for

reinstatement. Chen-Oster v. Goldman, Sachs & Co., 877 F. Supp. 2d 113, 121 (S.D.N.Y. 2012). Judge Sand indicated that he was obligated to follow the rule that he understood to have been announced in Dukes, "notwithstanding misgivings about its wisdom," which he discussed at length. Id. at 121-22. The plaintiffs now ask that Judge Sand's determination be revisited on the basis of three subsequent decisions in this district that interpreted Dukes more narrowly and reached a conclusion different from Judge Sand's. (Pl. Memo. at 43-44). Those decisions are Kassman v. KPMG LLP, 925 F. Supp. 2d 453, 467-68 (S.D.N.Y. 2013), Robinson v. Blank, No. 11 Civ. 2480, 2013 WL 2156040, at 12 & n.3 (S.D.N.Y. Feb. 22, 2013) (incorporating and adopting report and recommendation), and Kubicek v. Westchester County, No. 08 Civ. 372, 2013 WL 5423961, at *8 (S.D.N.Y. Sept. 27, 2013) (dicta, citing Kassman).

Not surprisingly, if I were considering this issue for the first time, I would adopt the plaintiffs' interpretation of Dukes as I did in the report and recommendation that Judge Sand reviewed. And, consequently, I would recommend certifying a class under Rule 23(b)(2) since, were the plaintiffs to prevail on the disparate impact claim, they would be entitled to an order enjoining Goldman Sachs' use of the 360 review and quartiling processes. But I am not writing on a clean slate; Judge Sand's determination is entitled to deference as law of the case.

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983). "Application of the doctrine is 'discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.'" U.S. Bank National Ass'n v. PHL Variable Insurance Co., Nos. 12 Civ. 6811, 13 Civ. 1580, 2014 WL 998358, at *3 (S.D.N.Y. March 14, 2014) (quoting DiLaura v. Power Authority of New York, 982 F.2d 73, 76 (2d Cir. 1992)). At the same time, while "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, [] as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 817 (1988) (quoting Arizona, 460 U.S. at 618 n.8).

There are no such extraordinary circumstances here. The plaintiffs argued to Judge Sand that Dukes does not foreclose injunctive relief for plaintiffs who are seeking reinstatement. He rejected that argument. The fact that subsequent decisions by parallel courts have accepted it is not a sufficient basis for overriding the law of the case. If it were, the law of the case doctrine would have little meaning in an unsettled area of law such

as this, since each new district court decision would prompt an application to revisit the issue in each case where it had previously been decided differently. Furthermore, in the context of class certification, the law of the case doctrine can be enforced with less fear of causing injustice, since an erroneous certification determination by the district court can be promptly corrected by the Court of Appeals on interlocutory appeal. See Fed. R. Civ. P. 23(f).

Therefore, the proposed class should not be certified pursuant to Rule 23(b)(2).

C. Rule 23(b)(3)

The Second Circuit recently expounded on the requirement of predominance that must be met in order to certify a class under Rule 23(b)(3):

> With respect to common issues, Rule 23(b)(3), by its plain terms, imposes a "far more demanding" inquiry into the common issues which serve as the basis for class certification. [Amchem, 521 U.S.] at 623-24. While the inquiry may be more demanding, the Supreme Court has also instructed that Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." Amgen Inc. v. Conn. Ret. Plans and Trust Funds, __ U.S. __, __, 133 S. Ct. 1184, 1196 (2013) (internal quotation marks omitted) (alterations in original). Rather, all that is required is that a class plaintiff show that "common questions 'predominate.'" Id. (quoting Fed. R. Civ. P. 23(b)(3)). That is, "[i]ndividual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions

> not predominate over the common questions affecting the class as a whole." Messner v. Northshore Uni. HealthSystem, 669 F.3d 802, 815 (7th Cir. 2012).

Sykes v. Mel S. Harris and Associates LLC, __ F.3d __, __, 2015 WL 525904, at *8 (2d Cir. 2015) (some alterations in original). Here, Goldman Sachs contends that this standard cannot be met because both causation and damages require highly individualized determinations. (Def. Memo. at 66-70).

In another case decided the same day as Sykes, the Second Circuit considered "the question of whether the Supreme Court's decision in Comcast Corp. v. Behrend, __ U.S. __, 133 S. Ct. 1426 (2013), overruled the law of this Circuit that class certification pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure cannot be denied merely because damages have to be ascertained on an individual basis." Roach v. T.L. Cannon Corp., __ F.3d __, __, 2015 WL 528125, at *1 (2d Cir. 2015). The court held that Second Circuit precedent remained viable. It reiterated the general principle that "[p]redominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" Id. at *3 (quoting In re Foodservice Inc. Pricing Litigation, 729 F.3d 108, 118 (2d Cir. 2013)). It went on to conclude as follows:

> To be sure, Comcast reiterated that damages questions should be considered at the certification stage when weighing predominance issues, but this requirement is entirely consistent with our prior holding that "the fact that damages may have to be ascertained on an individual basis is . . . a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." McLaughlin [v. American Tobacco Co.], 522 F.3d [215, 231 (2d Cir. 2008), partially abrogated on other grounds by Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639 (2008)]. The Supreme Court did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving individualized damages calculations.

Id. at *6. Thus, while the prospect of calculating individual damages in the instant case is daunting, it does not, by itself, necessarily preclude class certification.

More troublesome is the issue of causation. Because the plaintiffs' strongest argument for predominance arises from their disparate impact claim, I will focus on that cause of action. While proof that the 360 review or quartiling processes have a disparate impact would create a presumptive causal link between those processes and an individual class member's injury, Goldman Sachs would retain the right to demonstrate that there were other, legitimate explanations for any shortfall in compensation or failure to be promoted. See Chin, 685 F.3d at 151. At that point, evidence of the individualized factors that inform Goldman Sachs' compensation and promotion decisions -- the class member's particular skills, the nature of the work in her business unit, the

unit's profitability relative to other units, and, indeed, the extent to which the employee's manager considered 360 review and quartiling evaluations -- would effectively swamp the common question of whether the evaluative policies have, on average a discriminatory impact.

This distinction between the common and the individualized issues is reflected in the statistical analyses. Dr. Farber's regression model provides substantial evidence that 360 review and quartiling have a disparate impact. His model does not demonstrate what impact those processes may have had on any individual decision regarding compensation or promotion. Dr. Ward's analysis, by contrast, tells us less about the overall impact of the policies, but it suggests that, in many business units, any causal relationship between those policies and apparent gender discrepancies is a complex issue, subject to individualized proof. For example, in his analysis of Vice Presidents in thirty business units within the Securities Division, Dr. Ward found that in fifteen of the units, women were better compensated than men, controlling for other relevant factors, and that this was statistically significant for four of the units. (Ward Report at 55-57 & Figure 8). In the other fifteen units, women were less well compensated than similarly situated men, and this was statistically significant for four of the units. (Ward Report at

55-57 & Figure 8). This variability does not mean that there was no discrimination, and, indeed, dividing the data into many small samples may mask biased decision making, but Dr. Ward's analysis does show that demonstrating causation in any individual instance would require highly specific proof. Take a hypothetical business unit with four Vice Presidents, all women, who, according to the plaintiffs' statistical analysis, are each paid less than similarly situated male Vice Presidents. This could reflect their manager's adherence to discriminatory performance measures. But quite plausibly, the budget for this business unit might simply be constrained as a result of the unit's poor financial performance in the prior year; the women would appear to be victims of discrimination even in the absence of any biased decision making. Without specific information about the manager and the business unit, it could not be determined whether the apparent gender-related disparity in compensation was caused by bias in the 360 review or quartiling processes or by some other factor.

In this respect, this case is distinguishable from Sykes. Although the defendants there also argued that causation is necessarily an individualized determination, the court found otherwise. While the plaintiffs contended that the defendants had violated their rights under the Fair Debt Collection Practices Act (the "FDCPA"), the defendants maintained that they should be able

to demonstrate that any given plaintiff actually owed a valid debt. Sykes, __ F.3d at __, 2015 WL 525904, at *18. Yet, the FDCPA claims were based on the defendants' submissions of false affidavits of merit, which "were allegedly fraudulent in attesting to 'personal knowledge' of the existence of [the] underlying debt, and were also necessary to obtaining the default judgments that plaintiffs allege were fraudulently obtained." Id. In this context, the court concluded, "We fail to recognize any individualized causation issues with respect to plaintiffs' claims under the FDCPA." Id. The plaintiffs also brought claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") on the basis that the defendants had obtained default judgements through "sewer service," that is, false representations that the debtor had been served with the summons and complaint. Id. at *3. On this issue, the court acknowledged that there might be an individual causation issue "if a debt was actually owed, and a default judgment was achieved by means of proper service," but the court nevertheless concluded that this "remains a single arguably individual issue among [] myriad common issues." Id. at *18. Here, there is a different balance. While the validity or bias of Goldman Sachs' performance measures is a common issue, there are countless individualized factors that influence whether those performance measures cause legally cognizable injury. The common

issues therefore are not predominant,[8] as is required for certification under Rule 23(b)(3).[9]

D. Rule 23(c)(4)

Even where the predominance requirement is not met, a court may certify a class with respect to common issues that do exist. See McLaughlin, 522 F.3d at 234 (2d Cir. 2008); Nassau County Strip Search Cases, 461 F.3d at 226-27. However, in that circumstance, the possibility of certification should be weighed with an eye toward the end game. For example, in McReynolds, the court endorsed certification for purposes of determining liability for purportedly discriminatory firm-wide employment policies where a determination in favor of the plaintiffs could lead to injunctive relief. 672 F.3d at 490-92. But, for the reasons discussed above, no such relief is available here. In contrast to McReynolds, then, this is a case where the inability to obtain injunctive relief, together with highly individualized causation and damages issues, preclude certification under Rule 23(c)(4).

---

[8] Accordingly, there is no need to address whether, if the predominance requirement were met, a class action would be superior to other alternatives.

[9] Common issues are even less likely to predominate with respect to the plaintiffs' disparate treatment claims based on Goldman Sachs' corporate culture, and I will therefore not discuss those claims separately.

Conclusion

This is a close case. But for the fact that the law of the case doctrine dissuades me from revisiting the appropriateness of injunctive relief, I would recommend that the plaintiff class be certified pursuant to Rules 23(b)(2) and 23(c)(4) in order to obtain a final determination as to the allegedly discriminatory impact of Goldman Sachs' employee evaluation processes. But, because such relief has been held to be unavailable, I recommend that the plaintiffs' motion for class certification (Docket no. 246) be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Analisa Torres, Room 2210, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
March 10, 2015

Copies mailed this date to:

Adam T. Klein, Esq.
Cara E. Greene, Esq.
Justin M. Swartz, Esq.
Melissa L. Stewart, Esq.
Outten & Golden, LLP (NYC)
3 Park Avenue, 29th Floor
New York, NY 10016

Alison M. Stocking, Esq.
Anne B. Shaver, Esq.
Heather H. Wong, Esq.
Kelly Dermody, Esq.
Lisa J. Cisneros, Esq.
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Theodore O. Rogers, Jr., Esq.
Margaret E. Bartlett, Esq.
Michael P. Reis, Esq.
Suhana S. Han, Esq.
Robin D. Fessel, Esq.
Sullivan and Cromwell, LLP
125 Broad Street
New York, NY 10004

Barbara B. Brown, Esq.
Neal D. Mollen, Esq.
Paul Hastings LLP
875 15th Street N.W.
Washington, DC 20005

C. Geoffrey Weirich, Esq.
Paul Hastings LLP
1170 Peachtree Street, NE
Suite 2400
Atlanta, GA 30308