# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------x
                                            :
H. CRISTINA CHEN-OSTER; LISA PARISI;        :
and SHANNA ORLICH,                          :
                                            :
                        Plaintiffs,         :
                                            :
                                            :        10 Civ. 6950 (AT) (JCF)
            v.                              :
                                            :
GOLDMAN, SACHS & CO. and THE                :
GOLDMAN SACHS GROUP, INC.,                  :
                                            :
                        Defendants.         :
                                            :
---------------------------------------------------------------x
```

# DEFENDANTS' MEMORANDUM OF
## LAW IN OPPOSITION TO MOTION TO INTERVENE

Barbara B. Brown *(admitted pro hac vice)*
Neal D. Mollen *(admitted pro hac vice)*
Carson H. Sullivan *(admitted pro hac vice)*
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC  20005

Robert J. Giuffra, Jr.
Theodore O. Rogers, Jr.
Robin D. Fessel
Suhana S. Han
Jeffrey B. Wall *(admitted pro hac vice)*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Defendants*
*Goldman, Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

June 5, 2015

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** .................................................................. 1

**BACKGROUND** ...................................................................................... 4

    A.    Proceedings to Date .......................................................................4

    B.    The Putative Intervenors .................................................................5

    C.    Changes in Defendants' Processes Since 2011 ..................................8

**LEGAL STANDARD** .............................................................................. 10

**ARGUMENT** .......................................................................................... 11

**I.**    **PLAINTIFFS' EXTREME DELAY BARS THEIR APPLICATION SEEKING TO ADD NEW PLAINTIFFS IN THIS FIVE-YEAR-OLD ACTION.**....................11

**II.**    **AT THIS LATE DATE, PERMITTING THE INTERVENORS TO BRING AN INJUNCTION CLAIM IN THIS CASE WOULD BE HIGHLY PREJUDICIAL TO GOLDMAN SACHS.**....................14

    A.    Intervention Would Prejudice Goldman Sachs by Delaying Resolution of Plaintiffs' Existing Damages Claims. ...............................15

    B.    The Existing Record Cannot Support an Injunction. ..............................16

        1.    The Outdated Record Cannot Support an Injunction Against Current Goldman Sachs Evaluation and Compensation Processes. ...........................................................17

        2.    Plaintiffs' Rule 23(b)(3) Statistics Focused on a Different Population of Goldman Sachs's Professionals. ...........................20

        3.    In Any Event, the Existing, Stale Record Cannot Support an Injunction "Respecting the Class as a Whole."....................21

**III.**    **DENYING THIS MOTION WILL NOT PREVENT THE PUTATIVE INTERVENORS FROM PROTECTING THEIR RIGHTS OR PREJUDICE THEM IN ANY WAY.** ....................23

**IV.**    **THE INTERVENORS HAVE NOT SHOWN THAT THEIR CLAIMS SHARE COMMON QUESTIONS OF LAW OR FACT WITH THOSE OF THE EXISTING PLAINTIFFS.** ....................25

**CONCLUSION** ........................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar* v. *ICE*,
    2012 WL 1344417 (S.D.N.Y. April 16, 2012) (Forrest, J.)....................................................19

*Am. Pipe & Constr. Co.* v. *Utah*,
    414 U.S. 538 (1974)...........................................................................................................16

*In re Bank of New York Derivative Litig.*,
    320 F.3d 291 (2d Cir. 2003)..............................................................................................10

*Butler, Fitzgerald & Potter* v. *Sequa Corp.*,
    250 F.3d 171 (2d Cir. 2001)..............................................................................................11

*Cantazano* v. *Wing*,
    103 F.3d 223 (2d Cir. 1996)..............................................................................................11

*Carey* v. *Klutznick*,
    88 F.R.D. 249 (S.D.N.Y. 1980) (Werker, J.) ..................................................................14

*Chen-Oster* v. *Goldman, Sachs & Co.*,
    877 F. Supp. 2d 113 (S.D.N.Y. 2012) (Sand, J.) ...........................................................1, 4, 24

*Chicago Teachers Union* v. *Bd. of Educ.*,
    301 F.R.D. 300 (N.D. Ill. 2014)......................................................................................21

*City of New York* v. *Beretta U.S.A. Corp.*,
    2005 WL 1279183 (E.D.N.Y. May 26, 2005) (Weinstein, J.)........................................20

*Crown, Cork & Seal Co.* v. *Parker*,
    462 U.S. 345 (1983) (Powell, J., concurring) .................................................................16

*Fleming* v. *Bank of Boston Corp.*,
    127 F.R.D. 30 (D. Mass. 1989).........................................................................................24

*Floyd* v. *City of New York*,
    302 F.R.D. 69 (S.D.N.Y. 2014) (Torres, J.)............................................................ *passim*

*Gates* v. *Rohn & Haas Co.*,
    655 F.3d 255 (3d Cir. 2011)..............................................................................................21

*Haddock* v. *Nationwide Fin. Servs., Inc.*,
    262 F.R.D. 97 (D. Conn. 2009).........................................................................................12

*Hnot* v. *Willis Grp. Holdings Ltd.*,
　2006 WL 3476746 (S.D.N.Y. Nov. 30, 2006) (Lynch, J.) ............................................ *passim*

*In re Holocaust Victim Assets Litig.*,
　225 F.3d 191 (2d Cir. 2000) ..................................................................................... *passim*

*Hosp. Assoc.* v. *Toia*,
　577 F.2d 790 (2d Cir. 1978) .......................................................................................19, 20

*Kartman* v. *State Farm Mut. Auto. Ins. Co.*,
　634 F.3d 883 (7th Cir. 2011) ......................................................................................22, 23

*Laumann* v. *NHL*,
　2015 WL 2330107 (S.D.N.Y. May 14, 2015) (Scheindlin, J.) ............................................22

*MasterCard Int'l Inc.* v. *Visa Int'l Serv. Ass'n, Inc.*,
　471 F.3d 377 (2d Cir. 2006) .......................................................................................13, 14

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
　209 F.R.D. 323 (S.D.N.Y. 2002) (Scheindlin, J.) ............................................................21, 22

*Nationwide Life Ins. Co.* v. *Haddock*,
　460 F. App'x 26 (2d Cir. 2012) ...........................................................................................12

*N.J. Carpenters Health Fund* v. *Residential Capital, LLC*,
　2010 WL 5222127 (S.D.N.Y. Dec. 22, 2010) (Baer, J.) ........................................................13

*Peregrine Myanmar Ltd.* v. *Segal*,
　89 F.3d 41 (2d Cir. 1996) ...................................................................................................22

*In re Rezulin Prods. Liab. Litig.*,
　210 F.R.D. 61 (S.D.N.Y. 2002) (Kaplan, J.) .......................................................................21

*Shook* v. *Bd. of Cnty. Comm'rs*,
　543 F.3d 597 (10th Cir. 2008) .............................................................................................23

*Sidari* v. *Orleans Cnty.*,
　174 F.R.D. 275 (W.D.N.Y. 1996) ........................................................................................24

*Snell* v. *Suffolk Cnty.*,
　782 F.2d 1094 (2d Cir. 1986) ..............................................................................................25

*Swift & Co.* v. *United States*,
　276 U.S. 311 (1928) ............................................................................................................20

*Trief* v. *Dun & Bradstreet Corp.*,
　144 F.R.D. 193 (S.D.N.Y. 1992) (Edelstein, J.) ..................................................................13

*United States* v. *Pitney Bowes, Inc.*,
    25 F.3d 66 (2d Cir. 1994) ........................................................................... *passim*

*Valdez* v. *City of San José*,
    2013 WL 752498 (N.D. Cal. Feb. 27, 2013) ...........................................................20

*Wal-Mart Stores, Inc.* v. *Dukes*,
    131 S. Ct. 2541 (2011) ............................................................................... *passim*

*Webb* v. *Missouri Pacific R.R. Co.*,
    98 F.3d 1067 (8th Cir. 1996) .............................................................................20

**Statutes, Rules, and Regulations**

Fed. R. Civ. P. 23 ....................................................................................... *passim*

Fed. R. Civ. P. 24 ....................................................................................... *passim*

Fed. R. Civ. P. 65 ..................................................................................22, 23

**Other Authorities**

7A Charles A. Wright & Arthur R. Miller, et al., Federal Practice and Procedure,
    § 1784.1 (3d ed. 2005) .....................................................................................21

Goldman Sachs Gender Discrimination Class Action Lawsuit,
    www.goldmangendercase.com (last visited June 5, 2015) ......................................7

Kevin Dugan, *Goldman Sach's differentiating stats dominate sex suit*, N.Y. Post
    (Oct. 24, 2014), http://nypost.com/2014/10/24/goldman-sachs-differentiating-
    stats-dominate-sex-suit/ .....................................................................................7

Nathan Koppel, *Goldman Sachs Hit With Sex Discrimination Suit*, Wall St. J.
    LawBlog (Sept. 15, 2010), http://blogs.wsj.com/law/2010/09/15/goldman-hit-
    with-sex-discrimination-suit/ ...............................................................................7

Peter Lattman, *3 Women Claim Bias at Goldman*, N.Y. Times (Sept. 15, 2010),
    http://www.nytimes.com/2010/09/16/business/16bias.html?_r=0 ...........................7

Victor Li, *Goldman Loses Bid to Shake Proposed Bias Class Action*, Am. Lawyer
    (July 18, 2012), http://www.americanlawyer.com/id=1202563557953?slreturn
    =20150503105541; .............................................................................................7

Karen Gullo, *Goldman Must Turn Over Female Employee Complaints in Suit*,
    Bloomberg (Oct. 16, 2013), http://www.bloomberg.com/news/articles/2013-
    10-15/goldman-must-turn-over-female-employee-complaints-in-suit ......................7

The Goldman Sachs Group Inc., Proxy Statement: 2015 Annual Meeting of
    Shareholders (April 10, 2015).............................................................................9

William B. Rubenstein, Newberg on Class Actions § 3:64 (5th ed. 2014) ..................................22

## PRELIMINARY STATEMENT

Nearly three years ago, on July 12, 2012, Judge Sand explicitly struck Plaintiffs'
claim for injunctive relief from this case. *Chen-Oster* v. *Goldman, Sachs & Co.*, 877 F. Supp. 2d
113, 121, 124 (S.D.N.Y. 2012) ("*Dukes* forecloses certification under 23(b)(2)."). Relying on
that ruling, the parties (and their experts) developed—and this Court ruled on—a factual record
and legal arguments focused solely on Plaintiffs' Rule 23(b)(3) claims seeking retrospective
money damages. As a result, that record was limited to Goldman Sachs's employment processes
and their impact on the Firm's professionals only through 2011. There has been no discovery,
expert testimony, or legal argument about Goldman Sachs's *current* processes or the impact of
those processes on the Firm's *current* professionals, as would be required to certify a class under
Rule 23(b)(2) seeking forward-looking injunctive relief.

Now, five years into this litigation, after extensive discovery and briefing on
Plaintiffs' Rule 23(b)(3) damages claims, a two-day evidentiary hearing, and this Court's
recommendation that Judge Torres deny certification, Plaintiffs ask the Court to permit two new
intervenor-plaintiffs to assert a new claim for injunctive relief. Plaintiffs' request is
unprecedented: they do not cite a single decision from any court, in this District or elsewhere,
permitting such belated and prejudicial intervention. Because Plaintiffs' motion fails the criteria
for intervention, either as of right or permissively, this Court should deny it.

*First*, Plaintiffs' motion is untimely in the extreme. Plaintiffs assert that the
proposed intervenors would "address" Judge Sand's July 2012 decision, but the time to attempt
that came and went years ago. Plaintiffs, their experienced counsel, and the putative intervenors
have all been on notice since July 2012 that there was no Rule 23(b)(2) claim in this case.
Neither putative intervenor has offered any explanation—much less a legitimate excuse—for her
delay in seeking to intervene. Plaintiffs' counsel have known for years that their chosen

representatives had no standing to assert a Rule 23(b)(2) claim, but they elected to press forward to try to certify a Rule 23(b)(3) damages class.  Courts have uniformly refused to permit intervention after this sort of unjustified delay.  (*See* cases cited *infra* at 11 to 14.)

   *Second*, permitting Plaintiffs and their counsel to add a new class claim for injunctive relief at this late stage would severely prejudice Defendants in a number of ways.  Most obviously, Defendants would have to incur the time and expense of going back to square one to litigate the proposed intervenors' Rule 23(b)(2) claim, thereby delaying the resolution of the current Plaintiffs' Rule 23(b)(3) damages claims for months or, more realistically, years.  The pendency of the current Plaintiffs' damages claims permits putative class members to maintain that the statute of limitations on their damages claims is tolled.  As a result, allowing intervention would prejudice Defendants by forcing them to defend against the ever-larger damages claims of putative class members based on ever-staler evidence.

   Plaintiffs presume that the Court's Report and Recommendation ("R&R") determined "that class certification under Rule 23(b)(2) would be appropriate if standing were satisfied."  (Pls.' Mem. at 14.)  But the only question that the parties or the Court actually addressed was whether to revisit Judge Sand's 2012 ruling.  Because Judge Sand had struck Plaintiffs' injunctive claim, there was no legal or factual record on whether a Rule 23(b)(2) class could be certified.  If Judge Sand had not struck Plaintiffs' injunction claim, Plaintiffs would have been forced to identify precisely what aspects of Goldman Sachs's 360 Review or Manager Quartile ("MQ") processes they wanted to enjoin.  Defendants then would have made different decisions about discovery, presented different expert analyses, and briefed different legal issues.  In claiming that this Court could certify a Rule 23(b)(2) injunctive class "on the exact same record" before the Court on Plaintiffs' damages claim (Pls.' Mem. at 14), Plaintiffs ignore that

the existing record contains *no* statistical evidence about the impact of the Firm's current processes on its current group of professionals, and that Goldman Sachs's businesses and its evaluation, compensation, and promotion processes changed in many material respects since 2011.  In fact, *less than one-fifth* of the professionals that the parties' statistical experts studied are still in positions covered by Plaintiffs' putative Rule 23(b)(2) class.  (*See infra* at 20.)  Courts have repeatedly held that an injunction cannot rest on stale evidence.  (*See* cases cited *infra* at 19 to 20.)

Moreover, the existing, stale record would not support certifying a Rule 23(b)(2) injunction class here in any event.  Under Rule 23(b)(2), the Court may certify a class only if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate *respecting the class as a whole*" (emphasis added).  This requirement of cohesiveness is more rigorous than either Rule 23(a)(2)'s commonality requirement or Rule 23(b)(3)'s predominance requirement. Because, as this Court recognized in its R&R, the pre-2012 record reflects wide variation in evaluation and compensation outcomes across the putative class by position (Associate and Vice President), Division, and Business Unit (R&R at 40-42), that record could not possibly support a single injunction "respecting the class as a whole."  Nor is there any reason to believe that the record would warrant a different result if brought forward to the present, because Goldman Sachs's evaluation and compensation processes continue to grant individual managers wide discretion in making compensation decisions.

*Finally*, the putative intervenors will suffer *no* prejudice if the Court denies their motion to intervene.  Tellingly, they have not even argued how they would be prejudiced by not being able to bring their claims in this almost five-year-old action.  If this motion is denied, the

proposed intervenors can try to bring their own action against Defendants seeking injunctive relief.   Moreover, whether either proposed intervenor can seek injunctive relief is far from clear, rendering intervention futile.   Ms. Gamba's own allegations confirm that she is not a current Goldman Sachs employee, as required under Judge Sand's ruling to bring a Rule 23(b)(2) claim. And Ms. De Luis has not alleged—in fact, she has pointedly declined to assert—any harm from either Goldman Sachs's 360 Review or MQ processes, which are the basis of Plaintiffs' putative class claims.   In sum, this Court should deny what would be an untimely and severely prejudicial—indeed, unprecedented—intervention.

## BACKGROUND

### A.     Proceedings to Date

In September 2010, three former Goldman Sachs employees brought this action on behalf of a putative class of former and current Goldman Sachs professionals.   On July 17, 2012, Judge Sand expressly struck Plaintiffs' class claims for declaratory and injunctive relief, ruling that the Supreme Court's decision in *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2559-60 (2011), "forecloses certification under 23(b)(2)" because none of the lead Plaintiffs was a current Goldman Sachs employee.   *Chen-Oster*, 877 F. Supp. 2d at 121, 124.   Plaintiffs did not move to reconsider, or seek leave to appeal, Judge Sand's ruling, and they did not propose new named plaintiffs who might have standing to bring a Rule 23(b)(2) claim.   The stricken claims were not, as Plaintiffs now try to argue (Pls.' Mem. at 3-4, 9), merely placed on hold awaiting new class representatives.    Rather, Judge Sand unequivocally "GRANTED" Defendants' "motion to strike Plaintiffs 23(b)(2) class allegations" from this action.   *Chen-Oster*, 877 F. Supp. 2d at 124.

Thus, from Judge Sand's July 2012 ruling onward, the parties litigated this case exclusively as a Rule 23(b)(3) damages action.   Goldman Sachs spent enormous time and

-4-

resources developing a massive factual and expert record concerning the impact of the Firm's evaluation and compensation processes on the Firm's female professionals from 2002 to 2011. That record included comprehensive compensation data sets, extensive expert analyses, depositions, and lengthy legal briefing and argument on class certification, focused solely on commonality and predominance under Rules 23(a) and (b)(3).  On March 10, 2015, after considering this record and hearing live expert testimony during a two-day hearing, this Court recommended that Judge Torres deny Plaintiffs' motion to certify a class.  In doing so, the Court recognized that it was bound to follow Judge Sand's 2012 ruling barring certification of a Rule 23(b)(2) injunction class.  (R&R at 35-38.)

Shortly after the Court issued its R&R, the parties agreed to a schedule for resolving objections that would have concluded briefing before Judge Torres by June 12, 2015. Two weeks later, however, on March 24, 2015, Plaintiffs claimed to have "found" two new class representatives whom they alleged could "address" Judge Sand's nearly three-year-old decision striking their Rule 23(b)(2) claim for injunctive relief.  Neither intervenor herself filed a motion or explained her belated decision to seek intervention, even though both were on notice for almost three years that the current class representatives lacked standing to seek injunctive relief. After Defendants pointed out that Rule 24 requires the putative intervenors to file a proposed amended complaint, the Court directed them to file a proposed pleading.  (Memo Endorsement, Dkt. No. 386 (April 28, 2015).)

B.    **The Putative Intervenors**

Because Allison Gamba is not a current Goldman Sachs employee (*see* Proposed Second Am. Compl. ("SAC") ¶ 16), she has no standing under Judge Sand's order to bring a

Rule 23(b)(2) claim.[1]  Mary De Luis, who works as a Vice President in the Firm's Investment Management Division in its Dallas office, alleges that she has been paid less than unnamed male colleagues, but she does not claim that she was in any way discriminated against because of the 360 Review and MQ processes that Plaintiffs have sought to challenge through a class action. Ms. De Luis merely alleges that she "has *been subjected to* the performance evaluation and compensation systems and practices that are challenged in this action."  (SAC ¶ 139 (emphasis added).)

Ms. Gamba and Ms. De Luis both worked at Goldman Sachs when Judge Sand struck Plaintiffs' Rule 23(b)(2) claims, and both repeatedly received notice of this action.  But, fatally for Plaintiffs' motion, Ms. Gamba and Ms. De Luis elected to wait until March 24, 2015 to seek to intervene.   Ms. Gamba testified that she contacted Plaintiffs' counsel as early as January 2014.  (Gamba Dep. at 12:4-13:23.)  Indeed, on February 15, 2014, while still working at Goldman Sachs, she signed a declaration supporting Plaintiffs' motion for class certification. (Dkt. No. 254.)  Ms. De Luis has claimed that she has "raised concerns regarding the fairness of [the] compensation with [her] supervisors at Goldman on numerous occasions *since December 2012*."  (De Luis Decl. ¶ 4 (emphasis added).)  But her declaration studiously avoids explaining when she first became aware of the lawsuit, when she was first contacted by Plaintiffs' counsel, or why she delayed in seeking to intervene.  Plaintiffs' counsel notably never say when they first contacted her.

---

[1]   Ms. Gamba's employment ended in August 2014, when Goldman Sachs sold her entire Business Unit.  (Gamba Dep. at 24:11-25:2.)

Ms. Gamba and Ms. De Luis have repeatedly been notified of developments in this action.  On September 15, 2010, the filing of this lawsuit was widely reported in the press, including in the *New York Times* and the *Wall Street Journal*.[2]  Since then, the press has covered developments in this lawsuit extensively, including Judge Sand's decision striking Plaintiffs' injunction claim.[3]  Moreover, Goldman Sachs sent to all U.S. employees, including Ms. Gamba and Ms. De Luis, a document retention notice alerting them to the litigation.  (Yanagisawa Decl. ¶ 3.)  Ms. Gamba and Ms. De Luis then received multiple document retention reminders about this lawsuit, including in April 2013 and January 2014 for Ms. De Luis.  (*Id.* ¶ 4.)  Then, in late 2013, in connection with this Court's order that Defendants produce information relating to internal gender-related complaints, Goldman Sachs's Human Capital Management Division ("HCM") undertook a process for informing those whose identities would be disclosed, including Ms. Gamba and Ms. De Luis, that the Court had ordered their names to be disclosed to

---

[2]  *See* Peter Lattman, *3 Women Claim Bias at Goldman*, N.Y. Times (Sept. 15, 2010), http://www.nytimes.com/2010/09/16/business/16bias.html?_r=0; Nathan Koppel, *Goldman Sachs Hit With Sex Discrimination Suit*, Wall St. J. LawBlog (Sept. 15, 2010), http://blogs.wsj.com/law/2010/09/15/goldman-hit-with-sex-discrimination-suit/.

[3]  *See, e.g.*, Victor Li, *Goldman Loses Bid to Shake Proposed Bias Class Action*, Am. Lawyer (July 18, 2012), http://www.americanlawyer.com/id=1202563557953?slreturn=20150503105541; Karen Gullo, *Goldman Must Turn Over Female Employee Complaints in Suit*, Bloomberg (Oct. 16, 2013), http://www.bloomberg.com/news/articles/2013-10-15/goldman-must-turn-over-female-employee-complaints-in-suit; Kevin Dugan, *Goldman Sach's differentiating stats dominate sex suit*, N.Y. Post (Oct. 24, 2014), http://nypost.com/2014/10/24/goldman-sachs-differentiating-stats-dominate-sex-suit/.   In addition to publicizing this lawsuit in the press, Plaintiffs' counsel have created a website—www.goldmangendercase.com—that links to court documents, releases, and articles about this case.  Counsel's website features regular updates about the case and provides their biographical and contact information.  Goldman Sachs Gender Discrimination Class Action Lawsuit, www.goldmangendercase.com (last visited June 5, 2015) ("On March 10, 2015, Magistrate Judge James C. Francis IV issued a recommendation against certifying the class.").

Plaintiffs' counsel.  (*See* Reider Decl. ¶¶ 2-5, Ex. A; O'Keeffe Decl. ¶¶ 2-5, Ex. A.)  During that process, the Firm learned that Plaintiffs' counsel had contacted at least one of the women whose names had been disclosed (O'Keeffe Decl. ¶ 6), which, of course, was Plaintiffs' rationale for seeking the names in the first place.  (*See* June 27, 2013 Letter from Lisa J. Cisneros to Barbara Brown and Theodore O. Rogers, Jr. at 4-5 (requesting production of information concerning complainants because "a female who complains may provide relevant testimony when questioned directly").)

### C.    Changes in Defendants' Processes Since 2011

There is no record before the Court about Defendants' current processes, the only processes that could possibly be the subject of an injunction.  The record is limited to Goldman Sachs's businesses and evaluation, compensation, and promotion processes only through 2011.  Similarly, the existing record says nothing about any impact that Goldman Sachs's current processes now may have on the Firm's current female professionals; the parties' experts relied exclusively on pre-2012 factual material in developing their statistical analyses.

In fact, as shown in the accompanying declarations of David Landman, head of Goldman Sachs's Talent Assessment Group, and Michael Perloff, Global Head of Goldman Sachs's Executive Compensation Group, the Firm's processes have changed in material respects since 2011.  For example, the 360 Review criteria have been modified, and the Firm "also revised the descriptions of those criteria, and developed new training materials to familiarize the Firm's professionals with the 360 review process."  (Landman Decl. ¶ 7.)  In addition, all Associates and Vice Presidents are now provided with written 360 Review reports.  (*Id.* ¶¶ 8-9.)  Similarly, since 2011, Goldman Sachs has "made changes to the manager quartile process . . . in order to give the managers additional guidance on how to exercise their discretion in placing employees in the proper quartile."  (*Id.* ¶ 13.)  And, beginning in 2014, all Vice Presidents with

three or more direct reports receive an evaluation of their effectiveness as managers as part of the 360 Review process.  (*Id.* ¶¶ 9-10.)

Goldman Sachs's policies and practices relating to compensation likewise have changed since 2011.  For example, the Firm prepares annual Compensation Guidelines detailing how managers should use information in employee summaries to ensure proper application of discretion in compensation decisions.  These Compensation Guidelines "summarize the divisional metrics included in the employee summaries and explain their purpose and how they should be considered in determining variable compensation in light of Firm, Division, Business Unit, desk, and individual performance, as applicable."  (Perloff Decl. ¶ 12.)  "Since 2011, the Divisions have continued to modify and expand these Compensation Guidelines."  (*Id.* ¶ 13.)

The Firm's regulators also have driven substantial changes in the Firm's compensation processes.  Since the financial crisis, federal regulators have required Goldman Sachs and other financial institutions to assess performance and to set compensation in an even more individualized way than before.  (*Id.* ¶¶ 3-8.)  Regulators reject uniform or formulaic approaches to setting compensation because "activities and risks may vary significantly across banking organizations and across employees within a particular banking organization," and even "employees who generate the same amount of short-term revenue or profit" should not necessarily be paid the same compensation.  (*Id.* ¶¶ 5-6 (quotations omitted).)  Regulators also recognize that compensation processes will "evolve rapidly."  (*Id*. at ¶ 7 (quotation omitted).)  Moreover, since 2011, Goldman Sachs's many businesses have evolved in response to the market, and the Firm has sold or decreased the size of some businesses, while increasing its lending and investment management businesses.  *See, e.g.*, The Goldman Sachs Group Inc., Proxy Statement: 2015 Annual Meeting of Shareholders (April 10, 2015).

## LEGAL STANDARD

The standards required for mandatory and permissive intervention largely overlap. "In order to intervene as of right pursuant to Rule 24(a)(2), the applicant must:  (1) file a timely motion; (2) show an interest in the litigation; (3) show that its interest may be impaired by the disposition of the action; and (4) show that its interest is not adequately protected by the parties to the action."  *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 197 (2d Cir. 2000).   In analyzing the first element of timeliness, this Court must focus on four factors:  "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness."  *United States* v. *Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994).

The permissive intervention analysis is "[s]ubstantially the same."  *In re Bank of New York Derivative Litig.*, 320 F.3d 291, 300 n.5 (2d Cir. 2003).   As with mandatory intervention, permissive intervention is proper only "[o]n timely motion" and then only if intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b).   For permissive intervention, however, a putative intervenor also must demonstrate that she "has a claim or defense that shares with the main action a common question of law or fact."  *Id.*

Under either standard, "[f]ailure to meet any one of [the] requirements suffices for a denial of the motion," *In re Holocaust Victim Assets Litig.*, 225 F.3d at 197-98, and the applicant bears the burden of proving each element.  Because Plaintiffs have not met their burden, this Court should deny their application seeking to allow Ms. Gamba and Ms. De Luis to intervene.

-10-

**ARGUMENT**

**I.    PLAINTIFFS' EXTREME DELAY BARS THEIR APPLICATION SEEKING TO ADD NEW PLAINTIFFS IN THIS FIVE-YEAR-OLD ACTION.**

The "length of an applicant's delay in seeking intervention is '[a]mong the most important factors' to consider in a timeliness decision."  *Hnot* v. *Willis Grp. Holdings Ltd.*, 2006 WL 3476746, at *2 (S.D.N.Y. Nov. 30, 2006) (Lynch, J.) (quoting *Cantazano* v. *Wing*, 103 F.3d 223, 232 (2d Cir. 1996)).  "[T]he Second Circuit has repeatedly explained that the date on which the proposed intervenor learns of his or her *interest* in the litigation is of primary importance in the timeliness inquiry."  *Id.* at *3 (emphasis in original).  As Judge Torres has made clear, under Rule 24, an applicant may not hold back until her "interest [has] 'crystallize[d]'" or until there is "'no doubt' that . . . her interests will be impacted."  *Floyd* v. *City of New York*, 302 F.R.D. 69, 87 (S.D.N.Y. 2014).   Rather, Rule 24 requires applicants to move as soon as it "becomes apparent that their interests *might* not be protected."  *Id.* (emphasis in original); *see Butler, Fitzgerald & Potter* v. *Sequa Corp.*, 250 F.3d 171, 182 (2d Cir. 2001) (non-party should have sought intervention when it was on notice "that its interests might not be adequately represented").

Judge Sand's decision striking Plaintiffs' Rule 23(b)(2) claim clearly notified any current Goldman Sachs employee who wished to seek an injunction that her "interests *might* not be protected" by the existing Plaintiffs*.   Floyd*, 302 F.R.D. at 87 (emphasis in original).  Plaintiffs' insistence that Judge Sand's ruling was subject to some hypothetical possibility of reversal is irrelevant.  As Judge Torres explained in *Floyd*, "the intervention clock started to run from the moment [Ms. Gamba and Ms. De Luis] became aware or should have become aware that they had interests in the subject matter of the litigation not otherwise protected by the existing parties to the lawsuit."  *Id*. at 84-85; *see Pitney Bowes*, 25 F.3d at 71 ("BAII does not

-11-

tell us why it failed to move for intervention in the interim—perhaps as an anchor to windward—
to guard against the possibility that its hope for a change in the consent decree might be
dashed.").   In fact, courts routinely deny intervention in the face of far less extreme delay.  *See,
e.g.*, *In re Holocaust Victims Assets Litig.*, 225 F.3d at 198-99 (proposed intervenor delayed *eight
months* after receiving notice of the parties' settlement).[4]

        To try to justify their extreme delay, Plaintiffs rely heavily on *Haddock* v.
*Nationwide Financial Services, Inc.*, 262 F.R.D. 97, 102 (D. Conn. 2009), *vacated on other
grounds* 460 F. App'x 26 (2d Cir. 2012), but there the class representatives unexpectedly lost
standing in the middle of the litigation, and their counsel diligently "took action to find a new
class representative immediately after [the court] notified" the original representatives of their
lack of standing.   The court permitted intervention only "[o]n account of that unusual
circumstance."  *Id.* at 103.[5]  Here, by contrast, the named Plaintiffs never had standing to pursue
injunctive relief, Plaintiffs' counsel has made no showing of diligence, and this case has been
heavily litigated without such claims for three years.   Plaintiffs also cite a string of cases
where—unlike here—counsel found new plaintiffs to ensure adequate *ongoing* representation
*after* a class had been certified.  (*See* Pls.' Mem. at 12.)  Thus, as in *Haddock*, these cases make

---

[4]   *See Catanzano*, 103 F.3d at 232-34 (proposed intervenors were aware for at least *eighteen
months* of their interest in the case); *Pitney Bowes*, 25 F.3d at 71-72 (proposed intervenor had
constructive knowledge of interest in lawsuit for *fifteen months* and actual knowledge for
*eight months*); *Floyd*, 302 F.R.D. at 97 (proposed intervenors "should have known for years,"
but undoubtedly knew at least *six months* before attempting to intervene).

[5]   The Second Circuit vacated the district court's decision granting class certification in light of
*Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541 (2011), and remanded for reconsideration.
460 F. App'x at 28-29.

clear that if Plaintiffs' experienced counsel wanted "to address" Judge Sand's 2012 decision, they were required to do so promptly after he issued that decision.[6]

Courts routinely hold that constructive notice is sufficient to provide putative intervenors with notice of the need to intervene.  *See, e.g.*, *Pitney Bowes*, 25 F.3d at 70-71; *Floyd*, 302 F.R.D. at 97.  Here, both Ms. Gamba and Ms. De Luis have had constructive notice of Judge Sand's published decision since mid-2012.  *See Floyd*, 302 F.R.D. at 91 ("The litigation of important motions and other significant case developments have . . . been held to provide notice."); *MasterCard Int'l Inc.* v. *Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 390 (2d Cir. 2006) (putative intervenor had constructive notice in part because opposing party's "complaint and other filings, including its motion for preliminary injunctive relief," were "publicly available for anyone to access").  And, beyond constructive knowledge, Ms. Gamba and Ms. De Luis have had *actual* knowledge of this action since 2010, and they received regular document retention notices thereafter.  (*See* Yanagisawa Decl. ¶ 3.)

Neither of the putative intervenors has tried to explain, much less excuse, her extreme delay in seeking to intervene in this action.  Counsel asserts that "[a]t no time prior to March 23, 2015 did Plaintiffs' counsel have knowledge of any current Goldman employee willing to serve as a named plaintiff in this case" (Dermody Decl. ¶ 6), but that is a red herring; the issue is whether Ms. Gamba and Ms. De Luis "knew or should have known of their interest"

---

[6]   *See, e.g.*, *Trief* v. *Dun & Bradstreet Corp.*, 144 F.R.D. 193, 202 (S.D.N.Y. 1992) (Edelstein, J.) (addressing preemptive motion to intervene in response to defendants' argument that existing class representatives were inadequate); *N.J. Carpenters Health Fund* v. *Residential Capital, LLC*, 2010 WL 5222127, at *2 (S.D.N.Y. Dec. 22, 2010) (Baer, J.) (granting series of motions to intervene where first motion was filed fewer than three months after claims were dismissed for lack of standing); *see also id*. Dkt. Nos. 58, 74.

in this litigation prior to March 23, 2015, *Floyd*, 302 F.R.D. at 84-85, which they clearly did. Indeed, Ms. Gamba has testified that she was in direct communication with Plaintiffs' counsel by January 2014 (Gamba Dep. 12:4-10), and there is every reason to believe that Plaintiffs' counsel contacted Ms. De Luis in late 2013 or early 2014, after they received the names of complainants that the Court directed be produced to them.  *See supra* at 7-8.

In the end, Plaintiffs, their experienced counsel, and the proposed intervenors do not cite a single case—even one—permitting intervention on facts bearing any resemblance to those here.  Thus, in keeping with multiple decisions in this District, the Court should deny intervention—which the putative intervenors seek for the sole purpose of adding a claim that the current Plaintiffs never had a right to bring—at this indisputably advanced state of this case, *i.e.*, years after Judge Sand's ruling that the named Plaintiffs lacked standing, after the completion of extensive class discovery, after class briefing, and after this Court's determination that no class should be certified here.[7]

## II.   AT THIS LATE DATE, PERMITTING THE INTERVENORS TO BRING AN INJUNCTION CLAIM IN THIS CASE WOULD BE HIGHLY PREJUDICIAL TO GOLDMAN SACHS.

In evaluating the timeliness of a motion to intervene, this Court also must consider prejudice to existing parties.  *Pitney Bowes*, 25 F.3d at 70, 72.  Remarkably, Plaintiffs

---

[7]   *See Hnot*, 2006 WL 3476746, at *5 (denying intervention because of "the age of the lawsuit and the late stage to which it has progressed," emphasizing that "[t]he original complaint was filed over five years ago, fact discovery has been complete for over two and half years, . . . [and] [t]he Court has resolved over seven motions"); *see also MasterCard Int'l Inc.*, 471 F.3d at 390 (upholding denial of intervention where plaintiff "did not file its motion to intervene until the eve of [] hearing"); *Carey* v. *Klutznick*, 88 F.R.D. 249, 250 (S.D.N.Y. 1980) (Werker, J.) (denying intervention where "the issues have been well-defined by the parties," "[s]everal motions have been decided by the Court[,] and extensive discovery has been pursued by the parties").

and their counsel contend that Goldman Sachs would not be prejudiced by intervention because the Court can simply insert the proposed intervenors and then certify a Rule 23(b)(2) class on the existing record.  (Pls.' Mem. at 12-14.)  But Plaintiffs' claim cannot be squared with basic rules of civil procedure and due process, ignores the state of the existing record, and would prejudice Goldman Sachs by delaying, potentially for years, final resolution of the damages claims of the named Plaintiffs and putative class members.  Plaintiffs incorrectly contend that "the Court's R&R in effect notified the parties that class certification under Rule 23(b)(2) would be appropriate if standing were satisfied."  (*Id.* at 14.)  The only issue that the parties and the Court addressed in the R&R was whether the current named Plaintiffs have standing to bring a claim for injunctive relief.  Neither party briefed, and the Court did not address, any of the legal or factual barriers to certification of a class under Rule 23(b)(2).

### A. Intervention Would Prejudice Goldman Sachs by Delaying Resolution of Plaintiffs' Existing Damages Claims.

As detailed below, permitting a Rule 23(b)(2) injunction claim to proceed would require an entirely new factual record, new expert analyses, and substantial additional briefing. That process almost certainly would take many months at a minimum and, more realistically, years, to complete.  Indeed, the prior expert discovery alone in this case took approximately nine months, from designation of experts through the filing of final reports.  During this extended delay, the resolution of Plaintiffs' Rule 23(b)(3) claims would be further postponed, to Goldman Sachs's clear prejudice.  *See Hnot*, 2006 WL 3476746, at *5 (finding prejudice where "[g]ranting Cronas's motion would effectively require the Court to start from square one with respect to post-2001 claims, and a final resolution of the claims pertaining to the 1998-2001 period would likely be delayed for many more months, if not years").  As Judge Torres found in similar circumstances, "[h]aving prevailed to this extent, [defendants] face significant prejudice if

previously uninterested late-comers are permitted to prolong the legal wrangling and further delay [their] hard-won relief." *Floyd*, 302 F.R.D. at 98.  "This delay would constitute substantial prejudice to defendants, who have a legitimate interest in the expeditious resolution of claims that have been pending against them for [nearly] half a decade." *Hnot*, 2006 WL 3476746, at *5.

Moreover, permitting intervention here will delay the resolution of whether Plaintiffs can certify a Rule 23(b)(3) damages class, thereby subjecting Goldman Sachs to the risk of facing larger damages claims by putative class members, and having to defend those claims based on staler evidence.  Since Plaintiffs filed this action in September 2010, putative class members can maintain that the statute of limitations was tolled for their own individual damages claims against Goldman Sachs.  *See Am. Pipe & Constr. Co.* v. *Utah*, 414 U.S. 538, 553-54 (1974).[8]  But assuming Judge Torres agrees with this Court's R&R (as she should), her decision would definitively end any tolling of the statute of limitations on the damages claims of putative class members.  *Id.* at 561.  Thus, intervention will prejudice Goldman Sachs by extending even further its theoretical liability to putative class members.

**B.    The Existing Record Cannot Support an Injunction.**

This Court could not certify a Rule 23(b)(2) class based on the existing record for three separate and independent reasons.  *First*, injunctive relief is a remedy for present or imminent injury, but the existing record reflects statistics and other evidence only about

---

[8]    In some circumstances, the limitations period may not have been tolled as to individual class members' particular claims.  *See, e.g.*, *Crown, Cork & Seal Co.* v. *Parker*, 462 U.S. 345, 354-55 (1983) (Powell, J., concurring).  Goldman Sachs reserves the right to challenge tolling in such circumstances.

Goldman Sachs's businesses, processes, and professionals for no more than the period from 2002 to 2011.

   *Second*, the statistical analyses before the Court address only the impact of Goldman Sachs's challenged processes on female professionals across a putative Rule 23(b)(3) class comprising *both current and former* employees.  But the intervenors' proposed new claim for a forward-looking injunction could be brought only on behalf of a class of *current* Goldman Sachs professionals, about which the stale statistics in the existing record offer no evidence at all.

   *Third*, to the extent that the existing, stale record has any relevance to forward-looking injunctive relief, and Goldman Sachs believes that it has none, that record could not support an injunction under Rule 23(b)(2), which permits certification only where "final injunctive relief is appropriate respecting the class as a whole."  Here, Plaintiffs' own evidence demonstrates, as this Court has ruled, that the challenged processes have widely varying effects on female professionals in Goldman Sachs's various businesses and, in fact, benefit women working in many of these businesses.  (R&R at 41-42.)

### 1. The Outdated Record Cannot Support an Injunction Against Current Goldman Sachs Evaluation and Compensation Processes.

   The existing record contains not one word about Goldman Sachs's current processes for evaluating and compensating its professionals.  As shown by the examples Messrs. Perloff and Landman provide in their declarations, while compensation and appraisal processes remain just as individualized, the Firm's processes have changed in material respects since 2011, including in response to new federal guidance confirming the importance of individualized compensation decisions.  (*See* Perloff Decl. ¶¶ 3-8.)   Before any injunction class could be certified, the parties and their experts would have to address all of the substantive changes in those processes.

Proposed intervenors cannot simply join this action and seek injunctive relief when changes in Goldman Sachs's evaluation and compensation processes since 2011 directly undermine claims that Plaintiffs and their experts made concerning pre-2012 processes.  For instance, Plaintiffs asserted that the Firm supposedly relied on "poorly defined" factors to set compensation, and that managers were not adequately trained to use such factors.  (Pls.' Certification Br. at 10.)  But those assertions were based on pre-2012 criteria, definitions, and training that no longer exist.  Similarly, Plaintiffs' expert, Dr. Wayne Cascio, criticized Defendants for not providing 360 Review feedback reports to all rated employees, but the Firm now follows this practice.  (Landman Decl. ¶ 4.)[9]

Moreover, the accompanying declarations of Dr. Michael Ward and Dr. Michael Campion confirm that the existing pre-2012 record is not a sufficient basis for considering class claims seeking to enjoin Goldman Sachs's current evaluation and compensation processes.  Neither party nor their experts have analyzed the impact of Goldman Sachs's current evaluation or compensation processes on the Firm's current population of professionals.  In order to do that, Dr. Ward "would need to develop entirely new studies based on new data to analyze the specific aspects of now-current processes that Plaintiffs are challenging and their impact, if any, on current professionals."  (Ward Decl. ¶ 10.)  Specifically, "[i]n order to offer an opinion on the certification of a class seeking to bring an injunction claim in this case, [he] would need to know

---

[9]   Dr. Cascio also complained that Goldman Sachs managers were not required to document their criteria in setting compensation.  Since 2012, however, Goldman Sachs has required "additional documentation for compensation decisions with respect to covered employees," including "the key factors that drive compensation recommendations for certain covered employees."  (Perloff Decl. ¶ 9.)  The term "covered employees" includes Associates and Vice Presidents in the putative class "who, either individually or as part of a group, have the ability to expose the Firm to material amounts of risk."  (*Id.* ¶ 5 n.1.)

what the current evaluation and compensation processes are and what specific aspects of those processes Plaintiffs seek to enjoin. . . . There is no record of how these current processes impact incumbent Associates and Vice Presidents in the Securities, Investment Management, and Investment Banking Divisions." (*Id*. ¶¶ 8-9.) Dr. Campion similarly explains that to "express meaningful opinions" about the impact of Goldman Sachs's current evaluation processes on its current professionals, he would, among other things, need to (1) "study the available information about changes that have been made to the design of the 360 review evaluations"; (2) "investigate changes that Goldman Sachs has made to available training for managers and others in connection with 360 reviews and manager quartiling"; and (3) "study any new evaluation tools that Goldman Sachs has implemented since year-end 2011." (Campion Decl. ¶¶ 6-8.)

Judge Forrest's decision in *Aguilar* v. *ICE*, 2012 WL 1344417 (S.D.N.Y. April 16, 2012), confirms that this Court may not enter an injunction based on stale evidence. There, the named plaintiffs claimed that immigration officials engaged in an unconstitutional "policy, pattern and practice of conducting warrantless home raids on Latinos." *Id*. at *5. Judge Forrest refused to certify a Rule 23(b)(2) class seeking injunctive relief because the named plaintiffs had presented evidence only about conduct in *2007*, five years prior to her decision, which was "a separate issue from whether there is substantial evidence of a pattern or practice raising common questions regarding home raid patterns and practices in *2012*." *Id*. at *8 (emphasis added). Other courts likewise have refused to enter injunctions on the basis of a stale record. *See, e.g.*, *Hosp. Assoc.* v. *Toia*, 577 F.2d 790, 798 (2d Cir. 1978) ("'[T]he purpose of an injunction is to prevent future violations,'" which cannot be accomplished once "the record [is] rendered

stale . . . . The [record] to be tested for prospective purposes should be the current, not an outdated, one." (quoting *Swift & Co.* v. *United States*, 276 U.S. 311 (1928))).[10]

### 2. Plaintiffs' Rule 23(b)(3) Statistics Focused on a Different Population of Goldman Sachs's Professionals.

Beyond focusing on outdated Goldman Sachs processes, the parties' experts only examined a group comprised of both former and current professionals—the wrong population for purposes of a forward-looking injunction. Plaintiffs, as former employees, have no interest in, or right to obtain, injunctive relief. *See Wal-Mart*, 131 S. Ct. at 2560. But the statistical analyses in the current record all include both current employees *and* former employees (who have no Rule 23(b)(2) claim). Indeed, *only 17 percent* of the professionals in the pre-2012 database on which the parties' experts previously relied are still in Associate or Vice-President positions in the relevant Divisions. (Ginsberg Decl. ¶ 6, Exs. B-C.) And those 17 percent constitute only half of the current relevant population; thus, no expert has examined the impact at any time of any process on half of the current relevant population. (*Id.* ¶ 5, Exs. A, C.) As Dr. Ward explains, "[t]he existing record does not allow [him]—or any other expert or factfinder—to evaluate allegations related to any current Goldman Sachs evaluation or compensation processes or the impact of any such processes on a population of current Goldman Sachs professionals." (Ward Decl. ¶ 7.) Thus, before a Rule 23(b)(2) class could be certified here, the parties and their

---

[10] *See Valdez* v. *City of San José*, 2013 WL 752498, at *16 (N.D. Cal. Feb. 27, 2013) (holding that plaintiff's evidence likely failed to satisfy "Rule 23(a)'s commonality requirement because it rests on five year old data"); *City of New York* v. *Beretta U.S.A. Corp.*, 2005 WL 1279183, at *1 (E.D.N.Y. May 26, 2005) (Weinstein, J.) ("An injunction, primarily, should be based on current and prospective situations, rather than on past superannuated information."); *Webb* v. *Missouri Pacific R.R. Co.*, 98 F.3d 1067, 1069 (8th Cir. 1996) ("[D]istrict court abused its discretion by granting an injunction on a stale record.").

experts would have to conduct entirely new statistical analyses to evaluate whether Goldman Sachs's current processes adversely impact current female Goldman Sachs professionals. (*See, e.g.*, Ward Decl. ¶ 10.)

### 3. In Any Event, the Existing, Stale Record Cannot Support an Injunction "Respecting the Class as a Whole."

To the extent that the existing, stale record before the Court has any relevance to prospective injunctive relief, that record does not—and could not—support an injunction "respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) applies only when the defendants' "conduct is such that it can be enjoined or declared unlawful . . . as to all of the class members or as to none of them." *Wal-Mart*, 131 S. Ct. at 2557 (quotation omitted).[11] Courts have repeatedly held that the "cohesiveness requirement is greater in a Rule 23(b)(2) class action [than in a 23(b)(3) action], because unnamed class members are bound [under Rule 23(b)(2)] without the opportunity to opt out." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 343 (S.D.N.Y. 2002) (Scheindlin, J.) (quotation omitted).[12] Because this

---

[11] Plaintiffs have conceded that they have no evidence of any disparate impact in promotions post-2008, and thus no basis for an injunction concerning any aspect of the current promotion process at Goldman Sachs. (*See* Pls.' Certification Br. at 12 n.46; ECF 259 (Expert Report of Dr. Henry Farber) at 5.)

[12] *See In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 75 (S.D.N.Y. 2002) (Kaplan, J.) ("[T]he individual issues that defeat the predominance requirement of Rule 23(b)(3) also pose an obstacle to class certification in the Rule 23(b)(2) context."); *Chicago Teachers Union* v. *Bd. of Educ.*, 301 F.R.D. 300, 311-12 (N.D. Ill. 2014) (Where "[t]here can be no single injunction that would provide final relief to the class as a whole," and "some class members . . . may not even benefit from the relief Plaintiffs are seeking, . . . certification under Rule 23(b)(2) [is] inappropriate."); *see also Gates* v. *Rohm & Haas Co.*, 655 F.3d 255, 264 n.12 (3d Cir. 2011) ("[C]ertification requirements under Rule 23(b)(2) are more stringent than under (b)(3)."); 7A Charles A. Wright & Arthur R. Miller, et al., Federal Practice and Procedure, § 1784.1 (3d ed. 2005).

Court already has ruled that, on the current record, Plaintiffs cannot satisfy predominance (R&R 40-44), they plainly cannot satisfy the even more demanding cohesion requirement of Rule 23(b)(2). Thus, the Court could not declare any of the *current* Goldman Sachs processes unlawful for the additional reason that the existing, stale record before the court indicates that those processes statistically *favored* female professionals in many Business Units (as Plaintiffs' own statistics confirmed).[13] This intra-class conflict would bar certification under Rule 23(b)(2). *See* William B. Rubenstein, Newberg on Class Actions § 3:64 (5th ed. 2014) ("class representative harmed by the defendant's conduct cannot adequately represent class members who benefited from the defendant's conduct").[14]

Moreover, on the existing, stale record, any injunction barring Goldman Sachs's performance and compensation processes would not meet the requirement of Federal Rule of Civil Procedure 65(d) that an injunction must identify precisely the practices to be enjoined.[15]

---

[13]   The recent decision in *Laumann* v. *NHL*, --- F. Supp. 3d ----, 2015 WL 2330107 (S.D.N.Y. May 14, 2015) (Scheindlin, J.), *appeal pending* No. 15-1773 (2d Cir. June 1, 2015), is not to the contrary. There, the court noted that no conflict existed among class members because *all* of them had sustained damage from the alleged anti-competitive pricing practices. The court explicitly distinguished cases such as this, where some class members actually benefitted from the challenge practices. *Id.* at *10-11.

[14]   Because Judge Sand dismissed the Rule 23(b)(2) claims three years ago, these issues have not even been briefed or addressed by the Court. Defendants reserve their right to fully brief whether an injunction class can be certified on the existing or any other record if the Court permits intervention here, including through the submission of fact and expert testimony.

[15]   *See Kartman* v. *State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) (reversing certification under Rule 23(b)(2) because the requested injunctive relief "is far too general to satisfy Rule 65(d), yet to be more specific would essentially require the court to write an insurance-adjustment code"); *Peregrine Myanmar Ltd.* v. *Segal*, 89 F.3d 41, 50 (2d Cir. 1996) (injunction must be "narrowly tailored to fit specific legal violations" (quotation omitted)); *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. at 345 (denying class certification for injunctive order for "lack of specificity").

Plaintiffs could hardly contend that an injunction barring use of the 360 Review or MQ processes would meet Rule 65 when their own expert, Dr. Cascio, testified that he had no basis for concluding these processes had a gender impact, and he himself has recommended 360 Reviews and manager ranking for his clients.  (Cascio Dep. 45:15-46:4.)  Nor have Plaintiffs shown any basis for a more limited injunction, because neither they nor the proposed intervenors have ever identified any particular aspect of the 360 Review or MQ processes that allegedly harms the Firm's female professionals.[16]

## III. DENYING THIS MOTION WILL NOT PREVENT THE PUTATIVE INTERVENORS FROM PROTECTING THEIR RIGHTS OR PREJUDICE THEM IN ANY WAY.

In addition to their extreme and inexcusable delay, the putative intervenors have not come close to showing, as they must, that they would be prejudiced in any way if the Court denies their motion.  Fed. R. Civ. P. 24(a)(2); *Pitney Bowes*, 25 F.3d at 70, 72.  They offer only the tautological observation that if their motion is denied "they will lose the ability to [seek relief] as a class *in this action*."  (Pls.' Mem. at 15 (emphasis added).)  But the putative intervenors do not claim that they would be prejudiced by having to bring a separate action, and plainly they would not be.  The proper avenue for the proposed intervenors (and their counsel) is to bring their new claims in a new complaint in a new separate action.  Courts routinely deny motions to intervene for just this reason.  *See, e.g.*, *In re Holocaust Victim Assets Litig.*, 225 F.3d

---

[16]  This Court must consider both the cohesion requirement of Rule 23(b)(2) and the specificity requirement of Rule 65(d) at the class certification stage.  *See, e.g.*, *Kartman*, 634 F.3d at 893; *Shook* v. *Bd. of Cnty. Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008).

at 199 ("Because appellants remain free to file a separate action, they have not established that they will be prejudiced if their motion to intervene is denied.").[17]

Finally, there are substantial questions as to whether the intervenors can even seek injunctive relief.  *See Fleming* v. *Bank of Boston Corp.*, 127 F.R.D. 30, 37 (D. Mass. 1989) ("[T]here are several evident problems which suggest the futility of Breech's proposed class action and, therefore, the lack of prejudice to the putative class as a result of the denial of the motions to intervene.").   Under Judge Sand's controlling ruling, Ms. Gamba, as a former employee, simply has no standing to bring a Rule 23(b)(2) claim.  *Chen-Oster*, 877 F. Supp. 2d at 121.  And Ms. De Luis, although a current employee, merely claims to have "been subjected to the performance evaluation and compensation systems and practices that are challenged in this action."  (SAC ¶ 139.)  She makes no allegation that her allegedly lower compensation was *caused by* either the 360 Review or MQ processes.  Her failure to make such an allegation is particularly striking because, in asking the Court to require an actual pleading, Goldman Sachs expressly noted the absence of allegations concerning the 360 Review or MQ processes in Ms. De Luis's April 16, 2015 declaration in support of her intervention.  (Letter from Theodore O. Rogers, Jr., April 20, 2015, at 3.)[18]

---

[17]  Resolution of the existing Plaintiffs' damages claims will not affect the intervenors' ability to obtain injunctive relief in their own separate proceeding.  *Sidari* v. *Orleans Cnty.*, 174 F.R.D. 275, 285-86 (W.D.N.Y. 1996).  Goldman Sachs will stipulate that discovery in this action, to the extent relevant, can be used in any new action that Ms. Gamba and Ms. De Luis file.  The fact that Ms. Gamba and Ms. De Luis might incur certain costs in bringing their own lawsuit is insufficient to justify intervention.  *See In re Holocaust Victim Assets Litig.*, 225 F.3d at 199.

[18]  Neither Ms. Gamba nor Ms. De Luis has alleged that she complied with Title VII's requirement that she file a charge with the EEOC before bringing suit.  Instead, each claims that she need not do so, asserting that she "is not required to have filed a charge of gender

## IV. THE INTERVENORS HAVE NOT SHOWN THAT THEIR CLAIMS SHARE COMMON QUESTIONS OF LAW OR FACT WITH THOSE OF THE EXISTING PLAINTIFFS.

In addition to the criteria described above for intervention as of right, the standard for permissive intervention requires that putative intervenors demonstrate that their Rule 23(b)(2) claims share a common question of law or fact with Plaintiffs' existing damages claims. Plaintiffs do not even attempt to identify such a question, instead making the irrelevant argument that "the Court here has already found that all class members' claims share common issues of law and fact."  (Pls.' Mem. at 19.)   Commonality among the damages claims of the current Plaintiffs, based on processes and data only as of year-end 2011, says nothing about commonality between the claims of the current Plaintiffs and those of the putative intervenors. Here, as explained above, the putative intervenors' Rule 23(b)(2) injunction claim—if they could even bring one—would rest on different processes, populations, and legal principles than those at issue with respect to Plaintiffs' existing Rule 23(b)(3) damages claims.  None of the cases that Plaintiffs cite (Pls.' Mem. at 19) concerns a motion to intervene to add an entirely new claim based on new facts.  Indeed, in stark contrast to this case, every one of Plaintiffs' cases involves a motion aimed at preserving *existing* claims in already *certified* classes.

---

discrimination and retaliation with the EEOC, but instead may piggy-back off the previous filings of Chen-Oster and Orlich."  (SAC ¶¶ 33-34.)  To avoid the EEOC filing requirement, however, Ms. Gamba and Ms. De Luis must affirmatively prove that "their individual claims aris[e] out of similar discrimination treatment in the same time frame" as the class alleges so that "the purposes of the exhaustion requirement are adequately served if one plaintiff has filed an EEOC complaint."  *Snell* v. *Suffolk Cnty.*, 782 F.2d 1094, 1100-01 (2d Cir. 1986) (quotations omitted).

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion seeking to allow Ms. Gamba and Ms. De Luis to intervene in this nearly five-year-old action.

Respectfully,

Barbara B. Brown *(admitted pro hac vice)*
Neal D. Mollen *(admitted pro hac vice)*
Carson H. Sullivan *(admitted pro hac vice)*
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC  20005

Robert J. Giuffra, Jr.
Theodore O. Rogers, Jr.
Robin D. Fessel
Suhana S. Han
Jeffrey B. Wall *(admitted pro hac vice)*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Defendants*
*Goldman, Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

June 5, 2015

-26-