**OUTTEN & GOLDEN LLP**
Adam T. Klein
Cara E. Greene
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Facsimile: (212) 977-4005

**OUTTEN & GOLDEN LLP**
Paul W. Mollica
161 North Clark St., Suite 4700
Chicago, Illinois 60601
Telephone: (312) 809-7010
Facsimile: (312) 809-7011

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
Kelly M. Dermody (*admitted pro hac vice*)
Anne B. Shaver (*admitted pro hac vice*)
Martin D. Quinones (*admitted* pro hac vice)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
Rachel Geman
250 Hudson St., 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**H. CRISTINA CHEN-OSTER; SHANNA ORLICH; ALLISON GAMBA; and MARY DE LUIS,**

                                Plaintiffs,

                - against -

**GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,**

                                Defendants.

No. 10 Civ. 6950 (AT) (JCF)

**SECOND AMENDED CLASS ACTION COMPLAINT**
**(Trial by Jury Demanded)**

---

Individual and Representative Plaintiffs H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, and Mary De Luis (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

## NATURE OF THE CLAIM

1.      This is a class action brought by female professionals of Defendant Goldman,

Sachs & Co. ("GS") and Defendant The Goldman Sachs Group, Inc. ("GS Group") (collectively,

"Goldman Sachs"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e *et seq.* ("Title VII"); and the New York City Human Rights Law, Administrative Code

of the City of New York § 8-107 *et seq.* ("NYCHRL").

2.      Goldman Sachs is a global investment banking, securities and investment

management firm. The firm is famously secretive. Until its IPO and conversion to a corporation

in 1999, the firm operated as a partnership with relatively little public oversight and regulation.

Its culture has been described as insular, and its employees intensely loyal. The firm is also

famously profitable. In 2009, Goldman Sachs generated $45 billion in net revenues and $13

billion in net earnings. Goldman Sachs credits its employees as "a major strength and principal

reason" for its success on Wall Street. And it pays them accordingly—in 2009, it spent $16

billion on employee compensation and benefits alone.

3.      Goldman Sachs has distributed the benefits of its enormous success unequally –

systematically favoring male professionals at the expense of their female counterparts. At nearly

all levels of its management ranks, it has paid its female professionals less than similarly situated

male professionals, even though they hold equivalent positions and perform the same or

substantially similar work with similar or in some cases superior results.

4.      Goldman maintains policies and practices for promoting its employees that result

in the disproportionate promotion of men over equally or more qualified women. As a result,

female professionals have been systematically circumvented and excluded from promotion

opportunities that are routinely afforded to their male counterparts.

5.      The resulting underrepresentation of women in Goldman Sachs's management ranks is stark. The number of women in management positions at Goldman Sachs dwindles as the level of management rises—from Associates, to Vice Presidents, to Managing Directors, to Partners, and finally to the firm's management committee and executive officers. According to figures released by Goldman Sachs in 2009, women made up only 29% of the firm's Vice Presidents and 17% of Managing Directors. According to 2008 figures, women were only 14% of its Partners. Today, only 4 members of its 30-person management committee (roughly 13%) are women. Of its nine executive officers, only a single one is female; she co-heads the Legal Department with the firm's other General Counsel, a man.

6.      Women at Goldman Sachs have received less compensation and have been promoted less frequently than their male counterparts as a result of the firm's discriminatory policies, patterns, and/or practices. The violations of its female employees' rights are systemic, are based upon company-wide policies and practices, and are the result of unchecked gender bias that pervades Goldman Sachs's corporate culture. They have not been isolated or exceptional incidents, but rather the regular and predictable result of Goldman Sachs's company-wide policies and practices and lack of proper accountability measures to ensure fairness.

7.      Goldman Sachs's employment practices have a disparate impact on women. Specifically, the dual-track performance review process results in disproportionately higher rankings for male professional employees than their female comparators. In addition, Goldman Sachs's uniform, secretive procedure for determining employees' compensation has a disparate impact on female professional employees. There are no published criteria for determining compensation, and compensation is not determined by any objective measure of performance, such as an employee's profits and losses or performance evaluation score. The compensation

procedure results in a disproportionately low compensation rate for women compared with similarly situated males.

8.      Furthermore, these policies, patterns, and/or practices are no accident. Rather, they are part and parcel of an outdated corporate culture. Goldman Sachs has intentionally implemented these company-wide policies and practices in order to pay their male employees more money than their female counterparts, and to promote them more frequently.

9.      These company-wide policies and practices, while facially neutral, have had an adverse impact on the compensation, promotion, and performance evaluations of female employees as compared to their male counterparts. Moreover, because other terms and conditions of employment, such as business opportunities and professional support, are determined by an employee's quartile ranking, Goldman Sachs's discriminatory practices adversely affect women in these arenas as well.

10.      Accordingly, in addition to bringing this action on their own behalf, Plaintiffs also bring this action on behalf of a class of similarly situated current and former female Associates and Vice Presidents employed by Goldman Sachs in revenue-generating divisions[1] ("the Class"), in order to end Goldman Sachs's discriminatory policies and/or practices and to make the Class whole.

## PARTIES

**Plaintiffs**

### *H. Cristina Chen-Oster*

11.      Plaintiff H. Cristina Chen-Oster ("Chen-Oster") is a woman who lives in Monmouth County, in the State of New Jersey. She is a citizen of the United States.

---

[1] Revenue-generating divisions at Goldman Sachs include Investment Banking, Investment Management, Securities, and Merchant Banking/Private Equity.

12.     Chen-Oster was employed by Goldman Sachs from approximately March 1997 to March 2005 in New York, New York.

*Shanna Orlich*

13.     Plaintiff Shanna Orlich ("Orlich") is a woman who lives in Hudson County, in the State of New Jersey. She is a citizen of the United States.

14.     Orlich was employed by Goldman Sachs during the summer of 2006 and from approximately July 2007 to November 2008 in New York, New York.

*Allison Gamba*

15.     Plaintiff Allison Gamba ("Gamba") is a woman who lives in Nassau County, in the State of New York. She is a citizen of the United States.

16.     Gamba was employed by Goldman Sachs in New York, New York from approximately 2001 to August 2014, when Goldman Sachs divested itself of the department in which she worked.

*Mary De Luis*

17.     Plaintiff Mary De Luis ("De Luis") is a woman who lives in Dallas County, in the State of Texas. She is a citizen of the United States.

18.     De Luis has been employed by Goldman Sachs since June 2010, first in Miami, Florida and then in Dallas, Texas. She also travels to and works out of Goldman Sachs's New York, New York office.

**Defendants**

*Goldman, Sachs & Co.*

19.     Upon information and belief, Defendant Goldman, Sachs & Co. ("GS") is a limited partnership formed under the laws of the State of New York with a place of business within the City and County of New York at 200 West Street, New York, New York 10282.

20.     Upon information and belief, Defendant GS maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

21.     During all relevant times, Defendant GS was Plaintiffs' employer within the meaning of all applicable statutes.

22.     On information and belief, at all times pertinent hereto, Defendant GS has employed more than five hundred people. GS is a wholly owned subsidiary of The Goldman Sachs Group, Inc.

*The Goldman Sachs Group, Inc.*

23.     Upon information and belief, Defendant The Goldman Sachs Group, Inc. ("GS Group") is a Delaware corporation doing business within New York County in the State of New York and maintains corporate headquarters within the City and County of New York at 200 West Street, New York, New York 10282.

24.     Upon information and belief, Defendant GS Group maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

25.     During all relevant times, Defendant GS Group was Plaintiffs' employer within the meaning of all applicable statutes.

26.     On information and belief, at all times pertinent hereto, Defendant GS Group has employed more than five hundred people.

## JURISDICTION AND VENUE

27.     This Court has original subject matter jurisdiction over the Title VII claims pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e–5(f)(3), because they arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.

28.     This Court has original jurisdiction over the NYCHRL claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). This is a putative class action in which: (1)

there are 100 or more members in the Class; (2) at least some members of the proposed class have a different citizenship from at least one Defendant; and (3) the claims of the proposed class members exceed $5,000,000.00 in the aggregate.

29.     In addition, this Court has supplemental jurisdiction over the NYCHRL claims under 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

30.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3), because Defendants conduct business and can be found in this district and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and because the alleged unlawful employment practice was committed here, and employment records relevant to that practice are maintained and administered here.

31.     Plaintiffs have exhausted their administrative remedies and complied with all statutory prerequisites to their Title VII claims. Chen-Oster filed a charge of gender discrimination and retaliation individually and on behalf of all similarly situated women employed by Goldman Sachs with the Equal Employment Opportunity Commission ("EEOC") on or about July 7, 2005. Pursuant to the EEOC's worksharing agreement with the New York City Commission on Human Rights ("NYCCHR"), her charge is considered dually filed with the NYCCHR. By notice dated June 15, 2010, the EEOC dismissed Chen-Oster's case and issued a Notice of Right to Sue.

32.     On or about January 12, 2010, Orlich filed a charge of gender discrimination and retaliation with the EEOC individually and on behalf of all others similarly situated. Pursuant to

the EEOC's worksharing agreement with the NYCCHR, her charge is considered dually filed with the NYCCHR.

33.     Where applicable, under the Second Circuit's application of the single-filing rule, Gamba is not required to have filed a charge of gender discrimination and retaliation with the EEOC, but instead may piggy-back off the previous filings of Chen-Oster and Orlich, because those charges relate to the same claims that Gamba asserts.

34.     Where applicable, under the Second Circuit's application of the single-filing rule, De Luis is not required to have filed a charge of gender discrimination and retaliation with the EEOC, but instead may piggy-back off the previous filings of Chen-Oster and Orlich, because those charges relate to the same claims that De Luis asserts.

35.     Contemporaneously with the filing of this Complaint, Plaintiffs have mailed a copy to the New York City Commission of Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

36.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

37.     Goldman Sachs maintains uniform employment, compensation, performance review, and promotion policies throughout the United States. Likewise, it cultivates and promotes a common corporate culture. Indeed, Goldman Sachs prides itself on "instilling the Goldman Sachs culture" in all of its employees through initiation programs, training, seminars, and Goldman Sachs's "360-degree" performance review process.

38.     Goldman Sachs's offices throughout the country use a common organizational structure, organizing finance professionals as follows. Entry-level employees, typically straight out of college, hold the position of Analyst.  Analysts can be promoted to Associate, which

typically includes employees with two to five years of relevant experience and/or an MBA

degree. The next position to which Associates can be promoted is Vice President. Above Vice

Presidents are Managing Directors, and above Managing Directors are Partners. Finally, at the

top of Goldman's management hierarchy sits a 30-person management committee, which

includes its nine executive officers.

      39.     At the Associate andVice President levels, Goldman Sachs discriminates against

women in (1) performance evaluations; (2) compensation; (3) promotions; (4) business

opportunities; and (5) professional support, including but not limited to administrative support,

training, and mentoring.

**Performance Evaluations**

      40.     Goldman Sachs employs uniform procedures for evaluating employee

performance that systematically underrate female professionals relative to their similarly situated

male peers.

      41.     Upon information and belief, Goldman Sachs uses a "360-degree" employee

review process, by which an employee's supervisors, co-workers, and subordinates review the

employee's performance for the year. Reviewers give the employee a numerical rating on a scale

of 1 to 5, with 1 being the lowest score, and 5 being the highest. Reviewers also write comments

about the employee's performance.

      42.     After the 360-degree review process is complete, Goldman Sachs uses a computer

algorithm to adjust for the leniency and harshness of reviewers. This adjustment produces the

employee's "adjusted score," which supposedly determines the employee's quartile ranking.

      43.     Goldman Sachs managers are able to unduly influence the 360-degree evaluation

process by requesting or requiring which superior, co-workers, and subordinates will evaluate an

employee. Managers have the ability to add or remove a reviewer at their election.

44.     More significantly, even though the adjusted performance scores supposedly reflect performance, Goldman Sachs requires its managers to place employees into quartiles that are forced ranked (i.e., managers must assign an equal number of people to each quartile), largely untethered to the performance score. In this process, a manager can move an employee to a higher or lower quartile, without regard to the absolute values of the performance evaluations or to the initial quartile ranking the employee earned in the public 360-degree review. There are a limited number of slots in the top quartile, and these spots most often go to male employees. It is these unvalidated quartile rankings that determine employees' compensation, eligibility for transfer and promotion, business opportunities, and professional support.

45.     Together, Goldman Sachs's dual-track performance evaluation procedures systematically underrate female employees relative to male employees – that is, women, on average, receive lower 360-degree review scores, more negative reviews, and lower quartile rankings than men in similar positions who have delivered similar or worse objective performance.

## Compensation

46.     Because female professionals at Goldman Sachs systematically receive worse performance reviews and rankings, they have fewer opportunities to earn similar levels of compensation than their male peers. Accordingly, female Associates and Vice Presidents earn less, on average, than their similarly situated male peers.

47.     Goldman Sachs employs uniform, unvalidated procedures for determining employees' compensation that disparately impact female professionals. Goldman Sachs's compensation decisions are tightly controlled and extremely secretive. Goldman Sachs does not inform the employee how it arrived at his or her amount of compensation.

48.     Goldman Sachs also allows a small corps of managers to employ standardless, unvalidated, and/or illegitimate criteria without accountability measures to determine how credit is allocated to employees who share assets, accounts, or responsibility for a particular business. This process is unvalidated and favors male employees who systematically receive more credit for generating revenues for the firm than their female co-workers.

49.     Upon information and belief, an employee's quartile ranking is the major determinant of compensation. As described above, the quartile process is a common, unvalidated procedure through which discrimination occurs. Moreover, managers have discretion to pay one employee in a given quartile more than another employee in that same quartile, without reliance on legitimate, validated rationales.

50.     Associates and Vice Presidents typically receive a base salary as well as a year-end bonus. In an average year, the year-end bonus can be many multiples of an employee's base salary. Goldman Sachs refers to total compensation, which includes base salary and bonus, as "Per Annum Total Compensation," or "PATC."  Goldman Sachs's common, unvalidated, discriminatory compensation procedures have resulted in female professionals receiving lower PATC than their male peers for the same or substantially similar work.

51.     Moreover, these gender disparities in compensation permanently depress the earnings potential of female finance professionals. Goldman Sachs compensates its finance professionals in each year as a percentage increase from their prior year's PATC. Because an employee's PATC is linked to her past levels of compensation, each discriminatory compensation decision further widens the pay gap between male and female finance professionals at Goldman Sachs. As a result of these discriminatory compensation policies and

practices, female finance professionals at Goldman Sachs have earned less compensation during the liability period than their similarly situated male peers.

**Promotions**

52.     Goldman Sachs also employs unvalidated, and discriminatory procedures for selecting individuals for promotion.

53.     Goldman Sachs does not employ legitimate, validated and/or objective criteria for promotion to Managing Director or Partner. To receive a promotion from Vice President to Managing Director, a Managing Director or Partner must nominate you, and the firm must approve the promotion. Promotions are not determined by objective performance measures.

54.     The promotion process is tightly controlled among a small corps of managers whose decisions are based on inaccurate and unvalidated performance measures using a tap on the shoulder system. As a result, Goldman Sachs nominates and promotes an overwhelmingly disproportionate number of men, and passes over equally or more qualified women.

**Business Opportunities**

55.     Business opportunities are determined, at least in part, by the discriminatory quartiling system. Only employees in the top two quartiles will be chosen for the high-growth potential assignments. Because women are systematically underrepresented in the top two quartiles, they are given these types of opportunities less frequently than their male comparators.

56.     Goldman Sachs also discriminates against its female employees by denying them opportunities offered to men to move laterally into other areas of the firm. Lateral transfers are made based on unvalidated criteria and a tap on the shoulder system. On information and belief, Goldman Sachs transfers an overwhelmingly disproportionate number of men into the most lucrative positions, and passes over equally or more qualified women without regard to accurate measures of performance.

57.     These gender disparities in the allocation of business opportunities at Goldman Sachs perpetuate the disparities in performance evaluations, compensation, and promotions. Because women receive fewer and less lucrative opportunities than their male counterparts, it is more difficult for them to achieve the same level of performance. As a result, female financial professionals systematically receive worse performance evaluations, lower compensation, and fewer promotions despite equal or superior performance than their male comparators.

**Professional Support**

58.     Professional support is also influenced by the quartiling system. Goldman Sachs assigns the majority of its support resources to high-growth potential desks and strategic initiatives. Only employees in the top two quartiles will be chosen for these choice assignments. Because women are systematically underrepresented in the top two quartiles, they receive less professional support and resources than their male comparators. For example, female professionals at Goldman Sachs receive fewer junior employees to assist them with their work as a function of the discriminatory performance-evaluation process.

59.     Female Associates and Vice Presidents also receive less training and mentorship than similarly situated men in the same positions. Goldman Sachs managers disproportionately select male professionals to be paired with more senior mentors, to receive hands-on training, and to be included in social events where they have access to or visibility among senior management. In many areas, Goldman Sachs also discriminates against female finance professionals in seating assignments. For example, on trading floors, Goldman Sachs often places women at the periphery while seating similarly situated or more junior males near the center of the floor. Men thus have more access to the most senior managers who regularly sit in the middle of the floor, and are able to cultivate relationships with them more easily. Women lack this same access and face greater difficulties in cultivating the same relationships. These

employment practices are the product of common policies and practices tied to discriminatory performance measures that systematically disadvantage the putative class

**Conclusion**

60.     Accordingly, Chen-Oster,Orlich, Gamba, and De Luis bring this class action on behalf of themselves individually and all similarly situated female Associates and Vice Presidents in the United States. This action seeks to end Goldman Sachs's discriminatory policies, patterns, and/or practices, and to make the Class whole by requesting the following remedies: injunctive relief to remedy systemic sex discrimination; an award of back pay and front pay; compensatory and punitive damages; and attorneys' fees.

## CLASS ACTION ALLEGATIONS

61.     Plaintiffs bring this Class Action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (c)(4) seeking liability-phase injunctive and declaratory relief on behalf of a Class of all female financial-services employees who are at the Associates and Vice President corporate level and employed by Goldman, Sachs & Co. Inc. and its predecessors; and The Goldman Sachs Group, Inc. and its predecessors; in the United States at any time from September 10, 2004 through the resolution of this action for claims under Title VII. Plaintiffs also bring this Class Action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) seeking monetary damages and other make-whole relief on behalf of a Class of all female financial-services employees who are at the Associates and Vice President corporate level and employed by Goldman, Sachs & Co. Inc. and its predecessors; and The Goldman Sachs Group, Inc. and its predecessors; in the United States at any time from September 10, 2004 through the resolution of this action for claims under Title VII. Plaintiffs reserve the right to amend the definition of the Class based on discovery or legal developments.

62.     Plaintiffs also bring this Class Action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (c)(4) seeking liability-phase injunctive and declaratory relief on behalf of a Class of all female financial-services employees who are at the Associates and Vice President corporate level and employed by Goldman, Sachs & Co. Inc. and its predecessors; and The Goldman Sachs Group, Inc. and its predecessors; in New York at any time from July 7, 2002 through the resolution of this action for claims under the NYCHRL. Plaintiffs also bring this Class Action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) seeking monetary damages and other make-whole relief on behalf of a Class of all female financial-services employees who are at the Associates and Vice President corporate level and employed by Goldman, Sachs & Co. Inc. and its predecessors; and The Goldman Sachs Group, Inc. and its predecessors; in New York at any time from July 7, 2002 through the resolution of this action for claims under the NYCHRL. Plaintiffs reserve the right to amend the definition of the Class based on discovery or legal developments.

63.     All Plaintiffs are members of the Classes they seek to represent.

64.     The members of the Class identified herein are so numerous that joinder of all members is impracticable. As of December 2009, Goldman Sachs employs approximately 32,500 employees worldwide and approximately 18,900 in its Americas region (North and South America). Although Plaintiffs do not know the precise number of female financial-services employees at the Associates and Vice President levels at Goldman Sachs, the number is far greater than can be feasibly addressed through joinder.

65.     There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members. Common questions include, among others:

(a)     whether Goldman Sachs's policies or practices discriminate against female Associates and Vice Presidents;

(b)     whether Goldman Sachs's policies and practices violate Title VII and/or the NYCHRL; and

(c)     whether Goldman Sachs's performance evaluation system discriminates against women;

(d)     whether Goldman Sachs's compensation system discriminates against women;

(e)     whether Goldman Sachs's promotion system discriminates against women;

(f)     whether equitable remedies, injunctive relief, compensatory damages, and punitive damages for the Class are warranted; and

(g)     whether Goldman Sachs has failed to implement policies and procedures to prevent retaliation against employees who challenge perceived gender bias in the workplace, has failed to address complaints, and has failed to conduct proper investigations.

66.     The Representative Plaintiffs' claims are typical of the claims of the Class.

67.     The Representative Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

68.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Goldman Sachs has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole. The Class Members are entitled to injunctive relief to end Goldman Sachs's common, uniform, unfair, and discriminatory policies and practices.

69.     Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting

only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The Class Members have been damaged and are entitled to recovery as a result of Goldman Sachs's common, uniform, unfair, and discriminatory policies and practices. Goldman Sachs has computerized account data, payroll data, and personnel data that will make calculation of damages for specific Class Members relatively simple. The propriety and amount of punitive damages are based on Goldman Sachs's conduct, making these issues common to the Class.

## CLAIMS OF REPRESENTATIVE PLAINTIFFS

### H. Cristina Chen-Oster

70.     In March 1997, Plaintiff H. Cristina Chen-Oster began working for Goldman Sachs in the firm's Convertible Bonds Department, in the position of senior convertible bond salesperson. Goldman did not give her a title initially, despite the fact that Chen-Oster had held the title of Vice President for the same function with her previous employer. In June 1997, Goldman promoted Chen-Oster to Vice President from having no title. This was Chen-Oster's only promotion at Goldman Sachs during her eight-year tenure at the firm.

71.     During her employment, Goldman Sachs repeatedly denied Chen-Oster business opportunities, training and mentorship, and other terms and conditions of employment that it made available to similarly situated males. Additionally, throughout Chen-Oster's tenure at the firm, Goldman Sachs consistently reviewed her performance more harshly than it did similarly performing males, paid her less in base compensation and bonuses than it paid similarly situated men, and promoted equally or less qualified men instead of her to positions she was qualified to hold.

72.     In late 1997, Chen-Oster's direct supervisor, a male Managing Director, took away Chen-Oster's fastest growing account base – convertible bond arbitrage accounts – and

transferred them to the firm's London desk. A male Associate who was also a convertible bond salesperson had the same account base as Chen-Oster did, and had also shared with her responsibility for some of the same arbitrage accounts. Her supervisor permitted the male Associate to continue covering the arbitrage accounts, but did not allow Chen-Oster to keep her coverage of the accounts, even though, as a Vice President, she was more senior than the male Associate.

73.     In the fiscal year ending in November 1997, Chen-Oster earned significant revenues for Goldman Sachs. Nonetheless, Goldman Sachs paid her less that year than similarly situated males in her department who had generated less revenues. For example, upon information and belief, Goldman Sachs paid another male salesperson in the Convertible Bonds Department who had also been promoted to Vice President in June 1997 approximately 50% more than it paid Chen-Oster, even though this male salesperson had generated less revenues in both that year and the previous year.

74.     In early 1998, Chen-Oster's supervisor asked her to train a newly hired male Associate and to introduce him to her clients, telling her that she would be evaluated and rewarded based on how well she trained him. Chen-Oster invested significant time and energy on training the new male Associate, which she did well, and acted as a team player in sharing her client relationships with him.

75.     Despite her training efforts and strong sales performance, Goldman Sachs again paid Chen-Oster less in 1998 than it paid similarly situated men in her department. For example, the same male salesperson who had received more compensation than Chen-Oster in 1997 again received approximately 50% higher compensation than her in 1998, even though he again had generated less revenue that year, and had not shouldered the burden of training a new Associate.

76.     In 1998, Goldman Sachs promoted the male colleague who had been allowed to continue covering the arbitrage accounts to Vice President.

77.     In or around May 1999, Chen-Oster told her supervisor about an incident that had occurred in 1997, shortly after she joined Goldman Sachs. In the fall of 1997, Goldman Sachs sponsored a dinner for a male employee who had just been promoted to Managing Director. Part of the evening took place at Scores, a topless bar, and all employees in the group were encouraged to join. At the end of the evening, a married male Associate in her group insisted that he escort her to her boyfriend's apartment building a few blocks away. In the hallway outside the apartment, the male colleague surprised Chen-Oster by pinning her against a wall, kissing and groping her, and attempting to engage in a sexual act with her. Chen-Oster did not invite or welcome the attempt, and had to physically defend herself. The next morning, the male colleague apologized profusely to Chen-Oster and asked her not to say anything about the incident to anyone. On the same day, the male colleague also told his supervisor what had happened the night before. This supervisor was also Chen-Oster's supervisor. The supervisor and the male colleague had been friends and sat next to each other on the trading floor. The male colleague was also the same Associate who her supervisor had permitted to continue covering the arbitrage accounts in late 1997, and who had been promoted to Vice President in 1998. Chen-Oster later learned that her male colleague had told their supervisor about the incident on the morning after it occurred.

78.     After reporting the 1997 incident to her supervisor, Chen-Oster began to experience increased hostility and marginalization at the firm. In mid-1999, Goldman Sachs took away some of her job duties and responsibilities, including responsibility for new Asian deal allocations in the United States and for giving feedback on new deal pricing prior to new deal

announcements. Chen-Oster had been managing new Asian deal allocations successfully in the United States for the previous two years.

79.     At the end of 1999, Goldman Sachs again paid Chen-Oster less than it paid similarly situated men in her department. For example, upon information and belief, the male salesperson who had received more compensation than her in 1997 and 1998 again received over 50% more compensation than her in 1999. The male colleague involved in the 1997 incident also received over 50% more compensation than Chen-Oster, despite having been promoted to Vice President one year after Chen-Oster had been promoted. Both men had generated greater revenues in 1999 than Chen-Oster, but the difference resulted primarily from Chen-Oster's supervisor removing higher production accounts from her coverage, but not removing any accounts from either of the two similarly situated men in her department, and giving major new accounts to the men.

80.     In 2000, her supervisor rearranged seating assignments on the convertible bonds trading floor. In the trading world, seat assignments near the senior manager are highly coveted, as they signify people's rank and help them cultivate relationships with the most senior managers in the group. In the rearrangement, Chen-Oster's supervisor moved her to the seat farthest from him among all of the salespeople in the convertible bond department. In contrast, the supervisor placed the male colleague involved in the 1997 incident and the male Associate who Chen-Oster had trained – both of whom were more junior than her – near the center of the seating scheme where the supervisor sat.

81.     Goldman Sachs also restricted Chen-Oster's supervisory responsibilities. Goldman Sachs excluded her from delivering performance reviews and compensation numbers to the male Associate whom she had trained, even though employees with similar seniority

typically performed this role with Associates they had trained. Goldman Sachs similarly

excluded her from delivering performance reviews to her direct subordinate by scheduling the

review for the day before Chen-Oster returned from her honeymoon, which was highly unusual

and which even her direct subordinate perceived as strange. Instead, two male salespersons gave

Chen-Oster's direct subordinate the performance review. Typically, performance reviews are

delayed for days or even weeks so that an employee's direct supervisor can participate.

82.     In or about October 2000, Goldman Sachs promoted two male salespersons in her

department to Managing Director:  the salesperson who had consistently received higher

compensation than Chen-Oster even in years in which he generated fewer revenues, and the male

colleague involved in the 1997 incident. Both of these men were friends of Chen-Oster's direct

supervisor.

83.     At the end of 2000, both men who had been promoted to Managing Director

received at least 100% more in compensation than Chen-Oster.

84.     In January 2001, Chen-Oster spoke to her supervisor and another Managing

Director, both men, to ask for opportunities to advance her career. She indicated to them that her

assigned area of business, Southeast Asian and Japanese convertible bonds, was low on her

supervisor's priority list since her fastest growing accounts, the convertible arbitrage accounts,

had been taken away from her. Neither Managing Director offered her any help.

85.     In March 2001, Chen-Oster told her supervisor that the women in the Convertible

Bonds Department felt that Goldman Sachs did not treat them equally and that several of them

felt uncomfortable with the sexist banter that regularly occurred on the trading floor.

86.     In March 2001, her supervisor announced that the male salesperson that had

received higher compensation than Chen-Oster in the past, now a Managing Director, would be

Chen-Oster's direct supervisor. This new supervisor had previously undermined and denigrated Chen-Oster in front of others when they had been peers, and he continued to do so as her manager. In addition, the male colleague involved in the 1997 incident was made the sole head of U.S. convertible bond sales, effectively making him Chen-Oster's indirect supervisor.

87.     In July 2001, Chen-Oster conducted an analysis of her business area and concluded that the area was small and had few prospects for growth since it had been restructured to remove large accounts and those that had significant growth potential. She spoke with her new supervisor in an attempt to obtain more promising market opportunities, but the new supervisor instead directed her to continue working on her existing accounts.

88.     In late 2001, Chen-Oster's previous supervisor and new supervisor assigned the male salesperson who Chen-Oster had trained to assess a new market opportunity involving high-yield, distressed convertible bonds. Even though Chen-Oster was more qualified to take on the opportunity and had asked her supervisors for greater business opportunities, her supervisors intentionally excluded her from the project, even telling a Financial Analyst who worked directly for Chen-Oster not to inform Chen-Oster of the project. When Chen-Oster finally learned of the project and asked her new supervisor why she was never offered the opportunity, he responded that his opinion was that the male salesperson whom she had trained was better suited for the opportunity.

89.     In March 2002, Chen-Oster's subordinate, a Financial Analyst, transferred to London, leaving her without any dedicated support. Instead of finding a new Financial Analyst to support Chen-Oster, Goldman Sachs assigned her a more junior Sales Assistant, who worked only a fraction of his time with her. During the same period, the other male salespeople in the

Convertible Bonds Department continued to have a dedicated Analyst to support them, in addition to a Sales Assistant.

90.     In June 2002, Chen-Oster's new supervisor replaced nearly half of the individuals on Chen-Oster's peer review list with employees in Europe who are known to give their peers lower scores, as is the typical practice in Europe. Moreover, because these employees were located in Europe, they had little familiarity with Chen-Oster and her performance. One of the people designated as her reviewer was a male salesperson who had no clients in common with Chen-Oster and whom her new supervisor knew had sent racially offensive emails around the group, including one entitled, "Learn Chinese in 5 Minutes," which included statements such as "Our meeting is scheduled for next week . . . Wai Yu Cum Nao?" and "Great . . . Fu Kin Su Pah."  Chen-Oster is Chinese.

91.     Following this change to her peer review list, Chen-Oster submitted a written complaint to her new supervisor and one of Goldman Sachs's Leadership and Diversity Managers.

92.     Shortly afterward, Goldman Sachs asked Chen-Oster to transfer to a marketing position in a newly formed group, Synthetic Convertibles. The new position was effectively a demotion, because Chen-Oster would be reporting to another Vice President, also a woman, instead of to a Managing Director for the first time in her entire five year tenure at the firm. Nonetheless, Chen-Oster agreed to transfer to try to escape the discrimination she was experiencing.

93.     In 2002, Goldman Sachs promoted the male colleague who had been involved in the 1997 incident from Managing Director to Partner. Goldman Sachs did not promote Chen-Oster or the female Vice President who was Chen-Oster's supervisor to Managing Director.

94.     At the end of 2002, Chen-Oster again received significantly less compensation than her similarly situated male peers. The male Associate whom she had trained, for example, earned significantly more in compensation than Chen-Oster, despite having generated fewer gross sales credits than she had in that year.

95.     From March to July 2003, Chen-Oster took maternity leave.

96.     At the end of 2003, Goldman Sachs again paid Chen-Oster less than her similarly situated male peers. For example, the male salesperson she had once trained received substantially greater compensation than she did for 2003.

97.     From July to November 2004, Chen-Oster again took maternity leave. When she returned, Goldman Sachs removed her former accounts and failed to provide her with any meaningful responsibilities or accounts. Goldman Sachs also moved Chen-Oster's seat from the trading floor to a location among the administrative assistants, all of whom were female. Upon information and belief, Chen-Oster was the only Vice President-level professional who had been assigned to sit among support staff. The seating arrangement also had the effect of removing Chen-Oster from the visibility of managers and creating the perception that she was a junior person.

98.     In December 2004, Chen-Oster again received less compensation than her similarly situated male peers, including but not limited to the male salesperson she had trained.

99.     In February 2005, Goldman Sachs relocated Chen-Oster to a sales group that was known by managers to have lower average compensation than the convertible bonds sales group at Goldman Sachs. In this new group, her supervising Partner, a male, assigned her less favorable accounts than he assigned to male employees.

100.    The inferior business opportunities and treatment that Goldman Sachs gave Chen-Oster relative to her similarly situated male peers severely impacted her career growth and compensation at Goldman Sachs. After being promoted to Vice President, Chen-Oster was never promoted again. Between 1997 and 2004, her compensation increased by only 27%, far lower than comparable males. While Chen-Oster's career growth stagnated, the male colleague involved in the 1997 incident was promoted to Managing Director and finally Partner. Over the same period, he saw his compensation increase by more than 400%.

101.    Throughout Chen-Oster's employment, Goldman Sachs also discriminated against her by reviewing her performance more negatively than her similarly situated male peers. Although she received good 360 degree scores from her peers, these scores nevertheless did not fully reflect her contributions to the firm. Moreover, although they provided her with regular positive feedback, her supervisors reviewed her more negatively than her similarly situated male peers in their private evaluations of her, as is evidenced by the fact that she repeatedly received less compensation than male peers who had underperformed her.

102.    On March 10, 2005, Chen-Oster resigned due to the consistent and systematic discrimination she had suffered over her eight years at Goldman Sachs.

103.    On or about July 6, 2005, Chen-Oster filed a charge of gender discrimination and retaliation with the EEOC (attached hereto as Exhibit 1) and on June 22, 2010, she received a Notice of Right to Sue.[2]

**Shanna Orlich**

104.    Plaintiff Shanna Orlich first began working for Goldman Sachs as a Summer Associate in 2006 while a student in the JD/MBA program at Columbia University. As a Summer Associate, Orlich did rotations in several trading departments of Goldman. After

_____
[2] Chen-Oster's attorneys received a copy of her Notice of Right to Sue from the EEOC on June 18, 2010.

graduation, Orlich returned to Goldman Sachs in July 2007 and began working as an Associate in the Capital Structure Franchise Trading ("CSFT") Group, a unit within the firm's Fixed Income, Currencies, and Commodities ("FICC") Division.

105.    During her employment, Goldman Sachs repeatedly denied Orlich business opportunities, training and mentorship, and other terms and conditions of employment that it made available to similarly situated males. Additionally, throughout Orlich's tenure at the firm, Goldman Sachs consistently reviewed her performance more harshly than it did similarly performing males, paid her less in bonuses than it paid similarly situated men, and promoted equally or less qualified men instead of her to positions she was qualified to hold.

106.    At the time Orlich joined the CSFT group, the group consisted of 12 employees – 10 male and 2 female, including herself.

107.    In her first performance review, in December 2007, Orlich's direct supervisor, a male Managing Director, gave her only positive feedback and praise for the work she had done to date.

108.    Nonetheless, Goldman Sachs gave Orlich fewer opportunities to become a junior trader than it gave similarly situated males. Although Orlich joined Goldman to be a trader, when she arrived at the CSFT desk, her direct supervisor told her that there was no trading seat available, and that she would have to rotate with traders and serve as a desk analyst, a less desirable position.

109.    However, at the same time Goldman Sachs hired Orlich, it also hired a man who had been Orlich's business school classmate. Goldman Sachs's managers would challenge this male classmate to do push-up contests on the trading floor. When he arrived at Goldman Sachs, Goldman Sachs allowed him to start directly as a trader in the High Yield group.

110.     In October 2007, Orlich's male Managing Director, who was responsible for both the High Yield and CSFT groups, decided to take on a junior trading partner in CSFT. He offered the position to Orlich's male classmate but not to Orlich, even though she was a member of the CSFT desk and Orlich's male classmate was not.

111.     Around the same time Orlich was hired, Goldman Sachs also hired a male Analyst directly from college. Even though the new Analyst was junior to her, Goldman Sachs allowed him to begin working as a trader in the CSFT group immediately.

112.     In December 2007, Orlich complained to her direct supervisor that she had not been put in a trading seat. She pointed out to him that her male classmate and the new Analyst were already trading. When Orlich pressed him for a reason why she had not been put in a trading seat, he replied that she did not have enough experience in trading. However, Orlich's male classmate, like her, did not have any trading experience prior to his summer internship at Goldman in 2006. Likewise, the new Analyst also did not have any trading experience prior to his summer internship at Goldman in 2006. Nevertheless, Goldman Sachs readily placed her two male colleagues in trading positions, despite their lack of experience.

113.     As a desk analyst, Orlich essentially had no defined role and had to work on whatever assignments her superiors asked her to do. While her male classmate and the male Analyst received hands-on training and mentorship, Orlich was professionally and socially isolated in her role and did not receive similar levels of support, training, or mentorship from her managers.

114.     In January 2008, Orlich spoke to a more senior female trader about not having opportunities to trade. After this conversation, her direct supervisor agreed to assign her to a junior trader role with a male trader in CSFT. Days later, her direct supervisor left Goldman

Sachs. In April 2008, the male trader to whom Orlich had been assigned also left the firm. After the male trader's and his trading partner's departures, Goldman Sachs did not assign Orlich a new trading partner. As a result, she continued to have no opportunities to trade.

115.    In July 2008, Orlich reached out to a male Managing Director of Sales to complain that she did not have a trading partner and was not being given an opportunity to trade. The male Managing Director expressed surprise that Orlich had been hired to be a trader and told Orlich that he did not see her as the "right fit" to be a trader. He also told her that he saw her as an analyst, even though he had told a male colleague of hers that taking the analyst position would not be a good career move. He further told Orlich that because he had not hired her, he did not view her as his responsibility.

116.    Orlich then reached out to other members of Goldman Sachs's senior management team. A senior male Partner told Orlich to be a "team player" and to stay in the analyst role.

117.    After Orlich's direct supervisor, who was also her male classmate's trading partner, left Goldman Sachs, Orlich's male classmate also reached out to the same senior male Partner. When Orlich's male classmate sought his help, the senior male Partner assigned her male classmate to be a junior trader with a highly successful trader in High Yield.

118.    Throughout her employment at Goldman Sachs, Orlich worked in an environment in which her colleagues did not treat her and other women with the same respect that they gave to their male peers. This was true for work assignments and for social outings where relationships between managers and employees were cemented.

119.    For example, Goldman organized frequent golf outings and other social events to which female employees, including Orlich, were not invited. On one occasion, a senior analyst

on the CSFT desk asked every male person in Orlich's department and in neighboring groups to

be his partner at a golf outing, including individuals more junior to Orlich. However, he did not

ask Orlich, the only female on the fixed income side of the CSFT trading desk. Orlich has played

golf since childhood and also played varsity golf for her high school team.

120.    Orlich also learned of a golf outing attended by approximately 80 Goldman Sachs

employees, only one of whom was a female employee. Orlich was told that she was not invited

because she was too junior, but she later learned that several male analysts straight out of college

attended the outing.

121.    Orlich's superiors at Goldman Sachs also asked her to perform clerical and

administrative work that they did not give to male Associates, or even to male Analysts. For

example, a senior male analyst on the CSFT desk often gave her demeaning and menial

assignments, such as setting up his blackberry, making photocopies, and answering calls from his

wife. Similarly situated male Associates and even more junior male analysts were not asked to

perform such work.

122.    During Orlich's employment, Goldman Sachs also discriminated against her by

reviewing her performance more negatively than her similarly situated male peers. For example,

Orlich worked long hours during her employment and was often the first person to arrive at the

office and the last person to leave. Nevertheless, a senior male analyst to whom Orlich reported

criticized her for not working hard enough. In mid-2008, Orlich was given performance review

scores that penalized her for being given an undefined role as a desk analyst and for not having

had opportunities to develop trading expertise. However, Orlich never received a formal review

from any of her superiors.

123.    These disparities in the business opportunities and treatment that Goldman gave to Orlich's male peers but denied to her severely impacted her career growth and compensation at Goldman Sachs. In November 2008, Goldman Sachs terminated Orlich's employment.

124.    On or about January 7, 2010, Orlich filed a charge of gender discrimination and retaliation with the EEOC and the New York State Division of Human Rights. Orlich's charge is attached to this Complaint as Exhibit 3 and is incorporated by reference. Orlich is requesting a Notice of Right to Sue from the EEOC, to which she is entitled.

**Allison Gamba**

125.    In January 2001, Plaintiff Allison Gamba began working for Goldman Sachs after the Firm took over her then-employer, Spear, Leeds & Kellogg, L.P. After joining Goldman Sachs, Gamba worked as a trader, and in 2003, Gamba joined Goldman Sachs's New York Stock Exchange Equities Department, within the Securities Division. In 2003, Gamba was promoted to Vice President. This was Gamba's only promotion at Goldman Sachs during her thirteen-year tenure at the firm.

126.    During her employment with Goldman Sachs, Gamba was subjected to the performance evaluation, compensation, and promotion systems and practices that are challenged in this action. Goldman Sachs denied Gamba business opportunities, training and mentorship, and other terms and conditions of employment that it made available to similarly situated males. Additionally, throughout Gamba's tenure at the firm, Goldman Sachs evaluated her performance more harshly than it did similarly performing males, paid her less in base compensation and bonuses than it paid similarly situated men, and promoted equally or less qualified men instead of her to positions she was qualified to hold.

127.    Between 2005 and 2007, Gamba more than quadrupled earnings from her stock portfolio – from $1.2 million in 2005 to over $6 million in 2007. In 2007, her male manager

indicated that Gamba would be nominated for promotion to Managing Director, but suggested that she consider "adopting" instead of becoming pregnant. Gamba had never discussed the possibility of having children with her Managing Director or co-workers.

128.     Shortly thereafter, Gamba shared the comment about adoption and pregnancy with a more senior male manager because she was concerned that it could impact her advancement within the Firm. That senior male manager escalated the issue to the President and Chief Executive Officer of Goldman Sachs's New York Stock Exchange Equities Department, a man. Gamba met with the President/CEO and discussed the comments that had been made to her. Although Gamba had asked that her concerns be kept confidential, her complaint was widely disseminated within her department and her colleagues approached her about it and treated her negatively as a result.

129.     In 2008, Gamba increased her revenues to $9.5 million, even though she had her first child that year and was out on maternity leave for a portion of the year.

130.     In 2008, Goldman Sachs considered and rejected Gamba for promotion to Managing Director. Instead, Goldman Sachs promoted to Managing Director a male trader whose trading performance was not as good as Gamba's.

131.     The CFO of her Department instructed Gamba that in order to improve her chances of being promoted to Managing Director, she should undertake additional efforts to meet with Managing Directors and Partners outside of her Department and take on additional firm non-work activities. On information and belief, men were not instructed to undertake such efforts in order to be promoted, nor were such efforts necessary for men to be promoted.

132.     In 2010, Gamba took maternity leave for the birth of her second child. She was not promoted to Managing Director that year. When Gamba raised the issue with the CEO of her

Department and asked if she had been nominated for promotion to Managing Director, he said no and that he would have been a laughing stock if he had nominated her.

133.    Between 2005 and 2014, during which period she was qualified for promotion, the Firm did not promote Gamba to Managing Director. As a result of not being promoted, Gamba was denied compensation that she otherwise would have received. Goldman Sachs never promoted a woman to Managing Director out of Gamba's Department.

134.    Goldman Sachs evaluated Gamba more negatively than her male colleagues as part of the performance evaluation process. Further, after Gamba raised concerns about the pregnancy comment and took maternity leave, her performance evaluation scores were negatively impacted. In 2010 and 2011, reviewers were added to her 360 performance evaluation without her knowledge and she received unwarranted and unsubstantiated low review scores.

135.    Over her 13 years with Goldman Sachs, Gamba was regularly subjected to a discriminatory "Boys Club" environment. For instance, even though Gamba is an avid golfer, she was excluded from an annual golf outing hosted by her manager to which all the male golfers were invited and she was excluded from a "meat fest," to which only men were invited. On another occasion, she was berated by a male broker and called "Sweetheart" in front of her team captain, who did nothing to address the issue.

136.    The Goldman Sachs corporate culture required socializing as a means to move up within the firm and encouraged "after-hours" drinking as a means of socializing. The culture not only put women, like Gamba, at physical risk, it operated as a double-edged sword for women – women could not advance in their careers without networking, but those who participated in socializing networking activities were labeled "party girls" and were not well-regarded or

respected by their male peers. Indeed, at one such function in 2004, she was pinned against the wall and forcefully kissed by a male colleague.

**Mary De Luis**

137.    Plaintiff Mary De Luis first began working for Goldman Sachs in 2010 as a Senior Analyst in the Investment Management Division. In 2012, she was promoted to the position of Associate, and she was subsequently promoted to the position of Vice President in the same division in December 2014.

138.    De Luis works out of Goldman Sachs's Dallas, Texas office and regularly travels to and works from the Goldman Sachs's New York, New York office, where the Partner and one of the Managing Directors who supervise her group are located. De Luis holds Series 7 and 66 licenses and is registered in New York and Texas, since she services clients in both states. In addition, decisions regarding De Luis's compensation are made out of the New York office.

139.    During her employment with Goldman Sachs, De Luis has been subjected to the performance evaluation and compensation systems and practices that are challenged in this action. On information and belief, she has received lower compensation, and has been evaluated unfairly, due to her gender.

140.    Although Goldman Sachs promoted De Luis from Analyst to Associate and from Associate to Vice-President, Goldman Sachs has not paid De Luis equally to her male colleagues throughout her employment, including as both an Associate and Vice-President. De Luis has raised concerns to her supervisors about the fairness of her compensation on numerous occasions since December 2010.

141.    In September 2014, De Luis approached her male supervisors to discuss the fact that she was undercompensated compared to the market and her male colleagues. In response, her supervisors promised to increase her compensation in 2015.

142.    In January 2015, De Luis again raised questions about the fairness of her compensation with her managers at Goldman Sachs. In response, her supervisors told her they had decided not to increase her base salary in 2015 to the level that they had previously promised her, but instead would gradually increase her compensation over two years. In explaining why they were not raising De Luis's compensation at once, her supervisors suggested that it would not harm De Luis to achieve the higher promised salary over a longer time frame because her male domestic partner is an oncologist (and presumably she could rely on him to make up the difference in household income).

143.    On March 17, 2015, while she was in New York, New York for business, De Luis met with her supervisors' manager to discuss her career advancement at Goldman Sachs. He promised to consider the matter and discuss it with her supervisors.

144.    On March 24, 2015, De Luis met one final time with her two supervisors to address a proposed 2015 compensation plan. Her supervisors informed her that there would be no salary increase for 2015.

145.    After De Luis came forward in this action, Goldman Sachs indicated that it would increase her base salary for 2015, but its action does not address the full compensation disparity to which De Luis has been subjected and will continue to be subjected under Goldman Sachs's compensation policy.  Its action does not address the historical underpayments to De Luis that were compounded each year, nor does it address the system that caused the unequal treatment in the first place and will continue to cause disparities going forward.

## CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF**
**Intentional Discrimination**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*)**
**(On Behalf of All Plaintiffs and the Class)**

146.    Plaintiffs incorporate the preceding paragraphs as alleged above.

147.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Class they represent. Plaintiffs have timely filed charges with the EEOC and have thus exhausted their administrative remedies.

148.    Goldman Sachs has engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against its female Associates and Vice Presidents. Goldman Sachs has intentionally discriminated against Plaintiffs and the Class in violation of Title VII by, among other things:

(a)    Utilizing a biased performance system;

(b)    Utilizing a biased compensation system;

(c)    Utilizing a biased promotion system;

(d)    Systematically and intentionally undervaluing their aptitude and performance; and

(e)    Failing and refusing to take reasonable and adequate steps to prevent and correct the use of standardless, unvalidated, and/or illegitimate criteria to determine the terms and conditions of employment.

149.    These company-wide policies are intended to and do have the effect of:

(a)    Denying Plaintiffs and Class Members business opportunities because of their gender;

(b)    Compensating them less because of their gender;

(c)    Failing to promote them because of their gender;

(d)    Evaluating their performance more negatively because of their gender;

(e)     Offering them less administrative support, training, and mentorship as a result of discriminatory performance measures that systematically disadvantaged them because of their gender; and

(f)     Providing them with inferior terms and conditions of employment as a result of discriminatory performance measures that systematically disadvantaged them because of their gender.

150.    The discriminatory acts that constitute Goldman Sachs's pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

151.    As a direct result of Goldman Sachs's discriminatory policies and/or practices as described above, Plaintiffs and the Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

152.    The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by 42 U.S.C. §§ 2000e *et seq.*

153.    Plaintiffs request relief as hereinafter described.

## SECOND CLAIM FOR RELIEF

### Disparate Impact Discrimination
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*)
### (On Behalf of All Plaintiffs and the Class)

154.    Plaintiffs incorporate the preceding paragraphs as alleged above.

155.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Class they represent. Plaintiffs have timely filed charges with the EEOC and have thus exhausted their administrative remedies.

156.    Goldman Sachs's reliance on illegitimate and unvalidated systems and criteria to distribute business opportunities, determine levels of professional support, evaluate employee performance, set compensation, and select individuals for promotion, and determine other terms and conditions of employment have an adverse impact on female Associates and Vice Presidents in violation of Title VII and are not, and cannot be, justified by business necessity. Even if such

system and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

157.    Goldman Sachs has maintained these discriminatory policies, patterns, and/or practices both within and outside the liability period in this case.

158.    As a direct result of Goldman Sachs's discriminatory policies and/or practices as described above, Plaintiffs and the Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

159.    The foregoing policies, patterns, and/or practices have an unlawful disparate impact on women in violation of 42 U.S.C. §§ 2000e *et seq.*

160.    Plaintiffs request relief as hereinafter described.

## THIRD CLAIM FOR RELIEF

**Intentional Discrimination**
**(NYCHRL, New York City Administrative Code § 8-107 *et seq.*)**
**(On Behalf of All Plaintiffs and the Class)**

161.    Plaintiffs incorporate the preceding paragraphs as alleged above.

162.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and the Class they represent.

163.    Goldman Sachs has engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against its female Associates and Vice Presidents. Goldman Sachs has intentionally discriminated against Plaintiffs and the Class in violation of the NYCHRL by, among other things:

(a)     Utilizing a biased performance system;

(b)     Utilizing a biased compensation system;

(c)     Utilizing a biased promotion system;

      (d)     Systematically and intentionally undervaluing their aptitude and performance; and

      (e)     Failing and refusing to take reasonable and adequate steps to prevent and correct the use of standardless, unvalidated, and/or illegitimate criteria to determine the terms and conditions of employment.

164.    These company-wide policies are intended to and do have the effect of:

      (a)     Denying Plaintiffs and Class Members business opportunities because of their gender;

      (b)     Compensating them less because of their gender;

      (c)     Failing to promote them because of their gender;

      (d)     Evaluating their performance more negatively because of their gender;

      (e)     Offering them less administrative support, training, and mentorship because of their gender; and

      (f)     Providing them with inferior terms and conditions of employment because of their gender.

165.    The discriminatory acts that constitute Goldman Sachs's pattern and/or practice of discrimination has occurred both within and outside the liability period in this case.

166.    Goldman Sachs has set and/or maintained these discriminatory policies, patterns, and/or practices during the liability period within the City of New York, and the discriminatory policies, patterns, and/or practices have had a discriminatory impact on female employees of Goldman Sachs within the City of New York.

167.    As a direct result of Goldman Sachs's discriminatory policies and/or practices as described above, Plaintiffs and the Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

168.    The foregoing conduct constitutes illegal, intentional discrimination prohibited by the Administrative Code of the City of New York § 8-107 *et seq.*

169.    Plaintiffs request relief as hereinafter described.

## FOURTH CLAIM FOR RELIEF

### Disparate Impact Discrimination
### (NYCHRL, New York City Administrative Code § 8-107 *et seq.*)
### (On Behalf of All Plaintiffs and the Class)

170.    Plaintiffs incorporate the preceding paragraphs as alleged above.

171.    This Claim is brought by all Representative Plaintiffs on behalf of themselves and

the Class they represent. Plaintiffs have timely filed charges with the EEOC and have thus

exhausted their administrative remedies.

172.    Goldman Sachs's reliance on illegitimate and unvalidated systems and criteria to

distribute business opportunities, determine levels of professional support, evaluate employee

performance, set compensation, and select individuals for promotion, and determine other terms

and conditions of employment have an adverse impact on female Associates and Vice Presidents

in violation of Title VII and are not, and cannot be, justified by business necessity. Even if such

system and/or policies could be justified by business necessity, less discriminatory alternatives

exist and would equally serve any alleged necessity.

173.    Goldman Sachs has maintained these discriminatory policies, patterns, and/or

practices both within and outside the liability period in this case, and the discriminatory policies,

patterns, and/or practices have had a discriminatory impact on female employees of Goldman

Sachs within the City of New York.

174.    As a direct result of Goldman Sachs's discriminatory policies and/or practices as

described above, Plaintiffs and the Class have suffered damages including, but not limited to,

lost past and future income, compensation, and benefits.

175.    The foregoing policies, patterns, and/or practices have an unlawful disparate

impact on women in violation of the Administrative Code of the City of New York § 8-107 *et*

*seq.*

176.   Plaintiffs request relief as hereinafter described.

## FIFTH CLAIM FOR RELIEF

### Retaliation
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*)
### (On Behalf of Plaintiffs Chen-Oster, Orlich, and Gamba Individually)

177.   Plaintiffs incorporate the preceding paragraphs as alleged above.

178.   This Claim is brought by Plaintiffs Chen-Oster, Orlich, and Gamba individually. Plaintiffs have timely filed charges with the EEOC alleging retaliation claims and have thus exhausted their administrative remedies.

179.   Plaintiffs engaged in protected activities, including making internal complaints of unlawful discrimination and filing charges with the EEOC and NYCCHR complaining of Goldman Sachs's discriminatory policies and practices.

180.   Goldman Sachs took adverse actions against the Plaintiffs with the purpose of retaliating against them because of their participation in protected activities, and Plaintiffs suffered damages as a result of that conduct.

181.   Plaintiffs request relief as hereinafter described.

## SIXTH CLAIM FOR RELIEF

### Retaliation
### (NYCHRL, New York City Administrative Code § 8-107 *et seq.*)
### (On Behalf of Plaintiffs Chen-Oster, Orlich, and Gamba Individually)

182.   Plaintiffs incorporate the preceding paragraphs as alleged above.

183.   This Claim is brought by Plaintiffs Chen-Oster, Orlich, and Gamba individually.

184.   Plaintiffs engaged in protected activities, including making internal complaints of unlawful discrimination and filing charges with the EEOC and NYCCHR complaining of Goldman Sachs's discriminatory policies and practices.

185.     Goldman Sachs took adverse actions against the Plaintiffs with the purpose of retaliating against them because of their participation in protected activities, and Plaintiffs suffered damages as a result of that conduct.

186.     Goldman Sachs engaged in the retaliatory conduct alleged above during the liability period within the City of New York, and the retaliatory conduct had an impact within the City of New York

187.     Plaintiffs request relief as hereinafter described.

## SEVENTH CLAIM FOR RELIEF

### Pregnancy Discrimination
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k))**
**(On Behalf of Plaintiffs Chen-Oster and Gamba Individually)**

188.     Plaintiffs Chen-Oster and Gamba incorporate the preceding paragraphs as alleged above.

189.     This Claim is brought by Plaintiffs Chen-Oster and Gamba individually.

190.     Goldman Sachs has discriminated against Chen-Oster and Gamba in the terms and conditions of their employment on the basis of their status as pregnant women and as women with children, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, specifically the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k).

191.     Goldman Sachs knew that its actions constituted unlawful discrimination and showed willful and/or reckless disregard for Chen-Oster's and Gamba's statutorily protected rights.

192.     As a direct result of Goldman Sachs's discriminatory policies and/or practices as described above, Chen-Oster and Gamba have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

193.    Plaintiffs Chen-Oster and Gamba request relief as hereinafter described.

## EIGHTH CLAIM FOR RELIEF

**Pregnancy Discrimination**
**(NYCHRL, New York City Administrative Code § 8-107 *et seq.*)**
**(On Behalf of Plaintiffs Chen-Oster and Gamba Individually)**

194.    Plaintiffs Chen-Oster and Gamba incorporate the preceding paragraphs as alleged

above.

195.    This Claim is brought by Plaintiffs Chen-Oster and Gamba individually.

196.    Goldman Sachs has discriminated against Chen-Oster and Gamba in the terms

and conditions of their employment on the basis of their status as pregnant women and as women

with children, in violation of the Administrative Code of the City of New York § 8-107 *et seq.*

197.    Goldman Sachs knew that its actions constituted unlawful discrimination and

showed willful and/or reckless disregard for Chen-Oster's and Gamba's statutorily protected

rights.

198.    Goldman Sachs engaged in the discriminatory conduct alleged above during the

liability period within the City of New York, and the discriminatory conduct had an impact on

Chen-Oster and Gamba within the City of New York.

199.    As a direct result of Goldman Sachs's discriminatory policies and/or practices as

described above, Chen-Oster and Gamba have suffered damages including, but not limited to,

lost past and future income, compensation, and benefits.

200.    Plaintiffs Chen-Oster and Gamba request relief as hereinafter described.

## ALLEGATIONS REGARDING RELIEF

201.    Plaintiffs and the Classes they seek to represent have no plain, adequate, or

complete remedy at law to redress the wrongs alleged herein, and the injunctive relief they seek

in this action is the only means of securing complete and adequate relief. Plaintiffs and the

Classes they seek to represent are now suffering, and will continue to suffer, irreparable injury from Goldman Sachs's discriminatory acts and omissions.

202.    Goldman Sachs's actions have caused and continue to cause Plaintiffs and all Class Members substantial losses in earnings and other employment benefits.

203.    In addition, Plaintiffs and Class Members suffer and continue to suffer emotional distress, humiliation, embarrassment, and anguish, all to their damage in an amount according to proof.

204.    Goldman Sachs performed the acts herein alleged with malice or reckless indifference. Plaintiffs and Class Members are thus entitled to recover punitive damages in an amount according to proof.

## **PRAYER FOR RELIEF**

205.    WHEREFORE, Plaintiffs and the Class pray for relief as follows:

(a)    Certification of the case as a class action on behalf of the proposed Classes;

(b)    Designation of Representative Plaintiffs H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, and Mary De Luis as representatives of the Classes;

(c)    Designation of Representative Plaintiffs' counsel of record as Class Counsel;

(d)    A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. §§ 2000e, *et seq.*; and the Administrative Code of the City of New York § 8-107 *et seq.*;

(e)    A preliminary and permanent injunction against Goldman Sachs and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns, and/or practices that discriminate against Plaintiffs or the Class because of their gender or participation in this lawsuit;

(f)     An order that Goldman Sachs institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender, and that it eradicate the effects of their past and present unlawful employment practices;

(g)     An order requiring Goldman Sachs to develop and institute accurate and validated standards for evaluating performance, assigning job opportunities, determining pay, and making promotion decisions;

(h)     An order appointing a monitor to ensure that Goldman Sachs complies with the injunction provisions of any decree that the Court orders;

(i)     An order retaining jurisdiction over this action to ensure that Goldman Sachs complies with such a decree;

(j)     An order restoring Plaintiffs and Class Members to their rightful positions at Goldman Sachs, or in lieu of reinstatements, an order for front pay benefits;

(k)     Back pay (including interest and benefits) for the Representative Plaintiffs and Class Members;

(l)     All damages sustained as a result of Goldman Sachs's conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, according to proof;

(m)    Exemplary and punitive damages in an amount commensurate with Goldman Sachs's ability to pay and to deter future conduct;

(n)     Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(o)     Pre-judgment and post-judgment interest, as provided by law; and

(p)     Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

206.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action.

Dated: New York, New York
       May 8, 2015

                                   Respectfully submitted,

By: _____/s/ Adam T. Klein_____
        Adam T. Klein

        OUTTEN & GOLDEN LLP
        Adam T. Klein
        Cara E. Greene
        3 Park Avenue, 29th Floor
        New York, New York 10016
        Telephone:  (212) 245-1000
        Facsimile:  (212) 977-4005

        OUTTEN & GOLDEN LLP
        Paul W. Mollica
        161 North Clark Street, Suite 4700
        Chicago, Illinois 60601
        Telephone:  (312) 809-7010
        Facsimile:  (312) 809-7011


By: ____/s/ Kelly M. Dermody_____
           Kelly M. Dermody

LIEFF, CABRASER, HEIMANN &
     BERNSTEIN, LLP
Kelly M. Dermody (*admitted pro hac vice*)
Anne B. Shaver (*admitted pro hac vice*)
Martin D. Quinones (*admitted pro hac vice*)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

LIEFF, CABRASER, HEIMANN &
     BERNSTEIN, LLP
Rachel Geman
250 Hudson St., 8th Floor
New York, New York 10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

*Attorneys for Plaintiffs and the Putative Class*