UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x

H. CRISTINA CHEN-OSTER;
SHANNA ORLICH; ALLISON
GAMBA; and MARY DE LUIS,

                Plaintiffs,

        v.

GOLDMAN, SACHS & CO. and THE
GOLDMAN SACHS GROUP, INC.,

                Defendants.

---------------------------------------------------- x

:      10 Civ. 6950 (AT) (JCF)

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' REPLY IN SUPPORT OF THEIR OBJECTIONS TO
THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
CONCERNING THE PROPOSED RULE 23(b)(3) DAMAGES CLASS**

Barbara B. Brown (*admitted pro hac vice*)
Neal D. Mollen (*admitted pro hac vice*)
Carson H. Sullivan (*admitted pro hac vice*)
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC  20005

Robert J. Giuffra, Jr.
Theodore O. Rogers, Jr.
Ann-Elizabeth Ostrager
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Defendants
Goldman, Sachs & Co. and
Goldman Sachs & Co. LLC*

July 21, 2017

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 7

I.   PLAINTIFFS' RESPONSE CONFIRMS THAT THE CERTIFICATION OF PLAINTIFFS' PROPOSED CLASS WOULD BE LEGALLY UNPRECEDENTED ........................................................................................ 7

    A.   The Court Should Reject Plaintiffs' Effort To Dilute *Wal-Mart's* Holding on Commonality ................................................................................ 7

    B.   Plaintiffs Rely on a Handful of Cases Involving Facts Bearing No Resemblance to Those Present Here ....................................................... 9

II.  PLAINTIFFS DISTORT THE RECORD TO TRY TO FIT THIS CASE TO THEIR FEW, DISTINGUISHABLE CASES ............................................... 11

    A.   As Judge Francis Found, Compensation and Promotion Decisions Were Made at the Business-Unit Level. .......................................................... 11

        1.   Plaintiffs Are Wrong In Claiming that Business Units Are Not Material to Class Certification. ................................................. 11

        2.   Just as in *Wal-Mart*, Plaintiffs Cite High Level Guidelines that Merely Confirm That the Challenged Discretionary Decisions Were Made at the Business-Unit Level. ................................... 18

        3.   Plaintiffs Concede That Compensation Decisions Were Made Within Each Business Unit. ................................................... 20

        4.   Plaintiffs Mischaracterize Goldman Sachs's Promotion Process To Try To Manufacture Uniformity Where None Exists. ............. 23

        5.   Plaintiffs Distort the 360 Review and Manager Quartiling Processes. .............................................................................. 24

    B.   The Record Cannot Support a Finding of Commonality as to Plaintiffs' Disparate Impact Claims. ..................................................................... 25

        1.   The Legally Unprecedented Nature of Plaintiffs' Class Claims ............... 25

        2.   The Court Should Reject Plaintiffs' Aggregated Statistics ...................... 26

        3.   The Same Factual Findings That Led Judge Francis To Recommend Against Class Certification Defeat Commonality Here ....... 28

C.      To Try To Certify Their Disparate Treatment Claim, Plaintiffs Read the Intent Requirement out of Title VII. ................................................................. 30

D.      Beyond Commonality, the Court Should Accept Judge Francis' Recommendation that the "Countless Individual Factors" that Affected Compensation and Promotion Decisions Defeat Predominance Here ................. 34

III.    **PLAINTIFFS IGNORE THE IDIOSYNCRATIC NATURE OF LEAD PLAINTIFFS' CLAIMS, WHICH ARE NEITHER ADEQUATE NOR TYPICAL** ................................................................................................................ 36

A.      Plaintiff Orlich ................................................................................................ 36

B.      Plaintiff Chen-Oster ....................................................................................... 37

C.      Plaintiff Gamba .............................................................................................. 37

D.      Plaintiff De Luis ............................................................................................. 38

**CONCLUSION** ................................................................................................................ 39

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abdallah* v. *Coca-Cola Co.*,
  186 F.R.D. 672 (N.D. Ga. 1999) ........................................................................16

*Adams* v. *Henderson*,
  197 F.R.D. 162 (D. Md. 2000) ..........................................................................34

*Belt* v. *Emcare, Inc.*,
  299 F. Supp. 2d 664 (E.D. Tex. 2003) ..............................................................16

*Bennett* v. *Nucor Corp.*,
  656 F.3d 802 (8th Cir. 2011) .....................................................................10, 25

*Bolden* v. *Walsh Constr. Co.*,
  688 F.3d 893 (7th Cir. 2012) .......................................................................2, 20

*Brown* v. *Electrolux Home Prods., Inc.*,
  817 F.3d 1225 (11th Cir. 2016) ........................................................................36

*Brown* v. *Nucor Corp.*,
  785 F.3d 895 (4th Cir. 2015) ............................................................................26

*Bublitz* v. *E.I. DuPont de Nemours & Co.*,
  196 F.R.D. 545 (S.D. Iowa 2000) .....................................................................16

*Chin* v. *Port Auth. of N.Y. & N.J.*,
  685 F.3d 135 (2d Cir. 2012) .............................................................................34

*Coates* v. *Johnson & Johnson*,
  756 F.2d 524 (7th Cir. 1985) ............................................................................27

*Davis* v. *Cintas Corp.*,
  717 F.3d 476 (6th Cir. 2013) .......................................................................9, 25

*Dukes* v. *Wal-Mart Stores, Inc.*,
  222 F.R.D. 137 (N.D. Cal. 2004) ........................................................................8

*Dukes* v. *Wal-Mart Stores, Inc.*,
  964 F. Supp. 2d 1115 (N.D. Cal. 2013) ...............................................2, 8, 18, 19

*EEOC* v. *Bloomberg, L.P.*,
  778 F. Supp. 2d 458 (S.D.N.Y. 2011) (Preska, C.J.) ........................................32

*Ellis* v. *Costco Wholesale Corp.*,
  285 F.R.D. 492 (N.D. Cal. 2012) ................................................................ *passim*

Page(s)

*Gen. Tel. Co. of the S.W.* v. *Falcon*,
  457 U.S. 147 (1982)....................................................................................25, 26

*Green* v. *Borg-Warner Protective Servs. Corp.*,
  1998 WL 17719 (S.D.N.Y. Jan. 16, 1998) (Patterson, J.) ......................................33

*Gutierrez* v. *Johnson & Johnson*,
  2006 WL 3246605 (D.N.J. Nov. 6, 2006) .........................................................27

*In re Initial Public Offerings Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)........................................................................35

*Kleiner* v. *First Nat'l Bank of Atlanta*,
  751 F.2d 1193 (11th Cir. 1985) ...................................................................16

*Little* v. *Wash. Metro. Area Transit Auth.*,
  2017 WL 1403122 (D.D.C. Apr. 18, 2017)..........................................................35

*McLaughlin* v. *Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008)....................................................................35, 36

*McReynolds* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*
  672 F.3d 482 (7th Cir. 2012) .............................................................3, 4, 10, 13

*Mevorah* v. *Wells Fargo Home Mortg., Inc.*,
  2005 WL 4813532 (N.D. Cal. Nov. 17, 2005) ......................................................16

*Moore* v. *Publicis Grp. SA*,
  2014 WL 11199094 (S.D.N.Y. May 15, 2014) (Carter, J.) .........................................29

*Parra* v. *Bashas', Inc.*,
  291 F.R.D. 360 (D. Ariz. 2013) ...................................................................26

*Personnel Adm'r* v. *Feeney*,
  442 U.S. 256 (1979).........................................................................6, 30, 31

*Randall* v. *Rolls-Royce Corp.*,
  637 F.3d 818 (7th Cir. 2011) .....................................................................10

*Reed Constr. Data, Inc.* v. *McGraw-Hill Cos., Inc.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014) (Oetken, J.)..................................................27

*Roach* v. *T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015).......................................................................35

*Robinson* v. *Metro-North Commuter R.R. Co.*,
  267 F.3d 147 (2d Cir. 2001).......................................................................35

*Page(s)*

*Ruiz* v. *Citibank, N.A.*,
  93 F. Supp. 3d 279 (S.D.N.Y. 2015) (Failla, J.) ............................................9, 25, 34

*Scott* v. *Family Dollar Stores, Inc.*,
  2016 U.S. Dist. LEXIS 105267 (W.D.N.C. June 24, 2016) ....................................11

*Scott* v. *Family Dollar Stores, Inc.*,
  733 F.3d 105 (4th Cir. 2013) .........................................................................3, 10, 13

*Serrano* v. *Cintas Corp.*,
  2009 WL 910702 (E.D. Mich. Mar. 31, 2009) .......................................................34

*Tabor* v. *Hilti, Inc.*,
  703 F.3d 1206 (10th Cir. 2013) ...........................................................................9, 25

*Teamsters* v. *United States*,
  431 U.S. 324 (1977).............................................................................................6, 30

*United States* v. *City of New York*,
  717 F.3d 72 (2d Cir. 2013)................................................................................30, 33

*Wal-Mart Stores, Inc.* v. *Dukes*,
  564 U.S. 338 (2011) ...................................................................................... *passim*

*Watson* v. *Fort Worth Bank & Tr.*,
  487 U.S. 977 (1988)............................................................................................6, 30

**Rules**

Fed. R. Civ. P. 23(a) ...................................................................................... *passim*

Fed. R. Civ. P. 23(b)(2)........................................................................................35

Fed. R. Civ. P. 23(b)(3)...............................................................................3, 34, 39

## PRELIMINARY STATEMENT

In their Response, Plaintiffs try to escape that *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338 (2011), bars certification of Plaintiffs' proposed damages class of more than 2,300 female professionals who worked in 140 separate Business Units within Goldman, Sachs & Co. ("Goldman Sachs" or the "Firm") from 2002 through 2011 (the "Class Period"). Plaintiffs downplay *Wal-Mart* and its progeny in favor of decisions involving a small number of job functions and limited discretion bearing no resemblance to Goldman Sachs, where hundreds of managers applied the Firm's challenged processes—360 reviews and manager quartiling—in discretionary and non-uniform ways. Then, seeking to fit within their inapposite decisions, Plaintiffs distort the record supporting Magistrate Judge Francis' central finding that Goldman Sachs's compensation and promotion decisions were the result of many "individualized factors," including "the class member's particular skills, the nature of the work in her business unit, the unit's profitability relative to other units, and, indeed, the extent to which the employee's manager considered 360 review and quartiling evaluations." (Mar. 10, 2015 Report & Recommendation ("R&R") at 40–41, ECF No. 364.)

By Plaintiffs' account, the legal test for commonality is met if, as an administrative matter, Goldman Sachs used common practices and forms and provided high level guidance to managers making compensation and promotion decisions across the Firm. But Wal-Mart too had similar processes and provided general guidance for its employment decisions. In any complex organization like Wal-Mart, and even more so in the case of Goldman Sachs, commonality requires much more than having some overarching management structure and HR processes, or using the same forms for recording the views of individual managers or reviewers throughout the organization. Instead, as the Supreme Court has made clear, to find a common question for purposes of Federal Rule of Civil Procedure 23(a)(2), a district court must find that

the organization has one or more "*uniform* employment practices" constraining the discretion of individual managers over the challenged employment decisions.  *Wal-Mart*, 564 U.S. at 355 (emphasis added).

Here, as in *Wal-Mart*, Goldman Sachs's 360 reviews and quartiling processes were "just the opposite of a uniform employment practice," because they "allow[ed] discretion by local supervisors over employment matters."  *Id.*  As the Seventh Circuit held in *Bolden* v. *Walsh Constr. Co.*, 688 F.3d 893 (7th Cir. 2012), "*Wal-Mart* tells us that local discretion cannot support a company-wide class no matter how cleverly lawyers may try to repackage local variability as uniformity."  *Id.* at 898.  Indeed, in *Wal-Mart* itself on remand, the district court found that Wal-Mart's analogous corporate processes did not establish the required commonality, because those processes, like Goldman Sachs's, merely represented "repackaged delegated discretion."  *Dukes* v. *Wal-Mart Stores, Inc.*, 964 F. Supp. 2d 1115, 1125–27 (N.D. Cal. 2013).

Unable to contend with *Wal-Mart* on its terms, Plaintiffs likewise offer no cogent answer to the many cases cited by Defendants after *Wal-Mart* rejecting attempts to certify classes of different types of employees, performing different functions in different departments or facilities who are subject to varied decisions by their managers.  (*See* Defs.' Objections, App'x B, ECF No. 502.)  Instead, Plaintiffs rely primarily on three cases, which they continually rehash. But it is undeniable that those cases, unlike this one, *Wal-Mart* and the other cases cited by Defendants, involved only a single job or small number of similar jobs, and uniform policies or centralized decisionmaking eliminating or constraining manager discretion:

- *Ellis* v. *Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012), challenging direct decisionmaking by a small group of senior managers—including the CEO—on the promotion to one of two store level manager positions;

- *McReynolds* v. *Merrill Lynch, Pierce, Fenner & Smith*, Inc. 672 F.3d 482 (7th Cir. 2012), involving one job in one business unit—financial advisors in Merrill's retail business—challenging two allegedly biased rules, uniformly applied to account assignment and team formation decisions;

- *Scott* v. *Family Dollar Stores, Inc.*, 733 F.3d 105 (4th Cir. 2013), concerning one job—retail store manager—challenging four uniform company-wide practices for compensation decisions made by "high level decision makers."

By placing so much weight on these three cases, Plaintiffs effectively concede that unless they can fit within the facts of those cases—plaintiffs in one or two jobs challenging uniformly applied policies restricting employment decisions—they cannot satisfy Rule 23(a)(2)'s commonality requirement.  (*See* Plaintiffs' Responses to Defendant's Objections ("Pls.' Resp.") at 20 (commonality requires "specific practices and a common mode of guided discretion directed from the top levels of the company" (quoting *Ellis*, 285 F.R.D. at 509)).)

To create the illusion of the type of uniformity found in those cases, Plaintiffs resort to portraying falsely supposed corporate control over the challenged compensation and promotion decisions, and claiming the Firm's Business Units are "not material to class certification."  (Pls.' Resp. at 4.)  But Judge Francis, in correctly finding that a Rule 23(b)(3) damages class could not be certified here because any common questions did not predominate, found that hundreds of different managers, operating in Business Units, on discretionary and varied bases, made the challenged decisions.  (*See* R&R at 40–41.)

Specifically, Judge Francis found, based on record facts, that compensation budgets were set annually for each individual Business Unit, and individual managers within each Business Unit decided how to allocate this finite pool of resources to employees; tellingly, Plaintiffs now admit the same thing.  (*See* R&R at 42; Pls.' Resp. at 6.)  Moreover, Judge Francis explicitly found, based on undisputed record evidence, that:   individual Goldman Sachs

Case 1:10-cv-06950-AT-RWL   Document 522   Filed 07/31/17   Page 10 of 45

managers varied in their use of 360-review data and scores "depending on the types of skills most relevant *to any particular business unit*"; for manager quartiling, "the manager *of each business unit* [wa]s required to rank each of his or her employees"; compensation budgets were allocated "among [each] division's *business units*"; compensation recommendations were "reviewed by the *business unit head*"; and promotion from Vice President to Managing Director began with "each *business unit head*, in consultation with other managers, develop[ing] a list of candidates for promotion." (R&R at 7–8, 10–11 (emphasis added).)[1]  Even more, Plaintiffs' newly minted theory of centralized corporate control over these processes was contradicted by Plaintiffs' own expert, who complained that there was not enough oversight over the quartiling process:  that "there is no evidence that senior-management reviews focused on decisions at the level of each individual's quartile assignment." (Cascio Report at 50.)

　　　　In addition to their unsupported claim of centralized corporate control and disregard of Business-Unit level decisionmaking, Plaintiffs try to establish uniformity by likening the entire Goldman Sachs workforce to the single job title of Financial Advisor in *McReynolds*.  Advancing the fiction that the Firm's countless job functions are interchangeable, they suggest that the proposed class can be reduced to "two job titles" (*i.e.*, the corporate titles Associate and Vice President), making putative class members' "jobs and job duties . . . irrelevant" in the compensation and promotion processes. (Pls.' Resp. at 8–9.)  But Judge Francis found, and the undisputed record shows, that this is not the case.  Rather, Business Units are engaged in a "diversity of . . . activities," and there is wide variation in job functions encompassed within those Units, ranging from Ph.D.s in computer science creating computerized

---

[1]　　　(Citing Deposition of Caroline Heller Sberloti ("Heller Dep.") I at 203–04; Heller Dep. II at 271–72; Deposition of Bruce Larson ("Larson Dep.") at 61, 169–70, 227; Deposition of Jessica Kung ("Kung Dep.") I at 57–60; Kung Dep. II at 316–17, 414–15, 432–33.)

4

risk models to MBAs in mergers and acquisitions negotiating corporate mergers.  (R&R at 4–6 (citing various declarations submitted by Goldman Sachs).)  Those varied and inherently non-fungible skills explain why the employment decisions made about those individuals were determined within Business Units, rather than centrally, because individual managers could best evaluate the contributions made by the employees working for them.  Judge Francis recognized this Business-Unit level of decisionmaking when he emphasized the "individualized factors that inform[ed] Goldman Sachs'[s] compensation and promotion decisions"—including "the class member's particular skills" and "the nature of the work in her business unit."  (R&R at 40–41.)

Judge Francis' own findings of fact—that "countless individualized factors" influenced Goldman Sachs's compensation and promotion decisions across the Firm's Business Units (R&R at 43)—thus should have caused him to find that Plaintiffs could not establish commonality.  But Judge Francis erroneously posited that Plaintiffs could prove a common question simply because "each of the class members was subject to [the 360-review and quartiling] process."  (R&R at 27.)  He thus ignored *Wal-Mart* is clear guidance that Plaintiffs must show that Goldman Sachs managers uniformly applied those processes in making compensation and promotion decisions; otherwise, there can be no "common answer" to the question of what caused injury to individual class members.  564 U.S. at 352.  Absent such uniform application, Plaintiffs cannot meet their burden of showing that a classwide proceeding would "generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (internal quotation marks omitted; emphasis in original).

Nor can Plaintiffs prove commonality by exulting their expert's unreliable statistics, which aggregated evaluation, compensation and promotion data across all three Divisions and did not account for the 140 separate Business Units at all.  That meaningless

aggregation again ignores the teachings of *Wal-Mart*, in which the Supreme Court held that "[i]nformation about disparities at [the Firm] level does not establish the existence of disparities [within individual Business Unit], let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the [Business Unit] level." 564 U.S. at 356–57 (internal quotation marks omitted).

      As to their disparate treatment claim (Pls.' Resp. at 25–27), Plaintiffs make no attempt to "prove that [Goldman Sachs] had a discriminatory intent or motive" regarding its compensation or promotions processes. *Watson* v. *Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988) (citing *Teamsters* v. *United States*, 431 U.S. 324, 335 n.15 (1977)). Plaintiffs' effort to read the intent requirement out of Title VII is contrary to settled law and underscores their failure to prove commonality. Mere "awareness" of the alleged disparate impact is insufficient to show intent for disparate treatment as a matter of law, *Personnel Adm'r* v. *Feeney*, 442 U.S. 256, 279 (1979) ("awareness of consequences" does not constitute "discriminatory purpose"), and, as in *Wal-Mart*, Plaintiffs' handful of questionable declarations are not sufficient to meet their burden of proving intentional discrimination, 564 U.S. at 358 & n.9. And Plaintiffs ignore Goldman Sachs's demonstrated commitment to diversity and support of its female employees through, *inter alia*, mandatory diversity training, internal analysis and robust internal complaint procedures (Pls.' Resp. at 26–27 & nn.23–24), as recognized by Judge Francis (R&R at 33).

      In their attempt to defend adequacy and typicality, Plaintiffs do not dispute the idiosyncratic nature of each of the Lead Plaintiffs' claims and instead make baseless assertions that the Firm made various concessions (which it did not). (Pls.' Resp. at 28–30.) And Plaintiffs' short diversion into predominance ignores that, as we show at greater length in our Response to Plaintiffs' Objections, Defendants would have the right to dispute liability, not just damages, on

6

an individualized basis for each putative class member in all of the different businesses run by the Firm.  (Defs.' Resp. at 28–33, ECF No. 513.)

In sum, Plaintiffs cannot satisfy the legal standard for commonality that the Supreme Court established in *Wal-Mart*, and they distort the facts to try to fill that gap. Plaintiffs have no answer to Judge Francis' detailed findings of fact, based on an undisputed record.   These findings not only defeat predominance but plainly establish the lack of commonality here.

## ARGUMENT

## I.   PLAINTIFFS' RESPONSE CONFIRMS THAT THE CERTIFICATION OF PLAINTIFFS' PROPOSED CLASS WOULD BE LEGALLY UNPRECEDENTED.

### A.   The Court Should Reject Plaintiffs' Effort To Dilute *Wal-Mart*'s Holding on Commonality.

Plaintiffs cannot dispute *Wal-Mart*'s holding that Rule 23(a) commonality cannot be established through an aggregated statistical analysis of thousands of discretionary decisions made by disparate decisionmakers, and that a "'policy' of *allowing discretion* by local supervisors over employment matters . . . is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices." 563 U.S. at 355 (emphasis in original).   Instead, Plaintiffs mischaracterize *Wal-Mart*'s controlling legal principles.

*First*, Plaintiffs falsely claim that Wal-Mart did not have corporate personnel policies similar to those maintained by Goldman Sachs.  (Pls.' Resp. at 15.)  In fact, Wal-Mart had directly analogous policies, which similarly established processes for collecting reviews and implementing individual managers' discretionary decisions.   For example, Wal-Mart had "minimum corporate guidelines for promotion"—"which include[d] requirements that candidates have an 'above average' evaluation, have at least one year in their current position, be current on

training, not be in a 'high shrink' department or store, be on the company's 'Rising Star' list, and be willing to relocate"—and "Wal-Mart's Exempt Associate Pay Guidelines." *Dukes* v. *Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 147–48 (N.D. Cal. 2004).  In rejecting commonality, the Supreme Court thus confirmed that such guidelines are insufficient to establish uniform practices or a common mode of exercising discretion.  *Wal-Mart*, 564 U.S. at 356.

After the Supreme Court's *Wal-Mart* decision, the *Wal-Mart* plaintiffs moved to certify a more limited class—making prominent note of "Wal-Mart's Field Compensation *Guidelines*," "Wal-Mart's *guidelines* for salaried pay decisions," and the company's "use of promotion *guidelines*"—and alleged that these policies "had an adverse impact on women." *Dukes* v. *Wal-Mart Stores, Inc.*, 964 F. Supp. 2d 1115, 1119, 1125 (N.D. Cal. 2013) ("*Wal-Mart II*") (emphasis added).  Like Plaintiffs here, the *Wal-Mart II* plaintiffs argued that Wal-Mart's guidelines established commonality, pointing to guidelines that, just like Goldman Sachs's guidelines, advised managers to consider a range of factors in setting compensation, including employees' "skills, experience, or education," and to consider whether candidates for promotion had "leadership ability." *Id.* at 1126.  The district court, in a decision that Plaintiffs fail even to acknowledge, rejected the proposed class, holding that these guidelines "cannot provide a common question tying the class together," because the factors listed in the guidelines represented merely "repackaged delegated discretion," which the Supreme Court had rejected as insufficient to satisfy commonality.  *Id.* at 1125–27.

*Second*, Plaintiffs try to distinguish *Wal-Mart* by confusing commonality with numerosity, noting that the failed *Wal-Mart* putative class was larger than the one they seek to certify.  (Pls.' Resp. at 1 & n.1, 15.)  But Plaintiffs do not—and cannot—dispute that their putative class consists of more than 2,300 current and former Goldman Sachs employees over 10

years; the mere fact that this proposed class is smaller than the largest putative class in American history is irrelevant to whether Plaintiffs' claims depend on a "common contention" that is "capable of classwide resolution . . . in one stroke." *Wal-Mart*, 564 U.S. at 350. If anything, the putative class here, which involves hundreds of different professional job functions in one of the world's most complex financial services firms—ranging from programming trading algorithms to assisting clients with finding real estate—is *less* uniform than the one the Supreme Court rejected in *Wal-Mart*, which consisted entirely of retail store employees in a business with cookie-cutter stores.

*Finally*, Plaintiffs repeatedly emphasize that Goldman Sachs had a corporate structure and corporate policies, such as a human resources department and a review process. (Pls.' Resp. at 4–8.) But Wal-Mart too, as well as every other business or government entity of any size, has such an organization. If merely having senior management and a human resources department "were, standing alone, sufficient to satisfy Rule 23's commonality requirement, it would render commonality the sort of 'mere pleading standard' rejected by [*Wal-Mart*]." *Ruiz* v. *Citibank, N.A.*, 93 F. Supp. 3d 279, 290 (S.D.N.Y. 2015) (Failla, J.), *aff'd*, 2017 WL 1379369 (2d Cir. Apr. 14, 2017); *see id.* at 290 (commonality not satisfied where "the only evidence of uniform corporate policy" are "entirely legal employment practices" contained in "training materials, handbooks, and communications").

**B.      Plaintiffs Rely on a Handful of Cases Involving Facts Bearing No Resemblance to Those Present Here.**

Unable to distinguish the record evidence here from *Wal-Mart*, *Wal-Mart II* or the many other decisions cited by Defendants in their Objections (*see* Defs.' Objections, App'x B),[2]

---

[2]      *See, e.g.*, *Davis* v. *Cintas Corp.*, 717 F.3d 476, 489 (6th Cir. 2013) (rejecting putative class consisting of "a number of women, who failed to obtain employment at many places, over a long time, under a largely subjective hiring system"); *Tabor* v. *Hilti, Inc.*, 703 F.3d 1206, 1229

Plaintiffs fall back on the same three cases Defendants have previously distinguished (*see*, *e.g.*, Defs.' Class Cert. Opp. at 2, 39, 56–57, ECF No. 264; Defs.' Objections at 2, 28–29, 41 n.23, B-9).   Nowhere in their Response do Plaintiffs come to grips with the striking differences between these cases, and the facts here.

In *Ellis* v. *Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Ca. 2012), the Ninth Circuit upheld the certification of a class of retail store employees who challenged the company's processes for promotion to one of two manager positions run by a small group of senior managers—including the CEO—who were personally involved in identifying the candidates and making the challenged promotion decisions.   *Id.* at 497–98.   In *McReynolds* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012), the Seventh Circuit approved a class consisting of only one job in one business unit—financial advisors in Merrill's retail business—challenging two allegedly biased rules, on account assignment and team formation, which permitted managers only "a measure of discretion" and were applied uniformly across the class.   *Id.* at 488–89.   And in *Scott* v. *Family Dollar Stores, Inc.*, 733 F.3d 105 (4th Cir. 2013), the Fourth Circuit merely held that "[t]he district court abused its discretion in denying [the plaintiffs'] request for leave to amend their complaint," *id.* at 119, and expressly did not rule on a motion to dismiss "whether certification of the putative class will ultimately be warranted," *id.* at 117.   The district court later certified a class challenging a single, "company-wide policy" for one job:  uniformly paying "store managers who were promoted from within" less than those

---

(10th Cir. 2013) (rejecting putative class of female employees with "highly individualized facts and circumstances"); *Bennett* v. *Nucor Corp.*, 656 F.3d 802, 815 (8th Cir. 2011) (rejecting putative class of employees with "stark inter-departmental variations in job titles, functions performed, and equipment used"); *Randall* v. *Rolls-Royce Corp.*, 637 F.3d 818, 821–24 (7th Cir. 2011) (rejecting putative class "sprawl[ed] over twenty different compensation grades, including supervisory and nonsupervisory positions and encompassing starting salaries ranging from $40,050 to $190,750").

hired laterally.  *Scott* v. *Family Dollar Stores, Inc.*, 2016 U.S. Dist. LEXIS 105267, at *2–4, *25–26 (W.D.N.C. June 24, 2016).

Here, by contrast, the putative class members did not perform the same job or even the same handful of jobs.  Instead, as Judge Francis found, based on the undisputed record, these professionals worked in three separate Divisions of the Firm comprising 140 separate businesses, with a multitude of job functions, each run by managers with broad discretion over performance evaluation, compensation and promotion determinations.  (*See* R&R at 4–6 (describing "diversity of the business units' activities").)

## II.   PLAINTIFFS DISTORT THE RECORD TO TRY TO FIT THIS CASE TO THEIR FEW, DISTINGUISHABLE CASES.

### A.   As Judge Francis Found, Compensation and Promotion Decisions Were Made at the Business-Unit Level.

Plaintiffs acknowledge that "[t]he critical question is how the challenged personnel policies operate[d] and at what level."  (Pls.' Resp. at 4.)  But they cannot escape that, as Judge Francis found, Goldman Sachs's compensation and promotion policies operated at the Business-Unit level, where individual managers had broad discretion in making employment decisions based on open-ended criteria reflecting the multitude of job functions within each business.  Plaintiffs emphasize the existence of corporate guidelines, yet those very guidelines emphasized the importance of the role of Business Units in the Firm's individualized, discretionary compensation, promotion and evaluation decisions.

#### 1.   Plaintiffs Are Wrong In Claiming that Business Units Are Not Material to Class Certification.

Recognizing that decentralized, discretionary decisionmaking across more than 140 Business Units defeats commonality, Plaintiffs resort to the unsupported assertion that "[t]he existence of the business units is not material to class certification."  (Pls.' Resp. at 4.)  Yet at the

same time, Plaintiffs elsewhere in their Response concede that compensation was set at the Business-Unit level:  "each business unit [had] a budget" for compensation, individual "[m]anagers ma[de] [compensation] recommendations for specific employees," and "[t]hese recommendations [were] then reviewed by business unit leaders."  (*Id.* at 6.)  Plaintiffs further concede that "business unit leaders g[a]ve input as to who should be on the list of candidates for promotion from Vice President to Managing Director."  (*Id.* at 7.)  Plaintiffs' failure to point to any record evidence challenging the importance of Business Units to Goldman Sachs's compensation, promotion and evaluation processes dooms their effort to prove commonality.

Plaintiffs in fact concede even more in acknowledging that "it is undisputed that the three Divisions contain[ed] business units with different sub-specialties."  (*Id.* at 4; *see* R&R at 5 (discussing the "myriad" of different Business Units that "specializ[ed] in particular activities").)  "The diversity of the business units' activities," as Judge Francis found, ranged from the "FICC Strats Business Unit"—in which "employees deal[t] with technical, quantitative problems and questions posed by clients across a broad range of products"—to the "Prime Brokerage Business Unit"—which was "responsible for generating business, as by 'prospecting' new hedge fund clients"—to the "Leveraged Finance Business Unit"—in which employees made "decisions about the marketing, pricing, and distribution of leveraged financial products."  (R&R at 6 (citing Declaration of Mary Louise Kirk ("Kirk Decl.") ¶¶ 4–5, ECF No. 279; Declaration of John Levene ("Levene Decl.") ¶¶ 4, 6, ECF No. 280; Declaration of Craig Packer ("Packer Decl.") ¶¶ 7, 11, ECF No. 284).)

Ignoring all evidence in the record regarding "[t]he diversity of the business units' activities" (R&R at 6), Plaintiffs attempt to reduce the hundreds of jobs at issue in this case to the one or two in their three cases, *Ellis*, *McReynolds*, and *Scott*, by offering the canard that "[t]he

proposed Class consists of two job titles:  Associate and Vice President," (Pls.' Resp. at 9.).

Plaintiffs' invocation of corporate job *titles* is a transparent attempt to distract from differences in

job *function* (for which professionals often had more substantive titles reflecting their

responsibilities).  (*See* Kung Dep. II at 289 ("Even though the employees [were] at the same title,

they may [have] work[ed] in different functions or [on] different projects.").)  But Plaintiffs

cannot dispute the record evidence, and Judge Francis' findings, that professionals in different

Business Units performed vastly different jobs (R&R at 4–6 (citing declarations submitted by

Goldman Sachs)), relying instead on stricken expert testimony regarding job function not in the

record (Pls.' Resp. at 8–10).  As Judge Francis found, the actual record in this case is replete with

evidence that "Goldman Sachs'[s] compensation and promotion decisions" were heavily

informed by "the class member's particular skills [and] the nature of the work in her business

unit" (R&R at 40), not her job title.  And Plaintiffs concede that "managers must consider the

[evaluation] criteria in light of the work that the employee perform[ed]" in the particular

Business Unit (Pls.' Resp. at 5), which necessarily varied by Business Unit not job title.

Plaintiffs falsely assert that "Goldman's 'record' for its claim that the jobs vary

too much . . . is not based on any actual Goldman document or deponent."  (Pls.' Resp. at 8.)

Not so.  Multiple Goldman Sachs witnesses testified that "managers ha[d] a view on what [was]

important in their given business and depending on your role and your function, the product you

[were] covering, [and] the clients that you [were covering], the skills that would make you have

potential would be different based on your business unit, [and] your role within that business

unit."  (Heller Dep. I at 103.)[3]  Plaintiffs Gamba and Orlich themselves testified that the skills

---

[3]     (*See* Deposition of Sally Boyle at 138 ("The business of the securities division [wa]s
divided up into a number of business units . . . depending on the type of activity that the . . .
particular part of the business [wa]s doing"); *id.* at 142 (explaining that within Commodities,

they developed were "non-transferrable" to other Business Units.  (Deposition of Allison Gamba

("Gamba Dep.") at 289 ("Q. . .  [I]n light of the skill set you developed in the course of working

on the exchange floor, you believe that it would be hard for you to find another job within the

firm, is that your testimony?   A. Yes, because I couldn't actually walk on to a desk and

specifically do what they were doing dealing with clients because I had no experience dealing

with clients."); Deposition of Shanna Orlich ("Orlich Dep.") at 538 ("I mean, that was a

significant difference between, say, Trading and Sales . . . . As a trader, you got to commit

capital, you made that decision.").)

        Plaintiffs are wrong in claiming that Goldman Sachs's "manager declarations . . .

should be accorded little or no weight" and "confirm an absence of meaningful variation."  (Pls.'

Resp. at 8.)  It is understandable that Plaintiffs want to avoid the force of these declarations that

demonstrate  the  overwhelming  variation  in  job  responsibilities  and  the  variation  in  how

---

there [were] different Business Units, like sales, trading and strategies, and that this "applie[d] across many of the businesses"); Deposition of Genevieve Felix at 76 ("[T]here [were] other groups within private wealth management, such as trust services, strategic wealth advisory team, global client financing."); Heller Dep. I at 61 (the businesses of "FICC and Equities and the functions within them, the things that people d[id] within the divisions var[ied]"); *id.* at 351–352 ("[A]cross  the  Securities  Division"  there  were  "individual  specific  . . .  performance-related metrics" for "all different roles," including for sales credits, production, and salespeople, as well as "other business metrics that would be relevant in running their different businesses"); *id.* at 373–74 ("There [were] not guidelines about how [managers] [were] supposed to weight [factors] because it would vary very much depending on the individual's function, role, product."); Kung Dep. I at 80 (IMD is a division "where we ha[d] multiple businesses that operate[d] in very different  market  places"); *id.*  at  139  ("[A]cross  the  division  there[ were]  many  different businesses and what it [took] to be successful in one business may [have] be[en] very different from another business and quite frankly c[ould] vary from one individual to another"); Larson Dep. at 126 ("There were a variety of positions within the [Investment Banking] division that [were] not client facing professionals who would be considered nonbankers."); Deposition of Rodney Miller at 104 (explaining that even within a Business Unit, such as Prime Brokerage, "you[ were] going to have different functions. So you[ were] going to have salespeople, you[ were] going to have securities lending people, you[ were] going to have strategists.").)

managers evaluated compensation for individual employees across Business Units.[4]  But Judge

Francis rejected Plaintiffs' attempt to strike these declarations, holding that "the evidence of

Goldman Sachs'[s] declarants is plainly important:  the [F]irm's structure and its compensation

and promotion policies are central to a determination of issues such as commonality and

predominance."  (Memorandum and Order dated Mar. 10, 2015 ("Order") at 42, ECF No. 363.)

In fact, as Judge Francis stressed, Plaintiffs "could have taken the depositions of the Goldman

---

[4]     (*See*, *e.g.*, Declaration of Sue Benz ("Benz Decl.") ¶ 10 ("While successful bankers in
[the Public Sector and Infrastructure ('PSI') Business Unit] and the Classic [Banking group]
share[d] certain skills, there [were] also significant differences between them.  For example, PSI
bankers must be experts only in debt offerings; knowledge of equity offerings is not required."),
ECF No. 266; Declaration of Donald Casturo ("Casturo Decl.") ¶ 5 ("Commodities professionals
thus f[e]ll into two distinct groups:  (1) sales representatives and (2) traders.  These roles
require[d] different skill sets and competencies, and each addresse[d] the varied needs of our
diverse client base."), ECF No. 268; Declaration of Celeste Guth ("Guth Decl.") ¶ 7 ("[Financial
Institutions Group] bankers also differ[ed] from bankers in other Business Units within
[Investment Banking Division] Classic because FIG bankers tend[ed] to work with a greater
variety of financial products."), ECF No. 276; Levene Decl. ¶ 5 ("Though these [six Departments
within the Prime Brokerage Business Unit were] similar in that they [were] all 'client facing,'
each Department play[ed] a different role and provide[d] different services to our hedge fund
clients.  Individuals in these Departments perform[ed] dramatically different jobs and need[ed]
different skills."); Kirk Decl. ¶ 4 ("The departments my Sales Strats [were] divided into are:
(1) Mortgages;  (2) Foreign  Exchange  ('FX');  (3) Latin  America;  (4) Interest  Rates;
(5) Commodities; (6) Credit; (7) Sales Data Analytics; and (8) E-Products.  Although there may
[have] be[en] some mobility between these groups depending on market conditions, working in
these areas often require[d] specialized skill sets which ma[d]e movement infrequent.");
Declaration of Todd Lopez ("Lopez Decl.") ¶ 8 ("[Order management individuals were] different
than those in the other two roles because they [were] 'internally-facing' and d[id] not interact
with customers directly.  In addition to having a high degree of technical aptitude, those in order
management must also be able to handle stressful situations and make smart, quick decisions to
mitigate risk."), ECF No. 281; Declaration of Peter Craig Russell ("Russell Decl.") ¶ 4 ("With
the U.S. Institutional Business Unit, Vice Presidents and Associates generally work[ed] in four
different roles:  (1) sales; (2) internal strategists; (3) the client strategy team; and (4) the client
relationship management.  Each of these roles require[d] different skill sets to address numerous
client needs, and people in these groups are compensated very differently to reflect their distinct
responsibilities."), ECF No. 287; Declaration of James McNamara ("McNamara Decl.") ¶ 16
("Professionals in the [Product Strategy/Product Development] groups [were] very specialized,
often have advanced technical degrees, and may have [had] particular regulatory and product-
related focuses."), ECF No. 282.)

Sachs declarants," but declined to do so.   (*Id.*)[5]  Tellingly, Plaintiffs' only response to the

Goldman Sachs manager declarations is inadmissible testimony of a purported expert, Dr.

Yermack, whose "testimony was struck on *Daubert* grounds."  (Pls.' Resp. at 8 & n.12; *see*

Order at 39 (Dr. Yermack's opinions shall be "excluded from consideration in connection with

the motion for class certification").)[6]

　　　　　　In a final attempt to minimize the central importance of Business Units, Plaintiffs

claim that "business units [were] flexible entities that Goldman regularly adjusts."  (Pls.' Resp. at

11.)  This is untrue, as both parties' statistical experts agreed.  (*See* Hr'g Tr. at 312, dated Oct. 23,

2014 (Defendants' expert, Dr. Michael Ward, testified that "[t]he business units [were] not

unstable, only about 10 percent of the business units c[a]me and [went] from one year to the next

---

[5]     Specifically, Plaintiffs originally requested to take the depositions of eight of the declarants (Donald Casturo, Darren Cohen, John Levene, Todd Lopez, James McNamara, Craig Packer, Stephen Pierce and Peter Craig Russell), but then withdrew this request.  (*See* ECF No. 318 at 15–16; ECF No. 319.)

[6]     Plaintiffs' speculation about a supposed "high potential for coercion" of the declarants (Pls.' Resp. at 8 & n.13), many of whom were Managing Directors of Goldman Sachs—the highest position at the Firm—is meritless.  The cases they cite, all of which are out-of-circuit, are inapposite.  *See Belt* v. *Emcare, Inc.*, 299 F. Supp. 2d 664, 666, 668 (E.D. Tex. 2003) (defendants' unilateral communications with non-management employees—nurse practitioners and physicians assistants—were "misleading in several ways" and exploited the ongoing business "relationship by preying upon fears and concerns . . . that this action could affect the potential class members' employment"); *Mevorah* v. *Wells Fargo Home Mortg., Inc.*, 2005 WL 4813532, at *1, *4, *5 (N.D. Cal. Nov. 17, 2005) (finding that "defendant's statements to potential class members"—home-mortgage consultants—"were misleading," and declaration drafted by counsel "manipulated [the employee's] words" and "was not the complete truth" (internal quotation marks omitted)).  Plaintiffs' remaining cases discuss the "risk of coercion" to *class members*, not to managers.  *See Kleiner* v. *First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985) (defendant bank's unilateral communications with bank customers had "potential for coercion" as many "Bank borrowers . . . were dependent on the Bank for future financing"); *Bublitz* v. *E.I. DuPont de Nemours & Co.*, 196 F.R.D. 545, 546 (S.D. Iowa 2000) (discussing "risk of coercion" to "members of the putative class" regarding "a Retention Proposal," which would provide "incentives and benefits, in exchange for which the employees must waive their rights"); *Abdallah* v. *Coca-Cola Co.*, 186 F.R.D. 672, 678–79 (N.D. Ga. 1999) (holding that defendant was "prohibited from discussing th[e] lawsuit directly with potential class members").

and something on the order of 85, 87 percent of associates or vice presidents remain[ed] in the same business unit"), ECF No. 345; *id.* at 283 (Plaintiffs' expert "can't dispute" "Dr. Ward's study[] that 97 percent of the people in this class worked in no more than two business units").) Plaintiffs confuse Business Units with departments, citing examples where Goldman Sachs moved departments *within* Business Units rather than Units themselves.[7]  And Plaintiffs point to Business Units moving across Divisions, but this did not change the job responsibilities within or the independent nature of the Unit.  (*See*, *e.g.*, Benz Decl. ¶ 13 ("Because of its unique role— working with . . . Goldman Sachs clients and handling both client relationship and deal execution—PSI d[id] not fit neatly into any group at Goldman Sachs.").)  To the extent that some Business Units were occasionally displaced or merged with other Business Units, at best this shows that financial services is a dynamic industry, which seeks synergies through realignment of some businesses and the job functions within those Units.  It does not change the overwhelming record evidence that Business Units were discrete, independent entities that specialized in different activities, and that professionals within each Business Unit undertook a wide variety of duties that required vastly differently skillsets, wherever they happened to be aligned from time to time.  And, in any given year, the money available to compensate the

---

[7]     For example, Plaintiffs falsely claim that Goldman Sachs created a "new Business Unit" for John Levene.  (Pls.' Resp. at 11.)  In fact, the document cited by Plaintiffs shows that the Firm opened a new *department* for Mr. Levene, not a Business Unit.  (Pls.' Resp. at 15 (citing GS0374235)).  Plaintiffs also falsely claim that an email exchange in which Todd Lopez referenced the need to obtain a new *department* code evidences "frequent changes and adjustments to business units." (*Id.* at 15 (citing GS0374277).)  And the Declaration of Alice Merrill Chester shows that she transferred between *departments* within the same Business Unit. (Declaration of Alice Merrill Chester ¶ 2 ("Currently, I work in the Capital Introductions department (which we refer to as 'Cap Intro') in Prime Brokerage within the Equities subdivision of Securities. . . .  I first started in a sales role in Prime Brokerage and then transferred to Cap Intro in approximately March 2012."), ECF No. 269.)

professionals in a Business Unit was based on the budget allocated to that particular Business Unit.  (R&R at 10, 42.)

> **2.      Just as in *Wal-Mart*, Plaintiffs Cite High Level Guidelines that Merely Confirm That the Challenged Discretionary Decisions Were Made at the Business-Unit Level.**

In their Response, Plaintiffs repeatedly refer to firmwide and divisional "guidelines," but studiously ignore what those guidelines actually say.  This is no accident. Those guidelines provided only high level guidance and confirmed the individualized, discretionary nature of Goldman Sachs's compensation, promotion and evaluation processes, and the importance of Business Units to those processes.  Thus, just as the district court found in *Wal-Mart II*, these guidelines served the purpose of articulating the need for the exercise of managerial discretion and further support the lack of commonality.  964 F. Supp. 2d at 1125–27.

For example, Plaintiffs cite a document titled "Guidelines for Compensation Proposals" (Pls.' Resp. at 6 n.5), but ignore that it actually described the process for the exercise of discretion as to individuals, at the Business Unit level:

- The compensation proposal for *each individual* should reflect:

o The *performance* of the firm, the division and the *business unit* for the fiscal year

o The *market pay level* for the employee's role

o *Manager Performance Rating* and the factors that were considered in formulating that rating

o Other circumstances that should bear on the *individual's compensation* proposal for this year, include:

- *P&L impact* in the current year

- *Indispensability* of/risk of losing the individual

- Recent significant increase in *responsibility*

- Specialized contribution (e.g., *to diversity*, training recruiting) in current year"

(Declaration of Anne Shaver, Ex. A at GS0109367, ECF No. 248–2 (emphasis added).)[8]

Plaintiffs also cite guidelines for each of the three Divisions that memorialized prior practice in response to federal requirements.   (*See* Kung Dep. I at 218–219.)   Each



(Declaration of Anne Shaver dated July 14, 2017, Ex. D at 16–17 (considering "discretionary factors" for Securities Division); *see id.*, Ex. B at 19 (considering "discretionary factors" for Investment Management Division); *id.*, Ex. C at 15–16 (considering "discretionary factors" for Investment Banking Division).)

This Court should reject Plaintiffs' mischaracterization of these documents as "uniform firmwide guidelines[] with a uniform set of criteria."  (Pls.' Resp. at 6.)  Just as in *Wal-Mart*, these guidelines provided a list of ▊▊▊▊▊▊▊▊▊▊  for individual managers to consider in making their decisions, and thus "cannot provide a common question tying the class together," because the factors listed in these guidelines "imposed no real constraints" on manager discretion.  964 F. Supp. 2d at 1125–27.

---

[8]   The remaining guidelines cited by Plaintiffs (Pls.' Resp. at 6 n.5) similarly describe individualized and Business-Unit-specific compensation and evaluation processes.  (*See* Heller Dep. I 128–29 (explaining that managers considered Firm performance, business unit performance and individual performance when making compensation decisions).)

Moreover, Plaintiffs ignore the individual Divisional guidelines confirming that compensation decisions were made at the Business-Unit level, subject only to general oversight. The guidelines for each of the three Divisions constituting the putative class explicitly emphasized that "business unit compensation allocations [were] based on each business unit's risk-adjusted financial performance."  (GS0113426–28 ("Investment Banking Division Compensation Guidelines"); GS0113896 ("Securities Division Compensation Guidelines"); GS0113911 ("Investment Management Division Compensation Guidelines").)  It is thus simply untrue that "these documents do not point to any business-unit specific metrics or considerations." (Pls.' Resp. at 7.)  High level guidelines such as those used by Goldman Sachs and Wal-Mart, which provide a general framework for managers making individualized assessments at the Business-Unit or store levels, bear no resemblance to rigid policies constraining or displacing manager discretion.  *See Bolden* v. *Walsh Constr. Co.*, 688 F.3d 893 at 898 (explaining "local discretion cannot support a company-wide class").

### 3.   Plaintiffs Concede That Compensation Decisions Were Made Within Each Business Unit.

Plaintiffs admit—as they must—that compensation during the proposed Class Period was allocated "among the division's business units, based on their relative performance and contribution during the previous year."  (R&R at 6; *see* Pls.' Resp. at 6.)[9]  They further concede that individual "[m]anagers ma[d]e recommendations for specific employees" within their Business Unit's budget, which were "then reviewed by business unit leaders."  (Pls.' Resp.

---

[9]   The only firmwide component of compensation that Plaintiffs can identify is base salary (Pls.' Resp. at 7), but Plaintiffs challenge only Goldman Sachs's "bonus-setting" process (*id.* at 1), which could result in compensation that was multiples of base salary.

at 6; *see* R&R at 10 (citing Kung Dep. I at 57–60; Larson Dep. at 60–61).)[10]  As a result, professionals within each Business Unit essentially competed with each other for the finite dollars available in that Unit's bonus pool, but they did not compete for dollars with professionals in any other Business Unit.  (*See* Heller Dep. I at 85–86, 111; Larson Dep. at 204.) Thus, professionals in a Business Unit that had a very successful year generally received larger bonuses than professionals in a less successful Business Unit, even if other factors affecting their pay were the same.  (*See* Kung Dep. I at 71–72.)

There is no support for Plaintiffs' claim that "final decisions about individual compensation are made by the Division's compensation committees." (Pls.' Resp. at 7.) Remarkably, in the sentence immediately preceding that incorrect statement, Plaintiffs concede that the purpose of compensation committee review was "*not to review individual employee compensation*, but to 'review the aggregated recommendations to ensure that they are in compliance with the guidelines.'"  (*Id.* (emphasis added) (quoting Larson Dep. at 63; citing Kung Dep. I at 95–96).)

The Firm indisputably imposed no formula for determining compensation based on manager quartile results (*see* Deposition of Gargi Banerjee at 295; Declaration of Darren Cohen ("D. Cohen Decl.") ¶ 15 n.2, ECF No. 270; Lopez Decl. ¶ 10 n.2; Levene Decl. ¶ 18), and individual managers varied widely as to how they weighed 360 reviews and quartile results

---

[10]      (*See* Packer Decl. ¶ 15 ("Every year, as the Business Unit Leader, I receive[d] a separate budget from IBD leadership to allocate among the professionals in my Business Unit."); Lopez Decl. ¶ 11 ("When making my compensation decisions, I ha[d] to stay within the budget I [was] given for my Business Unit.  I d[id] not compare those in GSET with individuals outside of the Business Unit when making compensation decisions."); Casturo Decl. ¶¶ 12–13 ("[E]ach desk head (all of whom are Managing Directors) recommend[ed] to us during a meeting with the head of the Business Unit the year-end bonuses they want[ed] to pay each of the individuals on their desks"); McNamara Decl. ¶ 5; see also Kirk Decl. ¶ 10; Russell Decl. ¶ 13; D. Cohen Decl. ¶ 12; Benz Decl. ¶ 17–18; Declaration of Stephen Pierce ¶ 17, ECF No. 285; Guth Decl. ¶ 16.)

(R&R at 41).  Some managers viewed 360 reviews as primarily a developmental tool and did not give them significant weight for compensation purposes; other managers saw such results as useful for inwardly facing professionals.[11]  Similarly, some managers did not refer directly to quartiling results in recommending compensation, while other managers viewed quartile assignments as an integral part of their compensation recommendations.  (*See* Larson Dep. at 68, 71–73, Ex. 11A; Guth Decl. ¶ 17.)[12]  Thus, Plaintiffs are wrong in claiming without citation that "[t]he 360 review process [was] . . . used the same way for all employees:  not for development, but as a factor in quartiling and compensation."  (Pls.' Resp. at 5.)  As in *Wal-Mart*, Plaintiffs

---

[11]     (*See*, *e.g.*, McNamara Decl. ¶ 18 n.4 ("I also consider[ed] 360 reviews when making manager quartiling decisions, but I place[d] much more emphasis on the comments than the scores, and I use[d] the 360 primarily as a developmental tool rather than an evaluative one.  The weight I put on the [360] feedback also varie[d] by individual based on their business and role.  For example, commerciality [was] more important for my wholesalers and technical knowledge is critical for my product developers."); Russell Decl. ¶ 15 n.2. ([T]he weight that I g[a]ve the 360 results varie[d] based not only on the people who review the individual, but also on the nature of the work the individual d[id].  As just one example, I generally place[d] more emphasis on production numbers for those in the sales role than I d[id] on 360 feedback from internal Goldman Sachs professionals.  However, for my internal strategists, who d[id] not have production and [were] not client-facing, I generally g[a]ve more weight to how those with whom they work internally have reviewed them.").)

[12]     (*See also* McNamara Decl. ¶ 15 ("In making compensation determinations . . . [o]n the platform side we consider[ed] whether representatives [were] establishing client relationships and how clients respond[ed] to their pitches.  We also evaluate[d] the number of pitches they ha[d] delivered, and the placements that ha[d] resulted through those efforts.  By contrast, on the relationship side we consider[ed] the quality of client connections maintained, and how often representatives update[d] management about developments at a client's home office."); *id.* ¶ 18 n.5 ("While the manager quartiling exercise help[ed] us distinguish performance in [the Business Unit], it [was] just one input into compensation determinations."); Russell Decl. ¶ 14 ("[M]anager quartile [was] just one input into compensation determinations.  I d[id] not assign a uniform weight to the manager quartile when making compensation determinations."); Casturo Decl. ¶¶ 14–15 ("In evaluating compensation for sales representatives, we consider[ed] the economic value of the business that they ha[d] brought to the franchise. . . . By contrast, trader compensation [wa]s more directly tied to their profit and loss ("P&L") numbers, which [were] shared with them on a regular basis."); Heller Dep. I at 158–59; 170; Larson Dep. at 142–43; Kung Dep. I at 227–22.)

"have not identified a common mode of exercising discretion that pervades the entire company."

564 U.S. at 356.

### 4. Plaintiffs Mischaracterize Goldman Sachs's Promotion Process To Try To Manufacture Uniformity Where None Exists.

There is no basis for Plaintiffs' unsubstantiated characterization of promotion decisions as "uniform" and "centralized." (Pls.' Resp. at 7–8.)  As with their description of the compensation process, Plaintiffs actually admit that promotion decisions were derived from the Business-Unit level.

Plaintiffs agree with Judge Francis' finding that "[a]t the initial step, each *business unit head*, in consultation with other managers, developed a list of candidates for promotion."  (R&R at 11 (emphasis added) (citing Larson Dep. at 227; Kung Dep. II at 414–15, 432–33; Heller Dep. I at 203–04); *see* Pls.' Resp. at 7 ("[B]usiness unit leaders g[a]ve input as to who should be on the list of candidates for promotion from Vice President to Managing Director.").)  Plaintiffs also acknowledge that after the Business-Unit recommendations were made, there was a "cross-ruffing" process that involved receipt of comments by many different individuals about different candidates.  (Pls.' Resp. at 7; R&R at 12–13 (citing multiple depositions submitted by Goldman Sachs); *see also* Larson Dep. at 240; Heller Dep. I at 213–14; Kung Dep. II at 398–99.)  Although trying to make much of the fact that "materials" and "training" were provided to cross-ruffers (Pls.' Resp. at 7–8), Plaintiffs cannot dispute—and in fact in their Objections concede—that individualized factors drove this process, as cross-ruffing teams considered a "variety" of criteria, "such as whether the Vice President [wa]s a 'role model' or an 'effective coach.'"  (Pls.' Objections at 13 (quoting ECF No. 248–2 (GS0109329) at 340), ECF No. 511.)

23

5.      **Plaintiffs Distort the 360 Review and Manager Quartiling Processes.**

Putting aside Plaintiffs' rhetoric and distortions of the record (*see* Pls.' Resp. at 4), 360 reviews represented collections of co-workers' subjective assessments of a professional's performance across a number of broad criteria—such as "Technical Skills," "Team Work," "Diversity" and "Leadership"—that may have applied with varying degrees to each of the hundreds of jobs covered by their proposed class.  (Kung Dep. II at 307; *see* R&R at 7.)  And Plaintiffs' acknowledgement that "the set of reviewers [wa]s not constrained by business unit" (Pls.' Resp. at 5) underscores the decentralized nature of the 360 reviews.[13]

Plaintiffs similarly mischaracterize quartiling as "forced ranking" "subject to . . . a uniform set of criteria."  (*Id.*)  To the contrary, during the Class Period, the quartiling process granted managers the discretion *not* to "force" professionals into a category in which their managers did not believe they belonged.  (Deposition of David Landman ("Landman Dep.") II at 52, 131; Heller Dep. II at 323.)  As Judge Francis found, based on the undisputed record, managers considered various factors—"360 review data, the quality of the employee's performance, long-term commercial impact or contribution, technical and functional expertise, potential to assume greater responsibility, leadership and management skills, and diversity and citizenship-related activities"—and "[t]here [wa]s no formula dictating how these factors [were] to be weighted relative to one another."  (R&R at 9 (citing Landman Dep. at 37–38).)  Indeed, "an employee's quartile ranking [could] deviate from the ranking that might be expected based on the 360 review alone."  (*Id.* (citing Landman Dep. at 26–28; Kung Dep. II at 320–23; Larson Dep. at 187).)  And Plaintiffs' own expert concluded "that there is no evidence that senior-

---

[13]      Plaintiffs' assertion that Judge Francis stated that "Goldman's use of the 360 review and manager quartiling . . . is a form of a biased testing procedure" (Pls.' Resp. at 18 (citing R&R at 28)) misrepresents the R&R.  Judge Francis made no such findings about the 360 review; he merely reviewed the standardized-test cases cited by Plaintiffs.

management reviews focused on decisions at the level of each individual's quartile assignment."

(Cascio Report at 50, ECF No. 250.)

**B. The Record Cannot Support a Finding of Commonality as to Plaintiffs' Disparate Impact Claims.**

**1. The Legally Unprecedented Nature of Plaintiffs' Class Claims.**

Plaintiffs simply cannot escape that the record facts here are directly analogous to those in the multitude of cases denying class certification when employees "had to meet a basic set of criteria, but managers retained significant discretion over the challenged employment decisions." *Davis* v. *Cintas Corp.*, 717 F.3d 476, 486 (6th Cir. 2013). In *Ruiz* v. *Citibank, N.A.*, 93 F. Supp. 3d 279 (S.D.N.Y. 2015), *aff'd*, 2017 WL 1379369 (2d Cir. Apr. 14, 2017), for example, Judge Failla held that a class could not be certified challenging a "policy of delegating significant discretion to managers over pay and promotions," where "the only evidence of uniform corporate policy is Citibank's entirely legal employment practices" set forth in "training materials" and "handbooks." *Id.* at 290 (citing *Wal-Mart*, 564 U.S. at 355). Similarly, in *Davis* v. *Cintas*, the Sixth Circuit affirmed a finding that commonality could not be established where the challenged process was "conducted by thousands of Cintas managers at hundreds of Cintas facilities" under a "Meticulous Hiring System" with "subjective elements." 717 F.3d at 481, 486, 495 (internal quotation marks omitted). And in *Tabor* v. *Hilti, Inc.*, 703 F.3d 1206 (10th Cir. 2013), the Tenth Circuit found no commonality where "highly individualized facts and circumstances raised in each employment decision" under a "performance management and reporting process." *Id.* at 1212, 1229. Finally, in *Bennett* v. *Nucor*, 656 F.3d 802 (8th Cir. 2011), the Eighth Circuit affirmed the lack of commonality where "Nucor applied several objective criteria, including experience, training, disciplinary history, and test scores," but "[t]hese practices differed throughout the plant, with some departments emphasizing test scores, others

placing great weight on specialized training, and still others using unique scoring systems to evaluate candidates for promotion."  *Id.* at 815 (citing *Gen. Tel. Co. of the S.W.* v. *Falcon*, 457 U.S. 147, 159 n.15 (1982)).[14]  Accordingly, case law in this Circuit and around the country confirms that it would be unprecedented to find that Plaintiffs have met their burden of proving a common question here.  (*See* Defs.' Objections at 22–43; Defs.' Resp. at 40–42.)

### 2.   The Court Should Reject Plaintiffs' Aggregated Statistics.

Plaintiffs concede that, in *Wal-Mart*, "the Supreme Court rejected plaintiffs' proffered statistical analysis, which studied outcomes at the regional and national level, because it found that pay and promotion decisions were made at the store level."  (Pls.' Resp. at 20 (citing *Wal-Mart*, 564 U.S. at 356–57).)   Here, Plaintiffs' expert, Professor Henry Farber, similarly failed to analyze compensation separately for each of the Divisions, even though Plaintiffs themselves acknowledge in one of the *headings* in their brief that "[t]he Data Should Be Analyzed At The Division Level."  (Pls.' Resp. at 20.)  Instead, Dr. Farber's studies lumped employees in all the Divisions together in a single model, and then did not account or control for Business Unit as a key variable affecting employment decisions.  (*See* Deposition of Henry

---

[14]   (*See also* Defendants' Objections App'x B (collecting cases).)   Plaintiffs attack a strawman in claiming that "only a 'uniform application of a standardized test' would qualify for class treatment."  (Pls.' Resp. at 18 (quoting Defs.' Objections at 3).)   Defendants said no such thing.  Rather, Defendants pointed out that Plaintiffs rely on standardized-test cases, which are inherently uniform and entirely unlike Goldman Sachs's decentralized, discretionary compensation and promotion processes.  (Defs.' Objections at 27–28.)   *See Ellis*, 285 F.R.D. at 509 (finding commonality for claims concerning "two closely-related, management-level positions . . . that share a uniform job description across the class" where plaintiffs also "identif[ied] specific employment practices . . . implement[ed] companywide under the influence and control of top management"); *Parra* v. *Bashas', Inc.*, 291 F.R.D. 360, 375 (D. Ariz. 2013) (finding commonality for claims concerning "written, non-discretionary, centralized wage scale"); *Brown* v. *Nucor Corp.*, 785 F.3d 895, 910 (4th Cir. 2015) (finding commonality for claims "concern[ing] approximately 100 class members in a single steel plant," who all "shared common spaces, were in regular physical contact with other departments, could apply for promotions in other departments, and were subject to hostile plant-wide policies and practices").

Farber at 103 (testifying he "didn't control for department, desk or business unit"); *see also* Pls.'
Resp. 21–22).)

Because managers within each Business Unit within the Divisions were the key
decisionmakers in the evaluation, compensation and promotion processes, Dr. Farber needed to
analyze each Division separately and control for Business Unit in his models.  He refused to do
so.  His models did not account for the undisputed fact that compensation was allocated "among
the division's business units, based on their relative performance and contribution during the
previous year" (R&R at 10), and that individual "[m]anagers ma[d]e recommendations for
specific employees" within their Business Unit's budget, which "[were] then reviewed by
business unit leaders" (Pls.' Resp. at 6).

As such, Plaintiffs' aggregated statistical analysis is no more meaningful to a
finding of commonality than the analysis of the plaintiffs' expert in *Wal-Mart*, which the
Supreme Court rejected.  564 U.S. at 356–57.  Judge Francis thus erred in relying on Professor
Farber's aggregated statistics (R&R at 29–30), which, contrary to his own factual findings, did
not consider or account for Business Unit in any way.

Moreover, Plaintiffs do not dispute that Professor Farber's aggregated statistical
analysis failed the Chow test, a commonly recognized mechanism for testing whether data from
disparate datasets (like the evaluation and compensation data for each of the Divisions here) are
sufficiently homogeneous to permit them to be studied in a single regression dataset.[15]  Plaintiffs'
assertion that that no precedent *requires* using the Chow test (Pls.' Resp. at 24–25) ignores that

---

[15]    *See Coates* v. *Johnson & Johnson*, 756 F.2d 524, 542 (7th Cir. 1985) (Chow test used to
determine "whether two or more sets of data may be grouped as a single sample in a statistical
model"; affirming district court's ruling that statistical pooling was inappropriate where Chow
test so indicated); *Gutierrez* v. *Johnson & Johnson*, 2006 WL 3246605, at *8 (D.N.J. Nov. 6,
2006) ("Chow test [is a] standard, peer-reviewed test[] with acknowledged reliability.").

courts in this District rely on the Chow test as helpful in analyzing the reliability of aggregated data, *see*, *e.g.*, *Reed Constr. Data, Inc.* v. *McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 405–06 (S.D.N.Y. 2014) (Oetken, J.) (excluding statistical analysis of aggregated data that failed the Chow test), *aff'd*, 638 F. App'x 43 (2d Cir. 2016).  Here, the failure of Professor Farber's model under the Chow test underlines its unreliability.

Although Plaintiffs concede the validity of the Chow test as "a method of measuring how statistical relationships hold across multiple populations" (Pls.' Resp. at 23), they argue that there may be circumstances where an analysis that fails the Chow test can still be valid if there is a consistent negative impact on gender across the populations in the analysis (*id.* at 24).  But that is demonstrably not the case here.  As Professor Farber himself found when he analyzed Dr. Ward's model, in eight out of the ten groups (including all of the Associate groups he studied and three of the five Vice President groups he studied), the supposedly common negative gender impact was zero—*i.e.*, there were no statistically adverse results.  (*See* Hr'g Tr. at 334, Oct. 23, 2014.)  This is the very opposite of "significant evidence of discrimination" or a pattern of consistent negative impact on gender.  (Pls.' Resp. at 24.)

In sum, Plaintiffs cannot dispute that the Chow test provides statistical confirmation of what the undisputed record shows:  employees in different Goldman Sachs's Divisions and laterals and non-laterals were too dissimilar to be lumped together in the same statistical model, and Judge Francis erred in not rejecting Dr. Farber's analysis.

### 3. The Same Factual Findings That Led Judge Francis To Recommend Against Class Certification Defeat Commonality Here.

Plaintiffs offer no response to Judge Francis' conclusion that "countless individualized factors" "inform[ed] Goldman Sachs'[s] compensation and promotion decisions— the class member's particular skills, the nature of the work in her business unit, the unit's

28

profitability relative to other units, and, indeed, the extent to which the employee's manager considered 360 review and quartiling evaluations" (R&R at 40–41, 43)—which demonstrates why this Court should not adopt his recommendation that Plaintiffs have proved commonality. The record here simply cannot "produce a common answer to the crucial question *why was I disfavored*." *Wal-Mart*, 564 U.S. at 352 (emphasis in original).

"Like in [*Wal-Mart*], the evidence here demonstrates that . . . managers exercised discretion over pay and promotion decisions," which necessarily defeats commonality. *Moore* v. *Publicis Grp. SA*, 2014 WL 11199094, at *7 (S.D.N.Y. May 15, 2014) (Carter, J.) (denying certification of gender discrimination class). Based on an extensive record, Judge Francis found that Goldman Sachs did not have uniform criteria for making compensation and promotion decisions across its 140 diverse Business Units, stressing that "the functional definition of any particular category varied, depending on the types of skills most relevant to any particular business unit." (R&R at 7 (citing Heller Dep. I at 271–72; Larson Dep. at 169–70).) Judge Francis further emphasized "[t]he diversity of the business units' activities." (R&R at 6.) Across the "myriad" Business Units (*id.* at 5), Judge Francis found that individual managers did not rely on 360 reviews and manager-quartile ratings in a consistent manner in making compensation and promotion decisions (*id.* at 9–11). And the extent to which any employee's manager even considered 360 reviews and quartiling evaluations in making compensation and promotion decisions varied wildly (*id.* at 41), with "no formula dictating how these factors [were] to be weighted" (*id.* at 9). Judge Francis' factual findings thus compel the conclusion that there are no common questions here.

**C.      To Try To Certify Their Disparate Treatment Claim, Plaintiffs Read the Intent Requirement out of Title VII.**

Plaintiffs incorrectly contend that their "disparate treatment claim does not require proof that Goldman [Sachs] *selected* the challenged employment practices *because* they discriminate against women." (Pls.' Resp. at 25 (emphasis added).) To the contrary, disparate treatment claims clearly *do require* an intention to discriminate. As the Supreme Court has unequivocally held: "[i]n disparate treatment cases . . . the plaintiff is required to prove that the defendant had a discriminatory intent or motive." *Watson*, 487 U.S. at 986 (citing *Teamsters* v. *United States*, 431 U.S. 335 n.15 (1977)); (*see* R&R at 16 ("[A] disparate treatment claim is based on the allegation that the defendant engaged in intentional discrimination.").)

Plaintiffs attempt to circumvent the Supreme Court's clear holding by distinguishing pattern-or-practice discriminatory treatment claims from individual discriminatory treatment claims, with the misleading assertion that pattern-or-practice claims do not require a showing of intent. But the primary case Plaintiffs cite for this proposition, *United States* v. *City of New York*, 717 F.3d 72 (2d Cir. 2013), states no such thing. Instead, the Second Circuit makes clear that even "[i]n a pattern-or-practice case . . . the plaintiff must make a prima facie showing of a pervasive policy of *intentional* discrimination." *Id.* at 83–84 (emphasis added). This prima facie showing is a "high bar" that requires the putative class to present "evidence supporting a rebuttable presumption that an employer acted with the *deliberate purpose and intent of discrimination* against an entire class." *Id.* at 87 (emphasis added). Plaintiffs' assertion that they need not prove that Goldman Sachs "had specific intent to discriminate" flies in the face of the Second Circuit's holding and Supreme Court precedent. (Pls.' Resp. at 26.)

Plaintiffs' claim that they can meet their burden of making a prima facie showing of disparate treatment based on evidence of mere adverse impact is also wrong as a matter of law

and fact.  In *City of New York*, the Second Circuit, citing to *Personnel Adm'r* v. *Feeney*, 442 U.S. 256 (1979), held that the "'discriminatory purpose' [plaintiffs must prove] implies not just that the decisionmaker possessed 'intent as awareness of consequences' but that he 'selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'"  *Id.* at 93–94 (citing *Feeney*, 442 U.S. at 279). Plaintiffs cannot escape *Feeney*'s plain holding that disparate treatment claims require a showing of more than adverse effects by claiming that *Feeney* is an Equal Protection case.  As the Second Circuit makes clear, *Feeney* applies equally to Title VII pattern-or-practice disparate treatment claims and mandates that Plaintiffs prove that Goldman Sachs "selected the challenged employment policies *because* they discriminated against women."  (Pls.' Resp. at 25 (emphasis added).)  Judge Francis thus erred by not rejecting Plaintiffs' theory that mere "aware[ness] of the discriminatory impact of the 360 review and quartiling processes" constitutes "intentional disparate treatment."  (R&R at 32.)

Far from showing that Goldman Sachs had a "pervasive policy of intentional discrimination," (*City of New York*, 717 F.3d at 83–84), the only evidence of a corporate policy here is Goldman Sachs's widely disseminated policy that *strictly forbade* any discrimination against employees on the basis of gender or other protected characteristics.  Even Plaintiffs' own expert conceded that nothing in the design of the Firm's policies supports the claim that Goldman Sachs used the challenged processes to discriminate intentionally against its female professionals.  (Deposition of Wayne Cascio at 194–195 ("Q.  In your examination of the record in this case, did you find any evidence that suggests that the policies and practices that we've been discussing here today were implemented or designed by Goldman Sachs with an intent to discriminate against women? . . .  A . . . They were not.").)

31

Plaintiffs incorrectly assert that they have met their burden by presenting evidence such as findings of statistical disparities, internal complaints, articles about Goldman Sachs's culture in the press and class member and witness declarations.  None is sufficient.

*First*, Plaintiffs rely on Professor Faber's flawed expert report that lumps together all 2,300 members of the putative class, irrespective of their Business Units or job duties.  His failure to account for factors actually relevant to compensation and review decisions across the putative class renders his conclusions irrelevant factually and unreliable statistically.  (*See supra* Section II.B.2.)

*Second*, Plaintiffs emphasize just 12 complaints during the 10-year Class Period as support for their claims.  Plaintiffs do not dispute that, of those 12 instances, five resulted in the termination of the employment of the person about whom the complaint was lodged, five resulted in disciplinary warnings and in all of the situations the employees who raised the concerns were interviewed and offered support and other resources.  (*See* Declaration of Aime Hendricks ("Hendricks Decl.") ¶ 15, ECF No. 277.)

*Third*, Plaintiffs have submitted only five declarants other than themselves out of thousands of female professionals.  Even taken at face value, the paucity of complaints and declarations do not show a classwide policy of discrimination.  *See EEOC* v. *Bloomberg, L.P.*, 778 F. Supp. 2d 458, 479 (S.D.N.Y. 2011) (Preska, C.J.) ("[T]he number of admissible comments and supported assertions offered by the EEOC numbers around ten at most from roughly four or five individuals.  In a company of 10,000, with 603 women who took maternity leave, and during a class period of nearly six years, this type of evidence does not make out a pattern or practice claim.") (internal citation omitted); *Wal-Mart*, 564 U.S. at 358 & n.9.  ("120 affidavits reporting experiences of discrimination—about 1 for every 12,500 class members—

relating to only some 235 out of Wal-Mart's 3,400 stores" was "too weak to raise any inference that all the individual, discretionary personnel decisions are discriminatory").

*Finally*, as courts have made clear, newspaper articles cannot serve as evidence of discriminatory intent and cannot help Plaintiffs establish a prima facie showing of disparate treatment. *See Green* v. *Borg-Warner Protective Servs. Corp.*, 1998 WL 17719, at *11 & n.3 (S.D.N.Y. Jan. 16, 1998) (Patterson, J.) (denying motion for class certification and explaining that "Plaintiffs' counsel should be aware that news articles are of no evidentiary value to courts and that only on television shows or in newspapers are news articles cited as evidence").

By contrast to Plaintiffs' paltry evidence of alleged discriminatory treatment, the record is replete with evidence demonstrating Goldman Sachs's efforts to hire, retain and promote women professionals. (*See*, *e.g.*, Hendricks Decl. ¶¶ 21–26.) Plaintiffs' attempt to write off those efforts as "immaterial" (Pls.' Resp. at 27) is empty rhetoric. As the Second Circuit has held, "an employer's affirmative action efforts [] are both relevant and probative of the absence of intent to discriminate." *City of New York*, 717 F.3d at 86.

The Supreme Court emphasized in *Wal-Mart* that "Wal-Mart's announced policy forbids sex discrimination, and as the District Court recognized the company imposes penalties for denials of equal employment opportunity." 564 U.S. at 353 (internal citation omitted). The same is true of Goldman Sachs. As Judge Francis found, "Goldman Sachs has presented evidence that it t[ook] steps to counteract instances of gender bias." (R&R at 33; *see* Defs.' Objections at 41–43 & nn.26–31.) But, unlike Judge Francis, this Court should properly consider this evidence "to decide whether there is in fact a pattern of pervasive discrimination at Goldman Sachs." (R&R at 33.)

**D.     Beyond Commonality, the Court Should Accept Judge Francis'
Recommendation that the "Countless Individual Factors" that Affected
Compensation and Promotion Decisions Defeat Predominance Here.**

As Goldman Sachs explained in its Response to Plaintiffs' Objections (ECF No.

513), Plaintiffs misstate the law when they assert that "[i]ndividual trials are not required to

establish liability."  (Pls.' Resp. at 31.)  To the contrary, as Judge Francis recognized, even if

Plaintiffs can demonstrate that 360 reviews or manager quartiling have a disparate impact on the

putative class, "Goldman Sachs would retain the right to demonstrate that there were other,

legitimate explanations for any shortfall in compensation or failure to be promoted" with

"evidence of the individualized factors that inform Goldman Sachs'[s] compensation and

promotion decisions," which "would effectively swamp the common question of whether the

evaluative policies have, on average[,] a discriminatory impact."  (R&R at 40–41 (citing *Chin* v.

*Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012)).)

In a paragraph entirely devoid of citations (Pls.' Resp. at 32), Plaintiffs invent an

impermissible "Trial by Formula" procedure, *Wal-Mart*, 564 U.S. at 367, to deprive Defendants

of their statutory defenses under Title VII.  Plaintiffs ignore settled law that Defendants would

have the right to dispute *liability* as to each class member in all of the different businesses run by

the Firm with all of their disparate factual situations.  *See*, *e.g.*, *Ruiz*, 93 F. Supp. 3d at 295

("Defendants have raised a significant number of necessarily individualized inquiries into

liability that confirms the impracticability of proceeding as a class.").[16]  At the liability phase,

---

[16]     *See also Serrano* v. *Cintas Corp.*, 2009 WL 910702, at *10–11 (E.D. Mich. Mar. 31, 2009)
("Assuming that particular class members can put forward prima facie cases of discrimination, Cintas
has the opportunity to rebut the cases with unique defenses by demonstrating that there were
legitimate, nondiscriminatory reasons for the non-hirings, which would necessitate individualized
examinations into the circumstances of each class member's job application.  Accordingly, individual
liability issues would predominate over any common issues."), *aff'd sub nom.*, *Davis* v. *Cintas Corp.*,
717 F.3d 476 (6th Cir. 2013); *Adams* v. *Henderson*, 197 F.R.D. 162, 171–72 (D. Md. 2000)
("Certification is not proper under [Rule 23(b)(3)] because of the individualized liability

Goldman Sachs would have the right to introduce evidence regarding each class member's individual job responsibilities, performance (a key factor in making compensation and promotion decisions) and anything else relevant to determining whether that class member was the victim of discrimination—precisely the same evidence that would be introduced in an individual case. *See Wal-Mart*, 564 U.S. at 366–67; (R&R at 40–41).

Unable to dispute these settled principles of Title VII law, Plaintiffs instead conflate liability with damages in their predominance analysis. (Pls.' Resp. at 32–33.) The cases cited by Plaintiffs merely state that "individualized damages determinations *alone* cannot preclude" a finding of predominance. *Roach* v. *T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015) (emphasis added). But the individualized determinations here are not limited solely to damages. Rather, in order to determine liability, this Court must hear evidence regarding legitimate, nondiscriminatory reasons for compensation and promotion decisions for *each class member*, including "the class member's particular skills, the nature of the work in her business unit, the unit's profitability relative to other units, and, indeed, the extent to which the employee's manager considered 360 review and quartiling evaluations." (R&R at 40–41.) "Therefore, it is not the individual calculation of damages that destroys predominance, but the individual determinations of why a class member was not [promoted]" or received a particular compensation amount that defeats predominance. *Little* v. *Wash. Metro. Area Transit Auth.*, 2017 WL 1403122, at *22 (D.D.C. Apr. 18, 2017).[17]

---

inquiries involved with determining whether each class member was denied advancement and promotional opportunities for discriminatory reasons.").

[17]    *Robinson* v. *Metro-North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001), is not to the contrary. In *Robinson*, the court certified a disparate impact claim under Rule 23(b)(2) and reversed the district court's refusal to certify the "liability" phase of the plaintiffs' pattern or practice claim. *Id.* at 172. Both rulings rested on two legal principles that have since been repudiated. First, the court applied a much more forgiving Rule 23(b)(2) standard that was later

The cases cited by Plaintiffs (Pls.' Resp. at 32–35) demonstrate their inability to satisfy predominance here.  Nearly every one concerns standardized-testing procedures, which, unlike Goldman Sachs's discretionary, decentralized compensation and promotion processes, do not raise any individualized causation issues regarding liability:  failing the test automatically harms the class members.  In the only non-standardized-test case Plaintiffs cite, *Brown* v. *Electrolux Home Prods., Inc.*, 817 F.3d 1225 (11th Cir. 2016), the Eleventh Circuit *reversed* the district court's certification because "causation requires individual proof," which necessarily defeats predominance.  *Id.* at 1235.

## III.  PLAINTIFFS IGNORE THE IDIOSYNCRATIC NATURE OF LEAD PLAINTIFFS' CLAIMS, WHICH ARE NEITHER ADEQUATE NOR TYPICAL.

### A.  Plaintiff Orlich

Plaintiffs incorrectly claim, without citation, that Plaintiff Orlich "was subjected to the discriminatory 360 degree review and forced ranking process." (Pls.' Resp. at 28.)  Yet Plaintiffs do not dispute Defendants' showing that Plaintiff Orlich, as a junior associate who joined the Firm after earning an MBA, was compensated in "lockstep" with other MBA associates in her class.  (*Id.*)  Thus, Plaintiff Orlich's compensation could not have been subject to the challenged processes of the 360 review and manager quartiling.  Plaintiffs cite no evidence for the claim that Plaintiff Orlich's year-end bonus "var[ied] per the compensation round process

---

unanimously rejected by *Wal-Mart*.  Second, the court reached its commonality and predominance conclusions based largely on its view that a district court was prohibited from refereeing a dispute between "dueling experts," a holding that was explicitly repudiated in *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).  Finally, the Second Circuit has subsequently explained that issue certification is never "appropriate" as required by Rule 23 when "numerous issues . . . are not susceptible to generalized proof but would require a more individualized inquiry," such as liability to each individual class member.  *McLaughlin* v. *Am. Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008).  In such circumstances, "certification would not reduce the range of issues in dispute [or] promote judicial economy" as the Rule was intended to do.  *Id.* (internal quotation marks omitted.)

to which [Plaintiff] Orlich and other Associates were subjected," (*id.*) and there is none.  To the contrary, Plaintiff Orlich directly testified that the challenged processes had no impact on her compensation.  (Orlich Dep. at 48 (Q. "Was it your understanding that when you joined as a full associate, your salary and your bonus arrangements were the same as your peers who were also joining at the same time, from the same experience level?"  A. "Yes.").)  Plaintiffs also do not dispute that Plaintiff Orlich was not a candidate for promotion.  (Pls.' Resp. at 28 n.25.)  She therefore is plainly atypical of the class she seeks to represent.  (*See* Orlich Dep. at 10, 85.)

### B.  Plaintiff Chen-Oster

In view of their post-*Wal-Mart* change of theory, Plaintiffs try to minimize that Plaintiff Chen-Oster testified in her deposition that managers had "unchecked discretion," which is directly in conflict with the claims she seeks to litigate on behalf of the class.  (Defs.' Objections at 47 (citing Deposition of H. Cristina Chen-Oster at 436–37, 556–57).)  Plaintiffs also have no answer to the fact that her claim is centered on alleged retaliation for supposedly having complained about a co-worker's conduct, not the application of Firm's processes to her. (Defs.' Objections at 47.)[18]

### C.  Plaintiff Gamba

Plaintiffs do not dispute that Plaintiff Gamba cannot assert a viable promotion claim for the year 2010, because her department was being downsized and nobody from her department was nominated for promotion.[19]  Instead, Plaintiffs claim that "the fact that her

---

[18]      Plaintiffs also do not dispute Plaintiff Chen-Oster's testimony about her strange and incredible tale of surreptitiously tape recording conversations with other Goldman Sachs personnel, which bear directly on her credibility.  (Defs.' Objections at 48 n.37.)

[19]      Plaintiffs attempt to divert from this fact by falsely alleging that the document cited by Defendants did not support this fact.  (Pls.' Resp. at 29–30.)  Plaintiffs are wrong.  (Gamba Dep. 101–05 ("Q.  So the basis of your gender discrimination claim with respect to 2010 is based on

department had been downsizing does not mean that Ms. Gamba was ineligible for promotion" (Pls.' Resp. at 30), but Plaintiff Gamba testified to the contrary (Gamba Dep. at 105 ("Q. And do you think that the performance of a particular business should bear on whether an individual is promoted? . . . . A. I think that it does.")).  Plaintiffs' assertion that Plaintiff Gamba was "up for promotion to Managing Director in 2007, 2008 and 2009" (Pls.' Resp. at 30), is irrelevant because Plaintiff Gamba testified that she was not subject to any discrimination during those promotion cycles (Gamba Dep. at 102–03).

###    D.    Plaintiff De Luis

Plaintiffs claim that Plaintiff De Luis "alleges claims for discrimination in performance reviews and compensation that are typical of the class." (Pls.' Resp. at 30.)  But, as Defendants previously described, and Plaintiffs do not dispute, Plaintiff De Luis' compensation allegations do not concern the challenged practices of the 360 review and manager quartiling; rather, she alleges that her managers "would gradually increase her compensation over two years" instead of all at once as "they had previously promised her." (Defs.' Objections at 50.)  Plaintiffs further effectively concede that Plaintiff De Luis' claim is atypical because it arises from an "individual retaliation claim." (Pls.' Resp. at 30.)[20]

---

the fact that even though nobody else made managing director, you also did not make managing director . . . ?  A. Yes.").)

[20]    Throughout their arguments on adequacy and typicality (Pls.' Resp. at 27–30), Plaintiffs assert without citation that Goldman Sachs made various concessions that appear nowhere in its Objections.  To the contrary, Goldman Sachs has consistently maintained that none of the Lead Plaintiffs is adequate or typical of the putative class. (Defs.' Objections at 46–50; Defs.' Opp. to Class Cert. at 62–65.)

## CONCLUSION

For the foregoing reasons, this Court should accept Judge Francis' recommendation that no class be certified pursuant to Rule 23(b)(3) and deny Plaintiffs' motion for certification in its entirety.  In addition, the Court should hold that Plaintiffs have failed to satisfy the commonality, adequacy and typicality requirements of Rule 23(a).

Respectfully,

/s/ Robert J. Giuffra, Jr.

| | |
|---|---|
| Barbara B. Brown *(admitted pro hac vice)* | Robert J. Giuffra, Jr. |
| Neal D. Mollen *(admitted pro hac vice)* | Theodore O. Rogers, Jr. |
| Carson H. Sullivan *(admitted pro hac vice)* | Ann-Elizabeth Ostrager |
| PAUL HASTINGS LLP | Joshua S. Levy |
| 875 15th Street, NW | SULLIVAN & CROMWELL LLP |
| Washington, DC  20005 | 125 Broad Street |
| | New York, New York  10004 |
| | (212) 558-4000 |

*Attorneys for Defendants*
*Goldman, Sachs & Co. and*
*Goldman Sachs & Co. LLC*

July 21, 2017