UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- x
H. CRISTINA CHEN-OSTER,                        :
SHANNA ORLICH, ALLISON                         :
GAMBA and MARY DE LUIS,                        :
                                               :
                          Plaintiffs,          :
                                               :
            v.                                 :
                                               :
GOLDMAN, SACHS & CO. and THE                   :
GOLDMAN SACHS GROUP, INC.,                     :
                                               :
                          Defendants.          :
                                               :
------------------------------------------------------- x
```

10 Civ. 6950 (AT) (RWL)

**ORAL ARGUMENT
SCHEDULED FOR JUNE 27, 2018
AT 2:30 PM**

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO
### PLAINTIFFS' MOTION TO MODIFY SCHEDULE

Barbara B. Brown (*admitted pro hac vice*)     Robert J. Giuffra, Jr.
Neal D. Mollen (*admitted pro hac vice*)       Theodore O. Rogers, Jr.
Carson H. Sullivan (*admitted pro hac vice*)   Ann-Elizabeth Ostrager
PAUL HASTINGS LLP                              Joshua S. Levy
875 15th Street, NW                            SULLIVAN & CROMWELL LLP
Washington, DC  20005                          125 Broad Street
                                               New York, NY  10004
                                               (212) 558-4000

*Attorneys for Defendants
The Goldman Sachs Group, Inc. and
Goldman Sachs & Co. LLC*

May 23, 2018

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ................................................................................1

**BACKGROUND** ....................................................................................................6

**ARGUMENT** .........................................................................................................9

**I.   THE COURT SHOULD NOT RECONSIDER ITS PRIOR FINDING THAT GOLDMAN SACHS HAD SHOWN "A SUFFICIENT RECORD OF POTENTIALLY MATERIAL CHANGES" TO ITS EVALUATION PROCESSES TO WARRANT THE EXISTING SCHEDULE** ...................................9**

   A.   Documentary Evidence Shows Material Changes to the Challenged Processes. ................................................................................................10

   B.   Sworn Testimony Confirms that the Challenged Processes Have Materially Changed. ..................................................................................13

   C.   Preliminary Expert Analysis Demonstrates that the Challenged Processes Have Materially Changed. .......................................................16

**II.   JUDGE TORRES' CERTIFICATION OF A BACKWARDS-LOOKING RULE 23(B)(3) DAMAGES CLASS DOES NOT CONTROL PLAINTIFFS' EFFORT TO CERTIFY A FORWARD-LOOKING RULE 23(B)(2) INJUNCTION CLASS** .......................................................................................21

**CONCLUSION** .....................................................................................................25

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*A.P. Moller-Maersk A/S* v. *AGX Intermodal, Inc.*,
2014 WL 5315035 (S.D.N.Y. June 2, 2014) (Torres, J.) .....................................1, 10

*Aguilar* v. *ICE*,
2012 WL 1344417 (S.D.N.Y. Apr. 16, 2012) (Forrest, J.) .........................20, 22, 23

*Barnes* v. *Am. Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998) .............................................................................25

*Brown* v. *Kelly*,
609 F.3d 467 (2d Cir. 2010) ..........................................................................21, 22

*Burger* v. *Gonzales*,
498 F.3d 131 (2d Cir. 2007) ...............................................................................2

*Chateau de Ville Prods., Inc.* v. *Tams-Witmark Music Library, Inc.*,
586 F.2d 962 (2d Cir. 1978) ..............................................................................21

*Coopers & Lybrand* v. *Livesay*,
437 U.S. 463 (1978) ..........................................................................................23

*Fresh Del Monte Produce, Inc.* v. *Del Monte Foods, Inc.*,
304 F.R.D. 170 (S.D.N.Y. 2014) (Gorenstein, J.) ..............................................2

*Gen. Tel. Co. of Sw.* v. *Falcon*,
457 U.S. 147 (1982) ..........................................................................................23

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) .......................................................................................2

*Hosp. Ass'n of New York, Inc.* v. *Toia*,
577 F.2d 790 (2d Cir. 1978) ...............................................................................4

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
209 F.R.D. 323 (S.D.N.Y. 2002) (Scheindlin, J.) ............................................24

*In re Processed Eggs Prods. Antitrust Litig.*,
312 F.R.D. 124 (E.D. Pa. 2015) ........................................................................23

*In re Rezulin Prods. Liab. Litig.*,
210 F.R.D. 61 (S.D.N.Y. 2002) (Kaplan, J.) .................................................5, 24

*Page(s)*

*Jacob* v. *Duane Reade, Inc.*,
   293 F.R.D. 578 (S.D.N.Y. 2013) (Oetkin, J.) ........................................................5

*Jacob* v. *Duane Reade, Inc.*,
   602 F. App'x 3 (2d Cir. 2015) ............................................................................5

*Joye* v. *Psch, Inc.*,
   2016 WL 3141659 (S.D.N.Y. June 3, 2016) (Torres, J.) .....................................10

*Kartman* v. *State Farm Mut. Auto. Ins. Co.*,
   634 F.3d 883 (7th Cir. 2011) ..............................................................................24

*MacNamara* v. *City of New York*,
   275 F.R.D. 125 (S.D.N.Y. 2011) (Sullivan, J.) ..................................................22

*Maldonado* v. *Ochsner Clinic Found.*,
   493 F.3d 521 (5th Cir. 2007) ..............................................................................24

*Mathews* v. *Eldridge*,
   424 U.S. 319 (1976) ..............................................................................................2

*Merryman* v. *Citigroup, Inc.*,
   2018 WL 1621495 (S.D.N.Y. Mar. 22, 2018) (McMahon, C.J.) .........................22

*N.Y. 10-13 Ass'n* v. *City of New York*,
   1999 WL 177442 (S.D.N.Y. Mar. 30, 1999) (Koeltl, J.) ...............................20, 21

*Philip Morris USA* v. *Williams*,
   549 U.S. 346 (2007) ............................................................................................20

*Selby* v. *Principal Mut. Life Ins. Co.*,
   2000 WL 1863760 (S.D.N.Y. Dec. 20, 2000) (Carter, J.) ..................................22

*Shook* v. *Bd. of Cty. Comm'rs*,
   543 F.3d 597 (10th Cir. 2008) ............................................................................24

*In re St. Jude Med., Inc.*,
   425 F.3d 1116 (8th Cir. 2005) ............................................................................25

*United States* v. *Wells Fargo Bank, N.A.*,
   132 F. Supp. 3d 558 (S.D.N.Y. 2015) (Furman, J.) ...........................................20

*Wal-Mart Stores, Inc.* v. *Dukes*,
   564 U.S. 338 (2011) ..............................................................................................4

**Rules**

Fed. R. Civ. P. 16(b)(4) ..............................................................................................2

*Page(s)*

Fed. R. Civ. P. 23 ...........................................................................................4, 5, 21

Fed. R. Civ. P. 23(a) ............................................................................................5, 22

Fed. R. Civ. P. 23(b)(2).........................................................................................*passim*

Fed. R. Civ. P. 23(b)(3).........................................................................................*passim*

Fed. R. Civ. P. 23(c)(4) ........................................................................................5, 21

Fed. R. Civ. P. 30(b)(6).........................................................................................2, 8

**Other Authorities**

William B. Rubenstein, Newberg on Class Actions (5th ed. 2017) .........................................2, 24

## PRELIMINARY STATEMENT

Through their motion to "modify" this Court's schedule, Plaintiffs now seek, *for the third time*, to deprive Defendants of their due process right to submit fact and expert evidence and full legal briefing in opposing Plaintiffs' motion to certify a Rule 23(b)(2) class seeking injunctive relief.  In its December 13, 2017 and January 11, 2018 Orders, after reviewing extensive submissions from both parties, this Court correctly rejected Plaintiffs' effort to bar Goldman Sachs from submitting fact declarations, expert reports and full briefing, finding "*a sufficient record of potentially material changes* to Goldman's policies and procedures that warrant discovery into those changes and their impact, if any, on class certification for purposes of injunctive relief."  (Dec. 13, 2017 Hr'g at 57:23–58:3; *see also* January 11, 2018 Order at 3 (directing full briefing and ruling "[s]upplemental expert reports and discovery also are appropriate as contemplated by both parties"), ECF No. 565; January 30, 2018 Order (so-ordered schedule), ECF No. 568.)

While styled as a "motion to modify schedule," Plaintiffs effectively seek the "extraordinary remedy," *A.P. Moller-Maersk A/S* v. *AGX Intermodal, Inc.*, 2014 WL 5315035, at *1 (S.D.N.Y. June 2, 2014) (Torres, J.), of "reconsideration" of this Court's December 13, January 11 and January 30 Orders setting a discovery schedule and ordering full briefing of Plaintiffs' motion to certify a class seeking injunctive relief.  (Pls.' Br. at 1, ECF No. 590.)  But even if the Court treats Plaintiffs' motion as merely seeking to modify the schedule, Plaintiffs have not demonstrated the required "good cause" to cut short this Court's schedule and to prevent Goldman Sachs from submitting fact and expert evidence, including expert analysis of the data—produced to Plaintiffs nearly two months ago—on the impact of the Firm's *current* evaluation process on its *current* professionals.  *Fresh Del Monte Produce, Inc.* v. *Del Monte*

*Foods, Inc.*, 304 F.R.D. 170, 174 (S.D.N.Y. 2014) (Gorenstein, J.) (quoting Fed. R. Civ. P. 16(b)(4)).

In its December 13, January 11 and January 30 Orders, the Court did not provide for a process for Plaintiffs to short-circuit the schedule once they had received documents from Goldman Sachs and taken the one Rule 30(b)(6) deposition they requested. To the contrary, the Court ordered that the parties could conduct necessary discovery to update the stale record, and that Goldman Sachs, on October 26, 2018, could submit full briefing in opposition to Plaintiffs' motion to certify a class pursuant to Rule 23(b)(2), including fact declarations and expert reports on the impact of the Firm's current performance feedback and evaluation processes on its current professionals.

In prematurely trying to force a certification ruling based on a stale record, and before Goldman Sachs can present its full opposition, Plaintiffs baselessly accuse Goldman Sachs of "misleading" the Court in its finding of "a sufficient record of potentially material changes" to the Firm's evaluation processes. (Pls.' Br. at 1, 5, 6, 8.) Nothing could be further from the truth. In fact, it is Plaintiffs who mislead the Court to try to avoid their burden "to *prove*—not simply plead—that their proposed class satisfies each requirement of Federal Rule of Civil Procedure 23." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2403 (2014) (emphasis in original). Even if Plaintiffs forego their right to submit evidence and full briefing in order to meet their burden to establish that class certification is appropriate, Goldman Sachs has the right to do so opposing class certification. *See Burger* v. *Gonzales*, 498 F.3d 131, 134 (2d Cir. 2007) (due process requires that litigants "be afforded 'the opportunity to be heard at a meaningful time and in a meaningful manner'") (quoting *Mathews* v. *Eldridge*, 424 U.S. 319, 333 (1976)); William B. Rubenstein, Newberg on Class Actions § 9:11 (5th ed. 2017)

("defendant has a due process right to so defend itself and should not be unfairly prejudiced by being unable to develop its case") (footnote omitted).

Plaintiffs' cherry-picked facts and misleading diagrams purporting to show that the challenged processes have not changed provide no basis for this Court to bar Defendants, at mid-stream, from establishing a current record on which the Court can rule on whether Plaintiffs have met their burden to prove that certification is warranted of a mandatory Rule 23(b)(2) class seeking to enjoin the operation of processes impacting all of Goldman Sachs' thousands of employees in its three revenue divisions.  As the preliminary analysis of industrial psychologist Dr. Kathleen Lundquist demonstrates, Goldman Sachs' current evaluation processes "substantially differ[]" from its pre-2016 processes "in important ways that impact the interpretation and meaningfulness of the information obtained and its use in HR processes."  (Ex. 18 (Declaration of Kathleen Lundquist, Ph.D., dated May 23, 2018 ("Lundquist Decl.")) ¶ 12.)[1] And, the preliminary analysis of statistical expert Dr. Michael Ward, based on the most current data that Goldman Sachs has produced to Plaintiffs, shows that the Firm's current processes have ***no** statistically significant adverse impact on female professionals in the putative class*.  (Ex. 21 (Declaration of Michael Ward, Ph.D., dated May 23, 2018 ("Ward Decl. II")) ¶¶ 8, 9, 11.)  In fact, for Associates, the Firm's current processes *uniformly favor female professionals across the putative class*.  (¶¶ 8, 12.)  In terms of assignment to the top manager quartile, the current data reveals no "statistically significant adverse results for the 2016-2017 female employee class members."  (*Id.* ¶ 11.)  Even applying the flawed statistical model of Plaintiffs' expert, "[t]he results are very different for 2016-2017" and "could not have resulted from the same processes as produced the 2011 outcomes."  (*Id* ¶ 18.)  Tellingly, in support of their motion, Plaintiffs have

---

[1]    All references to "Ex." refer to exhibits to the accompanying declaration of Robert J. Giuffra, Jr., dated May 23, 2018.

not submitted any evidence from their statistical expert on the impact of the Firm's current processes on its current professionals, even though Plaintiffs have had the necessary data since March 30.

As this Court has recognized, the certification of an injunction class cannot rest on a stale evidentiary record.  (*See* Dec. 13, 2017 Hr'g at 57:5–20.)  At class certification, Plaintiffs must provide "'significant proof' of disparate impact" of Goldman Sachs' current processes on its current professionals.  (Mar. 30, 2018 Class Cert. Order at 24 (quoting *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 353 (2011)), ECF No. 578).   Fatally for Plaintiffs' effort to certify an injunction class here, the only evidence before the Court demonstrates that Goldman Sachs' current processes do not have a disparate impact on its current female professionals.  (*See* Ward Decl. II ¶¶ 8, 9, 11.)  Plaintiffs should not be permitted to use years-old statistical evidence, without any evidence of a current harm to putative class members, to satisfy their burden under Rule 23.  *See Hosp. Ass'n of New York, Inc.* v. *Toia*, 577 F.2d 790, 798 (2d Cir. 1978) ("The [record] to be tested for prospective purposes should be the current, not an outdated, one.").   Nor can Plaintiffs avoid their burden to prove every element of Rule 23 by claiming, as in every Title VII case,  that class certification "will entail some overlap with the merits."  *Wal-Mart*, 564 U.S. at 351.

Nothing in Judge Torres' decision certifying a Rule 23(b)(3) damages class here sanctions violating Defendants' right to establish a current record, as Plaintiffs contend.  To the contrary, that decision was based on data about the impact of Goldman Sachs' then-existing evaluation processes on professionals from 2003 to 2011, less than 10 percent of whom are even in their same positions today.  (*See* Ward Decl. II ¶ 25; Declaration of Cathy Obradovich, dated Oct. 11, 2017 ¶ 5, ECF No. 546–3.).  Indeed, Judge Torres expressly recognized that her opinion

addresses "only the portion of Plaintiffs' motion that seeks class certification under Rule 23(b)(3)," and "*[c]lass claims for injunctive and declaratory relief under Rule 23(b)(2) and (c)(4) are now being pursued on a separate track—currently scheduled to be fully submitted in late 2018*."[2]  (Class Cert. Order at 12–13 (emphasis added).)   Moreover, Judge Torres' prior orders made clear that Goldman Sachs has the right to submit evidence opposing Plaintiffs' motion to certify a Rule 23(b)(2) class.[3]

To certify a mandatory Rule 23(b)(2) class—which will significantly affect both class members (who cannot opt out) and non-class members (who have no say)—Plaintiffs must prove that every element of Rule 23 is satisfied for Goldman Sachs' current evaluation processes and current female professionals.   The requirements for the certification of a Rule 23(b)(3) damages class are different from those for Rule 23(b)(2), including that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Thus, "the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness."  *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 75 (S.D.N.Y. 2002) (Kaplan, J.).   Goldman Sachs accordingly has every right to contest the certification of a Rule 23(b)(2) injunction class, with its far-reaching implications, notwithstanding Judge Torres' certification of a damages class governed by different Rule 23 requirements.

---

[2]     Rule 23(c)(4) can only be used to certify an issue class "so long as the proposed liability class meets the requirements of Rule 23(a) and (b)."  *Jacob* v. *Duane Reade, Inc.*, 293 F.R.D. 578, 598 (S.D.N.Y. 2013) (Oetkin, J.), *aff'd* 602 F. App'x 3 (2d Cir. 2015).  It "cannot cure every ill that troubles a putative class" and rather serves as a "case management tool."  *Id.*  Accordingly, we focus herein on Plaintiffs' motion to certify a class pursuant to Rule 23(b)(2).

[3]     (*See* June 14, 2017 Order at 6 (recognizing the "extensive discovery process" required to address Plaintiffs' motion to certify an injunctive relief class"), ECF No. 500; August 30, 2017 Order at 1 (ordering the parties to set forth "their positions on what additional discovery is required in connection with Plaintiffs' motion for Rule 23(b)(2) and (c)(4) class certification and a proposed timeline for completing that discovery and filing supplemental briefing"), ECF No. 540.)

Simply put, this Court should swiftly reject Plaintiffs' invitation to reconsider and short-circuit the current schedule, which, in keeping with basic principles of due process, affords Defendants their first opportunity to submit fact and expert evidence in opposition to Plaintiffs' motion to certify a Rule 23(b)(2) injunction class.

## BACKGROUND

***The District Court Recognized Extensive Discovery Would Be Required Before a Rule 23(b)(2) Class Could Be Certified.***   On June 14, 2017, Judge Torres recognized that certification of a class pursuant to Rule 23(b)(2) would require "an extensive discovery process," because the "parties have not completed meaningful discovery of Defendants' current policies and practices." (June 14, 2017 Order at 6.)  Thereafter, as directed by the Court, Goldman Sachs submitted briefing, supported by fact and expert declarations, identifying material changes to the challenged practices and demonstrating that Goldman Sachs has the due process right to present evidence on the content and impact of its materially changed processes on the current population of professionals, as well as full legal briefing, before the Court considers whether to recommend certification of Rule 23(b)(2) class.  (ECF Nos. 544–46, 555.)

***This Court Has Twice Ordered Discovery and Full Briefing on Plaintiffs' Motion to Certify a Rule 23(b)(2) Injunction Class.***   On December 13, 2017, this Court held that Goldman Sachs "has supplied enough evidence, including declarations from three Goldman employees and a declaration from an expert who has analyzed some data of the impact of those changes to provide enough ground for further discovery of the extent *and impact* of those changes." (Dec. 13, 2017 Hr'g at 56:23–57:4 (emphasis added).)  Thus, in ordering the current schedule, the Court correctly found "*a sufficient record of potentially material changes* to Goldman's policies and procedures that warrant discovery into those changes and their impact, if any, on class certification for purposes of injunctive relief." (*Id.* at 57:23–58:3 (emphasis

6

added).)  The Court rejected Plaintiffs' motion to strike Goldman Sachs' evidence of changes to the challenged practices, observing that "[t]he purpose of these submissions was to provide evidence and argument as to material changes in Goldman's policies and their impact on class certification," and Plaintiffs' motion to strike was "essentially . . . premised on the argument that Goldman has failed to fully provide at this juncture that its policies and practices, have in fact, changed sufficiently to affect the class certification determination." (*Id.* at 58:7–16.)  But, as this Court correctly recognized, "[t]hat argument . . . essentially would put Goldman in the catch-22 position of having to support its motion for additional discovery by submitting *all such discovery in support of the motion to begin with*." (*Id.* at 58:16–20 (emphasis added).)  Indeed, the Court specifically recognized the fact that Plaintiffs had not yet deposed Goldman Sachs' statistical expert "merely underscores that additional discovery is warranted to determine if the class should be certified based on changed circumstances." (*Id.* at 59:2–5.)

Notwithstanding this Court's clear ruling, Plaintiffs have since tried to limit Goldman Sachs' right to submit full class certification briefing as to Plaintiffs' motion to certify an injunctive and declaratory relief class.  On January 11, 2018, this Court rightly rejected Plaintiffs' effort to avoid the import of its December 13 ruling, and made clear that "[t]he purpose of the additional briefing is to determine the propriety of class certification for injunctive relief.  That requires assessing the evidence both past and recent in the context of the elements required for class certification." (January 11, 2018 Order at 3.)  The Court emphasized that "given the limited earlier briefing on 23(b)(2) certification (a byproduct, at least in part, of the procedural history of this case), the Court will find it helpful to have full briefing on whether the requisite elements are satisfied." (*Id.*)  Accordingly, the Court ordered that the "stale record" be updated with "supplemental discovery" covering the time period 2012 through 2017 and that the

parties submit "full briefing on whether the requisite elements are satisfied" to permit certification of a class seeking injunctive and declaratory relief.  (*Id.* at 2–3.)

On January 30, 2018, this Court so-ordered a schedule, jointly proposed by the parties, for discovery and briefing of Plaintiffs' motion to certify a Rule 23(b)(2) class.  (January 30, 2018 Order at 1.)  In accordance with that schedule, Goldman Sachs produced to Plaintiffs, by March 30, 2018, (i) data about the impact of the challenged performance, compensation and promotion processes spanning a five-year time period, including the most current data; and (ii) documents covering the "six categories of information" requested by Plaintiffs.  (March 26, 2018 Joint Progress Report at 3–7, ECF No. 576.)  Goldman Sachs also made available the one Rule 30(b)(6) witness requested by Plaintiffs.  (January 11, 2018 Order at 3.)  As ordered by the Court, expert reports must be filed between June 29 and August 29.  (January 30, 2018 Order at 1.)[4]  Thereafter, Plaintiffs' and Defendants' class certification briefs are due on September 17 and October 26, respectively, with Plaintiffs' reply due on November 16.  (*Id.*)

*Plaintiffs Again Seek To Certify a Rule 23(b)(2) Injunction Class Based on a Stale Record.*  Attempting to short-circuit this Court-ordered schedule, Plaintiffs now effectively seek "reconsideration" (Pls.' Br. at 1) of the jointly proposed schedule, which was so ordered by the Court on January 30, purportedly on the grounds that Defendants' submissions justifying

---

[4]     Plaintiffs improperly seek to have it both ways:  having filed a motion to cut off Defendants' right to oppose their class certification motion on a current record alleging that doing so is in the interests of avoiding "additional expense, burden, and delay of further unnecessary pre-class discovery or supplemental evidentiary briefing" (Pls.' Br. at 2), they simultaneously are causing Defendants to incur the expense of briefing an issue already decided by this Court and seek to avoid their obligations to submit expert reports under the scheduling order now in place.  (*See* May 23, 2018 Joint Progress Report at 2 ("Plaintiffs intend to submit a letter motion for a continuance of the June 29 expert discovery deadline"), ECF No. 596.)  In fact, Plaintiffs' effort to postpone submission of their expert reports in light of the June 27, 2018 hearing scheduled on the instant motion (*id.* at 2) is counter to their own protestations that the Court should proceed on the stale record to avoid delay in this action (Dec. 13, 2017 Hr'g at 42:5–19).

development of a current record and full briefing painted an inaccurate picture of the changes since 2011.  In so doing, Plaintiffs studiously ignore not only the stringent standards for what is effectively a reconsideration motion, but also the updated data that corroborated and enhanced Defendants' submissions, which they have had since March 30, and the October 2017 declaration of Dr. Michael Ward, whose preliminary study of overall manager feedback and review of top manager quartile placement found that, as to Goldman Sachs' current evaluation processes and current population, "[n]one of these results is consistent with an overall adverse impact against women in the two processes at issue."  (Declaration of Michael Ward, Ph.D., dated Oct. 12, 2017 ("Ward Decl. I") ¶¶ 8–11, ECF No. 546–11.)  Instead, Plaintiffs charge that Goldman Sachs "misled" the Court about changes to the challenged processes.  (Pls.' Br. at 1.)  The parties will have ample opportunity in due course to argue, on a full record, about the degree of change to the Firm's challenged process, and the impact of those changes on the current population.  For now, the Court has already ruled that Goldman Sachs has "supplied enough evidence" to support the previously ordered discovery and briefing schedule (Dec. 13, 2017 Hr'g at 56:23), and Plaintiffs have offered no basis to reconsider that decision now and thereby to preempt the Court's orderly resolution of Plaintiffs' class certification motion.

## ARGUMENT

I.    **THE COURT SHOULD NOT RECONSIDER ITS PRIOR FINDING THAT GOLDMAN SACHS HAD SHOWN "A SUFFICIENT RECORD OF POTENTIALLY MATERIAL CHANGES" TO ITS EVALUATION PROCESSES TO WARRANT THE EXISTING SCHEDULE.**

In seeking to modify the current schedule mid-stream, Plaintiffs have the heavy burden of showing that this Court should reconsider its finding of "*a sufficient record of potentially material changes* to Goldman's policies and procedures that warrant discovery into those changes and their impact, if any, on class certification for purposes of injunctive relief."

(Dec. 13, 2017 Hr'g at 57:23–58:3 (emphasis added).)[5]  In making this finding, the Court relied on sworn testimony that, among other things, "[i]n 2016, the Firm significantly changed the 360 Feedback process," and these changes in turn led to changes to the way managers "think about manager quartiling."  (Declaration of Susan Benz, dated Oct. 13, 2017 ("Benz Decl.") ¶¶ 7, 18, ECF No. 546–2.)  The Court's finding also rested on a "declaration from an expert who has analyzed some data of the impact of those changes" (Dec. 13, 2017 Hr'g at 56:24–57:2), which demonstrated significant changes and concluded that, while "[t]he data need to be fully explored and the ramifications of these findings set forth for the Court's consideration," preliminary analysis revealed "no discernible adverse impact . . . for either the 360 or manager quartile processes for 2016" (Ward Decl. I ¶¶ 19–20).

There is no merit to Plaintiffs' attempt to preempt the development of a full record.  In fact, the record now before the Court fully bolsters its prior finding of "*a sufficient record of potentially material changes* to Goldman's policies and procedures that warrant discovery into those changes and their impact, if any, on class certification for purposes of injunctive relief."  (Dec. 13, 2017 Hr'g at 57:23–58:3.)

A.     **Documentary Evidence Shows Material Changes to the Challenged Processes.**

As hard as Plaintiffs try to distort the issue, documents produced to Plaintiffs overwhelmingly confirm that Goldman Sachs has made material changes to the challenged performance processes since the start of 2016.  This is clear based on a review of the old and new 360 Feedback forms, where the old form relied on mathematical metrics, averages, and relative

---

[5]     *See Joye* v. *Psch, Inc.*, 2016 WL 3141659, at *3 (S.D.N.Y. June 3, 2016) (Torres, J.) (limitations on reconsideration "serve to ensure finality and to prevent losing parties from using motions for reconsideration as a vehicle by which they may then plug the gaps of a lost motion"); *A.P. Moller-Maersk A/S*, 2014 WL 5315035, at *1 (reconsideration "is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources").

weightings, and the new form relies on qualitative assessments and narratives. (*Compare* Ex. 5 (GS0375541) (old 360 Review form), *with* Ex. 6 (GS0375609) (new 360 Feedback form).) Plaintiffs also ignore that the very point of the new process is to be different. For example, a message from Firm leadership, including the CEO, described the "new feedback practices and redesigned annual 360-degree feedback," which were adopted in 2016 "to enhance [Goldman Sachs'] focus on professional growth and continuous learning." (Ex. 3 (GS0376024) (Message from L. Blankfein, D. Solomon, H. Schwartz, dated Apr. 13, 2017).)

| Plaintiffs' Assertion | The Truth |
|---|---|
| Alleged Changes to the 360 Review System Are Illusory (ECF No. 590 at 5.) | • "Annual Feedback" includes "no numerical ratings" and provides "shortened form, qualitative feedback." (Ex. 4 (GS0380339) at 2.) <br><br> • "[N]ow is the time to make a significant change in our approach, to focus on providing more candid, constructive and developmental feedback." (Ex. 11 (GS0378300) at 6.) <br><br> • "[E]mployees want ongoing developmental feedback instead of just a score. . . . Last year, we launched Annual Feedback 360+," which provides "[a]n emphasis on qualitative feedback – what people do well and how they can improve – rather than numerical scores." (Ex. 12 (GS0376244) at 2.) <br><br> • Key elements of a new "streamlined approach to annual feedback" include "[a]n emphasis on qualitative feedback – what people do well and how they can improve – rather than numerical scores." Also, "[i]n addition to a written summary, managers will provide an overall rating on a scale of outstanding, good and needs improvement." (Ex. 13 (GS0377267) at 1.) <br><br> • "Enhanced Performance Reviews" intended to "[i]ncrease quality of feedback" and "[i]mprove quality of managers' conversations and follow-up" (Ex. 7 (GS0382285) at 14; *see also id.* at 16–17 (discussing what is changing and benefits of changes); Ex. 8 (GS0382262) (setting out "New Approach to Feedback").) |

| Plaintiffs' Assertion | The Truth |
|---|---|
| The New Quartiling System Is Almost Identical to the Old Quartiling System (ECF No. 590 at 12.) | • "Overall 360 ratings and ME 'scores' will <u>not</u> be fed into decision-making rosters for quartiling, compensation, promotions and other decisions." (Ex. 9 (GS0380334) at 1 (emphasis in original).) |
| | • Describing significant number of "Additional Factors to Consider" in manager quartiling. (Ex. 10 (GS0375658) at 4.) |
| | • Discussing how "changes to Feedback 360+ impacted quartiling," including the elimination of "numerical scores," and "refer[ing] to the factors to consider when assigning manager performance quartiles to employees as a guide to determining quartiles and quartile distributions." (Ex. 14 (GS0378427) at 5.) |

In its briefing in support of the Court's schedule, Goldman Sachs explained that the Firm "continually takes steps to improve" its employment practices, including to address "millennial job satisfaction." (Declaration of David Landman, dated Oct. 12, 2017 ("Landman Decl.") ¶¶ 3–4, ECF 546–1.) This too is reflected in documents produced to Plaintiffs, which explain that Goldman Sachs has "continued to evolve [its] approach to feedback" in order to address its professionals' demand for "more frequent, timely and specific feedback to support [their] ongoing development." (GS0376024; *see also* GS0376244 at 2 (Goldman Sachs "recogniz[ed] that employees want ongoing developmental feedback instead of just a score. . . . Last year, we launched Annual Feedback 360+," which provides "[a]n emphasis on qualitative feedback – what people do well and how they can improve – rather than numerical scores.").) Indeed, it was for this reason that the Firm "introduce[d] Ongoing Feedback360+, a new tool that facilitates real-time, constructive career development conversations and will complement annual 360-degree feedback." (GS0376024 ("Providing ongoing, high-quality feedback is at the heart of our culture of teamwork and excellence.").) Thus, just as the Firm proffered in its initial showing (Landman Decl. ¶ 4), because Goldman Sachs recognized that its "people want more real time and candid feedback," Goldman Sachs now "focus[es] on

increasing the quality and frequency of feedback conversations to help employees improve their performance."  (GS0376244 at 2.)

    **B.**    **Sworn Testimony Confirms that the Challenged Processes Have Materially Changed.**

    Although Plaintiffs suggest that the new 360 Feedback process is still scored (Pls.' Br. at 5) to try to show that their "original critique of the 360 score clustering stands" (*id.* at 7 n.7), testimony from Goldman Sachs managers confirms that the elimination of numerical scores in fact has made a meaningful impact on the way in which the challenged performance processes are used.  (*See* Ex. 15 (Declaration of Jacqueline Cassidy, dated May 23, 2018 ("Cassidy Decl.")) ¶ 4 ("In my opinion, the 360 feedback process has changed significantly since 2016.").)[6] For example, as one manager explained, "[i]n the current 360 feedback process, the focus of the 360 is the written commentary about an individual's performance.  While reviewers were able to provide comments pre-2016, the scores were the focus . . . .  Now, the comments are the up-front focus of the 360.  With this change, and without the numerical scores, the process has become much more developmental than evaluative."  (Levene Decl. ¶ 4; *see also id.* ¶ 3 (describing the significance of the elimination of "numerical scores associated with the 360").)[7]  Indeed,

---

[6]    (*See*, *e.g.*, Ex. 19 (Declaration of Brendan McGovern, dated May 22, 2018 ("McGovern Decl.")) ¶ 4 ("Since 2011, I have seen substantial changes to the 360 feedback process, most notably the elimination of numerical scores in 2016.  In my view, the 360 feedback process has substantially improved with this change."); Ex. 17 (Declaration of John Levene, dated May 23, 2018 ("Levene Decl.")) ¶ 3 ("Since I submitted my declaration in 2014, . . . there have been a number of changes to the 360 feedback and manager quartiling processes.  Specifically and most significantly, since 2016 there are no longer numerical scores associated with the 360.  I think [it] has been a helpful change."); Ex. 20 (Declaration of Luke Sarsfield, dated May 23, 2018 ("Sarsfield Decl.")) ¶ 3 ("Over the past few years, there have been significant changes to the 360 feedback process.  In my opinion, the new format of the 360, with the elimination of numerical scores in 2016, has solidified the role of the 360 as a developmental tool and feedback mechanism.").)

[7]    (*See*, *e.g.*, McGovern Decl. ¶ 5 ("I am very much in favor of the new 360's focus on comments because they help me shape my feedback discussion with the professionals I manage.

Goldman Sachs "very deliberately decided to remove the scores, as well as any real or perceived linkages to other decision-making because of the value of 360 feedback as a developmental tool." (Ex. 1 (Landman Dep.) 88:10–16.)

Plaintiffs' other attempts to minimize and to distort other changes to the 360 Feedback process described in Goldman Sachs' preliminary showing are also without basis.  For example, Plaintiffs claim that the new Manager Effectiveness review "just amounts to additional questions at the same time (and in fact as part of) the 'new' 360 process for those for whom it is relevant (*i.e.*, managers)."  (Pls.' Br. at 11 n.10.)  But the "Manager Effectiveness section of the 360 did not exist until 2014," and managers view this tool for Vice Presidents and other more senior managers, as an "important change to the 360."  (Ex. 16 (Declaration of Darren Cohen, dated May 22, 2018 ("Cohen Decl.")) ¶ 7.)  Notwithstanding Plaintiffs' misleading description, the Manager Effectiveness review is in fact:

> a tool by which more junior professionals can provide feedback for their managers (outstanding, good, needs improvement) on various management-related skills and behaviors, including, among others, communicating a strategic vision and driving execution; inspiring and motivating performance; coaching, developing, and mentoring others; delegating authority and decision making with appropriate oversight; and cascading relevant information to team members.

(*Id.*)

---

They also provide information about the individual that I might not have known, as the reviewers may see their performance from a different perspective than I do."); Cassidy Decl. ¶ 5 ("[N]ow that there are no scores, I have noticed that the quality of the written comments that reviewers provide has improved.  While reviewers were able to provide comments before the changes to the 360 process, those comments came after completing the section with numerical scores.  The comments I am seeing now in the new 360 feedback process seem to be more targeted and specific, and often include better, more illustrative examples of how a particular professional can develop and improve."); Sarsfield Decl. ¶ 4 ("[T]he focus, and even the entire look and feel of the new 360, is on qualitative comments.  With the elimination of the numerical scores, I believe professionals listen more carefully to the 360 feedback and take more substantive development points away from the review conversation.").)

14

Plaintiffs similarly distort the record in claiming that "Goldman's documents and Mr. Landman's testimony confirm that Goldman has not changed its Manager Quartiling . . . process in any material way." (Pls.' Br. at 15.) Indeed, Mr. Landman clearly testified that the 360 Feedback and manager quartiling processes have been delinked. (Landman Dep. 89:5–8.) And the sworn testimony of managers confirms that "[t]here is also now a larger time gap between the 360 feedback process and the manager quartiling process, which has created even more of a separation between the two processes." (Cassidy Decl. ¶ 11.) Most fundamentally, managers view the manager quartiling process differently because of the changes to the 360 Feedback process. (Cohen Decl. ¶ 9 ("Because of the changes to the 360 in 2016, the way I think about manager quartiling has changed.").) As one manager explained:

> While 360 reviewers do provide an overall assessment of 'outstanding,' 'good' or 'needs improvement,' in the new 360, I do not consider those assessments during the manager quartiling process. (And I am not provided with those assessments as part of the data I receive when making manager quartiling placements, whereas I used to receive the 360 scores.) I base by manager quartiling placements on my own assessment (informed by the professional's direct manager if I am not the direct manager), of the professional's potential and performance relative to his or her peers.

(McGovern Decl. ¶ 7; *see also id.* ¶ 9 ("I have found that, in the past two years, making manager quartile decisions is easier now that I do not have to worry about the numerical score from the 360. I have always believed that a manager's assessment of performance is the most important, and I prefer that the 360 feedback process and manager quartiling are now more independent of one another.").) As another manager testified, under the old processes, she "felt as if [she] had to consider the 360 score," but she is now "free of that burden." (Benz Decl. ¶ 18.)[8]

---

[8]     (*See also* Levene Decl. ¶ 8 ("without numerical scores, I feel even less bound to place someone in a certain manager quartile"); Cassidy Decl. ¶ 10 ("In my view, the 360 feedback

The record developed to date also contradicts Plaintiffs' claim that Goldman Sachs has made misrepresentations about increased levels of transparency and written feedback. As David Landman testified, Goldman Sachs is "very transparent with our employees via feedback and via the framing they get from their manager in their feedback conversation, in their ongoing feedback conversations as they're given feedback about promotions, in their compensation conversation, as well as in specific and different processes that some of the divisions have implemented."  (Landman Dep. at 91:1–8.)[9]

### C. Preliminary Expert Analysis Demonstrates that the Challenged Processes Have Materially Changed.

Importantly, preliminary expert analysis of the challenged performance processes supports the conclusion that "the 360-degree feedback processes used by Goldman Sachs prior to 2016 substantially differed from the processes used in 2016 and beyond in important ways that impact the interpretation and meaningfulness of the information obtained and its use in HR processes."  (Lundquist Decl. ¶ 12.)  Specifically, "[t]he pre- vs. post-2016 processes differed in the content of the review, how it was evaluated and who made the evaluation.  Moreover, the nature of the detailed numerical information pre-2016 presented to decision makers (direct

---

process is now more independent and separate from the manager quartiling process.  When there were numerical scores under the old 360, the 360 scores lent themselves to being sorted on a spreadsheet, and sometimes led to granular discrepancies between how an individual's numerical 360 score ranked among peers' scores. Without scores, this type of sorting cannot occur.").)

[9]    (See Cohen Decl. ¶ 8 ("When I deliver feedback, I now also provide an annual feedback summary to everyone I manage.  In 2011, it was not the practice in the Securities Division to give any written feedback to the professionals in the Division.  Now, professionals receive a written package that includes my overall manager rating of the professional (outstanding, good, or needs improvement), as well as written feedback regarding the professional's top strengths, what they should consider doing differently, and an assessment of that individual's risk management, reputation, culture, compliance and conduct related behaviors.  I believe that it is very helpful to have the written summaries because they provide me with a roadmap for my feedback discussions with the professionals who report to me.  I also believe it is helpful for the professional to have a written copy to keep.").)

managers and quartiling managers) permitted this information to play a greater role in subsequent decisions about employees than the more global overall categorizations of performance reported post-2016." (*Id.*)

Indeed, expert analysis supports the testimony in the record that "eliminating numerical scores [was] certainly one of the big changes" to the challenged processes. (Landman Dep. at 85:24–86:1.) Specifically, Dr. Lundquist has concluded that "whether there was a numerical rating versus a qualitative evaluation" is a "meaningful change[]." (Lundquist Decl. ¶ 4.) And, contrary to Plaintiffs' assertions, the fact that 360 Reviews were previously used for *both* development and evaluation (Pls.' Br. at 5–6) in no way minimizes the fact that 360 Feedback is now used primarily "for developmental purposes" (Landman Dep. at 29:3–4 (emphasis added); *see* Lundquist Decl. ¶ 7 (finding a "greater emphasis on development in the 2016 360 process"); Landman Decl. ¶ 6; Ex. 2 (GS0376157) at 2 ("employees want ongoing development feedback instead of just a score")). Dr. Lundquist also noted that Goldman Sachs' managers "felt less constrained when exercising their judgment in making manager quartiling decisions by the absence of the precise numerical scores from the 360 process." (Lundquist Decl. ¶ 11.)

Dr. Lundquist's analysis also reveals that the diagram in Plaintiffs' motion purporting to show "consistency across time" is inaccurate and misleading. (*See id.* Ex. 3 (setting out chart revealing significant differences between the 2016 evaluation process and prior processes); *id.* at Table 1 (setting out core areas of the challenged processes that have changed in material respects).) Indeed, Dr. Lundquist "found a substantial number of important areas in which the current 360-degree Feedback processes differed from those before 2016" (*id.* ¶ 4) and concluded that, under the current process, the "more limited and qualitative input from the 360

17

process allow[s] the manager quartiling decisions to be made with less reliance on what appeared to be very precise bases for comparison among employees simply because those comparisons were numbers carried to two decimal places." (*Id.* ¶ 11.)

Even more significantly, preliminary statistical analysis demonstrates that "outcomes have changed since 2011" (Ward Decl. II ¶¶ 15–24); there are "no statistically significant adverse findings in OMR or manager quartile assignment" (*id.* ¶ 3); and, as to manager quartiling, "*the current outcomes and the earlier outcomes are too different to have resulted from the operation of the same processes*" (*id.* ¶ 19 (emphasis added)).[10] Dr. Ward opined: "Statistical tests tell me that the differences between the current gender outcomes and earlier outcomes are so start that they are highly unlikely to have resulted from the same processes." (*Id.* ¶ 3.) Specifically, Dr. Ward's preliminary analysis shows:

- "no statistically significant gender differences" in the overall manager rating ("OMR") (*id.* ¶ 16);



---

10      Dr. Ward performed "comparisons using the manager quartile studies because the OMR is an entirely new process, with a qualitative outcome measure—outstanding, good, or needs improvement—which makes it more difficult to do a direct comparison with the previous 360 score-based process." (Ward Decl. II ¶ 23.)

- "the OMR results for Associates favor women but are not statistically significant," and "[t]his is true in all three Divisions" (*id.* ¶ 8);

- for Associates, "a higher percentage of women" receive a rating of "outstanding" than men (*id.*);

- "results for Vice Presidents on the OMR are all statistically insignificant" (*id.* ¶ 9);

- even under Plaintiffs' expert's model, "[f]or 2016-2017," there are "no statistically significant gender differences in OMR" (*id.* ¶ 16); and

- no "statistically significant adverse results for the 2016-2017 female employee class members in manager quartile assignment" and indeed, "average placement in the top manager quartile for Associates is higher for women than men (although the results are not statistically significant)" and, while statistically insignificant, for Vice Presidents, "[t]he results sometimes favor women, as in IBD and IMD, and sometimes favor men, as in Securities" (*id.* ¶¶ 11, 12, 13).



These statistical results cannot be squared with the certification of a Rule 23(b)(2) injunction class, much less the short-circuiting of the existing schedule allowing Defendants to put

forward—again, for the first time—evidence showing that no injunction class can be certified here.

In addition to the material changes that Goldman Sachs has made to its practices, Dr. Ward "observe[d] significant changes in the population covered by the new dataset." (Ward Decl. II ¶ 25.)  Specifically, less than 10 percent of the 2003 to 2011 population that the parties' experts previously analyzed remain in Associate or Vice-President positions in the three relevant Goldman Sachs Divisions.  (*Id.*)  Plaintiffs are certainly free to forego their opportunity to develop a record as to Goldman Sachs' *current* processes and their impact on the Firm's *current* professionals, although it is their burden to demonstrate that the Court should certify a Rule 23(b)(2) class.  *See Aguilar* v. *ICE*, 2012 WL 1344417, at *7–9 (S.D.N.Y. Apr. 16, 2012) (Forrest, J.) (declining to find commonality for purposes of an injunctive relief class when expert statistics were based on five-year-old data); (Dec. 13, 2017 Hr'g at 57:5–20 ("a stale record may not provide sufficient basis to certify a class for purposes of seeking injunctive relief.")).  But Goldman Sachs is entitled to oppose certification of a mandatory Rule 23(b)(2) class by introducing fact and expert evidence about the impact of Goldman Sachs' current evaluation processes on its current population of professionals.

\*       \*       \*

At best, Plaintiffs have raised a fact dispute, which the Court should resolve after the parties submit expert reports, any factual declarations, and the full briefing provided for in the current scheduling order.  This process cannot, consistent with due process, be short-circuited.[11]

---

[11]     *See United States* v. *Wells Fargo Bank, N.A.*, 132 F. Supp. 3d 558, 561 (S.D.N.Y. 2015) (Furman, J.) ("[D]ue process generally require[s] . . . 'an opportunity to present every available defense.'") (quoting *Philip Morris USA* v. *Williams*, 549 U.S. 346, 353 (2007)); *N.Y. 10-13 Ass'n*

## II.  JUDGE TORRES' CERTIFICATION OF A BACKWARDS-LOOKING RULE 23(B)(3) DAMAGES CLASS DOES NOT CONTROL PLAINTIFFS' EFFORT TO CERTIFY A FORWARD-LOOKING RULE 23(B)(2) INJUNCTION CLASS.

Beyond trying to preempt the Court's schedule for considering certification of Rule 23(b)(2) class by distorting the record to date, Plaintiffs seek to avoid their burden to prove *every* element of Rule 23 by claiming that Judge Torres' ruling certifying a Rule 23(b)(3) damages class somehow mandates certification here, even though Judge Torres made no findings about the impact of Goldman Sachs' challenged performance processes *after 2011*.  In fact, Judge Torres made clear that her certification decision "addresse[d] only the portion of Plaintiffs' motion that seeks class certification under Rule 23(b)(3)."  (Class Cert. Order at 12.)  Judge Torres recognized, in language that Plaintiffs studiously ignore, that "[c]lass claims for injunctive and declaratory relief under Rule 23(b)(2) and (c)(4) are now being pursued on a separate track—currently scheduled to be fully submitted in late 2018."  (*Id.* at 12–13.)  In addition, Judge Torres made no findings whatsoever about the cohesiveness of the putative Rule 23(b)(2) class members, or the adequacy or typicality of the lead Plaintiffs—who have undisputedly never been subject to the current processes Plaintiffs seek to enjoin—to represent a putative Rule 23(b)(2) injunctive class.  Under settled law, Plaintiffs cannot carry their burden to certify an injunctive class that will change Goldman Sachs' business operations and affect thousands of people (including non-class members) simply because Judge Torres certified a different class on a different record from a different time period.  *See Brown* v. *Kelly*, 609 F.3d 467, 482 (2d Cir. 2010) (certifying Rule 23(b)(3) class but denying certification of Rule 23(b)(2) class because "proposed class seems clearly to include members who are not at risk of injury,"

---

v. *City of New York*, 1999 WL 177442, at *17 (S.D.N.Y. Mar. 30, 1999) (Koeltl, J.) (courts "should defer decision on certification pending discovery if the existing record is inadequate for resolving the relevant issues") (quoting *Chateau de Ville Prods., Inc.* v. *Tams-Witmark Music Library Inc.*, 586 F.2d 962, 966 (2d Cir. 1978)).

and "injunctive relief . . . is not appropriate with respect to the . . . class as a whole"); *Aguilar*, 2012 WL 1344417, at \*7–9 (no commonality when expert statistics were based on five-year-old data).

Plaintiffs similarly presume that certification of an injunctive relief class must follow from Judge Torres' certification of a damages class. (May 2, 2018 Hr'g at 12:24–13:6, 14:18–20.) But this is not supported by the facts or the law. Were that so, Judge Torres would have ruled on Plaintiffs' motion to certify a Rule 23(b)(2) class, instead of referring that issue for discovery on the current record. (*See* August 30, 2017 Order at 1.) To the contrary, courts routinely certify Rule 23(b)(3) damages classes while denying certification of a related Rule 23(b)(2) injunction class.[12]

*First*, Plaintiffs claim, incorrectly, that Judge Torres' "order on Rule 23(a) is law of the case." (May 2, 2018 Hr'g at 14:18–20.) Not so. Plaintiffs must prove that they meet their burden as to *all* of the Rule 23(a) requirements, including adequacy and typicality, for a Rule 23(b)(2) class to be certified. Moreover, any class certification order "is inherently tentative,"

---

[12] *See, e.g.*, *Brown*, 609 F.3d at 482 (2d Cir. 2010) (granting Rule 23(b)(3) certification because plaintiffs were "allegedly aggrieved by a single policy of the defendants," and there is "strong commonality of the violation and the harm" but denying Rule 23(b)(2) certification because "proposed class seems clearly to include members who are not at risk of injury," and "injunctive relief . . . is not appropriate with respect to the . . . class as a whole."); *Merryman* v. *Citigroup, Inc.*, 2018 WL 1621495, at \*16 (S.D.N.Y. Mar. 22, 2018) (McMahon, C.J.) (granting Rule 23(b)(3) certification "[b]ecause the named Plaintiffs are themselves entitled to damages for past breaches of contract should they prevail on the merits" but denying Rule 23(b)(2) certification because "[a] plaintiff seeking injunctive relief must demonstrate both a likelihood of future harm and the existence of an official policy or its equivalent," and "Plaintiffs have not demonstrated a certainly impending future injury that could be redressed by this Court"); *MacNamara* v. *City of New York*, 275 F.R.D. 125, 141, 154 (S.D.N.Y. 2011) (Sullivan, J.) (granting Rule 23(b)(3) certification because plaintiffs established predominance of issues for claims of "individuals who were arrested as a group based on the alleged conduct of the group" but denying Rule 23(b)(2) certification because "Plaintiffs have failed to demonstrate a likelihood of future harm and therefore lack standing to seek injunctive relief," and "certification under Rule 23(b)(2) is appropriate only where injunctive or declaratory relief applies to the class as a whole"); *Selby* v. *Principal Mut. Life Ins. Co.*, 2000 WL 1863760, at \*2 (S.D.N.Y. Dec. 20, 2000) (Carter, J.) (granting Rule 23(b)(3) certification because "the appropriate final relief is predominantly money damages" but denying Rule 23(b)(2) certification because "plaintiffs have not produced any evidence of an ongoing harm").

because "actual, not presumed, conformance with Rule 23(a)" is required.  *Gen. Tel. Co. of S.W.* v. *Falcon*, 457 U.S. 147, 160 (1982) (quoting *Coopers & Lybrand* v. *Livesay*, 437 U.S. 463, 469 n.11 (1978)).

Judge Torres' findings as to Rule 23(b)(3) class members provide no basis to support a commonality finding as to a different putative class of current Goldman Sachs' professionals.  For example, because 360 scores no longer exist, and the feedback is now principally developmental, managers no longer take these scores into account in compensation or promotion decisions.[13]  Moreover, Judge Torres' findings of proof of disparate impact rested on statistics from 2003 to 2011, which provide *no* proof—let alone "significant proof"—that Goldman Sachs' *current* evaluation processes have a disparate impact on *current* Goldman Sachs' female professionals.  *Aguilar*, 2012 WL 1344417, at *7–9.  As to Plaintiffs' disparate treatment claim, Judge Torres made no findings that Goldman Sachs' *current* evaluation  processes had a disparate impact on its *current* female professionals, nor did she make any findings about whether Plaintiffs who have never been subject to the current processes are adequate and typical of a class seeking injunctive relief.  During the May 2 telephone conference, Plaintiffs made much of the fact that Judge Torres certified a Rule 23(b)(3) damages class "to the present." (May 2, 2018 Hr'g at 13:3–5; Class Cert. Order at 28 n.11.)  But Plaintiffs ignore that Judge Torres made no *findings* about the impact of Goldman Sachs' processes after 2011.[14]

---

[13]    (*See* Landman Decl. ¶ 6, ECF No. 546–1; Landman Dep. 29:3–4, 37:3–5, 85:24–86:1, 88:10–16, 96:12–97:1; Benz Decl. ¶¶ 7, 18, 20; GS0376157 at 2; GS0380339 at 2.)

[14]    *See In re Processed Eggs Prods. Antitrust Litig.*, 312 F.R.D. 124, 169 (E.D. Pa. 2015) ("[B]efore the Court can determine whether an injunction could be based on grounds that have general application to the class, it must know what policies of Defendants are ongoing and threaten future injury, and how any injunction could provide relief.  Plaintiffs have not provided the Court with sufficient evidence of Defendants' current policies or how an injunction could benefit the class.  Instead, their evidence has focused on past actions and past harm.").

*Second*, Rule 23(b)(2) differs from Rule 23(b)(3) in important ways. Should Plaintiffs prevail on the merits, a Rule 23(b)(2) class can seek an injunction requiring a business to change how it operates. And, unlike in a Rule 23(b)(3) class action, members of a mandatory Rule 23(b)(2) class have no opportunity to opt out of the class. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 343 (S.D.N.Y. 2002) (Scheindlin, J.) ("[T]he cohesiveness requirement is greater in a Rule 23(b)(2) class action than in a 23(b)(3) action, because unnamed class members are bound by the action without the opportunity to opt out.") (internal quotation marks, alterations, and citations omitted) (collecting cases). Indeed, Plaintiffs themselves claim that the challenged processes operate "firmwide" (Pls.' Objs. to R&R at 6, 12–13, 35, 50, ECF No. 511), including impacting non-class members. Accordingly, courts and commentators have recognized a heightened cohesiveness requirement that Plaintiffs must satisfy to certify a mandatory Rule 23(b)(2) class. *See, e.g.*, *In re Rezulin*, 210 F.R.D. at 75 (denying Rule 23(b)(2) class certification where the putative class "proposed here does not have the requisite level of cohesion"); *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. at 343 ("[T]he cohesiveness requirement is greater in a Rule 23(b)(2) class action than in a 23(b)(3) action, because unnamed class members are bound by the action without the opportunity to opt out") (citation omitted); Newberg on Class Actions § 4:33 ("Given the mandatory nature of (b)(2) certification, courts have hesitated to certify such classes absent some assurance that they indeed embody the cohesiveness that justifies certification.").[15] Plaintiffs thus cannot subject Goldman

---

[15]   *See also Kartman* v. *State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 n.8 (7th Cir. 2011) ("Where a class is not cohesive such that a uniform remedy will not redress the injuries of *all* plaintiffs, class certification is typically not appropriate.") (emphasis in original); *Shook* v. *Bd. of Cty. Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008) ("Rule 23(b)(2) demands a certain cohesiveness among class members with respect to their injuries, the absence of which can preclude certification."); *Maldonado* v. *Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007) (upholding denial of Rule 23(b)(2) class certification because "individualized issues here

Sachs to Rule 23(b)(2) certification, with its far-reaching implications, based solely on a prior determination about a different class during a different time period.

## CONCLUSION

For the foregoing reasons, this Court should deny the motion to modify the schedule for Rule 23(b)(2) discovery and briefing.

Respectfully,

*/s/ Robert J. Giuffra, Jr.*

| | |
|---|---|
| Barbara B. Brown *(admitted pro hac vice)* | Robert J. Giuffra, Jr. |
| Neal D. Mollen *(admitted pro hac vice)* | Theodore O. Rogers, Jr. |
| Carson H. Sullivan *(admitted pro hac vice)* | Ann-Elizabeth Ostrager |
| PAUL HASTINGS LLP | Joshua S. Levy |
| 875 15th Street, NW | SULLIVAN & CROMWELL LLP |
| Washington, DC  20005 | 125 Broad Street |
| | New York, NY  10004 |
| | (212) 558-4000 |

*Attorneys for Defendants*
*The Goldman Sachs Group, Inc. and*
*Goldman Sachs & Co. LLC*

May 23, 2018

---

overwhelm class cohesiveness"); *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005) ("Because 'unnamed members are bound by the action without the opportunity to opt out' of a Rule 23(b)(2) class, even greater cohesiveness generally is required than in a Rule 23(b)(3) class.") (quoting *Barnes* v. *Am. Tobacco Co.*, 161 F.3d 127, 142–43 (3d Cir. 1998)).