# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; LISA PARISI; and SHANNA ORLICH, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>     -against-<br><br>GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,<br><br>        Defendants. | NO. 10-CV-6950-AT-RWL<br><br>**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO MODIFY SCHEDULE** |

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   RELEVANT DISCOVERY RECORD ................................................ 4

    A.    It Is Undisputed That Goldman Still Uses the 360 Review as a Factor in the Manager Quartile. ................................................ 5

    B.    It Is Undisputed That Goldman Still Uses the Manager Quartile in Making Pay and Promotion Decisions. ................................ 6

    C.    Plaintiffs' Common Critiques of the 360 Review and Manager Quartiling Persist Undisturbed. .............................................. 7

III.  ARGUMENT ...................................................................................... 9

    A.    The Changes to the Performance Review Process Do Not Impact the Analysis the Court Is Required to Perform Under Rule 23(b)(2). ......................... 9

        1.    The Changes Are Immaterial to the Legal Standard for Class Certification Under Rule 23(b)(2). .......................... 9

        2.    Goldman's Cases About the Specter of "Stale Records" Are Inapposite. ................................................... 11

        3.    Dr. Ward's Statistical Analysis Is Irrelevant, and Also Incorrect. .......... 14

    B.    Judge Torres's Certification of a Rule 23(b)(3) Class Streamlines the Issues for Consideration in the Rule 23(b)(2) Motion. ................................ 15

IV.  CONCLUSION .................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aguilar* v. *ICE,*
   No. 07 Civ. 8224, 2012 WL 1344417 (S.D.N.Y. Apr. 16, 2012)...................................... 13, 14

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997)................................................................................................ 10

*Brown v. Kelly,*
   609 F.3d 467 (2d Cir. 2010) ................................................................................... 12, 13

*Easterling v. State Dep't of Corr.,*
   278 F.R.D. 41 (D. Conn. 2011) ............................................................................... 16

*Ellis v. Costco Wholesale Corp.,*
   285 F.R.D. 492 (N.D. Cal. 2012)............................................................................. 15, 16

*Ellis v. Tribune Television Co.,*
   443 F.3d 71 (2d Cir. 2006) ..................................................................................... 4, 17

*Hospital Association of New York, Inc. v. Toia,*
   577 F.2d 790 (2d Cir. 1978) ................................................................................... 12

*Houser v. Pritzker,*
   28 F. Supp. 3d 222 (S.D.N.Y. 2014) ....................................................................... 4, 11, 12

*In re Initial Pub. Offerings Sec. Litig.,*
   471 F.3d 24 (2d Cir. 2006) ..................................................................................... 11

*In re Processed Eggs Prods. Antitrust Litig.,*
   312 F.R.D. 124 (E.D. Pa. 2015)............................................................................... 13

*McGee v. Pallito,*
   No. 1:04 Civ. 00335, 2015 WL 5177770 (D. Vt. Sept. 4, 2015)............................. 14

*Robinson v. Metro–North Commuter Railroad Co.,*
   267 F.3d 147 (2d Cir. 2001) ................................................................................... 14

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011)................................................................................................ 3, 10, 11

*Watson v. Fort Worth Bank & Trust,*
   487 U.S. 977 (1988) ............................................................................................... 11

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**RULES**

Fed. R. Civ. P. 23 ..................................................................................................... *passim*

**TREATISES**

Wright & Miller, 7A Federal Practice and Procedure
  § 1759 (3d ed.) ........................................................................................................ 15

## I.   __INTRODUCTION__

At the May 2, 2018 hearing, this Court instructed the parties to assist the Court in understanding how the materiality (or lack thereof) of changes to Goldman's performance policies impacts the Federal Rule of Civil Procedure ("Rule") 23(b)(2) class certification determination here:

> [H]ow does it impact the class certification question if [the performance evaluation policy] ha[s] changed and if it hasn't? . . .
>
> I have the cases about stale record, I've read the facts of those cases, I don't know that I've really seen spelled out the logic of why it necessarily makes a difference, and why it would make a difference in this setting.

ECF No. 595 (May 2, 2018 Hr'g Tr.) at 20:15-16; 22:11-15.  Despite the Court's instruction, Goldman's opposition to Plaintiffs' Motion to Modify Schedule avoids the Court's question. Instead, Goldman raises baseless due process concerns and ignores the limited fact record *it fought to constrain* on its purported policy changes, introducing in its place yet another new evidentiary record in the form of newly-generated supporting material.  Yet this litigation "evidence" consists only of irrelevant and misleading statistical analysis, an Industrial Organizational Psychologist expert who affirms the continuing problems with the performance system identified by Plaintiffs' class certification expert, and new fact witness statements that actually corroborate the uncontested facts Plaintiffs have identified regarding the unchanged performance evaluation practices.  Goldman's brief misses the mark.

In response to the Court's instruction, Plaintiffs respectfully re-cap the relevant background as follows:  The parties are now before the Court supplementing the previously-closed class certification discovery record because Goldman claimed in 2015, and again in 2017, that it significantly changed its performance review systems and therefore that the class record

1

submitted with briefing in 2014 needs to be updated.[1]  While there are a few cases considering the staleness of a record before imposition of an injunctive remedy on the merits, there are *no* cases supporting re-opening the pre-certification evidentiary record on the facts presented here. Where, as here, the original class record readily met the standard for Rule 23(a) commonality, the proffered changes do not fix the original class critique or cure the disparities, and the common practices continue firmwide, fighting over the contours of a potential future injunction is unnecessary and inefficient.

Indeed, it is undisputed that Goldman still uses the 360 review as a factor in the secret Manager Quartile (forced ranking), and Goldman still uses the Manager Quartile as a factor in pay and promotion outcomes.  These common practices provide a basis for "injunctive relief or corresponding declaratory relief . . . respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2). Goldman's minor changes to the 360 review and Manager Quartile processes do not address, much less eliminate, the common problems with these common systems and thus are completely irrelevant to whether this Court should grant class certification under Rule 23(b)(2).

Contrary to Goldman's arguments, Plaintiffs do not seek to deprive Goldman of the opportunity to contest that the requirements of Rule 23(b)(2) are satisfied.  In fact, Plaintiffs' motion *asks the Court to set a briefing schedule promptly* for supplemental briefing on the 23(b)(2) requirement.[2]  Instead, Plaintiffs seek an order terminating a costly and unnecessary

---

[1] Notably, Plaintiffs' challenge to Goldman's biased performance systems is only one part of this litigation, as Plaintiffs also challenge Goldman's common compensation-setting (where, as relevant here, Goldman pays female Associates and Vice Presidents less than comparable males *even accounting for tainted performance scores*) and promotion systems.  Goldman has not claimed that its compensation or promotion systems have changed, and the discovery on the class claims attacking compensation and promotion systems has not been disturbed.

[2] Plaintiffs do not seek reconsideration of Judge Torres's order that Rule 23(b)(2) briefing proceed before Your Honor (ECF No. 540), but rather modification of the Order requiring supplemental expert reports on the supposed "new" policies, such that Rule 23(b)(2) briefing

supplemental pre-class certification expert discovery process, because the existing evidentiary record (based on policies that are unchanged as to the common issues infecting them) is sufficient for the Court to make the Rule 23(b)(2) determination.

Importantly, at the merits stage, the Court will determine whether Plaintiffs have met their burden of proving that Goldman's performance evaluation policies (as well as its compensation and promotion polices) have a disparate impact on women in violation of Title VII.  Only then would injunctive relief follow, based on the record at that time during the remedial phase of the case.  And both sides agree that the parties will submit additional expert reports based on the updated record at the merits stage.  What Goldman cannot explain is why updated expert reports are necessary at this stage, when the question before the Court is not whether Plaintiffs have proven that an injunction should be granted on the merits, but rather whether an injunction regarding the common policies would apply to the class as a whole, at the remedial stage of the case.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) ("23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."); *Houser v. Pritzker*, 28 F. Supp. 3d 222, 249 (S.D.N.Y. 2014) (explaining that a court need not craft injunctive relief at class certification stage and that "[t]here is no reason to believe the Court will be unable [to] craft such an appropriate remedy if and when it reaches that [remedies] stage").

---

takes place without further delay on an unnecessary new expert record.  Accordingly, the standards for motions for reconsideration do not apply here.  Further, under Goldman's own authorities, Plaintiffs meet the applicable standard for good cause as they brought their motion diligently, just two weeks after completing discovery on the current policies.  *See* Opp. at 1-2 (citing *Fresh Del Monte Produce, Inc.* v. *Del Monte  Foods, Inc.*, 304 F.R.D. 170, 174 (S.D.N.Y. 2014) ("'Good cause' inquiry for modification of a scheduling order turns on the diligence of the party seeking to modify the scheduling order.")).

Goldman also misrepresents Plaintiffs' position as arguing that "Judge Torres's ruling certifying a Rule 23(b)(3) damages class somehow mandates certification here." Opp. at 21. Not so. Plaintiffs agree that Rules 23(b)(2) and 23(b)(3) have different requirements, and have never argued that certification of one mandates certification of the other. The import of Judge Torres's ruling is rather that the requirements of Rule 23(a) have been found satisfied— requirements that are a *predicate* for any type of Rule 23(b) class (and for which Judge Torres also found Rule 23(b)(3) satisfied). Accordingly, while considering satisfaction solely of the Rule 23(b)(2) element, this Court may not revisit Judge Torres's findings as to Rule 23(a); in fact, to do so would be to risk an inconsistent adjudication, avoidance of which is the very purpose of the law of the case doctrine. *See Ellis v. Tribune Television Co.*, 443 F.3d 71, 88 (2d Cir. 2006) (noting that "conflicts arising within the same case are especially problematic" and precisely what the "law of the case" doctrine is designed to avoid). In light of the current record before the Court, however, briefing on Rule 23(b)(2) is ripe for completion now.

## II.    RELEVANT DISCOVERY RECORD

Goldman's opposition relies on thirteen corporate documents (ECF Nos. 598-2-14) previously produced pursuant to this Court's January 11, 2018 Order requiring supplementation of Goldman's performance policies (ECF No. 565), and seven brand new declarations not previously disclosed. This newly-created evidence includes statements from five managers (ECF Nos. 598-15-19); plus one from Industrial Organizational Psychologist Kathleen Lundquist (ECF No. 598-18),[3] and one from economist Michael Ward (ECF No. 598-21). Critically, this

---

[3] Goldman attempts to introduce factual evidence regarding the performance review policy through Ms. Lundquist's expert "opinion," which contradicts the contrary Rule 30(b)(6) admissions of its own corporate witness, David Landman, during his March 3, 2018 deposition. *See* Mot. at 5-16 (citing Landman's testimony regarding consistency of processes over time). While this was an inappropriate use of expert testimony, Ms. Lundquist's declaration is

evidence all accords with Plaintiffs' fundamental point: firmwide, (1) Goldman still uses the common 360 review with common, invalid criteria as a factor in the Manager Quartile, and (2) Goldman still uses the common Manager Quartile with common, invalid criteria as a factor in pay and promotion outcomes.[4]

A.   **It Is Undisputed That Goldman Still Uses the 360 Review as a Factor in the Manager Quartile.**

Goldman contends that it has changed the 360 review from an emphasis on numerical scoring to an emphasis on developmental feedback.  Yet it remains uncontested that during the 360 review process, each manager assigns his or her direct reports one of three available "overall manager ratings": Outstanding, Good, or Needs Improvement.[5]  ECF No. 598-8 ("New Approach To Feedback"); *see also* ECF No. 598-15 (Cassidy Decl.), ¶ 10 ("I find the 360 feedback to be very helpful when I am arriving at my overall manager rating for the professional"); ECF No. 598-16 (Cohen Decl.), ¶ 8 ("[P]rofessionals receive a written package that includes my overall manager rating of the professional (outstanding, good, or needs improvement)."); ECF No. 598-17 (Levene Decl.), ¶ 5 ("The new 360 . . . allows the reviewers to provide an assessment ('outstanding,' 'good,' or 'needs improvement') as to each question."); ECF No. 598-18 (Lundquist Decl.), ¶ 9 (post-2016, managers still "provide an overall rating of performance using the 3-point rating categories"); ECF No. 598-21 (Ward Decl.), ¶¶ 5-9 (presenting statistical analysis of overall manager rating results for men versus women).

---

ultimately untethered to the core issues identified by Plaintiffs and irrelevant, except insofar as she corroborates the fundamental aspects of the policies that are uncontested.

[4] Again, Goldman did not proffer any changes to its separate compensation and promotion policies, which remain challenged classwide for their discriminatory impact on women.

[5] The "overall manager rating" is distinct from the "overall 360 ratings" that are provided by reviewers other than the manager.  *See* ECF No. 598-9 ("Key Updates"); ECF No. 598-6 (sample current 360 form).

Likewise, Goldman's own evidence confirms that the overall manager rating is a factor in the Manager Quartile.  The document that Goldman submitted at ECF No. 598-9 explains this concisely:

> **Philosophy**: policy for how we will use Feedback360+ data for talent decisions (PDF)
>   - Overall 360 ratings and ME 'scores' will not be fed into decision-making rosters for quartiling, compensation, promotions and other decisions
>   - The manager's overall rating, which takes into account the 360 and ME feedback, will feed into decision-making

*See also* ECF No. 598-15 (Cassidy Decl.), ¶ 10 ("I am now only provided with the overall manager rating during the manager quartiling process"); ECF No. 598-16 (Cohen Decl.), ¶ 9 ("[W]hen I am asked to assign manager quartiles . . . I am only provided with my overall manager rating."); ECF No. 598-17 (Levene Decl.), ¶ 8 (declaring that manager quartile placements are "informed in part by the overall manager rating during the 360 process"); ECF No. 598-18 (Lundquist Decl.), Table 1 ("Information from 360 and Manager Review for Manager Quartiling Process" includes "Manager overall 3-point categorical rating").[6]

**B.     It Is Undisputed That Goldman Still Uses the Manager Quartile in Making Pay and Promotion Decisions.**

Goldman does not now contest, and never has contested, that the Manager Quartile is a major factor in pay and promotion decisions at the firm.  Nor could it.  Each year, the firm issues "Manager Quartiling Guidelines," and the document states consistently over time that the Manager Quartile's purpose is to serve as an input into these key personnel decisions:

---

[6] *See also* ECF No. 590 (Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Modify Schedule) at 6, showing GS0380249.

6

Purposes of Manager Performance Quartiles
 – Identify top, middle and bottom performers (relative to peers)
 – Input to talent management decisions (e.g., promotions, professional development, mobility, program nominations, etc.)
 – Consideration in compensation recommendations
 – Consideration in terminations of underperforming employees and business reorganizations and downsizings

ECF No. 598-10 (2017); *see also* ECF No. 591-1 (compendium of Manager Quartiling Guidelines over time).  And, notably, its original claim that the Manager Quartiling system has undergone major changes has largely and quietly dropped away, as Goldman has effectively conceded the non-materiality of these changes, from ongoing feedback to soft shoulders in the forced ranking.  *Compare* ECF No. 546-1 (Landman Declaration), ¶¶ 20-28 (describing "major changes" to quartiling) *with* Opp. at 10-15 (description of changes to quartiling focused completely on extent to which managers rely on 360 results).

### C.   Plaintiffs' Common Critiques of the 360 Review and Manager Quartiling Persist Undisturbed.

In sum, there is no dispute that Goldman's performance measures for the entire class period are (1) a 360 review and (2) Manager Quartiling.  Whatever version of these processes has been in place each year have been in place for all class members with absolutely no evidence that Goldman has any intention of discontinuing their use in the future.  Plaintiffs have presented critiques of (a) the common 360 degree review process, (b) the common Manager Quartiling process, (c) how the two interact with each other and, in turn, feed into other processes that have adverse impact, and (d) the common lack of training and monitoring of these systems.  *See, e.g.*, ECF No. 260 (Cascio Report); ECF No. 315 (Cascio Rebuttal Report).

The issue with the 360 review has never been primarily whether it uses 9, 3, or some other number of ratings.  In fact, Plaintiffs have observed that scores have always clustered in a narrow range in the 360, and Goldman itself stated that scores were too clustered (and therefore disconnected from performance) when it changed the range from five to nine levels earlier in the

7

Class Period (a period already discovered under the prior evidentiary record). ECF 248-6 at 16.[7] The issue with 360 reviews—where employees are reviewed by subordinates, peers, and managers—is that they are not reliable tools for measuring performance as implemented by Goldman Sachs. Cascio Report, ¶¶ 95-103; Cascio Rebuttal, ¶¶ 47-57. And despite the critiques raised by Plaintiffs in this case, Goldman still permits these unreliable 360 scores to feed into the other performance measure, forced ranking ("Manager Quartiling").

Similarly, the issue with Manager Quartiling is not the extent to which it relies on the 360 score per se (notably, then and now there is no weighting of the factors that go into Manager Quartiling, including the 360 score), but that Manager Quartiling forces an artificial distribution of tightly clustered performance scores. Cascio Report, ¶¶ 85-86.[8] The result is that the Manager Quartile can be untethered to actual performance, especially given there is no proper rater calibration and the criteria are unreliable. *Id*. ¶¶ 88-91. That the 360 scores have now been compressed into three categories may exacerbate the difficulty of then imposing a forced rank that describes actual performance, but this is nothing new. *Id*. ¶¶ 82-84. And this forced ranking process remains a secret from employees, rendering even more problematic Goldman's current purported focus on transparency. *Id*. at 80; *cf*. ECF No. 591-6 (Landman Tr.) at 90:15-19.

Despite Goldman's statements that the performance evaluation system's adverse impact on female professionals has been remedied, preliminary analysis of the updated data shows that even during the more recent 2012-2017 time frame, female Vice Presidents continue to be

---

[7] In fact, regardless of the time period and the range of 360 review scores (*e.g.*, 3, 5, or 9 categories) available, between 97.5 and 99.5 percent of 360 scores were clustered in two of the available categories. June 6, 2018 Declaration of Henry S. Farber ("Farber Decl."), filed herewith, ¶ 11.

[8] *See also* Farber Decl., Table 4 (showing that despite Goldman's claim that Manager Quartiling is not a "forced" distribution, the actual distribution of Vice President quartiles between 2015-2017 show remarkable consistency).

disadvantaged from being placed in the Top Quartile.  Farber Decl. ¶¶ 8-9, Table 3.  Moreover, those female Vice Presidents within the Top Quartile are *paid less* than their male peers in the Top Quartile who share the same objective characteristics.  *Id*. at Table 3.  When tainted performance scores are not included as a control for pay, female Vice Presidents earn 24.4% less than their male peers with the same objective characteristics.  *Id*.  The tainted performance scores account for 3.4% of this pay gap, with the rest resulting from Goldman's common, unreliable, and biased compensation process, which Plaintiffs have challenged separately and is not part of the current dispute about updated policies.[9]  *Id*.  Remarkably, while Goldman has narrowed the gender gap in performance scores in the 2012-2017 period (and perhaps in the wake of this litigation), the gender pay gap has actually *increased* from 22.4% to 23.3%.  *Id*.  In fact, the pay difference for the top quartile increased even more dramatically: from 25.7% to 32.0% during the same corresponding time periods.  *Id*.  In other words, Goldman has made a public display of improving its feedback to women, while still paying them less.

## III.    <u>ARGUMENT</u>

### A.    <u>The Changes to the Performance Review Process Do Not Impact the Analysis the Court Is Required to Perform Under Rule 23(b)(2).</u>

Because it is uncontested that Goldman still uses the 360 review and the Manager Quartile as a determinant in pay and promotions, an injunction against either or both of these processes, if granted at the merits stage, would apply to the Class as a whole.

#### 1.    **The Changes Are Immaterial to the Legal Standard for Class Certification Under Rule 23(b)(2).**

"Rule 23(b)(2) permits class actions for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.'  Civil

---

[9] Dr. Farber has not completed his study of the new data, including performance or pay for Associates, or promotions from Vice President to Managing Director.  Farber Decl., ¶ 9.

rights cases against parties charged with unlawful, class-based discrimination are prime examples." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (citations omitted).  In *Dukes*, the Supreme Court explained:

> The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.

564 U.S. at 360 (quotation marks and citation omitted).

None of Goldman's changes to the performance evaluation process impact this analysis, because they do not call into question whether the 360 review and Manager Quartiling affect the proposed Class as a whole.  At the merits stage, the parties will dispute whether Goldman's performance evaluation, compensation, and promotion processes in fact disparately impact women, and, if so, whether they are based on legitimate business reasons and whether a less discriminatory alternative exists. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-98 (1988).  At that stage, the details of the policies may affect the opinions of the parties' respective experts on whether the policies are justified by business necessity or whether less discriminatory alternatives are available.  But for purposes of Rule 23(b)(2) class certification, the Court need only determine whether the challenged common employment practice applies classwide, such that "a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360; *see also Houser*, 28 F. Supp. 3d at 249 (explaining that at the class certification stage "it is not necessary to speculate about the precise contours of such [(b)(2)] relief" and "[a]ll that matters is that the Court has the equitable power and the practical ability to fashion some form of injunctive or declaratory relief that would apply to all members

10

of the proposed (b)(2) class"); ECF No. 363 at 34 (J. Francis Order denying Plaintiffs' motion to exclude the opinion of Goldman's expert Industrial Organizational Psychologist because the critiques "go exclusively to Dr. Campion's opinions on the merits of their claims and not to issues of class certification").  Because the 360 review and Manager Quartiling have remained not only in effect, but as inputs into the pay and promotion outcomes, an injunction or declaratory judgment as to these processes would provide relief to each member of the proposed Class here.[10]

## 2.  Goldman's Cases About the Specter of "Stale Records" Are Inapposite.

In all the briefing submitted since Goldman first argued that its changes to the performance review policy required new discovery and briefing (ECF No. 487), Goldman has never been able to explain why the record must be updated for the Court to decide Rule 23(b)(2). Instead, it has merely repeated the same inapposite cases.  None address the situation before the Court here.

*Hospital Association of New York, Inc. v. Toia*, 577 F.2d 790 (2d Cir. 1978) does not even arise in the class action context.  Instead, there the Court found no abuse of discretion in the district court's dismissal of a complaint, noting that it was immaterial "whether or not [the challenged practice] be labelled moot or the record rendered stale" because "other actions [are]

---

[10] Perplexingly, Goldman suggests that "[a]t best, Plaintiffs have raised a fact dispute, which the Court should resolve" through the current discovery and class certification schedule.  Opp. at 20. However, the Court must not make merits determinations at the class certification stage when, as here, those determinations are unrelated to the elements of Rule 23.  *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) ("[A] district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement.").  Here, the question to be decided by the Court is whether "Plaintiffs liability claims are capable of classwide resolution"—which Plaintiffs have shown.  *See Houser*, 28. F Supp. 3d at 244 (noting "[i]t therefore would be inappropriate for me to opine as to the validity of the experts' merits conclusions at this preliminary [class certification] stage").

11

pending that seek to challenge the validity of the current methodology." *Id*. at 798.  *Toia* thus

offers no authority on what the state of the record needs to be for a Rule 23 determination.

Of Goldman's three cases that do arise in the class action context, none are on point.  In

*Brown v. Kelly*, 609 F.3d 467 (2d Cir. 2010), plaintiffs sought certification of a New York

statewide class to enjoin specific New York City officials from enforcing an unlawful statute.

But because proposed state class members who lived outside the City were not at risk of harm by

City officials, injunctive relief against City officials was not available to the class as a whole.  *Id*.

at 482.  *Brown* has nothing to do with whether the evidentiary record needed to be updated to

support certification of an injunctive relief class.  *In re Processed Eggs Prods. Antitrust*

*Litigation*, 312 F.R.D. 124 (E.D. Pa. 2015) is likewise off point.  There, the court found that the

parties had not adequately addressed the legal issues presented by the proposed 23(b)(2) class

and invited plaintiffs to re-submit their motion for certification with a specific direction to rely

on the *existing* record:  "Nevertheless, the Court is not convinced that the Rule 23(b)(2) class

could not be certified *using the evidence already in the record*.  The Court will thus provide

Plaintiffs with the opportunity to renew their motion for certification of their injunction class.

However, any such motion should discuss in detail *and with citation to the now-existing*

*evidentiary record . . . ." Id*. at 170 (emphasis added).  *Processed Eggs* does not help Goldman.

That leaves *Aguilar* v. *ICE*, No. 07 Civ. 8224, 2012 WL 1344417 (S.D.N.Y. Apr. 16,

2012), with which this Court is already very familiar.  A critical point about this case bears

emphasis:  the question in *Aguilar* was not whether specific challenged policies were on-going

because, unlike here, the existence of common questions of law and fact did not derive from

ICE's policies.  *Id*. at *6.  Rather, while ICE had a consistent policy of non-discrimination

throughout the time period, plaintiffs' claim was that individual ICE agents deviated from the

policy in an unlawful way.  *Id*.  The court only had proof in the form of eight anecdotes from

2007, a record that, *unlike here*, the court observed would have been insufficient to find 23(a)

commonality even in 2007 (the year of the anecdotes), much less five years later where no new

proof of policy deviations were available and a new federal administration was operating ICE.

2012 WL 1344417, at *7.  The court thus could not certify a class for injunctive relief from

conduct that may or may not have been common in any year.  *Id*. at *6-7.  By contrast, here it is

undisputed that the challenged performance review policy is on-going and systemwide,

regardless of some minor modifications, and that it remains a major driver of compensation and

promotion decisions.  Therefore, if the challenged policy were found unlawful on the merits, an

injunction against it would provide relief to the class as a whole.

In fact, several courts have certified Rule 23(b)(2) classes based on evidence that was

discovered years prior to the court's class certification ruling.  *See, e.g.*, *Robinson v. Metro–*

*North Commuter Railroad Co.*, 267 F.3d 147, 167, 172 (2d Cir. 2001) (reversing district court's

denial of class certification with instructions to certify a disparate impact class pursuant to Rule

23(b)(2) more than four years after the district court's initial denial based on substantially the

same record); *McGee v. Pallito*, No. 1:04 Civ. 00335, 2015 WL 5177770, at *1, *5-6 (D. Vt.

Sept. 4, 2015) (denying motion to decertify a Rule 23(b)(2) class approximately nine years after

first granting certification based on substantially the same evidentiary record, and rejecting

defendant's arguments based on new challenges to plaintiffs' expert opinions because challenges

went to the merits rather than to the propriety of class-wide treatment); *Ellis v. Costco Wholesale*

*Corp.*, 285 F.R.D. 492, 496 (N.D. Cal. 2012) (after appeal based on *Dukes*, certifying 23(b)(2)

class in 2012 based on expert reports submitted with original motion in 2006).  This is

13

unsurprising given that class actions often take longer than individual cases to discover and to brief.  This case is no different.

### 3.  Dr. Ward's Statistical Analysis Is Irrelevant, and Also Incorrect.

Dr. Ward's statistical analysis does not address the Court's question:  what impact do the changes to the performance evaluation policy have on class certification?  Instead, it appears to be a preview of the report that Goldman will likely submit at the merits stage to argue that its performance evaluation policy does not have a disparate impact on class members.  However, even though Plaintiffs' expert Dr. Henry Farber has not completed his analysis of the updated data, he can already determine that Dr. Ward's new study is misleading.  Ward purports to use Dr. Farber's models, which Judge Torres approved for purposes of the class certification analysis (*see* ECF No. 578 at 18-21).  However, he fails to report what Dr. Farber has found:  that the problems at Goldman have actually grown worse, not better, for women.  Female Vice Presidents remain underpaid by 24.4% compared to their male counterparts due to Goldman's biased compensation policies, including 3.4% of that pay difference explained by the biased performance evaluation process alone.   Farber Decl., Table 3.[11]

As noted above, Dr. Ward is also incorrect in finding that women are no longer disadvantaged in the 360 review and Manager Quartiling processes.  *Compare* Ward Decl., Tables 1-2 *with* Farber Decl., Table 3.  Thus, Dr. Ward's thesis—that the performance review outcomes for women are so different post-2016 as compared to before that they must result from a different process—likewise fails.

---

[11] The continued, bleak reality for women at Goldman is also borne out in the 72 formal complaints lodged by female professionals (including Associates, Vice Presidents, Managing Directors, and Analysts) in the three class divisions between 2012 and 2017 regarding unfair treatment of women, unequal pay of women, sexism, sexual harassment, hostile work environment, pregnancy discrimination, maternity discrimination, retaliation, and/or other gender discrimination.  Declaration of Michelle A. Lamy, filed herewith, ¶ 2.

**B.**     **Judge Torres's Certification of a Rule 23(b)(3) Class Streamlines the Issues for Consideration in the Rule 23(b)(2) Motion.**

Judge Torres's Order certifying a Rule 23(b)(3) class does not mandate certification of a Rule 23(b)(2) class because the requirements for each type of class are different.  Fed. R. Civ. P. 23.  However, the Order does streamline the matters for consideration before this Court.  In order to reach Rule 23(b)(3), Judge Torres first had to find that the requirements of Rule 23(a) were met.  The requirements of Rule 23(a) are a predicate for any type of Rule 23(b) class, and do not vary depending on the type of 23(b) class sought.  *E.g.*, Wright & Miller, 7A Federal Practice and Procedure § 1759 (3d ed.).  To illustrate, in cases where plaintiffs seek certification under multiple prongs of Rule 23(b), courts do not review the Rule 23(a) factors multiple times, one for each Rule 23(b) class sought; they do so once, and for all Rule 23(b) purposes.  *E.g.*, *Easterling v. State Dep't of Corr.*, 278 F.R.D. 41, 47-48 (D. Conn. 2011); *Ellis*, 285 F.R.D. at 495.

This Court should not consider Rule 23(a) elements again.  To reconsider whether Plaintiffs have satisfied Rule 23(a) after Judge Torres has already ruled on this question would impermissibly disturb the law of case.  *Tribune Television*, 443 F.3d at 88.

**IV.**     **CONCLUSION**

For the reasons set forth above and in Plaintiffs' opening memorandum of law, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion to Modify Schedule.

Dated:  June 6, 2018                                 Respectfully submitted,

                                                                  By:/s/ *Kelly M. Dermody*

                                                                  Kelly M. Dermody (admitted *pro hac vice*)
                                                                  Anne B. Shaver (admitted *pro hac vice*)
                                                                  Michelle A. Lamy (admitted *pro hac vice*)
                                                                  **LIEFF, CABRASER, HEIMANN &
                                                                  BERNSTEIN, LLP**

15

275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Rachel Geman
**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

Adam T. Klein
Cara E. Greene
Melissa Stewart
**OUTTEN & GOLDEN LLP**
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000
Facsimile:  (212) 977-4005

*Attorneys for Plaintiffs and the Putative Class*

1564716.5

16