**SULLIVAN & CROMWELL LLP**

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

December 14, 2018

Via ECF

The Honorable Robert W. Lehrburger,
    United States District Court for the
        Southern District of New York,
            500 Pearl Street,
                New York, New York 10007-1312.

      Re:    *Chen-Oster, et al.* v. *Goldman, Sachs & Co., et ano*.
              No. 10 Civ. 6950 (AT) (RWL)

Dear Judge Lehrburger:

        On behalf of Defendants Goldman Sachs & Co. LLC and The Goldman Sachs Group, Inc. ("Goldman Sachs" or the "Firm"), and further to Your Honor's request during the October 22, 2018 conference that the parties identify cases relevant to trial of the claims asserted in this case (Hr'g at 51:21–52:2), we write to provide you with a recent decision in *Kassman* v. *KPMG LLP*, 2018 WL 6264835 (S.D.N.Y. Nov. 30, 2018) (Schofield, J.), denying class certification under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

        In *Kassman*, employees of KPMG LLP ("KPMG") filed a Title VII complaint alleging gender discrimination. Much like the Rule 23(b)(3) damages class certified by Judge Torres here, the putative class in *Kassman* consisted of female Associates, Managers, Directors and Managing Directors within KPMG's Tax and Advisory Functions since October 30, 2009. 2018 WL 6264835, at *2. Judge Schofield found that plaintiffs' disparate impact and disparate treatment claims lacked commonality based, in part, on two critical findings: (1) the class comprised a "myriad" of jobs covering "wide-ranging educations, experiences, skills and specializations of employees across the 150 Cost Centers" in KPMG's Tax and Advisory business, *id*. at *4, *17; and (2) KPMG's senior management had "limited oversight" of pay and promotion decisions, which were largely left to the discretion of "individual decision makers or groups at the practice area level." *Id*. at *18–19. Judge Schofield further found that the challenged "pay and promotion procedures act more as a framework that dictates *who* will make discretionary decisions rather than *how* they will exercise their discretion." *Id*. at *18 (emphasis added). Judge Schofield accordingly concluded "there are no common questions that will generate 'common answers' in a classwide proceeding" and denied certification. *Id*. at *24.

        In denying class certification, Judge Schofield distinguished KPMG's Tax and Advisory business from Goldman Sachs' far more complex Investment Banking, Securities and Investment Management Divisions, on the basis of conclusions that Judge

The Honorable Robert W. Lehrburger                                                                -2-

Torres reached, without an evidentiary hearing or oral argument, in her class certification order.  It is blackletter law that findings or conclusions made for purposes of certification are non-binding.  *Coopers & Lybrand* v. *Livesay*, 437 U.S. 463, 469 n.11 (1978) (denial or grant of class status "is inherently tentative"); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (determination of Rule 23 requirement made for purposes of class certification is not binding on the trier of fact "even if that trier is the class certification judge").  As shown below (and as Defendants will prove in due course), this case is, in fact, similar to *Kassman* in several respects.

*First*, Judge Schofield distinguished this case on the basis that class members here hold only "two positions" as compared to the "myriad of job descriptions" at KPMG "ranging from accountants to scientists, engineers, attorneys and Ph.D. economists, at levels of seniority ranging from Associate to Managing Director."  2018 WL 6264835, at *17.  In fact, the highly complex Securities, Investment Banking and Investment Management Divisions at issue encompass a "myriad of job descriptions" more varied than KPMG's Tax and Advisory business.  As Magistrate Judge Francis found, for example, employees in the Securities Division "conduct transactions in stocks, options, futures, interest rate products, credit products, mortgages, currencies, and commodities," whereas employees in the Classic Banking or Financing sub-divisions within Investment Banking, "specialize in particular industries, advising the directors and managers of Goldman's clients on strategic matters such as mergers, debt offerings, and equity offerings" or work on "specific financing transactions such as the issuance of leveraged financing, structured financing, or equity."  (ECF No. 364 at 4–5.)  The Investment Management Division was found to be just as varied and complex:  employees in its two sub-divisions, Private Wealth Management and Asset Management, "provide[] wealth advisory and investment management services to high net-worth individuals and certain foundations and endowments" or "manage[] asset funds for institutional and PWM clients."  (*Id*. at 5.)  Thus, just as at KPMG, Associates and Vice Presidents across these Divisions perform distinct job functions—from salespeople to investment advisors to computer programmers to product developers, with skills and educations ranging from doctoral degrees in mathematics to experience in video game design.  (*See* Levene Decl. (ECF No. 280) ¶¶ 5, 17; Kirk Decl. (ECF No. 279) ¶ 6).)

*Second*, Judge Schofield also rested the denial of class certification on the decentralization of the challenged employment processes at KPMG and the lack of "sufficiently specific" criteria constraining those decisions. 2018 WL 6264835, at *1, *19.  She found that the KPMG procedures "merely set up a structure through which employees are evaluated," and that "individual decision makers . . . at the practice area level exercised discretion" over compensation and evaluation decisions.  *Id*. at *18 (internal quotations omitted).  Judge Schofield further found that plaintiffs had failed to show "sufficient involvement by top management" and that "mere approval or limited oversight by higher-level executives, without more, falls short of showing a sufficient common denominator" in the exercise of discretion for purposes of commonality under Rule 23.  *Id*. at *19–20.  Judge Schofield again drew a contrast with this case, where Judge Torres accepted

The Honorable Robert W. Lehrburger                                                                -3-

Plaintiffs' claim that "[u]ltimately, Goldman Sachs' management committee decides who is promoted" to Managing Director. (March 30, 2018 Order at 10; ECF No. 578; *see also id.* at 31 (on basis of Plaintiffs' assertions, finding commonality based in part on "the funneling of virtually all final decision-making to division heads and either division-wide or firm-wide committees").)

In fact, the record shows that Goldman Sachs' Management Committee does not make individual promotion decisions." (Boyle Dep. at 82:16–18 ("Q. Does the management committee make decisions about promotions? A. No.").)[1] Instead, promotion from Vice President to Managing Director at Goldman Sachs is decentralized, with decisions made through a broad-based, bottom-up process. Indeed, any Managing Director can recommend any Vice President for promotion. (*See* Heller Dep. I at 232:7–8.) With the assistance of Human Capital Management, leaders in each Division review all recommendations and narrow them to candidates who will be vetted through a "cross-ruffing" process, where a team is assigned to conduct 10 to 15 interviews to determine the candidate's readiness for promotion. (*See* Heller Dep. I at 205:18–23, 224:11–16; Kung Dep. II at 419:5–421:11, 434:15–20, 441:17–20.) The cross-ruffing team then confers and ranks its list of candidates. (*See* Heller Dep. I at 226:11–16.) Divisional leaders review the cross-ruffing team's ranked list with a focus on business areas in need of additional senior professionals more than on individual candidate assessments. (*See* Larson Dep. I at 247:6–15.) Finally, members of the Executive Office, in conjunction with others, review the candidate lists to ensure that business and regional needs are properly balanced. (*See* Heller Dep. I at 241:19–242:11.) The Management Committee is then informed of the outcome. (*See* Boyle Dep. at 89:5–89:9). In sum, as Judge Schofield recognized*,* and as Defendants will show in due course, where, as here, lack of commonality arises from decentralized, discretionary decision-making and myriad job functions subject to that decision-making, a class trial is impossible. 2018 WL 6264835, at *20.

                                                                            Respectfully,

                                                                            */s/ Robert J. Giuffra, Jr.*

Barbara B. Brown                                          Robert J. Giuffra, Jr.
of Paul Hastings LLP                                 of Sullivan & Cromwell LLP

cc:      Counsel of Record (via ECF)

---

[1] Goldman Sachs' compensation procedures are similarly decentralized and subject to local manager discretion. (*See* ECF No. 364 at 10–11, 5–6 (finding that "each manager [] recommends compensation for specific employees," and that "[t]hese recommendations then work their way back up the chain" for review by a business unit manager who "would make the final determination"; further finding that Goldman Sachs had "myriad smaller business units that specialize in particular activities. These units have evolved over time, sometimes numbering less than 100 and at other times more than double that number").