UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

H. CRISTINA CHEN-OSTER, SHANNA ORLICH, ALLISON GAMBA and MARY DE LUIS,

Plaintiffs,

v.

GOLDMAN SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,

Defendants.

10 Civ. 6950 (AT) (RWL)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO STAY THE CLAIMS OF CERTAIN CLASS MEMBERS, TO EXCLUDE THEM FROM THE CLASS, AND TO COMPEL THEM TO ARBITRATION**

Barbara B. Brown (*admitted pro hac vice*)
Carson H. Sullivan (*admitted pro hac vice*)
PAUL HASTINGS LLP
875 15th Street, NW
Washington, D.C. 20005

Patrick W. Shea
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166

Robert J. Giuffra, Jr.
Theodore O. Rogers, Jr.
Sharon L. Nelles
Ann-Elizabeth Ostrager
Hilary M. Williams
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004

Amanda Flug Davidoff
Elizabeth A. Cassady
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006

*Attorneys for Defendants*
*Goldman Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

April 12, 2019

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ..... 1

**FACTUAL BACKGROUND** ..... 5

A. The Agreements ..... 5

B. Goldman Sachs's Arbitration Practices ..... 7

1. The ███ Separation Agreements ..... 7

2. The 201 MD Agreements ..... 9

3. The 187 PWA Agreements ..... 10

4. The 694 Equity Agreements ..... 11

C. Actual or Constructive Notice of This Action ..... 14

D. Notice to the Class and Goldman Sachs's Arbitration Demands ..... 16

**ARGUMENT** ..... 18

**I. THE COURT MUST ENFORCE THE ARBITRATION AGREEMENTS OF ALL CLASS MEMBERS WHO HAVE REFUSED TO OPT OUT.** ..... 18

A. The FAA Imposes a "Strong Federal Policy" in Favor of Arbitration. ..... 18

B. The Agreements Are Presumptively Valid. ..... 19

C. The Second Circuit's Decision in Parisi Conclusively Held that Goldman Sachs's Arbitration Agreements Cover Class Members' Claims Here. ..... 22

**II. THE COURT SHOULD REJECT PLAINTIFFS' EFFORT TO AVOID ENFORCEMENT OF THEIR ARBITRATION AGREEMENTS.** ..... 24

A. Goldman Sachs Has Not Waived Its Right to Compel Arbitration Under the Agreements. ..... 24

B. Plaintiffs Cannot Establish Any Generally Applicable Contract Defenses to Enforcement of the Agreements. ..... 28

1. The Enforceability of the Agreements Turns on Whether Class Members Establish a Contract Defense, Not Notice of This Lawsuit. ..... 28

2. Plaintiffs Rely on Inapposite Cases Involving Arbitration Programs Purposefully Intended to Reduce Class Participation, Vulnerable Class Members, or Little or No Consideration. ..... 32

**CONCLUSION** ..... 34

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Allied Sanitation, Inc.* v. *Waste Mgmt. Holdings, Inc.*,
97 F. Supp. 2d 320 (E.D.N.Y. 2000) (Block, J.)....................27

*Am. Express Co.* v. *Italian Colors Rest.*,
570 U.S. 228 (2013)....................2, 31, 33

*Arciniaga* v. *Gen. Motors Corp.*,
460 F.3d 231 (2d Cir. 2006)....................18

*AT&T Mobility LLC* v. *Concepcion*,
563 U.S. 333 (2011)....................2, 18, 31, 33

*Aviall, Inc.* v. *Ryder Sys., Inc.*,
913 F. Supp. 826 (S.D.N.Y. 1996) (Mukasey, J.)....................19

*Balasanyan* v. *Nordstrom, Inc.*,
2012 WL 760566 (S.D. Cal. March 8, 2012)....................32

*Barreto* v. *Jec II, LLC*,
2017 WL 3172827 (S.D.N.Y. July 25, 2017) (Forrest, J.)....................3, 19

*Berger* v. *Cantor Fitzgerald Sec.*,
967 F. Supp. 91 (S.D.N.Y. 1997) (Scheindlin, J.)....................2, 20

*Cellular Tel. Co.* v. *210 E. 86th St. Corp.*,
839 N.Y.S.2d 476 (1st Dep't 2007)....................2, 20

*Circuit City Stores, Inc.* v. *Adams*,
532 U.S. 105 (2001)....................2

*Coleman* v. *Sys. Dialing LLC*,
2016 WL 3387748 (S.D.N.Y. June 17, 2016) (Cote, J.)....................19

*In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*,
790 F.3d 1112 (10th Cir. 2015)....................27

*In re Currency Conversion Antitrust Litig.*,
361 F. Supp. 2d 237 (S.D.N.Y. 2005) (Pauley, J.)....................27, 32

*Cypress* v. *Cintas Corp. No. 2*,
2017 WL 564492 (E.D.N.Y. Feb. 11, 2017) (Spatt, J.)....................22

*Degidio* v. *Crazy Horse Saloon & Rest.*,
880 F.3d 135 (4th Cir. 2018) ....................27

*Desiderio* v. *Nat'l Assoc. of Sec. Dealers, Inc.*,
191 F.3d 198 (2d Cir. 1999), *cert. denied*, 531 U.S. 1069 (2001) ....................22

*Doctor's Assoc., Inc.* v. *Casarotto*,
517 U.S. 681 (1996) .................... *passim*

*Edwards* v. *First Am. Corp.*,
289 F.R.D. 296 (C.D. Cal. 2012) ....................27

*Epic Sys. Corp.* v. *Lewis*,
138 S. Ct. 1612 (2018) ....................2, 18, 31

*Feuerman* v. *Sears*, *Roebuck & Co.*,
1996 WL 648966 (S.D.N.Y. Nov. 6, 1996) (Chin, J.) ....................4, 24

*Gauzza* v. *Prospect Med. Holdings, Inc.*,
2018 WL 4853294 (E.D. Pa. Oct. 4, 2018) ....................33

*Genesco, Inc.* v. *T. Kakiuchi & Co., Ltd.*,
815 F.2d 840 (2d Cir. 1987) ....................19

*Gold* v. *Deutsche Aktiengellschaft*,
365 F.3d 144 (2d Cir. 2004) ....................20

*Gutierrez* v. *Wells Fargo Bank, NA*,
889 F.3d 1230 (11th Cir. 2018) ....................4, 26, 27

*HSBC Bank USA Nat. Ass'n* v. *Strong Steel Door Corp.*,
954 N.Y.S.2d 759 (N.Y. Sup. Ct. 2012) ....................20

*Jimenez* v. *Menzies Aviation, Inc.*,
2015 WL 4914727 (N.D. Cal. Aug. 17, 2015) ....................32

*Katsoris* v. *WME IMG, LLC*,
237 F. Supp. 3d 92 (S.D.N.Y. 2017) (Abrams, J.) ....................24

*Kleen Prods. LLC* v. *Int'l Paper*,
306 F.R.D. 585 (N.D. Ill. 2015) ....................26

*Lillehagen* v. *Alorica*, *Inc.*,
2014 WL 12768156 (C.D. Ca. Dec. 18, 2014) ....................30, 33

*Marmet Health Care Ctr., Inc.* v. *Brown*,
565 U.S. 530 (2012) ....................24

*Meyer* v. *Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)....................18, 21

*O'Connor* v. *Uber Techs., Inc.*,
2013 WL 6407583 (N.D. Cal. Dec. 6, 2013)....................32

*Parisi* v. *Goldman Sachs & Co.*,
710 F.3d 483 (2d Cir. 2013).................... *passim*

*Piekarski* v. *Amedysis Illinois LLC*,
4 F. Supp. 3d 952 (N.D. Ill. 2013)....................32

*Raiola* v. *Union Bank of Switzerland, LLC*,
47 F. Supp. 2d 499 (S.D.N.Y. 1999) (Scheindlin, J.)....................20

*Rice* v. *Brown Brothers Harriman & Co.*,
1997 WL 129396 (S.D.N.Y. Mar. 21, 1997) (Mukasey, J.)....................23

*Stern* v. *eSpeed, Inc.*,
2006 WL 2741635 (S.D.N.Y. Sept. 22, 2006) (Castel, J.)....................22

*Stevenson* v. *Great Am. Dream, Inc.*,
2014 WL 3519184 (N.D. Ga. July 15, 2014)....................29, 30, 34

*Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010)....................33

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2011 WL 1753784 (N.D. Cal. May 9, 2011)....................26

*Thyssen, Inc*. v. *Calyposo Shipping Corp.*, *S.A.*,
310 F.3d 102 (2d Cir. 2002) (per curiam)....................4, 25

*Unique Woodworking, Inc.* v. *N.Y. City Dist. Council of Carpenters' Pension Fund*, 2007 WL 4267632 (S.D.N.Y. Nov. 30, 2007) (Conner, J.)....................19

*Whitt* v. *Prosper Funding LLC*,
2015 WL 4254062 (S.D.N.Y. July 14, 2015) (Woods, J.)....................21

*Whittington* v. *Taco Bell of Am., Inc.*,
2011 WL 1772401 (D. Colo. May 10, 2011)....................24

*Williams* v. *Securitas Sec. Servs. Inc.*,
2011 WL 27313741 (E.D. Pa. July 13, 2011)....................32

**Statutes**

9 U.S.C. § 2 ....................1, 18

9 U.S.C. § 4 ....................5

**Other Authorities**

David Benoit, *Goldman Sachs Sued for Discrimination Against Women*, Dow Jones News Serv. (Sept. 15, 2010)....................15

Alison Frankel, *Goldman Sachs Asks for Appellate Help in Sex Discrimination Class Action*, Reuters (June 27, 2017)....................16

Peter Lattman, *Women Sue Goldman, Claiming Pay and Jobs Bias*, N.Y. Times (Sept. 15, 2010)....................16

Nate Raymond, *Goldman Wins Ruling to Arbitrate Discrimination Claim*, Chi. Trib. (Mar. 21, 2013)....................16

Bob Van Voris, *Goldman Takes Key Step to Toss Group Discrimination Suit*, Bloomberg (Mar. 10, 2015)....................16

**PRELIMINARY STATEMENT**

Defendants bring this motion because highly sophisticated class members agreed to arbitrate "any dispute or claim" with Goldman Sachs & Co. and The Goldman Sachs Group, Inc. (collectively, "Goldman Sachs" or the "Firm"), but did not opt out of the class. These class members agreed to arbitration in exchange for valuable consideration: (i) promotion to the senior (and highly remunerative) position of Managing Director; (ii) the position and high compensation of a Private Wealth Advisor; (iii) severance benefits ; or (iv) valuable discretionary awards of equity-based compensation.

The Second Circuit has already conclusively determined *in this case* that Plaintiffs' Title VII claims fall squarely within the scope of Goldman Sachs's broad agreement to arbitrate covering "any dispute . . . or claim arising out of or based upon or relating to" employment, and that the Firm's agreements should be enforced. *Parisi* v. *Goldman Sachs & Co.*, 710 F.3d 483, 485–86 (2d Cir. 2013). Thus, in reversing Judge Francis's and Judge Sand's denial of Goldman Sachs's motion to compel arbitration against former named Plaintiff Lisa Parisi, and enforcing her agreement to arbitrate, the Second Circuit stressed that "[t]here is no dispute that the . . . broad arbitration clause [] covers Title VII claims." *Id.* at 486.

Under the Federal Arbitration Act ("FAA"), *all* of the agreements to arbitrate here (the "Agreements")—the 719 agreements executed before class members were part of any alleged class *and* the remaining 1,133 executed after the filing of the Complaint—are presumptively "*valid, irrevocable, and enforceable*." 9 U.S.C. § 2 (emphasis added). The Supreme Court has construed the FAA 56 times since its enactment in 1925 and, except for eight cases (involving questions of federal jurisdiction, agency action, or specific types of agreements

excluded from the FAA's purview by the statute itself), the Court has consistently ruled in favor of enforcing agreements to arbitrate.[1]

The FAA's presumption of validity "appl[ies] with even greater force" to the Agreements here, which were entered into by sophisticated and highly paid professionals. *Cellular Tel. Co.* v. *210 E. 86th St. Corp.*, 839 N.Y.S.2d 476, 480 (1st Dep't 2007). Indeed, courts in this District routinely compel sophisticated financial services professionals to arbitration, as this Court should now do, particularly in light of the Second Circuit's controlling decision in *Parisi*. *See, e.g.*, *Berger* v. *Cantor Fitzgerald Sec.*, 967 F. Supp. 91, 94 (S.D.N.Y. 1997) (Scheindlin, J.) (compelling arbitration of securities dealer's claim against brokerage firm and rejecting argument "that he lacked the sophistication required to understand the meaning of the arbitration clause").

To defeat the FAA's presumption of validity, *each class member* who wishes to remain in the class bears the burden of proving that a "generally applicable contract defense[], such as fraud, duress, or unconscionability," bars enforcement of her promise to arbitrate. *Doctor's Assoc., Inc.* v. *Casarotto*, 517 U.S. 681, 687 (1996). Thus, unless class members put

---

[1] *See*, *e.g.*, *Epic Sys. Corp.* v. *Lewis*, 138 S. Ct. 1612, 1632 (2018) (enforcing employer-employee arbitration agreements with class action waivers notwithstanding National Labor Relations Act provision permitting workers "to engage in other concerted activities for the purpose of . . . mutual aid or protection" (quoting 29 U.S.C. § 157)); *Am. Express Co.* v. *Italian Colors Rest.*, 570 U.S. 228, 233-34 (2013) (enforcing arbitration agreement with merchants, even though plaintiffs would "incur prohibitive costs if compelled to arbitrate under the class action waiver" (quoting *In re Am. Express Merchants' Litig.*, 554 F.3d 300, 315–16 (2d Cir. 2009), *cert. granted, judgment vacated sub nom. Am. Express Co.* v. *Italian Colors Rest.*, 559 U.S. 1103 (2010))); *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 351 (2011) (striking down California law prohibiting class arbitration waivers in consumer contracts, even though "class proceedings are necessary to prosecute small-dollar claims that might otherwise slip through the legal system"); *Circuit City Stores, Inc.* v. *Adams*, 532 U.S. 105 (2001) (rejecting that Section 1 of the FAA excludes "all employment contracts" and holding that FAA encompasses employment agreements).

forward sufficient evidence, on a summary judgment standard, and meet their burden to show that their Agreement was the result of fraud, duress or unconscionability, the Court must compel those class members to arbitration. *See*, *e.g.*, *Barreto* v. *Jec II, LLC*, 2017 WL 3172827, at *5 (S.D.N.Y. July 25, 2017) (Forrest, J.) (compelling arbitration where plaintiff failed to establish agreements were "unconscionable as a matter of law").

Right after the close of the opt-out period, Goldman Sachs promptly served arbitration demands on class counsel for each class member who failed to comply with her agreement to arbitrate, and Plaintiffs' counsel refused those demands without even contacting affected class members. (*See* ECF No. 671 at 1; Declaration of Robert J. Giuffra, Jr., dated April 12, 2019 ("Giuffra Declaration" or "Giuffra Decl."), Exs. 1290–1299.)[2] Although the Notice sent to class members advised that "Goldman Sachs has asserted that . . . those who have signed agreements to arbitrate . . . should be excluded from the Class" (Ex. 1300 at ¶ 5), class members may not have paid attention to the Notice or opt-out procedure, or even recognized their obligation under the Agreements to opt out of this class.

Class counsel cannot have it both ways: to purport to represent all absent class members, yet not to reach out to any of their clients to advise them of their obligations and the risks of ignoring their agreements to arbitrate. Instead, to avoid enforcement of the Agreements, class counsel have advanced two flawed theories, both of which the Court should reject.

*First*, class counsel have baselessly claimed that Goldman Sachs somehow waived its right to compel arbitration by not seeking to enforce the Agreements even before the Court certified the class and thus obtained jurisdiction over absent class members. As the

---

2 References to "App." or "Ex." are to Appendices or Exhibits to the Giuffra Declaration, unless otherwise noted.

Second Circuit has held, "[t]he key to a waiver analysis is prejudice." *Thyssen, Inc*. v. *Calyposo Shipping Corp.*, *S.A*., 310 F.3d 102, 105 (2d Cir. 2002) (per curiam). There can be no prejudice here, where Goldman Sachs raised its agreements to arbitrate dozens of times since this case started, including in its each of its three Answers (*see* App. F), and moved to compel arbitration at the legally earliest time. Under black letter law, this Court had no jurisdiction over absent class members until the class was certified, and "due process requirements" were met, including "adequate notice" to class members and the "opportunity to opt out." *Feuerman* v. *Sears, Roebuck & Co*., 1996 WL 648966, at *5 (S.D.N.Y. Nov. 6, 1996) (Chin, J.). Because "it would have been impossible in practice to compel arbitration against speculative plaintiffs" until after the close of the opt-out period, this motion is clearly timely, and those class members who have not abided by their agreements to arbitrate have suffered no prejudice. *See Gutierrez* v. *Wells Fargo Bank, NA*, 889 F.3d 1230, 1234, 1238 (11th Cir. 2018) (granting motion to compel where defendant "reserv[ed] its arbitration rights" and filed motion when court first had jurisdiction over absent class members).

*Second*, class counsel claim that *all* Agreements executed after the filing of the Complaint are *per se* unenforceable. But no court has ever adopted such a blanket rule, which would plainly conflict with the FAA, including the burden of those class members with arbitration agreements to prove a "contract defense." To avoid this Court's enforcement of the Agreements, class counsel rely on inapposite cases involving: (i) defendants who purposefully introduced arbitration agreements to reduce or eliminate participation in the class; (ii) vulnerable class members (such as consumers, security guards, home healthcare workers); (iii) little or no additional consideration for the promise to arbitrate; and/or (iv) class members with no "reasonable means" to learn about the class action. *See* cases cited in Part II.B.2, *infra*.

Here, by contrast, class members are highly sophisticated; received valuable consideration in exchange for agreeing to arbitration; and, through multiple litigation hold notices and extensive press coverage, were repeatedly put on actual or constructive notice of this lawsuit. Perhaps most importantly, all class members are financial industry professionals, where arbitration is widely and commonly used to resolve disputes with employees, regardless of gender. *See* FINRA Code of Arbitration Procedure for Industry Disputes Rule ("FINRA Rule") 13201(a).

This Motion is now ripe for decision, *see* 9 U.S.C. § 4 (arbitration may be compelled where party "refus[es] . . . to arbitrate under a written agreement"), and the Court should compel to arbitration class members who are parties to the Agreements but failed to opt out of this action.

## FACTUAL BACKGROUND

### A. The Agreements

This Motion concerns [redacted] Agreements used in the ordinary course of Goldman Sachs's business without regard to gender:

(1) [redacted] Agreements in which class members[3] agreed to arbitration and a release of [redacted] against the Firm in exchange for

---

[3] "Class member" is used throughout this brief to refer to the persons who are the subject of this Motion, none of whom was a class member on the date they executed their Agreements. The absent class members who executed Agreements before the filing of the Complaint of course were not class members when they executed their Agreements, and those who executed Agreements after the filing of the Complaint were *putative* class members or had no class status at all when they did so (*e.g.*, they signed agreements before starting employment at Goldman Sachs).

valuable, discretionary severance benefits—[REDACTED] ("**Separation Agreements**");[4]

(2) 201 Agreements in which class members agreed to arbitration in exchange for [REDACTED] and promotion to Extended Managing Director ("EMD") or Participating Managing Director ("Partner") (collectively, "MD") ("**MD Agreements**");

(3) 187 Agreements in which Private Wealth Advisors ("PWAs") agreed to arbitration in exchange for their employment by the Firm in a role with significant career and compensation benefits—[REDACTED] (Declaration of Kathleen Cupertino, dated April 11, 2019 ("Cupertino Decl."), ¶¶ 9–13.) ("**PWA Agreements**"); and

(4) 694 Agreements entered into by class members in exchange for valuable, discretionary equity-based compensation awards ("**Equity Agreements**").

Many of the Agreements were executed before class members were part of any alleged class, including:

- 647 Agreements executed *before* the filing of the original Complaint on September 15, 2010 (of which 61 are MD Agreements that are identical to the one enforced in *Parisi*);
- 67 Agreements executed post-filing of the Complaint, but prior to commencement of employment at Goldman Sachs; and

[4] For the Court's reference, attached as Appendices A to F to the Giuffra Declaration are spreadsheets summarizing documents placed into the record with this Motion and/or voluminous data otherwise made available to Plaintiffs. Appendices A to D identify the operative Agreement for each class member. All Agreements are included as Exhibits to the Giuffra Declaration, as are other relevant documents.

- Five Agreements executed post-filing of the Complaint, and post-commencement of employment, but prior to the class member being subject to any allegedly discriminatory employment practice (*i.e.*, prior to her first performance review).

(Apps. E-1; E-2; E-3.)

The remaining Agreements executed after the filing of the Complaint include a total of 46 Separation Agreements and MD Agreements executed by class members who had previously agreed to arbitration *before* the filing of the Complaint. (App. E-4.)

**B. Goldman Sachs's Arbitration Practices**

**1. The ███ Separation Agreements**

Since at least 2002, Goldman Sachs has used a largely standard form separation agreement. (*Compare* Ex. 622 *with* Ex. 727.) In the Separation Agreements here, Goldman Sachs agreed to provide valuable discretionary severance benefits to certain class members upon termination of their employment, in exchange for, among other things, a general release of claims and an agreement to arbitrate all disputes with the Firm.[5]

The valuable consideration granted to separated class members included, for example: ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[5] Goldman Sachs's policies governing severance were made available to class members in the Employee Handbook or, more recently, on an internal website, and make clear that "[p]ayment of severance is at the discretion of the [F]irm." (Exs. 1301–1303.)



(*See* App. A, Columns G–J.)

In exchange for these valuable severance benefits, each of the class members who signed Separation Agreements agreed, in broad terms, to (*See*, *e.g.*, Ex. 362 at § 5.1 (emphasis added).) These releases extend to (*Id.*) The Separation Agreements also provide for arbitration of [6] (*Id.* at § 9.1)

Class members who entered into a Separation Agreement were (*See*, *e.g.*, Exs. 735 ( ); 394 ( ); 336 ( ).) Eighteen of the Separation Agreements reflect on their face that the class members were represented by their own counsel (App. E-6), including four Agreements (two of which post-date the filing of the Complaint) where the class member was represented by Outten & Golden, one of class counsel here. (*See* Exs. 107, 385, 612, 727.)

---

[6] Of the Separation Agreements, were executed by former Managing Directors. These Separation Agreements ( of which were signed before the filing of the Complaint). (*See*, *e.g.*, Ex 416 at § 9.1; App. E-5 (providing that )). The arbitration provisions in MD Agreements are similarly broad, as shown in Part B.2., *infra*.

**2. The 201 MD Agreements**

Since at least 2002, Goldman Sachs has required *all* employees, regardless of gender, promoted to EMD or Partner to execute standard MD Agreements. (*Compare* Ex. 883 with Ex. 989.) As with the Separation Agreements, all 201 MD Agreements include a broad and virtually identical provision requiring arbitration of [7] (App. B, Column I.)[8] Consideration for entering into the MD Agreements and the commitment to arbitrate disputes included the promotion to the senior ranks of EMD or Partner and continued employment, . (Declaration of David Landman, dated April 11, 2019 ("Landman Decl."), ¶ 7.) EMDs and Partners also continue to be eligible for discretionary annual bonuses. (*Id.* ¶ 7.)

Those who achieve the rank of EMD or Partner are highly educated, experienced and sophisticated professionals. (*Id.* ¶¶ 4–6.) Virtually all EMDs have at least Bachelor's degree or foreign equivalent, and over 40% of the most recent EMD promotion class in 2017 had at least one advanced degree. (*Id.* ¶ 6.) Promotion to EMD is a significant achievement within the financial services industry, and . (*Id.* ¶¶ 4–5.) . (*Id.* ¶ 4.)

[7] (Ex. 895 § 10.)

[8] The form agreements used for promotion to EMD or Partner are substantially the same. (*Compare*, *e.g.*, Ex. 954 *with* Ex. 1057.)

[REDACTED]. (*Id.* ¶ 5.)

### 3. The 187 PWA Agreements

As required in the financial services industry, all PWAs at Goldman Sachs are registered with the Financial Industry Regulatory Authority ("FINRA") (or, prior to 2007, its predecessor entities the National Association of Securities Dealers and New York Stock Exchange Member Regulation. (Cupertino Decl. ¶ 4.) Under FINRA rules, registered representatives must agree "*to arbitrate any dispute, claim or controversy that may arise between me and my firm*" in the Form U4 required for FINRA registration. Uniform Application for Securities Industry Registration or Transfer § 15A, ¶ 5 (2009) (emphasis added). Since January 1, 1999, FINRA rules expressly permit arbitration of employment discrimination claims where the parties "have agreed to arbitrate it, either before or after the dispute arose." FINRA Rule 13201(a).

Since at least 1998, Goldman Sachs has required that *all* PWAs enter into a standard PWA Agreement specifying certain conditions of their employment, including that [REDACTED] (Ex. 1156 at § 9 (emphasis added); Cupertino Decl. ¶ 7.)

Like MDs, PWAs are highly educated and sophisticated professionals. They provide integrated wealth advisory services for high-net-worth individuals and families, such as portfolio management, administration of trusts and estates, and private banking and lending. (*Id.* ¶ 3.) Virtually all PWAs have at least a Bachelor of Arts or Science degree and all must pass FINRA's registration examinations for investment advisors. (*Id.* ¶ 4.) Many others have advanced degrees, such as an M.B.A. (*Id.* ¶¶ 4, 6.) PWAs work together in teams, overseeing

other wealth management professionals, to attract new and manage existing client relationships. (*Id.* ¶ 8.)

All PWAs are hired as "New Private Wealth Advisors" ("NPWAs"), whether from within the Firm or externally. (*Id.* ¶ 5.) Goldman Sachs currently hires approximately NWPAs annually out of a field of approximately applicants. (*Id.*) NPWAs are often hired from highly regarded M.B.A. programs or laterally from other financial services firms. (*Id.* ¶ 6.) Many NPWAs start at the Firm as summer interns while studying for a degree; they generally execute their PWA Agreement prior to commencing their employment when they return to the Firm after completing their studies. (*Id.* ¶ 7.) NPWAs hired laterally also typically execute their PWA Agreement prior to commencing employment at Goldman Sachs. (*Id.*)

Associate-level NPWAs are paid a base salary of



(*Id.* ¶ 9.)

(*Id.* ¶¶ 9–11.)

(*Id.* ¶ 11.)[10]

**4. The 694 Equity Agreements**

---

9 (Cupertino Decl. ¶ 10.) (*Id.*)

10 PWAs in the Partners Coverage Group provide wealth management services to current and former Partners. (Cupertino Decl. ¶ 13.) These PWAs . (*Id.*)

The 694 class members with operative agreements relating to awards of discretionary equity-based compensation ("Equity-Based Awards") generally received grants of [11] (*See* App. D; Declaration of Eric Dias, dated April 12, 2019 ("Dias Decl.") ¶ 5.) The approximate value of their Equity-Based Awards, based on the stock price on the date of grant, [12] (*Id.* ¶ 36, Dias Decl., Ex. 61.) In exchange for this valuable discretionary compensation, these class members agreed in broad terms to arbitrate "*all claims arising out of or relating to [their] employment with the Firm* or the termination thereof, or otherwise concerning any rights, obligations *or other aspects of [their] employment relationship with the Firm*." (*See, e.g.*, Dias Decl., Ex. 14 at ¶ 1 (emphasis added).)[13]

Almost all of the 694 class members agreed to the terms and conditions applicable to their Equity-Based Award .[14] (Dias Decl. ¶ 16.)

---

[11] The main types of Equity-Based Awards at issue in this motion are: (Dias Decl. ¶ 6.) A small number of class members received . (*See* Dias Decl., Ex. 1.)

[12] This approximate value is calculated by . (Dias Decl. ¶ 36, Ex. 61, Column P.) (Dias Decl. ¶ 11),

[13] All employees who receive Equity-Based Awards under the SIP must agree to arbitrate any disputes related to their Awards. (*See*, *e.g.*, Dias Decl., Ex. 14 at 1.) .

[14] Of the 694 class members whose operative agreement is an Equity Agreement, 689 submitted their Signature Card electronically, and five class members elected to print and sign



(*Id.* ¶¶ 24-25.) The Signature Card states in bold print at the top: "**YOU MUST PROPERLY EXECUTE THIS FORM TO ACKNOWLEDGE ACCEPTANCE OF THE TERMS AND CONDITIONS OF YOUR AWARD(S) AND RELATED MATTERS**." (*E.g.*, Dias Decl., Ex. 8 (emphasis in original).)

(*Id.* ¶ 21.)

(*Id.* (emphasis added).)[15]

(*Id.* ¶ 20.)

The 694 class members who agreed to arbitration in Equity Agreements were

---

the Signature Card and return it to the Firm's Equity Compensation Group. (App. D, Column I; Dias Decl. ¶ 24, Ex. 61, Column L.)

15 (*Id.* ¶ 28.) (*Id.* ¶¶ 28-29.) (*Id.* ¶ 30.)

highly compensated professionals. For example, 675 of these class members received

(*Id.*)[16] Over 500 of these class members also accepted Equity Agreements multiple times from 2015 to 2017 (141 submitted two Signature Cards; 371 submitted three Signature Cards; and three submitted four Signature Cards). (*See* App. E-7.)

### C. Actual or Constructive Notice of This Action

The class members who agreed to arbitration after the filing of the Complaint were repeatedly put on actual or constructive notice of this lawsuit and had multiple means available to learn about it.

*First*, on September 20, 2010—five days after the Complaint was filed—Goldman Sachs sent individual document retention notices ("Hold Notices") describing this case to all U.S.-based employees at the Firm. (Declaration of Joseph Yanagisawa, dated April 12, 2019 ("Yanagisawa Decl."), Ex. 1.) The Hold Notices advised employees that "three former employees sued the firm asserting claims concerning their employment and making general allegations about the firm's practices and policies with respect to female associates, vice presidents and managing directors," and directed employees to preserve any documents related to "the firm's practices and policies concerning compensation, promotion, assignments, support, training and mentoring and the firm's performance review system as they relate to associates, vice presidents and managing directors." (*Id.* at 1.)

---

16 Eighteen class members' operative Equity Agreements were for Broad-Based RSU Awards, and one class member's operative Equity Agreement was for a One-Time RSU Award. (App. D, Column E.) These awards have different eligibility requirements and were not subject to the PATC threshold for Year-End and Mid-Year RSU Awards. (Dias Decl. ¶¶ 12, 13.)

Goldman Sachs has distributed at least eight additional Hold Notices (hyperlinking to the original notice) to employees likely to have potentially relevant documents since the original notice was sent, including on September 21, 2010, August 2, 2011, June 19, 2012, April 9, 2013, January 29, 2014, July 15, 2015, December 2, 2016, and May 31, 2018. (Yanagisawa Decl., Exs. 2–9.) Collectively, to date, Goldman Sachs has sent Hold Notices via email more than 100,000 times, and many class members received Hold Notices multiple times since this case was filed. (Declaration of Michael Becker, dated April 12, 2019 ("Becker Decl.") Ex. 1; *see also* App. A, Column N; App. B, Column K; App. C, Column J.) In all, of the class members who executed agreements after the filing of the Complaint in this action, almost 90% received Hold Notices prior to execution. Specifically:

| | **Separation Agreements** | **MD Agreements** | **PWA Agreements**[17] | **Equity Agreements** |
|---|---|---|---|---|
| # Signed Post-Filing | [redacted] | 140 | 25 | 694 |
| # Signed Post-Filing Who Received Hold Notice | [redacted] (95%) | 136 (97%) | 21 (84%) | 580 (83%) |

*Second*, this case has received extensive press coverage. Just four days after the original Complaint was filed, at least 25 news articles about this lawsuit appeared in media around the world, including the New York Times, Bloomberg News, Business Insider, as well as several wire services such as the Associated Press, the Dow Jones News Service, New York Business Wire and Thompson Reuters. (*See*, *e.g*., Ex. 1309 (David Benoit, *Goldman Sachs Sued*

[17] A total of 92 PWAs executed their Agreement after the filing of the Complaint but, as shown in Part A, *supra*, 67 of these PWAs entered into their Agreements prior to commencing employment at the Firm, and thus could not have received a Hold Notice in advance of execution. The table above shows the remaining 25 PWAs who agreed to arbitration both post-filing and post-hiring, of which 21 received Hold Notices. (*See* App. C, Columns I, J.)

*for Discrimination Against Women*, Dow Jones News Serv. (Sept. 15, 2010); Ex. 1316 (Peter Lattman, *Women Sue Goldman, Claiming Pay and Jobs Bias*, N.Y. Times (Sept. 15, 2010).)

Each significant step in this action, including prior motion practice to enforce Ms. Parisi's arbitration agreement, has received additional press coverage. (*See*, *e.g.*, Ex. 1340 (Nate Raymond, *Goldman Wins Ruling to Arbitrate Discrimination Claim*, Chi. Trib. (Mar. 21, 2013); Ex. 1349 (Bob Van Voris, *Goldman Takes Key Step to Toss Group Discrimination Suit*, Bloomberg (Mar. 10, 2015); Ex. 1391 (Alison Frankel, *Goldman Sachs Asks for Appellate Help in Sex Discrimination Class Action*, Reuters (June 27, 2017).) To date, at least 114 articles have appeared in the press about this lawsuit, 96 of which specifically describe it as a class action. (*See* Exs. 1304–1417.)

*Finally*, Goldman Sachs has disclosed this lawsuit in each of its Form 10-Q and 10-K filings since Q3 2010, the same quarter that the original Complaint was filed. The disclosure states, in relevant part, that "[o]n September 15, 2010, *a putative class action* was filed . . . by three former female employees alleging that Group Inc. and GS&Co. have systematically discriminated *against female employees* in respect of compensation, promotion, assignments, mentoring and performance evaluations." (Exs. 1418–1451 (emphasis added).)[18]

**D. Notice to the Class and Goldman Sachs's Arbitration Demands**

Following class certification, the parties negotiated the content of the notice to class members advising them of the Certification Order (the "Notice") (Exs. 1473, 1474), which the Court approved on July 24, 2018. (ECF No. 618.) The Notice stated that "*Goldman Sachs has asserted that . . . those who have signed agreements to arbitrate* any claims they may have

[18] This disclosure was amended in Q1 2018 to reflect the Certification Order. (Ex. 1448 at 4.)

against the firm related to their employment *should be excluded from the Class*. Class Counsel do not agree with Goldman Sachs's position. As of this date, the Court has made no determination as to the current dispute between the parties on any of these issues. *The fact that you received this Notice does not mean that you will remain in the Class if you signed a release of claims or an agreement to arbitrate*." (Ex. 1300 at 3 (emphasis added).)

On November 30, 2018, the Notice was distributed to all putative class members notifying them of the Certification Order and their right to opt out of the class. The deadline to opt out was January 14, 2019. (*Id.*) [REDACTED] putative class members who executed agreements to arbitrate opted out by the deadline, but the [REDACTED] class members who are the subject of this Motion did not.

On February 5, 2019, Goldman Sachs promptly sent class counsel individual arbitration demands directed to each class member at issue on this motion requiring that she abide by her obligation to bring her claims, if any, in arbitration and file a voluntary dismissal of her claims in this action. (*See*, *e.g.*, Exs. 1290–1294.)[19] Goldman Sachs advised class counsel that if the Firm did not receive a response to its demands by March 7, 2019, Goldman Sachs would assume its demands had been refused and would move to compel arbitration. (*Id.*) Goldman Sachs repeatedly offered class counsel additional time to confer with their clients. (*See, e.g.*, ECF No. 668 at 1.)

To Defendants' knowledge, class counsel have made no effort to confer with any

---

19 Goldman Sachs also sent arbitration demands directed to counsel who had represented class members in connection with Separation Agreements. (*See*, *e.g.*, Exs. 1294, 1295.) Some of these class members, represented by their individual counsel, elected to voluntarily dismiss their claims from this lawsuit, but class counsel have thus far refused to file their Stipulations of Voluntarily Dismissal, in part on the basis that "class members cannot dismiss their claims in this action because they are not parties to this action." (Ex. 1298 at 1; s*ee also* Exs. 1296–1299.)

absent class members about Goldman Sachs's arbitration demands. (*See* ECF No. 671 at 1; Exs. 1297 at 1; 1298 at 2; 1299 at 2.) Plaintiffs' only response to the demands was to file a letter-motion seeking to defer Goldman Sachs's motions to compel until after a Phase One liability trial. (ECF Nos. 667, 671.) On February 26, 2019, the Court ruled that "Defendants may file their motion to compel arbitration by class members." (ECF No. 681 ¶ 3; *see also* ECF No. 694 ¶ 1.)

## ARGUMENT

### I. THE COURT MUST ENFORCE THE ARBITRATION AGREEMENTS OF ALL CLASS MEMBERS WHO HAVE REFUSED TO OPT OUT.

#### A. The FAA Imposes a "Strong Federal Policy" in Favor of Arbitration.

Congress enacted the FAA "in response to widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 339 (2011) (citing *Hall St. Assocs., L.L.C.* v. *Mattel, Inc.*, 552 U.S. 576, 581 (2008)). The FAA expressly provides that agreements to arbitrate "*shall be valid, irrevocable, and enforceable*, save upon such grounds as exist at law or in equity *for the revocation of any contract*." 9 U.S.C. § 2 (emphasis added). Last year, the Supreme Court reaffirmed that the FAA establishes "a liberal federal policy favoring arbitration agreements." *Epic Sys. Corp.* v. *Lewis*, 138 S. Ct. 1612, 1621 (2018) (citing *Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). The Second Circuit has emphasized that it is "difficult to overstate the strong federal policy in favor of arbitration," and that "it is a policy we have often and emphatically applied." *Arciniaga* v. *Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006).

"Courts deciding motions to compel arbitration apply a standard similar to that applicable for a motion for summary judgment." *Meyer* v. *Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal citation omitted). In seeking to compel arbitration, Defendants "need not

'show initially that the agreement would be enforceable,'" but must only "make a *prima facie* initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration . . . ." *Barreto* v. *Jec II, LLC*, 2017 WL 3172827, at *3 (S.D.N.Y. July 25, 2017) (Forrest, J.) (citation omitted). Class members here "bear[] the burden of showing the agreement to be inapplicable or invalid." *Coleman* v. *Sys. Dialing LLC*, 2016 WL 3387748, at *2 (S.D.N.Y. June 17, 2016) (Cote, J.) (citation omitted); *see Barreto*, 2017 WL 3172827, at *4 (compelling arbitration where plaintiff failed to meet burden to show agreements were "unconscionable as a matter of law").

On this Motion, if the Court determines "there is a valid contract to arbitrate between the[] [parties]," and the parties' dispute "is covered by the contract, the role of the court ends and the matter is one for arbitration." *Unique Woodworking, Inc.* v. *N.Y. City Dist. Council of Carpenters' Pension Fund*, 2007 WL 4267632, at *4 (S.D.N.Y. Nov. 30, 2007) (Conner, J.). As shown below, the Agreements—which were executed by sophisticated professionals for valuable consideration and apply to *all* employees, regardless of gender—are presumptively valid. Because the Second Circuit has already concluded in *Parisi* that Plaintiffs' employment claims fall squarely within the broad arbitration clause included in each Agreement, 710 F.3d at 486, the Court should compel those class members who have refused to comply with their Agreements to arbitration.

**B. The Agreements Are Presumptively Valid.**

In assessing the validity of arbitration agreements under the FAA, this Court must apply federal law "compris[ing] generally accepted principles of contract law." *Genesco, Inc.* v. *T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 845 (2d Cir. 1987). There is no question that the Agreements, and their arbitration clauses, are presumptively valid under these principles. *See Aviall, Inc.* v. *Ryder Sys., Inc.*, 913 F. Supp. 826, 831 (S.D.N.Y. 1996) (Mukasey, J.) ("New

York contract law presumes that a written agreement is valid and that it accurately reflects the intention of the parties, and imposes a heavy burden on the party seeking to disprove those presumptions.").[20] Indeed, "in the absence of fraud or other wrongful act on the part of another contracting party, a party 'who signs or accepts a written contract . . . is *conclusively presumed to know its contents and to assent to them*." *Gold*, 365 F.3d at 149, 150 (emphasis added) (quoting *Metzger* v. *Aetna Ins. Co.*, 227 N.Y. 411, 416 (1920)) (finding financial advisor, "a fully competent adult (with an MBA from a top-tier school)" bound to arbitrate Title VII claim with employer under "broad and plain" arbitration provision).

Moreover, this presumption of validity "appl[ies] with even greater force" where, as here, the parties are "sophisticated." *Cellular Tel. Co.* v. *210 E. 86th St. Corp.*, 839 N.Y.S.2d 476, 480 (1st Dep't 2007) (internal citation omitted); *see*, *e.g.*, *Berger* v. *Cantor Fitzgerald Sec.*, 967 F. Supp. 91, 94 (S.D.N.Y. 1997) (Scheindlin, J.) (compelling arbitration of securities dealer's claims and rejecting argument that he "lacked the sophistication required to understand the meaning of the arbitration clause"); *HSBC Bank USA Nat. Ass'n* v. *Strong Steel Door Corp.*, 954 N.Y.S.2d 759 (N.Y. Sup. Ct. 2012) (in breach of contract action, a "sophisticated businessman" is "presumed to understand a contract he executes and is conclusively bound to its terms absent a valid excuse for having failed to read it.") (internal punctuation omitted).

---

[20] Courts in this District regularly rely on New York law for "generally accepted principles of contract law" to resolve questions of validity under the FAA. *See Gold* v. *Deutsche Aktiengellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (applying New York law to find enforceable agreement between financial advisor and employer where Form U-4 was silent on governing law); *Raiola* v. *Union Bank of Switz., LLC*, 47 F. Supp. 2d 499, 502, 503 (S.D.N.Y. 1999) (Scheindlin, J.) (on motion to compel arbitration of registered representative's Title VII claims against employer, "the Court must apply the federal substantive law of arbitrability, which comprises generally accepted principles of contract law" and applying New York law) (internal citations and punctuation omitted).

As shown in Part B.2., *supra*, MDs at Goldman Sachs generally have anywhere from [redacted] years of experience in the financial industry, often have advanced degrees, and are highly sophisticated professionals. (Landman Decl. ¶¶ 4-6.) PWAs similarly are highly educated, credentialed financial professionals who provide investment and wealth management advice to the Firm's high-net-worth clients. (Cupertino Decl. ¶¶ 4–5.) All [redacted] class members who entered into Separation Agreements were highly educated professionals in revenue-producing roles at the Firm, [redacted] of whom were MDs and [redacted] were PWAs. (App. A, Column O.) And the 694 class members who agreed to arbitration in Equity Agreements are highly compensated professionals who, in most cases, earned total annual compensation of more than [redacted]. (Dias Decl. ¶ 7.)

This presumption of validity applies whether agreements are physically signed or, as in the Equity Agreements, accepted electronically. *See Whitt* v. *Prosper Funding LLC*, 2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015) (Woods, J.) (compelling arbitration and finding electronic agreements are "valid and enforceable contracts") (citing *Centrifugal Force, Inc.* v. *Softnet Commc'n, Inc.*, 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011) (McMahon, J.)). The Second Circuit has enforced agreements accepted electronically, especially where, as in this case, the web page informed the user that the terms and conditions referenced therein applied to the transaction and where the user unambiguously consented to those terms by clicking on a box or button. *See Meyer*, 868 F.3d at 75 (vacating district court's denial of motion to compel arbitration based on electronic agreement, emphasizing that "[c]ourts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree'").

Each class member indisputably received ample consideration for her agreement

to arbitrate. While an offer of employment or continuation of current employment alone is sufficient consideration, *see*, *e.g.*, *Desiderio* v. *Nat'l Assoc. of Sec. Dealers, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999) (holding that employment may be conditioned on agreement to mandatory arbitration provision that "may be applied to [] Title VII claims"), *cert. denied*, 531 U.S. 1069 (2001),[21] class members here received much more: promotion to highly remunerative positions within the financial services industry for MDs; employment as a financial professional serving the Firm's high-net-worth clients for PWAs; valuable Equity-Based Awards for class members who entered into Equity Agreements; or discretionary severance benefits [REDACTED] who entered into Separation Agreements. (*See* Parts B.1–4, *supra*; *see also* App. A, Columns G–J; App. B, Column F; App. D, Columns P–R.)

Thus, by every measure, Defendants have met their *prima facie* burden under the first prong of the FAA inquiry to establish presumptively valid agreements between class members and the Firm, and the Court should enforce the Agreements.

### C. The Second Circuit's Decision in *Parisi* Conclusively Held that Goldman Sachs's Arbitration Agreements Cover Class Members' Claims Here.

The Second Circuit has already determined that the arbitration clause in the MD Agreement is enforceable and covers Plaintiffs' Title VII claims here. All the Agreements contain arbitration clauses that are either virtually identical to, or substantively indistinguishable from, the arbitration clause in the MD Agreement in *Parisi*, 710 F.3d at 487, which forecloses

---

21 *See also Cypress* v. *Cintas Corp. No. 2*, 2017 WL 564492, at *3 (E.D.N.Y. Feb. 11, 2017) (Spatt, J.) (enforcing agreement to arbitrate and finding offer of employment "indisputably constitutes valid consideration for the bargain" (citing cases)); *Stern* v. *eSpeed, Inc.*, 2006 WL 2741635, at *2 (S.D.N.Y. Sept. 22, 2006) (Castel, J.) (finding that "in the specific context of post-employment arbitration agreements, several courts in this district have held that the continuation of employment alone is sufficient consideration . . . ." (collecting cases)).

further litigation of this issue:

- **MD Agreement**: (*See*, *e.g.*, Ex. 961 at § 8);

- **PWA Agreement**: (*See*, *e.g.*, Ex. 1196 at § 11);

- **Separation Agreement**: (*See*, *e.g.*, Ex. 385 at 4.);

- **Equity Agreement**: "I [] agree to arbitrate . . . all claims arising out of or relating to my employment with the Firm or the termination thereof, or otherwise concerning any rights, obligations or other aspects of my employment relationship with the Firm . . . ." (*See*, *e.g.*, Dias Decl., Exs. 14, 18, 24 at ¶ 1.)

In enforcing the MD Agreement in *Parisi*, the Second Circuit recognized that "[c]ourts have consistently found that [Title VII] claims can be subject to mandatory arbitration," *Parisi*, 710 F.3d at 487 (citing *Ragone*, 595 F.3d at 120). "Discrimination claims under New York City Human Rights law also are arbitrable." *Rice* v. *Brown Brothers Harriman & Co.*, 1997 WL 129396, at *3 (S.D.N.Y. Mar. 21, 1997) (Mukasey, J.). Thus, because the Agreements are presumptively valid, and because the Second Circuit has held that broad arbitration clauses, such as the ones in the Agreements, cover Plaintiffs' Title VII claims, the burden is on class members to prove a "generally applicable contract defense" to avoid enforcement of the

Agreements. *Casarotto*, 517 U.S. at 687. As shown *infra*, Part II.B., class members cannot meet this burden, and the Court should enforce their Agreements to arbitrate.

## II. THE COURT SHOULD REJECT PLAINTIFFS' EFFORT TO AVOID ENFORCEMENT OF THEIR ARBITRATION AGREEMENTS.

### A. Goldman Sachs Has Not Waived Its Right to Compel Arbitration Under the Agreements.

To try to end-run the Agreements, and the Second Circuit's controlling decision in *Parisi*, Plaintiffs have claimed that Goldman Sachs somehow waived its right to compel arbitration in this action. Because of the "emphatic federal policy in favor of arbitral dispute resolution," *Marmet Health Care Ctr., Inc.* v. *Brown*, 565 U.S. 530, 533 (2012), "waiver of the right to arbitration is not to be lightly inferred," and "*any doubts* concerning whether there has been a waiver are resolved in favor of arbitration," *Katsoris* v. *WME IMG, LLC*, 237 F. Supp. 3d 92, 100–01 (S.D.N.Y. 2017) (Abrams, J.) (citations omitted) (emphasis added). As shown below, there is no basis on which to infer waiver on the record here.

This Court did not have jurisdiction over absent class members until after class certification and until the "due process requirements" of "adequate notice, an opportunity to appear, an opportunity to opt out, and adequate representation" were satisfied. *Feuerman*, 1996 WL 648966, at *5. Indeed, any determination regarding the arbitrability of absent class members' claims prior to class certification would have been an impermissible advisory opinion. *See Whittington* v. *Taco Bell of Am., Inc.*, 2011 WL 1772401, at *6 (D. Colo. May 10, 2011) (where putative class members "are not currently before the court . . . a declaration regarding the enforceability of the proffered arbitration agreement would constitute an advisory opinion."). Goldman Sachs has thus moved to compel arbitration as soon as legally permissible to do so.

In any event, as the Second Circuit has made clear, "[w]aiver of the right to compel arbitration due to participation in litigation may be found only when prejudice to the

other party is demonstrated." *Thyssen, Inc.* v. *Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002). Since the start of this lawsuit, Goldman Sachs has repeatedly stated its intention to compel to arbitration all class members who agreed to arbitrate employment-related disputes with the Firm. Appendix F shows all 38 references in the record made both by Plaintiffs and Defendants to agreements requiring arbitration. For example:

- Goldman Sachs included as an *affirmative defense in each operative Answer* filed in 2010, 2012, and 2015 that "[l]itigation in this Court *is precluded with respect to potential claims by those members of the putative Class* of persons Plaintiffs purport to represent, *who have executed arbitration agreements* that require employment-related disputes to be submitted to arbitration." (ECF No. 426 ¶¶ 246, 247 (emphasis added); *see also* ECF No. 29 ¶¶ 235, 236; ECF No. 161 ¶¶ 229, 230.)

- As early as December 2010—shortly after this lawsuit was filed—Goldman Sachs provided to Plaintiffs exemplar arbitration agreements, including EMD, Partner, and Equity Award Agreements, in response to Plaintiffs' requests for samples of arbitration agreements which Goldman Sachs offered to its employees. (Ex. 1455 at 1.)

- In litigating the *Parisi* motion to compel arbitration, Plaintiffs acknowledged that Goldman Sachs maintains a "*compulsory arbitration policy for its Managing Directors* . . . ." (Ex. 1457 at 1 (emphasis added).)

- On June 18, 2013, Plaintiffs served document requests for "*every version of the release* of liability that . . . allegedly preclud[e] [putative class members] from participation in this litigation," and "*every version of the arbitration agreement* that you claim Defendants' Private Wealth Management Employees signed . . . thereby allegedly precluding them from participation in this litigation." (Ex. 1458 at 7 (emphasis added).) Goldman Sachs produced exemplar agreements in response on July 30, 2013 and August 2, 2013. (Exs. 1461, 1462.)

- When briefing the motion for class certification in 2014, Goldman Sachs's expert Dr. Ward critiqued Plaintiffs' expert for "includ[ing] *employees who are not in the putative class in his studies*," for example, "Private Wealth Advisors . . . who I have

been told *signed arbitration agreements* with Goldman Sachs." (ECF No. 298 at 3 n.4 (emphasis added).)

- Following the Certification Order, Plaintiffs requested "*all documents constituting the executed arbitration, separation or release agreements* for any class members who Defendants assert have released claims or signed arbitration agreements which Defendants assert cover the claims in this litigation." (Ex. 1475 at 7 (emphasis added).)

Because Goldman Sachs could not have moved to compel absent class members to arbitration in this case any earlier *and* repeatedly reserved its right to compel arbitration, there is neither waiver nor any conceivable prejudice to absent class members here. The decision in *Gutierrez* v. *Wells Fargo Bank, NA*, 889 F.3d 1230 (11th Cir. 2018), is directly on point. There, Wells Fargo asserted its arbitration agreements as a defense in its operative answers and notified the district court that it "reserve[d] its arbitration rights against any plaintiffs who might later join, individually or as putative class members, in this litigation." *Id.* at 1234 (internal punctuation omitted). As in this case, the parties proceeded through "class-related discovery and motions practice," and Wells Fargo moved to compel absent class members to arbitration shortly after the district court granted class certification. *Id.* at 1234–35. Reversing the district court's decision that Wells Fargo waived its right to compel arbitration, the Eleventh Circuit held, "it cannot be said that [a defendant's] failure to seek arbitration with the unnamed class members prior to class certification manifested an inconsistency with its arbitration rights" as "it would have been impossible in practice to compel arbitration against speculative plaintiffs." *Id.* at 1238.[22] Thus, because the defendants in *Gutierrez* were moving to compel arbitration at the

[22] *See also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 1753784, at *4 (N.D. Cal. May 9, 2011) (defendants could not have moved to compel arbitration prior to certification "because . . . putative class members are not parties to an action prior to class certification."); *Kleen Prods. LLC* v. *Int'l Paper*, 306 F.R.D. 585, 607 (N.D. Ill. 2015) ("more appropriate time"

earliest practicable time, the Court concluded "we need not and do not address prejudice." *Id.* at 1239 n.10. The record here similarly does not support any conceivable inference of waiver.

The cases Plaintiffs have relied on in support of the notion that Goldman Sachs waived the right to compel arbitration are plainly inapposite. Unlike here, where Defendants moved to compel arbitration as soon as the Court had jurisdiction over absent class members, those courts found waiver where defendants had engaged in extensive litigation, but failed to raise their arbitration rights earlier in the case, such as in the answer. *See*, *e.g.*, *In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*, 790 F.3d 1112, 1115, 1117, 1120 (10th Cir. 2015) (finding waiver where defendant "engaged in extensive" fact and expert merits discovery, moved to compel arbitration the "same day it moved for summary judgment," and "fail[ed] to mention its intent to raise its arbitration rights as a defense or inform the district court of the existence of those rights"); *In re Currency Conversion Antitrust Litig.*, 361 F. Supp. 2d 237, 258 (S.D.N.Y. 2005) (Pauley, J.) (waiver where defendant engaged in "[e]xtensive nationwide discovery involving nearly one hundred depositions," and where "expert discovery [was] in full swing and the trial [was] scheduled to commence in seven months").[23]

---

for motion to compel "is after the class is certified" when defendants "can determine which specific class members are subject to potentially disqualifying contractual provisions").

[23] *See also Allied Sanitation, Inc.* v. *Waste Mgmt. Holdings, Inc.*, 97 F. Supp. 2d 320, 328–29 (E.D.N.Y. 2000) (Block, J.) (no prejudice where defendant engaged in motion practice and first raised arbitration agreement two months post-certification because absent class member "was neither an actual nor putative litigant" prior to certification); *Degidio* v. *Crazy Horse Saloon & Rest.*, 880 F.3d 135, 141 (4th Cir. 2018) (finding waiver where "[i]nstead of filing a motion to compel arbitration at an early stage," defendant "filed multiple motions for summary judgment, served discovery, and twice asked the district court to certify questions of state law to" state Supreme Court); *Edwards* v. *First Am. Corp.*, 289 F.R.D. 296, 307 (C.D. Cal. 2012) (finding waiver where "[d]efendants could have asserted their intention to raise arbitration as a defense at a much earlier stage in the proceeding.").

### B. Plaintiffs Cannot Establish Any Generally Applicable Contract Defenses to Enforcement of the Agreements.

To try to escape enforcement of the Agreements, Plaintiffs have also claimed that "any arbitration agreements Goldman obtained from class members after Plaintiffs filed this class case are unenforceable" because "the agreements failed to give notice of this class action." (ECF No. 629 at 6 n.16; ECF No. 667 at 3.) As shown below, this broad proposition, which no court has ever endorsed, should be rejected for two reasons.

*First*, under the FAA, agreements to arbitrate must be enforced unless the party opposing arbitration establishes a "generally applicable contract defense[]," *Casarotto*, 517 U.S. at 687 (citing 9 U.S.C. § 2)—a stringent statutory requirement that cannot simply be displaced by citing reflexively to Federal Rule of Civil Procedure 23.

*Second*, no case holds, as Plaintiffs claim, that upon the mere filing of a putative class action that may implicate employee rights, an employer must dispense with its standard business practices and immediately include notice of the lawsuit for its agreements to arbitrate to remain enforceable. To the contrary, the FAA bars any such notice requirement.

#### 1. The Enforceability of the Agreements Turns on Whether Class Members Establish a Contract Defense, Not Notice of This Lawsuit.

Nothing about the Agreements suggests they are susceptible to a "generally applicable contract defense," such as fraud or unconscionability. *Casarotto*, 517 U.S. at 687. Indeed, in this case, Ms. Parisi never contended that her MD Agreement was invalid and conceded that her opposition to arbitration did not "involve[] . . . an unconscionability defense." (ECF No. 64 at 3.)[24] Class members agreed in unambiguous terms to arbitrate "all claims" or

[24] Ms. Parisi claimed her MD Agreement should not be enforced because she had a "substantive right under Title VII to pursue a pattern-or-practice claim, which is available only to

"any dispute"—broad language that indisputably "prevents the signatory from litigating her . . . claim in a judicial forum." *See Stevenson* v. *Great Am. Dream, Inc.*, 2014 WL 3519184 at *2 (N.D. Ga. July 15, 2014). This language captures *any* claims brought in court, including claims asserted in a class action, whether the party was aware of those claims or not. In fact, all Separation Agreements include a broad release of [REDACTED] (*See* App. A, Column L.) Class members who are parties to those Agreements cannot reasonably contend that the arbitration clause covering [REDACTED] does not extend to [REDACTED] claims, particularly given that the arbitration provision [REDACTED], (*see* App. A, Column K), which *necessarily* were unknown at the time of execution.

As other courts have held, a party's belated claim that she did not understand a clear term in her agreement is not a "generally applicable contract defense" that could defeat enforcement under the FAA. For example, in *Stevenson*, a collective action plaintiff argued "that an otherwise permissible arbitration agreement is unconscionable if it was executed during the pendency of a collective action," because it "divest[ed] her of the right to participate in the pending litigation," *id.* at *1, 2—precisely the theory that class members advance here. The court in *Stevenson* rejected the notion that an "agreement is unconscionable due to the time at which it was executed," because "the same could be said if the arbitration agreement had been signed *prior* to the filing of th[e] action—it still would have inhibited [plaintiff]" from participating in the collective action. *Id.* at *2 (emphasis in original). Thus, the court concluded that "[e]ven if [plaintiff] was unaware of this litigation when she signed the arbitration

class plaintiffs." 710 F.3d at 486. The Second Circuit held that Ms. Parisi had no such right and enforced the arbitration provision in her MD Agreement. *Id.*

agreement, she does not deny that *the text of the arbitration agreement made it clear to her that she could not participate* in [a] collective action suit, *pre-existing or not*." *Id*. (emphasis added).

Similarly, in *Lillehagen* v. *Alorica*, *Inc*., 2014 WL 12768156 (C.D. Cal. Dec. 18, 2014), an employer introduced a new arbitration program *after* the filing of a collective action. The court granted defendants' motion to compel arbitration where "nothing in the record" showed that collective action members who agreed to arbitration "*did not understand that they were agreeing to arbitrate their disputes*." *Id*. at *7 (emphasis added). The court further stressed that "[p]laintiffs have not attempted to argue that the Agreements were unconscionable. Nor have Plaintiffs attempted to argue that the Agreements were invalid under other contract principles." *Id*. Instead, plaintiffs claimed under Rule 23 that the agreements were "unenforceable as products of improper communications between [the defendant-employer] and potential class members," *id*. at *3, but "[w]ithout more, the [c]ourt [was] not persuaded that the federal policy against improper communications should trump the federal policy in favor of enforcing arbitration agreements." *Id*. at *7.[25]

Class members here similarly cannot trump the FAA and avoid their burden to establish a contract defense by grafting onto the Agreements a notice requirement unknown to contract law. In *Casarotto*, the Supreme Court struck down a state law providing that "[n]otice that a contract is subject to arbitration . . . shall be typed in underlined capital letters on the first page of the contract" in order for the agreement to be enforceable. 517 U.S. at 684. The

[25] The parties in *Lillehagen* disputed whether existing employees (including some who had already opted in) had signed arbitration agreements after the filing of the complaint, or whether the arbitration program had been limited to new hires. 2014 WL 12768156, at *2. The court found that even if plaintiffs had established that existing employees or opt-in plaintiffs had agreed to arbitration, the court would "still conclude[] that it is an insufficient basis to deny enforcement of the [a]greements to [a]rbitrate." *Id*.

Supreme Court emphasized that arbitration provisions cannot be "singl[ed] out . . . for suspect status" in this way and must instead be treated as on "the same footing as other contracts." *Id*. The Court thus held that the notice requirement "directly conflict[ed]" with the FAA because it "condition[ed] the enforceability of arbitration agreements on compliance with *a special notice requirement not applicable to contracts generally*." *Id*. at 687 (emphasis added).[26] Accordingly, whether under Rule 23 or otherwise, class members cannot evade the FAA's requirement to establish a "generally applicable contract defense"—which must rise to the level of fraud, unconscionability, or the like—by claiming the existence of a special class action "notice" requirement for arbitration agreements. *Id*.

In sum, the sophisticated class members who unambiguously agreed to individually arbitrate "any dispute or claim" in exchange for highly valuable consideration—whether before or after the Complaint was filed—cannot rely on the mere timing of the agreement or an invented notice requirement to avoid their promise. Because these class members cannot meet their burden under the FAA to establish a "generally applicable contract defense," the Court must enforce the Agreements.

---

26 The Supreme Court has repeatedly rejected similar requirements that "target" arbitration agreements. *Epic Sys. Corp*., 138 S. Ct. at 1622, 1624 (rejecting defense to class waiver in arbitration agreement based on statute allowing workers to engage in "mutual aid or protection" and enforcing agreement where employees did not "suggest that their arbitration agreements were extracted, say, by an act of fraud or duress or in some other unconscionable way"); *Italian Colors Rest.*, 570 U.S. at 232 (reversing Second Circuit holding that arbitration agreements may be invalidated to allow "effective vindication" of statutory rights, and enforcing agreement with class arbitration waiver even where plaintiffs would "incur prohibitive costs if compelled to arbitrate"); *Concepcion*, 563 U.S. at 351 (striking down as inconsistent with FAA California law classifying class arbitration waivers in consumer contracts as unconscionable notwithstanding that "small-dollar claims that might . . . slip through the legal system" as a result). These Supreme Court further cases confirm that, on its own, the fact that an arbitration agreement may foreclose class participation is not unconscionable.

### 2. Plaintiffs Rely on Inapposite Cases Involving Arbitration Programs Purposefully Intended to Reduce Class Participation, Vulnerable Class Members, or Little or No Consideration.

The cases relied on by class counsel in prior correspondence with this Court bear no resemblance to this one. (*See* ECF Nos. 610, 629.) Those cases involve: (i) defendants who introduced arbitration agreements with the specific aim of reducing or eliminating participation in the class; (ii) vulnerable class members (such as consumers, security guards, or home healthcare workers); (iii) little or no additional consideration for the promise to arbitrate; and/or (iv) class members with no "reasonable means" to learn about the class action. *See*, *e.g.*, *O'Connor* v. *Uber*, 2013 WL 6407583, at *6 (N.D. Cal. Dec. 6, 2013) (arbitration agreement not enforced where introduced in new "Licensing Agreement" for new and existing Uber drivers for no additional consideration while "similar" class action lawsuits were pending and where class members "had no meaningful way of learning of the current lawsuit").[27] Plaintiffs' cases focused predominantly on Rule 23, and two cases—*Williams* v. *Securitas Sec. Servs. Inc.*, 2011 WL 2713741 (E.D. Pa. July 13, 2011) and *Piekarski* v. *Amedysis Illinois LLC*, 4 F. Supp. 3d 952 (N.D. Ill. 2013)—did not address the FAA at all.

27 *See also Balasanyan* v. *Nordstrom*, *Inc*., 2012 WL 760566, at *1–*2 (S.D. Cal. March 8, 2012) (arbitration agreement unenforceable where "rolled out" by mail "two months after" case was filed to retail sales employees for no additional consideration); *Currency Conversion*, 361 F. Supp. 2d at 244 (cardholder agreements unilaterally modified after class action for no additional consideration held unenforceable where class members had "no other realistic source of information regarding th[e] litigation" besides defendants); *Jimenez* v. *Menzies Aviation, Inc.*, 2015 WL 4914727, at *1 & *6 n.5 (N.D. Cal. Aug. 17, 2015) (new "ADR Policy" imposed on airport employees "as a condition of employment" following class action); *Piekarski*, 4 F. Supp. 3d at 953–54 (agreement to arbitrate unenforceable where employer imposed new "Arbitration Program" for home healthcare workers after filing of complaint featuring "self-executing waivers"); *Williams*, 2011 WL 2713741, at *1, *2 ("Dispute Resolution Agreement" imposed on security guards for no additional consideration that required them to "opt out by calling a phone number" held unenforceable because "[l]ay persons commonly understand" that agreements are "not binding" until they "affix[] their signatures").

*First*, the MD, PWA and Separation Agreements have been in use at Goldman Sachs for a decade or more before the filing of the Complaint. Agreements to arbitrate are enforced where, as here, an employer maintains a standard practice requiring employees to sign arbitration agreements both before *and* after the pendency of a class action. *See*, *e.g.*, *Gauzza* v. *Prospect Med. Holdings, Inc*., 2018 WL 4853294, at *2 (E.D. Pa. Oct. 4, 2018) (enforcing arbitration agreements entered into pursuant to pre-existing arbitration policy while class action was pending where plaintiffs failed to "identif[y] specific facts . . . that suggest the arbitration agreement was rolled out in a 'blitzkrieg fashion,' required employees to opt-out, was introduced during the pendency of litigation, or was otherwise improper") (internal punctuation omitted).

The agreement to arbitrate all employment-related disputes included in the Equity Agreements after this class action was filed was not aimed at class members and was presented to *all* employees, regardless of gender, position, Division, or putative class membership. (Dias Decl. ¶¶ 7, 12, 13.) This broadened arbitration clause was in keeping with Supreme Court decisions eliminating any obstacles to arbitration, other than contract-based defenses.[28] Moreover, as shown in Part II.B.1, *supra*, the mere fact that an agreement does not expressly provide notice of a class action is not enough, standing alone, to meet class members' burden to prove a contract defense under the FAA. *See Lillehagen*, 2014 WL 12768156 at *7 (granting

[28] *See, e.g.*, *Italian Colors*, 570 U.S. at 232–233 (enforcing arbitration agreement with merchants even though plaintiffs would "incur prohibitive costs if compelled to arbitrate" because "courts must rigorously enforce arbitration agreements according to their terms" (internal quotation marks omitted)); *Concepcion*, 563 U.S. at 339 (striking down California law prohibiting class arbitration waivers and holding that FAA reflects "the fundamental principle that arbitration is a matter of contract" (quoting *Rent-A-Center, West, Inc.* v. *Jackson*, 561 U.S. 63, 67 (2010))); *Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (holding that allowing class arbitration absent parties' explicit agreement is inconsistent with FAA and that courts "must give effect to the contractual rights and expectations of the parties") (internal quotation marks omitted) (quoting *Volt Info. Sci., Inc.* v. *Bd. of Tr. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).

motion to compel arbitration where "nothing in the record" showed putative class members who agreed to arbitration after filing of complaint "did not understand that they were agreeing to arbitrate their disputes"); *Stevenson*, 2014 WL 3519184 at *3 (compelling arbitration where agreement executed while collective action pending where "text of the arbitration agreement made it clear to [collective member] that she could not participate in . . . [the] suit, pre-existing or not.").

*Second*, class members here are entirely different from those more vulnerable parties in Plaintiffs' inapposite cases. All class members who executed Agreements (i) were highly sophisticated (*see* Part B, *supra* (describing class members' high level of education, experience and compensation)); (ii) received substantial, valuable consideration for their promise to arbitrate (*see id.*, *supra* (describing compensation and career opportunities; [REDACTED] [REDACTED]; and Equity-Based Awards granted to class members)); and (iii) received actual and constructive notice of this lawsuit (*see* Part C, *supra* (describing Hold Notices and extensive press coverage)). There is simply no resemblance between the circumstances here and the cases cited by Plaintiffs. Thus, as required by *Parisi*, the Court should enforce the Agreements.

## CONCLUSION

Goldman Sachs respectfully requests that the Court enter an order (i) enforcing the Agreements and staying the claims of class members identified in the Notice of Motion who agreed to arbitrate claims with Goldman Sachs, but who failed to opt out of the class and refused Goldman Sachs's demand to arbitrate; (ii) excluding those class members from the class; and (iii) compelling those class members to bring their claims in arbitration within 90 days of the Court's order.

Respectfully,

/s/ Robert J. Giuffra, Jr.

Robert J. Giuffra, Jr.
Theodore O. Rogers, Jr.
Sharon L. Nelles
Ann-Elizabeth Ostrager
Hilary M. Williams
Joshua S. Levy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

Amanda Flug Davidoff
Elizabeth A. Cassady
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006

Barbara B. Brown (*admitted pro hac vice*)
Carson H. Sullivan (*admitted pro hac vice*)
PAUL HASTINGS LLP
875 15th Street, NW
Washington, D.C. 20005

Patrick W. Shea
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166

*Attorneys for Defendants*
*Goldman Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

April 12, 2019