# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| H. CRISTINA CHEN-OSTER; SHANNA ORLICH; ALLISON GAMBA; and MARY DE LUIS, <br><br> Plaintiffs, <br><br> -against- <br><br> GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC., <br><br> Defendants. | No. 10-cv-6950-AT-RWL |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY THE CLAIMS OF CERTAIN CLASS MEMBERS, TO EXCLUDE THEM FROM THE CLASS, AND TO COMPEL THEM TO ARBITRATION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   FACTUAL BACKGROUND ........................................................................ 4

   A.   This Case Has Been Thoroughly Litigated—Always as a Class Action—
        for More than Eight Years. ...................................................................... 5

   B.   Goldman's Opposition to Class Certification Made Zero References to
        Arbitration, and Focused Instead on the Large Size of the Full Class. ................. 5

   C.   Goldman Waited Until After Class Certification to First Raise Its Intent to
        Compel Certain Absent Class Members to Arbitration. ....................................... 7

   D.   Goldman Waited Until the Close of the Opt-Out Period to Disclose the
        Breadth of Its Arbitration Ploy and the Existence of Additional Arbitration
        Agreements. ............................................................................................ 7

   E.   Goldman Misleadingly Characterizes the Scope of the Equity Award
        Agreements. ............................................................................................ 8

   F.   Goldman's Minimal References to "Arbitration" in the Record Do Not
        Adequately Notice the Court or Plaintiffs of Its Intent to Force More than
        Half of the Class into Arbitration............................................................... 11

III.  LEGAL STANDARDS ............................................................................... 13

IV.   ARGUMENT .............................................................................................. 14

   A.   Individualized Inquiries Regarding Enforceability of the Agreements—
        which Goldman Now Demands—Must Be Reserved for Phase II................... 15

   B.   Goldman Waived Any Right to Compel Arbitration Against Absent Class
        Members. ............................................................................................... 17

        1.   Eight Years Lapsed Between the Complaint and Goldman's
             Arbitration Request.............................................................................. 18

        2.   Goldman Failed to Raise Arbitration in Opposition to Class
             Certification, and Its Justifications Are Misleading and False. .............. 19

        3.   Goldman's Delay in Raising Arbitration Would Result in
             Substantial Prejudice to Plaintiffs. ...................................................... 23

   C.   The Equity Award Agreements Are Facially Unenforceable as to the 694
        Implicated Class Members....................................................................... 25

        1.   The Equity Award Agreements Are Unconscionable............................. 25

        2.   Ambiguity Regarding the Claims Subject to Arbitration Under the
             Equity Award Agreements Must Be Resolved Against Goldman.......... 32

V.    CONCLUSION............................................................................................ 34

# TABLE OF AUTHORITIES

Page

## CASES

*151 W. Assocs. v. Printsiples Fabric Corp.*,
61 N.Y.2d 732 (1984) ............................................................................................... 33

*Allied Sanitation, Inc. v. Waste Mgmt. Holdings, Inc.*,
97 F. Supp. 2d 320 (E.D.N.Y. 2000) ........................................................................ 23

*Barreto v. Jec II, LLC*,
No. 16-cv-9729 (KBF), 2017 WL 3172827 (S.D.N.Y. July 25, 2017) ............... 13, 27

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) ........................................................................ 26

*Bolis v. Fitzpatrick*,
827 N.Y.S. 2d 801 (4th Dep't 2006)......................................................................... 17

*Chen-Oster v. Goldman, Sachs & Co.*,
325 F.R.D. 55 (S.D.N.Y. 2018) ................................................................................ 24

*Cole v. Burns Int'l Sec. Servs.*,
105 F.3d 1465 (D.C. Cir. 1997)................................................................................ 29

*Degidio v. Crazy Horse Saloon & Restaurant*,
880 F.3d 135 (4th Cir. 2018) *cert. denied sub nom.* 138 S. Ct. 2666 (2018) .......... 22

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*,
191 F.3d 198 (2d Cir. 1999) .................................................................................... 27

*Doctor's Assocs., Inc. v. Casarotto*,
517 U.S. 681 (1996)................................................................................................. 14

*Edwards v. First Am. Corp.*,
289 F.R.D. 296 (C.D. Cal. 2012) ............................................................................. 19

*Feuerman* v. *Sears, Roebuck & Co.*,
No. 96 Civ. 0120 (DC), 1996 WL 648966 (S.D.N.Y. Nov. 6, 1996)....................... 22

*First Options, Inc. v. Kaplan*,
514 U.S. 938 (1995)................................................................................................. 14

*Gillman v. Chase Manhattan Bank, N.A.*,
73 N.Y.2d 1 (1988) ............................................................................................. 25, 32

1730496.7

## TABLE OF AUTHORITIES
### (continued)

Page

*Gold v. Deutsche Aktiengesellschaft*,
    365 F.3d 144 (2d Cir. 2004) ................................................................... 27

*Granite Rock Co. v. Teamsters*,
    561 U.S. 287 (2010) ................................................................................. 13

*Gutierrez v. Wells Fargo Bank, NA*,
    889 F.3d 1230 (11th Cir. 2018) ........................................................ 17, 21

*In re Citigroup, Inc.*,
    376 F.3d 23 (1st Cir. 2004) ............................................................... 18, 19

*In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litig.*,
    790 F.3d 1112 (10th Cir. 2015) ........................................................ 18, 19

*In re Currency Conversion Fee Antitrust Litig.*,
    361 F. Supp. 2d 237 (S.D.N.Y. 2005) ..................................................... 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2011 WL 1753784 (N.D. Cal. May 9, 2011) ............. 23

*Kleen Prods. LLC v. Int'l Paper*,
    306 F.R.D. 585 (N.D. Ill. 2015) .............................................................. 23

*Klein v. ATP Flight Sch., LLP*,
    No. 14-cv-1522 (JFB)(GRB), 2014 WL 3013294 (E.D.N.Y. July 3, 2014) .......................... 29

*Kleiner v. First Nat'l Bank*,
    751 F.2d 1193 (11th Cir. 1985) .............................................................. 28

*Lillehagen v. Alorica, Inc.*,
    No. SACV 13-0092-DOC, 2014 WL 12768156 (C.D. Ca. Dec. 18, 2014) ...................... 14, 21

*Ludwig v. NYNEX Service Co.*,
    838 F. Supp. 769 (S.D.N.Y. 1993) ......................................................... 17

*Mandel v. Liebman*,
    303 N.Y. 88 (1951) ................................................................................. 32

*Martens v. Smith Barney, Inc.*,
    181 F.R.D. 243 (S.D.N.Y. 1998) ............................................................ 29

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith*,
    672 F.3d 482 (7th Cir. 2012) ............................................................... 1, 20

1730496.7

# TABLE OF AUTHORITIES
## (continued)

Page

*Milbourne v. JRK Residential Am., LLC*,
  No. 3:12CV861, 2016 WL 1071564 (E.D. Va. Mar. 15, 2016) ............................... 19

*Paladino v. Avnet Computer Techs., Inc.*,
  134 F.3d 1054 (11th Cir. 1998) ........................................................................... 29

*PFRMF Inv. Holdings, LLC v. Interpublic Grp. of Companies, Inc.*,
  No. 11 CIV. 6008 CM, 2012 WL 2849771 (S.D.N.Y. July 10, 2012) ..................... 17

*PPG Indus., Inc. v. Webster Auto Parts, Inc.*,
  128 F.3d 103 (2d Cir. 1997) ............................................................................... 13

*Ragab v. Howard*,
  841 F.3d 1134 (10th Cir. 2016) ........................................................................... 26

*Ragone v. Atl. Video at Manhattan Ctr.*,
  595 F.3d 115 (2d Cir. 2010) ........................................................................... 14, 25

*Raiola v. Union Bank of Switzerland, LLC*,
  47 F. Supp. 2d 499 (S.D.N.Y. 1999) ................................................................... 27

*S & R Co. of Kingston v. Latona Trucking, Inc.*,
  159 F.3d 80 (2d Cir. 1998) ........................................................................... passim

*Sinnett v. Friendly Ice Cream Corp.*,
  319 F. Supp. 2d 439 (S.D.N.Y. 2004) ................................................................. 14

*State v. Wolowitz*,
  468 N.Y.S.2d 131 (1983) ..................................................................................... 25

*Stern v. Espeed, Inc.*,
  No. 06 CIV. 958(PKC), 2006 WL 2741635 (S.D.N.Y. Sept. 22, 2006) ................. 27

*Thyssen, Inc. v. Calyposo Shipping Corp., S.A.*,
  310 F.3d 102 (2d Cir. 2002) ........................................................................... 23, 24

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
  363 U.S. 574 (1960) ........................................................................................... 13

*Whittington v. Taco Bell of Am., Inc.*,
  No. 10–cv–01884–KMT–MEH, 2011 WL 1772401 (D. Colo. May 10, 2011) ......... 23

*Wilson v. Phoenix House*,
  978 N.Y.S.2d 748 (Sup. Ct. 2013) ....................................................................... 29

**TABLE OF AUTHORITIES**
(continued)

Page

**STATUTES**

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e .................................................. 4, 28

Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 ............................................................................ 3

New York City Human Rights Law ("NYCHRL"), Administrative Code § 8-107 ................... 4

**RULES**

AAA Employment Arbitration Rules & Mediation Procedures,
    Rule 39.D (Nov. 1, 2019) ................................................................................................... 30

FINRA Rule 13802(e) (Apr. 3, 2017) ........................................................................................ 30

**TREATISES**

Restatement (Second) of Contracts § 206 .......................................................................... 4, 14, 33

1730496.7

## I.   **INTRODUCTION**

Defendants Goldman, Sachs & Co. and The Goldman Sachs Group, Inc. (collectively, "Goldman")'s belated attempt to compel more than half of this certified class to arbitration directly contravenes the position Goldman held during class certification. At every stage of class certification briefing—whether before the Magistrate Judge, District Judge, or Second Circuit— Goldman argued that this class would be unmanageable and that individual issues would predominate because of the specific size and purported resulting variability. Goldman *never* suggested at the class certification stage that the class might be smaller based on arbitration grounds, a tactical decision that facilitated Goldman's arguments against class manageability. Indeed, Goldman surely knew that if it raised arbitration issues at class certification, then the reduced class size would have fallen well within the range of similar certified classes since *Wal-Mart v. Dukes*. *See, e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012).

It is no coincidence that Goldman's last-ditch effort to dismantle the class came *after* it lost class certification, lost its Federal Rule of Civil Procedure ("Rule") 23(f) petition for appellate review, and observed that fewer than 5% of the class members opted out of this litigation. Only then, over eight years into this litigation, Goldman revealed its intent to exclude 1,852 class members—nearly 56% of the certified class—on the basis that they waived participation in this case through one of four categories of agreements: (1) "Separation Agreements" (770 total); (2) "Equity Award Agreements" (694 total); (3) "MD Agreements" (201 total); and (4) "PWA Agreements" (187 total) (collectively, the "Agreements"). ECF No. 715 ("Goldman Br.") at 5-6.[1] The Court should not allow this type of unfair gamesmanship.

---

[1] Goldman procured 1,291 of these 1,852 Agreements (nearly 70%) while this action was pending. Nearly 700 of these 1,291 were procured from current employee class members during

As an initial matter, Goldman's motion illustrates why, as Plaintiffs have previously argued, determinations as to the enforceability of each Agreement should be deferred until Phase II.  Though this Court specifically cautioned that it did "not contemplate individualized discovery or proceedings for un-named class members," ECF No. 694 at 2, that is precisely what Goldman's motion invites.  *See* Goldman Br. at 2 ("To defeat the FAA's presumption of validity, *each class member* who wishes to remain in the class bears the burden of proving that a generally applicable contract defense . . . bars enforcement of her promise to arbitrate.") (emphasis in original).  Pursuant to the Court's case management plan for a phased class proceeding, and consistent with decades of Title VII jurisprudence, such issues should be deferred until Phase II.  *See* ECF No. 694 at 2 (noting that the Court would postpone "determin[ing] whether there are individualized [arbitration] issues that should be deferred for resolution until after Phase 1").

Regardless of when the Court addresses this question, however, Goldman's tactical delay constitutes a waiver of both the arbitration clauses and the releases contained within the Separation Agreements.  *See S & R Co. of Kingston v. Latona Trucking, Inc*., 159 F.3d 80, 83 (2d Cir. 1998) (listing the Second Circuit's three factors for waiver of arbitration).  *First*, Goldman's eight-plus-year delay in raising arbitration against absent class members represents more than double or even quadruple the length of time that courts typically find constitutes waiver.  *Second*, Goldman waived the right to arbitrate against absent class members by failing to raise any intent to compel arbitration at class certification.  Goldman's argument that it had no choice but to wait until now is disingenuous and legally false.  Goldman's general citations about the importance of

---

the exact time that the parties were litigating the standing of former employees to represent a Rule 23(b)(2) class.  These 1,291 Agreements are the subject of Plaintiffs' separate Motion for Relief under Rule 23(d), ECF No. 718.  Should the Court grant that motion, Goldman's motion to compel arbitration would be *moot* as against these 1,291 class members.

2

arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.* are irrelevant to the settled law that defendants may waive their right to arbitrate through litigation conduct. Goldman's passing reference to some (but not all) of the Agreements in a handful of irrelevant circumstances in the years prior to class certification actually *underscores* Goldman's knowing waiver. By acknowledging the existence of certain Agreements early in the case, but then counting those purportedly subject to these same Agreements among the class when challenging certification, Goldman chose to swing for the fences (*i.e.*, try to defeat the entire class) rather than exclude only those purportedly subject to these Agreements (which would have weakened Goldman's Rule 23 manageability arguments). Goldman cannot now retract that position just because it lost at class certification and in the Second Circuit. *Third*, Goldman's "wait-and-see" approach significantly prejudices Plaintiffs and the 1,852 class members who, after more than eight years of investment in this litigation, Goldman seeks to force into an alternate forum to pursue their claims anew.

Finally, in addition to any Phase II individual defenses to the enforceability of the putative Agreements, and only if the Court does not find waiver as to all Agreements at this stage, there is a further categorical reason that the Equity Award Agreements' arbitration provision is unenforceable. Specifically, Goldman's practices in securing the Equity Award Agreements, as well as the terms of the Agreements themselves, render them procedurally and substantively unconscionable in a manner that applies equally to all 694 affected class members. The Equity Award Agreements contain an arbitration clause that is expressly limited to stock-related disputes, making no reference to generalized employment-related matters, much less discrimination or harassment claims. Goldman claims, however, that these Agreements cover this case because Goldman attempted to add a new arbitration term, not described in the Equity

Award Agreements, in a separate "Signature Card" for the Equity Awards.  While the Signature Card contains text informing the reader that its only purpose is to accept the terms of the Equity Award Agreements, it actually contains a new, untitled, expansive arbitration clause (buried in small print amidst unrelated information) that *contradicts* the clause set forth in the Equity Award Agreements by expanding arbitration to *all* employment-related disputes.  It is therefore highly probable that the 694 affected class members did not knowingly waive their right to pursue employment-related claims in court.  The conflict between the arbitration clauses contained in the Equity Award Agreements and Signature Card also creates an ambiguity that must be construed against Goldman, as the drafter of the Agreements, such that the actual Equity Award Agreements' narrower arbitration clause applies.  Restatement (Second) of Contracts § 206.

As a result, the Court should deny Goldman's motion to compel the 1,852 implicated class members to arbitration or otherwise exclude them from the class, or in the alternative, defer any ruling on these matters until Phase II, after the class liability trial is complete.

## II.   FACTUAL BACKGROUND

On September 15, 2010, Plaintiffs filed a class action complaint alleging that Goldman engages in disparate impact and disparate treatment discrimination against certain female employees, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the New York City Human Rights Law ("NYCHRL"), Administrative Code § 8-107 *et seq.*  Compl., ECF No. 5.

1730496.7

A.     **This Case Has Been Thoroughly Litigated—Always as a Class Action—for More than Eight Years.**

In the more than eight years that have elapsed between the filing of this class action and Goldman's request to arbitrate the claims of 56% of the class, the parties have extensively litigated this case.  This litigation included:

- 44 fully briefed motions, resulting in an Order;
- over 100 letters from counsel to the Court;
- 26 appearances before the Court, including a two-day class certification hearing;
- 2 appearances before the Second Circuit;
- 44 notices of appearance by separate attorneys;
- 755 docket entries reflecting progress in the litigation;
- 33 days of deposition;
- 20 expert reports (13 from Plaintiffs and 7 from Goldman);
- 99 discovery requests from Plaintiffs (including 87 requests for production and 12 interrogatories);
- 277 discovery requests from Goldman (including 251 requests for production and 26 interrogatories);
- Plaintiffs' review of 517,065 pages of discovery from Goldman;
- Plaintiffs' production of 15,942 pages of discovery to Goldman; and
- countless meet and confers, letters, and emails between the parties.

Declaration of Michelle A. Lamy ("Lamy Decl."), ¶¶ 7-8.

Over the course of this lengthy litigation, Plaintiffs' counsel incurred substantial expense, including in connection with expert reports, depositions, and the class notice process.  *Id.*, ¶ 9.

B.     **Goldman's Opposition to Class Certification Made Zero References to Arbitration, and Focused Instead on the Large Size of the Full Class.**

After years of hard-fought litigation, Plaintiffs moved for class certification on July 1, 2014.  ECF No. 247.  By then, Goldman had known for *more than three years* that Plaintiffs would move to certify a class that included all of the class members Goldman now seeks to exclude through arbitration.  *See* Lamy Decl., Ex. 1 (Jan. 26, 2011 Ltr. from Geoffrey Weirich, memorializing the parties' negotiations regarding "composition of the putative class"); Ex. 2

(Apr. 19, 2019 Ltr. from Ann-Elizabeth Ostrager, acknowledging that the parties completed "discussion of the composition of the putative class" in January 2011).

Goldman had ample opportunity in opposing class certification to raise its intent to compel absent class members to arbitration, or to even *reference* arbitration, yet Goldman cannot identify a *single instance* where it did so.  *See* Declaration of Robert J. Giuffra, Jr., ECF No. 716 ("Giuffra Decl."), at App. F.[2]  Instead, Goldman made the tactical decision to argue that the size of the full putative class (including the 56% of class members that Goldman now seeks to exclude) rendered the case unsuitable for class certification.  Throughout the five briefs Goldman submitted in opposition to class certification, Goldman referenced the full size of the putative class on *28 separate occasions*, including 22 references to the *precise number* of all potential class members.  *See* Lamy Decl., App. A.  By comparison, and by Goldman's own admission, the word "arbitration" does not appear *even once* in this briefing.  *See* Giuffra Decl., App. F.

On March 30, 2018, the District Court granted Plaintiffs' motion for class certification, certifying a class of female Associates and Vice Presidents who worked in Goldman's Investment Banking, Investment Management, and/or Securities Divisions from July 7, 2002 (in New York City) or September 10, 2004 (elsewhere in the United States) to the present.  ECF No. 578 ("Certification Order").

---

[2] Of the 38 purported "references in the record to agreements to arbitrate" that Goldman was able to locate, only one (No. 30) is in any way related to class certification, and that single reference: (1) is buried in a footnote to an expert report, *not authored by Goldman*; (2) does not mention Goldman's intent to compel arbitration; and (3) concerns only the PWA Agreements, which make up the smallest fraction—barely over 10%—of the Agreements Goldman now seeks to enforce.  *See* Giuffra Decl., App. F at 11; *see also infra* Section II.D.

6

**C.      Goldman Waited Until After Class Certification to First Raise Its Intent to Compel Certain Absent Class Members to Arbitration.**

Following the Court's March 30, 2018 Certification Order, the parties began negotiating the form of class certification notice.  *See* Giuffra Decl., App. F at No. 32.  During this negotiation, Goldman indicated for the first time an intent to reduce the class size on the basis of the Agreements.  *Id.*  As the parties negotiated the class notice over the next several months, Goldman limited its position to MD Agreements and Separation Agreements, and did not indicate the number of each type of Agreement purportedly implicated.  *See id.* at No. 37 ("[A]t the conclusion of the opt-out period, Defendants will move to compel arbitration for *any Managing Director* who did not opt out of the class.") (emphasis supplied); *id.* at No. 38 ("Goldman Sachs has asserted that those who have signed a release of claims involving their employment with the firm . . . should be excluded from the Class.").

Ultimately, a 45-day, Court-supervised notice program began in November 2018.  Notice was sent to all 3,487 certified class members, informing them of the Court's Certification Order and apprising them of the January 14, 2019 deadline to opt out of the class.  At the close of the opt-out period, 165 individuals (or less than 5% of the originally certified class) opted out, fixing the class size at 3,322 members as of that date.  ECF No. 674 at 1.

**D.      Goldman Waited Until the Close of the Opt-Out Period to Disclose the Breadth of Its Arbitration Ploy and the Existence of Additional Arbitration Agreements.**

On February 5, 2019, Goldman served individual arbitration demands on the 1,852 class members who are the subject of this motion.  Lamy Decl., ¶¶ 3-4.  Of these 1,852 demands, 770 are based on Separation Agreements, 694 on Equity Award Agreements, 201 on MD Agreements, and 187 on PWA Agreements.  Goldman Br. at 5-6.  In other words, Goldman alerted Plaintiffs' counsel for the first time, more than eight years into this litigation, of its

7

position that nearly 56% of the certified class should be excluded from this case.  Goldman

cannot justify its tactical decision to wait nearly five years after Plaintiffs moved for class

certification and nearly a year after the Court granted certification to reveal to Plaintiffs and this

Court that it intended to excise *more than half* of the certified class members through

enforcement of the Agreements.

And this was not the only surprise.  Goldman's belated production of arbitration demands

also represents the first time Goldman *ever* disclosed the existence of an employment-related

arbitration clause in the Equity Award Agreements.  *See* Giuffra Decl., App. F (locating no

reference to the relevant provision of the Equity Award Agreements in the case's entire history).

### E.   Goldman Misleadingly Characterizes the Scope of the Equity Award Agreements.

Goldman omits important details about the Equity Award Agreements, and misleadingly

describes the scope of those Agreements.

Contrary to Goldman's representation, no class member agreed "in broad terms to

arbitrate 'all claims arising out of or relating to [their] employment with the Firm or the

termination thereof, or otherwise concerning any rights, obligations or other aspects of [their]

employment relationship with the Firm.'"  Goldman Br. at 12.  In the actual Equity Award

Agreement of approximately 20 pages, **there is zero mention** that class members may be

waiving or releasing all employment claims, whether in this pending class action or any

litigation.  Instead, the text includes the following limited arbitration agreement:

> By accepting this Award, you are indicating that you understand
> and agree that the arbitration . . . provisions set forth in *Section
> 3.17 of the [Stock Incentive] Plan* will apply to this award.  These
> provisions . . . provide . . . that any dispute, controversy or claim
> between the Firm and you *arising out of or relating to or
> concerning the [Stock Incentive] Plan or this Award Agreement*
> will be finally settled by arbitration . . . .

8

Declaration of Michael Levin-Gesundheit, ECF No. 719 ("Levin-Gesundheit Decl."), Ex. A at 9

(emphasis modified).  Section 3.17 of the Stock Incentive Plan, in turn, includes a similarly

limited arbitration agreement: "[I]t shall be a condition of each Award that any dispute,

controversy or claim between the Firm and a Grantee, *arising out of or relating to or concerning*

*the Plan or applicable Award Agreement*, shall be finally settled in arbitration . . . ."  ECF No.

718 ("Rule 23(d) Mot.") at 6, n.6.  Thus, both the Equity Award Agreement and Stock Incentive

Plan explicitly *limit* arbitration to disputes *about the stock awards*.  Other employment

disputes—like the gender discrimination claims at issue in this case—are not covered.

It is only in the "Signature Card" for stock award acceptance—a separate and subsidiary

document—that Goldman includes language, buried in small print in the middle of a paragraph,

that purports to expand arbitration beyond the express terms of the Equity Award Agreement and

Stock Incentive Plan to "disputes concerning Employment-Related Matters."  Levin-Gesundheit

Decl., Ex. B.  The graphic below illustrates Goldman's misleading placement of this inconsistent

information within the Signature Cards of the 694 class members affected by these documents:



9

*Id.* (emphasis supplied).  Despite this new arbitration provision, the only prominent text on the

face of the Signature Card suggests the purpose of the Signature Card is merely to *accept the*

*terms contained in the previous two documents*—the Equity Award Agreement and Stock

Incentive Plan—which include a different, less expansive arbitration provision:

| |
|---|
| **IMPORTANT:  PLEASE REVIEW, EXECUTE AND RETURN THIS FORM TO: EQUITY COMPENSATION (DIVISION OF HCM), 200 WEST STREET, 25TH FLOOR, NEW YORK, NY 10282.**  **YOU MUST PROPERLY EXECUTE THIS FORM TO ACKNOWLEDGE ACCEPTANCE OF THE TERMS AND CONDITIONS OF YOUR AWARD(S) AND RELATED MATTERS.** |

*Id.*

By indicating that class members "MUST PROPERLY EXECUTE THIS FORM TO

ACKNOWLEDGE ACCEPTANCE OF THE TERMS AND CONDITIONS OF YOUR

AWARD(S) AND RELATED MATTERS," Goldman instructs class members that the Signature

Card reflects the terms set forth in the other two documents, despite the inclusion of a term not

found in those documents, which Goldman now claims deprives employees of the opportunity to

file gender discrimination claims in court.

Notably, Goldman's attempt to include employment-related disputes via the misleading

Signature Card with an expanded arbitration clause appears to post-date Plaintiffs' class

certification motion and Magistrate Judge Francis's 2015 Report and Recommendation, in which

Judge Francis indicated that he would have certified a Rule 23(b)(2) class if Plaintiffs had been

current employees.  ECF No. 364 at 35, 45.  Indeed, publicly-available, historical copies of

Goldman's Stock Incentive Plan include the same, limited arbitration provision set forth within

the current Agreement's 20-page explanatory booklet, without the inconsistent arbitration term

now included in the Signature Card.  *See, e.g.*, Goldman Sachs Amended and Restated Stock

Incentive Plan (2003), § 3.17 (limiting arbitration to disputes "arising out of or relating to or

concerning the Plan or applicable Award Agreement");[3] *see also* Lamy Decl., ¶ 6 (noting that the earliest Signature Card at issue in the current motion, *i.e.* the earliest expansion of the arbitration agreement to all employment-related disputes, is dated January 27, 2016).

The fact that Goldman chose to expand its arbitration provision for current employees in such an inconspicuous manner, at the same time that the parties were litigating former employee standing, exposes Goldman's problematic tactics with respect to the enforcement of these Agreements.

**F.    Goldman's Minimal References to "Arbitration" in the Record Do Not Adequately Notice the Court or Plaintiffs of Its Intent to Force More than Half of the Class into Arbitration.**

Over the entire course of this extensive litigation, Goldman can identify only 38 instances where it referenced even the *existence* of arbitration agreements.  *See* Giuffra Decl., App. F (listing "all references in the record to agreements to arbitrate employment-related disputes"). Of these 38 instances, 31 pre-date the 2018 Class Certification Order,[4] and almost half of those pertain solely to an individual arbitration motion as to former Plaintiff Lisa Parisi, as follows:

- 13 referred expressly to Ms. Parisi or related directly to Goldman's motion to compel arbitration of Ms. Parisi's individual claims.  *Id.* at Nos. 1-10, 12-14.

- 10 referred to the MD Agreements or PWA Agreements, in generic terms, with no discussion of which class members (if any) would be subject to such agreements.  *Id.* at Nos. 15-18, 20, 23, 27-30.

- 7 contained only generic references to "arbitration agreements," without any detail regarding the purported type of agreement or

---

[3] Available at https://www.sec.gov/Archives/edgar/data/886982/000095012303004051/y85129exv10w1.htm (last visited June 11, 2019).

[4]  The remaining seven references occurred after the Class Certification Order, in connection with the parties' negotiations regarding class certification notice.  *See* Giuffra Decl., App. F at Nos. 32-38.

which class members (if any) would be subject to such agreements. *Id.* at Nos. 11, 21-22, 24-26, 31.

- 1 is a reference (by Bates number only) to a single, blank separation agreement, with no discussion of the contents of that agreement or of which class members (if any) would have signed such an agreement. *Id.* at No. 19.

Importantly, Goldman concedes that it made **no reference**—in nearly a decade of litigating this case—to the *existence* of an entire category of Agreements upon which it now seeks to compel arbitration: the 694 Equity Agreements. In other words, Goldman does not dispute that it failed to notify Plaintiffs of its intent to compel arbitration against absent class members via the Equity Award Agreements until February 5, 2019, even though these Agreements account for 37% of the motion to compel arbitration that Goldman filed in April of 2019, and Goldman had knowledge that these Agreements contained arbitration clauses for at least three years prior to that date.[5]

Moreover, *none* of the 31 pre-certification references to arbitration agreements state any intention to compel arbitration against absent class members. All references to compelling arbitration were: (1) limited to Ms. Parisi's individual claims; (2) never raised again after March 8, 2011, after the Parisi matter was resolved; and (3) therefore gave no notice of Goldman's current intent to compel absent class members to arbitration. *See* Giuffra Decl., App. F at 3. The remaining pre-certification references to MD and PWA agreements and/or generic "arbitration agreements" consist of only general references to the existence of the agreements in various pro forma discovery responses or pleadings. None of them indicate an intent to eliminate large swaths of the class through arbitration. For example, 12 of the references to MD, PWA, or

---

[5] As discussed above, Plaintiffs were not made aware of the misleading arbitration clause added to Signature Cards in the Equity Agreements until Goldman filed its arbitration demands in February 2019, even though Goldman introduced that clause in January 2016. *See supra* Section II.C; Lamy Decl., ¶¶ 5-6.

generic "arbitration agreements" are nothing more than copy/pasted "General Objections" from Goldman's various responses and objections to Plaintiffs' discovery requests. *See id*. at Nos. 16-17, 20-29.

## III.   <u>LEGAL STANDARDS</u>

Litigants seeking to compel arbitration must do so promptly.  A party waives its right to compel arbitration if it "engages in protracted litigation that results in prejudice to the opposing party." *Latona Trucking, Inc*., 159 F.3d at 83 (citation omitted).  Courts consider: "(1) the time elapsed from the commencement of the litigation to the request for arbitration; (2) the amount of litigation (including exchanges of pleadings, any substantive motions, and discovery); and (3) proof of prejudice, including taking advantage of pre-trial discovery not available in arbitration, delay, and expense." *Id.*  If a litigant waives the right to compel arbitration, then courts need not address whether the agreement would otherwise be enforceable. *See, e.g.*, *PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 110 n.4 (2d Cir. 1997) ("Because we agree with the district court that PPG waived its right to arbitration, we need not address Webster's additional argument that the counterclaims asserted in its amended answer are beyond the scope of the arbitration clause.").

Where a defendant has not waived the right to arbitration, the Supreme Court has cautioned that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).  *See also Granite Rock Co. v. Teamsters,* 561 U.S. 287, 299 (2010) ("Arbitration is . . . a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.") (emphasis in original; quotation marks and citations omitted).  "Whether a dispute should be arbitrated depends on '(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the

particular dispute sought to be arbitrated falls within the scope of the arbitration agreement.'" *Barreto v. Jec II, LLC*, No. 16-cv-9729 (KBF), 2017 WL 3172827, at *3 (S.D.N.Y. July 25, 2017) (citation omitted).

"[W]hen determining whether a contract to arbitrate has been established for the purposes of the FAA, federal courts should apply 'ordinary state-law principles that govern the formation of contracts' to decide 'whether the parties agreed to arbitrate a certain matter.'" *Sinnett v. Friendly Ice Cream Corp.*, 319 F. Supp. 2d 439, 443 (S.D.N.Y. 2004) (quoting *First Options, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Accordingly, state-law grounds for the revocation of any contract apply with full force to arbitration agreements. *See Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) ("[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements.") (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681 (1996)).

"In evaluating a motion to compel arbitration, courts treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *Lillehagen v. Alorica, Inc.*, No. SACV 13-0092-DOC, 2014 WL 12768156, at *3 (C.D. Ca. Dec. 18, 2014). To the extent any agreement to arbitrate is ambiguous, the ambiguity must be construed against the drafter and in favor of the non-drafting party. Restatement (Second) of Contracts § 206.

## IV.  **ARGUMENT**

The Court should deny Goldman's motion to compel the 1,852 implicated class members to arbitration or otherwise exclude them from the class, for three reasons: *first*, Goldman's motion illustrates that the enforceability of the Agreements as against specific class members is a Phase II inquiry; *second*, Goldman waived its right to enforce both the arbitration clauses and the

releases contained within the Separation Agreements; and *third*, the Equity Award Agreements are facially and categorically unenforceable as to the 694 implicated class members because they are procedurally and substantively unconscionable and because the internal conflict within the Agreements must be resolved against Goldman.

A.    **Individualized Inquiries Regarding Enforceability of the Agreements—which Goldman Now Demands—Must Be Reserved for Phase II.**

Goldman's motion makes clear that it seeks individual determinations regarding the enforceability of the Agreements, demonstrating that these issues must be reserved for Phase II.[6]

Following the parties' briefing on the appropriate phasing of arbitration in Title VII class actions,[7] the Court determined that Goldman could file the current motion to compel arbitration. ECF No. 694 at 1.  However, the Court cautioned that it did "not contemplate individualized discovery or proceedings for un-named class members," and would "determine whether there are individualized [arbitration] issues that should be deferred" until Phase II once it had reviewed the parties' briefing.  *Id.* at 2.  Nonetheless, Goldman opened its motion to compel by declaring that, "[t]o defeat the FAA's presumption of validity, *each class member* who wishes to remain in the class bears the burden of proving that a generally applicable contract defense . . . bars enforcement of her promise to arbitrate."  Goldman Br. at 2 (emphasis in original).  *See also id.* at 3 (demanding that Plaintiffs' counsel "reach out to any of their clients to advise them of their obligations and the risks of ignoring their agreements to arbitrate").

This is precisely the reason Plaintiffs previously asserted, and now reiterate, that Phase II is the appropriate time for each class member to present arguments about the enforceability of any arbitration or severance agreement (where Goldman asserts such a defense), including those

---

[6] The Court has already determined that this case will "proceed in phases."  ECF No. 630 at 1.

[7] *See* ECF Nos. 675 (Plaintiffs' letter regarding phasing), 676 (Goldman's letter regarding same).

regarding contract formation.  *See* ECF No. 675 at 1-2 (explaining that "[d]ecades of judicial experience supports deferring individualized issues until after class issues have been resolved— both in Title VII and other class contexts") (collecting cases).  Indeed, Goldman concedes that such defenses include, *inter alia*, "fraud, duress, or unconscionability," and would need to be proven on an individual basis.  Goldman Br. at 2.  In fact, Goldman withdrew, without comment, 48 of its February 2019 arbitration demands, presumably because the Agreements were subject to individual defenses such as assent and execution, which only reveals the applicability of such defenses to the Agreements.  *See* Lamy Decl., ¶ 4.  Goldman's unilateral determination that several dozen of its original arbitration demands were improper—on the basis of contract defenses that must also be available to the remaining class members—cannot substitute for judicial review of *each* demand.

Given Goldman's concession that it seeks individualized proceedings, those proceedings should be deferred to Phase II.  There is no prejudice to Goldman by proceeding down this sensible and efficient path.  Goldman has yet to articulate a reason why the Court cannot make determinations regarding, *e.g.*, contract formation, within the context of Phase II *Teamsters* hearings.[8]  Goldman's citation to generalized cases about the importance of arbitration conflate form with substance: none of the cases suggest, let alone hold, that Goldman has a due process

---

[8] As the Supreme Court unanimously reaffirmed in *Wal-Mart Stores, Inc. v. Dukes*, Phase II— not Phase I—is when the employer has "the right to raise any individual affirmative defenses it may have[.]" 564 U.S. 338, 367 (2011).  In turn, "[t]he right to arbitrate is an affirmative defense." *Brookridge Funding Corp. v. Nw. Human Res., Inc.*, 170 F. App'x 170, 171 (2d Cir. 2006); *see also* Fed. R. Civ. P. 8(c) (listing "arbitration" as affirmative defense); ECF No. 629 at 10, 13 (Goldman stating that at the "second phase . . . 'Goldman [Sachs] will have a right to present affirmative defenses to each class member's entitlement to relief'" and admitting that arbitration agreements are one of its affirmative defenses).

16

right to demand individualized determinations regarding absent class members prior to Phase II.[9]

As this Court has observed, Goldman will never be forced to litigate against individuals subject

to a valid arbitration or separation agreement because the Phase I trial—which will proceed with

or without the 1,852 implicated class members—will not address or resolve the claims of any

particular class member.  *See, e.g.*, Feb. 25 Hr'g Tr. at 22:2-4 (The Court: "[I]n a class action

where it's not one of the named plaintiffs, what is the prejudice?"); 22:24-25 (The Court:

"[W]hat is wrong or bad or prejudicial about [absent class members] staying in a class until

phase two?"); 23:5-7 (The Court: "What would you be doing in – differently for this litigation

with or without those 1,800 people?").  Rather, Phase I will address whether Goldman's

challenged policies have a disparate impact and whether discrimination is Goldman's standard

operating procedure.  *Id*.  This framework sets the case apart from other cases, like *Gutierrez v.

Wells Fargo Bank, NA*, 889 F.3d 1230 (11th Cir. 2018), where the defendant faced the specter of

an entirely superfluous and unitary class liability and damages trial.

> **B.      Goldman Waived Any Right to Compel Arbitration Against Absent Class Members.**

All three of the Second Circuit's factors regarding waiver of arbitration support denying

Goldman's motion to enforce the arbitration clauses within each Agreement and the releases

within the Separation Agreements.  *Latona Trucking*, 159 F.3d at 83.[10]

---

[9] The cases either state only generalities or discuss the harm associated with a complete denial of a party's right to arbitrate, which Plaintiffs have never advocated.  *See Moses H. Cone Mem. Hosp. v. Mercury Contr. Corp.*, 460 U.S. 1, 22 (1983) (holding that allowing a parallel litigation over arbitrability is a final order and is immediately appealable); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (noting that courts respect contractual agreements to arbitrate).  Just as arbitration does not eliminate class members' substantive rights against Goldman, delaying those arbitrations to Phase II does not eliminate Goldman's right to arbitrate.

[10] For the same reasons that Goldman waived the right to compel arbitration, through any of the Agreements, contract law principles dictate that Goldman waived the right to enforce the releases contained in the Separation Agreements, be it in a judicial or arbitral forum.  *See PFRMF Inv.*

### 1. Eight Years Lapsed Between the Complaint and Goldman's Arbitration Request.

"[T]he time elapsed from the commencement of the litigation to the *request* for arbitration" counsels in favor of waiver. *Latona Trucking*, 159 F.3d at 83 (emphasis supplied). Courts routinely find that defendants who wait between one and three years to compel have waived the right to arbitrate. *See, e.g.*, *id.* at 82 (15 months between complaint and request to compel arbitration); *In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litig.*, 790 F.3d 1112, 1115 (10th Cir. 2015) (two years); *In re Citigroup, Inc.*, 376 F.3d 23, 24 (1st Cir. 2004) (three years).

Here, by any metric of time, Goldman waited much longer before stating any intention to compel arbitration against absent class members. Goldman did not make a request for arbitration against absent class members—under any of the Agreements—until February 2019, more than eight years after this case was filed. And Goldman does not cite anything from the case's eight-plus-year history where it stated an intent to do so, relying instead on a handful of unrelated references to one non-class member's arbitration agreement or on irrelevant statements about the existence of arbitration clauses for some MDs and PWAs.[11]  *See supra* Section II.F.  At the

---

*Holdings, LLC v. Interpublic Grp. of Companies, Inc.*, No. 11 CIV. 6008 CM, 2012 WL 2849771, at *8 (S.D.N.Y. July 10, 2012) ("Among the rights that can be waived are rights obtained by a release, including the right to enforce the terms of a release.") (citing *Ludwig v. NYNEX Service Co.*, 838 F. Supp. 769 (S.D.N.Y. 1993); *Bolis v. Fitzpatrick*, 827 N.Y.S.2d 801 (4th Dep't 2006)).

[11] Indeed, one of Goldman's own exhibits to the present motion is a letter stating that the "exemplar" agreements Goldman produced early in this case were to be treated "as separate from discovery in the *Chen-Oster* action and . . . destroy[ed] once the Motion to Compel individual Arbitration [against Lisa Parisi] has been decided."  *See* Giuffra Decl., Ex. 1455 (ECF No. 716-24 at 118-19).  Goldman now attempts to rely on these exemplars—which it previously instructed Plaintiffs to destroy—as evidence that it notified Plaintiffs of its intent to arbitrate against absent class members.  *Id.*, App. F at No. 6.  But by Goldman's own admission, these early "exemplars" pertained exclusively to the Parisi matter and therefore cannot have evinced an intent to compel arbitration against absent class members.

earliest, Goldman began stating its intent to exclude class members who signed MD and

Separation Agreements (and *only* MD and Separation Agreements), while the parties negotiated

class certification notice in 2018, *i.e.*, almost eight years after this case was filed.  *See supra*

Section II.C.

### 2.    Goldman Failed to Raise Arbitration in Opposition to Class Certification, and Its Justifications Are Misleading and False.

"[T]he amount of litigation (including exchanges of pleadings, any substantive motions,

and discovery)" counsels in favor of waiver.  *Latona Trucking*, 159 F.3d at 83.  Reviewing this

factor in the context of class actions, courts consistently hold that a defendant waives the right to

arbitrate if it fails to raise any intent to compel arbitration concurrently with class certification.

*See, e.g.*, *In re Cox*, 790 F.3d at 1119 (holding that defendant waived right to arbitrate by failing

to "assert[] its right to arbitrate against the absent class members as a possible defense against

class certification"); *In re Citigroup, Inc.*, 376 F.3d at 26-27 (same, by waiting until after class

was certified); *Edwards v. First Am. Corp.*, 289 F.R.D. 296, 306-308 (C.D. Cal. 2012) (same);

*Milbourne v. JRK Residential Am., LLC*, No. 3:12CV861, 2016 WL 1071564, at *8 (E.D. Va.

Mar. 15, 2016) ("[Defendant] knowingly failed to mention the arbitration issue in its opposition

to Plaintiffs' motion for class certification.  It is well-settled that 'the class certification decision

is generally the most important aspect of a class action case.  If a court certifies the case to

proceed as a class action, the case's dynamics change dramatically[.]' . . . Therefore, Plaintiffs

were significantly prejudiced by not being able to appropriately address the issue at that time.")

(citations omitted).

Goldman was on notice of the scope of the class Plaintiffs sought to certify by January

2011 (during the parties' detailed negotiations regarding class composition) or July 2014, at the

latest (when Plaintiffs filed their motion for class certification).  *See supra* Section II.B.  But

Goldman never raised the argument that any portion of the class—let alone more than half of the class—was improperly included due to arbitration or separation agreements, and never sought to strike, modify, or otherwise oppose the definition of the class on this basis or otherwise challenge the Rule 23 requirements on this basis.  *Id.*  That Goldman made generic references to a subset of the Agreements—in discovery or pleadings—prior to class certification actually underscores Goldman's *knowing* waiver of arbitration at class certification.  For example, by acknowledging the existence of the MD and PWA Agreements early in the case, but then counting individuals purportedly subject to these Agreements among the class size it challenged as unmanageable at certification, Goldman made the strategic choice to abandon any effort to exclude these class members from the case following a loss at certification.[12]  Goldman does not get a do-over five years later, after failing to defeat class certification; it is bound by its decision to knowingly abandon any arbitration argument at class certification.

Goldman is simply wrong that it was required to delay its arguments regarding absent class member arbitration until after class certification.  Indeed, a court in this District rejected the exact argument Goldman now makes, and found arbitration waived in circumstances less prejudicial than here.  *See In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 258 (S.D.N.Y. 2005) (Pauley, J.) ("This Court rejects Chase's and Citibank's argument that prior to the class certification order, the instant motion to stay the trial of their claims would not have been ripe.").[13]  At the very minimum, such case law put Goldman on notice that it should take steps to preserve its ability to compel arbitration.  As discussed above, Goldman did no such

---

[12] Goldman's calculation appears directed at avoiding the risk that a challenge to the class size (based on arbitration) might have reduced the class numerosity sufficiently to place it well within the manageability bounds of other classes certified post-*Dukes.  E.g.*, *McReynolds*, 672 F.3d 482.

[13] Goldman's attempt to distinguish *In re Currency* on the basis that there, "expert discovery [was] in full swing," Goldman Br. at 27, is puzzling in light of the fact that the *second round* of expert discovery in this case is ongoing.

thing.  Goldman's argument that prior to certification, the Court had no jurisdiction over absent class members misconstrues the relevant authority.  The inquiry is not jurisdictional; if that were the beginning and end of the analysis, there would be no law of waiver in class actions.  Rather, the relevant inquiry is *Goldman*'s conduct throughout the litigation.  *Goldman* was before the Court for eight years, *Goldman* elected to abandon arbitration at class certification, and *Goldman* waived its opportunity to compel arbitration.

In fact, the cases Goldman identifies, where post-certification motions to compel arbitration were permitted, involved remarkably different circumstances than here, and support a finding of waiver here.  In *Gutierrez v. Wells Fargo Bank*, the court identified numerous steps the defendant took to put both the court and plaintiffs on notice that it intended to compel arbitration against absent class members following class certification, including:

-   stating in a court filing "well before any discovery had been conducted . . . that it was not in a position to assert its arbitration rights against the unnamed Plaintiffs but wished to preserve those rights";

-   arguing in opposition to class certification that "a lack of numerosity existed because [class members were] bound by enforceable arbitration provisions [and] would have to be excluded from the class"; and

-   filing "conditional motions to compel arbitration against the unnamed class members" at the same time as its class certification opposition.

889 F.3d at 1235, 1237.  Goldman took none of these steps, opting instead to rely on the total class size—including all 1,852 class members Goldman now seeks to exclude—in opposition to class certification.  *See supra* Section II.B.  Accordingly, in the words of the *Gutierrez* court, Goldman's conduct "smacks of outcome-oriented gamesmanship played on the court and the opposing party's dime," and constitutes clear grounds for waiver.  *Id.* at 1236.

*Lillehagen v. Alorica, Inc.* is likewise distinguishable.  Goldman Br. at 30, 33.  There, unlike here, less than two months passed between the defendant's acquisition of knowledge of

21

the arbitration agreements and its disclosure of the agreements.  2014 WL 12768156, at *4.

More importantly, the defendant raised its intent to compel arbitration "when it filed its

opposition to Plaintiffs' motion for conditional certification," and waited one year to move to

compel arbitration only because it had been specifically ordered by the Court to "file[] its motion

to compel arbitration along with its motion to decertify."  *Id*.  Accordingly, *Lillehagen* actually

supports Plaintiffs' argument that Goldman was required to, at a minimum, raise any intent to

compel absent class members to arbitration in connection with its opposition to certification.

     *Degidio v. Crazy Horse Saloon & Restaurant*, 880 F.3d 135 (4th Cir. 2018) *cert. denied*

*sub nom.* 138 S. Ct. 2666 (2018), also cited by Goldman, likewise supports a finding of waiver

here.  Goldman Br. at 27.  There, the Fourth Circuit specifically rejected the defendant-

employer's argument that it "could not move to compel arbitration" until "after the district court

had conditionally certified an FLSA class" because "there was no party against whom it could

have moved to compel arbitration."  880 F.3d at 141-42.  The court reasoned that "[s]uch a ruling

would give defendants a perverse incentive to wait as long as possible to compel arbitration."  *Id*.

So too here.

     Unable to distinguish the case law from this Circuit and other relevant case law Plaintiffs

have cited, Goldman continues to cite inapposite cases for sweeping (and inaccurate)

propositions regarding general arbitration rights.  *Feuerman* v. *Sears*, *Roebuck & Co*., for

example, does not stand for the "black letter law" that courts cannot entertain arbitration

arguments as to absent class members because they lack "jurisdiction over absent class members

until the class was certified," as Goldman asserts.  Goldman Br. at 4, 24.  To the contrary,

*Feuerman* considered only the narrow issue of whether the named plaintiff in a new class action

was a class member in a prior class action.  No. 96 Civ. 0120 (DC), 1996 WL 648966 (S.D.N.Y.

Nov. 6, 1996).  The case contains *zero* discussion of arbitration, waiver, or Title VII.  *Id*.  The

fact that Goldman continues to reach for a 25-year-old unpublished opinion for "black letter law"

is indicative of the shaky ground on which Goldman's argument rests.[14]

> **3.    Goldman's Delay in Raising Arbitration Would Result in Substantial Prejudice to Plaintiffs.**

The Second Circuit's "proof of prejudice" factor also counsels in favor of waiver.

*Latona Trucking*, 159 F.3d at 83-84.  The Second Court recognizes both "substantive prejudice

and prejudice due to excessive cost and time delay."  *Thyssen*, 310 F.3d at 105.  *See also id.*

("Prejudice can be substantive, such as when a party loses a motion on the merits and then

attempts, in effect, to relitigate the issue by invoking arbitration, or it can be found when a party

too long postpones his invocation of his contractual right to arbitration, and thereby causes his

adversary to incur unnecessary delay or expense."); *Latona Trucking*, 159 F.3d at 83-84

("Prejudice results when a party seeking to compel arbitration engages in discovery procedures

not available in arbitration, makes motions going to the merits of an adversary's claims, or

delays invoking arbitration rights while the adversary incurs unnecessary delay or expense.")

(internal quotation marks omitted).

---

[14] Goldman's remaining authority is equally unavailing.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 1753784, at *3-4 (N.D. Cal. May 9, 2011) (noting that waiver law in the Ninth Circuit is "slightly less clear" and still finding the waiver issue to be "extremely close" in circumstances less prejudicial than here); *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 607 (N.D. Ill. 2015) (no discussion of waiver doctrine); *Whittington v. Taco Bell of Am., Inc.*, No. 10–cv–01884–KMT–MEH, 2011 WL 1772401, at *6 (D. Colo. May 10, 2011) (same);  *Allied Sanitation, Inc. v. Waste Mgmt. Holdings, Inc.*, 97 F. Supp. 2d 320, 328 (E.D.N.Y. 2000) (finding no waiver where, unlike here, "[t]here ha[d] been very little discovery other than turning over all the contracts . . . no depositions, [and] no interrogatory answers"); and *Thyssen, Inc. v. Calypose Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002) (determining that though 20 months between the complaint and motion to compel constituted a "significant length of time," finding no waiver because, unlike here, there was "no evidence of extensive discovery or substantive motions").

Here, Plaintiffs and the class face enormous prejudice from Goldman's strategic delay. Regarding substantive prejudice, it is now clear that Goldman, unhappy with the Court's Certification Order, seeks to undo that Order through arbitration. *Thyssen*, 310 F.3d at 105. And regarding cost and delay, "the current litigation has already been ongoing for 8 years and the parties have already litigated numerous issues that would arise in any new case." *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 84 (S.D.N.Y. 2018).[15] Plaintiffs have relied on the pleadings, rulings, and extensive discovery of the last eight-plus years to shape their case, including Court rulings on several dozen motions and/or discovery disputes, two appeals, and eight years of discovery that included more than 30 separate deposition days, required the parties to meet and confer regarding almost 400 discovery requests, and required that Plaintiffs' counsel review nearly half a million pages of discovery from Goldman. *See supra* Section II.A. Over the course of this extensive litigation, Plaintiffs' counsel also incurred substantial litigation expenses. *Id.* The Second Circuit has found prejudice in far less extreme circumstances. *See Latona Trucking*, 159 F.3d at 84 (finding prejudice where the moving party sought "3 depositions, 19 detailed interrogatories, and the production of more than 2100 pages in documents"). Each class member would therefore be harmed if she is compelled into arbitration and forced to proceed—from scratch—without the benefit of eight years of litigation before this Court.

If Goldman's "heads I win, tails you lose" gamesmanship were permitted, any employer could sit on its purported arbitration rights throughout the entire course of a litigation, invoke the

---

[15] As Judge Torres noted further, "it would be nonsensical to disaggregate the claims into hundreds or thousands of individual proceedings," because such an action "would only waste 'time, effort, and expense' and increase the likelihood of conflicting outcomes for Plaintiffs." *Chen-Oster*, 325 F.R.D. at 84. This is precisely the prejudice that would result if the Court compels arbitration at this late date, and prevents class members from benefiting from the time, effort, and expense of this litigation.

class size when it advantaged the employer to do so, and then jump to a friendlier forum if the court disagreed with its positions, or roll out arbitration agreements years after the start of the case to create a one-way escape hatch from court.  There is no case which permits such substantial prejudice to plaintiffs.

### C.   The Equity Award Agreements Are Facially Unenforceable as to the 694 Implicated Class Members.

The Equity Award Agreements are categorically unenforceable for two reasons.  *First*, Goldman's practices in securing the Equity Award Agreements, as well as the terms of the Agreements themselves, render them procedurally and substantively unconscionable in a manner that applies equally to all 694 affected class members.  *Second*, the conflict between the language of the arbitration clauses contained in the Equity Award Agreement (and Stock Incentive Plan) and that contained in the Signature Card creates an ambiguity that must be construed against Goldman, as the drafter of those clauses.

### 1.   The Equity Award Agreements Are Unconscionable.

Under New York law, which Goldman seeks to apply, "[a] determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made."  *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988).[16]  The procedural element "concerns the contract formation process and the alleged lack of meaningful choice," while the substantive element "looks to the content of the contract, per se."  *Ragone*, 595 F.3d at 121-22 (alterations omitted) (quoting *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (1983)).  In other words, the party opposing arbitration must make "some showing of an absence of meaningful choice on the part of one of the parties together with

---

[16] Plaintiffs do not concede that New York state contract law will apply to determine the enforceability of every category of Agreements.  However, even under New York state contract law, which Goldman seeks to apply (Goldman Br. at 20, n.20), Goldman is wrong.

contract terms which are unreasonably favorable to the other party." *Gillman*, 73 N.Y.2d at 10 (internal quotation marks omitted).

New York's unconscionability doctrine, "which is rooted in equitable principles, is a flexible one," and is therefore "intended to be sensitive to the realities and nuances of the bargaining process." *Id.* (quoting *State v. Avco Fin. Serv. of New York Inc.*, 50 N.Y.2d 383, 389-90 (1980)). Accordingly, "procedural and substantive unconscionability operate on a 'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (1983).

Here, the Equity Award Agreements are procedurally and substantively unconscionable, in a manner that applies to the 694 implicated class members, and are therefore unenforceable even without reference to any class member-specific defenses to contract formation that should be litigated at Phase II.[17]

### a.      The Agreements Are Procedurally Unconscionable.

Goldman's decision to bury a new contract term, expanding the Equity Award Agreements' arbitration provision from *stock-related* disputes to *all employment* disputes, unquestionably resulted in a lack of "meaningful choice" for the class members purportedly subject to those Agreements. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 385 (E.D.N.Y. 2015) ("Traditional contract law recognizes . . . unconscionability as [a] contract defense[] to bait-and-switch tactics.") (citation omitted); *Ragab v. Howard*, 841 F.3d 1134, 1138 (10th Cir. 2016) (affirming denial of motion to compel arbitration where "the conflicting details in the multiple arbitration provisions indicate that there was no meeting of the minds with respect to arbitration").

---

[17] Plaintiffs do not waive, and explicitly reserve, any additional, individualized Phase II defenses to arbitration on behalf of these class members.

The text of both the Equity Award Agreement and the Stock Incentive Plan (which the Equity Award Agreement cross-references) limits the arbitration agreement to stock disputes, and the text had been the same *for years*.  *See supra* Section II.E.  It was only beginning in 2016, and only in the fine print of the separate Signature Card for stock award acceptance, that Goldman added the newly expanded arbitration term to include "disputes concerning Employment-Related Matters."  *Id.*[18]

Nothing in the text explaining the awards or referenced on the face of the Signature Card would alert class members to this change.  To the contrary, the Signature Card advises class members in bolded text to review the Equity Award Agreement and Stock Incentive Plan documents for the material "TERMS AND CONDITIONS OF YOUR AWARD(S) AND RELATED MATTERS."  *Id.*  The fact that Goldman may have withheld equity compensation pending signature of the Equity Award Agreement only underscores the procedural unconscionability of this bait-and-switch.  *See* Goldman Br. at 13 n.15 ("Delivery of Equity-Based Awards did not proceed until the Signature Cards were submitted.").  Such conduct creates procedurally unconscionability.[19]

---

[18] It also bears noting that when Goldman amended the newly expanded arbitration language, it continued to omit language necessary to inform class members about this case, rendering any agreement to waive class members' rights to participate in this litigation unknowing.  *See* Rule 23(d) Br.

[19] The cases Goldman cites against a finding of unconscionability of the Agreements are irrelevant or involved remarkably different circumstances.  *See Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 146 (2d Cir. 2004) (considering the enforceability of the standard arbitration clause within the National Association of Securities Dealers' "Form U–4," which prior courts had already considered and which is not at issue here); *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 200 (2d Cir. 1999) (same); *Raiola v. Union Bank of Switzerland, LLC*, 47 F. Supp. 2d 499, 501 (S.D.N.Y. 1999) (same); *Stern v. Espeed, Inc.*, No. 06 CIV. 958(PKC), 2006 WL 2741635, at *3 (S.D.N.Y. Sept. 22, 2006) (finding no procedural unconscionability where "[t]he agreement is written in clear language and relies on capital lettering and/or bold print in key sections"); *Barreto v. Jec II, LLC*, No. 16-CV-9729 (KBF), 2017 WL 3172827, at *1, 4 (S.D.N.Y. July 25, 2017) (noting that the arbitration agreement "may

**b.      The Agreements Are Substantively Unconscionable.**

Goldman's Equity Award Agreement is substantively unconscionable for three reasons.

*First*, Goldman's addition of a term expanding arbitration to all employment-related disputes—six years into the case—was clearly intended to provide Goldman with an unfair advantage in this litigation and any resulting (individual) arbitration.  *See Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1202 (11th Cir. 1985) ("When confronted with claims pressed by a plaintiff class, it is obviously in defendants' interest to diminish the size of the class and thus the range of potential liability by soliciting exclusion requests.  Such conduct reduces the effectiveness of the 23(b)(3) class action for no reason except to undermine the purposes of the rule.") (citation omitted).  It appears this term was added to surreptitiously deprive current employee class members of the opportunity to step forward and represent a Rule 23(b)(2) class, just as the parties were litigating the issue of former employee standing in the wake of Magistrate Judge Francis's recommendation that he would have certified a Rule 23(b)(2) class but for (now reversed) law of the case regarding former employee standing.  ECF No. 364 at 45.

*Second*, the provision in the Equity Award Agreements eliminating access to injunctive and declaratory relief is substantively unconscionable because it eliminates the remedies available to class members at arbitration.  *See* Levin-Gesundheit Decl., Ex. A at 9 ("To the fullest extent permitted by applicable law, no arbitrator will have the authority to . . . grant relief other than on an individual basis to the individual claimant involved."); *id.*, Ex. B ("[T]o the fullest extent permitted by applicable law, no arbitrator shall have the authority to . . . grant relief other than on an individual basis to the individual claimant involved.").

---

have been presented in a procedurally unconscionable manner" even where agreement was *titled* "Mandatory Arbitration Policy and Procedure for Resolving Disputes *Arising Out of Its Employees' Employment* or Termination of Employment") (emphasis supplied).

Injunctive relief is a remedy under both Title VII and the NYCHRL.  *See* 42 U.S.C.A. § 2000e-5(g)(1) ("If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate . . . or any other equitable relief as the court deems appropriate."); *Wilson v. Phoenix House*, 978 N.Y.S.2d 748, 770 (Sup. Ct. 2013) ("Clearly, injunctive relief is available under the [NYCHRL].  Further, this provision was intended to give enhanced protection against discrimination and 'reflects the broad policy behind the local law to discourage discrimination.'") (citation omitted).

The Equity Award Agreement's elimination of this remedy through arbitration is therefore substantively unconscionable.  *See, e.g.*, *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 255 (S.D.N.Y. 1998) ("Arbitration is favored, but not to the point that it can run contrary to the public policy underlying Title VII. . . .  [U]nder Title VII, arbitrations cannot disallow remedies central to the Title VII scheme. . . .  Arbitration cannot be the exclusive Title VII forum where it provides only contract damages, not the broader range of Title VII monetary and equitable remedies.") (internal citations omitted); *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1059 (11th Cir. 1998) (holding that for Title VII claims, arbitration must offer "all of the types of relief that would otherwise be available in court") (quoting *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1482 (D.C. Cir. 1997)).

The arbitration forum rules, which mandate that the remedies in arbitration must match those available in a court of law, further demonstrate the unconscionability of the Equity Award

1730496.7

Agreement's prohibition on injunctive and declaratory relief.[20]  As per the Stock Incentive Plan, which the Equity Award Agreement incorporates, arbitration should proceed according to the current rules of the New York Stock Exchange ("NYSE") or American Arbitration Association ("AAA").  *See* Goldman Sachs Amended and Restated Sock Incentive Plan (2015), at § 3.17 (stating that disputes "shall be finally settled by arbitration . . . before, and in accordance with the rules then obtaining, of the New York Stock Exchange . . .  or . . . the American Arbitration Association").  As of 2007, NYSE merged into the Financial Industry Regulatory Authority ("FINRA").  FINRA's arbitration rules mandate that, in the context of "Statutory Employment Discrimination Claims," such as those at issue here, the arbitration "panel may award *any relief that would be available in court under law.*"  FINRA Rule 13802(e) (Apr. 3, 2017).[21]  AAA's Employment Arbitration Rules likewise provide that "[t]he arbitrator may grant *any remedy or relief that would have been available to the parties had the matter been heard in court*."  AAA Employment Arbitration Rules & Mediation Procedures, Rule 39.D (Nov. 1, 2019).[22]  For nearly 25 years, AAA has also recognized in its Employment Due Process Protocol that "[t]he arbitrator should be empowered to award *whatever relief would have been available in court under the law*."  AAA Employment Due Process Protocol, Part B.5 (May 9, 1995).[23]  Goldman's effort to contravene the *due process* protections of its own chosen arbitration forums underscores the substantively unconscionable nature of its Equity Award Agreements.

---

[20] Arbitration rules are the proper subject of judicial notice on a motion to compel arbitration. *See, e.g.*, *Klein v. ATP Flight Sch., LLP*, No. 14-cv-1522 (JFB)(GRB), 2014 WL 3013294, at *10 n.6 (E.D.N.Y. July 3, 2014) (collecting cases).

[21] *See* http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4284 (emphasis supplied) (Last visited June 11, 2019).

[22] *See* https://www.adr.org/sites/default/files/EmploymentRules_Web2119.pdf (emphasis supplied) (Last visited June 11, 2019).

[23] *See* https://www.adr.org/sites/default/files/document_repository/Employment%20Due%20Process%20Protocol_0.pdf (emphasis supplied) (Last visited June 11, 2019).

*Third*, the Equity Award Agreements are substantively unconscionable because their

Signature Cards include an overbroad and one-sided requirement that employees arbitrate *any*

*and all non-employment* disputes with any Goldman employee or affiliate, which includes not

only co-workers, but also former employees, clients, or vendors.  The pertinent provision begins

by defining "Employment-Related Matter" to mean *all* legal disputes, "includ[ing] matters

relating to actions or inactions by individuals associated with the Firm (including but not limited

to employees, officers, and directors), *irrespective of whether such actions or inactions occurred*

*in the ordinary course of employment*."  Levin-Gesundheit Decl., Ex. B (emphasis

supplied).[24]  To expand upon its unequal bargaining power, Goldman deceptively *re*-defined

"employment-related" to include anything that is *not* employment-related.  Employees are thus

required to arbitrate "*irrespective of whether the Firm is or would be a party to any such*

*arbitration* (*e.g.,* if I elect to pursue a claim against another employee, including my manager,

based on an Employment-Related Matter)," further highlighting that *personal* disputes must be

submitted to arbitration according to Goldman's rules.  *Id.* (emphasis supplied).  Finally,

employees must agree to the following non-mutual term: Goldman "may intervene in any

arbitration concerning an Employment-Related Matter to which the Firm is not a party if the

Firm determines, *in its judgment*, that the Firm has an interest in the outcome of the

---

[24] The full text of the relevant provision reads as follows: "I understand and agree that (a)
*'Employment-Related Matter' includes matters relating to actions or inactions by individuals*
*associated with the Firm (including but not limited to employees, officers, and directors),*
*irrespective of whether such actions or inactions occurred in the ordinary course of employment*,
and (b) my obligation to arbitrate matters that arise out of or relate to Employment-Related
Matters applies irrespective of whether the Firm is or would be a party to any such arbitration
*(e.g.,* if I elect to pursue a claim against another employee, including my manager, based on an
Employment-Related Matter). I agree that *the Firm may intervene in any arbitration* concerning
an Employment-Related Matter *to which the Firm is not a party if the Firm determines, in its*
*judgment, that the Firm has an interest in the outcome of the arbitration*." Levin-Gesundheit
Decl., Ex. B (emphasis supplied).

arbitration." *Id.* (emphasis supplied).  That is, Goldman, in its sole judgment may intervene in any *personal* dispute between an employee and any Goldman affiliate—*e.g.*, to come to the defense of the Goldman affiliate—while the employee does not maintain a mutual intervention right.  To be clear, in response to a woman's decision to bring a discrimination claim against Goldman, the firm could exercise its unique right to intervene in the woman's *unrelated* civil disputes, forcing them into arbitration and coming to the aid of defendants with any Goldman affiliation.

Goldman's insertion of itself into employees' *personal* disputes with *any* Goldman affiliate—*e.g.*, even for civil claims of sexual assault, intentional infliction of emotional distress, defamation, premises liability, or theft *not occurring* in the workplace—"is so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms."  *Gillman*, 537 N.Y.2d at 10 (quoting *Mandel v. Liebman*, 303 N.Y. 88, 94 (1951)).  Goldman's unwarranted intervention into the private disputes of its employees forces them into Goldman's preferred arbitral venue, bound by Goldman's hand-crafted rules.  Goldman's effort to deprive employees of access to the justice system for *non-employment* disputes—both by excluding employees from the courts and by inserting itself into any proceedings—further highlights the substantively unconscionable nature of its Equity Award Agreements.

### 2.  Ambiguity Regarding the Claims Subject to Arbitration Under the Equity Award Agreements Must Be Resolved Against Goldman.

The Equity Award Agreement and Signature Card contain different, contradictory arbitration clauses.  Under common law rules of contract interpretation, the ambiguity created by this conflict must be resolved against Goldman.  Accordingly, the narrower arbitration

Agreement contained within the actual Equity Award Agreement and Stock Incentive Plan is the only clause that should apply to the 694 affected class members.

The Equity Award Agreement's arbitration provision is expressly limited to disputes "arising out of or relating to or concerning the [Stock Incentive] Plan or this Award Agreement." Levin-Gesundheit Decl., Ex. A at 9.  The Equity Award Agreement directs readers to only one other document—the Stock Incentive Plan, not the Signature Card—for further information about this arbitration provision.  *See id.* ("[Y]ou are indicating that you understand and agree that the arbitration . . . provisions set forth in Section 3.17 of the [Stock Incentive] Plan will apply to this award.").  The Stock Incentive Plan, like the Equity Award Agreement, contains an arbitration provision that is expressly limited to disputes "arising out of or relating to or concerning the [Stock Incentive] Plan or applicable Award Agreement."  Rule 23(d) Mot. at 6, n.6.  This had been true for years.  *See supra* Section II.E.

The Signature Card's new, more expansive arbitration provision directly contradicts these two primary documents by expanding arbitration to "all claims arising out of or relating to my employment with the Firm or the termination thereof."  Levin-Gesundheit Decl., Ex. B. Accordingly, in the unlikely event that any class member looked beyond the Equity Award Agreement and Stock Incentive Plan to understand the scope of her agreement to arbitrate, the Signature Card would have, at most, created confusion about the scope of Goldman's arbitration provision.  Common law principles of contract interpretation dictate that this ambiguity must be construed against Goldman, as the drafter of those clauses.  *See* Restatement (Second) of Contracts § 206 ("In choosing among the reasonable meanings of a promise or agreement . . . that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds."); *151 W. Assocs. v. Printsiples Fabric Corp.*, 61

33

N.Y.2d 732, 734 (1984) ("It has long been the rule that ambiguities in a contractual instrument will be resolved *contra proferentem*, against the party who prepared or presented it.").

## V.     CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Goldman's motion to compel arbitration of the claims of all 1,852 absent class members, or in the alternative, defer any ruling on these matters until Phase II, after the class liability trial is complete.

Dated:  June 11, 2019          By:  _____

(     Kelly M. Dermody

Kelly M. Dermody (*admitted pro hac vice*)
Anne B. Shaver (*admitted pro hac vice*)
Michael Levin-Gesundheit (*admitted pro hac vice*)
Michelle Lamy (*admitted pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Rachel J. Geman
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-9592
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Adam T. Klein
Cara E. Greene
Melissa L. Stewart
Christopher M. McNerney
Michael C. Danna
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060

*Class Counsel*

34