## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------  x
                                                              :
H. CRISTINA CHEN-OSTER; SHANNA                                :
ORLICH; ALLISON GAMBA; AND MARY DE                            :
LUIS,                                                         :
                                                              :
                                    Plaintiffs,               :
                                                              :   10 Civ. 6950 (AT) (RWL)
v.                                                            :
                                                              :
GOLDMAN, SACHS & CO. and THE GOLDMAN                          :
SACHS GROUP, INC.,                                            :
                                                              :
                                    Defendants.               :
                                                              :
------------------------------------------------------------  x
```

### JOINT STATUS REPORT

In accordance with the Court's October 3, 2019 Order, ECF No. 870, the parties submit this Joint Status Report in advance of the November 19, 2019 Status Conference.  The Parties' respective sections follow beginning on the next page.

## PLAINTIFFS' POSITIONS

### A.   Page Limits & Unauthorized Appendix

Following the October 3, 2019 status conference, the Court indicated that it "prefers [status] reports to be no more than 25 pages in length absent compelling circumstances." ECF No. 870, at 3. Plaintiffs interpret this to mean that, absent compelling circumstances, which are not present here, each party may submit no more than 12½ pages of argument. Plaintiffs have complied with this request. Goldman, however, has submitted more than 22 pages of argument (more than 16 pages of argument in the body of the Joint Status Report and an additional 6 pages of argument contained in a misleading "appendix"). Plaintiffs object both to Goldman's disregard for the Court's instruction and Goldman's use of these additional pages to repeat unauthorized and meritless arguments about the trial plan. As explained further below in Section 0, Goldman previously violated the Court's Order permitting a 3-page letter brief on this topic when Goldman filed 11 pages of argument in two separate letters. *See* ECF Nos. 880, 885. Plaintiffs respectfully request that the Court impose some restraints on Goldman's indifference to the Court's rules and failure to accept orderly management of issues in the case.

### B.   Privilege Logs

The parties are meeting and conferring over Goldman's privilege logs of 5,341 documents withheld in their entirety and 3,165 documents partially withheld as redacted. Plaintiffs have not challenged any withheld or redacted documents sent by or to Goldman's outside counsel. However, we have identified several deficiencies in Goldman's extensive privilege logs, including its potential waiver of privilege through disclosure to third parties and undefined mailing lists, missing identities of authors and recipients of documents, and vague subject matter descriptions.

In order to assess Goldman's privilege claims over more than 8,300 records not sent or received by outside counsel and to resolve any ambiguities as to whether these documents concern legal advice, Plaintiffs require additional information from Goldman. Fed. R. Civ. P. 26(b)(5) (requiring the party asserting the privilege to "describe the nature of the documents … in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim"); July 25, 2019 Order, at 2, ECF No. 796. At this point, we ask that for all documents not sent or received by outside counsel, Goldman provide: (1) the identities of all authors and recipients of withheld or redacted documents, (2) adequate subject matter descriptions for communications with brand/marketing employees, between non-attorneys, or merely copying (or blind-copying) attorneys, and (3) the identities of members of the more than 160 non-legal mailing lists that are listed as recipients on more than 400 documents (including e-mail addresses such as gs@gs.com, firmwidecbsc@ny.email.gs.com, and gs-fwn@internal.email.gs.com).

While Goldman argues that there are listserv names from which Plaintiffs can discern the positions of listserv members, as this Court noted, where Goldman doesn't "identify every person in [a listserv] …. it may very well be that you can discern from the Listserv name or title, that … this could involve a lot of people, … [or] I don't really see any lawyers here, **then [Defendants] have to identify who in there they say is creating the privilege**." Oct. 3, 2019 Conf. Tr. at 45:21-46:5 (emphasis added). Merely listing names of listservs fails to meet Goldman's burden to identify "persons (name and position)" of all authors and recipients of documents on its privilege log, July 25, 2019 Order, at 2, ECF No. 796, as well as its burden "to show that it preserved the confidentiality of the communication by limiting dissemination only to employees with a need to know." *Bank of New York v. Meridien Biao Bank Tanzania Ltd.*, No. 95 Civ. 4856 (SS), 1996 WL 474177, at *2 (S.D.N.Y. Aug. 21, 1996); *Phillips v. C.R. Bard, Inc.*,

290 F.R.D. 615, 655 (D. Nev. 2013) (holding that the fact that a communication was distributed to a large distribution list "goes against Bard's assertion that it was sent only to people who needed the information to perform their jobs").[1] Courts have repeatedly rejected privilege logs that fail to identify members of listservs. *See, e.g.*, *Muro v. Target Corp.*, 250 F.R.D. 350, 364 (N.D. Ill. 2007), *aff'd,* 580 F.3d 485 (7th Cir. 2009) (holding that including e-mails sent to distribution lists without identifying all the people on those lists is "a serious defect in the privilege log; without the identities and job descriptions of the persons on the distribution lists, there is no way for an opposing party to assess whether they are within the sphere of corporate privilege").

Even if it is "challenging," Goldman "must provide adequate information about the individual authors and recipients" in its privilege logs. *Wultz v. Bank of China Ltd.*, 979 F. Supp. 2d 479, 497 (S.D.N.Y. 2013) (holding that privilege logs must identify individual authors and recipients, even though defendant had to "collect[] and review[] a large volume of documents maintained in a foreign country" and "providing adequate data for a privilege log [was] an unfamiliar task"). Moreover, Goldman should know who was included in each listserv if it claims that each person "need[ed] to know" the legal advice shared with the listserv. To accommodate Goldman, however, Plaintiffs request the identities of members of each listserv at six month intervals, rather than on specific dates.

Plaintiffs also request that Goldman provide the job position of all individuals on its privilege logs, as this Court ordered more than three months ago. *See* July 25, 2019 Order, at 2,

---

[1] *See also Verschoth v. Time Warner Inc.*, No. 00CIV1339AGSJCF, 2001 WL 286763, at *2 (S.D.N.Y. Mar. 22, 2001) ("The 'need to know' must be analyzed from two perspectives: (1) the role in the corporation of the employee or agent who receives the communication; and (2) the nature of the communication, that is, whether it necessarily incorporates legal advice.").

ECF No. 796 ("Defendants shall make reasonable efforts to provide more fulsome information for its privilege claims, including by identifying persons (name and position) creating, sending or receiving the particular document, and describing subject matter addressed by the document"). Goldman has yet to provide the positions of 134 individuals listed as authors or recipients on its privilege logs, and it has not even confirmed whether these are Goldman employees or third parties.

Plaintiffs will continue to meet and confer with Goldman to address our remaining concerns with its privilege logs, including the 3,487 attachments potentially withheld due to a claim of privilege over their cover e-mails; the 2,435 e-mail chains withheld in their entirety notwithstanding whether entries within the string are privileged; the inappropriate assertions of the bank examination privilege and the confidential supervisory information privilege over more than 757 records; and the potential waiver of privilege through indiscriminate dissemination to listservs and/or covering documents concerning gender audits and internal complaints that go to the heart of Goldman's affirmative defenses regarding corporate knowledge and intent.

### C.    Depositions

On April 19, 2019, Plaintiffs initiated a meet and confer regarding an extension of the presumptive limit of ten depositions under Federal Rule of Civil Procedure 30(a)(2)(A)(i).  In the intervening months, the parties have exchanged numerous letters on the topic, but have been unable to reach agreement regarding an appropriate extension.  Though the parties have not yet reached impasse, Plaintiffs anticipate that Court intervention will be required on this topic.

### D.    Named Plaintiff Supervisor Discovery

Following the October 3, 2019 status conference, the Court ordered Goldman, to the extent it has not already done so, to produce the following materials for the supervisors of the Named Plaintiffs: a) 360 reviews; b) promotion notes/cross-ruffing summaries for supervisors

promoted from managing director to partner; and c) complaints of gender discrimination.[2]  ECF
No. 870.  The Court directed the parties to meet and confer regarding the identities of the
supervisors.  *Id.*

      The supervisors of the Named Plaintiffs are those individuals at a higher rank within
Goldman who directed the Named Plaintiffs' work, reviewed their performance, or exercised
managerial control over the trajectory of their careers.  How these individuals treated the Named
Plaintiffs, particularly compared to their male peers, is relevant to the Named Plaintiffs'
individual intentional discrimination claims.  On October 15, 2019, Plaintiffs proposed that
supervisors of the Named Plaintiffs be defined as follows: i) individuals listed as managers or co-
managers on the Named Plaintiffs' 360-Degree Reviews; ii) individuals holding a higher title
than the Named Plaintiffs who provided them with 360-Degree Review feedback[3]; *and* iii)
individuals identified as supervisors during the Named Plaintiffs' depositions.  In Plaintiffs
October 15 correspondence, Plaintiffs noted that Goldman was in the best position to identify the
majority of these supervisors from its own HR databases.

      With no explanation of its methodology, on October 25, Goldman provided Plaintiffs
with a list of just nine supervisors, purportedly covering the four Named Plaintiffs'
approximately 28 years of combined service at Goldman.  Surprisingly, Goldman listed just two
supervisors for one of the Named Plaintiffs, even though she worked at the company for 13
years; and in just one of those years (2008), her performance review specifically described five

[2] On November 12, 2019, Goldman produced additional internal complaint files.

[3] Goldman's contention that the Court rejected Plaintiffs' definition of supervisor as
encompassing those individuals at a higher title who provided 360-Degree Review feedback is
wrong.  At the previous status conference, the Court indicated it was unfamiliar with the
supervisory structure of Goldman and was open to Plaintiffs' position, stating, "Not
necessarily.  But *I'm not sure there is necessarily a distinction either***."  Oct. 3, 2019 Tr. 79:10-11
(emphasis added).

different individuals as "managers."  Plaintiffs objected to Goldman's list, and on October 31, Goldman indicated that it would only consider Plaintiffs' position if Plaintiffs provided specific names (despite the fact that the vast majority of names are in Goldman's databases).  Plaintiffs then provided names—albeit an incomplete list because Plaintiffs have been unable to access documents identifying the Named Plaintiffs' supervisors in each of their years at Goldman—on November 5.  Thus, contrary to Goldman's claim, Plaintiffs did not delay this meet and confer.

On November 12, Goldman revised its position and identified 18 supervisors of the Named Plaintiffs during their 28 years of combined service.  Plaintiffs are considering Goldman's proposal but are skeptical given that Goldman has excluded numerous individuals whom Goldman itself specifically listed as "co-managers" on the Named Plaintiffs' performance reviews.  Plaintiffs also note that Goldman excluded a supervisor who counsel for Goldman recently and repeatedly represented to the Court was Ms. Chen Oster's supervisor when Goldman sought to deny Plaintiffs comparator discovery.  *See* Jul. 17, 2019 Hr'g Tr. 9:22-24 (MR. GIUFFRA: "Your Honor, if someone is, for example, like **Mr. —,**[4] **was a supervisor** but was never a peer, they should not be characterized as a comparator . . . .") (emphasis added); *id.* 7:20-22.  Having excluded this individual from comparator discovery, Goldman now denies that this individual was Ms. Chen-Oster's supervisor.  Goldman cannot have it both ways.

While Plaintiffs continue to meet and confer with Goldman, regretfully it appears that Court intervention will be needed to effectuate the Court's order compelling production of supervisor documents following the last status conference.  *See* ECF No. 870.

---

[4] To avoid filing under seal, Plaintiffs have omitted this supervisor's name from the Joint Status Report, though the name appears in the official transcript.

### E.   Withheld Password-Protected Documents

The parties have met and conferred and exchanged numerous letters regarding documents that Goldman identified for production but which still have *not* been reviewed or produced, in most cases because they were protected with passwords at the time the documents were attached to relevant emails.  These are called "exception documents."  Goldman has failed to take reasonable steps to access these documents, necessitating judicial intervention to ensure that Goldman complies with its discovery obligations.

As background, on May 16, 2019, Plaintiffs first alerted Goldman that over 5,900 documents produced during class certification and merits discovery were completely unreviewable due to errors in Goldman's production.  On June 17, Goldman responded that these documents were subject to a variety of processing errors that made them unreviewable (*e.g.*, because they were password-protected or corrupted).[5]  Accordingly, Plaintiffs requested that Goldman investigate those processing errors, inform Plaintiffs of the source of each error, and reproduce all correctable errors promptly.  In response, Goldman produced the requested information in an Exceptions Log, but the log accounted for only 772 of the over 5,900 documents identified by Plaintiffs.  Goldman refused to review, investigate, or attempt to remedy all other documents based on the contention that Plaintiffs waived the right to raise deficiencies regarding ESI productions made during class certification discovery.  On July 12, and August 2, Plaintiffs reiterated their request.  On August 8, Goldman agreed to review and attempt to resolve all exception documents identified by Plaintiffs and reproduce all resolvable documents.  On August 21, Goldman agreed to complete its review of these documents by September 30, and produce a complete Exceptions Log.

---

[5] Prior to Goldman's June 17 letter, the only notice Plaintiffs received regarding these wide-spread errors in Goldman's production process was a slip-sheet accompanying each exception document stating that the document "cannot be processed."

A review of Goldman's updated Exceptions Log shows that Goldman continues to withhold numerous documents that, in fact, *can* be accessed.  When a Goldman custodian sends a password-protected file, that custodian often provides the password for the file within the email body or a subsequent email in a conversation chain.  Just a cursory review of such emails yields over a hundred passwords for documents that Goldman continues to withhold.  During a November 6, 2019 meet and confer, Goldman even confirmed that it has not attempted to search for passwords in the emails to which the documents are attached.  As a courtesy, Plaintiffs provided Goldman with a list of 150 emails containing passwords, which Goldman failed to detect and resolve, despite the passwords being located in the email attachments of the withheld documents.  Goldman should resolve and reproduce these previously withheld exception documents now.

Accordingly, Plaintiffs request that, consistent with industry standard e-discovery practice, Goldman: (a) search for unresolved password protected documents in the search term-culled population (of which there are around approximately 2,636) and conduct reasonable searches (e.g., using keywords in parent emails) to attempt to recover remaining passwords; (b) add all recovered passwords identified throughout the exceptions process to Goldman's password-cracking process and re-run the process across all documents in the entire collection; (c) review newly identified search term hits and family members and decrypted documents in the review population; (d) produce additional relevant documents and family members identified by proper decryption methods and decrypted documents initially withheld; and (e) provide updated hit reports per the decryption process.

### F.    Court-Ordered Interrogatory re: Alternative Practices

On October 3, 2019, the Court ordered Goldman to answer Interrogatory No. 15 of

Plaintiffs' Eighth Set of Interrogatories rephrased as follows: "Identify any less discriminatory

alternatives to Quartiling, 360-Reviews, and Cross-Ruffing that Goldman considered to achieve

its business necessity."  *See* October 3, 2019 Order, ECF No. 870; *see also* Oct. 3, 2019 Tr.

83:12-15 (The Court: "So I'm so ordering that that interrogatory is rephrased as to identify any

less discriminatory alternatives that you consider in place of those policies.  Okay.").   The Court

has already found the information Plaintiffs seek to be relevant, and that Plaintiffs are entitled to

a response.  *See* Oct. 3, 2019 Tr. 81:19-82:4, 82:10-11 (The Court: "[I]t depends whether they

actually consider it[.]").

 However, Goldman did *not* answer the interrogatory, responding only with objections

that its process was not discriminatory.  *See* Resp. to Interrog. ("Goldman Sachs states that this

interrogatory improperly makes the implicit assumption that the 360 review, quartiling, and

cross-ruffing processes have a discriminatory impact.").  Plaintiffs then requested that Goldman

amend its response to actually answer the interrogatory or state that it did not consider any

alternatives to the three practices.  During a November 6 meet and confer, Goldman confirmed

that it refuses to answer the interrogatory because it objects to the premise that the three practices

are discriminatory at all.  It is unsurprising that the defendant in a Title VII disparate impact case

would deny that its policies are discriminatory, but Goldman must still answer the interrogatory

as to what alternative practices it did study, if any, while making that objection.

To date, Goldman has failed to correct its deficient response, and Court intervention is

now required to obtain an answer to an interrogatory question originally served four months ago,

on July 15, 2019, and to which the Court has already found Plaintiffs are entitled to a response.

Unfortunately, this needless delay is also yet another example of why a discovery extension is required.

### G.     Discovery Extension

The parties agree that some extension is warranted, but disagree as to its length and scope.  Plaintiffs propose that merits discovery should be extended to three months after the resolution of the party's ongoing privilege disputes, including the conclusion of Goldman's reproductions related to previously privileged documents.  Goldman proposes a much more limited three month extension from the current December 2 deadline, during which time the parties would be prohibited from serving additional discovery.  Goldman's proposal is unworkable and unfair, and completely ignores that an extension is required precisely because of Goldman's discovery delays and belated discovery productions and responses, which are ongoing.

As background, Goldman has continued to produce discovery since the August 30, 2019 ESI deadline, including late rolling productions of ESI production, on September 6, 2019 and September 13, 2019, and rolling productions (of several other categories of ESI, including documents previously withheld on the basis of privilege, previously redacted documents, previous exception documents, and some documents relating to Named Plaintiffs' comparators), on September 5, 2019, September 10, 2019, September 16, 2019, September 18, 2019, September 20, 2019, September 29, 2019, September 30, 2019, October 1, 2019, and October 24, 2019.  Plaintiffs continue to await forthcoming productions for comparators, supervisors, and 2018-2019 complaint files—which Goldman still has not produced.  Additionally, Goldman produced revised privilege logs on September 13 and 19, supplemented on October 15, 2019, which contain nearly 5,000 new entries.  Plaintiffs are in the process of reviewing these voluminous logs and provided a comprehensive deficiency letter to Goldman on November 4,

2019.  Plaintiffs' initial review of the production reveals significant concerns with the completeness of the logs, as indicated in Section I.A, above.  The substantive issues require time to meet and confer, with likely briefing, before all disputes can be resolved and Goldman's production can be complete—and Plaintiffs can complete review of those documents and follow-up (if necessary) or schedule depositions associated with withheld documents.

Although Goldman has agreed to a three-month discovery extension from the current deadline, its offer comes with unworkable conditions on *what* discovery can be conducted in the period when Goldman is still producing new information for the first time.  The Court already rejected Goldman's similar attempts to impose conditions on *what* information may be addressed during discovery, when it previously made similar arguments in seeking "an August 26, 2019 deadline for service of any new discovery requests."  ECF No. 820 (rejecting Goldman's position as unworkable "for substantially the reasons set forth in Plaintiffs' August 22, 2019 letter").  Those reasons continue to apply: Goldman is continuing to produce new information, it only recently provided privilege logs with a massive number of entries, the parties are working to schedule depositions (including based on information Goldman is *still* producing), and after Goldman *finally* completes production or as a result of information learned in depositions, additional targeted discovery may be needed.  *See* ECF No. 817.  Nonetheless, to ensure the parties stay on track, Plaintiffs propose that the Court order the parties to confer over a motion briefing schedule for the privilege log dispute.

**H.     Trial Plan**

Following the October 3, 2019 status conference, the Court directed Goldman to "submit a letter identifying specific information it proposes be provided in a 'trial plan'" and allowed Plaintiffs to respond by letter. ECF No. 870.  In contravention both of the spirit of the Court's instruction and its rules, on October 10, Goldman filed a 9-page single-spaced document, in large

11

part repeating inapposite class certification arguments it has made at every juncture since class

certification in March 2018.  *See* ECF No. 880; Individual Practices in Civil Cases, Robert W.

Lehrburger § I.A.3 ("Letters may not exceed 3 single-spaced pages in length."); Oct. 3, 2019 Tr.

89:14-16 ("I would like Mr. Giuffra to put in writing what it is, what is the information you

really feel you need.").  Plaintiffs responded to Goldman's letter on October 17 in the

appropriate 3-page format.  Goldman then filed a two-page unauthorized reply on October 21.

ECF No. 885.

Goldman has now submitted an additional 16 pages of argument on this topic (10 in the

body of the Joint Status Report and 6 in a one-sided appendix).  Plaintiffs object to Goldman's

improper attempt to submit yet further briefing both in excess of the page limits already

established for this topic and the page limits for the Joint Status Report itself about issues that

can and should be addressed through Judge Torres' detailed procedures setting out the parties'

precise obligations when preparing for trial.  To deviate from the well-trodden path of trial

preparation now is both unnecessary and unwise given that the parties are still in the middle of

merits discovery.  Finally, Goldman's manageability concerns, while meritless, were also raised

and rejected during class certification brief and may be addressed once again in Goldman's

forthcoming motion for decertification.

Based on the foregoing, Plaintiffs respectfully move to strike Goldman's arguments,

including its appendix, regarding the trial plan.  Plaintiffs also respectfully request that the Court

order Goldman to cease filing unauthorized argument about this topic.

### I.      Meet and Confer Correspondence

Plaintiffs do not believe that correspondence documenting meet and confers that are

summarized in this Joint Status Report should be attached as exhibits to this report.  Goldman

has insisted otherwise but has also refused Plaintiffs' request to include a full collection of

correspondence from *both sides* for any topic about which it attaches correspondence sent from Goldman to Plaintiffs.  Therefore, Plaintiffs have attached the missing correspondence sent from Plaintiffs to Goldman as Exhibits A and B to this report.  *See* Ex. A (regarding supervisor discovery); Ex. B (regarding a discovery extension).

## DEFENDANTS' POSITIONS

### I.   DEFENDANTS' REQUEST FOR A TRIAL PLAN

####    A.   Background

Because of Plaintiffs' ever-changing positions, recounted in Appendix A hereto, Defendants' ability to prepare for trial has been compromised.  Thus, pursuant to the Court's October 3, 2019 Order (ECF No. 870 at ¶ 6), Defendants identified categories of information that, at a minimum, Defendants require to conduct discovery and to prepare for trial.  ("Oct. 10 Ltr." (ECF No. 880) at 7–9.)  In this Status Report, as in their October 17 letter (ECF No. 884), Plaintiffs  refuse to engage on what should be the scope of a Phase I trial, instead objecting to the length of Defendants' discussion of those critical issues.[6]

In their October 17 letter, Plaintiffs proposed the following for a Phase I trial:

- for disparate impact claims, Plaintiffs propose to seek from Judge Torres "a liability determination and an aggregate backpay award and entitlement to injunctive relief";

- for disparate treatment claims, Plaintiffs propose to seek a jury "liability determination and finding as to whether Plaintiffs will be entitled to punitive

---

[6]       The Court did not set a page limit for the parties' trial plan letters, and Defendants' letter included critical background and context for their trial plan request.  As for this Status Report, it was, ironically, exactly 25 pages before Plaintiffs decided to raise an argument over page limits late on November 13 and new legal citations just two hours before filing on November 14.  In any event, the Court did "not impose a strict limit on the pages of future Joint Status Reports," and Defendants' showing of the urgent need for a trial plan provides just the sort of "compelling circumstances" justifying additional briefing.  (Oct. 3 Order ¶ 7.)  As for the Appendix, it does not contain "pages of argument," as Plaintiffs again wrongly assert, but is an entirely factual recitation of Plaintiffs' own statements  that shows the extent to which Defendants have been whipsawed by Plaintiffs' ever-changing positions.

damages"; and

- Plaintiffs propose that "the [N]amed Plaintiffs should testify about all of their claims."

(Oct. 17 Ltr. at 1–2.)   Tellingly, Plaintiffs do not attempt to support their proposal in this Status Report.

In their October 17 letter, Plaintiffs cited to irrelevant, out-of-Circuit cases tried at least 18 years before the Supreme Court's holding in *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 363 (2011) that backpay must be assessed individually and years before the 1991 amendments to Title VII that first allowed for punitive damages.[7]   As a framework for a Phase I trial, Plaintiffs pointed to *Velez* v. *Novartis Pharmaceuticals Corp.*, No. 04-CV-9194 (S.D.N.Y.)—another case tried before *Wal-Mart*—where (i) the named plaintiffs did not assert non-class claims; (ii) the court certified injunctive relief claims; (iii) the court certified backpay claims under Rule 23(b)(2) and deferred ruling on certification of damages claims until after trial, which is no longer permitted under *Wal-Mart*, 564 U.S. at 366, 363; and (iv) plaintiffs relied on a small number of anecdotes that, under *Wal-Mart*, would be "too weak to raise any inference that all the individual, discretionary personnel decisions are discriminatory," *id.* at 358. *Novartis* is no guide for a Phase I trial here.  (*See* ECF No. 885.)

Because Plaintiffs have repeatedly refused to propose a legally permissible trial

---

[7]     *See* Oct. 17 Ltr. at 2 n.2 (citing *Jenson* v. *Eveleth Taconite Co.*, 130 F.3d 1287, 1299-1300 (8th Cir. 1997) (trial in 1992–93 applying pre-1991 remedies; appeal addressed only Minnesota state law issues); *Kraszewski* v. *State Farm Gen. Ins. Co.*, 912 F.2d 1182, 1183 (9th Cir. 1990) (trial prior to 1986; appeal addressed "proper termination date for back pay liability" for post-trial settlement)).  Plaintiffs' other cases merely say that trial of Title VII claims *may* involve phasing.  *See Int'l Bhd. of Teamsters* v. *United States*, 431 U.S. 324, 361, 366 (1977) (phased approach for pattern-or-practice disparate treatment claims); *Chin* v. *Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 149–50 (2d Cir. 2012) (same); *Robinson* v. *Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 158–61 & n.4 (2d Cir. 2001) (same); *Brown* v. *Nucor Corp.*, 785 F.3d 895, 914 (4th Cir. 2015) (same); *Ellis* v. *Costco Wholesale Corp.*, 285 F.R.D. 49, 545–46 (N.D. Cal. 2012) (same).

plan or to turn over the information needed for Defendants to prepare for trial, Defendants respectfully request, as specified below, orders from this Court requiring Plaintiffs to explain how, consistent with Judge Torres's orders and applicable law, (i) Plaintiffs are entitled to an aggregate backpay award or a class-wide jury "finding" on punitive damages; (ii) Plaintiffs may seek class-wide injunctive relief in a damages class action certified only under Rule 23(b)(3); (iii) the Named Plaintiffs' individual, non-class claims may be heard in a trial "consist[ing] only of generalized proof," and without prejudicing Defendants and confusing the jury ("Oct. 7 Order" (ECF No. 873) at 2); (iv) Plaintiffs propose to use anecdotal evidence at trial; and (v) Plaintiffs intend to establish causation for their class-wide disparate impact claims.   After Plaintiffs provide this information, Defendants request the opportunity to respond, and the Court can decide any disputed issues.   Until these issues are resolved, the parties will not be able to prepare for the Phase I trial.   For example, the parties will need to retain experts if backpay and punitive damages are tried during Phase I.

### B.   The Information Needed on Plaintiffs' Trial Plan

#### 1.   Backpay or Punitive Damages at Phase I

Plaintiffs have flip-flopped on when and how their claims for punitive damages and backpay should be resolved.   (See Oct. 10 Ltr. at 6–7.)   After confirming unequivocally that damages would be in Phase II (*see* Dec. 20, 2018 Conf. Tr. at 46:25–47:2 (MR. GIUFFRA:   "Are we doing damages at phase [one]?" MS. GEMAN:   "No.")), Plaintiffs now contend that they will seek "an aggregate backpay award" at the end of Phase I from Judge Torres and a "finding" from the   jury "as to whether Plaintiffs will be entitled to punitive damages," but that "individual defenses to individual Class Members' entitlements to remedies" should be punted to Phase II. (Oct. 17 Ltr. at 1.)   Plaintiffs should be required to explain how their proposal is consistent both Judge Torres's orders and applicable law.

*First*, Plaintiffs must explain how "aggregate backpay" and some preliminary "finding" on punitive damages at Phase I accords with Judge Torres's order that "individualized issues, *such as* **damages**, would *later be separately considered*" *after* a Phase I trial. (Oct. 7 Order at 2 (emphasis added).) Judge Torres's ruling is consistent with established law holding that backpay and punitive damages must be decided on an individual basis, including (i) *Wal-Mart*'s holding that an employer "is entitled to *individualized determinations* of each employee's eligibility for backpay" under Title VII," 564 U.S. at 366–67 (emphasis added); (ii) the statutory language requiring individualized punitive damages awards, *see* 42 U.S.C. § 1981a(b)(1) (jury may award punitive damages if employer engaged in discriminatory practice "with malice or with reckless indifference" to the rights "*of an aggrieved individual*" (emphasis added)); and (iii) Supreme Court and Second Circuit precedent on due process requirements for imposing punitive damages.[8]

*Second*, Plaintiffs must explain how a Phase I jury can make a class-wide "finding as to whether **Plaintiffs** *will be entitled* to punitive damages" (Oct. 17 Ltr. at 1 (emphasis added)) without violating the Seventh Amendment's Reexamination Clause. In *Blyden* v. *Mancusi*, 186 F.3d 252 (2d Cir. 1999), the district court ordered bifurcation of a civil rights class action where a jury made factual findings concerning "reprisals" visited upon inmates by prison staff, followed by individual damages trials. This procedure risked "that acts found to be 'reprisals' by

---

[8]    *See Johnson* v. *Nextel Commc'ns Inc.*, 780 F.3d 128, 148–49 (2d Cir. 2015) ("express[ing] concern" that plaintiffs' proposal for jury to "determine a lump sum punitive damages award for the entire class, prior to any determination of actual injury to individual plaintiffs" would run afoul of holding in *State Farm Mutual Automobile Insurance Co.* v. *Campbell*, 538 U.S. 408, 419 (2003), that "punitive damages must be tethered to compensatory damages in order to comply with due process"); *EEOC* v. *Mavis Discount Tire, Inc.*, 129 F. Supp. 3d 90, 120 (S.D.N.Y. 2015) (Failla, J.) (in pattern-or-practice case, where "Phase I jury would be wholly ignorant as to the actual damages suffered by any of the individual claimants," the "prudent course is to address the issue of punitive damages during Phase II").

the liability jury were different from the acts found to be 'reprisals' by the damages juries," and "clearly violated the Seventh Amendment," because "a given issue may not be tried by different, successive juries." *Id*. at 268–69.  The same will happen here if a Phase I jury makes some class-wide, blunderbuss "finding" about future "entitlement" to punitive damages, and a "successive" Phase II jury make different findings when determining whether Defendants acted "with malice or with reckless indifference" toward each "aggrieved individual."  42 U.S.C. § 1981a(b)(1)*.*

### 2.    Injunctive Relief Claims

Judge Torres confirmed that she "*certified a damages class* pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3)" (Oct. 7 Order at 2 (emphasis added)), and emphasized in the Certification Order that "[c]lass claims for injunctive and declaratory relief" were "being pursued on a separate track" ("Cert. Order" (ECF No. 578) at 12–13).  Plaintiffs then elected to abandon their motion for certification of injunctive relief claims under Rule 23(b)(2).  (*See* "Sept. 27 Ltr." (ECF No. 625).  Though Goldman Sachs's modifications to its 360 review and manager quartiling processes in 2016 (the "2016 Process Changes") were substantial enough to "warrant discovery into those changes and their impact, if any, on class certification for purposes of injunctive relief" (Dec. 13, 2017 Tr. at 57:23–58)), Plaintiffs halted any further discovery related to the 2016 Process Changes and never developed the factual record needed for an injunctive remedy.

Moreover, Plaintiffs have no procedural vehicle for class-wide injunctive relief absent certification under Rule 23(b)(2).  Plaintiffs have not cited any relevant authority permitting injunctive relief in a case certified only under Rule 23(b)(3).[9]  To the contrary, the law

---

[9]      *See* Sept. 27, 2018 Ltr. (ECF No. 625) at 1–2; Oct.17, 2018 Joint Ltr. (ECF No. 629) at 8; Feb. 20, 2019 Joint Status Rep. (ECF No. 674) at 4 and Exs. B & D), citing *Sykes* v. *Mel Harris & Assocs., LLC*, 285 F.R.D. 279 (S.D.N.Y. 2012) (Chin, J.), *United States* v. *City of New York*, 276 F.R.D. 22 (E.D.N.Y. 2011) (Garaufis, J.), *Charron* v. *Pinnacle Grp. N.Y. LLC*, 269 F.R.D.

is clear that claims for class-wide injunctive relief must be certified under Rule 23(b)(2).  *See Wal-Mart,* 564 U.S. at 360, 362 (Rule 23(b)(2) applies where "injunction or declaratory judgment would provide relief to each member of the class"); *Adkins* v. *Morgan Stanley*, 307 F.R.D. 119, 141 (S.D.N.Y. 2015) (Caproni, J.) ("damages[] must be sought under Rule 23(b)(3), while injunctive and declaratory relief are both available under Rule 23(b)(2)"); *All Star Carts & Vehicles* v. *BFI Canada Income Fund*, 280 F.R.D. 78, 83 (E.D.N.Y. 2012) (Wexler, J.) (in certifying claims under Rules 23(b)(2) and (b)(3), "Rule 23(b)(2) governs class-wide injunctive relief"); 7 William B. Rubenstein, Newberg on Class Actions § 23:30 (5th ed. 2019) ("employment suit seeking primarily monetary damages cannot make itself into a hybrid case artificially—it must actually comply with the requirements of Rule 23(b)(2) to be certified"). Defendants thus request an order requiring Plaintiffs to provide relevant legal authority permitting class-wide injunctive relief in a damages class certified only under Rule 23(b)(3), or to confirm that such relief will not be sought.[10]

### 3.    Post-2015 Claims

Because Plaintiffs abandoned discovery into the 2016 Process Changes, Judge

---

221 (S.D.N.Y. 2010) (McMahon, J.), and *Easterling* v. *Connecticut Dept. of Corr.*, 278 F.R.D. 41 (D. Conn. 2011).  In all these cases, courts permitted injunctive claims because plaintiffs had certified claims under Rule 23(b)(2) *and* (b)(3).  *Mitchell* v. *Cty. of Clinton*, 2007 WL 1988716, at *5 (N.D.N.Y. July 5, 2007), and *Williams* v. *Cty. of Niagara*, 2008 WL 4501918, at *5 (W.D.N.Y. Sept. 29, 2008), misinterpreted *In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 n.4 (2d Cir. 2006), which does *not* hold that certification under Rule 23(b)(3) eliminates the need for certification of injunctive relief claims under Rule 23(b)(2).  The Second Circuit never considered this issue in *Nassau County* and addressed only whether the district court improperly denied certification under Rule 23(b)(3) and (c)(4).  *Id*. at 225–31.  Moreover, the *Mitchell* court subsequently approved a class settlement that did not include injunctive relief, 2009 WL 4730702 (N.D.N.Y. Dec. 4, 2009), and the *Williams* court later decertified the class entirely, No. 06 Civ. 291 (W.D.N.Y. Apr. 24, 2018) (ECF No. 121).

[10]     Because Plaintiffs have abandoned any viable class-wide claims for injunctive relief, the phased approach identified in *Teamsters*—which is predicated on determining class liability for "prospective relief" such as "an injunctive order" at Phase I, 431 U.S. at 361—does not apply here, as Defendants will show in moving for decertification.

Torres never made any Rule 23 findings governing the post-2015 period.[11]  Plaintiffs need to explain whether and how they intend to proceed with claims related to that time period to allow the parties to properly focus ongoing fact discovery and expert work.

### 4.    Named Plaintiffs' Individual Non-Class Claims in Phase I

Judge Torres's repeated orders that trial here will "consist *only* of *generalized proof*," and that "*individualized issues* such as damages, would later be *separately considered*" bar a Phase I trial where individualized, non-class claims are heard.  (Oct. 7 Order at 2 (emphasis added); *see also* Cert Order at 47; Oct. 24, 2018 Order (ECF No. 630) at 2.)

At class certification, Plaintiffs emphasized that "a class trial [would be] focused . . . on *[c]lass liability* findings," and Defendants' "presentation of affirmative defenses to [] *[c]lass liability . . . .*"  (Class Cert. Br. (ECF. No. 247) at 49–50 (emphasis added).)  But after certification, Plaintiffs insisted that the Named Plaintiffs' individualized, non-class claims for, *inter alia*, pregnancy discrimination and retaliation (*see* Oct. 10 Ltr., App. A) should be heard in Phase I for "efficiency" reasons.  (*See*, *e.g.*, Pls.' Jan. 16, 2019 Ltr. (ECF No. 674-2) at 1–2; Feb. 25, 2019 Conf. Tr. at 77:20–24.)  But Plaintiffs never explained how trying the Named Plaintiffs' individualized, non-class claims—each involving their own facts and witnesses—in the middle of a Phase I class trial would be "efficient" or would not prejudice Defendants by inviting the jury to conclude that the Named Plaintiffs' unique experiences were representative of the class as a whole.

---

[11]    *See Wal-Mart*, 564 U.S. at 350–51 ("certification is proper only if the trial court is satisfied, after a rigorous analysis that the prerequisites of Rule 23(a) have been satisfied"); *In re Initial Pub. Offerings Sec Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) district court may certify class "only after making determinations that each of the Rule 23 requirements has been met," which "can only be made if the judge resolves factual disputes relevant to each Rule 23 requirement"); *Kassman* v. *KPMG LLP*, 2018 WL 6264835, at *15 (S.D.N.Y. Nov. 30, 2018) (Schofield, J.) ("A certifying court must receive enough evidence . . . to be satisfied that each Rule 23 requirement has been met.") (internal quotation marks omitted).

Defendants thus request an order requiring Plaintiffs to explain how, consistent with Judge Torres's orders and best practices, Named Plaintiffs' highly individualized, non-class claims could be tried in a Phase I trial without (i) creating unmanageable mini-trials within that Phase I trial, (ii) prejudicing the defense of the class claims, and (iii) confusing the jury.[12]

### 5.    The Use of Anecdotal Evidence at Trial

Plaintiffs have proposed introducing at least four different categories of anecdotal evidence at trial, but refuse to provide any legal or logical support for their proposal:

*First*, Plaintiffs seek to present testimony about their cherry-picked "culture incidents" at trial to "bring [the] statistics to life." (Apr. 30, 2018 Conf. Tr. at 53:13–15; 54:5–6; 56:18–57:3). This is inconsistent with Judge Torres's ruling denying certification of Plaintiffs' "boys' club" theory of intentional discrimination (Cert. Order at 49), and her ruling that Phase I will "consist only of generalized proof" (Oct. 7 Order at 2.).

*Second*, Plaintiffs propose to have four Named Plaintiffs—who did not work in all Divisions or Business Units, in all offices, or for the entire class period—"testify about the typical experience of a class member at Goldman Sachs." (Oct. 3, 2019 Conf. Tr. at 55:17–21.) But the Named Plaintiffs' highly individualized experiences with the challenged processes are not representative of class of potentially more than 3,300 women over almost 18 years. (*See* Oct

---

[12]    *See* Ann. Manual Complex Lit. § 32:45 (4th ed.) ("whether the merits of the individual claims of the class representatives should be tried in Phase I *depends on whether proof of those claims is essential to establishing liability on the class claim*" (emphasis added)); *see also Buchanan* v. *Tata Consultancy Servs., Ltd.*, 2018 WL 3537083, at *5 (N.D. Cal. July 23, 2018) (ordering separate trial of non-class claim where named plaintiff "is subject to a different burden-shifting framework than will govern the claims of the class" and "overlap in the factual basis" of individual and class claims "is minimal"); *Bates* v. *United Parcel Serv.*, 204 F.R.D. 440, 448–49 (N.D. Cal. 2001) (bifurcating trial of class claims under ADA and ordering non-class claims to be tried at second, damages phase in order to, *inter alia*, "reduce the risk of confusion"); *Siddiqi* v. *Regents of Univ. of Cal.*, 2000 WL 33190435, at *9–11 (N.D. Cal. Sept. 6, 2000) (ordering named plaintiffs' damages ADA claims to be heard in phase two, where claims were "distinct from the equitable relief claims" sought by the class, such that bifurcation would not violate Seventh Amendment or "result in substantial overlap of evidence").

10 Ltr. at 4 n.2.).   Plaintiffs cannot continue to hide behind Judge Torres's preliminary, non-binding finding of typicality under Rule 23—which does not transform the Named Plaintiffs' unique experiences into evidence that can be extrapolated to every class member.   Instead, at a minimum, anecdotal evidence of "experiences" with the challenged processes presented to show "a general policy of discrimination" should accord with the "benchmark" identified in *Wal-Mart*, relying on *Teamsters*, of roughly "one [anecdote] for every eight class members."   564 U.S. at 358.   To meet that benchmark, Plaintiffs would need roughly 400 anecdotes for a class of 3,300, or half that amount if Defendants' motion to compel arbitration is granted—leading to an unmanageable trial in either case.

       *Third*, Plaintiffs propose to use so-called "comparator evidence" in Phase I to some end that they have yet to identify.[13]   If relevant to the Named Plaintiffs' individual claims, such evidence should be heard in Phase II.   If Plaintiffs contend that this comparator evidence is relevant to their class claims to show "the way these policies were used against the named plaintiffs [and] were not used in a similar way with their comparators" (July 17, 2019 Conf. Tr. at 12:10–12), Plaintiffs are simply proposing to add even more non-representative, individualized evidence at Phase I that says nothing about other class members' individualized experiences with the highly discretionary "policies" in this case.

       *Fourth*, to the extent Plaintiffs propose to have unnamed class members act as "witnesses to the experiences of our named plaintiffs" (Oct. 3, 2019 Conf. Tr. at 47:25–48:2), that cherry-picked, non-representative testimony equally belongs in Phase II.

---

[13]    *See* Apr. 30, 2019 Conf. Tr. at 52:21–25. ("THE COURT: Ms. Dermody, is Mr. Giuffra right that the reason you want the comparators are to compare specifically to the named plaintiffs?  Well, yes, you've said that, that's part of it.  MS. DERMODY:  Yeah, I mean that's part of it, Your Honor.  I mean there is also the whole disparate treatment line of case law which basically says we have to show that gender bias is a standard operating procedure of the company.  And we do that, in part through statistical proof and part through anecdotes.").

Defendants request an order directing Plaintiffs to specify the categories of anecdotal evidence that they propose to introduce, and to explain why those categories are permitted under Judge Torres's rulings and applicable law.  Defendants need this information to formulate objections and, to the extent the Court rules such evidence relevant, to develop appropriate rebuttal evidence, including by seeking leave to depose absent class members.[14]

**6.    Information Concerning the Challenged Processes.**

Now that Judge Torres has confirmed that Plaintiffs' stand-alone compensation claims were not certified (Oct. 7 Order at 1), Plaintiffs should explain which aspect(s) of the 360 review, manager quartiling and cross-ruffing processes have resulted in alleged disparate impact. This information is needed to allow Defendants to develop rebuttal expert evidence and to move for summary judgment for any class members who could not have been adversely impacted by the processes in the way Plaintiffs allege (for example, those compensated solely by commissions).

Finally, Plaintiffs should confirm that, consistent with the Certification Order, Plaintiffs will seek to prove that the subjective aspects of the cross-ruffing process itself caused disparate impact, not the process of selecting which Vice Presidents will be cross-ruffed.  (*See* Cert. Order at 8, 27–28 (finding commonality for "cross-ruffing process" which is "the vetting process for promoting Vice Presidents to Managing Directors")).

**II.    PLAINTIFFS' PREMATURE DISCOVERY ISSUES**

The Court has directed that "[t]he parties may not raise in status reports issues for

---

[14]      *See Jackson* v. *Bloomberg L.P.*, 2015 WL 1822695, at \*3, \*5, \*7 (S.D.N.Y. Apr. 22, 2015) (Oetken, J.) (employer may depose or seek discovery from "class member employees" in order "to prepare its defense"); *Rosen* v. *Reckitt & Colman, Inc.*, 1994 WL 652534, at \*4 (S.D.N.Y. Nov. 17, 1994) (McKenna, J.) (in disparate treatment case, defendant "is clearly entitled to seek anecdotal evidence that may be used to support or negate Plaintiffs' pattern or practice claim").

which the meet and confer process has not been completed." (July 17, 2019 Order (ECF No. 786) ¶ 5.)  In violation of the Court's Order, Plaintiffs again raise issues for which the conferral process is not complete.  Nevertheless, to avoid any waiver, Defendants respond below.

A.     **Privilege Logs**

Defendants began rolling productions of privilege logs over two months ago, yet Plaintiffs did not raise any concerns until November 4, 2019 (the day before providing their initial draft of this report), when they sent a 14-page, single-spaced letter that rests on speculation and fails to identify any actual deficiencies.  Defendants have already provided "the identities of all authors and recipients of withheld or redacted documents," and have provided "subject matter descriptions" for all logged documents.  (*See supra* at 2.)  Defendants are working with Plaintiffs to respond to their late-breaking concerns and are willing to confer with Plaintiffs on any motion schedule—which they have not yet raised—but these issues are not ripe for Court intervention.

Plaintiffs continue to request job position data for individuals on the logs, but Defendants have already provided this data for over 96% of over 3,400 individuals by creating a custom software process and conducting manual ESI searches, and are manually searching internal databases to provide data for the remaining 134 individuals.

As to Plaintiffs' request for "the identities of members" of more than 160 mailing lists from various points in time over the past 18 years (*see supra* at 2), Defendants have explained that "it may not be possible to go back and reconstruct a listserv from 10 or 12 years ago" (Oct. 3, 2019 Conf. Tr. at 45:2– 11), and it would be highly burdensome to attempt to pinpoint membership in these listservs on a specific date.  Even if Defendants could identify the listserv members, Plaintiffs would presumably demand that Defendants conduct additional burdensome searches to identify job position data for each of these individuals.  This will result

23

in unnecessary delay for no purpose because the names of the listservs (such as "the HR group") "tell you who's in there." (*Id.*)  Indeed, Plaintiffs want Defendants to chase down the members of "2006DiversityTaskForce@ny.email.gs.com" and "Employee Relations Advisors," where, as the Court recognized, the parties "can discern from the Listserv name or title" the positions of the listserv's members.   (*Id.* at 45:24–25.)   Moreover, contrary to Plaintiffs' out-of-context quotations (*see supra* at 2), for any e-mails containing listservs, Defendants have already identified all attorneys on those e-mails and have described the basis for asserting privilege over each document. Courts in this District and elsewhere routinely uphold privilege logs containing listservs, because specifying each person included in internal listservs that, on their face, describe their members and that do not form the basis of Defendants' claim of privilege is not needed to evaluate claims of privilege or waiver.  (*See*, *e.g.*, ECF No. 777-2 (holding that privilege log containing "ProjectSafety-SVC" listserv "is adequate").)[15]

## B. Named Plaintiff Supervisor Discovery

On October 3, 2019, the Court ordered certain supplemental productions for "supervisors of the named Plaintiffs," and directed the parties to "meet and confer with respect to the identities of the particular supervisors."  (Oct. 3 Order ¶ 4.a.)  Defendants repeatedly offered to confer and proposed a list of supervisors on October 25.

In response, Plaintiffs stated only that this list was "incomplete"—without further elaboration—and waited until November 5, 2019, the same day they shared an initial draft of this report, to provide a list of *70 people* who were allegedly "supervisors" for *four* Named Plaintiffs. Plaintiffs' list included (i) 16 "supervisors" for Plaintiff Shanna Orlich, who worked at Goldman

---

[15]    Plaintiffs added a full page of largely out-of-Circuit authority (*see supra* at 2–3) two hours before filing on November 14, which Defendants have not yet had an opportunity to review or address and which do not change the unreasonable request Plaintiffs have made regarding these listservs.

Sachs for approximately one year; (ii) "supervisors" who worked on different desks from Named Plaintiffs, who Named Plaintiffs testified were *not* their managers; and (iii) multiple "supervisors" who Plaintiffs claim are also "comparators."[16]  Plaintiffs are plainly conducting a fishing expedition based on an overbroad definition of "supervisor" that encompasses anyone with a "higher title" who happened to provide a 360 review for a Named Plaintiff.  (*See* Oct. 3, 2019 Conf. Tr. at 79:2–10 (MR. LEVIN-GESUNDHEIT:  "[S]omebody who works at a higher title who reviewed the named plaintiff, those would be the supervisors." . . . THE COURT:  "Not necessarily.").)

On November 12, 2019, Defendants provided an updated list of 18 supervisors that included (1) all "Primary Managers" who provided 360 reviews for any Named Plaintiff, and (2) additional supervisors identified in the record.  (Ex. 1.)[17]  Defendants have begun collecting and reviewing documents for these individuals.  Because Plaintiffs acknowledge that they are "considering Goldman's proposal" and "continue to meet and confer" (*see supra* at 6), Plaintiffs' request for Court intervention is premature.[18]

### C.   Defendants' Robust Password-Cracking Process

As Plaintiffs acknowledge, Defendants have provided multiple exception logs to

---

[16]    Plaintiffs are wrong in contending that Defendants "excluded" a supervisor that Defendants had previously identified as such at a court conference.  (*See supra* at 6.)  In fact, this manager was the head of the Business Unit in which Ms. Chen-Oster worked for just two weeks prior to leaving Goldman Sachs and was not her supervisor but was a "supervisor" within that unit.

[17]    The parties have each appended their respective meet-and-confer correspondence to prior status reports.  (*See*, *e.g.*, ECF Nos. 674, 730.)  Contrary to Plaintiffs' assertion that Defendants "refused Plaintiffs' request to include a full collection of correspondence" (*see supra* at 12–13), Defendants in fact invited Plaintiffs to attach additional correspondence they believed would assist the Court.

[18]    Plaintiffs' claim that they do not have "documents identifying Named Plaintiffs supervisors" (*see supra* at 6) is wrong.  Defendants produced all 360 reviews for Named Plaintiffs many years ago and provided Plaintiffs with the bates ranges for these productions.

Plaintiffs covering over 7,200 documents and fully disclosed their robust process for addressing password-protected files in letters dated July 16, August 8, and August 27, 2019.  Specifically, Defendants created a master password database containing all passwords identified during the course of document review (reviewers were asked to look for and record passwords identified in emails) *and* passwords collected during discovery in other cases filed against Goldman Sachs.  Using an iterative process, Defendants regularly re-ran the password-cracking software across the review population (containing documents that hit on the search terms) to identify documents that could be decrypted and reviewed.  Defendants also re-ran their continuously updated master password database against collected documents that did *not* hit on search terms, then re-ran search terms (which could hit on newly decrypted documents), and added any documents that hit upon the terms to the review population.  In total, Defendants cracked the passwords of over 100,000 documents.

On November 5, 2019, Plaintiffs for the first time claimed that they identified approximately 100 e-mails containing additional passwords—just 5% of the passwords Defendants have already identified.  Plaintiffs, however, waited until November 13 to provide a list of Bates numbers to Defendants.  To the extent these documents contain passwords that are not already included in Defendants' master password database—which Defendants have not yet determined for the list Plaintiffs provided last night—Defendants will run them across the review population and review any decrypted documents.

Plaintiffs now demand that Defendants conduct manual searches among 1.3 million documents to find passwords for 2,636 documents that still cannot be opened.  Plaintiffs also demand that Defendants run any passwords identified against "the entire collection" of over 37 million documents, and review all "newly identified search term hits and family members and decrypted documents in the review population." (*See supra* at 8.)  The burden of such manual

searches and review far outweighs Plaintiffs' speculation that such searches and review may yield additional responsive documents.  Fed. R. Civ. P. 26(b)(1).  Moreover, Plaintiffs did not raise this request when the parties were negotiating the scope of ESI discovery, which was finalized by March 29, 2019, or during ESI review, which was substantially completed on August 30, 2019.

### D.      Defendants' Amended Responses to Plaintiffs' Eighth Set of Interrogatories

During the October 3 conference, the Court directed Defendants to respond to a "rephrased" version of Plaintiffs' Interrogatory No. 15, asking Defendants to "[i]dentify any *less discriminatory alternatives* to Quartiling, 360-Reviews, and Cross-Ruffing that Goldman considered to achieve its business necessity," and Plaintiffs agreed.   (Oct. 3 Order ¶ 5.c (emphasis added); Oct. 3, 2019 Conf. Tr. at 81:24–82:16.)   On October 24, Defendants responded that they have not identified any less discriminatory alternatives that were considered, because "[t]he 360 review, quartiling, and cross-ruffing processes do not cause any adverse disparate impact, nor are they otherwise discriminatory in any way, across the class of female Associates and Vice Presidents in the Firm's Securities, Investment Banking, and Consumer and Investment Management Divisions."   (Ex. 2 at 17.)   Defendants would have disclosed any alternatives Goldman Sachs considered that it viewed as less discriminatory, but the interrogatory did not demand the highly burdensome exercise of identifying *every* evaluation and promotion process change considered over two decades (nor would such a request be permissible).[19]   Thus, Plaintiffs' assertion that Defendants "did not answer the interrogatory" is wrong, and based entirely on Plaintiffs' attempt to rewrite the interrogatory to include *any* "alternative practices [Defendants] did study" (*supra* at 9), which was not the question (Ex. 2 at

---

[19]      Plaintiffs are already well aware that Goldman Sachs significantly changed the 360 review process in 2016.

15).

Defendants also properly reserved the right to supplement their response should Plaintiffs "meet their burden to show discriminatory impact and then identify an alternative that they claim is equally effective and 'less discriminatory.'" (*Id.* at 17.)  Beyond being faithful to the language of the interrogatory, this approach makes good sense in light of the statutory scheme, under which less discriminatory alternatives come into play only if (i) Plaintiffs prove discriminatory impact, (ii) Defendants then sustain their business necessity defense, (iii) Plaintiffs *choose to identify* as yet unknown alternative processes they claim are "equally effective" and "less discriminatory," and (iv) Plaintiffs prove that Defendants "refuse[d] to adopt an available alternative employment practice that has less disparate impact and serves [their] legitimate needs." *Ricci* v. *DeStefano*, 557 U.S. 557, 578 (2009) (citing 42 U.S.C. §§ 2000-2(k)(1)(A)(ii) & (C)).

### E.    Discovery Extension

Plaintiffs repeatedly mischaracterize Defendants' timely and extensive documents productions (Ex. 3 at 1), and, in any event, Plaintiffs are responsible for any delay here.  For example, with less than one month left in the fact discovery, Plaintiffs have not yet noticed a single deposition or responded to Defendants' October 15, 2019 letter regarding depositions.

Plaintiffs' unworkable proposal to suspend all deadlines in this litigation until "three months after the resolution of the party's [*sic*] ongoing privilege disputes" (*see supra* at 10) would suspend all deadlines until three months after:  (i) the parties complete the meet-and-confer process over any "privilege disputes"; (ii) Plaintiffs move to resolve any remaining disputes; and (iii) the Court rules on the motions.  During the October 3 conference, the Court cited "further inordinate delay" in rejecting Plaintiffs' requests  to extend fact discovery by "three to five months extra" or "maybe six to eight months." (Oct. 3, 2019 Conf. Tr. at 38:3–11,

40:9.)  Plaintiffs' latest open-ended request likely would result in an even longer extension.

As a compromise, Defendants proposed a three-month extension of fact discovery (with appropriate adjustments to the expert discovery and post-discovery de-certification, summary judgment, and *Daubert* motion schedule) on the conditions that (i) the parties use the additional fact discovery period only to address privilege disputes and take depositions, consistent with the Court's August 23, 2019 Order (ECF No. 820) permitting additional discovery requests only through December 2, 2019; and (ii) the parties agree not to seek additional extensions.  (*See* Ex. 3 at 1–2.)  Plaintiffs rejected this proposal, to which Defendants remain amenable, and refuse to provide a date certain for any proposed extension.

\*                \*                \*

The parties thank the Court for its consideration and are available to answer any

questions or provide more details at the November 19, 2019 status conference or at the Court's

convenience.

Respectfully submitted,


*/s/ Kelly M. Dermody*                                     */s/ Robert J. Giuffra, Jr.*

Adam T. Klein                                                     Robert J. Giuffra, Jr.
Cara E. Greene                                                   Sharon L. Nelles
Melissa L. Stewart                                             Ann-Elizabeth Ostrager
OUTTEN & GOLDEN LLP                             Hilary M. Williams
685 Third Avenue, 25th Floor                        Joshua S. Levy
New York, New York  10017                          Hannah Lonky
Telephone: (212) 245-1000                            SULLIVAN & CROMWELL LLP
Facsimile: (646) 509-2060                             125 Broad Street
                                                                         New York, New York  10004
Paul W. Mollica                                              Telephone: (212) 558-4000
161 North Clark Street, Suite 4700                 Facsimile: (212) 558-3588
Chicago Illinois  60601
Telephone: (212) 809-7010                            Amanda Flug Davidoff
Facsimile: (312) 809-7011                             Elizabeth A. Cassady
                                                                         SULLIVAN & CROMWELL LLP
Kelly M. Dermody (*admitted pro hac vice*)      1700 New York Avenue, N.W. Suite 700
Anne B. Shaver (*admitted pro hac vice*)         Washington, District of Columbia
Tiseme G. Zegeye                                             20006-5215
LIEFF CABRASER HEIMANN &               Telephone: (202) 956-7500
        BERNSTEIN, LLP
275 Battery Street, 29th Floor                          Barbara B. Brown (*admitted pro hac vice*)
San Francisco, California  94111-3339           Carson H. Sullivan (*admitted pro hac vice*)
Telephone: (415) 956-1000                            PAUL HASTINGS LLP
Facsimile: (415) 956-1008                             875 15th Street, NW
                                                                         Washington, DC  20005
Rachel Geman                                                  Telephone: (202) 551-1700
250 Hudson Street, 8th Floor
New York, New York  10013-1413              Patrick W. Shea
Telephone: (212) 355-9500                            PAUL HASTINGS LLP
Facsimile: (212) 355-9592                             200 Park Avenue
                                                                         New York, NY 10166
                                                                         Telephone: (212) 318-6405


*Attorneys for Plaintiffs*                                 *Attorneys for Defendants*