1                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
2

3    ---------------------------------------X
                                           :
4    H. CHRISTINA CHEN-OSTER, et al.,      : 10-CV-06950 (AT)
                                           :
5                        Plaintiffs,       :
                                           :
6               v.                         :
                                           : 500 Pearl Street
7    GOLDMAN, SACHS & CO., et al.,         : New York, New York
                                           :
8                        Defendants.       : November 19, 2019
     ---------------------------------------X
9
         TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
10          BEFORE THE HONORABLE ROBERT W. LEHRBURGER
                  UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For the Plaintiffs:      ADAM KLEIN, ESQ.
13                            DANIEL STROMBERG, ESQ. (Via telephone)
                              Outten & Golden, LLP
14                            685 Third Avenue, 25th Floor
                              New York, New York 10017
15
                              KELLY DERMODY, ESQ.
16                            RACHEL GEMAN, ESQ.
                              Lieff Cabraser Heimann & Bernstein LLP
17                            275 Battery Street, 30th Floor
                              San Francisco, California 94111
18

19   For the Defendant:       ROBERT GIUFFRA, ESQ.
                              AMANDA DAVIDOFF, ESQ.
20                            HILARY WILLIAMS, ESQ.
                              Sullivan & Cromwell, LLP
21                            125 Broad Street
                              New York, New York 10004
22

23   Court Transcriber:       SHARI RIEMER, CET-805
                              TypeWrite Word Processing Service
24                            211 N. Milton Road
                              Saratoga Springs, New York 12866
25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

2

1          THE CLERK:  This is a status conference, 10-CV-6950,

2   Chen-Oster, et al v. Goldman Sachs & Co., et al.

3          Attorneys, please state your name for the record.

4          MR. KLEIN:  Adam Klein for Outten & Golden for the

5   plaintiff.

6          MS. DERMODY:  Good afternoon, Your Honor.  Kelly

7   Dermody from Lieff Cabraser.  With me are my colleagues

8   Valerie Comenencia Ortiz and Rachel Geman.

9          MR. GIUFFRA:  Good afternoon, Your Honor.  Robert

10  Giuffra with Sullivan & Cromwell for the defendants.

11         MS. WILLIAMS:  Good afternoon, Your Honor.  Hilary

12  Williams from Sullivan & Cromwell.

13         MS. DAVIDOFF:  Good afternoon, Your Honor.  Amanda

14  Davidoff also from Sullivan & Cromwell.

15         MR. LEVY:  Josh Levy, Sullivan & Cromwell for

16  defendants.

17         THE COURT:  Good afternoon --

18         MR. KLEIN:  If I could mention.  I'm sorry.  My

19  colleague [inaudible] is with me as well.

20         THE COURT:  Welcome all.  Oh.  There's someone on

21  the telephone?  I didn't realize you were on the telephone.

22  My apologies.

23         MR. STROMBERG:  Good afternoon, Your Honor.  This is

24  Daniel Stromberg from Outten & Golden for the plaintiff.

25         THE COURT:  Good.  Someone overhead watching over

1   us.

2          So I noticed -- I've read the status report

3   obviously and I noticed that the plaintiffs argue that it's

4   premature to address several issues, such as trial planning

5   that Goldman wants to address.  But Goldman argues that it's

6   premature to address the issues that the plaintiffs want to

7   address.  So I think in light of that we don't need to do

8   anything and we're done for the day.  No?

9          I think we'll just go down the list starting with

10  Goldman privilege logs which unfortunately I thought we had

11  resolved but apparently there continue to be some issues, and

12  am I correct that that's regarding the list serve and the job

13  positions?

14          MS. DERMODY:  Yes, Your Honor.  We identified a list

15  of nine general categories of deficiencies in Goldman's

16  privilege logs.  We received nine privilege logs with a total

17  of around 8,500 documents over the last couple of months.  We

18  are still needing and conferring over a few of the

19  deficiencies but there are a few things that we need right now

20  in order to move forward.

21          THE COURT:  All right.  What are those things?

22          MS. DERMODY:  So the first would be there are some

23  missing authors and recipients for some of the documents

24  listed on the privilege logs that includes a list that we've

25  received just last night of job positions for authors and

4

1   recipients.  It also includes some of the revised privilege
2   logs that did not include any authors or recipients.  So we
3   would like to receive the full information of all of the
4   authors -- all the recipients of all the documents listed.

5          THE COURT:  Okay.  I want to make sure I understand.
6   I saw it as there's the issue of the list serve that you have
7   a category of but you don't know who's in it; and b) there are
8   certain people whose job positions have not been identified.
9   I may have misread it but was it -- I thought that that was
10  134 persons for whom they have not been provided.  Is that
11  right?

12         MS. DERMODY:  Yes.  Yesterday we received a list of
13  additional information from that list.  We are still reviewing
14  that list.  We identified that there are still a few people
15  that they have not provided job information for.

16         THE COURT:  It seems like the larger issue though is
17  the list serve.  So have they provided any information
18  regarding who is in the list serve?

19         MS. DERMODY:  No.  So we have a list of around 160
20  list serve that are just really -- some of them very broad.
21  Like gs@gs.com, ods@gs.com, bogus@gs.com.  We have no
22  information from these and we understand that we need a list
23  of all the members who are part of that list search and also
24  all the people who have access to information from that list
25  search, send it or receive it.

5

1          THE COURT:  I thought that Goldman was going to
2   undertake to provide information about the list serves and
3   whatever method it was going to pursue.  It hasn't provided
4   anything?
5          MS. DERMODY:  No.
6          THE COURT:  We'll find out from them.  All right.
7          Let me ask Goldman where we are on that.
8          MR. LEVY:  Sure.  Josh Levy from Sullivan &
9   Cromwell.  So I think Your Honor started this off saying that
10  a number of the issues here were premature and I think the
11  privilege logs are a particularly good example where as
12  plaintiffs noted we provided multiple logs including revised
13  logs back in September.
14         We received a letter from plaintiffs, a 14 page
15  single spaced letter from plaintiffs about two weeks ago.
16         THE COURT:  They're being very diligent.
17         MR. LEVY:  And we are also being very diligent and
18  engaging with all of those arguments and a lot of the issues
19  that they've raised I think we can resolve in the meet and
20  confer process.  We're aiming to get a response to them this
21  week and I think that will address a lot of the issues that
22  they're raising and many of these issues, like the Lisers
23  [Ph.], for example, that plaintiffs added a full page to the
24  status report two hours before it was filed.  We obviously
25  haven't had a chance to meet and confer on those issues.

6

1          THE COURT:  Well, this issue has been going on for a

2  while.  So that's why I'm not understanding what -- where the

3  state of play is if you will on the list serves themselves

4  because we discussed this last time, didn't we, and I thought

5  Goldman said they were going to -- it wouldn't be perfect but

6  they are going to undertake to provide information about the

7  list serve using again whatever process they were going to use

8  and then there were going to be some blanks to fill in.  Do I

9  have that -- is that your understanding over on the plaintiff

10  side?

11          MS. DERMODY:  That's right.

12          THE COURT:  So why hasn't that happened or if it has

13  happened what part of it has?

14          MR. LEVY:  Sure.  So I think that process is

15  currently underway.  I think that's --

16          THE COURT:  What does that mean?

17          MR. LEVY:  So I think what Your Honor described is

18  the process we agreed to undertake for the job position data

19  and in terms of the job position data we've now provided the

20  plaintiffs 99.9 percent of all of the over 3,000 unique

21  individuals listed across all the privilege logs we provided

22  to plaintiffs.

23          THE COURT:  Of the 134 that they said weren't

24  identified, how many of those are identified in what you've

25  recently sent over?

7

1          MR. LEVY:  129 of them.  There are five people who

2    we've been unable to identify.  The other, over 3,500 people

3    we have provided specific job position data to plaintiffs.

4          THE COURT:  All right.

5          MR. LEVY:  So we don't think that there's actually

6    an issue here that requires the Court's attention.

7          THE COURT:  I would say that's a pretty good job.

8          MR. LEVY:  Thank you, Your Honor.  Credit to some of

9    the people still in the room for that.

10          THE COURT:  What about the list serves?

11          MR. LEVY:  Sure.  In terms of the list serves, I

12    guess break that into two pieces.  First, plaintiffs mentioned

13    that they identified certain documents on the logs that didn't

14    have all their recipient information at all.  So that's 36

15    documents that were produced with redactions and those

16    documents were pulled from databases.  They're not emails or

17    those kinds of communications that have to/from information.

18    They're a single entry pulled from a centralized database.  So

19    there is no to or from data that exists for that which is why

20    it's not included on the log.

21          Again, this is the kind of thing that will be

22    included in our submission that we'll send to plaintiffs.

23          In terms of the list serves, so there's a couple of

24    different categories.  We've been working very diligently with

25    both the IT personnel at Goldman Sachs and with our vendor to

8

1   see what's technologically feasible in terms of identifying

2   the members of the list serves.

3        So I think the starting point there is that for

4   almost all the list serves on the face of the list serve you

5   can tell exactly who the categories of people there are.  So

6   just to take a couple of examples, and these examples are

7   coming from plaintiff's list that they sent us.  2006

8   diversity task force and newyork.email.gs.com is pretty

9   clearly the 2006 diversity task force.

10       THE COURT:  Yes, but who's on that?  Who does it

11  include?  Does it include people who aren't lawyers?  Does it

12  include people who are lawyers?  Does it include people who

13  don't need to know information if it does include lawyers?

14  How did they make those determinations just by the name?

15       MR. LEVY:  Sure.  So in terms of the actual people

16  on the list serve, there is no systematic or programmatic way

17  that it's really technologically feasible to figure out

18  exactly who the senders and recipients are, and I don't think

19  that information is really needed to be able to assess the

20  privilege.  For none of these list serves are we claiming

21  privilege based on attorneys who might appear on the log.  Any

22  privilege would have been created either by others

23  specifically identified attorneys just as a sender to the list

24  serve or that the document itself doesn't contain an attorney

25  and it reflects legal advice provided by an attorney.

9

1          So we're not claiming that somewhere in this list

2     serve there's a hidden attorney that's creating the privilege.

3     The privilege is not being created by the list serve.

4          THE COURT:  But it couldn't it be waived by someone

5     who's on the list serve or some group of people?  In other

6     words, that they were included and received and -- when it was

7     disseminated and that somehow waives the privilege?

8          MR. LEVY:  No, Your Honor, because all of these list

9     serves are internal to Goldman Sachs and this would be a good

10    example of a 2006 diversity tax force.  It's being sent then

11    to a specific group of people who necessarily have a need to

12    know that information.  So, for example, there's a counsel to

13    the diversity task force and maybe sending an email to the

14    list serve is exactly the kind of document that would be

15    withheld on a privilege log and knowing the specific identity

16    or the specific positions of what division the people on the

17    list serve are on isn't really going to facilitate assessing

18    any claims of privilege.

19         THE COURT:  So I -- -again, this is my recollection

20    I may be wrong from the last time we met that Goldman said it

21    had a process it was going to be able to use to identify a

22    high percentage of these people.  I think I'm hearing now that

23    it's not going to happen at all.

24         MR. LEVY:  So again I think that's the process we

25    committed to for the job position data and that's the one that

we were successfully able and -- a fairly burdensome process
but we were in the end able to provide the information.

On the list serves what we are able to do based on
our discussion so far is it is -- it may be possible for
certain documents to manually go in and try to match up
individual emails with other repositories of data and there is
no way to kind of automatically match a specific email.  The
emails themselves don't contain the actual recipient lists in
the metadata in the document themselves.  They only contain
the list serve.  So going into kind of underlying repositories
of data.  And this requires going back 20 years [inaudible]
privilege logs include documents going back to 2001.  It may
be possible to identify certain -- if we're able to manually
match a document to an entry to then identify the specific
recipients.

So I think -- this is again how we're going to offer
to do this and continue to meet and confer with plaintiffs.
There is specific list serves.  I think -- they mention three
specific list serves.  So if there are three specific
documents where they can't on the face of the document
necessarily tell who the group of people is then that's the
kind of thing that we would absolutely be able to offer to
work with them and try to determine who the exact recipients
were.  But that sort of manual searching isn't scalable across
hundreds of documents.  On there I think because the list

1  serves are all internal and for the most part tell you exactly

2  who the categories of people are on their face they're not

3  really needed to assess any claim of privilege.

4          THE COURT:  Let me hear from the plaintiffs.

5          MS. DERMODY:  Yes, Your Honor.  We disagree that

6  just listing list serves list of names is enough.  By that

7  logic Goldman could just send every email to the whole company

8  and they remain privileged.  The losses that -- a corporate

9  employee in order for a communication to be privileged has to

10  -- has to have a need to know the information and it's clear

11  that where an employee does not have that need to know that

12  any privilege that was attached to that communication is

13  waived.

14          So in order for us to be able to make that

15  determination to be able to evaluate whether the privilege was

16  not waived or was properly attached to these documents we need

17  the information for all the individuals in these list serves.

18          It seems like Goldman did not do an analysis of

19  these list serves up front as -- what it seems from their

20  position.  They should have done an analysis of the potential

21  membership of these list serves in order to be able to assert

22  the privilege in the first place.

23          So what we're asking in order to accommodate some of

24  Goldman's concerns is the members of each list serve by

25  January 1st and July 1st of every year we think that is a fair

1  compromise considering that this is information that Goldman

2  should have included in the first place.

3           THE COURT:  How many different list serves are

4  there?

5           MS. DERMODY:  There are at least 160.

6           THE COURT:  That's a lot.

7           MS. DERMODY:  And they are listed across more than

8  430 or 40 documents.

9           THE COURT:  Are there ones that you think you need

10 more than others or ones that you can rule out that you

11 wouldn't need them for?

12          MS. DERMODY:  Well, we've already actually ruled out

13 list serves that include names like legal.  So we've already

14 ruled out those that we believe have a higher likelihood of

15 only belonging to attorneys.

16          THE COURT:  Right.  But what about ones that perhaps

17 because of the list serve to whom it's going it just not

18 likely to be as fruitful in terms of information you would

19 think would be needed?

20          MS. DERMODY:  I think that would be -- our position

21 is that that would be all of the -- 160 list serves were

22 included in documents that were for the most part withheld.

23 Only 30 of those documents -- communications to list serves

24 were sent by attorneys were around 30.  So the vast majority

25 of these are communications that were not even sent by

13

1   attorneys.

2           THE COURT:   Okay.   So the problem is obviously

3   there's information that ordinarily needs to be provided to

4   sustain a claim of privilege.   It is the party who asserts the

5   privilege who has to provide that information but we do have

6   an issue of practicality here it sounds like that an en --

7   potentially an enormous amount of work would be required but

8   it's still not clear to me that Goldman can't do something

9   here.

10          What about this idea of identifying who's on the

11  list serve for two points during each year?

12          MR. LEVY:   Sure, Your Honor.   I think -- to answer

13  your question, I think while two points is certainly less

14  burdensome than more than two points, I'm talking about 160

15  list serves, many of which I think really directly on their

16  face tell you exactly who the category of people are which is

17  what you need to know to actually access the privilege but

18  still the burden of that would far outweigh the benefit.

19          So plaintiff's own example I think makes this point.

20  They give the example of an email sent to all of GS.   Well,

21  then they don't need to know the identify -- I mean under that

22  example they would be demanding every single and employee --

23          THE COURT:   Right.

24          MR. LEVY:   -- of the hundreds of thousands

25  employees.   They don't need to know that to assess the

14

1  privilege.  They can make an argument about whether or not

2  confidentiality is waived or not simply on the face of that

3  email.

4       THE COURT:  I agree with you in that situation where

5  it's to everybody but that's kind of an extreme situation.

6       MR. LEVY:  And similarly, I think when you have a

7  more specific list serve then you also don't need to know

8  exactly who is on a specific committee.  You know it went to

9  that specific committee.  So, again, just to read -- we give

10 one example.  We give plenty of more on plaintiff's own list.

11 Employee relations advisors, ER leadership team, Goldman Sachs

12 board distribution.  These are the names of list serves

13 they're asking for information on.  They know exactly what the

14 category of information is.  To assess whether or not

15 privilege was waived you can assess that on the face of the

16 list serve and the extremely burdensome manual effort, which I

17 think we can do that if we're talking five, ten, 20 documents,

18 that's something doable.  When we're talking about hundreds,

19 whether you're talking 200 is less burdensome than 500 but

20 hundreds it's still going to take weeks and weeks and many

21 hours of burden for very little benefit.

22       THE COURT:  What is the process then you actually

23 need to employ to identify who's on those list serves?

24       MR. LEVY:  Sure.  And this data may not exist for

25 every single document.  I think I guess also to take a step

1  back.  We're talking about documents going all the way back

2  from 2001 and plaintiffs had some of these logs since 2011 and

3  saying that we needed to identify the specific numbers of

4  these list serves up front when they waited ten years to raise

5  this I don't think really works but the exact process would be

6  that there's sort of two separate areas where the information

7  would be contained.  One is what we actually exported or the

8  actual emails themselves, and none of the data is contained --

9  that they're looking for is contained in any of those actual

10  emails.

11        There's then an underlying repository that would

12  indicate the actual specific names of senders and recipients

13  for emails but there's no easy to way to match up any of those

14  to a specific email.  There's no kind of unique identifier.

15  You would sort of need to -- you need to manually go in and

16  look at the metadata and say oh, this email was sent by this

17  person on this day with a subject line and there might be

18  multiples.  So there's no kind of automated way.

19        We've been talking to our IT personnel and vendors

20  for weeks and they've confirmed that there really is no

21  automated way to do this.  So a person would need to manually

22  go in and run these searches which is why if they've got list

23  serves they asked questions about it that's fine.  Doing this

24  across hundreds of documents is really not feasible as a

25  practical matter and it would just take hundreds of hours.

16

1      So it can be done for a small number of people and

2 we're happy to work with plaintiffs and in our submission

3 we're going to send to them shortly we'll offer to do so and

4 explain some of this material but I think doing this across

5 hundreds of list serves is just not practical.

6      THE COURT:  Let me ask plaintiffs.  So let's say you

7 get a list serve with the identities of the individual people

8 on that list serve, what do you think it's going to show you

9 that would help you in terms of either getting documents or

10 information that you think you're entitled to?

11      MS. DERMODY:  Yes, Your Honor.  So we would do the

12 same process we've done with the privilege logs that we've

13 received with otherwise complete information of authors and

14 recipients.  We would look at their oppositions and we would

15 try to determine whether there are any employees that don't

16 seem to have had a need to know that information.

17      We -- I should note that for the list serves that

18 defendants have mentioned it seems like those would be the

19 easiest to find a membership of those list serves.  If they're

20 claiming that these list serves only contain board members or

21 members of the committee, it seems like Goldman should have

22 that information especially if it's asserting that everyone

23 there had to need to know the information and no one would

24 have waived the privilege.

25      It seems like Goldman is asking to be rewarded for

1   overage by attaching a lot of documents in these privilege

2   logs and only listing a list server can now claim that there

3   are too many documents and that it can't really go over all of

4   these and it would be too burdensome.

5          So we're asking for the information that Goldman

6   should have for all these list serves.

7          THE COURT:  All right.  Look, I do find it hard to

8   believe that every single one of those documents is going to

9   turn out to be privileged.  It is a lot of documents.

10         But what I'm going to ask that you do is this.  That

11  we choose a certain number of list serves that you'll get the

12  information for.  You'll test the waters with it.  If it helps

13  you discern anything and that bears fruit then that may open

14  the door to additional work on Goldman's behalf to identify

15  additional list serve information.

16         I'm trying to gauge what is an appropriate starting

17  point for that in terms of the number.  Then I can see picking

18  like ten different time points across different years and for

19  a certain number of list serves they would have to provide

20  that information.  I'm open to suggestions on what the number

21  should be.

22         MS. DERMODY:  Your Honor, we would also ask for all

23  titles or subject matters, more detailed descriptions for all

24  of these documents so that we can focus a little bit better on

25  which documents seem to ==

18

1          THE COURT:  It's hard to say though.  They have to

2     provide better subject matter for every single one.  I think

3     you need to be able to say here are ones we think are

4     insufficient rather than have them go back and try to provide

5     more information for 8,500 documents.

6          MS. DERMODY:  Just the titles or the relines for all

7     of these documents would be at least helpful for us to be able

8     to focus a little bit better.

9          MR. LEVY:  Your Honor --

10         THE COURT:  Yes, please go ahead.

11         MR. LEVY:  -- if I could be heard on that.  I think

12    to the point plaintiffs just raised, adding a subject line may

13    well reveal privileged information in terms of withheld

14    documents.  And in terms of redacted documents, plaintiffs

15    have that information already since the documents were

16    produced with redactions.  They would have the subject line at

17    every point and an entire email thread.

18         Adding a subject matter line would effectively

19    require redoing the entire privilege logs.

20         THE COURT:  Well, not if you have it -- I don't

21    know.  I was going to ask whether you have that as a field

22    that's been preserved in some way or easily isolated in which

23    case then it just presumably can be done fairly easily but I

24    don't know.

25         MR. LEVY:  I would add to that point that many of

1   the logs are categorical.  So different emails that would fall

2   in the same category may not have the same subject line making

3   it effectively impossible to provide a subject line for a

4   category of documents.

5         THE COURT:  Well, you should -- right.  I think as

6   plaintiffs point out though it's not -- they shouldn't bear

7   the burden of plaintiffs doing it in a way that makes it

8   impossible to figure things out.

9         MR. LEVY:  I agree with that and I think that the

10  logs themselves provide a detailed description that enable

11  plaintiffs to do that.  They provide the to and the from and

12  the names of the list serve in almost all -- almost all of the

13  cases the plaintiffs have identified themselves state on their

14  face what the type of list serve is and exactly who the

15  membership is going to be.

16        To I guess address Your Honor's proposal, you said a

17  reasonable number of list serves.  So I think we would --

18  given that we're talking -- Your Honor proposed ten specific

19  points in time.  I think --

20        THE COURT:  I just pulled that out of the hat.

21        MR. LEVY:  I think we're amenable to that and I

22  think five list serves would be a reasonable number.

23        THE COURT:  It's going to be more than that.

24        MR. LEVY:  I guess the concern in terms of our side

25  is if you five list serves at ten points in time --

20

1          THE COURT:  It's a lot.

2          MR. LEVY:  -- you're already talking about 50 and in

3     effect it's bigger.  It's now into the hundreds which is

4     exactly the burden that we were concerned about.

5          THE COURT:  Right.  So maybe we'll reduce -- you

6     know what, I'm a little leery of just pulling an arbitrary

7     number out without knowing exactly how much work is involved

8     but I could say let's do 25 list serves.  Not at every point

9     in time but in combination.  In other words, pick 25 list

10    serves.  Identify whatever time point you want for that

11    particular one and let's see what it yields.

12          At the same time I think I'd like the plaintiffs to

13    identify 50 documents, I realize it's a list of 8,500, that

14    the defendants are going to provide me in camera to just take

15    a look at and assess.

16          MS. DERMODY:  Your Honor, the one thing I'm

17    concerned about that was just said by defense counsel is that

18    we may not be able to get subject matter re lines or titles

19    because they've made categorical designations.  Every time we

20    talk about this it's like we hear something new that's

21    disturbing.

22          THE COURT:  Right.

23          MS. DERMODY:  So we thought we had 8,000 some odd

24    entries on various logs, most of which we just found out

25    about.  Now we might have 8,000 masking how many others.

21

 1          THE COURT:  Well, I think you --

 2          MS. DERMODY:  A 1,000, 20,000?

 3          THE COURT:  But I thought you knew that they have

 4   category -- they have categorical designations that include a

 5   number of documents.  You've known that already.  I'm not sure

 6   what you're saying that's different.

 7          MS. DERMODY:  Well, if the entry is actually

 8   covering a whole bunch of documents and we don't have them

 9   separated --

10          THE COURT:  Isn't that what a categorical entry

11   does?

12          MS. DERMODY:  Yeah.  And I'm concerned that how are

13   we supposed to indicate what 50 documents are the most

14   concerning.  We don't have the subject matter.  We don't know

15   if there's variation in the authors and recipients.  I mean

16   this is kind of absurd privilege discussion because in the

17   normal case you get a log.  You find out who's on the

18   document.  You find out what the name of the document is and

19   you can figure out whether it's worth challenging or not.

20   Here, there's a mirror behind every door behind every mirror

21   where we're back to going -- do we even have our hands around

22   the scope?

23          THE COURT:  I understand the concern but when you do

24   have a large litigation where there are huge numbers of

25   documents you're going to have larger privilege logs and

22

1   that's why it is permissible to have categories of privileged

2   items.  Everything within reason of course.  But it can't be

3   handled in the same way that you would handle something where

4   there's maybe 100 privileged documents.  There just has to be

5   another practical way of dealing with it and that's why I

6   think we need to test the waters and see if it starts bearing

7   some fruit.

8          MS. DERMODY:  So then, Your Honor -- I'm sorry.  If

9   we could then ask for an order to export what subject matters

10  are [inaudible] exported it would help us to identify -- I

11  mean it would help us to eliminate some documents presumably

12  from this discussion at all and it will help us to identify

13  those documents that we're most concerned about for Your Honor

14  to review.

15         MR. LEVY:  Your Honor, if I can be heard.

16         THE COURT:  Hold on.  So how would you go about

17  identifying or how do we categorize what those documents are?

18  Are you talking about for the ones that -- you're going to get

19  list serve lists of people.  That's separate from what you're

20  talking about now which is the subject matter of certain

21  documents.  Which documents are we talking about?

22         MS. DERMODY:  So certainly we want that for the list

23  serve documents.  Documents that are line cc'd to an attorney.

24  That to me strikes me as a huge question mark.

25         THE COURT:  We're not going to do it for every

23

1    single one.  I need -- if there's just some way to sort of

2    again test the waters with where you can say you know what,

3    why don't you give us the subject matter for every document

4    that's under this category or in this whatever.

5              MS. DERMODY:  Okay.  I'll give it to Your Honor.

6              MR. LEVY:  Your Honor --

7              MS. DERMODY:  I think there's 400 or so documents

8    that are copied to list serves.

9              THE COURT:  Okay.

10             MS. DERMODY:  So that's a very finite number of

11   documents.

12             THE COURT:  400 documents.

13             MS. DERMODY:  Yes, roughly 400 documents.  There are

14   documents that are blind copying attorneys that is not even

15   100 documents.

16             MR. LEVY:  Your Honor --

17             THE COURT:  Hold on.

18             MS. DERMODY:  Less than 100 documents.  Less than 10

19   documents.  Just blind copying.  Attorneys aren't -- on the

20   face they're blind cc'd.  Very questionable to us.  Then there

21   are documents where on the communications are either between

22   non attorneys, non attorney to non attorney, no attorney on

23   the document at all or documents that are to the marketing

24   department attorneys or PR attorneys which don't strike us

25   as --

24

 1          THE COURT:  They may not be but --

 2          MS. DERMODY:  If they're relevant documents in this

 3  lawsuit and they're being copied to those people --

 4          THE COURT:  But the name of the game is we are going

 5  to do some unofficial sampling essentially; right?

 6          MS. DERMODY:  Sampling, yes, but we can help you if

 7  we know what the subjects are.

 8          THE COURT:  But I need -- I want to limit the number

 9  of what we're talking about though.  So again I'm trying to

10  find a way of saying maybe it's this one category or these two

11  categories but let me -- well, let me go over here because

12  there seems to be some concern.

13          MR. LEVY:  I think plaintiffs have now started

14  litigating exactly the substantive privilege log issues in

15  which the parties have not yet conferred and they're taking

16  positions that are contrary to the local rules.

17          THE COURT:  You know what though?  We're not going

18  to just have it play out over time, over time, over time.

19  This has been an issue that's been around.  Goldman had made a

20  commitment that they were going to undertake a process that

21  was going to provide list serve information.  There is 8,500

22  documents at least on a privilege log.  I want to see some of

23  those and assess what I think of what's been logged.

24  Depending on that it may result in having to do more work to

25  provide more information or it might be like this all seems

1  fine.

2          So in terms of the list serves, we were going to

3  identify a certain number that you are going to provide to

4  Goldman and I think -- I arrived at the number of 10 total,

5  not 10 over different points of time but just 10 total.  So

6  you can pick this point in time for this one, this point in

7  time for another one.  Pick 10 list serves.

8          Then on the subject matter documents -- on the

9  subject line help me narrow it down.  What are you thinking

10  of?

11          MS. DERMODY:  I'm sorry, Your Honor.  So you had

12  said 25 list serves.  Have you modified --

13          THE COURT:  Did I say --

14          MS. DERMODY:  Yes, you did.

15          THE COURT:  Let's start with 10.  Let's start 10.  I

16  want to understand what we're talking about.  Let's start with

17  10.

18          MS. DERMODY:  So these are documents -- just to make

19  sure we know what the process is.  These are documents you'd

20  like us to identify for Your Honor to take a look at.

21          THE COURT:  So there are three things.  One, they're

22  going to provide list serves to you.

23          MS. DERMODY:  Sorry.

24          THE COURT:  Information to you.  For me, I want you

25  to identify 50 documents.  Maybe you'll just pick them at

1    random.  Maybe you have some other way of picking it that

2    they'll have to produce to me in camera for me to take a look

3    at and eyeball.

4            Then there are -- there's going to be a certain

5    number of documents separate and apart from that from which

6    you identify subject matter that you want the re line for.

7    The question is making that a reasonable number.

8            MR. LEVY:  Your Honor, Local Civil Rule 26.2 as you

9    noted before expressly permits categorical logs.

10           THE COURT:  It does.

11           MR. LEVY:  And --

12           THE COURT:  It doesn't mean it can be abuse though.

13   So we have to see if it's been used properly or not.

14           MR. LEVY:  Of course.  And 26.2(a) sets out the

15   specific fields that should be included in a privilege log and

16   the subject line is not one of them.

17           THE COURT:  The subject matter of the document is.

18   And often --

19           MR. LEVY:  The general subject matter of the

20   document is provided for every single document.

21           THE COURT:  What are some examples of general

22   subject matter that's been described?

23           MR. LEVY:  Sure.  So there are subjects like reflect

24   legal advice regarding manager core tiling --

25           THE COURT:  Right.  So what does that tell them

27

1    about what was exactly provided?  That's actually the claim of

2    privilege.  In my history I did an incredible amount of

3    privilege log work in my early years and there were very easy

4    ways to have information that just doesn't tell you enough.

5    It's not that anyone is purposely doing that.  Doing privilege

6    logs are hard and a pain.  But to really assess what is at

7    stake you have to have an understanding of what that document

8    is talking about.  It doesn't mean a paragraph description but

9    it means a re line essentially of what is being discussed in

10   there.  To say it's attorney advice is just really a

11   restatement of the privilege.

12        MR. LEVY:  Sure.  And our descriptions don't just

13   say attorney advice.  They do specifically describe like

14   manager core tiling or 360 reviews, what the -- they say

15   reflects attorney's advice regarding manager core tiling,

16   regarding 360 reviews, general subject matter.

17        THE COURT:  That's why I want to limit them to

18   taking some number of documents they think they don't have

19   adequate -- a name for or identifying information.  I'm sorry.

20   About the subject.  It may turn out that they really shouldn't

21   have any more and that what they have is enough.

22        But I'm going to say 200 documents.  Just let's see

23   what the re lines are.  If there are any of those that Goldman

24   thinks that themselves communicate privileged information you

25   can call that out and I'll look at it in camera.

1          When can we do all this by?  Ms. Dermody, you're

2    going to have to identify certain list serves, 50 documents

3    I'm going to look at and 200 documents for providing them the

4    re line.

5          MS. DERMODY:  Are we going to have a chance to hear

6    from Goldman about what the list serves mean before we pick

7    the list serves?

8          THE COURT:  If it's not clear what they mean I would

9    think so but what do you mean?  So --

10          MS. DERMODY:  What is gs@gs.com?  Who does -- just

11    tell us who that is.

12          THE COURT:  Is that a person or a list serve?

13          MS. DERMODY:  It's a mailing list.

14          THE COURT:  And you want to understand what is that

15    mailing list even if you don't know who the people are because

16    you want to know what you're asking for.

17          MS. DERMODY:  Right.

18          THE COURT:  And there are 160 and I -- is there any

19    problem with that, letting them know what the group really is?

20    Some of them may be obvious but some may not.

21          MR. LEVY:  I think it's going to depend on the

22    specific document and I think if plaintiffs have a question

23    about a document they've now gotten 10 list serves that they

24    can ask about.

25          THE COURT:  No, no.

1    MR. LEVY:  And we'll look into those.

2    THE COURT:  No, no.  I'm asking -- this is for the

3 160 different list serves just what does the name of the list

4 serve mean.  So who -- what is that -- how hard is that?

5    MR. LEVY:  I think for the ones that are obvious on

6 their face then sure, if plaintiffs want to ask what 2006

7 diversity task force means we're happy to tell them.

8    THE COURT:  What about the ones that aren't obvious?

9 Isn't that the most important for them to understand?

10    MR. LEVY:  And in those it might vary by document.

11 So I think it's not necessarily going to be as straight

12 forward.

13    THE COURT:  This is like providing a code of what

14 goes across a spreadsheet.  You can provide 160 descriptors of

15 what those mean.  GS, does it mean all of Goldman Sachs.  Does

16 it mean a certain committee.  It's a reasonable request.  So

17 I'm going to order that that be done.

18    So that needs to be done before your choices are

19 made.  So --

20    MS. DERMODY:  We could file that by a week, Your

21 Honor.  We just need to know what that is before we can apply

22 it.

23    THE COURT:  Right.  So I will order that that

24 information about the 160 descriptors be provided within a

25 week.  That is two days before Thanksgiving.  That's 11/26.

1   One day before Thanksgiving.  One day.  It's 11/26.

2           Then, Ms. Dermody, how long for you to turn around

3   and identify documents?

4           MS. DERMODY:  Can we have seven business days?  So

5   not including Thanksgiving.

6           THE COURT:  Yes.

7           MS. DERMODY:  Thank you.

8           THE COURT:  Then for Goldman to provide the

9   information in response to that.  Can we say a week?

10          MR. LEVY:  When you say the information in response

11  to that, do you mean the identities of the numbers of the list

12  serves?

13          THE COURT:  It's providing the -- no, no, no.  I'm

14  sorry.  The identities of --

15          MR. LEVY:  All of the numbers of those 10 specific

16  list serves.

17          THE COURT:  Yes --

18          MR. LEVY:  That I'm sure will take more than a week.

19          THE COURT:  Okay.  So there's that and then there's

20  the specific documents, the 250.  So for the list serves how

21  long would you need?

22          MR. LEVY:  On that I -- I have to talk to the IT

23  personnel and get back to the Court.

24          THE COURT:  No.  You're going to tell me now.

25          MR. LEVY:  How about --

1          THE COURT:  If it turns out from your IT people that

2   it is not practically capable of doing that you can get back

3   to me but I don't want to leave it open ended.  That's all.

4          MR. LEVY:  Sure.  How about three weeks?

5          THE COURT:  Fine.  That's for the list serve info

6   other than the designators.

7          Then at that point -- I've lost track.  There's

8   something that has to happen after that.  They're going to

9   provide the documents within a week and they're going to

10  provide the list serve list within three weeks.

11         So then plaintiffs are going to identify anything

12  after that or no?

13         MS. DERMODY:  I think I've lost the thread, Your

14  Honor.  So we're identifying 10 list serves to them that are

15  suspicious to us.

16         THE COURT:  Right.  And then they're going to

17  provide that -- okay, fine.  Then we don't need to account for

18  anything after that.

19         In terms of getting me the documents, that's within

20  the seven days.

21         MS. DERMODY:  Then maybe a week after that is when

22  we give you the list of 50 because that might include some of

23  those list serves.

24         THE COURT:  I see.  So documents for my review and

25  whatnot will be a certain time after that three weeks.  How

1   long do you need?

2          MS. DERMODY:  I think a week, Your Honor, would be

3   the most.

4          THE COURT:  Okay.

5          MS. DERMODY:  Where are we now?  Is that Christmas?

6   We have all the holidays coming up.

7          THE COURT:  I know.  Is there anything else we need

8   to identify there in terms of the timing?

9   (No response.)

10          THE COURT:  I think we put that one to bed and if we

11   spend the same amount of time on the other issues we'll only

12   be out of here by nine or ten; right?

13          MS. DERMODY:  Your Honor, I guess we just would ask

14   for the Court's instruction because we're going through a meet

15   and confer process on the specific things doesn't mean we

16   can't ask questions about the privilege logs otherwise.

17          THE COURT:  Of course not.  You still have the meet

18   and confer on issues.

19          MS. DERMODY:  Thank you.

20          THE COURT:  Of course.  Named plaintiff supervisory

21   discovery.  There's a disagreement about the number of

22   supervisors.  I have a question that no one put -- I may have

23   overlooked.  It may be in there.  What's the legal definition

24   of supervisor?  I'm going to start with the plaintiffs.

25          MS. DERMODY:  Well, I think we certainly could say

33

1  that anyone that controlled the circumstances of their

2  employment, that reviewed them, bonused them, promoted them,

3  are going to promote them.  Those would be the basics.

4         THE COURT:  Yes, but -- there can be a lot of people

5  involved in that.

6         MS. DERMODY:  One of the fallback proposals we made,

7  Your Honor, is to at least include all the people that have

8  been identified as supervisors or co-supervisors of the

9  plaintiffs by Goldman itself.

10        THE COURT:  Okay.

11        MS. DERMODY:  It would seem to be categorically

12 their supervisors under Goldman's nomenclature.

13        THE COURT:  How many people is that?

14        MS. DERMODY:  I believe that is 30.

15        THE COURT:  All right.  Goldman, why isn't that a

16 reasonable --

17        MS. DERMODY:  31, Your Honor.  I'm sorry.

18        THE COURT:  31.  Why isn't that a reasonable request

19 if you've identified them as supervisors or such?

20        MS. DAVIDOFF:  Your Honor, in response -- Amanda

21 Davidoff from Sullivan & Cromwell.

22        THE COURT:  Yes.

23        MS. DAVIDOFF:  In response to your question about

24 what's the legal definition of supervisor, I think the answer

25 is that it's the person to whom you report.  The people who

1   make tangible employment decisions about you.  It's not very

2   person who reviews you or has some input into whether you get

3   promoted.

4           THE COURT:  Aren't there people who can make a

5   decision about you who you don't even interact with and

6   someone else is supervising your work?

7           MS. DAVIDOFF:  People who make --

8           THE COURT:  There can be people involved in an

9   employment decision behind the scenes in some ways.  All

10  I'm -- I'm just trying to make the point that there are people

11  presumably who are literally supervising your work and that

12  may be -- it may be -- let's take a law firm.  Right.

13          So you're a junior associate, who are your

14  supervisors?  You're reporting to senior associates and you're

15  reporting to partners potentially.  That's a multitude of

16  people for one person, isn't it?

17          MS. DAVIDOFF:  Every firm is organized differently

18  but in corporations unlike law firms and Goldman Sachs in

19  particular each person does have someone to whom they report.

20          THE COURT:  Right.

21          MS. DAVIDOFF:  What we've been trying to do here --

22          THE COURT:  But then why -- then isn't -- shouldn't

23  that be the only person giving a review then?

24          MS. DAVIDOFF:  Well, so what we've been trying to

25  do, Your Honor, is to figure out -- how we figure out who's

1  the person who's reporting to you.  Let me give you an example

2  from a law firm.  Sometimes I am the deputy managing partner

3  of a litigation group.  I frequently am in charge of giving

4  associates their reviews but there could be an associate who

5  is out of the office on the days I'm available to deliver a

6  review and in that case I'll designate a guest reviewer to

7  review them.

8          THE COURT:  And you might review them and not

9  actually be their supervisor as well.

10         MS. DAVIDOFF:  That may well be but my point is that

11 who gives you your review can sometimes be a matter of

12 convenience --

13         THE COURT:  I agree.

14         MS. DAVIDOFF:  -- just on the circumstances of the

15 case.

16         THE COURT:  Right.  I agree with that.

17         MS. DAVIDOFF:  So we couldn't just go to some

18 automated space and say who are these people's supervisors but

19 likely we're talking about four people, four people about whom

20 we have a lot of information.  What information do we have?

21 We have the people who are designated on their 360 reviews as

22 their primary managers.  We took all of those people and said

23 those are your supervisors.  That doesn't cover everyone

24 though because not every 360 review designates a primary

25 manager.

1          So then we went to the record and we asked ourselves

2    based on the record, based on people's testimony, based on

3    what we know from people internally and documents internally

4    that we have seen who actually supervised these people.

5          So to take a step back, plaintiffs started with a

6    list of 70 people.  We wrote them a letter that explained that

7    many of these people were indifferent business units than them

8    or had been designated by them as comparators rather than

9    supervisors.  There were a lot of problems with that list of

10   70 people.

11         We've now come back with a list of 18 people that

12   reflect the primary managers on the 360 reviews supplemented

13   with people we identified from the record as people who

14   actually supervised them.  We haven't heard back from

15   plaintiffs on this list.  That's where this stands.  So it's a

16   classic unripe issue.  I would love to hear why they think

17   there's delta between the 18 people we've identified and the

18   70 people they've identified needs to go up but we haven't

19   heard that from them.

20         THE COURT:  Now we're talking about 18 and 31.

21         MS. DAVIDOFF:  I don't know who the 31 are.  They've

22   not provided that.

23         THE COURT:  According to them, and we'll find out in

24   a minute, it's persons that Goldman has identified as

25   supervisors or -- what was the or?

1        MS. DERMODY:  I think the terms are manager and co-

2   manager.  That includes Geoffrey Needleman that defense

3   counsel represented to the Court in the context of comparator

4   discovery was actually Ms. Chen-Oster's supervisor but they

5   now don't have him on their list.

6        THE COURT:  I understand.  I made a note to myself

7   there seem to be some inconsistencies or mistakes on both

8   sides but we don't have to worry about that.

9        MS. DAVIDOFF:  Your Honor, co-manager is the precise

10  field we identified as not a reliable indicator of somebody

11  who was a supervisor.  We went to people at Goldman Sachs to

12  try to investigate this.  Is this an indicator of who

13  supervised you and the answer is no.  Primary manager on your

14  360, yes.  Co-manager, no.  It's just a field someone filled

15  in and it doesn't actually relate --

16        THE COURT:  Wait, wait, wait.  What does a co-

17  manager do?  What is --

18        MS. DAVIDOFF:  That's what -- we are in the midst of

19  the meet and confer process.  This is the first time we've

20  heard that co-manager is what they think is the key field.

21        THE COURT:  All right.

22        MS. DAVIDOFF:  This is a classic unripe issue but we

23  went to our -- to people within Goldman Sachs today to ask

24  that very question, what is this co-manager field, why are you

25  telling us that these people listed as co-mangers are not the

38

 1  right people.  We're in the mist of conferring with them about

 2  it.

 3          MS. DERMODY:  Your Honor, I think we're in the

 4  upside down because we're trying to finish discovery and we

 5  can't ever move anything along.  What we started with was

 6  okay, we're not working at Goldman but we know that our

 7  clients were supervised and reviewed by a whole bunch of

 8  people petals above them.  We gave them the list of those

 9  people and they said no, that's way too many.  So we said

10  look, we'll just use Goldman's own terminology, manager or co-

11  manager.  That's 31 people.  And now they're saying no, that

12  doesn't really -- it doesn't really have meaning.  It seems

13  like an appropriate compromise to use the term --

14          THE COURT:  Just remind me what is it that's being

15  produced, what information for these people.

16          MS. DERMODY:  Yes.  This is the -- sorry.  This is

17  the small set of documents that were 360 reviews, the cross

18  roughing notes and complaints.

19          THE COURT:  Of the supervisors themselves?

20          MS. DERMODY:  The supervisors.  It's an incredibly

21  small collection of materials to begin with.  Now we're

22  reducing it to these 31 people that for whatever reason

23  Goldman's records show they're managers or co-managers.

24          THE COURT:  Okay.  Go ahead, Ms. Davidoff.

25          MS. DAVIDOFF:  If I may, Your Honor,.

1          THE COURT:  Yes.

2          MS. DAVIDOFF:  Again, this is the first time they've

3     raised the co-manager as the critical issue.  We went to our

4     client this morning and said we'd like to understand what this

5     co-manager is and why we're not finding in the record that co-

6     managers are actual supervisors.  This is not the way this is

7     supposed to work.

8          THE COURT:  When you say you're not finding in the

9     record that they're actual supervisors, what do you mean by

10    that?

11         MS. DAVIDOFF:  Because there's no indication that

12    somebody -- the people who are listed as primary managers

13    actually were supervising people.  That's what they -- that's

14    what the plaintiffs said in their depositions.  The people who

15    are the co-managers don't really appear anywhere in

16    relationship to these people.  So we went back to the company

17    and said why are they listed as co-managers, how do you get to

18    be listed as co-manager on a 360.  I'd love to be in a

19    position to tell you today what the answer to that question is

20    but I'm not because we're hearing this for the first time.

21         MS. DERMODY:  Your Honor, just respectfully, how can

22    it be the first time if it's on Page 6 of the joint status

23    report?  Goldman listed specifically co-managers.  I'm not

24    sure why this is the first time we're talking about this when

25    in fact it's been --

40

1          MS. DAVIDOFF:  Because there was a list --

2          THE COURT:  One at a time.

3          MS. DERMODY:  So regardless, just to move the

4    process along we're talking about three categories of

5    documents with a discrete number of people.  We started out

6    between 18 and 72.  Now we're at 31 as a compromise using

7    Goldman's own statements.  We can't verify what they're saying

8    about whether the people were co-managers.  We just look at

9    the documents and say that's the information that Goldman self

10   designated.

11         THE COURT:  I'm going to order --

12         MS. DAVIDOFF:  31 is not in the status report, Your

13   Honor.

14         THE COURT:  There was not a 31 but I'm going to

15   order that that be produced.  It's a small -- I agree that

16   it's a relatively small universe of documents and this isn't

17   an issue of what ultimately comes in a trial.  A lot of this

18   may end up proving to be irrelevant but I'm going to order

19   that the 31 be produced.

20         MS. DAVIDOFF:  Your Honor, may I ask that the Court

21   clarify that this is not a holding, that those 31 individuals

22   are in fact --

23         THE COURT:  No.  Absolutely -- agreed, it is not.

24   This is simply ordering the discovery and where it leads I

25   don't know but the Court agrees that this is not a holding in

41

1    any way that those people necessarily are supervised.

2              MS. DAVIDOFF:   Thank you.

3              THE COURT:   Withheld password protected documents.

4    A lot has been produced.   It seems like according to whatever

5    statistics are run there's something like 2,296 documents or

6    some sort that haven't been located because of this password

7    problem.   Goldman says it's going to be a huge manual effort

8    to do what's being asked.   I do not fully comprehend what that

9    effort is and exactly the extent of what is being asked for.

10   I didn't quite understand the process that plaintiffs were

11   proposing be done.

12             So help me understand why -- what plaintiffs thinks

13   is involved in having this done and what it's going to yield.

14             MR. STROMBERG:   Your Honor, this is Dan Stromberg on

15   the phone.

16             THE COURT:   Hello.

17             MR. STROMBERG:   So this process just to explain kind

18   of the situation that we're -- that we've run into and the

19   process the plaintiffs envision.   Obviously a lot of papers, a

20   lot of ESI parties come across -- producing parties come

21   across password protected documents and there's some sort of

22   process in place to access those -- the documents that are

23   reasonably accessible within that population and search and

24   produce as necessary.   In this situation what we have

25   identified -- plaintiffs identified a lot of documents that

1   were produced as slip sheets and then defendants further

2   clarified that those were password protected in addition to

3   some other categories of documents that are -- that didn't

4   process correctly and we're not talking about those today.

5         So for those password protected documents it was

6   understood or was explained by defendants that their process

7   for attempting to un-password protect documents in order to

8   search and produce was -- there's a master sheet of Goldman

9   common passwords that are applied across the whole universe

10  and when they work they encrypt the document and it's able to

11  be searched and produced.

12        Additionally, as their review went forward and the

13  reviewers identified passwords to I guess providers or some

14  supervising attorney those passwords would be added to that

15  master list and those passwords would then unlock password

16  protected documents in the universe of documents.

17        However, plaintiff's review of documents and

18  actually I should say a very simple search of documents where

19  we don't have -- all we have are documents -- for password

20  protected documents all that plaintiff have are password

21  protected documents that are part of families or attached to

22  otherwise relevant non privileged documents.  So it's a small

23  subset and we don't have metadata identifying okay, these are

24  the password protected documents versus other problems

25  although now we have -- we subsequently have a log that

43

identifies some of those but -- so with their limited set of documents from defendant we were able to identify a whole host of passwords pretty easily with limited searches just searching the text.

We identified back in the spring I believe examples. We just give exemplars.  Here are four examples and we think these examples show that the process being utilized by Goldman is insufficient.  Goldman has since produced those four documents along with some others but we can easily and we've sent to -- we recently sent a list of 150 emails that we easily identified as containing passwords for password protected documents again in the production set.

So we are not asking Goldman to go review the 2,636 documents that were password protected.  What we're asking them to do is instead of just relying on a really passive process where reviewers apparently sometimes identify passwords when they find them and sometimes they don't we in addition to applying the passwords that we identified, the plaintiffs identified, we would like Goldman to search the parent emails of those 2,636 documents for passwords.  When I say search I mean run some searches and we can provide some guidance on what those searches should be similar to what we ran of the [inaudible].

Based on the -- we don't know what subset of the 2,600 that's going to be.  Presumably a few hundred.  I don't

44

1  know.  Not a huge list.  Identify the passwords in those

2  emails.  Not only apply them to the attachments but also --

3  I'm sorry.  Not only apply them to those documents that

4  they've produced as slip sheets or password protected but also

5  apply those passwords to document families that weren't

6  produced because they're identified as not relevant -- sorry.

7  That were reviewed because they hit on search terms elsewhere

8  in the family but these -- the whole family is identified as

9  not relevant but these documents weren't reviewed because they

10 were password protected.

11         Then additionally in the entire population -- so

12 millions of documents that weren't reviewed at all because

13 they didn't hit on search terms, we're not asking Goldman to

14 go review all of those obviously.  We're asking for the finite

15 number of passwords that have -- that would be identified by

16 this process to be applied to that universe and see if any of

17 those documents hit on search terms.

18         So there are I would argue additional categories of

19 reasonably accessible passwords that they can find but -- and

20 we've talked about it with Goldman and they're not willing to

21 look into them without specific identification.  That category

22 would be emails that say use this -- something like this

23 department's password for fall 2008 for example or our usual

24 password or password coming in a second email.  Those would

25 all be I would argue are reasonably accessible.  However,

1  we're not even asking for those.  We're only asking for it

2  when the password is clearly visible in the cover email.

3  We're asking those passwords to be located and applied to the

4  review.

5          THE COURT:  How many documents are there in the

6  reviewed but not produced because not relevant?

7          MR. STROMBERG:  So it looks like -- that's the

8  number.  2,636.  We're asking for the search for passwords.

9  Basically look at the parent emails of those 2,636.  Run a

10 search for password or PW or the like to identify -- I don't

11 know how many of the 2,636 contain passwords but that's the

12 entire population over which to run our search.  So we're

13 basically asking for a proactive approach at all to identify

14 passwords rather than a passive approach whereby sometimes

15 reviewers report passwords that they find and obviously based

16 on our limited easy review -- or limited easy search and

17 review we found a lot of instances where that was not the

18 case.

19         THE COURT:  Right.  I may not have communicated this

20 well.  My question is I thought you referred to once you find

21 the passwords you want them to then run them for all the

22 documents that we reviewed but not produced for reasons of

23 relevance.  My question is what quantity of documents are we

24 talking about there.

25         MR. STROMBERG:  Oh, that is the 2,636.  So all -- we

1  don't know how many were reviewed because they didn't hit on

2  search firms because they had password protection.

3        THE COURT:  All right.  On the --

4        MR. STROMBERG:  We -- what the -- where the -- where

5  the family was not produced because it wasn't relevant however

6  the password protected document was never reviewed, that's

7  2,636.  2,636 attachments are password protected, but they're

8  family hit on search terms and the review did not identify

9  them as relevant not privileged.

10       THE COURT:  All right.  Let me -- let me ask Goldman

11 to address this and what is it that so burns them about what's

12 being asked to be done.

13       MR. LEVY:  Sure, Your Honor.  And it does seem like

14 plaintiff's position may have shifted somewhat since the joint

15 status reports.  And if what they'd only like us to review is

16 the parent emails for those 2,600 documents that would be

17 fine.  There's a difference between doing that and

18 affirmatively running searches across millions of documents in

19 a review database of their choosing.  If that's all they want

20 us to do is look at the parent emails of 2,000 documents

21 that's fine and we're happy to do that.

22       THE COURT:  Yeah.  It seemed to me like there may

23 have been ships passing in the night with different

24 understandings of what the scope of what involved was, but I'm

25 still not sure, so let me ask plaintiff.  You just heard

1   defendant's understanding of what was being asked.  Is that

2   what you're asking for?

3              MR. STROMBERG:  Yes and no.  We are asking for that,

4   but there would be, theoretically, additional steps based on

5   whatever additional passwords were identified in addition to

6   the passwords that we have identified for defendant.  Whatever

7   additional passwords are identified out of the 2,600 those

8   passwords should be added to the master Goldman password data

9   that's applied to the universe of documents.

10             And anything that -- so in the cold set, so

11  everything that wasn't reviewed in the first place because it

12  never had a search term hit, if there's a search term hit now

13  because the password has been -- because the document's been

14  password cracked, if the search term hits and other search --

15  whatever search criteria are applied to the documents and they

16  now get pulled in they should be reviewed.

17             And even if a document in the 2,636 parent email

18  doesn't contain a password, but obviously the passwords

19  identify -- the passwords identified and whatever we found --

20  or whatever Goldman finds in the -- in its review and get --

21  those passwords get added to the master list.  Anything that's

22  basically decrypted or unlocked should be reviewed and

23  produced as necessary.

24             THE COURT:  All right.  I'm still --

25             MR. STROMBERG:  So yes, the review -- the search,

48

1    rather, not the review, the search is limited to the 2,636.

2    That's what we're asking.  But any results of that search

3    should be applied as necessary across everything.

4          THE COURT:  Applied as necessary to millions of

5    documents?

6          MR. STROMBERG:  Potentially, just like any --

7          MR. LEVY:  Any millions upon --

8          MR. STROMBERG:  -- so it's not millions.  We don't

9    know how many it is, but that's what -- how their process was

10    done with their master Goldman password list initially.  They

11    applied those passwords to everything because you can't search

12    for text in documents that are password protected.  But these

13    -- that's what should also be included on that list.

14          So, yeah, it's really a simple processing step where

15    it's applied to everything that was culled.  If there are

16    additional -- we're not asking for them to review all of those

17    documents, but any search terms hits of the agreed upon search

18    terms that now exist because these documents have been

19    appropriately decrypted those should be reviewed because they

20    should've been reviewed originally.

21          THE COURT:  All right.  Let me -- Goldman please

22    attach --

23          MR. LEVY:  Sure.

24          THE COURT:  -- address again.

25          MR. LEVY:  I don't think plaintiffs have accurately

49

described our password cracking process.  And I -- and I think
it's important to remember that the legal standard for ESI
discovery is not perfection, it's reasonable and proportional.
And there's plenty of cases holding that.

So we started, as plaintiffs did accurately
describe, with a master password database.  It contains all
passwords that have been identified at any point in this
litigation and in other litigations involving Goldman Sachs
amassed through Goldman Sachs database.

During the course of review we specifically
instructed and trained reviewers any time they saw a password
that got -- there was a process so that could get added to the
database.  When that database was updated it would then be run
in an iterative fashion.  So within the review population that
hit on the search terms we would run the updated master
password database and review any decrypted documents.  And if
they were responsive we'd produce them and non-privileged,
we'd produce them.

We would also rerun the password database on the
documents that didn't hit on the search terms and so that in
case a document that was then decrypted hit on the search
terms.  And throughout the course of the review as we
identified more password it was an iterative process and we
would run the password database again and again.

THE COURT:  So it sounds like running the database

1   again as it changes over time is not that difficult?

2           MR. LEVY:  Running the password database is not.

3   And we've -- and that's exactly the point because we've

4   already done all of that.  What plaintiffs are asking us to do

5   now is to go back in and re-review the documents -- sorry --

6   that we've already reviewed, the documents that have already

7   been specifically searched through the search terms and

8   reviewers expressly instructed and trained to look for

9   passwords have already reviewed.

10          And plaintiffs' claim that they have identified

11  hundreds of additional passwords, that's not correct.  They

12  sent us over a hundred emails containing passwords.  Many of

13  those were the same passwords and most of those passwords we

14  had already identified.  In fact, we've --

15          THE COURT:  Already identified and run through?

16          MR. LEVY:  We submitted those documents and if they

17  were responsive we produced them.  We identified over 1,700

18  passwords.  Plaintiffs identified 24 new passwords.  That's

19  about one percent of additional passwords, which shows that

20  the process is, I think, by any measure reasonable and

21  proportional.

22          THE COURT:  What would be so hard, then, about

23  running the 24?

24          MR. LEVY:  We are currently running the 24 as we

25  speak and we will review any documents that are responsive and

51

1   non-privileged that are decrypted as a result of that.

2        THE COURT:  So I think we don't have a dispute.

3        MR. LEVY:  I think as to this issue we don't have a

4   dispute and Your Honor is absolutely right.

5        THE COURT:  Okay, then.

6        MR. STROMBERG:  Your Honor, that I -- respectfully,

7   that doesn't -- we are not just asking defendants to run the

8   passwords that we have identified.  We're asking for a

9   proactive search of the 2,600 documents -- or the parents

10  the 2,600 documents to identify additional passwords.

11       And while counsel may have said that their master

12  password list identified it -- I'm sorry, I don't know if it

13  was 17,000 or 1,700 passwords -- I don't believe that

14  reviewers identified 17,000 or 1,700 passwords.  And I believe

15  what -- again, what plaintiff's counsel has easily found shows

16  the flaw in relying on reviewers to identify passwords.

17       And again, we're not asking for a re-review of

18  everything.  We're asking for a simply search such as

19  plaintiffs used fairly easily to proactively identify

20  passwords in a really small subset of this -- of these

21  documents and apply them as necessary.

22       THE COURT:  So -- but again --

23       MR. STROMBERG:  And we're not asking for perfection

24  because I pointed out those other categories were

25  investigation could also uncover passwords, but we are not

1   asking for that.  We're asking for simple searches of the

2   parent emails to the 2,636 documents.

3          THE COURT:  And you're looking among those for

4   additional passwords that may not be known or have been used,

5   is that correct?

6          MR. STROMBERG:  Correct.

7          THE COURT:  Okay.  And why is that so difficult

8   then?  If you -- if you're running 24 new passwords now why

9   would it be so difficult to do this search of the 2,000

10  whatever documents and then run any unique passwords that

11  haven't already been run?

12         MR. LEVY:  Sure.  I think if plaintiffs are asking

13  that we look at the parent emails for these 2,000-some-odd

14  documents and run them within the review population, we're

15  happy to do that.

16         THE COURT:  Good.

17         MR. LEVY:  I think we would have an issue if they're

18  asking us to then -- I'd say they keep saying we're doing a

19  passive and not proactive search and I think that's incorrect

20  where we have search terms and reviewers were reviewing those

21  documents, which is essentially what plaintiffs are proposing

22  to run searches and then have reviewers review documents.

23         I think additional searches for passwords beyond

24  that is what we're not prepared to agree to.  And running

25  passwords that on the tens of millions of documents that

53

1   didn't hit on any search terms in the hopes that they might

2   decrypt documents and they hit on the search terms, now we're

3   talking about another kind of large scale search and review.

4   But if what plaintiffs are asking for is look at these 2,000

5   documents, pull out any new passwords, run them within the

6   review population, we're happy to do that.

7           THE COURT:  That's what we're --

8           MR. STROMBERG:  May I, Your Honor?

9           THE COURT:  Yes, last time.

10          MR. STROMBERG:  So as counsel explained their

11  password decryption process up until this proposal they would

12  identify passwords, add it to the master list, and apply it to

13  all documents in the universe and review search terms hits as

14  necessary.  We're simply saying they do this last step of

15  search these 2,600 documents to find more and apply it as

16  necessary to everything to -- so they are searching everything

17  and reviewing documents that hit on search term hits.

18          THE COURT:  But is that what you've been doing with

19  the passwords, running them against the entire universe

20  including documents that didn't have hits previously and were

21  deemed not relevant?

22          MR. LEVY:  We were running -- during the -- during

23  the ESI discovery we were running the updated master password

24  database within the review population which would decrypt

25  documents and in the larger population to ensure that any

54

1 documents that hit on the search terms were pulled in.  So

2 that's already been done.

3          I think now ESI discovery ended on August 30th and

4 we -- and all of the -- and essentially all of the passwords

5 thus far have been identified and so we're happy to run

6 additional search terms within the review population.  To then

7 be running additional searches across the tens and millions of

8 documents and be pulling them back in is, I think, another

9 round of ESI discovery would be disproportionate.

10          THE COURT:  But what's involved in doing that?  How

11 much time and effort?

12          MR. LEVY:  Running this -- actually running the

13 processes --

14          THE COURT:  Yeah.

15          MR. LEVY:  -- is not the burdensome part, it will be

16 the actual review of now we're talking about potentially

17 thousands of documents.

18          THE COURT:  Potentially thousands of relevant

19 documents?

20          MR. LEVY:  It's not clear whether or not they're

21 relevant until we review them.  And I would know that --

22          THE COURT:  Right.

23          MR. LEVY:  -- the types of documents that tend to

24 get decrypted are the most burdensome to review.  They're very

25 large Excel files.

55

1         THE COURT:  Okay.

2         MR. LEVY:  They're the types of documents you tend

3    to see password protected.

4         THE COURT:  All right.  All right.

5         MR. LEVY:  And one last point, Your Honor --

6         THE COURT:  Okay.

7         MR. LEVY:  -- if I may is that there's also

8    additional hosting costs.  When you move files into an active

9    review database you have to pay to host them.  And if you're

10   talking about large Excel files there is another attendant

11   burden and cost associated with that.

12        THE COURT:  Yeah, Goldman can afford those hosting

13   costs I believe.  The -- I'm not going to order a more wire

14   burdensome search.  I think what Goldman has suggested as what

15   they are going to do is sufficient.  It's as we've all agreed.

16   It's not perfect and there will be certain documents that

17   aren't caught, but there's no reason to believe that there

18   necessarily are documents among that search that will be

19   relevant or material.  So --

20        MR. STROMBERG:  Your Honor, can you clarify what

21   Goldman has agreed to do?  I'm just unclear.

22        THE COURT:  Why doesn't Goldman state it.

23        MR. STROMBERG:  Thank you.

24        MR. LEVY:  Sure.  So we're prepared to review the

25   parent documents of these 2,000 specific some odd emails.  And

56

1  then we'll run those within the review population and we'll

2  review any encrypted documents.

3           THE COURT:  Okay.  That's what they're doing.  Court

4  ordered interrogatory that Goldman has not answered because

5  they are concerned about the fact that the judge asked --

6  phrased it in a loaded way that asked for less discriminatory.

7  And I will say in looking it over in retrospect I understand

8  their concern.

9           And so I have a question for really -- well, all of

10  you about whether the following question would work.  Identify

11  any alternative to the three practices that Goldman considered

12  to achieve its business necessity and for which Goldman also

13  considered the impact on or treatment of men and women.

14           MR. KLEIN:  Your Honor, just on that as a point of

15  information, there are essentially two different standards.

16           THE COURT:  Okay.

17           MR. KLEIN:  And I'm not sure it matters, but I just

18  wanted to point it out.

19           THE COURT:  Yeah.

20           MR. KLEIN:  So there's Title VII which as an

21  articulation of I'll call it the last discriminatory

22  alternative prong of essentially the burden of proof for

23  plaintiffs in this case.  It's our affirmative burden.  The

24  city statute however has a different articulation, which is

25  although the words are different they cover the same concepts,

57

1  but they change the burdens of proof.

2          And so, I'll just point that out in particular that

3  essentially under the city statute which covers the majority

4  of the class at issue in this case, if the covered entity

5  fails to prove that such alternative policy of practice would

6  not serve the covered entity as well, that becomes their

7  burden --

8          THE COURT:  Right.

9          MR. KLEIN:  -- not ours.

10          THE COURT:  Right.

11          MR. KLEIN:  So that makes a different in the context

12  of framing the interrogatory.  And I think it's hard to sort

13  of understand the differences as between those two statutes as

14  applied to the rod you just articulated.  So I just -- I think

15  we just have to be sensitive to that difference in terms of

16  how the statute works.  So there's a different burden of proof

17  --

18          THE COURT:  Right.

19          MR. KLEIN:  -- depending on which statute you're

20  talking about.

21          THE COURT:  Okay.  But are you suggesting that means

22  the question is not sufficient or that it is?

23          MR. KLEIN:  So I just confirmed my client.  I think

24  it's okay.  You know, it's on the fly, so in terms of sort of

25  understanding exactly how that related to both statutes in the

58

1    way that it's articulated given the fact that we're just sort

2    of answering this in real time, I think -- I think it's -- I

3    think it would be okay.

4              THE COURT:  All right.  Give it thought and

5    hopefully you'll come -- well, let's see what Goldman thinks

6    of it.

7              MS. DAVIDOFF:  Well, Your Honor, I think this is the

8    first time we've heard -- in a theme for today this is the

9    first time we've heard that they think that the answer to this

10   question is sort of different depending on whether you're

11   looking at the federal or the -- or the state burden of proof.

12   But I do think that there's a more fundamental problem here

13   which is that the interrogatory is fundamentally trying to get

14   -- plaintiffs are trying to get at whether -- get Goldman to

15   identify less discriminatory alternatives that would've met

16   its business needs that it considered.

17             Why is that a problem?  Well, because it does

18   reverse the burdens under Title VII.  And as Your Honor has

19   recognized, you know, some of the information that will come

20   in on these business necessity and less discriminatory

21   alternatives issues is a matter of expert opinion and also,

22   you know, the way we've set up the expert reports.  You know,

23   people are going first depending on what their burden of proof

24   is.

25             So Goldman will go first on business necessity,

1   plaintiffs will go first on other issues.  Plaintiff's burden

2   here, and it's always their burden, is to identify

3   alternatives that they consider less discriminatory and that

4   would've met business needs and to prove that Goldman Sachs

5   should've adopted them and didn't.

6          So that's their burden.  Under Title VII that's

7   where that burden lies.  They start by making a prima facie

8   case that there was a disparate impact.  We can respond by

9   showing that the practice they're challenging met a business

10  necessity.  And they can reply by showing that there was a

11  less discriminatory alternative that also would've met that

12  business necessity and that we refused to adopt.

13         This interrogatory puts the cart before the horse

14  because it asks us to identify alternatives we considered that

15  met business necessity, right.  The way Your Honor is phrasing

16  it now is quite similar to that same problem of putting the

17  burden on Goldman to identify alternatives that were

18  considered that met business necessity and that would've been

19  less discriminatory, but it's plaintiffs who have to do that

20  in the first instance.

21         If Your Honor wants us to serve an interrogatory on

22  them that says, you know, identify the alternatives you

23  contend are less discriminatory and would have met our

24  business needs that we should've considered, you know, they

25  could answer that interrogatory and then we could answer the

1  interrogatory of whether we considered them.  But it's never

2  our burden to identify the less discriminatory alternatives,

3  it's their burden.

4           THE COURT:  Okay.  It doesn't mean an interrogatory

5  is not proper to be answered though.

6           MS. DAVIDOFF:  Well, I'm --

7           THE COURT:  I mean again it's a position, but even

8  more fundamentally it sounds like plaintiffs are saying, at

9  least as you have found out in this moment, that they have a

10  view that their burdens are different under the two statutes.

11           MS. DAVIDOFF:  It may be right for meeting and

12  conferring about that.  I don't quite understand the argument

13  they're making about this --

14           THE COURT:  Okay.

15           MS. DAVIDOFF:  -- in terms of the burdens being

16  different.

17           THE COURT:  But regardless of that whoever has the

18  burden, why isn't it sufficient to be able to answer, identify

19  any alternative to the three practices Goldman considered to

20  achieve its business necessity and for which Goldman also

21  considered the comparative impact on or treatment of men and

22  women.  That's just to identify what alternative practices, if

23  any, were considered.  Was there something other than

24  quartiling?  Was there something other than the 360 review?

25  Was the -- to me that's what it's asking for.

1          MR. KLEIN:  And, Your Honor, just on that point --

2          THE COURT:  Yeah.

3          MR. KLEIN:  -- if I could mention this.  It's likely

4   that they'll move for summary judgment or that one of the

5   parties may move for summary judgment.  So we're not even --

6   so at that point, right, it's a question of whether the

7   parties can establish that there are material issues of fact

8   that would not be susceptible to summary resolution.

9          THE COURT:  Right.

10          MR. KLEIN:  And, so we're entitled to discovery --

11          THE COURT:  Yes.

12          MR. KLEIN:  -- whatever they think of their merits.

13          THE COURT:  That's exactly my point that this is

14   just asking for information and it's not --

15          MR. KLEIN:  That's right.

16          THE COURT:  -- phrased in a sort of leading way, if

17   you will.  It's just saying what alternatives, if any, did you

18   consider?

19          MS. DAVIDOFF:  There's something built in here which

20   is identify any alternative that Goldman Sachs considered to

21   achieve its business necessity.

22          THE COURT:  Well, because I don't know what your

23   business necessity is, so.

24          MS. DAVIDOFF:  Right.  But that build -- and Your

25   Honor last time ruled that we didn't have to answer the

1   interrogatory about business necessity because that's a matter

2   of expert discovery and that would come later.  And so --

3          THE COURT:  But this is a different question.

4          MS. DAVIDOFF:  But we would have -- be having to

5   sort of assess the question of business necessity at this time

6   then.

7          THE COURT:  Well, to me this -- if your -- I assume

8   the business necessity was to have quality and effective

9   evaluation systems and promotion systems, et cetera, and here

10  are the systems you considered to do it.  And that's

11  really -- isn't that what this is getting at?  That's what I

12  think it's getting at.  I'm not sure what you're concerned

13  about.

14         Your business necessity was -- surely you can

15  identify your own business necessity.  What were you trying to

16  achieve?  What was the business necessity you were even having

17  these practices in place for?  So I think it can be answered,

18  so I'm going to require that it be answered --

19         MS. DAVIDOFF:  Okay.

20         THE COURT:  -- in that fashion.

21         MS. DAVIDOFF:  Thank you, Your Honor.

22         THE COURT:  All right.  There are two remaining --

23  no, there are three -- there are -- oh, there are four.  Okay.

24  So discovery extension and trial plan.  And the reason -- I

25  don't know if they really interact with each other too much.

63

1  I will tell you on the discovery extension I have no problem

2  with an extension of discovery.

3          I never do open-ended discovery extensions, so I'm

4  not going to do three months from the time Goldman finishes X.

5  I'm happy to issue right now a four month extension.  If for

6  some reason there's an essential need later on we can address

7  it then, but hopefully there will be no more.

8          MR. GIUFFRA:  Thank you.

9          THE COURT:  And let's see.  All right.  That takes

10  us to -- oh, and in terms of new discovery requests in my mind

11  you're always allowed to issue new requests that stem from new

12  information you've received via through new documents or

13  depositions.  So I'm not going to say you can't issue new

14  requests.  Of course, if it's more new stuff that you could've

15  asked earlier and isn't based on new information that's a

16  different story.

17          All right.  Trial planning.  Oh, Mr. Giuffra, you're

18  going to get some answers.

19          MS. DERMODY:  I'm sorry, Your Honor.

20          THE COURT:  I guess I'm not --

21          MS. DERMODY:  Just on the last comment you made --

22  I'm sorry to interrupt you --

23          THE COURT:  Yeah.  Please go ahead.

24          MS. DERMODY:  -- counsel.  Just in terms of the new

25  discovery piece --

64

1          THE COURT:  Yeah.

2          MS. DERMODY:  -- philosophically we don't disagree,

3    but there's one little issue which is depositions.  So we've

4    been trying to identify -- you know, we have like a big list

5    of key witnesses.  We're trying to narrow that down.  It's

6    informed by documents, obviously, and we're still getting

7    documents produced.  We're still fighting over some documents.

8          THE COURT:  Right.

9          MS. DERMODY:  So we might end up noticing a bunch of

10   depositions, you know, into the new discovery period.  It's

11   because of the work we're doing now to actually --

12         THE COURT:  Right.

13         MS. DERMODY:  -- identify them, but it will be a new

14   notice to them, but it's work stemming from this period.

15         THE COURT:  Yeah.

16         MS. DERMODY:  So I just want to make sure that when

17   we start noticing depositions in January we don't hear that

18   it's too late.

19         THE COURT:  That concept that you just described is

20   fine.

21         MS. DERMODY:  Okay.  Thank you, Your Honor.

22         THE COURT:  All right.  So trial planning, phase one

23   versus phase two.  I can answer this partially and then I can

24   tell you what won't be answered now.  So phase one will

25   include the liability on a classwide basis for discriminatory

1    treatment and impact caused by or associated with the three

2    processes which served as the basis for class certification,

3    i.e. quartiling, 360 reviews, and cross-ruffing.

4            Phase one will not include individual plaintiff

5    claims and defenses apart from application of the three

6    processes, will not include any boys club incidents, rather

7    only anecdotes for phase one will be those related to the

8    application and effect of the three processes.

9            And I just want to note on the boys club evidence of

10   course in the individual parts of this it's still possible

11   that, and maybe even likely, that boys club evidence might

12   come in for someone's individual claims.  They obviously have

13   claims about things that happened to them, but that's all the

14   more reason why it's not going to be done in phase one.

15   Damages and back pay, whether classwide or individual, also

16   not phase one, punitive damages, not phase one.

17           Other issues that I'm about to list are premature

18   and will be subject to expert reports, summary judgment,

19   motions in limine, and Judge Torres's pre-trial filings.

20   These include, among others, admissibility of non named class

21   member evidence, relevance and admissibility of comparators,

22   post 2016 process changes, how plaintiffs will prove

23   causation, and availability of injunctive relief in the

24   absence of certified class under 23(b)(2).  Questions?

25           MS. DERMODY:  Yeah, Your Honor.  So I'll start with

66

1    the named plaintiffs role in the phase one trial.  So as I

2    understand what Your Honor has said they will have a role.

3    They will be able to testify --

4              THE COURT:  Yep.

5              MS. DERMODY:  -- as to the application of the

6    processes to them?

7              THE COURT:  Yes.

8              MS. DERMODY:  Okay.  And then, Your Honor, in terms

9    of the back pay piece of it --

10              THE COURT:  Yes.

11              MS. DERMODY:  -- so when phase one is trying the

12    disparate impact claims as to processes from which experts can

13    derive a back pay number you will not have that back pay

14    number submitted to Judge Torres for her consideration?

15              THE COURT:  So -- well -- okay.  So the concern

16    there was why isn't back pay different for different

17    individuals?  How can that be determined on a classwide basis?

18    Isn't it going to depend on what that person's position was

19    and what their situation was, and what is their individual

20    back pay?  How is that determined on a classwide basis?

21              MS. DERMODY:  Sure, Your Honor.  So the way it's

22    been done in other cases is it's -- there's an aggregate back

23    pay award and then there's an allocation that happens --

24              THE COURT:  But --

25              MS. DERMODY:  -- subsequent.  So it's --

67

1          THE COURT:  -- what's it based on?  What's that back

2   pay work --

3          MS. DERMODY:  Because --

4          THE COURT:  -- based on?

5          MS. DERMODY:  Sorry, Your Honor.

6          THE COURT:  No, no, go ahead.  What's it based on?

7          MS. DERMODY:  It's based on the fact that you're

8   talking about a neutral practice applied to the class from

9   which you can see through data analysis what is the impact on

10  a classwide basis.  That won't tell you what the impact is on

11  an individual basis, class member to class member, but it will

12  tell you in the aggregate what the loss is to the class.  And

13  then in the allocation of that is something that is -- that

14  can be done at a subsequent remedial stage in terms of an

15  allocation process.

16          So the only different there really isn't a

17  difference about the jury's consideration necessarily,

18  although I think under New York City law that there's a open

19  question.  But certainly it's about whether the fact finder

20  allowed the disparate impact claim makes a finding as to both

21  liability and the back pay amount which can -- is the subject

22  of just, you know, an expert's report -- well, if it's

23  accepted.  They'd have done a different expert's.

24          If there was a liability finding the court might

25  have a different assessment than our expert of what that

68

1   number is.  But there would be expert analysis about that and

2   then the allocation, as I said, would be separate.

3             MR. GIUFFRA:  Your Honor, can I be heard?

4             THE COURT:  Of course.

5             MR. GIUFFRA:  You know, my neck is spinning from

6   what's gone on in this issue.  We had a hearing on December

7   20, 2018 and plaintiffs' counsel said no damages at phase one.

8   We had an order from Judge Torres October 7, individualized

9   issues such as damages will be separately considered phase

10  two.

11            Now, Your Honor just said damages is not in phase

12  one including back pay.  And we've laid out in some detail

13  while under Wal-Mart.  You can't get back pay in phase one

14  plus there had been amendments to Title VII that have talked

15  about individualized ascertainment of damages.

16            We need to obviously know what's in phase one.  So

17  we appreciate Your Honor's order and this just has to end.  No

18  back pay, no punitive damages, no computerized generated

19  numbers, nothing running around to a jury about, you know,

20  with some big judgment.  It's all going to be done in phase

21  two.

22            That's what the law is.  It's not -- maybe in some

23  case in 2011 or 1965 or 1985 or 19-you know-95, but in this

24  case with the law that currently exists no damages in phase

25  one.  And I think we just need to be clear about it because we

1   need to sort of put this issue to the side.

2          As I understood what Judge Torres did in class

3   certification it was about presumption shifting.  But it's --

4   the cases are going to be litigated in phase two on an

5   individualized basis, not in some, you know, aggregate award

6   that Mr. Dermody, you know, would like to get that's generated

7   by some computer.

8          And it wouldn't -- it would not apply in this kind

9   of a case anyway.  It's not a test case where someone took a

10  test and, you know, they either did or didn't get a job.  It's

11  a very complicated situation and from beginning of the case

12  they have wanted to get something they're not entitled to and

13  we need to put an end to it.

14         MS. DERMODY:  Your Honor, if I could, there's been a

15  lot made of a comment that my colleague, Ms. Geman, made in a

16  hearing about damages.  And I think the confusion comes from

17  the fact that disparate treatment talks about damages and

18  disparate impact talks about back pay.  And we have never

19  contended that disparate treatment damages would be tried in a

20  phase one of any class trial.  We agree completely with Mr.

21  Giuffra.  So we have one thing in agreement.

22         What we disagree about the placement of disparate

23  impact back pay findings.  And so we believe that there hasn't

24  been a case that has deferred those into a phase two.  It

25  doesn't make any sense to do that.  The allocation is

1  something that could be continued after the liability and back

2  pay finding is made.  But those things traditionally have

3  always been done in one class trial and <u>Wal-Mart</u> says nothing

4  about that.  It doesn't -- it didn't change Title VII.

5          THE COURT:  Yeah, but in those cases did they have

6  separate phase two for individual claims?

7          MS. DERMODY:  Yes, if they were disparate treatment

8  cases.  Yes.  That's the teamsters model which is when you

9  have a case involving those types of damages then, yes, you

10  have a subsequent -- a phase two.  And I think that that makes

11  sense when you're talking about things like compensatory

12  damages or, you know, issues of hostile work environment at

13  large not when you're talking about whether you were paid the

14  same as the person next to you with the objective

15  characteristics.

16          MR. GIUFFRA:  Your Honor, I mean, this has got to

17  end.  I mean I think you've entered an order that says back

18  pay, punitive damages, compensatory damages all goes into

19  phase two including for the named plaintiffs because otherwise

20  this will never end.  And --

21          THE COURT:  What will never end?

22          MR. GIUFFRA:  Well, we won't know -- we won't know

23  what's going to happen in phase one trial.

24          THE COURT:  Oh, I'm sorry.  Okay.  I thought you

25  meant -- yeah.

1        MR. GIUFFRA:  As I understood the whole purpose of

2   phase one trial it was going to be about -- it was going to be

3   about burden shifting.  That was the purpose of it.  As I

4   understand the teamster's process and I understand what was

5   happening here if there's a disparate impact shown, then if we

6   try the case against Ms. Chen-Oster in phase two she gets a

7   presumption of 50.1 percent and then we'd litigate the

8   question as to whether the process was applied against her in

9   her particular circumstances in a -- in a way that was -- had

10  some disparate impact on her and it was disparate treatment.

11  And that would all get dealt with in individualized

12  proceeding.

13        What they are looking for is something they're not

14  entitled to and it needs to end.  You know, one point of

15  clarification.  Again, phase one is not about liability being

16  determined on a classwide basis.  It's about burden shifting.

17  Because under Title VII that's all that can be done in a phase

18  one trial in a disparate impact case.

19        You can't have liability findings.  If they want to

20  claim that there are let's brief it.  It's like many things in

21  this case.  I mean we have -- you know, we put in an appendix

22  listing all the different changes of positions by the

23  plaintiffs, what they sought of class certification, what they

24  sought midway through the case, and at some point it needs to

25  end.

1            And, you know, candidly I think they're just going

2   to keep coming back, keep coming back trying to get something

3   they're not entitled to and that's why we've asked for this

4   order.  I think we just got the order, but even then, you

5   know, we're getting re-argument on the order.

6            THE COURT:  Well, we're discussing it.

7            MS. DERMODY:  That's funny.  Yeah, I would say

8   everything that Mr. Giuffra has said about the phasing of a

9   class trial and a Title VII disparate impact is reversible

10  error.  It's wrong.  It's just dead wrong.

11           MR. GIUFFRA:  Well --

12           MS. DERMODY:  And, so there's not going to be a

13  phase one that gives a presumption to 3,000 women to come in

14  with a presumption in phase two.  No, there's going to be a

15  class liability finding about the policies and there's going

16  to be a back pay award.  And then phase two is going to be

17  about the entitlement under disparate treatment analysis of

18  women with individual defenses raised by Goldman.  That is

19  Title VII.  That's what -- that's what Judge Torres laid in

20  the class cert. order.

21           THE COURT:  Yeah.  Don't worry.  In terms of that

22  issue of is it just a shifting burden or is it full liability

23  on impact that'll be something determined by Judge Torres when

24  it comes time for pre-trial filings or post trial.  My

25  question for you, Ms. Dermody, is in terms of back pay, and I

1   think you said there'll be experts which of course I would

2   assume there would be, but will it be purely essentially the

3   expert testimony and reports that determines what the back pay

4   is?

5           MS. DERMODY:  Yes, Your Honor.  It'll be -- we would

6   look at their own compensation database.  We would run a

7   regression analysis just like the model to show commonality

8   about.

9           THE COURT:  Okay.  No, you've answered --

10          MS. DERMODY:  And it's applied to the amount of

11  money it's made and the amount of money it's lost --

12          THE COURT:  Right.

13          MS. DERMODY:  -- and that gives you a number.

14          THE COURT:  Okay.  But that can just as easily be

15  done at phase one or phase two.  I understand it has been done

16  many a time while the jury is out and the -- a judge is

17  considering it.  I will -- on that particular issue I'm just

18  going to go back.  I know you don't want me to.  I'm not

19  changing it right now.  I do want to think about it for a day

20  or two and I actually -- I do want to run that one by Judge

21  Torres, so.

22          MR. GIUFFRA:  Your Honor, could I just be heard for

23  one second?

24          THE COURT:  Yeah, you can be heard.  Sure.

25          MR. GIUFFRA:  Look, this is an important issue.

74

1          THE COURT:  Yeah.

2          MR. GIUFFRA:  It needs to be addressed and we

3    actually proposed doing was to brief the issue, but, Your

4    Honor, if you look at <u>Wal-Mart</u> at Page 564,366 it says that

5    the employer is entitled to an individual determination of

6    each employee's eligibility for back pay.  What they want to

7    do is have some computer generate some number.  There could be

8    people in this class who benefitted from the process --

9          THE COURT:  I hope the experts are using computers

10   and not just doing it manually.

11         MR. GIUFFRA:  I hope so too, but the point is,

12   number one, it needs to be resolved because we need to know

13   what the issues are at phase one.

14         THE COURT:  Yeah, look, I don't think it's going to

15   change from what I said because not accepting that <u>Wal-Mart</u> is

16   everything, but just the general point that because there are

17   going to be very individualized claims here on damages it will

18   make sense to have back pay determined in connection with

19   that.  Whether it gets done by -- and it'll -- you know,

20   you'll still be able to submit the expert reports and have it

21   considered at that time.  That's really the only difference.

22         MS. DERMODY:  Well, and, Your Honor, if I could just

23   say --

24         THE COURT:  Yeah.

25         MS. DERMODY:  -- I think that this an issue that

1  this particular issue of when the back pay award is decided

2  itself could be decided at trial because the expert analysis,

3  the merits reports they add three tables or two tables --

4          THE COURT:  That's precisely why I just want to go

5  back on that issue and see if that's what may occur.  But --

6          MR. GIUFFRA:  Your Honor, we're open -- okay.  Our

7  position is the Title VII amendments bar what they want to do.

8          THE COURT:  Right.  Right.

9          MR. GIUFFRA:  And they can't cite a case post those

10  amendments, post <u>Wal-Mart</u> which does what they want to do.

11          THE COURT:  Right.

12          MR. GIUFFRA:  The case they cited was <u>Novartis</u>.

13  It's completely not on point.

14          THE COURT:  Right.  I'm not making a ruling on that.

15          MS. DERMODY:  But, Your Honor, Title VII got amended

16  as to disparate treatment damages not as to disparate impact.

17          THE COURT:  Okay.

18          MS. DERMODY:  So Title -- I mean the riddle answers

19  itself.

20          THE COURT:  But you all said it before which is --

21  well, and I said it.  That is an issue that's going to be

22  decided by Judge Torres.  You think it's not even appropriate.

23  But in terms of the individualized issue I am going to have to

24  have thought about just a little more and I will include it in

25  an order.

 1              MR. GIUFFRA:  Yeah, but --

 2              MS. DERMODY:  Thanks, Your Honor.

 3              MR. GIUFFRA:  -- again, Your Honor, let me just

 4    raise another question just for clarification.

 5              THE COURT:  Yep.

 6              MR. GIUFFRA:  Now, with respect to the named

 7    plaintiffs am I correct that, you know, Judge Torres said that

 8    all we're dealing with in phase one is generalized proof in a

 9    most recent order.  Their claims, which are highly

10    individualized, pregnancy discrimination, things -- someone

11    not getting transferred from Miami, those are phase two

12    issues, correct?

13              THE COURT:  Yes.

14              MR. GIUFFRA:  Okay.  And then in terms of -- in

15    terms of injunctive relief, which Your Honor said was going to

16    be pushed off, we do think there is an important issue that

17    should be briefed.  Again, they made the election not to seek

18    injunctive relief.  They abandoned it.

19              THE COURT:  I'm not saying it won't be briefed, just

20    saying it's not going to be dealt with now.

21              MR. GIUFFRA:  But the only reason why I think it's

22    important --

23              THE COURT:  Okay.

24              MR. GIUFFRA:  -- to deal with it now is we need to

25    know in terms of fact discovery and experts are we looking at

77

1  some sort of a classwide injunctive relief claim in a (b)(3)

2  class action.  And unless we --

3          THE COURT:  Well, we don't have a (b)(3) class

4  action, that's for sure.

5          MR. GIUFFRA:  Oh no, we do have.  That's --

6          THE COURT:  I'm sorry, (b)(2).

7          MR. GIUFFRA:  -- we don't have a (b)(2) class

8  action.  And, you know, there are may cases that make it quite

9  clear that unless you're seeking an injunction you can't get

10 injunctive relief.  That's why --

11         THE COURT:  Right.  No, I understand.  There's

12 disagreement on this.  You're saying better to get it resolved

13 earlier because of discovery and planning.  Ms. Dermody, do

14 you have any problem with it getting decided earlier rather

15 than later?

16         MS. DERMODY:  I do because we've got -- I'm sorry,

17 Your Honor.  That's really loud.  We have a schedule for

18 decert. and summary judgment and all of that and this is just

19 loading this -- these arguments that we talk about well,

20 things will never die, into this phase.  I think we -- Your

21 Honor a year ago had a sense of the proper order and we

22 should, you know, oblige Your Honor's instincts on that.

23         I also am just worried about the working the ref

24 situation here on the injunctive relief.  Title VII has a

25 remedy for injunctive relief.  It's in the complaint.  It's in

78

1   our case now.  It's still in our case.  We've never had a

2   summary judgment against the remedy.

3          We got a class certified for damages under the

4   process that Wal-Mart requires because of the notice to the

5   class and the manageability of the case.  But that doesn't

6   extinguish a remedy in the case.  And if we get a liability

7   finding at phase one that says these practices were illegal,

8   they discriminate against women, an injunction is one of the

9   remedies that flows under Title VII that's still in the case.

10          So all of this strikes me as a lot of, like, puffing

11  about ultimately nothing.  And we should put it in the place

12  it deserves in the case which is when we deal with decert. and

13  summary judgment.

14          MR. GIUFFRA:  Your Honor, respectfully, I think it's

15  front and center in the case.  And we spent a lot of time

16  about, you know, some of the discovery issues here, but unless

17  something like is there an injunction still possible in a

18  (b)(3) class action where they've abandoned their claim for an

19  injunction under (b)(2).  That's a legal question.  There's

20  certainly enough lawyers on both sides to brief that legal

21  question.

22          THE COURT:  Well, it will be briefed at some point.

23          MR. GIUFFRA:  And -- but it needs to be briefed now

24  because, you know, what kind of an injunction are they

25  seeking.  She keeps talking about classwide liability after

1 phase one.  There is no phase one classwide liability finding.

2 It's about a presumption shift.  And that issue --

3          THE COURT:  I know.  I know that's your position.

4 I'm not taking any position on that right now.  The ref feels

5 equally pummeled on both sides, so no worries.  All right.

6          MR. GIUFFRA:  But I -- but Your Honor --

7          THE COURT:  Yeah.

8          MR. GIUFFRA:  -- I hardly see -- you know, if each

9 side put in a brief of, say, 15 pages on this issue -- I mean,

10 Ms. Dermody loves to say oh, it's clear Title VII law.  And

11 then we look at the cases she cites and they're completely not

12 on point.  And so let's brief it.

13          We're ready to leap to -- I actually thought what we

14 would do today is -- and I'm glad you've resolved some of the

15 issues, but we're happy to brief these issues because unless

16 we know what's happening in phase one we don't know what fact

17 witnesses we need, we don't know what expert witnesses we

18 need.

19          And part of the problem is they have a conception of

20 phase one that they can just throw everything into the kitchen

21 soup, into the -- I guess that's not the right expression,

22 maybe it is -- and that -- and that -- or to a giant pot --

23          THE COURT:  If it's my child, it's accurate.

24          MR. GIUFFRA:  -- of stew -- into a stew and just

25 spin it --

1        THE COURT:  Right.

2        MR. GIUFFRA:  -- and then we get some judgment,

3   that's not what the law allows particularly in a case like

4   this one.

5        Everyone has said this is a case which is -- there's

6   -- you can't point to a case like this one.  I keep asking

7   them to cite one that's like it.  So we need to deal with

8   these rules of the road issues before we shut down discovery

9   so we know what's going to happen.

10        I don't want to appear at a trial before Judge

11   Torres and then suddenly find out it's a completely different

12   case than what we all thought it was and what discovery we

13   took and what fact and what experts we put forward.  It's just

14   it's not fair and we're just putting error into the record.

15   Let's get it resolved now.

16        THE COURT:  I'm glad you both think that there's

17   error either path I take.  That --

18        MS. DERMODY:  Your Honor, we just --

19        MR. GIUFFRA:  I think -- I suspect both sides will

20   think there are.  Who's right, you know, we'll see.

21        MS. DERMODY:  You know, the --

22        THE COURT:  Right.

23        MS. DERMODY:  -- court in the Vulcan case dealt with

24   these things in phases and including the injunctive remedy

25   happened after the class trial.  So there is no need to front

1  load like what will the injunction look like two years from

2  now or whenever.  I mean the court will decide it.

3          THE COURT:  No, those injunctions are always dealt

4  with on briefing afterwards.

5          MS. DERMODY:  Yes.

6          MR. GIUFFRA:  And, Your Honor, again, proving my

7  point, the Vulcan case as I best recall is a test case.

8  Clearly not something as complicated as the Goldman Sachs

9  multi-factor processes.

10          THE COURT:  Every case is different.

11          MR. GIUFFRA:  Plus, Your Honor, I believe there was

12  a -- I believe there was a claim under (b)(2) for an

13  injunction in the Vulcan case.

14          THE COURT:  Okay.

15          MR. GIUFFRA:  And so that's the legal question that

16  I think is --

17          THE COURT:  No, it's a good question.

18          MR. GIUFFRA:  -- before the court which is, you

19  know, they made the decision to abandon their (b)(2)

20  claim --

21          MS. DERMODY:  We did not do that.

22          MR. GIUFFRA:  -- so -- I think you did.  You

23  abandoned it.  At least I think there's court papers that say

24  that.  You withdrew your motion.  So that has to have some

25  consequence.  It's not like you can just use (b)(3) to get an

82

1   injunction.  Why do people move under (b)(2) then?  And I

2   think part of the problem is they made the decision to abandon

3   their claim for injunctive relief.

4          So our request, Your Honor, is let's brief the

5   issue.  Let's get Your Honor to decide it.  There's -- you

6   know, this is not a -- we're not asking for a hundred pages.

7   Fifteen pages, both sides and Your Honor gets the benefit of

8   it and can make a ruling.

9          THE COURT:  I understand the request.  It'll be

10  taken under advisement.  On -- let's see.  Oh, the last issue

11  I have are the status reports and other filings.  And I did

12  sort of -- I did indicate that 25 pages was what I was

13  shooting for as a max without saying it hard and fast.  I'm

14  not going to litigate who's responsible for undue length.

15         I do agree that the rehashing of the trial issues

16  was somewhat gratuitous, could've just referred back to the

17  prior status reports and positions.  Nonetheless, parties

18  should just be careful about the limits.  I have no problem

19  though with exhibits and charts and lists that are really sort

20  of just summaries of data or similar type of information.  If

21  it's just rehashing of arguments, no, we don't do that.

22         All right.  That's what I have on my list based on

23  the status report.  Is there anything else from the plaintiff?

24         MS. DERMODY:  Should we schedule another get

25  together, Your Honor?

83

1          THE COURT:  Yes, we're going to have to do that

2   separately when my deputy is back tomorrow.  She will reach

3   out.

4          MS. DERMODY:  Okay.

5          THE COURT:  And -- I know.  Yeah.  I'm going to ask

6   about that.  Wait.  Before you go just let me ask you so we're

7   going to talk to -- we'll resolve a date, did you have

8   anything else?

9          MS. DERMODY:  No, Your Honor.  Thank you.

10         THE COURT:  Okay.

11         MS. DAVIDOFF:  Your Honor, just in light of the fact

12  that Your Honor has twice rephrased interrogatories from

13  plaintiff we wanted to ask if it might be possible for Goldman

14  Sachs to have some additional interrogatories to serve on

15  plaintiffs.

16         THE COURT:  This is just dealing with one that was

17  an issue about not being answered and finding a way to stay

18  it.  This isn't about issuing all sorts of new

19  interrogatories.  Are you --

20         MS. DAVIDOFF:  We --

21         THE COURT:  -- have you used up your

22  interrogatories?

23         MS. DAVIDOFF:  -- have, Your Honor.  And typically

24  when an interrogatory is objected to and not responded to as

25  some of ours were that still counts as an interrogatory.  So

84

1   we hoped that --

2          THE COURT:  Was this among those -- well, was what

3   you had in mind among those that were responded to and not

4   answered -- but not answered?

5          MS. DAVIDOFF:  Pardon, Your Honor?

6          THE COURT:  What were -- was what you have in mind

7   something that wasn't answered in a previous interrogatory or

8   is it a whole new interrogatory?

9          MS. DAVIDOFF:  You know, we hadn't zeroed in on

10  that.  It just seemed like another two interrogatories might

11  be appropriate in the light of the fact.

12         THE COURT:  Talk about it with your adversaries, see

13  if they are amenable to it because it might actually make

14  things efficient and it might make things clear.  It could be

15  useful.  And we'll take it from there.

16         MS. DAVIDOFF:  Thank you, Your Honor.

17         THE COURT:  Okay.  Anything else from the

18  defendants?

19         MR. GIUFFRA:  Not that I can think of.  You may not

20  see us till next year.

21         THE COURT:  Oh, so we're going to talk about date,

22  but I also want to talk about a date, which may be the same,

23  for oral argument of the two motions that are pending.  We

24  could do that as part of the next time we meet, but I agree

25  that for status purposes we're not going to meet till January

85

1    and perhaps we'd be able to squeeze it in December.

2            You're all pulling out your calendars, but I'm going

3    to have to have my deputy confer and check my calendar as

4    well.  Is there any distinct preference among parties as to

5    whether it take place as a separate event in December or be

6    done in conjunction with our next status conference?

7            MS. DERMODY:  No, Your Honor, not on our side.  I

8    think we just need to know the dates.

9            THE COURT:  Yes.

10           MS. DERMODY:  It might affect that choice.

11           THE COURT:  Of course.

12           MR. GIUFFRA:  Yeah, I think January would be fine,

13   Your Honor.

14           THE COURT:  Okay.  All right.  So we will arrange it

15   and we'll take care of it.  I want to say everyone who argued

16   did an excellent job and I really appreciate the fact that you

17   are spreading the wealth in terms of the many issues.  I think

18   it's great and it's great giving people responsibility and

19   it's nice to see.  So everyone be well and --

20                        * * * * *

21

22

23

24

25

86

1      I, Shari Riemer, certify that the foregoing is a court

2  transcript from an electronic sound recording of the

3  proceedings in the above-entitled matter.

4

5                          *Shari Riemer*
   _____

6                              Shari Riemer, CET-805

7  Dated:  November 21, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25