**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

H. CRISTINA CHEN-OSTER; SHANNA      :
ORLICH; ALLISON GAMBA; AND MARY DE      :
LUIS,      :
     :
                       Plaintiffs,   :
     :   10 Civ. 6950 (AT) (RWL)
v.      :
     :
GOLDMAN, SACHS & CO. and THE GOLDMAN   :
SACHS GROUP, INC.,      :
     :
                       Defendants.   :
     :

------------------------------------------------------------ x

**JOINT STATUS REPORT**

       In accordance with the Court's October 3, 2019 Order (ECF No. 870), the parties submit

this Joint Status Report in advance of the January 23, 2020 Status Conference. The parties'

respective sections follow.

**PLAINTIFFS' POSITIONS**

I.    **PRIVILEGE LOGS**

    A.    **Redaction of Confidential Supervisory Information**

      More than a month after this Court ordered Goldman to redact and produce as redacted all "[d]ocuments withheld by Goldman solely on the basis of confidential supervisory information" ("CSI") (ECF No. 912, ¶1), Goldman has yet to submit redactions to the Federal Reserve for 350 documents it withheld solely on that basis,[1] none of which include Federal Reserve regulators[2] (and almost all of which do not include attorneys as senders or recipients). Goldman has instead elected to wait for the Federal Reserve to complete review of six previously-submitted documents (a review expected to be completed any day now), purportedly so Goldman can apply learnings from that experience to CSI-related redactions on the remaining 350 documents.  ECF No. 915.  At this rate, it could be months before Goldman complies with the Court's Order.  As this Court previously recognized, "this [privilege log] issue has been going on for a while."  Nov. 19, 2019 Conf. Tr. at 6:1-2.  Plaintiffs respectfully request that the Court order Goldman to review the Federal Reserve's feedback on Goldman's proposed redactions over the six documents already submitted and produce the 350 documents previously

---

[1] Goldman similarly redacted at least 213 documents solely on the basis of CSI, and Goldman appears to be planning to re-review these as well with the benefit of the Federal Reserve's guidance.

[2] Plaintiffs do not concede that this Court's authority to manage discovery is superseded by Federal Reserve regulations concerning disclosure of confidential supervisory information.  *See, e.g.*, *In re Bankers Tr. Co.*, 61 F.3d 465, 470 (6th Cir. 1995) (holding that "Congress did not empower the Federal Reserve to prescribe regulations that direct a party to deliberately disobey a court order, subpoena, or other judicial mechanism requiring the production of information"); *In re Vescio*, 208 B.R. 122, 127 (Bankr. D. Vt. 1997) (refusing to "subvert judicial autonomy and efficiency by elevating Fed's rules above our own [Federal Rules of Civil Procedure]"); *Merchants Nat'l Bank & Trust Co. v. United States,* 41 F.R.D. 266, 268 (D.N.D. 1966) ("While the statute gives the Secretary the right to restrict disclosure, judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers.").

withheld solely on the basis of CSI with the CSI redacted by January 28, 2020, or within five days of receiving the Federal Reserve's response on redactions, whichever is later.

In addition to the 350 documents withheld solely on the basis of CSI, Goldman has withheld at least 127 documents on the basis of both CSI and attorney-client privilege or work product. Plaintiffs request that the Court order Goldman to review these documents promptly and determine whether withholding for privilege would still be appropriate if CSI information were redacted. If Goldman maintains that withholding for privilege is still appropriate, Goldman must amend its privilege log to clarify the applicable privilege asserted. If Goldman no longer asserts privilege to documents once the CSI-related information is redacted, Goldman should be required to produce all such redacted documents by January 28, 2020, or within five days of receiving the Federal Reserve's response on proposed redactions of the six documents already submitted to the Federal Reserve, whichever date is later.

Because Goldman has rejected Plaintiffs' attempts to meet and confer over these concerns, this issue is ripe for the Court's intervention.

**B.      Gaps in Goldman's Identification of Listserv Members**

Pursuant to this Court's December 2, 2019 Order (ECF No. 888), Goldman was ordered to provide the identities of all authors and recipients on ten listservs of Plaintiffs' choosing. Among other deficiencies, Goldman represented that Goldman was unable to "reconstruct[] the recipient information" for "2006diversitytaskforce@ny.email.gs.com," and instead provided the membership of the 2006 Diversity Task Force rather than for what may be a much larger listserv, arguing in conclusory fashion that it is "likely the same as the listserv membership." Ex. 1, Goldman's Dec. 24, 2019 Ltr. at 1. Goldman also conveniently speculated that attorney Arline Mann, who served as counsel to the 2006 Task Force, was "likely a member of the listserv," (Appendix A to Goldman's Dec. 24, 2019 Ltr. at 1), a claim Ms. Mann does not

attest to in her sworn testimony (ECF No. 925-1).  As Plaintiffs explained in their January 10, 2020 letter, the evidence contradicts Goldman's self-serving claim that the 2006 Diversity Task Force was in the business of legal compliance, instead showing that the Task Force developed diversity and inclusion programming to promote diversity objectives, a business goal.  Pls'. Jan. 10, 2020 Ltr., ECF No. at 927 1-2.  The membership of the listserv is not "irrelevant."  *See infra* at 26.  Goldman's failure to identify listserv members falls short of its obligation to "provide the identities of all authors and recipients" (ECF No. 888, at 1), and fails to meet Goldman's burden to show that it preserved confidentiality "by limiting dissemination only to employees with a need to know."  *Bank of New York v. Meridien Biao Bank Tanzania Ltd.*, No. 95 Civ. 4856 (SS), 1996 WL 474177, at *2 (S.D.N.Y. Aug. 21, 1996).  Where, as here, "the recipient(s) at an e-mail address cannot be adequately identified, it is impossible to determine whether the privilege is properly asserted."  *Acosta v. Target Corp.*, 281 F.R.D. 314, 320 (N.D. Ill. 2012).[3]  As such, while Plaintiffs welcome Goldman's offer to provide information for an additional listserv to remedy the deficiencies in its December 24, 2019 Letter, it remains clear that Goldman cannot meet its burden to show that every person had a "need to know" where communications were sent via a listserv for which Goldman is unable or unwilling to adequately identify the members. The Court should reject any assertion of privilege here.[4]

---

[3] *See also ePlus Inc. v. Lawson Software, Inc.*, 280 F.R.D. 247, 253–56 (E.D. Va. 2012), *enforcement granted in part, denied in part,* No. 3:09CV620, 2012 WL 6562735 (E.D. Va. Dec. 14, 2012) (finding that Defendant waived privilege with respect to entries listing distribution list as a recipient, since whether the recipients had a "need to know" the communication was unclear).

[4] Goldman cites a series of unpublished decisions to claim that courts routinely "uphold privilege logs that do not identify the individual members of each listserv."  *See infra* at 26, n.21.  But those cases merely found privilege logs adequate without making any reference to the single mailing lists included, which the plaintiffs there did not challenge.

### C.     Goldman's Re-Review of Improperly Withheld Documents

On December 17, 2019, the Court ordered Goldman to undertake "efforts to identify all other improperly or errantly withheld documents" due to concerns that a "substantial percentage – from a relatively small sample – of documents initially withheld by Goldman on the basis of privilege ha[d] been determined by Goldman to have been 'inadvertently withheld' due to 'vendor errors.'"  Dec. 17, 2019 Order, ECF No. 912 ¶ 2.  While Goldman had dismissed these concerns, arguing that "[t]here is no basis for a wholesale re-review of thousands of documents" (Goldman's Dec. 16, 2019 Ltr., ECF No. 909), the Court found "good reason to believe that there are additional documents among the thousands remaining on Goldman's privilege logs that should have been produced in whole or in part," and noted that Goldman's efforts could "entail a wholesale review of its privilege log entries or some other method" (ECF No. 912 ¶ 2).

On January 13, 2020, Goldman filed a letter with the Court describing its process in re-reviewing a sample of the documents on its privilege logs.  Goldman's Jan. 13, 2020 Ltr., ECF No. 930.  While Plaintiffs will separately file a letter response to Goldman's filing (and in particular to respond to the adequacy of Goldman's purported re-review), Plaintiffs note major issues arising even as to Goldman's partial re-review of 3,190 documents (out of 7,773 entries) of withheld or redacted documents in Goldman's merits privilege logs.[5]  ECF No. 930.  Because Goldman logs "document families" with multiple documents under each log entry, it is unclear how many log entries Goldman reviewed, or if Goldman even reviewed all documents associated

---

[5] Goldman also partially reviewed an undisclosed amount of documents from 780 entries from its class certification privilege logs, the vast majority of which were categorical entries covering an unknown number of individual documents.

with a single log entry from the merits logs.[6]   But regardless, Goldman concluded that it had

improperly withheld 1,124 of the 3,190 documents sampled for review from its merits logs, or

more than 35%.[7]   *Id*.   Despite Goldman's attempts to disguise miscommunication with counsel

and lapses in quality control as "technical vendor errors," most of these errors were caused by

overzealous defense counsel and not an outside vendor.   *Id.*   This high error rate, along with

other deficiencies to be described in Plaintiffs' forthcoming letter, confirm that Goldman

systematically over-designated and withheld thousands of relevant documents from production.[8]

Because, as Goldman admits, its re-review "targeted the vendor and reviewer errors" identified

in the documents selected for *in camera* review and not the broader population of withheld

documents (*infra* at 28), Plaintiffs respectfully submit that it is imperative that Goldman re-

review its entire privilege collection promptly.

       In addition, Goldman's privilege logs still include 1,224 documents that Goldman

no longer holds to be privileged.[9]   However, due to Goldman's practice of combining numerous

documents under single log entries,[10] Plaintiffs are unable to determine which log entries

---

[6] This highlights how Goldman's practice of logging "document families" within a single entry may mask an untold number of documents, making it difficult for Plaintiffs to challenge its privilege assertions.

[7] This includes 38.46% of documents reviewed due to "vendor error," 26.47% of documents reviewed due to "reviewer error," and 8-10% of documents reviewed from other samples of documents.

[8] At the same time that Goldman conveniently asserts that no inferences may be drawn from the errors identified in the documents selected for *in camera* review because that sample is not representative, it asserts its confidence that "there are no systemic issues with the remaining documents on their privilege logs" based on random samples of 100 and 30 documents with an overturn rate of 8-10%.  ECF No. 930, at 5.

[9] Goldman will de-designate additional documents by January 20, 2020. ECF No. 930, at 5-6.

[10] As became clear during the *in camera* review process, Goldman's log contains log entries with multiple different "document families" reflecting different authors, recipients, dates, type of document, and content under a single log number.

correspond to these de-designated documents.  Plaintiffs respectfully request that the Court order Goldman to produce revised logs identifying (1) whether each entry has been de-designated in full or in part, and (2) the Bates number of each de-designated item.[11]

## II.      GOLDMAN'S REQUEST FOR 25 ADDITIONAL INTERROGATORIES

Goldman requests leave to serve a sweeping set of twenty-five additional interrogatories, in addition to the twenty-seven it has already served.  These interrogatories are not justified by any discovery need, are cumulative of Goldman's prior interrogatories, and prematurely seek information that will be included in written expert reports and deposition testimony.  For these reasons and as further stated below, Plaintiffs respectfully request that the Court deny Goldman's request and grant Goldman leave to serve no more than the two additional interrogatories agreed to by Plaintiffs.

### A.      Background to Goldman's Request

Goldman has served at least 27 interrogatories to date.[12]  Of the interrogatories already served, 20 asked how and whether Plaintiffs contend that the challenged performance evaluation, promotion, and compensation policies and practices were discriminatory and had a disparate impact on Class members, and the rest requested information on Plaintiff Chen-Oster's communications, Plaintiff Gamba's tax filings, and calculation of Class damages.  *See generally* Pls.' Ex. 2 (Goldman's Interrogatories).

---

[11] Plaintiffs are not necessarily demanding "separate entries for each member of 'document families'" at this time (*infra* at 28), though it is clear the logs as constructed are incomplete and opaque at best.  At minimum, Goldman should be required to identify the number of documents contained within each log entry.  In addition, Plaintiffs request that Goldman identify all log entries impacted by their de-designations and amend the log if the de-designation affects the information reported.

[12]  Goldman mischaracterizes the discovery record by repeatedly stating that Plaintiffs "fail[ed] to answer" many of its prior interrogatories.  In reality, Plaintiffs objected, the Parties litigated those objections, and the Court ruled that certain of Goldman's interrogatories were "flawed" and were "therefore disallowed."  ECF No. 207 at 3-4.

At the November 11, 2019 status conference, Goldman's counsel requested leave to serve "another two interrogatories"—which would increase its total number of interrogatories to 29. Nov. 11, 2019 Hr'g Tr. at 84:10-11. Rather than granting that request, the Court asked Goldman's counsel to describe the subject matter of the interrogatories and the basis for them, and counsel at that time responded that "[y]ou know, we hadn't zeroed in on that." *Id.* at 84:9-10. The Court then instructed Goldman to confer with Plaintiffs regarding whether the two proposed interrogatories "might actually make things efficient" and "clear" and would be "useful." *Id.* at 84:12-15.

Following the status hearing, Goldman asserted that it actually sought *not 2 but 25* additional interrogatories. Given the Court's guidance that the parties engage in a substantive discussion about the proposed interrogatories, Plaintiffs asked Goldman to provide a description of each proposed interrogatory or the text itself, as well as a justification for why the additional interrogatories are consistent with the requirements of Rule 26(b)(1)-(2), as required by Rule 33. After initially refusing Plaintiffs' request, Goldman acquiesced in part by providing the text for 21 of the 25 proposed interrogatories. The text of these 21 interrogatories confirms that Goldman seeks information substantially overlapping with its prior requests—*i.e.*, regarding how Plaintiffs contend the challenged policies and practices are discriminatory and have a disparate impact or meet the elements of Title VII. *See* Ex. 3 (Goldman's Proposed Interrogatories). Goldman offered no description or explanation for the remaining four proposed interrogatories.

All told, Goldman seeks to increase its total interrogatories to at least 52.

**B.     Goldman's Request for Twenty-Five Additional Interrogatories Is Not Justified**

In order to be permitted leave to exceed Rule 33's interrogatory limit, Goldman's proposed new interrogatories must be "consistent with Rule 26(b)(1) and (2)," and the Court must therefore consider whether Goldman "has had ample opportunity to obtain the information

by discovery in the action" and whether the new requests are relevant and proportional, or seek information "unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(1)-(2). Based on the text of the proposed interrogatories shared by Goldman, the Court should conclude that there is no justification consistent with Rule 26 for such an enormous expansion of the discovery limit.

*First*, there is no actual discovery need for the proposed interrogatories. Goldman has not explained why these requests, which nearly all require expert evidence, are not better addressed by the robust months-long expert discovery process in the coming months, or, to the extent they arguably seek factual information, why they cannot be addressed by the other discovery devices available to it under the Rules. For example, Goldman recently served *116* Requests for Admission on similar and overlapping issues, which may eliminate the need for some or all of the interrogatories. Further, Goldman's proposed additional interrogatories are not informed by any new information or discovery development in the intervening years since it reached Rule 33's interrogatory limit—as might justify additional, tailored interrogatories above the limit. Confusingly, when Plaintiffs asked Goldman to provide any such justification, which was not apparent on the face of the proposed interrogatories, Goldman refused.

*Second*, to the extent Goldman's proposed requests seek non-expert evidence, they are cumulative of its prior requests that Plaintiffs answered, and under Rule 26(b)(2) should be disallowed on this basis as well. As stated above, Goldman already served nearly twenty interrogatories exploring Plaintiffs' contentions regarding whether and how the challenged policies and practices discriminate against Class members, through intentional and unintentional discrimination. For example, Goldman's Interrogatory No. 2 asked: "For any period between July 7, 2002 and the present, do You contend that individual managers at Goldman Sachs have purposefully and commonly discriminated against women with respect to administering, participating in, or influencing their annual 360-degree performance reviews?" Plaintiffs

9

answered this interrogatory in the affirmative.   In Goldman's set of proposed additional interrogatories, No. 2 asks "Describe with specificity each component of the 360 review process that You contend caused a disparate impact on Class Members and the applicable time period," and No. 3 asks "For the 360 review process and each component thereof identified in Your response to Interrogatory No. 2, state how (*i.e.*, by what mechanism) You contend it caused a disparate impact on Class Members."   Goldman therefore seeks information already in its possession, or information it could have sought in its prior overlapping requests.

While Goldman argues in response that these proposed requests are focused on the "merits" and its prior requests focused on "class certification," this is a baseless distinction. Discovery in this litigation has not been bifurcated, and the text of the prior requests themselves reveals no limitation to class issues, regardless of Goldman's characterization of its legal strategy.  *See, e.g.*, Interrogatory No. 4 ("For any period between July 7, 2002 and the present, do You contend that the annual 360-degree performance review process used by managers at Goldman Sachs was designed with the purpose of discriminating against women or has had a discriminatory impact on women?").  In fact, both the Court in its December 11, 2013 Order and Goldman in this Joint Status Report agree that there is overlap between class certification and merits discovery.  This is especially true given that Goldman has indicated it intends to move for decertification.

Unable to provide a factual basis for its sweeping request, Goldman argues generally that parties in other class actions have been granted leave to exceed the limit.  This is not persuasive.  Goldman's authority, in which *plaintiffs* are permitted leave to serve additional interrogatories, provides no support for its request; instead, it supports the principle that, as here, most information relevant to the claims and defenses is in the defendant's possession, which may warrant granting *plaintiffs* additional discovery, including interrogatories and depositions.  *See*

*Pirnik v. Fiat Chrysler Autos., N.V.*, No. 15 Civ. 7199, ECF No. 200 (S.D.N.Y. May 14, 2018) (granting plaintiffs leave to take additional 20 depositions and serve 24 additional interrogatories); *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, No. 12 Civ. 2827, 2014 WL 6980524, at *1 (S.D.N.Y. Dec. 4, 2014) (ordering defendant to respond to plaintiff's two interrogatories over its objections that splitting the two interrogatories into subparts would put plaintiff over the interrogatory limit); *Treppel v. Biovail Corp.*, 33 F.R.D. 363, 368, 373-74 (S.D.N.Y. 2006) (construing plaintiff's questions regarding defendant's document and electronic discovery retention as interrogatories, but permitting them above the Rule 33 limit where serious questions arose in the litigation regarding defendant's document preservation and possible loss of relevant data).

Plaintiffs do not, as Goldman asserts here, argue that the interrogatory limit cannot be expanded. Plaintiffs are amenable to a reasonable, limited extension, as discussed in Section III.D below, when warranted by actual discovery needs.[13] However, because there is no such justification consistent with Rule 26(b)(1) and (2) for nearly any the proposed interrogatories here, Goldman's request should be denied.

## C.   Most of Goldman's Proposed Interrogatories Require Expert Evidence and Are Premature

Goldman's proposed interrogatories seek expert evidence that will be developed and produced to Goldman during the robust expert discovery period following fact discovery,

---

[13]   For example, Plaintiffs were open to Goldman exceeding Rule 33's limit to serve an interrogatory for the amount of Plaintiff Gamba's earnings where it was more efficient than a document request for her private tax filings. Goldman instead opted to seek this information with a request for admission, while also serving two unauthorized interrogatories seeking a different set of information that continued its harassing efforts to probe Ms. Gamba's private tax filings. Accordingly, Plaintiffs objected to those interrogatories on the grounds that they sought irrelevant and confidential financial information, exceeded the scope of the Court's September 11, 2019 Order, and that Goldman had exceeded Rule 33's limit without first seeking consent or leave to do so.

and Goldman will be able to review Plaintiffs' evidence, depose Plaintiffs' experts, and prepare responsive expert testimony. Because Goldman's proposed additional interrogatories primarily do not seek fact evidence, there is no basis for extending Rule 33's limit to permit them.

Were the Court to find a 25-interrogatory extension warranted now, nearly all of Goldman's proposed additional 21 interrogatories still would be premature under Local Rule 33.3(c), which requires that such interrogatories be served "[a]t the conclusion of other discovery, and at least 30 days prior to the discovery cut-off date." Eighteen of Goldman's 21 proposed interrogatories seek responses that cannot be completed in advance of expert discovery, which is months away.[14] The subject of these 18 proposed interrogatories—information regarding Plaintiffs' arguments as to how Goldman's policies cause a disparate impact, and the extent of that impact, the lack of a business necessity, and less discriminatory alternatives—will be provided in written expert reports and deposition testimony, and Goldman will have the opportunity to respond to Plaintiffs' experts.

Goldman makes much of Plaintiffs' prior arguments regarding the timing of their two recent interrogatories asking what business need is fulfilled by Goldman's practices and what alternative policies Goldman considered. But this is a comparison without substance. First, unlike Goldman's request, Plaintiffs' two interrogatories were within Rule 33's numerical limit. Second, while Plaintiffs' two interrogatories touch on factual issues relating to Goldman's affirmative defenses, the similarities end there. Plaintiffs' two narrow interrogatories sought information that the Court agreed regarded the decisions made or analysis conducted by Goldman Sachs in the course of its business. *See* Oct. 3, 2019 Hr'g Tr. at 81:19-22 ("[S]urely Goldman, as sophisticated as it is, determined it had a need and ought to be able to explain what

---

[14]   Of the remaining three, one requests information as to Class members' job titles and job functions, which is already in Goldman's possession and the subject of at least 51 of Goldman's recent Requests for Admission. The remaining two are addressed in Section III.D below.

that need is.").  For example, Goldman responded to one of these interrogatories that it "has not considered alternatives to the 360 review, manager quartiling, or cross-ruffing processes."  This is factual information in the possession of Goldman Sachs related to its business practices that would not depend on, or even necessarily be the subject of, Goldman's expert reports, and therefore a response during fact discovery was helpful and warranted.  Conversely, Goldman's proposed requests are not factual questions but instead seek Plaintiffs' merits arguments in litigation, which depend on what Plaintiffs' experts will state in forthcoming reports.  They are not "useful," as the Court instructed, and do not seek any factual information already in Plaintiffs' possession.[15]

Accordingly, even if Goldman were permitted to serve any of its requested 25 additional interrogatories above Rule 33's limit, its proposed requests requiring expert evidence are wholly premature and should not be permitted at this phase of discovery.

### D.    Plaintiffs' Proposed Compromise

To attempt to reach a reasonable compromise on this issue, Plaintiffs evaluated Goldman's proposed interrogatories and identified two that are arguably not cumulative of Goldman's prior requests.  These two proposed interrogatories—numbered 20 and 21—regard Plaintiffs' certified disparate treatment claims, do not exclusively rely on expert-generated evidence, and overlap with issues likely to be explored in Plaintiffs' upcoming depositions. Accordingly, Plaintiffs proposed as a compromise that Goldman serve only proposed interrogatories 20 and 21.  Goldman did not agree to this suggestion, even though it is consistent with the two additional interrogatories Goldman's counsel actually requested of the Court at the

---

[15] Fewer than a third (8) of the 21 proposed additional interrogatories request a factual basis for certain contentions, but even these are expressly linked to interrogatories that require expert discovery-generated contentions, and they therefore cannot be separately answered until expert discovery is completed.

previous status hearing, and is significantly more reasonable and proportional to Goldman's actual discovery needs.

## III.    PARTIES' NEGOTIATION REGARDING ADDITIONAL DEPOSITIONS

On April 19, 2019, Plaintiffs initiated a meet and confer regarding an extension of the presumptive limit of ten depositions under Federal Rule of Civil Procedure 30(a)(2)(A)(i).[16] In the intervening months, the parties have exchanged numerous letters on the topic.  While the parties have come close to reaching agreement regarding an appropriate number of additional deponents, a final resolution has been stalled by Plaintiffs' effort to comply with Goldman's request that they identify all additional deponents by name, and the problems with doing so while documents continue to be produced and privilege log issues continue to be litigated.  *See* Ex. 4, Oct. 15, 2019 Ltr. from Goldman (requesting that Plaintiffs "identify the 20 witnesses Plaintiffs seek to depose").

Specifically, several of the individuals Plaintiffs previously identified as potential deponents (and countless others) have since been identified on Goldman's privilege logs, including on entries directly challenged by Plaintiffs.  As discussed above in Plaintiffs' Section II, Goldman has still not complied with the Court's December 17, 2019 Order that Goldman "identify all other improperly or errantly withheld documents," and Goldman's recent correspondence reveals that it may be several more months before this issue is settled.  ECF No.

---

[16] During the meet and confer process, and again here, Goldman asserts that Plaintiffs have taken "14 fact depositions."  *See infra* at 19.  This is incorrect.  As Goldman knows, the majority were Rule 30(b)(6) depositions noticed on only four topics, for which *Goldman elected* to designate multiple witnesses per topic.  Accordingly, Plaintiffs have taken *at most* four Rule 30(b)(6) depositions.  *See, e.g.*, Fed. R. Civ. P. 30 advisory committee's note to 1993 amendment ("[A] deposition under Rule 30(b)(6) should, for purposes of this limit, be treated as a single deposition even though more than one person may be designated to testify."); *Hannah v. Wal-Mart Stores, Inc.*, No. 3:12-1361, 2014 WL 110950, at *7 (D. Conn. Jan. 10, 2014) (noting that each Rule 30(b)(6) witness designated to testify would together count as a single deposition toward Rule 30's limit).

912 and 2.  Plaintiffs cannot commit to a final list of additional deponents until this process is complete, though Plaintiffs expect to begin noticing depositions in early February.  Once the privilege issues are settled and previously withheld documents are produced, Plaintiffs intend to work quickly and cooperatively with Goldman to settle this issue, and remain hopeful, albeit not optimistic, that they can do so without Court intervention.

## DEFENDANTS' POSITIONS

### I.    DEFENDANTS' REQUEST FOR ADDITIONAL INTERROGATORIES

Defendants respectfully request the Court's leave to serve 25 additional interrogatories. Between 2011 and 2013, Defendants served 25 interrogatories regarding matters relevant to class certification; Plaintiffs never responded (beyond making objections) to 11 of those interrogatories. After refusing to consent to any expansion of the default 25-interrogatory limit for over a month, Plaintiffs have belatedly consented to Defendants serving just two additional interrogatories regarding the merits of this litigation. Defendants' request for 25 additional interrogatories is proportional to the needs of this case, particularly in light of the massive scope of discovery Plaintiffs have obtained, the fact that Defendants' prior interrogatories focused on class certification issues, Plaintiffs' failure to answer nearly half of those interrogatories, and Plaintiffs' own representations that interrogatories are an efficient method of discovery. (ECF Nos. 837, 840.) A draft set of interrogatories, which Defendants provided to Plaintiffs in an effort to confer on this issue, is appended as Exhibit A hereto.

#### A.    Background

During Rule 23(b)(3) class certification discovery in 2011 to 2013, Defendants served 25 interrogatories, which the Court recognized were "directed specifically to the issue of class certification." (Dec. 11, 2013 Order at 1, ECF No. 207.) After Plaintiffs refused to respond to nearly all of them, the Court rejected Plaintiffs' objections except as to 11 interrogatories, which it held were improperly framed. (*Id.* at 1, 4.) Thus, although Defendants have served 25 interrogatories (and two more Court-authorized merits interrogatories), Plaintiffs have only responded to 14. Plaintiffs objected to Defendants' 26th and 27th interrogatories on the ground that Defendants had already *served* 25 interrogatories, without regard to the much smaller

number Plaintiffs had actually *responded* to[17]—even though, when Plaintiffs served an improperly framed interrogatory, Plaintiffs were permitted to rephrase the interrogatory two times without counting the revisions against Plaintiffs' interrogatory limit.[18]

On December 10, Defendants sought Plaintiffs' agreement for Defendants to serve 25 additional interrogatories. (Ex. B.) In response, Plaintiffs refused even to speak about the request unless Defendants would first "provide the text and/or specific subject matter and the justification for each of the 25 additional proposed interrogatories." (*Id.*) After Defendants did just that—informing Plaintiffs that their interrogatories would seek information "about merits issues, including the components of the 360 review plaintiffs claim were discriminatory, the components of the manager quartiling and cross-ruffing processes that Plaintiffs contend cause a discriminatory impact, Plaintiffs' position that the challenged processes are not business necessities for Goldman Sachs, and identification of any purportedly less discriminatory alternatives to the challenged processes," Plaintiffs refused to reconsider their position or confer with Defendants, and instead demanded "the text of any proposed interrogatories." (*Id.*) Despite having no obligation to do so, Defendants provided their proposed interrogatories to Plaintiffs on December 19. (Exs. A & B.) Plaintiffs, however, continued to refuse to agree to Defendants' request and demanded Defendants' "justification for each of the 25 additional proposed interrogatories," which is plainly work product. (Ex. B.) After over a month of Defendants' attempts to confer on this issue, on January 7, 2020, Plaintiffs indicated they were "amenable to

---

[17]    Plaintiffs assert that they "were open to Goldman exceeding Rule 33's limit to serve an interrogatory for the amount of Plaintiff Gamba's earnings" (*see supra* at 11 n.13), ignoring that they then refused to respond, in part on the basis that Defendants had already *served* 25 (*see* Pl. Allison Gamba Nov. 25, 2019 Resp. & Objs. to Defs.' First Set of Interrogs. at 3).

[18]    In light of the Court's rephrasing of this interrogatory two times, at the November 19, 2019 conference, Defendants requested that they be permitted to serve two additional interrogatories on Plaintiffs. (Nov. 19, 2019 Conf. Tr. at 83:11–15.) Defendants continue to believe that two additional interrogatories are warranted on this basis, but they are seeking additional interrogatories beyond those two for the reasons set forth in this Joint Status Report.

an extension of Rule 33's interrogatory limit" for just "two additional interrogatories" of their choosing. (*Id.*)   Plaintiffs' refusal to meaningfully confer about Defendants' request for additional interrogatories has forced Defendants to seek relief from the Court.

B.   **Argument**

Rule 33(a)(1) permits a party to serve additional interrogatories where "stipulated or ordered by the court," and the Federal Rules advisory committee contemplated that "[i]n many cases it will be appropriate for the court to permit a larger number of interrogatories in the scheduling order." Fed. R. Civ. P. 33(a) advisory committee notes; *see also* 7 James Wm. Moore et al., Moore's Federal Practice § 33.30 (3d ed. 2019) ("The court may find numerous interrogatories appropriate in a case involving complex, technical litigation or significant amounts of money.").   Accordingly, courts in this District routinely authorize additional interrogatories, particularly in large class actions.   *See*, *e.g.*, *Pirnik* v. *Fiat Chrysler Autos., N.V.*, No. 15 Civ. 7199, ECF No. 200 (May 14, 2018 S.D.N.Y.) (Furman, J.) (granting leave "to propound 24 additional interrogatories" in class action); *Highland CDO Opportunity Master Fund, L.P.* v. *Citibank, N.A.*, 2014 WL 6980524, at *1 (S.D.N.Y. Dec. 4, 2014) (Buchwald, J.) ("[E]ven if we believed that the two interrogatories each counted as 23 discrete interrogatories for purposes of Rule 33, we would grant leave to serve these reasonable interrogatories under Rule 33(a)(1)."); *Treppel* v. *Biovail Corp.*, 233 F.R.D. 363, 368, 373–74 (S.D.N.Y. Feb. 6, 2006) (Francis, J.) (finding "ample justification for exceeding the 25-interrogatory limit" and requiring party to respond to additional questionnaire containing "19 questions, together with subparts").[19]

---

[19]   The authority cited by Plaintiffs (Ex. B) likewise confirms that courts routinely grant additional interrogatories in a variety of circumstances.   *See Riddle* v. *Liz Claiborne, Inc.*, 2003 WL 21982967, at *1 (S.D.N.Y. Aug. 19, 2003) (Pitman, J.) (granting party "permission to serve an additional 75 interrogatories"); *Auther* v. *Oshkosh Corp.*, 2010 WL 1404125, at *3 (W.D.N.Y. Mar. 30, 2010) (permitting defendants to serve "initial 26 interrogatories" and "second set of 23 interrogatories").

Plaintiffs acknowledge that "parties in other class actions have been granted leave to exceed the limit," but claim that this only "warrant[s] granting *plaintiffs* additional discovery." (*See supra* at 10 (emphasis in original).) Plaintiffs' assertion that plaintiffs may be granted additional interrogatories while defendants may not is contrary to the Federal Rules and fundamental principles of due process. *See Heffernan* v. *City of Paterson*, 136 S. Ct. 1412, 1418 (2016) ("[I]n the law, what is sauce for the goose is normally sauce for the gander.").

This is a paradigmatic case where additional interrogatories are "proportional" to Defendants' discovery needs. Fed. R. Civ. P. 26(b)(1). Plaintiffs seek substantial damages and challenge processes that go to the core of how Goldman Sachs manages its employees and conducts its business. Plaintiffs themselves have taken the position that extensive discovery is warranted in this case (*see*, *e.g.*, ECF Nos. 629, 647); as the Court has recognized, Defendants reviewed a "massive number" of documents during merits discovery (May 24, 2019 Order at 1, ECF No. 745), on top of the millions of documents Defendants previously reviewed during class certification discovery. And perhaps most telling, Plaintiffs, who have already exceeded the default 10-deposition limit under the Federal Rules by taking 14 fact depositions in preparation for their class certification motion, are currently seeking to take additional *depositions* (*see supra* at 14–15), which are far more burdensome than responding to interrogatories. Moreover, Plaintiffs have repeatedly argued that they are entitled to additional or different discovery on the merits as opposed to for class certification. (*See*, *e.g.*, Dec. 17, 2018 Joint Status Report at 5 & n.3, ECF No. 647 (proposing 201 document custodians for merits discovery despite that 83 custodians were selected for class certification); July 17, 2019 Conf. Tr. at 26:18–22 (MS. DERMODY: arguing that "the witnesses who were relevant to pre-class certification are different than the witnesses who are relevant to the merits").)

Defendants seek to use these additional interrogatories to obtain discovery about

highly relevant merits issues, which were not addressed during class certification discovery, and, now that the Court has provided additional guidance regarding the Phase One trial (ECF No. 888), to narrow the issues for trial.  (Ex. A.)  For example, Defendants seek to ask Plaintiffs to identify any alternatives to the 360 review, manager quartiling, and cross-ruffing processes they contend would have a less discriminatory impact on Class Members, and to identify the basis for their contention that these proposed alternatives would have a less discriminatory impact on Class Members.  (*Id.*)  Defendants also seek to ask Plaintiffs to identify the basis for their contention that the three challenged processes are not business necessities for Goldman Sachs.  (*Id.*)  And Defendants seek to ask Plaintiffs to identify each component of the challenged process that they contend caused a disparate impact on Class Members or was designed or implemented with the purpose of discriminating against female professionals at Goldman Sachs. (*Id.*)  Much of this is "factual information already in Plaintiffs' possession," which Plaintiffs concede is the standard for discoverability.  (*See supra* at 13.)

During the meet-and-confer process, Plaintiffs offered four baseless objections to Defendants' request.  *First*, Plaintiffs claim (based on a selective quotation from the November 19 status conference) that Defendants are limited to serving interrogatories "addressing something that wasn't answered in a previous interrogatory."  (Ex. B (internal quotation marks omitted).)   In fact, the Court merely asked at that conference whether the two additional interrogatories Defendants proposed at that time related to "a previous interrogatory" or a "new interrogatory," directing the parties to "[t]alk about it."  (Nov. 19, 2019 Conf. Tr. 84:7–8, 12.)

*Second*, Plaintiffs' claim that Defendants must provide a "justification for each of its proposed interrogatories, as required by Rules 33 and 26(b)" (Ex. B), appears nowhere in these Rules.  As described above, courts in this District routinely grant parties additional interrogatories without forcing them to disclose their work product explaining the rationale for

each interrogatory.  In any event, Defendants provided their proposed interrogatories to Plaintiffs nearly a month ago, affording ample opportunity to assess the discovery Defendants seek.  *See* Fed. R. Civ. P. 26(b)(1).

*Third*, Plaintiffs' assertion that Defendants' proposed interrogatories are "duplicative and cumulative" of their class certification interrogatories and requests for admission (Ex. B) is wrong.  Judge Francis expressly held that Defendants' prior interrogatories were "directed specifically to the issue of class certification" (Dec. 11, 2013 Order at 2), while Defendants' proposed interrogatories seek discovery about merits issues, such as business necessity and purportedly less discriminatory alternative processes.  While Plaintiffs make much of the fact that class certification "will entail some overlap with the merits," *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 351 (2011), they do not dispute that Defendants have not sought prior discovery about business necessity or proposed alternative processes.  Nor do Plaintiffs explain how Defendants can learn through "other discovery devices" such as document requests or depositions (*see supra* at 9) information such as what alternative processes Plaintiffs propose and their basis for contending those processes would be less discriminatory.  As to Defendants' requests for admissions, "[u]nlike interrogatories . . . RFAs are not a discovery device at all, since they presuppose that the party proceeding under Rule 36 knows the facts or has the document . . . ."  *Pasternak* v. *Kim*, 2011 WL 4552389, at *5 (S.D.N.Y. Sept. 28, 2011) (Cott, J.) (internal quotation marks and alterations omitted).   In any event, it is unsurprising that Defendants' merits interrogatories and requests for admission concern similar topics—*i.e.*, merits issues in this case.

*Finally*, Plaintiffs' position that Defendants' proposed interrogatories are "premature" and "cannot be completed in advance of expert discovery" (Ex. B) directly contradicts their prior position to this Court that because "[c]ontention interrogatories seek

information about the factual bases underlying the claims and contentions of an adverse party," each party must "provide the fact evidence that supports its contentions now; there is no basis for delay.  [Each party] may of course supplement its interrogatory responses with expert evidence later in the discovery period" (Sept. 27, 2019 Joint Status Report at 34, ECF No. 864).  The Court permitted Plaintiffs to serve contention interrogatories about "business necessity" and purportedly "less discriminatory alternatives," noting that, because these issues will also be subject to expert discovery, "[a]s with all interrogatories, the parties have not just the right but also the duty to supplement their disclosures."  (Oct. 3, 2019 Order ¶¶ 5.b–c, ECF No. 870.) Plaintiffs now claim that their responses to Defendants' proposed interrogatories will "require expert evidence," while Defendants' responses to Plaintiffs' interrogatories on the exact same topics "would not depend on, or even necessarily be the subject of . . . expert reports."  (*See supra* at 9, 13.)  This cannot be squared with the Court's October 3, 2019 Order or the Court-ordered schedule, which expressly states that Defendants "will file the first [expert] report" in support of their "business necessity defense."  (June 25, 2019 Order at 3, ECF No. 767.)  Indeed, Plaintiffs' assertion that they cannot respond to any interrogatories about business necessity or alternative processes because they "depend on what Plaintiffs' experts will state in forthcoming reports" (*see supra* at 13) is precisely the argument the Court rejected during the October 3 conference.  (*See* Oct. 3, 2019 Conf. Tr. at 81:12–22 (ordering that interrogatory about business necessary "should be answered" over Defendants' objection that "that defense relates directly to expert testimony")).)

To the extent some of Defendants' interrogatories are contention interrogatories (and Plaintiffs admit that "fewer than a third (8) of the 25 proposed additional interrogatories request a factual basis for certain contentions" (Ex. B)), if Plaintiffs believed that contention interrogatories were not premature in September, they are *a fortiori* not premature four months

later.  Accordingly, Defendants respectfully request that that Court permit Defendants to serve 25 additional interrogatories.

## II.   PLAINTIFFS' PREMATURE DEMAND FOR ADDITIONAL DEPOSITIONS

The Court has directed that "[t]he parties may not raise in status reports issues for which the meet and confer process has not been completed."  (July 17, 2019 Order ¶ 5, ECF No. 786.)  Notwithstanding the Court's Order, Plaintiffs raise issues about depositions despite refusing to complete the conferral process.  As of October, the parties had been conferring for months about Plaintiffs' request for additional depositions.  Because Plaintiffs were seeking to more than double the number of depositions permitted under the Federal Rules, on top of all the depositions they took during class certification discovery, Defendants asked who Plaintiffs seek to depose before consenting to additional depositions.  But Plaintiffs admit that they never responded to Defendants last communication about this issue on October 15, 2019.  The fact that Plaintiffs are challenging certain privilege log entries is not a basis to delay any discussion of depositions for three months.  Because, as Plaintiffs admit, the conferral process is not yet complete, this issue is not ripe for this Joint Status Report.[20]

## III.   PRIVILEGE LOGS

For the first time in a draft of the Joint Status Report, Plaintiffs raise issues about "redaction of confidential supervisory information" ("CSI") and purported "gaps in Goldman's

---

[20]     Plaintiffs also raise the issue of the number of depositions they have taken in this action. (*See supra* at 14 n.16.)  Plaintiffs do not dispute that they separately noticed and took 14 non-expert depositions, and that each deposition "notice typically counts as one deposition" under Fed. R. Civ. P. 30.  *Winfield* v. *City of New York*, 2018 WL 840085, at *4 n.6 (S.D.N.Y. Feb. 12, 2018) (Parker, J.).  Plaintiffs' assertion that these 14 depositions include "at most four Rule 30(b)(6) depositions" (*see supra* at 14 n.16) ignores that "an overly broad notice requiring multiple witnesses to testify may be deemed contrary to Rule 30's presumptive limit," *Winfield*, 2018 WL 840085, at *4 n.6, and that Plaintiffs also took three non-Rule 30(b)(6) fact depositions, for at least a total of seven by Plaintiffs' own count.  Yet Plaintiffs now seek to take an additional 20 depositions.

identification of listserv members." (*See supra* at 2–4.) Those issues are not ripe for the upcoming conference (*see* July 17, 2019 Order ¶ 5), nor do Plaintiffs' positions have merit. Despite representing that "Plaintiffs will separately file a letter response" to Defendants' January 13, 2020 letter ("Jan. 13 Ltr."; ECF No. 930) regarding their re-review of documents listed on their privilege logs, Plaintiffs submit a duplicative section covering the same topic that mischaracterizes Defendants' letter. (*See supra* at 5–7; Nov. 19, 2019 Conf. Tr. at 82:15–17 (THE COURT: "I do agree that the rehashing . . . was somewhat gratuitous, could've just referred back to the prior status reports and positions.").)

> *First*, as to CSI, it is the property of the Board of Governors of the Federal Reserve ("Federal Reserve"), and Defendants cannot disclose any such information without its consent. *See* 12 C.F.R. § 261.23(b). As Defendants explained in their December 20, 2019 letter (ECF No. 915), they have submitted proposed redactions of document families containing CSI—totaling over 950 pages—to the Federal Reserve, which has confirmed receipt of the documents, initially stated that it expected to provide guidance on these redactions during the week of January 6, 2020, and has informed Defendants that its review is ongoing. Once Defendants receive guidance on these redactions, they will apply it, in consultation with the Federal Reserve, to all documents withheld or redacted solely on the basis of CSI. (*Id.*) Thus, Plaintiffs' demand that Defendants "review the Federal Reserve's feedback on Goldman's proposed redactions over the six documents already submitted and produce the 350 documents previously withheld solely on the basis of CSI" to the extent such CSI can be redacted (*see supra* at 2–3) is precisely what Defendants already agreed to do. The Court should reject Plaintiffs' demand that Defendants re-review and implement redactions of CSI in 500+ documents "within five days" (*see supra* at 3), which is plainly unreasonable and does not permit any opportunity for further consultation with the Federal Reserve.

Plaintiffs also ask Defendants to re-review and re-designate documents withheld "on the basis of both CSI and attorney-client privilege or work product" as withheld only for "the applicable [non-CSI] privilege" (*see supra* at 3), but this makes no sense.  Regardless of whether any CSI in these documents can be redacted, the documents will remain withheld based on the non-CSI privilege Defendants have already asserted.  Plaintiffs' assertion that Defendants "rejected Plaintiffs' attempts to meet and confer over these concerns" (*see supra* at 3) is wrong. Plaintiffs never responded to Defendants' December 20 letter or sought to confer at all and now raise these issues for the first time.

*Second*, as to listservs, Defendants provided to Plaintiffs (i) detailed descriptions of over 160 listservs that appear on Defendants' privilege logs; (ii) recipient information as of specified dates for 10 listservs selected by Plaintiffs; and (iii) subject lines for over 200 e-mail documents from Defendants' privilege logs selected by Plaintiffs.  Plaintiffs never responded to any of Defendants' letters and now raise concerns about the "2006diversitytaskforce@ny.email.gs.com" listserv for the first time.  But as Defendants explained during the November 19, 2019 status conference, listserv data "may not exist for every single document" in part because Defendants reconstructed the recipient information using separate files ("TSV Files") that were collected from a separate system, which are akin to backup tapes.  "[N]one of the data is contained . . . in any of th[e] actual emails" collected by Defendants. (Nov. 19, 2019 Conf. Tr. at 14:24–25, 15:8–10.)  And as Defendants explained in their December 24, 2019 letter to Plaintiffs (Ex. C at 2), Defendants conducted extensive searches to identify TSV Files corresponding to an e-mail containing this listserv and identified no such files on any date.

Because Defendants could not locate any TSV File for this listserv, they instead provided the membership of the 2006 Diversity Task Force (*see*, *e.g.*, GS0525878), since it is

highly likely that the membership of the 2006 Diversity Task Force listserv is the same as the Task Force itself.  Plaintiffs do not dispute that, based on uncontroverted, sworn testimony (Mann Decl. ¶¶ 10–13, ECF No. 925-1), "attorney Arline Mann, who served as counsel to the 2006 Task Force, was likely a member of the listserv." (*See supra* at 3 (internal quotation marks omitted).)  But as Defendants explained in their January 3, 2020 letter (ECF No. 925), it is irrelevant whether Ms. Mann appeared on any particular e-mail, because the work of the Task Force was to monitor Goldman Sachs's compliance with employment laws and firm policies and to facilitate the provision of legal advice, which is privileged. *See Pearlstein* v. *Blackberry Ltd.*, 2019 WL 1259382, at *5, *17 (S.D.N.Y. Mar. 19, 2019) (Parker, J.) (finding "collection of additional information" to "provide information to counsel or aid counsel in providing legal advice" was privileged).   And Plaintiffs' attempt to claim otherwise rests on a mischaracterization of Goldman Sachs's documents.  (*See* Defs.' Jan. 13, 2020 Ltr. at 2 n.2, ECF No. 929.)  It is self-evident that the members of the 2006 Diversity Task Force had a "need to know" privileged information about the Task Force's work. *Bank of N.Y.* v. *Meridien Biao Bank Tanzania Ltd.*, 1996 WL 474177, at *2 (S.D.N.Y. Aug. 21, 1996) (Francis, J.) (not discussing listservs).   Thus, the bare fact that Goldman Sachs's systems do not contain individual membership information for a 14-year-old listserv that expressly identifies its purpose is not a basis to "reject any assertion of privilege." (*See supra* at 4.)[21]

---

[21]     The out-of-Circuit authority cited by Plaintiffs (*see supra* at 4 & n.3) is plainly distinguishable. *See Acosta* v. *Target Corp.*, 281 F.R.D. 314, 317–18, 320 (N.D. Ill. 2012) (considering 75 e-mails containing "unidentified distribution lists," unlike the thousands of e-mails and over 160 listservs—with detailed descriptive information—at issue here); *ePlus Inc.* v. *Lawson Software, Inc.*, 280 F.R.D. 247, 253 n.2 (E.D. Va. 2012) (considering 39 entries containing "an unidentified distribution list," whereas Defendants here have provided detailed information about over 160 listservs), *overruled in part by* 2012 WL 6562735 (E.D. Va. Dec. 14, 2012).  Conversely, Courts in this District routinely uphold privilege logs that do not identify the individual members of each listserv. *See, e.g., Medina* v. *Buther*, 2018 WL 4383098, at *4 (S.D.N.Y. Aug. 22, 2018) (Preska, J.) (upholding log containing emails sent to "DoccsFivePointsIRC@doccs.ny.gov") (ECF No. 278-18); *Pirnik* v. *Fiat Chrysler Auto. N.V.*,

To address Plaintiffs' concerns, Defendants are willing to provide recipient information for one additional listserv on a specified date selected by Plaintiffs, and would have offered to do so had Plaintiffs actually sought to confer, as required by the Court's Individual Rules and July 17 Order.

*Third*, as to Defendants' re-review of certain documents "inadvertently withheld due to vendor errors" in accordance with the Court's December 17, 2019 Order ("Dec. 17 Order"; ECF No. 912), Plaintiffs mischaracterize Defendants' January 13 letter and seek to re-litigate issues the Court already decided.  In their December 16, 2019 letter (ECF No. 909), Plaintiffs "request[ed] that the Court order Goldman to promptly re-review its privilege logs," but the Court did *not* require "wholesale review of [Defendants'] privilege log entries" and expressly permitted "other method[s]" (Dec. 17 Order ¶ 2).  Plaintiffs have not provided any basis for their demand that "Goldman re-review its entire privilege collection."  (*See supra* at 6.)

As Defendants explained in their January 13 letter, they have re-reviewed thousands of documents, on top of their prior privilege review and quality-control processes, and are confident that their privilege logs are "reasonable and proportional."  (Jan. 13 Ltr. at 1 (internal quotation marks omitted).)  Plaintiffs' assertion that "[m]ost of these errors were caused by overzealous defense counsel and not an outside vendor" (*see supra* at 6) is baseless and ignores the January 13 letter to which it purports to respond, which explains that *over 80%* of the produced documents were part of the vendor error population.  (Jan. 13 Ltr. at 3–6.)  The discrete errors described in Defendants' January 13 letter do not show any systemic issues with their privilege logs.  To the contrary, the vendor errors are segregable and have been addressed (*id.* at 3), and Plaintiffs' attempt to extrapolate an error rate from this re-review population is flawed.  It

---

No. 15 Civ. 7199 (S.D.N.Y. Jan. 2, 2018) (Furman, J.), ECF Nos. 152, 155 (rejecting privilege log challenge containing e-mails sent to "ProjectSafety-SVC" distribution list).

is a fundamental principle of statistics that inferences can be drawn from a sample only "when the sample is representative," Fed. Judicial Ctr., Reference Manual on Scientific Evidence 217 (3d ed. 2011), but Defendants' re-review targeted the vendor and reviewer errors, and is therefore not representative of the broader population of withheld documents.

After Defendants have completed their re-review, they are willing to provide revised privilege logs that exclude documents over which Defendants are no longer asserting privilege, and would have offered to do so had Plaintiffs actually sought to confer.  There is no basis, however, to demand that Defendants provide separate entries for each member of "document families" (*see supra* at 6–7 & n.10), a request this Court has consistently rejected (*see* Aug. 28, 2019 Order ¶ 4, ECF No. 830 ("Plaintiffs' request for Defendants to separately identify the authors and recipients of attachments is denied."); July 25, 2019 Order ¶ 2, ECF No. 796 (permitting Defendants to log documents by "categories or groups of documents asserted to be privileged").)  Nor have Plaintiffs provided any basis for their demand that Defendants "identify the number of documents contained within each log entry," which Plaintiffs raised for the first time the night before filing this Joint Status Report and appears nowhere in the Federal or Local Rules.  *See* Local Civ. R. 26.2(c) ("A party receiving a privilege log that groups documents or otherwise departs from a document-by-document or communication-by-communication listing may not object solely on that basis. . . .").

**JOINT REQUEST FOR PRETRIAL SCHEDULE EXTENSION**

In its November 25, 2019 Order, the Court held that "[t]he deadline for fact discovery shall be extended by four months from December 2, 2019 to April 2, 2020." (Nov. 25, 2019 Order ¶ 7, ECF No. 888.)  In light of the recent production of documents and to permit additional time to schedule depositions, the parties jointly request that the fact discovery deadline be extended an additional two months from April 2, 2020 to June 2, 2020, with corresponding extensions to the remaining pretrial schedule.  The parties also jointly propose staggering briefing on the *Daubert*, decertification, and summary judgment motions by two weeks.  The parties have included as Appendix 1 a proposed schedule that does so, with appropriate modifications for weekends and holidays.

*          *          *

The parties thank the Court for its consideration and are available to answer any questions or provide more details at the January 23, 2020 status conference or at the Court's convenience.

Respectfully submitted,


/s/ Kelly M. Dermody

Adam T. Klein
Cara E. Greene
Melissa L. Stewart
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, New York  10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060

Paul W. Mollica
161 North Clark Street, Suite 4700
Chicago Illinois  60601
Telephone: (212) 809-7010
Facsimile: (312) 809-7011


Kelly M. Dermody (*admitted pro hac vice*)
Anne B. Shaver (*admitted pro hac vice*)
Tiseme G. Zegeye
LIEFF CABRASER HEIMANN &
        BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California  94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008


Rachel Geman
250 Hudson Street, 8th Floor
New York, New York  10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592


*Attorneys for Plaintiffs*

/s/ Robert J. Giuffra, Jr.

Robert J. Giuffra, Jr.
Sharon L. Nelles
Ann-Elizabeth Ostrager
Hilary M. Williams
Joshua S. Levy
Hannah Lonky Fackler
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

Amanda Flug Davidoff
Elizabeth A. Cassady
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, District of Columbia
20006-5215
Telephone: (202) 956-7500

Barbara B. Brown (*admitted pro hac vice*)
Carson H. Sullivan (*admitted pro hac vice*)
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC  20005
Telephone: (202) 551-1700

Patrick W. Shea
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6405


*Attorneys for Defendants*