UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/26/2020
```

-------------------------------------------------------------X

H. CRISTINA CHEN-OSTER, SHANNA
ORLICH, ALLISON GAMBA, and MARY DE
LUIS, on behalf of themselves and all others
similarly situated,

                       Plaintiffs,

          - against -

GOLDMAN, SACHS & CO. and THE
GOLDMAN SACHS GROUP, INC.,

                      Defendants.

-------------------------------------------------------------X

10 Civ. 6950 (AT) (RWL)

**DECISION AND ORDER:
MOTION TO COMPEL ARBITRATION
AND CROSS-MOTION TO VOID
ARBITRATION AGREEMENTS**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

In this class action, Plaintiffs allege that Defendants Goldman Sachs & Co. and The Goldman Sachs Group, Inc. (collectively, "Goldman" or "Defendants") engaged in disparate impact and disparate treatment discrimination against female employees in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., and the New York City Human Rights Law ("NYCHRL"), Administrative Code § 8-107 et seq. On March 30, 2018, the Honorable Analisa Torres, U.S.D.J., granted Plaintiffs' motion for class certification, certifying a class of female employees in particular positions across three Goldman divisions. *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55 (S.D.N.Y. 2018) (the "Certification Order"). The parties have since been actively engaged in merits discovery, which currently is set to conclude on June 2, 2020. (Dkt. 943.)

Goldman now moves the Court for an order staying the claims of approximately fifty-six percent of the more than 3,000 class members, excluding them from the class, and compelling them to individually arbitrate their discrimination claims. (Dkt. 715.)

Goldman argues that the majority of class members previously agreed to arbitrate, rather than litigate, their claims when they signed various severance, promotion, and equity compensation agreements.  Plaintiffs contend that Goldman has waived its right to compel arbitration, and additionally that arbitration clauses in one category of agreements – equity compensation agreements – are unconscionable and therefore unenforceable.

Plaintiffs simultaneously cross-move, pursuant to Federal Rule of Civil Procedure 23(d) governing class actions ("Rule 23(d)"), seeking a judicial order voiding the arbitration clauses (and releases in severance agreements) contained in agreements executed after the filing of this case on September 15, 2010.  (Dkt. 717.)  Plaintiffs argue that Goldman has improperly attempted to narrow the scope of the class by having putative class members execute agreements to arbitrate and release their claims without notifying them of the existence of this action.  In opposition, Goldman contends that it has not coerced or misled class members with its agreements and that relief pursuant to Rule 23(d) is neither authorized nor warranted.  (Dkt. 758.)

This Decision and Order resolves both motions concurrently.  As set forth below, the Court finds that the four categories of arbitration agreements at issue are enforceable as a matter of contract law.  The arbitration clauses in one category of agreements – equity award agreements – nevertheless warrant remedial action under Rule 23(d). Accordingly, for the reasons that follow, Defendants' Motion to Compel and Stay Pending Arbitration is GRANTED IN PART and CONDITIONALLY GRANTED IN PART, and Plaintiffs' Cross-Motion is GRANTED IN PART and DENIED IN PART.[1]

---

[1] District courts in this Circuit regularly have concluded that a motion to compel arbitration and stay litigation pending arbitration is non-dispositive and therefore within a Magistrate Judge's purview to decide without issuing a report and recommendation pursuant to 28

**The Parties' Submissions**

**A.      Goldman's Motion to Compel Arbitration**

Goldman filed its Motion to Compel Arbitration on April 12, 2019 ("Motion to Compel" or "Motion"). (Dkt. 715.)  The Notice of Motion's "Appendix A" lists 1,852 class members whose claims Goldman seeks to stay and compel into arbitration.[2]  (*Id.*)  The motion includes the Declaration of Robert J. Giuffra, Jr. (Dkt. 716, "Giuffra Decl.") with Appendices A-F and Exhibits 1-1475 (which collectively include the agreements Goldman seeks to enforce).  The Motion also is supported by the declarations of five Goldman employees describing various aspects of Goldman's employment procedures.[3]  (Dkt. 721-725.)  Defendants submit a Memorandum of Law in Support (Dkt. 726, "Def. Mem.") and a Reply Memorandum of Law (Dkt. 779, "Def. Reply").

---

U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b).  Indeed, the Honorable James Francis IV, U.S.M.J., came to that conclusion in an earlier stage of this case on Goldman's motion to compel arbitration of a then-named plaintiff.  *Chen-Oster v. Goldman, Sachs & Co.*, 785 F. Supp. 2d 394, 399 n.1 (S.D.N.Y. 2011); *see also Marcus v. Collins*, No. 16 Civ. 4221, 2016 WL 8201629, at *1 n.1 (S.D.N.Y. Dec. 30, 2016) (collecting cases and observing that the only Courts of Appeal to have decided the issue, the First and Third Circuits, both held that orders granting or denying motions to compel arbitration and stay litigation pending arbitration are non-dispositive); *Zouras v. The Goldman Sachs Group, Inc.*, No. 02 Civ. 9249, 2003 WL 21997745, at *1 (S.D.N.Y. Aug. 22, 2003) (in Title VII employment discrimination action, granting motion to compel arbitration, dismissing action without prejudice to reopen, and acknowledging that "a motion to compel arbitration and stay an action is not a dispositive motion").

[2] By agreement following oral argument, the parties stipulated that the number of class members that Goldman seeks to compel to arbitrate is now 1,850.  (Dkt. 959.)  The parties' stipulation also clarified the specific number of agreements at issue in particular categories.  (*Id.*)  The Court incorporates those agreed-upon numbers into this decision, replacing the corresponding initial numbers set forth in the parties' motion papers.

[3] These individuals are: Kathleen Cupertino ("Cupertino Decl.") (Dkt. 721); David Landman (Dkt. 722, "Landman Decl."); Eric Dias (Dkt. 723, "Dias Decl."); Joseph Yanagisawa (Dkt. 724, "Yanagisawa Decl."); and Michael Becker (Dkt. 725, "Becker Decl.")

In opposition, Plaintiffs submit the Declaration of Michelle A. Lamy (Dkt. 757, "Lamy Decl.") with Appendix A and Exhibits 1-2.  They also submit a Memorandum of Law in Opposition (Dkt. 756, "Pl. Mem.") and a Sur-Reply Memorandum of Law (Dkt. 806, "Pl. Sur-Reply").

**B.    Plaintiffs' Cross-Motion to Void Arbitration Clauses and Releases**

Concurrently with Goldman's Motion to Compel, Plaintiffs filed their Cross-Motion for Relief under Rule 23(d) (Dkt. 717, the "Cross-Motion").  The Cross-Motion seeks an order: (1) voiding the arbitration clauses contained in agreements between Goldman and the class members "to arbitrate employment claims and/or waive participation in a class action that were purportedly executed after the filing of this lawsuit on September 15, 2010"; and (2) voiding releases of claims contained in Separation Agreements between Goldman and class members executed after the filing of this lawsuit on September 15, 2010 "to the extent the releases purport to cover claims that are the subject of this lawsuit."  (Cross Motion at 1.)  In support of their Cross-Motion, Plaintiffs include the Declaration of Michael Levin-Gesundheit (Dkt. 719, "Levin-Gesundheit Decl.") attaching Exhibits A-C, as well as a Memorandum of Law in Support (Dkt. 718, "Cross-Motion Mem.").  On July 11, 2019, Plaintiffs filed a Reply Memorandum of Law in Support. (Dkt. 778, "Cross Motion Reply".)

In opposition, Goldman filed the Declaration of Robert J. Giuffra, Jr. (Dkt. 759, "Giuffra Cross-Motion Decl.") with Appendices A-B and Exhibits 1-140. Goldman includes declarations by the same five Goldman employees who submitted declarations in connection with its Motion to Compel.  (Dkt. 760-764.)  Goldman also submits a Memorandum of Law in Opposition (Dkt. 758, "Cross-Motion Opp.").  On August 9, 2019,

Defendants filed a Sur-Reply Memorandum of Law (Dkt. 807, "Def. Sur-Reply").

The Court held oral argument on both motions on January 16, 2020. (*See* Transcript, Dkt. 940, hereinafter "T. at __".)

## Factual Background

The Court presumes the parties' familiarity with the factual and procedural history of this case, which has been recounted in prior decisions and orders.[4] This section focuses only on the background most relevant to the instant motions.

### A.    The Class

The Certification Order certified a damages class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).[5]   The class consists of current and former female Associates and Vice Presidents employed by Defendants in certain revenue-generating divisions from July 7, 2002 (for employees in New York City) and from September 10, 2004 (for employees in the United States outside of New York City), through the resolution of this lawsuit (collectively, the "Class Members").   There are 3,322 known members of the class (the "Class Members").   (*See* Pl. Mem. at 1.)

The Certification Order and subsequent case management orders provide that the trial will be conducted in two stages.   "Phase I" of the trial will determine whether Goldman discriminated against Class Members in implementing three specific evaluation

---

[4] *See, e.g.*, *Chen-Oster*, 325 F.R.D. at 62-67 (S.D.N.Y. 2018) (describing factual and procedural history).

[5] *Chen-Oster*, 325 F.R.D. at 55.  Plaintiffs initially moved to also certify an injunctive class pursuant to Fed. R. Civ. P. 23(b)(2) but later withdrew their application to do so. (*See* Dkt. 627.)

processes known as 360 Reviews, Quartiling and Cross-Ruffing.[6]  (Certification Order at 28, 44, 46; *see also* Dkt. 630.)  Plaintiffs allege that these practices are instruments of discrimination that favor men over women with respect to evaluation, compensation and promotion.  (Certification Order at 32.)  To determine whether discrimination resulted from these processes, the Phase I trial will include statistical evidence of a generalized nature.  Phase II will focus on individualized Class Member issues and damages.  (Certification Order at 41-47.)

## B.    The Arbitration Agreements

Goldman alleges that it entered into severance, promotion, compensation, and equity agreements, which included broad arbitration clauses, with over 1,800 Class Members.  These types of agreements "appl[ied] to all divisions, all jobs, all titles, [and] all genders" and were not solely offered to, or accepted by, Class Members.  (T. at 4.)  The agreements can be divided into four discreet categories: (1) Separation Agreements, (2) Managing Director ("MD") Promotion Agreements, (3) Private Wealth Advisor ("PWA") Agreements, and (4) Equity Award Agreements.[7]

---

[6] In "360 Reviews," employees evaluate themselves and then solicit eight to twelve evaluators (including subordinates, bosses, peers, and internal clients) to rate them on a variety of metrics. (Certification Order at 6.) In "quartiling," managers assign each professional to one of five ranked "quartiles" based upon comparative performance relative to other employees across another set of metrics. (Certification Order at 7-8.) In "cross-ruffing," employees are evaluated by Managing Directors selected from outside of that employee's specific business unit based on interviews with the employee's managers, peers, and internal clients. (Certification Order at 9.)

[7] Some Class Members executed multiple arbitration agreements with Goldman. For example, 46 employees who executed Separation Agreements and MD Promotion Agreements containing arbitration clauses after filing of the Complaint had already signed agreements to arbitrate before the Complaint was filed.  (Def. Mem. at 7; Giuffra Decl., App. E-4.)  Additionally, 30 Managing Directors who executed Separation Agreements had previously signed contracts that included agreements to arbitrate.  (Giuffra Decl., Ex.

1.      **Separation Agreements:** In 769 agreements, Class Members agreed to arbitrate employment-related disputes and release claims in exchange for lump-sum severance payments as well as other valuable benefits, such as continuation of base salary payments for months after the employee's departure, the payment of year-end bonuses after the employee's departure, access to job placement services, and/or continuation of health and other benefits.  (*See* Giuffra Decl., App. A, Columns G-J.) Taken together, these payments and benefits ranged in value from thousands to hundreds of thousands to millions of dollars.  (*Id.*)

Goldman has used the same form Separation Agreements since approximately 2002, all of which include a general release of claims and an agreement to arbitrate disputes. (*See* Def. Mem. at 7.)  Those same terms are also included in the company's Employee Handbook.  (*Id.*; *see also* Giuffra Decl., Ex. 1301-1303.)  Pursuant to the release provision, each employee who entered into a Separation Agreement agreed to "voluntarily waive and release forever whatever claims, whether known or unknown, [she] ever had or now ha[s] against Goldman Sachs . . . based upon any matter, cause or thing occurring through the date of [her] signature on this agreement."  (*See, e.g.*, Giuffra Decl., Ex. 362 at § 5.1.)  The releases extend to "claims based upon or relating to your hire by Goldman Sachs, any aspect of the work you performed, your employment relationship with the firm, or the termination of your employment" and include claims "for discrimination based upon . . . sex."  (*Id.*)  As for dispute resolution, the Separation Agreements require arbitration of "[a]ny dispute or claim arising out of or based upon or relating in any way to

_____

416 at § 9.1; Giuffra Decl., App. E-5 (providing that "[d]isputes arising out of or relating to this agreement are subject to the provisions of the [MD Agreement] with respect to such matters as arbitration, injunctive relief and jurisdiction").)

th[e] [Separation] [A]greement, or to your employment or other association with the firm, or the termination of your employment."  (*Id.* at § 9.1.)  Of the 769 Separation Agreements, 491 were executed before the lawsuit.[8]  (Dkt. 959 at 3.)

2.  **MD Promotion Agreements:** In 200 agreements, Class Members agreed to arbitrate in exchange for increased compensation and promotion to Extended Managing Director or Participating Managing Director ("Partner") (collectively, "MD"). (Dkt. 959 at 3.)  Since 2002, Goldman has required all employees promoted to Extended Managing Director or Partner to execute MD Promotion Agreements that require arbitration of disputes.  (*See, e.g.*, Giuffra Decl., Ex. 883, 989.)  All of the 200 MD Promotion Agreements at issue here include a provision virtually identical to that in the Separation Agreements requiring arbitration of "any dispute, controversy or claim arising out of or based upon or relating to Employment Related Matters."[9] (Giuffra Decl., App. B, Column I, Ex. 883 at 5.)  The MD Promotion Agreements were supported by substantial consideration in the form of sought-after titles along with an increase in base salary to at least $400,000 per year as well as other financial benefits including discretionary annual bonuses.[10]  (Landman Decl., ¶ 7.)  Of the 200 MD Promotion Agreements, 60 were

---

[8] Plaintiffs do not oppose arbitration of a relative handful of Separation Agreements where the putative Class Members each were represented by counsel.  (Dkt. 959 at 3, n.2-3.)

[9] "Employment Related Matters" are defined as "matters arising out of or relating to or concerning this Agreement, your employment with the Firm or the termination thereof, or otherwise concerning any rights, obligations, or other aspects of your employment relationship in respect of the Firm."  (Giuffra Decl., Ex. 883 at 5.)

[10] Goldman emphasizes that the individuals who achieve the rank of Executive Managing Director or Partner are "highly educated, experienced and sophisticated professionals," over forty percent of whom have at least one advanced degree. (Def. Mem. at 9; Landman Decl., ¶¶ 4-6.)  Promotion to Extended Managing Director is a significant achievement within the financial services industry; less than ten percent of Goldman's global workforce

executed before filing of the Complaint.  (Dkt. 959 at 3.)

3.       **PWA Agreements:** In 187 agreements, Class Members who served as Private Wealth Advisors agreed to arbitration in exchange for their placement "in a role with significant career and compensation benefit – which includes access to the Firm's high-net-worth clients, extensive training and placement in an existing PWA team." (Def. Mem. at 6; *see also* Dkt. 959; Cupertino Decl., ¶¶ 9-13.) Of the 187 PWA Agreements, 95 were executed before the Complaint was filed. (Dkt. 959.)

All Goldman PWAs are required to register with the Financial Industry Regulatory Authority ("FINRA") (or, prior to 2007, its predecessor entities the National Association of Securities Dealers and New York Stock Exchange Member Regulation).  (Cupertino Decl. ¶ 4.)   Registered representatives must agree "to arbitrate any dispute, claim or controversy that may arise between me and my firm" in the Form U4 required for FINRA registration. (Uniform Application for Securities Industry Registration or Transfer § 15A, ¶ 5 (2009).)  Since 1998, Goldman Sachs has required all PWAs to enter into a standard PWA Agreement specifying certain conditions of their employment, including that "[a]ny dispute or claim arising out of, based upon or relating in any way to . . . your employment at Goldman Sachs or the termination of your employment, will be settled and finally determined by arbitration."  (Giuffra Decl., Ex. 1156 at § 9; Cupertino Decl. ¶ 7.)  Like MDs, PWAs are well-educated and experienced professionals; PWAs also have passed FINRA's registration examinations for investment advisors.  (Cupertino Decl., ¶¶ 3-6.)

4.       **Equity Award Agreements:** Starting more than five years after

---

has achieved the rank of Extended Managing Director and less than two percent has achieved the rank of Partner.  (Landman Decl., ¶¶ 4–5.)

commencement of this litigation, 694 Class Members agreed to a broad arbitration clause while receiving discretionary equity-based compensation awards. (Dkt. 959; Lamy Decl. ¶¶ 5-6.) Individuals who entered into Equity Award Agreements generally received grants of Restricted Stock Units, which are promises to deliver Goldman Sachs stock at specific times in the future, subject to certain conditions. (Giuffra Decl., App. D; Dias Decl., ¶ 5.) The approximate value of individual equity awards, based on the stock price on the date of grant, ranged from $1,461 to over $1.3 million, with an average value of approximately $37,000. (Def. Mem. at 12; Dias Decl. ¶ 36, Ex. 61.) To be eligible for the equity awards, employees each had total annual compensation of at least $200,000, of which at least $15,000 was a discretionary bonus. (Dias Decl. ¶ 7.)

Goldman's employee equity program initially was set forth in a written Equity Award agreement. (Giuffra Decl., App. D; Dias Decl. ¶¶ 4-8.) The form Equity Award agreement included an arbitration provision limited to disputes related to the Equity Award agreement itself. The document also incorporated by reference Goldman's Stock Incentive Plan, which has its own documentation similarly requiring arbitration of disputes specifically related to the Equity Award program. (Dias Decl., Ex. 6.) In 2016, however, Goldman introduced an additional document into its electronic process for accepting equity benefits: an electronic Signature Card. (Dias Decl. ¶¶ 16-28; Lamy Decl., ¶¶ 5-6.) In contrast to the Equity Award agreements, which still contained their equity program-specific arbitration clauses, the Signature Card incorporated a broader arbitration provision applicable to all aspects of an employee's relationship with Goldman.[11] (*See,*

---

[11] The disputed arbitration provision at issue here appears in the Signature Card, not the underlying Equity Award agreement. Accordingly, the Court refers to Equity Award agreements and Signature Card together as "Equity Award Agreements," with a capital

*e.g.*, Dias Decl., Ex. 14 at 1.)  The intricacies, and implications, of this change and manner of acceptance are discussed later in this decision.

**C.    Notice to Class Members**

Goldman delineates various ways by which it contends Class Members received actual notice, or should have been on constructive notice, of the pendency of this action by the time they entered into their respective agreements containing arbitration clauses and releases.  (Def. Mem. at 14-18.)  The parties disagree on the legal import of these events, but the Court will describe three methods of notice that are potentially relevant.

First, beginning on September 20, 2010, five days after the Complaint was filed, Goldman emailed document retention notices ("Hold Notices") to all U.S.-based employees.  (Yanagisawa Decl., Ex. 1.)  The Hold Notices advised employees that "three former employees sued the firm asserting claims concerning their employment and making general allegations about the firm's practices and policies with respect to female associates, vice presidents and managing directors," and directed employees to preserve any documents related to "the firm's practices and policies concerning compensation, promotion, assignments, support, training and mentoring and the firm's performance review system as they relate to associates, vice presidents and managing directors."  (*Id.* at 1.)  Since that time, Goldman has sent at least eight additional Hold Notices to individuals who were determined to possibly have relevant documents.  (Yanagisawa Decl., Ex. 2-9.)  Goldman notes that, in total, it has sent Hold Notices via email over 100,000 times and that many Class Members would have received Hold Notices multiple

---

"A" for "Agreements."    When referring to the Equity Award agreement without the Signature Card, the Court uses a lower case "a" for "agreements."

times.  (Def. Mem. at 15; Becker Decl., Ex. 1.)

Second, Goldman emphasizes the press attention that this matter has received, including over 100 articles in media outlets such as *The New York Times*, *Business Insider*, and other industry publications since the case was filed in 2010.  (*See, e.g.*, Giuffra Decl., Ex. 1309, 1310.)  At least 96 such articles have specifically referred to the case as a "class action." (Giuffra Decl., Ex. 1304-1417.)

Third, Goldman disclosed the existence of this action in each of its Form 10-Q and 10-K filings since the third quarter of 2010 when the original Complaint was filed.  The disclosure states, in relevant part, that "[o]n September 15, 2010, a putative class action was filed . . . by three former female employees alleging that Group Inc. and GS&Co. have systematically discriminated against female employees in respect of compensation, promotion, assignments, mentoring and performance evaluations." (Giuffra Decl., Exs. 1418–1451.)  This disclosure was amended in the first quarter of 2018 to reflect the Certification Order.  (Ex. 1448 at 4.)

More recently, on November 30, 2018, Class Members were sent the negotiated, court-approved class action Notice (the "Notice").  (*See* Dkt. 618 (court approval); Giuffra Decl., Ex. 1300 (example Notice).)  The Notice specifically advised that: "Goldman Sachs has asserted that . . . those who have signed agreements to arbitrate any claims they may have against the firm related to their employment should be excluded from the Class. . . . The fact that you received this Notice does not mean that you will remain in the Class if you signed a release of claims or an agreement to arbitrate."  (Giuffra Decl., Ex. 1300 at 3.)  The Notice indicated that recipients had the right to opt out of the class by January 14, 2019.  (*Id*. at 4.)   During that period, 130 Class Members who had executed

agreements with arbitration clauses or releases opted out.  (Def. Mem. at 17.)  However, the Class Members who are the subject of Goldman's Motion did not.  (*Id.*)

On February 5, 2019, Goldman sent class counsel individual arbitration demands directed to each Class Member at issue on this motion requiring that she abide by her obligation to bring her claims in arbitration and file a voluntary dismissal of her claims in this action.  (Giuffra Decl., Ex. 1290–1294.)  Goldman further advised that if no response was received by March 7, 2019, it would assume its demands had been refused and would move to compel arbitration.  (*Id.*)  Plaintiffs did not directly respond to Goldman, instead addressing their views on the arbitration clauses and releases to the Court.  (Dkt. 667, 671.)  Briefing of the Motion and Cross-Motion followed.

## Discussion

The Court begins its analysis by addressing one of Plaintiffs' primary arguments against enforcing any of the arbitration agreements at issue – that Goldman waived its right to compel arbitration because it waited too long to assert it.  The Court finds otherwise, concluding that Goldman has asserted its right to arbitrate repeatedly during the litigation. Goldman moved to compel shortly after the class was certified at the earliest practicable time that it could have done so under the circumstances.

Second, the Court addresses the existence, scope and enforceability of the arbitration agreements with Class Members.  The Court concludes that the arbitration provisions of the Separation Agreements, MD Promotion Agreements, and PWA Agreements are enforceable under contract law and encompass the claims in suit. Absent voiding the arbitration provisions in those agreements pursuant to Rule 23(d), the individuals who signed these agreements should be compelled to arbitrate.  As for

arbitration provisions in the Equity Award Agreements, which Plaintiffs contend are unenforceable as unconscionable, the Court finds that although tainted by procedural unconscionability, those provisions are not substantively unconscionable and accordingly should be enforced, again subject to any different outcome under Rule 23(d).

Third, the Court considers Plaintiffs' Cross-Motion, and whether the otherwise enforceable arbitration provisions (and releases) of the Separation Agreements, MD Promotion Agreements, PWA Agreements, and Equity Award Agreements should be voided under Rule 23(d) as applied to Class Members.  After analyzing Rule 23(d) and relevant case law, the Court determines that none of the arbitration provisions (or releases) contained in the first three categories of agreements should be voided pursuant to Rule 23(d).  The Court finds, however, that the Equity Award Agreements do raise Rule 23(d) concerns warranting remedial action and that the Class Members who agreed to arbitrate solely pursuant to these agreements should be given an opportunity to opt out of arbitration and continue as parties to this action.

## I.   Goldman Did Not Waive Its Right to Compel Arbitration

Waiver is a gateway issue with respect to both the Motion and Cross-Motion; if Goldman's effort to seek arbitration is untimely, both motions are effectively moot. Plaintiffs argue that Goldman waited too long to move to compel arbitration and thereby has waived its right to do so.[12]  (Pl. Opp. at 17-25.)  Goldman counters that it has clearly

---

[12] Plaintiffs also argue that the determination of Goldman's request to compel arbitration is premature and should be deferred to Phase II when individual Plaintiff's claims will be addressed.  (Pl. Opp. at 15-17.)  The Court disagrees.  Such a process would be a rather inefficient way of managing this already-cumbersome litigation when the issue can be dealt with now.  Additionally, Plaintiffs have not made a similar argument with respect to their Rule 23(d) Cross-Motion, nor offered an affidavit or declaration from any individual Class Member raising the prospect of individualized issues.  Plaintiffs' suggestion also

stated its intention to compel arbitration since its first responsive pleading was filed in 2010, reiterated that intention repeatedly over many years, and moved to compel as soon as practicable following class certification.  (Def. Reply at 7-11.)  The Court agrees with Goldman and finds that Defendants did not waive their right to seek arbitration.

## A.    Legal Standards for Waiver of Right to Arbitrate

As a general matter, waiver of the right to seek arbitration is considered against the well-established backdrop of the "emphatic federal policy in favor of arbitral dispute resolution."  *Marmet Health Care Center, Inc. v. Brown*, 565 U.S. 530, 533 (2012) (internal citations omitted).  The Second Circuit has repeatedly emphasized that "waiver of the right to arbitration is not to be lightly inferred."  *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 104-105 (2d Cir. 2002) (internal citations omitted); *see also PPG Industries, Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 107 (2d Cir. 1997) (same).  As a result, "any doubts concerning whether there has been a waiver are resolved in favor of arbitration."  *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 100-01 (S.D.N.Y. 2017) (internal citations omitted).

To determine whether a party has waived its right to arbitration by expressing its intent to litigate the dispute in question, courts in the Second Circuit employ a three-factor analysis, examining "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice."  *Louisiana Stadium & Exposition District v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010) (quoting *Louis*

---

undermines Plaintiffs' own argument that pursuing ongoing litigation without addressing the arbitration issue serves as evidence of Goldman's waiver.

*Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 229 (2d Cir. 2001)).  The Court analyzes these three factors with respect to Goldman's conduct, while taking account of the "national policy favoring arbitration" and the unique procedural history of this case.  *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984); *Katsoris*, 237 F. Supp. 3d at 100 (same).

## B.    Goldman Timely Asserted Its Right to Arbitrate

This lawsuit is now ten years old.  Plaintiffs argue that Goldman's motion comes "too late" (Pl. Sur-Reply at 1); Goldman counters that it asserted its arbitration rights "early and often."  (Def. Reply at 8.)   But simply counting the years that have passed since Plaintiffs' commenced this action does not end the Court's analysis given the unusual and circuitous path of this complex litigation.[13]  Although significant time has elapsed since the Complaint was filed, Goldman made its motion to compel as soon as it was practicable and possible to do so.

In the context of class action litigation, courts repeatedly have held that the earliest time to move to compel arbitration is after class certification. At that juncture, previously putative class members first become subject to a court's jurisdiction.  *See Jensen v. Cablevision Systems Corp.*, 372 F. Supp. 3d 95, 123 (E.D.N.Y. 2019) (before certification, the court cannot "compel absent putative class members who are not before this [c]ourt to binding arbitration or issue a ruling regarding the enforceability of the [arbitration] provision," because "[a]ny such ruling is procedurally improper and analogous to an

---

[13]   The case was delayed at multiple junctures primarily due to interlocutory appeals concerning class certification. (Dkt. 126, 175.)  It also has seen two district judges and two magistrate judges over its history, causing further administrative delays through no fault of the parties. (Dkt. 181.)

advisory opinion"); *In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litigation*, No. 12-CV-711, 2016 WL 5508843, at *2 (D.N.J. Sept. 28, 2016) (finding "[i]t is not appropriate for the Court to exclude potential class members from this class action [based on arbitration agreements] . . . prior to their being made a party in this case" after certification); *Kleen Products LLC v. International Paper*, 306 F.R.D. 585, 607 (N.D. Ill. 2015) ("more appropriate time" for motion to compel "is after the class is certified [when defendants] . . . can determine which specific class members are subject to potentially disqualifying contractual provisions"); *Whittington v. Taco Bell of America, Inc.*, No. 10-CV-01884, 2011 WL 1772401, at *6 (D. Colo. May 10, 2011) ("The court finds no procedure or authority . . . to compel putative class members, who are not currently before the court and, because a class has not yet been certified, have not even received notice of the litigation, to arbitrate their potential claims against Defendants."); *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. 07-CV-1827, 2011 WL 1753784, at *4 (N.D. Cal. May 9, 2011) (defendants could not have moved to compel arbitration prior to certification "because . . . putative class members are not parties to an action prior to class certification") (internal citations omitted).

A recent Eleventh Circuit case, *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230 (11th Cir. 2018), is illustrative.   There, defendant Wells Fargo asserted arbitration agreements as an affirmative defense in its answers and repeatedly notified the plaintiffs and the court of those agreements.  *Id.* at 1234.  As here, the parties proceeded through "class-related discovery and motions practice," and Wells Fargo moved to compel absent class members to arbitration shortly after the district court granted class certification.  *Id.* at 1234-35.  Reversing the district court's decision that Wells Fargo waived its right to

compel arbitration, the Eleventh Circuit held, "it cannot be said that [a defendant's] failure to seek arbitration with the unnamed class members prior to class certification manifested an inconsistency with its arbitration rights [as such a procedure] . . . would have been impossible in practice to compel arbitration against speculative plaintiffs." *Id.* at 1238. The Court did not even reach a discussion of prejudice to the plaintiffs, because it found that Wells Fargo moved to compel arbitration as soon as it could. *Id.* at 1239 n.10.

Like Wells Fargo, Goldman moved to compel arbitration at the earliest practical time. The Certification Order was issued on March 30, 2018. *Chen-Oster*, 325 F.R.D. at 55. Thereafter, the parties agreed upon a Notice to the Class that was approved by the Court on November 16, 2018 (Dkt. 618, 639), and distributed on November 30, 2018. (Dkt. 647.) Notice was sent to 3,487 Class Members. (Dkt. 674.) The deadline to opt-out of the class was January 14, 2019 – the date by which Goldman would know which Class Members, if any, would comply with their arbitration agreements and leave the class. By that date, 165 individuals opted out of the class, resulting in a total class size of 3,322. (Dkt. 674.) About three weeks later, on February 5, 2019, Goldman served individual arbitration demands. (*Id*.) Goldman thus moved expeditiously.

Plaintiffs had extensive notice of Goldman's intention to compel arbitration. Since this lawsuit began, Goldman has repeatedly stated its right to compel arbitration of all Class Members who executed arbitration agreements. Indeed, Goldman includes a detailed list of 38 references it made between 2010 and 2019 that unambiguously telegraphed its plans. (Giuffra Decl., App. F; *see also* Dkt. 946; T. at 8-14.) For example, Goldman included arbitration as an affirmative defense in each of its Answers, noting that "[l]itigation in this Court is precluded with respect to potential claims by those members of

the putative Class of persons Plaintiffs purport to represent, who have executed arbitration agreements that require employment-related disputes to be submitted to arbitration." (Dkt. 426 ¶¶ 246, 247; *see also* Dkt. 29 ¶¶ 235, 236; Dkt. 161 ¶¶ 229, 230.)

Shortly after this lawsuit was filed, in December 2010, Goldman transmitted examples of arbitration agreements to Plaintiffs' counsel in response to Plaintiffs' requests for samples. (Giuffra Decl., Ex., 1455 at 1.) Plaintiffs then sought – and received – in discovery additional copies of the arbitration agreements covering at least some of their clients. (*See* Giuffra Decl., Ex. 1458 at 7 (Plaintiffs' document demands, dated June 18, 2013); Giuffra Decl., Ex. 1461, 1462 (Goldman's responsive production, dated July 30, 2013 and August 2, 2013).) And the list goes on. Goldman's offers an array of other communications or actions that unmistakably demonstrate its longstanding intent to arbitrate any of Plaintiffs' claims that could be arbitrated. Plaintiffs' argument to the contrary – that the instant strategy represents an unfair surprise after years of litigation that they could not have anticipated – is unavailing. No one involved in this litigation could reasonably have been uncertain that Goldman intended to move to compel arbitration.[14]

---

[14] Goldman's conduct stands in sharp contrast to similar class action disputes where corporate defendants failed to raise their arbitration rights earlier in the case. *See, e.g.*, *Degidio v. Crazy Horse Saloon & Restaurant*, 880 F.3d 135, 141 (4th Cir. 2018) (finding waiver where "[i]nstead of filing a motion to compel arbitration at an early stage," defendant "filed multiple motions for summary judgment, served discovery, and twice asked the district court to certify questions of state law to" state Supreme Court); *In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litigation*, 790 F.3d 1112, 1115, 1117, 1120 (10th Cir. 2015) (finding waiver where defendant "engaged in extensive" fact and expert merits discovery, moved to compel arbitration the "same day it moved for summary judgment," and "fail[ed] to mention its intent to raise its arbitration rights as a defense or inform the district court of the existence of those rights"); *In re Currency Conversion Antitrust Litigation*, 361 F. Supp. 2d 237, 258 (S.D.N.Y. 2005) (finding waiver where defendant engaged in "[e]xtensive nationwide discovery involving nearly one hundred depositions," and where "expert discovery [was] in full swing and the trial [was] scheduled to commence in seven months"); *Edwards v. First American Corp.*, 289 F.R.D.

**C.    The Extent of Litigation, Though Extensive, Does Not Disfavor Arbitration**

Plaintiffs are correct that, as a general rule, parties cannot participate in the litigation process only to move to compel arbitration when it strategically suits them.  (Pl. Opp. at 13.)  The amount of litigation that took place before Goldman moved to arbitrate is indisputably significant.  Plaintiffs highlight just some of the many legal filings in the case at the time of Goldman's motion: 44 fully-briefed motions, over 100 letters, 26 court appearances, and hundreds of thousands of pages of discovery production.  (Pl. Opp. at 5-6.)  Judicial economy dictates that parties may not burden the courts, only to then jump ship to arbitration when the strategic timing suits their interests. *See, e.g., PPG Industries*, 128 F.3d at 108-09 (plaintiff waived its right to arbitrate by "engaging in discovery" and "filing substantive motions" in a related action for "approximately five months" before moving to compel arbitration, which "evidenced a preference for litigation that supports a finding of waiver"); *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 26 (2d Cir. 1995) (finding waiver where a party engaged in an "energetic pursuit of discovery," and waited until "the eleventh hour, with trial imminent" to seek enforcement of an arbitration agreement); *Louisiana Stadium & Exposition District*, 626 F.3d at 159-160 (finding waiver where plaintiff waited eleven months to move to compel arbitration while defendants filed procedural motions and "began work on a motion for judgment on the pleadings").

But again, context is key.  Goldman could not compel arbitration until class certification and the members of the class were determined.  Moreover, Goldman did not

---

296, 307 (C.D. Cal. 2012) (finding waiver where "[d]efendants could have asserted their intention to raise arbitration as a defense at a much earlier stage in the proceeding.").

"hide the ball" with respect to its intent to compel arbitration to either Plaintiffs or the Court, having repeatedly asserted its intent to do so since it first answered Plaintiffs' complaint. Indeed, earlier in this very litigation, Goldman successfully advanced an interlocutory appeal in the Second Circuit, winning reversal of the district court's denial of Goldman's motion to compel arbitration against a former named plaintiff. *Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 488 (2d Cir. 2013). In short, Plaintiffs have been wholly aware of Goldman's strategy to compel arbitration at most every significant step of this case.

Moreover, it is important to keep in mind that Goldman's instant motion concerns only about half of the Class Members. Put differently, regardless of the outcome here, this dispute will proceed in litigation with more than a thousand remaining Plaintiffs even without those who must pursue their claims in arbitration. The great majority of the procedural history in this case, including the many motions, filings, discovery exchanged, and appearances would have occurred regardless of the size of the class and the absence of individuals who would have been in the class but for their agreement to arbitrate. Accordingly, the lengthy history of this case does not support finding waiver.

## D.    Plaintiffs Have Not Demonstrated Prejudice

Courts acknowledge that "[t]he key to a waiver analysis is prejudice." *Thyssen*, 310 F.3d at 105. Prejudice "refers to the inherent unfairness – in terms of delay, expense, or damage to a party's legal position – that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *PPG Industries*, 128 F.3d at 107 (quoting *Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126, 134 (2d Cir. 1997)).

The Second Circuit has identified two types of prejudice from a party's delay in compelling arbitration: "substantive prejudice and prejudice due to excessive cost and

time delay." *Thyssen*, 310 F.3d at 105.   Substantive prejudice occurs when the "invocation of arbitration [creates] a threat of re-litigation" of issues already resolved in court. *Jung v. Skadden, Arps, Slate, Meagher & Flom, LLP*, 434 F. Supp. 2d 211, 216 (S.D.N.Y. 2006); *see also Louis Dreyfus Negoce S.A.*, 252 F.3d at 229 (prejudice in the arbitration context "[typically] refers to the inherent unfairness . . . that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue") (internal citation omitted).   Substantive prejudice can also result from a party "secur[ing] . . . the benefits of pretrial discovery that is often unavailable in an arbitral forum." *Cotton v. Slone*, 4 F.3d 176, 180 (2d Cir. 1993). Courts generally hold that "it is unfair to allow a party to gather information that will be advantageous in a later arbitration proceeding, if that information cannot be obtained in the arbitration proceeding." *Jung*, 434 F. Supp. 2d at 217 (S.D.N.Y. 2006) (citing *Leadertex, Inc.*, 67 F.3d at 26).

For the second category of prejudice, courts will consider situations "when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense." *Thyssen, Inc.*, 310 F.3d at 105 (internal quotations omitted); *see also Polit v. Global Foods International Corp.*, No. 14 Civ. 7360, 2015 WL 1780161, at *5 (S.D.N.Y. April 20, 2015).   However, "pretrial expense and delay – unfortunately inherent in litigation – without more, do not constitute prejudice sufficient to support a finding a waiver." *Jung*, 434 F. Supp. 2d at 217 (quoting *Leadertex*, 67 F.3d at 26); *see also Anwar v. Fairfield Greenwich Ltd.*, 863 F. Supp. 2d 346, 349 (S.D.N.Y. 2012) (delay and expense "does not reach the level of prejudice necessary to create waiver and overcome the 'strong federal policy favoring arbitration'") (internal quotations omitted).

As indicated above, the parties have engaged in extensive and costly motion practice and pre-trial discovery.  The question is whether this activity has resulted in "delay, expense, or damage to [Plaintiffs'] legal position."  *Doctor's Associates*, 107 F.3d at 134.  Plaintiffs' opposition papers do not clearly articulate any demonstrable prejudice that they would face by having approximately half the class proceed to arbitration, alleging in conclusory fashion that Plaintiffs "have relied on the pleadings, rulings, and extensive discovery" described above and observing that the Second Circuit "has found prejudice in far less extreme circumstances."  (Pl. Opp. at 23-25.)

But, unlike the cases Plaintiffs cite, Goldman does not seek to "[engage] in discovery procedures not available in arbitration, [make] motions going to the merits of [Plaintiffs'] claims, or [purposely delay] invoking arbitration rights while the adversary incurs unnecessary delay or expense."  *S&R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 83-84 (2d Cir. 1998).  Goldman has not taken discovery of any non-named Plaintiffs who are subject to arbitration agreements.  Nor has it caused unnecessary expense.  Given that the instant motion covers only approximately half the class, the parties would have had to engage in most of the same discovery, motion practice and litigation regardless of when Goldman filed the instant motion.  Thus, Goldman has not gained the benefit of discovery procedures not available in arbitration or caused delay or expense that would not otherwise have been incurred had Goldman moved earlier, which it could not have done in any event.  *See Allied Sanitation, Inc. v. Waste Management Holdings, Inc.*, 97 F. Supp. 2d 320, 328-29 (E.D.N.Y. 2000) (no prejudice where defendant engaged in motion practice and first raised arbitration agreement two months post-certification because absent class member "was neither an actual nor putative

litigant" prior to certification).

Plaintiffs argue that "[i]f Goldman's 'heads I win, tails you lose' gamesmanship were permitted, any employer could sit on its purported arbitration rights throughout the entire course of a litigation . . . and then jump to a friendlier forum if the court disagreed with its positions, or roll out arbitration agreements years after the start of the case to create a one-way escape hatch from court."  (Pl. Opp. at 24-25.)  This Court does not endorse such a strategy, nor does this Decision and Order allow it.  A party can only "sit on its purported arbitration rights" to the extent that party can actually move to compel arbitration.  As discussed above, Goldman could not do so until the class was certified.

Moreover, it is not accurate that arbitration necessarily constitutes a "friendlier forum" for employers.  As the Second Circuit noted in *Parisi*,

> [Plaintiffs] must prove to the arbitrators that Goldman Sachs discriminated against [them] on the basis of sex in violation of Title VII. The rules of the fora in which [their] claims may be arbitrated, the Financial Industry Regulatory Authority ("FINRA") and the American Arbitration Association ("AAA"), afford flexibility and informality to parties adducing relevant evidence.  *See* FINRA Rule 13604; AAA Rule 30. Consequently, we have little difficulty in concluding, as Goldman Sachs concedes, that in proving her statutory claims, [Plaintiffs] may offer to the arbitrators evidence of discriminatory patterns, practices or policies at Goldman Sachs that [they contend] affected [them].

*Parisi*, 710 F.3d at 488.

In sum, Goldman consistently asserted its intent to move to compel arbitration, timely did so following certification of the class, and did not waive its right to do so.

## II.    Arbitration Clauses in All Four Categories of Agreements are Enforceable as a Matter of Contract Law

Having disposed of the waiver question, the Court turns to the enforceability of the arbitration agreements.  The analysis begins by considering federal arbitration law and the three inquiries required by the Second Circuit in assessing motions to compel

arbitration: (1) whether the parties agreed to arbitrate; (2) whether the scope of that agreement includes the dispute at hand; and, (3) if federal statutory claims are asserted, whether Congress intended those claims to be arbitrable.  *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019).  The Court answers all three questions in the affirmative.

## A.   Motions to Compel Arbitration and Stay Litigation

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., parties may contract to arbitrate their disputes rather than litigate them.  Such agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  FAA § 2.  For decades, the U.S. Supreme Court has held that, through the FAA, "Congress  declared a national policy favoring arbitration." *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984); *see also Doctor's Associates, Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) ("The FAA 'embodies a national policy favoring arbitration' founded upon 'a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, [their] disputes'") (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (internal citations and quotations omitted); *Preston v. Ferrer*, 552 U.S. 346, 349 (2008) (quoting *Southland*).

Enacted in 1925, the FAA sought to counteract traditional judicial hostility toward arbitration, which often overrode the parties' contractual intentions.  *See Allied-Bruce Terminix Cos., Inc. v. Dobson,* 513 U.S. 265, 270-72 (1995) (explaining legislative history).  In this way, the FAA places arbitration agreements "upon the same footing as other contracts."  *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 511 (1974) (internal quotations omitted); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (noting that the Supreme Court has "long recognized and enforced a liberal federal

policy favoring arbitration agreements") (internal citations and quotations omitted); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 344 (2011) (reiterating that it is a "fundamental principle" of the FAA that "arbitration is a matter of contract" and that its "overarching purpose . . . is to ensure the enforcement of arbitration agreements according to their terms"); *Sole Resort, S.A. de C.V. v. Allure Resorts Management, LLC*, 450 F.3d 100, 104 (2d Cir. 2006) ("The rules governing arbitration, its location, the law the arbitrators will apply, indeed, even which disputes are subject to arbitration, are determined entirely by an agreement between the parties. Any arbitration proceeding is thus an extension of the parties' contract with one another, a mechanism through which they attempt to ensure compliance with the terms of that contract.").

Where a party to an arbitration agreement refuses to comply with that agreement, and instead attempts to proceed in litigation, the other party may move to stay the litigation, FAA § 3,[15] and compel arbitration. FAA § 4.[16]  In reviewing a motion to compel arbitration, a court "must therefore determine: (1) 'whether the parties agreed to arbitrate'; (2) 'the scope of that agreement'; and, (3) 'if federal statutory claims are asserted, . . . whether Congress intended those claims to be nonarbitrable.'"  *Daly*, 939 F.3d at 421 (quoting *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 844 (2d Cir. 1987)).  In

---

[15] FAA § 3 states, in relevant part: "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ."

[16] FAA § 4 states, in relevant part: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."

accordance with the "strong federal policy favoring arbitration as an alternative means of dispute resolution," any doubts concerning the scope of arbitrable issues are resolved "in favor of arbitrability." *State of New York v. Oneida Indian Nation of New York*, 90 F.3d 58, 61 (2d Cir. 1996).  A court thus "will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (internal citations and quotations omitted).

"Courts deciding motions to compel apply 'a standard similar to that applicable for a motion for summary judgment.'" *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)).  The party moving to compel arbitration "must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order).

The moving party need not "show initially that the agreement would be *enforceable,* merely that one existed." *Id.* (emphasis in original).  Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atlantic Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Financial Corp.-Alabama v. Randolph,* 531 U.S. 79, 91–92 (2000)); *see also Porcelli v. JetSmarter, Inc.*, No. 19 Civ. 2537, 2019 WL 2371896, at *3 (S.D.N.Y. June 5, 2019) (applying summary judgment-like standard to motion to compel). Ultimately, a court faced with a motion under FAA § 3 and FAA § 4 must determine whether "there is a valid contract to arbitrate between the [parties]," and whether the parties' dispute "is covered by the contract." *Unique Woodworking, Inc. v. New York City*

*District Council of Carpenters' Pension Fund*, No. 07 Civ. 1951, 2007 WL 4267632, at *4 (S.D.N.Y. Nov. 30, 2007).  If so, "the role of the court ends and the matter is one for arbitration."[17]  *Id.*

**B.      Goldman Has Established the Existence of Binding Obligations to Arbitrate**

Goldman makes a strong *prima facie* showing that each category of agreements contains binding arbitration provisions under governing principles of contract law.  All the agreements were in writing and signed and accepted by Class Members.  And, there is no dispute that the consideration exchanged was substantial.  Courts have held that an offer of continuing employment alone is sufficient consideration to support an agreement for arbitration.  *See, e.g.*, *Stern v. Espeed, Inc.*, 2006 WL 2741635, at *2 (S.D.N.Y. Sept. 22, 2006) ("In the specific context of post-employment arbitration agreements, several courts in this District have held that continuation of employment alone is sufficient consideration to enforce such an agreement").   Here, Class Members who remained employed by Goldman (i.e., those who did not execute a Separation Agreement) received continued employment and much more.  For example, some received promotion to highly remunerative positions as MDs or employment as financial professionals serving high-net-worth clients as PWAs, while others received valuable equity awards.  (Guiffra Decl., App. B, Column F; *Id.*, App. D, Columns P-R.)   Those who executed Separation

---

[17] In recent years, scholars have raised concerns about the collateral consequences of compelling arbitration of discrimination claims. *See, e.g.*, Jean R. Sternlight, *Mandatory Arbitration Stymies Progress Towards Justice in Employment Law: Where To, #MeToo?*, 54 HARVARD CIV. RIGHTS-CIV. LIBERTIES L. REV. 155 (2019), Imre S. Szalai, *A New Legal Framework for Employee and Consumer Arbitration Agreements*, 19 CARDOZO J. CONFLICT RESOL. 653 (2018); Myriam Gilles, *Opting Out of Liability: The Forthcoming, Near-Total Demise of the Modern Class Action*, 104 MICH. L. REV. 373 (2005). The Court recognizes these public policy concerns, but they do not provide a basis to set aside the agreements here.

Agreements received lump-sum payments and discretionary severance benefits, including continued salary for a period following employment, year-end bonuses, and/or additional consideration that amounted to thousands, hundreds of thousands, or even millions of dollars. (Giuffra Decl., App. A, Columns G-J.)

Plaintiffs offer no meaningful argument to rebut Goldman's *prima facie* showing and do not challenge the agreements' contractual validity, with the exception of the Equity Award Agreements (discussed separately below).  Indeed, "New York contract law presumes that a written agreement is valid and that it accurately reflects the intention of the parties, and imposes a heavy burden on the party seeking to disprove those presumptions."[18]  *Aviall, Inc. v. Ryder System, Inc.*, 913 F. Supp. 826, 831 (S.D.N.Y. 1996).  Under those principles, "a party who signs or accepts a written contract . . . is

---

[18] "[W]hether the parties entered into a binding arbitration agreement is governed by state contract law principles." *Frydman v. Diamond*, No. 14 Civ. 8741, 2015 WL 5294790, at *4 (S.D.N.Y. Sept. 10, 2015) (citing *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 27 (2d Cir.2002)); *see also Raiola v. Union Bank of Switzerland, LLC*, 47 F. Supp. 2d 499, 502, 503 (S.D.N.Y. 1999) (on motion to compel arbitration of Title VII claims against employer, "the Court must apply the federal substantive law of arbitrability, which comprises generally accepted principles of contract law" and applying New York law) (internal citations and quotations omitted)."  The agreements here have different provisions with respect to governing law.  Both the PWA and Equity Award Agreements provide for application of New York law without regard to New York's choice of law principles.  (*See, e.g.*, Giuffra Decl., Ex. 364; Dias Decl., Ex. 2.)  Neither the Separation Agreements nor MD Promotion Agreements explicitly invoke New York law but do designate New York fora for dispute resolution.  (*See, e.g.*, Giuffra Decl., Ex. 1; Giuffra, Decl., Ex. 424.)  Goldman cites New York law as governing enforceability of the arbitration clauses, noting that "[c]ourts in this District regularly rely on New York law for 'generally accepted principles of contract law' to resolve questions of validity under the FAA."  (Def. Mem. at 20 n.20 (quoting *Gold*, 365 F.3d at 149.).)  Plaintiffs do not concede the applicability of New York law, but do not explain what other substantive law they believe should be applied or suggest that the analysis would be any different.  (Pl. Opp. at 25 n.16.)  Accordingly, the Court finds no basis to deviate from application of New York contract law.

conclusively presumed to know its contents and to assent to them." *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (compelling arbitration of claims by financial adviser who signed form contract and noting that "it was ultimately [the employee's] responsibility to ensure he understood the document that he signed"). Moreover, any "[q]uestions concerning the language or construction of an arbitration agreement 'must be addressed with a healthy regard for the federal policy favoring arbitration.'" *Pagaduan v. Carnival Corp.*, 709 F. App'x 713, 715 (2d Cir. 2017) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) and *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25 (1983)).

Courts apply the presumption of contractual validity "with even greater force" where the parties are "sophisticated."[19]   *Cellular Telephone Co. v. 210 E. 86th Street Corp.*, 44 A.D.3d 77, 83 (1st Dep't 2007) (internal citations omitted); *see also Branker v. Pfizer, Inc.*, 981 F. Supp. 862, 866 (S.D.N.Y. 1997) (enforcing release of discrimination claims where plaintiff who executed the release was "educated and sophisticated"); *Berger v. Cantor Fitzgerald Securities*, 967 F. Supp. 91, 94 (S.D.N.Y. 1997) (compelling

---

[19] While sophistication is a factor weighing in favor of enforceability of the arbitration clauses, it is by no means required. *See Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115, 122 (2d Cir. 2010) (enforcing arbitration clause in form agreement despite the fact that Title VII plaintiff claimed she did not read it and noting that "New York law . . . does not absolve Ragone of [her] obligation because she does not have a college degree and has no experience or background in business or human resources.  On the contrary, New York courts have repeatedly ruled that even the fact that a prospective employee possesses an imperfect grasp of the English language will not relieve the employee of making a reasonable effort to have the document explained to him.") (internal citations and quotations omitted).

arbitration of securities dealer's claims and rejecting argument that he "lacked the sophistication required to understand the meaning of the arbitration clause").

Goldman thus emphasizes that the Class Members who executed the agreements at issue were generally well educated and highly compensated, both indicative of sophistication for purposes of entry into contract.  Indeed, MDs at Goldman generally have anywhere from 10 to 16 years of industry experience and often have advanced degrees.  (Landman Decl. ¶¶ 4-6.)  PWAs are similarly highly educated, credentialed financial professionals who provide investment and wealth management advice to Goldman's high-net-worth clients.  (Cupertino Decl. ¶¶ 4-5.)  And, all Class Members who entered into Separation Agreements were well-educated professionals in revenue-producing roles. (Giuffra Decl., App. A, Column O.)

In short, Goldman has satisfied the first element required to compel arbitration, having demonstrated the existence of valid agreements to arbitrate.  *Daly*, 939 F.3d at 421; *Genesco*, 815 F.2d at 844.

**C.    Plaintiffs' Claims Fall Within the Scope of the Arbitration Clauses**

After finding that valid arbitration agreements exist, the Court must evaluate their scope.  *Daly*, 939 F.3d at 421.  The relevant question is whether the arbitration clauses contained in the agreements executed between Plaintiffs and Goldman cover the claims at issue in this litigation, namely claims of gender-based discrimination under Title VII and the NYCHRL.  The answer is yes.

Each category of agreement contains broad language as to what must be arbitrated:

- **Separation Agreements**: "Any dispute or claim arising out of or based upon or relating in any way to this agreement, or to your employment or other association

31

with the firm, or the termination of your employment, will be settled by arbitration."
(Giuffra Decl., Ex. 385 at 4.).

- **MD Promotion Agreements**: "[A]ny dispute, controversy or claim arising out of or based upon or relating to Employment Related Matters will be finally settled by arbitration. . . ."  (Giuffra Decl., Ex. 961 at § 8).

- **PWA Agreements**: "[A]ny dispute or claim arising out of, based upon or relating in any way to . . . your employment at Goldman Sachs or the termination of your employment, will be settled and finally determined by arbitration."  (Giuffra Decl., Ex. 1196 at § 11).

- **Equity Agreements**: "[a]ll claims arising out of or relating to my employment with the Firm or the termination thereof, or otherwise concerning any rights, obligations or other aspects of my employment relationship with the Firm."  (Levin-Gesundheit Decl., Ex. B, at 1.)

Those clauses capture essentially any possible type of employment-related dispute between the signatories, including claims for discrimination under Title VII and the NYCHRL. They are similar to other broad arbitration clauses that courts have found easily encompass employment discrimination-related claims.  *See, e.g.*, *Borden v. Wavecrest Management Team Ltd.*, No. 11 Civ. 6737, 2012 WL 4094959, at *2 (S.D.N.Y. Sept. 18, 2012) (finding that "broad arbitration clause" contained in employment agreement "unambiguously mandates binding arbitration" of discrimination claims); *Weiss v. Travex Corp.*, No. 02 Civ. 2380, 2002 WL 1543875, at *2-3 (S.D.N.Y. July 12, 2002) (granting defendants' motion to compel arbitration of Title VII claims because plaintiff executed an employment contract with a clause specifically providing that "*all* disputes and/or controversies arising out of [plaintiff's] employment . . . shall be settled by binding arbitration"); *Rajjak v. McFrank & Williams,* No. 01 Civ. 0493, 2001 WL 799766, at *5 (S.D.N.Y. July 13, 2001) (determining that statutory discrimination and retaliatory discharge claims were subject to arbitration where arbitration clause required arbitration of "any dispute of any kind between [parties], whether or not arising out of this

Agreement"). Accordingly, the subject matter of this litigation falls within the ambit of the arbitration clauses.

## D.    There are No Non-Arbitrable Claims at Issue

Third, the Court considers whether any of the claims sought to be compelled to arbitration are claims that are non-arbitrable as a matter of law.[20]  The answer to that inquiry is no.

Plaintiffs assert claims of gender discrimination under Title VII and the NYCHRL. Courts have routinely held that employment and Title VII claims are arbitrable. *See, e.g.*, *Casilla v. Philip & Jack Hirth Management*, 563 F. App'x 85, 86 (2d Cir. 2014) (affirming district court's compelling of Title VII claims to arbitration); *Desiderio*, 191 F.3d at 204-05 (Title VII claims are subject to arbitration); *Johnson v. Tishman Speyer Properties, L.P.*, No. 09 Civ. 1959, 2009 WL 3364038, at *2-3 (S.D.N.Y. Oct. 16, 2009) (granting motion to compel arbitration of discrimination claims under Title VII and the NYCHRL); *Zouras v. Goldman Sachs Group, Inc.*, No. 02 Civ. 9249, 2003 WL 21997745, at *2 (S.D.N.Y. Aug. 22, 2003) ("it is now clearly settled law within the Second Circuit that arbitration clauses can be enforced in Title VII cases") (quoting *Martens v. Smith Barney, Inc.*, 238 F.Supp.2d 596, 601 (S.D.N.Y. 2002)).  The same is true for Plaintiffs' claims under the NYCHRL. *See, e.g.*, *Ahing v. Lehman Brothers,* No. 94 Civ. 9027, 2000 WL

---

[20] Some types of claims are non-arbitrable as a matter of law, regardless of the terms of the parties' agreement.  For example, in *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 103-04 (2012), the Supreme Court noted that Congress has prohibited arbitration in the context of particular statutes. *See, e.g.*, 7 U.S.C. § 26(n)(2) (commodity whistleblower claims).  New York State similarly bars arbitration for certain types of claims. *See, e.g., Susquehanna Valley Central School District at Conklin v. Susquehanna Valley Teachers' Association*, 37 N.Y.2d 614, 616-17 (1975) (particular claims related to the New York Education Law were not subject to arbitration).  Plaintiffs do not assert claims against Goldman that fall into any statutory exception to arbitrability.

460443, at *4 (S.D.N.Y. April 18, 2000) (finding plaintiff's NYCHRL race and sex discrimination claims arbitrable); *Rice v. Brown Brothers Harriman & Co.*, No. 96 Civ. 6326, 1997 WL 129396, at *3 (S.D.N.Y. March 21, 1997) ("Discrimination claims under New York City Human Rights law also are arbitrable").

Of particular note, the Second Circuit in *Parisi*, 710 F.3d at 486-88 – examining this same case – held that Title VII and NYCHRL claims would be subject to arbitration. *Parisi*, 710 F.3d at 487. When she was a named Plaintiff in this case, Parisi contended that she had a substantive right under Title VII to pursue a pattern-or-practice claim in class action litigation, and that the court should invalidate the arbitration clause in her employment agreement. The Second Circuit disagreed, citing, *inter alia*, *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 25 (1991). In *Gilmer*, the Supreme Court held that "[e]ven claims arising under a statute designed to further important social policies may be arbitrated" because "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Gilmer,* 500 U.S. at 28. As with *Parisi*, the subject matter of the claims at issue in this iteration of the litigation – discrimination based upon claims under Title VII and the NYCHRL – can be arbitrated.

**E.     The Equity Award Agreements are Not Unenforceable as Unconscionable**

The Equity Award Agreements warrant separate analysis. Unlike the Separation, MD Promotion, and PWA Agreements, the Equity Award Agreements were presented to employees in multiple parts and accepted by different means at different times. Plaintiffs advance an argument they do not make with respect to the other types of agreements, contending that the arbitration provisions of the Equity Award Agreements are

unconscionable and therefore unenforceable.  As discussed below, the Court finds that the Equity Award Agreement arbitration provisions are tainted by procedural unconscionability but not substantive unconscionability.  Because both types of unconscionability are required to render an arbitration provision unenforceable under New York law, the Equity Award Agreement's provisions cannot be voided on this basis. Before analyzing this issue, however, the Court first describes the arbitration terms and means of acceptance relevant to analyzing the Equity Award Agreements.

### 1.    The Terms and Means of Entry into the Equity Award Agreements

As noted at the outset, Goldman's equity program for employees includes three components: the Equity Award agreement, the Stock Incentive Plan, and – beginning in 2016 – the Signature Card.  The Equity Award agreement incorporates the Stock Incentive Plan by reference.  (Levin-Gesundheit Decl., Ex. A at 1, 9.)  It also includes an arbitration clause providing that "[a]ny dispute, controversy or claim between the Firm and you arising out of or relating to or concerning the [stock] Plan or this [equity/stock] Award Agreement will be finally settled by arbitration[.]" (*Id.*)  The arbitration clause thus is limited, encompassing only claims related to the Stock Incentive Plan and Equity Award agreements.  Similarly, the Stock Incentive Plan documentation provides: "[I]t shall be a condition of each [equity] Award that any dispute, controversy or claim between the Firm and a Grantee, arising out of or relating to or concerning the [stock] Plan or applicable [equity] Award Agreement, shall be finally settled in arbitration[.]"[21]  (*See* Dias Decl., ¶ 20

---

[21] *See* U.S. S.E.C. Schedule 14A Proxy Statement of The Goldman Sachs Grp., Inc., Annex B § 3.17 (Apr. 10, 2015), available at https://www.sec.gov/Archives/edgar/data/886982/000119312515125238/d904615ddef14a.htm (last accessed March 26, 2020). (Cross-Motion Mem. at 6, n. 6.)

(describing process for acceptance).)  As with the Equity Award agreement, the scope of the arbitration clause in the Stock Incentive Plan encompasses only those disputes related to those programs.

Before 2016, employees manifested their acceptance of the Equity Award agreement and Stock Incentive Plan through an online portal. (Lamy Decl., ¶ 6; Opp. Mem. at 10).  Beginning in 2016, however, Goldman implemented a revised procedure for employees to accept their participation in the equity program by introducing an additional document, an electronic "Signature Card." (*Id*.; Dias Decl., Ex. 57.)  Since then, the acceptance process for Equity Awards is as follows.  Each year, employees eligible for equity participation receive a link to an internal Goldman website via email.  (Dias Decl., Ex. 51.)  Employees log onto the internal website using their secure credentials. (*Id*. at ¶ 15.)  They are presented with a page showing a series of tabs, including the "Award Statement" (summarizing the contents of the benefit), followed by "Plan Documents" and "Signature Card." (*Id*. at ¶ 20.)  The Plan Documents tab includes hyperlinks to the Award Agreement and Award Summary documents. (*Id*.)  This tab also includes hyperlinks to the Stock Incentive Plan, a summary of the Stock Incentive Plan, and the Goldman Sachs Annual Report for the prior year. (*Id*.)  The website is configured so that an employee must open the Award Agreement and Award Summary by using the hyperlinks in the Plan Documents tab. (*Id*.)  A "pop-up" error message appears if an employee clicks "Go to Next Step" on the Plan Documents tab without opening those documents. (*Id*.)

After opening the Award Agreement and Award Summary documents, the employee clicks "Go to Next Step" to display the next tab showing the Signature Card.

(Dias Decl., Ex. 57, Dias Decl. ¶ 21.)  However, the Signature Card tab only displays the first few lines of the Signature Card's text, which is contained within a sub-window and contains no reference to an arbitration clause on that initial screen. (*Id.*)  To see the full text of the Signature Card, which spans six single-spaced frames and which includes the arbitration clause, the employee would need to scroll or print the document.  (*Id.*)  At the bottom of the window, the employee must check a box stating: "I acknowledge and agree to: (i) the terms and conditions of the Award(s) granted to me contained in the Award Agreement(s) and the SIP [Stock Incentive Plan]; (ii) the agreements, representations and warranties contained in the above signature card; and (iii) the agreements, representations and warranties described above."  (*Id.*)

Of the 694 Class Members who executed Equity Award Agreements after 2016, 689 agreed to the terms and conditions electronically in this fashion; the remaining five elected to print and sign their Signature Card and return it to Goldman's Equity Compensation Group.  (Def. Mem. at 12, n.14; Dias Decl. ¶ 16, 24.)  Whether print or digital, the Signature Card states in bold and capitalized print at the top: "YOU MUST PROPERLY EXECUTE THIS FORM TO ACKNOWLEDGE ACCEPTANCE OF THE TERMS AND CONDITIONS OF YOUR AWARD(S) AND RELATED MATTERS."  (Dias Decl., Ex. 14, 18, 24.)

The Signature Card contains a broad arbitration clause, the scope of which differs from the arbitration provision in the Equity Award agreement as well as the Stock Incentive Plan.  When presented with the Signature Card on their computer screen, the employee sees only a portion of the Card and no reference to an arbitration clause; instead, the employee must scroll through to find the arbitration clause.  (Dias Decl., Ex.

57.)  The broad provision says: "I . . . agree to arbitration, in accordance with the [stock plan]-related arbitration procedure and to the fullest existence permitted by law, all claims arising out of or relating to my employment with the Firm or the termination thereof, or otherwise concerning any rights, obligations or other aspects of my employment relationship with the Firm[.]"  (Dias Decl., Ex. 14, 18, 24 at ¶ 1.)  Unlike the circumscribed arbitration provisions in the Equity Award and Stock Incentive Plan documents, the arbitration provision incorporated into the Signature Card extends beyond the Equity Award program to all employment matters.  In submitting the Signature Card, employees thus are indicating their agreement to both the terms of the underlying Equity Award agreement and Stock Incentive Plan provisions as well as the terms specifically associated with the Signature Card.

### 2.    Unconscionability Standards

At the broadest level, the doctrine of unconscionability "seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties."  *Spinelli v. National Football League*, 903 F.3d 185, 208 (2d Cir. 2018) (quoting *United States v. Martinez*, 151 F.3d 68, 74 (2d Cir. 1998)).  An agreement to arbitrate may be set aside if it is unconscionable.  *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687 (1996) ("[A]pplicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements");FAA § 2 (an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract").  The determination of "[w]hether a contract or any clause of the contract is unconscionable is a matter for the court to decide against the background of the contract's commercial setting, purpose, and

effect[.]" *Marvel Entertainment Group, Inc. v. Young Astronaut Council*, No. 88 Civ. 5141, 1989 WL 129504, at *4 (S.D.N.Y. Oct. 27, 1989) (quoting and applying *Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 403-404 (1968)).

Under New York law, a contract provision may be deemed unenforceable on unconscionability grounds "only where it is 'both procedurally and substantively unconscionable when made.'" *Spinelli*, 903 F.3d at 208 (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988)); *see also NML Capital v. Republic of Argentina*, 621 F.3d 230, 237 (2d Cir. 2010) (noting requirement for both procedural and substantive unconscionability).   While "the procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice[,] "the substantive element looks to the content of the contract, per se." *Nayal v. HIP Network Services IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (quoting *State v. Wolowitz*, 96 A.D.2d 47 (1983)); *see also Zam & Zam Super Market, LLC v. Ignite Payments, LLC*, 736 F. App'x 274, 277-78 (2d Cir. 2018) (same).

Procedural and substantive unconscionability are weighed on a "'sliding scale' . . . the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa.'" *Mayaguez S.A. v. Citigroup, Inc.*, No. 16 Civ. 6788, 2018 WL 1587597, at *12 (S.D.N.Y. March 28, 2018) (internal citations omitted); *see also I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 211 (S.D.N.Y. 2015) (same); *David v. #1 Marketing Service, Inc.*, 113 A.D.3d 810, 812 (2d Dep't 2014) (same). The doctrine of unconscionability "is a flexible one" and "is intended to be sensitive to the realities and nuances of the bargaining process." *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17 Civ. 4570, 2017 WL 7309893, at *11 (S.D.N.Y. Nov. 20,

2017), report and recommendation adopted, No. 17 Civ. 4570, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) (quoting *Gillman*, 73 N.Y.2d at 10).  The Court will consider each of the two types of unconscionability in turn.

### 3.    The Equity Award Agreements are Procedurally Unconscionable to Some Extent

The broad arbitration provision contained within the Equity Award Agreement Signature Card is, to some extent, procedurally unconscionable due to the way in which Goldman implemented and presented it – i.e., employing a means of securing agreement that obfuscated the scope of arbitration to which employees assented.

As the New York Court of Appeals has explained, procedural unconscionability concerns the contract formation process: "The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice. The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Gillman*, 73 N.Y.2d at 10-11 (internal citations omitted); *see also Passelaigue v. Getty Images (US), Inc.*, No. 16 Civ. 1362, 2018 WL 1156011, at *5 (S.D.N.Y. March 1, 2008) (same).

Some of the *Gillman* factors weigh in Goldman's favor.  For example, Plaintiffs do not point to any "high-pressured tactics" employed by Goldman to coerce signatures.[22] They do not claim that they felt compelled to agree to arbitrate disputes merely because

---

[22] *Cf. Urtubia v. B.A. Victory Corp.*, 857 F. Supp. 2d 476, 485 (S.D.N.Y. 2012) (finding that defendants' "workplace relationship with current employees" could "put them in a position to exercise strong coercion").

Goldman has superior bargaining power as their employer.[23]  Nor do they claim that a lack of experience or education prevented them from understanding the agreements.[24] To the contrary, as previously set forth, the employees who signed the agreements are generally well-educated and experienced in the financial industry.

As noted above, however, unconscionability is a "sliding scale" and no one factor is determinative.  *Mayaguez S.A.*, 2018 WL 1587597 at *12. Plaintiffs argue that the Equity Award Agreements are procedurally unconscionable because of "Goldman's decision to bury a new contract term" to expand the scope of the arbitration provision from stock-related disputes to all employment disputes.  (Pl. Opp. at 26.)  As discussed above, in 2016 Goldman introduced a new layer of the electronic acceptance process for Equity Award Agreement, requiring employees to submit a Signature Card acknowledging their acceptance of the terms associated with both the Signature Card and those of the Equity Award agreement and Stock Inventive Plan.  To view the full terms of the Signature Card, however, the employee had to scroll through six frames of fine-print and would have had to make it to the last frame to find its sweeping arbitration provision.  Even if they did

---

[23] *Cf. Arakawa v. Japan Network Group,* 56 F. Supp. 2d 349, 352 (S.D.N.Y. 1999) (rejecting plaintiff's argument that she "only signed the contract to keep her job, and, therefore, the agreement to arbitrate is . . . unenforceable" and noting that she "has not made the disturbing showing of unfairness, undue oppression or unconscionability necessary to void a contract on [that] basis . . . . [and does not allege] that she was threatened with the loss of her job unless she agreed to the arbitration policy") (internal citations and quotations omitted).

[24] *Cf. Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115, 122 (2d Cir. 2010) (enforcing arbitration clause in form agreement even though Title VII plaintiff claimed she did not have a college degree and would not have understood its meaning); *Victorio v. Sammy's Fishbox Realty Co., LLC*, No. 14 Civ. 8678, 2015 WL 2152703, at *13 (S.D.N.Y. May 6, 2015) (enforcing arbitration agreements despite plaintiffs' claims that they could not read English and did not understand the agreements' implications).

review the provision, nothing alerted employees to the fact that the Signature Card's arbitration provision was broader than those of the Equity Award agreement and the Stock Incentive Plan.

Undoubtedly, "neither the FAA nor New York law precludes the enforcement of employment contracts 'which make employment conditional upon an employee's acceptance of mandatory arbitration.'" *American Family Life Assurance Co. of New York v. Baker*, 778 F. App'x 24, 27 (2d Cir. 2019) (quoting *Ragone*, 595 F.3d at 121-22).   In *American Family Life Assurance Co. of New York*, the court noted that the agreement in question was not "deceptive" or "procedurally unconscionable" even if the terms were "take it or leave it."   *Id*.   Indeed, courts often decline to find procedural unconscionability in situations where the form contract has a clear statement of the arbitration agreement and its scope.   *See, e.g.*, *Carr v. Credit One Bank*, No. 15 Civ. 6663, 2015 WL 9077314, at *3 (S.D.N.Y. Dec. 16, 2015) (enforcing arbitration agreement in credit card contract where "arbitration clause was clear, conspicuous, and preceded by a heading written in all capital letters and bold print"); *Anonymous v. JP Morgan Chase & Co.*, No. 05 Civ. 2442, 2005 WL 2861589, at *6 (S.D.N.Y. Oct. 31, 2005) (enforcing arbitration agreement that was "clearly set out in all-caps following a heading in all-caps and bold print titled 'Arbitration Agreement.'").

Likewise, the Second Circuit has held that "clickwrap" agreements – in which the terms and conditions of a transaction are displayed on a screen, and a user must accept the terms through one or more clicks – "can serve as valid consent to arbitrate because in checking a box the user must affirmatively assent to the terms of the agreement." *Porcelli v. JetSmarter, Inc.*, No. 19 Civ. 2537, 2019 WL 2371896, at *4

42

(S.D.N.Y. June 5, 2019) (citing *Meyer v. Uber Technologies*, 868 F.3d 66, 75 (2d Cir. 2017)).  But even with clickwrap agreements, clarity remains a significant concern.  *See Meyer*, 868 F.3d at 775-76 (holding use of linked Terms of Service containing an arbitration clause was not procedurally unconscionable and recognizing that "clarity and conspicuousness are a function of the design and content of the relevant interface"); *Mallh v. Showtime Networks Inc.*, No. 17 Civ. 6549, 2017 WL 5157247, at *4-5 (S.D.N.Y. Nov. 7, 2017) (citing absence of "extraneous material" on a web page, clear labeling of terms of use, and a "reasonably conspicuous" arbitration clause as support for conclusion that plaintiff had notice of arbitration provision).

Here, there was no such clarity.  Although Goldman required employees to acknowledge that they had reviewed the provisions of the Signature Card, the employees had to scroll through to the sixth frame of fine-print to even come across the arbitration provision.  But the particular transgression here is that Goldman did not indicate in any way to employees that the scope of the arbitration provision in the Signature Card's terms was far broader than the limited arbitration provision associated with the equity program agreements.  Without placing the agreements side-by-side and comparing arbitration provisions, employees likely would not realize that with this change in process, they were newly agreeing to arbitrate every claim related to their employment.

Taking together, the limited scope of arbitration in the Equity Award Agreement and Stock Incentive Plan documents, Goldman's "burying" the broader provision in the Signature Card, Goldman's failure to alert employees to the change of scope, and the

resulting potential for confusion, the Court concludes the Signature Card's broad arbitration provision is tainted by procedural unconscionability.[25]

### 4. The Equity Award Agreements are Not Substantively Unconscionable

Even though the Signature Card's arbitration provisions are to some extent procedurally unconscionable, they are not substantively unconscionable. As noted above, substantive unconscionability, unlike procedural unconscionability, "looks to the content of the contract." *Nayal*, 620 F. Supp. 2d at 571 (citing *Wolowitz*, 96 A.D.2d at 67). It "entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Gillman*, 73 N.Y.2d at 12. An unconscionable contract is one that is "so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Ragone*, 595 F.3d at 121-22 (quoting *Gillman*, 73 N.Y.2d at 10; *see also Nayal*, 620 F. Supp. 2d at 571 (same). Plaintiffs advance three primary grounds for finding substantive unconscionability in the

---

[25] That is not to say, however, that the arbitration provisions contradict one another or create a contractual ambiguity that must be construed against the drafter as Plaintiffs argue. (Pl. Mem. at 32.) To the contrary, the Signature Card's arbitration provision expressly states that the employee agrees to arbitrate all claims under the SIP as set forth in the SIP and Award Agreement, and "further" agrees to arbitrate all employment-related claims. (Levin-Gesundheit Decl., Ex. B at 1.) Use of the term "further" indicates that the employee agrees to arbitration of both types of claims, not one or the other. *See Further*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/further (March 11, 2020) (defining "further" as "in addition"). Moreover, the Signature Card expressly incorporates the arbitration procedures of the Equity Award agreements and Stock Incentive Plan, while also distinguishing between the preconditions that apply to arbitration of equity award claims versus those applicable to other employment-related claims. (Levin-Gesundheit Decl., Ex. B at 1.) Again, there is no conflict but rather harmonization within the language of the different provisions. But the specific manner in which Goldman chose to implement the acceptance procedure for the far broader provision of the Signature Card lends itself to potential confusion.

arbitration provision of the Equity Award Agreements.  The Court addresses each of these in turn.

First, Plaintiffs argue that Goldman's change of its arbitration language "six years into [this] case . . . was clearly intended to provide Goldman with an unfair advantage in this litigation and any resulting (individual) arbitration."  (Pl. Opp. at 28.)  The Court is unpersuaded by this argument.  As a practical matter, this litigation has elapsed over a full decade.  Over such an extended period, a company may shift its business practices, particularly in light of changing law.[26]  The mere existence of a class action lawsuit does not bar Goldman from altering its business practices, arbitration policies, or form agreements.  Plaintiffs submit no evidence to suggest that the broader language on the Signature Cards was designed to target putative Class Members.  To the contrary, Goldman asked all eligible employees, regardless of gender, to execute identical form contracts.  (T. at 4.)  As a result, approximately one-third of Goldman's global workforce received these agreements.  (Dias Decl., ¶ 14.)  Moreover, Goldman did not introduce the new Signature Card process until 2016, six years after this case had been filed as a class action.  Goldman did not introduce the new process immediately upon or even shortly after the filing of this action, which might suggest that the contracts were entered into in bad faith – a contract-based defense to agreements to arbitrate.  *See, e.g.*, *Epic*

---

[26] Between the filing of this lawsuit in 2010 and the implementation of the broader arbitration language in 2016, the Supreme Court issued a series of decisions broadly interpreting the FAA and favoring class action waivers. *See, e.g.*, *AT&T Mobility LLC*, 563 U.S. at 333 (holding that the FAA pre-empted a state law deeming class action waivers unconscionable); *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013) (holding that FAA does not permit courts to invalidate a contractual waiver of class arbitration on the ground that the plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential recovery).

*Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1616 (2018) (listing common defenses under contract law and equitable principles to enforcement of arbitration agreements under FAA § 2). In short, the timing of the implementation of the amended arbitration clause does not demonstrate substantive unconscionability.

Second, Plaintiffs argue that the Equity Award Agreements eliminate access to injunctive and declaratory relief and therefore are inherently unconscionable. (Pl. Mem. at 28-29.) The premise of this argument is flawed. Paragraph 16(b) of the Equity Award agreement provides: "To the fullest extent permitted by applicable law, no arbitrator will have the authority to consider class, collective or representative claims, to order consolidation or to join different claimants or grant relief other than on an individual basis to the individual claimant involved." (Levin-Gesundheit Decl., Ex. A at 9.) The Signature Card includes virtually identical language. (Levin-Gesundheit Decl., Ex. B at ¶ 1.) Neither of these provisions refers to or bars either declaratory or injunctive relief. Rather, they preclude class action and similar group-based arbitration. And, as the Supreme Court has held, arbitration clauses are not unconscionable merely because they preclude class-wide action or relief.[27] *AT&T Mobility*, 563 U.S. at 351-52; *see also Fensterstock v.*

---

[27] Even if the Equity Award Agreement arbitration provisions did prohibit declaratory and injunctive relief, they would not necessarily be rendered unconscionable. Courts reject the notion that the trade-offs inherent to arbitration make the process less "fair." *See, Forbes v. A.G. Edwards & Sons, Inc.*, No. 08 Civ. 552, 2009 WL 424146, at *4 (S.D.N.Y. Feb. 18, 2009) (noting that lack of discovery available in arbitration is part of the bargained-for process, and cannot support a claim of substantive unconscionability); *see also Gilmer*, 500 U.S. at 31 (discovery process available to a plaintiff in arbitration is fair even though it is less extensive than it would be in federal court); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 481 (1989) (concerns about arbitration "as a method of weakening the protections afforded in the substantive law to would-be complainants . . . [are] far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes").

*Education Finance Partners*, No. 08 Civ. 3622, 2012 WL 3930647, at *7 (S.D.N.Y. Aug. 30, 2012) (applying *AT&T Mobility LLC* and commenting that "the one-sided effect of the class action waiver . . . does not necessarily lead to harsh or one-sided results in the ultimate arbitration" and therefore cannot be per se unconscionable); *Sacchi v. Verizon Online LLC*, No. 14 Civ. 423, 2015 WL 765940, at *10 (S.D.N.Y. Feb. 23, 2015) (confirming that class action waivers do not render arbitration agreements unconscionable).[28]

Third, Plaintiffs argue that the broad arbitration provisions found in the Signature Cards are substantively unconscionable because they "include an overbroad and one-sided requirement that employees arbitrate any and all non-employment disputes with any Goldman employee or affiliate, which includes not only co-workers, but also former employees, clients, or vendors."  (Pl. Mem. at 31.)  Plaintiffs claim that this could include mandatory arbitration for all disputes "irrespective of whether such actions or inactions occurred in the ordinary course of employment."  (*Id.*)  At oral argument, Plaintiffs' counsel suggested the provision would "sweep in" tort claims, contract claims, and other claims involving family members or other non-employees.  (T. at 44-45.)  The Court is dubious of such an expansive interpretation of the provision, and Goldman has not proffered one. In any event, the argument is irrelevant as this case does not present a dispute of the

---

[28] New York courts similarly have upheld class action waivers in arbitration agreements against challenges that they are unconscionable.  *See, e.g.*, *Tsadilas v. Providian National Bank*, 13 A.D.3d 190, 191 (1st Dep't 2004) (holding that "arbitration provision is enforceable even though it waives plaintiff's right to bring a class action" and explaining that "[u]nder New York law, 'a contractual proscription against class actions . . . is neither unconscionable nor violative of public policy'") (quoting *Ranieri v. Bell Atlantic Mobile*, 304 A.D.2d 353, 354 (2003)); *see also Nayal*, 620 F. Supp. 2d at 573 ("Courts applying New York law . . . have uniformly held that class action waivers are not unconscionable" in connection with arbitration clauses).

nature theorized by Plaintiffs. Employment-related claims, including alleged gender discrimination, fall squarely within the clause.

The arbitration clauses of the Equity Award Agreements are not substantively unconscionable. Accordingly, because there is at most procedural but not substantive unconscionability, the arbitration clauses are not unenforceable as unconscionable.

### III.   No Agreements Must Be Voided Under Fed. R. Civ. P. 23(d), but Opt-Out Notice is Warranted for Equity Award Agreements

Plaintiffs' Cross-Motion posits that the arbitration provisions in 1,220 agreements (and the releases in Separation Agreements) entered into after this case was filed should be voided as applied to Class Members pursuant to the Court's duty to manage communications with putative class members under Fed. R. Civ. P. 23(d).[29]  Plaintiffs claim that Goldman obtained these "unlawful agreements" through a "multi-year effort" comprised of "misleading communications" with Class Members with the goal of purposefully "circumventing class action protections."  (Cross-Motion Mem. at 1.)  Distilled to its core, Plaintiffs' complaint is that Goldman's inclusion of the arbitration provisions and releases in various employment and compensation agreements was coercive

---

[29] The precise number of agreements targeted by the Cross-Motion has shifted a number of times. The Cross-Motion initially sought to void 1,291 agreements. (Levin-Gesundheit Decl. ¶ 4.)  On Reply, Plaintiffs lowered the number to 1,274 to reflect 17 Separation Agreements that were entered into after filing of the Complaint and independently negotiated by counsel. (Pl. Reply Mem. at 1 n.1.)  In a later filing, Plaintiffs indicated that 1,230 agreements were at issue. (Dkt. 957.)  Of those, 1,209 were entered into after filing of the Complaint but before class certification, and 21 were entered into after class certification. (*Id.* at 2.)  In the same filing, however, Plaintiffs made additional concessions on several agreements they no longer challenged under Rule 23(d).  Taking those concessions into account, the final number is 1,220, which includes 1,200 agreements entered into after the Complaint was filed but before class certification, and the remaining 20 after class certification. (Dkt. 957 at 2 n.1.)  Accordingly, the Court takes 1,220 as the number of agreements for which Plaintiffs seek relief under Rule 23(d).

because of the employee-employer relationship between the parties, and misleading because Goldman did not identify the existence of this action or contact information for class counsel.  (Cross-Motion Mem. at 12.)  Accordingly, the Court must consider to what extent, if any, relief under Rule 23(d) is warranted based on the substance of the agreements and how Goldman presented the agreements to putative Class Members.

As discussed below, the Court concludes that the Separation Agreements, MD Promotion Agreements and PWA Agreements do not warrant judicial action under Rule 23(d).  The Equity Award Agreements, however, do warrant relief. The Court finds that the process by which arbitration provisions in the Equity Award Agreements were obtained was procedurally problematic and that limited remedial action is required for those Class Members who entered into only Equity Award Agreements.[30]

## A.     Rule 23(d) and Communications with Putative Class Members

Pursuant to Rule 23(d) "a district court may impose conditions on the parties and their counsel in a class action."  *Dodona I, LLC v. Goldman, Sachs & Co.*, 300 F.R.D. 182, 184 (S.D.N.Y. 2014) (citing Rule 23(d)); *see also In re Prudential Securities Inc. Ltd. Partnerships Litigation*, 164 F.R.D. 362, 369 at n.4 (S.D.N.Y. 1996), aff'd, 107 F.3d 3 n.4 (2d Cir. 1996) (Rule 23(d) "allows the Court to make appropriate orders to manage a class action.").  Rule 23(d)(1) provides, in relevant part, that a court supervising a class action "may issue orders" that:

> (A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;
>
> (B) require – to protect class members and fairly conduct the action – giving

---

[30] No remedial action is warranted with respect to Class Member who executed *both* an Equity Award Agreement *and* a PWA Agreement, MD Promotion Agreement or Separation Agreement, as the Court finds the latter three to be enforceable.

appropriate notice to some or all class members of:

> (i) any step in the action;
> (ii) the proposed extent of the judgment; or
> (iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

(C) impose conditions on the representative parties or on intervenors;

(D) require that the pleadings be amended to eliminate allegations about representation of absent persons . . . or

(E) deal with similar procedural matters.

Fed. R. Civ. P. 23(d)(1).  As can be seen from its text, Rule 23(d) is discretionary, permitting, but not requiring, a court to issue orders.

In *Gulf Oil Co. v. Bernard,* 452 U.S. 89 (1981) ("*Gulf Oil*"), a seminal case on Rule 23(d)'s application, the Supreme Court provided guidance for district courts to apply when deciding whether to limit communications with putative class members.  *Gulf Oil* was a class action employment discrimination case brought by and on behalf of African American employees of Gulf Oil, the oil and gas company. Before the lawsuit commenced, and pursuant to a conciliation agreement entered into with the Equal Employment Opportunity Commission ("EEOC"), Gulf Oil began sending proposed agreements to employees offering back pay awards in exchange for releases.  452 U.S. at 92.  After being served with the lawsuit, however, Gulf Oil stopped sending the offer and release forms to putative class members.  *Id.*  Even so, according to Gulf Oil, a lawyer for the class met with a group of employees recommending that they not sign the releases at issue and that they return any checks already received.  *Id.* at 93.

In response, Gulf Oil moved to limit party and counsel communications with

putative class members with the exception that Gulf Oil be allowed to continue offering back pay awards in exchange for releases.  *Id.*  The district court adopted Gulf Oil's proposal, issuing an order that imposed "a complete ban on all communications concerning the class action between parties or their counsel and any actual or potential class member who was not a formal party, without the prior approval of the court."  *Id.* at 94-95.  But the order exempted communications initiated by clients, communications "in the regular course of business," and, as Gulf Oil requested, Gulf Oil's communications about the EEOC conciliation agreement and settlement process.  *Id.* at 95.

The U.S. Court of Appeals for the Fifth Circuit affirmed the district court's decision, recognizing that orders limiting communications fall within the powers of district courts to manage class litigation.  *Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1258-1262 (5th Cir. 1980).  The Fifth Circuit then granted a rehearing *en banc*, reversing the panel decision.  *Bernard v. Gulf Oil Co.*, 619 F.2d 459 (1980).  The *en banc* majority found that the district court's order was an unconstitutional prior restraint on expression in violation of the First Amendment, and that the restraint imposed was overly broad.  *Id.* at 467.

The Supreme Court affirmed the Fifth Circuit's *en banc* decision, holding that the district court abused its discretion under Rule 23(d) by issuing the orders without basing them on "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties."  452 U.S. at 101. As the Court explained, "[o]nly such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23."  *Id.* at 101-02.  The Court directed that district courts pay "attention to whether [a] restraint is justified by a likelihood of serious abuses."  *Id.* at 104.

"[S]uch a weighing – identifying the potential abuses being addressed – should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances."  *Id.* at 102.

There are some important differences between *Gulf Oil* and the instant case.  For example, the relief sought in *Gulf Oil* was concerned with restrictions on future communications, not, as here, remedies for past communications.  The Supreme Court's concern with prior restraints on speech is thus not at issue.  And, Gulf Oil was animated in part by restrictions placed on class counsel's communications with putative class members, whereas the present case is focused on the defendant's communications with class members.  Further, arbitration was not at issue in *Gulf Oil*, and accordingly the Court had no occasion to take into account the regard for the FAA and arbitration repeatedly emphasized by the Court.

That said, *Gulf Oil* is clearly germane.  The Court expressly pronounced principles in terms applicable to plaintiffs and defendants alike, and addressed concerns at issue whether forward looking or backward looking, such as the need for a clear record, fair conduct of the action, due regard for any interference with the parties' rights, and the breadth of any remedy imposed by the Court pursuant to Rule 23(d).   Indeed, *Gulf Oil* has been invoked by most courts faced with disputes over the relationship between Rule 23(d) and agreements by putative class members to arbitrate or release claims.  The Court now turns to a discussion of that case law.

**B.     Rule 23(d), Arbitration Clauses and Releases**

The interplay between Rule 23(d) and a defendant's entry into arbitration agreements or releases with putative class members has been addressed in a number of

cases, primarily outside the Second Circuit.  There is no controlling decision or group of decisions, however, that dictates the outcome of this case.  Indeed, Plaintiffs predominantly cite district court cases from California and elsewhere, as does Goldman.

An overview of the case law, however, reveals that courts have found arbitration clauses and releases voidable when there is a record establishing actual or potential coercion or deception.[31]  While there is no "test" to determine whether there is such actual or potential coercion or deception, courts generally consider and weigh a number of case-specific factors.  These factors include, without limitation: (1) the relative vulnerability of the putative class members; (2) evidence of actual coercion or conditions conducive to coercion; (3) whether the defendant targeted putative class members in a purposeful effort to narrow the class; (4) whether the arbitration provision was unilaterally imposed on the putative class; and (5) evidence of misleading conduct, language, or omissions, including the extent to which the agreement does or does not mention the existence of the putative class action and related information.

No precedent before the Court has discussed all of these factors comprehensively; nor has any single factor been dispositive.  But these factors consistently emerge as those most frequently in play when courts evaluate whether remedial action should be taken with respect to arbitration clauses and releases entered into with class action members. To illustrate how courts have assessed whether Rule 23(d) warrants remedial action, the Court will discuss the relevant case law grouped as follows: (1) district court decisions

---

[31] To be clear, the Supreme Court's decision in *Gulf Oil* contemplated potential measures against "abuse" and interference with the fair administration of class actions, not just coercion and deception.  *Gulf Oil*, 452 U.S. at 104.  But in cases applying Rule 23(d) and *Gulf Oil*, coercion and deception emerge as the leading forms of abuse.

from within the Second Circuit; (2) decisions from Courts of Appeals; (3) and a collection of district court cases from the Ninth Circuit extensively cited by Plaintiffs.

### 1.    District Court Decisions from Within the Second Circuit

From this District, Plaintiffs place considerable weight on a case before Judge William H. Pauley III involving antitrust claims against several credit card companies and banks.  *See In re Currency Conversion Fee Antitrust Litigation*, 265 F. Supp. 2d 385 (S.D.N.Y.2003) ("*Currency Conversion I*"); *In re Currency Conversion Fee Antitrust Litigation*, 224 F.R.D. 555 (S.D.N.Y. 2004) ("*Currency Conversion II*"); *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005) ("*Currency Conversion III*") (collectively, the "*Currency Conversion* decisions").[32]

The *Currency Conversion* plaintiffs sought to certify a class of credit card holders to challenge the defendants' alleged price-fixing conspiracy and artificially inflated credit conversion fees.  *Currency Conversion II*, 224 F.R.D. at 564.  The defendants opposed the motion for class certification arguing, in part, that most putative class members voluntarily signed binding arbitration agreements with their credit card issuers, precluding them from bringing the court action.  *Id*. at 569.  Some of the banks had added the arbitration clauses to their cardholder agreements after the putative class action was filed. *Id*.  Judge Pauley considered whether cardholders who accepted arbitration clauses after the litigation commenced could participate in the class, and ultimately concluded that they could because the arbitration provisions should not be enforced*.  Id.* at 570.

---

[32] For present purposes, *Currency Conversion I* provides helpful procedural and factual background.  *Currency Conversion II* addressed plaintiffs' motion for class certification. *Currency Conversion III* modified the court's decision in *Currency Conversion II*.

The decision in *Currency Conversion* largely was grounded on three factors: substantially unequal bargaining power between the parties lending itself to coercion, the credit card issuers' purposeful targeting of putative class members following commencement of the action, and omission of information about the action.  As explained by Judge Pauley, Rule 23(d) permits a court to "exercise supervisory authority over a defendant's communications with putative class members . . . particularly . . . where a defendant attempts to alter the contours of the litigation or the availability of remedies." *Currency Conversion II*, 224 F.R.D. at 569.  Judge Pauley found that the defendants had done exactly that, specifically having "contact[ed] putative class members solely for the purpose of altering the status of the pending litigation."  *Id*. at 570. Moreover, the potential for coercion was heightened because "the potential class consisted of cardholders who depend on defendants for their credit needs."  *Currency Conversion III*, 361 F. Supp. 2d at 253.

Judge Pauley also expressed concern about deception, noting that the court "must take steps to further the policies embodied in Rule 23 . . . [for the] protection of class members from 'misleading communications from the parties or their counsel' . . .  where a party misleads class members by omitting critical information from its communications . . . that threaten[s] the choice of remedies available to class members." 361 F. Supp. 2d at 252. Addressing the specific factual context before him, Judge Pauley opined that defendants' addition of the arbitration clause was deceptive because "[t]here was no reasonable manner for cardholders to know that by failing to reject the arbitration clause, they were forfeiting their rights as potential plaintiffs in th[e] litigation."  *Id.* at 251.

In short, *Currency Conversion* declined to enforce arbitration provisions inserted

into contracts after filing of the class action where the putative class was particularly vulnerable, the new policy was specifically targeted at the putative class, and the communication did not include information about the class action.[33]

The most recent word on this subject comes from another case in this District presided over by the Honorable Gregory H. Woods, *O'Conner v. Agilant Solutions, Inc.*, No. 18 Civ. 6937, 2020 WL 1233749 (S.D.N.Y. March 12, 2020).[34]  In *Agilant* – an FLSA collective action asserting wage claims on behalf of field technicians – the defendant employer "rolled out a new policy" soon after plaintiffs moved for conditional certification of the collective.  *Id.* at *1.  The policy entailed asking employees to sign an agreement requiring arbitration of all employment-related disputes.  *Id*.

Plaintiffs moved to invalidate the signed arbitration agreements as against these putative class members, as well as for a protective order enjoining future communications, arguing that the court should exercise its discretionary powers to limit

---

[33] In *Currency Conversion*, Judge Pauley deemed *Gulf Oil* inapposite, emphasizing that *Gulf Oil* was concerned with "restrictions imposed by the trial court on *plaintiffs'* counsel's communications with putative class members."  361 F. Supp. 2d at 253-54 (emphasis in original).  As explained in the preceding section, however, while there are distinctions between *Gulf Oil* and this case (and, for that matter, *Currency Conversion*), the *Gulf Oil* principles are still relevant here.  And, *Currency Conversion* is itself distinguishable from the present case in that the *Currency Conversion* defendants specifically targeted putative class members with new arbitration provisions, and the putative class members were particularly vulnerable to coercion given their dependency on defendants for credit.

[34] On March 17, 2020, Plaintiffs filed a Notice of Supplemental Authority in further support of their Cross-Motion to notify the Court of this recent decision. (Dkt. 980.)  Goldman filed a response, contending that *Agilant* is distinguishable and that the decision actually demonstrates why Rule 23(d) does not warrant invalidating the agreements at issue here. (Dkt. 981.)  Plaintiffs filed a brief reply letter on March 23, 2020. (Dkt. 982.)  The Court will refer to this case as "*Agilant*" to avoid confusion with *O'Connor v. Uber Technologies, Inc.*, No. 13-CV-3826, 2013 WL 6407583, at *1 (N.D. Cal. Dec. 6, 2013), another case involving arbitration agreements with putative class members discussed below.

misleading, coercive and improper class communications. *Id*. For several reasons, Judge Woods agreed, finding that the defendant's practice was "coercive and misleading." *Id*. at *1. First, employees were required to sign the new arbitration agreements as a condition of continued employment. The employees "understood that refusing to sign the Arbitration Agreement could have a negative impact on their employment." *Id*. at *2.

Second, management pressured employees into signing the agreements: "Leadership at [defendant employer] insisted that the Arbitration Agreements be returned quickly. On his call with . . . managers, [the Executive Director] asked that the managers ensure that the documents were 'signed at their meetings.'" *Id.* at *2 (internal citation omitted). Those managers were further instructed to have employees execute and return the agreements "within two business days of when they were sent." *Id*. at *5.

And third, "[e]vidence suggest[ed] that the purpose of the new arbitration policy rollout was to foreclose putative plaintiffs from joining this lawsuit" – a strategy that was particularly apparent given that the defendant's same attorney in the litigation was also "intimately involved in [the policy's] introduction." *Id*. at *1. Indeed, "[c]ontemporaneous email evidence strongly suggest[ed] that . . . management intended the Arbitration Agreements to preclude [these plaintiffs] from participating in this litigation." *Id*. at *3.

Finally, the Judge Woods found unconscionable the defendants' failure to disclose that putative plaintiffs would lose their right to participate in the collective action by signing the arbitration agreements. *Id*. at *5-6. Considering all the circumstances – the defendant's failure to disclose the pending action, the pressure tactics employed by

management, the timing of the new policy, and the targeting of putative plaintiffs – Judge Woods held the arbitration agreements could not be enforced. *Id*.

Another case relied on by Plaintiffs from within the Second Circuit comes from the District of Connecticut. *See Tomkins v. Amedisys, Inc.*, No. 3:12-CV-01082, 2014 WL 129401, at *2 (D. Conn. Jan. 13, 2014). *Tompkins* was a collective action brought by employers and former employees against their employer pursuant to the Fair Labor Standards Act ("FLSA").[35] After the lawsuit was filed, the defendant employer issued a "Dispute Resolution Agreement" to employees that was deemed to be effective "upon receipt." *Id.* at *1. That "agreement" did not require "any signature or affirmative indication of consent from the employee." *Id*. The Court was "troubled that [the defendant employer] unilaterally issued a self-executing arbitration agreement that substantively affects the rights of putative members in this litigation." *Id*. In addition to that coercive aspect, the Court was concerned that putative class members were misled, finding the agreement was "vague, confusing, and written in legalistic language" and that while it identified the collective action by name, "it d[id] not contain any other information about the case"

_____

[35] The *Tompkins* court did not explicitly cite Rule 23(d) inasmuch as the case was an FLSA collective action, not a class action under Fed. R. Civ. P. 23. Courts have recognized, however, that the same standards governing communications with putative plaintiffs apply to collective and class actions. *See, e.g.*, *Bernhardi v. Lowe's Companies, Inc.*, No. 03-CV-6372, 2005 WL 8165980, at *2 n.1 (W.D.N.Y. Apr. 11, 2005) ("While there exist substantial procedural differences between class actions brought pursuant to Rule 23 and collective actions . . . communications between parties to a collective action are evaluated in the same manner as communications between parties to a Rule 23 class action") (citing *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 103-104 (S.D.N.Y. 2003)). Indeed, the *Tomkins* court relied on *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989), a collective action under the Employment Age Discrimination Act, which in turn relied upon the Supreme Court's decision in *Gulf Oil*. *See Hoffmann-La Roche Inc.*, 493 U.S. at 171. It is therefore not surprising that several of the cases cited by the parties are FLSA collective action cases.

regarding the effect of the arbitration agreement on class participation.  *Id*.

Considering "the totality of the circumstances," the Court granted Plaintiff's request for a protective order invalidating the unilaterally imposed arbitration requirement. *Id*. at *2.  *Tomkins* thus is an example case where the court invalidated "vague and confusing" arbitration provisions foisted upon vulnerable putative class member employees and deemed effective even without the employees' affirmative agreement.

### 2.    Decisions from Courts of Appeals

At least two Circuit Courts of Appeal – the Fourth Circuit and the Eleventh Circuit – have considered whether remedial measures were warranted for arbitration clauses or releases entered into by defendants and putative class members.  Like the cases discussed in the previous section, these two decisions underscore key factors, particularly evidence of coercion and deception, informing courts' consideration of arbitration agreements and releases entered into with putative class members.

In *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914 (11th Cir. 2014), the Eleventh Circuit affirmed the district court's order to void arbitration agreements where the defendant-employer obtained those agreements through coercive tactics.  *Billingsley* was a collective FLSA action against a retail clothing store alleging that the store underpaid their store managers.  *Id.* at 915.  About three months after filing of the action, the store implemented a new dispute resolution policy that included a mandatory agreement requiring employees to arbitrate all disputes and to do so individually rather than collectively.  *Id.* at 918.  The defendant "rolled out" the new policy in a "blitzkrieg fashion," to only putative collective action members, requiring them to attend meetings with human resource representatives under the deceitful guise of a fake purpose.  *Id.* at 918-19.

During these "two-on-one private meetings with each store manager in a small, back room," the defendant had store managers sign the dispute resolution policy. *Id*. at 918.

The district court found these individual meetings constituted a "rushed and atypical rollout" that were merely a "pretext for presenting the [arbitration] Agreement to the [store managers] to derail their participation in th[e] lawsuit." *Id*. This was particularly true given that the defendant "informed the store managers that the arbitration agreement was a condition of continued employment [and they] understood that they would be fired if they did not assent to the arbitration agreement or the new . . . policy." *Id.* at 919.

The district court concluded that the defendant's tactics were "highly coercive" "interrogation like," and "specifically targeted at curtailing this litigation." *Id.* The district court determined that it would not enforce the arbitration agreements against any opt-in plaintiffs who signed the arbitration agreement under the defendant's coercive process. *Id.* The Eleventh Circuit affirmed, invoking *Gulf Oil* and concluding that "[w]hatever right [the defendant] may have had to ask its employees to agree to arbitrate, the district court found that its effort in the summer of 2012 was confusing, misleading, coercive, and clearly designed to thwart unfairly the right of its store managers to make an informed choice as to whether to participate in this FLSA collective action." *Id.* at 922.

More recently, the Fourth Circuit affirmed a district court's denial of an FLSA defendant's motion to compel arbitration pursuant to agreements entered into with various plaintiffs. *DeGidio v. Crazy Horse Saloon & Restaurant Inc.*, 880 F.3d 135 (4th Cir.), cert. denied sub nom. *Crazy Horse Saloon & Restaurant, Inc. v. DeGidio*, 138 S. Ct. 2666 (2018). In *DeGidio*, the plaintiffs – entertainers and exotic dancers – filed a putative class action for underpayment violations against a bar and gentlemen's club. *Id.* at 138. The

60

defendant engaged in prolonged litigation in the district court, including multiple rounds of summary judgment briefing to attempt to dismiss the action. *Id.* At the "very end" of the discovery period, however, the defendant began entering into arbitration agreements with its entertainers by including those agreements within a "lease" document that entertainers were required to sign in order to perform at the club. *Id.* The defendant also obtained statements from many of the putative class members relating to their job descriptions, all without notifying the court or plaintiffs' counsel. *Id.* at 139. The district court rejected the defendant's attempt to enforce the agreements and compel arbitration, citing the likelihood that putative plaintiffs were either coerced or misled, and noting that the defendant's conduct would subvert the litigation process. *Id.* at 140.

The Fourth Circuit affirmed, finding the arbitration agreements to be a "sham." *Id.* at 144. The Court based its decision primarily on three factors: the timing of the defendant's motion, the misleading nature of the arbitration agreements, and coercion. As to timing, the Court faulted the defendant for "pursuing . . . [a] merits-based strategy for three years" and causing the court to "spend unnecessary time and resources" only to then attempt to enter into arbitration agreements when that forum appeared potentially more advantageous. *Id.* at 141. According to the Court, "[t]he only possible purpose of the arbitration agreements, then, was to give Crazy Horse an option to revisit the case in the event that the district court issued an unfavorable opinion. In other words, Crazy Horse did not seek to use arbitration as an efficient alternative to litigation; it instead used arbitration as an insurance policy in an attempt to give itself a second opportunity to evade liability." *Id.*

The Fourth Circuit was additionally troubled by the agreements themselves, which

"painted a false picture of the [plaintiffs'] legal posture" with incorrect or confusing information about their employment status under the FLSA.  *Id.* at 142.  Finally, the Court noted that the arbitration agreements "were all obtained after potential plaintiffs met with Crazy Horse's CFO or counsel."  *Id.* at 144.  In other words, "[t]he setting here was ripe for duress" especially given that the defendants suggested that "participation in the lawsuit would deprive potential plaintiffs of important professional rights" including the ability to use the facility for entertainment.  *Id.*

### 3.   The Ninth Circuit District Court Cases

Plaintiffs rely extensively on an array of cases from district courts in the Ninth Circuit, largely from California.  These decisions demonstrate courts' willingness to take remedial action against arbitration clauses or releases entered into with putative class members when there is actual or potential coercion or deception.  The decisions also evince courts' consideration of the same factors identified above in making that determination, again with the caveat that courts do not necessarily consider all those factors, and none are dispositive.[36]

---

[36] In addition to the cases discussed in the ensuing text, *see also Marino v. CACafe, Inc.*, No. 16-CV-6291, 2017 WL 1540717, at *1 (N.D. Cal. April 28, 2017) (voiding releases in FLSA case obtained through misleading letter sent by employer to putative class members, where letter presented immediate payment  as an "incentive" to cooperate with company's "restructuring its processes" but attachment contained general release and did not mention that a lawsuit had been filed); *Cheverez v. Plains All American Pipeline, LP*, No. 15-CV-4113, 2016 WL 861107, at *1 (C.D. Cal. March 3, 2016) (granting motion to order curative notice and invalidate misleading releases specifically targeted to victims of oil spill through advertising that did not comply with Oil Pollution Act, did not provide sufficient information about the claim being compromised, and misrepresented disparity in extent of damages that could be obtained through settlement as compared to class action); *Slavkov v. Fast Water Heater Partners I, LP*, No. 14-CV-04324, 2015 WL 6674575, at *6 (N.D. Cal. Nov. 2, 2015) (invalidating settlement releases and ordering corrective notice where employer in FLSA action obtained those releases through misleading letters that "confusingly suggest[ed] [employees] could not contact Plaintiffs'

A good example is *Kater v. Churchill Downs, Inc.*, No. 15-CV-612, 2019 WL 6130844 (W.D. Wash. Nov. 19, 2019).[37]  *Kater* was a consolidated decision in connection with two related class actions.  The defendant company ran an online gambling platform, and the plaintiff customers were "addicted gamblers" seeking compensation for lost "chips" they had purchased on the site.  *Id*. at *1.  The website had always contained a "generic arbitration agreement," but during the pendency of the class actions, the defendant added a new mandatory arbitration provision that displayed to users through a pop-up window.  *Id*. at *2.  The new arbitration provision was "expressly directed at [the

---

counsel," putative class consisted of plumbers unlikely to understand their legal rights, and employer did not explain that settlement would require judicial approval); *Jimenez v. Menzies Aviation, Inc.*, No. 15-CV-02392, 2015 WL 4914727, at *1 (N.D. Cal. Aug. 17, 2015) (deeming arbitration agreements unenforceable where employer implemented "ADR Policy" after filing of the putative class action, did not inform employees of effect of the policy on the pending action, and did not provide a reasonable opportunity to opt out); *Camp v. Alexander*, 300 F.R.D. 617, 619 (N.D. Cal. 2014) (ordering corrective notice where employer sent "misleading, improper, and coercive" letter to employees discussing negative effects of putative class action on the business, including the possibility of layoffs, and seeking employees' opt-outs); *Gonzalez v. Preferred Freezer Services LBF, LLC*, No. 12-CV-03467, 2012 WL 4466605, at *1 (C.D. Cal. Sept. 27, 2012) (ordering corrective notice where FLSA defendant obtained releases specifically targeting putative class members that were misleading in many ways and failed to include information about the pending putative class action or class counsel); *County of Santa Clara v. Astra USA, Inc.*, No. 05-CV-03740, 2010 WL 2724512, at *1 (N.D. Cal. July 8, 2010) (voiding releases in pharmaceutical overcharge case obtained after defendant sent settlement letter, with payment, to putative class members that was misleading for numerous reasons); *Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 515-16 (N.D. Cal. 2010) (voiding English-language opt-out forms that were presented by employer in "coercive" one-on-one meetings with employees - spa workers - who were vulnerable to retaliation, had limited education, and poor command of English).  As discussed below, these cases are characterized by a degree of coercion and deception not present in the instant case.

[37] After the Cross-Motion was fully briefed, Plaintiffs filed a Notice of Supplemental Authority to alert the Court to this decision, arguing that it supports their position that Goldman's arbitration clauses should be voided.  (Dkt. 917.)  Goldman filed a response, arguing that *Kater* supports the opposite conclusion. (Dkt. 921.)   Although *Kater* is currently on appeal to the Ninth Circuit, the district court's decision is instructive here. *See Kater*, Dkt. 106 (noting USCA Case Number 20-35043.)

pending] lawsuit" to reduce the scope of the putative class. *Id*. at *2. The putative class members received no additional consideration for the arbitration agreement contained in the pop-up window. The pop-up window explicitly referenced the pending class actions and warned: "The mandatory arbitration provision in these Terms of Use prevents you from participating in these class action lawsuits, even if a class is certified." *Id*. To use the website, users had to click "I agree." *Id*.

The court ordered relief under Rule 23(d), finding that "[t]he existing pop-up is coercive and misleading" and determined that the defendant must create a revised pop-up window with corrective notice that gave users the ability to opt out of arbitration. *Id*. at *6. *Kater* thus is another example of a case where the court took remedial – but limited – action against an arbitration "agreement" unilaterally imposed on, and specifically targeted to, an exceptionally vulnerable group of putative class members.

Plaintiffs also rely on *Balasanyan v. Nordstrom, Inc.*, No. 10-CV-2671, 2012 WL 760566, at *1 (S.D. Cal. March 8, 2012), which involved two putative class actions against Nordstrom alleging that the store underpaid its sales staff across the country. Nordstrom moved to compel arbitration, arguing that the plaintiffs had consented to the "Nordstrom Dispute Resolution Agreement" that was "rolled out" in August 2011. *Id*. By its terms, the arbitration agreement applied to all past, present and future disputes, and expressly required individual arbitration and precluded class or collective arbitration. *Id*. The arbitration agreement was first mailed to employees in June 2011, just two months after the putative class action was filed. *Id*. at *2. In August 2011, employees were given an updated version of the document, and asked to sign a form acknowledging receipt. *Id*. Instructions to Nordstrom's human resource personnel explained that the arbitration

agreement "is simply an acknowledgment reflecting [the employees] received the updated [Dispute Resolution] Program; it is not an Agreement" and that "regardless of whether [the employees sign], the updated Program applies to their employment effective immediately." *Id*.

Citing *Currency Conversion II*, the district court acknowledged that its supervisory power "extends to [any] communications that would affect participation in the lawsuit, such as the arbitration agreement at issue here." *Id*.   The court then assessed the situation facing the parties: Nordstrom introduced the arbitration program shortly after the class action was filed; the method of distribution – mailing the agreement followed by an updated "acknowledgement form" – was confusing "because it led employees to believe that they were not entering into an agreement"; and Nordstrom did not mention the existence of the class actions in the arbitration agreement.  *Id*. at *3, n.2.  Considering these facts, the court ultimately concluded that Nordstrom had engaged in an "inappropriate attempt to impose a binding agreement upon [the plaintiffs]."  *Id*. at *4.

Another California case cited by Plaintiffs is *O'Connor v. Uber Technologies, Inc.*, No. 13-CV-3826, 2013 WL 6407583, at *1 (N.D. Cal. Dec. 6, 2013).  In *O'Connor*, Uber drivers filed a putative class action on August 16, 2013 in connection with various wage claims.  *Id.*  At that time, Uber was already facing similar wage lawsuits in Massachusetts and Illinois.  *Id*.  Just over a month before the class action was filed, Uber informed drivers they would receive an electronic notification asking them to approve new contractual agreements, and that continued use of the Uber application was conditioned on approval of these agreements.  *Id*.  One of the agreements, titled Software Licensing and Online Services Agreement (the "Licensing Agreement"), contained an arbitration provision,

which users accepted with their mobile phones.  *Id*.  By its terms, the Licensing Agreement gave users 30 days to opt out of the arbitration provision by sending a letter via hand delivery or overnight mail to Uber's general counsel.  *Id*.  Plaintiffs moved for a protective order, arguing that the drivers were not informed of the pendency of the current action prior to consenting to arbitration through the Licensing Agreement.  They also argued that the method of opt-out – a physical letter – was unreasonably burdensome.  *Id*.[38]

The court focused on three concerns: the timing of Uber's new policy, the vulnerability of the class, and the confusing method by which the arbitration agreement was presented.  First, the court found that the timing of the Licensing Agreement was suspect, and that "there is a distinct possibility that the arbitration provision and class waiver imposed by Uber was motivated at least in part by the pendency of class action lawsuits[.]"  *Id*. at *4.  In other words, the court believed that Uber had employed the arbitration agreement specifically "as a means to thwart existing class action litigation," an estimation that was "heightened by the misleading nature of the communication and the unusually onerous procedures for opting out."  *Id*.

Second, the court noted that the putative class itself was particularly vulnerable.  "[M]any, if not the majority of, Uber drivers are smaller outfits run by immigrants for whom English is not their native language" and they "have no meaningful way of learning of the [pending class action] lawsuit."  *Id*. at *6.  Given their backgrounds, drivers "likely did not

---

[38] The *O'Connor* court was not persuaded by Uber's argument that its Licensing Agreement was merely a "business communication, [and] not a class communication" subject to court intervention under Rule 23(d).  *See* 2013 WL 6407583 at *4 ("[T]he touchstone under Rule 23(d) is not whether the communication is of an ordinary business nature; rather, the inquiry is whether the communication is abusive, misleading, coercive, or otherwise affects the administration of justice in the context of a putative class action lawsuit).

know the consequences of assenting to the Licensing Agreement . . . [and] were not aware they were losing the right to participate in this or any other lawsuit." *Id*. This fact was particularly compelling because Uber made "no effort to inform drivers of the legal consequence of the arbitration provision barring them from participation in pending and future class action lawsuit brought on their behalf." *Id*. Yet the drivers were required to agree to the Licensing Agreement in order to continue earning income from Uber. *Id*.

Third, the court highlighted the procedure by which drivers assented to arbitration, as well as the required mailing in order to opt out of arbitration. The opt-out provision was "buried" in the arbitration provision, "which itself is part of the larger, overall Licensing Agreement . . . ensconced in the penultimate paragraph of a fourteen-page agreement presented to Uber drivers electronically in a mobile phone application interface." *Id.* In short, the presentation of the clause was hardly conspicuous.

Examining the overall set of circumstances, the court held that Uber's attempt to have drivers agree to an arbitration provision during the pendency of the class action was "potentially misleading, coercive, and threatens to interfere with the rights of class members." *Id*. at *7. The court directed that the parties meet and confer on a proposed protective notice to send to drivers, and further enjoined Uber from issuing any other arbitration agreement to drivers that "waives putative class members' rights herein." *Id*.

The vitality of *O'Connor* – and perhaps all the district other cases within the Ninth Circuit in which courts voided arbitration provisions pursuant to Rule 23(d) – may now be uncertain, however, given the Ninth Circuit's orders reversing and vacating *O'Connor*. *See O'Connor v. Uber Technologies, Inc.*, 904 F.3d 1087, 1090 (9th Cir. 2018); *Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201, 1206 (9th Cir. 2016) (consolidated with

*O'Connor* and reversing district court's ruling that Uber's arbitration provisions were unconscionable).[39]  The Ninth Circuit reversed the district court's denial of Uber's motion to compel arbitration, reversed certification of the class, and determined that the district court's Rule 23(d) orders were moot as a result.  *O'Connor*, 904 F.3d at 1090-91.  While the Ninth Circuit did not substantively address the district court's analysis of its Rule 23(d) order, the appellate decision gives this Court pause in placing substantial weight on the Ninth Circuit group of cases.  That said, *O'Connor* and the other cases cited by Plaintiffs both within and beyond the Ninth Circuit evince the same core considerations that a court should evaluate when deciding whether Rule 23(d) relief is warranted in this context.[40]

To recap, the relevant cases together show that when considering whether remedial action is warranted pursuant to Rule 23(d), courts are primarily concerned with whether arbitration agreements with, or releases given by, putative class members were the result of coercion or deception.  And to determine whether they are the product of coercion or deception, courts will (or should) consider the totality of circumstances, including, without limitation: (1) the relative vulnerability of the putative class members; (2) evidence of actual coercion or conditions conducive to coercion; (3) whether the

---

[39] Curiously, neither party cited the Ninth Circuit's opinion vacating *O'Connor*.

[40] Other cases outside the Ninth Circuit cited by Plaintiffs are to the same effect.  *See, e.g.*, *Piekarski v. Amedisys Ill, LLC*, 4 F. Supp. 3d 952, 956 (N.D. Ill. 2013) (voiding arbitration agreements where FLSA defendant unilaterally implemented a company-wide arbitration policy after filing of the action and terms of the policy were "likely to confuse and mislead potential class members" – home healthcare workers – through a complex opt-out process involving multiple documents); *Williams v. Securitas Security Services USA, Inc.*, No. 10-CV-7181, 2011 WL 2713741, at *2-3 (E.D. Pa. July 13, 2011) (invalidating arbitration "agreements" where "confusion reign[ed]" because conflicting terminology about whether document was an "agreement" or merely "acknowledgment of receipt" was "very misleading to lay persons such as the hourly-paid security guards who are its target").

defendant targeted putative class members in a purposeful effort to narrow the class;
(4) whether the arbitration provision was unilaterally imposed on the putative class; and
(5) evidence of misleading conduct, language, or omissions, including the extent to which
the agreement does or does not mention the existence of the putative class action and
related information.

## C.   The Separation Agreements, MD Promotion Agreements, and PWA Agreements Do Not Warrant Relief Under Rule 23(d)

Considering all the circumstances of this case, the Court determines that the
Separation Agreements, MD Promotion Agreements and PWA Agreements were not
coercive, deceptive, or otherwise abusive – or susceptible to coercion, deception or other
abuse – so as to warrant relief under Rule 23(d).   The Court discusses the relevant
considerations, organized by the non-exclusive factors identified from the case law above.

### 1.   Putative Class Members Were Not Particularly Vulnerable

Courts are more likely to take remedial measures under Rule 23(d) when putative
class members are particularly vulnerable to coercion or being misled.   While there is no
common definition of what makes such individuals vulnerable, courts have shown
concern when, for example, putative class members have poor command of the relevant
language, work in low-wage jobs requiring minimal education, or are susceptible to
economic coercion.   *See*, *e.g.*, *Kater*, 2019 WL 6130844 at *3-4 (addicted gamblers);
*Guifu Li*, 270 F.R.D. at 511 (spa workers with limited education and poor language skills);
*O'Connor*, 2013 WL 6407583, at *6 (Uber drivers, many of whom did not speak English
as their native language); *Piekarski*, 4 F. Supp. 3d at 956 (home healthcare workers);
*Williams*, 2011 WL 2713741 at *3 (hourly-paid security guards).

Here, Plaintiffs are well-educated and well-compensated financial services

professionals.[41]  While not dispositive, the Class Members' sophistication is a factor that distinguishes this case from those where courts deemed it necessary to take action to prevent or cure likely confusion among low-wage or less-educated workers.  The putative Class Members were well-positioned to understand the implications of contracts presented to them.  (*See* Cupertino Decl. ¶¶ 3-6; Dias Decl. ¶ 4; Landman Decl. ¶¶ 4-7.) As Defendants' counsel noted at oral argument, these individuals were "highly sophisticated bankers [and this is] [w]hat . . . they do for a living."  (T. at 21.)  In short, Plaintiffs do not exhibit the vulnerability that would weigh in favor of remedial action under Rule 23(d).[42]

### 2.     There Is No Evidence of Coercion

Courts are apt to take remedial action under Rule 23(d) when there is evidence that putative class members entered into arbitration agreements or otherwise waived their rights because of actual or potential coercion.  Examples of coercion (without limitation) as drawn from the cases discussed above include two-on-one meetings between an employer's human resource representatives and putative class members[43] an employer's suggestion that participation in the group lawsuit would deprive potential plaintiffs of their

---

[41] Plaintiffs have not contended otherwise.

[42] The Court recognizes that unequal bargaining power in the employer-employee context is a relevant consideration and addresses it in the next subsection discussing actual or potential coercion.

[43] *See Billingsley*, 560 F. App'x at 918; *see also Guifu Li,* 270 F.R.D. at 511 (coercive one-on-one meetings with employee spa workers).

livelihood,[44] and management's insistence that employees return an arbitration agreement within two days.[45]

Here, Plaintiffs do not point to any coercion by Goldman in the form of pressure tactics, threats that putative Class Members had to execute arbitration agreements in order to keep their jobs, or otherwise.  The record is devoid of any evidence of that nature.  Instead, Plaintiffs focus more generally on the fact that the parties have an employee-employer relationship.  (Cross-Motion Mem. at 15-16.)  Plaintiffs cite cases to suggest that such a relationship, by its very nature, is prone to coercion.  *See, e.g.*, *Camp*, 300 F.R.D. at 623-24 ("caselaw nearly universally observes that employer-employee contact is particularly prone to coercion"); *Guifu Li*, 270 F.R.D. at 517 (recognizing that employer-employee relationship poses "a particularly acute risk of coercion and abuse when the employer solicits opt-outs from its workers").

The Court agrees that employees may be subject to employer coercion; after all, employees are dependent on their employers for their economic livelihood.  And generally speaking, there undoubtedly is a disparity of bargaining power as between many Goldman employees and their employer.  The Court is not persuaded, however, that this employment relationship alone is enough to demonstrate sufficient potential for coercion to merit relief under Rule 23(d).  The Supreme Court has rejected the argument that an employer-employee relationship alone evidences the coercion necessary to overturn an arbitration agreement.  In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991),

---

[44] *See DeGidio*, 880 F.3d at 144; *see also Camp*, 300 F.R.D. at 619 (letter to employees discussing negative effects of putative class action on the business, including the possibility of layoffs).

[45] *See Agilant*, 2020 WL 1233749 at *5.

the plaintiff argued that his agreement to arbitrate claims under the Age Discrimination in Employment Act should not be enforced because of the unequal bargaining power between himself and his employer.  The Court disagreed, holding that "there often will be unequal bargaining power between employers and employees" and that "[m]ere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context," and noting that there was no evidence that plaintiff, "an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause" at issue.  *Id*. at 32-33.

Other courts, too, have rejected the proposition that employment relationships are inherently coercive to a degree that requires voiding otherwise-enforceable arbitration clauses.  *See, e.g.*, *Stevenson v. The Great American Dream, Inc.*, No. 1:12-CV-3359, 2014 WL 3519184, at *3 (N.D. Ga. July 15, 2014) (rejecting FLSA plaintiff's arguments for ignoring arbitration agreement based only on timing of when the arbitration agreement was signed and the "inherent bargaining power asymmetry found in any employer-employee relationship"); *Ciago v. Ameriquest Mortgage Co.*, 295 F. Supp. 2d 324, 329 (S.D.N.Y. 2003) ("Standing alone, unequal bargaining power will not render an agreement to arbitrate within an employment contract invalid"); *Arakawa v. Japan Network Group*, 56 F. Supp. 2d 349, 352 (S.D.N.Y.1999) (same).

While many an employee-employer relationship is ripe for coercion, there is no indication in this case that Goldman's conduct was coercive or abusive with respect to the putative Class Members.  That is all the more so because (as discussed further below) there is no evidence that Goldman targeted the putative Class Members, let alone pressured them or took advantage of the disparity in bargaining power, to obtain their

acceptance of the agreements at issue.

Plaintiffs' invocation of coercion is especially dubious given that the putative Class Members' acceptance of the agreements resulted in substantial severance payments or promotions to Managing Director or Private Wealth Advisors.   These were hardly agreements that were foisted on putative class members against their will.  *Cf. Kater*, 2019 WL 6130844 at *3 ("Many courts have found that a defendant's attempt to foist a new arbitration provision on putative class members is an improper communication"). Finally, and although not dispositive on this point, Plaintiffs' Cross-Motion does not include any evidence to show that individual putative Class Members felt coerced into executing the Separation Agreements, MD Promotion Agreements, or PWA Agreements. For example, there are no affidavits or declarations of Class Members to show that managers intimated that failure to execute these agreements would result in termination, demotion, or retaliation.  Nor is there evidence of written communications attempting to strong-arm putative Class Members.  In short, there is no basis to find coercion, either actual or potential.

### 3.    The Agreements Were Not Targeted at Putative Class Members

A common fact pattern in many cases cited by Plaintiffs is that the defendant in a class or collective action implemented a new arbitration policy shortly after filing of the litigation and purposefully targeted putative class members with that policy.  *See, e.g.*, *Billingsley*, 560 F. App'x at 919 (defendant rolled out arbitration policy aimed only at collective members in "blitzkrieg fashion" to minimize scope of class); *Agilant*, 2020 WL 1233749 at *5 (management "instituted its novel arbitration policy for the purpose of foreclosing" plaintiffs' participation in the litigation); *Kater*, 2019 WL 6130844 at *2 (new

arbitration provision was "expressly directed at [the pending] lawsuit" to reduce the scope of the putative class); *Jimenez*, 2015 WL 4914727 at *1, *6 n.5 (new dispute resolution policy imposed on airport security guards after filing of class action); *Currency Conversion II* 224 F.R.D. at 569 (credit card issuers "contact[ed] putative class members solely for the purpose of altering the status of the pending litigation").

This case does not fit that fact pattern. Goldman did not target the agreements to putative Class Members, but rather extended them broadly to employees across the company to male and female alike. Indeed, the evidence establishes that Goldman had litigation-neutral reasons for entering into the agreements with their employees – namely, providing compensation and promotion in consideration for various services, or providing a separation package, in the normal course of business. Moreover, the agreements in question predominantly were based on form agreements containing mandatory arbitration clauses that pre-date this litigation.[46] *See Gauzza v. Prospect Medical Holdings, Inc.*, No. 17-3599, 2018 WL 4853294, at *2 (E.D. Pa. Oct. 4, 2018) ("continu[ing] [a] preexisting policy of requiring new hires to sign arbitration agreements as a condition for employment" is "not inherently abusive" under Rule 23(d)); *In re SunTrust Banks, Inc. 401(k) Plan Affiliated Funds ERISA Litigation*, No. 1:11-CV-784, 2017 WL 9884901, at *2 (N.D. Ga. Feb. 27, 2017) (finding that Plaintiffs failed to meet Rule 23(d) standard particularly "in light of the fact that the Severance Plan is longstanding, predating the litigation in this

---

[46] For example, the Separation Agreement form agreement had been used since at least 2002, eight years prior to the commencement of this action. (*See* Guiffre Decl. in Opp., Ex. 10 and 12; Def. Mem. at 4.). Similarly, since at least 1998, the Goldman has used a similar agreement for all PWA Agreements. (Cupertino Decl., ¶ 7) Plaintiffs do not argue that the Separation Agreements, MD Promotion Agreements or PWA Agreements were materially altered after filing of the action.

case and because the Severance Plan releases are widespread rather than being targeted at putative class members"). Plaintiffs have not shown that Goldman targeted putative Class Members or procured any of the agreements in an effort to subvert the class action.

### 4. Goldman Did Not Unilaterally Impose the Agreements

Some cases cited by Plaintiffs involved scenarios where defendants imposed new arbitration policies on employees following the filing of a litigation but without seeking agreement. The defendants unilaterally implemented these policies, sometimes seeking employee acknowledgment of their having received the new "agreement" and other times announcing them by fiat. Putative class members received no additional consideration for the new terms, other than continuing their existing employment. *See, e.g., Billingsley*, 560 F. App'x at 918-19 (plaintiff store managers were "ordered" to attend meetings by supervisors instructed to inform plaintiffs that the arbitration agreement was condition of continued employment); *Jimenez*, 2015 WL 4914727 at *6 (employer provided no opportunity to opt out of new policy, making assent to the policy a condition of employment; *Tomkins*, 2014 WL 129401 at *2 (employer imposed arbitration agreement "without any signature or affirmative indication of consent").

Here in contrast, policies were not simply announced and imposed. Rather, arbitration provisions (and releases for Separation Agreements) were part of agreements offered to, and individually accepted by, employees providing them valuable promotions, compensation, and severance arrangements. This factor, too, weighs against remedial action under Rule 23(d).

5.     **The Separation Agreements, MD Promotion Agreements, and PWA Agreements Had Some Potential to Mislead**

Courts exercise their authority to manage class and collective actions where communications, including proposed agreements, are apt to cause confusion or mislead putative class members.  *See, e.g.*, *DeGidio*, 880 F.3d at 135 (arbitration agreements contained "blatant factual misrepresentation" painting a "false picture" of the plaintiffs' legal posture employment status under the FLSA); *Piekarski*, 4 F. Supp. 3d at 956 (finding that defendant-employer's "distribution of [Dispute Resolution Agreement] was likely to confuse and mislead potential [FLSA] class members"); *Williams*, 2011 WL 2713741, at *3 (characterizing document as "agreement" was "very misleading to lay persons such as the hourly-paid security guards who are its target"); *County of Santa Clara*, 2010 WL 2724512, at *4 (letter accompanying settlement and releases contained "factually misleading" information in several respects).

The record here does not support finding that the Separation Agreements, MD Promotion Agreements or PWA Agreements were confusing or misleading or procured in a deceptive manner.  The presentation of these particular agreements was clear, and the arbitration provisions are unambiguous, as the Court explained above in connection with Goldman's motion to compel.  (*See* Guiffre Decl., Ex. 385 at 4; *Id*., Ex. 961 at § 8; Ex. 1196 at § 11.)  Plaintiffs do not argue otherwise; indeed, they have not pointed to any instance of unclear, vague, incorrect, or confusing language in these agreements.  Nor have they presented any evidence that Goldman secured agreement to these three categories of agreement by deceptive means.

Plaintiffs instead argue that Goldman's failure to disclose the existence of this action and provide putative Class Members with "an opportunity to consult with Class

Counsel to make an informed choice as to whether to waive their participation in this case" rendered the agreements misleading.  (Cross-Motion Mem. at 12-15.)  Courts are indeed more likely to take remedial action when the defendant presenting an arbitration agreement or release does not call attention to or provide sufficient information about a pending class or collective action. *See*, *e.g.*, *Agilant*, 2020 WL 1233749 at *5 (arbitration agreement); *Cheverez*, 2016 WL 861107 at *4 (settlement agreement and release); *Jimenez*, 2015 WL 4914727 at *5 (arbitration agreement); *Balasanyan*, 2012 WL 760566 at *3 (arbitration agreement).  Plaintiffs assert that Goldman should have provided this information alongside any potential arbitration clause or release presented to putative Class Members, so that employees would have been alerted to the fact that they were ceding their ability to litigate potential claims through this class action rather than in arbitration, or giving up that right completely.

Rule 23(d) itself does not expressly impose an affirmative obligation on Goldman to provide information about this action; rather, it authorizes the Court to make orders to manage class action communications.[47]   In light of *Gulf Oil*'s requirements for crafting such orders, courts "[examine] the entirety of defendant's conduct and communications [and there is no] statutory rule or case law that requires defense counsel to give specific information and instructions to putative class members, nor [are there] any 'magic words' that must be disclosed [in communications]." *Bobryk v. Durand Glass Manufacturing Co., Inc.*, No. 12-CV-5360, 2013 WL 5574504, at *6 (D.N.J. Oct. 9, 2013).

---

[47] There was no preexisting Rule 23(d) order in place that prohibited or limited Goldman from communicating with putative Class Members, all of whom are current or former employees.  Nor did Plaintiffs ever previously request such an order since this case began ten years ago.

The Court agrees, however, that omission of any reference to the pending class action is of some concern.  Employees may want to know that, in agreeing to arbitrate or release any and all claims, they are giving up the right to litigate a putative class action of which they could be a beneficiary.  Absent notice obtained elsewhere, employees would not have complete information on which to base their decision to accept, reject or negotiate unless the agreement provided information about the class action or the employees otherwise knew about the action.  *See Currency Conversion III*, 361 F. Supp.2d at 251 ("There was no reasonable manner for cardholders to know that by failing to reject the arbitration clause, they were forfeiting their rights as potential plaintiffs in th[e] litigation.").

At the same time, however, the agreements clearly set forth that the employees being promoted and receiving greater compensation would have to arbitrate any and all claims, existing or not, and employees agreeing to severance terms would be releasing Goldman from any and all claims, known or unknown up to time of agreement.  *See Stevenson*, 2014 WL 3519184, at *3 ("Even if [Plaintiff] was unaware of this litigation when she signed the arbitration agreement, she does not deny that the text of the arbitration agreement made it clear to her that she could not participate in an FLSA collective action suit, pre-existing or not").

Moreover, Plaintiffs have not submitted any evidence to show that any individual putative Class Member was, or even felt, misled by the agreements.  Given that there are over 1,200 agreements at issue entered into over the course of many years, there should

have been ample opportunity to do so.[48]   *Cf. DeGidio v. Crazy Horse Saloon and Restaurant, Inc.*, No. 13-cv-2136, 2017 WL 5624310, at *6 (D.S.C. Jan. 26, 2017) (declarations submitted from five plaintiffs who signed arbitration agreement and averred that they were misled).   Accordingly, the Court concludes that this factor somewhat favors remedial action under Rule 23(d) but is tempered by the lack of supporting evidence in the record, other than the omission itself, as well as by the many factors (discussed above) otherwise countenancing against intruding on the parties' agreements.[49]

### 6.   The Totality of Circumstances

Considering all the circumstances, the Court is not persuaded that either the arbitration provisions in the MD Promotion Agreements, PWA Agreements, and Separation Agreements, or the releases in the Separation Agreements, were procured by

---

[48] As Goldman noted at oral argument, "[n]othing stopped the plaintiffs from putting forward 10 or 15 or 20 declarations from class members saying, I was confused when I entered into these equity awards and they need to be voided. And then we would have an individualized issue, and you could deal with it. But they elected not to do that because they were shooting for the home run of a per-se rule."   (T. at 22.)   Indeed, "[Plaintiffs] haven't put forward a single piece of paper from anyone, any evidence to say that I was somehow confused or that I was snookered."   (T. at 24.)

[49] Goldman argues that omission of any reference to the pending class action was irrelevant because putative Class Members had actual or constructive notice of the pending action from at least three sources: media coverage, document hold notices Goldman circulated internally over several years, and disclosures in Goldman SEC filings. (See Def. Mem. at 14-16.)   Some significant portion, if not all, of those employees who executed the agreements may well have known of the putative class action at the time. But the extent of that actual or constructive notice remains speculative.   Indeed, Goldman acknowledged that notwithstanding publication of over a hundred articles, the case had not received the degree of public attention of "some big, public case" (T. at 79); Goldman's document hold notices did not refer to the action as a class action (*see* Becker Decl., Ex. 1); and there is no evidence that the putative Class Members read Goldman's SEC filings. Earlier in this case, Judge Francis issued an order in the context of a motion to intervene holding that there is no basis for imputing constructive knowledge to putative Class Members on the basis of public information or media coverage of this case.   (*See* Dkt. 410 at 18-21.)   Goldman has not presented any basis to revisit that holding.

means that were, or had sufficient potential to be, coercive, deceptive, or otherwise abusive.  The weightiest fact in Plaintiffs' favor is omission of any information about the pending class action.  The Court agrees that better practice would have been for Goldman to include that information in conjunction with agreements proposed to putative class members.

But standing alone, in the circumstances of this case, that fact does not warrant voiding or taking other remedial action with respect to those agreements.  There is no evidence of deceptive conduct, no evidence of coercion, no evidence of targeting putative Class Members, no evidence of imposing arbitration without agreement or without additional consideration.   To the contrary, Plaintiffs, who are well-educated and experienced professionals, received substantial rewards through promotion, compensation or severance pay, and entered into agreements based on standard forms that Goldman had been using long before the lawsuit was filed and which were extended to both men and women.

The cases relied upon by Plaintiffs are all distinguishable from the instant case because they involved evidence of potential or actual coercion, deception and abuse to a far more substantial degree than that present here.  Several of those cases dealt with agreements omitting any mention of the pending class action, but in each instance, other factors came into play such as coercion or targeting that are not present here.  *See, e.g., Billingsley*, 560 Fed. Appx. at 918 (new dispute resolution policy rolled out in "blitzkrieg fashion" following filing of action; targeted specifically to putative class members; acceptances obtained in coercive two-on-one meetings under deceptive pretenses); *Agilant*, 2020 WL 1233749 at *5-6 (new arbitration policy rolled out after action filed;

management pressure on employees to quickly sign agreement; and evidence of intent to prevent participation in the action); *Currency Conversion III*, 361 F Supp. 2d at 253 (vulnerable consumers dependent on plaintiffs for credit, arbitration requirement introduced after lawsuit filed; purposeful targeting of putative class members); *Tomkins*, 2014 WL 129401 at *1-2 (unilateral imposition of arbitration agreement on home health workers "without any signature or affirmative indication of consent from the employee"); *O'Connor*, 2013 WL 6407583 at *4-6 (new arbitration clause introduced after class action filed; vulnerable Uber drivers, many of whom did not speak English as native language; and unduly cumbersome opt-out procedure); *Balsanyan*, 2012 WL 760566 at *3 (arbitration agreement rolled out after action filed, and employees misled into believing they were not entering into an agreement); *cf. Lillehagen v. Alorica, Inc.*, No. SACV 13-0092-DOC, 2014 WL 12768156, at *7 (C.D. Ca. Dec. 18, 2014) (upholding arbitration agreement that made no mention of pending collective action because "[m]ost cases finding improper communication in employment class or collective actions involve communications with existing employees and involve more misleading or coercive behavior by the employer than appears in the record in this case.").

In the end, Plaintiffs have not provided a sufficient record of potential or actual abuse to warrant remedial action pursuant to Rule 23(d) against the arbitration or release provisions contained in the MD Promotion Agreements, PWA Agreements, or Separation Agreements.

## D.     The Equity Award Agreements Warrant Remedial Action

Just as the Court analyzed the Equity Award Agreements separately in the context of Goldman's Motion to Compel, it does so as well in the context of Plaintiffs' Cross-

Motion.  Like the other three types of agreements, there is no basis for finding that the Equity Award Agreements were secured through coercion, targeting, or unilateral imposition.  The Equity Award Agreements were desirable and lucrative.  Nearly one-third of Goldman's global workforce received them, the vast majority of whom were not putative Class Members. (Dias Decl., ¶ 14.)

While the Equity Award Agreements were not obtained through coercive means, however, the Court does find that they were procured in a confusing and potentially misleading fashion.  As explained previously, starting in 2016 Goldman obtained employees' agreement to the Equity Award Agreements using a new electronic procedure that obfuscated the expanded scope of mandatory arbitration.[50]

The Court has already concluded that that procedure did not rise to a level of unconscionability that would bar enforcement of the arbitration provisions pursuant to contract law.  But the standards for what is unconscionable and what merits remediation pursuant to Rule 23(d) are not the same.  Unconscionability is a contract doctrine.  Rule 23(d) is a means of managing class actions.  A procedure that does not "shock the conscience" or cannot bar enforcement in the absence of substantive unconscionability may still be one that so lends itself to potential for confusion or being misled as to merit the Court's discretionary relief under Rule 23(d).  *See O'Connor*, 2013 WL 6407583 at *2-3 (declining to act on and distinguishing unconscionability as issue of enforceability while proceeding to decide whether relief should be granted pursuant to Rule 23(d)); *cf. Currency Conversion III*, 361 F. Supp. at 252-54 (finding arbitration provision both

---

[50] The Court incorporates here its earlier analysis of the Equity Agreement Signature Card process in determining whether the arbitration provisions of the Equity Award Agreements are unenforceable as unconscionable.

unenforceable as unconscionable and unenforceable pursuant to Rule 23(d)).  That is so for the Signature Card process, which Goldman implemented to procure agreement to Equity Award Agreements.

Accordingly, the Court finds that the arbitration provisions of the Equity Award Agreements entered into between introduction of the Signature Card acceptance procedure and notice of class certification warrant a remedy with respect to Class Members.

## E.    Opt-Out Remedy for Equity Award Agreement Signatories

Having determined that the Equity Award Agreements warrant remedial action, the Court turns to determining the appropriate relief.  Courts have variously exercised their discretion to redress Rule 23(d) transgressions with measures that range from voiding arbitration clauses altogether, to ordering notice and opportunity for class members to opt out of arbitration and remain in the class action (or vice-versa), to merely warning parties to refrain from specified future activity.

Any remedy should be fashioned consistent with the Supreme Court's directive that remedies under Rule 23(d) should be narrow and limit speech "as little as possible, consistent with the rights of the parties under the circumstances."  *Gulf Oil*, 452 U.S. at 102.  Concerns for speech are not present here inasmuch as the relief will be applied to past, not future, events.  Nonetheless, it remains appropriate to narrowly tailor relief to the particular problem to be remedied with due regard for the rights of the parties under the circumstances of this case.

The Court concludes that the most appropriate remedy is providing notice to relevant Class Members that gives them the opportunity to opt out of arbitration and

remain in the class litigation.  *See Devries v. Morgan Stanley & Co. LLC*, No. 12-CV-81223, 2015 WL 11237669, at *3 (S.D. Fla. Aug. 18, 2015) (requiring notice to putative class members providing notice of opportunity to opt out of arbitration agreements); *cf. O'Connor*, 2013 WL 6407583 at *7 (ordering that class members who, when they were putative members, accepted agreements with arbitration provisions must be given "clear notice" of the arbitration provision, the effect of assenting to arbitration on their participation in the class action lawsuit at issue, and a 30-day period to accept arbitration provision anew).

This remedy avoids outright invaliding the arbitration provisions (as applied to Class Members) and provides individual Class Members with a choice that should have been theirs to make at an earlier time. *See Tolmasoff v. General Motors, LLC*, No. 16-11747, 2016 WL 3548219, at *15 (E.D. Mich. June 30, 2016) (rejecting voiding releases in favor of notice and opportunity to opt out of them because choice should be left to the putative class members).  In this Court's view, pre-emptively concluding that all relevant Class Members will prefer class action litigation to individual arbitration is presumptive and broader than necessary.  At the other end of the spectrum, merely warning Goldman to modify its Signature Card procedures in the future would be meaningless as the class already has been certified.

As for the relevant Class Members to whom notice should be sent, they are those employees who accepted Equity Award Agreements following introduction of the Signature Card process.  However, if a Class Member executed both an Equity Award Agreement and also a Separation Agreement, MD Promotion Agreement, or PWA Agreement, that individual should not be provided with opt-out notice because they have

separately agreed to arbitrate the claims at issue in this action through a document that does not pose a problem under Rule 23(d).

The parties will be directed to meet and confer as to the form and means of notice and to provide a 45-day opt-out period.

## IV.    There is No Conflict with the Rules Enabling Act

Goldman additionally argues that the Rules Enabling Act bars this Court from voiding the parties' agreements to arbitrate.  The Rules Enabling Act commands that a procedural rule cannot trump a substantive congressional statute like the FAA. Goldman asserts that "[t]here is no Rule 23(d) exception to the FAA" (Def. Sur-Reply at 1). Plaintiffs counter that "[t]here is no 'arbitration exception' to the Federal Rules of Civil Procedure." (Pl. Reply at 5.)  There is no need, however, to resolve that clash of perspectives as there is no such conflict here. The Court is exercising its supervisory authority over class actions and ordering a narrowly tailored remedy that does not void any arbitration provision.

Enacted in 1934, the Rules Enabling Act empowers the judiciary to promulgate the Federal Rules of Civil Procedure.  28 U.S.C.A. § 2072 (a). That authority is not unlimited, however, as "[s]uch rules shall not abridge, enlarge or modify any substantive right."  28 U.S.C.A. § 2072 (b).   Since at least 1984, a majority of the Supreme Court has held that the FAA confers substantive rights. *See Southland Corp. v. Keating*, 465 U.S. 1, 11 (1984) (holding that the FAA "rests on the authority of Congress to enact substantive rules under the Commerce Clause").[51]  From there, Goldman argues that the Court may not void any

---

[51] *See also AT&T Mobility*, 563 U.S. at 339 (noting that the FAA's "primary substantive provision" declares arbitration agreements to be "valid, irrevocable, and enforceable") (internal citations omitted); *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008) (FAA's substantive provisions reveal "a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving

of the arbitration provisions at issue under Rule 23(d) because to do so would abridge the substantive right to arbitration.

Goldman specifically relies on the Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013).  In that case, which arose from this District, American Express sought to compel the arbitration of claims by various merchants who accepted their credit cards. *Id*. at 231.  The merchant agreements prohibited class actions, thus requiring individual arbitration of all claims. The merchants nevertheless filed a class action, claiming that American Express was engaged in antitrust violations in contravention of the Sherman Act.  *Id*.  American Express successfully moved to compel arbitration. *Id*. The Second Circuit reversed, holding that because of the prohibitive costs that the merchants would face if they had to arbitrate their claims, the class action waiver was unenforceable and arbitration could not proceed. *Id*. at 232. The Supreme Court then reversed the Second Circuit and held that the FAA does not permit courts to invalidate an arbitration agreement, regardless of whether a statutory claim would become prohibitively expensive to address in individual arbitration. (*Id*. at 238.)

Goldman's reliance on *Italian Colors* is misguided. First, while addressing Rule 23 generally, the Court did not at all address Rule 23(d), and Rule 23(d) was not at issue. Rather, the issue centered on whether the availability of procedural rules to bring class actions could be invoked to nullify the parties' arbitration agreement.

Second, the Court grounded its decision on the conclusion that Rule 23 does not establish an "entitlement to class proceedings for the vindication of statutory rights."  *Id*.

---

disputes straightaway"); *Moses H. Cone Memorial Hospital*, 460 U.S. at 24-25 (the FAA represents "a body of federal substantive law of arbitrability" affording parties the right to have their arbitration agreements enforced as written).

at 234.   In *dicta*, the majority went on to say that "it is likely" that such an entitlement – if it existed – would be an abridgment or modification of substantive rights prohibited by the Rules Enabling Act.   *Id.*   Goldman's argument latches onto this statement about what is "likely" as if it were certain.

Third, the narrow remedy ordered here for the Equity Award Agreements does not invalidate the arbitration provisions of those agreements, although it does give Plaintiffs the opportunity to opt out of them.   The reason for that remedy, however, originates from the problematic means by which Goldman obtained agreement in the first place, not from the substance of the agreement.   As Justice Thomas' concurrence states in *Italian Colors*, "the FAA requires that an agreement to arbitrate be enforced unless a party successfully challenges the formation of the arbitration agreement, such as by proving fraud or duress."   570 U.S. at 239; *see also AT&T Mobility*, 563 U.S. at 353 (Thomas, J., concurring) (same).

The fault with the Equity Award Agreements' arbitration provisions similarly stems from the process of formation.   Remediation pursuant to Rule 23(d) as applied here in no way cabins the scope or substance of the FAA.

## Conclusion

For the foregoing reasons, Defendants' Motion to Compel and Stay Pending Arbitration is GRANTED IN PART and CONDITIONALLY GRANTED IN PART, and Plaintiffs' Cross-Motion is GRANTED IN PART and DENIED IN PART as follows:

1.    Defendants' Motion to Compel arbitration of current Class Members who executed Separation Agreements, MD Promotion Agreements, and PWA Agreements containing arbitration clauses is granted. These individuals are excluded from the class,

and their claims are stayed pending arbitration. They may bring their claims against Goldman by individual arbitration through the procedures articulated in their contractual agreements.

2.      Goldman's Motion to Compel with respect to the Equity Award Agreements is conditionally granted to the extent that those Class Members who executed only Equity Award Agreements (and not also Separation Agreements, MD Promotion Agreements, or PWA Agreements with arbitration provisions) shall have 45-days notice of the opportunity to opt out of arbitration. If they do not opt out, any claims those Class Members have against Goldman in connection with this action must be brought through individual arbitration through the procedures articulated in their contractual agreements.  Within 21 days of this Decision and Order, the parties shall meet and confer and submit to the Court a proposed form and method of notice.

3.      Plaintiffs' Cross-Motion to void arbitration clauses and releases is denied with respect to the Separation Agreements, MD Promotion Agreements, and PWA Agreements. The Cross-Motion is granted in part with respect to the Equity Award Agreements as specified in the previous paragraph.

The parties' additional arguments not expressly addressed herein have been considered by the Court and found to be without merit.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:      March 26, 2020
            New York, New York

Copies transmitted to all counsel of record.

88