# Exhibit M
*Excerpted*

Expert Report in the Matter of

<u>Chen-Oster, et al., v. Goldman Sachs & Co.</u>

Submitted by:

Wayne F. Cascio, Ph.D.

October 30, 2013

-2-

Wayne F. Cascio, Ph.D., hereby submits the following Expert Report:

**I.      STATEMENT OF QUALIFICATIONS**

1.      I am Wayne F. Cascio, Robert H. Reynolds Distinguished Chair in Global Leadership in the Graduate School of Business Administration, University of Colorado Denver. I have held this appointment since 1981.

2.      I reside at 24353 Paragon Place, Golden, Colorado 80401.

3.      I received a Ph.D. in industrial and organizational psychology from the University of Rochester in 1973.  Since that time I have held full-time and visiting faculty appointments at Florida International University, University of California-Berkeley, University of Hawaii, Wharton School of the University of Pennsylvania, University of St. Gallen (Switzerland), University of Geneva (Switzerland), the University of Hong Kong, and the National University of Singapore.

4.      I am a Diplomate in industrial and organizational psychology, of the American Board of Professional Psychology.

5.      I am a past president of the Society for Industrial and Organizational Psychology and of the Human Resources Division of the Academy of Management and a past member of its Board of Governors. I am a past Chair of the Society for Human Resource Management Foundation.

6.      I am the author of approximately 150 journal articles and book chapters, and 27 textbooks in the field of human resource management. I am the co-author of a graduate-level text that is used widely in industrial and organizational psychology programs in the United States and abroad.

7.      Since 2009 I have served as chairperson of the Compensation Committee of the Board of Directors of CPP, Inc., a small, privately held corporation in Mountain View, CA.

-3-

8. I have taught compensation administration at both graduate and undergraduate levels for many years, and have written extensively on that topic in all nine editions of my textbook, *Managing Human Resources: Productivity, Quality of Work Life, Profits* (9th ed., 2013). New York, NY: McGraw-Hill.

9. I received the Michael R. Losey Award for Human Resources Research in 2010 from the Society for Human Resource Management, and I received the Distinguished Scientific Contributions award from the Society for Industrial and Organizational Psychology in 2013.

10. I have testified as an expert in industrial and organizational psychology in both state and federal courts in the United States, for plaintiffs as well as defendants. Almost all of these cases involved allegations of discrimination on the basis of race, gender, age, or national origin. Clients and cases are listed in my curriculum vitae, which is attached as Appendix A to this report.

11. I am being paid for my time at the rate of $500 per hour.  My payment is not contingent on my opinions.  I reserve the right to supplement this report if and when additional, relevant material becomes known to me.

## II. NATURE OF ASSIGNMENT

12. I have been retained in this matter by attorneys for the plaintiffs to evaluate the performance-assessment and compensation-recommendation processes at Goldman Sachs.

## III. MATERIALS REVIEWED

13. I have reviewed the amended class action complaint, deposition testimony of the firm's divisional and other 30(b)(6) witnesses in this matter, together with attached Exhibits and supporting documentation, as well as various validation studies of behavioral competencies and compensation metrics. I also read materials produced by Goldman Sachs relevant to performance-assessment and decisions about variable (bonus) compensation.  Please refer to

Appendix B for a complete list of all materials that counsel sent to me and that I have reviewed in preparing this report.

## IV. SUMMARY OF CONCLUSIONS

14. Based on my review of the information provided, Goldman Sachs has utilized a uniform, firm-wide performance-assessment and compensation-recommendation process designed to accomplish two goals: (1) to assess the relative performance of its employees in a systematic manner, and (2) to set each employee's compensation.

15. A key aspect of setting each employee's compensation is predicated on a common, company-wide forced-distribution process known as manager quartiling. The quartiling process places individuals into groups that are meant to be substantially similar in terms of performance. But instead of creating groups of similar performers paid similarly, this ranking process is associated with large, unjustified differences in compensation outcomes for men and women. As a result, similarly situated men and women with the same quartile score receive different pay, with women earning significantly less (when controlling for the appropriate regression factors). Goldman Sachs also utilizes a common, company-wide 360-degree performance-review process to assess the relative performance of its employees as an input into quartiling and also compensation decisions. The 360-degree review incorporates feedback from a variety of reviewers – including both solicited and unsolicited reviewers – and uses a common numerical scoring process to calculate an average total score. The 360-degree review fails to measure the relative performance of employees based on unjustified and unreliable procedures that result in an adverse impact on women. Consequently, female employees systematically receive 360-degree scores that are lower than their similarly situated male counterparts. The result is biased performance assessment and compensation decisions.

### B. <u>Manager Quartiling</u>

29. From 2002 to the present, all divisions at Goldman Sachs have required managers to force-rank their employees into quartiles ("manager quartiling").[8] Firmwide guidelines on manager quartiling, created by the firm's Talent Assessment Group, are distributed to managers in all divisions.[9]

30. <u>Purpose</u>. Goldman Sachs provides the following purposes for the Manager Performance Rank ("Manager Quartiling"): understanding talent at the firm, identification of top/bottom performers, promotions, career-development reviews (CDRs), regretted losses, terminations/downsizings, and as a data point in compensation.[10] GS0153480. Goldman Sachs' corporate representative further testified that, "The purpose of the performance quartile is to provide an assessment of an employee's performance, potential, and contribution," and "[o]ne of the purposes of the quartiling process is to assess relative performance, and to do so we encourage managers to provide quartiles across a continuum on the distribution."[11]

31. Firmwide guidelines on quartiling show there are supposed to be three inputs: performance, contribution, and potential, relative to (1) each individual's level of experience and position, and (2) each individual's peers. GS0122587. Guidance to managers, *id.,* suggests that they assess overall performance, contribution, and potential by considering factors such as the following, as demonstrated by behavior displayed and results attained during the year:

---

[8] Deposition of Jessica Kung, July 31 and August 1, 2013, ("Kung Tr.") at 29:6-19; Deposition of Caroline Heller-Sberloti, July 10 and 11, 2013 ("Heller-Sberloti Tr.") at 39:20-24; Deposition of Bruce Larson, June 12, 2013 ("Larson Tr.") at 182:16-183:22; Deposition of Lisa Donovan, July 1 and 2, 2013 ("Donovan Tr.") at 136:2-14.
[9] Kung Tr. 120:6-25; Heller-Sberloti Tr. 92:9-99:20; Larson Tr. 83:19-84:22; Donovan Tr. 289:20-290:9.
[10] Despite the fact that one of the stated purposes of the manager quartile is promotions, there is no requirement that a Vice President attain a certain quartile in order to be eligible for promotion to Managing Director; in fact, there is no stated relationship between performance evaluation and eligibility for promotion at all, other than a recent 2011 document from one division that now suggests Vice Presidents may not be in the fifth quartile. GS0113973; GS0113548 at 558; Larson Tr. at 266:17- 267:14; 296:16- 297:17; Kung Tr. at 428:8-430:19. In my opinion, this is a flawed selection system, notwithstanding my other criticisms about the performance-measurement systems in place.
[11] Deposition of David Landman, October 10, 2013 ("Landman II Tr.") at 10:10-21.

- 360-degree review data
- Quality of performance
- Long-term commercial impact or contribution
- Potential to assume increasing responsibility
- Leadership/management skills
- Diversity and citizenship-related activities

32. <u>Input 1 – Performance</u>. As seen below, in 2011 the divisions created written lists of metrics used to evaluate an employee's financial performance. *See* GS0122913 (Securities); GS0122904 (IBD); GS0122937 (IMD); and GS0122928 (MBD). However, the construct of performance also includes non-financial indicators, such as the six criteria in the bulleted list above.

33. <u>Input 2 - Potential.</u> As examined in greater detail below, but as an overall conclusion, there is no standard definition of potential, no formal training in how to assess it, nor any requirement that managers document their view of an employee's potential. Landman II Tr. 29:3-25; 30:2-10; 18-24. With respect to training, the "Guidelines for the Manager Performance Rank," state: "Assess potential for future contribution to the firm by considering factors such as skill set, managerial capacity, and breadth of ability." GS0122587 at 588.

34. <u>Input 3 – Contribution</u>. This term is not defined separately or distinguished from the construct of performance in the guideline documents given to managers. GS0122587. As with performance, managers are advised to consider the six criteria in the bulleted list in paragraph 31 above. *Id*.

35. The 360-Degree Performance-Review Process

-11-

1137905.5

a. From 2002 to the present, all divisions have participated in the 360-degree performance-review process each year.[12] The firm's Talent Assessment Group administers this process centrally. Employees from one division may review employees in another division.

b. The process proceeds as follows. Employees create a list of reviewers. Managers review the list, and have the ability to add to or remove reviewers from their employees' reviewer lists, as they deem appropriate.[13] There is no requirement that the composition of reviewers be uniform for similarly situated employees; for instance, Associate A on Sales Team X may be reviewed by two partners, two VPs, and one associate, while Associate B on Sales Team X may be reviewed by one partner, one VP, and three associates.[14]

c. Reviewers are asked to provide both quantitative and qualitative feedback. Prior to 2009, each division used a five-point rating scale for quantitative feedback.[15] In 2010, there was a firm-wide shift to a nine-point rating scale, to address problems with lack of differentiation in review scores.[16]

d. The firm used the scores earned in certain "Firm-Wide Review Categories" to generate an overall "360 score." From 2003 to 2008, in all divisions, these included - Leadership, Overall Commercial Effectiveness, and Overall Professional Performance.[17] These three items were averaged to produce the employee's 360 score.[18]

---

[12] Kung Tr. 30:5-16; 278:16-279:12; Heller-Sberloti Tr. 79:18-21; 264:19-266:18; Larson Tr. 69:23-70:6; 167:20-168:1; Donovan Tr. 164:3-15; 165:4-7; 393:9-18.
[13] Kung Tr. 283:5-22; Heller-Sberloti Tr. 267:17-268:5; Larson Tr. 174:25-175:25; Donovan Tr. 384:11-20.
[14] Kung Tr. 288:19-289:14.
[15] Kung Tr. 291:4-11; 314:21-25; Heller-Sberloti Tr. 288:9-19; Larson Tr. 178:22-179:2; Donovan Tr. 358:15-359:6; GS0120580.
[16] GS0003436; Kung Tr. 314:21-25; Heller-Sberloti Tr. 288:9-19; Larson Tr. 180:4-181:4; Donovan Tr. 358:15-359:6.
[17] Kung Tr. 294:25-295:10; Heller-Sberloti Tr. 377:12-378:8; GS0120172; GS0120580.
[18] Kung Tr. 295:11-25; GS0098006; GS0120172; GS0120580.

-37-

79. Overall, the extreme differences in pay by gender that emerge in the compensation recommendations cannot be justified by the existing systems.

*Wayne F. Cascio*

_____

Wayne F. Cascio, Ph.D.
October 30, 2013