UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; SHANNA ORLICH; ALLISON GAMBA; and MARY DE LUIS, <br><br> Plaintiffs, <br><br> -against- <br><br> GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC., <br><br> Defendants. | INDEX NO.  10-cv-6950-AT-RWL |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S
ORDER REGARDING PUBLICLY DISCLOSED EQUAL PAY STUDY**

-i-

**TABLE OF CONTENTS**

**Page**

| | | |
|---|---|---|
| I. | INTRODUCTION ........................................................................................................... 1 | |
| II. | BACKGROUND ............................................................................................................. 2 | |
| | A. | Goldman Sachs's Equal Pay Study............................................................................ 2 |
| | B. | The Parties' Discovery Dispute and Magistrate Judge's Order............................. 6 |
| III. | STANDARD OF REVIEW ............................................................................................. 8 | |
| IV. | ARGUMENT ................................................................................................................... 8 | |
| | A. | The Equal Pay Study cannot be privileged because it was conducted for a business purpose and does not constitute legal advice. ........................................ 8 |
| | B. | Even if the Equal Pay Study were privileged, any privilege was waived when Goldman Sachs published its end result....................................................... 12 |
| | C. | Goldman Sachs's relevance argument is meritless. ............................................. 14 |
| V. | CONCLUSION.............................................................................................................. 15 | |

20099013.7

## TABLE OF AUTHORITIES

Page

**Cases**

*Abel v. Merrill Lynch & Co., Inc.*,
  No. 91-6261, 1993 WL 33348 (S.D.N.Y. Feb. 4, 1993)............................................................. 10

*Chen-Oster v. Goldman, Sachs & Co.*,
  325 F.R.D. 55 (S.D.N.Y. 2018) ............................................................................................... 14

*In re County of Erie*,
  473 F.3d 413 (2d Cir. 2007)................................................................................................. 9, 10

*In re Kidder Peabody Securities Litigation*,
  168 F.R.D. 459 (S.D.N.Y. 1996) ............................................................................................. 12

*In re Rivastigmine Patent Litig.*,
  237 F.R.D. 69 (S.D.N.Y. 2006) ............................................................................................ 9, 11

*Moussouris v. Microsoft,*
  No. 15-1483, ECF No. 225-1 (W.D. Wash. July 27, 2017)....................................................... 12

*Pearlstein v. Blackberry Ltd.*,
  No. 13-7060, 2019 WL 1259382 (S.D.N.Y. March 19, 2019) ................................................. 11

*Podell v. Citicorp Diners Club, Inc.*,
  112 F.3d 98 (2d Cir. 1997)......................................................................................................... 8

*Scott v. Chipotle Mexican Grill, Inc.*,
  94 F. Supp. 3d 585 (S.D.N.Y. 2015)........................................................................................ 10

*Urban Box Office Network, Inc. v. Interfase Managers, L.P.*,
  No. 01 CIV. 8854 LTS/THK, 2006 WL 1004472 (S.D.N.Y. Apr. 18, 2006) ........................... 9

*Voelker v. Deutsche Bank AG*,
  No. 11-6362, 2014 WL 4473351 (S.D.N.Y. Sep. 11, 2014)..................................................... 11

*Westmoreland v. CBS, Inc.*,
  97 F.R.D. 703 (S.D.N.Y. 1983) ............................................................................................... 12

*Zhao v. Deutsche Bank AG*,
  No. 13CV02116 (GBD) (DF), 2014 WL 12526256 (S.D.N.Y. June 24, 2014) ....................... 11

**Federal Rules of Civil Procedure**
Fed. R. Civ. P. 72 .......................................................................................................................... 1
Fed. R. Civ. P. 72(a) ..................................................................................................................... 8

## I. INTRODUCTION

Under Federal Rule of Civil Procedure 72, Plaintiffs submit the following objections to the Magistrate Judge's December 3, 2020 Order denying Plaintiffs' motion to compel production of the data analysis file underlying Goldman Sachs's publicly broadcasted Equal Pay Study. *See* ECF No. 1133. Goldman Sachs conducted the Equal Pay Study as a public relations exercise in order to quell a pay equity proposal from an institutional shareholder, match pay equity disclosures from Wall Street competitors, and offset negative publicity stemming from its mandatory public filing showing a large gender pay gap in the U.K. After completing its analysis, Goldman Sachs announced the purportedly positive results in an April 2018 report that it publicized on Twitter: "We have conducted an analysis that shows women at the firm on average make 99 percent of what men earn."[1] Goldman Sachs touted this figure to investors, government regulators, and employees alike. Despite the broad publication of the Equal Pay Study, Goldman Sachs refuses to produce the data analysis file that will allow Plaintiffs to understand and replicate (and thus test) its results.

Goldman Sachs's Equal Pay Study is highly relevant to Plaintiffs' claims in this class action, in which Plaintiffs allege that Goldman Sachs "has paid its female professionals less than similarly situated male professionals, even though they hold equivalent positions and perform the same or substantially similar work with similar or in some cases superior results." Second Amended Complaint ¶ 3, ECF No. 411. The integrity (or lack of integrity) of the study also implicates Goldman Sachs's knowledge of gender pay disparities, and thus is directly probative of whether Goldman Sachs intentionally discriminated against the Class by permitting systemic

---

[1] Goldman Sachs, *Purpose & Progress: 2017 Environmental, Social and Governance Report* at 24, *available at* https://www.goldmansachs.com/citizenship/sustainability-reporting/esg-content/esg-report-2017.pdf. *See* @GoldmanSachs, Twitter (Apr. 20, 2018, 10:19 a.m.), https://twitter.com/GoldmanSachs/status/987380154077982721.

gender bias to exist and, further, covering it up.

The Equal Pay Study served a business purpose and does not constitute legal advice, notwithstanding the involvement of attorneys. Nevertheless, the Magistrate Judge held that the Equal Pay Study was subject to attorney-client privilege, and that the privilege was not waived by Goldman Sachs's public disclosure of the Equal Pay Study's end result. Respectfully, the Magistrate Judge's conclusion is contrary to law, and for the reasons stated below, the Court should sustain Plaintiffs' objections and order Goldman Sachs to produce the data analysis file demonstrating the methodology of the publicly disclosed Equal Pay Study.

## II. BACKGROUND

### A. Goldman Sachs's Equal Pay Study

Whether men and women are compensated equally at Goldman Sachs—and more broadly in the financial services industry—has been the subject of intense public scrutiny in recent years. Clients, investors, regulators, current and future employees, and the public at large have all vocally demanded gender equality.[2] Convincing these constituencies that a firm's compensation practices are fair is a business imperative for any large company. Goldman Sachs recognized this imperative internally in its communications surrounding the Equal Pay Study, as shown below.

In the fall of 2016, institutional investors launched a pay equity campaign across the financial services industry. The investors filed shareholder gender pay equity resolutions ahead of Goldman Sachs's spring 2017 annual meeting, as well as in advance of the meetings of Wall

---

[2] *See, e.g.*, *Two Down, 11 To Go: "Median Gender Pay Gap" Shareholder Proposals Gaining Ground During The 2020 Proxy Season*, Arjuna Capital (Mar. 4, 2020), http://arjuna-capital.com/news/press-release-two-down-11-to-go-median-gender-pay-gap-shareholder-proposals-gaining-ground-during-the-2020-proxy-season/; Majority Staff of the H.R. Comm. on Financial Services, *Diversity and Inclusion: Holding America's Largest Banks Accountable* (Feb. 2020), https://docs.house.gov/meetings/BA/BA13/20200212/110498/HHRG-116-BA13-20200212-SD003-U1.pdf; Kim Girard, *MBA students fight the gender pay gap—one offer at a time*, BerkeleyHaas Newsroom (April. 8, 2019), https://newsroom.haas.berkeley.edu/haas-mba-students-fight-gender-pay-gap-one-offer-at-a-time/.

Street competitors, such as Citigroup, Bank of America, Wells Fargo, and Bank of New York Mellon, among others.  *See* Laura Colby, *Goldman, Citigroup Targeted by Diversity Activists in 2017*, Bloomberg News (Dec. 6, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-06/goldman-citigroup-in-crosshairs-of-diversity-activists-for-2017, Declaration of Michael Levin-Gesundheit Ex. 1.  Goldman Sachs responded quickly.  In early 2017, it engaged Welch Consulting, a statistical and economic consulting firm, to conduct an Equal Pay Study.  Declaration of Barbara Brown ¶ 6, ECF No. 1131.  And, in March 2017, it agreed "to enhance pay equity disclosures in a report."  Laura Colby, *Goldman, BNY Mellow Bow to Investor Pressure on Gender Pay*, Bloomberg News (Mar. 23, 2017), *available at* https://www.bloomberg.com/news/articles/2017-03-23/goldman-bny-mellon-bow-to-investor-pressure-on-gender-pay-gap, Levin-Gesundheit Decl. Ex. 2.  As a result, Pax World Management, the institutional investor that had targeted Goldman Sachs, withdrew its resolution ahead of the 2017 annual meeting.  *Id.*

Goldman Sachs issued its promised public pay equity disclosure in its *2017 Environmental, Social and Governance Report* ("ESG Report"), which, despite its name was not published until spring 2018.  Under the bolded heading "**GENDER PAY EQUITY**," it publicly announced, and widely distributed, the purported result: "We have conducted an analysis that shows women at the firm on average make 99 percent of what men earn."  Goldman Sachs, *Purpose & Progress: 2017 Environmental, Social and Governance Report* at 24; *see* Brown Decl. ¶ 9 ("ESG made a statement about compensation in its 2017 report, issued in the spring of 2018, which was intended for distribution both within Goldman Sachs and publicly.").

The discovery record in this litigation confirms that the public disclosure of the Equal Pay Study in the ESG Report was indeed motivated by public relations concerns and made in

response to investor pressure on Goldman Sachs and the financial services industry generally.  A Goldman Sachs Human Capital Management ("HCM")[3] employee acknowledged in a June 2017 email that the planned "[ESG] report disclosure was our response to the sh[areholder] proposal." Levin-Gesundheit Decl. Ex. 3 (GS0633109).  Although the Equal Pay Study itself had not yet been finalized and the ESG Report had not been published, June 2017 draft language already contained this conclusion: "Recently, we conducted a compensation analysis (base salary and discretionary bonus) examining gender pay parity for United States employees across job types and levels.  Based on this analysis, we determined that our employees receive comparable compensation for similar work regardless of gender." *Id.* (GS0633109) at -10.  This draft, however, did not contain the "99 percent" equivalent pay figure. *Id.*

In early 2018, before the 2017 ESG Report was published, HCM and investor relations employees observed that their competitors Citigroup, Wells Fargo, and Bank of America had all just recently published gender pay gaps of only 1 percent.  Levin-Gesundheit Decl. Ex. 4 (GS0477620) at 20-23.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Levin-Gesundheit Decl. Ex. 5 (GS0838447).

At the same time, Goldman Sachs anticipated negative media attention—and employee concerns—that would soon befall the firm in light of its impending March 16, 2018 government-mandated disclosure that it paid women 56 percent less than men in the U.K. *See* Charles Riley,

---

[3] HCM is Goldman Sachs's human resources department.

*Goldman Sachs has a big gender pay gap in the UK*, CNN (March 16, 2018), https://money.cnn.com/2018/03/16/investing/goldman-sachs-uk-gender-pay-gap/index.html. Thus, on February 6, 2018, an HCM employee explained, "[H]ow we want to use [the Equal Pay Study] in public disclosures (particularly in light of the Gender Pay gap disclosures required by April in [the] UK)—what the narrative should be—[is] mainly an EO/IR [Executive Office/Investor Relations] decision." Levin-Gesundheit Decl. Ex. 4 (GS0477620) at 20-21. ██

███████████████████████████████████████████████████████

██████████  Levin-Gesundheit Decl. Ex. 6 (GS0620101). Then, with the U.K. pay gap disclosure just days away, ████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Levin-Gesundheit Decl. Ex. 7 (GS1023616) (emphasis modified).

The press release aimed at changing the public relation narrative then came on April 20, 2018, when Goldman Sachs, taking to Twitter, published its own Equal Pay Study touting the exact same 99 percent pay equity result that by then become the industry standard. @GoldmanSachs, Twitter (Apr. 20, 2018), https://twitter.com/GoldmanSachs/status/ 987380154077982721.

Goldman Sachs broadcast the purported 99 percent pay equity finding of its Equal Pay Study through employee roundtables and even in a meeting between Goldman Sachs's CEO and

members of Congress.  *See* Levin-Gesundheit Decl. Ex. 8 (Erika Irish Brown Tr.) 134:17-18 & Exs. 9, 10 (Exs. 118, 119 of Irish Brown deposition) (Chief Diversity Officer testifying that her team prepared talking points containing the result of the 2017 Equal Pay Study for CEO David Solomon's meeting with House Financial Services Committee Chair Representative Maxine Waters); Irish Brown Tr. 131:2-133:1 (testifying that she used talking points based on the Equal Pay Study for discussions with various groups, including "groups of senior women and HR colleagues").  As Goldman Sachs's Chief Diversity Officer testified, the end result of the Equal Pay Study was "published throughout the firm."  *Id.* 129:22-130:6.

**B.  The Parties' Discovery Dispute and Magistrate Judge's Order**

Plaintiffs learned of the Equal Pay Study in the ESG Report in the course of deposing Erika Irish Brown, Goldman Sachs's current Chief Diversity Officer, on November 13, 2020. This was the first time Plaintiffs learned that Goldman Sachs conducted an independent study of pay equity separate and apart from the Employment Law Group's annual "review process with special focus on women and historically underrepresented groups[,] applied to the manager performance rating and compensation proposals,"[4] which the Court has ruled is privileged.  ECF No. 216.  *See* Irish Brown Tr. 153:24-154:15 ("So the 2017 review was a specific effort outside of the annual process [and] is the basis of the 99 percent figure.").[5]  Ms. Irish Brown testified that she was told that HCM's "compensation team did an actual pay equity like-for-like review, and that [99 percent] was the conclusion they drew."  *Id*. 125:11-17.  During Plaintiffs' questioning of Ms. Irish Brown regarding the 2017 Equal Pay Study, Goldman Sachs's counsel

---

[4] *See* Levin-Gesundheit Decl. Ex. 11 (GS0109366).

[5] During the parties' meet and confer, Goldman identified a single privilege log entry it contends pertains to the Equal Pay Study.  The entry is described as "[r]eflect[ing] request for and provision of legal advice regarding compensation."  There are approximately 80 entries with this same privilege description spanning 2011 to 2018 on Goldman's merits privilege log.  This was insufficient to give Plaintiffs notice of the existence of the Equal Pay Study.

*never* raised an attorney-client privilege objection.

With the discovery cut-off approaching, Plaintiffs requested, on the same day as Ms. Irish Brown's deposition, that Goldman Sachs produce responsive documents regarding the Study. In seeking this information from Goldman Sachs, Plaintiffs noted that materials concerning the 2017 Equal Pay Study are responsive to Plaintiffs' First Set of Requests for Production, Request No. 11, served in December 2010, which requested "[a]ll DOCUMENTS OR CORRESPONDENCE RELATED to all gender-related statistical audits, analyses, STUDIES OR reports regarding compensation . . . for Associates [and] Vice Presidents . . . that DEFENDANTS have performed, including but not limited to the underlying data for such audits, analyses, STUDIES OR reports." In 2012, as part of the parties' conferrals over this request, Goldman Sachs agreed to collect and produce "studies concerning gender and performance evaluations [or] compensation" that "pertain to the [] revenue divisions and were conducted by formal groups at the firm." Levin-Gesundheit Decl. Ex. 12 (Feb. 21, 2012 Ltr.) at 3. The Equal Pay Study at issue is exactly that: a formal study of gender, performance evaluation, and compensation that includes the revenue divisions of the firm. *See* Levin-Gesundheit Decl. Ex. 4 (GS0477620) (stating that the 2017 Equal Pay Study "takes into account . . . quartile," a performance metric challenged in this litigation).

The parties reached impasse on November 17, and on November 19, 2020, Plaintiffs filed a pre-motion letter to the Magistrate Judge seeking an order compelling production of only the data analysis file underling the Equal Pay Study that would allow Plaintiffs' expert to understand the statistical analysis, along with any final report describing the methodology and/or results of the Study. ECF No. 1111.

In opposing Plaintiff's request, Goldman Sachs represented that no reports exist and that

this dispute pertains only to a data file.  Goldman's Opp'n Letter, ECF No. 1130 at 1.  Goldman Sachs also invoked attorney-client privilege.  To support this invocation, Goldman Sachs made 10 different substantive alterations to Ms. Irish Brown's testimony to add references to counsel's involvement in the Equal Pay Study.  *See* ECF No. 1130-4.  As just one example, Ms. Irish Brown testified that she learned about the Equal Pay Study during her onboarding conversations with HCM's compensation team, but the errata sheet changes this testimony to indicate that she learned about it from counsel.  Irish Brown Tr. 125:11-127:1.[6]

The Magistrate Judge denied Plaintiffs' request on December 3, 2020, holding that the Study is protected by attorney-client privilege, and Plaintiffs had not established waiver.  ECF No. 1133.  These objections follow.

### III. STANDARD OF REVIEW

A district court "must consider timely objections and modify or set aside any part of [a magistrate judge's] order that is clearly erroneous or is contrary to law."  Fed. R. Civ. P. 72(a).

### IV. ARGUMENT

#### A. The Equal Pay Study cannot be privileged because it was conducted for a business purpose and does not constitute legal advice.

The Magistrate Judge's determination that the data analysis file underlying the Equal Pay Study is privileged runs contrary to Second Circuit law.  The Study was undertaken to foster public goodwill in response to a shareholder initiative, pay equity disclosures from Wall Street competitors, and negative publicity stemming from Goldman Sachs's required disclosure of its U.K. gender pay gap.  Managing public relations is a quintessential business function, and

---

[6] Despite Goldman's attempt to change unfavorable testimony, the Second Circuit also has made clear that the parties are entitled to rely on the answers provided in the deposition even at trial. *E.g.*, *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997).

-8-

2099013.7

business advice is not subject to attorney-client privilege no matter how many lawyers are involved.

"The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance." *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007). "Where there are several possible interpretations of a document based upon the surrounding circumstances, the party asserting the privilege must produce evidence sufficient to satisfy a court that legal, not business, advice is being sought." *Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, No. 01-8854, 2006 WL 1004472, at *6 (S.D.N.Y. Apr. 17, 2006). In particular, "courts must be wary that the involvement of the attorney is not being used simply to shield corporate communications from disclosure." *In re Rivastigmine Patent Litig.*, 237 F.R.D. 69, 80 (S.D.N.Y. 2006). The standard for invoking privilege is not satisfied here.

Goldman Sachs claims that the data analysis file showing the statistical regression underlying the 2017 Equal Pay Study is protected by attorney-client privilege simply because it was shepherded from a statistical consulting firm through various attorneys to the investor relations staffers who drafted the ESG Report, as shown below (together with additional facts in the record).

- *January 2017*: With institutional investor Pax World Management threatening to bring a pay equity proposal to a vote at the spring 2017 annual shareholder meeting, Goldman Sachs's Employment Law Group ("ELG") contacts the law firm Paul Hasting to "provide legal advice regarding Goldman Sachs's compensation practices"—*i.e.*, to request a statistical analysis be conducted. Brown Decl. ¶ 5.

- *Early 2017*: "Paul Hastings engage[s] Welch Consulting [] to provide statistical analyses." *Id.* ¶ 6.

- *February 2017 to mid-2018*: Data analyses are reviewed by Welch Consulting, Paul Hastings, and ELG. *Id.* ¶ 8. Goldman Sachs's outside counsel "understand[s] that ELG then provided legal advice to [Goldman Sachs's Environmental, Social and Governance]

> function"—*i.e.*, communicated the Equal Pay Study to the authors of the ESG Report—
> with the end result of the Equal Pay Study published in April 2018. *Id.* ¶ 9.

These maneuvers do not transform business advice aimed at bolstering Goldman Sachs's image in the marketplace into "legal advice." There is no dispute as to the impetus for the Equal Pay Study, nor as to how Goldman used it. As a Goldman Sachs HCM employee explained, the "narrative" of the public disclosures was "mainly an EO/IR [Executive Office/Investor Relations] decision." Levin-Gesundheit Decl. Ex. 4 (GS0477620) at 20-21. Goldman Sachs's position hinges entirely on the fact that lawyers acted as go-betweens. But the Second Circuit is clear that the involvement of individuals with law degrees does not transform business communications into "legal advice": "When an attorney is consulted in a capacity other than as a lawyer, as (for example) a . . . media expert [or] business consultant . . . that consultation is not privileged." *County of Erie*, 473 F.3d at 421; *see also Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 596 (S.D.N.Y. 2015) (same).

Nor can Goldman Sachs recast the business initiative that was the Equal Pay Study as a legal engagement by claiming that the data analysis file Plaintiffs seek amounts to "outside counsel's view of how to compare employee compensation for purposes of assessing legal compliance." Opp'n Letter at 3. Goldman Sachs conceded that the Equal Pay Study served no compliance purpose when it argued to the Magistrate Judge that the Study is "irrelevant" because it includes employees that it contends should *not* be compared on an employment law basis, in particular, employees subject to different regulation both inside and outside the United States. *Id.* at 2. Regardless, a document does not receive blanket protection because it may provide an incidental benefit to compliance. *See, e.g.*, *Abel v. Merrill Lynch & Co., Inc.*, No. 91-6261, 1993 WL 33348, at *3 (S.D.N.Y. Feb. 4, 1993) ("A corporation may not insulate itself from suit for civil rights violations by funneling all data on the demographic composition of its work force to

in-house counsel, eliminating the underlying records, and then claiming that the data in the in-house counsel's file is privileged."); *Zhao v. Deutsche Bank AG*, No. 13-2116, 2014 WL 12526256, at *2 (S.D.N.Y. June 24, 2014) (holding that report containing raw statistical data was not privileged because it was factual in nature).  Further, even if the Equal Pay Study could somehow be construed as serving *anything* other than a purely business purpose, it was not conducted "for the *predominant purpose* of seeking or conveying legal advice," as is required to maintain attorney-client privilege.  *Pearlstein v. Blackberry Ltd.*, No. 13-7060, 2019 WL 1259382, at *13 (S.D.N.Y. March 19, 2019) (emphasis added) (holding that communications about a press release aimed at countering a negative public report from a market research firm were motivated by concerns about "shareholders and the market" and thus were not privileged, even though the defendant was also considering taking legal action against that research firm).

Here, in particular, there also is significant reason to think "the involvement of the attorney is . . . being used simply to shield corporate communications from disclosure."  *In re Rivastigmine Patent Litig.*, 237 F.R.D. at 80.  *See also Voelker v. Deutsche Bank AG*, No. 11-6362, 2014 WL 4473351, at *2 (S.D.N.Y. Sep. 11, 2014) (stating same and denying motion to compel only where, unlike here, the defendant had "already been ordered to produce . . . *employment statistics* underling the Disputed Materials") (emphasis added).  Goldman Sachs never asserted privilege during the deposition of Ms. Irish Brown regarding the Equal Pay Study, but then specifically changed Ms. Irish Brown's testimony through errata to justify its invocation of privilege in opposing Plaintiffs' motion to compel.

Goldman Sachs has not met its burden to show that the data analysis file underlying the publicly disclosed Equal Pay Study is privileged *legal* advice.  The Study served a clear business purpose: public relations.  Moreover, there is no independent way to determine whether the

substance of the widely broadcasted 99 percent claim is true unless the underlying data analysis file is produced. Therefore, Plaintiffs' objections should be sustained, and the Court should order Goldman to produce the underlying data analysis file.

### B. Even if the Equal Pay Study were privileged, any privilege was waived when Goldman Sachs published its end result.

Even if Goldman Sachs could make a *prima facie* claim of privilege—and it cannot—any privilege would have been waived by Goldman Sachs's repeated publication of the existence of the Equal Pay Study and its end result.

Public disclosure and specific discussion of a study and its conclusions waive any purported privilege over the study itself. *See Westmoreland v. CBS, Inc.*, 97 F.R.D. 703, 706-07 (S.D.N.Y. 1983) (in analysis of related claim of self-evaluation privilege, granting motion to compel internal report where company relied in public statements on the fact of the report and its conclusions). *In re Kidder Peabody Securities Litigation*, is instructive. 168 F.R.D. 459 (S.D.N.Y. 1996). There, a court in this District held that, in the context of a report providing a sanguine summary of an internal investigation, "waiver by publication requires disclosure of those portions of interview documents that are specifically alluded to." *Id.* at 469. By that same logic, here, where Goldman Sachs published the end result of its Equal Pay Study in the ESG Report, Goldman must disclose what the purportedly positive 99 percent equality figure alludes to: the data analysis file. That file will allow a statistical expert to learn how Goldman Sachs arrived at its conclusion—*i.e.*, what variables it considered.

In a very similar context to the facts here, a federal court in *Moussouris v. Microsoft*, a gender discrimination class action, ordered production of a data analysis file underlying the publicly disclosed end result of an equal pay study. No. 15-1483, ECF No. 225-1 (W.D. Wash. July 27, 2017), Levin-Gesundheit Decl. Ex. 13 (*Microsoft* Order). Like here, the Microsoft equal

-12-

2099013.7

pay study originated with a shareholder demand a year prior to the investor activism at Goldman Sachs. Arjuna Capital, an institutional investor, "request[ed] that Microsoft provide greater transparency regarding gender pay equity." *Id.* at 2-3.[7] Acting through counsel, Microsoft, like Goldman Sachs, engaged the same consulting firm—Welch Consulting—to "r[un] various regression analyses." *Id.* at 3. The result was publication of a statement nearly identical to Goldman Sachs's statement in the ESG Report: "[F]or every $1 earned by men, our female employees in the U.S. earned 99.7 cents at the same job title and level." Kathleen Hogan, *Ensuring equal pay for equal work*, Official Microsoft Blog (Apr. 11, 2016), https://blogs.microsoft.com/blog/2016/04/11/ensuring-equal-pay-equal-work/. The court thereafter affirmed a special discovery master's determination that Microsoft had waived privilege: "Fundamental fairness suggests that Microsoft should not be allowed to publicly tout its favorable diversity data, including providing statistics on its success, and then claim the data and resulting method to reach its statistics are privileged." *Microsoft* Order at 5. The court ordered Microsoft to produce "[c]ommunications relating to the details of the final [Equal Pay Study]," including its "data and methodologies"—*i.e.*, the data analysis file. *Id.* at 3, 12 (brackets in original). The same process occurred here, and the result should be the same.

Thus, should this Court find that Goldman Sachs's Equal Pay Study is privileged, Plaintiffs' objections on the ground of waiver should be sustained, and Goldman Sachs should be ordered to produce the data analysis file underlying the end result of the Study.[8]

---

[7] This same institutional investor has co-filed gender pay equity proposals with Pax World Management, the activist investor here. *See* Pax World Management, *2017 Impact Report* at 10, https://impaxam.com/assets/pdfs/sustainability/pax-sustainability-report.pdf?pwm=610 (indicating that Pax World Management co-filed pay equity proposals with Arjuna Capital at Amazon, eBay, and Mastercard).

[8] To address any burden concerns, Plaintiffs have not sought the related internal communications that were also ordered produced in *Microsoft* and which would be subject to the same analysis.

### C. Goldman Sachs's relevance argument is meritless.

The Magistrate Judge's Order was not founded on Goldman's argument that the Equal Pay Study is irrelevant. Nevertheless, Plaintiffs address this argument below.

The data analysis file underlying the end result of the Equal Pay Study will show what variables Goldman Sachs employed to compare the compensation of men and women for the purpose of public disclosure. This information is highly relevant both with respect to Plaintiffs' disparate treatment and disparate impact claims. The data analysis file will reveal whether the Equal Pay Study is methodologically sound and consistent with Goldman Sachs's employment practices. Thus, it bears on Goldman Sachs's knowledge and mindset as to gender equity. It is probative of disparate treatment and whether Goldman Sachs was "aware of gender disparities and gender bias at Goldman Sachs, but did not adjust [its] policies or practices to account for the discrimination women faced." *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 77, (S.D.N.Y. 2018). The data analysis file for the Equal Pay Study is equally relevant to Plaintiffs' disparate impact claim and understanding Goldman Sachs's defenses, as it is probative of whether Goldman Sachs's challenged performance evaluation processes indeed have a disparate impact on women and whether any disparities can be justified by legitimate factors. *See* Levin-Gesundheit Decl. Ex. 4 (GS0477620) (stating that the 2017 Equal Pay Study "takes into account . . . quartile," a performance metric challenged in this litigation); *see, e.g.*, Answer to Am. Compl., 19th Affirmative Defense ("The employment actions taken by GS with respect to Plaintiffs were based solely on legitimate, non-discriminatory factors other than gender."), ECF No. 426. Plaintiffs are entitled to understand the Equal Pay Study, and to do so, Plaintiffs need access to the underlying data file.

That the Equal Pay Study concerned a broader population than the certified Class does not make it irrelevant, as Goldman Sachs claims. Opp'n Letter at 2. It is still relevant because it

is probative of whether Goldman Sachs has operated in good faith in response to concerns of systemic gender discrimination.  *Cf.* Answer to Am. Compl., 52nd Affirmative Defense ("[T]he alleged discrimination was contrary to Goldman Sachs' *good-faith efforts* to comply with Title VII, and therefore punitive damages may not be imposed against Goldman Sachs under Title VII.") (emphasis added).  Exactly which employees are included in the Study is beside the point since its modeling can be applied elsewhere.  The underlying data file would allow a statistician to apply the Equal Pay Study's methodology to the Class population to determine whether there is a gender disparity in compensation outcomes tied to performance evaluation based on a method Goldman Sachs has already endorsed.  Likewise, the fact that Plaintiffs have separate access to raw Class member HR data is immaterial because Plaintiffs cannot know how Goldman Sachs arrived at *its* end result (of 99 percent gender pay equity) that it published to the world in its ESG Report without the information sought herein.  Finally, to the extent that Welch Consulting's modeling in the Equal Pay Study is materially different or in conflict with expert reports in this case, which were also prepared by Welch Consulting, Plaintiffs should be entitled to use the Equal Pay Study data analysis file to cross-examine and potentially impeach Goldman Sachs's experts at the trial on the merits.[9]

## V.     CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court sustain Plaintiffs' objections and order Goldman Sachs to produce the data analysis file underlying the Equal Pay Study that would allow Plaintiffs' expert to replicate the statistical analysis Goldman Sachs has broadly touted.

---

[9] Notably, the Equal Pay Study's results appear to be inconsistent with the conclusions that Goldman Sachs's expert economist, Dr. Michael Ward of Welch Consulting, set forth in his class certification report.

Dated: December 17, 2020          By:
                                        */s Kelly M. Dermody*
                                          Kelly M. Dermody

                                  Kelly M. Dermody (admitted *pro hac vice*)
                                  Anne B. Shaver (admitted *pro hac vice*)
                                  Michael Levin-Gesundheit (admitted *pro hac vice*)
                                  Michelle Lamy (admitted *pro hac vice*)
                                  **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
                                  275 Battery Street, 29th Floor
                                  San Francisco, CA 94111-3339
                                  Telephone: (415) 956-1000
                                  Facsimile: (415) 956-1008

                                  Rachel J. Geman
                                  Jessica A. Moldovan
                                  **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
                                  250 Hudson Street, 8th Floor
                                  New York, NY 10013-9592
                                  Telephone: (212) 355-9500
                                  Facsimile: (212) 355-9592

                                  Adam T. Klein
                                  Cara E. Greene
                                  Melissa L. Stewart
                                  Christopher M. McNerney
                                  **OUTTEN & GOLDEN LLP**
                                  685 Third Avenue, 25th Floor
                                  New York, NY 10017
                                  Telephone: (212) 245-1000
                                  Facsimile: (646) 509-2060

                                  *Class Counsel*