# Exhibit 3

***Chen-Oster, et al. v. Goldman Sachs & Co., et al.***
Case No. 10-cv-09650-AT-RWL

Report of Caren Goldberg, Ph.D.


January 15, 2021

(As Revised February 4, 2021)

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   QUALIFICATIONS ................................................................................... 1

III.  METHODOLOGY & MATERIALS CONSIDERED ........................... 4

IV.  SUMMARY OF OPINIONS ..................................................................... 6

V.   OPINIONS ................................................................................................. 7

     a.     Goldman Sachs Maintains a Climate Tolerant of Bias and
            Harassment. ....................................................................................... 7

            1.     Goldman Sachs' Climate Is Tolerant of Bias. .................... 8

            2.     Goldman Sachs Tolerates Hostility Towards Women. ................... 16

     b.     Goldman Sachs Has Failed to Hold Managers Accountable for
            Diversity Performance. ...................................................................... 21

     c.     Goldman Sachs' Senior Management Has Offered Empty Platitudes
            While Failing to Advance or Require Diversity Results at the Firm. ........ 27

     d.     Goldman Sachs Has Relied On Diversity and Inclusion
            Programming that Lacks Efficacy in Advancing Diversity and
            Inclusion. .......................................................................................... 32

     e.     Goldman Sachs Has Adopted Inadequate Strategies to Address Its
            Acknowledged Glass Ceiling. ........................................................... 36

VI.  CONCLUSION ....................................................................................... 40

## I.   <u>INTRODUCTION</u>

1.      I have been asked by Plaintiffs' counsel to provide an expert report in the matter of *Chen-Oster, et al. v. Goldman Sachs & Co. and The Goldman Sachs Group, Inc.*, Case No. 1:10-cv-06950-AT-RWL.  My opinions focus on Defendant Goldman Sachs' policies, practices, and procedures with respect to diversity and inclusion and on whether its climate is tolerant of gender bias and harassment.  My testimony is based on my knowledge of the field of Human Resource Management ("HRM"), within which I have specific expertise in the area of diversity and inclusion.  I reserve the right to modify my opinion, as additional information becomes available at subsequent points in time or in response to a request by counsel to opine on additional issues that have not been addressed in this report.

## II.   <u>QUALIFICATIONS</u>

2.      During my academic career, I spent twenty-one years in the Management Departments at Bowie State University, American University and George Washington University and one year in the Industrial-Organizational Psychology Department at George Mason University.  For three years, I served as the Program Director for Human Resources at George Washington University.  I have taught undergraduate, master's, and doctoral level courses in Human Resource Management, Industrial Psychology, and Organizational Behavior. I have covered the topics of diversity, discrimination, equity, fairness, and harassment in my undergraduate and master's level Introduction to Human Resource courses, my undergraduate Cases and Exercises in Human Resource Management courses, my master's level Human Resources/Organizational Behavior survey courses, and my Ph.D. seminars in Industrial Psychology and Human Resource Management.  In addition, I have covered these topics in several off-campus accelerated MBA and executive MBA courses that I have taught, as well as

in training modules that I have designed and delivered for the Center for Excellence in Public

Leadership and the Council of Governments.

3.      I have written more than 50 articles for peer-reviewed journals and conferences.

I have also authored nine invited book chapters, including several that focus on harassment and

discrimination climates.  My peer-reviewed research has been published in *Journal of Applied*

*Psychology, Journal of Business and Psychology, Human Resource Management, Human*

*Relations, Human Resource Development International, Human Resource Development*

*Quarterly, Group and Organization Management, Journal of Occupational and Organizational*

*Psychology, Journal of Organizational Behavior, Psychology of Women Quarterly, European*

*Journal of Work and Organizational Psychology, Industrial and Organizational Psychology,*

*Academy of Management Best Paper Proceedings, Sex Roles, Assessment, Journal of Business*

*Research, Review of Global Management, Representative Research in Social Psychology,*

*Journal of Career Planning and Employment, Business Journal of Hispanic Research,* and

*Journal of Managerial Psychology*.  I have also conducted numerous media interviews and have

been featured in several television, radio, and print news pieces (*Forbes, AOL, NPR, Dateline*

*NBC, HRMagazine, USNews &World Report, Washington Post, Yahoo! Finance, FastCompany,*

*BBC News)* relating to my research.

4.      I have engaged in a variety of important leadership roles in my profession,

including serving as an Associate Editor of *Group and Organization Management*, as an editorial

board member of *Group and Organization Management, Human Resource Management*,

*Journal of Business and Psychology,* and *Journal of Management*, and as a Track Chair for the

Human Resource Division of the Southern Management Association.  In addition, I served on a

joint taskforce created by the Society for Human Resource Management (SHRM) and the

American National Standards Institute (ANSI), charged with creating national workplace standards for Diversity and Inclusion, which included sections on organizational culture and metrics and accountability.  In addition, I recently completed a three-year term as Treasurer of the Academy of Management's Gender and Diversity in Organizations Division, where I previously served a three-year term as an Executive Committee Member.

5.      I received my B.A. degree in Psychology from the State University of New York at Stony Brook in 1987, my M.B.A. degree from the State University of New York at Binghamton in 1990, and my Ph.D. degree in Human Resource Management from Georgia State University in 1997.  From 1988 to 1989, I worked in the compensation department at United Health Services.

6.      In previous cases, I have been retained by both plaintiffs' and defendants' counsel.  During the last four years, I have testified as an expert at trial or by deposition as follows.  In the matters of *Anderson, et al. v. Verizon New Jersey Inc., et al.* (United States District Court for the District of New Jersey, Case No. 13-cv-4777) and *Gardrie, et al. v. Verizon New Jersey Inc., et al.* (Case No. 15-cv-03538), I was deposed in September 2017 and October 2017.  In October 2017, I was deposed in the matter of *Kassman, et al. v. KPMG, LLC* (United States District Court for the Southern District of New York, Case No. 11-cv-03743).  In March 2018, I was deposed in *Ravina v. Columbia University and Geert Bekaert (*Civil Action No: 1:16-cv-02137(RA)).  In June 2018, I was deposed in *Maness v. City of High Point (*Civil Action No. 1:17-cv-384).  In September 2018, I was deposed in the matter of *Soto, et al. v. Microsoft Corporation*, 16-2-31049-4 SEA.  In August 2019, I was deposed in *Fowler v. AT&T, Inc., et al.*, Civil Action No. 18-CV-00667.  In October 2019, I was deposed in *Hightower v. Ingerman Management Company* and *McDonald v. Ingerman Management Company*, Civil Actions

No. 17-8025 (RMB-JS) and 17-12787(NLH-JS).  In December 2019, I was deposed in the matter of *Andrea Szaloki v. Wal-Mart Stores, Inc., et al.,* Case No. 50-2016-CA-007193- MB-AG.  I was deposed in April 2020 in the matter of *Alex Morgan, et al. v. United States Soccer Federation, Inc.*, Civil Action No. 2:19-cv-01717.  In *Alison Ray v. AT&T Mobility Services*, Civil Action No. 18-3303, I was deposed in May 2020.  Finally, in August 2020, I was deposed in the matter of *Starks, et al. v. Nationwide Mutual Insurance Company* No. 34-2016000199026-CU-OE-GDS.

7.      Appended to this report is a current copy of my *curriculum vitae*, which contains a more detailed description of my professional background, including a list of all publications authored in the previous ten years.  (Appendix 1).

8.      My rate for time spent working on this case (including for my report and any testimony) is $500 per hour.  My retainer agreement requires that a non-refundable testimony retainer of $4,000 plus travel expenses be paid in advance, per day of scheduled testimony.

III.    **METHODOLOGY & MATERIALS CONSIDERED**

9.      In formulating my opinions, I conducted an independent analysis of the materials in this case, using the case study method, a widely accepted qualitative method for conducting social science research.  (Berg, 1990).  Case studies involve in-depth analyses of a single or multiple cases using rich and varied sources of data.  In conducting a case study, one relies on established research or theory to evaluate the data presented.  Gioia, et al. (2012, 26) note that "consult[ing] with existing literature, with suspension of judgment about its conclusions," is a feature that enhances the ability of an inductive researcher to generate sound conclusions. Numerous methodology-focused articles discussing the advantages of the case study method have been published in some of the most highly-regarded, peer-reviewed Management journals

(e.g., Eisenhardt & Graebner, 2007; Eisenhardt, Graebner, & Sonnenshein, 2016; Gioia, Corely, & Hamilton, 2012).

10.     The case study method is well-suited to the current matter, as it permitted me to consider various types of data, including deposition testimony of Goldman Sachs' employees and senior leaders, correspondence, and presentations.  Following this method, I present the standards and findings of extant research in Human Resources (HR) and Industrial Psychology (IO) as a framework against which I evaluate Goldman Sachs' policies, procedures, and actions, as discerned from the data I reviewed.

11.     The key requirements of any analysis are replicability and transparency. (Aguinis and Solarino, 2019).  The table below lists these criteria and indicates how I satisfied each of them for transparency and replicability:

| Criterion for Transparency and Replicability | Satisfaction of Criterion |
|---|---|
| Kind of qualitative method | Fully met – I indicate that I rely on the case study method – see more detailed description above. |
| Research setting | This criterion is not relevant, as no attempt is made to generalize findings beyond Goldman Sachs. |
| Position of researcher along the outsider-insider continuum | Fully met – I am an outsider with no relationships with any of the named plaintiffs or deponents. |
| Sampling procedures | Fully met – I rely on purposeful sampling, as I was retained for the express purpose of opining on matters related to the ongoing litigation involving Goldman Sachs; thus, no variability was sought. |
| Relative importance of the participants/cases | Fully met – I detail the data points (testimony and discovery) used and did not give greater weight to any particular deponent's testimony.  To the extent that there were conflicting data points, they were generally between deposition testimony and discovery documents. In those instances, I gave greater weight to the documents, as they were created contemporaneously and hence, not subject to memory concerns. |
| Documenting interactions with participants | Fully met – I did not have interactions with participants; I relied on their sworn testimony and discovery documents. |

| | |
|---|---|
| Saturation point | Fully met – There was no saturation point – I reviewed all documents listed in the Appendix and will consider additional documents, should they be presented in the future. |
| Unexpected opportunities, challenges and other events | Fully met – Although not unexpected, because of the timing of depositions, I was provided with deposition transcripts after I began work on the matter. |
| Management of power imbalance | This criterion is not relevant, as I relied exclusively on secondary data (deposition transcripts and discovery); thus, I was not in a position to exert power on respondents. |
| Data coding and first-order codes | Fully met – The first-order codes are the research underpinnings that I describe in each of my opinions below (e.g., the scholarly literature on climate tolerance for bias and harassment, managerial accountability, top management commitment, diversity program effectiveness, and efforts to address the glass ceiling). |
| Data analysis and second– or higher–level codes | Fully met – The second-order codes include the excerpts I cite from the record on which I rely in formulating my opinions. |
| Data disclosure | Fully met – Full disclosure of all of the materials on which I relied is provided in the appendices to this report. |

12.     Prior to formulating my opinions, I reviewed the case documents listed in Appendix 2.  In addition to these discovery materials, throughout my report, I reference scholarly articles and practitioner materials, the citations for which I include in Appendix 3.

IV.   **SUMMARY OF OPINIONS**

13.     Having reviewed the materials in this case within the framework of the research and literature on diversity and inclusion, I offer the following opinions regarding Goldman Sachs' programs:

a.     Goldman Sachs has maintained a climate tolerant of bias and harassment;

b.     Goldman Sachs has failed to hold managers accountable for diversity performance;

  c.  Goldman Sachs' senior management has offered empty platitudes while failing to advance or require diversity results at the firm;

  d.  Goldman Sachs has relied on diversity and inclusion programming that lacks efficacy in advancing diversity and inclusion; and

  e.  Goldman Sachs has adopted inadequate strategies to address its acknowledged glass ceiling.

14.  Each of these opinions is discussed below.

## V. <u>OPINIONS</u>

### a. <u>Goldman Sachs Maintains a Climate Tolerant of Bias and Harassment.</u>

15.  Understanding an employer's climate is important because climates are predictive of bias and harassment.  (Willness, Steel, & Lee, 2007)  Positive diversity climates are associated with more diverse representation throughout the hierarchical levels and functions of an organization and a reduction in group-based inequities in access to jobs and rewards. (Dwertman, et al., 2016)  Harassment climates are the single strongest predictor of incidents of harassment.  (Willness et al., 2007).

16.  Sexual harassment scholars (Goldberg & Ahmad, 2019) have argued that the perceptions of employees who have experienced sexual harassment provide far more information about the climate's tolerance for harassment than do the perceptions of employees who have not. Here, the record is replete with examples of female employees' comments and complaints about the climate at Goldman Sachs that fell on deaf ears.  Below, I present items used by researchers to assess diversity and harassment climates and relate them to the discovery materials I reviewed in this case.

1.        <u>**Goldman Sachs' Climate Is Tolerant of Bias.**</u>

17.     Scholars have proposed multiple measures to assess the extent to which organizational climates tolerate bias.  (McKay, et al., 2007; McKay, et al., 2008; Mor Barak, Cherin, & Berkman, 1998; Nishii, 2013; Roberson, 2006).  In a thorough review, Dwertman, et al. (2016) noted that existing measures fall into two distinct theoretical perspectives: fairness and discrimination climates and synergy diversity climates.  The first perspective is directly relevant to the current matter.

18.     The fairness and discrimination climate perspective refers to "perceptions about the extent to which the organization and/or workgroup successfully *promotes fairness* and the *elimination of discrimination*" through (1) "diversity-specific management practices," (2) "the fair implementation of personnel practices," and (3) "the adoption of diversity-specific practices aimed at improving employment outcomes for underrepresented employees," what I refer to below as the organization's commitment to diversity (Dwertman, et al., 2016) (emphasis from original).  Given their relevance, I include here each of the authors' fairness and discrimination items, which comprise these three distinct sub-facets:

---

<u>Diversity-Specific Management Practices</u>

1. The goal of increasing diversity in the workforce is taken seriously.

2. Members of historically marginalized groups have access to leaders with influence.

3. Members of diverse groups have means of driving organizational change related to diversity.

4. Diversity-related training is taken seriously.

5. Managers are held accountable for diversity goals.

Fair Implementation of Personnel Practices

    6.  Employees can count on receiving a fair performance evaluation, regardless of their demographic background.

    7.  Developmental opportunities are fairly distributed across demographic groups.

    8.  Employees receive "equal pay for equal work."

Organization's Commitment to Diversity

    9.  Commitment to diversity is unquestioned.

    10.  The importance of diversity for the organization is communicated in a credible way.

    11.  Significant resources are committed to improving diversity and inclusion.

---

19.    The first item in the first sub-facet, Diversity-Specific Management Practices, reflects the extent to which a firm takes seriously its goals for increasing diversity.  It is clear that Goldman Sachs failed to meet its own diversity goals.

20.    In 2001, the company set a modest five-year goal with respect to women's representation at the Managing Director (EMD), Vice President (VP), and Associate levels. (GS1018539 at -55).  Fifteen years later, in 2016, Goldman Sachs still had not met that goal for VPs and Associates, and had only barely met it for EMDs.  (*Id.*).  Notably, Goldman Sachs only met the goal for EMDs when examining representation firmwide—Goldman Sachs did not meet the goal for its revenue-producing divisions (where female representation is lower), but was able to meet the goal "firmwide" by including representation gains in lower-paying federation positions (where women are more highly concentrated).  (GS0924657 at -68).  By measuring representation firmwide, Goldman Sachs was therefore able to present a better picture of women's representation than actually existed in the higher-paying, more prestigious jobs in the

revenue-producing divisions, which includes the jobs at issue in this case.[1]  Even when it relied on the lower firmwide bar, it did not meet its goals for VPs and Associates.

21.    In other words, Goldman Sachs did not achieve in fifteen years what it set out to achieve in five, despite being put on notice of class-based legal claims of gender discrimination by this case, which was filed in 2010.  When the failure to achieve this goal was brought to the attention of the Board of Directors, then-president Gary Cohn minimized it, responding that the goal was merely "aspirational."  (GS1013182 at -86).  *To this day*, Goldman Sachs "has not yet moved the needle" with respect to VPs and Associates.  (GS1043776 at -79).  Moreover, as discussed further below, Goldman Sachs set goals that focused on campus hiring instead of lateral hiring—which is both the largest area of hiring and the place where representation at higher levels could be most directly addressed—and failed to focus on the obvious leaks in its professional pipeline.  (GS0889602 at -2.007; GS0306430 at -437; GS0526158; GS0506002; GS0553689; GS1043784 at -94).

22.    The second and third items of the Diversity-Specific Management Practices sub-facet address whether members of historically marginalized groups have access to leaders with influence and employee resource groups.  Although Goldman Sachs offered superficial opportunities to engage with firm leaders,[2] (e.g., GS0269462 ("Summer Associate Diversity

---

[1] In 2019, the Board all but acknowledged this discrepancy, when the Lead Director "challenged management as to whether there was more that could be done to increase diversity at more senior levels, particularly in revenue divisions."  (GS1043771 at -75).

[2] It bears noting that when confronted with women's negative perceptions of the company at his deposition and asked if he thought the statements "accurately describe[d] the experience of female employees at Goldman Sachs up until [2001]," former president and CEO Lloyd Blankfein dismissed them.  Blankfein Tr. at 27:17-29:12 ("I can't tell you whether they're true or not, but it looks like those would—those comments were solicited and given, but I can't tell you whether they're—whether they're—I—the people who rendered these weren't under oath.  So I don't know.").

Dinner"; GS0497888 ("Female Partners Diversity Dinner")), its primary method of aiding

historically marginalized groups took the form of affinity groups, including the Women's

Network.

23.     Tasking women with advocating for other women through affinity groups, such as

the Women's Network, is also problematic: research shows that women who engage in diversity-

valuing behavior are punished.  (Hekman & Johnson, 2017).  Moreover, because of the paucity

of female leaders with influence, the few who are available to serve as mentors become

overburdened, thus diminishing their ability to perform other job-related tasks.  For example, a

2005 email from ████████, a pregnant employee in Equities, indicates that the firm's

"maternity buddy" website had not been updated since 2002, four of the twelve women listed

had since left the firm, and the remaining eight were overburdened.  (GS0167564).  Unable to

find "a maternity buddy who is knowledgeable about fair treatment," she wrote, "I really can't

believe that this is the year 2005!!"  (*Id.*).  Although the Global Diversity Working Group

considered the idea of a reverse mentoring program, where senior leaders would be matched with

individuals from underrepresented groups to learn about their experiences, Edith Cooper (the

Global Head of Human Capital Management from 2008 to 2017) testified that she could not

recall if reverse mentoring was ever implemented in the revenue divisions.  (Cooper Tr. at

225:11-24).

24.     The final two items in the Diversity-Specific Management Practices sub-facet

reflect the extent to which the organization takes seriously diversity training and managerial

accountability for diversity goals.  As discussed in more detail below, Goldman Sachs

emphasized two hours of training—a mere "checking the box" exercise[3]—which included many training programs with little or no connection to improving diversity and inclusion. Further, despite decades of discussion about holding managers accountable for diversity (GS0922708 at -73; GS1030267 at -68; GS0239861; GS1013182 at -93-95; GS1043758 at -63), Goldman Sachs failed to implement any viable means to do so. The foundations of this are evidenced in a 2006 survey of executive leadership in which most of Goldman Sachs' top managers did not express a strong commitment to diversity, with only one quarter of them describing their role in increasing diversity on the senior team as "Make It Happen." (GS1031217 at -38). The same percentage identified with the phrase "Let It Happen." (*Id.*).

25.     The Fair Implementation of Personnel Practices sub-facet captures employees' perceptions about the extent to which they can count on receiving a fair performance evaluation, development opportunities, and pay, regardless of their demographic background. The record demonstrates that women at Goldman Sachs did not perceive these practices as fair.

26.     In a 2005 email summarizing the results of that year's bi-annual People Survey, through which employees anonymously rate the company based on level of agreement with various statements, then-Chief Diversity Officer Edith Hunt specifically noted the gender gap in connection with the statement, "[t]he performance review process is fair." (GS0227078). In 2009, the People Survey revealed that "women and other diverse groups are much less positive about progress, and do not feel they have the same opportunities as non-diverse colleagues." (GS0246067). Comments from female associates included, "low correlation of the review

---

[3] While there is no value in focusing on mere attendance, even this goal was not taken seriously: in 2008, the majority of employees did not complete the "required" two hours of training. (GS0176249 at -57). By 2010, the majority of (though not all) employees had completed the training, largely as a result of the Americas Diversity Week event. (GS0230722 at -30, -33).

process with compensation" (GS0115173 at -260), "unclear career progress and low probability

of recognition for many years" (*id.*), "[want] projects/teams that are more important to the

division" (*id.* at -196), and "[i]mprove the transparency in staffing and reduce favoritism in the

process" (*id.* at -197).

27.     Female VPs were even more critical of Goldman Sachs.  Their comments

included: "the most qualified person doesn't always get the . . . promotion if they are not self-

promoting" (GS0115486 at -611); "path to career advancement is fairly clogged" (*id.*);

"[i]ncreased transparency regarding promotion process (from VP to MD)" (*id.*); "a better

understanding of the firm's (Division's) view of me and my potential for promotion" (*id.*); "less

room . . . to move internally or. . .  grow and advance career-wise" (*id.* at -612); "guidance

[regarding advancement] from senior leaders varies widely . . .  makes it challenging to focus on

[what's needed to advance]" (*id.*); "[o]nce you make VP, there is no support for further career

development" (*id.*); "[w]hile the firm continues to 'promote' diversity, there is little actual

progress at the senior management level. Upon review of the annual promotion lists for

managing directors, few are women" (*id.* at -613); "perception . . . that women and minorities get

hit harder [during cutback situations]" (*id.*); and "ranges of comp for top tier to bottom tier

should be given" (*id.* at -614).

28.     The results from People Surveys in subsequent years demonstrate that female

employees' perceptions of the company's personnel practices did not improve.  In 2013, for

example, "female VPs expressed concerns around clarity on career advancement and promotion"

and "[f]emale associates [were] least satisfied with career advancement."  (GS0493334).  In

2017, responses included: "There is not enough being done to promote and cultivate female VPs

for bigger leadership roles" and "[t]he 'boys club' still persists."  (GS1042713).  And one of the

largest gaps between women and men's favorability rankings pertained to the item "I can balance my work and personal life and still advance in my career." (GS0681117 at -135).

29.     The third and final sub-facet, Organization's Commitment to Diversity, includes the degree to which commitment to diversity is unquestioned, the credibility with which the importance of diversity is communicated, and the resources that are committed to improving diversity and inclusion. Here, again, the record reveals across-the-board failures.

30.     Goldman Sachs' commitment to diversity was questioned repeatedly, and to the extent the importance of diversity was communicated, it was not done so credibly. The flat representation of women in the relevant job positions is itself suggestive of a lack of commitment and credibility; for example, a 2006 Diversity Taskforce presentation to the Management Committee noted a "[s]ense of frustration that Goldman hasn't solved the numbers 'problem' after five years of effort." (GS0969861 at -1.003). There were clear indications that Goldman Sachs' leadership recognized that the company's efforts were insufficient as early as 2001, when it described its diversity efforts as little more than "a series of programs." (GS0922708 at -15). Likewise, responses to executive interviews conducted for the 2006 Diversity Taskforce included comments such as, "[w]e will have gender issues in the future" (GS1031217 at -23), the climate for diversity is "[v]ery difficult for women" (*id*. at -26), and a "men's club" feel in parts of the organization is a hindrance to increasing diversity (*id*. at -28).

31.     Female VPs also expressed concerns over the lack of commitment to diversity, noting that: "managers are [unaware] how flexible work arrangements work . . . for working mothers" (GS0115486 at -616); "'[y]ou can't have it all,' is the message" (*id*.); "the stigma around trying to get a more flexible situation is enough to keep people from asking" (*id*.); "[w]hile the firm continues to 'promote' diversity, there is little progress at the senior

management level" (*id.* at -613); and "[Goldman Sachs] does not do enough to train its male employees to foster an environment that is more supportive of the careers of their female colleagues" (*id.*).  Similarly, a presentation to the Board of Directors about the 2007 People Survey results recorded a "notable" gender gap in response to the prompt, "My manager demonstrates a commitment to promoting diversity in his/her running of the business." (GS0430409 at -31).

32.     Little changed over the years, both in terms of women's perceptions of the firm's commitment to diversity and their numerical representation at the firm.  (GS0522759 (2011 People Survey Results Key Findings) ("Comment Highlights" include: "While the firm continues to 'promote' diversity, there is little actual progress at the senior management level"; "We have so few women leaders. We have to continue to work on female diversity. I am starting to feel like the only woman in the room in every meeting"; "Our diversity efforts haven't shown a significant effect over the past ten years . . ."); GS0624586 (2013 People Survey Results) ("Commentary Highlights" include: "I wish the[] [training] programs felt more integrated into my day-to-day experience at work, but unfortunately they don't. . . . I still feel excluded, not well-advised and not positioned for advancement"); GS0897205 (2015 People Survey Results) (comments include: "Perception is reality. Women continue to be severely under-represented at senior levels at the firm. There has been little to no progress in this regard in the past decade"; "I don't think [Goldman Sachs] is doing a good job of teaching senior leaders how to promote and embrace diversity, there is a strong male culture. [Goldman Sachs] deals with it by promoting external programs . . ., creating seminars, etc. It's not something you can read about, or attend a seminar and learn from")).  "Busting the Boys Club" was still a focus for the Global Diversity Committee in 2018 (GS0584118 at -125), and a presentation made to the Board in June 2015

showed that the representation of women was 33.8% in 2007 and 34% in 2015—essentially flat for nine years (GS0954173 at -3.005).

33.     While Goldman Sachs did commit significant resources to Diversity and Inclusion programs, its expenditures were largely performative and ineffective.  In fact, despite acknowledging back in 2001 that "programs alone will not succeed in making Goldman Sachs a significantly more diverse workplace" (GS0922708 at -99), Goldman Sachs continued to spend money on programs that have been shown to be ineffective, as discussed further below.

### 2.     Goldman Sachs Tolerates Hostility Towards Women.

34.     Sexual harassment scholars (Fitzgerald, Drasgow, Gelfand, & Magley; 1997; Goldberg, Rawski, & Perry, 2018; Kath, Swody, Magley, Bunk, & Gallus, 2009) point to a number of practices that signal a favorable (i.e., low tolerance for harassment) or unfavorable (i.e., high tolerance for harassment) workplace climate.  Practices that reflect a climate that is intolerant of harassment include, among other things: pursuing preventative actions, thoroughly investigating complaints, and enforcing penalties against harassers.  By contrast, the absence of such practices signals a tacit acceptance of harassment.  Organizations that implement low-tolerance practices experience significantly fewer incidents of harassment than do organizations that are more tolerant of harassment.

35.     Researchers commonly use iterations of the following items to assess the extent to which an organization tolerates harassment.  Scholars who have relied upon this measure have reported consistently high scale reliabilities, with values ranging from .88 to .95.[4]  (Goldberg & Ahmad, 2019).  The items are:

---

[4] Scale reliabilities range from 0 – 1.  Scholars generally view .7 to be the minimum acceptable scale reliability for peer-reviewed research.

1. My workplace provides thorough investigations of sexual harassment complaints.

2. My workplace enforces penalties against harassers.

3. My workplace enforces penalties against managers who allow sexual harassment.

4. The leadership at my workplace enforces its policy against sexual harassment.

5. People at my workplace who sexually harass others get away with it. (Reverse-coded)

6. Sexual harassment is tolerated at my workplace. (Reverse-coded)

7. Senior leadership at my workplace makes honest and reasonable efforts to stop sexual harassment.

8. My immediate supervisor makes honest and reasonable efforts to stop sexual harassment.

9. Actions are taken at my workplace to prevent sexual harassment.

36.     Given the measure's widespread use among sexual harassment scholars, I rely on these items in evaluating the climate at Goldman Sachs, based on the testimony and discovery documents provided to me.  Because measures that have high reliability typically have a great deal of content overlap between items, in the interest of brevity, I have grouped the items into three categories in my analysis of the firm's tolerance for sexual harassment: (i) preventative actions; (ii) investigation of complaints; and (iii) enforcement of penalties against harassers. (Goldberg & Ahmad, 2019).[5]

i.     **Goldman Sachs Does Not Engage in Appropriate Efforts to Prevent Sexual Harassment.**

37.     A robust training program is an important means of preventing harassment and/or encouraging victims and observers to come forward.  (Grossman, 2003; Medeiros & Griffith, 2019).  Research indicates that training programs can improve behaviors and behavioral intentions, when the training exceeds four hours, is live (not computer-based), requires active

---

[5] Although researchers often include a fourth category, "allowing harassers to get away with their behavior," as this category is largely a function of the other three, for the purposes of analyzing the record in this case, this is subsumed in "holding leaders accountable," below.

trainee participation (e.g., role-plays), and has a live instructor.  (Kalinoski, et al., 2013).  Sexual harassment scholars have noted that training aimed at encouraging bystanders to intervene holds particular promise for deterring sexual harassment.  (Bowes-Sperry & O'Leary-Kelly, 2005).  Yet, the record reveals (GS0411141; GS0473433) that the firm rolled out a sexual harassment training program to a subset of its managers[6] in 2015 that was only two hours long and delivered online.

### ii.  Goldman Sachs Does Not Appropriately Investigate Allegations of Sexual Harassment.

38.     There is fairly strong agreement among scholars (Goldberg et al., 2018), practitioners (Association of Workplace Investigators, 2012; Cooper, 2012; Fischel, Wilson, & Young, 2003), and the Equal Employment Opportunity Commission (1999) that investigations need to be conducted in a thorough and timely manner.  However, the documents I reviewed indicate that Goldman Sachs was neither timely nor thorough.  The time to complete investigations varied widely, with several investigations requiring months to complete and some requiring over two years.  (GS0145358 at -58-60).  While there may be extenuating circumstances that necessitate extending an investigation, Fischel, et al. (2003) note that they should be completed within a matter of weeks; not months.

39.     The record also indicates a lack of thoroughness.  In particular, none of the cases had conduct flags, all indicated no disciplinary report, and the "linked cases" category was left blank across the board.  (GS0145358; Hendricks Tr. at 118:21-119:14).  As research indicates

---

[6] Ostensibly, at least as late as 2015, this training was only required of employees who supervised employees in California and Connecticut, as is evidenced by the fact that Mr. Karami-Pashaki sought help in identifying those employees.  (GS0437433).  Goldman Sachs deserves little credit for providing this training—it was required by law.  *See* Cal. Gov't Code § 12950.1 (West); Conn. Gen. Stat. Ann. § 46a-54 (West).

that many harassers are serial harassers (Cantalupo, 2017; Lucero, Allen, & Middleton, 2006),[7]

Goldman Sachs' failure to include this basic information in its investigation log represents a

serious shortcoming in the complaint tracking process.  Further, as harassment complaints often

involve behaviors to which there are no witnesses, the *relative* credibility of each party takes on

increased importance.  (Goldberg, et al., 2018).  Given the prevalence of repeat offenders,

investigators ought to consider prior allegations in the determination of relative credibility, even

if such allegations did not result in substantiating the prior complainant's allegation.

40.     A recent lawsuit suggests that Goldman's investigations are not only lacking in

thoroughness and timeliness, but also intended to cover up allegations that may be embarrassing

to the company.  The complaint alleges that Goldman hired Weil Gotshal & Manges LLP to

conduct a "bogus investigation" into claims of sexual harassment against the company's global

head of litigation, Darrell Cafasso.  The complainant, Marla Crawford, alleges that she was

terminated as associate general counsel after reporting Cafasso's conduct internally.

Specifically, Crawford alleges in her complaint (filed in November 2020) that Cafasso used his

position "to romantically prey upon a much younger and vulnerable female" subordinate.  (*See*

Complaint ¶ 2, *Crawford v. The Goldman Sachs Group, Inc. et al.*, No. 159731/2020 (New York

County Supreme Court, Nov. 12, 2020).  Though Carusso was forced to admit his alleged

misbehavior, Crawford alleges that instead of disciplining Cafasso, Goldman hired Weil to

"conduct a so-called 'independent' investigation" that was "expressly set up to clear Mr. Cafasso

of wrongdoing."  (*Id*. ¶¶ 99, 101).  Crawford, herself an attorney, alleges further: "The conduct

at issue here calls into doubt all internal investigations done at Goldman and demonstrates that

---

[7] For example, Lucero et al. found that in nearly half of all sexual harassment cases published in
*Labor Arbitration Reports* between 1983 and 2001 that involved discipline for the harasser, the
perpetrator had been involved in prior harassment cases.

the bank and its senior leaders are only concerned with protecting themselves and their executives, not the employees." (*Id.* ¶ 1).

### iii. Goldman Sachs Does Not Enforce Penalties Against Harassers or Hold Leaders Accountable for Harassment.

41.    The record indicates that many of the ███ complaints of sex discrimination at Goldman Sachs—which included ███ sexual harassment complaints—involved individuals who were in leadership positions, including serving on the firm's diversity or managing director selection (promotion) committees. (Appendix 4A-B). The scholarly research on sexual harassment points to some very serious implications of having harassers in leadership roles. Allowing individuals with a history of harassment to supervise others has particularly deleterious consequences on the climate, as other employees are more apt to engage in harassment when they observe an authority figure engaging in such behavior. (Pryor, 1987). Making matters worse, additional research suggests that employees' perceptions of the work group ethical climate is associated with their cynicism about the organization's willingness to tackle sexual harassment. (Cheung, Goldberg, King, & Magley, 2017). In short, allowing a sexual harasser to be in a leadership position contributes to a climate that facilitates additional harassment and is apt to undermine any efforts to improve perceptions regarding the seriousness with which the organization takes harassment.

42.    Further, allowing sexual harassers to remain in leadership positions (or be promoted to them) serves to perpetuate harassment by silencing victims and observers. Research is clear that people often fail to complain about harassment because they believe that doing so will be futile or, worse, damaging. (Bergman, Langhout, Palmieri, Cortina, & Fitzgerald, 2002). Retention of known harassers in leadership positions serves to indicate tacit approval of harassment and an organizational unwillingness to address concerns.

### b.   Goldman Sachs Has Failed to Hold Managers Accountable for Diversity Performance.

43.     The scholarly literature on diversity and inclusion is clear that managerial accountability is critical for success.  (Dwertman, Nishii, & van Knippenberg, 2016).  This work is based on the basic tenet of reinforcement theory: people engage in behaviors that result in rewards and avoid behaviors that result in punishment.  (Latham & Wexley, 1994).  Relating this work to the current context, researchers have noted that rewarding those who meet diversity goals is key to increasing the representation of women and minorities.  (Gilbert & Ivancevich, 2000).

44.     Contrary to this fundamental principle, between 2002 and the present, the only efforts Goldman Sachs made toward rewarding diversity performance were the use of Diversity Scorecards, a short-lived effort, and the inclusion of a single criterion on the 10-item Managerial Effectiveness (ME) Ratings, a means of evaluating managers that was implemented in 2014.[8] Crucially, neither effort directly affected compensation or promotion decisions.  I discuss each in turn.

45.     Diversity Accountability Scorecards, also known as Diversity Scorecards, were "designed to assess and evaluate the diversity performance of senior leaders at the firm." (GS0255496).  Based on the recommendations of the 2001 and 2006 Diversity Task Forces, the scorecards were created[9] to drive manager accountability and improve diversity outcomes by

---

[8] Although several recommendations were made in 2001, by 2006 Goldman Sachs had not done any (GS0149101), and indeed, as I note later in this report, in 2019, they were still repeating many of these same recommendations that had yet to be implemented (GS0076193 at -196).

[9] The Diversity Scorecards "were created by the Office of Global Leadership and Diversity, in partnership with the Employment Law Group, Human Capital Management, and the firm's senior leadership."  (GS0255496).

tying diversity performance to compensation and promotions.  (GS0922708 at -73; GS1030267 at -68).  Despite these recommendations, Goldman Sachs did not introduce Diversity Scorecards until 2008, discontinued them by 2012, and never actually tied them to compensation.  (*See, e.g.*, GS0149101 ("Given the pressure on compensation at year end [2008], there was not very much flexibility in the system to allow for any meaningful compensation differentiation for scorecard results"); GS0255496 at -99 ("There is no formulaic impact to a scorecard recipient's compensation or performance appraisal"); GS0239861 ("No clear link perceived to comp")).  In addition, former Chief Diversity Officer Edith Hunt testified that the Scorecards were discontinued over her objection in 2012 because they were "too time consuming," (Hunt Tr. at 104:17-105:2), and former Chairman and CEO Lloyd Blankfein explained to the Board of Directors in 2015 that Goldman Sachs had been unable "to effectively use the diversity scorecard data for compensation purposes" while they were in use, (GS1013182 at -87)).

46.     Goldman Sachs' continued failure to tie diversity performance to compensation and promotions is particularly troubling, given that its own diversity and inclusion experts repeatedly emphasized that Goldman needed to take this step in order to see change, including as recently as 2019.  (GS1043758 at -65).[10]  Indeed, this would not be radical; other organizations routinely do so (Babcock, 2009), a fact Goldman Sachs itself acknowledged when comparing itself to peers, (GS0924908 at -913).  Thus, rather than abandoning the Scorecards, Goldman Sachs should have maintained a process to score diversity performance that was directly linked to compensation.  Clearly, Goldman Sachs realized (but ignored) this as well.  The year after they stopped using the Scorecards, the Global Diversity Working Group produced a briefing which stated, "what gets measured, gets done.  Maybe we need to bring back diversity scorecards

---

[10] *See* paragraph 49 and footnote 11, below.

or an equivalent." (GS0655460 at -64). There appeared to be renewed interest in reviving

Diversity Scorecards in 2018 under then-Global Head of HCM Dane Holmes. (*See* GS0740061

at -62 (discussing Holmes raising the issue of "considering scorecards again"); GS1002505

("Dane also mentioned scorecards to me!  Sigh.")).  Yet, Goldman Sachs' witnesses confirmed

that Goldman did not at any time reinstitute the Scorecard, and in his deposition, Mr. Holmes

denied that he even considered it.  (Holmes Tr. at 135:20-24, 147:9-11; Brown Tr. at 121:15-21,

122:20-24; Cooper Tr. at 206:25-207:8).  Clearly, an organization whose top management fails

to implement the recommendations of its own Diversity Taskforce lacks commitment to

diversity.

     47.     The ME rating was one element of the 360 performance review feedback process,

which was added in 2014 for all VPs and MDs who had three or more direct reports.  (David

Landman Decl. ¶ 18, ECF No. 546-1).  Of the ten items on the ME scale, only one is connected

to the idea of diversity and inclusion: "demonstrates a commitment to developing a diverse team

and brings out the best in all employees."  However, this item is worded so vaguely as to be

meaningless.  Indeed, in her deposition, former Chief Diversity Officer and Global Head of

Talent Anilu Vazquez-Ubarri conceded that Goldman did nothing to evaluate whether Manager

Effectiveness diversity scores actually measured how well managers performed with respect to

diversity (Vazquez-Ubarri  Tr. at 151:19-154:19).  For example, she could not recall an analysis

that compared diversity scores against a manager's number of diverse promotes or diverse

quartiling (*id.* at 154:20-155:8); and could not remember ever looking at whether managers'

attrition rates by gender were related to their diversity scores (*id.* at 171:5-11).  In fact, Ms.

Vazquez-Ubarri suggested that her team merely went with their gut feelings about how well ME

ratings captured how managers performed with respect to diversity, noting, "we felt that the – the

contents of the [ME ratings] were accurate content… we thought that the scoring on those categories was the right way for us to assess performance" (*id*. at 158:2-159:15).

48.      Given the Chief Diversity Officer's inability to articulate how the ME score purported to measure performance on diversity and inclusion, it is not surprising that she could not explain whether or how such scores were used to hold managers accountable for diversity. Indeed, Ms. Vazquez-Ubarri conceded that she did not even recall having conversations about rewarding managers for diversity performance (Vazquez-Ubarri  Tr. at 166:7-14) and that she "wouldn't want to speculate," as to whether it would be possible for a manager to perform poorly on diversity and inclusion and see no impact on his or her compensation (*id.* at 162:9-17). Further, she admitted that there was no minimum score required on diversity performance for a manager to be placed in the top performance quartile (*id.* at 163:2-19) and that she never looked at diversity scores compared to compensation (*id*. at 220:7-19, 221:14-15) or compared to internal complaints (*id.* at 171:13-18).  As discussed earlier with respect to climate, this is particularly troubling because accountability for sexual harassment and discrimination is a key component of climate.  (Goldberg & Ahmad, 2019).

49.      The record also reveals that Goldman Sachs was well aware of the importance of managerial accountability, even while failing to link diversity performance to managers' rewards.  In fact, nearly every Diversity Taskforce, Americas Diversity Committee, and Diversity Working Group, and board presentation refers to the importance of managerial accountability.[11]  Additionally, Ms. Vazquez-Ubarri testified to the importance of linking

---

[11] *See, e.g.*, GS1030267 at -68, -71 (2006) ("Compensation and Promotion are the key drivers of accountability" and "Managerial accountability should be driven by the Diversity Scorecard"); GS0702964 at -68 (2013) ("Establish 'consequences' to drive manager accountability for their diverse employees"); GS0472676 at -87 (2013) ("Manager Awareness, Behavior, and

diversity performance to rewards, acknowledging, "[i]f the assessment did not feed into compensation as an input, that would not be a best practice." (Vazquez-Ubarri Tr. at 147:20-22). The record abounds with evidence of Goldman Sachs' failure to evaluate its managers' diversity performances, let alone hold them accountable:

a.   Ms. Cooper admitted that she never made an attempt to assess which managers were the most successful in managing diverse employees and which were the least successful. (Cooper Tr. at 231:20-232:1).

b.   Although the Firmwide Diversity Committee stated in 2011 that its key priority was "[h]olding managers accountable for attracting, retaining, and promoting talented men and women from the widest possible range of backgrounds" (GS0542164 (Cooper Ex. 24)), Ms. Cooper was unable during her deposition to describe any tools used to hold managers accountable for retaining women or to ensure that women were appropriately compensated for their performance (Cooper Tr. at 143:1-144:2).

c.   Ms. Cooper could not recall any interventions that related to manager accountability to drive diversity (*id.* at 200:22-201:5) and could not

---

Accountability" > "Gaps" > "imprecise definition of expectations, consequences, & incentives" > "Next Steps" >  "Design and develop expectations and consequences framework for managers to integrate into existing practices"); GS0924657 at -70 (2016) ("Engage senior leaders in ongoing talent discussions; drive accountability by measuring impact and results"); GS1023057 at -70 ("Objective: Enhance accountability of divisional leadership and managers" and "Hold managers accountable for the development and success of the pipeline"); GS1043758 at -63-65 (2019) ("Hold business leaders accountable; implement diversity dashboards to measure real-time progress.").

remember any initiatives focused on managerial accountability for

retention of female VPs (*id.* at 282:10-15).

d.      By 2013, results from the People Survey still indicated that the biggest

differences in perception between men and women related to meritocracy

and manager effectiveness.  (GS0513227 at -43).

e.      Ms. Vazquez-Ubarri testified that she did not recall any tools that the

Americas Diversity Committee divisional representatives used to hold

managers accountable.  (Vazquez-Ubarri Tr. at 118:15-18).

50.     Although nearly every presentation I reviewed made reference to the importance

of and Goldman Sachs' emphasis on managerial accountability, the foregoing list of examples

indicates that this was little more than lip service.  Indeed, the Global Diversity Committee

provided virtually the same recommendations in 2019 as the Diversity Taskforce made eighteen

years earlier, in 2001.[12]

51.     Moreover, Ms. Cooper's team was aware of the fact that managers were not being

held accountable.  For example, in an email from 2015, Ms. Cooper's colleague stated that the

verbiage in the headline of a slide on diversity that would be shown to the Board should be

---

[12] *Compare* GS0969915 at 41 (2001) ("Measurement and Accountability>Hold leadership
accountable for diversity results through:  Firmwide diversity goals for CEO/Co-COOs; Division
& Region Head annual diversity plans and scorecards; Board of Directors review of annual plans
and results; Tie PCP performance and compensation – carve out of % of PCP"), *with*
GS0796193 at -196 (2019) ("Recommendations > Enhance EMD pipeline tracking and
accountability to improve promotion rates; Develop dashboards to monitor progress and increase
accountability of business unit managers"); at -206 ("Accountability:  Hold managers
accountable for hiring, developing, and promoting diverse talent through manager dashboards
and business reviews"), and at -216 ("Improve business planning process to ensure impact and
accountability").

"change[d] [from 'From Awareness to Targeted Action to Accountability']"[13] to "Moving from

Awareness to Accountability," noting that, "we haven't arrived at accountability yet."

(GS0981426).  In fact, at least as recently as February 2018, the ADC was still grappling with

the issue of how to hold managers accountable, rather than evaluating its progress or even

developing an action plan.  (GS1023057; *see also* GS0584118 at -125 (discussing the need for

manager accountability in the context of diversity in 2018)).  Tellingly, despite the utter lack of

effort aimed at increasing managerial accountability for diversity and the obvious lack of success

in increasing gender diversity in the revenue-producing divisions, Ms. Cooper testified that by

the time she left Goldman in 2017, she believed that Goldman had done enough around manager

accountability to drive diversity.  (Cooper Tr. at 271:17-272:7).[14]

### c.   Goldman Sachs' Senior Management Has Offered Empty Platitudes While Failing to Advance or Require Diversity Results at the Firm.

52.     There has also been an abundance of research emphasizing the importance of top

management commitment to the successful implementation of diversity and inclusion programs.

(McKay, Avery, & Morris, 2008; Nishii, Gotte, & Raver, 2007; Shore, Cleveland, & Sanchez,

2017).  Senior managers are critical drivers of diversity efforts for multiple reasons: 1. they

control resources that are needed to plan, implement, and evaluate diversity programs; 2. they

---

[13] GS0539831.

[14] Ms. Cooper's assertions in her deposition are belied by her statements in a recent *Harvard Business Review* podcast where she acknowledged Goldman Sachs did not have that culture of manager accountability for much of her time there.  (*Former Goldman Sachs Partner Edith Cooper: Recruit, Retain, Mentor*, HARVARD BUS. REV. (Dec. 30, 2020), https://hbr.org/podcast/2020/12/former-goldman-sachs-partner-edith-cooper-recruit-retain-mentor).  She likewise implicitly acknowledged that Goldman Sachs' relentless focus on diversity and inclusion programming—without more—was ineffective.  (*Id.* ("[A]t the end of the day, you can have all the chit-chats you want, diversity dinners, mentoring, sponsor, but if you don't really hold yourself accountable, it's not going to make a difference.")).

serve as role models through their attitudes to diversity interventions; 3. they may be actively involved in supporting or undermining intervention activities; and 4. their support has a ''trickle down'' effect on middle managers' supportiveness.  (Nielsen & Randall, 2013).  The record is replete with evidence that Goldman Sachs knew senior management engagement was essential, yet likewise replete with evidence that this idea was given little more than lip service.  Indeed, documents from 2006 say virtually the same thing as documents from 2013, 2015, 2016, and 2018.

53.     For example, in 2006, the Diversity Taskforce Accountability Sub-Committee recommended "hold[ing] senior leaders accountable for improving the Firm's diversity performance."  (GS1030267 at -68).  In 2013, the Diversity Working Group identified "senior leadership messaging" as a "solution to consider" (GS0702964 at -68) (Vazquez-Ubarri Ex. 7) and recommended "demonstrate senior leadership commitment and engagement" in a 2013 presentation to the Management Committee (GS0622742 at -53).  In 2015, the Americas Diversity Committee (ADC) included "Engage Senior Leadership and Hold Them Accountable" as a subheading of the Accountability column of the Diversity Talent Framework.  (GS0882449 at -9.011).  A 2016 ADC presentation recommended, "engag[ing] senior leaders in ongoing talent discussions; drive accountability by measuring impact and results."  (GS0924657 at -70).  In 2018, the ADC posed the following questions in a presentation: "Who in senior leadership is focused on this population [women, black and Hispanic employees]?  What are they doing to engage?  How will you, as a senior leader, engage with the population?"  (GS1023057 at -71).

54.     In contrast to these proclamations and recommendations, the record shows that there was a lack of top manager action.  For example, the Diversity Working Group notes from its June 18, 2013 presentation to the Management Committee indicate that employees perceived

a "gap[]" in "senior leadership commitment and engagement." (GS0955995 at -6030).

Likewise, while Ms. Vazquez-Ubarri testified that she was satisfied with Lloyd Blankfein's

diversity and inclusion efforts (Vazquez-Ubarri Tr. at 128:5-15), she stated in an email to Ms.

Cooper that it "[d]oes seem like [Gary David Cohn] and [Lloyd Craig Blankfein] could be more

visible on the topic [of engaging with diverse high potentials]." (GS0639293, Cooper Ex. 26).[15]

Moreover, while the 2013 Diversity Working Group considered creating a Chairman's Forum on

Diversity, (GS0702964 at -68 (Vazquez-Ubarri Ex. 7)), Ms. Vazquez-Ubarri could not recall

whether the plan ever materialized (Vazquez-Ubarri Tr. at 126:2-12).

55.     The record shows that the firm's top leadership and decision-making body, the

Management Committee, was formally charged with improving diversity at Goldman,[16] and was

kept apprised of various metrics on women at Goldman Sachs (including female attrition rates by

gender, promotion rates by gender, performance review results by gender, and People Survey

results by gender).[17] However, there is no evidence that they tried to remedy known problems or

hold anyone accountable. This is well demonstrated by the deposition testimony of Lloyd

Blankfein, who was CEO from 2006 to 2017:

---

[15] This e-mail to which she was replying indicates that Ms. Cooper also felt that Mr. Blankfein and Mr. Cohn were not engaged. Specifically, Ms. Vazquez-Ubarri's message was in direct response to Ms. Cooper's e-mail, in which she conveyed to Ms. Vazquez-Ubarri, "We need the <sic> get Lloyd and Gary reengaged, particularly Lloyd."

[16] GS0187636 at -52, -54; GS1026240 at -45; GS0249588 at -621; GS0574442 at -48; Hunt Tr. at 56:2-57:23.

[17] GS0227078 at -78 (delivered to the Management Committee); GS0922708 at -766, -774 and Hunt Tr. at 55:17-22 (testifying that this presentation would have gone to the Management Committee); Irish-Brown Tr. at 59:2-61:3 (testifying that the Management Committee "knows exactly what is going on with [] the global inclusion and diversity committee," because the GIDC provides updates and presentations to the Management Committee).

a.   When asked about the processes to improve diversity at Goldman Sachs, he testified, "we had very, very senior executives charged, you know—the HCM department that may have had a thousand people in it that were charged with executing these things. So I couldn't tell you what it was." (Blankfein Tr. at 45:8-22).

b.   He asserted that he did not recall what Goldman Sachs did to improve compensation (*id.* at 47:21-48:5), or what, if anything, was done to determine whether there were gender differences in compensation (*id.* at 55:8-55:25).

c.   He was unaware that women and men had different 360 quintile distributions (*id.* at 65:6-17, 90:7-13) and indicated that the 360 review process was the province of HCM (*id.* at 74:8-20).

d.   When he was told that women earn 99% of men in similar roles, he took this fact at face value and did not inquire how his colleagues arrived at that result (*id.* at 83:18-84:5).

e.   He admitted that he did not know if Goldman Sachs did anything to hold managers accountable for their diversity performance between 2001 and 2006 (*id.* at 96:6-10).

f.   He further admitted that he "wouldn't have awareness of what was done" to hold managers of associates and vice-presidents accountable for diversity (*id.* at 98:20-5).

g.   When asked about the connection between the Diversity Scorecard and compensation, Mr. Blankfein conceded, "I can't tell you that there was a

necessary connection, I just don't know, between and how that was used"
(*id.* at 100:9-11).

h.   After struggling to discuss the limitations of using the Diversity Scorecard

for compensation, Mr. Blankfein finally admitted, "I'll tell you the truth, I

can't even—I mean I'm not sure I've ever looked at a [D]iversity

[S]corecard" (*id.* at 103:16-104:17).

56.   The testimony of Mr. Cohn, President of Goldman from 2006 to 2016, likewise

reveals that he was disconnected from the firm's diversity efforts:

a.   When asked whether he served on firmwide diversity committees during

his tenure at Goldman Sachs, Mr. Cohn responded, "I don't know if I

technically served on the committees or not, but I may have" (Cohn Tr. at

18:3-25).

b.   When asked, "can you tell us anything that you specifically changed about

the operation of… the [Fixed Income Currencies and Commodities]

division as a result of the 2001 Diversity Taskforce Report," Mr. Cohn

replied, "I honestly can't remember" (*id.* at 28:15-20).

c.   When asked what specific changes occurred from his perspective as a

result of the 2006 Diversity Taskforce report, Mr. Cohn responded, "I –

again, I—I don't remember the specific suggestions so – so, I'm not

comfortable commenting directly on – on what" (*id.* at 33:2-7).

d.   When asked if the final report of the 2006 Taskforce was something that

he would have received, Mr. Cohn replied, "I—I—I don't know. I don't

remember receiving it, but I could have.  It may have just gone to the legal

department or HCM or some other group or there was a committee

involved, so I may not have seen it" (*id.* at 62:21-63:3).

e.    When asked about accountability metrics for diversity at Goldman Sachs

in the 2006 timeframe, Mr. Cohn said HCM was responsible for

monitoring "a lot of things that were going on in the firm" but could not

come up with a specific example of how middle managers were rewarded

or held accountable for their diversity efforts (*id.* at 73:4-74:12, 78:4-

79:20).

f.    When asked whether he was ever part of the Diversity Working Group on

the Management Committee, Mr. Cohn stated, "I don't—I actually—I

don't remember" (*id.* at 161:23-25).

g.    Mr. Cohn testified that he was neither involved in nor received

information about analyses of the relative pay of men and women (*id.* at

165:25-66:12).

**d.    <u>Goldman Sachs Has Relied On Diversity and Inclusion Programming that
Lacks Efficacy in Advancing Diversity and Inclusion.</u>**

57.    While Goldman Sachs has many programs related to diversity and inclusion, the

record reflects an emphasis on quantity over quality.  As early as 2001, the Diversity Task Force

acknowledged this, noting that "Diversity at GS Has Been a Series of Programs," (GS0922708 at

-15), but "programs alone will not succeed in making Goldman Sachs a significantly more

diverse workplace" (*id*. at -99).

58.    Despite this acknowledgement, Goldman Sachs relied on the mere existence of

its many diversity-related offerings instead of ensuring that its overall approach was effective.

59.     For example, the company focused on mandating that employees receive two hours of diversity and inclusion training.  (GS0954173.003 at -3.003).  But this is a meaningless metric.  Meta-analyses[18] (Kalinoski, Steele-Johnson, Peyton, Leas, Steinke, & Bowling, 2013) have shown that diversity training programs that last less than four hours have _zero_ effect on affective outcomes (e.g., attitudes).  Thus, Goldman Sachs' training requirement is unlikely to yield an improvement in female representation.

60.     Beyond the inadequacy of the training duration, this meta-analytic research also indicates that online training also has no effect.  (Kalinoski et al., 2013).  Thus, the fact that at least since approximately 2013, the majority of Goldman Sachs' diversity training programs have been delivered online also renders them ineffective.[19]

61.     Moreover, many of the training titles that satisfy the two-hour requirement have ostensibly little, if anything, to do with creating a more diverse and inclusive environment at Goldman Sachs.  Course offerings include, for example, "Kick Off to the World Cup: Building the Future of US Soccer," "Operations Growth Markets Symposium," and a screening of the movie "The Entrepreneurs."  (Manager Training Transcript Data 11_19_13 (SENSITIVE CONFIDENTIAL)).

62.     Further, the discovery materials reveal a strong emphasis on unconscious bias training (GS0954173.003; GS0460116 at -117-119; GS0763845 at -48; GS0700470 at -475); research indicates, however, that such programs have no effect on behavior (Atewologun, Cornish, & Tresh, 2018; Emerson, 2017).  And, while unconscious bias training may raise

---

[18] A meta-analysis is a quantitative review of prior research, in which correlations reported in prior studies are aggregated, to arrive at an average or "true" relationship between variables.

[19] Indeed, in 2016, the Americas Diversity Committee admitted that it had been "7 years since live classroom training."  (GS1014689 at -741).

awareness, awareness does not translate into action or change. Indeed, the disconnect between awareness and change is laid bare in the draft of the 2015 Board of Directors presentation, which states, "although the firm's diversity training programs have proved <sic> to be useful vehicles for raising awareness, they are not enough to drive cultural and behavioral changes." (GS0917338 at -45).

63.      While Goldman Sachs' large number of diversity and inclusion programs might create a *perception* of commitment, their programming is little more than window-dressing. The fact that the People Survey results from multiple years point to disparities in men's and women's perceptions of their jobs, manager effectiveness, satisfaction/commitment to the firm, and the degree to which the firm is a meritocracy (GS0180331, GS0192652) coupled with the fact that the firm has been largely unsuccessful in increasing the representation of women (GS0954173 at -3.005) indicates that they have done little more than pile one ineffective program on top of the next. Indeed, Goldman Sachs' own benchmarking data demonstrate that more is not necessarily better: Goldman Sachs' competitor with the highest percentage of women employees (LinkedIn) also had the fewest number of diversity and inclusion program offerings.[20] (GS1023919 at -4007-19).

64.      In addition to training, Goldman Sachs' repertoire of diversity and inclusion efforts that target women also includes the use of affinity groups and the "Goldman Sachs Women's Initiative," both of which put women in charge of advocating for other women. As discussed above, this approach is problematic because research shows that women who engage in diversity-valuing behavior are punished. (Hekman & Johnson, 2017). Further, affinity groups

---

[20] It bears noting that these data also show that Goldman Sachs had lower female representation than almost any other financial firm (in some cases, the percentage difference was over 15%).

have limited utility in improving female outcomes.  (Wittenberg-Cox, 2017).  For example, Dobbins and Kalev (2013) found that, "networking groups show little direct effect on the share of women and minorities in good jobs."  In addition, as I reviewed the discovery materials, I saw repeated passing reference (GS0191073 at -97; GS0924456 at -84) to the importance of engaging men; however, the only "engagement" referenced was to make men aware of how gender inequality manifests itself and to illustrate how equality benefits everyone (GS1014689 at -735).

65.    Other diversity and inclusion efforts focus on marketing the firm's commitment to inclusion to new recruits; however, given the negative experiences of women at Goldman Sachs, such messaging is apt to increase early turnover (and hence, run counter to the stated interest in ensuring a robust pipeline of women for future promotions).  In particular, an abundance of research indicates that propagating inaccurate messages in recruitment results in increased turnover (*see* Phillips, 1998, for a meta-analytic review).  Yet, just two months after the DWG noted that there was a large gap (8%) between men's and women's perceptions of diversity (GS0954031 at -45), this group presented a slide on a marketing campaign aimed at attracting women to Goldman Sachs (GS0962505 at -14), which promoted the strategic message, "[o]ur success is the result of a culture of high expectations, integrity, and inclusion."  Focusing specifically on recruiting diverse talent, Avery and McKay (2006) note that minorities and women are apt to develop impressions about an employer based on its recruitment messages; "to the extent that such an impression is inaccurate, it could contribute to unmet expectations, which often results in turnover."  In short, not only do unrealistic recruitment messages fail to address the underlying causes for gender differences in the "female-friendliness" of the workplace, they result in higher turnover (which, at Goldman Sachs, was already higher among women than men,

GS0521319 at -30); hence, it is likely to exacerbate women's underrepresentation—particularly at higher levels—in the long run.

###    e.    Goldman Sachs Has Adopted Inadequate Strategies to Address Its Acknowledged Glass Ceiling.

66.    As discussed above, Goldman repeatedly failed to meet its own goals with respect to women's representation.  (GS1018539 at -55).  This is unsurprising, as Goldman's efforts were ill-suited to achieving results.

67.    For example, the "aspirational goal" that Goldman set for hiring in 2016 (GS0102198 at -302) was limited to entry-level hiring.  While this is not an inherently flawed metric, it is poorly suited to Goldman Sachs, given that: 1) a larger percentage of new hires are hired through experienced hiring than through campus recruitment (GS0889602 at -2.018-2.020); 2) experienced hiring has historically been dilutive to diversity, whereas analyst hiring has historically been accretive to diversity[21]; and 3) the proportion of women decreases substantially with each step in the organizational hierarchy (GS0889602 at -2.003).  It was not until 2020 that Goldman set firmwide aspirational representation goals for Vice Presidents, and, even then, it did not include lateral hiring goals.  (Brown Dep. at 38:17-39:2).  In short, Goldman Sachs failed to create hiring goals for the recruitment category that was most problematic, comprised the largest

---

[21] For example, a 2004 memo to Mr. Cohn noted that lateral hiring is diluting the percentage of women in FICC and Equities.  (GS0244967).  Similarly, a 2004 Talking Points document for Mr. Blankfein noted, "Results through the end of March indicate that in most divisions our experienced hire recruiting efforts have been dilutive to our existing population in terms of the percentage of women and other historically underrepresented groups."  (GS0232449).  Nearly fifteen years later, the 2018 Global Diversity Committee Update Slide: "Where do we have the biggest problems?" presents data on women representation declining at senior levels and lateral hiring diluting representation because women who leave are replaced by men lateral hires.  (GS0627496 at -6.002).  What is particularly troubling is that despite Goldman Sachs' awareness of the problem, the percentage of female experienced hires *decreased* dramatically between 2007 (35%) and 2015 (28%).  (GS0954173 at -3.014).

percentage of new hires, and had the greatest potential for decreasing gender imbalances at higher levels in the organization.

68.     Further, by limiting the focus to selection and promotion, Goldman Sachs ignores the unequal attrition rates between men and women.  Researchers use the term, "leaky pipeline" to refer to the general notion that women tend to leave organizations voluntarily at higher rates than men do.  (Blickenstaff, 2005).  Others have refined this notion, observing that a sharp increase in women's departures occurs at the first opportunity for promotions—i.e., "the broken rung"—when women first perceive that an organization's meritocracy fails them and/or they are plagued by a biased system.  (McKinsey & Company, 2019).

69.     A recent longitudinal study of the leaky pipeline showed that when an underrepresented group is perceived as less competent, members of that group exit at higher rates.  (Sabat, Goldberg, King, Watson, & Zhang, 2020).  Numerous documents reveal Goldman Sachs' low expectations of women's competency.  For example, the executive team makes repeated reference to an ongoing concern that increasing diversity requires a lowering of standards.  (GS1013182 at -91; GS1031217 at -37).  And the women at Goldman Sachs appear aware of these concerns: the People Survey results consistently show that one of the largest differences between men's and women's perceptions of the firm is with respect to whether the firm is a meritocracy—indeed, the results suggest that women at Goldman Sachs believe the meritocracy has failed them.[22]  (GS0495418 at -22; GS0176436 at -37; GS0192652 at -60).  Further, male and female attrition rates are quite similar for the first three years of employment, after which the gender gap in attrition starts to widen.  (GS1014689 at -92).  This result is

_____

[22] Consistent with the notion that women perceive that the meritocracy has failed them, career advancement is a bottom-scored item for them on the People Survey.  (GS0495418 at -22).

consistent with the broken rung theory and suggests that the climate at Goldman Sachs is not hospitable to women as they rise throughout the organization.  Goldman's leaky pipeline undermines its ability to increase female representation.  As I noted earlier, recruitment, alone, will not yield success if the environment encourages women to exit.

70.     Goldman Sachs' leaky pipeline and lack of promotions to senior leadership create further obstacles for women's success, due to the lack of mentorship for women in junior positions.  Research (Russell and Loepler, 2017) indicates that the quality of the working relationships between junior women and their senior colleagues—feedback and the perception that someone in leadership cares about them—is one of the most important predictors of women's retention, particularly among high-performing women.  Goldman Sachs was aware of women's dissatisfaction with feedback at least as early as 2003, when the People Survey results revealed that approximately half of the firm's women were not satisfied with the feedback or fairness of the performance review (GS0180331).  Similarly, results of the 2009 People Survey (GS0192652) showed that positive responses to the ongoing informal feedback item showed a large difference between male (50%) and female vice-presidents (41%).  Indeed, the ADC White Paper (GS1005796) noted, "feedback from diverse employees highlights a need for the firm to focus on the following:  increasing the frequency and quality of the feedback managers provided, increasing the effectiveness of managers with respect to coaching employees about career progression, and increasing the opportunities for diverse employees to be sponsored by senior leaders at the firm."  Simply put, Goldman Sachs was well aware of the need to improve the feedback and interpersonal quality of relationships between leaders and early- and mid-career women, yet failed to do so.

71.     Goldman Sachs does not focus on specific goals with respect to retention of women, but the discovery materials indicate that the company is well aware that women are being driven to leave.  For example, comments from female employees that were conveyed by the 2001 Diversity Task Force include, "at some level, I think they want us to quit," and, "there is a lack of understanding around why women leave.  Men think women leave because they want to (lifestyle issues).  This leads to anger on the part of the women who know they leave due to discrimination and lack of support."  (GS0922708 at -18).  Fifteen years later, at the 2016 meeting with the Board of Directors, Head of the Americas Diversity Committee Gwen Libstag reported that "when the firm's women are dropping out, in many cases they are not doing so to stay home with their families, but rather to work somewhere else." [23]  (GS1013182 at -93). While any demographic differences in voluntary turnover should raise a red flag, the problem at Goldman Sachs is particularly salient because it represents more-costly "dysfunctional turnover"—i.e., losing top performers (Tziner & Birati, 1996).  Several documents reveal that the turnover rate of women in the top performance category (i.e., Q1 performers) is consistently higher than that of Q1 men.  Gender disparities in Q1 turnover perpetuate the glass ceiling, as it results in fewer top-performing women in the pipeline for future promotions.  (*See* GS0882449 at -9.006 (2015: "Attrition rates for women have been higher than for men for each of the past five years, including top quartile attrition (primarily for vice presidents and associates)"); GS0679955 at -956 (2016: "8 of the last 9 years, the Q1 female attrition rate has exceeded Q1 male attrition rate (consistent with the overall attrition trend)")).

---

[23] When asked about this statement, which directly contradicted his own assertion that women left Goldman Sachs for "sociological factors," Lloyd Blankfein attempted to discredit Ms. Libstag, saying "I don't think Gwen Libstag would have a clue," even though she was co-head of the Americas Diversity Committee at the time.  (Blankfein Tr. at 118:10-121:2).

## VI.   <u>CONCLUSION</u>

72.     As laid out in the foregoing sections, based on my review of the materials in this case, it is my opinion that Goldman Sachs has maintained a climate tolerant of bias and harassment; has failed to hold managers accountable for diversity performance; has senior management that has offered empty platitudes while failing to advance or require diversity results at the firm; has relied on diversity and inclusion programming that lacks efficacy in advancing diversity and inclusion; and has adopted inadequate strategies to address its acknowledged glass ceiling.

*Caren Goldberg, Ph.D.*

_____

Caren Goldberg, Ph.D.

Appendix 1

**Curriculum Vitae**

# Caren Goldberg, Ph.D.

9949 Corsica Street
Vienna, VA  22181
571-426-8325
caren@carengoldberg.com

## EDUCATION

**Doctor of Philosophy -** W.T. Beebe Institute of Personnel & Employment Relations, Georgia State University.  1997.

**Master of Business Administration** - School of Management, State University of New York at Binghamton.  1990.

**Bachelor of Arts -** Psychology, State University of New York at Stony Brook.  1987.

**Study Abroad -**Instituto Internacional de Madrid.  Fall, 1985

## WORK EXPERIENCE

**Faculty Member –** Department of Management, Marketing, and Public Administration, Bowie State University.  August, 2015 – May, 2019.
        Program Coordinator, Management – 2015 – 2017.

**Visiting Faculty Member -** Department of Psychology, George Mason University, Fairfax, VA. August, 2014 – May, 2015.

**International Visiting Scholar** – Universidad Peruana de Ciencias Aplicadas, Lima, Peru. November, 2014 – present.

**Faculty Member -** Department of Management, American University, Washington, DC. January, 2006 – May, 2014.

**Faculty Member -** Department of Management Science, George Washington University, Washington, DC.  Fall, 1996 – Fall, 2005.
        Promoted and Tenured - Fall, 2003.
        Program Director, HR – 2002 – 2005.

<u>Faculty Exchange</u> – École des Sciences Politiques, Paris, France, 2003; 2004.

**Human Resources Specialist – Compensation -**United Health Services, Binghamton, NY. May, 1988 - March, 1989.


<u>EXPERT WITNESS ENGAGEMENTS</u>

**Public Testimony in Employment Law Cases (Past Four Years)**

❖ *Dené Starks, et al. v. Nationwide Mutual Insurance Company* No. 34-2016000199026-CU-OE-GDS.  Deposition – August, 2020.

❖ *Alison Ray v. AT&T Mobility Services, Inc.*, Civil Action No. 18-3303.  Deposition – May, 2020.

❖ *Alex Morgan, et al. v. United States Soccer Federation, Inc.*, Civil Action No. 2:19-cv-01717.  Deposition – April, 2020.

❖ *Andrea Szaloki v. Wal-Mart Stores, Inc., et al.,* Case No. 50-2016-CA-007193- MB-AG. Deposition – December, 2019.

❖ *Marshelle Hightower v. Ingerman Management Company* and *Andre'a McDonald v. Ingerman Management Company*, Civil Actions No. 17-8025 (RMB-JS) and 17-12787(NLH-JS).  Deposition – October, 2019.

❖ *Kathleen Fowler v. AT&T, Inc., et al.*, Civil Action No. 18-CV-00667.  Deposition – August, 2019.

❖ *Soto, et al v. Microsoft Corporation*, 16-2-31049-4 SEA.  Deposition – September, 2018.

❖ *Maness v. City of High Point.*  Civil Action No. 1:17-cv-384.  Deposition – June, 2018

❖ *Ravina v. Columbia University and Geert Bekaert.*  Civil Action No:  1:16-cv-02137(RA). Deposition – March, 2018.

❖ *Kassman, et al v. KPMG, LLC.*  Case No. 11-cv-03743.  Deposition – October, 2017.

❖ *Anderson, et al. v. Verizon New Jersey Inc., et al.* Civil Action No. 13-cv-4777 and *Gardrie, et al. v. Verizon New Jersey Inc., et al.* Civil Action No. 15-cv-3577.  Deposition – September, 2017.


**Citations in Judges' Decisions**

❖ *Alex Morgan, et al. v. United States Soccer Federation, Inc.*, Civil Action No. 2:19-cv-

01717.  Order on Defendant's Motion for Summary Judgment.  Judge R. Gary Klausner, United States District Judge.  Issue Date:  May 1, 2020.

❖ *Moussouris, et al. v. Microsoft Corporation*.  C15-1483JLR.  Order on Motions to Exclude. Judge James Robart, United States District Judge.  Issue Date:  April 25, 2018.

❖ *Seguin v. Northrop Grumman Corporation.*  2012-S0X-00037.  Decision and Order.  Judge Daniel Solomon, Administrative Law Judge.  Issue Date:  February 27, 2015.


TRAINING AND SPEAKING ENGAGEMENTS

❖ Co-presenter – Judgements Regarding Sex-Based Harassment of Uppity Women and Wimpy Men:  The Influence of Social Identity and Moral Disengagement.  Sexual Harassment Virtual Research Collaborative.  November, 2020.

❖ Presenter – "Compensation Issues in the US Women's Soccer Case."  Ohio State University, Department of Management.  October, 2020.

❖ Presenter – "Expert Witnessing in I-O/HR."  SUNY Albany, Department of Psychology Brown Bag Series.  September, 2020.

❖ Presenter – "Practical Ways to Foster Effective Group Dynamics."  Invited lecture, University of Malta Masters in Conflict Resolution Program. November 2019.

❖ Keynote Speaker – Interdisciplinary Conference on Sexual Harassment, University of Notre Dame.  2018

❖ Presenter – "Political affiliation and employment screening: The role of similarity and disidentification.  Industrial/Organizational Psychology Brown Bag Series, George Mason University.  2017.

❖ Presenter – "How political affiliation affects employment screening: The role of similarity and disidentification." College of Business Brown Bag Series, Bowie State University.  2017.

❖ Presenter – "Pygmalion in the Pipeline:  How Managers' Perceptions Influence Racial Differences in Turnover."  College of Business Brown Bag Series, Bowie State University. 2016.

❖ Keynote Presenter - "Attracting and Retaining a Diverse Pool of Talent."  3rd International Conference on Global Management.  Lima, Peru.  2016.

❖ Presenter – "Antecedents and Consequences of LMX Agreement."  Industrial/Organizational Psychology Brown Bag Series, George Mason University.  2015.

❖ Keynote Presenter – "Leading in Times of Crisis." 1st International Conference on Global Management. Lima, Peru. 2014.

❖ Presenter – "It's Not Just Who You Know, But Who You Are: Newcomer Race-Ethnicity on Leader-Member Exchange Development." Industrial/Organizational Psychology Brown Bag Series, George Mason University. 2011.

❖ Presenter – "Black and White and Read All Over: Race Differences in Reactions to Recruitment Websites." Industrial/Organizational Psychology Brown Bag Speaker Series, George Mason University. 2009.

❖ Session Organizer and Presenter – Diversity and Inclusiveness in the Classroom. Ann Ferren Teaching Conference, American University. Spring, 2009.

❖ Session Organizer and Presenter – Conference on Teaching and Training Workplace Diversity: Addressing the Research-Practice Gap. George Mason University. 2008.

❖ Center for Excellence in Public Leadership – Designed and delivered a senior executive development workshop for upper-level public managers in DC government. 2005.

❖ Council of Governments – Designed and delivered training workshop for mid- to upper-level government managers in VA, MD, and DC. 2005.

❖ Center for Excellence in Public Leadership – Designed and delivered training workshop for mid- to upper-level public managers in DC government. 2005.

❖ JOBS (Junior Options for Business Success). Designed and delivered workshop for job-seeking undergraduates. George Washington University. Spring, 2001.

❖ "The Use of Personality Tests in Employment" luncheon speaker. Society of Consumer Affairs Professionals. Spring, 2000.

❖ Group Dynamics and Teambuilding. Designed and delivered workshop for incoming MBA students. George Washington University. Fall, 1999, Spring, 2000, Fall, 2000, Spring, 2001, Fall, 2002.

❖ "Dancing in the Minefields: Managing Employee Performance and Compensation." Designed and delivered training for MBA residency. George Washington University. Spring, 1999.

❖ Center for Excellence in Municipal Management. Designed and delivered HRM training module for mid- to upper-level DC government managers. Spring, 1998.

❖ Tri-Way Enterprise. Designed and delivered Human Resources and Employee Motivation Workshop to Chinese delegation of accounting and finance professionals. Fall, 1998.

❖ "Generation X Views on Business and Work Issues" panel discussion.  Washington Human Resource Forum.  Fall, 1998.


PUBLICATIONS – IN PROGRESS

**Refereed Publications**

Goldberg, C., Roth, P., Thatcher, J., Matthews, K., & Ahmad, A.  The effects of religion on the evaluation of social media profiles in hiring.  Preparing for submission to *Journal of Applied Psychology.*

Scandura, T., Goldberg, C., Zhang, L., & McKay, P.  Leader-member exchange and turnover intentions:  The mediating roles of person-organization fit and perceived organizational support.  Preparing for submission to *Personnel Psychology*.

Cheung, H., Goldberg, C., Bruce, T., & Ahmad, A.  Measuring sexual harassment climate.  Preparing for submission to *Journal of Applied Psychology.*

Cheung, H., Bowes, L., Goldberg, C., & Pierce, C.  Determining discipline for harassers: The role of social identity and moral disengagement.  In preparation for submission to *Journal of Applied Psychology.*


**PUBLICATIONS - COMPLETED**

**Refereed Publications**

Sabat, I., Goldberg, C., King, E. Dawson, J., Zhang, L., & McKay, P.  (in press). Leaks in the pipeline:  How leaders' perceptions of new hires influence minority turnover. Accepted for publication at *Human Resource Management.*

Zhang, L., Goldberg, C. B., & McKay, P. (2020).  From New Hires to their Supervisors: The Influence of Newcomer Race/Ethnicity on Leader-Member Exchange Conveyance.  *Journal of Occupational and Organizational Psychology.*  https://doi.org/10.1111/joop.12314

Cheung, H., Goldberg, C., Konrad, A., Lindsey, A., Nicholaides, V., & Yang, Y. (2020).  A Meta-Analytic Review of Gender Composition Influencing Employees' Work Outcomes: Implications for Human Resource Development.  *Human Resource Development International.* DOI: 10.1080/13678868.2020.1749493

Roth, P., Bobko, P., Goldberg, C., Matthews, K., Ellingson, J., & Thatcher, J. (2020). Political affiliation and employment screening decisions: The role of similarity and disidentification processes. *Journal of Applied Psychology, 105*(5), 472-486. https://doi.org/10.1037/apl0000422.

Goldberg, C., & Ahmad, A.  (2019).  Improving the measurement of sexual harassment climate.

*Industrial and Organizational Psychology: Perspectives on Science & Practice, 12,* 64-67.

Goldberg, C., Rawski, S., & Perry, E. (2019). Training managers to handle sexual harassment complaints: A longitudinal examination. *Human Resource Development Quarterly, 30,* 81-100.

Roth, P., Goldberg, C., & Thatcher, J. (2017). The role of political affiliation on employment decisions: A model and research agenda. *Journal of Applied Psychology, 102,* 1286-1304.

Cheung, H.K., Goldberg, C., King, E., & Magley, V. (2017). Are They True to The Cause? Beliefs about Organizational and Unit's Commitment in Sexual Harassment Training. Online First at *Group and Organization Management*, *43,* 1-30. DOI: 10.1177/1059601117726677

Holtom, B., Goldberg, C., Allen, D., & Clark, M. (2016). Exploring the antecedents and consequences of shocks: A prospective perspective. *Journal of Business and Psychology, 31*: 1-13.

Burton, L.., Gilson, L., Goldberg, C. & K. B. Lowe (2016). Does being an athlete help a woman? Examining how subtle bias in perceptions of leadership potential differentially impact male and female athletes. *Review of Global Management*, 2(1), 66-72.

Zhang, L., & Goldberg, C. B. (2014). Sensitivity-to-diversity: A moderator of diversity - affective outcomes relationships. *Equality, Diversity, and Inclusion, 33,* 494-509.

Goldberg, C., Perry, E. L., Finkelstein, L. M., & Shull, A. (2013). Antecedents and outcomes of targeting older applicants in recruitment. *European Journal of Work and Organizational Psychology, 22.* 1-14.

Goldberg, C. B., Clark, M. A., & Henley, A. (2011). Speaking up: A conceptual model of voice responses following the unfair treatment of others in non-union settings. *Human Resource Management, 50*, 75-94.

Konrad, A.M., Cannings, K., & Goldberg, C.B. (2010). Asymmetrical demography effects on psychological climate for gender diversity: Differential effects of leader gender and work unit gender composition among Swedish doctors. *Human Relations, 63*, 1661-1685.

Goldberg, C. B., Riordan, C., & Schaffer, B. (2010). Does social identity theory underlie relational demography? A test of the moderating effects of self-continuity and status-enhancement on similarity effects. *Human Relations, 63*, 903-926.

Goldberg, C. B., & Allen, D. (2008). Black and White and read all over: Race differences in reactions to recruitment Web sites. *Human Resource Management, 47,* 217-236.

Goldberg, C., Riordan, C., & Zhang, L. (2008). Employees' perceptions of their leaders: Is similar always better? *Group and Organization Management, 33,* 330-355.

Taylor, M. A., Goldberg, C., Shore, L., & Lipka, P.  (2008).  The dynamic effects of retirement expectations and social support on post-retirement adjustment: A longitudinal analysis.  *Journal of Managerial Psychology, 24,* 1-8.  **\*(Winner of the Emerald Literati Award for Excellence).**

Goldberg, C. (2007).  The impact of training and conflict avoidance on responses to sexual harassment.  *Psychology of Women Quarterly, 31*, 62-72.

Goldberg, C. B.  (2007).  Cross-cultural perceptions of coworker- and supervisor-initiated social-sexual behaviors.  *Business Journal of Hispanic Research, 1,* 1-10.

Goldberg, C. (2005).  Relational demography and similarity-attraction in interview assessments and subsequent offer decisions:  Are we missing something?  *Group and Organization Management, 30,* 597-624.

Konrad, A.M., Yang, Y., Goldberg, C., & Sullivan, S.  (2005).  Preferences for job attributes associated with work and family:  A longitudinal study of career outcomes.  *Sex Roles, 53,* 303-316.

Goldberg, C., Finkelstein, L., Perry, E., & Konrad, A.  (2004) Job and industry fit:  The effects of age and gender matches on career progress outcomes.  *Journal of Organizational Behavior, 25,* 807-829.

Goldberg, C., & Zhang, L.  (2004).  Simple and joint effects of gender and self-esteem on responses to same-sex sexual harassment.  *Sex Roles, 50,* 823-833.

Goldberg, C., & Cohen, D.  (2004).  Walking the walk and talking the talk:  Gender differences in the impact of interviewing skills on applicant assessments.  *Group and Organization Management, 29,* 369-384.

Goldberg, C., Riordan, C., & Schaffer, B.  (2003).  Missing pieces in social identity theory:  Continuity and status as moderators of similarity.  *Academy of Management Best Paper Proceedings.*

Shore, L. M., Cleveland, J. N., & Goldberg, C.  (2003).  Work attitudes and decisions as a function of manager age and employee age.  *Journal of Applied Psychology, 88,* 529–537.

Goldberg, C.  (2003).  Applicant reactions to the employment interview:  A look at demographic similarity and social identity theory.  *Journal of Business Research, 56,* 561-571.

Goldberg, C., & Shore, L. M.  (2003).  The impact of age of applicants and of referent others on recruiters' assessments:  a study of young and middle-aged job seekers.  *Representative Research in Social Psychology, 27,* 11-22.

Goldberg, C.  (2003).  Who responds to surveys?  Assessing the effects of non-response in cross-

sectional dyadic research. *Assessment, 10,* 41-48.

Goldberg, C. (2002). The impact of the proportion of women in one's workgroup, profession, and friendship circle on males' and females' responses to sexual harassment. *Sex Roles, 45,* 359-374.

Goldberg, C., & Waldman, D. A. (2000). Modeling employee absenteeism: Testing alternative measures and mediated effects based on job satisfaction. *Journal of Organizational Behavior, 21,* 665-676.

Houghton, S. M., Simon, M., Aquino, K., & Goldberg, C. (2000). No safety in numbers: Persistence of biases and their effects on team risk perception and team decision making. *Group and Organization Management, 25,* 325-353.

Perry, A., & Goldberg, C. (1998). Who gets hired: Interviewing skills are a prehire variable. *Journal of Career Planning and Employment, 58 (2),* 47-50.

**Invited Publications**

Roth, P., Goldberg, C., Matthews, K.., Thatcher, J., Ellingson, J., & Goldberg, C. (2019). Social media cues about your political leanings might influence whether you're hired or not. Invited blog, London School of Economics. https://blogs.lse.ac.uk/businessreview/2019/10/17/social-media-cues-about-your-political-leanings-might-influence-whether-youre-hired-or-not/

Goldberg, C., & McDermott, E.P. (2018). Legal Issues Relating to an Aging Workforce. In G. Adams and K. Schultz (Eds.) *Aging and Work in the 21st Century*, pp. 102-122.

Roth, P., Goldberg, C., & Thatcher, J. (2017). I vote left, you vote right: How can we work together? Invited blog, London School of Economics. http://blogs.lse.ac.uk/usappblog/2017/10/28/i-vote-left-you-vote-right-how-can-we-work-together/

Goldberg, C. (in press). Global and Cultural Competencies. Contribution to Guidance Document of SHRM's Competency Model.

Goldberg, C., Gilson, L., & Nesci, S. (2017). Leading women: Unique challenges and suggestions for moving forward. In T. Scandura & E. Mouriño (Eds.), *Leading Diversity in the 21st Century.* Information Age Publishing.

Goldberg, C., & Gilson, L. (2016). Editors' Comment: What Makes the GOM Special Issue Special?

Goldberg, C. (2016). Recruiting and Retaining a Diverse Workforce. SHRM White Paper.

Gilson, L., & Goldberg, C. (2015). Editors' Comment: So, what is a conceptual paper? *Group*

*and Organization Management, 40*, 127-130.

Goldberg, C., & McKay, P. (2016).  Diversity and LMX development.  Invited chapter in T. Bauer and B. Erdogan (Eds.).  *The Oxford Handbook of Leader-Member Exchange.*  Oxford University Press. 381-396.

Goldberg, C., Perry, E. L., Finkelstein, L. M., & Shull, A.  (2014).  Antecedents and outcomes of targeting older applicants in recruitment.  In D. Truxillo and F. Fraccaroli (Eds.).  *Age in the Workplace:  Challenges and Opportunities.*  Routledge/Taylor and Francis.

Goldberg, C.  (2010).  What do we really know about sexual harassment training effectiveness?  Invited chapter in M. Paludi (Ed.).  *Praeger Handbook on Understanding and Preventing Workplace Discrimination.  Volume 2:  Best Practices for Preventing and Dealing with Workplace Discrimination.*  Westport, CT:  Praeger.

Goldberg, C.  (2007).  Social identity theory.  Invited chapter in S. Clegg & J. Bailey (Eds.), *International Encyclopedia of Organization Studies*, Sage Publications.

Goldberg, C.  (2007).  Diversity issues for an aging workforce.  Invited chapter in Kenneth A. Schultz and Gary S. Adams (Eds.), *Aging and Work in the 21*$^{st}$ *Century*, Lawrence Erlbaum.

Goldberg, C.  (2007).  Make the most of interviewing.  *Independent Agent*.  April, 2007, p. 42.

Goldberg, C.  (2006).  Look to your Web site to increase the quality and diversity of your applicant pool.  *HR Watch*.  Appeared December 6, 2006.

Shore, L. M., & Goldberg, C. B.  (2004).  Age discrimination in organizations.  In R. L. Dipboye and A. Colella (Eds.).  *Psychological and Organizational Bases of Discrimination at Work*.  Lawrence Erlbaum – SIOP Frontiers Series.
Swiercz, P., McHugh, P., & Goldberg, C.  (1997).  *Human Resource Systems for Competitive Advantage*.  Needham Heights, MA: Simon & Schuster.

Goldberg Sharak, C.  (1995).  Managing diversity at Cox Communications.  *H.R. Atlanta*.


## CONFERENCE PRESENTATIONS

Cheung, H., Goldberg, C., Lindsey, A., Konrad, A., & Yang, Y. (2020).  A Meta-Analytic Review of Gender Composition Influencing Employees' Work Outcomes:  Implications for Human Resource Development.  Academy of Human Resource Development.  November, 2020.

Ahmad., A.S & Goldberg, C**.** (2020). Improving the Measurement of Sexual Harassment Climate. In A. Shyamsunder & **A.** Ahmad (Co-Chairs), *Show and tell: Generating solutions in combating workplace sexual harassment.* Session to be conducted at the annual conference for the Society for Industrial Organizational Psychology, Austin, TX.

De Janasz, S., Kaplan, D., Goldberg, C., & Schneer, J. (2019). Conflict ahead: A workshop on conflict and negotiations pedagogy. Eastern Academy of Management International Conference, Dubrovnik, Croatia.

Goldberg, C., Roth, P., Thatcher, J., Matthews, K., & Ahmad, A. (2018). The effects of religion on the evaluation of social media profiles in hiring. Southern Management Association Conference, Lexington, KY.

De Janasz, S., & Goldberg, C. (2018). Innovative and Experiential Approaches to Teaching HR. Annual Academy of Management Meeting, Chicago, IL.

Goldberg, C., Scandura, T., Zhang, L., & McKay, P. (2018). Current Developments in Leader-Member Exchange: A Research Incubator. Annual Academy of Management Meeting, Chicago, IL.

Roth, P. L., Bobko, P., Thatcher, J. B, Matthews, K. D., Ellingson, J. E., & Goldberg, C. (2017). Political Affiliation and employment screening: The role of similarity and disidentification. Paper presented at the Annual Academy of Management Meeting in Atlanta, GA.

Zhang, L., Goldberg, C., & Hong, W. (2017). Diversity, Social Network Density, and Team Performance: The Moderating Role of Team Climate for Inclusion. Paper presented at the Annual Academy of Management Meeting in Atlanta, GA.

De Janasz, S., & Goldberg, C. (2017). Innovative and Experiential Approaches to Teaching HRM. Presented at the Academy of Management Conference, Atlanta, GA.

Cohen, D., Goldberg, C., Brown, K., Fisher, S., & Gittelman, S. (2017). At the interface: Online learning versus classroom learning. Presented at the Academy of Management Conference, Atlanta, GA.

Cheung, H.K., Goldberg, C., King, E., & Magley, V. (2017). Beliefs about Organizational and Unit's Commitment in Sexual Harassment Training. Paper presented at the Society for Industrial/Organizational Psychologists Conference, Orlando, FL.

De Janasz, S., & Goldberg, C. (2016). Innovative and Experiential Approaches to Teaching HRM II. Presented at the Academy of Management Conference, Anaheim, CA.

Goldberg, C., Konrad, A., Lindsey, A., & Yang, Y. (2016). Gender Context and Work Outcomes: A Meta-Analysis. Paper presented at the Society for Industrial/Organizational Psychologists Conference, Anaheim, CA.

Sabat, I., Goldberg, C., & King, E. (2016). Pygmalion in the Pipeline: How Managers' Perceptions Influence Minority Turnover. Paper presented at the Society for Industrial/Organizational Psychologists Conference, Anaheim, CA.

Medvin, E., Zacarro, S., & Goldberg, C. (2016). Relational, Situational, and Individual Factors

Influencing Managers' Telework Allowance Decisions.  Paper presented at the Society for Industrial/Organizational Psychologists Conference, Anaheim, CA.

Stockdale, P., Goldberg, C., Ross, D., Gutman, A., Dunleavy, E., & Banks, C.  (2016).  Competencies and Content Expertise for I/O Psychology Expert Witnesses.  Panel session presented at the Society for Industrial/Organizational Psychologists Conference, Anaheim, CA.

Roth, P., Goldberg, C., & Thatcher, J.  (2015).  The role of political affiliation on employment decisions: A model and research agenda.  Presented at the Academy of Management Conference, Vancouver, BC.

De Janasz, S., & Goldberg, C.  (2015).  More Experiential HR: A Potluck for reviving and expanding your repertoire.  Presented at the Academy of Management Conference, Vancouver, BC.

Bowes-Sperry, L., Goldberg, C., Blockson, L., and Kermond, C.  (2015). Facilitating Faculty Responses to Diversity Dilemmas: Toward Creating Classroom Inclusiveness.  Presented at the Academy of Management Conference, Vancouver, BC.

De Janasz, S., Goldberg, C., Bowes-Sperry, L., Kaplan, D., Forret, M., Van Emerick, H., Peiperl, M., Marx, R., Schneer, J.  (2015).  Teaching OB Experientially: Reviving and Expanding your Repertoire.  Presented at the Eastern Academy of Management International Conference, Lima, Peru.

Burton, L., Gilson, L., Goldberg, C., & Lowe, K.  (2015).  The impact of biased perceptions of leadership potential on job prospects for male and female athletes.  Presented at the Eastern Academy of Management International Conference, Lima, Peru.

Goldberg, C. (2015).  Doing meaningful research – IGNITE presentation at the Society for Industrial/Organizational Psychologists Conference.  Philadelphia, PA.

Sharif, M. Goldberg, C., Huang, J., Liu, H., & Cogliser, C. (2014).  New avenues in LMX agreement research. Presented at the Southern Management Association Conference, St. Pete's Beach, FL.

Zhang, L., & Goldberg, C.  (2014).  The Antecedents and Consequences of Leader-Member Exchange (LMX) Agreement.  Presented at the Academy of Management Conference, Philadelphia, PA.

Barclay, L., Markel, K., Caldwell, K., Dwerman, D., Goldberg, C., Honig, B., Martin, B., Simon, M., Harris, S., Renko, M. (2014).  Persons with disabilities and entrepreneurship:  Barriers and opportunities.  Presented at the Academy of Management Conference, Philadelphia, PA.

DeJanasz, S., & Goldberg, C.  (2014).  Experiential HR: A Potluck for reviving and expanding your repertoire.  Presented at the Academy of Management Conference, Philadelphia, PA.

Gourmanis, G., Ramsey, T., Milad, M., Goldberg, C., Crowder, D., Winberg, Y., Behnke, S., Crowder, D., El-Ghoroury, N., Lowman, R., & Tippins, N. (2014).  Competing coaches and coachees: Mock licensing board hearing.  Presented at the Society for Industrial/Organizational Psychologists Conference, Honolulu, HI.

Lowe, K., Gilson, L., Burton, L., & Goldberg, C. (2013). Pilot testing in organizational behavior research: A methodological overview and example from a study on the effects of gender and sport participation on perceptions of leadership.  Presented at the Eastern Academy of Management International Conference, Seville, Spain.  (**Winner - Best Paper Award, Research Methods Division).**

Gilson, L., Burton, L., Goldberg, C., & Lowe, K. (2012). Gender, sports, and leadership.  Presented at the Southern Management Association Conference, Fort Lauderdale, FL.

Holtom, B., Weller, I., Goldberg, C., Allen, D., & Clark, M. (2011). Predicting the consequences of shocks: A prospective perspective.  Presented at the Southern Management Association Conference, Savannah, GA.

Payton, F., Stafford, T., Goldberg, C., Nelson, T., Suarez-Brown, T.  (2010).  Expanding minority representation in management education.  Presented at the Academy of Management Conference, Montreal, Canada.

Goldberg, C. B., & Zhang, L.  (2009).  A second chance to make a first impression?  A longitudinal examination of changes in Black and White newcomers' leader-member exchange and career future.  Presented at the Academy of Management Conference, Chicago, IL.

Goldberg, C., & Perry, E.  (2009).  Training managers to handle sexual harassment complaints: Context matters.  Presented at the Society of Industrial/ Organizational Psychologists Conference, New Orleans, LA.

Goldberg, C. B., Clark, M., & Henley, A.  (2008).  You, me, and we:  Identity and unfair treatment in groups.  Presented at the Society of Industrial/ Organizational Psychologists Conference, San Francisco, CA.

Goldberg, C. B.  (2007).  Work and organizational issues in the retention of older employees.  Symposium at the Society of Industrial/ Organizational Psychologists Conference, New York, NY.

Goldberg, C. B., & Zhang, L.  (2006).  The positive and negative effects of racism and sexism on perceptions of group cohesiveness and performance.  Presented at the Southern Management Association Conference, Clearwater, FL.

Goldberg, C. B.  (2006).  The impact of organizational practices on recruiting a diverse workforce.  Coordinator of symposium presented at the Academy of Management Conference, Atlanta, GA.

Goldberg, C., Perry, E. L., & Finkelstein, L. M. (2006). Targeting older applicants in recruitment: An organizational perspective. Presented the Academy of Management Conference, Atlanta, GA.

Goldberg, C. B., & O'Leary, B. (2006). Theoretical bases for diversity and fairness effects: Linking the two together. Presented at the Academy of Management Conference, Atlanta, GA.

Goldberg, C. & Allen, D. (2005). Web-based recruiting: When women and minorities need not apply. Presented at the Academy of Management Conference, Honolulu, HI.

Goldberg, C., Kaplan, D.M., Marchese, M.M., & Mumford, T.V. (2005). Using popular film and television as pedagogical tools in HR/IR. Presented at the Innovative Teaching in HR/IR Conference. Park City, UT

Goldberg, C., Riordan, C., & Zhang, L. (2004). Relational demography and leadership perceptions: Is similar always better? Presented at the Academy of Management Conference, New Orleans, LA.

Zhang, L., & Goldberg, C. (2004). The effects of sensitivity to surface-level and deep-level diversity on work group performance and attitudes. Presented at the Academy of Management Conference, New Orleans, LA.

Konrad, A.M., Goldberg, C., Sullivan, S., & Yang, Y. (2004). Preferences for job attributes associated with work and family: A longitudinal study. Presented at the Academy of Management Conference, New Orleans, LA **(Nominated for Best Symposium – Careers Division).**

Goldberg, C., Riordan, C., & Schaffer, B. (2003). Missing pieces in social identity theory: Continuity and status as moderators of similarity. Presented at the Academy of Management Conference. Seattle, WA.

Zhang, L., & Goldberg, C. (2003). The effects of sensitivity to surface-level and deep-level diversity on work group performance and cohesion. Presented at the Eastern Academy of Management International Conference, Porto, Portugal.

Konrad, A., & Goldberg, C. (2002). An examination of the impact of gender context on individuals and organizations. Coordinator of symposium presented at the Academy of Management Conference, Denver, CO.

Goldberg, C., & Konrad, A. (2002). The effects of gender context: A meta-analysis. Presented at the Academy of Management Conference. Denver, CO.

Goldberg, C., & Stone, D. (2001). Older workers and disabled workers: A look at two underutilized groups. Coordinator of symposium presented at the Academy of Management Conference, Washington, DC.

Goldberg, C., Finkelstein, L., Perry, E., & Konrad, A. (2001). Age and career progress: Tests of simple and moderated effects. Presented at the Academy of Management Conference, Washington, DC.

Goldberg, C. (2001). Gender, gender context, and same-sex harassment: re-evaluating our theoretical understanding of social-sexual behavior. Presented at the Society of Industrial/Organizational Psychologists conference, San Diego, CA.

Goldberg, C. (2000). The impact of different gender contexts on responses to sexual harassment. Southern Management Association conference. Orlando, FL.

Goldberg, C., & Cohen, D. (2000). Walking the walk and talking the talk: Gender differences in the impact of interviewing skills on applicant assessments. Eastern Academy of Management Conference. Danvers, MA.

Case, J., Goldberg, C., McHugh, P., & Moreno-Tello, V. (2000). Cross-cultural perceptions of coworker- and supervisor-initiated social-sexual behaviors. Presented at the Society of Industrial/Organizational Psychologists conference, New Orleans, LA.

Cleveland, J. N., Shore, L. M., & Goldberg, C. (2000). Work attitudes and performance as a function of manager age, employee age, and their interaction. Presented at the Society of Industrial/Organizational Psychologists conference, New Orleans, LA.

Goldberg, C. (1999). Multiple perspectives of sexual harassment. Coordinator of symposium presented at the Academy of Management conference, Chicago, IL.

Goldberg, C., & McHugh, P. (1999). The impact of training on perceptions of and reactions to sexual harassment. Presented at the Academy of Management conference, Chicago, IL.

Taylor, M., Goldberg, C., & Shore, L. (1999). Retirement expectations and retirement satisfaction. Presented at the Society for Industrial/Organizational Psychologists conference, Atlanta, GA.

Goldberg, C. & McHugh, P. (1999). Cultural differences in perceptions of sexual harassment. Presented at the George Washington University Scholars Showcase, Washington, DC.

Goldberg, C. & McHugh, P. (1998). Is it sexual harassment? An East-West comparison. Presented at the Management of Human Resources Conference, Honolulu, HI.

Goldberg, C. (1998). Who responds to surveys? An application of Goodman and Blum's procedure to cross-sectional dyadic research. Presented at the Southern Management Association Conference, New Orleans, LA.

Goldberg, C. & Shore, L.M. (1998). The impact of applicant age and the ages of referents on recruiters' decisions. Presented at the Society for Industrial/Organizational Psychologists Conference, Dallas, TX.

Page **14** of **28**

Goldberg, C. (1997). Relational demography: A tale of two theories. Presented at the Academy of Management Conference, Boston, MA.

Goldberg, C. (1997). The impact of job qualifications and interviewing skills on selection decisions. Presented at the George Washington University Scholars Showcase, Washington, DC.

Goldberg, C., & Perry, A. (1996). The relative importance of background and interviewing skills in campus interviews. Presented at the Southern Association of Colleges and Employers Conference, Atlanta, GA.

Goldberg, C., & Shore, L. M. (1995). Age stereotypes and new hire performance ratings. Presented at the Southern Management Association Conference, Orlando, FL.

Goldberg, C. (1995). The proposed Employment Nondiscrimination Act: Implications for organizations. Presented at the Academy of Management Conference, Vancouver, BC.

Goldberg, C., & Shore, L. M. (1994). Measuring age context: A comparison of two approaches. Presented at the Academy of Management Conference, Dallas, TX.

Goldberg, C., & Waldman, D. A. (1994). Modeling the determinants of employee absenteeism. Presented at the Society for Industrial/Organizational Psychology Conference, Nashville, TN.


## GRANTS, SCHOLARSHIPS, AWARDS, AND HONORS

**Title III Faculty Professional Development Award** - $1,949. University-wide grant for teaching and pedagogy. Bowie State University. 2018.

**Academy of Management, Gender and Diversity in Organizations Division** – Elected to Treasurer, 2015 – 2018.

**Best Paper Award** ($500). Pilot testing in organizational behavior research: A methodological overview and example from a study on the effects of gender and sport participation on perceptions of leadership. Eastern Academy of Management International Conference, Research Methods Division. 2013.
**Academy of Management, Gender and Diversity in Organizations Division** – Elected to Executive Committee, 2012-2015 term.

**Society for Human Resource Management/American National Standards Institute** – Appointed to taskforce, charged with creating national standards in the area of Diversity and Inclusion. 2010 - present.

**Society for Human Resource Management** – Honored as one of 100 thought leaders at the Leadership Summit on Diversity and Inclusion. April 7-8, 2008.

**Kogod Research Grant** ($6,935).  A Multi-source, Multi-wave Investigation of New Hire Fit. Kogod School of Business, American University.  2007.

**Crain Summer Research Fellowship** - $12,500.  Relational demography and leadership perceptions:  Is similar always better?  George Washington University.  2005.

**Academy of Management Award for Outstanding Service** – Award from Human Resources Division for service as Secretary of the Executive Committee.  2001.

**Southern Management Association Award for Outstanding Service** – Plaque awarded for service as track chair for the Southern Management Association meeting.  2000.

**George Washington University Release Time for Research Award** - $2,000.  Employee perceptions of and reactions to sexual harassment: A field study (with Patrick McHugh). George Washington University.  1999.

**Junior Faculty Consortium Invitee -** Academy of Management Conference Human Resources Division, Boston, MA.  1997.

**Award for Outstanding Teaching Performance -** Department of Management, Georgia State University.  Winter, 1996.

**Award for Outstanding Teaching Performance** - Department of Management, Georgia State University.  Fall, 1995.

**Doctoral Consortium Invitee** - Academy of Management Conference Human Resources Division, Vancouver, BC.  1995.

**Georgia State University Dissertation Proposal Grant** - $1,000.  Georgia State University. 1995.

**Exemplar Research Award** - $2,000.  College of Business Administration, Georgia State University.  1995.

**William T. Rutherford Award** - $500.  W. T. Beebe Institute of Personnel and Employment Relations, Georgia State University.  1993.

**New York State Regents Scholarship** - $500/year.  New York State Board of Regents. 1984, 1985, 1986, 1987.

TEACHING EXPERIENCE

**Undergraduate Teaching Experience**

❖ Introduction to Business (Online)

❖ Introduction to Business (Traditional)

❖ Principles of Management (Online)

❖ Principles of Management (Traditional)

❖ Psychology of Working Groups and Teams

❖ Leading High-Performance Teams

❖ Principles of Organizational Theory, Behavior, and Management

❖ GWU Paris Program – Introduction to Human Resource Management

❖ Introduction to Human Resource Management

❖ Introduction to Organizational Behavior

❖ Principles of Management

❖ Advanced Topics:  Cases and Exercises in Human Resource Management

**Graduate Teaching Experience**

❖ Seminar in Personnel Selection and Testing

❖ Seminar in Industrial Psychology

❖ Seminar in Small Group Behavior

❖ High Performing Teams

❖ MBA – Organizational Behavior and Human Resource Management

❖ Doctoral Seminar – Research Design

❖ Performance Management and Development

❖ Accelerated AMBA – Human Dynamics in Organizations

❖ Doctoral Seminar – Current Research in Human Resource Management

❖ Executive MBA – Human Resource Management

❖ Pre-MBA Group Dynamics 1-Day Workshop

❖ Accelerated MBA (Off-Campus Mini-Residency) – Dancing in the Minefields:  Managing Employee Performance and Compensation

❖ MBA Organizations, Management, and Leadership

❖ MBA Organizations, Management, and Leadership I

❖ MBA Organizations, Management, and Leadership II

❖ Accelerated MBA (Off-Campus Residency) Organizations, Management, and Leadership II

**Dissertation and Thesis Committee Service**

David Arena (Psychology – George Mason University), 2015.  The impact of racial microaggressions on subsequent creativity and cognitive task performance.

Emily Medvin (Psychology – George Mason University), 2015.  The impact of telework on leader-member exchange quality.

Elaine Brenner (Psychology- George Washington University), 2006.  Telework and retention.

Beverly Nyberg (Human Resource Development – George Washington University), 2004.  A study of Jaques' requisite organization theory as it relates to the impact of person to role and person to supervisor degree of fit on employee satisfaction in a non-profit service agency.

Haven Battles (Psychology – George Washington University), 2000. Professional self-efficacy and burnout in pediatric HIV nurses.

M. Martha Neal (Logistics and Operations Management – George Washington University), 1999. Leadership in a change environment: A case study in the United States Navy Logistics.

**Student Evaluations**

❖ On two occasions, I received a perfect 5.0 for overall teaching effectiveness.

❖ Throughout my nine years at GWU, averages for all of my overall and item scores for every semester except one, ranged from 4.0 to 5.0 on a five-point scale.

❖ I have also had students in my workshops evaluate my performance.  The scores have consistently been in the 4.5 range.

❖  I received two departmental awards for my teaching performance.

## PROFESSIONAL LEADERSHIP ACTIVITIES

**Treasurer**

Academy of Management, Gender and Diversity in Organizations Division.  2015-2018.

**Coordinator – Online Paper Development Workshop**

Academy of Management, Gender and Diversity in Organizations Division. 2017; 2018.

**Keynote Speaker – Multidisciplinary Conference on Sexual Harassment**

University of Notre Dame, South Bend, IN.  2018.

**Chair – Dorothy Harlow Best Paper Award Committee**

Academy of Management, Gender and Diversity in Organizations Division.  2016.

**Editor – Special Conceptual Issue**

*Group and Organization Management.*  2015; 2016.

**Chair – Academy of Management Doctoral Consortium**

Gender and Diversity in Organizations Division. 2013; 2014; 2015.

**Panelist – Academy of Management Junior Faculty Consortium**

Human Resources Division. 2014.

**Executive Committee - Academy of Management**

Gender and Diversity in Organizations Division.  2012-2015.

**Mentor – Academy of Management**

Gender and Diversity in Organizations Division.  2012 Conference.

**Associate Editor**

*Group and Organization Management.*  2004 – 2007.

**Editorial Board Member**

*Journal of Business and Psychology*.  2015 – present.
*Group and Organization Management.*  2003 – 2004; 2007-2020.
*Human Resource Management.*  2003 – 2020.
*Journal of Management.*  2003 – 2009.

**Mentor – Paper Development Workshop**

Southern Management Association - Human Resources Division.  2011.

**Doctoral Consortium Committee**

Academy of Management - Human Resources Division.  2004-2005.

**Roundtable Discussion Leader**

Academy of Management Doctoral Consortium - Human Resources Division.  2004, 2007.

**Teaching Panel Presenter**

Academy of Management Doctoral Consortium - Human Resources Division.  2005, 2006.

**Editors' Roundtable Presenter**

Academy of Management Doctoral Consortium - Gender and Diversity in Organizations Division.  2005.

**Coordinator – Teaching Workshop**

Academy of Management - Human Resources Division.  2001.

**Secretary – Executive Committee**

Academy of Management - Human Resources Division.  2000 – 2002.

**Track Chair**

Southern Management Association - Human Resources Division.  2000.

**Ad-Hoc Journal Reviewer**

*Academy of Management Journal*

*American Economic Review*

*Assessment*

*European Journal of Work and Organizational Psychology*

*Group and Organization Management*

*Human Performance*

*Human Resource Management Journal*

*Human Resource Management Review*

*Journal of Applied Social Psychology*

*Journal of Business Research*

*Journal of Human Resource Planning*

*Journal of Management*

*Journal of Organizational Behavior*

*Organizational Behavior and Human Decision Processes*

*Personnel Psychology*

*Sex Roles*

**Text Book Reviewer**

Dessler, G. *Fundamentals of Human Resource Management, 4rd Ed*.  Prentice Hall.  2006.

Dessler, G. *Fundamentals of Human Resource Management, 3rd Ed*.  Prentice Hall.  2005.

Dessler, G. *Fundamentals of Human Resource Management, 2nd Ed*.  Prentice Hall.  2003.

**Conference Reviewer**

Innovative Teaching in HR/IR Conference.  2005.

Society for Industrial/Organizational Psychologists.  1999, 2000, 2012 – 2014.

Academy of Management Conference
- Human Resources Division.  1994, 1999-2007, 2009.
- Gender and Diversity in Organizations Division.  2000-2001, 2006, 2009 – 2014.
- Careers Division.  1996.

Southern Management Association Conference
- Human Resources/Careers Division.  1994-1999, 2002-2005.
- Organizational Behavior Division.  1996.
- Women in Management Division.  1992-1994.
- Research Methods Division.  1998.

**Conference Session Chair**

Academy of Management
- Human Resources Division.  2000, 2008.
- Gender and Diversity in Organizations Division.  2010.
- Organizational Behavior & Technology and Innovation Division.  2005.

Southern Management Association - Human Resources Division.  2002.

**Conference Discussant/Facilitator**

Southern Management Association
- Human Resources Division.  1997, 1999, 2001, 2002, 2009.
- Organizational Behavior Division.  1996.
- Careers Division.  1996.
- Women in Management Division.  1993, 1994.

Academy of Management - Human Resources Division.  2001.

## PROFESSIONAL COMMITTEE SERVICE

❖ Award Committee – Sage Scholarly Contributions to Management - Academy of Management, Gender and Diversity in Organizations Division.  2018.

❖ Committee on Ethnic and Minority Affairs Mentoring Program - Society for Industrial-Organizational Psychology.  2015 – present.

❖ Master Collaboration Committee - Society for Industrial and Organizational Psychology.  2012

❖ Dorothy Harlow Award Committee - Academy of Management Gender and Diversity Division.  2010.

❖ Best Paper Committee – Academy of Management Gender and Diversity Division.  2004.

❖ Best Student Paper Committee - Southern Management Association Conference.  1997.

❖ Member Relations Committee- Academy of Management Human Resources Division.  1993.

## UNIVERSITY SERVICE ACTIVITIES

**Ongoing Activities**

- ❖ Bowie State University – Salary Equity Committee.  2017 – 2019.
- ❖ Bowie State University – Faculty Mentor, MMPA Department.  2015 – 2019.
- ❖ Bowie State University – Program Coordinator, Management Program.  2016 – 2018.
- ❖ Bowie State University – Faculty Advisor, Delta Mu Delta.  2016 – 2019.
- ❖ Bowie State University – MMPA Curriculum Committee.  2016 – 2019.
- ❖ Bowie State University – Academic Advisement.  2016 – 2019.
- ❖ Bowie State University – Computerized Classroom Committee.  2015 – 2019.
- ❖ Bowie State University – Study Abroad Capacity Building Initiative 2015-2016.
- ❖ AU Faculty Retreat Planning Committee.  2011 – 2013.
- ❖ AU Faculty Advisor – Student SHRM Chapter.  2008 – 2014.
- ❖ AU Academic Integrity Code Review Committee.  2006 – 2014.
- ❖ AU University Policy Committee for Maternity & Family Obligations.  2007 – 2011.
- ❖ AU Management Department Faculty Search Committee.  2006 – 2007.
- ❖ AU Mgmt 353 Consistent Experiences across Sections (Teams Packet).  2006 – 2014.
- ❖ AU Faculty Advisory Board, Women's and Gender Studies.  2006 - 2014.
- ❖ GWU Doctoral Program Curriculum Committee.  2004 – 2005.
- ❖ GWU Undergraduate Program Committee.  2004 – 2005.
- ❖ GWU Liaison, Council on Education in Management.  2003 - 2005.
- ❖ GWU Conflicts of Interest and Commitment Committee.  2003 – 2005.
- ❖ GWU Study Abroad Committee.  2003 – 2005.
- ❖ GWU University Women's Committee.  2003 – 2005.
- ❖ GWU Program Director – HRM.  2003 – 2005.
- ❖ GWU Faculty Advisor – Student SHRM Chapter.  2000 – 2002.
- ❖ GWU University Women's Committee (alternate).  2000 – 2003.
- ❖ GWU Faculty Senate Committee on Research.  1998-2005.
- ❖ GWU Full-time MBA Curriculum Committee.  1999 – 2000.
- ❖ GWU Cohort MBA Curriculum Redesign Committee.  1997-1999.
- ❖ GWU Department of Management Science Annual Retreat Planning Committee.  1998.

❖ GWU MBA Core Faculty Meetings.  1997-2000.

❖ GWU Faculty Advisor - School of Business and Public Management Leadership Retreat. 1997-1998.

❖ GWU BBA Core Faculty Meetings.  1996-2005.

**One-Time or Periodic Activities**

❖ Chair, Search Committee – Public Administration Faculty.  Sp, 2018.

❖ Search Committee – Marketing Faculty.  Sp, 2018.

❖ Search Committee – Marketing Faculty.  Sp, 2017.

❖ Search Committee – Public Administration/Organizational Behavior Faculty.  Sp, 2017.

❖ Presenter – Research Brown Bag, "Pygmalion in the Pipeline," Fa, 2016.

❖ Presenter – Greenberg Seminar Series, "An Overview of Sexual Harassment," Fa, 2012.

❖ Moderator – KSB Alumni Event, "Redefining Having It All," Summer, 2012.

❖ Session Organizer and Presenter – Diversity and Inclusion in the Classroom.  Ann Ferren Teaching Conference, American University.  Sp, 2009.

❖ Faculty Presenter – MBA Orientation.  Fa, 2006.

❖ Faculty Presenter – GMU, GWU, UMD I/O-HR Brown Bag Series.  Sp, 2004.

❖ Faculty Presenter – First Year Development Program.  Sp, 2001, 2002, 2003.

❖ Presenter – Management Science Department-wide Doctoral Seminar.  Fa, 2003.

❖ Faculty Facilitator/Assessor – Graduate Teaching Assistantship Practicum.  Fa, 2003.

❖ Faculty Advocate – SBPM Distinguished Scholar Award (Jessica Toplin, nominee).  2003.

❖ Search Committee for Center for Excellence in Municipal Management Director.  2002.

❖ Faculty Judge – Undergraduate capstone assessment.  Sp, 2002.

❖ PMBA – "Customize Your MBA" program – Representative for HR group.  Fa, 1998, Fa, 2001, Sp, 2002.

❖ Designed and presented JOBS (Junior Options for Business Success) Workshop.  Sp, 2001.

❖ Undergraduate Programs Field Day – Presented information about HR field.  Sp, 2001, 2002.

❖ Search Committee for Graduate Career Center Assistant Director.  Sum, 2000.

❖ MBA Specialization Discussion and Reception – Representative for HR group.  Sp, 1999.

❖ KPMG National Case Competition – Faculty Host.  Sp, 1999.

❖ Cohort Team Assessments - Coaching and counseling session.  Fa, 1998.

❖ Speaker at Washington Human Resource Forum - Generation X Views on Business and
   Work Issues.  Fa, 1998.

❖ Moderator/Facilitator, EDS Consulting Week - Performance Management.  Sp, 1998.

❖ Faculty representative for Open House for newly-admitted MBA students.  Sp, 1997.

❖ Faculty representative for Family weekend for prospective undergraduate students.  Fa, 1996.


**Media Coverage**

❖ *ProPublica/Anchorage Daily News.* Interviewed for an article, "Alaska's attorney general sent
   hundreds of 'uncomfortable' texts to a female colleague." Published August 25, 2020.

❖ *Atlanta Journal-Constitution.* Interviewed for an article, "DeKalb principal's arrest shines
   light on district's hiring practices.  Published February 25, 2020.

❖ *WBAL Radio.*  Live radio interview regarding my research on political affiliation
   discrimination.  Aired December 4, 2019.

❖ *The Hill.  "*Is political affiliation the new discrimination? Our research suggests 'yes'."
   Article summarizing my research on political affiliation discrimination.  Published
   November 27, 2019.

❖ *New York Times*.  Interviewed for an article, "How to disclose a disability to an employer
   (and whether you should)."  Published July 10, 2019.

❖ *Vanity Fair*. Interviewed for an article, "'You will lose everything':  Inside the media's
   #metoo blacklist."  Published April 16, 2019.

❖ *CGTN America (Chinese National News Channel)* - Live television interview for a piece on
   the one-year anniversary of #metoo.  Aired October 14, 2018.

❖ *Anniston Star Daily.*  Interviewed for an article, "Experts: For Star, sexual harassment policy
   may not go far enough."  Published January 3, 2018.

❖ *The Parallax: Your Eye on Security News.*  Interviewed for an article, "At Chaos, a chaotic
   response to assault allegations."  Published January 4, 2018.

❖ *CGTN America (Chinese National News Channel)* - Live television interview for a piece on
   sexual harassment.  Aired December 7, 2017.

❖ *Anniston Star Daily*.  Interviewed for an article, "Alabama lawmaker at forefront of effort to
   change sexual harassment rules in Congress."  Published December 2, 2017.

❖ *CGTN America (Chinese National News Channel)* – Television interview for a piece on sexual harassment.  Aired November, 2017.

❖ *Elite Daily* – Interviewed for an article, "What can you do about sexual harassment in the workplace?  An expert breaks down the myths and truths."  Published November, 2017.

❖ *CGTN America (Chinese National News Channel)* – Live television interview for a piece on sexual harassment.  Aired October, 2017.

❖ *Bustle* – Interviewed for an article, "The statistics on reporting harassment will sadly validate your fears."  Published, October, 2017.

❖ *BBC* – Interviewed for an article, "How Metaphors Shape Women's Lives."  Published July, 2017.

❖ *New York Daily News* – Interviewed for an article, "Georgia college student says group of men threatened to 'grab her by the p---y' at Waffle House."  Published November, 2016.

❖ *El Comercio (Perú)* – Interviewed for an article, "Empresas líderes usan neurociencia para mejorar productividad."  Published September, 2016.

❖ *Fast Company* – Interviewed for an article, "The Other Wage Gap: Why Men In Female-Dominated Industries Still Earn More."  Published April, 2015.

❖ *Voice of America* – Interviewed for a televised segment on sexual harassment.  Aired on numerous worldwide affiliates, April, 2014.

❖ *Monster.com* – Interviewed for an article, "5 Items You Should Never Put in Your Cubicle."  Published, December 3, 2013.

❖ *Entrepreneur Magazine* – Interviewed for an article, "4 steps to creating a successful job-swapping program."  Published November 20, 2013.

❖ *Kiplinger* – Interviewed for an article, "Eight jobs that pay women more than men."  Published 4/11/13.

❖ *Yahoo! Finance* – Interviewed for an article, "Male nurses becoming more commonplace – and higher paid."  Published 2/26/13.

❖ *Forbes* – Interviewed for an article, "The 20 Best-Paying Jobs for Women in 2012."  Published 7/18/12.

❖ *US News & World Report* – Interviewed for an article, "Experts mixed on whether quotas boost women in business."  Published 6/26/12.

❖ *NPR, Kojo Show* – Hour-long, live call-in radio show on "The Nontraditional Workplace."

Aired 6/5/12.

❖ *Forbes* – Interviewed for an article, "A new obstacle for women:  The glass escalator." Published 5/21/12.

❖ *AOL* – Interviewed for an article, "Jobs where women make more than men."  Published 3/1/12.

❖ *Washington Post* – Interviewed for an article, "African American women see their own challenges mirrored in Michelle Obama's."  Published 1/23/12.

❖ *Forbes* – Interviewed for an article, "Five Ways to Spot a Bad Boss in an Interview." Published 12/11/11.

❖ *InsuranceQuotes.Com* – Interviewed for an article on sexual harassment.  Published 11/12/11.

❖ *Wisconsin Public Radio* – Hour-long, live call-in radio show on sexual harassment.  Aired 11/17/11.

❖ *WOR Radio* – Radio interview on Herman Cain's sexual harassment controversy.  Aired 11/11/11.

❖ *USA Today/Detroit Free Press* - Interviewed for an article on Herman Cain's sexual harassment controversy.  Published 11/9/11.

❖ *Fox 5 News* – Televised interview for a story on Herman Cain's sexual harassment controversy.  Aired 11/3/11.

❖ *CNN* – Interviewed for an article on Herman Cain's sexual harassment controversy. Published 11/1/11.

❖ *The Daily* – Interviewed for an article on Herman Cain's sexual harassment controversy. Published 11/1/11.

❖ *Voice of Russia* – Radio interview for, "The Walmart Case."  Aired 6/29/11.

❖ *Forbes* – Interviewed for an article entitled, "The 15 jobs where women earn more than men."  Published 3/14/11.

❖ *Forbes* – Interviewed for an article entitled, "20 surprising jobs women are taking over." Published 3/7/11.

❖ *Detroit Free Press* – Interviewed for an article on sexual harassment entitled, "Waterford settles sexual harassment lawsuit for $95,000."  Published 12/12/10.

- ❖ *Crain's New York Business* – Interviewed for an article on discrimination entitled, "J.Crew Fashion Week event to get dressed down."  Published 9/10/10.
- ❖ *Times-Standard* – Interviewed for an article on sexual harassment entitled, "Muddied waters: Eureka officials' testimony conveys role of personal relationships in EPD investigation." Published 9/3/10.
- ❖ *HRMagazine* – Interviewed for an article on building an HR consulting practice online. Published 6/09.
- ❖ *US News & World Report* – Interviewed for an article entitled, "Recruiting 2.0."  Published 2/09.
- ❖ *HRMagazine* – Interviewed for an article regarding my 2008 study on race and recruitment. Published 7/08
- ❖ *Firstline* – Interviewed for an article on sexual harassment in the workplace.  Published 5/08.
- ❖ *California Executive* – Interviewed for an article on obesity in the workplace.  Appeared 9/07.
- ❖ *American Banker* – Interviewed for an article on diversity of bank Boards of Directors.
- ❖ *The Washington Examiner* – Interviewed for an article on absenteeism.  Appeared 8/4/06.
- ❖ *Entrepreneur Magazine* – Interviewed for an article on hiring former dot-com employees. Appeared 9/01.
- ❖ *The Wall Street Journal* – Interviewed for an article on underemployment.  10/00.
- ❖ *Dateline, NBC* – Interviewed for a network television news piece on age discrimination. Aired 7/99 and 9/99.
- ❖ *KONA-TV* - Interviewed for local affiliate television news piece on sexual harassment.  8/98.
- ❖ *The Federal Times* - Interviewed for an article on employee absenteeism.  10/97.

## Appendix 2

## Materials Reviewed

| | | | | | |
|---|---|---|---|---|---|
| GS0076193 | GS0158774 | GS0161738 | GS0167529 | GS0167724 | GS0175818 |
| GS0102197 | GS0158775 | GS0161747 | GS0167544 | GS0167730 | GS0175819 |
| GS0115173 | GS0158785 | GS0161748 | GS0167545 | GS0167731 | GS0175827 |
| GS0115486 | GS0158788 | GS0161751 | GS0167546 | GS0167752 | GS0175828 |
| GS0135535 | GS0158791 | GS0161752 | GS0167547 | GS0167753 | GS0175872 |
| GS0138154 | GS0158793 | GS0161753 | GS0167548 | GS0167776 | GS0175873 |
| GS0140030 | GS0158798 | GS0161754 | GS0167557 | GS0167777 | GS0175876 |
| GS0140086 | GS0158801 | GS0161760 | GS0167558 | GS0167790 | GS0175877 |
| GS0140133 | GS0158803 | GS0161761 | GS0167559 | GS0167791 | GS0175886 |
| GS0140156 | GS0158898 | GS0161788 | GS0167564 | GS0167792 | GS0175887 |
| GS0140165 | GS0158910 | GS0161789 | GS0167566 | GS0167794 | GS0175963 |
| GS0140218 | GS0158917 | GS0162010 | GS0167567 | GS0167795 | GS0175964 |
| GS0140280 | GS0158923 | GS0162011 | GS0167568 | GS0167796 | GS0175967 |
| GS0145354 | GS0158959 | GS0162024 | GS0167574 | GS0175120 | GS0175968 |
| GS0145355 | GS0158960 | GS0162025 | GS0167575 | GS0175121 | GS0176082 |
| GS0145358 | GS0158962 | GS0162128 | GS0167576 | GS0175156 | GS0176083 |
| GS0145360 | GS0161430 | GS0162131 | GS0167577 | GS0175157 | GS0176105 |
| GS0145361 | GS0161431 | GS0162132 | GS0167578 | GS0175174 | GS0176106 |
| GS0145362 | GS0161479 | GS0162251 | GS0167579 | GS0175175 | GS0176124 |
| GS0146066 | GS0161480 | GS0162252 | GS0167604 | GS0175217 | GS0176125 |
| GS0147256 | GS0161501 | GS0162300 | GS0167605 | GS0175218 | GS0176130 |
| GS0149101 | GS0161502 | GS0162301 | GS0167616 | GS0175224 | GS0176131 |
| GS0158523 | GS0161504 | GS0162305 | GS0167617 | GS0175225 | GS0176167 |
| GS0158525 | GS0161505 | GS0162306 | GS0167631 | GS0175250 | GS0176168 |
| GS0158549 | GS0161506 | GS0162327 | GS0167632 | GS0175251 | GS0176203 |
| GS0158555 | GS0161507 | GS0162328 | GS0167673 | GS0175291 | GS0176204 |
| GS0158559 | GS0161512 | GS0162329 | GS0167674 | GS0175292 | GS0176249 |
| GS0158562 | GS0161513 | GS0162330 | GS0167675 | GS0175295 | GS0176436 |
| GS0158569 | GS0161544 | GS0162373 | GS0167676 | GS0175296 | GS0177871 |
| GS0158573 | GS0161545 | GS0162374 | GS0167677 | GS0175314 | GS0180331 |
| GS0158575 | GS0161580 | GS0162383 | GS0167678 | GS0175315 | GS0187636 |
| GS0158580 | GS0161581 | GS0162384 | GS0167679 | GS0175403 | GS0190406 |
| GS0158585 | GS0161596 | GS0162405 | GS0167680 | GS0175404 | GS0190618 |
| GS0158587 | GS0161597 | GS0162406 | GS0167681 | GS0175410 | GS0190633 |
| GS0158592 | GS0161647 | GS0162456 | GS0167682 | GS0175411 | GS0190776 |
| GS0158602 | GS0161648 | GS0162457 | GS0167683 | GS0175433 | GS0191073 |
| GS0158618 | GS0161726 | GS0167461 | GS0167685 | GS0175434 | GS0191142 |
| GS0158629 | GS0161727 | GS0167462 | GS0167686 | GS0175489 | GS0191981 |
| GS0158634 | GS0161728 | GS0167466 | GS0167707 | GS0175490 | GS0192652 |
| GS0158751 | GS0161731 | GS0167467 | GS0167708 | GS0175531 | GS0194236 |
| GS0158760 | GS0161732 | GS0167468 | GS0167709 | GS0175532 | GS0194437 |
| GS0158763 | GS0161733 | GS0167469 | GS0167712 | GS0175551 | GS0194575 |
| GS0158765 | GS0161734 | GS0167471 | GS0167713 | GS0175552 | GS0211456 |
| GS0158768 | GS0161737 | GS0167472 | GS0167722 | GS0175567 | GS0227078 |
| GS0158769 | GS0158774 | GS0167528 | GS0167723 | GS0175568 | GS0230686 |

# Appendix 2

# Materials Reviewed

| | | | | | |
|---|---|---|---|---|---|
| GS0230722 | GS0380623 | GS0381535 | GS0602544 | GS0921643 | GS1014689 |
| GS0232449 | GS0380625 | GS0381546 | GS0611523 | GS0922708 | GS1018539 |
| GS0237596 | GS0380629 | GS0381557 | GS0622742 | GS0922718 | GS1021083 |
| GS0239861 | GS0380633 | GS0381573 | GS0624586 | GS0923415 | GS1021298 |
| GS0239861 | GS0380642 | GS0381582 | GS0625342 | GS0924406 | GS1023057 |
| GS0240298 | GS0380647 | GS0381596 | GS0627496 | GS0924421 | GS1023919 |
| GS0240299 | GS0380685 | GS0381633 | GS0630038 | GS0924456 | GS1025664 |
| GS0240301 | GS0380702 | GS0381658 | GS0639293 | GS0924571 | GS1026240 |
| GS0240302 | GS0380706 | GS0381676 | GS0655460 | GS0924574 | GS1030267 |
| GS0240308 | GS0380734 | GS0381684 | GS0658360 | GS0924595 | GS1031217 |
| GS0240309 | GS0380788 | GS0382143 | GS0663107 | GS0924621 | GS1041107 |
| GS0240314 | GS0380818 | GS0382228 | GS0664340 | GS0924640 | GS1042713 |
| GS0240315 | GS0380850 | GS0382243 | GS0679955 | GS0924657 | GS1043758 |
| GS0240320 | GS0380853 | GS0411141 | GS0681117 | GS0924775 | GS1043771 |
| GS0240321 | GS0380856 | GS0430409 | GS0689353 | GS0924891 | GS1043776 |
| GS0240340 | GS0380883 | GS0437433 | GS0693482 | GS0924908 | GS1043784 |
| GS0240341 | GS0380888 | GS0460116 | GS0697187 | GS0948384 | |
| GS0240503 | GS0380937 | GS0466130 | GS0698144 | GS0948531 | |
| GS0240504 | GS0380956 | GS0467444 | GS0700470 | GS0950516 | |
| GS0240584 | GS0380978 | GS0468474 | GS0702202 | GS0953240 | |
| GS0240585 | GS0380985 | GS0473430 | GS0702964 | GS0953273 | |
| GS0244967 | GS0380990 | GS0476493 | GS0702964 | GS0954031 | |
| GS0246067 | GS0381020 | GS0493228 | GS0740061 | GS0954173 | |
| GS0247341 | GS0381024 | GS0493334 | GS0761549 | GS0955995 | |
| GS0249588 | GS0381053 | GS0495418 | GS0761910 | GS0962185 | |
| GS0255496 | GS0381061 | GS0497888 | GS0763845 | GS0962190 | |
| GS0258236 | GS0381073 | GS0506002 | GS0763869 | GS0962277 | |
| GS0258307 | GS0381085 | GS0513227 | GS0765194 | GS0962505 | |
| GS0258325 | GS0381087 | GS0513228 | GS0796193 | GS0962579 | |
| GS0269462 | GS0381106 | GS0521319 | GS0877592 | GS0967925 | |
| GS0306430 | GS0381111 | GS0522397 | GS0880550 | GS0967954 | |
| GS0374985 | GS0381144 | GS0522759 | GS0882449 | GS0969861 | |
| GS0380389 | GS0381217 | GS0525279 | GS0884179 | GS0969915 | |
| GS0380404 | GS0381235 | GS0526158 | GS0885257 | GS0972368 | |
| GS0380413 | GS0381252 | GS0535237 | GS0887654 | GS0973881 | |
| GS0380428 | GS0381294 | GS0536802 | GS0887680 | GS0975779 | |
| GS0380431 | GS0381308 | GS0539831 | GS0888534 | GS0978052 | |
| GS0380452 | GS0381333 | GS0542164 | GS0889602 | GS0978708 | |
| GS0380460 | GS0381341 | GS0553688 | GS0889657 | GS0981426 | |
| GS0380464 | GS0381344 | GS0574075 | GS0897205 | GS1002505 | |
| GS0380511 | GS0381376 | GS0574442 | GS0899585 | GS1004831 | |
| GS0380518 | GS0381386 | GS0579988 | GS0915869 | GS1005786 | |
| GS0380548 | GS0381414 | GS0584118 | GS0916085 | GS1005846 | |
| GS0380572 | GS0381432 | GS0598705 | GS0917338 | GS1013182 | |
| GS0380595 | GS0381527 | GS0602123 | GS0919897 | GS1014612 | |

# Appendix 2

# Materials Reviewed

| |
|---|
| *Chen-Oster v. Goldman, Sachs, & Co.* - Class Certification Briefing |
| Complaint, *Marla Crawford v. The Goldman Sachs Group, et al.*, No. 159731 2020, New York State Supreme Court, 11/12/2020 |
| Deposition of Aimee Hendricks, 13 September 2013 |
| Deposition of Anilu Vazquez-Ubarri, 18 August 2020 |
| Deposition of Dane Holmes, 22 October 2020 |
| Deposition of Edith Cooper, 9 September 2020 |
| Deposition of Edith Hunt, 30 September 2020 |
| Deposition of Erika Irish Brown, 13 November 2020 |
| Deposition of Gary Cohn, 20 November 2020 |
| Deposition of Lloyd Blankfein, 16 November 2020 |
| Dkt. 546-1 - Declaration of David Landman |
| Dkt. 578 - Order Granting Class Certification |

# Appendix 3

# Works Cited

Aguinis, H. & Solarino, A. M. (2019).  Transparency and replicability in qualitative research: The case of interviews with elite informants.  *Strategic Management Journal*, 40, 1291-1315.

Association of Workplace Investigators (2012). *Guiding Principles for Conducting Workplace Investigations.* Association of Workplace Investigators, Inc.

Atewologun, D., Cornish, T., & Tresh, F. (2018).  Unconscious bias training: An assessment of the evidence for effectiveness.  *Equality and Human Rights Commission*, Research report 113.

Avery, D. R. & McKay, P. F. (2006). Target practice: An organizational impression management approach to attracting minority and female job applicants. *Personnel Psychology*, 59(1), 157-187.

Babcock, P. (2009).  Diversity accountability requires more than numbers.  *Society for Human Resource Management*, 12 April 2009.

Bergman, M. E., Langout, R. D., Palmieri, P. A., Cortina, L., & Fitzgerald, L. (2002).  The (un)reasonableness of reporting: Antecedents and consequences of reporting sexual harassment. *Journal of Applied Psychology*, 37, 230-242.

Blickenstaff J. C. (2005).  Women and science careers: Leaky pipeline or gender filter?  *Gender and Education*, 17(4), 369-386.

Bowes-Sperry, L. & O'Leary-Kelly, A. (2005).  To act or not to act: The dilemma faced by sexual harassment observers.  *Academy of Management Review*, 30(2), 288-306.

Cantalupo, N. & Kidder, W. (2017).  Mapping the Title IX iceberg: Sexual harassment (mostly) in graduate school by college faculty.  *Journal of Legal Education*, 66, 850-881.

Cheung, H.K., Goldberg, C., King, E., & Magley, V.  (2017).  Are They True to The Cause? Beliefs about Organizational and Unit's Commitment in Sexual Harassment Training. Online First at *Group and Organization Management*, *43*, 1-30.

Cooper, L. M. (2012).  Top ten tips for conducting a sexual harassment investigation.  *California Employment Law Letter*, 1-4.  July 31, 2012.

Dobbin, F. & Kalev, A. (2016).  Why diversity programs fail.  *Harvard Business Review*, 94, 52-60.

Dobbin, F. & Kalev, A. (2013). The origins and effects of corporate diversity programs.  In. Q. Roberson (Ed).  Oxford Handbook of Diversity and Work (pp. 254-281). New York: Oxford University Press.

Dwertmann, D. J. G., Nishii, L. H., & van Knippenberg, D. (2016).  Disentangling the fairness & discrimination and synergy perspectives on diversity climate: Moving the field forward. *Journal of Management*, 42(5), 1136-1168.

Eisenhardt, K., & Graebner, M. (2007).  Theory building from cases: Opportunities and challenges.  *Academy of Management Journal*, 50, 25-32.

Eisenhardt, K. M., Graebner, M., & Sonnenshein, S. (2016).  Grand challenges and inductive methods:  Rigor without rigor mortis. *Academy of Management Journal*, 59, 1113–1123.

Emerson J. (2017).  Don't give up on unconscious bias training – Make it better.  *Harvard Business Review*, 28 April 2017.

Fischel, C., Willson, A.J., & Young, R. (2003).  Is there a standard of care to define a reasonable harassment investigation?  *SHRM-SIOP White Paper Series*.  Society for Human Resource Management:  Alexandria, VA.

Fitzgerald, L., Drasgow, F., Hulin, C. L., Gelfand, M. J., & Magley, V. J. (1997).  Antecedents and consequences of sexual harassment in organizations: A test of an integrated model.  *Journal of Applied Psychology*, 82, 578-589.

Gatewood, R. D., Field, H. S., & Barrick, M. (2011).  *Human Resource Selection, 7th Ed.*  Southwestern Publishing.

Gilbert, J. & Ivancevich, J. (2000).  Valuing diversity: A tale of two organizations. *Academy of Management Perspectives*, 14(1), 93-105.

Gioia, D. A., Corley, K. G., & Hamilton, A. L. (2012).  Seeking qualitative rigor in inductive research: Notes on the Gioia methodology.  *Organizational Research Methods*, 16, 15-31.

Goldberg, C., & Ahmad, A.  (2019).  Improving the measurement of sexual harassment climate.  *Industrial and Organizational Psychology: Perspectives on Science & Practice.*

Goldberg, C., Rawski, S., & Perry, E. (2018).  Training managers to handle sexual harassment complaints: A longitudinal examination.  *Human Resource Development Quarterly*, 30, 81-100.

Grossman, J. L. (2003).  The culture of compliance: The final triumph of form over substance in sexual harassment law.  *Harvard Women's Law Journal*, 26, 3-75.

Johnson, S.K. & Hekman, D.R. 2016.  Women and minorities are penalized for promoting diversity.  *Harvard Business Review*, March 23, 2016.

Kalinoski. Z., Steele-Johnson, D., Peyton, E., Leas, K., Steinke, J., & Bowling, N. (2013).  Meta-analytic valuation of diversity training outcomes.  *Journal of Organizational Behavior*, 34, 1076-1104.

Kath, L., Swody, C., Magley, V., Bunk, J., Gallus, J. (2009).  Cross-level, three-way interactions among work-group climate, gender, and frequency of harassment on morale and withdrawal outcomes of sexual harassment.  *Journal of Occupational and Organizational Psychology*, 82, 159-182.

Latham, G. P., & Wexley, K. N. (1994).  *Increasing Productivity Through Performance Appraisal, 2nd Edition*.  Addison Wesley Publishing:  Reading, MA.

Lucero, M., Allen, R., & Middleton, K. (2006).  Sexual Harassers: Behaviors, Motives, and Change Over Time.  *Sex Roles*, 55, 331-343.

Medeiros, K., & Griffith, J. (2019).  #Ustoo: How I-O psychologists can extend the conversation on sexual harassment and sexual assault through workplace training.  *Industrial and Organizational Psychology: Perspectives on Science and Practice*, 12(1), 1-19.

McKay, P. F., Avery, D. R., & Morris, M. A. (2008).  Mean racial-ethnic differences in employee sales performance: The moderating role of diversity climate.  *Personnel Psychology*, 61, 349-374.

Huang, J., Krivkovich, A., Starikova, I., Yee, L., Zanoschi, D. (2019).  Women in the Workplace.  *McKinsey and Company*, October 2019.

Mor Barak, M. E., Cherin, D. A., & Berkman, S. (1998).  Organizational and personal

    dimensions in diversity climate: Ethnic and gender in Employee Perceptions.  *Journal of*

    *Applied Behavioral Science*, 34, 82-104.

Nielsen, K. & Randall, R. (2013).  Opening the black box: Presenting a model for evaluating

    organizational-level interventions.  *European Journal of Work and Organizational*

    *Psychology*, 22(5), 601-617.

Nishii, L. H. (2013).  The benefits of climate for inclusion for gender diverse groups.  *Academy*

    *of Management Journal*, 56, 1754–1774.

Nishii, L., Gotte, A., & Raver, J. (2007).  Upper echelon theory revisited: The relationship

    between upper echelon diversity, the adoption of diversity practices, and organizational

    performance.  *CAHR Working Paper Series*, Paper 41.

Noe, R. A. (2002).  *Employee Training & Development, 2nd Edition*.  McGraw-Hill: Boston, MA.

Phillips J. M. (1998).  Effects of realistic job previews on multiple organizational outcomes: A

    meta-analysis.  *Academy of Management Journal*, 41(6), 673-690.

Pryor, J. B. (1987).  Sexual harassment proclivities in men.  *Sex Roles*, 17(5), 269-290.

Roberson Q. M. (2006).  Disentangling the meanings of diversity and inclusion in

    organizations. *Group & Organization Management*.  31(2), 212-236.

Russel M. S. & Lepler L. M. (2017).  How we Closed the Gap Between Men's and Women's

    Retention Rates.  *Harvard Business Review*.  19 May 2017.

Sabat, I. E., Goldberg, C., King, E. B., Watson, J., & Zhang, L. (2020).  Pygmalion in the
    pipeline: How managers' perceptions influence racial differences in turnover.  *Human
    Resource Management*.

Shore, L. M., Cleveland, J. N., & Sanchez, D. (2017).  Inclusive workplaces: A review and
    model.  *Human Resource Management Review*, 28, 176-189.

Tziner, A. & Birati, A. (1996).  Assessing employee turnover costs: A revised approach.  *Human
    Resource Management Review*, 6(2), 113-122.

Willness, C. R., Steel, P., Lee, K. (2007).  A meta-analysis of the antecedents and consequences
    of workplace sexual harassment.  *Personnel Psychology*, 60, 127-158.

Wittenberg-Cox, A. (2017).  Deloitte's radical attempt to reframe diversity.  *Harvard Business
    Review*, 3 August 2017.

**Appendix 4A:**
**Complaints Implicating Leadership**

| Male Bad Actor | Committee(s) | Investigation Bates No. | Sexual Harassment |
|---|---|---|---|
| ███ | ███ | GS0380595 | |
| ███ | ███ | GS0167617 - GS0167630 | |
| ███ | ███ | GS0162025 - GS0162130 unredacted | |
| ███ | ███ | GS0138154 - GS0138167 unredacted | |
| ███ | ███ | GS0145365 - GS0145369 redacted GS0158587 - GS0158591 unredacted | |
| ███ | ███ | GS0240315-GS0240319 unredacted | |
| ███ | ███ | GS0145370 - GS0145373 redacted | |
| ███ | ███ | GS0162025 - GS0162130 unredacted | |
| ███ | ███ | GS0161431 - GS0161478 unredacted | |
| ███ | ███ | GS0161431 - GS0161478 unredacted | |
| ███ | ███ | GS0175490 - GS0175530 unredacted | |
| ███ | ███ | GS0381596 GS0175828 - GS0175871 unredacted | |
| ███ | ███ | GS0146086 - GS0164089 redacted GS0158575 - GS0158579 unredacted | |
| ███ | ███ | GS0158751 - GS0158759, GS0175157 - GS0175173 unredacted | |
| ███ | ███ | GS0135481 - GS0135490 redacted GS0158592 - GS0158601, GS0176083 - GS0176104 unredacted | |
| ███ | ███ | GS0175315 - GS0175402 unredacted | X |
| ███ | ███ | GS0158793 - GS015877, GS0176125 - GS0176129 unredacted | |
| ███ | ███ | GS0138133 - GS0138137, GS0139908 - GS0139914 redacted GS0158618 - GS0158628 unredacted | |

| Male Bad Actor | Committee(s) | Investigation Bates No. | Sexual Harassment |
|---|---|---|---|
| ▮▮▮ | ▮▮▮ | GS0135481 - GS0135490 redacted<br><br>GS0158592 - GS0158601, GS0176083 - GS0176104 unredacted | |
| ▮▮ | ▮▮▮ | GS0175434 - GS0175488 unredacted | X |
| ▮▮ | ▮▮ | GS0135501 - GS0135506 redacted<br><br>GS0158917 - GS0158922, GS0161789 - GS0162009 unredacted | X |
| ▮▮ | ▮▮ | GS0135522 - GS0135524 redacted<br><br>GS0158760 - GS0158762, GS0175251 - GS0175290 unredacted | |
| ▮▮ | ▮▮ | GS0162357 - GS0192465 unredacted | X |
| ▮▮▮ | ▮▮▮ | GS0167709 - GS0167711 unredacted | |
| ▮▮ | ▮▮▮ | GS0135481 - GS0135490 redacted<br><br>GS0158592 - GS0158601, GS0176083 - GS0176104 unredacted | |
| ▮▮▮ | ▮▮ | GS0146106 - GS0146129 redacted, GS0158525 unredacted | X |

## Appendix 4B:
## Sexual Harassment Complaints



**Investigation Bates No.**

