# EXHIBIT 27

# EXPERT SUR-REBUTTAL REPORT

***Chen-Oster, et al. v.***
***Goldman, Sachs & Co. and The Goldman Sachs Group, Inc.***
**(Case Number 10-CV-06950)**

**Eric M. Dunleavy, Ph.D.**
**DCI Consulting Group**

**April 19, 2021**

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ....................................................................................................4

RESPONSES TO DR. CASCIO ...............................................................................................7

I. Dr. Cascio is Wrong that Validation is Required and the Accumulation of Validation Evidence I Present is Insufficient. ..........................................................................................7

A. Dr. Cascio's Attempt to Impose a Requirement of Predictive Criterion-Related Validity is Unfounded and Unwarranted .......................................................................7

B. Dr. Cascio's Claim that Validation is Required is Predicated on the Unestablished Premise that there are Gender Gaps in the Challenged Processes and the Incorrect Claim that the 360 Feedback Review and Manager Quartiling Processes are Selection Procedures.........................................................................................................11

C. Dr. Cascio is Wrong that a Predictive Criterion-Related Validation Study of the Cross-Ruffing Process is Required to Show Prediction of Performance as an Extended Managing Director ........................................................................................15

D. The Accumulation of Validation Evidence I Present is Sufficient and is Not "Contrary To Professional Standards" as Dr. Cascio Claims ......................................18

E. Even if Predictive Criterion-Related Validation was the Only Acceptable Validation Evidence (It Is Not), My Analyses Demonstrate Criterion-Related Validity .............21

II. Dr. Cascio's Assertion that My Analyses Have "Critical Methodological Deficiencies" is Baseless...........................................................................................................................23

A. Dr. Cascio's Criticism of the Use and Application of 360 Feedback Review Overall Average Ratings is Unfounded and Irrelevant ..........................................................24

B. Dr. Cascio is Wrong that My Computation and Interpretation of $r_{WG}$ are Methodologically Deficient and Do Not Support the Reliability of the 360 Feedback Review ......................................................................................................................25

III. Dr. Cascio's Other Criticisms are Baseless. .............................................................................40

A. Dr. Cascio's Criticisms of My Analysis of "Potential" are Unfounded .....................40

B. Dr. Cascio is Wrong in Suggesting that Guardrails Do Not Bear on the Reliability and Validity of the 360 Feedback Review and Manager Quartiling Processes .................43

C. Dr. Cascio is Wrong that Goldman Sachs was Required to Offer Suitable Alternative Systems .......................................................................................................................46



CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

CONCLUSION .....47

References .....48

Materials Considered .....51

Appendix A: Statistical Study 7 ..... A-1

Appendix B: Statistical Study 8 .....B-1

## LIST OF TABLES

**Table 1.** Hypothetical Response Patterns for Five Reviewers Providing 360 Feedback Review Ratings on a 5-Point Scale and Associated $r_{WG}$ Values Assuming a Null Distribution with a Heavy Skew .....30

**Table 2.** 360 Feedback Review Average Overall Score Agreement ($r_{WG}$) Results for the 5-Point Scale Using Slight Skew Null Distribution Variances of 1.34 and 1.72 .....33

**Table 3.** 360 Feedback Review Average Agreement ($r_{WG}$) Results Across All Relevant Competencies for the 5-Point Scale Using Slight Skew Null Distribution Variances of 1.34 and 1.72 .....35

## LIST OF FIGURES

**Figure 1.** Binning and Barrett (1989) Validation Framework .....15

**Figure 2.** Accumulation of Validity Evidence for the Challenged Processes .....20

**Figure 3.** Distribution of $r_{WG}$ Estimates from Dr. Farber's Simulation for IBD Vice Presidents 2006 .....38

**Figure 4.** Distribution of $r_{WG}$ Estimates from Dr. Farber's Simulation for Securities Associates 2013 .....39

## EXECUTIVE SUMMARY

Dr. Cascio submitted a Rebuttal Report (3/19/21) in which he asserts that (i) I did not validate the Challenged Processes for the purposes for which they were used; (ii) I fail to explain gender-based gaps in Goldman Sachs' performance review and promotion systems; (iii) my analyses of inter-rater agreement have methodological deficiencies; (iv) I ignore issues with managers' ratings of Potential; (v) my opinions about guardrails do not serve as evidence of validity; and (vi) I did not address suitable alternatives to Goldman Sachs' performance review and promotion systems. Counsel for Defendants have asked me to evaluate the opinions offered by Dr. Cascio, which I do herein.[1] Specifically:

In **Section I**, I explain that Dr. Cascio is wrong that validation of the Challenged Processes is required and that the Challenged Processes have not been fully validated. Faced with the accumulation of validation evidence in my opening Job Relatedness Report,[2] in his 3/19/21 report Dr. Cascio moves the goalposts by claiming that job relatedness of the Challenged Processes can only be demonstrated through a predictive criterion-related validity study (contrary to the several other ways to show validity he previously outlined). Dr. Cascio has no legitimate basis to impose this higher standard. His opinion appears to be based on one study conducted in 1974. Further, he ignores the overwhelming evidence of validation from the 13 studies presented in my previous reports. But I summarize additional research in this report to show that even if Dr. Cascio's new standard (i.e., predictive criterion-related validation) was required (it is not), the Challenged Processes demonstrate criterion-related validity across corporate titles when this research was

---

[1] I do not endeavor to address every single point raised in Dr. Cascio's 3/19/21 report; many of Dr. Cascio's criticisms have already been addressed in my two prior reports (i.e., Job Relatedness Report dated 1/15/21 ("Job Relatedness Report") and Rebuttal Report dated 3/19/21 ("Rebuttal Report")).

[2] I have no updates to the Rule 26 disclosures made in my January 15, 2021 Job Relatedness Report.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

feasible. Figure 2 (shown on p.20) summarizes **15 studies** related to the Challenged Processes in this matter, all of which provide an accumulation of evidence supporting the reliability and validity of the Challenged Processes.

In **Section II**, I show that Dr. Cascio's assertion that my analyses have "critical methodological deficiencies" is baseless. My calculations are appropriate and based on reasonable statistical assumptions. Dr. Cascio's critiques often plainly ignore the studies I conducted and detailed in my prior reports. Moreover, Dr. Farber's own simulation involving $r_{WG}$, referenced in Dr. Cascio's report, actually provides additional evidence that the 360 Feedback Review ratings were reliable.

In **Section III**, I refute Dr. Cascio's assertions that (i) my analysis of "Potential" is flawed; (ii) guardrails do not bear on the reliability and validity of the 360 Feedback Review and Manager Quartiling processes; and (iii) I was required to address suitable alternatives to Goldman Sachs' performance review and promotion systems. If the assessments of Potential were unreliable, as Dr. Cascio claims, the results of my statistical studies involving Manager Quartile assignments would not have shown significant positive correlations, including with objective metrics. And Dr. Cascio is simply wrong when he states that I have attempted to validate the Challenged Processes by references to guardrails. I have never stated that guardrails are *direct* evidence of validity — but they *enhance* reliability and validity, are available when a validation study may not be feasible, and they support the job relatedness of each Challenged Process. Finally, Dr. Cascio is wrong on his last claim — I do not need to address suitable alternatives because (a) the presence of adverse impact has not been established; (b) the 360 Feedback Review and Manager Quartiling processes are not selection procedures; and (c) the *Uniform Guidelines* address consideration of alternatives at the outset of implementation of a selection procedure (when multiple processes are being

considered and available for research), something that cannot be done almost two decades after implementation. Further Dr. Cascio does not opine that any of the Challenged Processes caused the alleged adverse impact and has not demonstrated any equally valid alternatives supposedly having a "lesser adverse impact."

In summary, as described in my prior reports, the validation evidence is overwhelming and Dr. Cascio's unfounded criticisms do not alter my conclusions that the Challenged Processes are valid, reliable, and job-related.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

## RESPONSES TO DR. CASCIO

### I. Dr. Cascio is Wrong that Validation is Required and the Accumulation of Validation Evidence I Present is Insufficient.

#### A. Dr. Cascio's Attempt to Impose a Requirement of Predictive Criterion-Related Validity is Unfounded and Unwarranted.

Confronted with the results of the analyses in my opening Job Relatedness Report — which directly addresses and rebuts Dr. Cascio's prior criticisms in this case — Dr. Cascio attempts to move the goalposts in his 3/19/21 Rebuttal Report. In all of his prior reports submitted in this litigation, Dr. Cascio's primary criticism concerning the validity of the Challenged Processes has been that Goldman Sachs has offered no evidence of the validity of the processes "as implemented" (Cascio 1/28/14 Report para 5b; Cascio 2/18/14 Report para 20; Cascio 5/19/14 Report para 2; Cascio 1/15/21 Report paras 62, 89). As I explain in my opening Job Relatedness Report and my Rebuttal Report, validation of the Challenged Processes "as implemented" is not required by any authority, nor is it typically done in practice (Job Relatedness Report, pp.3, 9; Rebuttal Report, pp.5, 9-10). But given Dr. Cascio's criticisms, I performed precisely the type of empirical studies prescribed by Dr. Cascio, the results of which are direct evidence of that the Challenged Processes are valid. These and other studies were summarized in my opening Job Relatedness Report. Specifically:

- In his 10/30/13 report, Dr. Cascio claimed that "Goldman Sachs lacks reliable, valid measures of potential in the quartiling process, and provides no assessment of inter-rater agreement in the 360-degree review process" (para 17). **I assessed inter-rater agreement and other approaches related to measurement consistency "in the 360-degree review process" (Job Relatedness Report, pp.36-40, Appendix 4E). Yet now Dr. Cascio claims that these studies are not enough.**
- In his 1/28/2014 report, Dr. Cascio stated, "In my opinion, if it wanted to adopt a proper system, and was prepared to accept the outcome, Goldman Sachs would subject its practices (*e.g.*, the 360-degree performance review as implemented, the forced ranking, and the compensation-setting) to the rigor of formal reliability and

validation studies. One such strategy would be to examine the relationship (correlation) between performance ratings (360-degree ratings and Quartile rankings) at Time 1 and performance ratings of the same individuals at a later time (*e.g.*, in the next year's performance-evaluation cycle). This is a form of test-retest reliability, even though the 360-degree raters might not constitute an identical set" (para 25). **I assessed the temporal consistency (i.e., a "form of test-retest reliability" as Dr. Cascio describes it) of both 360 Feedback Review ratings and Manager Quartile assignments (Job Relatedness Report, pp.39-40, 57-58). In fact, Dr. Cascio seems to concede that I performed test-retest reliability analyses when he discusses my "use of overall 360 ratings… in estimates of inter-temporal (or test-retest) reliability" (Cascio Expert Report, 3/19/21, para 52). Yet now Dr. Cascio claims that these studies are not enough.**

- In that same report, Dr. Cascio continued: "Yet [assessing test-retest validity] is by no means the only possible strategy. Promotion decisions, for example, are possible criteria to consider in validating performance appraisal and compensation systems. If individual performance really does predict important outcomes such as compensation or promotion decisions, then presumably there should be a high degree of relationship (correlation) between performance ratings (360-degree reviews or Quartile assignments) and bonuses or promotions" (para 25). **I performed such analyses, which demonstrated statistically significant correlations in a positive direction between 360 Feedback Review ratings and promotions and Manager Quartile assignments and promotions (Job Relatedness Report, pp.81-84). Yet now Dr. Cascio claims that these studies are not enough.**

- In his 1/15/21 report Dr. Cascio again pointed to analyses such as "interrater agreement" as analyses that would show reliability (para 69). Over the course of eight years Dr. Cascio's opinion regarding the need to show reliability did not change. **I not only conducted inter-rater agreement analyses, I also conducted intra-rater agreement analyses (Job Relatedness Report, pp.36-40, 57-58, Appendices 4E, 4F, and 5E). Yet now Dr. Cascio claims that these studies are not enough.**

As such, in my opening Job Relatedness Report I summarized specific studies (among others) that evaluated temporal consistency, rater agreement and reliability, and whether the Challenged Processes correlated with promotion outcomes, all of which Dr. Cascio himself recommended in previous reports. Now, in his 3/19/21 Report, Dr. Cascio asserts that my analyses "fall short" because they do not "establish the validity of each system for the purpose for which it is used—prediction" and there "is no evidence of criterion-related validity for any of these


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

systems" (para 37). Dr. Cascio claims — contrary to his prior statements — that the only sufficient validation evidence is (i) a criterion-based validity study of an employment process "as implemented" that (ii) analyzes a process "for [its] ability to *predict* relevant workplace behaviors," such as "quality of [*sic*] quantity of job performance" and "advancement" (para 32). In other words, according to Dr. Cascio, now nothing but a criterion-related study predicting performance in a future role will sufficiently establish job relatedness. Dr. Cascio is wrong. And, notably, he refuses to perform any studies to actually evaluate validity, as I have done. As I have explained and demonstrated in my prior reports (and as further discussed below), criterion-related validity of the Challenged Processes is not necessary and there is also no requirement to perform such analysis for the specific purpose of assessing the predictive value of employment processes (as opposed to their validity in measuring current performance). Dr. Cascio's new criticism also ignores my analyses that *did in fact* demonstrate a correlation between current performance assessments and future outcomes. As noted above, Dr. Cascio himself specifically mentions "advancement" as a relevant work behavior and recommended a study of promotion outcomes; Statistical Study 6 found strong correlations between performance ratings (i.e., 360 Feedback Review overall score and Manager Quartile assignment) with promotion to Extended Managing Director. How these results from my opening Job Relatedness Report do not directly meet his new and unwarranted standard related to "advancement" is a conundrum. Dr. Cascio also continues to ignore the preponderance of evidence I have summarized in my opening Job Relatedness Report that includes 13 individual studies (supplemented by two statistical studies described later in this report) that all support the Challenged Processes.

Further, Dr. Cascio's assertion that a predictive criterion-related validity study was required at some point *in the past* (see 3/19/21 Cascio Report para 20 ("Dr. Dunleavy's own report

confirms that Goldman Sachs should have attempted to validate its systems in real time, and not only after many years of litigation") is wrong for several reasons.

1. The content validation conducted by the HR consulting firms, PDI and APTMetrics, were performed in "real time" and this validation work was sufficient.

2. A criterion study, or any other type of validity study, would not have been required under the *Uniform Guidelines Questions & Answers* unless there were "substantially different rates of selection" (No. 11) in the Challenged Processes (there were not).

3. Prior to March 19, 2021 Goldman Sachs could not have known that Dr. Cascio would stake out the novel (and unsupported) position that a predictive criterion-related validity study across corporate titles is the only acceptable approach to show job relatedness. Although Dr. Cascio indicates that this is a mandatory study that was feasible and that Goldman Sachs should have undertaken years ago, there is no such requirement under the *Uniform Guidelines* or any other authority in I/O psychology.

The essential question is *whether* the Challenged Processes are reliable and valid. They are. The 15 studies summarized in Figure 1 demonstrate this. Dr. Cascio's preoccupation with *when* these studies occurred is irrelevant.[3]

Indeed, had Dr. Cascio taken the time to evaluate the available data and factors that he knows affect the feasibility of predictive criterion research across corporate titles, he would likely have concluded that such research was in fact difficult if not impossible. With regard to correlating performance in the corporate title of Associate with future performance of those individuals promoted into the corporate title of Vice President, some data were available, but as expected, sample sizes were very small and restriction of range limited variability. These data certainly do not meet Dr. Cascio's acknowledgement that "hundreds of subjects, or even several thousand" should be available for analysis in a criterion validation study (Cascio & Aguinis, 2019, p.157).

[3] Even if the question did relate to the timing of the validation, the PDI and APTMetrics studies, in 2003 and 2011, satisfied any requirements to validate.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

Such a study is not one that I would normally view as feasible, nor recommend, given these limitations, but I nevertheless performed Statistical Study 8, the results of which show that even under Dr. Cascio's new validation standard, the Challenged Processes are reliable and valid (see **Appendix B**).

### B. Dr. Cascio's Claim that Validation is Required is Predicated on the Unestablished Premise that there are Gender Gaps[4] in the Challenged Processes and the Incorrect Claim that the 360 Feedback Review and Manager Quartiling Processes are Selection Procedures.

Dr. Cascio's claim that Goldman Sachs was required to (and did not) validate the Challenged Processes is also based on fundamental misconceptions.

#### i. I Disagree with Dr. Cascio that there are Gender Gaps that Require Validation.

In his Rebuttal Report, Dr. Cascio asserts that the reliability and validity analyses in my opening Job Relatedness Report "fail to explain gender-based gaps in Goldman Sachs' performance-review and promotion systems" (paras 21-25). This assertion is premised on the assumption that there *are* such "gender-based gaps" in the Challenged Processes. The only evidence Dr. Cascio points to for this is the January 15, 2021 report of Plaintiffs' expert Dr. Farber (paras 21-25). According to Dr. Cascio, "[b]y not addressing or offering explanations for any of these gender-based gaps [in Dr. Farber's report], [I] fail[] to address the key issues in this case" (para 24).

This criticism is baseless for two obvious reasons. First, it would have been impossible for my report to address the opinions of Dr. Farber, because my opening Job Relatedness Report was submitted the same day as Dr. Farber's report. Second, I was not asked to address the opinions of

[4] According to the *Uniform Guidelines* validation would only have been required if there were "substantially different rates of selection" (Q&A 11).

Dr. Farber. I understand that Dr. Shaw was retained by Goldman Sachs for that purpose. I have reviewed Dr. Shaw's March 19, 2021 report and her analyses and opinions contradict those of Dr. Farber. Specifically, Dr. Shaw concludes, "There is no evidence of systemic gender bias in 360 review scores, manager quartiling, or promotions…" (Shaw Expert Report, 3/19/21, p.122) and "it is clear that the 360 review, OMR, manager quartiling, and promotion processes are not systemically biased against class members" (Shaw Expert Report, 3/19/21, para 238). Thus, the premise that there is adverse impact against women caused by the Challenged Processes is at a minimum, disputed and at most, wrong.

Therefore, I do not concede or agree with Dr. Cascio that there are, in fact, gender gaps that require explanation. But in any event, my opening Job Relatedness Report and my Rebuttal Report show that the Challenged Processes have been adequately validated and are job related, despite Dr. Cascio's claims to the contrary.

**ii. I Disagree with Dr. Cascio that the 360 Feedback Review and Manager Quartiling Processes are Selection Procedures.**

Dr. Cascio continues to assert that the 360 Feedback Review and Manager Quartiling processes are selection procedures — and so, by his reasoning, must be subject to criterion validation that assesses their validity as predictors of future performance. Dr. Cascio bases this claim on his theory that a purported key purpose of the processes is to "predict future performance as an Extended Managing Director" (para 17). Dr. Cascio's reasoning is convoluted and unsupported by either the *Uniform Guidelines* or the *SIOP Principles.*

As I described in my prior reports, the 360 Feedback Review and Manager Quartiling processes are performance measures. Their key purpose is to assess actual current/recent past performance, which is obviously different from a selection procedure used in a hiring process and intended to predict future performance. I have thoroughly explained why the 360 Feedback

Review and Manager Quartiling processes are not selection procedures in those two reports (Job Relatedness Report, pp.8-14, Rebuttal Report, footnote 7), so I respond only briefly to Dr. Cascio's arguments here.

Dr. Cascio points to Pulakos and Rose (2019) as support for his contention that "[in] the context of promotion, the 360 Feedback Review and Manager Quartile assignments are used to predict future performance as an Extended Managing Director. In that context, therefore, they are selection devices. As such, criterion-related evidence must focus on performance in the higher-level job" (para 17). As a threshold matter, while Pulakos and Rose (2019) argue that performance assessments can sometimes be selection tools (e.g., identification of "high potentials," selection of leaders), that is not the approach to promoting Vice Presidents to Extended Managing Director at Goldman Sachs. Instead, there is an entirely separate process, the Cross-Ruffing process, that is used to select Vice Presidents for promotion to Extended Managing Director roles. Pulakos and Rose (2019) expressly recognize that performance assessments such as the 360 Feedback Review are criterion measures, *that is*, measures of <u>current</u> performance, whose use can be limited to addressing/rewarding current performance:

> "As a criterion measure, 360 ratings can be used as a *basis for rewarding current performance* or, alternatively, to justify terminations or other performance actions. 360 ratings can also be used as a criterion measure against which predictors can be validated. What distinguishes the criterion use case is that the 360 ratings must capture how effectively each person is performing on the job today" (p.309, emphasis added).[5]

These authors accurately reflect that the 360 degree ratings are a criterion measure — (e.g., a measure of current performance) — because it is used as a "basis for rewarding current

[5] "**Criterion.** A measure of work performance or behavior, such as productivity, accident rate, absenteeism, tenure, reject rate, training score, and supervisory ratings of job relevant behaviors, tasks or activities" (*SIOP Principles*, 2018, p.47).


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

performance."

The fundamental flaw of Dr. Cascio's logic (i.e., that the 360 Feedback Review and Manager Quartiling processes "are selection procedures, and therefore must be analyzed for their ability to predict relevant workplace behaviors") (para 32) — is further shown by compensation experts Gerhart and Newman (2020) who state, "Merit payments are based on an assessment (or rating) of recent past performance made (with or without a formal performance evaluation)" (p.14). In other words, awarding merit increases or bonuses is generally an annual exercise based on a retrospective review of current/recent past performance but it is not based on a prediction of future performance.

Also, Binning and Barrett's (1989) validation framework, which is well accepted in I/O psychology, recognizes performance as a criterion measure, not a predictor. As shown in **Figure 1**, performance outcomes (i.e., 360 Feedback Review and Manager Quartiling) are represented by the black dotted box (B) whereas a predictor is represented by the blue dotted box (A). My view is consistent with Binning and Barrett's — that predictors (such as selection procedures) are differentiated from actual performance outcomes (which may be measured by performance assessments). Dr. Cascio, despite devoting several pages of his textbook to explaining this paradigm (Cascio & Aguinis, 2019, pp.75-77), conveniently fails to acknowledge it in his Rebuttal Report.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

**Figure 1. Binning and Barrett (1989) Validation Framework**




In summary, the 360 Feedback Review and Manager Quartiling processes function primarily as evaluations of current performance and/or to aid development — not as predictors of future performance — and thus are not selection procedures (such as employment tests that are part of a hiring process and explicitly designed to predict future performance).

### C. Dr. Cascio is Wrong that a Predictive Criterion-Related Validation Study of the Cross-Ruffing Process is Required to Show Prediction of Performance as an Extended Managing Director.

As detailed in my opening Job Relatedness Report, the Cross-Ruffing process has already been content validated by two reputable HR consulting firms (PDI and APTMetrics), and validated as implemented by my studies (pp.20-26). Notably, Dr. Cascio does not dispute this. Instead, he asserts in his Rebuttal Report that an *additional* study validating the predictive performance of Cross-Ruffing is required to establish validity. It is not, for the reasons explained above and in my two prior reports; there simply is no single mandatory approach by which to establish validity, and


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

the array of studies I performed is more than sufficient.[6] Dr. Cascio, moreover, assumes that the additional validation study he suggests related to Extended Managing Director performance is feasible — which it is not.[7]

Dr. Cascio cites the *SIOP Principles* regarding the availability of appropriate criterion measures, the availability and representativeness of the research sample, and the adequacy of statistical power, and states "all of the conditions necessary to satisfy the technical feasibility of criterion-related validity studies exist at Goldman Sachs" (para 41). But Dr. Cascio ignores that (i) Extended Managing Director performance information (i.e., 360 Feedback Review, Manager Quartile assignments, and objective metrics[8]) has not been produced in this matter and (ii) the small Extended Managing Director classes present sample size challenges — and thus it is not feasible for me to conduct the predictive criterion-related validation study he demands. Dr. Cascio merely assumes such a study is feasible without evaluating it in this circumstance.

Because Dr. Cascio and I have access to the same database, he could have directly evaluated these feasibility factors himself but did not. This is consistent with Dr. Cascio's

[6] In my Rebuttal Report I establish that content validation is sufficient (pp.8-11).

[7] Notwithstanding, I completed another study, Statistical Study 7, to provide additional validation evidence related to promotion to Extended Managing Director. Using available data I evaluated the relationship between the Division-specific objective metrics (described in Statistical Study 5) and promotion from Vice President to Extended Managing Director (described in Statistical Study 6). The aggregated results of the Spearman correlation coefficients and associated statistical significance levels are summarized in **Appendix A.** The majority of correlations between the Division-specific objective metrics and nomination and promotion are statistically significant, in the positive direction, and consistent with typical findings from the I/O psychology literature. These results show that Vice Presidents with stronger objective metrics were more likely to be nominated and promoted to Extended Managing Director.

[8] Dr. Cascio criticizes the objective metrics I used as unreliable because they are not available for all employees, because some metrics are supposedly "ambiguous," and because (he claims) I failed to include available metrics without explanation (para 34). I used only objective metrics that were attributable by individual within a Division and available widely within a Division as opposed to only for a small percentage of professionals. Objective metrics that did not meet these criteria would not have been appropriate for inclusion in my studies due to the need for individualized data and sufficient sample sizes.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

approach in this case: he claims the Challenged Processes are invalid but he refuses to perform any studies to evaluate validity. Given the preponderance of evidence across the 15 studies I have presented in this matter, and the fact that the same competency model exists across corporate titles, it is very likely that performance in the corporate title of Vice President would correlate with performance in the corporate title of Extended Managing Director if a predictive criterion-related study were feasible. Dr. Cascio's previous acknowledgement of past performance being "one of the best predictors of future behavior" (Cascio & Aguinis, 2005, p.357) also supports this expectation.

Dr. Cascio appears to base his claim that such a criterion study was "clearly possible" on a single study by AT&T in 1974 (paras 85-86). In fact, this is the only source he references in arguing for his new job relatedness standard of a predictive criterion-related validity study across corporate titles. The AT&T study was an 8-year longitudinal evaluation by an in-house assessment center requiring six days of testing per employee and involving hundreds of contributors. If such research were often feasible and frequently performed it would be reasonable to expect additional research examples that had been conducted more recently than 47 years ago. The study also has nothing to do with operational performance measures, further limiting its relevance. As such, the AT&T study has no bearing on what may be feasible in other organizations or in other settings, and using it as a feasibility comparison is both arbitrary and nonsensical.

Further, the AT&T study has no bearing on the *Uniform Guidelines* requirements for validation. What was done as part of a selection procedure validation study performed before the *Uniform Guidelines* were written does not make it the standard against which to evaluate all validation research. In my many years as a I/O psychology practitioner I have not participated in a study like the AT&T one, though I have conducted many large scale validation studies consistent



CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

with the requirements of the *Uniform Guidelines*.

### D. The Accumulation of Validation Evidence I Present is Sufficient and is Not "Contrary To Professional Standards" as Dr. Cascio Claims.

Dr. Cascio's assertion that my analyses are insufficient evidence of validity because they "only . . . try to show content-based validity" and there is "no evidence of criterion-related validity" (para 37) is based on an indefensibly narrow interpretation of validity that is entirely unsupported by the contemporary I/O psychology literature, which recognizes that "all evidence" is relevant to validity. As described in my opening Job Relatedness Report and Rebuttal Report, there is ample evidence supporting the reliability, validity, and job relatedness of the Challenged Processes.

In one of the most influential articles on validity since the implementation of the *Uniform Guidelines*, Landy (1986) stated, "Simply because the goal is to draw inferences about future job performance from present test scores, it does not necessarily follow that criterion-related validity strategies are the only means for documenting the soundness of those inferences" (p.1187).[9] And more recently, another eminent I/O psychologist, Thornton (2009) elaborated on Landy's interpretation of validity. This interpretation, as I stated in my Rebuttal Report**,** is now universally accepted within the field:

> "Landy (1986) admonished us to stop 'stamp collecting' when validating tests. He likened claims about a test's validity to hypotheses that are tested by gathering varieties of evidence. **There are NOT distinct and different types of validity** labeled 'content validity,' 'predictive validity,' 'content validity,' [sic] and 'construct validity.' Rather, all evidence bears on the validity of a test. **This means that we should not be trying to gather just one type of evidence to support one inference and another type of evidence to support another inference. All evidence that accumulates over time contributes to our understanding of a unitary concept of validity**" (Thornton, 2009, p.470, emphasis added).

[9] Importantly, Dr. Landy is referring to the validity of selection procedures (test scores). By definition, he is not referring to measures of current/recent past performance because the candidates generating the test scores would not yet have been hired. As I noted in my opening Job Relatedness Report, the distinction between selection procedure and operational performance measure cannot be ignored.

> "Professional judgments about the validity of a test involve a careful consideration of the variety of diverse evidence that has been accumulated about the test. **We are long past the point when we are just 'stamp collecting' (Landy, 1986) and looking for one type of evidence, namely, predictive correlations. A valid test is one with diverse supporting evidence**" (Thornton, 2009, p.471, emphasis added).

My opening Job Relatedness Report presents precisely the "diverse supporting evidence" of validity described by Thornton. As depicted in **Figure 2,** below, the preponderance of accumulated evidence of validity for the Challenged Processes includes two foundational competency model studies, five Consensus Studies, and eight Statistical Studies that contribute to an overall predominant accumulation of validity. More specifically the validity evidence is comprised of:

- Three studies of agreement/reliability (i.e., inter-rater agreement of the 360 Feedback Review, intra-rater temporal consistency of the 360 Feedback Review, and intra-rater temporal consistency of Manager Quartile assignments) (Statistical Studies 1-3).
- One study correlating 360 Feedback Review ratings and Manager Quartile assignments (Statistical Study 4).
- One study correlating 360 Feedback Review ratings and Manager Quartile assignments with objective metrics (Statistical Study 5).
- One study correlating 360 Feedback Review ratings and promotion outcomes and also correlating Manager Quartile assignments and promotion outcomes (Statistical Study 6).
- One study correlating promotion outcomes with objective metrics (Statistical Study 7).
- One study using performance as an Associate to predict future performance as a Vice President (Statistical Study 8, described below).
- Two content validation studies of the 360 Feedback Review.
- Two Consensus Studies providing foundational support for the 360 Feedback Review (Consensus Studies 1-2).


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

- Two Consensus Studies providing foundational support for Manager Quartiling (Consensus Studies 3-4).
- One Consensus Study providing foundational support for Cross-Ruffing (Consensus Study 5).

In total, there are **15 studies** all supporting the reliability and validity of the Challenged Processes, 13 of which were presented in my opening Job Relatedness Report.

**Figure 2. Accumulation of Validity Evidence for the Challenged Processes**




In summary, this varied and extensive evidence of validity overwhelmingly supports the job relatedness of each Challenged Process. Further evidence of validity is not required. But even

if it were, Statistical Study 8, discussed below, provides the exact type of evidence Dr. Cascio now demands.

### E. Even if Predictive Criterion-Related Validation was the Only Acceptable Validation Evidence (It Is Not), My Analyses Demonstrate Criterion-Related Validity.

Predictive criterion-related validity studies are often infeasible, and even when feasible present several challenges that may unduly impact the interpretation of results. These challenges are further exacerbated in the context of operational performance measures, as opposed to selection procedures used in the context of hiring. These challenges include the following:

1. Sample sizes are necessarily smaller in a predictive study. Because smaller samples invariably lead to underpowered statistical tests, studies like these are often considered infeasible. In my experience this is a common reason why criterion research is not feasible.

2. Range restriction, particularly on a performance measure of the lower-level role (given that stronger performers are often those promoted to the higher-level role that provides the "future performance" Dr. Cascio requires), can inhibit the ability to detect significant relationships between variables (Bobko, 2001; Salgado & Moscoso, 2019; Sackett, Laczo, & Arvey, 2002). In other words, analyses across corporate title can only include professionals promoted to the higher corporate title, and as I showed in my opening Job Relatedness Report, most professionals promoted into higher level jobs have been very high performers. When everyone in a study is a high performer in their cohort, there may be relatively little variability in performance to identify in a criterion validation study. In my experience this is a frequent reason why criterion research is not feasible.

Dr. Cascio recognizes these practical constraints of criterion-related validation research in his own work:

> "In planning validation research, certain issues deserve special consideration. One of these is sample size. Inadequate sample sizes are often the result of practical constraints on the number of available individuals" (Cascio & Aguinis, 2019, p.156).
>
> "In criterion-related validity studies, power is frequently overestimated because of a failure to consider the combined effects of range restriction in both the predictor and the criterion, criterion unreliability, and other artifacts that reduce the observed effect size vis-à-vis population effect sizes (Aguinis, 2004b; Schmidt, Hunter, &

> Urry, 19776). Thus, the sample sizes necessary to product adequate power are much larger than typically assumed. **Hundreds of subjects, or even several thousand, may be necessary, depending on the type of artifacts affecting the validity coefficient**" (Cascio & Aguinis, 2019, p.157, emphasis added).

Clearly, Dr. Cascio and I agree on the factors that make criterion research at a minimum difficult and sometimes impossible. Yet Dr. Cascio opines that this type of study was feasible (and required) at Goldman Sachs stating, "all of the conditions necessary to satisfy the technical feasibility of criterion-related validity studies exist at Goldman Sachs" (para 41), without considering the factors that he has previously discussed in his writings.

Even if Dr. Cascio's assertion that predictive criterion-related validation of the 360 Feedback Review and Manager Quartiling processes is required (which I dispute), I nonetheless provide such validation evidence below. Specifically, Dr. Cascio cites to the *SIOP Principles* for the proposition that "job-relatedness of a selection procedure has been demonstrated when evidence supports the accuracy of inferences made from scores on, or evaluations derived from, those procedures regarding some important aspect of work behavior (e.g., quality or quantity of job performance; performance in training, advancement, tenure, turnover, or other organizationally pertinent behavior)" (para 16). Setting aside that various studies summarized in my opening Job Relatedness Report already meet this standard, in response to Dr. Cascio's 3/19/21 Rebuttal report, I performed this very analysis by identifying Associates who were promoted to Vice President and then examining the relationship between 360 Feedback Review overall scores and Manager Quartile assignments as an Associate with future performance as a Vice President. I again note that this type of study is usually not feasible and is not required to show validity.

Specifically, in Statistical Study 8, I directly evaluated the relationship of the 360 Feedback Review overall score and Manager Quartile assignments with performance in a future role. For all Associates in one year who were promoted to Vice President the subsequent year, I evaluated


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

the correlations between: (i) 360 Feedback Review overall score as an Associate and 360 Feedback Review overall score as a Vice President; (ii) 360 Feedback Review overall score as an Associate and Manager Quartile assignment as a Vice President; (iii) Manager Quartile assignment as an Associate and 360 Feedback Review overall score as a Vice President; and (iv) Manager Quartile assignment as an Associate and Manager Quartile assignment as a Vice President. For each of the four sets of analyses, all correlations were positive, and the vast majority (ranging from 82 to 100% of strata for each analysis) were statistically significant. The results from these studies, reported in **Appendix B**, unequivocally support the validity of the 360 Feedback Review overall score and Manager Quartile assignments as predictors of performance in a future role.[10]

## II. Dr. Cascio's Assertion that My Analyses Have "Critical Methodological Deficiencies"[11] is Baseless.

Dr. Cascio asserts that my studies of 360 Feedback Reviews wrongly used overall scores rather than scores on particular competencies, and he also criticizes a part of my methodology for assessing inter-rater reliability. Dr. Cascio's criticisms are entirely without merit.

[10] This result does not surprise me. As Binning and Barrett (1989) note, the critical linkage for a performance measure is whether the measure itself maps onto the performance domain. Dr. Cascio has admitted that the research by PDI and APTMetrics confirmed this linkage, and now he requires that I show that performance measures that have been validated and shown to be reliable for one corporate title correlate with similar performance measures that have been validated and shown to be reliable for another corporate title. This correlation is to be expected.

[11] Dr. Cascio also claims that there are "at least three sources of potential error that are ignored in a 360 Review validation process that only considers the design of a selection procedure . . . fail[ing] to consider: (1) peers or direct reports as raters, (2) managers who integrate and interpret the feedback that peers and direct reports provide, and (3) the extent of interaction between rater and ratee" (Cascio Expert Report, 3/19/21, para 42). The first and third criticisms are addressed in my Rebuttal Report (pp.16-18, 20-23). My opening Job Relatedness Report details the numerous guardrails around the 360 Feedback Review and Manager Quartiling processes (pp. 33-35, 54-57), addressing Dr. Cascio's second critique. Further, I found statistically significant and positive correlations between 360 Feedback Review overall score and Manager Quartile assignment, and Manager Quartile assignment and Division-specific objective metrics (pp. 59-67), showing that Dr. Cascio's criticsm is unfounded.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

### A. Dr. Cascio's Criticism of the Use and Application of 360 Feedback Review Overall Average Ratings is Unfounded and Irrelevant.

Dr. Cascio baselessly criticizes my use of "overall average 360 ratings" in my statistical studies (III.C.1). First, Dr. Cascio ignores that in addition to using overall ratings, I *also* conducted studies of *each* of the individual competencies. I calculated agreement statistics for *each competency* individually, and the results indicated strong inter-rater agreement (Job Relatedness Report, Appendix 4E p.21). I also provided Table 4E.10 showing "the average agreement statistics across all reviewees *and across all individual competencies* for All Reviewers at each strata of interest" (Appendix 4E p.21, emphasis added). I averaged results in this way for ease of display — rather than including 13 tables (one for each competency) with 72 values each (one for each Division/corporate title/year strata), I summarized the results by reporting averages — though I also provided Plaintiffs with my calculations and all output files, which included all results. So even if Dr. Cascio were correct that it is inappropriate to use the 360 Feedback Review overall average rating — and he is not — his criticism carries no weight because my analyses demonstrated agreement on each individual competency.

Second, Dr. Cascio relies on overall average 360 Feedback Review ratings himself. As explained earlier, Dr. Cascio's arguments rest on an assumption of "gender-based gaps" in the 360 Feedback Review, a proposition based on Dr. Farber's studies (para 21). Dr. Farber's studies use the same overall average 360 ratings (Farber Expert Report, 1/15/21, para 85) that I analyzed. To my knowledge, Dr. Farber has conducted no analyses of individual competency ratings. Following Dr. Cascio's logic that the overall score is improper as a unit of analysis for job relatedness, Dr. Farber's analyses would also be unacceptable solely for this reason.

Third, as I explained in my opening Job Relatedness Report (Appendix 4E p.21), overall scores are expected to be more stable than individual competency scores or single ratings, and thus

more appropriate and more frequently used in validation studies, because they represent multiple data points instead of a single data point (Mosier, 1943; Nunnally & Bernstein, 1994; Wang & Stanley, 1970).

Fourth, Dr. Cascio criticizes my use of the 360 Feedback Review overall score in calculating the inter-rater agreement statistic $r_{WG}$, because it is "not a single item, as… $r_{WG}$ assumes, but rather is aggregated from 13 individual competencies" (para 55). He claims this causes a "particularly acute" problem of non-linearity "rendering interpretations of agreement levels ambiguous" (para 62). However, $r_{WG}$ is frequently applied to performance appraisals (Cascio & Aguinis, 2019; James, Demaree, & Wolf, 1993; LeBreton & Senter, 2008), nearly all of which are averages in some form. For example, if a reviewer provides a single numerical score for a reviewee's performance, that score reflects the reviewer's *overall* assessment, based on his/her assessments of *all* relevant dimensions of performance. The fact that the overall score is mechanically calculated as an average, rather than individually determined as a manager's judgment of the average of different facets of performance, makes it no less suitable for analyses using $r_{WG}$. This is in some ways beside the point, since I also demonstrated inter-rater agreement for each individual competency, as described above.

### B. Dr. Cascio is Wrong that My Computation and Interpretation of $r_{WG}$ are Methodologically Deficient and Do Not Support the Reliability of the 360 Feedback Review.[12]

As I explained in my opening Job Relatedness Report, "The $r_{WG}$ statistic evaluates the agreement in ratings of the same ratee by multiple raters and compares this to a null (hypothetical)

[12] Dr. Cascio's criticisms of my $r_{WG}$ analyses are also rebutted by my analyses using G(q,k) and my temporal consistency studies which also support measurement consistency of the 360 Feedback Review, as do the correlations between the 360 Feedback Review and Manager Quartile assignments, objective metrics, and promotion outcomes. Drs. Cascio and Farber devote considerable attention to criticizing $r_{WG}$

distribution" (Appendix 4E p.6). One of Dr. Cascio's criticisms focuses on the assumptions of the uniform distribution commonly used to compute $r_{WG}$ statistics (paras 60, 62-63), yet he eventually acknowledges that I did not use this distribution in any of my analyses (para 63). As such, all of Dr. Cascio's criticisms of the uniform distribution are irrelevant.[13] Dr. Cascio offers two additional criticisms of my use of the $r_{WG}$ statistic: (i) he incorrectly argues that the observed score distribution at Goldman Sachs should define the null distribution, and (ii) he criticizes the null distribution that I chose and questions whether my use of a "slightly skewed" null distribution was appropriately calculated. Additionally, Dr. Farber provides his own study to attempt to indicate that my analyses "lacked statistical power," but in doing so he actually demonstrates that reviewers at Goldman Sachs consistently had much higher agreement than his simulated models.

**i. Dr. Cascio is Wrong about How and When the Null Distribution Should be Derived when Computing Estimates of the $r_{WG}$ Statistic.**

Dr. Cascio states that, based on the "actual levels of skewness for the overall average … the correct variances to use for highly skewed null distributions of 5- and 9-point scales are 0.44 and 3.16, respectively" (para 68). It is patently incorrect to use actual (or observed) data to determine the null distribution for computing $r_{WG}$ to measure rater agreement.

The $r_{WG}$ statistic is calculated by comparing the observed variance of ratings for an individual with the variance of a hypothesized (or expected) null distribution. The recommended practice for determining a null distribution, as outlined by James, Demaree, and Wolf (1984), and

---

but it is only one of multiple studies related to measurement consistency, and all of those studies point in the same direction — high measurement consistency.

[13] Indeed, given that I "assumed 'slightly skewed' variances for the null distribution" — as Dr. Cascio himself recognizes (para 68) — his criticisms of a uniform distribution, and concerns that assumptions of such a distribution have been violated (e.g., para 60) are completely irrelevant.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

echoed by others (Brown & Hauenstein, 2005; LeBreton & Senter, 2008), is to consider, in advance or *a priori*, theoretically defensible null distributions that could reasonably indicate a complete lack of agreement among raters. The null distribution should be based on the answer to the question, "If raters responded randomly, then what would be the form of the distribution of scores?" (LeBreton & Senter, 2008, p.829). In other words, what would a complete lack of agreement among reviewers look like? In this situation, if reviewers did not know who they were rating but only knew that they were providing 360 feedback ratings on a 5-point scale, they might be expected to be somewhat positive in their ratings (i.e., it can be reasonably hypothesized that the distribution representing a complete lack of agreement might have a slight negative skew). Ratings with any more disagreement would be considered *theoretically implausible* and treated as a complete absence of agreement in the calculation of $r_{WG}$.

Using observed scores to establish a hypothesized null distribution runs counter to the scientific method. A null hypothesis (or distribution) should be determined *a priori*, and not *post hoc* based on observed results. In fact, James et al. (1984), in reference to the choice of a null distribution for computing the $r_{WG}$ statistic, specifically state that what Dr. Cascio recommends should not be done:

> "It follows that the shape of the observed distribution should *not* in general be employed to propose a null distribution" (p.93, emphasis in original).

Moreover, when there is agreement among raters, the distribution of their ratings will necessarily differ from a distribution that reflects disagreement in ratings (i.e., the null distribution). By arguing that I should have examined the actual distribution of ratings and used that as the null distribution for my calculations of $r_{WG}$, Dr. Cascio is advocating a post hoc approach for computing $r_{WG}$ that would seldom allow a researcher to recognize agreement among raters in a sample, even when there is strong agreement. Clearly, this was not the intent of the scholars who developed this


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

statistic. For all these reasons, the null distribution I chose was reasonable and did not result in an overestimation of agreement.

Dr. Cascio's assertion that I should have run my analyses using a heavily skewed null distribution does not make sense in the context of 360 Feedback Review ratings.[14] One of the strengths of a multi-source feedback system (like the 360 Feedback Review) is that these systems incorporate feedback from multiple sources who have different opportunities to observe different aspects of the reviewees' behavior (Cascio & Aguinis, 2019; Farr & Newman, 2001; Kabins, 2016). As a result, one would not expect each rater to assign the exact same score to a ratee, even in a perfect system. In fact, this outcome would defeat the purpose of 360 degree feedback. But Dr. Cascio's favored heavily skewed null distribution in fact *requires* perfect agreement among raters in order to achieve an $r_{WG}$ indicating "strong agreement" when applied to a 5-point rating scale like that used by Goldman Sachs early in the Class Period.

Some concrete examples may help explain this observation. Assume five hypothetical reviewers provide ratings using a 5-point scale; 10 different response patterns are illustrated in **Table 1**. The last column in Table 1 presents $r_{WG}$ assuming a null distribution with heavy skew and identifies hypothetical sets of ratings for which $r_{WG}$ is theoretically implausible (i.e., observed variance is greater than expected variance). These theoretically implausible results are essentially treated as rating patterns with such disagreement that they are not even in the realm of possibility (i.e., they are treated as the absence of any agreement whatsoever). Inspection of the pattern of

[14] Additionally, Dr. Cascio's criticism flies in the face of recommended practices drawn from the articles on which he relies in his Rebuttal Report. Specifically, Dr. Cascio cites SPC for Excel (2016) to define a highly skewed distribution (para 65) while ignoring the operational definitions of skewed distributions provided in the most authoritative sources (James et al., 1984; LeBreton & Senter, 2008) on the $r_{WG}$ statistic, which he himself cites. Importantly, the SPC for Excel (2016) definition of a highly skewed distribution does not comport with the distribution James et al. (1984) and LeBreton and Senter (2008) indicate as having "high skew."

ratings and associated $r_{WG}$ values in this table makes clear that it would be indefensible and absurd to use an assumption of a heavy skew null distribution. For example:

- If all five reviewers give a ratee exactly the same rating (response pattern 1), the $r_{WG}$ will be 1.00, indicating "strong agreement" per LeBreton & Senter (2008).

- But if four reviewers give a rating of 5, and *one* reviewer gives a rating just one level lower (response pattern 2), the $r_{WG}$ indicates only "moderate agreement."

- If *two* reviewers give a rating of 4 and three reviewers give a rating of 5 (as in response pattern 3), the $r_{WG}$ indicates only "weak agreement."

- And *various* ratings patterns that are entirely plausible and represent some level of agreement (e.g., four reviewers giving a rating of 5 and one reviewer giving a rating of 3, as in response pattern 6) yield implausible $r_{WG}$ values under heavy skew. In fact, for the majority of patterns in the table, the heavy skew distribution yields theoretically implausible values — where the observed variance is even *larger* than expected if ratings were assigned by chance.[15]

As can be seen in **Table 1**, only response patterns 1–3 yield plausible $r_{WG}$ values showing some level of agreement; the remaining patterns would all be theoretically implausible assuming a null distribution with a heavy skew. And of these three plausible response patterns, only response pattern 1 yields an $r_{WG}$ value that falls above the .70 threshold of strong agreement (as defined by LeBreton & Senter, 2008). In other words, achieving an interpretation of strong agreement across five reviewers for $r_{WG}$ using the null distribution with heavy skew requires *perfect* agreement among reviewers. Such a requirement is nonsensical.

[15] In computing $r_{WG}$, the a priori choice of the null distribution (and its associated expected variance) effectively constitutes a decision as to what, theoretically, a "perfect lack of agreement" (LeBreton & Senter, 2008, p. 825) would look like. Response patterns that are observed in the actual data that exhibit *more* disagreement (i.e., greater variance) than that of the null distribution (i) are essentially considered unexpected and theoretically implausible and (ii) result in $r_{WG}$ values of 0.00, indicating no agreement whatsoever. LeBreton and Senter (2008) discuss scenarios when the observed variance for a set of ratings exceeds the variance associated with the null distribution (i.e., response patterns 4-10 that are theoretically implausible) and note that one potential explanation is a misspecified null distribution.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

<table>
<tr><th colspan="7">Table 1. Hypothetical Response Patterns for Five Reviewers Providing 360 Feedback Review Ratings on a 5-Point Scale and Associated $r_{WG}$ Values Assuming a Null Distribution with a Heavy Skew</th></tr>
<tr><th>Response Pattern</th><th>Reviewer 1</th><th>Reviewer 2</th><th>Reviewer3</th><th>Reviewer 4</th><th>Reviewer 5</th><th>Heavy Skew $r_{WG}$</th></tr>
<tr><td>1</td><td>5</td><td>5</td><td>5</td><td>5</td><td>5</td><td>1.00</td></tr>
<tr><td>2</td><td>5</td><td>5</td><td>5</td><td>5</td><td>4</td><td>.55</td></tr>
<tr><td>3</td><td>5</td><td>5</td><td>5</td><td>4</td><td>4</td><td>.32</td></tr>
<tr><td>4</td><td>5</td><td>4</td><td>4</td><td>4</td><td>3</td><td rowspan="7">Theoretically Implausible (0.00)</td></tr>
<tr><td>5</td><td>5</td><td>5</td><td>4</td><td>4</td><td>3</td></tr>
<tr><td>6</td><td>5</td><td>5</td><td>5</td><td>5</td><td>3</td></tr>
<tr><td>7</td><td>5</td><td>5</td><td>4</td><td>3</td><td>3</td></tr>
<tr><td>8</td><td>5</td><td>4</td><td>4</td><td>4</td><td>2</td></tr>
<tr><td>9</td><td>5</td><td>5</td><td>4</td><td>4</td><td>2</td></tr>
<tr><td>10</td><td>5</td><td>5</td><td>5</td><td>1</td><td>1</td></tr>
</table>

In summary, the heavy skew null distribution offered by James et al. (1984) and LeBreton and Senter (2008) — and suggested by Dr. Cascio — is the most restrictive distribution, in terms of defining agreement. Requiring reviewers to essentially produce identical ratings for strong agreement runs counter to this design and to the purpose of multi-source feedback. I am not arguing that all of the rating patterns in Table 1 would truly reflect strong levels of agreement, but that they are theoretically plausible and do not represent a complete lack of agreement among raters (i.e., random ratings). Using Dr. Cascio's proposed null distribution, however, most rating patterns in Table 1 are theoretically implausible and are treated as the absence of any agreement whatsoever. In contrast, when using a null distribution with a slight skew as I did, the vast majority are recognized as plausible. Thus, it is clear to see why adopting an a priori null distribution with a heavy skew, as Dr. Cascio has argued, is nonsensical. Dr. Cascio either misunderstands the purpose of the null distribution or he is setting the bar for agreement so high it cannot be met by any 360 feedback tool.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

### ii. Dr. Cascio Wrongly Asserts that the Only Null Distributions and Expected Variances that can be Used to Compute $r_{WG}$ are the Exemplars Offered by LeBreton and Senter (2008).

After determining the general degree of skew that might be expected under the condition of rater disagreement, the next step in computing the $r_{WG}$ statistic is to determine an appropriate "expected variance" to use to represent the null distribution. A fundamental tenet in this process that Dr. Cascio apparently fails to understand is that there are no "golden variances" that must be used for a particular hypothesized distribution. James et al. (1984) present several hypothetical null distributions for a 5-point scale (including three negatively skewed distributions), each of which they use to compute a corresponding expected variance. They state the "Three distributions were *arbitrarily* selected to simulate different as well as representative degrees of skew" (p.91, emphasis added). Similarly, LeBreton and Senter (2008) note, in reference to their example distributions and variances, that "This table is not meant to be exhaustive but rather to give researchers guidance concerning variance estimates for alternative null distributions" (p.831). Thus, the null distributions presented by these authors, and the corresponding expected variances computed from those null distributions, were clearly intended to serve only as examples to inform the professional judgment of researchers in the field seeking to compute $r_{WG}$. No authors prescribe that those, and only those, specific null distributions and corresponding expected variances be used when computing $r_{WG}$. In other words, there is no single "correct" null distribution or set of null distributions.

Although many researchers, including Dr. Cascio, have adopted the specific expected variances associated with the examples provided in these articles, using these examples is not required. Indeed, the expected variance of *any* hypothesized null distribution can be calculated by researchers seeking to compute $r_{WG}$. Dr. Cascio criticizes me for using a variance for slight


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

skewness of 1.72, rather than 1.34 (the example listed by James et al., 1984 and repeated by LeBreton and Senter, 2008), for a 5-point scale. I carefully arrived at the value of 1.72 for the expected variance in order to make my calculations of $r_{WG}$ comparable across the 5-point and 9-point rating scales, which is an added complexity as compared with an $r_{WG}$ study where only one rating scale is considered.[16] The expected variance is properly calculated and is consistent with representing a slightly skewed null distribution that is similar across 5-point and 9-point conditions. Again, Dr. Cascio could have performed alternative analyses but did not.

It is my opinion that a value of 1.72 is an appropriate null distribution variance to use; however, I have repeated my analyses using the 1.34 value for a 5-point scale, which Dr. Cascio notes is the exemplar offered by LeBreton and Senter (2008). The results using this null distribution do not alter my original conclusions. **Table 2**[17] provides average agreement statistics aggregated across years for 360 Feedback Review overall scores on the 5-point scale for each reviewer group, Division, and corporate title using both the original variance from my Job Relatedness Report (i.e., 1.72) [18] and the slight skew variance estimate exemplar (i.e., 1.34) Dr.

[16] The slight skew distribution suggested by LeBreton and Senter (2008) for the 9-point scale uses a correction that reduces the uniform variance by about 15%, while the correction for the 5-point scale reduces the uniform variance by about 30%. I identified alternative values for the 5-point scale null distribution that were more consistent with the 9-point scale, informing the use of 1.72 (about a 14% reduction).

[17] After the opening Job Relatedness Report was submitted, a small subset of records (for years 2004-2006 and primarily in IBD) in which neither the 5-point nor 9-point rating scale was used were identified. These records were subsequently removed and the original analyses computing the $r_{WG}$ statistics were re-calculated using the original 1.72 null variance. Analyses that removed these records produced results very similar to the original analyses presented in my opening Job Relatedness Report and my opinions remain unchanged. It is these updated values that are used in Tables 2 and 3 here. Updated versions of the dataset, outputs, and results summaries used for all analyses associated with Statistical Study 1 are included in the backup materials for the current report. A corrected Appendix 4E and an errata to my opening Job Relatedness Report will be submitted.

[18] These original results are summarized across all years in Table 4E.9 of my opening Job Relatedness Report.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

Cascio references. When comparing the results for calculating $r_{WG}$ with a variance of 1.72 to a variance of 1.34, the change results in a .03 to .05 (average of .04) decrease in the aggregated 5-point $r_{WG}$ averages. Similar to previous results, the data show strong levels of agreement, and as such, these results do not affect my original opinion.

**Table 2. 360 Feedback Review Average Overall Score Agreement ($r_{WG}$) Results for the 5-Point Scale Using Slight Skew Null Distribution Variances of 1.34 and 1.72**

| Reviewer Group | 5-Point Scale Variance | IBD | | IMD | | Securities | | All Divisions | |
|---|---|---|---|---|---|---|---|---|---|
| | | Associate | Vice President | Associate | Vice President | Associate | Vice President | Associate | Vice President |
| All Reviewers | Original Variance 1.72 | .83 | .85 | .83 | .84 | .85 | .86 | .84 | .85 |
| | Revised Variance 1.34 | .78 | .80 | .78 | .79 | .81 | .82 | .79 | .80 |
| More Senior | Original Variance 1.72 | .85 | .89 | .85 | .86 | .86 | .87 | .85 | .87 |
| | Revised Variance 1.34 | .81 | .86 | .80 | .82 | .83 | .83 | .81 | .84 |
| Peer | Original Variance 1.72 | .85 | .87 | .82 | .85 | .85 | .86 | .84 | .86 |
| | Revised Variance 1.34 | .81 | .83 | .78 | .80 | .81 | .82 | .80 | .82 |
| More Junior | Original Variance 1.72 | .81 | .83 | .83 | .84 | .85 | .86 | .83 | .84 |
| | Revised Variance 1.34 | .76 | .78 | .79 | .80 | .81 | .83 | .79 | .80 |

**Table 3** provides average agreement statistics across years and across the relevant individual competencies on the 5-point scale for each reviewer group, Division, and corporate title


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

for the original variance used in the Job Relatedness Report (1.72)[19] and the slight skew variance estimate exemplar (1.34) provided in LeBreton and Senter (2008). Comparing the results for calculating $r_{WG}$ with a variance of 1.72 to a variance of 1.34, the change results in a .05 to .07 (average of .06) decrease in the 5-point $r_{WG}$ average. As expected, average agreement statistics across the individual competencies were again smaller in magnitude than those for the 360 Feedback Review overall score, yet these results are still indicative of moderate to strong agreement.

[19] These original results are summarized across all years in Table 4E.13 of my opening Job Relatedness Report.

| Table 3. 360 Feedback Review Average Agreement ($r_{WG}$) Results Across All Relevant Competencies for the 5-Point Scale Using Slight Skew Null Distribution Variances of 1.34 and 1.72 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Reviewer Group | 5-Point Scale Variance | IBD | | IMD | | Securities | | All Divisions | |
| | | Associate | Vice President | Associate | Vice President | Associate | Vice President | Associate | Vice President |
| All Reviewers | Original Variance 1.72 | .74 | .75 | .74 | .74 | .76 | .76 | .75 | .75 |
| | Revised Variance 1.34 | .67 | .68 | .67 | .67 | .69 | .70 | .68 | .68 |
| More Senior | Original Variance 1.72 | .77 | .80 | .76 | .77 | .77 | .78 | .77 | .79 |
| | Revised Variance 1.34 | .71 | .75 | .70 | .72 | .71 | .73 | .71 | .73 |
| Peer | Original Variance 1.72 | .75 | .78 | .75 | .76 | .77 | .77 | .76 | .77 |
| | Revised Variance 1.34 | .69 | .72 | .69 | .70 | .71 | .71 | .70 | .71 |
| More Junior | Original Variance 1.72 | .73 | .73 | .75 | .75 | .77 | .78 | .75 | .75 |
| | Revised Variance 1.34 | .68 | .66 | .69 | .69 | .71 | .72 | .69 | .69 |

### iii. Dr. Farber's Simulation Actually Provides Evidence that the 360 Feedback Review Ratings were Reliable and Not Assigned at Random.

Dr. Cascio's critique is similar to that of Dr. Farber, who suggests that my test "has no statistical power" because "[e]ven randomly assigned performance review scores will show 'strong agreement' between reviewers" (Farber Expert Report, 3/19/21, para 13). Dr. Farber appears to be suggesting that the use of $r_{WG}$ and the thresholds for interpreting $r_{WG}$ cannot be applied to

performance appraisal data — even though they commonly are (Cascio & Aguinis, 2019, James et al., 1993; LeBreton & Senter, 2008).

Dr. Farber supports his conclusion with a simulation, in which he takes the actual 360 Feedback Review scores given to Goldman Sachs professionals by Division, corporate title, and year, and randomly assigns them "in a way that retains the overall distribution of scores but eliminates any systematic agreement across reviewers," explaining that each simulation is "as if I simply shuffled the scores, so that the score from any given review is instead attached to some other review at random" (Farber Expert Report, 3/19/21, para 14). After "randomizing" the scores, Dr. Farber calculates $r_{WG}$, and then repeats the process 999 times for a total of 1,000 simulations showing that the $r_{WG}$ statistics generated by his calculation all support "strong agreement" among reviewers (Farber Expert Report, 3/19/21, paras 14-15).

What Dr. Farber does *not* do, however, is compare the actual $r_{WG}$ values I calculated based on actual reviewers at Goldman Sachs with those from his simulation. If he had, he would have found that my $r_{WG}$ values associated with actual reviewers are consistently higher than those produced by his simulation, providing evidence that scores are *not* assigned at random and supporting my opinion that despite any alleged compression or leniency, 360 Feedback Review scores differentiate among professionals and are reliable.[20] Notably, the actual values of $r_{WG}$ are higher than *any one* of Dr. Farber's 1,000 simulations for 62 of the 72 (86.1%) Division/corporate title/year strata. In other words, if scores reflected random assignment across professionals, rather than actual performance differences, such high $r_{WG}$ statistics as actually occurred at Goldman Sachs

[20] Importantly, this differentiation is also directly supported by Statistical Studies 4-6, which demonstrated that 360 Feedback Review scores correlate with Manager Quartile assignments, objective metrics, and promotion outcomes at statistically significant levels, in positive directions, and in ways consistent with or exceeding expectations from the I/O psychology literature.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

would rarely be observed.[21] Although Dr. Farber may take issue with the rules of thumb from LeBreton and Senter (2008), his simulation actually provides additional evidence that the 360 Feedback Review ratings at Goldman Sachs were reliable.

**Figure 3** is an example of one distribution of $r_{WG}$ estimates from Dr. Farber's simulation for Vice Presidents in IBD in 2006 (5-point rating scale).[22] As clearly shown, the $r_{WG}$ for actual 360 Feedback Review ratings is considerably higher (blue dotted line) than those produced by his simulation.

[21] Importantly, these findings would likely hold *regardless* of the null distribution used; any change would correspondingly change Dr. Farber's simulated estimates and my own estimates in a similar way, yielding a similar comparison between the two.

[22] Dr. Farber's $r_{WG}$ simulation for all 72 Division/corporate title/year strata is provided in the backup materials.

**Figure 3. Distribution of $r_{WG}$ Estimates from Dr. Farber's Simulation for IBD Vice Presidents 2006**




**Figure 4** is an example of another distribution of $r_{WG}$ estimates from Dr. Farber's simulation for Associates in Securities in 2013 (9-point rating scale). Again, as clearly shown, the $r_{WG}$ for actual 360 Feedback Review ratings is considerably higher (blue dotted line) than those produced by his simulation.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

**Figure 4. Distribution of $r_{WG}$ Estimates from Dr. Farber's Simulation for Securities Associates 2013**




The criticisms of Drs. Farber and Cascio do not undermine my use of the $r_{WG}$ statistic. The actual levels of $r_{WG}$ observed strongly reject the suggestion that scores are randomly assigned and instead support the reliability of the 360 Feedback Review process. I conclude, therefore (and as before), that my analyses of inter-rater agreement support the reliability of the 360 Feedback Review. Importantly, this finding is entirely consistent with other analyses that supported reliability as well, including temporal consistency results in Statistical Study 2, G(q,k) results in Statistical Study 1, and correlational results in Statistical Studies 3-6.

## III. Dr. Cascio's Other Criticisms are Baseless.

### A. Dr. Cascio's Criticisms of My Analysis of "Potential" are Unfounded.

My opening Job Relatedness Report provides evidence of validity that supports the reliability and validity of Potential as a consideration in Manager Quartile assignments (pp.47-51, 57-67, 81-84). This includes the results of Statistical Studies 3-6,[23] which are direct evidence of the reliability and validity of Manager Quartiling (of which Potential is an input). These studies provide empirical support indicating that the consideration given by managers to Potential is reliably incorporated into their Manager Quartile assignment. As emphasized in the quote below, underlying inputs (i.e., Potential) must be reliable (i.e., accurate) in order for the overall measure to be reliable —and I have shown that the Manager Quartile is reliable.

> "Despite the efficacy of a well-designed performance measurement system, the developed system will have little value if the actual data inputs (that is, the basic underlying metrics) lack veracity. High-quality, accurate, and believable data are critical to the overall success and use of any performance measurement system. **If lower-level underlying data are inaccurate, then the aggregated upper-level data will also be inaccurate. Just as in any computer software system, the phrase garbage in, garbage out is equally applicable to a performance measurement system**" (Harbour, 2011, p.9, emphasis added).

Dr. Cascio criticizes my consensus study of the components of "Potential" stating: (i) I did not assess the weights raters actually assigned to Potential (para 83); (ii) "Managers' ratings of 'Potential' have never been validated" (III.E.4) and "there was no effort to correlate managers' ratings of potential to any measure of future performance" (para 85); and (iii) "because it is not

[23] Statistical Study 3 shows strong evidence of the intra-rater temporal consistency of Manager Quartile assignments (in other words, that managers' ratings are consistent over time). Manager Quartile assignments would not be so similar over time if managers' assessments of Potential were not also similar. Statistical Study 6 shows that Manager Quartiling assignments have statistically significant positive correlations with promotion to Extended Managing Director, and Statistical Studies 4 and 5 show that Manager Quartiling assignments also correlate positively and significantly with 360 Feedback Review scores and objective measures. Statistical Studies 4-6 demonstrate an accumulation of validity evidence.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

possible to distinguish ratings of performance and contribution from ratings of potential in Manager Quartile assessments, this alone renders the Manager Quartile assessments invalid" (para 86).

Potential is only one consideration in Manager Quartile assignments, and the exact extent of its influence is unknown. But if the assessment of Potential were unreliable, as Dr. Cascio claims, the results of my statistical studies involving Manager Quartile assignments would not have shown significant positive correlations across all studies. Consensus Study 4 also shows how Goldman Sachs' conceptualization of Potential corresponds to the Silzer and Church (2009) comprehensive model of Potential in the I/O psychology literature, thereby demonstrating content validity. This accumulation of validity evidence on Potential is more than sufficient. Dr. Cascio speculates that a lack of safeguards for assessing Potential can lead to unreliability in Manager Quartile assignments, but he does not test this conjecture. But if this were true, my studies would not have produced the results they did.[23]

Dr. Cascio argues that my results are insufficient to demonstrate the validity of Goldman Sachs' use of Potential in Manager Quartile assignments, and I must *also* provide evidence of criterion-related validity. This is neither feasible nor required.

First, regarding feasibility, it is impossible to perform a criterion-related validation of ratings of Potential because standalone ratings of Potential do not exist. The *SIOP Principles* recognize that any validation strategy must be feasible in light of the constraints imposed by the situation (p.29).

Second, Dr. Cascio's argument that "because it is not possible to distinguish ratings of

[24] Dr. Cascio has not established that Potential is the mechanism that causes the alleged gender gaps in Manager Quartile assignments. His criticisms on this point are only speculative.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

performance and contribution from ratings of potential in Manager Quartile assessments, this alone renders the Manager Quartile assessments invalid" (para 86) completely ignores that there is no requirement to provide a standalone rating of Potential or a pre-determined weighting of that rating in the Manager Quartiling decision, nor should there be one. There is no requirement for formulaic weighting in the *Uniform Guidelines* or *SIOP Principles*, and Dr. Cascio has cited no such requirement.

Third, as I have already described in detail, I have demonstrated the reliability of Manager Quartiling, which includes assessments of both Potential and Performance and Contribution. If either input were fatally unreliable, I would not have found — as I did — that Manager Quartile assignments are reliable and valid.

Fourth, Dr. Cascio claims that "Goldman Sachs has developed no . . . evidence to demonstrate the relationship between managers' ratings of 'potential' and important career outcomes," which "renders the Manager Quartile assessments invalid" (para 86). I provided this exact evidence in Statistical Study 6, which shows that Manager Quartiling correlates significantly in a positive direction with promotion to Extended Managing Director. Dr. Cascio apparently ignores these results (in spite of recommending this very approach in his previous report and continuing to identify advancement as a relevant work outcome), and now claims that prediction of *performance* at the next level is what is required. As noted earlier in this report, although such a study is not usually done and is not required, Statistical Study 8 meets Dr. Cascio's new standard and renders his criticism moot.

Finally, Dr. Cascio criticizes my Consensus Study (4) of Potential because, "the definitions of 'potential' that Dr. Dunleavy provided do not cover the entire class period" (para 84). My study included definitions from the early, middle, and late years within the class timeframe. The intent


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

of the study was to cover the general content of definitions of Potential over time, and the definitions Dr. Cascio points out are not substantively different from those that I used. Specifically Dr. Cascio complains that the definition I used for 2008 to cover the early part of the class period did not adequately capture *all* of the definitions used in prior years. I disagree. The definition I used is not materially different from the definitions in prior years — they are merely elaborations on the 2008 definition of "potential to assume increasing responsibility." Inclusion in the study of the exact definitions used in each year from 2004 - 2007 would not have changed the results of the study or my conclusions.

### B. Dr. Cascio is Wrong in Suggesting that Guardrails Do Not Bear on the Reliability and Validity of the 360 Feedback Review and Manager Quartiling Processes.

Contrary to Dr. Cascio's assertions (para 92), I do not "attempt[] to validate Goldman Sachs' systems by reference to guardrails." I have never stated that guardrails are *direct* evidence of validity. When HR processes are being designed and/or direct research is not feasible, guardrails can be a particularly useful consideration related to expected reliability and validity. In this case, obviously multiple validation studies have been conducted, and I have offered direct evidence of validity that supports the job relatedness of each Challenged Process. But, as described extensively in my opening Job Relatedness Report, guardrails are important for *enhancing* reliability and validity. The use of guardrails concerning structure and accountability is supported by the academic literature (Campion, Palmer, & Campion, 1997; Mero & Motowidlo, 1995; Tetlock & Kim, 1987). Dr. Cascio is aware of how elements of structure enhance reliability and validity and considers this concept important enough to discuss in his textbook (Cascio & Aguinis, 2019, pp.302-303).

Dr. Cascio also claims that my selection of 360 feedback recommended practices was


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

selective and incomplete with no explanation of why I included/excluded certain practices (para 101). My opening Job Relatedness Report explicitly states, "The alignment between 360 Feedback Review procedures and recommendations from the I/O psychology literature related to reliability and validity (described more fully below) is an additional basis for my opinion that the 360 Feedback Review process is reliable, valid, and job related" (p.27). Recommended practices that *did not pertain to reliability and validity were not included* in the recommended practices table because they were of no interest (Job Relatedness Report, Appendix 4C). Therefore, Dr. Cascio should have known that not all of Campion, Campion, and Campion's (2019) 56 recommended practices were included in my table for this reason (which also included recommended practices identified by other authors).

Dr. Cascio's criticisms of certain guardrails that I describe in my opening Job Relatedness Report are unsupported (paras 93-99). For example, Dr. Cascio claims "there is no systematic evidence that offerings of rater training for 360 Review or Manager Quartile assessments were mandatory or effective. Hence, we cannot assume that this important guardrail had any effect on the ratings that were provided" (para 99). He makes the same criticism with respect to training for Cross-Ruffing (para 100). Neither criticism carries any weight.

Dr. Cascio's requirement that training must be mandatory to enhance reliability and validity is out of touch with both real world practices and the academic literature. The I/O psychology literature indicates that training for 360 degree reviews is "extremely rare" (Bracken, Rose, & Church, 2016, p.779) and "is the exception, not the rule" (Bracken et al., 2016, p.777) often because it is "too 'impractical' or costly" (Bracken, Timmreck, & Church, 2001, p.8). And if training for 360 degree reviews is provided, it is only to first-time participants (Bracken & Timmreck, 2001; Lepsinger & Lucia, 2001).

Yet, as Dr. Cascio seemingly acknowledges (para 94), training for 360 Feedback Reviews and Manager Quartiling were widely available at Goldman Sachs. As described in my opening Job Relatedness Report (pp.32-34, 54, 56-57, Appendix 4C pp.10-12; Appendix 5B p.6) Goldman Sachs offered an extensive array of training for the 360 Feedback Review and Manager Quartiling covering various delivery modalities:

a. Formal classroom instruction involving experiential exercises, mock videos with group discussion, case studies, and live feedback role plays.

b. Online training or e-learning modules.

c. Instructions and guidance provided in the actual 360 Feedback Review rating materials and Manager Quartiling guidelines and process overviews.

d. Frequently Asked Questions and Tip Sheets.

e. Availability of Human Capital Management to answer questions.

f. Hotline.

g. Emails.

In addition to extensive training and other guardrails, my statistical studies show reliability and correlations with various outcomes (Statistical Studies 1-8) which underscore that Goldman Sachs' 360 Feedback Review ratings were reliable and job related even if every reviewer did not take formal training every year.

Moreover, training for Cross-Ruffers was in fact mandatory. This is demonstrated by documents Dr. Cascio himself cites (i.e., "[t]his workshop should be considered mandatory for all first-time cross-ruffers and strongly recommended for those of you who have cross-ruffered before" (GS0124972); and "[a]ttendance is expected even if you have previously served as a cross-ruffer" (GS0604751)).


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

### C. Dr. Cascio is Wrong that Goldman Sachs was Required to Offer Suitable Alternative Systems.

Dr. Cascio's criticism that Goldman Sachs did not offer "suitable alternative systems" to the Challenged Processes having "lesser adverse impact" (para 107) is premised on his arguments that (i) adverse impact has been established and (ii) the 360 Feedback Review and Manager Quartiling processes are selection procedures. As explained earlier, and in my opening Job Relatedness Report and Rebuttal Report (i) adverse impact has not been established and (ii) the 360 Feedback Review and Manager Quartiling processes are not selection procedures. Therefore, a consideration of suitable alternatives never arose. Under Section 3B of the *Uniform Guidelines*, upon which Dr. Cascio relies, such guidance comes into play only for selection procedures, only where two or more such procedures are "available," and only where one of those procedures "has been demonstrated to have the lesser adverse impact." None of these conditions hold here. Further, the *Uniform Guidelines* discuss consideration of alternatives at the *outset* of implementation of a *selection procedure* when multiple processes are being considered and are available for research, something that could not be done one or two decades after implementation, which is when Dr. Cascio claims a validity study was called for.

Importantly, Dr. Cascio has not demonstrated any "equally valid," alternative procedures that are "available" and would have a "lesser adverse impact." In fact, Dr. Cascio does not even claim that any of the Challenged Processes caused any supposed adverse impact, nor has he identified which aspects of the Challenged Processes could be responsible for such impact and should be altered.

## CONCLUSION

Dr. Cascio continues to ignore the various studies demonstrating an overwhelming accumulation of evidence of validity I have presented supporting the Challenged Processes. Dr. Cascio has moved the goalposts across his own reports and instituted a different and unsupported standard requiring a predictive criterion-related validity study across corporate title in order to demonstrate job relatedness of the Challenged Processes. Although this standard is not required, I have now satisfied it. I have shown Dr. Cascio's criticisms of my calculations of inter-rater agreement to be fatally flawed. I have shown that my computation and interpretation of $r_{WG}$ for the 360 Feedback Review are consistent with the literature and methodologically sound, and a re-analysis using a variance for slight skewness of 1.34 for a 5-point scale, as suggested by Dr. Cascio, also indicates strong levels of agreement among reviewers. None of Dr. Cascio's unfounded criticisms alter my conclusions.

**Signed this 19th day of April 2021**

**Eric M. Dunleavy, Ph.D.**


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

## References

Bobko, P. (2001). *Correlation and Regression: Applications for Industrial Organizational Psychology and Management (2nd ed.).* Thousand Oaks, CA: Sage.

Brown, R. D., & Hauenstein, N. M. A. (2005). Interrater agreement reconsidered: An alternative to the $r_{wg}$ indices. *Organizational Research Methods, 8*, 165–184.

Binning, J.F., & Barrett, G.V. (1989). Validity of personnel decisions: A conceptual analysis of the inferential and evidential bases. *Journal of Applied Psychology, 74,* 478-494.

Bracken, D.W., Rose, D.S., & Church, A.H. (2016). The evolution and devolution of 360° feedback. *Industrial and Organizational Psychology*, *9,* 761–794.

Bracken, D.W., & Timmreck, C.W. (2001). Appendix: Guidelines for multisource feedback when used for decision making. In D.W. Bracken, C.W. Timmreck, & A.H. Church (Eds.), The Handbook of Multisource Feedback: The Comprehensive Resource for Designing and Implementing MSF Processes (pp.495-510). San Francisco: Jossey-Bass.

Bracken, D.W., Timmreck, C.W., & Church, A.H. (2001). Introduction: A multisource feedback process model. In D.W. Bracken, C.W. Timmreck, & A.H. Church (Eds.), The Handbook of Multisource Feedback: The Comprehensive Resource for Designing and Implementing MSF Processes (pp.3-14). San Francisco: Jossey-Bass.

Campion, E.D., Campion, M.C., & Campion, M.A. (2019). Best practices when using 360 feedback for performance appraisal. In A.H. Church, D.W. Bracken, J.W. Fleenor, & D.S. Rose (Eds.), *The Handbook of Strategic 360 Feedback* (pp.19-59). New York: Oxford University Press.

Campion, M.A., Palmer, D.K., & Campion, J.E. (1997). A review of structure in the selection interview. *Personnel Psychology, 50,* 655-701.

Cascio, W.F., & Aguinis, H. (2005). *Applied Psychology in Human Resource Management (6th ed.)*. Upper Saddle River, NJ: Pearson Prentice Hall.

Cascio, W.F., & Aguinis, H. (2019). *Applied Psychology in Talent Management (8th ed).* Thousand Oaks, CA: Sage.

Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor, & Department of Justice (1978). Uniform guidelines on employee selection procedures. *Federal Register, 43(166),* 38290-38315.



CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

Equal Employment Opportunity Commission, Office of Personnel Management, Department of Treasury (1979), *Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures,* 44 Federal Register 11, 996-12,009.

Farr, J.L., & Newman, D.A. (2001). Rater selection: Sources of feedback. In D.W. Bracken, C.W. Timmreck, & A.H. Church (Eds.), *The Handbook of Multisource Feedback: The Comprehensive Resource for Designing and Implementing MSF Processes* (pp.96-113*).* San Francisco: Jossey-Bass.

Gerhart, B., & Newman, J.M. (2020). *Compensation (13th ed.).* New York. McGraw-Hill Education.

James, L. R., Demaree, R. G., & Wolfe, G. (1984). Estimating within-group interrater reliability with and without response bias. *Journal of Applied Psychology, 69*, 85-98.

James*, L. R.,* Demaree*, R. G., &* Wolf*, G. (*1993*)*. rwg: An assessment of within-group interrater agreement. *Journal of Applied Psychology, 78(2),* 306–309.

Kabins, A. (2016). Why the qualms with qualitative? Utilizing qualitative methods in 360° feedback. *Industrial and Organizational Psychology, 9,* 806-810.

Landy, F.J. (1986). Stamp collecting versus science: Validation as hypothesis testing. *American Psychologist, 41,* 1183-1192.

LeBreton, J. M., & Senter, J. L. (2008). Answers to 20 questions about interrater reliability and interrater agreement. *Organizational Research Methods, 11*, 815-852.

Lepsinger, R. and Lucia, A.D. (2001). Performance management and decision making. In Bracken, D., Timmreck, C. & Church, A. (Eds.), *The Handbook of Multisource Feedback: The Comprehensive Resource for Designing and Implementing MSF Processes* (pp. 318–334). San Francisco, CA: Jossey-Bass.

Mero, N.P., & Motowidlo, S.J. (1995). Effects of rater accountability on the accuracy and favorability of performance ratings. *Journal of Applied Psychology, 80,* 517-524.

Mosier, C.I. (1943). On the reliability of a weighted composite. *Psychometrika, 8*, 161-168.

Nunnally, J.C. & Bernstein, I.H. (1994). *Psychometric Theory* (3rd ed.). New York: McGraw-Hill, Inc.

Pulakos, E. D., & Rose, D. S. (2019). Is 360 feedback a predictor or criterion measure? In A. H. Church, D. W. Bracken, J. W. Fleenor, & D. S. Rose (Eds.). *The handbook of strategic 360 feedback* (pp. 309-324). New York, NY: Oxford University Press.

Sackett, P. R., Laczo, R. M., & Arvey, R. D. (2002). The effects of range restriction on estimates of criterion interrater reliability: Implications for validation research. *Personnel Psychology*, *55*, 807-825.

Salgado, J. F., & Moscoso, S. (2019). Meta-analysis of interrater reliability of supervisory performance ratings: Effects of the appraisal purpose, range restriction, and scale type. *Frontiers in Psychology, 10,* 2281.

Silzer, R., & Church, A.H. (2009). The pearls and perils of identifying potential. *Industrial and Organizational Psychology: Perspectives on Science and Practice, 2*(4), 377-412.

Society for Industrial and Organizational Psychology (2018). *Principles for the validation and use of personnel selection procedures* (5th ed.). Bowling Green, OH: Author.

SPC For Excel. (2016, Feb.). Are the skewness and kurtosis useful statistics? Retrieved on March 24, 2021 from: www.spcforexcel.com/knowledge/basic-statistics/are-skewness-and-kurtosis-useful-statistics.

Tetlock, P.E., & Kim, J.I. (1987). Accountability and judgment processes in a personality prediction task. *Journal of Personality and Social Psychology, 52,* 700–709.

Thornton, G.C. (2009). Evidence of content matching is evidence of validity. *Industrial and Organizational Psychology, 2,* 469-474.

Wang, M.W., & Stanley, J.C. (1970). Differential weighting: A review of methods and empirical studies. *Review of Educational Research, 40*, 663-705.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

## MATERIALS CONSIDERED

- Cascio Expert Report, 10/30/13
- Cascio Expert Report, 1/28/14
- Cascio Expert Report, 2/18/14
- Cascio Expert Report, 5/19/14
- Cascio Expert Report, 1/15/21
- Cascio Expert Report, 3/19/21
- Farber Expert Report, 3/19/21
- Shaw Expert Report, 3/19/21
- GS0124972
- GS0604751


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

## APPENDIX A: STATISTICAL STUDY 7

I completed another study, Statistical Study 7, to provide additional validation evidence related to promotion to Extended Managing Director. Specifically, using available data I evaluated the relationship between the Division-specific objective metrics (described in Statistical Study 5) and promotion from Vice President to Extended Managing Director (described in Statistical Study 6). All relevant data cleaning rules applied in Statistical Studies 5 and 6 were similarly applied to the data of the current study. The aggregated results of the Spearman correlation coefficients and associated statistical significance levels are summarized in **Table A.1**.[25] As can be seen, the majority of correlations between the Division-specific objective metrics and nomination and promotion are statistically significant, in the positive direction, and consistent with typical findings from the I/O psychology literature. These results show that Vice Presidents with stronger objective metrics were more likely to be nominated and promoted to Extended Managing Director.

**Table A.1 Correlations Between Division-Specific Metrics and Promotion Outcomes**

| Outcome | Daily IBD Production[25] | | | GSAM Composite Score | | | Daily Securities Production | | |
|---|---|---|---|---|---|---|---|---|---|
| | Spearman Range | Spearman Average | Statistically Significant | Spearman Range | Spearman Average | Statistically Significant | Spearman Range | Spearman Average | Statistically Significant |
| Nominated | .09 – .36 | .20 | 6 of 10 | .25 – .56 | .44 | 6 of 6 | .16 – .45 | .30 | 11 of 11 |
| Promoted | .06 – .30 | .20 | 8 of 10 | .24 – .49 | .36 | 6 of 6 | .23 – .41 | .31 | 10 of 10 |

Note: 1) Sample sizes for IBD range from 105-180; sample sizes for IMD range from 89-162; sample sizes for Securities range from 192-494 (one year excluded for promoted outcome because 0 professionals were promoted).

[25] Importantly, revenue from a given project is allocated evenly to all bankers who worked on the project. As such, this metric is not as individualized as metrics in IMD and Securities. However, these values nevertheless demonstrate more instances of statistical significance than expected by chance, and all results were in a positive direction.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

## APPENDIX B: STATISTICAL STUDY 8

Professionals who were promoted from Associate to Vice President were identified, and analyses were performed to evaluate the relationship of an Associate's 360 Feedback Review overall score and Manager Quartile assignment (Time 1) with future performance indicators as a Vice President (Time 2).[26] Specifically, the following were examined:[27]

- Relationship of 360 Feedback Review overall score as an Associate (Time 1) with performance outcomes in the following year (Time 2) as a Vice President, including:
    1. Vice President 360 Feedback Review overall score.
    2. Vice President Manager Quartile assignment.
- Relationship of Manager Quartile assignment as an Associate (Time 1) with performance outcomes in the following year (Time 2) as a Vice President, including:
    1. Vice President 360 Feedback Review overall score.
    2. Vice President Manager Quartile assignment.

Since all professionals in this study were an Associate at Time 1 and a Vice President at Time 2, the analysis strata for this study were Division and Year Pairings (e.g., data from professionals who were Associates in 2010 and Vice Presidents in 2011). Not surprisingly, the sample sizes within analysis strata were often small,[28] which impacted the analyses that were feasible.

---

[26] As mentioned earlier, a similar study was not feasible for promotions from Vice President to Extended Managing Director because performance information for Extended Managing Director has not been produced in this matter. Even if those data were available, based on the small number of promotions to Extended Managing Director, it is likely that small sample sizes would have precluded analyses.

[27] Small sample sizes precluded the inclusion of objective metrics in these analyses.

[28] For the correlation analyses within strata, a minimum sample size of 30 was required to be consistent with the threshold used in Statistical Studies 2, 3, and 4. This minimum sample size was derived using a power analysis ($\alpha$ = .05, $\beta$ = .80, estimated correlation = .50). This sample size threshold was


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

**Results for 360 Feedback Review Overall Scores**

**Table B.1** presents the correlations of the Associate 360 Feedback Review overall scores (Time 1) with the Vice President 360 Feedback Review overall scores in the subsequent year (Time 2). As can be seen, correlations between the Associate 360 Feedback Review overall scores and subsequent Vice President 360 Feedback Review overall scores ranged from .45 to .76, with an average of .62, and *all* 31 correlations were statistically significant and in a positive direction. The results from this study are similar to Statistical Study 2 for temporal consistency of the 360 Feedback Review (within corporate title) reported in my opening Job Relatedness Report. The results from this study unequivocally support the validity of the 360 Feedback Review overall score *as a predictor of performance in a future role* — the very type of predictive criterion-related validation evidence Dr. Cascio now demands.

---

chosen to try to ensure that more strata would be included in the analyses and that all three Divisions would be represented, even though power analyses suggest that a larger sample would be necessary for more accurately detecting if relationships exist. Once again, this is not an analysis that I would typically conduct or recommend because of the small sample size.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

| Table B.1. Associate 360 Feedback Review Overall Scores Predicting Vice President 360 Feedback Review Overall Scores a Year Later (Pearson Correlations) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year at Time 1 (Associate) | Year at Time 2 (Vice President) | IBD | | IMD | | Securities | |
| | | N | Pearson Correlation | N | Pearson Correlation | N | Pearson Correlation |
| 2003 | 2004 | | | | | 33 | .45** |
| 2004 | 2005 | | | | | 92 | .70** |
| 2005 | 2006 | | | 53 | .64** | 125 | .70** |
| 2006 | 2007 | 35 | .67** | 48 | .71** | 163 | .76** |
| 2007 | 2008 | 37 | .63** | 45 | .57** | 164 | .61** |
| 2008 | 2009 | 36 | .60** | 52 | .66** | 124 | .60** |
| 2009 | 2010 | 52 | .58** | 53 | .57** | 123 | .57** |
| 2010 | 2011 | 47 | .67** | 57 | .55** | 91 | .69** |
| 2011 | 2012 | 46 | .53** | 59 | .53** | 90 | .65** |
| 2012 | 2013 | 36 | .48** | 72 | .75** | 67 | .65** |
| 2013 | 2014 | 44 | .73** | 74 | .73** | 70 | .71** |
| 2014 | 2015 | 49 | .51** | 59 | .54** | 55 | .51** |
| | **Average** | | **.60** | | **.62** | | **.63** |

Note: 1) Analyses were conducted only when the sample size for a given strata was 30 or more; blank cells indicate insufficient data. 2) Cells denoted by ** indicate a correlation is statistically significant at p < .01.

**Table B.2** presents the correlations of the Associate 360 Feedback Review overall scores (Time 1) with the Vice President Manager Quartile assignments in the subsequent year (Time 2). As can be seen, correlations between the Associate 360 Feedback Review overall scores and the subsequent Vice President Manager Quartile assignments ranged from .17 to .77, with an average of .51, and 29 of 32 (90.6%) correlations were statistically significant and in a positive direction. These results are similar to those found in Statistical Study 4 (within corporate title) in my opening

Job Relatedness Report. The results from this study unequivocally support the validity of the 360 Feedback Review overall score *as a predictor of performance in a future role* — the very type of predictive criterion-related validation evidence Dr. Cascio now demands.

**Table B.2. Associate 360 Feedback Review Overall Scores Predicting Vice President Manager Quartile Assignments a Year Later (Spearman Correlations)**

| Year at Time 1 (Associate) | Year at Time 2 (Vice President) | IBD | | IMD | | Securities | |
|---|---|---|---|---|---|---|---|
| | | N | Pearson Correlation | N | Pearson Correlation | N | Pearson Correlation |
| 2003 | 2004 | | | | | 33 | .41* |
| 2004 | 2005 | | | | | | |
| 2005 | 2006 | | | | | 125 | .56** |
| 2006 | 2007 | 35 | .77** | 48 | .23 | 163 | .61** |
| 2007 | 2008 | 43 | .70** | 48 | .38** | 164 | .63** |
| 2008 | 2009 | 36 | .69** | 52 | .56** | 124 | .38** |
| 2009 | 2010 | 52 | .57** | 53 | .26 | 123 | .55** |
| 2010 | 2011 | 47 | .36* | 57 | .33* | 91 | .42** |
| 2011 | 2012 | 46 | .75** | 59 | .56** | 89 | .58** |
| 2012 | 2013 | 36 | .55** | 72 | .45** | 67 | .54** |
| 2013 | 2014 | 44 | .69** | 74 | .63** | 72 | .46** |
| 2014 | 2015 | 49 | .60** | 59 | .42** | 55 | .45** |
| 2015 | 2016 | 56 | .49** | 71 | .52** | 51 | .17 |
| | **Average** | | **.62** | | **.43** | | **.48** |

Note: 1) Analyses were conducted only when the sample size for a given strata was 30 or more; blank cells indicate insufficient data. 2) Cells denoted by * indicate a correlation is statistically significant at $p < .05$, and ** indicates a correlation is statistically significant at $p < .01$.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

**Results for Manager Quartile Assignments**

**Table B.3** presents the correlations of the Associate Manager Quartile assignments (Time 1) with Vice President 360 Feedback Review overall scores a year later (Time 2). As shown, correlations between the Associate Manager Quartile assignments and the subsequent Vice President 360 Feedback Review overall score ranged from .07 to .63, with an average of .43, and 23 of 28 (82.1%) correlations were statistically significant and in a positive direction. These results are similar to those found in Statistical Study 4 (within corporate titles) in my opening Job Relatedness Report although average correlations are slightly lower, which is expected given the correlations are across corporate titles. The results from this study unequivocally support the validity of Manager Quartile assignments as *a predictor of performance in a future role* — the very type of predictive criterion-related validation evidence Dr. Cascio now demands.

**Table B.3. Associate Manager Quartile Assignments Predicting Vice President 360 Feedback Review Overall Scores a Year Later (Spearman Correlations)**

| Year at Time 1 (Associate) | Year at Time 2 (Vice President) | IBD | | IMD | | Securities | |
|---|---|---|---|---|---|---|---|
| | | N | Pearson Correlation | N | Pearson Correlation | N | Pearson Correlation |
| 2003 | 2004 | | | | | 92 | .50** |
| 2004 | 2005 | | | | | 88 | .39** |
| 2005 | 2006 | | | | | | |
| 2006 | 2007 | 33 | .63** | | | 164 | .47** |
| 2007 | 2008 | 36 | .61** | 45 | .40** | 161 | .36** |
| 2008 | 2009 | 36 | .44** | 51 | .22 | 124 | .32** |
| 2009 | 2010 | 52 | .56** | 53 | .24 | 123 | .49** |
| 2010 | 2011 | 46 | .58** | 56 | .07 | 91 | .40** |
| 2011 | 2012 | 46 | .45** | 59 | .24 | 90 | .54** |
| 2012 | 2013 | 38 | .13 | 71 | .34** | 68 | .50** |
| 2013 | 2014 | 44 | .56** | 74 | .49** | 70 | .38** |
| 2014 | 2015 | 48 | .57** | 59 | .50** | 55 | .53** |
| | **Average** | | **.50** | | **.31** | | **.44** |

Note: 1) Analyses were conducted only when the sample size for a given strata was 30 or more; blank cells indicate insufficient data. 2) Cells denoted by ** indicates a correlation is statistically significant at $p < .01$.

**Table B.4** presents the correlations of the Associate Manager Quartile assignments (Time 1) with Vice President Manager Quartile assignments a year later (Time 2). As seen in Table 4, correlations between the Associate Manager Quartile assignments and the subsequent Vice President Manager Quartile assignments ranged from .18 to .69, with an average of .52, and 32 of 36 (88.9%) correlations were statistically significant and in a positive direction. These results are similar to those found in Statistical Study 3 (within corporate titles) in my opening Job Relatedness

Report. The results from this study unequivocally support the validity of Manager Quartile assignments as *a predictor of performance in a future role* — the very type of predictive criterion-related validation evidence Dr. Cascio now demands.

**Table B.4. Associate Manager Quartile Assignments Predicting Vice President Manager Quartile Assignments a Year Later (Spearman Correlations)**

| Year at Time 1 (Associate) | Year at Time 2 (Vice President) | IBD | | IMD | | Securities | |
|---|---|---|---|---|---|---|---|
| | | N | Pearson Correlation | N | Pearson Correlation | N | Pearson Correlation |
| 2003 | 2004 | | | | | 92 | .51** |
| 2004 | 2005 | | | | | | |
| 2005 | 2006 | | | | | | |
| 2006 | 2007 | 33 | .68** | | | 164 | .53** |
| 2007 | 2008 | 42 | .65** | 48 | .51** | 161 | .52** |
| 2008 | 2009 | 36 | .52** | 51 | .26 | 124 | .43** |
| 2009 | 2010 | 52 | .61** | 53 | .58** | 123 | .53** |
| 2010 | 2011 | 46 | .41** | 57 | .18 | 91 | .48** |
| 2011 | 2012 | 46 | .62** | 59 | .23 | 89 | .63** |
| 2012 | 2013 | 38 | .37* | 71 | .42** | 68 | .56** |
| 2013 | 2014 | 44 | .69** | 74 | .51** | 72 | .56** |
| 2014 | 2015 | 48 | .66** | 59 | .65** | 55 | .55** |
| 2015 | 2016 | 56 | .49** | 71 | .66** | 50 | .24 |
| 2016 | 2017 | 52 | .59** | 64 | .55** | 62 | .62** |
| 2017 | 2018 | 55 | .64** | 94 | .51** | 64 | .58** |
| | **Average** | | **.58** | | **.46** | | **.52** |

Note: 1) Analyses were conducted only when the sample size for a given strata was 30 or more; blank cells indicate insufficient data. 2) Cells denoted by a * indicate a correlation is statistically significant at $p < .05$, and ** indicates a correlation is statistically significant at $p < .01$.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT

**Statistical Study 8 Summary**[29]

The pattern of results in Statistical Study 8 overwhelmingly support that 360 Feedback Review overall scores and Manager Quartile assignments for professionals holding the corporate title of Associate predict 360 Feedback Review overall scores and Manager Quartile assignments for those promoted into the corporate title of Vice President. Dr. Cascio's new and unreasonable standard of a predictive cross-corporate title criterion-related validity study has been met. More specifically:

- All correlations between Associate 360 Feedback Review overall score and Vice President 360 Feedback Review overall score were statistically significant and in a positive direction.
- The majority (90.6%) of correlations between Associate 360 Feedback Review overall score and Vice President Manager Quartile assignments were statistically significant and in a positive direction.
- The majority (82.1%) of correlations between Associate Manager Quartile assignments and Vice President 360 Feedback Review overall score were statistically significant and in a positive direction.
- Similarly, the majority (88.9%) of correlations between Associate Manager Quartile assignments and Vice President Manager Quartile assignments were statistically significant and in a positive direction.
- This pattern of results was generally similar to the pattern of results within corporate title presented in my opening Job Relatedness Report (Appendix 4F). Average correlations within corporate title were generally higher than average correlations across corporate title, which is exactly what one would expect.

---

[29] Similar analyses were performed (and are contained in the backup materials) correlating Associate 360 Feedback Review overall score and Manger Quartile assignments with performance outcomes as a Vice President *two* years later and the results are similar.


CONFIDENTIAL PURSUANT TO COURT ORDER AND DATA HANDLING AGREEMENT