# EXHIBIT 31

# EXECUTIVE COMPENSATION CONSULTANTS

**Ruth Bender**

**Cranfield School of Management**

*Presented at the*

**Executive Compensation and Corporate Governance Conference**

**University of Genoa, 12 March 2011**

Remuneration consultants are an integral part of the process of determining executive pay in large listed companies. This paper discusses the role of the consultants in the United Kingdom, United States and Canada, analyses their industry and the factors currently affecting it, and summarises the growing academic literature on why consultants are used, their impact on pay policies and packages, and their potential conflicts of interest.

*This paper will form a chapter in The Research Handbook on Executive Pay, edited by Jennifer Hill and Randall S Thomas, to be published by Edgar Elgar*

**Correspondence Details**
Dr Ruth Bender
Cranfield School of Management
Cranfield
Bedfordshire
MK43 0AL
United Kingdom

+44 (0) 1234 751122
r.bender@cranfield.ac.uk

Electronic copy available at: https://ssrn.com/abstract=1788322

# EXECUTIVE COMPENSATION CONSULTANTS

Ruth Bender

**Introduction ..... 1**
**1. The role of compensation consultants ..... 3**
1.1 The consultant as an expert ..... 4
1.2 The consultant as an intermediary ..... 6
1.3 Legitimizing the committee's decisions ..... 7
1.4 Hiring consultants ..... 9
**2. Executive compensation consulting as an industry ..... 10**
2.1 Industry analysis ..... 10
2.2 Who is the client? Conflicts of interest and how they are addressed ..... 12
**3. Research findings on the impact of compensation consultants ..... 16**
3.1 Level and structure of compensation schemes ..... 17
3.2 Conflicts of interest ..... 19
**4. The future? ..... 22**
**References ..... 23**

Table 2.1 Forces impacting the executive compensation consulting industry ..... 27
Table 2.2 Regulation on disclosure of advisor information ..... 28
Table 3.2 An overview of research studies ..... 29

Executive compensation in listed companies is, in many jurisdictions, determined by a compensation committee comprising independent directors. In most large companies, that committee is advised by one or more compensation consultants. The consultants provide advice on the appropriate level of pay and on the types of plan that will be suitable. They model likely outcomes, and advise on a variety of other matters including tax, accounting treatments, regulation and investor sentiment. This use of independent advisors to the compensation committee is not mandatory, but is encouraged by regulators.

This chapter discusses the role of compensation consultants, and summarizes research into how they have impacted executive pay. It is structured in three sections.



Electronic copy available at: https://ssrn.com/abstract=1788322

Firstly, we review the role of the executive compensation consultant, considering the reasons that companies use them: their expertise, and their impact in legitimizing the compensation committee's decisions. In doing so, we examine how the consultants operate, and the factors influencing companies' choice of consulting firm.

In the second section we consider executive compensation consulting as an industry, and review the forces affecting the business of consulting, and the effect that these have on the consulting firms, their clients, shareholders and regulators. The industry is dominated by a few large firms, of which most are multi-business organisations, earning fees from other activities in addition to advice on executive compensation. The main factor determining a firm's ability to attract executive compensation assignments is its reputation, enhanced by expertise and proprietary knowledge. However, reputation may be damaged due to two potential conflicts of interest: the consultants' desire to retain an assignment in future years, and their wish to cross-sell other services. Investors and regulators perceive that these conflicts of interest can lead to the firms shaping their advice to favour the client's executives, which is damaging the reputation of the industry.

These operational matters give a context to the final part of the chapter, in which we review research on the impact that the use of consultants has had on the level and structure of executive compensation in the USA, UK and Canada, the three main jurisdictions in which studies have been undertaken. This research demonstrates that companies using consultants have higher pay levels and more equity-based compensation than do others. However, the reasons for these differences are unclear. Furthermore, contrary to common perceptions, research is equivocal as to whether there is evidence that pay structures do indeed reflect a conflict of interest between the firms and their clients.



Electronic copy available at: https://ssrn.com/abstract=1788322

## 1. The role of compensation consultants

According to Crystal (1991) executive compensation consulting as a profession dates back to the 1950s, but it only took off in the early 1980s, triggered by movements in the stock market which led to a greater sophistication in compensation schemes. As plans have become more complex, the use of consultants has grown, itself resulting in further complexity. In this section we consider what consultants do, and how and why they are appointed.

The first reason for using consultants is the need for their expertise. The process of determining executive compensation includes establishing an appropriate level of pay based on some sort of 'market' indicator, and determining suitable incentive plans for the short- and long-term. In doing this, account needs to be taken of current market trends, tax and accounting treatments, regulatory requirements and investors' preferences. The compensation committee charged with this task is staffed by outside directors, with neither the time nor the experience to undertake this task. Accordingly, they look to consultants for advice and assistance.

A second reason for employing consultants, and one which is fundamental to their activities, is the role that advisors have in legitimizing the committee's remuneration decisions. Executive pay is a high-profile subject, and there is no one right answer to the question, "How much should we pay the executives?". Accordingly, there is always the danger for the committee members that they will be seen as making pay decisions that favour their executive colleagues. It can be argued that the use of an independent advisor will result in a



Electronic copy available at: https://ssrn.com/abstract=1788322

more optimal contract. Thus, committees obtain legitimacy for their decisions by seeking advice from consultants.

## 1.1 The consultant as an expert

The consultants' expertise is harnessed both in determining the level of pay, and in devising a suitable pay scheme. It is also important in managing the presentation of the plans to, and liaising with, key investors.

It is customary for executive pay levels to be determined with reference to appropriate comparators amongst the company's peers. One area of expertise for the consultancies is through maintaining proprietary databases which collect comparative data on pay levels and structures in different industries and sizes of business. These, supplemented by surveys conducted by the consulting firms, are used in benchmarking 'market' levels of pay. Companies often use several firms to supply such data for their remuneration decisions, perhaps taking generic published data from some and commissioning bespoke analysis from others. Frequently, the lead consultant will provide advice to the committee on which comparators should be used (Bender, 2003). Given that this selection will set the yardstick for executive pay, the choice is critical, and the consultants' advice will have considerable influence on the level of pay.

In addition to the level of pay, decisions need to be taken on the structure of the schemes to be used. Structures have become increasingly complex over the last two decades, with companies using various types of short- and long-term incentive. With this complexity and variety, the need for consultants' advice has grown. They provide input on plan design,



Electronic copy available at: https://ssrn.com/abstract=1788322

modelling the possible pay outcomes for a range of different profitability scenarios, and they advise on tax and accounting consequences. In this, the consulting firms display their technical knowledge of the different types of plan that are possible, their understanding of different valuation methodologies for equity-based plans, their market knowledge of what is acceptable to shareholders, and their experience of successful implementation. They also work with clients on existing compensation plans, helping to provide data on, for example, comparative shareholder return, in order to establish whether executives have met performance targets.

Whereas companies will use several consultancy firms to provide benchmark data on pay levels, it is less common to use more than one advisor to determine the structure of pay. If two advisors work on different parts of the pay package, there is a danger that they will produce something that is not coherent as a whole, and the incentives they design might drive different behaviours, or could produce too rich a reward for the executive. Nevertheless, there are instances where companies choose to use different consultants for different parts of the package. Alternatively, companies may employ two firms of consultants because one is being used to review existing schemes, to provide an opinion on whether they are still appropriate (Bender, 2011; Kabir and Minhat, 2009; Murphy and Sandino, 2010).

It is worth noting that the consultants' role is to provide both information and advice. In theory, the comparator data is merely information, free of value-judgements and given to committees to help them determine an appropriate pay level. However, in producing the figures, the consultants take a view on what data to include and exclude from the comparators they use. This act of selection effectively blurs the boundary between information and advice on pay levels. Furthermore, the consultants do more than advise clients on 'best practice' in



Electronic copy available at: https://ssrn.com/abstract=1788322

scheme design – they also help create that practice. In an example of normative isomorphism, the practices they follow are promulgated around the various companies they advise, until often they become seen as best practice (Bender, 2003; Conyon et al., 2000; Conyon et al., 2009b; Hodak 2005; Thorley-Hill and Stevens, 1995). Thus, their influence permeates the market.

Compensation consultants clearly have a lot of influence over the outcome of the pay-setting process in the companies they advise. But it is worth noting that all they are doing is *advising*, they do not actually make the compensation decisions. The decision rests with the remuneration committee, which could if it wished ignore their advice, although the psychological impact of the numbers they produce leads to an anchoring effect that might be difficult to overcome (Bender, 2003). Research by Bender (2011) highlighted committee members' awareness of the limitations and possible biases in the data supplied to them. That research was not able to determine whether committees did in fact act independently of the consultants' recommendations.

## 1.2 The consultant as an intermediary

The level and structure of executive compensation have to be tolerable to shareholders. In some jurisdictions this is more important to the board than others. For example, in the UK shareholders have had a non-binding vote on the annual remuneration report since 2002. This practice was adopted in the following few years by several European countries and Australia (Hodgson, 2009). In 2010, the Canadian Coalition for Good Governance brought in a recommendation on 'say on pay'. And the passing of the Dodd-Frank Act of 2010 means the practice of regular 'say on pay' will become compulsory in the



Electronic copy available at: https://ssrn.com/abstract=1788322

USA as well. Accordingly, the views of investors have become more important to compensation committees, and consultants who can moderate these discussions can add value for their clients.

One advantage of using consultants as intermediaries is that they understand, and can explain to the shareholders, all the technical details of the schemes they have devised. More importantly, they have experience in liaising between companies and their investors, and understand the investors' approach. Research in the UK (Bender, 2011) shows that this expertise is one of the key reasons behind a company's choice of advisor. In addition to giving their clients an understanding of the institutional viewpoint, the consultants often play an active part in the dialogue, attending meetings with investors, or drafting correspondence. For the consultants, this reinforces their institutional network and, of course, generates fees. For the compensation committees it gives comfort that the task is being handled in an appropriate manner. However, investors often prefer to see the directors themselves, rather than having the conversation conducted through their advisors.

### 1.3 Legitimizing the committee's decisions

In addition to the stated objective of advice on structuring packages, an important reason for using consultants is to create legitimacy for the committee's decisions on executive pay (Suchman, 1995).

In a board, the executives and directors will work closely together, which leads many observers to suggest that the directors cannot then be totally unbiased in determining the compensation of their executive colleagues, and that, consciously or unconsciously, they will



Electronic copy available at: https://ssrn.com/abstract=1788322

be predisposed towards high awards (Murphy, 1999, p2518). The use of an external, independent advisor can help provide some comfort in the objectivity of these decisions (Bender, 2003). This phenomenon was illustrated by Wade, Porac and Pollock (1997), examining how compensation committees justified CEO pay to shareholders. They found that companies frequently legitimized their executive compensation practices by citing the role of consultants in the process. Similarly, Barkema and Gomez-Mejia (1998, p141) referred to "judgments of the committee members, legitimized by the opinions of external consultants". In a situation where the decision cannot be proved to be 'right', such legitimation is valuable to boards.

This potential bias means that regulators also see the need for independent advice to the committee. This has been the situation for many years: for example in 1995 the UK's Greenbury Committee stated, "The committee may need to draw on outside advice. This should combine quality and judgement with independence." (para 4.17). Since then, regulation has strengthened in all jurisdictions, emphasizing the need for independent advice. An example of such regulation is in the Dodd-Frank Wall Street Reform and Consumer Protection Act (2010), which views factors influencing consultants' independence as including: the provision of other services to the company; the level of fees for the assignment as a percentage of the consultant's total fee income; procedures in place to prevent conflicts of interest; and any business or personal relationships with committee members, or shareholdings in the company.

The employment of independent consultants is seen as protecting stakeholders. Accordingly, it can act as a form of risk-management by the company; advice from consultants can be used by the committee and the board to justify any decisions that are later



Electronic copy available at: https://ssrn.com/abstract=1788322

challenged. However, this legitimacy is an intangible that can only be achieved if the consultants are perceived to be independent. Thus, the challenge to their independence posed by their potential conflicts of interest could have a detrimental impact.

## 1.4 Hiring consultants

The length of tenure of advisors to the compensation committee is not governed by rules or guidance. Some companies retain the same consulting firm for many years; others change advisors regularly. Changes might occur as a matter of good practice (for example, because the advisors were becoming too close to management), or because the committee is not satisfied with the advice given. Dissatisfaction can arise for several reasons, one illustration being that the advice was felt to be insufficiently tailored to the particular company[1]. However, advisors might also be removed because the outcome of a scheme was less than the anticipated level of executive reward (Bender, 2011).

Bender (2011) reporting work done in the UK in 2001 - 2003, found that the selection of consultants to advise the committee took into account the reputation and expertise of the consulting firm. This makes sense, given the need for both advice and legitimacy from the appointment. Furthermore, she found that the choice of consultant was often influenced by personal recommendation: with a preference for shortlisting a consulting firm that was known to the non-executive directors, either due to another appointment, or because they had put on seminars which the directors had attended. Firms were shortlisted based on the knowledge of

[1] Consultants sell their services partly on their ability to match solutions specifically to the needs of the company. However, there is a need for the plans to be acceptable, and therefore recognizable to their clients and to the rest of the corporate world. It is an odd fact of the consultancy industry in general that whilst consultants claim to produce novel recommendations, and clients claim to employ them so to do, a consultant producing something far removed from accepted practice will be treated with suspicion, and so fresh ideas can be stifled. The way in which consultants balance this tension is discussed by Sturdy (1997) and Hodak (2005).



Electronic copy available at: https://ssrn.com/abstract=1788322

the remuneration committee members, and also that of their internal advisors in the company's human resources department. Those internal advisors were sometimes influential in making the decision as to which firms to employ.

## 2. Executive compensation consulting as an industry

Academics and regulators view executive compensation consultants through a corporate governance lens, examining their impact on the compensation landscape. But for those involved, consultancy is first and foremost a business. Accordingly, it is worth discussing the business of consultancy, and how it makes its money. In doing this we commence with a brief industry analysis before looking at the mechanisms adopted by consultants to protect their franchise. We also consider the threat to their business due to their potential conflicts of interest, and how this is being addressed.

### 2.1 Industry analysis

In common with most management consultants, executive compensation consulting can be expensive. In large companies, where the resources are available and where pay decisions are high-profile and thus high-risk for the directors, this is seen as a necessary and affordable cost. However, the expense is less justifiable in smaller companies, and such organisations make less use of the advisors (Conyon, Peck and Sadler, 2009b; Cadman, Carter and Hillegeist, 2010; Goh and Gupta, forthcoming; Voulgaris, Stathopoulos and Walker, 2009). The industry analysis that follows reflects the consulting market for the larger listed companies, as does the majority of academic research on the subject.



Electronic copy available at: https://ssrn.com/abstract=1788322

In the major jurisdictions studied by researchers – USA, Canada and UK – this is an oligopoly, with a handful of large firms dominating.[2] Conyon (2010) summarized the basic market structure in each jurisdiction, noting then that six major firms dominated the market. Merger activity meant that his data, extracted from earlier studies, became quickly out of date. Adjusting for this, the major players, present in all three jurisdictions, are: Towers Watson, Mercer Human Resources Consulting, and Hewitt New Bridge Street, all global, diversified consultancies[3].

In the USA, there are two other significant players, Pearl Mayer and Frederic W Cook & Co., both focusing just on compensation. Thus in the USA, the five leading firms are all consultancies.[4] This differs from the situation in the UK, where accounting firms such as PricewaterhouseCoopers and Deloitte also have a significant profile in the market.

The classic way to analyse an industry is Michael Porter's five forces analysis (1998). Applying this model, as set out in Table 2.1, gives a context for understanding industry behaviour.

[Please enter Table 2.1 here]

Given the analysis above, the main factors impacting a firm's ability to compete are its reputation and expertise. These are closely linked.

---

[2] For example, Cadman et al. (2010), reporting 2006 data, noted that 76% of their S&P 500 sample employed one of the large consultants, and the remaining companies used one of 63 smaller consulting firms.
[3] Conyon (2011) notes that the industry in Australia appears to share similar attributes to these other jurisdictions.
[4] See Conyon (2011) for a full analysis of consultant engagement presence in the USA over the S&P 1500, S&P 500 and Russell 3000.



Electronic copy available at: https://ssrn.com/abstract=1788322

For a firm to be successful there are two prerequisites. To undertake the assignments the consultant needs to have expertise; to win assignments, it needs to *appear* to have expertise. The consultants' actual expertise is evidenced in their advice. This will include their understanding of what is acceptable to the market, technical knowledge of what might be appropriate and how it will work, and their ability to implement the resultant schemes. But the appearance of expertise is vital in convincing potential clients to consider them for the work in the first place. Impression management techniques, used in all areas of management consultancy, are relevant here. A firm's reputation will be signalled through its blue chip client base, the words used to describe its expertise; and its website, literature and presentations. These are all seen as indicators of the quality of the advice and, ultimately used to signal that their clients are adopting 'best practice' (Bender, 2011).

The value of the consulting firm in legitimizing its client's decisions will be reduced if the firm itself is not seen as independent. Thus we now need to consider ways in which this has affected consultants and the committees they advise.

## 2.2 Who is the client? Conflicts of interest and how they are addressed

Sturdy (1997, p406) argues that in every field of consultancy the consultant has two goals: to complete the assignment, and to gain repeat business. In executive compensation consulting this tension is exacerbated. A compensation consultant could potentially earn fees from three types of assignment for a company. He could advise the compensation committee (or board) on their executive compensation schemes; he could advise the executives on the executive compensation schemes[5]; and he could advise the executives on compensation in

[5] The use of consultants to advise executives on their packages is less common in the UK than in the USA.



Electronic copy available at: https://ssrn.com/abstract=1788322

other parts of the organization or on wider business issues. This gives rise to three possible areas for conflict of interest between the consulting firm's duty to its compensation committee client, and its own financial benefit.

One of these potential conflicts should seldom arise. There would be an unavoidable conflict of interest if a firm of consultants were to advise both the executives and the committee on the same issue. Committees and consultants are aware of this, and it is not usual practice, certainly not on a formal, fee-earning basis. However, other areas are of more concern. Although the consulting firm should be formally instructed by the compensation committee, if in practice the executives have power or influence over this decision the consultant could be tempted to design packages that are more rewarding than appropriate. In this way one might assume that they would gain favour with the executives, and thus retain their advisory position.

There is also potential for conflict if the committee's consultants are, or wish to become, advisors to the company on its other compensation and human resource issues, or wider business matters. For any major company, the potential fee income from this other business will significantly exceed that from advising the compensation committee. [6] Accordingly, in addition to the sell-on of other executive compensation consulting, there is potentially a conflict of interest for the consultant, who might be swayed into recommending packages that favour a CEO who has influence over the award of other work. Thus, the pull of obtaining new work is added to the desire to retain the original assignment.

[6] The multi-business consulting firms provide advice on all aspects of remuneration, pensions and benefits throughout the company, but also on wider employment matters, outsourcing, aspects of mergers and acquisitions, risk management, and investment management. Using US data, Waxman (2007, p4) reported that the ratio of 'other' fees to fees from executive compensation advice to the board averaged almost 11:1 and in some cases was over 100:1. There is thus a powerful financial incentive to win and retain this business, which could compromise independence from management.



Electronic copy available at: https://ssrn.com/abstract=1788322

Against this backdrop, many have suggested that consultants tend to produce schemes structured to favour the company's executives. For example, Crystal (1991, p9) commenced his thesis on why CEO pay had increased by stating, "The first culprits in what will be a litany of culprits are compensation consultants..." Others have taken similar views (e.g. Bebchuk and Fried, 2006; Hodak, 2004; Liberman, 2003).

One way in which regulators have sought to limit the impact of this potential conflict of interest is by requiring companies to disclose the names and interests of their compensation committee advisors. In doing so, the intention is to give prominence to potential threats to the advisors' independence. For example, the UK's Directors' Remuneration Report Regulations (2002) demanded disclosure of the names of advisors, the nature of their involvement, and whether or not they were appointed by the committee itself. It is possible that this disclosure, by highlighting whether consultants were working for the company as well as the committee, led to more separation of these roles; this may be one reason why the use of multiple consultants is more prevalent in the UK than the USA, where regulation came later (Conyon, 2009a; Kabir and Minhat, 2009). Table 2.2 summarizes the relevant disclosure requirements in the UK, Canada and the USA, to date the only large regimes requiring such public information.[7]

[7] Within the European Union, although there is a Recommendation that the remuneration committee should ensure that its consultant does not at the same time advise the human resources department or executives of the company, only the UK and Ireland require disclosure of the other services that a consultant provides for the company. German and Italian governance codes require that the committee's consultants be independent (Shearman & Sterling, 2009).



Electronic copy available at: https://ssrn.com/abstract=1788322

[insert Table 2.2 here]

As set out in the final part of this chapter, although the potential conflict of interest is widely discussed, it has not been unequivocally demonstrated through academic research. Nevertheless, it is a live issue, addressed by regulators. For example, in the UK, the House of Commons Treasury Committee, examining the role of executive compensation practices in the financial crisis, concluded in its final report (2009, para 82):

> *We have received a body of evidence linking remuneration consultants to the upward ratchet of pay of senior executives in the banking sector. We have also received evidence about potential conflicts of interest where the same consultancy is advising both the company management and the remuneration committee. Both these charges are serious enough to warrant a closer and more detailed examination of the role of remuneration consultants in the remuneration process.*

Likewise the Waxman committee (2007) in the USA concluded that "[c]ompensation consultant conflicts of interest are pervasive", and recommended that the consultant retained by the board should not perform other work for the company. And in Australia, the Productivity Commission Inquiry (2009) also thought it necessary to recommend ways in which such conflicts could be minimized or avoided.

The consulting firms themselves are actively taking measures to reduce the perception of a conflict of interest. They argue that it is against their interest to succumb to these pressures: were they to do so, it would damage their market reputation for independence and



Electronic copy available at: https://ssrn.com/abstract=1788322

thus harm their chances of obtaining future work, either from that client or from others.[8] In evidence to the Waxman committee they explained measures taken to prevent conflicts of interest clouding their advice, such as implementing Chinese walls between different parts of their business (Waxman, 2007, p8). Taking this one step further, in the USA the consultant Pay Governance LLC was spun out of Towers Watson with the specific aim of picking up executive compensation work from those of Towers Watson's clients who wished to demonstrate the independence of their board advisors.[9]

Another outcome of such regulatory interest, in the UK, was the formation in 2009 of the Remuneration Consultants Group. The sole aim of this group, which represents executive remuneration consultancy firms advising UK listed companies, was to develop "a voluntary Code of Practice that clearly sets out the role of executive remuneration consultants and the professional standards by which they advise their clients, which for the most part are Remuneration Committees". The five principles behind the Code are: Transparency, Integrity, Management of Conflicts to Ensure Objectivity, Competence and Due Care, and Confidentiality.[10]

## 3. Research findings on the impact of compensation consultants

Until relatively recently, there were few studies on the impact of executive compensation consultants, due to the lack of available data. However, regulatory changes in three

[8] These same arguments have been used in the past by credit ratings agencies (who are paid by the companies on which they report) and by the auditors to Enron and other high-profile failures. The threat of reputational damage is not always sufficient to prevent independence being compromised.
[9] However, Towers Watson has stated that it will continue to work with compensation committees that are comfortable with the company's existing protocols on independence.
[10] www.remunerationconsultantsgroup.com. This came about as a direct result of the various enquiries into the role played by bankers' pay structures in causing the financial crisis. The members of The Remuneration Group, listed on its website, are all firms advising at least one FTSE 350 company on their executive remuneration.



Electronic copy available at: https://ssrn.com/abstract=1788322

jurisdictions led to mandatory disclosure, summarized above in Table 2.2, which triggered academic research into the subject.

The nature of the available data has driven the research agenda. Some studies have examined the structure of the industry, dominated by a few key players (e.g. Conyon, Peck and Sadler, 2009a for USA and UK; Murphy and Sandino, 2010 for USA and Canada; Conyon, 2011 for USA). More have investigated the impact of using consultants on the level of executive compensation and the nature of schemes adopted. A particular concern has been whether there is evidence that executive pay is impacted by the potential for conflict of interest in the consultancy firms.

Most of the studies, particularly those concerning conflict of interest, have examined the data through the lens of managerial power theory and rent extraction (for example Goh and Gupta, forthcoming; Murphy and Sandino, 2010; Voulgaris et al., 2009). However, Conyon et al. (2009b) use a multi-theoretical approach which also included institutional and social comparison theories, to explore how practices are transmitted, and executive pay becomes homogenized. Institutional theory is also used by Bender (2011), who additionally takes an impression management perspective. The majority of the research uses quantitative methodologies, but Bender (2003, 2011) and Kostiander (2009) have both adopted an interview-based approach.

### 3.1 Level and structure of compensation schemes

Researchers have sought to determine the impact on executive pay, if any, of committees taking advice from compensation consultants. Although there are differences in



Electronic copy available at: https://ssrn.com/abstract=1788322

research approach (set out in detail by Conyon, 2011), the results of many of these studies are similar, finding that, after controlling for the size of company, the use of compensation consultants correlates to higher pay levels for the CEO (e.g. Armstrong, Ittner and Larcker, 2008; Conyon et al., 2009a; Conyon, 2011; Voulgaris et al., 2009). Armstrong et al. suggest that governance differences between the companies explain this correlation, arguing that CEOs of companies with weaker governance use consultants to extract higher pay. Conyon et al. (2009a) suggest several potential reasons for the finding, including differences in the characteristics of firms employing consultants to those not doing so. They point out that the use of pay consultants is endogenous, and this precludes a causal explanation of the correlation. Conyon (2011) concludes that "establishing a statistical relationship between CEO pay and consultants may indeed be sensitive to the type of method used".

Using consultants also has an implication for plan design; companies advised by consultants tend to adopt a higher level of equity-based incentives in their pay packages than do companies which do not use such advice (Conyon et al., 2009a and 2009b; Voulgaris et al., 2009). This finding could be explained in two different ways. It may be that companies seeking to use equity-based plans realize that this is a complex area and thus decide to employ consultants to advise and implement them (Conyon et al., 2009b). Alternatively, it could be because, as suggested by Hodak (2004), consultants have a natural bias towards complexity. Hodak points out that, quite apart from the higher fees generated by designing and implementing complex plans, implementing more sophisticated schemes enables the advisor to resolve conflicting agendas amongst the stakeholders, and can sometimes be used to prevent 'gaming' of the outcomes by management. On the other hand, Kostiander (2009), in a study of Finnish state-owned enterprises finds that complex plans are deliberately adopted in order to exploit loopholes to benefit management.



Electronic copy available at: https://ssrn.com/abstract=1788322

In considering the outcome of the consultants' advice, the constituent parts of the compensation cannot be considered in isolation. The design of compensation plans is holistic, with fixed and variable elements being balanced to meet the company's and individual's needs. So, although the use of consultants correlates with increased pay, Conyon (2009a) and Voulgaris et al. (2009) both point out that this makes sense in terms of balancing risk and return for the executive: the increased amounts of pay compensate for the greater risk due to the volatility of the equity-based elements.

Other studies have examined different aspects of the consultants' impact. Both Goh and Gupta (forthcoming) and Kabir and Minhat (2009) use time series data in investigating the ways in which UK companies use multiple consultants. Neither study finds evidence that the use of multiple consultants leads to higher executive pay. Goh and Gupta also consider the effect on compensation of a change in advisors. Their results are mixed, but overall, they find some evidence that opinion-shopping (i.e. changing the lead consultant) leads to higher executive salaries and less pay-risk. Cadman et al. (2010) tested the impact of adding or dropping a consultant, and found no impact on pay. Likewise, they reviewed the data by consultant and, although there was some variation, found no significant differences in median executive pay between clients of different consulting firms.

### 3.2 Conflicts of interest

Waxman (2007), using proprietary data, found that at least 45% of Fortune 250 companies used their executive pay advisors to provide other services as well. Murphy and



Electronic copy available at: https://ssrn.com/abstract=1788322

Sandino (2010) returned a lower estimate, but this may be understated due to the limitations of available data. Their Canadian data showed about 47% providing other services. UK research by Conyon et al. (2009a) found that some 45% of companies used their executive pay consultants to supply other services. No data are published on the level of fees paid to UK compensation consultants, but for Canada, where there is such disclosure, Murphy and Sandino's sample put the ratio of 'other' fees to executive compensation advice fees at approximately 13:1. This is similar to the average for the US from Waxman's proprietary data, which showed ratios averaging almost 11:1.

There is little doubt that the consultants' multiple business relationships can result in a conflict of interest. The important issue is whether this conflict biases their advice in favour of the CEO and executives, causing them to recommend higher pay awards, or to reduce the level of risk in a scheme.

Much has been written about this problem. For example, a survey of US boards by Lawler and Finegold (2007) found that directors believed that most important cause of rising executive compensation was the actions of compensation consulting firms. Likewise, the governance commentator Robert Monks (1998, p37) stated:

> *"A critical question of corporate legitimacy is whether CEOs set their own pay. 'Best practice' has decreed an elaborate 'ritual' through which the board of directors creates a Compensation Committee consisting entirely of 'independent' directors. ... Likewise, when the independent members of the Compensation Committee appoint an independent executive compensation consultant to assist them, one need suspend disbelief as to the appetite of personal service organizations to bring unwelcome advice to their clients."*



Electronic copy available at: https://ssrn.com/abstract=1788322

Some research evidence has been found which supports this view. The Waxman committee found a correlation between the extent of a consultant's conflict of interest and the level of CEO pay. Also, a qualitative study by Kostiander (2009) reported consultants' bias in favour of management. Kabir and Minhat (2009) found that consultants' market share was significantly related to CEO compensation, consistent with their hypothesis that the consultants are concerned with the risk of losing business. Nonetheless, the bulk of the extant research is equivocal, either showing no evidence of conflict of interest or only slight correlations.

One measure used to proxy conflict of interest is the use of multi-business consultancies, where it can be assumed that there might be a desire to cross-sell services to clients. Testing for this, Armstrong et al. (2008) found no support for claims that CEO pay is higher in companies advised by multi-business firms. Nor did Cadman et al. (2010). Likewise, Conyon et al. (2009a) also reported no evidence that this potential conflict of interest affected contract design (although Conyon et al. (2009b) did find some evidence consistent with conflict of interest). However, Murphy and Sandino (2010) using several measures of potential conflicts of interest, had different results. In some of their analyses, for USA and Canada, they found evidence that pay was higher in companies where the consultants supplied other services. Also, for their Canadian sample, they reported that the level of pay was correlated with the size of the consultants' fees for 'other' services. As regards the other type of conflict of interest, the desire for repeat business, they hypothesised that pay would be higher when consultants were employed by the CEO rather than the committee. They found the opposite to be true: CEO pay was about 13% higher in US companies where the consultant worked exclusively for the committee, rather than for the management.



Electronic copy available at: https://ssrn.com/abstract=1788322

Conyon (2011) reviews this literature, setting out details of the samples and methodologies in these studies, and concludes that there is no clear-cut evidence of the effect of a conflict of interest. He argues that the choice of methodology affects the robustness of the studies' results, and advises caution in interpreting the research findings due to selection effects and the possibility of reverse causality.

Table 3.2 sets out an overview of the main studies.

## 4. The future?

Compensation consultants provide advice and expertise in the increasingly-complex area of executive pay. They are part of the governance landscape, and their use appears likely to continue. Indeed, as more jurisdictions introduce regulation on independence and disclosure, it seems probable that the use of advisors will increase.

If they are perceived as independent, they also serve a role in legitimizing the decisions of the remuneration committee. Although their independence has been queried, due to the existence of areas for conflict of interest, regulation in many jurisdictions is being enhanced to try to strengthen their independence, or to ensure fuller disclosure of their activities. This growth in disclosure will also drive developments in the research agenda, and over the next decade we can anticipate further revelations on how consultants are employed, and what they do.



Electronic copy available at: https://ssrn.com/abstract=1788322

## References

André, P.M., Khalil, S. and Magnan, M. (2010). The adoption of deferred share unit plans for outside directors: economic and social determinants, *Journal of Management and Governance*, DOI: 10.1007/s10997-010-9142-5.

Armstrong, C.S., Ittner, C.D. and Larcker, D.F. (2008). *Economic Characteristics, Corporate Governance, and the Influence of Compensation Consultants on Executive Pay Levels* http://ssrn.com/abstract=1145548

Australian Government Productivity Commission (2009). *Executive Remuneration in Australia*, accessed from http://www.pc.gov.au/__data/assets/pdf_file/0008/93590/executive-remuneration-report.pdf on 13 August 2010.

Barkema, H.G. and Gomez-Mejia, L.R. (1998). Managerial Compensation and Firm Performance: a General Research Framework. *Academy of Management Journal*, 41(2), 135-145.

Bebchuk, L.A. and Fried, J.M. (2006). Pay without Performance: An Overview of the Issues, *Academy of Management Perspectives*, 5-23.

Bender, R. (2003) How Executive Directors' Remuneration is Determined in Two FTSE 350 Utilities, *Corporate Governance: An International Review*, 11(3), 206-217.

Bender, R. (2011 ). Paying for Advice: The role of the remuneration consultant in UK listed companies. Vanderbilt Law Review, *forthcoming*.

Cadman, B.D., Carter, M.E. and Hillegeist, S.A. (2010). The Role and Effect of Compensation Consultants on CEO Pay, *Journal of Accounting and Economics*, 49(3), 263-280.



Electronic copy available at: https://ssrn.com/abstract=1788322

Canadian Coalition for Corporate Governance (2010). *Model Shareholder Engagement And "Say On Pay" Policy For Boards Of Directors*, available from www.ccgg.ca .

Conyon, M.J., Peck, S.I., Read, L.E. and Sadler, G.V. (2000). The Structure of Executive Compensation Contracts: UK Evidence. *Long Range Planning*, 33(4), 478-503.

Conyon, M.J., Peck, S.I., and Sadler, G. V. (2009a) Compensation Consultants and Executive Pay: Evidence from the United States and the United Kingdom, *Academy of Management Perspectives*, 23(1), 43-55.

Conyon, M.J., Peck, S.I., and Sadler, G. V. (2009b) New perspectives on the governance of executive compensation: an examination of the role and effect of compensation consultants, *Journal of Management and Governance*, DOI 10.1007/s10997-009-9117-6

Conyon, M.J. (2010). "Compensation Consultants and Executive Compensation, Chapter 15. in "Corporate Governance: A Synthesis of Theory, Research, and Practice" H. Kent Baker (Editor), Ronald Anderson (Editor), Wiley.

Conyon, M.J. (2011) Executive Compensation Consultants and CEO Pay, *Vanderbilt Law Review*, forthcoming.

Crystal, G.S. (1991) Why is CEO compensation so high?, California Management Review, 34(1), 9-29.

Department of Trade and Industry. (2002). *Statutory Instrument 2002 No. 1986: The Directors' Remuneration Report Regulations 2002,* London, DTI.

Goh, L. and Gupta, A. (forthcoming). Executive Compensation, Compensation Consultants, and Shopping for Opinion: Evidence from the UK, *Journal of Accounting, Auditing and Finance.*



Electronic copy available at: https://ssrn.com/abstract=1788322

Greenbury, Sir Richard (1995). *Directors' Remuneration: Report of a Study Group Chaired by Sir Richard Greenbury.* London, Gee.

Hodgson, P. (2009). *A Brief History of Say on Pay*, 1st October, accessed from http://blog.thecorporatelibrary.com/blog/2009/10/a-brief-history-of-say-on-pay.html .

Hodak, M. (2004). Alignment Exposed: How CEOs are Paid, and What Their Shareholders Get for It, *Journal of Applied Corporate Finance*, 16(2/3), 111-121.

Hodak, M. (2005). Alignment Exposed: Letting Go of Norm: How Executive Compensation Can Do Better Than "Best Practices", *Journal of Applied Corporate Finance*, 17(4), 115-124.

House of Commons Treasury Committee (2009). *Banking Crisis: reforming corporate governance and pay in the City*. 12 May.

Kabir, R. and Minhat, M. (2009). *The Role of Compensation Consultants on UK CEO Pay,* Edinburgh Napier University Working Paper.

Kostiander, L. (2009) *How Consultants Increase Executive Remuneration: A Process Approach*, Aalto University School of Economics, Finland.

Lawler, E.E. III, and Finegold, D. (2007). CEO Compensation: What Board Members Think *Center for Effective Organizations, CEO PUBLICATION* G 07-8 (518)

Liberman, V. (2003). It's Not Our Fault – Usually, *Across the Board*, http://www.conference-board.org/publications/atb/articles/03marLiberman_02.cfm accessed 28 Mar 03

Monks, R.A.G. (1998). Executive and Director Compensation - 1984 REDUX, *Corporate Governance: An International Review*, 6(3), 135-139.

Murphy, K.J. (1999). Executive Compensation. In: *Handbook of Labor Economics, Volume 3B*, edited by Ashenfelter, O. and Card, D., Elsevier: Amsterdam.



Electronic copy available at: https://ssrn.com/abstract=1788322

Murphy, K.J. and Sandino, T. (2010). Executive Pay and 'Independent' Compensation Consultants, Journal of Accounting and Economics, REF . 247

Porter, M. (1998). *Competitive Strategy: Techniques for Analyzing Industries and Competitors*, Free Press.

Shearman & Sterling LLP (2009). *Corporate Governance of the Largest US Public Companies: Director and Executive Compensation*, accessed from www.shearman.com/corporategovernance.

Sturdy, A. (1997). The Consultancy Process An Insecure Business?, Journal of Management Studies, 34, 389-413

Suchman, M. (1995). Managing Legitimacy: Strategic and Institutional Approaches, *Academy of Management Review*, 20, 571-610.

Thorley Hill, N. and Stevens, K.T. (1995). CEO Compensation and Corporate Performance, *Journal of General Management*, 20(4), 65.

Tosi, H.L.Jr. and Gomez-Mejia, L.R. (1989) . The Decoupling of CEO Pay and Performance: An Agency Perspective, *Administrative Science Quarterly*, 34, 169-189.

Voulgaris, G., Stathopoulos, K. and Walker, M. (2009). *Compensation Consultants and CEO Pay: UK Evidence,* http://ssrn.com/abstract=1293864

Wade, J.B., Porac, J.F. and Pollock, T.G. (1997). Worth, Words, and the Justification of Executive Pay, *Journal of Organizational Behavior*, 18, 641-664.

Waxman, Henry A. (et al.). (2007). *Executive Pay: Conflicts Of Interest Among Compensation Consultants*, United States House of Representatives Committee On Oversight And Government Reform Majority Staff, December.



Electronic copy available at: https://ssrn.com/abstract=1788322

## Tables

### Table 2.1 Forces impacting the executive compensation consulting industry

| FORCE | IMPLICATION |
| --- | --- |
| **Threat of new entrants**<br>A low threat, reduced by barriers to entry in the form of reputation, proprietary databases, contacts and expertise. | Although there are many firms of consultants, a few dominate. New entrants are disadvantaged by having less access to proprietary and market information. Also, companies are unlikely to risk employing an unknown firm, as it may not give their decisions the legitimacy they require. |
| **Substitutes**<br>Minimised due to the use of independent consultants being seen as 'best practice'. | Regulatory expectations mean that companies choosing not to employ compensation consultants will be queried. Tighter regulations, on advisors and on compensation plans, have led to more work for the consultants. |
| **Rivalry**<br>Although there are many consultants, at the top end the industry is an oligopoly with strong competition. | Mergers between firms have reduced numbers, but rivalry is still strong. |
| **Buyer power**<br>Individual clients have few switching costs in moving between the major consultancies. | Clients have some power over the consultancy firm, as the impact on a consultancy of losing clients could be a loss of reputation, potentially damaging future income. Such buyer power could be evidenced in schemes which are favourable to the company's executives. |
| **Supplier power**<br>The main suppliers to the consulting firms are the consultants themselves. | Not a constraint on the industry. Some individuals have a personal reputation, but the importance of firm brands outweighs individuals'. |



Electronic copy available at: https://ssrn.com/abstract=1788322

## Table 2.2 Regulation on disclosure of advisor information

| | UK | Canada | USA[11] |
|---|---|---|---|
| Regulation or Recommendation | Directors' Remuneration Report Regulations | National Instrument 58-101 | Regulation S-K , Item 407(e) |
| First year for which disclosure made | 2002 | 2005 | 2006 |
| Names of all advisors to the committee | Yes | Yes | Yes |
| Information about their appointment / mandate (detail varies by country) | Yes | Yes | Yes |
| Nature of any other work done for the company by the advisors | Yes | Yes | No |
| Fees earned for advising the committee | No | Yes[12] | No |
| Fees earned for other work for the company | No | Yes[12] | No |

[11] Disclosures in the USA have been enhanced following the passing in 2010 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which strengthened the requirements of the independence of the committee's consultants.
[12] Fee disclosure arises under best practice guidelines issued by the Canadian Coalition for Good Governance.



Electronic copy available at: https://ssrn.com/abstract=1788322

## Table 3.2 An overview of research studies

| Study | Sample | Key findings |
|---|---|---|
| **QUANTITATIVE STUDIES ON EXECUTIVE COMPENSATION** | | |
| Armstrong, Ittner and Larcker (2008) | USA: 2,116 publicly-traded companies with fiscal years ending on or after 2006. Russell 3000, plus select smaller companies. | Differences in pay levels are not statistically significant when companies are matched on governance.<br>No support for claims that CEO pay is higher in conflicted consultants that also offer additional services. |
| Cadman, Carter, and Hillegeist, (2010) | USA: 755 firms from the S&P 1500, for 2006. | No widespread evidence of higher levels of pay or lower pay-performance sensitivities where consultants have potential conflicts of interest.<br>Differences in average pay but no significant differences in median pay between clients of different consultancies. |
| Conyon, Peck and Sadler (2009a) | USA: 308 companies drawn from the S&P 500 in 2006.<br><br>UK: about 230 companies drawn from the FTSE 250 in 2003. | CEO pay is generally greater in firms using consultants, as is the amount of equity used in the CEO compensation packages.<br>Little evidence that using consultants with potential conflicts of interest leads to greater CEO pay or the adverse design of pay contracts. |
| Conyon, Peck and Sadler (2009b) | UK: about 230 companies drawn from the FTSE 250 in 2003 | Consultant use is positively associated with firm size and the equity pay mix.<br>CEO pay is positively associated with peer firms with high board and consultant interlocks.<br>Some evidence that where firms supply other business services to the firm, CEO pay is greater. |
| Conyon (2010) | UK: about 230 companies drawn from the FTSE 250 in 2003. | Some evidence that pay is higher in firms using consultants. Less evidence that conflicts of interest increase pay. |
| Conyon (2011) | USA: 308 companies drawn from the S&P 500 in 2006.<br><br>UK: about 230 companies drawn from the FTSE 250 in 2003 | CEO pay is higher in firms using consultants.<br>Slight evidence that pay is higher when consultants face conflicts of interest.<br>No evidence that changing |



Electronic copy available at: https://ssrn.com/abstract=1788322

| | | |
|---|---|---|
| | | consultants leads to higher levels of CEO pay. |
| Goh and Gupta (forthcoming) | UK: FTSE 350, 2002-2008. 1359 firm-years covering 420 unique firms. Includes CEOs and other executives. | Level of pay and equity-based pay are higher if consultants retained.<br>Mixed evidence on whether companies undertake opinion-shopping.<br>Changing the number of consultants does not increase pay. |
| Kabir and Minhat (2009) | UK: 175 FTSE 350 companies (700 firm-year observations) 2003-2006. | No support for the hypothesis that CEO pay is higher when firms employ multiple compensation consultants.<br>Market share of compensation consultants is significantly related to CEO compensation. |
| Murphy and Sandino (2010) | USA: 1,046 firms from S&P 500, MidCap 400, SmallCap 600, and others.<br><br>Canada: 124 of largest Canadian firms by market capitalisation, fiscal year 2006. | Pay was higher where the consultant provided other services.<br>In Canadian sample, pay was higher where consultants had high fees for other services.<br>In US sample, tests for conflict of interest due to 'repeat business' were negative: CEO pay was higher when consultant worked for the board rather than for management. |
| Tosi and Gomez-Mejia (1989) | USA. Survey of Chief Compensation Officers (175 usable replies) | Using consultants influences CEO pay to a greater extent in manager-controlled firms than in owner-controlled firms. |
| Voulgaris, Stathopoulos and Walker (2009) | UK: 500 firms from FTSE 100, 250 and Small Cap indexes, 2006 data. | Large firms are more likely to use consultants.<br>Consultant use is positively associated with CEO total pay, mainly due to increase in equity based compensation. |

| **QUALITATIVE STUDIES ON EXECUTIVE COMPENSATION** | | |
|---|---|---|
| Bender (2003) | UK: 10 interviews conducted 2001/2 with protagonists in the pay-setting decision in 2 FTSE 350 utility companies. | Discusses the detailed reports produced by consultants, and the processes used. |
| Bender (2011) | UK: 40 interviews conducted 2001-2003 with protagonists in the pay-setting decision in 12 FTSE 350 companies. | Discusses how consultants are chosen; their roles as expert, intermediary and legitimating device; conflicts of interest. Also, why companies choose |



Electronic copy available at: https://ssrn.com/abstract=1788322

| | | |
|---|---|---|
| | | not to use consultants. |
| Kostiander (2009) | Finland: 44 interviews conducted 2006/7 and 2009 with protagonists in pay-setting in 23 state owned enterprises. | Remuneration consultants are not independent of management, and work creatively to increase remuneration. Competition between consultancies influences the forms, levels, and structures of remuneration designs. |

| **QUANTITATIVE STUDY ON OUTSIDE DIRECTOR COMPENSATION** | | |
|---|---|---|
| André, Khalil and Magnam (2010) | Canada: 130 firms adopting a deferred share unit plan over the period 1997–2005 | Likelihood of adopting a deferred unit share plan for outside directors is greater when using compensation consultants. |



Electronic copy available at: https://ssrn.com/abstract=1788322