UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

H. CRISTINA CHEN-OSTER, SHANNA
ORLICH, ALLISON GAMBA and MARY
DE LUIS,

                 Plaintiffs,

       v.

GOLDMAN SACHS & CO. and THE
GOLDMAN SACHS GROUP, INC.,

             Defendants.

-------------------------------------------------- x

10 Civ. 6950 (AT) (RWL)

**ORAL ARGUMENT REQUESTED**

# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR DECERTIFICATION

Barbara B. Brown (*admitted pro hac vice*)
Carson H. Sullivan (*admitted pro hac vice*)
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C.  20005

Patrick W. Shea
PAUL HASTINGS LLP
200 Park Avenue
New York, New York  10166

Robert J. Giuffra, Jr.
Sharon L. Nelles
Ann-Elizabeth Ostrager
Hilary M. Williams
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004

Amanda Flug Davidoff
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006

*Attorneys for Defendants*
*Goldman Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

July 22, 2021

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND ...........................................................................................7

A.    The Class-Relevant Goldman Sachs Divisions and Business Units ...................7

B.    Class Members' Many Different Jobs Across and Within Divisions .................8

C.    Goldman Sachs's Discretionary and Decentralized Evaluation Processes ......10

      1.    360 Reviews ...........................................................................................10

      2.    Manager Quartiling ...............................................................................14

      3.    Cross-Ruffing ........................................................................................15

D.    Class Members' Involvement in the Challenged Processes ...........................17

E.    Dr. Farber's Analyses and Admissions ...........................................................17

F.    Relevant Procedural History ...........................................................................19

      1.    Plaintiffs' Motion for Class Certification and Discovery for Injunctive Relief Claims ........................................................................20

      2.    The Class Certification Order ................................................................21

LEGAL STANDARD ....................................................................................................22

ARGUMENT .................................................................................................................22

I.    THIS COURT SHOULD DECERTIFY THE CLASS BECAUSE PLAINTIFFS CANNOT ESTABLISH THAT CLASS MEMBERS HAVE STANDING TO SEEK BACKPAY. ..................................................................23

II.    DISCOVERY HAS CONFIRMED THAT PLAINTIFFS CANNOT MAINTAIN A CLASS ACTION BASED ON GOLDMAN SACHS'S DECENTRALIZED, DISCRETIONARY EVALUATION PROCESSES. .............27

      A.    Plaintiffs Have Not Shown a "Common Mode" of Decision-Making, as Required for Disparate Impact Commonality. ......................................28

      B.    Plaintiffs' Statistical Analysis Cannot Show That the Challenged Processes Were the Common Cause of Any Disparities, as Required for Disparate Impact *and* Disparate Treatment Commonality. ...................31

C.    There Is Also No "Significant Proof" of a "General Policy of Discrimination," as Required for Disparate Treatment Commonality. .................36

III.   THE NEED FOR INDIVIDUAL INQUIRIES TO IDENTIFY CLASS MEMBERS WITH BACKPAY CLAIMS DEFEATS RULE 23(B)(3) PREDOMINANCE. ...........................................................................37

IV.   NAMED PLAINTIFFS ARE NOT "TYPICAL" AND INSTEAD, LIKE ALL OTHER CLASS MEMBERS, HAVE HIGHLY INDIVIDUALIZED CLAIMS. .........................................................................................40

V.    THIS CLASS ACTION IS UNMANAGEABLE AND PROVIDES NO ADVANTAGE OVER INDIVIDUAL ACTIONS. .......................................42

VI.   INTRACTABLE INTERNAL CLASS CONFLICTS REQUIRE DECERTIFICATION. .............................................................................45

CONCLUSION ...................................................................................................45

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abram* v. *United Parcel Service of Am., Inc.*,
200 F.R.D. 424 (E.D. Wis. 2001) ...................................................................35, 38

*Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)...........................................................................................22

*Andrews* v. *Chevy Chase Bank*,
545 F.3d 570 (7th Cir. 2008) ..............................................................................44

*Bolden* v. *Walsh Constr. Co.*,
688 F.3d 893 (7th Cir. 2012) .........................................................................34, 35

*Brand* v. *Comcast Corp.*,
302 F.R.D. 201 (N.D. Ill. 2014)...........................................................................35

*Calvo* v. *City of New York*,
2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017)......................................................24

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013).........................................................................................5, 37

*Denney* v. *Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)......................................................................2, 24, 29

*Dillon* v. *Coles*,
746 F.2d 998 (3d Cir. 1984)......................................................................2, 25, 27

*Donaldson* v. *Microsoft Corp.*,
205 F.R.D. 558 (W.D. Wash. 2001) .................................................................7, 45

*Floyd* v. *City of New York*,
283 F.R.D. 153 (S.D.N.Y. 2012) .........................................................................45

*Flynn* v. *DIRECTV, LLC*,
2018 WL 3970913 (D. Conn. Aug. 20, 2018) ......................................................24

*Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000).......................................................................................2, 25

*Gen. Tele. Co. of Sw.* v. *Falcon*,
457 U.S. 147 (1982).......................................................................................1, 22

*Houser* v. *Pritzker*,
   28 F. Supp. 3d 222 (S.D.N.Y. 2014)..........................................................................38, 41, 42

*In re Initial Pub. Offerings Secs. Litig.*,
   471 F.3d 24 (2d Cir. 2006).......................................................................................................22

*Int'l Bhd. of Teamsters* v. *United States*,
   431 U.S. 324 (1977)........................................................................................................ *passim*

*Jin* v. *Shanghai Original, Inc.*,
   990 F.3d 251 (2d Cir. 2021)...............................................................................................1, 22

*Jones* v. *National Council of Young Men's Christian Associations*,
   34 F. Supp. 3d 896 (N.D. Ill. 2014) ........................................................................... *passim*

*Kassman* v. *KPMG LLP*,
   419 F. Supp. 3d 252 (S.D.N.Y. 2018) ......................................................................... *passim*

*Kempner* v. *Town of Greenwich*,
   249 F.R.D. 15 (D. Conn. 2008)..............................................................................................24

*Lackawanna Chiropractic P.C.* v. *Tivity Health Support, LLC*,
   2020 WL 4692464 (W.D.N.Y. July 7, 2020).........................................................................24

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018).....................................................................................6

*Lott* v. *Westinghouse Savannah River Co.*,
   200 F.R.D. 539 (D.S.C. 2000) ...............................................................................................36

*Mandala* v. *NTT Data, Inc.*,
   975 F.3d 202 (2d Cir. 2020)..........................................................................................5, 32, 33

*Marisol A.* v. *Giuliani*,
   126 F.3d 372 (2d Cir. 1997)..............................................................................................6, 43

*Mazzei* v. *Money Store*,
   829 F.3d 260 (2d Cir. 2016)...............................................................................................1, 22

*Moore* v. *The Boeing Co.*,
   2004 WL 3202777 (E.D. Mo. Mar. 31, 2004) .......................................................................35

*Moussouris* v. *Microsoft Corp.*
   2018 WL 3328418 (W.D. Wash. June 25, 2018)........................................................... *passim*

*New York* v. *Scalia*,
   490 F. Supp. 3d 748 (S.D.N.Y. 2020).....................................................................................23

*Olean Wholesale Grocery Coop., Inc.* v. *Bumble Bee Foods LLC*,
    993 F.3d 774 (9th Cir. 2021) ................................................................6, 37, 44

*Penk* v. *Or. State Bd. of Higher Educ.*,
    1985 WL 25631 (D. Or. 1985) ...................................................................18, 36

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019) .........................................................................38

*Rapcinsky* v. *Skinnygirl Cocktails, L.L.C.*,
    2013 WL 93636 (S.D.N.Y. Jan. 9, 2013) .........................................................43

*Robinson* v. *Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d. Cir. 2001)................................................................... *passim*

*Ross* v. *Lockheed Martin Corp.*,
    267 F. Supp. 3d 174 (D.D.C. 2017) ..................................................................29

*Stastny* v. *S. Bell Tel. & Tel. Co.*,
    628 F.2d 267 (4th Cir. 1980) ...........................................................................35

*Stockwell* v. *City & County of San Francisco*,
    2015 WL 2173852 (N.D. Cal. May 8, 2015) ...............................................38, 42

*Tomassini* v. *FCA U.S. LLC*,
    326 F.R.D. 375 (N.D.N.Y. 2018).......................................................................24

*TransUnion LLC* v. *Ramirez*,
    141 S. Ct. 2190 (2021)........................................................................... *passim*

*Tyson Foods, Inc.* v. *Bouaphakeo*,
    577 U.S. 442 (2016).....................................................................................6, 43

*Wal-Mart Stores, Inc.* v. *Dukes*,
    564 U.S. 338 (2011).............................................................................. *passim*

**Statutes**

42 U.S.C. § 2000e ......................................................................................4, 31

**Other Authorities**

Fed. R. Civ. P. 23 .................................................................................. *passim*

# GLOSSARY OF DECLARANTS[1]

| Abbreviation | Declaration | Corporate Title, Role & Division |
|---|---|---|
| Abramian-Katz Decl. | 7/14/21 Declaration of Angela Abramian-Katz | Vice President, Global Business Partner for Securities, Human Capital Management, as of 11/30/18 |
| 7/3/14 Benz Decl. | 7/3/14 Declaration of Susan Benz | Managing Director, Head of Healthcare & Higher Education Group, Public Sector & Infrastructure, Investment Banking Division, as of 7/3/14 |
| 7/15/21 Benz Decl. | 7/15/21 Declaration of Susan Benz | Managing Director, Head of Healthcare Group, Public Sector & Infrastructure, Investment Banking Division, as of 11/30/18 |
| Brasco Decl. | 7/12/21 Declaration of Thomas Brasco | Managing Director, Chief Operating Officer of Private Wealth Management, Investment Management Division, as of 11/30/18 |
| Casturo Decl. | 6/27/14 Declaration of Donald Casturo | Participating Managing Director, Global Chief Operating Officer of Commodities, Securities, as of 6/27/14 |
| Chi Decl. | 7/12/21 Declaration of Alex Chi | Participating Managing Director, Financial and Strategic Investors Group, Investment Banking Division, as of 11/30/18 |
| D. Cohen Decl. | 7/16/21 Declaration of Darren Cohen | Managing Director, Head of Principal Strategic Investment, Securities, as of 11/30/18 |
| S. Cohen Decl. | 7/8/21 Declaration of Stephanie Cohen | Participating Managing Director, Chief Strategy Officer, Executive Office, as of 11/30/18 |
| Courtney Decl. | 7/13/21 Declaration of Louise Courtney | Associate, Equity Capital Markets, Investment Banking Division, as of 11/30/18 |

---

[1] Declarants or deponents are identified in this brief by their corporate rank and Division using the following defined terms for Division: (IBD (Investment Banking Division); IMD (Investment Management Division; Securities (Securities Division); HCM (Human Capital Management Division), and the following defined terms for rank: PMD (participating managing director); MD (managing director); VP (vice president). For example: "Abramian-Katz Decl. (VP, Securities)."

| Abbreviation | Declaration | Corporate Title, Role & Division |
|---|---|---|
| Creedon Decl. | 6/30/14 Declaration of Nora Creedon | Managing Director, Co-Head of US Real Estate Investment Trust Group, Value, Investment Management Division, as of 6/30/14 |
| Duffy Decl. | 7/12/21 Declaration of Suzanne Duffy | Vice President, Private Wealth Management Sales, Investment Management Division, as of 11/30/18 |
| Féliz-Taveras Decl. | 7/13/21 Declaration of Virginia Féliz-Taveras | Vice President, Equities Global Sales, Securities, as of 11/30/18 |
| Giovanni Decl. | 7/13/21 Declaration of Nicholas Giovanni | Participating Managing Director, Co-Head of Global Technology Investment Banking and Chief Operating Officer of Technology, Media and Telecommunications, Investment Banking Division, as of 11/30/18 |
| Glassman Decl. | 7/19/21 Declaration of Joshua Glassman | Participating Managing Director, Co-Head of Americas Equities Sales, Securities, as of 11/30/18 |
| Goddeeris Decl. | 7/14/21 Declaration of Cyril Goddeeris | Participating Managing Director, Head of Emerging Markets Trading Latin America Business Unit and Co-Head of Micro and Macro One Delta and Synthetic Trading in the Equities Global One Delta Trading, Securities, as of 11/30/18 |
| Guth Decl. | 6/30/14 Declaration of Celeste Guth | Participating Managing Director, Financial Institutions Group, Investment Banking Division, as of 6/30/14 |
| Hammack Decl. | 7/6/21 Declaration of Elizabeth Hammack | Participating Managing Director, Corporate Treasury Division, as of 11/30/18 |
| Keefe Decl. | 7/15/21 Declaration of Geraldine Keefe | Participating Managing Director, Industrials Business Unit, Investment Banking Division, as of 11/30/18 |
| Kirk Decl. | 7/2/14 Declaration of Marie Louise Kirk | Participating Managing Director, Fixed Income, Currencies, and Commodities Strats, Securities, as of 7/2/14 |

| Abbreviation | Declaration | Corporate Title, Role & Division |
|---|---|---|
| Kopylov Decl. | 7/8/21 Declaration of Jennifer Kopylov | Managing Director, Consumer Retail Group, Investment Banking Division, as of 11/30/18 |
| Kozlowski Decl. | 7/13/21 Declaration of Joanna Kozlowski | Managing Director, Global Talent Advisor for Investment Banking Division, Human Capital Management, as of 11/30/18 |
| Krevitt Decl. | 7/9/21 Declaration of Jennifer Krevitt | Managing Director, Global Head of Human Capital Management for Investment Management Division, Human Capital Management, as of 11/30/18 |
| Kung Decl. | 7/6/21 Declaration of Jessica Kung | Vice President, Senior Talent Advisor for Investment Management Division, Human Capital Management, as of 11/30/18 |
| Lakdawala-Flynn Decl. | 7/12/21 Declaration of Meena Lakdawala-Flynn | Participating Managing Director, Head of Market Solutions Group, Private Wealth Management, Investment Management Division, as of 11/30/18 |
| Landman Decl. | 10/12/17 Declaration of David Landman | Vice President, Talent Assessment Group, Human Capital Management, as of 10/12/17 |
| Leone Decl. | 7/13/21 Declaration of Deborah Leone | Participating Managing Director, Chief Operating Officer of Investment Management Division, as of 11/30/18 |
| 6/30/14 Levene Decl. | 6/30/14 Declaration of John Levene | Participating Managing Director, Head of Client Franchise for Prime Brokerage, Securities, as of 6/30/14 |
| 7/9/21 Levene Decl. | 7/9/21 Declaration of John Levene | Participating Managing Director, Co-Head of Client Experience for Prime Services, Securities, as of 11/30/18 |
| Lisko-Murphy Decl. | 7/12/21 Declaration of Bozhena Lisko-Murphy | Associate, Financial Institutions Group, Investment Banking Division, as of 11/30/18 |
| Lopez Decl. | 7/1/14 Declaration of Todd Lopez | Managing Director, Head of Goldman Sachs Electronic Trading, Securities, as of 7/1/2014 |
| McGovern Decl. | 7/12/21 Declaration of Brendan McGovern | Participating Managing Director, Co-Head of Credit Alternatives, Investment Management Division, as of 11/30/18 |

| Abbreviation | Declaration | Corporate Title, Role & Division |
|---|---|---|
| McNamara Decl. | 6/30/14 Declaration of James McNamara | Participating Managing Director, Head of Global Third Party Distribution, Investment Management Division, as of 6/30/14 |
| Mora Decl. | 7/14/21 Declaration of Ricardo Mora | Participating Managing Director, Co-Head of Fixed Income, Currencies, and Commodities Americas Sales, Securities, as of 11/30/18 |
| Mossavar-Rahmani Decl. | 7/20/21 Declaration of Sharmin Mossavar-Rahmani | Participating Managing Director, Chief Investment Officer and Head of Investment Strategy Group, Investment Management Division, as of 11/30/18 |
| Packer Decl. | 7/2/14 Declaration of Craig Packer | Participating Managing Director, Head of Leveraged Finance, Investment Banking Division, as of 7/2/14 |
| Pierce Decl. | 7/2/14 Declaration of Stephen Pierce | Participating Managing Director, Head of Equity Capital Markets, Investment Banking Division, as of 7/2/14 |
| 6/30/14 Russell Decl. | 6/30/14 Declaration of Peter Craig Russell | Participating Managing Director, Head of U.S. Institutional Business, Investment Management Division, as of 6/30/14 |
| 7/10/21 Russell Decl. | 7/10/21 Declaration of Peter Craig Russell | Participating Managing Director, Co-Head of Americas Client Business, Investment Management Division, as of 11/30/18 |
| Sands Decl. | 7/8/21 Declaration of Diana Patterson Sands | Vice President, Global Fixed Income Business, Goldman Sachs Asset Management, Investment Management Division, as of 11/30/18 |
| Scher Decl. | 7/12/21 Declaration of Susan Jane Scher | Participating Managing Director, Co-Head of Global Financing Group, Investment Banking Division, as of 11/30/18 |
| Scherrer Decl. | 7/12/21 Declaration of Clare Scherrer | Participating Managing Director, Co-Head of Industrials, Investment Banking Division, as of 11/30/18 |

## GLOSSARY OF EXPERT REPORTS AND
## EXPERT AND FACT DEPOSITION TESTIMONY

| Defined Term | Expert Report/ Deposition | Fact Deponent's Corporate Title, Role & Division | Giuffra Decl. Ex. No. |
|---|---|---|---|
| Blankfein Tr. | 11/16/20 Deposition of Lloyd Blankfein | Senior Chairman, Former Chairman and Chief Executive Officer of Goldman Sachs, as of 11/16/20 | Ex. 23 |
| Boyle Tr. | 6/15/12 Deposition of Sally Boyle | Managing Director, Head of Human Capital Management for Europe, Middle East and Africa & India Regions, Human Capital Management, as of 6/15/12 | Ex. 24 |
| 2/18/14 Cascio Rpt. | 2/18/14 Expert Report of Wayne F. Cascio, Ph.D. | N/A | Ex. 67 |
| 1/15/21 Cascio Rpt. | 1/15/21 Expert Report of Wayne F. Cascio, Ph.D. (and accompanying 3/24/21 errata) | N/A | Ex. 41 |
| 11/16/13 Cascio Tr. | 11/16/13 Deposition of Wayne Cascio, Ph.D. | N/A | Ex. 42 |
| 7/31/18 Cascio Tr. | 7/31/18 Deposition of Wayne Cascio, Ph.D. | N/A | Ex. 43 |
| 6/9/21 Cascio Tr. | 6/9/21 Deposition of Wayne Cascio, Ph.D. | N/A | Ex. 44 |
| Chen-Oster Tr. | 12/8/11 Deposition of Cristina Chen-Oster | Former Vice President, NY1 Research Sales, Securities, as of 12/8/11 | Ex. 25 |
| De Luis Tr. | 8/3/18 Deposition of Mary De Luis | Former Vice President, Global Client Financing, US Private Banking, Private Wealth Management, Investment Management Division, as of 8/3/18 | Ex. 26 |

| Defined Term | Expert Report/ Deposition | Fact Deponent's Corporate Title, Role & Division | Giuffra Decl. Ex. No. |
|---|---|---|---|
| Dunleavy Job Rpt. | 1/15/21 Expert Report of Eric M. Dunleavy, Ph.D. (as corrected 4/23/21) | N/A | Ex. 45 |
| Dunleavy Rebtl. Rpt. | 3/19/21 Expert Rebuttal Report of Eric M. Dunleavy, Ph.D. | N/A | Ex. 47 |
| Dunleavy Work Rpt. | 1/15/21 Work Analysis of Goldman Sachs Professionals Holding the Corporate Titles of Associate and Vice President in the Investment Banking Division, Investment Management Division, and Securities Division by Eric M. Dunleavy, Ph.D. | N/A | Ex. 46 |
| Dunn Rpt. | 1/15/21 Expert Report of Brian Dunn | N/A | Ex. 48 |
| Farber Rpt. | 1/15/21 Expert Report of Henry S. Farber | N/A | Ex. 49 |
| Farber Rebtl. Rpt. | 4/19/21 Rebuttal Report of Henry Farber (as corrected 5/11/21) | N/A | Ex. 50 |
| Farber Tr. | 5/18/21 Deposition of Henry Farber, Ph.D. | N/A | Ex. 51 |
| Felix Tr. | 6/21/12 Deposition of Genevieve Felix | Vice President, Co-Head of Americas Global Leadership and Diversity, Human Capital Management, as of 6/21/12 | Ex. 27 |
| 6/18/14 Gamba Tr. | 6/18/14 Deposition of Allison Gamba | Vice President, New York Stock Exchange Specialists, Securities, as of 6/18/14 | Ex. 28 |
| 9/14/18 Gamba Tr. | 9/14/18 Deposition of Allison Gamba | Former Vice President, New York Stock Exchange Specialists, Securities, as of 9/14/18 | Ex. 29 |

| Defined Term | Expert Report/ Deposition | Fact Deponent's Corporate Title, Role & Division | Giuffra Decl. Ex. No. |
|---|---|---|---|
| Heller Sberlati Tr. | 7/10–7/11/13 Deposition of Caroline Heller Sberlati | Managing Director, Co-Head of Business Partners for Securities, Human Capital Management, as of 7/10–7/11/13 | Exs. 30–31 |
| Hunt Tr. | 9/30/20 Deposition of Edith Hunt | Former Participating Managing Director, Global Head of Talent and Global Head of Global Leadership & Diversity, Human Capital Management, as of 9/30/20 | Ex. 32 |
| 9/5/13 Landman Tr. | 9/5/13 Deposition of David Landman | Vice President, Talent Assessment Group, Human Capital Management, as of 9/5/13 | Ex. 33 |
| 10/10/13 Landman Tr. | 10/10/13 Deposition of David Landman | Vice President, Talent Assessment Group, Human Capital Management, as of 10/10/13 | Ex. 34 |
| 4/3/18 Landman Tr. | 4/3/18 Deposition of David Landman | Managing Director, Talent Assessment Group, Human Capital Management, as of 4/3/18 | Ex. 35 |
| Larson Tr. | 6/12/13 Deposition of Bruce Larson | Managing Director, Head of Human Capital Management in the Americas (outside of New York) & Former Head of Human Capital Management for Investment Banking Division, Human Capital Management, as of 6/12/13 | Ex. 37 |
| Lauto Tr. | 11/12/20 Deposition of John Lauto | Former Participating Managing Director, Head of New York Stock Exchange Specialists, Securities, as of 11/12/20 | Ex. 38 |

| Defined Term | Expert Report/ Deposition | Fact Deponent's Corporate Title, Role & Division | Giuffra Decl. Ex. No. |
|---|---|---|---|
| Miller Tr. | 6/20/12 Deposition of Rodney Miller | Managing Director, Chief of Staff for Heads of Equities & Chief Financial Officer for Prime Brokerage Business, Securities, as of 6/20/12 | Ex. 39 |
| Orlich Tr. | 7/12/11 Deposition of Shanna Orlich | Former Associate, Capital Structure Franchise Trading, Securities, as of 7/12/11 | Ex. 40 |
| Shaw Rpt. | 3/19/21 Expert Report of Katherine Shaw, Ph.D. (as revised 3/24/21) | N/A | Ex. 52 |
| Yermack Rpt. | 3/19/21 Expert Report of David L. Yermack | N/A | Ex. 53 |
| Yermack Tr. | 5/6/21 Deposition of David Yermack, Ph.D. | N/A | Ex. 54 |

## PRELIMINARY STATEMENT

In its March 30, 2018 order ("Certification Order" or "Cert. Order" (ECF No. 578)), this Court certified a Rule 23(b)(3) damages class of Goldman Sachs's female associates and vice presidents in revenue-producing positions over an almost 16-year period in three Goldman Sachs Divisions—Securities, Investment Banking ("IBD"), and Investment Management ("IMD"). Plaintiffs' disparate impact and treatment claims, brought under Title VII and the New York City Human Rights Law, allege discrimination in compensation and promotion through three evaluation processes: (i) annual 360 performance reviews; (ii) manager quartiling to assess relative performance; and (iii) the cross-ruffing vetting process for promotion to managing director.

As the Supreme Court and the Second Circuit have emphasized, a certification order "is inherently tentative," *Gen. Tel. Co. of Southwest* v. *Falcon*, 457 U.S. 147, 160 (1982) (citation omitted), and a "district court has the affirmative 'duty of monitoring its class decisions in light of the evidentiary development of the case,'" *Mazzei* v. *Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) (citation omitted). Decertification is mandatory if "the class no longer meets the requirements of Rule 23 . . . before final judgment is entered." *Jin* v. *Shanghai Original, Inc.*, 990 F.3d 251, 261 (2d Cir. 2021). This Court should decertify the class here for the following reasons.

*First*, Plaintiffs have failed to establish that all class members have standing to pursue a Rule 23(b)(3) damages class action. Following this Court's certification of a damages class, Plaintiffs affirmatively abandoned—in the middle of fact discovery—their effort to certify a Rule 23*(b)(2)* class seeking declaratory and injunctive relief. (ECF No. 625 at 1.) As a result, this case no longer involves, as Plaintiffs promised at class certification (ECF No. 514 at 9), the prospect of a class fitting within the "well-established framework" announced in *Int'l Bhd. of Teamsters* v. *United States*, 431 U.S. 324 (1977), for litigating Title VII class claims.

In the Second Circuit, "no class may be certified that contains members lacking Article III standing." *Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).  When Title VII plaintiffs bring a class action seeking injunctive and declaratory relief, the class as a whole has standing because the risk of future harm from an allegedly discriminatory employment practice constitutes Article III "injury-in-fact."  Then, individual class members can try to show at Phase II proceedings that they were "adversely affected" by the challenged practice and, therefore, have standing to pursue their individual liability and damages claims.  *Robinson* v. *Metro-North Commuter R.R. Co.*, 267 F.3d 147, 161–62 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 360–67 (2011); *see Dillon* v. *Coles*, 746 F.2d 998, 1004 (3d Cir. 1984) (at Phase II, class members "have the additional burden of showing that each was an actual victim of discrimination").  In certifying the Rule 23(b)(3) damages class here, the Court understood that Plaintiffs would follow this established *Teamsters* framework, where Plaintiffs would pursue "[c]lass claims for injunctive and declaratory relief under Rule 23(b)(2)" at Phase I and individual damages in later Phase II proceedings.  (Cert. Order at 12–13.)

As the Supreme Court recently confirmed, class-wide standing must be established for "'each form of relief sought'"—here, now only backpay and punitive damages.  *TransUnion LLC* v. *Ramirez*, 141 S. Ct. 2190, 2210 (2021) (quoting *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).  "In a suit for damages," Article III standing requires actual, "concrete harm," and Plaintiffs must do more to show the "mere risk of future harm" that may support standing for injunctive relief.  *Id*. at 2210–11.  Thus, having abandoning the *Teamsters* framework, Plaintiffs cannot rely on a "risk of future harm" for standing in a damages-only class action, particularly where they challenge individualized, discretionary and decentralized employment decisions that may or may not have "concretely harmed" any particular class member.

Plaintiffs' key evidence comes from Dr. Henry Farber, who opines—based on aggregated

data for *all* women and men in class-relevant roles across all three Goldman Sachs Divisions for 16 years—that women, "on average," received lower 360 scores and quartiles than men, and were promoted less often.  (Ex. 49 Tables 11, 12, 7, 8 (Farber Rpt.); Ex. 50 at App. A, Table 28 (Farber Rebtl. Rpt.).)[2]  But, fatally for Plaintiffs' efforts to maintain a Rule 23(b)(3) damages class, Dr. Farber admitted that these aggregated "averages" "*can't tell you*" who "*was discriminated against.*"  Instead, he simply speculates that "*there had to be someone*" in the class who suffered discrimination.  (Ex. 51 at 210:14–19, 360:15–19 (Farber Tr.).)  He further conceded that his aggregated models could not identify whether sub-groups, such as professionals in an *entire Goldman Sachs Division*, suffered any discrimination.  (*Id*. at 85:17–86:4.)  In other words, after full discovery, Plaintiffs cannot show, as they must to avoid decertification, that all members of their Rule 23(b)(3) damages class suffered "a concrete harm" from the challenged evaluation processes.  *TransUnion*, 141 S. Ct. at 2210.  (*See* Part I, *infra*.)

*Second*, even assuming Plaintiffs had shown (they have not) that all class members suffered some kind of concrete injury sufficient to support standing, Plaintiffs cannot show, for both their disparate impact and disparate treatment claims, the existence of a common question of fact, as required by Rule 23(a)(2), the prerequisite to the certification of a Rule 23(b)(3) damages class.  In *Wal-Mart*, the Supreme Court held that the existence of a common question of fact for disparate impact claims based on employment processes that "giv[e] discretion to lower-level supervisors" requires proof that each challenged process constituted "a common mode of exercising discretion that pervades the entire company."  564 U.S. at 356.  This Court found, based on the then-limited record, that 360 reviews, manager quartiling and cross-ruffing could be "common mode[s] of exercising discretion" (Cert. Order at 28), because Plaintiffs claimed that Goldman Sachs centrally

---

[2]  References to "Ex." are to exhibits to the Declaration of Robert J. Giuffra, Jr., dated July 22, 2021, unless otherwise noted.

applied those processes to all class members, who held just "two jobs." (Cert. Order at 28 n.11.)

Over the past three years, extensive discovery, including millions of pages of documents, 21 expert reports, 33 depositions and dozens of written declarations of fact witnesses, has shown that the factual basis for the Court's preliminary findings does not exist. The challenged processes involved the exercise of discretion by tens of thousands of reviewers for more than a thousand class members performing widely varying jobs in one of the most complex businesses in the world. Over 40 individuals have testified (*see* Apps. A–C) that the challenged processes affirmatively granted discretion to reviewers to apply flexible review criteria (such as "Leadership", "Judgment" and "Creativity") *in different ways*. And, these reviewers did not apply these processes to Goldman Sachs professionals in "just two job[s]," as Plaintiffs told the Court at class certification. (Pls.' Class Cert. Reply (ECF No. 310) at 1.) Rather, they applied these processes differently based on the varied functions and skills of the professional being evaluated—to cite just four examples, private advisors to weathy individuals, bond structurers, bankers who raised funds for corporations, and engineers who built algorithms. Because the Plaintiffs can no longer claim to have identified a "common mode of exercising discretion that pervades the entire company." *Wal-Mart*, 564 U.S. at 356, the class must be decertified. In fact, since *Wal-Mart*, multiple courts, including after the Certification Order, have consistently found that discretionary evaluation processes applied to myriad jobs cannot support the Rule 23(a)(2) commonality predicate for a disparate impact class action. (*See* Part II.A., *infra*.)

For both disparate impact and disparate treatment commonality, Plaintiffs also must prove that Goldman Sachs's discretionary evaluation processes "cause[d] a [gender-based] disparate impact" on all class members. 42 U.S.C. § 2000e-2(k)(1)(i); Cert. Order at 41 (Plaintiffs' disparate treatment claims are "predicated on the statistical evidence of disparate impact."). Despite years of litigation, Plaintiffs have never explained, nor have any of their experts even opined on, how

the three evaluation processes—as opposed to underlying discretionary decisions by tens of thousands of reviewers applying those processes to professionals in a multitude of jobs across a vast and complex organization—impacted women differently than men.  But one thing is clear: Plaintiffs' aggregated statistical analyses based on class-wide "averages" do not establish that the challenged employment practices were the common cause of any claimed class injury.

Courts have consistently rejected similar analyses that wrongly "assum[e] that what is true for the whole is true for a[ll] subset[s] of the whole."  *Mandala* v. *NTT Data, Inc*., 975 F.3d 202, 211 (2d Cir. 2020) (affirming dismissal of discrimination claims based on aggregated statistical evidence) (citations and alterations omitted).  Indeed, in *Moussouris* v. *Microsoft Corp*., the court held that *Dr. Farber's* analysis of average gender differences, virtually identical to his analysis here, could not "establish the uniform, [manager-by-manager] disparity" on which "commonality depends."  2018 WL 3328418, at *1 (W.D. Wash. June 25, 2018) (quoting *Wal-Mart*, 564 U.S. at 357), *aff'd*, 799 F. App'x 459 (9th Cir. 2019).  (*See* Part II.B., *infra*.)

Plaintiffs' flawed statistical analyses also do not establish a common question of fact for Plaintiffs' disparate treatment claims, for the independent reason that Plaintiffs have not shown unified, centralized decisionmaking, or that the challenged processes caused a common class-wide injury.  As a result, Plaintiffs do not have "significant proof" of "a general policy of discrimination" executed through those processes sufficient to support any inference that every class member was the victim of *the same* intentional employment discrimination.  *Wal-Mart*, 564 U.S. at 353 (quoting *Gen. Tel. Co.*, 457 U.S. at 159).  (*See* Part II.C., *infra*.)

*Third*, having failed to establish commonality for either their disparate impact or disparate treatment claims, Plaintiffs cannot meet Rule 23(b)(3)'s "even more demanding" predominance requirement.  *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 34 (2013) (citing *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 623–24 (1997)).  Courts regularly reject class certification on

predominance grounds alone where, as here, plaintiffs present flawed statistical evidence that "sweeps in uninjured class members," such that "the 'need to identify those individuals'" and eliminate them from the class "will predominate.'"  *Olean Wholesale Grocery Coop., Inc*. v. *Bumble Bee Foods LLC*, 993 F.3d 774, 791 (9th Cir. 2021) (citation omitted).  (*See* Part III, *infra*.)

*Fourth*, the resolution of just the four Named Plaintiffs' claims would require individualized inquiries that, by themselves, defeat typicality under Rule 23(a)(3).  To establish typicality, class members' claims must "arise[] from the same course of events."  *Marisol A*. v. *Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (citation omitted).  Here, because tens of thousands of individual reviewers exercised their discretion differently across the class, *no* class members' claims arose from the "same course of events."  Each Named Plaintiff had different managers and held different jobs at different times; three were never cross-ruffed (two were ineligible for promotion); one received the top quartile in six of the 12 years she was employed at Goldman Sachs; and another was paid lock-step with her peers.  (*See* Part IV, *infra*.)  In short, there is no "typical" claim in this class, and even the Named Plaintiffs' claims cannot "produce a common answer to the crucial question *why was I disfavored.*"  *Wal-Mart*, 564 U.S. at 352.

*Fifth*, where, as here, predominance and commonality are lacking, it "follows" that a class is neither manageable nor superior to individual actions.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 546 (S.D.N.Y. 2018) (Buchwald J.).  In fact, Plaintiffs' proffered aggregated statistical evidence cannot support a presumption of discrimination for any individual without running afoul of *Tyson Foods, Inc*. v. *Bouaphakeo*, 577 U.S. 442, 466 (2016), which holds that representative evidence may be used to establish class liability only if such evidence can be used by "each class member . . . to establish liability" in an "individual action." Dr. Farber's 16 years of "averaging" results across the class would never be admissible in an individual discrimination claim for backpay arising from 360 reviews, quartiling or cross-ruffing.

Because there will be no viable presumption of discrimination to carry over from a Phase I trial to individualized Phase II proceedings, there is no point to the Phase I class trial contemplated here.

And even if a presumption of discrimination could carry over from a Phase I class trial to individualized Phase II proceedings based on this infirm evidence (and it cannot), the Phase II proceedings would remain unmanageable.  "Each class member['s]" threshold showing at Phase II "that he or she was among those adversely affected by" the challenged processes, *Robinson*, 267 F.3d at 161–62, would require detailed, individualized proof of how reviewers applied the challenged processes to them, including the discriminatory impact the processes may have had on compensation or promotion.  In response, Goldman Sachs would have the right to present individualized defenses showing that "it took an adverse employment action against an employee for a[] [non-discriminatory] reason."  *Wal-Mart*, 564 U.S. at 366.  In these circumstances, a Rule 23(b)(3) class action plainly is not superior to individual actions, because Phase II would involve a series of individual actions where plaintiffs have nothing in common but their gender and employment at Goldman Sachs.

*Finally*, Named Plaintiffs cannot adequately represent the class because class members' interests fundamentally conflict.  Large percentages of the class evaluated *other members of the class*, and the Named Plaintiffs, through each of the challenged evaluation processes, claim that these class members engaged in discrimination, creating an "insurmountable" conflict compelling decertification.  *Donaldson* v. *Microsoft Corp*., 205 F.R.D. 558, 562 (W.D. Wash. 2001) (denying certification where class included "current or former managers" who implemented challenged pay and promotion practices).  (*See* Part VI, *infra*.)

## FACTUAL BACKGROUND

### A.    The Class-Relevant Goldman Sachs Divisions and Business Units

The class is comprised of female associates and vice presidents in three of Goldman

Sachs's revenue-generating Divisions in the United States during the class period: IBD, IMD, and Securities. As Plaintiffs' expert Dr. Henry Farber acknowledged, each of these three Divisions engaged in substantially different businesses:

- "IBD work[ed] with corporate clients, pension funds, financial institutions, asset managers, entrepreneurs and governments to structure and execute financing and risk management transactions." (Ex. 49 ¶ 21 (Farber Rpt.));

- IMD provided "investment management services" and "investment products" in "all major asset classes to institutional and individual clients," and "wealth advisory services" to high-net-worth individuals and families. (*Id.* ¶ 22); and

- Securities assisted investors "with interest rate products (such as government bonds, treasury bills and other highly liquid instruments), credit products, mortgages, currencies, commodities, and stocks and other equity-related products." (*Id.* ¶ 23.)

"Each of the[] three [D]ivisions is comprised of Business Units" (*Id.* ¶ 24; *accord* Ex. 52 ¶ 58 (Shaw Rpt.).) As of 2018, there were 24 in IBD, 23 in IMD, and 32 Business Units in Securities. (Ex. 52 ¶ 58 (Shaw Rpt.).) Business Units are further divided into departments, desks, and job functions. (*See id.* ¶¶ 71–72.) Business Units, which are largely autonomous, "are a critical organizational feature at [Goldman Sachs]." (*Id.* ¶ 66.)

## B.  Class Members' Many Different Jobs Across and Within Divisions

Goldman Sachs uses corporate titles such as "associate", "vice president" and "managing director" to designate nothing more than "level[s] of seniority" across its Divisions. (Ex. 48 ¶ 16 (Dunn Rpt.).) Sixteen witnesses have testified that these titles are *not* job descriptions (*see* App. D), and no witness in this case has opined that class members who share the same corporate title all perform the same or even similar jobs.

Plaintiffs' expert Dr. Farber included in his model a job function control "to account for broad differences in the type of work performed" by class members. (Ex. 49 ¶ 62 (Farber Rpt.).) At his deposition, Dr. Farber admitted that this case involves "thousands," "hundreds," or a least

"a few dozen" of different job functions.  (Ex. 51 at 369:5–370:14 (Farber Tr.).)  Dr. Yermack—

Plaintiffs' expert retained to evaluate Defendants' expert Brian Dunn's opinion that "Associates

and [vice presidents] . . . hold a wide variety of non-fungible jobs" (Ex. 48 ¶ 12 (Dunn Rpt.))—

testified that he was *not* opining "that all revenue generating associates [and vice presidents] . . .

perform[ed] the same job" (Ex. 54 at 54:23–55:13 (Yermack Tr.)), and he conceded that such

corporate titles are merely "echelons" or "rank[s]" "in the investment banking hierarchy."  (Ex. 53

¶ 16 (Yermack Rpt.).)

Defendants' expert Dr. Eric Dunleavy's analysis showed "extensive" job variation among

"associates" and "vice presidents" across at least nine separate criteria.[3]  In fact, the 44 associates

and 45 vice presidents whom Dr. Dunleavy interviewed identified, respectively, 177 and 157

separate "job responsibilities."  (Ex. 46 at 3, 118, 197 (Dunleavy Work Rpt.).)  Just a few examples

from Dr. Dunleavy's Report show the stark differences in jobs performed by class members:

- "Associate 46" is a Private Wealth Advisor ("PWA") in IMD who "advis[es] clients on how to invest, save, and spend."  (*Id.* at 200.)  This associate "spends 90% of his/her time . . . prospecting for new clients."  (*Id.*)

- "Associate 53" is in Mergers & Acquisitions (M&A) in IBD, and "assists oil and gas companies in M&As" and "in raising equity and debt capital."  (*Id.* at 201.)  S/he builds "financial models to perform company valuations" and performs "market analysis to form views on the state of the oil and gas industry and economy more broadly."  (*Id.*)

- "Vice president 18" is a Bond Structurer in IBD specializing in "consumer lending such as auto loans, student loans, credit cards, and personal loan backed securities."  (*Id.*

---

[3] These criteria are:  ***education/certification requirements*** (Ex. 46 at 3, 43–50, 125–31 (Dunleavy Work Rpt.)); ***job responsibilities*** (*id*. at 3, 50–71, 131–51); ***worker characteristics*** such as skills "required for success" (*id*. at 5–6, 71–83, 151–63); ***contextual work factors***, including hours and travel (*id*. at 6, 83–95, 164–76); type and frequency of ***decision-making*** (*id*. at 6–7, 95–100, 176–79); types and numbers of ***external clients*** (*id*. at 7, 100–07, 180–86); ***team structure*** (*id*. at 7, 107–110, 187–89); and applicable ***performance metrics*** (*id*. at 8, 111–14, 189–93).  For the final criterion—***job fungibility***—associates and vice presidents tended to agree that another professional could not "assume their role without training."  (*Id*. at 8, 115–18, 194–96.)

at 203.) S/he "has a master's degree in quantitative finance" and his/her responsibilities include "designing bond structures" and "communicating with investors." (*Id.*)

- "Vice president 76" works in Securities and specializes in "foreign exchange" involving 15 currencies. (*Id.* at 204.) S/he has a "Ph.D. in electrical engineering," and serves clients by "improving hedging performance, finding signals in the market, and building algorithms" in a role that is "not client facing." (*Id.* at 204–05.)

Evidence developed during and since certification from over 30 witnesses across the class-relevant Divisions confirms the wide range of different job functions within the class. (*See* App. D.)[4]

## C.    Goldman Sachs's Discretionary and Decentralized Evaluation Processes

Plaintiffs challenge three decentralized, discretionary evaluation processes—360 reviews, quartiling, and cross-ruffing—as applied to associates' and vice presidents' myriad jobs since July 7, 2002 (for class members in New York) or September 10, 2004 (for others). (Cert. Order at 4.)

### 1.    360 Reviews

From 2002 through 2015, Goldman Sachs's annual 360 review process began with professionals soliciting feedback on various criteria from a total of 8 to 12 peers, subordinates and more senior personnel whom each professional selected with input from her or his manager. (Ex. 8 at -727 (2014 Performance Reviews: FAQs); Ex. 31 at 268:6–14 (Heller Sberlati Tr. (MD, HCM)); Ex. 41 ¶ 38 (1/15/21 Cascio Rpt.).) Because of this individualized selection process, "[n]early every single class member's 360 review scores were determined by a unique set of reviewers," and the set of professionals who provided 360 reviews in 2005 "was almost entirely different" in 2018. (Ex. 52 ¶¶ 103, 107 (Shaw Rpt.).) Thousands of reviewers engaged in the 360 review

---

[4]  (*See, e.g.*, Glassman Decl. ¶ 4 (PMD, Securities) ("There can be major differences among the roles of professionals in Securities, even among those . . . who share the same corporate title"); Kozlowski Decl. ¶ 10 (MD, HCM) ("Because IBD Classic and IBD Financing serve different functions . . . , there are many differences between the roles and skill sets of professionals in each of those sub-divisions . . . ."); Leone Decl. ¶ 4 (PMD, IMD) (professionals in IMD "perform a variety of different jobs that vary greatly by . . . product, responsibility, and skill set.").)

process over the class period:  for vice presidents in the Securities Division alone, there were "approximately 550 and 1,800 different [360] reviewers in each year." (*Id.* ¶ 107.)

The thousands of selected 360 reviewers each applied their own judgment and experience to this task; individual reviewers "ha[d] detailed knowledge of the specific job and role of the professional being evaluated," and their feedback was "aggregate[d] and synthesize[d]" and interpreted by the professional's performance manager who also had "very local knowledge of the workers she manage[d]."  (Ex. 52 ¶¶ 93, 105 (Shaw Rpt.); *see* Ex. 42 at 53:5–9 (11/16/13 Cascio Tr.) (admitting that 360 reviewers "provide different perspectives and different levels of ratings").) The performance manager would meet with the professionals under her supervision, review a consolidated summary of the feedback received from the 360 reviewers, and present the professional with an average review score and the manager's own assessment of the professional's performance.  (Ex. 31 at 279:6–280:3, 280:12–15 (Heller Sberlati Tr. (MD, HCM)); *accord* Ex. 41 ¶¶ 38–46 (1/15/21 Cascio Rpt.).)

The subjective criteria used to guide 360 reviews also changed over the 16-year class period.  As Dr. Shaw explained, (i) from 2003–2005 professionals were rated on three criteria—*i.e.*, "Overall Commercial Effectiveness," "Leadership," and "Overall Professional Performance"; (ii) from 2006–2009 they were rated on nine general criteria—*i.e.*, "Technical Skills," "Communication Skills," "Judgment/Problem Solving," "Teamwork," "Compliance," "Diversity & Equitable Treatment," "Leadership," "Overall Commercial Effectiveness," and "Overall Professional Performance."  (Ex. 52 ¶¶ 98–100 & nn.101, 107 (Shaw Rpt.).)

From 2010 through 2015, the terminology and descriptions for some of the criteria were modified.  (*Id.* ¶ 99 & n.107.)  Certain Divisions also used certain criteria only in some years:

- In 2006–2010, "Creativity/Innovation" was used only in IBD and Securities.
- In 2005–2010, "Recruiting, Training, and Mentoring" was only for IMD and Securities.

- In 2005–2010, "Client/Business Focus," "Drive & Motivation," and "Influencing Outcomes" were used mainly in IBD and IMD, and never in Securities in 2005 or 2009.
- In 2005–2010, "Managing Execution" and "Strategic Thinking & Planning" were used mainly in IBD and IMD, and never in Securities from 2005–2007 or in 2009.

(*See* Giuffra Decl. ¶ 6).[5]   Beginning in 2016, the process shifted from numerical ratings to qualitative feedback, with reviewers providing ratings for general criteria, including:   "risk management," "reputation," "culture," and "conduct-related behaviors," in addition to comments on strengths and weaknesses.   (Ex. 36 Landman Decl. ¶¶ 6–7, 11 (VP, HCM); Ex. 6 at -344 (Feedback 360+ Summer 2017).)

Because of the wide range of jobs performed across Divisions and Business Units, Goldman Sachs created "broad and flexible" criteria for 360 reviews "to enable reviewers to determine the appropriate factors to consider, and their relative importance," based on the specific job and professional being reviewed.   (Kozlowski Decl. ¶ 13 (MD, HCM).)   As numerous witnesses attest, 360 reviewers were "*never limited as to the content of their [360] reviews*." (Duffy Decl. ¶ 14 (VP, IMD) (emphasis added); *see* App. A.)   As such, "the content of [360] reviews *[was] decided completely by the individual[] [reviewers]*" and "the professional's manager who summarize[d] the performance feedback." (Scher Decl. ¶ 10 (PMD, IBD) (emphasis added).)[6]   Senior managers did not approve or alter 360 reviews, and no central committee oversaw the 360 review process.   (*See, e.g., id.* ("I have never sought approval for the 360 reviews I give"

---

[5]   From 2003 through 2009, reviewers scored each criterion on a 1–5 scale, and then on a 1–9 scale beginning in 2010.   (*See* Ex. 1 at -401 (2003 Review Process FAQs); Ex. 2 at 971 (2010 FAQs).)

[6]   (*See also* Duffy Decl. ¶ 14 (VP, IMD) ("reviewers are never limited as to the content of their reviews"); Chi Decl. ¶ 9 (PMD, IBD) ("the contents of 360 reviews are left to the discretion of each reviewer"); 7/10/21 Russell Decl. ¶ 7 (PMD, IMD) ("across the board, the contents of an individual's 360 review are left up to the discretion of the individuals who fill out 360 reviews"); Glassman Decl. ¶ 6 (PMD, Securities) (360 reviewers "are free to consider the factors they believe are the most relevant and important" to "the needs of the businesses and the relevant market").)

and "[n]one of my [subordinates] seek[s] my approval" before delivering 360 reviews).)

As a result, reviewers intepreted and applied the criteria used for 360 reviews differently across Goldman Sachs. For example, a 360 reviewer evaluating "commercial effectiveness" for a PWA in Private Wealth Management in IMD might have examined objective measures of production because "█████████████████████████████████████

████████." (Brasco Decl. ¶ 5 (MD, IMD).)   By contrast, a 360 reviewer evaluating the "commercial effectiveness" of a Wealth Management Professional—a "support" role that involves "administrative work, such as answering phones and responding to client questions"—in the same Business Unit and Division might have focused on the professional's ability to "support [ ] daily client service activity." (*Id.* ¶ 6.)  "Technical Effectiveness" was more important for professionals in Securities in consulting roles "specializ[ing] in networks and cabling and technology," but less important for client service professionals in Securities who "over[saw] the relationships with, and [were] the point of contact for, 20-30 hedge fund clients." (7/9/21 Levene Decl. ¶ 5 (MD, Securities).)  In IMD, "Communication Effectiveness" was less important for professionals who perform complex financial modeling, but more important for portfolio managers who "require[d] strong interpersonal skills and a talent for building and maintaining client relationships." (Mossavar-Rahmani Decl. ¶ 8 (PMD, IMD); *see also* App. A.)[7]

Through regular communications, training sessions, and postings on its internal web site Goldman Sachs repeatedly reiterated that reviewers could not discriminate in 360 reviews. Goldman Sachs instructed reviewers that the Firm "[r]efuse[d] to tolerate any type of discrimination prohibited by law" including sexual harassment. (Ex. 3 (Feb 8, 2010 email from

---

[7]   Named Plaintiffs and their experts agree that 360 reviews are "subjective." (Ex. 40 at 439:5–15 (Orlich Tr.); *see* Ex. 51 at 62:13–63:3, 127:6–16 (Farber Tr.) (360 reviews have "elements of subjectivity" and "room for judgment").)

E. Cooper to all Americas staff); Ex. 7 (FAQs – Firmwide Review System).)  The Firm's training materials for 360 reviewers emphasized that "[f]eedback describing or based on circumstances regarding gender" or other protected characteristics, or affected by maternity leave, "is not appropriate or acceptable."  (Ex. 4 at -451 (Writing Effective Performance Feedback).)

### 2.   Manager Quartiling

During the class period, Goldman Sachs had a decentralized process—manager quartiling—for evaluating professionals' relative "performance, contribution, potential and capability."  (*See* Ex. 9 at -391 (Sept. 2008 Performance Quartiling Process Overviews).) Managers assigned professionals under their supervision to quartiles, with the top quartile having the "strongest" overall ranking, and the bottom quartile having the "lowest."  (*See* Ex. 10 at -659 (2017 Manager Performance Quartiling); *see also* Ex. 5 at -3385 (Firmwide Review System: Frequently Asked Policy, Data & Reporting Questions); Ex. 36 Landman Decl. ¶ 26 (VP, HCM).)

Managers in every class-relevant Division have attested that manager quartiling decisions were made at the Business Unit level, not the Division level, (*see* App. B), because managers "must be familiar with a professional's job, individual performance, and the relative performance of each professional's peers."  (Ex. 52 ¶ 111 (Shaw Rpt.).)  Senior manager review of manager quartiles set at the Business Unit level "rarely led to any changes."  (Goddeeris Decl. ¶ 11 (PMD, Securities); Scher Decl. ¶ 14 (PMD, IBD) ("It would be very unusual for anyone more senior than a Business Unit leader to weigh in on the manager quartiles of individual Associates and Vice Presidents in the Business Unit, and they are not reviewed by Division Heads . . . I cannot remember any time when someone more senior changed a manager quartile for an Associate or Vice President in a Business Unit I managed.").)

As for 360 reviews, Goldman Sachs's manager quartiling process was intentionally flexible so that mangers could apply this process to many different roles and functions across the Firm.

For example, in assessing performance, managers could "put more weight on . . . production numbers" for those in sales roles.  (Ex. 61, Lopez Decl. ¶ 10 (MD, Securities).)  For "client-facing roles," managers could emphasize "excellent interpersonal skills," whereas traders may have been assessed based on "objective performance metrics, including profit and loss."  (Goddeeris Decl. ¶ 12 (PMD, Securities).)  For PWAs within IMD, a manager "might consider how many client contacts each PWA made in the previous year, ██████████████████████████ ████████████, and which PWAs are gaining the most traction with new clients."  (Brasco Decl. ¶ 11 (MD, IMD).)  For a support role, a manager "might consider responsiveness to team requests, work ethic, and demeanor with clients." (*Id.*)[8]

Like 360 Reviews, Goldman Sachs's anti-discrimination policy barred discrimination in quartiling, and managers were further instructed to guard against implicit biases by "challeng[ing] perceptions" and "consider[ing] that affinities between yourself and employees (similar personalities, backgrounds, experiences, etc.) may influence . . . perceptions of employees' performances."  (Ex. 11 at -287 (2015 Manager Quartiling Guidelines).)

Many class members achieved the highest possible quartile ratings:  "[M]ore than a third of class members received a top manager quartile in at least one year, and . . . 8 percent of class members received a top manager quartile in all years."  (Ex. 52 ¶ 221 (Shaw Rpt.).)

### 3.    Cross-Ruffing

For promotion from vice president to managing director, cross-ruffing "capitalize[d] on the perspectives of many senior managers to provide a comprehensive evaluation of candidates."  (*See* Ex. 45 at 69 (Dunleavy Job Rpt); Ex. 41 ¶¶ 55–61 (1/15/21 Cascio Rpt.).)  Cross-ruffers conducted

---

[8]  Plaintiffs' expert, Dr. Wayne Cascio, who purports to have examined the implementation of the challenged processes, admitted that managers apply the quartiling factors in different ways. (Ex. 43 at 142:17–143:16 (7/31/18 Cascio Tr.) (**Q.** "And in making those quartiling decisions . . . managers can give different weight to different factors, right?"  **A.** "Of course, of course.").)

10 to 12 interviews with senior professionals who were familiar with the candidates and rated them on two broad categories: "Management, Leadership & Culture" and "Commercial Effectiveness." (Ex. 12 at -266, -272 (2017 Cross-Ruffing Guide); *see* Ex. 52 ¶ 123 (Shaw Rpt.).)  Goldman Sachs granted cross-ruffers latitude to assess candidates' readiness for promotion and determine the substance of the interviews, because "[a] rigid procedure" requiring cross-ruffers "to consider identical factors across all jobs would not make sense."  (Ex. 47 at 40 (Dunleavy Rebtl. Rpt.).)

New cross-ruffing teams were drawn for each promotion cycle and operated separately by Division; cross-ruffers within a Division evaluated only candidates from their Division and ultimately created Division-specific ranked recommendations.  (Ex. 30 at 213:25–214:17 (Heller Sberlati Tr.) (MD, HCM); Ex. 37 at 250:12–251:15 (Larson Tr.) (MD, HCM); Ex. 52 ¶¶ 122–24 (Shaw Rpt.).)  Divisional leaders could then revise the team's rankings with a focus on business areas in need of senior professionals.  (*See* Ex. 37 at 247:9–15, 248:16–20 (Larson Tr.) (MD, HCM).)  Although members of the Executive Office reviewed the candidate list to ensure that business and regional needs were considered, they rarely made adjustments.  (*See* Ex. 30 at 241:19–242:11 (Heller Sberlati Tr.) (MD, HCM).)  The Management Committee "[d]oes [not] make decisions about promotions" and so was merely informed of the outcome once finalized. (*See* Ex. 24 at 82:16–18, 89:5–9 (Boyle Tr.) (MD, HCM).)  Even Dr. Farber acknowledged that cross-ruffing decisions were made at the "[D]ivision" level.  (Ex. 49 ¶¶ 38 (Farber Rpt.).)

All associates in the class were ineligible for promotion to managing director, as were vice presidents in certain roles or who lacked sufficient seniority.  (*See, e.g.*, Scher Decl. ¶ 7 (PMD, IBD).)  Significantly, more than 85 percent of vice presidents were never cross-ruffed because they were never nominated for promotion to managing director.  (Giuffra Decl. ¶ 11.)  A total of 219 class members were promoted to managing director following cross-ruffing, and female professionals were "nominated at a higher rate than men" in IMD and Securities over the class

period.  (Giuffra Decl. ¶ 12; Ex. 52 ¶ 235 (Shaw Rpt.).)  Dr. Farber, who did not analyze cross-ruffing (*see* Ex. 51 at 149:12–16  (Farber Tr.); Part E, *infra*), found that women were promoted to managing director at *higher* rates than men for five of the 14 promotion cycles that occurred over the class period.  (*See* Ex. 50 App. A, Table 28 (Farber Rebtl. Rpt.).)

D.    **Class Members' Involvement in the Challenged Processes**

Hundreds of class members, including at least one Named Plaintiff, Allison Gamba (*see* Ex. 29 at 91:10–14 (9/14/18 Gamba Tr.)), participated as managers implementing the challenged processes.  Approximately *75%* of class members conducted a 360 review of another class member.  (Giuffra Decl. ¶ 9.)  At least eight percent of class members delivered 360 reviews because they were performance managers for other class members or for female professionals in class-relevant roles.  (*Id*. ¶ 10.)  Class members also "account[ed] for about 8 percent of cross ruffers during th[e class] period."  (Ex. 52 ¶ 341 (Shaw Rpt.).)

E.    **Dr. Farber's Analyses and Admissions**

Plaintiffs' statistical expert, Dr. Farber, analyzed "[w]hether there is statistical evidence of a difference in how men and women fare in Goldman's performance review system," and "[w]hether there is statistical evidence of disparities between men and women in promotion rates." (Ex. 49  ¶¶ 6(c), (e) (Farber Rpt.).)  To try to answer these questions, Dr. Farber built regression models that aggregated data across all three class-relevant Divisions for all women (whether or not they opted out of the class) and men in class-relevant roles for 16 years (from 2003 to 2018).  Based on his aggregated analyses, Dr. Farber opined that "women receive[d] *average 360 scores* that are lower, *on average*, than those of men who have the same levels of characteristics included in the model"; and that women were "less likely to be in the top quartile than males."  (*Id*. Tables 8, 11 (emphasis added).)  And examining promotions generally—without regard to the specific impact of the cross-ruffing process—Dr. Farber opined that "during the period 2003 through 2018,

fewer female vice presidents were promoted to managing director than one would expect had women been promoted at the same rate as men with the same observed characteristics."  At the same time, Dr. Farber found no disparities, or found disparities that favored women, for five of 14 promotion cycles in the class period.  (Ex. 50 ¶ 15, App. A, Table 28 (Farber Rebtl. Rpt.).)

Because Dr. Farber aggregated 360 review and quartiling data across all three Divisions, he acknowledged that his model cannot "measure whether disparities for each of the challenged processes for men and women differ by division."  (Ex. 51 at 71:11–15 (Farber Tr.).)  In fact, Dr. Farber responded, "No," when asked:  "If there were statistically significant disparities . . . in [IBD and IMD] but not the Securities division, would your single model be able to identify [that]?"  (*Id*. at 85:17–86:4.)  Moreover, because Dr. Farber aggregated data across Divisions to calculate "average" differences in 360 scores and manager quartiles, he testified that he "*can't tell you whether any particular woman was discriminated against*."  (*Id*. at 210:13–19 (emphasis added).)  In other words, Dr. Farber simply opines that "on average, *there had to be someone* who was discriminated against," but his model cannot discern who or how many or in what Division that might be.  (*Id*. at 360:10–19 (emphasis added).)  His analysis admittedly "doesn't attach damages to any particular woman.  *It's not really possible in the data to determine how much any particular woman was discriminated against*."  (*Id.* at 345:14–18 (emphasis added); *see id*. at 345:19–346:6 (admitting he had not analyzed "the damages suffered by any particular woman in the class").)

Dr. Farber acknowledged that the three challenged evaluation processes "go[] down through their hierarchy and get[] implemented."  (*Id*. at 215:10–13; *see id.* at 171:21–23 ("there is a firm-wide policy of evaluation that's done at the much lower levels").)  Tellingly, Dr. Farber admitted he did "no work to assess the extent to which individual managers exercise discretion in applying 360 reviews."  (*Id*. at 381:3–10.)   In fact, Dr. Farber did "not look at

the . . . implementation" of 360 reviews at all, including whether "different managers implemented the 360 process differently" nor did he "examine how in each individual [D]ivision[] managers assigned quartiles." (*Id.* at 141:20–142:3, 142:21–23, 158:17–20.)  Dr. Farber was not aware of any "committees" involved in 360 reviews or quartiling, or of any "centralized review" of compensation or promotion decisions. (*Id.* at 173:2–21; 171:21–172:9.)

Dr. Farber also "did not do any analysis of cross-ruffing," but instead chose to analyze "the overall effect of the promotion process, not cross-ruffing specifically." (*Id.* at 137:9–10; 149:12–16.)  He confirmed that he was "not offering any opinion about disparities between the rates of promotion of men and women who are on cross-ruffing lists." (*Id.* at 185:18–22.)

Dr. Farber's own analyses reveal that his claimed systemic, class-wide "gender gaps" in the three challenged processes do not exist.  He found no gender disparity when individual decision-makers implemented 360 reviews or manager quartiling ***after 2015***. (*See* Ex. 49 ¶¶ 10, 138 & Table 22 (Farber Rpt.).)  And his analysis showed several years where *more* female vice presidents were promoted than predicted by his model.  (Ex. 51 at 186:13–187:24 (Farber Tr.); *see* Ex. 50 ¶ 117 & n.124 & Table 28 (Farber Rebtl. Rpt.).)  Consistent with these results, Defendants' expert Dr. Kathryn Shaw of Stanford University confirmed the absence of any common impact of the challenged processes.  Using separate regression models by Division, Dr. Shaw showed that there were ***no*** statistically significant gender gaps for female associates or vice presidents for cross-ruffing, and ***none*** for five of six manager quartiling groupings and eight of 12 groupings for 360 reviews.  (*See* Ex. 52 at Exs. 21, 24, 28 (Shaw Rpt.).)[9]

## F.      Relevant Procedural History

---

[9]      Both statistical experts grouped the data for their regression models by time period and title, and Dr. Shaw also created separate models by Division.  (Ex. 52 ¶¶ 38, 190 (Shaw Rpt.); *see, e.g.*, Ex. 49 ¶¶ 85–87 (Farber Rpt.).)

1.      **Plaintiffs' Motion for Class Certification and Discovery for Injunctive Relief Claims**

On July 1, 2014, Plaintiffs initially moved for class certification under *both* Rules 23(b)(2) and 23(b)(3), proposing a classic Title VII litigation plan to adjudicate their "disparate impact and/or pattern-or-practice claims":

> *Teamsters* sets forth a framework for litigating Title VII pattern or practice cases, which the Supreme Court affirmed in *Dukes*.  At the initial liability stage of the case, the plaintiffs must establish a prima-facie case of discrimination, by showing that widespread acts of discrimination against individuals were standard operating procedure.  If the employer fails to defeat the prima facie case by showing that plaintiffs' evidence is inaccurate or insignificant, *the court may conclude that a violation has occurred and grant declaratory and injunctive relief.  Plaintiffs then can move to the remedial phase of the case with a presumption of discrimination in their favor.*

(ECF No. 247 at 45–46 & n. 122 (citations omitted and emphasis added).)[10]  Magistrate Judge Francis recommended denying class certification.  (*See* Mar. 10, 2015 Report & Recommendation ("R&R") (ECF No. 364 at 1–2, 45).)  In briefing their objections, Plaintiffs again emphasized the "well-established" Title VII "framework," whereby liability "results *in classwide injunctive relief,*" but recognized that "*membership in the back pay class*" would raise "individual issues" (Pls.' Obj. Reply Br. (ECF No. 514) at 9 (emphasis added).)

While Plaintiffs' objections to the R&R were pending, Judge Francis directed the parties to brief whether Goldman Sachs's "evaluation policies and practices ha[d] changed in material ways" beginning in 2016 when, as shown above, the Firm shifted its 360 reviews to focus on qualitative feedback over numerical ratings.  (ECF No. 544 at 1.)  Based on this briefing, Judge Lehrburger later ordered supplemental discovery on the "potentially material changes to [Goldman Sachs's] policies and procedures" and "their impact, if any, on class certification for purposes of

---

[10]   As the Second Circuit has made clear, Plaintiffs' reference to Phase II as "remedial" is a "misnomer," because that Phase "implicates questions of liability . . . to each individual class member rather than to the class as a whole." *Robinson*, 267 F.3d  158 n.4.

injunctive relief."  (December 13, 2017 Tr. (ECF No. 560) at 57–58.)

### 2.   The Class Certification Order

Because discovery into Goldman Sachs's revised evaluation processes was ongoing as of March 30, 2018, this Court's Class Certification Order in 2018 "addresse[d] only the portion of Plaintiffs' motion that seeks class certification [of claims for backpay and punitive damages] under Rule 23(b)(3)."  (Cert. Order at 12–13.)

In certifying Plaintiffs' claims for monetary relief, the Court based its commonality findings for Plaintiffs' disparate impact claims on the preliminary determination that the challenged processes constituted a "common mode of exercising discretion," as required to establish the Rule 23(a)(2) commonality under *Wal-Mart*, 564 U.S. at 356.  Specifically, based on the limited record at the time, the Court found that (i) all class members were "subject to [the 360 review and manager quartiling] processes" and "all promotions from Vice President were awarded through the cross-ruffing process" (Cert. Order at 26–28); and (ii) class members did not "hold a multitude of jobs," but instead "h[e]ld only one of two jobs: Associate or Vice President," (*id*. at 28 n.11.)

For Plaintiffs' disparate treatment claims, the Court's commonality determination was based on Dr. Farber's aggregated statistical analyses, which it concluded constituted "significant proof" of "a general policy of discrimination."  (*Id.* at 23–24, 29.)  The Court accepted Dr. Farber's aggregated statistics based in part on the finding (derived from the limited record at the time) that "virtually all final decision-making" for the evaluation processes was "funnel[ed]" to senior management and that the Firm's Management Committee (comprised of the most senior officers at the Firm) "decides who is promoted to Managing Director."  (*Id.* at 10, 31.)

The Court found that common issues predominated as to Plaintiffs' statistical evidence of disparate impact and business necessity, while recognizing that predominance would not exist

when it came to "rebutting the causal link between the challenged processes and every single class member's claim" or "individualized damages issues." (*Id.* at 44.) The Court ruled that these individualized damages issues could be adjudicated through the use of "management tools" such as "bifurcation, the use of a magistrate or special master, alteration of the class definition, the creation of subclasses, or even decertification after a finding of liability." (*Id.* at 49 (internal quotations and citations omitted).) Judge Lehrburger has since reiterated that the Phase I trial will "not include . . . damages (including back pay) and punitive damages." (ECF No. 888 at 3.)

Three weeks after the Second Circuit denied Goldman Sachs's Rule 23(f) petition seeking review of the Class Certification Order, Plaintiffs "withdr[ew] [their] currently pending motion for class certification pursuant to [Rule 23(b)(2)]." (ECF No. 625 at 1.) At the close of discovery, with Plaintiffs' best evidence of centralized decisionmaking before him, Judge Lehrburger concluded that Plaintiffs failed to establish any "role" for the Management Committee "in approving, revising, [or] implementing" the challenged processes. (ECF No. 1100 at 3.)

## LEGAL STANDARD

Class "certifications are not frozen once made." *Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 480 n.9 (2013). Instead, the "district court has an affirmative duty" to monitor class decisions "in light of the evidentiary development of the case," *Mazzei*, 829 F.3d at 266 (citation omitted), and has the authority to decertify a class where "the class no longer meets the requirements of Rule 23 at any time before final judgment." *Jin*, 990 F.3d at 261; *see* Fed. R. Civ. P. 23(c)(1)(C). [11] "[A]ctual, not presumed, conformance with Rule 23[] remains . . . indispensable" to maintaining a class action. *Gen. Tel. Co.*, 457 U.S. at 160.

## ARGUMENT

---

[11]  *See In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (Rule 23 findings are not binding on the trier of fact "even if that trier is the class certification judge").

I.     **THIS COURT SHOULD DECERTIFY THE CLASS BECAUSE PLAINTIFFS CANNOT ESTABLISH THAT CLASS MEMBERS HAVE STANDING TO SEEK BACKPAY.**

Plaintiffs' claims fail at the most basic step: they have not demonstrated that class members have Article III standing to pursue the only certified claims in this case, which exclusively seek backpay and, derivatively, punitive damages. For class-wide standing to exist, Plaintiffs must establish that the female associates and vice presidents in the class suffered discrimination caused by the challenged evaluation processes and, in turn, that discrimination must have caused those class members to earn less or to be denied a promotion such that they could recover backpay. Because the certified Rule 23(b)(3) damages class does not satisfy controlling Supreme Court and Second Circuit law, this Court should decertify the class.

Starting with the Supreme Court, "[t]o have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm." *TransUnion*, 141 S. Ct. at 2200. In *TransUnion*, the Supreme Court held that only about 23% of the certified Rule 23(b)(3) class had "demonstrated concrete harm" and had standing to seek damages. *Id*. Moreover, Article III standing is not "dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for *each form of relief that they seek*." *Id.* at 2208 (citing *Davis* v. *Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *Friends of the Earth, Inc.*, 528 U.S. at 185) (emphasis added).[12] Under this rule, "a plaintiff's standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages." *Id*. at 2210. Instead, standing requirements turn on the "form of relief" sought, *i.e.*, a plaintiff may

---

[12] Plaintiffs must meet their standing burden "with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion*, 141 S. Ct. at 2208 (quoting *Lujan* v. *Defs.' of Wildlife*, 504 U.S. 555, 561 (1992)). Because this case is now at the summary judgment stage, Plaintiffs must "establish[], and not merely allege[], standing." *New York* v. *Scalia*, 490 F. Supp. 3d 748, 767 (S.D.N.Y. 2020) (Woods, J.).

have standing to seek "*forward-looking, injunctive relief*" where she or he can show an "imminent and substantial" "*risk of future harm*," but "*in a suit for damages*" Article III standing requires an actual, concrete "*injury.*"  *Id.* at 2210–11 (emphasis added).  This direction from the Supreme Court must be read together with the Second Circuit's rule that "no class may be certified that *contains members lacking Article III standing.*"  *Denney*, 443 F.3d at 264 (emphasis added).[13] Thus, under *TransUnion* and *Denney*, no class may be certified that contains members lacking Article III standing to pursue *the particular claim plaintiffs elected to bring,* here backpay claims.

At class certification, Plaintiffs promised this Court that they would follow the "well-established" Title VII "framework," where "common issue[s] of liability" would be determined at a Phase I trial that may "result[] *in classwide injunctive relief*," but where "*eligibility for membership in the back pay class*," which raises "individual issues," would be addressed in a later Phase II.  (ECF No. 514 at 9 (emphasis added); *see id.* at 19 (acknowledging that "*membership in the damages class*" would require "individualized" inquiries) (emphasis added).)  Under Plaintiffs' proposal—and longstanding Title VII law—class-wide standing at Phase I was to be premised on Rule 23(b)(2) certification for class-wide injunctive relief to remedy the risk of future harm posed by a discriminatory employment practice.  *See Teamsters*, 431 U.S. at 361 ("a court's finding of a pattern or practice" of discrimination "justifies *an award of prospective relief*" such as "*an*

---

[13]  Courts in this Circuit routinely deny class certification where plaintiffs fail to show class-wide standing.  *See, e.g.*, *Calvo* v. *City of New York*, 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017) (Caproni, J.) ( "a class cannot be certified if any person" within class definition "lacks standing"); *Lackawanna Chiropractic P.C.* v. *Tivity Health Support, LLC*, 2020 WL 4692464, at *2–4 (W.D.N.Y. July 7, 2020) (denying certification where certain class members "were not injured"); *Flynn* v. *DIRECTV, LLC*, 2018 WL 3970913, at *3–4 (D. Conn. Aug. 20, 2018) (denying certification of class including members who consented to alleged infringement and thus "have not suffered any wrong or injury at all"); *Tomassini* v. *FCA U.S. LLC*, 326 F.R.D. 375, 384 (N.D.N.Y. 2018) (denying certification after identifying "just two examples" of class members who had no injury); *Kempner* v. *Town of Greenwich*, 249 F.R.D. 15, 17–18 (D. Conn. 2008) (denying certification where class included members who "have not or will not suffer injury").

*injunctive order*") (emphasis added)).  But "discrimination in general does not entitle an individual to specific relief."  *Dillon*, 746 F.2d at 1004.  Thus, at Phase II, "[e]ach class member must show that he or she was among those *adversely affected by* the challenged policy or practice" (*i.e.*, suffered a concrete harm) in order to establish entitlement to individual monetary relief.  *Robinson*, 267 F.3d at 161–62; *Dillon*, 746 F.2d at 1004 ("Until the individual [class member] *has demonstrated actual injury to [her]self*," at Phase II, "*the court may not direct individual relief*") (emphasis added).

Plaintiffs abandoned this Title VII playbook when, shortly after the Court certified the Rule 23(b)(3) damages class, they withdrew their motion to certify class claims for injunctive relief under Rule 23(b)(2).  (*See* ECF No. 625.)  Plaintiffs' bait-and-switch turned the "well-established" Title VII framework on its head—they no longer seek class-wide injunctive relief at all (nor is it available).[14]  As a result, the Court is now left with certified disparate impact and disparate treatment claims for a class where the *only* forms of relief sought are *individualized* awards of "backpay and punitive damages."  (Pls.' Class Cert. Br. (ECF No. 247) at 45; Cert. Order at 12–13.)  But Plaintiffs cannot jettison the *Teamsters* framework along with the discovery and motion practice needed to certify their injunctive relief claims, yet continue to rely on the *Teamsters* framework to establish class-wide standing.  Instead, as *TransUnion*, *Robinson*, and *Dillon* make clear, class-wide standing for Plaintiffs' backpay claims requires generalized proof that all women in the class suffered a "concrete harm," *i.e.*, that "the challenged practices caused [class members] *injury in compensation or promotion*" (not the mere risk of future harm).  (June 25, 2019 Order (ECF No. 767) at 2 (emphasis added); *see* Nov. 25, 2019 Order (ECF No. 888 at 3 (confirming

---

[14]  Any claim for injunctive relief is now moot, as Plaintiffs' statistical expert Dr. Farber found no "gender gaps" for 360 reviews or quartiling after 2015 and admittedly never analyzed "cross-r[uff]ing specifically."  (*See* Ex. 49 ¶¶ 10, 114 (Farber Rpt.); Ex. 51 at 149:14–16 (Farber Tr.).)

Phase I scope and Plaintiffs' burden to show class-wide injury).)

Plaintiffs' evidence does not—and cannot—suffice as common affirmative evidence that the challenged practices caused all class members seeking backpay concrete "injury in compensation or promotion." Dr. Farber's statistical analyses are based on "averages" and "probabilities" drawn from data encompassing *all women* and men in class-relevant roles across all three Divisions and over the entire class period. (Ex. 49 ¶¶ 41–48 (Farber Rpt.).) Based on his analyses, Dr. Farber could speculate only that that "*there had to be someone* who was discriminated against," and conceded that he had no way to distinguish between class members who could be entitled to backpay and those who were not. (Ex. 51 at 360:15–17; 361:9–17 (Farber Tr.) (emphasis added) (agreeing that he could not "testify that all women in the class were the victims of discrimination").) Because Dr. Farber lumped all three Divisions into a single regression model, he also did not "measure whether disparities for each of the challenged processes . . . differ by [D]ivision," and thus cannot discern whether women in *an entire Division* suffered no discrimination at all in connection with 360 reviews or quartiling. (*Id.* at 71:11–15; 85:17–86:4.) And because Dr. Farber "did not do any analysis of cross-r[uff]ing," Plaintiffs have no evidence to meet their standing burden for claims related to that process. (*Id.* at 137:9–10.) In the end, Dr. Farber could opine only that, "*on average*, the women [earn] less than men [after] controlling for factors that [he] thought were important," but he "can't tell you *whether any particular woman was discriminated against*." (Ex. 51 at 210:13–19 (Farber Tr.).) Because Plaintiffs' burden is to show that discrimination caused injury to *every particular woman* in the class, Dr. Farber's own analyses support decertification of this Rule 23(b)(3) damages class action.

Moreover, the record now confirms that the class contains many class members who indisputably were not adversely impacted by—and, in many cases, benefited from—one or more of the challenged processes. (*See* Part III, *infra*.) For 360 reviews and manager quartiling, this

includes, for example, all class members who joined Goldman Sachs after 2015, when Dr. Farber found no evidence of disparate impact, and all those who received top quartile scores in each relevant year.  (*Id.*)  For cross-ruffing, *all* associates (who cannot be promoted to managing director), and all vice presidents who were promoted or who were ineligible for promotion (for example because of their role or lack of seniority) have no claim.  (*Id.*)  As Plaintiffs concede, some class members were not employed "long enough to be subject to the compensation policy," and thus could not have been adversely impacted by the 360 review or quartiling processes.  (ECF No. 514 at 19.)

On this record, *TransUnion* and *Denney* are clear:  failure to establish class-wide standing for "the form[s] of relief sought"—backpay and punitive damages—is fatal to maintaining a class action.  *TransUnion*, 141 S. Ct. at 2210.  Because Plaintiffs have not established that all class members suffered concrete injury, this Court should decertify their Rule 23(b)(3) damages class.[15]

## II.   DISCOVERY HAS CONFIRMED THAT PLAINTIFFS CANNOT MAINTAIN A CLASS ACTION BASED ON GOLDMAN SACHS'S DECENTRALIZED, DISCRETIONARY EVALUATION PROCESSES.

In a class action based on employment practices that "giv[e] discretion to lower-level supervisors" to make employment decisions, the existence of a common question of fact, a prerequisite for the certification of a class action, *see* Fed. R. Civ. P. 23(a)(2), requires that Plaintiffs identify "some glue holding the alleged reasons for all those decisions together."  *Wal-Mart*, 564 U.S. at 352, 355.  For Plaintiffs' disparate impact claim, the Supreme Court has held that this "glue" must be "a common mode of exercising discretion that pervades the entire

---

[15]   Because Plaintiffs abandoned the *Teamsters* framework by withdrawing their motion for injunctive relief, Defendants have repeatedly objected that this framework is not appropriate for trial of Plaintiffs' claims.  (*See, e.g.*, ECF No. 629 at 18 n.33; ECF No. 864 at 13 n.7; ECF No. 887 at 18 n.10.)  Plaintiffs have yet to specify how this case can be tried consistent with Defendants' due process and other rights, and Defendants accordingly reserve all of their rights, including under the U.S. Constitution, and to raise objections once Plaintiffs present a trial plan.

company." *Id.* at 352, 356.  Similarly, for disparate impact and disparate treatment claims, Plaintiffs must establish that these "common" processes caused class members' injuries.  *Id.* at 349–50, 353.  Finally, the Supreme Court requires "significant proof" of an employer's "general policy of discrimination" to support commonality for disparate treatment claims  *Id.* at 353.

At class certification, the Court found that a common question of fact existed based on Plaintiffs' representations that the challenged processes were "uniform and centralized" (Pls.' R&R Objs. (ECF No. 511) at 1), finding that (1) "the job evaluation processes . . . applied to every single member of the class . . . and the cross-ruffing process applied to every single possible promotion from Vice President" (Cert. Order at 28); and (2) class members "hold only one of two jobs:  Associate or Vice President" (*id.* at 28 n.11).  The Court also ruled that Dr. Farber's aggregated statistics could establish common injury.  (*Id.* at 29, 32.)  After more than three years of discovery, the Court should revisit those preliminary findings because they are not supported by the record.

### A.   Plaintiffs Have Not Shown a "Common Mode" of Decision-Making, as Required for Disparate Impact Commonality.

Every court since *Wal-Mart* has concluded that common questions of fact do not exist for disparate impact claims challenging evaluation systems where local managers apply highly discretionary criteria in evaluating professionals holding diverse jobs.  As Judge Schofeld explained in *Kassman* v. *KPMG LLP*, "relative freedom . . . extended to local supervisors" in the application of employment processes and a "lack of rigid criteria to channel [their] discretion . . . all *dictate the conclusion* that there was no common mode of exercising discretion that would warrant class certification after [*Wal-Mart*]."  419 F. Supp. 3d 252, 259, 277, 281 (S.D.N.Y. 2018) (emphasis added).  Similarly, in *Moussouris* v. *Microsoft*, the court denied certification of disparate impact claims arising out of a "Calibration Process" whose  criteria were "subjective and open to

many different interpretations," so that "managers could adapt it to various employees' roles." 2018 WL 3328418, at *20.   And in *Jones* v. *National Council of Young Men's Christian Associations*, the YMCA's "numerical performance ratings" of employees' "'honesty, respect, responsibility, and caring'" did not establish a common mode because of "*the discretionary nature of the decisionmaking*" and "myriad permutations" in the policies' application.  34 F. Supp. 3d 896, 904, 906 (N.D. Ill. 2014); *see Ross* v. *Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 198 (D.D.C. 2017) (no common question of fact where a common "numerical rubric . . . says nothing about how individual supervisors exercised what discretion was left to them").

By every relevant measure, these cases are indistinguishable from Plaintiffs' disparate impact claims here.  *First*, just as in *Kassman*, *Moussouris*, *Jones*, and *Ross*, the evidence overwhelmingly establishes that Goldman Sachs provided only generalized criteria for the 360 review and quartiling processes to allow managers to account for "the variables that affect an individual's . . . []performance" such as "differences in job duties across business units."  (Ex. 52 ¶ 60 (Shaw Rpt.); *see* App. A (summarizing testimony from almost thirty Goldman Sachs professionals across the class-relevant Divisions attesting to flexibility in applying subjective review criteria).)  Manager quartiling similarly focuses on flexible and subjective concepts of relative "performance, contribution, potential and capability."  (*See* Part C.2, *supra*.)  Cross-ruffing criteria too gave cross-ruffers wide discretion to consider any "role-dependent factors" they consider relevant to an "in-depth assessments of each candidate."  (Ex. 45 at 69–70 (Dunleavy Job Rpt.); *see* Part C.3, *supra*.)  In short, the facts here are no different from the cases cited above where courts found the use of a firmwide "structure," a "numerical rubric," or "subjective criteria" that were "open to many different interpretations" failed to satisfy commonality.

*Second*, thousands of different decision-makers working in different businesses across Goldman Sachs over almost two decades exercised the discretion afforded by the three challenged

processes.  (*See* Part C, *supra*.)  In fact, nearly every class member's 360 review scores were "determined by a unique set of reviewers," and the reviewer population in 2005 had almost completely turned over by 2018.  (Ex. 52 ¶¶ 103, 107 (Shaw Rpt.).)  Forty declarants and deponents across the Divisions have attested to the decentralized nature of 360 reviews and quartiling (*see* App. A–B), and undisputed evidence confirms that cross-ruffing compiled the input of multiple decision-makers.  (*See* Ex. 45 at 69 (Dunleavy Job Rpt.); Ex. 41  ¶¶ 57–58 (1/15/21 Cascio Rpt.).) Notably, as in *Moussouris*, "the recommendations of lower level . . . managers [are] almost always accepted."  2018 WL 3328418, at *18; *see* Ex. 37 at 248:16–20 (Larson Tr. (MD in HCM)) ("the final list" put forward by Division Heads "is ultimately approved by the management committee"). This "limited oversight" "d[oes] not change the dominant feature" of the challenged processes, "namely . . . subjective, discretionary, assessments and recommendations of [] direct supervisors and managers."  *Jones*, 34 F. Supp. 3d at 908.

*Third*, and most significantly, as 41 professionals have attested, the thousands of decision-makers involved in 360 reviews, quartiling, and cross-ruffing *exercised their discretion differently* because they applied the criteria (which evolved over the course of the class period) to a myriad of "specific roles[s] and function[s]."  (McGovern Decl. ¶ 10 (PMD, IMD); *see* App. A–C.) Plaintiffs themselves admit that 360 reviews and quartiling were subjective, managers "g[a]ve different weight to different factors" (Ex. 43 at 142:17–143:16 (7/31/18 Cascio Tr.); Compl. (ECF No. 5) ¶ 43), and that cross-ruffers may ask different questions of different interviewees (Ex. 41 ¶ 81 (1/15/21 Cascio Rpt.)).  Managers involved in cross-ruffing have similarly testified that cross-ruffers focus on different factors depending on the individual candidates and the unique nature of their roles.  (*See* Kozlowski Decl. ¶ 24 (MD, HCM).)  The *Moussouris* court could have been speaking about this case in pronouncing it "'quite unbelievable' that all Microsoft managers supervising over 8,600 putative class members 'would exercise their discretion in a common

way.'"  2018 WL 3328418, at *23 (quoting *Wal-Mart*, 564 U.S. at 356).

*Fourth*, the myriad jobs performed by class members further confirms that evaluators exercised their discretion differently in applying the challenged processes across the class.  The record now establishes that, just as in *Wal-Mart*, *Kassman*, and *Moussouris*, class members who share the corporate title of associate or vice president held "not one of two" but "'a multitude of jobs.'" (Cert. Order, at 27–28 n.11 (quoting *Wal-Mart*, 564 U.S. at 359–60)).  The latter cases distinguished the instant one as addressing class members in "two positions," *Kassman*, 416 F. Supp. 3d at 277; *Moussouris*, 2018 WL 3328418, at *19, *22 n.17, but that is now proven incorrect. (*See* Part B, *supra*.)  Because every particular class member's 360 review or quartile was tailored by their manager to their individual job function, the "reason" why any particular class member was allegedly "disfavored" necessarily has no single answer.  *Wal-Mart*, 564 U.S. at 352.

In short, to the extent that this Court preliminarily found a common question of fact because the same evaluation processes "applied to every single member of the class"  (Cert. Order at 28), the record evidence now makes clear that those processes were in fact *applied in very different ways* by *different managers/cross-ruffers* at *different times* using *different criteria*.  This record evidence bars any finding of commonality based on a "common mode" of decision-making.

**B.    Plaintiffs' Statistical Analysis Cannot Show That the Challenged Processes Were the Common Cause of Any Disparities, as Required for Disparate Impact *and* Disparate Treatment Commonality.**

For both of their claims, Plaintiffs also must prove that the challenged processes caused a common injury shared by all class members.  *Wal-Mart*, 564 U.S. at 355; *see* 42 U.S.C. § 2000e-2(k)(1)(i).  In over a decade of litigation, Plaintiffs have never articulated a common theory of how admittedly neutral employment processes affected women differently than men.  Their initial complaints and expert reports rested on a theory that was decidedly *not* common—that Goldman Sachs permitted too much discretion in, and lacked clear standards for, employment decisions.

(*See, e.g.*, Compl. (ECF No. 5) ¶ 43 (alleging that managers exercised "wide discretion" based on "subjective feelings"); Ex. 67 ¶ 17(b) (2/18/14 Cascio Rpt.) (criticizing "[l]ack of clear standards for decision making in []performance-assessment").)

Even after the Supreme Court in *Wal-Mart* made clear that Plaintiffs' claims could not proceed class-wide on such theories, Plaintiffs (through their expert in industrial and organizational psychology, Dr. Wayne Cascio) continue to assail the challenged processes as (i) relying on 360 reviewers who do not "understand" the rating scales and lack "expertise," (ii) resulting in "artificial" quartiles and (iii) lacking "standardiz[ation]" for cross-ruffing. (Ex. 41 ¶¶ 65, 70, 79 (1/15/21 Cascio Rpt.).) Thus, while Dr. Cascio criticizes the challenged processes, he offers no opinion—and directly refuses to opine—on how any aspect of the processes that he finds deficient "has a disparate impact on women." (Ex. 42 at 67:9–21, 149:5–19, 160:5–13, 170:23–171:8 (11/16/13 Cascio Tr.); *see* Ex. 44 at 321:5–10 (6/9/21 Cascio Tr.) (whether "certain employment processes cause an adverse impact" is "not in [Dr. Cascio's] balliwick").)[16]

Plaintiffs' cannot plug the hole in their common theory of causation with Dr. Farber's statistical evidence. "[A] plaintiff's statistical analysis 'must . . . be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity.'" *Mandala*, 975 F.3d at 209 (citation omitted). Dr. Farber cannot meet this standard. His aggregated "average" gender gaps for the entire population of associates and vice presidents in all three Divisions across almost two decades say nothing about how or even whether each class member was injured (in the same way or otherwise). In positing that these calculations somehow prove class-wide disparate impact caused by the challenged processes, Plaintiffs "assum[e] '*that what is true for the whole is*

---

[16]  Though Dr. Cascio proposes changes that he thinks would "reduce the susceptibility of the [challenged processes] of adverse effects on females" (Ex. 44 329:3–11 (6/19/21 Cascio Tr.)), he never explains how those purported adverse effects were supposedly caused, nor does he analyze the effect of his proposed changes. (*Id.* at 328:22–329:6.)

*true for a[ll] subset[s] of the whole*,'" which can be—and, in this case, is—"dramatically wrong." *Id.* at 211 (citing *Daye* v. *Cmty. Fin. Serv. Ctrs., LLC*, 233 F. Supp. 3d 946, 1017 (D.N.M. 2017)). Indeed, Dr. Farber admits that he has no way to know whether "gender gaps" he purports to have found looking at "the whole" are true for all subsets within the whole—he "can't tell you *whether any particular woman was discriminated against*," or even any women in an *entire Division*. (Ex. 51 at 210:13–19, 71:11–12 (Farber Tr.).)  Dr. Farber's own analyses show many women were *not* discriminated against by these supposedly uniform policies.  He found no adverse impact for women after 2015 for 360 reviews and manager quartiling, and in multiple promotion cycles.  (*See* Part E, *supra*.)

    The Second Circuit recently affirmed dismissal of disparate impact claims based on the same flawed reasoning that underlies Dr. Farber's improperly aggregated statistical analysis.  In *Mandala*, plaintiffs alleged that defendant's policy against hiring candidates with criminal convictions discriminated illegally against Black candidates, relying on national statistics showing that "African Americans are arrested and incarcerated for crimes at higher rates than [w]hites.'" 975 F.3d 206.  But the allegedly discriminatory hiring policies there involved "skilled positions" requiring "educational or technical experience," so conviction rates among the general population were not reflective of the relevant pool of eligible "skilled" candidates. *Id.*  In affirming the district court's dismissal of the complaint, the Second Circuit held that plaintiffs erred in "*fail[ing] to distinguish between [sub-group] averages and total [national] averages*," and "simply presum[ing] that population-level statistics" were an adequate proxy for the skilled, educated "subgroups of that population."  *Id*. at 211 (emphasis added).

    In fact, courts have consistently rejected this type of improperly aggregated statistical analysis as inadequate to establish Rule 23(a)(2) commonality.  Dr. Farber himself made this same error in *Moussouris*, where plaintiffs (represented by Plaintiffs' counsel here) challenged

Microsoft's pay and promotions processes.  2018 WL 3328418, at *1.  In that case, as here, Dr. Farber offered "a similar statistical study" to the one found lacking in *Wal-Mart* "in which regression analyses" purportedly revealed "statistically significant disparities between men and women" that supposedly could "'be explained only by gender discrimination.'"  *Id*. at *24 (citing *Wal-Mart*, 564 U.S. at 356).  But as in *Wal-Mart*, Dr. Farber's "statistical evidence . . . suffered from a 'failure of inference'" because, at best, his analyses "established only that there was a [gender] disparity at the [highest] level[s]," but ignored that the disparity could be "attributable to only a small set" of managers and thus could not "establish the uniform, [manager-by-manager] disparity" on which "commonality depends."  *Id*. (quoting *Wal-Mart*, 564 U.S. at 357).  Dr. Farber took no steps to correct the same mistakes here.

Judge Schofield in *Kassman* reached the same conclusion.  As in *Moussouris*, plaintiffs (again represented by Plaintiffs' counsel here) challenged KPMG's pay and promotion "framework" nationwide based on similar aggregated "regression analyses" purporting to show gender disparities.  *Kassman*, 416 F. Supp. 3d at 282 (citing *Wal-Mart*, 564 U.S. at 356).  Judge Schofield found "no good reason to rely on nationwide statistics" when pay and promotion decisions were not made at the national level and emphasized that plaintiffs' expert's disparities "may be attributable to only a small set of KPMG decision makers at the practice-area level" where pay and promotion decisions were actually made, thus undermining "the uniform disparity" required to support a common question of fact under Rule 23(a)(2) to certify a Rule 23(b)(3) damages class.  *Id*. at 282–83 (quotation marks omitted).

Similarly, in *Bolden* v. *Walsh Construction Co.*, 688 F.3d 893 (7th Cir. 2012), the district court certified a class of Black workers at "all of [defendant's] 262 [construction sites] . . . since mid-2001" alleging that defendant's site superintendents had discriminated in assigning overtime and tolerated a hostile work environment.  *Id*. at 894–95.  Plaintiffs' statistical expert aggregated

results from all 262 sites, but, in reversing certification, the Seventh Circuit held that "th[is] sort of statistical evidence . . . *begs the question*," because "[i]f [defendant] had 25 superintendents, 5 of whom discriminated in awarding overtime, aggregate data would show that [B]lack workers did worse than white workers—*but that result would not imply that all 25 superintendents behaved similarly, so it would not demonstrate commonality*." *Id*. at 896 (emphasis added).

Likewise, in *Abram* v. *United Parcel Service of America, Inc.*, 200 F.R.D. 424 (E.D. Wis. 2001), the court refused to certify a putative class action alleging racial discrimination in compensation decisions.  The court reasoned that if there "[w]ere [] a *systematic bias* in the pay of African-American supervisors *we would expect the salary difference . . . to be found in most places we looked*," but, as here, plaintiffs' expert provided a "nationwide average" that "*disguises enormous variety*." *Id*. at 431 (emphasis added).[17]  When sub-groups were correctly analyzed, there were districts where "African-American supervisors make more than white supervisors, [and] . . . districts where they make less," with some "statistically significant . . . while in most . . . . the difference [wa]s insignificant—exactly what would be expected if these differences were *unsystematic and random*." *Id*. (emphasis added).  This is exactly what Dr. Shaw showed here: that systematic gender gaps do not exist across Divisions or time periods.  (*See* Part E, *supra*.) Courts thus routinely reject commonality where plaintiffs made the same error as Dr. Farber.[18]

---

[17]  The court in *Abram* colorfully illustrated the expert's flawed reasoning: "[i]f Microsoft founder Bill Gates and nine monks are together in a room, it is accurate to say that on average the people in the room are extremely well-to-do, but this kind of aggregate analysis obscures the fact that 90% of the people in the room have taken a vow of poverty."  200 F.R.D. at 431.

[18]  *See Stastny* v. *S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 274, 280 (4th Cir. 1980) (decertifying class where statewide data showed that female managers "were paid less on the average," but decisions were made by "one's immediate boss" in "autonom[ous]" facilities," such that any inference "of a statewide pattern or practice" was "impossible"); *Brand* v. *Comcast Corp.*, 302 F.R.D. 201, 227 (N.D. Ill. 2014) (denying certification in part where "[s]tatistical data indicating adverse outcomes" for pay and promotion "overall does not answer the commonality question" because of possible subgroup differences); *Moore* v. *The Boeing Co.*, 2004 WL 3202777, at *12, *13 (E.D. Mo. Mar. 31, 2004) (denying certification of pay discrimination claims where plaintiffs

In sum, as the court in *Jones* explained, an analysis "derived from hundreds of employment decisions made by myriad decision-makers, at different times, under mutable procedures and guidelines in different departments, and in different office locations, concerning employees at varying levels of experience, responsibilities, and education—*says nothing about what caused these disparities*—whether one thing ('the [challenged policy]') or many things (the discretionary evaluations of individual supervisors and managers)."  34 F. Supp. 3d at 909 (emphasis added). Because Dr. Farber's aggregated analyses do not show that the challenged employment processes caused discrimination across the class, this Court should hold that Plaintiffs' disparate impact and disparate treatment claims cannot be litigated as a class action.

### C.    There Is Also No "Significant Proof" of a "General Policy of Discrimination," as Required for Disparate Treatment Commonality.

Finally, the existence of a common question of fact for Plaintiffs' disparate treatment claims requires "significant proof" that Goldman Sachs "operated under a general policy of discrimination."  *Wal-Mart*, 564 U.S. at 353.  Relying on Plaintiffs' representations at class certification that the challenged processes were "uniform and centralized" (ECF No. 511 at 1), and finding that "virtually all final decision-making" for the challenged processes "[was] funnel[ed] . . . to [D]ivision heads and either division-wide or firm-wide committees," this Court ruled that Plaintiffs had met the "significant proof" standard for certification.  (Cert. Order at 31.)

Since the Certification Order, the record evidence now shows that decision-making for 360

---

"aggregate[d] data" masked that disparities were significant "in only three" job groups and that one job group favored women); *Lott* v. *Westinghouse Savannah River Co.*, 200 F.R.D. 539, 560, 561 (D.S.C. 2000) (denying certification of discrimination claims "statistical reports . . . [that were] aggregated across divisions and across classes of employees" "fail[ed] to 'reveal whether there is a pattern of disparities across the various decision-making units'" (citing *Stastny*, 628 F.2d at 278)); *Penk* v. *Or. State Bd. of Higher Educ.*, 1985 WL 25631, at *35 (D. Or. 1985), *aff'd*, 816 F.2d 458 (9th Cir. 1987) (rejecting "aggregating statistical results" to support "[school] system-wide class" where evidence failed to show gender gaps "at four of the eight institutions").

reviews, manager quartiling, and cross-ruffing was not centralized or made at the level of "the whole" in this way—indeed, performance evaluations and promotion vetting for thousands of employees could not possibly be "funneled" to just a few senior decision-makers. Judge Lehrburger specifically found that Plaintiffs failed to identify "any role" for the Management Committee "in approving, revising, [or] implementing . . . the three challenged processes." (ECF No. 1100 at 3 (denying additional discovery).) Instead, "the content of [360] reviews [was] decided completely by the [thousands] of individuals who fill out reviews" and "the professional's manager who summarizes the performance feedback" (Scher Decl. ¶ 10 (PMD, IBD)), and senior managers did not assign manager quartiles, which are done at the Business Unit level. (Ex. 52 ¶ 111 (Shaw Rpt.); *see* Parts C.1–2, *supra*.) The record is equally clear that Goldman Sachs's Management Committee does *not* make individual "decisions about promotions" (*see* Ex. 24 at 82:16–18 (Boyle Tr. (MD, HCM))), which are made at a Divisional level.

Because Plaintiffs' flawed statistical evidence—which papers over these myriad "permutations" and rests on a flawed inference of uniformity across the 'whole' class, *Jones*, 34 F. Supp. 3d at 904—cannot support disparate treatment commonality, this Court should decertify Plaintiffs' Rule 23(b)(3) damages class.

## III. THE NEED FOR INDIVIDUAL INQUIRIES TO IDENTIFY CLASS MEMBERS WITH BACKPAY CLAIMS DEFEATS RULE 23(B)(3) PREDOMINANCE.

Plaintiffs' failure to establish class-wide standing or commonality confirms their failure to meet Rule 23(b)(3)'s "even more demanding" predominance requirement. *Comcast*, 569 U.S. at 34 (citing *Amchem*, 521 U.S. at 623–24). As the Ninth Circuit recently held in *Olean*, in assessing statistical evidence, "a key factual determination courts must make is whether the . . . evidence *sweeps in uninjured class members*" such that "the 'need to identify those individuals will predominate.'" 993 F.3d at 791 (citation omitted). Courts confronting class certification where,

as here, plaintiffs have failed to "separate those class members who are entitled to damages from those who are not," have thus repeatedly held that individual inquiries needed to identify class members with damages claims bars a finding that common questions of law or fact predominate. *Houser* v. *Pritzker*, 28 F. Supp. 3d 222, 227–28, 253 (S.D.N.Y. 2014) (Maas, J.).

In *Houser*, for example, plaintiffs were U.S. Census Bureau job applicants who were rejected based on allegedly discriminatory criminal background checks. *Id.* at 227–28. Because, as here, Plaintiff's proposed liability and damages model "doubtlessly include[d] individuals who [were] not entitled to backpay under the proposed theory of liability because they would not have been hired even absent the alleged discrimination*,*" and plaintiff made "no attempt" to identify those class members who were in fact injured, Judge Maas correctly denied Rule 23(b)(3) class certification on predominance grounds. *Id*. at 253.

In *Stockwell* v. *City & County of San Francisco*, the court similarly denied certification of a Rule 23(b)(3) "damages-only" class where plaintiffs alleged that a police department promotion test "had a substantial adverse impact on officers over the age of forty." 2015 WL 2173852, at *1, *9 (N.D. Cal. May 8, 2015). The proposed class admittedly included class members "who [we]re not entitled to any backpay" because they "would not have been promoted" regardless of the testing procedure. *Id.* Because plaintiffs failed "to distinguish the class members who were entitled to damages from those who were not," the court ruled that plaintiffs failed to meet Rule 23's predominance requirement. *Id*. at *8 (citing *Houser*, 28 F. Supp. 3d at 251); *see also In re Rail Freight Fuel Surcharge Antitrust Litig*., 934 F.3d 619, 625 (D.C. Cir. 2019) (affirming denial of class certification based on lack of predominance where plaintiffs' expert failed "to identify which [class members], or what percentage of them, were in fact harmed" by antitrust conspiracy).

Here it is indisputable that Plaintiffs' class definition and damages model inappropriately sweeps in uninjured class members. For example:

- All associates (including Named Plaintiff Ms. Orlich) in connection with claims based on cross-ruffing, even though associates are not eligible for promotion to managing director.  (*See* Ex. 37 at 297:3–17 (Larson Tr.) (MD, HCM); Ex. 44 at 91:15–18 (6/9/21 Cascio Tr.).)

- Class members who were employed by Goldman Sachs only after 2015 as to 360 reviews and quartiling, even though Dr. Farber found no evidence of any gender gaps after 2015.  (*See* Ex. 49 ¶¶ 10, 114 (Farber Rpt.).)  Associates employed only after 2015 therefore have no claim related to *any challenged process*.

- Class members who always received the top manager quartile and who thus cannot claim that they fared worse than any comparable male peer in the quartiling process.  (Ex. 52 at App. L (Shaw Rpt.).)

- Class members who were not employed "long enough to be subject to the compensation policy and receive a bonus" and thus could not have been adversely impacted so as to be entitled to backpay.  (ECF No. 514 at 19.)

- Class members who were never nominated for promotion (over 85 percent of vice presidents) (Giuffra Decl. ¶ 11) and thus never cross-ruffed.

- Class members (i) who were promoted to managing director or (ii) who were cross-ruffed in one of the five promotion cycles where even Dr. Farber finds no gender gaps or gaps that favor women.  (*See* Ex. 50 at App. A, Table 28 (Farber Rebtl. Rpt.).)

- Class members who were ███████████████████████████████████████████████████████████. (Brasco Decl. ¶ 8 (MD, IMD).)

Even Plaintiffs recognized at class certification that it would be necessary in Phase II to determine "membership in the damages class" individually, by determining "for example, whether someone worked in a class position long enough to be subject to the compensation policy." (ECF No. 514 at 19.)  More fundamentally, Dr. Farber's flawed class-wide "averaging" analysis is fatal to establishing predominance under Rule 23(b)(3)—just as it is to establishing standing and commonality—because, as he admits, his analysis cannot identify "whether any individual class

member was discriminated against" because of the challenged processes.  (Ex. 51 at 360:10–17 (Farber Tr.).)  Because Plaintiffs have offered no class-wide mechanism for identifying and excluding uninjured class members, this Court, as in *Olean*, *Houser* and *Stockwell*, should hold that individualized inquiries will overwhelm any common questions, defeating predominance.[19]

## IV.    NAMED PLAINTIFFS ARE NOT "TYPICAL" AND INSTEAD, LIKE ALL OTHER CLASS MEMBERS, HAVE HIGHLY INDIVIDUALIZED CLAIMS.

Typicality requires that "class members' claims . . . 'arise[] *from the same course of events,*' as the Named Plaintiffs', and "each class member [must] make[] similar legal arguments to prove the defendant's liability.'"  *Rapcinsky* v. *Skinnygirl Cocktails, L.L.C.*, 2013 WL 93636, at *5 (S.D.N.Y. Jan. 9, 2013) (Oetken, J.) (quoting *Marisol A.*, 126 F.3d at 376) (emphasis added). Following three years of discovery, the evidence now shows that *no* class members' claims, including those of Named Plaintiffs, arose from the "same course of events" because, as shown above, the conduct underlying each class member's claim "necessarily differs" from any other claim, "foreclosing any contention that the named plaintiffs' claims are typical."  *Moussouris*, 2018 WL 3328418, at *27–28.  Named Plaintiffs reflect this individualization.

***Shanna Orlich.***  Ms. Orlich testified that she was paid in lockstep with associates who joined the Firm at the same time that she did (2007).  (Ex. 40 at 449:7–18 (Orlich Tr.).)  As a result, neither Ms. Orlich's sole 360 review (which was created in 2008, but never delivered prior to her termination during the global financial crisis (*id.* at 440:24–441:17 (Orlich Tr.)), nor her placement "into the 5th [lowest] quartile" (Declaration of Shanna Orlich, dated Feb. 16, 2014 (ECF No. 255) ¶ 6), had any impact on her compensation or her promotion prospects.  As an associate, Ms. Orlich was not eligible for promotion to managing director and thus never cross-ruffed.  (Ex. 30 at

---

[19]  In addition, because Dr. Farber found no gender disparity in 360 reviews or manager quartiling after 2015 and never analyzed cross-ruffing (*see* Part E, *supra*), the class period should at least end as of December 31, 2015.

205:24–206:3 (Heller Sberlati Tr.) (MD, HCM).)

*Allison Gamba.* Ms. Gamba was in the ███████████████████ ████████ was the highest paid vice president in her Business Unit in 2010, and earned ████ *more* in 2012 than predicted for a comparable man. (Giuffra Decl. ¶ 7; Ex. 52 ¶ 41 (Shaw Rpt.).) She was cross-ruffed in 2008 and 2009—but Ms. Gamba does not contend that she was discriminated against in those years. (Ex. 28 at 129:25–130:5, 130:19–22 (6/18/14 Gamba Tr.).) Instead, Ms. Gamba claims that she was discriminated against only in 2010, the year when she was the highest paid vice president in her Business Unit. That year, no one from her Business Unit—female or male—was nominated for promotion (or cross-ruffed) because her Business Unit was on the brink of collapse and was sold thereafter. (*Id.* at 105:3–106:11; 263:24–264:12; Ex. 29 at 109:3–7; 142:15–19 (9/14/18 Gamba Tr.); Ex. 38 at 94:10–95:20 (Lauto Tr.) (PMD, Securities).)

*Mary De Luis.* Ms. De Luis joined Goldman Sachs in 2010 as an analyst, was promoted to associate in 2013, and to vice president effective in 2015. (Ex. 13 at -099–100 (De Luis Employee Profile).) Ms. De Luis was never cross-ruffed because she resigned in 2016 (Ex. 14 at -202 (May 2, 2016 email from M. De Luis)), and to be eligible for "[p]romotion from Vice President to Manager Director," "the candidate generally must have served as Vice President for a minimum of two years" (Mar. 10, 2015 R&R at 11 (ECF No. 364); *see* Ex. 26 at 55:6–14 (De Luis Tr.) (testifying that "I don't think I should have been promoted to managing director" because she did not meet eligibility requirements)). In each of the three years in which she served in a class-relevant role (2013, 2014, and 2015), Ms. De Luis was in the ████ quartile (*see* Ex. 13 at -107 (De Luis Employee Profile)), but also received a salary increase in 2015 outside of the Firm's annual compensation process after she elected to decline a job offer and return to the Firm after business school (which was paid for by Goldman Sachs) (*see* Ex. 26 at 90:5–11; 206:12–207:7, 241:21–242:6 (De Luis Tr.); Ex. 15 (Notes)).

***H. Cristina Chen-Oster.***  Ms. Chen-Oster joined Goldman Sachs in 1997 as an associate International Convertible Bond Salesperson within the Equities Division (now a sub-division of Securities), and was promoted to vice president shortly thereafter.  (Ex. 25 at 66:9–10, 68:4–18, 77:8–11 (Chen-Oster Tr.).)  Unlike the other Named Plaintiffs, Ms. Chen-Oster had persistent and significant performance problems, as documented in her (male and female) colleagues' 360 comments (*see, e.g.*, Ex. 16 at -545 (Chen-Oster 2000 360 review) (her "lack of sales trading basics produces a handling of client inquiries and trader interactions which is usually poor and sometimes appal[l]ing"); Ex. 17 at -556 (Chen-Oster 2001 360 review) ("[S]he frequently misreads people and business situations, demsonstrating poor judgment or insensitivity."); Ex. 18 at -570 (Chen-Oster 2002 360 review) ("[S]ome decisions were made for her own benefit or made hastily.").)  As a result, Ms. Chen-Oster was placed in the ▮▮▮▮▮▮ manager quartile in 2002 and 2003, and the ▮▮▮▮ quartile in 2004.  (Giuffra Decl. ¶ 8; Ex. 19 at -222 (Chen-Oster Employee Profile).)  Ms. Chen-Oster was highly compensated: between 1997 and 2004, her total annual compensation ranged from ▮▮▮▮▮ to ▮▮▮▮▮.  (Ex. 19 at -219–220 (Chen-Oster Employee Profile).)  She resigned in 2005, when her team disbanded for business reasons and she rejected an offer of a new position.  (*See* Ex. 20 (8/16/2004 email from Chen-Oster); Ex. 21 (2/17/2005 email from Chen-Oster); Ex. 22 (3/10/2005 email from Chen-Oster).)  Ms. Chen-Oster was never cross-ruffed.

Though Named Plaintiffs contend they were all adversely impacted by the challenged processes, the reasons "why [they were allegedly] disfavored" were not the same or even similar even among them, much less across the entire class.  *Wal-Mart*, 564 U.S. at 352.  On this record, the Court should hold that their claims are not typical of the class that they purport to represent.

## V.   THIS CLASS ACTION IS UNMANAGEABLE AND PROVIDES NO ADVANTAGE OVER INDIVIDUAL ACTIONS.

Having elected to dispense with the typical Title VII framework—where the Phase I trial

determines class liability for injunctive relief only—Plaintiffs now propose a free-wheeling Phase I trial where flawed statistical evidence and random, inflammatory anecdotes (all of which should in any event be inadmissible)[20] will somehow add up to an evidentiary presumption of "liability" for backpay across the entire class.  But, as shown above, (i) the record already shows that whole swathes of the class suffered no injury at all; (ii) Dr. Farber's statistical model cannot identify who, if anyone, actually suffered discrimination; and (iii) the claims of just the Named Plaintiffs, not to mention more than one thousand other class members, turn on unique facts.  At *most*, a Phase I trial could result in an evidentiary finding of average differences *that could not even apply to any class member*.  Indeed, the contemplated Phase I "trial" would not even result in a liability finding.  Plaintiffs suggest that this Court can then somehow use "questionnaire[s]" or "management tools" to "streamline [] individualized hearings as to liability and damages." (Ex. 66 Rule 23(f) Oral Arg. Tr., 18-1075 (2d Cir. Aug. 28, 2018) at 12:24–13:8.)  But any such "tools" would not answer the point that the Phase I trial will have achieved *nothing* towards resolving class members' claims.  This Court should decertify the class because Plaintiffs' contemplated proceedings are unmanageable and provide no advantage over individual litigation.

*First*, the Supreme Court held in *Tyson Foods* that representative evidence may be used to establish class liability (here, for backpay) only where "each class member could have relied on th[e] [evidence] to establish liability" in an "individual action."  577 U.S. at 466.  But Dr. Farber's aggregated "averaging" analysis covering 16 years of data is so disconnected from any particular class member's experience, it could never support an inference of discrimination in an individual claim for backpay arising from 360 reviews, quartiles or cross-ruffing.  Allowing a Phase I trial to proceed on the premise that, in the unlikely event of a liability finding, every class member would

---

[20]  (*See* Defs.' Omnibus Mtn. to Exclude the Testimony of Pls.' Experts (ECF No. 1188); Nov. 25, 2019 Order (ECF No. 888) at 3 (a Phase I trial will not include "boys' club" evidence).)

be entitled to a presumption of discrimination based on such unsupported "representative" evidence would improperly "enlarge or modify [class members'] substantive right[s]" and "contravene the Rules Enabling Act." *Olean*, 993 F.3d at 787 (citing 28 U.S.C. § 2072(b)).

*Second*, even if some presumption of discrimination could carry over to Phase II based on Plaintiffs' flawed statistical evidence (and it cannot), those Phase II proceedings would not be simply about "damages." Instead, at the outset of each individual Phase II trial, "each class member" would have to first show that "she was among those adversely affected by the challenged policy or practice." *Robinson*, 267 F.3d at 161–62. Such a showing would require individualized evidence of, among other things, each class member's experience with the challenged processes, their appropriate male comparators, and the extent to which any alleged discrimination in the processes impacted their pay or promotion. Moreover, during Phase II, Goldman Sachs "is entitled to individualized determinations of each employee's eligibility for backpay" and would have the right to present individualized defenses showing a non-discriminatory reason for any adverse employment action. *Wal-Mart*, 564 U.S. at 366.

This Court has no magic wand or special "tools" that will "streamline" the adjudication of these myriad individualized issues. The different experiences with the challenged processes of *just the four named Plaintiffs*—some had good reviews, some had poor reviews, some were highly paid relative to peers and others received only lockstep compensation (*see* Part IV, *supra*)— confirm that a Phase I and II class action affords no advantages over individual litigation. *Andrews* v. *Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008) (where "class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate or how a class action would be the superior means to adjudicate the claims"). Because this class action is not superior to individual adjudication, this Court should decertify it.

## VI.   INTRACTABLE INTERNAL CLASS CONFLICTS REQUIRE DECERTIFICATION.

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), which demands an inquiry into, among other things, whether "plaintiff's interests are antagonistic to the interest of other members of the class," *Floyd* v. *City of New York*, 283 F.R.D. 153, 161 (S.D.N.Y. 2012) (Scheindlin, J.) (quotation marks omitted). Adequacy may be defeated where either "the named plaintiffs' interests [are] in potential conflict with those of the putative class," or where "class members are also potentially in conflict with one another." *Donaldson*, 205 F.R.D. at, 568; *see Moussouris*, 2018 WL 3328418, at *29 (finding "insurmountable" conflicts where class members "participated in the very [performance and evaluation] system . . . alleged to be discriminatory"); *Jones*, 34 F. Supp. 3d at 911–12 (finding conflicts where certain "class members . . . participated in the [challenged] evaluation process" and "influenced pay and promotion decisions concerning other class members").

The evidence now shows this class action is infected with intra-class conflicts that demand decertification. If Plaintiffs' theory is that 360 reviewers were biased against women, the vast majority of class members both gave a 360 review to, and received a 360 review from, another class member. If, instead, Plaintiffs' theory is that only managers delivering 360 reviews were biased, at least eight percent of class members served in the manager role, and class members also made up eight percent of cross-ruffers. (*See* Part D, *supra*.) Because these are insuperable conflicts among class members, the Court should decertify Plaintiffs' Rule 23(b)(3) damages class.

## CONCLUSION

For the foregoing reasons, the Court should grant Goldman Sachs's motion to decertify the class. At a minimum, the Court should end the class period in 2015, as Plaintiffs have not presented any evidence of supposed "gender gaps" after that year outside of that time period.

Respectfully,

/s/ Robert J. Giuffra, Jr.

Barbara B. Brown (*admitted pro hac vice*)          Robert J. Giuffra, Jr.
Carson H. Sullivan (*admitted pro hac vice*)        Sharon L. Nelles
PAUL HASTINGS LLP                                    Ann-Elizabeth Ostrager
875 15th Street, N.W.                                Hilary M. Williams
Washington, D.C.  20005                              SULLIVAN & CROMWELL LLP
                                                     125 Broad Street
                                                     New York, New York  10004
Patrick W. Shea                                      (212) 558-4000
PAUL HASTINGS LLP
200 Park Avenue                                      Amanda Flug Davidoff
New York, New York  10166                            SULLIVAN & CROMWELL LLP
                                                     1700 New York Avenue, N.W., Suite 700
                                                     Washington, D.C. 20006

*Attorneys for Defendants*
*Goldman Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

July 22, 2021