UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x

H. CRISTINA CHEN-OSTER, SHANNA
ORLICH, ALLISON GAMBA and MARY
DE LUIS,

                   Plaintiffs,

        v.

GOLDMAN SACHS & CO. and THE
GOLDMAN SACHS GROUP, INC.,

                   Defendants.

------------------------------------------------------ x

10 Civ. 6950 (AT) (RWL)

**ORAL ARGUMENT REQUESTED**

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Barbara B. Brown (*admitted pro hac vice*)
Carson H. Sullivan (*admitted pro hac vice*)
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C.  20005

Patrick W. Shea
PAUL HASTINGS LLP
200 Park Avenue
New York, New York  10166

Robert J. Giuffra, Jr.
Sharon L. Nelles
Ann-Elizabeth Ostrager
Hilary M. Williams
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004

Amanda Flug Davidoff
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006

*Attorneys for Defendants*
*Goldman Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

August 9, 2021

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ................................................................ 1

**BACKGROUND** ...................................................................................... 8

    A.    Plaintiffs sued with respect to all four of Goldman Sachs' revenue-producing Divisions ............................................................. 8

    B.    After dropping MBD, Plaintiffs continued to challenge three evaluation processes in three Divisions, over the entire class period .................................... 10

        1.    360 Reviews ...................................................... 10

        2.    Manager Quartiling ......................................... 11

        3.    Cross-Ruffing ................................................... 12

    C.    Experts for *both parties* found no gender differences in the challenged processes for many groups of Goldman Sachs professionals ............................. 13

    D.    Plaintiffs and their expert, Dr. Wayne Cascio, have not proposed any alternatives to the three challenged processes ................................... 16

    E.    Relevant procedural history ............................................. 17

**SUMMARY JUDGMENT STANDARD** ................................................. 18

**ARGUMENT** ........................................................................................... 19

**I.**    **There is no triable issue over Plaintiffs' disparate impact claims** ............. 19

    A.    Plaintiffs' Title VII claim fails because they have not justified their decision to lump together the discrete components of two challenged processes ................................................ 20

    B.    All of Plaintiffs' disparate impact claims fail because of undisputed significant gaps in Plaintiffs' purported evidence of statistical disparities .................................................. 23

    C.    Partial summary judgment is warranted because even if Plaintiffs could establish a *prima facie* case, they cannot prove the existence of any "less discriminatory alternative" to any of the challenged processes ................ 27

**II.**    **There is no triable issue over Plaintiffs' disparate treatment claims** ........ 31

A.   Plaintiffs' disparate treatment claims fail because their meager and equivocal statistical evidence cannot support an inference that discrimination was Goldman Sachs' "standard operating procedure" ............... 32

B.   Because Plaintiffs' statistical evidence is legally deficient, any anecdotal evidence Plaintiffs may try to rely on cannot create a triable issue as to Goldman Sachs' intent ....................................................... 36

III.   **There is no triable issue as to certain claims and class members** ............................. 37

A.   Summary judgment is warranted with respect to the cross-ruffing process, which Dr. Farber never analyzed ........................................... 37

B.   In the period before 2005, there was no class-wide 360 review process that could give rise to disparate impact or disparate treatment claims ............... 38

C.   Summary judgment is warranted with respect to all claims arising from the period after 2015 ........................................................................... 39

D.   Self-Sustaining Private Wealth Advisors ███████████ ████████ and therefore could not have suffered any injury caused by the challenged processes ..................................................................... 40

E.   Absent Class Members who signed releases without arbitration provisions have agreed to release their claims against Goldman Sachs .............. 41

**CONCLUSION** ............................................................................................. 42

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abram* v. *United Parcel Serv. of Am., Inc.*,
200 F.R.D. 424 (E.D. Wis. 2001) ........................................................ 27

*Adams* v. *City of Chicago*,
469 F.3d 609 (7th Cir. 2006) ............................................................ 31

*Allen* v. *City of Chicago*,
351 F.3d 306 (7th Cir. 2003) ........................................................ 6, 29

*Anderson* v. *Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ......................................................................... 19

*Attenborough* v. *Constr. & Gen. Bldg. Laborers' Loc. 79*,
691 F. Supp. 2d 372 (S.D.N.Y. 2009) .............................................. 32

*Belfi* v. *Prendergast*,
191 F.3d 129 (2d Cir. 1999) ............................................................... 8

*Brnovich* v. *Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021) ..................................................................... 35

*Campbell* v. *Nat'l R.R. Passenger Corp.*,
311 F. Supp. 3d 281 (D.D.C. 2018) .............................................. 21, 22

*Chin* v. *Port Auth. of N.Y. & N.J.*,
685 F.3d 135 (2d Cir. 2012) .......................................................... 23, 39

*Coates* v. *Johnson & Johnson*,
756 F.2d 524 (7th Cir. 1985) ............................................................ 25

*Cooper* v. *Fed. Reserve Bank of Richmond*,
467 U.S. 867 (1984) ......................................................................... 37

*Davis* v. *Cintas Corp.*,
717 F.3d 476 (6th Cir. 2013) ...................................................... 2, 21, 23

*Davis* v. *D.C.*,
925 F.3d 1240 (D.C. Cir. 2019) ....................................................... 21

*Deng* v. *N.Y. State Off. of Mental Health*,
2018 WL 1176018 (S.D.N.Y. Feb. 28, 2018) .................................. 19

*EEOC* v. *Bloomberg L.P.*,
    778 F. Supp. 2d 458 (S.D.N.Y. 2011) ........................................................ 32, 33, 37

*El* v. *SEPTA*,
    479 F.3d 232 (3d Cir. 2007) ................................................................. 30

*Gay* v. *Waiters' & Dairy Lunchmen's Union*,
    694 F.2d 531 (9th Cir. 1982) ................................................. 7, 34, 35, 36

*Hernandez* v. *Off. of Comm'r of Baseball*,
    2021 WL 1226499 (S.D.N.Y. Mar. 31, 2021) ........................................ 30

*Houser* v. *Pritzker*,
    28 F. Supp. 3d 222 (S.D.N.Y. 2014) ................................................. 28, 31

*Int'l Bhd. of Teamsters* v. *United States*,
    431 U.S. 324 (1977) ......................................................... 7, 31, 33

*Interpharm, Inc.* v. *Wells Fargo Bank, N.A.*,
    655 F.3d 136 (2d Cir. 2011) ................................................................. 41

*Johnson* v. *City of Memphis*,
    770 F.3d 464 (6th Cir. 2014) ................................................................ 6, 29

*Jones* v. *Nat'l Council of Young Men's Christian Assocs.*,
    34 F. Supp. 3d 896 (N.D. Ill. 2014) ..................................................... 27

*Lewis* v. *City of Chicago*,
    560 U.S. 205 (2010) ............................................................ 31

*Lopez* v. *City of Lawrence*,
    823 F.3d 102 (1st Cir. 2016) ........................................................ 30, 31

*Major League Baseball Props., Inc.* v. *Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ................................................................ 39

*Mandavia* v. *Columbia Univ.*,
    2013 WL 2391695 (S.D.N.Y. June 3, 2013) ....................................... 41

*Meacham* v. *Knolls Atomic Power Lab*,
    461 F.3d 134 (2d Cir. 2006) ..................................................... 3

*Meacham* v. *Knolls Atomic Power Lab'y*,
    554 U.S. 84 (2008) ......................................................... 20

*Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013) ................................................................ 32

*Morgan* v. *United Parcel Service of America, Inc.*,
  380 F.3d 459 (8th Cir. 2004) ..................................................................... 26, 27, 32

*Munoz* v. *Orr*,
  200 F.3d 291 (5th Cir. 2000) ................................................................................. 32

*Niagara Mohawk Power Corp.* v. *Jones Chem. Inc.*,
  315 F.3d 171 (2d Cir. 2003) ................................................................................. 19

*Pacheco* v. *N.Y. Presbyterian Hosp.*,
  593 F. Supp. 2d 599 (S.D.N.Y. 2009) ............................................................. 29, 38

*Reynolds* v. *Barrett*,
  685 F.3d 193 (2d Cir. 2012) ................................................................................. 34

*Ricci* v. *DeStefano*,
  557 U.S. 557 (2009) ................................................................................... 3, 19, 20

*Richardson* v. *City of N.Y.*,
  2018 WL 4682224 (S.D.N.Y. Sept. 28, 2018) ...................................................... 31

*Richardson* v. *City of N.Y.*,
  2021 WL 1910689 (S.D.N.Y. May 12, 2021) ........................................... *passim*

*Robinson* v. *Metro-N. Commuter R.R. Co.*,
  267 F.3d 147 (2d Cir. 2001) .................................................... 6, 28, 30, 32

*Simsbury-Avon Pres. Club, Inc.* v. *Metacon Gun Club, Inc.*,
  575 F.3d 199 (2d Cir. 2009) ................................................................................. 19

*Smith* v. *City of Des Moines*,
  99 F.3d 1466 (8th Cir. 1996) ........................................................................... 29, 30

*Smith* v. *City of Jackson*,
  544 U.S. 228 (2005) ........................................................................................ 8, 20

*Smith* v. *Xerox Corp.*,
  196 F.3d 358 (2d Cir. 1999) ............................................................... *passim*

*Ste. Marie* v. *E. R. Ass'n*,
  650 F.2d 395 (2d Cir. 1981) .............................................................................. 7, 36

*Teasdale* v. *N.Y.C. Fire Dep't*,
  574 F. App'x 50 (2d Cir. 2014) ............................................................................ 20

*United States* v. *City of N.Y.*,
  717 F.3d 72 (2d Cir. 2013) ..................................................................................... 7

*Valentino* v. *U.S. Postal Serv.*,
    674 F.2d 56 (D.C. Cir. 1982) ........................................................................ 33, 34

*In re W. Dist. Xerox Litig.*,
    850 F. Supp. 1079 (W.D.N.Y. 1994) .................................................................. 32

*Waisome* v. *Port Auth. of N.Y.*,
    948 F.2d 1370 (2d Cir. 1991) ..................................................................... 34, 35

*Wal-Mart Stores, Inc.* v. *Dukes*,
    564 U.S. 338 (2011) ......................................................................... 4, 21, 23

*Wernsing* v. *Dep't of Hum. Servs.*,
    427 F.3d 466 (7th Cir. 2005) .......................................................................... 8

*Williams* v. *Wells Fargo Bank, N.A.*,
    901 F.3d 1036 (8th Cir. 2018) ...................................................................... 30

**Statutes**

29 U.S.C. § 206(d)(1) ........................................................................................ 8

42 U.S.C. § 2000e–2(h) ..................................................................................... 8

42 U.S.C. § 2000e-2(k)(1) ........................................................................ *passim*

N.Y.C. Code § 8-107(17)(a) ...................................................................... *passim*

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................. 18, 28

Fed. R. Evid. 702 ........................................................................................... 23

## PRELIMINARY STATEMENT

After years of discovery, including 64 days of depositions and the production of more than one million pages of documents, the record is clear that Goldman Sachs is entitled to summary judgment.  Plaintiffs have not identified sufficient evidence that could prove their disparate impact and disparate treatment pattern-or-practice claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York City Human Rights Law ("NYCHRL").  In certifying the class, the Court relied on Plaintiffs' claim that they had identified "significant proof" of discrimination sufficient for "the class certification stage of litigation."  (Class Cert. Order (ECF No. 578) at 29, 32.)  Plaintiffs promised that this evidence would show that "*[t]hroughout the entire [16-year] class period and across the [three] Class divisions*, female Associates and Vice Presidents at Goldman have received lower scores" on 360 reviews and lower "quartile placements," and were "promoted [to managing director] . . . at a statistically significantly lower rate" than their male counterparts.  (Pls.' Class Cert. Br. (ECF No. 247) at 12, 15  (emphasis added).)  But the analyses of Plaintiffs' own labor economics expert, Dr. Henry Farber, now show that the three supposedly uniform challenged processes—360 reviews, manager quartiling, and cross-ruffing (vetting for promotion)—did not have Plaintiffs' promised class-wide disparities.  Because discovery has shown that Plaintiffs do not have sufficient evidence to *prove* their disparate impact and disparate treatment claims at trial, this Court should grant summary judgment to Defendants on all claims.

**Disparate Impact.**  The Court should grant summary judgment to Defendants on Plaintiffs' disparate impact claims for three independent reasons.

*First*, contrary to Title VII's express requirements, Plaintiffs failed to identify and then analyze the "particular" elements of 360 reviews and Goldman Sachs' promotions process that they contend "cause[d] a disparate impact," or otherwise to demonstrate that the elements of these processes are "not capable of separation for analysis."  42 U.S.C. § 2000e-2(k)(1)(B)(i); *see, e.g.,*

*Davis* v. *Cintas Corp.*, 717 F.3d 476, 496-97 (6th Cir. 2013) (affirming summary judgment on disparate impact claim because plaintiff "did not isolate the specific practices that caused the disparate impact").

Plaintiffs' expert, Dr. Farber, only analyzed *overall* 360 scores.  These scores were the product of multiple, separate steps that Plaintiffs could have analyzed separately—specifically, after a professional selected 8 to 12 reviewers with input and approval of his or her managers, each of those individual reviewers gave separate feedback and individual scoring on "up to 13 underlying competencies," then the professional's manager added his or her own review, and finally the scores were averaged and the review delivered to the professional.  (56.1 ¶¶ 13-15, 18-19, Ex. 42 ¶¶ 28-29 (Farber Rpt.); Ex. 33 ¶¶ 38, 65 (Cascio Rpt.); Ex. 27 at 279:15-280:11 (7/11/13 Heller Sberlati Tr.); Ex. 28 at 280:1-18 (Kung Tr.); Ex. 35 at 5, 7 (4/19/21 Cascio Rebtl. Rpt.); Ex. 34 ¶¶ 50-51 (3/19/21 Cascio Rebtl. Rpt.).)  Plaintiffs' own expert, Dr. Cascio, initially called Dr. Farber's failure to analyze each of the elements of the 360 review process "improper" before trying to pull back that admission at his deposition.  (Ex. 35 at 7 (4/19/21 Cascio Rebtl. Rpt.).)  Plaintiffs likewise had data to break down the overall "promotions" process into its two primary steps of nominations and cross-ruffing (*i.e.*, vetting of candidates).  (56.1 ¶ 46, Ex. 42 ¶¶ 125-35 (Farber Rpt.)  But Plaintiffs elected not to do so, even though cross-ruffing *was the only part of the Firm's promotions process that this Court certified for class treatment.*  (*See infra* p. 18.)  By contrast, Defendants' expert, Stanford Professor Kathryn Shaw, did the required analysis:  to respond to Dr. Farber's faulty analysis lumping all promotion elements together, she evaluated the nominations process, the cross-ruffing process for professionals who had been nominated, and the overall promotions process.  Notably, the only differences that Dr. Shaw found *favored women*.

*Second*, no triable issue exists over whether the three class-certified processes "cause[d] a disparate impact on the basis of" gender. *Ricci* v. *DeStefano*, 557 U.S. 557, 578 (2009); *see* N.Y.C. Code § 8-107(17)(a)(1). As the Second Circuit made clear, a "decision-making process either caused [a] disparate impact or it did not," and "[h]aving chosen" to stake their claim on a supposedly "identical" "overall process," "[i]t is only reasonable to infer a disparate impact from the . . . process if *all persons who were subject to the process*" experienced such impact. *Smith* v. *Xerox Corp.*, 196 F.3d 358, 369-70 (2d Cir. 1999) (affirming summary judgment on a disparate impact claim) (emphasis added).[1] In other words, if the three challenged employment processes are "the root cause of the inequality, their impact would presumably be felt and ascertainable across [all] [] job groups" where the processes were applied. *Richardson* v. *City of N.Y.*, 2021 WL 1910689, at *9 (S.D.N.Y. May 12, 2021) (Oetken, J.). But, here, when the evidence is considered in the light most favorable to Plaintiffs, and disparate impact can at most be found in only some parts of the class where a supposedly uniform policy was applied, but not in other parts, when the same supposedly uniform policy applied to all, then that policy cannot be the cause of any supposed "class-wide" disparate impact as a matter of law. Instead, where the impact is sporadic, "it stretches credulity to suggest that [one] job group . . . is uniquely situated to escape [a policy's] discriminatory effects." *Id.*

This Court should enter judgment for Goldman Sachs on Plaintiffs' class-wide disparate impact claims, because after years of analysis, sporadic impact is all Plaintiffs' expert purports to

---

[1] The Second Circuit has since overruled *Smith*, but only on a different point—"insofar as it holds that [Title VII's] 'business necessity' test governs [Age Discrimination in Employment Act] disparate-impact claims." *Meacham* v. *Knolls Atomic Power Lab*, 461 F.3d 134, 141 (2d Cir. 2006).

have found, just as it was in *Smith* and *Richardson*.[2]  Plaintiffs' case rests on the theory that the 360 review, manager quartiling, and promotion processes were "uniform" throughout the 16-year class period.  (SAC (ECF No. 411) ¶¶ 37, 40, 68.)  Even under Dr. Farber's flawed models, ***the three challenged processes produced no gender disparities for large groups of class members during multiple years of the 16-year class period***.  Specifically, Dr. Farber found that 360 reviews and manager quartiling produced no gender disparities for three full years of the class period (2016 to 2018), and that promotions favored women for five of 14 promotion cycles (2002, 2003, 2010, 2012, 2015).  (56.1 ¶¶ 40, 43, 49, Ex. 43, Table 28 (Farber Rebtl. Rpt.).)  Dr. Farber thus found no gender disparities that disfavored women in ***one third to one half of the class-member groups he examined for all three challenged processes***.  (*See infra* pp. 13-15.)  He also impermissibly "'gerrymander[ed]' [his] data to skew the results of statistical analysis in [Plaintiffs'] favor," *Smith*, 196 F.3d at 369-70, by completely excluding from his analysis associates and vice presidents in Goldman Sachs' remaining, fourth revenue-generating Division (the Merchant Banking Division ("MBD")), who were subject to the same challenged processes.  The sporadic and inconsistent "impact" Dr. Farber found shows that the challenged processes ***did not cause Plaintiffs' claimed disparities*** for ***any*** groups or time periods.

Dr. Shaw likewise found that when regression models associated with the challenged processes are run separately by each of the three remaining Divisions (Investment Banking

---

[2] *Richardson* was decided at class certification, where evidence that there was no disparate impact for portions of a class is proof that there is no commonality, because plaintiffs' evidence is not capable of "produc[ing] a common answer to the crucial question why was I disfavored," *Richardson*, 2021 WL 1910689, at *7 (quoting *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 352 (2011)).  Similarly, at summary judgment, if the most that plaintiffs can show is sporadic pockets of disparities, this proves that Plaintiffs' evidence does not, *in fact*, produce the requisite common answer as to causation.  As the Supreme Court explained in *Wal-Mart*, "proof of commonality necessarily overlaps with [the] merits."  564 U.S. at 352.

("IBD"), Securities, and Investment Management ("IMD")—which Dr. Farber agreed is statistically permissible, even though he did not do the analysis (*see* p. 25, *infra*)—no gender disparities exist for most class members in most time periods. As shown in the below table, there are no disparities for cross-ruffing at all, no disparities for 11 of 12 manager quartiling groupings, and no disparities for 14 of 18 groupings for 360 reviews:

| | Models | IBD | | IMD | | Securities | |
|---|---|---|---|---|---|---|---|
| | | Junior Bankers | Senior Bankers | Associates | Vice Presidents | Associates | Vice Presidents |
| Cross ruffing | | n/a | 🟢 | n/a | 🟢 | n/a | 🟢 |
| Manager quartiles | pre-2016 | 🟢 | 🔴 | 🟢 | 🟢 | 🟢 | 🟢 |
| | 2016 to 2018 | 🟢 | 🟢 | 🟢 | 🟢 | 🟢 | 🟢 |
| 360 Review (OMR) | pre-2010 | 🔴 | 🟢 | 🟢 | 🟢 | 🔴 | 🔴 |
| | 2010 to 2015 | 🔴 | 🟢 | 🟢 | 🟢 | 🟢 | 🟢 |
| | 2016 to 2018 | 🟢 | 🟢 | 🟢 | 🟢 | 🟢 | 🟢 |

(56.1 ¶¶ 54, 57-59, Ex. 45 § 5 (Shaw Rpt.).)

The fact that *both* parties' experts found—at most—a patchwork of varied gender differences refutes any notion that "a uniformly applied, common practice is driving the [allegedly] unequal outcomes at issue." *Richardson*, 2021 WL 1910689, at *9. Plaintiffs who seek to prove that a uniform process caused disparate impact "must present statistics that support that contention." *Smith*, 196 F.3d at 369-70. Here, the Court should grant summary judgment because Plaintiffs have not, and cannot, do so.

*Third*, and, in the alternative, the Court should grant partial summary judgment on Plaintiffs' disparate impact claims because Plaintiffs have not raised a triable issue of fact over the existence of viable, less discriminatory "alternative employment practice[s]" that Goldman Sachs

has "refuse[d] to adopt."  42 U.S.C. § 2000e-2(k)(1)(A)(ii); *see* N.Y.C. Code § 8-107(17)(a)(2).[3]

To satisfy their burden, "[P]laintiffs may not rest on speculation regarding the availability, validity, or less discriminatory nature of their proffered alternatives."  *Johnson* v. *City of Memphis*, 770 F.3d 464, 472 (6th Cir. 2014).  Instead, Plaintiffs must "establish the availability of an alternative policy or practice that would also satisfy the asserted business necessity, but would do so without producing the disparate effect."  *Robinson* v. *Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 161 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338 (2011).  Rather than proffering any purportedly less discriminatory alternative employment practice, Plaintiffs merely hint at vague and indefinite proposals—for example, that Goldman Sachs could "measur[e] people based on goal achievement [and] competencies" (56.1 ¶ 63, Ex. 33 ¶ 75 (Cascio Rpt.))—which courts have held is insufficient to raise a triable issue.  *Allen* v. *City of Chicago*, 351 F.3d 306, 313 (7th Cir. 2003) (affirming summary judgment for defendant).

  ***Disparate Treatment.***  Because Plaintiffs have failed to create a triable issue of fact over whether the challenged processes caused any disparate impact, the Court should dismiss their disparate treatment claims as well.  This Court certified disparate treatment claims only "predicated on the statistical evidence of disparate impact" supposedly caused by the challenged processes.  (Class Cert. Order at 41.)  With (at most) sporadic, non-uniform evidence of disparate impact, Plaintiffs have not created a triable issue that Goldman Sachs adopted a "pervasive policy of intentional discrimination" through the three challenged processes across all three Divisions,

---

[3]  If Plaintiffs make out a *prima facie* case of disparate impact, Goldman Sachs will be entitled to show that the 360 review, manager quartiling, and cross-ruffing processes are "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i).  To prevail after Goldman Sachs makes that showing, Plaintiffs would have to prove the existence of viable, less discriminatory "alternative employment practice[s]" that Goldman Sachs has "refuse[d] to adopt." 42 U.S.C. § 2000e-2(k)(1)(A)(ii).  Summary judgment is warranted as to that last step, so that if Goldman Sachs proves job-relatedness, judgment should be entered in its favor.

*United States* v. *City of N.Y.*, 717 F.3d 72, 84 (2d Cir. 2013), which requires Plaintiffs to show that "discrimination was [Goldman Sachs'] *standard operating procedure*—the regular rather than the unusual practice." *Int'l Bhd. of Teamsters* v. *United States*, 431 U.S. 324, 336 (1977) (emphasis added). Because Dr. Farber's statistical evidence found (i) no gender disparities caused by 360 reviews and manager quartiling *after 2015*, (ii) no gender disparities in promotions *for five years* during the relevant period, and (iii) failed even to study alleged gender disparities in MBD, Plaintiffs cannot support a reasonable jury finding that "[Goldman Sachs] practiced sex-based discrimination **across the board** during the period of its potential liability," *Ste. Marie* v. *E. R. Ass'n*, 650 F.2d 395, 406 (2d Cir. 1981) (Friendly, J.) (emphasis added), as opposed to there being "the mere occurrence of isolated . . . or sporadic discriminatory acts," *Teamsters*, 431 U.S. at 405. On top of that, even the disparities that Dr. Farber claimed to identify are not "gross or stark" (*e.g.*, that 360 review scores for women were 98% to 99% of Dr. Farber's expected median 360 review scores), which undermines Plaintiffs' theory of intentional discrimination. *Gay* v. *Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 551-52 (9th Cir. 1982).

   ***Additional Grounds for Summary Judgment.*** Plaintiffs have ignored their burden to prove certain claims, leaving no triable issue over: (1) all claims related to promotion, because Dr. Farber never analyzed the cross-ruffing process, which is the only class-certified process relating to promotion; (2) all claims relating to the 360 review process for the period *before 2005*, because there was no class-wide 360 review process that could give rise to disparate impact or disparate treatment claims; (3) all claims arising *after 2015*, because there were no injuries in that period from any of the three challenged processes; (4) all claims as to Self-Sustaining Private Wealth Advisors ("SSPWAs"), because those professionals were paid by commission and, as a

result, their compensation was unaffected by the outcome of the challenged processes; and (5) claims for class members who agreed to release their claims against Goldman Sachs.[4]

## BACKGROUND

### A.   Plaintiffs sued with respect to all four of Goldman Sachs' revenue-producing Divisions.

Goldman Sachs is a global investment banking, securities, and investment management firm that offers a broad range of financial services to a diversified client base, with anywhere between 20,000 and 36,000 professionals working in its offices around the globe during the class period.  (*See* 56.1 ¶ 1, Ex. 1 at -045 (GS0114042); Ex. 24 at -869 (GS0399865).)  In that period, which begins July 7, 2002 (for New York-based class members) and September 10, 2004 (for class members outside of New York), Goldman Sachs was organized into four revenue-generating Divisions and numerous other non-revenue-generating Divisions.  (*See* 56.1 ¶ 2, Ex. 24 (GS0399865 at -869 to -873).)

---

[4]   To the extent Plaintiffs contend that the 360 review, manager quartiling, and cross-ruffing processes caused pay disparities, Goldman Sachs has a complete defense under the Bennett Amendment, which incorporates the affirmative defenses of the federal Equal Pay Act into Title VII by providing that pay differentials between men and women are not prohibited under Title VII if the pay disparity is justified by a defense listed in the Equal Pay Act, including a defense for pay "differential[s] based on any other factor other than sex." 29 U.S.C. § 206(d)(1); 42 U.S.C. § 2000e–2(h).  Although the Second Circuit added an atextual requirement to the "'factor other than sex' defense," requiring that the employer "also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential," *Belfi* v. *Prendergast*, 191 F.3d 129, 136 (2d Cir. 1999), the Second Circuit rule contravenes the plain text of the Equal Pay Act, as acknowledged by the Seventh Circuit and by the Supreme Court in dicta.  *See Wernsing* v. *Dep't of Hum. Servs.*, 427 F.3d 466, 469 (7th Cir. 2005) ("the employer may act for any reason, good or bad"); *Smith* v. *City of Jackson*, 544 U.S. 228, 239 n.11 (2005).  The meaning of *Smith* could not be clearer; the Supreme Court wrote that unlike the Age Discrimination in Employment Act, which permits employers to consider "only reasonable factors," "in the Equal Pay Act . . . , Congress barred recovery if a pay differential was based 'on any other factor'—reasonable or unreasonable—'other than sex,'" thus barring all "disparate impact" claims.  *Id.*  Because this Court is required to follow *Belfi*, which remains the law of the Second Circuit, at trial, Goldman Sachs will preserve for appeal the argument that the neutral 360 review, manager quartiling, and cross-ruffing processes are "factor[s] other than sex" under the Bennett Amendment, which provides a complete defense to any pay differential.

Class members are associates and vice presidents, a designation of "corporate level" at Goldman Sachs (SAC (ECF No. 411) ¶¶ 61, 62),[5] who work in revenue-generating roles, presently in only three of Goldman Sachs' four revenue-generating Divisions—IBD, IMD, and Securities.[6] In their original complaint, Plaintiffs included Goldman Sachs' fourth revenue-generating Division, Merchant Banking ("MBD"), which "deal[t] with corporate equity and corporate debt as well as real estate equity and real estate debt and investments in infrastructure." (56.1 ¶ 6, Ex. 40 ¶ 13 (10/30/13 Farber Rpt.).) Goldman Sachs employed the same three challenged processes in MBD as it did in IBD, IMD, and Securities during the class period. (56.1 ¶¶ 20, 23, 31, Ex. 31 ¶¶ 27, 29, 35 (10/30/13 Cascio Rpt.); Ex. 40 ¶¶ 24-25 (10/30/13 Farber Rpt.).) Plaintiffs originally alleged that associates and vice presidents in MBD similarly suffered discrimination as a result of the challenged processes, which Plaintiffs alleged were "uniform[ly]" applied "throughout the United States." (Am. Compl. (ECF No. 104) ¶ 10 & n.1, 34.)

After analyzing the results of the challenged processes for all four Divisions (56.1 ¶ 9, Ex. 40 (10/30/13 Farber Rpt.)), without explanation, Plaintiffs abandoned their claims on behalf of women in MBD. (*Compare* SAC (ECF No. 411) ¶ 10 & n.1 (asserting claims as to all four Divisions), *with* Pls.' Class Cert. Br. (ECF No. 247) at 1 ("Plaintiffs . . . seek certification of a Class of female Associates and Vice Presidents who have worked in the United States in the Investment Banking, Investment Management, and/or Securities Divisions.").) The only possible inference is that, though Plaintiffs had claimed that the "uniform employment, compensation, performance review, and promotion policies throughout the United States" applied to MBD as

---

[5] These corporate titles "do *not* describe a professional's specific job or function." (56.1 ¶¶ 7-8, Ex. 39 ¶ 16, 25 (Dunn Rpt.); *see also* Ex. 46 ¶ 16 (Yermack Rpt.) ("Associate" and "Vice President" are "job titles" in the "investment banking hierarchy").

[6] This brief refers to Goldman Sachs' Divisions and structure as they existed in November 2018. Plaintiffs have adduced no evidence that post-dates that period.

well as the three other Divisions (Am. Comp. (ECF No. 104) ¶ 34), Plaintiffs found no common

discriminatory effect of the processes in MBD.

**B.    After dropping MBD, Plaintiffs continued to challenge three evaluation processes in three Divisions, over the entire class period.**

Plaintiffs now claim that 360 reviews, manager quartiling, and cross-ruffing disparately

impacted female associates and vice presidents in IBD, IMD, and Securities (but not MBD) during

the class period.  (Class Cert. Order at 4.)  Dr. Henry Farber, one of Plaintiffs' experts, described

each Division's distinct businesses as follows:

- "IBD work[ed] with corporate clients, pension funds, financial institutions, asset managers, entrepreneurs and governments to structure and execute financing and risk management transactions."  (56.1 ¶ 3; Ex. 42 ¶ 21 (Farber Rpt.).)

- "IMD provide[d] investment management services" and "investment products" in "all major asset classes to institutional and individual clients," as well as "wealth advisory services" to high-net-worth individuals and families.  (56.1 ¶ 4; Ex. 42 ¶ 22 (Farber Rpt.).)

- "Securities deal[t] with interest rate products (such as government bonds, treasury bills and other highly liquid instruments), credit products, mortgages, currencies, commodities, and stocks and other equity-related products."  (56.1 ¶ 5; Ex. 42 ¶ 23 (Farber Rpt.).)

The three processes Plaintiffs challenge are as follows:

**1.    360 Reviews**

The 360 review process was a multi-step "framework[] for providing performance

feedback" to Goldman Sachs professionals.  (56.1 ¶ 12, Ex. 47 ¶ 3 (Abramian-Katz Decl.); *see

also* Ex. 49 ¶ 12 (Keefe Decl.).)  The first step of the annual 360 review process was for Goldman

Sachs professionals to select approximately 8 to 12 reviewers who were peers, superiors, and

subordinates, with input from and approval of their managers. (56.1 ¶ 13, Ex. 29 at 17:8-16 (9/5/13

Landman Tr.); Ex. 3 at -401 (GS0119399); Ex. 27 at 267:8-268:14, 280:12-15 (7/11/13 Heller Sberlati Tr.); Ex. 42 ¶ 28 (Farber Rpt.); Ex. 33 ¶ 38 (Cascio Rpt.).)  After professionals selected their reviewers, each reviewer provided feedback and scoring on each of "up to 13 underlying competencies" that were part of the 360 review (56.1 ¶ 14, Ex. 35 at 5 (4/19/21 Cascio Rebtl. Rpt.)), such as "Technical Skills," "Communication Skills," and "Overall Commercial Effectiveness."  (56.1 ¶ 15, Ex. 12 at -385 (GS0003383).)[7]  Next, average overall 360 scores and overall manager ratings were prepared, and a manager summary was prepared that incorporated the manager's own evaluation of the professional.  (56.1 ¶ 18, Ex. 27 at 280:5-11 (7/11/13 Heller Sberlati Tr.); Ex. 28 at 280:1-18 (Kung Tr.); Ex. 33 ¶¶ 38, 65 (Cascio Rpt.); Ex. 45 ¶¶ 98-99 (Shaw Rpt.); *see also* Ex. 35 at 5 (4/19/21 Cascio Rebtl. Rpt.).)  Last, the manager delivered the overall average 360 review score or overall manager rating and narrative feedback to the professional, typically in person.  (56.1 ¶ 19, Ex. 27 at 279:15-23 (7/11/13 Heller Sberlati Tr.); Ex. 28 at 290:6-12 (Kung Tr.); Ex. 45 ¶¶ 98-99 (Shaw Rpt.).)

As Plaintiffs' expert Dr. Cascio stated, "[t]his [360 review] process was employed in each class Division throughout the entire class period."  (56.1 ¶ 20, Ex. 33 ¶ 38 (Cascio Rpt.).)  Dr. Cascio further opined that the "360-degree review . . . process [did] not materially change[] in the period after 2012."  (56.1 ¶ 20, Ex. 32 ¶ 5 (6/29/18 Cascio Rpt.).)

### 2.  Manager Quartiling

Goldman Sachs used manager quartiling as a "tool" to evaluate relative performance, contribution, potential, and capability.  (56.1 ¶ 21, Ex. 42 ¶ 34 (Farber Rpt.), Ex. 22 at -659

---

[7] Through 2009, in addition to providing "concise, bulleted written feedback" in each competency, 360 reviewers scored each competency on a 1-5 scale; this was changed to a 1-9 scale in 2010. (56.1 ¶ 17, Ex. 15 at -971, -974 (GS0004968); Ex. 42 ¶ 30 (Farber Rpt.).)  After 2016, three ratings were used.  (56.1 ¶ 17, Ex. 21 at -347 (GS0380339); Ex. 42 ¶ 31 (Farber Rpt.).)

(GS0375658).)   The purpose of manager quartiling was to "[i]dentify top, middle, and bottom performers (relative to peers)" by distributing professionals into four or five manager "quartiles." (56.1 ¶ 22, Ex. 22 at -659 (GS0375658); Ex. 42 ¶ 35 (Farber Rpt.).)

"[T]hroughout the [c]lass [p]eriod," Goldman Sachs used manager quartiling in the class-relevant Divisions as well as across the firm globally.  (56.1 ¶ 23, Ex. 42 ¶ 34 (Farber Rpt.); Ex. 31 ¶ 29 (10/30/13 Cascio Rpt.).)   According to Plaintiffs' expert, Dr. Cascio, "any changes Goldman Sachs has made to its quartiling process are not meaningful or material."  (56.1 ¶ 23, Ex. 32 ¶ 8 (6/29/18 Cascio Rpt.).)

### 3.   Cross-Ruffing

The promotion process from vice president to managing director at Goldman Sachs involved two principal steps:  (i) a nomination process; and (ii) a vetting process known as "cross-ruffing" for those candidates who were nominated for promotion.  (56.1 ¶ 24, Ex. 45 ¶¶ 117-27 (Shaw Rpt.), Ex. 44 183:17-184:11 (Farber Tr.).)

"Nomination consist[ed] of compiling a list of Vice Presidents to be considered for promotion from Vice President to EMD."  (56.1 ¶ 25, Ex. 45 ¶¶ 118-120 (Shaw Rpt.).)   Within Divisions, managing directors, business unit heads, and Division heads helped select nominees. (*Id.*)  While Plaintiffs and their expert assert that the nominations process is a "tap on the shoulder" system (56.1 ¶ 26, Ex. 33 ¶ 79 (Cascio Rpt.); *see also* SAC (ECF No. 411) ¶ 54), that unsupported characterization of the nomination process is not relevant to this motion.

During the cross-ruffing process, each member of each Division's cross-ruffing selection committee was assigned a list of nominated candidates to evaluate by "interview[ing] [managing directors] who [were] knowledgeable about the candidate"; each then "prepar[ed] a one-page summary review sheet."  (56.1 ¶ 28, Ex. 42 ¶ 38 (Farber Rpt.); *see, e.g.*, Ex. 23 at -265 and -268 (GS0375264).)   Cross-ruffers, who were newly selected by Divisions for each promotion cycle,

typically conducted 10 to 12 interviews per candidate and rated assigned candidates on categories related to "Management, Leadership & Culture" and "Commercial Effectiveness."  (56.1 ¶ 29, Ex. 23 at -266 and -272 (GS0375264); Ex. 45 ¶ 122 (Shaw Rpt.).)  Following the interviews, the divisional cross-ruffing team "rank[ed] the list of candidates in order of preference for promotion," and "[t]he division heads then review[ed] this list and create[d] their own ranked list."  (56.1 ¶ 30, Ex. 42 ¶ 38 (Farber Rpt.); *see, e.g.*, Ex. 23 at -270 (GS0375264); Ex. 30 246:20–247:15 (6/12/13 Larson Tr.).)  Goldman Sachs used "the same cross-ruffing process . . . during the entire relevant time period."  (56.1 ¶ 31, Ex. 33 ¶ 61 (Cascio Rpt.).)

C.    **Experts for *both parties* found no gender differences in the challenged processes for many groups of Goldman Sachs professionals.**

Plaintiffs' statistical expert, Dr. Farber, analyzed "[w]hether there is statistical evidence of a difference in how men and women fare in Goldman's performance review system" and "[w]hether there is statistical evidence of disparities between men and women in promotion rates from Vice President positions to positions as Managing Directors."  (56.1 ¶ 34, Ex. 42 ¶ 6 (Farber Rpt.).)  To attempt to do this, Dr. Farber built regression models that aggregated data across all three class-relevant Divisions for all women and men in all class-relevant roles for 16 years (from 2003 to 2018).  (56.1 ¶ 35, Ex. 42 Tables 7, 8, 11, 12, 19, 20, 28 (Farber Rpt.); Ex. 44 at 71:3-10, 72:5-73:6 (Farber Tr.).)  Because Dr. Farber aggregated data across all three Divisions, he acknowledged that his model cannot "measure whether disparities for each of the challenged processes differ by [D]ivision" and so could not say if there were gender disparities in any particular Division.  (56.1 ¶ 36, Ex. 44 at 71:11-15, 85:17-86:4 (Farber Tr.).)

At the same time, Dr. Farber did analyze the three challenged processes by title (*i.e.*, associate or vice president) and by time period.  As to 360 reviews, Dr. Farber segmented his analysis into three time periods (2003 to 2009, 2010 to 2015, and 2016 to 2018) to enable him to

perform calculations on the different rating scales used in each.  (56.1 ¶ 37, Ex. 42 Tables 11, 12, 19, 20 (Farber Rpt.).)  Dr. Farber did not separately analyze *any* of the individual processes that make up the 360 review cycle, such as reviewer selection; individual peer, subordinate, and manager reviews; the averaging process by which individual reviews were converted into overall 360 scores or ratings; or the impact of individual competencies addressed in 360 reviews.  (56.1 ¶ 38, Ex. 42 ¶¶ 86-88 & Tables 11, 12 (Farber Rpt.).)  Dr. Farber found "no statistically significant differences between male and female" associates or vice presidents in their 360 review scores after 2015.  (56.1 ¶ 40, Ex. 42 ¶ 114 & Tables 19, 20 (Farber Rpt.); Ex. 45, Ex. 69 (Shaw Rpt.) (summarizing Dr. Farber's findings).)[8]

As to manager quartiling, Dr. Farber segmented his analysis in the 2003 to 2018 class period into two time periods, running a separate analysis for the 2016 to 2018 period.  (56.1 ¶ 42, Ex. 42 Tables 7, 8, 19, 20 (Farber Rpt.).)  As with 360 reviews, Dr. Farber found "no statistically significant differences between male and female" associates or vice presidents in manager quartiling after 2015.  (*See* 56.1 ¶ 43, Ex. 42 ¶ 114 & Tables 19, 20 (Farber Rpt.).)

With respect to the certified "cross-ruffing process" (Class Cert. Order at 28), Dr. Farber admitted that he "***did not do any analysis of cross-ruffing***" and instead chose to analyze "the overall effect" of the "promotion process, not cross-ruffing specifically."  (56.1 ¶ 45, Ex. 44 at 137:9-10, 149:10-16 (Farber Tr.) (emphasis added).)  Although he acknowledged that it was possible to "disaggregat[e] the promotions process into separate steps," Dr. Farber did not do so.

---

[8]  Although he purported to conclude that he found gender differences in 360 scores "from 2002 through 2015," Dr. Farber only claimed that data regarding 360 scores was available for *2003* to 2015.  (56.1 ¶ 39, Ex. 42 ¶¶ 10, 45 (Farber Rpt.).)  He thus admitted that no data was available for 2002.  And, in fact, the data he used contained (i) just one 360 review from 2003 and 11 from 2004 for IBD, and (ii) just one 360 review from 2003 and four from 2004 for IMD.  (56.1 ¶ 39, Ex. 45 ¶ 334 (Shaw Rpt.); (Giuffra Decl. ¶ 5.)

(56.1 ¶ 47, Ex. 43 ¶ 81 (Farber Rebtl. Rpt.).)  He thus confirmed that he was "not offering any opinion about disparities between rates of promotion of men and women who are on cross-ruffing lists." (56.1 ¶ 45, Ex. 44 at 185:18-22 (Farber Tr.).)  Dr. Farber conducted his flawed analysis of promotions for each individual promotion cycle.  (56.1 ¶ 48, Ex. 42 Tables 28-30 (Farber Rpt.); Ex. 43 Tables 28-30 (Farber Rebtl. Rpt.).)  He found no disparities, or disparities that favored women, in over a third (five out of 14) of the promotion cycles during the class period.  (56.1 ¶ 49, Ex. 43 ¶ 117, Table 28 (Farber Rebtl. Rpt.).)

Goldman Sachs' expert, Dr. Shaw, conducted regression analyses of the same time periods and title groupings that Dr. Farber used, but she also ran separate regression models for each Division (IMD, IBD, and Securities).  (56.1 ¶ 51, Ex. 45, ¶ 187, Exs. 21, 24, 27-29 (Shaw Rpt.).)  Dr. Farber testified that there was sufficient data to run separate models for each Division.  (56.1 ¶ 52, Ex. 44 at 176:21-177:2 (Farber Tr.) ("Q.  Did you ever determine that the sample sizes in the divisions were too small to run your model separately by division?  A.  No, I don't think that was an issue.").)  With respect to 360 reviews and manager quartiling, Dr. Shaw found that there were no common gender gaps when she ran separate regression models for each Division, as shown in the table below:

| | Models | IBD | | IMD | | Securities | |
|---|---|---|---|---|---|---|---|
| | | Junior Bankers | Senior Bankers | Associates | Vice Presidents | Associates | Vice Presidents |
| Manager quartiles | pre-2016 | ⊖ | ⊖ | ⊖ | ⊖ | ⊖ | ⊖ |
| | 2016 to 2018 | ⊖ | ⊖ | ⊖ | ⊖ | ⊖ | ⊖ |
| 360 Review (OMR) | pre-2010 | ⊖ | ⊖ | ⊖ | ⊖ | ⊖ | ⊖ |
| | 2010 to 2015 | ⊖ | ⊖ | ⊖ | ⊖ | ⊖ | ⊖ |
| | 2016 to 2018 | ⊖ | ⊖ | ⊖ | ⊖ | ⊖ | ⊖ |

(56.1 ¶ 54, Ex. 45 ¶¶ 193, 214 & Exs. 21, 24 (Shaw Rpt.).)

As to promotions, Dr. Shaw analyzed separately the "two key steps in the promotion process: (i) selection to the nominee list, and (ii) cross-ruffing," and additionally analyzed the promotions process as a whole. (56.1 ¶ 55, Ex. 45 ¶¶ 232, 237, Exs. 27-29 (Shaw Rpt.).)[9] Dr. Shaw found that "women [were] actually nominated at a higher rate than men in two of the three divisions" (IMD and Securities); that once nominated, "women nominees [were] promoted no less often than men" if not "more likely to be promoted than men" in all three Divisions; and that when the overall promotions process is analyzed, "women VPs [were] no less likely to be promoted to [managing director] than their male counterparts are." (56.1 ¶¶ 58-60, Ex. 45 ¶¶ 235-37, Ex. 27-29 (Shaw Rpt.).)

|  | IBD | IMD | Securities |
|---|---|---|---|
| Nominations | ⊖ | ⊕ | ⊕ |
| Promotions (among those nominated) | ⊖ | ⊖ | ⊖ |
| Overall Promotion Process | ⊖ | ⊖ | ⊕ |

As Dr. Shaw explained, "[p]romotion to [managing director] is a significant business decision for GS," and "[t]he fact that women fare as well as or better than men in the promotion process is strongly inconsistent with the claim that GS is biased against women." (56.1 ¶ 57, Ex. 45 ¶ 40 (Shaw Rpt.).)

### D. Plaintiffs and their expert, Dr. Wayne Cascio, have not proposed any alternatives to the three challenged processes.

In more than 10 years of litigating this case, Plaintiffs did not offer a single supposedly "less discriminatory alternative" to Goldman Sachs' processes for evaluation and promotion until

---

[9] Dr. Shaw explained that while "nomination is not itself a challenged process in this matter," she analyzed it in order to respond to Dr. Farber's analysis of "promotions as a whole," which are comprised of nominations and cross-ruffing. (56.1 ¶ 56, Ex. 45 ¶ 232 (Shaw Rpt.).)

the last two pages of the April 19, 2021 **rebuttal report** of their Expert Dr. Wayne Cascio (which did not respond to anything in Defendants' expert reports, and was improper given that Plaintiffs' reports on issues for which they bear the burden, such as proving less discriminatory alternatives, were due three months earlier, on January 15, 2021 (ECF No. 1050)).[10]  (56.1 ¶ 64 Ex. 35 at 51-52 (4/19/21 Cascio Rebtl. Rpt.).)  Dr. Cascio offered a few vague suggestions, but made no effort to explain how any of them would reduce or eliminate any supposed gender disparities, or to show that they would be reliable, job-related, and satisfy Goldman Sachs' business necessity.  (56.1 ¶¶ 66-67, Ex. 35 at 46, 51 (4/19/21 Cascio Rebtl. Rpt.); Ex. 37 at 328:22-329:11 (Cascio Tr.).)

Although Dr. Cascio speculated that his suggested enhancements would address his criticisms of the challenged processes (56.1 ¶ 66, Ex. 35 at 51 (4/19/21 Cascio Rebtl. Rpt.)), he offered no opinion—and directly refused to opine—on how or even whether any aspect of the processes that he found deficient "has a disparate impact on women."  (56.1 ¶ 68, Ex. 36 at 67:9-21, 149:5-19, 160:5-13 (11/16/13 Cascio Tr.); *see* Ex. 37 at 321:5-20 (Cascio Tr.) (whether "certain employment processes cause an adverse impact" is "not in [Dr. Cascio's] balliwick").

### E.   Relevant procedural history

In its March 30, 2018 Order, the Court certified a class consisting of female associates and vice presidents in revenue-producing roles within IBD, IMD, and Securities.  (Class Cert. Order at 49.)  Under the Order, Plaintiffs may seek to prove that the three challenged processes had a disparate impact on class members, and to prove a "disparate treatment claim predicated on the statistical evidence of disparate impact."  (*Id.* at 41, 49.)  The Order also directed that, at any Phase I trial, Plaintiffs must prove a *prima facie* case of disparate impact through "generalized

---

[10] In fact, at deposition, Dr. Cascio admitted that he did not intend to propose purportedly less discriminatory alternatives in his January report, but was "trying to do [so] in this April report." (56.1 ¶ 65, Ex. 37 at 323:7-324:18 (Cascio Tr.).)

proof of statistical evidence"; Goldman Sachs must establish that "the challenged processes are job related or consistent with business necessity"; and Plaintiffs must then prove "the availability of an alternative policy or practice that would also satisfy the asserted business necessity." (*Id.* at 43-44.)[11]   The Order expressly refused to certify Plaintiffs' "boy's club" theory of disparate treatment, which would require "individualized inquiries into each [alleged] incident of sexual assault, sexual harassment, stereotyping, impunity for male misconduct, and retaliation, to properly consider Goldman Sachs' defenses." (*Id.* at 47.)

The Court did not certify promotions generally, but instead only cross-ruffing.  *See*, *e.g.*, Oct. 7, 2019 Order (ECF No. 873) at 5 (The Court certified a class "with respect to three specific policies: 360 reviews, quartiling, and cross-ruffing."); Class Cert. Order at 28 ("Whether Goldman Sachs discriminated against the class via its use of 360 reviews, quartiling, or cross-ruffing raises yes-or-no questions that can each be answered 'in one stroke.'")).   In response to an interrogatory that asked for "each employment practice or policy" that Plaintiffs would challenge, the only promotion-related practice identified by Plaintiffs was "the firm wide 'cross ruffing' process for promotion from Vice President to Managing Director."   (56.1 ¶ 27, Ex. 53 at 3-5 (Pls.' 4/10/19 R&O to Defs.' Third Set of Interrogs.).)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(a).   To defeat summary judgment, "the nonmoving party must come forward with 'specific

---

[11]   As explained further in Defendants' motion to decertify the class (ECF No. 1224, at 27 n.15), because Plaintiffs withdrew their motion to certify a Rule 23(b)(2) class seeking injunctive relief, Defendants have objected that the "phased" framework for trying Title VII class claims, which is premised on adjudicating class-wide injunctive relief at Phase I, is not appropriate for trial of Plaintiffs' backpay and punitive damages claims.   Defendants preserve that objection here.

facts showing that there is a *genuine issue for trial*'"; "[c]onclusory allegations, conjecture, and speculation . . . are insufficient," as is "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case." *Niagara Mohawk Power Corp.* v. *Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (emphasis in original).

When, as here, "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Pres. Club, Inc.* v. *Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). To defeat summary judgment, the nonmoving party must come forward with "evidence on which the jury could reasonably find for the plaintiff" based on the "evidentiary standard of proof that would apply at the trial on the merits." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). It is "beyond cavil" that this rule applies, and summary judgment may be granted, "in the fact-intensive context of discrimination cases." *See Deng* v. *N.Y. State Off. of Mental Health*, 2018 WL 11176018, at *10 (S.D.N.Y. Feb. 28, 2018) (Carter, J.). As applied here, Plaintiffs must demonstrate that they can prevail on their class-wide disparate impact and disparate treatment claims with the evidence they have adduced during the last 10 years. Because they cannot do so, Goldman Sachs is entitled to judgment as a matter of law.

## ARGUMENT

## I.     There is no triable issue over Plaintiffs' disparate impact claims.

To establish disparate impact under Title VII's burden-shifting framework, Plaintiffs must prove that Goldman Sachs "uses 'a particular employment practice that causes a disparate impact on the basis of . . . sex.'" *Ricci*, 557 U.S. at 578. If Plaintiffs make this showing, Goldman Sachs can "defend against liability by demonstrating that the [challenged] practice is 'job related for the position in question and consistent with business necessity.'" *Id.* If Goldman Sachs makes that showing, "[P]laintiff[s] may still succeed by showing that [Goldman Sachs] refuses to adopt an

available alternative employment practice that has less disparate impact and serves [Goldman Sachs'] legitimate needs." *Id.*; *accord* Class Cert. Order at 42-44 (describing the three-step burden-shifting framework).[12]

Here, summary judgment on Plaintiffs' disparate impact claims is warranted because Plaintiffs have failed to demonstrate: (i) disparate impact for any element of the 360 review and promotions processes, or to show that those elements "are not capable of separation for analysis," 42 U.S.C. § 2000e-2(k)(1)(B)(i); (ii) that 360 reviews, manager quartiling, and cross-ruffing *caused* class-wide disparities; and (iii) that there is any available alternative that is valid, job-related and would demonstrably reduce any supposed disparate impact.

### A.   Plaintiffs' Title VII claim fails because they have not justified their decision to lump together the discrete components of two challenged processes.

Title VII expressly requires Plaintiffs to identify the "particular employment practice" that they contend caused a disparate impact, and only permits Plaintiffs to group together discrete elements and analyze them as one if Plaintiffs "can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis." 42 U.S.C. § 2000e-2(k)(1)(B)(i). This is not some technical requirement, but a critical feature of Title VII: a plaintiff's "failure to identify the specific practice being challenged is the sort of omission that could 'result in employers being potentially liable for the myriad of innocent causes that may lead to statistical imbalances.'" *Smith*, 544 U.S. at 241; *see also Meacham* v. *Knolls Atomic Power Lab'y*, 554 U.S. 84, 101 (2008) ("Identifying a specific practice is not a trivial burden."). "The requirement of precisely identifying the challenged employment practice . . . has substantial

---

[12] The elements of Plaintiffs' disparate impact claim under the NYCHRL are substantially similar to those under Title VII. *See Teasdale* v. *N.Y.C. Fire Dep't*, 574 F. App'x 50, 51 (2d Cir. 2014); N.Y.C. Code § 8-107(17)(a)(2).

consequences in any Title VII case," because it sets the stage for the remainder of the Title VII analysis, from the scope of "persons subject to the challenged employment practice," to the identification of the particular aspect of the defendant's practice that must be justified as a business necessity.  *Davis* v. *D.C.*, 925 F.3d 1240, 1263 (D.C. Cir. 2019) (Katsas, J., concurring in part).

For this reason, the Supreme Court has been crystal clear:  "[M]erely proving that the discretionary system has produced a racial or sexual disparity *is not enough*.  'The plaintiff must begin by identifying the specific employment practice that is challenged.'"  *Wal-Mart*, 564 U.S. at 357 (emphasis in original).  A plaintiff who fails to take this simple step cannot prove his or her claims.  For example, in *Campbell* v. *National Railroad Passenger Corp.*, 311 F. Supp. 3d 281 (D.D.C. 2018), the court granted summary judgment to the defendant where plaintiffs did not demonstrate that Amtrak's hiring and promotion processes "were not capable of being divided into smaller subsets related to specific employment practices for purposes of a statistical analysis."  *Id.* at 325.  Likewise, the Sixth Circuit affirmed summary judgment for the defendant where the plaintiff did not "isolate any allegedly adverse practices and [] examine their individual effects on the [hiring] process" and also did not show that the hiring system's "many steps were so intertwined that they were not capable of separation for analysis."  *Davis*, 717 F.3d at 496-97 (alterations omitted).

Here, Plaintiffs have not even attempted to show that the discrete parts of the challenged processes are "not capable of separation for analysis."  42 U.S.C. § 2000e-2(k)(1)(B)(i).  With respect to 360 reviews, there are numerous distinct elements—for example, reviewer selection; individual peer, manager and subordinate reviews; overall 360 reviews; and each of the separate competencies that reviewers assess (*see supra* pp. 10-11)—that Dr. Farber could have examined separately.  Plaintiffs' own expert, Dr. Cascio, opined that the overall 360 score that Dr. Farber

used in his analysis groups together the steps of the 360 review process:  it is an "average [of] ratings of up to 13 underlying competencies" and is composed of scores provided by three different groups of people ("managers," "peers and subordinates"), which then gets averaged into an overall score.  (56.1 ¶¶ 13, 18, Ex. 35 at 5 (4/19/21 Cascio Rebtl. Rpt.); Ex. 33 ¶¶ 38, 65 (Cascio Rpt.).)  It is, in other words, undisputed that these competencies and groups of reviewers *can* be analyzed separately—and, indeed, in evaluating job-relatedness, Defendants' expert, Dr. Eric Dunleavy, *did* exactly that:  he analyzed various 360 review competencies by Division, corporate title, year, and reviewer groups independently.  (56.1 ¶ 16, Ex. 38 at App. 4E (Dunleavy Job Relatedness Rpt.).)  As a result, Plaintiffs cannot carry their burden of showing that they could not separately analyze whether certain competency questions or groups of reviewers drove supposed disparities, and Goldman Sachs is entitled to summary judgment.  *See, e.g.*, *Campbell*, 311 F. Supp. 3d at 326 (granting summary judgment where plaintiffs "failed to meet their burden to show that Amtrak's selection procedures are 'not capable of separation for analysis'").

Promotions, too, consisted of multiple components, including:  (i) nominations; and (ii) cross-ruffing.  Because only the cross-ruffing process, rather than promotions generally, was certified for class treatment (Class Cert. Order at 28), Dr. Farber's analysis of the "overall promotions process" is facially inadequate to satisfy Plaintiffs' burden to prove disparate impact or treatment.  (*See infra* pp. 37-38.)  But Dr. Farber's "overall promotions process" analysis fails to prove disparate impact under Title VII for an additional reason:  Dr. Farber indisputably had the data to analyze the nominations and cross-ruffing processes separately and inexplicably chose not to "disaggregat[e] the promotions process into separate steps."  (*See supra* p. 14.)  Thus, the Court should grant summary judgment to Goldman Sachs with respect to cross-ruffing (or, in Dr. Farber's words, the "overall effect of the promotion process" (56.1 ¶ 45, Ex. 44 at 149:14-16

(Farber Tr.)) as well.  *See, e.g.*, *Davis*, 717 F.3d at 497-98 (granting summary judgment where plaintiff did not show that "managers' various exercises of discretion . . . were incapable of separation for analysis").

### B.   All of Plaintiffs' disparate impact claims fail because of undisputed significant gaps in Plaintiffs' purported evidence of statistical disparities.

To prove their Title VII and NYCHRL disparate impact claims, Plaintiffs must establish both that (i) "a disparity exists" and (ii) the "specific [challenged] practice" "caused" the disparity. *Chin* v. *Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151-52  (2d Cir. 2012); *see* N.Y.C. Code § 8-107(17)(a)(1).  Thus, merely claiming to identify an average disparity "*is not enough*." *Wal-Mart*, 564 U.S. at 357 (emphasis in original).  Instead, Plaintiffs must prove that the processes they challenge are what "*causes* [the] disparate impact."  42 U.S.C. § 2000e-2(k)(1)(A) (emphasis added).

Plaintiffs failed to meet that burden here.  If the challenged processes were the root cause of purported "continuous, systemic disadvantages for women" at Goldman Sachs, as Plaintiffs allege (Pls.' Class Cert. Br. (ECF No. 247) at 30), the impact of those purportedly uniform processes would necessarily be felt wherever and whenever those processes were applied within the Firm.  Here, however, the parties' experts *agree* that there is no consistent, class-wide impact. Even accepting Dr. Farber's flawed results at face value, gender disparities exist only in certain groups and time periods. (*See supra* pp. 13-15.)[13]  Dr. Shaw's statistically appropriate analysis goes even farther and demonstrates that, when modeled by Division as they should be, there are

---

[13]  Of course, if the Court excludes Dr. Farber's opinions under Federal Rule of Evidence 702 (*see* Defs. *Daubert* Br. (ECF No. 1188) at 36-55), the Court should grant summary judgment to Goldman Sachs because Plaintiffs will have no evidence to support their disparate impact or disparate treatment claims.  As explained in Goldman Sachs' *Daubert* motion, Dr. Farber's regression models ignore the divisional structure of Goldman Sachs, and suffer from numerous other methodological flaws that make them improper evidence to support Plaintiffs' burden.

no gender differences in nearly all groups and time periods, leaving no systematic disparities. (*See supra* pp. 15-16.)  These results conclusively prove that something *other* than the challenged processes themselves—for example, the individualized discretion of the thousands of decision-makers applying the challenged processes in different ways at different times, or Dr. Farber's flawed and unscientific methodology—caused any purported disparities.

Starting with Plaintiffs' expert, Dr. Farber's own statistical analysis shows that the three challenged processes did ***not*** cause a common, class-wide impact on female professionals:

- Dr. Farber opined that the "uniform" 360 review framework that applied to associates and vice presidents throughout the class period and across all three Divisions did not discriminate against female professionals in any Division during three of those years, 2016, 2017 and 2018.  (56.1 ¶ 40, Ex. 42 ¶ 114 & Tables 19, 20 (Farber Rpt.), Ex. 45 (Shaw Rpt. Ex. 69) (summarizing Dr. Farber's findings).)

- Dr. Farber opined that the "uniform" manager quartiling framework that applied to associates and vice presidents throughout the class period and across all three Divisions did not discriminate against female professionals in any Division during the same three years.  (56.1 ¶ 43, Ex. 42 ¶ 114 & Tables 19, 20 (Farber Rpt.), Ex. 45 Ex. 69 (Shaw Rpt.) (summarizing Dr. Farber's findings).)

- Dr. Farber opined that class members were not subject to discrimination with respect to promotions in 2002, 2003, 2010, 2012, and 2015 (30% of the class period)—in fact, more women were promoted to managing director in those years than Dr. Farber's model predicted.  (56.1 ¶ 49, Ex. 42 ¶ 152, Table 28 (Farber Rpt.), Ex. 43 ¶ 117, Table 28 (Farber Rebtl. Rpt.).)

- Dr. Farber removed one of Goldman Sachs' four revenue-generating Divisions, MBD, from his analysis—*after* examining whether there were gender disparities for the three challenged processes in that Division (56.1 ¶ 9 (Ex. 40 (10/30/13 Farber Rpt.); Ex. 41 (2/17/14 Farber Rpt.))—despite Plaintiffs' allegation that all three processes applied "uniform[ly]" in MBD, as they did in IMD, IBD and Securities.  (Am. Compl. (ECF No. 104) ¶ 10 & n.1, 34; *see also* pp. 9-10, *supra*.)

Goldman Sachs' expert, Dr. Shaw, likewise found that gender disparities vanished nearly entirely when regression models associated with the challenged processes were analyzed by Division. (56.1 ¶ 51, Ex. 45 § 5 (Shaw Rpt.).)[14]  As shown in the table above (*supra* at 5), there are no disparities for cross-ruffing at all, no disparities for 11 of 12 manager quartiling groupings, and no disparities for 14 of 18 groupings for 360 reviews. (56.1 ¶¶ 54, 57-59, Ex. 45 § 5 (Shaw Rpt.).)

This indisputable evidence of an absence of common impact across the class from the three allegedly uniform processes is fatal to Plaintiffs' disparate impact claims, because it refutes the notion that the processes *themselves* (as opposed to other factors such as random individual manager discretion, unmeasured factors, or Dr. Farber's flawed statistical approach) were the cause of any gender disparities identified by Dr. Farber's analysis. As the Second Circuit explained in affirming summary judgment on a disparate impact claim in *Smith*, "[t]he decision-making process either caused a disparate impact or it did not," and "[h]aving chosen" to stake their claim on a supposedly "identical" "overall process, [Plaintiffs] must present statistics that support that contention." *Smith*, 196 F.3d at 369-70.

---

[14]  Though the Court need not reach the issue, it is indisputable that it is statistically permissible and appropriate to run separate regression models by Division. *First*, neither Plaintiffs nor Dr. Farber claim that disaggregating the data by each of the three Divisions would prevent a robust statistical analysis. To the contrary, Dr. Farber admittedly "had the data" to disaggregate by Division (56.1 ¶ 52, Ex. 44 at 178:21-180:7 (Farber Tr.)), and expressly acknowledged that the Divisions were large enough to conduct an appropriate analysis (*id.* at 176:21-177:2). *Second*, it is undisputed that a recognized statistical "Chow" test confirms that it is appropriate to disaggregate the data by Division. As Dr. Shaw confirmed, the Chow tests "reject" Plaintiffs' and Dr. Farber's assumption that any of the challenged processes can be modeled firm-wide, as opposed to by Division. (56.1 ¶ 53, Ex. 45 ¶¶ 177, 194, 218 (Shaw Rpt.).) *See, e.g., Coates* v. *Johnson & Johnson*, 756 F.2d 524, 540-42 (7th Cir. 1985) (affirming judgment that pooling year-by-year samples was inappropriate where Chow test so indicated).

Statistical evidence that fails to satisfy this requirement or—as here—actually "undermines the idea that a uniformly applied, common practice is driving the unequal outcomes at issue" is fatal to a disparate impact claim. *Richardson*, 2021 WL 1910689, at *9. That is because, if certain processes are "the root cause of the inequality, their impact would presumably be felt and ascertainable across [all] job groups." *Id.* Thus, in *Smith*, where there was (at best) statistical evidence of disparate impact in "a few work-groups," but not in every one, and the plaintiff failed to analyze other work-groups subject to the same allegedly firm-wide process—precisely as Plaintiffs have done here with respect to MBD—the Second Circuit found that plaintiffs had "'gerrymander[ed]' data to skew the results of statistical analysis in [their] favor" and affirmed summary judgment for the defendant. *Smith*, 196 F.3d at 370. Similarly, in *Richardson*, where plaintiffs' expert found racial disparities in *five of six* job groups at issue, but found no disparities in *just one* job group, the court concluded that undisputed statistical evidence refutes "Plaintiffs' suggestion that these supposed practices were uniformly applied or had common effects on . . . class members." 2021 WL 1910689 at *7, 10.

Other courts have applied the same exacting test to hold that causation cannot be established when a plaintiff's own statistics do not find disparate impact even in small subgroups of a class. In *Morgan* v. *United Parcel Service of America, Inc.*, the Eighth Circuit affirmed summary judgment for the defendant because the court could not "infer from Plaintiffs' regression analyses that UPS set center managers' base pay lower for blacks as a matter of practice all across the country during the period in question" when the evidence showed no disparities in certain regions and in certain years. 380 F.3d 459, 472 (8th Cir. 2004).[15] "[P]roof of discrimination in

---

[15] Though *Morgan* involved disparate treatment claims, the court's analysis of plaintiffs' statistical evidence is nevertheless germane to disparate impact claims because, "in either case, the plaintiff must still establish that the practice is the common cause of [the discrimination] for which the

some districts and not others tends to defeat the argument that discrimination was UPS's nationwide standard operating procedure," just as "the fact that no correlation existed in 1995"— a *single year* out of the seven-year class period—"severely damages the inference that UPS had a nationwide standard operating procedure of [discrimination]." *Id.* at 464, 471.  Another court concluded that the absence of disparities in certain groups doomed plaintiffs' class action alleging racial discrimination:  if there "[w]ere [] a systemic bias in the pay of African-American supervisors[,] we would expect the salary difference . . . to be found in most places we looked," and therefore, "[t]he lack of any *consistent* pattern belies the notion that class members have been affected in common ways by the supposed 'practice' of 'subjective decisionmaking.'" *Abram* v. *United Parcel Serv. of Am., Inc.*, 200 F.R.D. 424, 431 (E.D. Wis. 2001) (emphasis in original) (denying class certification).

Because Plaintiffs' evidence of a patchwork of disparate impact is proof that the challenged processes are not "driving" any gender disparities, *Richardson*, 2021 WL 1910689, at *9, the Court should grant summary judgment to Goldman Sachs.

**C.**   **Partial summary judgment is warranted because even if Plaintiffs could establish a *prima facie* case, they cannot prove the existence of any "less discriminatory alternative" to any of the challenged processes.**

The Court should grant summary judgment to Goldman Sachs on the question of whether there are viable, less discriminatory "alternative employment practice[s]" that Goldman Sachs has "refuse[d] to adopt."   42 U.S.C. § 2000e-2(k)(1)(A)(ii).  This question would arise if Plaintiffs establish that the challenged processes cause a disparate impact—something that, as shown above, they cannot do—and Goldman Sachs proves that the processes are "job related for the position in

---

defendant is alleged to be liable under Title VII." *Jones* v. *Nat'l Council of Young Men's Christian Assocs.*, 34 F. Supp. 3d 896, 909 (N.D. Ill. 2014).

question and consistent with business necessity." *Id.* § 2000e-2(k)(1)(A)(i). Plaintiffs have failed to create a triable issue on the next step—the question of less discriminatory alternatives.[16]

To carry their burden under 42 U.S.C. § 2000e-2(k)(1)(A)(ii), Plaintiffs must "establish" (i) "the availability of an alternative policy or practice," (ii) "that would also satisfy the asserted business necessity," and (iii) "would do so without producing the disparate effect." *Robinson*, 267 F.3d at 161. Once Plaintiffs establish that threshold showing, Plaintiffs must then further establish that Goldman Sachs "has refused to adopt [Plaintiffs' proffered] available alternative employment practice." *Houser* v. *Pritzker*, 28 F. Supp. 3d 222, 234-35 (S.D.N.Y. 2014) (Maas, J.).[17] Plaintiffs and their expert, Dr. Cascio, have not met their burden on any of the required elements.

*First*, Plaintiffs must describe with specificity "a viable alternative" to each of the challenged processes that would be available to Goldman Sachs; "[a] vague or fluctuating proposed alternative ordinarily would frustrate [the Title VII] statutory scheme." *Allen*, 351 F.3d at 313. But rather than propose any alternative performance review or promotion processes, Plaintiffs and their expert, Dr. Cascio, just speculate (in the last two pages of Dr. Cascio's last, improperly submitted Reply expert report) that vague "enhancements" *might* serve as

---

[16]   Goldman Sachs is not seeking summary judgment with respect to step two of the Title VII framework—*i.e.*, showing that the 360 review, manager quartiling, and cross-ruffing processes are "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Although Goldman Sachs' expert, Dr. Eric Dunleavy, conducted a detailed validation study of the challenged processes showing that they are reliable, valid, and job-related, Goldman Sachs recognizes that Plaintiffs' expert, Dr. Cascio, disputes this conclusion. Rule 56 expressly authorizes parties to move for summary judgment as to "part of [a] claim or defense," Fed. R. Civ. P. 56(a), and thus this Court may grant summary judgment on an individual element of Plaintiffs' claims even if that decision will not resolve those claims entirely.

[17] Plaintiffs' NYCHRL disparate impact claim similarly requires Plaintiffs, to overcome Goldman Sachs' showing that the challenged processes "bear[] a significant relationship to a significant business objective," to "produce[] substantial evidence that . . . alternative polic[ies] or practice[s] with less disparate impact [are] available." N.Y.C Code § 8-107(17)(a)(2). But unlike Title VII, the NYCHRL does not require Plaintiffs to prove that Goldman Sachs refused to adopt their proposed alternatives. *Id.*

improvements.  For example, Dr. Cascio contends that Goldman Sachs could introduce additional "safeguards," like documentation requirements or "mandatory training" for 360 reviewers.  (56.1 ¶ 66, Ex. 35 at 46, 51 (4/19/21 Cascio Rebtl. Rpt.); *see also supra* pp. 16-17.)  Such "broad suggestions" for "proposed alternatives" do not remotely satisfy Plaintiffs' burden to identify concrete alternative employment practices.  *Johnson*, 770 F.3d at 472, 477-78 (reversing judgment for plaintiffs where plaintiffs proposed, among other things, adding assessment of "candidates' 'integrity' and 'conscientiousness'" to promotions process); *see Allen*, 351 F.3d at 316-17 ("bare assertion" of an alternative held insufficient).

*Second*, even if Plaintiffs theoretically had identified any alternatives with enough specificity, Plaintiffs also must show that those alternatives are "of substantially equal validity as" the challenged performance and promotion review processes.  *Allen*, 351 F.3d at 313; *Pacheco* v. *N.Y. Presbyterian Hosp.*, 593 F. Supp. 2d 599, 622 (S.D.N.Y. 2009) (Karas, J.) (alternative must satisfy "business necessity").  Plaintiffs also must show that their proposed alternatives would have "comparable cost," *Smith*, 196 F.3d at 365, and establish their "practicability," *Johnson*, 770 F.3d at 474-75 (citing cases).  Plaintiffs did none of this.  Their expert, Dr. Cascio, candidly admitted that he "didn't do any statistical analyses" or any other kind of analysis to "test whether the [alternatives] that . . . [he is] recommending here are equally valid as the challenged processes." (56.1 ¶ 67, Ex. 37 at 325:5-19 (Cascio Tr.).)  Nor have Plaintiffs even attempted to estimate the relative cost or other burdens of their supposed alternatives.  Plaintiffs' failure to offer validity and practicality evidence is fatal to proving a suitable alternative to the challenged processes.  *See Johnson*, 770 F.3d at 475-76 (reversing judgment for plaintiffs where they "offer[ed] no data showing that [the alternatives] provide equally valid and less discriminatory evaluations"); *Smith* v. *City of Des Moines*, 99 F.3d 1466, 1473-74 (8th Cir. 1996) (affirming summary judgment where

plaintiff did not prove alternative "would serve the city's legitimate interest . . . as well as the current system").

Third, Plaintiffs must show that their proposed alternatives to each of the challenged processes would be less discriminatory, meaning that they will "satisfy the asserted business necessity, but . . . without producing the disparate effect." *Robinson*, 267 F.3d 147 at 161. To carry their burden on this element, Plaintiffs must produce "evidence that plaintiffs' preferred alternative would have improved upon the challenged practice . . . not just that such practices exist in the abstract." *Lopez* v. *City of Lawrence*, 823 F.3d 102, 121 (1st Cir. 2016). Plaintiffs have failed to proffer any supposedly less discriminatory employment practice, much less one that would satisfy Goldman Sachs' business needs. When Plaintiffs' expert, Dr. Cascio, was asked if he "test[ed] . . . whether any of [his] recommendations would be less discriminatory toward women than the use of the challenged processes," he admitted that "I didn't, I didn't test them statistically," and he never identified any other kind of testing. (56.1 ¶ 67, Ex. 37 at 328:22-329:11 (Cascio Tr.).) Courts routinely grant summary judgment to defendants where, as here, the plaintiff never attempted to show "how such alternative practices would eliminate the disparity at issue." *Hernandez* v. *Off. of Comm'r of Baseball*, 2021 WL 1226499, at *12 (S.D.N.Y. Mar. 31, 2021) (Oetken, J.) (granting summary judgment); *see El* v. *SEPTA*, 479 F.3d 232, 249 (3d Cir. 2007) (affirming summary judgment where there was "no evidence in the record indicating that any alternative policy would have less of a disparate impact"); *Williams* v. *Wells Fargo Bank, N.A.*, 901 F.3d 1036, 1041 (8th Cir. 2018) (affirming summary judgment where plaintiffs "present no data that the [alternative] ameliorated racial disparity"); *Smith*, 99 F.3d at 1473 (same). The lack of any statistical analysis of Dr. Cascio's suggestions—by him or by Dr. Farber—speaks volumes.

*Finally*, Plaintiffs failed to establish that Goldman Sachs "has refused to adopt an available alternative employment practice." *Houser*, 28 F. Supp. 3d at 234-35. To do that, Plaintiffs had to "demonstrate a viable alternative and give the employer an opportunity to adopt it." *Lopez*, 823 F.3d at 120. Because Plaintiffs have not even demonstrated that allegedly less discriminatory alternatives existed or proposed them to Goldman Sachs, they cannot show that Goldman Sachs refused to adopt any such phantom alternatives. *See Adams* v. *City of Chicago*, 469 F.3d 609, 615 (7th Cir. 2006) (affirming summary judgment where plaintiffs "have not demonstrated that [defendant] refused to adopt an available [alternative]").

## II.   There is no triable issue over Plaintiffs' disparate treatment claims.

As this Court has repeatedly made clear, the disparate treatment claims that it certified are limited to Plaintiffs' "disparate treatment claim predicated on the statistical evidence of disparate impact." (Class Cert. Order at 41; *see, e.g.*, Oct. 7, 2019 Order (ECF No. 873) at 2, 5 (clarifying that a Phase I trial in this action "would consist only of generalized proof to address the common issues that justified certifying the class," specifically "360 reviews, quartiling, and cross-ruffing").) To meet their burden, Plaintiffs must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," but instead must "establish by a preponderance of the evidence that [] discrimination was the company's *standard operating procedure*[,] the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336 (emphasis added). To meet this burden, Plaintiffs also must prove "discriminatory intent"—that is, that the defendant's discriminatory operation was "*deliberate.*" *Lewis* v. *City of Chicago*, 560 U.S. 205, 214-15 (2010) (emphasis added).[18]   Plaintiffs typically try to establish a pattern or practice of intentional

---

[18]   Plaintiffs' NYCHRL pattern-or-practice disparate treatment claim likewise requires Plaintiffs to "show differential treatment—that [they were] treated 'less well'—because of a discriminatory intent." *Richardson* v. *City of N.Y.*, 2018 WL 4682224, at *9 (S.D.N.Y. Sept. 28, 2018) (Oetken, J.). The Second Circuit has cautioned district courts to "be mindful that the NYCHRL is not a

discrimination "through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally." *EEOC* v. *Bloomberg L.P.*, 778 F. Supp. 2d 458, 469 (S.D.N.Y. 2011) (Preska, C.J.).  Here, the Court has already held that any such anecdotal evidence must be limited to the three challenged processes. But the Court need not reach the issue of anecdotal evidence, since summary judgment is routinely granted where a plaintiff's statistical proof falls short, which is the case here.[19]

### A.   Plaintiffs' disparate treatment claims fail because their meager and equivocal statistical evidence cannot support an inference that discrimination was Goldman Sachs' "standard operating procedure."

"[T]he burden of establishing a pattern or practice of discrimination is not an easy one to carry," and "courts in pattern-or-practice cases have required substantial proof of the practice." *In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1085 (W.D.N.Y. 1994).  To carry their burden based on statistical evidence, "the statistics [must] reveal 'a gross disparity in the treatment of workers based on [sex].'" *Robinson*, 267 F.3d at 158.  Only "gross disparities can give rise to a reasonable inference that paying [or promoting] [women] less ***because they are [women]*** is [a firm's] standard operating procedure." *Morgan*, 380 F.3d at 468 (emphasis added).  Applying these standards, summary judgment is warranted on Plaintiffs' disparate treatment claims for the same reasons it should be granted on their disparate impact claims.  The undisputed facts show that the challenged

---

'general civility code'" and "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).

[19] *E.g.*, *Bloomberg*, 778 F. Supp. 2d at 478 (granting summary judgment where plaintiff "has not presented the quality of evidence that would allow a factfinder to infer that discrimination is Bloomberg's standard operating procedure or widespread practice"); *Attenborough* v. *Constr. & Gen. Bldg. Laborers' Loc. 79*, 691 F. Supp. 2d 372, 389 (S.D.N.Y. 2009) (Holwell, J.) ("plaintiffs' evidence does not raise an inference of intentional discrimination"); *Munoz* v. *Orr*, 200 F.3d 291, 304 (5th Cir. 2000) ("[t]aken as a whole, plaintiffs' evidence properly before the district court does not raise a genuine issue of material fact as to either disparate impact or disparate treatment class-wide claims").

processes, used "firm-wide" in every Division at Goldman Sachs (Class Cert. Order at 31), did not cause class-wide disparate impact, much less "gross disparit[ies]" that could serve as "substantial proof" of deliberate discrimination. *Bloomberg*, 778 F. Supp. 2d at 468-69.

As shown above (*supra* pp. 23-27), Plaintiffs' own analyses make clear that the challenged processes—the only basis for their disparate treatment claims—did not *cause* different outcomes for women, as would be the case if "discrimination [was] [Goldman Sachs'] standard operating procedure or widespread practice." *Bloomberg*, 778 F. Supp. 2d at 478. Dr. Farber found no gender disparities from 360 reviews and manager quartiling after 2015, and no gender disparities in promotions in five separate years. (*Supra* pp. 13-15.)[20] Plaintiffs also offer no evidence that the very same challenged processes disfavor women in the fourth revenue-generating Division where they are applied (MBD), conceding that discrimination is *not* standard procedure across the Firm. Such an "equivocal statistical analysis" cannot meet Plaintiffs' burden to show a pattern or practice of purposeful discrimination. *See Richardson*, 2021 WL 1910689, at *9-10 (denying class certification on disparate treatment claim where plaintiffs' statistical evidence of disparities in a subset of job titles "does not suggest the kind of pattern or practice of discrimination that would create common questions and answers across the far-reaching Rejected Applicant Class").

Justice Ginsburg, as a judge on the D.C. Circuit, affirmed judgment for the defendant on a disparate treatment claim after a bench trial in analogous circumstances, holding that the plaintiffs' "statistics failed to show any pattern operating to the disadvantage of women" caused by the U.S. Postal Service's "promotion system for upper echelon positions." *Valentino* v. *U.S. Postal Serv.*,

---

[20] In addition, many class members were promoted to managing director after being cross-ruffed, or were the highest-paid employees in their business unit (56.1 ¶¶ 61-62, Giuffra Decl. ¶¶ 3-4), which is flatly inconsistent with Plaintiffs' contention that discrimination is Goldman Sachs' "standard operating procedure." *Teamsters*, 431 U.S. at 336.

674 F.2d 56, 60, 70 (D.C. Cir. 1982) (Ginsburg, J.).  Instead, as here, in some years there were no differences, or women were favored over men:

- "the percentage of women at [pay scale] levels 17 to 19 who received increases was lower than the percentage of men in 1976 and 1978 but the difference in 1977 was negligible,"

- "the difference in levels 20 to 22 was negligible in 1976 but the percentage of women who received increases in 1977 and 1978 was lower than that of men," and

- "at levels 29 to 31, in 1976 and 1977 women received no increases, whereas a small percentage of men did, while in 1978, one woman out of three received an increase, which made the percentage of women receiving increases higher than the percentage of men." *Id.* at 70 n.20.

In *Valentino*, as here (*see* Defs.' *Daubert* Br. (ECF No. 1188) at 36-55), errors in plaintiffs' models rendered them inadequate to "raise an inference that sex discrimination accounts for salary differences."  674 F.2d at 71.  But even accepting the models at face value, the "sporadic" pockets of gender disparities they revealed were fatal to plaintiffs' class claim premised on "systemwide discrimination."  *Id.* at 67.  Such inconsistent evidence precludes any finding "that sex discrimination by the employer is the explanation" for the gender disparities.  *Id.* at 69.

Moreover, even in those instances where Dr. Farber claimed to find statistically significant gender differences, many of those purported gaps were of "limited magnitude," *Waisome* v. *Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1376 (2d Cir. 1991), which further undermines any inference that "**intentional** discrimination was [Goldman Sachs'] 'standard operating procedure,'" *Reynolds* v. *Barrett*, 685 F.3d 193, 203 (2d Cir. 2012) (emphasis added).  "Whatever the impact demonstrated by a plaintiff's statistical evidence is in fact, the legal question is whether that impact is sufficiently gross or stark that a court must infer that it was intended by the defendant." *Gay*, 694 F.2d at 552.  Determining whether the disparities are "gross or stark" in a practical sense helps

to ensure that a plaintiff's "statistical evidence" does not "completely blur the distinction between 'impact' and 'intent,' and thus eliminate the legal difference between disparate impact and disparate treatment lawsuits." *Id.*[21]

Here, for example, even Dr. Farber's faulty promotions model—which baselessly assumed that all female vice presidents were eligible to be named managing director, contrary to the undisputed factual record, as Judge Francis recognized in his Report and Recommendation denying class certification, that vice presidents could only be promoted after a "minimum of two years" (Mar. 10, 2015 R&R (ECF No. 364) at 11); 56.1 ¶ 33, Ex. 25 at 55:6-14 (De Luis Tr.); Ex. 26 at 205:24-206:3 (7/10/13 Heller Sberlati Tr.))—predicted that 3.68% of eligible women should have been promoted from vice president to managing director, and that the actual rate of promotion was 3.27%, **which is 89% of Dr. Farber's expected promotion rate**.  (56.1 ¶ 50, Ex. 43 App. A, Table 24 (Farber Rebtl. Rpt.).)  Similarly, Dr. Farber's model predicted that 29% of female associates and vice presidents should have been placed in the first quartile and that in fact 26% were so placed, **which is 88% of his expected rate**.  (56.1 ¶ 44 Ex. 43 App. A, Tables 5-8 (Farber Rebtl. Rpt.).)  And, as shown in the table below, Dr. Farber found even smaller disparities for the 360 review process:

---

[21]   As the Supreme Court recently emphasized, "[s]tatistical significance may provide 'evidence that something besides random error is at work,'" *Brnovich* v. *Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2343 n.17 (2021), but "statistical significance tells nothing of the importance, magnitude, or practical significance of a disparity," *Waisome*, 948 F.2d at 1376.



(56.1 ¶ 41, Ex. 43 App. A, Tables 9-12 (Farber Rebtl. Rpt.).)

The small disparities identified by Dr. Farber's faulty analysis do not support an inference of intentional discrimination. *See Gay*, 694 F.2d at 551-52 ("the difference in this case between the expected result of 11.1% and the actual results of 7.2% and 8.3% 'may be sufficiently small to weaken the [plaintiffs'] other proof'"). On similar evidence, courts conclude that it "could not seriously be maintained that [a defendant] practiced sex-based discrimination ***across the board*** during the period of its potential liability." *Ste. Marie*, 650 F.2d at 406 (emphasis added).

**B.  Because Plaintiffs' statistical evidence is legally deficient, any anecdotal evidence Plaintiffs may try to rely on cannot create a triable issue as to Goldman Sachs' intent.**

Because Plaintiffs have failed to establish that the challenged processes actually discriminated against women, and any gaps they do claim to identify are small, it follows that Goldman Sachs could not have *intentionally* discriminated against women by maintaining the challenged processes, as required to establish a pattern-or-practice disparate treatment claim.

Thus, the Court need not address the issue of Goldman Sachs' intent at all.  It is enough to grant summary judgment that Plaintiffs failed to show that the challenged processes operate class-wide as a tool of discrimination.  *Bloomberg*, 778 F. Supp. 2d at 471-72 ("no statistical evidence" is "fatal" where, as here, there is "no evidence of an explicit discriminatory policy, and no evidence of an 'inexorable zero' in any position").

Moreover, while anecdotal evidence of discrimination may "provide[] 'texture'" to statistical evidence, *id.* at 469, the Supreme Court has cautioned against relying too heavily on such individualized narratives:  "court[s] must be wary of a claim that the true color of a forest is better revealed by reptiles in the weeds than by the foliage of countless free-standing trees." *Cooper* v. *Fed. Reserve Bank of Richmond*, 467 U.S. 867, 879-80 (1984).  Put more bluntly, "rarely, if ever, can [anecdotal] evidence show a systemic pattern of discrimination."  *Bloomberg*, 778 F. Supp. 2d at 469.  It certainly could not do so here, where Plaintiffs' own evidence disproves any such "systemic pattern."

III.   **There is no triable issue as to certain claims and class members.**

A.   **Summary judgment is warranted with respect to the cross-ruffing process, which Dr. Farber never analyzed.**

As shown above, the promotion process at Goldman Sachs involved two primary steps: (i) nomination; and (ii) cross-ruffing.  (56.1 ¶ 24, Ex. 45 ¶¶ 117-27 (Shaw Rpt.); Ex. 44 at 183:17-184:11 (Farber Tr.).)  The Court did not certify a class regarding promotions generally or nominations specifically.  It instead certified the "cross-ruffing process," based on specific factual findings that do not apply to nominations.  (Class Cert. Order  at 28 ("[T]he cross-ruffing process applied to every single possible promotion from Vice President."); *id.* at 30 ("[C]ross-ruffing [wa]s an inter-business unit undertaking.   Indeed, cross-ruffers [were] not permitted to evaluate candidates in their own business unit.").)  Plaintiffs recognized as much in responding to an

interrogatory, stating that they would challenge "the firm-wide 'cross-ruffing' process for promotion from Vice President to Managing Director."  (56.1 ¶ 27, Ex. 53 at 3-5 (Pls.' 4/10/19 R&O to Defs.' Third Set of Interrogs.).)

Plaintiffs' expert, Dr. Farber, made no attempt to analyze cross-ruffing.  He conceded that his model analyzed only "the overall effect of the promotion process, not cross-r[uff]ing specifically."  (56.1 ¶ 45, Ex. 44 at 149:14-16 (Farber Tr.).)  Because Dr. Farber did not study the only aspect of Goldman Sachs' promotion process that the Court certified for class treatment, Plaintiffs have not "provided any statistical analysis, or any other empirical proof" of a class-wide, gender-based disparity in cross-ruffing.  *Pacheco*, 593 F. Supp. 2d at 621.  Plaintiffs' failure to offer any proof, as they are required to do in order to satisfy their burden, requires summary judgment for Goldman Sachs.  *Id.* (granting summary judgment on national origin discrimination claim where plaintiffs provided no "statistical analysis" that hospital policy requiring employees to speak only English while performing job duties "disproportionately affected any group, whether categorized by race, ethnicity, or language").  Indeed, the only admissible evidence in the record relating to cross-ruffing is Dr. Shaw's opinion based on her analysis of professionals who had been nominated that through cross-ruffing, "women are promoted to EMD at a higher rate than men," and that, "after controlling for function, Business Unit, and production, women nominees are more likely to be promoted than men."  (*See* 56.1 ¶ 59, Ex. 45 ¶ 236 & Ex. 28 (Shaw Rpt.).)  Because Plaintiffs have no evidence, expert or otherwise, to counter Dr. Shaw's opinions on cross-ruffing, the Court should grant summary judgment to Goldman Sachs.

**B.      In the period before 2005, there was no class-wide 360 review process that could give rise to disparate impact or disparate treatment claims.**

Plaintiffs' expert, Dr. Farber, opined that "[f]rom 2002 through 2015, women are evaluated lower on the 360-degree review."  (Ex. 42 ¶ 10 (Farber Rpt.).)  But Goldman Sachs did not have

firm-wide 360 reviews until 2003—meaning there is no 360 review data at all from 2002—and 360 reviews were not fully implemented until 2004. (56.1 ¶ 10, Ex. 45 ¶ 98 (Shaw Rpt.); Ex. 29 at 38:14-19 (9/5/13 Landman Tr.); 56.1 ¶ 11, Ex. 29 at 231:21-232:13 (9/5/13 Landman Tr.).) In fact, Dr. Farber analyzed (i) just one 360 review from 2003 and 11 from 2004 for IBD, and (ii) just one 360 review from 2003 and four from 2004 for IMD. (56.1 ¶ 39, Ex. 45 App. C ¶ 334 (Shaw Rpt.); Giuffra Decl. ¶ 5.)  Thus, there was insufficient data for Dr. Farber to opine on class-wide gender disparities in 360 reviews for the years 2002 through 2004—leaving no evidence of such purported disparities.  "An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment."  *Major League Baseball Props., Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (affirming summary judgment).  Accordingly, summary judgment is warranted for all claims as to 360 reviews before 2005.

### C.   Summary judgment is warranted with respect to all claims arising from the period after 2015.

It is axiomatic that class members are entitled to relief only if they "suffered an adverse employment decision."  *Chin*, 685 F.3d at 151.  Summary judgment is warranted on Plaintiffs' challenge to the 360 review and manager quartiling processes after 2015, because (as shown *supra* pp. 13-15) Dr. Farber himself finds no evidence of gender disparities.  In addition, Dr. Farber never analyzed cross-ruffing (*see supra* pp. 37-38), which means that there are *no claims* whatsoever arising from the period after 2015 for any class member.

Even if Dr. Farber could have created a disputed issue regarding cross-ruffing—and he did not—summary judgment still should be granted as to class members who were *hired* by Goldman Sachs after 2015.  Associates were not eligible to be promoted to managing director at all (56.1 ¶ 32, Ex. 37 at 91:15-18 (Cascio Tr.)), and vice presidents hired after 2015 also were never eligible

during the class period because, as Judge Francis explained, vice presidents could only be promoted after "a minimum of two years." (Mar. 10, 2015 R&R (ECF No. 364) at 11.)

**D.    Self-Sustaining Private Wealth Advisors** ████████████████████ ████████ **and therefore could not have suffered any injury caused by the challenged processes.**

The Court certified a class where the *only* forms of relief sought are *individualized* awards of "backpay and punitive damages" caused by supposed discrimination as a result of the challenged processes. (Pls.' Class Cert. Br. (ECF No. 247) at 45; *see* Cert. Order at 12-13, 49.) But for associates and vice presidents known as Self-Sustaining Private Wealth Advisors ("SSPWAs"), the outcome of the challenged processes had no effect on their compensation. These professionals worked in IMD and "provide[d] integrated wealth advisory services for high-net-worth individuals and families," such as portfolio management, administration of trusts and estates, and private banking and lending. (56.1 ¶ 69, Ex. 48 ¶ 3 (Cupertino Decl.).) ████████

████████████████████████████████████████████████████████████████████████████

████████████████████ (56.1 ¶ 70 Ex. 48 ¶¶ 9-11 (Cupertino Decl.).)[23]

Because SSPWAs ████████████████████████████ or on other factors apart from the 360 review and quartiling processes, and because Dr. Farber did not study the cross-ruffing process for any class member,[24] the challenged processes could not have caused female

---

[22] ████████████████████████████████████████████████████████
████████████████████ (56.1 ¶ 70, Ex. 48 ¶ 10 (Cupertino Decl.).)
████████████████████████████ (*Id.*)

[23] PWAs in the Partners Coverage Group provided wealth management services to then-current and former Participating Managing Directors. (56.1 ¶ 70, Ex. 48 ¶ 13 (Cupertino Decl.).) ████████
████████████████████ (*Id.*)

[24] In fact, Dr. Shaw found that "all of the female SSPWAs who were nominated for cross-ruffing were eventually promoted to [managing director]." (56.1 ¶ 72, Ex. 45 ¶ 237 n.280 (Shaw Rpt.).)

SSPWAs to be treated any differently than male SSPWAs.  (56.1 ¶¶ 70-71 Ex. 48 ¶¶ 9-11 (Cupertino Decl.); Giuffra Decl. App. A.)  Summary judgment should therefore be granted as to their claims.

### E. Absent Class Members who signed releases without arbitration provisions have agreed to release their claims against Goldman Sachs.

Under New York law, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Interpharm, Inc.* v. *Wells Fargo Bank, N.A.*, 655 F.3d 136, 142 (2d Cir. 2011) (applying New York law).  "An individual may 'settle or waive claims of discrimination in violation of [Title VII] so long as the waiver is made knowingly and voluntarily.'" *Mandavia* v. *Columbia Univ.*, 2013 WL 2391695, at *4 (S.D.N.Y. June 3, 2013) (Oetken, J.) (alteration in original).

The three class members identified in 56.1 ¶¶ 73, 74, Exhibits 50-52, agreed to "knowingly and voluntarily waive and release forever whatever claims, whether known or unknown, [she] ever had or now ha[s] against Goldman Sachs."  (56.1 ¶¶ 73, 74 Ex. 52 at -111 (GS0391110); *see also* Ex. 50 at -288 (GS0391288); Ex. 51 at -924 (GS0390923).)  Because there is no evidence in the record that the agreements to release their claims in this litigation were anything but knowing and voluntary, the Court should grant summary judgment to Goldman Sachs on each of their claims.

## CONCLUSION

The Court should grant Goldman Sachs' motion for summary judgment.

Respectfully,

*/s/ Robert J. Giuffra, Jr.*

|  |  |
|---|---|
| Barbara B. Brown (*admitted pro hac vice*) | Robert J. Giuffra, Jr. |
| Carson H. Sullivan (*admitted pro hac vice*) | Sharon L. Nelles |
| PAUL HASTINGS LLP | Ann-Elizabeth Ostrager |
| 875 15th Street, N.W. | Hilary M. Williams |
| Washington, D.C.  20005 | SULLIVAN & CROMWELL LLP |
|  | 125 Broad Street |
|  | New York, New York  10004 |
| Patrick W. Shea | (212) 558-4000 |
| PAUL HASTINGS LLP |  |
| 200 Park Avenue |  |
| New York, New York  10166 | Amanda Flug Davidoff |
|  | SULLIVAN & CROMWELL LLP |
|  | 1700 New York Avenue, N.W., Suite 700 |
|  | Washington, D.C. 20006 |

*Attorneys for Defendants*
*Goldman Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

August 9, 2021