# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; SHANNA ORLICH; ALLISON GAMBA; and MARY DE LUIS, <br><br> Plaintiffs, <br><br> -against- <br><br> GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC., <br><br> Defendants. | No. 10-cv-6950-AT-RWL |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' *PRIMA FACIE* CASE OF DISPARATE IMPACT

## TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.  RELEVANT FACTS ........................................................................................... 4

    A.  Goldman Employs the Challenged Employment Practices Firm-Wide. ................ 4

        1.  Performance Reviews ................................................................................ 4

            a.  The 360 Review ................................................................................ 4

            b.  Manager Quartiling ......................................................................... 5

        2.  Cross-Ruffing ......................................................................................... 6

    B.  The Challenged Employment Practices Disadvantage Women........................... 7

        1.  Goldman's performance review practices adversely impact women. ........ 8

        2.  The adverse impact in performance reviews results
            in lower compensation for women............................................................ 11

        3.  Goldman's cross-ruffing process adversely impacts women.................... 13

III.  LEGAL STANDARD...................................................................................... 155

IV.  ARGUMENT ................................................................................................. 16

    A.  Summary Judgment Should Be Granted on Plaintiffs'
        Title VII *Prima Facie* Case.................................................................... 16

        1.  Plaintiffs have satisfied their *prima facie* burden as
            to 360 Reviews and Manager Quartiling. ................................................ 17

        2.  Plaintiffs have satisfied their *prima facie* case as to cross-ruffing. .......... 22

    B.  Summary Judgment Should Be Granted on Plaintiffs'
        NYCHRL Disparate Impact Claim....................................................... 24

        1.  The Challenged Employment Practices had an adverse impact on Class
            Members in violation of the NYCHRL. ................................................. 25

V.  CONCLUSION................................................................................................ 27

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                           **PAGE(S)**

*Albemarle Paper Co. v. Moody*,
   422 U.S. 405 (1975)...................................................................................... 21

*Albunio v. City of New York*,
   947 N.E.2d 135 (N.Y. 2011)......................................................................... 25

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...................................................................................... 15

*Brown v. City of New York*,
   No. 16 Civ. 1106, 2017 WL 1102677 (E.D.N.Y. Mar. 23, 2017) ........................... 27

*Castaneda v. Partida*,
   430 U.S. 482 (1977)...................................................................................... 17

*Chen–Oster v. Goldman, Sachs & Co.*,
   325 F.R.D. 55 (2018) ...................................................................................... 1

*Chin v. Port Auth. Of N.Y. and N.J.*,
   685 F.3d 135 (2d Cir. 2012)...................................................................... 3, 17

*Easterling v.Connecticut*,
   783 F. Supp. 2d 323 (D. Conn. 2011) ............................................... 18, 19, 20

*EEOC v. Joe's Stone Crab, Inc.*,
   220 F.3d 1263 (11th Cir. 2000) ................................................................... 16

*EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*,
   164 F.3d 89 (2d Cir. 1998)..................................................................... 20, 24

*Griggs v. Duke Power Co.*,
   401 U.S. 424 (1971).............................................................................. 16, 21

*Guardians Ass'n v. Civil Serv. Comm'n of New York*,
   630 F.2d 79 (2d Cir. 1980)........................................................................... 17

*In re Omicron Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)..................................................................... 15, 24

*Kerzer v. Kingly Mfg.*,
   156 F.3d 396 (2d Cir. 1998)......................................................................... 15

*Kirkland v. N.Y. State. Dep't of Corr. Servs.*,
   520 F.2d 420 (2d Cir. 1975)......................................................................... 23

*Loeffler v. Staten Island Univ. Hosp.*,
    582 F.3d 268 (2d Cir. 2009)..................................................................................... 25

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)............................................................ 15, 16, 20, 24

*Malave v. Potter*,
    320 F.3d 321 (2d Cir. 2003)..................................................................................... 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).................................................................................................. 15

*Meacham v. Knolls Atomic Power Lab.*,
    461 F.3d 134 (2d Cir. 2006)..................................................................................... 17

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013)..................................................................................... 25

*NAACP v. North Hudson Regional Fire and Rescue*,
    742 F. Supp. 2d 501 (D.N.J. 2010) .................................................................. 20, 24

*NAACP v. N. Hudson Reg'l Fire & Rescue*,
    665 F.3d 464 (3d Cir. 2011).............................................................................. 20, 24

*R.B. Ventures. Ltd. v. Shane*,
    112 F.3d 54 (2d Cir. 1997)....................................................................................... 15

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997)................................................................................. 15, 24

*Richardson v. City of New York*,
    No. 17 Civ. 9447, 2018 WL 4682224 (S.D.N.Y. Sept. 28, 2018)........................... 26

*Robinson v. Metro-North Commuter R.R.*,
    267 F.3d 147 (2d Cir. 2001) ......................................................................... passim

*Rothenberger v. N.Y. City Police Dep't*,
    No. 6 Civ. 868, 2008 WL 2435563 (E.D.N.Y. Jun. 16, 2008) ................................ 15

*Smith v. Xerox Corp.*,
    196 F.3d 358 (2d Cir. 1999)............................................................................ 17, 18, 23

*Stinson v. City Univ. of N. Y.*,
    No. 17 Civ. 3949, 2018 WL 2727886 (S.D.N.Y. June 6, 2018)............................... 25

*Teasdale v. City of N.Y.*,
    No. 8 Civ. 1684, 2013 WL 5300699 (E.D.N.Y. Sept. 18, 2013)............................. 27

*Teasdale v. N.Y.C. Fire Dep't, FDNY*,
   574 F. App'x 50 (2d Cir. 2014) ........................................................................ 27

*U.S. v. City of New York*,
   637 F. Supp. 2d 77 (E.D.N.Y. 2009) ........................................................ 19, 21

*United States v. City of Warren*,
   759 F. Supp. 355 (E.D. Mich. 1991).............................................................. 20

*Washington v. Davis*,
   426 U.S. 229 (1976)........................................................................................ 21

*Watson v. Fort Worth Bank & Trust*,
   487 U.S. 977 (1987)........................................................... 2, 16, 18, 23

*Zelnik v. Fashion Inst. of Tech.*,
   464 F.3d 217 (2d Cir. 2006)........................................................................ 15

## STATUTES

42 U.S.C. §§ 2000e ........................................................................... 1, 2, 16

New York City Administrative Code § 8–107 ......................................... 1, 25, 26, 27

## RULES

Fed. R. Civ. P. 56........................................................................................ 14, 15

## OTHER AUTHORITIES

Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 ............................... 24, 25

## I.    <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Representative Plaintiffs Cristina Chen-Oster, Shanna Orlich, Allison Gamba, and Mary
De Luis ("Plaintiffs") respectfully submit this memorandum of law in support of their motion for
summary judgment on the *prima facie* case of Plaintiffs' class gender discrimination claim.
Plaintiffs' claim that three employment practices of Defendants Goldman, Sachs & Co. and the
Goldman Sachs Group (collectively "Goldman") cause a disparate impact on women in violation
of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the
New York City Human Rights Law, Administrative Code of the City of New York § 8-107 *et
seq.* ("NYCHRL"): (1) a 360 Performance Review; (2) Manager Quartiling (also known as
"forced ranking"); and (3) "cross-ruffing" for promotion decisions (together, the "Challenged
Employment Practices").[1]  As to Goldman's 360 Review and Manager Quartiling practices,
Plaintiffs move for summary judgment on their claim that these practices caused a disparate
impact from the start of the Class Period through the end of 2015.  As to Goldman's promotion
practice, Plaintiffs move for summary judgment on their claim that this practice caused a
disparate impact for the entire Class Period (*i.e.*, through the present).

Although Plaintiffs maintain all of their claims, Plaintiffs focus this pre-trial Motion
narrowly on the *prima facie* case of disparate impact, where there are no material facts in dispute

---

[1]    In its decision to certify the Class pursuant to Rule 23(b)(3), this Court found that these
three employment practices were the basis for Plaintiffs' compensation, evaluation, and
promotion claims. *See Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 64-66 (2018).  The
Court certified this Class of female Associates and Vice Presidents for claims under both Title
VII and the NYCHRL.  *See id.* at 63 (recognizing the three Class Divisions and the Class Period
for employees in the United States "from September 10, 2004 through the resolution of this
action," and for employees in New York City "from July 7, 2002 through the resolution of this
action").

that preclude a summary determination.[2]  Awarding judgment as a matter of law on this discrete but important element will significantly streamline the trial and avoid unnecessary testimony and mid-trial motion practice on issues that can be adjudicated now.  By addressing this motion now, the Court and/or jury will be able hereafter to focus on the disputed issues of Goldman's knowledge or intent (for the disparate treatment claim) as well as on the job-relatedness and business necessity of the Challenged Employment Practices and/or the less discriminatory alternatives (for steps two and three of the disparate impact claim).

In order to establish a *prima facie* case of disparate impact, Plaintiffs must prove by a preponderance of the evidence that the challenged practices have caused a disparate impact on the basis of sex.  42 U.S.C. § 2000e-2(k)(1)(A)(ii); *Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147, 160 (2d Cir. 2001).  Plaintiffs amply meet that standard.  "[S]tatistical proof almost always occupies center stage in a *prima facie* showing of a disparate impact claim." *Robinson,* 267 F.3d at 160.  As described herein, Plaintiffs' statistical proof is overwhelming. The reports and testimony of Plaintiffs' labor economist expert, Dr. Henry S. Farber—the Hughes-Rogers Professor of Economics at Princeton University, who analyzed the personnel data provided by Goldman—establish conclusively that Class members fare far worse than men with the same relevant characteristics, to a statistically significant degree, in each of the three Challenged Employment Practices.  This is enough to establish a *prima facie* case of disparate impact.  *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1987); *Robinson*, 267 F.3d at 160.

---

[2]      Plaintiffs are not moving for summary judgment on their disparate treatment claim, nor on the additional elements—business necessity/job relatedness and less discriminatory alternatives—of their disparate impact claim.

Goldman does not rebut Plaintiffs' *prima face* case.  Goldman's labor economist expert, Dr. Kathryn Shaw, concedes that there is a statistically significant gender pay gap caused by the Challenged Employment Practices.  In order to save Goldman from the inevitable conclusion that this constitutes a *prima facie* case of disparate impact, Dr. Shaw invents a different legal standard for Plaintiffs to clear that does not exist under Title VII or the NYCHRL—the manufactured requirement of *identical impact* on each Class Member.  That is, according to Dr. Shaw, there is no unlawful gender discrimination unless each class member's regression point estimation is negative, even if the overall effects are biased against women.  There is no basis for the Court to apply this non-existent requirement.  Under well-established law, a plaintiff's statistics must be "of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity."  *Chin v. Port Auth. Of N.Y. and N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (quoting *Robinson*, 267 F.3d at 160).  Here, the undisputed statistics establish precisely that relationship, which is what is required to "establish[] a disparate impact violation." *Id*.

After more than ten years of litigation, including multiple rounds of depositions and expert reports, the record establishes that Plaintiffs have met their *prima facie* burden of proving that the Challenged Employment Practices cause an adverse impact on the Class under both Title VII and the NYCHRL.  The Court should grant summary judgment on this element.

## II.   RELEVANT FACTS[3]

### A.   Goldman Employs the Challenged Employment Practices Firm-Wide.

#### 1.   Performance Reviews



Pls. SOF ¶ 1.[4]                                                                                    *Id.*

##### a.   The 360 Review

Pls. SOF ¶ 2.[5]

*Id.* ¶ 3.[6]

---

[3]      Pursuant to Local Rule 56.1, Plaintiffs have filed with this motion a separate Statement of Material Facts in Support of Motion for Summary Judgment on Plaintiffs' *Prima Facie* Case of Disparate Impact Pursuant to Local Civil Rule 56.1 ("Pls. SOF") with references to sources in the record for evidence supporting each material fact.  Also, pursuant to Judge Torres's Special Rules for Summary Judgment Motions, citations to the record evidence are incorporated herein.

[4]      *See* Deposition of Jessica Kung, July 31 & August 1, 2013 ("Kung Tr.") at 30:5-16; 278:16-279:12; Deposition of Caroline Heller-Sherloti, July 10 & 11, 2013 ("Heller-Sberloti Tr.") at 79:18-21; 264:19-266:21; Deposition of Bruce Larson, June 12, 2013 ("Larson Tr.") at 69:23-70:6; 167:20-168:1; Deposition of David Landman, October 10, 2013 ("Landman II Tr.") at 8:10-15; Declaration of David Landman, October 13, 2017 ("2017 Landman Declaration") at ¶ 2; Deposition of Anilu Vazquez-Ubarri, August 13, 2020 ("Vazquez-Ubarri Tr.") at 131:4-15; GS0380249 at -249.

[5]      *See* Kung Tr. at 280:22-283:22; GS0098769 at -770.

[6]      *See* GS0003383 at -387; GS0120172 at -177; Kung Tr. at 305:14-18, 307:2-8; GS0120195 at -209; GS0121383 at -388; GS0120828 at -833; GS0110583 at -591; GS0110603 at -611.

                                                                        Pls. SOF ¶ 4 (citing GS0003383 at -387; GS0120172 at -177; Kung Tr. at 305:14-18, 307:2-8; GS0120195 at -209; GS0121383 at -388; GS0120828 at -833; GS0110583 at -591; GS0110603 at -611).

*Id.* ¶ 5.[7]



*Id.* ¶ 6.[8]

*Id.* ¶ 7.[9]

        **b.**   **Manager Quartiling**

Pls. SOF ¶ 8.[10]

*Id.* ¶ 9.[11]

*Id.* ¶ 10.[12]

---

[7]    *See* Kung Tr. at 311:6-314:25; 2017 Landman Declaration at ¶¶ 6-8, 11.

[8]    *See* Kung Tr. at 305:14-306:2; GS0005283 at -285; Shaw March 19, 2021 Report at ¶ 98; Farber January 15, 2021 Report at ¶¶ 29, 32.

[9]    *See* GS0155193 at -193; GS0153032 at -032; GS0153290 at -290; GS0109353 at -355; GS0109390 at -391; GS0126057 at -058; GS0136548 at -549; GS0153035 at -036; GS0450859 at -860-61; GS0153476 at -480; GS0484728; GS0637321 at -321; GS0637303 at -304; GS0440622 at -623-24; GS0456223 at -224-25; Vazquez-Ubarri Tr. at 131:4-132:15 (▮▮▮▮▮▮▮▮▮▮▮).

[10]   *See* Kung Tr. at 29:6-19, 316:15-317:2, 317:7-24; Larson Tr. at 182:16-183:22; Landman II Tr. at 9:12-10:13.

[11]   GS0153476 at -478, -485.

[12]   *See* GS0153290 at -290; GS0109353 at -355.



*Id.* ¶ 11.[13]

*Id.* ¶ 12.[14]

### 2. **Cross-Ruffing**

Pls. SOF ¶ 13.[15]  The process occurs in two steps.

*Id.* ¶ 14.[16]

*Id.* ¶ 15.[17]

*Id.* ¶ 16.[18]

---

[13]     *See* GS0153290 at -290; GS0109353 at -355.

[14]     *See* GS0155193 at -194; GS0153032 at -033; GS0113858 at -860; GS0123223 at -224; GS0123267 at -268; GS0123295 at -296.

[15]     *See* Kung Tr. at 398:11-21; Heller-Sberloti Tr. at 80:10-21, 213:25-214:8; Larson Tr. at 226:21-228:4; *see also* GS0113568 at -573-76; GS0113548 at -552-57; GS0109256 at -259-63; GS0109329 at -332-37; GS0109273 at -276-84; GS0109299 at -302-08; GS0004990 at -993-99; GS0004777 at -781-88; GS0003547 at -550-57; GS0004705 at -708-16; GS0109235 at -238-45; GS0375517 at -520-27; GS0375294 at -297-305; GS0375741 at -744-46; GS0375264 at -265-68.

[16]     *See* GS0215973 at -973-74; GS0164972 at -972; GS0113568 at -583-87; GS0113548 at -564-67; GS0109256 at -270-72; GS0109329 at -344-48; GS0109273 at -295-98; GS0109299 at -320-21; GS0004990 at -5009-10; GS0004777 at -779-80; GS0003547 at -549; GS0004705 at -707; GS0109235 at -237; GS0375517 at -519; GS0375294 at -296; GS0375741 at -748; GS0375264 at -270.

[17]     *See* GS0215973 at -973-74; GS0164972 at -972; GS0113568 at -583-87; GS0113548 at -564-67; GS0109256 at -270-72; GS0109329 at -344-48; GS0109273 at -295-98; GS0109299 at -320-21; GS0004990 at -5009-10; GS0004777 at -779-80; GS0003547 at -549; GS0004705 at -707; GS0109235 at -237; GS0375517 at -519; GS0375294 at -296; GS0375741 at -748; GS0375264 at -270.

[18]     *See* GS0215973 at -973-74; GS0164972 at -972; GS0113568 at -583-87; GS0113548 at -564-67; GS0109256 at -270-72; GS0109329 at -344-48; GS0109273 at -295-98; GS0109299 at -320-21; GS0004990 at -5009-10; GS0004777 at -779-80; GS0003547 at -549; GS0004705 at -707; GS0109235 at -237; GS0375517 at -519; GS0375294 at -296; GS0375741 at -748; GS0375264 at -270.



*Id.* ¶ 17.[19]

*Id.* ¶ 18.[20]

*Id.* ¶ 19.[21]

*Id.* ¶ 20.[22]

*Id.* ¶ 21.[23]

*Id.* ¶ 22.[24]

### B.    **The Challenged Employment Practices Disadvantage Women.**

Goldman's performance review practices have systematically disadvantaged female

Associates and Vice Presidents across the Class Divisions.  Goldman's cross-ruffing process has

---

[19]    *See* Kung Tr. at 399:6-24; Larson Tr. at 240:10-21; Heller-Sberloti Tr. at 214:9-215:4.
[20]    *See* Kung Tr. 439:25-440:9 ("█████████████████████████████████████████████
█████████████████████"); Heller-Sberloti Tr. 218:8-19 (███████████████████████████

███████████████████████████████"); Larson Tr. at 242:5-11,
242:24-243:4 (cross-ruffers ██████████████████████████████████████
███████████████████████████████").
[21]    *See* GS0375264 at -265, -268; GS0375741 at -744,  -746; GS0375294 at -298,  -305;
GS0004705 at -709, -716; GS0004990 at -993, -999; GS0109256 at -259, -263; GS0109329 at -
337; GS0113548 at -566.
[22]    *See* GS0113548 at -566; Larson Tr. at 244:14-20.
[23]    *See* GS0113548 at -566; Larson Tr. at 246:20-247:5.
[24]    *See* Larson Tr. at 247:24-248:8; Kung Tr. at 453:13-23; Heller-Sberloti Tr. at 230:6-9;
GS0164972 at -972.

systematically disadvantaged female Vice Presidents across the Class Divisions.  Plaintiffs' labor economist expert, Dr. Farber, analyzed Goldman's personnel and payroll data, and found that Class Members are adversely impacted in each of the three Challenged Employment Practices as compared to similarly situated male colleagues.

**1.**    **Goldman's performance review practices adversely impact women.**

Dr. Farber used a generally accepted econometric method—multivariate regression modeling—to investigate how comparable men and women fare in the 360 Review and Manager Quartile processes.  Pls. SOF ¶ 23.[25]  Multivariate regression models allow one to control for relevant worker characteristics in the data that may affect the outcome (that is, to only compare people against others who have the same seniority, education, prior experience, etc.), while then measuring the residual gender differences in scores.  *Id.* ¶ 24.[26]

**360 Review:** Dr. Farber found statistical evidence of adverse impact against Class Members in the 360 Review from 2002 to 2015.  Pls. SOF ¶ 25.[27]  The data show that for Associates, mean scores are lower for women than for men in every year except 2008, when they are the same as men's scores.  *Id.* ¶ 26[28]  For Vice Presidents, mean scores are lower for women in every year.  *Id.* ¶ 27.[29]  Dr. Farber studied whether the gender differences in scores could be explained by relevant worker characteristics, including division, business unit, year, location, education, prior work experience, tenure at Goldman, AAP job group, and direct or lateral hire status.  *Id.* ¶ 28.[30]  After controlling for all of these factors in a multivariate regression model,

---

[25]    Farber January 15, 2021 Report at ¶ 77, Tables 7 & 8.
[26]    Farber January 15, 2021 Report at ¶ 77.
[27]    Farber January 15, 2021 Report at ¶¶ 86-90, Tables 11 & 12.
[28]    Farber January 15, 2021 Report at ¶¶ 86, 89, Table 11.
[29]    Farber January 15, 2021 Report at ¶ 90, Table 12.
[30]    Farber January 15, 2021 Report at ¶¶ 88, 95.

female Associates received demonstrably lower ratings.  *Id.* ¶ 29.[31]  For the time period 2003-2009 (when Goldman had a 5-point rating scale), the gender difference was statistically significant at the level of 4.16 standard deviations; and for the period 2010-2015 (when there was a 9-point scale), the gender difference was statistically significant at the level of 4.13 standard deviations.  *Id.* ¶¶ 30-31.[32]  Female Vice Presidents were also rated lower on the 360 Review at a statistically significant level of 5.28 standard deviations (years 2003-2009) and 5.17 standard deviations (years 2010-2015).  *Id.* ¶ 32.[33]

**Manager Quartile:** Dr. Farber found statistical evidence of adverse impact against Class Members in the Manager Quartile from 2002 to 2015.  Pls. SOF ¶  33.[34]  First, the data show that among Associates, 28.2% of men received a top quartile score, as opposed to 25.8% of women; among Vice Presidents, 27.4% of men received a top quartile score, as opposed to 25.6% of women.  *Id.* ¶ 34.[35]  Using a chi-squared test of independence of gender and quartile placement,[36] Dr. Farber found a statistically significant relationship at the 5% level between gender and quartile placement for both Associates and Vice Presidents.  *Id.* ¶ 36.[37]

---

[31]     Farber January 15, 2021 Report at ¶¶ 8, 10.
[32]     Farber January 15, 2021 Report at Table 11.
[33]     Farber January 15, 2021 Report at Table 12; *see also* GS0621389 at -390, -395-97. Goldman did not produce 360 data for the year 2002 due to data retention issues but agreed not to contest the representativeness of the data for the earlier time period.  *See* ECF No. 159 at 40.
[34]     Farber January 15, 2021 Report at ¶ 10.
[35]     Farber January 15, 2021 Report at ¶ 76.
[36]     A chi-squared test of independence determines whether there is an association between categorical variables.  Pls. SOF  ¶ 35 (citing Farber January 15, 2021 Report at ¶ 76, n.71).
[37]     Farber January 15, 2021 Report at ¶ 76.

Dr. Farber then tested whether the difference in top quartile placement could be explained by relevant worker characteristics. *Id.* ¶ 37.[38] Using a probit regression model,[39] Dr. Farber controlled for division, business unit, year, location, education, prior work experience, tenure at Goldman, AAP job group, and direct or lateral hire. *Id.* ¶ 38.[40] Accounting for all these factors, female Associates were 3.4% less likely to be in the top quartile than men with the same characteristics, and female Vice Presidents were 3.6% less likely. *Id.* ¶ 39.[41] Both gender gaps are statistically significant at the 5% level, with standard deviations of 2.9 and 3.2, respectively. *Id.* ¶ 40.[42]

Notably, ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ *Id.* ¶¶ 41, 41 n. 3.[43]

████████████████████████████████████████████████████████

*Id.* ¶42.[44]

---

[38]   Farber January 15, 2021 Report at ¶ 77.

[39]   A probit regression model is a type of multivariate statistical model appropriate when there are two discrete outcomes, such as top quartile placement or not top quartile placement. Pls. SOF ¶ 38 n.2 (citing Farber January 15, 2021 Report ¶ 126).

[40]   Farber January 15, 2021 Report at ¶ 77.

[41]   Farber January 15, 2021 Report at ¶¶ 82-83.

[42]   Farber January 15, 2021 Report at ¶¶ 82-83 & Tables 7 &8.

[43]   *See* GS0918243 at -257 & -272. ████████████████████████

   *See* GS0176436 at -438 ("█████████████████████████████████

   ██ ).

[44]   *See* GS0155193 at -194; GS0153032 at -033; citing GS0113858 at -860; GS0123223 at -224; GS0123267 at -268; GS0123295 at -296.

### 2.   The adverse impact in performance reviews results in lower compensation for women.

Goldman pays female Associates and Vice Presidents substantially less than their comparable male counterparts, and that difference is statistically significant using an appropriately specified model that controls for relevant factors that make apples to apples comparisons possible.  Pls. SOF ¶ 43-44.[45]  Dr. Farber's regression analysis shows that Goldman pays its female Vice Presidents, on average, 14% less than it pays comparable male Vice Presidents, with a standard deviation of 9.9.  *Id.* ¶ 46.[46]  Goldman pays its female Associates, on average, 4% less than it pays its comparable male Associates, with a standard deviation of 4.6.  *Id.* ¶ 47.[47]

The disparities between how women and men fare in the 360 Review and quartiling processes directly contribute to this gender pay gap.  *Id.* ¶ 48.[48]  Dr. Farber found that 54% of the observed compensation shortfall between female and male Associates and 40% of the observed compensation shortfall between female and male Vice Presidents is attributable to differences in how women and men are evaluated in the 360 Review and quartiling processes.  *Id.* ¶ 49.[49]  This translates to a substantial amount of lost income.  For Associates, this amounts to almost $19

---

[45]   Farber April 19, 2021 Rebuttal Report ("Farber April 19, 2021 Reply Report") at ¶ 4. Specifically, Dr. Farber's pay regression controlled for education, prior work experience, division, business unit, job function, AAP job group, location, whether the employee is a lateral hire, and year.  Pls. SOF ¶ 45 (citing Farber April 19, 2021 Reply Report at ¶ 4).

[46]   Farber April 19, 2021 Reply Report at Table 2, Model 3 + Division Function, Excluding SSPWA's.

[47]   Farber April 19, 2021 Reply Report at Table 1, Model 3 + Division Function, Excluding SSPWA's

[48]   Farber April 19, 2021 Reply Report at ¶ 10-12.

[49]   Farber April 19, 2021 Reply Report at ¶¶ 12, 37, 41.

million in lost earnings directly attributable to the 360 Review and Manager Quartile, and $201.5 million for Vice Presidents. *Id.* ¶ 50.[50]

Critically, Goldman's expert Dr. Kathryn Shaw concedes both that there is a statistically significant gender pay gap at Goldman Sachs, and that the 360 Review and Manager Quartile are a major cause of it. *Id.* ¶ 51.[51]  In Exhibit 68 of her expert report dated March 19, 2021, Dr. Shaw presents a comparison of the results of Dr. Farber's model and her models. *Id.* ¶ 52.[52] Even when Dr. Shaw wrongly disaggregates by division, and adds every single control variable that she advocates for (even if inappropriate), she *still* finds gender pay gaps of 1.89% for Associates and 9.47% for Vice Presidents, and these pay gaps are statistically significant at the 5% level. *Id.* ¶¶ 53-54.[53]  Dr. Shaw next adds controls for 360 Review Scores and Manager Quartile ranks, and finds that the pay gap is reduced by 1.7% for Associates and 4.36% for Vice Presidents. *Id.* ¶ 55.[54]  In other words, Goldman's statistical expert confirms that the 360 Review Score and Manager Quartile account for almost all of the Associate pay gap and more than 50% of the Vice President pay gap. *Id.* ¶ 56.[55]  Thus, both parties' experts agree that the 360 Review and Manager Quartiling practices result in lower compensation for women. *Id.* ¶ 57.[56]

---

[50]    Farber April 19, 2021 Reply Report at Table 17, Model 3 + Division Function Controls, Damages Explained By Performance Metrics, Full Sample.
[51]    Shaw March 19, 2021 Report at Table 68.
[52]    Shaw March 19, 2021 Report at Table 68.
[53]    Shaw March 19, 2021 Report at Table 68, Rows 4 & 9.
[54]    Shaw March 19, 2021 Report at Table 68 Rows 5 & 10.
[55]    Shaw March 19, 2021 Report at Table 68.
[56]    *See* Shaw March 19, 2021 Report at Table 68; Farber April 19, 2021 Reply Report at ¶¶ 10-12.

### 3.      Goldman's cross-ruffing process adversely impacts women.

The statistical evidence also shows that Goldman's cross-ruffing process has disadvantaged female Vice Presidents throughout the Class Period.  Pls. SOF ¶ 58.[57]

Because promotion is a discrete event with two possible outcomes (promoted or not), Dr. Farber used a properly specified probit regression model to calculate the likelihood of an employee being promoted, controlling for number of years as Vice President, division, location, education, tenure at Goldman, prior work experience, AAP job group, direct or lateral hire status, and the year.  *Id.* ¶ 59.[58]  With this model, Dr. Farber estimated a benchmark promotion model for males only and used the resulting coefficients to predict the promotion probabilities for females using the observed characteristics (education, experience, etc.).  *Id.* ¶ 60.[59]  The result is the number of women one would have expected to be promoted if a woman with a given set of characteristics had the same probability of promotion as a man with those same characteristics.  *Id.* ¶ 61.[60]  The analysis shows that female Vice Presidents were promoted 27 fewer times over the Class Period than would be expected had they been promoted at the same rate as comparable men, and the results are statistically significant at the 5% level.  *Id.* ¶ 62.[61]

Dr. Shaw does not contest the accuracy of these findings.   Instead, she inappropriately splits the promotions process into two separate sub-processes and analyzes each separately, in a way that limits statistical power and contradicts the requirements of Title VII and the NYCHRL.  *Id.* ¶ 63.[62]

---

[57]      Farber January 15, 2021 Report at ¶ 135.  2018 is the last year for which Goldman Sachs has produced data in this litigation. Plaintiffs' promotion claim covers 2002 to the present.
[58]      Farber January 15, 2021 Report at ¶ 126.
[59]      Farber January 15, 2021 Report at ¶ 128.
[60]      Farber January 15, 2021 Report at ¶¶ 128-130.
[61]      Farber April 19, 2021 Reply Report at Table 14 & ¶ 86.
[62]      Shaw March 19, 2021 Report at ¶¶ 234, 326.

As promotion at Goldman is fairly rare—the promotion rate among male Vice Presidents is only 3.87% on average per year, and 3.08% for women—a shortfall of 27 promotions is not just statistically significant, but also practically meaningful.  *Id.* ¶ 64.[63]  Goldman's discriminatory promotion processes results in a dearth of women in leadership positions at the Firm. ███████████████████████████████████████████████████████████████



███████████████████████████████████████████ *Id.* ¶ 65.[64] ████████

████████████████████████████████████████████████████████████████████████

██ *Id.* ¶ 66.[65] ██████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.* ¶ 67.[66]

The data provided by Goldman show unequivocally that women do worse in performance reviews, are paid less, and are promoted less often than men with the same relevant characteristics.

---

[63]     Farber January 15, 2021 Report at Table 24.
[64]     GS0204773 at -773 ("████████████████████████████████████████████████").
[65]     *See* GS0954173 at -173.006 ("██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); GS1013182 at -192 (minutes from 2015 Board of Directors meeting: "████████████████████████████████████████████████████████████████████████████████████████████████████"); GS0493421 at -426 ("████████████████████████████████"); *id.* at -430 ("████████████████████████████████████████████"); GS0249588 at -627 (█████████████████████████████); GS0219988 at -016 ("███████████████████████████████████").
[66]     GS0176436 at -439 ("████████████████████████████████████████████████████████████████████████").

III.   **LEGAL STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To survive summary judgment "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted).  "Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  A "material fact is one that would 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs if the evidence is such that 'a reasonable [factfinder] could return a verdict for the nonmoving party.'"  *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 224 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also R.B. Ventures. Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997); *Rothenberger v. N.Y. City Police Dep't*, No. 6 Civ. 868, 2008 WL 2435563 at *6 (E.D.N.Y. Jun. 16, 2008).

Summary judgment can be granted even when there is competing expert testimony. *Raskin v. Wyatt Co.*, 125 F.3d 55, 66-67 (2d Cir. 1997).  This is because a district court must exercise its "gatekeeper" function and disregard expert opinions "that are without factual basis and are based on speculation or conjecture."  *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).  Thus, the Second Circuit consistently holds that summary judgment may be warranted in cases in which both parties introduce expert opinions, but the district court determines that the opinions of one party's experts are irrelevant or unreliable and thus fail to create a material issue of fact. *See, e.g.*, *Raskin*, 125 F.3d at 67-68 (affirming summary judgment because expert's report "lack[ed] probative value"); *In re*

*Omicron Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512-13 (2d Cir. 2010) (expert's testimony was

"unsustainable" and "irrelevant"); *Major League Baseball Properties, Inc.*, 542 F.3d at 311

(expert's report was "entirely conclusory").

## IV.   ARGUMENT

### A.   Summary Judgment Should Be Granted on Plaintiffs' Title VII *Prima Facie* Case.

Title VII's prohibition against disparate impact encompasses employment practices that,

although "fair in form," are "discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S.

424, 431 (1971).  Title VII requires "the removal of employment obstacles, not required by

business necessity, which create built-in headwinds and freeze out protected groups from job

opportunities and advancement." *Robinson*, 267 F.3d at 160 (quoting *EEOC v. Joe's Stone

Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000)).  Unlike disparate treatment claims, disparate

impact claims are concerned with whether employment practices "had a disparate effect on the

protected group" regardless of the subjective intent of the employer. *Robinson*,  267 F.3d at 160

(citing *Griggs*, 401 U.S. at 432).

The burdens of proof in a disparate impact case are set forth in Section 703(k) of Title

VII, as amended by Congress in 1991, 42 U.S.C. § 2000e-2(k).  To establish a *prima facie* case

of disparate impact, plaintiffs must demonstrate that the employer "uses a particular employment

practice that causes a disparate impact on the basis of race, color, religion, sex, or national

origin[.]" *Id.* § 2000e-2(k)(1)(A)(i).  This standard requires plaintiffs to "identify[] the specific

employment practice that is challenged" and then "offer statistical evidence of a kind and degree

sufficient to show that the practice in question has caused the exclusion of applicants for jobs or

promotions because of their membership in a protected group." *Watson v. Fort Worth Bank &

Trust*, 487 U.S. 977, 994 (1987); *see also Robinson*, 267 F.3d at 160 (same).  "The statistics must

reveal that the disparity is substantial or significant, and must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity." *Chin*, 685 F.3d at 151 (quoting *Robinson*, 267 F.3d at 160).

Disparate impact under Title VII requires a showing of statistically significant differences in outcomes relevant to the claims in the case. *See Guardians Ass'n v. Civil Serv. Comm'n of New York*, 630 F.2d 79, 86 (2d Cir. 1980) (citing *Castaneda v. Partida*, 430 U.S. 482, at 496 n.17 (1977)). Under this approach, a plaintiff can make out a *prima facie* case of disparate impact by showing a statistically significant disparity of two standard deviations or more. *See Smith v. Xerox Corp.*, 196 F.3d 358, 366 (2d Cir. 1999) (internal citations omitted) ("If an obtained result varies from the expected result by two standard deviations, there is only about a 5% probability that the variance is due to chance. Courts generally consider this level of significance sufficient to warrant an inference of discrimination."), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006); *Malave v. Potter*, 320 F.3d 321, 327 (2d Cir. 2003) (internal citations and quotation marks omitted) (noting that courts generally consider disparities of two standard deviations or more "sufficient to warrant an inference of discrimination").

### 1. Plaintiffs have satisfied their *prima facie* burden as to 360 Reviews and Manager Quartiling.

Plaintiffs have shown that the 360 Review and Manager Quartile cause an adverse impact on the Class.

Using a generally accepted statistical method and appropriate model specifications, Dr. Farber's analyses show that in the 360 Review, female Associates were rated lower at a statistically significant level of 4.16 standard deviations (across the 5-point system of years 2003-2009) and 4.13 standard deviations (across the 9-point system of years 2010-2015). Pls.

SOF ¶¶ 30-31.[67]  Female Vice Presidents were rated lower on the 360 Review at a statistically significant level of 5.28 standard deviations (years 2003-2009) and 5.17 standard deviations (years 2010-2015).  *Id.* ¶ 32.[68]  In Manager Quartiling, female Associates were 3.4% less likely, and female Vice Presidents were 3.6% less likely, to be in the top quartile than men with the same characteristics.  *Id.* ¶ 39.[69]  Both gender quartiling gaps are statistically significant at the 5% level, with standard deviations of 2.9 and 3.2, respectively.  *Id.* ¶ 40.[70]

All analyses exceed the threshold of two standard deviations that courts routinely accept as probative evidence of discrimination.  Thus, Plaintiffs have presented statistical evidence of a kind and degree from which causation may be inferred as a matter of law.  *See Watson*, 487 U.S. at 994-95 (holding statistical evidence must be "of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.").  The statistical disparities here are "sufficiently substantial to raise an inference of causation."  *Smith*, 196 F.3d at 365 (citing *Watson*, 487 U.S. at 994-95); *see also Robinson*, 267 F.3d at 160 (same).

Courts have granted summary judgment based on the same proof Plaintiffs submit here. For example, in *Easterling v. Connecticut*, the court granted plaintiffs' motion for summary judgment on their *prima facie* case of disparate impact based on statistical evidence showing that the challenged fitness test "yielded statistically significant gender disparities in outcome."  783 F. Supp. 2d 323, 333 (D. Conn. 2011).  Because the statistical showing of more than four standard deviations there exceeded the two-deviation benchmark, the court held that the evidence

---

[67]     Farber January 15, 2021 Report at Table 11.
[68]     Farber January 15, 2021 Report at Table 12; *see also* GS0621389 at -390, -395-97.
[69]     Farber January 15, 2021 Report at ¶¶ 82-83.
[70]     Farber January 15, 2021 Report at ¶¶ 82-83 & Tables 7 &8.

supported the inference that the fitness test caused a disparate impact on female applicants. *Id*. Likewise, in *U.S. v. City of New York*, the court granted summary judgment for plaintiffs on their *prima facie* case of disparate impact based on a showing of racial disparity in test scores. 637 F. Supp. 2d 77, 79 (E.D.N.Y. 2009). Specifically, the court found that "[t]he calculated standard deviations in this case are well beyond 2 to 3 units, strongly supporting a conclusion of a causal relationship between the observed disparities and the employment practices at issue." *Id*. at 94.

Furthermore, Plaintiffs here also present direct evidence of causation. There is no dispute that the 360 Review Score and Manager Quartile rank were explicitly used to make compensation decisions across the entire company from 2002 through 2015. And Dr. Farber's analysis of the relationship of the performance review processes to compensation shows that between 54% (Associates) and 40% (Vice Presidents) of the overall gender pay gap is caused by the differences between men and women in performance reviews. Thus, there is direct evidence that the performance review practices caused a disparate impact in pay for female Associates and Vice Presidents.

Goldman relies on the March 19, 2021 Report of Dr. Kathryn Shaw to rebut Dr. Farber's findings. However, even under Dr. Shaw's most conservative models, she still found a statistically significant gender pay gap.[71] She further found that the 360 Review and Manager Quartile scores explain almost 100% of the pay gap for Associates, and explain over 50% of the pay gap for Vice Presidents.[72] Thus, no matter which expert is considered, Plaintiffs' *prima facie* case is unrebutted.

---

[71]   Shaw March 19, 2021 Report at Table 68, Rows 4 & 9.
[72]   Shaw March 19, 2021 Report at Table 68, Rows 5 & 10.

To be sure, Plaintiffs have set forth in extensive detail why Dr. Shaw's modeling decisions, such as disaggregating by division and controlling for production metrics, are unreliable and wrong.  *See* Plaintiffs' *Daubert* Motion (ECF No. 1191) at pp. 5-19.  The Court may elect to resolve these expert statistical criticisms at the summary judgment stage.  In *NAACP v. North Hudson Regional Fire and Rescue*, the court analyzed the parties' experts' competing statistical models, found that the defense expert's model was based on an assumption "unsupported by the evidence," and held that the plaintiffs met their burden at summary judgment by showing a disparity "sufficiently substantial to support an inference of causation." 742 F. Supp. 2d 501, 520-21 (D.N.J. 2010), *aff'd sub nom. NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 479 (3d Cir. 2011).  Likewise, in *Easterling*, the court granted summary judgment on plaintiff's *prima facie* case of disparate impact and resolved a dispute over the proper level of statistical aggregation.  783 F. Supp. 2d at 328, 334-35.  There, plaintiffs' expert showed that a physical fitness test caused a disparate impact on female applicants for one position, but the defendant's expert argued that the proper statistical analysis should have included applicants across *all positions*.  The court rejected the defendant's model of aggregation, which did not fit the case, and granted summary judgment for plaintiffs.  *Id*. at 335; *see also EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 164 F.3d 89, 96 (2d Cir. 1998) (affirming finding that plaintiff met *prima facie* case of disparate impact after resolving competing expert analyses in favor of plaintiff and finding that defendants "proposed statistical approach [is] inapposite"); *Major League Baseball Properties, Inc.*, 542 F.3d at 311-12 (holding that at summary judgment stage, experts should be scrutinized and upholding lower court's finding that expert's "conclusory opinions" had "no basis for denying summary judgment"); *United States v. City of Warren*, 759 F. Supp. 355, 360-62 (E.D. Mich. 1991)

(granting summary judgment for plaintiffs after analyzing parties' expert conclusions on statistical evidence of disparate impact, and dismissing defendant's argument that plaintiffs' "statistical data is 'flawed'").

Alternatively, the Court does not have to reject Goldman's expert or decide that Plaintiffs' expert's model is better in order to find in favor of Plaintiffs now. The uncontroverted evidence shows that Plaintiffs have met their *prima facie* case because under both experts' models there is a statistically significant pay gap caused by the challenged practices. *See City of New York*, 637 F.Supp.2d at 94 (where defendant's expert admitted the disparity caused by the challenged practices was statistically significant, "these admissions eliminate the existence of any factual dispute over the *prima facie* case").

Dr. Shaw's only answer to this irrevocable conclusion is that Plaintiffs' case fails because it is not enough to show a statistical pattern of average gender differences; instead, Plaintiffs must show that the challenged processes have the same effect on every Class member.[73] There is simply no basis in law for this contrived requirement. Every single seminal Title VII case examining Plaintiffs' burden of proof in a disparate impact case has relied on the same type of statistical regression analysis that Plaintiffs present here, which by its nature is designed to show average effects on a protected group. *See, e.g.*, *Washington v. Davis*, 426 U.S. 229 at 246-47 (1976) (explaining that discriminatory intent need not be proven in disparate impact case when "hiring and promotion practices disqualify[] substantially disproportionate number of blacks"); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975) (holding that plaintiffs were required to show "that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants."); *Griggs*, 401 U.S. at 426 (examining

---

[73]     Shaw March 19, 2021 Report ¶¶ 31, 109, & Ex. 23.

requirements that operated to disqualify black applicants "at a substantially higher rate than white applicants"); *see also* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression, in Reference Manual on Scientific Evidence* (3d ed. 2011) 303, 334 ("Multiple regression analysis . . . is a method in which a regression line is used to relate the *average* of one variable—the dependent variable—to the values of other explanatory variables." (emphasis added)) & 339-40 (explaining that the measure of sex discrimination in pay is defined as the difference between the average compensation of men and the average compensation of women (the dependent variable) while controlling for relevant characteristics (independent variables)).  There is no authority for imposing a heightened requirement for a more granular, individual-by-individual or manager-by-manager showing, which would destroy the ability of a regression analysis to detect any pattern of discrimination.

In sum, there is no genuine issue of material fact that Goldman's 360 Review and Manager Quartile practices cause a disparate impact on the Class.  The Court should accordingly grant summary judgment on Plaintiffs' *prima facie* case of disparate impact as to these practices.

### 2.   Plaintiffs have satisfied their *prima facie* case as to cross-ruffing.

Plaintiffs have also shown that the cross-ruffing practice causes an adverse impact on Vice Presidents in the Class from 2002 to the present.

Again, using a standard generally accepted statistical method, Dr. Farber's analysis shows that female Vice Presidents were promoted 27 fewer times over the Class Period than would be expected had they been promoted at the same rate as comparable men, and the results are statistically significant at the 5% level.  Pls. SOF¶ 62.[74]  This finding, too, exceeds the threshold of two standard deviations that courts routinely accept as probative evidence of

---

[74]     Farber April 19, 2021 Reply Report at Table 14 & ¶ 86.

discrimination.  Thus, Plaintiffs have presented "statistical evidence of a kind and degree" from which the Court can infer as a matter of law that the cross-ruffing process causes a disparate impact on female Vice Presidents.  *Watson*, 487 U.S. 994-95; *accord Robinson*, 267 F.3d at 160; *Smith*, 196 F.3d at 365.

Dr. Shaw does not posit that Dr. Farber's model is unreliable or that his results are inaccurate.[75]  Instead, her rebuttal to Dr. Farber's showing is to split the promotion process into two distinct pieces for analysis, separating study of the nomination stage versus the interview stage.  That is, Dr. Shaw performed a regression analysis on whether female Vice Presidents are disadvantaged in terms of who is selected as a candidate for cross-ruffing interviews, and then a separate regression to study whether female candidates that have been nominated are disadvantaged in terms of who is selected for promotion after the interview process is concluded. This disaggregated approach must be rejected as a matter of law because there is no reason to divide a challenged process into subparts for separate analysis.  *See Kirkland v. N.Y. State. Dep't of Corr. Servs.*, 520 F.2d 420, 425 (2d Cir. 1975) (where an overall process has an adverse impact, it is not appropriate to "fractionalize" the process by looking for disparities in sub-parts, because there is "little relevance" where the overall process is the "cumulative result[]" of the sub-parts); *see also* U.S. Equal Emp. Opportunity Comm'n, EEOC-NVTA-1979-1, *Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures* (1979) (stating that "the initial basis for determining the impact

---

[75]     While Dr. Shaw criticized Dr. Farber for using a model that used only promoted men as a benchmark (as opposed to a pool of both promoted men and women), Dr. Farber re-did the analysis in the way Dr. Shaw suggested (even though he disagreed with the criticism), and it did not change his results: he still found a shortfall of 27 promotions.  Farber April 19, 2021 Report ¶¶ 82-87.

of selection procedures" is the "total selection process," i.e. "the combined effect of all selection procedures leading to the final employment decision such as . . . promoting").

Here, the final employment decision at issue is promotion from Vice President to Managing Director, and that decision is a result of both the nomination and interview parts of cross-ruffing. There is simply no justification for analyzing them separately, other than to separate the population into smaller pools to study, which artificially reduces the statistical power of the analysis and makes the pattern impossible to discern.[76]

In sum, Dr. Shaw's decision to split the promotions analysis into subparts is scientifically unsound and plainly inconsistent with the law and thus fails to create a material issue of fact. *See, e.g.*, *N. Hudson Reg'l Fire & Rescue*, 742 F. Supp. 2d at 520-21 (granting summary judgment where expert report relied on flawed assumption); *Joint Apprenticeship Comm.*, 164 F.3d at 96 (expert's "proposed statistical approach [is] inapposite"); *Raskin*, 125 F.3d at 67-68 (expert's report "lack[ed] probative value"); *In re Omicron Grp., Inc. Secs. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (expert's testimony was "unsustainable" and "irrelevant"); *Major League Baseball Properties, Inc.*, 542 F.3d at 311 (expert's report was "entirely conclusory"). Accordingly, the Court should reject Dr. Shaw's response and grant summary judgment on Plaintiffs' *prima facie* case of disparate impact in promotions.

**B.    Summary Judgment Should Be Granted on Plaintiffs' NYCHRL Disparate Impact Claim.**

For Class Members who worked for Goldman in New York City, the civil rights protections provided by local law[77] are distinct and materially stronger than those provided under federal law. Accordingly, even if this Court finds that summary judgment is not appropriate for

---

[76]    Farber April 19, 2021 Reply Report at ¶¶ 77-78.

[77]    *See* Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 ("Restoration Act").

Plaintiffs' Title VII *prima facie* case, summary judgment on Plaintiffs' *prima facie* case of

NYCHRL disparate impact should be granted.

The New York City Restoration Act of 2005 mandates that "the provisions of New York

City's Human Rights Law are to be construed independently from similar or identical provisions

of . . . federal statutes" and more "'liberally.'"[78]  The Second Circuit recognizes this mandate:

"courts must analyze NYCHRL claims separately and independently from any federal and state

law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to

the extent that such a construction is reasonably possible."  *Mihalik v. Credit Agricole Cheuvreux*

*N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citations omitted) (quoting *Albunio v. City of*

*New York*, 947 N.E.2d 135, 137 (N.Y. 2011)); *accord Stinson v. City Univ. of N. Y.*, No. 17 Civ.

3949, 2018 WL 2727886, at *6 (S.D.N.Y. June 6, 2018).  This statutory language undoes years

of rote "parallelism"[79] by courts: the Restoration Act recognizes that the "sense of the Council

[is] that [NYCHRL] has been construed too narrowly to ensure protection of the civil rights of all

persons covered by the law."[80]

With this statutory framework in mind, the critical textual distinctions between Title VII

and NYCHRL's disparate impact legal standards further support a finding that Plaintiffs have

established their *prima facie* disparate impact case under the NYCHRL.

### 1.    The Challenged Employment Practices had an adverse impact on Class Members in violation of the NYCHRL.

To establish an "unlawful discriminatory practice based upon disparate impact" under

New York City Administrative Code § 8-107(17), a plaintiff must show that "a policy or practice

---

[78]    Restoration Act §1 ("[F]ederal and state civil rights laws [are] a floor below which the City's Human Rights law cannot fall . . . .") & § 8-130.

[79]    *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).

[80]    Restoration Act § 1.

. . . or group of policies or practices . . . results in a disparate impact to the determent of" a protected group. *Id.* The language "or group of policies or practices" differs critically from Title VII's legal standard requiring a showing of a particular employment practice as a source of the adverse impact suffered by plaintiffs. *See* N.Y.C. Admin Code § 8-107(17)(a)(2) ("[I]f the commission or such person who may bring an action demonstrates that a group of policies or practices results in a disparate impact, the commission or such person shall not be required to demonstrate which specific policies or practices within the group results in such disparate impact . . . .").

As explained in section II.B *supra*, Plaintiffs' expert Dr. Farber has conclusively shown the adverse impact suffered by Class Members: (1) Goldman rates women lower on the 360 Review than comparable men; (2) Goldman ranks women lower in Manager Quartiling than comparable men, and (3) Goldman promotes female Vice Presidents to Managing Director at a lower rate than it promotes comparable male Vice Presidents. In all cases, the differences are statistically significant above the 5% level using standard generally accepted statistical methods.

Under New York law, once impact has been established, the plaintiff need not show which policies establish impact. *See* N.Y.C. Admin Code § 8-107(17)(a)(2); *see also id.* § 8-107(17)(a)(1) (unlawful disparate impact requires "that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter"); *Richardson v. City of New York*, No. 17 Civ. 9447, 2018 WL 4682224, at *10 (S.D.N.Y. Sept. 28, 2018) ("To the extent the City argues that Plaintiffs were obliged to select one from among the four alleged human resource deficiencies as the source of the disparate impact, the argument is foreclosed by NYCHRL's text, which provides that a plaintiff who "demonstrates that a *group* of policies or practices results in

a disparate impact . . . shall not be required to demonstrate which specific policies or practices within the group results in such disparate impact") (emphasis added) (citing N.Y.C. Admin. Code § 8-107(17)(a)(2)).  Accordingly, the NYCHRL permits a plaintiff to identify a *group* of practices that cause a disparate impact without demonstrating "which specific policies or practices within the group results in such disparate impact."[81]

Importantly, this distinction is underscored by the maxim that the NYCHRL disparate impact standard is more lenient than Title VII.  *See Teasdale v. N.Y.C. Fire Dep't, FDNY*, 574 F. App'x 50, 52 (2d Cir. 2014); *see also Brown v. City of New York*, No. 16 Civ. 1106, 2017 WL 1102677, at *3 (E.D.N.Y. Mar. 23, 2017).  Thus, even if this Court finds that Plaintiffs' *prima facie* proof as to each Challenged Employment Practice does not warrant summary judgment under Title VII, Dr. Farber's well-supported conclusions still supports summary judgment as a matter of law on the *prima facie* case under the NYCHRL.  *See Teasdale v. City of N.Y.*, No. 8-Civ. 1684, 2013 WL 5300699, at *10 (E.D.N.Y. Sept. 18, 2013), *aff'd sub nom. Teasdale*, 574 F. App'x 50 (granting summary judgment on NYCHRL disparate impact claim where non-moving party was unable to make "material or relevant" objections to the moving party's data and statistical showing).

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for summary judgment as to their *prima facie* case of disparate impact discrimination under both Title VII and the NYCHRL.

---

[81]     N.Y.C. Admin. Code § 8-107(17)(a)(2).

Dated: August 9, 2021
New York, NY

By:

_____
Adam T. Klein

Adam T. Klein
Cara E. Greene
Melissa L. Stewart
Christopher M. McNerney
Michael C. Danna
Sabine Jean
Maya S. Jumper
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060

Kelly M. Dermody (*admitted pro hac vice*)
Anne B. Shaver (*admitted pro hac vice*)
Michael Levin-Gesundheit (*admitted pro hac vice*)
Michelle A. Lamy (*admitted pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Rachel Geman
Jessica A. Moldovan
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-9592
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

*Class Counsel*