REDACTED VERSION

# Exhibit 58

# REBUTTAL REPORT OF HENRY FARBER

**IN CONNECTION WITH**

**Chen-Oster v. Goldman Sachs**

**April 19, 2021**

**(as corrected May 11, 2021)**

I. Introduction ....................3
II. Minor Corrections to January 2021 Farber Report ....................9
III. Self-Sustaining Private Wealth Advisors ....................10
IV. Dr. Shaw's Criticisms of Job Controls ....................11
A. AAP Job Groups ....................11
B. Business Units ....................13
C. Division Function ....................15
1. Adding Division Function Controls ....................16
2. Effect of Performance Reviews in a Model with Division Function Controls ....18
V. Disaggregation by Division ....................23
A. The Chow Test ....................23
B. The Effect of Estimating my Compensation Models Separately by Division ........26
VI. Dr. Shaw's Criticisms of Omitted Variable Bias ....................27
A. Production ....................28
B. Controlling for 360 Score in Manager Quartile Regression ....................32
C. Controlling for Performance Review in Compensation Regression ....................32
D. Controlling for performance in promotions analysis ....................33
VII. Dr. Shaw's Median Regression and Removal of Outliers ....................33
VIII. Dr. Shaw's Analysis of Promotion ....................40
A. Disaggregation by division and year ....................40
B. Disaggregation of the promotions process ....................43
C. Dr. Shaw's other criticisms of my promotions analysis ....................43
IX. Other Criticisms ....................46
A. Dr. Shaw asserts wrongly that women in the top quartile are not harmed..............46
B. Dr. Shaw's analysis of individual women's compensation and performance is flawed on a conceptual level ....................47
1. Dr. Shaw's analysis of individual class member compensation ....................47
2. Allison Gamba and Mary De Luis ....................49
C. Estimating Gender Gap by Business Unit ....................51
D. Goldman's Performance Review and Promotion Policies are Common to the Class 55
E. Effect of Performance Reviews 2016-2018 ....................55

X. Damages ....................................................................................................................58
A. Damages Associated with Compensation Claims ..................................................58
B. Damages Associated with Promotions Claims .......................................................63

## I. Introduction

1. I have been asked by counsel for Plaintiffs to review and comment on a report submitted by Dr. Kathryn Shaw dated March 19, 2021 ("Shaw Report") in connection to this case.[1] In this report, I present my comments on and responses to the Shaw Report.

2. Plaintiffs in this case are bringing several charges against Goldman. I perform analyses related to three of these claims: a claim regarding compensation at Goldman that is unrelated to the impact of performance measures, a claim regarding compensation at Goldman that is related to the impact of performance measures, and a claim that there is gender discrimination in promotions at Goldman.

3. Dr. Shaw suggests a small number of technical corrections that I accept and which do not materially change the results of my analyses. Nothing in the Shaw report causes me to materially change my central opinions, which are as follows:

4. Women are paid less than otherwise similar men, on average, and the difference in pay is statistically significant. I calculate that the average gender pay difference is 5.1 or 3.6 percent for Associates (depending respectively on whether or not I control for each employee's Business Unit) and 22.4 percent or 21.6 percent for Vice Presidents (again, depending respectively on whether or not I control for each employee's Business Unit) when I adjust for differences between men and women in tenure (and the

---

[1] Expert Report of Kathryn Shaw, Ph.D., March 19, 2021. ("Shaw Report")

square of tenure) at Goldman, related prior experience (and the square of related prior experience), division, Affirmative Action ("AA") job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employee is a new lateral hire, and year.

5. Though I do not believe it necessary to additionally control for each employee's division function, because AAP job groups are sufficient to control for the type of work performed by each employee, if I additionally control for each employee's division function, the average pay difference among Associates is 5.5 percent if I do not control for Business Unit and 3.9 percent if I do. If I additionally control for each employee's division function, the average pay difference among Vice Presidents is 15.7 percent if I do not control for Business Units and 14.2 percent if I do.

6. I have estimated damages associated with the gender difference in pay for women and men after controlling for the variables listed above. These damages are between $31 million and $48 million for Associates and $634 million to $1.1 billion for Vice Presidents, depending on the specification.

7. I do not believe it necessary to estimate the gender difference separately by division, because employees are subject to common compensation and performance review policies across all three divisions. Nevertheless, if I estimate the average pay difference separately by division, I find there is a negative (adverse to women) gender pay gap in all

six division/title combinations, and that for five of these six groupings, this difference is statistically significant.[2]

8. From 2002 through 2015, women receive lower scores on the 360 Degree performance review and are less likely to be ranked in the top quartile than otherwise-similar men. Those differences are statistically significant and adverse to women.

9. Among Associates, women are paid less on average than men even when they are in the same quartile grouping, in the first through third quartiles. In these three quartiles these differences are statistically significant among Associates. Among Vice Presidents, women are paid less on average than men even when they are in the same quartile grouping, for all quartiles. Among Vice Presidents, these differences are statistically significant and adverse to women in every quartile.

10. A core allegation in this case is that Goldman's 360 Review scores and manager quartiles have the effect of depressing women's pay relative to men's pay. I perform versions of my compensation analyses that additionally control for differences in each employee's 360 Review Score and manager quartile. I find that when I adjust for these potentially tainted variables, the estimated average difference in pay is smaller (in absolute value) than when I do not adjust for these factors. Among Associates, there are

[2] I find negative (adverse to women), statistically significant gender differences in pay in all divisions among Vice Presidents and in IBD and Securities among Associates. The gender difference in pay among IMD Associates is negative, but not statistically significant.

remaining pay differences after controlling for performance reviews between similar men and women of approximately 3.1 or 1.7 percent, depending respectively on whether or not I control for Business Units.[3] Among Associates, the remaining pay differences after controlling for performance are statistically significant when I do not control for Business Unit, and are not statistically significant when I do.[4] Among Vice Presidents, there are remaining pay differences after controlling for performance reviews between similar men and women of approximately 14.7 or 10.7 percent, depending respectively on whether or not I control for Business Units. The remaining pay differences among Vice Presidents after controlling for performance are statistically significant whether or not I control for Business Units.

11. I do not believe it necessary to additionally control for each employee's division function, because AAP job group controls are sufficient to control for the type of work performed by each employee. However, if I additionally control for each employee's division function, the remaining pay difference among Associates after controlling for performance reviews is 3.3 percent if I do not control for Business Unit and 1.9 percent if I do. The remaining pay differences among Associates after controlling for performance are statistically significant when I do not control for Business Unit, and are not significant

[3] All of the analyses discussed in this paragraph also include the controls listed in ¶8, above.

[4] My conclusions regarding the effect of performance reviews on the gender compensation gap do not depend on whether the remaining pay differences after controlling for performance reviews are statistically significant.

when I do. If I additionally control for each employee's division function, among Vice Presidents, there are statistically significant remaining pay differences after controlling for performance reviews between similar men and women of approximately 10.7 or 8.5 percent, depending respectively on whether or not I control for Business Units.

12. Among Associates, differences between women's and men's quartile and 360-degree review ratings explain approximately 41 percent or 57 percent of the observed pay difference, depending respectively on whether or not I control for Business Units. If I additionally control for division function, differences between women's and men's quartile and 360-degree review ratings explain approximately 43 percent or 54 percent of the observed pay difference among Associates, depending respectively on whether or not I control for Business Units. Among Vice Presidents, differences between women's and men's quartile and 360-degree review ratings explain approximately 23 or 33 percent of the observed pay difference, depending respectively on whether or not I control for Business Units. If I additionally control for division function, differences between women's and men's quartile and 360-degree review ratings explain approximately 34 percent or 40 percent of the observed pay difference among Vice Presidents, depending respectively on whether or not I control for Business Units.

13. I have estimated the back-pay damages associated with the proportion of the gender difference in pay for women that are explainable by the differences in performance reviews. These estimated damages are between $18.3 million and $21.4 million for Associates and between $161 million and $201 million for Vice Presidents.

14. One cannot expect an existing pay gap to disappear even if gender disparities in the rating system are removed. In order to close the pay gap among Vice Presidents, Goldman would need to correct for the degree to which those current pay values reflect past discrimination. I have estimated the total value of raises to female Vice Presidents necessary to bring women to pay parity with male Vice Presidents. Closing the entire pay gap would require raises in the current time frame to female Vice Presidents totaling between $28 million and $50 million, depending on model specification. In order to close the portion of the pay gap that is due to differences in performance review systems would require raises in the current time-frame to female Vice Presidents totaling between $6.5 million and $8.1 million, depending on model specification.

15. I find that during the period 2003 through 2018, fewer female Vice Presidents were promoted to Extended Managing Director (EMD) than one would expect had women been promoted at the same rate as men with the same observed characteristics. Women experienced 27 fewer promotions than I would expect in the absence of discrimination, if I compare men and women Vice Presidents in the same year with the same number of years as Vice President and also adjust for differences in division, office, education, experience at Goldman, experience at Goldman squared (both from the most recent hire date), relevant experience prior to most recent date at Goldman (including experience in prior employment spells at Goldman), relevant prior experience squared, AAP job group, and whether a direct hire into the VP position. The difference in promotions is statistically significant and adverse to women.

16. I have calculated the damages associated with the gender difference in promotions from Vice President to Managing Director for women and men after controlling for the variables listed above. These damages are $143 million.

## II. Minor Corrections to January 2021 Farber Report

17. In her report, Dr. Shaw pointed out a small number of minor technical errors in the data build used in the analyses for my January 2021 report.[5] I have corrected these errors, none of which materially affect the opinions rendered in my January report. Namely, I have corrected the construction of the tenure variable for my promotions analysis, I have corrected the construction of Business Unit in IMD, I have adjusted the way that I am annualizing compensation so that I avoid annualizing any make-whole bonuses, and I have corrected my definitions of fiscal years prior to 2009. I have also made a minor correction to my variable that controls for related experience prior to working at Goldman,[6] and I have changed the way that I treat small Business Units.[7] These changes are minimal, and do not materially affect my findings. Appendix A to this report presents updated versions of the analyses presented in the January 2021 Farber Report with these alterations.

---

[5] Expert Report of Henry Farber, January 15, 2021. ("January 2021 Farber Report" or "my January 2021 report").

[6] This correction affects 263 observations in my analysis file, all of which correspond to new hires in 2018.

[7] In my January 2021 Report, I grouped all Business Units with fewer than 10 observations into a single "Other" Business Unit, across all divisions. I have redefined this "Other" grouping to have three separate "Other" Business Unit groups, one for each division.

## III. Self-Sustaining Private Wealth Advisors

18. In her report, Dr. Shaw describes "Self-Sustaining Private Wealth Advisors," ("SSPWAs") who are a subset of Private Wealth Advisors ("PWAs"). Both PWAs and SSPWAs are in the Investment Management Division ("IMD"), and are included in both the Associate and Vice President job titles.[8] Unlike other class members, SSPWAs are paid on a straight commission basis.[9]

19. Because SSPWAs are paid entirely on a commission basis, their compensation is not influenced directly by performance reviews. As such, counsel have instructed me to exclude SSPWAs from my analyses that relate to the use of 360 scores and quartiling in determining compensation.[10]

20. However, I include SSPWAs when I perform analyses of promotions and of the overall difference in compensation.[11]

---

[8] Dr. Shaw identifies SSPWAs as those people whose "division function" field takes one of the following values: "IP Self Sustaining", "IP Self Sustaining -Commission", or "IP Self Sustaining Conversion".

[9] Declaration of Megan Taylor, June 30, 2014 at ¶ 9.

[10] In particular, I will exclude SSPWAs from my analyses of whether or not there are gender differences in performance reviews (360 scores, manager quartiles, or top quartile placement), as well as when I perform compensation analyses seeking to estimate the impact of performance reviews on the size of the gender pay gap.

[11] In particular, I will include SSPWAs in my analyses when estimating the size of the gender pay gap without regard to the role of performance reviews. I will also include SSPWAs when I estimate the promotion shortfall among women.

## IV. Dr. Shaw's Criticisms of Job Controls

21. Dr. Shaw argues that I "ignore…that the thousands of professionals at Goldman Sachs who held the corporate titles of Associate and VP during the relevant period engaged in different 'jobs': They performed different functions in different divisions in different Business Units, and they performed roles that required different skills and that were evaluated using different measures of productivity. Prof. Farber conducts his analysis as if there are only two jobs at Goldman Sachs that are the same across all divisions and Business Units: Associate and VP."[12] This is not true. While I perform separate analyses for each job title (Associate or Vice President), I include controls for the type of work performed by each employee in my regression, as described in the remainder of this section.

### A. AAP Job Groups

22. In all of my compensation regressions, I include a control for each employee's "AAP job group." Dr. Shaw dismisses this control as "aggregated job groupings constructed for a specific regulatory purpose."[13] However, as described in my January 2021 report, AAP (or AA) job groups are reported to the Office of Federal Contract Compliance Programs within the United States Department of Labor (OFCCP), to account for broad differences in the type of work performed.[14] This classification system

---

[12] Shaw Report at ¶ 31, first bullet point.

[13] Shaw Report at ¶ 73.

[14] The purpose of the OFCCP is to "protect workers, promote diversity through equal opportunity and enforce the law. [The OFCCP] hold[s] those who do business with the

is described by the United States Department of Labor Code of Federal Regulations, Title 41 – Public Contracts and Property Management. §60-2.12(b) states:

> In the job group analysis, jobs at the establishment with similar content, wage rates, and opportunities, must be combined to form job groups. Similarity of content refers to the duties and responsibilities of the job titles which make up the job group. Similarity of opportunities refers to training, transfers, promotions, pay, mobility, and other career enhancement opportunities offered by the jobs within the job group.[15]

23. In Judge Francis's Memorandum and Order in the class certification stage of this case, he accepted my use of AAP job groups as a way to control for the type of work that each employee performs, writing "[s]ince Goldman Sachs was required to classify its employees into AAP job groups precisely on the basis of both similarity of duties and responsibilities and opportunities for compensation and promotion, the defendants cannot now reject that classification system as an input in creating a model for calculating expected pay and advancement."[16] This finding was affirmed by Judge Torres.[17]

---

federal government – contractors and subcontractors – to the fair and reasonable standard that they take affirmative action and not discriminate based on race, color, religion, sex, sexual orientation, gender identity, national origin, disability or status as a protected veteran." Federal Contract Compliance Manual https://www.dol.gov/agencies/ofccp/manual/fccm/introduction. Accessed April 17, 2021.

[15] https://ecfr.federalregister.gov/current/title-41/subtitle-B/chapter-60/part-60-2/subpart-B/section-60-2.12. Accessed November 17, 2020.

[16] Memorandum and Order of James C. Francis, March 10, 2015 ("Francis Order") at p. 17

[17] Opinion and Order of Hon. Analisa Torres, March 30, 2018 ("Torres Order") at pp. 20-21.

24. Given Goldman's representation to the Federal government of the United States that employees in the same AAP job group have similar opportunities for promotions and pay (among other factors), I believe that AAP job group is a valid control for the type of work performed.

B. Business Units

25. In her report, Dr. Shaw seems to imply that I did not control for Business Unit in most of the analyses in my January report.[18] This is not true. While I believe that it may be inappropriate to include Business Unit controls for reasons described in my January 2021 report,[19] I also present versions of each of my compensation and performance review regression analyses controlling for Business Unit.[20] As discussed in my January report, controlling for Business Unit yields qualitatively similar estimates of the gender pay gap estimated by my model.[21]

---

[18] *See*, for instance, Shaw Report at ¶ 245 ("Prof. Farber excludes many variables that are important to compensation setting…including…Business Unit…."). *See also* Shaw Report at ¶ 65, which rebuts my statement that it *may* be inappropriate to control for Business Unit because of their instability, but does not acknowledge that I do, in fact, control for Business Unit in my compensation and performance review analyses, though the Shaw Report at fn 64 (which is attached to ¶ 65) cites a portion of my report that describes my use of Business Units as a control in my regression analyses.

[19] Namely, Business Units are a potentially tainted variable; Additionally, Business Units and the populations that work within them are unstable, and I am not provided a method to identify Business Units for all years of my analysis. See January 2021 Farber Report at fn. 4.

[20] These are presented in Tables 3, 4, 7, 8, 11, 12, 15, 16, 19, 20, and 22.

[21] *See* January 2021 Farber Report at ¶ 73 ("I additionally include a version of this analysis which also controls for Business Unit, in addition to the other "Model 2" controls described above. The results of this analysis are reported in the third row of Tables 3 and 4, and are qualitatively similar to those from Model 2, which does not include Business Unit

26. In my January 2021 report, I did not calculate damages based on a model with Business Units because Goldman did not provide a method by which to identify Business Units in all divisions prior to 2004.[22] However, I can estimate damages for the period 2004-2020 on both (a) a model that does not include Business Units and (b) a model that does include Business Units. In Section X of this report, I will present versions of my damages estimates that are based on models that include Business Units.

27. Dr. Shaw presents a graph describing variation in compensation levels across Business Units among Senior Bankers in IBD in 2018 at Exhibit 14, and notes that there is variation in compensation across Business Units within this division.[23] Controlling for Business Unit in a compensation regression—as I did—adjusts the regression analysis for differences in average compensation across Business Units. This is a sounder way to

---

controls."). *See also* January 2021 Farber report at ¶ 84 ("As with the pay analyses reported in Tables 3 and 4, [the results presented in Tables 7 and 8] are qualitatively similar whether or not I control for Business Unit.") and at ¶ 91 ("For both Associates and Vice Presidents, my results [presented in Tables 11 and 12] are qualitatively similar whether or not I control for Business Unit.")

[22] January 2021 Farber Report at fn 4.

[23] Shaw Report at ¶¶ 78-79 and Exhibit 14, which presents a graph of compensation among "Senior Bankers" in IBD in 2018. Rather than use the corporate job titles "Associate" and "Vice President" in IBD, Dr. Shaw uses "Junior Banker" and "Senior Banker," where she describes Junior Bankers as Associates plus Vice Presidents in their first or second year in IBD at Goldman, and Senior Bankers are Vice Presidents with three or more years of tenure in IBD at Goldman. (Shaw Report at ¶ 50). Given that the class is defined by the titles "Associate" and "Vice President", and because Goldman has identified employees in IBD by these titles rather than by Junior or Senior Banker, I will continue to use the definitions used in Goldman's databases, provided to me in this case.

account for Business Unit assignment than Dr. Shaw's analysis of individual Business Units for the reasons explained in Section IX.C., below.

C. Division Function

28. Dr. Shaw argues that I should have also added controls for each employee's division function when analyzing gender differences in compensation.[24] I did not control for division function in my original analyses because, like Business Units, placement into a particular division function is a decision that is under Goldman's control and is therefore a potentially tainted variable. Furthermore, as acknowledged by Dr. Shaw, information on division function is not available for all divisions (in particular, it is never available for IBD).[25] Furthermore, even in the divisions which report division function, it is not available for all employees.[26] I believe that my models, which control for AAP job group (discussed in ¶¶ 22-24 above) in all versions, and additionally control for Business Unit

---

[24] Shaw Report at ¶ 148. Dr. Shaw uses the descriptor "job function" However, the variable that she uses to control for "job function" is defined by the variable "division function" in IMD. Though division function is available in Securities, Dr. Shaw builds her "job function" variable from a variety of sources (that change over time) for Securities. Dr. Shaw does not define any job functions in IBD. I have used Dr. Shaw's variable in my analyses that follow, but I will use Goldman's term "division function" to describe it.

[25] Shaw Report at ¶ 71. In this section Dr. Shaw also identifies several other potential variables, including "department" and "desk" but acknowledges that "the fact that many departments and desks comprise only a few individuals limits my ability to use these fields in my regression models of compensation." (Shaw Report at ¶ 72).

[26] 24 percent of observations do not have available division function data. Excluding IBD (which never has division function data), 5.8 percent of observations do not have available division function data, using Dr. Shaw's specification of this variable.

(discussed in ¶¶ 25-27, above) in some versions, adequately control for differences in the type of work performed by each employee.[27]

1. *Adding Division Function Controls*

29. Nevertheless, I can perform my analyses controlling for division function. Table 1 presents the results of this analysis for Associates. The left-hand side of this table includes SSPWAs, while the right-hand side excludes them. The top row presents the results of my "baseline" Model 2. The second row presents results from a model that includes Model 2 controls plus indicator variables for every division function with more than 50 employee-years in a given division and title, grouping remaining division functions into an "Other" category specific to each division/title.[28] I have included separate division-specific indicators for those employee-years for which division function data are not available.[29] I find that the Model 2 pay gap increases slightly, from 5.2 log points (5.1 percent) to 5.7 log points (5.5 percent) among Associates when I add division function controls. When I exclude SSPWAs, these results are similar, with the Model 2 pay gap

[27] Throughout this report, I will discuss variations on two models, "Model 2" and "Model 3." In Model 2, I control for: division, year, office, education, AA job group, experience at Goldman, experience at Goldman squared (both from the most recent hire date), relevant experience prior to most recent date at Goldman, relevant experience squared, whether a direct hire into the Associate or VP position and an indicator for the fiscal year being the year of hire for those hired into Associate/VP positions directly. In Model 3, I add Business Unit controls to the list of Model 2 controls. These are the same controls (and same model names) used in my January 2021 report.

[28] I construct "other" division function categories separately by division. 4.1 percent of observations among Associates are grouped into an "other" category.

[29] I construct "missing" division function categories separately by division. 32.8 percent of observations among Associates are grouped into a "missing" category.

increasing from 5.2 log points (5.1 percent) to 5.7 log points (5.5 percent) among Associates when I add division function controls. The subsequent pair of rows presents a parallel baseline analysis for Model 3 (which adds Business Unit controls) to Model 2, and a version of Model 3 that additionally controls for division function as described above. I find that the Model 3 pay gap increases slightly, from 3.7 log point (3.6 percent) to 4 log points (3.9 percent) when I control for division function. When I exclude SSPWAs, these results are similar, with the Model 3 pay gap increasing slightly from 3.6 log points (3.5 percent) to 4 log points (3.9 percent) among Associates when I add division function controls. In all cases, the female coefficient is statistically significant.

30. Table 2 presents a parallel analysis for Vice Presidents, and can be read in the same way. I find that the Model 2 pay gap decreases from 25.4 log points (22.4 percent) to 17.1 log points (15.7 percent) among Vice Presidents when I add division function controls.[30] When I exclude SSPWAs, the impact of adding division function controls is smaller, with the Model 2 pay gap falling from 20.4 log points (18.5 percent) to 16.9 log points (15.5 percent) among Vice Presidents when I add division function controls. I find that the Model 3 pay gap falls from 24.4 log points (21.6 percent) to 15.3 log points (14.2 percent) among Vice Presidents when I add division function controls. When I exclude

---

[30] 2.4 percent of observations among Vice Presidents are grouped into an "other" division function category, constructed separately by division. 19 percent of observations among Vice Presidents are grouped into a "missing" division function category, constructed separately by division.

SSPWAs, the impact of adding division function controls is smaller, with the Model 3 pay gap decreasing from 16.8 log points (15.5 percent) to 15 log points (13.9 percent) among Vice Presidents when I add division function controls. In all cases, the female coefficient is statistically significant.

31. The overall pattern in Tables 1 and 2 is clear. The gender pay gap remains substantial and statistically significant in models that control for division function. This is true for both Associates and Vice Presidents, whether or not I control for Business Units, and whether or not I exclude SSPWAs.

*2. Effect of Performance Reviews in a Model with Division Function Controls*

32. I study the effects of the performance review systems on pay in the versions of Models 2 and 3 that include controls for each employee's division function. Table 3 contains estimates of the pay gap for Associates. Table 4 contains results from parallel analyses for Vice Presidents. These Tables contain results from ten models (described in the paragraphs below): 2, 2a, 2b, 2c, 2d, 3, 3a, 3b, 3c, and 3d. . Because these analyses are relevant for the claim tied to the effects of performance measures on compensation, I exclude SSPWAs in all versions.

33. The top panels of Tables 3 and 4 are based on Model 2. Model 2 is identical to the Model 2 reported in Tables 1 and 2 above. Model 2a is defined in the same way as Model 2, but is limited to those observations for which I have data on 360 Review score and manager quartile. Models 2b through 2d include measures of performance. Model 2b includes all of the variables in Model 2a plus indicators for each manager quartile. Model

2c includes all of the variables in Model 2a plus the 360 Review score.[31] Model 2d includes all of the variables in Model 2a plus indicators for both the manager quartile and the 360 Review score.

34. The bottom panels of Tables 3 and 4 are based on Model 3, which contains all of the controls from Model 2, and adds controls for Business Unit. Model 3 is identical to the Model 3 reported in Tables 1 and 2, above. Model 3a is defined in the same way as Model 3, but is limited to those observations for which I have data on 360 Review score and manager quartile. Models 3b through 3d include measures of performance. Model 3b includes all of the variables in Model 3a plus indicators for each manager quartile. Model 3c includes all of the variables in Model 3a plus the 360 Review score. Model 3d includes all of the variables in Model 3a plus indicators for both the manager quartile and the 360 Review score.

35. I note that in all cases, moving from the sample that includes all observations regardless of whether or not they have information on performance reviews to the restricted sample that requires that each observation have information on both 360 Review and manager quartile has a negligible impact on the gender coefficient.[32]

---

[31] Throughout this report, for Models that include 360 Review score controls, I use two variables for 360 Reviews: one for the period when the score used a scale of 1 through 5, and one for the period when the score used a scale from 1 through 9.

[32] This is seen e.g. moving from Model 2 to Model 2a, or from Model 3 to Model 3a. A greater proportion of observations are missing performance reviews prior to 2006. 54.8 percent of observations from 2003-2005 are missing performance reviews, while 10.7 percent of observations from 2006-2018 are missing performance reviews). Additionally, performance reviews are most likely to be missing in the first year of employment

a) Associates

36. The top panel of Table 3 reports these results for Associates, excluding SSPWAs. In versions of this analysis without division function controls, going from Model 2a to Model 2d, the gender pay gap falls from 5.4 log points (5.3 percent) to 3.2 log points (3.1 percent), with both of these coefficients being statistically significant. This indicates that approximately 41 percent of the overall pay gap given by Model 2a among Associates excluding SSPWAs is explained by differences in performance reviews, when I do not control for division function. If I control for division function, the results of this analysis are similar. I find that going from Model 2a + division function controls to Model 2d + division function controls (which adds controls for both 360 Reviews and manager quartile), the gender pay gap falls from 5.9 log points (5.8 percent) to 3.4 log points (3.3 percent), with both of these coefficients being statistically significant. This indicates that approximately 43 percent of the overall pay gap given by Model 2a among Associates excluding SSPWAs is explained by differences in performance reviews, when I control for division function.

37. The bottom panel of Table 3 reports these results for Associates, based on variations of Model 3, which includes controls for each Business Unit. In versions of this analysis without division function controls, going from Model 3a to Model 3d, the gender pay gap falls from 3.9 log points (3.8 percent) to 1.7 log points (1.7 percent), with the

---

(over the period 2006-2018, 77.8 percent of observations with missing performance reviews are from employees in their year of hire).

former coefficient statistically significant (but not the latter). This indicates that approximately 57 percent of the overall pay gap given by Model 3a among Associates excluding SSPWAs is explained by differences in performance reviews. When I control for division function, the results of this analysis are similar. I find that going from Model 3a + division function controls to Model 3d + division function controls (which adds controls for both 360 Reviews and manager quartile), the gender pay gap falls from 4.2 log points (4.2 percent) to 2 log points (1.9 percent), with both former coefficients being statistically significant. This indicates that approximately 54 percent of the overall pay gap given by Model 3a among Associates excluding SSPWAs is explained by differences in performance reviews, if I control for division function.

38. I find that among Associates, adding controls for division function slightly increases the size of the gender pay gap estimated by either Model 2 or Model 3. Adding division function controls increases the proportion of the gender pay gap explained by performance reviews, whether or not I control for Business Units.

b) Vice Presidents

39. Table 4 is parallel to Table 3 but is for Vice Presidents, and it can be read in a parallel fashion. As with Table 3, the analyses reported in Table 4 exclude SSPWAs.

40. The top panel of Table 4 reports these results for Vice Presidents. In versions of this analysis without division function controls, going from Model 2a to Model 2d, the gender pay gap falls from 20.7 log points (18.7 percent) to 15.9 log points (14.7 percent), with both of these coefficients being statistically significant. This indicates that

approximately 23 percent of the overall pay gap given by Model 2a among Associates is explained by differences in performance reviews when I do not control for division function. When I control for division function, the results of this analysis are similar. I find that going from Model 2a + division function controls to Model 2d + division function controls (which adds controls for both 360 Reviews and manager quartile) in a model excluding SSPWAs, the gender pay gap falls from 17.1 log points (15.8 percent) to 11.3 log points (10.7 percent), with both of these coefficients being statistically significant. This indicates that approximately 34 percent of the overall pay gap given by Model 2a among Vice Presidents is explained by differences in performance reviews when I control for division function.

41. The bottom panel of Table 4 reports these results for Vice Presidents, based on variations of Model 3, which includes controls for each Business Unit. In versions of this analysis without division function controls, going from Model 3a to Model 3d, the gender pay gap falls from 16.6 log points (15.3 percent) to 11.1 log points (10.5 percent), with both of these coefficients being statistically significant. This indicates that approximately 33 percent of the overall pay gap given by Model 3a among Vice Presidents is explained by differences in performance reviews when I do not control for division function. When I control for division function, the results of this analysis are similar. I find that going from Model 3a + division function controls to Model 3d + division function controls (which adds controls for both 360 Reviews and manager quartile), the gender pay gap falls from 14.9 log points (13.8 percent) to 8.9 log points (8.5 percent), with both of

these coefficients being statistically significant. This indicates that approximately 40 percent of the overall pay gap given by Model 3a among Vice Presidents (excluding SSPWAs) is explained by differences in performance reviews when I control for division function.

42. I find that among Vice Presidents, adding controls for division function decreases the size of the gender pay gap estimated by either Model 2 or Model 3. However, adding division function controls increases the proportion of the gender pay gap explained by performance reviews, whether or not I control for Business Units.

## V. Disaggregation by Division

43. Dr. Shaw argues that my compensation and performance regressions each fail a Chow test, and therefore I should have separately analyzed each division/job title (Associate or Vice President) separately. In this section, I discuss the Chow test and why I still believe it is appropriate to analyze compensation and performance across all divisions (controlling for division). Though, for reasons explained below, I do not believe it is necessary to do so, I will also present a version of my compensation analysis that is estimated separately by division, and show that in every model specification, there is a gender pay gap that is adverse to women in each job title/division group, and for five of the six groups, these differences are statistically significant.

### A. The Chow Test

44. A Chow test is performed to determine whether all of a model's coefficients are identical across subsets of the data. These subsets may be distinct time periods before

and after some event of interest, or they may be groupings of individuals. The Chow test that Dr. Shaw performed is a test of whether or not, taken as a group, all coefficients of the model are the same across all three divisions. They are not. However, Dr. Shaw is wrong to conclude from that that my analysis "incorrectly pools" the data.[33]

45. A Chow test is not a pre-requisite for pooling data across groups. Researchers may use a Chow test to look for structural differences across groups, but it would generally not be good statistical practice to perform a Chow test for every identifiable group in the data without a sound conceptual reason to do so. Dr. Shaw argues that differences among the three divisions are important, and this is her motivation for performing a Chow test. However, I believe that notwithstanding any of the noted differences across divisions, a class consisting of revenue-producing employees sharing a common job title, and subject to common compensation and performance review policies at a single firm are sufficiently similar that a single model is appropriate.[34] Indeed, Judge Francis ruled in this case that "Where there is a rational basis for aggregation, as there is here, the Chow test is not a basis for categorically rejecting a model that does not meet its requirements."[35]

---

[33] Shaw Report at ¶ 190, second bullet point.

[34] For examples of firmwide compensation policies, *see* GS0113422, GS0109371; GS0113414; GS0459365. For examples of divisional compensation policies, each of which restate the firmwide policy and describe the common role of performance reviews (360 Review scores and manager quartiles) in compensation setting, *see* GS0113426 (IBD); GS0113896 (Securities); GS0115109 (IMD).

[35] *See* Francis Order at p. 23. Judge Torres affirmed. Torres Order at pp. 19-21.

46. In his Order, Judge Francis further cautions against requiring that a statistical model passes the Chow test in a situation where there are gender pay gaps in each division, even if the size of the gender pay gap varies by division. He writes, "[m]ore importantly, an analysis could fail the Chow test where the coefficient for the variable of interest varies in magnitude but not in the direction of impact. For instance, if being female is always negatively associated with compensation, even if not always to the same magnitude, it may be appropriate to utilize a unitary model notwithstanding failure to satisfy the Chow test."[36]

47. I note that all my models control for division and I present versions of the models that also control for business units. Furthermore, I have presented versions of my analyses (reported in Tables 1, 2, 3, and 4 that additionally control for division function. These richly-specified models account for average differences across divisions, Business Units, and division functions.

48. Given the allegation in this case that gender bias in compensation is based at least in part on bias in the common performance review process (the Firmwide Review System), it is inappropriate to disaggregate by division. As the name suggests, the Firmwide Review System is, in fact, used company-wide. In particular, Goldman Sachs uses the same underlying 360 review criteria and manager quartiling policy in the

[36] Francis Order at pp. 23-24.

Securities, IBD, and IMB divisions.[37] This common process spans divisions, and, as such, should be analyzed with a common model.

B. The Effect of Estimating my Compensation Models Separately by Division

49. Though I do not believe it is necessary to estimate my compensation models separately by division, in Tables 5 and 6 I present the results of such an analysis. Table 5 presents the results of this analysis for Associates. The top panel presents results based on Model 2; the bottom panel presents results based on Model 3, which includes Business Units. Both of these analyses also include versions that control for division function. Within each panel, the top row presents my baseline results, estimated on all divisions together.[38] Subsequent rows present these results separately by division. I find that whether or not I control for Business Unit (Model 2, presented in the top panel does not control for Business Unit, while Model 3, presented in the bottom panel does), the female coefficient is always negative for all divisions, and is statistically significant for Securities and IBD, though it is not statistically significant for IMD.

50. Table 6 presents a version of this analysis for Vice Presidents and can be read in a parallel fashion. I find that whether or not I control for Business Unit (Model 2, presented in the top panel does not control for Business Unit, while Model 3, presented in

[37] *See* January 2021 Farber Report at ¶¶ 27-35 for a discussion of performance review polices at Goldman.

[38] This is sometimes called a "pooled" model.

the bottom panel does), the female coefficient is always negative and statistically significant for all divisions.

51. I conclude that if I estimate my model separately by division and include controls for division function, I find negative (adverse to women) pay gaps for all divisions in both job titles, whether or not I control for Business Unit. These results are statistically significant for five out of six division/job title groups: Vice Presidents in all three divisions, and for two of three divisions (Securities and IBD) among Associates.[39]

## VI. Dr. Shaw's Criticisms of Omitted Variable Bias

52. Dr. Shaw argues that I erred in omitting several variables from my analyses. She is mistaken about my omission of some of these variables, like Business Unit, discussed in Section IV.B, which is included in versions of my analyses included in my January 2021 report. Others, like division function, I have included in versions of my analysis in this report.[40] Dr. Shaw also states that I "ignore" the impact of performance reviews on compensation and other outcomes.[41] This is not true—I examine gender bias in performance reviews and include performance review metrics in my compensation analyses to allow me to estimate the effect of performance reviews on the size of the

---

[39] Indeed, Dr. Shaw's own analyses show that according to my model, there is a gender pay gap (that is adverse to women) for each division and job title when my model is estimated separately by division and job title. Of the six job title-division groups, this difference is statistically significant in five of the six groups. *See* Shaw Report at Exhibit 68, p. 244 at rows 2 (Associates) and 7 (Vice Presidents).

[40] See analyses in Section V, above.

[41] Shaw Report at ¶ 148.

gender pay gap. Other variables (like production measures) are excluded from my analysis for reasons that I have discussed in previous reports in connection in this matter, and which I will explain further in this section.

A. Production

53. I start by noting (as I did in my 2014 Rebuttal Report) that since Goldman controls job assignments to Business Units and production opportunities vary across Business Units, production itself is a potentially tainted variable for the purpose of estimating discriminatory pay differences.[42]

54. In addition to this fundamental problem, production data are unreliable for a number of reasons. The two most significant issues are the lack of consistent data across the class and across divisions, and the inconsistent meaning of data across job groups.

55. The production metrics used by Dr. Shaw are unavailable for a majority of the class. Table 7 presents the percent of observations within each job title and division that are missing production data in the data used in my analysis and in the data used in Dr. Shaw's analysis.[43] Among Associates in Securities, 69 percent of observations do not contain production information. Among Associates in IBD, 54 percent of observations do not contain production information. There is no production data at all for Associates in IMD. Among Vice Presidents in Securities, 58 percent of observations do not contain

---

[42] Farber Rebuttal Report, July 29, 2014 at ¶ 33.

[43] I refer in this paragraph to precent missing in our data, but the extent of missing data is generally similar in Dr. Shaw's data.

production information. Among Vice Presidents in IBD, 26 percent of observations do not contain production information on one production variable; 91 percent of observations do not contain information on the other production variable. Among Vice Presidents in IMD, 88 percent of observations do not contain production information on one variable; 96 percent of observations do not contain information on the other production variable. Given that the extent of missing production measures, I conclude that Dr. Shaw did not, in fact, compare employees with the same production.

56. Additionally, one of the shortfalls acknowledged by Dr. Ward, an expert witness for Goldman in prior stages of this proceeding, is that purportedly objective measures of productivity may combine "soft" credits and "hard" credits, where certain production dollars are more difficult to obtain than other production dollars. Dr. Shaw's analysis does not account for how easy or difficult it was to attain given production levels, though differences in difficulty are acknowledged by Goldman.[44]

57. Furthermore, some of the production metrics used by Dr. Shaw are reported at a group rather than an individual level. For instance, the variable "gross_amount_usd" in IBD is at the "deal" level.[45] These metrics report the total size of each deal and do not account for the number of people working on each deal. Each employee on a given deal receives the same production credit. Therefore, even when "production data" is available

[44] *See* Deposition of Michael P. Ward, January 6, 2014 at 147:15-150:10. Dr. Ward was Goldman's economics expert in previous stages of this litigation.

[45] Prior to 2012, gross_amount_usd is used as an input into Shaw's production variables l140_ibd-l1144_ibd and l240_ibd-l244_ibd

for a group of employees, it is measuring different information, and is measuring it using different criteria, and this is inappropriate for use in a regression analysis.

58. When production was not available, Dr. Shaw controls for missing production with a dummy variable, implicitly assuming that all people with “missing” production have same production value. Given the large amount of missing production data, this is likely to introduce bias in Dr. Shaw’s analysis. Further, the production data is missing in a way that appears correlated to compensation and gender. Table 8 presents summary statistics for two groups of people: those for whom the production metrics selected by Dr. Shaw are available (the left-hand panel) and those for whom they are not (the right-hand panel). The top panel presents this information separately for each production metric for Associates; the bottom panel presents this information separately for each production metric for Vice Presidents. Within each panel, there are three subgroupings based on estimation sample: the top two represent my sample (with and without SSPWAs, respectively), and the bottom represents Dr. Shaw’s sample. It is clear that there are substantial differences in compensation based on whether or not have production data available, though the patterns of these relationships differ by division and particular compensation metric. Additionally, there can be large differences in the degree to which production data are missing by gender.[46] I note that these production data are an example of data that are not “missing at

---

[46] For example in my sample, in IMD excluding SSPWAs 20 percent of Vice President observations with the variable “prodgsam_comp _score” reported are associated with women, but 34 percent of observations for which this variable is missing are associated with women.

random," a problem which I discuss further in the context of Dr. Shaw's lagged performance review analysis.

59. Additionally, the production metrics used by Dr. Shaw are only a few of the production metrics reported by Goldman. Goldman's compensation guidelines list [redacted] production metrics for each Division.[47] Goldman [redacted][48]

[47] IMD's 2018 Compensation Guidelines list [redacted] production metrics (GS0400026 at Annex 1 (pp. -037 through -039.)); Securities' 2018 Compensation Guidelines list [redacted] production metrics (GS0400052 at Annex 1 (pp. -062 through -063)); IBD's 2018 Compensation Guidelines list [redacted] production metrics (GS0400008 at Annex 1 (pp. -017 through -018)).

[48] IMD's Compensation Guidelines, October 2018 read [redacted] (GS0400026 at -031) (emphasis added). IBD's 2018 Compensation Guidelines have similar language (GS0400008 at -12). The Securities Division's 2018 Compensation Guidelines [redacted] (GS0400052 at -52).

B. Controlling for 360 Score in Manager Quartile Regression

60. Dr. Shaw suggests that I made a mistake in not controlling for 360 score when determining whether there is evidence of gender discrimination in manager quartiling.[49] 360 scores are an explicit input into managers' quartiling decisions,[50] and the presence of discrimination in 360 scores is a primary issue in this case. As such, it is inappropriate to control for 360 scores in a model of manager quartiling. Additionally, I present models where I control for both quartiling and 360 scores. These models appropriately account for the combined effect of both performance measures.[51]

C. Controlling for Performance Review in Compensation Regression

61. Dr. Shaw suggests that I am "ignoring" the impact of performance review metrics on compensation.[52] The opposite is true. Plaintiffs specifically allege that the performance review system at Goldman is biased against women. In my January 2021 report, I studied whether there was evidence of a gender difference in performance review

---

[49] Shaw report at ¶ 147.

[50] *See* January 2021 Farber Report at ¶ 33 for discussion of 360 reviews and manager quartiling.

[51] Dr. Shaw argues that "in order to assess whether there is any *incremental* bias in the manager quartiling process beyond the alleged bias in the 360 review scores, the manager quartiling model must contain the 360 review scores." (Shaw Report at ¶ 216, italics in original) I am not concerned about the incremental bias in manager quartiling, but rather I am concerned about the potential for bias in the performance review processes both individually and in combination. Furthermore, if the 360 Review score is biased against women (as plaintiffs allege), inclusion of this score would tend to mask the lower quartile scores received by women.

[52] Shaw Report at ¶ 148.

outcomes, and find that, indeed, there is evidence of such differences.[53] I use the comparison of models that include performance review with models that do not include performance reviews to estimate the portion of the pay gap that is explained by gender differences in performance reviews. Dr. Shaw ignores this explanation and instead asserts that I ignore the role of performance reviews on compensation. I do not. My compensation regressions also include versions that control for performance reviews.[54]

D. <u>Controlling for performance in promotions analysis</u>

62. Dr. Shaw argues that I should have controlled for performance reviews (360 reviews, OMR, and manager quartile) when studying the presence and magnitude of gender differences in promotion to EMD. I did not do so because as described above, performance reviews are alleged to be a tainted variable that is biased against women, and I have found evidence of a gender gap in performance reviews that is adverse to women. Inclusion of such a variable would tend to bias the estimate of the gender gap in promotions. As such, I have not included performance reviews my analysis of the promotions process.

## VII. Dr. Shaw's Median Regression and Removal of Outliers

63. In her analyses, Dr. Shaw removes high-earning Associates and Vice Presidents, which she describes as "outliers," and also performs a regression which

---

[53] See January 2021 Farber Report at ¶¶ 76-91 and Tables 7 through 14, which examine the presence of a performance review gender gap.

[54] January 2021 Farber Report at ¶¶ 92-107 and Tables 15 and 16, which examine the impact of performance reviews on the gender pay gap.

identifies differences in the conditional median of log compensation rather than the standard OLS regression, which identifies differences in the conditional mean of log compensation. In this section, I will discuss why these analyses are unsound, and additionally show that my analyses are robust to reasonable treatment of outliers.

64. Dr. Shaw expresses concern that a small number of high earners at Goldman might be driving my results.[55] She removes the highest earners in the data—dropping as many as 10 percent of observations—runs analyses based on these limited samples (analyses which also inappropriately, as discussed above, control for production, performance and other factors) and concludes that there is no statistically significant gender gap in most division-job title combinations.

65. Dr. Shaw seems to ignore the fact that I have performed all of my compensation analyses (other than reporting out simple summary statistics of average pay) by taking the natural logarithm of compensation ("log compensation"). The use of log compensation rather than levels of compensation is very common in econometric analyses.[56] One reason that econometricians use log transformations rather than performing analyses in levels is that analyses performed on log-transformed variables are less influenced by outliers than those performed on level variables.

[55] Shaw report at ¶ 257

[56] By "levels" of compensation, I mean simply the dollar value of compensation.

66. It is not, contrary to Dr. Shaw's assertion, standard practice to remove "outliers" *because* they are outliers. Sometimes, outliers might be a result of data entry or other data quality issues (for instance, an adult person's weight being recorded as 900 pounds). Outliers that are valid data, by contrast, should not automatically be removed. That is the case here.

67. The vast majority of high earning "outliers" that Dr. Shaw removes are men.[57] Table 9 presents, for each of the "outlier" definitions used by Dr. Shaw in Exhibit 34 of her report, the following statistics: Column 1 reports the proportion of the "outlier" group that is male, Column 2 reports the proportion of the non-"outlier" group that is male.[58] Column 3 presents the results of a chi-squared test of equality of these two distributions. This table shows, that for each of Dr. Shaw's "outlier" definitions, the "outlier" group has a greater proportion of men than does the "non-outlier" group. In other words, Dr. Shaw removes a disproportionate number of male observations *because these men earned high compensation* in a case involving allegations of gender discrimination in pay. These

[57] The proportion of high-earning professionals by gender can be observed from Exhibit 33 of the Shaw Report (p. 136), which is limited to Senior Bankers in IBD, and indicates high-earning "outliers" as circles. Men are represented by blue circles, women by orange circles. There are five female high-earning outliers and 84 high-earning male outliers in this graph. That is, 94 percent of the "outliers" identified by Dr. Shaw in Exhibit 33 are men.

[58] Dr. Shaw reports gender gaps after excluding "outliers" based on three definitions: those whose compensation is greater than 1.5 times the interquartile range (the 75th percentile minus the 25th percentile) above the 75th percentile in their division/title group; those whose compensation is in the top five percent of all professionals in their division/title group; those whose compensation is in the top ten percent of all professionals in their division/title group (Shaw Report at ¶ 258).

analyses are biased against finding evidence of a pay gap adverse to women and should be ignored.

68. Additionally, the outlier definitions used by Dr. Shaw are based on thresholds determined over the entire time period. In effect, this removes a different proportion of observations in each year. Table 10 presents, for each of the "outlier" definitions used by Dr. Shaw, the fraction of observations removed in each year. The most observations are removed in 2007, with up to 21 percent of observations removed in the "outlier" definition that drops the top 10 percent of compensation; the fewest observations are removed in 2011, with 4 percent of observations removed using the same 10 percent cutoff.[59] This table illustrates that by not calculating "outlier" cutoffs separately by year, Dr. Shaw is actually removing more than 20 percent of the data in some years and a much smaller percent in others. This is an analysis designed to reduce the estimated gender pay gap and is inappropriate.

69. I also note that Dr. Shaw's "outlier" analysis does not simply identify those observations that are far removed from the remainder of the data, but because she has chosen such expansive definitions of "outliers," she includes observations that have PATC within a few thousand—or even a few *hundred*—dollars of observations that are excluded on the grounds of being "outliers." Table 11 presents, for each division and for each of Dr.

[59] Using Dr. Shaw's other "outlier" definitions, 2007 remains the year with the greatest percent of observations dropped, but the year with the fewest observations dropped is 2018 using the IQR criteria and 2016 when Dr. Shaw drops the top 5 percent of observations.

Shaw's "outlier" definitions, the highest PATC earned in an observation in the "non-outlier" group, and the lowest PATC earned in an observation in the "outlier" group. The top panel of Table 11 presents this information for Associates, and reports differences between high-earning "outliers" and lower-earning "non-outliers" as small as $4,925.[60] The bottom panel of Table 11 presents this information for Vice Presidents, and reports differences between high-earning "outliers" and lower-earning "non-outliers" as small as $619.[61]

70. While I do not believe that removing high-earning individuals from my analysis is appropriate, as a robustness check, I present variations of my analysis in Table 12 where I remove observations that are greater than mean log compensation by more than two standard deviations (calculated within a division, job title, and year). The first row of the top panel of Table 12 presents my baseline estimates for Associates from Model 2, without dropping any "outliers." The second row presents the estimates for that same model after removing employee-years with log-compensation values that are more than two standard deviations above the mean. The estimated gender gap falls from 5.2 log points to 3.2 log points, and it remains statistically significant with a t-ratio of 3.62. The bottom panel of Table 12 presents a parallel analysis for Associates, but based on Model 3 (which is similar to Model 2 but includes Business Unit controls). I find that after excluding employee-years with log-compensation values that are more than two standard

---

[60] This is in IMD using Dr. Shaw's Top 5 percent "outlier" definition.

[61] This is in IMD using Dr. Shaw's Top 10 percent "outlier" definition.

deviations above the mean, the pay gap falls from 3.7 log points to 2.1 log points and remains statistically significant with a t-ratio of 2.64.

71. Table 13 is parallel to Table 12 but presents these results for Vice Presidents. Again, the top panel of Table 13 presents results based on Model 2, and the bottom panel presents results based on Model 3. The first row of each panel presents my baseline model. The second row presents the estimates for that same model after removing employee-years with log-compensation values that are more than two standard deviations above the mean. Based on Model 2, after removing employee-years with log-compensation values that are more than two standard deviations above the mean, the estimated gender gap falls from 25.4 log points to 21.6 log points, and it remains statistically significant with a t-ratio of 12.64. The bottom panel is based on Model 3, and shows that after removing employee-years with log-compensation values that are more than two standard deviations above the mean, the estimated gender gap falls from 24.4 log points to 20.8 log points, and this difference remains statistically significant with a t-ratio of 12.60.

72. It is not surprising or troubling that the estimated gender pay gap falls somewhat (though remains statistically significant) when outliers are removed in this case. Since the outliers are disproportionately highly paid men, removing the outliers will certainly reduce the gender pay gap at least to some degree. This is a strategy that results in reducing the key outcome that reflects pay discrimination. Therefore, while I drop these observations when carrying out the analyses in Tables 12 and 13 as a robustness check, I do not adopt this approach in my own analyses.

73. Dr. Shaw misapplies labor economics research on "tournament theory" to justify trimming outliers. The idea of tournament theory is that the winners of the "tournament" get a disproportionate reward in the form of higher compensation in order to incentivize them.[62] But if there is a tournament at Goldman (and I am not asserting that there is) the reward is a promotion (to VP from Associate or to Managing Director from VP) with the associated substantial increase in compensation. Since my analyses are entirely within rank (Associate or VP), the compensation numbers we see are not the tournament reward. They are simply the within-rank compensation received by employees. Hence, there is no justification from tournament theory to trim outliers here.

74. Dr. Shaw also recommends analyzing the gender gap in *median* compensation, rather than *mean* (or average) compensation, arguing that medians are less affected by outliers.[63] This is not the standard approach to estimating pay gaps. Medians do not have the same averaging or additive properties of means. Any gender gap in a median regression is not informative about the average pay differences in the data. As I described in ¶ 65 above, performing analyses on log compensation, as I do, is an appropriate method of analysis that also dampens the effect (if any) of outliers.

---

[62] In a published paper, Dr. Shaw writes: "Tournament theory begins with the notion that prizes are fixed in advance. In other words, wages are associated, to a first approximation, with jobs rather than with the individual who holds the job. A vice president who is promoted to president receives the salary of a president." Lazear, Edward P. and Katheryn L. Shaw (2007). Personnel Economics: The Economist's View of Human Resources." Journal of Economic Perspectives. 21(4), pp. 91-114 at p. 94.

[63] Shaw Report at ¶ 260.

Additionally, the analyses described in ¶¶ 70-71 above, where I remove some high-earning observations shows that my analysis is not sensitive to the exclusion of these observations.

## VIII. Dr. Shaw's Analysis of Promotion

75. Dr. Shaw argues that I erred by not analyzing promotions to EMD separately by division and year.[64] She also argues that I should have examined gender differences in nomination to the "cross-ruffing" list separately from gender differences in promotion conditional on being on the "cross-ruffing" list.[65] I disagree with these criticisms, which I discuss in turn in this section.

### A. Disaggregation by division and year

76. Dr. Shaw argues that I should have analyzed promotions separately by division. I disagree. I note that the cross-ruffing procedure that is key to being promoted at Goldman is designed by a firm-level cross-ruffing committee. This committee is comprised of employees from many divisions.[66] Additionally, the talent management committee publishes training materials for the cross-ruffing process that are used

---

[64] Dr. Shaw argues that I should have analyzed promotions separately by division at ¶ 234. She argues that I should have analyzed promotions separately by year in ¶ 326.

[65] Shaw Report at ¶ 232.

[66] See Cross-Ruffing committees at GS0113548 at -50 (2002); GS0181122 at -24 (2003); GS0180019 at -22 (2005); GS0109299 at -301 (2006).

firmwide.[67] Likewise, the criteria for nomination are uniform across divisions.[68] The cross-ruffing and promotion procedure is common to class members across all divisions, and therefore I believe that it is appropriate to analyze promotions in a pooled model that includes Vice Presidents in all three divisions.[69]

77. I further note that promotion to EMD is a low-probability event, with 4 percent of observations leading to promotion among male Vice President years, and 3.3 percent of observations leading to promotion among female Vice President years. Because of the relative infrequency of promotions, disaggregating promotions by division merely creates smaller groups of data, which will inappropriately reduce the statistical power of my analysis.[70]

---

[67] See Promotion Guidelines at GS0253511; GS0258942; GS0276276; GS0147555; GS0004210; GS0004219; GS0274858; GS0004741; GS0123010; GS0140383; GS0604637; GS0533693; GS0546942; GS0592247; GS0482254.

[68] See VP/MD Nomination Guidelines at GS0004210; GS00004219; GS0004741; GS0123010; GS0140383; GS0147555; GS0253511; GS0258942; GS0274858; GS0276276; GS0482254; GS0533693; GS0546942; GS0592247; GS0604637.

[69] Note that my promotions model includes an indicator variable for each division, which adjusts for any differences in the average probability of promotions across division. I also note that Dr. Shaw's Exhibit 29 reports that my model has promotion gaps that are adverse to women in all divisions, and this difference is statistically significant in IBD. I do not believe it is appropriate to control for production or performance reviews for the reasons outlined in ¶¶ 53-59 and 61 above, namely that production is missing for a large portion of the data, is unreliable, and may be tainted, and that performance reviews are tainted (and the alleged gender bias in performance reviews is at issue in this case).

[70] Statistical power refers to the probability that a test correctly rejects the null hypothesis (e.g. that women and men have the same probability of promotion) when the alternative (e.g. that women are promoted at a lower rate than men) is true. James H. Stock and Mark W. Watson (2004). Introduction to Econometrics. Pearson Education, Inc., at p. 681.

78. Dr. Shaw also argues that I should have estimated the promotion shortfall separately by year.[71] Again, I disagree. The promotions process challenged by the Plaintiffs is in existence over the entire class period. My analysis has indicator variables for each year, which adjusts for differences in the average probability of promotion in each year. In order to calculate damages associated with the estimated promotion shortfall, it was necessary to identify the size of the estimated promotion shortfall in each year. Promotions in earlier years are generally more valuable than promotions in later years, because the earlier a person is promoted, the longer he or she tends to receive higher EMD earnings, through the present. It was with this limited purpose—assigning lost promotions to particular years—that I performed the analysis reported in Table 28 of my January 2021 report. In some years, the estimated promotion shortfall is small (e.g. 2004, where I reported a shortfall of less than one promotion), but as acknowledged by Dr. Shaw, "promotion from VP to EMD is rare."[72] By insisting on examining promotion shortfalls by year, Dr. Shaw is merely breaking up the data into small groups to reduce the statistical power of my analysis.

79. While I do not agree that this analysis should be disaggregated by year, I do note that in Dr. Shaw's Table 45, which presents separate estimates of the promotion shortfall in each year, there are three years with positive (meaning adverse to women) and statistically significant shortfalls in promotion, and one year with a statistically significant

[71] Shaw Report at ¶ 326.

[72] Shaw Report at ¶ 224.

negative (meaning not adverse to women) shortfall. The net total shortfall from these four years is 23.9 promotions, which is close to the shortfall I reported in my January report (25 promotions) and is also close to the shortfall I calculate in this report (27 promotions).[73]

B. Disaggregation of the promotions process

80. Dr. Shaw also argues that I should examine gender differences in nomination to the "cross-ruffing" list separately from gender differences in promotion conditional on being on the "cross-ruffing" list.[74] Again, I disagree.

81. Plaintiffs are challenging the promotions process as a whole. Again, by disaggregating the promotions process into separate steps, Dr. Shaw is merely breaking up the data in order to reduce the statistical power of my analysis.

C. Dr. Shaw's other criticisms of my promotions analysis

82. Dr. Shaw notes that I performed my promotions analysis using a slightly different statistical technique than I did when I performed my compensation and other analyses.[75] Namely, when I performed my promotions analysis, I estimated my model on a group of men only, used the results of this model to predict the number of women who would have been promoted, had they been promoted in the same manner as men, and then

---

[73] Dr. Shaw identifies statistically significant promotion shortfalls in 2005 (a shortfall of 5.4), 2007 (a shortfall of 12.2), and 2017 (a shortfall of 7.4). Dr. Shaw identifies a statistically significant positive shortfall in 2012 (3.3). At Dr. Shaw's suggestion, I have modified my fiscal year definitions prior to 2009. Under this modification, I find a shortfall of 27 promotions, as described in Section VIII.C.

[74] Shaw Report at ¶ 232.

[75] Shaw Report at ¶ 230.

compared this predicted number of promotions of women to the observed number of promotions of women.[76] When I performed my compensation (and other) analyses, I estimated my model on both men and women, and included an indicator variable that takes the value of one if the observation is associated with a woman, and zero otherwise. The coefficient on this female indicator gives me the size of the gender difference in compensation (or other outcome variables, e.g. 360 review score).

83. It is true that I have performed these analyses slightly differently, but the difference in unimportant. As I explained at the class certification hearing in this case, the difference between these two modeling choices is "fundamentally…just a question of whether you use the women's characteristics in promotions to explain the promotion process as well."[77] I have modeled this promotion process by attempting to answer the question: "what if women were promoted in the same way that men were—how many women would have been promoted?"

84. Nevertheless, it is possible to analyze a model of promotions in a similar manner to how I analyzed the model of compensation: namely, by estimating my model based on both men and women, and including a "female" indicator variable. Doing so does not change my opinions. Table 14 reports the results of this analysis, and compares it to the results of the male-only promotion analysis I performed in my January 2021 report.

[76] January 2021 Farber Report at ¶ 128.

[77] Tr. At 299:9-12

85. The top row of Table 14 reports the results of the model estimated only on men.[78] I display the total number of observations on men in Column 1. This is the number of male person/years contained in annual "snapshot" data. I report the promotion rate for men in Column 2. It indicates the percentage of male person/years for men promoted during the following fiscal year. In Column 3 I report the total number of observations on women. Column 4 reports the promotion rate among women. I report the actual number of promotions from VP to EMD among women in Column 5. Column 6 reports the expected number of promotions among women, if women were treated the same as men with regard to promotion. Column 7 presents the difference between the actual and the expected number of promotions for women. It indicates that women experienced 27 fewer promotions than they would have if they had been promoted according to the model of promotions that applies among comparable men. Columns 8 and 9 present the lower and the upper bounds, respectively, of the 95 percent confidence interval for the number of promotions for women. The observed value of promotions for women in Column 5 (219) is below the lower bound of the 95 percent confidence interval in Column 8 (231). This means that the number of observed promotions for women is different from the expected number of promotions, and that the difference is statistically significant at the 5 percent level.

[78] This table is slightly different than the one presented as Table 24 in my January 2021 report. This is because I have made a few changes to my data. See Section II. However, the top row of 14 is identical the updated version of Table 24 presented in Appendix A to this report.

86. The second row of Table 14 reports the results of the model estimated on both men and women and includes a "female" indicator variable. The model that is estimated on both men and women continues to find a shortfall of 27 promotions for women. The observed value of promotions for women in Column 5 is still lower than the lower bound of the 95 percent confidence interval of 231 in Column 8. This means that the number of observed promotions for women is different from the expected number of promotions, and that the difference is statistically significant at the 5 percent level.

87. This analysis shows that there is a virtually identical shortfall of 27 promotions of female Vice Presidents to EMD, whether I use a model estimated on men, or a model estimated on both men and women, and this promotion shortfall is statistically significant when estimated using either method. When I estimate damages related to the Plaintiffs' promotion claim in Section X, I do so using my original model, estimated on men only.

## IX. Other Criticisms

A. Dr. Shaw asserts wrongly that women in the top quartile are not harmed

88. Dr. Shaw argues that women who received top quartile placement cannot have been harmed in the manager quartiling process.[79] This is irrelevant. Plaintiffs allege disparate impact in both the 360 review process and manager quartiling, which are connected because the 360 review feeds into the manager quartile. In the analyses where I

---

[79] Shaw report at ¶ 221

examine the impact of performance reviews on the size of the gender pay gap (namely, Tables 3 and 4) I report variations that include the following performance review controls: controls for manager quartiles alone (the model variants denoted "b"); controls for 360 Degree reviews alone (the model variants denoted "c"); and versions that control for both manager quartile and 360 score (the model variants denoted "d"). Each of these analyses yield qualitatively similar results.[80] I also note, as I reported previously, that among Associates, women are paid less on average than men even when they are in the same quartile grouping, in the first through third quartiles. In these three quartiles these differences are statistically significant among Associates. Among Vice Presidents, women are paid less on average than men even when they are in the same quartile grouping, for all quartiles. Among Vice Presidents, these differences are statistically significant and adverse to women in every quartile.[81]

B. <u>Dr. Shaw's analysis of individual women's compensation and performance is flawed on a conceptual level</u>

*1. Dr. Shaw's analysis of individual class member compensation*

89. Dr. Shaw performs an exercise comparing actual compensation to the compensation that her (or my) model "predicts" that each class member would have received, absent discrimination. She does this by comparing each class member's actual earnings to the earnings predicted by her model, or by my model.

---

[80] I also showed in my January 2021 report that within the top quartile, women have lower average earnings than men (*See* Tables 13 and 14 of my January 2021 report).

[81] *See* January 2021 Farber Report at Tables 13 and 14 and ¶ 92.

90. At root, for both the criticism aimed at individual class members' compensation and for the class at large, Dr. Shaw has made a conceptual error.[82] Namely, the difference between any individual's actual compensation and the compensation predicted by my model is *not* meant to be interpreted as the amount to which she was or was not discriminated against. Rather, my model is designed to provide a statistical estimate of the amount by which female Associates and Vice Presidents at Goldman are underpaid, on average. Any statistical analysis will *always* have an error term, which represents the portion of the dependent variable (here, log compensation) that is not explained by the variables included in the model. Some women (and some men) will have positive error terms, indicating that their compensation is higher than the model predicts; some women (and some men) will have negative error terms, indicating that their compensation is lower than the model predicts.[83] As described by Bielby and Coukos (2007) and cited by Judge Francis: "a woman who is penalized because of her gender to the same extent as any other class member could still end up being more highly compensated than the vast majority of men or even be the highest-paid person in the entire

---

[82] The argument in this paragraph applies equally to differences in predicted and observed performance reviews.

[83] I note also that in the top panel of Exhibit 23, which performs a similar analysis comparing actual performance reviews to predicted performance reviews, Dr. Shaw presents a "hypothetical example that demonstrates how the data might look if Plaintiff's theory were correct," and goes on to state that "[i]f Plaintiffs' allegations of systemic discrimination were true, the dots would fall below the 45-degree line." The standard that Dr. Shaw has invented—requiring that *all* women receive lower scores (or compensation) than the model predicts in order to be evidence of systemic discrimination—is the same as requiring no individual woman to have a residual that is larger than the gender gap. (*See* Shaw Report at ¶ 205 and Exhibit 23)

company, due to the impact of unmeasured factors. Absent discrimination, her high salary would have been even higher."[84]

*2. Allison Gamba and Mary De Luis*

91. Dr. Shaw reports the result of the above exercise for Allison Gamba (a named Plaintiff).[85] Dr. Shaw concludes that because Ms. Gamba's compensation [redacted] is greater than the amount of compensation predicted by her model [redacted] in 2012, this is evidence that she earned more than a comparable man and implies that she was therefore not subject to discrimination.[86]

92. First, I note my objection to this exercise as described in ¶ 90, above: the difference between any individual's actual compensation and the compensation predicted by my model is *not* meant to be interpreted as the amount by which she was or was not discriminated against. Second, I note that the predicted compensation reported by Dr. Shaw uses Dr. Shaw's methodology, not my own. She modifies my analysis in important and incorrect ways that are addressed throughout this report.[87] Additionally, I note that

---

[84] Bielby, William T. and Pamela Coukos, "'Statistical Dueling' with Unconventional Weapons: What Courts Should Know about Experts in Employment Discrimination Class Actions" 56 Emory Law Journal (2007) at p. 1602. This is cited in Judge Francis's Order at p. 20.

[85] Dr. Shaw adds a number of controls to my model, including production.

[86] Shaw Report at ¶ 182.

[87] That is, she controls for Ms. Gamba's performance reviews and production, among other factors. See Section VI for discussion. I note that Dr. Shaw does not use any information about Ms. Gamba's production in this (or any other) year, as the production measures used by Dr. Shaw are missing for Ms. Gamba in all years.

Ms. Gamba earned [redacted] less than a male employee in her Business Unit (NYSE Specialists) with the same years of tenure (14), who earned [redacted] in 2012, the year identified in Dr. Shaw's Exhibit 20.[88]

93. Dr. Shaw also calculates the predicted 360 score for Ms. Gamba and another plaintiff, Mary De Luis, and compares it to each woman's actual score. In this exercise, Dr. Shaw once again misinterprets the results of my analysis, in a manner analogous to her misinterpretation of my compensation analysis, as described in ¶ 90 above. Any difference between an individual's actual 360 score and the 360 score predicted by my model (or by Dr. Shaw's variations of my model) should not be interpreted as the amount by which she was or was not discriminated against. Further, I note that these predictions rely on Dr. Shaw's methodology, not my own. Lastly, I note that both Ms. Gamba and Ms. DeLuis receive lower scores than predicted in at least one year. Ms. Gamba receives a lower score than predicted (according to both my Model 2 and my Model 3) in 2004, 2010, 2011, 2012, and 2013. Plaintiff DeLuis receives a lower score than predicted (according to both my Model 2 and my Model 3) in 2014 and 2015.

[88] This is the individual with the employee ID [redacted] Ms. Gamba and employee [redacted] also shared the same job title (Vice President) and division (Securities). Another male Vice President in the NYSE Specialists Business Unit with less than half of Ms. Gamba's tenure at Goldman Sachs (6 years to her 14) received the same compensation as did Ms. Gamba (employee number [redacted]).

C. Estimating Gender Gap by Business Unit

94. Dr. Shaw presents separate estimates of the gender gap in both compensation (Shaw Report Exhibit 37) and performance review (Exhibit 22) by business unit. With regard to performance reviews, Dr. Shaw indicates that "[i]f GS's review processes impose a consistent bias against class members, we should see common gender gaps across Business Units."[89] With regard to compensation, Dr. Shaw writes "if Prof. Farber is correct that there is a *common* gender gap that affects all women Associates and VPs in the same way regardless of which Business Unit they belong to, then when I use my regression model to estimate distinct gender gaps for each Business Unit (by interacting an indicator variable for being female with Business Unit), I should see that gender gaps are similar across Business Units."[90]

95. This argument is similar to Dr. Shaw's argument surrounding compensation of individual women, discussed above at Section IX.B, and is also similar to the argument presented by Goldman's previous expert, that "if there were in fact a systematic pattern of pay discrimination as Plaintiffs allege, I would expect to find the women in all Business Units similarly disadvantaged and that the differences would be statistically significant for most parts of the organization."[91]

[89] Shaw Report at ¶ 196.

[90] Shaw Report at ¶ 269.

[91] Expert Report of Michael P. Ward, July 3, 2014 ("July 2014 Ward Report") at p. 55.

96. First, I note that the Court in this case has previously ruled that my decision to aggregate data (both across Divisions and Business Units) "was reasonable both in light of the evidence that Goldman Sachs applies common performance measures that influence pay and promotion across business units and in light of the statistical pitfalls of disaggregation."[92]

97. The "statistical pitfalls" of disaggregating data into small groups arise because of small sample size problems. In previous stages of this case, Goldman's expert Dr. Ward estimated separate models for each Business Unit.[93] Dr. Shaw performs a different analysis, estimating a model pooled over all divisions (but separately by job title), and including an interaction term between female and business unit. This allows her to estimate a separate gender gap for each Business Unit. She then performs an F-test of equality of these coefficients and concludes that the gender pay gap is not constant across all Business Units.[94]

98. However, the fact that some business units have larger pay gaps than other business units—and even if some individual business units appear to have pay gaps that favor women—is not evidence that there is not broad class-wide gender discrimination. As described by Bielby and Coukos (2007) and cited by Judge Francis, "[T]he presence of this

---

[92] Francis Order at pp. 20-21. This was affirmed by Judge Torres at pp. 20-21. (*See* Opinion and Order of Analisa Torres, March 30, 2018).

[93] See Farber Rebuttal Report, July 29, 2014 at ¶¶ 53-58 for a critique of this approach.

[94] I also note that these tests are performed on her models.

kind of random variation does not mean that the average is deceptive. A woman may be the highest earner in her particular office but may be paid far lower than a host of equally or lesser-qualified men in other offices."[95] If you replace "office" with "Business Unit" this is the case here: within a relatively small group of people (e.g. Business Units), it may well be the case that women within that small group are paid more, on average, than men in the small group. However, looking at small groups in this way masks the overall gender difference in pay. It may be the case that within subgroups (e.g., Business Units), the random variation in pay that exists for both men and women will mask the gender effect within that group, even if women do experience uniform pay discrimination.[96] The splitting of the data into subgroups reduces the statistical power of the analysis (the ability to identify a pay disparity where it exists).

99. In a simulation exercise Bielby and Coukos (2007) speak directly to this point. They examined the question of whether a common gender pay gap would necessarily manifest in a common pay gap across all subunits (e.g. Business Units). In this exercise, they simulate each employee's earnings using a regression model, allowing each employee to have a randomly-distributed error term but enforce a common gender pay gap

---

[95] Bielby and Coukos at p. 1602. This is cited by Judge Francis at p. 20

[96] This problem is illustrated by way of analogy by Bielby and Coukos at p. 1602-1603: "Imagine performing 1000 coin flips. Given such a large sample, the result is likely to be very close to 500 heads and 500 tails. If the result were 600 heads and 400 tails, one would suspect a loaded coin. Yet each group of ten tosses might be all over the map. Some would be 6 heads and 4 tails, but others might include more tails than heads. Looking at the smaller groups might not alert the coin tosser to the underlying problem."

of approximately 11 percent, against all women. They then estimate the gender pay gap separately for each subunit (an office), and find no significant disparity in the overwhelming majority of offices.[97] The results of this exercise were described by Bielby and Coukos: "The results of statistical analysis—seemingly random disparity—fail to line up with the empirical reality—uniform disparity—because of lowered statistical power. By breaking up the dataset into much smaller units, the amount of 'noise,' or random variation, is elevated over any pattern that exists….Because individual salaries will tend to vary for a host of reasons, looking at smaller groups will tend to diminish evidence that women as a group are harmed more than men."[98] This pattern is what we see from Dr. Shaw's disaggregation analysis.

100. Dr. Shaw also presents a graph (Exhibit 39) comparing the size of the "residuals" of her version of my analysis (which includes inappropriate controls, e.g. production and performance) and argues that the presence of residuals that are larger than the estimated size of the gender pay gap is evidence that unnamed omitted variables may be causing the gender gap.[99] Dr. Shaw is implying that in order to show statistical evidence of gender bias, the residuals must be smaller than the size of the measured gender pay gap, or else there is insufficient evidence of bias. There is no such rule in statistics.

---

[97] This simulation results in a significant disparity disfavoring women in 2 offices, a significant disparity disfavoring men in 5 offices, and no significant disparity in 174 offices.

[98] Bielby and Coukos (2007) at p. 1602.

[99] Shaw Report at Exhibit 39 and ¶ 285 (pp. 149-150).

Indeed, the point of performing statistical analyses (like regression analysis) is to be able to identify patterns in data in spite of variations in these data.

D. Goldman's Performance Review and Promotion Policies are Common to the Class

101. Dr. Shaw argues that these policies are not common to the class because 360 performance reviews are performed by different people, different women have different managers, and multiple people make compensation decisions.[100] Whether or not there are multiple reviewers, managers, or people making compensation decisions, these decisions are made and reviews are performed under common written policies, that apply to all Associates and Vice Presidents at Goldman. Consequently, Dr. Shaw attempts to answer an irrelevant question because Plaintiffs are challenging an explicit policy that applies to the entire class regardless of the number of different managers.

E. Effect of Performance Reviews 2016-2018

102. In Exhibit 43, Dr. Shaw purports to show that pre-2016 performance reviews have no impact on compensation from 2016 onwards. This analysis is dependent on improper modeling techniques, and therefore the entire analysis is unreliable.

103. Table 15 summarizes the percent of observations underlying Dr. Shaw's Exhibit 43 for which lagged 360-review scores are unavailable. 74 percent of observations do not have a six-year-prior 360-review score, and even the lag length with the fewest

[100] Shaw Report at ¶ 36 and Section 4.2, generally.

missing values (3-years prior) is missing for nearly half (47 percent) of the sample.[101] Clearly, there is not sufficient data for a lagged-performance review analysis. Rather than acknowledge this deficiency, however, Dr. Shaw artificially inflates the sample size. Dr. Shaw eschews standard practices concerning regressions with lagged explanatory variables, which generally necessitate dropping observations that lack the full set of lagged values.[102] Instead, whenever an employee lacks a lagged score required by her model, Dr. Shaw simply creates a score of 0 and then includes an indicator for "missing lagged score." This is inappropriate. Such a methodology to deal with missing values is acceptable only under certain conditions, not present here, explained below. These conditions are not met, and this methodology is completely unsuited for Dr. Shaw's lagged performance analysis.

104. First and foremost, to include observations with missing data in the way Dr. Shaw does, the researcher must at a minimum believe that any missing data are "missing at random." That is, the researcher must believe that there is no correlation between the likelihood the data are missing and, for example, the compensation outcome and other factors in the model being analyzed. Such a belief is indefensible in this case. Generally, employees are missing performance review data not because of something random (e.g. a

---

[101] Note that Dr. Shaw's analysis requires a lagged performance review in the pre-2016 period. This means, for instance, that in 2017, it is generally impossible to have a one-year lag, and in 2018 it is generally impossible to have either a one-year or a two-year lag (though, due to the way that Dr. Shaw constructed these variables, there are approximately a dozen employees in 2017 and 2018 with unexpected lags).

[102] As the last row of Table 15demonstrates, 91.3 percent of observations underlying Exhibit 43 lack the full set of lagged values.

data error), but because of their characteristics. Employees who have only received one performance review will be “missing” values for their one-year lagged review, their two-year lagged review, etc. Additionally, employees who are promoted out of their title or leave the firm after only, say, 3 years in a position are likely to have different characteristics than those who remain in a given title for 4-6 years. The former will have “missing” values for any 4-year, 5-year, or 6-year lagged performance reviews, while the latter generally will not be missing these values. Since the characteristics that determine whether an employee is promoted or leaves the firm in a given time frame are likely to be characteristics that also influence pay, it is wrong to employ a model that assumes the lagged reviews are missing at random.

105. Furthermore, I note that Dr. Shaw’s lagged performance reviews are not all “missing” in the usual sense. Insofar as Goldman’s data are complete, it is not as if there are performance reviews that occurred but which we fail to observe. Nor is it as if the employee performed work but failed to be reviewed. Rather, there is simply no lagged value that one could even potentially observe, no performance to be potentially measured. In such a situation, a researcher must choose between retaining a larger sample size or including longer lag lengths in the model. Dr. Shaw avoids this choice by employing an improper technique.

106. Dr. Shaw’s analysis merely obfuscates what remains true: each of her six lagged-360-review coefficients is based on an extremely limited and non-randomly selected sample. As such, Dr. Shaw’s analysis is unreliable and uninformative.

107. Dr. Shaw's unworkable lagged-performance-review model is not necessary for answering the question of whether bias in performance reviews can affect compensation after 2016. As long as current compensation is influenced by past compensation, one cannot expect the influence of past discrimination to disappear unless an explicit adjustment is made to correct for it. As I explained in my January 2021 Report, the gender pay gap for Vice Presidents did not decrease when Goldman transitioned to a new performance review system in 2016, so there is no evidence of such an adjustment.[103]

## X. Damages

### A. Damages Associated with Compensation Claims

108. In Dr. Shaw's report, she identifies three "broad" errors in the way in which my back-pay damages were calculated.[104] The first of these—that there are no damages—I reject for the reasons explained previously in this report. I find that when I estimate my models using a single "pooled" regression across all divisions, female Associates and Vice Presidents at Goldman earn statistically significantly less, on average, than male Associates and Vice Presidents at Goldman, after controlling for "Model 2" controls,[105] whether or not I additionally control for Business Units and division function. I further find

---

[103] January 2021 Farber Report at ¶¶ 115-124 and Tables 21-22. This analysis showed that among Vice Presidents, the gender pay gap did not decrease during the 2016-2018 period relative to the gender pay gap in earlier years.

[104] Shaw Report at ¶¶ 300-303.

[105] These controls are tenure (and the square of tenure) at Goldman, related prior experience (and the square of related prior experience), division, Affirmative Action ("AA") job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employee is a new lateral hire, and year.

that if I estimate the gender pay gap separately by division, female Associates and Vice Presidents at Goldman in each division earn less than male Associates and Vice Presidents at Goldman. These differences are statistically significant for all groups of Vice Presidents, and for two of three groups of Associates (IBD and Securities).

109. I make the following corrections to my damages calculations based on comments from Dr. Shaw. First, I correct the error that caused me to omit 278 professionals who signed severance agreements after the complaint was filed from my "Exclusion Group 2."[106] I additionally recalculate damages associated with Vice Presidents after 2016 with the requirement that, in order to be included in this analysis, each Vice President in the period after 2016 must have received at least one performance review prior to 2016.[107] Beginning in 2019, when I no longer have data, I assume that these Vice Presidents who were reviewed prior to 2016 experience attrition from the class at the average annual rate of attrition over the period 2002-2018, which is approximately 20 percent.

110. I believe that my AAP group controls are adequate to control for variations in the type of work performed. Nevertheless, I present alternative damages calculations based

---

[106] Shaw Report at ¶ 303

[107] *See* Shaw Report at ¶ 302. In particular, I require that to be included in my damages estimate for the period beginning in 2016, each class member must have received at least one performance review during the same employment "stint" as her current stint, and within the period 2013-2015

on models with and without Business Unit controls, with and without division function controls.

111. Table 16 presents damages associated with the overall compensation claim. These damages are based on versions of my models that include SSPWAs. These damages calculations are based on the total gender pay gap. I estimate damages in the same way as I reported in my January 2021 Report, though I do not estimate the impact of performance reviews on this group, consistent with my explanation in paragraph 20 above.[108] I present damages estimates for four specifications: Model 2, Model 2 + division function controls, Model 3, and Model 3 + division function controls. The top row of each model specification in Table 16 presents damages estimates for the entire class, including those who may be excluded from the class for various reasons.[109] I find that, depending on specification, overall compensation damages range from $668 million to $1.2 billion. Within each model specification in Table 16, the middle row presents damages estimates for the class, excluding those individuals in “Exclusion Group 1.”[110] I find that, depending on specification, overall compensation damages excluding those individuals in Exclusion

[108] These damage estimates are based on the method described in ¶¶ 137-143 of my January 2021 report. In Appendix B to this report, I include tables parallel to Table 25 from my January 2021 report for each of the models summarized in this section. These can be interpreted as described in Section VIII of my January 2021 report, though the tables underlying Table 16 do not include columns beyond the first four.

[109] See January 2021 Farber Report at ¶ 148 for a discussion of these women.

[110] “Exclusion Group 1” are those former Class members who either: 1) opted out of the class in a timely manner; 2) signed severance agreements before the original complaint was filed; or 3) signed Managing Director agreements with arbitration agreements therein before the original complaint was filed. See January 2021 Farber Report at ¶ 148.

Group 1 range from $550 million to $950 million. Within each model specification in Table 16, the bottom row presents damages estimates for the class, excluding those individuals in "Exclusion Group 2."[111] I find that, depending on specification, overall compensation damages excluding those individuals in Exclusion Group 2 range from $314 million to $540 million.

112. Table 17 presents estimates of damages associated with the impact of performance reviews. These damages are based on versions of my models that exclude SSPWAs. These damages calculations are based on the portion of the gender pay gap that is explained by differences in performance review, and are estimated in the same manner as in my January 2021 report.[112] This table follows a similar format as Table 17 but adds a panel that presents the damages explained by performance review metrics.

113. I present damages estimates for four specifications: Model 2, Model 2 + division function controls, Model 3, and Model 3 + division function controls. The top row of each model specification in Table 17 presents estimates for the portion of the pay gap that is associated with performance reviews for the entire class, including those who may

---

[111] "Exclusion Group 2" includes individuals identified in Exclusion Group 1, plus individuals who 1) signed a severance agreement; 2) signed a Managing Director agreement with an arbitration agreement therein; or 3) signed a Private Wealth Management agreement with an arbitration agreement therein. It does not include class members who accepted Equity Awards. See January 2021 Farber Report at ¶ 148.

[112] These damages estimates are based on the method described in ¶¶ 137-147 of my January 2021 report. In Appendix B to this report, I include tables parallel to Table 25 from my January 2021 report for each of the models summarized in this section. These can be interpreted as described in Section VIII of my January 2021 report.

be excluded from the class for reasons related to arbitration. I find that, depending on specification, damages associated with performance reviews range from $179 million to $220 million. The middle row of each model specification in Table 17 presents damages estimates for the portion of the pay gap that is associated with performance reviews for the class, excluding those individuals in "Exclusion Group 1." I find that, depending on specification, damages associated with performance reviews range from excluding those individuals in Exclusion Group 1 range from $146 million to $177 million. The bottom row of each model specification in Table 17 presents damages estimates for the portion of the pay gap that is associated with performance reviews for the class, excluding those individuals in "Exclusion Group 2." I find that, depending on specification, these damages excluding those individuals in Exclusion Group 2 range from $93 million to $114 million.

114. The damages reported in Tables 16 and 17 are associated with harm to class members that has already occurred ("backpay").[113] Tables 18 and 19 follow a similar format as Tables 16 and 17 above, but present the one-year total value of pay increases required to bring female Vice Presidents to pay parity with men, going forward, for each compensation analysis. This is simply a one-year estimate of "current" total pay (reported in Column 1), multiplied by the pay-gap factor (reported in Column 3).[114] Table 18 reports the total value of raises necessary to bring female Vice Presidents to pay parity. Depending

---

[113] Damages are currently estimated through June 2021.

[114] Included in this analysis are Vice Presidents in 2018 who have at least one performance review prior to 2016. *See* January 2021 Farber Report at ¶ 141 for description of the "pay gap factor."

on model specification, these damages range from $28 million to $50 million. Table 19 reports the total value of raises necessary to bring female Vice Presidents to pay parity, considering only the portion of the gender pay gap that is due to differences in performance reviews. Depending on model specification, the amount of money required to bring women to parity going forward ranges from $6.5 million to $8.1 million.

B. Damages Associated with Promotions Claims

115. In calculating damages associated with the Plaintiffs' allegation that there is gender bias in the way in which female Vice Presidents are promoted to EMD, Dr. Shaw argues that I should have calculated the earnings differences between EMDs and Vice Presidents differently. Namely, she argues that I used too low of an earnings benchmark for Vice Presidents,[115] and too high of an earnings benchmark for EMDs.[116] I reject both of these arguments, as described further below. I also reject her other criticisms—that I should have estimated the promotion shortfall separately by division and/or year, and that I should have examined each stage of the promotion process separately—for reasons discussed in Section VIII above.

116. My promotions shortfall analysis finds that 27 fewer women were promoted between 2003 and 2018 than one would expect had women been promoted at the same rate as men with the same observed characteristics.[117] However, I cannot identify *which*

---

[115] Shaw Report at ¶ 327.

[116] Shaw Report at ¶ 328.

[117] See Table 14.

particular women were denied these promotions. As such, I have compared the 90th percentile of earnings of female Vice Presidents at Goldman to the average earnings of EMDs with given tenure at Goldman.[118] Dr. Shaw argues that because you might expect "only the 'best' VPs to be promoted to EMD," I should have used a different benchmark for Vice President pay (namely, the average pay of women who were promoted). However, I disagree that my analysis understates VP pay of women who were denied promotion. First, I note that in order to calculate damages, I must be able to identify the "value" of being an EMD (relative to being a Vice President) in every year, even if no promotions occurred in that year.[119] Using a percentile of female Vice Presidents' pay in each year provides a natural way to identify this value in each year, even when no promotions occurred, and using the 90th percentile of pay among female Vice Presidents accounts for Dr. Shaw's argument that those promoted to EMD are likely high earners.[120] Dr. Shaw also argues that I should have used *median* compensation of EMDs as a benchmark rather than *mean* compensation of EMDs. I disagree. By using mean EMD pay as a benchmark

[118] Goldman provided me information on the mean and median compensation of EMDs at Goldman by tenure.

[119] *See* January 2021 Farber Report at ¶ 154 for a complete description of this calculation.

[120] I note that the median pay of women promoted to EMD is at the 91st percentile of the distribution of pay among all female Vice Presidents, meaning that half of promoted female VPs earn above the 91st percentile of all female Vice Presidents and half of promoted female Vice Presidents earn below the 91st percentile of all female Vice Presidents. This is additional evidence that my benchmark of the 90th percentile of female Vice Presidents pay is reasonable.

against which I compare Vice President pay, I am capturing the average compensation for EMDs.

117. My damages analyses related to promotions are similar to those presented in my January 2021 report, with a modification to the timing of certain promotions as recommended by Dr. Shaw.[121] As in my January Report, because promotions in some years may be worth more than promotions in other years, I have estimated the promotion shortfall separately by year.[122] Column 1 of Table 20 reports the number of promotions from VP to EMD in each year, among women. Column 2 reports the expected number of promotions for women, predicted separately by year.[123] Column 3 reports the difference between the expected number of promotions and the observed number of promotions for women in each year. In most years, the difference is positive, indicating that fewer women were promoted compared to what I would expect. In a few years (namely, 2003, 2010, 2012, and 2015) the difference between the expected and the observed promotions is negative.[124] This indicates that more women were promoted in that year relative to what I would expect. To the extent that some of the differences are negative, I "credit" Goldman

---

[121] Shaw Report at ¶ 342.

[122] *See* January 2021 Farber Report at ¶ 151 for details.

[123] I estimate separately by year for the limited purpose of estimating damages. I do not believe it is appropriate to estimate this model separately by year for the purposes of identifying an overall promotion shortfall effect for reasons discussed in Section VII.A above.

[124] I have assumed on instruction from Counsel that 2002 is identical to 2003, so 2002 is also negative. See January 2021 Farber Report at fn 100 for details.

for these negative shortfalls in a subsequent step of my damages calculation, effectively reducing my estimate of damages from disparities in promotion. I calculate two "total" rows, one that includes 2002 (which I have assumed on the instruction of counsel to be identical to 2003), and one that does not. Note that the "total" row that does not include 2002 has the same overall shortfall as was estimated over the entire time period, presented in Table 14.

118. I estimate damages for gender disparity in promotion through June 2021 making adjustments for the attrition rate and the differences between EMD and VP pay by year and tenure as EMD in the same manner as in my January 2021 Report.[125] I report these damages in Table 21. For years in which the adjusted shortfall is negative (indicating that more women were promoted than I expected), I calculate negative damages, which offset a portion of the damages total. Summing across all years 2003-2018, I find that there was a shortfall of 27 promotions, and I estimate total damages associated with this promotion shortfall to be equal to $143 million. Summing across all years 2002-2018, I find that there was a shortfall of 24 promotions, and I estimate total damages associated with this promotion shortfall to be equal to $117 million.

119. I also perform a similar exercise as described in my January 2021 Report and above to exclude from these damages calculations certain Class members who may be excluded from the Class for having signed an arbitration agreement.[126] In order to perform

---

[125] *See* January 2021 Farber Report at ¶¶ 153-156.

[126] *See* January 2021 Farber Report at ¶ 157.

this approximation, I have calculated, separately for each year, the share of person-years represented by women in each of the Exclusion Groups. I then reduce the damages estimate associated with lost promotions in each year by the proportion of female Vice Presidents who may be excluded from the class for reasons discussed in ¶ 148 of my January 2021 report. However, because I cannot identify whether any particular woman who is a member of one of the Exclusion Groups would have wrongfully been denied a promotion, this exercise is an approximation. The results of this analysis are presented in Table 22 which represents the lower bound of damages associated with the promotions claim receivable by the Plaintiffs if the Court were to decide to reduce promotions by the proportion of employee-years associated with each of the Exclusion Groups.

120. I reserve the right to supplement my opinion should additional information become available to me.

Henry S. Farber
April 19, 2021

Table 1

Regression Analysis of the Male/Female Pay Difference, Associates

| | Full Sample | | | | | Excluding SSPWAs | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Log-Point Difference | T-Ratio | Employee-Years in Sample | Percent Difference | Adjusted R-Squared | Log-Point Difference | T-Ratio | Employee-Years in Sample | Percent Difference | Adjusted R-Squared |
| Model 2 | -0.052 | -5.13 | 16,251 | 5.09% | 0.320 | -0.052 | -5.08 | 16,038 | 5.09% | 0.321 |
| + Division Function | -0.057 | -6.06 | 16,251 | 5.52% | 0.407 | -0.057 | -6.02 | 16,038 | 5.54% | 0.408 |
| Model 3 | -0.037 | -4.13 | 15,417 | 3.61% | 0.484 | -0.036 | -4.02 | 15,204 | 3.54% | 0.486 |
| + Division Function | -0.040 | -4.72 | 15,417 | 3.92% | 0.522 | -0.040 | -4.63 | 15,204 | 3.88% | 0.525 |

Notes

Self Sustaining Private Wealth Advisors (SSPWAs) have been identified using the definition provided by Dr. Shaw.

The table gives an absolute value of the t-ratio for the test of no difference in earnings between men and women. Generally speaking, a t-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characteristics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables in Model 2 are non-missing.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employee is a new lateral hire, and year.

Model 3 includes all the same variables as Model 2 and, in addition, Business Unit. It is limited to the years 2004 through 2018, the period of time over which I have information on Business Units in each division.

Table 2

Regression Analysis of the Male/Female Pay Difference, Vice Presidents

| | Full Sample | | | | | Excluding SSPWAs | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Log-Point Difference | T-Ratio | Employee-Years in Sample | Percent Difference | Adjusted R-Squared | Log-Point Difference | T-Ratio | Employee-Years in Sample | Percent Difference | Adjusted R-Squared |
| Model 2 | -0.254 | -13.55 | 30,050 | 22.43% | 0.211 | -0.204 | -12.58 | 26,915 | 18.48% | 0.269 |
| + Division Function | -0.171 | -10.87 | 30,050 | 15.74% | 0.376 | -0.169 | -11.02 | 26,915 | 15.52% | 0.364 |
| Model 3 | -0.244 | -13.56 | 28,922 | 21.64% | 0.370 | -0.168 | -10.88 | 25,787 | 15.51% | 0.433 |
| + Division Function | -0.153 | -9.79 | 28,922 | 14.19% | 0.458 | -0.150 | -9.92 | 25,787 | 13.94% | 0.455 |

Notes

Self Sustaining Private Wealth Advisors (SSPWAs) have been identified using the definition provided by Dr. Shaw.

The table gives an absolute value of the t-ratio for the test of no difference in earnings between men and women. Generally speaking, a t-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characteristics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables in Model 2 are non-missing.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employee is a new lateral hire, and year.

Model 3 includes all the same variables as Model 2 and, in addition, Business Unit. It is limited to the years 2004 through 2018, the period of time over which I have information on Business Units in each division.

Regression Analysis of the Male/Female Pay Difference, Associates
Controlling for Performance

| | | Log-Point Difference | T-Ratio | Employee-Years in Sample | Percent Difference | Adjusted R-Squared | Percent of Pay Gap Explained by Performance Metrics |
|---|---|---|---|---|---|---|---|
| Model 2 | 2 | -0.052 | -5.08 | 16,038 | 5.09% | 0.321 | |
| | 2a | -0.054 | -4.58 | 11,797 | 5.27% | 0.328 | |
| | 2b | -0.044 | -4.17 | 11,797 | 4.30% | 0.444 | 18.85% |
| | 2c | -0.031 | -3.05 | 11,797 | 3.05% | 0.454 | 42.77% |
| | 2d | -0.032 | -3.22 | 11,797 | 3.14% | 0.488 | 41.10% |
| Model 2 + DF Controls | 2 | -0.057 | -6.02 | 16,038 | 5.54% | 0.408 | |
| | 2a | -0.059 | -5.37 | 11,797 | 5.76% | 0.421 | |
| | 2b | -0.048 | -5.08 | 11,797 | 4.73% | 0.542 | 18.22% |
| | 2c | -0.030 | -3.23 | 11,797 | 3.00% | 0.531 | 48.58% |
| | 2d | -0.034 | -3.70 | 11,797 | 3.30% | 0.573 | 43.38% |
| Model 3 | 3 | -0.036 | -4.02 | 15,204 | 3.54% | 0.486 | |
| | 3a | -0.039 | -3.70 | 11,636 | 3.79% | 0.482 | |
| | 3b | -0.028 | -3.10 | 11,636 | 2.73% | 0.596 | 28.39% |
| | 3c | -0.014 | -1.49 | 11,636 | 1.36% | 0.565 | 64.55% |
| | 3d | -0.017 | -1.92 | 11,636 | 1.65% | 0.612 | 56.89% |
| Model 3 + DF Controls | 3 | -0.040 | -4.63 | 15,204 | 3.88% | 0.525 | |
| | 3a | -0.042 | -4.24 | 11,636 | 4.15% | 0.517 | |
| | 3b | -0.031 | -3.68 | 11,636 | 3.03% | 0.635 | 27.41% |
| | 3c | -0.017 | -1.95 | 11,636 | 1.68% | 0.605 | 60.09% |
| | 3d | -0.020 | -2.41 | 11,636 | 1.94% | 0.653 | 53.90% |

Notes
Self Sustaining Private Wealth Advisors (SSPWAs) have been excluded. SSPWAs have been identified using the definition provided by Dr. Shaw.

The table gives an absolute value of the t-ratio for the test of no difference in earnings between men and women. Generally speaking, a t-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characteristics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variable in Model 2 are non-missing.

Model 2a controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employee is a new lateral hire, and year. It differs from Model 2 only in the restriction of the sample to employees with non-missing performance reviews.

Model 2b includes all the same variables as Model 2 and, in addition, quartile.

Model 2c includes all the same variables as Model 2 and, in addition, average 360-score (which is defined from 2003 to 2015) and overall manager rating (which is defined from 2016 to 2018).

Model 2d includes all the same variables as Model 2 and, in addition, quartile, average 360-score, and overall manager rating.

Models 3a through 3d are parallel to Models 2a through 2d, but add controls for Business Units. These analyses are limited to the years 2004 through 2018, the period of time over which there is have information on Business Unit in each division.

The percentage explained by performance ratings is equal to (A-X)/A, where A is the percentage pay gap in Model 2a or 3a and X is percentage pay gap for the given model.

Regression Analysis of the Male/Female Pay Difference, Vice Presidents
Controlling for Performance

| | | Log-Point Difference | T-Ratio | Employee-Years in Sample | Percent Difference | Adjusted R-Squared | Percent of Pay Gap Explained by Performance Metrics |
|---|---|---|---|---|---|---|---|
| Model 2 | 2 | -0.204 | -12.58 | 26,915 | 18.48% | 0.269 | |
| | 2a | -0.207 | -12.21 | 23,505 | 18.73% | 0.282 | |
| | 2b | -0.170 | -11.56 | 23,505 | 15.65% | 0.463 | 17.93% |
| | 2c | -0.170 | -10.90 | 23,505 | 15.62% | 0.404 | 18.11% |
| | 2d | -0.159 | -10.91 | 23,505 | 14.74% | 0.486 | 23.12% |
| Model 2 + DF Controls | 2 | -0.169 | -11.02 | 26,915 | 15.52% | 0.364 | |
| | 2a | -0.171 | -10.78 | 23,505 | 15.75% | 0.385 | |
| | 2b | -0.126 | -9.90 | 23,505 | 11.80% | 0.566 | 26.77% |
| | 2c | -0.127 | -9.04 | 23,505 | 11.94% | 0.503 | 25.84% |
| | 2d | -0.113 | -9.05 | 23,505 | 10.73% | 0.586 | 33.81% |
| Model 3 | 3 | -0.168 | -10.88 | 25,787 | 15.51% | 0.433 | |
| | 3a | -0.166 | -10.34 | 23,079 | 15.30% | 0.443 | |
| | 3b | -0.121 | -9.48 | 23,079 | 11.44% | 0.624 | 26.87% |
| | 3c | -0.125 | -8.81 | 23,079 | 11.73% | 0.551 | 24.85% |
| | 3d | -0.111 | -8.78 | 23,079 | 10.50% | 0.640 | 33.20% |
| Model 3 + DF Controls | 3 | -0.150 | -9.92 | 25,787 | 13.94% | 0.455 | |
| | 3a | -0.149 | -9.50 | 23,079 | 13.82% | 0.466 | |
| | 3b | -0.101 | -8.37 | 23,079 | 9.59% | 0.646 | 32.19% |
| | 3c | -0.102 | -7.55 | 23,079 | 9.72% | 0.576 | 31.24% |
| | 3d | -0.089 | -7.52 | 23,079 | 8.52% | 0.662 | 40.14% |

Notes

Self Sustaining Private Wealth Advisors (SSPWAs) have been excluded. SSPWAs have been identified using the definition provided by Dr. Shaw.

The table gives an absolute value of the t-ratio for the test of no difference in earnings between men and women. Generally speaking, a t-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characteristics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variable in Model 2 are non-missing.

Model 2a controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employee is a new lateral hire, and year. It differs from Model 2 only in the restriction of the sample to employees with non-missing performance reviews.

Model 2b includes all the same variables as Model 2 and, in addition, quartile.

Model 2c includes all the same variables as Model 2 and, in addition, average 360-score (which is defined from 2003 to 2015) and overall manager rating (which is defined from 2016 to 2018).

Model 2d includes all the same variables as Model 2 and, in addition, quartile, average 360-score, and overall manager rating.

limited to the years 2004 through 2018, the period of time over which there is have information on Business Unit in each division.

The percentage explained by performance ratings is equal to (A-X)/A, where A is the percentage pay gap in Model 2a or 3a and X is percentage pay gap for the given model.

Table 5

Regression Analysis of the Male/Female Pay Difference, Associates
Estimated Separately by Division; Adding Division Function

| | Sample | Log-Point Difference | T-Ratio | Employee-Years in Sample | Percent Difference | Adjusted R-Squared |
|---|---|---|---|---|---|---|
| Model 2 | All Divisions | -0.052 | -5.13 | 16,251 | 5.09% | 0.320 |
| | Securities | -0.081 | -4.03 | 7,131 | 7.76% | 0.271 |
| | IBD | -0.029 | -3.17 | 4,785 | 2.83% | 0.497 |
| | IMD | -0.019 | -1.31 | 4,335 | 1.92% | 0.180 |
| Model 2 + Division Function | All Divisions | -0.057 | -6.06 | 16,251 | 5.52% | 0.407 |
| | Securities | -0.102 | -5.44 | 7,131 | 9.71% | 0.364 |
| | IBD | -0.029 | -3.17 | 4,785 | 2.83% | 0.497 |
| | IMD | -0.008 | -0.59 | 4,335 | 0.78% | 0.314 |
| Model 3 | All Divisions | -0.037 | -4.13 | 15,417 | 3.61% | 0.484 |
| | Securities | -0.067 | -3.54 | 6,520 | 6.45% | 0.443 |
| | IBD | -0.023 | -2.67 | 4,641 | 2.26% | 0.546 |
| | IMD | -0.004 | -0.30 | 4,256 | 0.38% | 0.351 |
| Model 3 + Division Function | All Divisions | -0.040 | -4.72 | 15,417 | 3.92% | 0.522 |
| | Securities | -0.074 | -4.17 | 6,520 | 7.17% | 0.483 |
| | IBD | -0.023 | -2.67 | 4,641 | 2.26% | 0.546 |
| | IMD | -0.004 | -0.34 | 4,256 | 0.40% | 0.421 |

Notes

The table gives an absolute value of the t-ratio for the test of no difference in earnings between men and women. Generally speaking, a t-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characteristics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variable in Model 2 are non-missing.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether

Model 3 includes all the same variables as Model 2 and, in addition, Business Unit. It is limited to the years 2004 through 2018, the period of time over which I have information on Business Units in each division.

Table 6

Regression Analysis of the Male/Female Pay Difference, Vice Presidents
Estimated Separately by Division; Adding Division Function

| | Sample | Log-Point Difference | T-Ratio | Employee-Years in Sample | Percent Difference | Adjusted R-Squared |
|---|---|---|---|---|---|---|
| Model 2 | All Divisions | -0.254 | -13.55 | 30,050 | 22.43% | 0.211 |
| | Securities | -0.215 | -8.07 | 14,207 | 19.34% | 0.265 |
| | IBD | -0.121 | -4.84 | 4,098 | 11.40% | 0.361 |
| | IMD | -0.297 | -10.18 | 11,745 | 25.71% | 0.333 |
| Model 2 + Division Function | All Divisions | -0.171 | -10.87 | 30,050 | 15.74% | 0.376 |
| | Securities | -0.213 | -8.52 | 14,207 | 19.17% | 0.345 |
| | IBD | -0.121 | -4.84 | 4,098 | 11.40% | 0.361 |
| | IMD | -0.127 | -5.44 | 11,745 | 11.92% | 0.525 |
| Model 3 | All Divisions | -0.244 | -13.56 | 28,922 | 21.64% | 0.370 |
| | Securities | -0.180 | -7.09 | 13,377 | 16.48% | 0.441 |
| | IBD | -0.115 | -4.66 | 3,983 | 10.88% | 0.447 |
| | IMD | -0.300 | -10.58 | 11,562 | 25.94% | 0.390 |
| Model 3 + Division Function | All Divisions | -0.153 | -9.79 | 28,922 | 14.19% | 0.458 |
| | Securities | -0.180 | -7.05 | 13,377 | 16.46% | 0.446 |
| | IBD | -0.115 | -4.66 | 3,983 | 10.88% | 0.447 |
| | IMD | -0.124 | -5.55 | 11,562 | 11.68% | 0.559 |

Notes

The table gives an absolute value of the t-ratio for the test of no difference in earnings between men and women. Generally speaking, a t-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characteristics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variable in Model 2 are non-missing.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether

Model 3 includes all the same variables as Model 2 and, in addition, Business Unit. It is limited to the years 2004 through 2018, the period of time over which I have information on Business Units in each division.

Table 7

Missing Production by Title and Division

Panel A: Associates

| Division | Shaw Variable(s) | Raw Variable(s) | Percent Missing: Farber Sample | Percent Missing: Farber Sample Excluding SSPWAs | Percent Missing: Shaw Sample |
|---|---|---|---|---|---|
| Securities | l140_sec-l144_sec | Securities Production | 69.23% | 69.23% | 58.45% |
| IBD | l140_ibd-l144_ibd | gross_amount_usd | 53.92% | 53.92% | 59.82% |
| IMD | No production variable identified | | NA | NA | NA |

Panel B: Vice Presidents

| Division | Shaw Variable(s) | Raw Variable(s) | Percent Missing: Farber Sample | Percent Missing: Farber Sample Excluding SSPWAs | Percent Missing: Shaw Sample |
|---|---|---|---|---|---|
| Securities | l140_sec-l144_sec | Securities Production | 57.53% | 57.53% | 50.91% |
| IBD | l140_ibd-l144_ibd | gross_amount_usd / Total Gross Revenue: Accrued Incl Mark | 26.06% | 26.06% | 6.27% |
| IBD | l240_ibd-l244_ibd | gross_amount_usd * reg_rep | 90.57% | 90.56% | 85.57% |
| IMD | prodgsam_comp _score | Investment Composite Score | 88.48% | 84.28% | 82.07% |
| IMD | quart_ltfb_full_yr | Long Term Fee Based | 95.57% | 93.96% | 93.03% |

Notes

Based on Dr. Shaw's statistical backup materials.

Production variables not included among Dr.Shaw's controls have not been included.

Dr. Shaw creates the variable reg_rep (used in IBD), and codes it as either 1 or 0, and never as "missing".

Table 8

Summary Statistics by Availability of Production Data

Panel A: Associates

| | | | Not Missing Production | | Missing Production | |
|---|---|---|---|---|---|---|
| Sample | Division | Shaw Variable(s) | Percent Female | PATC | Percent Female | PATC |
| Farber | Securities | l140_sec-l144_sec | 25.75% | $ 456,370 | 26.12% | $ 241,450 |
| | IBD | l140_ibd-l144_ibd | 28.04% | $ 316,774 | 27.86% | $ 270,168 |
| Farber Excl. SSPWAs | Securities | l140_sec-l144_sec | 25.75% | $ 456,370 | 26.13% | $ 241,145 |
| | IBD | l140_ibd-l144_ibd | 28.04% | $ 316,774 | 27.88% | $ 270,045 |
| Shaw | Securities | l140_sec-l144_sec | 25.92% | $ 459,513 | 28.25% | $ 217,469 |
| | IBD | l140_ibd-l144_ibd | 27.54% | $ 395,189 | 26.91% | $ 328,261 |

Panel B: Vice Presidents

| | | | Not Missing Production | | Missing Production | |
|---|---|---|---|---|---|---|
| Sample | Division | Shaw Variable(s) | Percent Female | PATC | Percent Female | PATC |
| Farber | Securities | l140_sec-l144_sec | 16.19% | $ 992,418 | 19.13% | $ 558,662 |
| | IBD | l140_ibd-l144_ibd | 21.48% | $ 701,460 | 23.41% | $ 522,199 |
| | IBD | l240_ibd-l244_ibd | 13.18% | $ 861,318 | 22.90% | $ 633,098 |
| | IMD | prodgsam_comp _score | 20.41% | $ 507,713 | 28.39% | $ 623,964 |
| | IMD | quart_ltfb_full_yr | 16.73% | $ 573,311 | 27.97% | $ 612,305 |
| Farber Excl. SSPWAs | Securities | l140_sec-l144_sec | 16.19% | $ 992,418 | 19.14% | $ 558,697 |
| | IBD | l140_ibd-l144_ibd | 21.48% | $ 701,460 | 23.41% | $ 521,477 |
| | IBD | l240_ibd-l244_ibd | 13.18% | $ 861,318 | 22.90% | $ 633,010 |
| | IMD | prodgsam_comp _score | 20.41% | $ 507,713 | 33.83% | $ 440,502 |
| | IMD | quart_ltfb_full_yr | 16.73% | $ 573,311 | 32.69% | $ 443,200 |
| Shaw | Securities | l140_sec-l144_sec | 16.29% | $ 983,799 | 19.65% | $ 443,501 |
| | IBD | l140_ibd-l144_ibd | 21.02% | $ 714,300 | 34.53% | $ 484,452 |
| | IBD | l240_ibd-l244_ibd | 13.13% | $ 825,793 | 23.34% | $ 678,669 |
| | IMD | prodgsam_comp _score | 20.51% | $ 504,741 | 35.16% | $ 413,079 |
| | IMD | quart_ltfb_full_yr | 17.00% | $ 575,130 | 33.70% | $ 418,606 |

Notes

This analysis is based on Dr. Shaw's statistical materials using Farber sample.

Production variables not included among Dr. Shaw's controls have not been included.

Dr. Shaw creates the variable reg_rep (used in IBD division), and codes it as either 1 or 0, and never as "missing".

Table 9

Gender Composition and Compensation of Outlier Observations Using Dr. Shaw's Definitions of Outliers

| Outlier Criteria | Outlier Proportion Male [1] | Non-outlier Proportion Male [2] | Chi-squared p-value [3] |
|---|---|---|---|
| IQR Criteria | 0.862 | 0.740 | <0.0005 |
| Top-5% Criteria | 0.875 | 0.742 | <0.0005 |
| Top-10% Criteria | 0.849 | 0.738 | <0.0005 |

The sample is all the employee years in Dr. Shaw's Exhibit 34, as identified by the the variable reg_sample_shaw in the file gsbuild_corrected_farber.dta

According to the criteria of Dr. Shaw's that I have labelled "IQR criteria", outliers are defined as observations with PATC that is greater than the 75h percentile of PACT by an amount equal to 1.5*IQR, where IQR is the inter-quartile range. The inter-quartile range equals the difference between the 75th percentile and the 25th percentile of PATC.

Outliers Excluded by Year
Using Dr. Shaw's Various Definitions of Outliers

| Year | Employees in Baseline Sample | Dropped by IQR Criteria | Dropped by Top-5% Criteria | Dropped by Top-10% Criteria |
|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] |
| 2005 | 1,150 | 13% | 10% | 19% |
| 2006 | 2,203 | 14% | 10% | 18% |
| 2007 | 2,764 | 16% | 13% | 21% |
| 2008 | 2,492 | 4% | 3% | 6% |
| 2009 | 2,366 | 14% | 11% | 18% |
| 2010 | 2,474 | 8% | 6% | 11% |
| 2011 | 2,491 | 3% | 2% | 4% |
| 2012 | 2,394 | 5% | 3% | 7% |
| 2013 | 2,356 | 6% | 4% | 9% |
| 2014 | 2,436 | 4% | 3% | 7% |
| 2015 | 2,629 | 2% | 2% | 5% |
| 2016 | 2,591 | 2% | 1% | 4% |
| 2017 | 2,676 | 3% | 2% | 5% |
| 2018 | 2,461 | 2% | 2% | 5% |
| Total | 33,483 | 7% | 5% | 10% |

Column [3] presents the % of employees that are dropped when outliers are defined as observations with PATC greater than the 75h percentile of PATC by an amount equal to 1.5*IQR, where IQR is the inter-quartile range. The inter-quartile range equals the difference between the 75th percentile and the 25th percentile of PATC.

Column [4] presents the % of employees that are dropped when outliers are defined as observations in the top 5% of PATC.

Column [5] presents the % of employees that are dropped when outliers are defined as observations in the top 10% of PATC.

The sample are all the employee years in Dr. Shaw's Exhibit 34, as identified by the the variable reg_sample_shaw in the file gsbuild_corrected_farber.dta

Table 11

Total Compensation for Outlier and Non-Outlier Observations, Composition of Minimum and Maximum Values

Panel A: Associates/Junior-Bankers

| | Securities | | IBD | | IMD | |
|---|---|---|---|---|---|---|
| | Maximum PATC, Non-Outlier | Minimum PATC, Outlier | Maximum PATC, Non-Outlier | Minimum PATC, Outlier | Maximum PATC, Non-Outlier | Minimum PATC, Outlier |
| Outlier Definition | [1] | [2] | [3] | [4] | [5] | [6] |
| IQR | $560,000 | $575,000 | $690,000 | $700,000 | $295,000 | $300,000 |
| Top 5% | $825,000 | $850,000 | $625,000 | $630,000 | $350,000 | $354,924 |
| Top 10% | $550,000 | $555,000 | $550,000 | $555,000 | $275,000 | $280,000 |

Panel B: VPs/Senior-Bankers

| | Securities | | IBD | | IMD | |
|---|---|---|---|---|---|---|
| | Maximum PATC, Non-Outlier | Minimum PATC, Outlier | Maximum PATC, Non-Outlier | Minimum PATC, Outlier | Maximum PATC, Non-Outlier | Minimum PATC, Outlier |
| Outlier Definition | [1] | [2] | [3] | [4] | [5] | [6] |
| IQR | $1,575,000 | $1,600,000 | $1,370,000 | $1,400,000 | $982,941 | $988,476 |
| Top 5% | $2,000,000 | $2,050,000 | $1,250,000 | $1,275,000 | $950,000 | $955,000 |
| Top 10% | $1,400,000 | $1,410,000 | $1,100,000 | $1,110,000 | $755,000 | $755,619 |

The sample are all the employee years in Dr. Shaw's Exhibit 34, as identified by the the variable reg_sample_shaw in the file gsbuild_corrected_farber.dta

According to the outlier definition of Dr. Shaw's that I have labelled "IQR", outliers are defined as observations with PATC that is greater than the 75h percentile of PACT by an amount equal to 1.5*IQR, where IQR is the inter-quartile range. The inter-quartile range equals the difference between the 75th percentile and the 25th percentile of PATC.

Regression Analysis of the Male/Female Pay Difference with Outliers Removed, Associates

| Panel A: Model 2 | | | | |
|---|---|---|---|---|
| | Log-Point Difference | T-Ratio | Employee-Years in Sample | Adjusted R-squared |
| | [1] | [2] | [3] | [4] |
| Associates Baseline Regression | -0.052 | -5.13 | 16,251 | 0.320 |
| Associates Regression w/o Outliers | -0.032 | -3.62 | 15,656 | 0.360 |

| Panel B: Model 3 | | | | |
|---|---|---|---|---|
| | Log-Point Difference | T-Ratio | Employee-Years in Sample | Adjusted R-squared |
| | [1] | [2] | [3] | [4] |
| Associates Baseline Regression | -0.037 | -4.12 | 15,431 | 0.484 |
| Associates Regression w/o Outliers | -0.021 | -2.64 | 14,859 | 0.515 |

Notes:
In this table, "Outliers" are defined as those observations with log compensation that is more than 2 standard deviations above the mean log compensation, calculated separately for each job title-division-year.

Self Sustaining Private Wealth Advisors (SSPWAs) are identified using Dr. Shaw's definition.

The table gives an absolute value of the t-ratio for the test of no difference in earnings between men and women. Generally speaking, a t-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characterics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variable in Model 2 are non-missing.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model 3 includes all the same variables as Model 2 and, in addition, Business Unit. It is limited to the years 2004 through 2018, the period of time over which I have information on Business Units in each division.

Regression Analysis of the Male/Female Pay Difference with Outliers Removed, Vice Presidents

Panel A: Model 2

| | Log-Point Difference | T-Ratio | Employee-Years in Sample | Adjusted R-squared |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| Vice Presidents Baseline Regression | -0.254 | -13.55 | 30,050 | 0.211 |
| Vice Presidents Regression w/o Outliers | -0.216 | -12.64 | 29,147 | 0.221 |

Panel B: Model 3

| | Log-Point Difference | T-Ratio | Employee-Years in Sample | Adjusted R-squared |
|---|---|---|---|---|
| | [1] | [2] | [3] | [4] |
| Vice Presidents Baseline Regression | -0.244 | -13.56 | 28,946 | 0.370 |
| Vice Presidents Regression w/o Outliers | -0.208 | -12.60 | 28,076 | 0.365 |

Notes:

In this table, "Outliers" are defined as those observations with log compensation that is more than 2 standard deviations above the mean log compensation, calculated separately for each job title-division-year.

Self Sustaining Private Wealth Advisors (SSPWAs) are identified using Dr. Shaw's definition.

The table gives an absolute value of the t-ratio for the test of no difference in earnings between men and women. Generally speaking, a t-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characterics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variable in Model 2 are non-missing.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model 3 includes all the same variables as Model 2 and, in addition, Business Unit. It is limited to the years 2004 through 2018, the period of time over which I have information on Business Units in each division.

Table 14

Comparison of Actual and Expected Promotion Rates to Managing Director

| | | | | | | | Bootstrap | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of Men [1] | Promotion Percentage for Men [2] | Number of Women [3] | Promotion Percentage for Women [4] | Promotions, Women [5] | Expected Promotions, Women [6] | Shortfall [7] | Expected Promotions 2.5 Percentile, Women [8] | Expected Promotions 97.5 Percentile, Women [9] |
| Estimated on male observations only | 23443 | 4.03% | 6688 | 3.27% | 219 | 246.38 | -27.38 | 230.64 | 263.01 |
| Estimated on male and female observations | 23443 | 4.03% | 6688 | 3.27% | 219 | 245.97 | -26.97 | 230.99 | 262.32 |

Note:
Bootstrap size = 1,000

Only promotions to an in-class division and in the US are included.

Results are are based on Model 2. Model 2 controls for tenure at Goldman (and the square of tenure), tenure as Vice President at Goldman (and the square of tenure as VP), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, and year.

Job groups with fewer than 250 observations are grouped as "Other."

Range of Expected Promotions given by Columns [8] and [9] denotes 95% confidence interval for number of expected female promotions, if women were promoted at the same rate as men, given their observable characteristics. If the number of women's promotions (Column [5]) is below the lower end of this range, this indicates a statistically significant shortfall of promotions among women.

Table 15

Missing Lagged Performance Review Outcomes, by Lag Length

| Lag Length | Percent of Sample Missing Lagged 360 Value | Percent of Sample Missing Lagged Quartile Value |
|---|---|---|
| 1 year prior | 72.8% | 72.7% |
| 2 years prior | 54.2% | 54.2% |
| 3 years prior | 47.0% | 47.0% |
| 4 years prior | 58.2% | 58.1% |
| 5 years prior | 67.2% | 67.1% |
| 6 years prior | 73.6% | 73.5% |
| Missing any of the above | 91.3% | 91.3% |

Note, the sample in this table is limited to the employee-years underlying Dr.Shaw's Exhibit 43.

Table 16

Summary of Damages Associated with the Overall Compensation Claim

| | | Damages Associates | Damages Vice Presidents | Damages Total |
|---|---|---|---|---|
| Model 2 | Full Sample | $ 44,309,975 | $ 1,109,267,104 | $ 1,153,577,079 |
| | Full Sample less Exclusion Group 1 | $ 36,915,406 | $ 913,159,373 | $ 950,074,778 |
| | Full Sample less Exclusion Group 2 | $ 24,789,196 | $ 515,737,626 | $ 540,526,821 |
| + Division Function Controls | Full Sample | $ 48,324,492 | $ 716,548,213 | $ 764,872,706 |
| | Full Sample less Exclusion Group 1 | $ 40,259,969 | $ 589,869,396 | $ 630,129,365 |
| | Full Sample less Exclusion Group 2 | $ 27,035,115 | $ 333,148,683 | $ 360,183,798 |
| Model 3 | Full Sample | $ 30,946,141 | $ 1,059,239,602 | $ 1,090,185,743 |
| | Full Sample less Exclusion Group 1 | $ 25,781,765 | $ 871,976,251 | $ 897,758,015 |
| | Full Sample less Exclusion Group 2 | $ 17,312,805 | $ 492,478,065 | $ 509,790,870 |
| + Division Function Controls | Full Sample | $ 33,761,646 | $ 634,527,969 | $ 668,289,614 |
| | Full Sample less Exclusion Group 1 | $ 28,127,410 | $ 522,349,540 | $ 550,476,950 |
| | Full Sample less Exclusion Group 2 | $ 18,887,937 | $ 295,014,561 | $ 313,902,499 |

Notes
The sample for this table includes women in the New York class from 2003 to 2018, and nationally from 2005 to 2018.
Full Sample includes all women who meet the class requirements specified in my report.
Exclusion Group 1 consists of women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.

Exclusion Group 2 = Exclusion Group 1 and in addition, women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

This analysis is based on the percent differences from Table 1 for Assicates and Table 2 for Vice Presidents.

Table 17

Summary of Damages Associated with the Compensation Claim Related to Impact of Performance Measures

| | | Damages | | | Damages Explained by Performance Metrics | | |
|---|---|---|---|---|---|---|---|
| | | Associates | Vice Presidents | Total | Associates | Vice Presidents | Total |
| Model 2 | Full Sample | $ 45,694,361 | $ 754,587,116 | $ 800,281,477 | $ 18,479,980 | $ 160,821,865 | $ 179,301,845 |
| | Full Sample less Exclusion Group 1 | $ 38,057,756 | $ 615,462,652 | $ 653,520,408 | $ 15,391,540 | $ 131,170,874 | $ 146,562,414 |
| | Full Sample less Exclusion Group 2 | $ 25,726,253 | $ 388,845,104 | $ 414,571,357 | $ 10,404,361 | $ 82,872,863 | $ 93,277,224 |
| + Division Function Controls | Full Sample | $ 50,131,761 | $ 612,436,520 | $ 662,568,282 | $ 21,381,075 | $ 195,453,160 | $ 216,834,235 |
| | Full Sample less Exclusion Group 1 | $ 41,753,562 | $ 499,520,595 | $ 541,274,157 | $ 17,807,793 | $ 159,417,141 | $ 177,224,934 |
| | Full Sample less Exclusion Group 2 | $ 28,224,541 | $ 315,593,703 | $ 343,818,244 | $ 12,037,699 | $ 100,718,662 | $ 112,756,360 |
| Model 3 | Full Sample | $ 32,357,533 | $ 591,659,551 | $ 624,017,084 | $ 18,255,838 | $ 185,655,454 | $ 203,911,292 |
| | Full Sample less Exclusion Group 1 | $ 26,949,827 | $ 482,574,309 | $ 509,524,136 | $ 15,204,857 | $ 151,425,853 | $ 166,630,711 |
| | Full Sample less Exclusion Group 2 | $ 18,217,523 | $ 304,887,156 | $ 323,104,679 | $ 10,278,168 | $ 95,669,821 | $ 105,947,989 |
| + Division Function Controls | Full Sample | $ 35,557,664 | $ 525,207,026 | $ 560,764,690 | $ 18,976,480 | $ 201,494,833 | $ 220,471,313 |
| | Full Sample less Exclusion Group 1 | $ 29,615,140 | $ 428,373,745 | $ 457,988,885 | $ 15,805,063 | $ 164,344,900 | $ 180,149,963 |
| | Full Sample less Exclusion Group 2 | $ 20,019,220 | $ 270,643,609 | $ 290,662,829 | $ 10,683,894 | $ 103,831,986 | $ 114,515,881 |

Notes

The sample for this table includes women in the New York class from 2003 to 2018, and nationally from 2005 to 2018. Self Sustaining Private Wealth Advisors (SSPWAs) have been excluded from both the estimation and calculation. SSPWAs have been identified using Dr. Shaw's provided definition.

Full Sample includes all women who meet the class requirements specified in my report.

Exclusion Group 1 consists of women who signed a Severance

Exclusion Group 2 = Exclusion Group 1 and in addition, women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

This analysis is based on the percent differences from Table 3 for Assicates and Table 4 for Vice Presidents .

Table 18

Total Value of Raises Necessary to Bring Female Vice Presidents to Pay Parity, Overall Compensation Claim

| | | One-Year total PATC [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] |
|---|---|---|---|---|---|
| Model 2 | Full Sample | $171,628,513 | 22.43% | 28.91% | $49,622,074 |
| | Full Sample less Exclusion Group 1 | $154,328,429 | 22.43% | 28.91% | $44,620,189 |
| | Full Sample less Exclusion Group 2 | $124,668,077 | 22.43% | 28.91% | $36,044,644 |
| + Division Function Controls | Full Sample | $171,628,513 | 15.74% | 18.68% | $32,054,145 |
| | Full Sample less Exclusion Group 1 | $154,328,429 | 15.74% | 18.68% | $28,823,100 |
| | Full Sample less Exclusion Group 2 | $124,668,077 | 15.74% | 18.68% | $23,283,594 |
| Model 3 | Full Sample | $171,628,513 | 21.64% | 27.61% | $47,384,139 |
| | Full Sample less Exclusion Group 1 | $154,328,429 | 21.64% | 27.61% | $42,607,837 |
| | Full Sample less Exclusion Group 2 | $124,668,077 | 21.64% | 27.61% | $34,419,045 |
| + Division Function Controls | Full Sample | $171,628,513 | 14.19% | 16.54% | $28,385,043 |
| | Full Sample less Exclusion Group 1 | $154,328,429 | 14.19% | 16.54% | $25,523,842 |
| | Full Sample less Exclusion Group 2 | $124,668,077 | 14.19% | 16.54% | $20,618,419 |

Note:
Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.
Model 3 includes Model 2 controls + business unit controls.

[1] is based the sum of PATC for all Vice Presidents in class at the end of the final year of data available, 2018, with at least one performance review prior to 2016.
[2] the absolute value of the Percent Difference from Table 2.
[3] = [2]/(1-[2])
[4] = [1] x [3]

Table 19

Total Value of Raises Necessary to Bring Female Vice Presidents to Pay Parity, Compensation Claim Related to Impact of Performance Measures

| | | One-Year total PATC [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] | Percent Difference After Accounting for Performance Metrics [5] | Pay-gap Factor for Performance [6] | Damages Explained by Performance Metric [7] |
|---|---|---|---|---|---|---|---|---|
| Model 2 | Full Sample | $132,135,961 | 18.73% | 23.04% | $30,445,630 | 14.74% | 4.91% | $6,488,745 |
| | Full Sample less Exclusion Group 1 | $119,873,179 | 18.73% | 23.04% | $27,620,146 | 14.74% | 4.91% | $5,886,561 |
| | Full Sample less Exclusion Group 2 | $118,605,179 | 18.73% | 23.04% | $27,327,984 | 14.74% | 4.91% | $5,824,294 |
| + Division Function Controls | Full Sample | $132,135,961 | 15.75% | 18.70% | $24,710,223 | 10.73% | 5.97% | $7,886,027 |
| | Full Sample less Exclusion Group 1 | $119,873,179 | 15.75% | 18.70% | $22,417,009 | 10.73% | 5.97% | $7,154,170 |
| | Full Sample less Exclusion Group 2 | $118,605,179 | 15.75% | 18.70% | $22,179,885 | 10.73% | 5.97% | $7,078,495 |
| Model 3 | Full Sample | $132,135,961 | 15.30% | 18.07% | $23,871,926 | 10.50% | 5.67% | $7,490,715 |
| | Full Sample less Exclusion Group 1 | $119,873,179 | 15.30% | 18.07% | $21,656,509 | 10.50% | 5.67% | $6,795,545 |
| | Full Sample less Exclusion Group 2 | $118,605,179 | 15.30% | 18.07% | $21,427,430 | 10.50% | 5.67% | $6,723,663 |
| + Division Function Controls | Full Sample | $132,135,961 | 13.82% | 16.04% | $21,190,739 | 8.52% | 6.15% | $8,129,793 |
| | Full Sample less Exclusion Group 1 | $119,873,179 | 13.82% | 16.04% | $19,224,148 | 8.52% | 6.15% | $7,375,314 |
| | Full Sample less Exclusion Group 2 | $118,605,179 | 13.82% | 16.04% | $19,020,798 | 8.52% | 6.15% | $7,297,299 |

Note:
Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model 3 includes Model 2 controls + business unit controls.

[1] is based on the total value of PATC for all Vice Presidents in class at the end of the final year of data available, 2018.
[2] the absolute value of the Percent Difference from Model 2a from Table 4.
[3] = [2]/(1-[2])
[4] = [1] x [3]
[5] the absolute value of the Percent Difference from Model 2d from Table 4.
[6] = (1-[5]) / (1-[2]) - 1
[7] = [6] x [1]

Estimated Promotions Shortfall by Year

| Missed Promotion Year | Promotions, Women [1] | Expected Promotions, Women [2] | Promotions Shortfall, Women [3] |
|---|---|---|---|
| 2002 * | 9 | 6.34 | -2.66 |
| 2003 | 9 | 6.34 | -2.66 |
| 2004 | 11 | 11.60 | 0.60 |
| 2005 | 13 | 15.84 | 2.84 |
| 2006 | 14 | 19.45 | 5.45 |
| 2007 | 14 | 21.12 | 7.12 |
| 2008 | 15 | 22.26 | 7.26 |
| 2009 | 15 | 18.49 | 3.49 |
| 2010 | 23 | 19.72 | -3.28 |
| 2011 | 13 | 14.95 | 1.95 |
| 2012 | 21 | 17.21 | -3.79 |
| 2013 | 14 | 15.14 | 1.14 |
| 2014 | 0 | 0.00 | 0.00 |
| 2015 | 29 | 28.18 | -0.82 |
| 2016 | 0 | 0.00 | 0.00 |
| 2017 | 28 | 36.09 | 8.09 |
| 2018 | 0 | 0.00 | 0.00 |
| Total | 228 | 252.71 | 24.71 |
| Total Excl. 2002 | 219 | 246.38 | 27.38 |

Notes:
There were no observed promotions to EMD in 2014, 2016, and 2018.
This table presents the yearly promotion shortfall estimates from the model reported in Table 14.
[1] Observed promotions among women
[2] Expected promotions among women
[3] = [2] - [1]

* I have been instructed by counsel to assume that the promotions shortfall in 2002 is equal to the shortfall in 2003

Promotion Damages Summary

| Year | Value of a Missed Promotion in Given Year [1] | Promotions Shortfall, Women [2] | Damages [3] |
|---|---|---|---|
| 2002 * | $9,638,993 | -2.66 | -$25,657,987 |
| 2003 | $9,638,993 | -2.66 | -$25,657,987 |
| 2004 | $9,354,826 | 0.60 | $5,584,493 |
| 2005 | $8,003,484 | 2.84 | $22,696,318 |
| 2006 | $7,468,457 | 5.45 | $40,674,512 |
| 2007 | $6,961,691 | 7.12 | $49,568,667 |
| 2008 | $5,817,614 | 7.26 | $42,234,030 |
| 2009 | $5,497,420 | 3.49 | $19,184,938 |
| 2010 | $5,513,890 | -3.28 | -$18,063,649 |
| 2011 | $4,654,696 | 1.95 | $9,079,731 |
| 2012 | $4,300,181 | -3.79 | -$16,291,918 |
| 2013 | $3,404,128 | 1.14 | $3,874,542 |
| 2014 | $2,829,842 | 0.00 | $0 |
| 2015 | $2,412,115 | -0.82 | -$1,982,738 |
| 2016 | $1,961,981 | 0.00 | $0 |
| 2017 | $1,456,323 | 8.09 | $11,778,302 |
| 2018 | $888,292 | 0.00 | $0 |
| Total | | 24.71 | $117,021,254 |
| Total Excl. 2002 | | 27.38 | $142,679,241 |

Sources: 'GS CCO - Summary of EMD PATC - 20180913.xlsx' and 'GS CCO Summary of EMD Prom Term - 20180913.xlsx'

Notes:
There were no (observed) promotions to EMD in 2014, 2016, and 2018.
[1] Amount of money associated with a single foregone promotion from VP to EMD, valued through June of 2021. This multiplies the difference between the 90th percentile of VP pay and average total EMD pay by the probability that a woman remains as an EMD (or in a higher-earning role) at Goldman through June 2021. Attrition rate is equal to 11% - the average annual EMD attrition rate.
[2] corresponds with the shortfall in column [3] presented in Table 14
[3] = [1] * [2]

* I have been instructed by counsel to assume that the promotions shortfall in 2002 is equal to the shortfall in 2003

Table 22

Promotion Damages Sample Specification Comparison

| Missed Promotion Year | Value of a Missed Promotion in Given Year [1] | Promotions Shortfall, Women [2] | Damages, Full Sample [3] | Percent of Total Person-Years not in Exclusion Group 1 [4a] | Damages less Exclusion Group 1 [4] | Percent of Total Person-Years not in Exclusion Group 2 [5a] | Damages less Exclusion Group 2 [5] |
|---|---|---|---|---|---|---|---|
| 2002 * | $9,638,993 | -2.66 | -$25,657,986 | 71.16% | -$18,258,939 | 39.07% | -$10,024,515 |
| 2003 | $9,638,993 | -2.66 | -$25,657,986 | 71.16% | -$18,258,939 | 39.07% | -$10,024,515 |
| 2004 | $9,354,826 | 0.60 | $5,584,493 | 68.02% | $3,798,461 | 37.84% | $2,113,051 |
| 2005 | $8,003,484 | 2.84 | $22,696,318 | 68.68% | $15,587,414 | 42.24% | $9,587,238 |
| 2006 | $7,468,457 | 5.45 | $40,674,512 | 65.87% | $26,790,945 | 36.53% | $14,859,755 |
| 2007 | $6,961,691 | 7.12 | $49,568,668 | 68.45% | $33,927,511 | 35.96% | $17,826,319 |
| 2008 | $5,817,614 | 7.26 | $42,234,028 | 77.15% | $32,583,501 | 40.54% | $17,121,903 |
| 2009 | $5,497,420 | 3.49 | $19,184,938 | 90.19% | $17,302,066 | 49.34% | $9,465,248 |
| 2010 | $5,513,890 | -3.28 | -$18,063,648 | 92.52% | -$16,712,253 | 50.37% | -$9,099,394 |
| 2011 | $4,654,696 | 1.95 | $9,079,731 | 92.07% | $8,359,855 | 54.73% | $4,969,469 |
| 2012 | $4,300,181 | -3.79 | -$16,291,918 | 91.98% | -$14,985,298 | 57.39% | -$9,350,499 |
| 2013 | $3,404,129 | 1.14 | $3,874,542 | 92.03% | $3,565,581 | 64.66% | $2,505,092 |
| 2014 | $2,829,843 | 0.00 | $0 | 92.29% | $0 | 65.72% | $0 |
| 2015 | $2,412,115 | -0.82 | -$1,982,738 | 92.08% | -$1,825,726 | 65.93% | -$1,307,220 |
| 2016 | $1,961,981 | 0.00 | $0 | 91.55% | $0 | 73.70% | $0 |
| 2017 | $1,456,323 | 8.09 | $11,778,302 | 90.71% | $10,684,603 | 77.68% | $9,149,217 |
| 2018 | $888,292 | 0.00 | $0 | 91.68% | $0 | 83.92% | $0 |
| Total | | 24.71 | $117,021,256 | | $82,558,781 | | $47,791,149 |
| Total Excl. 2002 | | 27.38 | $142,679,242 | | $100,817,720 | | $57,815,664 |

Sources: 'GS CCO - Summary of EMD PATC - 20180913.xlsx' and 'GS CCO Summary of EMD Prom Term - 20180913.xlsx'

Notes:
There were no observed promotions to EMD in 2014, 2016, and 2018.
[1] Amount of money associated with a single foregone promotion from VP to EMD, valued through June of 2021. This multiplies the difference between the 90th percentile of VP pay and average total EMD pay by the probability that a woman remains as an EMD (or in a higher-earning role) at Goldman through June 2021. Attrition rate is 115 - the average annual EMD attrition rate.

[2] corresponds with the shortfall [3] presented in Table 14.
[3] = [1] * [2]
[4a] the percentage of female person-years eligible promotions in the group of people not in Exclusion Group 1.
[4] = [3] x [4a]
[5a] the percentage of female person-years eligible for promotions in the group of people not in Exclusion Group 2.
[5] = [3] x [5a]

Full Sample includes all women who meet the class requirements specified in my report.
Exclusion Group 1 consists of women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.
Exclusion Group 2 = Exclusion Group 1 and in addition, women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

* I have been instructed by counsel to assume that the promotions shortfall in 2002 is equal to the shortfall in 2003

# Appendix A

Appendix A

Table 1
Employee Years in Analysis Sample, by Title and Gender

Associates

| | Number of Person-Years | Percent | Number of Individuals | Percent |
|---|---|---|---|---|
| Women | 4,599 | 27.9% | 2,081 | 28.2% |
| Men | 11,885 | 72.1% | 5,310 | 71.8% |
| Total | 16,484 | 100.0% | 7,391 | 100.0% |

Vice Presidents

| | Number of Person-Years | Percent | Number of Individuals | Percent |
|---|---|---|---|---|
| Women | 6,688 | 22.2% | 1,831 | 24.2% |
| Men | 23,443 | 77.8% | 5,747 | 75.8% |
| Total | 30,131 | 100.0% | 7,578 | 100.0% |

The sample for this table includes all Associates and Vice Presidents, in the New York class from 2003 to 2018, and nationally from 2005 to 2018.

Appendix A

Table 2
Mean Annual Earnings, by Title and Gender

Associates

| | Mean, Men | Standard Deviation, Men | Mean, Women | Standard Deviation, Women |
|---|---|---|---|---|
| Annual Earnings | $270,611 | $300,050 | $239,125 | $179,402 |
| Log of Annual Earnings | 12.32 | 0.55 | 12.26 | 0.48 |

Vice Presidents

| | Mean, Men | Standard Deviation, Men | Mean, Women | Standard Deviation, Women |
|---|---|---|---|---|
| Annual Earnings | $706,623 | $732,689 | $499,753 | $468,305 |
| Log of Annual Earnings | 13.17 | 0.74 | 12.87 | 0.67 |

The sample for this table includes all Associates and Vice Presidents, in the New York class from 2003 to 2018, and nationally from 2005 to 2018. The data include 4599 employee-year observations on female Associates, 11885 observations on male Associates, 6688 observations on female Vice Presidents, and 23443 observations on male Vice Presidents. Earnings for part-year workers are adjusted to a full-year equivalent level.

Appendix A

Table 3
Regression Analysis of the Male/Female Pay Difference, Associates

| | Log-Point Difference | T-Ratio | Percent Difference | Employee-Years in Sample | Adjusted R-squared |
|---|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] | [5] |
| Model 1 | -0.066 | 5.01 | -6.4% | 16,251 | 0.003 |
| Model 2 | -0.052 | 5.13 | -5.1% | 16,251 | 0.320 |
| Model 3 | -0.037 | 4.12 | -3.6% | 15,431 | 0.484 |

The table gives an absolute value of the T-ratio for the test of no difference in earnings between men and women. Generally speaking, a T-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characterics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variable in Model 2 are non-missing.

Model 1 is the difference between the average earnings of men and women. It is included for reference.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model 3 includes all the same variables as Model 2 and, in addition, business unit.

Appendix A

Table 4
Regression Analysis of the Male/Female Pay Difference, Vice Presidents

| | Log-Point Difference | T-Ratio | Percent Difference | Employee-Years in Sample | Adjusted R-squared |
|---|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] | [5] |
| Model 1 | -0.295 | 14.21 | -25.5% | 30,050 | 0.028 |
| Model 2 | -0.254 | 13.55 | -22.4% | 30,050 | 0.211 |
| Model 3 | -0.244 | 13.56 | -21.6% | 28,946 | 0.370 |

The table gives an absolute value of the T-ratio for the test of no difference in earnings between men and women. Generally speaking, a T-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characterics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variable in Model 2 are non-missing.

Model 1 is the difference between the average earnings of men and women. It is included for reference.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model 3 includes all the same variables as Model 2 and, in addition, business unit.

Appendix A

Table 5
Number of Person-Years by Quartile, Associates

| Quartile | Male | Percent, Male | Female | Percent, Female |
|---|---|---|---|---|
| 1 | 2,424 | 28.2% | 869 | 25.8% |
| 2/3 | 4,271 | 49.6% | 1,765 | 52.4% |
| 4/5 | 1,914 | 22.2% | 735 | 21.8% |

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables, including the peformance-review variables, are non-missing.

A chi-squared test for the equality of quartile across genders yields a test statistic of 8.815 with an associated p-value of .012

Appendix A

Table 6
Number of Person-Years by Quartile, Vice Presidents

| Quartile | Male | Percent, Male | Female | Percent, Female |
|---|---|---|---|---|
| 1 | 5,765 | 28.2% | 1,549 | 26.2% |
| 2/3 | 10,033 | 49.1% | 2,919 | 49.3% |
| 4/5 | 4,628 | 22.7% | 1,453 | 24.5% |

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables, including the peformance-review variables, are non-missing.

A chi-squared test for the equality of quartile across genders yields a test statistic of 14.113 with an associated p-value of .001

Appendix A

Table 7
Probit Regression Analysis of the Male/Female Placement in the Top Quartile, Associates

| | Regression Coefficient | T-Ratio | Marginal Effect | Z-Score | Employee-Years in Sample |
|---|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] | [5] |
| Model P1 | -0.072 | 2.050 | -0.024 | 2.052 | 11,978 |
| Model P2 | -0.097 | 2.726 | -0.031 | 2.730 | 11,978 |
| Model P3 | -0.111 | 3.032 | -0.035 | 3.038 | 11,799 |

The table gives an absolute value of the Z-score for the test of no difference in the top quartile placement between men and women in a probit regression. A Z-score with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. Z-scores were calculated using standard errors clustered by individual. The marginal effect is the discrete difference between females and males in the probability of being in the top quartile implied by the regression coefficients in column [1]. A negative marginal effect implies that females are less likely to be in the top quartile than males accounting for the factors included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables, including the peformance-review variables, are non-missing.

Model P1concerns the raw difference between top-quartile placement rates of men and women. It is included for reference.

Model P2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model P3 includes all the same variables as Model 2 and, in addition, Business Unit. It is limited to the years 2004 through 2018, the period of time over which I have information on Business Units in each division.

Appendix A

Table 8
Probit Regression Analysis of the Male/Female Placement in the Top Quartile, Vice Presidents

| | Regression Coefficient | T-Ratio | Marginal Effect | Z-Score | Employee-Years in Sample |
|---|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] | [5] |
| Model P1 | -0.062 | 1.812 | -0.021 | 1.813 | 26,347 |
| Model P2 | -0.105 | 3.027 | -0.034 | 3.031 | 26,347 |
| Model P3 | -0.115 | 3.194 | -0.036 | 3.200 | 25,887 |

The table gives an absolute value of the Z-score for the test of no difference in the top quartile placement between men and women in a probit regression. A Z-score with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. Z-scores were calculated using standard errors clustered by individual. The marginal effect is the discrete difference between females and males in the probability of being in the top quartile implied by the regression coefficients in column [1]. A negative marginal effect implies that females are less likely to be in the top quartile than males accounting for the factors included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables, including the peformance-review variables, are non-missing.

Model P1concerns the raw difference between top-quartile placement rates of men and women. It is included for reference.

Model P2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model P3 includes all the same variables as Model 2 and, in addition, Business Unit. It is limited to the years 2004 through 2018, the period of time over which I have information on Business Units in each division.

Appendix A

Table 9
Summary of 360-Scores, Associates

| Year | Mean, Men | Standard Deviation, Men | Mean, Women | Standard Deviation, Women |
|---|---|---|---|---|
| 2003 | 3.93 | 0.41 | 3.88 | 0.40 |
| 2004 | 3.99 | 0.39 | 3.96 | 0.36 |
| 2005 | 3.87 | 0.45 | 3.79 | 0.47 |
| 2006 | 4.02 | 0.31 | 4.01 | 0.29 |
| 2007 | 4.12 | 0.29 | 4.07 | 0.31 |
| 2008 | 4.28 | 0.26 | 4.28 | 0.24 |
| 2009 | 4.40 | 0.29 | 4.39 | 0.23 |
| 2010 | 7.70 | 0.56 | 7.59 | 0.56 |
| 2011 | 8.10 | 0.43 | 8.00 | 0.42 |
| 2012 | 8.23 | 0.38 | 8.19 | 0.37 |
| 2013 | 8.33 | 0.39 | 8.32 | 0.36 |
| 2014 | 8.36 | 0.39 | 8.32 | 0.38 |
| 2015 | 8.44 | 0.36 | 8.38 | 0.40 |

The sample for this table includes employees in the New York class from 2003 to 2015, and nationally from 2005 to 2015; it is limited to employees for whom all regression control variables, including the peformance-review variables, are non-missing.

The underlying range for the 360 score was 1-5 from 2003 to 2009, and 1-9 from 2010 to 2015. Goldman stopped using this metric after 2015.

Appendix A

Table 10
Summary of 360-Scores, Vice Presidents

| Year | Mean, Men | Standard Deviation, Men | Mean, Women | Standard Deviation, Women |
|---|---|---|---|---|
| 2003 | 3.96 | 0.41 | 3.82 | 0.35 |
| 2004 | 4.07 | 0.37 | 4.02 | 0.35 |
| 2005 | 4.15 | 0.43 | 4.05 | 0.42 |
| 2006 | 4.18 | 0.26 | 4.13 | 0.26 |
| 2007 | 4.22 | 0.24 | 4.18 | 0.26 |
| 2008 | 4.33 | 0.23 | 4.31 | 0.23 |
| 2009 | 4.45 | 0.24 | 4.41 | 0.23 |
| 2010 | 7.80 | 0.46 | 7.74 | 0.48 |
| 2011 | 8.17 | 0.33 | 8.10 | 0.33 |
| 2012 | 8.29 | 0.30 | 8.20 | 0.32 |
| 2013 | 8.38 | 0.29 | 8.29 | 0.32 |
| 2014 | 8.38 | 0.30 | 8.31 | 0.32 |
| 2015 | 8.45 | 0.27 | 8.37 | 0.28 |

The sample for this table includes employees in the New York class from 2003 to 2015, and nationally from 2005 to 2015; it is limited to employees for whom all regression control variables, including the peformance-review variables, are non-missing.

The underlying range for the 360 score was 1-5 from 2003 to 2009, and 1-9 from 2010 to 2015. Goldman stopped using this metric after 2015.

Appendix A

Table 11
Regression Analysis of the Male/Female 360-Score Difference, Associates

Panel A: 2003-2009

| | Difference | T-Ratio | Employee-Years in Sample | Adjusted R-squared |
|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] |
| Model 360-1 | -0.022 | 1.50 | 4,781 | 0.001 |
| Model 360-2 | -0.050 | 4.15 | 4,781 | 0.341 |
| Model 360-3 | -0.064 | 5.51 | 4,620 | 0.402 |

Panel B: 2010-2015

| | Difference | T-Ratio | Employee-Years in Sample | Adjusted R-squared |
|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] |
| Model 360-1 | -0.057 | 2.68 | 4,669 | 0.003 |
| Model 360-2 | -0.054 | 4.13 | 4,669 | 0.569 |
| Model 360-3 | -0.050 | 3.81 | 4,669 | 0.593 |

The table gives an absolute value of the T-ratio for the test of no difference in average 360 score between men and women. Generally speaking, a T-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive average 360 scores that are lower, on average, than those of men who have the same levels of characterics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables, including the peformance-review variables, are non-missing.

Model 360-1 is the difference between the average overall 360 score of men and women. It is included for reference.

Model 360-2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model 360-3 includes all the same variables as Model 2 and, in addition, Business Unit. It is limited to the years 2004 through 2018, the period of time over which I have information on Business Units in each division.

The underlying range for the 360 score was 1-5 from 2003 to 2009, and 1-9 from 2010 to 2015. Goldman stopped using this metric after 2015.

Appendix A

Table 12
Regression Analysis of the Male/Female 360-Score Difference, Vice Presidents

Panel A: 2003-2009

| | Difference | T-Ratio | Employee-Years in Sample | Adjusted R-squared |
|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] |
| Model 360-1 | -0.050 | 4.17 | 8,931 | 0.004 |
| Model 360-2 | -0.057 | 5.39 | 8,931 | 0.263 |
| Model 360-3 | -0.065 | 6.31 | 8,505 | 0.280 |

Panel B: 2010-2015

| | Difference | T-Ratio | Employee-Years in Sample | Adjusted R-squared |
|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] |
| Model 360-1 | -0.056 | 4.13 | 11,488 | 0.003 |
| Model 360-2 | -0.048 | 5.17 | 11,488 | 0.557 |
| Model 360-3 | -0.057 | 6.18 | 11,488 | 0.586 |

The table gives an absolute value of the T-ratio for the test of no difference in average 360 score between men and women. Generally speaking, a T-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive average 360 scores that are lower, on average, than those of men who have the same levels of characterics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables, including the peformance-review variables, are non-missing.

Model 360-1 is the difference between the average overall 360 score of men and women. It is included for reference.

Model 360-2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model 360-3 includes all the same variables as Model 2 and, in addition, Business Unit. It is limited to the years 2004 through 2018, the period of time over which I have information on Business Units in each division.

The underlying range for the 360 score was 1-5 from 2003 to 2009, and 1-9 from 2010 to 2015. Goldman stopped using this metric after 2015.

Appendix A

Table 13
Comparison of Male and Female Total Earnings by Quartile, Associates

| Quartile | Mean Earnings, Men | Mean Earnings, Female | $ Difference | T-Ratio for $ Difference | % Difference |
|---|---|---|---|---|---|
| 1 | $411,739 | $316,886 | -$94,853 | -4.82 | -23.0% |
| 2/3 | $260,883 | $244,440 | -$16,443 | -3.63 | -6.3% |
| 4/5 | $182,655 | $185,072 | $2,417 | 0.67 | 1.3% |

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables, including the peformance-review variables, are non-missing. Earnings for part-year workers are adjusted to a full-year equivalent level.

Note, the T-ratio in this table is for the level difference in earnings.

Appendix A

Table 14
Comparison of Male and Female Total Earnings by Quartile, Vice Presidents

| Quartile | Mean Earnings, Men | Mean Earnings, Female | $ Difference | T-Ratio for $ Difference | % Difference |
|---|---|---|---|---|---|
| 1 | $1,076,060 | $699,160 | -$376,900 | -12.83 | -35.0% |
| 2/3 | $629,079 | $473,188 | -$155,890 | -14.98 | -24.8% |
| 4/5 | $436,777 | $335,947 | -$100,830 | -9.37 | -23.1% |

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables, including the peformance-review variables, are non-missing. Earnings for part-year workers are adjusted to a full-year equivalent level.

Note, the T-ratio in this table is for the level difference in earnings.

Appendix A

Table 15
Regression Analysis of the Male/Female Pay Difference, Associates

| | Log-Point Difference | T-Ratio | Percent Difference | Employee-Years in Sample | Adjusted R-squared | Percent of Pay Gap Explained by Performance Metrics |
|---|---|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] | [5] | [6] |
| Model 2a | -0.054 | 4.58 | -5.21% | 11,978 | 0.328 | |
| Model 2b | -0.044 | 4.19 | -4.28% | 11,978 | 0.443 | 17.86% |
| Model 2c | -0.031 | 3.12 | -3.09% | 11,978 | 0.453 | 40.67% |
| Model 2d | -0.032 | 3.29 | -3.18% | 11,978 | 0.487 | 38.92% |
| | | | | | | |
| Model 3a | -0.039 | 3.74 | -3.80% | 11,817 | 0.480 | |
| Model 3b | -0.028 | 3.15 | -2.76% | 11,817 | 0.594 | 27.41% |
| Model 3c | -0.014 | 1.55 | -1.40% | 11,817 | 0.564 | 63.04% |
| Model 3d | -0.017 | 1.98 | -1.69% | 11,817 | 0.610 | 55.52% |

The table gives an absolute value of the T-ratio for the test of no difference in earnings between men and women. Generally speaking, a T-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characterics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables, including the peformance-review variables, are non-missing.

Model 2a controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year. It differes from Model 2 only in the restriction of the sample to employees with non-missing performance reviews.

Model 2b includes all the same variables as Model 2a and, in addition, quartile.

Model 2c includes all the same variables as Model 2a and, in addition, average 360-score (which is defined from 2003 to 2015) and overall manager rating (which is defined from 2016 to 2018).

Model 2d includes all the same variables as Model 2a and, in addition, quartile, average 360-score, and overall manager rating.

Models 3a through 3d are parallel to Models 2a through 2d, but adds controls for Business Units. These analyses are limited to the years 2004 through 2018, the period of time over hiwh I hae information on Business Unit in each division.

The percentage explained by performance ratings in Column [6] is equal to (A-X)/A, where A is the percentage pay gap in Model 2a or 3a and X is percentage pay gap for the given model.

Appendix A

Table 16
Regression Analysis of the Male/Female Pay Difference, Vice Presidents

| | Log-Point Difference | T-Ratio | Percent Difference | Employee-Years in Sample | Adjusted R-squared | Percent of Pay Gap Explained by Performance Metrics |
|---|---|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] | [5] | [6] |
| Model 2a | -0.263 | 13.53 | -23.09% | 26,347 | 0.221 | |
| Model 2b | -0.235 | 13.15 | -20.94% | 26,347 | 0.368 | 9.33% |
| Model 2c | -0.225 | 12.46 | -20.18% | 26,347 | 0.332 | 12.59% |
| Model 2d | -0.221 | 12.55 | -19.84% | 26,347 | 0.394 | 14.09% |
| | | | | | | |
| Model 3a | -0.249 | 13.40 | -22.04% | 25,921 | 0.378 | |
| Model 3b | -0.219 | 13.31 | -19.70% | 25,921 | 0.524 | 10.64% |
| Model 3c | -0.209 | 12.27 | -18.83% | 25,921 | 0.478 | 14.57% |
| Model 3d | -0.205 | 12.61 | -18.53% | 25,921 | 0.543 | 15.92% |

The table gives an absolute value of the T-ratio for the test of no difference in earnings between men and women. Generally speaking, a T-ratio with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. T-ratios were calculated using robust standard errors clustered by individual employee. Negative differences indicate that women receive earnings that are lower, on average, than those of men who have the same levels of characterics included in the model.

The sample for this table includes employees in the New York class from 2003 to 2018, and nationally from 2005 to 2018; it is limited to employees for whom the relevant control variables, including the peformance-review variables, are non-missing.

Model 2a controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year. It differes from Model 2 only in the restriction of the sample to employees with non-missing performance reviews.

Model 2b includes all the same variables as Model 2a and, in addition, quartile.

Model 2c includes all the same variables as Model 2a and, in addition, average 360-score (which is defined from 2003 to 2015) and overall manager rating (which is defined from 2016 to 2018).

Model 2d includes all the same variables as Model 2a and, in addition, quartile, average 360-score, and overall manager rating.

Models 3a through 3d are parallel to Models 2a through 2d, but adds controls for Business Units. These analyses are limited to the years 2004 through 2018, the period of time over hiwh I hae information on Business Unit in each division.

The percentage explained by performance ratings in Column [6] is equal to (A-X)/A, where A is the percentage pay gap in Model 2a or 3a and X is percentage pay gap for the given model.

Appendix A

Table 17

Panel A: Number of Person-Years by Overall Manager Rating, Associates, 2016-2018

| Rating | Male | Percent, Male | Female | Percent, Female |
|---|---|---|---|---|
| Outstanding | 1,241 | 68.2% | 514 | 72.6% |
| Good | 492 | 27.0% | 167 | 23.6% |
| Needs Improvement | 87 | 4.8% | 27 | 3.8% |

Panel B: Number of Person-Years by Overall Manager Rating, Vice Presidents, 2016-2018

| Quartile | Male | Percent, Male | Female | Percent, Female |
|---|---|---|---|---|
| Outstanding | 3,130 | 71.3% | 1,086 | 70.7% |
| Good | 1,174 | 26.7% | 420 | 27.3% |
| Needs Improvement | 87 | 2.0% | 31 | 2.0% |

The sample for this table includes employees in class from 2016 to 2018; it is limited to employees for whom all relevant control variables, including the peformance-review variables, are non-missing.

Among Associates, a chi-squared test for the equality of Overall Manger Rating across genders yields a test statistic of a 4.8 with an associated p-value of 0.09

Among Vice Presidents, a chi-squared test for the equality of Overall Manger Rating across genders yields a test statistic of a 0.2 with an associated p-value of 0.897

Appendix A

Table 18

Panel A: Number of Person-Years by Quartile, Associates, 2016-2018

| Quartile | Male | Percent, Male | Female | Percent, Female |
|---|---|---|---|---|
| 1 | 498 | 27.4% | 211 | 29.8% |
| 2/3 | 954 | 52.4% | 389 | 54.9% |
| 4/5 | 368 | 20.2% | 108 | 15.3% |

Panel B: Number of Person-Years by Quartile, Vice Presidents, 2016-2018

| Quartile | Male | Percent, Male | Female | Percent, Female |
|---|---|---|---|---|
| 1 | 1,127 | 25.7% | 409 | 26.6% |
| 2/3 | 2,239 | 51.0% | 784 | 51.0% |
| 4/5 | 1,025 | 23.3% | 344 | 22.4% |

The sample for this table includes employees in class from 2016 to 2018; it is limited to employees for whom all relevant control variables, including the peformance-review variables, are non-missing.

Among Associates, a chi-squared test for the equality of quartile across genders yields a test statistic of a 8.4 with an associated p-value of 0.015

Among Vice Presidents, a chi-squared test for the equality of quartile across genders yields a test statistic of a 0.8 with an associated p-value of 0.654

Appendix A

Table 19

Panel A: Probit Regression Analysis of the Male/Female Reception of the Outstanding Rating, 2016-2018, Associates

| | Regression Coefficient | T-Ratio | Marginal Effect | Z-Score | Employee-Years in Sample |
|---|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] | [5] |
| Model 1 | 0.128 | 1.838 | 0.045 | 1.843 | 2,528 |
| Model 2 | 0.095 | 1.350 | 0.029 | 1.351 | 2,522 |
| Model 3 | 0.124 | 1.661 | 0.035 | 1.662 | 2,515 |

Panel B: Probit Regression Analysis of the Male/Female Placement in the Top Quartile, 2016-2018, Associates

| | Regression Coefficient | T-Ratio | Marginal Effect | Z-Score | Employee-Years in Sample |
|---|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] | [5] |
| Model 1 | 0.072 | 1.043 | 0.024 | 1.044 | 2,528 |
| Model 2 | 0.052 | 0.738 | 0.017 | 0.738 | 2,522 |
| Model 3 | 0.042 | 0.571 | 0.013 | 0.571 | 2,507 |

The table gives an absolute value of the Z-score for the test of no difference in the top quartile placement between men and women in a probit regression. A Z-score with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. Z-scores were calculated using standard errors clustered by individual. The marginal effect is the discrete difference between females and males in the probability of being in the top quartile implied by the regression coefficients in column [1]. A negative marginal effect implies that females are less likely to be in the top quartile than males accounting for the factors included in the model.

The sample for this table includes employees in class from 2016 to 2018; it is limited to employees for whom all relevant control variables, including the peformance-review variables, are non-missing.

Model 1 Concerns the raw difference in each performance metric. It is included for reference.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model 3 includes all the same variables as Model 2 and, in addition, business unit.

Note that the coefficients in a probit model are related to a change in the probability of each binary outcome, so it is not possible to estimate a coefficient for a variable that is associated with only one outcome. Consequently, the corresponding observations must be dropped from the model. Therefore, even though Model 1 is limited to observations for which control variables are available, I must drop some of those observations in Models 2 and 3, resulting in a different observation count across rows.

Appendix A

Table 20

Panel A: Probit Regression Analysis of the Male/Female Reception of the Outstanding Rating, 2016-2018, Vice Presidents

| | Regression Coefficient | T-Ratio | Marginal Effect | Z-Score | Employee-Years in Sample |
|---|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] | [5] |
| Model 1 | -0.018 | 0.355 | -0.006 | 0.355 | 5,928 |
| Model 2 | -0.035 | 0.660 | -0.011 | 0.660 | 5,921 |
| Model 3 | 0.003 | 0.051 | 0.001 | 0.051 | 5,874 |

Panel B: Probit Regression Analysis of the Male/Female Placement in the Top Quartile, 2016-2018, Vice Presidents

| | Regression Coefficient | T-Ratio | Marginal Effect | Z-Score | Employee-Years in Sample |
|---|---|---|---|---|---|
| Model | [1] | [2] | [3] | [4] | [5] |
| Model 1 | 0.029 | 0.538 | 0.009 | 0.538 | 5,928 |
| Model 2 | 0.015 | 0.275 | 0.005 | 0.275 | 5,914 |
| Model 3 | 0.003 | 0.059 | 0.001 | 0.059 | 5,914 |

The table gives an absolute value of the Z-score for the test of no difference in the top quartile placement between men and women in a probit regression. A Z-score with an absolute value of 1.96 or higher indicates that the difference is statistically significantly different from zero at the five percent significance level. Z-scores were calculated using standard errors clustered by individual. The marginal effect is the discrete difference between females and males in the probability of being in the top quartile implied by the regression coefficients in column [1]. A negative marginal effect implies that females are less likely to be in the top quartile than males accounting for the factors included in the model.

The sample for this table includes employees in class from 2016 to 2018; it is limited to employees for whom all relevant control variables, including the peformance-review variables, are non-missing.

Model 1 Concerns the raw difference in each performance metric. It is included for reference.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model 3 includes all the same variables as Model 2 and, in addition, business unit.

Note that the coefficients in a probit model are related to a change in the probability of each binary outcome, so it is not possible to estimate a coefficient for a variable that is associated with only one outcome. Consequently, the corresponding observations must be dropped from the model. Therefore, even though Model 1 is limited to observations for which control variables are available, I must drop some of those observations in Models 2 and 3, resulting in a different observation count across rows.

Appendix A

Table 21

Panel A: Summary of Compensation by Performance-Rating Regime , Associates

| Group | | Average Male Pay [1] | Average Female Pay [2] | Difference [3] | Percentage Difference = [3]/[1] [4] | N [5] | Percent Female [6] |
|---|---|---|---|---|---|---|---|
| All employees-years, 2003-2015 ratings regime | [1] | $296,738 | $253,215 | -$43,523 | -14.67% | 9450 | 28.2% |
| All employee-years, 2016-2018 ratings regime | [2] | $245,790 | $238,749 | -$7,041 | -2.86% | 2528 | 28.0% |
| All employee-years | [3] | $285,967 | $250,175 | -$35,792 | -12.52% | 11978 | 28.1% |

Panel B: Summary of Compensation by Performance-Rating Regime , Vice Presidents

| Group | | Average Male Pay [1] | Average Female Pay [2] | Difference [3] | Percentage Difference = [3]/[1] [4] | N [5] | Percent Female [6] |
|---|---|---|---|---|---|---|---|
| All employees-years, 2003-2015 ratings regime | [1] | $747,481 | $531,444 | -$216,037 | -28.90% | 20419 | 21.5% |
| All employee-years, 2016-2018 ratings regime | [2] | $580,866 | $405,022 | -$175,844 | -30.27% | 5928 | 25.9% |
| All employee-years | [3] | $711,664 | $498,626 | -$213,037 | -29.94% | 26347 | 22.5% |

Rows [1] and [2] of each panel are based on all employee-years, in the given time range, that are not missing any of the model control variables, including peformance metrics. Rows [3] pools all employee-years with non-missing control variables.

Appendix A

Table 22

Panel A: Regression Analysis of Pay Gap Persistence Since 2016, Associates

| | | Female Coefficient, Old Ratings Regime (2003-2015) | T-Ratio | Percent | Female Coefficient, New Ratings Regime (2016-2018) | T-Ratio | Percent | N | Adjusted R-squared |
|---|---|---|---|---|---|---|---|---|---|
| | | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] |
| Model 1 | [1] | -0.080 | 4.31 | -7.7% | -0.005 | 0.27 | -0.5% | 11,978 | 0.003 |
| Model 2 | [2] | -0.066 | 4.72 | -6.4% | -0.006 | 0.41 | -0.6% | 11,978 | 0.328 |
| Model 3 | [3] | -0.052 | 4.21 | -5.0% | 0.008 | 0.51 | 0.8% | 11,817 | 0.480 |

Panel B: Regression Analysis of Pay Gap Persistence Since 2016, Vice Presidents

| | | Female Coefficient, Old Ratings Regime (2003-2015) | T-Ratio | Percent | Female Coefficient,New Ratings Regime (2016-2018) | T-Ratio | Percent | N | Adjusted R-squared |
|---|---|---|---|---|---|---|---|---|---|
| | | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] |
| Model 1 | [1] | -0.281 | 11.94 | -24.5% | -0.330 | 11.95 | -28.1% | 26,347 | 0.038 |
| Model 2 | [2] | -0.254 | 12.04 | -22.5% | -0.287 | 11.20 | -25.0% | 26,347 | 0.221 |
| Model 3 | [3] | -0.235 | 11.72 | -21.0% | -0.290 | 11.44 | -25.1% | 25,921 | 0.378 |

This pay regressions in this table estimate seperate gender coefficients for employees in the old ratings regime (2003-2015) and the new ratings regimes (2016-2018). For each coefficient, this tables reports the absolute value of the T-ratio for the test of no difference in earnings between men and women. Generally speaking, if the p-value is less than 0.05, the coefficients are considered different at the 5% level of statistical significance.

Model 1 is the difference between the average earnings of men and women. It is included for reference.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

Model 3 includes all the same variables as Model 2 and, in addition, business unit.

Appendix A

Table 23
Percent of Observations in 2016-2018 with Performance Reviews Prior to 2016

| Number of Years of Performance Review Available Prior to 2016 | Percent of Corresponding Associate Observations in 2016-2018 | Percent of Corresponding Vice President Observations in 2016-2018 |
|---|---|---|
| 0 | 75% | 33% |
| 1 | 15% | 11% |
| 2 | 7% | 10% |
| 3 | 2% | 8% |
| 4 | 1% | 11% |
| 5 or more | 0% | 27% |

| Mean Years of Performance Review Available Prior to 2016 | Associates | Vice Presidents |
|---|---|---|
| | 0.40 | 2.32 |

Appendix A

Table 24
Comparison of Actual and Expected Promotion Rates to Managing Direction

| | | | | | Bootstrap | | | |
|---|---|---|---|---|---|---|---|---|
| Number of Men | Promotion Rate, Men | Number of Women | Promotion Rate, Women | Promotions, Women | Expected Promotions, Women | Shortfall | Expected Promotions 2.5 Percentile, Women | Expected Promotions 97.5 Percentile, Women |
| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
| 23443 | 4.03% | 6688 | 3.27% | 219 | 246.38 | -27.38 | 231 | 263 |

Note:
Only promotions that are both to the an in-class division as well as in the US have been tracked.

Expected promotion rate for women (and the resulting shortfall) is calculated using a probit regression model for men only and calculating the probability of promotion for women using men's coefficients. The model controls for tenure at Goldman (and the square of tenure), tenure as Vice President at Goldman (and the square of tenure as VP), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, and year. Note when coding education BA, associates and some college have been assigned to a single category.

Job groups with fewer than 150 observations in the relevant sample are combined into an expanded "Other" group.

Appendix A

Table 25
Damage Summary Model Comparison

| | Total In-class Compensation [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] | Percent Difference After Accounting for Performance Metrics [5] | Pay-gap Factor for Performance [6] | Damages Explained by Performance Metric [7] |
|---|---|---|---|---|---|---|---|
| Associates | $826,493,239 | 5.21% | 5.50% | $45,426,073 | 3.18% | 2.14% | $17,680,739 |
| Vice Presidents | $4,165,344,605 | 23.09% | 30.02% | $1,250,603,547 | 19.84% | 4.23% | $176,152,559 |
| Total | $4,991,837,844 | | | $1,296,029,620 | | | $193,833,298 |

Notes
Associate total in-class compensation runs through 2015. Vice President total in-class compensation projected through June of 2021.

Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AA job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

[1] Associate total in-class compensation runs through 2015. Vice President total in-class compensation projected through June of 2021.
[2] The absolute value of the Percent Difference from Model 2d from Table 15 for Associates and Table 16 for Vice Presidents.
[3] = [2]/(1-[2])
[4] = [1] x [3] .
[5] The absolute value of the Percent Difference from Model 2d from Table 15 for Associates and Table 16 for Vice Presidents.
[6] = (1-[5]) / (1-[2]) - 1
[7] = [6] x [1]

Appendix A

Table 26
Damage Summary Sample Specification Comparison

Full Sample

| | Total In-class Compensation [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] | Percent Difference After Accounting for Performance Metrics [5] | Pay-gap Factor for Performance [6] | Damages Explained by Performance Metric [7] |
|---|---|---|---|---|---|---|---|
| Associates | $826,493,239 | 5.21% | 5.50% | $45,426,073 | 3.18% | 2.14% | $17,680,739 |
| Vice Presidents | $4,165,344,605 | 23.09% | 30.02% | $1,250,603,547 | 19.84% | 4.23% | $176,152,559 |
| Total | $4,991,837,844 | | | $1,296,029,620 | | | $193,833,298 |

Damages for Full Sample less Exclusion Group 1 (Excluding Opt Outs, Pre-Complaint Severance Agreements, and Pre-Complaint MD Agreements )

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] |
|---|---|---|---|---|---|---|---|
| Associates | $688,565,793 | 5.21% | 5.50% | $37,845,246 | 3.18% | 2.14% | $14,737,005 |
| Vice Presidents | $3,465,082,635 | 23.09% | 30.02% | $1,040,356,812 | 19.84% | 4.23% | $146,538,458 |
| Total | $4,153,648,427 | | | $1,078,202,058 | | | $161,275,463 |

Damages for Full Sample less Exclusion Group 2 (Excluding Severance Agreement, MD Agreement, Private Wealth Management Agreement, Exclusion Group 1)

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] |
|---|---|---|---|---|---|---|---|
| Associates | $462,381,269 | 5.21% | 5.50% | $25,413,596 | 3.18% | 2.14% | $12,039,305 |
| Vice Presidents | $2,058,153,448 | 23.09% | 30.02% | $617,940,230 | 19.84% | 4.23% | $102,544,839 |
| Total | $2,520,534,718 | | | $643,353,826 | | | $114,584,144 |

Notes
[1] shows the total compensation for the given sample.
[2] The absolute value of the Percent Difference from Model 2d from Table 15 for Associates and Table 16 for Vice Presidents.
[3] = [2]/(1-[2])
[4] = [1] x [3] .
[5] The absolute value of the Percent Difference from Model 2d from Table 15 for Associates and Table 16 for Vice Presidents.
[6] = (1-[5]) / (1-[2]) - 1
[7] = [6] x [1]

Full Sample includes all women who meet the class requirements specified in my report.
Exclusion Group 1 removes from Full Sample women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.
Exclusion Group 2 removes from the Full Sample both Exclusion Group 1 and women who signed a Severance Agreement, MD, or PWA Agreement at any point in time

Appendix A

Table 27
Total Value of Raises Necessary to Bring Female Vice Presidents to Pay Parity

| | One-Year total PATC [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] | Percent Difference After Accounting for Performance Metrics [5] | Pay-gap Factor for Performance [6] | Damages Explained by Performance Metric [7] |
|---|---|---|---|---|---|---|---|
| Vice Presidents | $227,135,284 | 23.09% | 30.02% | $68,195,124 | 19.84% | 4.23% | $9,605,559 |

Note:
Model 2 controls for tenure at Goldman (and the square of tenure), related prior experience (and the square of related prior experience), division, AAP job group, employee's office (city), education (highest degree), whether employee is a lateral hire, whether employe is a new lateral hire, and year.

[1] is based the sum of PATC for all Vice Presidents in class at the end of the final year of data available, 2018.
[2] The absolute value of the Percent Difference from Model 2d from Table 15 for Associates and Table 16 for Vice Presidents.
[3] = [2]/(1-[2])
[4] = [1] x [3] .
[5] The absolute value of the Percent Difference from Model 2d from Table 16.
[6] = (1-5]) / (1-[2]) - 1
[7] = [6] x [1]

Appendix A

Table 28: Estimated Promotion Shortfall by Year

| Missed Promotion Year | Promotions, Women [1] | Expected Promotions, Women [2] | Promotions Shortfall, Women [3] |
|---|---|---|---|
| 2002 * | 9 | 6.34 | -2.66 |
| 2003 | 9 | 6.34 | -2.66 |
| 2004 | 11 | 11.60 | 0.60 |
| 2005 | 13 | 15.84 | 2.84 |
| 2006 | 14 | 19.45 | 5.45 |
| 2007 | 14 | 21.12 | 7.12 |
| 2008 | 15 | 22.26 | 7.26 |
| 2009 | 15 | 18.49 | 3.49 |
| 2010 | 23 | 19.72 | -3.28 |
| 2011 | 13 | 14.95 | 1.95 |
| 2012 | 21 | 17.21 | -3.79 |
| 2013 | 14 | 15.14 | 1.14 |
| 2014 | 0 | 0.00 | 0.00 |
| 2015 | 29 | 28.18 | -0.82 |
| 2016 | 0 | 0.00 | 0.00 |
| 2017 | 28 | 36.09 | 8.09 |
| 2018 | 0 | 0.00 | 0.00 |
| Total | 228 | 252.71 | 24.71 |
| Total Excl. 2002 | 219 | 246.38 | 27.38 |

Notes:
There were no observed promotions to EMD in 2014, 2016, and 2018.
This table presents the yearly promotion shortfall estimates from the
[1] Observed promotions among women

[2] Expected promotions among women
[3] = [2] - [1]

Appendix A

Table 29: Promotion Damage Summary

| Year | | Value of a Missed Promotion in Given Year [1] | Promotions Shortfall, Women [2] | Damages [3] |
|---|---|---|---|---|
| 2002 | * | $9,638,993 | -2.66 | -$25,657,987 |
| 2003 | | $9,638,993 | -2.66 | -$25,657,987 |
| 2004 | | $9,354,826 | 0.60 | $5,584,493 |
| 2005 | | $8,003,484 | 2.84 | $22,696,318 |
| 2006 | | $7,468,457 | 5.45 | $40,674,512 |
| 2007 | | $6,961,691 | 7.12 | $49,568,667 |
| 2008 | | $5,817,614 | 7.26 | $42,234,030 |
| 2009 | | $5,497,420 | 3.49 | $19,184,938 |
| 2010 | | $5,513,890 | -3.28 | -$18,063,649 |
| 2011 | | $4,654,696 | 1.95 | $9,079,731 |
| 2012 | | $4,300,181 | -3.79 | -$16,291,918 |
| 2013 | | $3,404,128 | 1.14 | $3,874,542 |
| 2014 | | $2,829,842 | 0.00 | $0 |
| 2015 | | $2,412,115 | -0.82 | -$1,982,738 |
| 2016 | | $1,961,981 | 0.00 | $0 |
| 2017 | | $1,456,323 | 8.09 | $11,778,302 |
| 2018 | | $888,292 | 0.00 | $0 |
| Total | | | 24.71 | $117,021,254 |
| Total Excl. 2002 | | | 27.38 | $142,679,241 |

Sources: 'GS CCO - Summary of EMD PATC - 20180913.xlsx' and 'GS CCO Summary of EMD Prom Term - 20180913.xlsx'

Notes:
There were no (observed) promotions to EMD in 2014, 2016, and 2018.
[1] Amount of money associated with a single foregone promotion from VP to EMD, valued through June of 2021. This multiplies the difference between the 90th percentile of VP pay and average total EMD pay by the probability that she remains as an EMD (or in a higher-earning role) at Goldman through June 2021. Each year there is assumed to be an 11% chance she leaves Goldman, which is the average annual EMD attrition rate.

[2] corresponds with the shortfall in column [3] presented in Table 28
[3] = [1] * [2]

* I have been instructed by counsel to assume that the promotions shortfall in 2002 is equal to the shortfall in 2003

Appendix A

Table 30: Promotion Damage Sample Specification Comparison

| Missed Promotion Year | | Value of a Missed Promotion in Given Year [1] | Promotions Shortfall, Women [2] | Damages, Full Sample [3] | Percent of Total Person-Years not in Exclusion Group 1 [4a] | Damages, Exclusion Group 1 [4] | Percent of Total Person-Years not in Exclusion Group 2 [5a] | Damages, Exclusion Group 2 [5] |
|---|---|---|---|---|---|---|---|---|
| 2002 | * | $9,638,993 | -2.66 | -$25,657,986 | 71.16% | -$18,258,939 | 39.07% | -$10,024,515 |
| 2003 | | $9,638,993 | -2.66 | -$25,657,986 | 71.16% | -$18,258,939 | 39.07% | -$10,024,515 |
| 2004 | | $9,354,826 | 0.60 | $5,584,493 | 68.02% | $3,798,461 | 37.84% | $2,113,051 |
| 2005 | | $8,003,484 | 2.84 | $22,696,318 | 68.68% | $15,587,414 | 42.24% | $9,587,238 |
| 2006 | | $7,468,457 | 5.45 | $40,674,512 | 65.87% | $26,790,945 | 36.53% | $14,859,755 |
| 2007 | | $6,961,691 | 7.12 | $49,568,668 | 68.45% | $33,927,511 | 35.96% | $17,826,319 |
| 2008 | | $5,817,614 | 7.26 | $42,234,028 | 77.15% | $32,583,501 | 40.54% | $17,121,903 |
| 2009 | | $5,497,420 | 3.49 | $19,184,938 | 90.19% | $17,302,066 | 49.34% | $9,465,248 |
| 2010 | | $5,513,890 | -3.28 | -$18,063,648 | 92.52% | -$16,712,253 | 50.37% | -$9,099,394 |
| 2011 | | $4,654,696 | 1.95 | $9,079,731 | 92.07% | $8,359,855 | 54.73% | $4,969,469 |
| 2012 | | $4,300,181 | -3.79 | -$16,291,918 | 91.98% | -$14,985,298 | 57.39% | -$9,350,499 |
| 2013 | | $3,404,129 | 1.14 | $3,874,542 | 92.03% | $3,565,581 | 64.66% | $2,505,092 |
| 2014 | | $2,829,843 | 0.00 | $0 | 92.29% | $0 | 65.72% | $0 |
| 2015 | | $2,412,115 | -0.82 | -$1,982,738 | 92.08% | -$1,825,726 | 65.93% | -$1,307,220 |
| 2016 | | $1,961,981 | 0.00 | $0 | 91.55% | $0 | 73.70% | $0 |
| 2017 | | $1,456,323 | 8.09 | $11,778,302 | 90.71% | $10,684,603 | 77.68% | $9,149,217 |
| 2018 | | $888,292 | 0.00 | $0 | 91.68% | $0 | 83.92% | $0 |
| Total | | | 24.71 | $117,021,256 | | $82,558,781 | | $47,791,149 |
| Total Excl. 2002 | | | 27.38 | $142,679,242 | | $100,817,720 | | $57,815,664 |

Sources: 'GS CCO - Summary of EMD PATC - 20180913.xlsx' and 'GS CCO Summary of EMD Prom Term - 20180913.xlsx'

Notes:
There were no observed promotions to EMD in 2014, 2016, and 2018.
[1] Amount of money associated with a single foregone promotion from VP to EMD, valued through June of 2021. This multiplies the difference between the 90th percentile of VP pay and average total EMD pay by the probability that she remains as an EMD (or in a higher-earning role) at Goldman through June 2021. Each year there is assumed to be an 11% chance she leaves Goldman, which is the average annual EMD attrition rate.

[2] corresponds with the shortfall [3] presented in Table 26.
[3] = [1] * [2]
[4a] the percentage of female person-years eligible promotions in the group of people not in Exclusion Group 1.
[4] = [3] x [4a]
[5a] the percentage of female person-years eligible for promotions in the group of people not in Exclusion Group 2.
[5] = [3] x [5a]

Exclusion Group 1 removes from Full Sample women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.

Exclusion Group 2 removes from the Full Sample both Exclusion Group 1 and women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

* I have been instructed by counsel to assume that the promotions shortfall in 2002 is equal to the shortfall in 2003

# Appendix B

Appendix B

Table 1
Summary of Damages Associated with the Overall Compensation Claim
Model 2

Full Sample

| | Total In-class Compensation [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] |
|---|---|---|---|---|
| Associates | $826,493,239 | 5.09% | 5.36% | $44,309,975 |
| Vice Presidents | $3,836,636,545 | 22.43% | 28.91% | $1,109,267,104 |
| Total | $4,663,129,784 | | | $1,153,577,079 |

Damages for Full Sample less Exclusion Group 1 (Excluding Opt Outs, Pre-Complaint Severance Agreements, and Pre-Complaint MD Agreements )

| | | | | |
|---|---|---|---|---|
| Associates | $688,565,793 | 5.09% | 5.36% | $36,915,406 |
| Vice Presidents | $3,158,356,186 | 22.43% | 28.91% | $913,159,373 |
| Total | $3,846,921,979 | | | $950,074,778 |

Damages for Full Sample less Exclusion Group 2 (Excluding Severance Agreement, MD Agreement, Private Wealth Management Agreement, Exclusion Group 1)

| | | | | |
|---|---|---|---|---|
| Associates | $462,381,269 | 5.09% | 5.36% | $24,789,196 |
| Vice Presidents | $1,783,788,427 | 22.43% | 28.91% | $515,737,626 |
| Total | $2,246,169,697 | | | $540,526,821 |

Notes
[1] shows the total compensation for the given sample.
[2] The absolute value of the Percent Difference from Model 2d from Table 1 for Associates and Table 2 for Vice Presidents.
[3] = [2]/(1-[2])
[4] = [1] x [3] .

Full Sample includes all women who meet the class requirements specified in my report.
Exclusion Group 1 consists of women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.
Exclusion Group 2 = Exclusion Group 1 and in addition, women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

# Appendix B

Table 2
Summary of Damages Associated with the Overall Compensation Claim
Model 2 + Division Function Controls

Full Sample

| | Total In-class Compensation [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] |
|---|---|---|---|---|
| Associates | $826,493,239 | 5.52% | 5.85% | $48,324,492 |
| Vice Presidents | $3,836,636,545 | 15.74% | 18.68% | $716,548,213 |
| Total | $4,663,129,784 | | | $764,872,706 |

Damages for Full Sample less Exclusion Group 1 (Excluding Opt Outs, Pre-Complaint Severance Agreements, and Pre-Complaint MD Agreements )

| | [1] | [2] | [3] | [4] |
|---|---|---|---|---|
| Associates | $688,565,793 | 5.52% | 5.85% | $40,259,969 |
| Vice Presidents | $3,158,356,186 | 15.74% | 18.68% | $589,869,396 |
| Total | $3,846,921,979 | | | $630,129,365 |

Damages for Full Sample less Exclusion Group 2 (Excluding Severance Agreement, MD Agreement, Private Wealth Management Agreement, Exclusion Group 1)

| | [1] | [2] | [3] | [4] |
|---|---|---|---|---|
| Associates | $462,381,269 | 5.52% | 5.85% | $27,035,115 |
| Vice Presidents | $1,783,788,427 | 15.74% | 18.68% | $333,148,683 |
| Total | $2,246,169,697 | | | $360,183,798 |

Notes
[1] shows the total compensation for the given sample.
[2] The absolute value of the Percent Difference from Model 2d from Table 1 for Associates and Table 2 for Vice Presidents.
[3] = [2]/(1-[2])
[4] = [1] x [3] .

Full Sample includes all women who meet the class requirements specified in my report.
Exclusion Group 1 consists of women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.
Exclusion Group 2 = Exclusion Group 1 and in addition, women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

Appendix B

Table 3
Summary of Damages Associated with the Overall Compensation Claim
Model 3

Full Sample

| | Total In-class Compensation [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] |
|---|---|---|---|---|
| Associates | $826,493,239 | 3.61% | 3.74% | $30,946,141 |
| Vice Presidents | $3,836,636,545 | 21.64% | 27.61% | $1,059,239,602 |
| Total | $4,663,129,784 | | | $1,090,185,743 |

Damages for Full Sample less Exclusion Group 1 (Excluding Opt Outs, Pre-Complaint Severance Agreements, and Pre-Complaint MD Agreements )

| | | | | |
|---|---|---|---|---|
| Associates | $688,565,793 | 3.61% | 3.74% | $25,781,765 |
| Vice Presidents | $3,158,356,186 | 21.64% | 27.61% | $871,976,251 |
| Total | $3,846,921,979 | | | $897,758,015 |

Damages for Full Sample less Exclusion Group 2 (Excluding Severance Agreement, MD Agreement, Private Wealth Management Agreement, Exclusion Group 1)

| | | | | |
|---|---|---|---|---|
| Associates | $462,381,269 | 3.61% | 3.74% | $17,312,805 |
| Vice Presidents | $1,783,788,427 | 21.64% | 27.61% | $492,478,065 |
| Total | $2,246,169,697 | | | $509,790,870 |

Notes
[1] shows the total compensation for the given sample.
[2] The absolute value of the Percent Difference from Model 2d from Table 1 for Associates and Table 2 for Vice Presidents.
[3] = [2]/(1-[2])
[4] = [1] x [3] .

Full Sample includes all women who meet the class requirements specified in my report.
Exclusion Group 1 consists of women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.
Exclusion Group 2 = Exclusion Group 1 and in addition, women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

Appendix B

Table 4
Summary of Damages Associated with the Overall Compensation Claim
Division Function Controls

Full Sample

| | Total In-class Compensation [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] |
|---|---|---|---|---|
| Associates | $826,493,239 | 3.92% | 4.08% | $33,761,646 |
| Vice Presidents | $3,836,636,545 | 14.19% | 16.54% | $634,527,969 |
| Total | $4,663,129,784 | | | $668,289,614 |

Damages for Full Sample less Exclusion Group 1 (Excluding Opt Outs, Pre-Complaint Severance Agreements, and Pre-Complaint MD Agreements )

| | | | | |
|---|---|---|---|---|
| Associates | $688,565,793 | 3.92% | 4.08% | $28,127,410 |
| Vice Presidents | $3,158,356,186 | 14.19% | 16.54% | $522,349,540 |
| Total | $3,846,921,979 | | | $550,476,950 |

Damages for Full Sample less Exclusion Group 2 (Excluding Severance Agreement, MD Agreement, Private Wealth Management Agreement, Exclusion Group 1)

| | | | | |
|---|---|---|---|---|
| Associates | $462,381,269 | 3.92% | 4.08% | $18,887,937 |
| Vice Presidents | $1,783,788,427 | 14.19% | 16.54% | $295,014,561 |
| Total | $2,246,169,697 | | | $313,902,499 |

Notes
[1] shows the total compensation for the given sample.
[2] The absolute value of the Percent Difference from Model 2d from Table 1 for Associates and Table 2 for Vice Presidents.
[3] = [2]/(1-[2])
[4] = [1] x [3] .

Full Sample includes all women who meet the class requirements specified in my report.
Exclusion Group 1 consists of women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.
Exclusion Group 2 = Exclusion Group 1 and in addition, women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

Appendix B

Table 5
Damages Associated with the Compensation Claim Related to Impact of Performance Measures
Model 2

Full Sample

| | Total In-class Compensation [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] | Percent Difference After Accounting for Performance Metrics [5] | Pay-gap Factor for Performance [6] | Damages Explained by Performance Metric [7] |
|---|---|---|---|---|---|---|---|
| Associates | $820,853,100 | 5.27% | 5.57% | $45,694,361 | 3.14% | 2.25% | $18,479,980 |
| Vice Presidents | $3,274,955,804 | 18.73% | 23.04% | $754,587,116 | 14.74% | 4.91% | $160,821,865 |
| Total | $4,095,808,904 | | | $800,281,477 | | | $179,301,845 |

Damages for Full Sample less Exclusion Group 1 (Excluding Opt Outs, Pre-Complaint Severance Agreements, and Pre-Complaint MD Agreements )

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] |
|---|---|---|---|---|---|---|---|
| Associates | $683,669,196 | 5.27% | 5.57% | $38,057,756 | 3.14% | 2.25% | $15,391,540 |
| Vice Presidents | $2,671,146,831 | 18.73% | 23.04% | $615,462,652 | 14.74% | 4.91% | $131,170,874 |
| Total | $3,354,816,026 | | | $653,520,408 | | | $146,562,414 |

Damages for Full Sample less Exclusion Group 2 (Excluding Severance Agreement, MD Agreement, Private Wealth Management Agreement, Exclusion Group 1)

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] |
|---|---|---|---|---|---|---|---|
| Associates | $462,146,182 | 5.27% | 5.57% | $25,726,253 | 3.14% | 2.25% | $10,404,361 |
| Vice Presidents | $1,687,612,342 | 18.73% | 23.04% | $388,845,104 | 14.74% | 4.91% | $82,872,863 |
| Total | $2,149,758,524 | | | $414,571,357 | | | $93,277,224 |

Notes
[1] shows the total compensation for the given sample.
[2] The absolute value of the Percent Difference from Model 2d from Table 3 for Associates and Table 4 for Vice Presidents.
[3] = [2]/(1-[2])
[4] = [1] x [3] .
[5] The absolute value of the Percent Difference from Model 2d from Table 3 for Associates and Table 4 for Vice Presidents.
[6] = (1-[5]) / (1-[2]) - 1
[7] = [6] x [1]

Full Sample includes all women who meet the class requirements specified in my report.
Exclusion Group 1 consists of women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.
Exclusion Group 2 = Exclusion Group 1 and in addition, women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

Appendix B

Table 6
Damages Associated with the Compensation Claim Related to Impact of Performance Measures
Model 2 + Division Function Controls

Full Sample

| | Total In-class Compensation [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] | Percent Difference After Accounting for Performance Metrics [5] | Pay-gap Factor for Performance [6] | Damages Explained by Performance Metric [7] |
|---|---|---|---|---|---|---|---|
| Associates | $820,853,100 | 5.76% | 6.11% | $50,131,761 | 3.30% | 2.60% | $21,381,075 |
| Vice Presidents | $3,274,955,804 | 15.75% | 18.70% | $612,436,520 | 10.73% | 5.97% | $195,453,160 |
| Total | $4,095,808,904 | | | $662,568,282 | | | $216,834,235 |

Damages for Full Sample less Exclusion Group 1 (Excluding Opt Outs, Pre-Complaint Severance Agreements, and Pre-Complaint MD Agreements )

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] |
|---|---|---|---|---|---|---|---|
| Associates | $683,669,196 | 5.76% | 6.11% | $41,753,562 | 3.30% | 2.60% | $17,807,793 |
| Vice Presidents | $2,671,146,831 | 15.75% | 18.70% | $499,520,595 | 10.73% | 5.97% | $159,417,141 |
| Total | $3,354,816,026 | | | $541,274,157 | | | $177,224,934 |

Damages for Full Sample less Exclusion Group 2 (Excluding Severance Agreement, MD Agreement, Private Wealth Management Agreement, Exclusion Group 1)

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] |
|---|---|---|---|---|---|---|---|
| Associates | $462,146,182 | 5.76% | 6.11% | $28,224,541 | 3.30% | 2.60% | $12,037,699 |
| Vice Presidents | $1,687,612,342 | 15.75% | 18.70% | $315,593,703 | 10.73% | 5.97% | $100,718,662 |
| Total | $2,149,758,524 | | | $343,818,244 | | | $112,756,360 |

Notes
[1] shows the total compensation for the given sample.
[2] The absolute value of the Percent Difference from Model 2d from Table 3 for Associates and Table 4 for Vice Presidents.
[3] = [2]/(1-[2])
[4] = [1] x [3] .
[5] The absolute value of the Percent Difference from Model 2d from Table 3 for Associates and Table 4 for Vice Presidents.
[6] = (1-[5]) / (1-[2]) - 1
[7] = [6] x [1]

Full Sample includes all women who meet the class requirements specified in my report.
Exclusion Group 1 consists of women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.
Exclusion Group 2 = Exclusion Group 1 and in addition, women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

Appendix B

Table 7
Damages Associated with the Compensation Claim Related to Impact of Performance Measures
Model 3

Full Sample

| | Total In-class Compensation [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] | Percent Difference After Accounting for Performance Metrics [5] | Pay-gap Factor for Performance [6] | Damages Explained by Performance Metric [7] |
|---|---|---|---|---|---|---|---|
| Associates | $820,853,100 | 3.79% | 3.94% | $32,357,533 | 1.65% | 2.22% | $18,255,838 |
| Vice Presidents | $3,274,955,804 | 15.30% | 18.07% | $591,659,551 | 10.50% | 5.67% | $185,655,454 |
| Total | $4,095,808,904 | | | $624,017,084 | | | $203,911,292 |

Damages for Full Sample less Exclusion Group 1 (Excluding Opt Outs, Pre-Complaint Severance Agreements, and Pre-Complaint MD Agreements )

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] |
|---|---|---|---|---|---|---|---|
| Associates | $683,669,196 | 3.79% | 3.94% | $26,949,827 | 1.65% | 2.22% | $15,204,857 |
| Vice Presidents | $2,671,146,831 | 15.30% | 18.07% | $482,574,309 | 10.50% | 5.67% | $151,425,853 |
| Total | $3,354,816,026 | | | $509,524,136 | | | $166,630,711 |

Damages for Full Sample less Exclusion Group 2 (Excluding Severance Agreement, MD Agreement, Private Wealth Management Agreement, Exclusion Group 1)

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] |
|---|---|---|---|---|---|---|---|
| Associates | $462,146,182 | 3.79% | 3.94% | $18,217,523 | 1.65% | 2.22% | $10,278,168 |
| Vice Presidents | $1,687,612,342 | 15.30% | 18.07% | $304,887,156 | 10.50% | 5.67% | $95,669,821 |
| Total | $2,149,758,524 | | | $323,104,679 | | | $105,947,989 |

Notes
[1] shows the total compensation for the given sample.
[2] The absolute value of the Percent Difference from Model 2d from Table 3 for Associates and Table 4 for Vice Presidents.
[3] = [2]/(1-[2])
[4] = [1] x [3] .
[5] The absolute value of the Percent Difference from Model 2d from Table 3 for Associates and Table 4 for Vice Presidents.
[6] = (1-[5]) / (1-[2]) - 1
[7] = [6] x [1]

Full Sample includes all women who meet the class requirements specified in my report.
Exclusion Group 1 consists of women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.
Exclusion Group 2 = Exclusion Group 1 and in addition, women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

Appendix B

Table 8
Damages Associated with the Compensation Claim Related to Impact of Performance Measures
Model 3 + Division Function Controls

Full Sample

| | Total In-class Compensation [1] | Percent Difference [2] | Pay-gap Factor [3] | Damages [4] | Percent Difference After Accounting for Performance Metrics [5] | Pay-gap Factor for Performance [6] | Damages Explained by Performance Metric [7] |
|---|---|---|---|---|---|---|---|
| Associates | $820,853,100 | 4.15% | 4.33% | $35,557,664 | 1.94% | 2.31% | $18,976,480 |
| Vice Presidents | $3,274,955,804 | 13.82% | 16.04% | $525,207,026 | 8.52% | 6.15% | $201,494,833 |
| Total | $4,095,808,904 | | | $560,764,690 | | | $220,471,313 |

Damages for Full Sample less Exclusion Group 1 (Excluding Opt Outs, Pre-Complaint Severance Agreements, and Pre-Complaint MD Agreements )

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] |
|---|---|---|---|---|---|---|---|
| Associates | $683,669,196 | 4.15% | 4.33% | $29,615,140 | 1.94% | 2.31% | $15,805,063 |
| Vice Presidents | $2,671,146,831 | 13.82% | 16.04% | $428,373,745 | 8.52% | 6.15% | $164,344,900 |
| Total | $3,354,816,026 | | | $457,988,885 | | | $180,149,963 |

Damages for Full Sample less Exclusion Group 2 (Excluding Severance Agreement, MD Agreement, Private Wealth Management Agreement, Exclusion Group 1)

| | [1] | [2] | [3] | [4] | [5] | [6] | [7] |
|---|---|---|---|---|---|---|---|
| Associates | $462,146,182 | 4.15% | 4.33% | $20,019,220 | 1.94% | 2.31% | $10,683,894 |
| Vice Presidents | $1,687,612,342 | 13.82% | 16.04% | $270,643,609 | 8.52% | 6.15% | $103,831,986 |
| Total | $2,149,758,524 | | | $290,662,829 | | | $114,515,881 |

Notes
[1] shows the total compensation for the given sample.
[2] The absolute value of the Percent Difference from Model 2d from Table 3 for Associates and Table 4 for Vice Presidents.
[3] = [2]/(1-[2])
[4] = [1] x [3] .
[5] The absolute value of the Percent Difference from Model 2d from Table 3 for Associates and Table 4 for Vice Presidents.
[6] = (1-[5]) / (1-[2]) - 1
[7] = [6] x [1]

Full Sample includes all women who meet the class requirements specified in my report.
Exclusion Group 1 consists of women who signed a Severance Agreement or MD Agreement prior to the filing of the complaint as well as women who opted out of the class by the opt-out deadline.
Exclusion Group 2 = Exclusion Group 1 and in addition, women who signed a Severance Agreement, MD, or PWA Agreement at any point in time.

# Appendix C

# Documents Relied On

**Case Documents**
Memorandum and Order of James C. Francis, March 10, 2015
Opinion and Order of Hon. Analisa Torres, March 302, 2018

**Previously Submitted Reports and Declarations**
Expert Report of Henry S. Farber in Connection with Chen-Oster v. Goldman Sachs, October 30, 2013

Addendum to the October 30, 2013 Expert Report of Henry S. Farber in Connection with Chen-Oster v. Goldman Sachs, December 3, 2013

Expert Rebuttal Report of Henry S. Farber in Connection with Chen-Oster v. Goldman Sachs, January 28, 2014

Expert Report of Henry S. Farber in Connection with Chen-Oster v. Goldman Sachs, February 17, 2014

Supplemental Expert Report of Henry S. Farber in Connection with Chen-Oster v. Goldman Sachs, February 17, 2014

Expert Rebuttal Report of Henry S. Farber in Connection with Chen-Oster v. Goldman Sachs, July 29, 2014

Second Expert Rebuttal Report of Henry S. Farber in Connection with Chen-Oster v. Goldman Sachs, May 19,
2014.

Declaration of Henry Farber in Connection with Chen-Oster v. Goldman Sachs, June 6, 2018, UPDATED June 29, 2018

Declaration of Henry Farber in Connection with Chen-Oster v. Goldman Sachs, June 29, 2018.

Expert Report of Henry S. Farber in Connection with Chen-Oster v. Goldman Sachs, January 15, 2021

**Declarations**
Declaration of Jacqueline Cassidy, October 19, 2020
Declaration of Kathleen Cupertino, November 12, 2020
Declaration of Joanna Kozlowski, November 28, 2020
Declaration of Megan Taylor, June 30, 2014

**Deposition Transcripts**
Deposition of Michael P. Ward, January 6, 2014

**Bates-Numbered Documents**
GS0004210
GS0004219
GS0004741
GS0109299
GS0109371

GS0113414
GS0113422
GS0113426
GS0113548
GS0113896
GS0115109
GS0123010
GS0140383
GS0147555
GS0180019
GS0181122
GS0253511
GS0258942
GS0274858
GS0276276
GS0400008
GS0400026
GS0400052
GS0459365
GS0482254
GS0533693
GS0546942
GS0592247
GS0604637

**Websites**
https://www.dol.gov/agencies/ofccp/manual/fccm/introduction.
https://ecfr.federalregister.gov/current/title-41/subtitle-B/chapter-60/part-60-2/subpart-B/section-60-2.12.

**Textbooks**
James H. Stock and Mark W. Watson (2004). Introduction to Econometrics. Pearson Education, Inc., at p. 681.

**Academic Literature**
Bielby, William T. and Pamela Coukos, "'Statistical Dueling' with Unconventional Weapons: What Courts Should Know about Experts in Employment Discrimination Class Actions" 56 Emory Law Journal (2007)

Lazear, Edward P. and Katheryn L. Shaw (2007). Personnel Economics: The Economist's View of Human Resources." Journal of Economic Perspectives. 21(4), pp. 91-114 at p. 94.