UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| H. CRISTINA CHEN-OSTER, SHANNA ORLICH, ALLISON GAMBA and MARY DE LUIS,<br><br>Plaintiffs,<br><br>v.<br><br>GOLDMAN SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,<br><br>Defendants. | 10 Civ. 6950 (AT) (RWL) |

**OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY**

Barbara B. Brown (*admitted pro hac vice*)
Carson H. Sullivan (*admitted pro hac vice*)
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C. 20005

Patrick W. Shea
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166

Robert J. Giuffra, Jr.
Sharon L. Nelles
Ann-Elizabeth Ostrager
Hilary M. Williams
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004

Amanda Flug Davidoff
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006

*Attorneys for Defendants*
*Goldman Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

September 10, 2021

# TABLE OF CONTENTS

*Page*


**PRELIMINARY STATEMENT** .......... 1

**LEGAL STANDARD** .......... 7

**ARGUMENT** .......... 8

**I. The Court should find that Dr. Shaw's opinions and testimony are admissible** .......... 8

A. Dr. Shaw's use of production metrics is appropriate and reliable .......... 9

1. Dr. Shaw fully supported her use of production data and presented undisputed evidence establishing the reliability of each metric .......... 10

2. Plaintiffs' assertion that Dr. Shaw "cherry-picked" production variables is false .......... 15

3. Plaintiffs falsely claim that Dr. Shaw "invented" production data .......... 15

B. Dr. Shaw's disaggregation of data to the Division level is appropriate and reliable .......... 18

C. There is no basis to hide Dr. Shaw's Chow test from the jury .......... 20

D. The Court should reject Plaintiffs' meritless claim that Dr. Shaw did not do her own work .......... 22

E. Dr. Shaw's "outlier" analyses are appropriate and reliable .......... 23

F. Dr. Shaw's analyses of the discrete components of Goldman Sachs' promotions process is consistent with the factual record, this Court's Orders, and Title VII law .......... 25

**II. The Court should find that Dr. Stockdale's opinions and testimony are admissible** .......... 27

A. Dr. Stockdale's methodology is reliable .......... 27

B. Dr. Stockdale was not required to apply the same frameworks as Dr. Goldberg .......... 29

C. Dr. Stockdale's opinions based on her People Survey analysis are reliable .......... 32

1. Plaintiffs' own experts rely on the People Survey data that they claim is unreliable .......... 32

2. Plaintiffs identify no evidence that the People Survey or Exit Survey responses are biased ..... 33

3. Dr. Stockdale's People Survey analysis is not "flawed" ..... 34

D. Plaintiffs mischaracterize the support that Dr. Heck and Cornerstone Research provided to Dr. Stockdale ..... 36

**III. The Court should find that Dr. Dunleavy's opinions and testimony are admissible** ..... 38

A. Dr. Dunleavy's Work Analysis methodology is appropriately tailored to the purpose of his study ..... 40

1. Plaintiffs wrongly criticize Dr. Dunleavy for not applying standards that do not apply to Dr. Dunleavy's work ..... 40

2. Although not required, Dr. Dunleavy did both qualitative and quantitative analyses ..... 42

3. Dr. Dunleavy did, in fact, use multiple methods and verify his responses ..... 43

4. Dr. Dunleavy's process of generating taxonomies was reliable ..... 44

5. There is no evidence that Dr. Dunleavy's questions were ambiguous or misunderstood ..... 45

B. Dr. Dunleavy's sample was adequate in size, was representative, and had a sufficient response rate ..... 46

C. Dr. Dunleavy's opinions are relevant ..... 50

**IV. The Court should find that Mr. Dunn's opinions and testimony are admissible** ..... 51

A. Mr. Dunn's opinion on the variety of jobs held by associates and vice presidents is both reliable and relevant ..... 51

B. Mr. Dunn's opinion concerning "pay for performance" is relevant ..... 54

**CONCLUSION** ..... 55

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abram* v. *United Parcel Serv. of Am., Inc.*,
200 F.R.D. 424 (E.D. Wis. 2001) .......... 25

*Am. Home Assur. Co.* v. *Merck & Co.*,
462 F. Supp. 2d 435 (S.D.N.Y. 2006) .......... 23

*Apple* v. *Atl. Yards Dev. Co., LLC*,
2015 WL 11182422 (E.D.N.Y. Mar. 31, 2015) .......... 17

*Arista Recs. LLC* v. *Lime Grp. LLC*,
2011 WL 1674796 (S.D.N.Y. May 2, 2011) .......... 1

*Ass'n of Oil Pipe Lines* v. *FERC*,
281 F.3d 239 (D.C. Cir. 2002) .......... 2, 25

*Auto. Ins. Co. of Hartford* v. *Electrolux Home Prod., Inc.*,
2012 WL 6629238 (S.D.N.Y. Dec. 20, 2012) .......... 34

*Aventis Env't Sci. USA LP* v. *Scotts Co.*,
383 F. Supp. 2d 488 (S.D.N.Y. 2005) .......... 14, 15

*Bd. of Trustees of AFTRA Ret. Fund* v. *JPMorgan Chase Bank, N.A.*,
2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) .......... 23

*CFTC* v. *Wilson*,
2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) .......... 18

*Coates* v. *Johnson & Johnson*,
756 F.2d 524 (7th Cir. 1985) .......... 21

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......... *passim*

*DPWN Holdings (USA), Inc.* v. *United Air Lines, Inc.*,
2019 WL 1515231 (E.D.N.Y. Feb. 21, 2019) .......... 3

*EEOC* v. *Morgan Stanley & Co.*,
2004 WL 1542264 (S.D.N.Y. July 8, 2004) .......... 55

*EEOC* v. *Texas Roadhouse, Inc.*,
215 F. Supp. 3d 140 (D. Mass. 2016) .......... 42

*Fed. Hous. Fin. Agency* v. *Nomura Holding Am., Inc.*,
104 F. Supp. 3d 441 (S.D.N.Y. 2015) .......... 25

*Forte* v. *Liquidnet Holdings, Inc.*,
2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015) .......... 8

*Guardians Ass'n of N.Y.C. Police Dep't, Inc.* v.
*Civ. Serv. Comm'n of City of N.Y.*,
630 F.2d 79 (2d Cir. 1980) .......... 42

*Gulino* v. *Bd. of Educ. of City Sch. Dist.*,
113 F. Supp. 3d 663 (S.D.N.Y. 2015) .......... 42

*Hart* v. *BHH, LLC*,
2018 WL 3471813 (S.D.N.Y. July 19, 2018) .......... 3, 37

*Heatherly* v. *Nat'l Presto Indus., Inc.*,
2008 WL 11334519 (W.D. Tex. Dec. 3, 2008) .......... 12

*Henkel* v. *Wagner*,
2016 WL 1271062 (S.D.N.Y. Mar. 19, 2016) .......... 52

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .......... 2, 25

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) .......... 5

*In re Autozone*,
2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) .......... 48, 49

*In re Namenda Indirect Purchaser Antitrust Litig.*,
2021 WL 2403727 (S.D.N.Y. June 11, 2021) .......... 1, 36

*In re Pfizer Inc. Sec. Litig.*,
819 F.3d 642 (2d Cir. 2016) .......... 1, 8, 54

*In re Pool Prod. Distribution Mkt. Antitrust Litig.*,
2016 WL 2756437 (E.D. La. May 12, 2016) .......... 21

*Johnson* v. *Big Lots Stores, Inc.*,
2008 WL 1930681 (E.D. La. Apr. 29, 2008) .......... 48

*Kassman* v. *KPMG LLP*,
416 F. Supp. 3d 252 (S.D.N.Y. 2018) .......... *passim*

*Katt* v. *City of N.Y.*,
151 F. Supp. 2d 313 (S.D.N.Y. 2001) .......... 30

*Kelly* v. *Healthcare Servs. Grp., Inc.*,
2015 WL 1737870 (E.D. Tex. Apr. 10, 2015) .......... 48

*Kumho Tire Co.* v. *Carmichael*,
526 U.S. 137 (1999) .......... 22

*Levy* v. *Lexington Cty.*,
589 F.3d 708 (4th Cir. 2009) .......... 26

*Linde* v. *Arab Bank*,
PLC, 922 F. Supp. 2d 316 (E.D.N.Y. 2013) .......... 29

*M.O.C.H.A. Soc'y, Inc.* v. *City of Buffalo*,
689 F.3d 263 (2d Cir. 2012) .......... 49

*Nicholas* v. *Bratton*,
376 F. Supp. 3d 232 (S.D.N.Y. 2019) .......... 30

*On Track Innovations Ltd.* v. *T-Mobile USA, Inc.*,
106 F. Supp. 3d 369 (S.D.N.Y. 2015) .......... 7

*Ottaviani* v. *State Univ. of N.Y. at New Paltz*,
875 F.2d 365 (2d Cir. 1989) .......... 15

*Phoenix Light SF Ltd.* v. *Bank of N.Y. Mellon*,
2020 WL 1322856 (S.D.N.Y. Mar. 20, 2020) .......... 5, 23

*Premium Plus Partners, L.P.* v. *Davis*,
653 F. Supp. 2d 855 (N.D. Ill. 2009) .......... 18

*Reed Const. Data Inc.* v. *McGraw-Hill Cos.*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014) .......... 21

*Scott* v. *Chipotle Mex. Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y. 2016) .......... 51

*SEC* v. *Badian*,
2012 WL 2354458 (S.D.N.Y. June 20, 2012) .......... 18

*SEC* v. *Lek Sec. Corp.*,
370 F. Supp. 3d 384 (S.D.N.Y. 2019) .......... 17

*Smith* v. *City of Jackson*,
544 U.S. 228 (2005) .......... 27

*Sobel* v. *Yeshiva Univ.*,
839 F.2d 18 (2d Cir. 1988) .......... 9

*Static Control Components, Inc.* v. *Lexmark Int'l, Inc.*,
2007 WL 7083655 (E.D. Ky. May 12, 2007) ..... 12

*United States* v. *City of N.Y.*,
637 F. Supp. 2d 77 (E.D.N.Y.2009) ..... 42, 43

*United States* v. *H & R Block, Inc.*,
831 F. Supp. 2d 27 (D.D.C. 2011) ..... 49

*United States* v. *Napout*,
963 F.3d 163 (2d Cir. 2020) ..... 3

*Univ. of Kansas* v. *Sinks*,
2008 WL 755065 (D. Kan. Mar. 19, 2008) ..... 49

*Valentino* v. *U.S. Postal Serv.*,
674 F.2d 56 (D.C. Cir. 1982) ..... 50

*Veleron Holding, B.V.* v. *Morgan Stanley*,
117 F. Supp. 3d 404 (S.D.N.Y. 2015) ..... 52

*Wallace* v. *Countrywide Home Loans Inc.*,
2012 WL 11896333 (C.D. Cal. Aug. 31, 2012) ..... 48, 49

**Statutes, Regulations, and Rules**

29 C.F.R § 1607.2 ..... 43

42 U.S.C. § 2000e-2(k)(1)(B) ..... 27

Fed. R. Evid. 702 ..... *passim*

**Other Authorities**

Alison Konrad, *Family Demands & Job Attribute Preferences*, in "Sex Roles" (2003) ..... 32

Alison T. Wynn & Shelley J. Correll, *Combating Gender Bias in Modern Workplaces*, in "Handbook of the Sociology of Gender" (2018) ..... 32

Am. Bar Ass'n, *Applying Econometrics to Address Class Certification*, in"Econometrics: Legal, Practical & Technical Issues" (2014) ..... 20

Am. Psychological Ass'n, *Ethical Principles of Psychologists & Code of Conduct* (2003) ..... 37

Am. Psychological Ass'n, *Principles for the Validation & Use of Personnel Selection Procedures* (2018) ..... 51

Arthur Gutman & Eric M. Dunleavy, *Documenting Work Analysis Projects*, in "The Handbook of Work Analysis" (2012) ..... 41

Caren Goldberg et al., *Employees' Perceptions of Their Leaders: Is Being Similar Always Better?*, in "Group & Org. Mgmt." (2008) .................. 33

Chester Hanvey, *Wage & Hour Law: Guide to Methods & Analysis* (2018) .................. 47, 48

Christine Meyer, *A Case in Case Study Methodology*, in "Field Methods" (2001) .................. 29

Claudia Goldin & Lawrence F. Katz, *The Cost of Workplace Flexibility for High-Powered Prof'ls*, in "The Annals of the American Academy of Political & Social Science" (2011) .................. 32

David Cruickshank, *Deloitte 2016 Millennial Survey* < tinyurl.com/y5nwex58 > .................. 36

David Dwertmann et al., *Disentangling the Fairness & Discrimination & Synergy Perspectives On Diversity Climate*, in "Journal of Mgmt." (2016) .................. 4, 30

EEOC Uniform Guidelines § 14(b)(3) .................. 51

Gary W. Heiman, *Basic Statistics for the Behavioral Sciences* (2015) .................. 14

Henry S. Farber et al., *Factors Determining Callbacks to Job Applications by the Unemployed*, Russell Sage Found. J. of the Social Sciences (2017) .................. 18

Henry S. Farber, *Why You Can't Find a Taxi in the Rain & Other Labor Supply Lessons From Cab Drivers*, 130 Quarterly J. of Economics (2015) .................. 24

J. Hofhuis, *Diversity Climate Enhances Work Outcomes Through Trust & Openness In Workgroup Commc'n* (2016) .................. 30

James W. Drisko & Tina Maschi, *Content Analysis* (2016) .................. 28

Kimberly A. Neuendorf, *Content Analysis – A Method. Primer for Gender Research*, "Generating Data, Volume III" (2016) .................. 28

Kimberly A. Neuendorf, *The Content Analysis Guidebook* (2016) .................. 37

*Merriam-Webster Dictionary* < tinyurl.com/yh4fzx6j > .................. 46

Michael G. Aamodt, *I/O Psychology: An Applied Approach* (2016) .................. 43

*O*NET*, DEP'T OF LABOR < tinyurl.com/2pf2ms85 > .................. 45

P. Morrel-Samuels, *Getting the Truth into Workplace Surveys*, in "Harvard Business Review" (2002) .................. 34

Ruth Bender, *Exec. Comp. Consultants* (2011) .................. 53

Scott Coltrane, *Research on Household Labor: Modeling & Measuring the Social Embeddedness of Routine Family Work*, in "Journal of Marriage and the Family" (2000) .......... 36

Shari Seidman Diamond, *Reference Guide on Survey Research*, in "Reference Manual on Scientific Evidence" (2011) .......... 45

Sidney Gael, *Interviews, Questionnaires, & Checklists* (1998) .......... 44

Todd D. Jick, *Mixing Qualitative & Quantitative Methods: Triangulation in Action*, in "Administrative Science Quarterly" (1979) .......... 28

W.M. Gibson & J.A. Caplinger, *Transportation of Validation Results*, in "Alternative Validation Strategies" (2007) .......... 43

William H. Macey & Alexis A. Fink, *Employee Surveys & Sensing* (2020) .......... 35

Y. Perera Li, *Inclusion Climate: A Multilevel Investigation Of Its Antecedents & Consequences*, in "Human Resource Mgmt." (2019) .......... 30

## PRELIMINARY STATEMENT

Plaintiffs' motion is "a classic example of the 'his expert doesn't agree with my expert, so we must exclude his expert's testimony' school of *Daubert* motions." *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *18 (S.D.N.Y. June 11, 2021) (McMahon, J.). In moving to exclude all four of Goldman Sachs' nationally-respected experts, Plaintiffs do not muster a single valid argument for excluding any of them. Instead, Plaintiffs (i) baselessly attack the industry-standard methods (and even integrity) of Goldman Sachs' experts, (ii) misleadingly quote snippets of their testimony, and (iii) raise false or at best trivial complaints that at most "go to the weight, rather than the admissibility," of the testimony. *Arista Recs. LLC* v. *Lime Grp. LLC*, 2011 WL 1674796, at *7 (S.D.N.Y. May 2, 2011) (Wood, J.). Applying settled law, the Court should deny Plaintiffs' motion in its entirety.

***Dr. Katherine Shaw***, a leading national labor economist for over 40 years, the last 18 at Stanford University, performed multiple regressions and found "no evidence of systemic bias" in Goldman Sachs' 360 review and manager quartiling processes, and that "women are nominated and promoted to [managing director] at significantly higher rates than men in multiple divisions." (Pls.' Ex. 9 ¶¶ 38-40 (Shaw Rpt.).) Dr. Shaw's multiple regression analyses demonstrate that the three Goldman Sachs evaluation processes that Plaintiffs challenge—360 reviews, manager quartiling, and cross-ruffing—did *not* cause a disparate impact across the class of female associates and vice presidents at Goldman Sachs over a 16-year period.

As the Second Circuit has made clear, "Rule 702 directs the district court to 'focus on the principles and methodology employed by the expert.'" *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 662 (2d Cir. 2016). Here, in reaching her conclusions, Dr. Shaw applied standard econometric modeling, and courts regularly find such modeling admissible and reliable. Thus, for example, the fact that Dr. Shaw's models follow recognized and common-sense econometric techniques by

accounting for objective production metrics of class and non-class members (*e.g.*, profit and losses, and sales credits) does not undermine the reliability of Dr. Shaw's methods. (Pls.' Br. 6-15.) Instead, it confirms why the Court should exclude the models offered by Plaintiffs' labor economist, Dr. Henry Farber, which *ignore production*, even though this case involves employees in the highly competitive world of financial services.

Having no basis in *Daubert* or Rule 702 to challenge Dr. Shaw's work, Plaintiffs try to impugn her integrity by mischaracterizing her well-established statistical methods. For example, Plaintiffs falsely accuse Dr. Shaw of "subtract[ing] actual recorded data" and making a "radical and unjustified decision to exclude highly-paid men" from one part of her analysis to "ensur[e] that the compensation disparities would be minimized." (Pls.' Br. 5-6.) In fact, Dr. Shaw used an "accepted econometric methodology" of testing her results by removing both male and female "outliers in the data." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *17-18 (E.D.N.Y. Oct. 15, 2014) (Pohorelsky, J.). Plaintiffs claim that employment processes at Goldman Sachs systemically disadvantage women. To test that theory, economists must model how the processes work, which includes the standard step of removing "extreme" data that may be "biasing an analysis." *Ass'n of Oil Pipe Lines* v. *FERC*, 281 F.3d 239, 246 (D.C. Cir. 2002). Plaintiffs' own expert, Dr. Farber, uses outlier analyses. (*See infra* at 24.)

Similarly, Plaintiffs baselessly claim that Dr. Shaw "made up," "fabricated," and "invent[ed] data" that "does not exist . . . to generate misleading results in support of Goldman's position." (Pls.' Br. 5, 11 n.6, 12.) Not so. Dr. Shaw followed the common and well-accepted statistical technique of using indicators or "dummy variables" to account for the fact that not all production metrics apply to every Goldman Sachs professional in this class (*e.g.*, profit and loss data is typically tracked for traders, but not other job functions). Tellingly, Plaintiffs' own expert,

Dr. Farber, has applied the same methodology in his academic work, and the use of dummy variables most certainly is not "tantamount to data fabrication," let alone "reverse engineering data to achieve a desired result." (Pls.' Br. 10, 15); *see DPWN Holdings (USA), Inc.* v. *United Air Lines, Inc.*, 2019 WL 1515231, at *10 (E.D.N.Y. Feb. 21, 2019) (Cogan, J.) ("disagree[ment] with Dr. Moore's employment of a dummy variable" "fail[s] to raise a *Daubert* issue").

Plaintiffs also insinuate that there are "questions about the extent to which [Dr. Shaw] actually performed the work to which she signed her name" (Pls.' Br. 10), merely because she worked with "a team who knew the data" in selecting the production metrics used in her models. (Ex. 1 at 23:7-9 (Shaw Tr.).) Dr. Shaw testified that she "wrote every word" in her report (*id.* at 22:9-11) and that her "empirical analys[e]s . . . were produced under [her] direction." (*Id.* at 25:21-25.) There is nothing improper or at all unusual about an expert relying on support staff working under her direction; in fact, many of Plaintiffs' experts, including Dr. Farber,[1] did the same. *See Hart* v. *BHH, LLC*, 2018 WL 3471813, at *8 (S.D.N.Y. July 19, 2018) (Pauley, J.) (testifying expert "may certainly present the findings and conclusions of those whose work he or she supervised and that he or she could personally replicate if necessary").

Stripping away their overheated rhetoric, Plaintiffs just pick at the edges of Dr. Shaw's methodology—for example, quibbling about which variables she used to measure employee production—which is not remotely a basis for exclusion under the "liberal standard of admissibility for expert opinions." *United States* v. *Napout*, 963 F.3d 163, 187 (2d Cir. 2020).

***Dr. Margaret Stockdale*** is a professor at Indiana University-Purdue University who specializes in Industrial/Organizational ("I/O") psychology, "diversity in the workplace, diversity

[1] Ex. 2 at 12:5-9, 13:2-5 (Farber Tr.) ("[Ashenfelter & Ashmore] provides me with backup support I need to do this kind of work. . . . They present me with analyses that I've asked.").

and ethics, gender issues in the workplace, and applied social science research methods." (Pls.' Ex. 10 ¶¶ 1-2 (Stockdale Rpt.).) Dr. Stockdale offers rebuttal testimony in response to Plaintiffs' expert, Dr. Caren Goldberg. (*Id.* ¶ 8.) After comprehensively reviewing academic and industry literature, publicly available information and case documents, and Goldman Sachs' biannual employee opinion survey (the People Survey), Dr. Stockdale concluded that Dr. Goldberg's opinions are "fatally flawed" and "egregiously misleading." (*Id.* ¶ 13, App'x C.) Specifically, Dr. Stockdale found that, "throughout the Class Period, Goldman Sachs has demonstrated a commitment to a corporate culture and climate that supports gender diversity and inclusion, has not been tolerant of gender bias and harassment, and has been supportive of women and their career success." (*Id.* ¶ 14.)

Plaintiffs contend that Dr. Stockdale "applies no scientific methodology" merely because she did not exclusively rely on the so-called "Diversity Climate [and] Tolerance for Sexual Harassment" frameworks that their expert, Dr. Goldberg, applied both arbitrarily and selectively in her expert report. (Pls.' Br. 27.) But that baseless criticism ignores that there is no single framework that an expert must use to assess diversity climate and harassment in corporate culture; the very one Dr. Goldberg relies on cites numerous other frameworks. David Dwertmann et al., *Disentangling the Fairness & Discrimination & Synergy Perspectives On Diversity Climate*, 1141-53 (2016) (Ex. 22). Dr. Stockdale considered the full range of relevant academic literature and, unlike Dr. Goldberg—who merely reviewed a small selection of record documents chosen by Plaintiffs' counsel and then, like a human highlighter, quoted in her report snippets of documents that she believes help Plaintiffs' case—conducted a robust analysis of the People Survey responses, Exit Survey data, complaint files, and record documents, which she used to systematically assess the effectiveness of Goldman Sachs' diversity-promoting structures. (*See*

Pls.' Ex. 10 ¶¶ 9, 38-39 (Stockdale Rpt.).) Dr. Stockdale's analysis is more than sufficient to satisfy *Daubert*, particularly given that, as a rebuttal witness, Dr. Stockdale "need only attack" Dr. Goldberg's opinions, not "produce models or methods of [her] own." *In re Aluminum Warehousing Antitrust Litig*., 336 F.R.D. 5, 29 (S.D.N.Y. 2020) (Engelmayer, J.).

Plaintiffs' criticism of Dr. Stockdale's use of People Survey data is similarly flawed. (Pls.' Br. 30.) Plaintiffs say the People Survey data is "biased" and "flawed" (Pls' Br. 29, 30-33), but do not explain why that is so, and ignore that two of Plaintiffs' own experts, Dr. Goldberg and Ms. Sarah Butler, relied on the *very same data* to reach certain of their opinions. Plaintiffs' speculation that Goldman Sachs "cooked" the People Survey data by removing questions that yielded answers that could supposedly look bad in hindsight (*id.* at 31) is wrong and nonsensical for an internal survey used to assess and improve recruitment and employee retention.

Finally, Plaintiffs allege that Dr. Stockdale's use of a support team "calls into question [her] broader judgment and credibility as a testifying expert." (*Id*. 35.) This mischaracterizes the role of Dr. Stockdale's support team and ignores Dr. Stockdale's repeated testimony that she directed and supervised all of the team's work and independently reviewed all of the open-ended responses to the People Survey that her support team coded. (Ex. 6 at 99:17-22, 109:13-17, 190:14-17 (Stockdale Tr.); Pls.' Ex. 10 ¶ 10, App'x C (Stockdale Rpt.).) It is well-accepted that "[o]thers may assist [an expert] so long as the expert's opinion is within his or her expertise, based upon sufficient facts, and the product of a reliable methodology." *Phoenix Light SF Ltd.* v. *Bank of N.Y. Mellon*, 2020 WL 1322856, at *10 (S.D.N.Y. Mar. 20, 2020) (Caproni, J.).

***Dr. Eric Dunleavy*** is the Director of the Employment and Litigation Services division at DCI Consulting Group, Inc., a human resources consulting firm. (Pls.' Ex. 2 at 10 (Work Analysis Rpt.).) Dr. Dunleavy conducted a Work Analysis to determine whether associates and vice

presidents in Goldman Sachs' Investment Banking Division ("IBD"), Investment Management Division ("IMD"), and Securities Division "perform the same work activities, have the same worker characteristics, and share the same contextual work factors." (*Id*. 14.) Dr. Dunleavy's Work Analysis refutes Plaintiffs' unsupported assertion that the challenged 360 review, manager quartiling, and cross ruffing processes applied to "professionals in just two job titles (Associate and Vice President) with similar job duties" (Pls.' Class Cert. Reply (ECF No. 310) at 1), which led the Court astray in concluding at class certification that "Plaintiffs hold only one of two jobs: Associate or Vice President" (Class Cert. Order (ECF No. 578) at 28 n.11).

Dr. Dunleavy's Work Analysis consisted of comprehensive background research, 14 informational interviews with senior leaders, forming a testable hypothesis, touring representative workspaces of the three Divisions, drawing a sample, conducting pilot interviews, and, finally, conducting and interpreting more than 80 work analysis interviews. (Pls.' Ex. 2 at 15-29, 33-34 (Work Analysis Rpt.).) Following that robust process, Dr. Dunleavy concluded that the "professionals [at Goldman Sachs] holding the corporate titles of Associate and Vice President . . . do not all perform the same role" (*id*. 2), and instead hold jobs that vary extensively (*id*. 36-37).

Though Plaintiffs and their expert, Dr. Leaetta Hough, agree that "the purpose of a [work] analysis determines its particular methodology" (Pls.' Br. 40; Ex. 9 at 80:11-15 (Hough Tr.)), Plaintiffs attack Dr. Dunleavy for not employing an analysis used in a different type of job study that would not be appropriate for the task at hand. Judge Schofield rejected similarly baseless claims lodged against a job analysis when made by Plaintiffs' counsel here in another lawsuit, and the Court should reject it in this case too. *See Kassman* v. *KPMG LLP*, 416 F. Supp. 3d 252, 269-70 (S.D.N.Y. 2018) (Schofield, J.) (refusing to exclude an "individualized job analysis").

Lastly, Plaintiffs' criticisms about the sample size for Dr. Dunleavy's study is meritless,

and their claim that Dr. Dunleavy's analysis is irrelevant because it "does not address . . . Goldman's alleged intentional discrimination of women" (Pls.' Br. 36-37) ignores that an expert's testimony need not "prove[] the entirety of [a party's] case." *On Track Innovations Ltd.* v. *T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 379 (S.D.N.Y. 2015) (Nathan, J.).

***Brian Dunn*** is the former Chairman of McLagan—a leading compensation consulting firm—where he provided compensation benchmarking services to large financial services firms. (Pls.' Ex. 4 ¶¶ 1, 4 (Dunn Rpt.).) Drawing on his 35 years of experience in the compensation consulting industry (17 of which he dedicated exclusively to consulting with financial services firms), Mr. Dunn offers two opinions to assist the trier of fact in understanding the varied roles at Goldman Sachs held by associates and vice presidents. *First*, Mr. Dunn opines that, despite sharing basic corporate titles, "Associates and VPs at financial services firms such as Goldman Sachs hold a wide variety of non-fungible jobs." (*Id.* ¶¶ 12-13.) *Second*, Mr. Dunn opines that financial services firms such as Goldman Sachs must "pay-for-performance," *i.e.*, "structure compensation in order to attract, retain, and create incentives for high-performing talent" which "necessarily requires financial services firms to assess their employees' performance." (*Id.* ¶ 14.)

In seeking to exclude Mr. Dunn's first opinion, Plaintiffs mischaracterize what compensation benchmarking firms do. But Plaintiffs' real quarrel with Mr. Dunn is clear: they do not like that Mr. Dunn's analysis undermines Dr. Farber's oversimplified analysis. (*See* Pls.' Br. 50-51 (complaining that the job categories employed by compensation benchmarking firms are too "narrow").) And Plaintiffs' attack on Mr. Dunn's second opinion fares no better. They argue that Mr. Dunn's opinion on pay for performance is irrelevant (Pls.' Br. 50), even though it directly addresses the business necessity of the challenged processes.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, testimony from a qualified expert is admissible when

it "rests on a reliable foundation and is relevant to the task at hand." *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). In evaluating the reliability of expert testimony, the Court should "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Pfizer*, 819 F.3d at 662. Under the "the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology warrant exclusion." *Forte* v. *Liquidnet Holdings, Inc.*, 2015 WL 5820976, at *5 (S.D.N.Y. Sept. 30, 2015) (Torres, J.).

## ARGUMENT

### I. The Court should find that Dr. Shaw's opinions and testimony are admissible.

In attacking Dr. Kathryn Shaw's expertise and diligence, Plaintiffs make one false assertion after another. Dr. Shaw, who received a Ph.D. in economics from Harvard, has researched and taught labor economics and econometrics for over 40 years.[2] (Pls.' Ex. 9 ¶¶ 1-7 (Shaw Rpt.).) Dr. Shaw calculated whether there were gender disparities associated with the challenged processes using the same job titles (*i.e.* associate and vice-president) and time periods as Plaintiffs' expert, Dr. Farber. But Dr. Shaw ran separate models by each of the three Goldman Sachs Divisions (Securities, IBD and IMD) and controlled for relevant variables, such as an employee's production, that Dr. Farber ignored. (Pls.' Ex. 9 § 5 & Exs. 21, 24, 27-29 (Shaw Rpt.).) Dr. Farber also ignored the third challenged process, cross ruffing, in favor of analyzing the "entire promotion process, and not cross-ruffing specifically." (Ex. 2 159:17-20 (Farber Tr.)). In response, Dr. Shaw performed separate analyses to discern any gender differences in (i) nomination, (ii) cross-ruffing, and (iii) overall promotions (*see* Pls.' Ex. 9 ¶¶ 232-237 (Shaw Rpt.).)

---

[2] Puzzlingly, Plaintiffs criticize Dr. Shaw for not being a full-time professional expert "in employment discrimination cases," but wisely "do not move to exclude" her on this basis. (Pls.' Br. 4, 5 n.3.) Nor could they. Plaintiffs' own expert, Dr. Farber, testified that Dr. Shaw is "a terrific labor economist." (Ex. 2 at 156:18-19 (Farber Tr.).)

After conducting her comprehensive analysis, Dr. Shaw found "no evidence of systemic bias" in the 360 review and manager quartiling processes, and that "women are nominated and promoted to EMD at significantly higher rates than men in multiple divisions." (*Id.* ¶¶ 38-40.) Dr. Shaw's analysis goes to the heart of the issues before this Court, and, try as they might to obfuscate the issues, Plaintiffs have no legitimate grounds to refute—much less exclude—her opinions.

**A. Dr. Shaw's use of production metrics is appropriate and reliable.**

In analyzing whether there are common gender disparities associated with the challenged processes, Dr. Shaw built statistical models to "properly reflect the true underlying processes that drive different review scores, compensation, and promotion rates for different professionals at GS," including by accounting for "important measure[s]" of productivity and performance that bear on outcomes for each of the challenged processes. (Pls.' Ex. 9 ¶ 27 (Shaw Rpt.).) Plaintiffs' claim that Dr. Shaw's analyses including productivity metrics should be excluded is meritless, and tellingly, not even a proper basis for a *Daubert* motion.[3]

It is indisputable (and Plaintiffs do not contend otherwise) that an expert studying the effect of gender on a company's evaluation and promotion processes should account for employee performance and production. Dr. Farber agrees: "Economists define sex discrimination in pay to be differences in pay between men and women that cannot be explained by differences in *productivity-related* characteristics." (Ex. 13 ¶ 33 (Oct. 30, 2013 Farber Rpt.) (emphasis added).) If a female trader received a higher 360-review score than a male trader, it would be unreasonable to conclude that gender discrimination was the reason if the female trader made $2 billion in profits

[3] Unlike a statistician's failure to account for a major variable, as Dr. Farber did when he ignored production variables, and which is grounds for exclusion (*see* Defs' Daubert Br. 39), "the inclusion" of an allegedly "irrelevant . . . variable[] [in a regression model] will go to the probative value of the analysis, not its admissibility." *Sobel* v. *Yeshiva Univ.*, 839 F.2d 18, 36 (2d Cir. 1988).

for the firm during the year while the male trader incurred $50 million in losses. As Dr. Shaw explains, academic literature amply supports the common-sense notion that employee performance and production is critical to studying accurately an organization's evaluation and promotion processes.[4] And as detailed below, Dr. Shaw found that basic tenet of labor economics fully consistent with the record in this case, which shows that production metrics matter to performance assessment at Goldman Sachs. (*See, e.g.,* Pls.' Ex. 9 ¶¶ 144 (Shaw Rpt.) ("decision makers at GS use available production measures . . . to help measure performance . . . .") (citing evidence).)

Plaintiffs' criticisms of Dr. Shaw's use of production metrics are meritless. It is well accepted that a reliable regression model must reflect the business that is being studied, which in a financial services firm includes intense commercial focus on employee production.

**1. Dr. Shaw fully supported her use of production data and presented undisputed evidence establishing the reliability of each metric.**

Plaintiffs contend that "Dr. Shaw [o]ffers no foundation for her 'production' data fields" because she purportedly failed to show how the production data she used "related to Goldman's quartiling, 360 reviews, or promotion guidelines" and to "Goldman's compensation guidelines and policy documents" or was reliable. (Pls.' Br. 7-8, 11-16.) That is wrong. As Dr. Shaw explained, the production variables she used in her analysis "track [the] variety of different variables that different divisions use to measure productivity." (Pls.' Ex. 9 ¶ 74, 114 (Shaw Rpt.).) Indeed, witness after witness explained how they use production data in connection with all three

[4] As Dr. Shaw explains, "[a] widely accepted tenet of labor economics is that key drivers of compensation" include "a worker's productivity." (Pls.' Ex. 9 ¶ 76 (Shaw Rpt.) (citing Daron Acemoglu & David Autor, *Skills, Tasks & Techs.*, 1043-1171 (2011).)

challenged processes: 360 reviews,[5] manager quartiling,[6] and cross-ruffing.[7]

Dr. Shaw carefully explained how she selected each of the 11 production variables on which she relied: she analyzed "[t]he available productivity data . . . [to] delineate the different skills that are valued across jobs within the firm" and selected those variables that "track [the] variety of different variables that different Business Units within a division use to measure productivity." (Pls.' Ex. 9 ¶ 74 (Shaw Rpt.).) In Appendix C to her Report, Dr. Shaw identified each production variable and described the relationship between each variable and a professional's performance within their respective Division. (*Id.* App'x C.) Plaintiffs do not address, much less undermine, these justifications for Dr. Shaw's use of these production variables.

In the end, Plaintiffs' criticism boils down to their use of a memory test of Dr. Shaw, demanding that she recite at her deposition how she selected each production variable from hundreds of columns of raw data files in the record. (Pls.' Br. 11-15.) Rule 702 does not impose a memory test. There is "no authority to suggest," and Plaintiffs proffer none, that an expert must "recite every detail of [her] testing upon demand during a deposition." *Heatherly* v. *Nat'l Presto Indus., Inc.*, 2008 WL 11334519, at *2 (W.D. Tex. Dec. 3, 2008); *see Static Control Components, Inc.* v. *Lexmark Int'l, Inc.*, 2007 WL 7083655, at *5 (E.D. Ky. May 12, 2007) (that expert "did not recollect" at deposition "how or why the data was chosen" not grounds for exclusion).

---

[5] *See, e.g.*, Ex. 4 at 377:25-378:8 (7/11/13 Heller Sberlati Tr.) ("individual production" metrics influence 360 reviews); Craig Decl. ¶ 7 (ECF No. 1220) ("commercial production" influences 360 reviews); Cohen Decl. ¶ 12 (ECF No. 1199) ("commercial impact" influences 360 reviews).

[6] *See, e.g.*, Abramian-Katz Decl. ¶ 12 (ECF No. 1195) ("profit and loss for traders . . . and revenue generation" in certain Business Units influence quartiling); Russell Decl. ¶ 8 (ECF No. 287) ("production numbers" influence quartiling); Goddeeris Decl. ¶ 12 (ECF No. 1206) ("objective performance metrics, including profits and losses" influence quartiling for Securities traders); Lopez Decl. ¶ (ECF No. 281) (same for electronic sales trading and sales acquisition).

[7] *See, e.g.*, Kozlowski Decl. ¶ 26 (ECF No. 1210) ("commercial productivity" accounted for in cross ruffing); Ex. 3 at 221:23-222:10 (7/10/13 Heller Sberlati Tr.) (same); Scher Decl. ¶ 11 (ECF No. 289) (same for "productivity"); Mora Decl. ¶ 19 (ECF No. 1218) (same).

Regarding the Securities Division, Plaintiffs wrongly claim that Dr. Shaw used production metrics without any foundation (Pls.' Br. 8, 15), but those metrics are based on information in the "Production" data field in files produced in this case ("l140_sec-l144_sec") which reflected employee performance factors that individual Goldman Sachs managers relied on to set compensation—namely, profit and loss data ("P&L") for traders and sales credits for salespeople. (*See* Pls.' Ex. 9 App'x B & C (Shaw Rpt.).) As Caroline Heller Sberlati, a managing director in Human Capital Management and Co-Head of Business Partners for Securities testified, "'production' [in the Securities Division] corresponds to P&L for traders and sales credits for salespeople." (Ex. 3 at 78:1-4 (7/10/13 Heller Sberlati Tr.) (MD, HCM).) Numerous declarants in the Securities Division also have explained that they rely upon P&L and sales credits to measure performance of traders and salespeople, respectively.[8] And, contrary to Plaintiffs' contention that this variable "fail[s] to align with the compensation key metrics" (Pls.' Br. 11), the Securities compensation guidelines confirm that both "P&L" and "Sales Credits" are "key metrics used to assess performance and make compensation determinations" (Ex. 20 at -3903 (GS0113896)).

For IBD, Plaintiffs criticize a production metric that measures "revenue generated from deals worked on by *entire teams* of employees" without differentiating the contribution of individual deal team members. (Pls.' Br.at 11-12.) Measuring team-based productivity is necessary in Divisions like IBD, where "tasks . . . are often team-oriented" and where "profits are measured after months or even years of work on a deal" by the team's members. (Pls.' Ex. 9 ¶ 54 (Shaw Rpt.) (citing Packer Decl. ¶ 6 (ECF No. 284).) "IBD is highly team oriented," and where

[8] *See*, *e.g.*, Casturo Decl. ¶ 15 (PMD, Securities) (ECF No. 268) (traders evaluated based on "profit and loss ('P&L') numbers"); Levene Decl. ¶¶ 8-9 (PMD, Securities) (ECF No. 280) (salespeople evaluated based on "'sales attribution,' which is a credit attributed to a particular individual for securing business or producing revenue"); Mora Decl. ¶ 19 (PMD, Securities) (ECF No. 1218) (FICC Americas Sales professionals evaluated on "production" in cross ruffing).

"a typical financing performed by an IBD team could involve 20 professionals," "an individual banker's contributions may not always be obvious." (Packer Decl. ¶ 6 (ECF No. 284).) For this reason, Bruce Larson, the former Head of Human Capital Management for IBD, testified that "[i]n the investment banking division, all of the individuals assigned to that client team or transaction receive equal credit for the revenues associated with a given transaction." (Ex. 5 at 131:9-12 (6/12/13 Larson Tr. ); *see also* Keefe Decl. ¶ 11 (ECF No. 1208) ("[360] reviewers are encouraged to look holistically at the bankers' performance within the bankers' teams.").) Plaintiffs have no basis to claim that Dr. Shaw's decision to measure production in the exact way that Goldman Sachs does is "nonsensical and incoherent." (Pls.' Br. 12.)[9]

Turning to IMD, Plaintiffs criticize Dr. Shaw for using metrics related to an individual's "Investment Composite Score" and "Long Term Fee Based sales," "rather than any other" data fields that might also be "correlated with employees' 'production,'" but which Plaintiffs do not identify. (Pls.' Br. 14.) This kind of theorizing that better variables might exist cannot, and does not, undermine the fact that Dr. Shaw "ha[d] a rational basis" for her selection of production variables. *Aventis Env't Sci. USA LP* v. *Scotts Co.*, 383 F. Supp. 2d 488, 515 (S.D.N.Y. 2005) (Preska, J.). An unsubstantiated claim that Dr. Shaw might "be able to identify a different [production] variable that perhaps leads to a better fit between [her] model and the data" simply is not a basis for exclusion. (March 10, 2015 Order (ECF No. 363) at 17.)

---

[9] Plaintiffs' criticism of two other IBD production variables is equally meritless. (Pls.' Br. 13) The "reg_rep" variable indicates whether an investment banker "holds a client representative role," and the "1240_ibd –l144_ibd" variable measures annualized revenue "from projects for which the professional is a client representative." (Pls.' Ex. 9 App'x C (Shaw Rpt.).) The success of an IBD professional's client relationships is a factor considered by IBD business leaders in assessing performance. (*See*, *e.g.*, Scherrer Decl. ¶ 13 (PMD, IBD) (ECF No. 1223) (noting, as part of 360 reviews, the importance of whether a banker is a "[client] relationship manager" who "handl[es] accounts"); (Ex. 19 -0013 (GS0400008)) (IBD compensation guidelines direct IBD managers to focus on "[r]evenue-related metrics show[ing] the financial impact of client activity").)

More fundamentally, Plaintiffs' general criticism that the production metrics used by Dr. Shaw "bear[] no relationship with the actual compensation metrics used by Goldman to make bonus decisions" (Pls.' Br. 15) is both misguided—Dr. Shaw focused on modeling *the three certified challenged processes*, which do not include compensation—and wrong. The compensation guidelines direct managers to focus on "the financial performance of . . . the individual employee" (Ex. 20 -3898 (GS0113896)), which is exactly the information contained in the metrics Dr. Shaw used (Pls.' Ex. 9 App'x (Shaw Rpt.)). Moreover, Plaintiffs' obsessive focus on Divisional compensation guidelines (Pls.' Br. 15) misses the point. These guidelines exist to assist managers who observed their direct reports all year and have rich first-hand information about each professional's work specific to the business and what they do. A labor economist studying a company such as Goldman Sachs, who does not have that first-hand information, must work with the data that is available and centrally stored, and Plaintiffs do not dispute that Dr. Shaw incorporated into her models the best data available in the record to measure production.

And there is more. Dr. Shaw evaluated a well-recognized statistical measure called the "r-squared" to confirm that the productivity variables correlate with compensation.[10] The inclusion of production variables in Dr. Shaw's models increases their r-squared—meaning that the production measures Dr. Shaw used correlate highly with the measures of production used by decision-makers at Goldman Sachs. (*See* Pls.' Ex. 9 Exs. 31, 32 (Shaw Rpt.).) This confirms that Dr. Shaw "ha[d] a rational basis" for her selection of production variables. *Aventis*, 383 F. Supp.

[10] In a regression model, an r-squared value is the standard measure of the model's explanatory power. *See* Gary W. Heiman, *Basic Statistics for the Behavioral Sciences*, 176-77 (2015) (Ex. 21). For example, if a compensation regression model's r-squared value is 80%, this means that the model explains roughly 80% of the variation in pay across the studied employee population. *Id.* Dr. Shaw found that production metrics improved the r-squared values of her compensation models by as much as 30% (from 50% to 66% for vice presidents in Securities), even after controlling for tenure and job function. (Pls.' Ex. 9 ¶ 250 & Exs. 31, 32 (Shaw Rpt.).)

2d at 515. Neither Plaintiffs nor Dr. Farber refute or even address this point.

Nor does Dr. Shaw's acknowledgement that "available metrics do not perfectly capture the performance of each professional" (Pls.' Ex. 9 ¶ 161 (Shaw Rpt.)), mean that using the production data that exists is improper. To the contrary, Dr. Shaw's r-squared test confirms that "the limited production measures that are available in the data still explain a substantial share of differences in compensation across employees." (*Id.*)

**2. Plaintiffs' assertion that Dr. Shaw "cherry-picked" production variables is false.**

Dr. Shaw did not "cherry-pick[] [production] data" in order to "mask gender disparities in 360 reviews, quartiling, promotions, and compensation." (Pls.' Br. 9.) Tellingly, Plaintiffs do not identify a single production metric that Dr. Shaw omitted and that would have increased any gender disparities if used. Plaintiffs ask the Court to exclude Dr. Shaw's analyses simply because Dr. Shaw finds that production, unsurprisingly, is an important explanatory variable correlated with outcomes for 360 reviews, quartiling, promotions, and compensation. Including major variables in a regression analysis is not "mask[ing] gender disparities" nor is it "cherry-pick[ing]." (Pls.' Br. 9.) To the contrary, that is what an economist is supposed to do when conducting regression analyses. *See Ottaviani* v. *State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 367 (2d Cir. 1989) ("The first step in such a regression analysis is to specify all of the possible 'legitimate' (*i.e.*, nondiscriminatory) factors . . . which could account for disparities.").

**3. Plaintiffs falsely claim that Dr. Shaw "invented" production data.**

Goldman Sachs is not a company where all employees do the same job or produce one product. As the uncontroverted record makes clear, the professionals in Goldman Sachs' more than 100 Business Units do many different jobs, only some of which result in production metrics. "Strats," for example—professionals who develop algorithms for trading and sales desks—have

no production metrics. Even for job functions with production metrics, the function (trading foreign currencies versus making investment decisions versus any number of other duties) necessarily determines the metric.[11] To illustrate, "revenue-generating" professionals in the Principal Strategic Investment Business Unit "focus[] on making strategic investments for the Securities Division," and "[u]nlike sales or trading," their performance is "not primarily judged by the profit or loss associated with the investments that they make," but on whether they are "good stewards of Firm capital" and "positively contribute to the success of [the] franchise." (Cohen Decl. ¶¶ 3, 4, 11 (ECF No. 270).)

Ignoring that one production metric does not fit all associates and vice presidents across the class, Plaintiffs claim that "several measures are missing for over 80%" of the professionals in Dr. Shaw's models. (Pls.' Br. 9.) This so-called discrepancy merely reflects that class members have many different job functions, and Goldman Sachs measures the contributions of its employees who do different jobs in different ways, as shown in Appendices A-C to Goldman Sachs' motion to decertify the class, which contain compilations from declarations of dozens of business leaders. (*See* ECF Nos. 1225-1, 1225-2, 1225-3.) It does not mean, as Plaintiffs contend, that Dr. Shaw has improperly used "non-representative" data or "invented data" by using "dummy variables" to indicate when production metrics do not apply to particular professionals. (Pls.' Br. 9.) Instead, the real significance of the many different performance metrics at Goldman Sachs is to refute Plaintiffs' central claim that firm professionals work in only two jobs.

---

[11] *See* Pls.' Ex. 2 at 193 (Work Analysis Rpt.). As Dr. Shaw explains, the economic literature backs up this common-sense observation that employers use specialized performance metrics to measure performance of employees who do different work: "The performance measure will vary with the extent to which the job involves specialization or multitasking and the extent to which the employee is given the discretion to make few or many decisions." (Pls.' Ex. 9 ¶ 144 n.206 (Shaw Rpt.) (quoting Edward P. Lazear, *Personnel Economics in Practice*, 215 (2015)).)

Each of Plaintiffs' arguments is meritless. *First*, Plaintiffs' assertion that Dr. Shaw reached "opinions regarding an entire population based on unrepresentative data" (Pls.' Br. 11 n.6, 10-11) reflects a fundamental misunderstanding of statistics and Dr. Shaw's work. If a statistician uses sampling to draw broad conclusions about a population (as in political polls), it can be problematic if the sample is "unrepresentative of the general population to which inferences are to be made." *SEC* v. *Lek Sec. Corp.*, 370 F. Supp. 3d 384, 405 (S.D.N.Y. 2019) (Cote, J.). Thus, in the case Plaintiffs cite (Pls.' Br. 10), Judge Amon rightly excluded an expert who estimated the "average hours worked by New Yorkers in the iron workers union" based on a sample of two unions from "Hawaii and . . . northern California." *Apple* v. *Atl. Yards Dev. Co., LLC*, 2015 WL 11182422, at *8 (E.D.N.Y. Mar. 31, 2015). But the notion that a statistician should not extrapolate from a non-representative sample has nothing to do with this case, because *Dr. Shaw did not do any sampling*. Her models included the entire population of associates and vice presidents in the three Divisions at issue and accounted for production data where it exists, which is an appropriate and accepted methodology for a statistician to use. Plaintiffs' misleading use of the word "unrepresentative" (Pls.' Br. 10) to describe the fact that particular production data exists only for professionals who perform jobs relevant to that metric is no basis to exclude Dr. Shaw's opinions.[12] Even Plaintiffs' expert testified that it "would be fine" to take "production metrics into account in reviewing the category of employees for whom the[] [data] exist." (Ex. 12 at 150:6-19 (Cascio Tr.).)

---

[12] Plaintiffs similarly attempt to lead the Court astray by declaring that "data was missing" and then faulting Dr. Shaw for not being "aware that data was missing" and not "study[ing] the potential effect of missing data." (Pls.' Br. 10.) Again, certain production data simply never existed for certain employee populations because it did not apply to them, but that does not mean data is "missing." The fact that this Court excluded an expert who formed an opinion based on a single data point, *CFTC* v. *Wilson*, 2016 WL 7229056, at *7 (S.D.N.Y. Sept. 30, 2016) (Torres, J.) (Pls.' Br. 10), provides no basis to exclude Dr. Shaw's regression analysis based on data relating to the thousands of associates and vice presidents in the three Divisions at issue.

*Second*, Plaintiffs misrepresent Dr. Shaw's use of "dummy [production] variables" (*i.e.* indicator variables) as "invented data," "tantamount to data fabrication," and as "junk science." (Pls.' Br. 9-10.) These false statements should be ignored. As Dr. Shaw testified, she used an indicator variable "for the times when [a] production variable is not relevant" for the studied employee population. (Ex. 1 at 82:17-20 (Shaw Tr.).) In doing so, Dr. Shaw ensured that her models did not treat employees without particular production metrics as having low production. There is nothing improper (much less sinister) about "dummy variables," as their use "accord[s] with accepted principles found in the relevant academic literature." *SEC* v. *Badian*, 2012 WL 2354458, at *4 (S.D.N.Y. June 20, 2012) (Swain, J.); *see also Premium Plus Partners, L.P.* v. *Davis*, 653 F. Supp. 2d 855, 865-66 (N.D. Ill. 2009) (declining to exclude expert opinion despite alleged improper use of "dummy variables," because "the regression analyses employed are standard in . . . the industry"). Indeed, Plaintiffs' own expert, Dr. Farber, uses dummy variables in his published statistical work. *See* Farber et al., *Factors Determining Callbacks to Job Applications by the Unemployed*, Russell Sage Found. J. of the Social Sciences 3, 184 (2017) (Ex. 23) (using "dummy variable" in a study of factors influencing job callbacks).

### B. Dr. Shaw's disaggregation of data to the Division level is appropriate and reliable.

In reaching her conclusions, Dr. Shaw calculated gender disparities associated with each of the three challenged processes by performing separate regression models by Division. (*See* Pls.' Ex. 9 § 5 & Exs. 21, 24, 28 (Shaw Rpt.).) While Plaintiffs claim that performing regressions by Division was improper, their own expert, Dr. Farber, acknowledged that the three Divisions each had sufficient populations to analyze in a statistically valid way. (*See* Ex. 2 at 176:21-177:2 (Farber Tr.) ("Q. Did you ever determine that the sample sizes in the divisions were too small to run your model separately by division? A. No, I don't think that was an issue.").

*First*, Plaintiffs falsely contend that Dr. Shaw's decision to run separate models by Division is "unsupported by . . . the record in this case." (Pls.' Br. 16.) Dr. Shaw explained in extensive detail the basis for analyzing the challenged processes at the Divisional level. (Pls.' Ex. 9 ¶¶ 89-135 (Shaw Rpt).) She grounded her decision on evidence of the decentralized nature of Goldman Sachs' evaluation and promotions processes[13] as well as basic statistical tests confirming that pooling data in one model across all three Divisions, which is what Dr. Farber did, produces unreliable results. Because Dr. Farber ignored how Goldman Sachs is organized and how the challenged processes are operationalized by each Division, the Court should exclude his methodology.

*Second*, Plaintiffs invoke Judge Francis' ruling that Dr. Farber's failure to run separate regression models for each Division and Business Unit did not require exclusion of his opinions at class certification. (Pls.' Br. 16.) From this, Plaintiffs claim that the Court should exclude Dr. Shaw's analyses because she (i) ran separate regressions by Division, and (ii) accounted for Business Unit in her Divisional regression models (which Dr. Farber also did for some of his models). Both claims are erroneous and misleading. Judge Francis' ruling reflected his concern about running separate regression models by individual Business Unit given their relatively smaller size, a concern having no application to running models by *Division*. (March 10, 2015 Order at 19 ("the sample size in each [business] unit is so small").) Moreover, a six-year-old decision to permit Dr. Farber's one-size-fits-all pooling analyses—based on the incomplete record at class certification—simply does not mean that an economist *must* pool the three Divisions together, especially in the face of new evidence. Indeed, Dr. Farber has now agreed that Dr.

[13] Appendices A through C of Goldman Sachs' motion to decertify the class contain compilations from declarations of dozens of business leaders explaining how they uniquely apply the challenged processes. (*See* ECF Nos. 1225-1, 1225-2, 1225-3.)

Shaw's methodology was sound, testifying that he "[did]n't think that [sample size] was an issue" preventing him from "run[ning] model[s] separately by division." (Ex. 2 at 176:21-177:2 (Farber Tr.).) Dr. Farber could not contend otherwise given the record developed since Judge Francis' ruling of how differently the Divisions apply the challenged processes. (*See supra* n.13.)

*Third*, Plaintiffs try to muddy the waters by contending that Dr. Shaw ran her analyses by Business Unit and in doing so "mask[ed]" over discrepancies uncovered by Dr. Farber's one-size-fits-all regression model. (Pls.' Br. 18.) To be clear: Dr. Shaw did not run separate regression models by Business Unit; the models she ran are by Goldman Sachs' ***Divisions***, units Dr. Farber agreed were large enough to be separately analyzed. (*See* Ex. 2 at 176:21-177:2 (Farber Tr.).)[14]

**C. There is no basis to hide Dr. Shaw's Chow test from the jury.**

A Chow test (also called an F-test) is a recognized statistical technique for determining whether the thing being studied (here, gender disparities) "should be [modeled] separately for two or more potential subgroups." Am. Bar Ass'n, *Applying Econometrics to Address Class Certification*, 358-59 (2014) (Ex. 24).[15] "Econometrics literature generally encourages the use of F-tests in data analyses," *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 2016 WL 2756437, at *11 (E.D. La. May 12, 2016), and courts have excluded experts who failed to conduct a Chow test, or other similar statistical tests, to provide a "solid statistical reason for [the] decision to pool the data." *E.g.*, *Reed Const. Data Inc.* v. *McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014) (Oetken, J.); *Coates* v. *Johnson & Johnson*, 756 F.2d 524, 540-42 (7th Cir. 1985) (affirming judgment that pooling year-by-year samples was inappropriate where Chow test so indicated).

[14] Dr. Shaw used Business Unit only as a control variable, like tenure or education, and only for her promotion and compensation regressions. (*See* Pls.' Ex. 9 Exs. 27-29, 30-32 (Shaw Rpt.).)

[15] Dr. Shaw's Chow tests showed that the regression results are not the same between Goldman Sachs' Divisions, and therefore, "Prof. Farber's pooled model" does not "reflect actual patterns in the dataset being analyzed." (Pls.' Ex. 9 ¶¶ 169-177, 194, 218 (Shaw Rpt.).)

Here, Dr. Shaw performed a Chow test to determine whether it is appropriate to "pool[] together . . . all three divisions," as Dr. Farber does, or whether Divisions should be modeled separately. (Pls.' Ex. 9 ¶ 170 (Shaw Rpt.).) Dr. Shaw's Chow test results establish that the three challenged processes do not operate in the same way across the three Divisions and undermine the validity and reliability of Dr. Farber's results. Dr. Farber performed no similar analysis to test his firmwide models—and has never disputed this conclusion by Dr. Shaw or the manner in which she performed her Chow tests. There is thus no basis to exclude Dr. Shaw's Chow tests, which she performed to satisfy the *Daubert* standard of "employ[ing] in the courtroom the same level of intellectual rigor that characterizes" her academic work. *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 152 (1999).

Plaintiffs contend that Dr. Shaw should be forbidden from performing a Chow test based on some warped notion that she uses it to claim that "*every* woman [must be] disadvantaged . . . to the *exact same degree*" for Plaintiffs to prevail. (Pls.' Br. 20.) Dr. Shaw never said this, and more to the point, that contention has nothing to do with performing a Chow test, which simply determines whether or not the challenged processes are general frameworks that apply the same way "firm-wide." (Pls.' Br. 19-21.) This Court should reject Plaintiffs' attempt to exclude Dr. Shaw's opinions based on a misrepresentation of her work.

As another diversionary tactic, Plaintiffs repeat their mantra that the three challenged processes are general frameworks that apply "firm-wide." (Pls.' Br. 21.) But the fact that Plaintiffs' case hinges on the ***alleged*** common application of the challenged processes makes it even more "helpful [and] relevant" ***to test*** statistically with a Chow test whether the frameworks are, in fact, applied the same way in Goldman Sachs' three large and very different Divisions. (*Id.*) As Dr. Shaw has shown, they do not.

### D. The Court should reject Plaintiffs' meritless claim that Dr. Shaw did not do her own work.

Plaintiffs' accusations that Dr. Shaw (i) allegedly "import[ed] . . . the judgments" of Dr. Michael Ward, Goldman Sachs' expert at a previous stage of this case, and (ii) purportedly "left . . . critical decision[s] entirely to others on her 'team'" (*see* Pls.' Br. 7-8), misrepresent Dr. Shaw's work and methods.

*First*, Plaintiffs' claim that Dr. Shaw "copied the production fields selected by Dr. Ward" (Pls.' Br. 8), is not true. Plaintiffs ignore that Dr. Shaw independently determined which production variables to include in her models—in fact, she actually used a different set of variables than Dr. Ward.[16] When asked whether she "relied on [the] work performed by Dr. Ward," Dr. Shaw testified that she and her team "did our own work." (Ex. 1 at 94:11-15 (Shaw Tr.).) And even if Dr. Shaw had used the same production variables as Dr. Ward, which she did not, that would not be improper. An expert may "rel[y] on the report of [a] prior [] expert" where, as here, the testifying expert "reviewed all the underlying materials that informed the [prior report] and reached similar conclusions . . . . [and] adds additional observations." *Am. Home Assur. Co.* v. *Merck & Co.*, 462 F. Supp. 2d 435, 448 (S.D.N.Y. 2006) (Marrero, J.).

*Second*, Plaintiffs' accusation that "Dr. Shaw did not direct the selection of the production variables" for her models is baseless. (Pls' Br. 7.) Dr. Shaw testified that her "empirical analys[e]s" and selection of production variables was done "*under [her] direction*." (Ex. 1 at 25:21-25, 92:20-23 (Shaw Tr.) (emphasis added).) Specifically, Dr. Shaw "directed [her] team to get [the production] data that Goldman Sachs uses" from the data files produced in the case, and then, based on the universe of production metrics identified by her team, she "selected the

[16] Dr. Shaw constructed variables differently than Dr. Ward did, and she used certain production variables that Dr. Ward did not include, such as the production variable "quart_ltfb_full_yr," a measure of production for certain salespeople in IMD. (Pls.' Ex. 9 App'x C (Shaw Rpt.).)

[production] variables in [her] report." (*Id.* at 105:7, 130:23-24.) There is nothing improper—and certainly nothing "lack[ing] rigor" (Pls.' Br. 8)—"about an expert relying on third-parties [or support staff] for data collection." *Bd. of Trustees of AFTRA Ret. Fund* v. *JPMorgan Chase Bank, N.A.*, 2011 WL 6288415, at *10 (S.D.N.Y. Dec. 15, 2011) (Scheindlin, J.). "Others may assist so long as the expert's opinion is within his or her expertise, based upon sufficient facts, and the product of a reliable methodology." *Phoenix Light*, 2020 WL 1322856, at *10. Plaintiffs' expert Dr. Farber testified that he also relied on a team that assisted him. (*See supra* at n.1.)

**E. Dr. Shaw's "outlier" analyses are appropriate and reliable.**

In conducting her work, Dr. Shaw carefully performed two analyses to determine whether any estimated gender disparities were "influence[d] [by] outlier observations," which are "data point[s] that ha[ve] a value that diverges sharply from the vast majority of other data points." (Pls.' Ex. 9 ¶ 253 (Shaw Rpt.).) Dr. Shaw's two outlier studies consisted of (i) an "outlier analysis" of compensation that "remove[s] the extraordinarily high earners" (*id.* ¶ 258 & Ex. 34), and (ii) a "regression model [that] analyze[s] gender gaps in median compensation rather than average compensation" (*id.* ¶ 260 & Ex. 35). Plaintiffs only seek to exclude the former. (*See* Pls.' Br. 22.)

In removing statistical outliers from her study of compensation, Dr. Shaw was validly "concern[ed]" that "a small number of professionals generating unique value in the marketplace and earning commensurately high compensation" would "skew[] the results" of her compensation models, causing them to "either vastly overstate or understate the typical effect of certain variables on pay." (Pls.' Ex. 9 ¶¶ 254-55 (Shaw Rpt.).)[17] For example, including a uniquely successful "young star banker" in a pay regression model "would distort the estimated relationship between

[17] Dr. Shaw's median regression analysis, wholly unchallenged by Plaintiffs, confirms Dr. Shaw's concern about the effect of outliers: "[t]he median gender gap is not significant in any division-corporate job title groups . . . impl[ying] that where they exist, average gender gaps in compensation are driven by a small number of outliers." (Pls.' Ex. 9 ¶ 264 & Ex. 35 (Shaw Rpt.).)

tenure and compensation." (*Id.* ¶ 256.) Using three different outlier definitions (as described further below) (*id.* ¶ 258 & Ex. 34), Dr. Shaw reached the same conclusion in each analysis: "there is no common gender gap after omitting individuals with extraordinarily high compensation"—*i.e.*, the removal of outliers showed that there was no common class-wide gender gap. (*Id.* ¶ 259.)

Plaintiffs are wrong in claiming that it was "methodologically inappropriate" for Dr. Shaw to exclude high-earning outliers from her analyses. (Pls.' Br. 22.) Removing outliers is a common technique in econometrics. (*See* Pls.' Ex. 9 ¶ 253 n.286 (Shaw Rpt.) (quoting Jeffrey M. Wooldridge, *Introductory Econometrics* (2012).) One court explained why removing outliers is necessary to avoid skewing the results of the models when evaluating average disparities in a Title VII case, as Plaintiffs seek to do here: "If Microsoft-founder Bill Gates and nine monks are together in a room, it is accurate to say that on average the people in the room are extremely well-to-do, but this kind of aggregate analysis obscures the fact that 90% of the people in the room have taken a vow of poverty." *Abram* v. *United Parcel Serv. of Am., Inc.*, 200 F.R.D. 424, 431 (E.D. Wis. 2001). Thus, as Judge Cote and others have recognized, "filtering [] data" to "eliminate outliers" is a method "routinely used . . . in econometrics." *Fed. Hous. Fin. Agency* v. *Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 505 (S.D.N.Y. 2015); *see In re Air Cargo*, 2014 WL 7882100, at *17 (same); *Ass'n of Oil Pipe Lines*, 281 F.3d at 246 (to the same effect). Here, the trier of fact will be helped by knowing whether or not an average discrepancy in compensation is driven by a few highly paid outliers versus a common pattern across the class. Tellingly, when not testifying as Plaintiffs' expert, Dr. Farber has used this same method "to adjust the data to eliminate . . . serious outliers." Henry S. Farber, *Why You Can't Find a Taxi in the Rain & Other Labor Supply Lessons From Cab Drivers*, at n.27 (2015) (Ex. 25).

Plaintiffs also mischaracterize Dr. Shaw's basis for testing the effect of outliers in this case,

stating that she "justif[ied] this subtraction of data" based on "pop culture" references. (Pls.' Br. 22.) Another lie. As Dr. Shaw explained, "[a] range of academic studies has documented this phenomenon in the finance industry" (*id.* ¶ 255 n.287 (citing sources)), and "[c]ompensation data shows that GS operates in exactly such a star labor market" with "about half of investment bankers at GS and its competitors earn[ing] less than $500,000, while approximately four percent earned more than $2,000,000." (*Id.* ¶ 257.)

Plaintiffs further misrepresent Dr. Shaw's chosen outlier definitions as "arbitrar[y]" and "nonsensical." (Pls.' Br. 1, 23.) But Dr. Shaw selected three different outlier definitions to ensure the robustness of her analysis, each of which is well-founded in academic literature.[18] Plaintiffs also bemoan that "the difference between an outlier (removed) and the population that remained was as little as $619," suggesting that this one data point erases the "distinction between an outlier and non-outlier in Dr. Shaw's report." (Pls.' Br. 23.) But the principled use of any statistical cut-off will inevitably result in a few observations being close to the line, and is not a basis to exclude Dr. Shaw's outlier analyses. Plaintiffs' apparent suggestion that Dr. Shaw should have used an "'eyeball' test to identify outliers" that Plaintiffs deem too close to the line is precisely the kind of "suspect" methodology courts reject. *Levy* v. *Lexington Cty.*, 589 F.3d 708, 719 (4th Cir. 2009).

### F. Dr. Shaw's analyses of the discrete components of Goldman Sachs' promotions process is consistent with the factual record, this Court's Orders, and Title VII law.

Plaintiffs' assertion (Pls. Br. 24) that Dr. Shaw should not have separately analyzed the

---

[18] Dr. Shaw's first definition, "removing professionals with compensation greater than 1.5 times the interquaritle range (the 75th percentile minus the 25th percentile) above the 75th quartile," has been established for decades in econometrics. (Pls.' Ex. 9 ¶ 258 n.289 (Shaw Rpt.) (citing John W. Tukey, *Exploratory Data Analysis* (1977)).) Dr. Shaw's second and third outlier definitions, "removing professionals with compensation in the top five percent" and "the top ten percent" respectively, "is common in labor economics." (*Id.* ¶ 258 n. 290 (citing Joshua D. Angrist & Alan B. Krueger, *Empirical Strategies in Labor Economics* (1999)).)

component parts of the promotions process (*i.e.*, nominations and cross-ruffing), as opposed to promotions generally (which Dr. Shaw also did), flies in the face of this Court's order, the factual record, and the language in Title VII.

*First*, this Court did not certify a class regarding promotions *generally*, but rather certified only the "cross-ruffing process." (Class Cert. Order at 28 (ECF No. 578) (certifying a class with respect to "[w]hether Goldman Sachs discriminated against the class via its use of 360 reviews, quartiling or *cross-ruffing*") (emphasis added).) There accordingly is nothing "arbitrary" about Dr. Shaw's decision to analyze the specific process certified by this Court. (Pls.' Br. 24.)

*Second*, the factual record amply supports Dr. Shaw's decision to analyze nominations separately from cross ruffing. (*See* Pls.' Ex. 9 ¶¶ 118-127 (Shaw Rpt.) (citing testimony of HCM personnel describing the discrete components of the overall promotions process).) Plaintiffs' own expert, Dr. Farber, understood this distinction: the "first stage" of the promotions process is for "managing directors [to] nominate vice presidents for promotion to EMD" (Ex. 1 at 273:20-274:10 (Farber Tr.)), and "cross-r[uff]ing [is] *part of* the promotion process, but it's not the entire promotion process" (*id.* at 149:13-14). This Court has also recognized the promotion process's discrete components by expressly distinguishing between "nomination," which it described as an initial eligibility determination that "does not involve an application process," and "cross-ruffing," defined as "the vetting process" for promotion to managing director. (Class Cert. Order at 8.)

*Third*, Plaintiffs are wrong that there is no "disparate impact caselaw to divide a challenged process into subparts for separate analysis." (Pls.' Br. 24.) In fact, the opposite is true. Title VII expressly requires Plaintiffs to identify the "particular employment practice" that they contend caused a disparate impact, and only permits Plaintiffs to group discrete elements and analyze them as one if Plaintiffs "can demonstrate to the court that the elements of a respondent's

decisionmaking process are not capable of separation for analysis." 42 U.S.C. § 2000e-2(k)(1)(B)(i); *see also* Defs.' SJ Br. 20-23. That is not the case here. As the Supreme Court has made clear, a plaintiff's "failure to identify the specific practice being challenged is the sort of omission that could 'result in employers being potentially liable for the myriad of innocent causes that may lead to statistical imbalances.'" *Smith* v. *City of Jackson*, 544 U.S. 228, 241 (2005).

## II. The Court should find that Dr. Stockdale's opinions and testimony are admissible.

To rebut Dr. Caren Goldberg, Plaintiffs' purported expert on workplace culture, Dr. Stockdale evaluated Dr. Goldberg's methodology and analysis and concluded that "Dr. Goldberg's implementation of the case study method and her conclusions regarding Goldman Sachs are fatally flawed and, in many areas, egregiously misleading." (Pls.' Ex. 10 ¶ 13 (Stockdale Rpt.)) In reaching these conclusions, Dr. Stockdale comprehensively reviewed thousands of pages of case documents, hundreds of pieces of academic and industry literature and dozens of sources of publicly available information.

### A. Dr. Stockdale's methodology is reliable.

In contrast to Dr. Goldberg, who rifled through a meager 556 documents hand-selected by Plaintiffs' counsel to determine whether examples of gender bias or harassment "pop[ped] out" to her (Ex. 8 at 164:11-20 (Goldberg Tr.)), Dr. Stockdale conducted a detailed analysis that included at least ten components:

1. "a comprehensive analysis of the closed-ended responses to the Firm's employee opinion survey" (*i.e.*, the People Survey) (Pls.' Ex. 10. ¶ 39);
2. "a comprehensive content analysis of a large, random sample of open-ended responses to the People Survey" based on a detailed scientific protocol, which neither Dr. Goldberg nor Plaintiffs challenge (*id.*)[19];

[19] Content analysis is "a family of research techniques for making systematic, credible, or valid

3. "an in-depth interpretive qualitative analysis of different themes in the open-ended responses to the People Survey," using "principles of grounded theory methodology" (Pls.' Ex. 10. ¶ 39)[20];
4. "an analysis of Exit Survey data" (Pls.' Ex. 10. ¶ 39);
5. "a comprehensive review of record documents concerning the Firm's diversity strategy and programs including, but not limited to, recruiting strategy, training programs, leadership develop programs for women, and affinity groups" (*id.*);
6. "a review of the complaint files cherry picked by Dr. Goldberg" (*id.*);
7. "a site visit" (*id.*);
8. "a review of relevant literature, including papers cited by Dr. Goldberg and, critically, important scholarship that she did not cite, to develop a scientific framework through which to evaluate Goldman Sachs' culture and practices" (*id.*);
9. "research into third party sources and data, to provide context for and assess Goldman Sachs' progress vis-à-vis its peers" (*id.*); and
10. "consideration of alternative theories that explain the perceptions of women at Goldman Sachs." (*Id.*)

As explained in the academic literature, Dr. Stockdale's consideration "of alternative theories to explain [Dr. Goldberg's] findings, [search] for disconfirming evidence, and [] use [of] multiple sources of data or evidence to test the validity of [her] findings" is a process known in social science as "triangulation." (Pls.' Ex. 10 ¶ 37 (Stockdale Rpt.).)[21] Dr. Stockdale achieved

and replicable inferences from texts and other forms of communication," and is commonly used to assess open-ended responses to employee surveys, James W. Drisko & Tina Maschi, *Content Analysis*, 7 (2016), and "messages containing information about sex and gender roles," Kimberly A. Neuendorf, *Content Analysis – A Method. Primer for Gender Research*, 111 (2016) (Ex. 27).

[20] Interpretive content analysis looks deeper into open-ended responses to draw inferences about underlying meaning. *See* Drisko & Maschi, *Content Analysis*, 7 (Ex. 26).

[21] *See, e.g.*, Todd D. Jick, *Mixing Qualitative & Quantitative Methods: Triangulation in Action*, 602-611 (1979) (Ex. 29) (defining "[t]riangulation" as "'the combination of methodologies in the

triangulation by examining multiple sources of non-redundant data,[22] such as record documents, deposition testimony, and email communications regarding Goldman Sachs' commitment to diversity, and triangulated those findings against both the academic literature and responses from the People Survey. (*Id.* ¶ 62-86.) This review informed Dr. Stockdale's conclusion that Goldman Sachs "demonstrated a commitment to corporate culture and climate that supports gender diversity and inclusion." (*Id.* Section III.)

By any measure, Dr. Stockdale's thorough methodology fully satisfies Rule 702. *See Linde* v. *Arab Bank*, PLC, 922 F. Supp. 2d 316, 323 (E.D.N.Y. 2013) (Gershon, J.) (expert "applied his expertise to analyze the underlying evidence" where "[h]e pulls together information from discrete sources, . . . and cross-references it against other supportive or contradictory information in reaching his conclusions"); *Katt* v. *City of N.Y.*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001) (Lynch, J.) (expert's opinion on organizational culture and practices of city police department admissible where based on "hundreds of [internal] reports, research articles, scholarly journals, books, and newspaper reports that he had read in the course of over twenty years of academic research"); *Nicholas* v. *Bratton*, 376 F. Supp. 3d 232, 290 (S.D.N.Y. 2019) (Oetken, J.) (rejecting contention that expert "has applied no methodology at all" where expert's opinions were based on "deposition testimony from the parties to this case, . . . training materials, and secondary sources from both press and academic publications").

### B. Dr. Stockdale was not required to apply the same frameworks as Dr. Goldberg.

Plaintiffs contend that Dr. Stockdale's opinions should be excluded because she did not apply the Diversity Climate or Tolerance for Sexual Harassment "frameworks" used by Dr.

---

study of the same phenomenon.'").

[22] *See* Christine Meyer, *A Case in Case Study Methodology*, 336 (2001) (Ex. 30).

Goldberg. In wrongly claiming that not using these frameworks equates to "appl[ying] no scientific methodology at all" (Pls.' Br. 27), Plaintiffs do not cite a single source for their bold contention that the "frameworks" used by Dr. Goldberg are "the *only* scientific framework[s] for analyzing corporate diversity climate." (*Id.* (emphasis in original).) To the contrary, academics studying diversity issues routinely rely on different frameworks in their own academic work.[23] Even Dr. Goldberg's Diversity Climate Framework notes that "[t]his list is not meant to be exhaustive. We understand it as clarifying material and groundwork for potential item generations," *i.e.*, new framework criteria. (Ex. 22 at 1152 (Dwertmann et al.).)

In any event, Dr. Stockdale's report addresses each of the 11 elements in the Diversity Climate framework:

| **Diversity Climate Framework Element** | **Dr. Stockdale's Analysis** |
|---|---|
| (1) The goal of increasing diversity in the workforce is taken seriously. | "Diversity Plans were introduced . . . to advance the Firm's diversity goals." (Stockdale Rpt. ¶ 143.) |
| (2) Members of historically marginalized groups have access to leaders with influence. | "Senior leaders mentor women and other diverse professionals." (*Id.* ¶ 122.) |
| (3) Members of diverse groups have means of driving organizational change related to diversity. | "Goldman Sachs' Women's Networks support the career development of women." (*Id.* ¶¶ 231-43.) |
| (4) Diversity-related training is taken seriously. | "Throughout the Class Period, Goldman Sachs has provided effective diversity and inclusion training, consistent with scientifically-supported leading practices." (*Id.* ¶¶ 190-97.) |
| (5) Managers are held accountable for diversity goals. | "Throughout the Class Period, Goldman Sachs has held its people, including its managers, accountable for building and maintaining a culture |

[23] *See, e.g.*, J. Hofhuis, *Diversity Climate Enhances Work Outcomes Through Trust & Openness In Workgroup Commc'n*, 5, 714 (2016) (Ex. 31) (using a "Diversity climate" framework "adapted from a Dutch-language scale"); Y. Perera Li, *Inclusion Climate: A Multilevel Investigation Of Its Antecedents & Consequences*, 353-69 (2019) (Ex. 32) ("using the four-item organizational inclusion factor developed by Mor Barak and colleagues").

| | |
|---|---|
| | that is inclusive, not tolerant of bias, and supportive of women." (*Id.* ¶¶ 123-52.) |
| (6) Employees can count on receiving a fair performance evaluation, regardless of their demographic background. | "Dr. Goldberg mischaracterizes women's perceptions regarding the fair implementation of personnel practices." (*Id.* ¶¶ 272-75.) |
| (7) Developmental opportunities are fairly distributed across demographic groups. | "The data reject Dr. Goldberg's conclusion that Class-relevant women perceive that Goldman Sachs is not a meritocracy." (*Id.* ¶¶ 326-43.) |
| (8) Employees receive equal pay for equal work. | "[T]he data show that men were also more likely than women to leave Goldman Sachs due to dissatisfaction with career progression or with compensation," and "women more frequently discussed [compensation] positively than men. (*Id.* ¶¶ 304.) |
| (9) Commitment to diversity is unquestioned. | "Dr. Goldberg's baseless conclusion that Goldman Sachs does not take its diversity goals seriously relies on an unsound assessment of Goldman Sachs' diversity progress and recruiting strategies." (*Id.* ¶¶ 276-306.) |
| (10) The importance of diversity for the organization is communicated in a credible way. | "Goldman Sachs communicates its commitment to diversity, both internally and externally." (*Id.* ¶¶ 76-86.) |
| (11) Significant resources are committed to improving diversity and inclusion. | "Goldman Sachs has committed tremendous resources, time, and leadership toward women's success at the Firm," including "[r]esources and support provided to parents at Goldman Sachs." (*Id.* ¶ 23, Ex. 5.) |

Moreover, as Dr. Stockdale explained at her deposition, the Diversity Climate framework "isn't really satisfactory to analyzing gender issues fully," because "there are other matters . . . related to fairness and discrimination, [and] mistreatment that are relevant to gender that are not in the [Diversity Climate] analysis," such as "issues related to worklife balance, worklife flexibility," among others. (Ex. 6 at 68:9-12, 196:3-14 (Stockdale Tr.).) Thus, Dr. Stockdale went "further than" the 11 elements in the Diversity Climate framework (*id.*), and assessed elements

relevant to gender, including support for career development (Pls.' Ex. 10 ¶ 213 (Stockdale Rpt.))[24] and support for work-life flexibility and working parents (*id.* ¶¶ 244-67).[25]

**C. Dr. Stockdale's opinions based on her People Survey analysis are reliable.**

By criticizing the underlying data, Plaintiffs take issue with Dr. Stockdale's opinion that "Class-relevant women's People Survey responses reflect perceptions of a strong collaborative culture." (Pls.' Ex. 10 ¶¶ 319-41 (Stockdale Rpt.).) According to Plaintiffs, the Goldman Sachs People Survey data is "an inherently unreliable source to measure employees' perceptions of gender bias." (Pls.' Br. 30.) This criticism fails for several reasons.

**1. Plaintiffs' own experts rely on the People Survey data that they claim is unreliable.**

In criticizing Dr. Stockdale's use of the People Survey data, Plaintiffs ignore that two of Plaintiffs' own experts—Dr. Goldberg and Ms. Butler—rely on the very same data. (Pls.' Ex. 6 ¶¶ 26, 28, 31, 32, 49(d), 55, 63, 69 & n.22, 70 (Goldberg Rpt.); Ex. 14 ¶¶ 41-69 (Butler Rpt.); Ex. 8 at 135:17-22 (Goldberg Tr.); Ex. 10 at 269:17-270:3 (Butler Tr.).) In fact, Dr. Goldberg testified that she considered the People Survey data to be "reliable," and could not identify a "better source of information about employee perceptions" of Goldman Sachs than the People Survey. (Ex. 8 at 135:23-137:13, 201:19-203:25 (Goldberg Tr.).) At the very least, if the Court precludes Dr. Stockdale from relying on analyses based on People Survey data, it must also preclude Dr. Goldberg and Ms. Butler from doing so.

---

[24] Academic and industry practitioners identify training, mentoring, and career support as critical in supporting women's careers. *See* Alison T. Wynn & Shelley J. Correll, *Combating Gender Bias in Modern Workplaces*, 514 (2018) (Ex. 33).

[25] Academic research has found that improving work-life flexibility and balance is a way to support women's career success. *See* Claudia Goldin & Lawrence F. Katz, *The Cost of Workplace Flexibility for High-Powered Prof'ls*, 45-67 (2011) (Ex. 34); Alison Konrad, *Family Demands & Job Attribute Preferences*, 35-46 (2003) (Ex. 35).

**2. Plaintiffs identify no evidence that the People Survey or Exit Survey responses are biased.**

Plaintiffs' speculation that the People Survey is "positively biased" and "subject to social desirability or acquiescence bias" is both unsubstantiated and not grounds to preclude Dr. Stockdale's opinions. (Pls.' Br. 30.) It is common in I/O psychology for survey questionnaires to feature prompts framed in the affirmative, as used in the People Survey. In fact, Plaintiffs' expert, Dr. Goldberg, has designed and analyzed an employee survey using positively framed prompts.[26] Dr. Goldberg expressed no concerns about the reliability of the People Survey data, testifying that "I still have no reason to believe that people expressed anything, other than their honest opinion." (Ex. 8 at 137:11-13 (Goldberg Tr.).)

Plaintiffs posit that Dr. Stockdale must have overlooked Plaintiffs' meritless criticisms about the People Survey data because Dr. Stockdale supposedly is "not familiar with the basic precepts of survey design." (Pls.' Br. 30.) Not true. Dr. Stockdale has published over 20 peer-reviewed journal articles in which she designed, used, and/or analyzed survey instruments, including surveys of employees, and evaluated previously published survey research; and has taught numerous courses on survey design and methods at colleges and universities across the country. (*See* Pls.' Ex. 10 App'x A (Stockdale Rpt.).)[27] Based her extensive expertise, Dr. Stockdale testified that she "saw nothing in the construction of this survey or in the responses that made [her] conclude that it wasn't [sound]." (Ex. 6 at 164:7-11, 152:8-13 (Stockdale Tr.).)

Nor do Plaintiffs point to any evidence suggesting that the Exit Survey is biased. (Pls.' Br.

[26] *See* Goldberg et al., *Employees' Perceptions of Their Leaders: Is Being Similar Always Better?*, 338 (2008) (Ex. 36).

[27] Dr. Stockdale has conducted more than 25 survey-based consulting projects. And for over 20 years, Dr. Stockdale has taught survey design and survey methods at Southern Illinois University, as well as other survey-related courses at IUPUI. (Pls.' Ex. 10 App'x A (Stockdale Rpt.).)

31.) Although Ms. Butler speculates in her report that "the small and highly connected world of investment banking may have made former employees hesitant to disclose or discuss sensitive issues during the Exit Survey" (Butler Rpt. ¶ 59), she admitted that she had no experience in the investment banking "world" and identified no evidence beyond a single survey response that any participants were reluctant to provide negative information. (Ex. 10 at 252:9-253:9 (Butler Tr.).)[28]

In any event, even if Plaintiffs' unsubstantiated assertions about bias in the People Survey or Exit Survey data were correct (they are not), that at most would be fodder for cross-examination, not grounds for precluding Dr. Stockdale from testifying. *See*, *e.g.*, *Auto. Ins. Co. of Hartford* v. *Electrolux Home Prod., Inc.*, 2012 WL 6629238, at *2 (S.D.N.Y. Dec. 20, 2012) (Seibel, J.) (possibility of "some sample bias" not a basis to exclude expert's opinion).

**3. Dr. Stockdale's People Survey analysis is not "flawed."**

Plaintiffs wrongly accuse Dr. Stockdale of using "close-ended questions de-linked from the open-ended responses." (Pls. Br. 32-33). She did not do that. Instead, Dr. Stockdale considered patterns in the aggregate data of both open-ended and close-ended responses. (Pls.' Ex. 10 ¶¶ 228-29 (Stockdale Rpt.).) Plaintiffs do not contend that there is anything improper about what Dr. Stockdale did. To the contrary, there are several ways to validate survey responses, including by comparing responses "with objective metrics." P. Morrel-Samuels, *Getting the Truth into Workplace Surveys*, 5 (2002) (Ex. 37). That is precisely what Dr. Stockdale did by

---

[28] Plaintiffs wrongly claim that Goldman Sachs "cooked the results" of the People Survey by "dropp[ing] questions from the Survey that generated more negative responses from women than men." (Pls.' Br. 31.) Plaintiffs offer no explanation as to why Goldman Sachs would "cook[]" the results of an internal employee feedback survey administered voluntarily to improve their recruitment and retention of talented professionals. (*Id.*) Nor did Goldman Sachs actually drop the questions generating the most negative responses in each iteration of the People Survey. To give just one example, in 2011, 2013, 2015, and 2017, the question "Goldman Sachs culture is [Getting Stronger/Staying the Same/Getting Weaker]" generated the most negative responses among women, but Goldman Sachs never dropped that question. (Pls.' Ex. 10 App'x Ex. 1 (Stockdale Rpt.).)

triangulating People Survey responses, women's attrition rates, and Exit Survey data. (Pls.' Ex. 10 ¶¶ 9, 29 (Stockdale Rpt.).)

Nor did Dr. Stockdale create a "made up scale for evaluating the favorability of the survey responses." (Pls.' Br. 31.) As is standard practice in evaluating the results of such surveys, Dr. Stockdale calculated the percentage of respondents that responded "favorably" to each prompt—that is, the percentage that selected "Strongly Agree" or "Agree" (or the analogous responses) for a given prompt.[29] Plaintiffs' own expert agreed that it "can be appropriate to collapse" ratings into "percent favorable responses." (Ex. 10 at 313:16-20 (Butler Tr.).)

There also is no merit to Plaintiffs' assertion that Dr. Stockdale's opinion regarding "gender disparities in perceptions of work-life balance" (Pls.' Ex. 10 ¶ 344 (Stockdale Rpt.)) should be excluded because it is "contradicted by" the opinions of Plaintiffs' expert, Ms. Butler, based on her "content search." (Pls.' Br. 33.) Even putting to one side that "his expert doesn't agree with my expert" is not grounds for preclusion, *In re Namenda*, 2021 WL 2403727, at *18, Ms. Butler's purported "content search" of open-ended survey responses actually *supports* Dr. Stockdale's conclusions that "differences in male and female perceptions of work-life balance at Goldman Sachs reflect differences, on average, in the preferences of and societal expectations for men and women." (Pls.' Ex. 10 ¶ 344 (Stockdale Rpt.).) Ms. Butler's "content search" of People Survey responses found that "women are more likely to reference family and children" and that while both genders "express concerns about the demands of the job and balance with life

[29] *See* William H. Macey & Alexis A. Fink, *Employee Surveys & Sensing*, 246 (2020) (Ex. 38) ("Often, survey results will be displayed by recoding responses into categories of favorable, neutral, and unfavorable. For example, the total percentage of respondents who responded with 'Strongly Agree' or 'Agree' would be collapsed into 'percent favorable.'").

outside of work," *women were more likely to do so than men*. (Ex. 14 ¶ 63, Table 4 (Butler Rpt.).)[30] This data—from Plaintiff's own expert—supports Dr. Stockdale's opinion that "the job demands in financial-sector professional services firms, like Goldman Sachs, are more likely to conflict with women's greater need for work-life flexibility." (Pls.' Ex. 10 ¶¶ 344-45 (Stockdale Rpt.).) This opinion is not a "stereotype" (Pls' Br. 32), but a widely-accepted academic theory grounded in numerous articles and studies.[31]

### D. Plaintiffs mischaracterize the support that Dr. Heck and Cornerstone Research provided to Dr. Stockdale.

Plaintiffs baselessly claim that Dr. Stockdale served as a "conduit" for the work of her husband, Dr. Michael Heck, and Cornerstone Research. (Pls.' Br. 35.) As explained above, there is nothing improper about an expert relying upon support staff "whose work he or she supervised and that he or she could personally replicate if necessary." *Hart*, 2018 WL 3471813, at *8. Dr. Stockdale directed and supervised every aspect of the work underlying her opinions. (Pls.' Ex. 10 ¶ 10 (Stockdale Rpt.); Ex. 6 at 99:17, 109:15-17, 190:14-17, 123:24-124:17 (Stockdale Tr.).)

***Dr. Heck.*** In performing her content analysis of a random sample of People Survey responses, Dr. Stockdale was assisted by her husband, Dr. Michael Heck, an applied psychologist, who independently coded the same set of People Survey responses as Dr. Stockdale using the content category dictionary that Dr. Stockdale developed. (Pls.' Ex. 10; App'x C, App'x Ex. 2

---

[30] As explained in Goldman Sachs' *Daubert* brief, Ms. Butler's "content analysis" cannot be used to evaluate whether a survey response contains "concerns" about anything, because Ms. Butler simply tabulated the frequency with which a random set of words appears in survey responses. (*See* Defs.' Daubert Br. 19-28 (ECF No. 1188).)

[31] *See* David Cruickshank, *Deloitte 2016 Millennial Survey* < tinyurl.com/y5nwex58 >; Scott Coltrane, *Research on Household Labor: Modeling & Measuring the Social Embeddedness of Routine Family Work*, 1208-33 (2000) (Ex. 39).

(Stockdale Rpt.).)[32] Dr. Stockdale's use of a second, independent coder is a standard practice in content analyses, in which the two coders compare their coding and reconcile any discrepancies.[33] Plaintiffs' claim that Dr. Heck performed "50 percent" of Dr. Stockdale's analysis is thus incorrect. (Pls.' Br. 34.) Dr. Stockdale herself independently coded and analyzed every piece of data, using Dr. Heck's coding as a double-check on the reliability of her own coding decisions. (*Id.*; Pls.' Ex. 10 App'x C ¶ 1 (Stockdale Rpt.).)

Plaintiffs' accusation that Dr. Stockdale violated the American Psychological Association's *Ethical Principles of Psychologists & Code of Conduct* is unfounded and despicable. (Pls.' Br. 34.) Dr. Stockdale's work complied with all three parts of the guidelines Plaintiffs cite.[34] *First*, Plaintiffs identify no evidence, nor can they, that Dr. Heck lacked objectivity or that he was exploited by Dr. Stockdale by virtue of being her spouse. *Second*, Dr. Heck was qualified to perform the coding. As reflected in the very document Plaintiffs cite, Dr. Heck has a doctorate degree in applied experimental psychology (Pls.' Br. 33 n.25 (citing Dr. Heck's biography)), and he followed Dr. Stockdale's content coding dictionary to guide the coding of open-ended

---

[32] Dr. Stockdale and Dr. Heck coded the People Survey responses into the following categories defined in the content category dictionary: (1) Climate, Culture, Work Environment; (2) Career Advancement; (3) Compensation; (4) Performance Review Process; (5) Professional Development; (6) Diversity; Work-Life Flexibility; (7) Gender/Parent-Based Work-Life Flexibility; (8) Flexibility Concerns – Gender Non-Specific; (9) Gender-Based Mistreatment; (10) Stigmatized Identity-Based Mistreatment – Non-Gendered; and (11) Mistreatment – Without Reference to Stigmatized Identities. (Pls.' Ex. 10 App'x C, App'x Ex. 2 (Stockdale Rpt.).)

[33] Kimberly A. Neuendorf, *The Content Analysis Guidebook*, 41, 159, 166 (2016) (Ex. 28) ("Coding: Use at least two coders to establish intercoder reliability.").

[34] *See* Am. Psychological Ass'n, *Ethical Principles of Psychologists & Code of Conduct* < tinyurl.com/386wze4p > ("Psychologists who delegate work to employees, supervisees, or research or teaching assistants . . . take reasonable steps to (1) avoid delegating such work to persons who have a multiple relationship with those being served that would likely lead to exploitation or loss of objectivity; (2) authorize only those responsibilities that such persons can be expected to perform competently on the basis of their education, training, or experience, either independently or with the level of supervision being provided; and (3) see that such persons perform these services competently.").

responses. *Third*, Dr. Stockdale reviewed Dr. Heck's coding, confirming that he performed the work competently. (Pls.' Ex. 10, App'x C (Stockdale Rpt.); Ex. 6 123:24-124:17 (Stockdale Tr).)

***Cornerstone Research.*** Cornerstone Research "worked at [Dr. Stockdale's] direction" to "identify documents and organize" them for her review based on an outline developed by Dr. Stockdale in response to Dr. Goldberg's report (Ex. 6 at 99:17-22, 104:11-16 (Stockdale Tr.)) and also "tabulat[ed]" the results of Dr. Stockdale's interpretative qualitative analysis, in which she "did the coding" and then reviewed Cornerstone Research's "tabulations." (*Id.* 110:16-111:10.) Plaintiffs' criticisms of Dr. Stockdale's use of Cornerstone Research are unsupported and meritless. *First*, the fact that Goldman Sachs "retained" Cornerstone Research before Dr. Stockdale "joined this case" has no relevance to any factor in Rule 702. (Pls' Br. 35.) What matters is whether Dr. Stockdale directed and supervised Cornerstone (*supra* at 3, 22-23), and she repeatedly testified that she did. (Ex. 6 at 99:17, 109:15-17, 190:14-17 (Stockdale Tr.).) *Second*, Plaintiffs insinuate that Dr. Stockdale abdicated her job as an expert because Cornerstone Research billed more hours to this case than Dr. Stockdale. (Pls' Br. 35.) That is nonsense. Dr. Stockdale spent more time (819 hours) reviewing the record in full and developing her opinions than Ms. Butler and Dr. Goldberg ***combined*** ([redacted], respectively). (*See* Pls.' Ex. 33 (Stockdale Invoices), Ex. 17 (Goldberg Invoices), Ex. 18 (Butler Invoices).) Moreover, the ratio of Dr. Stockdale's time to Cornerstone's (1:4.26) is similar to that of Ms. Butler's and her support team ([redacted]). (*Compare* Stockdale Invoices *with* Butler Invoices.)[35]

**III. The Court should find that Dr. Dunleavy's opinions and testimony are admissible.**

Dr. Dunleavy's Work Analysis was thorough and comprehensive. He began by extensively

[35] Dr. Stockdale's inability to recall at her deposition the number of hours billed by Cornerstone Research or its billing rates is likewise inconsequential. (Pls.' Br. 35.) Those figures have been provided to Plaintiffs and have nothing to do with the reliability of Dr. Stockdale's opinions.

reviewing Goldman Sachs organizational materials and case documents and then conducted two-hour in-person interviews with 14 Managing Directors and PMDs ("subject matter experts") from the relevant Divisions who identified substantial differences across 14 elements of work. (Pls.' Ex. 2 at 15-17 (Work Analysis Rpt.).) Informed by those interviews, Dr. Dunleavy designed a research methodology to test the hypotheses that "[t]here is no meaningful difference in the work activities, work characteristics, and contextual work factors of professionals holding the corporate title of [associate or vice president] in IBD, IMD, and Securities. Every [associate or vice president] is performing the same work and their roles are fungible." (*Id.* 17-18.)

Dr. Dunleavy subsequently developed an interview protocol, which was reviewed by five I/O psychologists. (*Id.* 21.) He then conducted a pilot study to further refine his questions, and finally two trained I/O psychologists conducted 89 90-minute in-person interviews under his direction. (*Id.* 26-28, 32, 33.) Two I/O psychologists independently coded the responses, entered the data into spreadsheets and analyzed it for inconsistences and overlapping categories. (*Id.* 31, 35-36.) Dr. Dunleavy then reconciled data discrepancies, and "applied descriptive statistics to address the variability of work performed." (*Id.* 38.)

Based on this robust work, Dr. Dunleavy concluded that "professionals holding the corporate title of Associate [or Vice President] cannot be considered to be performing the same job simply by virtue of corporate title and therefore cannot be considered fungible (*i.e.*, mutually interchangeable)." (*Id.* 9.) As shown in Goldman Sachs' motion to decertify the class (ECF No. 1224 at 9-10, 36-37), Dr. Dunleavy's Work Analysis reflects extensive job variation among associates and vice presidents. Plaintiffs offer no viable ground for excluding his careful investigation.

**A. Dr. Dunleavy's Work Analysis methodology is appropriately tailored to the purpose of his study.**

Plaintiffs' expert, Dr. Hough, acknowledged that "there are many approaches to conducting work and job analys[e]s" (Ex. 9 at 78:19-24 (Hough Tr.)), and Plaintiffs also recognize that "the purpose of a [work] analysis determines its particular methodology." (Pls.' Br. 40.) Dr. Dunleavy tailored the Work Analysis methodology to its purpose, specifically, to assess "the extent to which" Class-Relevant professionals (*i.e.*, professionals holding the corporate titles of associate and vice president) "performed the same work activities," "have the same worker characteristics," and "the same contextual work factors." (Pls.' Ex. 2 at 30 (Work Analysis Rpt.).) This purpose "necessitated an examination of specific work activities performed at the *individual level*" to compare the work conducted by each of the interviewees.[36] (Pls.' Ex. 3 at 8 (Work Analysis Rebtl. Rpt.).) Dr. Dunleavy's individualized structured interview protocol supported such an evaluation.

**1. Plaintiffs wrongly criticize Dr. Dunleavy for not applying standards that do not apply to Dr. Dunleavy's work.**

Ignoring the literature, case-law, and their own expert's testimony, Plaintiffs criticize Dr. Dunleavy for not using an inapplicable standard relevant only to an entirely different type of job study: "content validation" studies for performance selection procedures. (Pls.' Br. 38.) Such "content validation" studies analyze whether entry requirements for a given job adequately test the skills needed to perform the job. This was not the purpose of Dr. Dunleavy's Work Analysis,

[36] Plaintiffs claim that Dr. Dunleavy did not perform a "scientific job analysis" because he supposedly was "unfamiliar with how Goldman itself organizes its workforce below the divisional level," and "he could not opine as to whether there is variability within job function or any level below division." (Pls.' Br. 38.) This misrepresents Dr. Dunleavy's testimony. In fact, Dr. Dunleavy testified that he could not define "job codes" or "DBS code[s]," which are internal designations used for certain reporting purposes and are not relevant to Dr. Dunleavy's Work Analysis. (Ex. 7 at 27:10-15 (Dunleavy Work Analysis Tr.).) In any event, Dr. Dunleavy was not asked to opine on "variability within function" or "variability within business unit." (*Id.* at 120:22-123:12.) Plaintiffs' claim that Dr. Dunleavy's methodology "presupposes his conclusion that there was variability" (Pls.' Br. 42) likewise misrepresents Dr. Dunleavy's testimony.

which set out to determine whether "professionals holding the corporate titles of Associate and Vice President . . . perform the same role." (Pls.' Br. Ex. 2 at 2 (Work Analysis Rpt.).) Plaintiffs' misguided focus on content validation drives their baseless claim that Dr. Dunleavy should have ranked and compared the relative importance of competencies important to certain jobs (Pls.' Br. 40-42), which is standard for developing a hiring assessment tool but completely irrelevant for determining whether professionals in the same corporate titles perform the same role. Arthur Gutman & Eric M. Dunleavy, *Documenting Work Analysis Projects*, 147-48 (2012) (Ex. 45).

In fact, Dr. Dunleavy's approach is nearly identical to that used in an "individualized job analysis" that Judge Schofield found admissible. *See Kassman*, 416 F. Supp. 3d at 262; (Expert Report of Cristina Banks ("Banks Rpt."), 11-cv-3743 (ECF No. 803-13) at 9-15.) The expert in *Kassman*, Dr. Cristina Banks, tailored her work analysis methodology to its purpose of identifying "similarities and differences among the jobs held by the opt-in plaintiffs" in KPMG's Tax and Advisory functions. (Banks Rpt. at 1.) In doing so, Dr. Banks conducted "structured interviews" with 81 employees across KPMG's Tax and Advisory groups. *Kassman*, 416 F. Supp. 3d at 262. As here, the structured interviews involved the "same verbatim interview protocol" and "interviewees were asked [] open-ended questions. *Id.* at 262-63. Based on her study, Dr. Banks concluded that "KPMG professionals differ widely in the jobs they perform in Tax and Advisory functions of the firm" and used qualitative responses from the interviews "to demonstrate this variety." *Id.* The court found "***none of***" plaintiffs challenges to Dr. Banks' methodology "persuasive" and rejected plaintiffs' arguments that the absence of a "task list" and "use of open ended" questions made the study unreliable. *Id.* at 270 (emphasis added); *see also EEOC* v. *Texas Roadhouse, Inc.*, 215 F. Supp. 3d 140, 165 (D. Mass. 2016) (admitting Dr. Dunleavy's opinions based on work analysis because experts may employ a "wide choice of methodologies in

developing an expert opinion"). For the same reasons, this Court should reject Plaintiffs' attempt to exclude Dr. Dunleavy's testimony here.

Ignoring the most directly on point case-law, Plaintiffs cite inapposite cases in which courts analyzed "content validation" studies. For example, the purpose of the expert's analysis in *Gulino* v. *Bd. of Educ. of City Sch. Dist.*, 113 F. Supp. 3d 663, 676 (S.D.N.Y. 2015) (Wood, J.), was to ensure that the qualifying exam for New York City school teachers "adequately test[ed] for the [Knowledge, Skills, and Abilities] that are actually needed to perform the daily tasks of the job." *Id*. Similarly, in *Guardians Ass'n of N.Y.C. Police Dep't, Inc.* v. *Civ. Serv. Comm'n of City of N.Y.*, 630 F.2d 79, 83-84 (2d Cir. 1980), the City conducted an analysis to identify "tasks that police officers generally perform" and the "knowledge, skills, and abilities required to perform [those] tasks at the entry level" for the purpose of designing a test administered to NYPD applicants. And in *United States* v. *City of N.Y.* ("*Vulcan Soc'y*"), 637 F. Supp. 2d 77, 86 (E.D.N.Y.2009) (Garaufis, J.), the City analyzed "the tasks of an entry-level firefighter" to determine whether an entrance exam "had some relationship to the job of entry-level firefighter." *Id*. at 111, 116. While these cases set forth the standard for "assessing the *validity of employment tests*" for a specific job, *id*. at 108, they say nothing about how to test whether there is variability (or not) in jobs across corporate titles.[37]

**2. Although not required, Dr. Dunleavy did both qualitative and quantitative analyses.**

Plaintiffs contend that Dr. Dunleavy was required to derive quantitative data from a "fixed set of scales" rather than solely rely on answers to open-ended questions collected from structured interviews. (Pls.' Br. 40-42.) Even if a quantitative approach were required, and it is not, Plaintiffs

[37] Plaintiffs' citation to the EEOC Uniform Guidelines cited in *Guardians* is similarly misplaced. "These guidelines apply *only* to the selection procedures which are used as a basis for making employment decisions." 29 C.F.R § 1607.2(C).

are wrong that "qualitative information from structured interviews . . . compris[ed] the entirety of [Dr. Dunleavy's] analysis." (Pls.' Br. 41, 43.) In keeping with the academic literature, Dr. Dunleavy employed "a combination of quantitative and qualitative judgment to arrive at a final decision regarding job similarity." W.M. Gibson & J.A. Caplinger, *Transportation of Validation Results*, 69-70 (2007) (Ex. 40). Dr. Dunleavy's Work Analysis protocol contained 48 closed-ended questions and 13 open-ended questions, which yielded both quantitative and qualitative information. (Pls.' Ex. 3 at 2 (Work Analysis Rebtl. Rpt.).) Indeed, Dr. Dunleavy's method of first coding the content of the qualitative responses, which "generated quantitative data and descriptive statistics (*e.g.*, the frequency and percentage of interviewees who identified a particular knowledge, skill, ability, or personal attribute)" (Pls.' Ex. 2 at 49 (Work Analysis Rpt.); Pls.' Ex. 3 at 11-12 (Work Analysis Rebtl. Rpt.)), is a "commonly used strategy for conducting a job analysis." Aamodt, *I/O Psychology: An Applied Approach*, 49, 54 (2016) (Ex. 41.).

**3. Dr. Dunleavy did, in fact, use multiple methods and verify his responses.**

Plaintiffs' claims that Dr. Dunleavy should have (but did not) use "multiple methods" and "verify answers he received from the small set of incumbents" are wrong on both scores. (Pls.' Br. 39, 46.) Dr. Dunleavy employed numerous methods: he reviewed relevant materials, he conducted subject matter interviews, he performed a pilot study, and he conducted incumbent interviews. (Pls.' Ex. 2 at 10-15 (Work Analysis Rpt).) Dr. Dunleavy also employed verification techniques, including "project[ing questions] on a large . . . digital monitor so interviewees could follow along" and "transcrib[ing responses] in real-time" so interviewees could "correct and/or clarify the information captured to ensure their responses were recorded accurately." (*Id.* 28.)

This is precisely the kind of verification described in Plaintiffs' own authorities.[38]

**4. Dr. Dunleavy's process of generating taxonomies was reliable.**

After Dr. Dunleavy gathered information from the structured interviews, a team of two I/O psychologists coded the responses to the open-ended questions and came to consensus on the categories or taxonomies. (Pls.' Ex. 2 at 36-37 (Work Analysis Rpt.).) This methodology of asking open-ended questions and generating taxonomies from the responses, *i.e.* an inductive approach, is well-accepted in I/O Psychology. (*Id.* at 37 (citing Paul M. Muchinksy & Satoris S. Howes, *Psychology Applied To Work*, 76 (2019)). Dr. Dunleavy's approach also was consistent with recommendations of Plaintiffs' own expert, Dr. Hough, namely to gather "information about the jobs" in employees' own words, including from "subject matter experts, incumbents, supervisors, using an interview, focus groups to elicit all of the different knowledge, skills, abilities, all the different things that make up the job." (Ex. 9 at 89:25-90:20, 170:21-171:9 (Hough Tr.).)

Despite this, Plaintiffs criticize Dr. Dunleavy for (i) not "using agreed-upon terminology for job incumbents to evaluate"—that is, not using a pre-existing taxonomy—and (ii) using taxonomies with supposedly "overlapping items." (Pls.' Br. 39, 44) Plaintiffs' critiques, repeated from Dr. Hough's report, are off-base.

*First*, Dr. Dunleavy generated his own taxonomy because there was no pre-existing taxonomy suitable for this job analysis. (Pls.' Ex. 3 at 37 (Work Analysis Rebtl. Rpt.).) Plaintiffs' expert Dr. Hough admitted that she could not identify any taxonomy Dr. Dunleavy could have used "without modification." (Ex. 9 at 140:10-20 (Hough Tr.).) Implicitly acknowledging that Dr. Dunleavy had no choice but to generate his own taxonomy, Dr. Hough admitted that O*NET

[38] Sidney Gael, *Interviews, Questionnaires, & Checklists*, 395 (1998) (Pls.' Ex. 21) (interviewers can pose "[v]erification questions," such as, "Did I get this right?").

taxonomies[39] her report insisted Dr. Dunleavy had to use were not "likely or probably appropriate for Goldman Sachs," nor could she identify any other appropriate taxonomy. (*Id.* at 170:9-13.).

*Second*, Dr. Dunleavy's process of generating taxonomies was reliable and supported by recognized academic literature. Consistent with this literature, two I/O psychologists independently came to a consensus when coding responses to generate the taxonomies. *See, e.g.*, Shari Seidman Diamond, *Ref. Guide on Survey Research*, 413 (2011) (Ex. 42) (recommending that "[t]wo trained coders should independently score the same responses to check for the level of consistency in classifying responses"). In addition, a panel of five I/O psychologists performed linkage ratings between the final set of unique skills, abilities, and personal attributes and commonly used definitions to further ensure reliability. (Pls.' Ex. 2 at H-2 (Work Analysis Rpt.).)

*Third*, as Dr. Hough acknowledged, developing taxonomies with no overlap is "almost impossible to achieve." (Ex. 9 149:7-150:10 (Hough Tr.).) Dr. Hough admitted that the O*NET taxonomy she espoused had "some overlap." (*Id.* at 149:21-150:10.) Moreover, Plaintiffs' purported evidence that Dr. Dunleavy used overlapping taxonomies proves no such thing. For example, Plaintiffs argue that cognitive reasoning and inductive reasoning are incorrectly listed as separate, but Dr. Hough's own preferred taxonomy, O*NET (*Id.* at 138:15-139:2; 142:18-20 (Hough Tr.)), agrees that they are distinct. (Ex. 7 at 184:21-18 (Dunleavy Work Analysis Tr.)).

**5. There is no evidence that Dr. Dunleavy's questions were ambiguous or misunderstood.**

Plaintiffs say that Dr. Dunleavy's Work Analysis contained a "fatal" "ambiguity." (Pls.' Br. 44.) In particular, Plaintiffs speculate that the Goldman Sachs professionals interviewed by

[39] The Occupational Information Network (O*NET) is a database of occupational characteristics and worker requirements commonly used by I/O psychologists. *See O*NET*, DEP'T OF LABOR < tinyurl.com/2pf2ms85 >. Dr. Dunleavy considered using the O*NET taxonomy but found that as to Goldman Sachs, it was both overinclusive (e.g., arm-hand steadiness) and underinclusive (e.g., knowledge of underwriting). (Pls.' Ex. 3 at 38-40 (Work Analysis Rebtl. Rpt.).)

Dr. Dunleavy might have been confused about what the word "team" meant in the single question: "How often do you accomplish your work as part of [a] team?" (*Id.*) This criticism is meritless. Setting aside that there is no basis to think that any respondent mistakenly believed they were being asked whether they were part of "a brood [] of young pigs or ducks," *Merriam-Webster Dictionary* (defining "team") < tinyurl.com/yh4fzx6j >, as opposed to whether they work with others in "a group" at Goldman Sachs, *id.*, Dr. Dunleavy took steps to ensure that respondents understood the questions. During the pilot interviews, "each interviewee was asked whether the questions were clear, understandable, used appropriate wording, and also asked whether they had any suggestions for improvement." (Pls.' Ex. 2 at 28 (Work Analysis Rpt.).) Dr. Dunleavy and his team also "observed [the interviewees] for any difficulties with the questions" and "probed for the source of any such difficulties" to fix the questions, if needed. (*Id.*) During the interviews, not a single interviewee indicated they were confused or unable to answer the questions that Plaintiffs criticize. (Ex. 7 at 141:20-23, 176:3-12 (Dunleavy Work Analysis Tr.).)

**B. Dr. Dunleavy's sample was adequate in size, was representative, and had a sufficient response rate.**

Plaintiffs nitpick Dr. Dunleavy's sampling methodology—claiming inadequate sample size, a low and unexamined response rate, and a non-representative sample—and fault him for conducting interviews in 2019 during merits expert discovery. (Pls.' Br. 38-39, 47.) Plaintiffs' criticisms ignore the academic literature, case-law, and practical constraints. And, to the extent Plaintiffs hint that these supposed lapses had the potential to "bias" the results of Dr. Dunleavy's analysis (Pls.' Br. 39), not one of Plaintiffs' experts has asserted (let alone demonstrated) that Dr. Dunleavy's analysis actually was biased.[40]

[40] Plaintiffs also fail to identify any evidence to support their conclusory assertion that Dr. Dunleavy "showed little concern for bias." (Pls.' Br. 39 n.34.) In fact, Plaintiffs' own expert,

**Sample Size.** Plaintiffs criticize Dr. Dunleavy for having an "inadequate sample size" but neither Plaintiffs nor their expert, Dr. Hough, cite any sources for this proposition. (Pls.' Br. 47; Pls.' Ex. 8 ¶ 35 (Hough Rpt.).) Dr. Dunleavy conducted 89 structured interviews and included representation across 34% of Business Units. (Pls.' Ex. 3 at 15 (Work Analysis Rebtl. Rpt.).) While there are no "hard-and-fast rules for minimum sample sizes in work analysis" (*id.*), Dr. Dunleavy's 89 interviewee sample is more than double the "minimum sample size of 30 [which] is often used" for wage and hour work analysis studies. Chester Hanvey, *Wage & Hour Law: Guide to Methods & Analysis* 155 (2018) (Ex. 43). Indeed, in *Kassman*, the Court upheld an expert work analysis that included structured interviews of 81 employees. 416 F. Supp. 3d at 262, 270-71.

**Representativeness.** Dr. Dunleavy's sample was randomly drawn from the population of professionals eligible to be interviewed. Further, Dr. Dunleavy performed representativeness testing based on gender, time spent in corporate title, percentage holding advanced degrees, and broad coverage of Business Units. (Pls.' Ex. 2 at 21-26 (Work Analysis Rpt.); Pls.' Ex. 3 at 18-22 (Work Analysis Rebtl. Rpt.).) Dr. Dunleavy also "employed sampling with replacement within gender, corporate title, and Division" meaning "a professional who declined was replaced with another professional of the same gender, holding the same corporate title, and in the same Division in order to maintain the original sample representation." (*Id.* at 16.)

Plaintiffs criticism that Dr. Dunleavy's sample is not representative because "all the female employees interviewed had opted out of this lawsuit" ignores both case-law and reality. (Pls.' Br. 39.) Dr. Dunleavy excluded class members to "avoid improper *ex parte* communication with represented opt-in Plaintiffs," a practice accepted by courts. *Kelly* v. *Healthcare Servs. Grp., Inc.*,

Dr. Hough, testified that she "ha[s] not seen evidence in Dr. Dunleavy's report about [bias]." (Ex. 9 at 291:4-16 (Hough Tr.); *id.* at 281:11-23, 289:19-291:16.)

2015 WL 1737870, at *2 (E.D. Tex. Apr. 10, 2015) (admitting expert report relying on nonparty, current employees as opposed to class members). The relevant literature similarly recognizes practicality restraints, noting that "reasonable compromises [may be] necessary" because "certain members of the class may be inaccessible and therefore cannot be included in the study." Hanvey, 150 (Ex. 43). Courts, too, recognize the role of practicality and accessibility in determining study participants. *See Johnson* v. *Big Lots Stores, Inc.*, 2008 WL 1930681, at *6 (E.D. La. Apr. 29, 2008) (rejecting argument that "survey population is problematic because it consists entirely of . . . opt-in plaintiffs" where expert lacked "access to nonopt-in" employees); *Kelly*, 2015 WL 1737870, at *2 (to the same effect).

The cases cited by Plaintiff are inapposite. In both, a plaintiff-side expert surveyed *class members* who were *told* the survey was being done for a litigation to determine overtime hours worked—meaning that survey respondents had a discernable "self-interest" to "provide answers suggesting labor violations" so they could be compensated. *In re Autozone*, 2016 WL 4208200, at *18 (N.D. Cal. Aug. 10, 2016); *Wallace* v. *Countrywide Home Loans Inc.*, 2012 WL 11896333, at *4-5 (C.D. Cal. Aug. 31, 2012). Here, the interviewees were not told of the litigation and no employee had an incentive to manipulate his or her answers for personal gain.[41] (Pls.' Ex. 2 Appendix D (Talent Advisor Scripts for Contacting Potential Interviewees), E (Structured Work Analysis Interview Protocol) (Work Analysis Rpt.).) This conforms with Plaintiffs' own expert's views on how to safeguard against bias. (Ex. 9 at 298:6-11 (Hough Tr.) ("it's possible" that "one safeguard against participant bias [is to] not to tell participants the purpose of the study.").)

[41] Plaintiffs speculate that the 14 senior employees Dr. Dunleavy interviewed "were likely to know of the lawsuit" and thereby inject bias into the study. (Pls.' Br. 39 n.34.) Plaintiffs cite no evidence of such knowledge, and also fail to explain how senior employees' responses to fact-based questions about the Business Units they oversee—which were used solely to inform the development of the structured interview protocol—would have impacted the results of the study.

**Response Rate.** Dr. Dunleavy's 41.6% overall response rate does not impact the representativeness of the sample. (Pls.' Ex. 2 at 33 (Work Analysis Rpt.).) In fact, such a response rate "exceeds the numbers required by accepted statistical methodologies." *M.O.C.H.A. Soc'y, Inc.* v. *City of Buffalo*, 689 F.3d 263, 270 (2d Cir. 2012) (regarding response rates of 42.2%, 40.7% and 41.6%). Indeed, courts have admitted surveys with drastically lower response rates. *See United States* v. *H & R Block, Inc.*, 831 F. Supp. 2d 27, 34 (D.D.C. 2011) (refusing to exclude a survey with 1.56% response rate and citing other cases where courts have admitted surveys with response rates of 10% or lower); *Univ. of Kansas* v. *Sinks*, 2008 WL 755065, at *4 (D. Kan. Mar. 19, 2008) (admitting survey with 2.16% response rate).

Notwithstanding that Dr. Dunleavy's response rate is not low, a low response rate is "only concerning if respondents differ from non-respondents in a systematic, meaningful way." (Pls.' Ex. 3 at 17-18 (Work Analysis Rebtl. Rpt.) (citing Shari Seidman Diamond, *Reference Guide on Survey Research* (2011).). Unlike in Plaintiffs' two cases (*Wallace*, 2012 WL 11896333; and *Autozone*, 2016 WL 4208200), Dr. Dunleavy did not merely assume there was no nonresponse bias; he examined the patterns among those who declined to participate and "found no systematic patterns." (Ex. 7 at 105:2-4 (Dunleavy Work Analysis Tr.).)

**Timing of Interviews.** Plaintiffs claim that Dr. Dunleavy "did not purport to draw any conclusions about the nature of jobs during the class period, rather than in 2019." (Pls.' Br. 39.) But 2019 was the time period for merits expert discovery, and the limits of the space-time continuum precluded him from conducting his job study during the class period. Plaintiffs cite no support for their assumption that the nature of the jobs in 2019, when the interviews were conducted, is different from the nature of the jobs during the class period. In fact, everyone in the sample was in a Class-Relevant role in 2018 (part of the class period). (Pls.' Ex. 2 at 22 (Work

Analysis Rpt.).) As Justice Ginsburg explained in rejecting a similar argument while on the D.C. Circuit, "categorical rejection" of statistics not "tuned to the proper time" is "not warranted." *Valentino* v. *U.S. Postal Serv.*, 674 F.2d 56, 71 n.26 (D.C. Cir. 1982).

**C. Dr. Dunleavy's opinions are relevant.**

There is no merit to Plaintiffs' claim that Dr. Dunleavy's work analysis is "irrelevant to the questions at issue in this case" because Dr. Dunleavy "does not address . . . Goldman's alleged intentional discrimination of women, or adverse impact of its common performance and promotions systems." (Pls.' Br. 36-37.) Neither *Daubert* nor Rule 702 requires expert testimony to address the ultimate issues in this case. (*See* March 10, 2015 Order at 31 ("It is not necessary for each expert to provide evidence establishing every element of the claim.").)

Instead, expert testimony is relevant, and admissible, where, as here, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Dr. Dunleavy's analysis is undeniably relevant to assessing the claims of Plaintiffs' statistical expert, Dr. Farber, that data can be aggregated across Business Unit and Division because the challenged processes allegedly constitute a "common mode of exercising discretion," and that class members "hold only one of two jobs: Associate or Vice President." (Class Cert. Order at 28 n.11; *see also* Ex. 2 at 56:13-17, 57:16-58:4, 67:21-68:23 (Farber Tr.).) Dr. Dunleavy's work analysis—including his findings on whether professionals holding the corporate titles of associate and vice president in IBD, IMD, and Securities all perform the same roles, and the extent and nature of the variability of roles for professionals holding the corporate titles of associate and vice president—demonstrates that proposed class members "are not similarly situated" and that Dr. Farber's aggregate statistics lack an evidentiary basis. *Kassman*, 416 F. Supp. 3d at 262, 271, 288 (rejecting argument that expert's "individualized job analysis" "should be excluded as unhelpful," where the expert's work analysis

in that case showed that proposed class members "are not similarly situated"); *accord Scott* v. *Chipotle Mex. Grill, Inc.*, 315 F.R.D. 33, 47 (S.D.N.Y. 2016) (Netburn, J.) (denying motion to exclude expert testimony related to job descriptions because evidence regarding the uniformity of plaintiffs' work experiences "is helpful" to questions relating to class certification).[42]

## IV. The Court should find that Mr. Dunn's opinions and testimony are admissible.

### A. Mr. Dunn's opinion on the variety of jobs held by associates and vice presidents is both reliable and relevant.

Plaintiffs seek to exclude Mr. Dunn's opinion that "Associates and VPs at financial services firms such as Goldman Sachs hold a wide variety of non-fungible jobs" (Pls.' Ex. 4 ¶¶ 12-13 (Dunn Rpt.)) by claiming that compensation benchmarking (a widely-used process that Plaintiffs blatantly misrepresent) is unreliable. (Pls.' Br. 49-50.) Plaintiffs offer nothing concrete to back up their claim. Instead, Plaintiffs rely on conjecture—the assertion that compensation benchmarking cannot be trusted because providers are paid for "selling [their] analyses." (Pls.' Br. 51.) That comes nowhere close to justifying Mr. Dunn's exclusion.

*First*, Plaintiffs misrepresent both the facts and the law in claiming that Mr. Dunn's opinion "is not based on any accepted method of evaluating job content" because it supposedly relies solely on the results of compensation benchmarking surveys. (Pls.' Br. 49, 50.) Unlike Plaintiffs' expert, Dr. Yermack, who formed his views about the fungiblility of jobs at financial services firms based on his recollection of anecdotal conversations with colleagues and former classmates (*see* Defs.' Daubert Br. 29-31), Mr. Dunn formed his opinions based on his 35 years of experience as a compensation consultant (17 years of which were dedicated solely to financial services firms).

---

[42] Plaintiffs argue in a footnote that two studies in Dr. Dunleavy's job-relatedness report should be excluded because he relies on production data used by Dr. Shaw. (*See* Pls.' Br. 36 n.30.) This argument is meritless for the reasons explained at pp. 9-18. Moreover, I/O Psychology authorities support the use of production metrics in validity analyses. *Principles for the Validation & Use of Personnel Selection Procedures*, 29 (2018) (Ex. 44); EEOC Uniform Guidelines § 14(b)(3).

Beyond this, he reviewed case documents, public documents concerning the financial services industry, Goldman Sachs' compensation guidelines and numerous manager declarations. (*See* Pls.' Ex. 4 ¶¶ 1, 4, 29-33, App'x B (Dunn Rpt.).) This is far more than sufficient facts, data, and experience to support expert testimony. *See Henkel* v. *Wagner*, 2016 WL 1271062, at *10 (S.D.N.Y. Mar. 19, 2016) (Nathan, J.) (executive compensation expert qualified to testify based on "independent research, [his] first-hand experience within the search industry, and information" that "provided insights into compensation practices"); *see Veleron Holding, B.V.* v. *Morgan Stanley*, 117 F. Supp. 3d 404, 447 (S.D.N.Y. 2015) (McMahon, J.) (expert with decades of experience in the financial services industry qualified to opine on industry standards).

*Second*, Plaintiffs claim that Mr. Dunn "presumes that discrimination never exists because any pay difference means a job difference." (Pls.' Br. 50.) Not so. Mr. Dunn's opinion does not assume that a pay difference between *individual* professionals means that they are performing different jobs; instead, he interprets different *market rates* between categories of jobs—which are measurable across various firms throughout the industry—as evidence that different jobs exist. (Pls.' Ex. 4 ¶ 38 (Dunn Rpt.) ("While there is certainly variation in compensation among professionals *within* each job . . . different jobs have different market rates.").) Plaintiffs offer no explanation as to how gender discrimination could possibly lead to measurably different industry-wide market rates that correspond to distinct job functions.

*Third*, Plaintiffs parrot Dr. Yermack's baseless opinion that compensation benchmarking firms cannot be trusted because they have a "financial incentive (selling more analyses) to slice the comparisons into small units." (Pls.' Br. 51.) Like Dr. Yermack, Plaintiffs offer no evidence for this nonsensical conspiracy theory.[43] Nor do Plaintiffs offer any explanation of how or why

[43] Dr. Yermack's only purported basis for this allegation, aside from his claim that it is "almost

compensation consulting firms would be more highly compensated for fabricating a higher number of job categories. That glaring omission is not surprising because, as Mr. Dunn explained, compensation consulting firms "have a financial incentive to provide valuable services to their clients," which are led by sophisticated employees who would not invest time and resources in a process if it did not provide useful information. (Ex. 15 ¶¶ 58-59 (Dunn Rebtl. Rpt.).)

*Fourth*, Plaintiffs complain that the job categories recognized by compensation benchmarking "are exceedingly narrow; going so far as to, for example, segregate employees of Goldman Sachs' Fixed Income, Currencies, and Commodities subdivision into 546 distinct job categories." (Pls.' Br. 51.) But Mr. Dunn does not opine that employees of Goldman Sachs' FICC sub-division perform 546 distinct jobs; rather, he reports that revenue-producing associates and vice presidents in Goldman Sachs' entire Securities Division (which includes the FICC sub-division) in 2017 were divided into 81 and 96 job categories, respectively. (Pls.' Ex. 4 Exhibit 1-A (Dunn Rpt.).) Moreover, Plaintiffs' complaints about Mr. Dunn's conclusions are not grounds for excluding them. *Pfizer*, 819 F.3d at 662.

*Fifth*, Plaintiffs claim that compensation benchmarking is unreliable because it differs from the job analysis conducted by Dr. Dunleavy, which Plaintiffs concede is "an accepted method for assessing similarities and differences between jobs." (Pls.' Br. 52.) But Plaintiffs make no effort to explain why the existence of one acceptable methodology renders all others invalid. It does not.

Notably, Plaintiffs' attacks on the compensation consulting industry are undermined by their own experts, who have extolled the value of compensation benchmarking and even relied on it elsewhere in offering their own expert opinions. Dr. Wayne Cascio testified that job distinctions

---

self-evident," is a single article that does not support his theory. (Ex. 11 at 227:5–22; 230:11-20 (Yermack Tr.).) That article simply says that, "to win assignments, [a consulting firm] needs to appear to have expertise." Ruth Bender, *Exec. Comp. Consultants*, 12 (2011) (Pls.' Ex. 31).

in compensation surveys reflect actual job differences and acknowledged that survey companies "try to get away from the job titles and focus on the actual work that people do." (Ex. 12 at 251:25-252:4 (Cascio Tr.).) In fact, Dr. Cascio even touted the usefulness of benchmarking data, observing that "pay surveys are used virtually by every organization," that "companies depend on this kind of competitive intelligence in order to ensure that they are paying going rates," and that "[compensation] surveys themselves are absolutely critical to the success [sic] operation of virtually any firm." (*Id.* at 245:3-13, 249:2-14.) And Dr. Hough relied on compensation benchmarking in a prior case and agrees with Mr. Dunn that the "determination that a job is sufficiently similar to a benchmark job is based on a comparison of the knowledge, skills and abilities required in a job, responsibilities/complexity of the work, discretionary authority, work context and other characteristics of the benchmark job and job in question." (Ex. 16 ¶ 25 (Hough 7/23/21 Decl. in *Ellis* v. *Google*, CGC-17-561299 (Cal. Sup. Ct.)).)

**B. Mr. Dunn's opinion concerning "pay for performance" is relevant.**

Plaintiffs wrongly challenge Mr. Dunn's second opinion—that financial services firms like Goldman Sachs must "structure compensation in order to attract, retain, and create incentives for high-performing talent," which "necessarily requires financial services firms to assess their employees' performance" (Pls.' Ex. 4. ¶ 14 (Dunn Rpt.))—as irrelevant to the disputed issues. (Pls.' Br. 50, 53.) Goldman Sachs offers Mr. Dunn's opinion to demonstrate that it is universal and necessary industry practice to evaluate performance "by examining metrics generated in the ordinary course of business, such as the sales or revenues generated by the individual," and to compensate professionals accordingly. (Pls.' Ex. 4 ¶ 62 (Dunn Rpt.).) As Mr. Dunn opines, "the use of performance evaluation processes" such as a 360 review process "is widespread in the financial services industry." (*Id.* ¶ 63.). This opinion relates directly to Goldman Sachs' defense that it has a business necessity for its performance assessment processes.

Plaintiffs also are wrong that that Mr. Dunn's opinion cannot support business necessity because it concerns industry practice rather than the three challenged processes. (Pls.' Br. 53.) As Judge Francis has recognized, "industry practice concerning compensation might ultimately be relevant, for example, to support a business necessity defense." (March 10, 2015 Order at 36-37.) Courts in this Circuit have permitted similar industry practice testimony to evaluate the reasonableness of a defendant's compensation practices. *See EEOC* v. *Morgan Stanley & Co.*, 2004 WL 1542264, at *2 (S.D.N.Y. July 8, 2004) (Berman, J.) (reversing exclusion of compensation expert who "explains how legitimate business reasons motivate financial service firms to adopt the type of compensation system that Morgan Stanley uses").

## CONCLUSION

The Court should deny Plaintiffs' motion to exclude the reports and testimony of Goldman Sachs' experts.

Respectfully submitted,


*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
Sharon L. Nelles
Ann-Elizabeth Ostrager
Hilary M. Williams
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

Amanda Flug Davidoff
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
(202) 956-7500

Barbara B. Brown (*admitted pro hac vice*)
Carson H. Sullivan (*admitted pro hac vice*)
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C. 20005

Patrick W. Shea
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166

*Attorneys for Defendants*
*Goldman, Sachs & Co. and*
*The Goldman Sachs Group, Inc.*


September 10, 2021