# Exhibit 03

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
H. CRISTINA CHEN-OSTER; LISA PARISI;
and SHANNA ORLICH,
Plaintiffs,
- against -
GOLDMAN, SACHS & CO. and THE GOLDMAN
SACHS GROUP, INC.,
Defendants.
CASE NO.: 10-cv-06950 (LBS)(JCF)
---------------------------------------X

* * * C O N F I D E N T I A L * * *

250 Hudson Street
New York, New York
July 10, 2013
9:40 a.m.

DEPOSITION of CAROLINE HELLER SBERLOTI, pursuant to 30(b)(6) Notice, before Sophie Nolan, RPR, a Shorthand Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Attorneys for the Plaintiffs
250 Hudson Street
New York, New York 10013
BY: RACHEL GEMAN, ESQ.
PHONE 212-355-9500
FAX 212-355-9592
E-MAIL rgeman@lchb.com

OUTTEN & GOLDEN, LLP
Attorneys for Plaintiffs
3 Park Avenue New York, New York 10016
BY: CYRUS E. DUGGER, ESQ.
PHONE 212-245-1000
FAX 646-509-2060
E-MAIL cdugger@outtengolden.com

A P P E A R A N C E S: (Cont'd)

SULLIVAN & CROMWELL, LLP
Attorneys for Defendants
125 Broad Street
New York, New York 10004
BY: SUHANA S. HAN, ESQ.
PHONE 212-558-4647
FAX 212-558-3588
E-MAIL hans@sullcrom.com

PAUL HASTINGS, LLP
Attorneys for Defendants
875 15th Street, N.W.
Washington, DC 20005
BY: CARSON H. SULLIVAN, ESQ.
PHONE 202-551-1809
FAX 202-551-0209
E-MAIL carsonsullivan@paulhastings.com

ALSO PRESENT:
MARTIN L. SCHMELKIN, ESQ.

[redacted]

[redacted]

[redacted]

MS. SULLIVAN: Objection, vague.

A. So, for traders, production would refer to their P&L and for salespeople it would refer to sales credits.

Q. What about for strategists or researchers?

A. Some of those groups don't have any production associated with their names.

Q. And would you say about what -- about what percent of the Securities Division employees at the associate and VP level are sales or traders?

A. Can you clarify what you mean?

Q. Sure. Of the associate level and vice president level employees in the Securities Division, about what percent are in sales or trading positions as distinct from strategy or research positions?

MS. SULLIVAN: I'm going to object as vague and compound.

A. I'm going to ballpark it, 70 percent.

Q. And of the remaining approximately 30 percent, would you say, how are they divided?

A. Maybe 20 percent in -- or 15 percent in strats and 5 percent in prime brokerage kind of roles, 5 percent in management or administration.

Q. And for those in prime brokerage roles, what's the key performance metric, if any?

A. So some of the -- this is where it gets complicated. Some of the prime brokerage folks are salespeople, so they would have sales credits. Some of them are securities lending traders so they would have trading and then a smaller subset would fall into groups such as capital introductions or other things where they wouldn't have a specific P&L metrics.

Q. Would they have any performance metrics?

A. Everybody has the 360 review and the manager quartile and then there would be metrics that a business could decide to look at. So in terms of -- you know, as an example, capital introductions is a business where you introduce investors to hedge funds looking to raise money. So they would evaluate the quality of their relationships or the feedback

they've gotten from clients or different business metrics like those. We didn't cover investing which would be another bucket. So if you want to slice a small percentage off the 70 and put those into investing roles, and those people would also have P&L information.

Q. That's revenue-producing information?

A. Yes.

Q. Okay. We'll come back to that. Is the executive committee, the executive/compensation committee, the committee that handles promotions from the vice president at the MD level?

MS. SULLIVAN: Objection, vague.

A. The promotions from vice president to MD are not, I guess, handled by a committee.

Q. Okay.

A. The -- there's a process.

Q. Is there any promotions committee?

A. There's a cross-ruffing team.

Q. And does the executive committee address or have responsibility for the performance, the FRS system or the performance evaluation?

MS. SULLIVAN: Objection, vague.
A. HCM facilitates the process of FRS. I'm not sure -- can you clarify what you mean if they have responsibility for the system?
Q. Well, I can ask the question a different way. Are there any Securities Division-specific policies relating to the firm-wide review system?
MS. SULLIVAN: Objection, vague.
A. So there are nuances, small nuances in the FRS system that can vary by division and I don't think we'd get those approved at the executive committee level. We might discuss them with the COO or other business heads to get a feeling, but there's not a formal process for the executive committee or compensation committee to get involved in the system details of FRS.
Q. And even beyond, literally, the system like who inputs what and what the screens look like or what have you, is the executive committee in the Securities Division involved in setting policy for performance reviews?
MS. SULLIVAN: Objection, vague.

unit, function MD

Q. Title and gender?

A. They would know the gender of the individuals.

Q. All right. So then you said the cross-ruffer teams meet?

A. Yes.

Q. And so then what happens then?

A. The FICC teams and Equity teams meet separately. We've assigned the captain. Each team has a captain. The captain, in conjunction with HCM, would assign candidates to individuals cross-ruffers.

Q. And then what happens?

A. The cross-ruffers would conduct interviews on the candidates that are assigned to them with the managing directors and partners that have interaction with that candidate and knowledge of their activities.

Q. And they don't interview the candidate him or herself; correct?

A. Correct.

Q. Are there any guidelines or template questions that the cross-ruffers use in their interviews with the managing directors

and partners who have worked with a candidate?

MS. SULLIVAN: Objection, vague.

A. The cross-ruffers attend a cross-ruffing best practices workshop and they also use a questionnaire.

Q. And the cross-ruffing best practices workshop is the TAG sponsored workshop; correct?

A. Correct. We also have a Securities Division, like, kickoff meeting with each team where the captain and HCM would talk about best practices that are more specific to Securities.

Q. Are there written documents that are associated with that Securities Division meeting, either materials provided to the attendees or generated by the meeting?

A. We would share the questionnaire form and we would -- that would sort of talk about the criteria because they're consistent with the questions you ask. There's some other administrative stuff that we'd help with, like I think we have a guide for how your assistant should schedule your meetings, things along those lines.

Q. And who makes the questionnaire,

the Securities Division or the firm-wide?

A. There used to be a Securities Division-specific questionnaire. There's now a firm-wide questionnaire, but the detail and nuance you would collect would be really specific to Securities. We also provide for Security specific information on the candidates.

Q. Is that information conveyed during the kickoff meeting?

A. Or subsequent meetings depending on timing.

Q. And, so, when did the firm-wide questionnaire come into effect?

A. I want to say 2010, 2011. I'm not sure.

MS. GEMAN: Counsel, do you know if you've produced the division specific questionnaire and the firm-wide questionnaire.

MS. SULLIVAN: I'd have to check.

+ MS. GEMAN: We'd ask for the production of those materials if they haven't already been produced. And also for the packet of materials given by HCM to

the executive committee in connection with the candidates?

MS. SULLIVAN: I don't know that there was testimony on a packet of materials, but I can look back at the transcript.

MS. GEMAN: Yeah. I mean, there was a discussion of names plus high level statistics.

Q. Do you have a flavor for what -- how long is the questionnaire?

A. I believe it's two pages.

Q. Are the cross-ruffers given any training about interviewing techniques?

A. They're told things like the information you discuss is confidential. You should be probing. Much of that would be discussed at the cross-ruffing best practices workshop.

Q. Is that attended by people across divisions?

A. Yes.

Q. Okay. And then what happens? So there's the kickoff meeting, the cross-ruffers are given the questionnaire and either at that

meeting or subsequent meeting they're given production information. What other information are the cross-ruffers given about the candidates?

A. They're given their quartile and their 360 review for the past two years.

Q. And over what period of time is production information given?

A. I believe they're given the prior year and year-to-date for that year.

Q. Okay. And what about comp. information?

A. No comp. information.

Q. For the employees -- for the vice presidents in the Securities Division who don't have production information like the strats, is anything given in its place?

A. We also give a role description as collected from the manager and some managers may include in that role description discussion about their contribution to the -- their contribution to the P&L of the given unit.

Q. But there's no metric or productivity metric automatically given like desk performance or something?

[redacted]

[redacted]

[redacted]

C E R T I F I C A T E

STATE OF NEW YORK )
)ss.:
COUNTY OF NEW YORK )

I, SOPHIE NOLAN, a Notary Public within and for the State of New York, do hereby certify:

That CAROLINE HELLER SBERLOTI, the witness whose deposition is herein before set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of July, 2013.

------------------
SOPHIE NOLAN