# Exhibit 06

SOUTHERN DISTRICT OF NEW YORK

NO. 10-cv-6950-AT-RWL

H. CHRISTINA CHEN-OSTER, )
SHANNA ORLICH; ALLISON GAMBA; )
and MARY DE LUIS, )
Plaintiffs, )
vs. )
GOLDMAN SACHS & CO. and THE )
GOLDMAN SACHS GROUP, INC., )
Defendants. )
-------------------------------)

***HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY***

THURSDAY, JUNE 3, 2021

Remote Videotaped deposition of MARGARET STOCKDALE, PH.D., beginning at 10:06 a.m., taken by and before Nancy J. Martin, Certified Shorthand Reporter No. 9504, Certified Realtime Reporter. All parties appeared remotely.

Pages 1-234

A P P E A R A N C E S:

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
BY: KELLY DERMODY, ATTORNEY AT LAW
JESSICA MOLDOVAN, ATTORNEY AT LAW
DEVIN WILLIAMS, ESQ.
MICHELLE LAMY, ATTORNEY AT LAW
275 Battery Street
29th Floor
San Francisco, California 94111
Attorneys for the Plaintiffs

SULLIVAN & CROMWELL, LLP
BY: ANN-ELIZABETH OSTRAGER, ATTORNEY AT LAW
MADELEINE BUML, ATTORNEY AT LAW
SAMANTHA R. BRIGGS, ATTORNEY AT LAW
1700 New York Avenue N.W.
Suite 700
Washington, D.C. 20006
Attorneys for the Defendants
-AND-
PAUL HASTINGS LLP
BY: CARSON H. SULLIVAN, ATTORNEY AT LAW
515 South Flower Street
25th Floor
Los Angeles, California 90071
carsonsullivan@paulhastings.com
Attorneys for the Defendants

ALSO PRESENT:

ADAM HEFT, GOLDMAN SACHS

AVIGAIL KIFER, CORNERSTONE

DARWIN NEHER, CORNERSTONE

DAVID WALCK, Legal Videographer
MIGUEL EVAGELISTA, Tech Concierge

at Southern Illinois University. So it would have been prior to 2012. So sometime, I would say, in the aughts, 2000 to 2011 perhaps.

Q. Okay. Are there any textbooks you used since 2011 that cover survey design?

MS. OSTRAGER: Objection.

MS. DERMODY: And that's a bad question.

You're right, Annie. Thank you.

Q. Are there any textbooks that you have used where you used the textbook to teach survey design?

MS. OSTRAGER: Objection.

THE WITNESS: I don't recall, sitting here. I know that I used textbooks on research methods generally, and if the text did not have a chapter on survey design, I probably relied on my own knowledge and past, you know, lectures -- lecture material.

BY MS. DERMODY:

Q. Okay. And -- sorry. What do Ely and Thomas say about diversity frameworks -- diversity climate framework?

A. I would have to review their research.

Q. Isn't it true that Ely and Thomas were actually talking about a case study of three organizations?

A. That's my recollection.

Q. Okay. Have you published any papers on diversity climate?

A. Can I look at my CV?

Q. Sure.

A. I'm stepping over here (indicating). I'm going to get my glasses.

Q. Sounds good.

A. Okay. And this is going to be the same clarification question that we had before. Do you want papers where I have measured diversity climate as part of the research, or do you want papers where I am talking about the development of a diversity climate?

Q. Let's start with the latter.

A. And second clarification question: Do you want empirical studies or maybe, you know, like literature reviews or conceptual papers?

Q. Why don't we take whatever you have where you are describing a diversity climate framework.

A. Well, I'm not sure if I have a framework paper. I can check, but I know I've measured aspects of diversity perceptions. A lot of my work on sexual harassment, for example, would fit in there.

Q. Okay.

A. Well, okay. So Page 20 of my Appendix A, which is my CV, Publication No. 4, "Smith, Gilmer &

Stockdale (2019)" was a framework for understanding workplace flexibility, which is, you know, an aspect of diversity.

Q. In that study, did you apply any framework that has been developed in the literature?

A. Well, we use literature extensively throughout the paper, and I believe -- I'd have to go back and reread that paper -- that then we applied that literature to develop kind of -- what I call "an ecological model."

Q. Did you use the Dortman work in that paper?

A. Dortman?

Q. Uh-huh. Yes.

A. I don't think so.

Q. Okay.

(The witness further reviewed Exhibit 200.)

THE WITNESS: So would you define what you mean by "framework" because I can pick up all sorts of different things, but they may not be relevant to what you're asking.

BY MS. DERMODY:

Q. Well, do you understand what the term "framework" means when referring to climate analysis?

A. Well, I understand that the word "framework" is sometimes model, sometimes theory. So we use those

words slightly differently but sometimes interchangeably.

Q. Okay. Have you used the Dortman framework, or, if you call it "model" or if you call it "theory," whichever term you use, in any of your work?

A. I don't because it's usually not relevant to my work.

Q. Why is that?

A. I focus really mostly on gender issues, and the Dortman model isn't really satisfactory to analyzing gender issues fully. It has some relevant aspects to it, but not fully.

Q. Okay. Do you agree that the Dortman model relates to diversity itself?

A. Yeah, in a general sense.

Q. Okay. Have you ever taught about the Dortman model?

A. When I taught diversity in the workplace, the Dortman model was not published.

Q. And you haven't taught it since it's been published?

A. I haven't taught a workplace diversity course since that's been published.

Q. Okay. And outside of litigation, have you ever been hired to assess employers' diversity

climate?

A. Well, what do you mean by "climate," or "diversity climate"?

Q. It's climate for fairness. It's climate for discrimination.

A. Anything else?

Q. No.

A. Would you consider sexual harassment in that definition?

Q. We can get to that one, but let's put that on hold for a second.

A. So these -- this list of engagements that I just went through, there were climate assessments in some of those engagements, particularly the campus climate survey that I conducted in the mid '90's.

Q. Okay. Since the campus climate survey, are there any other engagements you've had to assess an employer's diversity climate?

A. Yes.

Q. Okay. Please describe.

A. Well, you didn't want me to talk about this before, but it is part of my role at my current university, the service that I perform and grants that I have involves conducting diversity climate surveys of university employees, staff, and students.

Q. Okay. So tell me what you do in your university role with respect to that.

A. Okay. I have conducted at least two, if not more, since I've been at my current institution, surveys of the climate for fairness, discrimination, inclusiveness, belongingness, and so forth.

Q. Okay. And have you used a framework to design that survey?

A. I rely on the published literature for the constructs of interest.

Q. Okay. Did you rely on Dortman?

A. No.

Q. Okay. Even though Dortman publishes in that area?

A. They don't have scales that would be -- you know, to my knowledge. There are very well-established theories and measures and constructs that I use in my research.

Q. Okay. And what research do you rely on?

A. I rely on measures of instability, of microaggression, sexual harassment, and related constructs.

Q. Okay. In the two surveys that you did, were they student surveys?

A. What do you mean by "student survey"?

Q. Who were you surveying?

A. I believe -- well, I know we surveyed faculty, and I think the first one was faculty, staff, and graduate students.

Q. Okay. And the second one?

A. I think just faculty.

Q. And what was the purpose of the first survey?

A. I have to go back and think about that. That was in preparation for a grant that I was part of a team, and we were writing -- we were doing the preliminary research to gather data to support our grant application.

Q. Okay. And how about the second one?

A. So then we got the grant, and the second one was part of the grant activity to get a baseline assessment of diversity -- constructs related to diversity climate, gender particularly.

Q. And what was the population being surveyed? Was it thousands of people, hundreds?

A. Which survey?

Q. The faculty -- the second one you're talking about.

A. The second one. Well, the population would have been all faculty, and I might have put a little caveat on that because I don't recall if we included

your report that you're following?

A. Well, to the extent that my whole framework is to respond to Dr. Goldberg's report. The report on her framework.

Q. Okay. But you don't actually say anywhere in your report that you're applying a specific OTSH framework; correct?

A. It was assumed that because I --

Q. I'm sorry. You don't say it though; correct? "Yes" or "no"?

A. I don't believe so.

Q. Okay. And you don't apply the Dortman framework in your report; is that correct?

A. I did further than the Dortman framework in my report.

Q. But you don't apply Dortman itself; is that correct?

A. And to the extent that I am responding to the work that Dr. Goldberg did, using the Dortman framework, I have looked at my -- the data in that regard and some.

Q. But you don't say anywhere in your report that you're applying the Dortman framework; is that correct?

A. As I said before, it was implied with the act

of responding to Dr. Goldberg's report.

Q. Can you point to me anywhere in your report where you say, "Under the Dortman framework I find 'X'"?

MS. OSTRAGER: Objection.

THE WITNESS: No.

BY MS. DERMODY:

Q. Okay. And do you know what the "case study method" is?

A. Yes.

Q. And what is it?

A. Well, there are methods. It's not just a method.

Q. Okay. What's your understanding of the case study -- I'm sorry -- method or methods?

A. Case studies are a form of qualitative research where you are doing in-depth examination of a company -- of an organization or some other unit of the case. It could be even a case study of a person, for example, but it's an in-depth examination of that case, or it can sometimes involve comparison cases.

Q. Okay. And when -- have you used the case study method for any purpose?

A. I use it in my litigation work in a sense, yes.

Q. Okay. And do you teach on the case study method?

A. I include discussion of the case study method and other qualitative research in courses that I've talked about before teaching on qualitative methods.

Q. Why --

REPORTER MARTIN: I'm sorry. I didn't hear --

THE WITNESS: Why do I teach it?

MS. DERMODY: Uh-huh.

Was someone talking? I'm sorry.

REPORTER MARTIN: I didn't hear the last part of the answer. ..."talked about before teaching on" something methods.

THE WITNESS: If you can repeat the question, I can recall an answer.

REPORTER MARTIN: That's okay. You just trailed off briefly for that one word, but I'll go back to the audio and check it.

THE WITNESS: May I ask, was I talking over somebody or not clear on my speaker, if I need to make an adjustment.

REPORTER MARTIN: It was just that one word. For some reason you faded out briefly.

THE WITNESS: I'll be more careful about

that.

BY MS. DERMODY:

Q. Okay. And why do you teach the case study method?

A. As an example of different ways of doing qualitative research.

Q. Is the case study method an accepted form of performing research?

A. Again, they're methods, and any research is subject to its -- you know, its quality, but it doesn't -- well done research -- case study research is in the published research, yes.

Q. Okay. In this case you worked with Cornerstone Research; is that correct?

A. That's correct.

Q. What was Cornerstone's role?

A. So Cornerstone worked at my direction to -- on a variety of things. For example, identify documents and organize those documents into files so that I can review them. They helped with the production of the report, exhibits, appendices, and so forth.

Q. Did they write any of the report?

A. At my direction.

Q. What parts did they write?

A. Well, everything was written by me in draft form, and they added some, you know, verbiage that would relate to some of the -- you know, put in the form that was as you see it now. But all the concepts, all of the thinking, all of the, you know, conclusions were my -- was me.

Q. Okay. I'm going to go to Exhibit 200, if we could.

A. And that's my full report; correct?

Q. Exactly. Sorry. Yes, your report.

A. Do I need to write that on here?

Q. Only if it helps you remember what 200 is. I wrote it on my own for that reason.

A. I'll do that. Exhibit 200. Okay.

Q. And is Exhibit 200 your report?

A. Let me look at it real quickly.

(The witness reviewed Exhibit 200.)

THE WITNESS: I'm just making sure it's complete. I'm just making sure it's complete.

(The witness further reviewed Exhibit 200.)

THE WITNESS: Yes.

BY MS. DERMODY:

Q. Okay. And this is your report?

A. Yes.

Q. And if you could take a look at the

paragraphs and let me know which ones did Cornerstone Research help draft?

A. I can't do that.

Q. Can you do it with any of them?

A. They were involved throughout the report. It's not like I wrote one paragraph and they wrote another. I wrote the drafts. We -- you know, they would put it into a form. I would review that. I might make suggestions for, you know, rewording things or if I just -- if there was something that wasn't accurately conveyed, I corrected it. So that was throughout the whole report.

Q. Are there any paragraphs that you can look at and say, "They drafted that"?

A. I think I just explained exactly how it worked. The whole report --

Q. I understand you said how it worked, but if you can look at your report, are there any paragraphs, if you were to look at your report, that you can say Cornerstone drafted?

A. No. They didn't draft anything. I drafted it.

Q. Is it fair to say you did not draft every single word in here? Some of these words are drafted by Cornerstone?

A. At my direction.

Q. They wrote words -- you didn't give them a transcript; correct?

A. Well, that's correct.

Q. Okay. So they came up with a sentence on their own; is that correct?

A. To convey what I had wanted to say.

Q. Are there any conclusions in here that Cornerstone drafted originally for you to review?

A. No. All the conclusions are mine.

Q. Are all the -- excuse me.

Did Cornerstone draft any of the discussions of the survey design -- terrible question. Strike all that.

Did Cornerstone draft any of the discussion of the survey design?

A. In the sense of memorializing what we had verbal discussions about what we were doing -- what I was doing.

Q. Who did you work with at Cornerstone?

A. I had a team. Some of the personnel changed over time.

Q. What were the names?

A. I don't remember everybody's name, but the current team is Darwin Neher, Brian Fryd, Avigail

Kifer, K-i-f-e-r, Jerome Williams. I think that's it.
Q. You said that's the current team. Do you recall if there were other folks who were on the team?
A. Previously there was somebody -- I'm forgetting her name -- Thompson -- but she left the firm about a year ago.
Q. Okay. How often did you meet with Cornerstone during this project?
A. It would vary.
Q. Do you know when Cornerstone began working on the project with you?
A. When I was first appointed to the case or signed my consultancy agreement.
Q. So I think you testified earlier that was in 2019 or 2020?
A. Yes.
Q. Okay. And who retained -- or who reached out to Cornerstone to be hired. Was that you?
A. No.
Q. Okay. Was that someone from Goldman Sachs?
A. I really don't know.
Q. Okay. And did you give the assignments to Cornerstone, or did someone else give the assignments to Cornerstone?
A. What do you mean by "give the assignments

to"?

Q. Communicate what Cornerstone's work was to be.

A. Well, I mean as I said, all the work that I did -- that I put into this came from me. I don't know if there was instruction that said, "By the way, you're keeping the time records" or, you know, something like that. I don't have that information.

Q. What was your direction to Cornerstone in connection with the opinions you prepared here?

A. Well, learning more about the facts of the case and the issues at hand and what my assignment was. I developed an outline of the kinds of things I wanted to be able to examine, including Dr. Goldberg's report, and we identified everything that I have listed in my report and all the work that I did.

Q. You were working with Cornerstone before you got Dr. Goldberg's report; correct?

A. Correct.

Q. Okay. And were you working on the People survey issues with them?

A. We were working on, yes, the People survey work.

Q. Okay. And the exit surveys, were you working on that with them?

A. I think so. That we were -- that was part of the data set that we were considering as well.

Q. Okay. Were you working with any other materials with Cornerstone?

A. All of the documents, all of the -- you know, the deposition testimony, the various, you know, documents that have been produced that are relevant to my analysis and what Dr. Goldberg did. You know, all of that.

Q. Did you ask Cornerstone to do any analysis of data that's not contained in your report?

A. What do you mean?

Q. Are there any data analyses you asked them to conduct that you didn't report out?

A. Not in the -- you know, that we might have had -- as you do in research, you know, you have rough drafts, and then you build on that.

Q. Did you do any research on performance ratings at Goldman Sachs with Cornerstone?

A. Only to the extent to see that diversity performance was being measured.

Q. Did you do any tracking to see what trends were in diversity management by gender?

MS. OSTRAGER: Objection.

THE WITNESS: What do you mean by "tracking

diversity management by gender"?
BY MS. DERMODY:
     Q. So did you do any analysis of the performance scores on diversity by gender?
     A. No. That was not relevant to my work in this case.
     Q. Did you ask Cornerstone to do that work?
     A. No.
     Q. You didn't find it to be of interest whether there were gender differences in the ratings on diversity on the performance management system?
     A. No. That's not the purpose of my work in this case.
     Q. Okay. Did you ask Cornerstone to do any analysis of the People surveys that Cornerstone -- that you have decided not to publish?
     A. What do you mean by "publish"?
     Q. That you found the results and did not report them out.
     A. No.
     Q. Okay. Did you ask Cornerstone to do any work that Cornerstone did not do?
     A. Not that I recall.
     Q. Okay. Was Cornerstone already working on this project before you were retained?

A. What do you mean by "this project"?
Q. Was Cornerstone already analyzing the People survey data before you were retained in this case?
MS. OSTRAGER: Objection.
THE WITNESS: I don't believe so.
BY MS. DERMODY:
Q. Do you know if Cornerstone was already retained before you were retained?
A. For the purpose of work that I did on this --
Q. Just in general. Do you know if Cornerstone was retained before you or after you?
A. I believe they've been retained before me, yes.
Q. Okay. Do you know if Cornerstone had materials in the case before you were retained?
MS. OSTRAGER: Objection.
THE WITNESS: It would all be speculation, but I -- I know that they had access to all of the production.
BY MS. DERMODY:
Q. Okay. When you were retained in the case, did you meet with Cornerstone sometime after you were retained?
A. Yes.
Q. Okay. And in that meeting, did Cornerstone

share with you that it already had done an analysis of People survey data?

A. No.

Q. Had Cornerstone already done an analysis of exit survey data?

A. No.

Q. Had Cornerstone already received that data?

A. That would be speculation, but my assumption is that they have all of the production.

Q. Did Cornerstone share with you the results of any analysis they had done in the case when you first met with them?

A. No.

Q. Okay. Do you have, in writing anywhere, your direction to Cornerstone about what Cornerstone would do in connection with your opinions here?

A. I believe our discussions were all verbal.

Q. Do you know if anyone else gave Cornerstone direction about what to do in terms of reviewing the People survey data?

A. I don't believe so.

Q. Was anyone besides you and Cornerstone at the meetings about the Cornerstone work?

A. Well, I mean that's broad. What do you mean by "the Cornerstone work"?

Q. The Cornerstone People survey data work. Did anyone attend those meetings besides you and Cornerstone?

A. Okay. Again, in terms of defining that the scope of those analyses would be -- I'm trying to get a clarification on what you mean by "meetings."

Q. Sure.

A. No.

Q. Okay. And -- sorry.

Are you thinking of any other meetings where there were other people that were there besides you and Cornerstone?

A. Well, there were -- I mean we met all the time, and sometimes we met with counsel, you know, talk about big-picture things but not about how we're going to analyze the data. That was done -- that was under my direction in collaboration with Cornerstone.

Q. How many hours did Cornerstone bill to this project?

A. No idea.

Q. Do you know what their billing rate is?

A. No.

Q. Given they were doing this work at your behest, are you able to get from them an estimate of how much time they spent on this project?

A. I suppose I could ask.
Q. Do you have any estimate at all as to number of hours? Was it more or less than yours?
MS. OSTRAGER: Objection.
THE WITNESS: I have no basis to be able to answer that question.
BY MS. DERMODY:
Q. Cornerstone didn't bill you; is that correct?
A. Meaning?
Q. They didn't send their bills to you. They weren't working for you; correct?
A. They did not send their bills to me.
Q. Okay. Did you do anything to verify the accuracy of their work?
A. Specify what you mean.
Q. Did you double-check the tabulations in any way, spot-check or quality control?
A. I reviewed all of the results, and they spot-check, you know, things for me because, you know, there was some times, like with the qualitative analysis, we wanted to make sure we got the coding right. So we did that kind of work.
Q. Did you check to see if their coding was right?
A. I did the coding.

Q. Did you check to see that their counts were correct in the tabulations?
A. Yes.
MS. OSTRAGER: Objection.
BY MS. DERMODY:
Q. When you said, "check," I'm not sure what that means. What does "check" mean?
A. Well, I did the coding and kept the spreadsheet, and then they would do the analysis, and I compared those two sources.
Q. Did they do any of the coding themselves?
A. No.
MS. OSTRAGER: Objection.
BY MS. DERMODY:
Q. In your report you've listed your history as an expert in the last four years, and thank you for correcting me earlier. It's Paragraph 3 of your report. That's Exhibit 200.
If I'm paraphrasing your Paragraph 3 correctly, you list three sex discrimination cases and one age case; is that correct?
MS. OSTRAGER: Objection.
THE WITNESS: Generally speaking, yes.
BY MS. DERMODY:
Q. Okay. Are there any other cases that you

didn't reference there, things that happened more recently, perhaps?

A. Not more recently, no.

Q. Okay. I want to briefly try to get a sense of what these other cases are. So let me start with E.E.O.C. v. GMRI. Is that the age discrimination case?

A. Yes.

Q. Okay. And what was your -- is that a class case or individual case?

A. E.E.O.C. matter. So, you know, pattern and practice, I believe.

Q. Okay. And what was the claim there?

A. The claim was that the Season 52, one of the imprints of GMRI was discriminating against people over 40 in their -- I can't remember if it was front and back of house or just front-of-house positions, the restaurant working positions.

Q. Okay. And what was your role as an expert in that case?

A. I served as a rebuttal witness.

Q. Okay. And what type of opinion were you assessing?

A. That the -- it's been a while, but my recollection is that the opinion referred to the

testimony in this case?

A. I was present for the deposition of Caren Goldberg last week or so. That's the only expert in the current -- no, that's the only one I read, listened to.

Q. Have you been given a transcript of any of the others?

A. I don't believe so, no.

Q. Okay. Outside of this case, are you familiar with Dr. Goldberg's work?

A. Yes.

Q. And do you have an opinion of her professionally?

A. Well, I have an opinion of her academically, and I have an opinion of her as in the two cases that I worked on the same matter. They're different opinions.

Q. Okay. What's your opinion of her academically?

A. Academically, she's published in respectable journals, and I have no reason to question that work.

Q. Okay. Outside of this case, are you familiar with Sarah Butler's work?

A. No, I'm not.

Q. Do you have any opinion of her

professionally?
A. Only to the extent that her work that she did in this matter I don't believe is of high quality.
Q. Okay. Do you have any reason to doubt her qualifications in the field of survey design?
A. She says what she says. I haven't -- I don't know -- I don't know if she has publications or not. I haven't seen that. It could be there. I'm not sure. I haven't seen her present at professional conferences.
Q. Do you have an understanding of how many women are involved in this class action?
A. Several thousands.
Q. Do you know whether this case involves women worldwide or if it's limited geographically?
A. U.S.
Q. Okay. And do you know what positions?
A. Well, I mean there are titles, but the depositions can be -- you know, there's many positions, but the associate and VP roles in the general sense, and IMD, IBD, and securities.
Q. Okay. Do you have an understanding of the representation rates for the men and women at the associate level in the class?
A. At which time period?

Q. At any time period.
A. Yeah. I have -- I've got that in my report.
Q. Okay. And what's that understanding?
THE WITNESS: May I look at my report.
MS. DERMODY: Sure.
(The witness reviewed Exhibit 200.)
THE WITNESS: Well, it's going to be tucked away in a footnote. So give me a minute.
(The witness further reviewed Exhibit 200.)
THE WITNESS: I would need to, you know, go into my electronic version of my backup report to get to the footnote that I'm hunting for. I understand that that's not -- you know, I'm not allowed to look at my notes on that.
BY MS. DERMODY:
Q. You can do that at a break if you want to try to ferret that out. Thank you for offering.
Let me go to -- oh, yeah. Are you employed by the university now?
A. "The university"? Which university?
Q. By -- is it Indiana?
A. So it's complicated. I am employed by Indiana University, and I work on the Indiana University, Purdue University, Indianapolis campus, otherwise known as IUPUI.

Q. And is your current title "professor"?
A. Correct.
Q. Okay. Did you work with anyone at the university -- I'll call it "the university" if that's okay -- on the report that you drafted here?
A. No.
Q. Did you speak with anyone at the university about your conclusions in the report you drafted?
A. No.
Q. Did you have any staff, besides the Cornerstone team, working with you on the report?
A. I have an associate.
Q. Okay. Who is that?
A. My husband, Michael Heck.
Q. Okay. And what was his role on the project?
A. He was the bill keeper, but substantively, he was my second coder when we were doing the content analyses.
Q. And did anyone else assist with that work?
A. The coding?
Q. Yes.
A. In the coding, no. It was just the two of us.
Q. And was he one of the individuals, besides yourself, who developed the coding?

A. No. Well, what do you mean "developed"?

Q. You just said he was a second coder. Tell me exactly what he did.

A. So as I detail in my report, I had developed a set of kind of broad categories that were relevant to the case matter, and we took a sample of -- a random sample of People survey clients, independently read them, and decided which of those categories -- and it could be more than one category, that comment was related to. And then also for tone, what the tone was of the comment.

Q. So each of you looked at some aspect of the sample and coded; is that correct?

A. We both looked at the same, exact set of comments independently -- I was upstairs. He was downstairs -- coded each comment, and then we compared our results and discussed --

Q. Okay. And if you had different results, then what happened?

A. We would discuss it and say, "What did you read into this comment? What do I read into it?" And to the extent that we needed clarification and that would help to build our content dictionary and improve upon the content dictionary so that we had more clarity as to how comments would be coded into

different categories.

Q. How much time did this project take that the two of you were working on?

A. Hours and hours and hours.

Q. Was it over more than a day?

A. Oh, yes.

Q. Was it weeks?

A. Yes.

Q. That sounds fun during Covid. Okay.

A. What else are you going to do?

Q. Yeah. So this was a full-time sort of adventure, this project of taking the sample, going off and reviewing for, you know, many hours in the day and then getting back together and discussing?

A. Well, let me clarify. I have a full-time job, which is not this, but we would spend, on days that we were coding, however much time it took to code the sample that we were working with, potentially 300 at a time.

And sometimes we did that over a few days, you know, maybe in the evening, typically, a couple hours here, couple hours there, but yeah, it would, you know, take several days to get through it.

Q. Okay. And do you have a sense of the time period? Was this in this calendar year? Was it last

year? Do you know when you were doing --

A. It was primarily, I think, last fall.

Q. And do you have a sense of when you started and when you were done?

A. Can I clarify that last answer?

Q. Of course.

A. The content analysis portion was last fall.

Q. Right. I'm trying to get a sense. It sounds involved to an outsider. So you started sometime, would you say, September, October?

A. Well, that's a good guess. You know, I could go back and look at our time sheet and get a better answer for you, but that's a good guess.

Q. Okay. And both of you were working on that project during that same time?

A. Well, yeah. So we would have a set of comments, and he got a spreadsheet, I've got a spreadsheet, and we independently went through it until we were done with our coding. And then we compared our answers and we talked, which you do. That's the sine qua non of qualitative research is that the coders get together and discuss, you know, "How did you see this? How did I see this? How can we clarify this so that it's clear on how to code this."

Q. In your report you offered opinions about Goldman's People survey result; is that correct?

A. Correct.

Q. And did you consider whether the wording of the statements in the People survey would influence the results?

A. Yes. I looked at the wordings of the items. I found them to be typical employment wording surveys.

Q. Do you agree that the People survey is positively biased?

A. No.

Q. Do you know what "positively biased" means?

A. Well, going back to the discussion we had earlier today, whether there was acquiescence, something that would have created an acquiescence bias.

Q. Do you agree that each statement in the People survey is worded in the affirmative?

A. Yes.

Q. Okay.

A. As I would expect it to be.

Q. And do you believe presenting respondents with only statements worded in an affirmative direction makes the survey vulnerable to acquiescence bias?

A. No.

Q. Why is that?

A. There are many advantages to positively worded survey items, some disadvantages, but the advantages outweigh the disadvantages.

Q. That's not the question.

The question is do you agree that having only statements worded in an affirmative direction makes the survey vulnerable to acquiescence bias?

A. No.

Q. Do you agree that social reliability bias or impression management is a relevant concern in a non-anonymous employee survey?

A. I don't believe that's the case here. I saw no evidence of it creating a social desirability bias.

Q. And how would you have seen evidence of that if people were managing impressions in their answers?

A. I just don't see any evidence that -- I mean there were disagreements on items. There were negative comments in the open-ended questions. There was nothing I could find in any other source of data that suggested that it was creating an acquiescence bias or that people who, you know, wanted to appear positive because the survey was identifiable, and that there was sufficient caution in the instructions at

the beginning of each survey about why those data were -- could be used.

Like if they wanted to follow up on a concern raised in the survey, even though that wasn't the primary purpose of the survey.

Q. Is it your opinion that there cannot be social desirability bias if people answer a survey with negative answers?

MS. OSTRAGER: Objection.

THE WITNESS: So my testimony with that, I didn't see any, through my review of the People survey responses, both to the close-ended and the open-ended, or any other source of data, that that was ever a concern raised.

BY MS. DERMODY:

Q. So the -- is it your opinion that if no one raises a concern, that they need to impress to management that therefore there is no impression management bias?

MS. OSTRAGER: Objection.

THE WITNESS: So as I said, looking at all sources of data that I looked at, People survey data, results, the closed-ended, the open-ended, any other information that was relevant, I mean until Ms. Baxter -- Baker, Baxter, I can't remember --

reported that, I saw nothing that would lead me to this conclusion.

BY MS. DERMODY:

Q. And that's based on the fact that no one said they had a concern about impression management; correct?

MS. OSTRAGER: Objection.

THE WITNESS: Again, the pattern of the data in all of -- across all survey periods, the closed-ended, the open-ended, the instructions on the survey itself plus my knowledge of the literature on employee surveys and employee surveys that are, you know, considered identifiable, led me to no worries about -- you know, there could be one or two people, but not as a, you know, pattern across all of the data.

BY MR. DERMODY:

Q. What would you expect to see if there was a social desirability bias that would confirm for you that this was a problem?

A. Well, it could be a number of things. It could be a lack of variance. It could be, you know, a concern raised that, you know -- again, a salient concern raised in the open-ended survey about the survey being identifiable.

Q. So let me start with the second one first. What would be a -- what do you mean by the survey "being identifiable"? You mean a concern being raised that the survey was not anonymous?

A. Right. That something could -- I mean either an exit survey or in the People survey. I mean I think there was like one comment about, you know, being identified, but there was -- that just was not an issue raised.

Q. But did you just say that that's what you're looking for, is someone to say that they're concerned?

A. And I didn't find it.

Q. But you just said you found it?

A. One.

MS. OSTRAGER: Objection.

BY MS. DERMODY:

Q. So how many would you need to see? Would it have to be hundreds? Like how many people have to say that they're concerned about being identified for you to agree that there's a worry about being identified?

A. A lot more than one.

Q. How many more?

MS. OSTRAGER: Objection.

THE WITNESS: Enough for me to feel like there was a concern raised.

BY MS. DERMODY:
Q. Well, I'm trying to get a standard here.
A. I don't have a standard.
Q. Okay. And what does "lack of variance" mean?
A. That there wouldn't be any variation in -- across respondents in how they respond to an item.
Q. I'm trying to understand what that looks like in practice. So if you can pick a hypothetical that doesn't apply to Goldman, if it helps, or Goldman, great. What would that -- what does that mean in that hypothetical?
A. Well, the hypothetical would be -- actually, we're kind of -- we're talking about response bias; right?
Q. Social desirability bias.
A. Social desirability bias.
Well, okay. First of all, in the literature on social desirability bias --
Q. I'm sorry, Dr. Stockdale, I cut you off. I just want to know a definition of lack of variance. If you could --
A. I realize I was kind of going off an a different tangent. I was thinking of positivity bias.
Q. Okay. Do you want to withdraw that as a possible --

A. Yeah, I do.

Q. Okay. Thank you. That's totally fine.

And do you know if the survey responses in Goldman for the People survey are anonymous or not anonymous?

A. My understanding is that they're confidential. There is an identifier so that there's -- the data are not shared at an individual level with, you know, a specific manager, but HCM might, if they see like a complaint of harassment or an ethical violation raised in the survey, they could follow up on that.

Q. They know who the individual is who responded; is that correct?

A. At HCM, in a confidential manner. And it may be just the group that is dealing with, you know, the ER.

Q. I don't need speculation though, Dr. Stockdale. Do you know if that's true?

A. According to the directions that are on the survey, that that would be the purpose of them following up on it.

Q. Do you agree that the People survey was not designed with the purpose to measure perceptions of gender bias?

a list of reasons to leave. You can see Goldman Sachs lists exit survey, and it says, "Please select up to five main reasons/factors which contributed to your decision to leave the firm." And do you see that there's a list below? Do you see anything on that list that offers bias as a reason to leave?

A. There are -- there are -- no, there's not a bias-related category, but I did see the follow-up interviews that were conducted that those kinds of questions could be probed.

Q. Okay. So let's just stick with this document, which is the exit survey.

So on the exit survey there's no question to mark about bias being a -- sorry, an answer to mark about bias being a reason for departure; correct?

A. Not on its face.

Q. Okay. And there's no reason to mark for leaving that says, "unfairness"; is that correct?

A. Not on its face.

Q. Okay. And there's nothing that says just the words "EEO complaint" or words to that effect; is that correct?

A. That is correct.

Q. Okay. And are there any questions on the People survey that directly ask employees anything

about whether they've experienced gender discrimination at Goldman Sachs?

A. Okay. So, again, my analysis is not to measure gender discrimination. So that was not my, you know, concern about the People survey.

Q. Okay. But just to go to the question I asked, which is do you agree that there is no question on the People survey that asks whether employees agree with the statement as to whether they've suffered gender discrimination?

A. There are questions about fairness.

Q. Is there a question about gender discrimination on the People survey?

A. If you're -- which is why I looked into it. If there were questions about fairness, unfairness, and I wanted to know if they were raising concerns about gender discrimination in the qualitative.

So I mean that's a way that many employee surveys are written. This was not an investigation of whether there was discrimination. This was an investigation of culture and whether the culture supports bias or the treatment of women.

Q. Okay. So there's no question on the survey that asks whether employees have experienced gender discrimination; is that correct?

MS. OSTRAGER: Objection.

BY MS. DERMODY:

Q. It's a "yes" or "no" question.

A. It wasn't relevant to my assignment.

Q. Okay. If respondents on a survey do not believe that their answers will make any difference, do survey experts caution that it may cause respondents to be less forthcoming?

A. I certainly didn't see evidence of that here.

Q. Let me again -- so I'm asking a different question, which is if respondents on a survey do not believe that their answers will make a difference, do survey experts caution that it may cause respondents to be less forthcoming? Is that a survey concern that you're aware of?

A. That's not one that -- I'm trying to think -- recall my reading of survey textbooks. You know, that language, I am not seeing.

Q. So you're not aware of the science around employee survey where respondents don't think it will matter what they say; is that correct?

A. Can you point me to what literature you're talking about.

Q. I'm just asking if you know it. You're not aware of that --

A. So in the Butler -- I guess it's the Butler report, she cites to some reference that had no references itself. So I don't -- I can't rely on that as scientific.

Q. I'm asking --

A. That was the only -- that was the only one that I saw that raises this issue. You know, yes, I'm concerned generally about whether people are going to give good answers and the survey is sound. I saw nothing in the construction of this survey or in the responses that made me conclude that it wasn't.

Q. If respondents indicate they don't think responding will make a difference, can it affect the reliability of a survey?

A. Well, again, it would depend.

Q. And what would it depend on?

A. How the respondents -- you know, what their view is, how they're enacting that behavior. You know, I didn't see any evidence of shallow or -- or, you know, untruthful responses to these questions.

Q. How did you measure people's untruthfulness? Did you interview any people to ask them what they really thought?

A. The -- the consistency of the data, if I had seen wildly different, you know, responses to items

that suggest random responding, for example. Didn't see that. The earnestness of the open-ended responses and the way that the company uses People survey data. I mean there may be people who don't think it's being used to address their particular concern, but we know that it is being used and that the firm acts on People survey results. So...

Q. If 40 percent of the employees do not think that responding to a People survey will make a difference, is that number, in your view, a concern for the reliability of the survey?

A. So as I would have said earlier, it's a signal, you know, for me to look at, and then when I look into it, I don't see any other concerns. I don't see random responding on the survey. I don't see disingenuous responses on the open-ended questions. I see one or two responses to that effect, not -- you know, I looked at 1,800. 1 or 2 doesn't make a culture problem.

So that's why I look at these things in a comprehensive manner and not just one data point.

Q. Do you agree that if only 30 percent believe that responding will make a difference, that that's a concern?

A. My answer is the same.

Q. What if it's only 17 percent?
A. My answer is the same.
Q. Okay. Were you aware that in some years one of the People survey prompts was "I am confident that the firm will act on the results of this survey"?
A. That sounds familiar. If I can double-check.
Q. I mean I'm not asking you to confirm it exists. I'm asking if you recall that. Does that sound familiar to you? Is that right?
A. That sounds familiar.
Q. Okay.
A. I'd prefer to be able to answer your question accurately though.
Q. Well, let me ask you a separate question. Did you consider the extent to which employees agreed with that prompt when you were doing your analysis?
A. I saw it as a sign, a signal. Looked into it. Didn't see it was a problem.
Q. Did you look at the difference between male and female answers on that prompt?
A. I looked at male -- differences in male and female answers to all prompts.
Q. And how did you determine whether a response was genuine, your words?
A. Well, again, I'm looking at patterns.

Looking for patterns. Randomness is one. Lack of coherence in, you know, responses to items of a similar nature, and then the open-ended survey. Those would be an example.

Q. You testified earlier you didn't look at individual responses, but you looked at totals. So how did you assess whether one individual was having lack of coherence?

A. Coherence is in the aggregated data.

Q. You were looking to see if there was a lack in the aggregated data, not in individual-level data?

A. Well, I don't have individual level data. So I would have to look at the aggregate. So, for example, you know, high agreement on -- or even if there was -- well, let's say high agreement on -- with one question about diversity and then, you know, really low agreement about another one that's, you know, very similar would be an example of an incoherent finding.

Q. So if a few people were answering with incoherence, you wouldn't pick that up. You'd have to see it at a population level; is that correct?

A. Well, it -- I'm not analyzing these results to get at individual answers. I'm looking at them as data much more comprehensively than Dr. Goldberg did,

A. Sure. Thank you. So it's a signal, and I would look at other data to see if that -- what the signal is telling me. So for this case, I looked at the open-ended responses, my content analysis, my interpretive analysis, mostly to be able to get a sense of what men and women are saying with regard to diversity.

Q. Pardon me. I'm just going to take a look.

(Pause in proceedings.)

BY MS. DERMODY:

Q. And how do you verify whether the signal is -- I'm not sure what the term would be. Is a concern -- where you go from signal to something else? A signal to --

A. Well, in this case, I -- you know, I did a content analysis of both the positive and negative -- I mean the responses to the greatest positive impact and recommendations for improvement, which is, you know, fairly laid out in my report, and, you know, diversity is certainly a theme that I was coding for. It's also a theme I recall that the respondents themselves can say, "My response has to do with diversity." I did that independent of what the respondent did.

And then once we had items -- or codice that

were coded as well as the diversity, I did the interpretive analysis to say what are they saying with regards to diversity. And so that's my interpretive analysis.

Q. So do you contend that no conclusions can be drawn from the fact that at Goldman Sachs women's favorable response rate on diversity prompts is lower than men's?

A. I'm saying, as I think I said, that that's a signal to which I do more thorough research on.

Q. And would there be any number in the signal that itself would be so concerning that even if you found contradictory or explanatory information, you would still find that signal to be probative?

MS. OSTRAGER: Object to the form.

THE WITNESS: Could you restate your question?

BY MS. DERMODY:

Q. What didn't you understand about it?

A. I just actually lost track of it.

Q. Okay. No problem. I can repeat it.

Would there be a number in the signal that itself would be so concerning that, even if you found contradictory or explanatory information, you would still find that number to be probative?

MS. OSTRAGER: Object to the form.

THE WITNESS: And by "probative," you mean?

BY MS. DERMODY:

Q. Evidence of a gender concern.

A. A pattern of -- I would examine in the context of everything else that I'm looking at. There's not a specific number.

Q. Okay.

A. As I shared in my analysis, I don't think that there's a gender concern on diversity.

Q. In Paragraph 359, you state that "Class-relevant women have very favorable perceptions regarding the Firm's commitment to and progress regarding diversity." Do you see that?

A. Yes.

Q. Okay. And in forming this opinion, did you consider the gender gap in response or only the overall female positive response?

MS. OSTRAGER: Objection.

THE WITNESS: Well, I'm looking at the level of response that women are providing and the growth in that over time.

BY MS. DERMODY:

Q. You're comparing women to women, not women to men?

A. In this particular, yes.

Q. Did you do any analysis to determine in what years or on what questions the female response on diversity questions met Goldman's threshold for good?

A. Like I said, I took note of their criterion, but it's -- they have a strategic purpose that's different from mine.

Q. So you didn't do a calculation to assess that. Is that fair?

A. That's fair.

Q. Okay. You also looked at exit surveys; is that correct?

A. Yes.

Q. Okay. And that was an analysis that Cornerstone did; is that correct?

MS. OSTRAGER: Objection.

THE WITNESS: At my direction.

BY MS. DERMODY:

Q. Okay. And in your report you talk about the usefulness of exit survey data.

Does that sound familiar?

A. Yep. Please point me again. 353, perhaps.

Q. We can go all the way back, I think to -- let's do Footnote 11. Yeah, "The academic suggests that exit surveys." It's in the middle of that.

Okay. And are you aware that the literature that you're referring to actually describes a strong potential for bias and unreliability in exit survey data?

A. You know, I'm familiar with the pros and cons of exit survey data.

Q. And what are the cons?

A. Some people don't fill them out. It is -- they're exiting employees. So they're not really a valid -- or they're not -- I wouldn't say, "not valid," but I would rely on People survey and current employees' perceptions on issues related to the current, you know, work environment and exit survey data for that purpose, for exiting.

Q. Is it true that experts warn that exit surveys have a risk of employees not expressing their honest appraisal of certain topics?

A. I didn't see evidence of that in the survey.

Q. Isn't that what experts warn, however, is a con of exit surveys?

A. I would want to read that literature to confirm if that's what's being said.

Q. Okay. And you said you didn't see evidence of that. Did you call any of the people that exited to find out if their feelings matched their remarks on

exit survey?

A. I'm not privy to class members.

Q. So that's just a "no"; correct?

A. Well, I wouldn't have that availability; right?

Q. I just want to make sure that you didn't --

A. Nor was I able to.

Q. Okay. And you didn't call any other employee who's left the company to find out if their exit survey matched their feelings; correct?

A. And nor would that be my -- you know, that wouldn't be any more valid than the exit survey itself.

Q. Okay. So how did you assess in your view that there was no evidence that people were not giving an honest appraisal on the exit survey?

A. In terms of seeing the responses to the exit survey data and the -- you know, that they were responsive to the questions being asked, I didn't see evidence in terms of some of the -- I didn't analyze this, but I looked at the interview notes, and certainly nothing there led me to believe that there was -- you know, people were holding back on what they were saying, what they were feeling.

Q. So your reason for thinking that there was no

risk of employees not giving an honest appraisal was that people were responsive and that there was no indication in the documentation that they were holding back?

A. The responses that I just -- you know, I looked at on the exit survey had all the indicia of honest, candid responses, and that there wasn't, you know, a covering up.

Q. What would have been indicia of dishonest responses?

A. I mean I'd have to see it. I can't sit here and tell you, you know, but an impression of that they're not being honest. But I'm not able to, sitting here -- if they said this is what, you know, this would mean that they're being dishonest.

Q. Well, you just offered the opinion that there was no evidence that people did not give their honest appraisal, and I'm trying to figure out what you would have had to see to know that they had been less than candid.

A. Well, what I saw was candidness. So that's what my opinion is based only.

Q. And how did you assess candidness in this context?

A. By the forthrightness of the responses to

inquiries that they talked about in their -- or wrote about in their responses to the exit survey.

Q. Did you count the number of words people used when they were --

A. I did not count words --

Q. Okay.

A. -- as lengthy either notes themselves or the interviewer notes.

Q. So we're talking just about the exit surveys here. On the exit survey documents, did you do an assessment of the number of words that people wrote on those?

A. I don't think that would be relevant.

Q. Okay. Did you do an assessment of how many people wrote additional comments beyond checking boxes?

A. So I just -- I testified that I did not do an analysis. I reviewed it for did it look like honest responses. And in what I looked at, I felt like that was, you know, honest responding. And there may be one or two but, you know, that doesn't mean it's flawed.

Q. One or two that look dishonest?

A. No, not dishonest but maybe that are not, you know, telling the full story. But I didn't say, "Oh,

this is not true." It's just there appeared to be very candid responses to the exit survey. And I'm only using the exit survey for the purpose of looking at what people checked for reasons of leaving. It's not my primary data source, but it is an additional piece of evidence that Dr. Goldberg did not look at to understand concerns that she says are being raised about leaving former meritocracy reasons, for example.

Q. When -- considering diversity climate, is there a better or preferred framework to Dortman?

A. Again, diversity is really not at issue in this case. It's gender; right? And so there are other issues, other matters that are not picked up by the Dortman framework that I felt were important to include in my thinking about how to examine this case.

MS. DERMODY: Move to strike as nonresponsive. I'm going to repeat my question.

Q. Dr. Stockdale, the question is when considering diversity climate, is there a better or preferred framework to Dortman?

A. And my answer is that it would depend on what aspect of diversity I am examining --

Q. Okay.

A. -- if it was gender.

Q. For fairness in discrimination, is there a

better framework or preferred framework than the one that is outlined by Dortman?

A. I think that there are other matters related -- that are related to fairness and discrimination, mistreatment that are relevant to gender that are not in the Dortman analysis.

Q. What is the preferred framework for fairness and discrimination than the Dortman framework that is supported in the social science literature?

A. There are issues related to worklife balance, worklife flexibility, flexible work arrangements. There's a social role theory. Social worklife boundaries, all of which are not assessed in the Dortman.

Q. Who has published the framework for worklife balance?

A. There's many publications. I would point to Ellen Kossek as a premiere scholar in this area. I've done research in this area.

Q. You've published a framework for worklife balance?

A. Well, worklife flexibility in the business horizons paper. But it's a framework for understanding an ecological model. You know, there are many scientifically validated concepts and

measures and matters relevant to gender that wouldn't be labeled as a framework, but they are concepts or they're constructs or they are, you know, issues.

Q. What is -- sorry.

A. I just wanted to be thorough when I did my analysis and make sure I wasn't skipping something, such as flexibility stigma, when I was reviewing -- doing my analysis that would not have been picked up by the Dortman framework.

Q. What is an ecologically -- an ecological model. You've used that term -- you've used it twice today, and I meant to ask you earlier, what does that mean?

A. It's looking at things that are -- systems that are embedded within broader systems. So usually you think about a micro system, which might be an individual's personal experiences, and then you have a mezzo level, which is individuals within a certain context, like a work -- you know, a job or an office, for example, which then are embedded in larger systems, organization as a whole, the society, or the legal system that then you can build that out.

Q. Is that different than a climate model?

A. Well, climate would be relevant to those systems. They can interact, especially at the -- I

would say at the individual and mezzo and maybe organizational level, depending on the level of analysis that you're interested in.

Q. So setting aside whether or not it should have been applied here, would you agree that the Dortman framework is the preferred model for assessing diversity climate?

MS. OSTRAGER: Objection.

THE WITNESS: I'm not willing to make that characterization. I'm not saying it's not a good one, but I'm also saying I wouldn't say it's the preferred. It is a -- you know, it's published. It is a framework. It is published. You know, it's got -- I think -- I don't disagree with its elements. I'm just saying it's not a fully comprehensive assessment for gender that I felt was important to examine.

BY MR. DERMODY:

Q. Okay. And would you agree -- let me strike that.

Is there any other model, besides Dortman, that is accepted for assessing diversity climate?

MS. OSTRAGER: Objection.

THE WITNESS: I don't want to answer that speculatively because I know of other researchers, Jones, Hebold, and others who have frameworks and

models relative to diversity. But, you know, as a scholar, I don't want to speculate without doing the proper literature review and assessment of that literature to reach that conclusion.

BY MS. DERMODY:

Q. So sitting here right now, there's not another one that you can think of; is that correct?

A. Oh, no. I can think of others.

Q. So which others can you think of that are the accepted framework for assessing diversity climate?

A. Well, like I said, there is work by Jones, Lindsay, Hebold, Avery, and others. But, again, I would need to -- I mean those are all scholars who work in this area and have created models or frameworks. Maybe not labeled as a framework.

I'm not trying to argue that Dortman isn't okay, but I'm just saying there are others. And before I make an opinion, I would, you know, want to do the proper research on that.

Q. Did you apply the Jones framework here?

A. There are aspects of -- it's either Jones or it's some other name that I'm blanking on. But in terms of creating my content analysis dictionary, I relied on concepts that they -- like, for example, subtle bias versus latent. Stigmatized identity bias.

C E R T I F I C A T E

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

Dated: June 7, 2021

Nancy J. Martin, RMR, CSR