# Exhibit 07

SOUTHERN DISTRICT OF NEW YORK

NO. 10-cv-6950-AT-RWL

H. CHRISTINA CHEN-OSTER, )
SHANNA ORLICH; ALLISON GAMBA; )
and MARY DE LUIS, )
Plaintiffs, )
vs. )
GOLDMAN SACHS & CO. and THE )
GOLDMAN SACHS GROUP, INC., )
Defendants. )
-------------------------------)

***HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY***

FRIDAY, MAY 28, 2021

Remote Videotaped deposition of ERIC DUNLEAVY, PH.D., beginning at 10:16 a.m., taken by and before Nancy J. Martin, Certified Shorthand Reporter No. 9504, Certified Realtime Reporter. All parties appeared remotely.

Pages 1-254

A P P E A R A N C E S:

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
BY: RACHEL GEMAN, ATTORNEY AT LAW
JESSICA MOLDOVAN, ATTORNEY AT LAW
275 Battery Street
29th Floor
San Francisco, California 94111
Attorneys for the Plaintiffs

SULLIVAN & CROMWELL, LLP
BY: AMANDA FLUG DAVIDOFF, ATTORNEY AT LAW
ALISA LU, ATTORNEY AT LAW
MADELEINE BUML, ATTORNEY AT LAW
1700 New York Avenue N.W.
Suite 700
Washington, D.C. 20006
Attorneys for the Defendants

ALSO PRESENT:

JONATHAN SOKOTCH, In-House Counsel, Goldman Sachs

BRIAN FRYD, Carson Research,

BARBARA NETT, DCI

ANGIE ROSENSTEIN, DCI

DAVID WALCK, Legal Videographer

SEAN MORRISSEY, Tech Concierge

A. I did, yes.
Q. I would ask you now to please turn to Page 1 of your January report.
A. I'm on Page 1.
Q. Do you see in the middle of the page it reads, "Counsel asked me to opine on the following issues:" and then there's text below that?
A. I do.
Q. Can you review to yourself those three bullet points and tell me if that represents the full scope of your assignment for the work analysis.
(The witness reviewed document(s).)
THE WITNESS: I've reviewed the three bullet points, and those were the research questions that the work analysis was intended to answer.
BY MS. GEMAN:
Q. Was there anything else in connection with work analysis about which counsel asked you to opine?
A. No, not that I can recall.
Q. Then do you see at the bottom of Page 1 and continuing onto Page 2, you summarized the steps you took in conducting and memorializing the work analysis?
A. Yes, I see that list of bullet points.
Q. All right. And did you review organizational

materials, such as job requisitions and organizational charts, to learn relevant background information about the three relevant divisions and the two relevant corporate titles at Goldman Sachs?

A. I did.

Q. What are the relevant divisions?

A. IBD, IMD and Securities.

Q. What is CIMD?

A. CIMD?

Q. Yes.

A. I don't recall that acronym off the top of my head.

Q. Did you review the background materials for any other purpose?

A. The background material review was intended to essentially gain familiarity with the corporate titles that would be part of the work analysis, understanding what professionals in those corporate titles are doing and how those corporate titles, you know, exist in different divisions and other organizational sort of structural strata business units, those types of things.

So the purpose was really to gain familiarity upon the corporate titles themselves, which obviously helps in designing the work analysis methodology. And

then also to gain additional understanding on the organizational structure that would be helpful for considering how to sample a representative population for the work analysis.

Q. Do you feel that your review did enable you to understand the organizational structure at Goldman?

A. It did.

Q. Would you say that it helped you to understand the taxonomy of jobs at Goldman?

A. What do you mean when you say "taxonomy of jobs"?

Q. Let me ask you, what is a job taxonomy?

A. In the context of my report, taxonomies come up relative to job elements. So, for example, knowledges, skills, abilities and other characteristics.

Q. Did you consider -- let me ask you some questions. Did you review the job requisitions from the period 2010 through 2018, that you recall?

A. I don't recall the exact time period that the job requisitions were from.

Q. What is a reporting group?

A. What is a reporting group?

Q. Yes.

A. I'm not sure exactly what that phrase means

as I sit here.

Q. What are organizational levels?

A. Is there a particular document that you'd like me to look at?

Q. Well, sure, but let me just ask your indulgence. Do you know what that is without looking at a document?

A. Not as I sit here, I can't define that specific term.

Q. What about job codes?

A. Again, not as I sit here.

Q. What about a DBS code?

A. Can you repeat the question.

Q. Do you know what a DBS code is at Goldman?

A. Not as I sit here, no.

Q. What is a function at Goldman?

A. So a function is something that was considered as part of the sampling plan, and it refers essentially to an area of specialization.

Q. And where does a function sit on the -- in the job structure at Goldman?

MS. DAVIDOFF: Objection. Form.

MS. GEMAN: I'm sorry. I couldn't hear Amanda's objection.

MS. DAVIDOFF: Objection to form.

BY MS. GEMAN:

Q. You can answer.

A. I'm not sure I understand exactly what the question is asking.

Q. So is function a level above division or below?

MS. DAVIDOFF: Objection to form.

THE WITNESS: So in the course of developing a sampling plan, function was available and -- I'm having a hard time thinking. So function within division was how we were thinking of it for sampling purposes.

BY MS. GEMAN:

Q. Did you use any other organizational level below division to create your sampling plan?

A. So I discussed the sampling methodology that was used in detail in my report, and a random sampling methodology was used. We focused on associates and vice-presidents as separate corporate titles and then drew a random sample separately for the men and women. We looked at business units and division as strata variables to consider representation.

Q. Did you use function as a strata variable?

A. I did not stratify the sample based on function, no.

Q. Did you use any strata variables other than division and business unit in terms of job levels at Goldman?
A. Can you repeat the question?
Q. Sure. Let me rephrase it, actually. Did you use any organizational strata variables other than division and business unit?
A. Again, I conducted a random sample from the eligible population of professionals and did so separately for associates and vice-presidents, and then by male and female separately to ensure an adequate female representation.
So the sample was not formally stratified by division or business unit. Division and business unit were things that were used to assess the representativeness of the sample.
Q. They were strata variables?
MS. DAVIDOFF: Objection. Misstates testimony.
BY MS. GEMAN:
Q. Is that correct? Would you describe them as strata variables?
A. No. They were not incorporated in the random sampling methodology.
Q. I see. Were any -- all right. So just so

we're 100 percent clear, neither divisions nor business units nor functions were used to stratify the random sample?

A. Repeat the question.

Q. Neither division nor business units nor functions were used to stratify the random sample?

A. The sample was not pulled using a stratified approach that incorporated those factors. The random sampling methodology by corporate title and stratified by gender allowed for representation of division and business unit simply based on the randomness.

MS. GEMAN: So we are going to introduce as Exhibit 190 the 2008 job -- 2018 job requisitions, which is GS 0772535. And I can represent that this was a document listed on your materials reviewed page.

MS. MOLDOVAN: It's 191.

MS. GEMAN: 191. Excuse me.

Q. Please let me know when you are able to see that on your screen.

(Deposition Exhibit 191 was marked for identification.)

THE WITNESS: I have that pulled up.

BY MS. GEMAN:

Q. I'm just going to ask you, please, to look at the headers. If you need to zoom in to make them more

Oh, I see. And you were not there after October 18?

A. On Page 33 in the middle of the page, the report notes that "...I attended the work analysis interviews conducted on October 18 and October 29..."

Q. And October 28, was that the -- sorry. Strike that.

Was October 18 the first day?

A. I don't recall.

Q. And -- all right. Again, were notes taken during the interviews by you or the I/O psychologist?

A. Yes.

Q. Were those notes preserved?

A. Yes. The backup materials are essentially the electronic version of the notes.

Q. Is there anything in the notes that isn't in the backup?

A. I'm not sure. There may be.

Q. How would you find that out?

A. I'd have to look at the raw interview protocols relative to what's in the electronic file.

Q. How did you, if at all, oversee the interviews conducted by people other than yourself?

A. So as the report discusses, I was updated daily on interview progress when I was not there in

person. And two I/O psychologists on my team with extensive experience and having conducted hundreds of work analysis studies facilitated the interviews that I was not there for.

Q. What form did those updates take?

A. Phone calls mostly.

Q. Any written summaries?

A. I don't recall.

Q. Could you please turn to D-3 and D-4?

A. I'm on D-3 and -4.

Q. And the -- can you explain the purpose for which the September 13 notes were used versus the October 10 points?

A. I'm sorry. Where are you?

Q. I'm sorry. D-2 and D-3?

A. D-2 and D-3. Yes, I'm there. What's your question?

Q. What was -- how were these -- I don't want you to tell me word for word how they're different, but what was the September 13 talking point used for versus the October 10?

A. The October script has more detail around the request and some sort of process descriptions at the bottom, some additional bullet points just to provide more information.

Q. Who was the September 13 talking points used for? The pilot incumbents?
A. I don't recall specifically.
Q. Who amended the talking points from the September 13 to the October 10 version?
A. So the question is who added the bullets? Who wrote the bullets?
Q. Yeah.
A. Yeah. So this was language that I believe I originally put together.
Q. Why did you decide to add more information?
A. I don't remember the specifics around why more information was added. It can be beneficial for participants to have more specific information around the, you know, the purposes of the study and how the information will be used. And they're fairly similar in terms of tone and texture.
Q. Was one of the reasons you amended the talking points to try to up the response rate?
A. It may have been. I don't recall specifically.
Q. Were you concerned by how low the response rate was?
A. No.
Q. Did you do any analysis of those who chose

not to participate to see if there were patterns?

A. I did look at those who declined participation relative to those who participated, yes, and I found no systematic patterns.

Q. Where is that examination reflected?

A. I don't know if that was provided in the backup materials or not.

Q. It was not. Do you still have that examination?

A. That was something that I looked at, yep.

MS. DAVIDOFF: Object to the testimony.

MS. GEMAN: Amanda, was that provided and we didn't --

MS. DAVIDOFF: I'm happy to look into it.

MS. GEMAN: Okay. Thank you.

Q. How much time elapsed between -- excuse me. I'm going to re-begin the question.

How much time elapsed between an incumbent's agreement to be interviewed and their interview itself?

A. I'm not sure.

Q. It wasn't immediate; right? Like somebody didn't get a phone call and then have the interview that -- right after; correct?

A. Again, I don't recall as I sit here.

Q. Well, the talking points indicate that somebody would be -- that if the person was willing to be interviewed, they would be contacted about scheduling. Is that accurate that that's what happened?

A. That sounds right. These are not the easiest data collection approaches to schedule. And, obviously, we wanted to get ahead of scheduling as much as possible given that interviews require travel.

Q. And so certainly there could have been time between the scheduling and the interview for the employee to learn more about the gender discrimination lawsuit if they didn't -- if somehow they didn't already know about it; correct?

A. Repeat the question.

Q. Certainly there could have been time between the scheduling of the interview and the interview itself for the incumbent to learn more about the gender discrimination lawsuit if they didn't already know about it; correct?

A. I don't know, but the litigation was not mentioned in any of the communications.

Q. But you did disclose the purpose of the -- or you claim that you disclosed the purpose of the work analysis; correct?

MS. DAVIDOFF: Objection. Misstates testimony.

THE WITNESS: The topic points describe the general purpose of the work analysis as described in Bullet Point 2. Topics such as your daily responsibilities, the interaction between your role and other roles and the skills necessary to perform your role are the types of things that were discussed in these interviews and -- for the purpose of the data collection.

BY MS. GEMAN:

Q. And are you asserting that the incumbents did not know the work analysis was in connection with this lawsuit?

A. Again, the lawsuit is not discussed in any written communication and was not mentioned by me or the I/O psychologists working under my direction.

Q. But my question is different. Are you asserting that the incumbents did not know that the work analysis was in connection with this lawsuit?

A. Again, I don't know the answer to that question.

Q. If you look at Pages E-2 and E-3.

A. Okay.

Q. That's the interview introductions scripts;

correct?

A. Yes.

Q. All right. And can you tell me how many of the incumbents asked questions about the purpose of the interview beyond what was read to them?

A. Repeat the question.

Q. Can you tell me how many of the incumbents asked questions about the purpose of the interview beyond what was read to them?

A. I don't know the answer to that question.

Q. Would that have been reflected in your notes?

A. I don't know.

Q. How many of the incumbents interviewed were up for promotion or believed they were up for promotion that year?

A. I don't know the answer to that question.

Q. What was the temporal overlap between those few months that you conducted these interviews and comp setting or performance evaluations?

A. I'm not sure I know the answer to that question.

Q. Do you know how many of the incumbents you've interviewed reported to people against whom complaints of gender discrimination had been lodged?

A. No, I don't know the answer to that question.

again, I'll find what source that is.
Q. But I mean that's not inherent to social interactions; correct?
A. That was the definition that was found.
Q. I'm asking you if -- are you telling me if you were to ask people what is the meaning of "social interaction," that is an answer that would be given?
MS. DAVIDOFF: Objection to form.
THE WITNESS: Yes.
BY MS. GEMAN:
Q. So if I -- my 10-year-old daughter likes social interactions. Does that mean that she's willing to engage in social activities with clients?
A. Again, context matters. These are defined in the context of the work analysis of Goldman Sachs professionals.
Q. So some of these were defined in the context of the work analysis. Some of these, meaning the skills, abilities and personal attributes and others were defined just categorically; correct?
MS. DAVIDOFF: Objection to form.
THE WITNESS: Again, the I/O psychologists use their professional judgment to map on existing definitions from various sources to the responses that were provided by the subject matter experts, the words

and the phrases that the subject matter experts used to answer the structured questions.

BY MS. GEMAN:

Q. So this is sort of a hodgepodge of sources; is that correct?

MS. DAVIDOFF: Objection to form.

THE WITNESS: I wouldn't use that word. It's a combination of a variety of sources that I/O psychologists, a group of five I/O psychologists all agreed were acceptable definitions and different constructs.

BY MS. GEMAN:

Q. Okay. So let's turn to Pages 3 through 8 of your report, if we could, starting on Page 3.

You've identified, between Pages 3 and 8, 9 elements, work elements where you observed variations; correct?

A. Yes. Pages 3 through 8. Those describe the various categories of information collected as part of the structured interview.

Q. And it was the answers to those questions that led you to reach your conclusions about variability; correct?

A. My conclusions about variability were based on the full set of interview questions, yes.

Q. And those questions are reported starting on Page E-4; correct?

MS. DAVIDOFF: Sorry. What page are you asking?

MS. GEMAN: E-4.

THE WITNESS: That looks right.

MS. GEMAN: Amanda, are you there?

MS. DAVIDOFF: Sorry. You are saying the answers are recorded on E-4?

BY MS. GEMAN:

Q. No. The questions begin on E-4; is that correct, Dr. Dunleavy?

A. Yes. You're in Appendix E, which is the "Structured Work Analysis Interview Protocol."

Q. How many different functions did your subjects -- did the incumbents collectively work in?

A. That information is described in Chapters 5 and 6 in separate tables.

Q. Did you or anyone under your direction do any cross-checking of the answers of different incumbents in the same functions?

A. Repeat the question.

Q. Did you or anyone under your direction do any cross-checking of the answers of the different incumbents who were in the same function?

MS. DAVIDOFF: Objection to form.

THE WITNESS: Yeah. Meaning?

BY MS. GEMAN:

Q. Meaning, let's just say that there was six people in one function; right? You could have, and perhaps did, look at the answers of those six people to see if -- to look for differences in overlap as a cross-check for the quality of your overall questionnaire; correct?

MS. DAVIDOFF: Objection to form.

THE WITNESS: The question of variability was focused on the corporate title level. And so my focus was very specific to evaluate whether or not there's variability within the corporate title of associate, within the corporate title of vice-president.

And if there is variability, I used other structural variables like division, primarily division because those were sample sizes to evaluate patterns, to potentially describe those differences in variability.

BY MS. GEMAN:

Q. I understand. So you were not looking at variability, if any, within function; correct?

A. I don't recall conducting separate analysis by function, if that's your question.

Q. Are you rendering any opinions on job variability, if any, within function?

A. Again, that's not something that I directly evaluated, but it may be the case that there's variability within function.

Q. Are you saying there is or you don't know?

A. Again, I didn't evaluate that specifically.

Q. So you don't know?

A. I didn't evaluate that specifically.

Q. My question is are you rendering -- is it your opinion that there's variability within function?

A. That's not something I have an opinion on.

Q. Do you have any opinion on whether there's variability within business unit?

A. Again, my focus is on variability within corporate title, and analysis were not conducted at the business unit level.

Q. Do you have any opinion on whether there's variability within business unit?

MS. DAVIDOFF: Objection. Form.

THE WITNESS: Again, that's not something that I specifically evaluated.

BY MS. GEMAN:

Q. So the answer is no?

A. I don't have an opinion on variability

specific to business units.

Q. And as part of the background, you determined years and months the incumbent had been in their current position; correct? I'm on Page E-4.

A. I'm sorry. Can you say that one more time.

Q. I'm sorry. You asked incumbents how long they had been in their current position; correct? I'm looking at Question 6.

A. Yes. I see that, "How many years and months have you been in your current position?"

Q. What did you mean by "current position"?

A. I believe that was associate and vice-president.

Q. And do you recall if any of the -- strike that. I'm sorry.

Did you ask any questions about whether an incumbent had recently lateraled from another company to Goldman?

A. That's not something that I directly asked questions about. That may have come up in any number of the interview responses.

Q. So would you say that the job an incumbent held immediately prior to coming to Goldman was at least as relevant as their college major?

MS. DAVIDOFF: Objection to form.

THE WITNESS: We could ask work analysis questions about a wide variety of different job elements. And I focused on the job elements that I concluded would be most helpful in answering the research question I was asked to focus on.

BY MS. GEMAN:

Q. Right. So my question is -- so is it correct, then, that you considered college major more important than the job somebody had before going to Goldman?

A. More important meaning made it on the interview protocol versus didn't make it on the interview protocol?

Q. Yes.

A. My focus was on, again, general background information and worker characteristics, work responsibilities and work context.

There are many other questions that could be asked as part of a work analysis protocol. And, obviously, practical constraints need to be balanced with the questions that most directly answer the research topics of interest.

Q. So let's say that you -- I think there were ten incumbents and had ten different college majors, similar but different. One person is biomedical

engineering, one person is chemical, et cetera. But all ten came over from being in the same job, the exact, same job to Goldman. Which piece of information do you think is more relevant to give insight into the nature of their job at Goldman, their major or the job they came from?

MS. DAVIDOFF: Objection. Form.

THE WITNESS: Again, in this broad hypothetical, both could be relevant.

BY MS. GEMAN:

Q. You don't see one as more relevant than the other?

A. Not in a vacuum, especially when the I/O psychologist is able to ask more direct questions about what you do at Goldman.

Q. So even if everyone is about 31 and they had 10 different majors 10 years ago but for the last 10 years they've all been doing the exact, same thing and the exact, same job, you'd consider, or at least as reflected in your questions, the college major more important?

A. Yeah. Not necessarily. But I was able to ask very direct questions about what people are doing at Goldman, which is more relevant to me than what people were doing in a previous job given the

assignment.

Q. And isn't it also what they're doing at Goldman far more relevant than their college major?

A. College major is a common qualification that's considered as part of a job analysis. In a situation where you're interested in understanding worker characteristics that are important for a job, it's very common to ask about college major as a proxy for knowledgists.

Q. Proxy for knowledgists. What about -- but yet you didn't ask about the training that people got on the job; correct?

MS. DAVIDOFF: Objection to form.

BY MS. GEMAN:

Q. Isn't that an even better proxy for knowledgists?

A. I was also able to ask questions directly about knowledgists.

Q. That's not my question. I was asking about training. You don't have any questions here about the on-the-job training.

A. And there's no requirement to have questions about on-the-job training. And I balanced the practical limitations of collecting data via a structured interview with the questions that were most

relevant to the research question I was being asked.

Q. If all associates in a division have the same on-the-job training, would that change your view of the variability of jobs?

A. Repeat the question.

Q. Sure. If all, say, associates in a division had the same on-the-job training, would that change your view of job variability?

A. Not necessarily. I mean, what do you mean by "on-the-job training"?

Q. Well, you didn't ask any questions about it; correct?

A. I didn't directly ask questions about that, that's right. This is a hypothetical that we're discussing.

Q. Well, it's an actuality. You did not ask questions in your questionnaire about on-the-job training; correct?

A. There are no questions in my questionnaire specifically about on-the-job training. It wasn't necessary to answer the research question I was focused on.

Q. And you're not asserting that the jobs in this case require a certain major; correct?

A. Repeat the question.

MS. DAVIDOFF: Objection. Misstates testimony.

THE WITNESS: And, again, the notes related to the follow-up question is a useful piece of context.

BY MS. GEMAN:

Q. If the employee just answered the question -- so if one of your staff would, as I understand it, simply read the question; is that right?

Is that correct?

A. Yeah. The question -- repeat the question?

Q. So it's Question No. 20. And the incumbent is sitting there. Your I/O would ask the incumbent this question in these words; correct?

A. With the interview protocol projected on a big screen in front of the interviewee, yes.

Q. So they could read it as well as hear it?

A. That's right.

Q. Okay. And if the incumbent just said C, what follow up, if any, would occur? It says below it that the interviewer would ask level and role performed; correct?

A. That's right. "...describe the nature of the oversight." And, ["If informally supervises more than one person, collect information for all individuals

supervised.]"

Q. But if they said B, there would be no follow-up; correct?

A. That may or may not be the case, but the follow-up question differentiates formal responsibility from informal responsibility.

Q. And if they said A, there would be no follow-up; correct?

A. Potentially.

Q. And indeed there's only required follow-up about limited choices in a few places; correct? It's written here, when there is such follow-up; correct?

A. The follow-up question instructs if B or C, and there may be additional conversation around the question regardless of the answer, but the written instruction is follow up for B or C.

Q. Let me have you turn to Question 29, "When are you expected to be available for work (including entertaining clients)?" Do you see that?

A. I do.

Q. The only required -- or the only requested elaboration is if the incumbent selects "Other," which is F; correct?

A. I see that, and I know that in some situations there were additional conversations around

responses regardless of what was stated.

Q. Can you read answers C and D out loud.

A. "Business hours plus evenings and/or weekends. As needed (24 hours a day/7 days a week)."

Q. So it would seem to me that business hours plus evenings and/or weekends is the same as -- or it's not meaningfully different from as needed. Would you agree?

MS. DAVIDOFF: Objection to form.

THE WITNESS: The definitions between D and C are different. 24 hours a day/7 days a week is not the same thing as working in the evenings or working on the weekend.

BY MS. GEMAN:

Q. But that's not what it says.

A. Sure it is.

Q. No, it isn't. It says, "Business hours plus evenings and/or weekends." So business hours plus after-business hours plus weekends is working all the time. Working 24 hours a day/7 days a week is working all the time.

MS. DAVIDOFF: Objection. Misstates the record.

BY MS. GEMAN:

Q. Clearly, nobody is literally working 24 hours

a day/7 days a week. And my question is is it your honest view that there's much daylight between C and D?

MS. DAVIDOFF: Objection to form. Misstates the document.

THE WITNESS: Again, there are different response options. And 24 hours a day/7 days a week is not the same thing as business hours plus evenings or business hours plus weekends.

BY MS. GEMAN:

Q. But you're misreading the document, aren't you? Doesn't D say "as needed"?

A. 24 hours a day/7 days a week.

Q. No. Doesn't it say, "As needed, (24 hours a day/7 days a week)"?

A. Yes. 24 hours a day and 7 days a week is included in the definition.

Q. Okay. So "as needed" doesn't imply 24/7. It just implies whenever that need arises, doesn't it?

A. Again, the definition is self-evident. And, once again, this was a question that received no responses from incumbents in terms of their inability or confusion about answering it.

Q. So if it's self-evident, does D mean literally 24 hours a day/7 days a week, or does it

mean as needed regardless of when that need arises?

A. Again, 24 hours/7 days a week is included in the line.

Q. That's not what I asked. You're the testifying expert. You're testifying that it's self-evident. Which does it mean? Does it mean as needed, whenever that need is, or does it mean 24/7?

A. D is written as different from C. And in this particular situation, we could go to the -- we could go to the notes and see if incumbents provided any additional detail that might be helpful in answering this question.

MS. GEMAN: Move to strike as nonresponsive. You're answering a completely different question. And it's your job today to answer the questions that I'm asking, not make sound bites.

MS. DAVIDOFF: Objection. Argumentative.

BY MS. GEMAN:

Q. Does D mean as needed, whenever that need is, or does it mean 24 hours a day/7 days a week?

A. "As needed" is defined in the parenthetical as 24 hours a day/7 days a week.

Q. So which is it?

MS. DAVIDOFF: Objection to form. Asked and answered.

THE WITNESS: Yeah --

MS. GEMAN: It hasn't been answered.

Q. So people who answered D worked, like never stopped working, they never slept and they died after a couple of weeks because a human can't go without sleep. Is that what you're saying?

MS. DAVIDOFF: Objection. Misstates testimony.

THE WITNESS: I hope that's not what happened, but there's a difference between 24/7 and business hours plus evenings or weekends.

MS. GEMAN: So you say, but I think this colloquy has illustrated there absolutely is not.

MS. DAVIDOFF: Object to the testimony by counsel. Argumentative.

BY MS. GEMAN:

Q. All right. In question -- I'll just give you one more opportunity. Could you attempt to articulate the difference between C and D?

MS. DAVIDOFF: Objection. Asked and answered.

THE WITNESS: Yeah. Again, self-evident as described.

BY MS. GEMAN:

Q. So you're not able to articulate it?

MS. DAVIDOFF: Object. Misstates testimony. Object to the testimony of counsel.
BY MS. GEMAN:
Q. In Question 28, which is on Page E-13, do you agree that people often exaggerate the number of hours they work in a week?
A. Not necessarily.
Q. Did you do any checking of the accuracy of the answers people gave?
A. The right answer was the answer that the subject matter expert provided.
Q. Could you look at Question 31-A, which is on Page E-15.
A. Okay.
Q. Would you agree that there's overlap between and among B, C and D?
A. Again, the subject matter experts selected the response that they thought was most appropriate to answer this question.
Q. But that's a different answer. I'm asking do you agree there's overlap between and among B, C and D?
A. I'm not sure. In the sense that B, C, and D are different iterations of variable hours worked? They're different iterations of variable hours worked

A. In this context, we're talking about without any training. So can someone come in --

Q. Dr. Dunleavy, I'm going to ask you to answer the question I'm asking. You said --

MS. DAVIDOFF: Objection. Please allow him to finish.

Go ahead, Dr. Dunleavy.

BY MS. GEMAN:

Q. Go ahead and finish your answer, but then I'm going to ask you again, what is the meaning of training?

A. So in the broader context of the question, if you were to leave Goldman Sachs, are you aware of someone at your level in your immediate work group who could assume your role without training.

Q. Again, reading the question --

A. Yes, without needing training in your role.

Q. Again, what does "training" mean? You said it's self-evident. You said it has meaning. Tell us, what is that meaning?

A. Once, again, the incumbents had no questions about answering this. And it wasn't 2 hours of training or 10 hours of training or 50 hours of training. It was without training.

Q. So it was different based on how the listener

understood that?

A. Well, it was --

MS. DAVIDOFF: Misstates testimony.

THE WITNESS: The question asks the incumbent to think about their specific role. So it would be training for that particular role.

BY MS. GEMAN:

Q. But I'm asking about the meaning of "training." So I'm asking you, you tell me, define "training" for purposes of this question.

A. Taught to perform the role.

Q. What does that mean?

A. I don't know -- again, I don't know. We can try and parse the meaning of commonly known words, but I don't know how to say it more clearly than that.

Q. And you haven't --

A. The question is focused on the individual and the role that the individual is in. So the focus here is on the role itself.

Q. Well, so it sounds like, by definition, this question, again, yields generalizable information?

A. I disagree.

Q. Notwithstanding that, there's no definition of "training" here.

MS. DAVIDOFF: Object to the testimony.

BY MS. GEMAN:
Q. Did you do any cross-checking of the answers to these questions from other sources?
A. Is that question specific to the -- what questions are you asking about?
Q. I'm asking you about the Job Fungibility section.
A. I conduct -- I collected no additional data related to job fungibility other than what you see here.
Q. Did you look into what happens when employees are on planned or unexpected leaves of absences?
A. In what context?
Q. In the context of doing any kind of cross-check of the data.
A. To determine what?
Q. To look at data integrity or for any other purpose.
A. Again, the questions in this section are the only data points related to fungibility that I evaluated.
Q. Okay. Do you agree that the people being interviewed should understand the terminology used in the questions?
A. Repeat the question.

Q. Do you agree that the incumbents should understand the terminology used in the questions?

A. Yes. And that's exactly why I had a team of industrial and organizational psychologists to vet the questions under my direction. And that's why I had a pilot study, where if incumbents had any questions around the meaning of words, we asked them very specifically to identify those for us. And we had no issues come up other than minor typos and the one question that was removed that we discussed earlier. So I have no concerns that incumbents did not understand these questions.

BY MS. GEMAN:

Q. Please turn to Appendix G now. Tell me when you're there.

A. I'm at Appendix G.

Q. Do you consider that redundancies were already removed from this list?

A. The process that was used to develop this list involved two I/O psychologists who conducted the interviews to independently enter the data and check the reliability of the data and then to code the knowledges by reducing duplicate knowledges and using their professional judgment to come to consensus that these were the knowledges that the subject matter

experts discussed.

Q. So your opinion is that this final list of knowledges does not contain redundancies; is that correct?

A. My opinion is that there are no duplicate knowledges in this list.

Q. Okay. So do you see on Pages G-2 and G-3, that there are knowledges of coding in Java, Python, Q, R, SLANG and coding principals?

A. You're referring to Knowledges 14 through 19?

Q. Yes.

A. Yes.

Q. And do you see on Page G-8 starting at 122, there's knowledges of programming in Java, JavaScript, Python, Q, R, programming languages at Goldman Sachs, specifically Slang.

A. I do see that, yes. Nos. 122 through 127?

Q. Yes. What is the distinction you believe is being drawn between coding and programming?

A. This is something that I discussed directly in my April 19 surrebuttal report. Coding and programming are two different things. Coding is simpler than programming and simply refers to translating natural text into a computer language. And programming is creation of a fully functional

program that, you know, runs as is planned.

Coding is simpler than programming, and they are two different things.

Q. So where do you -- where did you define -- you define coding, but you didn't define programming in your report; correct? Look on Page I-9.

MS. DAVIDOFF: Sorry. I-9 of which report?

MS. GEMAN: The January 15 report.

THE WITNESS: I'm sorry. Where are you?

BY MS. GEMAN:

Q. I'm on I-9.

A. Appendix I is the skills, the abilities and the personal attributes, and Appendix G is knowledges. Those are two separate sets of questions, two separate categories.

Q. Okay. But why do you define coding but not programming?

A. In Appendix I?

Q. Uh-huh.

A. That must be because programming didn't come up in subject matter expert responses as it relates to skills, abilities and personal attributes but it did come up in discussion of knowledge.

Q. And you're treating knowledges and skills as distinct?

A. Yes, which is accepted practice in I/O psychology, yes.

Q. How many -- if you had -- I'm going to strike that question.

You consider knowledge of, say, math distinct from knowledge of algebra and geometry?

A. Again, those were identified by the I/O psychologist as separate knowledge areas, and I have confidence in that coding methodology. Two I/O psychologists that conducted the interviews thought that those were different knowledges.

And the other thing that's worth noting is that as part of the coding process, I/O psychologists were able to consider the full set of interviewee responses in addition to any particular question that's being considered. So the process had a consensus mechanism built in and those are distinct categories.

Q. I'm asking if you consider, for this purpose, knowledge of algebra, geometry and math distinct and not overlapping.

A. They are not duplicate knowledges, I agree with the coding.

Q. And while we're on the subject of math, if you look at 114 it says, "Knowledge of options math."

Q. Sure. Let's pick any of these. I mean what's the overlap between quantitative methods, 130, math which is here somewhere, and accounting which is No. 1?

MS. DAVIDOFF: Objection to form.

THE WITNESS: Your question is what's the overlap?

BY MS. GEMAN:

Q. Yes.

A. Again, the two I/O psychologists came to consensus that these are separate knowledges, and I agree with that coding scheme.

Q. Okay. Why? Can you explain, other than by deferring to someone else because you're the testifying expert, why that's justified?

A. Again, these knowledges are different. The subject matter experts used different phrases, different words to describe the knowledge areas. And the I/O psychologist evaluated the full set of interview responses in determining the knowledge coding schemes and these are different knowledges.

Q. You're saying that, but that doesn't make it so. I'm asking you to explain your basis for stating that accounting and quantitative methods, for example, are non-overlapping.

MS. DAVIDOFF: Objection. Argumentative.

THE WITNESS: Again, they're non-duplicative. My basis is the fact of the I/O psychologist consensus on this coding scheme.

BY MS. GEMAN:

Q. Is knowledge of differential equation different from knowledge of advanced calculus?

A. Yes. Again, the two I/O psychologists came to a consensus that those are different things. The subject matter experts used different words. Just because two knowledges are mathematical in nature does not mean that they're duplicate knowledges.

Q. No, those weren't here. Those are just synonyms for third semester calculus. So, again, I really would like to know your basis for -- it sounds like you're giving sort of complete deference to other people who are not testifying experts.

MS. DAVIDOFF: Objection. Misstates testimony.

THE WITNESS: What's the question again?

BY MS. GEMAN:

Q. I said it sounds like your basis for claiming non-redundancies is deference to other individuals who are not testifying experts.

A. Again, my answer is --

MS. DAVIDOFF: Sorry. I don't think that was a question, but objection. Argumentative.

BY MS. GEMAN:

Q. Is that correct? I can ask it again if you'd like. It sounds like your basis for claiming non-redundancies is deference to other individuals who are not testifying experts; is that correct?

A. My answer is the same. The research methodology that was used here is accepted practice in I/O psychology and the full spectrum of responses to interview questions were used in consideration of this coding scheme.

Q. Do you think it's possible for a job to require deductive reasoning but not cognitive reasoning?

A. Can you point me to where you're at?

Q. No. I'm just asking you the question.

A. When you say "cognitive reasoning," what are you referring to?

Q. If you can't answer the question, then let me know, but that's -- I'm curious if you can answer that question. As an I/O psychologist who's read the psychological literature, in your opinion, is it possible for a job to require deductive reasoning but not cognitive reasoning?

MS. DAVIDOFF: Objection. Form.

THE WITNESS: I'm not sure what you mean by "cognitive reasoning." Again, that hypothetical question is ambiguous in contestable matter and trying to understand what the different cognitive functions are. There are a number of cognitive abilities that exist.

BY MS. GEMAN:

Q. Fair enough. So why don't you look at Page I-3.

A. Okay.

Q. All right. The definition, you say, of cognitive ability is, "Abilities that influence the acquisition and application of knowledge in problem solving."

A. I see that, yes.

Q. All right. And I'm asking you -- and then you'll see there's a definition of inductive reasoning on Page I-6.

A. I see that, yes.

Q. So do you think -- can you picture a job that requires inductive reasoning but not cognitive ability?

A. I think it's telling that the definition of cognitive ability and the definition of inductive

reasoning both came from the Occupational Information Network. So that existing taxonomy that Dr. Hough recommend I consider used these two cognitive abilities as separate and non-duplicative.

Q. Those are the definitions from O*NET, but I'm asking you if -- and I realize they're both from O*NET -- but I'm asking you if you can think of a job at Goldman Sachs that requires one of those but not the other?

A. Again, that's not what I was asked to do in this work analysis, and there are measures of cognitive ability that exist that are different from measures of indicative reasoning. We can certainly go to the backup materials and explore examples of when this came up, but these are different definitions from O*NET. Psychologists view these as different cognitive abilities. They're cognitive in nature but they're different. They're distinct.

Q. Can you think of any of the jobs at Goldman Sachs that require one of those but not the other?

A. Again, these are not the same thing. So that's likely, but as I sit here, that's not something I directly evaluated.

Q. So, again, sitting here now, you can't think of any job that requires one but not the other?

A. These are different cognitive abilities. The subject matter experts identified the cognitive abilities that they thought were most important to their role. Some of them identified general intelligence, others identified inductive reasoning, others identified deductive reasoning. These are the words that were used and they're different constructs in psychology.

Q. But I'm asking you a different question, and I need you to answer it if you can. Which is, sitting here today, can you think of any job at Goldman Sachs that requires one but not the other?

A. When you say "require" --

MS. DAVIDOFF: Object to the form. Asked and answered.

THE WITNESS: Again, my work analysis did not evaluate the extent to which -- I mean, you're asking essentially if I defined the jobs that exist within corporate title.

BY MS. GEMAN:

Q. No. I'm asking you a question. A simple question. Can you think of any job at Goldman Sachs in the associate or vice-president level that -- where to do the job, you need to have cognitive ability but not inductive reasoning ability or vice versa?

A. Again, the definitions of these two abilities are clearly different. Cognitive ability is focused on the acquisition and application of knowledge. And so, essentially, that's how quickly can you get up to speed and learn on the job. That's a distinct ability relative to inductive reasoning which is much more specific, combining pieces of information to form general rules or conclusions.

Q. I know what the words mean. What I'm asking you is whether you can think of any job at Goldman Sachs at the associate or vice-president level that requires one of those but not the other?

A. Again, that's not what I was asked to do. As I sit here, there are no examples that are coming to mind, but that may very well be obvious in the backup materials. The work analysis focused on what were the most important abilities (inaudible).

Q. Can you think of any jobs, sitting here now, at Goldman Sachs in the associate or vice-president level that require inductive reasoning but not deductive reasoning or vice versa?

A. Again, these are separate abilities according to O*NET. This is something else that O*NET views as separate.

The work analysis focused on asking subject

matter experts what the most important characteristics were.

MS. GEMAN: Madam Court Reporter, do you mind reading my question back.

(Record read.)

MS. DAVIDOFF: Objection. Asked and answered.

THE WITNESS: Yeah. Again, as I sit here, nothing is jumping out at me, but the backup materials would provide examples for people who identified one or not the other.

BY MS. GEMAN:

Q. Is your view if somebody identified one but not the other, that that means that the job only requires one but not the other?

A. It means that the incumbent identified one as important and not the other as important. So those are different response patterns.

Q. Right. But what I'm asking is if the incumbent -- and, obviously, people confuse inductive and deductive all the time. But putting that aside, if the incumbent identified one but not the other, would that mean that the job didn't require the other one or only that the incumbent had identified one rather than the other?

C E R T I F I C A T E

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

Nancy J. Martin, RMR, CSR

Dated: June 5, 2021

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)