# Exhibit 08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 10-cv-6950-AT-RWL
- - - - - - - - - - - - - - - - - - - - -x
H. CHRISTINA CHEN-OSTER, SHANNA ORLICH, ALLISON GAMBA, and MARY DE LUI,

Plaintiffs,

-against-

GOLDMAN SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,

Defendants.
- - - - - - - - - - - - - - - - - - - - -x

May 25, 2021
9:15 a.m.

HIGHLY CONFIDENTIAL

VIDEOTAPED ZOOM DEPOSITION of CAREN GOLDBERG, Ph.D., an Expert Witness, located in Vienna, Virginia, taken in the above-entitled action, taken before Dawn Matera, a Certified Shorthand Reporter and Notary Public.

*     *     *

APPEARANCES:

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Attorneys for Plaintiff
275 Battery Street, 29th Floor
San Francisco, California 94111

BY: MICHELLE A. LAMY, ESQ.
mlamy@lchb.com
BY: KELLY DERMODY, ESQ.
kdermody@lchb.com

BY: JESSICA MOLDOVAN, ESQ.
jmoldovan@lchb.com

OUTTEN & GOLDEN
Attorneys for Plaintiffs
601 Massachusetts Ave, NW Second
Floor West Suite
Washington, DC 20001
BY: ADAM KLEIN, ESQ.
atk@outtengolden.com

BY: MICHAEL DANNA, ESQ.
mdanna@outtengolden.com

APPEARANCES: (Continued)

SULLIVAN & CROMWELL LLP
Attorneys for Defendants
1700 New York Avenue NW
Suite 700
Washington, D.C. 20006

BY: AMANDA FLUGG DAVIDOFF, ESQ.
davidoffa@sullcrom.com
BY: SAMANTHA R. BRIGGS, ESQ.
briggss@sullcrom.com

BY: ANN-ELIZABETH OSTRAGER, ESQ.
ostragerae@sullcrom.com
BY: MADELEINE G, BRUML, ESQ.
brumlm@sullcrom.com

PAUL HASTINGS LLP
Attorneys for Defendants
2050 M Street NW
Washington, D.C. 20036

BY: CARSON H. SULLIVAN, ESQ.

Also Present:

RYAN GALLAGHER, Videographer

VINCENT MAGGIANO, Concierge

ADAM HEFT, Goldman Sachs

MARGARET STOCKDALE

JEROME WILLIAMS, Cornerstone Research

promotion outcome signifies a lack of commitment to diversity, would it matter to you what the proportion of women are in the population eligible to be promoted?

MS. DERMODY: Object to form.

A. I am going to say that my focus, looking at the diversity climate issue, is not just on the proportion of women who have been promoted, whether that's in absolute terms or whether that's relative to the number available.

That, in addition to many of the other factors that I note in my report, such as women, you know, who are repeatedly, you know, from every People Survey that I looked at, up through 2017, indicates that women are expressing concerns about not understanding how the process works, and there being a lack of meritocracy. So it's the, you know, sort of the opening up in addition to these other elements that comprise the diversity climate.

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.
Q. But looking at the ultimate outcome issue, what ultimate outcome about cross-ruffing is it that causes you to conclude that there is an antifemale diversity climate at Goldman Sachs?
MS. DERMODY: Object to form.
A. Yeah, I think that's not actually what I said, so.
Q. Well, okay. I can ask you. What is it about the promotion statistics that's relevant to your opinion about the climate at Goldman Sachs?
A. What is it about the promotion what?
Q. Statistics, results.
A. Oh, okay. It's the fact that Goldman Sachs, again, you know, everybody is screaming here in all of these committees, you know, we need to hold people accountable, we need to, you know, we have these goals of female representation that they keep not meeting. And people keep shouting, what about headcount. And they are just not

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

moving the needle. And people are, again, in these committees are saying maybe we should go back to the scorecard. You have 47 top HR and DEI people, you know, talking more about holding people accountable for diversity goals, and it just keeps falling on deaf ears.

Q. So is the relevant point the extent to which female representation is increasing at the managing director level?

A. Well, I would say there is not anything that I would characterize as the relevant point. I mean there are a lot of -- again, this is a constellation of factors that I look at, you know, based on what the scientific literature says. And I look at how those facets play out at Goldman Sachs. So I wouldn't say there is any one that I would call the factor -- and now I forgot the second half of your question.

Q. I was trying to get at, what data about promotions is relevant to your

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

analysis.

A. I was not really focusing that much on the absolute percentage. Again, I am focused on Goldman's stated goals, and Goldman's failure to achieve them, as well as the fact that there is not any assessment of which of the programs that they engage in are helping, as well as the fact that women at Goldman Sachs continued to, you know, sort of report year after year after year that, you know, hey, this isn't a meritocracy here.

Q. You're talking about People Survey data?

A. Yeah.

Q. What role does People Survey play in your case study?

A. Again, in this whole process of triangulating different sources of data, that is one of the data sources that I considered.

Q. Did you consider the People Survey data that you use in your case study to be reliable?

A. In what way do you mean reliable?

Q. Do you use the term "reliable" in thinking about how to perform your case studies?

A. Yeah. So I would say insofar as that, yeah. I have no reason to believe these are fake data. And I have every reason to believe that any other scholar who were to perform a case study after me with the data that they had, would reach a similar conclusion with regard to the diversity climate assessment.

And, in fact, the fact that Dr. Stockdale completely avoided the diversity climate assessment, that is really the assessment in the academic literature I thought spoke to that point.

Q. Were there any parts of the People Survey data that you considered unreliable?

MS. DERMODY: Object to form.

A. Well, now I think you're having

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

to get into a very different definition of reliability.

Q. I just want to use your definition as you were just using it in your last answer when you said yes, yes, I believe people -- I have no reason to believe these are fake data. In whatever sense you were using it in your last answer.

A. I still have no reason to believe that people expressed anything, other than their honest opinion.

Q. Are you providing an opinion in this case about whether cross-ruffing has a discriminatory impact on woman professionals at Goldman Sachs?

A. No.

Q. Are you providing an opinion in this case about whether the cross-ruffing process serves a legitimate business need?

A. No.

Q. Are you providing an opinion about whether there is a less

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

discriminatory alternative to cross-ruffing that would accomplish the same business need at Goldman Sachs?

A. No.

Q. Did anyone other than plaintiffs' counsel review or comment on your reports in this case?

A. No.

Q. I think we discussed earlier that you read Dr. Stockdale's expert report in this case, right?

A. Yes.

Q. Before this case, were you familiar with Dr. Stockdale and her work?

A. I thought I was.

Q. Have you read any of her articles?

A. I have. As I mentioned, she invited me to be on a panel at SIOP. We do work in the same sphere. We knew each other professionally.

Q. What's your opinion of Dr. Stockdale's work, outside of the litigation context?

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

A. Prior to this, I had a favorable impression of her.

Q. Do you believe Dr. Stockdale is qualified to provide an opinion as to whether Goldman Sachs has implemented scientifically supported and other leading practices that provide a culture and climate that's not tolerant of gender bias and that is supportive of women and their career success?

MS. DERMODY: Object to form.

A. Qualified how?

Q. By her education and experience.

A. She should be.

Q. She has a Ph.D. in industrial organizational psychology from Kansas State University, right?

A. I'll take your word for that. If you represent to me that that is true, I will accept that.

Q. She's authored dozens of academic articles and peer-reviewed journals discussing sexual harassment

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.
stereotyping and other industrial organizational psychology issues in the workplace?
MS. DERMODY: Object to form. Assumes facts not in evidence.
A. Can you repeat the question?
Q. Isn't it the case that she's authored dozens of academic articles and peer-reviewed journals discussing sexual harassment, stereotyping and other industrial organizational psychology issues in the workplace?
MS. DERMODY: Object to form. Assumes facts not in evidence.
A. I am aware of her publication record. And that's particularly why I find it problematic of how she approached the current matter.
Q. Right. And she finds your approach problematic, too, right?
MS. DERMODY: Object to the question. Argumentative. Badgering the witness.
You don't need to answer that.

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

Q. Help me then. I thought I was pretty -- I thought I had it right. What did I get wrong?

A. Okay. So if I cited something in both reports, I think I would have included it here in the second one. So there is redundancy. There is just not a redundancy of the entire universe. Does that make sense?

Q. I understand. To the extent there is documents in reply Appendix A that are not in report Appendix 2, those are documents you didn't review for your opening report but that you did review for your reply report; is that right?

A. I think so, yes.

MS. DAVIDOFF: Okay. Great. All right. Do you want to take a break?

THE WITNESS: Yes.

THE VIDEOGRAPHER: Going off the record now at 3:44 p.m.

[Discussion held off the record.]

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

THE VIDEOGRAPHER: Now going back on the record at approximately 4:05 p.m., beginning at media 5.

Q. Dr. Goldberg, what is the case study method?

A. The case study method is a qualitative data analytic approach.

Q. And what does it entail?

A. It entails reviewing a variety of different sources of information starting with a theoretical framework as your backdrop.

Q. And then what?

A. Then once when it determines what the appropriate theoretical frame work is, they review whatever materials are available.

In this case I have the deposition testimony, e-mails, meeting notes, presentations, external communications, and so forth I guess.

And we looked for information that was relevant to, in the case of the diversity climate, the 11 items. And in

the case of the tolerance for sexual harassment, the nine items.

Q. Is there any other steps after that?

MS. DERMODY: Object to form.

A. And reach an opinion based on that information.

Q. Okay. Does that complete the process?

A. In a quite general sense. That is the abridged version.

Q. You said you -- in the step, the middle step, you said once you determine the theoretical framework that you review the materials and look for information that was relevant to the 11 items or the nine items. Did I summarize that right?

A. I am not sure -- the first step is determining a theoretical framework. I don't know if the way you just phrased that made that clear.

Q. Okay. Well, in that step where you're looking for information relevant

to the frame work or frame works that you're using, how do you organize the information, if at all?

A. So, for example, if we go to the 11 items, right, so those are on page 8 and 9.

Q. I am sorry, in Exhibit 181?

A. 181, yes.

Q. Sorry, go ahead.

A. And that is the frame work for determining a fairness and discrimination diversity climate. That is accepted in the literature on diversity climates.

So with that as my frame work, I then review the materials. And if any materials, any information pops out that is related to these 11 categories or 11 items, I note them in my notes which eventually become my report.

Q. Would you call that a coding exercise?

A. It is a coding exercise. But in the context of a case study, the first step in coding is determining the

theoretical frame work.

Q. Does that make it different from coding in some way? I am just trying to understand your answer.

A. Well, it makes it different from coding in other types of qualitative research.

Q. What is coding in your understanding?

A. So coding is the means by which, or the theoretical -- in the first stage coding is determining the theoretical frame work. And the second stage coding is determining the pieces of specific information that are relevant to that, to the first order codes.

Q. Okay. And so am I right that you -- and I'm taking just your opening report here -- am I right that you looked at the materials in Appendix 2 and put each of them into a code or not, potentially, that matched up with the 11 diversity frame work metrics?

A. I don't think that's an

accurate characterization.

Q. Okay. What did I get wrong?

A. So I didn't put each individual item in. So it could be -- a perfect example would be a deposition transcript, right. Because in any given deponent's testimony, they may have touched on several of these issues.

So it's not like I take, okay, Gary Cohn's deposition belongs under item 8, but Ms. Hunt's deposition testimony falls under item 2. It's, I go through, you know, the entirety of the deposition and sort of look for, are there issues that talk about, you know, the goal of increasing diversity is it taken seriously. Are there issues or elements that speak to members of an historically marginalized group have access to leaders. So on and so forth.

Q. And let's just take one of those examples. You go through a deposition. You find something relevant to one of the elements. Then, what do

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

you do?

A. I type it or paste it, depending on what the format of the source is.

Q. Okay. So I'll try it one more time. If I don't get it right, I hope you'll just explain it to me.

Then is it right that you looked at the materials in Appendix A and identified excerpts from them that fit into each of your elements, and then categorized those excerpts by element?

MS. DERMODY: Object to form.

A. I would say that's reasonably -- that's a reasonable description.

Q. So anything that you considered relevant to the 11 elements of the diversity frame work or the nine elements of the sexual harassment frame work, would have been categorized into one of the elements of those frame works; is that right?

A. Or more. I mean sometimes things are relevant to a multiple of

are doing a case study?

A. Different sources of data may have richer information about certain aspects of the frame work than others, and vice-versa.

Q. Different sources of data could have different information about the data than others, right?

A. That's true as well, yes.

Q. Okay. And so how does triangulation help with that problem of different sources of information having richer or different information about certain aspects of the frame work?

A. Well, as a researcher -- you know, I think I noted in my initial report, if there are disparate pieces of information, one needs to consider which source is most likely informative.

So, for example, if, you know, the marketing literature to, you know, new recruits says, you know, we have a great environment for women. And the People Survey results say, you know,

women don't feel like there is meritocracy. So the researcher needs to resolve which source is likely most relevant.

Q. So triangular would be the first step in terms of a researcher deciding which different pieces of information to credit, if they are inconsistent?

A. I don't think I would call triangulation a step. Triangulation is a process that kind of occurs throughout as the sources of information are being coded.

Q. Okay. When you're doing a case study, in a very practical way, how do you engage in triangulation?

A. So --

Q. I can ask it in a different way?

A. Yeah, I don't really know exactly what you're looking for.

Q. Discussing -- we were talking earlier about putting excerpts into

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

categories as part of your case study. In that process, where does triangulation fit in, if at all?

A. So again, triangulation is part of that. So as I am going through -- now I need to go back to my other one -- my 11 diversity climate items, or as I am taking notes on anything.

I am going to sort of look at where it falls in these 11 categories, and that's going to be the notes that I am taking on meetings. The notes that I am taking on e-mails. The notes I am taking on e-mails. The notes that I am taking on deposition testimony. So on and so forth.

And so all three of those are going to go into my notes comprising my second order codes, and into what eventually gets put into those 11 item categories.

Q. Okay. And how does triangulation fit into that process?

A. So triangulation is the

consideration of multiple sources of data. So it may be that I have, you know, one source of information saying that employees can count on receiving a fair performance evaluation regardless of their demographic background. And then I have information from employees saying that we don't think we can count on getting a fair performance evaluation.

So in the context or in a situation like that, I would look at the employee's perceptions, if there is a divergence between those two.

Q. Okay. And would you sort of record that decision in some way as part of this process or how would you reflect it in your process?

A. I didn't. I don't think there would be any researcher that would disagree with me that employees are a better source of whether employees can count on receiving fair performance than any information coming from other spokespeople of the company.

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

Q. Are you talking about People Survey data?

A. Largely in that particular example.

Q. Are there any sources of information about employee perception that you can think of at Goldman Sachs and the work you did, that are better sources of information about the employee's perceptions than the People Survey data?

MS. DERMODY: Object to form.

A. It varies from item to item. That was my pause, I was kind of going through -- I have my report in front of me -- going through each item, and weighing if I can think of an example where the People Survey would not be the best.

Q. So did you identify any examples?

A. Yeah, I guess the managers are held accountable for diversity goals, would be one example where other

documents outside of the People Survey would be much more informative.

Likewise, the diversity-related training being taken seriously, is something that most employees do not have a means of truly assessing, because most employees don't know what the factors that contribute to effective training are.

Q. So is there any source besides the People Survey data that is a better source of information about employee perception? And tell me if that's unclear and I will reask it.

A. I think it's clear. Give me a moment to -- well, not all of these items are assessed by the People Survey, right? So the People Survey measures the People Survey items that Goldman Sachs thought they wanted to measure on the People Survey. And those don't necessarily correspond to the perceptual items on, that their researchers have deemed relevant for assessing diversity climate.

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

Q. Fair enough. But to the extent that employee perceptions are relevant to your analysis, my question is is there any better source of information about employee perception than People Survey data?

MS. DERMODY: Object to form.

A. Better sources that were available?

Q. Yes.

A. I think for the most part, the last subfactor, the organization's commitment to diversity items. So for example, number 9, commitment to diversity is unquestioned.

Well, certainly that's an employee perception relevant item but it also is the case that the board of directors questioned Goldman Sachs's commitment to diversity.

Q. But to the extent you're looking to understand employee perception, was there better data available to you than the People Survey

HIGHLY CONFIDENTIAL - C. GOLDBERG, Ph.D.

for purposes of this case?

MS. DERMODY: Object to form.

A. And again, I am saying that not every item in here is measured in the People Survey. So I think your question presupposes that the People Survey data are useful in assessing employee's perceptions on the employee perception-related items in the, in the diversity climate scale. And that's not necessarily the case.

Q. Maybe untethered from the diversity climate scale, to the extent that you want to understand employee perceptions for purposes of a case study, is there a better source of information about those perceptions than People Survey data?

MS. DERMODY: Object to form.

A. So there could be. I mean there is nothing universal. So, for example, reading a lot of the investigative files was far more informative to me than one could -- than

the information one could ever glean from a survey.

Q. And why was that?

A. Well, I think some of the interview notes suggested -- well, you have some of these investigations that are, you know, 100-plus pages long. You get a lot more detail in 100 pages than you do in one or a handful of items in a seven point scale or, excuse me, a five point scale that gets collapsed to two or something. Whatever it is.

Q. Is information provided by a single person like comparable to People Survey data provided by thousands of people.

A. Comparable in what way?

Q. Well, I think you were comparing them. I think you were saying you learned much more from the investigative files than from People Survey data.

So I am trying to understand, you know, whether data learned about what

CERTIFICATION

I, DAWN MATERA, a Notary Public, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of May, 2021.

Dawn Matera

DAWN MATERA

* * *