# Exhibit 09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 10-cv-6950-AT-RWL

-------------------------------------x

H. CHRISTINA CHEN-OSTER, SHANNA ORLICH, ALLISON GAMBA, and MARY DE LUIS,

Plaintiffs,

-against-

GOLDMAN SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,

Defendants.

-------------------------------------x

June 4, 2021
11:13 a.m.

** CONFIDENTIAL **

REMOTE VIDEOTAPED DEPOSITION of LEAETTA HOUGH, Ph.D., an Expert Witness, before Anthony Giarro, a Registered Professional Reporter, a Certified Realtime Reporter and a Notary Public of the State of New York.

A P P E A R A N C E S :

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Attorneys for Plaintiff
250 Hudson Street
New York, New York 10013
BY: RACHEL GEMAN, ESQ.
rgeman@lchb.com
JESSICA MOLDOVAN, ESQ.
jmoldovan@lchb.com

SULLIVAN & CROMWELL LLP
Attorneys for Defendants
1700 New York Avenue N.W.
Suite 700
Washington, D.C. 20006
BY: AMANDA FLUG DAVIDOFF, ESQ.
davidoffa@sullcrom.com
ALISA LU, ESQ.
lua@sullcrom.com

SULLIVAN & CROMWELL LLP
Attorneys for Defendants
125 Broad Street
New York, New York 10004
BY: MADELEINE G. BRUML, ESQ.
brumlm@sullcrom.com

PAUL HASTINGS LLP
Attorneys for Defendants
2050 M Street NW
Washington, D.C. 20036
BY: CARSON H. SULLIVAN, ESQ.
carsonsullivan@paulhastings.com

A P P E A R A N C E S (Cont.):

ALSO PRESENT:
SEAN MORRISSEY, Concierge Tech
ERIC DUNLEAVY, DCI Consulting
BRIAN FRYED, Cornerstone Research
BARBARA NETT, DCI Consulting
JONATHAN SOKOTCH, Goldman Sachs
ANGIE ROSENBAUM, DCI Consulting
COREY WAINAINA, Videographer

extreme temperatures or maybe really confined quarters? Kind of physical nature of the work. And sometimes circumstances refers to other things as well. But it's the context of the work.

Q You mentioned activities, past work functions and work responsibilities in circumstances or contexts of the work.

Are there any other factors about work that you take into account when you're defining a job?

A Well, you often typically also describe the worker characteristics that enables someone to perform those activities, tasks, the skills and abilities and knowledge and other attributes that enable a person to perform effectively, the actual work.

Q Anything else that you would use to define a job?

A I'm sure there are. I can't think of any right now.

Q And if there are differences

DR. LEATTA HOUGH -- CONFIDENTIAL
along the factors you just described -- activities, tasks, work functions, work responsibilities, context, worker characteristics -- at some level of difference, would you determine that the jobs are different?
MS. GEMAN: Objection.
A I would like to -- I don't know that you included the word "behavior" in what constitutes the work itself. But it should be included. So what was your question? I'm sorry.
Q If all the factors that you've identified as being useful in defining work or considering all the factors you've identified as being useful in defining work, if they differ from one job to another, is that how you determine jobs are different?
MS. GEMAN: Objection.
A Well, you look at similarities and differences. It's the combination of similarities and differences on these factors that are

used to determine whether or not work or jobs, however you want to use the terms, are -- how different are they, how similar are they? It's a gradation.

Q What is a work analysis in your terminology as an I-O psychologist?

A A work analysis is when you study the work performed and the requirements of the -- of people to perform that work effectively.

Q What purposes are work analyses used?

A Oh. Huge number of things. They're used obviously for selection, promotion, performance appraisal, training. They're used for determining the amount of time that people should spend on tasks. Virtually, any of the human resource management functions are based on work analysis. The structure of how work is conducted, I should say the processes by work, how work is conducted is a part of work analysis. It's anything to do with the work that's

DR. LEATTA HOUGH -- CONFIDENTIAL

performed -- well, it doesn't even have to be in an organization. It can be volunteer groups, whatever, if you're analyzing the work. Anything related to the work.

Q Is it fair to say work analysis is an essential tool in I-O psychology?

A Yes.

Q Do you agree that there's no single approach that's the preferred method for work analysis?

A Yes.

Q Do you agree that there's no right way method or strategy for analyzing work?

A Well, it depends on the purpose. And then depending upon the purpose, some approaches are simply not appropriate, whereas others are. It depends on what you're doing. So, for example, one of the things I did specifically name as a function of work analysis is determining job structures.

DR. LEATTA HOUGH -- CONFIDENTIAL
And that's an important part -- I kind of alluded to it. But that's an important part of work analysis.
Q Are you saying some methods or strategies for analyzing work are appropriate for some purposes and not others?
A They're more appropriate, yes, for some -- some methods are more appropriate for certain kinds of purposes than others.
Q But is it fair to say that -- and as a general matter, there's no right way or method or strategy for analyzing work at large?
A Work at large, correct. But it depends on the purpose.
Q Sure.
There are many ways and methods to conduct a job analysis; is that right?
A There are many approaches to conducting work and job analysis. And some are more appropriate, some are

inappropriate for certain purposes.

Q When you've done work analyses, you haven't used the exact same methodology every time, have you?

A Exact methodology, probably not. But in general, fairly similar.

Q Well, don't you use different methodologies, depending on the purpose of the work analysis and the circumstances?

A Yes, you do, and I do. But some methods are, in general, better because they are multipurpose. And they are going to provide the client with information about a variety of their HR systems.

Q So I'm sorry.

Are you testifying there are some methods of work analysis in I-O psychology that are generally considered better than other methods?

A Depending upon the purpose, yes. There are articles, chapters written about that in evaluating the

DR. LEATTA HOUGH -- CONFIDENTIAL

methods that are more appropriate for certain uses.

Q Sure.

But setting aside the purpose, I think you've testified a couple of times that the purpose of the work analysis determines the method of work analysis you're going to use; is that right?

MS. GEMAN: Objection.

A The purpose is critically important to determining what method that I would use and the field would recommend.

Q But before you know the purpose, I'm just talking about work analysis generally, is there some one method of work analysis that's better than other methods of work analysis?

A My opinion is that in general, some are better than others in general.

Q Let's take a look at tab 7. This will be Exhibit 206.

DR. LEATTA HOUGH -- CONFIDENTIAL

(The above-referred-to document was marked as Exhibit 206 for identification, as of this date.)

Q To your deposition, I believe.

A Which exhibit is it?

Q It should be 206, I believe.

A I don't have that.

MS. BRUML: Uploading right now. If you refresh, it should be there.

MS. GEMAN: I've refreshed. And I don't have it. I'll try again.

A I do have it now.

MS. DAVIDOFF: Do you have it, Rachel?

MS. GEMAN: Yes.

Q Is Exhibit 206 a declaration you submitted in the Ellis versus Google matter?

A I can't get beyond page 1. Here we go. Yes. I can't get beyond -- I don't know. Okay. Now I can. Okay. Yeah. Yes.

DR. LEATTA HOUGH -- CONFIDENTIAL
Q It can take a little while to download.
If you can -- sorry. You wrote this declaration?
A I wrote this report, yes.
Q Can you please take a look at paragraph 11 of your report?
MS. GEMAN: Can you tell us the page number, please?
MS. DAVIDOFF: 9.
A Yes. I see that.
Q You wrote, "There are many ways and methods of conducting job analysis"; is that correct?
A Yes. That's correct.
Q And you agree with that statement?
A Yes.
Q At the end of that paragraph, you wrote -- sorry. Let me go on.
You said, "Handbooks on job/work analysis, chapters in personnel selection handbooks, chapters in

DR. LEATTA HOUGH -- CONFIDENTIAL

industrial organizational psychology handbooks, and related articles and books on validation of personnel decisions described many methods and strategies for analyzing work, work context and the knowledge, skills, abilities and other characteristics that enable and facilitate work accomplishment."

Did I read that right?

A Yes.

Q And do you agree with that statement?

A Yes.

Q You followed up with, "All the authors of these scholarly materials concur in stating there's no one right way, method or strategy for analyzing work."

Do you see that?

A Yes.

Q And do you concur with all of those authors, that there's no one right way, method or strategy analyzing work?

DR. LEATTA HOUGH -- CONFIDENTIAL
analyses using their data.
Q Evaluating the similarity of jobs, and the same job code is part of that work; right?
MS. GEMAN: Objection.
A Yes.
Q But you're saying that was not a work analysis that you did?
A As I said, I did not gather, I did not conduct the job or work analysis. Another company conducted the job analysis, gathered the information, analyzed the information. I used that information to inform my analyses and opinion.
Q In this case, did you conduct a job analysis?
A What do you mean by this case? You're referring to Google?
Q Sorry.
In the Chen-Oster case, the case we're here on today, did you conduct a job analysis?
A I did not conduct a job

DR. LEATTA HOUGH -- CONFIDENTIAL
analysis in this case.
Q Have you ever used a structured interview before in your work as an I-O psychologist?
A Yes. In conjunction with gathering information that was used for other things, other steps as a first step, yes, I have used structured interviews.
Q Can you give me some examples or an example where you've used a structured interview?
A Virtually, every job analysis I've done, one of the early steps is to conduct a job -- a structured interview in conjunction with many additional steps about refining the information that is obtained in those interviews.
Q What is a structured interview?
A A structured interview is when you have a set of questions that have been determined ahead of time of

DR. LEATTA HOUGH -- CONFIDENTIAL

what those questions would be. And then you follow that template or that protocol during the interview.

Q So let's go back to your use of structured interview.

Have you ever used structured interviews of subject matter experts in your work analysis?

A Are you asking, have I conducted structured interviews in interviewing subject matter experts?

Q Yes.

A Yes, I have.

Q And what is a subject matter expert?

A Someone who's very knowledgeable about the content of whatever you're talking about.

Q In the context of work analysis, what is a subject matter expert?

A A subject matter expert in the context of job analysis is someone who is very knowledgeable about the work,

DR. LEATTA HOUGH -- CONFIDENTIAL

the work itself, the circumstances of the work and the knowledges, skills and abilities that are needed to enable someone to perform that work effectively. It could also be someone who's knowledgeable about the organizational structure and that would be, again, knowledgeable about the structure.

Q What's an example of a subject matter expert in the context of work analysis?

A Well, one example would be a person who is working on the -- at that job who has been there a sufficient amount of time to know the work, what's needed, to know it well and is also an effective performer of that work. That's one form of subject matter expert.

Q Under what circumstances would an I-O psychologist conduct subject matter expert interviews for a work analysis?

MS. GEMAN: Objection.

A It would be one of the

first -- maybe not the first, certainly not the first, but one of the first steps in conducting a job analysis, followed by an iteration of the information that was obtained during those interviews to confirm, revise the information, such that you go back and ask perhaps the same or additional subject matter experts about the information, perhaps if you're forming tax -- taxonomies or groupings of work that are basically the same, you want to use their terminology, you want a common language, so that the people that you're talking with, these subject matter experts, can communicate with you in the same language that other people doing that similar -- that same work or similar work would communicate that information, so that there's an agreed-upon.

And that's just one aspect of the information that needs to be confirmed, revised from subject matter experts that are interviewed. But as I said, that is -- interviews typically are

DR. LEATTA HOUGH -- CONFIDENTIAL

one of the very first steps.

Q What are the benefits of using a structured interview of a subject matter expert in work analysis, if any?

A The benefits that are that you are gathering information in a systematic way. And if you've set up your interview questions, such as you're gathering information about the full range of the job, you can be more certain that you've, in fact, gathered the information that is needed to conduct a thorough understanding or to gain a thorough understanding of the work and the worker requirements.

Q When you've undertaken structured interviews, Dr. Hough, have you ever used open-ended questions?

A Yes.

Q When you've undertaken structured interviews in connection with work analysis, have you used close-ended questions?

A Yes.

DR. LEATTA HOUGH -- CONFIDENTIAL

Q In terms of the topics that are covered in a structured interview for work analysis, does a structured interview include questions about the knowledges of the incumbents in the job?

A To the extent that they're needed to perform the work, yes. That's important information.

Q Does a structured interview in a work analysis include questions about the skills of the incumbents in the job, to the extent they're needed to perform the work?

A Yes.

Q Does a structured interview in a work analysis include questions about the abilities of incumbents in the job, to the extent they're needed to perform the work?

A It often does. But it depends on what -- for all of these questions, it depends on what you're trying to learn in that interview for that.

DR. LEATTA HOUGH -- CONFIDENTIAL

Q Does a structured interview in a work analysis include questions about the responsibilities that incumbents in the job have to undertake?

A That is one part of what a structured interview would often ask in a job analysis framework.

Q Does a structured interview in a work analysis include questions about contextual work factors for that work?

A Often does, yes.

Q And, by the way, I've used the term "work analysis" a few times. You've used the term "job analysis" a few times. I think we've probably used them both.

Is there a difference between work analysis and job analysis in your opinion?

A They're used interchangeably. And I use them interchangeably.

Q Okay. I will also use them

DR. LEATTA HOUGH -- CONFIDENTIAL
turn to your March report, Exhibit 203, in hard copy?
A I have it.
Q And looking at paragraph 79 to 90, is that where you've identified your criticisms of Dr. Dunleavy's taxonomy of knowledges?
A 79 to 90?
Q Right.
A I think I referred to taxonomies in several places in the report. So they would apply to knowledges as well.
Q Okay. Fair enough. Well, let me ask more generally then.
Have you identified a particular taxonomy of knowledges that you believed Dr. Dunleavy should have used for his work in this case?
A My -- I have not identified a particular taxonomy. My point is that a taxonomy needed to be developed, specific to Goldman Sachs, that consisted of mutually exclusive non-overlapping

DR. LEATTA HOUGH -- CONFIDENTIAL

homogeneous taxons or groupings of knowledges or skills or abilities, whatever the topic was. And so it's a matter of tailoring, taking an existing taxonomy and tailoring it by obtaining information from subject matter experts at the organization, in this case, Goldman Sachs, and developing a taxonomic structure that consists of language that they understand, that they agree on, such that it's common language for them and commonly understood by them, so that, for example, you don't have issues of, oh, well, that's really the same thing to me, but it's really in this other area.

So you want them to come to agreed-upon definitions. And that takes a significant amount of back-and-forth and iterative development of a taxonomic structure that is for a particular organization.

Q So I want to take that in a couple of pieces.

First of all, just to make

DR. LEATTA HOUGH -- CONFIDENTIAL

sure I understand, is it your opinion that Goldman Sachs -- sorry. Let me start over.

Is it your opinion that Dr. Dunleavy should have used any existing taxonomy to categorize any of the work factors he looked at: Knowledges, skills, abilities, personal attributes?

MS. GEMAN: Objection.

A Using an existing taxonomy only as an initial starting point and then tailoring it by going back to the subject matter experts in getting their input and refining, an iterative process.

Q So you would agree there's no taxonomy that's already been developed that could be used to categorize all of the knowledges, skills, abilities and personal attributes observed among associates and vice presidents at Goldman Sachs?

MS. GEMAN: Objection, misstates testimony.

A I would say that there are

DR. LEATTA HOUGH -- CONFIDENTIAL

taxonomies that you could start with and modify to arrive at a taxonomic structure of all these various features or skills, abilities, knowledges, responsibilities, all of those things.

Q But there's no taxonomy that exists that you could use without modification as it stands to arrive at a taxonomic structure of all the various features or skills, abilities, knowledges, responsibilities of associates and vice presidents at Goldman Sachs?

A Well, in thinking about it, it's possible that the abilities, set of taxons that exist in the Fleishman or the O*NET would be something that could be used to gather information from the incumbents and asking them how important is this ability to your job, how much and in that way, gather information on each of those ability statements and compare across incumbents, their statements about the importance of each of those to their

DR. LEATTA HOUGH -- CONFIDENTIAL

job.

Q So just to make sure because you said it's possible, and I want to get your opinions as an expert in this case, is it your opinion that the abilities set of taxons in the Fleishman or the O*NET could be used without modification to categorize the abilities of associates and vice presidents at Goldman Sachs?

MS. GEMAN: Objection, misstates testimony.

A I would say that it's -- I would want to take a look at that entire taxonomic structure. But it's possible that it could be used, the abilities taxonomic structure, that it's possible that while I'll look at it carefully, that it's possible.

Q Have you -- as of today's date, have you done the work to determine whether the abilities taxonomic structure from Fleishman or O*NET could be used without modification to categorize the abilities of vice presidents and

DR. LEATTA HOUGH -- CONFIDENTIAL

associates at Goldman Sachs?

A I think you've asked me a confusing question because you asked me about categorizing there, the incumbents categorizing their abilities. I was suggesting that you might use that taxonomy to rate the importance of the ability for that job.

Q My question is not really related to the categorizing issue. My question is whether you've done the work as of today's date to determine whether the abilities taxonomic structure from Fleishman or O*NET could be used to rate the importance of the abilities of the jobs of associates and vice presidents at Goldman Sachs without modification.

A I have not done that analysis as of today.

Q So are you offering that opinion in this case, that the abilities taxonomy from Fleishman or O*NET can be used without modification to rate the importance of the abilities of the jobs

DR. LEATTA HOUGH -- CONFIDENTIAL

of associates and vice presidents at Goldman Sachs?

MS. GEMAN: Objection, misstates testimony, asked and answered.

A I said that I would want to take a look at it before I determined that it could be used as is, that it's, I believe, possible that it could be.

Q And you're saying you agree it's not possible to use the taxonomies from O*NET or Fleishman or any other existing source without modification to categorize the knowledges, skills, other attributes of associates and vice presidents at Goldman Sachs; is that right?

Sorry. I said categorize again. Let me try it again.

So you're saying you do not believe that the O*NET or Fleishman or another existing taxonomy could be used without modification for incumbents to rate their knowledges, skills and other

DR. LEATTA HOUGH -- CONFIDENTIAL

attributes for associates and vice presidents at Goldman Sachs; is that right?

MS. GEMAN: Objection.

A I think that the knowledges that they're -- I don't know of an existing taxonomic structure for knowledges. It's possible that the other attributes, existing taxonomies could be used to rate the importance of the other attribute to the person's job.

Q Sitting here today, have you identified an existing taxonomy that could be used to rate the other attributes of vice presidents and associates at Goldman Sachs?

A I think the O*NET taxonomic structure would be a good candidate for that.

Q But sitting here today, have you identified an existing taxonomy? Are you offering the opinion that there's an existing taxonomy that can be used without modification to rate other

DR. LEATTA HOUGH -- CONFIDENTIAL
attributes of vice presidents and associates at Goldman Sachs?
MS. GEMAN: Objection.
A I'm testifying that I believe the O*NET taxonomic structure is a structure that could be used to rate the importance of these other characteristics to the work of an incumbent.
Q And you're saying it could be used without modification. That's your professional opinion?
A I believe so.
Q Is it your opinion that the -- when you say "the Fleishman taxonomy," let's make sure we agree on what we're talking about.
When you say "the Fleishman taxonomy," are you referring to the taxonomy published by Fleishman and Mumford in the job analysis handbook 1988?
A No. I believe that has changed since then.

DR. LEATTA HOUGH -- CONFIDENTIAL

Q So which version of Fleishman's taxonomy are you referring to?

A Well, he was a contributor to the O*NET project in terms of his research on taxonomic structures. And I believe that would be a current structure that would be more appropriately referenced.

Q So looking at -- just to make sure I understand, when you're referring to the Fleishman taxonomy or the O*NET taxonomy, are you really referring to the O*NET taxonomies as they currently stand?

A As they currently stand, yes.

Q Okay. Great. Thanks. That's very helpful.

A Dr. Fleishman's work is incorporated into O*NET. So that would be what I regard as most current version.

Q So to the extent that existing taxonomies could have been used

DR. LEATTA HOUGH -- CONFIDENTIAL

to -- as a starting point or otherwise in Dr. Dunleavy's work, are you referring to the current versions of the O*NET taxonomies?

A Yes, as a starting point, yes.

Q Okay. Great.

A And there might be others out there that are more specific to Goldman Sachs that exist.

Q Okay.

Have you identified any others out there that are more specific to Goldman Sachs?

A No. But it's not uncommon for industries to have groups of I-O psychologists that meet or at least know each other, and they exchange information along those lines. So it's possible that the I-O psychologists at Goldman Sachs have access to others, other taxonomic structures, other work that has been done at other investment companies like Goldman Sachs.

DR. LEATTA HOUGH -- CONFIDENTIAL
Q Are you aware of any groups of I-O psychologists in the financial services industry that have prepared and exchanged that kind of taxonomic information?
A No. But it's not uncommon in our field for those kinds of industry groupings to exist.
Q Right. I understand.
But you're not aware of any?
A That's correct.
Q Well, let's take a look then at the current O*NET taxonomy. And I'm going to ask to put up tab 42 as Exhibit 209.
(The above-referred-to document was marked as Exhibit 209 for identification, as of this date.)
MS. DAVIDOFF: For the record, I'm going to introduce as Exhibit 208, Dr. Dunleavy's work analysis, which we went ahead and uploaded because it's very large and takes a long time to upload. But

DR. LEATTA HOUGH -- CONFIDENTIAL
we're not going to use it right now. I just wanted it up there.
(The above-referred-to document was marked as Exhibit 208 for identification, as of this date.)
MS. GEMAN: Sorry. I'm trying to find the exhibits.
MS. DAVIDOFF: Do you want to go off the record?
MS. GEMAN: No.
A I have it.
MS. DAVIDOFF: We can go off if you're not ready, Rachel.
MS. GEMAN: I have 207. This is?
MS. DAVIDOFF: 209. Let's go off the record.
MS. GEMAN: Yup. I have it.
MS. DAVIDOFF: Oh, okay. We don't need to go off.
Q Let's take a look at -- let me ask you, Dr. Hough.
Do you recognize Exhibit 209?

DR. LEATTA HOUGH -- CONFIDENTIAL

A Yes.

Q What is it?

A I believe it's the O*NET abilities taxonomy.

Q And if you scroll down, do you also see the O*NET knowledges taxonomy and the O*NET skills taxonomy?

A Let's see. I see abilities. I see knowledges. I see skills. I don't see the other taxonomies that they developed.

Q But these are the O*NET's taxonomies abilities, knowledges and skills?

A Yes.

Q Now, you note in your March report that Dr. Dunleavy did not generate reliable, mutually exclusive categories with agreed-upon definitions. Do you remember that?

A Yes.

Q Now, what do you mean by mutually exclusive?

A Mutually exclusive means

that they are not overlapping in the sense that they have definitions, such that you can differentiate one taxon from other. And people would reliably differentiate them.

Q Does mutually exclusive mean that there is no overlap between the categories?

A Well, that's almost impossible to achieve. So there's going to be some overlap, some ambiguity.

Q Does mutually exclusive mean that the categories are not the same?

A It means that they are not the same categories. They are different, yes.

Q They're not duplicates of each other; right?

A Right.

Q So to be clear, is it your contention that existing and extensively researched taxonomic structures of skills, abilities and other attributes and knowledges are not overlapping?

MS. GEMAN: Objection, misstates testimony.

A There will be some overlap. As I said, it's virtually impossible to have total separation. So there would be homogeneous within, and they would be non-overlapping across. But there will be some -- the categorization is not perfect. So there will be some overlap.

Q I'm having a little difficulty with this one. Leave that exhibit up on your screen.

But if you could go to your March report, please, at paragraph 68.

A I have it.

Q You write, "Good taxonomies are characterized by non-overlapping mutually exclusive categories for taxons."

Do you see that?

A Yes, I do.

Q You don't literally mean non-overlapping, do you?

MS. GEMAN: Objection.

DR. LEATTA HOUGH -- CONFIDENTIAL

A I do mean non-overlapping. The question is, is it 100 percent non-overlapping? And that it's virtually impossible for humans to be able to develop or categorize things perfectly.

Q How overlapping is non-overlapping? How do you decide whether something's non-overlapping?

A Well, you can ask people to sort something into the various categories and see what kind of agreement there is among the sorters or raters. So that's a way of assessing whether or not there's overlap.

Q But even the O*NET taxonomies in your view do have some overlapping; right?

MS. GEMAN: Objection.

A I'm sure there is some overlap but not -- not a great deal. They are regarded as homogeneous within and non-overlapping across. And they're not perfect. But they are regarded as non-overlapping.

DR. LEATTA HOUGH -- CONFIDENTIAL

Q Why are they regarded -- or who regards them as non-overlapping if they actually are overlapping?

A People who study taxonomic structures, people in the field who are interested in taxonomic structures and using the taxonomies for practical purposes.

Q Did you identify a literature site in your March report that identifies the O*NET taxonomy as non-overlapping?

A I believe that the -- let's see. Let's look at the reference. I would think that the Peterson, yes. There are a couple of -- if you look on page 53, the Peterson, Mumford, Borman, Jeanneret and Fleishman reference and then the Peterson, Mumford, Borman, Jeanneret, Fleishman, Levin, Campion, Mayfield, Morgeson, Pearlman, Gowing, Lancaster, Silver and Dye, that reference would talk about the development of the taxons.

DR. LEATTA HOUGH -- CONFIDENTIAL

Q And do they identify the O*NET taxonomy as non-overlapping?

A That was their goal. That was their goal when they were working on these taxonomic structures. And as I said, are they perfectly non-overlapping? That would be almost impossible to achieve. And I would think they did use this kind of language because that is the language that Fleishman uses. And it's the language that all of those folks probably use.

Q Do you agree that --

A What page were we on?

Q We were on page 25 of your report.

A Okay. Thank you.

Q Do you agree that -- strike that.

A I would also point out that on that paragraph 68, I reference Fleishman and Quaintance. And I believe they characterized good taxonomies as non-overlapping and mutually exclusive.

DR. LEATTA HOUGH -- CONFIDENTIAL

analysis says, oh, these folks are doing different things when, in fact, they're doing -- if you had given them the information about what telecommunications meant and what the group would agree it means, then you would conclude that they might be doing very similar things. And so it's a series of interlocking kinds of issues and problems that emerge based on the set of steps that Dr. Dunleavy did and did not do.

Q And, Dr. Hough, I'm going to ask your indulgence to just listen really carefully to the questions and try to answer them a little more succinctly, if you can try to do that.

Now, let's take a look at your -- I hear what you're saying about giving the incumbents lists of taxons.

But is there a risk that taking that approach would create demand characteristics?

A I believe that virtually all research has demand characteristics

DR. LEATTA HOUGH -- CONFIDENTIAL

associated with it. So I don't know -- I don't know what they would be at this point. But there might be. I don't know what the demand characteristic would be. Put it that way.

Q Well, if you put a taxonomy in front of incumbents that didn't contain all of the knowledges or skills, whatever the taxonomy was for, didn't contain all of the knowledges or skills or personal attributes or other abilities of the job, might they select one that's close to the one that they want to select because the one they actually believe is not there?

MS. GEMAN: Objection.

A The point of the job analysis is to gather complete information about the job. So the person would not have developed a very good taxonomic structure if that, in fact, was the case.

Q Okay.

Well, is there a risk if you

DR. LEATTA HOUGH -- CONFIDENTIAL

used a taxonomy that's at too high a level of generality, that you don't have the ability to assess differences between different incumbents?

A If the level of generality is so high, yes, that is a possible problem.

Q And so when you're doing an analysis of similarities and differences between jobs, is it fair to say that you shouldn't use a taxonomy that's at too high a level of generality because then you can't identify differences?

MS. GEMAN: Objection, misstates testimony.

A I would say there is a risk in that there's also a risk in having the level of specificity so fine that you can't identify similarities. And for all practical purposes, there are similarities. So both ends of the continuum have problems.

Q There were a number of Goldman Sachs professionals who

DR. LEATTA HOUGH -- CONFIDENTIAL

identified knowledge of pension plans, including pension liabilities as important to their role.

Looking at the O*NET taxonomy of knowledges, that was Exhibit 209, where does that knowledge fit best?

MS. GEMAN: Objection.

A I don't see that in here. And I also said that I didn't think that the O*NET taxonomy of knowledges was likely or probably appropriate for Goldman Sachs.

Q If there's no taxonomy of knowledges, preexisting taxonomy of knowledges that's appropriate for Goldman Sachs, how can you do a work analysis that presents a menu of knowledges taxonomies to the incumbents and ask them to rate them?

A That's part of the initial steps that you take in a work analysis. And that is you would gather information about the jobs. You might look at prior work analysis. You might look at work

DR. LEATTA HOUGH -- CONFIDENTIAL

documents that are used. You might look at work products. That's an initial step. You would also gather information from subject matter experts, incumbents, supervisors using an interview, focus groups to elicit all of the different knowledges, skills, abilities, all the different things that make up the job.

And so that is an important first step before you present to the incumbents or supervisors or job analysts, whoever it's going to be, that's going to just assess or evaluate the jobs or describe the jobs you're using taxonomy.

Q In that methodology --

A As I'm saying, developing that taxonomy requires earlier work than when you're presenting it to the incumbents to get their ratings on how important or how much time they spend on it.

Q So in that methodology, how many interviews or focus groups, that

DR. LEATTA HOUGH -- CONFIDENTIAL

first step of sort of creating your taxonomies, how many interviews would have had to be done to do that first step?

A There's no set number on how many need to be done. When you start getting no more information and you start getting only redundant information, then you can take your list and do a pretest or have a focus group take a look at what you've developed and ask them what's missing.

Q Okay.

A So you -- these initial steps that involve these subject matter experts as input into developing this taxonomic structure is an extremely important step.

Q And you wrote in your report that Dr. Dunleavy's samples of interviewees were too small; right?

A Yes.

Q How big should his samples have been?

DR. LEATTA HOUGH -- CONFIDENTIAL

A Well, there's a rule of thumb that if you want stable mean estimates, mean scores that are stable, you need about 30 people for each of the cells that you're interested in. So, for example, you need about 30 people from each of the different -- probably levels, probably divisions, possibly business units. All of the different levels -- I shouldn't say levels. All of the different groupings that you want to say this information generalizes to. And so in this case, you might also want 30 women, 30 men.

Q Now, if Dr. Dunleavy's analysis was about the nature and extent of differences and similarities in work within the two titles at issue in this case, so the groupings are associate and vice president, would it be sufficient for him to have 30 people or more within each of those two categories?

A Well, then within each of those levels, within associates, you'd

DR. LEATTA HOUGH -- CONFIDENTIAL

need -- if you're trying to generalize to all of the different business units and all of the different divisions, you'd need 30 people in those as well. So it's much larger than just a total of 30.

Q Why can't you generalize to the title based on having 30 incumbents in each title?

A Well, part of being able to generalize has to do with how representative your sample is of the total group that you want to generalize to. And in this case, the group that you're trying to generalize to is much more than just level.

Q What do you mean by that?

A Well, within associate level, you're wanting to describe or you want to generalize your results to be relevant to the investment banking division and all of the business units within it. And you want your results to generalize to the investment management division and the business units within it

DR. LEATTA HOUGH -- CONFIDENTIAL

Q What do you mean by ipsative?

A Ipsative is when the information -- an individual is asked what are the -- they're forced to choose, in this case, the three to five most important and ignoring all the other things that maybe also very important. An ipsative results in a measurement that you cannot compare across people. It's only within that individual persons that you could make the comparison.

Q And would you still have that criticism if interviewers allowed participants to list as many responses as they wished?

A If they had provided a full description of their work, then I would -- and then information was gathered from other people about their work, such that you could compare between jobs but also, again, it's very important that they provide information in language that the other people would use and agree

DR. LEATTA HOUGH -- CONFIDENTIAL

to as the taxon that they're talking about. It's important. All of these things are interrelated.

Q Are you aware, did you consider whether any of the interviewees listed more than three to five knowledges?

A Three to five knowledges, I did look at -- I think it was Appendix F. And I couldn't -- I don't know for sure if they listed more than five. And if they did, how many more. But I suspect any one of those folks would have more than ten knowledges that are needed in their jobs. So just as a basic kind of assumption, important information was not gathered. The full description of the work was not gathered.

Q Would it matter to you if all of the interviews listed more than three to five responses?

A My point here is that the -- you need the full set in this generation, the data gathering phase where you're

DR. LEATTA HOUGH -- CONFIDENTIAL

generating the list of knowledges, skills, abilities, tasks, activities, all of these things. You need to generate all of them and then give them an opportunity to help you define and refine a taxonomic structure and then give them an opportunity to describe their jobs, using that common language.

Q You wrote in your March report -- and I'm looking at paragraph 12B which is on page 5 -- "Associates and vice presidents -- sorry. Are you there yet?

A I am now.

Q It's the second-to-last sentence in that last paragraph.

"Associates and vice presidents who chose not to be interviewed might differ in substantial ways from those who agree to be interviewed."

What's your basis for saying that?

A The literature is replete

DR. LEATTA HOUGH -- CONFIDENTIAL

with concerns about the accuracy of work analysis information and the kinds of potential biases that can enter into this kind of information. And the point is, I'm reflecting the literature that says that they may differ in ways, in substantial ways, and people have agreed to participate. It's just common in the field to have concerns about this.

Q Did you find any evidence that associates and VPs who chose not to be interviewed differed in substantial ways from those who agreed to be interviewed?

MS. GEMAN: Objection.

A I didn't gather any information. I think Dr. Dunleavy was in a position to gather such information, to do some kind of work to determine if there might be -- if this might be an issue. But I am not aware of any such work that was done.

Q What kind of work would be done to determine if that was an issue?

DR. LEATTA HOUGH -- CONFIDENTIAL

A I'm going to refer to the literature again, the science in I-O. Dr. Rogelberg in an article on accuracy and bias about this kind of information talks about what he regards -- he has procedures. It's called M-Bias. And he lists a number of issues and ways in which you might investigate this kind of concern.

So off the top of my head, I can't think of -- well, I take it back. One of his suggestions was because of the issue of accuracy and replicability conduct, use another method to investigate the same question.

Q What would that mean in this context?

A Well, in this context, the things I've been describing would be another method.

Q What do you mean the things you've been describing? What would be another method for investigating the same question?

A Conducting the interviews to develop the -- initial interviews to conduct a taxonomic structure and then to refine that structure and then administer. It could be interview, but more efficient would be to use a questionnaire approach to gather from all of -- not everybody -- but from your sample, information about how important this is and how much time to spend on it. That would be another method that could be used to determine whether or not the results are the same. And that has to do with accuracy of information.

Q So are you saying you could essentially redo the study in a different way and if the results matched, you would be more confident that those who elected not to be interviewed didn't affect the result?

A You would be more confident. But there's also strategies by trying to increase the response rate. There are articles about ways to increase your

DR. LEATTA HOUGH -- CONFIDENTIAL

response rate. There's also -- one could do a quick follow-up with people who have not responded or chose not to interview. It could be a two-minute conversation, why didn't you participate?

Q And do you know whether any of those approaches were feasible in this case?

A Yes.

Q You think it was feasible to go back to people who had declined to participate and ask them questions?

A A couple of minutes, yeah, I think, you could. It wouldn't take much time but a simple very brief conversation with them. You could have elicited information about their reasons.

Q So do you think either people who didn't want to participate -- should participation had been mandatory?

MS. GEMAN: Objection.

A I don't know that it should be mandatory. But I'm suggesting that there are things that could have been

DR. LEATTA HOUGH -- CONFIDENTIAL

satisfaction.

Now, I don't know what job satisfaction is at Goldman Sachs. But one might speculate that those that did not participate were less satisfied than those who did.

Q You're saying --

A That meta-analysis indicates that that is the characteristic that differentiates from people that participate from those who don't.

Q Let me ask you this.

Whether there's nonresponse bias in a survey tool depends on whether the respondents differ from the non-respondents and how they would have responded to the questions that are asked; is that fair?

A I'm sorry. Can you ask that again?

Q Sure.

Whether there's non-response bias depends on whether respondents differ from non-respondents in how they

DR. LEATTA HOUGH -- CONFIDENTIAL
would have responded to the questions being asked; is that fair?
A I don't really follow the question.
Q What is non-response bias?
A I don't know. That's part of the problem.
Q No. I mean the definition.
A Non-response bias, I can't -- the way you're asking that question, I can't answer it. Non-response might be an indication that there is a bias in the ratings or the information that was obtained from those who did participate, compared to those who did not. I don't know if that's what you mean by definition of response bias.
Q Right. Well, yeah. So I think what you're saying is the same as what I was saying.
You only have non-response bias if there's a difference in the information that would have been obtained from those who didn't participate,

DR. LEATTA HOUGH -- CONFIDENTIAL
compared to those who did participate; right?
A I'm sorry. I can't follow the question.
MS. GEMAN: Objection.
Q I said almost the exact same thing as you. I'll say it slower.
You only have non-response bias?
A Let's try again.
Q Is it fair to say that you only have non-response bias if there's a difference in the information that would have been obtained from people who didn't participate, compared to those who did participate?
MS. GEMAN: Objection.
A I still can't follow the question.
Q Can you provide any other definition of non-response bias?
A Well, I'm not sure that non-response bias is a term. The issue is whether or not those people who did

respond would have responded differently from those who did not. And the bias, you don't know what the bias is.

Q And do you have any evidence that responses from professionals who participated in the study would differ meaningfully from those who declined?

MS. GEMAN: Objection, asked and answered.

THE WITNESS: I'm sorry. I didn't hear, Rachel, what you said.

MS. GEMAN: I'm sorry. I said objection, asked and answered.

A Was your question, have I seen any information about the --

Q I can ask it again.

A Okay.

Q Have you seen any evidence that responses from professionals who participated in the study would differ meaningfully from those who declined?

MS. GEMAN: Objection.

A I have no way of answering the question. There wasn't any

DR. LEATTA HOUGH -- CONFIDENTIAL

information about those people who didn't respond.

Q You say -- and this is at paragraph 43 to 44 -- that -- I'll give you a chance to get there.

A Okay.

Q It's really paragraph 44. You say, "It's possible, even likely, that those associates and vice presidents who agreed to participate in the study held views concerning the outcome of the study. Their motives cannot be assumed to be representative, and the impact of those motives on the data is unknown."

Do you see that?

A Yes.

Q Have you seen any evidence that associates and vice presidents who agreed to participate in the study held views concerning the outcome of the study?

A I did not see any information in Dr. Dunleavy's report about people who did not participate.

DR. LEATTA HOUGH -- CONFIDENTIAL

Q This is about participants.

A Okay.

Q Your point here is, it's possible, even likely, that those associates and vice presidents who agreed to participate held views concerning the outcome of the study.

So my question is, have you identified any evidence that associates and vice presidents who agreed to participate, the actual participants held views concerning the outcome of the study?

A I have not seen evidence in Dr. Dunleavy's report about that. But I would like to add that our science, the field is very concerned about replication, reproducibility, concerning the findings of a study.

Just this last month, there's an article called Saving Science. And it's about this kind of issue, reproducibility of a study. And we don't know. And Dr. Dunleavy provides no

DR. LEATTA HOUGH -- CONFIDENTIAL

information about the participants. And it is well-documented that interviewees, participants in the study can affect the results of the outcome in line with what the researchers or investigators are trying to find. It's well-documented in the field. And it's a major concern. It's a concern for science in general.

Q What views about the outcome of the study are you hypothesizing that participants had or may have had?

A I am not hypothesizing what their motives or desires for the outcome are. I'm expressing the concern that it is possible.

Q How do you contend that they would have known the purpose of the study?

A I don't know what they thought the outcome or the purpose of the study was. I don't know.

Q And do you know how they would have found out the purpose, could have found out the purpose of the study?

A Well, it's my understanding -- and I have no reason to doubt it -- that the people at Goldman Sachs, professionals there are very, very smart people. They kind of know what's going on in the world. They may very well know what's going on in this case. I don't know. But we know they're very smart.

Q Well, they weren't told that the interviews were for purposes of this case; right?

A Not according to the information in Dr. Dunleavy's report.

Q If they thought the study was for litigation, how do you contend they would have known which Goldman Sachs litigation it was for?

MS. GEMAN: Objection.

A I don't know.

Q If they knew which Goldman Sachs litigation it was for, how do you think they would have known what kinds of responses would have benefited Goldman

DR. LEATTA HOUGH -- CONFIDENTIAL

Sachs in the litigation?

MS. GEMAN: Objection.

A Again, I don't know. But we also know based on what Goldman Sachs says, the employees, the professionals at Goldman Sachs are very intelligent.

Q Well, wouldn't what responses might benefit Goldman Sachs in your view depend on what responses other people gave?

A I'm sorry. Can you ask me that again, please?

Q Wouldn't what kinds of responses would have benefited Goldman Sachs in the litigation would depend on what kind of responses other people gave?

MS. GEMAN: Objection.

A I believe so.

Q And is it your contention that participants coordinated to make sure they gave different responses?

MS. GEMAN: Objection, misstates testimony.

A I have not hypothesized

DR. LEATTA HOUGH -- CONFIDENTIAL

that.

Q And that's not your contention either; right?

A Correct.

Q Was there anything in the answers given by the respondents that suggested to you that their motives were impacting the data?

A Well, I am aware that a good percentage of them inflated the -- their responses in some way. They described themselves as being able to do work in other parts of the organization, whereas other people couldn't do their work. And that's a self-inflation in terms of their assessment or rating or description of what their job was.

Q That's not necessarily a self-inflation, is it?

MS. GEMAN: Objection.

A What is not necessarily a self-inflation?

Q The fact that people believed that fewer people believed that

DR. LEATTA HOUGH -- CONFIDENTIAL

there were others at Goldman Sachs that could do their jobs than believed they could do another job at Goldman Sachs. It's not necessarily inflation, is it? It's a logical matter.

A Don't you mean just the reverse? Maybe I misheard you.

Q I might have said it wrong.

But you're referring to the job fungibility questions; right?

A Yes.

Q And if somebody knows their job well and believes that there's nobody else at the firm that can do that job without additional training, is that necessarily inconsistent with the idea that they believed there is at least one other job at Goldman Sachs that they can do without additional training?

MS. GEMAN: Objection.

A I consider it self-inflation of what one's job and talents are.

Q Are those two necessarily inconsistent?

DR. LEATTA HOUGH -- CONFIDENTIAL
A Which two?
Q I believe that there's nobody at Goldman Sachs who can do my job without additional training, but I believe there's at least one other job at Goldman Sachs that I can do without additional training, are those two necessarily inconsistent?
A Not necessarily. But when you have a good percentage of people saying that, then I'm concerned, and I think many people would be concerned about it.
Q What percentage was it? How much higher was it?
A It was almost twice. The percentages were like in the 20s versus the 40s.
Q So do you think that incumbents should not be interviewed in litigation?
MS. GEMAN: Objection.
A Not necessarily.
Q Is one safeguard that can be

DR. LEATTA HOUGH -- CONFIDENTIAL

used to prevent participant bias, not telling participants about the purpose of the study?

A Is that one way to what?

Q Is that one safeguard against participant bias, not to tell participants the purpose of the study?

A Possibly. But it's also possible that they would think -- well, yes, it's possible.

Q You say, "Small sample size raises the question about whether participants nonetheless knew about the purpose of the study."

Why does small sample size raise that question?

A If I understood your question correctly, I am not sure I said that.

Q It's paragraph 45 right underneath the paragraph we were looking at.

A Okay. So what was your question?

DR. LEATTA HOUGH -- CONFIDENTIAL

Q Right in the middle of that paragraph, you say, "Although the talking points and the scripts do not mention ongoing litigation, the small sample size raises the question of whether associates and vice presidents who agreed to be interviewed were blind to the use of the interview information for ongoing litigation against Goldman Sachs."

Do you see that?

A Yeah, I do.

Q And why does small sample size raise questions about whether participants knew about the purpose?

A Well, if more people had participated or agreed to participate, there wouldn't be as many people to be concerned about whether or not they were blind.

Q So you're saying that actually, the fact that there were not just the actual respondents but an additional dozen or so people who didn't participate, that's what -- that

DR. LEATTA HOUGH -- CONFIDENTIAL

additional number of people creates the possibility that people knew about the purpose of the study?

MS. GEMAN: Objection, misstates testimony, misstates the record.

A That wasn't what I was saying.

Q So what is it about the small sample size that raises the question about whether associates and vice presidents who agreed to be interviewed were blind to the use of the interview information for ongoing litigation against Goldman Sachs?

A The point I was making was that if there were more people, you would have more people that would in this example or this statement, that you have to -- let's see how to say it differently such that you can understand. There are simply more people that one has -- the small sample size raises the question of whether those who did agree were blind.

DR. LEATTA HOUGH -- CONFIDENTIAL

And if you had more, you would have more people that -- what shall we say? I don't know how to express myself. There would be more people that would be -- just the base rate; okay? We're talking about the frequency with which somebody -- it's not base rate issues.

The small sample size, it gets back to the question of why didn't people participate. Is it because they had some inkling of what might be going on? It's unknown. But when it's a small sample size, then there's not as many people, obviously, to be that you would have that concern, in that you have -- it's just more people.

Q Okay.

Dr. Hough, you say in paragraph -- I think it's paragraph -- we're at paragraph 140. But I don't think that can be right because you don't go up to 140 in this report.

A Well, actually, there is a 140 on page 50.

C E R T I F I C A T I O N

I, ANTHONY GIARRO, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, DR. LEAETTA HOUGH, was duly sworn on the date indicated, and that the foregoing, to the best of my ability, is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.



_____________________
ANTHONY GIARRO