# Exhibit 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 10-cv-6950-AT-RWL
- - - - - - - - - - - - - - - - - - - - -x
H. CHRISTINA CHEN-OSTER, SHANNA ORLICH, ALLISON GAMBA, and MARY DE LUI,

Plaintiffs,

-against-

GOLDMAN SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,

Defendants.
- - - - - - - - - - - - - - - - - - - - -x

June 15, 2021
8:00 a.m.

** HIGHLY CONFIDENTIAL **

VIDEOTAPED ZOOM DEPOSITION of SARAH BUTLER, an Expert Witness, taken in the above-entitled action, taken before Dawn Matera, a Certified Shorthand Reporter and Notary Public.

APPEARANCES:

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Attorneys for Plaintiffs
275 Battery Street, 29th Floor
San Francisco, California 94111
BY: ANNE SHAVER, ESQ.
ashaver@lchb.com

SULLIVAN & CROMWELL LLP
Attorneys for Defendants
1700 New York Avenue NW
Suite 700
Washington, D.C. 20006
BY: AMANDA FLUG DAVIDOFF, ESQ.
davidoffa@sullcrom.com
MADELEINE BRUML, ESQ.
brumlm@sullcrom.com
SAMANTHA BRIGGS, ESQ.
briggss@sullcrom.com

APPEARANCES: (Continued)

PAUL HASTINGS LLP
Attorneys for Defendants
2050 M Street NW
Washington, D.C. 20036

BY: CARSON H. SULLIVAN, ESQ.

Also Present:
JIM WINSLOW, Videographer
CARISSA NARCISO, Concierge
AVIGAIL KIFER, Cornerstone Research
BRIAN FRYD, Cornerstone Research
ADAM HEFT, Goldman Sachs
MARGARET STOCKDALE

HIGHLY CONFIDENTIAL - S. BUTLER

A. Sure. I mean if you look at a number of exit interview responses themselves, there are responses in which individuals indicate I am going to a competitor. I am going to a company that Goldman Sachs will be a client or we'll be a client of Goldman Sachs. So there is certainly references in the exit survey data themselves indicating that there are crossovers, essentially, between firms. So those references are within the data themselves.

Q. Okay. So are you offering the opinions that that, in fact, employees were hesitant to disclose or discuss sensitive issues during the exit survey because of the nature of the investment banking world?

A. Well, I think earlier in the day I mentioned there was even a response where somebody says, okay, I don't think the exit survey is an appropriate platform to kind of express these kinds of things -- I can't remember the

response exactly.

But certainly, again, given the patterns in the data, including responses that indicate that respondents may want to return or not kind of burn a bridge behind them, that may suggest that respondents would be unwilling to use an exit survey as a means by which to kind of express or provide their grievances.

Q. There were plenty of negative exit survey comments, right?

A. I mean, I think, in fact Dr. Stockdale's opinion is the opposite, right? The exit survey, I think, in her conclusion, demonstrates that people were generally happy.

So I mean are you asking me are there open-ended responses in the exit survey that provide negative feedback? Yes, I think there are.

Q. Right. Those people weren't concerned about providing negative information in response to the exit survey, right?

HIGHLY CONFIDENTIAL - S. BUTLER

MS. SHAVER: Object to form.

A. I think I have to look at the exact nature of their responses. I mean to the extent, again, that somebody tempered their response given the certain platform in which they were responding, that's also possible. So it's possible to provide negative feedback, but not kind of be as honest as one might otherwise.

Q. Don't the high rates of men and women indicating that they would consider returning to Goldman Sachs indicate that employees perceived a supportive work environment?

A. Oh, I don't know that that's necessarily the case, no. It could very well mean that somebody is leaving to try a new job and doesn't want to burn a bridge in case they want to return.

Q. It could mean that, but does it suggest that the work environment at Goldman Sachs was desirable?

MS. SHAVER: Asked and answered.

HIGHLY CONFIDENTIAL - S. BUTLER

A. No, I mean, I think there is not enough data or information to necessarily infer, as I think Dr. Stockdale is trying to do, that a question that simply asks would you be willing to come back means that it was a good work environment.

Q. How many exit survey responses did you identify that reflected individual's concerns about expressing negative information?

A. Well, I didn't code the data to count the rate at which someone says I am not going to provide kind of a full answer. I mean that, again, would be -- the extent to which that may be a pattern as part of the data, one is probably not going to see a bunch of people say that's what they are going to do, that they are not going to provide a full answer. They may just not answer.

Q. Okay. Was it more than five exit survey responses that you identified that reflected individual's concerns

HIGHLY CONFIDENTIAL - S. BUTLER

about expressing negative information?

A. Again, I didn't tabulate a count of respondents in the exit survey who said I am not going to respond fully or I am not going to use that exit survey as a mode to air my grievances. I think we would expect to see a lot of responses that way.

Q. Let's take a look at your more detailed analysis recommendations that specifically mentioned gender diversity. That starts at paragraph 65 of your report. Let me know when you're there?

A. Okay.

Q. I want to make sure I understand how you did this analysis. Did you start that work by taking all the responses that hit on the search terms under your group category in Exhibit C?

A. So these were, yes, the responses that were flagged as part of group, so mentioning gender or diversity.

Q. Right. Sorry. That's what I am confused about. So you say specific

HIGHLY CONFIDENTIAL - S. BUTLER

-- so I want to take it step by step and make sure I understand what you did. So if you will bear with me.

Was the first step taking all of the responses that hit on the search terms under the group category and reviewing those responses?

A. So these were looking at the responses that are flagged for gender or diversity.

Q. So what does that mean? What does that mean?

A. So the terms gender or diversity are mentioned.

Q. So you did a new search unrelated to your content search analysis for the terms gender or diversity?

A. No. These are flagged in the content search as responses that mentioned gender or diversity.

Q. But there is no category in the content search analysis for gender or diversity. So I am just wondering how you identified that universe of

responses.

A. So these are the responses that are mentioning the gender and diversity as part of the group flag.

Q. Did you start this analysis by reviewing all of the responses that hit on the group flag?

A. Then were specific to mentions of gender and diversity, yes.

Q. So did you start this analysis by reviewing all of the responses that hit on the group flag and hit on one of the terms under that flag related to gender or diversity?

A. Yes.

Q. Which of the terms under the group flag did you not use for this analysis?

A. So I am not sure what you mean did we not use. So we took the pool of 111 females that are flagged in group, 106 males that are flagged in the group. And then we reviewed those and looked at those that were mentioning gender and

HIGHLY CONFIDENTIAL - S. BUTLER

diversity, and then this is the set of examples.

Q. Thank you, that's what I wanted to understand. And the examples that you chose are examples, as you say in the title of table 5, that question the prioritization of diversity or the effects of diversity on employee quality; is that right?

MS. SHAVER: Object to form.

A. So the table title is, and these examples are open-ended comments that while they reference diversity and gender, are suggesting that -- I mean, you can look at the quality of the comments themselves, but they are basically responses where there is kind of merit being sacrificed for diversity or diversity is being prioritized inappropriately.

Q. And you identified the comments in table 5 by just reviewing all of the 106 male and 111 female responses flagged in the group category; is that right?

HIGHLY CONFIDENTIAL - S. BUTLER

towards male and female employees. Certainly, I point out that in the data that contrary to the conclusions Dr. Stockdale is trying to draw from these data, there are patterns which -- and I think Dr. Stockdale herself notes -- patterns of persistent differences between genders in the People Survey results.

Q. I'll ask my question again. Is the People Survey instrument fit for the purpose of you opining on employee's perceptions of gender bias at Goldman Sachs?

MS. SHAVER: Object to form.

A. So I think to the extent that there are patterns from the People Survey that contradict the conclusions that Dr. Stockdale has attempted to draw from the People Survey data, certainly I can point to those patterns in the data.

So to that extent, yes, I am looking to patterns in the data. I think certainly, as well, in my report I lay

HIGHLY CONFIDENTIAL - S. BUTLER

out all of the reasons as to why the People Survey data are not or why the survey instrument itself is not a -- why it is an instrument that has significant limitations.

Q. So is it your testimony that you can use People Survey data to contradict the conclusions that Dr. Stockdale is drawing, but it's not appropriate to use that data to affirmatively draw conclusions about gender bias or discrimination at Goldman Sachs?

A. I think that my testimony is that in terms of the conclusions that Dr. Stockdale is offering, based on the People Survey data, the survey instrument is, A, not appropriate to draw those conclusions and, B, there are patterns in the data that contradict those conclusions.

Q. Right. And I am asking beyond that, is it appropriate for anybody to draw conclusions about gender bias and

HIGHLY CONFIDENTIAL - S. BUTLER

discrimination at Goldman Sachs based on People Survey data?

A. Well, I guess that would depend to some extent on what the conclusions one is trying to draw from it. But certainly, the conclusions I am offering in my review of both Dr. Stockdale's analysis and my own review of the data, are as I set forth, which is the instrument, the availability of the data, creates substantial limitations for what the data can be used for.

And moreover, when we look at the data, there are certainly patterns of differences between men and women related to experiences, of compensation, of diversity, of -- let me think of the other questions. I think in terms of the rate at which those differences occur. I think about two-thirds of the questions had statistically significant differences between men and women in which women evaluate things less positively.

Q. Are you drawing any conclusions

HIGHLY CONFIDENTIAL - S. BUTLER

from those differences between men and women that you observed in the People Survey data?

A. I am certainly drawing the conclusion that the data that Dr. Stockdale is relying on to assert that there is a, that there are, that these data show that women believed Goldman Sachs has an inclusive and collaborative culture, often have similar perceptions as men and do not perceive Goldman Sachs to have a hostile or biased climate, and certainly offering the opinion that the People Survey do not support that assessment.

Q. I understand that. Are you offering any other opinions based on the People Survey data?

A. Sure. In addition to that or in response to that, the data themselves actually indicate contrary to Dr. Stockdale's conclusions or the conclusions she's attempting to draw, that there are persistent differences

HIGHLY CONFIDENTIAL - S. BUTLER

between men and women across a series of questions, and again -- I can't point to this table. Because of questions that there is a difference between 85 percent of the questions that women are more negative. And then of all questions, I think it's about two-thirds.

Q. Okay. And aside from your opinions about the existence of those differences, are you offering any other opinions based on the People Survey data?

A. So I mean I think there are certainly other opinions that I am offering as to the limitations of the People Survey data.

Q. Any other opinions that you're offering based on the People Survey data, aside from your opinions on the existence of the differences, your disagreement with Dr. Stockdale, and the limitations of the People Survey?

A. I think there is also, which we didn't really touch on today, but there are a number of differences in measures

in which Goldman Sachs themselves indicated that there were areas of concern in terms of the responses provided by women. Let me get to that section.

So, yeah, if I look at -- so we already discussed, essentially, the point that there are certainly differences in the data. Those differences are across years, depending on how one reviews the data, it's either 85 percent of the questions or 65 percent or 60.

Q. Well, let's take a look at paragraph 41. And in the second sentence you say, "The data reveal statistically significant patterns of differences in responses between female and male associates and vice presidents at Goldman Sachs, and do suggest that women have experienced a more negative, problematic work environment."

Do you see that?

A. Yes.

Q. Is it your opinion that women

HIGHLY CONFIDENTIAL - S. BUTLER

have experienced a more negative, problematic work environment than men at Goldman Sachs?

A. I think if we look at the People Survey and we look at the questions, in fact, where there are substantially or statistically significant different measures, there are certainly data that indicate that there are negative experiences for women, or women are less positive as to their experiences.

Q. And you're relying on the People Survey data for that opinion?

A. Well, certainly, again, recognizing, as I lay out in the report, that the People Survey data have limitations associated with them.

Yes, even looking within those limitations there are patterns in the data that suggest women have, are far less likely to review certain attributes less favorably.

So, for example, if we look in

paragraph 46 there is a negative 10 percent difference between men and women with the question "I have the same opportunity to succeed as peers/colleagues in similar roles at Goldman Sachs," and the proportion for women in that particular question also falls within a proportion of Goldman Sachs itself that was an area of concern.

So a proportion of women agree with that statement that Goldman Sachs themselves kind of in their own analyses of these data would have said is an area for concern.

Q. Okay. So hopefully you can give me a succinct answer here.

Is it fair to say then that you are relying on People Survey to offer opinions about the experiences of women versus men at Goldman Sachs?

A. Well, again, understanding these data have limitations in response to Dr. Stockdale's conclusions, based on these data, I certainly can identify

HIGHLY CONFIDENTIAL - S. BUTLER

and were very likely to purchase, was statistically distinguishable from the 49.8 percent of participants who didn't receive the disclosure and were very likely to purchase, right?

MS. SHAVER: Asked and answered.

A. So those results are broken out in table 6. And did I do a statistical test of those? I would have to go back and look. It's not specifically discussed in this section of the report.

Q. Is it acceptable in the matter of survey interpretation to group together the two most positive response options in a single category?

A. Is it appropriate, is that what you asked?

Q. Is it acceptable as a matter of survey interpretation?

A. It can be. I mean, for example, if the very likely and somewhat likely, if those distributions, essentially, were offsetting each other or very different and then simply the sum

HIGHLY CONFIDENTIAL - S. BUTLER
of them made them equivalent, that's a different data pattern.
So I think as you see here, while I summed them in 64, I am also presenting the results broken out, so you can look at the results by the actual distribution.
Q. Right. You didn't break everything out, though, you didn't break out the statistical significance testing?
MS. SHAVER: Asked and answered.
A. Again, to the extent that I ran that statistical test for this particular report, I don't recall. I would have to go back and look.
Q. Is it, in fact, standard practice in survey analysis to group together the two most positive response options in this kind of set of survey responses?
MS. SHAVER: Object to form.
A. I think you just asked me that. I mean is it common practice? Is that the difference in your question?

HIGHLY CONFIDENTIAL - S. BUTLER

Q. Is it standard practice --

MS. SHAVER: Object to form.

Q. -- to report results in the way that you did here?

A. So the way in which I reported the results here is I have presented the results both broken out in their original distribution, and then in the text following the table that breaks out the results, I sum the two uppermost categories. So I presented the results both ways.

Q. Right. But you -- to the extent you only presented the statistical significance testing, by collapsing together the two most favorable response options, is that standard practice in survey analysis?

MS. SHAVER: Object to form.

A. So again, the data, at least in this report, are certainly being presented in both ways. And they are broken out distributions and in the text I collapse them.

HIGHLY CONFIDENTIAL - S. BUTLER

It looks like in this particular circumstance, what I am reporting is the statistical indistinguishability between those two uppermost categories.

I certainly think by looking at the table, we can evaluate that those distributions across those two categories aren't -- whether they are statistically significant, I can't tell you that just by looking at them here, but they aren't substantively different. So that may be why we chose just to collapse them in this particular circumstance.

Q. Sometimes it can be appropriate to collapse -- what I think it's called -- and report on percent favorable responses, right?

A. It potentially can be. I think it's helpful to, as I have done here, to present the results certainly in table form. We can see the entire distribution, not just a favorable but all of the responses across all of the

HIGHLY CONFIDENTIAL - S. BUTLER

different response options.

Q. After the sentence we just looked at, you say "These results demonstrate that" -- I'm still in paragraph 64 -- "in the aggregate the HVAC disclosure had no overall effect on the purchase intentions of respondents."

Do you see that?

A. Yes.

Q. Is it acceptable as a matter of survey interpretation to draw conclusions from a lack of statistically significant differences?

A. Well, I think, again, this, in that statement, I think -- let's just see where we are in the report -- I think is a conclusion based on a number of responses that are being used to evaluate whether this disclosure between a test and the control group and this experimental design has any impact. So certainly given the experimental design and the series of questions and the data, I believe -- I haven't read through the

HIGHLY CONFIDENTIAL - S. BUTLER

whole report -- but the data that are informing those conclusions; yes. I mean I think that was a reasonable conclusion to draw from this experimental design-type survey.

MS. SHAVER: Can we go off the record real quick?

THE VIDEOGRAPHER: The time is 4:49, we are off the record.

[Discussion held off the record.]

THE VIDEOGRAPHER: The time is 4:50 p.m., we are back on the record.

Q. You reported your results in the Toyota case by region; do you recall that?

A. Well, it looks like we were looking at a paragraph that references the South. So, yes, there is certainly a reference there to a census region in the South.

Q. Yeah, I think I can find it. Let's see, if you look across the top there are kind of page entries in blue,

HIGHLY CONFIDENTIAL - S. BUTLER

page (blank) 246; do you see that?

A. Yes.

Q. And if you go down to page 240 of 246, you will see the reporting by region begins.

A. I can get there, also I can say it takes a second for it to load so.

Q. Let me represent to you that you recorded by region in your appendix there, and I'll further represent that you have 40 disclosure participants and 40 non-disclosure participants in the Northeast U.S. Census Region, okay?

A. Okay. I actually have it now. So I can see the tables new.

Q. Okay. Great. So you did have 40 disclosures and 40 non-disclosure participants in the Northeast Region; is that right?

A. Yes, that looks correct.

Q. Were those sample sizes big enough to draw conclusions by region?

A. I don't think so. I mean I may have to go back and look to see a

CERTIFICATION

I, DAWN MATERA, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as here in set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of June, 2021.

______________________

DAWN MATERA