# Exhibit 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 10-cv-6950-AT-RWL

- - - - - - - - - - - - - - - - - - - - -x

H. CHRISTINA CHEN-OSTER, SHANNA ORLICH, ALLISON GAMBA, and MARY DE LUI,

Plaintiffs,

-against-

GOLDMAN SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,

Defendants.

- - - - - - - - - - - - - - - - - - - - -x

June 9, 2021
11:08 a.m.

HIGHLY CONFIDENTIAL

VIDEOTAPED ZOOM DEPOSITION of WAYNE CASCIO, Ph.D., an Expert Witness, located in Colorado, taken in the above-entitled action before Dawn Matera, a Certified Shorthand Reporter and Notary Public.

* * *

A P P E A R A N C E S :

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Attorneys for Plaintiff
275 Battery Street, 29th Floor
San Francisco, California 94111

By: ANNE SHAVER, ESQ.
Ashaver@lchb.com
RACHEL GEMAN, ESQ.
rgeman@lchb.com

SULLIVAN & CROMWELL LLP
Attorneys for Defendants
1700 New York Avenue NW
Suite 700
Washington, D.C. 20006
By: AMANDA FLUG DAVIDOFF, ESQ.
davidoffa@sullcrom.com
ALISA LU, ESQ.
lua@sullcrom.com
WILLIAM S. WOLFE, ESQ.
wolfew@sullcrom.com
1888 Century Park E, Suite 2100
Los Angeles, California 90067

PAUL HASTINGS LLP
Attorneys for Defendants
2050 M Street N.W.
Washington, D.C. 20036
By: CARSON H. SULLIVAN, ESQ.

A P P E A R A N C E S : (Continued)

Also Present:

ERIC DUNLEAVY

BRIAN FRYD

JONATHAN SOKOTCH, Goldman Sachs

JOE RAGUSO, Videographer

DINA MARTIN, Concierge

~oOo~

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.
A. And that's a judgment call by the researcher.
Q. Well, that was going to be my next question. Could you still analyze production data from the other 500 employees?
MS. SHAVER: Object to form.
A. Well, you could do it with those caveats, with those caveats. I would want to look, for example -- this is always an issue in survey research, for example.
You want to say of the people who responded, are they similar to the people who didn't respond. You know it's called nonresponse bias. And you always want to check for that.
So that becomes -- that becomes the first step in the process. So to the extent that, using your hypothetical, if you only had data on 500 out of a thousand people, to what extent are those 500 truly representative of the larger population of 1000. And you have to be

completely open and aboveboard in your description of the analysis that you did, given the limitations that you faced. And then report out the results.

Q. I feel like I am not being clear or maybe going back and forth. Let me see if I could get the hypothetical a little better.

You have a thousand employees. 500 of them are in sales jobs, and they have sales production data. 500 of them are in administrative jobs and they don't have production data. Could you do an adverse impact analysis that took into account the sales data for the 500 employees who have sales data, despite the fact that the other 500 employees don't have sales data?

MS. SHAVER: Objection to the hypothetical.

You can answer.

A. What you couldn't do, what you can't do, Amanda, is to say that the 500 employees with the sales data, the

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

results that you observed from those analyses, generalize to the 500 administrative employees for whom we don't have any data. The only thing, I think, legitimately that you could say, is that this analysis, using these data, only apply to the 500 salespeople.

Now, suppose of those 500 salespeople, you don't have data for some of those. Then it becomes another question of how representative is this sample of salespeople.

Q. Well, couldn't you just use a dummy variable for the 500 employees that don't have sales data at all?

MS. SHAVER: Object to form.

A. What would that tell me?

Q. That they didn't have sales data.

A. No, you don't need a dummy variable to say that or include it in the analysis. The only thing you would say in reporting it out, was that there were no data available for this segment of the

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

population, so therefore, any results that we observe, we can't generalize to that segment. I mean that's the most honest thing that you can say.

Q. Okay. In that hypothetical I just gave where production metrics exist for one category of employees but not for another category of employees, is there anything wrong with a company taking production metrics into account in reviewing the category of employees for whom they exist?

MS. SHAVER: Object to form.

A. The category, if you limited, if you limited your conclusions to the category of employees for whom they exist, for whom they are relevant, that would be fine.

It wouldn't be fine to say that production data are related to some other important outcome.

It would be production data for these people for whom we have information, and then you make a judgment

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

of whether that sample was representative of the broader population that you're trying to generalize to.

Q. If production data exists for some part of the work force, could those data be used as criterion measures to validate an employment process?

MS. SHAVER: Object to form.

A. I would say only for that segment of the work force --

Q. Okay.

A. -- assuming it was representative. Production data are very tricky, very tricky. That's because you always run into this, this question about how representative are the data of the broader population that you are trying to generalize to. And we need to be very circumspect in drawing conclusions in limiting those only to representative samples.

Q. Is it true that an employment process can be valid, even if it has an adverse impact on a subgroup?

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.
A. In a hypothetical it could. It could be valid, because if it has the adverse impact, it may be that these are true and legitimate differences.
Q. Are you aware that -- well, let me take a step back. You were involved in an earlier phase of this case that goes back to 2013, right?
A. Yes, that's my recollection. Yeah.
Q. This case is as old as one of my children. Are you aware that in 2013, Goldman Sachs retained an expert to analyze whether there was adverse impact on women of the challenged processes?
A. Going back to 2013, it's hard to separate out what I know in hindsight from what I knew back in 2013. But I believe that, as is typically the case in matters like this, both sides retained experts in various areas. And my recollection is that Goldman Sachs, just like the plaintiffs, retained a statistical expert.

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

Q. Right. So do you understand that, in fact, Goldman Sachs's statistical expert performed three or submitted three reports analyzing whether there was adverse impact on women on the challenged processes in 2013 and in 2014?

A. No, I can't say I have any recollection of that. I have never seen them. I didn't know how many reports that expert produced.

Q. Well, I am going to represent to you that in 2013 and 2014, Goldman Sachs retained an expert that submitted three reports analyzing the question of whether there was adverse impact on women based on the challenged processes. All right?

A. Yes.

Q. I am going to represent to you that that same expert submitted reports analyzing the same question, whether there was adverse impact on women of the challenged processes, one in 2017 and one in 2018. All right?

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

are people we want to retain. These are people we want to attract and motivate to continue to perform well.

Q. How do you think Goldman Sachs would do in the market for talent and competition for talent with other financial services firms if it didn't pay for performance?

MS. SHAVER: Object to form.

A. Well, we know that the biggest reason for doing pay surveys every year is to make sure that you're paying a rate that's competitive.

You may choose to leave the market or match the market or in some cases lag because you want to be able to attract and retain the best people. Paying above the market will certainly attract the top talent. It will also attract less, the bottom of the talent. But paying for performance is a very important signal, you know.

And there is -- in the field of compensation, we use the term a sorting

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

effect. A sorting effect. In other words, it sorts out workers. Those who want to have kind of a cushy, predictable stream of income go to work for the civil service, go to work for a government agency. But on the other hand, if you want, to use the words of Jamie Diamond, if you want to hustle and you want to get ahead and you know that by doing well, performing well, you're going to be rewarded well, this is the place for you to come. You know, that's an important signal, I think, for workers everywhere, so that they can sort themselves into the jobs that best fit what they want to do with their careers.

Q. And is it important for the success of Goldman Sachs or other financial services firms to attract, using Mr. Diamond's words, the people who want to hustle?

MS. SHAVER: Object to form.

A. Well, yeah, absolutely. You want to get people who are committed

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

heart and soul to your organization because, let's face it, you're facing global competition, especially in financial services. You want to hire the best of the brightest. And absolutely you want to communicate to people that you pay for performance. And we have a high bar.

Q. You mentioned pay surveys if I got that right. What is that?

A. Pay surveys are -- well, you know what a survey is, basically a questionnaire that is distributed to -- typically pay surveys are definitely distributed to competitors in the same industry. But also to competitors who may not be in the same industry but hire the same kinds of people, like a computer programmer, you know, and pay surveys are critical because they provide competitive intelligence about going market rates, because the last thing you want to do is fall behind -- is fall behind and not be competitive. You're not going to attract

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

the best talent.

So pay surveys are used virtually by every organization. Some of them are -- there are many private sector firms that do this. Many specialize, for example, just in the field of financial services or just in healthcare or just in IT or just for overseas jobs. But companies depend on this kind of competitive intelligence in order to ensure that they are paying going rates, competitive rates.

Q. So for these companies that do that work in the field of financial services, do they say, "Oh, here's the going rate for an associate and here's the going rate for a vice president"?

MS. SHAVER: Object to form.

A. Well, they typically report the data in a variety of ways. So sometimes, especially in executive levels, it's by title. CEO, CFO, chief legal officer, chief IT officer, things like that. It will be by title.

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

Many times it's, you know, because it wouldn't typically be reported by level because what an associate is or a vice president, or some other title, can vary pretty dramatically across firms. So typically the pay survey data come back by, usually a broad job title. What we call in the field benchmark jobs. Jobs whose requirements are well known, like computer programmer or nurse. Something like that. They are well known. There are lots of companies out there who hire these people. That's typically the way it would be reported.

Q. Okay. Have you ever used data from a pay survey?

MS. SHAVER: Object to form.

A. Absolutely. In my capacity as chair of the board's compensation committee I had to.

We retained compensation consultants whose job was to solicit these surveys and bring them to us. And that's typical, that in most firms, you

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

don't rely on a single one, but rather a variety of surveys so that you're trying to make the most accurate decision you can about going rates of pay.

Q. Do you have a view of sort of how reliable or useful pay survey data is? I'll stop there.

A. How reliable or useful it is, yes. And typically in looking at pay survey, the first thing you will look at is how similar is the industry that they are surveying. Because the survey data come from -- let's say -- here is a good example, public sector versus private sector firms. And suppose they combine both of those, the pay survey data are not very useful at all. Just like when we were talking about regression modeling and trying to make sure that you have the most relevant factors. You want to look at things like do they hire the same kinds of people that we do. Is it the same type of industry. Are we talking about the same skill sets. When they

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

describe the work that's done, does it correspond to what we actually do.

And secondly, what's the sample size. The sample size of surveys is absolutely critical because if the survey data are based to and maybe 20 employers as compared to 200 employers, the survey is based on the larger sample size will be more reliable.

Q. You're reminding me, I can't put my finger on where it is in your reports right now, but you mentioned a firm called McLagan in one of your reports. Is that a pay survey firm?

A. As far as I understand, I don't know that they do pay surveys. I know they are consultants to the financial services industry.

Q. Okay. Do you have any sense that pay survey firms kind of invent distinctions between jobs in order to create a market for their services?

MS. SHAVER: Object to form.

Lacks foundation.

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

A. It's an interesting question because the reason why you use a third party is to avoid charges of price fixing. For example, if you know the identities of the firms in the survey, my understanding is that has been construed legally as price fixing. So you choose a third party specifically to avoid that because they don't disclose the names of the respondents to the survey. So surveys themselves are absolutely crucial to the success operation of virtually any firm.

Now, typically, what they do is they provide what is known as a thumbnail sketch. A thumbnail sketch is a brief one or two-sentence description of the work, of the work itself. And because they recognize that when they do the survey, companies may use different titles. You know, in some firms we talk about a department of human capital management, in other firms it's HR, in others it will be people operations. So

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.
rather than refer to the title, they will refer -- give a description of the -- a broad description of the work to be done.
And then the individual respondents decide whether or not that's close enough to the work that they actually have, and then they provide responses.
Q. So when the survey firms are providing the descriptions of the work to be done, are they basically describing the jobs that exist in the company or the companies?
MS. SHAVER: Object to form.
A. No. No, they are not. They are describing, not the jobs that exist. They want to get away from individual job titles. They provide descriptions of the work that the person does.
Q. But the different descriptions of the work that are made available by pay survey companies, would you say that people doing those different groups of work are doing different jobs or the same

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.
job?
MS. SHAVER: Object to form.
A. I don't know how to answer that. Like, for example, you might be describing engineering jobs. And, you know, whether they are doing the same job or different jobs, the question is does their work fall within the scope of this description. And if it doesn't, you don't provide data on it because it is not relevant to your company.
Q. And sorry, in your experience, are the distinctions between work that survey firms make, are they invented because the survey firms are trying to build a business for themselves?
MS. SHAVER: Object to form.
A. I think they -- when you say they are invented, I think that, you know, they always say necessity is the mother of invention. But the necessity here is the fact that similar work might go, might have different job titles in different companies. And so what they do

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

is try to get away from the job titles and focus on the actual work that people do. And that can be, you know, more abstract. It typically is at a more abstract level than focusing on specific tasks that people do.

Q. I want to ask you about -- I think you mentioned earlier Dr. Dunleavy's consensus study evaluating the linkage between Goldman Sachs's definition of potential and other conceptualizations of potential. Do you recall that?

A. Yes.

Q. Now, do you have any criticisms of his consensus study on potential other than your argument that potential shouldn't be used in certain circumstances?

A. Oh, yes. Yeah, sure, I have objections. There are many different definitions of potential and different conceptions of what it means.

Basically it's expectations

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

about a person's future trajectory of their career. And the model, the specific model that Dr. Dunleavy looked at is the model of Silzer and Church, 2009, and then Silzer and Borman in 2017 updated that. But there were 27 dimensions of potential. And I believe the consensus study was designed to match Goldman's definition of potential in various years to the 27 dimensions.

And my objection was that in a number of years potential was defined in a very circular manner as potential to assume increasing responsibility. And it seems inconceivable to me that based on that simple sentence could be related to all of these 27 dimensions or even to a large number of them.

Q. So if I am understanding you correctly, you don't believe his consensus study addresses all of the definitions of potential that Goldman Sachs had used during the class period; is that right?

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

MS. SHAVER: Object to form. Misstates testimony.

A. That's a part of it. For example, and I don't have it in front of me, there were different definitions of "potential" used during the class period. And some of those definitions were quite specific in highlighting certain dimensions, like the ability to strategically lead teams or the ability to continue to learn and develop. Off the top of my head, I don't have all of those dimensions there.

And so if we are very specific about what we mean by "potential," you could map those dimensions on to the Silzer and Church model. I don't have a problem with that. The problem is, we don't know what managers were considering when they were evaluating potential. They never gave a stand-alone rating of potential. And even if they did, there is no documentation beyond that to suggest what dimension of potential they

HIGHLY CONFIDENTIAL-WAYNE CASCIO, Ph.D.

are looking at. And that, to me, is problematic.

Q. I fear I asked you already, but you do have clients that assess potential as part of their employment processes, right?

A. Absolutely, sure.

Q. And do you have clients that -- sorry, do you have any clients that assess potential as part of their employment processes but don't separately document their potential rating?

A. Well, as I mentioned, you know, things have evolved over time. And there has been a lot of discussion of this in academic circles, in research circles.

And I was recently talking with one of the authors of that Silzer and Church article, Alan Church, who works at Pepsico and asking him to help educate me. I was working on a separate article that I was writing, a research article on how the concept of potential has changed over the years. And, you know, I was

CERTIFICATION

I, DAWN MATERA, a Notary Public for, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of June, 2021.

Dawn Matera

DAWN MATERA

* * *