# Exhibit 14

# EXPERT REPORT OF SARAH BUTLER

(as corrected June 11, 2021)

# EXPERT REPORT OF SARAH BUTLER

In connection with

H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, and Mary De Luis v. Goldman Sachs & Co. and The Goldman Sachs Group, Inc.

Table of Contents

**I. QUALIFICATIONS** 4

**II. DOCUMENTS REVIEWED** 6

**III. ASSIGNMENT AND SUMMARY OF OPINIONS** 6

**IV. BACKGROUND** 9

**V. SUMMARY OF STOCKDALE SURVEY ANALYSES** 11

**VI. LIMITATIONS OF PEOPLE SURVEY DATA** 13

A. Closed-Ended People Survey Positively Biased 15
B. Open-Ended People Survey Questions Are Positively Biased 17
C. Widespread Lack of Confidence in the Impact of People Survey 19
D. Dr. Stockdale Cannot Analyze Response Patterns Across the Data 20
E. Goldman Sachs Dropped Questions from the Survey that Generated More Negative Responses from Women 21

**VII. PEOPLE SURVEY DATA DEMONSTRATE GENDER DISPARITY** 24

A. Across All Questions and Years, There Are Statistical Differences Between Female and Male Employees 24
B. Viewed Properly, Data Demonstrates Many “Areas of Concern” for Female Employees 28

**VIII. DISPARITY NOT EXPLAINED BY PREFERENCES FOR FAMILY AND DIVERSITY** 30

A. Low Rates of Allegations in Survey Unsurprising 31
B. Data Do Not Demonstrate Work Life Balance Is Solely A Female Concern 32
C. Content Search 35

**IX. CONCLUSIONS** 40

# I. QUALIFICATIONS

1. I am over 21 years of age and have personal knowledge of and am competent to testify to the facts set forth herein. I am a Managing Director at NERA Economic Consulting ("NERA"), where I am the Chair of the Survey and Sampling Practice and a member of the Intellectual Property, Product Liability, Antitrust, and Labor practices. My business address is 4 Embarcadero Center, San Francisco, CA 94111. NERA is a firm providing expert statistical, survey, economic, and financial research analysis.

2. Among my responsibilities, I conduct survey research, market analysis, and design and implement statistical samples for analysis on a wide range of topics regarding business and consumer decision making, consumer choice, and consumer behavior. In the course of my career, I have conducted research for leading corporations and government agencies on consumers, employees, and businesses. I have been an expert witness in numerous lawsuits involving issues related to employment practices, as well as in matters related to false and misleading advertising, trademark and trade dress confusion, and secondary meaning, as well as antitrust. I have reviewed statistical samples and data and offered opinions in employment matters and have designed and conducted surveys of financial professionals. I am a member of the American Association of Public Opinion Research, the American Statistical Association, the Intellectual Property Section of the American Bar Association, and the International Trademark Association (INTA).

3. I have also worked as a market researcher conducting surveys, in-depth interviews, and focus groups of consumers and professionals. I have worked as an independent consultant conducting research for the Department of Environment and Rural Affairs in the United Kingdom. I have taught courses focused on or involving research methodologies in both

the United States and Europe. I hold a Master's Degree from Trinity College, Dublin and another Master's Degree from Temple University.

4. I have substantial experience conducting and using surveys to measure consumer opinions and behaviors regarding products and services including purchase processes, product attributes, branding and positioning, market segmentation, new product research, and communications strategies. During my career in academic and commercial research, I have personally facilitated a wide range of research including focus groups, in-depth interviews, and large-scale surveys.

5. I have submitted expert reports, been deposed, and testified at trial within the last five years. A list of my testimony is included on the copy of my current resume, which is attached as **Exhibit A**.

6. NERA is being compensated for my services in this matter at my standard rate of $700 per hour. Members of the staff at NERA have worked at my direction and under my supervision to assist me in this engagement. No part of my compensation or NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction and under my supervision.

## II. DOCUMENTS REVIEWED

7. As part of my work, I reviewed the operative Complaint[1] and the expert report of Dr. Margaret S. Stockdale.[2] A list of the specific materials I reviewed can be found in **Exhibit B**.

## III. ASSIGNMENT AND SUMMARY OF OPINIONS

8. I was asked by counsel for Plaintiffs to review the report submitted by Dr. Stockdale to specifically address her conclusions that data from the People Survey, "shows that women believe Goldman Sachs has an inclusive and collaborative culture, often have similar perceptions as men, and do not perceive Goldman Sachs to have a hostile or biased climate."[3] I also examined Dr. Stockdale's use of the Exit Survey data to assert that concerns about meritocracy were not the cause of women leaving Goldman Sachs.[4]

9. Dr. Stockdale reports that she was asked by Defendants' counsel to, "address whether Goldman Sachs has implemented scientifically-supported and other leading practices that work to provide a culture and climate that is not tolerant of gender bias and that is supportive of women and their career success,"[5] and specifically, to "address this question as it applies to a class of female Associates and Vice Presidents who worked in Goldman Sachs' Investment Banking ("IBD"), Investment Management ("IMD"), and Securities Divisions since July 7, 2002

[1] Second Amended Class Action Complaint, *H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, & Mary De Luis, v. Goldman Sachs & Co, and The Goldman Sachs Group Inc.,* United States District Court for the Southern District of New York, Case No. 10-CV-6950 (AT) (RWL), dated August 3, 2015 (hereinafter, "*Complaint*").

[2] Rebuttal Expert Report of Margaret S. Stockdale, Ph.D., and accompanying appendices, exhibits, and production, *H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, & Mary De Luis, v. Goldman Sachs & Co, and The Goldman Sachs Group Inc.,* United States District Court for the Southern District of New York, Case No. 10-CV-6950 (AT) (RWL), dated March 19, 2021, (hereinafter, "*Stockdale Report*").

[3] *Stockdale Report*, ¶19. These opinions are addressed in Section IV of Dr. Stockdale's Report.

[4] *Stockdale Report*, ¶¶304, 340.

[5] *Stockdale Report*, ¶6.

for employees at Goldman Sachs' New York office, or since September 10, 2004 for employees in Goldman Sachs' other U.S. offices ("the Class Period")."[6]

10. I reviewed Dr. Stockdale's conclusions based on her analysis of the People Survey and Exit Survey and find that these conclusions are unreliable, not supported by the data, and rely on survey instruments that are biased and not fit for purpose. More specifically, based on my review of Stockdale's report and my own analyses, I conclude the following:

- The People Survey is positively skewed and, as a result of acquiescence bias and social desirability bias, the data from this survey do not reliably demonstrate that gender-based discrimination has not occurred.
- The unreliability of the People Survey is further exacerbated by employee skepticism about the utility of the exercise. Data from the actual People Survey demonstrate that employees had little faith that their responses would have any impact.
- The data from the People Survey, in their current form, are of limited utility. Dr. Stockdale's analysis of the open-ended responses is separated from the closed-ended data and inappropriately assumes that the open-ended responses can be used to dismiss patterns in the closed-ended data. In reality, survey respondents answered both open and closed-ended questions in one survey and their results and the data should be viewed in this context.
- Questions which demonstrated larger differences between female and male employees were often dropped from the People Survey over time. The questions dropped include

[6] *Stockdale Report*, ¶7.

questions about compensation, management, and diversity and had more negative responses from female employees.

- Despite all the limitations of the People Survey and its biases, these data do demonstrate patterns of different experiences and concerns for female and male employees. In general, female employees were statistically significantly less likely to agree with statements related to meritocracy and diversity. These differences were not solely related to questions about work life balance.
- Upon leaving Goldman Sachs, both men and women expressed concerns about work life balance. Women leaving the firm also list other reasons for leaving.
- A more fulsome examination of open-ended comments related to diversity demonstrates that female employees were more likely to mention the need for programs, mentors, and diversity in leadership. In contrast, male employees mentioning diversity were more likely to suggest that programming was unnecessary or a hinderance.

11. Dr. Stockdale attempts to dismiss statistical differences in the People Survey by suggesting that these data were positive overall or that the differences can be explained by female preferences for greater work-life balance and diversity. While the survey data demonstrate that women at Goldman Sachs were concerned with diversity and work-life balance, these were not their sole concerns. Moreover, given the nature of the instrument (an internal survey), its design (positively skewed), and employee skepticism about the usefulness of participating, it is entirely inappropriate to assume, as Dr. Stockdale has, that the People Survey (or the Exit Survey–an instrument also limited in scope) is an appropriate source to determine

that "women professionals perceive a supportive culture and climate that is free from gender bias and harassment."[7]

## IV. BACKGROUND

12. I understand that Plaintiffs allege that Defendant Goldman Sachs has violated "Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 et seq. ("NYCHRL")."[8] Specifically, Plaintiffs allege that the violations of Defendants female employees' rights "are systemic, are based upon company-wide policies and practices, and are the result of unchecked gender bias that pervades Goldman Sachs's corporate culture."[9]

13. Goldman Sachs is a global investment banking, securities and investment management firm located in New York, New York. I understand that Goldman Sachs is an owned subsidiary of The Goldman Sachs Group.[10]

14. Named Plaintiffs H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, and Mary De Luis were employees of Goldman Sachs.[11] On August 3, 2015, Plaintiffs filed a Second Amended Complaint, alleging that "[a]t the Associate and Vice President levels, Goldman Sachs discriminates against women in (1) performance evaluations; (2) compensation; (3) promotions; (4) business opportunities; and (5) professional support, including but not limited to administrative support, training, and mentoring."[12] On March 30, 2018, the Court granted

---

[7] *Stockdale Report*, ¶308.

[8] *Complaint*, ¶1.

[9] *Complaint*, ¶6.

[10] *Complaint*, ¶¶2, 19, 22.

[11] *Complaint*, ¶¶11-18.

[12] *Complaint*, ¶39.

Plaintiffs' motion for class certification, and certified for class treatment Plaintiffs' claims that Goldman Sachs' performance review and promotion policies have an adverse impact on women, and that Goldman Sachs was aware of this and continued to use the policies.[13]

15. Plaintiffs submitted a report from Dr. Caren Goldberg, an expert in Human Resource Management, and specifically in diversity and inclusion programs.[14] I understand that Dr. Goldberg used a case study method to conduct her analysis of Goldman Sachs' practices.[15] As part of her investigation, Dr. Goldberg cites to a number of internal emails, summaries, and Board presentations based on the results of Goldman Sachs' People Survey, a bi-annual survey conducted to assess employees' level of agreement with particular statements.[16] In part, Dr. Goldberg references these internal discussions and reporting of the People Survey results to establish that, "[t]he record shows that firm's top leadership and decision-making body, the Management Committee, was formally charged with improving diversity at Goldman, and was kept apprised of various metrics on women at Goldman Sachs (including female attrition rates by gender, promotion rates by gender, performance review results by gender, and People survey results by gender)."[17]

16. In response to Dr. Goldberg's report, Defendants submitted a report from Dr. Margaret Stockdale.

---

[13] Opinion and Order, ECF No. 578, *H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, & Mary De Luis, v. Goldman Sachs & Co, and The Goldman Sachs Group Inc*., United States District Court for the Southern District of New York, Case No. 10-CV-6950 (AT) (RWL), dated March 30, 2018.

[14] Report of Caren Goldberg, Ph.D., *H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, & Mary De Luis, v. Goldman Sachs & Co, and The Goldman Sachs Group Inc*., United States District Court for the Southern District of New York, Case No. 10-CV-6950 (AT) (RWL), dated January 15, 2021, (hereinafter, "*Goldberg Report"),* ¶1.

[15] *Goldberg Report,* ¶9.

[16] *Goldberg Report,* ¶¶26-28, 31-32, 49d, 63, 69, 70.

[17] *Goldberg Report,* ¶55.

# V. SUMMARY OF STOCKDALE SURVEY ANALYSES

17. Dr. Stockdale indicates that her assignment was "to address whether Goldman Sachs has implemented scientifically-supported and other leading practices that work to provide a culture and climate that is not tolerant of gender bias and that is supportive of women and their career success."[18]

18. As part of her analysis, Dr. Stockdale analyzed data from Goldman Sachs' People Survey and data from the Exit Survey. While Dr. Stockdale reviews other documents and literature in her response to Dr. Goldberg, I am not offering an opinion on any of the other analyses or documents she cites. The focus of my report and expertise is on the two surveys – the People Survey and Exit Survey – and Dr. Stockdale's conclusions based on these data.

19. I understand that the People Survey is a voluntary, biennial survey of Goldman Sachs professionals. Dr. Stockdale analyzed the survey data for Associates and Vice Presidents between 2003 and 2017. The Exit Survey data contain what appear to be 3,090 surveys or interviews which have some data from an employee leaving Goldman Sachs between 2004 and 2019.[19]

20. To conduct her analysis of the People Survey, Dr. Stockdale selected what she characterizes as the "meritocracy-related" closed-ended questions from the People Survey and compares the proportion of men and women who respond "favorably" (i.e. who strongly agree or

[18] *Stockdale Report,* ¶6.

[19] While there are 12,875 rows with an ID listed in this file, only 3,090 rows are populated with at least one reason for leaving Goldman Sachs, with many of these being duplicate entries. An additional 27 respondents gave "ratings" to career advancement, compensation, and other aspects of Goldman Sachs employment, but gave no reasons for leaving. The remaining 9,758 rows of data have no useable feedback or data regarding employment at Goldman Sachs.

agree with the statement).[20] Based on this analysis, she states that high rates of both male and female employees report a strong and collaborative culture,[21] have positive views on company culture overall,[22] and report fair treatment.[23]

21. Dr. Stockdale also conducts a content analysis of responses from two open-ended questions that were part of the People Survey in the years between 2007 and 2017.[24] There were three open-ended questions on average per year during this time period.[25] Using responses to the two following questions: "What has had the greatest positive impact on your experience at the firm?"("Greatest Positive Impact" question), and "What changes, if any, would you recommend to improve the work environment?" ("Recommended Improvements" question), Dr. Stockdale and a colleague created categories for tabulation and analysis. The ten categories created by Dr. Stockdale included areas such as: 1) climate, culture, and work environment; 2) career advancement; 3) work-life flexibility; 4) diversity; 5) gender-based mistreatment; and, 6) stigmatized identity-based mistreatment. The selected responses were also coded for "tone" (i.e. positive, negative, or neutral).[26] Based on an analysis of sampled records, Dr. Stockdale reports that only 17 of women's "negatively toned responses" out of the 1,800 comments sampled reflect

---

[20] *Stockdale Report,* ¶312. Dr. Stockdale only includes questions that have four years of data. Her analysis is based on 41 questions and there appear to be 82 questions in total asked over the relevant time period in the People Survey.

[21] *Stockdale Report,* ¶319.

[22] *Stockdale Report,* ¶321.

[23] *Stockdale Report,* ¶328.

[24] *Stockdale Report,* ¶311.

[25] In 2007, a third location specific question was asked along with a follow up question. These questions read, "Are there any challenges you face specific to the office in which you work (e.g., New York, London, Tokyo)? What suggestions do you have to address these challenges?" (GS0152533, GS0152571, GS0152616). In 2011, a third question asked, "What actions can the firm take to protect and foster the Goldman Sachs culture?" (GS0115251, GS0115334, GS0115590). These questions were dropped from later versions of the People Survey and were excluded by Dr. Stockdale in her analysis.

[26] *Stockdale Report,* Appendix Exhibit 2, Content Category Dictionary.

gender-based mistreatment.[27] Dr. Stockdale also conducted an "interpretive qualitative analysis," which involved the selection and coding of 269 open-ended meritocracy-related responses.[28] Based on the coding of these data, Dr. Stockdale concludes that negative views on meritocracy, lack of transparency, and limited career advancement were shared between men and women.[29] Finally, Dr. Stockdale cites to the Exit Survey data to support her conclusion there is no quantitative evidence of bias and claims that only four women listed lack of meritocracy among the reasons for leaving the firm, and that men reported dissatisfaction with compensation and career progression more frequently than women.[30]

22. As discussed below in more detail, there are substantial problems with each of Dr. Stockdale's conclusions.

# VI. LIMITATIONS OF PEOPLE SURVEY DATA

23. Any analysis of survey data must first determine whether the data can reliably be used to answer the research question at hand.[31] Furthermore, when using third-party survey results, the researcher must account for the limitations of the data and ensure that those limitations do not bias interpretations of the results. This is especially important when the researcher is attempting to draw quantitative, statistical, or causal conclusions from the data. While the

[27] *Stockdale Report,* ¶324.

[28] *Stockdale Report,* fn. 719.

[29] *Stockdale Report,* ¶338.

[30] *Stockdale Report,* ¶342.

[31] "One indication that a survey offers probative evidence is that it was designed to collect information relevant to the legal controversy (e.g., to estimate damages in an antitrust suit or to assess consumer confusion in a trademark case). Surveys not conducted specifically in preparation for, or in response to, litigation may provide important information, but they frequently ask irrelevant questions or select inappropriate samples of respondents for study. Nonetheless, surveys do not always achieve their stated goals. Thus, the content and execution of a survey must be scrutinized even if the survey was designed to provide relevant data on the issue before the court." Diamond, S. S. (2000). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence,* 2nd Edition, Federal Judicial Center, pp. 236-237.

reliability of any survey can be potentially affected by bias, surveys of employees, designed and implemented by employers, can be particularly susceptible.[32] In part, the unreliability of an employee survey may be related to errors in the design,[33] and bias may be the result of employee concerns that the survey does not affect management decisions or that the answers may negatively impact their role or career.[34] Social desirability bias may also play a role in skewing the results of employee surveys, with data indicating that women are more likely than men to respond to employee surveys in a socially desirable way.[35] When responding to surveys, particularly those that may be reviewed by superiors, employees can adopt an "impression management" approach which means that rather than answer questions truthfully, employees use responses to attempt to frame themselves in a positive light.[36] Employees may also respond with artificial positivity if they believe the survey results may help their immediate manager or group.[37] As employee

---

[32] See fns. 33 – 34.

[33] "What makes the difference between a good workplace survey and a bad one? The difference, quite simply, is careful and informed design. And it's an unfortunate truth that too many managers and HR professionals have fallen behind advances in survey design. Although the last decade has brought dramatic changes in the field and seen a fivefold increase in the number of publications describing survey results in corporations, many managers still apply design principles formulated 40 or 50 years ago." Morrel-Samuels, P. (2002). "Getting the Truth into Workplace Surveys." *Harvard Business Review*, p. 5 (hereinafter, "*Morrel-Samuels*").

[34] Detert, J. R., Burris, E. R., & Harrison, D. A. (2010, May 26). "Do Your Employees Think Speaking up Is Pointless?" *Harvard Business Review* (hereinafter, "*Detert, Burris, & Harrison*"); Cleveland, J. N., Lim, A. S., & Murphy, K. R. (2007). "Feedback phobia? Why employees do not want to give or receive performance feedback." In Langan-Fox, J., Cooper, C. L., & Klimoski, R. J. (Eds.), *New Horizons in Management. Research Companion to the Dysfunctional Workplace: Management Challenges and Symptoms*, pp. 168–186 (hereinafter, "*Cleveland, Lim, & Murphy*"); Atwater, L. E., Waldman, D. A., Atwater, D., & Cartier, P. (2000). "An Upward Feedback Field Experiment: Supervisors' Cynicism, Reactions, and Commitment to Subordinates," *Personnel Psychology,* 53(2), pp. 275-297; Smith, A. F., & Fortunato, V. J. (2008). "Factors Influencing Employee Intentions to Provide Honest Upward Feedback Ratings," *Journal of Business & Psychology*, 22(3), pp. 191-207 (hereinafter, "*Smith & Fortunato*").

[35] Bernardi, R. A. & Guptill, S. T. (2008). "Social Desirability Response Bias, Gender, and Factors Influencing Organizational Commitment: An International Study," *Journal of Business Ethics* 81, pp. 797–809; Arnold, H. J., Feldman, D. C., & Purbhoo, M. (1985). "The Role of Social-Desirability Response Bias in Turnover Research," *Academy of Management Journal* 28, pp. 955–966.

[36] "Studies from a number of fields have found that when survey participants perceive less anonymity, their survey rating become more positive, more socially desirable, less honest, and/or of lower quality." Saari, L. M. & Scherbaum, C. A. (2011). "Identified Employee Surveys: Potential Promise, Perils, and Professional Practice Guidelines," *Industrial and Organization Psychology* 4, p. 440.

[37] Sanchez, P. M. (2007). "The employee survey: more than asking questions," *Journal of Business Strategy* 28, pp. 48-56.

surveys, the People Survey and the Exit Survey are vulnerable to all of these biases and the value of the data must be carefully considered. Moreover, there is evidence that beyond these general biases, the design of the People Survey is flawed and therefore, the data from it cannot reliably be used to inform Dr. Stockdale's conclusions.

## A. Closed-Ended People Survey Positively Biased

24. The People Survey is biased in its design. Each statement in the survey is framed in the affirmative and the use of repeated, positively framed statements, creates acquiescence bias.[38] Survey respondents have a natural tendency to select the positive response or agree, and this form of bias is exacerbated when the structure of the survey indicates to respondents that the researcher is looking for agreement. By repeatedly framing questions in the positive direction, respondents "learn" over the course of the survey that the expected answer is a positive one. As explained by one author detailing the most common flaws in employee surveys:

> One of the best-documented response biases is the tendency of respondents to agree with questions, a tendency that becomes more pronounced as work progresses through the survey.[39]

25. The entire People Survey is framed in a biased direction – every single statement is worded positively. For example, "My chances for advancement **are as good as others**…," "I **am rewarded** based on my job performance," and "I **have the same opportunity to succeed**…". Thus, every two years employees at Goldman Sachs were simply asked to review a series of, on

---

[38] See, Diamond, S. S. (2011). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, p. 394.

[39] *Morrel-Samuels*, p. 8.

average, over 50 positive statements about the company, and indicate how strongly they agreed. Such an exercise will generate positively skewed feedback.

26. This positive bias is likely further exacerbated because respondents in the People Survey could not frame their answers in terms of frequencies. In other words, none of the statements would allow a respondent to indicate that she sometimes agreed and sometimes disagreed with the statement, nor could she indicate that agreement depended on the situation. For example, an employee who believes her manager sometimes treats her fairly, but sometimes does not, is likely to select "agree" rather than "disagree" since the entire context of the survey is framed positively. Rather than use the absolutes, which suggest that the respondent is always in agreement, a properly designed survey would use frequency words where possible.[40]

27. Presenting respondents with all statements worded in a positive direction biases the results and suggests to respondents that they should agree and answer favorably.[41] An unbiased survey would have provided balanced response options or would have asked balanced questions. Questions in the People Survey could have been framed both positively and negatively such that some questions would suggest disagreement. Of the seven questions, that Dr. Stockdale assigned to the "meritocracy" category, three or four could have been framed in the opposite direction; for example, rather than, "My chances for advancement **are as good** as others with similar qualifications," the statement could have read, "My chances for advancement **are not as good** as others with similar qualifications." As another example, the statement, "Compared to my colleagues doing similar work, I **am paid fairly for the work I do**," could have read, "Compared

[40] For example, the survey could have asked how often the manager is fair and used answer choices ranging between "always" and "never." *Morrel-Samuels*, p. 9.

[41] As discussed below in Section VII.B., this positivity bias may be part of the reason the authors of the survey themselves suggest that results between 60-75% are average and those below 60% favorable are "cause for concern."

to my colleagues doing similar work, I **am not paid fairly for the work I do**." These simple changes would let the respondent know that no particular answer was expected and would have guarded against acquiescence bias.[42]

28. In fact, Dr. Stockdale appears to be aware of the potential pitfalls associated with acquiescence bias and omits some of the survey results because she is concerned that the answers may be skewed. For example, she does not include any closed-ended items that ask whether Goldman Sachs "met expectations" on various dimensions because "the response options to these statements are all somewhat favorable. "*Goldman Sachs met expectations to some extent*," for example, is the midpoint of the scale."[43] Despite her awareness that skewed response options may render the results unreliable, Dr. Stockdale does not account for, or appear to be concerned with the fact that the entire structure of the People Survey is positively biased.

## B. Open-Ended People Survey Questions Are Positively Biased

29. While open-ended questions that allow respondents to offer their own thoughts can be less subject to bias, this is not the case in the People Survey. The two questions Dr. Stockdale relies on for her in-depth analysis are also positively skewed. These questions simply ask respondents to recount their most positive experience and ask for recommendations for future improvements. The exact phrasing of these questions is shown below:[44]

1) "What has had the greatest positive impact on your experience at the firm?" ("Greatest Positive Impact" question); and

[42] See, *Morrel-Samuels*, pp. 8-9.

[43] *Stockdale Report*, fn. 689.

[44] *Stockdale Report*, ¶311.

2) "What changes, if any, would you recommend to improve the work environment?" ("Recommended Improvements" question).

30. While the question related to improvements may allow for some negative reference (i.e. the thing requiring change), the focus of the question is on the positive improvement. Moreover, because the recommended improvements question asks for "changes," it directs employees to focus on offering tangible, actionable suggestions rather than voicing broad concerns about inequities. As such, this question is unlikely to reflect employee concerns.[45]

31. Given the nature of these questions, it is unclear why Dr. Stockdale believes it would be reasonable to find employee complaints about experiences of gender-based discrimination in these positively biased data, found in an employer-issued survey, distributed once every two years. This is particularly so because I understand that employees are instructed to direct such complaints to Goldman Sachs' Employee Relations office, not the bi-annual People Survey.[46] Indeed, it is not surprising that a positively skewed survey, potentially affected by social desirability bias or impression management, contains low rates of complaints in open-ended textual responses. Moreover, I understand that the survey data were not anonymized, and in a number of years, the total number of women responding was relatively small and therefore, open-ended comments could easily have been attributed to a specific individual.[47] The potential risk

[45] Interestingly, the phrasing of these questions has changed throughout the survey period being examined. In 2007 and 2009, for example, the 'Recommended Improvements' question read as "If you have experienced obstacles at work that limit your effectiveness, *please describe the single greatest obstacle* [emphasis added] and your suggestions for addressing it." *Stockdale Report*, fn. 687. Here, it seems, the item was reworded to remove the request for respondents to list obstacles and instead focus on suggested improvements, which are more likely to be favorably worded responses. Based on Dr. Stockdale's coding, I do not observe any changes in the emotional tone or valence in the responses to this item between years. This is likely because the rest of the survey remained so positively skewed.

[46] See, GS0003860 at 3950, 3953, & 3955, & GS0099133 at 49.

[47] In a number of years, there were only approximately 50 female Associates or VPs for different divisions. See, for example, GS0115731 or GS0152768.

that a superior could identify the respondent is yet another reason that these open-ended responses are not a reliable source to disprove gender bias.

## C. Widespread Lack of Confidence in the Impact of People Survey

32. As indicated above, women were unlikely to view the People Survey as a responsive forum for reporting gender-based discrimination. In general, employees may not answer internal surveys truthfully for fear of identification, retaliation, or because they believe the feedback will not be used to change the organization.[48] In fact, one of the respondents selected for Dr. Stockdale's interpretive qualitative analysis commented, "I fear being singled out if i [sic] were to address obstacles within the work environment."[49] Biased framing, such as that throughout the People Survey, likely exacerbated employee skepticism that the survey (with its limited set of questions) was an opportunity to affect real change or express actual concerns.

33. Interestingly, Goldman Sachs measured employee perceptions of its People Survey. In the years, 2003 – 2009, respondents were asked whether they agreed with the statement "I am confident that the firm will act on the results of this survey." At most, 65% of men and 61% of women agreed that Goldman Sachs would do anything with the survey results. In

[48] *Cleveland, Lim, & Murphy*; *Smith and Fortunado*; See also, the discussion of a 2009 Cornell Study which found that 26% of employees withheld information about problems or improvement due to a sense of futility, in *Detert, Burris, & Harrison*.

[49] *Stockdale Report,* psql_mst.xlsx, Respondent 809. Additional examples evidencing fear of identification and retaliation include Respondent 6692, "I don't feel comfortable enough that this survey is confidential to expand on any issues I may or may not have. So much so that I even picked a different category. Different subject - enough already on diversity. I feel like diversity is taking priority over everything else. GS too focused on checking the box," and, Respondent 3266, who noted "Women often talk about these things in whispers among themselves but rarely state them out loud for fear of being labeled troublemakers." Respondent 6711 expressed skepticism regarding "real" diversity in the workplace, saying, "I am based out of the Chicago office and wanted to attend a female VP diversity event in NYC and was told by my manager that I was unable to attend due to cost cutting and that they weren't flying anyone to NYC. If the firm is supposedly as committed to diversity as it claims to be, I don't think a $300 plane ticket for a day trip to attend the event should have been an issue. It is frustrating to have that told to you and then go through this survey and see 5 questions on the importance of 'diversity' in the workplace." IDs presented above correspond to the row in which the data can be found.

2003, the rates of agreement were far lower, as only 40% of women and 48% of men agreed and, in this year, the difference between female and male employees is statistically significant.

34. Goldman Sachs also asked for responses to the following statement, "Actions are being taken in my division/region to resolve the issues in the last People Survey" and these results are even more telling. At best, 33% of women taking the survey in 2007 agreed with this statement, and in 2003 only 17.2% of women agreed. While the results for men and women are similarly low for many of these years, these numbers demonstrate that, in general, employees had little faith that providing feedback in the survey would result in any meaningful change.

## D. Dr. Stockdale Cannot Analyze Response Patterns Across the Data

35. Dr. Stockdale attempts to use the data from the People Survey as evidence that gender-based discrimination has not occurred, but even setting aside all the biases marring the results, the data are of limited analytical use. First, there is no way to link the closed-ended responses with the open-ended data. The absence of individual-level data also means that subjective coding like that conducted by Dr. Stockdale, which attempts to interpret the overall meaning of a given individual's comments, is problematic since there is no means by which to validate or test her post hoc, subjective coding.[50] For example, Respondent 205, a female VP in Dr. Stockdale's open-ended analysis provided the following response for the "Recommended Improvements" question: "Private club set-up. People get promoted based on number and quality of 'sponsors', not quality of work and production. Self-selects people of 'like' kind." Dr. Stockdale codes this response as referencing "career advancement" and "mistreatment without

[50] *Morrel-Samuels,* p. 6.

reference to stigmatized identities."[51] While this respondent does not make any specific reference to compensation or diversity, had we been able to view her closed-ended responses, we may have been able to contextualize and better understand the open-ended response. As another example, Respondent 808 stated, "Boys club, lack of communication to those not in the club," and while this comment was coded as "gender based mistreatment," had we been able to view her other answers, we may have seen how she responded to questions about compensation, promotion, and diversity – information which is not contained in her open-ended response.

36. By examining the open-ended responses in isolation, Dr. Stockdale's analysis presents counts of codes as though these represent the totality of an individual's responses. For example, Dr. Stockdale codes only one response as relating to "compensation" and "gender-based mistreatment," and concludes on this basis that, "women were not raising concerns of gender-based mistreatment when they expressed any frustrations regarding compensation."[52] But, there is a statistical difference between female and male employees related to compensation in the closed-ended responses. Without the ability to look at patterns across both open and closed-ended data, it is irresponsible to conclude that the paucity of comments related to diversity, compensation, or meritocracy in the open-ended data proves the absence of these concerns.

## E. Goldman Sachs Dropped Questions from the Survey that Generated More Negative Responses from Women

37. The People Survey was not designed as a survey to specifically understand or measure perceptions of gender bias. Moreover, as described above, the questions and responses are all framed positively, biasing the results and undermining the reliability of the data. As such,

[51] *Stockdale Report,* Final Coding.xlsx.

[52] *Stockdale Report,* ¶331.

the survey is not an appropriate instrument for drawing the conclusion that employees do not perceive a culture of gender bias at Goldman Sachs.[53]

38. In addition to the positively skewed questions, the survey is further biased as it appears that poorly performing questions were dropped from later iterations of the People Survey. Importantly, as shown in Table 1 below, a number of these dropped questions performed poorly for female employees compared to male colleagues. For example, the statement, "I have the same opportunity to succeed as peers/colleagues in similar roles at Goldman Sachs" received a statistically significantly lower share of women agreeing (hovering between 54 – 64%) in all four years it was asked, and the question was ultimately dropped in 2011. Of the questions included in Dr. Stockdale's analysis, there was only one question that was dropped in which women agreed at higher rates compared to men. This statement was, "Having a diverse workforce enables Goldman Sachs to attract the best talent."[54] This question was dropped from the survey in 2015.

[53] While I understand the data from the survey may have been used to inform management of potential issues, the goal of the survey was generally described as a way to "identify ways in which policies and practices can be improved in various areas related to the work environment, culture and overall experience of working at the firm." *Stockdale Report,* ¶¶161-162. Note that this is not equivalent to a survey that is specifically designed to measure gender disparity.

[54] Table 1 contains the dropped questions of those utilized by Dr. Stockdale in her analysis. Two additional questions not included in Dr. Stockdale's analysis which also showed women agreeing at a significantly higher rate than men were also dropped from the People Survey, both in 2005. These statements were: "The programs sponsored by the affinity networks (e.g., Asian, Hispanic and Gay and Lesbian Networks) are professionally and personally beneficial to me," and, "The firm's affinity networks (e.g. Women's and Black Networks) support the attraction, development and retention of women and underrepresented groups."

**Table 1: Favorable Response Rates of Dropped Questions from People Survey, 2003-2013**

| Question/Prompt | | Percentage with Favorable Response [1] | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2003 | 2005 | 2007 | 2009 | 2011 | 2013 |
| I have the same opportunity to succeed as peers/colleagues in similar roles at Goldman Sachs. | Female | 54.9% | 57.1% | 63.2% | 59.4% | ---- | ---- |
| | Male | 61.5% | 67.3% | 70.6% | 68.0% | ---- | ---- |
| | Difference | -6.6% * | -10.2 * | -7.4% * | -8.6% * | ---- | ---- |
| My manager quickly addresses performance issues. | Female | 55.6% | 54.2% | 55.5% | 65.0% | ---- | ---- |
| | Male | 66.7% | 64.6% | 65.3% | 71.0% | ---- | ---- |
| | Difference | -11.1% * | -10.4% * | -9.8% * | -6.0% * | ---- | ---- |
| My manager makes it clear what I need to work on to improve my performance. | Female | 61.7% | 61.0% | 63.2% | 63.2% | 64.2% | ---- |
| | Male | 65.7% | 67.6% | 70.6% | 67.2% | 69.1% | ---- |
| | Difference | -4.0% | -6.6% * | -7.4% * | -4.0% | -4.8% * | ---- |
| Having a diverse workforce enables Goldman Sachs to attract the best talent. | Female | ---- | 73.4% | 83.2% | 82.6% | 86.3% | 87.2% |
| | Male | ---- | 69.6% | 78.0% | 82.8% | 81.3% | 84.6% |
| | Difference | ---- | 3.8% | 5.2% * | -0.2% | 5.0% * | 2.6% |
| Diversity is valued as a firm priority. | Female | ---- | 65.1% | 75.1% | 80.2% | 84.7% | ---- |
| | Male | ---- | 78.8% | 83.9% | 89.1% | 90.3% | ---- |
| | Difference | ---- | -13.7% * | -8.8% * | -8.9% * | -5.6% * | ---- |
| People at Goldman Sachs think the firm is making progress towards a more inclusive work environment that supports a diverse workforce. | Female | 51.8% | 58.5% | 68.5% | 70.8% | 75.2% | 74.6% |
| | Male | 68.8% | 70.9% | 78.4% | 81.4% | 84.0% | 83.8% |
| | Difference | -17.0% * | -12.4% * | -9.9% * | -10.6% * | -8.8% * | -9.2% * |
| People at Goldman Sachs think the firm has increased its efforts to bring about a more globally diverse workforce. | Female | 55.5% | 60.6% | 72.6% | 71.5% | ---- | ---- |
| | Male | 74.6% | 73.8% | 82.2% | 82.2% | ---- | ---- |
| | Difference | -19.1% * | -13.2% * | -9.6% * | -10.6% * | ---- | ---- |

Source: Stockdale Report, Exhibit 1A.

Note: [1] An asterisk indicates that the female percentage of favorable responses for a given year and prompt is significantly different from the male percentage of favorable responses at the 95% confidence interval.

39. Interestingly, it also appears that the overall number of questions related to diversity declined over time. In 2003, there were four statements that were characterized in the People Survey as addressing diversity, this increased to seven in the years 2005 to 2009, and then declined in the following years to only three statements in 2015 and 2017.[55]

[55] *Stockdale Report,* Appendix Exhibit 1.

40. In sum, the fact that Goldman Sachs dropped the survey questions that resulted in different responses as between male and female employees is another reason why this instrument is not fit for the purpose of measuring employees' perceptions of gender bias.

## VII. PEOPLE SURVEY DATA DEMONSTRATE GENDER DISPARITY

41. Setting aside the limitations of the People Survey as a definitive source of quantitative evidence for ruling out employee perceptions of a culture of bias, the data when viewed in full show the opposite pattern. The data reveal statistically significant patterns of differences in responses between female and male Associates and Vice Presidents at Goldman Sachs and do suggest that women have experienced a more negative, problematic work environment. Dr. Stockdale attempts to dismiss many of these differences by relying on select sets of numbers (rather than looking at the overall patterns present across questions and years) and by relying on her categorization and coding of the open-ended responses. Neither of these arguments is satisfactory.

### A. Across All Questions and Years, There Are Statistical Differences Between Female and Male Employees

42. Dr. Stockdale notes that the closed-ended People Survey data show, "some persistent gender differences."[56] In fact, there are numerous questions in which there is a statistically significant difference in the percent favorable ratings between female and male employees. As shown below in Table 2, of all the questions asked on the People Survey across all survey years, 32.8% have a negative statistically significant difference between positive ratings

[56] *Stockdale Report,* ¶328.

for women and men. In other words, one third of all the questions for all the years of the People Survey have statistically significantly fewer women agreeing with the questions asked. If we look only at the questions with a statistically significant difference (as reported by Dr. Stockdale), 85.1% are negative in direction, meaning women were less likely than men to agree or strongly agree with the statements posed in the People Survey.

**Table 2: Statistical Differences in People Survey**

| | Measures | |
|---|---|---|
| | **Count** | **Percent** |
| Positive statistically significant measures | 25 | 14.9% |
| Negative statistically significant measures | 143 | 85.1% |
| Total statistically significant measures | **168** | **100.0%** |
| Non-statistically significant measures | 268 | 61.5% |
| Total measures | **436** | |

Source: Exhibit 1A _Appendix Exhibit 1.xlsx

43. In responding to these statistical differences, Dr. Stockdale notes that a, "potential interpretation of such a pattern is that women are treated less fairly than men," but dismisses this possibility in favor of the explanation that, "women with competing work and household role demands perceive career success and advancement as harder to achieve" by citing to a number of select findings.[57] For example, Dr. Stockdale cites to data from the People Survey indicating that a majority of women agree that their manager treats people fairly.[58] While she is correct that the majority of women believe their manager treats people fairly, in four of the eight years this question was asked, there is a negative statistically significant difference between female and

[57] *Stockdale Report*, ¶328.

[58] *Stockdale Report,* ¶329.

male employees. In fact, in roughly half of the data collected on "Manager Effectiveness," female employees provide statistically significantly less favorable responses.[59]

44. Dr. Stockdale also references perceptions related to compensation as, "another indicator of whether employees believe that merit is rewarded,"[60] and argues that data from the People Survey do not reflect gender-based mistreatment. Yet, Dr. Stockdale concedes that there *is* a gender difference in the question she includes in her Exhibit 1A, and a review of the larger set of responses demonstrates gender disparities in other questions related to compensation. For both "Compared to my colleagues doing similar work at Goldman Sachs, I am paid fairly for the work I do," and "I am rewarded based on my job performance" women are statistically significantly less likely to agree compared to men.[61] These data suggest that over time and across questions there are patterns indicating women are less likely to believe they have been fairly treated with respect to compensation.

45. Dr. Stockdale also references questions related to performance reviews and argues that the People Survey data indicate that women and men held positive perceptions of performance reviews.[62] Yet, when reviewing the overall results for the questions related to "Managing Performance," 51.5% of the yearly data demonstrate a statistically significant difference between women and men with female employees less likely to agree with the statements.[63]

[59] This tabulates the number of results with negative statistically significant differences and divides by the total number of observations for the category "Manager Effectiveness," in *Stockdale Report,* Appendix Exhibit 1, p. 4.

[60] *Stockdale Report,* ¶331.

[61] *Stockdale Report,* Appendix Exhibit 1, pp. 5-6.

[62] *Stockdale Report,* ¶332.

[63] This tabulates the number of results with negative statistically significant differences and divides by the total number of observations for the category "Managing Performance," in *Stockdale Report,* Appendix Exhibit 1, p. 5.

46. In fact, the statements/questions that were classified in the People Survey by Goldman Sachs as related to "Meritocracy" are those which yield the largest differences between female and male employees. Across all the "Meritocracy" statements, on average, 6.4% fewer female employees agree or strongly agree with the statements presented. The data from a number of these years present some large, statistically significant differences between positivity rates between female and male employees. For example, in 2005, 67.3% of male employees but only 57.1% of women agreed with the statement, "I have the same opportunity to succeed as peers/colleagues in similar roles at Goldman Sachs," and this -10.2% difference is statistically significant. In fact, all years of data from this question show lower percentages of female employees in agreement and all of the differences between female and male employees are statistically significant. Similar patterns are found in relation to the statement, "Compared to my colleagues doing similar work at Goldman Sachs, I am paid fairly for the work I do." For this statement, the differences between female and male employees are -4.8 and -7.9%, with less than half of women agreeing with the statement. In fact, 14.4% of female employees *disagreed* with the statement, "I have the same opportunity to succeed as peers/colleagues in similar roles at Goldman Sachs," and 19.6% *disagreed* with the statement, "Compared to my colleagues doing similar work at Goldman Sachs, I am paid fairly for the work I do."[64] Another question that similarly addressed merit-based pay (but is classified in the data as "Uncategorized") is the statement, "People are rewarded based on their job performance." As with the other meritocracy-related statements, these data show a statistically significant difference with fewer women agreeing (-7.3% and -8.0%).

[64] Both of these questions were ultimately dropped from the People Survey.

47. Overall these data demonstrate a number of patterns that contradict Dr. Stockdale's conclusions; approximately one third of all of the data show statistical differences between female and male employees and these differences are overwhelmingly negative, meaning that women are less positive and less likely to agree with the statements. A number of the differences are large and are related to statements about compensation, management, and career, as well as those that Dr. Stockdale points to related to work-life balance and diversity. Many of the exceptions are statements related to the importance of diversity initiatives for which women are more likely to be positive.

## B. Viewed Properly, Data Demonstrates Many "Areas of Concern" for Female Employees

48. In her analysis, Dr. Stockdale asserts that responses to the People Survey indicate that, "most women and men held positive perceptions of the meritocracy at Goldman Sachs."[65] While Dr. Stockdale appears to suggest that more than half of respondents agreeing or strongly agreeing with a given statement suggests a positive result, the People Survey itself actually provides a different instruction for interpreting these data. It notes:

> As a rule, % Favorable rating over 75% are considered good, ratings between 60% and 75% are considered average, and **ratings under 60% are areas for concern**.[66]

49. Using the criteria set forth by Goldman Sachs, none of the data for questions related to meritocracy could be characterized as "good" for female employees and 66% of the results from these questions would be characterized as an "area for concern" for female

[65] *Stockdale Report,* ¶328. Dr. Stockdale's assertion is made possible in part by shifting one of the meritocracy statements in the survey to a different category.

[66] GS0115648 at 50; GS0115783 at 85; GS0115692 at 94; GS0152682 at 84; GS0152909 at 911; GS0152759 at 61; GS0378588 at 90; GS0378677 at 79; GS0378631 at 33; GS0378718 at 20; GS0378920 at 22; GS0379113 at 15; GS0604150 at 52; GS0379199 at 201; GS0379246 at 48; GS0379159 at 61; GS0604196 at 98; GS0604241 at 43. *Emphasis added.*

employees. In other words, when the rates are properly evaluated, not only are female employees statistically less likely to agree with the statements related to merit, but there are numerous instances in which the overall rates of women agreeing represent areas of concern.

50. In large part, relying on her subjective analyses of the open-ended responses, Dr. Stockdale dismisses the possibility that a gender bias exists. I discuss in greater detail the problems with Dr. Stockdale's qualitative analysis in Section VIII. below. Here, I note that Dr. Stockdale does not rely on all of the closed-ended data from the People Survey, but instead selects 41 of the 82 questions to include in her Exhibit 1A. Based on these selected statements (and in reality relying primarily on her qualitative coding), Dr. Stockdale argues that perceptions related to compensation,[67] career advancement,[68] performance reviews,[69] and professional development[70] do not reflect gender bias.

51. Rather than selectively identifying questions to include (or exclude) from an analysis of the closed-ended data, I identified all the statements with results for female employees classified as "area of concern" according to Goldman Sachs' "How to Read the Results" instructions for the People Survey. Included in this analysis are any statements which received 60% or fewer of female employees agreeing or strongly agreeing.

52. Of the 82 statements that were included in the data produced by Dr. Stockdale based on the People Survey,[71] 23 or 28% have agreement rates less than 60% for female

[67] *Stockdale Report,* ¶331.

[68] *Stockdale Report,* ¶330.

[69] *Stockdale Report,* ¶332.

[70] *Stockdale Report,* ¶334.

[71] One statement appears in the psqn_mst.xlsx data file but does not contain any counts or information ("I am encouraged to identify and escalate concerns and challenge business decisions that may present a risk to the firm), and therefore I exclude this from my analysis.

employees and of these, six are *only* areas of concern for female employees. The six statements meeting the criteria for an area of concern for female employees (but not for male employees) are as follows:

- Diversity of the workforce.
- I am rewarded based on my job performance.
- I can balance my work and personal life and still advance in my career.
- Senior Leadership decisions are well communicated.
- I have the same opportunity to succeed as peers/colleagues in similar roles at Goldman Sachs.
- My manager quickly addresses performance issues.

53. It is obvious that these areas are not limited to work/life balance and diversity, as Dr. Stockdale argues, but also include performance, compensation, and career success.

## VIII. DISPARITY NOT EXPLAINED BY PREFERENCES FOR FAMILY AND DIVERSITY

54. Dr. Stockdale admits there are differences in closed-ended data. She either asserts these differences aren't meaningful because overall rates are high (which is not the correct interpretation according to Goldman Sachs) or because her analysis of the open-ended data suggest different preferences and attitudes between women and men (which is inappropriate and not supported by the data itself).

55. Dr. Stockdale argues that observed differences (even those not directly tied to questions related to work-life balance and diversity) are likely to be the result of greater stressors/burdens from societal roles as caregivers at home and the higher values women place on diversity. She states, "some women with competing work and household role demands perceive

career success and advancement as harder to achieve given the burdensome work demands inherent in a professional services firm such as Goldman Sachs."[72] Similarly, Dr. Stockdale asserts that, "Again, given the academic research and surveys on the topic, it is not surprising that women's perceptions of aspects of Goldman Sachs relating to diversity are at times less positive than men's."[73]

56. I am not offering any opinion as to the validity of these positions, but rather examine the extent to which preferences for greater work/life balance and higher value placed on diversity are the sole drivers of differences in the data.[74] As I have already outlined above, there are areas of concern and statistical differences in response to the closed-ended People Survey questions unrelated to work/life balance and diversity. Further, as noted above, given the disconnect between the closed-ended and open-ended responses, it is inappropriate for Dr. Stockdale to rely solely on a subjective coding of the open-ended results to dismiss patterns of statistical difference.

## A. Low Rates of Allegations in Survey Unsurprising

57. Dr. Stockdale points to her content analysis and qualitative analysis and concludes that, "survey responses alleging gender-based mistreatment or other forms of bias or mistreatment were rare."[75] As described above, given the survey's limited questions, positive skew, and general

---

[72] *Stockdale Report,* ¶329.

[73] *Stockdale Report,* ¶365.

[74] There is literature indicating that the quality of work/life balance affects earnings. Specifically, one study of financial analysts (including those at Goldman Sachs) found that improvements in work/life balance leads to greater career success and potential earnings. Interestingly, this study found a *smaller* impact for women. The authors explain, "However, we find that female analysts' buy-recommendation profitability and career advancement are less affected by WLB environment. These findings are consistent with Kumar (2010) who suggests that female analysts are a special group of competitive and less risk-averse females who choose to pursue a career in a male dominated industry. Due to this self-selection process, females are likely to be more skillful and stronger than male counterpart analysts." Hope, O. K., Li, C., Lin, A. P., & Rabier, M. (2020). Happy analysts. *Research Collection School of Accountancy,* p. 29.

[75] *Stockdale Report,* ¶336.

employee perception that the survey was unlikely to create change, it is hardly surprising that the open-ended comments do not reveal high rates of gender mistreatment.

## B. Data Do Not Demonstrate Work Life Balance Is Solely A Female Concern

58. Dr. Stockdale asserts that, "differences in men's and women's perceptions of work-life balance reflect the fact that the job demands in financial-sector professional services firms, like Goldman Sachs, are more likely to conflict with women's greater need for work-life flexibility and to increase role conflicts for women imposed by societally-driven gender roles."[76]

59. Dr. Stockdale also bases her analysis on the Exit Survey data – information employees leaving Goldman Sachs provided in response to questionnaires and interviews. While it may seem like an exit interview or survey would be an appropriate place to find potential grievances not disclosed prior to leaving Goldman Sachs, the small and highly connected world of investment banking may have made former employees hesitant to disclose or discuss sensitive issues during the Exit Survey. Similarly, former employees may have feared retaliatory behavior from their managers in the form of poor recommendations, or informal comments in networking spaces. In fact, 64.8% of male employees and 62.4% of female employees indicated that they would consider returning to Goldman Sachs in their Exit Survey, meaning they'd be unlikely to want to leave a negative impression. Given that the majority of respondents were at least, on the surface, leaving the door open for return, it is unsurprising that 4% of males said that they would not return to Goldman Sachs, compared to 3.1% of females.[77]

[76] *Stockdale Report,* ¶345.

[77] These percentages were calculated using the "Return to GS?" variable in the Exit Survey data, for the 2,601 respondents included in the analysis in Table 3. See Table 3 notes for clarification on respondents.

60. While it is unlikely then, that the Exit Survey would be a vehicle for expressing concerns about gender discrimination, these data do indicate that work/life balance issues were not solely the concern of female employees. While women were statistically more likely to voice such issues as a concern, more than one quarter of all men leaving the firm list work/life balance as a reason for leaving, as shown in Table 3 below.

## Table 3: Goldman Sachs Employees' Reasons for Leaving Company

| Reason | Female Count | Female Percent[1] | Male Count | Male Percent[2] | Net Percent[4] |
|---|---|---|---|---|---|
| Change career direction | 332 | 41.7% | 777 | 43.0% | -1.34% |
| Work/personal life balance | 305 | 38.3% | 503 | 27.9% | 10.45% * |
| Assume greater job responsibility | 277 | 34.8% | 869 | 48.1% | -13.35% * |
| Want more interesting job | 250 | 31.4% | 754 | 41.8% | -10.37% * |
| Dissatisfaction with career progression | 198 | 24.9% | 563 | 31.2% | -6.32% * |
| Dissatisfaction with compensation (salary/bonus) | 181 | 22.7% | 530 | 29.4% | -6.62% * |
| Increase compensation | 140 | 17.6% | 491 | 27.2% | -9.61% * |
| Relocation | 136 | 17.1% | 246 | 13.6% | 3.46% * |
| Return to education | 97 | 12.2% | 111 | 6.1% | 6.04% * |
| Relationship with manager | 82 | 10.3% | 157 | 8.7% | 1.60% |
| Childcare - spend more time with children/family | 75 | 9.4% | 75 | 4.2% | 5.27% * |
| Lack of mobility/transfer opportunities | 72 | 9.0% | 176 | 9.8% | -0.71% |
| Other[3] | 70 | 8.8% | 150 | 8.3% | 0.49% |
| Career break | 69 | 8.7% | 70 | 3.9% | 4.79% * |
| Dissatisfaction with training and development | 63 | 7.9% | 102 | 5.7% | 2.26% * |
| Manage staff or to manage a larger staff | 61 | 7.7% | 179 | 9.9% | -2.25% |
| Start up own business | 46 | 5.8% | 197 | 10.9% | -5.14% * |
| Dissatisfaction with commuting | 36 | 4.5% | 60 | 3.3% | 1.20% |
| Travel | 36 | 4.5% | 70 | 3.9% | 0.64% |
| Health reasons | 31 | 3.9% | 27 | 1.5% | 2.40% * |
| Relationship with colleagues | 29 | 3.6% | 42 | 2.3% | 1.32% |
| Childcare - non-return from maternity | 21 | 2.6% | 0 | 0.0% | 2.64% * |
| Marriage | 19 | 2.4% | 27 | 1.5% | 0.89% |
| Lack of recognition | 16 | 2.0% | 34 | 1.9% | 0.13% |
| Care for dependents (other than children) | 14 | 1.8% | 28 | 1.6% | 0.21% |
| Did not want to relocate | 7 | 0.9% | 16 | 0.9% | -0.01% |
| Retirement | 7 | 0.9% | 24 | 1.3% | -0.45% |
| Lack of meritocracy | 6 | 0.8% | 18 | 1.0% | -0.24% |
| Misrepresentation of the job | 5 | 0.6% | 6 | 0.3% | 0.30% |
| Childcare - unable to find adequate childcare facilities | 2 | 0.3% | 0 | 0.0% | 0.25% |
| Did not return from LOA | 2 | 0.3% | 0 | 0.0% | 0.25% |
| End of analyst programme | 2 | 0.3% | 5 | 0.3% | -0.03% |
| Military service | 0 | 0.0% | 3 | 0.2% | -0.17% |
| **Total Respondents** | **796** | | **1805** | | |

Notes: [1], [2] Percent does not sum to 100 because respondents could select multiple answers.

[3] "Other" includes those who specifically indicated "Other" in 'reasons' 1-5. It does not account for responses given in the "reason_other" variable.

[4] An asterisk indicates that the difference between the female response rate and male response rate is statistically significant at the 95% confidence interval.

This analysis was restricted to:
1. Respondents who were labeled as having completed "Goldman Sachs US Exit Survey" in the exit survey data.
2. Respondents who gave at least one reason for leaving the company during the exit survey. This includes respondents who had a reason listed under "reason_1," "reason_2," "reason_3," "reason_4", and/or "reason_5" in "exit_survey_data.xlsx."
3. Respondents whose gender and job title could be verified and matched to an exit survey using company data from "Gender Class main.xlsx," "Final File - Main_SENSITIVE_CONFIDENTIAL_DATA.xlsx," and "Gender Class - Main File (3-1-2018)_SENSITIVE_CONFIDENTIAL_DATA.xlsx." From these data, respondents' job title and gender were matched to an exit interview using the employee ID. This analysis includes only respondents whose "Status Title Description" was coded as either a VP or Associate and whose "Employee Status Description" indicated Termination or Retirement. Employees were only considered a match if the effective date of the action (either termination or retirement) was within one year of the date of the exit interview survey.

Note: Employees with multiple valid exit interviews based on the criteria described above were counted separately for each valid exit interview (i.e if an employee competed an exit interview in 2010 for an Associate position and again in 2015 for a VP position, each exit interview was considered in the analysis).

Sources: Gender Class main.xlsx, Final File - Main_SENSITIVE_CONFIDENTIAL_DATA.xlsx, Gender Class - Main File (3-1-2018)_SENSITIVE_CONFIDENTIAL_DATA.xlsx, & exit_survey_data.xlsx

61. The Exit Survey data indicate that women are more likely to report that work/life balance is a concern. However, these data also show that more women leave Goldman Sachs for a career change than due to work/life balance (and this is equivalent to men), and almost the same share of women are leaving to take on a new job with *greater* job responsibilities.

## C. Content Search

62. To further test Dr. Stockdale's conclusion that gendered differences in responses are driven by women's concern for work/life balance and diversity, I conducted a content search of all People Survey open-ended responses. To conduct the content search analysis, I created a list of terms to search in the approximately 9.7 thousand open-ended responses from which Dr. Stockdale draws her sample of 1,800 for her content analysis. The list of terms for the search are in Exhibit C. These terms were separated into categories based on the issues of the case. The "Group" category focuses on key terms relating gender and diversity, while the "Home Life" category focuses on key terms relating to home life, such as "mother," "maternity," "father," "paternity," "children," "marriage," and "work/life."[78] By carrying out a word search on the open-ended responses for these categories, I am able to analyze the rates at which these terms are mentioned by female and male employees.

63. First, this analysis further demonstrates that both female and male employees raise concerns about work/life balance. While women are more likely to reference family and children, both genders express concerns about the demands of the job and balance with life outside of work.

[78] See Exhibit C for full list.

64. This analysis also shows that female employees are more likely to recommend improvements related to compensation, support, and promotions rather than focus solely on family, childcare, or work/life balance. Both female and male employees appear to make recommendations related to compensation, support, and promotions similarly. Moreover, 90 responses or 6.5% of all the “Recommendations” from women were flagged for both group (i.e. mentioning gender or diversity or both) and at least one of the other areas (home/life, experience, performance, compensation, promotion, business opportunity, support). For male employees the comparable rate was only 2.1%. This analysis demonstrates that when female employees were expressing concerns and were offering recommendations related to things like compensation, performance, and support, they were more likely to reference the role their gender or issues of diversity play in relation to these topics.

**Table 4: Flagged Recommended Improvement[1] Responses for Keyword Categories[2] by Gender**

| | Female | | Male | | |
|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Difference |
| | (a) | (b) | (c) | (d) | (e) |
| | | | | | (b) - (c) |
| Experience | 436 | 31.5% | 886 | 24.6% | 6.9% |
| Compensation | 377 | 27.2% | 921 | 25.6% | 1.6% |
| Support[3] | 292 | 21.1% | 702 | 19.5% | 1.6% |
| Promotions | 259 | 18.7% | 588 | 16.3% | 2.4% |
| Home Life | 203 | 14.7% | 243 | 6.8% | 7.9% |
| Performance | 192 | 13.9% | 475 | 13.2% | 0.7% |
| Business Opportunity | 166 | 12.0% | 410 | 11.4% | 0.6% |
| Group | 111 | 8.0% | 106 | 2.9% | 5.1% |
| **Total Open-ended Recommended Improvement Responses** | **1,384** | | **3,597** | | |

Notes:

1. This analysis is based on the total number of open-ended responses to the "Recommended Improvements" question from the 9.7 thousand responses from which Dr. Stockdale draws her sample of 1,800. These 9.7 thousand responses were cleaned and categorized for question type by Dr. Stockdale.
2. The keywords for each category are presented in Exhibit C.
3. Excludes any response that was flagged for "Tech" related keywords, as such responses are conservatively assumed to relate to tech-support.

Sources: psql_mst.xlsx and content_analysis_sampling.R

65. Moreover, men and women differ dramatically in the nature of recommendations that *specifically mention gender or diversity.* Women are far more likely to raise issues related to being women, the treatment of women, having women peers, and diversity. In fact, it appears that when women mention gender and diversity, they emphasize the need for greater support, equality, and representation, while in contrast male colleagues emphasize the need for *less,* or a complaint about diversity initiatives. When I reviewed the recommended improvements flagged for gender and diversity terms, there are far more instances of male respondents choosing to raise a concern over merit being sacrificed for diversity, issues with the prioritization of diversity or diversity quotas, or general negative feedback from diversity initiatives at Goldman Sachs. Among the 106

male and 111 female responses which were flagged for gender or diversity-related words, there were twenty-one such comments from men and only three from women. These responses are shown below in Table 5.

**Table 5: Recommended Improvements Flagged for Gender or Diversity That Question the Prioritization of Diversity or the Effects of Diversity on Employee Quality**

| ID | Year | Question Type | Comments | Gender |
|---|---|---|---|---|
| 4984 | 2011 | Recommended Improvements | Diversity: Push for diversity but hire the best candidates. Do not try to meet quotas for certain types of people. Work-Life Flexibility: FIG IBD specifically banks needs to improve the work life balance. This is especially true in New York. | Female |
| 6692 | 2011 | Recommended Improvements | I don't feel comfortable enough that this survey is confidential to expand on any issues I may or may not have. So much so that I even picked a different category. Different subject - enough already on diversity. I feel like diversity is taking priority over everything else. GS too focused on checking the box. | Female |
| 12440 | 2015 | Recommended Improvements | Improved execution of senior leadership's direction as it relates to 1) junior banker initiatives, 2) diversity recruiting and 3) technology: 1. Junior banker initiatives - widely held that the firm focuses on junior bankers who are not committed to GS at the expense of mid-level employees who are committed to the firm. The latter is not appear to be intentional but rather an unintended consequence resulting from the way the junior banker initiatives are executed (Messaging from HCM could be refined). Further, a number of senior bankers have noted that their compensation is 100% tied to revenues, hence they are not incentivized to change their working style to focus on return for work invested 2. There is some frustration among bankers who do recruiting (typically our top performing bankers) that we are lowering the bar meaningfully in order to meet diversity quotas. There is very broad support for diversity hiring but many bankers would rather do additional work to identify the best candidates possible instead of leaning in on candidates who may not be a good fit. Bankers are often told that 'divisional leadership mandated diversity hiring at all costs' which is impacting sentiment in a negative way (Messaging from HCM could be refined, or perhaps but the onus on business units to meet the quotas, they will be incentivized to look for the best possible candidates) 3. Greater emphasis on practical technology improvements (server size, internet speed, outlook speed stability) would be more impactful day to day than higher profile more exciting launches like 'RelSci' or 'AskGS' | Female |
| 573 | 2007 | Recommended Improvements | I joined GS believing it was a meritocracy. I am not sure I believe that now although I think the firm strives to be that. I think it is hard for a big firm such as GS to be a meritocracy when it is potentially open to citicism from the outside world if there are not enough gender promotions. It seems the firm is very focused on gender promotions. Conceptually it is admirable, the execution leaves some room for improvement I believe. | Male |
| 1228 | 2007 | Recommended Improvements | The single greatest obstacle is something that is a constant challenge...which is that more and more groups within Goldman are committing capital and we are regularly bumping into each other, bumping up against ownership thresholds....competing for the same opportunities. Another obstacle is the hyperfocus on diversity. Our group is so focused on diversity candidates this year that we have virtually ruled out considering candidates that are not diversity candidates...which will eventually put us in a position where we may not be competitive. Diveristy is important, but so is finding and attracting the most talented candidates. There has to be a balance. | Male |
| 1343 | 2007 | Recommended Improvements | Limited career advancement. I don't beleive GS can any longer claim to be a pure meirtocary. Diversity is becoming more important then merit in career advancement. I am a strong supported of diversity but not a the expense of merit. The silent quoat system should be addressed. | Male |
| 3002 | 2009 | Recommended Improvements | I agree with diversity as a focus for the firm and I think recruiting diverse candidates from universities is a productive process but mandating diversity in areas where the diversity candidate pool is weak is dilutive to the firm. For areas of the firm that don't leverage campus recruiting, I would recommend creating an analyst program to create a bench of qualified diversity candidates that can be additive to the group as they graduate to more senior positions. Mandating diversity can have an adverse effect on the firm when implemented incorrectly. | Male |

| ID | Year | Question Type | Comments | Gender |
|---|---|---|---|---|
| 3959 | 2009 | Recommended Improvements | Seniority and diversity play a larger role in advancement than I would have expected at a firm that values merit-based performance to such a high degree. I think this hurts the firm. | Male |
| 3986 | 2009 | Recommended Improvements | The firm is overly obsessed with diversity. Its 2009, not 1969, let's move on. | Male |
| 4891 | 2011 | Recommended Improvements | The training requirements are imposing and often silly. The firm (and division), while still flat and relatively flexible, seems to be getting mired in bureaucracy (especially as it relates to diversity, the definition and value of which is not clearly defined or, I suspect, understood by leadership and employees). | Male |
| 6952 | 2011 | Recommended Improvements | Hiring due to diversity goals should not be the primary driver behind a hire. Diversity is very important don't get me wrong, but not when it detracts from promoting hiring the top talent available. | Male |
| 8228 | 2011 | Recommended Improvements | We are not run as a pure meritocracy and it is hurting us. Diversity and politics are playing too large a factor in management decisions. | Male |
| 8280 | 2011 | Recommended Improvements | Its 2011, not 1969, yet the firm remains obsessed with diversity. There is no greater injustice and hiring someone because of their sex or skin color and nothing more demoralizing than getting passed over for a promotion just because you dont fit a quota. | Male |
| 8284 | 2011 | Recommended Improvements | The firm has great diversity programs which bring out the best in everyone and allow us to hire retain best talent at a reasonable cost. However, we need to be cognizant of the reverse discrimination or a perception of it. | Male |
| 9209 | 2013 | Recommended Improvements | Goldman has become increasingly bureaucratic, with its obsession for 'diversity,' its demands for participation in events training (e.g., mandating participation in community teamwork), and an incentive structure that too often overlooks leadership - doing the right thing and managing those around and below - and instead rewards 'managing up'. | Male |
| 10871 | 2013 | Recommended Improvements | We are stretched too thin. You cant take a vacation day without worrying about overloading others on your team with work. We need to hire additional resources to prevent turnover.<br>Diversity- People should be hired on the basis of merit, not cultural background. | Male |
| 11679 | 2013 | Recommended Improvements | i find it can be demotivating to non-diversity employees when special accommodations are given to diversity employees or candidates | Male |
| 11680 | 2013 | Recommended Improvements | Continue to support diversity, and hire as diverse an employee base as possible. But promote people because they have earned the right to be promoted. | Male |
| 11761 | 2013 | Recommended Improvements | Too much emphasis on diversity - we get it. The firm should refocus its culture-building efforts on skills development, improving the amount and quality of feedback, and other leadership skills. Ultimately the firm's culture is underpinned by our commitment to meritocracy and self-improvement. These are skills that are appreciated by everyone, regardless of affinity group. | Male |
| 13874 | 2015 | Recommended Improvements | I would prefer GS find some way to force PMDs to advance the business principles and to hold partners accountable for living up to firm standards. I have been particularly disappointed with the failures to embody business principle #7: 'we offer people the opportunity to move ahead more quickly than is possible at most other places.' Advancement within my team has stalled, and junior professionals believe the team's leadership has intentional ceased to offer a competitive career trajectory. Firm wide, I worry that the amendment to principle #7, which shifted focus of that language to emphasize diversity over merit, seems to have diluted the focus on advancing 'the best.' Perhaps this is confined to my broader team, but diversity deserves its own principle and meritocracy deserves our continued focus. | Male |
| 14054 | 2015 | Recommended Improvements | Over the course of my ten years at the firm, I feel like we have lost some of the culture that made the firm great in a quest for increasing diversity at any cost. Also, relocating functions to cost effective locations (Bangalore and SLC, for example) is without question impacting quality of service. | Male |
| 16224 | 2017 | Recommended Improvements | The firm has lost its way on diversity. Having a diverse work force is important but the firm has let a myopic focus on diversity statistics drive hiring and promotion decisions. It is harder for white men to get ahead in a environment where leadership is focused on quotas and stats. Perhaps leadership is willing to accept that risk in the name of diversity statistics but it has become very noticeable within the group and IBD. | Male |
| 16290 | 2017 | Recommended Improvements | I fear some of our initiatives around culture and diversity may swing too far and have the adverse impact of lower quality junior bankers, in particular. The junior bankers - when I started - were a lot stronger. I do not think this is exclusively a function of 'the best and brightest' all heading to Silicon Valley. This is a demanding job - and that is actually a very real benefit that junior bankers come to desire and appreciate. Let's just not become too soft. | Male |
| 16500 | 2017 | Recommended Improvements | Firm has an issue with retention, driven by detachment of senior personnel from juniors and mediocrity of new hires. The firm should consider hiring based on merit over quotas for diversity. I say this as a minority myself. Quality talent wants to be surrounded by quality talent, and seniors should be encouraged to pass on their knowledge more actively to juniors. | Male |

Sources: psql_mst.xlsx and content_analysis_sampling.R

66. In Dr. Stockdale's Exhibit 1G, she identifies an equal number of men and women whom she categorizes as offering a response equivalent to "Diversity Efforts Gone Too Far." However, when analyzing the full collection of recommended improvements flagged for gender and diversity terms, the differences between the types of recommendations offered by women and men are more apparent.

67. These results quantitatively indicate a difference in the propensity to mention gender and diversity issues, and the difference in the context in which these concerns are discussed. These results emphasize the potential for misleading results from Dr. Stockdale's qualitative coding of these responses and further indicate a difference across men and women in both experiences surrounding and priorities relating to issues of gender and diversity. Thus, the qualitative results of my content search confirm the patterns of statistical difference in the quantitative results and further suggest that some male employees may have been averse to diversity efforts.

# IX. CONCLUSIONS

68. Dr. Stockdale's conclusions based on the People Survey and Exit Survey are not supported by the data and are unreliable. Generally, Dr. Stockdale is relying on survey instruments which, even if designed without bias, would be unlikely to contain specific information about employees' perception of a culture of gender discrimination. In this case, the instruments are biased. Even a cursory review of the People Survey demonstrates that it is entirely positively skewed, perhaps a reason that the authors of the study caution to review results showing less than 60% agreement as an indication of an area of concern. The Exit Survey is also likely biased given the potential that negative feedback could have potentially affected recommendations or networks for employees leaving the firm.

69. Setting aside the design issues, the People Survey data do in fact demonstrate patterns of statistical difference between female and male employees and these differences are most pronounced in questions that were ultimately dropped from the survey, rendering the data from this survey even less suitable for Dr. Stockdale's purpose. Moreover, areas where female and male employees differ are not limited to statements related to work-life balance and

diversity. Dr. Stockdale's reliance on subjective coding of a sample of open-ended data to dismiss differences in the closed-ended data is inappropriate. There is no way to tie the open-ended responses to the patterns in the closed-ended data and these data would have provided necessary context for a more precise interpretation of the textual responses.

70. My opinions and conclusions as expressed in this report are to a reasonable degree of professional and scientific certainty. I may conduct additional analyses and offer additional tables or conclusions at trial based on information made available to me. My conclusions have been reached through the proper application of survey methods, and using standard methodologies relied upon by experts in the field of survey and market and consumer research. My opinions will continue to be informed by any additional material that becomes available to me. I reserve the right to update and or supplement my opinions if provided additional information.

71. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Dated April 19, 2021.

Sarah Butler, Managing Director

# Exhibit A

NERA
Economic Consulting

**Sarah Butler**
Managing Director

National Economic Research Associates, Inc
4 Embarcadero, Suite 400
San Francisco, CA 94111
+ 1 415 291 1000 Fax + 1 415 291 1010
Direct dial: + 1 415 291 1022
sarah.butler@nera.com
www.nera.com

# SARAH BUTLER, M.A.
## MANAGING DIRECTOR

Ms. Butler is an expert in survey research, market research, sampling, and statistical analysis. She has applied her expertise in a wide range of litigation and strategic business cases. Her litigation and project experience includes survey research, market research, the design of samples, and the statistical and demographic analysis of large data files in a number of areas including:

Intellectual Property

- Trademark and Trade Dress Infringement: Design, analysis, and critique of surveys used to measure consumer confusion, secondary meaning, and dilution in trademark and trade design infringement cases.
- False and Misleading Advertising: Design, analysis and critique of surveys used to measure consumer perceptions and the materiality of advertising claims.
- Patent Infringement: Sample designs and surveys to the value of patented feature of a larger product and to establish rates at which infringing material exist in populations of products.
- Copyright infringement: Sampling plans and analysis of the rates of infringing material in populations of shared information (such as through websites or other sharing medium).

Mass Torts/Class Actions

- Conduct surveys and design samples providing evidence on issues of commonality and consumers' awareness of key documents or facts and reliance on representations.
- Analyze large databases of claims files to generate invoices, estimate future liabilities and calculate policy shares for insurer liabilities in asbestos, tobacco and pharmaceuticals.
- Design, analyze and critique surveys and sampling plans used to evaluate employment and promotion records. Review and design surveys for purposes of estimating key facts

in labor class actions including time to complete activities, exempt/nonexempt activities, and meal and rest break issues.

Antitrust

- Design, analysis and critique of surveys and other market research used as evidence of consumer purchasing and switching behavior in the areas of CPG, entertainment, automobiles, public transportation, sports and consumer electronics.
- Design, analysis and critique of surveys used to demonstrate consumer price sensitivities and willingness to pay.

Prior to joining NERA, Ms. Butler worked in market research, conducting survey research, focus groups and in-depth interviews.

## Education

**Temple University**
Applied Sociology, coursework, exams and dissertation proposal complete (2005).

**Temple University**
M.A. Sociology, (2000).

**Trinity College, Dublin Ireland**
M.Phil. (1997).

**Wellesley College**
B.A. Sociology and History (with honors). (1995).

## Professional Experience

| | |
|---|---|
| July 2006 - Present | **Senior Consultant – Managing Director**<br>NERA Economic Consulting<br>San Francisco, California, USA |
| Oct 2005 – May 2006 | **Special Consultant**<br>NERA Economic Consulting<br>London, England |
| Jan 2003 – Oct 2005 | **Senior Analyst - Consultant**<br>NERA Economic Consulting<br>Philadelphia, Pennsylvania, USA |

| | |
|---|---|
| 2002 - 2003 | **Consultant**<br>Integrated Marketing Associates<br>Bryn Mawr, PA, USA |
| Oct 1998 - Jan 2002 | **Research Associate – Analyst**<br>NERA Economic Consulting<br>Philadelphia, Pennsylvania, USA |
| Sept 1998 – May 2003 | **Adjunct Professor**<br>Temple University<br>Philadelphia, Pennsylvania, USA |
| Jan 1997 – Feb 1998 | **Manager of Member Research**<br>Society for Neuroscience<br>Washington DC, USA |

## Expert Analysis and Testimony

Michael Madeda and Rick Smith, et. al, v. Kennedy Endeavors, Inc.* United States District Court for the District of Hawai'i. Surveys and rebuttal report concerning behavior and preferences of potato chip purchasers. [Expert Report: February 19, 2021.]

Shelly Benson and Lisa Caparelli, et. al, v. Newell Brands, Inc.* United States District Court for the Northern District of Illinois. Report responding to survey conducted of pacifier purchasers. [Expert Report: February 17, 2021. Deposition: March 10, 2021.]

Thomas Bailey, et. al, v. Rite Aid Corporation.* United States District Court for the Northern District of California. Survey and rebuttal report to evaluate consumer purchasing of acetaminophen products. [Expert Report: January 14, 2021. Deposition: March 5, 2021.]

Clear Imaging Research, LLC v. Samsung Electronics Co. LTD and Samsung Electronics America.* United States District Court for the Eastern District of Texas Marshall Division. Report in patent matter. [Expert Report: December 23, 2020. Deposition: January 8, 2021.]

Patagonia, Inc. and Patagonia Provisions, Inc. v. Anheuser-Busch, LLC dba Patagonia Brewing Co.* United States District Court for the Central District of California Western Division, Los Angeles. Rebuttal report evaluating likelihood of confusion claims. [Expert Report: December 4, 2020.]

In the Matter of Certain Audio Players and Controllers, Components Thereof, and Products Containing the Same. United States International Trade Commission, Washington DC. Surveys to evaluate consumer interest in patented features of wireless speaker products. [Expert Report: November 13, 2020. Deposition: December 2, 2020. Trial testimony: February 25, 2021.]

Vicky Maldonado, et. al., v. Apple, Inc.* United States District Court, Northern District of California, San Francisco Division. Rebuttal conjoint survey testing damages claims. [Expert Report: March 13, 2020. Deposition: November 19, 2020]

Jason DeCarlo v. Costco Wholesale Corporation and MBNR.* United States District Court Southern District of California. Survey and expert report to evaluate consumer perceptions of optometrists located at Costco. [Expert Report: November 13, 2020.]

Javier Cardenas et al., Plaintiffs v. Toyota Motor Corporation et al., Defendants.* United States District Court Southern District of Florida. Survey and expert report to evaluate impact of disclosure about allegedly defective product feature. [Expert Report: October 20, 2020. Deposition: November 10, 2020.]

Nirvana LLC v. Marc Jacobs International LLC.* United States District Court Central District of California. Survey related to secondary meaning. [Expert Report: September 8, 2020. Deposition: October 20, 2020.]

Girl Scouts of the United States of America* v. Boy Scouts of America. United States District Court Southern District of New York. Review of survey report in a likelihood of confusion matter. [Expert Report: September 9, 2020. Deposition: October 16, 2020.]

TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Strum Foods, Inc.,* v. Keurig Green Mountain, Inc. United States District Court for the Southern District of New York. Surveys related to false advertising, and antitrust claims. Report on testing evidence. [Expert Reports: August 28, 2020. Rebuttal Reports: January 26, 2021. Deposition: February 2-3, 2021.]

American Dairy Queen Corporation v. W. B. Mason Co. Inc.* United States District Court for the District of Minnesota. Surveys related to fame, dilution, and likelihood of confusion. [Expert Report: August 28, 2020. Deposition: October 26, 2020.]

Seven Networks, LLC v. Apple Inc.* United States District Court for the Eastern District of Texas Marshall Division. Conjoint survey and expert report related to mobile phone features. [Expert Report: July 13, 2020. Deposition: July 23, 2020.]

Brian Gozdenovich et al., v. AARP Inc., AARP Services, Inc., AARP Insurance Plan, UnitedHealth Group, Inc., and UnitedHealthCare Insurance Company.* United States District Court District of New Jersey. Expert rebuttal report of survey related to estimating value. [Expert Report: July 9, 2020.]

Barbara Lewis, et al., v. Rodan & Fields, LLC.* United States District Court Northern District of California Oakland Division. Survey and expert report to assess consumer perception about eyelash serum. [Expert Report: July 2, 2020. Deposition: July 20, 2020.]

Austin Rugg v. Johnson & Johnson Consumer Inc.* United States District Court Norther District of California San Jose Division. Survey and expert report in a false advertising matter. [Expert Report: June 22, 2020.]

New NGC, Inc. d/b/a National Gypsum Company, NGC Industries, LLC, and National Gypsum Properties,* LLC v. Alpinebay, Inc. Survey and expert report to evaluate likelihood of consumer confusion. [Expert Report: June 18, 2020. Deposition: August 6, 2020]

Glaxo Group Limited* v. Respirent Pharmaceuticals Co., LTD. United States District Court Southern District of New York. Survey and expert report on likelihood of consumer confusion. [Expert Report: June 15, 2020.]

Caryn Gorzo, et al., v. Rodan & Fields, LLC.* The Superior Court of California County of San Francisco. Survey and expert report to assess consumer perception about eyelash serum. [Expert Report: June 15, 2020.]

Kaifi LLC v. AT&T Inc.; AT&T Corp.; AT&T Communications, LLC; AT&T Mobility, LLC; and AT&T Services, Inc.* United States District Court Eastern District of Texas Marshall Division. Survey and expert report related to patent infringement matter. [Expert Report: June 1, 2020. Deposition: June 8, 2020.]

CFA Institute v. American Society of Pension Professionals & Actuaries, et. al.* United States District Court for the Western District of Virginia, Charlottesville Division. Rebuttal survey evaluating claims of likelihood of confusion. [Expert Report: April 14, 2020. Deposition: May 14, 2020.]

Match Group LLC* v. Bumble Trading Inc., Bumble Holding, LTD., Badoo Trading Limited, Magic Lab Co., Worldwide Vision Limited, Badoo Limited, Badoo Software Limited, and Badoo Technologies Limited. United States District Court for the Western District of Texas, Waco Division. Secondary meaning survey and rebuttal report. [Expert Report: March 3, 2020. Rebuttal Report: March 27, 2020. Deposition: May 20, 2020.]

ClearPlay, Inc. v. Dish Network, L.L.C. and Echostar Technologies, L.L.C.* United States District Court, District of Utah, Central Division. Expert report evaluating surveys used to inform allocation in patent infringement matter. [Expert Report: February 21, 2020.]

Toya Edwards and Jamal Erakat, et al., v. Walmart, Inc.* United States District Court, Central District of California. Survey and expert report to evaluate label statements on acetaminophen products. [Expert Report: January 23, 2020. Deposition: February 7, 2020.]

Ohio State Troopers Association, Inc., et al., & Miguel Porras v. Point Blank Enterprises, Inc.* United States District Court, Southern District of Florida. Survey and expert report to evaluate impact of disclosure about allegedly defective product feature. [Expert Report: January 17, 2020. Deposition: January 27, 2020.]

In re: Windstream Holdings, Inc., et al., Debtors. Windstream Holdings Inc., et. al.* v. Charter Communications, Inc. and Charter Communications Operating, LLC. United States Bankruptcy Court, Southern District of New York. Chapter 11, Case No. 19-22312 (RDD). Review of survey report in a bankruptcy matter. [Expert Report: December 5, 2019.]

Paul Stockinger, et al., v. Toyota Motor Sales, U.S.A., Inc.* United States District Court, Central District of California. Survey and expert report to evaluate impact of disclosure about allegedly defective product feature. [Expert Report: October 21, 2019. Deposition: November 5, 2019.]

Thomas Allegra, et. al.* v. Luxottica Retail North America, d/b/a LensCrafters, United States District Court, Eastern District of New York, Brooklyn Division. Survey to evaluate consumers' willingness to pay for Accufit measurement system. [Expert Report: September 10, 2019. Deposition: December 5, 2019.]
Sazerac Brands, LLC* v. Bullshine Distillery, LLC. In the United States Patent and Trademark Office Before the Trademark and Trial Appeal Board. Opposition No. 91227653. Survey to assess consumer perception and association with alcohol brand. [Expert Report: September 4, 2019. Deposition: October 30, 2019.]

Collin Shanks v. Jarrow Formulas, Inc.* United States District Court Central District of California. Survey of coconut oil purchasers and response to conjoint survey in false advertising matter. [Expert Report: August 4, 2019.]

X One* v. Uber Technologies, Inc. United States District Court Northern District of California. Survey of ride share app features. [Expert Report: August 2, 2019. Deposition: September 19, 2019.]

Belcher Pharmaceuticals, LLC v. Hospira, Inc.* United States District Court for the Middle District of Florida, Tampa Division. Review of survey report in false advertising matter. [Expert Report: June 28, 2019. Deposition: July 11, 2019.]

NIKE, Inc. v. Skechers U.S.A., Inc.* United States District Court, Central District of California. Survey and expert report related to design patent infringement. [Expert Report: June 20, 2019. Deposition: September 12, 2019.]

State of Washington* v. TVI, INC., d/b/a Value Village. State of Washington King County Superior Court. Survey and expert report evaluating consumer perceptions of for-profit thrift store and donation center. [Expert Report: May 24, 2019. Deposition: July 17, 2019. Trial testimony: October 8, 2019.]

Vital Pharmaceuticals, Inc. v. Monster Energy Company and Reign Beverage Company, LLC.* United States District Court Southern District of Florida. Survey and expert report related to consumer perception of names associated with energy drinks. [Expert Report: May 23, 2019. Deposition: July 15, 2019.]

Mahindra & Mahindra, Ltd. and Mahindra Automotive North America, Inc.* v. FCA US LLC.

United States District Court, Eastern District of Michigan. Survey and expert report on secondary meaning. [Expert Report: May 10, 2019. Deposition: May 30, 2019. ITC Trial testimony: August 22, 2019.]

Rex Real Estate I., L.P., v. Rex Real Estate Exchange, Inc.* United States District Court for the Eastern District of Texas, Sherman Division. Survey and expert report in trademark matter. [Expert Report: April 24, 2019.]

adidas America, Inc., et al. v. Forever 21 Inc., et al.* United States District Court District of Oregon Portland Division. Survey and expert report in trade dress matter. [Expert Report: April 4, 2019.]

Crystal Hilsley vs. Ocean Spray Cranberries, Inc.*, Arnold Worldwide LLC. United States District Court Western District Southern District of California. Survey, expert report and rebuttal in false advertising matter. [Expert Report: April 1, 2019. Deposition: May 26, 2019.]

Erin Allen et al. v. Conagra Foods Inc.* United States District Court Northern District of California San Francisco Division. Survey, expert report and rebuttal in false advertising matter. [Expert Report: March 30, 2019. Deposition: April 25, 2019. Rebuttal Report: May 6, 2020. Deposition: May 30, 2020.]

Tortilla Factory, LLC vs. GT's Living Foods, LLC*. United States District Court for The Central District of California. Expert report in false advertising matter. [Expert Report: March 29, 2019.]

Obagi Cosmeceuticals LLC* v. ZO Skin Health, Inc. and Zein E. Obagi, M.D. JAMS Arbitration Proceeding. Survey and expert report in arbitration. [Expert Report: March 13, 2019. Deposition: April 18, 2019. Arbitration testimony: May 17, 2019.]

Lodestar Anstalt v. Bacardi & Company Limited, Bacardi U.S.A., Inc., and Bacardi Limited.* United States District Court Central District of California, Western Division. Survey and expert report in trademark matter. [Expert Report: January 11, 2019. Deposition: April 5, 2019.]

James Pudlowski, Louis C. Cross, III, Gail Henry, Steve Henry v. St. Louis Rams, LLC, St. Louis Rams Partnership, ITB Football Company, LLC*. United States District Court for the Eastern District of Missouri Eastern Division. Survey and affidavit to evaluate consumer perceptions of information related to the Los Angeles Rams. [Affidavit: January 11, 2019.]

People of the State of California vs. The Hertz Corporation, American Traffic Solutions, Inc., ATS Processing Services, L.L.C., American Traffic Solutions Consolidated, L.L.C., PlatePass, L.L.C.* Superior Court of the State of California County of San Francisco. Survey and expert report on unfair competition and false advertising issues. [Deposition: January 10, 2019.]

Riley Johannessohn, Daniel C. Badilla, James Kelley, Ronald Krans, Kevin R. Wonders, William Bates, James Pinion* v. Polaris Industries, Inc. United States District Court District of Minnesota. Conjoint survey and expert report related to ATVs. [Expert Report: November 16, 2018. Expert Rebuttal Report: March 21, 2019. Deposition: January 15, 2019.]

Spangler Candy Company vs. Tootsie Roll Industries, LLC*. United States District Court Northern District of Ohio Western Division Toledo. Survey and expert report in trademark matter. [Expert Report: November 5, 2018. Deposition: December 4, 2018.]

Kaylee Browning and Sarah Basile v. Unilever United States, Inc.* United States District Court Central District of California. Expert Report in false advertising matter. [Expert Report: November 5, 2018. Deposition: November 19, 2018.]

American Automobile Association of Northern California, Nevada & Utah and A3 Mobility LLC v. General Motors LLC and Maven Drive LLC*. United States District Court Northern District of California San Jose Division. Survey and expert reports to evaluate likelihood of confusion. [Expert Report: November 1, 2018. Expert Rebuttal Report: November 28, 2018. Deposition: December 6, 2018.]

Merck & Co., Inc., and Merck Sharp & Dohme Corp. v. Merck KGaA*. United States District Court District of New Jersey. Expert report to evaluate likelihood of confusion. [Expert Report: October 30, 2018. Deposition: February 6, 2019.]

Scott R. Bernard v. Public Power, LLC*. In the Circuit Court of Cook County, Illinois County Department, Chancery Division. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: October 17, 2018.]

MZ Wallace Inc. v. Sue Fuller, d/b/a/ The Oliver Thomas, and Black Diamond Group, Inc.* United States District Court Southern District of New York. Survey and expert report to evaluate likelihood of confusion. [Expert Report: September 14, 2018. Deposition: October 22, 2018.]

Kristian Zamber v. American Airlines, Inc.* United States District Court Southern District of Florida Miami Division. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: September 10, 2018. Deposition: October 19, 2019.]

Thomas Blitz v. Monsanto Company.* United States District Court Western District of Wisconsin. Survey and expert report to evaluate liability and harm claims related to consumer perceptions in labeling matter. [Expert Report: July 30, 2018. Deposition: August 8, 2018.]

State of Washington* v. Johnson & Johnson, Ethicon, Inc. Ethicon US, LLC. King County Superior Court State of Washington. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: July 27, 2018.]

Newmark Realty Capital, Inc.* v. BCG Partners, Inc. United States District Court Northern District of California San Jose Division. Expert report in trademark matter. [Expert Report: July 6, 2018. Supplemental Report: July 20, 2018. Deposition: September 18, 2018.]

Steven A. Conner DPM, P.C. v. Optum 360, LLC.* United States District Court Eastern District of Pennsylvania. Expert report in Telephone Consumer Protection Act case. [Expert Report: June 28, 2018. Deposition: July 17, 2018.]

Advice Interactive Group, LLC* v. Web.Com Group, Inc. United States District Court for the Middle District of Florida Jacksonville Division. Expert report in copyright apportionment case. [Expert Rebuttal Report: June 18, 2018. Deposition: June 29, 2018.]

State of Washington* v. Comcast Cable Communications Management, LLC, et. al. State of Washington King County Superior Court. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: June 4, 2018. Deposition: July 31, 2018. Trial Testimony: December 11-12, 2018.]

Global Brand Holdings, LLC* v. Church & Dwight Co., Inc. United States District Court Southern District of New York. Survey and expert report in trademark infringement matter. [Expert Report: May 21, 2018. Rebuttal Report: June 15, 2018. Deposition: July 11, 2018.]

Josephine James Edwards v. Hearst Communications, Inc.* United States District Court for the Southern District of New York. Survey and expert report to evaluate consumer perceptions of information sharing. [Expert Report: April 16, 2018. Deposition May 25, 2018.]

Forever 21, Inc.* v. Gucci America, Inc., and Guccio Gucci S.p.A. United States District Court Central District of California Western Division. Survey and expert report in trade dress claims matter. [Expert Report: March 23, 2018. Supplemental Report: April 12, 2018. Deposition May 30, 2018.]

Masterbuilt Manufacturing, LLC v. Wal-Mart Stores, Inc.* United States District Court for the Middle District of Georgia Columbus Division. Expert report in patent infringement matter relating to consumer demand. [Expert Report: February 23, 2018. Deposition: March 27, 2018.]

Strategic Partners, Inc.* v. Koi Design, LLC. United States District Court Central District of California. Survey and expert report in trademark infringement matter. [Expert Report: February 13, 2018.]

Hard Rock Café International (USA), Inc., and Tarsadia Hotels v. RockStar Hotels, Inc.* United States District Court for the Southern District of Florida Fort Lauderdale Division. Survey and expert report in trademark infringement matter. [Expert Report: February 12, 2018.]

Ghostbed, Inc. and Werner Media Partners, LLC d/b/a Nature's Sleep, LLC v. Casper Sleep, Inc., Red Antler, LLC and ICS, Inc.* United States District Court for the Southern District of Florida. Survey of awareness of mattress companies and advertising slogans. [Expert Report: January 2, 2018. Deposition: January 23, 2018.]

Shelia Dashnaw, et. al. v. New Balance Athletics, Inc.* United States District Court Southern District of California. Review of expert report and contingent valuation/conjoint survey to evaluate consumer perceptions in false advertising claim. [Expert Report: November 8, 2017. Deposition: November 28, 2017.]

State of Arizona v. Volkswagen AG, et. al.* Superior Court of the State of Arizona – Maricopa County. Declaration and research on purchasing behavior for luxury, specifically Porsche buyers. Survey of advertising materials and material impact on purchasing decisions. [Expert Report: November 10, 2017. Expert Report: December 14, 2017]

Tri-Union Seafoods, LLC v. Otis McAllister, Inc.* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. Survey and expert report on market parameters and customer perceptions. [Expert Report: September 27, 2017.]

Martin Schneider, et. al. v. Chipotle Mexican Grill, Inc.* United States District Court Northern District of California. Review of expert report and contingent valuation/conjoint survey to evaluate consumer perceptions in false advertising claim. [Expert Report: September 15, 2017. Deposition: November 22, 2017.]

ADT LLC, and ADT US Holdings, Inc., v. Vivint, Inc.* United States District Court Southern District of Florida Palm Beach Division. Expert report on sampling and data analysis. [Expert Report: July 24, 2017. Deposition: August 18, 2017.]

Michael Kors, L.L.C.* v. Chunma USA, Inc. United States District Court Central District of California. Expert report on likelihood of confusion. [Expert Report: August 4, 2017. Deposition: October 31, 2017.]

Weems Industries, Inc. v. Plews, Inc.* United States District Court for Northern District of Iowa, Cedar Rapids Division. Expert report on likelihood of confusion. [Expert Report: May 1, 2017. Deposition: August 1, 2017.]

Trevor Singleton et. al. v. Fifth Generation, Inc. d/b/a Tito's Handmade Vodka.* United States District Court for the Northern District of New York. Survey and expert report on false advertising issues. [Expert Report: April 21, 2017. Deposition: July 10, 2017.]

Mars Incorporated and Mars, Petcare US, Inc. v. The J. M. Smucker Company and Big Heart Pet, Inc.* United States District Court for the Eastern District of Virginia. Survey and expert report on likelihood of confusion. [Expert Report: April 6, 2017. Deposition: June 30, 2017.]

Professional Liability Insurance Services, Inc. v. U.S. Risk, Inc. and Crystal Jacobs.* United States District Court for Western District of Texas, Austin Division. Expert report on likelihood of confusion. [Expert Report: April 4, 2017. Deposition: June 22, 2017.]

Luxe Hospitality Company, Inc.* v. SBE Entertainment Group. United States District Court Central District of California. Survey and expert report on genericness. [Expert Report: March 6, 2017. Deposition: March 30, 2017.]

Desiccare, Inc. v. Boveda, Inc.* and Charles Rutherford. United States District Court for the Central District of California. Survey and expert report on false advertising issues. [Expert Report: December 5, 2016. Deposition: January 25, 2017.]

Scat Enterprises, Inc. v. FCA US LLC.* United States District Court for the Central District for California Western Division. Survey and expert report on likelihood of confusion. [Expert Report: November 21, 2016.]

YETI Coolers, LLC v. RTIC Coolers, LLC.* United States District Court Western District of Texas, Austin Division. Survey and expert report on secondary meaning. Rebuttal of reports on fame, secondary meaning and likelihood of confusion. [Expert Report: November 18, 2016. Deposition: January 13, 2017.]

Lifeway Foods Inc. v. Millennium Products, Inc. d/b/a GT'S Kombucha/ Synergy Drinks/ CocoKeifer LLC.* United States District Court Central District of California. Rebuttal report to Plaintiff's counsel's survey. [Expert Report: October 17, 2016.]

adidas America, Inc. et. al. v. Skechers USA, Inc.* District of Oregon. Portland Division. Surveys and expert reports to evaluate secondary meaning, likelihood of confusion, and brand recognition. [Expert Report: October 14, 2016. Deposition: January 10, 2016. Expert Report: November 6, 2015. Deposition: November 24, 2015. Preliminary Injunction testimony: December 15, 2015.]

In the Matter of Certain Potassium Chloride Powder Products. United States International Trade Commission, Washington DC. Survey to evaluate false advertising claims associated with pharmaceuticals. [Expert Report: October 13, 2016.]

AMID, Inc.* v. Medic Alert Foundation United States, Inc. d/b/a Medic Alert Foundation and Justin Noland. Southern District of Texas. Houston Division. Expert report in trade dress infringement matter. [Expert Report: September 22, 2016. Preliminary Injunction Hearing Testimony: October 11, 2016.]

Surgiquest, Inc. v. Lexion Medical LLC*. District Court of Delaware. Expert report evaluating evidence in false advertising matter. [Expert Report: August 19, 2016. Deposition: October 7, 2016. Trial testimony: April 10, 2017.]

GIT-R-DONE Productions Inc.* v. GITERDONE C Store LLC. Southern District of Mississippi. Southern Division. Survey and expert report evaluating recognition and association of phrase with celebrity. [Expert Report: July 29, 2016.]

State of Oregon* v. Living Essentials LLC and Innovation Ventures LLC. Circuit Court of the State of Oregon. Survey and analysis used as evidence in false advertising matter. [Trial Testimony: July 6, 2016. Rebuttal testimony: July 19, 2016.]

Teferi Abebe Bikila. et. al. v. Vibram USA, Inc. et. al.* District of Washington at Tacoma. Survey and expert report to evaluate awareness and potential confusion related to athlete endorsement. [Expert Report: June 21, 2016. Rebuttal Report: August 23, 2016.]

Noah Silver-Sky, Fabian Lozano, and Jorge Rodriguez; and ROES 1-400 v. SRAC Holdings I, INC., Strategic Restaurants Acquisition Company, LLC, Strategic Restaurants Acquisition Company II, LLC, Strategic Restaurants Acquisition Corp.* American Arbitration Association – Commercial Arbitration Tribunal. Statistical sample, analysis, and expert report on the impact and commonality of edits to workers time. [Expert Report: May 23, 2016. Deposition: August 30, 2016.]

Homeland Housewares, LLC and Nutribullet, LLC v. SharkNinja Operating LLC.* Central District of California, Western Division. Survey and expert report to evaluate misleading advertising claims. [Expert Report: February 19, 2016. Deposition: April 18, 2016.]

QuickChek Corporation* v. Gold Associates, Inc. District of New Jersey. Survey and Report on likelihood of confusion. [Preliminary Report: January 5, 2016.]

TOD'S S.p.A.* v. Mycoskie, LLC Respondent. United States Patent and Trademark Office - TTAB. Survey and Expert report on likelihood of confusion. [Expert Report: December 15, 2015.]

Razor USA LLC* vs. Vizio, INC. Central District of California. Survey and expert report to evaluate likelihood of confusion. [Expert Report: August 13, 2015. Deposition: September 14, 2015.]

In Connection with Sprint Communications Company L.P. and Sprint Spectrum L.P.* v. Comcast Cable Communication LLC et al. Eastern District of Pennsylvania. Conjoint survey and expert report to evaluate consumer preferences for particular features of cable packages. [Expert Report: June 17, 2015. Reply Report: July 29, 2015. Deposition: April 14, 2015.]

Select Comfort Corporation; and Select Comfort SC Corporation* v. John Baxter; Dires LLC; Scott Stenzel; and Craig Miller and Digi Craft Agency and Direct Commerce. District of Minnesota. Survey and expert report for evidence of secondary meaning. [Expert Report: May 20, 2015. Deposition: June 16, 2015. Trial testimony: October 9, 2017.]

In the Matter of Certain Footwear Products. United States International Trade Commission, Washington DC. Survey to evaluate secondary meaning associated with footwear. [Expert Report: April 17, 2015. Rebuttal Report: May 13, 2015. Deposition: May 19, 2015. Testimony before the International Trade Commission: August 6, 2015.]

Circle Click Media LLC, Metro Talent LLC, and CTNY Insurance Group v. Regus Management Group, LLC, Regus Business Centre LLC, Regus PLC and HQ Global Workplaces LLC.* Northern District of California. Survey of business consumers used to address class certification and false advertising claims. [Expert Report: April 1, 2015. Deposition: May 6, 2015.]

*In re* Determination of Royalty Rates and Terms for Ephemeral Recording and Digital Performance of Sound Recordings. Before the United States Copyright Board. Survey and Expert Report on consumer substitution of various music listening options. [Expert Report: February 24, 2015. Deposition: March 27, 2015. Hearing Testimony: May 29, 2015.]

Larry Butler, Joseph Leonard, Kevin Barnes, Victor Matos, Alfred Blair, and Martin Champion, Individually and On Behalf of All Others Similarly Situated* v. Sears, Roebuck and CO. Northern District of Illinois – Eastern Division. Surveys, statistical analysis and Expert Report on issues of experienced rates and consumer preference for machines with product defects. [Expert Report: February 2, 2015.]

* Retaining party

## Publications and Presentations

"A tale of two cups: Acquired distinctiveness and survey evidence before the TTAB." (May-June 2020), with Healey Whitsett. *The Trademark Reporter.*

"Survey response bias and the 'privacy paradox': Evidence from a discrete choice experiment." (May, 2020), with Garrett Glasgow in *Applied Economics Letters.* DOI: 10.1080/13504851.2020.1770183.

NAD Panel – "Consumer Perception Survey Design Safeguards & Pitfalls." National Advertising Division Annual Meeting, New York, NY (September, 2019).

INTA Panel – "Surveys in the Brave New World: Designing and Using Survey Evidence in the Age of Online Shopping, Influencers and Hashtags." Annual Meeting, Boston MA (May, 2019).

"The value of non-personally identifiable information to consumers of online services: evidence from a discrete choice experiment," (2016) with Garrett Glasgow in *Applied Economics Letters*, DOI: 10.1080/13504851.2016.1197357.

"Using Survey Methods to Demonstrate the Value of Personal Information and Privacy" (May 2015) *Panel on Privacy, Security and IRBs – American Association for Public Opinion Research,* Annual Meeting, Hollywood Florida.

"Battle of the Experts—Deploying the Proper Scientific Methodology for Supporting or Challenging Claims" (March 13, 2015) invited panelist at the *Advanced Forum on Resolving & Litigating Advertising Disputes.*

"Effective Use of Surveys in Trademark Litigation," (August, 2014) *Knowledge Group Webinar*.

"The Use of Statistical Sampling Post-Duran," (August, 2014) *Law360.*

"The Value of Personal Information to Consumers of Online Services: Evidence from a Discrete Choice Experiment," (June 19, 2014). *National Economic Research, Inc.*

"An assessment of the nonmarket benefits of the Water Framework Directive for households in England and Wales," with Metcalfe, Baker, Andrews, Atkinson, Bateman, Carson, East, Gueron,

Sheldon and Train in *Water Resources Research,* 48:W10516. (Paper awarded Editor's Choice Award for 2013).

ABA Webinar "The Use of Surveys in Advertising Substantiation" (June 23, 2011).

"Meeting the New Standards for Reasonable Royalties," (February, 2011) with Mario Lopez. *Law360.*

"Survey Evidence in False Advertising Cases," (Winter, 2010). *The Antritrust Trial Practice Newsletter.*

"The Use of Surveys in Litigation: Recent Trends," (April, 2010) with Kent Van Liere. National Economic Research Associates, Inc.

"Emerging Issues in the Use of Surveys in Trademark Infringement on the Web," with Kent Van Liere. Paper published in the *Advanced Trademark & Advertising Law Conference* proceedings, September 2007, Seattle, WA.

"An Analysis of the Hypothetical Situations in Willingness to Pay Studies." Paper presented at the July 2006 Thematic Seminar "Quality Criteria in Survey Research," hosted by World Association for Public Opinion Research, Lake Como, Italy.

"Use of Surveys in Intellectual Property Disputes," (2005) with Eugene P. Ericksen, in *Economic Approaches to Intellectual Property Policy, Litigation and Management Issues,* Gregory K. Leonard and Lauren J. Stiroh (eds.) National Economic Research Associates, Inc.

"Response Rate Standards: Lessons from the 2004 Presidential Polls." Paper presented at the 2005 Annual Meeting of American Association of Public Opinion Research, Miami Beach, FL.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, March 2004 Charlotte, NC.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, January 2004 San Diego, CA.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, June 2003, McLean, VA.

## Professional Associations

Member, American Association of Public Opinion Research and World Association for Public Opinion Research, Member, American Statistical Association, Member, American Bar Association, Intellectual Property Section, Member, International Trademark Association (INTA), Reviewer for *Trademark Reporter*, Member, American Marketing Association.

# Exhibit B

**Exhibit B**

**Materials Considered**

**Court Documents**

- Opinion and Order, ECF No. 578, *H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, & Mary De Luis, v. Goldman Sachs & Co, and The Goldman Sachs Group Inc.,* United States District Court for the Southern District of New York, Case No. 10-CV-6950 (AT) (RWL), dated March 30, 2018.
- Second Amended Class Action Complaint, *H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, & Mary De Luis, v. Goldman Sachs & Co, and The Goldman Sachs Group Inc.,* United States District Court for the Southern District of New York, Case No. 10-CV-6950 (AT) (RWL), dated August 3, 2015.

**Expert Reports**

- Rebuttal Expert Report of Margaret S. Stockdale, Ph.D., and accompanying appendices, exhibits, and production, *H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, & Mary De Luis, v. Goldman Sachs & Co, and The Goldman Sachs Group Inc.*, United States District Court for the Southern District of New York, Case No. 10-CV-6950 (AT) (RWL), dated March 19, 2021.
- Report of Caren Goldberg, Ph.D., *H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, & Mary De Luis, v. Goldman Sachs & Co, and The Goldman Sachs Group Inc.*, United States District Court for the Southern District of New York, Case No. 10-CV-6950 (AT) (RWL), dated January 15, 2021.

**Literature**


- Atwater, L. E., Waldman, D. A., Atwater, D., & Cartier, P. (2000). "An Upward Feedback Field Experiment: Supervisors' Cynicism, Reactions, and Commitment to Subordinates," *Personnel Psychology* 53(2), pp. 275–297.

- Arnold, H. J., Feldman, D. C., & Purbhoo, M. (1985). "The Role of Social-Desirability Response Bias in Turnover Research," *Academy of Management Journal* 28, pp. 955–966.

- Bernardi, R. A. & Guptill, S. T. (2008). "Social Desirability Response Bias, Gender, and Factors Influencing Organizational Commitment: An International Study," *Journal of Business Ethics* 81, pp. 797–809.

- Cleveland, J. N., Lim, A. S., & Murphy, K. R. (2007). "Feedback phobia? Why employees do not want to give or receive performance feedback." In Langan-Fox, J., Cooper, C. L., & Klimoski, R. J. (Eds.), *New Horizons in Management. Research Companion to the Dysfunctional Workplace: Management Challenges and Symptoms*, pp. 168–186.

- Detert, J. R., Burris, E. R., & Harrison, D. A. (2010, May 26). "Do Your Employees Think Speaking up Is Pointless?" *Harvard Business Review.*

- Diamond, S. S. (2000). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence,* 2nd Edition, Federal Judicial Center, pp. 236–237.

- Diamond, S. S. (2011). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 395–420.

- Hope, O. K., Li, C., Lin, A. P., & Rabier, M. (2020). "Happy analysts." *Research Collection School Of Accountancy*, pp. 1–71.

- Morrel-Samuels, P. (2002). "Getting the Truth into Workplace Surveys." *Harvard Business Review*, pp. 5–12.

- Saari, L. M. & Scherbaum, C. A. (2011). "Identified Employee Surveys: Potential Promise, Perils, and Professional Practice Guidelines," *Industrial and Organization Psychology* 4, pp. 435–448.

- Sanchez, P. M. (2007). "The employee survey: more than asking questions," *Journal of Business Strategy*, pp. 48–56.

- Smith, A. F., & Fortunato, V. J. (2008). "Factors Influencing Employee Intentions to Provide Honest Upward Feedback Ratings," *Journal of Business & Psychology* 22(3), pp. 191–207.


**<u>Data</u>**

- exit_survey_data.xlsx

- Gender Class - Main File (3-1-2018)_SENSITIVE_CONFIDENTIAL_DATA.xlsx

- Gender Class main.xlsx, Final File - Main_SENSITIVE_CONFIDENTIAL_DATA.xlsx

- *Stockdale Report,* Final Coding.xlsx

- *Stockdale Report,* psql_mst.xlsx

- *Stockdale Report,* psqn_mst.xlsx

**<u>Bates Documents</u>**

- GS0003860-GS0004118

- GS0099133-GS0099387

- GS0115173-GS0115263
- GS0115264-GS0115473
- GS0115486-GS0115647
- GS0115648-GS0115691
- GS0115692-GS0115736
- GS0115783-GS0115826
- GS0152533-GS0152570
- GS0152571-GS0152615
- GS0152616-GS0152681
- GS0152682-GS0152758
- GS0152759-GS0152835
- GS0152909-GS0152995
- GS0154467-GS0154487
- GS0154829-GS0154849
- GS0378588-GS0378630
- GS0378631-GS0378676
- GS0378677-GS0378717
- GS0378718-GS0378763
- GS0378764-GS0378833
- GS0378834-GS0378919
- GS0378920-GS0378961
- GS0378962-GS0379112
- GS0379113-GS0379158
- GS0379159-GS0379198
- GS0379199-GS0379245

- GS0379246-GS0379289
- GS0379290-GS0379387
- GS0379388-GS0379552
- GS0379553-GS0379658
- GS0379659-GS0379750
- GS0379751-GS0379946
- GS0379947-GS0380009
- GS0603882-GS0603942
- GS0603943-GS0604041
- GS0604042-GS0604149
- GS0604150-GS0604195
- GS0604196-GS0604240
- GS0604241-GS0604282
- GS0953616-GS0953620
- GS1013182-GS1013195
- GS0724794

# Exhibit C

## Category Keywords Used for Word Search Analysis on Open-Ended People Survey Responses[1]

| Group | Home Life | Experience | Performance | Compensation | Promotions | Business Opportunity | Support | Tech[2] |
|---|---|---|---|---|---|---|---|---|
| male | family | limited | rate | salary | select | growth | resource | technology |
| female | families | no help | rates | salaries | criteria | grow | resources | tech |
| males | family's | unclear | rating | bonus | nominate | assignment | supportive | computer |
| females | mother | not explained | ratings | bonuses | nominated | lateral | suppport | computers |
| man | mothers | hidden | review | money | nominates | transfer | supports | monitor |
| men | mother's | no reason | reviews | award | nominating | transfers | supported | monitors |
| man's | parent | difficult | rank | awards | approve | lucrative | supporting | software |
| men's | parents | underrepresent | ranks | awarded | approval | opportunity | administration | hardware |
| boy | parent's | underrepresented | ranking | reward | approves | opportunities | admin | |
| boys | father | underrepresents | rankings | rewards | approved | chances | staff | |
| woman | father's | hurdles | quartile | rewarded | group | chance | junior | |
| women | fathers | ceiling | quartiles | secret | advance | | train | |
| woman's | mom | harassment | value | transparency | advancement | | training | |
| women's | moms | harassed | values | transparencies | advancing | | mentor | |
| girl | mom's | harasser | valuation | transparent | advances | | mentoring | |
| girls | moms' | harassers | evaluation | clarity | promotion | | mentors | |
| club | dad | unfair | evaluate | clarities | promotions | | periphery | |
| diverse | dads | harsh | evaluates | control | promote | | peripheral | |
| diversity | dad's | favortism | performance | credit | promoted | | seat | |
| gender | dads' | fair | perform | revenue | promoting | | sit | |
| genders | work life | unfair | performed | assets | promotes | | access | |
| minority | work / life | negative | performs | allocate | | | sponsor | |
| minorities | work/life | positive | performing | account | | | sponsors | |
| minority's | work-life | frustrating | recognition | responsibility | | | guide | |
| background | married | frustrated | recognize | manager | | | guidance | |
| | marriage | bias | recognizes | PACT | | | foster | |
| | children | biased | recognized | gap | | | fostering | |
| | kids | biases | | comp | | | care | |
| | child | discrimination | | compensation | | | caring | |
| | kid | discriminatory | | pay | | | | |

**Category Keywords Used for Word Search Analysis on Open-Ended People Survey Responses[1]**

| Group | Home Life | Experience | Performance | Compensation | Promotions | Business Opportunity | Support | Tech[2] |
|---|---|---|---|---|---|---|---|---|
| | husband | discriminate | | pays | | | | |
| | husbands | discriminates | | paid | | | | |
| | wife | discriminations | | | | | | |
| | wives | hostile | | | | | | |
| | pregnancy | hostility | | | | | | |
| | pregnant | relatiation | | | | | | |
| | maternity | retaliate | | | | | | |
| | paternity | concern | | | | | | |
| | personal life | concerns | | | | | | |
| | devotion | concerned | | | | | | |
| | devoted | exclusion | | | | | | |
| | hours | exclusive | | | | | | |
| | demanding | excluded | | | | | | |
| | | excludes | | | | | | |
| | | exclude | | | | | | |
| | | inclusion | | | | | | |
| | | inclusive | | | | | | |
| | | included | | | | | | |
| | | includes | | | | | | |
| | | include | | | | | | |
| | | insults | | | | | | |
| | | insulted | | | | | | |
| | | insult | | | | | | |
| | | sexist | | | | | | |
| | | sexism | | | | | | |
| | | racist | | | | | | |
| | | racism | | | | | | |
| | | homophobiea | | | | | | |
| | | homophobic | | | | | | |
| | | stigma | | | | | | |

## Category Keywords Used for Word Search Analysis on Open-Ended People Survey Responses[1]

| Group | Home Life | Experience | Performance | Compensation | Promotions | Business Opportunity | Support | Tech[2] |
|---|---|---|---|---|---|---|---|---|
| | | stigmas | | | | | | |
| | | fear | | | | | | |
| | | afraid | | | | | | |
| | | fears | | | | | | |
| | | fearful | | | | | | |
| | | insensitive | | | | | | |
| | | insensitivity | | | | | | |
| | | understanding | | | | | | |
| | | ineffective | | | | | | |
| | | culture | | | | | | |
| | | cultural | | | | | | |
| | | struggle | | | | | | |
| | | struggling | | | | | | |
| | | flexible | | | | | | |
| | | flexibility | | | | | | |

Notes:

1. These keywords were used to search each of the open-ended responses to the "Recommended Improvements" question from the 9.7 thousand responses from which Dr. Stockdale draws her sample of 1,800. These 9.7 thousand responses were cleaned and categorized for question type by Dr. Stockdale.
2. "Tech" was only used to control for tech-support related comments in the tabulation of "Support" related responses.