# Exhibit 15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| H. CRISTINA CHEN-OSTER;<br>SHANNA ORLICH, ALLISON GAMBA; and MARY DE LUIS,<br><br>Plaintiffs,<br><br>v.<br><br>GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,<br><br>Defendants. | Case No. 10-cv-6950 (AT) (RWL)<br><br>CONFIDENTIAL |

# Expert Report of Brian Dunn

April 19, 2021
(as corrected May 25, 2021)

# Table of Contents


I. Qualifications .......... 1

II. Assignment .......... 1

III. Summary of Opinions .......... 1

IV. Associates and VPs at Financial Services Firms Perform a Wide Variety of Different Jobs .......... 5

A. Dr. Yermack's Claims that All Associates and VPs "Share a Common Set of Foundational Skills" are Inaccurate and Do Not Contradict the Point that Associates and VPs Perform a Wide Variety of Different Jobs .......... 5

1. Dr. Yermack's Analysis of Common Skills Among Newly-Hired Associates at Financial Services Firms Is Flawed .......... 7

2. Dr. Yermack Ignores the Fact that Associates and VPs Need Specialized Skills and Begin to Specialize Immediately .......... 10

B. Dr. Yermack's Claims Regarding the Movement of Professionals from One Business Unit to Another Are Misleading and Do Not Contradict the Fact that Associates and VPs Perform a Wide Variety of Different Jobs .......... 18

1. Dr. Yermack's Interpretation of Business Unit Changes is Flawed .......... 19

2. Dr. Yermack's Claims Regarding Job Transfers within Goldman Sachs Do Not Show that Jobs Are Fungible .......... 21

C. Dr. Yermack's Claims About Compensation Benchmarking Categories Are Unfounded and Incorrect .......... 26

V. Financial Services Firms Need to Pay Professionals According to Their Performance, Which Requires Firms to Evaluate Individual Performance .......... 29

A. Whether Firms in Industries Other than Finance Also Pay for Performance Is Irrelevant, and Dr. Yermack is Incorrect that the Practice is "Equally Important" in Other Industries .......... 29

B. Dr. Yermack Is Incorrect that Promotion Is a "More Important Form of Incentive" than Annual Pay for Professionals in Financial Services Firms .......... 35

VI. Conclusion .......... 38

## I. Qualifications

1. I have more than 35 years of experience as a compensation consultant and have consulted extensively with financial services firms. A summary of my qualifications is provided in my January 15, 2021 opening report ("Opening Report").[1] My CV is attached as Appendix A. A list of my prior testimony in the past four years is provided in Appendix B.

## II. Assignment

2. Counsel for Goldman Sachs asked me to review and respond to the Expert Report of David Yermack, dated March 19, 2021 (the "Yermack Report"). A complete list of materials I have considered in reaching my opinions is provided in Appendix C.

3. I am being compensated for my time at the rate of $900 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. My compensation in this matter is not in any way contingent or based on the content of my opinions or the outcome of this matter.

## III. Summary of Opinions

4. In my Opening Report, I explained that Associates and Vice Presidents ("VPs") at financial services firms such as Goldman Sachs hold a wide variety of non-fungible jobs, which differ among and within divisions in many ways.[2] I further explained that it is necessary for financial services firms to structure compensation in order to attract, retain, and create incentives for high-performing talent, which necessarily requires these firms to assess their employees' performance.[3] Nothing in Dr. Yermack's report changes those fundamental truths.

5. I supported my opinions in my Opening Report with numerous documents, as well as my own observations from my experience as a compensation consultant to the financial services industry (among others) for 35 years. Dr. Yermack's rebuttal misses the point on several occasions. When Dr. Yermack directly addresses my opinions, his objections are

---

[1] Expert Report of Brian Dunn, January 15, 2021 ("Dunn Report"), ¶¶ 1–7.
[2] Dunn Report, ¶ 12.
[3] Dunn Report, ¶ 14.

premised on irrelevant, factually incorrect statements and selective and misleading quotations from documents, which, reviewed in their entirety, clearly support my opinions.

6. For example, Dr. Yermack disputes my opinion that professionals holding the corporate titles Associate and VPs in revenue-producing roles at Goldman Sachs perform a "wide variety of individual jobs."[4] He makes this argument primarily on the basis of a claim that Associates and VPs in revenue-producing roles in financial services firms have a "common set of foundational skills."[5] However, as I show in Section IV.A, this claim is both incorrect and irrelevant. Dr. Yermack greatly exaggerates the extent to which new Associates at financial services firms have training in common: in fact, only a minority of new Associates at Goldman Sachs are graduates of MBA programs (despite Dr. Yermack's focus on MBAs) and new Associates have a wide variety of advanced degrees and prior experiences. Moreover, new Associates with particular advanced degrees or backgrounds tend to be clustered in certain jobs in financial services firms, reflecting the fact that they perform different jobs that require different skills. For example, PhDs are far more likely to be hired into Securities or the Investment Management Division ("IMD") than into the Investment Banking Division ("IBD"). In addition to the differences in education and training, as I explained in my Opening Report, Associates and VPs hold a wide variety of non-fungible jobs, which differ in terms of the tasks and functions performed; the products, industries, or markets with which the professional interacts; and whether the professional is client-facing (and to what extent) or in a support function.[6]

7. Dr. Yermack also exaggerates the extent to which summer training programs provide common skills to new Associates: the very examples he cites show that the training programs for new Associates in each of IBD, IMD, and Securities teach different skills depending on the Division.[7] Regardless, even if new Associates have some basic skills in common, that finding is irrelevant, because the jobs performed by Associates and VPs also require *specialized* skills relevant to the different jobs they perform. Indeed, the declaration evidence cited by Dr. Yermack makes clear that different jobs performed by Associates and VPs require specialized skills. Dr. Yermack selectively quotes from the declarations of Goldman Sachs employees, cherry-picking quotes that refer to skills that some jobs may have

---

[4] Expert Report of David L. Yermack, March 19, 2021 ("Yermack Report"), ¶¶ 17–18.
[5] Yermack Report, Section V.A.
[6] Dunn Report, Section V.A.
[7] Yermack Report, ¶ 26.

in common (such as "analytical financial skills" or "relationship management"), and entirely ignoring any quote that refers to specialized skills. As one example among many, Dr. Yermack quotes the declaration of Stephen Pierce, of Goldman Sachs' Equity Capital Markets ("ECM") Business Unit in IBD to claim that "analytical financial skills" are required by all Associates and VPs.[8] This is not what Mr. Pierce says; rather, he identifies a skill that matters for *IBD* professionals generally. As important, Mr. Pierce explains that even within IBD, the skills required of bankers in Classic banking differ from those in ECM because, for example, ECM bankers require "expertise in equity offerings, while Classic bankers generally need less product knowledge and instead require more knowledge of the particular industries they cover."[9] Dr. Yermack simply ignores this and numerous other statements in the declarations he cites, which discuss specialized skills necessary for individual jobs.

8. In further support of his opinion that the jobs performed by Associates and VPs require only a common skillset, Dr. Yermack mistakenly claims that Associates and VPs regularly switch between different revenue-producing jobs. As I show in Section IV.B, this statement too is both inaccurate and irrelevant. First, Dr. Yermack misinterprets the analysis of professionals who purportedly changed Business Units presented by Dr. Farber. That analysis dramatically overstates the number of people whose jobs actually change, because many of the transfers appear to be the result of the Business Units splitting, combining, or being renamed. For instance, Dr. Yermack interprets the employees who "moved" from the "Equities Strats" Business Unit in 2005 to the "Equities Strategies" Business Unit in 2006 as having changed jobs, when in fact all that happened was that the name of the Business Unit was modified.[10] Even if he were correct that many professionals change jobs, Dr. Yermack ignores that these changes generally occur, *not* because all of the jobs are the same and require the same skills, but because one job may develop skills that are particularly useful for another job.

9. Similarly, Dr. Yermack also has no basis for his claim that data from compensation benchmarking studies are unreliable. Dr. Yermack claims without evidence that compensation consulting firms have an incentive to inflate or otherwise distort the job categorizations used in their compensation benchmarking surveys.[11] This, too, is inaccurate,

[8] Yermack Report, ¶ 22.
[9] Declaration of Stephen Pierce, July 25, 2014 ("Pierce Declaration"), ¶ 10.
[10] *See* Workpaper 1.
[11] Yermack Report, Section V.B.

as I show in Section IV.C. It is wrong, because the business incentive that compensation consulting firms have is to provide a valuable service, which can only be done by producing analysis that *accurately* reflects the professional workforces at financial services firms. Dr. Yermack completely and inexplicably ignores the fact that firms purchasing this service invest substantial internal resources to participate, which they would not do if the compensation benchmarking process did not provide them with commensurate value. Similarly, Dr. Yermack ignores actual differences in pay across jobs at the Associate and VP levels—something that would not and could not occur if the jobs were not different and did not require different skills.

10. Dr. Yermack levels a similarly flawed attack on my other opinion, that Goldman Sachs and other financial services firms need to pay professionals according to their individual performance, which in turn requires financial services firms to evaluate professionals on their performance. As an initial matter, I note that he does not contest that conclusion—he only claims that paying for performance is as important in other industries as it is in the finance industry.[12] However, even this irrelevant criticism is wrong, as I discuss in detail in Section V.A. Dr. Yermack offers no evidence that paying for performance is as important in other industries as in financial services; rather, he merely provides several examples of other industries (such as law, agriculture, sports, and software) in which, he claims, paying for performance is equally important.[13] Not a single example provided by Dr. Yermack involves an industry that pays for performance in the same way or to same extent as financial services firms. Moreover, even if paying for performance were in fact equally important in many other industries, that would not change the fact that paying for performance (and therefore evaluating performance) is necessary for financial services firms.

11. Dr. Yermack's final claim—that the prospect of promotion is more important in creating incentives for Associates and VPs than variation in annual compensation—is likewise incorrect. It is also irrelevant: that some employees at Goldman Sachs and other financial services firms may be incentivized by potential promotion to managing director ("MD") does nothing to undermine the importance of paying for performance. As I explain in Section V.B, Dr. Yermack is wrong to claim that promotion is more important as a motivating tool than variable annual compensation tied to annual performance. Dr. Yermack

[12] Yermack Report, ¶ 47.
[13] Yermack Report, ¶¶ 47–48.

ignores the fact that, for most Associates and VPs, the prospect of being promoted to MD is many years in the future and that many Associates and VPs anticipate never being in contention for promotion to MD, for various reasons. In my experience, less than 10 percent of new Associates in the financial services industry ever reach the level of MD. Financial services firms need to reward *all* professionals for high performance on an ongoing basis; thus, paying for performance is a more important tool to these firms than the potential reward of promotion. Dr. Yermack also ignores significant and meaningful variation in pay within a given job even for junior Associates, variation that reflects the extent to which financial services firms pay for performance, even at junior levels, as I discuss in Section V.B.

## IV. Associates and VPs at Financial Services Firms Perform a Wide Variety of Different Jobs

12. Dr. Yermack disputes my opinion that professionals holding the corporate titles Associate and VP at Goldman Sachs perform a "wide variety of individual jobs."[14] Dr. Yermack claims that Associates and VPs in the at-issue jobs "share a common set of foundational skills," that the movement of a limited number of professionals between Business Units is evidence of the fungibility of these professionals, and that the classification of jobs for compensation benchmarking is an unreliable measure of actual job differences.[15] These claims are inaccurate and irrelevant and reveal Dr. Yermack's lack of familiarity with the financial services industry, with which I worked closely for decades.

### A. Dr. Yermack's Claims that All Associates and VPs "Share a Common Set of Foundational Skills" are Inaccurate and Do Not Contradict the Point that Associates and VPs Perform a Wide Variety of Different Jobs

13. Dr. Yermack's assertion that Associates and VPs at large financial services firms have a "common set of skills," which they learn in MBA programs,[16] is wrong for several reasons. First, Dr. Yermack is wrong that the talent pool that financial services firms draw on for the at-issue jobs share the same initial skills and expertise. Second, even if some newly-hired Associates in the Divisions do have some basic training in common, the at-issue jobs also

[14] Yermack Report, ¶¶ 17–18.
[15] Yermack Report, Section V.A, ¶¶ 31, 42.
[16] Yermack Report, ¶¶ 18, 25–26.

require additional *specialized* skills that are not shared in common by all new Associates. Throughout his report, Dr. Yermack suggests that because Associates and VPs share common skills and have common training, they can easily be moved among jobs.[17] Even accepting that some skills are relevant to multiple jobs at Goldman Sachs, that would not imply that the workers in those jobs are fungible. For example, Dr. Yermack notes that "professionals in diverse business units" at Goldman Sachs share a "common need for relationship management skills."[18] Many diverse jobs (both within financial services firms and outside them) require such skills, but this does not mean all such jobs are the same. For example, a "Tax Services Manager" at Ernst & Young is required to "manage client relationship[s]."[19] This job requires the candidate to be a CPA, EA, or a licensed attorney, and to be "proficient in the use of various tax and accounting technologies."[20] Surely it is not the case that any Associate or VP at Goldman Sachs could fill this role, simply because they also have "relationship management skills"—and thus Dr. Yermack's focus on "common skills" obscures meaningful differences among the jobs. While it is of course true that certain common foundational skills, such as reading, writing, financial literacy, and spreadsheet skills, are demanded of Associates and VPs in a majority of revenue-producing roles, this does not mean that these roles do not also require other, specialized skills.

14. Finally, Dr. Yermack ignores the fact that, although some new Associates may start their careers with similar backgrounds or training, professionals in the at-issue jobs acquire specialized skills and expertise while working on the job, rendering them specialized and non-fungible early in their careers.

---

[17] Yermack Report, ¶¶ 27–32.

[18] Yermack Report, ¶ 23.

[19] "Tax Services Manager – EY EDGE – Financial Services Organization in Honolulu, Hawaii," *Ernst and Young*, April 2, 2021, https://ey.jobs/honolulu-hi/tax-services-manager-ey-edge-financial-services-organization/FC5665D8562E4F8B99358BE895CDD55D/job/, accessed April 19, 2021.

[20] "Tax Services Manager – EY EDGE – Financial Services Organization in Honolulu, Hawaii," *Ernst and Young*, April 2, 2021, https://ey.jobs/honolulu-hi/tax-services-manager-ey-edge-financial-services-organization/FC5665D8562E4F8B99358BE895CDD55D/job/, accessed April 19, 2021.

### 1. Dr. Yermack's Analysis of Common Skills Among Newly-Hired Associates at Financial Services Firms Is Flawed

15. Dr. Yermack claims that "Associates and VPs in revenue-generating roles at financial services firms are purposefully educated and trained with a common skill set . . ."[21] and that all such Associates and VPs "must master a set of financial and accounting concepts that are taught in all MBA programs."[22] Dr. Yermack also claims that the summer training programs that financial services firms run for new Associates serve to provide these new Associates with common skills that are required for all jobs performed by revenue-producing Associates and VPs.[23] Both of these claims are incorrect, as I discuss below.

#### a) Associates and VPs in Different Revenue-Producing Jobs Have Different Skills and Backgrounds

16. Contrary to the impression given by Dr. Yermack, not all newly hired Associates in the three Divisions are graduates of MBA programs—in fact, fewer than one-third of new Associates in Class-relevant jobs from 2005 through 2017 had graduated an MBA program. Between 2005 and 2017, the proportion of new Associates with MBAs was only 36 percent of in IBD, 33 percent in IMD, and 5 percent in Securities. The percentage of new Associates with MBAs is consistently higher in IBD and in IMD than it is in Securities. This reflects the fact that skills learned in MBA programs are less relevant for jobs in Securities than for jobs in IBD or IMD.[24] Dr. Yermack's focus on MBA programs and the training they provide,[25] therefore, is clearly misplaced.

17. Indeed, the advanced degrees or prior experience of many Associates and VPs differ both across and within Divisions, reflecting the fact that their jobs leverage a wide variety of specialized skills that are different from the skills taught in MBA programs. Professionals with specific, prior experience or other advanced degrees tend to be clustered in certain Business Units or Divisions, further indicating the differences in skills and expertise required for different jobs.

---

[21] Yermack Report, ¶ 13.
[22] Yermack Report, ¶¶ 20, 25.
[23] Yermack Report, ¶¶ 25–26.
[24] *See* Workpaper 2.
[25] Yermack Report, ¶¶ 16, 20, 25, 27, 32, 33.

18. For example, law school graduates are far more likely to be hired into IBD than IMD or Securities, suggesting that some jobs in IBD require skills that are likely to be held by professionals with legal training. Of the 115 JDs hired as Associates at Goldman Sachs between 2005 and 2017, 63 percent were hired into IBD, compared with 29 percent in IMD and only 9 percent in Securities.[26]

19. On the other hand, professionals with PhDs are much *less* likely to be hired into IBD, and instead tend to be hired for jobs in Securities and IMD, both of which offer roles that requite quantitative research or modeling: of the 291 Associates with PhDs hired at Goldman Sachs between 2005 and 2017, only 6 percent were hired into IBD, compared with 68 percent in Securities and 26 percent in IMD.[27] "Strats" jobs, in particular, often are filled with individuals with PhDs or other advanced degrees. For example, a job requisition for an "Intermediate Research Associate" in Goldman Sachs' Equities sub-division (within Securities) from 2010 required a "PhD degree… in Physics, Mathematics, Engineering, Chemistry or Finance or a related field."[28] Indeed, Associates with PhDs tend to be clustered in certain Business Units: in 2015, for example, 40 percent of all Class-relevant Associates with PhDs were in Strats jobs and were approximately eight times more likely to be in Strats jobs than if they were assigned randomly (as would be expected if every job actually drew only from common skills, as Dr. Yermack claims).[29]

20. The proportion of new Associates who are promoted Analysts also varies across Divisions and Business Units, reflecting the fact that different jobs place more value on prior experience versus formal education. Many more Analysts are promoted to Associate roles in Securities than in IBD or IMD. Between 2005 and 2017, 56 percent of new Associates in Securities were promoted Analysts, compared to 34 percent and 33 percent in IBD and IMD, respectively.[30] Moreover, *within* Securities, trading jobs are disproportionately filled by

---

[26] *See* Workpaper 2.
[27] *See* Workpaper 2.
[28] Goldman Sachs Job Listings, undated, GS0003613–859 at 854 (Job #9859). Additionally, some Strats roles in Securities require proficiency in computer programming languages, as illustrated by a job requisition for an Intermediate Research Associate role in the (then) FICC division from 2010, which requires candidates with a doctoral degree and "prior work experience… [b]uilding financial software in C/C++, Matlab and SQL." *See* Goldman Sachs Job Listings, undated, GS0003613–859 at 855 (Job #9957).
[29] *See* Workpaper 2.
[30] Calculated as the average across years between 2005 and 2017 of the percentage of new Associates at Goldman Sachs who were promoted Analysts in the three Divisions each year. *See* Workpaper 1;

promoted Analysts (70 percent of new Associates in trading jobs are promoted analysts, compared to 53 percent in non-trading Securities jobs),[31] indicating the relative preference for hiring professionals with real-world experience with the relevant products and markets, rather than those with more formal education.

21. As the examples above show, the jobs held by Associates and VPs in revenue-producing Divisions actually require a wide variety of different skills and backgrounds, contrary to Dr. Yermack's assertions.

#### b) Internal Training Programs Do Not Provide All Newly Hired Associates with a Common Set of Skills

22. Dr. Yermack also claims that summer training programs, run by financial services firms for their new class of Associates each year, result in all new Associates in revenue-producing jobs having a common set of skills, "regardless of which subdivision of the firm for which these Associates will ultimately work."[32] Dr. Yermack cites training programs for new Associates at Goldman Sachs in each of IBD, IMD, and Securities, and notes that training programs in the three Divisions share some commonalities, especially with regard to basic finance concepts.[33] However, although the three training programs do feature some topics in common, such as discounted cash flow valuation and the time value of money,[34] Dr. Yermack ignores the extent to which the training programs actually *differ* across Divisions, reflecting the fact that jobs in different Divisions require different skills and expertise. For example, the 2005 IBD New Associate training program covered "Merger Modeling," "LBO [Leverage Buyout] Valuation," "Convertible Debt," "Bridge Loans," "Bank Loans / Hybrid Loans," and "Covenants 101,"[35] topics not covered by the Securities or IMD new Associate trainings[36]—which is logical, since an understanding of these topics is likely to be far more useful for professionals in investment banking than in securities or investment management jobs. On the other hand, the 2010 Securities New Hire Program included

---

David P. Stowell, *Investment Banks, Hedge Funds, and Private Equity*, Third Edition (London: Academic Press, 2018) ("Stowell"), p. 225.

[31] *See* Workpaper 2.

[32] Yermack Report, ¶¶ 25–26.

[33] Yermack Report, ¶ 26.

[34] GS0297833; GS0005298–300; GS0168653–8.

[35] GS0297833.

[36] GS0005298–300; GS0168653–8.

training on "Currency and Commodities products," as well as "trading simulations,"[37] neither of which appear on the programs for IBD or IMD.[38] Similarly, while the 2006 IMD Associate Orientation involved two days of instruction on "Financial Foundations," which included topics common to the other Divisions,[39] the bulk of the program consisted of training specific to IMD, such as "IMD Orientation" and "IMD Foundations."[40] For example, the portion on "IMD Foundations" lasted five days and covered topics specific to IMD, such as "Customer Goals and Constraints," "Asset Allocation," "The Role of Alternative Assets," and "Institutional v. Individual Considerations,"[41] none of which appear on the programs for IBD or Securities.[42]

### 2. Dr. Yermack Ignores the Fact that Associates and VPs Need Specialized Skills and Begin to Specialize Immediately

23. As I discuss in Section IV.A.1, Dr. Yermack focuses his argument entirely on his claim that financial services firms draw on a talent pool that shares the same initial skills and expertise. In doing so, Dr. Yermack ignores the direct evidence that many of the at-issue jobs require *different* specialized skills, including evidence in the very declarations he himself cites. Additionally, Dr. Yermack ignores the fact that, even if some new Associates in at-issue jobs start their jobs with similar prior training, these Associates begin to specialize in their particular jobs immediately after starting, developing specialized skills and quickly becoming non-fungible. I discuss both points in turn below.

#### a) The Jobs Performed by Revenue-Producing Associates and VPs Require Specialized Skills

24. The existence of some "foundational" skills that are useful to many jobs performed by revenue-producing Associates and VPs at financial services firms does not demonstrate that the jobs are the same, because it is also the case that different jobs in the at-issue divisions, require *additional, specialized* skills. Throughout his report, Dr. Yermack suggests that

---

[37] GS0005298–300.
[38] GS0297833; GS0168653–8.
[39] GS0168653–8; GS0297833; GS0005298–300.
[40] GS0168653–8.
[41] GS0168653–8.
[42] GS0297833; GS0005298–300.

because Associates and VPs share common skills and have common training, they can easily be moved among jobs.[43] Even if Dr. Yermack were correct about the sharing of skills—and he is not, as I explained above—that does not imply that the professionals are fungible.

25. In support of his claims, Dr. Yermack misleadingly uses selective quotes from a handful of declarations of Goldman Sachs professionals. According to him, these declarations show that there are common skills, such as "analytical financial skills," "relationship management skills," and "risk management skills," that are required by all Associates and VPs in Class-relevant jobs.[44] However, these excerpts are cherry-picked to create an illusion of uniformity. Indeed, the very declarations cited by Dr. Yermack—when read in full—make abundantly clear how *different* many of the at-issue jobs are from each other and how the professionals performing these jobs require very different skills, depending on the job they are performing.

26. For example, one of the declarations selectively quoted by Dr. Yermack is that of Craig Packer, head of the Leveraged Finance Business Unit in IBD in 2014. In support of his claim that many at-issue jobs require "analytical financial skills," Dr. Yermack cites a sentence in Mr. Packer's declaration that states: "This role [the role of Originator in the Leveraged Finance Business Unit] involves financial analysis and modeling."[45] However, the sentence excerpted by Dr. Yermack continues far beyond the single "common" skill emphasized by Dr. Yermack to show a variety of specialized skills: "This role involves financial analysis and modeling; *credit analysis; negotiation of commitment papers, indentures, and credit agreements; industry research; and preparation of offering documents*."[46] The declaration clearly indicates that the role of Originator in Leveraged Finance in fact requires many *additional* skills, beyond the basic skills acknowledged by Dr. Yermack, which are not shared in common with all other at-issue jobs, such as jobs in IMD or Securities, or even many jobs in IBD.

27. Mr. Packer's declaration also makes clear the many ways in which jobs in his Business Unit (Leveraged Finance) *differ* from other jobs done by Associates and VPs at Goldman Sachs. For example, Mr. Packer explains that jobs in IBD differ in terms of the

---

[43] Yermack Report, ¶¶ 27–32.
[44] Yermack Report, ¶¶ 22–24.
[45] Yermack Report, ¶ 22, citing Declaration of Craig Packer, July 25, 2014 ("Packer Declaration"), ¶ 10.
[46] Packer Declaration, ¶ 10 (emphasis added).

pace of work from those in other Divisions, noting that in IBD "it can take months or years for work to result in revenues," whereas in Securities, for example, "trades are consummated relatively quickly, usually within minutes or hours."[47]

28. Mr. Packer also explains that, even within IBD, jobs in the Financing Group differ from jobs in Classic banking and require different skills as a result:

> "The skills required of a professional in the Financing Group are generally more technical [redacted] and a banker in the Financing Group must have a much deeper knowledge of the relevant financial market [redacted] For example, the role of a professional in the Financing Group requires expertise in creating financial models, analyzing balance sheets, and conducting discounted cash flow analyses."[48]

29. Dr. Yermack also selectively quotes the declaration of Stephen Pierce, in 2014 a PMD in the Equity Capital Markets ("ECM") Business Unit in IBD, in support of his claim that "analytical financial skills" are a common skillset required by all Associates and VPs in the at-issue jobs. However, Mr. Pierce's declaration discusses in detail the ways in which jobs in ECM *differ* in the skills they require from other at-issue jobs held by Associates and VPs. Dr. Yermack quotes Mr. Pierce's statement that "bankers in ECM must demonstrate strong competency with financial tools like discounted cash flow analyses and valuation indicators such as price/earnings ratios."[49] However, Mr. Pierce goes on to say that "[w]hile financial analysis and modeling can help answer [relevant] questions, a key piece of the assessment involves a general understanding of market dynamics and human psychology. *In this way, ECM differs from more technical groups in Financing, like Structured Finance.*"[50]

30. Mr. Pierce also highlights the different mix of skills required in ECM versus other Business Units in the Financing Group and in Classic banking in IBD:

> "Strong presentation and people skills also typically play a larger role in ECM than in other Financing Business Units . . . . If an ECM banker is incredibly smart and an expert in financial analysis but cannot make a compelling presentation, he or she will not excel. This skillset is generally less integral in other Financing Business Units."[51]

---

[47] Packer Declaration, ¶ 6.
[48] Packer Declaration, ¶ 5.
[49] Yermack Report, ¶ 22, citing Pierce Declaration, ¶ 7.
[50] Pierce Declaration, ¶ 7 (emphasis added).
[51] Pierce Declaration, ¶ 8.

> "While successful ECM bankers share certain traits with successful Classic bankers, such as presentation skills, the skills required of these bankers may also differ, particularly as the bankers become more senior. ECM bankers must possess expertise in equity offerings, while Classic bankers generally need less product knowledge and instead require more knowledge of the particular industries they cover. [redacted][52]

31. Dr. Yermack also cites the declaration of Celeste Guth, in 2014 a PMD in the Financial Institutions Group ("FIG") Business Unit in IBD, in support of his claim that "risk management" skills are required by all Associates and VPs in revenue-producing jobs at financial services firms.[53] However, the paragraph excerpted by Dr. Yermack actually makes the *opposite* point, that the skills required by professionals in FIG are *different* from those required in other Business Units in Classic Banking:

> "Because FIG tends to work with a greater number of financial products [redacted] FIG bankers must have a wider breadth of knowledge concerning potential financial solutions, such as structured finance as well as risk management."[54]

32. Ms. Guth also explains that even within FIG, different jobs require expertise in different areas:

> "[B]ecause FIG's clients tend to be heavily regulated, successful FIG bankers must have deep knowledge of relevant regulations. The level of regulatory knowledge required is somewhat dependent on the professional's subgroup within FIG. For example, asset management firms and financial technology companies are less regulated than banks and insurance companies. [redacted][55]

33. Dr. Yermack also cites the declaration of Peter Craig Russell, in 2014 a PMD in the U.S. Institutional Business Unit in Goldman Sachs Asset Management ("GSAM") in IMD, in support of his claim that "relationship management" skills are required by all Associates and

[52] Pierce Declaration, ¶ 10.
[53] Yermack Report, ¶ 23.
[54] Declaration of Celeste Guth, June 30, 2014 ("Guth Declaration"), ¶ 11.
[55] Guth Declaration, ¶ 10.

VPs in revenue-producing jobs at financial services firms. However, the quote cited by Dr. Yermack in fact demonstrates that U.S Institutional—which is just one Business Unit in one part of IMD—has different jobs that require different skills. Dr. Yermack quotes Mr. Russell's statement that "[w]ithin the U.S. Institutional Business Unit, Vice Presidents and Associates generally work in four different roles: (1) sales; (2) internal strategies; (3) the client strategy team; and (4) client relationship management."[56] However, Dr. Yermack omits Mr. Russell's very next sentence, which is: "*Each of these roles requires different skill sets* to address numerous client needs, and people in these groups are compensated very differently to reflect their distinct responsibilities."[57] Mr. Russell's declaration then elaborates on the differences in the four roles in the U.S. Institutional Business Unit and on the differences in skills required by professionals in those roles.[58]

34. A complete list of the declarations cited by Dr. Yermack, with additional context showing that they all actually *contradict* rather than support his conclusion, is provided in Appendix D.

35. Similarly, in support of his claim that Associates and VPs in the at-issue jobs have a "common set of foundational skills," Dr. Yermack provides several examples of pairs of jobs that he considers to "involve very similar tasks and serve identical customer bases."[59] However, in making these comparisons, Dr. Yermack ignores significant differences in the jobs that he considers to be undifferentiated and again suggests that jobs requiring common "foundational" skills require *only* common skills. For example, Dr. Yermack claims that "the underwriting of municipal bonds is not materially different from the underwriting of corporate bonds."[60] However, the underwriting of municipal bonds *is* materially different from the underwriting of corporate bonds, as is made by clear by one of the declarations cited by Dr. Yermack himself, that of Susan Benz, in 2014 an EMD in the Public Sector & Infrastructure ("PSI") Business Unit in IBD. As Ms. Benz explains, "because not-for-profit companies and governmental entities [such as municipalities] issue tax-exempt bonds, they are governed heavily by tax regulations," meaning that bankers in PSI must have specialized

---

56 Yermack Report, ¶ 23, citing Declaration of Peter Craig Russell, July 25, 2014 ("Russell Declaration"), ¶ 4.
57 Russell Declaration, ¶ 4 (emphasis added).
58 Russell Declaration, ¶¶ 5–9.
59 Yermack Report, Section V.A, ¶ 34.
60 Yermack Report, ¶ 34.

expertise not typically required by professionals in other Business Units in IBD (such as those involved in corporate bond issuances): "For example, PSI bankers must understand the rule against arbitrage, or the ability to obtain tax-exempt bond proceeds and invest the funds in higher yielding taxable securities, resulting in a profit. These rules generally do not apply to clients covered by other areas of the Firm."[61]

36. Dr. Yermack also claims that "many investment products are sold to the same base of institutional investor customers."[62] As the declaration of Peter Craig Russell discussed above makes clear, however, the business of selling investment products to institutional investors involves professionals in multiple different roles (sales, internal strategies, client strategy, and client relationship management), each of which "requires different skill sets to address numerous client needs"[63] Moreover, even within these roles, professionals may *further* specialize by client type; for example, Mr. Russell explains that when hiring for sales roles, he "look[s] for individuals who already have developed expertise with particular types of clients."[64]

37. Dr. Yermack also claims that "[a]nalyzing the value of a company that is a potential merger partner is similar to analyzing the value of a company that is considering an initial public offering ["IPO"] or a company that may propose a management buyout."[65] Dr. Yermack's claim is incorrect and also misleading for several reasons. First, there are, in fact, meaningful differences between analyzing the value of a company for a merger rather than for an IPO; in a merger, for example, the acquirer often pays a "control premium"—*i.e.*, an additional amount reflecting the value to the *acquirer* from the ability to control the company—which is typically not a feature of IPOs.[66] Second, when investment banks assist clients with mergers, IPOs, or other corporate transactions, they do far more than simply analyze the value of the company in question. For example, they also market the company to potential acquirers or potential investors. They advise the company on strategic issues, which may differ, depending on the situation (*e.g.*, in a merger, there may be antitrust considerations, requiring regulatory review; in an IPO, additional public disclosures of

---

[61] Declaration of Susan Benz, July 3, 2014 ("Benz Declaration"), ¶ 11.
[62] Yermack Report, ¶ 34.
[63] Russell Declaration, ¶ 4.
[64] Russell Declaration, ¶ 6.
[65] Yermack Report, ¶ 34.
[66] Stowell, p. 76.

financial results are required).[67] Third, as I discussed in my Opening Report,[68] investment bankers who work on mergers and IPOs tend to specialize into *industry* groups, such as Industrials, Consumer Products,[69] or FIG, and build expertise with particular industries.[70] For example, as the declaration of Celeste Guth, cited by Dr. Yermack, explains, investment bankers in FIG "are assigned to one of five sectors: insurance, banks, specialty finance, asset management, and financial technology" and "[e]ach sector requires different skills and expertise."[71]

38. Finally, Dr. Yermack claims that "[r]isk management products offered to agriculture companies whose revenues are vulnerable to uncertain weather patterns will have similarities with risk management products offered to airlines whose costs are vulnerable to changes in the energy market."[72] However, this ignores the fact that providing risk management products to clients often requires specific expertise in the relevant industry or the relevant product or both. In his report, Dr. Yermack cites the declaration of Donald Casturo, in 2014 the Chief Operating Officer of the Commodities Business Unit at Goldman Sachs, which "work[s] with end users of commodity products," such as airlines or oil refineries.[73] As Mr. Casturo explains, both salespeople and traders in the Commodities Business Unit specialize according to the type of commodity they deal with, because "there are specific considerations germane to each area;"[74] traders, for example, "need unique knowledge and skills depending on their commodity and type of seat."[75] Mr. Casturo provided an example:

> "[O]ur sales representative focusing on coal is a geologist and an engineer by training. He worked in the coal industry for 20 years before joining Goldman Sachs, and both owned and operated power plants that consumed coal. His experience is critical to his ability to work with that commodity today. Coal is a complicated commodity to trade; no two types of coal are the same and they have different characteristics impacting efficiency, which in turn impacts transactions. Because only a few companies produce and market coal in the United States, anyone working in this area must be very familiar with the

67 Stowell, pp. 78–79, 57–58.
68 Dunn Report, ¶¶ 30–31.
69 Packer Declaration, ¶ 3.
70 Packer Declaration, ¶ 4.
71 Guth Declaration, ¶ 9.
72 Yermack Report, ¶ 34.
73 Declaration of Donald Casturo, June 27, 2014 ("Casturo Declaration"), ¶ 4.
74 Casturo Declaration, ¶ 7.
75 Casturo Declaration, ¶ 9.

dynamics of the market, and must be able to work with clients to help them avoid the risks inherent in their coal-related transactions."[76]

39. Mr. Casturo's declaration thus makes clear that while "risk management" may indeed be a skill shared by many professionals at Goldman Sachs, those professionals have—and need—additional specialized skills to perform their specific jobs.

**b) Dr. Yermack Ignores On-the-Job Specialization**

40. Dr. Yermack agrees that professionals in the relevant divisions are typically "fully specialized in one area"[77] by the time they are MDs and Partners, but does not acknowledge the logical extension: even if he is correct that new Associates enter with common skills, then the fact that professionals are "*fully* specialized in one area" as MDs implies that specialization must begin *before* the MD level. Dr. Yermack's assumption that professionals immediately become specialized when they are promoted to MD has no basis in the reality of the financial services industry.

41. In fact, it has been my observation over the course of decades working with financial services firms that professionals generally begin to specialize *almost immediately* upon beginning their careers, if not before. For example, an Associate hired into a particular industry coverage business unit in investment banking will either have prior experience working in that industry or immediately begin to learn about the specifics of that industry, make connections with clients in that industry, develop an understanding of the financing requirements of firms in that industry, and generally build up specialized human capital for the job they occupy. In fact, in my experience, it would be more common for such an Associate to move to a position at *a different firm* covering the same industry, or to move to the client side, than to transfer to a different industry group at the same firm, and it would be very uncommon for such an Associate to move to an investment management or securities job.

42. Similarly, an Associate hired as a trader on a particular trading desk (*e.g.*, U.S. equity derivatives) will have relevant experience as an Analyst or at a competitor firm or will immediately begin building expertise and experience specific to the product being traded, as well as developing relationships with potential counterparties. A trader's job can differ

---

[76] Casturo Declaration, ¶ 7.
[77] Yermack Report, ¶ 13 (emphasis added).

substantially from product to product, so the human capital built by a new professional in one trading job will not necessarily be transferable to another trading job, let alone other non-trading jobs within the Firm. Indeed, this is reflected in the hiring patterns described above—far more new Associates in trading roles are former analysts than are graduates of MBA programs, demonstrating that specialization can begin even *before* the Associate level. In fact, promoted Analysts typically make up a substantial fraction of new Associates across Divisions at financial services firms,[78] which suggests that specialization in *all* jobs often begins even *before* the Associate level, when the employee is an Analyst.

43. The fact that firms prefer prior experience in the specific area relevant to the job, rather than merely prior experience at a large financial services firm, when hiring at the senior Associate or VP level, is evidence of the specialization of new Associates. For example, a Morgan Stanley job posting for an "Interest Rate Sales" position at the VP level required four years of experience specifically in interest rate product sales.[79] Even at the more junior level of *a first or second year Associate*, a J.P. Morgan job posting for a "Healthcare Coverage" investment banking job described a requirement of prior work experience in investment banking, "preferably" in "Healthcare coverage or M&A."[80]

### B. Dr. Yermack's Claims Regarding the Movement of Professionals from One Business Unit to Another Are Misleading and Do Not Contradict the Fact that Associates and VPs Perform a Wide Variety of Different Jobs

44. Dr. Yermack highlights the fact that professionals in financial services firms switch from one business unit to another.[81] Dr. Yermack misrepresents the extent to which such switching occurs and inaccurately interprets such movements as evidence that *all* of the jobs done by Associates and VPs in the at-issue Divisions are the same. Although some degree of internal mobility exists at financial services firms such as Goldman Sachs, this does not mean that all Associates and VPs are in revenue-producing roles are fungible or that they can be

---

[78] For example, at Goldman Sachs, the fraction of new Class-relevant Associates across IBD, IMD, and Securities who were promoted Analysts ranged from 27 percent to 64 percent between 2005 and 2017 and averaged 42 percent. *See* Workpaper 1.

[79] "Job Description: Vice President, Interest Rate Sales," *Morgan Stanley*, August 28, 2019, https://ms.taleo.net/careersection/2/jobdetail.ftl, accessed September 13, 2019.

[80] "CIB – Investment Banking – Healthcare Coverage – 1st/2nd Year Associate," *J.P. Morgan*, https://jobs.jpmorganchase.com/ShowJob/Id/238967/CIB-Investment-Banking-Healthcare-Coverage-1st-2nd-Year-Associate/, accessed September 23, 2019.

[81] Yermack Report, ¶¶ 28–30.

transferred from one revenue-producing job to any other revenue-producing job, as Dr. Yermack suggests.[82]

### 1. Dr. Yermack's Interpretation of Business Unit Changes is Flawed

45. To support his claim that Class-relevant Associates and VPs transfer jobs frequently, Dr. Yermack cites Dr. Farber's analysis of the "internal transfers" of Associates and VPs at Goldman Sachs from one Business Unit to another.[83] Dr. Yermack interprets this analysis as indicating that these individuals changed jobs, but that interpretation is significantly flawed.[84] Dr. Yermack's interpretation dramatically overstates the frequency of job changes implied by Dr. Farber's analysis because (a) Business Units at Goldman Sachs have been reorganized, moving groups of professionals in the organizational structure while those professionals nonetheless performed the same roles and (b) the names assigned to the Business Unit in Goldman Sachs' internal database changed from one year to another, without any corresponding real change in the jobs being performed.

46. When a Business Unit was renamed or reorganized, when two or more Business Units were combined, or when a single Business Unit was split into multiple Business Units, Dr. Yermack interprets Dr. Farber's analysis as showing that professionals in the affected Business Units changed jobs, when in fact there is no evidence that any professionals affected by these reorganizations in fact changed jobs. The following are examples of such Business Unit reorganizations:[85]

a. The Sales Business Unit in Securities split primarily into three separate Business Units in 2005: Americas Sales (66 employees), Americas Trading (63 employees), and EQ Americas Execution Services (37 employees). Due to this change, 166 employees are interpreted by Dr. Yermack as having "transferred" Business Units and as having changed jobs.

---

[82] Yermack Report, ¶¶ 28–29.
[83] Yermack Report, ¶ 28.
[84] Defendants' Expert Kathryn Shaw notes technical issues in Dr. Farber's analysis of Business Units, such as failing to construct his dataset consistently with the Business Unit definitions provided in declarations, and failing to fill in Business Units "for a subset of professionals in IBD who are not assigned to a Business Unit after relying on the variables described in the Cupertino declaration." *See* Expert Report of Kathryn Shaw, Ph.D., March 19, 2021, Section 20.2.2.
[85] *See* Workpaper 1.

b. Securities Services was formed as a Business Unit in 2005, combining employees from Futures (91 employees) with a small number from Floor Support and Sales (four employees and two employees, respectively). Securities Services was reorganized again the following year, and employees were assigned to the Prime Brokerage (133 employees) or Clearing Business Units (20 employees). Due to this change, 97 employees in 2005 and 153 employees in 2006 are interpreted by Dr. Yermack as having "transferred" Business Units and as having changed jobs.

c. QT was formed as a Business Unit in 2009, combining employees primarily from Americas Trading (18 employees), Equities Strategies (32 employees), and NYSE Specialists (43 employees). QT was renamed Quantitative Trading the following year, and both NYSE Specialists (29 employees) and Equities Strats (previously called Equities Strategies, 41 employees) spun off as separate Business Units once again, which suggests that the majority of the professionals involved in this reorganization did not actually change jobs in either year. Due to this change, 93 employees in 2009 and 70 employees in 2010 are interpreted by Dr. Yermack as having "transferred" Business Units and as having changed jobs.

47. Similarly, an examination of the data provides several examples of Business Units that were renamed. Dr. Yermack interprets Dr. Farber's table as showing the individuals in these Business Units changed jobs, when there is no evidence that any of these professionals actually changed jobs. For example, among those captured as "transfers" are the following changes in Business Unit name:[86]

a. In 2005, the "Equities Strats" Business Unit was relabeled "Equities Strategies" in the Goldman Sachs database. Due to this change, the 52 employees in Equities Strats are interpreted by Dr. Yermack as having "transferred" Business Units and as having changed jobs.

b. In 2010, "Equities Strategies" was renamed back to "Equities Strats." Due to this change, 76 employees are interpreted by Dr. Yermack as having "transferred" Business Units and as having changed jobs.

---

[86] *See* Workpaper 1.

c. In 2008, "North American Sales" was renamed "FICC Americas Sales." Due to this change, 157 employees are interpreted by Dr. Yermack as having "transferred" Business Units and as having changed jobs.

48. The examples mentioned above, which occur between 2004 and 2010 (and are only *examples* of these types of errors), reduce the average percentage of professionals purportedly transferring jobs in the same years by over 40 percent.[87]

### 2. Dr. Yermack's Claims Regarding Job Transfers within Goldman Sachs Do Not Show that Jobs Are Fungible

49. In support of his claim that the similarity of the at-issue jobs allows professionals to transfer between them, Dr. Yermack cites examples of "professionals [who have] been transferred or reassigned to different positions within Goldman Sachs."[88] However, none of the examples presented by Dr. Yermack support his claims that Associates and VPs in the at-issue jobs are fungible or that they can be readily reassigned from one at-issue job to another.[89] In fact, some of the examples cited by Dr. Yermack support the *opposite* point—that different jobs in the at-issue Divisions require different skillsets and that professionals in one at-issue job cannot easily transfer to any other at-issue job, as I discuss below.

a. **Transferring while an Analyst.** One of the examples Dr. Yermack cites,[90] that of Ashley Eckhard, describes a Business Unit transfer that occurred while the professional in question was an Analyst rather than an Associate or VP.[91] In my experience, Analysts at financial services firms are often less specialized than Associates or VPs and it is not surprising that one Analyst (out of hundreds) at Goldman Sachs transferred jobs. However, this example

---

[87] Dr. Farber estimates the number of professionals who "transfer" jobs separately for Associates and VPs. For clarity, I combine the two. Between 2004 and 2010, Dr. Farber estimates an average of 20 percent of Associates and VPs "transfer" jobs. Removing only the examples discussed reduces the estimate to 11.9 percent. *See* Workpaper 1.

[88] Yermack Report, ¶ 31.

[89] In one example Dr. Yermack cites, the employee, Samantha Davidson, does not even describe actually transferring positions. Instead, she describes being selected for a "unique" rotational position within her Business Unit, AIMS. She also notes that the position was a rare offering, stating that "[t]ypically, someone at my level would have focused on one particular business or product." *See* Declaration of Samantha Davidson, July 1, 2014, ¶ 7.

[90] Yermack Report, ¶ 31.

[91] Declaration of Ashley Eckhard, June 26, 2014 ("Eckhard Declaration"), ¶ 2.

is not informative about the degree of specialization of Associates or VPs. I note that the declaration does not suggest that Ms. Eckhard changed jobs while an Associate or VP.[92]

b. **Transferring as part of reorganizations.** Dr. Yermack also cites the example of Clare Scherrer,[93] in 2014 a PMD in IBD, whose declaration describes two Business Unit Transfers as part of Divisional reorganizations, and provides *no* indication that her actual job changed: "In approximately 2001, [IBD] was reorganized, and I became part of the Mergers and Strategic Advisory group. In approximately 2003, the Division again was reorganized to become more industry-aligned. I joined Industrials and have worked there ever since."[94]

c. **Transferring based on specialized skillsets.** Two other examples provided by Dr. Yermack may represent actual job changes; however, rather than supporting Dr. Yermack's claim that Associates and VPs in the at-issue jobs are fungible, these examples instead show the extent to which different jobs require different skills and the extent to which Associates and VPs specialize in their roles. Dr. Yermack cites the example of Celeste Guth, who in her declaration describes transferring from the Pensions Services Business Unit to FIG after she "led a very successful effort to sell leveraged employees stock ownership plans to a broad range of clients, which involved working with multiple Business Units within IBD."[95] Ms. Guth states that the transfer came at the request of leaders in FIG, presumably because Ms. Guth's effort demonstrated the requisite skills of FIG professionals, including the ability to "work with a greater variety of financial products" and with clients who "tend to be financially complex and sophisticated."[96] Dr. Yermack also cites the example of Alice Merrill Chester,[97] in 2014 a VP in Prime Brokerage in Securities, who in her declaration describes transferring within Prime

---

[92] Eckhard Declaration.
[93] Yermack Report, ¶ 31.
[94] Declaration of Clare Scherrer, July 26, 2014, footnote 1.
[95] Yermack Report, ¶ 31, citing Guth Declaration, ¶ 23.
[96] Guth Declaration, ¶¶ 5–7, 23.
[97] Yermack Report, ¶ 31.

Brokerage from the Prime Brokerage Sales department to the Capital Introductions department because transferring gave her the opportunity to build on skills she developed in Prime Brokerage and to become more specialized.[98] She actively worked with managers in Prime Brokerage Sales to help her "move to Cap Intro so that [she] could further develop a specialty focus . . . [because] moving to another desk would be an opportunity to develop an expertise, something . . . important to have for long-term career success in Prime Brokerage."[99]

50. Dr. Yermack also cites the declaration of Donald Casturo, in which Mr. Casturo explains that certain roles in Commodities (institutional sales and trading of certain "uniform" commodities) can be performed by professionals who transfer from other areas of the Firm.[100] However, Mr. Casturo makes clear that only professionals with *specific* relevant experience are suitable candidates for these roles: good candidates for institutional sales come from "other sales roles within the Firm" and "need to generally understand portfolio construction," while "individuals with experience in financial products such as stocks or futures, as those general skills are readily transferable" may be trained to be traders of certain "uniform" commodities.[101] Additionally, Mr. Casturo indicates that professionals from other areas of the Firm still require additional training to perform these roles.[102] Moreover, Mr. Casturo's declaration makes clear that roles that can be filled from within the Firm are the exception rather than the rule; for example, he states that "[d]ue to their specialized concentrations, corporate sales representatives [as opposed to institutional sales representatives] require specific knowledge regarding their underlying commodities and the relevant industry" and thus are typically hired "from industry jobs"[103] and traders of "less uniform commodities" usually come from prior jobs in the relevant industry (such as coal or natural gas).[104]

---

[98] Declaration of Alice Merrill Chester, June 30, 2014 ("Chester Declaration"), ¶ 3.
[99] Chester Declaration, ¶ 3.
[100] Yermack Report, ¶ 30; Casturo Declaration, ¶¶ 8, 11.
[101] Casturo Declaration, ¶¶ 8, 11.
[102] Casturo Declaration, ¶ 11 ("To trade these commodities we may train campus hires or individuals with experience in financial products such as stocks or futures, as those general skills are readily transferable.").
[103] Casturo Declaration, ¶ 7.
[104] Casturo Declaration, ¶ 11.

51. As the examples above show, the fact that in some cases Associates and VPs in certain at-issue jobs transfer to other at-issue jobs does not show that all at-issue jobs performed by Associates and VPs are the same. Professionals often transfer jobs precisely because one job has prepared a professional particularly well for another job—not because all jobs are interchangeable. Both the Guth and Chester Declarations cited by Dr. Yermack and discussed above provide examples of these types of transfers.

52. Similarly, the declarations of Business Unit leaders provide additional evidence that, in some cases, a particular job may provide a professional with the right set of skills for a different job. For example, John Levene, the 2014 head of six "client franchise" Departments in the Prime Brokerage Business Unit in Securities, describes in his declaration how certain positions and departments within Prime Brokerage prepare professionals for moving into other roles. He explains that the New Business Department, which helps businesses review and execute material before conducting business with Goldman Sachs, can act as an "introduction for more junior employees to other [more highly compensated] positions in Prime Brokerage, in areas like Sales and Relationship Management, Client Services, or Capital Introductions" where they would make use of the skills they had developed in the New Business Department.[105] Similarly, Mr. Levene describes Client Services as a "stepping stone to other positions in areas like Sales and Relationship Management or Capital Introductions."[106] In another declaration, Mary Louise Kirk, in 2014 head of multiple departments in the FICC Strats Business Unit in Securities, describes the backgrounds required of employees in Strats Business Units within Securities.[107] While many Strats jobs require advanced degrees (as discussed in Section IV.A), Ms. Kirk notes that Sales Strats is well-suited to lateral hires or transfers from trading. As Ms. Kirk describes, former traders would have been "educated on markets, products, pricing, and risk management" and gained significant client interaction experience that would be valuable in Sales Strats.[108] The obvious corollary to Ms. Kirk's explanation is that professionals in at-issue jobs *other* than trading jobs—for example, professionals in IBD—would not be as well suited to a job in Sales Strats, because they would not have developed the particular skills and prior experience necessary to succeed in Sales Strats.

---

[105] Declaration of John Levene, June 30, 2014 ("Levene Declaration"), ¶¶ 10–16.
[106] Levene Declaration, ¶ 16.
[107] Declaration of Marie Louise ("MaLou") Kirk, July 2, 2014 ("Kirk Declaration"), ¶¶ 2–9.
[108] Kirk Declaration, ¶ 9.

53. Though some degree of internal mobility does exist at financial services firms, this certainly does not mean that all Associates and VPs in revenue-producing jobs are fungible nor does it mean that professionals can readily transfer from one job to another. Indeed, internal candidates for other jobs are often required to submit their resumes and be interviewed, just like external candidates.[109] The fact that firms screen internal hires through resume review and interviews demonstrates that not all internal candidates will have the necessary skills and experiences for any internal position, which is evidence that professionals at financial services firms are not fungible across jobs.

54. Additionally, internal job transfers are likely to involve periods of adjustment with low productivity for the transferring professional, who may find the new role challenging due to a lack of experience or a lack of the specialized skillset required for his or her new job, further illustrating the fact that the professionals in these jobs are not fungible.[110] In one study comparing internal promotees to external hires at financial services firms, researchers found that, because of the need for position-specific skills, those who were promoted internally but transferred to a different group performed no better than external hires, *unlike* those were promoted internally but did not transfer.[111] As a result, the study found that large changes in the nature of a job, even within an organization, tend to be associated with performance declines.[112]

---

[109] For example, Deutsche Bank uses a job portal called "Connect2Job" that "allows employees interested in taking on a new role to upload their CV to review a personalized list of open positions for which they can apply." *See* "Internal Mobility," *Deutsche Bank*, https://www.db.com/who-we-are/our-culture/hr-report/enriching-our-workforce/internal-mobility, accessed March 29, 2021; Amy Gallo, "How to Ace an Internal Interview," *Harvard Business Review*, July 2, 2013, https://hbr.org/2013/07/how-to-ace-an-internal-intervi?registration=success, accessed March 29, 2021. Goldman Sachs' internal website features an "Internal Mobility Program," through which employees can "review current job openings across divisions and regions and apply online." Internal applicants must then submit resumes and be interviewed, reflecting the fact that even internal candidates must have the requisite "qualifications and relevant experiences . . . ." *See* GS0392182–3 at 182.

[110] Internal transfers may take several months to adjust to new positions and gain full productivity: "'When you look at high-level employees transitioning within a company, research indicates they feel they add value by about six months,' [Michael Watkins, author of *The First 90 Days*] says . . . [that]'[o]ften the people who get the least attention are those making internal moves [but those transitions] can be terribly challenging.'" *See* Sara Stibitz, "How to Get a New Employee Up to Speed," *Harvard Business Review*, May 22, 2015, https://hbr.org/2015/05/how-to-get-a-new-employee-up-to-speed, accessed March 29, 2021.

[111] Matthew Bidwell, "Paying More to Get Less: The Effects of External Hiring Versus Internal Mobility," *Administrative Science Quarterly* 56, no. 3, 2011, pp. 369–407.

[112] Matthew Bidwell, "Paying More to Get Less: The Effects of External Hiring Versus Internal Mobility," *Administrative Science Quarterly* 56, no. 3, 2011, pp. 369–407.

### C. Dr. Yermack's Claims About Compensation Benchmarking Categories Are Unfounded and Incorrect

55. Without any basis, Dr. Yermack claims that the categorization of professionals for compensation benchmarking is not a reliable reflection of actual job differences.[113] Dr. Yermack speculates that this is the case because, in his view, "market survey companies have a self-interest in amplifying the number of job 'variations' they seek to survey."[114]

56. Dr. Yermack provides no support for his assertion that the survey companies invent or exaggerate job differences. Dr. Yermack also does not provide any evidence that the categorization of the Class-relevant professionals at Goldman Sachs by Willis Towers Watson fails to reflect actual job differences.

57. Likewise, Dr. Yermack has no basis for his claim that market survey companies have an *incentive* to "amplify[] the number of job 'variations' they seek to survey."[115] Dr. Yermack provides a single citation, Bender (2011), which refers to *executive* compensation consulting, *i.e.*, compensation consulting that focuses on executive officers rather than more junior professionals.[116] Additionally, Bender (2011) does not argue that compensation consultants have an incentive to distort their benchmarking services in any way; the paper merely states that a consulting firm "needs to appear to have the expertise" to win assignments.[117] This uncontroversial fact is irrelevant; a compensation consulting firm does not "appear to have the expertise" by telling the client something inaccurate (such as that the client has 100 different jobs when the client actually has only five).

58. More generally, Dr. Yermack's claim that market survey companies have an incentive to "amplify" the number of job categories in their surveys ignores economic logic and betrays an ignorance of how the compensation benchmarking process actually works. Compensation consulting firms have a financial incentive to provide valuable services to their clients. To

---

[113] Yermack Report, ¶ 42.
[114] Yermack Report, ¶ 42.
[115] Yermack Report, ¶ 42.
[116] Ruth Bender, "Executive Compensation Consultants," Executive Compensation and Corporate Governance Conference Paper, March 12, 2011 ("Bender, (2011)"). In my experience, *executive* compensation consulting differs in several important ways from the benchmarking of more junior professionals such as Associates and VPs at Goldman Sachs. One relevant difference is the fact that executives typically occupy only a small number of distinct roles, even across industries, while Associates and VPs at Goldman Sachs perform a large number of differentiated jobs, as I explained in my Opening Report. Dunn Report, ¶ 25.
[117] Yermack Report, ¶ 42, citing Bender, (2011).

ensure that compensation benchmarking services are useful to clients, compensation consulting firms strive to be accurate in their classification of job differences.

59. As I discussed in my Opening Report, firms that participate in compensation benchmarking surveys and hire compensation benchmarking services typically invest substantial resources, both in terms of money and employee time, in the benchmarking process.[118] At a large firm such as Goldman Sachs, multiple professionals are involved in administering in the annual benchmarking process, which involves classifying participating professionals, collecting and cleaning personnel data, interacting with the compensation consultants, and analyzing the survey results.[119] Firms would not invest these resources in the compensation benchmarking process if they did not perceive it as providing valuable information, and they would not perceive it as providing valuable information if the survey results were anything other than accurate and precise.

60. Additionally, compensation consulting firms have no incentive to increase the work performed for any given survey beyond what is necessary. Since processing survey data for additional positions is costly and since firms typically charge fixed fees per survey, consulting firms have no incentive to add non-existent or over-specialized positions to surveys, since doing so would merely serve to increase costs, while adding no value.

61. Moreover, Dr. Yermack's claim that the Willis Towers Watson compensation benchmarking data "reflect[] a job architecture created for the industry by Willis Towers Watson" is misleading. In my experience, both the creation of the job category definitions and the matching of incumbents to job categories are iterative procedures, in which the firms participating in the survey have input into the categorizations that are used and can communicate with the compensation consultant regarding revisions to category definitions. As an example of this, the 2018 matching guide for Willis Towers Watson Fixed Income survey includes the instruction to survey participants to "Submit data for all incumbents . . . [and] [i]nclude a comment or note for any incumbent data that might be unusual, or to indicate those individuals who cannot be matched."[120] Additionally, Goldman Sachs—along

---

[118] Dunn Report, ¶ 42.

[119] Dunn Report, ¶ 42.

[120] Willis Towers Watson, "MGMC Compensation Study: Global Fixed-Income Data Matching Guide," 2018, GS0891824–63 at 27. In my experience, compensation consultants talk to business people at participating firms in order to understand how the job definitions may need to be revised. For example, compensation consultants might receive input from participant firms on what new jobs are developing, what jobs are no longer being performed, which job categories have become too broad due to changes in the business, and so on.

with virtually every other major financial services firm—makes use of the job architecture year after year and invests substantial resources in the process that is based on the job architecture, as I discuss above, reflecting the fact that Goldman Sachs and its peers view the job architecture as a useful description of the different jobs in the relevant Divisions.

62. Dr. Yermack also overlooks the fact that, as I discuss in my Opening Report, the variation in pay across different jobs is itself evidence that the categorization for the benchmarking process reflects true job differences and also that professionals are not fungible across these jobs. This is a matter of the simple application of the economic logic of supply and demand: given the competition for talent in this industry,[121] if professionals in these various jobs were truly fungible and if the jobs were all truly the same, all professionals would flock to the highest paying among the jobs and leave the lower paying ones, thereby driving down the compensation in the formerly high-paying jobs and driving up compensation in the formerly low-paying ones, until pay levels were approximately equal across all jobs.[122] As I discussed in my Opening Report, the Goldman Sachs benchmarking data reveal a wholly different pattern:[123] different jobs have different ranges of pay, even within the same Division. For example, as Exhibits 3-A and 3-B in my Opening Report show, Associates and VPs in Trading jobs in 2015 typically earned more than their counterparts in Sales jobs, who in turn typically earn more than those in Strats and Prime Brokerage jobs.[124] I further explained that even with a given function (*e.g.*, Trading), different job classifications have different market rates; in 2015 the median compensation for a VP in mortgage trading ("FICC, Trading, Mortgages") was 17 percent higher than for a VP in commodities trading ("FICC, Trading, Commodities"), and that the majority of

---

[121] Dunn Report, ¶¶ 51–54.

[122] Additionally, if, in fact, all new Associates were fungible, they would be hired centrally, paid exactly the same, and assigned to roles randomly. This does not happen. Instead, in my experience, individual Business Units recruit talent based on their specific requirements and are selective as to whom they make offers to and at what rate of pay.

[123] Dr. Yermack notes that Goldman Sachs in some cases uses "junior banker guidelines" to guide compensation for Associates and junior VPs in IBD, suggesting that the range of compensation for these professionals is similar across jobs and Business Units. *See* Yermack Report, ¶ 45. However, this does not demonstrate that the jobs done by these professionals are the same. Although a difference in market rates is evidence of differences in jobs, the converse is not true. For example, a junior investment banker may earn the same as a junior associate in a law firm, although the jobs done by these two professionals differ substantially.

[124] Dunn Report, ¶ 38.

professionals in a single job classification have compensation levels that are higher or lower than almost *all* professionals in a different job.[125]

63. Importantly, in my experience, the classification of jobs in benchmarking surveys often *understates* the true number of different jobs being done.[126] This is because the benchmarking exercise requires each job category to be broad enough so that it will apply to a sufficient number of individuals (across different firms) in order for useful comparisons to be made. When a firm has employees who perform highly specialized jobs that are different from any jobs done at other firms, any categorization of those employees will be approximate—or the employees will be "unmatched"—and the categorization will likely understate the true number of different jobs.

## V. Financial Services Firms Need to Pay Professionals According to Their Performance, Which Requires Firms to Evaluate Individual Performance

64. Dr. Yermack does not dispute my opinion that financial services firms need to pay professionals according to their performance, which requires firms to evaluate professionals on their performance. Instead, he merely claims that paying for performance is "equally important" in other industries and that, within the financial services industry, promotion is a "more important form of incentive" than variation in annual compensation.[127] He is wrong, and his claims are a distraction from the undisputed fact that financial services firms need to pay professionals according to their performance.

### A. Whether Firms in Industries Other than Finance Also Pay for Performance Is Irrelevant, and Dr. Yermack is Incorrect that the Practice is "Equally Important" in Other Industries

65. Dr. Yermack agrees that financial services firms need to pay for performance[128] and that, as a result, financial services firms need to evaluate performance, recognizing that "financial services firms rely upon performance-based incentive compensation to motivate and reward their professional staff."[129] He notes that firms in other industries (such as

[125] Dunn Report, ¶¶ 39–40.
[126] I noted this in my Opening Report as well. *See* Dunn Report, ¶ 36.
[127] Yermack Report, ¶¶ 47, 51.
[128] Yermack Report, ¶ 47 ("It is true that paying for performance is common in financial services.").
[129] Yermack Report, ¶ 47.

software, ride-sharing, and healthcare) also in some cases use pay-for-performance or incentive compensation systems,[130] but that is beside the point. Whether firms in other industries pay for performance has no bearing on the fact that financial services firms need to pay for performance.

66. However, although what other industries do has no bearing on my opinion that financial services need to pay for performance, I disagree with Dr. Yermack's claim that performance-based incentive compensation is "equally important in a wide variety of industries" as it is in the financial services industry.[131] Importantly, Dr. Yermack provides no evidence on the prevalence or importance of paying for performance in industries other than financial services, and my experience in compensation consulting over nearly 40 years contradicts his claim. Generally speaking, pay-for-performance is typically more important in industries that are people-intensive (rather than capital-intensive) and in industries in which a single professional's individual performance can have a large impact on firm revenues—both of which are characteristics of the financial services industry. Indeed, in my experience, incentive compensation is generally larger—both absolutely and as a percentage of total compensation—in the financial services industry than in other industries. Relatedly, the variance in compensation based on performance is generally larger in financial services firms in other industries.

67. As I discussed in my Opening Report, paying for performance is a fundamental principle of compensation in the financial services industry.[132] Additionally, in my experience, the incentive component of compensation tends to be a far larger share of total compensation in the financial services industry than in almost any other industry, including those cited by Dr. Yermack.[133] A 2017 survey, for example, found that jobs in financial services held five of the of top ten places in a listing of jobs with the highest median annual bonuses.[134] Additionally, the financial services jobs included on that list (investment banking associate, private equity associate, equity research analyst, investment banking analyst, and wealth management advisor) had the highest proportional bonuses, as measured by the ratio

---

[130] Yermack Report, ¶¶ 47–50.
[131] Yermack Report, ¶ 47.
[132] Dunn Report, ¶ 56.
[133] Yermack Report, ¶¶ 48, 50.
[134] Keren Baruch, "LinkedIn Data Reveals the Jobs and Industries Earning the Biggest Bonuses," *Official LinkedIn Blog*, December 20, 2017, https://blog.linkedin.com/2017/december/20/linkedin-data-reveals-the-jobs-and-industries-earning-the-biggest-bonuses, accessed April 9, 2021.

of median annual bonus to median total salary.[135] As I also explained in my Opening Report, variation in compensation based on performance in financial services firms can be quite large. I provided an example showing that, among "Debt Capital Markets" professionals in 2014, a senior VP at the 90th percentile was paid *more than twice* what a senior VP at the 10th percentile was paid.[136]

68. Additionally, the examples of incentive compensation in other industries given by Dr. Yermack differ meaningfully from the practice of paying for performance in the financial services industry. All of Dr. Yermack's comparisons are inapt; not a single industry that he mentions pays for performance in the same way or to the same extent as financial services firms. In many of his examples, Dr. Yermack conflates two concepts: the unremarkable idea that strong performers will be rewarded with better compensation through increases in *subsequent* compensation, on the one hand, and the concept that strong performance in a given year will be rewarded with higher compensation in that *same* year, on the other. It is the latter concept, which I refer to as paying for performance, that is fundamental to the compensation principles of every financial services firm, and is used more extensively in the financial services industry than in other industries. Additionally, as discussed below, in the examples he provides, Dr. Yermack conflates rewarding group performance with rewarding individual performance and conflates rewarding a single component of performance with rewarding overall performance. I discuss each of Dr. Yermack's examples individually:

a. Law:[137] Many of the largest law firms in the United States pay associates a lockstep salary and bonus based on tenure: "Lawyers working in [these firms] are generally paid on . . . a system of lockstep associate compensation based on the number of years out of law school . . . . In addition to receiving standardized salaries across the industry, associates working in Biglaw can

---

[135] Keren Baruch, "LinkedIn Data Reveals the Jobs and Industries Earning the Biggest Bonuses," Official LinkedIn Blog, December 20, 2017, https://blog.linkedin.com/2017/december/20/linkedin-data-reveals-the-jobs-and-industries-earning-the-biggest-bonuses, accessed April 9, 2021. Note that the statistics provided by LinkedIn are median values across multiple firms. In my experience, incentive compensation is frequently an even larger share of total compensation for professionals in financial services firms than the median values provided by LinkedIn.
[136] Dunn Report, ¶ 60, Exhibit 4-A.
[137] Yermack Report, ¶ 47.

expect to receive the same annual bonuses and summer bonuses as their peers based on the market bonuses set by the leading firms."[138]

b. Agriculture:[139] The paper cited by Dr. Yermack discusses "piece rate" compensation, in which "some measure of output is specified and workers are paid on the basis of the number of units they produce."[140] This context is in no way comparable to financial services firms. Indeed, the paper itself notes that this type of compensation may not be well-suited to jobs like those in financial services firms in which quality, as well as quantity, is important.[141]

c. Sports: [142] Players who perform better will generally be compensated with higher pay in future contracts. However, in many professional leagues, performance in a given season does *not* affect compensation in that season. For example, Major League Baseball's collective bargaining agreement "prohibits incentives from being awarded based on statistical achievement. Thus, playing time is the near-universal means by which players receive incentives."[143] Performance bonuses in the National Hockey League are limited to players on entry level contract, players over age 35 on one-year contracts, or veteran players who were injured for much of the previous season and are on one-year contracts. No other players are "permitted to receive Performance Bonuses of any kind."[144] These limitations are fundamentally different from paying for performance in the financial services industry, in which the performance of nearly *each* individual directly affects his or her compensation *in that year*.

d. Software:[145] The article cited by Dr. Yermack documents that "stock-based compensation" has been an important component of compensation (relative to

---

[138] "Biglaw Salary Scale," *Biglaw Investor*, https://www.biglawinvestor.com/biglaw-salary-scale/, accessed April 9, 2021.
[139] Yermack Report, ¶ 47.
[140] Edward P. Lazear, "Compensation and Incentives in the Workplace," *Journal of Economic Perspectives* 32, no. 3, 2018 ("Lazear (2018)"), pp. 195–214 at p. 198.
[141] Lazear (2018), p. 198.
[142] Yermack Report, ¶ 47.
[143] "Incentive Clause," *Major League Baseball*, https://www.mlb.com/glossary/transactions/incentive-clause, accessed April 9, 2021.
[144] Collective Bargaining Agreement by and between National Hockey League and National Hockey League Players' Association, September 16, 2012–September 15, 2022, p. 249.
[145] Yermack Report, ¶ 48.

cash-based compensation) for "new economy firms."[146] However, the *form* of compensation—cash vs. stock—does not determine whether the compensation is "for performance." Paying for performance means paying *more*—whether in stock or in cash—for higher performance.[147]

e. Ride-sharing:[148] Dr. Yermack cites the example of Uber's "driver reward system," through which drivers receive monetary rewards for hitting certain metrics, such as completing a certain number of orders or maintaining a certain average score on customer ratings.[149] Although financial services firms do consider certain metrics (such as sales or P&L) when setting compensation for some professionals, compensation at financial services firms is generally based upon an assessment of *all* aspects of the professional's performance, rather than merely those that can easily be quantified.

f. Healthcare and Medicine:[150] Dr. Yermack cites a "survey of dozens of studies of pay-for-performance" (Lazear, 2018),[151] which includes a discussion of incentives for physicians based on a single study, Gaynor, Rebitzer, and Taylor (2004). That latter study notes that a "key feature of the HMO's incentive system was that the incentive contracts were group-based; that is, bonuses were based on the performance of *panels* of primary care physicians rather than individual doctors."[152] In contrast, though financial services firms do reward group (*e.g.*, firm, division, or business unit) performance—

---

[146] Kevin J. Murphy, "Stock-based Pay in New Economy Firms," *Journal of Accounting & Economics* 34, 2003, pp. 129–147 at p. 129.

[147] Compensating employees in stock often results in highly socialized returns, *i.e.*, returns shared equally among employees, since stock grants are frequently the same for employees at the same level and the return on the stock based on price increases is the same for all stockholders.

[148] Yermack Report, ¶ 49.

[149] Feng Xiong et al., "An Investigation of the Uber Driver Reward System in China – An Application of a dynamic Pricing Model," *Technology Analysis & Strategic Management* 33, no. 1, 2021, pp. 44–57.

[150] Yermack Report, ¶ 50.

[151] Yermack Report, ¶ 47.

[152] Martin Gaynor et al., "Physician Incentives in Health Maintenance Organizations," *Journal of Political Economy* 112, no. 4, 2004, pp. 915–931 at p. 917. Note also that the incentive compensation in this study is based purely on "keeping annual expenditures below the budgeted amount," which is not the same holistic assessment of performance considered by financial services firms.

particularly at the MD and Partner levels[153]—these firms set compensation specifically to reward *individual* performance.[154]

g. Religion:[155] Dr. Yermack cites his own paper (Hartzell et al., 2010), which documents that, in certain churches, there is a correlation between the compensation of ministers and the size of the church congregation, reflecting a form of paying for performance in which ministers receive "approximately 3% of the incremental revenue from membership increases."[156] However, the paper argues that ministers' compensation is correlated with their performance in the *previous year*,[157] which is different from the incentive compensation structure at Goldman Sachs, in which an individual's performance in a given year affects his or her compensation in that year. Additionally, the paper does not suggest that ministers' compensation is based upon an *explicit* tying of compensation to performance, let alone one known to all parties in advance, as is the case with paying for performance at financial services firms. Finally, the article shows that compensation is correlated with a single imperfect measure of performance (congregation size) rather than a holistic evaluation, such as those that are used by financial services firms.

h. Airlines:[158] The paper cited by Dr. Yermack analyzes an incentive scheme in which "Continental Airlines . . . promised monthly bonuses to all 35,000 hourly employees if the company achieved a firm-wide performance goal."[159] As discussed above, though financial services firms do reward firmwide performance, they more heavily reward *individual* performance, particularly among Associates and VPs.[160]

---

[153] Dunn Report, footnote 74. *See also* GS0113198–201 at 200 ("Firmwide compensation should directly related to firmwide performance over the cycle. Junior people may experience less volatility in compensation. Senior and more highly paid people may experience more variability in their compensation based on year-to-year changes in the firm's results.").
[154] Dunn Report, ¶ 56.
[155] Yermack Report, ¶ 50.
[156] Jay C. Hartzell et al., "Is Higher Calling Enough? Incentive Compensation in the Church," *Journal of Labor Economics* 28, no. 3, 2010, pp. 509–539 at p. 509 ("Hartzell 2010").
[157] Hartzell 2010, p. 520.
[158] Yermack Report, ¶ 50.
[159] Marc Knez and Duncan Simester, "Firm-Wide Incentives and Mutual Monitoring at Continental Airlines," *Journal of Labor Economics* 19, no. 4, 2001, pp. 743–772 at p. 743.
[160] Dunn Report, footnote 74.

i. Government Regulatory Agencies:[161] Contrary to Dr. Yermack's claim, government employees receive little or no incentive compensation. Pay in governmental agencies, like the Securities and Exchange Commission ("SEC"), is typically set "commensurate with the experience – both 'relevant' and 'specialized' – that he or she brings to the position."[162] The article cited by Dr. Yermack, which focuses on attorneys at the SEC, argues that the incentive of potentially being promoted motivates attorneys to perform well, but this is fundamentally different from paying for performance in the financial services industry, in which the individual's performance in a given year directly affects his or her compensation in that year.[163]

### B. Dr. Yermack Is Incorrect that Promotion Is a "More Important Form of Incentive" than Annual Pay for Professionals in Financial Services Firms

69. I agree with Dr. Yermack that, along with annual compensation that is tied to individual performance, the prospect of being promoted to a more senior position (*e.g.*, to MD or Partner) plays a role in motivating and creating incentives for Associates and VPs at financial services firms. However, the fact that promotion also plays a role in motivating and creating incentives for Associates and VPs has no bearing on my opinion that financial services firms need to pay for performance. Indeed, as I explained in my Opening Report, rewarding individual performance is a fundamental principle of compensation across the financial services industry.[164] Dr. Yermack is also wrong to suggest that promotion is necessarily a "more important form of incentive"[165] for Associates and VPs at financial

---

[161] Yermack Report, ¶ 50.
[162] "SEC Compensation Program," *U.S. Securities and Exchange Commission*, April 17, 2020, https://www.sec.gov/ohr/sec-compensation, accessed April 9, 2021.
[163] Joseph Kalmenovitz, "Incentivizing Financial Regulators," *Working Paper*, 2020. While Kalmenovitz (2020) also documents that certain attorneys at the SEC receive performance bonuses, the fraction of total compensation paid in the form of bonuses to these attorneys, averaging only 1.6 percent of the attorneys' base compensation, is far smaller than the equivalent ratio for revenue-producing professionals at financial services firms such as Goldman Sachs.
[164] Dr. Yermack does not dispute my opinion that it is necessary for financial services firms to *evaluate* individual performance. Since performance assessments are typically used as an input into promotion decisions, even to the extent that promotion plays a role in motivating and creating incentives for employees, it is still true that financial services firms need to evaluate individual performance.
[165] Yermack Report, ¶ 51.

services firms than annual bonuses that are linked to individual performance, for at least two reasons.

70. First, compared to annual bonuses, the prospect of promotion to MD or Partner is far in the future for the majority of Associates and VPs at financial services firms and therefore provides weaker and highly discounted incentives than does the prospect of variation in annual pay. In financial services firms, Associates are generally promoted to VP after 3½ to five years and VPs are promoted to MD after four to ten years, depending on the firm and the individual's performance.[166] Relying on a single distant reward many years in the future is a less efficient way of motivating and creating incentives for employees on an ongoing basis than tying annual compensation to measures of that year's performance.[167] Indeed, compensation specialists have commented that timing and frequency of performance-related rewards is an important element in the design of an incentive compensation plan and that rewards that are "too far off into the future" may not "effectively motivate employees."[168] This is consistent with my experience, in which I have observed that annual compensation is a primary incentive at financial services firms.

71. Second, financial services firms also need to motivate and create incentives for professionals who may not anticipate being promoted to MD or Partner, whether because those professionals do not anticipate that they will be selected for promotion or because they do not plan to stay at the firm long enough to be promoted. Dr. Yermack argues that the compensation structure at financial services firms can be described as a "tournament,"[169] where large rewards go to the winners, *i.e.*, to those who are eventually promoted to MD. However, for such a "tournament" to be an effective motivator, all players should feel that they are participating; in the financial services industry, promotion to MD is so rare that the prospect of promotion can only play a limited role in motivating many if not most employees.

---

[166] Stowell, p. 223. For example, at Goldman Sachs, newly promoted MDs in 2017 had been VPs at the Firm for an average of 7½ years. *See* Declaration of David Landman, April 11, 2019, ¶ 4.
[167] Linda E. Amuso and David Knopping, "Incentive Compensation Program Design," in *The Compensation Handbook: A State-of-the-Art Guide to Compensation Strategy and Design*, eds. Lance A. Berger and Dorothy R. Berger (New York: McGraw Hill, 2008), p. 213. ("As a guideline, the tighter the timeframe between goal achievement and award, the more powerfully the incentive motivates future behavior.").
[168] Erin C. Packwood, "Using Variable Pay Programs to Support Organizational Goals," in *The Compensation Handbook: A State-of-the-Art Guide to Compensation Strategy and Design*, eds. Lance A. Berger and Dorothy R. Berger (New York: McGraw Hill, 2008), pp. 218–219.
[169] Yermack Report, ¶ 51.

At Goldman Sachs, for example, during the Class Period, an average of 3.5 percent of current VPs were promoted to MD each year, and only 26 percent of Class-relevant professionals who were VPs as of 2003 had been promoted to MD by 2018.[170] Paying for performance, therefore, is critical to Goldman Sachs, in order to motivate and create incentives for the entire population of VPs (and Associates) on an ongoing basis.

72. In support of his claim that the financial services industry fits a "tournament theory of compensation," where "differences in compensation within a given rank [are] relatively smaller, while the rewards for advancing to a higher rank [are] relatively larger,"[171] Dr. Yermack highlights the fact that, for financial services firms, variation in pay between levels (*e.g.*, between VPs and MDs) tends to be greater than the variation within a given level (*e.g.*, among VPs in Equity Capital Markets).[172] However, the fact that variation in pay across levels is larger than variation in pay within levels is irrelevant. There is still meaningful variation in pay within jobs for a given corporate title, demonstrating the prevalence and importance of paying for performance.

73. Even at junior levels, where the variation in pay is less than at more senior levels, employees are still paid for performance, and the extent of the variation in pay is substantial. For example, consider the compensation data for junior Associates in Equity Capital Markets that I presented in my Opening Report and which is cited by Dr. Yermack.[173] Those data show that the 90th percentile Associate in Equity Capital Markets in 2014 made 50 percent more than the 10th percentile employee.[174] A 50 percent increase in compensation—approximately $80,000 in this example—is not trivial, especially considering the median starting salary for all newly hired MBAs in 2014 was $95,000.[175] In other words, the *additional* compensation earned (for example) by a strong performer in her first year after graduating an MBA program, relative to a weak one, is nearly as large as the *entire* compensation of her average classmate. As Exhibits 3-A, 3-C, and 4-A through 4-C in my

---

170 *See* Workpaper 3.
171 Yermack Report, ¶ 52.
172 Yermack Report, ¶¶ 53–55.
173 Dunn Report, ¶ 60; Yermack Report, ¶ 53.
174 Dunn Report, Exhibit 4-B.
175 Della Bradshaw, "More Jobs and Higher Salaries for 2015 MBA Graduates," *Financial Times*, May 19, 2015, https://www.ft.com/content/958b6c88-fd7e-11e4-b824-00144feabdc0, accessed April 1, 2021.

Opening Report show, there is substantial and meaningful variation in annual compensation for Associates across multiple Business Units, in both IBD and Securities.[176]

74. Furthermore, it is logical for variance in compensation to increase as seniority increases. The more senior a professional is, the more the professional's skills and value have been enhanced, and the more the professional's individual performance can affect the firm's performance. A first-year investment banking Associate, for instance, typically works under the direction of others, and has limited scope to excel, beyond being efficient and mistake-free in his or her work, whereas the performance of a more senior banker has a larger impact, through his or her decision-making and interactions with clients, which can lead to the generation or loss of business.[177] Similarly, a senior trader who is responsible for managing his or her own trading "book" may have more scope to affect the firm's performance than a junior trader who largely carries out the instructions of more senior professionals.

## VI. Conclusion

75. Nothing in Dr. Yermack's report changes my opinion that Associates and VPs at financial services firms such as Goldman Sachs perform a wide variety of different jobs. Dr. Yermack claims that Associates and VPs in revenue-producing jobs share a common set of foundational skills and are therefore readily transferred, but these claims are flawed in numerous ways. First, Dr. Yermack exaggerates the extent to which Associates and VPs share skills in common: he focuses entirely on MBA programs and summer training programs while ignoring the fact that many new Associates have a variety of different backgrounds, including backgrounds that provide them with specialized skills, and that summer training programs actually provide new Associates with differentiated training depending on their Division. Second, even if new Associates share some basic skills in common, this does not mean that all jobs performed by Associates and VPs are the same or that Associates and VPs can be readily transferred from one job to another. Dr. Yermack ignores the direct evidence that Associates and VPs perform a wide variety of different jobs, including evidence from the declarations upon which he himself relies. Third, Dr. Yermack's

[176] Dunn Report, Exhibits 3-A, 3-C, 4-A–C.
[177] Benz Declaration, ¶ 15. *See also* Packer Declaration, ¶ 6 ("as a junior banker in IBD, it is difficult to be the primary driver of revenues.").

interpretation of Business Unit changes at Goldman Sachs is flawed and does not support his claim that Associates and VPs frequently change jobs. Fourth, Dr. Yermack is wrong to assert that job categorizations created for the purposes of compensation benchmarking surveys inflate the number of jobs done by Associates and VPs.

76. Dr. Yermack does not dispute my opinion that in order to remain competitive by attracting and retaining talent financial services firms need to pay for performance, and, therefore, financial services firms must assess individual performance. Additionally, Dr. Yermack is wrong to claim that pay for performance is as important in other industries as it is in the financial services industry: in none of the examples presented by Dr. Yermack do firms pay for performance in the same way or to the same extent as financial services firms do. Finally, Dr. Yermack's assertion that promotion is as important a motivating factor for Associates and VPs at financial services firms as annual incentive compensation is incorrect: promotion to MD requires many years of experience and is so rare that the prospect of promotion can play only a limited role in motivating many if not most employees.

Executed this 19th of April, 2021

Brian Dunn

# Appendix A

**Brian D Dunn**
**1 Scarsdale Rd. #512**
**Tuckahoe, NY 10707**
**914/473-2360**
**bddunn@optonline.net**

Brian Dunn retired as the Chairman of McLagan and the CEO of Performance, Reward & Talent for Aon Hewitt Consulting Worldwide at the end of 2015. In 2016, he served as a special advisor to the Vatican where he developed plans for a new HR function and helped create an executive development program for Vatican leaders. He currently serves on the Board of Directors of Silvercrest Asset Management, where he is Chairman of the Compensation Committee and a member of the Governance and Audit Committees. He is also a Board Member of Spire Technologies and of the Phi Delta Theta Educational Foundation, where he is chair of the Audit Committee and a member of the Investment Committee. He is a Board Advisor for Sullivan & Cotter, a private health care consulting firm.

Mr. Dunn has been a lecturer at Cornell University since 2015, where he teaches a course in Executive Compensation. Mr. Dunn has a number of consulting clients and frequently serves as an expert witness.

Before his retirement, Mr. Dunn specialized in incentive and executive compensation, where he helped companies and their boards design and implement short and long-term incentive plans and opined on the fairness and reasonableness of the pay plans and levels. Among Mr. Dunn's clients were IBM, Altria, General Motors, Legg Mason, Ameriprise, Goldman Sachs, JP Morgan, Timberland, Hewlett Packard, and over 50 other large publicly traded firms. Mr. Dunn also worked with dozens of private firms helping develop partnership and phantom equity plans as well as assisting in creating compensation packages for newly hired executives.

From 1981 until 1998, Mr. Dunn worked at Towers Perrin, where he was an executive compensation specialist. In his last role he co-managed the firm's executive compensation practice.

Mr. Dunn received a B.S. degree summa cum laude from the New York State School of Industrial and Labor Relations at Cornell University in 1977 and an M.B.A. with highest honors from the Cornell University Graduate School of Management in 1981.

Publications

- McLagan Alert, "What Does the Fed Really Want? Horizontal Review Update," Brian Dunn and Greg Loehmann, May 11, 2011.
- McLagan Alert, "What Does the Fed Really Want? Practical Ways to Meet the Fed's Guidelines," Brian Dunn, October 4, 2011.
- McLagan Alert, "Bonus Cap: Capital Requirements Directive IV," Judith Lipton, Julian Ingleby, Lex Verweij and Brian Dunn, March 11, 2013.
- McLagan Alert, "Constraints, Caps & Clawbacks: The New Compensation Paradigm for Bankers," Brian D. Dunn, May 22, 2013.

# Appendix B

## Deposition and Trial Testimony

During the Past Four Years

**Case Name:** Kihara Kiarie, et al., v. Dumbstruck, Inc., et al.

**Case No.:** 1:19-cv-00827

**Date of Testimony:** March 2021 (Deposition)

# Appendix C

## Documents Considered List

---

**Expert Reports**

Expert Report of Brian Dunn, and materials relied upon, January 15, 2021

Expert Report of David L. Yermack, and materials relied upon, March 19, 2021

Expert Report of Kathryn Shaw, Ph.D., and materials relied upon, March 19, 2021

Supplemental Report of Henry Farber, and materials relied upon, March 19, 2021

**Declarations**

Declaration of Alice Merrill Chester, June 30, 2014

Declaration of Ashley Eckhard, June 26, 2014

Declaration of Carolyn Sabat, July 25, 2014

Declaration of Celeste Guth, June 30, 2014

Declaration of Clare Scherrer, July 26, 2014

Declaration of Craig Packer, July 25, 2014

Declaration of David Landman, April 11, 2019

Declaration of Donald Casturo, June 27, 2014

Declaration of John Levene, June 30, 2014

Declaration of Marie Louise ("MaLou") Kirk, July 2, 2014

Declaration of Peter Craig Russell, July 25, 2014

Declaration of Samantha Davidson, July 1, 2014

Declaration of Stephen Pierce, July 25, 2014

Declaration of Susan Benz, July 3, 2014

**Academic Text**

David P. Stowell, *Investment Banks, Hedge Funds, and Private Equity*, Third Edition (London: Academic Press, 2018)

Edward P. Lazear, "Compensation and Incentives in the Workplace," *Journal of Economic Perspectives* 32, no. 3, 2018, pp. 195–214

Feng Xiong et al., "An Investigation of the Uber Driver Reward System in China – An Application of a dynamic Pricing Model," *Technology Analysis & Strategic Management* 33, 1, 2021, pp. 44–57

# Appendix C

**Document Title, Bates Numbers** **Document Date**

Jay C. Hartzell et al., "Is Higher Calling Enough? Incentive Compensation in the Church," *Journal of Labor Economics* 28, no. 3, 2010, pp. 509–539

Joseph Kalmenowitz, "Incentivizing Financial Regulators," *Working Paper*, 2020.

Kevin J. Murphy, "Stock-based Pay in New Economy Firms," *Journal of Accounting & Economics* 34, 2003, pp. 129–147

Lance A. Berger and Dorothy R. Berger, eds., *The Compensation Handbook: A State-of-the-Art Guide to Compensation Strategy and Design* (New York: McGraw Hill, 2008)

Marc Knez and Duncan Simester, "Firm-Wide Incentives and Mutual Monitoring at Continental Airlines," *Journal of Labor Economics* 19, no. 4, 2001, pp. 743–772

Martin Gaynor et al., "Physician Incentives in Health Maintenance Organizations," *Journal of Political Economy* 112, no. 4, 2004, pp. 915–931

Matthew Bidwell, "Paying More to Get Less: The Effects of External Hiring Versus Internal Mobility," *Administrative Science Quarterly* 56, no. 3, 2011, pp. 369–407

**Public Materials**

Amy Gallo, "How to Ace an Internal Interview," *Harvard Business Review*, July 2, 2013, https://hbr.org/2013/07/how-to-ace-an-internal-intervi?registration=success, accessed March 29, 2021

"Biglaw Salary Scale," *Biglaw Investor*, https://www.biglawinvestor.com/biglaw-salary-scale/, accessed April 9, 2021

"CIB – Investment Banking – Healthcare Coverage – 1st/2nd Year Associate," *J.P. Morgan*, https://jobs.jpmorganchase.com/ShowJob/Id/238967/CIB-Investment-Banking-Healthcare-Coverage-1st-2nd-Year-Associate/, accessed September 23, 2019

Collective Bargaining Agreement by and between National Hockey League and National Hockey League Players' Association, September 16, 2012–September 15, 2022

Della Bradshaw, "More Jobs and Higher Salaries for 2015 MBA Graduates," *Financial Times*, May 19, 2015, https://www.ft.com/content/958b6c88-fd7e-11e4-b824-00144feabdc0, accessed April 1, 2021

"Incentive Clause," *Major League Baseball*, https://www.mlb.com/glossary/transactions/incentive-clause, accessed April 9, 2021

"Internal Mobility," *Deutsche Bank*, https://www.db.com/who-we-are/our-culture/hr-report/enriching-our-workforce/internal-mobility, accessed March 29, 2021

"Job Description: Vice President, Interest Rate Sales," *Morgan Stanley*, August 28, 2019, https://ms.taleo.net/careersection/2/jobdetail.ftl, accessed September 13, 2019

Keren Baruch, "LinkedIn Data Reveals the Jobs and Industries Earning the Biggest Bonuses," *Official LinkedIn Blog*, December 20, 2017, https://blog.linkedin.com/2017/december/20/linkedin-data-reveals-the-jobs-and-industries-earning-the-biggest-bonuses, accessed April 9, 2021

Ruth Bender, "Executive Compensation Consultants," Executive Compensation and Corporate Governance Conference Paper, March 12, 2011

# Appendix C

**Document Title, Bates Numbers** **Document Date**

Sara Stibitz, "How to Get a New Employee Up to Speed," *Harvard Business Review*, May 22, 2015, https://hbr.org/2015/05/how-to-get-a-new-employee-up-to-speed, accessed March 29, 2021

"SEC Compensation Program," *U.S. Securities and Exchange Commission*, April 17, 2020, https://www.sec.gov/ohr/sec-compensation, accessed April 9, 2021

"Tax Services Manager – EY EDGE – Financial Services Organization in Honolulu, Hawaii," *Ernst and Young*, April 2, 2021, https://ey.jobs/honolulu-hi/tax-services-manager-ey-edge-financial-services-organization/FC5665D8562E4F8B99358BE895CDD55D/job/, accessed April 19, 2021

**Bates Stamped Documents**

GS0003613–859

GS0005298–300

GS0168653–8

GS0113198–201

GS0392182–3

GS0297833

GS0891824–63

**Note: In addition to the documents on this list, I considered all documents cited in my report and my exhibits to form my opinions.**

# Appendix D

## Declarations Cited by Dr. Yermack as Evidence That All At-Issue Jobs Require Common Skills

### Declaration of Stephen Pierce, in 2014 a PMD in Equity Capital Markets in the Financing Group in IBD

| Yermack Report, ¶ 22, citing Pierce Declaration, ¶ 7 (“Analytical financial skills”) | Pierce Declaration, ¶¶ 7, 8 |
|---|---|
| “*bankers in ECM must demonstrate strong competency with financial tools like discounted cash flow analyses and valuation indicators such as price/earnings ratios.*” | “To be successful, *bankers in ECM must demonstrate strong competency with financial tools like discounted cash flow analyses and valuation indicators such as price/earnings ratios. They must also possess excellent market judgment, as the issues they face are not black-and-white.* As an example, ECM recently worked on the IPO of the Empire State Building. Among other things, *the team had to determine whether an offering of an iconic American building would be successful in Europe, or in Asia, and how investors would value the observatory at the top of the building.* While financial analysis and modeling can help answer such questions, *a key piece of the assessment involves a general understanding of market dynamics and human psychology. In this way, ECM differs from more technical groups in Financing, like Structured Finance,* which deals with the technical structuring of esoteric products. *In general, Structured Finance is thus closer to a ‘science’ than is ECM,* which tends to draw on both ‘art’ and ‘science.’<br><br>*Strong presentation and people skills also typically play a larger role in ECM* [redacted] ECM works closely with Classic bankers to pitch ideas to the boards of directors and senior management of clients and potential clients and to update these key players on the progress of an offering and proposed pricing. *ECM bankers must also be able to present well to potential investors and tell a company’s story persuasively.* If an ECM banker is incredibly smart and an expert in financial analysis but cannot make a compelling presentation, he or she will not excel.” |

# Appendix D

## Declarations Cited by Dr. Yermack as Evidence That All At-Issue Jobs Require Common Skills

### Declaration of Stephen Pierce, in 2014 a PMD in Equity Capital Markets in the Financing Group in IBD

| **Yermack Report, ¶ 23, citing Pierce Declaration, ¶ 12** (“Analytical financial skills”) | **Pierce Declaration, ¶¶ 10, 12** |
|---|---|
| “*Classic bankers in IBD are more focused on companies’ long-term strategies and are more involved with managing client relationships than with executing transactions. Financing falls somewhere in the middle.*” | “*While successful ECM bankers share certain traits with successful Classic bankers, such as presentation skills, the skills required of these bankers may also differ,* particularly as the bankers become more senior. *ECM bankers must possess expertise in equity offerings, while Classic bankers generally need less product knowledge and instead require more knowledge of the particular industries they cover.* [redacted] *While Classic bankers perform financial analysis to assess market conditions, they often turn to ECM bankers for ultimate guidance on market judgments.* Further, because ECM bankers are experts in specific financial products, other bankers and clients may rely on the judgment of ECM bankers [redacted]<br><br>…<br><br>*There are also notable differences between IBD’s Classic and Financing bankers, on the one hand, and professionals in the Securities Division, on the other hand.* Professionals in Securities must be able to work in an extremely fast-paced environment. *They must be market savvy, be able to communicate information rapidly and effectively, and be able to make quick decisions and sales. Classic bankers in IBD are more focused on companies’ long-term strategies and are more involved with managing client relationships than with executing transactions. Financing falls somewhere in the middle.*” |

# Appendix D

## Declarations Cited by Dr. Yermack as Evidence That All At-Issue Jobs Require Common Skills

### Declaration of Stephen Pierce, in 2014 a PMD in Equity Capital Markets in the Financing Group in IBD

| **Yermack Report, ¶ 22, citing Pierce Declaration, ¶ 22** ("Analytical financial skills") | **Pierce Declaration, ¶ 22** |
| --- | --- |
| "*To receive high compensation relative to his or her peers, an Associate in ECM should demonstrate excellent technical proficiency and mastery of financial models.*" | "*To receive high compensation relative to his or her peers, an Associate in ECM should demonstrate excellent technical proficiency and mastery of financial models.* An Associate should also exhibit a positive attitude, *a strong and proactive work ethic, and budding interpersonal skills*. To receive high compensation relative to his or her peers, *a Vice President should excel in all of these areas and, in addition) should maintain strong client contact on a day-to-day basis and create opportunities for revenue generation*." |

# Appendix D

## Declarations Cited by Dr. Yermack as Evidence That All At-Issue Jobs Require Common Skills

### Declaration of Craig Packer, in 2014 a PMD in the Leverage Finance Business Unit in the Financing Group in IBD

| **Yermack Report, ¶ 22, citing Packer Declaration, ¶ 5** (“Analytical financial skills”) | **Packer Declaration, ¶¶ 5, 6, 7** |
| --- | --- |
| *“a professional in the Financing Group requires expertise in creating financial models, analyzing balance sheets, and conducting discounted cash flow analyses.”* | *“The skills required of a professional in the Financing Group are generally more technical* [redacted] *and a banker in the Financing Group must have a much deeper knowledge of the relevant financial market* [redacted] For example, the role of *a professional in the Financing Group requires expertise in creating financial models, analyzing balance sheets, and conducting discounted cash flow analyses.*<br><br>…<br><br>*Both Classic Banking and the Financing Group are very different from Securities.* In IBD, for example, it can take months or years for our work to result in revenues. In Securities, trades are consummated relatively quickly usually within minutes or hours... *While professionals in Securities tend to be more individually focused and their individual contributions are relatively easy to determine, IBD is highly team oriented, and an individual banker's contribution may not always be obvious...*<br><br>*Leveraged Finance bankers work closely with private equity firms, whose management is usually far more sophisticated* [redacted] *and the bankers must therefore be able to interact with such sophisticated clients at their high level.”* |

# Appendix D

## Declarations Cited by Dr. Yermack as Evidence That All At-Issue Jobs Require Common Skills

### Declaration of Craig Packer, in 2014 a PMD in the Leverage Finance Business Unit in the Financing Group in IBD

| Yermack Report | Packer Declaration |
|---|---|
| **Yermack Report, ¶ 22, citing Packer Declaration, ¶ 10** (“Analytical financial skills”)<br><br>*“This role involves **financial analysis and modeling**”* | **Packer Declaration, ¶ 10**<br><br>“Originators are responsible for sourcing, structuring and executing the transactions. *This role involves **financial analysis and modeling**; credit analysis; negotiation of commitment papers, indentures, and credit agreements; industry research; and preparation of offering documents.* To be successful, originators must have *technical expertise in the financial products that they offer, must be extremely knowledgeable about market conditions,* and *must excel at credit analysis.* Additionally, they must *be able to drive the process, managing everything from the moment a decision is made to undertake a financing to structuring the product and getting it to the market.”* |
| **Yermack Report, ¶ 24, citing Packer Declaration, ¶ 19** (“Risk management skills”)<br><br>*“As a professional becomes more senior, his or her market judgment and risk assessment capabilities become increasingly crucial.”* | **Packer Declaration, ¶ 19**<br><br>“To receive high compensation relative to his or her peers, an Associate in Leveraged Finance should demonstrate certain skills including strong analytical ability; a good work ethic; good judgment; and the capacity to work on multiple projects, think ahead, manage analysts effectively, and interact well with clients. To receive high compensation relative to his or her peers, a Vice President in Leveraged Finance should demonstrate additional skills, including the ability to develop relationships with clients and secure their trust, and to present information effectively, run internal processes efficiently, and create consensus in internal meetings. *As a professional becomes more senior, his or her market judgment and risk assessment capabilities become increasingly crucial. These abilities are especially important for professionals in Leveraged Finance, because unlike other Business Units, Leveraged Finance often commits the Firm’s capital in risky situations.”* |

# Appendix D

## Declarations Cited by Dr. Yermack as Evidence That All At-Issue Jobs Require Common Skills

### Declaration of Celeste Guth, in 2014 a PMD in the Financial Institutions Group ("FIG") Business Unit in IBD

| **Yermack Report, ¶ 23, citing Guth Declaration, ¶ 10; ¶ 24, citing Guth Declaration, ¶ 11** ("Relationship management skills" and "risk management skills") | **Guth Declaration, ¶¶ 7, 8, 10, 11** |
|---|---|
| | "*FIG [Financial Institutions Group] bankers ... differ from bankers in other Business Units within IBD Classic because FIG bankers tend to work with a greater variety of financial products.* The Technology, Media and Telecommunications group, for example, deals almost exclusively with M&A or equity offerings. *FIG, by contrast, deals not only with M&A and equity offerings, but also with traditional debt products, risk management, and hedging, as well as structured finance issuances.*<br><br>*FIG* [redacted] *is more integrated with the Financing Group within IBD.* FIG's large institutional clients cannot do M&A deals without considering their balance sheets and the implications of regulatory capital requirements. Accordingly, FIG has its own team of financing bankers who get involved fairly early in assignments and work alongside the Classic bankers…. |
| "*To be successful, bankers in FIG, like bankers in other Classic Banking groups, must have strong interpersonal skills and be able to maintain long-term client relationships.*" | *To be successful, bankers in FIG, like bankers in other Classic Banking groups, must have strong interpersonal skills and be able to maintain long-term client relationships.* Additionally, because FIG's clients tend to be heavily regulated, *successful FIG bankers must have deep knowledge of relevant regulations. The level of regulatory knowledge required is somewhat dependent on the professional's subgroup within FIG.* For example, asset management firms and financial technology companies are less regulated than banks and insurance companies. [redacted] |
| "*FIG bankers must have a wider breadth of knowledge concerning potential financial solutions, such as structured finance as well as risk management.*" | Because FIG tends to work with a greater number of financial products [redacted] *FIG bankers must have a wider breadth of knowledge concerning potential financial solutions, such as structured finance as well as risk management.*" |

# Appendix D

| Declarations Cited by Dr. Yermack as Evidence That All At-Issue Jobs Require Common Skills | |
|---|---|
| **Declaration of Celeste Guth, in 2014 a PMD in the Financial Institutions Group ("FIG") Business Unit in IBD** | |
| **Yermack Report, ¶ 22, citing Guth Declaration, ¶ 21**<br>("Analytical financial skills") | **Guth Declaration, ¶ 21** |
| "*When I oversaw FIG, an Associate or Junior Vice President in the Business Unit would generally receive high compensation relative to his or her peers if he or she demonstrated very strong analytical, modeling and accounting skills*" | "*When I oversaw FIG, an Associate or Junior Vice President in the Business Unit would generally receive high compensation relative to his or her peers if he or she demonstrated very strong analytical, modeling and accounting skills* and *inspired confidence that he or she could complete projects competently with little oversight*. Senior Vice Presidents in FIG would generally receive high compensation relative to their peers if, in addition to honing the skills that make junior bankers successful, they *developed strong client relationships, led the deal execution process, and utilized their technical and leadership skills to manage and review junior bankers' work.*" |

# Appendix D

## Declarations Cited by Dr. Yermack as Evidence That All At-Issue Jobs Require Common Skills

### Declaration of Ashley Eckhard, in 2014 a VP in the US Institutional Business Unit in Goldman Sachs Asset Management in IMD

| **Yermack Report, ¶ 23, citing Eckhard Declaration, ¶ 2**<br>(“Risk management skills”) | **Eckhard Declaration, ¶¶ 2, 4** |
|---|---|
| “*I work in the U.S. Institutional Business Unit in Goldman Sachs Asset Management (‘GSAM’) within IMD. I am a relationship manager for institutional asset management clients.*” | “*I work in the U.S. Institutional Business Unit in Goldman Sachs Asset Management (‘GSAM’) within IMD. I am a relationship manager for institutional asset management clients.*<br>…<br>I now manage the day-to-day work of a team of Analysts and Associates, and we expect the team will grow. Being the team lead is *an excellent opportunity for me to gain management experience* and to have increased exposure to other senior members of our Business Unit.” |

# Appendix D

## Declarations Cited by Dr. Yermack as Evidence That All At-Issue Jobs Require Common Skills

### Declaration of Peter Craig Russell, in 2014 a PMD in the U.S. Institutional Business Unit in Goldman Sachs Asset Management ("GSAM") in IMD

**Yermack Report, ¶ 23, citing Russell Declaration, ¶ 4**
("Relationship management skills")

"*Within the U.S. Institutional Business Unit, Vice Presidents and Associates generally work in four different roles: (1) sales; (2) internal strategists; (3) the client strategy team; and (4) client relationship management.*"

**Russell Declaration, ¶¶ 4, 5, 7, 8, 9**

"*Within the U.S. Institutional Business Unit, Vice Presidents and Associates generally work in four different roles: (1) sales; (2) internal strategists; (3) the client strategy team; and (4) client relationship management. Each of these roles requires different skill sets to address numerous client needs, and people in these groups are compensated very differently to reflect their distinct responsibilities.*

[redacted] They reach out to a diverse group of prospective and existing institutional clients such as insurance companies, corporate and public pension funds, and nonprofits, and they travel frequently to meet those clients and pitch the Firm's institutional products….

*Internal strategists are not front-line salespeople. They are internal-facing. They often have advanced degrees and must have some particular technical skill (e.g., people with PhDs who construct financial models).* Typically, they have developed expertise in narrow fields such as asset allocation, risk management and analysis….

Individuals on the client strategy team are senior professionals who are experienced with some sort of industry focus or client expertise. *Unlike internal strategists, many are client-facing, and they often have more direct investment and product knowledge.* These individuals work with salespeople to address specific client needs….

*Those in the client relationship management ('CRM') role spend most of their time fielding in-bound calls from existing clients and organizing and attending client meetings.* These individuals serve as point people to service clients, and are typically Associates and Vice Presidents [redacted]"

# Appendix D

## Declarations Cited by Dr. Yermack as Evidence That All At-Issue Jobs Require Common Skills

**Declaration of John Levene, in 2014 the head of the six domestic "client franchise" departments in the Prime Brokerage Business Unit in Securities**

| **Yermack Report, ¶ 24, citing Levene Declaration, ¶ 4** ("Risk management skills") | **Levene Declaration, ¶¶ 3, 4, 5** |
| --- | --- |
| "*The overall function of the Prime Brokerage Business Unit is to provide comprehensive services to Goldman Sachs's hedge fund clients in order to help them manage risk, monitor their portfolios, maintain liquidity, and build their businesses.*" | "There are currently ten Departments within Prime Brokerage in the United States... Each Department may be further broken down into desks or teams, and those desks or teams may be further subdivided based on region....<br><br>*The overall function of the Prime Brokerage Business Unit is to provide comprehensive services to Goldman Sachs's hedge fund clients in order to help them manage risk, monitor their portfolios, maintain liquidity, and build their businesses*....<br><br>The six different Departments I lead are: (1) Sales and Relationship Management; (2) New Business Group; (3) Hedge Fund Consulting; (4) Capital Introduction; (5) Client Services; and (6) Product Development.... Each of these groups has separate management that reports to me. Though these Departments are similar in that they are all 'client facing,' each Department plays a different role and provides different services to our hedge fund clients. *Individuals in these Departments perform dramatically different jobs and need different skills.*" |