# Exhibit 24

# Econometrics

## Legal, Practical and Technical Issues (Second Edition)

ABA Antitrust Section
American Bar Association

### *1. Regression Analysis*

To illustrate the use of regression analysis to evaluate issues related to class certification, this section reviews the application of multivariate regression to three types of analyses: (1) assessing the extent of customer-specific pricing; (2) assessing the existence of a common price structure; and (3) testing for impact using a benchmark or before-and-after approach.

#### a. Assessing the Extent of Customer-Specific Pricing

Subject to data availability, a useful starting point for determining whether a classwide approach exists to assess impact and estimate damages is to review the distribution of prices paid by class members at given points in time. A plot of such prices will usually provide initial insights into individual price patterns. Customer-specific pricing is consistent with demonstrable price dispersion across class members, all else being equal. In this context, regression analysis can help economists hold constant the factors that systematically affect prices across customers. Prices often reflect a combination of systematic product and service characteristics, transaction characteristics, and customer-specific pricing strategies. Simple descriptive statistics computed using transaction prices will reveal price differences that result from both systematic and customer-specific factors without providing insight about the relative importance of each, which is crucial to the class certification inquiry.[47]

While descriptive statistics can be presented along discrete product dimensions by isolating, for example, transactions for the same quality and quantity of a product, multivariate regression can be useful as the number of price determinants increases and comparisons within subgroups using descriptive statistics become unwieldy. A properly specified regression analysis can help assess the extent of individualized pricing, holding constant the observable characteristics that systematically affect prices, though it may still suffer from the problem

---

47. For example, a two-gallon carton of milk will almost always cost more than a one-gallon carton, but such price dispersion is not evidence of customer-specific pricing or lack thereof. A more useful test of the relevance of systematic versus customer specific factors would examine the dispersion of prices for two- and one-gallon milk cartons separately.

that estimated price effects may be averages of different effects experienced by differently-situated customers.

Specifically, transaction prices paid by individual customers at various times can be regressed against a set of explanatory variables, such as product and manufacturer characteristics, location and time of the transaction, and other observable determinants of the transaction price. Such a regression will yield coefficients that indicate the strength of the empirical association between each explanatory variable and price. It will also yield an R-squared statistic, which, as was explained in Chapter 6,[48] is an overall measure of the explanatory power of these systematic factors. In the approach described here, R-squared measures the fraction of the overall variation in transaction prices that is explained by the systematic factors included as explanatory variables. It is often argued that a higher R-squared statistic is evidence that customer-specific factors are less likely to be important determinants of prices.

However, a higher R-squared that indicates that systematic factors explain a relatively large proportion of differences in prices can also be consistent with customer-specific pricing. Consider, for example, a market with two product types, A and B, sold at customer-specific and individually negotiated prices: between $10 and $20 for product A, and between $30 and $40 for product B. Each of these two products is sold at varying prices; however, if told the price of a product, it is easy to determine which product it is (product A if the price is $20 or less and product B if it is $30 or more). Hence, the product is a very important determinant of the price. Nevertheless, pricing *within* each product type still may be customer-specific and vary widely in absolute value. In fact, in this example, assuming uniform price distributions within the ranges indicated above for the two products and an equal number of sales, the R-squared from regressing the transaction price on a product indicator variable is 0.90. This indicates that systematic product characteristics (whether it is product A or product B) explain 90 percent of the variation. However, even an R-squared of 90 percent (or higher) is compatible with substantial customer-specific variation *within* each product (for instance, variation in prices not explained by common factors). [49]

48. See Appendix and Glossary for a definition of the R-squared statistic.

49. For an example of statistical analysis of data used to support class certification, see In re Tableware Antitrust Litig., 241 F.R.D. 644, 652 (N.D. Cal. 2007).

Consider an alternative example using the same two products, with customer-specific and individually negotiated prices still between $10 and $20 for product A but between $12 and $22 for product B. The R-squared for the regression described above would now be 0.09, explaining only 9 percent of the variation. The R-squared is much lower in the second example even though the *within*-product customer-specific variation is as large as before. More generally, the R-squared indicates the relative magnitude of the systematic and non-systematic components of pricing, but it does not provide a basis to evaluate the absolute magnitude of the customer-specific determinants of prices.

Thus, plaintiffs may believe that regression analysis in general, and the R-squared in particular, may be useful tools to investigate the relative importance of customer-specific as opposed to classwide determinants of pricing. However, even the R-squared, which seems custom-designed for such a determination, must be interpreted with caution since any given R-squared value may be consistent with very small or very large variations in customer-specific pricing.

In the discussion above, the R-squared is used to assess the extent of customer-specific pricing by measuring the explanatory power of systematic factors and using this to infer the importance of unexplained but customer-specific factors. The importance of customer-specific factors can also be estimated directly using regression specifications that include customer-fixed effects.

In general, a fixed effect in a regression model will capture unexplained differences among groups of observations. A customer-fixed effect, for example, will capture the extent to which different customers paid different prices, even after controlling for other observable factors that might also affect prices.

If pricing is not customer-specific, the estimated customer-fixed effects will tend to be small in absolute value, not statistically significant, and will add relatively little to the overall explanatory power of the regression. If pricing is customer-specific, the estimated customer-fixed effects will tend to be larger in absolute value, statistically significant, and will add more to the overall explanatory power of the regression. F-tests for the joint significance of customer-fixed effects can be computed to provide a summary measure of the importance of idiosyncratic customer-specific factors.

The implications of such analyses for common proof are complex and often ambiguous. If the customer-specific fixed effects are statistically significant and economically meaningful, then the regression analysis is not explaining observed prices and is unlikely to provide a

common method of proof. If the customer-specific fixed effects are not statistically significant or economically meaningful, two alternative conclusions may hold. One interpretation is that customer-specific factors do not matter. An alternative explanation is that prices are idiosyncratic and vary within customers across time. If so, customer-specific fixed effects will be insignificant, but regression analysis will not constitute a common method to determine impact.

In some cases it may also be useful to assess price dispersion in percentage terms by calculating the coefficient of variation ("CV") of the error term from a regression model. This statistic may be interpreted as a measure of unexplained price dispersion, in percentage terms, around the average price. In the above examples, a CV calculation would show a somewhat higher dispersion in the second example compared to the first, because the unexplained price variation is a larger percentage of the average price in the latter example. This difference between the examples, which is roughly a CV calculation change from 12 percent to 19 percent, is much less dramatic than the change shown in R-squared.

### b. Testing for the Existence of a Common Price Structure

When attempting to demonstrate individual impact in a class certification dispute, plaintiffs sometimes study how prices change over time among class members in an effort to demonstrate that there is a common price structure and that changes in this common price structure will affect all class members.[50] Using this approach, plaintiffs contend that if a price structure exists, even if pricing is to some extent customer specific, a change in the price structure will impact all members of the

50. While the term "price structure" often is not precisely defined, it usually refers to a situation where prices stay in fixed relation to each other over time. Furthermore, the concept of a pricing structure is not well-established in the economics literature or profession: "To determine whether 'pricing structure' exists in an industry, the expert combines his or her 'knowledge' with 'visual inspection' of graphs of average prices paid by different customers and for different products to whether the prices 'move together' over time. As explained below, this method is not generally accepted among economists, does not appear in the economics literature, and fails to meet the standards of objective economic scientific practice." John H. Johnson & Gregory K. Leonard, *In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class Certification Proceedings*, ANTITRUST, Summer 2008, at 108.

class because of the largely fixed difference in prices among customers over time, which is a "rising tide raises all boats" argument.

Multivariate regression analysis is used to test for a common price structure because, as discussed in the previous section, it can help the economist hold potentially confounding factors constant. Suppose, for example, that one variable has a direct effect on price and that the effect varies by customer. It is possible that differences in prices across customers that result from that variable might mask the fact that, once the variable is controlled for, customers pay prices that move in the same way over time. A regression analysis that controlled for that variable might reveal this type of price structure.

The hypothetical structure could be revealed by regressing prices on a set of explanatory variables and then analyzing the residuals from the regression. For each observation in the regression, the residual is the difference between the price that a customer paid and what the regression predicted the customer would pay based on the systematic factors included in the model. If the prices that customers pay move together once those factors are controlled for, estimated residuals for different customers should be positively correlated. The economist can determine that by taking the time series of residuals for specific customers, and then calculating correlation coefficients between those time series. Very high correlation coefficients may be consistent with a price structure. (That price structure, however, might not be maintained in the event of anticompetitive behavior. Thus, the existence of a price structure before an anticompetitive act does not necessarily imply common impact.)

A practical constraint that can arise in using regression analysis to test for the existence of a price structure is data availability. In some cases, many class members will have purchased only in one period, which means they cannot be included in the regression analyses described above. If too many purchased in only one period, applying the regression results to them may be problematic. An expert may also want to assess the extent to which some customers purchased infrequently or only once during the alleged class period and how the prices paid by such customers may or may not relate to the purchase prices of customers who purchased relatively frequently.

c. Testing for Classwide Impact

Plaintiffs' class experts often argue that a common method of proof exists because a regression analysis can be implemented. However, as

noted earlier, regression analysis will always yield a result. Whether a regression is useful for assessing classwide impact is a different question.

A test of classwide impact requires the estimation of "but-for prices" (i.e., prices that would have prevailed but for the alleged anticompetitive act).[51] Benchmark and before-and-after analyses are empirical methodologies used to estimate but-for prices using counterfactuals or but-for worlds that are as similar to the allegedly collusive market as possible, except for the alleged anticompetitive behavior.[52] Regression can be helpful because potential competitive benchmarks are almost never identical to an alleged collusive market.[53] For example, prices and competitive interactions are rarely fixed over time, which makes before-and-after analyses difficult without controlling for other time-varying factors.[54]

More specifically, regression analysis may supplement a detailed marketplace analysis and a review of customer-specific data while accommodating the simultaneous and systematic influences of numerous economic factors. Regression analyses may also be employed to test for classwide impact directly, to help identify potential subclasses, or to help demonstrate the existence or absence of a common method of proof altogether.

### *(1) Regression Analysis to Measure Average Impact*

To measure the average effect of an alleged conspiracy, a regression would typically model the price paid by a given customer at a given time as a function of variables that affect the demand and supply of the product as well as a conspiracy-related dummy variable that takes the value of one during the conspiracy (or for the products subject to the conspiracy) and zero otherwise. This approach requires an understanding of industry structure, price patterns, and other factual issues that may

---

51. See Chapter 12 for a detailed discussion of methods used to estimate damages.
52. A benchmark market analysis uses an alternative market and the same time period as the competitive benchmark. A before-and-after analysis uses the same market but a different time period as the competitive benchmark.
53. For example, if prices are delivered prices, differences in transportation costs would need to be considered.
54. For example, changes in prices are likely affected by changes in manufacturing costs, including changes in input costs.

also bear on the merits of the case. As discussed earlier in this chapter, some courts have considered such inquiry appropriate, or even necessary, while others have considered merits analysis to be beyond the scope of the class certification phase. (See Section A.)

If the regression described above is specified correctly and includes all appropriate control variables, the coefficient on the conspiracy-related variable will provide a measure of the average effect of the alleged conspiracy on prices. For example, assuming a correct specification, a positive coefficient would indicate that prices were, on average, elevated.

Whether this coefficient indicates classwide impact depends on whether the average estimated impact applies to all of the members of the proposed class. Here, the plaintiffs will often argue that documentary evidence or basic statistical analysis shows that pricing is not individualized, and/or that a price structure exists, and consequently, the average estimated effect of the conspiracy is a good proxy for the *individual* effect on each and every class member. By contrast, the defendants may argue that individualized pricing and the absence of a price structure render such an average meaningless because it lacks relevance for *individual* members of the class and is biased because of omitted individualized pricing factors that are necessary to explain observed price levels and movements. Further regression analysis can provide a quantitative answer, as the section below discusses.

*(2) Regression Analysis as a Test of Classwide Impact Using a Common Method of Proof*

If correctly specified, the regression analysis just described yields an estimate of average impact. Other statistical tools, including additional regression specifications, may be used to test whether the average effect represented by a single coefficient from a classwide regression masks widely varying individual effects that require individualized inquiry, or whether it truly reflects common impact.

One such approach is to divide the proposed class into narrowly defined subgroups and construct a series of regressions to test the stability of any estimate of average impact. For example, suppose there is an allegation of a conspiracy among vitamins manufacturers, and suppose further that a regression of vitamin prices on product characteristics and a time dummy variable indicates that the price of Vitamin A was elevated, on average, by 10 percent during the alleged conspiracy period. To test the hypothesis that the alleged conspiracy resulted in classwide impact over the alleged conspiracy period, the

regression could be re-estimated by including dummy variables that identify particular years. Correctly specified, this approach will estimate the average effect of the alleged conspiracy in each of the relevant years. If these estimated coefficients are stable over the entire alleged conspiracy period, this stability would provide support for the claim that the alleged conspiracy affected proposed class members in similar fashion, at least on average, in each year of the alleged conspiracy. However, a coefficient that is zero or negative in any year covered by the alleged conspiracy would suggest that proposed class members who purchased the product during those years were not harmed by the alleged conspiracy.

Further estimating the average effect of the alleged conspiracy separately for different products, geographies, time periods, suppliers, or purchaser types can yield additional insights into classwide impact and the existence and stability of a common method of proof. Estimates of average impact across groups of customers that are similar in magnitude and/or sign may suggest that the alleged misconduct resulted in common impact for all (or nearly all) members of the proposed class. Alternatively, estimated effects that vary widely or are nonsensical would suggest that the alleged misconduct did not result in common impact for all members of the proposed class.

Standard statistical tests can be applied to test the stability of coefficients among subgroups of customers, products, time, geographies, or other subsamples, and to determine whether it is appropriate to pool potential subgroups when estimating the average effect of the alleged conspiracy. For example, a Chow test can be implemented to determine whether the effect of an alleged conspiracy should be estimated separately for two or more potential subgroups of customers, products or periods.

To illustrate this point, suppose that in the vitamins example discussed above, two types of vitamins (A and B) are implicated in an alleged conspiracy that covered two distinct time periods (1 and 2). Suppose further that the expert begins by regressing the logarithm of vitamin prices on vitamin type, time, and conspiracy dummy variables, and that the estimated average effect of the conspiracy is 5 percent (that is, the coefficient on the conspiracy dummy variable is 0.05). Suppose now that separate conspiracy dummy variables are introduced for each vitamin type and that the estimated effect of the alleged conspiracy is 0 percent for Vitamin A and 10 percent for Vitamin B. This second regression would reveal that the initial estimated average effect of 5 percent lumped together some prices that may not have been inflated

(Vitamin A) and some that may have been inflated (Vitamin B). Thus, relying solely on the estimated average effect would lead to the incorrect conclusion that all customers were impacted.

A Chow test that compares the relative explanatory power of a joint regression against separate regressions for the two products will help determine whether the two can be included as part of a single econometric analysis. Even if the Chow test rejects the equivalency of the Vitamin A and Vitamin B dummy variables, this result may still provide a common method of proof if the results are consistent with the "proof" that Vitamin A customers were not affected and Vitamin B customers were. The question then would be whether the estimated average effect for Vitamins A and B mask further underlying heterogeneity.

Re-estimating a separate regression for Vitamin A and for Vitamin B with further dummy variables to distinguish class members who purchased, for example, wholesale versus retail, could help clarify further the stability of each estimate. Suppose that retail and wholesale sales were equal in volume and that the estimated effect of the alleged conspiracy for Vitamin B was 20 percent for retail customers and 0 percent for wholesale customers. This result would suggest that the estimated average effect of 10 percent for Vitamin B lumped together inflated and not-inflated prices. A demonstration that the conspiracy variable's effect for increasingly narrowly defined subgroups of class members stabilizes would support a claim that impact can be assessed by a common method of proof. The lack of such stability would suggest that there may not be classwide impact across the proposed class and that a common method of econometric proof may not be available.

There are several issues associated with the use of regression and statistical tests to demonstrate classwide impact or lack thereof. First, as the class is divided into more and more subgroups, the need for data increases significantly. Estimating a model that allows each purchaser to experience a different price increase, for example, requires data that are rarely available. The data demands become even more daunting if possible interactions between customer effects and other supply and demand variables (i.e., allowing coefficient on supply and demand variables to vary across customers) are considered.

Second, because the number of observations per grouping declines as transactions are divided into more and more subgroups, coefficients become less precise, which makes a test of coefficient stability or robustness less reliable.

Third, the effects of potential outliers on regression estimates increase as the number of observations available to estimate each separate coefficient decreases. As a result, estimated coefficients may make little economic sense even if they have been estimated precisely. Trimming data of outlier observations is sometimes an acceptable practice, but it can introduce arbitrariness and potentially remove relevant observations.

Finally, when using data, one must also consider whether the data are averages or reflect individual observations. For example, economists sometimes use prices averaged across customers or products to assess impact, rather than individual price data that reflect the prices that particular customers paid. When averages are used, there is a risk that the averages may hide substantial differences among customers or products, which may be critical for determining whether there is individual impact. The reliance on averages may be a critical flaw in the work of a plaintiffs' economics expert who concludes that price data reflect individual impact, since the underlying customer-specific pricing data may show a wide range in prices and/or changes in prices.[55] For example, in *In re Plastics Additives Antitrust Litigation*,[56] the use of averages was found to obscure differences in the movement of prices to individual customers. The court found that a number of the plaintiffs' expert's charts that relied on average prices "do not even superficially show prices moving similarly" in part because even when the average prices moved similarly, the prices paid by specific customers included in those averages did not.[57] As a result, the court found that plaintiffs' pricing structure analysis could not serve as proof of impact common to the class.[58]

d. Summary

This section has discussed the use of regression analysis in class certification to assess the extent of customer-specific pricing, to test for the existence of a price structure, and to test for classwide impact.

---

55. *See, e.g.*, Reed v. Advocate Health Care, 268 F.R.D. 573 (N.D. Ill. 2009); Freeland v. AT&T, 238 F.R.D. 130, 151 (S.D.N.Y. 2006) (looking at "overall average price" does not "demonstrate that the alleged overcharge affected prices for all handset models").

56. No. 03-CV-2038, 2010 U.S. Dist. LEXIS 90135, at *50 (E.D. Pa. 2010).

57. *Id.* at *50-55.

58. *Id.* at *55.

Regression analysis is a powerful tool that enables economists to control for observable confounding factors. Because regression analysis yields average effects, more sophisticated regression specifications as well as additional non-regression based tools are necessary to determine whether the average effects typically observed from regression results mask individualized pricing or if instead they provide support to a claim of classwide impact. More generally, regression analysis as a tool to assess classwide impact is most useful as a complement to careful analysis of case-specific facts in class certification disputes.

## C. Case Studies

This section presents two case studies in which econometric methods have been applied to class certification. The first focuses on identifying customer-specific pricing; the second focuses on testing for classwide impact.

### *1. Identifying Customer-Specific Pricing:* **In re Graphics Processing Units Antitrust Litigation (GPU)**

#### a. Case Background

The *GPU*[59] case was litigated in the Northern District of California. The case concerned an alleged price-fixing conspiracy for graphics processing cards and chips (together, GPUs) between Nvidia Corp. and ATI Technologies. The plaintiffs alleged that the conspirators fixed prices by coordinating their product releases and prices rather than competing to expand their market presence.

Most direct-purchase volume for GPUs was negotiated without regard to list price by wholesale purchasers, including Microsoft, Apple, Dell, and Best Buy. These and other firms purchased GPUs for resale or as an intermediate input into their own final products, such as video game consoles or personal computers. In addition, some individual consumers, including all the named plaintiffs, had purchased GPU cards online directly through ATI's website at posted prices.

In July 2008, the district court granted in part and denied in part certification of a direct purchaser class, while denying certification of an

59. *In re* Graphics Processing Units Antitrust Litig., 253 F.R.D. 478 (N.D. Cal. 2008).