# Exhibit 40

JB JOSSEY-BASS

# Alternative Validation Strategies

## Developing New and Leveraging Existing Validity Evidence

S. Morton McPhail, Editor

Foreword by Allan H. Church and Janine Waclawski

BICENTENNIAL 1807 WILEY 2007 BICENTENNIAL

John Wiley & Sons, Inc.

Copyright © 2007 by John Wiley & Sons, Inc. All rights reserved.

Published by Jossey-Bass
A Wiley Imprint
989 Market Street, San Francisco, CA 94103-1741 www.josseybass.com

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, 978-750-8400, fax 978-646-8600, or on the Web at www.copyright.com. Requests to the publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, 201-748-6011, fax 201-748-6008, or online at http://www.wiley.com/go/permissions.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

Readers should be aware that Internet Web sites offered as citations and/or sources for further information may have changed or disappeared between the time this was written and when it is read.

Jossey-Bass books and products are available through most bookstores. To contact Jossey-Bass directly call our Customer Care Department within the U.S. at 800-956-7739, outside the U.S. at 317-572-3986, or fax 317-572-4002.

Jossey-Bass also publishes its books in a variety of electronic formats. Some content that appears in print may not be available in electronic books.

**Library of Congress Cataloging-in-Publication Data**

Alternative validation strategies : developing new and leveraging existing validity evidence / S. Morton McPhail, editor ; foreword by Allan H. Church and Janine Waclawski.
p. cm. – (Professional practice series)
Includes index.
ISBN-13: 978-0-7879-8242-3 (cloth)
ISBN-10: 0-7879-8242-3 (cloth)
1. Employee selection. 2. Employment tests. 3. Prediction of occupational success.
I. McPhail, S. Morton.
HF5549.5.S38A45 2007
658.3'112–dc22

2006033436

Printed in the United States of America
FIRST EDITION
*HB Printing* 10 9 8 7 6 5 4 3 2 1

ITHACA

This material may be protected by Copyright law (Title 17 U.S. Code)

CHAPTER 2

# Transportation of Validation Results

Wade M. Gibson and
Julie A. Caplinger

## Theoretical Development

Transportability and transported validity are common labels that have been ascribed to a validation strategy sanctioned in the *Uniform Guidelines* (Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor, & Department of Justice, 1978), Section 7B. This section allows for validity evidence to be borrowed from one setting and applied to another. In this sense, validity is "transported" to a new setting, giving rise to the commonly used name. As described in this chapter, the process of transporting validity entails formally extending empirical, criterion-related validation evidence obtained in one setting by applying it to similar jobs in another setting, where no empirical validation research has been conducted.

Transportability is distinguishable from other validation strategies described in this book, in that it did not derive from a theory or body of research in validation, nor do the strategies for establishing it follow a strong professional consensus developed from integrated theory or research. Instead, formal statements of transported validity have tended to follow explicit requirements articulated in the

*Uniform Guidelines*, and in this sense the *Uniform Guidelines* have provided controlling language that has driven validation practice in this area. Because it is fundamental to the validation strategy itself, an understanding of Transportability must come from examination of the relevant *Uniform Guidelines* language.

Section 7B of the *Uniform Guidelines* provides the basis for establishing transported validity through the following language:

> Criterion-related validity studies conducted by one test user, or described in test manuals and the professional literature, will be considered acceptable for use by another user when the following requirements are met:
>
> Validity evidence. Evidence from the available studies meeting the standards of section 14B of this part clearly demonstrates that the selection procedure is valid;
>
> Job similarity. The incumbents in the user's job and the incumbents in the job or group of jobs on which the validity study was conducted perform substantially the same major work behaviors, as shown by appropriate job analyses both on the job or group of jobs on which the validity study was performed and on the job for which the selection procedure is to be used; and
>
> Fairness evidence. The studies include a study of test fairness for each race, sex, and ethnic group which constitutes a significant factor in the borrowing user's relevant labor market for the job or jobs in question. If the studies under consideration satisfy paragraphs (1) and (2) of this section but do not contain an investigation of test fairness, and it is not technically feasible for the borrowing user to conduct an internal study of test fairness, the borrowing user may utilize the study until studies conducted elsewhere meeting the requirements of these guidelines show test unfairness, or until such time as it becomes technically feasible to conduct an internal study of test fairness and the results of that study can be acted upon. Users obtaining selection procedures from publishers should consider, as one factor in the decision to purchase a particular selection procedure, the availability of evidence concerning test fairness. (Sect. 7.B.)

A fourth condition for transporting validity is provided in Section 7D of the *Uniform Guidelines*. It states:

> If there are variables in the other studies which are likely to affect validity significantly, the user may not rely upon such studies, but will be expected either to conduct an internal validity study or to comply with section 6 of this part. (Sect. 7.D.)

Thus, three requirements for transporting validity entail establishing: (1) criterion-related validity evidence from one setting that satisfies *Uniform Guidelines* requirements for documenting validity; (2) evidence from job analysis of the similarity between the job(s) from the original validation study and the job(s) in the setting to which validity will be transported; and (3) fairness evidence, where available or technically feasible to obtain, or until unfairness is demonstrated elsewhere. A final condition is that there must not be variables in the borrower's situation that would likely change the validity results.

A closer examination of each of the four elements of transportability is useful for better understanding it. The four conditions vary in clarity and in importance, and, as discussed throughout this chapter, the second one, job similarity, has been the subject of the greatest range of interpretation.

The first requirement, validity evidence, is a critical element of transportability but is relatively straightforward: "Evidence from the available studies meeting the standards of section 14B of this part clearly demonstrates that the selection procedure is valid." The research techniques and *Uniform Guidelines* requirements for conducting criterion-related validation studies are well understood by industrial psychologists. Use of the word "clearly" in the *Uniform Guidelines* statement suggests that the original validity evidence should be persuasive; that there should be no doubt that validity has been demonstrated. Although it is obviously open to interpretation, many practitioners have concluded that issues such as sample size, quality and comprehensiveness of criteria, timeliness, and the magnitude of computed validity should all be carefully considered when contemplating a transportability approach (Tippins, McPhail, Hoffman, & Gibson, 1999). An extremely cautious interpretation may be a belief that the quality and comprehensiveness of the borrowed validity study (source study) should be as good as or better than that which would be possible if original criterion-related validation research were to be conducted in the setting to

which validity will be transported (target setting). This interpretation is not supported by specific language in the *Uniform Guidelines.* At a minimum, however, the *Uniform Guidelines* language makes clear that the borrowed validity evidence shall be subjected to the scrutiny of requirements in Section 14B, and suggests that the original inference of validity—that from the source study—should be clearly supported.

The third requirement, fairness evidence, might be better described as a strong suggestion, because the second sentence of that requirement excuses users from demonstrating it. It states,

> If the studies under consideration satisfy paragraphs (1) and (2) of this section but do not contain an investigation of test fairness, and it is not technically feasible for the borrowing user to conduct an internal study of test fairness, the borrowing user may utilize the study until studies conducted elsewhere meeting the requirements of these guidelines show test unfairness, or until such time as it becomes technically feasible to conduct an internal study of test fairness and the results of that study can be acted upon.

A study of test fairness requires data from a criterion-related validation study, with adequate sample sizes for each of the studied groups (such as gender, racial, ethnic) to support the appropriate analyses. By definition, without local criterion-related validation research in the borrowing user's setting, fairness studies are not feasible. Unless a local criterion-related validation study is conducted, fairness studies remain unfeasible. Thus, only in the case of an affirmative finding of test unfairness, established elsewhere based on research on the selection procedure of interest, will the requirement of researching fairness be a barrier to transportability. Of course, if the original validation research includes a study of fairness, then the "requirement" will have already been met. If it does not, the borrowing user need only satisfy the final sentence of Section 7B:

> Users obtaining selection procedures from publishers should consider, as one factor in the decision to purchase a particular selection procedure, the availability of evidence concerning test fairness.

This sentence most certainly applies to all borrowed validity evidence, not just to that borrowed from test publishers, but in any

case, it appears to be a very modest requirement and would seem to be met easily. (Section 7 of the *Uniform Guidelines* begins with the statement, "Users may, under certain circumstances, support the use of selection procedures by validity studies conducted by other users or conducted by test publishers or distributors and described in test manuals." This introductory sentence suggests, as has been common in practice, that users may borrow validity evidence from any number of sources, not just test publishers. Presumably, borrowing users should consider availability of research on test fairness regardless of the source from which they are borrowing.)

Whether intended or not, the *Uniform Guidelines* language, placing no absolute requirement of studies of fairness on transportability, was prescient of professional consensus in industrial psychology. As described later in this chapter, fairness of ability tests—those most likely to result in adverse impact and to require validation in accordance with the *Uniform Guidelines*—has been well established for the major demographic groups (Society for Industrial and Organizational Psychology, 2003).

The fourth "requirement" provides that there must not be differences in variables that are likely to impact validity results. This condition is explained further in the *Uniform Guidelines* Question and Answer section, in Question # 66, which in pertinent part states,

> Q. Under what circumstances can a selection procedure be supported (on other than an interim basis) by a criterion-related validity study done elsewhere?
> A. A validity study done elsewhere may provide sufficient evidence if four conditions are met . . .
> 4. Proper account is taken of variables which might affect the applicability of the study in the new setting, such as performance standards, work methods, representativeness of the sample in terms of experience or other relevant factors, and the currency of the study.

It is interesting to note that neither Section 7 nor the Questions and Answers describe this fourth condition as a "requirement." Nor is the term *evidence* used to describe what is probative in establishing that the condition has been met. This fourth condition was set apart from the three requirements of Section 7B, and the language used to describe it both is general and appears

to be less rigorous. Based on these differences, many practitioners have concluded that this fourth condition requires little documentation above and beyond that required to satisfy their own professional judgment that such variables do not threaten an inference of transported validity.

The second requirement, job similarity, is the crux of transportability. The *Uniform Guidelines* state,

> The incumbents in the user's job and the incumbents in the job or group of jobs on which the validity study was conducted perform substantially the same major work behaviors, as shown by appropriate job analyses both on the job or group of jobs on which the validity study was performed and on the job for which the selection procedure is to be used.

The plain language requires that job analysis in both settings establish that the source and target jobs entail "substantially the same major work behaviors." Thus, it appears job similarity is to be judged on the basis of work behaviors, as opposed to required personal characteristics such as knowledge, skills, abilities, and other characteristics (KSAOs). This interpretation appears to be reinforced by the definition of *work behavior* provided in Section 16Y of the *Uniform Guidelines*, which states:

> Work behavior. An activity performed to achieve the objectives of the job. Work behaviors involve observable (physical) components and unobservable (mental) components. A work behavior consists of the performance of one or more tasks. Knowledges, skills, and abilities are not behaviors, although they may be applied in work behaviors.

Some practitioners, however, view a firm distinction between behaviors and KSAOs as artificial. For example, the KSAO "ability to communicate orally" is manifestly behavioral, and in any regard, it may be written in explicit behavioral terms by rephrasing it to "communicates orally" or "communicating orally." Further, many practitioners believe that to the extent that they are distinguishable, a showing of job similarity on the basis of required, measurable KSAOs is more directly relevant to a judgment of transported validity than is one based on common behaviors or tasks. Certainly,

it can be argued that there are fewer inferences in a KSAO approach than there are in one based on common work behaviors. Much of what is interesting and challenging in transportability research and practice, as discussed throughout this chapter, entails exploration of job similarity and various proposed methods for evaluating and documenting it.

## Transportability versus Traditional Approaches to Validity

Although transportability, as it is discussed in this chapter, derives from *Uniform Guidelines* language establishing it, transportability obviously is connected to other standard concepts of validity. It is used to extend a cornerstone approach—criterion-related validity—to unstudied jobs. At its core, transported validity requires an inference that differences between research settings have not disturbed or undermined validity. In this regard, it is connected closely to the concept of validity generalization (VG), the conclusion that validity generalizes across common situational variables that may differ from one setting to another. If meta-analysis and VG are conceptualized as the body of research and techniques used to understand the threats to generalized validity, then transportability is obviously related to them. Techniques for establishing validity through meta-analysis and validity generalization are covered elsewhere in this book.

Throughout this chapter we will attempt to distinguish between the two approaches, to the extent possible. Transportability, in this chapter, will be defined on the basis of *Uniform Guidelines* requirements for establishing it. Thus, whether the term can be interpreted more broadly or applied to a broader array of procedures is moot for our purpose. This distinction may seem false because conclusions from validity generalization research—namely those relating to the potential for moderators to limit generalizations of research conducted remotely to other settings—are profoundly important to transporting validity. One of the authors has conceptualized establishing transportability as a carefully played game of documentation, in which a rulebook, the *Uniform Guidelines* (and perhaps developed case law related to it), is referenced and followed closely, but in which independent professional judgment.

beyond *Uniform Guidelines* requirements, is required and used to make decisions. This professional judgment is properly impacted by developed professional consensus regarding research in meta-analysis and validity generalization as well as other issues regarding moderators of validity. Certainly, the body of research associated with validity generalization entails much of the developed thought that should guide professional judgment in this area. Thus, when judging whether evidence of job similarity is sufficient to warrant transporting validity, the practitioner must consider two standards: (1) whether existing evidence is sufficient to conform with *Uniform Guidelines* requirements (one standard), and (2) whether the existing data and other relevant information actually support an inference of validity (another standard). Successful transportability efforts occur when the application at hand is thoroughly understood and all information and data relevant to an inference of validity support an affirmative conclusion under both standards.

Acknowledging a distinction between *Uniform Guidelines* requirements and professional judgment used to transport or generalize validity is not meant to undermine practitioners who might wish to blur the two or acknowledge they are strongly connected. Ideally, the standards of judgment would be the same, and indeed, when they were published, the *Uniform Guidelines* and professional consensus were better aligned. Thirty years ago there was relatively little appreciation for the effects of sampling error and other artifacts on computed validity coefficients, and situational specificity was presumed to account for varied results among validity studies. This point illustrates how the two standards can yield different conclusions today. The 1978 *Uniform Guidelines* were shaped by the zeitgeist of the time and are still intact; however, situational specificity, at least for ability tests, has been largely disconfirmed. Hence, there are common situations in which informed professional judgment would support an inference of transported or generalized validity, yet *Uniform Guidelines* requirements based on available data for transportability may be unmet. This issue is obvious to practitioners and illustrates the two standards. However, an opposite situation is feasible as well. Suggested procedures described in this chapter, if followed blindly without thought or inappropriately manipulated to yield hoped-for conclusions, might result in documentation that

conforms to *Uniform Guidelines* requirements for transported validity, yet fails to support an inference of validity based on a reasonable standard of informed professional judgment. In transportability work the practitioner must ensure an inference of validity is supportable under both standards. Transportability is a useful strategy for developing evidence for validity in circumstances in which situational specificity is known not to operate, or is so trivial that it cannot subvert validity. Practitioners must judge this when conducting transportability research.

## Research Base

Because transportability was derived from the *Uniform Guidelines* as opposed to spawning from and being debated in research literature, relatively little exists in professional literature that is explicitly focused on methods or proper uses for transporting validity evidence. Researchers tend to ignore transportability, as it is usually conducted for legal compliance rather than answering research questions about properties of a test or test battery. In fact, Guion (1998) characterized discussion of transportability as "quaint" given the current state of the validity generalization research. He also noted that, although still part of the legal context,

> It is less certain that broader similarity is truly necessary, and very nearly certain (from research done in the 1970s) that demographic similarity is not necessary . . .

As we now discuss, there are a limited number of references to transporting validity evidence in the literature.

A recent discussion of transportability in published research was in the larger context of defining and classifying techniques to generalize validity evidence as opposed to specifying methods or applications. Hoffman and McPhail (1998) compared and contrasted test transportability, validity generalization, and synthetic validity. After discussing the *Uniform Guidelines* requirements for borrowing validity evidence, they discuss challenges inherent in applying a transportability strategy. These complexities include requiring permission to use a source study, as well as the fact that applicable source studies may not contain the job analysis data necessary to

Case 1:10-cv-06950-AT-RWL Document 125



conduct an examination of job similarity. Hoffman and McPhail also noted that many modern jobs are too fluid or change too rapidly to make a criterion-related validation study feasible, and consequently no source study could exist.

There are limited examples of actual methods for establishing job similarity discussed in the literature. Hoffman (1999) and Hoffman, Holden, and Gale (2000) both provided practical examples of a Position Analysis Questionnaire (PAQ)–based method of establishing similarity between job families; however, this example is not applicable to most situations as it requires a sizable sample of jobs with PAQ data. Johnson and Jolly (2000) provided a practical example of establishing job similarity between jobs at different business units within the same company for the purpose of supporting use of a test battery. This study provides a step-by-step process that the authors used to determine if use of a test battery was appropriate at additional facilities, as well as a description of the statistical methods and professional judgment required to make this determination. Brannick (2001) and Rafilson, Allscheid, and Weiss (1994) also discussed methods for establishing job similarity. The methods in these articles are applicable in idiosyncratic situations when job analysis data are available in certain formats or data have been collected regarding a large number of jobs.

Although most of the aforementioned articles do focus on the most ambiguous aspect of transporting validation evidence—establishing job similarity—most of the authors acknowledge a lack of confidence when attempting to determine the proper extent of job similarity. The question raised is: how similar is similar enough? A portion of the body of validity generalization research described below focuses on the topic of forming job families for the purpose of generalizing test constructs within a job family.

Mobley and Ramsay (1973) discussed using cluster analysis to establish job similarity. They identified two points that are still salient today regarding differences between jobs: namely, what variables to consider when comparing jobs and what index to use as an indicator of similarity. Cluster solutions do not allow a researcher to declare confidently that jobs are substantially similar or dissimilar.

Arvey and Mossholder (1977) summarized this research and present an analysis of variance (ANOVA) procedure as an alterna-

tive method to determine the degree of similarity between jobs. They assessed the similarity of a group of jobs with three raters providing PAQ ratings for each job and compared to the cluster analytic technique. This article spawned progeny (McIntyre & Farr, 1979; Lissitz, Mendoza, Huberty, & Markos, 1979; Hanser, Mendel, & Wolins, 1979; Arvey, Maxwell, & Mossholder, 1979; Lee & Mendoza, 1981), all of which compare and contrast the relative strengths and weaknesses of using ANOVA, multivariate analysis of the variance (MANOVA), and cluster analytic techniques for establishing job families. A study by Sackett, Cornelius, and Carron (1981) provided an example in which global SME judgments regarding job family membership yielded identical results to statistical methods.

A single superior method of establishing similarities or differences between jobs did not evolve from this line of research, primarily due to the fact that different methods are appropriate, given different sample sizes (of both jobs and raters) as well as varying formats of job analytic data. In addition, many of these methods involve comparing multiple jobs for job family inclusion or exclusion, whereas when transporting validity, we often seek to compare one target job to one source job or family of jobs.

The lack of published research regarding methods and applications of borrowing validation evidence is certainly disheartening to a practitioner seeking guidance in methodology or support for a decision of establishing job similarity. Practitioners must apply the culmination of knowledge and experience from other bodies of research as well as professional judgment when engaging in such endeavors.

## Review of Legal Implications

There is a modest number of cases in which transportability issues have been addressed in the courts, and among these, fewer still by which transportability was central to the case or even offered as a planned validation strategy. In addition, many of the cases were adjudicated under now expired EEOC or DOJ *Guidelines* that predate and differ from the *Uniform Guidelines*. All of these issues diminish what can be leveraged from these cases; nevertheless, a review of them yields some useful information for practitioners.

In *Albemarle Paper v. Moody* (1975), the Supreme Court considered the validity of three ability tests used to select employees for numerous skilled jobs that formed six lines of progression in a paper mill. The concurrent validity study included ten small samples (based on eight to twenty-one employees each) from "job groups" formed by combing adjacent titles in the lines of progression. The high court confirmed the notion that extending validity evidence to unstudied jobs requires completion of an adequate job analysis. Relying on language from the then-current EEOC *Guidelines*, the court stated,

> Even if the study were otherwise reliable, this odd patchwork of results would not entitle Albemarle to impose its testing program under the *Guidelines*. A test may be used in jobs other than those for which it has been professionally validated only if there are "no significant differences" between the studied and unstudied jobs. 29 CFR § 1607.4 (c)(2). The study in this case involved no analysis of the attributes of, or the particular skills needed in, the studied job groups. There is accordingly no basis for concluding that "no significant differences" exist among the lines of progression, or among distinct job groupings within the studied lines of progression. Indeed, the study's checkered results appear to compel the opposite conclusion.

Perhaps most important in Albemarle, to the issue of proper use of transportability, was the court's reliance upon then-current EEOC *Guidelines* language requiring that "no significant differences" exist between studied and unstudied jobs. Clearly the court insisted that there be evidence of job similarity. Existing lines of progression in the work setting, without further study, were inadequate evidence of job similarity for this court. With so little job information for the court to consider, it is less clear what showing of job similarity might have satisfied it. However, it is interesting to examine the court's brief language describing what was missing, namely, "The study in this case involved no analysis of the attributes of, or the particular skills needed in, the studied job groups." Apparently, at least under consideration of the EEOC *Guidelines*, the high court would allow similarity to be established through an analysis of attributes of the jobs (such as tasks or work behaviors) or of the person attributes (skills, and presumably other KSAOs)

needed to perform them. Whether or not adoption of the *Uniform Guidelines* subsequent to Albemarle renders this inference transitory is unknown.

In *Dickerson v. United States Steel Corp* (1978), a district court rejected as inadequate and a "fatal flaw" the defendant's job analysis based on only "existing corporate job descriptions and apprentice training syllabi." The case involved three criterion-related validation studies conducted in two settings (South Works and Fairless) that were in support of tests for numerous craft jobs. Each study addressed multiple craft jobs that were pooled together for analysis purposes; criteria included grades in classroom apprentice training and supervisory ratings of on-the-job training after an average of one year in the apprentice program. The court found that the syllabi did not contain descriptions of the courses, but were "merely a listing of each course to be taken." The court continued, "Even if this coursework analysis were adequate . . . there is no analysis of the first year on-the-job training." Of the corporate job descriptions, the court stated, "Neither the descriptions or classifications from the JDC indicate which skills are expected to be mastered." The court concluded, "The Court finds that this information, while it may constitute a superficial description of a journeyman's work, certainly does not constitute an analysis of a first-year apprentice's job."

Having found that the job analyses were " . . . either completely deficient or unrelated to the first-year apprentice work," the court concluded, "For the Fairless crafts jobs not included in any validation 'pool,' the Court holds that the test battery has not been validated. This failure to include those crafts is conclusive against USS, since the Court has rejected the conclusory evidence of all-craft similarity."

On the issue of test fairness, the court stated,

> The absence of a differential validity study in the Fairless studies, and the use of a "borrowed" study to establish racial fairness, is treated differently under the two sets of guidelines. Under the DOJ guidelines, where a user is unable to conduct its own internal analyses for racial fairness, it may rely on the analyses of others if the validity studies are otherwise properly used under the guidelines as "borrowed" studies. However, under the EEOC instructions, § 1607.7, a more stringent set of rules for "transportability" is called

> into play when a test user seeks to use another's study in lieu of its own, rather than merely as corroboration. It must then substantiate "in detail" job comparability and must show the absence of "major difference in contextual variables or sample composition which are likely to significantly affect validity." This section does not allow the party seeking to rely on a borrowed validation to benefit from any inferences of assumptions of similarity. Since the Court has only been able to find a hint of task and content similarity through inference, and the evidence on similarity of the sample reveals distinct difference between the South Works and Fairless groups, this higher standard clearly has not been met.

The court noted,

> For example, the South Works sample contains: more crafts (16 as compared with 12 and 8), proportionately more minorities, and older apprentices (mean age 25.6 compared with 22.1 in Fairless III) . . . The Court sees these differences as potentially significant, and finds that USS failed to satisfy its burden of explaining them or demonstrating their non-significance.

It continued,

> What this means, to this Court using the EEOC guidelines, is that the South Works study's evidence of racial fairness cannot be considered probative of the fairness of the tests at Fairless. It is not "transportable" to the Fairless situation, and cannot be used as primary evidence. . . . Therefore, even if the Court were to accept the South Works study as corroborative on other issues, it cannot accept it as the sole evidence of the tests' racial fairness. By rejecting this evidence, the record is now barren of evidence of the tests' racial fairness.

*Dickerson* illustrates very clearly the importance of job analysis in transportability; it is difficult to read the decision and not conclude the defendant's case was lost largely on this issue. However, the court's reasoning on test fairness must be seen as troubling by I/O practitioners. It seems as though pertinent sections from both the EEOC and DOJ *Guidelines* were used in combination to present an insurmountable hurdle on the issue of fairness to defendants. The fairness study conducted at South Works supported a conclu-

sion that race membership had no impact on validity. (The court did not criticize the conclusions of the fairness study itself, nor disparage the credibility of testimony supporting it; presumably the study demonstrated fairness for the two groups of interest in the sample on which it was based, and the court accepted this evidence.) With affirmative evidence of test fairness established in the only setting in which it was feasibly researched, the court concluded that such fairness evidence was irrelevant to the other studies. The court seems to have missed the meaning of test fairness: that validity is not impacted by racial group membership. The affirmative finding was itself empirical evidence that it did apply to other settings, regardless of any racial differences in samples. By citing differences in the proportion of minorities between the two settings as a reason for rejecting applicability of fairness evidence, the court may have placed an insurmountable burden on defendants to prevail on the issue.

We find it even more troubling that the court refused to apply the fairness evidence to settings in which the proportion of minorities was *smaller*. Having accepted evidence that race was *irrelevant* to validity, the court insisted that in other settings, in which fewer minorities were employed and no such research could be conducted, race *might impact* validity, and so the court rejected its probative value. In doing so, the court rejected as irrelevant the evidence that was contrary to its premise. Given that the court acknowledged " . . . only the South Works validity analysis contained a sufficiently large minority sample to conduct the differential validity analyses," it is difficult to understand how it did not view its own decision as a "Catch-22" that was impossible to overcome.

To conclude this discussion of *Dickerson*, practitioners must hope that the test fairness conclusions in the case are anomalous and can be ignored. Given the different perspective on fairness taken in the *Uniform Guidelines*, contrary court decisions noted as follows in this section, and the developed consensus based on accumulated research in the field since the time of this decision (Society for Industrial and Organizational Psychology, 2003), it seems reasonable to do so.

In *Vanguard Justice Society v. Hughes* (1979), a district court considered multiple lines of evidence in support of a written promotional exam for police sergeant, including an eleventh-hour

Case 1:10-cv-06950-AT-RWL Document 125



attempt to transport validity evidence. The transportability effort did not include complete documentation of most of the borrowed validity studies or of job analysis information linking the studied and unstudied jobs. The court noted,

> Defendants have not themselves conducted any validity study. Nor have they stated any reason why they did not do so. However, defendants' expert . . . introduced documentary evidence and testified concerning validity studies conducted in other police departments in other locales. Defendants seek to borrow or, to use the professional jargon, to "transport" such other studies to Baltimore City.

The court concluded that

> . . . any study . . . is of little support to defendants because the record fails to disclose that any such study was itself conducted in accordance with the appropriate guidelines. Further, even if the said other studies relied upon by defendants were conducted in accordance with such guidelines, they are of little aid to defendants unless their transportability is established pursuant to the guidelines.

The court further observed,

> Mr. Bemis testified (Tr. 92) that the authors of the neighboring jurisdiction study examined Test No. 10 for fairness. Guidelines § 15(B)(8). However, no evidence of test fairness, i.e., in this instance, comparison of test scores of blacks and whites versus their respective job performances, was presented other than Mr. Bemis' stamp of seeming approval upon the conclusion of the psychologists who conducted the study that Test No. 10 was fair.

The court then concluded,

> In sum, the evidence presented with regard to the neighboring jurisdiction study, both considered separately and together with all other evidence, does not constitute a showing by defendants of the job-relatedness of Test No. 10. Accordingly, that test, because of its discriminatory impact, was utilized by defendants in violation of Title VII.

In *Vanguard* we are reminded that both the borrowed validity study and the job analysis transporting it must conform to *Uniform Guideline* requirements. Throughout the decision, the court seemed to rebuke casual and incomplete statements of validity. In discussing *Uniform Guidelines'* Section 9A—No Assumption of Validity, the court noted (1) there was expert testimony unsupported by court documents, (2) the expert did not bring such documents to court, (3) the expert acknowledged that a body of research referenced by him to transported validity was not "by itself" sufficient to transport validity, and (4) the expert failed to provide results from a study that he testified would be available "shortly." The court concluded by finding that the single study best documented for transportability failed to meet *Uniform Guidelines* requirements for establishing validity. Without a thorough review of all expert reports and pleadings, it is impossible to infer many issues that may have influenced the court, but *Vanguard* appears to beg for more precision and care in the presentation of relevant validation evidence and for exclusion of evidence only marginally related to support. It seems apparent that expert testimony without explicit written support of it substantially diminished the credibility of the witness.

In *Friend v. Leidinger* (1977), the District court considered the validity of an entry-level fire fighter exam based on evidence obtained elsewhere. Defendants provided expert testimony supporting transported validity of the test. Plaintiffs did not dispute the evidence directly, but instead argued that the EEOC *Guidelines* did not permit an employer to rely upon "vicarious" validation where a validity study was feasible. The court opined that both the EEOC *Guidelines* and the more recent DOJ *Guidelines* were both relevant and "of great value" but stated that "the Court will not be bound by one set of guidelines over another, but only by what the Court deems as reasonable in this case." The court concluded,

> . . . the Court finds it credible . . . that the job of a fireman in Richmond is very similar to the job of a fireman in certain California cities. Given this, the Court concludes that the City of Richmond carried its burden of showing the Firefighters B-1 (m) test to be job-related by proof that the test had been validated as job-related according to EEOC guidelines in a validation study in California, and that proof that the job for which the test was validated

was substantially the same as the job for which the test was being used in Richmond.

Upon appeal (*Friend v. Leidinger,* 1978), the appellate court affirmed the district court's judgment. The appellate court agreed that neither it, nor the trial court, need consider only the EEOC *Guidelines*, and on the issue of transportability, it concluded,

> . . . plaintiffs have shown no difference in the duties of a fireman in the 55 areas of California, where the test was validated, from the duties of a Richmond fireman. To require local validation in every city, village and hamlet would be ludicrous.

In *Friend*, the district court approved transported validity without any criticism of unmet guidelines in either the source study or the job analysis used to demonstrate job similarity. It cannot be known whether the favorable opinion would have been reached had plaintiffs challenged the evidence of transportability. However, the eloquent appellate quote must leave practitioners interested in transportability feeling empowered.

In *Bernard v. Gulf Oil Corporation* (1986), the court considered, among other issues, the validity of entry-level tests for numerous craft jobs. Having accepted criterion-related validation evidence for two crafts, the court approved the tests for all crafts based on job analysis information showing that the measured abilities were common to all crafts jobs. On remand, the district court, in an unpublished decision, again found for the defendants on all issues.

Upon appeal (*Bernard v. Gulf Oil Corporation,* 1989), the appellate court affirmed the district court's final judgment, summarizing,

> Having found that Gulf had shown the new tests were significantly correlated with performance as a boilermaker and pipefitter, the district court considered and compared the most important abilities in those two crafts with the important abilities in all the other crafts. If the most important abilities required for the other crafts are closely related to the most important abilities of the boilermaker or pipefitter, it may be concluded that the new tests, which predict significant aspects of job performance for the boilermaker or pipefitter, also predict important abilities related to the performance of all other craft jobs as well. The district court found that the most important abilities for boilermakers or pipefitters were

closely related to the important abilities for all of the other crafts, and extrapolated from that to find that the tests were job related for all of the crafts.

The district court decisions in *Bernard* permitted an important extension of transportability research that is not explicitly sanctioned in the *Uniform Guidelines*. A showing of job similarity based on common important abilities is a meaningful departure from what were previously presumed to be the requirements. It is interesting to note that none of the versions of the *Guidelines* were referenced in the earlier district decision or in the 1989 appellate decision supporting it.

In *Pegues v. Mississippi State Employment Service* (1980), the district court considered, among many issues, the validity and proper use of the General Aptitude Test Battery (GATB) by a local office of a state employment service. Although a formal transportability argument was not presented, the court nevertheless made several findings relevant to conclusions of validity for jobs not specifically studied. Among the court's findings were the following:

> Empirical research has demonstrated that validity is not perceptibly changed by differences in location, differences in specific job duties or applicant populations. Valid tests do not become invalid when these circumstances change. Plaintiffs' allegation that validity is specific to a particular location, a particular set of tasks and to a specific applicant population, or in other words, that a valid test in one set of circumstances is not valid in circumstances not perfectly identical is not true.
>
> The research done by Dr. John Hunter and his colleagues shows that the validity of tests is broadly generalizable across jobs, geographical locations and applicant populations. In both the 1970 EEOC *Guidelines* and the Standards of the American Psychological Association such research has been called for.
>
> No differences between the job duties in the research sample and the jobs in Bolivar County were specified. According to research, even gross changes in job duties did not destroy validity. It follows that small and/or hypothesized differences have little or no effect on validity. Plaintiffs have not shown that the USES tests were invalid because the tasks of the jobs in the research setting may have been different from those in Bolivar County.

Case 1:10-cv-06950-AT-RWL Document 125



> The United States Employment Service (USES) tests meet all of the applicable EEOC guidelines for test usage and validation.
>
> Section 1607.4(c)(1) has been met. Differences in location, jobs and applicant characteristics do not alter the proper interpretation of validity evidence. Further, no credible evidence exists that differences between units, jobs and applicant populations alter test validity.
>
> Section 1607.5(b)(1) has been met. No evidence was presented that any of the samples are atypical or unrepresentative. Differences in applicant characteristics do not moderate or change validity.

The court concluded,

> When the evidence is considered as a whole, the court has concluded that plaintiffs have not shown by a preponderance of the evidence that they and the members of the class represented by them have suffered, or are likely to suffer, discrimination on the basis of race or sex at the hands of defendants . . .

Upon appeal (*Pegues v. Mississippi State Employment Service*, 1983; certiorari denied), the Appellate court affirmed the District court's finding that no adverse impact had been demonstrated. The court concluded,

> Because we affirm the district court's determination that the disputed tests produced no disparate impact upon black referral candidates during the years involved in plaintiffs' studies, we do not address . . . the challenge to expert testimony on the job-validation issue.

Although *Pegues* is not a transportability case per se, it nevertheless addressed issues highly relevant to establishing validity for unstudied jobs. The court's findings were supportive of many research conclusions central to both generalizing and transporting validity. Given how broadly supportive the court's conclusions were, it may be prudent to note that the findings remained intact, but without review, on appeal.

A summary of cases showing: (1) referenced *Guidelines*, (2) controlling *Guidelines*, (3) deference given, (4) transportability issues concluded, and (5) final judgment is provided in Table 2.1.

**Table 2.1. Case Summary.**

| Case | Referenced Guidelines | Controlling Guidelines | Deference Given | Transportability Issues Concluded | Final Judgment |
|---|---|---|---|---|---|
| Albemarle (1975) | EEOC<br>DOJ | EEOC | "entitled to great deference"; "measured against the Guidelines . . ." | JA must show "no significant differences" between studied and unstudied jobs | Test not validated |
| Dickerson (1978) | EEOC<br>DOJ | EEOC<br>DOJ | "looked for guidance" to both Guidelines; "not legally binding . . ."; "will use both sets . . . as an aid" | "Superficial description" of work inadequate and a "fatal flaw" | Test not validated |
| Vanguard (1979) | EEOC<br>Uniform | Uniform[a] | ". . . requires consideration of the applicable EEOC guidelines"; many court citations of various levels of deference to Guidelines | Borrowed study and transportability must be established in accordance with and pursuant to Guidelines | Test not validated |
| Friend (1977, 1978) | EEOC<br>DOJ | EEOC<br>DOJ | "of great value"; "not bound by one set of guidelines over another" | Borrowed test is job related, and studied and unstudied jobs are substantially the same | Test valid |
| Bernard (1986, 1989) | Uniform | Uniform | Unknown[b] | Permitted transportability based on common important abilities | Test valid |
| Pegues (1980, 1983) | EEOC<br>Uniform | EEOC[c] | "meets applicable EEOC guidelines"; adherence to numerous specific guidelines noted | Variety of conclusions favorable to transporting and generalizing validity | Test valid |

[a] The Vanguard decision stated that the *Uniform Guidelines*, "with a few modifications and clarifications, were the same as the proposed Guidelines published before trial in these cases" and defendants "have stressed that their evidence . . . is related to those Guidelines." The court then referenced the *Uniform Guidelines* throughout its decision.

[b] No reference to *Guidelines* was found in the Appellate decision, and the published District court decision referenced only the 4/5ths rule from the *Uniform Guidelines*.

[c] The Pegues decision stated: "The EEOC Guidelines on Employee Selection Procedures in effect at the time of the alleged discrimination are

As can be seen in Table 2.1, the *Guidelines* that were "controlling" for the cases varied, as did the level of "deference" given them by the courts. Since each set of *Guidelines* differs somewhat in their requirements for transportability, and since the EEOC and DOJ *Guidelines* now are expired (unless "in effect at the time of alleged discrimination"), the specific inferences we can draw from the developed case law are diminished further. This issue is perhaps more constraining to inferences regarding transportability than to other validation strategies, because transportability approaches have developed from *Guidelines* language to professional practice, more so than for traditional strategies for validation.

One other constraint of this and other reviews of case law is the limited detail provided in the court decisions. Without a thorough review of all pleadings and expert reports before the court, it is often difficult to understand precisely what issues may have influenced the judgment of the court. Even with such a review, subtleties regarding a court's weighing and judgment of witness credibility, the clarity and competence with which evidence was presented, and other intangibles cannot be completely understood in a retrospective review. Thus, the following conclusions must be tempered with caution.

The review of these cases suggests several conclusions that are consistent with language in the *Uniform Guidelines* defining transportability. First, it is feasible to establish validity and job relatedness through a strategy of transportability. The courts in *Friend* and *Bernard* supported explicit transportability strategies, and several of the court's findings in *Pegues* are supportive of transporting and generalizing validity. Second, it is clear that the borrowed validity study must itself conform to the requirements of the *Uniform Guidelines* for establishing validity. This requirement is explicit in the *Uniform Guidelines* and is not novel to transportability strategies; the courts in *Vanguard* and *Dickerson* reinforced this point.

Third, the courts inform us that casually conducted or presented job analyses offered as evidence of job similarity are probably insufficient and certainly are not prudent. Although the *Uniform Guidelines* offer less explicit instruction for establishing job similarity than they do for establishing criterion-related validity, for example, the standards imposed by the courts seem reasonable. The Supreme Court in *Albemarle* refused to infer job similarity from

existing lines of job progression without further study and, in *Dickerson*, rejected a "superficial description" of work as a basis for establishing similarity. However, the courts in *Friend* and *Bernard* accepted job analysis information showing job similarity, and in *Bernard*, clarified interpretation of explicit language in the *Uniform Guidelines* to allow that similarity be established on the basis of common abilities.

In *Pegues*, the court found credible (and held) that "even gross changes in job duties did not destroy validity. It follows that small and/or hypothesized differences have little or no effect on validity." This finding and others from *Pegues* illustrate that a court may assimilate widely held research conclusions with possibly disparate regulatory requirements (in this case, the earlier *Guidelines* from the EEOC), and support varied strategies for test validation. The court's findings regarding validity and "applicant characteristics" and "populations" stand in stark contrast to the fairness conclusions in *Dickerson*.

Taken together these decisions provide useful context with which to judge how thresholds of job similarity in transportability efforts will be assessed. Though these cases vary in their instructions, they begin to inform us of the courts' view of transportability, and with regard to job similarity, how similar is similar enough?

## Review of Professional Implications

The two primary sources for professional guidance regarding test validation were revised more recently than the *Uniform Guidelines*. Both the *Standards for Educational and Psychological Testing* (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, 1999) and the *Principles for the Validation and Use of Personnel Selection Procedures* (Society for Industrial and Organizational Psychology, 2003) have been updated in the past decade, and both of these documents reflect evolution in research regarding generalizing validity evidence. Although the *Uniform Guidelines* were adopted when the tenets of situational specificity were still widely accepted, the *Standards* and the *Principles* both support the accumulation of validity evidence by gathering data from multiple studies regarding the specific test or construct being studied in situations similar to the target environment.

The *Principles* define transportability as:

> A strategy for generalizing evidence of validity in which demonstration of important similarities between different work settings is used to infer that validation evidence for a selection procedure accumulated in one work setting generalizes to another work setting (p. 71).

The *Principles* denote transportability as one of three methods of generalizing validity evidence from previously conducted research, along with job component validity and synthetic validity and meta-analysis. The *Principles* provide general guidance for conducting a transportability study, such as the recommendation that care be taken when evaluating the technical merits of a source validation study as well as consideration of the comparability between the target job and the source job. "Job comparability" is described as the similarity of job "content or requirements." No preferred method for comparing and contrasting two jobs is specified in the *Principles*. The more general considerations of the job context and candidate group are listed as additional factors for establishing job comparability. Specific aspects of the source study that should be documented according to the *Principles* are possible sampling biases, aspects of the target population which may not be representative of the source study population, as well as range restriction that may have occurred during the source study.

Although the above-mentioned recommendations regarding statistical considerations (that is, range restriction) seem to refer to the process of transporting validity from a criterion-related validation study, another section in the *Principles* implies that transporting validity evidence from studies that employ other validation strategies is appropriate as well. In the section describing meta-analysis, the *Principles* state:

> While transportability and synthetic validity/job component validity efforts may be based on an original study or studies that establish the validity of inferences based on scores from the selection procedures through a content-based and/or a criterion-related strategy, meta-analysis is a strategy that only can be applied in cases in which the original studies relied upon criterion-related evidence of validity. (p. 28)

This compare-and-contrast statement widens the definition of transportability from the original in the *Uniform Guidelines* to include borrowing validity evidence from a source study or group of studies that used either a criterion-related strategy or a content strategy. The effect of this evolution is to broaden the usefulness of transportability to apply to the types of assessments that typically evolve from a content strategy, such as job knowledge or work sample assessments. This is especially useful, given that content validity studies often are site- or organization-specific. Relying on a transportability strategy to support validity inferences allows organizations to spread these selection procedures across multiple sites without expending the resources for a second content validity study. However, the work steps required to transport validity from a content validation study would be similar to conducting a separate content validation study at the target location. Both studies would involve a thorough job analysis and documentation of how the tested constructs relate to the job. This endeavor would not qualify as transportability as sanctioned by the *Uniform Guidelines*, but it may be an example of how professionally accepted norms in the field continue to outgrow the aging *Uniform Guidelines*.

The *Standards* never actually use the term *transportability*, but they do refer to strategies for borrowing validity evidence from other sources. Standard 14.6 cautions against borrowing validation evidence from a single source unless the study was conducted under favorable conditions. Regarding the issue of job similarity, the *Standards* state the "current situation must closely correspond to the previous situation" (p. 159). The general nature of that statement is daunting; however, the comment following it recommends a job analysis to identify if the job requirements and underlying constructs are the same for the source job and the target job. The mention of predictor-criterion relationships and sample size implies that the reference is to borrowing validity evidence from a criterion-related validation study (as opposed to content validation); however, that is not explicitly stated. Similar to the *Principles*, the *Standards* promote gathering evidence of validity from as many sources of validation evidence as possible, as evidence gathered at different locations can bolster support for validity.

Neither the *Principles* nor the *Standards* provide much guidance for practitioners seeking to determine if a situation is appropriate

for transporting validity evidence. In a situation in which a practitioner seeks to borrow validation evidence from a particular study or group of studies, it seems advantageous to set a threshold or statistical standard for the level of similarity between target and source jobs. In an isolated case of borrowing validation evidence, it may prove that professional judgment of the level of similarity is more appropriate. Although variables such as tasks, KSAOs, minimum qualifications, and requirements can be quantified and compared using quantitative methods, those variables can be affected by larger, more nebulous factors such as organizational culture, place in hierarchy, and other administrative duties. Because such factors may not be consistent between sites or organizations, careful professional judgment is required in all situations when evaluating job similarity. This indeterminacy may be why authors of the *Standards* and the *Principles* refrained from making specific procedural recommendations.

## Practical Development

This section addresses some of the practical issues that may be encountered when conducting transportability studies. A sample study is used to illustrate some of the concepts. The sample study is contrived; it is based on several client situations encountered in our transportability work. The details and data have been changed or omitted both to provide anonymity to client organizations and to optimize our illustration and discussion of the data and decision issues.

The simplest situation in which a transportability approach can be applied is one involving two jobs: a source job, in which criterion-related validation evidence (and a fairness study, if feasible) has been established, and a single target job to which that evidence is to be transported. A basic approach may follow closely the pertinent *Uniform Guidelines* language (quoted in earlier sections of this chapter).

The job analysis approach for transporting validity focuses on a showing of substantial similarity in major work behaviors for the jobs under review. With only two jobs under consideration, this effort can be relatively straightforward. The process entails (1) an appropriate job analysis effort to identify the major work behaviors on a common metric for both jobs and (2) a mechanism for judg-

ing the degree of job similarity. Judging job similarity is the most ambiguous aspect of the process, and various methods for this comparison are described as follows.

## Situation Scenario

The following details provide some context for this example. The client organization is a paper and wood products manufacturer with several production facilities. An ability-testing program for the skilled trade job of millwright was validated and implemented for existing paper mills several years ago. Recently, the company acquired a plywood plant from a competitor, and there was a strong desire to standardize employee selection procedures and to extend the ability test, with validation support, for use in selecting among millwright applicants at the new plant. A company HR representative familiar with skilled plant jobs worked with plant personnel to better understand any differences in the jobs due to different work processes, production facilities, or plant organizational structure. Based on a favorable cursory review, the company asked an I/O psychologist to advise them about extending the testing program and any prudent and cost-effective validation that might be conducted. The project steps and a discussion of the issues considered at each work step are discussed as follows.

### *Step One. Review Existing Job Information and Develop Preliminary Project Plan.*

*Overview.* This effort should result in a basic understanding of the relevant information that will shape a successful project plan. It is at this preliminary phase where feasibility, risk, and any known or anticipated problems should be identified, including numerous general "consultative" issues. These issues include historic or ongoing enforcement activity, the equal employment posture and status of the organization, presence and severity of adverse impact, presence of and constraints from bargaining agreements, and other stakeholder issues. In the interest of space, we will focus on only those issues that are specifically pertinent to transportability.

*Project Details.* The following should be accomplished:

A. A practitioner should attempt to identify if basic information required for the study is available. This information includes full documentation of the source study—likely in the form of a technical report—as well as needed data not contained in the report. It is prudent to verify that subject matter experts (SMEs) will be available at the target location to provide job analysis information. Any available job information, such as job descriptions, training manuals, or other relevant documentation, should be collected and reviewed.

B. To properly explore the feasibility of the project, the following considerations must be explored:

### What is the exact purpose of validation?

An organization may engage in a test validation project for multiple reasons, some more potentially contentious than others. It is necessary to understand the context under which a study will be conducted. Important contextual information includes the possible existence (or anticipation) of a legal challenge, the stance of the organization on adverse impact and other equal employment issues, and the specific problem or concern that is prompting the need for testing at the target location.

### What is known about the source and target jobs?

Subject matter experts at both the source and target locations should be consulted for knowledge of possible differences in job tasks, possible variations in complexity of the jobs (perhaps due to technology or autonomy), or possible differences between positions or shifts. Other information to be collected could include demographic data and the existence of any recruiting or relevant labor pool issues. An important issue with serious consequences is the nature of the planned use of the test within an applicant flow process. If the target location plans to use the test subsequent to more (or fewer) screening hurdles than the source location, the pass rate and selection ratio could be substantially different from those observed in the current implementation.

### What is known about the source study?

A full review of the source study should occur at this point. A complete understanding of the assessed test constructs and how they

are combined, weighted, and used is necessary. The currency of the study is important to consider, as the transportability effort may be futile if the study is approaching obsolescence in the short or medium term. It is ideal to borrow validation evidence from a trusted source or a study author with whom communication is possible. As indicated in the *Uniform Guidelines* requirements, it is optimal if an analysis of test fairness was conducted. Knowledge of the state of the testing program as it exists for the source job is key, as any problems occurring will likely carry over to the target location. Any changes that have occurred in the source job since the study was conducted also should be considered.

C. Develop a basic project plan. Strategies for conducting the job analysis—ideally including interviews, observations, and a data collection effort—should be developed.

*Outcomes.* If step one is completed successfully, any knowable barriers to success will have been identified, and sound decisions about how (or whether) to proceed can be made. It is at this phase when deal breakers or insurmountable problems should be identified. Sometimes a preliminary desire to use transportability is reversed here, and the project morphs into something different or otherwise ends before it begins. Although this phase entails a relatively cursory review, much of what will be learned later can be anticipated and predicted here.

*Issues and Commentary.* Several practical barriers to transportability work may be identified during this early phase of inquiry. A common one relates to ownership of the source study and data, and a frequent desire to shield an existing testing program supported by the source study from expanded risk of review or litigation. Even within a single corporate environment, perceived risk can result in a study "owner" choosing to restrict use of a desired source study. Complications can arise regarding data ownership during mergers and acquisitions and when facilities participating in a testing program are sold. If particular locations participated in the validation study or conducted a transport study, the question of that location's right to use a test battery must be considered. Many test publishers face difficult questions regarding data ownership when allowing clients to borrow validation evidence from data compiled

Case 1:10-cv-06950-AT-RWL Document 125



from past studies. Efforts should be made in advance of borrowing validation evidence to formally designate study and data ownership rights.

Another concern that can be difficult to judge occurs when an organization desires to leverage a relatively modest source study in support of a much larger testing program. If the resources used in the source study appear to be "upside down" when compared to those available for the target job(s), and especially if adverse impact may be an issue, it may be prudent to advise against a transportability approach; although scientific rationale for caution may not exist, practical experience with enforcement begs for caution here. Finally, preliminary information may suggest sufficient possible differences between source and target jobs to make a transportability approach a risky strategy. In general, it is useful to know at the outset whether or not the study is exploratory or whether there is reasonable confidence that job similarity will likely be established.

*Situation Scenario Update.* Step one resulted in a preliminary decision to proceed with a transported validity project for the plywood plant millwright job. No discovered risk issues or technical barriers to success were identified. The I/O psychologist judged the credibility of all of the information exchanged to be high, and there was good reason to believe the source and target jobs were the same in complexity and very similar in major work behaviors and tasks.

### Step Two. Review Source Study.

*Overview.* Although this review must confirm that the study meets *Uniform Guidelines* requirements for establishing criterion-related validation evidence, we will focus on only those issues pertinent to leveraging such studies in transportability work. This effort should result in a determination of whether the source study, if substantial similarity in jobs is shown, provides adequate evidence of validity to support its transport.

*Project Details.* The following should be accomplished:

A. Examine the job(s) comprised by the original research sample to understand the source of validation data. For studies based

on a single job title, this evaluation can be straightforward. However, if similar titles have been combined in the validation study, or job families have been developed and sampled from, this step may require much more effort.

B. Examine the job analysis approach used in the source study. In general, there is a need to connect the source and target jobs based on a common format of job analysis data. It is difficult to compare two datasets that used different metrics in data collection and will make quantitative comparisons of any kind difficult or impossible. It may be necessary to obtain the actual job analysis questionnaire from the original study (or other relevant data collection tool) to use in collecting SME data for the target job.

C. Examine the effects of the test. All of the information in the source study regarding subgroup differences in mean scores and pass rates should be reviewed and considered in the target environment. Consider the appropriateness of the existing cutting score and the likely effect in the applicant pool at the target location.

*Outcomes.* If step two is completed successfully, the practitioner will have a thorough understanding of the testing program itself as well as the likely consequence of its use in the target location. A plan for collecting target job analysis data in the same format as in the source study should be developed, and any normative data or pass rate information should be considered in the context of the target location.

*Issues and Commentary.* The source study review should provide information that directs the strategy for continuing the transportability effort. Often, job titles are combined in validation studies to obtain sufficient sample size or because they require the same aptitudes at the time of hire. When validation analyses in the source study are based on more than one job and the data are described by a job family profile, it may be difficult to determine precisely which "job" from the source study to compare to the target of transportability. In some cases, the raw data on which validity coefficients were computed in the source study will not be available, and segmenting the study sample and computing coefficients for only one job will not be feasible. Even when feasible, doing so may produce undesirable results because the job initially may have been combined with others to create enough statistical power to detect

an effect. In these cases it is important to know that the description of the study sample (often a centroid or other statistical average) is weighted appropriately to reflect the actual validation data that is to be transported. If the only basis of comparison provided in the source study is a centroid calculated from unit-weighted job analysis data for jobs assigned to the family, it may not fairly represent the computed validity data and therefore is not optimal as a basis of comparison for transportability. If the jobs that make up the computed validity data cannot be determined with precision, then judgment of similarity to the target job should be qualified accordingly.

Understanding the job analysis data is the primary component of step two. In a sense, a practitioner should attempt to reproduce the method used to collect the data, as the relationship between these two datasets forms the foundation on which the validation evidence is to be generalized. The practitioner should have a thorough understanding of how cut scores were devised, as well as any weighting or compensatory scheme that contributes to a battery score. It is important to assess the applicability of the theory behind a multiple hurdle or compensatory approach and its relevance in the target location. Alternatively, there should be a plan to address these important test use issues based on other information, whether from the target setting or from other experience with the tests.

A decision must be made regarding the variables that will be considered for the purpose of establishing job similarity. The *Uniform Guidelines* state that the target job and the source job should have “substantially the same major work behaviors.” Work behavior is defined as including “observable (physical) components as well as unobservable (mental) components.” This definition (and the court’s opinion in *Bernard*) suggests that a review of knowledge, skills, and abilities is certainly within the scope of consideration for the purpose of establishing job similarity. Substantial task overlap implies that the underlying KSAOs for the target and source jobs will be analogous, as it is unlikely that similar activities are being performed without a similar skill set supporting the behavior. A comparison of KSAOs should focus on the level of assessed KSAOs, to establish that the source and target jobs do not differ in the level of complexity of tested constructs. If the level of assessed KSAOs is different, it may result in the test battery being inappropriate for

use at the target location. This issue is addressed further in the Constraints and Risks section of this chapter.

*Situation Scenario Update.* Step two resulted in a favorable review of the source study. A cognitive test battery measuring mechanical comprehension and reasoning skills was validated against several measures of job performance. The validity evidence documented was compelling, with significant and sizable computed validities based on a reasonable sample size. The study included useful job analysis information collected on a task-based job analysis questionnaire (JAQ) and associated data. No fairness study was conducted, but it was determined to be unfeasible in the current sample. Job analysis ratings were collected at the Work Behavior level as well as at the task level. This issue led to a preliminary decision to examine job similarity both on the basis of work behaviors as well as on that of common tasks.

### *Step Three. Develop Procedures, Plan Analyses, and Gather Data to Examine Job Similarity.*

*Overview.* This effort should result in the design of a JAQ that will be used to collect SME ratings regarding the target job, along with a plan to gather data and analyze it. The plan and JAQ should address all issues critical to the analysis of job similarity. There should be a high degree of confidence before the data are collected that the obtained data will support the analyses needed to properly inform an assessment of job similarity, to judge an inference of transported validity, and to support needed documentation.

*Project Details.* The following should be accomplished:

A. Identify an appropriate job analysis tool and group of job experts to provide job analysis information. The job experts should understand the purpose and nature of the rating task and provide ratings based on the entry-level job. It is important that the job experts receive instructions similar to those given to the job experts in the source study, with one exception: the SMEs in the target job should be given the opportunity to add any tasks performed that are not included on the rating form. There may be tasks performed by the target job incumbents that are not included in the source study job analysis form. Ratings of these tasks should be provided

Case 1:10-cv-06950-AT-RWL Document 125



as well to allow the practitioner to decide on their relevance to the process of establishing job similarity. Alternatively, there must be a mechanism to otherwise conclude that no additional important tasks were relevant to the target job but omitted from the rating form. The intent is to ensure that all important elements of the job are understood.

B. Compile the job analysis results and create a dataset to prepare for conducting analyses of similarity. A preliminary examination of the results should prove useful to identify anomalous ratings. If there are additional tasks performed by the target job incumbents, consider the importance of these tasks to the job and whether or not they affect the level of complexity in any of the testable construct areas.

C. Based on thorough knowledge of the source study and the data requirements, similarity analyses should be planned. At this point, the practitioner should decide on a threshold of similarity that will be acceptable as an indicator of similarity.

*Outcomes.* If step three is completed successfully, the job analysis data regarding the target job will be collected and prepared for analysis. Decisions will be made regarding the relevance of any additional tasks performed by the target job. Analyses will be planned and decision rules for job similarity will be decided upon.

*Issues and Commentary.* It is important to collect the job analysis data in a format and method parallel to the source study, to provide a sound basis of comparison to the source job. The identified SMEs must be capable of providing accurate information regarding the target job (for example, journey-level millwright incumbents or supervisors in our client scenario). In some cases, the rating scales used in the rating form from the source study will easily support a rational distinction between critical and noncritical tasks or work behaviors. In some cases, perusal of the job analysis data from the source study can provide a basis for inferring a reasonable threshold. Whether or not a firm decision regarding any needed thresholds is made prior to data collection, the issues should be carefully weighed and considered. In some cases, distinguishing critical from unimportant tasks is so subjective that an alternative approach based on continuous data is preferable.

*Situation Scenario Update.* Step three resulted in a decision to use the existing JAQ to investigate job similarity. A focus group meeting with SMEs was used to explore whether or not the tasks and work behaviors identified in the previous study were current and comprehensive. This and a review of the JAQ instructions and rating scales indicated that data parallel to those existing in the original source study could support a careful examination of job similarity. Thus, the JAQ could be used without modification to gather information on the millwright job at the plywood plant, and the resulting data would provide a basis for judging similarity. Representative incumbent and supervisor SMEs for the plywood millwright job completed the JAQ. The JAQ used, with rating scales, and tasks nested under the identified work behaviors, is presented in Exhibit 2.1.

A measure of overall task and work behavior salience had been computed in the source study by multiplying the time spent and importance ratings for each work behavior and for each task. This measure of task and work behavior salience was judged to be useful and sufficient for analyses of job similarity between the target job and the source job. A rational and defensible method for distinguishing critical and noncritical tasks and work behaviors on the basis of salience indices was developed. All feasible combinations of time spent and importance ratings are shown in Table 2.2 (p. 68), along with the threshold value identified for designating tasks as critical.

The following summary question was used to document whether tasks identified in the JAQ were comprehensive, thereby providing a mechanism to ensure important job elements were not omitted.

Summary: Considering all of the tasks performed on the job, how many hours per week (in a typical forty-hour work week) have been accounted for by the tasks on this list? (Circle one.)

| | |
|---|---|
| 6 | 35 or more hours |
| 5 | 30 to 34 hours |
| 4 | 25 to 29 hours |
| 3 | 20 to 24 hours |
| 2 | 15 to 19 hours |
| 1 | 10 to 14 hours |
| 0 | Fewer than 10 hours |

**Exhibit 2.1. Instructions for Rating Work Behaviors.**

On the following pages is a list of work behaviors with associated tasks performed on various maintenance jobs at Client Company. Please indicate whether each task is performed by incumbents in the job you are rating by answering the first question below. Do this for each task or work behavior. The work behavior ratings are at the top of each section. Work behavior should be rated first, followed by each task below that is a component of the work behavior. Answer each of the following questions for each work behavior and associated task.

First, is the task/work behavior normally performed as part of the job?

1 = YES, task/work behavior is performed

0 = NO, task/work behavior is not performed

If the task or work behavior is not performed, mark "0" for "NO" and do not answer the second and third questions for the task.

Second, how much time is spent performing this task/work behavior? (If the time varies from week to week, indicate the average over a month or a year.) Use the following scale:

5 = *Much more time* than other job tasks/work behaviors

4 = *More time* than other job tasks/work behaviors

3 = *About the same* amount of time as other job tasks/work behaviors

2 = *Less time* than other job tasks/work behaviors

1 = *Much less time* than other job tasks/work behaviors

Third, how important is it to successful job performance to perform this task/work behavior acceptably? Use the following scale:

4 = Critical

3 = Very Important

2 = Moderately Important

1 = Somewhat Important

0 = Of No Importance

To answer these questions, refer to these scales and mark your ratings directly on the task list. After you have completed the task ratings, answer the summary question at the end of the task list.

## Millwright

Work behaviors are in the shaded section of each table. Please rate the work behavior first, then rate the task set associated with each work behavior.

| Performed? | Time Spent | Importance | |
|---|---|---|---|
| ____ | ____ | ____ | *Installs Equipment* (pumps, turbines, compressors, motors, gearboxes, rolls, valves, and so on) in accordance with accepted safety standards as well as layout plans, blueprints, or other drawings in order to generate power and maintain plant operations. |
| ____ | ____ | ____ | 1. Reads blueprints, sketches, and schematic drawings |
| ____ | ____ | ____ | 2. Builds scaffolding and other supports |
| ____ | ____ | ____ | 3. Obtains parts, materials, and supplies |
| ____ | ____ | ____ | 4. Moves materials and equipment using cherry picker, mobile cranes, fork lifts, boom trucks, electric hoists, cables, nylon slings, come-alongs, and so on |
| ____ | ____ | ____ | 5. Constructs bases for machines and equipment |
| ____ | ____ | ____ | 6. Assembles equipment |
| ____ | ____ | ____ | 7. Aligns machines and equipment |
| ____ | ____ | ____ | 8. Connects power to equipment, up to 440 volts |
| ____ | ____ | ____ | 9. Connects piping to equipment |
| ____ | ____ | ____ | 10. Secures machines to solid structures using bolts, welds, rivets, or other fasteners |
| ____ | ____ | ____ | *Inspects and Maintains Equipment* by watching for potential problems and taking corrective actions in order to comply with safety standards and prevent equipment failure. |
| ____ | ____ | ____ | 11. Checks lubrication |
| ____ | ____ | ____ | 12. Observes flow and pressure indicators |

| Performed? | Time Spent | Importance | |
|---|---|---|---|
| ____ | ____ | ____ | 13. Examines parts for visible flaws |
| ____ | ____ | ____ | 14. Checks clearances between parts |
| ____ | ____ | ____ | 15. Listens to mechanical devices in operation |
| ____ | ____ | ____ | 16. Tests vibration using a vibration analyzer |
| ____ | ____ | ____ | 17. Checks temperature by touch or with a temperature probe |
| ____ | ____ | ____ | 18. Checks general structural conditions (painting, corrosion, and so on) |
| ____ | ____ | ____ | 19. Reads gauges for strainers and filters |
| ____ | ____ | ____ | 20. Checks alignment of equipment |
| ____ | ____ | ____ | 21. Examines welded joints for external defects |
| ____ | ____ | ____ | 22. Checks safety equipment (backup alarms, beacons, flag switches, pressure shutdown, level shutdown, temperature shutdown, and so on) |
| ____ | ____ | ____ | 23. Cleans equipment |
| ____ | ____ | ____ | 24. Adjusts packing |
| ____ | ____ | ____ | 25. Measures parts using calipers, micrometers, rules, and other devices |
| ____ | ____ | ____ | 26. Notifies appropriate personnel of problems |
| ____ | ____ | ____ | *Repairs Equipment* (gearboxes, pumps, compressors, hydraulic cylinders, rolls, valves, turbines, and so on) according to blueprints, diagrams, and technical manuals so that defective machinery can be returned to normal operation. |
| ____ | ____ | ____ | 27. Dismantles equipment |
| ____ | ____ | ____ | 28. Replaces worn parts |
| ____ | ____ | ____ | 29. Realigns gears and adjusts bearing clearance |
| ____ | ____ | ____ | 30. Adjusts clutches |
| ____ | ____ | ____ | 31. Adjusts brakes |

| Performed? | Time Spent | Importance | |
|---|---|---|---|
| ____ | ____ | ____ | 32. Fabricates parts |
| ____ | ____ | ____ | 33. Joins metal parts using a variety of welding procedures (electric arc welding, acetylene, oxyacetylene, oxyhydrogen, and so on) |
| ____ | ____ | ____ | *Trains Workers* by following specified procedures to expand the technical job knowledge of maintenance personnel. |
| ____ | ____ | ____ | 34. Explains procedures |
| ____ | ____ | ____ | 35. Demonstrates procedures |
| ____ | ____ | ____ | 36. Observes performance |
| ____ | ____ | ____ | 37. Provides feedback |
| ____ | ____ | ____ | *Maintains Records* according to specified procedures in order to document worker and maintenance activities. |
| ____ | ____ | ____ | 38. Lists tools, equipment, and materials needed |
| ____ | ____ | ____ | 39. Records inspection and maintenance data |
| ____ | ____ | ____ | 40. Completes personnel forms (time cards, vacation request slips, floating holiday requests, and so on) |
| ____ | ____ | ____ | *Cleans Work Area* using good housekeeping rules and established procedures to ensure a safe and efficient work environment. |
| ____ | ____ | ____ | 41. Sweeps floor |
| ____ | ____ | ____ | 42. Removes trash and scrap |
| ____ | ____ | ____ | 43. Wipes up spills |
| ____ | ____ | ____ | 44. Washes equipment |
| ____ | ____ | ____ | 45. Stores tools and equipment |

**Table 2.2. Distinguishing Critical and Noncritical Tasks and Work Behaviors.**

| | | Amount of Time Spent | | | | |
|---|---|---|---|---|---|---|
| | | Much More Time – 5 | More Time – 4 | About the Same – 3 | Less Time – 2 | Much Less Time – 1 |
| Importance | Critical – 4 | **20** | **16** | **12** | **8** | 4 |
| | Very Important – 3 | **15** | **12** | **9** | **6** | 3 |
| | Moderately Important – 2 | **10** | **8** | **6** | 4 | 2 |
| | Somewhat Important – 1 | 5 | 4 | 3 | 2 | 1 |
| | Of No Importance – 0 | 0 | 0 | 0 | 0 | 0 |

*Note:* Tasks or work behaviors with salience indices ≥ 6 are designated critical.

***Step Four. Complete Analyses of Job Similarity and Document Study Results***

*Overview.* This effort entails examination and analysis of job similarity data, the weighing of evidence regarding an inference of transported validation evidence, and documentation of the study results.

*Details.* The following should be accomplished:

A. Many indices are available for comparing two arrays of task data. A practitioner must consider the nature of the dataset and make decisions regarding the best methods for examining differences. A list of job similarity indices is presented at the end of this section.

B. Weigh the evidence of the analyses. The result of quantitative comparisons between two task arrays is the starting point for a decision regarding job similarity. One must closely examine the data and pinpoint specific tasks or work behaviors for which differences exist between the source and target jobs. The most important similarities are those regarding aspects of the job that involve the testable constructs in question. Any deviations in job similarity in terms of complexity of testable abilities are especially troublesome and should be given proper deference. Their existence may indicate that an inference of transportability is not appropriate, despite the results of statistical comparisons.

C. Document the results in a technical report. After any validation effort, the study steps and results should be described in a final technical report.

*Outcomes.* When assessing job similarity, a practitioner should be intimate with the job analysis results. Any deviations in job tasks should be identified and understood. After carefully weighing the evidence, a decision should be made regarding the appropriateness of the use of the test or test battery at the target location. A final technical report should contain the study steps and results to comply with all relevant legal and professional guidelines.

*Issues and Commentary.* The decision on whether or not a target job is "substantially similar" to a source job is a multifaceted verdict. The job similarity indices presented in this section provide initial indicators of the overall correspondence between the tasks performed on two jobs. Further investigation beyond this global evaluation is necessary any time two jobs are compared. Other matters must be considered: most saliently, those issues that involve the level of the testable constructs required at the time of entry into the jobs. A practitioner must not lose sight of the purpose and nature of a testing program and its likely effects on applicants. For example, if the job similarity index indicates a strong relationship between the jobs, but differences are found in a group of tasks that involve automation of a complex function, the possible result could be that an ability test appropriate for the source job is inappropriate for the target job.

The practitioner must employ a combination of quantitative and qualitative judgment to arrive at a final decision regarding job

similarity. A responsible choice to borrow validity evidence will require a thorough understanding of the target job and the source job and the nature of any differences in job requirements. Relying solely on the result of a quantitative comparison of tasks or work behaviors is inadvisable because it may be insensitive to important differences or similarities in KSAO importance and thus result in erroneous conclusions.

*Situation Scenario Update.* The data obtained from the JAQ are summarized in Table 2.3, along with computed task salience indices and identified critical tasks. The SMEs all responded to the summary question by marking "6," indicating that their job was adequately described by the task list.

The planned analyses entailed identification of critical work behaviors and critical tasks based on analysis of salience indices as previously described. Perusal of the data indicated some modest differences, but also that the two jobs share most critical tasks and all but one critical work behavior.

One method of quantifying the degree of job similarity involves examining the overlap of critical tasks or work behaviors. There are several overlap indices that might be used (some are listed at the end of this section). One is based on the following formula:

$$SI = \frac{N_C}{\sqrt{N_S * N_T}}$$

where $N_S$ and $N_T$ are the number of critical tasks for the source and target jobs, respectively, and $NC$ is the number of critical tasks common to both jobs. A Similarity Index greater than 0.5 indicates that the two jobs are more alike than different in critical tasks. Choosing a threshold based on this index for designating jobs as substantially similar involves judgment, but the authors generally look for values greater than 0.75.

For the JAQ data summarized earlier, the similarity index yields a value of 0.94 for critical tasks and 0.91 for critical work behaviors, indicating the jobs are substantially similar and that an inference of job similarity is, at least initially, supportable. However, further examination of the job tasks is warranted to identify the nature of any dissimilarities.

**Table 2.3. Source Job and Target Job Analysis Results.**

| | Source Job | | | | Target Job | | | |
|---|---|---|---|---|---|---|---|---|
| Work Behavior or Task | Average Time Spent | Average Importance | Salience | Average Critical? | Average Time Spent | Importance | Salience | Critical? |
| Installs Equipment | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.0 | 9 | √ |
| Task 1 | 3.0 | 4.0 | 12 | √ | 3.0 | 4.0 | 12 | √ |
| Task 2 | 1.0 | 3.0 | 3 | | 1.0 | 2.5 | 2.5 | |
| Task 3 | 3.0 | 4.0 | 12 | √ | 3.0 | 4.0 | 12 | √ |
| Task 4 | 3.0 | 4.0 | 12 | √ | 3.0 | 4.0 | 12 | √ |
| Task 5 | 1.5 | 4.0 | 6 | √ | 2.0 | 3.5 | 7 | √ |
| Task 6 | 4.0 | 4.0 | 16 | √ | 4.0 | 4.0 | 16 | √ |
| Task 7 | 4.0 | 4.0 | 16 | √ | 4.0 | 4.0 | 16 | √ |
| Task 8 | 1.0 | 2.0 | 2 | | 0.0 | 0.0 | 0 | |
| Task 9 | 3.0 | 4.0 | 12 | √ | 3.0 | 3.5 | 10.5 | √ |
| Task 10 | 4.0 | 4.0 | 16 | √ | 4.0 | 4.0 | 16 | √ |
| Inspects or Maintains Equipment | 3.0 | 4.0 | 12 | √ | 3.0 | 3.5 | 10.5 | √ |
| Task 11 | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.0 | 9 | √ |
| Task 12 | 3.0 | 4.0 | 12 | √ | 3.0 | 3.0 | 9 | √ |

## Table 2.3. Source Job and Target Job Analysis Results.

| | Source Job | | | | Target Job | | | |
|---|---|---|---|---|---|---|---|---|
| Work Behavior or Task | Average Time Spent | Average Importance | Salience | Average Critical? | Average Time Spent | Importance | Salience | Critical? |
| Task 13 | 3.0 | 4.0 | 12 | √ | 3.0 | 3.0 | 9 | √ |
| Task 14 | 3.0 | 4.0 | 12 | √ | 3.0 | 3.0 | 9 | √ |
| Task 15 | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.5 | 10.5 | √ |
| Task 16 | 3.0 | 3.5 | 10.5 | √ | 0.0 | 0.0 | 0 | |
| Task 17 | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.0 | 9 | √ |
| Task 18 | 3.0 | 3.0 | 9 | √ | 3.0 | 3.0 | 9 | √ |
| Task 19 | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.0 | 9 | √ |
| Task 20 | 3.0 | 4.0 | 12 | √ | 3.0 | 3.5 | 10.5 | √ |
| Task 21 | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.5 | 10.5 | √ |
| Task 22 | 3.0 | 4.0 | 12 | √ | 3.0 | 4.0 | 12 | √ |
| Task 23 | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.0 | 9 | √ |
| Task 24 | 3.0 | 3.0 | 9 | √ | 3.0 | 3.0 | 9 | √ |
| Task 25 | 3.0 | 4.0 | 12 | √ | 3.0 | 3.5 | 10.5 | √ |
| Task 26 | 3.0 | 4.0 | 12 | √ | 3.0 | 4.0 | 12 | √ |
| Repairs Equipment | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.0 | 9 | √ |
| Task 27 | 3.0 | 4.0 | 12 | √ | 3.0 | 3.5 | 10.5 | √ |
| Task 28 | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.5 | 10.5 | √ |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Task 29 | 3.0 | 4.0 | 12 | √ | 3.0 | 3.0 | 9 | √ |
| Task 30 | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.0 | 9 | √ |
| Task 31 | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.5 | 10.5 | √ |
| Task 32 | 3.0 | 3.5 | 10.5 | √ | 3.0 | 3.5 | 10.5 | √ |
| Task 33 | 3.0 | 4.0 | 12 | √ | 3.0 | 4.0 | 12 | √ |
| Trains Workers | 3.0 | 3.5 | 10.5 | √ | 1.0 | 3.0 | 3 | |
| Task 34 | 2.5 | 3.5 | 8.75 | √ | 1.0 | 3.0 | 3 | |
| Task 35 | 3.0 | 4.0 | 12 | √ | 1.5 | 3.0 | 4.5 | |
| Task 36 | 2.5 | 3.5 | 8.75 | √ | 1.0 | 2.5 | 2.5 | |
| Task 37 | 3.0 | 4.0 | 12 | √ | 1.0 | 3.0 | 3 | |
| Maintains Records | 3.0 | 4.0 | 12 | √ | 3.0 | 3.5 | 10.5 | √ |
| Task 38 | 3.0 | 4.0 | 12 | √ | 3.0 | 3.0 | 9 | √ |
| Task 39 | 3.0 | 4.0 | 12 | √ | 3.0 | 4.0 | 12 | √ |
| Task 40 | 3.0 | 4.0 | 12 | √ | 3.0 | 3.5 | 10.5 | √ |
| Cleans Work Area | 3.0 | 3.0 | 9 | √ | 3.0 | 3.0 | 9 | √ |
| Task 41 | 3.0 | 3.0 | 9 | √ | 3.0 | 3.0 | 9 | √ |
| Task 42 | 3.0 | 3.0 | 9 | √ | 3.0 | 3.0 | 9 | √ |
| Task 43 | 3.0 | 3.0 | 9 | √ | 3.0 | 3.0 | 9 | √ |
| Task 44 | 3.0 | 2.5 | 7.5 | √ | 3.0 | 2.5 | 7.5 | √ |
| Task 45 | 3.0 | 3.0 | 9 | √ | 3.0 | 2.5 | 7.5 | √ |

Case 1:10-cv-06950-AT-RWL Document 125



Task #16, "Tests vibration using a vibration analyzer," was a critical task for the source job, but was not performed at all in the target job. Further investigation revealed that this task is trained well after the time of hire and is not especially complex, so it would not affect the level of ability required for the source job.

Tasks #34 through #37, all relating to the work behavior "Trains Workers," met the criticality threshold in the source job; although each was performed in the target job, none was designated critical. The overall work behavior of "Trains Workers" also indicated that it is performed, but it is not a very important aspect of the target job. Follow-up discussion with plant personnel revealed a somewhat different approach to worker training between the source and target plants, and this in turn was reflected in the JAQ data. Since the plant personnel in both plants engage in some training, preliminary discussions of the source and target jobs did not reveal this modest difference in job structure.

The job differences in tasks comprised by the work behavior "Trains Workers" reflects the only important difference identified between the source and target jobs. Consideration of the complexity and cognitive skills required for the shared tasks comprising the other work behaviors led to a conclusion that the differences in training tasks did not undermine an inference of transportability. These considerations also led to the conclusion that a summary of job similarity based on the task-level data would meaningfully reflect the similarity of jobs for purposes of judging transportability.

This scenario was purposefully simplistic for the purpose of illustrating the process of a transportability project, although the authors did attempt to present realistic decision points and issues for consideration, many based on previous experiences. The decision to borrow validity evidence is frequently not as straightforward as it may initially seem. Our goal was to present a practical approach that could prove useful for a practitioner who is seeking to use this validation strategy.

## Job Similarity Indices

A quantitative examination of job analysis ratings forms an important basis for a job similarity argument. The following are examples of some indices of job similarity that have proven useful to the authors in the past. Although these indices may allow a practitioner

to compare arrays of task, work behavior, or KSAO data, the judgment of the level of similarity that is required as a threshold of establishing job similarity should be a function of both a qualitative as well as these quantitative analyses.

A. Pearson Product Moment correlation. A correlation between two arrays of job analysis data can provide an indicator of the strength of the relationship between the two jobs. The result of this analysis will provide a global evaluation of the relationship. The data should be further examined to pinpoint the nature of differences in the SME job analysis ratings.

B. Critical Task Overlap (Fleishman & Quaintance, 1984). Computing the critical task overlap between two different task lists provides an indication of the level of similarity among those tasks that are important to each job. This index does not take into consideration the overlap or lack thereof for tasks deemed as not important to the job. Also, the practitioner must identify an appropriate threshold for criticality.

$$S = \frac{n_s}{n_d + n_s}$$

where

$S$ = Proportion of overlap of critical tasks

$n_s$ = Number of important tasks common to both source and target jobs (tasks are the *s*ame)

$n_d$ = Number of important tasks that are important to one job but not the other job (tasks are *d*ifferent)

C. Squared Euclidean Distance (Aldenderfer & Blashfield, 1984). Distance statistics are useful indications of the amount of deviation by task from the target job. This type of statistic is especially useful for examining the distance between a job and aggregate job family ratings. A useful decision rule is to assign the target into the job family if it is not farther from the centroid than the farthest job already in the job family.

$$D^2 = \Sigma\ (X - X)^2$$

where

$D^2$ = Squared Euclidean distance between measures

$X$ = Task rating index

## Constraints and Risks

Transportability can provide a cost-effective method for establishing validity and legal defensibility by formally leveraging validation research conducted in other settings. There are a number of challenges and limitations to the method, however, that can impact its feasibility or usefulness in any given situation.

Primary among these is the need for an adequate source study and an appropriate method for establishing job similarity. Insufficient planning often results in inadequate job analysis information to support a comparison of jobs, thereby prohibiting a transportability approach. Often, where adequate studies do exist, stakeholder interests are divided, and source study owners do not have sufficient incentive to overcome the perceived risk of sharing the source study data. Where incentives are aligned, such as in the test publishing industry, publishers may still narrowly restrict critical information that companies or consultants desire due to proprietary interests. When source studies are offered without adequate details to enable a thorough understanding of their technical features, some companies and consultants may decline to use them. Further, for a variety of reasons, some companies and consultants prefer to conduct local empirical validation research to support and inform their test use. With relatively modest attention given transportability in the *Uniform Guidelines*, and few court cases examining their use, some attorneys involved in compliance are less familiar with and therefore wary of transportability approaches. All of these pragmatic obstacles serve to limit transportability research.

Other challenges and limitations relate to job analyses needed to establish job similarity. Unfortunately, job analysis is a complex endeavor that requires professional judgment and is necessarily somewhat subjective. There is no standard job analysis method for establishing job similarity, nor is there a standard index of comparison or an agreed-upon threshold required to affirm similarity among jobs. With so many decision points requiring professional judgment, the opportunity for challenge or dispute among interested parties may be substantial.

Work behaviors and tasks as written often vary in their levels of specificity and detail. The level of both will influence job analysis data and the results of any comparison among jobs. Whether work-

ing at a general level of work behaviors or a specific level of tasks, the amount of detail included in them will influence their meaning and, consequently, JAQ data obtained based on them. In general, if less detail is provided in a behavioral description, that description becomes easier to endorse. This point is illustrated as follows, using examples in the sample study from the previous section. Each successive level shown provides less detail and as a result each becomes somewhat easier to endorse. This is true for both work behaviors and tasks.

## Work Behavior #1

Level 1: Installs equipment (pumps, turbines, compressors, motors, gearboxes, rolls, valves, and so on) in accordance with accepted safety standards as well as layout plans, blueprints, or other drawings in order to generate power and maintain plant operations.
Level 2: Installs equipment in accordance with accepted safety standards as well as layout plans, blueprints, or other drawings in order to generate power and maintain plant operations.
Level 3: Installs equipment in accordance with accepted safety standards as well as layout plans, blueprints, or other drawings.
Level 4: Installs equipment in accordance with plans.
Level 5: Installs equipment.

## Task #4

Level 1: Moves materials and equipment using cherry picker, mobile cranes, fork lifts, boom trucks, electric hoists, cables, nylon slings, come-alongs, and the like.
Level 2: Moves materials and equipment.

The examples just presented illustrate how the choice of taxonomic level and detail may influence job analysis data, making conclusions of similarity or dissimilarity more likely. Sound professional judgment is required throughout the job analysis process to ensure that a conclusion of job similarity and transported validity is supportable and appropriate. An incorrect affirmative inference of validity will occur when undetected differences in tasks or work behaviors diminish the importance of the target KSAOs to performance of the job. This concern is true of detected differences in

tasks as well. Recalling the sample study from the previous section, there was no threat to an inference of transported validity for an ability test battery due to the differences between jobs in training tasks. The training tasks were not particularly complex, whereas most remaining shared tasks were. Hence the millwright job at the plywood plant was comparable in complexity to the source job, requiring mechanical and reasoning abilities for much of it. The jobs shared most critical tasks, and this overlap permitted an affirmative inference of transported validity supported both by the study documentation (for compliance purposes) and by sound professional judgment.

It is interesting to note, however, that confidence in a conclusion of substantial similarity and transported validity for tests of other KSAOs might have been lower. For example, if the test battery to be transported had included a test related to trainer style or interpersonal skill, the identified task differences would threaten an inference of validity. Perusal of the task list reveals no other tasks involving training or even interaction with other workers. Although the task differences between jobs were modest, they happened to influence dramatically the difference in importance of other KSAOs. It is important to remember that this example is contrived; there was no validated test of interpersonal skill in the source study, probably because it was associated with a small portion of the source job. Nevertheless, the example is useful because it illustrates that a focus on tasks and work behaviors can be insensitive to differences in KSAO importance to the respective jobs. For measures of KSAOs that are ubiquitous in job performance, there is little concern that modest or even substantial differences in tasks will result in diminished importance of a ubiquitous KSAO. Because it is ubiquitous, the KSAO will be required for many remaining shared tasks, and possibly for tasks novel to the target job. In this regard, a transportability approach that follows *Uniform Guidelines* requirements focused on similarity in work behaviors is "forgiving"; it is unlikely to result in an incorrect affirmative inference of transported validity for tests of ubiquitous KSAOs.

This reasoning is consistent with the results of meta-analysis and validity generalization research, and research examining moderators of ability test validity (Ackerman & Humphreys, 1990; Callender & Osburn, 1980; Hartigan & Wigdor, 1989; Hunter & Hunter, 1984; Schmidt & Hunter, 1998; Schmidt, Hunter, & Pearl-

man, 1981). This research suggests that for tests of ability, most observed variability in validity is attributable to statistical artifacts and not to situational variables that differ from one setting to another. Further, where variability in true validity exists, it is associated with differences in job complexity and not with modest or even substantial differences in tasks. Thus, it is the importance of the measured KSAO to overall job performance, and not the specific tasks performed, that is important to a proper inference of validity.

Despite complexities in job analysis, perusal of developed case law indicates that courts will accept, as an adequate defense of Title VII claims, a well-documented transportability study that includes an adequate source study and a reasonable showing of substantial job similarity. Although the *Uniform Guidelines* language focuses on transportability on the basis of job similarity in work behaviors and not in abilities, language in the *Albemarle* decision appeared to have invited the latter, and in *Bernard*, the court accepted it. In *Pegues*, the court did not rule on transportability per se, but it did demonstrate a court's willingness to embrace findings widely held in the profession that are discordant with language in the *Uniform Guidelines*. Taken together these cases suggest that practitioners should view transportability as a viable option for test validation; although an approach based on work behaviors may be less vulnerable to challenge, the courts may permit strategies that are not specifically sanctioned by *Uniform Guidelines* language. Whether the courts will move to accept validity generalization strategies and render transportability efforts obsolete cannot be known at this time.

Our advice to practitioners conducting transportability studies is to approach the endeavors with as much rigor as possible and to provide a clear chain of evidence linking the source study and target job. Risk of litigation and risks to effective selection will be minimized if an inference of transported validity is supported by both the study documentation and by sound professional judgment.

## References

Ackerman, P. J., & Humphreys, L. G. (1990). Individual differences theory in industrial and organizational psychology. In M. D. Dunnette & L. M. Hough (Eds.), *Handbook of industrial and organizational psychology* (2nd ed., Vol. 1, pp. 223–282). Palo Alto, CA: Consulting Psychologists Press.

*Albemarle Paper Company et al. v. Moody*, 422 U.S. 405 (1975).

Case 1:10-cv-06950-AT-RWL Document 125



Aldenderfer, M. S., & Blashfield, R. K. (1984). *Cluster analysis.* Thousand Oaks, CA: Sage.

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (1999). *Standards for educational and psychological testing.* Washington, DC: American Educational Research Association.

Arvey, R. D., Maxwell, S. E., & Mossholder, K. M. (1979). Even more ideas about methodologies for determining job differences and similarities. *Personnel Psychology, 32,* 529–538.

Arvey, R. D., & Mossholder, K. M. (1977). A proper methodology for determining similarities and differences among jobs. *Personnel Psychology, 30,* 363–374.

*Bernard v. Gulf Oil Corporation,* 643 F. Supp. 1494 (E.D.TX 1986).

*Bernard v. Gulf Oil Corporation,* 890 F.2d 735 (5th Cir. 1989).

Brannick, M. T. (2001). Implications of empirical Bayes meta-analysis for test validation. *Journal of Applied Psychology, 86,* 468–480.

Callender, J. C., & Osburn, H. G. (1980). Development and testing of a new model of validity generalization. *Journal of Applied Psychology, 65,* 543–558.

*Dickerson v. U.S. Steel Corp.,* 472 F. Supp. 1304 (1978).

Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor, & Department of Justice. (1978). *Uniform guidelines on employee selection procedures. Federal Register, 43*(166), 38290–38315.

Fleishman, E. A., & Quaintance, M. K. (1984). *Taxonomies of human performance.* Orlando: Academic Press.

*Friend v. Leidinger,* 446 F. Supp. 361 (E.D. VA 1977).

*Friend v. Leidinger,* 588 F.2d 61 (4th Cir.) (1978).

Guion, R. M. (1998). *Assessment, measurement, and prediction for personnel decisions.* Mahwah, NJ: Erlbaum.

Hanser, L. M., Mendel, R. M., & Wolins, L. (1979). Three flies in the ointment: A reply to Arvey and Mossholder. *Personnel Psychology, 32,* 511–516.

Hartigan, J. A., & Wigdor, A. K. (Eds.) (1989). *Fairness in employment testing.* Washington, DC: National Academy Press.

Hoffman, C. C. (1999). Generalizing physical ability test validity: A case study using transportability, validity generalization, and construct validation evidence. *Personnel Psychology, 52,* 1019–1041.

Hoffman, C. C., Holden, L. M., & Gale, K. (2000). So many jobs, so little "N": Applying expanded validation models to support generalization of cognitive test validity. *Personnel Psychology, 53,* 955–991.

Hoffman, C. C., & McPhail, S. M. (1998). Exploring options for supporting test use in situations precluding local validation. *Personnel Psychology, 50*, 987–1003.

Hunter, J. E., & Hunter, R. F. (1984). Validity and utility of alternative predictors of job performance. *Psychological Bulletin, 96*, 72–88.

Johnson, M., & Jolly, J. (2000). Extending test validation results from one plant location to another: Application of transportability evidence. *The Journal of Behavioral and Applied Management, 1*(1), 127.

Lee, J. A., & Mendoza, J. L. (1981). A comparison of techniques which test for job differences. *Personnel Psychology, 34*, 731–748.

Lissitz, R. W., Mendoza, J. L., Huberty, C. J., & Markos, H. V. (1979). Some further ideas on a methodology for determining job similarities/differences. *Personnel Psychology, 32*, 517–528.

McIntyre, R. M., & Farr, J. L. (1979). A comment on Arvey and Mossholder's "A proposed methodology for determining similarities and differences among jobs." *Personnel Psychology, 32*, 507–510.

Mobley, W. H., & Ramsay, R. S. (1973). Hierarchical clustering on the basis of inter-job similarity as a tool in validity generalization. *Personnel Psychology, 26*, 213–225.

*Pegues et al. v. Mississippi State Employment Service*, 488 F. Supp. 239 (N.D. Miss. 1980), 699 F. 2d 760 (5th Cir.) 464 U.S. 991 (1983).

Rafilson, F. M., Allscheid, S. P., and Weiss, J. G., (1994). Transportability of validity of the National Police Officer selection test for a large eastern metropolitan police department. *Psychological Reports, 75*, 707–718.

Sackett, P. R., Cornelius, E. T., & Carron, T. J. (1981). A comparison of global judgment versus task oriented approaches to job classification. *Personnel Psychology, 34*, 791–804.

Schmidt, F. L. & Hunter, J. E. (1998). The validity and utility of selection methods in personnel psychology: Practical and theoretical implications of 85 years of research findings. *Psychological Bulletin, 124*, 262–274.

Schmidt, F. L., Hunter, J. E., & Pearlman, K. (1981). Task differences as moderators of aptitude test validity in selection: A red herring. *Journal of Applied Psychology, 66*, 166–185.

Society for Industrial and Organizational Psychology. (2003). *Principles for the validation and use of personnel selection procedures* (4th ed.). Bowling Green, OH: Society for Industrial and Organizational Psychology.

Tippins, N. T., McPhail, S. M., Hoffman, C. C., & Gibson, W. M. (1999, April). Transporting validity in the real world. Continuing Education Workshop presented at the 14th Annual Conference of the Society of Industrial/Organizational Psychology, Atlanta, GA.

*Vanguard Justice Society v. Hughes*, 471 F. Supp 670 (D. MD 1979).