# Exhibit 43

Chester Hanvey

# Wage and Hour Law

## Guide to Methods and Analysis

Springer

# Wage and Hour Law

chanvey@thinkbrg.com

Chester Hanvey

# Wage and Hour Law

## Guide to Methods and Analysis

Springer

chanvey@thinkbrg.com

Chester Hanvey
Berkeley Research Group, LLC
Emeryville, CA, USA

ISBN 978-3-319-74611-1 ISBN 978-3-319-74612-8 (eBook)
https://doi.org/10.1007/978-3-319-74612-8

Library of Congress Control Number: 2018935252

© Springer International Publishing AG, part of Springer Nature 2018, corrected publication 2018
This work is subject to copyright. All rights are reserved by the Publisher, whether the whole or part of the material is concerned, specifically the rights of translation, reprinting, reuse of illustrations, recitation, broadcasting, reproduction on microfilms or in any other physical way, and transmission or information storage and retrieval, electronic adaptation, computer software, or by similar or dissimilar methodology now known or hereafter developed.
The use of general descriptive names, registered names, trademarks, service marks, etc. in this publication does not imply, even in the absence of a specific statement, that such names are exempt from the relevant protective laws and regulations and therefore free for general use.
The publisher, the authors and the editors are safe to assume that the advice and information in this book are believed to be true and accurate at the date of publication. Neither the publisher nor the authors or the editors give a warranty, express or implied, with respect to the material contained herein or for any errors or omissions that may have been made. The publisher remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

Printed on acid-free paper

This Springer imprint is published by the registered company Springer International Publishing AG part of Springer Nature.
The registered company address is: Gewerbestrasse 11, 6330 Cham, Switzerland

chanvey@thinkbrg.com

# Chapter 8
# Sampling and Statistics

**Chester Hanvey**

In this chapter, I address several issues related to statistical sampling and statistical analysis when used as evidence in wage and hour litigation. Though these concepts are involved to some degree in studies that proactively evaluate compliance, they typically become significantly higher stakes when used in litigation. Sampling and statistical analysis are commonly used in a variety of legal contexts including antitrust, employment discrimination, toxic torts, and voting rights cases.[1] Properly designed and executed statistical analysis is generally considered admissible in litigation under the Federal Rules of Evidence as most sampling and analysis methods meet the "scientific knowledge" requirement in *Daubert v. Merrell Dow Pharmaceuticals*,[2] a case which guides the admissibility of expert evidence in litigation.

This chapter focusses on aspects of sampling and statistical analysis that are most frequently applied to address wage and hour disputes. This typically includes descriptive statistics to summarize data collected from a sample or estimates of population characteristics ("parameters") based on data from a sample. Though these types of analyses are conceptually simple, disputes over sampling and statistical analysis are common and often play a major role in a court's decisions to certify a class or determine liability. Disputes tend to be unrelated to the accuracy of the calculations but rather the reliability of the underlying data, the representativeness of the sample from which the data were collected, or the proper interpretation of statistical analysis results. I discuss each of these issues in the following sections.

The original version of this chapter was revised. A correction to this chapter can be found at https://doi.org/10.1007/978-3-319-74612-8_10

[1] *see, generally,* Gastwirth (2000), DeGroot et al. (1986), and Fienberg (1989).

[2] Kaye and Freedman (2011).

© Springer International Publishing AG, part of Springer Nature 2018

C. Hanvey, *Wage and Hour Law*, https://doi.org/10.1007/978-3-319-74612-8_8

chanvey@thinkbrg.com

**Table 8.1** Research questions applicable to each stage of the lawsuit

| Stage | Key legal question[a] | Examples of research questions |
|---|---|---|
| Class certification | Are the claims of the putative class members similar enough to be resolved on a class-wide basis? | • What proportion of putative class members were misclassified as exempt?<br>• To what degree do class members vary on the percent of time spent performing exempt tasks?<br>• What proportion of class members worked off the clock?<br>• To what degree do class members vary on the frequency of non-compliant meal breaks?<br>• To what degree does the company exert similar control over independent contractors? |
| Merits/liability | Did the defendant violate a wage and hour law? | • Were class members misclassified as exempt?<br>• Were class members misclassified as independent contractors?<br>• Did class members receive compliant meal breaks?<br>• Did class members work off the clock? |
| Damages | What amount of monetary recovery will fairly compensate class members? | • What amount of wages did employees lose as a result of being misclassified as exempt?<br>• What amount of wages did employees lose as a result of being misclassified as independent contractors?<br>• What penalties are employees owed for not receiving compliant meal breaks?<br>• What amount of wages did employees lose by working off the clock? |

[a]There are numerous legal questions at each stage. This table provides examples of legal questions that are typically addressed by experts

## 8.1 Stages of a Class Action Lawsuit

Most wage and hour lawsuits are brought as class or collective action.[3] A wage and hour class action typically proceeds through three broad phases: class certification, liability/merits, and damages. The legal questions at each stage differ in meaningful ways, and accordingly, the data and analyses required to answer these questions often differ. Examples of research questions at each phase are included in Table 8.1

At the class certification stage, the goal of the analyses is to characterize the degree of variability between putative class members to allow the court to determine whether the claims of class members can be resolved on a class-wide basis. If the

[3]For simplicity, the term "class action" is used for the remainder of this chapter to refer to both types of multi-plaintiff actions. See Chap. 1 for more detail.

chanvey@thinkbrg.com

class is certified, the next question becomes whether the defendant violated the law (i.e., liability/merits). The analyses at this stage are less focused on differences between class members and more focused on describing the work experiences of class members generally as its already been determined that their claims are similar. If the court finds in favor of plaintiffs on liability/merits (i.e., defendant violated the law), the third phase is to quantify the "damages" class members suffered as a result of the violations. This may include unpaid wages, unpaid overtime, meal break penalties, interest or a variety of other state-specific penalties such as inaccurate wage statement penalties, or penalties for failing to provide all wages at the time of termination for former employees.

## 8.2 Sampling

Nearly all data collection exercises to evaluate wage and hour compliance involve some form of sampling. The ultimate goal of data collection is typically to provide the court useful information about legally relevant factors (e.g., average amount of off the clock work per workweek) for members of the class or proposed class. However, collecting data from all class members or putative class members, called a "census," is rarely feasible[4] as a class may include up to tens of thousands of employees. Aside from being time and cost prohibitive, many class members may be unavailable or unwilling to participate in a study or otherwise provide data. Most classes also include a mix of former and current employees who may be unable or unwilling to participate in a study for a variety of reasons. For example, former employees cannot be observed on the job and may be difficult to locate for participation using other methods (e.g., self-report).

Therefore, a sampling approach is usually required. Sampling refers to a process of selecting elements (e.g., employees) from a population (e.g., all class members) in a way that allows an accurate description of some aspect of the population.[5] There are a variety of textbooks that provide a discussion of the many issues involved in sampling.[6] In this chapter, I will discuss the aspects that are frequently disputed in wage and hour litigation.

### *8.2.1 Population and Sampling Frame*

Two important concepts in sampling are the population and the sampling frame. The population consists of all "elements" whose characteristics the sample is intended to represent.[7] The sampling frame is the group from which the sample is selected.

---

[4] Kaye and Freedman (2011).

[5] *See* Diamond (2011); Babbie (1990).

[6] *See, e.g.*, Thompson (2012).

[7] Diamond (2011).

chanvey@thinkbrg.com

Ideally, the population and sampling frame would be identical, but imperfect overlap between the two groups occurs in many cases. Typically, the population consists of all class members or putative class members, which is defined by plaintiffs filing the lawsuit. This is not always clearly defined, so to the extent possible, the researcher needs to understand who is included within the class in order to determine the appropriate representation in the sample. In addition, the time period of the lawsuit should also be defined because it impacts which, if any, former employees are included.

In many situations, all class members cannot be included in the sampling frame, making reasonable compromises necessary.[8] For example, certain members of the class may be inaccessible and therefore cannot be included in the study.[9] In other instances, it is prudent to collect data only from current employees (e.g., observational study), even if former employees are included on the class. Consistent with job analysis practice, data should be collected from persons who are most knowledgeable about the job and best situated to provide accurate job data (see Chap. 2). Because of potential problems with former employee data, such as memory decay and motivated distortion, it often makes sense to collect data from current employees. In this circumstance, it may be necessary to define the sampling frame as all current employees in the job title. The impact of this decision is that the sample is representative of current employees, and results are relevant to former employees because they were current employers in the same position at some point during the class period. Unless significant changes to the job have occurred during the class period, former employees are likely to have performed the job in a manner similar to those currently in the job.[10] Therefore, current employees usually provide the best estimates of work performed for former employees during a time when they were also employees in the job title.

### *8.2.2 Sampling Strategies*

The ultimate goal in sample selection is typically to obtain a sample that is "representative" of the population. Data collected from a representative sample is desirable because sample data can be used to make useful estimates of population characteristics.[11] Representative samples also provide "unbiased" estimates of population parameters, meaning that the results will not systematically over- or underestimate population parameters. Although data from a representative sample may produce a value (e.g., percent of time performing exempt tasks) that is higher or

[8] Diamond (2011).

[9] Diamond (2011).

[10] This does not mean that former and current employees are similar for purposes of addressing class certification decisions. It means that the pattern of variability within current employees is likely similar to what would be found for former employees.

[11] *See* Diamond (2011); Kaye and Freedman (2011); Babbie (1990).

chanvey@thinkbrg.com

lower than the corresponding population value, the expected sample value is equal to the population value, and results from the sample will not be systematically biased in either direction.

The manner in which the sample is selected is often closely scrutinized in wage and hour litigation, and substantial thought and care is devoted to the sample selection process. The accuracy of the information collected from a sample depends not only on how the data were collected but on how the sample was selected.[12] There are two broad categories of sampling strategies: probability sampling and non-probability sampling. Non-probability sampling is subject to a variety of sampling biases and is less common in wage and hour litigation.[13] Probability sampling is the preferred method in most situations because it offers two important advantages.[14] First, probability samples generally result in a sample that is more representative because this approach avoids many of the biases associated with some non-probability methods. Second, probability sampling allows a researcher to use probability theory to quantify the degree of uncertainly in estimates of population parameters. This is particularly important when the results are used in litigation because the degree of uncertainty in the estimate may determine whether a study is admissible.

When using a probability sampling technique, each element within the sampling frame has a known, nonzero probability of being included in the sample.[15] Random selection is a key component in probability sampling and is typically accomplished by assigning a random number to each element,[16] sorting by the random number, and selecting those at the top of the list. There are multiple forms of probability samples that range in complexity from simple random samples to complex multi-stage sampling designs.[17] In a simple random sample, for example, all elements in the sampling frame have an identical probability of being selected.[18] For example, if the population consists of 100 employees and a sample of 30 is selected, each population member will have an identical 30% probability of being selected.

A simple random sampling procedure ensures that, within the limits of chance, a sample will be representative of the population from which it was drawn. However, this procedure does not guarantee that any one sample will be representative. Due to chance (i.e., sampling error), some samples will over-select certain features and

---

[12] Kaye and Freedman (2011).

[13] *See* Thompson (2012) for further discussion of non-probability samples.

[14] *See* Babbie (1990).

[15] Diamond (2011). It is common in job analysis to exclude employees from the sample if they have not been the position for a period of time long enough to learn the job fully or who are known to not be performing the job adequately (e.g., undergoing disciplinary action).

[16] Random number generators are available in most statistical analysis software, including Microsoft Excel.

[17] Diamond (2011).

[18] Kaye and Freedman (2011).

chanvey@thinkbrg.com

under-select others.[19] A common method to minimize this form of sampling error is to use a stratified random sampling procedure. This approach involves identifying key characteristics of the population that may impact the results, dividing the population into mutually exclusive groups ("strata") based on these characteristics, and randomly selecting samples from within these strata.[20] For example, assume that we want to estimate the average height of all students at a high school based on a sample of 200 students. Fifty percent of students at the school are female and 50% are male. If we select a simple random sample, it's possible that, due to chance, we will get a sample with more females than males (or vice versa). Because females are shorter than males on average, the sample is likely to underestimate the height of the entire population. In a stratified random sampling approach, we would split the population into two subpopulations (females and males) and randomly select a sample from within those groups. In this example, we would ensure that the sample consists of 50% females and 50% males to match the population by randomly sampling 100 females and 100 males.

In wage and hour cases and job analysis, stratified random sampling procedures are used to ensure that certain employee characteristics that may impact the study results are appropriately represented in the sample. Depending on the issue being studied, this may include factors such as job title, employment status (i.e., active or terminated), location type, location sales volume, or tenure in position. Factors included in the sampling plan differ by organization and can be identified during the preliminary phase of the project.

### *8.2.3 Representativeness*

As described in the previous section, the term "representative" has a specific meaning within the scientific community. However, the same term sometimes has a slightly different meaning when used within the court system. For example, procedures designed to collect "representative testimony" are often proposed by plaintiffs in support of their position to certify a class. This approach is so common that simply using the term "representative" in the context of sampling is sometimes interpreted to be supportive of class certification. Defense attorneys may try to avoid using the term, and plaintiffs' attorneys may argue that any use of the term by defense experts supports certification of a class.

This perspective seems to be based on differences in the use of the term across disciplines. Within the court system, representative testimony is used in Fair Labor Standards Act (FLSA) cases to increase efficiency of the judicial process by eliminating redundant testimony from plaintiffs with similar circumstances.[21]

---

[19] Larger samples and samples from homogeneous populations are less susceptible to sampling error (Kaye & Freedman, 2011; Babbie, 1990).

[20] Diamond (2011); Babbie (1990).

[21] Finberg and Thoreen (2007).

chanvey@thinkbrg.com

The inherent assumption in this approach is that there is similarity between class members who share certain characteristics. Thus, the testimony from one class member can be used to "represent" other class members who would have provided similar testimony. No such assumption is made by a social scientist who selects a representative sample. Whether class members have similar work experiences is an empirical question that can be answered based on the data that are collected. The choice of sampling method should not be interpreted to mean that the researcher is acknowledging any degree of similarity between putative class members, only that the resulting sample will not over- or under-select certain types of putative class members.

### *8.2.4 Sample Size*

How big should the sample be? More often than not, this is one of the first questions asked when preparing a sampling plan.[22] However, as Kaye and Freedman (2011) put it, "there is no easy answer to this sensible question." Generally speaking, "more is better" because, all else being equal, increasing the sample size reduces error and increases precision of estimates.[23] Larger samples also tend to be more representative of the population. A sample that comprises 90% of the population is likely to be more representative than a sample that comprises 5% of the population. Despite the universal desire for more data, practical constraints such as cost, time, or access to individuals limit the amount of data that can be collected. Logistically, a sample cannot be selected without first determining the size of the sample.[24] Therefore, specifying the desired sample size is a critical first step in most sampling plans.

There are a variety of factors that influence the desired sample size including the level of error that is tolerable, the nature of the issue, or the degree of variability within the population. [25] An overarching consideration is the intended use of the study results. Many studies are conducted for the purpose of estimating population parameters based on data from a sample. Other studies are conducted for the purpose of measuring the degree of variability within a group. The approach to determining an appropriate sample size differs in these two scenarios.

To select a sample used to estimate population parameters, a common method is to calculate the sample size that will be required to make population estimates within a specified degree of precision. That is, the mathematical formulas used to calculate confidence intervals (more on this later in the chapter) after data are collected can be "flipped" to calculate the sample size needed to generate an estimate

[22] Thompson (2012).

[23] Kaye and Freedman (2011).

[24] In some situations, samples are supplemented at a later time; however a sample size still must be specified to select the initial sample.

[25] Surprisingly, population size usually has little impact on the degree of precision of estimates or the required sample size (Kaye & Freedman, 2011).

chanvey@thinkbrg.com

within a specific confidence interval. That is, rather than calculating the confidence interval based on the known sample size, the sample size can be calculated based on a desired confidence interval. Using this approach, one must specify three variables in order to calculate sample size: (1) desired confidence interval width, (2) estimated amount of variability in the sample, and (3) confidence level.[26] This approach has the advantage of being based on a widely accepted formula, which lowers the perceived subjectivity of this process. However, subjectivity is still required to arrive at sample size. Of the three components that must be specified to calculate sample size, two (confidence interval width and amount of variability)[27] must be estimated, and experts often disagree on the correct values that should be used. The width of the confidence reflects the amount of uncertainty in estimates after data are collected. Ultimately, it is up to the court to decide what amount of uncertainty is tolerable.[28] As a practical matter, an expert must use professional judgment to specify a reasonable confidence interval. The amount of variability within the sample may also be disputed. The more variability within the sample, the larger the sample must be to obtain estimates at a given degree of precision.[29] One approach when estimating a proportion (e.g., proportion of employees misclassified) is to assume the maximum possible variability (0.50) and calculate the sample size based on that assumption.[30] This guarantees that the sample will provide an estimate at least as precise of the value specified. However, the resulting sample size will be relatively large which may be impractical in some circumstances. When estimating a population average, there is no "maximum possible" variability. Instead, the sample variability can be estimated either by using variability found in a pilot study, using existing data, or using an existing proxy to estimate the degree of variability that will be found in the sample.

Alternatively, many studies are conducted to estimate the degree of variability between putative class members, not to estimate population parameters. These studies are most likely to be conducted to address questions related to the certification of a class. In this circumstance, the sample size may be based on the number of data points needed to generate a representative sample, not to estimate population parameters. This also requires professional judgment as there are not widely agreed-upon standards for the proper sample size. One useful source of guidance is research based on the central limit theorem, which has demonstrated measures of central tendency (such as the average) become normally distributed for samples of 30 or

---

26 Most textbooks on statistical analysis and sampling (e.g., Thompson, 2012) contain formulas and steps for calculating confidence intervals in a variety of scenarios.

27 Most experts apply a 95% confidence interval; however there may be some situations where a 90% or a 99% confidence interval is used (Kaye & Freedman, 2011).

28 As an example, the California Supreme Court in *Duran v US Bank* (described later in the chapter) found that a relative confidence interval of 43% (confidence interval/average) contained too much uncertainty and the analyses were not accepted.

29 Kaye and Freedman (2011).

30 When estimating a proportion, the maximum possible variability occurs when the estimate is 0.50. That is, 50% of the group fall into one category and 50% fall into the other category.

chanvey@thinkbrg.com

more, regardless of whether the population values are normally distributed.[31] Using this research as a rule of thumb, a minimum sample size of 30 is often used in wage and hour litigation, especially when data collection involves methods that collect large amounts of detailed data from each employee such as observations or structured interviews.

There are some rare situations where the researcher is unable to specify the sample size in advance because there are significant restrictions on access to putative class members or their willingness to participate in a study. That is, the researcher may need to simply "take what they can get." When a sample is obtained in this manner, there are significant limitations on the inferences that can be made from sample data. However, if collected appropriately, those data can still provide valuable information about the experiences of the individuals included in the sample but will be less useful for describing the experiences of other individuals. Potentially useful applications for data collected in this manner are to evaluate the validity of information collected from other sources and to determine if there are meaningful differences between the members of the sample.

## 8.3 Impact of Non-responses

A concern for researchers arises when some of those selected into the sample do not participate. This frequently occurs when collecting self-report data, for example, as it is extremely rare to achieve a 100% participation rate in surveys.[32] Even when a perfectly selected random sample is drawn, non-responses may compromise randomness of the sample and the ability to make accurate estimates about the population. If the pattern of non-responders is random, valid inferences about the population can still be drawn based on data from the sample.[33] Evaluating whether non-response bias is likely to have impacted the results requires the researcher to determine, to the extent possible, the degree to which non-respondents differ from the respondents in the responses they would have provided if they were present in the sample.[34] The presence of non-respondents does not ensure that study results will be biased,[35] only that the sample is susceptible to bias. The higher the response rate, the less likely non-respondents will bias the results.

[31] *See, e.g.*, Brase and Brase (2011); Howell (2010).
[32] Krosnick and Presser (2010); Stetz, Beaubien, Keeney & Lyons (2008).
[33] Diamond (2011).
[34] Diamond (2011).
[35] Krosnick and Presser (2010).

chanvey@thinkbrg.com

## 8.4 Extrapolation and Confidence Intervals

Many legal questions in wage and hour class actions require information about the entire population of class members. To address these questions, experts often use extrapolation to estimate one of two population parameters: population average (or mean) or population proportion. For example, extrapolation may be used to estimate the average amount of time the class members spend working off the clock each workweek. Alternatively, extrapolation could be used to estimate the proportion of class members who are misclassified as exempt.

Estimating population parameters based on sample data is imperfect, as the estimates are unlikely to be exactly equal to population parameters due to sampling error. [36] The exact amount of the error is unknown because data are only available for the sample; however confidence intervals are often reported to quantify the likely magnitude of this error.[37] Statistics calculated from the sample, called the "point estimate," are considered the best estimate of the population parameters, assuming that data are collected from a representative sample and not impacted by non-response bias or other forms of systematic error.[38] The upper bound of the confidence limit is obtained by adding the confidence interval to point estimate, and the lower bound of the confidence limit is obtained by subtracting the confidence interval from the point estimate.[39] Confidence intervals are typically expressed as the point estimate "plus or minus" some value.

Smaller confidence intervals are generally preferable because they reflect less uncertainty in the estimate. The width of a confidence interval is based on three factors: sample size, variability within the sample, and the desired confidence level.[40] All things being equal, larger samples are associated with smaller confidence intervals. This is because estimates based on more data points have less uncertainty than estimates based on fewer data.[41] All things being equal, less variability within the sample is associated with smaller confidence intervals. If all employees in a sample report the same (or very similar) experiences, one would expect less uncertainty in the extrapolation when compared to a sample that reports highly diverse experiences. Finally, the desired confidence level also impacts the width of the confidence interval. While the first two factors are based on the data provided by the sample, the confidence level is determined by the researcher. By far the most common confidence level used by scientists is 95%,[42] although occasionally 90% or 99% confidence intervals are used.[43] The 95% confidence interval roughly corresponds to two

[36] Kaye and Freedman (2011); Babbie (1990).
[37] Kaye and Freedman (2011).
[38] Kaye and Freedman (2011); Howell (2010).
[39] Howell (2010).
[40] Diamond (2011).
[41] Kaye and Freedman (2011).
[42] Diamond (2011).
[43] Kaye and Freedman (2011).

chanvey@thinkbrg.com

standard error units and is often used interchangeably with the term "margin of error."[44] Most statistics textbooks contain a discussion of confidence intervals including the theoretical basis, basic calculation formulas, adjustments for small samples, adjustments for small populations, and use of one- or two-tailed intervals.[45] Disputes regarding confidence intervals in wage and hour litigation tend not to be related to the mathematical accuracy of the calculations but rather the interpretation of the results. Therefore, I focus the discussion below on conceptual issues related to applying confidence intervals to address legal questions in wage and hour cases.

### *8.4.1 Implications of Variability on Confidence Interval Interpretation*

The interpretation of confidence interval width is sometimes misunderstood. For example, small confidence intervals have been interpreted by plaintiffs arguing in support of class certification to indicate a high degree of similarity between putative class members. However, remember that a confidence interval reflects the precision with which we can estimate the population average (or proportion). The degree of variability within the sample is only one of the three factors that influence the width of a confidence interval. To illustrate this point, imagine data were collected from the entire population rather than a sample. In that situation, the confidence interval would be zero, because there is no uncertainly in our estimate of population parameters (we have data from the entire population). This will be true regardless of the degree of variability within the population. In other words, the ability to estimate the average, regardless of the degree of precision with which this can be done, reveals nothing about the amount of variability within the population. A sample with extremely high variability can yield a very small confidence interval if the sample is large enough.

The issue of variability is more problematic in the legal context when some of the class members in the sample don't have any recovery (e.g., not misclassified). When this occurs, the proportion of the sample with no recovery is sometimes used as an estimate of the proportion of the entire class has no recovery. For example, suppose there is a class of 1000 employees who claim they were required to work off the clock. To evaluate this claim prior to class certification, a random sample of 100 is selected to provide data about the amount of time they worked off the clock each workweek. Data show that 40 of the 100 class members in the sample worked off the clock and the other 60 never worked off the clock. An expert in this case would be able to estimate that because 40% of the sample worked off the clock, 40% of the entire class (or 400 class members) have also worked off the clock. However, it is

[44] Kaye and Freedman (2011).

[45] *See, e.g.*, Thompson (2012); Howell (2010); Witte and Witte (2010).

chanvey@thinkbrg.com

not possible, based on data from the sample, to determine *which* of the 900 class members who were not sampled worked off the clock and which did not. Instead there is a 40% probability that each of the 900 non-sampled class members worked off the clock. When the percent of class members in the sample with no recovery approaches 50%, the representative sampling approach is only capable of calculating a 50% likelihood that any non-sampled class member has liability, which would literally be equivalent to determining liability by flipping a coin.

### *8.4.2 Group vs Individual*

Another point to consider is the utility of extrapolated results when variability within the sample is high. When estimating the average, it is important to understand what information a confidence interval provides about the population versus individuals within the population. The average is single number that is used to summarize a group of numbers (or data from many class members). In other words, it provides information about the group overall but limited information about any individual within that group. As an example, suppose that a group of students takes a multiple-choice test. Half of the students receive a perfect score (100% correct), and half of the students do not get any answers correct (0%). The average score for that group of students is 50%, and if a large enough sample was taken, the confidence interval around that point estimate may be very narrow. However, knowing that the point estimate is 50% and that there is a small confidence interval around that estimate is not helpful for describing the performance of any of the students. In fact, that result would be quite misleading. No student in the sample scored anywhere close to 50%. If this average were applied to others outside the sample (as is often done in wage and hour litigation), the error associated with that procedure would be extremely large. Though mathematically correct, the results are not very meaningful in this example.

Situations like this, though not nearly as extreme, occur in wage and hour class actions. This can be problematic because certain legal questions, such as exemption classifications or damages, are made on an individual basis. The mean and confidence interval do not provide much information relevant to that inquiry, especially when variability within the sample is high.

## 8.5 Assessing Variability

A critical question in class certification decisions is the degree of variability between putative class members on relevant factors. At the class certification stage, the analyses must address whether the degree of variability is such that the claims of the putative class members are capable of being resolved on a class-wide basis. For example, do employees perform the same set of tasks? Do they spent the same

chanvey@thinkbrg.com

amount of time on the tasks they perform? Do they perform a similar set of activities before they clock in or after they clock out? Do they take meal breaks with the same frequency?

A comparison of any group of employees will reveal *some* variability, so the question is whether the amount of variability is so great that class treatment becomes inappropriate or whether differences between employees are trivial. This question can be partly answered using statistics but also relies on professional judgment. A variety of descriptive statistics are available to address variability (e.g., range, standard deviation, coefficient of variation), and these are typically calculated to quantify the degree of variability within a group. However, there is not widespread agreement about which statistic is most appropriate.[46] Perhaps more challenging is that these statistics lack defined thresholds that would be required to draw objective conclusions about variability.[47] As a result, experts, enforcement agencies, attorneys, and judges have used various methods and thresholds to arrive at conclusions about whether individuals are similar enough to certify a class. Experts often rely on additional information beyond statistics to reach conclusions about the degree of variability including shape of the frequency distribution, the proportion of individuals for whom violations exist (e.g., misclassified, denied meal breaks, worked off the clock), variation in factors that impact the results (e.g., regions, sales volume), differences in the sequence of tasks performed, and unique features of the job that apply to some individuals such as special roles or assignment or unique features of certain locations (e.g., operating hours, unique policies, or procedures). Each of these may play a role in the court's decision to certify a class. Expert opinions regarding the degree of variability between putative class members tend to be strongest when they are supported by multiple types of reliable data.

## 8.6 Data Quality Issues

One of the first steps in a statistical analysis is to assess the quality of the data being relied upon. In this regard, an assessment of data quality is listed as an ethical responsibility for anyone conducting statistical analyses by the American Statistical Association.[48] In litigation, experts often have an additional responsibility to base their opinions on reliable data.[49] The value of the results from any statistical analysis is dependent on the quality of the underlying data[50] leading one author to comment "most statistics books assume you are using good data, just as a cookbook assumes

46 Kaye and Freedman (2011).

47 Some recent strategies have been proposed for establishing objective thresholds including rules of thumb for the coefficient of variation (Murphy, 2014) and repeated measure strategies (Hanvey, 2014). No strategy has yet been widely accepted and applied.

48 American Statistical Association (2016).

49 Allen et al. (2011).

50 Kaye and Freedman (2011).

chanvey@thinkbrg.com

Case 1:10-cv-06950-AT-RWL Document 1259-44 Filed 09/10/21 Page 19 of 29



you are not buying rancid meat and rotten vegetables."[51] In wage and hour litigation, disputes frequently arise over the quality of the data used in statistical analyses.[52]

When a researcher analyzes data they have collected themselves, they have detailed knowledge about the study design and the degree to which the data are reliable and valid. However, many times a statistician[53] relies on data from an external source. For example, a survey expert may collect self-report data, and a statistician may analyze the data,[54] or a statistician may analyze existing electronic data such as time clock, payroll, or register data. It is these situations, where performing an assessment of the underlying data quality is particularly important. Without this assessment, the statistician has no way of knowing whether the data upon which their conclusions are based are meaningful.

Some authors have noted that certain data sources are inherently more reliable than others. Allen et al. (2011) state that data quality is based, in part, on commonsense indicators of accuracy and bias. They provide a list of data sources in rough order of "presumptive validity" that are commonly used for damage calculations in litigation. The top of the list includes official government publications and databases such as those produced by the Bureau of Labor Statistics. Data from these sources require less assessment of their quality. The middle of the range includes survey data prepared by a survey expert following survey design standards. An assessment of the degree to which the survey was properly designed and executed is a critical component of an assessment of data quality. At the low end of the range are studies that estimate damages specifically for the purpose of litigation. Studies of this sort are not typically found in wage and hour cases. However, plaintiffs regularly self-report critical components in litigation either through declarations or depositions. These components may include number of hours worked per workweek, time worked off the clock, or frequency of missed meal or rest breaks. An important consideration before conducting any analysis using these data is the degree to which these estimates are accurate, as the presumptive validity of these reports is low.

An additional question to consider when working with existing data is what the data were intended to measure. Some analyses involve data from a reliable source, but the data were intended for a purpose other than addressing legal questions. For example, suppose employees allege they worked off the clock at the beginning of their shift. Employees at this company are required to swipe a security badge to enter the building. To determine the amount of uncompensated time, the swipe data is compared to the time clock data, and discrepancies for each employee on each workday are calculated. Though both sources of data (swipe data and time clock data) are considered reliable for their intended purpose, the results of the analysis may not provide meaningful information about the amount of time employees have

[51] Wheelan (2013) (p. 111).

[52] Kaye and Freedman (2011); Allen et al. (2011).

[53] I use the term "statistician" in this chapter to refer to any person performing statistical analysis, regardless of their educational or professional background.

[54] *See* Kaye and Freedman (2011).

chanvey@thinkbrg.com

worked off the clock. One reason could be whether the clocks in both systems were synchronized. In many organizations, the security and time clock systems are operated by two different vendors, and the clocks may not match. One or both systems may not be centralized, so the amount of discrepancy between the two system's clocks differ in each facility. Therefore, calculating an adjusted time for one of the systems to synchronize them may be very challenging and potentially impossible depending on the class period.

A more fundamental issue is whether the data actually address relevant legal questions. The results of the analysis tell the court how much time elapsed between employees entering the building and clocking in. This is different from the legal question: How much compensable work do employees perform before clocking in? In this example, electronic data alone may not be able to answer this question because they reveal nothing about what the employee actually does after entering the building. Although employees may perform compensable activities during this period of time, they may also eat breakfast, talk to co-workers about personal matters, put their personal belongings away, make personal phone calls, or any number of activities that are typically not compensable. Despite the quality of the underlying data in this example, the results of the analysis may be of limited utility because of what the data measure and more importantly do not measure.

Ultimately, the validity of data is a matter of professional judgment.[55] An evaluation of data quality is most effective before the data are analyzed. Although the type of data will largely dictate the steps in the evaluation, it is good practice in most situations to review relevant data fields to evaluate the degree to which data are missing or erroneous. For example, datasets sometimes contain duplicate data, data that are not properly aligned, dates in the future, more than 24 h in a day, or highly implausible data (e.g., employees working 18-h shifts every day). It is often a valuable exercise to identify these types of issues within the data. Experts in litigation have a general obligation to rely on data that are as accurate as possible and free of erroneous information.[56] When possible, the data can also be cross-checked with other data to assess the quality.[57] For example, time records can be cross-checked with payroll data to determine whether they are consistent.

The presence of erroneous data raises two questions. The first is whether they provide evidence that the entire dataset is flawed and therefore should not be relied upon. For example, if a significant portion of the data are found to be erroneous, it may be difficult to justify relying on remaining data from that same dataset. Assuming the dataset is not fatally flawed, the second question is how to conduct the analysis such that these data do not introduce error into the results. In many cases, erroneous data found within company electronic data can be resolved through consultation with the company that produced the data.[58] For example, manual time

[55] Allen et al. (2011).

[56] Allen et al. (2011).

[57] Allen et al. (2011).

[58] In many organizations, an IT or HRIS employee will be the most knowledgeable about the details of the data.

chanvey@thinkbrg.com

clock edits may be retained in a separate database which can be incorporated to replace erroneous records. Many payroll systems provide datasets with many similarly labelled fields which require a conversation to understand the appropriate fields for analysis. Even after attempting to get clarity on the data, erroneous data may still remain in the dataset. Typically, these data will be removed before conducting analyses.

The consequences of relying on unreliable or inaccurate data increase when those data are extrapolated to a larger group. Attempting to extrapolate unreliable sample data to a population will magnify errors and result in inaccurate conclusions about the population. The smaller the sample or the larger the population, the greater impact data errors in the sample will have.

## 8.7 Calculating Damages

Statistical analysis is commonly used to calculate estimates of financial damages for wage and hour violations. That is, an analysis is required to determine the amount of money each class member is owed as compensation for the organization's violations (e.g., back overtime pay, unpaid meal break premiums). Damage calculations are typically required if plaintiffs prevail in the merits of the case, but they may also be calculated at earlier stages by plaintiffs to demonstrate to the court that the case is manageable as a class action.[59] Defendants may also conduct a similar analysis called an "exposure analysis" early in the litigation to estimate potential damages or assist in settlement negotiations.

Typically, the statistical analysis to calculate damages in wage and hour cases is not overly complex, as it rarely involves advanced statistical modeling, for example. Instead, one of the primary challenges is working with datasets that may be extremely large or are not in a format conducive to analysis. It is not uncommon for a time clock database to include tens of millions of rows, for example. In some cases, separate datasets are generated for each employee, requiring hundreds of datasets to be combined before the analyses can begin. This step becomes especially time-consuming when the datasets do not contain identical fields or use different formats (numeric in some datasets and character in others) or lengths.

Working with large datasets requires an analysis program that is capable of handling large volumes of data such as SAS, SPSS, R, or STATA. Each of these programs is capable of handling large volumes of data and can work with data in a variety of formats. Large datasets also require quality checking throughout the analysis process. Manual quality checking is not very feasible, so part of the analysis should include checking the data and results throughout the analysis process. If a formula is written to calculate the number of overtime hours worked per workweek, for example, the resulting values can be inspected to assess whether they fall within a reasonable range. Extremely high or low values may indicate an error in the

[59] Allen et al. (2011).

chanvey@thinkbrg.com

Case 1:10-cv-06950-AT-RWL Document 1259-44 Filed 09/10/21 Page 22 of 29



calculation and likely warrant a further attention being paid to the formula and underlying data.

Statistical analysis conducted for purposes of damages generally has a more "relaxed standard of proof" when compared to analyses used to determine liability.[60] However, the outcome of a damages analysis will have a direct financial impact on all parties involved in the litigation. The relaxed standard refers to the amount of uncertainly that is tolerable as a result of the available data[61] and not in the quality of the analyses performed.

### *8.7.1 Damages Based on Representative Sampling*

In many cases, an approach called "representative sampling" is proposed to estimate damages. This approach typically follows a consistent pattern. First, a sample of class members is selected, data are collected from the sample, and inferences about the entire class are made based on data collected from the sample. Issues related the sampling and extrapolation were addressed in prior sections. In this section, I will focus on how the approach is typically applied for calculating damages.

When calculating damages, many experts perform an analysis that assumes the sample average (e.g., unpaid hours each workweek) for all non-sampled class members and calculates damages based on that assumption. For example, suppose a class consists of 500 employees who allege they were misclassified as exempt and not paid overtime. Damages on this claim are based on the number of overtime hours worked by each class member. A sample of 50 class members is selected, and each class member reports the number of overtime hours they personally worked per workweek. The class members in the sample report an average of 10 h of overtime per workweek. To calculate damages for the remaining 450 class members, the analysis assumes that each of them worked 10 h of overtime each workweek (based on the sample average). Practically, we know that this assumption is unlikely to be accurate for most, if not all, of the class members. Because courts are generally willing to tolerate a reasonable degree of uncertainty, the question becomes how much uncertainly is included in these estimates. The confidence interval will answer this question at the group level, but not at the individual level. In other words, the confidence interval may be useful for estimating the average and therefore the total damages for the entire class, but not the amount of error associated with any one class member. One way to address this is to analyze the degree of variability within the sample. In the prior example, assume that all 50 class members in the sample reported working between 9 and 11 h per workweek. This situation is likely to produce relatively small errors on an individual level after extrapolation. However, what if individuals in the sample reported anywhere between 1 h and 30 h of

---

[60] "[B]roadly speaking, the law tolerates more uncertainty with respect to damages than to the existence of liability" *Duran v US Bank (p. 38).*

[61] *See Duran v. US Bank*; *Bruckman v. Parliament Escrow Corp.* (1987).

chanvey@thinkbrg.com

overtime per workweek? The non-sampled class members are likely to reflect a similar pattern of variability, and therefore applying an average of 10 h to each of them will result in large errors at an individual level. The direction and magnitude of the error for each individual cannot be known using this approach.

## 8.8 Documenting the Analyses

An issue that comes up regularly when statistical analyses are used in litigation is how the analyses are documented and "produced." Experts are typically required to produce all files upon which they relied for review by both parties. When a statistical analysis is performed, the production usually includes data and analysis files. Issues related to file production are unique to litigation, and the amount of time and resources required may not be anticipated by those without prior exposure to this process.

It is not uncommon for disputes to arise over experts' file production. In many cases, there are specific legal requirements that define an expert's obligation to provide information responsive to a production request. However, this may differ by jurisdiction or can be impacted by informal agreements between the parties. Therefore, production is generally performed in collaboration with the attorney who retained the expert to ensure that obligations with respect to file production are met. In this section, I describe some of the professional standards which may be helpful in determining what information should be documented and produced.

Experts in wage and hour case often rely on a statistical analysis program to analyze electronic data. The more sophisticated computer programs require the user to write programming code to conduct the analysis. It is standard practice to save this code in its native format. In addition to the analysis files, it is standard practice to retain and produce the original "raw" data in their native format. The contents of the analysis files and raw data files will allow anyone with access to the analysis program to rerun, modify, or inspect the analyses. Inspection of the analysis code also allows another expert to identify potential errors in the analysis and all assumptions that were included in the analysis.

Disputes sometimes occur when files are produced in non-native format. For example, a database may be printed as a table in a pdf document. This may technically fulfill the requirements of an imprecisely worded subpoena but is not useful for purposes of evaluating the work performed by the expert. In other situations, experts may perform analyses within excel files but overwrite formulas within the cells before producing the files. This is another area that can lead to disputes regarding the adequacy of production. An additional issue may arise when analyses are performed within a program such as excel because it may be difficult or impossible to retrace all the steps in the analysis. Unlike programs such as SAS, SPSS, or R, excel allows the user to manipulate, move, copy and paste, or combine data without any record of the specific actions that were performed. This can make it difficult if not impossible to replicate the analyses.

chanvey@thinkbrg.com

## 8.9 Key Litigation Involving Sampling and Statistics

Issues related to sampling and statistical analysis are involved to some degree in nearly all wage and hour class actions. However, recent rulings from the California Supreme Court and the US Supreme Court have directly addressed the use of sampling and statistical analysis in wage and hour cases. These cases are regularly cited by attorneys and have a substantial impact on the work performed by experts working in this area. These cases are summarized below.

### *8.9.1 Duran v US Bank*

The *Duran* case was a class action in California in which loan officers at US Bank alleged they were misclassified as exempt. US Bank argued that the employees met the criteria for the outside salesperson exemption. The final class included 260 current and former employees who worked for the company between 1997 and 2005. The trial court found in favor of plaintiffs and awarded the class a verdict of $15 million. The case was appealed up to the California Supreme Court ("the court") which issued a ruling on May 29, 2014.

The primary issue addressed by the court was the trial court's reliance on a representative sampling procedure to assess liability. The trial court allowed a sample of 21 class members to provide testimony in trial and, based on that testimony, found the *entire* class of 260 current and former employees to be misclassified. An overview of the procedure used by the trial court is provided below.

**Representative Sampling Plan Used by the Trial Court** The trial court selected 20 random class members to provide testimony. Then the two named plaintiffs were added to the sample, called the "representative witness group" (RWG). The trial court then excluded one person from the RWG, because his work activities differed from a "true" employee in the loan officer role. After the sample had been selected, the class definition was revised, and class members were given a second opportunity to opt out of the class. Nine class members, including four from the RWG, elected to opt out of the class at that point. New class members were randomly selected to replace the members of the RWG who had been excluded or opted out. Each member of the RWG provided testimony regarding their experience, except for one who failed to appear for his testimony. The final RWG therefore consisted of 21 class members, and the court ruled that the entire class was misclassified based on the testimony provided by this group.

The court noted several deficiencies in the process used by the trial court, which it described as "profoundly flawed."[62] Below, I discuss the issues raised by the court that are related to sampling and statistical analysis.

[62] *Duran v. US Bank* (p. 2).

chanvey@thinkbrg.com

Case 1:10-cv-06950-AT-RWL Document 1259-44 Filed 09/10/21 Page 25 of 29



**Sample Size** The sample of 21 was too small to provide reliable information about the larger group. This lead to an "intolerably" large margin of error. The data from the sample enabled a statistics expert to estimate that the average number of overtime hours worked per workweek by the class was 11.86 h, with a margin of error of 5.14 h. The 43% relative margin of error (margin of error divided by the average) reflected more uncertainly than the court was comfortable with. In addition, the data from the sample allowed the same statistics expert to determine that at least 87% of the class members were misclassified. The court noted that using these calculations, up to 13% of the class members were properly classified which "stood in contrast to the trial court's determination that the *entire* class was misclassified."[63] In addition, the trial court selected a sample size without providing rationale for the decision and without input from the statistical experts retained by either party. The sample size appeared to be chosen based on convenience and manageability, but as the court noted, the same could be said for a sample of one and does not justify the use of a small sample.

**Preliminary Assessment of Variability** The court recognized that an appropriate sample size is influenced by the amount of variability within the population. The more variability between class members, the larger sample size needed to generate sufficiently precise estimates. However, no assessment of variability was performed in this case to help determine an appropriate sample size.

**Nonrandom Sample** In addition to sample size, the court noted problems with how the sample was selected. First, the two named plaintiffs were included in the sample. These two class members were not randomly selected and were already known to reflect a particular viewpoint. In addition, the two named plaintiffs were selected to replace four other previous named plaintiffs, each of whom later provided testimony that they believed they were properly classified. Second, the trial court excluded one randomly selected employee from the sample because his job duties were unique and not typical for the position. The court noted that this employee could have represented many other class members who performed work similar to him, and his exclusion imposed less variability in the sample that would have been found randomly.

**Non-response bias** Other randomly selected class members either opted out of the class after learning they would be required to give testimony or failed to appear to give testimony. Those who had weaker claims would be less motivated to provide testimony and opt out, leaving a sample that overrepresents those with stronger claims. Indeed, 4 out of 20 (20%) of those selected in the RWG chose to opt out compared to 2% from the rest of the class. US Bank also produced declarations from two of the members of the RWG who opted out stating that they opted out because the plaintiff attorneys urged them to do so. However, the trial court chose to remove and replace the four who had opted out.

[63] *Duran v. US Bank* (p. 14).

chanvey@thinkbrg.com

**Implications** The court's ruling did not prohibit the use of statistical sampling in wage and hour cases but has had an impact on experts by raising the bar for what is acceptable. Since *Duran,* experts are generally required to fully explain their sampling plan at the class certification stage and present a sampling plan that is reliable and follows scientific standards. Though this decision was from the California court system, the reasoning of the court provides useful guidance to experts in all jurisdictions.

### 8.9.2 *Tyson Foods, Inc. v Bouaphakeo et al.*

*Tyson* was a class action FLSA case that involved a claim that workers at an Iowa pork-processing plant were not properly compensated for time spent putting on and taking off protective gear ("donning and doffing"). There were 3500 individuals involved in the lawsuit, between two separate classes that differed only with respect to time frame. The classes were certified, and the defendant was found to be liable for $2.9 million in compensatory damages. The case was eventually appealed to the US Supreme Court which issued a ruling on March 22, 2016. The central issue addressed by the Supreme Court was whether it was appropriate for the trial court to use the calculated average amount of time a sample of employees spent donning and doffing to certify a class and determine damages.

An expert retained by the plaintiffs conducted a video-based time and motion study in which he measured the time spent donning and doffing required personal protective equipment (PPE)[64] for a sample of employees. The court was forced to decide whether the statistical evidence can be used to establish class-wide liability. The dispute in this case was based not on the quality of the data collected but whether that data revealed enough variability to make class treatment inappropriate. In other words, the dispute was over the interpretation of the data, not the data themselves. Tyson argued that the degree of variability among class members made reliance on the sample improper and would result in recovery for class members who had no claims. Plaintiffs argued that differences between class members were minimal. The Supreme Court found in favor of the plaintiffs. An overview of the issues and the court's logic are provided below.

**Data** Tyson did not maintain time records showing the time individual employees spent donning and doffing PPE. As a result, the parties were forced to rely on "representative evidence." This evidence came from 744 videotaped observations, in which the time employees spent donning and doffing PPE was measured across three departments. The study results showed that employees spend an average of 18 min/day donning and doffing PPE in the "cut" and "retrim" departments and an average of 21.25 min/day in the "kill" department. A different expert, also retained by the plaintiffs, then applied these averages to employee time records and calculated

[64] The PPE included protection against knife cuts which both parties agreed was compensable.

chanvey@thinkbrg.com

the amount of unpaid overtime owed to each class member.[65] This analysis showed that 212 class members were not entitled to any recovery, while the rest of the more than 3000 class members were. Tyson argued that the study overstated the average donning and doffing time but did not present an expert to oppose the validity of the data or offer an alternative study.

**Variability** The primary issue for the Supreme Court involved variability. Defendants argued that the classes should not have been certified for two reasons. First, there is too much variability in time spent donning and doffing. They argued that the method used assumed no variability by applying an average for all class members even though that is the key question that should have been answered prior to certifying the class. Second, the statistical approach used by the plaintiffs will provide recovery for some class members who have no claims, such as those who never worked more than 40 h in a workweek.

The court addressed both of those arguments. The court noted that unlike other cases in which class certification was denied due to high variability, the class members in this case all worked in the same facility, performed similar work, and were paid under the same policy. The question remaining was whether the time spent donning and doffing substantially differed from person to person. The court stated that this decision was appropriately made by the jury who found that employees spent roughly equal time donning and doffing. The district court could have denied class certification only if it concluded that no reasonable juror could have reached this conclusion. The court addressed the second argument by stating that Tyson could challenge the proposed method of allocating damages when they are dispersed. However, neither argument raised by Tyson persuaded the court to decertify the class.

**Implications** This case was notable because it provided an example of how representative evidence can be used effectively in wage and hour cases. However, the court also cautioned that the outcome of this case does not mean that similar approaches are useful in every circumstance:

> This case presents no occasion for adoption of broad and categorical rules governing the use of representative and statistical evidence in class actions. Rather, the ability to use a representative sample to establish class wide liability will depend on the purpose for which the sample is being introduced and on the underlying cause of action.[66]

This case is often cited by plaintiffs attempting to introduce statistical evidence to resolve wage and hour class actions.

---

[65] Some employees were compensated between 4 and 8 min for donning and doffing PPE. This time was removed as part of the calculation.

[66] *Tyson Foods, Inc. v Bouaphakeo et al.*, (p. 2).

chanvey@thinkbrg.com

## 8.10 Conclusion

Sampling and statistical analyses often play a central role in resolving wage and hour disputes. This chapter provides the underlying logic supporting many of the sampling and statistical approaches used by experts in these cases. In addition, I have highlighted several areas where the approaches can be misapplied or results may be misinterpreted and discussed how factors such as non-response bias and variability may impact the ability to reach meaningful conclusions about a population based on sampling and extrapolation. To illustrate these points, I've summarized two important cases that addressed sampling and statistics in detail. Together, this information is intended to provide a useful reference for those evaluating wage and hour compliance.

## References


Allen, M. A., Hall, R. E., & Lazear, V. A. (2011). Reference guide on estimation of economic damages. In*Reference manual of scientific evidence* (3rd ed.). Washington, DC: National Academies Press.

American Statistical Association, Committee on Professional Ethics. (2016). *Ethical guidelines for statistical practice*. Retrieved from http://www.amstat.org/asa/files/pdfs/EthicalGuidelines.pdf

Babbie, E. R. (1990). *Survey research methods* (2nd ed.). Belmont, CA: Wadsworth.

Brase, C. H., & Brase, C. P. (2011). *Understandable statistics: Concepts and methods* (10th ed.). Boston, MA: Cengage Learning.

Bruckman v. Parliament Escrow Corp. (1987). 190 Cal.App.3d 1051, 1061.

DeGroot, M. H., Fienberg, S. E., & Kadane, J. B. (Eds.). (1986). *Statistics and the law*. New York: Wiley.

Diamond, S. S. (2011). Reference guide on survey research. In*Reference manual of scientific evidence* (3rd ed.). Washington, DC: National Academies Press.

Fienberg, S. E. (Ed.). (1989). *The evolving role of statistical assessments as evidence in the courts*. New York: Springer.

Finberg, J. M., & Thoreen, P. J. (2007). *The use of representative testimony and bifurcation of liability and damages in FLSA collective actions*. Prepared for the American Bar Association Section of Labor and Employment Law, Philadelphia, PA.

Gastwirth, J. L. (Ed.). (2000). *Statistical science in the courtroom*. New York: Springer.

Hanvey, C. M. (2014, May). Evaluating "statistically significant" within-title variability. In C. Hanvey (Chair), *Within-group variability: Methodological and statistical advancements in the legal context*. Symposium presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Honolulu, HI.

Howell, D. C. (2010). *Statistical methods for psychology* (7th ed.). Belmont, CA: Cengage Wadsworth.

Kaye, D. H., & Freedman, D. A. (2011). Reference guide on statistics. In*Reference Manual of Scientific Evidence* (3rd ed.). Washington, DC: National Academies Press.

Krosnick, J. A., & Presser, S. (2010). Questions and questionnaire design. In P. V. Marsden & J. D. Wright (Eds.), *Handbook of survey research* (2nd ed.). Bingley, UK: Emerald.

Murphy, K. R. (2014, May). Describing variability: The coefficient of variation. In C. Hanvey (Chair), *Within-group variability: Methodological and statistical advancements in the*


chanvey@thinkbrg.com

*legal context.* Symposium presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Honolulu, HI.
Stetz, T. A., Beaubien, M., Keeney, M. J., & Lyons, B. D. (2008). Nonrandom response and rater variance in job analysis surveys: A cause for concern? *Public Personnel Management, 37*(2), 223–241.
Thompson, S. K. (2012). *Sampling* (3rd ed.). Hoboken, NJ: Wiley.
Wheelan, C. (2013). *Naked statistics: Stripping the dread from the data*. New York: W. W. Norton.
Witte, R. S., & Witte, J. S. (2010). *Statistics* (9th ed.). Hoboken, NJ: Wiley.

## Court Cases

*Duran v. U.S. Bank Nat'l Ass'n*, No. S200923 (May 29, 2014).
*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. ___ (2016).

chanvey@thinkbrg.com