# Exhibit 45

# 8

# *Documenting Work Analysis Projects*

## A Review of Strategy and Legal Defensibility for Personnel Selection

ARTHUR GUTMAN
*Florida Institute of Technology*

ERIC M. DUNLEAVY
*DCI Consulting Group*

This chapter reviews strategies for documenting work analysis data. These data are used in the development of personnel selection procedures (i.e., any tool used to make an employment decision, such as hiring, promotion, termination, and pay raises). The documentation of work analysis data is critical for both organizational strategy and legal defensibility. Because work analysis is a tool for making decisions, documenting what those decisions are based on seems intuitive. Work analysis is not a static process, and there are many ways and tools for conducting and using a work analysis. For work analysis data to be useful to the organization, they must be presented in a way that is interpretable. Of course, in some situations work analyses may be summarized in ways that are unintelligible to the layperson responsible for making high-level organizational decisions.

For example, many practitioners have been faced with situations early in their careers when a client or manager asked for a translation of work analysis reports into nontechnical terms, "take-home" messages, and action items. However, work analysis documentation should be stringent enough to meet legal defensibility requirements stemming from potential equal employment opportunity (EEO) court challenges. Thus, the work analyst is challenged with balancing two competing goals: (a) presenting work analysis results in a manner that can be understood by the layperson and is usable to the organization, and (b) ensuring that the details of the work analysis are sufficient to survive legal scrutiny.

Understanding the take-home messages and potential implications of a work analysis effort can offer organizations a competitive advantage in developing personnel selection procedures. Specifically, well-documented work analysis data should provide the organization with a conceptual connection between work requirements and the worker characteristics (e.g., knowledge, skills, abilities, competencies) necessary to perform those requirements. This conceptual link can be used as the foundation for developing appropriate measures of work performance (e.g., work samples, performance appraisals), as well as for measures of constructs used in hiring, promotion, termination, and other employment decisions that affect applicants and/or employees. These data may also be used in a number of smaller scale efforts, including job description development, realistic

job previews, career progression plans, training need identification, curriculum development, job evaluations, and compensation worth analyses.

When work analysis data are used to develop personnel selection procedures, the legal defensibility of those procedures may be challenged legally. For example, a challenge to a personnel selection procedure may reduce to whether the challenged procedure is related to the job in question and/or whether data suggest that less discriminatory yet equally appropriate alternative procedures were available. For example, a personnel selection decision may be challenged because White applicants were hired at a substantially higher rate than minority applicants. In this situation, documentation of a work analysis (as the foundation of a content validity study) may be the focal point in determining whether the selection procedure used to make hiring decisions is job related, and therefore whether it will survive a legal challenge. If that documentation is unavailable or inadequate, the employer may be found guilty of unintentionally discriminating against a particular group of applicants or employees.

Both the Equal Employment Opportunity Commission (EEOC) and Office of Federal Contract Compliance Programs (OFCCP) enforce antidiscrimination law, and both agencies have exerted substantial enforcement effort related to personnel decision systems that may affect a large class of potential victims of discrimination (Dunleavy & Gutman, 2007). Personnel selection tools involved in hiring, promotion, termination, and compensation exemplify systems that affect a large group of potential victims of discrimination. Thus, the current EEO enforcement landscape only increases the need for adequate work analysis documentation.

This chapter presents work analysis documentation considerations from the perspectives of organizational strategy and legal defensibility. These topics are presented in a number of ways. First, a case study is described illustrating development and validation of a selection procedure using work analysis documentation as the general foundation for content-oriented validity evidence. Second, a framework for the common phases of a work analysis project is presented, as are some documentation considerations for each phase. This section also links documentation considerations to the case study for exemplary purposes. Third, a set of legal defensibility considerations are presented, with particular emphasis on using work analysis data to support the use of personnel selection tools. This section reviews both case law and technical authorities. Fourth, a review of common mistakes in documenting work analysis data and a treatment of some more recent legal defensibility challenges that may relate to work analysis is presented. Finally, the chapter closes with some general recommendations regarding work analysis given the changing nature of work in the 21st century, as well as additional resource recommendations.

## A CASE STUDY DEMONSTRATING WORK ANALYSIS DOCUMENTATION IN SUPPORT OF A PERSONNEL SELECTION PROCEDURE

The following is a reenactment of actual events surrounding the development and validation of a test battery commissioned by a large engineering firm. The purpose of the test battery was to hire entry-level technicians that maintain and repair equipment used to manufacture wafers and assemble chips. Names are changed to protect the confidentiality of the firm and the participants, and there are some alterations for the purposes of exposition. However, the actual procedures used and results obtained are faithfully represented. The case study includes both a content validity and a criterion validity component. Portions of both studies were done contemporaneously. They are reported as separate components for the purposes of exposition.

An industrial and organizational (IO) psychologist, Dr. Good, was hired to address the following problem. Previously, the firm hired entry-level technicians based on minimum qualifications gleaned from resumes and background checks focusing primarily on prior education, training, and

work history. Applicants deemed to possess the requisite minimum qualifications were interviewed by managers, who were all engineers. Those passing the interview were hired for a two-month probationary period. There were two problems with this method of selection. First, on average, only 8 of 10 interviewees were found acceptable for probationary hiring. Second, 50% of those found acceptable for were terminated during or after probationary period for poor performance and/or inability to learn new processes. The firm hired Dr. Good to improve upon both percentages.

### Preliminary Steps

Dr. Good met with the director of human resources, Mr. Deeds and two engineers, Mr. Pouba and Ms. Brane. After reading written material describing the entry-level technician job, Dr. Good outlined the general steps Deeds would have to take to ensure that all participants, including engineers and incumbent entry-level technicians, understood the mission and were on board. Dr. Good arranged a meeting with Pouba and Brane, during which he outlined nine major duty areas for the entry-level technician job based on his reading material. Pouba and Brane suggested that two of these areas were essentially the same (troubleshooting and equipment repair), and the following eight major duty areas were established:

1. Repetitive tasks
2. Training new technicians
3. Use of test equipment
4. Working with engineering personnel
5. Troubleshooting and repairing equipment
6. Record keeping
7. Ordering spare parts/equipment
8. Safety

Dr. Good then arranged a 3-hour job observation in which Pouba and Brane demonstrated critical job tasks within each of these eight duty areas.

### Work Analysis

Deeds gathered two subject matter expert (SME) groups, each with six members. No engineers were used in the work analysis phase. Both groups (SME1 and SME2) were representative of race, gender, and seniority of entry-level technicians. There were two phases in the work analysis study, a job task phase and a knowledge, skill, and ability (KSA) phase.

In the job task phase, SME1 was presented with the major duty areas and asked to compose critical job task statements within each duty area in a focus group format. Each job task statement was structured to represent an activity, with or without equipment, to fulfill a purpose. Examples were provided (e.g., inspection of equipment, with meter, to determine proper functioning). Each job task was then independently rated by SME1 members on a 5-point scale for task complexity and consequences of error. These ratings were then multiplied for each SME1 member, and means were computed. A mean multiplicative value of 10 was used as benchmark to operationally define critical tasks. SME2 examined and rated the tasks generated by SME1 in a shortened version of the SME1 procedure, and a final list of critical tasks was generated.

In the KSA phase, SME1, operating as a focus group, generated KSAs associated with the critical tasks. The KSAs were then graded by individual members on the basis of four questions:

1. Is the KSA necessary for new workers? *(Answer yes or no.)*
2. Is it practical to expect a new hire to have the KSA? *(Answer yes or no.)*

3. Is trouble likely if the KSA is ignored? *(Rate 1–5.)*
4. Does the KSA distinguish average and superior performers? *(Rate 1–5.)*

As in the job task phase, SME2 verified the answers provided by SME1. A total of 62 KSAs were generated; 18 for knowledge, 10 for skills (with equipment), 29 for general abilities (without equipment), and 5 personal characteristics.

A *yes* answer to Question 1 was required to qualify for the final group of KSAs. A *yes* answer to Questions 1 and 2 meant a KSA would require training prior to employment. Among KSAs with *yes* answers to Question 1, mean multiplicative ratings of 10 or higher on Questions 3 and 4 were used as the benchmark, and KSAs above benchmark were examined to determine suitability for testing versus other methods of assessment (e.g., resumes, background checks). The following knowledge areas and abilities were deemed suitable for testing:

| Knowledge | | Abilities | |
|---|---|---|---|
| K1 | Units of measurement | A1 | Problem solving |
| K2 | Electrical systems | A2 | Deductive reasoning |
| K3 | Basic math | A3 | Reading comprehension |
| K4 | Basic electronics | A4 | Following directions |
| K5 | Basic mechanics | A5 | Written instructions |

### Content Validity Strategy

Dr. Good presented the work analysis results to Deeds, Pouba, and Brane, and proposed a test battery consisting of three component tests. Test 1 was a prior in-house test previously developed by Good for the firm's wafer technicians and assemblers. The in-house test assessed basic abilities in math, reading comprehension, and following directions. Test 2 consisted of three subtests in the commercially available Differentially Aptitude Test (DAT), including abstract reasoning, mechanical reasoning, and spatial relations. Test 3 was an electronics knowledge test to be developed internally because there was no in-house or commercially available electronics knowledge test suitable for the firm.

Dr. Good explained that a content valid test or test battery adequately samples the job domain, as well as the KSAs required to perform critical job tasks (i.e., criterion relevance). It also avoids assessment of irrelevant or marginal job tasks or KSAs (i.e., criterion contamination). The grid below was presented to demonstrate how the proposed test battery fulfilled both criteria:

| | In-House Test | Abstract Reasoning DAT | Mechanical Reasoning DAT | Spatial Relations DAT | Electronics Knowledge Test |
|---|---|---|---|---|---|
| Units of measurement | | | | | X |
| Electrical systems | | | | | X |
| Basic math | X | | | | X |
| Basic electronics | | | | | X |
| Basic mechanics | | | X | | |
| Problem solving | | X | | X | X |
| Deductive reasoning | | X | | X | X |
| Reading comprehension | X | | | | |
| Following directions | X | | | | |
| Written instructions | X | | | | |

### Test Development Phase

The electronics knowledge test was developed using a single group of SMEs, all engineers, including Pouba and Brane. There were two sessions. In Session 1, the SMEs identified five major electronic knowledge components, including the following:

1. *Ohm's law calculations*: Calculation of voltage, current, and/or resistance based on circuit diagrams
2. *Rectification, regulation, and induction*: Circuit diagrams to examine knowledge of the function of rectifiers, transformers, and capacitors with respect to both inputs and outputs
3. *Component identification*: Recognition of component parts, including capacitors, electrolytic capacitors, crystals, transistors, Zener diodes, inverters, gates, mosfets, and buffer amps
4. *Component knowledge*: How the component's parts are used
5. *Troubleshooting*: Troubleshooting (or problem-solving) questions, including items based on oscilloscope diagrams, nonelectrical tracing circuits, and circuits taken directly from manuals covering the firm's actual equipment

In Session 2, SME1 generated between 10 and 15 items for each knowledge area for a total of 60 items. Subsequently, the SMEs individually rated each item on a 5-point scale, where *1* = low value, *3* = average value, and *5* = high value. These ratings were averaged and filed for subsequent use.

### Preliminary Selection Tool Data

Deeds arranged for administration of the in-house test, DAT subtests, and electronics knowledge to 80 incumbent entry-level technicians, which included all entry-level technicians with at least 1 year of experience with the firm. The entry-level technicians were informed that the testing was for research purposes only and that the test results would be known only to Dr. Good and his associates. The purpose of the study was explained, questions were fielded, and the test was subsequently administered in single 3-hour sessions to 20 entry-level technicians at a time.

### Preliminary Demographic Data

Descriptive statistics were computed for four demographic variables, including frequencies and percentages for race, gender, and job level (i.e., Levels I and II), as well as means and standard deviations for age. There was an insufficient number of minorities and women among the 80 entry-level technicians for subsequent adverse impact statistics. Differences related to age were nonthreatening, as older entry-level technicians outperformed younger entry-level technicians on measures related to knowledge (but not initiative). This was attributable to superior performance by higher level entry-level technicians, a factor positively correlated with age. Job level was used as a covariate in all subsequent analyses.

### Reliability of the EKT Test

Individual test items were examined using correlations between each item and total score, percentage correct per item, and the aforementioned SME item ratings. Five items were eliminated on this basis, yielding a final electronics knowledge test with 60 items. Internal consistency reliability for the final 60 items was assessed using Cohen's alpha, which was acceptable at .90. The alphas for the five components of the test were also acceptable, ranging from .85 to .92.

### Work Analysis Report

After these pilot results, the organization was content with initial evidence supporting the use of a test for personnel selection. The final work analysis report was divided into four components.

Component 1 was a five-page executive summary outlining the results of the work analysis study and the evidence for content validity. This summary used bullet points to illustrate the major work requirements, worker characteristics, and test content. A few figures were used to demonstrate summary content validity evidence (e.g., mean frequency, importance).

Component 2 was a full report detailing each of the aforementioned procedures and results. This included a review of rating scales, with particular emphasis on frequency, importance, and criticality ratings. Rater agreement was also presented. Component 3 was an appendix that documented the SME processes, including names, dates, and procedures, and other statistics not included in the main body of the report. Finally, Component 4 was a two-page job description including the major duty areas, the critical job tasks within each duty area, the KSAs associated with critical job tasks, working conditions, and prerequisite educational and work history minimum qualifications.

The executive summary served the needs of interested stakeholders with short attention spans. The main body and appendix served the needs of interested stakeholders who want complete detail, including federal agencies that administer EEO laws. Lastly, the job description was used for recruitment purposes.

### Criterion-Related Validity Strategy

For the criterion validity study, the firm's internal performance appraisals evaluated entry-level technicians on a 4-point scale on four dimensions and a global rating as follows:

1. Quality orientation/attention to detail
2. Problem solving/judgment
3. Initiative
4. Technical knowledge
5. Global rating

These dimensions were consistent with the job requirements documented in the work analysis study. However, the actual (or operational) performance ratings were restricted in range to values of 3 and 4. This was an anticipated outcome. To solve the problem, an experimental performance appraisal study was conducted.

Appraisers (all engineers) were gathered by Deeds for a 3-hour training session conducted by Dr. Good. Dr. Good explained that the experimental ratings were for research purposes only, would be held in confidence by Dr. Good, and would therefore not affect the status of any of the entry-level technicians appraised. Dr. Good then explained the statistical problems associated with restriction in range and rater biases (e.g., halo effects, leniency, stringency, central tendency). Primary and secondary ratings were obtained. Primary ratings were for entry-level technicians under direct supervision and included ratings on a 9-point scale for both the four dimensions and the global rating. Secondary ratings were for entry-level technicians supervised by others, and included only the global ratings.

Raw scores for the in-house test, DAT subtests, and electronics knowledge test were converted to *z*-scores, and *t*-scores were computed by adding 10 to each individual Z score. Thus, by definition, mean performance was 10.0 for the in-house test, each subtest of the DAT, and the electronics knowledge test.

Preliminary descriptive statistics (means and standard deviations) were then computed for each of the predictors. They were comparable across the in-house test, each of the three DAT subtests, and the electronics knowledge test for the sample as a whole. However, Level II entry-level technicians scored significantly higher on the electronics knowledge test (but not the in-house test or DAT). Critically, the correlation between primary and secondary global ratings resulted in an acceptable reliability coefficient ($r = .73$).

With regard to criterion measures, means and standard deviations were computed for the performance appraisals for the sample as a whole and for job level. Means were comparable within and across job levels for two of the dimensions (attention to detail and initiative), but were significantly higher for the Level II entry-level technicians on the other two dimensions (problem solving and technical knowledge) and the global rating. Correlations among the four dimensions and global rating were high, ranging from .63 (between technical knowledge and initiative) to .91 (between global rating and attention to detail). For purposes of exposition, the global scores will be used to illustrate criterion validity below.

There was strong evidence of criterion validity for the individual tests, incremental validity for the test battery as a whole, and utility for the electronics knowledge test and a composite of the in-house test and DAT subtests. The individual correlations (i.e., validity coefficients) were moderated by job level. The validity coefficients for Level I entry-level technicians were .59 for the in-house test, .53 for the DAT, and .35 for the electronics knowledge test. The validity coefficients for Level II entry-level technicians were .31 for the in-house test, .27 for the DAT, and .51 for the electronics knowledge test. All validity coefficients were corrected for unreliability, and both the raw and corrected validity coefficients were reported. A multiple regression analysis showed incremental validity. That is, there were significantly higher multiple R values for the test battery as a whole as compared to individual validity coefficients for the whole sample and for Level I and Level II entry-level technicians.

Utility was estimated by using global performance appraisal ratings of 5 or 6 (out of 9) as an estimate of average performance and global ratings of 7 or higher as an estimate of superior performance. The percentages of the entry-level technicians showing average and superior global ratings were 69.7% and 21.1%, respectively, for the whole sample. In comparison, these percentages were 78.9% and 39.5% for the top one-third performers on the electronics knowledge test, and 76.3% and 31.6% for the top one-third performers on a composite of the in-house test and DAT subtests.

### Critical Decisions

Dr. Good met again with Deeds, Pouba, and Brane to explain two critical decisions: cutoff scores and the combination of the component tests. It was agreed that test results would serve as the first step of a multiple hurdle in which applicants were screened for subsequent interviews by engineers. The cutoff score for the electronics knowledge test was set at one half a standard deviation below, and the cutoff score for the composite of the in-house test and DAT was set at one standard deviation below the total sample means. Failure to reach either cutoff was grounds for exclusion, with exceptions made for applicants that scored one half a standard deviation or higher above the incumbent sample on the electronics knowledge test.

### Final Report

A similar strategy was used to communicate results of the criterion study as was used for the work analysis report. A two-page executive summary outlined criterion results of the work analysis study and the evidence for content and criterion validity. Component 2 was a full report detailing each of the aforementioned procedures and results. Component 3 was an appendix that documented all of the specific statistical analyses.

### What Does This Case Study Demonstrate?

This case study identifies a number of important issues regarding the documentation of work analysis. For example, note the following:

- The purpose of the project was clearly identified, as were specific strategies intended to meet various goals.

- Initial job information was reviewed and a baseline set of major duties were documented.
- Information about the number, adequacy, and representation of SMEs used in focus groups was documented.
- Data collection procedures were described.
- Work behavior and worker characteristic information were included.
- Other summary data were presented (e.g., descriptive statistics, rater agreement indices).
- Relevant decisions made based on SME evaluation were clearly documented.
- Summary statistics were described, as were psychometric analyses of the quality of the work analysis data.
- Content validity linkage data were included.
- Additional context (e.g., pilot testing, how work analysis data were used for criterion development in the criterion study) was documented, although some of this information was presented separate from the work analysis report.
- The work analysis was clearly used at various stages of multiple validation strategies.

## DOCUMENTING VARIOUS PHASES OF A WORK ANALYSIS PROJECT

As the case study demonstrates, work analysis data are critical for both proximal and distal personnel selection work. That is to say, work analysis data may be used immediately after being collected for a content or criterion validity study, or may be used years later to conduct a job worth analysis, or to determine if the advent of a new technology has substantially changed a job and the worker characteristics necessary to perform that job. In most instances, the role of work analysis data in the short term is well understood and documentation strategies can be catered toward that end. However, it is difficult to predict how work analysis data may be used in the future, and as such the work analyst should consider best practice documentation strategies for the long term.

Figure 8.1 displays a chronology of work analysis phases, and this framework may be used in considering documentation strategies in each phase. Both short-term and long-term organizational goals should be considered, as should the employment decisions made from procedures developed from work analysis data and corresponding legal defensibility considerations. As the figure shows, the process may be cyclical in nature, such that the conclusions based on one completed work analysis could be used for planning another work analysis or for developing a different validation strategy. This notion is consistent with the dynamic nature of human resource management. Phases include initial planning, instrument development, data collection, summarizing results and creating a deliverable, making decisions based on the results, and evaluating the deliverable and considering next steps.

### Phase 1: Initial Job Planning

During the initial planning phases of a work analysis project, a number of considerations should be evaluated and documented, and the specific documentation strategies depend on relevant context. From a strategy perspective, it is often useful to document the expected steps in the work analysis project up front, with a description of each phase and expectations of the deliverable at that phase. It is also useful to consider the legal defensibility of the envisioned process.

Generally, the work analyst should document any available baseline information about the jobs of interest. For example, perhaps training materials, an older work analysis, and/or job descriptions can be leveraged for initial information, and initial work behavior and worker characteristic lists are available. Even if no work analysis has been conducted before, there may be already existing taxonomies available to document and summarize work relevant data, leading to what




**Figure 8.1** A framework for documenting phases in a work analysis.

is often called a deductive analysis. For example, the Position Analysis Questionnaire offers a variety of already existing taxonomies (see http://www.paq.com). Additionally, the Occupational Information Network (O*NET) is a federally-funded database system that provides work behavior, worker characteristics, and linkage documentation systems (Peterson & Jeanneret, 1997). Both of these may offer reasoning starting points.

On the other hand, some work analysis projects start with no previously existing information. In other words, the work analyst is responsible for collecting baseline data and developing documentation and summary systems for such items as work behaviors, worker characteristics, equipment, work conditions, and recent changes (Williams & Crafts, 1997). This situation generally requires more consideration upfront simply because information taxonomies must be developed. For example, the work analysts should develop a sampling plan to ensure that an adequate number of SMEs are available for the research and that this group generalizes well to the population of workers of interest. The work analyst would also want to consider some initial models for how data should be collected. Table 8.1 presents a general set of steps in the work analysis that one might expect to see at the beginning of a work analysis report. This table is simply intended to provide a general overview of the process.

### Phase 2: Instrument Development

With regard to specific information about the work and relevant worker characteristics to perform that work, the work analyst should document how initial lists were developed. This may include source material from already existing taxonomies or work analysis reports, and/or the processes used to generate initial lists (usually focus groups, interviews, and job observations). This phase may also include the classification of other information, including tools, equipment, work conditions

**Table 8.1** Example Process for a Work Analysis Project

| Work Analysis Phase | Purpose of Phase |
|---|---|
| Starting point | Identify baseline job information.<br>Consider steps, timeline, and deliverable. |
| Job observation (20 hours) and interviews ($n = 10$) | Verify/revise baseline info or develop initial work behavior and worker characteristic lists.<br>Collect contextual info on the job, equipment, work conditions, changes, etc. |
| Work survey ($n = 40$) | Identify critical work behaviors. |
| Worker characteristic survey ($n = 40$) | Identify critical worker characteristics. |
| Linkage exercises ($n = 20$) | Prioritize worker characteristics as they relate to the job. |
| Summary analyses | Summarize previous steps via descriptive statistics and agreement indices (e.g., intraclass correlations). |
| Assessment development | Develop assessment items that capture appropriate worker characteristics. |
| SME review of assessment ($n = 10$) | Verify that test content links to worker characteristics. |
| Pilot test ($n = 100$) | Collect data and assess psychometrics. |
| Assessment evaluation and next steps | Assess adverse impact, make revisions, and consider the adequacy of accumulated evidence and legal defensibility. |
| Deliverable | A content validity study and recommended next steps for validation research. |

(e.g., weather issues, volume variability, deadlines), and whether or not any core aspects of the job have changed. Generally, the work analyst may go through multiple iterations of instruments to be used for data collection; these instruments may be administrative in nature (e.g., sign in sheets, schedules, assignments) or more directly related to data collection (e.g., SME training documents, focus group protocols, interview scripts).

### Phase 3: Data Collection

Regardless of the work analysis phase, from a legal defensibility perspective, it is critical to document the actual methods and processes used to collect and summarize data. This includes any job observation, interview, focus group, or survey conducted as part of the work analysis. From a legal defensibility perspective, the work analyst may benefit from treating method and process documentation like they would a methods section in a research report for a scholarly journal. Issues related to the methods themselves and the SMEs who participated in those methods should both be recorded, although this information may fit better in an appendix as opposed to the text of a report.

One of the more common criticisms of work analysis data used in content-oriented validation research is that the SMEs used in the analysis do not represent the general workforce. This misrepresentation may exist along various dimensions, including gender, race, age, tenure, job title, and quality of work. If this criticism is true, it is a damaging one because the job information collected may not accurately depict the work as it exists in reality. For this reason, it is important to develop and document a sampling plan that generalizes to the workforce. We recommend that summary information such sample size and sample characteristics be documented. Additionally, it is also useful to keep a running table of SMEs who participate in various processes, as seen in Table 8.2. It is also generally a good idea to include the actual work analysis tools (e.g., job observation form, interview script, survey) in an appendix to the work analysis report. Alternatively, the work analyst could present actual instruments in the text, as Table 8.3 exemplifies.

With regard to the actual processes, keeping track of each individual data collection allows for easy data summary. For example, something like Table 8.4 could be used to document job observations, and maintenance of this worksheet would allow for easy summary of job observation efforts and evaluation of whether the observations represent the workforce as a whole. Other data that are

**Table 8.2** Example of Subject Matter Expert Table

| Subject Matter Expert | Race | Sex | Age | Job Title | Tenure (years) | Previous Job | Supervise Job in Question? | Comments |
|---|---|---|---|---|---|---|---|---|
| 1 | B | M | 30–39 | Adm | 4 | None | Y | |
| 2 | W | M | 20–29 | Whse | 6 | Whse | Y | |
| 3 | B | M | 40–49 | Adm | 7 | None | Y | |
| 4 | B | F | 50–59 | Oper | 1 | Whse | Y | |
| 5 | H | M | 50–59 | Adm | 1 | None | Y | Left workforce for 20 years |
| 6 | W | M | 40–49 | Adm | 3 | Adm | Y | |
| 7 | W | M | 30–39 | Oper | 9 | None | Y | |
| 8 | W | F | 60–69 | Whse | 11 | Adm | Y | New team leader |
| 9 | H | M | 20–29 | Adm | 2 | None | Y | |

Adm = administrative; Oper = operator; Whse = warehouse.

**Table 8.3** Example Work Requirement Survey Sheet

| Survey Item | Scale |
|---|---|
| Do employees in this job perform this behavior? | 1. Yes<br>2. No |
| How often is this behavior performed on this job? | 1. Never<br>2. Yearly<br>3. Monthly<br>4. Daily<br>5. Multiple times a day |
| How important is this work behavior to successful job performance? | 1. Not important at all<br>2. Somewhat important<br>3. Important<br>4. Extremely important |
| Is this work behavior necessary to perform on the first day of the job? | 1. Yes<br>2. No |

Note that a worker characteristic survey sheet would include similar scales measuring things such as:

- How frequently is this worker characteristic seen on the job?
- How important is worker characteristic to performing the job?
- Does this worker characteristic differentiate adequate workers from inadequate workers?

**Table 8.4** An Example Job Observation Worksheet

| Date | Location | Number of Subject Matter Experts | Time Spent (hours) | General Description |
|---|---|---|---|---|
| 1/1/2008 | Washington, DC | 10 | 4 | Observed warehouse workers on the job |
| 2/1/2008 | New York City (1) | 7 | 3 | Observed supervisors oversee warehouse production |
| 2/1/2008 | New York City (2) | 5 | 6 | Observed administrative workers on the job |
| 4/1/2008 | Miami | 11 | 7 | Observed administrative workers on the job |
| 4/15/2008 | Pittsburgh | 13 | 10 | Observed operator jobs |

often measured in survey format include data about tools, equipment, contextual differences in job duties (e.g., location differences in work). Again, it is also a good idea to keep documentation of the actual surveys that are used.

### Phase 4: Results and Deliverables

Summary data should also be included in the work analysis report; this should be intuitive because it is this summary data that will likely be used to make a series of important decisions. With regard to SME ratings, these data are often represented via descriptive statistic tables like Table 8.5, which presents summary linkage data. Bar or line graphs may also offer illustrative methods of demonstrating these data. General agreement and/or reliability indices also fit into this category. Oftentimes these data are fairly simple and can be presented in the text. In other situations, it may be more appropriate to present these data in some form of a matrix.

### Phase 5: Decision-Making Based on the Analysis

It is also important to document decisions made based on a work analysis, as would be appropriate in a content-oriented validity strategy. Recall the example in the case study of a linkage matrix of worker characteristics and jobs for which those characteristics are important. In this example, perhaps inclusion criteria were empirical rules using importance, the extent to which a characteristic differentiates successful from unsuccessful performance, and a more subjective expert opinion of practical constraints such as measurement difficulties and budgetary constraints. In a stand-alone content validity report, this section would include decisions related to pilot testing and initial test evaluation.

In any technical report, an obvious challenge is to describe conclusions from complex data in ways that audience members without technical expertise can understand. For example, general communication style issues can differentiate a useable report from one that seems insurmountable to the nontechnical manager who is responsible for making decisions based on a work analysis. Some general communication strategies for presenting key points and implications from work analysis data include the following:

- Create a short executive summary written in nontechnical style that summarizes the major conclusions/deliverables from the work analysis.
- Use bullet points when feasible, particularly in the executive summary.
- When appropriate, summarize data via graphs or figures. These are often more engaging and less complex than tables and can be used break up the text of the document.

**Table 8.5** Example of Summary Linkage Data (Based on 56 Subject Matter Experts)

| KSA | Importance | Frequency | Criticality | Necessary on Day 1? | Can Be Trained Easily on the Job? | Distinguishes Successful from Unsuccessful? |
|---|---|---|---|---|---|---|
| A | 4.1 | 4.5 | 4.2 | Y (88%) | N (63%) | Y (100%) |
| B | 4.6 | 4.2 | 4.5 | Y (80%) | N (61%) | Y (75%) |
| C | 3.8 | 3.6 | 3.7 | N (56%) | Y (67%) | Y (68%) |
| D | 2.9 | 4.0 | 3.3 | Y (91%) | N (52%) | N (63%) |
| E | 3.1 | 3.0 | 3.1 | N (62%) | N (38%) | N (60%) |
| F | 3.4 | 2.1 | 3.0 | N (38%) | N (12%) | N (40%) |
| G | 4.7 | 3.8 | 4.4 | Y (67%) | N (20%) | Y (88%) |
| H | 3.4 | 3.4 | 3.4 | N (10%) | N (28%) | N (50%) |
| I | 4.0 | 4.8 | 4.3 | Y (91%) | N (0%) | Y (89%) |

- Consider placing a potentially large portion of technical information in a series of appendices in a stand-alone document. This may allow both the technical expert and the layperson to read the text of the report; the layperson can ignore the appendices, while the technical expert can thumb through the text and appendices simultaneously.
- Include a "Next Steps" section to conclude the work analysis report; this section ensures that the audience can understand the temporal nature of the project.

### Phase 6: Evaluation and Next Steps

This concluding phase in the work analysis process is general in scope and may or may not link to additional work analysis or other validation research. Additionally, this step may be on hold for an extended amount of time as more information about the selection procedure or job is collected. This section could include a review of practical constraints on the current work analysis that may spur more research, additional legal defensibility concerns, and any issues related to whether the jobs of interest may have changed. Any job changes may require additional research. Because these job changes could occur years after a work analysis has been conducted, it is often difficult to determine whether this phase has concluded because it is impossible to predict the future. Table 8.6 summarizes these phases and details more specific documentation considerations.

## OVERVIEW OF EEO LAWS FOR WHICH WORK ANALYSIS MAY PLAY A ROLE

The work analytic documentation strategies described previously are particularly important when a selection procedure based on a work analysis comes under legal defensibility scrutiny. This section describes a number of EEO laws that collectively offer protections against workplace discrimination based on race, color, religion, sex, national origin, age, and disability. Title VII of the Civil Rights Act of 1964 is the most comprehensive law, protecting five of these classes: race, color, religion, sex, and national origin. Age is covered in the Age Discrimination in Employment Act of 1967; disability is covered in the Americans with Disabilities Act of 1990 (ADA) and its precursor, the Rehabilitation Act of 1973.

Other important laws include Executive Order 11246, the 5th, 13th, and 14th Amendments to the U.S. Constitution, and the Equal Pay Act of 1963. Unlike Title VII, which protects all members of each protected class, Executive Order 11246 generally applies to underutilization of minorities and women. The 5th and 14th Amendments provide equal protection in federal and state/local entities, respectively, and the 13th Amendment has overlapping coverage with Title VII based on race, color, religion, and national origin, but not sex. The Equal Pay Act is a surgical statute covering equal pay for equal work based on sex. Equal pay for equal work is also covered in Title VII based on race, color, religion, sex, and national origin.

A final point to note is that virtually all of these laws have been amended. The most noteworthy amendments are the EEO Act of 1972, which extended Title VII coverage to federal, state, and local governments, the Civil Rights Act of 1991, which added compensatory and punitive damages and jury trials to Title VII, and also affected several of the other laws cited above, and the ADA Amendments Act of 2008, which authorized important changes in how we define being disabled within the meaning of the ADA. At the time this chapter was written, the Ledbetter Fair Pay Act had recently been signed into law and President Obama had created a multi-agency task force on pay equity. These political initiatives may substantially change the landscape of compensation discrimination enforcement.

There are several areas in which work analysis has been featured in case law. For present purposes, we focus on three of them: (a) adverse impact of tests and other selection criteria, (b) the definition of essential job functions in disability cases, and (c) compensation discrimination under the Equal Pay Act.

**Table 8.6** A Matrix of Work Analysis Phases, Typical Tasks, and Documentation Considerations

| Phases | Phase I: Initial Planning | Phase II: Instrument Development | Phase III: Data Collection | Phase IV: Results and Deliverable | Phase V: Decision Making | Phase VI: Evaluation and Next Steps |
|---|---|---|---|---|---|---|
| **Typical tasks** | • Identify purpose<br>• Envision deliverable<br>• Set up timeline<br>• Conduct literature review<br>• Develop sampling plan | Develop job observation, surveys, focus groups, etc.<br>SME training<br>Pilot measures<br>Revise measures<br>Legal defensibility considerations | Schedule collections<br>Strategize data maintenance<br>Collect data on work behaviors, worker characteristics, other (equipment, conditions, etc.)<br>Evaluate whether sampling plan was met | Summarize results with descriptive, tables, figures, etc.<br>Interpret results<br>Assess psychometric properties of data collection instruments<br>Write up results in an executive summary<br>Prepare full report with appendices<br>Request feedback and revise deliverable<br>Submit deliverable | Consider what constructs to measure<br>Make decisions<br>Test development<br>Pilot test<br>Revise test<br>Conduct other research<br>Make recommendations based on available information | Consider practical constraints/legal defensibility considerations<br>Review recency of data<br>Supplement data as necessary<br>Plan next research steps |
| **Documentation considerations** | • Write up a summary of the literature review<br>• Record the sampling plan and possible difficulties<br>• Create spreadsheets with assignments, timelines, etc. | Create a list of materials reviewed<br>Document the instrument development process<br>Capture any SME and expert reviews of the instruments<br>Start an appendix with all instruments<br>Keep pilot statistics<br>Conduct an initial audit using UGESP as a model | Create and update an SME list<br>Document a list of final instruments<br>Create a summary of where data were collected | Develop a psychometric appendix with relevant supporting data<br>Summarize all descriptive data<br>Write an executive summary of results | Write down construct inclusion criteria and the decision process<br>Write a reasonable alternatives section for the report<br>Write a content validity report with linkage of selection procedure to work analysis data<br>Write a pilot test section | Conduct a "final" audit using UGESP as a model<br>Document recency studies<br>Refine longer-term validation plan |

## Adverse Impact

Adverse (or disparate) impact occurs when an otherwise facially neutral test or other selection criterion disproportionately excludes a higher percentage of one group as opposed to another. For example, in *Griggs v. Duke Power* (1971), Duke Power required a high school diploma and passing scores on two cognitive tests (the Bennett and Wonderlic tests) for entry in or promotion to higher-level jobs. The cognitive tests excluded 94% of black applicants compared to 42% of white applicants. The high school graduation rate in North Carolina at the time was 34% for whites, but only 12% for blacks. A unanimous Supreme Court struck down both requirements, ruling that if an employment practice produces adverse impact, there must be a "manifest relationship" between the challenged practice and the "employment in question."

Then, in *Albemarle v. Moody* (1975), Albemarle used the high school diploma, Wonderlic, and Revised Beta Exam for hiring. Aware of the *Griggs* ruling, Albemarle hired an expert to correlate test scores with job performance ratings. However, it was a hasty effort conducted shortly before trial. Indeed, the expert was not even on site when the study was conducted. One of the more glaring errors was absence of work analysis data. Thus, as noted by the Fourth Circuit in *Moody v. Albemarle* (1973):

> In developing criteria of job performance by which to ascertain the validity of its tests, Albemarle failed to engage in any job analysis. Instead, test results were compared with possibly subjective ratings of supervisors who were given a vague standard by which to judge job performance. Other courts have expressed skepticism about the value of such ill-defined supervisor appraisals.

Albemarle lost, and the *Griggs* and *Albemarle* rulings formed the basis for the *Uniform Guidelines on Employee Selection Procedures* (UGESP; U.S. Equal Employment Opportunity Commission et al. 1978). After *Griggs* and *Albemarle*, adverse impact rulings with work analysis implications occurred primarily in the lower courts. The most important early rulings were in *Guardians v. Civil Service* (1980) and *Gillespie v. Wisconsin* (1985), which established precedents for content validity, cutoff scores, and rank ordering. The most important recent ruling is *Lanning v. SEPTA* (1999), which on the surface contradicts precedents established in *Guardians*, *Gillespie* and most other relevant rulings.

*Guardians* addressed a portion of the UGESP implying that content validity is insufficient to support tests of mental processes. Accordingly:

> A selection procedure based on inferences about *mental processes* cannot be supported solely or primarily on the basis of content validity. Thus, a content strategy is not appropriate for demonstrating the validity of selection procedures which purport to measure traits or constructs such as intelligence, aptitude, personality, common sense, judgment, leadership and spatial ability.

The Second Circuit Court struck down this guidance in *Guardians*, and established the following five steps to support content validity regardless of the construct measured:

1. Suitable work analysis
2. Reasonable competence in test construction
3. Test content related to job content
4. Test content representative of job content
5. Scoring systems selecting applicants that are better job performers

The five steps have been supported in several subsequent cases, most notably, *Gillespie v. Wisconsin* (1985) and *Police Officers v. Columbus, Ohio* (1990), and most recently, in *Gulino v. NY State* (2006).

It is now commonly accepted in the courts that content validity is sufficient to prove that a test is job-related, as long as the work analysis is properly conducted, the test is properly created and scored, and the test is broadly representative of critical KSAs. For example, in *Green v. Washington State* (1997), virtually all of the steps established in *Guardians* were violated, resulting in the rejection of a job element exam. Five failures were cited, including: test items that are not representative of critical KSAs, measurement of abstract concepts, failure to measure intended KSAs, items with no clear-cut answers, and measurement of KSAs learned on the job.

Precedent for cutoff scores and rank ordering were also established in *Guardians* and *Gillespie*. The UGESP are vague with respect to cutoff scores, stating only that they "should normally be set as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force." However, in *Guardians*, the Second Circuit ruled:

> An employer may establish a justifiable reason for a cut-off score by, for example, using a professional estimate of the requisite ability levels, or, at the very least by analyzing the test results to locate a logical break-point in the distribution of scores.

Additionally, in a series of questions and answers relating to the UGESP, the EEOC gave the following answer to Question 62:

> Use of a selection procedure on a ranking basis may be supported by content validity if there is evidence from job analysis or other empirical data that what is measured by the selection procedure is associated with differences in levels of job performance.

Question 62 was subsequently cited *Gillespie* to support both strict rank ordering and cutoff scores.

The *Lanning* case featured an aerobic capacity test for the hiring of transit authority police officers that adversely impacted female applicants. There were two Third Circuit rulings. In *Lanning I* (*Lanning v. SEPTA*, 1999), the Third Circuit adopted new rules for cutoff scores, ruling that cutoff scores must measure "the minimum qualifications necessary for successful performance of the job in question." In *Lanning II* (*Lanning v. SEPTA*, 2002), the Third Circuit supported the challenged cutoff score under these new rules.

In its original ruling, the district court favored SEPTA (*Lanning v. SEPTA, 1998*). The court was particularly impressed with work analysis data showing the importance of aerobic capacity to officer and public safety, and multiple regression data showing the relationship between aerobic capacity and successful criminal arrests and commendations for field work. On remand after *Lanning I*, the district court cited the following passage from the Society for Industrial and Organizational Psychology (SIOP, 2003):

> Judgment is necessary in setting any critical or cutoff score. A fully defensible empirical basis for setting a critical score is seldom, if ever, available. The only justification that can be demanded is that critical scores be determined on the basis of a rationale which may include such factors as estimated cost-benefit ratio, number of openings and selection ratio, success ratio, social policies of the organization, or judgments as to require knowledge, skill or ability on the job. If critical scores are used as a basis for rejecting applicants, their rational or justification should be made known to the users. (p. 47)

The district court then reiterated its earlier ruling, and the Third Circuit affirmed the district court in *Lanning II*.

The *Lanning I* ruling was criticized by members of the IO community (e.g., DeNisi, 1999; Sharf, 1999). In our opinion, these criticisms are valid. Nevertheless, in view of *Lanning II*, it is not clear that *Lanning I* is as threatening as first thought. For example, several of the major features of the

case study are consistent with the reasoning used in *Lanning II*, including use of the work analysis to establish critical KSAs, test creation based solely on these KSAs, and establishment of a cutoff score based on the average performance of existing incumbents.

### Essential Job Functions and the ADA

The ADA defines a qualified individual with a disability as one who can perform all essential job functions with or without reasonable accommodation. The EEOC Interpretive Guidelines supports this definition with the following two steps for determining qualification:

> The *first step* is to determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skill, licenses, etc. The *second step* is to determine whether or not the individual can perform the essential functions of the position held or desired with or without reasonable accommodation.

In other words, Step 1 means having prerequisite KSAs for essential job functions and Step 2 means performing those essential job functions either with or without reasonable accommodation. For present purposes, our focus is on Step 1.

The following analogy by the Seventh Circuit in *Miller v Illinois* (1996) illustrates the distinction between essential and marginal job duties. Accordingly:

> If it is reasonable for a farmer to require each of his farmhands to be able to drive a tractor, clean out the stables, bale the hay, and watch the sheep, a farmhand incapable of performing any of these tasks except the lightest one (watching the sheep) is not able to perform the essential duties of his position.

In this hypothetical example, it would be a reasonable accommodation to eliminate marginal duties, such as watching sheep, but not essential duties, such as driving tractors, cleaning stables, or baling hay.

More realistic examples of essential versus marginal duties are illustrated in *Borrowski v Valley Central* (1995) and *Stone v. Mt. Vernon* (1997). In *Borrowski*, a school librarian with memory and concentration deficits was able to perform the essential duties of actual librarian work, but could not control her students during class. Borrowski requested a teacher's aide, but the school refused. The Second Circuit ruled that her request is reasonable as long the duty in question is not essential, an issue that was remanded back to the district court for a jury to decide.

In *Stone*, a fire chief denied a paraplegic former firefighter a bureau job involving deskwork. The chief claimed that all bureau personnel must fight fires in emergencies, which obviously, Stone could not do. However, two long-term bureau employees testified such emergencies had never occurred, and fighting fires was deemed nonessential for the job in question.

More recently, in *PGA v. Martin* (2001), Casey Martin, a professional golfer, challenged a PGA rule requiring competitors to walk the golf course during PGA events. Martin suffered from a circulatory disease that restricted blood flow in his right leg and made it difficult for him to walk on a golf course without pain. He requested use of a golf cart as a reasonable accommodation, which the PGA denied on grounds that it would "fundamentally alter" its tour events. The Supreme Court disagreed, ruling:

> The use of carts is not inconsistent with the character of golf, the essence of which has always been shot-making. The walking rule ... is neither an essential attribute of the game itself nor an indispensable feature of tournament golf.

The implications of these rulings are clear. Employers cannot put themselves outside the reach of the ADA by arbitrarily defining what is fundamental or essential to a job. Rather, what is essential

versus marginal must stand up to a work analysis in order to survive a court challenge. Additionally, employers that use tests requiring nonessential skills to take, or which assess marginal skills, are also vulnerable.

### Compensation and the Equal Pay Act

The Equal Pay Act requires equal pay for equal work based on sex, with exceptions for seniority and merit, and any other factor other than sex (e.g., educational background). Other statutes also use Equal Pay Act rules, including Title VII, the Age Discrimination in Employment Act of 1967, and the ADA. Equal work means that jobs are substantially equal with respect to skill, effort, responsibility and working conditions. Jobs differing on any one of these dimensions are not equal. Work analysis is featured in two ways: (a) as a basis for job evaluations that establish compensation for different jobs, and (b) in distinguishing between essential job duties that make given job titles "substantially equal."

The connection to job evaluation is illustrated in *American Federation of State, County and Municipal Employers (AFSCME) v. State of Washington* (1985), where the State of Washington compared pay scales based on internal versus external worth. For internal worth, 600 points were assigned to jobs based on skill (280), mental effort (140), accountability (160), and working conditions (20). For external worth, other employers were surveyed to determine prevailing market rates. The state found that jobs with 70% or more females were underpaid relative to job evaluation rates, but were paid at or near prevailing market rates. The state chose to use market forces and AFSCME filed a Title VII suit, claiming that market forces adversely impact females. However, borrowing from a parallel case in *Spaulding v. Washington* (1984), the Ninth Circuit ruled that adverse impact claims require a specific employment practice and that market forces do not constitute an employment practice.

The connection to "substantially equal" jobs is illustrated in several early Equal Pay Act cases. Many of these cases occurred in an era in which it was common to segregate men and women in different areas of a workplace and/or to classify women into lower paying job titles even though the lower and higher paying jobs were substantially equal. Examples of job titles deemed substantially equal include male orderlies and female nurses (*Hodgson v. Brookhaven*, 1970) and male tailors and female seamstresses (*Brennan v. City Stores*, 1973). Additionally, in two cases that combined EPA and Title VII charges, female bindery workers were found to perform work essentially equal to male bookbinders (*Thompson v. Sawyer*, 1982), as were female stewardesses in relation to male pursers (*Laffey v. Northwest Airlines*, 1984).

There were several cases in which employers attempted to justify pay differentials on grounds that were deemed to be artificial. For example, in *Shultz v. Wheaton* (1970), the employer argued that male selector-packers were paid more than their female counterpart because males were expected to be more flexible and perform the work of "snap up boys," and they were required to left heavy objects. The Third Circuit viewed this as an example of artificially generated job classifications because the snap-up work paid the same hourly rate as selector-packer, and females were prohibited from lifting heavy objects because of union rules.

Similar rulings were rendered in *Hodgson v. Brookhaven* (1970) and *Hodgson v. Daisy* (1971). In *Brookhaven*, the Fifth Circuit ruled that additional marginal duties performed by male orderlies were insufficient to justify higher pay as compared to female nurses, and in *Daisy*, the Eighth Circuit ruled that light-duty tasks with greater mental effort performed by females were substantially equal to heavy-duty tasks with greater physical effort performed by males.

Lastly, in *Corning v. Brennan* (1975), Corning attempted to justify higher pay for males and females that had the same job titles on ground than males working the night shift worked under

more hazardous conditions than females working the day shift. The Supreme Court ruled that the surroundings and hazards were not different across these shifts.

In short, the moral for substantially equal work in the Equal Pay Act (and related statutes) parallels the moral for essential job functions in the ADA. That is, marginal extra duties do not make otherwise equal jobs unequal.

## LEGAL/PROFESSIONAL AUTHORITIES AND WORK ANALYSIS

The work analyst may refer to a number of technical authorities that, in part, identify what makes a work analysis adequate or inadequate. These authorities may be used in assessing the legal defensibility of a selection procedure as described above. However, the scope and purpose of these authorities differ (Jeanneret, 2005; Stelly & Goldstein, 2007). For example, the UGESP were written by a joint committee representing the EEOC, the U.S. Department of Labor, the U.S. Department of Justice, and the Civil Service Commission, and as such were developed explicitly for enforcement considerations. These guidelines are enforced as law by the OFCCP and are the most referred authority in EEOC-related litigation (Jeanneret, 2005). As stated in the UGESP:

> These guidelines incorporate a single set of principles which are designed to assist employers, labor organizations, employment agencies, and licensing and certification boards to comply with requirements of Federal law prohibiting employment practices which discriminate on grounds of race, color, religion, sex, and national origin. They are designed to provide a framework for determining the proper use of tests and other selection procedures.

The UGESP contain a number of sections relevant to work analysis. For example, on the expertise necessary to conduct adequate work analysis research, the U.S. Equal Employment Opportunity Commission et al. (1978) stated:

> Professional supervision of selection activities is encouraged but is not a substitute for documented evidence of validity. The enforcement agencies will take into account the fact that a thorough job analysis was conducted and that careful development and use of a selection procedure in accordance with professional standards enhance the probability that the selection procedure is valid for the job. (Section 9B)

On the role of work analysis in all validation strategies, the U.S. Equal Employment Opportunity Commission et al. (1978) stated:

> Any validity study should be based upon a review of information about the job for which the selection procedure is to be used. The review should include a job analysis except as provided in section 14B(3) of this section with respect to criterion-related validity. Any method of job analysis may be used if it provides the information required for the specific validation strategy used. (Section 14-A)

On the role of work analysis in supporting the use of criteria in a criterion-related validity strategy, the U.S. Equal Employment Opportunity Commission et al. (1978) stated:

> There should be a review of job information to determine measures of work behavior(s) or performance that are relevant to the job or group of jobs in question. These measures or criteria are relevant to the extent that they represent critical or important job duties, work behaviors or work outcomes as developed from the review of job information. (Section 14-B(2))

On the use of criteria that are not supported by a work analysis, the U.S. Equal Employment Opportunity Commission et al. (1978) stated:

> Certain criteria may be used without a full job analysis if the user can show the importance of the criteria to the particular employment context. These criteria include but are not limited to production rate, error rate, tardiness, absenteeism, and length of service. (Section 14-B-3)

On the role of work analysis in content-oriented research, the U.S. Equal Employment Opportunity Commission et al. (1978) stated:

> There should be a job analysis which includes an analysis of the important work behavior(s) required for successful performance and their relative importance and, if the behavior results in work product(s), an analysis of the work product(s). (Section 14C(2))

On the role of work analysis in construct validity research, the U.S. Equal Opportunity Employment Commission (1978) stated:

> There should be a job analysis. This job analysis should show the work behavior(s) required for successful performance of the job, or the groups of jobs being studied, the critical or important work behavior(s) in the job or group of jobs being studied, and an identification of the construct(s) believed to underlie successful performance of these critical or important work behaviors in the job or jobs in question. Each construct should be named and defined, so as to distinguish it from other constructs. (Section 14 D(3))

It is important to note that the UGESP have been featured in a growing number of controversies in recent years, stemming primarily from a perceived disconnect between the science of personnel selection and the law. Much of this disconnect relates to the fact that the UGESP were written decades ago but still serve as the most dominant authority in adverse impact case law. Clearly, the science of personnel selection has advanced considerably since 1978.

For example, the UGESP were written before the "Unitarian" concept of validity was developed and accepted by the scientific community. Landy (1986) was among the first to decry "Trinitarian" distinctions in the UGESP between content, criterion, and construct validity. The Trinitarian view, advocated in the UGESP, treats criterion validity as the preferred method for proving job relatedness. In contrast, the Unitarian view holds that any evidence of what a test measures adds to our understanding of job relatedness, regardless of how it is collected. Thus, as noted in the prior section, the UGESP dictum that "inferences based on mental processes cannot be supported solely or primarily on the basis of content validity" contradicts the more modern Unitarian view.

As discussed elsewhere (Gutman, 2005; Landy, Gutman, & Outtz, 2010; Stelly & Goldstein, 2007), the UGESP dictum on content validity has caused quite a bit of confusion in understanding whether content-oriented research is appropriate for supporting the use of measures of constructs such as cognitive abilities and personality traits. Given the advent of the Unitarian perspective of validity, it seems reasonable that a rational linkage of critical work behaviors to the worker characteristics necessary to perform those behaviors and a linkage between procedures and those worker characteristics would meet UGESP requirements, regardless of what constructs are being measured. For example, these requirements are illustrated in *Guardians* (1980) and its progeny, as well as in our featured case study. Fortunately for practitioners, acceptance of well-performed content validity studies is now accepted in case law.

Nevertheless, despite the general acceptance of *Guardians* and its progeny, the reader should be mindful that a literal interpretation of this UGESP dictum may still be used by enforcement

agencies, particularly the OFCCP, and state and local civil rights agencies. Therefore, it is recommended that other evidence (e.g., criterion-related validity) be gathered when it is technically feasible. For example, in the featured case study, a criterion validity study was technically feasible. However, there may be other situations, most notably when municipalities face large-scale hiring or promotion of police or firefighters, that criterion validity studies are less feasible because of contextual factors (e.g., impracticality of administering an examination more than once because applicants are likely to memorize questions and pass them on).

There are other important disconnects. For example, the UGESP define test fairness in an ambiguous fashion. From a scientific perspective, the requirement of a fairness study (without formally defining fairness) is not consistent with research findings that tests are generally fair from a moderated multiple regression perspective.

Guion (1998) provided a very interesting perspective on UGESP, its development, and inconsistencies between UGESP and the current science of selection. For example, he wrote that "the document is not static. Judicial and administrative decisions have modified some interpretations.... the guidelines provisions on content validity (and construct validity) are confused and confusing." With regard to work analysis, Guion pointed out the following:

> Even the most careful job analysis is subjective. Job analysis is not science, even when it is used in scientific research or guided by scientific thought. It is an information gathering tool to help managers or researchers what to do next. (p. 93)

In spite of these disconnects, there are reasonable arguments supporting the belief that the UGESP still meet its intended EEO purpose (e.g., Biddle, 2008). Additionally, our conversations with practitioners in the field suggest that many have adapted to the requirements of the UGESP, as written and modified by case law, and it would be a burden to adapt to new updated rules. A final point to note is that the U.S. Equal Employment Opportunity Commission et al. (1978) recognized the UGESP would someday become outdated, stating "new strategies for showing the validity of selection procedures will be evaluated as they become accepted by the psychological profession." Many of the new strategies are discussed in the most recent edition of the *Principles for the Validation and Use of Personnel Selection Procedures* (SIOP, 2003) and the *Standards for Educational and Psychological Tests* (American Educational Research Association [AERA], American Psychological Association, & National Council on Measurement in Education, 1999), and it is to these authorities we turn to next.

The *Principles for the Validation and Use of Personnel Selection Procedures* (SIOP, 2003) were written by a division within the American Psychological Association (APA). This document provides scientific guidance specifically for those involved in the development and implementation of employment selection systems. The purpose is stated as the following:

> To specify established scientific findings and generally accepted professional practice in the field of personnel selection psychology in the choice, development, evaluation, and use of personnel selection procedures designed to measure constructs related to work behavior with a focus on the accuracy of the inferences that underlie employment decisions. (SIOP, 2003, p. 1)

Toward that end, guidance is framed toward those making employment decisions with selection procedures, and as such focuses on research, application, operational use, and the evaluation of selection procedures.

As expected, the principles include information directly related to work analysis. In fact, the principles take a Unitarian perspective on validation research and present the analysis of work as a precursor to all selection procedure support. Note that these principles were most recently updated in 2003, and as such they include more recent scientific advances as compared to UGESP.

In fact, some in the field of personnel selection advocate the use of the principles in the enforcement context, although the principles themselves state that they are not intended to be a technical translation of existing or future regulations. Specific guidance on work analysis is provided in the following extracts.

On the definition of work or work analysis, SIOP (2003) stated:

> When they are intended to support the underlying validity or use of a selection procedure, these Principles apply. The term "analysis of work" is used throughout this document and subsumes information that traditionally has been collected through job analysis methods as well as other information about the work, worker, organization, and work environment. (p. 10)

On the general purposes of work analysis work, SIOP (2003) stated:

> There are two major purposes for conducting an analysis of work. One purpose is to develop selection procedures. Part of this process is an analysis of work that identifies worker requirements including a description of the general level of ability, skill, knowledge, or other characteristics needed. Such an analysis of work would determine the characteristics workers need to be successful in a specific work setting, or the degree to which the work requirements are similar to requirements for work performed elsewhere. The other purpose is to develop or identify criterion measures by assembling the information needed to understand the work performed. (p. 10)

On the appropriateness of particular work analysis strategies, SIOP (2003) stated:

> There is no single approach that is the preferred method for the analysis of work. The analyses used in a specific study of work are a function of the nature of work, current information about the work, the organizational setting, the workers themselves, and the purpose of the study. Understanding the organization's requirements or objectives is important when selecting an appropriate method for conducting an analysis of work. (p. 11)

On the level of detail required of a work analysis, SIOP (2003) stated:

> The level of detail required of an analysis of work is directly related to its intended use and the availability of information about the work. A less detailed analysis may be sufficient when there is already information descriptive of the work.... situations that require a more detailed analysis of work may include those in which there is little existing work information available and the organization intends to develop predictors of specific job knowledge. (p. 11)

Regarding initial considerations in content-oriented strategies, SIOP (2003) stated:

> The content-based validation study specifically demonstrates that the content of the selection procedure represents an adequate sample of the important work behaviors, activities, and/or worker KSAOs defined by the analysis of work. This involves choosing subject matter experts, defining the content to be included in the selection procedure, developing the selection procedure, establishing the guidelines for administration and scoring, and evaluating the effectiveness of the validation effort. (p. 22)

On the evaluation of content validity evidence, SIOP (2003) stated:

> The documented methods used in developing the selection procedure constitute the primary evidence for the inference that scores from the selection procedure can be generalized to the work behaviors and can be interpreted in terms of predicted work performance. The sufficiency of the match between selection procedure and work domain is a matter of professional judgment based on evidence collected in the validation effort (Goldstein, Zedeck, & Schneider, 1993). (p. 25)

The *Standards for Educational and Psychological Testing* (AERA et al., 1999, p. 2) were generally written for the "professional and for the educated layperson and addresses professional and technical issues of test development and use in education, psychology, and employment." Because this purpose is broader than other authorities, the standards cover a much wider range of topics. For example, the standards spend more time on test-taker rights than the other technical authorities.

Generally, the standards and the principles are in agreement on most topics, primarily because both technical authorities are affiliated with the APA and were written at a similar period of time. Although the standards do not go into as much detail on work analysis topics as the principles, specific information is offered.

On the use of work analysis for transportability of criterion support to a new job, AERA et al. (1999) stated:

> Evidence of predictor-criterion relationships in a current local situation should not be inferred from a single previous validation study unless the previous study was done under favorable conditions....and if the current situation corresponds closely to the previous situation....comment: close correspondence means that the job requirements or underlying psychological constructs are substantially the same (as deemed by a job analysis). (Standard 14.7)

On content-oriented validity, AERA et al. (1999) stated:

> Evidence of validity based on test content requires a thorough and explicit definition of the content domain of interest. For selection, classification, and promotion, the characterization of the domain should be based on the job analysis. (Standard 14.8)

On generalizing content-oriented validity to a new job, AERA et al. (1999) stated:

> If evidence based on test content is a primary source of validity evidence supporting the use of a test for selection into a particular job, a similar inference should be made about the test in a new situation only if the critical job content factors are substantially the same (as is determined by a work analysis). (Standard 14.11)

In summary, the work analyst has the opportunity to use any of the three technical authorities discussed above to evaluate the professional and legal defensibility of a selection procedure where a work analysis provides the crux of supporting evidence. Given the purpose of each authority, it may be most appropriate to use the UGESP, as updated by the principles. Although the UGESP do not capture recent advances in the science of selection, they are most likely to be used in enforcement context (Biddle, 2005), are backed by the U.S. government, and are the most often cited authority in case law (Jeanneret, 2005). As such, using UGESP as a legal defensibility template may most closely mirror the perspective of an enforcement agency or an opposing expert witness whose intention is to point out flaws in work analytic research. The UGESP include technical standards and documentation requirements for content-oriented, criterion, and construct validity studies. Table 8.7 shows how some of the technical standards from section 14C of the UGESP can be used to evaluate the legal defensibility of a selection system supported via a content validity study built upon a work analysis. Section 15-3-C of the UGESP describes the documentation requirements of a content validity study.

As Table 8.7 shows, a number of considerations are related to the legal defensibility of a selection procedure based on a content validity study that leverages a work analysis. These considerations span the different phases of a work analysis project. Additionally, these technical standards demonstrate the longitudinal nature of supporting the use of a selection procedure and highlight the use of a work analysis as a starting point for this supporting evidence. As described by Landy (2007),

**Table 8.7** Using UGESP as a Template for Assessing Legal Defensibility

| Technical Standard from the UGESP | Consideration |
|---|---|
| Appropriateness of content validity study | What types of constructs are being assessed? |
| Analysis of the job | Are observable work behaviors identified?<br>Sample size?<br>Demographic/job/job level representation?<br>Appropriate data collection and analysis methods? |
| Development of selection procedures | Link between procedure and job analysis data (e.g., observable work behavior)? |
| Standards for studies | Representation of content domain? |
| Reliability according to the guidelines | Reliability analyses of the selection procedure?<br>Reliability of SME ratings in a job analysis? |
| Operational use | Is the cut score reasonable?<br>Are the most important aspects of the job incorporated in operationalization? |
| Ranking according to the guidelines | Is the construct linearly related to performance?<br>Does the procedure measure aspects of performance that differentiate among levels of job performance? |

content-oriented approaches are more on the abstract end of the continuum of validity evidence, but all of the technical authorities are in agreement on the importance of understanding work behaviors before developing selection procedures intended to predict those behaviors.

## RECENT LEGAL DEFENSIBILITY TRENDS

Given the case law and technical authorities presented earlier in this chapter, we conclude with some common and more recent legal defensibility issues related to the use of a work analysis project as a foundation for supporting the use of a selection procedure. Certainly there are a number of common mistakes in documenting work analysis data, and many of these have been made before and after the UGESP were written. Other issues are more recent in nature and demonstrate strategic enforcement initiatives and potential loopholes in technical authorities and/or case law. Note that many of these issues could be unavoidable practical constraints; if job analysts document these limitations in the technical report, they could alleviate these limitations in future research.

Some of the more common and long-standing mistakes in documenting work analysis include the following:

- Conducting a work analysis on too small of a sample of SMEs. Although no rule of thumb exists with regard to an adequate sample size, work analysis can usually be done with 5–10 SMEs, although this number depends on a variety of contextual factors.
- Having an SME group that is not representative of the general job population of interest along various dimensions, including but not limited to demographics, performance, and experience.
- Conducting work analysis without linking an assessment to the actual KSAs it is purported to measure. In other words, a work analysis is a necessary but not sufficient phase in a content validity study, and it is possible to conduct a work analysis without supporting the use of a selection procedure (Seberhagen, 2004).
- Not documenting SME agreement given particular measurement designs (e.g., intraclass correlations, corrected Pearson correlations, G-theory estimates; Putka, Le, McCloy, & Diaz, 2008).

One more recent legal defensibility issue concerns the requirement of considering and documenting reasonable alternatives in the adverse impact scenario. Recall that even if an employer demonstrates the job-relatedness of a selection procedure, the enforcement agency/plaintiff can still demonstrate that said procedure is discriminatory if there existed an equally valid and less adverse alternative that the employer knew or should have know about but still did not use. Unfortunately, this issue has become a legal defensibility grey area in the sense that little specific guidance is available via technical authorities, and the enforcement agency/plaintiff burden of demonstrating an equally valid alternative is just beginning to emerge in case law (e.g., *Hayden v. Nassau County*, 1999; *Johnson v. City of Memphis*, 2006; *Bradley v. City of Lynn*, 2006; *Ricci v. Destefano*, 2006).

Despite the greyness of this issue, there are some alternatives open to rational speculation. For example, an alternative could in theory be a measure of a different construct (e.g., an integrity test instead of a cognitive ability test), a different measure of the same construct (e.g., using an interview method instead of a paper-and-pencil test), or a different scoring parameter of the same construct (e.g., lowering the cut score and/or combining multiple predictors). However, what is "equally valid"? Could this be established via correlations in an already existing criterion study or in SME ratings in a work analysis? In the already existing work analysis case, could the equal validity criterion simply be construct rank-ordering based on frequency, importance, or critically ratings?

Likewise, what is "less adverse"? Is it simply anything producing a lower adverse impact ratio, or is it any procedure that does not produce a statistically significant difference in pass rates (assuming that the selection procedure that was implemented had a significant disparity)? The enforcement agency/plaintiff burden to demonstrate a reasonable alternative is also unclear; is the burden simply to articulate a reasonable alternative based on the literature, previous work conducted by the test vendor, or speculation? Or does the plaintiff burden match the employer burden in phase two of an adverse impact scenario, where the test user must demonstrate job-relatedness via research? These issues appear to consider both scientific and socially derived value judgments.

When content validity research is used, this issue often focuses on the worker characteristic identification and/or linkage phase of the work analysis. For example, already available and well-designed work analysis documentation may provide a list of alternatives in the form of other KSA lists that were rated by SMEs but eventually not chosen to be measured and used for selection. In this situation, existing work analysis reports may provide enforcement agencies and plaintiff experts with alternatives in the form of other constructs that were not measured. In some situations, this available work analysis data may actually provide useful alternatives to consider. This assumes that the constructs of interest would likely produce less adverse impact and would be a reasonable predictor of job performance for the jobs of interest. Of course, this alternative does not shed light on the specific reasonable alternative burden required of enforcement agencies/plaintiffs.

Of course, there is a potentially infinite universe of KSAs that could be measured for the purpose of selection. In fact, it is impossible for the selection procedure developer to analyze and document the entire job domain. Perhaps SIOP (2003) stated it best:

> The domain need not include everything that is done on the job. The researcher should indicate what important work behaviors, activities, and worker KSAOs are included in the domain, describe how the content of the work domain is linked to the selection procedure, and explain why certain parts of the domain were or were not included in the selection procedure. (p. 22)

Guion (1998) also spoke to this general issue, stating that, with regard to work analysis,

> Clarity counts more than detail. Lawyers and courts want more detail than is useful. Too much detail can muddle matters; what is needed is a clear enough understanding of the job to move on to the next step, the development of one or more predictive hypotheses...information needed is not necessarily the information desired. (p. 59)

Regardless of the arguments against arbitrary identification of alternatives based on previous work analysis information, it is generally a useful strategy to include in a content validity technical report a short section that explicitly documents the consideration of alternatives constructs and methods. Any inclusion criteria for selecting a construct to measure could be included in this section, as well as why particular construct(s) were chosen for measurement and others that were not.

Note that there are no hard-and-fast rules for inclusion criteria for measurement, although job relatedness and adverse impact should obviously be considered. Practical considerations like administration time, development time, and budgetary constraints could also be included in this section. Additionally, a review of cut score decisions and methods of measurement could also be included in this section. This section could also present a plan related to the longitudinal consideration of reasonable alternatives (e.g., proactive adverse impact analyses, an analysis of alternative cut scores when predictor-criterion relationships are available). Of course, it is impossible to take expert judgment out of the equation in determining which constructs should be assessed and which should not; as such, the work analyst should make a reasonable argument for measuring specific constructs given the available data that support that decision.

Another issue of recent legal defensibility focus is on the currency or recency of work analytic data. This issue has become an important issue as the nature of work has changed from a product-based environment to a service-based environment (Cascio, 1995). In this new world of work, innovations in technology, automation, and the advent of cross-functional work teams have essentially moved many traditional jobs into a continual state of flux. In this situation, previous work analytic information may no longer be relevant, even in situations where these data are only a few years old. In situations where the job has changed, any selection procedure based on an outdated work analysis may no longer be appropriate, and as such the work analysis should be updated. In recent years, enforcement agencies have taken a fairly liberal stance on this issue, essentially criticizing any work analysis conducted in the recent past as outdated and inaccurate without supporting evidence. There are no hard-and-fast rules related to this issue, although enforcement agencies have generally suggested that the shelf life of a content validity study is about 5–7 years. According to SIOP (2003):

> There should be a periodic audit of the use of the selection procedures. Departures from established procedures often occur over time and new findings in psychological or psychometric theory may be relevant to one or more of the assessment procedures in use.

Bobko, Roth, and Buster (2008) published research on assessing the currency of work analysis data. This research was conducted under a consent decree stemming from employment discrimination litigation and was accepted by a court of law. They developed a multiphase system that evaluates the currency of already existing work analysis. Generally, this process includes the following steps:

1. Obtain an understanding of the job and the prior work analysis results.
2. Invite subject matter experts to a two-part meeting.
3. Conduct an SME discussion of what tasks and/or KSAs might have changed in recent years; focus on reasons for any major changes.

4. Use the same work behavior and worker characteristic scales and criteria for inclusion as in the previous work analysis questionnaire to ask SMEs to individually rate any work behaviors or worker characteristics that were suggested as possible changes (e.g., additions or deletions).

At the end of the process, the selection procedure user can determine whether the available work analysis is still current. If these data are outdated, small- or large-scale changes may be required. In some situations, small changes should be documented and the selection procedure can still be supported as job related. In the worst case scenario, the current selection procedure is no longer appropriate and should be revised or even replaced; these changes may require a new content validity study or other strategy.

## CONCLUDING THOUGHTS

This chapter reviewed strategies for documenting work analysis data from both organizational strategy and legal defensibility perspectives. As the chapter suggests, the work analyst can use a variety of strategies in documenting work analytic data, and the case study work analysis framework provides one way of considering what to document and how. As the legal defensibility and technical authority sections show, documenting the appropriate information in professionally sound fashion can play an important role in the defensibility of a selection procedure that is supported by the use of a work analysis. Regardless of the strategies used, there are four major points we feel are worth emphasizing.

First, jobs change over time. This places a premium not only on periodic updates of work analysis data, but also on periodic evaluation of the selection procedures to ensure that they are as connected to the changes in work as they were to the original work. This proactive strategy should be documented appropriately each step of the way.

Second, the law changes over time. Thus, what seems like a best practice or even a legal practice at one point in time is only one major Supreme Court ruling away from being outdated. In the absence of major Supreme Court rulings, the forceful rulings are at the circuit court level, and what is the law in one circuit may not be the law in another circuit.

Third, and closely connected to the previous point, regulations change along with critical court decisions. It is a good rule of thumb to believe that every time the Supreme Court makes a major ruling, or a lower court makes a controversial ruling, the EEOC will have something to say about it. A good way to keep up with regulatory changes is to periodically visit the EEOC web site (http://www.eeoc.gov).

Fourth, the science of personnel selection continues to evolve, and with it, so does the research basis for supporting the use of a test or test battery and the technical authorities. For example, the last two revisions of SIOP principles have featured new material on topics such as validity generalization. Additionally, in between revisions of technical authorities, there is always relevant research in the field that, for example, compares traditional paper-and-pencil tests to other tests (e.g., situational judgment tests and assessment centers), reviews inaccuracies in work analysis rating, and considers the appropriateness of psychometric techniques when humans make ratings.

In closing, we reiterate that work analysis is not a static process. There are many ways and tools for conducting a work analysis, and there are many ways to use a work analysis. The main recommendations we have focused on in this chapter are to (a) document the work you do so that professional and lay audiences alike can understand what was done, and (b) assume that there will be a legal challenge for any work you do, so documentation must include important information that enforcement agencies and courts will want to see.

## FURTHER READING


Brannick, M. T., & Levine, E. L. (2002). *Job analysis: Methods, research and applications for human resource management in the new millennium.* Thousand Oaks, CA: Sage Publications.

Gibson, W. M., & Caplinger, J. A. (2008). Transportation of validation results. In S. M. McPhail (Ed.), *Alternative validation strategies: Developing new and leveraging existing validity evidence.* San Francisco, CA: Jossey Bass.

Gutman, A. (2000). *EEO law and personnel practices* (2nd ed.). Thousand Oaks, CA: Sage Publications.

Harvey, R. (1990). Job analysis. In M. Dunnette & L. Hough (Eds.), *Handbook of industrial and organizational psychology* (2nd ed., Vol. 1, pp. 71–163). Palo Alto, CA: Consulting Psychologists Press.

Kleiman, L. S., & Faley, R. H. Assessing content validity: Standards set by the court. *Personnel Psychology, 31,* 701–713.

Malos, S. (2005). The importance of valid selection and performance appraisal: Do management practices figure in case law? In F. J. Landy (Ed.), *Employment discrimination litigation: Behavioral, quantitative, and legal perspectives.* San Francisco, CA: Jossey Bass.

Outtz, J. L., & Landy, F. J. (2005). Concluding Thoughts. In F. J. Landy (Ed.), *Employment discrimination litigation: Behavioral, quantitative, and legal perspectives.* San Francisco, CA: Jossey Bass.

Thompson, D., & Thompson, T. (1982). Court standards for job analysis in test validation. *Personnel Psychology, 35,* 865–874.

Viswesvaran, C. (2003). Introduction to special issue: Role of technology in shaping the future of staffing and assessment. *International Journal of Selection & Assessment, 11,* 107–112.


## REFERENCES


Albermarle Paper Co. v. Moody, 422 U.S. 405 (1975).

American Educational Research Association [AERA], American Psychological Association, & National Council on Measurement in Education. (1999). *Standards for educational and psychological testing.* Washington, DC: American Psychological Association.

American Federation etc. (AFSCME) v State of Washington (CA9 1985) 770 F.2d 1401.

Banks, C., & Cohen, L. (2005). Wage and hour litigation: I-O Psychology's new frontier. In F. J. Landy (Ed.), *Employment discrimination litigation: Behavioral, quantitative, and legal perspectives.* San Francisco, CA: Jossey Bass.

Biddle, D. (2005). *Adverse impact and test validation: A practitioners guide to valid and defensible employment testing.* Burlington, VT: Gower.

Biddle, D. A. (2008). Are the uniform guidelines outdated? Federal guidelines, professional standards, and validity generalization. *The Industrial-Organizational Psychologist, 45,* 17–23.

Bobko, P., Roth, P. L., & Buster, M. A. (2008). A systematic approach for assessing the currency ("up-to-dateness") of job-analytic information. *Public Personnel Management, 37,* 261–277.

Borrowski v. Calley Central School District, 63 F.3d 131 (Ca. 2 1995).

Bradley v. City of Lynn, 443 F. Supp. 2d. 145 (D. Mass 2006).

Brennan v. City Stores, Inc., 479 F.2d 235 (Ca. 5 1973).

Cascio, W. F. (1995). Whither industrial and organizational psychology in a changing nature of work? *American Psychologist, 50,* 928–939.

Corning Glass Works v. Brennan, 417 U.S. 188 (1974).

DeNisi, A. (1999). A message from your president. *The Industrial-Organizational Psychologist, 37,* 2.

Dunleavy, E., & Gutman, A. (2007). EEO enforcement activity in 2007: A sign of things to come? *The Industrial-Organizational Psychologist, 46,* 77–83.

Gillespie v. State of Wisconsin, 771 F.2d 1035 (Ca. 7 1985).

Goldstein, I., Zedeck, S., & Schneider, B. (1993). An exploration of the job analysis-content validity process. In N. Schmitt & W. Borman (Eds.), *Personnel selection in organizations.* San Francisco, CA: Jossey-Bass

Green v. Washington State, WL 17802 (1997).

Griggs v. Duke Power Co., 401 U.S. 424 (1971).

Guardians of NY v. Civil Service Commission, 630 F.2d 79 (Ca. 2 1980).

Guion, R. M. (1998). *Assessment, measurement, and prediction for personnel decisions.* Mahwah, NJ: Lawrence Erlbaum Associates.

Gulino v. State Education Department, 461 F.3d 134 (Ca. 2 2006).

Gutman, A. (2005). Adverse impact: Judicial, regulatory, and statutory authority. In F. J. Landy (Ed.), *Employment discrimination litigation: Behavioral, quantitative, and legal perspectives.* San Francisco, CA: Jossey Bass.

Hayden v. Nassau County, 180 F.3d 42 (Ca. 2 1999).
Hodgson v. Brookhaven General Hospital, 470 F.2d 729 (Ca. 5 1970).
Hodgson v. Daisy Mfg. Co., 445 F.2d 823 (Ca. 8 1971).
Jeanneret, R. (2005). Professional and technical authorities and guidelines. In F. J. Landy (Ed.), *Employment discrimination litigation: Behavioral, quantitative, and legal perspectives.* San Francisco, CA: Jossey Bass.
Johnson v. City of Memphis, 355 F. Supp. 2d 911 (W. D. Tenn. 2006).
Laffey v. Northwest Airlines, 740 F.2d 1071 (Ca. DC 1984).
Landy, F. J. (1986). Stamp collecting versus science: Validation as hypothesis testing. *American Psychologist, 41,* 1183–1192.
Landy, F. J. (2007). The validation of personnel decisions in the twenty-first century: Back to the future. In S. M. McPhail (Ed.), *Alternative validation strategies: Developing new and leveraging existing validity evidence.* San Francisco, CA: Jossey Bass.
Landy F. J., Gutman, A., & Outtz, J. (2010). Legal issues related to employment discrimination: Major principles and exemplar case law. In J. L. Farr & N. T. Tippens (Eds.), *The handbook of employee selection* (pp. 627–648). Hillsdale, NJ: Lawrence Erlbaum Associates.
Lanning v. SEPTA, No. 97-1161 (E. D. Pa. 1998).
Lanning v. SEPTA, 181 F.3d 478 (Lanning I) (Ca. 3 1999).
Lanning v. SEPTA, 308 F.3d 286 (Lanning II) (Ca. 3 2002).
Miller v. Illinois, 107 F.3d 483 (Ca. 7 1996).
Moody v. Albemarle, 474 F.2d 134 (Ca. 4 1973).
Peterson, N. G., & Jeanneret, P. R. (1997). Job analysis: Overview and description of deductive methods. In D. L. Whetzel & G. R. Wheaton (Eds.), *Applied measurement methods in industrial psychology.* Palo Alto, CA: Davies-Black.
PGA Tour v. Martin, 532 U.S. 661 (2001).
Police Officers for Equal Rights v. City of Columbus, 916 F.2d 1092 (Ca. 6 1990).
Putka, D. J., Le, H., McCloy, R. A., & Diaz, T. (2008). Ill-structured measurement designs in organizational research: Implications for estimating interrater reliability. *Journal of Applied Psychology, 93,* 959–981.
Ricci v. Destefano, 30 F.3d. 88 (Ca. 2 2008).
Schultz v. Wheaton Glass Co., 421 F.2d 259 (Ca. 3 1970).
Seberhagen, L. (2004, August). A job analysis is not a validation study. *Personnel Testing Council of Metropolitan Washington D.C. Newsletter, 26,* 8.
Sharf, J. (1999). Third Circuit's Lanning v. SEPTA decision: Business necessity requires setting minimum standards. *The Industrial-Organizational Psychologist, 37,* 2.
Society for Industrial and Organizational Psychology. (2003). *Principles for the validation and use of personnel selection procedures* (4th ed.). Bowling Green, OH: Author.
Spaulding v. University of Washington, 740 F.2d 686 (Ca. 9 1984).
Stelly, D. J., & Goldstein, H. J. (2007). Application of content validation methods to broader constructs. In S. M. McPhail (Ed.), *Alternative validation strategies: Developing new and leveraging existing validity evidence.* San Francisco, CA: Jossey Bass.
Stone v. City of Mount Vernon, 118 F.3d 92 (Ca. 2 1997).
Thompson v. Sawyer, 678 F.2d 257 (Ca. DC 1982).
U.S. Equal Employment Opportunity Commission, U.S. Civil Service Commission, U.S. Department of Labor, U.S. Department of Justice. (1978). Uniform Guidelines on employee selection procedures. *Federal Register, 43,* 38295–38309.
Williams, K. M., & Crafts, J. L. (1997). Inductive job analysis: The job/task inventory method. In D. L. Whetzel & G. R. Wheaton (Eds.), *Applied measurement methods in industrial psychology.* Palo Alto, CA: Davies-Black.