# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

H. CHRISTINA CHEN-OSTER, ET AL.,

Plaintiffs,

v. 10 CV 6950 (AT) (RWL)

GOLDMAN, SACHS & CO. ET AL.,

Defendants.

------------------------------x

New York, N.Y.
January 23, 2020
2:52 p.m.

Before:

HON. ROBERT W. LEHRBURGER

Magistrate Judge

APPEARANCES

LIEFF CABRASER HEIMANN & BERNSTEIN
Attorneys for Plaintiffs
BY: KELLY DERMODY

OUTTEN & GOLDEN
Attorneys for Plaintiffs
BY: MICHAEL DANNA
CHRISTOPHER MCNERNEY

SULLIVAN & CROMWELL
Attorneys for Defendants
BY: ROBERT GIUFFRA, JR.
AMANDA DAVIDOFF
JOSHUA LEVY
ELIZABETH CASSADY
ANN ELIZABETH OSTRAGER

THE COURT: Good afternoon, everybody. Please be seated.

(Case called)

MS. DERMODY: Good afternoon, your Honor. Kelly Dermody from Leiff Cabraser for plaintiffs.

MR. DANNA: Michael Danna, Outten & Golden, for the plaintiffs.

MR. McNERNEY: Christopher McNerney, also from Outten & Golden, for the plaintiffs.

THE COURT: Good afternoon.

MR. GIUFFRA: Good afternoon, your Honor. Robert Giuffra with Sullivan & Cromwell for the defendants. And I think you won't be hearing very much from me today but from my other colleagues. So that's a blessing.

MS. DAVIDOFF: Good afternoon, your Honor.

Amanda Davidoff from Sullivan & Cromwell.

MR. LEVY: Josh Levy, Sullivan & Cromwell, for defendants.

MS. CASSADY: Good afternoon, your Honor. Elizabeth Cassady, Sullivan & Cromwell.

THE COURT: Good afternoon. And kudos to counsel for bringing others to the tables with them to address certain things.

So this is the way I have the agenda I'd like to follow. It's very much -- I think it's fairly like what you

have. I just mentioned the schedule. You proposed a new schedule and it looks fine to me so I'll approve that unless someone tells me there's a reason that things have changed. Are we OK with that?

MS. DERMODY: Yes, your Honor. Thank you.

MR. GIUFFRA: Yes, your Honor.

THE COURT: Terrific.

Depositions have been sort of presented as a preview but not yet ripe. Is that still the case?

MS. DERMODY: I think that's right, your Honor. I just want to make sure the Court is aware, it's going to probably come up as an issue, we don't want to be surprising anyone to think that somehow that part of discovery is resolved.

MR. GIUFFRA: Yes, your Honor. We think it's premature.

THE COURT: Now if we could only stop.

So I want to cover the interrogatories. I want to cover privilege log issues. But I also want to address, and apologies if there's not a heads-up on this, I want to address the motion for reconsideration, in which case Mr. Giuffra may want to speak.

So let's talk about the interrogatories, 21 additional interrogatories. I see 18 of them as essentially contention interrogatories that are asking six questions each about the

three different processes. And I'm kind of curious. Ms. Dermody or whoever will be addressing this, why is it that you can't answer these now?

Putting aside the question of number. We'll address that separately. I just want to understand. There is an argument about these being really experts and I just want to understand why they can't be answered.

MR. DANNA: Thanks, your Honor. Michael Danna for the plaintiffs.

I think our position is not that we cannot answer these 18 interrogatories. It's that they require expert evidence in order to fully answer them, in order to have useful answers to the interrogatories.

THE COURT: So expert evidence being expert opinions?

MR. DANNA: Yes. That's right. Just as an example. So, proposed interrogatories 4, 10, and 16 ask plaintiffs to state the specific adverse impacts associated with the challenged policies. That, of course, will require statistical evidence.

Proposed interrogatories 6, 7, 12, 13, 18, 19, ask about less discriminatory alternatives. These, too, will require expert opinions before we can fully answer these.

So the question is not that we cannot answer them but that there is no -- they're both premature in that expert discovery has not happened yet but also there is no need to

serve these because the topics of the interrogatories will be fully covered by the expert discovery period.

THE COURT: What I'm trying to get to the bottom of in part, not that this will necessarily make a difference, but it's one thing to say you basically know the answer now but you're holding off until expert opinions are served versus the answers can really only be provided by the experts. I'm trying to understand. And you don't have that information yet because the experts haven't analyzed the facts and all the facts aren't out that they need to analyze.

MR. DANNA: I understand the question. I think our answers to all of those 18 interrogatories will be developed by expert -- during expert discovery.

THE COURT: They struck me as answers or questions that would be the subject of expert testimony. So I think I understand where you're coming from.

Other than the expert issue and the issue that these are in addition to the limit of interrogatories that have already been issued, any other bases that you're saying that you should not be required to answer?

MR. DANNA: Yes, your Honor. These interrogatories are cumulative of prior requests, both prior interrogatories and also requests for admission that plaintiffs have not yet responded to.

THE COURT: Well an interrogatory is different than a

request for admission.

MR. DANNA: Right. Yes.

THE COURT: So I don't know that it's cumulative exactly of that. And often you ask them in tandem.

With respect to the ones you're saying they're cumulative of, are those ones that Judge Francis previously ruled did not have to be answered because they were improperly put?

MR. DANNA: Well the interrogatories, no. I think the proposed interrogatories are more cumulative of the requests for admission. And I understand your point that they are different. However -- and unfortunately we didn't submit the requests for admission into the record. We have copies and so I can provide those to you.

But just as some examples as to the overlap. Three of Goldman's requests for admission ask that plaintiffs admit that we have not identified any alternative processes to the three challenged practices. And then six of the proposed interrogatories ask that we identify the alternatives that we have identified.

THE COURT: So what's the answer to the request for admission? It depends. All right.

So if the answer is yes, there are some, then you'd have ones to identify. If you haven't -- if there aren't any you've identified, then there's nothing to answer the

interrogatory with.

MR. DANNA: I think that speaks to our -- one of our concerns here, which is that Goldman has not yet waited to see if there's a discovery need for these interrogatories. They have not even seen our responses to their requests for admission those are due on February 3.

THE COURT: They're due on February 3.

MR. DANNA: So our responses to those requests for admission could eliminate the need for some or many of the proposed --

THE COURT: Well, that only goes so far because potentially some of those answers could render moot some of these but still it leaves the question of ones that you don't give the admission that would moot them. And so it just pushes down the line, well then what about serving answers with them when you serve answers to their requests to admit?

MR. DANNA: I think the issue is that under Rule 33 and Rule 26 there has to be some discovery need to go above Rule 33's limit of 25 interrogatories. And Goldman has not shown that there is any need when the vast majority of these proposed interrogatories will be fully covered by the six-month-long expert discovery period to come and are cumulative of and premature to our responses to other discovery requests.

THE COURT: All right. Again, my sense is you'd still

be making your other arguments if it were simply kicking the can down the road to say they should be served with your answers to the requests to admit.

MR. DANNA: Right. We're not trying to kick the can down the road. Our position is that there is no basis for Goldman to be able to serve these interrogatories at all given that, like your Honor said, 18 of them will be fully covered by the expert discovery period.

THE COURT: OK. Thank you. And there's actually a question I have about the content of those but I'm going to pose it to Goldman first but I may come back to you.

Who is addressing this?

MS. CASSADY: Yes, your Honor. Elizabeth Cassady for defendant.

THE COURT: I don't want you to have bend over so you can either bring that closer to you or stand up, whatever you feel comfortable with.

MS. CASSADY: Thank you, your Honor.

First, I'd just like to address the comment that we're still -- we haven't waited to receive the requests for admission. We served those on December 2 and we gave plaintiffs an extension so they wouldn't be due over the holidays. So we haven't received them yet but they were also given an extension.

But on the question of whether they seek information

that's solely within the realm of expert testimony, we think that they seek information both to the merits of plaintiffs' case. And what we're seeking is the factual basis that's underlying the opinion. So I think that it's not that it's all expert testimony that is going to require expert discovery. For example, we seek the specific components of the challenged processes that plaintiffs contend caused disparate impact upon class members.

What the specific component is of the process and what the time period is that plaintiffs are alleging, that's factual information that's within plaintiffs' possession right now. That's not expert testimony.

Similarly --

THE COURT: The one you just called out is precisely what I have a question about on the substance. What is the relevance and why does anybody, the Court or you, need to know, and break it down by component. Or is it enough that there's this overall process; and if that's shown to have a disparate impact, then you don't need to get it broken down.

MS. CASSADY: I think we're interested in finding that out, your Honor, what plaintiffs' theory is on their disparate impact claim.

So if plaintiffs are alleging it's just the general process versus whether they're going to point to the specific component, these are very complex processes that have many

different components and they've changed over time.

And, your Honor, plaintiffs argued exactly the opposite when we proposed objections to their interrogatory requests no. 8. So we made a very similar objection. And plaintiff said, and this is in the September 27 status report, that defendants had "refused to articulate with any specificity what the defense will actually be and what facts support it."

THE COURT: This was in regard to business necessity?

MS. CASSADY: In regard to business --

THE COURT: So I was thinking about that, because I know you pointed that out. The way I was thinking about it is Goldman has that information. They are the ones who are determining what processes they are going to use and what the business necessity is for them. I don't know that any of the plaintiffs have facts to address that question. But they will have experts who will address it. So I'm not sure that it's -- should be treated reciprocally, put it that I way.

MS. CASSADY: It might not be an apples-to-apples comparison, and I take your point on that. I certainly think there are facts. We've produced over one million pages of discovery in this action. Plaintiffs have repeatedly requested extensive discovery and argued that it's necessary for them to put on a case.

THE COURT: Right. But there's still discovery ongoing. There's still documents to be produced. So it's a

classic contention interrogatory that is the type you would answer after discovery is at the end.

MS. CASSADY: We think that for the same reasons that plaintiffs articulated why we were required to answer the interrogatories that called for expert testimony, which we very much expect to put on business necessity -- testimony from our experts. The start of the schedule is the burden is to put on reports of business necessity. And at that time plaintiffs argued the fact that it touched on expert subject matter or the fact that experts were going to also opine on it shouldn't be a reason for precluding us from having to identify the factual bases. That's all we're asking them to do at this point. Certainly they'll have the opportunity to supplement the interrogatories, as will we. That was also pointed out when they previously argued for why our objection was improper based on the fact that it was the subject of expert testimony.

THE COURT: And what entitles you to now submit 21 additional interrogatories?

MS. CASSADY: Your Honor, we think they're proportional to the needs of the case. Plaintiffs repeatedly point out that we've served 27 interrogatories and, in fact, plaintiffs have only substantively answered 14 of those and only one of those was answered postclass certification.

And, again, we're arguing for additional interrogatories. We're not taking the position that those

don't count. But we're saying we didn't receive the information. So an argument that it's burdensome or it's cumulative or duplicative, that assumes we already have the information in our possession. We don't.

So while, yes, they are above the limit, they clearly are seeking information that goes to merits issues that are central to this case. They're necessary for us to be able to plan for the Phase I trial. They're necessary for our experts to be able to do their work. And we do think that they're proportional, given that this is a large class action, plaintiffs are seeking substantial damages and plaintiffs themselves have repeatedly argued that additional merits discovery is appropriate in this case.

THE COURT: Thank you.

Do you want to respond?

MR. DANNA: Yes, your Honor.

First, I'd like to point out that, as I think your Honor already recognizes, the majority of these interrogatories do not seek fact information. And counsel just said that they're seeking our theories, our legal theories for the Title VII framework of the case.

Essentially at this point we're still in the middle of merits discovery, as your Honor pointed out, and six months of expert discovery still awaits us. Those theories are still being developed. It's premature to have to answer them now.

Essentially all we can offer is draft attorney work product and that's not an appropriate use of an interrogatory.

I'd also like to just note, I think your Honor also indicated the differences between plaintiffs' interrogatories on business necessity and less discriminatory alternatives. But plaintiffs were seeking different information, truly was fact information, whether Goldman as a business entity identified needs that were fulfilled by the challenged processes and also whether Goldman as a business entity considered alternatives to those policies. That's not information that an expert would generate. That's information that Goldman as an entity would know and an expert could offer additional information to bolster the rationale for Goldman's decisions but we were seeking fact information and that's what Goldman provided in its responses.

THE COURT: Can you tell me anything about what you think the relevance is to breaking down the process into components?

And I can imagine if your expert says here are particular components that are causing this disparate impact, if there is one, then of course it's relevant. But I'm just a little surprised to see you going down possibly to that level of granular detail. I'm not saying it shouldn't be asked. I'm just curious whether there's a view over here on the plaintiffs' side about it.

MR. DANNA: I think our view is the policies that were certified by the Court are the policies that we're challenging and, to the extent that we have more information, to say that will come up in expert discovery.

THE COURT: It may be that if you don't provide that maybe that's a basis for summary judgment. I don't know. That's one thing I just don't know about. I don't like and nobody likes trial by surprise. Information should be given to let the other side know what you are doing for the most part and where things are going.

But I do agree that those 18 interrogatories are classic contention interrogatories that are premature. So I don't think they need to be answered now. I do think, to the extent any of those are relevant, they should be answered in connection with the expert reports when they are served. If any of them are mooted by answers to requests to admit, then sobeit.

What about the first interrogatory and 20 and 21? Twenty asks for identification of persons who are culpable for intentional discrimination. That seems like an appropriate interrogatory. And I think there was discussion, as was pointed out, that Goldman was going to sub in two interrogatories, I think. Any objection to having that one answered?

MR. DANNA: No, your Honor. In fact, plaintiffs have

offered already to respond to these two and we don't --

THE COURT: So 21 and 22 will be answered.

Tell me about number one. I just don't -- I'm not appreciating the context of it and I know that's really a question for -- well, let me ask over here on Goldman's side. Where does number one come from?

MS. CASSADY: This relates to the corporate titles of associate and vice-president and the idea that they're synonomous. So this is going back to the class certification order and the plaintiffs' assertion or theory that there's only two jobs at issue in this case. So that goes directly to their prior position on that.

THE COURT: Is there any reason that can't be answered?

MR. DANNA: I think this interrogatory is simply not necessary. It's completely cumulative of the pending 51 requests for admission that cover the same topic, which we have not answered yet.

THE COURT: But if your answer to the request to admit, assuming there is one specifically to this, if you are not contending they are synonomous, then you're right, there would be no need to answer; but if you are contending that they are synonomous or with regard to a request to admit, then there would be information to provide, right.

So, I'll direct that the answer to this one be

provided along with the answers to the requests to admit.

MS. CASSADY: Your Honor, can I ask one clarification?

THE COURT: Sure.

MS. CASSADY: So are you permitting the additional 21 interrogatories at the time the expert reports are served to the extent that they're not mooted?

THE COURT: What I am saying about that is that information has to be brought out one way or the other if it's going to be the subject of discussion at trial. And if it's not -- if it's not identified through the expert report, then it should be identified in response to an interrogatory.

MS. CASSADY: Thank you, your Honor.

THE COURT: Privilege logs. So a couple issues here. First one we can address I think is the first one you addressed which is confidential supervisory information. This seemed fairly straightforward. I think it looks like the parties are in agreement on part of this, that Goldman Sachs shall review the Federal Reserve feedback on Goldman's proposed redactions over the six documents already submitted and then produce the 350 documents previously withheld solely on the basis of CSI with the CSI redacted. Is there agreement on that part?

MS. DERMODY: On that process, yes. On the timing --

THE COURT: I know. On the timing.

So there was a request that it be five days. Goldman is saying that's too long.

I assume at this point there still has not been an answer from the Federal Reserve or has there?

MR. LEVY: Josh Levy. We have not heard from the Federal Reserve.

THE COURT: I agree that five days is short, but I think it can be done within ten days once you find out. So any reason that can't be done?

MR. LEVY: I think ten days might be a little optimistic.

To give the Court a sense, we put in six documents to the Federal Reserve with full attachments. It takes up a very large binder totaling over 950 pages.

THE COURT: Because there are all these attachments?

MR. LEVY: Can't even hold on to it.

So I think when we're talking about reviewing over three hundred documents with full attachments, we're really talking well over a thousand documents. So I think we would request at least, say, three weeks in order to review those documents. And it's possible, after consultation with the Federal Reserve, we may need to seek additional time.

THE COURT: Well I'm not going to say whether you can or can't on that. You make an application if you think you need it.

Ms. Dermody, how does three weeks sound?

MS. DERMODY: I think that sounds fine, your Honor,

although obviously each time we move the schedule we start to have cascading but you understand.

THE COURT: I understand. We'll give you three weeks for that. But you know what, do it on a rolling basis. Maybe do a batch a week. Why don't you do that.

Now the documents that -- for which an objection was asserted based on CSI plus either attorney-client and/or work product, I didn't understand Goldman's point. If CSI is -- if there are multiple reasons a document was withheld or redacted and there's a portion that is CSI that is now no longer subject to being withheld, why can't that document be produced with the attorney-client and work product material still redacted but the CSI information revealed?

MR. LEVY: I think this is -- a couple of points. First, I think this is getting a little bit ahead of ourselves. We haven't heard from the Federal Reserve yet. It's not clear that the CSI can be redacted.

But I do think even if we're looking at these documents that are withheld on both the grounds of CSI and attorney-client privilege, these documents are almost certainly draft submissions to the Federal Reserve that are likely going to continue being withheld in their entirety. So even if some portions of the CSI can be redacted, and assuming the unredacted portions are still relevant, they are almost certainly going to be covered by the attorney-client privilege.

THE COURT: So, to the extent that any portion of those documents have a double objection based on two reasons, one of which is CSI, then you're right. That would still be withheld. But if there are sections that are being withheld purely on CSI and the Federal Reserve says this is OK, then that document or those documents should be produced with the information disclosed. Why don't we leave it at that.

MR. LEVY: Yes, your Honor.

THE COURT: OK. So we've answered CSI. Listserv. Wait. I am seeing -- did we sufficiently address CSI over here on the plaintiffs' side?

MS. DERMODY: Yes.

THE COURT: I'm now moving to the listserv issue and the mysterious diversity task force.

So as I understand it, it hasn't been able to be reconstructed and on the one hand Goldman says well by the nature of what this is we know that the people that it went to are people who need to know. And on plaintiffs' side the argument is that we don't know who it actually went to because we don't know who was on the listserv and therefore we don't know if it went to the need to know. Is that a fair summary? Let me ask plaintiffs.

MS. DERMODY: Yes. That's a fair summary of the membership of the listserv. Obviously we have other arguments about really what the purpose of that group was.

THE COURT: It's interesting you say that because my note to myself is that to me this is really a question of whether their work is protected. If it's protected, then I don't think we need to -- I wouldn't conclude that there's waiver of the inability to reconstruct it. There have been declarations about it. If we need more, we can ask for it, but I don't think we do. It's really a question, in my mind, of is this material protected by such a broad swath and under such a big umbrella.

So I do want to discuss briefly -- maybe not so briefly -- the general nature of the diversity task force documents, the white papers, the proposed review process changes, the employee review and quartiling decisions and the stats, charts, graphs and analyses prepared for any of the above. Those are, I think, how it was broken down or how I broke it down when I previously addressed it.

I understand the arguments that are being made. There are two competing interests. You want to encourage folks to have candid discussions with, and candid preparations for counsel for the purpose of providing advice and you don't want to have abuse of the process. The question is where does this fall.

And I guess I'll ask the plaintiffs: Why isn't it that you can't have an entire project that is being worked on by a large group of people. Document production, for example.

That's all work product but lots of people working on it, although we're talking about attorney-client privilege. Why can't that all be protected under the aegis of the lawyers are trying to determine what we need to do; we need to collect data to figure it out; and we're going to make recommendations about what we need to do for diversity based on it. That will require a lot of work in a big company like Goldman. So why can't all that be protected?

MS. DERMODY: I think the law is a lot tougher than that. I think that Judge Parker in Pearlstein, and I forget the judge's name in the Rivastigmine case, which are both cases where the courts did in camera review of documents, really looked at whether there was an individual-by-individual justification for documents being withheld that are involving a whole lot of people that are not lawyers but are kind of associated with legal people doing what is kind of a quasi business function that has value perhaps to legal compliance.

This is a situation where if they said, look, which is what they said to Judge Francis, we have this one audit we do, the employment law department does, to check on the performance ratings and we know from the calendar it happens during like one week or two weeks in the calendar where ELG comes in and reviews and enters changes in a data field. And they said, look, this process right there is all constrained by the legal review of this particular practice that we do.

What they have done from that concept is try to bootstrap in every analysis about their workforce that has demographic data. So anything that's about this diversity task force which they tell the federal government is about promoting diversity objectives, it's not the employment law group, it's not employment lawyers, it's not lawyers in this group. Suddenly that group because it --

THE COURT: I thought there was a lawyer or lawyers.

MS. DERMODY: There's a lawyer who has in her jurisdiction a liaison to that task force. But they could not confirm that she was actually on the task force list. And her declaration does not say I was on task force e-mails. It doesn't say that. So the fact that a lawyer is around doesn't confer a privilege on nonprivileged business work.

And the idea is: Would they have done this work anyway? Was it solely done because they had to do legal compliance?

And presumably Goldman would say proudly we're a diversity and inclusion employer. We are striving to have a workforce that's representative, or whatever positives around diversity, and we have people who have their eyes focused on that initiative. That's a business objective. It's important to their clients, important to their brand. They would not necessarily be having anything that involves legal if they didn't have those business objectives.

So, again, this is like what is the reason that they're doing these things. And to me it seems that we're swallowing into privilege a whole host of regular activities that are really about the diversity initiatives and about basic human resources function; not about specific legal compliance. It's only about matching the letter of the law; that is, have you done an adverse impact analysis of our performance ratings and discovered whoops there's a whole bunch of problems where women are being rated poorly relative to men and we need to go in and fix ratings so we don't have adverse impact problems.

That's a different question than doing work to figure out are we having issues in the field around who is reviewing people poorly and who has a problem managing diversity generally. Those are business objectives. Those are -- they might have a mixed motive but they're business objectives that would happen independent of the company's need to do legal compliance.

So I think that with respect to all of these things Goldman has to be much more granular about what is happening with the different documents that are being created; not just the projects but the documents.

And what's frustrating about where we are sitting today towards the end of January is that we're kind of back at the beginning in a respect. The privilege log has baked into it so many documents per log entry that we don't know and you

don't know, no one but Goldman knows, how many different documents and communications and issues are being covered per entry. So there is no even pretense of being some individual justification per document.

THE COURT: Put that issue aside for the moment because to that me goes to the rereview but I understand how you're saying it's relating but just sweeping everything in.

MS. DERMODY: Because it's these compilations that really make it impossible for us to fairly evaluate this.

So with respect to the 2006 diversity task force I think Goldman should be at least held to what it says the federal government is the purpose of that task force. That is cited in our letter to your Honor from January 10. We copy Goldman's own documents of things they say to the U.S. Department of Labor. We attach them as exhibits.

We think that makes pretty clear what the objectives are. They're business objectives. It's not legal compliance. The membership tells you it's not legal compliance. And there is no specific confirmation that's verified under oath about any particular document that this group generated that's being withheld based on privilege with an attorney saying I directed that be generated for this specific legal outcome.

THE COURT: Understood.

We're not going to do that for thousands and thousands of documents. That's not to say that more needs to be done.

So let me hear from Goldman.

MS. DAVIDOFF: Thank you, your Honor.

I do want to be granular and I think we have been granular in the many submissions to the Court.

So maybe it would be helpful to take a step back and put the categories of privilege claims into buckets and go through them one by one because what I heard was Goldman is throwing a lot of spaghetti at the wall and can't claim privilege over processes without specific information about why they're privileged. I don't think that's what we've done.

I can go through it in a granular way that really breaks it down. I'm happy to start with the processes that counsel was referring to, the diversity task force.

THE COURT: This has been set forth in the letter so don't go too granular. I don't need all the detail.

But I really would like a better understanding of why it cuts such a wide swath.

MS. DAVIDOFF: I guess that's what I'm trying to explain is I don't think it does cut such a wide swath. We're talking, again, about a nearly two-decade period, a time of great development in focus on diversity and the law on diversity. And when it comes to collaborative attorney HCM processes, evaluating, analyzing and summarizing the diversity efforts at the firm for the purpose of obtaining legal advice, there are two of them. There's the diversity task force.

That's 2001 and 2006. And then beginning in 2013 the white papers.

So both of those processes have been described in sworn declarations from the legal counsel under whose purview they were -- sorry, the diversity task force has been described in a sworn declaration from the legal counsel to the task force, Ms. Arline Mann, who explains that the analyses that the task force undertook were undertaken at least in part for the purpose of allowing the legal group to understand the work that was being done on diversity, the plans that were being done on diversity and to give --

THE COURT: Isn't that relevant though because that means the other part is presumably for a business reason?

MS. DAVIDOFF: There is no question that these also served a business purpose. But the predominant purpose is legal. And that's the question the Court has to answer. Not would these have been done in any event but what is the predominant purpose.

And just for the diversity task force --

THE COURT: If they would have been done in any event then why would it be the predominant purpose?

MS. DAVIDOFF: I wasn't saying that they would have been done in any event. I think that was the test that counsel proposed. I don't believe that is the test.

THE COURT: Well it may not be but it's an interesting

question.

MS. DAVIDOFF: It's an interesting question. I don't think anybody in the world could answer it. So the way we look at it is whether the predominant purpose of the task force is legal versus business.

And as Ms. Mann's declaration set forth, the analyses that were undertaken were a way for the legal department to get a handle on the diversity work that was being done in this time of great change at the firm and give advice on plans for the future and current practices.

THE COURT: Just tell -- you said it was 2001 and 2006.

MS. DAVIDOFF: Right.

THE COURT: So did they have a yearly mandate? In other words, did they do work every year?

MS. DAVIDOFF: No. The group was constituted in 2001, completed a final report -- and this was what I was going to get to, your Honor, because I think it's important -- we did produce the final task force reports.

So what we've got that is being withheld is the work that went behind those reports and it's privileged for two reasons. One is that the work itself and part of the animus behind the diversity task force was to enable legal to understand what was going on at the firm and allow that back and forth so that legal could give advice as the task force was

developing its plans; and two, because legal was giving ongoing advice to the task force about the plans and about in final product that they were developing. But the final product itself we haven't claimed as privileged and plaintiffs do have that.

THE COURT: And they also have the underlying data, right?

MS. DAVIDOFF: And they do also have the underlying data, absolutely.

That takes us to the white papers which I think if anything is even a stronger claim for privilege.

THE COURT: Before you get to the white papers, what about counsel's argument of what was stated to the federal government or the Department of Labor?

MS. DAVIDOFF: This is a submission to the OFCCP that that explained I think in one or two sentences what -- that one of the purposes of the diversity task force was to develop plans for the future and next generation diversity initiatives. And that's true. But that's captured in the final reports. In other words, the final reports, that's the work product that reflects Goldman's processes as they exist and plans for the future. All of the work that went behind it was done very much hand in glove between those nonlawyers working on the diversity task force and the lawyers overseeing that process so that they could give legal advice about it and because the communications

between them reflected that legal advice.

THE COURT: OK.

MS. DAVIDOFF: So the diversity task force did have that dual purpose but we think plaintiffs have the nonprivileged aspect of it.

THE COURT: Counsel is referring to what I thought were regularly scheduled audits. Is that separate from the diversity task force?

MS. DAVIDOFF: I'm not sure what the audits are that they're referring to. It may be they're referring to some of the -- I'm not sure what they're referring to there.

THE COURT: Was there a process for collecting data on a yearly basis in regard to diversity?

MS. DAVIDOFF: There is a lot of diversity data that is collected and circulated. We estimated in one of our letters that we produced almost 50,000 documents regarding diversity issues and we submitted some samples as well as --

THE COURT: I'm just wondering if there's a yearly process that's implemented, whether it be to collect and report or other similar purposes in connection with what is more sort of the business side than saying this is part of the task force.

MS. DAVIDOFF: I would say there are many processes annually that collect and report on diversity data at the firm. I don't know that there's sort of one, but I have seen

documents that are IBD -- investment banking division reports on diversity.

THE COURT: But have documents like these been produced?

MS. DAVIDOFF: Yes.

And then turning to the white papers, your Honor. That was I think -- there is some speculation in the letter that perhaps there was a business purpose behind them. I believe the documents we've submitted in camera, privileged documents to your Honor and privileged memoranda, explain that the white papers were created specifically at the request of legal, to allow legal to understand certain diversity metrics and give advice on those metrics. I am happy to answer any questions about that.

THE COURT: No need.

MS. DAVIDOFF: Turning to the other large category of material.

THE COURT: Well one was proposed review process changes.

MS. DAVIDOFF: I think these all fall into the bucket of the employment law group giving legal advice on the legal risks posed to the firm by tentative or potential decisions, decisions that were under consideration.

So we've got tentative compensation and manager quartiling decisions. We've got draft reviews, 360 review

comments. We've got a 2013, 2014 process to consider whether they would change the review system.

So these really are, I think, very squarely classic inflection points, whether on a micro basis, you know, here's our tentative quartiling comp. Legal, what's your advice on that? Or larger: We're thinking of changing the compensation system -- sorry, the review system and we want advice from you, legal, on what legal risk that might pose?

THE COURT: So what about communications nonlawyer to nonlawyer about those type of issues?

You know I hear there's thought about changing a process. God, I hope they don't -- anything between business people that's not a communication with a lawyer. Have you produced those?

MS. DAVIDOFF: No, no, that's not the kind of thing we're talking about.

THE COURT: I know it's not what you're talking about. I just want to know has there been a distinction so that not everything related to the proposed review process change is automatically thrown on a privilege log because there may be some communications that don't fall under the attorney-client privilege about that.

MS. DAVIDOFF: That's fair, your Honor.

What happened in 2013 and 2014 was that HCM considered revisions to the review process, specifically reached out to

both in-house and outside counsel, asked for advice on the legal risk those changes would pose, in part in light of an ongoing litigation that has to do with those processes and received advice on that topic.

THE COURT: That's fine. But I'm still talking about to the extent, maybe there are none, but communications business to businessperson.

MS. DAVIDOFF: So to the extent there were communications business to businessperson outside of that process, they wouldn't be captured.

Let me give an example that would be captured. They say we need legal advice on this. Legal -- and this is an example not meant to reflect any particular document I have seen. But legal says we need information about what your ideal system would look like so we can comment on it. And some businessperson says well what would we want that change to look like. That would be gathering information at the request of legal for the purpose of legal being able to provide legal advice.

THE COURT: I understand that. But I just want to make sure that there may be documents, again, that don't fall in that bucket.

You said they wouldn't be captured, meaning they wouldn't be captured for production or they wouldn't be captured for the privilege log?

MS. DAVIDOFF: They wouldn't be captured for the privilege log. Our aim was to capture documents that were part of this 2013, 2014 process --

THE COURT: Right. But there shouldn't be an automatic assumption that a business to businessperson communication or any communication about a particular subject is necessarily privileged.

MS. DAVIDOFF: I agree, your Honor.

There are two other processes that fall in this category of getting advice from legal on tentative or potential decisions. One is the process for reviewing tentative compensation and manager quartiling decisions. And that was the subject of Judge Francis' decision, docket 183, I believe, in 2013. He was addressing the question of whether the data fields that ELG created for purposes of conducting the tentative quartiling compensation review and the information that the data fields contained was privileged and concluded that it was.

In the course of reaching that decision, he explained, and Ms. Palumbo submitted a declaration explaining, that the data fields were only the beginning of the process; that in fact, after gathering the data fields ELG would have to get additional information -- that would raise questions, that would raise things that they would want to investigate. ELG would ask for additional information from the business. The

business would provide that information. There would be a fair amount of back and forth so that ELG could provide the advice they were -- they were being asked for. In other words, it did not start and stop with the diversity objects data fields.

So I think the question that -- before your Honor, assuming we're not relitigating the issue of whether the diversity objects data fields are privileged, which I don't think came up in any of the in camera documents in any event, is whether the rest of the documents surrounding that process. Another chart that ELG created and sent over to business said give us this information so that we can provide you with legal advice on that.

THE COURT: OK. But I want to make sure that in terms of, again, supervisors' reviews and quartiling decisions, those are actually produced, I assume, right.

And if they have particular comments that they put either in a review form or even randomly in a memo or something like that, those type of things have been produced, yes?

MS. DAVIDOFF: Correct.

MS. DERMODY: Your Honor, could I respond.

THE COURT: I want to understand better what it is that hasn't been, because my note to myself is: Employee reviews and quartiling decisions, and I can't remember how far that goes. Again, if it's a communication with an attorney or to get information for an attorney, then it's more likely to be

privileged. I understand that. I just didn't -- employee reviews or quartiling decisions, there's obviously a lot around that that would be producible.

MS. DAVIDOFF: Right. And that's, as your Honor said, has been produced. The quartiles, the compensation decisions, and even various rounds of the compensation decisions have been produced.

What hasn't been produced, for example, is other types of forms created by legal asking for different information so that they could provide this advice on the tentative compensation or quartiling decisions or interim summaries that legal created of where things stood on the tentative compensation and quartiling review.

THE COURT: Why is legal weighing in on that?

MS. DAVIDOFF: Why is legal weighing in on the tentative compensation and quartiling?

THE COURT: That's one question. Was that a regular process that legal would weigh in on, every compensation and review decision?

MS. DAVIDOFF: Yes. There's an annual process for legal to do that. That's described in Ms. Palumbo's 2013 declaration. And as she explained, there were requests from the business beginning in about 2003 or 2004, I believe, to get legal advice on compensation and quartiling decisions. And then over time, rather than do it on a one-off basis, they

created the diversity object fields and they really eventually created a whole process that is the tentative compensation and manager quartiling review to do this review because the demand for that legal advice was consistent every year.

THE COURT: OK. Ms. Dermody, you wanted to say something.

MS. DERMODY: Yes. Sorry, your Honor. I thought Ms. Davidoff was done. I'm sorry to interrupt.

THE COURT: Well, are you done?

MS. DAVIDOFF: I'm never done. But there is one other process that is within this bucket, which is the review of reviews.

THE COURT: Just refresh me on the review of reviews.

MS. DAVIDOFF: Sure. It's very similar to the tentative compensation and manager quartiling review. Basically, kind of similar to that. And this is the subject of Ms. Palumbo's 2020 declaration. Basically, on an annual basis, again when the reviews come in, there is a process directed by ELG to review those reviews and identify if they raise any issues that need to be explored through other firm processes like the complaints process or pose other legal risks to the firm.

So ELG every year engages in some process. Sometimes it's been developing keywords to search through the review comments. Sometimes it's been working with tech to create

algorithms that would search through the review comments, pull out a set of reviews that they want to look more closely at, direct people -- either outside contractors or people within ELG -- to review those as a first review, elevate any that raise concerns to lawyers in ELG. And then ELG decides on and ultimately implements any further review, like through the complaint process or other response that needs to be taken to address whatever legal risk a review poses.

THE COURT: Thank you.

Ms. Dermody.

MS. DERMODY: Yes. Thank you, your Honor.

So I thought maybe before I give a factual response to some of the arguments I wanted to direct the Court if I could to some language in the Pearlstein case which I think is very instructive. This is Pearlstein v. BlackBerry Limited. As I said, it was a Magistrate Judge Parker decision from last year in the Southern District. It's cited in our papers but 2019 WL 1259382. And at pincite 1415 there's discussion about a comparable inquiry where Judge Parker is doing an in camera review of e-mails and correspondence between inside counsel and employees of BlackBerry as they're figuring out on a deal with a very damning market analysis about BlackBerry sales. And they're figuring out what they can say.

And basically what she says is that although it is true that a fact investigation conducted at the direction of an

attorney for purposes of rendering legal advice is protected by the attorney-client privilege, the purpose of a fact investigation must be to aid the provision of legal advice. As discussed above, it is clear to this Court that the fact investigation into Z10 sales and return rates prior to issuance of the press release would have been conducted regardless of any legal advice and, thus, communications predating the press release were predominantly for business purposes.

So the Court is making the distinction about things that are done in the regular course, even if they have a legal benefit, are done for business purposes. And that I think is the question that I was raising earlier about all of this.

And the problem with the --

THE COURT: Can't anything said to be done for a business purpose? Everything that goes on in business -- in corporations for a business purpose, the legal department is there, is to prevent problems and give advice.

MS. DERMODY: Yes. You could sweep in literally every single aspect of a company's practices.

Privilege requires more rigor than that. I think this is why Judge Francis -- he was not addressing a collection of documents. He was addressing a data field where it was reported that that data field itself reflected a decision of the employment law department about reviews, to change them. It was a direction to change them. So it was directly tied to

an activity of legal for the legal purpose of preventing some type of legal exposure.

What has been suggested now is that everything that happens in the review cycle could be swept up in the diversity object field. And that makes no sense. That means that all the materials collected, discussions about whether the review process should be tweaked, whether new fields of review should be allowed, all of that suddenly becomes in this process because legal somehow downstream somewhere is going to have an annual review of it. And that can't be the rule. Otherwise, it just eviscerates the whole concept of there being an exception for privilege.

The other thing I would say is that with respect to these white papers, so-called white papers, these could have been individually supported by attorney declarations saying: I directed this. I cowrote this. I was involved in this.

That didn't happen. There are general statements about employees being around these HR processes. That's not sufficient to keep these things under the blanket of privilege.

And I think, your Honor, again, I've totally mangled the pronunciation of this case but it's In Re and it's spelled R-I-V-A-S-T-I-G-M-I-N-E patent litigation. It's 237 F.R.D. 69 Southern District 2006. And In Re Rivastigmine is a case that really talks about what you need to do to justify privilege over documents where an attorney is associated with a document

in some respect. It's not enough an attorney, as we see from Pearlstein and other cases, is associated with it. There has to be a much more deeper connection to the legal purpose and to the attorney's work on that document. So I don't think that there's any legitimate showing here that has been made.

I will say that we essentially offered up a line to maybe draw around some of the documents, which is: If Goldman wants to say, which I think they have said in a general way, that there is an employment law department review that happens at the end of the process to make sure everything looks OK and then to direct outcomes from that process, that that's a very discrete couple of weeks. Their documents tell us which weeks legal is around. It says it on the document in the calendar.

But there are documents on the privilege log connected to diversity issues or connected to quartiling are all months of the year, all weeks of the year. They aren't limited to this very finite area of time where legal is very hands-on about potential liability issues.

I'm not sure that even the documents in that time period will legitimately, under this record, be kept on this privilege log. But at least there would be an argument under the record that exists that there's something happening in a time period that would be privileged.

We don't have that but I think if your Honor is looking for a way to split the baby here that is one way to at

least give some sensible approach to how we look at the time period things are being kept, the fact this happens every single year, the fact that there are a lot of documents --

THE COURT: But that's one of the reasons I asked about the task force -- there were two task forces and they're discrete in time over the larger period. Why -- that suggests to me it's not a regular process that may have been spearheaded by the lawyers to address certain concerns and, if that's the case, why shouldn't it be privileged?

MS. DERMODY: Well, OK. Just to play that out, your Honor. The 2020 recruiting committee is going to meet and get together and maybe a lawyer sits on that recruiting committee. The fact that it happened for one year, does that mean that that's privileged?

THE COURT: Depends what was discussed.

MS. DERMODY: I'm sorry?

THE COURT: Depends what's discussed.

MS. DERMODY: I mean if they're going out and doing campus recruiting, it strikes me that that's an annual process --

THE COURT: By the way, I was on a recruiting committee and everyone was a lawyer.

MS. DERMODY: I've been on that myself, yes. I recognize this. Thankless task.

So I think, your Honor, that the fact that it happened

with a date name attached to it only means that maybe that particular year it had a higher profile for some senior leader and they actually gave it some special mandate to look at this a little more closely. It doesn't mean it wasn't done for a business purpose. And, again, because it wasn't done within the legal department, it's hard to make that case here. And the fact that you've got one person who was a liaison to it, you know, that seems extraordinarily weak.

THE COURT: OK. Ms. Davidoff, I assume you want to respond.

MS. DAVIDOFF: How did you know.

I would just -- I want to keep it short, your Honor. I would just like to say that In Re Rivastigmine case, which I'm sure is also incorrect, was a patent case with very complicated privilege issues resulting from the fact that in a patent transaction the due diligence that's done is both business oriented and legal oriented and it's very difficult to --

THE COURT: That's part of the argument that's being made here too, right.

MS. DAVIDOFF: Correct. And there were privilege calls in that case that were upheld and privilege calls that were not upheld. And it's a complex decision.

One that's quite a bit more on point is the Voelker v. Deutsche Bank case that we cited, and I will give you the cite:

2014 WL 4473351 by Judge Caproni, which is actually an employment dispute and involves a Deutsche Bank process to evaluate periodic reductions in force, very similar to the requests from the business to periodically evaluate tentative compensation decisions, tentative reviews, one time a potential change in the review process in 2013, 2014. I think that is a case that really is a better guideline for the kinds of decisions that have to be made here than a complex patent dispute.

THE COURT: What about Pearlstein?

MS. DAVIDOFF: Pearlstein v. BlackBerry is -- was a little difficult for me to follow there because I don't think the cite is 1415. It's a Westlaw cite. So I didn't quite find where Ms. Dermody was reading from.

THE COURT: I think it was previously cited in your submission.

MS. DAVIDOFF: It was cited in their papers, for sure. That's a case that sets forth the standard for the test being whether the predominant purpose is legal. In a certain sense I think we agree on the predominant -- on what the legal standards are. Not every communication that involves a lawyer is privileged. I don't disagree with that.

And what I do disagree with, though, is the assertion that the evidence that we have put forward, very granular evidence on these three categories of challenge processes, and

within each category, two or three categories of subprocesses, that that puts us in some bucket in other cases where people have just asserted that huge groups of people working on nonlegal issues are generating privileged material.

We're not in the Pearlstein bucket. We're in the Voelker v. Deutsche Bank bucket where we've shown that the processes were created in response to a need for legal advice. Their purpose was predominantly legal. And we've been narrow and cabined in identifying materials that pertain to these processes. And, on the other hand, we've produced a huge volume of material that isn't privileged that relates to diversity analyses and recruiting and all sorts of other things that have been thrown around today.

The kind of speculation that there's a 2020 recruiting committee that may be out there and has a lawyer on it and we're not producing documents for it, that's wrong. We've identified a very small number of privileged processes in the letters to your Honor. Those are the ones that we've been able to identify and have backed up with privileged memoranda, privileged documents submitted in camera and also declarations submitted to this Court to show that they were -- had a predominantly legal purpose and that the documents created as part of those processes reflect legal advice or reflect communications created for the purpose of obtaining --

THE COURT: What about Ms. Dermody's argument, though,

that at least for some of this there was only a liaison and that's just sort of covering -- provides a cover, if you will. That's my term, not Ms. Dermody's.

MS. DAVIDOFF: Some of this is something I just have to respond to. Because each of these processes is different. I hate to be granular. But she's talking about the diversity task force. That's it. And there was -- Ms. Mann was a liaison to the diversity task force which was mostly made up of nonlawyers. Ms. Mann submitted a sworn declaration that she asked the diversity task force to perform these analyses so that she could both give them legal advice on the work -- the diversity work being undertaken at the firm and advise them on this final product that they were creating that ultimately would be a nonprivileged business document that would both describe diversity work at the firm and plan for the future.

So, yes, that's a situation where there was one liaison. But I believe we have explained why the materials that pertain to that process are privileged.

THE COURT: OK. All right.

MS. DERMODY: Your Honor, if I just might on the cases that were mentioned?

THE COURT: Sure.

MS. DERMODY: The Deutsche Bank case is an excellent case for a couple of reasons. One, we're talking about reduction in force even though, poor Deutsche Bank, that

probably feels like an annual process for them. It should be a unique process. It should be a one-off for a company with a lot of need for legal focus on a rift. And so that's totally different than what we're talking about here which is annual comp cycle.

THE COURT: But, again, that's an awfully broad brushstroke. The task force, there are two tasks force. That again were discrete in time. There are some white papers but, again, we're not talking about a regular event. So I'm not sure what you're talking about as the what happens on a regular basis every year that's covered by what they're claiming privilege for.

MS. DERMODY: Sure. You're -- I appreciate the question, your Honor, because you're right. There are different arguments for different issues. So things like the statistics and the graphic representations that are involved in a lot of different materials, that comes up across all of these, they are collected annually, that sort of subject to --

THE COURT: Well they are and they aren't. There's data that's collected -- again, it could be a legal purpose annually, right. You could have certain data, like the data fields that were directed by lawyers to be collected every year so that the lawyer could review it and do an annual analysis: Are we doing the right thing, etc., etc.

MS. DERMODY: That's conjecture. We don't actually

have that in the record for specific studies. We have a general statement that that covers who knows how many thousands, tens of thousand of documents.

THE COURT: We're going to take care of that though because I am -- we'll get to it.

MS. DERMODY: With respect to the white papers issue, I think that the Deutsche Bank case, we address this on page four, that basically the universe of people that were involved in these communications were all legal and HR people with legal. It was a very close circle. They were for this specific purpose on these documents.

We don't have that here. We have basically business people who are meeting with each other in the task force and we have white papers that involve a collection of business people as well as others. So it's much more like the BlackBerry case where there are lawyers involved along with employees talking about topics that are hybrid legal purpose and business purpose.

And what the court is drawing a line around, if this would have happened regardless, well it's a business purpose; and if it's not, it would have happened regardless, what is the specific legal purpose.

And if Goldman is telling the federal government that it's not a legal purpose, it's about setting their diversity initiatives in the right direction, that seems to be the

summary of what that group is doing that we should live with.

THE COURT: Just back to Goldman for just a sec. Do you know how many white papers there were; not drafts but discrete final ones.

MS. DAVIDOFF: I don't have the answer but I could get that, your Honor.

THE COURT: I'm just trying to understand. Is it a handful? Is it 20?

MS. DAVIDOFF: A handful.

THE COURT: OK.

MS. DAVIDOFF: I have to, if you don't mind, give you a quote from the Voelker case which is, "The fact that certain e-mail communications were circulated among HR personnel only is not surprising inasmuch as HR personnel needed to gather information among themselves before passing that information on to counsel." That's in the context of upholding those documents as privileged.

THE COURT: All right. I'm going to -- I'll issue an order on this in the very near future. It will be short and sweet but I just want to look at and think about a couple things.

I want to move on to the rereview issue. And as I was telling, I'm going to order a rereview of the documents that haven't been reviewed. The question is whether Goldman has done enough to remedy the inclusion on logs -- other privilege

logs of documents not protected by the attorney-client privilege or other protection. I ordered, the Court ordered Goldman Sachs to engage in efforts to identify all other improperly or errantly withheld documents from its privilege logs. And I did say it very particularly that way because I was conscious of not wanting to say outright at that time all documents but rather engage in efforts in case Goldman was able to devise some way that would short circuit the need for a full review or would be so clearly reliable as to indicate that there was a true de minimis set of documents that were not captured.

Goldman reported on its efforts by letter on January 13, 2020. The report, while disclosing substantial efforts, and I recognize those, shows that those efforts were not, however, sufficient. The error rate has been very high, almost 35 percent, when including the errors attributed to the vendor and the reviewers. I understand that those account for the lion's share of what was found in what has been reviewed so far and that the remaining rate of the so-called sampling is eight to ten percent. The sampling method, I think, is questionable and it should have included, if it was even reliable, all reviewers, not just ones that might be suspect based on another sampling. In any event, I just didn't find it sufficient.

Putting that aside, eight to ten percent of privileged

docs in a huge number of claimed documents, that's a lot of documents. This is a privilege log. It's not about capturing relevant documents. And we have to get down to a much more negligible level. So I don't think that's negligible.

And I also really do have concern, and I know that plaintiffs have hit this again and again, but I share that concern. This logging of entire families of documents is different than category, than logging by category. There are documents in some of these -- well, I don't know. There are hundreds of documents within a document that's listed. And even in what was submitted in camera where this only came up a couple times in what I received, there are -- some of the documents in there, they are just not privileged and they're not even relevant but they're not privileged. And there a couple where I said OK I don't think these are going to be particularly useful but they're not privileged. They just happened to get caught up in whatever was the larger group of documents.

Ms. Davidoff is looking at me inquisitively, like what the hell is he talking about. I just don't have a particular example at hand.

But everything here just indicates that the review -- and granted it's a large review -- it just wasn't sufficiently done in a way that it needs to be.

So I am ordering that Goldman Sachs conduct a rereview

of any documents on its privilege logs that have not previously been rereviewed. You're going to have to produce a revised log or revised logs, identify whether the entry has been de-designated in full or in part, Bates numbers, and the number of documents reflected in each entry of the logs. I want to know if there is still a family listed that has a thousand documents on it at the end of the day.

I'm sorry to have to create more work. I think it's unfortunate. Privilege logs are a grind and often are about a lot of nothing in the end. This is not a case like that though. There is a lot that's on the privilege log that's very much point-on in regard to the subject of the litigation. And it may well be perfectly entitled to privilege. But I'm not confident that there's not a lot on there that still might not be. So there we are.

All right. I would like to address the motion for reconsideration.

MS. DAVIDOFF: Your Honor, would it be all right to ask for clarification on one part of that order?

THE COURT: Yes.

MS. DAVIDOFF: You said that we would need to rereview all documents that haven't been previously rereviewed. There were two stages of rereview.

THE COURT: I'm not talking about quality control done in the initial instance. I'm talking about the rereview in

connection with anything that was done as a result of bringing up the privilege issues.

MS. DAVIDOFF: OK.

THE COURT: Does that answer your question? I cut you off.

MS. DAVIDOFF: It answers my question. I'm not sure it's the right answer.

THE COURT: Why? Tell me why it's not.

MS. DAVIDOFF: So, the vendor errors that were the vast majority of the errors here, those started to be attacked in the quality control process. That was the main work that was done in the quality control process. We identified two categories of confusion that reviewers had experienced. They were marketing documents, privileged and confidential without regard to -- simply based on legends and there were some attorneys that had moved out of legal roles that were still showing up as lawyers in the review system. And so we noticed this in August and September and did a huge amount of rereview then, basically used search terms to identify documents that would have experienced those errors, rereviewed thousands --

THE COURT: Whatever documents were rereviewed in connection with that process, that's fine. You don't have to redo those. But if you missed documents, you've got to rereview documents that weren't captured by that process.

MS. DAVIDOFF: Thank you, your Honor.

THE COURT: All right. On the motion for reconsideration. So I'm going to give you a little narrative and then I'm going to ask some questions.

So the plaintiff asked for reconsideration of discovery of boys club evidence as a result of the Second Circuit's recent decision in Lenzi v. Systemax, 2019 WL 6646630 (2d Cir. December 6, 2019).

Putting aside the procedural issue about whether there was an unnecessary surreply, addressing the substance, I agree that it's important to consider Systemax and in that respect I'm willing to discuss it and consider the motion.

On the one hand, plaintiffs emphasize that the Second Circuit took pains to clarify an important issue. But that issue is not the one of concern here. The issue the Court clarified was that to establish a Title VII discriminatory compensation practice claim a plaintiff need not establish she performed equal work for unequal pay. That is not the issue here. The issue here is the relevance and probity of individual incidents indicative of discriminatory intent. That was the second issue addressed by the Second Circuit but is not the subject for which the Court clarified a principle of law.

There are clear differences between Systemax and this case. For instance, this is a class action. Systemax involved an individual claim of discrimination.

This Court certified the class only with respect to

particular practices which could be analyzed using generalized proof of statistical evidence. In Systemax, the Second Circuit reaffirmed use of the four-factor test to assess the relevance and probity of specific comments or actions by individual actors. That's precisely the type of analysis of individual claims the Court held was not appropriate for class treatment. All these points counsel against modification or reconsideration of the November 25 order.

But I do have questions. So, let me -- if you don't mind I'm going to start with Goldman. So, first of all, would you agree that discriminatory intent or animus is relevant to the case even Phase I?

MR. GIUFFRA: Not if it's unrelated to the three processes and that's clearly what --

THE COURT: So in that respect you're saying it's relevant but -- to the extent it concerns the three processes.

MR. GIUFFRA: Yes, your Honor.

THE COURT: OK. So let's take that a step further. So is it relevant whether the persons who maintained and implemented the practices harbored discriminatory animus towards women?

MR. GIUFFRA: I think it's unrelated to the processes. No.

THE COURT: What if in implementing -- if these are people who implement those processes or design them or consider

them, doesn't it matter if they harbor an animus towards women?

MR. GIUFFRA: Your Honor, I think it's important to keep in mind that what the case is about, the Systemax case is stray comments. And when you look at what the Court has already done in this case -- and this is sort of a Groundhog day motion on boys club evidence.

THE COURT: It does bring up boys club evidence. I know we've gone over that a lot. But there's a question here. And the Second Circuit is very clear that where there's a discriminatory intent or treatment case, inquiry into discriminatory animus by, at least in the individual setting, by the individual involved, it's relevant.

MR. GIUFFRA: My understanding, your Honor, is that what your Honor has said repeatedly going back as far as 2018 is there has to be some animus related to the processes, knowing that the processes have a disparate impact on women and then putting them in place for that reason.

And I think it's just important when you look at what's already been ordered in this case, you ordered us to produce complaint files for the three divisions for 17 years. You've ordered us to produce additional files for another two years if it relates to the three processes. You've ordered us to produce complaint and disciplinary files of the named plaintiffs.

What they are seeking right now is to reopen discovery

with respect to I believe it's 62 folks who can be described as senior management types and doing a review of more than a million e-mails, looking for stray comments.

And that clearly runs afoul of, number one, the original class certification order where Judge Torres said we're not certifying a boys club case. We're going to base this on generalized proof. And she said that individualized inquiries into each alleged incident of misconduct would overwhelm the common issues and that this case in Phase I would consist only of generalized proof.

And I think your Honor got it absolutely right when you look at this Systemax case. It has nothing to do with class actions. It doesn't set forth a new rule of law. And all this case does in one sentence talk about the fact that plaintiffs in an individual case, the direct supervisor, happened to be the CFO of the company. If that person had been the assistant financial controller, it still would have been relevant evidence. And that was not the basis for the decision.

So what they are looking to do is get a license to conduct some sort of a fishing expedition to find stray comments having nothing to do with the three processes.

And, again, if there's someone where there's a formal complaint that's been filed, those documents have been turned over.

THE COURT: Got it.

MR. GIUFFRA: So clearly what they want to do is have a whole series of individualized supposed bad acts and parade them before the jury. And that's something that Judge Torres rejected in the class cert or your Honor has rejected I think on two separate occasions at least.

THE COURT: Three.

MR. GIUFFRA: Actually it's three. And this decision which is the most important point doesn't change the law. It's a case applying the four-factor test.

THE COURT: I agree. It doesn't change it.

MR. GIUFFRA: So it can't be that this decision suddenly requires your Honor to basically require us to go out and review more than a million pages of documents.

THE COURT: And I had forgotten and you reminded me about having reduced the complaint files, etc.

And the next step in what I was going to ask, that you've just addressed, was if the four-factor test is something that is going to be applied, don't we have a problem with breaking things down to an individualized level; but even if we do, should that be in Phase II. And I guess the question is boys club evidence relevant to Phase II.

MR. GIUFFRA: It could be with respect to a particular plaintiff for sure.

And I think it's important also, your Honor, when you

look at the way the plaintiffs describe this case, they say it's binding authority on the exact issue of how to prove a disparate treatment claim. And they make this seem as if it's announcing some new law --

THE COURT: That's why --

MR. GIUFFRA: It's clearly not right.

THE COURT: -- conflated two things; maybe just inartfully. But I understand. All right.

Ms. Dermody.

MS. DERMODY: Sure, your Honor.

THE COURT: And I really sort of have the same questions in the inverse. And I'll let you say whatever you want to say but let me go through these.

And, in fact, I think Mr. Giuffra, being prescient in this particular instance, to me Systemax simply reconfirms that discriminatory animus is relevant to a discriminatory treatment claim. And in this case isn't the discriminatory animus at issue the knowledge and intent with respect to the three practices at issue? What would you say?

MS. DERMODY: I disagree with a couple of assumptions there.

Systemax actually clarified that when the case is not about hostile work environment generally but about a particular practice or practice decision that this hostile work environment evidence is relevant to show intent. And that's

what we have here. And the fact that it's a class action versus an individual case doesn't change the framework for Title VII.

THE COURT: No, it doesn't.

MS. DERMODY: It doesn't somehow bridge the law.

So I don't think that that difference is meaningful. I think what was meaningful is how does it actually affect what are the certified -- what the certified claims are here.

And so I think your Honor asked exactly the right question which is does it matter if senior leaders who have control over these practices are hostile to women. And absolutely it matters. Second Circuit tells us it matters that that is relevant evidence to show intent.

And because we have a high burden to show that discrimination is the standard operating practice of Goldman Sachs, the existence of that animus amongst senior leaders, among the people who could make a difference is directly tied to the existence and maintenance and failure to ameliorate the effect of these practices.

So we think Systemax directs that a court permit this evidence to be discovered. It doesn't require a court to ignore its own judgment about trial management.

THE COURT: Right. I will not be making decisions on that aspect. And one of the questions I had about it is well is there material possibly to be discovered here and then left

to Judge Torres down the line at trial to decide what comes in or doesn't. But to that end help me a little bit. There were 62 I think you referred to evidence regarding 62 individuals; is that correct?

MS. DERMODY: Right. We have document custodians and we had agreed upon search lists from a long time ago. Presumably when Goldman went out and applied the search term list to those custodians, it then looked at the documents and it saw boys club material and it put that in a bin and didn't produce it to us.

So we're a little bit confused about Goldman's document collection practice because we just would assume that when they did the search term application to these custodians and they did the review, that's where they were making decisions about pulling boys club; not that they've never touched those documents before.

Now, even if they hadn't touched those documents before, we believe that there's an appropriate record here and that we already have agreements about what terms to apply and what custodians to use and they can go out and do that.

THE COURT: And why isn't having something like the complaint files and other related material that Mr. Giuffra referred to, why isn't that sufficient?

MS. DERMODY: Because that doesn't show senior leadership animus the way comments from senior leadership would

show the animus.

THE COURT: Are you saying that none of the people represented by those files are the senior leadership you're interested in?

MS. DERMODY: There were a couple files that involve complaints against senior leaders, there are. But that's different than senior leaders actually having a record of making a statement.

THE COURT: But, again, so going back to sort of what I've previously considered and decided, you're getting anything that indicates the powers that be that use or implement the process had -- indicative of intent, right; that they know it's discriminatory against women in some way or evidence of that type. I realize that is different than if that same person expresses somewhere else some hostility towards women.

Help me with what group of people -- you said senior management. But without -- not all senior management but those who control and implement these processes, what would the universe of people be we'd be talking about?

MS. DERMODY: I think we define that, your Honor, in footnote no. 2 of our brief at ECF 901. We're talking about people that are at that corporate level or that are in the participating managing director title or extended managing director title and who served on certain of the committees that were at issue.

THE COURT: So help me. What quantity of people are we talking about?

MS. DERMODY: I actually don't know, your Honor. But it's not a huge number because there's only so many crossrefers every year. Like if it's 17 or 20 people a year that are doing crossrefing and there are corporate people.

Your Honor, just to make sure we're really clear about what the record is right now. We have complaints that involve women in the class, in the class divisions. But if, for example, a senior leader was sexually harassing his administrative assistant, we didn't get that. We don't know that. If that senior leader was known for making comments about how women can't do finance, and that shut up, and the report of an analyst from a different division, we wouldn't have that. That's not in the record that we have. So unless that senior corporate leader somehow shows up in the complaint file of an associate or vice-president and one of -- and in our class, it's very unlikely for us to ferret out that type of information; whereas getting into the ESI, we -- if we were able -- it might not be, one hopes for Goldman's sake there isn't some huge volume of this material, but even a couple of documents that show attitudes like that are hugely important when you think about the influence that certain people have that are either on the selection committees for promotion to MD or who are the people who run the company and are basically

creating the culture in which these policies are retained.

So we think that -- again, this is not a huge volume of people. These documents --

THE COURT: Well, I know you're not giving a definite number but let's say it were 20 people a year. You've got many years and people change over those years so that exponentially grows the number of people involved.

I would like to understand whether there is a discrete group of persons that could be identified as ones who are responsible for considering these processes and changes in them and approvals that gets outside the lawyer process of it because we have that part of it, but if it goes before a board member or somebody at another level and they are provided information about the -- what the stats are basically and there's a discussion of the processes and what should be done about them, if anything. I would think it would be relevant if those particular people have an animus towards women. We can't just amorphously say that there's this group so it's going to be scores and scores of people.

MS. DERMODY: Your Honor, if it would be helpful to this process for us to meet and confer with defense counsel and come up with the names, we might have different names, but to at least give the Court something that is concrete about who the people are, we can do that. I think it's a fair question for your Honor about what the number is and who these people

are.

MR. GIUFFRA: Your Honor, in a case like this, which has been going on for some time, the Court has repeatedly ruled on these issues. Judge Torres ruled on these issues.

When they moved for class certification they had two theories. The first one was disparate treatment based on boys club evidence. She said, this is Judge Torres, too individualized, doesn't predominate, can't do it.

Then there was the issue well if senior management -- this is her decision -- had awareness of the impact with respect to the processes and was doing nothing. We haven't disputed that that information should be turned over.

THE COURT: No. I know. We're talking about an in-between area of sorts. Because the first group in the individualized case you're going to have a lot of reviewer or individual reviews but it's going to depend on the individual plaintiff and what their experience was and who they dealt with versus those engaged with the process at large.

Again, hypothetical. Let's say there are a group of four people who are the main people responsible in a corporation for developing this process, implementing it. They are aware that there is a discriminatory impact and it turns out that three out of the four really just are misogynists and I would think that would be relevant.

MR. GIUFFRA: Your Honor, but I think it's important

to keep in mind we've given over, by my account, 19 years worth of complaint filing. So if somebody is in the division and they are a victim -- they make a complaint, they're covered. If someone is in the division and they do something wrong, they're covered and they would have gotten all those files.

THE COURT: But there are persons at a higher level who may not be captured by that, again, who are responsible for the process.

MR. GIUFFRA: But, your Honor, if someone says there's an e-mail, someone who is -- I don't like women and let's keep the 360s going, they're really bad for women, they would get that document, there is no question about that.

Now the question is here --

THE COURT: Why do you say that?

MR. GIUFFRA: Everybody who is a PMD or higher, everyone who is an extended managing director or higher, anybody who is on a division or firm-wide committee they want. So you're talking about now over this case, which is now like 19 years. It could be hundreds of people. And to go --

THE COURT: We're not going there. I understand that. And you're just picking up on what I was saying.

But I do have a question about whether there is some discrete group, whether it be five, six, maybe even ten people, I don't know. And maybe there isn't.

MR. GIUFFRA: Which processes were up --

THE COURT: Hold on. Maybe there isn't. In which case then it's a much -- if there isn't that sort of core, then I think it just shows more dispersion and that the answer is then it doesn't apply to anyone who is actually implementing and designing or controlling these processes. But I'm still not sure. I don't have a firm understanding of how that is handled at Goldman.

MR. GIUFFRA: Judge, to go back to what we talked about. In December of last year there was a request made to basically excise out, let's look at all the senior management people for this kind of animus evidence. You said no. That's a fact.

Then they came back again in November and they wanted it again. You said no.

And the problem, your Honor, is that let's suppose, let's just theoretically there's some e-mail that someone in a senior position wrote a stupid e-mail. Then we're going to end up with Phase I being a big dispute about one or two or three individualized e-mails that somebody wrote and they are going to say this person has a senior position, a ha, this proves that they had animus and these policies are done for animus.

THE COURT: But isn't that what happened in Systemax?

MR. GIUFFRA: No, because the difference in Systemax -- this is not a change in the law. You have it exactly right.

THE COURT: I understand that.

MR. GIUFFRA: It restates the four-factor test. And if you just take a look at what the Court says, in that particular case the plaintiff's direct supervisor happened to be the CFO, but that was not the dispositive fact. That person who was the one who was discriminating against the plaintiff in an individualized case made comments about dating and sex life and stuff like that. That's a different case.

Now as I conceded, in Phase II, if we get to that, and there's someone who -- and someone who is a direct supervisor engaged in this kind of stuff, it might all be relevant. But to turn Phase I, which is supposed to be generalized proof, into a whole series of individualized things: This one wrote an e-mail about this, this one wrote an e-mail about that, well Judge Torres reejected that in the class cert decision now back in March 2018. We're in 2020. And they want to basically come back in -- I think it's the third or fourth time -- and try to get it based on a decision that says nothing about class actions, as you correctly pointed out, and based on a decision that is merely an application of a Second Circuit standard, a four-part standard that existed in 2010 and as to specific facts. And the nature of this is clearly highly individualized, highly factual. And we've already, again, turned over the complaint files.

So think about, let's just assume theoretically

there's one bad e-mail that someone wrote or two bad e-mails, it's a big company, over 19 years. What is the relevance of any of that in Phase I?

THE COURT: I explained what the relevance is potentially. If there are people who are responsible for implementing the processes, and they discuss these processes, and they're responsible for approving them, and they have -- let me finish this thought because it's going slightly somewhere else, which is -- and there are people who are responsible for that and they harbor an animus towards women that is evidenced in whatever. They're the ones pulling the strings. So, isn't it relevant?

But where I'm going is: It depends on that connection; that is, are they responsible for it and do they know, do they have knowledge of issues or problems with these processes, which documents are being produced.

So the question is: If there is that evidence, would it then be appropriate to have discovery with respect to the persons with that knowledge --

MR. GIUFFRA: The problem --

THE COURT: -- as to whether they harbor an animus?

MR. GIUFFRA: The problem, your Honor, is that these processes are applied in three divisions by hundreds of managers and where do you draw the line? And they will say -- our position, I think your Honor knows, is that these are

highly individualized processes and gets applied to each employee.

THE COURT: I agree. Again, Phase I is about the process and whether it has a disparate impact. But disparate treatment is relevant as you quoted from Judge Torres. And I'm just getting at whether there's one aspect that would be appropriate given the Second Circuit law on what's relevant to a disparate treatment case.

Let me ask plaintiff something. Are you -- if this is work product, you don't have to reveal it.

Are you aware at this point of evidence that falls in the category of senior leadership's knowledge of problems with the processes that is the evidence that Judge Torres recognized could be considered in regard to disparate treatment?

MS. DERMODY: I don't know if I could catalog it for you, your Honor. I think that is in some respects still being produced on privilege log, honestly.

THE COURT: Because my thought is it's an issue that actually turns on that in part, maybe in whole, because it's only relevant to those persons. And right now we don't know if there are such persons. Presumably there have to be. But if there is indeed a disparate impact.

MS. DERMODY: We know from this argument that they're studying it every year.

THE COURT: No. I understand that. I got that.

MS. DERMODY: So we know that many people know about this.

THE COURT: I have no doubt. I mean it's a concern. There's a lawsuit. Of course there's a concern about it. What they conclude from it is a different issue.

So I'm going to deny without prejudice -- I'm sorry. The motion for reconsideration. Because to me, as I said, there are issues that I think distinguish Systemax and which if we apply here would be directly contrary to the contours of the class that has been certified and because of the concerns that Judge Torres and myself have expressed about individualized evidence. I am willing to consider an application in the future if the plaintiff is able to show evidence of disparate treatment on particular individuals in regard to the processes that are at issue. I'm not saying I'll grant it. I'm saying I will entertain it.

MS. DERMODY: So I'm not sure I understand, your Honor. What would the evidence be that -- as to specific individuals or that we would show that there are specific corporate people that have information?

THE COURT: Corporate people, corporate individuals. What's the distinction there?

MS. DERMODY: I wasn't sure I heard you right. I wasn't disagreeing.

THE COURT: The level of those who can approve them,

change them, etc. A high level.

Again, if you're going to make a determination of what you think is evidence of discriminatory animus -- I'm sorry, discriminatory treatment evidence in the realm of what Judge Torres and I have ruled, which is that it's got to relate to the three processes, and if you have such evidence and believe you have such evidence and think that that should then justify the discovery you're seeking from persons that fall within that category, you can make an application by letter in the first instance. First, meet and confer, obviously. And it might be appropriate to readdress it at that time but right now it's not.

MS. DERMODY: OK, your Honor.

Just to identify the elephant in the room. At some point we'll again be creeping up against the discovery cutoff so we will be in this funny position that documents come towards the end that would lend themselves to --

THE COURT: Right. You have to have an opportunity to review the documents.

MS. DERMODY: Just to make sure we're not then put in a box where we're told it's just too late. We want to be sure we highlight that now.

THE COURT: It may be that for something like that if it's a discrete small group of individuals there may be a way to do a discrete search but who knows.

MR. GIUFFRA: Again, your Honor, I just think it's important to go back to what on the application for class certification they had two theories. One was boys club and the other was that folks in management who were putting -- setting the processes up did so because they had discriminatory intent.

THE COURT: Right.

MR. GIUFFRA: And Judge Torres said to the latter they could go forward. With respect to the former they could not.

THE COURT: I'm talking about it in the context of the latter, the one that she said could go forward.

And if you take my hypotheticals, they're not so unrealistic. I'm not saying anything -- suggesting happened in Goldman in any way. But I think it would do a disservice to not explore such evidence if it existed in connection with the powers that be that made those decisions.

MR. GIUFFRA: Again, your Honor, we've turned over lots of documents and they haven't come running in here and said: Oh, senior manager A is --

THE COURT: No. I agree. I agree. That's why I said she can make the application but maybe there won't be.

MR. GIUFFRA: My only concern, your Honor, we've been litigating about --

THE COURT: This is a discrete part. It's not the same issue. It is not the exact same issue. It is not. I'm not considering it as boys club evidence. It is a question of

discriminatory animus by those who are aware that there is an issue with the processes. It's a different question.

All right. Anything else we need to discuss from the plaintiff?

MS. DERMODY: No, your Honor. Thank you.

THE COURT: Anything else we need to discuss with respect --

MS. DAVIDOFF: I apologize. Just one further clarification on the rereview.

THE COURT: Sure.

MS. DAVIDOFF: I don't want to come back to it again. The issues that we were discussing all related to the merits privilege logs. Does the rereview order apply to the class --

THE COURT: I was afraid you were going to ask --

MS. DAVIDOFF: Which we did review over the summer in response to your order.

THE COURT: It does not.

MS. DAVIDOFF: Thank you, your Honor.

MS. DERMODY: Sorry, your Honor. One more question. With respect to those class certification logs, would you ask Goldman to least identify how many documents it --

THE COURT: Yes. Because we have the same problem. It's an issue. Yes. Absolutely.

All right. Anything else? Plaintiffs?

MS. DERMODY: No. Thank you.

THE COURT: Defense?

MR. GIUFFRA: Not from us, your Honor.

THE COURT: Deputy.

She was just informing me about the next conference.

MR. GIUFFRA: You get to see us in March.

THE COURT: Seems like it's actually coming up pretty quickly. All right. Everybody thank you and be well and we're adjourned.

(Adjourned)