# EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

H. CRISTINA CHEN-OSTER; LISA PARISI; and SHANNA ORLICH,

Plaintiffs,

-against- Civil Action No.

GOLDMAN, SACHS & CO. and THE 10-CV-06950(LBS)
GOLDMAN SACHS GROUP, INC.,

Defendants.

----------------------------------------x

VIDEOTAPED DEPOSITION OF:
DAVID L. YERMACK, Ph.D.
Tuesday, February 25, 2014
New York, New York
10:17 a.m. - 2:49 p.m.

Reported in stenotype by:
---- Rich Germosen, CCR, CRCR, CRR, RMR ----
NCRA & NJ Certified Realtime Reporter
NCRA Realtime Systems Administrator
Job No. 71460

point for the distribution of a lot of up-to-date, leading edge research in economics and finance. And it's located in Cambridge, Massachusetts. It's been in business since the nineteen-twenties. It's the unofficial arbiter of things like when recessions begin and end, so, it's what you would think of as an influential think tank in the economics finance fields.

Q. What has your role been as a faculty research associate with that organization?

A. I'm part of the law in economics program and essentially when I write a new paper it's distributed under their label to people in the profession and so it's meant to benefit both ways that their researcher gets the exposure and prestige of the affiliation and if they recruit the right faculty members it draws interest to the organization itself if they're putting out research that is news worthy or affecting policy or something.

So I essentially put out early versions of papers that are candidates for publication under the label of the NBER and from time to time they hold conferences and other

related events where I may be asked to speak or I may just attend to see the papers presented by other people and so forth.

Q. Have any of the papers that you've put out under the label of the NBER dealt specifically with compensation of associates and vice-presidents in the financial services industry?

A. No.

Q. Backing up for a moment to Paragraph 3, you note that you have published more than twenty-five peer reviewed articles in the top academic journals. The same question with respect to those articles: Namely have any of them dealt specifically with compensation of associates and vice-presidents in the financial services industry?

MS. GEMAN: And I would just object that the document states academic journals in finance in economics and accounting.

A. I would give you an answer very similar to the answer about my dissertation, which is that many of these papers have compensation as a topic and they refer to general principles and

aspects of compensation that apply not only to financial services, but broadly speaking to all firms in the economy and many of them include data sets that would include financial services firms. Some of them may be more relevant than others and none is focused exclusively on this area, but many of them are relevant.

Q. You mentioned that some of your publications deal with principles of general application, compensation principles of general application.

Can you give me an example or two so that I can have a more concrete idea of what you're referring to?

A. Sure.

MS. GEMAN: I would just object to the extent it misstates the testimony, but you can answer if you understand.

A. There is a paper that I published in 2007 which was the lead article in the Journal of Finance called Pay Me Later: Inside Debt and its Role in Management Compensation. And this paper makes the observation that it's well-known that people receive equity compensation, stock

options and shares and so forth, but they also receive compensation in the form of what's called inside debt and typically this would be deferred compensation that is earned but not yet paid. Pensions also take this form.

It's compensation where the firm agrees to pay you money at a future date and your ability for collect this compensation ultimately hinges on the firm being solvent and still in business at the date that it's payable.

So a simple example would be General Motors had pensions for tens of thousands of people. When they filed for bankruptcy a couple of years ago those pensions then were unsecured claims and they were not paid in full and the pension holders didn't collect on the entire obligation.

This type of pay is especially relevant to financial services and it's one area where many researchers have picked up on the ideas in my paper and written other papers about how this is especially relevant for firms where the default risk is of great concern. And in financial services there's been great interest in

Paragraph 4 refer to conference talks that you've given recently --

A. Yes.

Q. -- on the topic of compensation in the financial services industry. What were the specific subjects of those talks?

A. Those were exactly the talks we just spoke about.

Q. The one in Frankfurt and the one in Cardiff?

A. Yes.

Q. Okay.

In Paragraph 5 you talk about your teaching at NYU when you say that you teach a course called Restructuring Firms and Industry. What is the nature of that course?

A. It's a course that begins with the topic of agency theory which looks at conflicts of interest between different stakeholders in a business. And mostly we look at corporations, but the course also considers partnerships and mutuals and LLCs and other organizations and typically the conflict of interest that's most relevant is the conflict between managers and shareholders of a

corporation where their interests sometimes diverge and various incentive systems and sometimes legal rules and other things are used to bring those incentives back into line.

So using that as the point of departure, we survey a large range of transactions that typically take place in the business world and these can be things as generic as mergers and acquisitions, but also things that are sometimes quite specialized, things like equity carve-outs, recapitalization, spinoffs and so forth and the course is subject to a great deal of revision.

I use a lot of examples from current business events that relate to the issues in the course and for that reason the restructuring of the financial services industry and the government's decision to bailout banks and organizational issues about what financial firms should and should not be allowed to do, they've played a big role on the course in recent years and it's the course that tries to connect students very directly with issues that they're likely to face when they graduate, but also as a way to apply material that's very general and has been

part of corporate finance and corporate law really for centuries in one form or another.

Q. And you note in the middle of Paragraph 5 that many of the students who take this course work after graduation in investment banking or corporate law jobs.

A. Uh-huh.

Q. Is that statement related to your qualifications to issue the opinions you've issued?

MS. GEMAN: Objection.

A. It is at least indirectly in that I know that these are their career goals so it will affect my presentation and selection of topics for the course and many of these students stay in touch. I hear from many of them as they go out into the work world. They provide me sometimes with off the record examples or anecdotes or data that I can take back to the course. They tell me how they are being paid and motivated and how the people around them are.

At this point I've got, you know, after twenty years maybe five thousand alumni of this course and I hear back from many of them and

focused investment banking and underwriting of securities and so forth.

Q. That's all I wanted to clarify.

A. Yeah.

Q. Thank you.

And then in Paragraph 19 at the end you quote a statement from Mr. Curran's report and you say in Paragraph 20 that you do not agree with Mr. Curran's characterization of the breadth of diversity of jobs.

A. Uh-huh.

Q. You begin that statement by saying that you are drawing upon your experience as an educator and researcher. What in your experience as an educator and researcher informs you about the breadth or diversity of jobs that associates and vice-presidents hold in the financial services industry?

A. As an educator I teach many students who take these jobs and either are candidates interviewing for them or maybe newly hired and then they communicate with me directly about what their role and responsibilities are. Sometimes this occurs on campus at NYU, other

times in executive or other summer training programs; and as a researcher, especially in the period since 2008, there's been a great deal of discussion about how compensation should be regulated at different levels of the firm and especially in discussing these issues with agencies such as the Federal Reserve, you hear about the commonality of the organization of many of these institutions about how even though they may have different labels for different jobs there is a great deal of similarity in the roles and qualifications and the duties of the people from one organization to another.

Q. Okay. Well, let me take those separately.

A. Uh-huh.

Q. In terms of your role as an educator, leaving aside the executive training programs for a moment, you're communicating with students who are going to join a firm in the future; right?

A. Uh-huh.

Q. So the information that they're imparting to you is information that they have

gleaned from interviews or initial contacts with the firm; right?

A. Yeah. Many of these firms will visit campus and make presentations to the students who are interested in applying and the firms themselves make an effort to communicate this information very directly to the school. Not only through contact with students, but also through the career office and sometimes even interacting with the faculty.

So we get a lot of opportunities to hear from the different companies themselves what it is that they're looking for in the preparation of the students, what skills they want, what responsibilities these people would take on initially and so forth.

Q. And have students conveyed to you or communicated to you what they've heard from firms about the breadth of jobs in those firms?

A. Yes, from time to time they have.

Q. What specifically have they told you?

A. It can vary somewhat from company to company. As I think I've stated elsewhere in

DAVID L. YERMACK, Ph.D. / 02.25.14

Q. The only information you have is the anecdotal evidence that you've described?

MS. GEMAN: Objection. Misstates the report.

And the testimony.

A. I'm not sure that's the only evidence that I've had. I've talked with regulators about this. I've read numerous stories in the financial press about how the industry organizes itself.

We have faculty at NYU and I have faculty colleagues at other universities who actually work part-time in the industry and who've described to me their experiences and I wouldn't want to limit -- you use the word only and limiting, words like that are almost always incorrect. I've followed this industry from many points of view over a long period of time.

Q. What do you recall being told in this regard by faculty at other universities?

A. What I've told you before, that people are shifted as the need arises within a firm from time to time and often this is based on client demand for products or services that can be

very volatile over sometimes even seasonal within the same year.

Q. And I may have asked you this before and if I did I apologize: What specifically have you heard from people at the Fed on this topic?

A. The Fed has tried very hard to organize people into groups that permanent them to make inquiries about things like the risk taking and the incentive structures that are in place and they've not found this terribly difficult. They found that the data that they're met with from different companies is reasonably comparable and that, as I state in the report, that the specialization really is at higher levels. At lower levels you have people who have common skills and are likely to move around and don't necessarily exhibit big differences in compensation compared to people at the upper echelon at the firm.

Q. Let me ask you about that point. This is in Paragraph 20 of your report. You say in Paragraph 20 that: "The lower levels of associate and vice-president most staff have

DAVID L. YERMACK, Ph.D. / 02.25.14

common, have a common set of skills. They do not become fully specialized and locked into an area until later in their careers."

You speak of lower levels. Are you referring to all associates and all vice-presidents?

A. Well, I use the word most in the report. You know, it's very rare that something is always or never true or applies to every person or only one person. So most is a word that I would be more comfortable with.

Q. Okay. So are you saying that most associates and vice-presidents at financial services firms have a common set of skills that they employ on their jobs?

A. Yeah, that's almost a verbatim paraphrase of the sentence, yes.

Q. Okay. Do they have different skills that they use as well as the common skills?

MS. GEMAN: Objection.

A. I think inevitably people will have different work histories and maybe more interested or more familiar with a certain product line. So I think as a matter of logic the answer has to be

yes, but in the end they're relying very heavily on financial concepts including certain common measures of risk, rates of return, time value of money calculations that allow them to understand the products and services the firm is offering.

So there may be nuance differences for sure, you know, it's like no two lawyers know exactly the same body of law, but everybody knows torts, property and so forth.

Q. Well, if you were in the market to hire a bankruptcy lawyer you'd like for somebody specialized in that area, wouldn't you?

A. It would depend on the level that I was trying to hire somebody at. If I were looking for a partner who would be a rainmaker and bring in a lot of cases to the firm and lead up the practice, yeah, I'd want a specialist with a long history of work in these cases. But if I were looking for a new associate, I would be looking for a smart law school graduate who was bright and willing to learn and so forth and had a good knowledge of the basics.

So depending on the level that you're hiring at, it's a very different answer you

get to a question like that.

Q. So suppose you were contemplating, God forbid, filing for bankruptcy, you'd want somebody who specialize in bankruptcy?

A. Speaking of personal bankruptcy?

Q. Yes.

MS. GEMAN: Objection.

A. My knowledge of who specializes in personal bankruptcy law, and whether that's even a distinct specialty, is limited because fortunately I'm not in the position that you're suggesting. So I don't know the answer to that.

Q. You'd be happy to have any lawyer of any specialty advise you on that?

MS. GEMAN: Objection. Harassing the witness. Misstates testimony. Asked and answered.

A. Not necessarily. I would want to familiarize myself about the organization of the local legal market to know the range of skills that were available and with more information I could make a more informed choice.

Q. Let me ask you to look at Mr. Curran's report, Paragraph 17.

C E R T I F I C A T E

STATE OF _____________)
                      ) :ss.
COUNTY OF ____________)

I, RICH GERMOSEN, a Certified Court Reporter, New Jersey Certified Realtime Court Reporter, NCRA Certified Realtime Reporter, NCRA Registered Merit Reporter, do hereby certify:

That DAVID L. YERMACK, Ph.D., the witness whose deposition is hereinbefore set forth, having been duly sworn, and that such deposition is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of February, 2014.

________________________________________

RICH GERMOSEN, CCR, CRCR, CRR, RMR, CLR
LICENSE NO. 30XI00184700
LICENSE NO. 30XR00016800