# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

H. CRISTINA CHEN-OSTER; SHANNA ORLICH, ALLISON GAMBA; and MARY DE LUIS, Plaintiffs,

v.

GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC., Defendants.

Case No. 10-cv-6950 (AT) (RWL)

REMOTE VIDEO RECORDED
VIDEOCONFERENCE DEPOSITION OF
BRIAN DUNN

DATE TAKEN: MAY 11, 2021
REPORTED BY: RENEE HARRIS, CSR 14168, CCR, RPR
JOB NO. 4568119
PAGES: 1 - 217

PROCEEDINGS

Research, that is.

A. No.

Q. Have you discussed this case or your opinions with Eric Dunleavy? 09:28:40

A. I don't know Eric Dunleavy.

Q. What about Margaret Stockdale?

A. I don't know Margaret either.

Q. What about Kathryn Shaw?

A. No. 09:28:55

Q. You obtained a Bachelor's Degree in 1973; is that correct?

A. No. 1977.

Q. Excuse me, 1977.

And what was that degree in? 09:29:12

A. Industrial labor relations.

Q. And where did you get that degree?

A. Cornell.

Q. You also obtained an MBA in 1981; is that correct? 09:29:35

A. That is correct.

Q. Where did you get that degree?

A. Johnson School of Business at Cornell.

Q. Other than the bachelor's and the MBA, have you obtained any other degrees? 09:29:49

PROCEEDINGS

A. No.

Q. Have you engaged in any other additional courses of study?

A. I've taken training courses over my career, but no -- no formal education. 09:29:59

Q. What sort of training courses have you taken?

A. Technical courses in compensation. Some statistics courses. Communications. I went to a course on how to do a deposition. 09:30:14

Q. And where did you take these courses?

A. Variety of places. Mostly provided by my employer.

Q. Which employer is that? 09:30:35

A. I spent the first 17 years of my career at a place called Towers Perrin. And then I spent the next 17 years at firm called McLagan that ultimately merged with Aon and Aon Hewitt. And then I spent the last year of my career working at the Vatican. 09:30:57

Q. Was Towers Perrin your first job after the MBA?

A. Yes, it was.

Q. What was your role -- to be clear, and I 09:31:13

PROCEEDINGS

understand there have been some court restructuring for Towers Perrin over the years; in your report, you refer to that organization as Willis Towers Watson. 09:31:25

A. Right.

Q. I understand that refers to all three of the various iterations of the company over the years. I will also refer to that as Willis Towers Watson, and you will understand that I'm referring 09:31:36 to including your time at Towers Perrin; is that correct?

A. Yeah, I mean, it wasn't -- they merged after I left with -- with Willis Watson -- or with Watson first, and then with Willis. 09:31:49

But yes, I understand what you're talking about.

Q. So what was your role at Towers Perrin?

A. So my first couple years, I was an assistant to the person who ran a practice called 09:32:06 human resource planning and development.

And then after those two years, I transferred into the New York office and their compensation practice, and I ran that -- I mean, I was part of that compensation practice. 09:32:23

PROCEEDINGS

have a different system there about how experts testify. So I wasn't required to testify. I was just a consulting expert. I think they called me. So that's two cases. 11:30:31

Then there was the case that we talked about, about ERISA. There was the case of the high-tech person which we talked about. There was the case of -- two cases of class action lawsuits about unreasonable compensation. That's six, 11:30:44 right?

I can use my fingers, Amanda, can't I?

MS. DAVIDOFF: Yes.

BY MS. LAMY:

Q. So I think you might have been repeating 11:30:56 just there in running through that list some cases we've already talked about. So I just want to be clear.

So far, we've talked about -- we'll just call this the first one; the case that included -- 11:31:12 it was the class action suit where you were tasked with determining who was and who was not in the class. We discussed that case.

A. Yeah.

Q. And then a second and third example where 11:31:21

PROCEEDINGS

there were folks who were terminated and contended that they had lost wages moving forward in the U.K.

And just sticking with that example for now, as part of that expert work or consulting work, did you interview those employees about the content of their jobs? 11:31:32

A. No. I can answer that -- I've never in any of the expert witness work I've done, I've never interviewed individuals. I've only relied on their depositions or other cases, declarations. But I've never actually interviewed people about their jobs. 11:31:51

Q. And so in each instance -- well, say, in the case of the U.K. example, how did you determine the content of their jobs? 11:32:06

A. Well, because they were asked to describe what activities they were involved in. There was also depositions of the people that they reported to about what work they actually did. 11:32:28

Q. Okay.

A. So they were interviewed. They just weren't interviewed by me.

Q. Did you review in the U.K. cases 11:32:51

PROCEEDINGS

testimony from any other employees of the firm about the work that they did?

A. I honestly don't recall. I mean, I read a lot of depositions. I honestly don't remember. 11:33:04

Q. Okay. So we've -- we've discussed this U.K. -- these two U.K. examples and then the class action suit.

You also mentioned an ERISA case. What was the nature of your expert opinion in that 11:33:23 case?

A. So it was whether or not they should understand what the nature of this deferred compensation was and why it was not deemed to be an ERISA-protected payment, but rather, it was a 11:33:39 deferred compensation.

Q. Did that work involve any analysis of the content of the jobs at issue?

A. Fortunately, I mean, it was mostly around -- you had to understand what the job was 11:34:06 so you could understand why they were getting that form of deferred compensation, and why other people that were getting pensions were -- were in different roles doing different things.

Q. In the -- in the ERISA case, did you -- 11:34:24

PROCEEDINGS

Q. Well, what's your billing rate?
A. My billing rate is $900 an hour.
Q. So 900 times something between 40 and a hundred? 11:57:18
A. That's a pretty good estimate.
Q. Can you turn to Appendix B of your report.
A. Sure. Yeah.
Q. Is this a complete list of the materials 11:57:54 that you considered in performing your opinion?
A. I think this is a pretty complete list, so yes.
Q. Did you personally review everything that's listed here in Appendix B? 11:58:05
A. I did not read everything that's listed in Appendix B. But to the extent that I relied upon it in my opinion, I reviewed it.
Q. What is the distinction you're drawing between reading and reviewing a document? 11:58:25
A. So some documents have many, many pages, and the area that I care about is a relatively small part of that. I would only look at that part.
Q. Okay. What portion of the documents -- 11:58:42

PROCEEDINGS

would it be fair to call that skimming a document?

MS. DAVIDOFF: Objection to form.

THE WITNESS: No, not necessarily. I mean, I just read a part of it, but I didn't read the whole thing. It's like reading a chapter but not the whole book. 11:58:55

BY MS. LAMY:

Q. Looking at the case documents that are listed, on the first page here, did you -- 11:59:04

A. So I read -- I'm sorry. Go ahead. Finish your question, I'm sorry.

Q. Did you read portions of these documents or the entire documents?

A. I read the entirety of everything that's page 1. 11:59:16

Q. Of every item on page 1?

A. Yes.

Q. What about page 2?

A. I read all of the declarations. All of these filings were used as examples that were cited in the report. And I relied on Cornerstone to help me identify those and to find which ones made the most sense to further illustrate my opinion. 11:59:31 11:59:56

PROCEEDINGS

These textbooks, I literally looked at the -- the areas that were relevant to the -- to helping clarify the opinions that I was making; the same thing on the public materials. 12:00:12

These compensation tables, I'm familiar with them. We -- I only looked at them to the extent that we extracted the information that I was looking for.

Q. Are you referring to now the produced documents? 12:00:37

A. Yeah, the produced documents.

Q. Okay. Other than the compensation tables, did you review the entirety of the other documents listed under produced documents? 12:00:55

A. Well, can you point me to a specific one and I can tell you?

Q. Sure. Did you review the second down in the list, Goldman Sachs guidelines?

A. Sorry, where are you looking? 12:01:16

Q. On page B-3.

A. Okay. "Goldman Sachs Presentation, Officer Compensation Training."

Q. Right. Did you personally review that document? Did you read it? 12:01:33

PROCEEDINGS

data provided in these reports.

Q. Is that true for the remainder of the documents in this section?

A. Yes. 12:03:25

Q. In connection with forming your opinions in this case, did you review anything that is not listed in this appendix?

MS. DAVIDOFF: Objection to form.

THE WITNESS: I did not rely on anything 12:03:41 that's not in this appendix.

BY MS. LAMY:

Q. Did you review anything that's not listed in this appendix?

A. Not for purposes of my opinion. I'm just 12:03:50 hedging a little bit because I read lots of things in the course of my day-to-day life.

So whether that helped shape something I had in my opinion, I don't know. But everything I relied upon in my opinion is listed here. 12:04:09

Q. And how did you select the materials that are listed here? So going back -- go ahead.

A. I'm sorry. I interrupted you.

Q. Well, going back to page B-1, there's a list of declarations. 12:04:27

PROCEEDINGS

Do you see that?

A. Right.

Q. How did you select these declarations?

A. So I -- I asked for any declarations that related to work that was, you know, roles and responsibilities performed by people who worked in the class; so associates and VPs in these three business unit sections. 12:04:37

Q. And are there any declarations that you reviewed that are not listed here? 12:05:06

A. No, not that I recall.

Q. Above that, you see the case documents. You say you read each of these?

A. Yes. 12:05:25

Q. There are a couple of expert reports listed there dating back to 2013 and 2014.

Did you review any more recent expert reports in forming your opinions?

A. The only other expert report that came into -- and it's not with this, my initial report. 12:05:40

But if you're talking about this particular, my -- this expert report, no. These are the only expert reports I looked at.

Q. What's the additional expert report that 12:05:52

PROCEEDINGS

you later reviewed?

A. The Farber report.

Q. And when did you review that?

A. And Dr. Yermack's subsequent report. 12:06:02

Q. Okay. So did you review both of those reports after drafting this report?

A. Yeah, I reviewed them -- well, I couldn't -- Dr. Yermack's report I don't think was written until after this report was drafted. 12:06:19

Q. But -- so -- so, yes?

A. Yes, I'm sorry.

Q. And did reviewing those reports lead you to change any of the conclusions you reached in your report -- 12:06:37

A. In this report?

Q. -- here? Yes.

A. No.

Q. Have you ever reviewed an expert report by Eric Dunleavy? 12:06:42

A. No.

Q. Or Wayne Cascio?

A. No.

Q. Or Leaetta Hough?

A. No. 12:06:55

PROCEEDINGS

A. I do.

Q. What do you mean by "specialized" here?

A. So if -- if you are trading municipal bonds, it's different than trading equities. They are just fundamentally different markets. They have different characteristics, so -- and you -- you would specialize -- and at some point, you may further specialize into, you know, different kinds of, you know -- you know, different forms of equity. You may specialize in a specific -- in a specific industry. You may specialize in certain -- whether -- how big their market cap is. 13:54:39 13:55:00

There's a whole bunch of things that you can specialize in that makes you much more effective in what you do. 13:55:19

Q. So would an analyst who is, you know, working with municipal bonds be specialized in municipal bonds in your opinion?

A. Absolutely they would be. 13:55:34

Q. Okay. So it is your opinion that specialization occurs immediately upon beginning a job; is that correct?

A. So someone enters immediately into a specialized job. 13:55:45

PROCEEDINGS

Q. Are you familiar with the research that Dr. Yermack cited on market preferences for generalized skills?

A. No. I mean, I read his report but I'm not. 13:56:07

Q. Did you read the academic literature that he cited in this report?

A. No.

Q. Are you familiar with any academic literature other than that cited in Dr. Yermack's report on this topic? 13:56:19

MS. DAVIDOFF: Objection to form.

THE WITNESS: Am I familiar with --

BY MS. LAMY: 13:56:37

Q. Do you read -- do you read -- yeah.

Do you read -- do you keep up with the academic literature on the topic of market preferences for generalized versus specialized skills? 13:56:48

A. I don't -- I don't subscribe to academic journals, if that's what you're asking me.

In the course of my teaching, sometimes someone will send me an academic article and say does this -- "I thought this might be of interest 13:57:10

PROCEEDINGS

to you." I can't think of one that was relevant to, whatever you call it -- whatever that study was.

Q. So unless somebody sends you an academic study, you're not likely to go out in search of it yourself? 13:57:22

A. No. They tend to be very divorced from reality.

Q. Could you please turn to Paragraph 48 of your report? 13:57:35

MS. DAVIDOFF: At some convenient point, could we take a break, Michelle?

MS. LAMY: Yeah, we can take a break.

THE WITNESS: I can use one, too, actually. 13:58:25

MS. LAMY: Now is a fine time, actually, for a break.

THE VIDEOGRAPHER: Okay then. This is the end of Media Unit 6. We are going off the record at 1:59 p.m. 13:58:33

(Short break taken.)

THE VIDEOGRAPHER: We are going back on the record at 2:10 p.m., and this is the beginning of Media Unit 7. 14:10:16

PROCEEDINGS

responsibility for either job.

And so it's the wholeness of the job itself that makes it unique. It's not any one particular skill, whether they have it or don't 14:14:54 have it. It's the combination of all the skills and responsibilities and activities and knowledge that they have to have to perform that job.

Q. So when -- when talking about the combination of all the skills and responsibilities 14:15:10 and activities and knowledge that they have to do to perform that job, what do you base your opinion on -- on what basis do you conclude that they are different, you know, as between -- to continue with this example, the leveraged financed business 14:15:29 unit and the capital markets business unit at Goldman Sachs, specifically?

A. Well, leveraged finance is a part of capital markets. So I'm not sure what -- what we're -- 14:15:43

Q. Sorry. Debt capital markets.

A. Okay. So ask me the question again. So the difference between debt capital markets and...

Q. I'm asking you to explain the basis for your basis for your opinions about the knowledge 14:15:58

PROCEEDINGS

and skills necessary to perform jobs at Goldman Sachs. And specifically, you know, what you rely upon to conclude that two jobs are different.

A. Well, having a set of knowledge and skills that overlap each other doesn't by definition mean that the jobs aren't different. 14:16:15

So what one person does in leveraged finance is different than what somebody does in debt capital markets. I mean, they are just different activities. 14:16:29

Q. But --

A. Now, would they bring overlapping skills? Sure. They would bring overlapping skills. But they are not doing the same job. 14:16:39

Q. So with respect to, you know, the specific work being done by these people, what do you know about what an associate at Goldman Sachs specifically does in, for example, the debt capital markets business unit? Have you spoken to any associates or vice presidents in that business unit? 14:16:56

A. No.

Q. Have you asked them what their day-to-day skills are? 14:17:08

PROCEEDINGS

A. No.
Q. Have you spoken with associates or vice presidents in any business unit at Goldman Sachs about their skills and responsibilities? 14:17:18
A. As relates to this case? No.
Q. Could you turn to Paragraph 35. So here --
A. Excuse me for a second. I'm just reading the paragraph. 14:17:56
Q. Sure. Take your time.
A. Okay.
Q. So here, you take the opinion -- you take the position that underwriting of municipal bonds is materially different from the underwriting of 14:18:31 corporate bonds; is that correct?
A. I did.
Q. What is the basis for that opinion?
A. These corporate bonds are different than municipal bonds. You're underwriting different 14:18:43 credits. You're underwriting credits for -- you know, your underwriting bonds for a corporation is different than underwriting a dormitory bond -- a dormitory authority bond or a water works bond or, you know, some other form of municipal bond. 14:19:06

PROCEEDINGS

I just -- they are fundamentally different. That's why they have different people doing them.
Q. Well, specifically here, you cite the tax regulations that govern underwriting of municipal bonds; is that right? 14:19:13
A. That's correct. They have different economics.
Q. Is the underwriting of corporate bonds governed by any regulations? 14:19:27
A. Of course.
Q. Which ones?
A. There's different ones.
Q. Do you know which ones they are? 14:19:35
A. There's all kinds of disclosure laws that you have to -- you have to conform to.
Q. Okay. So in both context --
A. I'm not an expert in bond underwriting, so I can't tell you exactly what -- what regulations a bond underwriter has to adhere to. But I know -- I know that they are different than a municipal bond. 14:19:49
Q. But both involve regulatory compliance, correct, which is what you cite as the difference 14:20:09

I, RENEE HARRIS, a Certified Shorthand Reporter of the State of California, a Certified Court Reporter for the State of New Jersey, and a Registered Professional Reporter, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to tell the truth, the whole truth, and nothing but the truth;

That the said deposition was by me recorded stenographically;

And the foregoing pages constitute a full, true, complete and correct record of the testimony given by the said witness;

That I am a disinterested person, not being in any way interested in the outcome of said action, or connected with, nor related to any of the parties in said action, or to their respective counsel, in any manner whatsoever.

Dated: May 16, 2021



Renee Harris, CSR, CCR, RPR
CA CSR No. 14168,
NJ CRR No. 30XI00241200; RPR