# EXHIBIT 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 10-cv-6950-AT-RWL
- - - - - - - - - - - - - - - - - - - - -x
H. CHRISTINA CHEN-OSTER, SHANNA ORLICH, ALLISON GAMBA, and MARY DE LUI,

Plaintiffs,

-against-

GOLDMAN SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,

Defendants.
- - - - - - - - - - - - - - - - - - - - -x

June 15, 2021
8:00 a.m.

** HIGHLY CONFIDENTIAL **

VIDEOTAPED ZOOM DEPOSITION of SARAH BUTLER, an Expert Witness, taken in the above-entitled action, taken before Dawn Matera, a Certified Shorthand Reporter and Notary Public.

HIGHLY CONFIDENTIAL - S. BUTLER

been as an expert doing surveys which involves a wide range of people and questions that ask about practices and experiences, questions related to employment experiences or practices are not uncommon. So I'll just have to think of some other examples for you on a break.

Q. Okay. But there are no other examples besides the one.

(Lost connection. )

MS. SHAVER: Let's go off the record.

THE VIDEOGRAPHER: The time is 8:48, we are off the record.

[Off the record.]

THE VIDEOGRAPHER: The time is 8:58, we are back on the record.

Q. All right. Ms. Butler, have you ever designed an employee survey?

A. Yes.

Q. And let's talk first about your non-litigation work. Have you ever designed an employee survey not for

HIGHLY CONFIDENTIAL - S. BUTLER

litigation?

A. Yes.

Q. Tell me about that work.

A. Sure. In part, as NERA is the chair of our survey and statistical sampling practice, I design and have designed over the course of a number of years employee surveys that we have used as a company for all of our employees.

Q. Are there any other examples where you designed employee surveys outside of litigation?

A. Not that I recall, no.

Q. Have you, again, outside of litigation, have you provided advice to clients about their employee surveys?

A. Yes. Certainly, again, externally, since I am responsible for designing, collecting the data and interpreting the data of our own employee surveys, yes, I mean I certainly offer advice and good practice as to how those surveys should be designed and implemented.

HIGHLY CONFIDENTIAL - S. BUTLER

Q. Sorry, and I meant to clients. Not to NERA. But have you had -- let me try to ask it a different way.

Outside the context of litigation, have you provided advice to clients of NERA about their employee surveys?

A. Not that I can recall a specific example. I can't recall a specific example, no.

Q. Again, outside the context of litigation and outside the context of the use of NERA's employee survey data, have you used employee survey data in your work?

MS. SHAVER: Object to form.

A. That's a big question. Certainly there are many surveys, let's say, conducted by the Labor Department that help to classify a survey -- classify employees, provide proportions and estimates of employees involved in certain industries. Look at crossover. So, yes, certainly I have used

basically two open-ended questions.

Q. Okay. But is there some term as an expert in surveys that you use to describe a survey that an employer does of its employees similar to the People Survey?

A. Well, again, I think there are lots of ways in which one could characterize the survey. One could talk about the types of questions asked. So there are these Likert scale type questions. There are open-ended questions. You could talk about the substance that Goldman Sachs intended to cover with the survey. It is a survey of its employees.

Q. Would you call that an employee survey?

A. Again, if you would like to, I mean, just so now we're distinguishing between our kind of earlier discussion of employee surveys. But if we want to talk about this particular survey, the People Survey, I mean I don't think Goldman

HIGHLY CONFIDENTIAL - S. BUTLER

Sachs was distributing the People Survey to non-Goldman Sachs employees. So, yes, we can certainly call the Goldman Sachs People Survey a survey of its employees.

Q. And, in fact, when you were talking about the work that you do at NERA, designing, collecting the data and interpreting the data of NERA's surveys of its employees, you were calling that an employee survey, right?

A. I think I certainly referenced it as a survey of NERA's employees, yes. We have done surveys in terms of evaluating colleagues. We've done surveys recently of kind of the workplace environment and returning to work and comfort levels with that. So the environment of the workplace.

Q. Right. No, I am just pointing out that you used the term "employee surveys" in describing that work. So do you understand that term "employee surveys"?

MS. SHAVER: Object to form.

HIGHLY CONFIDENTIAL - S. BUTLER

Asked and answered.

A. Sure. And I think the only reason, I just want to be clear, when you originally had mentioned employee surveys, you were offering a much more limited or focused definition of it. Employee surveys, again, could include other type of employee surveys.

Q. Okay. Okay. Using this definition of employee surveys where it refers to, you know, NERA's survey of its employees or Goldman Sachs's survey of its employees, could we agree to use that definition for now?

A. Sure.

Q. Okay. Have you done any litigation work designing or conducting employee surveys?

A. I am not quite sure that question makes sense, given the definition we're using of employee surveys. So I thought what you intended was that an employee survey, the way we were talking about it, like the surveys

HIGHLY CONFIDENTIAL - S. BUTLER

there because I am a survey expert.

Q. Right. You can testify that you're a survey expert, right?

A. I am not sure what you mean by I can. Yes. I think I have been admitted to court a number of times. I have had my reports accepted. I have had them relied on by courts as a survey expert.

Q. Okay. Are you also an expert in assessing workplace culture?

MS. SHAVER: Object to form.

A. So I think to the extent, again, that a measure or an assessment of the workplace environment or culture related to workplace is being assessed by a survey, then, yes, I can certainly offer my opinions as to how a particular survey has been designed or how one ought to design one.

Q. Has your -- you said you have been admitted to court a number of times on the topic as a survey expert. Have you ever been admitted to court as an

HIGHLY CONFIDENTIAL - S. BUTLER

expert on workplace culture?

MS. SHAVER: Object to form.

A. No, I believe the times in which I have been presented to a court has been as a survey expert. And that expertise covers a wide range of different topics, but the expertise has been specific to a survey.

Q. How would you evaluate whether a workplace culture is tolerant of gender bias and harassment?

MS. SHAVER: Object to form.

A. So I think, again, kind of aside from a survey that might be developed to assess that, that's not something I kind of particularly considered.

Q. So are you offering an opinion in this matter of whether Goldman Sachs' culture is tolerant of gender bias and harassment?

A. No. So I am offering an opinion as to the -- well, to be clear, the opinion I am offering is related to

HIGHLY CONFIDENTIAL - S. BUTLER

the survey, what it can and cannot be used to determine. And certainly what the results are of that survey and what kind of patterns those data show.

Q. Are you offering the opinion that Goldman Sachs culture is tolerant of gender bias and harassment?

MS. SHAVER: Object to form. Asked and answered.

A. So unless there is a specific survey question in terms of tolerance as you described it, I would have to go back and pull up all the questions. But aside from the questions in the People Survey, I am not offering an opinion as to whether Goldman Sachs tolerates a particular environment.

Q. Okay. What do you mean aside from the questions in the People Survey?

A. Well, so, for example, there are certainly questions that reveal a difference in the experience between men and women. And there are statistical patterns or differences in those

HIGHLY CONFIDENTIAL - S. BUTLER

responses. So certainly, I have looked at those data and those patterns.

Q. And are you drawing any opinions on Goldman Sachs' culture based on those data and those patterns?

A. I am not offering kind of a broader opinion as to Goldman Sachs' culture beyond the survey data that I analyzed and looked at and certainly how Dr. Stockdale uses those data.

Q. And I do want to focus on that survey data. So my question is, whether you're offering opinions about Goldman Sachs' culture based on the survey data and the patterns that you observed?

A. I wouldn't say I am offering opinions as to Goldman Sachs' culture. No, I am offering opinions as to the reliability or usefulness of the survey, I am sorry, the People Survey as well as the exit survey and to the extent to which those data show different gender patterns.

Q. Okay. Do you have any

HIGHLY CONFIDENTIAL - S. BUTLER

experience in assessing work environments for gender-based discrimination?

A. I would not say I have specific -- again, if it's unrelated to surveys, looking at gender-based discrimination.

Q. And I don't mean to cabinet it to something unrelated surveys. My question is, do you have experience in assessing work environment for gender-based discrimination?

A. I don't think I have looked at specifically gender-based discrimination in a work environment, no.

Q. Have you ever developed an exit survey?

A. I certainly have helped our own internal folks develop questions that can be posed to, and I think are typically posed to, what we call leavers of our firm.

Q. Well, let me ask you this, what is an exit survey?

A. Generally, my understanding is an exit survey is a survey done of an

HIGHLY CONFIDENTIAL - S. BUTLER

A. Yes.

Q. So in the second sentence you said, "To conduct the content search I created a list of search terms to search in the approximately 9.7 thousand open-ended responses from which Dr. Stockdale draws her sample of 18,000 for her content analysis. The list of terms for the search are in Exhibit C. These terms were separated into categories based on the issues of the case."

Did I get all that right?

A. Yes.

Q. So was the first step creating a list of search terms or was the first step creating the categories?

MS. SHAVER: Object to form.

A. I don't know that one necessarily preceded the other. So I think that was kind of done in conjunction. Certainly, there were terms that hung together as more of a group. And I think we developed the specific

HIGHLY CONFIDENTIAL - S. BUTLER

categories.

Q. Who worked on this analysis with you?

A. So it would have been my researchers Monica Gronseth, Emma Debauld that may have worked on it as well. Maybe Kathy, Kathy Wang.

Q. How did you go about creating the list of terms to search?

A. I developed a list of search terms in terms of looking both at words that Dr. Stockdale had coded for or looked for in her own analysis, and looking at the complaints. Looking at samples of the data. At this point we had the open-ended responses to take a look at, as well.

Q. Did you review any other sources to develop your research terms?

A. Any other sources? I am sorry, I just missed you.

Q. Yeah, sources.

A. No, not that I can think of any specific sources, no.

HIGHLY CONFIDENTIAL - S. BUTLER

Q. Okay. You say words that Dr. Stockdale coded for, what do you mean by that?

A. So I would have to go back or pull up her report, but I think she certainly looked for themes in her own analysis of the data. So she looked at tone. But then she also categorized responses into different categories of what the response was related to.

Q. So were you using her categories?

A. No. I am not sure what you mean by using. Certainly, I looked at the terms that she searched for or kind of the themes that she evaluated in her sample of data. We used those words. We certainly added to the list.

So if you look at Exhibit C, it has a lengthy list of all of the different words that were searched for in the text.

Q. Do you have compiled somewhere the words that you derived from

HIGHLY CONFIDENTIAL - S. BUTLER

Dr. Stockdale's coding?

A. No, I don't have them specifically as, you know, so if I look at Exhibit C, I don't have that kind of broken out specifically as to where it came from.

Let's say Dr. Stockdale. I mean if you look at, for example, the category of group, I mean, it's male, female, males, female. Those are words in the data that Dr. Stockdale looked at.

Q. But you don't have a list somewhere of the words that you used that you derived from Dr. Stockdale's coding?

A. I think as I already indicated, no. I don't have, I don't have Exhibit C broken out, as to whether it specifically came from Dr. Stockdale or came from, you know, some other source or is kind of a version of a word that came from one of the sources.

Q. And you say that you also derived your search terms from complaints. What did you mean by that?

HIGHLY CONFIDENTIAL - S. BUTLER

A. Sorry, they are legal documents.

Q. So which legal documents did you derive your search terms from?

A. I certainly looked at the complaint in this matter, so the legal complaint, which I think is the second amended.

Q. Got it. Okay. Any other legal documents you used to develop search terms?

A. Now that I am thinking about it, I certainly did review it. I certainly reviewed Dr. Goldberg's report.

Q. Okay. And you may have -- are you saying you might have used that as well to develop search terms?

A. Well, I think she might have had references in her report. I would have to go back and look. But that's, you know, specifically added an additional term to the list that is in Exhibit C.

Q. Are there any other legal

HIGHLY CONFIDENTIAL - S. BUTLER

documents that you used as sources to derive your search terms from?

A. No, not that I recall.

Q. Okay. And you also mentioned samples of the responses to the recommended improvements question as a source from which you derived search terms. What did you mean by that?

A. Sure. So when coding data, you can just code down, meaning develop a set of codes without looking at the data themselves or you can also look at the responses and see what kinds of words or language comes up in those responses, and also use those to help inform.

Q. Okay. Is one or the other of those methods preferred as a coding approach?

A. Preferred, I don't know that it's necessarily preferred. I find it helpful to look at responses.

Q. Why is that?

A. Well, because they may provide answers or codes that I would not have

HIGHLY CONFIDENTIAL - S. BUTLER
independently thought of.
Q. Did you consider using a preexisting taxonomy to code your or to develop your search terms or categorize them?
MS. SHAVER: Object to form.
A. I don't know what preexisting taxonomy I would have used, so no.
Q. If a preexisting taxonomy does exist that applies to assessing culture and diversity within a firm, would it be wrong to take the approach that you took of developing your own search terms and categories?
MS. SHAVER: Object to form.
A. Would it be wrong? No, I don't think so.
Q. Why not?
A. Well, I am not sure what the taxonomy you're referencing, of how it was developed, what it was intended to do or measure. I don't know how it was or wasn't different from the search terms I have here.

HIGHLY CONFIDENTIAL - S. BUTLER

given somebody's actual reading of the open-ended response, is appropriate.

Q. And did you make any changes to your category key words or categories, based on your testing?

A. Yes. So I think that's how this tech category was developed, because it became apparent that, again, rather than support as resources and staff and junior and all of the other things that are listed, what was falling into a support category were, again, IT-related support.

Q. Understood. Did you make any other changes to your category key words or categories based on your testing?

A. No, not that I recall.

Q. And again, how large was the sample that you examined?

MS. SHAVER: Object to form.

A. So my standard practice would have been somewhere around 1 to 200. We may have even pulled more because we would have done it again after creating

HIGHLY CONFIDENTIAL - S. BUTLER

the tech variables to make sure that that was functioning properly.

Q. And what was the error rate yielded by your testing that you just described?

A. So in terms of the error rate in terms of the tech variable, that I would have to go back and look at to see how many responses -- I don't know that we even have an estimated error rate for that per se. For the others, the program works just fine. I mean, it confines the word that is listed in the category.

Q. Okay. But did you determine an error rate for the extent to which -- I mean I understand probably 100 percent of the time the program, you know, correctly identified words in the responses. But did you determine an error rate for how frequently the search terms erred in identifying a People Survey response as belonging in a particular category when it didn't actually belong in that category?

HIGHLY CONFIDENTIAL - S. BUTLER

A. No, because I mean I think the categories -- well, there would be no errors because the categories are simply based on the search terms.

Q. So you were not in this review testing for whether, you know, a search for rank actually came up with a People Survey response that related to performance, for example?

A. So the term "rank" is listed under the category of performance, and certainly that respondent or response would have mentioned rank.

To the extent that, you know, there is some subjective assessment as to does the overall response kind of more substantively, let's say, relate to promotions rather than performance. No, that, again, is not the purpose of this analysis. I am not making subjective assessments, trying to interpret what the responses are. But one can try to infer from these responses.

Q. So when you were doing the

HIGHLY CONFIDENTIAL - S. BUTLER

testing you just described, you weren't trying to determine whether a response identified by a particular key word actually pertained to the category in which you had placed that key word?

A. No, I don't think that's a correct categorization. I mean I think the categories are based on the words that are a part of the content search. And the goal of the content search was to look at the rate at which men versus women use certain language or reference certain words within their open-ended response to improvement. And we've parsed those words into these different categories. And we can look at the rates at which men and women use these certain terms.

Q. Sure. And you tested whether, in fact, you were accurately capturing the rate at which men and women use these terms, right?

A. Yes.

Q. But you didn't test whether the

CERTIFICATION

I, DAWN MATERA, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as here in set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of June, 2021.

Dawn Matera

______________________

DAWN MATERA