**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; SHANNA ORLICH; ALLISON GAMBA; and MARY DE LUIS,<br><br>     Plaintiffs,<br><br>   -against-<br><br>GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,<br><br>     Defendants. | No. 10-cv-6950-AT-RWL |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR DECERTIFICATION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.     Factual Background ............................................................................................... 3

      A.     The 360 Review ........................................................................................ 3

      B.     Manager Quartiling ................................................................................... 6

      C.     Cross-Ruffing ........................................................................................... 8

      D.     Goldman's Knowledge of Adverse Impact in the Challenged Practices ............. 11

II.    Procedural Background ........................................................................................ 14

LEGAL STANDARD ....................................................................................................... 17

ARGUMENT .................................................................................................................... 18

I.     Goldman's Only Purportedly New Argument—Lack of Standing—Does Not
Reflect a Change In the Law and Is Legally Incorrect. ...................................... 19

      A.     *TransUnion* Affirmed Existing Law, Under Which All Class Members
Here Have Suffered a Concrete Harm. ................................................... 20

      B.     A Rule 23(b)(3) Class May Seek Injunctive Relief for Violations of Title
VII. .......................................................................................................... 24

      C.     The *Teamster's* Framework Still Governs Trial of Plaintiffs' Disparate
Treatment Claim. ..................................................................................... 27

II.    Goldman's Remaining Arguments Are Identical to Its Prior Failed Arguments,
and Continue to Warrant Rejection ..................................................................... 28

      A.     Commonality ............................................................................................ 29

            1.     The Challenged Practices Are a Common Mode of Exercising
Discretion. ................................................................................... 29

            2.     The Challenged Practices Caused a Disparate Impact. ................ 32

            3.     There Is "Significant Proof" of a General Policy of
Discrimination. ............................................................................ 36

      B.     Typicality ................................................................................................. 37

      C.     Adequacy ................................................................................................. 39

      D.     Predominance ........................................................................................... 40

      E.     Superiority ................................................................................................ 43

CONCLUSION ................................................................................................................. 44

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Abdallah v. Coca-Cola Co.*,
  186 F.R.D. 672 (N.D. Ga. 1999) ................................................................................... 29

*Abram v. UPS of Am., Inc.*,
  200 F.R.D. 424 (E.D. Wis. 2001) ................................................................................ 34

*Amador v. Morgan Stanley & Co., LLC*,
  No. 11 Civ. 4326(RJS), 2013 WL 494020, (S.D.N.Y. Feb. 7, 2013) ......................... 29

*Belt v. Emcare, Inc.*,
  299 F. Supp. 2d 664 (E.D.Tex. 2003) ......................................................................... 29

*Bolden v. Walsh Constr. Co.*,
  688 F.3d 893 (7th Cir. 2012) ...................................................................................... 34

*Brown v. Nucor Corp.*,
  785 F.3d 895 (4th Cir. 2015) ...................................................................................... 28

*Brown v. Wal-Mart Store, Inc.*,
  No. 09-CV-03339-EJD, 2018 WL 1993434 (N.D. Cal. Apr. 27, 2018) ...................... 18

*Bublitz v. E.I. DuPont de Nemours & Co.*,
  196 F.R.D. 545 (S.D. Iowa 2000) ............................................................................... 29

*Calvo v. City of New York*,
  No. 14-CV-7246 (VEC), 2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017) ................... 21

*Chen-Oster v. Goldman Sachs & Co.*,
  No. 18-mv-1075 (2d Cir. Aug. 13, 2018) ............................................................. 1, 9, 17

*Chin v. Port Auth. of N.Y. & New Jersey*,
  685 F.3d 135 (2d Cir. 20212) ............................................................................... 23, 36

*Cohen v. W. Haven Bd. of Police Comm'rs*,
  638 F.2d 496 (2d Cir. 1980) ....................................................................................... 23

Connor B. ex rel. Vigurs v. Patrick,
  278 F.R.D. 30 (D. Mass. 2011) ............................................................................ 28, 41

*Day v. Celadon Trucking Servs., Inc.*,
  827 F.3d 817 (8th Cir. 2016) ...................................................................................... 18

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d. Cir. 2006) ...................................................................................... 21

*Donaldson v. Microsoft Corp.*,
  205 F.R.D. 558 (W.D. Wash. 2001) ........................................................................... 40

*Easterling v. Conn. Dep't of Correction*,
  278 F.R.D. 41 (D. Conn. 2011) .............................................................................. 41, 42

*Ellis v. Costco Wholesale Corp.*,
  285 F.R.D. 492 (N.D. Cal. 2012) ..................................................................... 27, 35, 41, 44

# TABLE OF AUTHORITIES
## (continued)

Page

*Flynn v. DIRECTTV, LLC*,
No. 3:15-cv-01053 (JAM), 2018 WL 3970913 (D.Conn. Aug. 20, 2018) ........................... 21

*Friends of the Earth, Inc. v. Laidlaw Environ. Svs., Inc.*,
528 U.S. 167 (2000) ........................................................................................................ 20, 26

*Gordon v. Hunt*,
117 F.R.D. 58 (S.D.N.Y.1987) .............................................................................................. 18

*Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*,
630 F.2d 79 (2d Cir. 1980) ................................................................................................... 23

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*,
907 F. Supp. 2d 492 (S.D.N.Y. 2012) ................................................................................. 17

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*,
No. 96 CV 8414 KMW, 2013 WL 4647190 (S.D.N.Y. Aug. 29, 2013) ............................. 41

*Hnot v. Willis Grp. Holdings Ltd.*,
241 F.R.D. 204 (S.D.N.Y. 2007) .......................................................................................... 17

*Houser v. Pritzker*,
28 F.Supp.3d 222 (S.D.N.Y. 2014) ....................................................................... 19, 22, 41

*In re Johnson*,
760 F.3d 66 (D.C. Cir. 2014) ............................................................................................... 39

*In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869*,
934 F.3d 619 (D.C. Cir. 2019) ............................................................................................. 41

*In re Vivendi Universal, S.A. Sec. Litig.*,
No. 02 CIV. 5571 RJH HBP, 2009 WL 855799 (S.D.N.Y. Mar. 31, 2009) ........................ 18

*Ingram v. Coca-Cola Co.*,
200 F.R.D. 685 (N.D. Ga. 2001) .......................................................................................... 28

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977) ............................................................................................... 24, 27, 41

*Jermyn v. Best Buy Stores, L.P.*,
276 F.R.D. 167 (S.D.N.Y. 2011) .................................................................................... 18, 19

*Jin v. Shanghai Original*,
990 F.3d 251 (2nd Cir. 2021) ............................................................................................... 18

*Jones v. National Council of Young Men's Christian Ass'ns*,
34 F. Supp. 3d 896 (N.D. Ill. 2014) ............................................................................... 29, 40

*Kassman v. KPMG LLP*,
416 F.Supp.3d 252 (S.D.N.Y. 2018) ....................................................................... 30, 31, 35

*Kempner v. Town of Greenwich*,
249 F.R.D. 15 (D. Conn. 2008) ............................................................................................ 21

*Lackawanna Chiropractic P.C. v. Tivity Health Support LLC*,
No. 18-CV-649-LJV-JJM, 2021 WL 3827733 (W.D.N.Y. Aug. 27, 2021) ........................ 22

# TABLE OF AUTHORITIES
## (continued)

Page

*Langley v. Coughlin*,
715 F. Supp. 522 (S.D.N.Y. 1989)........................................................................ 17, 18

*Little v. Wash. Metro. Area Transit Auth.*,
249 F. Supp. 3d 394 (D.D.C. 2017) ............................................................................ 22

*Lott v. Westinghouse Savannah River Co.*,
200 F.R.D. 539 (D.S.C. 2000) ..................................................................................... 34

*Mandala v. NTT Data, Inc.*,
975 F.3d 202 (2d Cir. 2020)......................................................................................... 34

*Mazzei v. Money Store*,
308 F.R.D. 92 (S.D.N.Y. 2015) ........................................................................... 1, 17, 18

*Mazzei v. Money Store*,
829 F.3d 260 (2d Cir. 2016)........................................................................................ 18

*Mevorah v. Wells Fargo Home Mortg., Inc.*,
No. C 05-1175 MHP, 2005 WL 4813532 (N.D. Cal. Nov. 17, 2005) ................................. 29

*Moore v. Boeing Co.*,
No. 4:02CV80 CDP, 2004 WL 3202777 (E.D. Mo. Mar. 31, 2004)................................... 34

*Moussouris v. Microsoft*,
No. C15-1483LJR, 2018 WL 3328418 (W.D. Wash. June 25, 2018) ................ 30, 31, 35, 40

*Olean v. Wholesale Grocery Coop., Inc.*,
5 F.4th 950 (9th Cir. 2021) ......................................................................................... 41

*Olean v. Wholesale Grocery Cooperative, Inc.*,
993 F.3d 774 (9th Cir. 2021) ....................................................................................... 41

*Parra v. Bashas', Inc.*,
291 F.R.D. 360 (D. Ariz. 2013) ................................................................................... 28

*Penk v. Or. State Bd. of Higher Ed.*,
No. 80-436, 1985 WL 25631 (D. Or. Feb. 13, 1985) ......................................................... 34

*Robinson v. Metro-N. Commuter R.R. Co.*,
267 F.3d 147 (2d Cir. 2001)...................................................................................... passim

*Roe v. City of New Orleans*,
766 F. Supp. 1443 (E.D. La. 1991)................................................................................ 22

*Ross v. Lockheed Martin Corp.*,
267 F. Supp. 3d 174 (D.D.C. 2017) .............................................................................. 29

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 39 (2010)...................................................................................................... 25

*Stockwell v. City & Cty. of S.F.*,
No. C 08-5180 PJH, 2015 WL 2173852 (N.D. Cal. May 8, 2015) ..................................... 41

*Tomassini v. FCA U.S. LLC*,
326 F.R.D. 375 (N.D.N.Y. 2018).................................................................................. 21

## TABLE OF AUTHORITIES
### (continued)

**Page**

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ........................................................................... passim

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ...................................................................................... 21

*United States v. City of N.Y.* ("*City of New York I*"),
    276 F.R.D. 22 (E.D.N.Y. 2011) ............................................................. 23, 44

*United States v. City of New York* ("*City of New York II*"),
    717 F.3d 72 (2d Cir. 2013) ........................................................................... 24

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .............................................................................. passim

*Watson v. Fort Worth Bank & Tr.*,
    487 U.S. 977 (1987) ...................................................................................... 23

*Wilder v. Bernstein*,
    645 F.Supp. 1292, 1311 (S.D.N.Y. 1986) .................................................... 28

*Zimmerman v. Portfolio Recovery Assocs., LLC*,
    No. 09 CIV. 4602 PGG, 2013 WL 1245552 (S.D.N.Y. Mar. 27, 2013) .............. 18

### STATUTES

28 U.S.C. § 2072(a) ............................................................................................. 25

28 U.S.C. § 2072(b) ............................................................................................. 25

42 U.S.C.A. § 2000e-5(g) .................................................................................... 25

N.Y.C.A.C. § 8-502(a) ......................................................................................... 25

### RULES

Rule 23(a) ................................................................................................ 14, 15, 16

Rule 23(b)(2) ................................................................................................ passim

Rule 23(b)(3) ................................................................................................ passim

Rule 23(c) ........................................................................................................... 17

Rule 23(f) ...................................................................................................... 1, 17

### OTHER AUTHORITIES

Daniel L. Rubinfeld,
    *Reference Guide on Multiple Regression, in Reference Manual on Scientific
    Evidence* 303 (3d ed. 2011) ........................................................................ 23

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Erin L. Sheley & Theodore H. Frank,
  *Prospective Injunctive Relief and Class Settlements*, 39 Harv. J.L. & Pub.
  Pol'y 769 (2016) .................................................................................................. 25

Ramona L. Paetzold & Steven L. Willborn,
  *The Statistics of Discrimination* § 6.3 (2020) ...................................................... 23

Wiliam B. Rubentstein, et al.,
  *Newberg on Class Actions* 7:39 (5th Ed.) ............................................................ 18

2288688.4

## INTRODUCTION

After more than 500 pages of class certification briefing over 12 briefs,[1] nine expert reports,[2] six *Daubert* motions,[3] a two-day hearing, two forty-five page orders from Magistrate Judge Francis,[4] a forty-nine page order from this Court,[5] and Rule 23(f) briefing and argument before the Second Circuit, Defendant Goldman, Sachs & Co. and the Goldman Sachs Group ("Goldman") now asks this Court to re-do all of the aforementioned work.  There is no reason to indulge this manifest waste of time and resources.  Goldman has not met its "heavy burden" to show a "significant intervening event or . . . compelling reasons to reexamine the question" of class certification.  *Mazzei v. Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015) (citations omitted).  Indeed, the parties' dueling summary judgment briefs plainly show that the elements of and defenses to Plaintiffs' claims are susceptible to common proof because each party has moved for summary judgment using only common proof.  This decertification motion only serves to undermine the efficacious administration of justice and unnecessarily protract litigation.

Unable to meet its burden, Goldman argues that Plaintiffs' decision not to seek certification under Rule 23(b)(2) undermines this Court's well-reasoned decision to certify this Class under Rule 23(b)(3).  That is unsupported and even nonsensical.  Whether there is a (b)(2) class has no bearing whatsoever on the issue of whether (b)(3) certification is appropriate.  It was and it is.  As the Court determined after careful consideration of the record, common issues

---

[1] ECF Nos. 247, 264, 310 (three class certification briefs); ECF Nos. 502, 511, 513, 514, 522, & 525 (six briefs containing objections to Judge Francis' Report & Recommendation); *Chen-Oster v. Goldman Sachs & Co.*, No. 18-mv-1075 (2d Cir. Aug. 13, 2018), ECF Nos. 1, 20, 28 (three Rule 23(f) briefs).

[2] ECF Nos. 248-26, 248-27, 294-294-1, 295, 297, 298-298-7, 313, 314, 315.

[3] ECF Nos. 303, 305, 307, 323, 351, 357.  This includes only the *Daubert* briefs filed in 2014 in connection with class certification briefing, and not the *Daubert* briefs on the experts' merits report that are currently pending.

[4] ECF No. 363, March 10, 2015 Memorandum and Order on *Daubert* Motions ("M&O"); ECF No. 364, March 10, 2015 Report and Recommendation on Class Certification ("R&R").

[5] ECF No. 578, March 30, 2018 Opinion and Order ("Order").

predominate under the applicable legal framework for trying Title VII disparate impact and disparate treatment claims.  Order at 40-44.  There has been no change in that legal framework—emphatically, *Teamsters* continues to apply.  In arguing otherwise, Goldman advances the convoluted argument that under *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), the certified Class would have standing under only (b)(2) and not (b)(3).  That is plainly wrong.  If that were true, then the Class would have lacked standing in 2018 as well, because *TransUnion* (a case under the Fair Credit Reporting Act involving completely distinct issues) did not alter existing law on this point.  Instead, it is as clear today as it was in 2018 that the Class this Court certified has standing to seek damages.

Other than the standing red herring, all Goldman offers is recycled arguments based on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), each and every one of which the Court already expressly considered and rejected.  Indeed, the arguments Goldman makes now are the *exact same* arguments this Court rejected in 2018: that there is no "common mode" of decision-making (rejected, Order at 25); that Plaintiffs have not shown the challenged practices caused gender disparities (rejected, Order at 43); that Plaintiffs have not shown "significant proof" of a general policy of discrimination (rejected, Order at 28, 34); and that the Class representatives are not typical or adequate (rejected, Order at 34-39).  And, as with the legal framework, the facts on which the Court granted certification have not changed in the intervening three years.  Goldman's *Dukes*-based arguments fail today, as they failed then.

Goldman has offered no legitimate basis for the Court to reverse itself on certification.  After eleven years, it is time to move forward with resolution of the merits.

## BACKGROUND

### I.      Factual Background

The Court certified for class-wide adjudication Plaintiffs' disparate impact challenge to three employment practices: the 360 Review, Manager Quartiling, and Cross-Ruffing (the "Challenged Practices").  The Court also certified Plaintiffs' disparate treatment claim that Goldman was aware of the discriminatory impact of the Challenged Practices yet continued to use them.  Order at 49.  The fact and expert record developed since then confirms Goldman's continued use of the Challenged Practices in the Securities, Investment Management, and Investment Banking Divisions (the "Class Divisions") throughout the entire Class Period.  It also confirms Goldman's knowledge of the Practices' discriminatory impact on its female employees.

### A.      The 360 Review

At class certification, this Court found that the 360 Review was a "common policy . . . developed by a central Goldman Sachs committee and applied to every single member of the class."  Order at 28.  In its Motion for Summary Judgment, Goldman confirmed the consistency and uniformity of the 360 Review across the Class Divisions:

> The 360 review process was a multi-step 'framework[] for providing performance feedback' to Goldman Sachs professionals. The first step of the annual 360 review process was for Goldman Sachs professionals to select approximately 8 to 12 reviewers who were peers, superiors, and subordinates, with input from and approval of their managers. After professionals selected their reviewers, each reviewer provided feedback and scoring on each of 'up to 13 underlying competencies' that were part of the 360 review, such as 'Technical Skills,' 'Communication Skills,' and 'Overall Commercial Effectiveness.'  Next, average overall 360 scores and overall manager ratings were prepared, and a manager summary was prepared that incorporated the manager's own evaluation of the professional. Last, the manager delivered the overall average 360 review score or overall manager rating and narrative feedback to the professional, typically in person. As Plaintiffs' expert Dr. Cascio stated, '[t]his [360 review] process was employed in each class Division throughout the entire class period.'

ECF No. 1243 ("GS MSJ") at 10-11.  The "███████████████████" that Goldman references ████████████████████████.  ECF No. 1236-9 (GS0003383) at -387. Goldman calculated average overall 360 scores using ███████████████████.  *Id.*  Any additional competency that a division may have used in a year was irrelevant to an employee's average overall 360 score and thus irrelevant to Plaintiffs' disparate impact claim.  *Id.*

Plaintiffs' labor economist expert, Dr. Henry Farber—the Hughes-Rogers Professor of Economics at Princeton University—found statistical evidence of adverse impact against Class members in overall 360 Review scores from 2002 to 2015.[6]  The data show that for Associates, mean overall 360 Review scores are lower for women than for men in every year except 2008, when they are the same as men's scores.[7]  For Vice Presidents, mean scores are lower for women in every year.[8]  Dr. Farber studied whether the gender differences in scores could be explained by relevant worker characteristics, including division, business unit, year, location, education, prior work experience, tenure at Goldman, AAP job group, and direct or lateral hire status.[9] After controlling for all of these factors in a multivariate regression model, female Associates received demonstrably lower ratings.[10]  For the time period 2003-2009 (when Goldman had a 5-point rating scale), the gender difference was statistically significant with 4.16 standard deviations; and for the period 2010-2015 (when there was a 9-point scale), the gender difference was statistically significant with 4.13 standard deviations.[11]  Female Vice Presidents were also rated lower on the 360 Review than men with the same relevant characteristics at a statistically

---

[6] ECF No. 1188-3 ("Farber 1/15/21 Rep.") at ¶¶ 86-90, Tables 11 & 12.

[7] *Id.* at ¶¶ 86, 89, Table 11.

[8] *Id.* at ¶ 90, Table 12.

[9] *Id.* at ¶¶ 88, 95.

[10] *Id.* at ¶¶ 8, 10.

[11] *Id.* at Table 11.

significant levels, with standard deviations of 5.28 (2003-2009) and 5.17 (2010-2015).[12]

Plaintiffs' Industrial & Organizational Psychology expert, Dr. Wayne Cascio—Distinguished Professor Emeritus in the Graduate School of Business at the University of Colorado Denver—reviewed Goldman's 360 Review process and concluded it "is not a suitable tool for assessment or compensation decisions."[13]  Dr. Cascio explained that 360 reviews "should always be first and foremost a development tool," but Goldman uses its particular 360 Review not just for professional development, but also as an input to compensation and promotion decisions.[14]  Thus, the 360 Review is a "selection device" under the Society of Industrial and Organizational Psychology's Principles and Uniform Guidelines on Employee Selection Procedures.  As a selection device, the 360 Review must be validated; as in, shown by reliable methods to produce consistent outcomes and to measure what it purports to measure.[15]  In Dr. Cascio's expert opinion, however, there is no evidence that the 360 Review is valid for use in making compensation or promotion decisions.[16]  Further, according to the academic literature, when (as here) 360 reviews are selection devices, specific features are required to mitigate the well-known risks of rater-error, rater-bias, and gaming in 360 review systems.[17]  Dr. Cascio explained that Goldman Sachs' 360 Review lacked those features, including mandatory training for raters; procedures to exclude raters with conflicts of interest with the ratee; procedures to

---

[12] *Id.* at Table 12; *see also* Shaver Decl. Ex. 1 (GS0621389) at -390, -395-97.  Goldman did not produce 360 Review data for the year 2002 due to data retention issues, but agreed not to contest the representativeness of the data it did produce starting in 2003.  ECF No. 159, at 40; ECF No. 1263-3 (9/27/12 Letter to A. Shaver).

[13] ECF No. 1245-34 ("Cascio 1/15/21 Rep.") at ¶ 13.  Goldman did not seek to exclude Dr. Cascio's opinions.

[14] *Id*. at ¶¶ 12, 95.

[15] ECF No. 1245-35 ("Cascio 3/19/21 Rep.") at ¶¶ 17-18, 73.

[16] Cascio 1/15/21 Rep. at ¶ 89; Cascio 3/19/21 Rep. at ¶¶ 27-29, 38-41, 50-69; ECF No. 1245-36 ("Cascio 4/19/21 Rep.") at 17-18.

[17] Cascio 4/19/21 Rep. at 37-39.  Goldman was well aware that gaming in its 360 Review was widespread and persistent.  *See id*. at 22 (citing evidence).

- 5 -

exclude raters who lack sufficient knowledge of the person or the role; and requiring active monitoring of average subgroup differences in 360 Review scores.[18]  All of Dr. Cascio's critiques of the 360 Review are common to the entire class.

### B.   Manager Quartiling

At class certification, this Court found that the Manager Quartile was a "common policy . . . developed by a central Goldman Sachs committee and applied to every single member of the class."  Order at 28.  Goldman again confirms this common and uniform practice across the Class Divisions:  "Goldman Sachs used manager quartiling as a 'tool' to evaluate relative performance, contribution, potential, and capability.  The purpose of manager quartiling was to identify top, middle, and bottom performers (relative to peers) by distributing professionals into four or five manager quartiles.  Throughout the class period, Goldman Sachs used manager quartiling in the class-relevant Divisions as well as across the firm globally. According to Plaintiffs' expert, Dr. Cascio, any changes Goldman Sachs has made to its quartiling process are not meaningful or material."  GS MSJ at 11-12.

Dr. Farber found statistical evidence of adverse impact against Class members in Manager Quartiling from 2002 to 2015.[19]  First, the data show that among Associates, 28.2% of men received a top quartile score, as opposed to 25.8% of women; among Vice Presidents, 27.4% of men received a top quartile score, as opposed to 25.6% of women.[20]  Dr. Farber found a statistically significant relationship at the 5% level between gender and quartile placement for both Associates and Vice Presidents.[21]  Dr. Farber then tested whether the difference in top

---

[18] Cascio 1/15/21 Report at ¶¶ 62-69; Cascio 4/19/21 Rep. at 37-38.

[19] Farber 1/15/2021 Report at ¶ 10.

[20] Farber 1/15/21 Rep. at ¶ 76.

[21] *Id.* at ¶ 76.

quartile placement could be explained by relevant worker characteristics.[22]  After accounting for division, business unit, year, location, education, prior work experience, tenure at Goldman, AAP job group, and lateral hire status, female Associates were 3.4% less likely to be in the top quartile than men with the same characteristics, and female Vice Presidents 3.6% less likely.[23] Both gender gaps are statistically significant at the 5% level, with standard deviations of 2.9 and 3.2, respectively.[24]

The disparities between how women and men fare in the 360 Review and Manager Quartiling processes directly contribute to the gender pay gap.[25]  Dr. Farber found that 54% of the observed compensation shortfall between female and male Associates and 40% of the observed compensation shortfall between female and male Vice Presidents is attributable to differences in how women and men are evaluated in the 360 Review and Manager Quartile.[26]

Just as the Manager Quartile is a common practice with common evidence demonstrating its impact, the problems with the Manager Quartile are likewise necessarily common.  As an initial matter, Dr. Cascio explained that because Goldman uses Manager Quartiling as an input to compensation and promotion decisions, it is a selection device and thus subject to the requirements of validation.[27]  However, as Dr. Cascio opines, there is no evidence of validity of the Manager Quartile.[28]  Dr. Cascio also identified serious problems with Goldman's Manager Quartiling, including: 1) force ranking employees in an environment that relies heavily on

---

[22] *Id.* at ¶ 77.

[23] *Id.* at ¶¶ 82-83.

[24] *Id.* at ¶¶ 82-83 & Tables 7 & 8.

[25] Farber 4/19/21 Reply Report at ¶ 10-12.

[26] *Id.* at ¶¶ 12, 37, 41.

[27] Cascio 3/19/21 Rep. at ¶¶ 17-18, 73.

[28] Cascio 1/15/21 Rep. at ¶¶ 13, 89; Cascio 3/19/21 Rep. at ¶¶ 30-34, 38-41, 75-88; Cascio 4/19/21 Rep. at 16-18.

teamwork leads to unreliable outcomes because personal results depend on collective effort;[29] 2) force ranking in a population of exceptionally-talented employees creates artificial distinctions of high-to-low that do not reflect actual distributions of performance, as reflected in the fact that 360 Review scores are clustered at the high end of the rating scale;[30] 3) the Manager Quartiling process lacks transparency as it is kept secret from most employees;[31] and 4) the ranking includes flawed and unreliable common inputs. In particular, Goldman's heavy reliance on the criterion of "potential" is particularly problematic, as "potential" has been demonstrated to discriminate against women, and at Goldman, managers do not give a separate rating to "potential" such that bias could be measured or monitored.[32] Further, "potential" is an inherently invalid consideration in compensation, since it is a forward-looking assessment, while pay (including per Goldman's compensation principles) is based on current and past performance.[33]

### C.   Cross-Ruffing

This Court certified Plaintiffs' challenge to Goldman's process for determining who will be promoted from Vice President to Managing Director and described it as follows: "At Goldman Sachs, the vetting process for promoting Vice Presidents to Managing Directors is known as 'cross-ruffing.' Cross-ruffing does not involve an application process; rather the firm selects Vice Presidents to promote through cross-ruffing." Order at 8. The Court recognized the process as including the steps that Goldman takes to develop division-wide lists of candidates for promotion, select cross-ruffers, and for cross-ruffers to interview persons familiar with the candidates' work. *Id*. at 9-10.

---

[29] Cascio 1/15/21 Rep. at ¶¶ 72-73; Cascio 3/19/21 Rep. at ¶ 104; Cascio 4/19/21 Rep. at 39-42.

[30] Cascio 1/15/21 Rep. at ¶¶ 70-71; Cascio 3/19/21 Rep. at ¶ 104; Cascio 4/19/21 Rep. at 39-42.

[31] Cascio 4/19/21 Rep. at 33, 51; Cascio 1/18/14 Rep. at ¶¶ 79-80.

[32] Cascio 1/15/21 Rep. at ¶ 78; Cascio 3/19/21 Rep. at ¶¶ 75-86; Cascio 4/19/21 Rep. at 44-46.

[33] Cascio 3/19/21 Rep. at ¶¶ 76-79.

Goldman now misleadingly asserts that its process for promoting Vice Presidents to Managing Director is actually *two* processes—nominations *and* cross-ruffing—and that the Court only certified the latter.  GS MSJ at 12-14 (inventing distinction); *cf.* ECF No. 1235 ("Decert. Mot.") at 16, 19, 39 (relying on distinction).  This is a self-serving re-imagination of the record evidence: Goldman made no attempt to artificially bifurcate its promotion process at class certification, and the Court certified Plaintiffs' challenge to the entire process.  It is clear from the factual record, the parties' past briefing, and this Court's orders that the challenged promotion process includes its component parts: the identification, high-level vetting, and ultimate section of candidates.[34]  Order at 8-10.  As support for its post-hoc narrative about discrete processes, Goldman cites to the Court's statement that "[t]he cross-ruffing process applied to every single possible promotion from Vice President."  GS MSJ at 37 (quoting Order at 28 (citing R&R at 11-14)).  But that statement, correctly, notes that the only route to Managing Director is through the cross-ruffing process; it does not mean that the Court carved out a subset of that process for certification purposes.  Indeed, both that portion of the Order and the pages of Judge Francis's R&R that the Court cited describe the cross-ruffing process challenged by Plaintiffs as including the so-called nominations process.[35]  The record is clear that the Court certified Plaintiffs' challenge to the entire promotion process from Vice President to Managing Director, which Plaintiffs, Magistrate Judge Francis, this Court, and (until now) Goldman referred to as "cross-ruffing."

---

[34] *See, e.g.*, ECF Nos. 1253-40, 1253-45, 1253-49 (Cross-Ruffing Best Practices Guides for 2003, 2008, and 2012); ECF No. 511, Plaintiffs' Objections to the Magistrate Judge's Report and Recommendation Regarding Plaintiffs' Motion for Class Certification Pursuant to Rule 23(b)(3) at 12; ECF No. 247, Plaintiffs' Motion for Class Certification at 10-11; Goldman's 23(f) Pet. for Permission to Appeal, *Chen-Oster v. Goldman, Sachs, & Co.*, No. 18-mv-1075, ECF No. 1 at 9 (2d Cir. Apr. 13, 2018); Order at 8-10.

[35] *See* R&R at 11 ("Promotion from Vice President to Managing Director at Goldman Sachs is accomplished through a process known as 'cross-ruffing.' At the initial step, each business unit head, in consultation with other managers, develops a list of candidates for promotion; there is no application process as such.").

As before, the evidence still shows that Division Heads, Goldman's Executive Office, and the Management Committee ultimately decide who is promoted.  For instance, the most recent cross-ruffing guide produced in this case, from 2017, shows this senior-level involvement directly:



ECF No. 1236-16 (GS0375264 at -270); *see also* Shaver Decl., Ex. 2 (GS0375741) at -748 (2015 guide, showing same); *id*. at Ex. 3 (GS0547082) (email attaching presentation to Management Committee on proposed MD class of 2017); *id*. at -089 (speaker notes for same).

Dr. Farber examined Goldman's promotion data, and found that Goldman's cross-ruffing process has disadvantaged female Vice Presidents throughout the Class Period.[36]  Dr. Farber used a probit regression model to calculate the likelihood of an employee being promoted, controlling for number of years as Vice President, division, location, education, tenure at Goldman, prior work experience, AAP job group, direct or lateral hire status, and the year.[37]  With this model, Dr. Farber estimated a benchmark promotion model and used the resulting coefficients to predict the promotion probabilities for females using the observed characteristics

---

[36] Farber 1/15/21 Rep. at ¶ 135.  2018 is the last year for which Goldman has produced data in this litigation. Plaintiffs' promotion claim covers 2002 to the present.

[37] Farber 1/15/21 Rep. at ¶ 126.

- 10 -

(education, experience, etc.).[38]  The result is the number of women one would have expected to be promoted if men and woman with a given set of characteristics were treated the same.[39]  The analysis shows that female Vice Presidents were promoted 27 fewer times over the Class Period than would be expected had they been promoted at the same rate as comparable men, and the results are statistically significant at the 5% level.[40]

Dr. Cascio also studied Goldman's cross-ruffing process.  As a procedure for determining promotion outcomes, it is a selection device, yet Goldman has not demonstrated that it is a valid process for predicting performance at the higher level of Managing Director.[41]  Dr. Cascio also pointed out flaws in the architecture of the cross-ruffing process that reduce reliability.  First, the process for identifying candidates is a quintessential tap-on-the-shoulder system, because there is no requirement that Division Heads take into account anything in particular nor document what factors they relied on to select candidates.[42]  Second, interviews are insufficiently structured, with latitude to ask different questions of different interviewees, which leads to less reliable outcomes versus highly structured interviews.[43]  Third, only one cross-ruffer is assigned to each candidate, making it impossible to assess inter-rater reliability and making the process more vulnerable to bias.[44]

### D.    Goldman's Knowledge of Adverse Impact in the Challenged Practices

Both before and after the issuance of the Court's Order, Goldman's senior leadership has been aware that the Challenged Practices adversely impact women, but continued to use them

---

[38] *Id.* at ¶ 128.

[39] *Id.* at ¶¶ 128-130.

[40] Farber 4/19/21 Reply Report at Table 14 & ¶ 86.

[41] Cascio 1/15/21 Rep. at ¶ 89; Cascio 3/19/21 Rep. at ¶¶ 35-41, 74; Cascio 4/19/21 Rep. at 11-14, 49-51.

[42] Cascio 1/15/21 Rep. at ¶ 79; Cascio 3/19/21 Rep. at ¶¶ 108-09; Cascio 4/19/21 Rep. at 46-47.

[43] Cascio 1/15/21 Rep. at ¶ 81; Cascio 3/19/21 Rep. at ¶ 106; Cascio 4/19/21 Rep. at 47-49.

[44] Cascio 1/15/21 Rep. at ¶ 81; Cascio 3/19/21 Rep. at ¶ 105; Cascio 4/19/21 Rep. at 49.

anyway.  For example, Goldman studied the outcomes of its 360 Review and Manager Quartiling

practices by gender and found "consistent" differences in both: women were underrepresented by

███████████████████████████████████████████████████████████████████

██████, Shaver Decl., Ex. 4 (GS0888961) at -971, findings which are remarkably consistent with

Dr. Farber's.  These results were presented and discussed at a meeting of nine Management

Committee members called the "Diversity Working Group."  *Id.* at -961; *see also id.* Ex. 5

(GS0574442) at -448.  The presentation noted that ███████████████████████.  *Id.*, Ex. 4

(GS0888961) at -971.  Members of the Management Committee later reported these results to

the Board of Directors.  *Id.*, Ex. 6 (GS0600233) at -235.018; *see also id.*, Ex. 7 (GS1023919) at -

945 (same for 2017 Board presentation).  Likewise, Goldman regularly analyzed its Managing

Director promotions by gender and reported that █████████████████████████

████████████████████████████████████████, as shown in this 2015

Board of Directors presentation:

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

*Id.*, Ex. 6 (GS0600233) at -235.019; *see also id.* Ex. 7 (GS1023919) at -944 (same for 2017

Board).  As the Chief Diversity Officer testified: █████████████████████████████

███████████████████████████████████████████████████████████

█████████████████"[45]  Analyses done by the diversity office, such as those quoted above,

went straight up the chain.

_____

[45] Shaver Decl., Ex. 18 (Irish-Brown Tr.) at 59:2-61:3.

In fact, Goldman was aware of specific defects in its processes that Dr. Cascio identified,

and after internal discussion, continued to employ the practices without alteration.  *See, e.g.,*

Shaver Decl. Ex. 8 (GS0567448) at -449 (Quartiling Taskforce noting that █████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ ); *id*., Ex. 9 (GS0637316) at 316-17 ( ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████ ; *id*. Ex. 10 (GS0590524) at -526 ( ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ ); Cascio 4/19/21 Rep. at 22-27 (cataloguing evidence that Goldman knew gaming

was a widespread problem in its 360 Review).  When Goldman did undertake changes to the 360

Review or Manager Quartiling process, the committees responsible vetted the proposed changes

with members of the Management Committee individually.[46]  Importantly, though, none of the

changes fixed the deficiencies identified both by Goldman itself and by Plaintiffs' experts.[47]

---

[46] Shaver Decl., Ex. 11(GS0685472) at -472; Ex. 12 (GS0616392) at -392; Ex. 13 (GS0910007) at -009-10; Ex. 14 (GS0684228) at -231; Ex. 15 (GS0614981) at -981; Ex. 8 (GS0567448) at -451.

[47] Shaver Decl., Ex. 16 (GS0484728) at -728 (explaining that "█████████████████████████████████████████ " led Goldman to "███████████████████████████████ " and confirming that ████████████████████

## II.   **Procedural Background**

Plaintiffs filed their motion for class certification on May 19, 2014, ECF No. 246, and the

Court referred it to then-presiding Magistrate Judge James C. Francis, ECF No. 240.  Following

substantial briefing, Judge Francis held a two-day hearing on the admissibility of expert

testimony and class certification.  He issued an order excluding a portion of the opinion of

Goldman's previous labor economist expert, Dr. Ward, as well as the parties' industry experts,

and otherwise denied all *Daubert* motions.  M&O at 44.

Judge Francis also issued a Report and Recommendation finding that all Rule 23(a)

factors—numerosity, commonality, typicality, and adequacy—had been satisfied, but

recommending against certifying a class under Rule 23(b)(3) because individual causation issues

would predominate over class-wide issues.  R&R at 6-14, 24-35.  He further recommended that

certification under Rule 23(b)(2) be denied, but solely on the basis that, under the law of the case

at that time, former employees could not seek injunctive relief and both class representatives

were former employees.  *Id*. at 36-38.

The parties then filed objections to the M&O and the portion of the R&R pertaining to

Rule 23(b)(3).  In the interim, Plaintiffs appealed the issue of whether former employees could

seek injunctive relief on a separate track, with this Court reversing the law of the case and the

Second Circuit denying interlocutory appeal of that order.  ECF No. 540.  After the parties

submitted a total of six briefs in support of their objections to the M&O and R&R, this Court

certified a class pursuant to Rule 23(b)(3).  Order at 49.  Because injunctive relief is a

substantive entitlement under Title VII, and can therefore be obtained whether the claim is

---

██████████████████████████ ); *see also* ECF No. 1245-33 (Cascio 6/29/18 Rep.) at ¶¶ 6-9
(reviewing changes made to 360 Review and Manager Quartile and confirming that the infirmities he identified are
still present and "the processes still lack reliability and validity.")

certified under (b)(2) or (b)(3) (*see* Argument § I.B., *infra*), Plaintiffs elected not to burden the Court with another motion for certification under (b)(2) that would be wholly duplicative and legally and practically unnecessary.  ECF No. 625.  In other words, after *Dukes*, it is clear that class actions seeking monetary damages must be certified under 23(b)(3); having obtained certification under 23(b)(3), which entitles Plaintiffs to both monetary and injunctive relief, there was no reason to litigate separately for (b)(2) certification.

The Court's Order affirmed the M&O in its entirety.  Specifically, as relevant here, the Court affirmed Judge Francis's finding that Dr. Farber appropriately analyzed Goldman's employee data in a model that aggregated employees across the Class Divisions and business units, because "Goldman Sachs utilizes 360 review and quartiling in each division and every business unit" and "disaggregation tends to mask common mechanisms because the sample size in each unit is so small."  Order at 19.

The Court affirmed the R&R on Rule 23(a), but not on 23(b)(3).  As to the Rule 23(a) factors, the Court found numerosity, commonality, typicality, and adequacy satisfied.  Order at 23-39.  *Disparate impact* commonality was satisfied because Plaintiffs identified "common modes of exercising discretion for the purposes of *Dukes*" in the Challenged Practices.  *Id*. at 28.  The Court specifically rejected Goldman's argument that the fact that mangers exercise discretion in applying firm-wide criteria in the Challenged Practices precluded certification under *Dukes*.  *Id*. at 25-28.  And the Court found that Dr. Farber's opinion providing evidence of statistically significant gender disparities in the Challenged Practices provided "significant proof" that these common modes were discriminatory.  *Id*. at 29.  *Disparate treatment* commonality was satisfied with "significant proof" of pervasive discrimination via both statistical and anecdotal evidence.  *Id*. at 32-34.  Typicality and adequacy were satisfied.  As

- 15 -

relevant here, the Court rejected Goldman's arguments that: (1) Plaintiff Orlich was atypical because she was allegedly paid in lockstep with her peers and not based on the 360 Review or Manager Quartile (*id*. at 36); (2) Plaintiff Gamba was atypical because she only claimed discrimination in 2010 (*id*. at 38); and (3) Plaintiff De Luis's claims are unrelated to the 360 Review and Manager Quartiling process (*id*. at 39). Nevertheless, Goldman restates all of these rejected arguments in its decertification motion. *See* Decert. Mot. at 28-31 (no commonality because no common mode of exercising discretion under *Dukes*); *id*. at 36-37 (no "significant proof" of a general policy of discrimination); *id*. at 40-41 (typicality arguments regarding Plaintiffs Orlich, Gamba, and De Luis).

As to the Rule 23(b)(3) factors, the Court found that common issues will predominate in all three steps of Plaintiffs' disparate impact claim: the prima facie case, Goldman's business necessity defense, and whether there is a less discriminatory alternative are all questions capable of generalized proof. Order at 43-44. The Court rejected Goldman's argument that Plaintiffs could not prove that the Challenged Practices caused the disparity, holding that evidence of statistically significant gender disparities can give rise to a prima facie case of disparate impact. *Id*. at 43. The Court also clarified that "Defendants are tasked not with rebutting the causal link between the challenged processes and every single class member's claim, but rather, establishing that the challenged processes were a business necessity." *Id*. at 44. Likewise, the Court found that for Plaintiffs' disparate treatment claim—rooted in "awareness of the discriminatory impact of its employment practices and continued use of the practices"—both the prima facie case and Goldman's rebuttal would be subject to generalized proof. *Id*. at 45-47. The Court concluded that a class action would be manageable and superior to thousands of individual proceedings. *Id*. at 47-48. Nevertheless, as with the Rule 23(a) factors, Goldman now restates these rejected

- 16 -

arguments in its decertification motion.  *See* Decert. Mot. at 31-36 (causation); *id*. at 42-44 (manageability).

Following the Court's Order, Goldman moved the Second Circuit for Rule 23(f) review. Plaintiffs opposed the motion, and Goldman submitted a reply.  The Second Circuit heard oral argument on August 28, 2018, *Chen-Oster*, No. 18-mv-1075, ECF No. 51 (2d Cir. Aug. 13, 2018), and denied Goldman's motion.  *Id.*, ECF No. 54 (2d Cir. Sept. 4, 2018).

Since that time, the parties sent notice to the Class and completed merits discovery, including dozens of new requests for production, requests for admission, and interrogatories, 23 additional fact and expert depositions, and production of more than 152,000 new documents. The parties completed expert discovery on June 21, 2021, with ten experts submitting 21 reports. Concurrent with Goldman's decertification motion, the parties are also submitting *Daubert* and summary judgment motions.

## **LEGAL STANDARD**

Pursuant to Rule 23(c)(1)(C), "[a]n order that grants or denies class certification may be altered or amended before final judgment."  However, a court "may not disturb its prior findings absent some significant intervening event or a showing of compelling reasons to reexamine the question."  *Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 907 F. Supp. 2d 492, 504 (S.D.N.Y. 2012) (quoting *Doe v. Karadzic,* 192 F.R.D. 133, 136–37 (S.D.N.Y. 2000)).  *See also Hnot v. Willis Grp. Holdings Ltd.*, 241 F.R.D. 204, 208 (S.D.N.Y. 2007) (same); *Mazzei v. Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015) (same); *Langley v. Coughlin*, 715 F. Supp. 522, 553 (S.D.N.Y. 1989) ("Absent some significant intervening event, those [prior Rule 23] findings may be deemed to be the law of the case . . . .").  "Compelling reasons include an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Gulino*, 907 F. Supp. 2d at 504 (citation omitted).

- 17 -

"Courts faced with a motion to decertify must also take account of the progression of the litigation.  Decertification is an 'extreme step,' particularly at a late stage in the litigation, 'where a potentially proper class exists and can easily be created.'"  *Zimmerman v. Portfolio Recovery Assocs., LLC*, No. 09 CIV. 4602 PGG, 2013 WL 1245552, at \*2 (S.D.N.Y. Mar. 27, 2013) (citations omitted).  *See also Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 169 (S.D.N.Y. 2011) (same); *Langley*, 715 F. Supp. at 552 (same).

"The moving party in a decertification motion bears 'a heavy burden to prove the necessity of either the drastic step of decertification or the less draconian but still serious step of limiting the scope of the class.'"  *Mazzei*, 308 F.R.D. at 106 (quoting *Gordon v. Hunt*, 117 F.R.D. 58, 61 (S.D.N.Y.1987)).  *See also In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 CIV. 5571 RJH HBP, 2009 WL 855799, at \*3 (S.D.N.Y. Mar. 31, 2009) ("[D]ecertifying or redefining the scope of a class should only be done where defendants have met their 'heavy burden' of proving the necessity of taking such a 'drastic' step." (citations omitted)).[48]

## **ARGUMENT**

Goldman has not met its "heavy burden" to show a compelling reason why the Court should revisit class certification, particularly on the eve of summary judgment and after the

---

[48] The Second Circuit has not addressed the burden of proof that applies when a defendant moves to decertify a class, recently reserving that precise issue.  *See Jin v. Shanghai Original*, 990 F.3d 251, 262 n.18 (2nd Cir. 2021) ("Because the issue of whether a significant intervening event or a similar type of showing might be appropriate when a defendant moves to decertify is not before us, we do not address this issue.").  However, the *Jin* court noted that district courts in the Second Circuit, as well as the Eighth Circuit, have required defendants to show a "change in law or circumstances."  *Id.* (citing *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 832 (8th Cir. 2016)).  In an earlier case, the Second Circuit held that "in opposing the decertification motion, [plaintiff] retained the burden to demonstrate that [the Rule 23 criteria] were satisfied."  *Mazzei v. Money Store*, 829 F.3d 260, 270 (2d Cir. 2016).  But as others have explained, that is only true if defendants first meet their burden: "If the defendant makes the requisite showing of changed circumstances, the plaintiff, of course, has the ultimate burden to show that Rule 23's requirements are met. But the critical issue here is whether the defendant has met its initial burden."  *Brown v. Wal-Mart Store, Inc.*, No. 09-CV-03339-EJD, 2018 WL 1993434, at \*2 (N.D. Cal. Apr. 27, 2018).  *See also* Wiliam B. Rubentstein, et al., *Newberg on Class Actions* 7:39 (5th Ed.) ("Like any movant, therefore, a defendant seeking decertification or modification ought to be required to make some showing of changed circumstances or law, which would then trigger a plaintiffs' obligation to defend certification.").

parties have spent three and a half years completing discovery of *class* claims.  Indeed, the

parties' summary judgment briefs make plain that the elements of and defenses to Plaintiffs'

claims are susceptible to common proof, as each party has articulated its entitlement to summary

judgment using only common proof.[49]  As to the Rule 23 factors, there is no intervening change

in law or material change in the evidence.  Goldman's attempt to turn the *TransUnion* case into a

compelling reason fails, because *TransUnion* did not alter the law in any way material here.

Other than that, Goldman presents only old arguments the Court has already rejected.

Accordingly, the Court should deny Goldman's motion.  *Jermyn,* 276 F.R.D. at 172 (denying

defendants' motion for decertification where defendants presented "essentially identical"

arguments that had been previously rejected).  If anything, Plaintiffs' case for class certification

is even stronger in light of expert discovery of common defects in the Challenged Practices, and

Goldman's admissions of uniformity therein in its summary judgment briefing, which confirm

the Court's class certification findings.

I.     **Goldman's Only Purportedly New Argument—Lack of Standing—Does Not Reflect
       a Change In the Law and Is Legally Incorrect.**

       While Goldman does not acknowledge its burden to show a compelling reason to revisit

class certification, it implies that *TransUnion* represents an intervening change in law with

respect to standing. Goldman mischaracterizes the case and misstates its relevance here (there is

none). Goldman is simply restating its argument that Plaintiffs must show individual proof of

---

[49] *See Houser v. Pritzker*, 28 F. Supp. 3d 222, 244 (S.D.N.Y. 2014) (on question of whether defendant's employment practice was justified by business necessity, "the fact that both sides' experts are able to provide classwide answers to the liability question suffices to satisfy the commonality requirement").  This further confirms the Court's conclusion at class certification that Plaintiffs' prima facie cases, and Goldman's defenses, are certifiable because they are subject to common proof.

- 19 -

damages at the liability stage of a class trial, an argument that it already lost[50] and that

contravenes the established and required framework for Title VII cases.

Goldman relies on *TransUnion*'s statement reaffirming settled law that "a plaintiff must

demonstrate standing separately for each form of relief sought.  Therefore, a plaintiff's standing

to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek

retrospective damages."  141 S.Ct. at 2210 (citing *Friends of the Earth, Inc. v. Laidlaw Environ.*

*Svs., Inc.*, 528 U.S. 167, 185 (2000)).  Specifically, Goldman argues that absent Rule 23(b)(2)

certification, Plaintiffs gave up their standing.  Goldman is wrong for at least three related

reasons.

First, *TransUnion* did not alter the law in any respect on absent class member standing to

seek damages, under which all class members have suffered a concrete harm by dint of their

exposure to the Challenged Practices.  Second, a Rule 23(b)(3) class is entitled to seek injunctive

relief for Title VII and NYCHRL violations.  Goldman wrongfully conflates injunctive relief—

an allowed remedy under the substantive law—and Rule 23(b)(2), a subsection of the procedural

device.  Third, the *Teamster's* framework continues to apply to this case.

A.    ***TransUnion* Affirmed Existing Law, Under Which All Class Members Here
      Have Suffered a Concrete Harm.**

*TransUnion* merely affirmed existing law by holding that class members need to establish

concrete harm to recover damages from a liability finding at trial.  141 S. Ct. at 2205.  In

*TransUnion*, a class of consumers filed suit under the Fair Credit Reporting Act for

misinformation in their credit reports.  *Id.* at 2201.  The jury returned a verdict for Plaintiffs,

---

[50] ECF No. 264 (Def. Opp. to Class Cert) at 67-68 (arguing that "individualized determinations of each employee's eligibility for backpay" will predominate); Order at 43-44 (rejecting Goldman's argument and finding that its rebuttal to Plaintiffs' prima facie case will require "proof on a general level, rather than individualized proof on a claim-by-claim basis to support its company-wide pay, promotion, and performance evaluation systems").

including monetary damages.  *Id*. at 2202.  The Court found that although all class members had

a statutory cause of action to assert a claim for relief, only those class members whose reports

were actually disseminated to third parties had suffered a "concrete injury" for purposes of

Article III's injury-in-fact requirement and were entitled to damages.  *Id*. at 2210.  Notably, the

Court cited *long-established law,* and *even made clear it was not changing it*:  "[e]very class

member must have Article III standing in order to recover individual damages." *Id.* at 2208

(citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 446 (2016)).  "We do not here address

the distinct question whether every class member must demonstrate standing *before* a court

certifies a class."  *Id*. at n.4 (emphasis in original).  *Denney v. Deutsche Bank AG*, is in accord: at

the class certification stage, "[w]e do not require that each member of a class submit evidence of

personal standing."  443 F.3d 253, 263 (2d. Cir. 2006).  The *Denney* court instead required that

the class "be defined in such a way that anyone within it would have standing," but explicitly did

not require evidence that every single class member had suffered individual damages in order to

certify the class.[51]  *Id*. at 264.

Here, the Class is defined such that every Class member is subject to one or more of the

Challenged Practices.  Therefore, all Class members have standing to bring a disparate impact

claim pertaining to that Challenged Practice, as well as a disparate treatment claim that Goldman

---

[51] Goldman's other cases are inapposite because they address class definitions that included persons who could not
have been injured.  For instance, in *Calvo v. City of New York*, 2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017), the
court affirmed that "it is not necessary that each member of the putative class submit evidence of personal standing,"
but found the class definition to be problematic because it included registered owners of vehicles seized unlawfully
by the City who were mere "straw owners" and thus were uninjured.  *See also Flynn v. DIRECTTV, LLC*, No. 3:15-
cv-01053 (JAM), 2018 WL 3970913, at *4 (D. Conn. Aug. 20, 2018) (proposed class definition necessarily included
members who consented to defendant's conduct); *Tomassini v. FCA U.S. LLC*, 326 F.R.D. 375, 386 (N.D.N.Y.
2018) (class definition included "significant numbers" of individuals who "never owned a vehicle with the allegedly
defective valve stems"); *Kempner v. Town of Greenwich*, 249 F.R.D. 15, 18 (D. Conn. 2008) (proposed class
contained members who could not be harmed by policy of charging a fee for beach access because they were exempt
from the fee requirement by, *e.g.*, age). By contrast, in this case the Class is defined such that every single member
was subject to the 360 Review and Manager Quartiling, and all Vice Presidents to Cross-Ruffing.

knew that the practice caused a disparate impact and continued to use it. *See, e.g., Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 423 (D.D.C. 2017) ("The Court finds that Plaintiffs have identified three of the Appendices of Policy 7.2.3 as the 'particular challenged employment practice' and have adequately demonstrated that every putative class member will be affected by one of the three."); *Houser*, 28 F. Supp. 3d at 237 (holding that plaintiffs bringing disparate impact challenge to hiring practice need not establish that they would have ultimately been hired to show an injury in fact, but need only show they were subject to the hiring policy); *Roe v. City of New Orleans*, 766 F. Supp. 1443, 1450 (E.D. La. 1991) ("An employee asserting a class action attack on a drug testing program of his employer generally has standing where the program necessarily requires mandatory testing of all employees . . . .").

Goldman mistakenly argues that Plaintiffs must do what *TransUnion* and *Denney* expressly disavow: "Plaintiffs' burden is to show that discrimination caused injury to *every particular woman* in the class." Decert. Mot. at 26 (emphasis in original). Goldman conflates Plaintiffs' burden at the remedial phase of trial with standing. As the court recently explained in *Lackawanna Chiropractic P.C. v. Tivity Health Support LLC*, 2021 WL 3827733 (W.D.N.Y. Aug. 27, 2021), the fact that a defendant might prevail on its defenses as to certain class members' claims did not mean that plaintiffs had not adequately alleged a class injury, where all class members were subject to the same conduct. *Id*. at *3. Instead, relying on *TransUnion* and *Denney*, the court held that "a court need not determine that every class member was in fact injured in connection with the claim" before certifying a class. *Id*. at *4.

Goldman's position (now disguised as an incorrect standing argument) is actually the same argument that Goldman made previously and this Court rejected, based on decades of

undisturbed Title VII jurisprudence.[52]  In a *disparate impact* case, a plaintiff's burden to
establish a prima facie case of discrimination is to "identify[] the specific employment practice
that is challenged" and then "offer statistical evidence of a kind and degree sufficient to show
that the practice in question has caused the exclusion of applicants for jobs or promotions
because of their membership in a protected group."  *Watson v. Fort Worth Bank & Tr.*, 487 U.S.
977, 994 (1987).  *See also Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir.
2001) (same); *Chin v. Port Auth. of N.Y. & New Jersey*, 685 F.3d 135, 151 (2d Cir. 20212)
(same); *Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 630 F.2d 79, 86 (2d Cir. 1980) (same).
This does not and has never required statistical evidence on a class member-by-class member
level, as Goldman argues (without authority).  Rather, the statistical analyses relied on in every
single one of these cases calculates the average effects of a challenged practice on members of a
protected group.  *Id.*; *see also* Ramona L. Paetzold & Steven L. Willborn, *The Statistics of
Discrimination* § 6.3 (2020); Daniel L. Rubinfeld, *Reference Guide on Multiple Regression, in
Reference Manual on Scientific Evidence* 303 at 334 & 339-40 (3d ed. 2011).  If a plaintiff
prevails on her prima facie case and defendant cannot show that the practice is justified by
business necessity for which there was no less discriminatory alternative available, then liability
is established and the case proceeds to the relief phase.  There, the plaintiff is entitled to an
immediate injunction against the challenged practice and the entire class is entitled to a
presumption of make-whole relief.  *Robinson*, 267 F.3d at 161; *Cohen v. W. Haven Bd. of Police
Comm'rs*, 638 F.2d 496, 502 (2d Cir. 1980); *United States v. City of N.Y.* ("*City of New York I*"),
276 F.R.D. 22, 34 (E.D.N.Y. 2011).

---

[52] Order at 42-46 (setting forth legal frameworks for disparate impact and disparate treatment claims).

In a *disparate treatment* case, a plaintiff's burden is to show that "discrimination was the company's standard operating procedure," which can be accomplished with the same statistical proof used to establish a prima facie case of disparate impact. Order at 45-46 (citing *United States v. City of New York* ("*City of New York II*"), 717 F.3d 72, 88 (2d Cir. 2013)). If the defendant does not successfully rebut this prima facie case, plaintiff prevails on liability and proceeds to the relief stage with the benefit of a rebuttable inference that any particular employment decision was made pursuant to the policy of discrimination. *City of New York II*, 717 F.3d at 88; *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 362 (1977).

Class members' individual entitlement to damages is an issue for the remedial phase of a Title VII class trial, and not a standing issue. Nothing in *TransUnion* says otherwise, or remotely affects the Court's earlier correct discussion of how proving liability in both the disparate impact and disparate treatment cases are the subject of generalized proof: statistical evidence, and "proof on a general level" regarding the business necessity of the Challenged Practices. Order at 44-47. Goldman's argument that individualized proof of damages is required at the liability stage of a class trial remains incorrect and should be rejected again.

**B.     A Rule 23(b)(3) Class May Seek Injunctive Relief for Violations of Title VII.**

Even so, this is not a "damages-only class," as Goldman wrongly asserts. Decert. Mot. at 2. The Class seeks all available statutory remedies including injunctive relief. Goldman does not and could not challenge the Class's standing to seek injunctive relief, and so instead it argues that Title VII classes certified under Rule 23(b)(3) lack access to injunctive relief. Goldman offers no authority for this illogical proposition. *See* Decert. Mot. at 25. Rule 23(b)(3) nowhere states that it is limited to certain types of remedies. Rather, it provides a higher standard for class certification than Rule 23(b)(2), consistent with due process. *See Robinson*, 267 F.3d at 165 ("In contrast, where non-incidental monetary relief such as compensatory damages are involved, due

- 24 -

process may require the enhanced procedural protections [from Rule 23(b)(3)] of notice and opt

out for absent class members.").  It makes no sense to conclude that fewer remedies are available

under 23(b)(3) when a higher standard is met.  It also invites another irrational outcome—a

liability finding that a practice disparately impacts a protected class, but no legal right to enjoin

that practice—which no court has countenanced.  Goldman's argument should therefore be

rejected.

 To hold otherwise would be to eliminate a statutory right that emanates directly from

Title VII and the New York City Human Rights Law.  *See* 42 U.S.C.A. § 2000e-5(g) ("If the

court finds that the respondent has intentionally engaged in or is intentionally engaging in an

unlawful employment practice charged in the complaint, the court may enjoin the respondent

from engaging in such unlawful employment practice, and order such affirmative action as may

be appropriate . . . ."); N.Y.C.A.C. § 8-502(a) ("[A]ny person claiming to be a person aggrieved

by an unlawful discriminatory practice . . . shall have a cause of action in any court of competent

jurisdiction for damages, including punitive damages, and for injunctive relief and such other

remedies as may be appropriate . . . .").[53]

 The availability of this statutory right is not dependent on the procedural mechanism—

Rule 23(b)(2) or (b)(3)—through which Title VII is enforced.  *See, e.g.*, Erin L. Sheley &

Theodore H. Frank, *Prospective Injunctive Relief and Class Settlements*, 39 Harv. J.L. & Pub.

Pol'y 769, 772 (2016) ("Rule 23(b) allows for injunctive remedies under all three subsections.").

---

[53] The Rules Enabling Act empowers the Supreme Court to "prescribe general rules of practice and procedure and rules of evidence," so long as "[s]uch rules shall not abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072(a), (b).  Rule 23 has been specifically upheld by the Supreme Court as a procedural Rule that does *not* improperly alter substantive rights.  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407-08 (2010); *cf. Dukes*, 564 U.S. at 367 ("[T]he Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'").  Here, however, Goldman advances a reading of the Rule that would (sub silentio and without the say-so of any court) eliminate substantive rights under both federal and state law.

In fact, courts are typically asked to consider the *opposite* situation than the one presented here: where a party attempts to certify an action for both monetary and injunctive relief under Rule 23(b)(2), to avoid having to meet the additional elements of predominance and superiority required by Rule 23(b)(3). *Cf. Dukes*, 564 U.S. at 362. Here, on the other hand, Plaintiffs satisfied the heightened requirements of Rule 23(b)(3), and simply elected not to delay this case with additional briefing regarding the lesser requirements of Rule 23(b)(2))—which Judge Francis agreed were readily met. *See* Background § II, *supra*.[54] Moreover, the notice and opt-out requirements of Rule 23(b)(3) create *more* protections for absent class members, not less; the notion that absent class members would *lose* rights for having undergone these processes undercuts the very purpose of these procedural protections.

Finally, the fact that the Class was not adversely impacted by the 360 Review and Manager Quartiling practices after 2015 has no bearing on the Court's ability to enjoin those practices now. As discussed above, Goldman has not fixed any of the deficiencies with either practice that were identified by Plaintiffs' experts or acknowledged internally at Goldman. *See* Background § I.D, *supra*. Accordingly, adverse impact is likely to recur, particularly after this case resolves. *See Friends of the Earth*, 528 U.S. at 169–70 ("A defendant's voluntary cessation of a challenged practice ordinarily does not deprive a federal court of its power to determine the legality of the practice. If it did, courts would be compelled to leave the defendant free to return to its old ways." (citations omitted)).

---

[54] In the event the Court credits Goldman's nonsensical argument about the availability of injunctive relief at this late stage, then the proper recourse would be to grant Plaintiffs an opportunity to reinstate their Rule 23(b)(2) motion, so that Judge Francis's recommendation that it be granted can be formally effectuated. In fact, Goldman's principle basis for opposing such relief was an argument that discovery was required because—it claimed—its policies had changed materially in the intervening years. *See* ECF No. 545. But Goldman has conceded that argument to be wrong in its summary judgment motion, where it admits that all three relevant policies were uniformly applied throughout the class period. GS MSJ at 10-13. Again, Plaintiffs believe this would be a waste of the Court's and parties' time, which is the reason Plaintiffs withdrew their Rule 23(b)(2) claim in the first place.

C.    **The *Teamster's* Framework Still Governs Trial of Plaintiffs' Disparate Treatment Claim.**

Goldman's assertion that Plaintiffs pulled a "bait-and-switch" on the Court by first arguing that *Teamsters* would govern trial in this case, and then electing not to pursue a Rule 23(b)(2) class, Decert. Mot. at 25, is disingenuous, insulting, and most importantly, wrong.

The application of *Teamsters* does not depend on the procedural rule under which a class is certified; indeed, *Teamsters* was not even a class action under Rule 23, but a pattern and practice case brought by the government.  *Teamsters* set forth the governing framework for trial of disparate treatment claims, regardless of the type of relief sought—damages, injunction, or both.  In fact, in *Teamsters* the government sought both types of relief, and the opinion deals explicitly with what is required when class members are entitled to make-whole relief (i.e., damages) after the liability phase of the case.  431 U.S. at 361.  This is where the oft-used term "*Teamsters* hearings" comes from: the hearings exist for the very purpose of determining individual damages in a disparate treatment case.  *See, e.g.*, *Robinson*, 267 F.3d at 159 ("If individual relief such as back pay, front pay, or compensatory recovery is sought in addition to class-wide injunctive relief, the court must conduct the 'remedial' phase.  Class members enter this second phase with a presumption in their favor 'that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy.'" (quoting *Teamsters*, 431 U.S. at 362)).

It is therefore absurd to argue, as Goldman does, that *Teamsters* is "jettisoned" because the Class was certified under Rule 23(b)(3) rather than Rule 23(b)(2).  Further, Goldman's position would mean that every case certifying a class alleging disparate treatment under Rule 23(b)(3) was wrongly decided, which Goldman has no authority for whatsoever.  *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 538 (N.D. Cal. 2012) (certifying (b)(3) class

- 27 -

alleging disparate treatment for trial under *Teamsters* framework); *Brown v. Nucor Corp.*, 785 F.3d 895, 914 (4th Cir. 2015) (same); *Parra v. Bashas', Inc.*, 291 F.R.D. 360, 392 (D. Ariz. 2013) (same); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 689 (N.D. Ga. 2001) (same). The *Teamsters* framework continues to apply to this case.[55]

## II.  Goldman's Remaining Arguments Are Identical to Its Prior Failed Arguments, and Continue to Warrant Rejection.

Beyond its failed standing argument, Goldman presents only recycled arguments as to commonality, typicality, adequacy, predominance, and manageability that the Court has already rejected. The Court need not revisit them. *See Wilder v. Bernstein*, 645 F. Supp. 1292, 1311–12 n.16 (S.D.N.Y. 1986) (denying decertification motion where defendants simply recast earlier arguments against class certification); *Connor B. ex rel. Vigurs v. Patrick,* 278 F.R.D. 30, 34, 36 (D. Mass. 2011) (denying decertification because the argument was "largely identical to the argument this court rejected in its original certification order").

Perhaps recognizing this fatality, Goldman misleadingly suggests "discovery has confirmed" that its prior arguments are correct. Decert. Mot. at 27, 28. This suggestion is without evidentiary support: Goldman does not (and cannot) identify any new evidence about the Challenged Practices that is relevant to the arguments it makes. The salient facts about each Challenged Practice remain unchanged since the Court's order. *See* GS MSJ at 10-13. Instead, the only new "evidence" Goldman points to is in post-discovery declarations Goldman now files with its motion. These declarations are late, lawyer-crafted statements taken from captive

---

[55] Goldman is also incorrect that "Plaintiffs have yet to specify how this case can be tried." Decert. Mot. at 27, n.15. Plaintiffs proposed a specific trial plan (the same one adopted by the court in *Ellis*, 285 F.R.D. at 503) in their Objections to the R&R, ECF No. 511 at 47-48. That trial plan remains appropriate. Further still, in certifying Plaintiffs class, the Court also set forth a straightforward way for Plaintiffs to meet their prima facie case for their class claims: as to impact, through common statistics, and as to treatment, through common statistics and other evidence probative of Goldman's knowledge of discrimination. Order at 42-46.

current employees and not subject to cross-examination; they are inherently unreliable.[56]  Even if

the Court considers them, however, they do not change the outcome for the reasons below.

### A.    Commonality

####     1.    *The Challenged Practices Are a Common Mode of Exercising Discretion.*

Goldman's first repeated argument is that there is no "common mode" of decision-

making under *Dukes* because managers exercised their discretion in different ways.[57]  Goldman

does not present any new facts about the Challenged Practices themselves, but instead points

only to employee declarations purporting to show variation in how managers applied the

standard, uniform criteria within the standard, uniform Practices.  Yet the Court reviewed the

same kinds of suspect declarations previously (or even the exact same declarations, as some are

copies of those submitted in 2014), and rejected this same argument for very sound reasons: "[A]

common mode need not strip managers of all flexibility in compensation and promotion

decisions.  *Contra* Defs. Objs. at 26.  That is because, if 'common mode' were so defined, it

would divest lower-level managers of all discretion, and, as a result, would render the phrase

'common mode of exercising discretion' oxymoronic."  Order at 25.

Nor does Goldman point to any new controlling legal authority, instead citing largely the

same cases as it did previously, including *Dukes*; *Jones v. National Council of Young Men's

Christian Ass'ns*, 34 F. Supp. 3d 896 (N.D. Ill. 2014); and *Ross v. Lockheed Martin Corp.*, 267

F. Supp. 3d 174 (D.D.C. 2017).[58]  The only new cases that Goldman cites are two non-binding

---

[56] *See Amador v. Morgan Stanley & Co., LLC*, No. 11 Civ. 4326 (RJS), 2013 WL 494020, at *8 (S.D.N.Y. Feb. 7, 2013) (finding that "statements gathered by an employer from its current employees are of limited evidentiary value in the [conditional certification] context because of the potential for coercion"); *Bublitz v. E.I. DuPont de Nemours & Co.*, 196 F.R.D. 545, 548 (S.D. Iowa 2000) (same); *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 668 (E.D.Tex. 2003) (same); *Mevorah v. Wells Fargo Home Mortg., Inc.*, No. C 05-1175 MHP, 2005 WL 4813532, at *4 (N.D. Cal. Nov. 17, 2005) (same); *Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672, 678 (N.D. Ga. 1999) (same).

[57] *See, e.g.*, ECF No. 264 ("Def. Opp. Class Cert.") at 57-62; ECF No. 502 ("Def. Obj. R&R") at 9-15, 25-30.

[58] *See, e.g.*, Def.'s Obj. to R&R at 26 & B-5 (*Dukes, Jones*); ECF No. 528 (Def.'s Notice of Supp. Authority) (*Ross*).

2288688.4

district court opinions where the relevant facts differed materially from this case (and which have little value here because of the differing standards at class certification and decertification). In *Kassman v. KPMG LLP*, plaintiffs argued that KPMG's use of overlapping pay ranges divorced pay from performance to women's detriment, and its use of prior salary to set current salary entrenched disparities. 416 F. Supp. 3d 252, 278 (S.D.N.Y. 2018). Fatally, however, plaintiffs did not present statistical evidence that the pay ranges "operated as a common causal mechanism across the class," or evidence of any initial pay gap through which the use of prior pay could entrench disparities. *Id.* at 278. In contrast, Dr. Farber's analysis here has shown that the 360 Review and Manager Quartile are responsible for 40-54% of the overall pay gap. In addition, the *Kassman* opinion emphasized both the large size of the class (three times larger than this class, at over 10,000 employees),[59] and the fact that top management was not involved in the practices at issue (specifically distinguishing this Court's finding with respect to cross-ruffing of the involvement in senior leadership in the promotions process). *Id.* at 277, 280. The only new record evidence on this point confirms this Court's findings, as it continues to show senior manager involvement in cross-ruffing and knowledge of gender disparities in the Challenged Practices (even up to the Board of Directors). *See* Background § I.D., *supra*.

Likewise, the court in *Moussouris v. Microsoft* also focused on the size of the class (more than 8,600 employees) and the lack of involvement of upper management, as well as the fact that the challenged performance evaluation system allowed managers to consider "any metric[,] so long as it is relevant to the employees' impact." No. C15-1483LJR, 2018 WL 3328418, at *20-21 (W.D. Wash. June 25, 2018) (citation omitted). In addition, the plaintiffs' expert in

---

[59] Plaintiffs disagree that the size of the class is a relevant consideration in commonality. *See Ellis*, 285 F.R.D. at 509 ("[C]lass size has no *per se* bearing on commonality . . . ."). Regardless, the certified class here is much smaller: between 1,466 and 2,160 depending on the outcome of the arbitration opt-out process ordered by the Court at ECF No. 1264. Shaver Decl. ¶ 20.

- 30 -

organizational psychology opined that the failing in Microsoft's system was too much managerial discretion, which the court found weighed against commonality.  *Id*.  In contrast, the challenge in this case is not to excessive discretion in the Challenged Practices, but rather to features of these Practices that reduce their validity and reliability, such as allowing raters who have conflicts of interest with the ratee to participate in the 360 Review, or the use of forced ranking to impose artificial distinctions among equally well-performing employees.  *See* Background § II.A-C, *supra*.

Yet another difference between *Kassman* and *Moussouris* and this case is that here, Plaintiffs have not merely presented an overall pay disparity along with policy documents linking the process to pay outcomes, but have also shown with statistical evidence that the 360 Review and Manager Quartiling practices directly account for 40-54% of the overall pay disparity.  *See* § I.B., *supra*.  Hence, there is ample evidence here of the "common causal mechanism" that the other courts found lacking.

Finally, Goldman argues that "the record now establishes that" Class members held not just two jobs—Associate and Vice President—but rather "a multitude of jobs," again relying on the new employee declarations and its expert's so-called job analysis, which is wholly unreliable and inadmissible for the reasons set forth in Plaintiffs' *Daubert* motion.[60]  Decert. Mot. at 31. But this argument, too, is nothing new—Goldman previously relied on declarations and expert testimony to argue that Class members use a "diversity of skills" across hundreds of business units that include "a wide array of functions."[61]  The problem for Goldman, then and now, is that it cannot explain why this matters when all Class members are subject to the same Challenged

---

[60] ECF No. 1186 (Pl. Daubert Mot.) at 36-49.

[61] Def. Opp. to Class Cert. at 2, 9-12; Def. Obj. to R&R at 7-8.

Practices, under which they are reviewed based on the same criteria.  Furthermore, Dr. Farber controlled not just for division, but also for business unit *and* job function in his analyses.[62] Accordingly, to the extent that either one is relevant to how a professional is evaluated or promoted, only professionals in the same business unit and with the same job function are compared to one another in Dr. Farber's analysis.  As there is still adverse impact even with these detailed controls, this evidence continues to support certification.

### 2.   *The Challenged Practices Caused a Disparate Impact.*

Goldman's next recycled argument is that Plaintiffs cannot show that the Challenged Practices caused adverse impact to Class members.[63]  Again, the Court already disposed of this argument in its Order.  Order at 42.  The Court first explained that to make out a prima facie case of disparate impact, Plaintiffs must identify a specific employment practice, demonstrate that a disparity exists, and establish a causal relationship between the two.  *Id*.  Statistics alone can make out a prima facie case if they are of a kind and degree sufficient to reveal a causal relationship.  *Id*. at 44.  Then the Court rejected the same causation argument Goldman makes again here, stating: "If Plaintiffs' statistical evidence makes out a prima facie claim of disparate impact, Defendants are tasked not with rebutting the causal link between the challenged processes and every single class member's claim, but rather, establishing that the challenged processes were a business necessity.  This is an issue capable of generalized proof."  *Id*.

Apparently ignoring the Court's prior holding, Goldman argues (yet again) that Dr. Farber's statistics cannot show a causal relationship because his aggregated statistics do not show injury to every single Class member.  This is a re-hash of Goldman's standing argument,

---

[62] Farber 1/15/21 Rep. at n.4, ¶ 64.
[63] *See, e.g.*, Def. Opp. to Class Cert. at 24, 42; Def. Obj. to R&R at 35; ECF No. 513 (Def. Resp. to Pl. Obj. to R&R) at 47.

and is wrong for the same reasons set forth above: i.e., it is not Plaintiffs' burden to provide individualized evidence of injury to every Class member.  *See* Argument § I.A., *supra*. Goldman's argument also fails for the same reasons that the Court previously rejected its "impermissible aggregation" argument.  As Judge Francis explained:

> The design of a statistical model must necessarily follow the structure of the entity being studied in light of the questions sought to be answered.  In this case, there is substantial evidence that Goldman Sachs utilizes 360 review and quartiling in each division and every business unit.  Therefore, it is appropriate to examine these policies across the entire population[.]

M&O at 19.  Judge Francis further held that there are methodological reasons to avoid disaggregation, noting that "disaggregation tends to mask common mechanisms" and citing research on how segregating a population by office location can cause a "gap in pay [to] apparently disappear[]" because "random variation[] is elevated over any pattern that exists."  *Id.* at 19-20.  This Court adopted Judge Francis's findings and specifically "agree[d] with Judge Francis that . . . it is perfectly appropriate for the model to include data across business units when it is being used to explore the impact of a firm-wide policy such as 360 review or quartiling."  Order at 20.

There has been no intervening change in evidence or law to warrant a different outcome today.  As to the evidence, Dr. Farber's analysis is even more granular than at the class certification stage, because his models now control for both business unit and job function, and still find statistically significant gender disparities of a kind and degree sufficient to justify an inference of causation.  *Robinson*, 267 F.3d at 151; Pl. Mot. For SJ (ECF No. 1251) at 17, 22. Dr. Farber also now shows with statistical evidence that the results of the 360 Review and Manager Quartile account for 54% of the overall pay disparity for Associates and 40% for Vice

Presidents.[64]  As to the law, once again Goldman cites the same cases it previously relied on for

this same argument, including *Dukes*; *Abram v. UPS of Am., Inc.,* 200 F.R.D. 424 (E.D. Wis.

2001); *Bolden v. Walsh Constr. Co.*, 688 F.3d 893 (7th Cir. 2012); *Lott v. Westinghouse

Savannah River Co.*, 200 F.R.D. 539 (D.S.C. 2000); *Moore v. Boeing Co.*, No. 4:02CV80 CDP,

2004 WL 3202777 (E.D. Mo. Mar. 31, 2004); and *Penk v. Or. State Bd. of Higher Ed.*, Civ. A.

No. 80-436, 1985 WL 25631 (D. Or. Feb. 13, 1985).[65]

 The only new authority Goldman points to is *Mandala v. NTT Data, Inc.*, 975 F.3d 202

(2d Cir. 2020).  But *Mandala* was a Rule 12(b)(6) case addressing a very different question than

the Court faces here; namely, what allegations a plaintiff must set forth in a complaint alleging

hiring discrimination in order to meet the *Iqbal's* "plausibility" standard.  The *Mandala* court

found that plaintiffs' nationwide incarceration statistics did not support their allegations that the

employer's criminal background check policy caused a disparate impact on Black applicants at

that company.  The court explained that "[i]n a typical case concerning racially discriminatory

hiring policies, the relevant comparison is between the racial composition of the at-issue jobs and

the racial composition of the qualified population in the relevant labor market."  *Id*. at 210

(citations omitted).  In that case, the court found that plaintiffs' nationwide incarceration

statistics were not *plausibly* representative of the applicant pool for the jobs at issue.  *Id*. at 211.

*Mandala* in no way supports the argument that aggregated statistical analyses cannot show

commonality.  In fact, the opinion says absolutely nothing on the topic of the proper level of

aggregation in a disparate impact case examining the impact of company-wide policies—

focusing instead on whether statistics untethered to the company's applicant pool can plausibly

---

[64] Farber 4/19/21 Rep. at ¶ 12.
[65] *See, e.g.*, Def. Opp. to Class Cert. at 42 (*Dukes*, *Abram*, *Bolden*, *Lott*, *Moore, Penk*); Def. Obj. to R&R at 31, 34
(*Dukes*, *Abram*, *Bolden*).

plead discriminatory impact at that company. Plaintiffs' authorities, on the other hand, address this issue directly (and, indeed, there is no question of representativeness because Plaintiffs' statistic are actually based on Goldman employee data, and actually show statistical impact). *See*, *e.g.*, *Ellis*, 285 F.R.D. at 523 (where "promotion policies and practices are uniform *across the company* . . . Plaintiffs' [aggregated] statistical analysis conforms to the level of decision for the challenged practices").[66]

Lastly, Goldman mischaracterizes Dr. Cascio's criticisms of the Challenged Practices. As set forth above, Dr. Cascio opined, *inter alia*, that Goldman should not have used its 360 Review for purposes beyond professional development (including as an input to compensation and promotion), without first undergoing structural changes (such as eliminating conflicts of interest between raters and ratees and mandating training). Likewise, Dr. Cascio opined that Goldman should not have used forced ranking in a teamwork environment, particularly among a high achieving workforce where scores are clustered at the top of the rating scale. *See* Background § I.A-C., *supra*; *contra* Decert. Mot. at 32. Goldman is also incorrect that Dr. Cascio never considered whether these specific defects *can* cause disparate impact. When Goldman's counsel asked Dr. Cascio at deposition whether he did any work to determine whether the Challenged Practices "caused adverse impact," Dr. Cascio responded: "What I did do was to cite an extensive amount of scientific literature that identified common defects in the process[es] that can lead to adverse impact. . . . That's a legal question for a jury to decide after hearing all the evidence as to whether or not there was causation involved." ECF No. 1245-38

---

[66] Goldman also cites *Kassman* and *Moussouris* again. Not only are those cases non-binding, but those courts found no company-wide common policies that could be modelled statistically. The courts' findings that plaintiffs' nationwide statistics were inappropriate flowed from that finding, and are inapposite here.

- 35 -

(Cascio 6/9/21 Tr.) at 320:5-321:4.  He further explained that causation is not the province of

Industrial Organizational psychology:

> **Q:** As an I-O psychologist, have you ever considered the question of whether certain employment practices cause an adverse impact?
>
> **A:** I think it would be more correct to say that I have been retained regularly to identify aspects or procedures or policies that don't meet accepted technical standards and that can lead, may lead to adverse impact. . . . I [am] never asked to – causation is not in my bailiwick. . . . I believe that the best I can say is that there is a lot of literature to indicate that the defects I identified make the process [susceptible] to adverse impact.

*Id*. at 321:6-322:6.  Goldman would have Dr. Cascio usurp the role of the finder of fact in

determining whether the evidence proves that the Challenged Practices caused an adverse impact

on the Class.  That is not a proper function of expert testimony.[67]  Moreover, Goldman

acknowledges that the 360 Review and Manager Quartile are inputs to compensation.[68]

### 3. There Is "Significant Proof" of a General Policy of Discrimination.

Goldman argues there is no "significant proof" of a general policy of discrimination as

required for Plaintiffs' *disparate treatment* claim, but it fundamentally mistakes the Court's

Order on this issue.  For that claim, the Court found significant proof of a general policy of

discrimination based on anecdotal evidence of a culture rife with sexism and harassment, as well

as "proof that Defendants were aware of gender disparities and gender bias at Goldman Sachs,

but did not adjust their policies or practices to account for the discrimination women faced."

Order at 33-34.[69]  The Court did not tie its finding on this claim to evidence of senior leadership

involvement in the Challenged Practices, as Goldman argues.  Rather, that finding was relevant

to *disparate impact* commonality.  Order at 31.  Accordingly, Goldman does not challenge

---

[67] *See, e.g., Chin*, 685 F.3d at 151 (statistics "of a kind and degree [ ] reveal a causal relationship between the challenged practice and the disparity" (citation omitted)).

[68] Shaver Decl., Ex. 17 (GS0380249).

[69] Gross statistical disparities are relevant, too.  *Robinson*, 267 F.3d at 158-59.

disparate treatment commonality at all.  Regardless, all new evidence relevant to this issue supports "significant proof" of Goldman's awareness of gender disparities and failure to change its policies.  *See* Background § I.D., *supra*.

As relevant to disparate impact, Goldman is also wrong that "the record evidence now shows" that senior management was not involved in decision-making in the Challenged Practices.  Decert. Mot. at 36.  The evidence that the Court cited in its Order on this point remains uncontested: Division Heads select candidates for cross-ruffing, and approve the divisions' final nominations for promotion after cross-ruffing, which are then reviewed by the Management Committee.  Background § I.C., *supra*.  The 360 Review and Manager Quartiling are still managed by the firmwide Talent Assessment Group, and any changes to these policies are vetted with senior leaders, including the Management Committee.  *Id*.[70]  There is no reason for the Court to revisit its prior finding that senior management were involved in the Challenged Practices, which supported (but did not alone determine) commonality for the disparate impact claim.  Order at 31.

### B.    Typicality

Goldman's typicality arguments as to Plaintiffs Orlich, Gamba, and De Luis are a carbon copy of the assertions—all either factually inaccurate, legally irrelevant, or both—that Goldman made (and, again, the Court explicitly rejected) at class certification:

---

[70] Goldman misstates Judge Lehrburger's basis for denying Plaintiffs' requests for additional discovery from members of the Management Committee.  He specifically found that the Management Committee had the awareness necessary under Plaintiffs' disparate treatment theory: "And the MC was made aware of gender disparities based on information provided to it by other groups such as Human Capital Management or one of Goldman's diversity committees."  ECF No. 1100 at 3.  However, under the proportionality analysis and given the stage of the case at the time this discovery was requested, Judge Lehrburger denied plaintiffs' motion to compel.

| Shanna Orlich | |
|---|---|
| *Decert. Mot. at 40 (2021)* | *Goldman Objs. at 47 (2015)* |
| "Ms. Orlich testified that she was paid in lockstep with associates who joined the Firm at the same time that she did (2007)." | "Shanna Orlich . . . was paid in lockstep with others of her tenure—both women and men." |
| "[N]either Ms. Orlich's sole 360 review . . . nor her placement into the 5th [lowest] quartile had any impact on her compensation." | "[N]either the 360-review nor the manager-quartile processes had anything to do with her compensation." |
| "As an associate, Ms. Orlich was not eligible for promotion to managing director and thus never cross-ruffed." | "[H]aving been an Associate for about 16 months, she was not a candidate for promotion to EMD." |
| Allison Gamba[71] | |
| *Decert. Mot. at 41* | *Goldman Objs. at 49* |
| "Ms. Gamba claims that she was discriminated against only in 2010." | "Ms. Gamba conceded that her claims are limited to 2010." |
| Mary De Luis | |
| *Decert. Mot. at 41* | *Goldman Objs. at 50* |
| "Ms. De Luis . . . was promoted to associate in 2013, and to vice president effective in 2015 . . . [she] also received a salary increase in 2015 outside of the Firm's annual compensation process." | "She . . . admits that she received two promotions and a mid-year 'increase [in] her base salary' outside of Goldman Sachs's typical compensation procedures." |

Goldman cites no new facts or legal authority to support these arguments—nor could it, as neither has changed. The Court should therefore reject these arguments again today, for the same reasons it did in 2018. *See* Order at 36-37 (rejecting same arguments as to Plaintiff Orlich); *id*. at 38-39 (as to Plaintiff Gamba); *id*. at 39 (as to Plaintiff De Luis).[72]

As to Plaintiff Chen-Oster, Goldman takes a new and likewise meritless tack—asserting that Ms. Chen-Oster "was highly compensated" and "had persistent and significant performance

---

[71] Goldman's only new "argument" as to any of Ms. Gamba's claims is its assertion that in 2010, she was "the highest paid vice president in her Business Unit." Decert. Mot. at 41. This is irrelevant, as it does not mean that she was not discriminated against, and in any event, already addressed by the Court's prior (and correct) finding that "Gamba participated in the 360 review and quartiling processes in years prior to 2010, and, accordingly, her claims of gender discrimination are not limited to that time period." Order at 38.

[72] Goldman also advances the circular argument that Plaintiffs are per se atypical due to the presence of "manager discretion" in the Challenged Practices and to purported temporal and geographical differences in how each Plaintiff experienced the Practices. Decert. Mot. at 6, 40. This is nothing more than a reiteration of Goldman's recycled commonality arguments, which fail (again) for the reasons set forth above. *See* Argument § II.A., *supra*.

problems." Decert. Mot. at 42.  First, the fact that Ms. Chen-Oster worked in a high-paying

industry does not undercut her typicality; if anything, this supports her typicality because *all*

Class members worked within this same high-paying industry.  Moreover, the relevant question

is how Ms. Chen-Oster's pay compared to her male counterparts, not the rest of the labor market.

Similarly, Goldman's citation to selected "peer comments" from Ms. Chen-Oster's 360

Reviews—such as the notation that she is "insensitiv[e]," Decert. Mot. at 42—only further

supports her typicality, because it illustrates a core problem with the 360 Review—namely, the

inclusion of peer raters who may possess conflicts with the ratee, or lack sufficient perspective

on the role.  Background § I.C., *supra*.[73]  Accordingly, Ms. Chen-Oster is now, as she was then,

a typical class representative.  *See* Order at 37-38 (finding Ms. Chen-Oster typical).

## C. Adequacy

As to adequacy, Goldman argues that Class members' requisite participation in the

Challenged Practices somehow creates "intra-class conflicts that demand decertification."

Decert. Mot. at 45.  Even setting aside the fact that participation in the Challenged Practices has

always been mandatory—such that this purported "conflict" existed at the time the Court

certified the Class and Goldman has presented nothing new—this argument lacks merit.

There is no conflict here.  All Class members were subjected to the same unlawful

practice that had a disparate impact on women, regardless of the role they occupied at any given

---

[73] Goldman's characterization of Ms. Chen-Oster's performance is also remarkably inaccurate.  For example, it omits all of the following comments from Ms. Chen-Oster's 2001 360 Review that appear on the page *before* the negative comment that Goldman cherry-picked for this brief: "Cristina has made meaningful contributions to the intl converts effort over time.  She is hardworking and diligent."; "In a context of a particularly difficult environment, Cristina has continued to drive the business in a professional and committed way."; "Christina [sic] appears to be very professional and knowledgeable about the convertible product."; "Always seems to be in the game.  Constantly working.  Appears to do good business.  Very knowledgeable about the product.  Makes certain all the calls are made."; "Cristina continues to stand out as a model for cross selling and teamwork."; and "Very thorough analysis of client needs, quick response to client requests.  Good marketer of deals."  ECF No. 1236-21 (GS0099554) at -556.

moment in the 360 Review.  *See, e.g.*, *In re Johnson*, 760 F.3d 66, 74 (D.C. Cir. 2014) ("If class members neutrally applied a flawed rating system and thereby reached a discriminatory result, then they were not themselves discriminating and therefore have no apparent interest that is in conflict with the attempt to prove other agents were denied promotions because of their race.").

The cases upon which Goldman relies involved inapposite facts, wherein plaintiffs alleged that the high degree of discretion in the challenged practice resulted in discrimination of class members by class members.  In *Moussouris*, the plaintiffs challenged the degree of "unfettered" managerial discretion in Microsoft's pay and promotion process, which allegedly permitted bias to creep into that process.  2018 WL 3328418, at *3-5, *16, *19.  The court therefore determined that the discriminatory intent of specific managers—many of whom were class members—was directly at issue.  *Id*. at *28-29.  *See also Donaldson v. Microsoft Corp.*, 205 F.R.D. 558, 568 (W.D. Wash. 2001) (same); *Jones*, 34 F. Supp. 3d at 906 (same).  But "unfettered" managerial discretion—and specific managerial discrimination—is not at issue here. Instead, Plaintiffs here challenge the continued application of fundamentally flawed policies that are not valid for making pay and promotion decisions, and have been shown to have a disparate impact on women.  *See* Background § I.A., *supra*.

### D.    Predominance

Goldman yet again asserts that establishing individual damages defeats predominance.[74] And Goldman again ignores the Court's clear holding on this issue: that individualized damages issues do not defeat predominance, because the common question of liability predominates. Order at 43-46.  The Court also held that if Plaintiffs prevailed on liability, individualized damages issues could be managed in a variety of ways, including aggregation and pro rata

---

[74] *See, e.g.*, Def. Opp. to Class Cert. at 69-70; Def. Obj. to R&R at 20-21.

distribution, or the use of a magistrate or special master.  *Id*. at 48-49.  In so holding, the Court followed a robust line of Title VII jurisprudence.[75]

Tellingly, the only two cases Goldman cites that post-date the Court's Order are not Title VII cases, but rather antitrust cases addressing the unique requirement of proving common impact under the antitrust laws, which are concerned with impacts affecting an entire market and not just a singular business.[76]  Further, since Goldman filed its motion, one of those two opinions was vacated.[77]  Goldman otherwise relies entirely on case law already considered by this Court through prior briefing.[78]

In addition to being "identical to the argument this court rejected in its original certification order," *Connor B,* 278 F.R.D. at 34, 36, Goldman's argument is also wrong.  First, Goldman relies on *Houser* and *Stockwell*, which have limited application here because they address only circumstances in which "the number of qualified class members exceeds the number of openings lost to the class through discrimination."  *Houser*, 28 F. Supp. 3d at 252 (citation omitted).  Thus, those courts' concerns with apportionment of damages have absolutely no applicability to Plaintiffs' disparate treatment claim, nor with their disparate impact challenge to the performance measurements (i.e., 360 Review and Manager Quartile).  Second, to the extent these cases have any bearing on Plaintiffs' promotion claim, their analysis of *Comcast* is not helpful here, as *Comcast* did not address much less preclude the well-accepted remedial stage procedure in employment shortfall cases (which *Comcast* was not) of estimating aggregate

---

[75] *See e.g., Teamsters*, 431 U.S. at 362; *Robinson*, 267 F.3d at 159; *Easterling v. Conn. Dep't of Correction*, 278 F.R.D. 41, 50 (D. Conn. 2011); *Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, No. 96 CV 8414 KMW, 2013 WL 4647190, at *3, *11, *13 (S.D.N.Y. Aug. 29, 2013); *Ellis*, 285 F.R.D. at 503.

[76] *Olean v. Wholesale Grocery Cooperative, Inc.*, 993 F.3d 774 (9th Cir. 2021); *In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869*, 934 F.3d 619, 625 (D.C. Cir. 2019).

[77] *Olean v. Wholesale Grocery Coop., Inc.*, 5 F.4th 950 (9th Cir. 2021).

[78] *See, e.g.*, Def. Obj. to R&R at B-8 (*Houser*); Def. Resp. to Pl. Obj. to R&R at 48 (*Houser*), A-2 (*Stockwell v. City & Cty. of S.F.*, 2015 WL 2173852 (N.D. Cal. May 8, 2015)).

damages and distributing them on a pro rata basis.  *Id.* at 253.  *Cf. Easterling*, 278 F.R.D. at 50

("[S]ubstantive Title VII law suggests that aggregate assessment and pro rata distribution is a

fairer method of affording individual relief . . . .").  Instead, in *Comcast* the plaintiffs' damages

model was overinclusive because it measured damages for class members who were injured

according to any one of four separate modes of antitrust violation.  When the court ultimately

certified only one of those modes, the damages model therefore could not show damages for only

those who were injured by the certified mode of violation.  That is a very different scenario than

a single employment practice that has been proven to discriminate unlawfully, such that

aggregation and pro rata distribution are the preferred method of affording relief.  In such cases,

there is still a single damages model that calculates the overall damages classwide, satisfying

*Comcast*.

Goldman next points to certain categories of Class members who were not subject to one

or the other of the Challenged Practices, and argues they are a reason to decertify the Class.  Not

so.  These are exactly the issues that Plaintiffs previously proposed be adjudicated in the

remedial phase, if liability is established.[79]  That adjudication can be done efficiently on a group

basis, as follows:

- "All associates in connection with claims based on cross-ruffing."  Decert. Mot. at 39.
  Plaintiffs have only alleged a promotion claim for Vice-Presidents,[80] and the judgment and
  jury verdict forms will follow that limitation.

- "Class members who were employed by Goldman Sachs only after 2015 as to 360 reviews
  and quartiling," *id.*, when Dr. Farber has not found statistical evidence of adverse impact
  after 2015.  First, all Class members, including those since 2015, have claims for injunctive
  relief from these practices.  As for damages, this can be addressed at summary judgment
  and/or in the damages phase of trial, where Class Members employed only after 2015 can

---

[79] ECF No. 514 (Pl. Reply ISO Obj. to R&R) at 19.

[80] *See* ECF 411 (Second Amended Complaint) at ¶¶ 52-54 (describing promotion process from Vice President to
Managing Director).

be categorically excluded from damages associated with the 360 Review and Manager Quartile.

- "Class members who always received the top manager quartile and who thus cannot claim that they fared worse than any comparable male peer in the quartiling process." *Id.* Plaintiffs have presented evidence that women who receive top quartile marks still earn less compensation and are promoted less often than their comparable male peers.[81]

- "Class members who were not employed long enough to be subject to the compensation policy and receive a bonus and thus could not have been adversely impacted so as to be entitled to backpay." *Id.* To the extent Goldman's data shows a group of Class Members who were not employed long enough to be subjected to any Challenged Process, they can easily be categorically excluded from damages at the remedial stage. They are still entitled to the benefit of injunctive relief that would flow from a liability finding.

- "Class members who were never nominated for promotion and thus never cross-ruffed." *Id.* Plaintiffs' promotion claim encompasses the entire process, including "nomination." *See* Background § I.C., *supra*. Vice Presidents who were never nominated *do* have claims for injury from the cross-ruffing process.

- "Class members (i) who were promoted to managing director or (ii) who were cross-ruffed in one of the five promotion cycles where even Dr. Farber finds no gender gaps or gaps that favor women." Decert Mot. at 39. This goes to damages arising from the practice, and not whether it is subject to a liability finding and injunction. Damages connected to the promotions claim will be dealt with in the aggregate at the remedial phase. *See* Order at 48 (citing *Easterling*).

- "Class members who were self-sustaining PWAs with compensation based solely on production, not their 360 review or quartiling results." Decert Mot. at 39. These Class members were subject to the 360 Review and Manager Quartile, meaning this is an irrelevant distinction for purposes of the liability phase. At the remedial phase, self-sustaining PWAs can be categorically excluded from damages in connection with the 360 Review and Manager Quartile. However, those who were Vice-Presidents may still have damages in connection with Cross-Ruffing.

### E.     Superiority

Goldman's critical error is the assumption that in "the typical Title VII framework" the "phase I trial determines class liability *for injunctive relief only*." Decert. Mot. at 43 (emphasis added). This is an extraordinary re-writing of anti-discrimination laws, contrary to binding

---

[81] Farber 4/19/21 Rep. at ¶ 88.

precedent, and absurd.  It presumes that somehow every Title VII case would contain two liability trials, one for injunctive relief and one for damages, a process that is inefficient and would risk inconsistent results.  No court would sanction it.  Further, a finding of liability does not hinge on the type of relief sought.  The actual purpose of Phase I is to adjudicate whether Goldman is liable *for unlawful discrimination*.  If so, an injunction is an automatic remedy for both disparate impact and disparate treatment, and the entire Class is entitled to a presumption of make whole relief.  *Robinson*, 267 F.3d at 161; *City of New York I*, 276 F.R.D. at 34; *see also Ellis*, 285 F.R.D. at 503 (setting forth trial plan, wherein liability for damages and injunctive relief is adjudicated in Phase I).[82]

The Court's Order expressly recognized that this framework applied to Plaintiffs' claims here, and found a class action to be a superior method to adjudicate those claims.  Order at 48.  Goldman's misunderstanding of Title VII law appears to animate its requests here.  Goldman offers no new case law and no new evidence. There is no reason for the Court to disturb its detailed superiority and manageability findings:  The Court got it right the first time, and should affirm those findings.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Goldman's motion for decertification.

---

[82] Even if Goldman were right that Phase I determined liability for injunctive relief only (it is not), as set forth above, Plaintiffs are entitled to and will seek injunctive relief as well as damages.  *See* Argument § I.A., *supra*.

Dated:  September 24, 2021          Respectfully submitted,

*/s/ Anne B. Shaver*
Kelly M. Dermody (*admitted pro hac vice*)
Anne B. Shaver (*admitted pro hac vice*)
Michael Levin-Gesundheit (*admitted pro hac vice*)
Michelle A. Lamy (*admitted pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Rachel Geman
Jessica A. Moldovan
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-9592
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Adam T. Klein
Cara E. Greene
Melissa L. Stewart
Christopher M. McNerney
Michael C. Danna
Sabine Jean
Maya S. Jumper
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060

*Class Counsel*

- 45 -