**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; SHANNA ORLICH; ALLISON GAMBA; and MARY DE LUIS, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> -against- <br><br> GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC., <br><br> Defendants. | No. 10-cv-6950-AT-RWL |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT..................................................... 1

II.     RELEVANT FACTS ....................................................................................................... 4

        A.      Goldman Applied the Challenged Practices Throughout the Class Period ........... 4

        B.      The Challenged Practices Caused an Adverse Impact on Class Members............. 7

        C.      Discrimination Is Goldman's Standard Operating Procedure .............................. 12

        D.      Plaintiffs Have Identified Less Discriminatory Alternatives............................... 17

III.    LEGAL STANDARD ................................................................................................... 19

IV.     ARGUMENT ............................................................................................................... 21

        A.      Goldman Has Not Met Its Burden To Show a Lack of Genuine Issues of
                Material Fact Supporting Plaintiffs' Prima Facie Case of Disparate Impact........ 21

                1.      Plaintiffs Challenge "Specific Employment Practices."........................... 21

                        a.      Goldman's invented sub-parts are not "employment
                                practices."................................................................................... 23

                        b.      Cross-Ruffing Is a Single Process To Be Analyzed as a
                                Whole.......................................................................................... 26

                2.      Plaintiffs Establish the Practices Caused Disparate Impact..................... 28

        B.      Goldman Fails To Show Lack of Material Disputed Facts as to Plaintiffs'
                Showing of Less Discriminatory Alternative Practices ....................................... 34

        C.      Goldman Fails To Demonstrate an Absence of Material Disputed Facts as
                to Plaintiffs' Disparate Treatment Claim ............................................................ 38

                1.      Plaintiffs' Statistics Establish a *Prima Facie* Showing ............................ 38

                2.      Goldman Ignores Plaintiffs' Substantial Showing of Knowledge............ 42

        D.      Goldman Ignores the Class' NYCHRL Claims, Which Generally Are Not
                Subject to Goldman's Arguments ........................................................................ 44

                1.      NYCHRL Was Amended Specifically To Be More Protective Than,
                        and Separately Analyzed from, Title VII.................................................. 44

                2.      Goldman's Arguments Are Not Relevant to the NYCHRL ...................... 45

        E.      Goldman's Miscellaneous Additional Arguments Also Fail To Establish a
                Basis For Summary Judgment ............................................................................. 46

CONCLUSION.......................................................................................................................... 48

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                                           **PAGE(S)**

*Abram v. UPS*,
  200 F.R.D. 424 (E.D. Wis. 2001) ..........................................................................................31

*Allen v. City of Chicago*,
  351 F.3d 306 (7th Cir. 2003) .........................................................................................36, 37

*Amnesty Am. v. Town of W. Hartford*,
  361 F.3d 113 (2d Cir. 2004)..............................................................................................19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...................................................................................................19, 20

*Bazemore v. Friday*,
  478 U.S. 385 (1986)...........................................................................................................29

*Bridgeport Guardians, Inc. v. City of Bridgeport*,
  735 F. Supp. 1126 (D. Conn. 1990)...............................................................................36, 37

*Brown v. City of N.Y.*,
  No. 16 Civ. 1106, 2017 WL 1102677 (E.D.N.Y. Mar. 23, 2017) ..........................................45

*Campbell v. National R.R. Passenger Corp.*,
  311 F. Supp. 3d 281 (D.D.C. 2018) ....................................................................................25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).........................................................................................................19

*Chin v. Port Auth. of N.Y. & N.J.*,
  685 F.3d 135 (2d Cir. 2012).....................................................................................*passim*

*Chrisner v. Complete Auto Transit, Inc.*,
  645 F.2d 1251 (6th Cir. 1981) .......................................................................................35, 37

*Davis v. Cintas Corp.*,
  717 F.3d 476 (6th Cir. 2013) ......................................................................................24, 25

*E.E.O.C. v. Bloomberg L.P.*,
  778 F. Supp. 2d 458 (S.D.N.Y. 2011)................................................................................41

*E.E.O.C. v. Mavis Disc. Tire, Inc.*,
  129 F. Supp. 3d 90 (S.D.N.Y. 2015)..............................................................................39, 43

*Easterling v. State of Conn.*,
  783 F. Supp. 2d 323 (D. Conn. 2011) .................................................................35

*Ellis v. Costco Wholesale Corp.*,
  285 F.R.D. 492 (N.D. Cal. 2012) ......................................................................22

*Finch v. Hercules Inc.*,
  865 F. Supp. 1104 (D. Del. 1994) .....................................................................24

*Freyd v. Univ. of Or.*,
  990 F.3d 1211 (9th Cir. 2021) ...........................................................................36

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ...........................................................................................32

*Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30*,
  694 F.2d 531 (9th Cir. 1982) .............................................................................42

*Gulino v. N.Y. State Educ. Dep't*,
  460 F.3d 361 (2d Cir. 2006) ..............................................................................35

*Hernandez v. Off. of Comm'r of Baseball*,
  No. 18 Civ. 9035, 2021 WL 1226499 (S.D.N.Y. Mar. 31, 2021) .....................38

*Howley v. Town of Stratford*,
  217 F.3d 141 (2d Cir. 2000) ..............................................................................20

*Int'l Bhd. of Teamsters v. U.S.*,
  431 U.S. 324 (1977) .....................................................................................14, 39

*Johnson v. City of Memphis*,
  770 F.3d 464 (6th Cir. 2014) .........................................................................36, 37

*In re Joint E. & S. Dist. Asbestos Litig.*,
  52 F.3d 1124 (2d Cir 1995) ...............................................................................20

*Kaur v. N.Y.C. Health & Hosps. Corp.*,
  688 F. Supp. 2d 317 (S.D.N.Y. 2010) ...............................................................45

*Lall v. City of New York*,
  No. 17 Civ. 609, 2021 WL 848851 (E.D.N.Y. Mar. 5, 2021) ..........................43

*Lopez v. City of Lawrence, Mass.*,
  823 F.3d 102 (1st Cir. 2016) ..............................................................................38

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) ..............................................................................20

*Marcus v. AT&T Corp.*,
    138 F.3d 46 (2d Cir. 1998).............................................................................34

*Meacham v. Knolls Atomic Power Lab'y*,
    461 F.3d 134 (2d Cir. 2006)...........................................................................30

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013)...........................................................................45

*Morgan v. UPS*,
    380 F.3d 459 (8th Cir. 2004) ...................................................................31, 40

*In re Omicron Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)...........................................................................20

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997).............................................................................20

*Reynolds v. Barrett*,
    685 F.3d 193 (2d Cir. 2012)...........................................................................42

*Richardson v. City of N.Y.*,
    No. 17 Civ. 9447, 2021 WL 1910689 (S.D.N.Y. May 12, 2021)..............30, 31, 42

*Richardson v. City of N.Y.*,
    No. 17 Civ. 9447, 2018 WL 4682224 (S.D.N.Y. Sept. 28, 2018).........................46

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)...........................................................................34

*Robinson v. Metro-N. Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001)..................................................................*passim*

*Smith v. Xerox*,
    196 F.3d 358 (2d Cir. 1999)......................................................................30, 34

*Ste. Marie v. Eastern Railroad Assoc.*,
    650 F.2d 395 (2d Cir. 1981)...........................................................................42

*Stinson v. City Univ. of N.Y.*,
    No. 17 Civ. 3949, 2018 WL 2727886 (S.D.N.Y. June 6, 2018)...........................45

*Teasdale v. N.Y.C. Fire Dep't, FDNY*,
    574 F. App'x 50 (2d Cir. 2014) .....................................................................45

*U.S. v. Diebold, Inc.*,
    369 U.S. 654 (1962)......................................................................................20

*United States v. N.Y.C. Dep't of Educ.*,
  407 F. Supp. 3d 365 (S.D.N.Y. 2018)........................................................34, 39, 43

*Valentino v. U.S. Postal Serv.*,
  674 F.2d 56 (D.C. Cir. 1982) .....................................................................................41

*Velez v. Novartis Pharms. Corp.*,
  244 F.R.D. 243 (S.D.N.Y. 2007) ...............................................................................20

*Waisome v. Port Auth. of N.Y. & N.J.*,
  948 F.2d 1370 (2d Cir. 1991)....................................................................................42

*Watson v. Fort Worth Bank & Trust*,
  487 U.S. 977 (1987)...................................................................................................21

*Williams v. Sprint/United Mgmt. Co.*,
  No. 3 Civ. 2200, 2005 WL 1801605 (D. Kan. July 29, 2005)..........................24, 26

## STATUTES

9 U.S.C. § 4.......................................................................................................................48

42 U.S.C. § 2000e-2(k)(1)(A)(i) ...............................................................................21, 35

42 U.S.C. § 2000e-2(k)(1)(B)(i) ......................................................................................22

N.Y.C. Admin Code § 8-107(17)(a)(1) ............................................................................46

N.Y.C. Admin. Code § 8-107(17)(a)(2) ...............................................................2, 45, 46

## OTHER AUTHORITIES

Class Actions, *Defining the class—Judicial discretion to ensure satisfactory class
  definition* § 7:27 (5th ed.).......................................................................................34

Fed. R. Civ. P. 26(e) ........................................................................................................47

Fed. R. Civ. P. 56(c) ........................................................................................................19

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Goldman[1] fails to meet its heavy burden to show there are no material disputed issues of fact such that summary judgement is warranted on Plaintiffs' class claims of gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York City Human Rights Law ("NYCHRL").  Plaintiffs have provided robust evidence establishing that the certified class has suffered statistically significant gender pay disparities caused by Goldman's 360 Review, Manager Quartiling, and Cross-Ruffing practices (the "Challenged Practices"), and that Goldman has engaged in intentional systemic gender discrimination as its standard operating procedure.

As a threshold matter, given the central role of statistical proof in discrimination cases, Goldman's challenge to the sufficiency of Plaintiffs' statistical proof is meritless.  Goldman has not shown (and cannot show) that its own statistical analysis satisfies *Daubert*, let alone that its "numerical picture is more accurate, valid, or reliable" than Plaintiffs'.  *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 161 (2d Cir. 2001).  Goldman's arguments as to disparate impact, disparate treatment, and discrete time periods or issues fail due to the existence (at best for Goldman) of disputed material facts:

*First*, Goldman argues for the first time in this litigation that two of the Challenged Practices, 360 Reviews and Cross-Ruffing, are not employment practices, but instead are made up of various intermediate sub-parts that each must be analyzed in isolation.  The factual record belies this argument.  Throughout the entire class period, Goldman itself considered the 360 Review as a singular distinct practice that drove compensation and promotion outcomes, and Cross-Ruffing as a singular distinct practice that drove promotion outcomes.  No intermediate

---

[1]      "Goldman" refers to Goldman Sachs, & Co. and The Goldman Sachs Group, Inc.

step or sub-part within either process is itself linked to an employment decision or adverse outcome. Goldman misunderstands or misstates the substantive law, which does not require that Plaintiffs undertake the unprecedented and impossible task of separately estimating the effect of each individual identifiable sub-component of the same process. Under Title VII, Plaintiffs need only to identify (as they have) a specific policy that causes impact. The NYCHRL is yet more protective because it does not even require the identification of a specific employment practice that causes impact. Goldman's argument is thus incorrect as to Title VII, and legally baseless in connection with the NYCHRL (especially given that most Class members have a NYCHRL claim).[2] At best for Goldman, material disputed facts exist.

*Second*, Goldman's challenge to causation fails because Plaintiffs have provided statistical proof "of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (quoting *Robinson*, 267 F.3d at 160). In addition, Plaintiffs hewed to Goldman's own processes for how compensation and promotion decisions are actually made in analyzing the relevant data. By contrast, Goldman offers an alternative statistical analysis from its own expert, Dr. Kathryn Shaw, based on a counter-factual presentation of how the processes operate. This defensive opinion does not negate Plaintiffs' causation showing, nor make Plaintiffs' showing methodologically unsound. At the very least, material disputed facts exist (via a classic "battle of the experts") in connection with the statistical proof relating to causation.

---

[2]     *See* N.Y.C. Admin Code § 8-107(17)(a)(2) ("[I]f . . . such person who may bring an action demonstrates that a group of policies or practices results in a disparate impact, the commission or such person shall not be required to demonstrate which specific policies or practices within the group results in such disparate impact . . . .").

*Third*, Goldman seeks summary judgment as to the third stage of the disparate impact analysis (*i.e.*, Plaintiffs' showing of alternative practices, which follows a first stage proof by Plaintiffs' of the *prima facie* case, and a second stage of proof that shifts to Goldman).  But this prong of Plaintiffs' showing is not even at issue because Goldman failed to attempt to meet its own burden at the second stage of the analysis in its motion—*i.e.* to show that its discriminatory practices are job-related and consistent with business necessity.  Even aside from this dispositive problem, Plaintiffs have amassed a significant record identifying the shortcomings of Goldman's policies and alternatives to those shortcomings that would lead to less discriminatory outcomes. Accordingly, if the Court entertains the consideration of alternative, less discriminatory practices in a vacuum created by Goldman's raising it in this improper posture, material disputed facts exist.

*Fourth*, Goldman argues in conclusory fashion that Plaintiffs' disparate treatment class claim fails for the same reasons their disparate impact claims fail.  But the same material dispute as to the parties' statistical analysis also is present here, and also requires denial of the motion as to this claim.  Additionally, Goldman's knowledge of the disparities is a quintessential jury issue, which Goldman does not dispute.  Likewise, Goldman fails to rebut Plaintiffs' significant evidence that Goldman knew that the Challenged Practices caused an adverse impact on female employees, as well as other significant evidence that discrimination was Goldman's standard operating procedures.  Material disputed facts exist.

*Fifth*, Goldman's miscellany of undeveloped arguments as to specific time periods and sub-populations are not only counter-factual, but include speculative assertions unsupported by the record.  These arguments fail.

For these reasons, and as elaborated below, the Court should deny Goldman's motion.

## II.    **RELEVANT FACTS**

Plaintiffs provided a comprehensive accounting of the factual background in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment on Plaintiffs' *Prima Facie* Case of Disparate Impact Motion ("Pls.' Mot."), Plaintiffs' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pls. 56.1"), and exhibits cited in support of that motion, which Plaintiffs incorporate by reference here. *See* ECF No. 1256 (Pls.' Mot.) at 4-14; ECF No. 1257 (Pls.' 56.1); ECF Nos. 1250, 1258 (Declaration of Adam T. Klein in Support of Motion for Summary Judgment on Plaintiffs' *Prima Facie* Case of Disparate Impact Motion) and accompany exhibits. For the Court's convenience, specific facts particularly relevant to this motion are presented below and in Plaintiffs' Responses to Defendants' Local Civil Rule 56.1 Statement of Material Facts and Counterstatement of Material Facts ("Pls.' Counterstatement") and accompanying exhibits.

### A.    **Goldman Applied the Challenged Practices Throughout the Class Period.**

From July 7, 2002 through the present ("Class Period"), and for all employees in the Securities, Investment Banking, and Investment Management Divisions ("Class Divisions"), Goldman has used a two-part performance review process—the 360 Review and the Manager Quartile—that is a direct input into compensation and promotion. ECF No. 1257 (Pls.' 56.1) ¶¶ 1, 7, 12.[3] The 360 Review is a part of the performance review process in which employees are

---

[3]    *See* ECF Nos. 1242-29, 1258-1 (Deposition of Jessica Kung, July 31 & August 1, 2013 ("Kung Tr.")) at 30:5-16; 278:16-279:12; ECF Nos. 1258-2; 1242-27, 1242-28 (Deposition of Caroline Heller-Sherloti, July 10 & 11, 2013 ("Heller-Sberloti Tr.")) at 79:18-21; 264:19-266:21; ECF Nos. 1242-31, 1258-3 (Deposition of Bruce Larson, June 12, 2013 ("Larson Tr.")) at 69:23-70:6; 167:20-168:1; ECF No. 1258-4 (Deposition of David Landman, October 10, 2013 ("Landman II Tr.")) at 8:10-15; ECF No. 1250-5 (Declaration of David Landman, October 13, 2017 ("2017 Landman Declaration")) ¶ 2; ECF No. 1258-5 (Deposition of Anilu Vazquez-Ubarri, August 13, 2020 ("Vazquez-Ubarri Tr.")) at 131:4-15; ECF No. 1258-6 (GS0380249) at -249.

evaluated by peers, subordinates, and managers using a set of firm-wide criteria.  ECF No. 1257

(Pls.' 56.1) ¶ 3;[4] ECF No. 1241 (Defendants' Local Civil Rule 56.1 Statement of Material Facts

as to Which There Is No Genuine Issue To Be Tried ("Defs' 56.1")) ¶¶ 13-15.  The overall 360

score, which is used to make compensation and promotion decisions, is the aggregation of all

360 sub-parts.  Pls.' Counterstatement ¶ 2.[5]  The overall 360 score is then a "direct input into the

Manager Quartile rank and hence to compensation."  ECF No. 1257 (Pls.' 56.1) ¶ 7.[6]  After the

360 Review is completed, managers must force rank employees using a five "quartile"

distribution: Quartile 1: Top 25%; Quartile 2: Next 25%; Quartile 3: Next 25%; Quartile 4: Next

---

[4]      *See* ECF Nos. 1242-13, 1258-8 (GS0003383) at -387; ECF Nos. 1242-12; 1258-9
(GS0120172) at -177; ECF Nos. 1242-29, 1258-1 (Kung Tr.) at 305:14-18, 307:2-8; ECF No.
1258-10 (GS0120195) at -209; ECF No. 1258-11 (GS0121383) at -388; ECF No. 1258-12
(GS0120828) at -833; ECF No. 1258-13 (GS0110583) at -591; ECF No. 1258-14 (GS0110603)
at -611.  The nine Firmwide Review Categories are Technical Skills, Communication Skills,
Judgment/Problem Solving, Teamwork, Compliance, Diversity, Leadership, Overall Commercial
Effectiveness, and Overall Professional Performance.  ECF No. 1257 (Pls.' 56.1) ¶ 4 (citing ECF
Nos. 1242-13, 1258-8 (GS0003383) at -387; ECF No. 1258-9 (GS0120172) at -177; ECF Nos.
1242-29, 1258-1 Kung Tr.) at 305:14-18, 307:2-8; ECF No. 1258-10 (GS0120195) at -209; ECF
No. 1258-11 (GS0121383) at -388; ECF No.1258-12 (GS0120828) at -833; ECF No. 1258-13
(GS0110583) at -591; ECF No. 1258-14 (GS0110603) at -611).

[5]      *See* ECF No. 1257 (Pls.' 56.1) ¶¶ 2-7.

[6]      *See* ECF No. 1258-16 (GS0155193) at -193; ECF No. 1258-17 (GS0153032) at -032;
ECF No. 1258-18 (GS0153290) at -290; ECF No. 1258-19 (GS0109353) at -355; ECF Nos.
1242-11, 1258-20 (GS0109390) at -391; ECF No. 1258-21 (GS0126057) at -058; ECF No. 1258-
22 (GS0136548) at -549; ECF No. 1258-23 (GS0153035) at -036; ECF No. 1258-24
(GS0450859) at -860-61; ECF No. 1258-25 (GS0153476) at -480; ECF No. 1258-26
(GS0484728); ECF No. 1258-27 (GS0637321) at -321; ECF No. 1258-28 (GS0637303) at -304;
ECF No. 1258-29 (GS0440622) at -623-24; ECF No. 1258-30 (GS0456223) at -224-25; ECF
No. 1258-5 (Vazquez-Ubarri Tr.) at 131:4-132:15 (testifying that 360 reviews are one input into
compensation decisions).  Likewise, the overall 360 score is the input into promotions, and not
some sub-part of that score.  Pls.' Counterstatement ¶ 1; *see also* GS0338711.

15%; and Quartile 5: bottom 10%. ECF No. 1257 (Pls.' 56.1) ¶ 8;[7] ECF No. 1241 (Defs.' 56.1)

¶ 22. The Manager Quartile is a direct input to compensation. ECF No. 1257 (Pls.' 56.1) ¶ 12.[8]

Goldman awards promotions from Vice President to Managing Director across the three

Class Divisions through an annual (or, starting in 2015, biannual) "cross-ruffing" process. ECF

No. 1257 (Pls.' 56.1) ¶ 13;[9] ECF No. 1241 (Defs.' 56.1) ¶ 24. As certified by the Court, "cross-

ruffing" includes all aspects of the promotion process, including nominations.[10] This is

consistent with the parties' use of "cross-ruffing" to refer to the overall promotion process

throughout the litigation.[11] The overall 360 Review score and Manager Quartile are inputs into

promotions, and not some sub-part of that score. Pls.' Counterstatement ¶ 1.[12]

---

[7]     ECF Nos. 1242-29, 1258-1 (Kung Tr.) at 29:6-19, 316:15-317:2, 317:7-24; ECF Nos. 1242-31, 1258-3 (Larson Tr.) at 182:16-183:22; ECF No. 1258-4 Ex. 4 (Landman II Tr.) at 9:12-10:13.

[8]     ECF No. 1258-16 (GS0155193) at -194; ECF No. 1258-17 (GS0153032) at -033; ECF No. 1258-31 (GS0113858) at -860; ECF No. 1258-32 (GS0123223) at -224; ECF No. 1258-33 (GS0123267) at -268; ECF No. 1258-34 (GS0123295) at -296.

[9]     ECF No. 1258-1 (Kung Tr.) at 398:11-21; ECF No. 1258-2 (Heller-Sberloti Tr.) at 80:10-21, 213:25-214:8; ECF No. 1258-3 (Larson Tr.) at 226:21-228:4; *see also* ECF No. 1258-35 (GS0113568) at -573-76; ECF No. 1258-36 (GS0113548) at -552-57; ECF No. 1258-37 (GS0109256) at -259-63; ECF No. 1258-38 (GS0109329) at -332-37; ECF No. 1258-39 (GS0109273) at -276-84; ECF No. 1258-40 (GS0109299) at -302-08; ECF No. 1258-41 (GS0004990) at -993-99; ECF No. 1258-42 (GS0004777) at -781-88; ECF No. 1258-43 (GS0003547) at -550-57; ECF No. 1258-44 (GS0004705) at -708-16; ECF No. 1258-45 (GS0109235) at -238-45; ECF No. 1258-46 (GS0375517) at -520-27; ECF No. 1258-47 (GS0375294) at -297-305; ECF No. 1258-48 (GS0375741) at -744-46; ECF No. 1258-49 (GS0375264) at -265-68.

[10]     Plaintiffs filed and sought to certify, and the Court certified, claims challenging the entire promotions process. ECF No. 5 (Complaint), ECF No. 411 (Second Amended Complaint), ECF No. 486 (Supplemental Amended Complaint); ECF No. 247 (Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Class Certification) at 10-12; ECF No. 578 (March 30, 2018 Opinion and Order ("Order")) at 8-10.

[11]     *See* ECF No. 1186 (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion to Exclude Expert Testimony ("Pls.' *Daubert* Mot.")) at 24; ECF No. 1283 (Plaintiffs' Reply in Support of Plaintiffs' Motion to Exclude Expert Testimony ("Pls.' *Daubert* Reply")) at 9; ECF No. 1269 (Plaintiffs' Opposition to Defendants' Motion to Decertify the Class ("Pls.' Opp. Decert. Mot.")) at 9-11, 43.

[12]     *See* ECF No. 1257(Pls.' 56.1) ¶¶ 1, 7, 12; GS0338711 at -711-13.

Goldman admits that the Challenged Practices were applied uniformly across IMD, IBD, and Securities throughout the class period.  ECF No. 1241 (Defs' 56.1)) ¶ 20 ("The 360 review process was employed in IMD, IBD, Securities, and MBD during the class period."); *id* ¶ 23 ("Goldman Sachs employed manager quartiling in the three certified Divisions—IMD, IBD, and Securities—throughout the class period, as well as in MBD."); *id.* ¶ 31 ("Goldman Sachs has used the "same cross-ruffing system . . . during the entire relevant time period" in all three certified Divisions—IMD, IBD, and Securities—as well as in MBD.").[13]

### B.    The Challenged Practices Caused an Adverse Impact on Class Members.

Dr. Farber used a generally accepted econometric method—multivariate regression modeling—to investigate how comparable men and women fare in the 360 Review and Manager Quartile processes.  ECF No. 1257 (Pls.' 56.1) ¶ 23.[14]  Multivariate regression models allow one to control for relevant worker characteristics in the data that may affect the outcome (that is, to only compare people against others who have the same seniority, education, prior experience, etc.), while then measuring the residual gender differences in scores.  *Id.* ¶ 24.[15]

**360 Review:** Dr. Farber found statistical evidence of adverse impact against Class Members in the 360 Review from 2002 to 2015.  ECF No. 1257 (Pls.' 56.1) ¶ 25.[16]  The data show that for Associates, mean scores are lower for women than for men in every year except

---

[13]    While Goldman argues, and Plaintiffs dispute, that the 360 Review process was adopted in 2003 and not fully implemented until 2004, ECF No. 1241 (Defs.' 56.1) ¶¶ 10-11, Goldman admits that Manager Quartiling and Cross-Ruffing were employed throughout the class period, *see id.* ¶¶ 23, 31.

[14]    ECF Nos. 1242-43, 1250-18 (Expert Report of Dr. Henry Farber, January 15, 2021("Farber Jan. 15, 2021 Report")) ¶ 77, Tables 7 & 8.

[15]    ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶ 77.

[16]    ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶¶ 86-90, Tables 11 & 12.

2008, when they are the same as men's scores. *Id.* ¶ 26.[17] For Vice Presidents, mean scores are lower for women in every year. *Id.* ¶ 27.[18] Dr. Farber studied whether the gender differences in scores could be explained by relevant worker characteristics, including division, business unit, year, location, education, prior work experience, tenure at Goldman, AAP job group, and direct or lateral hire status. *Id.* ¶ 28.[19] After controlling for all of these factors in a multivariate regression model, female Associates received demonstrably lower ratings. *Id.* ¶ 29.[20] For the time period 2003-2009 (when Goldman had a 5-point rating scale), the gender difference was statistically significant at the level of 4.16 standard deviations; and for the period 2010-2015 (when there was a 9-point scale), the gender difference was statistically significant at the level of 4.13 standard deviations. *Id.* ¶¶ 30-31.[21] Female Vice Presidents were also rated lower on the 360 Review at a statistically significant level of 5.28 standard deviations (years 2003-2009) and 5.17 standard deviations (years 2010-2015). *Id.* ¶ 32.[22]

**Manager Quartiling:** Dr. Farber found statistical evidence of adverse impact against Class Members in the Manager Quartile from 2002 to 2015. ECF No. 1257 (Pls.' 56.1) ¶ 33.[23] The data show that among Associates, 28.2% of men received a top quartile score, as opposed to 25.8% of women; among Vice Presidents, 27.4% of men received a top quartile score, as opposed to 25.6% of women. *Id.* ¶ 34.[24] Using a chi-squared test of independence of gender and

---

[17]     ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶¶ 86, 89, Table 11.
[18]     ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶ 90, Table 12.
[19]     ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶¶ 88, 95.
[20]     ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶¶ 8, 10.
[21]     ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) at Table 11.
[22]     ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) at Table 12; *see also* ECF No. 1258-52 (GS0621389) at -390, -395-97. Goldman did not produce 360 data for the year 2002 due to its data retention issues but agreed to concede the representativeness of later data for use in the earlier period. *See* ECF No. 159 (September 10, 2012 Memorandum and Order) at 40.
[23]     ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶ 10.
[24]     ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶ 76.

quartile placement,[25] Dr. Farber found a statistically significant relationship at the 5% level between gender and quartile placement for both Associates and Vice Presidents. *Id.* ¶ 36.[26]

**The Role of 360 Review and Manager Quartile in Pay:** Dr. Farber found that Goldman pays female Associates and Vice Presidents substantially less than their comparable male counterparts, and that difference is statistically significant using an appropriately specified model that controls for relevant factors that make apples-to-apples comparisons possible. ECF No. 1257 (Pls.' 56.1) ¶ 43-44.[27] Dr. Farber's regression analysis shows that Goldman pays its female Vice Presidents, on average, 14% less than it pays comparable male Vice Presidents, with a standard deviation of 9.9. *Id.* ¶ 46.[28] Goldman pays its female Associates, on average, 4% less than it pays its comparable male Associates, with a standard deviation of 4.6. *Id.* ¶ 47.[29]

The disparities between how women and men fare in the 360 Review and quartiling processes directly contribute to this gender pay gap. *Id.* ¶ 48.[30] Dr. Farber found that 54% of the observed compensation shortfall between female and male Associates and 40% of the observed compensation shortfall between female and male Vice Presidents is attributable to differences in how women and men are evaluated in the 360 Review and quartiling processes. *Id.* ¶ 49.[31] This

---

[25]    A chi-squared test of independence determines whether there is an association between categorical variables. ECF No. 1257 (Pls.' 56.1) ¶ 35 (citing ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶ 76, n.71).

[26]    ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶ 76.

[27]    ECF Nos. 1242-44, 1250-58 (Rebuttal Report of Dr. Henry Farber, April 19, 2021 ("Farber Apr. 19, 2021 Rebuttal Report")) ¶ 4. Dr. Farber's pay regression controlled for education, prior work experience, division, business unit, job function, AAP job group, location, whether the employee is a lateral hire, and year. ECF No. 1257 (Pls.' 56.1) ¶ 45 (citing ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) ¶ 4).

[28]    ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) at Table 2, Model 3 + Division Function, Excluding SSPWA's.

[29]    ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) at Table 1, Model 3 + Division Function, Excluding SSPWA's.

[30]    ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) ¶ 10-12.

[31]    ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) ¶¶ 12, 37, 41.

translates to substantial lost income:  $201.5 million lost by female Vice Presidents, and $19 million lost by female Associates.  *Id.* ¶ 50.[32]

Goldman's expert Dr. Kathryn Shaw conceded both that there is a statistically significant gender pay gap at Goldman Sachs, and that the 360 Review and Manager Quartile are a major cause of it.  *Id.* ¶ 51.[33]  In Exhibit 68 of her expert report dated March 19, 2021, Dr. Shaw presented a comparison of the results of Dr. Farber's model and her models.  *Id.* ¶ 52.[34]  Even when Dr. Shaw wrongly disaggregated by division, and included all control variables she wanted (even if inconsistent with the record or otherwise inappropriate), she *still* found gender pay gaps—for example, 1.89% for Associates and 9.47% for Vice Presidents in Investment Banking Division, and these pay gaps are statistically significant at the 5% level.  *Id.* ¶¶ 53-54.[35]  Dr. Shaw also added controls for 360 Review Scores and Manager Quartile ranks, and found that doing so substantially reduced the pay gap—for example, from 4.17% to 1.32% (or by 68.3%) for Securities Associates and from 9.47% to 5.11% (or by 46%) for IBD Vice Presidents.  *Id.* ¶ 55.[36]  In other words, Goldman's statistical expert confirmed that the 360 Review Score and Manager Quartile account for significant portions of the Associate and the Vice President pay gaps.  *Id.* ¶ 56.[37]  Thus, both parties' experts' evidence confirms that the 360 Review and

---

[32]     ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) at Table 17, Model 3 + Division Function Controls, Damages Explained By Performance Metrics, Full Sample. Excluding individuals compelled into arbitration, the total lost compensation is closer to $115 million for Vice Presidents.  *See id.*, Model 3 + Division Function Controls.

[33]     ECF Nos. 1242-46, 1242-47, 1250-17 (Expert Report of Dr. Kathryn Shaw, March 19, 2021 ("Shaw Mar. 19, 2021 Report")) at Table 68.

[34]     ECF Nos. 1242-46, 1242-47, 1250-17 (Shaw Mar. 19, 2021 Report) at Table 68.

[35]     ECF Nos. 1242-46, 1242-47, 1250-17 (Shaw Mar. 19, 2021 Report) at Table 68, Rows 4 & 9.

[36]     ECF Nos. 1242-46, 1242-47, 1250-17 (Shaw Mar. 19, 2021 Report) at Table 68 Rows 5 & 10.

[37]     ECF Nos. 1242-46, 1242-47, 1250-17 (Shaw Mar. 19, 2021 Report) at Table 68.

Manager Quartiling practices result in lower compensation for women.  *Id.* ¶ 57.[38]

**Cross-Ruffing:**  The statistical evidence also shows that Goldman's cross-ruffing process has disadvantaged female Vice Presidents throughout the Class Period.  ECF No. 1257 (Pls.' 56.1) ¶ 58.[39]  Because promotion is a discrete event with two possible outcomes (promoted or not), Dr. Farber used a properly specified probit regression model to calculate the likelihood of an employee being promoted, controlling for number of years as Vice President, division, location, education, tenure at Goldman, prior work experience, AAP job group, direct or lateral hire status, and the year.  *Id.* ¶ 59.[40]  With this model, Dr. Farber estimated a benchmark promotion model for males only and used the resulting coefficients to predict the promotion probabilities for females using the observed characteristics (education, experience, etc.).  *Id.* ¶ 60.[41]  The result is the number of women one would have expected to be promoted if a woman with a given set of characteristics had the same probability of promotion as a man with those same characteristics.  *Id.* ¶ 61.[42]  The analysis shows that female Vice Presidents were promoted 27 fewer times over the Class Period than would be expected had they been promoted at the same rate as comparable men, and the results are statistically significant at the 5% level.  *Id.* ¶ 62.[43]

As promotion at Goldman is fairly rare—the promotion rate among male Vice Presidents is only 3.87% on average per year, and 3.08% for women—a shortfall of 27 promotions is not

---

[38]    *See* ECF Nos. 1242-46, 1242-47, 1250-17 (Shaw Mar. 19, 2021 Report) at Table 68; ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) ¶¶ 10-12.
[39]    ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶ 135.  2018 is the last year for which Goldman Sachs has produced data in this litigation. Plaintiffs' promotion claim covers 2002 to the present.
[40]    ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶ 126.
[41]    ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶ 128.
[42]    ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶¶ 128-130.
[43]    ECF Nos. 1242-44, 1250-58  (Farber Apr. 19, 2021 Rebuttal Report) at Table 14 & ¶ 86.

just statistically significant, but also practically meaningful.  *Id.* ¶ 64.[44]

      **C.**      **Discrimination Is Goldman's Standard Operating Procedure.**

     **Knowledge of adverse impact:**  Throughout this litigation, Goldman's senior leadership

has been aware that the Challenged Practices adversely impact women, but continued to use

them anyway.  Pls.' Counterstatement ¶ 6.[45]  For example, Goldman studied the outcomes of its

360 Review and Manager Quartiling practices and found "consistent" gender differences in both:

women were underrepresented by 2-3% in top ratings in the 360 and Manager Quartile, and

overrepresented by 2-4% in bottom ratings, Pls.' Counterstatement ¶ 7,[46] findings which are

remarkably consistent with Dr. Farber's.  Goldman presented and discussed these damaging

findings at a meeting of nine Management Committee members called the "Diversity Working

Group."  Pls.' Counterstatement ¶ 8.[47]  The presentation noted that the trend was consistent since

2007.  Pls.' Counterstatement ¶ 9.[48]  Members of the Management Committee later reported

these results to the Board of Directors.  Pls.' Counterstatement ¶ 10.[49]  Likewise, Goldman

regularly analyzed its Managing Director promotions by gender and reported that women were

consistently under-selected as candidates for cross-ruffing and ultimately under-selected for

promotion.  Pls.' Counterstatement ¶ 11.[50]  As the Chief Diversity Officer testified: REDACTED

---

[44]    ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) at Table 24.

[45]    *See* ECF No. 578 (Order) at 34; GS0190618 at -623 (       REDACTED

).

[46]    GS0888961 at -97.

[47]    GS0600233 at -235.018; *see also* GS1023919 at - 945 (same for 2017 Board presentation).

[48]    GS0888961 at -971.

[49]    GS0600233 at -235.018; see also GS1023919 at - 945 (same for 2017 Board presentation).

[50]    GS0600233 at -235.019; *see also* GS1023919 at -944 (same for 2017 Board).

███████████████████████████ REDACTED ███████████████████████████

████████████████████████████████████." Pls.' Counterstatement ¶ 12.[51]

Results from Goldman's bi-annual People Survey -- through which employees

anonymously rank the company based on level of agreement with various statements -- show that

women consistently rate the fairness of the 360 Review process significantly lower than their

male counterparts. Pls.' Counterstatement ¶ 13.[52] Goldman studied these trends carefully, and

in response, did not fix the problem but merely dropped survey questions that revealed troubling

gender differences. Pls.' Counterstatement ¶ 14.[53] Goldman even considered abandoning the

quartiling practice on at least two occasions due to these findings, but maintained the system

instead. Pls.' Counterstatement ¶ 15.[54]

Goldman was aware of specific defects in its processes that were identified by Plaintiffs'

expert, Dr. Cascio, and after internal discussion, continued to employ the practices without

alteration. Pls.' Counterstatement ¶ 16.[55] When Goldman did undertake changes to the 360

---

[51]   Deposition of Erika Irish-Brown, November 13, 2020 at 59:2-61:3.
[52]   *See* GS0201530 at 531-532 (2003); GS0227078 (2005); GS0264120 at 122 (2007);
GS0192652 at 704 (2009).
[53]   Expert Report of Sarah Butler, June 11, 2021 ¶ 11 & Table 1.
[54]   *See* ECF No. 1242-34 (Expert Report of Dr. Wayne F. Cascio, January 15, 2021 ("Cascio
Jan. 15, 2021 Report")) ¶¶ 75, 77; GS0590521-22 (January 11, 2016 email from David Landman
to Edith Cooper listing key points from a recent article from McLagan, a leading
performance/reward consulting and benchmarking firm for the financial services industry, stating
"██████████████████████ REDACTED ██████████████████████████
██████████████████████████████████████████████████
██████████); GS0637316 at -317 (December 2010 document detailing Goldman's experts'
observations regarding using forced ranking).
[55]   *See, e.g.*, GS0567448 at -449 (Quartiling Taskforce noting that "██████ REDACTED ██████
██████████████████████████████████████████████
██████████████████████ and that even forced ranking's supporters
indicate it is effective only if certain best practices that Goldman does not employ—███ REDACTED ███
█████████████████████████████" are followed);
GS0637316 at 316-17 (notes from Goldman's internal I/O psychologist's meeting with

Review or Manager Quartiling process, the committees responsible vetted the proposed changes with members of the Management Committee individually.  Pls.' Counterstatement ¶ 17.[56] Importantly, though, none of the changes fixed the deficiencies identified both by Goldman itself and by Plaintiffs' experts.  Pls.' Counterstatement ¶ 18.[57]

**Culture of Gender Bias**: The Court identified substantial evidence of gender animus in its class certification decision, *see* ECF No. 578 (Order) at 32-33; Pls.' Counterstatement ¶ 19, bringing the statistics "convincingly to life," *Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 339 (1977).  Additionally, after an extensive review of the record, Plaintiffs expert, Dr. Caren Goldberg, performed a case study on Goldman's corporate culture to assess Goldman's climates for diversity and harassment.  *See* Pls.' Counterstatement ¶ 20.[58]  Dr. Goldberg is a widely

---

performance management consultant REDACTED

"); GS0590524 at -526 (internal presentation comparing performance management practices at other companies and noting that Goldman is different in using the 360 Review for more than development, and in using forced ranking, particularly without transparency); ECF No. 1242-36 Rebuttal Report of Dr. Wayne F. Cascio, April 19, 2021 ("Cascio Apr. 19, 2021 Rebuttal Report")) at 22-27 (cataloguing evidence that Goldman knew gaming was a widespread problem in its 360 Review).

[56]    GS0685472 at -472; GS0616392 at -392; GS0910007 at -009-10; GS0684228 at -231; GS0614981 at -981; GS0567448 at -451.

[57]    GS0484728 at -728 (explaining that REDACTED " led Goldman to " REDACTED " and confirming that the 360 Review, while no longer providing numerical scores, will still be collected prior to Quartiling and can still be considered in Quartiling); *see also* ECF No. 1245-33 (Expert Report of Dr. Wayne F. Cascio, June 29, 2018 ("Cascio June 29, 2018 Report")) ¶¶ 6-9 (reviewing changes made to 360 Review and Manager Quartile and confirming that the infirmities he identified are still present and "the processes still lack reliability and validity.").

[58]    Expert Report of Dr. Caren Goldberg, January 15, 2021 ("Goldberg Jan. 15, 2021 Report") ¶¶ 9-12; ECF No. 1262 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Preclude the Opinions and Reports of Dr. Caren Goldberg, Ms. Sarah Butler, Dr. David Yermack, and Dr. Henry Farber ("Pls.' *Daubert* Opp.")) at 24-28.

published expert with substantial experience assessing corporate climates for diversity and harassment.  Pls.' Counterstatement ¶ 21.[59]  She has spent more than two decades teaching undergraduate, master's, and doctorate level courses covering topics of diversity, discrimination, equity, fairness, and harassment.  Pls.' Counterstatement ¶ 22.[60]  She has published more than fifty articles in peer-reviewed journals and authored nine book-chapters, including several publications that focus on harassment and discrimination climates.  Pls.' Counterstatement ¶ 23.[61]

Dr. Goldberg found that: Goldman maintains a climate tolerate of bias and harassment; Goldman has failed to hold managers accountable for diversity performance; Goldman's senior management has failed to advance or require diversity results at the firm; Goldman has relied on diversity and inclusion programming that lacks efficacy in advancing diversity and inclusion; and Goldman has adopted inadequate strategies to address its acknowledged glass ceiling.  *See* Pls.' Counterstatement ¶¶ 24-28.[62]

Of note, Dr. Goldberg reviewed Goldman's evaluations of the "key findings" of the People Survey data it elicited and found that Goldman observed gender-based disparities year after year in response to questions directly relevant to Plaintiffs' disparate treatment claim, such as employees' agreement with the statement **REDACTED** Pls.' Counterstatement ¶ 29.[63]

Dr. Goldberg also found inaction in the context of managerial accountability.  Despite repeated acknowledgment at the highest levels that things would not improve for women at

---

[59]   Goldberg Jan. 15, 2021 Report ¶¶ 2-3.
[60]   Goldberg Jan. 15, 2021 Report ¶¶ 2-3.
[61]   Goldberg Jan. 15, 2021 Report ¶¶ 2-3.
[62]   Goldberg Jan. 15, 2021 Report ¶¶ 13, 43-71.
[63]   Goldberg Jan. 15, 2021 Report ¶¶ 26-28, 31-32, 49(d), 63, 69, 70.

Goldman unless managerial success was somehow tied to diversity outcomes, Goldman refused to tie diversity performance to compensation and promotions.  Pls.' Counterstatement ¶ 30.[64] Rather, Goldman recycled the same idea of implementing what it called Diversity Scorecards to assess and evaluate the diversity performance of senior leaders at the firm but (for the limited time the Scorecards were in use *at all*) never actually tied the results to compensation or promotions.  Pls.' Counterstatement ¶ 31.[65]  This reflected what Dr. Goldberg found more generally—that Goldman's committees tasked with eliminating bias against women made the same pleas for change year after year, which Goldman leadership ignored.  Pls.' Counterstatement ¶ 32.[66]

Perhaps most troubling, Dr. Goldberg found that Goldman did not engage in appropriate efforts to prevent sexual harassment.  Dr. Goldberg found that Goldman did not conduct thorough or timely investigations of complaints of sexual harassment; failed to include basic information in its records such as whether allegations had been made against the same actor; and refused to discipline alleged harassers who were in leadership positions, allowing them to remain in those positions.  Pls.' Counterstatement ¶ 33.[67]  As Dr. Goldberg explained in her report: "[r]etention of known harassers in leadership positions serves to indicate tacit approval of harassment and an organizational unwillingness to address concerns."  Pls.' Counterstatement ¶ 34.[68]

---

[64]   Goldberg Jan. 15, 2021 Report ¶¶ 46-49.
[65]   Goldberg Jan. 15, 2021 Report ¶¶ 45-46.
[66]   Goldberg Jan. 15, 2021 Report ¶ 50 REDACTED
").
[67]   Goldberg Jan. 15, 2021 Report ¶¶ 37-42.
[68]   Goldberg Jan. 15, 2021 Report ¶ 42.

D.        **Plaintiffs Have Identified Less Discriminatory Alternatives.**

Goldman has not moved for summary judgment on whether the Challenged Practices are job-related and consistent with business necessity, on which Goldman bears the burden of proof. *See* ECF No. 1240 (Defendants' Memorandum of Law in Support of Motion For Summary Judgment ("Defs.' Mot.")) at 28 n.16.  To be clear: there is nothing in the summary judgment record in which Goldman attempts to justify its practices.  This also means that the question of alternative practices (which does not arise unless Goldman shifts the burden back) is necessarily and logically off the table.

In any case, Plaintiffs' Industrial and Organizational ("I/O") psychology expert, Dr. Wayne Cascio, provided extensive analysis and multiple substantive reports that convincingly show alternative practices that Goldman should have adopted.  Pls.' Counterstatement ¶ 35.[69] Dr. Cascio's extensive analysis in these reports contains specific recommendations addressing the deficiencies in Goldman's practices that contravene IO guidance and the established scientific literature, and discuss that Goldman should have explored alternatives to the challenged processes.  Pls.' Counterstatement ¶ 35-36.[70]

---

[69]    ECF No. 1242-32 (Expert Report of Dr. Wayne F. Cascio, October 30, 2013 ("Cascio Oct. 30, 2013 Report")) ¶¶ 55 -56, 69, 78; ECF No. 1242-35 (Rebuttal Report of Dr. Wayne F. Cascio, March 19, 2021 ("Cascio Mar. 19, 2021 Rebuttal Report")) ¶¶ 107-109; ECF No. 1242-36 (Cascio Apr. 19, 2021 Rebuttal Report) at 51-53.

[70]    ECF No. 1245-32 (Cascio Oct. 30, 2013 Report) ¶¶ 14-71; Cascio Jan. 28, 2014 Rebuttal at ¶¶ 5, 8, 9-10, 24-26, 42-109; Second Rebuttal Report of Dr. Wayne F. Cascio, May 19, 2014 ¶¶ 2-9; Cascio July 25, 2014 Rebuttal at ¶¶ 5-96; ECF No. 1242-33 (Cascio June 29, 2018 Report) ¶¶ 2-9;  ECF No. 1245-34 (Cascio Jan. 15, 2021 Report) ¶¶ 11-33, 62-104; ECF No. 1245-35 (Cascio Mar. 19, 2021 Rebuttal Report) ¶¶ 1-110; ECF No. 1245-36 at (Cascio Apr. 19, 2021 Rebuttal Report) at 1-53.

These were well-reasoned, comprehensive recommendations, as illustrated by the description provided by Dr. Cascio in his April 19, 2021 Report, where he identified (as quoted below):

- Monitoring: Goldman Sachs should engage in regular monitoring for adverse impact untethered to litigation (and shared with business leaders responsible for development and implementation of the practices being monitored).

- 360 Reviews: If, as Goldman Sachs claims, it wants to change the role of the 360 to be developmental, it can truly make it for development only, and remove its role in employment decisions regarding compensation and promotion. If, instead, Goldman Sachs insists on continuing to use the 360 Review for employment decisions, it must (at a minimum) incorporate the safeguards I have addressed, including mandatory training for all users of the system, at least moderate familiarity with a ratee's work in order to provide a rating, and selection of raters based on objective criteria that will exclude those with conflicts of interest (or at least ensure their feedback is not used for decision-making purposes). I strongly recommend frame-of-reference training within the following groups: managers, peers, and subordinates doing similar work. In addition, Goldman Sachs must address other defects that I describe extensively in this report and in my prior reports in this matter – including the problems with gaming, bias, score compression, and inappropriate uses that pervade its current 360 Review system.

- Manager Quartiling:  It is eminently possible to engage in relative ratings of employees without using a (secret and flawed) forced-ranking system. (A) For example, when Quartiling is used to make compensation decisions, Goldman Sachs could remove "potential" as a rating criterion, and instead focus only on "performance and contribution." It could allow managers to rank their direct reports and to include ties. Thus, if a manager has 6 direct reports and all are superior, he or she might recommend that equal amounts of the budgeted increase be allocated to each direct report. This is a form of banding of similar scores for compensation and promotion outcomes. (Again, I do not advocate forced ranking at Goldman Sachs.) Alternatively, he or she might recommend that differential amounts be allocated, based on the rank he or she assigns to each direct report. (B) For purposes of promotion, ratings of "potential" along with ratings of "performance and contribution" could be included, with proper safeguards. Managers can still rank order their direct reports in terms of readiness for promotion. As with their ratings for the purpose of compensation, ties are fine. The objective of having separate rankings for different purposes is to focus squarely on the use of the ratings and the information they consider for a specific purpose. Both the existence of the Manager Quartiling process and the purposes for which the results are used should be transparent to employees. As with 360 Reviews, there should be adequate training, validation, and

18

monitoring of the outcomes of compensation and promotion decisions for adverse impact against women and other protected groups, coupled with attempts to eliminate the various concerns that I have articulated in this report and my other reports in this case.

- Cross-Ruffing: I recommend (A) the establishment of valid written criteria for identifying candidates for promotion to Extended Managing Director. For example, in addition to a required level of performance and demonstrated accomplishments in one's current job, consider the relevance of the candidate's experience for the higher-level job in question. It should not be a tap-on-the-shoulder system; VPs at a certain performance level and tenure should be considered automatically or be able to self-nominate. Assemble a dossier for each candidate and allow each candidate to submit a record of his or her accomplishments to the dossier. (B) For any candidate under consideration, two (or more) Cross-Ruffers should interview MDs and Partners about the candidate.  (C) Cross-Ruffers should ask the same questions about a candidate to each MD and Partner interviewed, and require documented evidence for each question asked. Doing so will support ratings of candidates on the validated criteria and also facilitate comparisons across candidates. (D) Interview candidates last in order to give them an opportunity to respond to issues raised about them by MDs and Partners and also to explain any special circumstances that might have affected their performance. (E) Share this information with the group tasked with reaching consensus about whom to promote. Moreover, any inputs into the promotion process should be free from unreliable and invalid performance measures.

*See* Pls.' Counterstatement ¶ 37.[71]

## III.   **LEGAL STANDARD**

A district court may only grant a motion for summary judgment where there is no genuine issue of material fact and where the undisputed facts warrant judgment for the moving party as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  District courts must "view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.1996)); *see also Anderson v.*

---

[71]    ECF No. 1242-36 (Cascio Apr. 19, 2021 Rebuttal Report) at 51-53.

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").

These rules apply to all forms of evidence, including statistical.  Specifically, disputes regarding appropriate statistical methodology, control, or interpretation of results are "the sort of 'statistical dueling' that should be resolved by a factfinder" unless the statistical evidence is unrebutted.[72] *Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 261 (S.D.N.Y. 2007); *see also In re Joint E. & S. Dist. Asbestos Litig*., 52 F.3d 1124, 1135 (2d Cir 1995) (court should not abrogate "jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts") (internal quotation marks and alterations omitted).

Failure to properly consider and weigh the evidence in the light most favorable to the non-moving party is reversible error.  *See, e.g.*, *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (overturning summary judgment as court drew inferences contrary to the non-moving party); *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000) (overturning summary judgment as court failed to view evidence in light most favorable to, and failed to give credit to permissible inferences that could be drawn in favor of, the non-moving party).

---

[72]     As described in Plaintiffs' affirmative summary judgment motion, summary judgment *is* warranted in Plaintiffs' favor because Goldman failed to create a material issue of fact when it failed to produce expert opinions that are relevant or reliable.  *See, e.g.*, ECF No. 1256 (Pls.' Mot.) at 15-16; *Raskin v. Wyatt Co.,* 125 F.3d 55, 67-68 (2d Cir. 1997) (affirming summary judgment because expert's report "lack[ed] probative value"); *In re Omicron Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512-13 (2d Cir. 2010) (expert's testimony was "unsustainable" and "irrelevant"); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (expert's report was "entirely conclusory").

IV.     **ARGUMENT**

A.      **Goldman Has Not Met Its Burden To Show a Lack of Genuine Issues of Material Fact Supporting Plaintiffs' Prima Facie Case of Disparate Impact.**

To establish a *prima facie* case of disparate impact, the plaintiff must demonstrate that the employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(k)(1)(A)(i).  This standard requires the plaintiff to "identify[] the specific employment practice that is challenged" and then "offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1987); *see also Robinson*, 267 F.3d at 160 (same).

Goldman attacks both prongs – identification of a "specific employment practice" and causation – but cannot meet its burden to show that no reasonable factfinder could find for Plaintiffs based on undisputed facts.  Moreover, that Plaintiffs have identified three specific Goldman employment practices that cause a disparate impact on female Associates and Vice Presidents cannot credibly be disputed.

1.      **Plaintiffs Challenge "Specific Employment Practices."**

Plaintiffs have identified three specific employment practices: the 360 Review, Manager Quartiling, and Cross-Ruffing.  For the first time in eleven years of litigation, Goldman argues that the 360 Review and Cross-Ruffing process are not "specific employment practices" within the meaning of Title VII.  Instead, Goldman suggests that because there are multiple intermediate steps within the 360 Review and Cross-Ruffing, Plaintiffs are required to isolate each step and statistically analyze it separately from the whole.  This is not, and has never been, the law.

Virtually every imaginable employment practice – from hiring to performance reviews to compensation to promotions to terminations – involves multiple intermediate sub-steps.  There is no statutory requirement that a single process must be broken apart and analyzed even if data exists on numerous intermediate steps.  To the contrary, "[w]hether a particular decisionmaking process is capable of separation for analysis largely turns on the details of the specific process and its implementation in a given case."  *Chin*, 685 F.3d at 154 (finding that promotion process was properly analyzed as one employment practice); *see also* 42. U.S.C. § 2000e-2(k)(1)(B)(i) (plaintiff must identify a "particular challenged employment practice").  Here, the 360 Review and the Cross-Ruffing processes are each cohesive, specific employment practices that do not warrant segmentation into a series of intermediate tasks.[73]

It is plain why Goldman advocates for such segmentation: it artificially chops the data into pieces so small (*e.g.*, a single individual 360 review competency) that it "tends to mask common mechanisms."  *Chen-Oster*, 114 F. Supp. 3d at 120 (rejecting disaggregation into business units which hide the pattern); *see also Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 523 n. 25 (N.D. Cal. 2012) ("Indeed, Defendant appears to largely offer a tautology—that disaggregated data is more probative simply because it yields results favorable to Costco.").  In other words, Goldman seeks to compartmentalize the challenged policies for analysis at the intermediate sub-task level to conceal the pattern of adverse impact or render it impossible to produce statistically significant results from disaggregated data.  This is not appropriate.[74]

---

[73]     See also Section IV.D.2 below (addressing how, under the NYCHRL, a plaintiff does not even need to identify a specific employment practice to prevail in a disparate impact claim).  Thus, Goldman's argument is particularly misplaced as to the majority of class members with claims under New York City's liberal statute

[74]     Goldman concedes that Manager Quartiling is a specific employment practice, so that claim is unaffected by this argument.

### a. Goldman's invented sub-parts are not "employment practices."

Contrary to Goldman's suggestion otherwise, Plaintiffs have already separated the performance review process into its relevant distinct processes: (1) the 360 Review and (2) Manager Quartiling. There is no basis in fact or law to separate the 360 Review process into further subparts, such as individual competencies or groups of reviewers (peer and subordinate, manager). The overall 360 score, and not the sub-score on a particular competency or from a particular reviewer group, is the "direct input into the Manager Quartile rank and hence to compensation." ECF No. 1257 (Pls.' 56.1) at ¶ 7. Likewise, the overall 360 score is the input into promotions, and not some sub-part of that score. Pls.' Counterstatement ¶ 1. The sub-parts that Goldman invents are not the basis for any employment decision at Goldman Sachs. *E.g.*, ECF No. 1257 (Pls.' 56.1) ¶¶ 7, 11. There also is no way to link a particular 360 sub-score with the resulting compensation and promotion outcomes: the overall 360 score, which is used to make compensation and promotion decisions, is the aggregation of all 360 sub-parts.

Accordingly, Plaintiffs' expert Dr. Farber appropriately studied whether there is adverse impact against women in the overall 360 score, rather than in the sub-pieces that make up the whole. ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶¶ 85-91. And Goldman's own labor economist expert Dr. Shaw did the *exact same thing*. In her words, "[t]he regression analysis of compensation needs a clear model of the relationships between the factors that determine pay as reflected in the review processes in order to be valid." ECF Nos. 1242-46, 1242-47, 1250-17 (Shaw Mar. 19, 2021 Report) ¶ 27. Dr. Shaw did not examine, or even suggest that one should examine, individual competency scores or reviewer group scores in order to appropriately study whether the 360 Review causes a disparate impact on women's pay. Thus, Goldman's argument must fail because it cannot show that analyzing individual

competency scores or only certain reviewer groups establishes a "numerical picture [that] is more accurate, valid, or reliable" than Plaintiffs. *Robinson*, 267 F.3d at 161.[75]  Its argument is data mining totally divorced from the reality of how the 360 Review is used.

The court's analysis in *Williams v. Sprint/United Mgmt. Co.*, is instructive.  No. 3 Civ. 2200, 2005 WL 1801605, at *2 (D. Kan. July 29, 2005), *on reconsideration in part*, 232 F.R.D. 388 (D. Kan. 2005).  There, the plaintiffs sought to amend their complaint to add a claim that defendant's forced ranking (aka, "alpha rating") performance practice caused a disparate impact on older workers.  *Id.* at *1.  The defendant argued that amendment would be futile, because the plaintiffs had "failed to identify the 'specific part' of the alpha rating system that has a disparate impact on older workers."  *Id.* at *2.  In rejecting this argument, the court explained that "the alpha rating system itself is a specific employment practice . . .  that allegedly has an adverse impact," distinguishing this from allegations of a "generalized policy" writ large.  *Id.* at *2; *see also Finch v. Hercules Inc.*, 865 F. Supp. 1104, 1128 (D. Del. 1994) (forced ranking process sufficiently identified "specific employment practice" for purposes of establishing prima facie case of disparate impact); *cf. Chin*, 685 F.3d at 154 (analysis "largely turns on the details of the specific process and its implementation in a given case").

Goldman's few cases are distinguishable.  The plaintiffs in *Davis v. Cintas Corp.* "did not identify a 'particular employment practice' within the meaning of Title VII," 717 F.3d 476, 497 (6th Cir. 2013), but challenged the "subjective decisions made by some of [defendant's]

---

[75]     While Goldman suggests that Dr. Dunleavy, Goldman's I/O psychology expert, performed such an analysis (ECF No. 1240 (Defs.' Mot.) at 22), that is wrong: Dr. Dunleavy looked for evidence of validity in the 360 Review process, and for that purpose he examined levels of inter-rater agreement on various competencies and rater groups.  ECF No. 1242-39 (Expert Report of Dr. Eric M Dunleavy, January 15, 2021) at App. 4E.  Dr. Dunleavy was not assigned to answer the question whether the 360 Review caused a disparate impact on women, nor do his studies purport to answer that question.

managers [that] favored males because of [defendant's] male-dominated corporate culture." *Id.* at 488. Moreover, *Davis* challenged all of the elements in each part of the hiring process, and the numerous employment decisions (rejections) at multiple steps along the way, including: initial manager screening interviews; pre-employment written tests; a "1st In-Depth Interview"; a "route ride"; a "2nd In-Depth Interview Guide"; and a final interview, often with a location general manager; followed by a conference between management and everyone involved in the interview process, criminal, drug, driving, and credit screens; a reference check; and a final determination. *Id.* at 480-81. The claims and facts are inapposite.

Similarly, in *Campbell v. National R.R. Passenger Corp.*, plaintiffs alleged overall disparate impact in hiring, promotions, and discipline, based on, *inter alia*, the employer's "selection interview process, ratings, rank-orderings, input from other managers, amorphous decision making, and the disqualifying discipline criterion." 311 F. Supp. 3d 281, 316 (D.D.C. 2018). Plaintiffs failed to "allege, much less demonstrate, that all members of the putative class were subject to the same set of objective procedures or policies," and the evidence instead showed "that the interview process, assignment of ratings, and rank orderings varied depending on the position and the panel of interviewers involved." *Id.* Plaintiffs argued racial bias was caused by "*variations* in practice," versus the operation of a common policy: "plaintiffs' theory of commonality rests on the contention that [the employer] allowed lower-level employees to deviate from standard policies, which resulted in employment decisions being infected by bias." *Id.*

In contrast to these to these out-of-circuit, inapposite decisions, in this case Plaintiffs challenge a specific performance review process with common, acknowledged infirmities. And Plaintiffs have demonstrated that women are adversely impacted in this process, leading in part

to the larger gender pay gap.  Farber April 19, 2021 Reply Report ¶¶ 12, 37, 41.  This is more than sufficient to meet the requirements of Title VII.

> **b.**    **Cross-Ruffing Is a Single Process To Be Analyzed as a Whole.**

Plaintiffs challenge Goldman's systemic failure to promote women from the Vice President position to the Managing Director position.  ECF No. 1186 (Pls.' *Daubert* Mot.) at 24-25; ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶¶ 126-29.  Crucially, it is undisputed that every step of this process is necessary for a promotion, and thus it is necessary to study the final outcome to measure the impact of Goldman's promotions process.  ECF No. 1241 (Defs.' 56.1) ¶¶ 24-30; ECF No. 1257 (Pls.' 56.1) ¶¶ 13-22; ECF No. 578 (Order) at 8-10 (describing promotion process that includes selection of VPs, division-wide candidate lists, reviewed by division-heads, and then firm-wide talent assessment group, as well as cross-ruffing, while noting that "[u]ltimately, Goldman Sachs' management committee decides who is promoted"); *see also Williams*, 2005 WL 1801605, at *1-2 (holding Title VII requires only that plaintiff identify discrete policy driving impact, not impact as to component parts). [76]  The adverse action Plaintiffs challenge is the failure to promote, not any one particular step in the process like "nominations."[77]

---

[76]    It is notable that, as Dr. Shaw testified in her deposition, some individuals at Goldman were promoted without nomination, which further illustrates that it would be improper to attempt to separate out the cross-ruffing process into its component parts.  *See* Pls.' Counterstatement ¶ 3; Deposition of Dr. Kathryn Shaw, June 18, 2021 ("Shaw Tr.") at 284:20-23 ( REDACTED ███████████████████████████████████████████ "); *see also Chin*, 685 F.3d at 154-55 (finding process was not capable of separation because the individual components of the process were not always applied to each candidate for promotion).

[77]    It also is unclear what the *separate* measure of damages are for a discrete "failure to nominate claim."  The result would still be a lost promotion caused by a denial of the opportunity to compete for a promotion.

Fragmenting the analysis is also statistically improper:  such "disaggregating" has no purpose but to "break[] up the data in order to reduce the statistical power of [the] analysis." ECF Nos. 1245-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) ¶ 81; ECF No. 1186 (Pls.' *Daubert* Mot.) at 24-25; *see also Chin*, 685 F.3d at 153 (rejecting requirement for "statistical showing of 95-percent confidence" when it "would make it mathematically impossible to rely upon statistics in a case like this one, in which the relevant population included so few Asian Americans" (citation omitted)).  This is shown by Dr. Shaw's analysis: when she separated the promotion process into "nominations" and "cross-ruffing" subparts, it merely reduced the amount of data studied such that the pattern of female under-promotion went from statistically significant to lacking statistical significance.  ECF Nos. 1245-46, 1242-47, 1250-17 (Shaw Mar. 19, 2021 Report) ¶¶ 232-37; ECF Nos. 1245-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) ¶ 81.  Dr. Shaw offers no principled reason why "nominations" are sufficiently distinct to require separate analysis, or why the process should only be split into "nominations" and "cross-ruffing" when, by her same logic, the process also involved multiple other sub-steps.  ECF No. 1257 (Pls.' 56.1) ¶ 63; ECF No. 1241 (Defs.' 56.1) ¶¶ 24-25, 28 *see also* ECF No. 578 (Order) at 8-10. At best, Dr. Shaw's analysis creates a dispute as to which expert's methodology is "more accurate, valid, or reliable," *Robinson*, 267 F.3d at 161, but such a "battle of the experts" would be for the factfinder to resolve at trial.

Finally, Goldman's argument that the certified "Cross-Ruffing" claim does not include nominations, ECF No. 1240 (Defs.' Mot.) at 22-23, 37-38, is squarely foreclosed by the Court's own language on the certification record.  The Court certified the entire process.  *See* ECF No. 578 (Order) at 8 (The "vetting process for promoting Vice Presidents to Managing Directors is known as 'cross-ruffing.'").  Moreover, the parties have used the shorthand "Cross-Ruffing" to

refer to the entire promotion process before Goldman came to this late-found argument that the term as used in this context means something less.  *See supra*, Relevant Facts § II.A.

### 2.   Plaintiffs Establish the Practices Caused Disparate Impact.

Plaintiffs have put forward statistical proof "of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity."  *Chin*, 685 F.3d at 151 (quoting *Robinson*, 267 F.3d at 160); *see also* ECF No. 1256 (Pls.' Mot.) at 7-14.  While Goldman challenges causation, ECF No. 1240 (Defs.' Mot.) at 23-27, it cannot show that undisputed facts preclude a finding that the Challenged Practices caused the adverse impact here.

**Plaintiffs' Showing**:  Plaintiffs' robust showing of causation at a minimum creates a disputed issue of fact as to the Challenged Practices, and rebuts Goldman's false argument that "the parties' experts *agree* that there is no consistent, class-wide impact" to the Challenges Practices:[78]

- 360 Review Score and Manager Quartile:  These practices were explicitly used to make compensation decisions across the entire company, and Dr. Farber's analysis of the relationship of the performance review processes to compensation shows that between 54% (Associates) and 40% (Vice Presidents) of the overall gender pay gap is caused by the differences between men and women in performance reviews from 2002 through 2015.  Even under Dr. Shaw's most conservative models, she still found a statistically significant gender pay gap.[79]  She further found that the 360 Review and Manager Quartile scores explain almost 100% of the pay gap for Associates, and explain over 50% of the pay gap for Vice Presidents.[80]

This is direct evidence that these review practices caused a disparate impact.

---

[78]     *Compare* ECF No. 1240 (Defs.' Mot.) at 23, with ECF No. 1257 (Pls.' 56.1) ¶¶ 25-32, 43-57 (statistically significant impact for 360 Review from 2002-2015 for Associates and VPs); 33-42, 43-57 finding statistically significant impact for Quartiling from 2002-2015 for Associates and VPs); 58-64 (statistically significant impact for Cross-Ruffing throughout class period for VPs).

[79]     ECF Nos. 1242-46, 1242-47, 1250-17 (Shaw Mar. 19, 2021 Report) at Table 68, Rows 4 & 9.

[80]     ECF Nos. 1242-46, 1242-47, 1250-17 (Shaw Mar. 19, 2021 Report) at Table 68, Rows 5 & 10.

- Cross-ruffing:  This practice was explicitly used to make promotion decisions across the entire company, and Dr. Farber's analysis shows that female Vice Presidents were promoted 27 fewer times over the Class Period than would be expected had they been promoted at the same rate as comparable men, and the results are statistically significant at the 5% level.  ECF No. 1257 (Pls.' 56.1) ¶ 62.[81]  This finding exceeds the two standard deviations that courts accept as probative evidence of discrimination.

This is direct evidence that the promotion practices caused a disparate impact.

Goldman attempts to rebut the showing of systemic disparities through the disaggregated analyses of its proposed expert, Dr. Shaw, Mot. at 23-25.  But a regression analysis does not need to include "all measurable variables . . . to prove a plaintiff's case."  *See, e.g.*, *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence.") (citation omitted).  And even Dr. Shaw's flawed analyses confirm gender disparities in the outcomes of *every* challenged practice.  *See* ECF Nos. 1242-46, 1242-47, 1250-17 (Shaw Mar. 19, 2021 Report) at Exs. 67 (360 reviews), 68 (compensation), 24 (quartiling), 29 (promotion).  This is fatal.  While Dr. Shaw also argues that those disparities "disappear" for certain parts of Goldman's population when she slices the study into separate analyses by division (ECF No. 1240 (Defs.' Mot.) at 23-24), the Court has rejected this type of disaggregation:

> The design of a statistical model must necessarily follow the structure of the entity being studied in light of the questions sought to be answered.  In this case, there is substantial evidence that Goldman Sachs utilizes 360 review and quartiling in each *division* and every business unit.  Therefore, it is appropriate to examine these policies across the entire population. . . .

ECF No. 363 (March 10, 2015 Memorandum and Order ("Francis Order")) at 19; *accord* ECF 578 (Order) at 20 (adopting same).  Goldman has provided no basis to revisit the Court's ruling,

---

[81]     ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) at Table 14 & ¶ 86.

because it was rightly concerned with disaggregation, which tends to mask discrimination and create misleading outcomes. *See* ECF No. 363 (Francis Order) at 19; ECF No. 578 (Order) at 20-21.

In addition, there are separate reasons for rejecting Dr. Shaw's analyses on the merits. As described in Plaintiffs' separate Motion to Exclude, Dr. Shaw's work is significantly flawed and does not meet the *Daubert* standard—including, among other things, because it incorporates cherry-picked unrepresentative "production" data and disaggregates by division to shrink gender gaps and eliminate statistical significance from her results. *See* ECF No. 1192 (Pls.' *Daubert* Mot.) at 4-25; ECF No. 1283 (Pls.' *Daubert* Reply) at 1-4. Regardless, Dr. Shaw's opinions do not erase Plaintiffs' causation showing, and at best create a dispute that requires trial to resolve.[82]

Goldman's cases also fail to support its causation argument. *See* Mot. at 25-26. Goldman cites *Smith v. Xerox* for the proposition that Plaintiffs must match the statistics to the challenged process, which is precisely what Plaintiffs have done. 196 F.3d 358, 369-70 (2d Cir. 1999), overruled by *Meacham v. Knolls Atomic Power Lab'y*, 461 F.3d 134 (2d Cir. 2006). In *Richardson v. City of New York*, where the court was faced with "myriad" job titles, the statistical analysis did not establish causation because it showed that African-American Science Professionals "were not underutilized" for *14 consecutive* years, while White Science

---

[82]    Goldman also continues to misrepresent the conclusions to be drawn from Dr. Shaw's "Chow test." As Judge Francis previously wrote, a Chow test measures whether statistical "relationships are 'identical'" across different populations or within the same population over different periods of time. ECF No. 363 (Francis Order) at 21. He further wrote that "[t]he fact that a Chow test might indicate that the coefficients for variables conducted on subgroups of the putative class are not equal" – *i.e.*, that Goldman evaluates some women more harshly than others, compensates some women more poorly than others, or promotes some women and not others – does not support a finding that the policies should not be studied firm-wide because that variation is expected and there are methodological reasons to study at the firm level. *See id.*; *see also* ECF No. 1192 (Pls.' *Daubert* Mot.) at 19-22; ECF No. 1283 (Pls.' *Daubert* Reply) at 7.

Professionals "were underutilized" for *five consecutive* years, and there was no statistically significant race-based disparity for Clerical Supervisors. *Richardson v. City of N.Y.*, No. 17 Civ. 9447, 2021 WL 1910689, at *9 (S.D.N.Y. May 12, 2021). Here, Dr. Farber has shown consistent statistical evidence of adverse impact, as described in particular detail in Plaintiffs' motion for partial summary judgment. *See* ECF No. 1256 (Pls.' Mot.) at 7-14. The *Richardson* court even *cited with approval* this Court's certification decision in this case, which was based on a review of Plaintiffs' statistical analysis and showing of causality. *Id.* at *8. In *Morgan v. UPS*, the court rejected the plaintiff's analysis of a "denial-of-upward-mobility" claim because the plaintiff's expert did not perform a statistically defensible analysis to show nationwide discrimination, relying instead on a bottom-line racial imbalance and showing impact in only some UPS districts at issue. 380 F.3d 459, 464-65 (8th Cir. 2004). In addition, the court was troubled that the plaintiffs analyzed some but not all years of performance data and that when the defendant did, it found no impact as to the year plaintiff ignored. *Id.* at 471.

None of these cases supports Goldman's argument that causation exists only when data is disaggregated to the smallest unit of analysis and the impact is identical across subsets.[83]

**Impacts Reduced Over Time:** Goldman asserts that the Class was not adversely impacted by the 360 Review and Quartiling after 2015. ECF No. 1240 (Defs.' Mot.) at 24 (bullet points 1 and 2), 39-40. But this does not negate Goldman's liability for impacts in 2002-2015. And all Class Members, including those added since 2015, have ongoing claims for injunctive relief from Goldman's Challenged Practices. *See* ECF No. 1269 (Pls.' Opp. to Decert.) at 24-26. Goldman does not argue (much less prove) it has fixed any of the deficiencies

---

[83]     *Abram v. UPS* likewise represents the factually distinct situation where pay decisions were localized, outliers were driving the analysis, and there was no pattern across the company's districts. 200 F.R.D. 424, 430-32 (E.D. Wis. 2001).

in either practice identified by Plaintiffs' experts or acknowledged internally at Goldman.  *See* ECF No. 1269 (Pls.' Opp. to Decert.) at 27-28.  Absent judicial order, there is nothing precluding the reoccurrence of adverse impact or Goldman from doubling down on the problematic aspects of the Challenged Practices.  *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169-70 (2000) ("A defendant's voluntary cessation of a challenged practice ordinarily does not deprive a federal court of its power to determine the legality of the practice. If it did, courts would be compelled to leave the defendant free to return to its old ways.") (citations and alterations omitted).

Further, contrary to Goldman's argument (ECF No. 1240 (Defs.' Mot.) at 35, 39-40), Goldman does not require a fixed length of time in position to be eligible for promotion to managing director.  *See* Pls.' Counterstatement ¶ 5.  Goldman cites Judge Francis's summary, which itself does not describe a set eligibility requirement, only that "the candidate *generally* must have served as Vice President for a minimum of two years."  ECF No. 364 (March 10, 2015 Report and Recommendation) at 11 (emphasis added).  The deponent cited by Judge Francis for this point, Caroline Heller-Sberloti, testified that while "there's not minimum requirements," "it's around typically two years," but there are no written guidelines.  ECF Nos. 1258-2, 1242-27, 1242-28 (Caroline Heller-Sberloti Tr.) at 206:2-16.  Furthermore, Dr. Farber controlled for years in position as a variable in his regression analysis, ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) at. ¶ 126, ensuring that if Vice Presidents were unlikely to be promoted with a certain level of tenure (*e.g.*, less than two years) then the model would appropriately assign smaller shortfalls to women with that level of tenure.

The change in impact over time does not support summary judgment on liability.

**Impacts Vary Over Time:**  Goldman argues that there were no promotion discrimination impacts in 2002, 2003, 2010, 2012 and 2015.  Mot. at 24 (bullet point 3).  But differences in impact by year do not make the system non-discriminatory.  Plaintiffs have identified flaws in the Cross-Ruffing process that are uniform and consistent across the entire time period.  That the process resulted in shortfalls in some years and not others does not negate the overall problems or damages associated with the process.  *Cf. Chin*, 685 F.3d at 153 (rejecting standard that "would make it mathematically impossible to rely upon statistics" to prove promotions claim (citation omitted)).  Here, Dr. Farber concluded that women lost approximately 27 Managing Director promotions during the Class period, and he calculates the associated lost earnings.[84]  The bias in the process exists across the Class period even if in a given year there is not a particular lost female promotion; women are subject to the consistent policy in all years, and may be eligible for promotion both in years where Dr. Farber found disparities and in those for which he did not.  *See* ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) at Table 20 (finding promotions shortfall in years throughout Class period).

**Merchant Banking Division Straw Man:**  Goldman also suggests that claims for employees of the Merchant Banking Division, which are not in this case, somehow impact Plaintiffs' statistical showing for the Divisions that are.  Mot. at 24 (bullet point 4), 26, 33.  They do not: Plaintiffs' expert's statistical analysis only involves employees in the Class positions.  ECF Nos. 1242-43, 1250-18 (Farber Jan. 15, 2021 Report) ¶¶ 5, 20.[85]  Goldman's argument

---

[84]   ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) ¶ 15 & App. A, Tables 28-29.  This is a significant number of promotions given the overall rarity of promotions (which also reinforces why it is important to look at the whole time period).

[85]   That Plaintiffs removed MBD from the class definition during litigation does not prove that discrimination did not occur in the Class divisions.  Goldman's citation (ECF No. 1240

contradicts law and strains reason.  *See, e.g.*, *United States v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 365, 421 (S.D.N.Y. 2018) (adopting recommendation of Lehrburger, J.) (agreeing that discrimination lawsuits can be brought against "subsets of organizations) (citation omitted)).

Plaintiffs also are the master of their complaint, and can set the definition and scope of their claims.  *See, e.g.*, 3 Newberg on Class Actions, *Defining the class—Judicial discretion to ensure satisfactory class definition* § 7:27 (5th ed.) ("party moving for class certification, . . . will identify the proposed class"); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 52 (2d Cir. 1998) ("plaintiff is the master of the complaint"); *cf. Robidoux v. Celani*, 987 F.2d 931, 937-38 (2d Cir. 1993) (vacating class certification denial and explaining court can define class more narrowly).

**B.**       **Goldman Fails To Show Lack of Material Disputed Facts as to Plaintiffs' Showing of Less Discriminatory Alternative Practices.**

Goldman's motion for summary judgment on the third stage of alternative employment practices fails for two distinct reasons: Goldman has not attempted to meet its second stage burden to prove the business necessity and job-relatedness of the Challenged Practices (*i.e.*, it has conceded the point for purposes of this motion); and Plaintiffs have provided substantial evidence of less discriminatory alternatives.  Goldman's challenge is premature, but even if it were properly before the Court, Plaintiffs' evidence establishes a material dispute that requires the denial of Goldman's motion.

**Goldman Failed To Shift Burden to Plaintiffs on This Element:**  Under Title VII's burden shifting framework, the Court only reaches whether Plaintiffs have met their third-stage

---

(Defs.' Mot.) at 26) to *Smith v. Xerox Corp.* is unavailing.  *Smith* admonished that a plaintiff cannot "gerrymander" data but must generate statistics from the policy challenged.  196 F.3d at 370.  This does not impose a nonsensical requirement that Plaintiffs must analyze claims not in the case.

burden after it has determined that Goldman has met its business necessity and job-relatedness burden (and not at all if the Court rules against Goldman at the second stage).  *See* 42 U.S.C. § 2000e–2(k)(1)(A)(ii), (C); *Robinson*, 267 F.3d at 161 ("*If* the employer succeeds in establishing a business justification, however, the disparate impact claim proceeds to a third stage.") (emphasis added); *see also Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 382 (2d Cir. 2006).

Goldman must prove an "asserted business necessity" related to the Challenged Practices before Plaintiffs' obligation to articulate alternatives responsive to the stated necessities is triggered.  *See Robinson*, 267 F.3d at 161 (plaintiff's third-stage burden is to "establish the availability of an alternative policy or practice that would also satisfy *the asserted business necessity*, but would do so without producing the disparate effect.") (emphasis added); *see also Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1263 (6th Cir. 1981) (remanding where "the district court failed to consider [plaintiff's alternatives burden] as a separate stage in the analytical framework of the case").

And here, Goldman has simply failed to do so.  *See, e.g.*, *Easterling v. State of Conn.*, 783 F. Supp. 2d 323, 344 (D. Conn. 2011) (explaining that the court need "not reach the issue of whether [the employer] refused to adopt an alternative employment practice that would serve the employer's legitimate needs" because the defendant had not shown the challenged practice was job-related and consistent with business necessity).  Rather, Goldman concedes that material issues of fact remain in dispute regarding whether it has established a justifiable business necessity or job-relatedness for the Challenged Practices at the second-stage of the disparate impact analysis.  ECF No. 1240 (Defs.' Mot.) at 28 n. 16.

**Substantial Evidence on Less Discriminatory Alternatives:**  Contrary to Goldman's argument, Plaintiffs have provided extensive evidence of less discriminatory alternatives creating

a material dispute of fact.  *See supra*, Relevant Facts § II. D.  In particular, Dr. Cascio provided a thorough analysis in multiple reports that demonstrates alternative practices that Goldman should have adopted.  *See supra*, Relevant Facts § II.D.[86]  This is more than sufficient to defeat summary judgment and take the parties' dispute to trial.  *See, e.g.*, *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1227-28 (9th Cir. 2021) (finding proposal that university should evaluate resulting salary disparity with comparable professors when using retention bonuses, and give affected professors a raise, was sufficient to create genuine issue of material fact as to adequacy of plaintiff's proposal); *Bridgeport Guardians, Inc. v. City of Bridgeport*, 735 F. Supp. 1126, 1137 (D. Conn. 1990), *aff'd*, 933 F.2d 1140 (2d Cir. 1991) (plaintiffs met burden at third stage when plaintiffs proposed "banding" as alternative promotions process).

Plaintiffs' concrete proposals are nothing like the barebones assertions identified in the cases Goldman cites.  *See Johnson v. City of Memphis*, 770 F.3d 464, 477-78 (6th Cir. 2014) (plaintiffs' showing insufficient where plaintiff failed to articulate more than "broad suggestions" devoid of  "justification for their comparative validity or discriminatory effect"); *Allen v. City of Chicago*, 351 F.3d 306, 315–17 (7th Cir. 2003) (finding plaintiffs' alternative proposals "vague and indefinite"; first, the proposal to "increase[] merit-based promotions" was insufficient, and second, the proposal to increase the "ability of raters to assess job knowledge" was merely a "bare assertion," neither of which satisfied their burden).[87]

---

[86]   Goldman misleadingly cites only the summary of Dr. Cascio's conclusions, suggesting that this is the only evidence Plaintiffs proffered as to alternative practices.  ECF No. 1240 (Defs.' Mot.) at 28.  While this evidence itself contains specific recommendations to each of Goldman's deficiencies, Goldman's argument also ignores Dr. Cascio's extensive analysis in multiple reports.  *See supra* Relevant Facts, § II.D.

[87]   Highlighting the premature nature of this inquiry, *Johnson* was decided after trial, 770 F.3d at 467, and in *Allen*, unlike here, the question of whether the challenged process was job-related and consistent with business necessity was conceded by plaintiffs, 351 F.3d at 316.

While Goldman challenges the practicality of implementing Plaintiffs' alternatives, ECF

No. 1240 (Defs.' Mot.) at 29-30, this is misleading.  Dr. Cascio provides substantive proposals

for what changes should be implemented and how those changes would lead to a *more* valid

system.  *Cf. Bridgeport Guardians, Inc.*, 735 F. Supp. at 1137 (rejecting defendant's critique that

proposal is "unclear at best, along with the parameters of what factors should be appropriately

considered").[88]  His opinions are based in established scientific evidence and research that shows

the alternatives will negate and/or reduce the discriminatory impact produced by the Challenged

Practices.

Goldman misinterprets Plaintiffs' burden at this stage as one requiring showing the

"comparable cost" of Plaintiffs' proposed alternatives; while costs are among "factors which

should not be omitted from consideration," *Chrisner*, 645 F.2d at 1263, Plaintiffs' burden is to

demonstrate the "availability" of alternative factors, *Robinson*, 267 F.3d at 161 (citing 42 U.S.C.

§ 2000e–2(k)(1)(A)(ii), (C)).  And, unlike the defendant in *Johnson*, Goldman has submitted

zero evidence indicating that Dr. Cascio's proposed alternatives engender unreasonable expense

or burden negating their viability.  *Compare Johnson*, 770 F.3d at 474 (citing the defendant's

specific evidence of the impracticality of the plaintiff's alternatives), *with Bridgeport Guardians,

Inc.*, 735 F. Supp. at 1137 ("There is no evidence before the Court that any added burdens that a

banding analysis would impose upon the defendants are more than minimal, either financially or

temporally.").  This argument is also silly given that certain of the alternatives available would

---

[88]     Goldman's cases say nothing different.  In *Allen*, plaintiffs merely relied on the "non-discriminatory history" of their proposed alternative to establish validity and less discriminatory effect.  351 F.3d at 317.  In *Johnson*, plaintiffs proffered "no explanation for [its proposed alternative] . . . or why it would produce better outcomes." 770 F.3d at 477.

be free or cost-saving to Goldman, including removing 360 Reviews as an input in pay and promotion decisions and ending forced ranking.

Goldman argues vaguely that these proposed alternatives will not "satisfy Goldman['s] business needs[,]" Mot. at 30, but has failed to provide evidence of what the legitimate business needs associated with each Challenged Practice might be.  And, Plaintiffs have provided specific ways to reduce the gender disparity at Goldman, including to monitor for impact, remove the role of 360 Reviews in pay and promotion decisions and cease forced ranking its employees (which would reduce impact because Dr. Farber has identified these processes as driving impact), and institute valid written criteria to avoid the bias in the current cross-ruffing system.[89]

Finally, Goldman suggests that Plaintiffs have failed to show that Goldman has "refused to adopt an alternative employment practice."  ECF No. 1240 (Defs.' Mot.) at 31.  This is perplexing given that Goldman indisputably continues to employ the challenged systems in their current problematic form, despite knowing that they cause an adverse impact and despite the recommendations of their own subject matter experts that align with Dr. Cascio's.  *See supra* Relevant Facts § II.D.  Further, as Goldman concedes, demonstrating refusal is not a requirement under the NYCHRL.  *See id.* at 28 n.17.

C.    **Goldman Fails To Demonstrate an Absence of Material Disputed Facts as to Plaintiffs' Disparate Treatment Claim.**

1.    **Plaintiffs' Statistics Establish a *Prima Facie* Showing.**

---

[89]    The inapposite authority cited by Goldman is devoid of any showing of less discriminatory effect.  *See Hernandez v. Off. of Comm'r of Baseball*, No. 18 Civ. 9035, 2021 WL 1226499, at *12 (S.D.N.Y. Mar. 31, 2021) (no evidence of reduced impact); *Lopez v. City of Lawrence, Mass.*, 823 F.3d 102, 120 (1st Cir. 2016) (same).

Goldman argues that "summary judgment is warranted on Plaintiffs' disparate treatment claims for the same reasons it should be granted on their disparate impact claims."  ECF No. 1240 (Defs.' Mot.) at 32.  This argument fails for the same reasons Goldman's arguments as to Plaintiffs' disparate impact claims fail.  Plaintiffs have made a robust showing that the Challenged Practices have a statistically significant impact on women.  *See supra* Relevant Facts § II.B; *see also Robinson*, 267 F.3d at 158 (statistics "alone can make out a prima facie case of [intentional] discrimination").  In turn, Goldman has failed to show that Plaintiffs' statistical evidence cannot establish that "discrimination was the company's standard operating procedure," *Int'l Bhd. of Teamsters*, 431 U.S. at 336, as is its summary judgment burden, *see also E.E.O.C. v. Mavis Disc. Tire, Inc.*, 129 F. Supp. 3d 90, 115 (S.D.N.Y. 2015) (denying summary judgment on pattern and practice claim, and explaining that statistical dispute is "precisely what the jury will see and hear in this case, with each party presumably attempting to undermine the other's approach during cross-examination" and with jury "then decid[ing]" which expert's approach to "credit"); *N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d at 421 ("As described throughout this opinion, the evidence underlying the United States' pattern or practice claim implicates varied questions of material fact, making summary judgment on this claim inappropriate.").

While Goldman's arguments on this claim recycle failed disparate impact arguments, *see* ECF No. 1240 (Defs.' Mot.) at 33, and should be rejected for those same reasons, Goldman also argues that the discrimination is somehow acceptable because of its "limited magnitude" statistically.  *See id.* at 34-36.  However, this is not a legal standard.  If anything, minimizing

statistically significant impact itself evinces a corporate hostility to creating a fair workplace for women.[90]

Here, in addition to the significant statistical disparities identified with respect to 360 reviews (4.16-5.28 standard deviation) and Manager Quartiling (3.04-3.20 standard deviation), Dr. Farber calculated that Goldman pays its female on Associates on average 4% less than comparable male Associates (4.6 standard deviation) and Vice Presidents on average 14% less (standard deviation of 9.9).  And 54% of the observed compensation shortfall between female and male Associates, and 40% of the observed compensation shortfall between female and male Vice Presidents is attributable to differences in how women and men are evaluated in the 360 Review and Quartiling processes.  Class Members lost nearly $220 million in unpaid compensation ($19 million by female Associates, $201.5 million by female Vice Presidents) as a result of the disparities in Goldman's evaluations.  *See supra* Relevant Facts, § II.B.  Because Goldman has never corrected these disparities, Class Members continue to lose compensation year after year through the present.  ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) ¶ 114 & Table 18.  Significant sums are necessary to bring women to parity.

---

[90]      Goldman highlights language that plaintiffs must establish a "gross" statistical disparity, but this does not mean Plaintiffs must meet a higher standard for their statistical evidence for their treatment claim than for their impact claim.   ECF No. 1240 (Defs.' Mot.) at 32.  As this Court held, and Goldman acknowledges, Plaintiffs' "disparate treatment claim is predicated on the statistical evidence of disparate impact."  ECF No. 578 (Order) at 41; ECF No. 1240 (Defs.' Mot.) at 31.  A plaintiff's statistical showing is the same for both claims.  *See Robinson*, 267 F.3d at 160 (holding that "[a]s with the liability phase of a pattern-or-practice disparate treatment claim, statistical proof almost always occupies center stage in a  . . . disparate impact claim" and must reveal that the disparity is "substantial or significant") (citations and quotations omitted); *see also Morgan*, 380 F.3d at 464 (explaining that "[t]he bottom-line question in this case is whether Plaintiffs produced more than a scintilla of evidence showing [the defendant] engaged in a pattern or practice of discrimination with regard to the class members"); *cf.* ECF No. 1240 (Defs.' Mot.) at 32.

As to statistical evidence of promotion bias, Dr. Farber found significant statistical disparities (4.6 standard deviation) even though the expected promotion rate for all employees is low because "promotion to EMD is a low-probability event."  ECF Nos. 1242-44, 1250-58 (Farber Apr. 19, 2021 Rebuttal Report) ¶ 77.  Even among the small numbers of promotions made from Class positions, women lost 27 promotions over the Class period, resulting in over $140 million in lost compensation.  *Id.* ¶¶ 15, 116 & Tables. 20-22.  Once again, this equates to significant value to Class Members.

The cases on which Goldman relies do not support argument that statistically meaningful disparities that deprive women of hundreds of millions of dollars are somehow of "limited magnitude" (whatever that means).  For example, Goldman repeatedly cites the insufficient showing made by the plaintiffs in *E.E.O.C. v. Bloomberg L.P.*, 778 F. Supp. 2d 458 (S.D.N.Y. 2011).  There, however, the plaintiffs relied "only on anecdotal evidence of alleged discrimination incidents" and "presented *no* admissible statistical evidence" at all.  *Id.* at 470 (emphasis supplied).  Likewise, in *Valentino v. U.S. Postal Service*, the evidence was superficial, with a statistical showing that only "demonstrated that men dominate the top-positions at USPS," an issue not in dispute in the case, and "failed to establish much more" because the plaintiff "did not control for occupational classifications" of the many jobs at issue ("including, inter alia, confidential secretaries, lawyers, engineers, business managers"), rendering it "impossible to determine . . .  whether similarly situated and similarly available men and women have been treated differently from each other."  *Valentino v. U.S. Postal Serv.*, 674 F.2d 56, 61, 69 (D.C. Cir. 1982).  Unlike *Valentino*, Plaintiffs' statistical analysis here is robust precisely because it

controls for relevant factors, including differentiating job titles and seniorities as to three admittedly uniform policies.[91]

Notably, Plaintiffs' statistical showing here, and the Court's determination to certify a class based on it, is lauded in *Richardson v. City of New York*, on which Goldman also relies. 2021 WL 1910689, at *9 (recognizing *Chen-Oster* as an example of appropriate statistical evidence). The *Richardson* court likewise reiterated that a disparate treatment pattern and practice showing can be made (as it is here) with a "class-based difference" that is "statistically significant by several deviations" and "traceable to the employer's choices." 2021 WL 1910689, at *9.[92]

### 2.    Goldman Ignores Plaintiffs' Substantial Showing of Knowledge.

As the Court explained in certifying the class, Plaintiffs' showing can include proof that Goldman was "aware of gender disparities and gender bias at Goldman Sachs, but did not adjust their policies or practices to account for the discrimination women faced." *Chen-Oster*, 325 F.R.D. at 77. Here, Plaintiffs have provided substantial evidence of just that: Goldman's senior leaders were aware that the Challenged Practices adversely impacted women, but continued to

---

[91]    Goldman also misleadingly highlights *Ste. Marie v. Eastern Railroad Assoc.* as the supposed model for situations presenting "similar evidence" to Plaintiffs here. ECF No. 1240 (Defs.' Mot.) at 36. Unlike here, the plaintiffs in *Ste. Marie* were "lacking" in "relevant statistics," their evidentiary showing appeared to consist of "seven instances of individual discrimination," hiring qualifications that "were ad hoc and made up," and test administration that was "home made" with "no written objective criteria for evaluating a candidate's qualifications." 650 F.2d 395, 404–05 (2d Cir. 1981). And yet the court still remanded for further findings. *Id.* at 407.

[92]    Goldman's other cases are also unhelpful. *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (pattern-or-practice framework inapplicable to § 1983 claims against state officials and saying nothing about the *magnitude* of statistical showing required); *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1376–77 (2d Cir. 1991) (disparity "of limited magnitude" is eliminated when two additional Black candidates passed test); *Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30*, 694 F.2d 531, 551 (9th Cir. 1982) (rejecting inference of causation with standard deviations of 2.46 and 1.30 as to challenged policies).

use them after finding "consistent" underrepresentation of women in 360 Review and Manager Quartiling outcomes, scoring of women's' competencies that reflected gender bias, and women consistently under-selected as candidates for cross-ruffing and for promotion.  *See supra* Relevant Facts, § II.C.  Goldman even considered abandoning the Quartiling practice at least twice due to these issues, but maintained this biased system instead.  *Id.*

Further, through the testimony of Dr. Goldberg, Plaintiffs have submitted significant expert evidence that Goldman has maintained a culture that is tolerant of gender bias and harassment, and that it identified but failed to take steps to implement known interventions to address gender bias.  *See id.*  And Plaintiffs have also presented powerful evidence of Goldman's hostility to women.  *See id.*

A jury is entitled to hear this evidence, and decide for itself the extent that Goldman knew of its discriminatory treatment of women, whether Goldman ignored that evidence, and whether discrimination is Goldman's standard operating procedure.  *See, e.g.*, *N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d at 419 (finding that in light of "extensive anecdotal evidence . . . a reasonable jury could find that the United States has met its *prima facie* burden to show a pattern or practice of discrimination"); *Mavis Disc. Tire, Inc.*, 129 F. Supp. 3d at 112 ("Taking the EEOC's proffered statistical and anecdotal evidence together, the Court finds no difficulty in finding that the prima facie burden has been met.").  This is all the more so because when intent is at issue, an "extra measure of caution is merited when deciding summary judgment for a discrimination action."  *Lall v. City of New York*, No. 17 Civ. 609, 2021 WL 848851, at *4 (E.D.N.Y. Mar. 5, 2021) (collecting cases).

While Goldman argues this evidence should not be considered (Mot. at 36-37), it is wrong.  This evidence is part of Plaintiffs' showing that discrimination is Goldman's standard operating procedure, and provides further reason why Goldman's motion should be denied.

**D.      Goldman Ignores the Class' NYCHRL Claims, Which Generally Are Not Subject to Goldman's Arguments.**

The vast majority of all Class Members have claims under the NYCHRL.  [To the extent Goldman is purporting to move for summary judgment on Plaintiffs' NYCHRL disparate impact claim, its arguments are wholly insufficient to make this showing.  *See* ECF No. 1240 (Defs.' Mot.) at 1, 28 n.17, 31 n.18 (mentioning NYCHRL only in passing).  Plaintiffs also highlight two fundamental differences between the NYCHRL and Title VII that further compel denial of the motion: (1) the NYCHRL is more protective of workers than Title VII; and (2) the NYCHRL explicitly allows a plaintiff to prevail on disparate impact without having identified specific employment practices.

**1.      NYCHRL Was Amended Specifically To Be More Protective Than, and Separately Analyzed from, Title VII.**

In 2005, the New York City Council amended the NYCHRL by passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85:

> In amending the NYCHRL, the City Council expressed the view that the NYCHRL had been 'construed too narrowly' and therefore 'underscore[d] that the provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes.' To bring about this change in the law, the Act established two new rules of construction. First, it created a 'one-way ratchet,' by which interpretations of state and federal civil rights statutes can serve only 'as a *floor* below which the City's Human Rights law cannot fall.' Second, it amended the NYCHRL to require that its provisions 'be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed.'

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (internal citations committed).

Accordingly, in order to effectuate the NYCHRL's "uniquely broad and remedial purposes," *Kaur v. N.Y.C. Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 339 (S.D.N.Y. 2010), "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik*, 715 F.3d at 109 (internal citations and quotations omitted); *see also Stinson v. City Univ. of N.Y.*, No. 17 Civ. 3949, 2018 WL 2727886, at *6 (S.D.N.Y. June 6, 2018); *see also Teasdale v. N.Y.C. Fire Dep't, FDNY*, 574 F. App'x 50, 51 (2d Cir. 2014); *Brown v. City of N.Y.*, No. 16 Civ. 1106, 2017 WL 1102677, at *3 (E.D.N.Y. Mar. 23, 2017).

Here, Goldman's motion fails because it does not analyze Plaintiffs' NYCHRL claims separately and independently.  Likewise, it fails because Plaintiffs NYCHRL claims are to be construed in Plaintiffs' favor, which further constrains Goldman's ability to challenge Plaintiffs' evidence, something it already failed to do on Plaintiffs' Title VII claims.  For example, Goldman's argument that Plaintiffs' statistical showing on their pattern and practice claim is of "insufficient magnitude" is even more specious under the NYCHRL.

### 2.  Goldman's Arguments Are Not Relevant to the NYCHRL.

A plaintiff need not show which policies establish impact as part of her *prima facie* case under the NYCHRL.  *See*  N.Y.C. Admin. Code § 8-107(17)(a)(2) ("however, that if the commission or such person who may bring an action demonstrates that a group of policies or practices results in a disparate impact, the commission or such person shall not be required to demonstrate which specific policies or practices within the group results in such disparate

45

impact"); *id.* § 8-107(17)(a)(1) (plaintiff must "demonstrate[] that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter").  Thus, Goldman's argument that Plaintiffs did not sufficiently analyze the components of 360 Reviews and Cross-Ruffing, Mot. at 20-23, are wholly foreclosed by the NYCHRL.  *See, e.g.*, *Richardson v. City of N.Y.*, No. 17 Civ. 9447, 2018 WL 4682224, at *10 (S.D.N.Y. Sept. 28, 2018) (citing N.Y.C. Admin. Code § 8-107(17)(a)(2)) (holding defendant's argument that plaintiffs failed to identify which policy was source of disparate impact was "foreclosed by NYCHRL's text, which provides that a plaintiff who 'demonstrates that a *group* of policies or practices results in a disparate impact . . .  shall not be required to demonstrate which specific policies or practices within the group results in such disparate impact'") (emphasis added).

### E. Goldman's Miscellaneous Additional Arguments Also Fail To Establish a Basis For Summary Judgment.

Finally, Goldman makes a series of miscellaneous additional arguments that each fail to establish a proper basis for summary judgment (ECF No. 1240 (Defs.' Mot.) at 37-41):

**"Missing" Data:**  Goldman seeks summary judgment based on "missing" 360 Review data for the years 2002-04.  Mot. at 38.  As explained in Plaintiffs' *Daubert* opposition brief and incorporated here, this data is not "missing": Goldman refused to produce it, claiming undue burden, and accordingly represented to Plaintiffs and the Court that the information from later produced data was "representative of the comparable data . . . between January 2002 and September 2004."  *See* ECF No. 1262 (Pls.' *Daubert* Opp.) at 14.  Goldman cannot walk back this agreement now.

In its reply brief in support of its *Daubert* challenge to Dr. Farber, Goldman argues that it only agreed to stipulate to the representativeness of the data *for class certification*.  *See* ECF No.

1281 (Defendant' Reply in Support of Defendants' Omnibus Motion to Exclude Expert

Testimony ("Defs.' *Daubert* Reply")) at 22.  But this is a distinction without meaning.  Goldman

admits that the "360 review process was employed in IMD, IBD, [and] Securities . . . during the

class period."[93]  *See* ECF No. 1241 (Defs.' 56.1) ¶¶ 20, 23, 31.  And Goldman offers no reason,

grounded in Dr. Shaw's analysis or otherwise, for why the data is not representative for 2002-04

(as opposed to the rest of the class period).  Dr. Farber properly accounted for those years.

Further, Goldman had the affirmative duty to supplement its production when it

determined it would contest the representativeness of data for the 2002-04 period.  *See, e.g.*, Fed.

R. Civ. P. 26(e).  Goldman cannot both refuse to produce the requested information with a

proffer to use alternate data, and then argue that Plaintiffs should not use the data proffered.

**PWA Compensation:**  Goldman contends that PWAs are paid solely on their production,

not their 360 Review or quartiling results, and thus cannot have been discriminatorily impacted.

ECF No. 1240 (Defs.' Mot.) at 40.  Even if this were true, it would not change the fact that these

Class Members, like the other Class Members, were subject to the biased 360 Review and

Manager Quartile, making this distinction irrelevant at the liability phase.  At the remedial phase,

PWAs will not recover damages if they do not suffer lost pay due to the 360 Review and

Manager Quartile.  However, because performance measures were an input into promotions,

those PWAs who were Vice-Presidents may seek damages due to the impact on Cross-Ruffing.

It is premature to dispose of their claims here.

**Three Absent Class Members:**  The three individuals identified by Goldman as subject

to unique arbitration agreements are also most properly addressed at the stage two damages

---

[93]    The class period began on September 10, 2004, nationally, and on July 7, 2002, for those
employed in New York City.  ECF No. 578 (Order) at 4.

phase.  *Cf.* ECF No. 1240 (Defs.' Mot.) at 41.  However, if the Court determines to resolve their

claims now, the proper vehicle under the Federal Arbitration Act is to stay, and not dismiss, their

claims while Class claims proceed to trial.  *See* 9 U.S.C. § 4.[94]

## CONCLUSION

Plaintiffs respectfully request that the Court deny Goldman's motion.


Dated: October 12, 2021
    New York, NY

By:

_____
Adam T. Klein

Adam T. Klein
Cara E. Greene
Melissa L. Stewart
Christopher M. McNerney
Michael C. Danna
Sabine Jean
Maya S. Jumper
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060

Kelly M. Dermody (*admitted pro hac vice*)
Anne B. Shaver (*admitted pro hac vice*)
Michael Levin-Gesundheit (*admitted pro hac vice*)
Michelle A. Lamy (*admitted pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Rachel Geman
Jessica A. Moldovan

---

[94]    Additionally, Goldman's challenge to the cross-ruffing process is addressed in §IV.A.1.b and Goldman's challenge to liability after 2015 is addressed in §IV.A.2.

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-9592
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

*Class Counsel*