UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; LISA PARISI; and SHANNA ORLICH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,<br><br>Defendants. | INDEX NO. 10-CV-6950-AT-JCF<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

1176116.1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................. 1

II.  RELEVANT FACTS ........................................................................... 3

    A.   Goldman Has a Uniform Corporate Structure and Uniform Employment Procedures. ...................................................... 3

        1.   Corporate Organization .............................................. 3

        2.   Uniform Performance Evaluation Procedures ............... 4

            a.   The 360 Review Process .................................. 5

            b.   The Forced Ranking Process ........................... 7

        3.   Uniform Compensation Policies and Procedures .......... 9

        4.   Uniform Promotion Procedures .................................. 10

    B.   Goldman's Uniform Policies and Procedures Disadvantage Women. ......................................................... 12

        1.   Goldman systematically scores and ranks women lower than their male counterparts in both the 360 and forced ranking process. ........................................................ 12

        2.   Goldman pays women substantially less than similarly situated men. ............................................................ 14

        3.   Prior to 2010, Goldman promoted women from Vice President to Managing Director less frequently than it promoted similarly-situated men. ................................ 15

    C.   The Named Plaintiffs and Class Member Witnesses Illustrate the Common Experiences of Women at Goldman with the Three Challenged Practices. ........................................................ 16

    D.   Goldman Has Failed to Correct Known Disadvantages for Women Caused by Its Common Policies and Has Maintained a Culture of Gender Stereotyping and Bias. ............................................. 17

        1.   The Core Challenged Practices in this Case Are Affected by a Culture of Gender Bias. ....................................... 17

        2.   Goldman Has Ignored Overwhelming Evidence of Intentional Discrimination Against Women and Maintained a Firm Culture Hostile Towards Women. ...................... 19

            a.   Goldman Maintains a "Boy's Club" Atmosphere. .......... 20

1176116.1

# TABLE OF CONTENTS
## (continued)

Page

|  | | b. | Goldman Condones the Sexualization of Women and an Uncorrected Culture of Sexual Assault and Harassment............................................................ 22 |

|  | | c. | Goldman Tolerates and/or Rewards Men Who Engage In Misconduct Towards Women......................... 25 |

d.    Goldman Devalues Pregnant Women and Punishes Working Mothers Based on Stereotypes about their Commitment to their Jobs.................................................. 28

e.    Goldman Lacks Appropriate Preventative Measures Against Discrimination. ................................................... 30

f.    Goldman Retaliates Against Women Who Complain........................................................................... 32

III.    ARGUMENT ........................................................................................ 34

A.    Legal Standard .......................................................................... 34

B.    This Case Meets the Requirements of Rule 23(a) .................................. 36

1.    The Class is Sufficiently Numerous. ........................................... 36

2.    The Class Presents Common Issues of Law and Fact................. 36

a.    Plaintiffs Challenge Specific Biased Employment Practices Which Raise Common Questions.................... 37

b.    Plaintiffs Present Significant Proof of a General Policy of Discrimination. ......................................... 38

3.    The Named Plaintiffs' Claims are Typical. ................................ 41

4.    Adequacy is Satisfied.................................................................. 42

C.    The Court Should Certify Claims for Injunctive Relief under Rule 23(b)(2). ..................................................................................... 42

1.    Under Rule 23(c)(1)(C), Plaintiffs Have Standing To Seek Injunctive Relief Under Rule 23(b)(2)........................................ 43

2.    Certification Under Rule 23(b)(2) is Appropriate. ..................... 44

D.    Certification Under Rule 23(b)(3) is Appropriate For Plaintiffs' Claims for Backpay and Punitive Damages.............................................. 45

1.    Predominance.............................................................................. 45

2.    Superiority................................................................................... 48

1176116.1

**TABLE OF CONTENTS**
**(continued)**

Page

IV.     CONCLUSION ............................................................................................. 50

1176116.1

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
  133 S. Ct. 1184 (2013) ................................................................ 34, 35, 36

*Cal. Pub. Emples. Ret. Sys. v. Worldcom, Inc.,*
  368 F.3d 86 (2d Cir. 2004) ................................................................ 43

*Chin v. Port Auth. of N.Y. & N.J.,*
  685 F.3d 135 (2d Cir. 2012) ................................................................ 48

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426 (2013) ................................................................ 46

*Consol. Rail Corp. v. Town of Hyde Park,*
  47 F.3d 473 (2d Cir. 1995) ................................................................ 36

*Denney v. Deutsche Bank AG,*
  443 F.3d 253 (2d Cir. 2006) ................................................................ 42

*Duling v. Gristede's Operating Corp.,*
  267 F.R.D. 86 (S.D.N.Y. 2010) ................................................................ 43

*Easterling v. Connecticut Dep't of Corr.,*
  278 F.R.D. 41 (D. Conn. 2011) ................................................................ passim

*Ellis v. Costco Wholesale Corp.,*
  285 F.R.D. 492 (N.D. Cal. 2012) ................................................................ passim

*Gulino v. Bd. of Educ.,*
  201 F.R.D. 326 (S.D.N.Y 2001) ................................................................ 45

*Gulino v. Bd. of Educ.,*
  No. 13-1001, 2014 U.S. App. LEXIS 2070 (2d Cir. Feb. 4, 2014) ................................................................ 43

*Gulino v. Bd. of Educ.,*
  No. 96-8414, 2013 U.S. Dist. LEXIS 123948 (S.D.N.Y. Aug. 29, 2013) ............. 2, 36, 46, 47

*Hnot v. Willis Group Holdings Ltd.,*
  228 F.R.D. 476 (S.D.N.Y. 2005) ................................................................ 13

*In re Grand Jury Proceedings,*
  219 F.3d 175 (2d Cir. 2000) ................................................................ 31

*In re Nassau Cnty. Strip Search Cases,*
  461 F.3d 219 (2d Cir. 2006) ................................................................ 42

*In re Sumitomo Copper Litig.,*
  262 F.3d 134 (2d Cir. 2001) ................................................................ 43

*In re U.S. Foodservice Inc. Pricing Litigation,*
  729 F.3d 108 (2d Cir. 2013) ................................................................ 35

*In re Visa Check/Mastermoney Antitrust Litig. v. Visa, United States,*
  280 F.3d 124 (2d Cir. 2001) ................................................................ 49

# TABLE OF AUTHORITIES
## (continued)

Page

*Int'l B'hd of Teamsters v. United States*,
    431 U.S. 324 (1977)................................................................................. 19, 40, 46, 50

*Kassman v. KPMG LLP*,
    925 F. Supp. 2d 453 (2013 S.D.N.Y.)............................................................... 43

*Kubicek v. Westchester Cnty.*,
    No. 08-372, 2013 U.S. Dist. LEXIS 139552 (S.D.N.Y. Sept. 27, 2013)............... 43

*Loeffler v. Frank*,
    486 U.S. 549 (1988)........................................................................................ 45

*Malave v. Potter*,
    320 F.3d 321 (2d Cir. 2003)............................................................................. 14

*Marisol A. by Forbes v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)......................................................................... 36, 41

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    672 F.3d 482 (7th Cir. 2012) *cert. denied* 133 S. Ct. 338 (2012).................. passim

*Meacham v. Knolls Atomic Power Lab.*,
    461 F.3d 134 (2d Cir. 2006)......................................................................... 12, 14

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010)............................................................................. 39

*Parra v. Bashas', Inc.*,
    291 F.R.D. 360 (D. Ariz. 2013) ................................................................... 39, 46

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)............................................................................. 41

*Robinson v. Blank*,
    No. 11-2480, 2013 U.S. Dist. LEXIS 72068 (S.D.N.Y. Feb. 22, 2013)............... 43

*Robinson v. Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001)....................................................................... passim

*Schear v. Food Scope Am., Inc.*,
    297 F.R.D. 114 (S.D.N.Y. 2014) .................................................................... 47

*Smith v. Xerox Corp.*,
    196 F.3d 358 (2d Cir. 1999)......................................................................... 12, 14

*Stockwell v. City & County of San Francisco*,
    No. 12-15070, 2014 U.S. App. LEXIS 7694 (9th Cir. Apr. 24, 2014)................. 35

*Sykes v. Mel Harris & Assocs., LLC*,
    285 F.R.D. 279 (S.D.N.Y. 2012) .................................................................... 49

*Toure v. Cent. Parking Sys.*,
    No. 05-5237, 2007 U.S. Dist. LEXIS 74056 (S.D.N.Y. Sept. 28, 2007)............. 42

*United States v. Brennan*,
    650 F.3d 65 (2d Cir. 2011)............................................................................. 45

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. City of New York*,
258 F.R.D. 47 (E.D.N.Y. 2009) ...................................................... 46

*United States v. City of New York*,
276 F.R.D. 22 (E.D.N.Y. 2011) ................................................ passim

*United States v. City of New York*,
No. 07-2067, 2011 U.S. Dist. LEXIS 60276 (E.D.N.Y. June 6, 2011) ............................... 49

*Velez v. Novartis Pharms. Corp.*,
244 F.R.D. 243 (S.D.N.Y. 2007) ................................................ 36, 50

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) .............................................................. passim

*Watson v. Ft. Worth Bank & Trust Co.*,
487 U.S. 977 (1988) ................................................................. 38, 39

*Wright v. Stern*,
450 F. Supp. 2d 335 (S.D.N.Y. 2006) ....................................... 13, 46

## STATUTES

42 U.S.C. §§ 2000e *et seq.* ......................................................... passim

Administrative Code of the City of New York
§ 8-107 *et seq.* .............................................................................. 1, 42

## RULES

Fed. R. Civ. P. 23 ............................................................... 2, 34, 37

Fed. R. Civ. P. 23(a)(1) ................................................................. 36

Fed. R. Civ. P. 23(a)(4) ................................................................. 42

Fed. R. Civ. P. 23(b)(2) ............................................................ 34, 43

Fed. R. Civ. P. 23(b)(3) ................................................................. 34

Fed. R. Civ. P. 23(c)(4) ............................................................ 34, 43

Fed. R. Civ. P. 23(g) ..................................................................... 42

Fed. R. Civ. P. 23(g)(1) ................................................................. 42

Fed. R. Civ. P. 65(d)(1)(C) ........................................................... 45

I.   **INTRODUCTION**

Plaintiffs Cristina Chen-Oster and Shanna Orlich seek certification of a Class of female Associates and Vice Presidents who have worked in the United States in the Investment Banking, Investment Management, and/or Securities Divisions of Defendants Goldman, Sachs & Co. and the Goldman Sachs Group (collectively "Goldman") since September 10, 2004, and in New York City from July 7, 2002 to the present.[1]   As the evidence described herein shows, Goldman has maintained common, discriminatory performance review, compensation, and promotion procedures throughout the Class period.[2]   Plaintiffs allege that these practices cause systemic disparate impact and disparate treatment against women in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 *et seq.* ("NYCHRL").

Through the common challenged practices, similarly situated female Vice Presidents have earned 21% less than male Vice Presidents; female Associates have earned 8% less than male Associates; and approximately 23% fewer female Vice Presidents have been promoted to Managing Director relative to their male counterparts.   As described in Section II.D., below, Goldman also perpetuates a gender-biased culture that sexualizes women and undermines their success.

In support of this Motion, Plaintiffs present convincing evidence demonstrating systemic gender discrimination.   This evidence includes the expert statistical analyses of Dr. Henry S.

---

[1] Investment Banking, Investment Management, and Securities are Goldman's three main revenue-producing divisions.

[2] The pay differences between men and women are caused by both the discriminatory performance and compensation-setting procedures.

Farber, the Hughes-Rogers Professor of Economics at Princeton University, describing the experiences of comparable men and women with the three challenged employment practices across the Class period;[3] the expert analysis of Dr. Wayne F. Cascio, Industrial Organizational Psychologist and the Robert H. Reynolds Distinguished Chair in Global Leadership in the Graduate School of Business Administration at the University of Colorado Denver, describing the common problems with Goldman's challenged unreliable and invalid employment practices;[4] Plaintiff and Class member declarations describing their experiences with the challenged employment practices; the complaints of 133 Goldman women describing a culture that is hostile to women; and documentary evidence from Goldman's records reflecting its contemporaneous recognition of gender issues at the firm and re-adoption of common flawed policies. The record overwhelmingly demonstrates that year after year Goldman continues to treat women as second-class employees, permitting a culture of fear and retaliation to flourish rather than fixing known, systemic gender bias.

For the reasons set forth below, Plaintiffs' challenge to Goldman's three uniform and centrally-determined employment procedures readily satisfies the requirements of Fed. R. Civ. P. 23 and *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), and is consistent with authority in the Second Circuit, *see, e.g., Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 161 (2d Cir. 2001) (abrogated on other grounds by *Dukes*), as well as recent certification decisions by courts in and out of this Circuit. *See Gulino v. Bd. of Educ.*, No. 96-8414, 2013 U.S. Dist. LEXIS 123948, *39 (S.D.N.Y. Aug. 29, 2013); *McReynolds v. Merrill Lynch, Pierce,*

---

[3] For a complete summary of Dr. Farber's credentials, please see the Report of Dr. Henry S. Farber ("Farber Report"), at ¶ 2.

[4] For a complete summary of Dr. Cascio's credentials, please see the Report of Dr. Wayne F. Cascio ("Cascio Report"), at ¶¶ 1-10.

*Fenner & Smith, Inc.*, 672 F.3d 482, 489 (7th Cir. 2012) *cert. denied* 133 S. Ct. 338 (2012);

*Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012); *United States v. City of New York*, 276 F.R.D. 22, 35 (E.D.N.Y. 2011); and *Easterling v. Connecticut Dep't of Corr.*, 278 F.R.D. 41 (D. Conn. 2011).  Plaintiffs respectfully request that their motion be granted.

## II.   RELEVANT FACTS

Plaintiffs' challenge to three uniform employment practices will provide common answers to common questions.  *Dukes*, 131 S. Ct. at 2553.

### A.   Goldman Has a Uniform Corporate Structure and Uniform Employment Procedures.

#### 1.   Corporate Organization

Goldman is a global investment banking, securities, and investment management firm headquartered in New York.  The firm is run from the top down; a central Management Committee, composed of only 34 of Goldman's top partners, oversees the entire firm.[5] GS0100556 at 560.[6]  Goldman's human resources division is called Human Capital Management ("HCM").  HCM is responsible for overseeing the firm's centralized compensation, performance evaluation, and promotion processes, as well as its diversity-related initiatives.[7]

Class members are female Associates and Vice Presidents in revenue-producing roles in three of the company's nine divisions:  Securities, Investment Management ("IMD"), and

---

[5] *See* http://www.goldmansachs.com/who-we-are/leadership/management-committee/index.html (last visited May 7, 2014).

[6] Evidence cited herein is attached to the Declaration of Anne B. Shaver in Support of Plaintiffs' Motion for Class Certification ("Shaver Decl."), as follows:  All corporate documents are attached as collective Exhibit A in numerical order by Bates Number.  All non-corporate documents, including public records, are attached as Exs. D-J in the order listed in Appendix One to the Shaver Decl.  Excerpts of Deposition Transcripts are attached as Exs. K to Q, in alphabetical order by witness.  Declarations and Reports in support of this Motion are submitted separately and referred to herein by last name of author.

[7] Boyle Tr. at 25:17-26:3; 29:25-30:25; 52:15-24.

Investment Banking ("IBD") (the "Class divisions").  Class members generally work in a team-based environment on financial products and services involving large and/or institutional clients.

Since 2002, women have comprised only a fraction of the professional workforce at Goldman.  In the Class divisions, from 2002 to 2011,[8] women represented approximately 27% of Associates, and 21% of Vice Presidents.[9] These numbers are symptomatic of the male-dominated leadership at Goldman even today:  across the firm, women now comprise only 17% of Managing Directors, and only 5 of 34 members of the Firm's Management Committee.[10]

### 2.    Uniform Performance Evaluation Procedures

Plaintiffs challenge Goldman's uniform and common performance evaluation procedures, which disadvantage women and explain a material part of the compensation discrimination that women experience at the company.  *See, e.g., McReynolds*, 672 F.3d at 489-90 (reversing denial of class certification where employees challenged common employment practice through which discrimination operated).  Throughout the entire Class period, Goldman's performance evaluation system has consisted of two processes in tandem: the 360 degree review ("the 360 Review") and forced ranking, also called "manager quartiling."  Both of these systems are invalid, unreliable, and – as Goldman acknowledges – "impacted by gender differences."[11]

Plaintiffs' expert Dr. Wayne Cascio has comprehensively examined the 360 Review and forced ranking processes and concludes they fail to meet basic professional standards in the field of Industrial Organizational Psychology – the field dedicated to designing and/or validating

---

[8] Goldman has not produced personnel and payroll data beyond 2011.

[9] Shaver Decl., ¶ 22.

[10] *See* http://www.goldmansachs.com/who-we-are/leadership/management-committee/index.html (last visited May 7, 2014); http://www.goldmansachs.com/s/2012annual/assets/downloads/GS_AR12_AllPages.pdf (last visited May 7, 2014).

[11] GS0190618 at 623.

employment systems.  In applying his four decades of experience and the standard methods of his field, Dr. Cascio specifically finds that "the observed gender differences arising from the performance evaluation systems are not justified by reliable measures [and] are based on practices that are unsupported in my field…."  Cascio Report, ¶ 21.

As shown below, Goldman itself has long known that these performance evaluation procedures generate gender bias, but continues to use the same invalid systems year after year.

### a.   The 360 Review Process

The 360 Review has been used uniformly across the Class divisions throughout the Class period.[12]  In this process, reviewees are evaluated by supervisors, peers, and subordinates (as well as self-reviewed).  The 360 Review includes a uniform rating system for providing quantitative feedback, and uses firmwide review categories – such as "overall commercial effectiveness" – whose scores are used to generate the employee's overall 360 score.[13]

While a multi-source feedback process such as a 360 review arguably could be constructed to provide valid developmental feedback, Goldman's particular 360-degree review is an improper tool to make compensation and evaluation decisions.  As described by Dr. Cascio, there are numerous design and implementation deficiencies that render it unreliable and invalid. For example, review scores are clustered such that the vast majority of employees receive virtually the same numerical score.[14]  This has caused Goldman itself to acknowledge the 360's overall unreliability, with Goldman's head of HCM stating that the 360 scores are inflated and in

---

[12] Kung Tr. 30:5-16; 278:16-279:12; Heller-Sberloti Tr. at 79:18-21; 264:19-266:18; Larson Tr. 69:23-70:6; 167:20-168:1.

[13] Kung Tr. 305:14-306:2; 307:2-8; Landman Day 1 Tr. 145:17-146:17; GS0005283 at 287.

[14] Cascio Report, ¶¶ 82-84, 97-98.

- 5 -

addition are *decoupled from performance* in such a way that they cannot be relied on.[15]

Likewise, Goldman provides ineffective training to its managers on the implementation of the

360 and fails to train reviewers on how to calibrate for specific results across categories of

performance, meaning that reviewers are not trained to value the same performance similarly.[16]

In addition, the 360 systematically undervalues the relative performance of women in

critical areas.[17]  For example, women are rated much worse than men on business-related

measures such as "commercial effectiveness" and better on areas such as "teamwork."[18]  Overall,

rather than being a feedback tool to assist employees in development, the 360 Review has

common structural components that systematically undervalue the performance of women.[19]

Goldman's own internal audits of the process confirm this fact.[20]

As a result of these problems with the 360 Review, female Associates and Vice

Presidents have received lower scores on the 360 Review in every year for which data has been

---

[15] GS0143793 at 794 ("[T]here has been a notable inflation of scores over time, and this year the gap between the scores of top and bottom performers has become particularly compressed.  You may, for example, encounter situations where bottom performers received high scores, or where strong performers received relatively low scores.  It is more important than ever to avoid over-reliance on scores when forming a view of an individual's performance.").  *See also* Cascio Report, ¶¶ 82-84, 97-98.

[16] *See, e.g.*, Cascio Report, ¶¶ 17, 52, 78, 95, 112-13.

[17] *See* GS0176436 at 438 ("[O]ur women score differently on our performance review system than men do.).

[18] GS0204343 at 344-349.

[19] Cascio Report, ¶¶ 37, 52-53, 73-74, 95-103; *see also* GS0161489 (female complained that men intentionally underrated female co-worker).

[20] *See, e.g.*, GS0176436 at 438 ("the number of women who are able to score in the upper quintile of the review process does not represent the normal distribution we would expect to see. Does that really make sense? How much of this result is due to substantive differences in performance and how much is due to perceptions or style differences?"); GS0190618 at 623 ("The underlying assessment of individuals that feed into the firm's processes are colored and impacted by gender differences (*e.g.*, communication styles, behavioral norms, access to informal networks, etc.").

produced (2003-2011).  Farber Report, Tables 12 & 13.  In addition, the differences in scores between male and female Associates, and between male and female Vice Presidents, comparing employees with the same relevant characteristics – including year, office, division, education, and experience – were consistently statistically significant, supporting a finding that discrimination is the cause.  *Id*., Tables 14 & 15.

While the 360 Review is riddled with problems, it also taints the second performance evaluation process, forced ranking, for which the 360 score is an input.[21]

### b.      The Forced Ranking Process

Forced ranking is a fad employment practice typically used by companies for termination decisions; it has no validity in the scientific literature and has fallen out of favor even among human resources professionals.  Cascio Report, ¶ 86.  Nevertheless, Goldman has maintained this practice despite its adverse impact on women.

After the 360 process is completed, Goldman requires its managers to group their employees using a five "quartile" distribution:[22]  Quartile 1:  Top 25%; Quartile 2:  Next 25%; Quartile 3:  Next 25%; Quartile 4:  Next 15%; and Quartile 5:  bottom 10%.[23]  Thus, Goldman force ranks its employees based on a relative scale, even if the actual differences in employee performance do not conform to such distinctions and/or are trivial.

Goldman's firmwide guidelines on forced ranking direct managers to consider three factors for making ranking decisions: performance, contribution, and potential, and to do so by

---

[21] GS0155193 (2004); GS0153032 (2005); GS0153290 (2006); GS0109353 at 355 (2007); GS0109390 at 391 (2008); GS0126057 at 058 (2009); GS0136548 at 549 (2010); GS0153035 at 036 (2011).

[22] Kung Tr. at 29:6-19; Heller-Sberloti Tr. at 39:20-24; Larson Tr. at 182:16-183:22; Landman Day 2 Tr. at 9:12-10:13.

[23] Though technically not four categories, Goldman uses the term "quartile" to refer to each bucket and "quartiling" to refer to the forced ranking process.

considering these tainted or largely undefined criteria: a) the 360 Review results (which systematically disadvantage women); b) quality of performance; c) long-term commercial impact or contribution; d) potential to assume increasing responsibility; e) leadership/management skills; and f) diversity and citizenship-related activities.[24]  As with the 360 Review, there is inadequate training and ineffective monitoring.

In fact, Goldman does not even require or suggest weighting of the factors, nor does Goldman require managers to document how they determined the score or provide transparency to employees about the process; most employees are unaware of the details (or existence) of the forced ranking process, much less their own rank or why they are being perceived (and paid) the way they are.[25]  By way of notable example, while the 360 score (which has its own infirmities, as discussed above) is an input into the forced ranking process, managers may place their employees into quartiles that differ significantly from the rank they earned per their 360 score.[26] There is no limitation on how much the forced ranking may diverge from the 360 score.[27]

Forced ranking is a particularly unreliable tool for evaluating (and compensating) employees who work in teams, as Class members frequently do, where it is difficult to determine how to allocate credit for team results.  Similarly, where, as here, employees are recruited as superstars and are overwhelmingly rated at a high level (as reflected in 360 scores clustered at

---

[24] *See*, *e.g.*, GS0153290; GS0109353 at 355.

[25] Larson Tr. at 167:9-19; GS0113380 at 393; GS0113764 at 777; GS0113509 at 523; GS0113456 at 469; GS0153941 at 966-971; GS0153035 at 038; Declaration of Shanna Orlich ("Orlich Decl."), ¶6; Declaration of Cristina Chen-Oster ("Chen-Oster Decl."), ¶ 6; Declaration of Denise Shelley ("Shelley Decl."), ¶ 6; Declaration of Lisa Albanese ("Albanese Decl."), ¶ 6; Declaration of Allison Gamba (" Gamba Decl."), ¶ 6; *see also* Cascio Report, ¶ 37(g).

[26] Landman Day 2 Tr. 26:25-27:7, 96:4-21; Kung Tr. 320:4-323:9; Heller-Sberloti Tr. 40:15-41:24, 106:11-107:6; Larson Tr. 187:9-19.

[27] Larson Tr. at 187:9-12.  *See also* GS0123267 at 290.

the top of the range), arbitrary forced rankings driven by the need to rank and not by performance ensure that the system is unreliable.

Despite forced ranking's general problems and the extent to which Goldman's particular forced ranking process is strikingly flawed, the forced ranking decisions are a major driver of compensation at Goldman, with compensation materials at every level -- from the line manager up to the divisional compensation committee – reflecting data about employee quartile placement.[28]  At every step, the disadvantages for women are compounded.[29]  Goldman's common forced ranking system adversely affects Class members and contributes to unjust, gender-based pay differences tied to this common practice.[30]

### 3. Uniform Compensation Policies and Procedures

Throughout the Class period and across all three Class divisions, Goldman maintained uniform and centrally-managed compensation policies and procedures. From 2002 to the present, the Class divisions have participated in a common bonus-setting process, known as the compensation "rounds", overseen by the firmwide compensation team and the Chief Financial Officer ("CFO").[31]  The process is uniformly comprised of several steps, with a final recommendation and approval up through the divisional Compensation Committee and

---

[28] *See, e.g.*, GS0155193 at 194; GS0153032 at 033; GS0113858 at 860; GS0123223-224; GS0123267; GS0123295-296.

[29] The disadvantages in the forced ranking process can also be observed through statistical analysis, which shows that women are significantly less likely to be classified in the top quartile. *See* Farber Report, ¶¶ 63-65, Tables 10 & 11.

[30] Goldman's forced ranking process is not transparent to employees, who are advised by Goldman that the 360 Review process is the complete performance review.  Thus, Class members are not able to challenge the legitimacy of this performance measurement or complain about biased results, which are largely unknown to them.

[31] Kung Tr. 56:7-12; Heller-Sberloti Tr. 20:25-21:5; Larson Tr. 113:25-114:22; GS0222964-967 (email from firmwide compensation to HCM leaders with year-end compensation calendar, salary guidelines, and divisional per capita targets).

ultimately to the firm compensation team.[32]  The process ends each year when the Firm finally approves each division's final compensation recommendations.[33]

The firmwide compensation guidelines require managers to consider common tainted or poorly defined factors in determining employee compensation, including manager forced rank and "other circumstances that should bear on the individual's compensation proposal for this year, such as P&L impact in the current year, indispensability of/risk of losing the individual, recent significant increase in responsibility, and specialized contribution (*e.g.* to diversity, training, recruiting) in current year."[34]  Goldman does not train managers with respect to a common understanding of how to evaluate these various factors, does not weight the factors, and does not require specific pay recommendations to be justified in writing.[35]  Women are systematically disadvantaged under this compensation-setting system.[36]

## 4.    Uniform Promotion Procedures

Goldman has maintained uniform and centrally-managed promotion policies and procedures, including the annual "cross-ruffing" process to determine who will be promoted from Vice President to Managing Director.[37]  Cross-ruffing is an interview process for pre-approved candidates.  Vice Presidents who seek promotion cannot "apply," but must instead be

---

[32] Kung Tr. 40:17-22, 41:8-24, 64:15-65:8; Heller-Sberloti Tr. 24:8-15; 57:9-24; Larson 55:14-22; 62:5-17. *See also* GS0225247.

[33] Kung Tr. 114:21-115:9; Heller-Sberloti Tr. 27:22-23; Larson Tr. 66:4-67:2.

[34] *See* GS0122587 at 589; GS0109366 at 367; *see also* Kung Tr. 117:9-121:16; Heller-Sberloti Tr. 128:2-129:8; Larson Tr. 83:4-85:19.

[35] Kung Tr. 192:7-194:3; 226:18-25; Heller-Sberloti Tr. 159:1-160:11; Larson Tr. 142:22-143:4. *See also* FN 19, *supra*; Cascio Report, ¶¶ 17, 39-42, 48-51, 73-74, 104-111.

[36] *See* Section II.B., *supra*.

[37] Kung Tr. 398:11-21; Heller-Sberloti Tr. 80:10-21; Larson Tr. 227:5-11.

invited.[38]  The process is centrally directed and managed by a firmwide group that creates and

distributes the firmwide cross-ruffing manual and trains all interviewers ("cross-ruffers").[39]

Each cross-ruffer is assigned a list of candidates to evaluate.[40]  After the cross-ruffing is

completed, the cross-ruffing committee meets and generates a list of candidates ranked in order

of preference for promotion.[41]  The division heads review this list and then create their own

separate list of ranked candidates.[42]  Both lists are submitted to the firmwide executive office for

edits and approval.[43]  The firm's Management Committee ultimately decides who is promoted.[44]

While Goldman does not require Vice Presidents to attain any particular performance

level to qualify for promotion,[45] it does consider a variety of poorly defined and unreliable

criteria, such as whether the Vice President is a "role model" or an "effective coach."  *See*

GS0109329 at 340.  Like the class certified in *Ellis*, 285 F.R.D. 492, the Class here challenges

Goldman's invalid and opaque selection process, controlled by a small group of Goldman

managers.  As a result of maintaining this process, Goldman promoted 23% fewer women than

---

[38] *See* GS0164972.

[39] *See, e.g.*, GS0163511-35; Kung Tr. 434:15-435:9; 438:22-439:9; Heller-Sberloti Tr. 211:24-212:21, 218:23-219:9; Larson Tr. 232:6-233:11, 240:10-21, 251:16-22.  The process has been directed and managed by the Subcommittee on MD Selection of the Partnership Committee (2000-2003), the Partner Practices Group (2004 and 2005), and the Talent Assessment Group (2006 forward).  *See, e.g.*, GS0109256; GS0109273.

[40] Kung Tr. 439:25-440:9; Heller-Sberloti Tr. 218:8-13; Larson Tr. 242:5-11;

[41] GS0109235 at 237; Kung Tr. 448:8-449:3; Heller-Sberloti Tr. 228:20-25; Larson Tr. 244:11-20.

[42] GS0163621; Kung Tr. 449:23-450:7; Heller-Sberloti Tr. 231:3-7; Larson Tr. 246:20-247:3.  Goldman reports that frequent comments on the bi-annual People Survey include that "division heads have too much influence over process relative to cross-ruffing/division heads overruled cross-ruffing results."  GS0296931 at 946.

[43] GS0242506; GS0222789; Kung Tr. 453:7-23; Heller-Sberloti Tr. 230:4-12; 240:22-241:11; Larson Tr. 247:24-248:8.

[44] GS0109235 at 237; GS0163511 at 535; Kung Tr. 452:19-454:16; Heller-Sberloti Tr. 230:10-231:19; Larson Tr. 248:16-20.

[45] Kung Tr. 429:5-20.

would have been expected if they had been promoted at the same rate as men with the same characteristics.  *See* Farber Report, ¶ 89, Table 20.  This pattern persisted during the Class period from 2002-2008.[46]

### B.   Goldman's Uniform Policies and Procedures Disadvantage Women.

As described above, Goldman's uniform performance, compensation, and promotion policies and procedures have systematically disadvantaged female Associates and Vice Presidents across the Class divisions.  Dr. Henry Farber, a recognized expert in labor economics, analyzed Goldman's personnel and payroll data, and concluded that these uniform procedures disadvantage women at statistically significant levels,[47] as follows:

### 1.   Goldman systematically scores and ranks women lower than their male counterparts in both the 360 and forced ranking process.

Throughout the entire class period and across the Class divisions, female Associates and Vice Presidents at Goldman have received lower scores than their male counterparts on the 360 Review and lower quartile placements in the forced ranking process.  Using a regression analysis,[48] these differences are statistically significant after controlling for differences in

---

[46] *See* Section II.B.3, *supra*. Because there were no promotions across the Class divisions in 2009, the systemic impacts are only observed prior to 2009.  This pattern changed after Plaintiffs commenced this litigation.  Shaver Decl., ¶ 26.

[47] Similarly, Dr. Cascio analyzed Goldman's systems from the perspective of Industrial Organizational Psychology and concluded that adverse outcomes for women cannot be justified by Goldman's systems.

[48] Multiple regression analysis is a statistical test which identifies factors, called independent variables, that might influence the outcome of an observed phenomenon, called a dependent variable. In the employment discrimination context the dependent variable is the employment decision, such as hiring, promotion, or termination. The statistician identifies legitimate factors that could have influenced the decision, *e.g.*, education and experience, and determines through multiple regression analyses how well these legitimate factors account for the employment decision. In this manner the influence of a protected characteristic on the employment decision can be statistically isolated.  *Smith v. Xerox Corp.*, 196 F.3d 358 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006); *see*

background, experience, tenure, position, and other relevant variables.[49]  Specifically, female

Associates were rated materially lower on the 360 score at a statistically significant level of 4.47

standard deviations (across the 5-point system of years 2003-2009) and 3.01 standard deviations

(across the 9-point system of years 2010-2011).[50]  Female Vice Presidents were rated

significantly lower on the 360 Review at a statistically significant level of 5.15 standard

deviations (years 2003-2009) and 2.7 standard deviations (years 2010-2011).[51]  Goldman's

internal audits of its 360 results corroborate Dr. Farber's findings.[52]

Female Associates and Vice Presidents fare no better in the forced ranking process:

Dr. Farber found that women are significantly less likely to be ranked in the top quartile than

their male counterparts.  For the years 2003-2011, the regression analysis comparing employees

with the same relevant characteristics reveals that Goldman systematically ranked male

Associates in the top quartile statistically significantly more often than female Associates, at a

standard deviation of 4.84.[53]  Similarly, for the years 2003-2011, the regression analysis reveals

that Goldman systematically ranked male Vice Presidents in the top quartile statistically

significantly more often than female Vice Presidents, at a standard deviation of 3.09.[54]

---

also *Hnot v. Willis Group Holdings Ltd.*, 228 F.R.D. 476 (S.D.N.Y. 2005) (discussing control
variables used in compensation regression analysis); *Wright v. Stern*, 450 F. Supp. 2d 335
(S.D.N.Y. 2006) (same).

[49] Farber Report, ¶ 7(a).

[50] Farber Report, Table 14.

[51] Farber Report, Table 15.

[52] *See*, *e.g.*, GS0176436 at 438 ("the number of women who are able to score in the upper
quintile of the review process does not represent the normal distribution we would expect to see.
Does that really make sense? How much of this result is due to substantive differences in
performance and how much is due to perceptions or style differences?").

[53] Farber Report, Table 10.

[54] Farber Report, Table 10.

All of these studies (and those reported in Section II.B.2. and II.B.3, below), exceed the threshold of 1.96 standard deviations to establish statistical significance that courts routinely accept as probative evidence of discrimination.[55]

### 2. Goldman pays women substantially less than similarly situated men.

Dr. Farber found that Goldman pays female Associates and Vice Presidents materially less than their comparable male counterparts and that the difference is statistically significant after adjusting for the relevant regression-controlled factors that make apples to apples comparisons possible.

In fact, Dr. Farber's statistical regression analysis shows that Goldman pays its female Vice Presidents, on average, 21% less than it pays comparable male Vice Presidents, with a standard deviation of 9.88.[56]  Goldman pays its female Associates, on average, 8% less than it pays its comparable male Associates, with a standard deviation of 5.1.  The disparities between how women and men fare in the 360 Review and forced ranking processes contribute to the observed compensation disparities between female Associates and Vice Presidents and their male counterparts.  Dr. Farber found that 50% of the observed compensation shortfall between female and male Associates and 22% of the observed compensation shortfall between female and male Vice Presidents is attributable to differences in how women and men are evaluated in the

---

[55] *See Smith v. Xerox Corp.*, 196 F.3d 358, 366 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006) ("If an obtained result varies from the expected result by two standard deviations, there is only about a 5% probability that the variance is due to chance. Courts generally consider this level of significance sufficient to warrant an inference of discrimination.") (internal citations omitted); *Malave v. Potter*, 320 F.3d 321, 327 (2d Cir. 2003) (noting that courts generally consider disparities of two standard deviations or more "sufficient to warrant an inference of discrimination") (internal citations and quotation marks omitted).

[56] Farber Report, ¶¶ 7(a), 56 & Table 7.

discriminatory and invalid 360 Review and forced ranking processes.[57]  The remaining gender-based pay differentials arise from the invalid compensation-setting process.  In fact, even after controlling for the 360 Review and forced ranking processes, Goldman pays its female employees less than their male counterparts despite identical qualifications and performance.[58]

These shortfalls are even more dramatic in light of the mean annualized earnings for men and women at Goldman during the Class period, which ranged for Vice Presidents between ███████████████████, and for Associates between ███████████████████[59]

### 3. Prior to 2010, Goldman promoted women from Vice President to Managing Director less frequently than it promoted similarly-situated men.

The statistical evidence also corroborates that Goldman has discriminated against women in the promotion selection process from Vice President to Managing Director.  Dr. Farber's promotion analysis indicates that Goldman promoted female Vice Presidents to Managing Director at a statistically significantly lower rate than it promoted male Vice Presidents prior to the filing of this lawsuit.[60]  While Goldman made no promotions in 2009 and then promoted more women after Plaintiffs commenced this litigation,[61] during the period from 2004 (reflecting promotion decisions made starting in 2003)[62] to 2008, Goldman failed to promote women from the Class divisions on the same basis that it promoted comparable men, to a statistically-

---

[57] Farber Report, ¶ 82.

[58] Farber Report, ¶¶ 77, 79 & Table 17.

[59] Farber Report, Tables 4 & 5.

[60] Farber Report, ¶¶ 89, 90 & Table 20.

[61] Shaver Decl., ¶ 26.

[62] Goldman did not produce data for Class period promotions in 2002 and 2003, though it has stipulated that the data would be similar.  Dkt. 159 (September 10, 2012 Memorandum and Order).  Accordingly, Plaintiffs seek certification of Managing Director promotion claims for Class members from 2002-2008.

significant level of 2.59 standard deviations.  As a result of this discrimination, 23% fewer

women were promoted between 2004 and 2008.[63]

C.   **The Named Plaintiffs and Class Member Witnesses Illustrate the Common Experiences of Women at Goldman with the Three Challenged Practices.**

The named Plaintiffs and the Class member witnesses illustrate the common experiences

of women at Goldman with respect to the three challenged practices.  All participated in the 360

Review each year.[64]  Evidence produced in this case confirms that all were subject to the forced

ranking process, though none had knowledge of this process while they worked for Goldman,

nor were they told what their quartile placements were.[65]  The experiences of named Plaintiffs

Chen-Oster and Orlich are particularly illustrative: through this litigation, they learned that

although they earned 360 scores that placed them in the 2nd and 3rd quartiles, respectively,

Goldman's system force ranked them into the 4th and 5th quartiles, respectively.[66]

In addition, the experiences described by Plaintiffs and Class member witnesses illustrate

the systemic compensation bias against women at Goldman.[67]  Likewise, the experiences of

Plaintiff Chen-Oster and Class member witnesses Lisa Albanese and Allison Gamba illustrate

the systemic discrimination against female Vice Presidents in promotions to Managing

Director.[68]

---

[63] Farber Report, ¶ 89.  This resulted in at least 19 fewer promotions for women.

[64] Albanese Decl., ¶ 5; Chen-Oster Decl., ¶ 5; Gamba Decl., ¶ 5; Orlich Decl., ¶ 5; Shelley Decl., ¶ 5.

[65] Albanese Decl., ¶ 6; Chen-Oster Decl., ¶ 6; Gamba Decl., ¶ 6; Orlich Decl., ¶ 6; Shelley Decl., ¶ 6.

[66] Chen-Oster Decl., ¶ 6; Orlich Decl., ¶ 6.

[67] Albanese Decl., ¶ 8; Chen-Oster Decl., ¶ 8; Gamba Decl., ¶ 8; Orlich Decl., ¶ 8; Shelley Decl., ¶ 8.

[68] Albanese Decl., ¶ 11; Chen-Oster Decl., ¶ 9; Gamba Decl., ¶¶ 8-16.

**D.** **Goldman Has Failed to Correct Known Disadvantages for Women Caused by Its Common Policies and Has Maintained a Culture of Gender Stereotyping and Bias.**

**1.** **The Core Challenged Practices in this Case Are Affected by a Culture of Gender Bias.**

The common performance evaluation, compensation-setting, and promotion processes are implemented against the backdrop of a gender-biased culture, described below.  Predictably, bias informs these processes.[69]  As Goldman's own Americas Diversity Committee has recognized, "[t]he underlying assessment of individuals that feed into the firm's processes are colored and impacted by gender differences."[70]  For instance, Goldman's own analyses of 360 Review results show persistent gender differences in how women and men are evaluated.  Women consistently score highest on categories like "teamwork," "diversity," and "citizenship," while men score highest on categories that are more traditionally esteemed, such as "technical skills," "client relationships," and "execution skills."[71]  In addition, results on Goldman's bi-annual People

---

[69] GS0138160, GS0140223, GS0158556, GS0158599, GS0161489, GS0161492, GS0167480-481, GS0167830, GS0176163-164 (complaints about gender bias in 360 Review); GS0115260 (female People Survey respondent notes: "[l]ow correlation of the review process with compensation"); GS0140160 (male managing director to female professionals, "I have to compensate the men better.  They are heads of households."); GS0140135, GS0167473, GS0240501 (complaints of gender bias in compensation); GS0140221-222, GS0158910-916 (complaints about gender bias in promotions); GS0152652 (female People Survey respondent: "promotion is driven by who you know and who is willing to fight for you to make it than your business contributions to the firm."); GS0135539 (awarding of promotions feels discriminatory; women cannot garner enough support, and as a result, there are very few women in senior positions); GS0240317 (after being twice passed over for promotion to MD, "I was told that my leadership position in the Women's Network negatively impacted my Managing Director reviews…"); GS0115613 (female People Survey respondent: "While the firm continues to 'promote' diversity, there is little actual progress at the senior management level.  Upon review of the annual promotion lists for managing directors, few are women.").

[70] GS0179657, GS0190618 at 623.

[71] GS0204343 at 347-349; GS0204580 at 581; GS0205118 at 131-132; GS0205551 at 556-559; GS0176436 at 438 ("[O]ur women score differently on our performance review system than men do.").

Survey -- through which employees anonymously rank the company based on level of agreement with various statements -- show that women consistently rate the fairness of the 360 Review process significantly lower than their male counterparts.[72]

Goldman itself routinely observed gender differences in compensation and did virtually nothing to remedy the problem. The sense of gender inequity in compensation is so strong that the first question on a list of topics for an HCM Associate panel was: "could you please talk about whether pay for women and men is thought to be equal and fair, and what checks & balances we have in place to be certain that there is integrity to the comp process?"[73]

It is no surprise that such a discriminatory environment exists when there is a dearth of women in leadership positions at the Firm. In fact, the lack of women at the top is such a visible problem that the Firmwide Women's Network identified it as the first of their top three action areas.[74] Internal documents show that Goldman itself was aware of the problem, yet struggled with how to address it. One presentation to Managing Directors during the 2008 promotions process stated, "the gender breakdown on the candidates and the promotes from last year [is] 10% below where we would like to be … our diversity mix, [] is not acceptable."[75] Feedback from Managing Directors in the cross-ruffing process also reflects concerns about gender bias,[76]

---

[72] GS0201530 at 531-532 (2003); GS0227078 (2005); GS0264120 at 122 (2007); GS0192652 at 704 (2009).

[73] GS0178240.

[74] GS0204773 ("Top 3 issues: promotion, promotion, promotion (and comp)").

[75] GS0219988 at 016.

[76] *See, e.g.*, GS0220543 at 544 ("Women were criticized [in cross-ruffing process] for not being involved in community service; double-standard is applied to women candidates."); *see also* GS0176436 at 439 ("For most women in [IBD] given their tenure, the process has been hard to measure – not that many have the ten year perspective required").

- 18 -

while Diversity Committee materials from 2007 concede that "[p]romotion is based on who you know and who knows you" but "the playing field is not level."[77]

Despite being aware of substantial, systemic gender bias for many years, Goldman has failed to correct these problems.

> ### 2.      Goldman Has Ignored Overwhelming Evidence of Intentional Discrimination Against Women and Maintained a Firm Culture Hostile Towards Women.

Goldman's discriminatory processes do not arise in a vacuum, but instead are shaped by a common culture of gender stereotyping and hostility towards women at the Firm.  The evidence of intentional discrimination is substantial, from many different sources, which separately and collectively bring statistical evidence of systemic discrimination to life,[78] including:  1) internal complaints by female employees submitted to Goldman's Employee Relations department; 2) comments made by employees in the bi-annual Goldman People Survey; 3) civil lawsuits and gender discrimination charges filed against Goldman with governmental agencies; 4) documentary evidence such as corporate emails and records reflecting persistent biases and systemic problems for women; 5) articles about Goldman's culture in the press; and 6) the Class member and witness declarations submitted herewith.

This constellation of evidence reflects widespread concerns among women about gender bias and a "boys club" atmosphere; the sexualization of women and an uncorrected culture of sexual harassment and assault; the advancement by the firm of male employees and managers accused of misconduct towards women; the gender stereotyping of working mothers as unfit for

---

[77] GS0194265 at 276. *See also* GS0191994 at 014 (Global Leadership and Diversity materials note that women "lack [] strategic sponsor/champion relationships"; "Meritocracy is perceived as not transparent, specifically as it relates to promotion and compensation").

[78] *See Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977).

or uncommitted to their careers; the lack of appropriate human resources interventions; and a culture of retaliation in response to employee complaints.

a. <strong>Goldman Maintains a "Boy's Club" Atmosphere.</strong>

Like every other large company in the United States, Goldman has a nominal policy against sex discrimination.  Goldman does not follow its policy.

Women report a "boy's club" atmosphere, where binge drinking is common and women are either sexualized or ignored.  For example, a presentation by Goldman's Americas Diversity Committee reports that women are "unable to crack male informal networks."[79]  Similarly, a presentation to new Business Unit Managers states that, "to our minorities … the limited sharing of the secret code of requirements to succeed at GS must feel awfully different" and, by way of illustration noted a recent Business Unit Leaders panel where "the number of references to 'buddies', 'drinking buddies', 'sports' and 'frat pals' makes it easier to understand how someone who didn't grow up in that environment might find it more challenging."[80]

Goldman's internal complaint files confirm that the sexualized and male-centric workplace is a major hurdle for women.  *See e.g.*, GS0175193 (manager is a "locker room guy" and the team feels like a "boys club"; manager has "never seen women on a distressed [sales] desk" and "the women feel they have never had the same opportunity profile"); GS0175509 (manager runs the team like a "boys club"); GS0161490 (managers made regular comments about women being "no good after [age] 27").  Women are excluded from events and outings, which provide valuable networking opportunities and help men advance their careers.  *See, e.g.*, GS0175439-441 (complaint by female Associate that she is excluded from client events

---

[79] GS0179657.

[80] GS0205231 at 236.

including dinners and sporting events; harassed at client event by employee "drinking heavily");

GS0175494 (men on the desk had baseball tickets and did not invite the women); GS0158556

(reporting a "male dominated/very difficult environment for women"; one time she went out

with the guys from her desk involved heavy drinking); GS0175204 (manager invited the men on

the desk out for drinks, making the women feel excluded).[81]  Plaintiff Shanna Orlich's

experience illustrates this problem, in that she was denied opportunities to work as a trader,

while a male colleague with no more experience was given a trading seat right away; senior

managers challenged him to do push-ups on the trading floor due to his background in the

Marine Corps.  Orlich Decl., ¶ 10.  Likewise, despite being a Varsity golfer in school, Orlich was

not invited to all-male golf outings that her male peers and male subordinates attended with

senior managers.  *Id.*, ¶ 9.

     Other documents further illustrate that the Firm has been well aware of its culture and

reputation.  *See*, *e.g.*, GS0191994 at 2014 (Global Leadership and Diversity meeting notes report

that "the 'boy's club' environment creates limited networking opportunities," and "the

environment appears inclusive, but on 'male terms' – a feeling that 'GS men don't get

women'"); GS0176436 at 439 ("A female VP posts a male [Partner] about a women's dinner.

His response 'How did the bitch session go?'"); GS0264184 (head of Global Leadership and

Diversity calls gender differences in responses on People Survey "appalling").  In fact, on the bi-

---

[81] *See also* Albanese Decl., ¶ 13 (excluded from important networking opportunities and client events); Shelley Decl., ¶¶12-15 (women overwhelmingly excluded from important social and professional networks, and men frequently went out drinking together); Gamba Decl., ¶18 (excluded from outings among male colleagues); Parisi Decl., ¶ 6 (males benefit from the favoritism of senior managers); Tischhauser Decl., ¶ 6; Greg Smith, *Why I left Goldman Sachs: A Wall Street Story* (2012) 98, 101("Alcohol was a big part of the culture at the firm, as it is on Wall Street in general"); describing social pressure to impress his managers by drinking excessively).

annual People Survey, the Firm's performance on "diversity" is consistently rated as the lowest or second lowest category, especially by women.[82]

> **b.   Goldman Condones the Sexualization of Women and an Uncorrected Culture of Sexual Assault and Harassment.**

Company records indicate that Goldman permits or facilitates a culture where male professionals view women as sexual objects, leading to substantial numbers of incidents of alleged sexual assault and harassment in just the three Class divisions.  In complaint files produced for the period 2000-2011, there have been at least 75 such *reported* incidents.[83]  For instance, one male manager took his female employee to an abandoned office floor and propositioned her for sex; he separately called her and said he was masturbating to the sound of her voice.[84]  He also insisted that she come to his apartment, where he showed her pictures he had taken of other Goldman female employees in lingerie.[85]

Another Goldman manager told his female employee that, "with that feisty nature, you would be good in bed."  GS0158798.  Yet another male Goldman manager told his female employee that he loved her, and repeatedly made sexually suggestive comments and overtures during business trips.[86]  *See also* GS0162302 ("I was talking to this guy who just got promoted to VP . . . I told him about how it made me uncomfortable how the guys were touching me, and he was really supportive and giving me advice on what to do, and the next thing I know, his hand is on my ass, too!");  GS0162142, 160, 171-173, 191 (male vice president massaged female employees' shoulders and asked them out for drinks while on the desk; another male supervisor

---

[82] GS0180331 at 338 (2003); GS0180657 (2003); GS0227078 (2005); GS0246067 (2009).

[83] *See* Shaver Decl., ¶ 23.

[84] GS0175921.

[85] GS0175916.

[86] GS0175325-326, 329.

and vice president allowed client to discuss female subordinate in a sexual manner while female subordinate was on the calls and also discussed performing sexual acts on another female colleague he labelled a lesbian); GS0167579-603 (male manager rated the outfits of female employees on the desk, rubbed the shoulders of female analysts, told a female colleague he is "big down there", and asked if female employee's roommates are "easy fucks"); GS0167542 (male employee showed coworkers a sex tape he made with an unidentified woman and perpetuated rumor that the woman was a female coworker). *See also* Shaver Decl., Ex. D (Marie Myung-Ok Lee, *What It was Like to Be a Woman at Goldman Sachs*, The Atlantic, November 26, 2012, www.theatlantic.com/sexes/archive/2012/11/what-it-was-like-to-be-a-woman-at-goldman-sachs/265572) (describing "memos announcing a new crop of incoming female associates [that] instead of the usual corporate headshot . . . used different semi-nude pictures of *Playboy* playmates," and a widely-held belief "that it was a professional responsibility for women to wear heels, the higher the better"); *id*., Ex. I (Daniel Bates, *How to Party Like a Goldman Trader*, Daily Mail Online, October 18, 2012, www.dailymail.co.uk/news/article-2219662/Inside-bankers-lives-excess-hot-tubs-Goldman-Sachs.html) (describing corporate party in Las Vegas including hot tubs with topless woman).

Even more disturbingly, in the same time period, at least seven women reported criminal sexual assault, attempted rape, or rape by male Goldman employees from the three Class divisions. GS0162409-410 (female employee drugged and raped by male employee after company baseball game); GS0161598-600 (female employee persistently harassed, groped, and propositioned for sex by male manager at Goldman orientation retreat; after being rejected, he followed her into her room, tried to get into her bed, and would not leave her alone until she was able to lock the door); GS0162306 at 313 (after drinks with colleagues, male Vice President took

sick female coworker back to her house, followed her into her home, got in her bed, and put her

hand on his crotch); GS0158763-764 (male colleague groped female employee during an

evening social event, said "I want to fuck you" and put his hand down her pants multiple times to

grab her crotch while in front of friends, despite her protestations); GS0162384-385 (Managing

Director took his assistant out to dinner, and during the taxi ride back he groped her and put his

hand down her blouse); Chen-Oster Decl., ¶ 10 ("I was sexually assaulted by a married male co-

worker after attending a Goldman dinner to celebrate the promotion of a man in my group to

Managing Director."); Shaver Decl., Ex. G (Chris Dolmetsch, *Goldman Managing Director to*

*Be Arraigned on Rape Charge*, Bloomberg News, September 20, 2013,

www.bloomberg.com/news/2013-09-20/goldman-managing-director-to-be-arraigned-on-rape-

charge.html) (Managing Director accused of raping 20-year old woman after meeting her at a

nightclub and inviting her to his Hamptons property rented for $33,000 a month).

Unsurprisingly in such a culture, work events are held at strip clubs where the

sexualization of women is endorsed and celebrated.  *See*, *e.g.*, Shelley Decl., ¶ 10 ("my male

colleagues at Goldman took their clients to strip clubs"); Tischhauser Decl., ¶ 7 ("In my

experience, entertaining clients at strip clubs was considered routine for Goldman in the U.S.");

GS0158596 (male partner took clients to strip clubs); GS0167724 at 726 (work events took place

at restaurant where female servers wear bikini tops); GS0175455 ("traders take clients to Asian

massage parlors"); GS0161513 at 518 (email from Vice President to administrative assistant

stating as the "subject" of the email, "new place for mmkt [money market] party!!"with the text

of the message, "what do you think. . . Penthouse Launches Flagship Club in Manhattan . . . a

Manhattan-based, luxury gentlemen's club"); Shaver Decl., Ex. H (Tracy Clark-Flory, *Goldman*

*Sachs: When business and strip clubs mix*, Salon, Sept. 16, 2010,

www.salon.com/2010/09/17/strip_club_business) (strip club marketing manager noting frequent business visits to the club with topless entertainment and an "extremely upscale" steakhouse); *id.*, Ex. E (Patrick McGeehan, *Former Trader Sues Goldman, Charging Firing Was Illegal*, N.Y. Times, February 09, 2000, www.nytimes.com/2000/02/09/business/former-trader-sues-goldman-charging-firing-was-illegal.html) (describing lawsuit by former trader for Goldman, alleging that he believed that his inter-office, extramarital affair would be accepted by the Firm because the Firm accepted his entertaining clients at strip clubs); *id.*, Ex. F (Mike Taylor, *Goldman "Defender" Saw Harassment at Firm: "Deep Doodah",* The N.Y. Observer, September 23, 2010, observer.com/2010/09/goldman-defender-saw-harassment-at-firm-deep-doodah) (former Goldman partner acknowledging that her boss engaged in sexual harassment and discrimination and she personally experienced inappropriate behavior, including a Goldman outing to a strip club). In fact, Goldman has such a strong reputation for this kind of behavior that in 2005 the Firm cautioned new associates in their orientation that while clients will ask to go to strip clubs, they should merely not "expense" that entertainment.[87]  However, the record above demonstrates that entertaining clients at strip clubs remained unabated, if frequently "off the books."

c.   **Goldman Tolerates and/or Rewards Men Who Engage In Misconduct Towards Women.**

Goldman is aware of these problems, and it tolerates managers who engage in gender stereotyping, sexual harassment, and/or gender favoritism. For example, one female employee reported that it is "widely known" that ▮▮▮Participating Managing Director▮▮▮ ▮▮▮Participating Managing Director▮▮▮ is "inappropriate toward young women," that "other women have inappropriate experiences with [him]," and that she is

---

[87] GS0177811 at 838.

"terrified of being with him alone."  GS0175498-989.  She reported that walking down the hallway, she had to face ██Participating Managing Director██ 'checking her out' up and down."  GS0175490 at 502, 513.

Likewise, ███████ Participating Managing Director ███████ was accused of directing a male employee to order a video called "Girls Having Fun" during work hours, GS0161950-51, and of telling his female assistant that she would not need her job after becoming engaged since she would be a "trophy wife."  GS0162457.  He was also accused of retaliating against female employees who complained of gender discrimination.  GS0162457.

Another male Managing Director, who was on the 2004 cross-ruffing committee for the Securities Division,[88] was the subject of three separate complaints by female employees.[89]  Just one of the complaints against him states that, "in the past year [manager] pushed a minority woman off the Sales desk, fired a woman on maternity leave, failed to promote a well-credentialed and deserving woman (who ultimately resigned) and is currently performance managing another woman (who happens to be pregnant) off the Sales desk."[90]  The same complaint alleges that this manager browbeat his female employee to the point of tears, and then offered her dollar bills to wipe her eyes.[91]  Another woman claimed that this manager asked her whether she intended to have children, and when she responded affirmatively, she found herself selected for termination.[92]  *See also* Chen-Oster Tr. at 424:11-18 (describing this same manager as a "guys' guy" who did not support another female star employee for promotion because of her gender).

---

[88] GS0109329 at 331.
[89] *See* GS0145358, GS0158576, GS0175866, and GS0175883.
[90] GS0175867.
[91] GS0178566.
[92] GS0145358.

This is typical of a broader pattern: men who engage in these behaviors are often protected or given a slap on the wrist (if that), and the problems remain wholly unaddressed. *See*, *e.g.*, GS0175440 (multiple women complain about gender issues on the desk, including inappropriate comments made by one male employee, but no actions are taken after an investigation); GS0145360 and GS0158798 (manager who told his employee she would be good in bed was given nothing more than verbal warning); GS0162384-385, 404 (manager who groped his assistant received only a written warning).  *See also* GS0162463 (when [Participating Managing Director] [Participating Managing Director] assistant complained about gender discrimination and "trophy wife" comment, HCM told her she should take the comments as a joke and feel flattered); GS0167542 (male associate who perpetrated sex tape rumor was investigated by Employee Relations, which recommended a "strongly worded written warning").

In fact, perpetrators of sexual harassment have been promoted to or allowed to remain in senior managerial positions.  For example, the co-worker who sexually assaulted named Plaintiff Chen-Oster was later promoted to Managing Director.[93]  Another female employee complained that her male supervisor rang a bell every time a woman walked on to the floor, and the supervisor was soon after promoted to Managing Director.[94]  A different Managing Director was the subject of multiple complaints of gender discrimination; Employee Relations commented that "the stats don't look that good,"[95] and yet he continued to force women in his group to leave.  As

---

[93] GS0109873.

[94] GS0167724 & *2008 Goldman Sachs Annual Report*, Goldman Sachs, http://www.goldmansachs.com/investor-relations/financials/archived/annual-reports/2008-entire-annual-report.pdf (last visited February 16, 2014).

[95] GS0175552.

one of the women who complained about him put it, "No one is stopping what is happening to women."[96]

> **d.     Goldman Devalues Pregnant Women and Punishes Working Mothers Based on Stereotypes about their Commitment to their Jobs.**

Goldman views women who have children as less committed to their jobs, and penalizes them for having children by reassigning key accounts, relationships, and roles.  Internal complaints on this issue present a consistent pattern of pregnancy-related discrimination.  *See* GS0158549 (Vice President's job responsibilities taken away upon her return from maternity leave); GS0175874 (good accounts denied to Vice President "because they knew she would be going out on maternity leave. Given smaller accts. Told she would get bigger accts when she got back. Didn't happen."); GS0167564 (told by male manager "that I would be moved because I am going on maternity leave … The person who is replacing me just had a baby, so I am led to believe that because I am pregnant I lost my spot and because he is male he is allowed to keep one."); GS0140133 at 137-138 ("The stereotypical perception by my male colleagues and supervisors was that my new child caring responsibilities meant I was no longer 100% devoted to my work. At one point my boss suggested that I might want to speak with the women's committee and go into a job that would not be as demanding."); Albanese Decl., ¶ 12 ("During my pregnancy, Goldman Sachs removed my duties and took away my assistants.  I was told that I would be transferred to a department of one person (me) with no advancement opportunities."); Chen-Oster Decl., ¶ 12 (after maternity leave, "Goldman Sachs removed me from meaningful responsibilities and accounts and moved my seat to a location among administrative assistants");

---

[96] GS0158912.

Gamba Decl., ¶¶ 9-17 (denied promotion to Managing Director after taking maternity leave; manager said he would "be ridiculed" if he supported her candidacy).

For instance, one Vice President reported that when she announced she was pregnant, her managers moved her off a business she had personally grown and in which she had managed several employees in so doing. GS0158602. When she returned from leave, she was moved out of a managerial position entirely, and her compensation went down by over 40% even though her book of business was up 72%. GS0158607. Another Vice President reported that after she returned from maternity leave, her managers "keep 'forgetting' to include me in calls/meetings they set up" and that much of the credit for revenues associated with her accounts was given to male colleagues at the year's end. GS0138162.

Goldman's internal documents demonstrate the firm's knowledge of problems in its treatment of working mothers and women on maternity leave. A 2003 document titled "Talking Points for Managing Maternity Leave" acknowledges, "We have limited experience in dealing with the issues surrounding managing a professional on maternity leave, and some of our experience has proven that we are not very good at it."[97] Similarly, meeting notes from the Global Leadership and Diversity office note that women report "concerns around maternity leave and re-entry."[98]

In a firm where having children is disfavored and carries adverse assumptions about future performance, it is easy to see how Goldman's invalid performance, compensation, and promotion measurements are a common vehicle to cement and utilize improper stereotypes.

---

[97] GS0204237.
[98] GS0191994 at 2014.

### e.      Goldman Lacks Appropriate Preventative Measures Against Discrimination.

Despite knowledge of persistent bias and stereotyping at the firm, Goldman has failed to implement even the most basic preventative measures, such as appropriate diversity training or effective Human Resources auditing for biased outcomes.  Though employees are supposedly required to complete two hours of diversity training per year, internal audits suggest that most do not.[99]  In fact, Goldman's manager training data indicates that between one-half and three-quarters of managers attended no diversity training at all between 2002 and 2007.[100]  Moreover, many of the trainings that satisfy this requirement – such as a 2010 presentation called "Kick-off to the World Cup: Building the Future of U.S. Soccer," a 2010 film screening of "Team Everest: A Himalayan Journey", or a 2011 presentation called "Diversity in the Business of Sports" – appear not to even address the subject matter, much less curtail inappropriate behavior or teach managers how to manage fairly.[101]

Likewise, Goldman fails adequately to review its evaluation, compensation, and promotion practices, maintaining review procedures that have been perfunctory at best and have failed to correct known, continuous, systemic disadvantages for women.[102]  For example, each year during the Class period, Goldman's firm-wide Employment Law Group ("ELG") conducted a secret, privileged review process that Goldman does not share with management or use to correct known problems.[103]

---

[99] *See* GS0176249 at 255, 258 (in 2007, only 35% of employees completed 2 hour requirement, and 54% did no training; the Firm's unstated goal is that 75% of employees complete 2 hours).

[100] Shaver Decl., ¶ 24.

[101] GS0139403 at 406; Shaver Decl., ¶ 25.

[102] *See also* Cascio Report, ¶ 17, 65-70, 73-74, 114-131.

[103] Shaver Decl., ¶ 27; *see also* Kung Tr. 156:16-157:13, 161:2-10, 162:18-163:1; Mehling Tr. 168:7-12; Kung Tr. 160:17-163:17; Landman Day 2 Tr. at 152:18-153:11; GS0109352,

HCM also reviewed manager forced rankings for each of the Class years, purportedly "focusing on women and historically underrepresented groups."[104]  However, instead of conducting a meaningful review of specific forced rankings to identify and rectify discriminatory outcomes, HCM did nothing more than perform a top-level verification that rankings mathematically satisfied the required firm-wide percentage distributions (*e.g.*, no more than 25 percent of individuals ranked in the top quartile).[105]  HCM reviewed the ranked groupings, or "buckets," across business units, regions, and job titles, to ensure that the percentages were mathematically correct on each level.[106]  If the buckets were mathematically correct, HCM did not conduct any other review of the forced rankings.[107]  Importantly, HCM lacks a uniform system for flagging and addressing discrepancies between 360 scores and the manager forced ranking,[108] which Goldman allows to deviate without limit.[109]

Based on the statistical results that show adverse impact against women across the Class period in both the compensation and performance processes, and for the period through 2008 for promotions from Vice President to Managing Director, whatever auditing Goldman has done,

---

GS0122587 at 590-591.  Notably, Goldman has claimed that this ELG review is privileged, refusing to produce discovery about its work.  Accordingly, the existence of this review, as anemic as it may be, cannot be offered by Goldman as a defense in this action.  *See, e.g.*, *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) ("[F]airness considerations arise when the party attempts to use the privilege both as 'a shield and a sword.' . . . a party cannot partially disclose privileged communications or affirmatively rely on privileged communications *to support its claim or defense* and then shield the underlying communications from scrutiny by the opposing party." (emphasis added) (citations omitted)).

[104] GS0122587 at 598; *see also* GS0109402.

[105] Heller-Sberloti Tr. 321:4-322:23; GS0212469.

[106] Heller-Sberloti Tr. 322:11-14; Larson Tr. at 70:17-21.

[107] Heller-Sberloti Tr. 322:24-323:7.

[108] Heller-Sberloti Tr. at 35:20-48:24; Kung Tr. at 322:24-325:11.

[109] Heller-Sberloti Tr. at 106:11-107:6; Kung Tr. 325:12-326:5; Larson Tr. at 190:16-24; *but see* Larson Tr. at 187:9-12 (Q: "Are there any restrictions on how far a Manager Quartile can deviate from the performance review Quartile?" A: "No.").

whether through the ELG or HCM processes or otherwise, has not corrected the problem.[110]  As

Dr. Cascio observed, "[t]he existence of these review processes indicates that Goldman knew

that women were being disadvantaged by the quartiling process, and also that they were

underpaid relative to similarly situated men, but the statistical analyses in this case show that it

has failed to correct the problem."[111]  Goldman's own documents reflect likewise:

> REALITY: The underlying assessment of individuals that feed into the firm's
> processes are colored and impacted by gender differences (e.g., communication
> styles, behavioral norms, access to informal networks, etc.)
>
> GS0190618 at 623 (Goldman Americas Diversity Committee).

### f.       Goldman Retaliates Against Women Who Complain.

Goldman lacks a complaint process free of retaliation and women report that speaking to

Employee Relations is a "career ender."  *See*, *e.g.*, GS0140283 (after female employee

complained about gender discrimination, she overheard statements that her manager "considered

me to be a 'troublemaker' and a 'bitch' and that I had to be 'broken.'"); GS0140033 (after

complaining of sexual harassment, female employee was told she had thirty days to find a new

job, and her complaint was never addressed); GS0175544-547 (after complaining to Employee

Relations, Vice President received overwhelmingly negative 360 reviews from her team;

Employee Relations investigation found that her act of raising her complaint to Employee

Relations had "impacted her review."); GS0175455 (female complainant: "Feel very strongly

that I would be sacrificing myself if I gave you [the harassers'] names."); GS0175454 (women in

my group "are concerned about retaliation" if they complain); GS0175507 (female complainant:

reporting to Employee Relations will cause relationships to be damaged, bridges burned);

---

[110] *See* Cascio Report, ¶¶ 55, 120; *see also* FN 106, *supra*.

[111] Cascio Report, ¶ 120.

GS0161435 (female Managing Director did not raise gender concerns in her original written complaint because she feared retaliation); GS0140222 (female Vice President: "after I raised complaints of gender discrimination, [my manager] questioned my 'work ethic' and said I was not working hard enough."); GS0140168 (complainant: "I believe that the reason Goldman has taken the foregoing adverse actions, including reducing my job responsibilities, decreasing my compensation, breaching its compensation agreements with me, and otherwise undermining my ability and preventing me from performing my job, related to my sex and to the complaint I registered against [my manager]."); Albanese Decl., ¶ 14 (complaining to Employee Relations would have amounted to "throwing my career away"); Shelley Decl., ¶ 19 ("voicing such complaints is considered damaging to one's career, if not career ending at the firm."); Baggett Decl., ¶ 9 ("I understood, based on the way I was treated after speaking up, that I would not be offered a full-time position with the company."); Gamba Decl., ¶ 21 ("I believe that only a small fraction of the women who suffered sex discrimination and bias at Goldman Sachs have come forward due to the risk of retaliation," and that "[g]iven what I experienced . . . I believe that these fears are well founded."); Chen-Oster Decl., ¶ 11 (after reporting sexual assault to supervisor, the assaulter was assigned to be one of her co-managers and other job duties and responsibilities were removed); Parisi Decl., ¶ 8 ("When I brought the repeated instances of discrimination to the Firm's attention, the Firm did not act to remedy the situation, but instead retaliated against me by reviewing me negatively, lowering my compensation, threatening to take away my [account] coverage . . . and ultimately terminating my employment.").  As one complainant put it, "when you raise issues, [they] don't get addressed, you get in trouble"; you either "keep your mouth shut or get ostracized."[112]

---

[112] GS0175979.

Given this abundant evidence of a culture of retaliation, it is not surprising that women's fear of speaking up about gender discrimination at Goldman extends even beyond their tenure at the firm.  Former employees who still work in the financial services industry report concerns that if they come forward with negative statements about Goldman, the firm will blacklist them, causing career problems for years after they leave the company.  *See, e.g.*, Shaver Decl., Ex J, ¶¶ 4-6 (former Vice President describes how Goldman sabotaged her prospective job offers at two other firms because of her discrimination complaint, by telling those firms she is a "troublemaker" and that they should "run, not walk, away.").

## III.   ARGUMENT

Plaintiffs seek certification of the following Classes under Fed. R. Civ. Proc. 23(a), (b)(2), b(3) and/or c(4):

> All female Associates and Vice Presidents who have worked in Goldman Sachs' Investment Banking, Investment Management, and/or Securities Divisions in the United States at any time from September 10, 2004 to present, and in New York City from July 7, 2002 to the present.

For the reasons set forth below, Plaintiffs satisfy the requirements of Rule 23.

### A.   Legal Standard

A court's class certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim."  *Dukes*, 131 S. Ct. at 2551.  However, Rule 23 "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013) (emphasis in original).  Hence, the Court's task at the Rule 23 stage is "not to adjudicate the case; rather, it is to select the metho[d] best suited to adjudication of the controversy fairly and efficiently."  *Id.* (internal quotation marks omitted).

The Ninth Circuit recently applied the standards enunciated in *Amgen* to an employment discrimination class action. *Stockwell v. City & County of San Francisco*, No. 12-15070, 2014 U.S. App. LEXIS 7694 (9th Cir. Apr. 24, 2014). The court reversed denial of class certification wherein the district court had found that Rule 23(a) was not satisfied because plaintiffs' statistical report, which showed a disparate impact against older workers, did not establish causation, *i.e.*, that age was the reason that the class was adversely affected. The district court also had resolved numerous challenges to the statistical methodology in favor of the defendant. The Ninth Circuit, citing *Amgen*, held that the district court had impermissibly considered merits questions because "demonstrating commonality does not require proof that the putative class will prevail on whatever common questions it identifies." *Id*. at *12. Instead, the court was satisfied that plaintiffs produced a statistical study "purportedly showing a disparate impact" and "whatever the failings of the class's statistical analysis, they affect every class member's claims uniformly," which "strengthened, not weakened, the case for certification, as it has identified a common question, the resolution of which will uniformly affect all members of the class." *Id*. at *21, 24.

The same standard applies here. Plaintiffs' burden at the class certification stage is to show that "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and [that] these particular issues are more substantial than the issues subject only to individualized proof." *In re U.S. FoodService Inc. Pricing Litigation*, 729 F.3d 108, 118 (2d Cir. 2013) (quotations and citation omitted) (citing *Amgen*). Plaintiffs have met that burden here.

### B.      This Case Meets the Requirements of Rule 23(a)

In determining whether class certification is appropriate, the Court first must confirm that Plaintiffs have satisfied the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a).  All of these are met here.

### 1.      The Class is Sufficiently Numerous.

Rule 23(a)(1) requires Plaintiffs to show that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1); *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (numerosity presumed at 40 class members).  Here, the class is larger than the minimum threshold, totaling at least 1,762 women, and well within the range of class sizes suitable for class treatment.[113]  *See, e.g., Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 257 (S.D.N.Y. 2007) (class size in the thousands).  Numerosity is met.

### 2.      The Class Presents Common Issues of Law and Fact.

Rule 23(a)(2) requires common questions of law or fact. Fed. R. Civ. P. 23(a)(2). Although class members' claims need not be identical and determination of the answer is reserved for the merits stage,  *Amgen*, 133 S. Ct. at 1191, they must share common questions of fact or law, such that "a classwide proceeding [can] generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 131 S. Ct. at 2551 (emphasis in original) (citation omitted). Individual variation among the class does not defeat commonality; "even a single common question" is enough to satisfy Rule 23(a).  *Gulino*, 2013 U.S. Dist. 123948 at *23 (citations omitted) (internal quotation marks omitted); *see also Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (issues of fact are common when the injuries derive from a "unitary course of conduct by a single system").

---

[113] Farber Report, Table 1.

In *Wal-Mart v. Dukes*, the Supreme Court identified two types of questions that generate common answers for purposes of Rule 23:  1) if a plaintiff shows that an employer used a "biased testing procedure to evaluate" applicants and employees; or 2) if a plaintiff presents "significant proof that an employer operated under a general policy of discrimination . . . if the discrimination manifested itself . . . in the same general fashion, such as through entirely subjective decisionmaking processes."  131 S. Ct. at 2553 (citations omitted) (internal quotation marks omitted).  Plaintiffs raise both types of common questions here.

### a.   Plaintiffs Challenge Specific Biased Employment Practices Which Raise Common Questions.

Post-*Dukes*, district courts in the Second Circuit have found the requirements for class certification satisfied where the claims derive from an employer's uniform and centrally determined employment practices and policies.  *See City of New York*, 276 F.R.D. at 35; *Easterling*, 278 F.R.D. 41; *see also McReynolds*, 672 F.3d at 489 (allowing Title VII class certification where the plaintiffs pointed to two company-wide policies).  Plaintiffs here challenge specific, biased employment practices:  Goldman's compensation policies and procedures; Goldman's promotion procedures with respect to promotion from Vice-President to Managing Director; and the 360 Review process and forced ranking processes that contribute to compensation and promotion decisions.  These challenged policies and procedures are specific employment practices that present common questions capable of "generat[ing] common answers apt to drive the resolution of the litigation."  *Dukes*, 131 S. Ct. at 2551 (citation omitted) (internal quotation marks and emphasis omitted).  These questions include: (1) whether Goldman treated women differently than men in the application of its evaluation, compensation, and/or promotion policies and procedures; (2) whether Goldman's evaluation, compensation, and/or promotion policies and procedures have an adverse impact on women; and (3) if adverse impact is shown,

- 37 -

whether Goldman satisfies its affirmative defenses (*e.g.*, business necessity) to maintain such policies and procedures causing adverse impact.  Consistent with *Dukes*, common evaluation practices give rise to common questions apt to drive common answers, as do more discretionary systems so long as there is a common mode of exercising discretion.  *Dukes*, 131 S. Ct. at 2554.

A recent circuit decision highlights the appropriateness of class certification in employment discrimination cases where companies craft and maintain specific policies like those here.  In *McReynolds v. Merrill Lynch*, the plaintiffs contested two national, company-wide policies – a teaming policy and an account distribution policy.  672 F.3d at 488.  In reversing the district court's denial of class certification, the Seventh Circuit held that, like here, these two policies were specific employment practices that were "practices of Merrill Lynch, rather than practices that local managers can choose or not at their whim.  Therefore challenging those policies in a class action is not forbidden by the Wal–Mart decision."  *Id*. at 489–90.

Consistent with *Dukes*, Plaintiffs here challenge compensation, promotion, and performance evaluation procedures that were centrally developed and uniformly implemented and that collectively disadvantage women at Goldman.  Those challenges will generate common answers.

### b.      Plaintiffs Present Significant Proof of a General Policy of Discrimination.

Plaintiffs typically make their *prima facie* showing through statistical evidence demonstrating "significant proof" of a significant disparity caused by the challenged employment practice.  *Dukes*, 131 S. Ct. at 2553; *see also Watson v. Ft. Worth Bank & Trust Co.,* 487 U.S. 977, 987 (1988); *Robinson*, 267 F.3d at 160.  Whether Goldman's facially neutral practices have a disparate impact on women, and whether they are nonetheless justified by business necessity, are common questions essential to every class members' entitlement to

injunctive and monetary relief.  *See Easterling*, 278 F.R.D. at 45-6; *see also Parra v. Bashas', Inc.*, 291 F.R.D. 360, 392 (D. Ariz. 2013) (certifying pay discrimination claim under 23(b)(3) where "common questions regarding liability as to the pay claim are a significant aspect of this case and they can be resolved for all members of the class in a single adjudication.") (citations omitted) (internal quotation marks and brackets omitted).  Indeed, "[a]djudicating these issues on a classwide basis is necessary before any individualized proceeding can occur," such that "certification would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated.'"  *Ellis*, 285 F.R.D. at 538 (quoting *Myers v. Hertz Corp.,* 624 F.3d 537, 547 (2d Cir. 2010)) (internal citations omitted).

Here, Plaintiffs have presented significant proof, through documentary evidence and the expert report of Dr. Farber, that the three challenged employment practices cause a statistically significant adverse impact on performance, pay, and promotion rates for female Associates and Vice Presidents.  *See Ellis*, 285 F.R.D. at 538 ("Plaintiffs … presented significant proof that Costco operated under a common, nationwide promotion system for [certain] positions and have identified specific employment practices that have caused a disparity in promotions."). Dr. Farber observed disparities between male and female Associates and Vice Presidents in the Class divisions in compensation and performance evaluation outcomes, and for Vice Presidents in promotion rates, at statistically significant levels.  *See* Section II.B., *supra*.  This statistical showing governs all Class members' claims and establishes commonality for disparate impact claims.  *See, e.g., Robinson*, 267 F.3d at 160.  In fact, once a common challenged policy is identified, "[s]tatistics alone can make out a prima facie case of discrimination if the statistics reveal 'a gross disparity in [the] treatment of workers based on [a protected class]."  *Robinson*, 267 F.3d at 159 (addressing both disparate impact and disparate treatment); *see also Watson*, 487

U.S. at 994; *Teamsters*, 431 U.S. at 339; *Easterling*, 278 F.R.D. at 46 ("liability in [pattern-or-practice disparate treatment and disparate impact] actions is established via class-wide, statistical proof.") (citing *City of New York,* 276 F.R.D. at 34).

In addition to statistical evidence, Plaintiffs also provide significant proof, including through the expert report of Dr. Wayne Cascio, that Goldman's performance review and compensation policies: 1) are not valid as implemented and 2) cannot support the "business necessity" defense, both of which are common questions. [114]

Plaintiffs have also amassed considerable anecdotal evidence of a general policy of discrimination at Goldman, including the 133 complaints of Goldman women, company documents reflecting known and uncorrected problems of gender bias (including People Survey Responses), and eight declarations of named Plaintiffs, Class members, and employee witnesses. *See* Section II.D., *supra*. Such evidence brings "the cold numbers convincingly to life." *Teamsters*, 431 U.S. at 339. It also demonstrates that widespread acts of discrimination against women are standard operating procedure at Goldman, and that the company knew of these acts and failed to take steps to effectively curtail them. *See Ellis*, 285 F.R.D. at 515 ("Costco's own anecdotal evidence and admissions further evidence the existence of common practices that apply to the class as a whole. For example, Costco's internal diversity studies, focusing on

---

[114] Dr. Cascio has explained in detail how the performance evaluation and compensation-setting procedures are unreliable and invalid. Goldman may not ignore evidence of adverse impact year after year. Instead, Goldman must use reliable, valid systems and even in that case must look for alternatives when disparate impact exists. Cascio Report, ¶¶ 21, 23-27, 57-74, 114-115. Goldman has done none of these things. As discussed above in Sections II.A. and II.B., and in more detail in Dr. Cascio's report, the 360 and the forced ranking systems are unreliable, they lack clear standards for decision-making, and are not implemented correctly or effectively monitored. Cascio Report, ¶ ¶¶ 14-22, 28-131. The pay and promotion differences identified by Dr. Farber cannot be justified by use of these invalid systems.

- 40 -

barriers to women's advancement, treat its promotion process (and the gender disparities therein) as a common, companywide problem with a companywide solution.").

### 3. The Named Plaintiffs' Claims are Typical.

Rule 23(a)(3) requires that the claim of the representative plaintiffs be typical of those of the class. The typicality rule is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376 (citations and internal quotation marks omitted). "[M]inor variations in the fact patterns underlying individual claims" do not defeat typicality when the defendant directs "the same unlawful conduct" at the named plaintiffs and the class. *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).

Here, Plaintiffs are typical of the class they seek to represent. Each is a female Associate or Vice President who worked for Goldman in one of the three Class divisions and each was subject to the challenged compensation and performance evaluation processes.[115] In addition, Plaintiff Chen-Oster was subject to the challenged promotion process.[116] The Plaintiffs are typical of female Associates and Vice Presidents across the Class divisions because Goldman applied the three challenged employment practices to all women in the Class regardless of division.[117] Further, there has always been significant interplay between the divisions with respect to compensation, promotion, and performance evaluation decisions. For example, annual compensation is overseen above the division-level, by the firmwide compensation team and senior management (*see* §II.A.2, *supra*); 360 reviews are conducted across divisions (with reviewers and reviewees crossing division lines) as part of the performance evaluation process

---

[115] Chen-Oster Decl., ¶¶ 5-8; Orlich Decl., ¶¶ 5-8.

[116] Chen-Oster Decl., ¶ 9.

[117] *See* Section II.A., *supra*.

which informed forced ranking and compensation decisions (*see* §II.A.1), *supra*; Managing

Directors could nominate Vice Presidents outside their division for promotion; and final

promotion decisions were made by the firmwide Management Committee (*see* §II.A.3, *supra*).

### 4.      Adequacy is Satisfied.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

the interests of the class." Fed. R. Civ. P. 23(a)(4).  "The adequacy requirement exists to ensure

that the named representatives will 'have an interest in vigorously pursuing the claims of the

class, and . . . have no interests antagonistic to the interests of other class members.'"  *Toure v.*

*Cent. Parking Sys.*, No. 05-5237, 2007 U.S. Dist. LEXIS 74056 at *18-19 (S.D.N.Y. Sept. 28,

2007) (quoting *Denney v. Deutsche Bank AG,* 443 F.3d 253, 268 (2d Cir. 2006)).  Plaintiffs

clearly fulfill the adequacy requirement.  They properly exhausted their remedies with the EEOC

and have demonstrated their commitment to the Class throughout this litigation.  *See* Chen-Oster

Decl., ¶ 18; Orlich Decl., ¶ 16.  Additionally, there is no evidence that the Plaintiffs' and the

Class members' interests are at odds.[118]

### C.      The Court Should Certify Claims for Injunctive Relief under Rule 23(b)(2).

Pursuant to Fed. R. Civ. P. 23(b)(2) or (c)(4), the Court may certify Title VII and

NYCHRL claims seeking injunctive relief for Goldman's challenged compensation, promotion,

and performance evaluation procedures.[119]  This is the process followed by courts in this circuit,

and across the country.  *See, e.g., Gulino v. Bd. of Educ.*, No. 13-1001, 2014 U.S. App. LEXIS

---

[118] Plaintiffs also satisfy Rule 23(g), requiring appointment of counsel who will "fairly and
adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1); *see* Dermody Decl., Ex.
A; Klein Decl., Ex. A.

[119] A court may employ Rule 23(c)(4) "when common questions predominate only as to the
particular issues of which the provision speaks."  *In re Nassau Cnty. Strip Search Cases*, 461
F.3d 219, 226 (2d Cir. 2006) (internal quotation marks omitted).

2070, at *8-9 (2d Cir. Feb. 4, 2014) (affirming district court's certification under (b)(2));

*Duling v. Gristede's Operating Corp.*, 267 F.R.D. 86, 100 (S.D.N.Y. 2010) (same); *see also*

*McReynolds*, 672 F.3d at 491 (certification appropriate under (b)(2) and (c)(4)).

> **1.    Under Rule 23(c)(1)(C), Plaintiffs Have Standing To Seek Injunctive Relief Under Rule 23(b)(2).**

Pursuant to Rule 23(c)(1)(C), Plaintiffs request that the Court alter the prior order of

Judge Leonard Sand barring, as a matter of law, certification of this action under Rule 23(b)(2).

Rule 23(c)(1)(C) provides that an order denying class certification "may be altered or amended

before final judgment."  *See also In re Sumitomo Copper Litig.*, 262 F.3d 134, 139 (2d Cir. 2001)

(noting the circuit's "longstanding view that the district court is often in the best position to

assess the propriety of the class and has the ability" to among other things, "alter or modify the

class . . . whenever warranted.").

On July 17, 2012, Judge Sand held that while Plaintiffs are former Goldman employees

who have sought reinstatement in their prayer for relief, the Supreme Court's decision in *Dukes*

precluded their class claims for injunctive relief under Rule 23(b)(2).  Dkt. No. 158.  The denial

was issued "with significant reservations," and several courts within this District have since

reached the opposite conclusion from what Judge Sand reluctantly did here.  *See e.g.*, *Kassman v.*

*KPMG LLP*, 925 F. Supp. 2d 453, 467-68 (2013 S.D.N.Y.);[120] *Robinson v. Blank*, No. 11-2480,

2013 U.S. Dist. LEXIS 72068, *16-19 (S.D.N.Y. Feb. 22, 2013); *Kubicek v. Westchester Cnty.*,

No. 08-372, 2013 U.S. Dist. LEXIS 139552, *29 (S.D.N.Y. Sept. 27, 2013).  These courts have

---

[120] *Kassman*, a Title VII sex discrimination class action, questioned whether *Dukes* reached the conclusion that former employees lacked standing to pursue injunctive relief and observed that it was dicta if it had.  925 F. Supp. 2d at 467-68; *see also Cal. Pub. Emples. Ret. Sys. v. Worldcom, Inc.*, 368 F.3d 86, 106 n.19 (2d Cir. 2004) (citations omitted) (defining dictum).

found that former employee-plaintiffs seeking reinstatement, like Plaintiffs here,[121] have standing to pursue injunctive relief under Rule 23(b)(2).  Accordingly, these courts have rejected the very rule that Judge Sand criticized as "cut[ting] too broad a swath" when he felt compelled, erroneously, to issue the prior ruling.  Dkt. No. 158 at 15.

With the benefit of these additional court decisions, and to ensure that this issue is consistently resolved by courts within this district, Plaintiffs respectfully request that this Court exercise its discretion to reverse the prior ruling and permit Plaintiffs to seek Rule 23(b)(2) certification.  Indeed, this Court, through Judge Sand and Magistrate Judge Francis, has already recognized "that a specific request for 'reinstatement absent a corresponding injunction would expose plaintiffs to the immediate threat of further discrimination,'" rendering injunctive relief an appropriate remedy for consideration in this case.  Dkt. No. 158 at 13 (quoting Judge Francis's R&R, Dkt. No. 134 at 15).

## 2.    Certification Under Rule 23(b)(2) is Appropriate.

Plaintiffs' proposed class squarely meets the requirements of Rule 23(b)(2) on the issue of liability for injunctive relief.  Rule 23(b)(2) is satisfied when "a party opposing the class has acted or refused to act on grounds that apply generally to the class," making injunctive or declaratory relief "appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  As the Supreme Court has held, "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) classes.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

Title VII confers courts with "broad equitable powers" in order to provide victims of employment discrimination with "complete relief."  *Loeffler v. Frank*, 486 U.S. 549, 558 n.6

---

[121] First Amended Complaint, ¶ 197(j) (seeking reinstatement) (Dkt. 104).

(1988); *United States v. Brennan*, 650 F.3d 65, 90 (2d Cir. 2011).  For these purposes, injunctive and declaratory relief can both restrain actions and mandate that certain actions be taken.  *See* Fed. R. Civ. P. 65 (d)(1)(C).  This structure permits a single liability finding based on common evidence.  *See McReynolds,* 672 F.3d at 491 ("The practices challenged in this case present a pair of issues that can most efficiently be determined on a class-wide basis.").

Here, Goldman's compensation and promotion policies and procedures, and the performance evaluation and ranking systems that feed into them, were applied to the proposed class generally, caused the injury, and thereby satisfy the Rule 23(b)(2) standard.  *See Gulino v. Bd. of Educ.*, 201 F.R.D. 326, 333-34 (S.D.N.Y 2001).  The Class seeks final relief for a specified injury: Goldman's biased and unreliable performance, compensation, and promotion procedures.  Consistent with the Federal Rules, the Court can craft an order that both enjoins the discriminatory practices and mandates that the practices reflect job-related, non-discriminatory measures.

### D. Certification Under Rule 23(b)(3) is Appropriate For Plaintiffs' Claims for Backpay and Punitive Damages.

Plaintiffs move for certification of their claims for backpay and punitive damages under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Dukes*, 131 S. Ct. at 2558 (quoting Fed. R. Civ. P. 23(b)(3)).  Plaintiffs meet their burden.

#### 1. Predominance

The common question that predominates is liability for Plaintiffs' disparate impact and/or pattern-or-practice claims.  Adjudication of this issue will resolve, in one proceeding, whether all class members are entitled to a finding of liability under Plaintiffs' disparate impact theory,

*Easterling*, 278 F.R.D. at 48, or to a presumption of liability and monetary relief under the

*Teamsters* disparate treatment framework, *Ellis*, 285 F.R.D. at 538.[122]  This question

predominates because it is determinative of every Class member's ability to move forward with

her claims.  This issue can be determined on a classwide basis with common proof of statistical

and expert evidence.  *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *Teamsters*,

431 U.S. at 339; *Robinson*, 267 F.3d at 159; *Easterling*, 278 F.R.D. at 46; *United States v. City of*

*New York*, 258 F.R.D. 47, 56 (E.D.N.Y. 2009); *Wright v. Stern,* Nos. 01-4437 & 2-4699, 2003

LEXIS 11589, *16 (S.D.N.Y. July 7, 2003).

     Here, Plaintiffs' expert statistician has provided a model for estimating the aggregate

backpay damages across the class, based on the common proof of a statistical regression

incorporating objective human resources data.  *See Parra*, 291 F.R.D. at 393 (plaintiffs'

methodology for calculating backpay need not be fully developed at Rule 23 stage, as long as it

demonstrates that such damages are "capable of measurement on a classwide basis.") (quoting

*Comcast*, 133 S. Ct. at 1433).  In a Title VII class action, it is appropriate to measure such

damages in the aggregate, with individual remedial hearings reserved for a later stage.  *Gulino*,

2013 U.S. Dist. LEXIS 123948, at *35 ("[T]his methodology is not a 'Trial by Formula' but

rather a way to isolate common questions 'susceptible of measurement across the entire class' in

order to streamline individual proceedings.") (quoting *Comcast*, 133 S. Ct. at 1433 (internal

---

[122] *Teamsters* sets forth a framework for litigating Title VII pattern or practice cases, which the
Supreme Court affirmed in *Dukes*.  *Dukes*, 131 S. Ct. at 2561.  At the initial liability stage of the
case, the plaintiffs must establish a prima-facie case of discrimination, by showing that
widespread acts of discrimination against individuals were standard operating procedure.
*Teamsters*, 431 U.S. at 360-61.  If the employer fails to defeat the prima facie case by showing
that plaintiffs' evidence is inaccurate or insignificant, the court may conclude that a violation has
occurred and grant declaratory and injunctive relief.  *Id.* at 361.  Plaintiffs then can move to the
remedial phase of the case with a presumption of discrimination in their favor.  *Id.*

citation omitted)).  *See also Easterling*, 278 F.R.D. at 49 ("[T]he court will make an aggregate calculation of the backpay to which the class is entitled . . .  this method of assessing monetary relief 'is a consequence of substantive Title VII law, and not a creative method of proof intended to accommodate the logistical demands of class proceedings.'") (quoting *City of New York*, 276 F.R.D. at 44).  It is well-established that "individualized calculations of damages do not defeat the predominance requirement."  *Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 126 (S.D.N.Y. 2014); *Gulino*, 2013 U.S. Dist. LEXIS 123948 at \*33; *Ellis*, 285 F.R.D. at 539 (collecting cases).  Indeed, as the Supreme Court clarified in *Dukes*, "individualized monetary claims belong in Rule 23(b)(3)."  131 S. Ct. at 2558.

In addition, Plaintiffs' methodology for calculating the gender effects associated with Goldman's discriminatory conduct satisfies Rule 23(b)(3).  *Schear*, 297 F.R.D. at 125-6.  After accounting for objective, non-tainted factors, Dr. Farber concludes that female Associates are paid 8% less than similarly situated male Associates, and female Vice Presidents are paid 21% less than similarly situated male Vice Presidents.  This difference cannot be explained by any other reliable metric.  Approximately 50% of the pay differential for female Associates and 22% for female Vice Presidents are attributable to discrimination in the performance evaluation process, with the remainder attributable to discrimination in the compensation setting process.

Dr. Farber does a separate analysis, accounting for objective, non-tainted factors, to calculate the gender effects in the promotion process.  *See* Section II.B., *supra*.  Analyzing the promotion data for males, he creates a benchmark promotion model that predicts the number of women with the same characteristics one would expect to have also been promoted in the same time period (2004-2008), in the absence of discrimination.  He finds that women experienced 19

- 47 -

(or 23%) fewer promotions than they would have received if they had been promoted according to the model of promotions that applies among men, at a statistically significant rate.

### 2. Superiority

A class action is a superior method for adjudicating this case. Fed. R. Civ. P. 23(b)(3). The alternatives – either thousands of individual proceedings on the same subject inefficiently using court resources or (given the widespread fear among Class members of retaliation and blacklisting by Goldman) likely no cases challenging these systemic problems – are not appropriate alternatives at all. *See, e.g.*, *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 149 (2d Cir. 2012) (pattern-or-practice method of proof only available in class action).

The Court may consider four factors bearing on whether it is more fair and efficient to proceed as a class action here: 1) the extent and nature of any pending litigation commenced by or against the class involving the same issues; 2) the interest of individuals within the class in controlling their own litigation; 3) the convenience and desirability of concentrating the litigation in a particular forum; and 4) the manageability of the class action. Fed. R. Civ. P. 23(b)(3).

### a. Extent and Nature of Pending Litigation

Plaintiffs are not aware of any pending gender discrimination litigation commenced by or against Class members on the same issues. To the contrary, current and former female employees of Goldman are highly reluctant to sue the company for fear of retaliation, including diminished career opportunities in the financial services industry generally.[123]

---

[123] Baggett Decl., ¶ 6; Gamba Decl., ¶ 21; Shelley Decl., ¶ 19; Shaver Decl., Ex. J; *see also* Section II.D.2.f., *supra*.

### b.     Interest of Class Members in Controlling Own Litigation

There are several reasons why absent Class members benefit from participating in a class action, rather than controlling their own litigation.  First, the costs of Title VII litigation are prohibitive, even for a Goldman professional.  The expert work required to prove damages would overwhelmingly deter individual cases.  Second, as stated above, Class members benefit from remaining anonymous, rather than risking their reputations and careers by bringing a lawsuit in their own names.  Third, this particular "court and the class counsel are already familiar with much of the statistical evidence on which an aggregate assessment of back pay . . . relief will depend," *Easterling*, 278 F.R.D. at 50, ensuring economies of scale.

### c.     The Convenience and Desirability of Concentrating the Litigation in This Forum

Plaintiffs have already conducted extensive discovery and litigation in this forum.  It would be far more efficient and convenient to continue litigating common questions here. *United States v. City of New York*, No. 07-2067, 2011 U.S. Dist. LEXIS 60276, at *59 (E.D.N.Y. June 6, 2011).

### d.     Manageability

Any difficulties likely to arise can be addressed by the "management tools" the Court has at its disposal.  *See In re Visa Check/Mastermoney Antitrust Litig. v. Visa, United States*, 280 F.3d 124, 141 (2d Cir. 2001); *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 294 (S.D.N.Y. 2012); *see also City of New York*, 276 F.R.D. at 50.  Moreover, while it is unnecessary to adopt a specific trial plan now, Plaintiffs submit that this case may proceed along a well-recognized path, with a class trial focused on, in the first phase, (1) Class liability findings regarding a pattern and practice of discrimination, (2) Class liability findings of adverse impact,

and (3) Goldman's presentation of affirmative defenses to a Class liability finding of adverse impact; and then a second, remedial phase, consistent with *Teamsters*. *See, e.g.*, *Robinson,* 267 F.3d at 161; *City of New York*, 276 F.R.D. at 32-33; *Velez*, 244 F.R.D. at 243; *see also Ellis*, 285 F.R.D. at 538 ("whether Defendant has engaged in a pattern or practice of discrimination such that all class members are entitled to a presumption of discrimination under the *Teamsters* method of proof is a common issue subject to classwide resolution.").

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court certify the case as a class action, appoint the named Plaintiffs as representatives of the Class, and appoint Plaintiffs' counsel as Class Counsel.

Dated: May 19, 2014          Respectfully submitted,

By:   /s/ *Kelly M. Dermody*

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
Kelly M. Dermody (*admitted pro hac vice*)
Anne B. Shaver (*admitted pro hac vice*)
Lisa J. Cisneros (*admitted pro hac vice*)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Rachel Geman
250 Hudson St., 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

**OUTTEN & GOLDEN LLP**
Adam T. Klein
Cara E. Greene
Jennifer L. Liu
Melissa Stewart
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000
Facsimile:  (212) 977-4005

*Attorneys for Plaintiffs and the Putative Class*

1176116.1