UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| H. CRISTINA CHEN-OSTER; LISA PARISI; and SHANNA ORLICH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>GOLDMAN, SACHS & CO. and THE GOLDMAN SACHS GROUP, INC.,<br><br>Defendants. | INDEX NO. 10-CV-6950-AT-JCF<br><br>**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

1187533.5

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................. 1

II.    THE REQUIREMENTS OF RULE 23(a) ARE SATISFIED. ....................................... 6

    A.    Commonality Is Satisfied By Plaintiffs' Challenge To Common Specific Employment Practices That Adversely Affect Women. ..........................................6

        1.    Plaintiffs challenge common performance evaluation, compensation, and promotion practices. ................................................................................6

        2.    The challenged practices apply criteria that are common and invalid. ...........8

        3.    The challenged practices are a common mode through which any manager discretion is exercised. ...................................................................9

        4.    Goldman's performance evaluation systems are employment actions that cause adverse impact. ..........................................................................11

        5.    Plaintiffs present substantial evidence that discrimination against women is Goldman's standard policy. ........................................................12

    B.    Variation In Job Duties Does Not Defeat Commonality. ....................................13

        1.    The factual record, including expert and witness testimony, confirms that Goldman's asserted variations in job duties and business units are grossly overstated. ....................................................................................13

        2.    *Dukes* supports class certification even if Class members perform different tasks. ..........................................................................................17

    C.    The Battle Of The Experts, Which Need Not Be Resolved At This Stage, Shows That Common Questions Can Be Resolved On A Classwide Basis. .........21

        1.    There are central questions in this case that have common, classwide answers. ......................................................................................................21

        1.    To the extent the Court is inclined to probe the merits of the disputes between the statisticians, Dr. Farber's is the correct approach, and Goldman's characterization of his opinions is wrong. ...................................24

            a.    Plaintiffs' statistical analysis is proper and reliable. ...........................24

            b.    Dr. Ward's response is improper and litigation driven. .......................25

            c.    Dr. Farber appropriately did not study business unit-level groups because the challenged policies operate at the corporate or division level, relevant decisions are made above the business unit level, and business units are inherently unstable. ..........26

            d.    Dr. Farber properly excluded production data from his analysis because it is largely missing, and at best, what exists is misleading. ...............................................................................28

i

|   |   | e. | Dr. Farber correctly omitted performance measures from his studies about pay and promotion disparities because the measures are rife with bias that would taint the results. .....................29 |
|---|---|---|---|
|   |   | f. | Goldman's Chow test is irrelevant and should be disregarded.............30 |
|   |   | g. | Dr. Ward's results, properly analyzed, reflect common proof. ...........31 |
|   |   | h. | Contrary to Goldman's critiques, Dr. Farber's promotions analysis is robust. ...................................................................31 |
|   | 2. | | To the extent the Court is inclined to probe the merits of the disputes between the I/O Psychologists, Dr. Cascio's is the correct approach, and Goldman's characterization of his opinions is wrong............................32 |
| D. | | | Plaintiffs' Anecdotal Evidence of A General Policy of Discrimination Is Both Sufficient and Admissible. ...............................................................36 |
|   | 1. | | Plaintiffs have offered "significant proof" that Goldman operates under a general policy of discrimination. ................................................36 |
|   | 2. | | The internal complaint evidence is admissible. ..............................................39 |
|   | 3. | | Goldman's employee declarations are inherently unreliable........................41 |
| E. | | | The Named Plaintiffs Are Adequate And Typical.....................................43 |
|   | 1. | | Adequacy .........................................................................................43 |
|   | 2. | | Typicality ........................................................................................44 |
| F. | | | The Class Definition Is Appropriate. ....................................................45 |
| III. | | | THE REQUIREMENTS OF RULE 23(b) ARE SATISFIED.......................................45 |
| A. | | | Class Certification Under Rule 23(b)(2) May Proceed............................45 |
| B. | | | Certification Under Rule 23(b)(3) Is Approrpriate. ...............................47 |
|   | 1. | | Plaintiffs satisfy the predominance standard under Rule 23(b)(3). ..............47 |
|   |   | a. | Plaintiffs' disparate impact claims satisfy predominance....................49 |
|   |   | b. | Plaintiffs' disparate treatment claims satisfy predominance. ..............51 |
|   | 2. | | Backpay and damages classes may be certified under 23(b)(3). ..................53 |
|   | 3. | | Plaintiffs have also demonstrated superiority..............................................54 |
| C. | | | In The Alternative, Certification Of A Liability Class Under Rule 23(c)(4) Would Materially Advance The Litigation............................................55 |
| IV. | | | CONCLUSION..............................................................................58 |

1187533.5

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abdallah v. Coca-Cola Co.*,
   186 F.R.D. 672 (N.D. Ga. 1999) ........................................................................ 42

*Allen v. Int'l Truck & Engine Corp.*,
   358 F.3d 469 (7th Cir. 2004) ............................................................................. 54

*Amador v. Morgan Stanley & Co., LLC*,
   No. 11-4326, 2013 U.S. Dist. LEXIS 19103 (S.D.N.Y. Feb. 7, 2013) .................................... 42

*Belt v. Emcare, Inc.*,
   299 F. Supp. 2d 664 (E.D. Tex. 2003) ................................................................... 42

*Bennett v. Nucor Corp.*,
   656 F.3d 802 (8th Cir. 2011) ............................................................................. 19

*Braun v. Wal-Mart Stores, Inc.*,
   No. 3217, 2005 Phila. Ct. Comm. Pl. LEXIS 551 (Phil. Comm. Pl. Dec. 27, 2005) .............. 42

*Bublitz v. E.I. DuPont de Nemours & Co.*,
   196 F.R.D. 545 (S.D. Iowa 2000) ........................................................................ 41

*Byrd v. Merrill Lynch*,
   No. 10-247, 2011 WL 2680572 (D.N.J. July 8, 2011) ................................................. 39

*Chen-Oster v. Goldman, Sachs & Co.*,
   877 F. Supp. 2d 113 (S.D.N.Y 2012) ............................................................... 2, 4, 5

*Chin v. Port Authority of New York & New Jersey*,
   685 F.3d 135 (2d Cir. 2012) ......................................................................... 50, 54

*Cokely v. N.Y. Conv. Ctr. Op. Corp.*,
   No. 00-4637, 2004 U.S. Dist. LEXIS 9264 (S.D.N.Y. May 21, 2004) .................................. 41

*Davis v. Cintas Corp.*,
   717 F.3d 476 (6th Cir. 2013) ..................................................................... 18, 19, 20

*Day v. Sears Holdings Corp.*,
   930 F. Supp. 2d 1146 (C.D. Cal. 2013) ................................................................. 40

*Easterling v. State Dep't of Corr.*,
   278 F.R.D. 41 (D. Conn. 2011) .................................................................... passim

**TABLE OF AUTHORITIES**
(continued)

Page

*Eisen v. Carlisle & Jacquelin,*
  417 U.S. 156 (1974)..................................................................................... 40

*Ellis v. Costco Wholesale Corp.,*
  285 F.R.D. 492 (N.D. Cal. 2012)........................................................... passim

*Flores v. Anjost Corp.,*
  284 F.R.D. 112 (S.D.N.Y. 2012) ................................................................. 40

*Franks v. Bowman Transportation Co.,*
  424 U.S. 747 (1976)..................................................................................... 50

*Godoy v. Maplehurst Bakeries, Inc.,*
  747 F. Supp. 2d 298 (D.P.R. 2010)............................................................. 40

*Gonzalez v. Millard Mall Servs., Inc.,*
  281 F.R.D. 455 (S.D. Cal. 2012) ................................................................ 40

*Gulino v. Bd. of Educ.,*
  No. 13-1001, 2014 U.S. App. LEXIS 2070 (2nd Cir. Feb. 4, 2014) ......................................... 46

*Gulino v. Bd. of Educ.,*
  No. 96-8414, 2013 U.S. Dist. LEXIS 123948 (S.D.N.Y. Aug. 29, 2013)................ 5, 48, 50, 54

*Houser v. Pritzker,*
  No. 10-03105, 2014 U.S. Dist. LEXIS 91451 (S.D.N.Y. July 1, 2014)........................... passim

*In re Aftermarket Auto Lighting Prods. Antitrust Litig.,*
  276 F.R.D. 364 (C.D. Cal. 2011) ................................................................ 21

*In re Front Loading Washing Mach. Class Action Litig.,*
  No. 08–51, 2013 U.S. Dist. LEXIS 96070 (D.N.J. July 10, 2013)........................ 40

*In re High-Tech Employee Antitrust Litigation,*
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ................................................... 17

*In re Initial Pub. Offering Sec. Litig.,*
  471 F.3d 24 (2d Cir. 2006) ........................................................................ 21

*In Re Zurn Pex Plumbing Prods. Liab. Litig.,*
  644 F.3d 604 (8th Cir. 2011) ..................................................................... 40

*Jacob v. Duane Reade, Inc.,*
  293 F.R.D. 578 (S.D.N.Y. 2013) ............................................................... 57

**TABLE OF AUTHORITIES**
(continued)

Page

*Kassman v. KPMG LLP*,
   925 F. Supp. 2d 453 (2013 S.D.N.Y.) ........................................................ 46

*Khalil v. The Farash Corp*.,
   452 F. Supp. 2d 203 (W.D.N.Y.2006)......................................................... 27

*Kleiner v. First Nat'l. Bank of Atlanta*,
   751 F.2d 1193 (11th Cir. 1985) ................................................................. 42

*Kubicek v. Westchester Cnty.*,
   No. 08-372, 2013 U.S. Dist. LEXIS 139552 (S.D.N.Y. Sept. 27, 2013) ................................. 46

*La Day v. Catalyst Tech., Inc.*,
   302 F.3d 474 (5th Cir. 2002) .................................................................... 39

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) ............................................................... 44

*Lewis v. City of Chicago*,
   560 U.S. 205 (2010).............................................................................. 50

*McLaughlin v. American Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008) .................................................................... 52

*McReynolds v. Merrill Lynch*,
   672 F.3d 482 (7th Cir. 2012) ........................................................... passim

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) .................................................................... 47

*Mevorah v. Wells Fargo Home Mortgage, Inc.*,
   No. 05-1175, 2005 U.S. Dist. LEXIS 28615 (N.D. Cal. Nov. 17, 2005) ................................. 42

*Morgan v. UPS*,
   380 F.3d 459 (8th Cir. 2004) ............................................................... 24, 42

*Ohio Valley Envtl. Coal. v. Elk Run Coal. Co., Inc.*,
   No. 12-0785, 2014 U.S. Dist. LEXIS 75814 (S.D. W. Va. June 4, 2014)................................ 30

*Parra v. Bashas', Inc*.,
   291 F.R.D. 360 (D. Ariz. 2013) ........................................................ passim

*Randall v. Rolls-Royce Corp.*,
   637 F.3d 818 (7th Cir. 2011) .............................................................. 19, 20

**TABLE OF AUTHORITIES**
(continued)

Page

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) ................................................. 44

*Robinson v. Blank*,
  No. 11-2480, 2013 U.S. Dist. LEXIS 72068 (S.D.N.Y. Feb. 22, 2013) .................................. 46

*Robinson v. Metro–North Commuter R.R. Co.*,
  267 F.3d 147 (2d Cir. 2001) ................................................. 55, 56

*Smith v. Nike Retail Servs.*,
  234 F.R.D. 648 (N.D. Ill. 2006) ................................................. 54

*Spencer v. No Parking Today, Inc.*,
  No. 12-6323, 2013 WL 1040052 (S.D.N.Y. Mar. 15, 2013) ............................................. 41, 44

*Stockwell v. City & County of San Francisco*,
  749 F.3d 1107 (9th Cir. 2014) ................................................. 5, 17, 49

*Tabor v. Hilti, Inc.*,
  703 F.3d 1206 (10th Cir. 2013) ................................................. 19, 20

*Tischmann v. ITT/Sheraton Corp.*,
  145 F.3d 561 (2d. Cir. 1998) ................................................. 45

*United States v. City of New York*,
  07-2067, 2013 U.S. Dist. LEXIS 166616 (E.D.N.Y. Oct. 28, 2013) ....................................... 57

*United States v. City of New York*,
  276 F.R.D. 22 (E.D.N.Y. 2011) ................................................. 50, 53, 55, 57

**STATUTES**

42 U.S.C. § 2000e-2(k) ................................................. 50

Civil Rights Act of 1991 ................................................. 35

**RULES**

Fed. Civ. R. P. 23(a) ................................................. 5, 6, 57

Fed. R. Civ. P. 23(b)(2) ................................................. passim

Fed. R. Civ. P. 23(b)(3)(D) ................................................. 54

Fed. R. Civ. P. 23(c)(1)(C) ................................................. 45

**TABLE OF AUTHORITIES**
(continued)

Page

Fed. R. Civ. P. 23(g) ................................................................................ 6

Fed. R. Evid. 403 .................................................................................... 40

Fed. R. Evid. 801(d)(2)(C) ....................................................................... 39

Fed. R. Evid. 801(d)(2)(D) ....................................................................... 39

Fed. R. Evid. 803(6) ............................................................................ 39, 40

**TREATISES**

American Law Institute, *Principles of the Law of Aggregate Litigation* § 2.02(a)(1) (2010) ...... 56

Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3:29 (5th ed.) ....................... 45

Manual for Complex Litigation (4th) § 21.24 (2010) ................................................. 56

**OTHER AUTHORITIES**

Admin. Code of the City of New York § 8-107 *et seq.* ................................................ 50

Robert H. Klonoff, *The Decline of Class Actions*, 90 Wash. U. L. Rev. 729 (2013) .................. 55

I.      **INTRODUCTION**

This proposed Class is modest in size and located across a small number of offices (with the vast majority working in the NYC metro area alone).  The Class challenges standard, firmwide, uniform performance evaluation (360-review process and forced ranking), compensation-setting, and promotion procedures, and is limited to low- and mid-level professionals in just two job titles (Associate and Vice President) with similar job duties. Critically, Plaintiffs demonstrate through compelling statistical evidence that the common biased performance evaluation system at Goldman is a primary reason why the proposed Class members are disadvantaged at Goldman.  This proposed Class has also experienced rampant discrimination, as shown by, among other things, unrelenting, known, statistically-significant pay discrepancies, lost promotions, and pervasive mistreatment. Taken collectively, Plaintiffs readily establish that it is the standard operating procedure at Goldman to discriminate against this proposed Class of women.

Goldman's opposition to class certification avoids or mischaracterizes the basic facts and law.  Plaintiffs address the primary issues below:

First, and principally, Goldman argues that a class should not be certified because Goldman claims that Class members are assigned to unique and specialized "business units" where relevant decisions are made by line managers exercising unbridled discretion.  This is demonstrably false.  In fact, Goldman's business units are not free-standing organizations, but malleable and constantly-evolving work teams.  Class members switch out of business units every two years on average, and the vast majority of Class members are reviewed by personnel outside their units.  In addition, as even Goldman's own witnesses confirm and no expert can dispute, employees in the three revenue-producing divisions at issue here rely on the same basic skill sets regardless of the particular business unit in which they work.  Further, the evidence

1

shows that the relevant decision-making relating to the challenged practices is governed by firm or division wide principles, under the oversight of top management.  *See McReynolds v. Merrill Lynch*, 672 F.3d 482, 489-490 (7th Cir. 2012); Section II.A., *supra*.  For these, and other, reasons, Goldman's "business unit" defense – appearing in multiple repetitive guises throughout its brief – is a red herring.

Second, Goldman ignores the plain conclusion mandated by *Dukes* and subsequent case law that class certification is appropriate where, as here, Plaintiffs have presented common questions about uniform practices[1] that rely on invalid criteria and that harness manager discretion (to the extent it is used) through a common process.  *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 118 (S.D.N.Y. 2012) ("What was missing in *Dukes,* but is present here, are 'specific employment practice[s]' (the 360–degree review, for example) that "tie[ ] all [of Plaintiffs'] claims together.'"); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2554 (2011); *McReynolds*, 672 F.3d at 490; *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 518 (N.D. Cal. 2012).  Goldman's brief is heavy on argument but thin on relevant case law.  Contrary to Goldman's assertions, there is no case that actually stands for the proposition that any discretion defeats class certification. Were that the case, this matter, and myriad others across the country, would have been defeated at the pleading stage – when the opposite is true.  *See Chen Oster*, 877 F. Supp. 2d at 118 ("It is true that an individual manager's decision might be more or less discretionary, but this, as the Supreme Court made clear in *Dukes,* does not doom a class, since

---

[1] Goldman's assertion in its introduction that the 360 review is somehow not a challengeable employment practice is curious. *See* Section II.A.4., *supra*.  It is undisputed that Goldman uses its 360 review as an explicit factor in *compensation decisions* (*see* Section II.B.4., *supra*), an atypical and disfavored practice.  *See, e.g.*, July 29, 2014 Rebuttal Expert Report of Wayne F. Cascio ("Cascio Reb. Rep.") (filed herewith), at 22, n.13.

this discretion would have been exercised under the rubric of a company-wide employment practice.").

Third, Goldman's attacks on Plaintiffs' experts are misplaced, but regardless underscore the existence of common questions susceptible to common proof and common answers. Plaintiffs' statistical expert, Dr. Henry Farber, makes robust findings of statistically significant adverse impact and a pattern or practice of gender discrimination in Goldman's performance evaluation, compensation, and promotion systems.  And, as noted above, Dr. Farber links the challenged biased performance measures with the observed pay shortfalls.  The methods of Goldman's statistical expert, Dr. Michael Ward, are unreliable and improper.[2]  At best, the statistical dueling amounts to disputes about methodology, which points to common answers for the Class no matter which expert's approach is favored.  These disputes go to the merits and need not be resolved to determine any Rule 23 issue. The same is true with respect to the parties' disputes over the conclusions of their respective Industrial Organizational Psychologists: Plaintiffs' expert Dr. Wayne Cascio conclusively demonstrates that Goldman's common employment practices are unreliable and invalid as implemented; Goldman's expert Dr. Michael Campion makes a series of odd and methodologically-unsound arguments in response,[3] but in general these experts are fighting over the same common practices.  Overall, the expert work,

_____

[2] Among other things, Dr. Ward manipulates his studies, cutting up data differently by time period for the different divisions rather than just using the data to address the identical claims and class period alleged by Plaintiffs across divisions as they have been pled.  Dr. Ward also slices sample sizes down to the smallest conceivable unit, ensuring before he even starts that an analysis will mask the statistical power of patterns of discrimination.  Dr. Ward's unscientific parroting of a defense counsel-created "matched pairs" study is the subject of Plaintiffs' separate Motion to Exclude, filed concurrently.

[3] Dr. Campion's reliance on fad "best practices" that ignores the standards in his field, and his gender-baiting and wholly unsubstantiated speculation that women might be paid less because they are not cut out for such difficult Goldman work ("extreme jobs") are the subject of Plaintiffs' separate Motion to Exclude, filed concurrently.

along with Plaintiffs' extensive anecdotal evidence, establishes the necessary connection

between the challenged practices and their claims.

Fourth, and closely related, Goldman flatly misunderstands the ultimate proof in a

disparate treatment case, and incorporates that confusion generally into its discussion of

Rule 23(b)(3). In fact, for their disparate treatment claim, Plaintiffs simply need to show that

there was a common pattern or practice of discriminatory decision making. *Chen-Oster*, 877 F.

Supp. 2d at 118; *Ellis*, 285 F.R.D. at 518.  Plaintiffs do not need to show that each individual was

affected by this policy in an identical way, not even at the merits stage much less for Rule 23.

*Id*. (citing *Int'l Bhd of Teamsters v. United States*, 431 U.S. 324, 336 (1977)).

Fifth, in criticizing Plaintiffs' anecdotal evidence in support of their disparate treatment

claims, Goldman relies on the completely unremarkable fact that in 2014 Goldman has no stated

policy of discrimination.  It also tries, unsuccessfully, to chip away at the mountain of evidence

provided by Plaintiffs, by submitting its own purported counter-evidence.  Unfortunately for

Goldman, the evidence it submits overwhelmingly supports Plaintiffs.  In particular, as described

below and even despite Goldman's discovery shenanigans regarding their witnesses,[4] Goldman's

witness declarations corroborate the uniformity of practices, commonality of skills, and depth of

problems at the company.  If the best a Goldman witness can say about Goldman's culture is that

---

[4] Goldman's misconduct regarding manager witnesses – who Goldman never placed on its
document custodian list and for whom Goldman withheld specifically-requested documents,
such as complete personnel files (with certain qualifications information that their statements put
at issue), performance reviews (including diversity scores), and agreed search term documents –
and its untimely production of a purported business unit organization chart (Dkt. 264-1) are the
subject of Plaintiffs' separate Motion to Strike Declarations, filed concurrently.

she "never felt pressure to go" to strip clubs (and the witness is not even able to say that strip clubs are not a feature of Goldman culture), Goldman has a serious problem.[5]

Sixth, Goldman's perfunctory attack on the typicality and adequacy of the Class Representatives is without basis. Ironically, the issues Goldman identifies arise from the common discriminatory practices resulting in retaliation against Ms. Chen-Oster and in Ms. Orlich being forced out of the company. These are hardly bases for challenges to their ability to fairly represent the Class. Goldman has not suggested, nor could it suggest, that the Plaintiffs are not committed representatives or have interests antagonistic to the Class.

Finally, Goldman ignores the manifest manageability for trial of Plaintiffs' disparate impact claims, conflating them with Goldman's assertion of the exaggerated difficulty of managing a disparate treatment case for a class of 1,800 women. Judge Sand and Courts in this District and appellate courts around the country disagree. *Chen-Oster*, 877 F. Supp. 2d at 119 ("Plaintiffs do not number in the millions; Plaintiffs all worked at - and the allegations all center around – Goldman's New York office; Plaintiffs were all members of a circumscribed category of Goldman employees; and Plaintiffs do not challenge literally millions of employment decisions."); *see also McReynolds*, 672 F.3d at 490; *Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1115 (9th Cir. 2014); *Easterling v. State Dep't of Corr.*, 278 F.R.D. 41, 49-50 (D. Conn. 2011); *Ellis*, 285 F.R.D. at 538; *Gulino v. Bd. of Educ.*, No. 96-8414, 2013 U.S. Dist. LEXIS 123948, *35-36 (S.D.N.Y. Aug. 29, 2013); *Houser v. Pritzker*, No. 10-03105,

---

[5] *See*, *e.g.*, Benz Decl. ¶ 27 ("I have not felt pressured by managers, co-workers, or clients to go to a strip club or similar environment.") (Dkt. 266); Cohen, S. Decl. ¶ 11 ("I have not felt pressured by managers, co-workers, or clients to go to a strip club or similar establishment.") (Dkt. 271); Kirk Decl. ¶ 18 ("I have also never felt pressured to go to strip clubs . . . .") (Dkt. 279); Sabat Decl. ¶ 9 ("I have never felt pressured to go to a strip club.") (Dkt. 288); Scher Decl. ¶ 12 ("I have never felt pressured by managers, co-workers, or clients to go to a strip club or similar establishment.") (Dkt. 289)).

2014 U.S. Dist. LEXIS 91451, *52 (S.D.N.Y. July 1, 2014); *Parra v. Bashas', Inc*., 291 F.R.D.

360, 392 (D. Ariz. 2013).

Plaintiffs respectfully request that the Court certify this Class under Rule 23(a), certify

claims for injunctive relief under Rule 23(b)(2), and certify claims for back pay and punitive

damages under Rule 23(b)(3).  In the alternative, as recent authority in the Title VII context and

nearly a decade of well-established law in the Second Circuit confirms, certification of a liability

class under Rule 23(c)(4) would materially advance this litigation.  The motion should be

granted.

## II.     THE REQUIREMENTS OF RULE 23(a) ARE SATISFIED.[6]

### A.     Commonality Is Satisfied By Plaintiffs' Challenge To Common Specific Employment Practices That Adversely Affect Women.

#### 1.     Plaintiffs challenge common performance evaluation, compensation, and promotion practices.

This case involves a highly centralized organization with very detailed companywide

evaluation, compensation, and promotion procedures that rely on common, invalid criteria and

provide managers with a common mode for making employment decisions.

As set forth at length in Plaintiffs' Opening Brief ("Pl. Br."), all Class members are

subject to Goldman's uniform and common performance evaluation procedures – the 360-review

process and manager forced ranking - which disadvantage women and explain a material part of

the compensation discrimination that women experience at the company.  *See* Pl. Br. at 4-8.  The

360-review process operates uniformly across all divisions and business units, and evaluates all

Class members on the same key criteria, regardless of position.  Pl. Br. at 12.  The forced ranking

---

[6] Goldman concedes Rule 23(a) numerosity and Rule 23(g) adequacy of proposed class counsel.
Plaintiffs will not address those again.

process likewise operates uniformly across the Firm, directed by Goldman's firmwide manager forced ranking guidelines.[7]

All Class members are also subject to Goldman's common compensation rounds process. *See* Pl. Br. at 9-10. Managers make compensation recommendations for their employees, directed by the firmwide compensation guidelines.[8] Goldman's own witnesses confirm that their compensation recommendations are based on the established criteria.[9] The recommendations are reviewed at successively higher levels of management, with final decisions made at the division level by the divisional compensation committees.[10]

Finally, all Vice Presidents are subject to the "cross-ruffing" promotion process. Cross-ruffers from every division are trained in one setting, based on a uniform set of guidelines, applied to all employees (regardless of business unit) throughout the divisions. *See* Pl. Br. at 10-

---

[7] *See* Pl. Br. at 7, n. 21 (citing firmwide manager quartile guidelines); *id.* at 5, n. 13 (citing firmwide review categories used in 360 reviews).

[8] Pl. Br. at 10, n. 34 (citing firmwide compensation recommendation guidelines). In addition, HCM prepares and distributes annual Compensation Communication Guides for all managers in the firm. *See, e.g.*, GS0113711, GS0113883, GS0113811, GS0113858, GS0113786, GS0113833, GS0113740, GS0113509, GS0113456. All corporate documents are attached as collective Exhibit A to the Declaration of Anne B. Shaver in Support of Plaintiffs' Reply ("Shaver Decl. II") in numerical order by Bates Number.

[9] The Firmwide Compensation Guidelines state that individual compensation is based on "the firm's performance, performance of the individual, business unit performance, and external market comparators for a particular job." Goldman's declarants confirm that managers rely on the same common, firmwide performance measures to determine compensation, regardless of purported variations in job duties or business units. Benz Decl. ¶ 16 ("Compensation in PSI is determined by a number of factors, including the Firm's performance, divisional performance, Business Unit performance, group performance, and individual performance , as well as market considerations.") (Dkt. 266); Pierce Decl. ¶ 15 (Compensation in ECM is determined by a number of factors, including the Firm's performance, divisional performance, Business Unit performance, and individual performance, as well as market considerations.") (Dkt. 285).

[10] *See, e.g.*, Pl. Br. at 10, n.32. In fact, the record shows that business unit mangers are required to attend meetings of the divisional compensation committees in order to justify their compensation recommendations. Kung Tr. 44:22-45:8; Heller-Sberloti Tr. 24:12-25:20; Larson Tr. 61:2-62:23 (attached as Exhibits N, M, and P, respectively, to the to the Declaration of Anne B. Shaver In Support of Plaintiffs' Motion for Class Certification ("Shaver Decl. I") (Dkt. 248).).

12.  Each division's leaders make the final decision with respect to who gets promoted (regardless of business unit), and the firmwide Management Committee determines the total number of promotions available each year.  *Id*.

> ## 2.   The challenged practices apply criteria that are common and invalid.

As set forth at length in Plaintiffs' Opening brief, the challenged practices apply criteria that are common to all Class members and are invalid and unreliable.

The 360-review process applies common criteria to all Class members – in fact, every 360 review contains a set of "firmwide review categories" which are used to generate the employees' overall 360 score.[11]  Plaintiffs' expert Dr. Cascio examined Goldman's 360-review process, and determined that it suffered from numerous deficiencies, including a lack of inter-rater reliability; an excess of score compression; and a lack of calibration across reviewers.  Dkt. 260 (February 18, 2014, Expert Report of Wayne F. Cascio ("Cascio Opening Rep.")), ¶ 15.  Dr. Cascio concluded that the observed gender disparities arising from the 360-review process cannot be justified by any reliable performance standard.  *Id*., ¶ 16.

The forced ranking guidelines prescribe a set of criteria for managers to apply to all Class members to determine their rank.[12]  Dr. Cascio found numerous deficiencies in these criteria, including that there is no standard definition of "potential", no formal training in how to assess it, nor any requirement that managers document their view of an employee's potential.  Cascio Opening Rep., ¶ 35, 79, 81, 88-91.  His criticism that Class members are not told about the forced ranking process or its import in compensation and promotion decisions was confirmed by Goldman's own employee declarations.[13]  *Id*., ¶¶ 80, 92-94.  Further, Dr. Cascio noted that

---

[11] Pl. Br. at 5, n.13.

[12] *See* Pl. Br. at 7, n.21.

[13] *See*, *e.g.*, Bohm Decl. ¶ 14 ("I do not recall ever being informed of my specific manager quartile…") (Dkt. 267); Creedon Decl. ¶ 8 ("While I do not always know my exact manager

forced ranking is a particularly unreliable and invalid tool at Goldman given that Goldman uses

it to create artificial, exacerbated differences between very similar performers in a teamwork

setting. *Id.*, ¶¶ 17, 79-103, 52-53, 113.

Dr. Cascio also found that Goldman exacerbates the unreliability and invalidity of the

performance review systems by how they are used in determining employee compensation.

Firmwide manager compensation guidelines instruct managers to consider "individual

performance" when making compensation recommendations.[14]  However, managers are not

required to follow valid, reliable measures to reward performance.  Cascio Opening Rep., ¶ 106.

In addition, there is no requirement that managers document the specific metrics they rely on for

bonus-recommendation decisions, and there is no documentation of the relative weights they

assign to those metrics.  *Id.*, ¶ 108.

The promotion process is controlled by the division heads, a small group of decision

makers. While Goldman does not require Vice Presidents to attain any particular performance

level to qualify for promotion, it does consider a variety of poorly defined and unreliable criteria,

such as whether the Vice President is a "role model" or an "effective coach."[15]

### 3.  The challenged practices are a common mode through which any manager discretion is exercised.

Goldman's argument that the challenged practices are mere "frameworks" through which

managers exercise discretion (Def. Br. at 6, 32) is exactly the reason why commonality is

satisfied here: Plaintiffs have presented significant proof of common employment practices

---

quartile, I am aware that Manager Quartiling exists…") (Dkt. 272); Eckhard Decl. ¶ 6 ("[] my
manager has not told me my exact manager quartile…") (Dkt. 275); Robertson Decl. ¶ 10 ("[] I
generally do not tell the professionals I supervise their exact Manager Quartile (as in the
number)…") (Dkt. 286); Scherrer Decl. ¶ 6 ("I do not generally tell my bankers their Manager
Quartile number…") (Dkt. 290).
[14] *See* footnote 8, *infra*.
[15] Pl. Br. at 11.

through which manager discretion operates.  *See* Jan. 19, 2012 Order (Francis, J.) at 12-13

(*quoting Wal-Mart*, 131 S. Ct. at 2554).

In *Dukes*, the Supreme Court held that plaintiffs had not established commonality,

because the only company policy plaintiffs pointed to was one of allowing discretion to local

supervisors over a million class members, and "[plaintiffs] have not identified a common mode

of exercising discretion that pervades the entire company . . . it is quite unbelievable that all

managers would exercise their discretion in a common way without some common direction."

131 S. Ct. at 2554-55.  As set forth above and in Plaintiffs' Opening Brief, this case is replete

with the "common direction" to managers that was utterly lacking in *Dukes*.

The fact that managers still exercise some discretion within these common practices does

not defeat commonality.  For instance, in *McReynolds*, plaintiffs challenged two common,

companywide policies – a teaming policy and an account distribution policy.  672 F.3d at 488.

The court recognized that managers maintained "a measure of discretion with regard to teaming

and account distribution."  *Id*. at 489.  Nonetheless, the court found that these were "practices of

Merrill Lynch, rather than practices that local managers can choose or not at their whim," and

distinguished the case from *Dukes* on that basis.  *Id*. at 490; *see also Ellis*, 285 F.R.D. at 509

("Plaintiffs in this case identify specific employment practices Costco implements companywide

under the influence and control of top management.  Unlike in *Dukes*, which the Supreme Court

concluded merely identified the delegation of discretion (i.e., the absence of a policy), here

Plaintiffs identify specific practices and a common mode of guided discretion directed from the

top levels of the company.").

### 4. Goldman's performance evaluation systems are employment actions that cause adverse impact.

Goldman advances the novel argument that its performance evaluation systems are not "employment actions" capable of causing direct adverse impact because the performance evaluations have no uniform effect on the class. Def. Br. at 5, 59-61. This is false for two principal reasons.

First, Goldman's own documents provide the link between performance evaluation and pay, unambiguously showing that performance evaluation is a direct factor in compensation.[16] In fact, managers are required to consider performance evaluations as a factor in pay. *Id.* Goldman's employee declarations further confirm that managers follow the firmwide policy, as required, and pay their employees based in part on performance review results. *See*, *e.g.*, Casturo Decl. ¶ 17; Cohen, D. Decl. ¶ 15; Guth Decl. ¶¶ 13-15; Levene Decl. ¶ 18; Lopez Decl. ¶ 10; McNamara Decl. ¶ 18; Packer Decl. ¶ 14; Pierce Decl. ¶ 16; Russell Decl. ¶ 14.[17] Moreover, and unsurprisingly given it is firm policy, Goldman's expert Dr. Ward confirmed that both manager quartile and 360 reviews are correlated with pay. Ward Report at 26 (Dkt. 298).[18]

Second, Dr. Farber's study shows that these performance review processes directly account for a significant percentage of the observed pay differences. After accounting for objective, non-tainted factors Dr. Farber concludes that female Associates are paid 8% less than similarly situated male Associates, and female Vice Presidents are paid 21% less than similarly situated male Vice Presidents. Approximately 50% of the pay differential for female Associates and 22% for female Vice Presidents are attributable to discrimination in the performance evaluation process, with the remainder attributable to discrimination in the compensation setting

---

[16] GS0122587 at 589, 592; GS0109366 at 367 (contained in Exhibit A to Shaver Decl. I).

[17] Dkt. Nos. 268-287.

[18] Frankly, if Goldman is arguing that its compensation system is totally arbitrary, having nothing to do with its own performance measures, such practice is indefensible.

process.  February 17, 2014 Expert Report of Dr. Henry Farber (Dkt. 269) ("Farber Opening Report"), ¶¶ 7(a), 7(d), 82.  Dr. Farber does a separate analysis, accounting for objective, non-tainted factors, to calculate the gender effects in the promotion process. He finds that women experienced 19 (or 23%) fewer promotions than they would have received if they had been promoted according to the model of promotions that applies among men, at a statistically significant rate.  *Id*., ¶¶ 7(f), 89-90 & Table 20.

**5.**     **Plaintiffs present substantial evidence that discrimination against women is Goldman's standard policy.**

Goldman asserts that Plaintiffs have not "introduced any proof of an institutional Firm policy of gender discrimination."  Def. Br. at 4.  Goldman is incorrect, as evidenced by the substantial evidence of intentional discrimination, the lack of corrective action on complaints, the protection (and advancement) of male Goldman leaders who have a history of misconduct toward women, the culture of retaliation, and the known and uncorrected systemic disadvantages to women over many years, among other things.  Pl. Br. at 17-32.  If Goldman is suggesting that Plaintiffs are required to present a written "policy of discrimination" to proceed as a class action in a Title VII case, such suggestion is facially absurd and not supported anywhere in the law. Moreover, the presence or absence of a corporate (anti-)discrimination policy is irrelevant to Plaintiffs' disparate impact claim. As the court similarly recognized in *McReynolds*, "there is no indication that the corporate level of Merrill Lynch (or its parent, Bank of America) *wants* to discriminate against black brokers. Probably it just wants to maximize profits. But in a disparate impact case the presence or absence of discriminatory intent is irrelevant[.]"  672 F.3d at 490 (emphasis in original).

B.   **Variation In Job Duties Does Not Defeat Commonality.**

Goldman devotes large portions of its opposition to arguing that Class members - who worked in just two positions - perform different jobs requiring different skills, in different business units.  Goldman contends that such variation precludes commonality with respect to how Class members are compensated, promoted, and reviewed.  This argument is both belied by the record and also largely irrelevant.  In fact, courts have readily granted certification of Title VII classes that include varied job duties, as long as plaintiffs challenge specific discriminatory company-wide policies shown to affect class members similarly.

1.   **The factual record, including expert and witness testimony, confirms that Goldman's asserted variations in job duties and business units are grossly overstated.**

Fundamentally, Goldman's asserted variations in jobs and job duties are pure hyperbole. The proposed Class consists of just two job titles: Associate and Vice President.  As for job duties, Dr. David L. Yermack, Professor of Finance at New York University's Stern School of Business, reports that specialization of the sort described by Goldman tends to happen at the level of Managing Director and above; at the lower levels of Associate and Vice President, most employees have a common set of skills.  Expert Report of Dr. David L. Yermack ("Yermack Rep."), ¶ 20 (filed concurrently).  For example, "[w]hether one works in asset management, sales & trading, underwriting, research, or another area, it is necessary to have a strong knowledge of financial statement analysis, discount rates and the time value of money, risk measurement, compounding, and the like."  *Id*., ¶ 21.[19]  Moreover, those skills are purposefully fungible across

---

[19] Even defense expert Michael Curran, whose entire report is subject to a separate Motion to Exclude (filed concurrently), had to concede the point.  Shaver Decl. II, Ex. D (Curran Dep. at 49:13-25-54:1-5).  He discussed, for example, how junior, post-MBA associates are looked at on "a development curve" and/or "a standardized kind of approach."  *Id*. at 50, 52.  He explained how vice president bankers "in most organizations are, in essence, project managers on transactions . . . it's efficiency of activity, it's quality of the management, it's understanding what

businesses, so that financial services firms can deploy staff to meet the needs of constantly evolving markets and client demands. *Id*., ¶¶ 21-22; Shaver Decl. II, Ex. G (Yermack Dep. at 75:5-17).

This is underscored at Goldman, where business units are constantly in flux. As Dr. Farber reported, "Business Units appear to be unstable. For example, according to Dr. Ward's data, there were as many as 227 business units in 2003 and as few as 94 in 2005. About 20 percent of business units that existed in one year did not exist one year later." July 29, 2014 Expert Rebuttal Report of Henry S. Farber ("Farber Reb. Rep.," filed concurrently), ¶ 32 ("business units do not appear to be measures of either inherent employee characteristics or job characteristics"). Goldman's own declarants confirm that business units are not stable, but instead expand, contract, move, and/or dissolve over time. (*See* Benz Decl. ¶ 13 ("During my tenure, [Public Sector & Infrastructure] has been housed in various areas within the Firm. PSI originally sat in … 'FICC,' which became part of the Securities Division. PSI then moved to IBD, where it was initially part of the Classic Banking Group, and subsequently moved to Financing.") (Dkt. 266); *see also* Bohm Decl. ¶ 7 ("[I]n approximately 2013, [Goldman Sachs Options Advisory Services] group and another joined to become Equities Solution.") (Dkt. 267); Cohen, S. Decl. ¶ 2 ("While I was an Associate, the Business Unit I worked in combined with another …") (Dkt. 271); Kirk Decl. ¶ 6, n. 1 ("Prior to this time, the Sales Strats were organized into four departments (Mortgages, FX, Latin America, and Interest Rates) . . . The E-Products (an existing team) and Commodities (a new team) joined Sales Strats in August 2013 and

---

the senior people on the transaction need, it's being present. . . for both categories [associates and Vice Presidents], it's hard work and effort, time commitment." *Id*. at 51. Similarly, he explained how vice president traders engage in the "same kinds of activities" as associate traders– such as "analytic skills; knowledge of the markets; knowledge of the clients; understanding the trading systems…." *Id*. at 53-54.

December 2013, respective, and Sales Data Analytics (a new team) and Credit (an existing team) joined in January 2014 and July 2014, respectively.") (Dkt. 279).

The documents tell a similar story: business units are flexible entities that Goldman regularly adjusts. For instance, the documents show that when declarant John Levene joined Goldman, the Firm created a new business unit for him. *See* GS0374235 ("Will open a new department for [Levene] (New Market Shares Sales) as soon as there are two people for the department. In the meantime, charge him to Department "E811 UK/Euro Shares Sales."). Likewise, the documents show frequent changes and adjustments to business units. *See*, *e.g.*, GS0374277 (". . . trying to coordinate the relocation of my team from one department code to another within Equities . . . Currently we are part of Equities Mgmt E174 and we are moving to SG-SLK E164"); GS0374905 (email requesting transfer of all individuals from Capital Markets business unit (001) to Corporates business unit (003) and Emerging Markets business unit (005)).

Just as business units are not stagnant, Goldman's employees are not stagnant; they frequently move between business units and divisions. The average time that a Class member Associate spends in a business unit is only 1.66 years and the average time that a Class member Vice President spends in a business unit is 2.17 years.[20] Goldman's own declarants likewise transferred internally on a regular basis.[21] In addition, the set of People Survey responses hand-selected by Goldman show that transfer across roles, functions, units, and divisions is common.[22]

---

[20] Declaration of Rachel Geman in Support of Plaintiffs' Reply ("Geman Decl."), ¶ 4.

[21] *See*, *e.g.*, Chester Decl. ¶ 2 (transferred from Prime Brokerage to Capital Introduction); Ekhard Decl. ¶ 2 (transferred from Operations to IMD); Sabat Decl. ¶ 3 ("In about March of 2004, a trading role became available on a trading desk. My then –managers, who were male, encouraged me to take it even though it meant leaving their team."); Taylor Decl. ¶ 2 (currently works within IMD) and GS0374948 (previously worked in IBD); Guth Decl. ¶ 2 (currently works for Financial Institutions Group) and GS0374151 (previously worked in Corporate Finance; Pension & Insurance; and Financial Planning & Analysis); Levene Decl. ¶ 2 ("I have worked for Goldman Sachs since 1998…I have worked in Prime Brokerage since 2002.");

Finally, the connectedness between units is demonstrated by Goldman's common review process. Over 80% of 360 reviews of Class members included at least one review from a reviewer in a different business unit, and more than a third of all reviews are from different business units. Geman Decl., ¶¶ 5-6.

Dr. Yermack also disagrees with Goldman's contention that the jobs themselves are very different and criticizes the superficial analysis of purported defense expert, consultant Michael Curran: "While Mr. Curran's report enumerates many different jobs in a typical financial services firm (¶17), these positions often involve very similar tasks and serve identical customer bases. For instance, the underwriting of municipal bonds is not materially different from the underwriting of corporate bonds, and many investment products are sold to the same base of institutional investor customers such as insurance companies and pension funds." Yermack Rep., ¶ 23. *Cf. McReynolds*, 672 F.3d at 488 (certifying class of financial advisors serving vastly

---

McNamara Decl. ¶ 2 (currently heads Global Third Party Distribution in GSAM) and GS0374307 (previously worked in Mutual Fund Sales); Pierce Decl. ¶ 2 (currently heads Equity Capital Markets) and GS0374370 (previously worked in Corporate Finance). Other declarants have held a variety of positions across the financial services. *See, e.g.*, Creedon Decl. ¶ 2 (describing how she originally worked in Global Investment Research Division (the "sell side"), then left the Firm to work on the "buy side." She later rejoined Goldman in GSAM); Criqui Decl. ¶ 2 (currently works in the Goldman Sachs Electronic Trading business unit – "Before joining Goldman Sachs, I worked at another investment bank for about nine years in multiple roles, including most recently a sales role on the bank's equities derivatives desk, and then worked at a hedge fund for about a year."); Cohen, D. Decl. ¶ 2 (currently works for Principal Strategic Investment business unit) and GS0374218 (previously worked for Goldman in the Technology business unit of Equities Research) (*see generally* Dkt. Nos. 266-292).
[22] When asked to highlight positive aspects of their experiences at the firm, several Associates and Vice Presidents noted the ability to move laterally to other job functions and other groups within a division. *See, e.g.*, Hendricks Decl. (Dkt. 277), Ex. 13 at 2 ("Mobility to another group within the division."); *id.* Ex. 14 at GS0152650 ("Ability to move laterally to other job functions."); *id.* at GS0152651 ("Opportunity for internal transfer."). Manager declarants describe hiring across the Firm to fill positions in business units they oversee. (*See, e.g.*, Casturo Decl. ¶ 11 ("we may train campus hires or individuals with experience in financial products such as stocks or futures, as those general skills are readily transferable.") (Dkt. 268); *see also* Kirk Decl. ¶ 6; Lopez Decl. ¶ 5) (Dkt. 279 & 281).

different clients, featuring widely varying portfolios, across 600 branch offices run by individual branch managers).

It is not surprising then, that Goldman also ranks individuals across business units when conducting forced ranking. *See*, *e.g.*, GS0196667 (listing individuals across business units for manager quartiling); GS0196697 (same); GS0196707 (same). Nor is it surprising that Goldman applies the same guidelines for manager quartiling, regardless of business unit or Division. *See*, *e.g.*, Pl. Br. at 7, n.21 (citing Uniform Guidelines for Manager Quartiling).

Contrary to Goldman's assertions, business units are not autonomous companies, but are akin to teams in a single law firm working on a particular litigation. Class members transfer between business units (and divisions), and work is routinely evaluated across business unit (and divisional) lines. Regardless of which business unit or division a person works in, Goldman applies a common, standardized set of performance review, compensation, and promotion criteria.

## 2.   *Dukes* supports class certification even if Class members perform different tasks.

Notably, Plaintiffs seek certification of a class of just two job titles: Associate and Vice President. Courts readily grant certification of employee classes where the job titles at issue encompass varied duties, as long as plaintiffs challenge common, standardized company-wide policies like those challenged here. *See, e.g., Stockwell*, 749 F.3d 1107 (reversing denial of certification of class of police officers who challenged uniform promotion policy); *McReynolds*, 672 F.3d at 489-90 (reversing denial of certification of class of female financial advisors who challenged company-wide teaming and account distribution policies); *Parra*, 291 F.R.D. at 365-66 (certifying class of all Hispanic employees at three different grocery chains operating in different niche markets where plaintiffs produced evidence of company-wide pay scales that

17

resulted in significant disparities for comparable jobs); *see also In re High-Tech Employee Antitrust Litigation*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013) (certifying employee class alleging anticompetitive wage suppression that contained over 3,000 job titles, at seven companies, across dozens of states).

Tellingly, Goldman attempts to distinguish *McReynolds* on the grounds that that case involved "a single business", "only one job", and "two specific and substantive nationwide policies."  Def. Br. at 56-57.  Yet the *McReynolds* defendant's argument in opposition to class certification expressly repudiates Goldman's characterization of the case.  There, defendants advanced the same argument that Goldman presents here:  "[C]ourts have declined to certify a class as broad and fragmentary as this one, involving more than 1,000 class members in more than 100 office complexes [over 600 offices] challenging dozens of different types of actions by hundreds of different managers over a period that extends for at least 8 years—a sharp contrast to the single facility, limited time-frame cases upon which plaintiffs rely."  No. 05-06583 (N.D. Ill. Aug. 7, 2009) (Dkt. 386), 2009 WL 3024399, at 1; *see also* Brief for Defendant-Appellee Merrill Lynch, No. 11-3639 (7th Cir. Dec. 29, 2011), 2011 WL 9165433, at *5 ("FAs operate their own businesses using different strategies.").

Defendants also argued, as Goldman does, that no two financial advisors' jobs were alike: "financial advisors operate their own businesses within a business."  *Id*. at 7.  As the Seventh Circuit recognized in reversing denial of certification in *McReynolds*, this generic defense argument does not pass muster where plaintiffs challenge specific common employment practices.  "[P]ermitting brokers to form their own teams and prescribing criteria for account distributions . . . are practices of Merrill Lynch, rather than practices that local managers can

choose or not at their whim. Therefore challenging those policies in a class action is not forbidden by the *Wal-Mart* decision." 672 F.3d at 490.

Goldman relies on four cases that it mischaracterizes as denying class certification purportedly because the classes involved "different types of employees, performing different functions in different departments or facilities." Def. Br. at 1.  Not so.  In each case, the court denied certification because plaintiffs, unlike here, failed to identify a specific, uniform employment practice that affected the class members in a similar way.  For instance, in *Davis v. Cintas Corp.*, 717 F.3d 476 (6th Cir. 2013), the putative class consisted of applicants for just one job, service sales representatives.  The court found a lack of commonality not because of variation in jobs or duties, but because the hiring policy plaintiffs challenged was solely one of untethered manager discretion, and because the court could not ascribe abuse of discretion to the district court's finding that plaintiffs' expert evidence "did not support a finding of companywide gender discrimination."  *Id*. at 487-88.

Goldman is also incorrect that *Tabor v. Hilti, Inc.*, 703 F.3d 1206 (10th Cir. 2013), involved a class of different types of employees performing different functions.  There, the putative class consisted of employees in a *single* job title who were denied promotions to another *single* job title.  703 F.3d 1206, 1211-12 (10th Cir. 2013).  The problem at class certification was that the challenged promotions were not conducted in a uniform manner, unlike the systems at issue here.  *Id.* at 1229.  Though the court emphasized that *Dukes* did not preclude disparate impact claims involving discretionary practices, plaintiffs in *Tabor* "did not show a common mode of exercising discretion that pervaded the entire company" due to the variability of the promotion system.  *Id*. (internal citations and quotations omitted).

Goldman similarly mischaracterizes *Bennett v. Nucor Corp.*, 656 F.3d 802 (8th Cir. 2011), as turning on "stark" variations in job titles and functions performed. Instead, in affirming the district court's denial of class certification, the Eight Circuit relied on the substantial variability of the challenged policies across "autonomous" departments. *Id*. at 814-15 (citing "detailed evidence showing that this operational independence has resulted in a wide variety of promotion, discipline, and training policies that vary substantially among departments."). Because there was no uniform, centralized policy at issue, commonality was not satisfied.

Finally, in *Randall v. Rolls-Royce Corp.*, 637 F.3d 818 (7th Cir. 2011), the court affirmed the denial of class certification where plaintiffs had moved exclusively pursuant to Rule 23(b)(2) and the relief sought was mainly monetary. *Id*. at 825. In addition, the court critiqued plaintiffs' assertion that women's starting salaries were five percent lower than men's where such analysis compared men and women in wildly disparate job titles. *Id*. at 822-23 (noting that expert compared the starting salary of an aeronautical engineer to that of a personnel director). *Id*. at 822-23. Here, by contrast, Plaintiffs make apples-to-apples comparisons of men and women in the same title, year, division, office, job group, education level, and prior experience level (including whether a direct hire or lateral hire). *See* Farber Opening Rep., ¶¶ 7, 53, 55-57, 60-82, 84-89.

*Davis*, *Tabor*, *Bennet*, and *Randall* do not support Defendants' arguments. They merely reinforce the unremarkable requirement that a plaintiff's claims must derive from an employer's uniform and centralized employment practices and policies to proceed on a class basis. *See McReynolds*, 672 F.3d at 489. Plaintiffs readily meet that standard here. Plaintiffs' claims derive from three challenged practices that are uniform throughout Goldman Sachs; they apply in every

division and in every business unit.  In addition, Plaintiffs present evidence that the challenged

practices affect Class members in a similar way, constituting a pattern or practice of

discrimination and causing a statistically-significant adverse impact to women.

      C.      **The Battle Of The Experts, Which Need Not Be Resolved At This Stage, Shows That Common Questions Can Be Resolved On A Classwide Basis.**

      1.      **There are central questions in this case that have common, classwide answers.**

Goldman argues that Plaintiffs have not satisfied commonality because Dr. Farber's

statistical analysis does not show adverse impact to women in all 140 business units.  Def. Br. at

55-57.  Curiously, Goldman claims that Plaintiffs have "abandoned any effort to show that the

processes at issue had the same effect in one Business Unit as another."  *Id.* at 55.  This argument

is a straw man.  As set forth in Section II.C.2., below, Plaintiffs have never advocated a

statistical model that limits comparisons to employees within the same business unit because

such an approach would be methodologically unsound and contrary to the evidence in this case.

Further, Goldman does not even suggest that the dueling conclusions of each side's

Industrial Organizational Psychologist experts – Dr. Cascio for Plaintiffs and Dr. Campion for

Goldman – about the reliability and validity of Goldman's common, adverse-impact causing

systems (or the related question of whether Goldman has any obligation to validate its common

systems) preclude class certification.  Instead, Goldman flatly mischaracterizes Dr. Cascio's

opinions and incorrectly and prematurely attacks Dr. Cascio's conclusions (as Goldman has

chosen to interpret them) on the merits.

Goldman's arguments simply highlight the fact that key common questions in this case –

whether Goldman's compensation, performance review, and promotion practices are unreliable

and invalid and adversely affect (or manifest a pattern or practice of discrimination against)

women – have common, classwide answers.  That the parties disagree on the answers – or adopt

21

different assumptions as part of their respective statistical models – is simply not relevant for purposes of Rule 23. *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (holding that a district court must "assure that a class certification motion does not become a pretext for a partial trial of the merits," and "should not assess any aspect of the merits unrelated to a Rule 23 requirement."). What is relevant at this stage is that both parties' experts have asserted that they can answer these key questions for the Class as a whole – albeit using different statistical methods – even if they result in different outcomes. The Court need not determine which method is the correct one at this juncture, because it is simply not germane to any Rule 23 requirement. *See In re Aftermarket Auto Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 373-74 (C.D. Cal. 2011) (post-*Dukes* case finding that courts "need not cho[o]se between experts" at the class certification stage because inquiry is limited to determining whether merits issues can be resolved through "generalized proof common to the class") (internal citations omitted).

Two recent, post-*Dukes* Title VII cases confirm that the Court need not resolve a battle of the experts like the one presented here at the Rule 23 stage. First, in *Houser v. Pritzker*, the court considered whether to certify a disparate impact case alleging racial discrimination in hiring. 2014 U.S. Dist. LEXIS 91451. Plaintiffs' statistical expert submitted a report showing adverse impact nationwide. *Id*. at * 51. Defendant's expert criticized this report for failing to control for the differences between local offices, and offered his own report showing no statistically significant adverse impact in any local office. *Id*. at *52. The court found that

> [I] need not resolve such 'battles of the experts' at this juncture. The question at this preliminary stage of the litigation is not whether the challenged hiring procedure actually had a disparate impact or were justified by business necessity, but merely whether those questions can be resolved on a classwide basis. . . . Although the experts obviously reach different conclusions regarding the merits in this case, the fact that both sides' experts are able to provide classwide answers to the liability question suffices to satisfy the commonality requirement.

*Id*. at *53-54 (citations omitted).

Similarly, in *Ellis v. Costco*, the court rejected defendant's argument that commonality was not satisfied because defendant's expert report showed that promotion disparities were not statistically significant once certain variables, such as region, experience in position, and leave of absence data, were included. 285 F.R.D. at 524-25. Plaintiffs countered that such variables were tainted or otherwise methodologically unreliable, and offered a competing expert report that showed statistically significant adverse impact at the nationwide level. *Id*. As to the dispute over which variables should be included, the court noted that "these disputes amount to competing classwide explanations for the observed raw disparity and therefore support, rather than undermine, a finding of commonality." *Id*. at 524. As to defendant's argument that, when properly disaggregated, the data showed no disparate impact, the court held that it "need not resolve this factual question at the certification stage; rather, it presents a common question suitable for classwide resolution." *Id*. Collectively, the court found that none of the expert disputes were necessary to resolve to determine a Rule 23 issue. "These questions are therefore not factual disputes necessary to determine whether there was a common pattern and practice that could affect the class as a whole. To the contrary, they provide support for the Court's conclusion that Plaintiffs have demonstrated 'the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'" *Id*. at 528 (quoting *Dukes*, 131 S. Ct. at 2551) (internal citations omitted).

As these cases demonstrate, a determination of whether the Rule 23 requirements are met here does not require the Court to resolve the dispute between Dr. Farber and Dr. Ward as to the proper method for analyzing the data, *e.g.*, at the division level or the business unit level (though the latter is guaranteed to mask discrimination due to the small size of many business units – a

point that Dr. Ward acknowledges).[23]   Regardless of the answer, it will be common to the Class – either there is disparate impact in every division, or there is only disparate impact in certain business units.  *See Houser*, 2014 U.S. Dist. LEXIS 91451 at *51 ("[C]ommonality will exist at the very least if it is possible to prove either that (i) the challenged hiring practices had a disparate impact on minority applicants across <u>all</u> [Local Census Offices], or (ii) the challenged hiring practices had <u>no</u> disparate impact in <u>any</u> LCO.") (emphasis in original).  Either way, the dispute "is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.

### 1.   To the extent the Court is inclined to probe the merits of the disputes between the statisticians, Dr. Farber's is the correct approach, and Goldman's characterization of his opinions is wrong.

#### a.   Plaintiffs' statistical analysis is proper and reliable.

Dr. Farber makes robust findings of statistically-significant adverse impact and a pattern or practice of gender discrimination in Goldman's performance evaluation, compensation, and promotion systems.  First, Dr. Farber's study shows that the challenged performance review processes have a common impact on the class.  After accounting for objective, non-tainted factors[24] Dr. Farber concludes that female Associates are paid 8% less than similarly situated male Associates, and female Vice Presidents are paid 21% less than similarly situated male Vice Presidents.  Farber Opening Rep., ¶¶ 7(a), 55-56 & Tables 6 & 7.  Approximately 50% of the pay differential for female Associates and 22% for female Vice Presidents are attributable to discrimination in the performance evaluation process, with the remainder attributable to

---

[23] Ward Rep. at 16, fn 30.

[24] "[I]llegitimate reasons - reasons themselves representative of the unlawful discrimination at issue - should be excluded from the regression (or otherwise dealt with) to avoid under-estimating the significance of a disparity. *See* Paetzold & Willborn, *ante* § 6.13 (discussing the problem of tainted variables)."  *Morgan v. UPS*, 380 F.3d 459, 470 (8th Cir. 2004).

discrimination in the compensation setting process.[25]  *Id.*, ¶¶ 7(d), 82.   Second, Dr. Farber's study shows that female class members are evaluated lower on the 360 review and are less likely to be ranked in the top quartile than otherwise similar men and that female class members are paid less than similar men even when they receive the same quartile score.  *Id.*, ¶¶ 7, 65, 69-70, 77, 79, 81-82.   All three of these results are statistically significant.  *Id.*, ¶¶ 7, 63-65, 69-70, 77, 79-80.   Finally, Dr. Farber's study shows that prior to 2009 women were promoted from Vice President to Managing Director at a lower rate than expected, controlling for relevant factors, and that difference is statistically significant.  *Id.*, ¶¶ 83-90.

### b.  Dr. Ward's response is improper and litigation driven.

In response, Goldman's statistical expert, Dr. Michael Ward, uses a variety of attacks on Dr. Farber's work that are either factually incorrect or methodologically improper as a way to mask evidence of discrimination.  First, Dr. Ward adds business unit and production variables to his model not based on a scientific method, but as a way to reach Goldman's litigation objectives – even though business units are demonstrably unstable and the production data is incomplete and unreliable.  Farber Reb. Rep., ¶¶ 19, 31-32, 38, 53-54.  Dr. Ward also includes performance measures to his model – the very employment practices that Plaintiffs are challenging as discriminatory.  *Id.*, ¶¶ 28, 75.  Dr. Ward then "slices and dices" the data by performing regression analyses on 16 separate subgroups that all but guarantees that the results are not statistically significant based solely on the lack of statistical power.  *Id.*, ¶ 54.  Incredibly, Dr. Ward tinkers with the model again, overlooking available data and Plaintiffs' allegations and instead restricting his study to results-driven time periods that *vary by division*, as follows:

---

[25] Dr. Farber excluded a small percentage of the class for this analysis – most of whom are paid on a straight commission basis, such as PWAs in IMD.  Farber Reb. Rep., ¶ 41.

Securities (2007-2011), IBD (2005-2011), and IMD (2008-2011).  *See* Ward Report, Figures 8-10.

Dr. Ward's analysis of promotions is also meaningless because it controls for manager quartile and 360-review score, even though Goldman does not assert these as criteria and even though they are tainted variables.  Farber Reb. Rep., ¶¶ 75-76.  Dr. Ward next claims that the Chow Test demonstrates a lack of commonality – but is irrelevant and based on the same obvious methodological flaws that are highlighted above.  *Id.*, ¶¶ 59-69.  Finally, Goldman makes other grab bag arguments that are either nonsensical (r-squared values are not meaningful), suggest factors not used by Dr. Ward either (job function), are rhetorical (use of AA job group variable), ignore Plaintiffs' actual Class claims (e.g., time period of promotion claim), or are factually wrong (Dr. Farber did control for laterally hired into position, *see* Farber Opening Rep. at ¶ 7(a)).[26]  These main critiques are described more fully below.

c.  **Dr. Farber appropriately did not study business unit-level groups because the challenged policies operate at the corporate or division level, relevant decisions are made above the business unit level, and business units are inherently unstable.**

Goldman criticizes Dr. Farber for failing to study compensation differences down to the lowest level, the business unit (Def. Br. at 24-25), and alternatively promotes Dr. Ward's business unit study.  *Id.* at 27-28.  Goldman ignores the evidence in the case that the challenged policies do not operate at the business unit level, but are developed and mandated at the corporate and division level.  *See* Section I.A.1., *infra*.

---

[26] *See infra*; *see also* Shaver Decl. II, Exhibit F (Ward Dep. 135:20-24); Ward Report, Figures 8-10; Farber Opening Rep., ¶ 7(a) (control for laterally hired into position). The affirmative action ("AA") job group is superior to tainted variables, like performance ratings (as Dr. Ward uses at Goldman's direction), to determine the system's gender neutrality or bias.  Shaver Decl. II, Ex. E (Farber Dep. 216:6-25); Farber Reb. Rep., ¶ 24.

In addition, business unit is not a stable variable at Goldman, as discussed in section II.B.1., *infra*. Goldman pretends that business units are free-standing organizations operating in silos. This is not true. As discussed in Section II.B., the Associate and Vice President skills are largely transferable and fungible across business units, and employees are routinely transferred among business units as certain products rise and fall in popularity. The shared work of employees across business units is reflected in the fact that 80% Class members were reviewed by employees *outside* their business unit during the Class period. Geman Decl., ¶ 5.

Dr. Ward's litigation-driven modeling has one even more dramatic effect, however. Slicing the data down to smaller time periods and by business units disburses the data into cells too small to analyze. Farber Reb. Rep., ¶¶ 53-58.[27] Dr. Ward first inexplicably limits the temporal scope of his analysis inconsistently and variously to 2008-2011 (IMD), or 2007-2011 (Securities), or 2005-2011 (IBD), overlooking available data. Ward Rep. at 6, fn 8. Next, "Dr. Ward analyzes 190 division/business unit/rank groupings. 62% of these groupings have sample sizes of less than 60," the threshold below which regression analysis ceases to reliably produce statistical significance. Farber Reb. Rep., ¶ 73. "As a result," Dr. Farber summarizes, "it is not possible to learn about the presence or absence of systemic discrimination from these analyses. Dr. Ward has constructed them in such a way that if statistical evidence of systemic discrimination exists in these data, it would not be detected by his tests because his tests have so little statistical power." *Id*., ¶ 58. The sample size problem predictably renders Dr. Ward's analysis unreliable. *Id*., ¶¶ 59-69, 73. "The sizes of the groups Dr. Ward analyzes are important because with such small sample sizes, he would not be able to observe statistical significance

---

[27] It is no secret why defendants prefer the lowest unit of analysis in Title VII cases: this method drives the cells down to sample sizes that are below the threshold where they can yield statistical significance. *See, e.g., Chin*, 685 F.3d at 153; *Khalil v. The Farash Corp*., 452 F. Supp. 2d 203, 210 (W.D.N.Y. 2006).

even if there were very substantial pay differences between men and women."  *Id.*, ¶ 61.  "These data show that it is not possible to learn about the presence or absence of systemic discrimination from Dr. Ward's analyses."  *Id.*, ¶ 69.[28]  Dr. Ward <u>agrees</u> with this point:  "[S]ome of these Business Units are small, and when the number of observations is too small, a regression model may not be mathematically feasible; alternatively, the model may be unduly affected by a few observations."  Ward Rep. at 16, n.30.

> **d.     Dr. Farber properly excluded production data from his analysis because it is largely missing, and at best, what exists is misleading.**

Goldman's second argument is that Dr. Farber should have used production data as a variable.  Def. Br. at 25-26.  However, as noted, Goldman's production data is incomplete and unreliable, judged by "the lack of consistent data across the class and across divisions and the inconsistent meaning of data across job groups."  Farber Reb. Rep*.,* ¶ 34.  Among the deficiencies are that "[a] large number of employees lack productivity data and Dr. Ward did not study the percentage or number of employees without production data.  In fact, there are no such data for employees in one of the three Divisions, IMD, and data are missing for 59 percent for employees in Securities and for 5 percent of employees in IBD.  Dr. Ward did not, in fact, compare employees with the same production."  *Id.*, ¶ 35.  Moreover, "Dr. Ward also concedes that one of the 'objective' measures of productivity - Sales Credits - may be 'soft' or 'hard' – meaning that it may be more or less difficult to generate commissions from particular clients."

---

[28] Incredibly, without any methodology or basic proof of reliability, Goldman argues that "just [by] taking Dr. Farber's own results by Business Unit and then simply counting up the Units in which the pay differences are favorable to women—without doing any statistical analysis or examining statistical significance—shows that 42% of the Business Units are favorable to women."  Def. Br. at 27, n.16.  This count is not sensitive to the size of the business unit.  Therefore, a business unit that includes four or fewer person/years is counted the same as a much larger business unit.  *See* Farber Reb. Rep., ¶ 54. Such an unscientific nose-count deserves absolutely no weight against Dr. Farber's rebuttal report, which reveals gender bias across Dr. Ward's sixteen groupings.

*Id.*, ¶ 36.  Hence, Dr. Farber was correct to not rely on this data, while Dr. Ward erred in doing so.

> **e.      Dr. Farber correctly omitted performance measures from his studies about pay and promotion disparities because the measures are rife with bias that would taint the results.**

Goldman's third major contention is that Dr. Farber should have studied what Goldman describes as "performance" data, *i.e.*, the 360-review and forced ranking/quartile scoring.  Def. Br. at 27-28.  However, the performance measures are biased employment practices that Plaintiffs are challenging in this lawsuit.  Using a regression analysis, Dr. Farber studied whether the 360-review process systematically undervalues the relative performance of female employees.  Dr. Farber found that both Associates and Vice Presidents in Class positions received lower 360 scores that are statistically significant across all years.  Farber Opening Rep., Tables 14 & 15; *see also id.*, ¶¶ 69-70.  Similarly, Dr. Farber found that, using a regression analysis, both Associates and Vice Presidents in Class positions were excluded from placement in the top quartile of the forced ranking process at a statistically significant level.  *Id.* at Tables 10 & 11; *see also id.*, ¶¶ 63-65.  By including these factors in his models, Dr. Ward, in effect, assumes that the allegation is false and that it is legitimate to include these performance measures in a compensation model designed to measure discriminatory pay differences.  Farber Reb. Rep., ¶ 28.  As Dr. Farber states in his report, "a statistical analysis that relies on the discriminatory performance evaluation system will show that the pay gap is 'accounted for' by differences in 'performance.'"  *Id.*, ¶ 23.

To support this assessment, Dr. Farber ran further tests using 360-review scores and forced ranking/quartile placements, and confirmed that these factors actively suppressed evidence of pay disparities.  Farber Reb. Rep., ¶¶ 29, 44-45.  "I found that when I adjust for these potentially tainted factors the estimated average difference in pay is smaller (in absolute value)

than when I do not adjust for these factors. … I show below that Dr. Ward's estimates, in fact, lead to the same conclusion." *Id.*, ¶ 29. By re-running Dr. Ward's study without the tainted 360-review ratings/forced ranking quartiles, Dr. Farber finds a common pattern of women being "paid statistically significantly less than men who are the same in terms of the factors included in Dr. Ward's models …." *Id.*, ¶¶ 44-52, and Tables R1-R2. "I also find that when I include adjustments for differences in 360 Degree Review score and Quartiles, these differences in pay diminish but are not eliminated." *Id.*, ¶ 44. This means, that the negative directionality of the pay differences between men and women exists no matter what model you use. This is common proof. *See Ellis*, 285 F.R.D. at 511 (accepting as common proof statistical model which included regions where no showing of statistical significance but results still trending negatively for women where Plaintiffs challenge a common employment practice).

> **f.      Goldman's Chow test is irrelevant and should be disregarded.**

Goldman finally criticizes Dr. Farber for not running a Chow test. Def. Br. at 29-30. Yet the "Chow test" attempts to answer an immaterial question: whether, *in the absence* of a common mode of discrimination (like the delegation of authority to local managers in *Dukes*), the magnitude and direction of the effects of all modeled factors (not just the challenged practices) are the same across the entire class. Here, the Plaintiffs have alleged and seek to prove a common mode of discrimination: the performance, compensation, and promotion systems challenged by Plaintiffs (and studied by Dr. Farber). The other modeled factors do not measure injury (gender pay disparities) and thus are unnecessary to support a finding of commonality. Goldman's reliance on the R-squared test is even further afield; raw R-squared scores alone tell us little about the predictive value of a model relating to specific challenged practices. *See, e.g., Ohio Valley Envtl. Coal. v. Elk Run Coal. Co., Inc*., No. 12-0785, 2014 U.S. Dist. LEXIS 75814, *76 n.22 (S.D. W. Va. June 4, 2014) (noting, for instance, that "the r-squared number for the

correlation between cigarettes smoked and lung cancer is only about .08 to .15, but it is seen as highly significant and very predictive"). This is inapposite to this case.

> g.      **Dr. Ward's results, properly analyzed, reflect common proof.**

Dr. Ward asserts that he found wide variations in pay gaps among the different groups of Associates and Vice Presidents, thus supposedly discrediting any common pattern of bias across the company. This is not true. On review of Dr. Ward's results across the five largest groups of Associates and Vice Presidents (covering over 91% of the Class members studied), Dr. Farber discovered no evidence of statistically-significantly variable pay gaps, even when including Dr. Ward's suspect modeling factors. Farber Reb. Rep., ¶ 41. Accordingly, Dr. Ward's results are, if anything, "consistent with there being a consistent pay gap across his groups of Associates and … Vice Presidents." *Id.*, ¶ 43. And Dr. Farber found that when he analyzed the data using Dr. Ward's sixteen groupings, it *supported* Dr. Farber's conclusion that gender disparities disfavoring women exist across these groups. *Id.*, ¶¶ 14, 43-52. There is thus strong statistical support of common pay disparities cutting across Goldman's entire population.

> h.      **Contrary to Goldman's critiques, Dr. Farber's promotions analysis is robust.**

Dr. Farber found that women suffered statistically-significant disparities in promotion from Vice President to Managing Director prior to 2009.[29] Farber Reb. Rep., ¶ 9. Goldman's criticisms (Def. Br. at 28-29) do not hold water. The first argument, that Dr. Farber should have used performance data, has already been addressed above (in subsection II.C.2.e.)); *accord* Farber Reb. Rep., ¶¶ 75-76. Goldman also argues that Dr. Farber misunderstood the competitive nature of its promotion practices, but Goldman makes no effort to analyze or quantify what

---

[29] Dr. Farber studied data produced by Goldman from 2004 to 2008. While Goldman did not provide complete data for the time prior to 2004 (and thus Dr. Farber did not analyze promotions in the Class years of 2002-2003), Goldman previously agreed that the latter data could be extrapolated to cover this earlier time period as well.

impact that purported error (if it is indeed an error at all) has on the net result, or how it

undercuts the observed shortfall in promotions.  Finally, Goldman asserts that Dr. Farber should

have "used the same probit model as he did when studying the other binary decisions," but offers

no authority mandating this approach or suggesting that the outcome would have been any

different.  Other than to request more studies, Goldman makes no meaningful criticism of Dr.

Farber's promotion study, which is appropriate and compelling.

> ## 2. To the extent the Court is inclined to probe the merits of the disputes between the I/O Psychologists, Dr. Cascio's is the correct approach, and Goldman's characterization of his opinions is wrong.

Dr. Cascio has opined that despite the adverse impact of Goldman's common

performance evaluation and compensation-setting employment practices, they have not been

validated to show they make accurate decisions, that they could and should have been validated,

that the systems are not reliable and valid as implemented, and that they fail to meet basic

professional standards.  Cascio Opening Rep., ¶¶ 14-21.  Dr. Cascio has applied his four decades

of experience to identify specific infirmities with Goldman's 360-review, quartiling (forced

ranking), and compensation-setting systems.  Dr. Cascio concludes:

> Goldman Sachs' performance evaluation and compensation-
> recommendation systems have significant deficiencies and,
> consequently, fail to meet basic professional standards in the field
> of Industrial/Organizational Psychology. The observed gender
> differences arising from the performance evaluation systems are
> not justified by reliable measures, they are based on practices that
> are unsupported in my field, and they are not consistent with the
> core requirements of the SIOP Principles and the Uniform
> Guidelines.

*Id.*, ¶ 21. Dr. Cascio's opinions are comprehensively presented and documented in his reports,

and certain relevant conclusions are summarized in paragraphs 17 and 57 of his Expert Report

and paragraph 5 of his Rebuttal Report.

In response, Goldman expert Dr. Campion has jettisoned the standard methods of his field, suggesting that Goldman's practices should be examined through the loose, made-up prism of "best practices."[30]  Campion Report (Dkt. 294), ¶ 15.  To the extent he addresses the standard analysis of his field, he presents a common question: whether Goldman's employment practices need to be validated (*i.e.*, shown to create consistent and accurate outcomes) due to the adverse impact.  Cascio Opening Rep., ¶¶ 59-70 (relevant background); Cascio Reb. Rep., ¶¶ 11-12 (discussing Dr. Campion's opinions).  Dr. Campion disagrees with Dr. Cascio as to whether the common systems can be validated.  Cascio Opening Rep., ¶¶ 71-72; Cascio Reb. Rep., ¶¶ 18-19; Shaver Decl. II., Ex. B (Campion Dep. at 219:13-220:15).  Finally, he misleadingly argues that Goldman has in fact externally validated its systems -- when in fact Goldman has never validated (1) its quartiling/forced ranking system; (2) its 360-review system other than by some minimal examination of the inputs (rather than the entire process); (3) the compensation-setting process; or (4) its promotion process.  Cascio Opening Report at ¶¶ 71-72; Cascio Reb. Rep. at ¶¶ 18-19 (addressing performance evaluation and compensation-setting; neither Goldman nor its expert has suggested that Goldman has validated its promotion system).[31]  Dr. Campion's opinions, while internally contradictory, do at least contend with the same common employment practices as Dr. Cascio's, raising common issues.

Goldman's attack on Dr. Cascio further underscores these points.  Specifically, in its opposition, Goldman badly mischaracterizes Dr. Cascio's opinions, including his deposition

---

[30] Plaintiffs' Motion to Exclude certain of Dr. Campion's opinions fully explicates the problems with Dr. Campion's expert reports.  Ultimately, Dr. Campion throws up his hands and opines that it is "plausible" that the pay differences can be explained by the fact that, as he suspects, women simply can't cut it at Goldman Sachs.  This rank speculation is not expert worthy.

[31] Dr. Campion did not suggest, however, that Goldman's promotion systems have been validated, or render any opinions about Goldman's promotion process. Shaver Decl. II, Ex. B (Campion Dep. at 14:1-7).

testimony, and simply ignores Dr. Cascio's identification of the myriad specific problems with Goldman's systems.  Def. Br. at 15-16, 23-24.

First, Goldman attempts to turn Dr. Cascio's consulting work (in which Dr. Cascio has simply "never been asked" to advise on whether to eliminate a forced ranking system) into a convoluted endorsement of its *own* flawed system.  Shaver Decl. II., Ex. C (Cascio Dep. at 45:23-24).  To the contrary, Dr. Cascio has opined (among other things) that: (a) the forced ranking inputs themselves lack reliable and valid measures (such as ranking employees on "potential", and considering the 360-review scores that even Goldman has admitted to be overly clustered and inaccurate); (b) Goldman in no way ensures that raters are calibrated to a common standard (*i.e.*, that they have a "common understanding and rating of different types or levels of behavior") and otherwise does not ensure consistency or transparency in its processes; and (c) forced ranking is a particularly unreliable and invalid tool at Goldman given that Goldman uses it to create artificial, exacerbated differences between very similar performers in a teamwork setting. Cascio Opening Rep., ¶¶ 17, 79-103, 52-53, 113.

Second, Goldman mischaracterizes Dr. Cascio's views on multi-source (*i.e.*, 360 degree) feedback. Rather than offering a monolithic endorsement that all multi-source feedback is appropriate (no matter how replete with unreliability and invalidity, as Goldman's system is), Dr. Cascio instead cautioned that 360 reviews can be "valuable for *some* purposes . . . I don't throw the baby out with the bathwater . . . [but] under certain circumstances they can be [less useful and even problematic]."  Shaver Decl. II., Ex. C (Cascio Dep. at 46:17-47:3) (emphasis added) (spelling typo in original corrected by errata on December 23, 2013).[32]  Instead of examining Goldman's policies at a useless level of abstraction, Dr. Cascio examined Goldman's *particular*

---

[32] Goldman uses 360 reviews for administrative and even compensation purposes, rather than the typical use for developmental purposes.

360-review system and, using the methods of his field, concluded that it was neither reliable nor valid as implemented, especially as a tool to evaluate and compensate employees. Cascio Opening Rep., ¶¶ 17, 27, 52-54, 75-78, 82-86, 95-103 (discussing clustered scoring, lack of inter-rater reliability, absence of training and monitoring).[33]

Overall, Goldman tries to minimize Dr. Cascio's findings by dismissing them as mere "procedural justice" infirmities, and faulting Dr. Cascio for not rendering *legal* opinions on ultimate issues of discrimination. Goldman has muddled the issues. Where, as here, employment procedures cause adverse impact, the Civil Rights Act of 1991 and the Uniform Guidelines place obligations on the employer to monitor for such impact (as Goldman's proposed expert acknowledges[34]) and look for suitable alternatives. Cascio Opening Rep., ¶¶ 57-74. Dr. Cascio has opined that the challenged processes in this case, namely, performance evaluation and compensation-setting processes, are subject to this well-established framework and could and should be evaluated and monitored for their results. *Id.*, ¶¶ 59-64. Goldman – in failing to validate its systems and in continuing to use adverse-impact causing systems that are invalid and unreliable without looking for suitable alternatives – therefore fails to comport with the Uniform Guidelines. While Goldman may not like the implications of this relationship between its use of unreliable and invalid systems and the pronounced adverse outcomes, this does not mean Dr. Cascio has failed to demonstrate that relationship. At most, the dispute between experts presents a common dispute on the merits of the appropriate tools through which to examine Goldman's severely flawed common performance measurement and compensation setting systems.

---

[33] These criticisms underscore that Goldman employs common processes, such as unweighted criteria, that are highly specific and channeled through common modes.
[34] Shaver Decl. II, Ex. B (Campion Dep. at 127:22-128:3; 131:8-23; 149:19-150:11).

**D.** **Plaintiffs' Anecdotal Evidence of A General Policy of Discrimination Is Both Sufficient and Admissible.**

      **1.** **Plaintiffs have offered "significant proof" that Goldman operates under a general policy of discrimination.**

Plaintiffs have submitted substantial anecdotal evidence that Goldman has a general policy of intentional discrimination, including 133 complaints of gender discrimination within the Class divisions (including 73 from Class members); nine charges of discrimination filed against the company by Class members with the EEOC or other governmental agencies; four civil complaints of discrimination filed against Goldman by Class members (other than in the instant case); eight declarations filed by women in the Class divisions (including five Class members) describing a culture of gender bias; internal Goldman memoranda that evince awareness of (but no solution to) the systemic disadvantages faced by women at the firm; and responses to Goldman's bi-annual "People Survey" collected by the company, which show scores of comments by Class members complaining of gender bias. *See* Pl. Br. at 17-33, 38-41. While there is no threshold amount of anecdotal evidence required at class certification in order to show a general policy of discrimination, this evidentiary record is overwhelming under any standard.

Goldman's attempts to diminish the power of this evidence are unavailing.  For instance, Goldman suggests that Plaintiffs cherry-picked examples from the People Surveys, and offers its own "positive" responses from the surveys of Class members in response to the survey question, "What has had the greatest positive impact on your experience at the firm?"  Def. Br. at 54 n.50 (citing Hendricks Decl. ¶¶ 33-36 & Exs. 11-14).  Notwithstanding the positive directionality of the question, even the "positive" comments of Vice Presidents and Associates hand-selected by Goldman for its opposition brief confirm discrimination against women at the firm.  For example, within the responses submitted by Goldman, female Vice Presidents and Associates

commented on the difficulties women face in advancing within the firm.  *See* Hendricks Decl.,

Ex. 14 at GS0152650 ("The challenge of retaining and promoting female employees still exists

at the VP level and up."); *id.* Ex. 12 at GS0115640 ("20 years at the firm as an assistant ZERO

advancement, lack of opportunity, no encouragement for professional growth.").  Other survey

comments submitted by Goldman describe the underrepresentation of women in leadership

positions and the ineffectiveness of Goldman's "diversity training."  *See id.*, Ex. 12 at

GS0115231 ("Diverse role models (women, minorities) have had the most positive impact on my

experience at the firm. However, there are so few of them."); *id.*, Ex. 14 at GS0152565 ("Perhaps

the diversity training classes that have been implemented are a step in the right direction;

question is whether anyone will attend them.").  Several women in the surveys submitted by

Goldman commented on Goldman's negative treatment of working mothers and the stigma

associated with motherhood and flexible work arrangements at the firm.  *Id.*, Ex. 14 at

GS0152565 ("GS does not do a good job of retaining women who are married and have

children."); *id.* at GS0152505 ("I do feel sometimes that my flexible work arrangement is a

signal that I am not serious about my career – which isn't true at all."); *id.,* Ex. 12 at GS0115232

("More flexible work arrangements should be encouraged.  I cannot imagine having a baby and

doing my job in my current capacity (short of having a 24-hour nanny). I would like to consider

a 'job-share' arrangement but worry that if I were to seriously propose such an arrangement it

would not be given serious consideration.").  If these are among the positive responses, what

does that say about the negative views?  *See e.g.*, GS0152652-660, GS0180017, GS0192652-

GS0192732; GS0201530-GS0201534 (contained in Exhibit A to Shaver Decl. I).

   Goldman also attempts to undermine the power of the internal complaint evidence by

stating that 64 of the 133 complaints were not made by Class members.  Def. Br. at 53.  First,

this is inaccurate; the actual number made by non-Class members is 60 (73 by Class members).

Shaver Decl. II, ¶ 9.  Second, while 60 may have been outside the Class, they still worked in the

Class divisions, for the same managers (or male coworkers) as Class members.  As this Court has

already recognized, "although they are outside the class, these employees may also have felt,

either directly or indirectly, the negative impact of a pattern or practice of discrimination against

their putative class member coworkers."  Dkt. 196 at 24.  In addition, the Court was correct in

predicting that complaints by non-Class members would provide anecdotes regarding

interactions with common bad actors,[35] and "the general culture of these divisions."  *Id*.

Similarly, Goldman argues that 24 of the internal complaints concerned the conduct of

third parties such as clients or vendors.  Def. Br. at 53.  Yet Goldman ignores the fact that five of

these 24 complaints included the conduct of the Goldman manager in not adequately responding

to the client or vendor harassment; another two expressed concern that reporting the incident

would jeopardize the woman's career at Goldman; and another one shows that the complainant

was not hired for a "client facing" role she had applied to within Goldman because she told her

manager that she had been made uncomfortable at a client event.  Shaver Decl. II, ¶ 10.

Goldman would like to pretend none of this entirely contemporaneous evidence exists

and focus only on the eight sworn statements submitted by Plaintiffs on behalf of Goldman

women in this litigation.  But there is no requirement that anecdotal evidence be limited to

litigation declarations, nor does this make sense.

Here, for example, Goldman has limited the ability of Plaintiffs to secure such statements

by paying over seven hundred Class members to stay silent about their employment.  Shaver

Decl. II, ¶ 11 (732 signed severance agreements with female former Goldman Vice Presidents

---

[35] *See* Pl. Br. at 25 (identifying managers who were the subject of multiple complaints, including by both Class and non-Class members).

38

and Associates that prohibit them from making statements about their employment).

Unsurprisingly, the rate of severance agreements proved to be very high among women who had

complained about gender discrimination to Employee Relations – and these were the employees

whose contact information was accessible to Plaintiffs per Court order.  *Id.*, ¶ 12.  Additionally,

those women who did submit declarations in support of class certification confirmed that fear of

blacklisting in the financial services industry for speaking out about gender discrimination is

prevalent.  Albanese Decl., ¶ 14 (Dkt. 251); Shelley Decl., ¶ 19 (Dkt. 257); Baggett Decl., ¶ 9

(Dkt. 252); Gamba Decl., ¶ 21 (Dkt. 254); Chen-Oster Decl., ¶ 11 (Dkt. 253); Parisi Decl., ¶ 8

(Dkt. 256).  Thus, Class member litigation declarations alone are an inadequate gauge of the

Class members' views of the firm.

Finally, Goldman falls back on the argument that the internal complaint evidence is

inadmissible, which is incorrect, as described below.

### 2.    The internal complaint evidence is admissible.

Contrary to Goldman's position, internal complaint files are admissible as business

records under Fed. R. Evid. 803(6) and as party admissions under Fed. R. Evid. 801(d)(2)(C) and

(D) .

As several courts have recognized, such files are business records because they are

contemporaneous records of a regularly conducted activity.  For example, in *La Day v. Catalyst*

*Tech., Inc.,* 302 F.3d 474 (5th Cir. 2002), plaintiff alleged sexual harassment by his supervisor

and relied on the investigation notes of a human resources executive in order to show that the

supervisor had sexually harassed other men as well.  The notes detailed two other sexual

harassment complaints against the same supervisor, and contained statements of the other

complainants.  *Id.* at 481.  The court found that the files fell within the business records

exemption to the hearsay rule and were therefore admissible.  *Id.* at 481, n.7.  Likewise, in *Byrd*

39

*v. Merrill Lynch*, No. 10-247, 2011 WL 2680572 (D.N.J. July 8, 2011), plaintiff objected on hearsay grounds to a declaration submitted by defendant's human resources executive summarizing the company's investigation into complaints made against plaintiff and attaching the investigative file.  The court rejected the plaintiff's hearsay objection and confirmed the admissibility of the investigative file as a business record under Federal Rule of Evidence 803(6).  *Id*. at *6.

The internal complaint files are also admissible as party admissions.  *See Godoy v. Maplehurst Bakeries, Inc*., 747 F. Supp. 2d 298, 305 (D.P.R. 2010) (finding that plaintiff's internal complaint "is a party admission and therefore not hearsay"); *Day v. Sears Holdings Corp*., 930 F. Supp. 2d 1146, 1183 n.138 (C.D. Cal. 2013) (human resources comments regarding investigation into complaints of sexual harassment qualified as party admissions). Notably, Goldman does not contest that the internal complaint files satisfy this hearsay exception.

However, even if the internal complaints contained hearsay and did not fall within an exception to the hearsay rule, they would still be relevant evidence at the Rule 23 stage where the rules of evidence do not apply with rigidity.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (class certification determination is "of necessity . . . not accompanied by the traditional rules and procedures applicable to civil trials");[36] *Flores v. Anjost Corp.*, 284 F.R.D. 112, 124 n.3 (S.D.N.Y. 2012) ("[M]ost district courts addressing this question have held that evidence

---

[36] *See also In Re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613-14 (8th Cir. 2011) (quoting this passage from *Eisen* in holding that the FRE should not be strictly applied at class certification); *Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 459 (S.D. Cal. 2012) (same); *In re Front Loading Washing Mach. Class Action Litig.*, No. 08–51, 2013 U.S. Dist. LEXIS 96070, at *30-31 (D.N.J. July 10, 2013) (same).  Goldman's objection under Fed. R. Evid. 403 fails for the same reason, and because the probative value of this evidence highly outweighs any prejudice to Goldman.

need not be admissible under the Federal Rules of Evidence—or that the rules should not be

applied strictly—on a motion for class certification."); *Spencer v. No Parking Today, Inc.*, No.

12-6323, 2013 WL 1040052, at *1 n.5 (S.D.N.Y. Mar. 15, 2013) ("The Court may consider this

evidence for purposes of the present motion, regardless of its admissibility.").  In fact, in a prior

matter this Court properly relied on evidence just like that offered here at the Rule 23 stage.  *See*

*Cokely v. N.Y. Conv. Ctr. Op. Corp.*, No. 00-4637, 2004 U.S. Dist. LEXIS 9264, at *17

(S.D.N.Y. May 21, 2004) (Motley, J.) (considering union grievance forms, EEOC charges, and

NYSDHR complaints of racial discrimination and harassment as evidence of "a hostile work

environment and management's failure to address it.").  The evidence should be admitted here.[37]

### 3.     Goldman's employee declarations are inherently unreliable and its undisclosed manager testimony and late-produced documentary evidence should be stricken.

While Goldman criticizes Plaintiffs for including too few Class member declarations, it

offers declarations from a token few women who got promoted out of Class positions into

conflicting management roles, and just five Class member declarations – all from current

employees – by five female Vice Presidents.[38]  The remaining declarations are from men, or

from women who did not work in Class positions.

The current Class member declarations Goldman has submitted are inherently unreliable,

and the Court should afford them little weight.  Courts recognize that an at-will employment

relationship has a high potential for coercion because of an employee's dependence on her

employer for income.  *See Bublitz v. E.I. DuPont de Nemours & Co.*, 196 F.R.D. 545, 548 (S.D.

---

[37] In response to Plaintiffs' presentation of complaint evidence, Goldman disputes one interpretation by Plaintiffs of the handwritten notes from Employee Relations regarding one internal complaint.  Def. Br. at 54, n.49.  Goldman apparently concedes the accuracy of Plaintiffs' characterization of the other internal complaints in Plaintiffs' Opening Brief.

[38] *See* Declarations of Alice Chester (Dkt. 269), Arianne Criqui (Dkt. 273), Ashley Eckhard (Dkt. 275), Ritu Kalra (Dkt. 278), and Carolyn Sabat (Dkt. 288).

Iowa 2000) ("Where the defendant is the current employer of putative class members who are at-will employees, the risk of coercion is particularly high; indeed, there may in fact be some inherent coercion in such a situation."); *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 668 (E.D. Tex. 2003) ("[W]here the absent class member and the defendant are involved in an on-going business relationship, such as employer-employee, any communications are more likely to be coercive.") (citing *Kleiner v. First Nat'l. Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985)); *Mevorah v. Wells Fargo Home Mortgage, Inc.*, No. 05-1175, 2005 U.S. Dist. LEXIS 28615, *13 (N.D. Cal. Nov. 17, 2005) (same); *Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672, 678 (N.D. Ga. 1999) (same).

Accordingly, courts have disregarded employee declarations submitted by an employer in opposition to class certification or conditional class certification.  For example, in *Amador v. Morgan Stanley & Co., LLC*, No. 11-4326, 2013 U.S. Dist. LEXIS 19103, *27 (S.D.N.Y. Feb. 7, 2013), the court found that "statements gathered by an employer from its current employees are of limited evidentiary value in the [conditional certification] context because of the potential for coercion."  Similarly, in *Braun v. Wal-Mart Stores, Inc.*, defendants sought to introduce excerpts of class member deposition testimony at class certification.  The court declined to consider the testimony, explaining that:

> One need only recall the symbolic placement of the middle finger of captured crew members of the USS Pueblo in photographs displayed by their North Korean captors along with their "confessions" to recognize the need to observe all the testimony of current employees testifying under their employer's watchful eye that they voluntarily worked off-the-clock without pay because of their devotion to the ideal of corporate profitability through customer satisfaction.

No. 3217, 2005 Phila. Ct. Comm. Pl. LEXIS 551, *19-20 (Phil. Comm. Pl. Dec. 27, 2005).  The *Mevorah* court put it even more plainly: "it is [ ] reasonable to assume that an employee would

feel a strong obligation to cooperate with his or her employer in defending against a lawsuit." 2005 U.S. Dist. LEXIS 28615, at *14.

As these and other courts have recognized, employers possess an economic power to induce employees into giving favorable statements.  This is all the more salient where, as here, there is a broad perception that Goldman maintains a culture of retaliation.  *See* Pl. Br. at 32-34; Shaver Decl. I, Ex J, ¶¶ 4-6; Albanese Decl., ¶ 14 (Dkt. 251); Shelley Decl., ¶ 19 (Dkt. 257); Baggett Decl., ¶ 9 (Dkt. 252); Gamba Decl., ¶ 21 (Dkt. 254); Chen-Oster Decl., ¶ 11 (Dkt. 253); Parisi Decl., ¶ 8 (Dkt. 256).  Such "inherent coercion" undermines the credibility of Goldman's declarations.  To the extent that the Court must weigh competing evidence at class certification, these declarations merit little, if any, weight.

In addition, Plaintiffs have moved concurrently to strike the declarations of Goldman's managers on the grounds that Goldman violated basic discovery obligations by never including these individuals on any document custodian list, refusing to produce search term documents from their files, refusing to hold open their deposition until such documents could be produced, and failing to produce even the personnel file documents that it agreed it would produce.  *See* Plaintiffs' Motion to Strike Declarations (filed concurrently).  Plaintiffs also move to strike Appendix A to Defendants' brief (Dkt. 264-1), which was never produced in discovery despite Goldman's representation that all organizational charts had been produced.  *Id*.

    **E.**    <u>**The Named Plaintiffs Are Adequate And Typical.**</u>

        **1.**    **Adequacy**

Goldman erroneously asserts that Plaintiff Cristina Chen-Oster is not adequate because she acknowledged in her deposition that Goldman managers exercise some discretion in

conducting performance reviews.[39] However, Ms. Chen-Oster's statements about the existence

of some manager discretion in the common performance review process are consistent with the

evidence submitted and Plaintiffs' theory of the case.  Goldman's challenge is misplaced.[40]

### 2.      Typicality

Goldman also attacks Plaintiff Shanna Orlich as being atypical of the Class because it

claims she was not subject to the firm's compensation systems.[41]  Goldman is mistaken.

Ms. Orlich's claims are typical of the Associate position: she was subjected to the

discriminatory 360-degree review and forced ranking process, and subjected to the

discriminatory compensation setting process for year-end bonuses.  Even if, as Goldman argues,

incoming Associates are offered the same starting salary and sign-on bonus, the Associates'

year-end bonus will vary per the compensation rounds process to which Ms. Orlich and other

Associates were subjected.  In addition, the bias in the performance review process ultimately

caused Ms. Orlich to be determined ineligible for further compensation, and she was forced out

of the company.  She is typical.

---

[39] Goldman concedes the adequacy of Plaintiff Shanna Orlich.

[40] Goldman also argues that her "credibility" is affected because she tape recorded some conversations with other Goldman personnel before she left the firm in 2005.  This attack on Ms. Chen-Oster for recording conversations that she has never relied on or sought to use is a misdirection, having nothing at all to do with her knowledge of the case or ability to reflect the interests of the Class.  Goldman has no authority suggesting otherwise. *See* Goldman Br. at n. 55. As *Lapin v. Goldman Sachs & Co.* (a case on which Goldman erroneously relies) confirms in *rejecting* an adequacy challenge, "only when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177-78 (S.D.N.Y. 2008) (internal citation and quotations omitted) (finding that discrepancy between plaintiff's original testimony and later statement did not "impugn [his] credibility in any meaningful way") (gathering cases).

[41] Goldman concedes that Ms. Orlich is typical of the Class with respect to the challenged performance review systems. Because Ms. Orlich was an Associate, she does not have a Class claim for denial of promotion from Vice President to Managing Director.

With respect to Plaintiff Chen-Oster, Goldman concedes her typicality other than raising concerns about her individual retaliation claim.  It is well-established, however, that a class representative's individual retaliation claim does not defeat typicality.[42]

### F.    The Class Definition Is Appropriate.

The proposed Class includes female Associates and Vice Presidents in revenue-producing roles in Goldman's three main revenue-generating divisions: Securities, Investment Management, and Investment Banking.  The Class definition is appropriate because all Class members are subject to the same challenged policies and procedures.  As Goldman's documents and declarations demonstrate, all proposed Class members are subject to Goldman's uniform performance evaluation system, including the 360 review and the forced ranking process.  *See* Section II.A.1., *infra*.  All Vice Presidents are subject to the uniform promotion process.  *Id*.  All Class members except Private Wealth Advisors are subject to the same uniform compensation process, based on the same key compensation criteria.[43]  *Id*.

## III.    THE REQUIREMENTS OF RULE 23(b) ARE SATISFIED.

### A.    Class Certification Under Rule 23(b)(2) May Proceed.

Goldman boldly, but mistakenly, contends that the doctrine of law of the case precludes this Court from considering the propriety of class certification under Rule 23(b)(2).  However,

---

[42] *See, e.g., Spencer*, 2013 U.S. Dist. LEXIS 36357, at *80 ("[T]here is no merit to [defendant's] argument that [plaintiff's] individual retaliation claim defeats class certification." (citation omitted)), *affirmed*, 2013 U.S. Dist. LEXIS 80587 (S.D.N.Y. June 7, 2013); *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."); Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3:29 (5th ed.) ("Newberg") ("The plaintiffs' claims need not be identical to those of the class; typicality will be satisfied" as long as their "claims share the same essential characteristics as the claims of the class at large") (internal quotation marks omitted).

[43] To the extent the Court is concerned that Private Wealth Advisors are not similar with respect to compensation, the solution is to exclude them from the Class compensation claim.

the Supreme Court recently observed that "Rule 23(c)(1)(C) empowers district courts to 'alter or amend' class-certification orders based on circumstances developing as the case unfolds." *Amgen*, 133 S. Ct. 1184, 1202 n. 9. The Second Circuit has explained that "the law of the case doctrine is, at best, a discretionary doctrine, which does not constitute a limitation on the court's power, but merely expresses a general reluctance, absent good cause, to reopen rulings that the parties have relied upon." *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 564 (2d. Cir. 1998) (internal citations, quotation marks, and alterations omitted). Just as Rule 23 protects the flexibility of class proceedings, the law of the case principle is a "flexible doctrine[] from which [the court] may depart," when the circumstances warrant review. *Gulino v. Bd. of Educ.*, No. 13-1001, 2014 U.S. App. LEXIS 2070, *39-40 (2nd Cir. Feb. 4, 2014). Here, the Court's contemporaneous expression of reluctance to issue the controversial ruling, believing mistakenly that it might be compelled to do so, has been proven a well-founded misgiving. *See* Opinion & Order (Dkt. 158), at 13-15. Intervening court decisions and the record evidence provide compelling reasons to revisit Rule 23(b)(2) certification.

On July 17, 2012, Judge Sand issued his decision barring class-wide injunctive relief for former-employee plaintiffs "with significant reservations." Dkt. 158 at 13. This decision was based on the pleadings alone and covered an issue of first impression, interpreting the meaning of dicta in the newly-issued *Dukes* opinion. A series of decisions by three other courts in this District followed, and all three came to the exact opposite conclusion: former employees who seek reinstatement have standing to pursue injunctive relief. *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 467-68 (2013 S.D.N.Y.) (Furman, J.); *Robinson v. Blank*, No. 11-2480, 2013 U.S. Dist. LEXIS 72068, *16-19 (S.D.N.Y. Feb. 22, 2013) (Freeman, J.) (noting application of

*Kassman* in a non-class case); *Kubicek v. Westchester Cnty.*, No. 08-372, 2013 U.S. Dist. LEXIS 139552, *29 (S.D.N.Y. Sept. 27, 2013) (Ramos, J.) (noted in dicta).

Contrary to Goldman's assertions, Plaintiffs satisfy the rule of this District and have standing because they have sought reinstatement here. First Am. Compl. 191(j). The Class faces a real risk of harm if certification under Rule 23(b)(2) is denied, and Goldman maintains its discriminatory practices. Goldman's own evidence demonstrates that former female employees are actively recruited as part of its "Returnship program," and if injunctive relief is not in place to protect them from the long-standing patterns and practices of discrimination, they may very well experience the same barriers that this lawsuit seeks to correct. *See* Hendricks Decl. ¶ 25, Ex. 7 (attaching GS0225871 (2011 Returnship program, a Goldman Sachs program designed to "reintegrate women returning to work" after time off for parenting)).

Given the record evidence and the intervening authority, review of the ruling on the Plaintiffs' standing for certification under Rule 23(b)(2) is warranted. For the reasons set forth in Plaintiffs' Opening Brief, which Goldman does not contest, the proposed class more than satisfies the requirements of Rule 23(b)(2). Pl. Br. at 44-45.

### B.   Certification Under Rule 23(b)(3) Is Appropriate.

#### 1.   Plaintiffs satisfy the predominance standard under Rule 23(b)(3).

For Plaintiffs to meet their burden under Rule 23(b)(3), they must show that the common questions are the principal issues – they have no burden to prove the ***absence*** of individual questions. Rule 23(b)(3) itself anticipates that individual questions will exist in class suits. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present."). To certify a case under Rule 23(b)(3), the Court need find only that

questions of law *or* fact common to the members of the class predominate over questions affecting individuals, and that a class action is superior to other available methods.

Goldman argues against certification under Rule (b)(3) on the basis that, according to Goldman, (a) liability requires individualized inquiries, (b) damages require individual inquiries, and (c) a class is not superior because the Class members make too much money and/or should have joined as proposed Class representatives.  Plaintiffs address all of Goldman's arguments in detail below, but briefly note that they are all meritless. Goldman's liability argument misunderstands or overlooks governing law that in a disparate impact case the trier of fact necessarily reviews common evidence to address the central liability questions of whether common practices (such as, here, for example, forced ranking) cause adverse impact, are consistent with business necessity, and whether alternatives exist; and that in a disparate treatment case the trier of fact necessarily reviews common evidence to address the central liability question of whether there was a pattern or practice of discrimination. These answers by definition do not vary by Class member.

Goldman's damages argument is wrong because it ignores substantial caselaw from this District and others certifying backpay and damages classes under Rule 23(b)(3).  *See, e.g.*, *Gulino*, 2013 U.S. Dist. LEXIS 123948, at *36; *Easterling*, 278 F.R.D. at 51; *Ellis*, 285 F.R.D. at 538; *Parra*, 291 F.R.D. at 392.  Goldman's superiority argument is wrong because the relevant inquiry is not whether Class members could theoretically afford to bring individual litigation, but rather whether a class is superior to the alternatives, as it is here. Further, Goldman's manageability argument is entirely derivative of, and rests on the same flaws, as its predominance argument, and the notion that more Class members should have tried to join as

Class representatives when there are perfectly adequate and typical Plaintiffs already representing the case perverts a core purpose of Rule 23.

> **a.   Plaintiffs' disparate impact claims satisfy predominance.**

Plaintiffs' disparate impact claims under Title VII or the NYCHRL readily meet the predominance requirement.  As described above and in Plaintiffs' opening brief and the expert reports of Dr. Henry Farber, Plaintiffs challenge common, corporate policies which have statistically-significant adverse impacts on women. Courts in this District and around the country have certified similar disparate impact claims post-*Dukes*.  *See, e.g.*, *Gulino*, 2013 U.S. Dist. LEXIS 123948 (after prior certification of injunctive relief claims under (b)(2), certifying disparate impact claims for backpay under (b)(3) where minority teachers challenged employer's employment requirements); *Parra*, 291 F.R.D. at 392 (certifying disparate impact claims of Hispanic employees of grocery chain challenging employer's pay practices); *Ellis*, 285 F.R.D. 492 (certifying disparate impact claims of female employees of big-box retail chain challenging employer's promotion policy under (b)(2) for liability and injunctive relief and under (b)(3) for backpay and money damages, finding whether Defendant's facially neutral policies and practices have a disparate impact on class members, and whether those practices are nonetheless justified by business necessity, are issues best addressed with respect to the entire class); *Easterling*, 278 F.R.D. at 51 (certifying disparate impact claims challenging employer fitness policy under (b)(2) for classwide declaratory and injunctive relief, and under (b)(3) for backpay and monetary damages); *see also Stockwell*, 749 F.3d at 1114 (reversing certification denial of disparate impact age discrimination class action because plaintiffs identified "a single, well-enunciated, uniform policy" and produced a statistical study "purportedly showing a disparate impact," noting "whatever the failings of the class's statistical analysis, they affect every class member's claims uniformly.").

Even the presence of some discretion does not doom predominance due to the existence of common challenged policies.  As the court recognized in *Ellis*, because the question under disparate impact is "whether Defendant's policies and practices have a discriminatory impact on the Class as a whole without regard to intent, the *Dukes*-identified problem of decentralized and discretionary individual managers' decisions presents less of a hurdle to certification if the plaintiffs identify *specific companywide employment practices* responsible for the disparate impact."  *Ellis*, 285 F.3d at 531 (relying on *McReynolds*, the court found that plaintiffs had identified common specific employment practices within Costco's promotion system, and a common question of whether or not they caused a disparate impact).  Back pay awards for disparate impact violations may also be determined on a classwide basis.[44]  *See Gulino*, 2013 U.S. Dist. LEXIS 123948, at \*34 (disparate impact claims may be certified under (b)(3) for determination of a classwide backpay award); *Easterling*, 278 F.R.D. at 49 (approving aggregate calculation of back pay due class members to be distributed on a pro rata basis).  Individualized hearings are not required to assess back pay for disparate impact claims under Title VII and the NYCHRL because neither statute includes a same decision defense.  *See* 42 U.S.C. § 2000e-2(k) (Title VII disparate impact); Admin. Code of the City of New York § 8-107 *et seq.*; *see also Lewis v. City of Chicago*, 560 U.S. 205, 217 (2010) (noting that under section 2000e–

---

[44] Goldman argues that without full-blown individual remedy trials, any back-pay order would amount to a "Trial by Formula" condemned in *Dukes.* This is a frequently misunderstood neologism of *Dukes.* There, the Supreme Court criticized the particular trial plan of extrapolating damages from a supposedly representative sample of employees, an approach that the Court criticized as "novel." *Dukes*, 131 S. Ct. at 2561.  Here, by contrast, Plaintiffs propose a method approved by courts for decades: a shortfall analysis that values the overall loss to the Class, followed by a Court proceeding to allocate relief. Such relief is not Trial-by-Formula.

2(k)(1)(A)(i), "Congress allowed claims to be brought against an employer who uses a practice that causes disparate impact, whatever the employer's motives …. ").[45]

> **b.    Plaintiffs' disparate treatment claims satisfy predominance.**

Plaintiffs' disparate treatment claims under Title VII or the NYCHRL likewise meet the predominance requirement.  At the liability stage of a disparate treatment pattern-or-practice trial, the inquiry focuses on whether there is a pattern of discriminatory decision-making. *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 148 (2d Cir. 2012) (*citing Franks v. Bowman Transportation Co.,* 424 U.S. 747, 772 (1976)); *see also Teamsters*, 431 U.S. at 360 n.46.  The liability stage focuses on common proof, such as class statistical evidence and evidence showing a common corporate culture, such as through witnesses and company documents reflecting, for example, the employer's failure to correct known systemic problems. Once a class pattern-or-practice determination is made in favor of the class in phase one, the employer cannot rely on the tainted selection device to deny relief to class members. *Teamsters*, 431 U.S. at 362 (during remedial phase, "the employer cannot, therefore, claim that there is no reason to believe that its individual employment decisions were discriminatorily based; it has already been shown to have maintained a policy of discriminatory decisionmaking").  At stage two, the burden then rests on the employer to demonstrate that the employee was denied an employment opportunity "for lawful reasons." *Id*.  Those class members who the employer elects not to challenge (or for whom it loses its challenges) proceed to the remedial phase, where the principal issues are once again class-wide.

Although the evidentiary record here is not yet complete, it is clear that Plaintiffs' pattern-or-practice claims rely on common statistical and intentional discrimination evidence

---

[45] Goldman's argument that *Teamsters* hearings are required to assess back pay for unlawful disparate treatment, Def. Br. at 67, is inconsistent with law.

suitable for 23(b)(3) certification.  Courts considering similar claims routinely certify them under Rule 23(b)(3).  *See, e.g.*, *Ellis*, 285 F.R.D. at 538 ("This pattern or practice question predominates because it has a direct impact on every class member's effort to establish liability and on every class member's entitlement to [ ] monetary relief.") (internal quotation and citation omitted); *Parra*, 291 F.R.D. at 392 (same).

The trial plan approved by the court in *Ellis* is instructive, and would be appropriate in this case as well given the similar types of issues (disparate treatment and disparate impact claims, certified under (b)(2) and (b)(3)).  In Stage One (Part One) of the proceedings, Plaintiffs propose that the jury decide: (1) Whether Goldman has engaged in a pattern or practice of discrimination (liability for classwide disparate treatment); (2) Whether Goldman's conduct meets the standard for an award of punitive damages; (3) If liable for punitive damages, the aggregate amount of punitive damages owed to the class (with the Court retaining discretion to adjust said damages after Stage Two); and (4) Whether Goldman is liable to the named Plaintiffs for gender discrimination and, if so, in what amount. Plaintiffs propose that the Court will then decide whether Goldman's employment practices have had an adverse impact on the class (prima facie case of disparate impact).  In Stage One (Part Two) of the proceedings, Plaintiffs propose for the Court to determine (1) Whether Goldman's employment practices were justified by business necessity (defense to the disparate impact claim), and if so, whether there was a less discriminatory alternative; and (2) In the event of a liability finding, appropriate injunctive relief. Finally, in Stage Two, Plaintiffs propose individual hearings to determine entitlement to back pay and compensatory damages and to adjudicate individual defenses. The Court would then adjust the punitive damages award to reflect any due process concerns as to its proportionality to actual damages awarded.  *See Ellis* 285 F.R.D. at 503.

Goldman glosses over the facts in attempting to distinguish the cases that Plaintiffs cite in support of the well-established principle that individualized calculations of damages do not defeat predominance. [46]  Goldman argues that where the court certified a Rule 23(b)(3) class, it was based on a record that evidenced an "easy or mechanical approach" to calculating damages as compared to this case where "putative class members occupied different jobs, at different pay levels, at different time and for varying periods."  Def. Br. at 69.  Goldman's argument, though, finds no support in the relevant decisions, which actually underscore that individual differences of the type Goldman cites do not defeat predominance.

### 2.  Backpay and damages classes may be certified under 23(b)(3).

Goldman contends that a class-based finding of liability under Title VII has little actual value but only leads to a string of full-blown individual trials to assess the "unique circumstances of each class member." That is wrong.  First, there are no individualized affirmative defenses against Plaintiffs' Title VII and NYCHRL disparate impact claims. As for Plaintiffs' disparate treatment claims under Title VII and NYCHRL, as set forth above, Goldman misunderstands *Dukes.*

Contrary to Goldman's position, the Supreme Court did not hold that full-blown individual trials are required in all Title VII class actions.  Under applicable Second Circuit authority, the Court can calculate a class-wide back-pay award for the Class as a consequence of substantive Title VII law.  *Easterling*, 278 F.R.D. at 49; *United States v. City of New York*, 276 F.R.D. 22, 44 (E.D.N.Y. 2011).  Should the Court determine that individual hearings may be required for some purposes, there are several trial management tools available to the Court to

---

[46] This case is vastly different from Goldman's principal authority, *McLaughlin v. American Tobacco Co.,* 522 F.3d 215, 231-32 (2d Cir. 2008), a case that involved legal (rather than equitable) relief and where the factors for proving loss (for a tobacco-related, personal injury-based RICO claim) were far more individualized; the case involved an immense class of smokers who had purchased "light" cigarettes over a thirty-seven year period.

—

address those issues after the Class liability phase is concluded.  The only appellate courts to address this issue since Dukes have held that cases of this size or larger are appropriate for Rule 23(b)(3) certification.  *See Ellis*, 285 F.R.D. at 500 (noting prior order certifying a class of approximately 700); *Parra*, 291 F.R.D at 368, 395 (certifying class of "thousands" of class members, and noting that the defendant had employed between 3,000 and 4,440 Hispanic workers); *cf. Houser*, 2014 U.S. Dist. LEXIS 91451, at *47-48 (certified class of over 250,000 African-American applicants under (b)(2) and (c)(4)); *City of New York*, 276 F.R.D. at 43 (certifying backpay class of approximately 3,000 under (b)(2) and (c)(4)).

### 3.      Plaintiffs have also demonstrated superiority.

For the reasons described above in Section B.1.a, Plaintiffs' disparate impact claims, addressing common classwide policies causing disparate impact and implicating common remedies, are manifestly superior to multiple (and possibly inconsistent) proceedings.  Even given the prospect of stage two hearings on individualized relief for Plaintiffs' disparate treatment claims, certification is appropriate because a class action is superior to and more manageable than either hundreds of individual claims in numerous different courts, all relying on pattern-or-practice evidence (highly relevant in individual cases as well, *Chin*, 685 F.3d at 151),[47] or a free pass to Goldman because of the extraordinary fear of retaliation in the Class and the high reluctance to pursue individual litigation.[48] This is tantamount to no alternative at all.

---

[47] *See, e.g., Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 471 (7th Cir. 2004) (questioning logic of denying certification due to individualized damage questions because plaintiffs would still be entitled to present "evidence about the plant-wide environment," among other reasons); *Gulino*, 2013 U.S. Dist. LEXIS 123948, at *38 ("[r]edressing the Board's Title VII violation on a case-by-case basis would sacrifice the efficiencies that could be obtained by resolving common issues together and using those determinations to streamline individual proceedings"); *Easterling*, 278 F.R.D. at 50 ("any difficulties likely to arise in managing this class action, see Rule 23(b)(3)(D), are far less daunting than the difficulties involved in litigating over a hundred separately captioned actions"); *Smith v. Nike Retail Servs.*, 234 F.R.D. 648, 667 (N.D. Ill. 2006) ("the need for careful administration of a class action will pose fewer problems than the

Goldman makes the novel and baseless argument that the failure of more women to join the case as class representatives is a strike against superiority.  Def. Br. at 70-71.  Not surprisingly, Goldman cites no case for this proposition – nor could it, since such a finding would contradict the very purpose of Rule 23, to permit representative plaintiffs to proceed on behalf of *absent* class members who are not required to "opt in" in order to benefit.

### C.        In The Alternative, Certification Of A Liability Class Under Rule 23(c)(4) Would Materially Advance The Litigation.

As an alternative to certifying the class under Rule 23(b)(2) and Rule 23(b)(3), the Court may elect to certify a liability phase class pursuant to Rule 23(c)(4), which provides that "an action may be brought or maintained as a class action with respect to particular issues."  Fed. R. Civ. P. 23(c)(4).  The Second Circuit has encouraged courts to "take full advantage of this provision to certify separate issues in order to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies."  *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 167 (2d Cir. 2001) (internal alterations and citation omitted).[49]  Specifically, in *Robinson*, the court held that the district court abused its discretion in declining to certify the liability stage of a Title VII pattern-or-practice disparate treatment case:

> [L]itigating the pattern-or-practice liability phase for the class as a whole would both reduce the range of issues in dispute and promote judicial economy. For example, if the class should succeed and, even assuming that the remedial stage is ultimately resolved on a non-class basis, the issues and evidence relevant to these individual adjudications would be substantially narrowed . . . If, on the other hand, Metro-North succeeds at the liability stage, the question of whether it engaged in a pattern or practice of

---

alternative of separate lawsuits by over 230 individual class members, each advancing his or her own assortment of discriminatory actions.").

[48] *See* Pl. Br. at 32-34; Shaver Decl. I, Ex J, ¶¶ 4-6; Albanese Decl., ¶ 14 (Dkt. 251); Shelley Decl., ¶ 19 (Dkt. 257); Baggett Decl., ¶ 9 (Dkt. 252); Gamba Decl., ¶ 21 (Dkt. 254); Chen-Oster Decl., ¶ 11 (Dkt. 253); Parisi Decl., ¶ 8 (Dkt. 256).

[49] *See, e.g.,* Robert H. Klonoff, *The Decline of Class Actions*, 90 Wash. U. L. Rev. 729, 809 (2013) (noting Second Circuit's historical support of issue certification).

> intentional discrimination that injured its African-American
> employees would be completely and finally determined, thereby
> eliminating entirely the need for a remedial stage inquiry on behalf
> of each class member.

*Id*. at 168.  Several courts post-*Dukes* have recognized the continuing vitality of this holding of

*Robinson*, and have held that *Robinson* applies with equal force to disparate impact cases as well.

*See, e.g., Easterling*, 278 F.R.D. at 46; *City of New York*, 276 F.R.D. at 34.

As described above in Section III.B, whether proving systemic adverse treatment or

impact, statistical evidence of the type Plaintiffs have already presented will be central to the

class trial.  *Id*. ("As with the liability phase of a pattern-or-practice disparate treatment claim,

statistical proof almost always occupies center stage in a prima facie showing of a disparate

impact claim.") (quotations omitted).  Further, if Plaintiffs prevail, a court may enter classwide

injunctive and declaratory relief without any inquiry into individualized damages. *Easterling*,

278 F.R.D. at 46; *Robinson*, 267 F.3d at 159.  This makes such cases particularly well-suited for

issue certification as to liability.  *See, e.g., McReynolds*, 672 F.3d at 491 (reversing denial of

certification of liability class under (c)(4) and (b)(2) where "the practices challenged in this case

present a pair of issues that can most efficiently be determined on a class-wide basis, consistent

with [Rule 23(c)(4)].").[50]

This Court reached the same conclusion earlier this month, and certified a liability and

injunctive relief class under Rule 23(c)(4) in a Title VII disparate impact case.  *Houser v.

Pritzker*, 2014 U.S. Dist. LEXIS 91451.  The Plaintiffs in *Houser* brought a case against the U.S.

---

[50] Scholarly authority supports issue certification, as well.  *See*, *e.g.*, American Law Institute, *Principles of the Law of Aggregate Litigation* § 2.02(a)(1) (2010) (advocating issue certification where it would "materially advance the resolution of multiple civil claims by addressing the core of the dispute in a manner superior to other realistic procedural alternatives"); Manual for Complex Litigation (4th) § 21.24 (2010) ("issues-class approach contemplates a bifurcated trial where the common issues are tried first, followed by individual trials on questions such as proximate causation and damages").

Census on behalf of over 250,000 minority applicants, alleging that the Census's applicant screening process is racially discriminatory.  Plaintiffs sought both injunctive relief and monetary damages.  The Court found that the requirements for injunctive relief under 23(b)(2) were met, and certified a liability and injunctive relief class pursuant to 23(c)(4), which would "materially advance the litigation and make the proceedings more manageable." *Id.* at 85. Significantly, the Court rejected the very same kind of manageability arguments that Goldman makes here with respect to class members' damages claims:

> If and when the litigation reaches that stage, the Court will have a number of management tools at its disposal to help resolve these issues. For example, the Court could appoint a special master to preside over individual damages proceedings, or could decertify the class after the liability phase and provide notice to plaintiffs as to how to proceed to prove damages. [citation] There is no need to decide at this time which avenue to pursue. What is important is that the Court has the tools to handle any management difficulties that may arise at the remedial phase of this litigation.

*Id.* at *85-86 (citing *In re Nassau Cnty. Strip Search Cases*, 461 F.3d at 231).

The same is true here.  If the Court should find that this case does not meet the predominance requirement of 23(b)(3), certification of a liability class is still warranted.  As in *Houser*, *Easterling*, *City of New York*, *Robinson*, and *McReynolds*, among other cases,[51] resolution of Goldman's liability for adverse treatment and impact based on classwide evidence will materially advance the litigation.  If and when the litigation reaches a remedial phase, there are a number of ways to determine Class member's eligibility for damages without violating Goldman's right to present individual defenses.  *See id.*; *see also United States v. City of New*

---

[51] *See, e.g.*, *In re Nassau Cnty. Strip Search Cases*, 461 F.3d at 227 ("courts may use subsection (c)(4) to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3)."); *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 589 (S.D.N.Y. 2013) ("Nothing in *Comcast*, however, vitiates the longstanding principle in this Circuit that courts may certify a class as to liability, but not damages, utilizing Rule 23(c)(4), so long as the proposed liability class meets the requirements of Rule 23(a) and (b).").

*York*, 07-2067, 2013 U.S. Dist. LEXIS 166616, *7-8 (E.D.N.Y. Oct. 28, 2013) (describing

procedure for special masters to determine class members' eligibility for damages).

**IV.     <u>CONCLUSION</u>**

      For the reasons set forth above and in Plaintiffs' opening memorandum of law, Plaintiffs

request that the Court certify this proposed Class.

Dated:  July 29, 2014                          Respectfully submitted,

                                               LIEFF, CABRASER, HEIMANN &
                                               BERNSTEIN, LLP

                                               By:_____

                                               Kelly M. Dermody (admitted *pro hac vice*)
                                               Anne B. Shaver (admitted *pro hac vice*)
                                               Lisa J. Cisneros (admitted *pro hac vice*)
                                               LIEFF, CABRASER, HEIMANN &
                                               BERNSTEIN, LLP
                                               275 Battery Street, 29th Floor
                                               San Francisco, CA 94111-3339
                                               Telephone:  (415) 956-1000
                                               Facsimile:   (415) 956-1008

                                               Rachel Geman
                                               LIEFF, CABRASER, HEIMANN &
                                               BERNSTEIN, LLP
                                               250 Hudson Street, 8th Floor
                                               New York, New York 10013-1413
                                               Telephone:  (212) 355-9500
                                               Facsimile:   (212) 355-9592

                                               OUTTEN & GOLDEN LLP

Dated:  July 29, 2014

                                               By:_____

                                               Adam T. Klein
                                               Cara E. Greene
                                               Melissa Stewart
                                               OUTTEN & GOLDEN LLP
                                               3 Park Avenue, 29th Floor
                                               New York, New York 10016
                                               Telephone:  (212) 245-1000
                                               Facsimile:   (212) 977-4005

                                               Paul W. Mollica
                                               OUTTEN & GOLDEN LLP
                                               203 North LaSalle Street, Suite 2100
                                               Chicago, IL  60601
                                               Telephone:  (312) 924-4888
                                               Facsimile:   (646) 509-2075

                                               *Attorneys for Plaintiffs and the Putative Class*