# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

H. CRISTINA CHEN-OSTER; SHANNA
ORLICH; ALLISON GAMBA; and MARY
DE LUIS,

                    Plaintiffs,

                 -against-

GOLDMAN, SACHS & CO. and THE
GOLDMAN SACHS GROUP, INC.,

                  Defendants.

No. 10 Civ. 6950 (AT) (JCF)

## PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION REGARDING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO RULE 23(b)(3)

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

II.     RELEVANT BACKGROUND ......................................................................... 4

    A.    Plaintiffs' Motion for Class Certification .................................................. 4

    B.    Summary of the Class Evidence .............................................................. 5

        1.   Compensation ...................................................................... 6

        2.   Performance Reviews ............................................................ 7

            a.   The 360 Review Process ............................................... 7

            b.   The Forced Ranking Process .......................................... 9

        3.   Promotions ........................................................................ 12

        4.   Corporate Culture of Bias .................................................... 13

            a.   Goldman Maintains a "Boy's Club" Atmosphere. ............... 14

            b.   Goldman Condones the Sexualization of Women and an
               Uncorrected Culture of Sexual Assault and Harassment. ..... 16

            c.   Goldman Tolerates and/or Rewards Men Who Engage In
               Misconduct Towards Women. ....................................... 20

            d.   Goldman Devalues Pregnant Women and Punishes Working
               Mothers Based on Stereotypes about their Commitment to their
               Jobs. ...................................................................... 22

            e.   Goldman Lacks Appropriate Preventative Measures Against
               Discrimination. ......................................................... 24

            f.   Goldman Retaliates Against Women Who Complain. ........... 26

    C.    The Expert Reports of Dr. Farber and Dr. Ward .................................... 28

        1.   Dr. Farber's Report ............................................................ 29

            a.   Compensation Model and Findings ................................. 30

            b.   Performance Review Model and Findings .......................... 31

            c.   Promotion Model and Findings ...................................... 32

        2.   Dr. Ward's Report .............................................................. 33

            a.   Compensation Model and Findings ................................. 33

                i.    Dr. Ward Improperly Included Business Unit in his Study. ........ 34

               ii.   Dr. Ward Relied on Tainted Performance Variables. ................. 35

               iii.  Dr. Ward Ensured Outcomes by Disaggregating Data
                    Without Methodological or Record Support. ........................ 36

# TABLE OF CONTENTS
(continued)

Page

|   |   |   |   |
|---|---|---|---|
|   | b. | Performance Review Model and Findings | 37 |
|   | c. | Promotion Model and Findings | 38 |
| III. | LEGAL STANDARD | | 38 |
| A. | Legal Standard for Review of a Magistrate Judge's Report and Recommendation. | | 38 |
| B. | Legal Standard for Rule 23(b)(3) | | 39 |
| IV. | ARGUMENT | | 39 |
| A. | Judge Francis erred in finding that Plaintiffs' disparate impact challenge to the performance review system did not satisfy Rule 23(b)(3) predominance. | | 40 |
|   | 1. | Common Issues Predominate In Plaintiffs' Disparate Impact Claims Challenging Performance Policies. | 41 |
|   |   | a. Although Judge Francis failed to assess it, Plaintiffs also satisfy Rule 23(b)(3)'s superiority requirement, particularly as to manageability, in connection with their disparate impact challenge to the performance review system. | 45 |
|   |   | b. Extent and Nature of Pending Litigation | 46 |
|   |   | c. Interest of Class Members in Controlling Own Litigation | 47 |
|   |   | d. Convenience and Desirability of Concentrating the Litigation in This Forum | 47 |
|   |   | e. Manageability | 47 |
|   | 2. | Judge Francis failed to analyze Plaintiffs' claim of disparate impact in compensation or promotions. | 48 |
|   |   | a. Plaintiffs satisfy Rule 23(b)(3) with respect to the disparate impact challenge to compensation setting. | 49 |
|   |   | b. Plaintiffs satisfy Rule 23(b)(3) with respect to the disparate impact challenge to promotions. | 50 |
| B. | Judge Francis erred in failing to consider Plaintiffs' disparate treatment claim. | | 51 |
|   | 1. | A trial On Plaintiffs' Disparate Treatment Claim Would Be Manageable. | 56 |
| C. | In the alternative, a Rule 23(c)(4) liability class should be certified as to Rule 23(b)(3) liability issues. | | 57 |
|   | 1. | Liability Issue Certification Is Warranted | 58 |
|   | 2. | Liability Issue Certification Would Materially Advance The Litigation | 59 |
| V. | CONCLUSION | | 61 |

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Accord Sellars v. CRST Expedited, Inc.*,
No. C15-117-LTS, 2017 WL 1193730 (N.D. Iowa Mar. 30, 2017) ........................................ 62

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013) ................................................................................................................ 40

*Bridgeport Guardians, Inc. v. Bridgeport*,
933 F.2d 1140 (2d Cir. 1991) ..................................................................................................... 63

*Brown v. Nucor Corp.*,
785 F.3d 895 (4th Cir. 2015) ........................................................................................ 48, 56, 57

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ...................................................................................................... 65

*Chin v. Port Authority of N.Y. & N.J.*,
685 F.3d 135 (2nd Cir. 2012) ............................................................................................. 42, 64

*Davis v. D.C.*,
No. CV 10-1564 (RC), 2017 WL 1208388,  (D.D.C. Mar. 31, 2017) ..................................... 57

*Easterling v. Conn. Dep't of Corr.*,
278 F.R.D. 41 (D. Conn. 2011) ........................................................................................... 47, 49

*Ellis v. Costco Wholesale Corp.*,
285 F.R.D. 492 (N.D. Cal. 2012) ......................................................................................... passim

*Fudge v. City of Providence Fire Dep't*,
766 F.2d 650 (1st Cir. 1985) ...................................................................................................... 38

*Gulino v. Bd. of Educ.*,
No. 96-8414, 2013 U.S. Dist. LEXIS 123948 (S.D.N.Y. Aug. 29, 2013) ............................... 47

*Hazelwood Sch. Dist. v. United States*,
433 U.S. 299 (1977) ..................................................................................................... 55, 56, 59

*Hnot v. Willis Group Holdings Ltd.*,
228 F.R.D. 476 (S.D.N.Y. 2005) ............................................................................................... 31

*Houser v. Pritzker*,
28 F. Supp. 3d 222 (S.D.N.Y. 2014) ................................................................................... 3, 65

*In re Aftermarket Auto Lighting Prods. Antitrust Litig.*,
276 F.R.D. 364, 373-74 (C.D. Cal. 2011) ................................................................................. 29

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ...................................................................................................... 64

*In re Grand Jury Proceedings*,
219 F.3d 175 (2d Cir. 2000) ....................................................................................................... 25

*In re Initial Pub. Offering Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) .................................................................................................. 29, 64

*In re Nassau County Strip Search Cases*,
461 F.3d 219 (2d Cir. 2006) ................................................................................................. 1, 61

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*In re U.S. FoodService Inc. Pricing Litigation,*
729 F.3d 108 (2d Cir. 2013) ................................................................................... 41

*In re Visa Check/Mastermoney Antitrust Litig.,*
280 F.3d 124 (2d Cir. 2001) ................................................................................... 50

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.,*
722 F.3d 838 (6th Cir. 2013) .................................................................................. 65

*Ingram v. Pac. Gas & Elec. Co.,*
No. 12-CV-02777, 2013 WL 6174487 (N.D. Cal. Nov. 25, 2013) ........................ 38

*Int'l Bhd. of Teamsters v. United States,*
431 U.S. 324 (1977) ....................................................................................... passim

*Jacks v. DirectSat USA, LLC,*
No. 10-CV-1707, 2015 WL 1087897 (N.D. Ill. Mar. 10, 2015) ............................ 62

*Malave v. Potter,*
320 F.3d 321 (2d Cir. 2003) ................................................................................... 34

*Manolov v. Borough of Manhattan Cmty. Coll.,*
952 F. Supp. 2d 522 (S.D.N.Y. 2013) ................................................................... 40

*Meacham v. Knolls Atomic Power Lab.,*
461 F.3d 134 (2d Cir. 2006) ................................................................................... 31

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,*
715 F.3d 102 (2d Cir. 2013) ................................................................................... 41

*Ottaviani v. SUNY New Paltz,*
875 F.2d 365 (2d Cir. 1989) ................................................................................... 60

*Parra v. Bashas', Inc.,*
291 F.R.D. 360 (D. Ariz. 2013) ............................................................................. 46

Robinson v. Metro-North Commuter R.R. Co.,
267 F.3d 147 (2d Cir. 2001) ............................................................... 44, 60, 62, 63

*Rollins v. Traylor Bros., Inc.,*
No. 14-1414, 2016 WL 258523 (W.D. Wash. Jan. 21, 2016) ........................ 57, 58

*Scott v. Family Dollar Stores, Inc.,*
No. 08-00540, 2016 U.S. Dist. LEXIS 105267 (W.D.N.C. June 24, 2016) ...... 47, 59

*Sengupta v. Morrison-Knudsen Co.,*
804 F.2d 1072 (9th Cir. 1986) ............................................................................... 38

*Smith v. Xerox Corp.,*
196 F.3d 358 (2d Cir. 1999) ........................................................... 31, 34, 42, 52

*Sykes v. Mel Harris & Assocs., LLC,*
285 F.R.D. 279 (S.D.N.Y. 2012) ........................................................................... 50

*Sykes v. Mel S. Harris and Associates LLC,*
780 F.3d 70 (2nd Cir. 2015) ..................................................................................... 5

*U.S. v. The Vulcan Society, Inc.,*
2010 WL 234768 (E.D.N.Y. 2010) ........................................................................ 60

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. City of N.Y.*,
   258 F.R.D. 47 (E.D.N.Y. 2009) ................................................................ 42, 50, 54, 55

*United States v. City of N.Y.*,
   No. 07-2067, 2011 U.S. Dist. LEXIS 60276 (E.D.N.Y. June 6, 2011) .................................. 50

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 131 S. Ct. 2541 (2011) ...................................................................... passim

*Watson v. Fort Worth Bank & Trust*,
   487 U.S. 977 (1988) ............................................................................................. 38

*Wright v. Stern*,
   450 F. Supp. 2d 335 (S.D.N.Y. 2006) ................................................................... 31

## STATUTES

28 U.S.C. § 636(b)(1) ................................................................................................ 40

New York City Human Rights Law.................................................................................. 1

Title VII ........................................................................................................... passim

## I.   <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Plaintiffs challenge uniform and centralized performance, compensation, and promotion practices applicable to two positions in three of the revenue-producing divisions at Goldman Sachs. In recommending denial of class certification under Rule 23(b)(3) and (c)(4), Judge Francis erred in two fundamental, outcome-determinative respects.

First, Judge Francis skipped most of the grounds on which Plaintiffs seek certification. He failed to consider any of Plaintiffs' Title VII disparate impact claims as to compensation *or* promotion, *any* Title VII disparate treatment claims, or certification of any type under the liberal New York City Human Rights Law ("NYCHRL").

Second, Judge Francis applied an incorrect predominance analysis to Plaintiffs' disparate impact claim challenging Goldman's performance review practice (the only practice he analyzed), misapplying applicable law and misunderstanding how Goldman's system operates.[1] In doing so, Judge Francis failed to consider how the procedural law of Rule 23 (including the manageability tools under Rule 23(c) whose consideration is favored *if not required* in the Second Circuit[2]) applies against the backdrop of the anti-discrimination laws and their frameworks of burden-shifting. In addition, Judge Francis elevated issues pertinent only to a Stage Two damages proceeding to deny certifying liability issues. This was clear error. Here, the question of whether Goldman's performance evaluation practices have a discriminatory impact

---

[1] Judge Francis also skipped any manageability or superiority analysis for the performance system challenge. Plaintiffs have established that both considerations readily support certification in this case. *See* Section IV.A.1.a.

[2] Judge Francis committed related legal error in his treatment of issue classes under Rule 23(c)(4). While noting the availability of issue certification in both (b)(2) and (b)(3) class cases as a manageability tool, Judge Francis went on to hold, effectively, that the absence of (b)(2) certification foreclosed a discussion of (c)(4). *Cf. In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006) (reversing a district court that had refused to certify a liability issue class in a 23(b)(3) case).

(which Judge Francis concedes is a common issue) is a classwide liability issue that should be certified under Rule 23(b)(3) or (c)(4) without *any* need at this juncture to consider whether any particular class member has an individual entitlement to relief for Goldman's violation of the law—something that would occur, if ever, through a Stage Two proceeding.

Judge Francis' ruling is further undermined because he identified abundant common issues and then ignored them in the predominance analysis. For example, he listed four potentially "individualized factors" that "would effectively swamp the common question of whether the evaluative policies have, on average a discriminatory impact": the class member's skills, the work in her business unit, the unit's profitability relative to other units, and the extent to which the employee's manager considered 360 review and quartiling evaluations. *See* R&R at 40-41, Dkt. 364. All of these concerns are misplaced.

As described below, the educational and experiential background (*i.e.*, skills) of Class members (as well as other relevant characteristics) are already addressed—and controlled for—in Plaintiffs' expert's statistical studies. This is a non-issue. By contrast, Judge Francis' reference to the work performed in and the profitability of business units as a factor of analysis is not grounded in company practice. Rather, it is a product of a defense expert's baseless methodological choices. Even Goldman readily concedes that performance evaluations, compensation, and promotions are not determined at the business unit level. Business units are not part of, or relevant to, the company's own system of evaluating, paying, or promoting Class members.

Despite Judge Francis' careful and correct analysis of the expert statistical reports for *Daubert* purposes, Judge Francis ignored the admonition to avoid weighing in on a "battle of the experts" when applying the work of the statistical experts to class certification. *See, e.g.*, *Houser*

*v. Pritzker*, 28 F. Supp. 3d 222, 243 (S.D.N.Y. 2014) ("In the end, though both sides have spent a great deal of energy arguing the validity of their experts' analyses, the Court need not resolve such 'battles of the experts' at this juncture.") (collecting similar cases). Significantly, after properly recognizing in the *Daubert* context that the defense expert's use of business unit as a model control is methodologically unsound (Dkt. 363 at 19), for Rule 23 purposes, Judge Francis improperly adopted wholesale the defense expert's made-up use of business unit as a basis to defeat certification. Notably, even Goldman's expert did not include business unit in his models for promotion,[3] which Judge Francis did not recognize.

Likewise, the managers' implementation of the *common* and *uniform* performance measures, with *common* and *uniform* (albeit unvalidated and uncalibrated) criteria, is the quintessential common mode of exercising discretion that the Supreme Court in *Wal-Mart Stores, Inc. v. Dukes* explicitly authorized as a basis for class certification. 564 U.S. 338, 353, 131 S. Ct. 2541, 2553 (2011) (explaining that "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes" (citation omitted)). The application of these common systems to this modest-sized (and largely based in NYC) class is a reason to grant class certification, not to deny it. Indeed, the implemented common systems for performance, pay, and promotion are the common and predominating issues that support class certification.

Finally, Judge Francis called this a "close case." Respectfully, Plaintiffs disagree. The evidence they have proffered is akin to the evidence that has supported certification in countless

---

[3] Dkt. 296-1 (Ward Report) at 28.

other Title VII actions and fully warrants disparate impact and disparate treatment class

certification under Rule 23(b)(3). Nonetheless, even if the decision could be construed as

"close," Plaintiffs submit that Judge Francis landed on the wrong side with respect to the Rule

23(b) (3) finding by misapplying certain key legal and factual issues and skipping most of the

required analysis. Accordingly, the Court should certify the requested class under Rule 23(b)(3).

## II.    RELEVANT BACKGROUND

### A.    Plaintiffs' Motion for Class Certification

Plaintiffs submitted their motion for class certification ("the motion") to Your Honor on

May 19, 2014, whereupon Your Honor referred the motion to Magistrate Judge Francis. Dkt.

240. Plaintiffs moved for class certification pursuant to Fed. R. Civ. P. 23(b)(2), 23(b)(3), and

23(c)(4), and Goldman opposed the motion. Dkts. 247, 264 & 310. On October 22 and 23, 2014,

Magistrate Judge Francis heard oral argument on the motion, including examination and cross-

examination of Plaintiffs' statistical expert (Dr. Farber) and Goldman's statistical expert (Dr.

Ward). On March 10, 2015, Judge Francis issued a Report & Recommendation ("R&R") on the

motion and a Memorandum and Order largely on Daubert issues. Dkts. 363 & 364.

In the R&R, Judge Francis determined that all class members were subject to uniform

policies concerning performance evaluations, compensation, and promotions, and that Plaintiffs

satisfied all of the requirements of Fed. R. Civ. P. 23(a)—numerosity, commonality, typicality,

and adequacy—as to both their disparate impact and disparate treatment claims. Dkt. 364 at 6-

14, 24-35. Judge Francis also found that Plaintiffs would have satisfied Rule 23(b)(2), but for

Judge Sand's prior ruling that the named Plaintiffs—as former employees—lacked standing to

seek injunctive relief.[4] *Id*. at 36.

---

[4] This Court has since overruled Judge Sand's decision, and held that former employees who
seek reinstatement do have standing to seek injunctive relief, and therefore could represent a

As to Rule 23(b)(3), Judge Francis, relying on *Sykes v. Mel S. Harris and Associates LLC*, 780 F.3d 70 (2nd Cir. 2015), found that Plaintiffs' claim that Goldman's performance evaluation procedure caused a disparate impact on female employees did not satisfy predominance because individual causation issues would predominate over common issues. R&R at 40-44. He did not make any findings with respect to Plaintiffs' disparate treatment claim, except to say that it was less likely to satisfy predominance and so he would not address it, nor did he address the other Rule 23(b)(3) elements—superiority and manageability—at all. *Id.* at 44, n. 9. He also did not make any Rule 23(b)(3) findings with respect to the other challenged employment practices—compensation and promotion. *Id.*

Finally, as to Rule 23(c)(4), Judge Francis held that the inability to obtain class-based injunctive relief under Rule 23(b)(2) precluded issue certification under (b)(3) and (c)(4). R&R at 44. He did not address Plaintiffs' argument that a liability only class could be certified under (c)(4), with damages issues and individualized make-whole relief reserved for a second stage after liability is determined. *Id.*

### B.    Summary of the Class Evidence

Plaintiffs sought certification of a class consisting of:

> All female Associates and Vice Presidents who have worked in Goldman Sachs' Investment Banking, Investment Management, and/or Securities Divisions in the United States at any time from September 10, 2004 to the present, and in New York City from July 7, 2002 to the present.

Plaintiffs contend that the approximately 1,800 putative class members have been discriminated against on the basis of their gender through three common, uniform employment practices: Goldman's compensation system, Goldman's performance review system, and Goldman's promotion system. *See* R&R at 6-14 (practices found to be uniform).

---

Rule 23(b)(2) class. Dkt. 479. Goldman has sought interlocutory appeal of this order, Dkt. 485, which the Court certified. Dkt. 500.

1. **Compensation**

Plaintiffs challenge Goldman's bonus-setting system, known as the compensation "rounds," because it is based on uniform invalid or poorly defined criteria and systematically disadvantages women.[5]

The rounds are overseen by a centralized, firmwide compensation team and the Chief Financial Officer ("CFO").[6] The rounds begin with individual manager compensation recommendations, which are then rolled up through successively higher levels of management review through each division's Compensation Committee and ultimately to the firm compensation team.[7] The process ends each year when the Firm finally approves each division's final compensation recommendations.[8]

The firmwide compensation guidelines require managers to consider common tainted or poorly defined factors in determining employee compensation, including manager forced rank and "other circumstances that should bear on the individual's compensation proposal for this year, such as P&L impact in the current year, indispensability of/risk of losing the individual, recent significant increase in responsibility, and specialized contribution (*e.g.* to diversity, training, recruiting) in current year."[9] Goldman does not train managers with respect to a common understanding of how to evaluate these various factors, does not weight the factors, and

---

[5] Dkt. 260 (Cascio Report, ¶¶ 17, 39-42, 48-51, 73-74, 104-111).
[6] Dkt. 248-22 (Kung Tr. 56:7-12); Dkt. 248-21 (Heller-Sberloti Tr. 20:25-21:5); Dkt. 248-24 (Larson Tr. 113:25-114:22); Dkt. 248-9 (GS0222964-967 (email from firmwide compensation to HCM leaders with year-end compensation calendar, salary guidelines, and divisional per capita targets)).
[7] Dkt. 248-22 (Kung Tr. 40:17-22, 41:8-24, 64:15-65:8); Dkt. 248-21 (Heller-Sberloti Tr. 24:8-15; 57:9-24); Dkt. 248-24 (Larson 61:1-67:2; 62:5-17). *See also* Dkt. 248-9 (GS0225247).
[8] Dkt. 248-22 (Kung Tr. 114:21-115:9); Dkt. 248-21 (Heller-Sberloti Tr. 27:22-23); Dkt. 248-24 (Larson Tr. 66:4-67:2).
[9] *See* Dkt. 248-4 (GS0122587 at 589); Dkt. 248-2 (GS0109366 at 367); *see also* Dkt. 248-22 (Kung Tr. 117:9-121:16); Dkt. 248-21 (Heller-Sberloti Tr. 128:2-129:8); Dkt. 248-24 (Larson Tr. 83:4-85:19).

does not require specific pay recommendations to be justified in writing.[10] As a result of these common unreliable factors and common inadequate training, women are systematically disadvantaged under this compensation-setting system.[11]

### 2. Performance Reviews

Plaintiffs challenge Goldman's performance review system because it is uniformly based on design and implementation deficiencies that render it invalid for its stated purpose, and results in a systematic disadvantage to women.

Throughout the entire Class period, Goldman's performance evaluation system has consisted of two processes working in tandem: the 360 degree review ("the 360 Review") and forced ranking, also called "manager quartiling." Both of these systems are invalid, unreliable, and—as Goldman acknowledges—"impacted by gender differences."[12]

Plaintiffs' expert Dr. Wayne Cascio comprehensively examined the 360 Review and forced ranking processes and concluded they fail to meet basic professional standards in the field of Industrial Organizational Psychology—the field dedicated to designing and/or validating employment systems. In applying his four decades of experience and the standard methods of his field, Dr. Cascio specifically found that "the observed gender differences arising from the performance evaluation systems are not justified by reliable measures [and] are based on practices that are unsupported in my field…." Dkt. 260 (Cascio Report, ¶ 21).

### a. The 360 Review Process

In this process, reviewees are evaluated by supervisors, peers, and subordinates (as well as self-reviewed). The 360 Review includes a uniform rating system for providing quantitative

---

[10] Dkt. 248-22 (Kung Tr. 192:7-194:3, 226:18-25); Dkt. 248-21 (Heller-Sberloti Tr. 159:1-160:11); Dkt. 248-24 (Larson Tr. 142:22-143:4). *See also* FN 19, *supra*; Dkt. 260 (Cascio Report, ¶¶ 17, 39-42, 48-51, 73-74, 104-111).
[11] *See* Section II.B., *supra*.
[12] Dkt. 248-8 (GS0190618 at 623).

feedback, and uses firm-wide review categories—such as "overall commercial effectiveness"—whose scores are used to generate the employee's overall 360 score.[13]

While theoretically a multi-source feedback process such as a 360 review might be constructed to provide valid *developmental* information, Goldman's particular 360-degree review is an improper tool to make compensation and evaluation decisions. Significantly, the 360 systematically undervalues the relative performance of women in critical areas.[14] For example, women are rated much worse than men on business-related measures such as "commercial effectiveness" and better on areas such as "teamwork."[15] Overall, rather than being a feedback tool to assist employees in development, the 360 Review has common structural components that systematically undervalue the performance of women.[16] Goldman's own internal audits of the process confirm this fact.[17]

As described by Dr. Cascio, there are numerous design and implementation deficiencies that render it unreliable and invalid, as confirmed by Goldman itself. For example, Goldman's head of HCM has stated that the 360 scores are *decoupled from performance* in such a way that

---

[13] Dkt. 248-22 (Kung Tr. 305:14-306:2, 307:2-8); Dkt. 248-23 (Landman Day 1 Tr. 145:17-146:17); Dkt. 248-1 (GS0005283 at 287).

[14] *See* Dkt. 248-7 (GS0176436 at 438 ("[O]ur women score differently on our performance review system than men do.")).

[15] Dkt. 248-8 (GS0204343 at 344-349).

[16] Dkt. 260 (Cascio Report, ¶¶ 37, 52-53, 73-74, 95-103); *see also* Dkt. 248-6 (GS0161489 (female complained that men intentionally underrated female co-worker)).

[17] *See, e.g.*, Dkt. 248-7 (GS0176436 at 438 ("the number of women who are able to score in the upper quintile of the review process does not represent the normal distribution we would expect to see. Does that really make sense? How much of this result is due to substantive differences in performance and how much is due to perceptions or style differences?")); Dkt. 248-8 (GS0190618 at 623 ("The underlying assessment of individuals that feed into the firm's processes are colored and impacted by gender differences (*e.g.*, communication styles, behavioral norms, access to informal networks, etc.")).

they cannot be relied on.[18] Likewise, Goldman provides ineffective training to its managers on the implementation of the 360 and fails to train reviewers on how to calibrate for specific results across categories of performance, meaning that reviewers are not trained to value the same performance similarly.[19]

As a result of these problems with the 360 Review, female Associates and Vice Presidents have received lower scores on the 360 Review in every year for which data has been produced (2003-2011). Dkt. 259 (Farber Report), Tables 12 & 13. In addition, the differences in scores between male and female Associates, and between male and female Vice Presidents, comparing employees with the same relevant characteristics—including year, office, division, education, and experience—were consistently statistically significant, supporting a finding that discrimination is the cause. *Id.*, Tables 14 & 15.

While the 360 Review is riddled with problems, it also taints the second performance evaluation process, forced ranking, for which the 360 score is an input.[20]

### b.  <u>The Forced Ranking Process</u>

Forced ranking is a fad employment practice typically used by companies for termination decisions; it has no validity in the scientific literature and has fallen out of favor even among human resources professionals. Dkt. 260 (Cascio Report), ¶ 86. Nevertheless, Goldman has maintained this practice despite its adverse impact on women.

---

[18] Dkt. 248-6 (GS0143793 at 794 ("[T]here has been a notable inflation of scores over time, and this year the gap between the scores of top and bottom performers has become particularly compressed. You may, for example, encounter situations where bottom performers received high scores, or where strong performers received relatively low scores. It is more important than ever to avoid over-reliance on scores when forming a view of an individual's performance.")). *See also* Dkt. 260 (Cascio Report, ¶¶ 82-84, 97-98).

[19] *See, e.g.*, Dkt. 260 (Cascio Report), ¶¶ 17, 52, 78, 95, 112-13.

[20] Dkt. 248-6 (GS0155193 (2004)); Dkt. 248-6 (GS0153032 (2005)); Dkt. 248-6 (GS0153290 (2006)); Dkt. 248-2 (GS0109353 at 355 (2007)); Dkt. 248-3 (GS0109390 at 391 (2008)); Dkt. 248-5 (GS0126057 at 058 (2009)); Dkt. 248-5 (GS0136548 at 549 (2010)); Dkt. 248-6 (GS0153035 at 036 (2011)).

After the 360 process is completed, Goldman requires its managers to group their employees using a five "quartile" distribution:[21] Quartile 1: Top 25%; Quartile 2: Next 25%; Quartile 3: Next 25%; Quartile 4: Next 15%; and Quartile 5: bottom 10%.[22] Thus, Goldman force ranks its employees based on a relative scale, even if the actual differences in employee performance do not conform to such distinctions and/or are trivial.

Goldman's firm-wide guidelines on forced ranking direct managers to judge three factors for making ranking decisions: performance, contribution, and potential, and to do so by considering the following tainted or largely undefined criteria: a) the 360 Review results (which systematically disadvantage women); b) quality of performance; c) long-term commercial impact or contribution; d) potential to assume increasing responsibility; e) leadership/management skills; and f) diversity and citizenship-related activities.[23] As with the 360 Review, there is inadequate training on how to score these common factors and ineffective monitoring.[24]

In fact, Goldman does not even require or suggest weighting of the factors, nor does Goldman require managers to document how they determined the score or provide transparency to employees about the process; most employees are unaware of the details (or existence) of the forced ranking process, much less their own rank or why they are being perceived (and paid) the way they are.[25] By way of notable example, while the 360 score (which has its own infirmities,

---

[21] Dkt. 248-22 (Kung Tr. at 29:6-19); Dkt. 248-21 (Heller-Sberloti Tr. at 39:20-24); Dkt. 248-24 (Larson Tr. at 182:16-183:22); Dkt. 248-23 (Landman Day 2 Tr. at 9:12-10:13).

[22] Though technically not four categories, Goldman uses the term "quartile" to refer to each bucket and "quartiling" to refer to the forced ranking process.

[23] *See*, *e.g.*, Dkt. 248-6 (GS0153290); Dkt. 248-2 (GS0109353 at 355).

[24] Dkt. 260 (Cascio Report), ¶¶ 88-91.

[25] *Id.*; *see also* Dkt. 248-24 (Larson Tr. at 167:9-19); Dkt. 248-3 (GS0113380 at 393); Dkt. 248-3 (GS0113764 at 777); Dkt. 248-3 (GS0113509 at 523); Dkt. 248-3 (GS0113456 at 469); Dkt. 248-6 (GS0153941 at 966-971); Dkt. 248-6 (GS0153035 at 038); Dkt. 255 (Declaration of Shanna Orlich ("Orlich Decl."), ¶6); Dkt. 253 (Declaration of Cristina Chen-Oster ("Chen-Oster Decl."), ¶ 6); Dkt. 257 (Declaration of Denise Shelley ("Shelley Decl."), ¶ 6); Dkt. 251

as discussed above) is an input into the forced ranking process, managers may assign different performance quartiles during forced ranking than the rank employees are told they earned per their 360 score.[26] There is no limitation on how much the forced ranking may diverge from the 360 score.[27]

Forced ranking is a particularly unreliable tool for evaluating (and compensating) employees who work in teams, as Class members frequently do, where it is difficult to determine how to allocate credit for team results. Similarly, where, as here, employees have 360 scores clustered at the top of the range,[28] forced rankings driven by the arbitrary need to rank and not by performance ensure that the system is unreliable.

Despite forced ranking's general problems and the extent to which Goldman's particular forced ranking process is strikingly flawed given the composition of its workforce and the nature of class members' work, the forced ranking decisions are a major driver of compensation at Goldman, with compensation materials at every level—from the line manager up to the divisional compensation committee—reflecting data about employee quartile placement.[29] At every step, the disadvantages for women are compounded.[30] Goldman's common forced ranking system adversely affects Class members and contributes to unjust, gender-based pay differences tied to this common practice. Moreover, Goldman's forced ranking process is opaque to

---

(Declaration of Lisa Albanese ("Albanese Decl."), ¶ 6); Dkt. 254 (Declaration of Allison Gamba (" Gamba Decl."), ¶ 6); *see also* Dkt. 260 (Cascio Report, ¶ 37(g)).

[26] Dkt. 248-23 (Landman Day 2 Tr. 26:25-27:7, 96:4-21); Dkt. 248-22 (Kung Tr. 320:4-323:9); Dkt. 248-21 (Heller-Sberloti Tr. 40:15-41:24, 106:11-107:6); Dkt. 248-24 (Larson Tr. 187:9-19).

[27] Dkt. 248-24 (Larson Tr. at 187:9-12). *See also* Dkt. 248-5 (GS0123267 at 290).

[28] Dkt. 260 (Cascio Report, ¶¶ 82, 84, 97, 98).

[29] *See, e.g.*, Dkt. 248-6 (GS0155193 at 194); Dkt. 248-6 (GS0153032 at 033); Dkt. 248-4 (GS0113858 at 860); Dkt. 248-4 (GS0123223-224); Dkt. 248-5 (GS0123267); Dkt. 248-5 (GS0123295-296).

[30] The disadvantages in the forced ranking process can also be observed through statistical analysis, which shows that women are significantly less likely to be classified in the top quartile. *See* Dkt. 259 (Farber Report, ¶¶ 63-65, Tables 10 & 11).

employees, who are advised by Goldman that the 360 Review process is the complete performance review. Thus, Class members are not able to challenge the legitimacy of this performance measurement or complain about biased results, which are largely unknown to them.

### 3.   Promotions

Plaintiffs challenge Goldman's promotion system because it is a common, invalid and opaque selection process applied uniformly to all Vice Presidents, and systematically disadvantages women.

Goldman has maintained an annual "cross-ruffing" process to determine who will be promoted from Vice President to Managing Director.[31] Cross-ruffing is a tap-on-the-shoulder interview process for pre-approved candidates. Vice Presidents who seek promotion cannot "apply," but must instead be invited.[32] The process is centrally directed and managed by a firmwide group that creates and distributes the firmwide cross-ruffing manual and trains all interviewers ("cross-ruffers").[33]

Each cross-ruffer is assigned a list of candidates to evaluate.[34] After the cross-ruffing is completed, the cross-ruffing committee meets and generates a list of candidates ranked in order of preference for promotion.[35] The division heads review this list and then create their own

---

[31] Dkt. 248-22 (Kung Tr. 398:11-21); Dkt. 248-21 (Heller-Sberloti Tr. 80:10-21); Dkt. 248-24 (Larson Tr. 227:5-11).

[32] *See* Dkt. 248-7 (GS0164972).

[33] *See, e.g.*, Dkt. 248-6 (GS0163511-35); Dkt. 248-22 (Kung Tr. 434:15-435:9; 438:22-439:9); Dkt. 248-21 (Heller-Sberloti Tr. 211:24-212:21, 218:23-219:9); Dkt. 248-24 (Larson Tr. 232:6-233:11, 240:10-21, 251:16-22). The process has been directed and managed by the Subcommittee on MD Selection of the Partnership Committee (2000-2003), the Partner Practices Group (2004 and 2005), and the Talent Assessment Group (2006 forward). *See, e.g.*, Dkt. 248-2 (GS0109256); Dkt. 248-2 (GS0109273).

[34] Dkt. 248-22 (Kung Tr. 439:25-440:9); Dkt. 248-21 (Heller-Sberloti Tr. 218:8-13); Dkt. 248-24 (Larson Tr. 242:5-11).

[35] Dkt. 248-1 (GS0109235 at 237); Dkt. 248-22 (Kung Tr. 448:8-449:3); Dkt. 248-21 (Heller-Sberloti Tr. 228:20-25); Dkt. 248-24 (Larson Tr. 244:11-20).

separate list of ranked candidates.[36] Both lists are submitted to the firmwide executive office for

edits and approval.[37] The firm's 32-person Management Committee ultimately decides who is

promoted.[38]

      While Goldman does not require Vice Presidents to attain any particular performance

level to qualify for promotion,[39] it does consider a variety of poorly defined and unreliable

common criteria, such as whether the Vice President is a "role model" or an "effective coach."

*See* Dkt. 248-2 (GS0109329 at 340). Like the class certified in *Ellis*, 285 F.R.D. 492, the Class

here challenges Goldman's invalid and opaque uniform selection process, controlled by a small

group of Goldman managers. As a result of maintaining this process, Goldman promoted 23%

fewer women than would have been expected if they had been promoted at the same rate as men

with the same characteristics. *See* Dkt. 259 (Farber Report, ¶ 89, Table 20).

### 4.  Corporate Culture of Bias

      Goldman's discriminatory processes do not operate in a vacuum, but instead are shaped

by a common culture of gender stereotyping and hostility towards women at the Firm. The

evidence of intentional discrimination is substantial, from many different sources, including:

1) internal complaints by female employees submitted to Goldman's Employee Relations

department; 2) comments made by employees in the bi-annual Goldman People Survey; 3) civil

lawsuits and gender discrimination charges filed against Goldman with governmental agencies;

---

[36] Dkt. 248-6 (GS0163621); Dkt. 248-22 (Kung Tr. 449:23-450:7); Dkt. 248-21 (Heller-Sberloti Tr. 231:3-7); Dkt. 248-24 (Larson Tr. 246:20-247:3). Goldman reports that frequent comments on the bi-annual People Survey include that "division heads have too much influence over process relative to cross-ruffing/division heads overruled cross-ruffing results." Dkt. 248-9 (GS0296931 at 946).

[37] Dkt. 248-9 (GS0242506); Dkt. 248-9 (GS0222789); Dkt. 248-22 (Kung Tr. 453:7-23); Dkt. 248-21 (Heller-Sberloti Tr. 230:4-12, 240:22-241:11); Dkt. 248-24 (Larson Tr. 247:24-248:8).

[38] Dkt. 248-1 (GS0109235 at 237); Dkt. 248-6 (GS0163511 at 535); Dkt. 248-22 (Kung Tr. 452:19-454:16); Dkt. 248-21 (Heller-Sberloti Tr. 230:10-231:19); Dkt. 248-24 (Larson Tr. 248:16-20).

[39] Dkt. 248-22 (Kung Tr. 429:5-20).

4) documentary evidence such as corporate emails and records reflecting persistent biases and systemic problems for women; 5) articles about Goldman's culture in the press; and 6) Class member and witness declarations.

This constellation of evidence reflects widespread complaints about gender bias and a "boys club" atmosphere; the sexualization of women and an uncorrected culture of sexual harassment and assault; the advancement by the firm of male employees and managers accused of misconduct towards women; the gender stereotyping of working mothers as unfit for or uncommitted to their careers; the lack of appropriate human resources interventions; and a culture of retaliation in response to employee complaints. Judge Francis found the following evidence "substantial" and sufficient to satisfy commonality for purposes of Plaintiffs' disparate treatment claim. R&R at 33.

### a.   Goldman Maintains a "Boy's Club" Atmosphere.

Like every other large company in the United States, Goldman has a nominal policy against sex discrimination. Goldman does not follow its policy.

Women report a "boy's club" atmosphere, where binge drinking is common and women are either sexualized or ignored. For example, a presentation by Goldman's Americas Diversity Committee reports that women are "unable to crack male informal networks."[40] Similarly, a presentation to new business unit managers states that, "to our minority population . . . the limited sharing of the secret code of requirements to succeed at GS must feel awfully different" and, by way of illustration noted a recent business unit leaders panel where "the number of references to 'buddies', 'drinking buddies', 'sports' and 'frat pals' makes it easier to understand how someone who didn't grow up in that environment might find it more challenging."[41]

---

[40] Dkt. 248-7 (GS0179657).
[41] Dkt. 248-9 (GS0205234, 236).

Goldman's internal complaint files confirm that the sexualized and male-centric workplace is a major hurdle for women. *See e.g.*, Dkt. 248-7 (GS0175193 (manager is a "locker room guy" and the team feels like a "boys club"; manager has "never seen women on a distressed [sales] desk" and "the women feel they have never had the same opportunity profile")); Dkt. 248-7 (GS0175509 (manager runs the team like a "boys club")); Dkt. 248-6 (GS0161490 (managers made regular comments about women being "no good after [age] 27")). Women are excluded from events and outings, which provide valuable networking opportunities and help men advance their careers. *See, e.g.*, Dkt. 248-7 (GS0175439-441 (complaint by female Associate that she is excluded from client events including dinners and sporting events; harassed at client event by employee "drinking heavily")); Dkt. 248-7 (GS0175494 (men on the desk had baseball tickets and did not invite the women)); Dkt. 248-6 (GS0158556 (reporting a "male dominated/very difficult environment for women"; occasion involved heavy drinking when she went out with men from her desk)); Dkt. 248-7 (GS0175204 (manager invited the men on the desk out for drinks, making the women feel excluded)).[42] Plaintiff Shanna Orlich's experience illustrates this problem, in that she was denied opportunities to work as a trader, while a male colleague with no more experience was given a trading seat right away; senior managers challenged him to do push-ups on the trading floor due to his background in the Marine Corps. Dkt. 255 (Orlich Decl., ¶ 10). Likewise, despite being a Varsity golfer in school, Orlich was not

---

[42] *See also* Dkt. 251 (Albanese Decl., ¶ 13 (excluded from important networking opportunities and client events)); Dkt. 257 (Shelley Decl., ¶¶12-15 (women overwhelmingly excluded from important social and professional networks, and men frequently went out drinking together)); Dkt. 254 (Gamba Decl., ¶18 (excluded from outings among male colleagues)); Dkt. 256 (Parisi Decl., ¶ 6 (males benefit from the favoritism of senior managers)); Dkt. 258 (Tischhauser Decl., ¶ 6); Greg Smith, *Why I left Goldman Sachs: A Wall Street Story* (2012) 98, 101("Alcohol was a big part of the culture at the firm, as it is on Wall Street in general"); describing social pressure to impress his managers by drinking excessively).

invited to all-male golf outings that her male peers and male subordinates attended with senior managers. *Id.*, ¶ 9.

Other documents further illustrate that the Firm has been well aware of its culture and reputation. *See*, *e.g.*, Dkt. 248-8 (GS0191994 at 2014 (Global Leadership and Diversity meeting notes report that "the 'boy's club' environment creates limited networking opportunities," and "the environment appears inclusive, but on 'male terms'—a feeling that 'GS men don't get women'")); Dkt. 248-7 (GS0176436 at 439 ("A female VP posts a male [Partner] about a women's dinner. His response 'How did the bitch session go?'")); Dkt. 248-9 (GS0264184 (head of Global Leadership and Diversity calls gender differences in responses on People Survey "appalling")). In fact, on the bi-annual People Survey, the Firm's performance on "diversity" is consistently rated as the lowest or second lowest category, especially by women.[43]

### b.      Goldman Condones the Sexualization of Women and an Uncorrected Culture of Sexual Assault and Harassment.

Company records indicate that Goldman permits or facilitates a culture where male professionals view women as sexual objects, leading to substantial numbers of incidents of alleged sexual assault and harassment in just the three Class divisions. In complaint files produced for the period 2000-2011, there have been at least 75 such *reported* incidents.[44] For instance, one male manager took his female employee to an abandoned office floor and propositioned her for sex; he separately called her and said he was masturbating to the sound of her voice.[45] He also insisted that she come to his apartment, where he showed her pictures he had taken of other Goldman female employees in lingerie.[46]

---

[43] Dkt. 248-7 (GS0180331 at 338 (2003)); Dkt. 248-8 (GS0180657 (2003)); Dkt. 248-9 (GS0227078 (2005)); Dkt. 248-9 (GS0246067 (2009)).
[44] *See* Dkt. 248 (Shaver Decl., ¶ 23).
[45] Dkt. 248-7 (GS0175921).
[46] Dkt. 248-7 (GS0175916).

Another Goldman manager told his female employee that, "with that feisty nature, you would be good in bed." Dkt. 248-6 (GS0158798). Yet another male Goldman manager told his female employee that he loved her, and repeatedly made sexually suggestive comments and overtures during business trips.[47] *See also* Dkt. 248-6 (GS0162302 ("I was talking to this guy who just got promoted to VP . . . I told him about how it made me uncomfortable how the guys were touching me, and he was really supportive and giving me advice on what to do, and the next thing I know, his hand is on my ass, too!")); Dkt. 248-6 (GS0162142, 160, 171-173, 191 (male vice president massaged female employees' shoulders and asked them out for drinks while on the desk; another male supervisor and vice president allowed client to discuss female subordinate in a sexual manner while female subordinate was on the calls and also discussed performing sexual acts on another female colleague he labelled a lesbian)); Dkt. 248-7 (GS0167579-603 (male manager rated the outfits of female employees on the desk, rubbed the shoulders of female analysts, told a female colleague he is "big down there," and asked if female employee's roommates are "easy fucks")); Dkt. 248-7 (GS0167542 (male employee showed coworkers a sex tape he made with an unidentified woman and perpetuated rumor that the woman was a female coworker)).[48]

---

[47] Dkt. 248-7 (GS0175325-326, 329).

[48] *See also* Dkt. 248-12 (Shaver Decl., Ex. D (Marie Myung-Ok Lee, *What It was Like to Be a Woman at Goldman Sachs*, The Atlantic, November 26, 2012, www.theatlantic.com/sexes/archive/2012/11/what-it-was-like-to-be-a-woman-at-goldman-sachs/265572) (describing "memos announcing a new crop of incoming female associates [that] instead of the usual corporate headshot . . . used different semi-nude pictures of *Playboy* playmates," and a widely-held belief "that it was a professional responsibility for women to wear heels, the higher the better")); Dkt. 248-17 (Ex. I (Daniel Bates, *How to Party Like a Goldman Trader*, Daily Mail Online, October 18, 2012, www.dailymail.co.uk/news/article-2219662/Inside-bankers-lives-excess-hot-tubs-Goldman-Sachs.html) (describing corporate party in Las Vegas involving a hot tub and a topless woman)).

Even more disturbingly, in the same time period, at least seven women reported criminal sexual assault, attempted rape, or rape by male Goldman employees from the three Class divisions. Dkt. 248-6 (GS0162409-410 (female employee drugged and raped by male employee after company baseball game)); Dkt. 248-6 (GS0161598-600 (female employee persistently harassed, groped, and propositioned for sex by male manager at Goldman orientation retreat; after being rejected, he followed her into her room, tried to get into her bed, and would not leave her alone until she was able to lock the door)); Dkt. 248-6 (GS0162306 at 313 (after drinks with colleagues, male Vice President took sick female coworker back to her house, followed her into her home, got in her bed, and put her hand on his crotch)); Dkt. 248-6 (GS0158763-764 (male colleague groped female employee during an evening social event, said "I want to fuck you" and put his hand down her pants multiple times to grab her crotch while in front of friends, despite her protestations)); Dkt. 248-6 (GS0162384-385 (Managing Director took his assistant out to dinner, and during the taxi ride back he groped her and put his hand down her blouse)); Dkt. 253 (Chen-Oster Decl., ¶ 10 ("I was sexually assaulted by a married male co-worker after attending a Goldman dinner to celebrate the promotion of a man in my group to Managing Director.")).

Unsurprisingly in such a culture, work events are held at strip clubs where the sexualization of women is endorsed and celebrated. *See*, *e.g.*, Dkt. 257 (Shelley Decl., ¶ 10 ("my male colleagues at Goldman took their clients to strip clubs")); Dkt. 258 (Tischhauser Decl., ¶ 7 ("In my experience, entertaining clients at strip clubs was considered routine for Goldman in the U.S.")); Dkt. 248-6 (GS0158596 (male partner took clients to strip clubs)); Dkt. 248-7 (GS0167724 at 726 (work events took place at restaurant where female servers wear bikini tops); Dkt. 248-7 (GS0175455 ("traders take clients to Asian massage parlors")); Dkt. 248-6 (GS0161513 at 518 (email from Vice President to administrative assistant stating as the

"subject" of the email, "new place for mmkt [money market] party!!" with the text of the message, "what do you think. . . Penthouse Launches Flagship Club in Manhattan . . . a Manhattan-based, luxury gentlemen's club")); Dkt. 248-16 (Shaver Decl., Ex. H (Tracy Clark-Flory, *Goldman Sachs: When business and strip clubs mix*, Salon, Sept. 16, 2010, www.salon.com/2010/09/17/strip_club_business) (strip club marketing manager noting frequent business visits to the club with topless entertainment and an "extremely upscale" steakhouse)); Dkt. 248-13 (Shaver Decl., Ex. E (Patrick McGeehan, *Former Trader Sues Goldman, Charging Firing Was Illegal*, N.Y. Times, February 09, 2000, www.nytimes.com/2000/02/09/business/former-trader-sues-goldman-charging-firing-was-illegal.html) (describing lawsuit by former trader for Goldman, alleging that he believed that his inter-office, extramarital affair would be accepted by the Firm because the Firm accepted his entertaining clients at strip clubs)); Dkt. 248-14 (Shaver Decl., Ex. F (Mike Taylor, *Goldman "Defender" Saw Harassment at Firm: "Deep Doodah,"* The N.Y. Observer, September 23, 2010, observer.com/2010/09/goldman-defender-saw-harassment-at-firm-deep-doodah) (former Goldman partner acknowledging that her boss engaged in sexual harassment and discrimination and she personally experienced inappropriate behavior, including a Goldman outing to a strip club)). In fact, Goldman has such a strong reputation for this kind of behavior that in 2005 the Firm cautioned new associates in their orientation that while clients will ask to go to strip clubs, they should merely not "expense" that entertainment.[49] However, the record above demonstrates that entertaining clients at strip clubs remained unabated, if frequently "off the books."

---

[49] Dkt. 248-7 (GS0177811 at 838).

c.   **Goldman Tolerates and/or Rewards Men Who Engage In Misconduct Towards Women.**

Goldman is aware of these problems, and it tolerates managers who engage in gender stereotyping, sexual harassment, and/or gender favoritism. For example, one female employee reported that it was "widely known" that ███████ Participating Managing Director ██████ ████ Participating Managing Director █████████ was "inappropriate toward young women," that "other women have inappropriate experiences with [him]," and that she was "terrified of being with him alone." Dkt. 248-7 (GS0175498-989). She reported that walking down the hallway, she had to face him "checking her out up and down." Dkt. 248-7 (GS0175490 at 502, 513).

Likewise, ███████ Participating Managing Director ███████ was accused of directing a male employee to order a video called "Girls Having Fun" during work hours, Dkt. 248-6 (GS0161950-51), and of telling his female assistant that she would not need her job after becoming engaged since she would be a "trophy wife." Dkt. 248-6 (GS0162457). He was also accused of retaliating against female employees who complained of gender discrimination. Dkt. 248-6 (GS0162457).

Another male Managing Director, who was on the 2004 cross-ruffing committee for the Securities Division,[50] was the subject of three separate complaints by female employees.[51] Just one of the complaints against him states that, "in the past year [manager] pushed a minority woman off the Sales desk, fired a woman on maternity leave, failed to promote a well-credentialed and deserving woman (who ultimately resigned) and is currently performance

---

[50] Dkt. 248-2 (GS0109329 at 331).
[51] *See* Dkt. 248-6 (GS0145358), Dkt. 248-6 (GS0158576), Dkt. 248-7 (GS0175866), and Dkt. 248-7 (GS0175883).

20

managing another woman (who happens to be pregnant) off the Sales desk."[52] The same

complaint alleges that this manager browbeat his female employee to the point of tears, and then

offered her dollar bills to wipe her eyes.[53] Another woman claimed that this manager asked her

whether she intended to have children, and when she responded affirmatively, she found herself

selected for termination.[54] *See also* Dkt. 248-20 (Chen-Oster Tr. at 424:11-18 (describing this

same manager as a "guys' guy" who did not support another female star employee for promotion

because of her gender)).

      This is typical of a broader pattern: men who engage in these behaviors are often

protected or given a slap on the wrist (if that), and the problems remain wholly unaddressed. *See*,

*e.g.*, Dkt. 248-7 (GS0175440 (multiple women complain about gender issues on the desk,

including inappropriate comments made by one male employee, but no actions are taken after an

investigation)); Dkt. 248-6 (GS0145360) and Dkt. 248-6 (GS0158798 (manager who told his

employee she would be good in bed was given nothing more than verbal warning)); Dkt. 248-6

(GS0162384-385, 404 (manager who groped his assistant received only a written warning)). *See*

*also* Dkt. 248-6 (GS0162463 (when ▮Participating Managing Director▮ assistant complained about gender

discrimination and "trophy wife" comment, HCM told her she should take the comments as a

joke and feel flattered)); Dkt. 248-7 (GS0167542 (male associate who perpetrated sex tape rumor

was investigated by Employee Relations, which recommended a "strongly worded written

warning")).

      In fact, perpetrators of sexual harassment have been promoted to or allowed to remain in

senior managerial positions. For example, the co-worker who sexually assaulted named Plaintiff

---

[52] Dkt. 248-7 (GS0175867).
[53] Dkt. 248-7 (GS0178566).
[54] Dkt. 248-6 (GS0145358).

Chen-Oster was later promoted to Managing Director.[55] Another female employee complained that her male supervisor rang a bell every time a woman walked on to the floor, and the supervisor was soon after promoted to Managing Director.[56] A different Managing Director was the subject of multiple complaints of gender discrimination; Employee Relations commented that "the stats don't look that good,"[57] and yet he continued to force women in his group to leave. As one of the women who complained about him put it, "No one is stopping what is happening to women."[58]

> **d.    Goldman Devalues Pregnant Women and Punishes Working Mothers Based on Stereotypes about their Commitment to their Jobs.**

Goldman views women who have children as less committed to their jobs, and penalizes them for having children by reassigning key accounts, relationships, and roles. Internal complaints on this issue present a consistent pattern of pregnancy-related discrimination. *See* Dkt. 248-6 (GS0158549 (Vice President's job responsibilities taken away upon her return from maternity leave)); Dkt. 248-7 (GS0175874 (good accounts denied to Vice President "because they knew she would be going out on maternity leave. Given smaller accts. Told she would get bigger accts when she got back. Didn't happen.")); Dkt. 248-7 (GS0167564 (told by male manager "that I would be moved because I am going on maternity leave … The person who is replacing me just had a baby, so I am led to believe that because I am pregnant I lost my spot and because he is male he is allowed to keep one."); Dkt. 248-6 (GS0140133 at 137-138 ("The stereotypical perception by my male colleagues and supervisors was that my new child caring

---

[55] Dkt. 248-3 (GS0109873).
[56] Dkt. 248-7 (GS0167724 & *2008 Goldman Sachs Annual Report*, Goldman Sachs, http://www.goldmansachs.com/investor-relations/financials/archived/annual-reports/2008-entire-annual-report.pdf (last visited February 16, 2014)).
[57] Dkt. 248-7 (GS0175552).
[58] Dkt. 248-6 (GS0158912).

responsibilities meant I was no longer 100% devoted to my work. At one point my boss suggested that I might want to speak with the women's committee and go into a job that would not be as demanding.")); Dkt. 251 (Albanese Decl., ¶ 12 ("During my pregnancy, Goldman Sachs removed my duties and took away my assistants. I was told that I would be transferred to a department of one person (me) with no advancement opportunities.")); Dkt. 253 (Chen-Oster Decl., ¶ 12 (after maternity leave, "Goldman Sachs removed me from meaningful responsibilities and accounts and moved my seat to a location among administrative assistants")); Dkt. 254 (Gamba Decl., ¶¶ 9-17 (denied promotion to Managing Director after taking maternity leave; manager said he would "be ridiculed" if he supported her candidacy)).

For instance, one Vice President reported that when she announced she was pregnant, her managers moved her off a business she had personally grown and in which she had managed several employees in so doing. Dkt. 248-6 (GS0158602). When she returned from leave, she was moved out of a managerial position entirely, and her compensation went down by over 40% even though her book of business was up 72%. Dkt. 248-6 (GS0158607). Another Vice President reported that after she returned from maternity leave, her managers "keep 'forgetting' to include me in calls/meetings they set up" and that much of the credit for revenues associated with her accounts was given to male colleagues at the year's end. Dkt. 248-5 (GS0138162).

Goldman's internal documents demonstrate the firm's knowledge of problems in its treatment of working mothers and women on maternity leave. A 2003 document titled "Talking Points for Managing Maternity Leave" acknowledges, "We have limited experience in dealing with the issues surrounding managing a professional on maternity leave, and some of our experience has proven that we are not very good at it."[59] Similarly, meeting notes from the

---

[59] Dkt. 248-8 (GS0204237).

Global Leadership and Diversity office note that women report "concerns around maternity leave and re-entry."[60]

In a firm where having children is disfavored and carries adverse assumptions about future performance, it is easy to see how Goldman's invalid performance, compensation, and promotion measurements are a common vehicle to cement and utilize improper stereotypes.

### e.      Goldman Lacks Appropriate Preventative Measures Against Discrimination.

Despite knowledge of persistent bias and stereotyping at the firm, Goldman has failed to implement even the most basic preventative measures, such as appropriate diversity training or effective Human Resources auditing for biased outcomes. Though employees are supposedly required to complete two hours of diversity training per year, internal audits suggest that most do not.[61] In fact, Goldman's manager training data indicates that between one-half and three-quarters of managers attended no diversity training at all between 2002 and 2007.[62] Moreover, many of the trainings that satisfy this requirement—such as a 2010 presentation called "Kick-off to the World Cup: Building the Future of U.S. Soccer," a 2010 film screening of "Team Everest: A Himalayan Journey," or a 2011 presentation called "Diversity in the Business of Sports"— appear not to even address the subject matter, much less curtail inappropriate behavior or teach managers how to manage fairly.[63]

Likewise, Goldman fails adequately to review its evaluation, compensation, and promotion practices, maintaining review procedures that have been perfunctory at best and have

---

[60] Dkt. 248-8 (GS0191994 at 2014).
[61] *See* Dkt. 248-7 (GS0176249 at 255, 258 (in 2007, only 35% of employees completed 2 hour requirement, and 54% did no training; the Firm's unstated goal is that 75% of employees complete 2 hours)).
[62] Dkt. 248 (Shaver Decl., ¶ 24).
[63] Dkt. 248-5 (GS0139403 at 406); Dkt. 248 (Shaver Decl., ¶ 25).

failed to correct known, continuous, systemic disadvantages for women.[64] For example, each year during the Class period, Goldman's firm-wide Employment Law Group ("ELG") conducted a secret, privileged review process that Goldman does not share with management or use to correct known problems.[65]

HCM also reviewed manager forced rankings for each of the Class years, purportedly "focusing on women and historically underrepresented groups."[66] However, instead of conducting a meaningful review of specific forced rankings to identify and rectify discriminatory outcomes, HCM did nothing more than perform a top-level verification that rankings mathematically satisfied the required firm-wide percentage distributions (*e.g.*, no more than 25 percent of individuals ranked in the top quartile).[67] HCM reviewed the ranked groupings, or "buckets," across business units, regions, and job titles, to ensure that the percentages were mathematically correct on each level.[68] If the buckets were mathematically correct, HCM did not conduct any other review of the forced rankings.[69] Importantly, HCM lacks a uniform system for

---

[64] *See also* Dkt. 260 (Cascio Report, ¶ 17, 65-70, 73-74, 114-131).

[65] Dkt. 248 (Shaver Decl., ¶ 27); *see also* Dkt. 248-22 (Kung Tr. 156:16-157:13, 161:2-10, 162:18-163:1); Dkt. 248-25 (Mehling Tr. 168:7-12); Dkt. 248-22 (Kung Tr. 160:17-163:17); Dkt. 248-23 (Landman Day 2 Tr. at 152:18-153:11); Dkt. 248-2 (GS0109352), Dkt. 248-4 (GS0122587 at 590-591). Notably, Goldman has claimed that this ELG review is privileged, refusing to produce discovery about its work. Accordingly, the existence of this review, as anemic as it may be, cannot be offered by Goldman as a defense in this action. *See, e.g.*, *In re Grand Jury Proceedings,* 219 F.3d 175, 182 (2d Cir. 2000) ("[F]airness considerations arise when the party attempts to use the privilege both as 'a shield and a sword.' . . . a party cannot partially disclose privileged communications or affirmatively rely on privileged communications *to support its claim or defense* and then shield the underlying communications from scrutiny by the opposing party." (emphasis added) (citations omitted)).

[66] Dkt. 248-4 (GS0122587 at 598); *see also* Dkt. 248-3 (GS0109402).

[67] Dkt. 248-21 (Heller-Sberloti Tr. 321:4-322:23); Dkt. 248-9 (GS0212469).

[68] Dkt. 248-21 (Heller-Sberloti Tr. 322:11-14); Dkt. 248-24 (Larson Tr. at 70:17-21).

[69] Dkt. 248-21 (Heller-Sberloti Tr. 322:24-323:7).

flagging and addressing discrepancies between 360 scores and the manager forced ranking,[70] which Goldman allows to deviate without limit.[71]

Based on the statistical results that show adverse impact against women across the Class period in both the compensation and performance processes, and for the period through 2008 for promotions from Vice President to Managing Director, whatever auditing Goldman has done, whether through the ELG or HCM processes or otherwise, has not corrected the problem.[72] As Dr. Cascio observed, "[t]he existence of these review processes indicates that Goldman knew that women were being disadvantaged by the quartiling process, and also that they were underpaid relative to similarly situated men, but the statistical analyses in this case show that it has failed to correct the problem."[73] Goldman's own documents reflect likewise:

> REALITY: The underlying assessment of individuals that feed into the firm's processes are colored and impacted by gender differences (e.g., communication styles, behavioral norms, access to informal networks, etc.)
>
> Dkt. 248-8 (GS0190618 at 623 (Goldman Americas Diversity Committee)).

### f.    Goldman Retaliates Against Women Who Complain.

Goldman lacks a complaint process free of retaliation and women report that speaking to Employee Relations is a "career ender." *See*, *e.g.*, Dkt. 248-6 (GS0140283 (after female employee complained about gender discrimination, she overheard statements that her manager "considered me to be a 'troublemaker' and a 'bitch' and that I had to be 'broken.")); Dkt. 248-6 (GS0140033 (after complaining of sexual harassment, female employee was told she had thirty days to find a new job, and her complaint was never addressed)); Dkt. 248-7 (GS0175544-547

---

[70] Dkt. 248-21 (Heller-Sberloti Tr. at 35:20-48:24); Dkt. 248-22 (Kung Tr. at 322:24-325:11).

[71] Dkt. 248-21 (Heller-Sberloti Tr. at 106:11-107:6); Dkt. 248-22 (Kung Tr. 325:12-326:5); Dkt. 248-24 (Larson Tr. at 190:16-24); *but see* Dkt. 248-24 (Larson Tr. at 187:9-12 (Q: "Are there any restrictions on how far a Manager Quartile can deviate from the performance review Quartile?" A: "No.")).

[72] *See* Dkt. 260 (Cascio Report, ¶¶ 55, 120); *see also* FN 106, *supra*.

[73] Dkt. 260 (Cascio Report, ¶ 120).

(after complaining to Employee Relations, Vice President received overwhelmingly negative 360 reviews from her team; Employee Relations investigation found that her act of raising her complaint to Employee Relations had "impacted her review.")); Dkt. 248-7 (GS0175455 (female complainant: "Feel very strongly that I would be sacrificing myself if I gave you [the harassers'] names.")); Dkt. 248-7 (GS0175454 (women in my group "are concerned about retaliation" if they complain)); Dkt. 248-7 (GS0175507 (female complainant: reporting to Employee Relations will cause relationships to be damaged, bridges burned)); Dkt. 248-6 (GS0161435 (female Managing Director did not raise gender concerns in her original written complaint because she feared retaliation)); Dkt. 248-6 (GS0140222 (female Vice President: "after I raised complaints of gender discrimination, [my manager] questioned my 'work ethic' and said I was not working hard enough.")); Dkt. 248-6 (GS0140168 (complainant: "I believe that the reason Goldman has taken the foregoing adverse actions, including reducing my job responsibilities, decreasing my compensation, breaching its compensation agreements with me, and otherwise undermining my ability and preventing me from performing my job, related to my sex and to the complaint I registered against [my manager].")); Dkt. 251 (Albanese Decl., ¶ 14 (complaining to Employee Relations would have amounted to "throwing my career away")); Dkt. 257 (Shelley Decl., ¶ 19 ("voicing such complaints is considered damaging to one's career, if not career ending at the firm.")); Dkt. 252 (Baggett Decl., ¶ 9 ("I understood, based on the way I was treated after speaking up, that I would not be offered a full-time position with the company.")); Dkt. 254 (Gamba Decl., ¶ 21 ("I believe that only a small fraction of the women who suffered sex discrimination and bias at Goldman Sachs have come forward due to the risk of retaliation," and that "[g]iven what I experienced . . . I believe that these fears are well founded.")); Dkt. 253 (Chen-Oster Decl., ¶ 11 (after reporting sexual assault to supervisor, the assaulter was assigned

to be one of her co-managers and other job duties and responsibilities were removed)); Dkt. 256 (Parisi Decl., ¶ 8 ("When I brought the repeated instances of discrimination to the Firm's attention, the Firm did not act to remedy the situation, but instead retaliated against me by reviewing me negatively, lowering my compensation, threatening to take away my [account] coverage . . . and ultimately terminating my employment.")). As one complainant put it, "when you raise issues, [they] don't get addressed, you get in trouble"; you either "keep your mouth shut or get ostracized."[74]

Given this abundant evidence of a culture of retaliation, it is not surprising that women's fear of speaking up about gender discrimination at Goldman extends even beyond their tenure at the firm. Former employees who still work in the financial services industry report concerns that if they come forward with negative statements about Goldman, the firm will blacklist them, causing career problems for years after they leave the company. *See, e.g.*, Dkt. 248-18 (Shaver Decl., Ex J, ¶¶ 4-6 (former Vice President describes how Goldman sabotaged her prospective job offers at two other firms because of her discrimination complaint, by telling those firms she is a "troublemaker" and that they should "run, not walk, away.")).

## C.   The Expert Reports of Dr. Farber and Dr. Ward

Pursuant to the Court's Order, Dkt. 491, the parties will separately submit briefing on Judge Francis' Order addressing the parties' *Daubert* motions, which will detail challenged aspects of the expert reports of the parties' statisticians, Dr. Farber and Dr. Ward. However, because Judge Francis' assessment of these expert reports was important to his ruling on 23(b)(3), Plaintiffs briefly summarize the relevant portions for Rule 23 purposes.

For these Rule 23 purposes, of course, the Court need not "select" a method of analysis so long as the methodology offered is sound and supports commonality. *In re Initial Pub.*

---

[74] Dkt. 248-7 (GS0175979).

*Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) ("a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement."); *In re Aftermarket Auto Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 373-74 (C.D. Cal. 2011) (finding that courts "need not cho[o]se between experts" at the class certification stage because inquiry is limited to determining whether merits issues can be resolved through "generalized proof common to the class") (internal citations omitted).

While there can be no doubt that Dr. Farber's analyses meet this standard, it is notable that Dr. Farber and Dr. Ward use many of the same regression-controlled factors, and often pursue similar information through different model specification choices. Yet their disagreements in certain important areas are stark and are not random. Indeed, as described below, Dr. Farber consistently modeled Goldman's own processes (including decision-making at the divisional level), and offered methodological explanations for his choice of specifications. By contrast, Dr. Ward consistently sought to disaggregate data, whether or not the choice was internally consistent or methodologically sound (such as by slicing years randomly or including data that was wholly incomplete or irrelevant across the class). As a result, Dr. Farber's models are more probative.

### 1. Dr. Farber's Report

Dr. Farber is a Professor of Economics at Princeton University. His opening report states that he was asked to consider the following questions: a) whether there is statistical evidence of discrimination in pay against class members; b) if so, to what extent can it be explained by differences between how men and women fare in Goldman's performance review system; c) whether there is statistical evidence of a difference in how men and women fare in Goldman's performance review system; and d) whether there is statistical evidence of disparities between

men and women in promotion rates from Vice President to Managing Director through 2008.
Dkt. 259 at 3.

### a.      Compensation Model and Findings

Dr. Farber found that Goldman pays female Associates and Vice Presidents materially

less than their comparable male counterparts and that the difference is statistically significant

after adjusting for the relevant regression-controlled factors that make apples to apples

comparisons possible.[75] Specifically, Dr. Farber controlled for division, year, office, education,

affirmative action job group, experience at Goldman, relevant experience prior to Goldman, and

whether the employee was a direct hire into the position or a lateral hire.[76]

Dr. Farber's statistical regression analysis shows that Goldman pays female Vice

Presidents, on average, 21% less than it pays comparable male Vice Presidents, with a standard

deviation of 9.88.[77] Goldman pays female Associates, on average, 8% less than it pays its

comparable male Associates, with a standard deviation of 5.1.[78] The disparities between how

women and men fare in the 360 Review and forced ranking processes (addressed below)

contribute to the observed compensation disparities between female Associates and Vice

Presidents and their male counterparts. Dr. Farber found that 50% of the observed compensation

---

[75] Multiple regression analysis is a statistical test which identifies factors, called independent variables, which might influence the outcome of an observed phenomenon, called a dependent variable. In the employment discrimination context the dependent variable is the employment decision, such as hiring, promotion, or termination. The statistician identifies legitimate factors that could have influenced the decision, *e.g.*, education and experience, and determines through multiple regression analyses how well these legitimate factors account for the employment decision. In this manner the influence of a protected characteristic on the employment decision can be statistically isolated. *Smith v. Xerox Corp.*, 196 F.3d 358 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006) ; *see also Hnot v. Willis Group Holdings Ltd.*, 228 F.R.D. 476 (S.D.N.Y. 2005) (discussing control variables used in compensation regression analysis); *Wright v. Stern*, 450 F. Supp. 2d 335 (S.D.N.Y. 2006) (same).

[76] Dkt. 259 (Farber Report, ¶ 7(a)).

[77] Dkt. 259 (Farber Report, ¶¶ 7(a), 56 & Table 7).

[78] Dkt. 259 (Farber Report, ¶¶ 7(a), 55 & Table 7).

shortfall between female and male Associates and 22% of the observed compensation shortfall between female and male Vice Presidents is attributable to differences in how women and men are evaluated in the discriminatory and invalid 360 Review and forced ranking processes.[79] The remaining gender-based pay differentials arise from the invalid compensation-setting process.

Dr. Farber did not control for performance review scores in his main compensation regressions because his studies of the 360 review and quartiling processes revealed them to be discriminatory; *e.g.*, tainted variables.[80] But to forestall any criticism on this issue, he nonetheless also performed regressions with controls for the 360 Review and forced ranking processes, and found that, even with those tainted variables included, Goldman pays its female employees less than their male counterparts, to a statistically significant degree, despite identical performance ratings.[81]

### b.  <u>Performance Review Model and Findings</u>

Throughout the entire class period and across the Class divisions, female Associates and Vice Presidents at Goldman have received lower scores than their male counterparts on the 360 Review *and* lower quartile placements in the forced ranking process. Dr. Farber's regression showed that differences in scores are statistically significant after controlling for division, year, office, education, affirmative action job group, experience at Goldman, relevant experience prior to Goldman, and whether the employee was a direct hire into the position or a lateral hire.[82] Specifically, female Associates were rated materially lower on the 360 score at a statistically significant level of 4.47 standard deviations (across the 5-point system of years 2003-2009) and

---

[79] Dkt. 259 (Farber Report, ¶ 82).
[80] Dkt. 259 (Farber Report, ¶ 58).
[81] Dkt. 259 (Farber Report, ¶¶ 77, 79 & Table 17).
[82] Dkt. 259 (Farber Report, ¶ 60).

3.01 standard deviations (across the 9-point system of years 2010-2011).[83] Female Vice

Presidents were rated significantly lower on the 360 Review at a statistically significant level of

5.15 standard deviations (years 2003-2009) and 2.7 standard deviations (years 2010-2011).[84]

Goldman's internal audits of its 360 results corroborate Dr. Farber's findings.[85]

      Female Associates and Vice Presidents fare no better in the forced ranking process:

Dr. Farber found that women are significantly less likely to be ranked in the top quartile than

their male counterparts. For the years 2003-2011, the regression analysis comparing employees

with the same relevant characteristics reveals that Goldman systematically ranked male

Associates in the top quartile statistically significantly more often than female Associates, at a

standard deviation of 4.84.[86] Similarly, for the years 2003-2011, the regression analysis reveals

that Goldman systematically ranked male Vice Presidents in the top quartile statistically

significantly more often than female Vice Presidents, at a standard deviation of 3.09.[87]

### c.      Promotion Model and Findings

      The statistical evidence also corroborates that Goldman has discriminated against women

in the promotion selection process from Vice President to Managing Director. Dr. Farber's

promotion analysis indicates that Goldman promoted female Vice Presidents to Managing

Director at a statistically significantly lower rate than it promoted male Vice Presidents prior to

the filing of this lawsuit.[88] While Goldman made no promotions in 2009 and then promoted more

---

[83] Dkt. 259 (Farber Report, Table 14).

[84] Dkt. 259 (Farber Report, Table 15).

[85] *See*, *e.g.*, Dkt. 248-7 (GS0176436 at 438 ("the number of women who are able to score in the upper quintile of the review process does not represent the normal distribution we would expect to see. Does that really make sense? How much of this result is due to substantive differences in performance and how much is due to perceptions or style differences?")).

[86] Dkt. 259 (Farber Report, Table 10).

[87] Dkt. 259 (Farber Report, Table 10).

[88] Dkt. 259 (Farber Report, ¶¶ 89, 90 & Table 20).

women after Plaintiffs commenced this litigation,[89] during the period from 2004 (reflecting promotion decisions made starting in 2003)[90] to 2008, Goldman failed to promote women from the Class divisions on the same basis that it promoted comparable men, to a statistically-significant level of 2.59 standard deviations. As a result of this discrimination, 23% fewer women were promoted between 2004 and 2008.[91]

All of these studies—for compensation, for performance reviews, and for promotions—well exceed the threshold of 1.96 standard deviations to establish statistical significance that courts routinely accept as probative evidence of discrimination.[92]

### 2.    Dr. Ward's Report

#### a.    Compensation Model and Findings

On behalf of Goldman, Dr. Ward also performed a regression analysis comparing the compensation of male and female Associates and Vice Presidents. His regression controlled for year, business unit, function, tenure in role, manager quartile, 360 review score, production in current and prior year, education, office, whether an employee was a lateral hire into their role, and whether a laterally-hired employee had a guaranteed compensation.[93] He ran separate regressions for each of the three divisions, and only for particular subsets of time in the class

---

[89] Dkt. 248 (Shaver Decl., ¶ 26).

[90] Goldman did not produce data for Class period promotions in 2002 and 2003, though it has stipulated that the data would be similar. Dkt. 159 (September 10, 2012 Memorandum and Order). Accordingly, Plaintiffs seek certification of Managing Director promotion claims for Class members from 2002-2008.

[91] Dkt. 259 (Farber Report, ¶ 89). This resulted in at least 19 fewer promotions for women.

[92] *See Smith*, 196 F.3d at 366  ("If an obtained result varies from the expected result by two standard deviations, there is only about a 5% probability that the variance is due to chance. Courts generally consider this level of significance sufficient to warrant an inference of discrimination.") (internal citations omitted); *Malave v. Potter*, 320 F.3d 321, 327 (2d Cir. 2003) (noting that courts generally consider disparities of two standard deviations or more "sufficient to warrant an inference of discrimination") (internal citations and quotation marks omitted).

[93] Dkt. 298 - 298-1 (Ward Report pp. 52-53).

period in each division: Securities, 2007-2011; IBD, 2005-2011; and IMD, 2008-2011.[94]  Dr.

Ward's results are displayed by business unit to draw attention to this business unit variable over

all others. He found that whether women were advantaged, disadvantaged, or neither varied from

business unit to business unit, with no consistent trend in either direction.[95] Dr. Ward's study

suffered from several critical deficiencies.

### i.      Dr. Ward Improperly Included Business Unit in his Study.

First and most importantly, Dr. Ward's determination to include business units (and the

litigation-driven salience Goldman places on business units after-the-fact) is without basis and

does not detract from, but rather confirms, the soundness of Dr. Farber's robust findings. Dr.

Ward conceded that business unit data was not reliable prior to 2005,[96] and the data thereafter

reflects that business units are close to ephemeral, often tiny, similar to each other but for minor

differences in financial products; in other words, they change with each year's changing financial

products (or nomenclature of such products). According to Dr. Ward's own data, there were as

many as *227* business units in 2003 and as few as *94* in 2005. *Id*. at ¶ 32. About 20 percent of

business units that exist in one year are gone, renamed, or reformulated just one year later. *Id*.

The average time a Class member Associate spends in a business unit is only 1.66 years and the

average time that a Class member Vice President spends in a business unit is 2.17 years. Dkt.

311 (Geman Decl., ¶ 4). By contrast, the divisions within which the business units reside are

constant from year to year. Critically, it is divisional decision makers who determine the budgets

for the various business units and which units will continue from year to year.[97] Indeed, the

---

[94] Dkt. 298-1 (Ward Report pp. 54-59).
[95] Dkt. 298 (Ward Report p. 7); Dkt. 298-1 (Ward Report pp. 55-61).
[96] Dkt. 298 (Ward Report, p. 7 Fn. 10)
[97] Dkt. 248-22 (Kung Dep at 57-59); Dkt. 248-24 (Larson Dep. at 61).

official compensation policy documents that Goldman produced in this litigation are either firm-wide or division wide; none exist for independent business units.[98]

As Dr. Farber noted, controlling for business units, especially absent documentation in real time that business units are relevant for compensation studies, runs the risk of obscuring valid results, including because many or most of the business units are so small that the resulting margins of error of any statistical conclusions are dramatic. Put simply, any results across business units are not reliable and in no way should obscure devastating statistical evidence of discrimination, evidence modeled on the Company's own practices.

### ii.        Dr. Ward Relied on Tainted Performance Variables.

The second fundamental error in Dr. Ward's analysis, among other errors, is that he included tainted, duplicative, and/or problematic performance measures to his model—the very employment practices that Plaintiffs are challenging as discriminatory, and which Dr. Farber has shown adversely impact female employees.[99] Thus, the use of 360 review scores and manager quartiling scores are classic tainted variables that should not have been included. As Dr. Farber states in his report, "a statistical analysis that relies on the discriminatory performance evaluation system will show that the pay gap is 'accounted for' by differences in 'performance.'" Dkt. 314 (Farber Reb. Rep. ¶ 23).

Dr. Ward compounded his errors by adding production variables in addition to the performance measures that *purport to incorporate productivity*, and even though the production data is incomplete and unreliable. In fact, there are no such data at all for employees in one of the three divisions (IMD), and data are missing for 59% of employees in Securities and for 5% of employees in IBD. Dkt. 314 (Farber Reb. Rep. ¶ 35). Moreover, even where "production" data

---

[98] Dkt. 248-4 (GS0123223-24); Dkt. 248-5 (GS0123267-68, GS0123295-98)
[99] Dkt. 314 (Farber Reb. Rep. ¶¶ 28, 75).

was available, it merely generates unreliable noise in the model, as excellent performance in financial services might just as well be reflected in minimizing losses (low production) as in above average gains (high production).[100]

### iii. Dr. Ward Ensured Outcomes by Disaggregating Data Without Methodological or Record Support.

Finally, Dr. Ward "sliced and diced" the data by performing regression analyses on 16 separate subgroups, which all but guarantees that the results are not statistically significant based solely on the lack of statistical power.[101] If one unsupported limitation was by scope, another was by time: ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████[102]

Dr. Ward has effectively disaggregated data to an extent that it will mask discriminatory outcomes. *See Khalil v. The Farash Corp.*, 452 F. Supp. 2d 203, 210 (W.D.N.Y. 2006) ("As the Second Circuit has observed, "where statistics are based on a relatively small number of occurrences, the presence or absence of statistical significance is not a reliable indicator of disparate impact.") (citing cases); *Gutierrez v. Johnson & Johnson, Inc.*, No. 01 Civ. 5302, 2002 WL 34717245, at *4-5 (D.N.J. Aug. 13, 2002) ("often a pattern of discrimination will only be apparent when enough data is analyzed," and "because of the concept of statistical power, 'disaggregating' of data by business unit, type of job, or other fragments may serve only to mask violations of the law that actually exist"); *Paige v. California*, 291 F.3d 1141, 1148 (9th Cir. 2002) ("it is a generally accepted principle that aggregated statistical data may be used where it is more probative than subdivided data. Such use is particularly appropriate where small sample

---

[100] Dkt. 313 (Yermack Report ¶ 38).
[101] *Id.*, ¶ 54.
[102] *See* Dkt. 298 (Ward Report, Figures 8-10).

size may distort the statistical analysis and may render any findings not statistically probative.").[103] The Court should be skeptical of data modeling which ensures a defense-friendly outcome.

### b.      Performance Review Model and Findings

As with the compensation model, Dr. Ward's performance review model suffered from the key problems of over-disaggregation of data (ensuring no statistical significance), inclusion of tainted variables, and reliance on business unit and production data. Notably, Dr. Ward did not analyze whether women are disadvantaged in the 360 review process, meaning that Dr. Farber's analysis showing that the 360 review disadvantages women is the only one in evidence.

For manager quartiling, Dr. Ward sliced the data into 12 separate regressions: three per division. Dkt. 298 at 39. Analyzing these small slices of data, he found "insignificant gender differences in the manager quartile assignment process in all Divisions for all corporate titles." *Id.* at 40.

Dr. Ward also controlled for the (tainted) 360 review score, incomplete and unreliable production quartile, irrelevant business unit, year, and function. *Id*. Significantly, there is nothing in the record to suggest that an employee's business unit has ever been a factor in determining his or her performance. In fact, *reviews are not circumscribed by business unit at all*, as over 80% of Class member 360 reviews included at least one reviewer from a different business unit,

---

[103] *See also Ingram v. Pac. Gas & Elec. Co.*, No. 12-CV-02777, 2013 WL 6174487, at *4 (N.D. Cal. Nov. 25, 2013) (ordering defendants to produce discovery for broader labor pool because "statistical evidence derived from an extremely small universe . . . has little predictive value and must be disregarded.") (quoting *Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072, 1076 (9th Cir. 1986)); *Fudge v. City of Providence Fire Dep't*, 766 F.2d 650, 658 (1st Cir. 1985) (noting the difficulties of proving a disparate impact claim to a level of statistical significance with sample data or a "narrow data base"); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995-97 (1988) (statistical evidence may not be probative if the data set is "small or incomplete").

and more than a third of all reviews are from reviewers in different business units than the

reviewee. Dkt. 311 (Geman Decl., ¶¶5-6).

<strong>c.      Promotion Model and Findings</strong>

Dr. Ward's promotion analysis imported the same errors as the others, with over-

disaggregation, reliance on tainted performance variables, and inclusion of incomplete and

unreliable production data. He appeared to concede there was no basis for including business

unit as a factor in promotions.

Specifically, Dr. Ward ran separate regressions by division and for those hired laterally

into Vice President and those promoted to Vice President from inside Goldman. Dkt. 298 at 74.

He controlled for year, tenure as a Vice President, (tainted) manager quartile and 360 degree

score, (incomplete and irrelevant) production in the current and former year, and education. *Id*.

He found no adverse impact. *Id*. at 75.

Dr. Ward's analysis of promotions is meaningless because it controls for tainted manager

quartile and 360 review score, *even though Goldman does not assert these as promotion criteria*.

Dkt. 314 (Farber Reb. Rep., ¶¶ 75-76).

**III.    LEGAL STANDARD**

**A.      Legal Standard for Review of a Magistrate Judge's Report and
          Recommendation.**

A district court "may accept, reject or modify, in whole or in part, the findings and

recommendations set forth within the Report." *Manolov v. Borough of Manhattan Cmty. Coll.*,

952 F. Supp. 2d 522, 526 (S.D.N.Y. 2013) (citing 28 U.S.C. § 636(b)(1)). This review must

include "a *de novo* determination of those portions of the Report to which objections are made,"

meaning the court must "arrive at its own, independent conclusions regarding those portions." *Id*.

(internal quotation marks and citation omitted).

38

**B.**     **Legal Standard for Rule 23(b)(3)**

A court's class certification analysis must be "rigorous" and may "entail some overlap

with the merits of the plaintiff's underlying claim." *Dukes*, 131 S. Ct. at 2551. However, Rule

23(b)(3) "requires a showing that *questions* common to the class predominate, not that those

questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans

& Trust Funds*, 133 S. Ct. 1184, 1191 (2013) (emphasis in original). Hence, the Court's task at

the Rule 23 stage is "not to adjudicate the case; rather, it is to select the metho[d] best suited to

adjudication of the controversy fairly and efficiently." *Id.* (internal quotation marks omitted).

Plaintiffs' burden is to show that "resolution of some of the legal or factual questions that

qualify each class member's case as a genuine controversy can be achieved through generalized

proof, and [that] these particular issues are more substantial than the issues subject only to

individualized proof." *In re U.S. FoodService Inc. Pricing Litigation*, 729 F.3d 108, 118 (2d Cir.

2013) (quotations and citation omitted) (citing *Amgen*). Crucially, the determination of whether

there is generalized proof is an exercise that requires looking at Rule 23 against the backdrop of

the substantive law at issue.

Plaintiffs have met their burden here, and Judge Francis erred in finding otherwise.

**IV.     ARGUMENT**

The R&R must be reversed due to the two fundamental errors in the Rule 23(b) (3)

analysis: first, the failure to analyze most of Plaintiffs' claims at all, and second, the failure to

examine Rule 23 (including its manageability tools) with respect to Plaintiffs' disparate impact

challenge to Goldman's performance system within the context of the substantive framework for

Title VII and the NYCHRL's burden-shifting. Specifically, Judge Francis did not: (1) properly

perform the Rule 23(b)(3) predominance analysis of Plaintiffs' claim of disparate impact in

Goldman's performance evaluation system; (2) address Plaintiffs' disparate impact claims

39

challenging Goldman's compensation and promotion systems, each of which separately qualify for class treatment; (3) address any of Plaintiffs' challenges under a disparate treatment theory, which also qualify for class treatment; and (4) consider manageability tools, including a liability class under Rule 23(b)(3) and/or (c)(4).[104]

A.   **Judge Francis erred in finding that Plaintiffs' disparate impact challenge to the performance review system did not satisfy Rule 23(b)(3) predominance.**

"A plaintiff establishes a prima facie case of disparate impact by identifying a specific employment practice which, although facially neutral, has had an adverse impact on her as a member of a protected class." *Smith*, 196 F.3d at 364-65. If the trier of fact determines that the plaintiffs have established disparate impact, each person seeking relief "need only show that he or she suffered an adverse employment decision and therefore was a potential victim of the proved discrimination. After such a showing, the employer bears the burden of persuading the trier of fact that its decision was made for lawful reasons; otherwise, the employee is entitled to individualized relief." *Chin v. Port Authority of N.Y. & N.J.*, 685 F.3d 135, 151 (2nd Cir. 2012).[105]

---

[104] Plaintiffs also sought certification of their claims under the New York City Human Rights Law, which has an independent and liberal construction. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (provisions must "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed" (citation omitted)). The R&R did not address claims under the NYCHRL either.

[105] *See also United States v. City of N.Y.*, 258 F.R.D. 47, 56-57 (E.D.N.Y. 2009) ("Should the plaintiffs succeed in establishing a Title VII disparate impact violation, the court may order prospective class-wide injunctive relief. If individual relief is requested, an inquiry similar to the remedial stage of a pattern-or-practice disparate treatment claim is generally required. Back pay and front pay are considered to be individual equitable relief.") (internal citations and quotation marks omitted).

Rule 23(b)(3) asks whether Plaintiffs can establish a prima facie case of disparate impact with common proof, such that common issues predominate over individualized issues. The answer here is yes.

       **1.**    <u>**Common Issues Predominate In Plaintiffs' Disparate Impact Claims Challenging Performance Policies.**</u>

In analyzing commonality of Plaintiffs' disparate impact claim under Rule 23(a)(2), Judge Francis unequivocally determined that all class members were subject to a common 360 review and manager quartiling, and that those practices caused a common injury to class members even though some women fared better than men in some business units. R&R at 27. He correctly stated, "[I]n a disparate impact case, however, it is not the plaintiffs' obligation to show that every class member suffered an identical injury as the result of a policy with a discriminatory impact." *Id*. He cited Dr. Farber's study as evidence "that gender bias causes women to score less well than men in both types of evaluations," *id*. at 29, and rejected all of Goldman's challenges to Dr. Farber's methodology, including Dr. Farber's rejection of mass disaggregation across business units. *Id*. at 29-31. With respect to that issue, Judge Francis found that "it is perfectly appropriate for the model to include data across business units when it is being used to explore the impact of a firm-wide policy such as 360 review or quartiling." *Id*. at 31.

Yet, when it came time to analyze predominance under 23(b)(3), Judge Francis's findings were exactly the opposite, and without explanation: that the dispute between each side's experts regarding whether to include business units in the model raised individualized issues of causation, precluding predominance. *Id*. at 40. This finding was in error.

Fundamentally, it appears that Judge Francis misapplied a causation analysis at the Rule 23 stage in a disparate impact class action. The key part of his analysis is this: "While proof that

the 360 review or quartiling processes have a disparate impact would create a presumptive causal link between those processes and an individual class member's injury, Goldman Sachs would retain the right to demonstrate that there were other, legitimate explanations for any shortfall," particularly what business unit the employee worked in. *Id.* at 40-41. Judge Francis labelled this "individualized causation issues." This is incorrect.

Within the framework of Title VII disparate impact analysis, Judge Francis' so-called causation issues are actually the second part of the burden-shifting framework described above—that is, whether there are legitimate explanations, such as business necessity, for the adoption of a practice with adverse impact. *See Chin*, *supra*, 685 F.3d at 151 (after plaintiff makes prima facie case, "the employer bears the burden of persuading the trier of fact that its decision was made for lawful reasons; otherwise, the employee is entitled to individualized relief."); *Smith*, 196 F.3d at 365; *Robinson*, 267 F.3d at 161-62. And the business necessity inquiry would be the same for every member of the class at the liability stage—not an individualized inquiry about the particular circumstances of each class member.

Judge Francis missed that causation at the Rule 23 stage of a disparate impact claim may be demonstrated, as here, through expert statistical analysis: "to make out a prima facie case the statistical disparity must be sufficiently substantial to raise an inference of causation." *Smith*, 196 F.3d at 365 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988)). "The statistics must reveal that the disparity is substantial or significant, and must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity." *Chin*, 685 F.3d at 151 (citing *Robinson v. Metro-North Commuter R.R. Co.,* 267 F.3d 147, 160 (2d Cir. 2001)).

Dr. Farber's report provides exactly that substantial disparity, creating the presumptive causal link between the performance review processes and the injury. Specifically, Dr. Farber found that female Associates were rated lower on the 360 score at a statistically significant level of 4.47 standard deviations (across the 5-point system of years 2003-2009) and 3.01 standard deviations (across the 9-point system of years 2010-2011).[106] Female Vice Presidents were rated lower on the 360 Review at a statistically significant level of 5.15 standard deviations (years 2003-2009) and 2.7 standard deviations (years 2010-2011).[107] With respect to the manager quartiling process, Goldman ranked male Associates in the top quartile statistically significantly more often than female Associates, at a standard deviation of 4.84.[108] Similarly, Goldman ranked male Vice Presidents in the top quartile statistically significantly more often than female Vice Presidents, at a standard deviation of 3.09. All of these statistical findings are robust and well above the threshold of significance of 2 standard deviations. "Courts generally consider this level of significance sufficient to warrant an inference of discrimination." *Smith*, 196 F.3d at 366.

Judge Francis also misapplied *Sykes v. Mel. S. Harris & Assoc., LLC*, 780 F.3d 70 (2nd Cir. 2015), as to when individual issues of causation might defeat predominance. In *Sykes*, a Fair Debt Collection and RICO case, plaintiffs alleged that defendant debt collectors targeted thousands of people without knowing if they actually owed a debt, and then made false representations that the alleged debtors had been served with a summons in order to obtain default judgments in collection proceedings. *Id*. at 76-77. But under RICO, if a debt was actually owed, and service of summons was done properly, then the default judgment (the injury) was lawful and was not caused by defendant's allegedly fraudulent conduct. *Id*. at 91. On this issue,

---

[106] Dkt. 259 (Farber Report, Table 14).
[107] Dkt. 259 (Farber Report, Table 15).
[108] Dkt. 259 (Farber Report, Table 10).

the *Sykes* court acknowledged that there would be individual issues as to whether a debt was actually owed and as to whether the individual actually received summons, but that these individual issues (notably larger than any present here) did *not* predominate over the common issues of the legality of defendant's conduct. *Id.*

Judge Francis, however, applied *Sykes* and concluded that individual causation issues predominated over the common issue of the legality of Goldman's performance system. In so doing, he applied *Sykes* outside the context of the relevant law: Title VII and the burden-shifting framework defined by controlling Second Circuit decisions that are outlined above. Unlike in *Sykes*, if Plaintiffs have established that Goldman's uniform performance practices contained commonly challenged invalid criteria and unreliable processes, then the burden-shifting described above relates to whether Goldman can legitimately justify these challenged invalid and unreliable processes, and the key individual question is whether or not any given woman received a performance review for the year(s) in question. Such issues properly analyzed would not defeat predominance.

There are many Title VII cases providing relevant authority on the predominance analysis—and specifically the issue of "individualized determinations," R&R at 42—in disparate impact claims, but Judge Francis appears to have overlooked them in his focus on *Sykes*. *See, e.g., Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 538 (N.D. Cal. 2012) (finding that plaintiffs had provided "significant proof" of "specific employment practices that have caused a disparity in promotions" and that "[r]esolution of Plaintiffs' challenge to those practices will resolve significant issues with respect to the class as a whole, and this dwarfs individualized issues as to particular employment decisions."); *Parra v. Bashas', Inc.*, 291 F.R.D. 360, 392 (D. Ariz. 2013) (rejecting defendant's arguments that the numerous subjective assessments of

individual employees precluded predominance because in a disparate impact case, "plaintiffs have identified a specific employment policy, *i.e.,* Bashas' wage scales, which have caused a pay disparity . . . Adjudicating these issues on a classwide basis is necessary before any individualized proceeding can occur.") (internal citation omitted); *Easterling v. Conn. Dep't of Corr.*, 278 F.R.D. 41, 48 (D. Conn. 2011) (certifying damages class under (b)(3) despite individual issues as to entitlement to relief where "[t]he liability stage of this case was resolved on the basis of generalized proof: the plaintiff made a prima facie showing—via class-wide statistical evidence—that the challenged physical fitness test caused a disparate impact on the basis of sex, and the defendant failed to rebut that statistical evidence or demonstrate a business justification for the test's use."). As these and other cases[109] make clear, Plaintiffs have met the standard for satisfying predominance in a disparate impact case.

> a.   **Although Judge Francis failed to assess it, Plaintiffs also satisfy Rule 23(b)(3)'s superiority requirement, particularly as to manageability, in connection with their disparate impact challenge to the performance review system.**

Because he found that common questions did not predominate, Judge Francis did not address Rule 23(b)(3)'s second requirement: superiority. R&R at 44, n.8. He thus erred in failing to consider how class members' claims would be litigated without class certification, as required by Rule 23(b)(3)'s superiority requirement. *Gintis v. Bouchard Transp. Co.*, 596 F.3d 64, 66-68 (1st Cir. 2010) (Souter, J., sitting by designation) (noting "the need for a trial court to come to grips with the actual alternatives of common versus individual litigation in the specific circumstances").

---

[109] *See, e.g., Gulino v. Bd. of Educ.*, No. 96-8414, 2013 U.S. Dist. LEXIS 123948 (S.D.N.Y. Aug. 29, 2013); *Scott v. Family Dollar Stores, Inc.*, No. 08-00540, 2016 U.S. Dist. LEXIS 105267 (W.D.N.C. June 24, 2016).

Judge Francis' error is particularly problematic here. Addressing manageability, a key part of superiority (*Amchem*, 521 U.S. at 615), would underscore that all of the issues that Judge Francis identified as predominating over individual issues are not presented in the context of Title VII Stage One liability cases. Rather, individual issues of the sort Judge Francis identified are presented, if ever, in Stage Two.

A class action is a superior method for adjudicating this case. Fed. R. Civ. P. 23(b)(3). The alternatives—either thousands of individual proceedings on the same subject inefficiently using court resources or (given the widespread fear among Class members of retaliation and blacklisting by Goldman) likely no cases challenging these systemic problems—are not appropriate alternatives at all. *See Brown v. Nucor Corp.*, 785 F.3d 895, 915 (4th Cir. 2015) ("Here, where substantial evidence suggests a pattern of engrained discriminatory decision-making that consistently disadvantaged black workers at Nucor, to deny class certification would significantly weaken Title VII as a bulwark against discrimination."). In the absence of a class action, the challenged practices will continue to harm women unabated.

Rule 23 provides four factors bearing on whether it is more fair and efficient to proceed as a class action here: (1) the extent and nature of any pending litigation commenced by or against the class involving the same issues; (2) the interest of individuals within the class in controlling their own litigation; (3) the convenience and desirability of concentrating the litigation in a particular forum; and (4) the manageability of the class action. Fed. R. Civ. P. 23(b)(3). Each supports certifying a 23(b)(3) class here.

### b.   Extent and Nature of Pending Litigation

Plaintiffs are not aware of any pending gender discrimination litigation commenced by or against Class members on the same issues. To the contrary, current and former female employees

of Goldman are highly reluctant to sue the company for fear of retaliation, including diminished

career opportunities in the financial services industry generally.

### c.     Interest of Class Members in Controlling Own Litigation

There are several reasons why absent Class members benefit from participating in a class

action, rather than controlling their own litigation. First, the costs of Title VII litigation are

prohibitive, even for a Goldman professional. At the minimum, the expert work required to

prove damages would overwhelmingly deter individual cases. Second, as stated above, Class

members benefit from remaining anonymous, rather than risking their reputations and careers by

bringing a lawsuit in their own names. Third, this particular "court and the class counsel are

already familiar with much of the statistical evidence on which an aggregate assessment of back

pay . . . relief will depend," *Easterling*, 278 F.R.D. at 50, ensuring economies of scale.

### d.     Convenience and Desirability of Concentrating the Litigation in This Forum

Plaintiffs have already conducted extensive discovery and litigation in this forum. It

would be far more efficient and convenient to continue litigating common questions here. *United

States v. City of N.Y.*, No. 07-2067, 2011 U.S. Dist. LEXIS 60276, at *59 (E.D.N.Y. June 6,

2011).

### e.     Manageability

Any difficulties likely to arise can be addressed by the "management tools" the Court has

at its disposal. *See In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir.

2001); *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 294 (S.D.N.Y. 2012); *see also City

of N.Y.*, 276 F.R.D. at 50. The trial plan approved by the court in *Ellis* is instructive, and would

be appropriate in this case as well given the similar types of issues (disparate treatment and

disparate impact claims, certified under (b)(2) and (b)(3)). In Stage One of the proceedings,

Plaintiffs propose that the Court decide (1) whether Goldman's employment practices have had an adverse impact on the class (prima facie case of disparate impact); (2) Whether Goldman's employment practices were (a) justified by business necessity (defense to the disparate impact claim), and if so, (b) whether there was a less discriminatory alternative; and (3) if a liability finding, the appropriate injunctive relief. Plaintiffs also propose that at that stage a jury decide liability on Plaintiffs' pattern or practice (disparate treatment) claims as well as entitlement to and amount of punitive damages. In Stage Two, Plaintiffs propose individual hearings to adjudicate individual defenses to monetary relief, if any, and set individual monetary awards. The Court would then adjust the punitive damages award to reflect any due process concerns as to its proportionality to actual damages awarded. *See Ellis*, 285 F.R.D. at 503.

### 2.   Judge Francis failed to analyze Plaintiffs' claim of disparate impact in compensation or promotions.

Although Judge Francis gave a thorough description of each of the three challenged employment policies, he only considered one—performance reviews—in his Rule 23 analysis. To the extent he mentioned compensation and promotions, it was solely in connection with whether Plaintiffs had sufficiently shown that the performance reviews were the cause of the shortfall in compensation or promotions. R&R at 40 & 41.

Yet Plaintiffs challenge the compensation setting and promotions processes separately from the performance review process. Notably, performance scores are not even relevant to promotions.[110]  Likewise, performance reviews only explain part of the compensation shortfalls between men and women, with significant pay disparities arising independent of performance scores, as a result of the challenged compensation system. As the analyses in this case reflect, 50% of the observed compensation shortfall between female and male Associates is attributable

---

[110] Thus, Dr. Farber did not study the effect of tainted performance review scores in promotions. Dkt. 314 (Farber Reb. Rep. ¶75); Dkt. 248-22 (Kung Tr. 429:5-20); Dkt. 248-1 (GS0109235-98).

to differences in the tainted review scores, and 50% of the shortfall occurs due to the separately invalid and unreliable compensation setting process; for Vice Presidents, 22% of the observed compensation shortfall is attributable to differences in review scores and 78% is due to the separately invalid and unreliable compensation setting process.[111] These challenges to the adverse impact of other Goldman processes provide independent bases to satisfy Rule 23(b)(3).

### a. **Plaintiffs satisfy Rule 23(b)(3) with respect to the disparate impact challenge to compensation setting.**

As Judge Francis concluded with respect to Rule 23(a), Goldman's compensation setting is a facially neutral employment practice common to all class members. *See* § II.B.1., *supra*. It incorporates common invalid criteria and processes. *Id*. Final compensation decisions are made at the division level by the divisional compensation committees.[112] Plaintiffs presented evidence that this compensation setting process has an adverse impact on the class.[113]

The statistical evidence is "sufficiently substantial to raise an inference of causation." *Smith*, 196 F.3d at 365. Dr. Farber's study shows that Goldman pays its female Vice Presidents, on average, 21% less than it pays comparable male Vice Presidents, with a standard deviation of 9.88.[114] Goldman pays its female Associates, on average, 8% less than it pays its comparable male Associates, with a standard deviation of 5.1.[115] And the evidence showing that compensation is run and determined at the Division level establishes that Dr. Farber's model is reliable. R&R at 31 ("it is perfectly appropriate for the model to include data across business units when it is being used to explore the impact of a firm-wide policy").

---

[111] Dkt. 259 (Farber Report, ¶ 82); Dkt. 247 (Pl. Op. Br. p. 15).

[112] In fact, the record shows that business unit mangers attend meetings of the divisional compensation committees in order to justify their compensation recommendations, which may be approved, rejected, or modified. Dkt. 248-22 (Kung Tr. 44:22-45:8); Dkt. 248-21 (Heller-Sberloti Tr. 24:12-25:20); Dkt. 248-24 (Larson Tr. 61:2-62:23).

[113] Dkt. 259 (Farber Report, ¶¶ 7(a), 56 & Table 7).

[114] Dkt. 259 (Farber Report, ¶¶ 7(a), 56 & Table 7).

[115] Dkt. 259 (Farber Report, ¶¶ 7(a), 56 & Table 7).

Moreover, to the extent Judge Francis was concerned that, as to the performance system challenge, gender-based shortfalls in performance rating might be explained by the business unit in which the employee worked, that concern is even less present here, where final compensation decisions are made at the division level.

For the same reasons set forth in Section IV.A.1.a., *supra*, Plaintiffs satisfy superiority and manageability as to their compensation system challenge.

**b.    Plaintiffs satisfy Rule 23(b)(3) with respect to the disparate impact challenge to promotions.**

Similarly, as Judge Francis concluded with respect to Rule 23(a), Goldman's promotions system is a facially neutral employment practice common to all class members. *See* § II.B.3, *supra*. It likewise incorporates common invalid criteria and processes applied to all employees, regardless of business unit.[116] Each division's leaders make the final decision with respect to who gets promoted (regardless of business unit), and the firmwide Management Committee determines the total number of promotions available each year.[117] Because Goldman does not rely on performance rating in connection with promotions, any analysis of Plaintiffs' performance system claim is irrelevant here.

Plaintiffs presented substantial evidence that this promotion system has an adverse impact on the class.[118] Dr. Farber's study showed that Goldman failed to promote women from

---

[116] *See, e.g.*, Dkt. 248-6 (GS0163511-35); Dkt. 248-22 (Kung Tr. 434:15-435:9; 438:22-439:9); Dkt. 248-21 (Heller-Sberloti Tr. 211:24-212:21, 218:23-219:9); Dkt. 248-24 (Larson Tr. 232:6-233:11, 240:10-21, 251:16-22). The process has been directed and managed by the Subcommittee on MD Selection of the Partnership Committee (2000-2003), the Partner Practices Group (2004 and 2005), and the Talent Assessment Group (2006 forward). *See, e.g.*, Dkt. 248-2 (GS0109256); Dkt. 248-2 (GS0109273).

[117] Dkt. 248-6 (GS0163621); Dkt. 248-22 (Kung Tr. 449:23-450:7); Dkt. 248-21 (Heller-Sberloti Tr. 231:3-7); Dkt. 248-24 (Larson Tr. 246:20-247:3); Dkt. 248-1 (GS0109235 at 237); Dkt. 248-6 (GS0163511 at 535); Dkt. 248-22 (Kung Tr. 452:19-454:16); Dkt. 248-21 (Heller-Sberloti Tr. 230:10-231:19); Dkt. 248-24 (Larson Tr. 248:16-20).

[118] Dkt. 259 (Farber Report, ¶ 89).

the Class divisions on the same basis that it promoted comparable men, to a statistically-significant level of 2.59 standard deviations.[119] As a result of this discrimination, 23% fewer women were promoted between 2004 and 2008.[120]

In addition, Plaintiffs presented documentary evidence of the gender bias in promotions. The lack of women in roles above Vice President is such a visible problem that the Firmwide Women's Network identified it as the first of their top three action areas.[121] One presentation to Managing Directors during the 2008 promotions process stated, "the gender breakdown on the candidates and the promotes from last year [is] 10% below where we would like to be … our diversity mix, [] is not acceptable."[122] Feedback from Managing Directors involved in the process also reflects concerns about gender bias,[123] while Diversity Committee materials from 2007 concede that "[p]romotion is based on who you know and who knows you" but "the playing field is not level."[124]

For the same reasons set forth in Section IV.A.1.a., *supra*, Plaintiffs satisfy superiority and manageability as to their promotion system challenge

## B.  Judge Francis erred in failing to consider Plaintiffs' disparate treatment claim.

In a class action, plaintiffs may make a disparate treatment claim under Title VII based on evidence of "pattern or practice." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336

---

[119] Dkt. 259 (Farber Report, ¶ 89).

[120] Dkt. 259 (Farber Report, ¶ 89).

[121] Dkt. 248-8 (GS0204773 ("Top 3 issues: promotion, promotion, promotion (and comp)")).

[122] Dkt. 248-9 (GS0219988 at 016).

[123] *See, e.g.*, Dkt. 248-9 (GS0220543 at 544 (women criticized for not being involved in community service; "double-standard is applied to women candidates.")); *see also* Dkt. 248-7 (GS0176436 at 439 ("For most women in [IBD] given their tenure, the process has been hard to measure—not that many have the ten year perspective required")).

[124] Dkt. 248-8 (GS0194265 at 276). *See also* Dkt. 248-8 (GS0191994 at 014 (Global Leadership and Diversity materials note that women "lack [] strategic sponsor/champion relationships"; "Meritocracy is perceived as not transparent, specifically as it relates to promotion and compensation")).

(1977). Under this method, plaintiffs "must make a prima facie showing of a pervasive policy of intentional discrimination." *United States v. City of N.Y.*, 717 F.3d 72, 84 (2d Cir. 2013). Statistics play an important role in establishing a pattern or practice of discrimination, *see Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."), but anecdotal evidence of discrimination against particular individuals is also probative to "[bring] the cold numbers convincingly to life." *Teamsters*, 431 U.S. at 339. If plaintiffs make a prima facie showing, the burden then rests on the employer to proffer a nondiscriminatory explanation for the apparently discriminatory result. *City of N.Y.*, 717 F.3d at 84. If the employer makes such a showing, the burden then shifts back to the plaintiffs to prove that intentional discrimination was the employer's "standard operating procedure." *Teamsters*, 431 U.S. at 336.

Judge Francis found that Plaintiffs had satisfied all of the requirements of Rule 23(a), including commonality, with regard to their disparate treatment claims. R&R at 33. Specifically, he recognized that Plaintiffs advanced two theories of disparate treatment: (1) that Goldman is aware of the discriminatory impact of its employment practices and continues to use them, and (2) that Goldman maintains a "boys' club" culture of bias and sexualization of women, and retaliation against those who complain. *Id*. at 32-33. He found that, "[w]ith respect to each of these assertions, the plaintiffs have proffered substantial evidence." *Id*. at 33.

However, when it came to assessing whether Plaintiffs had satisfied Rule 23(b)(3), Judge Francis did not analyze the disparate treatment claim, stating only that "common issues are even less likely to predominate with respect to the plaintiffs' disparate treatment claims based on

Goldman Sachs' corporate culture, and I will therefore not discuss those claims separately." R&R at 44, n.9.

Judge Francis' conclusion rests on two fundamental errors. First, Plaintiffs' disparate treatment claim is not based solely on Goldman's "corporate culture." Instead, it is based on the core elements identified in *Teamsters* and *Hazelwood*, among others: (1) compelling statistical evidence of gender bias, (2) contemporaneous records of women complaining about gender bias at Goldman (bringing "the cold numbers convincingly to life"); and (3) substantial evidence that Goldman was aware of systemic problems of gender bias that it failed to correct.[125] Even by itself, Plaintiffs' claim that Goldman was aware of and maintained policies with adverse impact is a predominant common question of law as to intentional discrimination because "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. This claim is eminently suited for certification under (b)(3).

Second, Judge Francis erred in concluding—without any analysis or support—that the disparate treatment claim based on Goldman's corporate culture of bias was "even less likely" to satisfy predominance. In fact, his concerns regarding a causal link between policy and impact— while wrong even with respect to disparate impact—have absolutely no bearing on Plaintiffs' disparate treatment claim. As the Fourth Circuit recently articulated in certifying a disparate treatment claim for class resolution, "[u]nlike a disparate impact claim, a showing of disparate treatment does not require the identification of a specific employment policy responsible for the discrimination." *Nucor Corp.*, 785 F.3d at 915 (4th Cir. 2015) (citing *Teamsters*). *See also Davis v. D.C.*, No. CV 10-1564 (RC), 2017 WL 1208388, at *18 (D.D.C. Mar. 31, 2017) ("[T]he more

---

[125] See Dkt. 247 (Pl. Op. Br., pp. 17-32).

practical distinction is that disparate impact plaintiffs identify particular employment practices that are allegedly responsible for those disparities, while 'pattern or practice' plaintiffs do not."); *Rollins v. Taylor Bros., Inc.*, No. 14-1414, 2016 WL 258523 (W.D. Wash. Jan. 21, 2016) (same).[126] The *Dukes* opinion itself made this distinction; it rejected plaintiffs' disparate impact claim for failure to identify any common policy or common mode of exercising discretion, and rejected plaintiffs' disparate treatment claim for failure to provide significant proof that Wal-Mart operated under a standard operating procedure of discrimination across thousands of stores and millions of employees. 564 U.S. at 354-55.

Recent class certification orders in Title VII cases have demonstrated that substantial evidence of a biased culture or environment, together with a statistical showing of an overall pattern of discrimination, satisfies Rule 23(b)(3) for disparate treatment claims. In *Brown*, the Fourth Circuit reversed denial of certification of a disparate impact claim of racial discrimination in promotions by black workers in a steel plant. 785 F.3d 898. The court found that plaintiffs provided "abundant direct and circumstantial anecdotal evidence of discrimination," including complaints of discrimination made to the company, retaliation against those who complained, and named plaintiff and class member declarations and deposition testimony containing many descriptions of racial epithets and aggressive harassment directed against black employees. *Id.* at 899. Plaintiffs also provided a regression analysis showing that the disparity in promotions was statistically significant at 2.54 standard deviations, across the company.[127] The court held that Plaintiffs had satisfied the requirements for class certification:

---

[126] *Rollins* was subsequently decertified upon a showing that the class contained only 19 individuals, such that "joinder also appears to be the superior method of managing this litigation." 2016 WL 5942943, at *1 (W.D. Wash. May 3, 2016).

[127] The court rejected defendant's argument that it was improper to aggregate the six separate divisions of the plant together in the statistical analysis, citing that promotions were determined

> For a liability determination in a disparate treatment claim, the workers' statistical and anecdotal evidence, especially when combined, thus provide precisely the 'glue' of commonality that Wal-Mart demands. . . . A pattern of discrimination, revealed through statistics and anecdotal evidence, can alone support a disparate treatment claim, even where the pattern is the result of discretionary decision-making. To hold otherwise would dramatically undermine Title VII's prophylactic powers.

*Id.* at 914-15.

Similarly, in *Rollins*, the court certified a class of black workers alleging disparate treatment in hiring, firing, and allocation of work. 2016 WL 258523, at *1. The court found that, under *Dukes*, a disparate treatment claim required "significant proof" that defendant operated under a general policy of discrimination, which "can be shown entirely through statistics and anecdotal evidence that demonstrate a pattern of discrimination." *Id.* at *7. Citing testimony from workers concerning derogatory remarks made towards black workers and emails evincing racial animus, the court found substantial anecdotal evidence of discrimination. *Id.* at *8. The court also found that plaintiffs' statistical evidence—which showed that black workers overall were fired more often, and given fewer shifts, than white workers at statistically significant rates— "convincingly support[ed] their claims of disparate treatment." *Id.* at *9-10. With respect to Rule 23(b)(3), the court held that common questions would predominate for the disparate treatment claim because "whether Defendant has engaged in a pattern or practice of discrimination such that all class members are entitled to a presumption of discrimination under the *Teamsters* method of proof is a common issue subject to classwide resolution." *Id.* at *15 (citing *Ellis*, 285 F.R.D. at 538). *See also Scott v. Family Dollar Stores, Inc.*, No. 08-00540, 2016 U.S. Dist. LEXIS 105267, *26 (W.D.N.C. June 24, 2016) (predominance satisfied where plaintiffs proffered anecdotal and statistical evidence of a class-wide pattern-or-practice of discrimination

---

by "top management" and "nothing in [*Dukes*] suggests that single, localized operations must be analytically dissected into component departments." 785 F.3d at 911.

that could establish liability and result in class-wide entitlement to a presumption of discrimination).

The evidence presented by Plaintiffs in this case is squarely in line with these cases and constitutes significant proof of a general policy of discrimination. Judge Francis recognized this in his commonality analysis, finding that Plaintiffs showed "substantial evidence" that Goldman maintains a "boy's club" atmosphere, condones the sexualization of women, and retaliates against those who complain. R&R at 33. Indeed, the evidence Plaintiffs presented was overwhelming. Plaintiffs also presented evidence of statistically significant disparities in compensation, performance review scores, and promotion rates between male and female employees at the Associate and Vice President levels. This is sufficient common proof for the trier of fact to determine whether Plaintiffs have proven a "systemwide pattern or practice" of discrimination at Goldman, such that discrimination is "the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336; *Hazelwood*, 433 U.S. at 307-08 ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.").

### 1.  A trial On Plaintiffs' Disparate Treatment Claim Would Be Manageable.

Second Circuit precedent supports two avenues for a finding of disparate treatment liability: (1) if the jury finds "gross" disparities that defendant is unable to successfully rebut (i.e. by undermining the validity of Plaintiffs' statistical analysis or by attributing disparities to non-discriminatory factors), it has necessarily found a pattern-or-practice of discrimination; or (2) if the jury finds substantial but not "gross" disparities, it may infer a "standard operating procedure" of discrimination on the totality of the evidence. *See, e.g.*, *Robinson,* 267 F.3d at 158-59; *Ottaviani v. SUNY New Paltz*, 875 F.2d 365 (2d Cir. 1989) (declining to set a specific

threshold at which statistical disparities automatically give rise to a rebuttable presumption of discrimination; without such presumption, statistics are "persuasive" rather than "dispositive" evidence); *see also U.S. v. The Vulcan Society, Inc.*, 2010 WL 234768, at \*14-15 (E.D.N.Y. 2010) (if plaintiffs meet their burden by introducing evidence of "gross" disparities and defendant does not sustain its burden to rebut, "judgment must be entered for the plaintiffs"). If the jury returns a disparate treatment verdict, the parties will present competing methods for determining class-wide compensatory damages for the Court to choose between. If the jury finds against disparate treatment liability, there will be no damages.

### C.   In the alternative, a Rule 23(c)(4) liability class should be certified as to Rule 23(b)(3) liability issues.

Judge Francis recognized that courts may still use 23(c)(4) to certify single issues even where a claim as a whole does not satisfy Rule 23(b)(3)'s predominance requirement. R&R at 44 (citing cases). The question, as correctly identified in the R&R, is whether issue certification will materially advance the litigation. *Id*. However, Judge Francis determined that because he could not certify a liability class that would lead to injunctive relief pursuant to 23(b)(2), issue certification under (c)(4) was precluded. *Id*. But no such rule limiting 23(c)(4) ) to (b)(2) classes exists. Judge Francis' legal error precluded issue certification here.

In fact, the Court may use Rule 23(c)(4) to certify a *liability* class regardless of whether the Court later certifies a damages class or whether it certifies a liability class under Rule 23(b)(2).[128] For example, in *In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006), the Second Circuit held that the district court erred in denying certification of a liability issue class in a 23(b)(3) case, where a (b)(2) class was never sought because the policy at issue

---

[128] Again, Judge Francis's concerns with certifying a Rule 23(b)(3) performance class due to purported issues with determining individual entitlements to relief do not apply to certifying a (c)(4) class limited to liability.

had been abandoned. As with the R&R here, the district court in *Nassau* denied certification on the basis that individual issues of causation and damages predominated. *Id*. at 223. The Second Circuit reversed, finding that "[t]he class definition also implicated two broad common liability issues: whether the blanket policy existed and whether defendants are liable for its implementation," and that the district court should have "employ[ed] subsection (c)(4) to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement." *Id*. at 227, 229-30. *Accord Sellars v. CRST Expedited, Inc.*, No. C15-117-LTS, 2017 WL 1193730, at *27 (N.D. Iowa Mar. 30, 2017) (certifying liability for hostile work environment and retaliation claims under (c)(4) and (b)(3)); *Jacks v. DirectSat USA, LLC*, No. 10-CV-1707, 2015 WL 1087897, at *7-8 (N.D. Ill. Mar. 10, 2015) (certifying liability issues for classwide determination and tabling damages determinations for separate trials).

The Second Circuit has encouraged courts to "take full advantage of this provision to certify separate issues in order to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies." *Robinson,* 267 F.3d at 167 (internal alterations and citation omitted).

Here, if the Court has questions about certifying damages claims at this juncture, liability class certification is still warranted and would materially advance the litigation.

### 1.     Liability Issue Certification Is Warranted.

Judge Francis previously found that Plaintiffs submitted substantial common proof of both disparate impact and disparate treatment—in other words, that the prima facie case of both claims can be resolved on a classwide basis. R&R at 27.

With respect to disparate impact, the R&R noted that "proof that the 360 review or quartiling processes have a disparate impact would create a presumptive causal link between those processes and an individual class member's injury," and found that Plaintiffs' statistical

evidence was appropriately modeled and provided such proof. R&R at 29, 40. Regarding the

disparate impact of Goldman's promotion policy, the R&R noted that "the alleged bias of the test

is a common issue" whose use should be enjoined "if disparate impact is proven." *Id*. at 28. In

fact, Dr. Farber's promotion study showed statistically significant disparities.

With respect to disparate treatment, the R&R acknowledged that Plaintiffs had submitted

"substantial" common anecdotal evidence in support of their claim. R&R at 32-33. When

combined with Plaintiffs' statistical showing (as the caselaw instructs should have happened)

regarding Goldman's practices causing disparate impact on women, there is enough common

proof to determine whether Goldman intentionally discriminated on a class-wide basis.

In sum, as the R&R identified, Plaintiffs have more than demonstrated the existence of

common proof to determine Goldman's liability on a classwide basis.

## 2. Liability Issue Certification Would Materially Advance The Litigation.

Title VII claims are subject to burden-shifting frameworks under which Plaintiffs must

first present a prima facie claim, and then questions of a nondiscriminatory explanation for a

result (in disparate treatment cases) or whether the policy in question is job related and consistent

with business necessity (in disparate impact cases) are a defendant's burden. R&R at 15-18.

As set forth in Section IV.A.1., *supra*, a <u>disparate treatment</u> finding has an important

impact on the burden shifting framework of Title VII cases: it creates a presumption of

individual discrimination by the employer against each of the class members, shifting the burden

to the employer. *Dukes*, 564 U.S. 338, 367-68; *Teamsters*, 431 U.S. at 361-62.

A finding of <u>disparate impact</u> under Title VII *entitles* the class to equitable and make-

whole relief. *Robinson*, 267 F.3d at 167-68 & n.6; *Bridgeport Guardians, Inc. v. Bridgeport,* 933

F.2d 1140, 1149 (2d Cir. 1991) (finding of disparate impact gives district court "broad, albeit not

unlimited, power to fashion the relief it believes appropriate"). Any individual seeking relief

need only show that she suffered an adverse employment action, and the burden shifts to the

employer to demonstrate legitimate reasons for the action. *See Chin*, 685 F.3d at151.

Certifying a liability issue class here would materially advance the litigation with respect

to both Plaintiffs' disparate impact and disparate treatment claims. If proven on the merits, it

would result in declaratory relief that the challenged practices are illegal, causing Goldman to

end these practices harming women, and allow the Court to manage proceedings over injunctive

and equitable remedies. As to monetary relief, all class members would receive a classwide

presumption of discrimination in their favor. *Teamsters*, 431 U.S. at 361; *Chin*, 685 F.3d at 151.

Whether and what shape any subsequent individual remedial phase might take need not be

determined now.[129] But without a liability proceeding on the challenged practices, such practices

will effectively remain unrestrained by anti-discrimination laws, an untenable and unfair

outcome.

This Circuit is joined by numerous other courts in awarding or upholding Rule 23(c)(4)

certification. *See In re Deepwater Horizon*, 739 F.3d 790, 816-17 (5th Cir. 2014) (upholding

certification of liability under (c)(4) in a (b)(3) case because the "phased trial of common issues

in this case would undoubtedly prevent the repetitious re-litigation of these common issues");

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) ("[A] class action limited to

determining liability on a class-wide basis, with separate hearings to determine—if liability is

established—the damages of individual class members, or homogenous groups of class

---

[129] After a liability phase (and only assuming a favorable ruling for the plaintiffs), the Court could revisit the question of whether any damages class could be certified. At this stage of the case, the Court does not need to resolve that issue to certify a liability class. In fact, the Second Circuit in *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), held that "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement."

members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed."); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013) (upholding bifurcation of liability and damages pursuant to 23(c)(4)); *Houser v. Pritzker*, 28 F. Supp. 3d 222, 254 (S.D.N.Y. 2014) ("There is no need to decide at this time which avenue to pursue. What is important is that the Court has the tools to handle any management difficulties that may arise at the remedial phase of this litigation.").

## V.   **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court reject Judge Francis' Report and Recommendation as to Rule 23(b)(3) issues, and certify a class pursuant to Rule 23(b)(3) on Plaintiffs' claims challenging Goldman's performance, compensation, and promotion systems under (1) a disparate impact theory for liability, backpay, and equitable relief; and (2) a disparate treatment theory for liability and damages (including compensatory and punitive damages); or, in the alternative, certify Plaintiffs' liability claims based on disparate impact and disparate treatment under Rule 23(c)(4).

Dated: June 23, 2017                    Respectfully submitted,

**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP**


By: */s/ Kelly M. Dermody*
          Kelly M. Dermody

Kelly M. Dermody (*admitted pro hac vice*)
Anne B. Shaver (*admitted pro hac vice*)
Tiseme G. Zegeye
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile:  (415) 956-1008

**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP**

Rachel Geman
250 Hudson St., 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
Facsimile:  (212) 355-9592

Dated: May 23, 2017                    **OUTTEN & GOLDEN LLP**


By: */s/ Adam T. Klein*
          Adam T. Klein

Adam T. Klein
Cara E. Greene
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Facsimile:  (646) 509-2060

**OUTTEN & GOLDEN LLP**
Paul W. Mollica
161 North Clark Street, Suite 4700
Chicago, Illinois 60601
Telephone: (312) 809-7010
Facsimile:  (312) 809-7011

*Attorneys for Plaintiffs and the Putative Class*

1354839.1