UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------- x
H. CRISTINA CHEN-OSTER, SHANNA        :
ORLICH, ALLISON GAMBA and MARY        :
DE LUIS,                              :
                                      :
                    Plaintiffs,       :          10 Civ. 6950 (AT) (RWL)
                                      :
         v.                           :
                                      :
GOLDMAN SACHS & CO. and THE           :
GOLDMAN SACHS GROUP, INC.,            :
                                      :
                    Defendants.       :
------------------------------------------------- x
```

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS OMNIBUS
MOTION *IN LIMINE* REGARDING EVIDENTIARY ISSUES**

Lynne C. Hermle (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, California  94025

Erin M. Connell (admitted *pro hac vice*)
Kathryn G. Mantoan (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California  94105

Marc Shapiro
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York  10019

Robert J. Giuffra, Jr.
Sharon L. Nelles
Ann-Elizabeth Ostrager
Hilary M. Williams
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004

Amanda Flug Davidoff
Jeffrey B. Wall (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006

*Attorneys for Defendants
Goldman Sachs & Co. and
The Goldman Sachs Group, Inc.*

February 1, 2023

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ..................................................................................1

**BACKGROUND** ..........................................................................................................2

**ARGUMENT** ..............................................................................................................4

**I.**     **THE COURT SHOULD EXCLUDE EVIDENCE ABOUT INDIVIDUAL EXPERIENCES WITH THE EVALUATION PROCESSES** ...............................4

      A.     The Court Has Already Prohibited Plaintiffs' Individualized Evidence ................5

      B.     Plaintiffs' Individualized Evidence Is Not Representative of the Class .................7

      C.     Plaintiffs' Individualized Evidence Would Create an Unmanageable Trial ...........9

**II.**    **THE COURT SHOULD EXCLUDE IRRELEVANT "INTENT" EVIDENCE AND ARGUMENT** ............................................................................11

      A.     The Court Should Exclude Any Argument That Plaintiffs' Statistical Disparities Alone Raise an Inference of Discriminatory Intent ............................12

      B.     The Court Should Order Plaintiffs To Identify the Goldman Sachs Decisionmakers Whose Intent Matters ...................................................15

      C.     The Court Should Bar Plaintiffs from Calling Goldman Sachs's CEO at Trial .......................................................................................................................17

**III.**   **THE COURT SHOULD PRECLUDE ANY EVIDENCE OF PLAINTIFFS' REJECTED "BOY'S CLUB" CLAIM** ......................................19

      A.     The Court Should Preclude Plaintiffs' "Boy's Club" Evidence ...........................20

      B.     The Court Should Preclude Any Supposed "Bad Acts" Evidence .......................23

      C.     The Court Should Clarify That Ordinary Rebuttal Evidence Will Not "Open the Door" to Culture Evidence ................................................................24

**IV.**   **THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT RELATED TO DAMAGES OR OTHER REMEDIES** ...............................27

      A.     The Court Should Preclude Plaintiffs' Aggregate Backpay Damages Models .............................................................................................................27

      B.     The Court Should Reject Plaintiffs' Request for a Punitive Damages Finding .............................................................................................................30

      C.     The Court Should Preclude Any Evidence or Argument Relevant To Injunctive or Declaratory Relief ..........................................................................32

**CONCLUSION** ...........................................................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Adkins* v. *Morgan Stanley,*
    307 F.R.D. 119 (S.D.N.Y. 2015) ............................................................34

*Adorno* v. *Port Authority of New York & New Jersey,*
    258 F.R.D. 217 (S.D.N.Y. 2009) ............................................................25

*All Star Carts & Vehicles, Inc.* v. *BFI Canada Income Fund,*
    280 F.R.D. 78 (E.D.N.Y. 2012) ............................................................34

*Andrus* v. *Juniper Group, Inc.,*
    2011 WL 4532694 (E.D.N.Y. Sept. 26, 2011) ......................................12

*Asmus* v. *Metro-North Railroad Co.,*
    2019 WL 2603532 (D. Conn. June 25, 2019)........................................32

*Bailey* v. *City of New York,*
    2003 WL 21031972 (S.D.N.Y. May 2, 2003) ......................................13

*Boyle* v. *City of Philadelphia,*
    476 F. Supp. 3d 101 (E.D. Pa. 2020) ....................................................13

*Burgis* v. *New York City Department of Sanitation,*
    798 F.3d 63 (2d Cir. 2015)....................................................................14

*Buscemi* v. *Pepsico, Inc.,*
    736 F. Supp. 1267 (S.D.N.Y. 1990).....................................................30

*City of Almaty, Kazakhstan* v. *Ablyazov,*
    2022 WL 16901995 (S.D.N.Y. Nov. 11, 2022)................................9, 11

*Correction Officers Benevolent Association of Rockland City* v. *Kralik,*
    226 F.R.D. 175 (S.D.N.Y. 2005) ............................................................23

*EEOC* v. *Bloomberg L.P.,*
    2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) ..................................... 22

*EEOC* v. *Mavis Discount Tire, Inc.,*
    129 F. Supp. 3d 90 (S.D.N.Y. 2015)....................................................31

*EEOC* v. *Performance Food Group, Inc.,*
    16 F. Supp. 3d 576, 580, 582 (D. Md. 2014).......................................32

*Fox* v. *General Motors LLC*,
    2019 WL 13060148 (N.D. Ga. Oct. 31, 2019) ....................................................32

*Garcia De León* v. *New York University*,
    2022 WL 2237452 (S.D.N.Y. June 22, 2022) .................................................34

*Handwerker* v. *AT&T Corp.*,
    211 F.R.D. 203 (S.D.N.Y. 2002) ...................................................................16

*Hart* v. *RCI Hospitality Holdings, Inc.*,
    90 F. Supp. 3d 250 (S.D.N.Y. 2015)........................................................22, 24

*Hazelwood School District* v. *United States*,
    433 U.S. 299 (1977)..........................................................................13, 14, 15

*Hopkins* v. *National Railroad Passenger Corp.*,
    2016 WL 8711718 (E.D.N.Y. Apr. 29, 2016) ...............................................30

*In re ICN/Viratek Securities Litigation*,
    1996 WL 34448146 (S.D.N.Y. July 15, 1996) .........................................8, 9, 10

*Levitant* v. *City of New York Human Resources Administration*,
    914 F. Supp. 2d 281 (E.D.N.Y. 2012) ..........................................................23

*Lewis* v. *City of Chicago*,
    560 U.S. 205 (2010)....................................................................................12

*MF Global Holdings Ltd.* v. *PricewaterhouseCoopers LLP*,
    232 F. Supp. 3d 558 (S.D.N.Y. 2017) (Marrero, J.) ....................................24

*Mineo* v. *City of New York*,
    *2013 WL 1334322* (E.D.N.Y. Mar. 29, 2013)..............................................30

*Moore* v. *Publicis Group SA*,
    2014 WL 11199094 (S.D.N.Y. May 15, 2014) ..............................................29

*Moore* v. *Rubin*,
    2020 WL 13573582 (E.D.N.Y. Jan. 31, 2020) .............................................24

*Munafo* v. *Metropolitan Transportation Authority*,
    2003 WL 21799913 (E.D.N.Y. Jan. 22, 2003) .............................................32

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litgation*,
    827 F.3d 223 (2d Cir. 2016)........................................................................34

*Philip Morris USA* v. *Williams*,
    549 U.S. 346 (2007)....................................................................................32

*Plew* v. *Limited Brands, Inc.*,
   2012 WL 379933 (S.D.N.Y. Feb. 6, 2012) ........................................................18, 19

*Pruter* v. *Local 210, International Brotherhood of Teamsters*,
   2020 WL 6729406 (S.D.N.Y. Nov. 16, 2020) ............................................................16

*Qorroli* v. *Metropolitan Dental Associates, D.D.S. – 225 Broadway, P.C.*,
   2022 WL 17689836 (S.D.N.Y. Dec. 15, 2022) .........................................................31

*Reddy* v. *Nuance Communications, Inc.*,
   2015 WL 4648008 (N.D. Cal. Aug. 5, 2015) ............................................................18

*Republic of Turkey* v. *Christie's Inc.*,
   527 F. Supp. 3d 518 (S.D.N.Y. 2021) ......................................................................11

*Reynolds* v. *Barrett*,
   685 F.3d 193 (2d Cir. 2012) ....................................................................................29

*Ruiz* v. *Citibank, N.A.*,
   93 F. Supp. 3d 279 (S.D.N.Y. Mar. 19, 2015) ..........................................................8

*SEC* v. *Genovese*,
   2022 WL 16748779 (S.D.N.Y. Nov. 7, 2022) ..........................................................26

*In re Simon II Litigation*,
   407 F.3d 125 (2d Cir. 2005) ....................................................................................31

*State Farm Mutual Automobile Insurance Co.* v. *Campbell*,
   538 U.S. 408 (2003) ................................................................................................31

*United States* v. *City of New York*,
   717 F.3d 72 (2d Cir. 2013) ............................................................................ *passim*

*Vaughn* v. *Phoenix House New York Inc.*,
   957 F.3d 141 (2d Cir. 2020) ....................................................................................29

*Wal-Mart Stores, Inc.* v. *Dukes*,
   564 U.S. 338 (2011) ...................................................................................... *passim*

*Wedra* v. *Cree, Inc.*,
   2022 WL 2116760 (S.D.N.Y. June 13, 2022) ..........................................................34

*Westchester Independent Living Center, Inc.* v. *State University of New York,*
   *Purchase College*,
   331 F.R.D. 279 (S.D.N.Y. 2019) .............................................................................34

**Statutes:**

42 U.S.C. § 1981a(b)(1) ...........................................................................................31

N.Y.C. Admin. Code § 8-502(a)...................................................................................................31

**Other Authorities:**

Fed. R. Evid. 403 ..........................................................................................................................22

## PRELIMINARY STATEMENT

This Court has repeatedly made clear what the upcoming Phase I trial is, and is not, about.  In ruling after ruling over nearly five years, the Court has held that Phase I is only about issues common to the certified class.  Specifically, Phase I is only about whether three employment processes (the "Evaluation Processes") caused substantial and unlawful statistical disparities between certain male and female employees at Goldman Sachs, and whether the senior decisionmakers who implemented and maintained the Evaluation Processes intentionally kept them in place to perpetuate those disparities.  Phase I is not about the application of these processes in individual cases.  It is not about the intent of individual managers.  It is not about an alleged "boy's club" culture at Goldman Sachs.  It is not about damages.  It is not about injunctive relief.

Plaintiffs, however, have advised Goldman Sachs that they still intend to do what this Court has already said they cannot do, and what settled law otherwise forbids them from doing.  They want the Named Plaintiffs to testify about their individual, idiosyncratic experiences with the Evaluation Processes, even though this Court has held that the focus of Phase I must be common issues.  They want the jury to find disparate treatment on the basis of statistical disparities alone, even though this Court has already said they need to show more.  They want to call Goldman Sachs's CEO as a witness at trial, even though this Court has twice ruled that there was insufficient justification to make him sit for a deposition.  They want to introduce extensive testimony and documents about an alleged "boy's club," even though this Court has repeatedly deemed such evidence inadmissible.  They want to introduce evidence of lost compensation and ask the jury to find that punitive damages are appropriate, even though this Court has held that all damages issues are to be decided in Phase II.  They want to obtain injunctive and declaratory relief if they prevail in Phase I, even though they abandoned their right to seek that relief.

This Court's intervention is necessary to enforce the Court's prior rulings, to maintain consistency with settled law, and to ensure a manageable and fair Phase I trial. Goldman Sachs thus moves the Court to rule that, with respect to this Phase I trial:

1. Plaintiffs may not introduce evidence about individualized experiences with the Evaluation Processes, including those of the Named Plaintiffs. *See* Section I.

2. Plaintiffs may not argue that their statistical evidence of disparate impact alone suffices to prove disparate treatment. The Court should further require Plaintiffs to identify the senior Goldman Sachs decisionmakers whose intent they contend will be relevant at trial, and should preclude Plaintiffs from calling as witnesses those Goldman Sachs executives (including its current CEO) whose intent is not relevant. *See* Section II.

3. Plaintiffs may not present evidence of what they claim was a "boy's club" culture within Goldman Sachs, or of "bad acts" evincing such a culture. The Court should further clarify that Goldman Sachs will not "open the door" to such irrelevant and prejudicial exploration of company culture if it introduces, as is its right, tailored rebuttal evidence about the intent of any decisionmakers that Plaintiffs identify. *See* Section III.

4. Plaintiffs may not present argument or evidence concerning remedies, including backpay, punitive damages, and classwide injunctive and declaratory relief, nor may Plaintiffs seek a jury finding on punitive damages. *See* Section IV.

## BACKGROUND

In 2018, this Court certified a Rule 23(b)(3) class challenging the application of the three Evaluation Processes. Specifically, the Court certified both disparate impact and disparate treatment claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York City Human Rights Law ("NYCHRL"). (Mar. 30, 2018 Order ("Certification Order," ECF No. 578) at 49.) The Court expressly rejected Plaintiffs' attempt to certify a disparate treatment claim based on an alleged "boy's club" culture within Goldman Sachs, explaining that, under such a theory, "individualized inquiries" into each alleged incident of misconduct would "overwhelm

the common issues." (*Id.* at 47.)  The Court also denied Plaintiffs' effort to certify a standalone claim that Goldman Sachs's compensation process discriminated against class members, which similarly could not satisfy Rule 23.  (Oct. 7, 2019 Order (ECF No. 873) at 5.)

   The Court directed that trial proceed in two phases, with Phase I consisting only of "generalized proof" regarding the disparate impact and disparate treatment claims.  (Cert. Order at 43, 44, 45 n.16, 46; *see* Oct. 7, 2019 Order at 2.)  If Plaintiffs prove any of their claims in Phase I, the case proceeds to "separate [Phase II] trials."  (Mar. 23, 2022 Order (ECF No. 1341) at 1.)  In these individualized proceedings, class members will be entitled to a rebuttable presumption that any Evaluation Process on which Plaintiffs prevailed at Phase I was discriminatory, but each individual must still establish that she personally was harmed by the process and must prove any entitlement to backpay or punitive damages.  (Mar. 17, 2022 Order (ECF No. 1337) at 40; Nov. 25, 2019 Order (ECF No. 888) at 3; June 25, 2019 Order (ECF No. 767) at 2.)  During Phase II, Goldman Sachs also will be entitled to present its individualized defenses against each class member's claim, including by showing that any review or promotion decision was made for legitimate, non-discriminatory reasons.  (Mar. 17, 2022 Order at 40.)

   In the nearly five years since its Certification Order, the Court has repeatedly confirmed the limited scope of the upcoming Phase I trial.  In particular, it has reaffirmed that: (i) the Named Plaintiffs' individual claims will not be adjudicated until Phase II (Nov. 25, 2019 Order at 3); (ii) "Phase 1 will not include . . . any 'boy's club' claims or anecdotes" (*id.*); (iii) compensation may be addressed in Phase I only "insofar as it is connected to one or more of" the Evaluation Processes (Mar. 17, 2022 Order at 20); and (iv) "damages are beyond the scope of the Phase I trial" and are exclusively an individualized issue for Phase II (*id.*).

**ARGUMENT**

This Court has carefully delineated the parameters of this Phase I trial and made clear what Plaintiffs must and must not do to prevail.  During meet-and-confers, in the Joint Pre-Trial Order, in their proposed Jury Instructions, and elsewhere, Plaintiffs have advised Goldman Sachs and now this Court that they have no intention of honoring the Court's orders.  Instead, Plaintiffs have indicated that they plan to introduce irrelevant evidence of individual experiences with the Evaluation Processes, to advance an unprecedented and unsupported theory of discriminatory intent, to introduce foreclosed "boy's club" evidence and excluded expert testimony, and to smuggle in evidence of damages properly introduced only in Phase II and relief they abandoned.  This Court should reject those attempts and put an end to Plaintiffs' games.

**I.    THE COURT SHOULD EXCLUDE EVIDENCE ABOUT INDIVIDUAL EXPERIENCES WITH THE EVALUATION PROCESSES.**

As the Court has held, Phase I of this trial must focus on two issues common to the certified class:  (i) whether the Evaluation Processes caused substantial and unlawful statistical disparities, and (ii) whether senior Goldman Sachs decisionmakers knew of those unlawful disparities and kept the policies in place because of them.  But Plaintiffs seek to present evidence relevant to neither issue.

In a purported effort to show "how the policies operate in real life and affect women differently than men" and to "illustrate the common deficiencies of the practices," Plaintiffs intend to offer testimony from the Named Plaintiffs about their highly individualized experiences with the Evaluation Processes.  (Ex. B at 2; JPTO at 11–12.)[1]  For example, Ms. Chen-Oster claims that she was discriminated against in her 360 review in 2002 because her supervisor added European

---

[1]    References to "Ex." are to exhibits to the Declaration of Robert J. Giuffra, Jr., dated February 1, 2023.

colleagues to her reviewer list.  (Second Am. Compl. (ECF No. 411) ¶ 90.)  Ms. De Luis alleges that her 360 reviews in 2013 and 2015 contained "gendered" comments from individual colleagues about her strong personality and lack of patience.  (De Luis Dep. Tr. (ECF No. 1225-30) at 107:6–12, 347:11–21.)  Ms. Orlich believes that based on her 360 reviews in 2008, she should have been placed in the third rather than the fifth quartile.  (Orlich Decl. (ECF No. 255) ¶ 6.)  And Ms. Gamba claims she was discriminated against in 2010 because she was not promoted shortly after returning from maternity leave.  (Second Am. Compl. ¶¶ 131–132.)  Plaintiffs will apparently attempt to introduce all of that at the Phase I trial.

The Court should reject Plaintiffs' transparent effort to focus on the idiosyncratic experiences of the Named Plaintiffs instead of issues common to the certified class.   The introduction of such individualized evidence would contradict this Court's prior orders; would contravene Supreme Court precedent requiring that the Named Plaintiffs' experiences be representative; and would be prejudicial and unmanageable, in violation of Rule 403.

### A.   The Court Has Already Prohibited Plaintiffs' Individualized Evidence.

Plaintiffs' latest effort to conduct a class action trial-by-anecdote contravenes this Court's explicit and repeated orders that Phase I will adjudicate issues common to the class, not individualized ones.  In its Certification Order, the Court explained that Phase I would deal only with "generalized proof" about the Evaluation Processes.  (Cert. Order at 43.)  Several months later, the Court reiterated that Phase I "would consist only of generalized proof to address the common issues that justified certifying the class at the outset."  (Oct. 24, 2018 Order (ECF No. 630) at 2.).  It said the same in 2019 ("The Phase I trial [will] consist only of generalized proof to address the common issues that justified certifying the class" (Oct. 7, 2019 Order at 2)) and again in 2020 ("[T]he Phase I trial will include statistical evidence of a generalized nature" (Mar. 26, 2020 Order (ECF No. 983) at 6)).  Even over the last year, the Court has reiterated that

"the Phase I trial . . . shall focus on generalizable issues of liability."  (Mar. 17, 2022 Order at 20.)  Conversely, the Court has indicated that individual experiences with the Evaluation Processes are to be addressed in Phase II, and has even specified that the Named Plaintiffs' individual claims of gender discrimination, pregnancy discrimination, and retaliation will be addressed only in their specific Phase II trials.  (*See* Nov. 25, 2019 Order at 3 ("Phase 1 will not include . . . [N]amed Plaintiffs' individual claims.").)    Testimony  and  evidence  about  the  Named  Plaintiffs' idiosyncratic experiences with the Evaluation Processes is the opposite of the "generalized proof" that this Court has said is appropriate and relevant to the "common issues" on trial in Phase I.

Moreover,  allowing  the  Named  Plaintiffs  (or anyone else) to testify about their individual experiences would undercut the fundamental premise of the Certification Order.  The Court certified this class action on the ground that the Evaluation Processes were a "common mode" of decision making and that the processes themselves—*not* the decisions of individual managers employing the processes—were the common "cause" of disparate impact.  (Cert. Order at 28, 47.)[2]  Had Plaintiffs challenged instead the discretionary decisions of hundreds or thousands of individual managers, they could never have satisfied the requirements for class certification in the first place.  Plaintiffs should not be permitted to get their class certified one way (by disclaiming reliance on decisions of individual managers) and then try the case a different way (by focusing on decisions of individual managers).  They should be held to the common theory on which they sought and obtained class certification.

Plaintiffs may try to claim that this Court has blessed the introduction of the Named Plaintiffs' individual stories because the Court stated in 2019 that certain anecdotal evidence may

---

[2]      Although some courts have permitted certain anecdotal evidence in support of a disparate treatment claim, Plaintiffs have not identified any court that has admitted individualized evidence for a disparate impact claim—which appears to be Plaintiffs' purpose here.

be permissible if "related specifically to application of the three processes." (Ex. B at 2 (quoting Nov. 25, 2019 Order at 3).) That contention misreads the 2019 order, and cannot be squared with the rest of the Court's rulings. Individualized evidence about the Named Plaintiffs' personal experiences with the Evaluation Processes cannot be "related specifically to application" of the Evaluation Processes; if it were, that would countermand the Court's multiple other orders indicating that Phase I must focus on "generalized proof" and "common issues" and that individual experiences were to be addressed only in Phase II. Instead, the only logical way to read the Court's order, consistent with its prohibition on "generalized proof," is that the Court remains willing to entertain evidence of intent (anecdotal or not) regarding application of the Evaluation Processes *by the senior decisionmakers responsible for implementing and maintaining those Processes* firmwide. That is also consistent with the Court's recent orders, in which it has emphasized that Plaintiffs' evidence of discrimination must start with proof of a "nexus regarding [a] particular individual or group's role in approving, revising, implementing, or ignoring disparities linked to the three processes," not idiosyncratic, individualized testimony about the application of the Evaluation Processes to the four Named Plaintiffs. (Dec. 12, 2022 Order (ECF No. 1393) at 5.)

B.     **Plaintiffs' Individualized Evidence Is Not Representative of the Class.**

Even if individualized evidence were permissible at this Phase I trial, under well-settled law, any individual experiences need to be *representative* of the experiences of the 1,400 class members writ large. Here, the experiences of the four Named Plaintiffs are not.

To be admissible, Plaintiffs' evidence of discrimination must appropriately reflect the scope of the class and provide a representative sample of such experience. *See Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 358 n.9 (2011) (finding that a small number of cherry-picked anecdotes "prove[s] nothing at all"). In *Wal-Mart*, for example, the Supreme Court explained that 120 class-member affidavits "reporting experiences of discrimination" was grossly insufficient to

represent a nationwide class of 1.25 million employees.  *Id.* at 358 & n.9.  Other courts have similarly found a smattering of anecdotes across a broad class to be insufficiently representative to support a classwide inference of discrimination.  *See, e.g.*, *Ruiz* v. *Citibank, N.A.*, 93 F. Supp. 3d 279, 291 (S.D.N.Y. Mar. 19, 2015) (Failla, J.) (finding that 15 anecdotes in a class of 2,346 was insufficient to prove "uniformity of experience" of discrimination), *abrogated on other grounds by Scott* v. *Chipotle Mexican Grill, Inc.*, 954 F.3d 502 (2d Cir. 2020); *In re ICN/Viratek Sec. Litig.*, 1996 WL 34448146, at *4 (S.D.N.Y. July 15, 1996) (Wood, J.) (finding that the experiences of six class members in a class of "thousands" "ha[ve] little, if any, probative value").

        The experiences of the four Named Plaintiffs are, by any measure, not representative of the class certified here.  The class spans almost 20 years and covers three Evaluation Processes, three Goldman Sachs Divisions, and over 100 Business Units.  The Named Plaintiffs were employed in just two of the three class-relevant Divisions (IMD and Securities) for just a portion of the almost 20-year class period.  At best, the Named Plaintiffs can testify about their personal experiences as (i) an associate in IMD in 2013 and 2014 and a vice president in IMD in 2015 and 2016 (De Luis); (ii) an associate in Securities in 2007 and 2008 (Orlich); (iii) a vice president in Securities from 2002 through 2005 (Chen-Oster); and (iv) an associate in Securities from 2002 through 2006 and a vice president in Securities from 2006 through 2014 (Gamba). Those individualized snippets would prove *nothing* about "how the policies operated" or how "women were affected" in any of the three class Divisions for significant portions of the class period.  Instead, dozens or hundreds of witnesses would need to testify about their individual experiences before the evidence could have any probative value to classwide questions.  The need for that extensive individualized evidence would ordinarily defeat class certification.

### C.   Plaintiffs' Individualized Evidence Would Create an Unmanageable Trial.

Even if Plaintiffs could introduce the Named Plaintiffs' individualized experiences without undermining this Court's orders or flouting *Wal-Mart*'s commands, Rule 403 would still foreclose the introduction of such testimony.

For one thing, such testimony would confuse the jury by distracting them from the common issues that are supposed to be the focus of Phase I.  As Judge Wood has explained, any minimal probative value from a small, unrepresentative sampling of individual experiences "is greatly outweighed by the potential for jury confusion" because testimony about individualized issues would cause the jury to "understandably be distracted from" the generalized issues to be resolved at trial.  *ICN/Viratek Sec. Litig.*, 1996 WL 34448146, at *4.  Here, in a case involving 1,400 class members and a nearly 20-year period, any probative value of that idiosyncratic testimony is "greatly outweighed by the potential for juror confusion."  *Id.*

Moreover, individualized evidence from the Named Plaintiffs would lead to a sprawling and unmanageable trial.  If such evidence were allowed, Goldman Sachs would be entitled to put on extensive rebuttal testimony—both to contest the Named Plaintiffs' individualized claims about their own experiences and to show that other employees had quite different, non-discriminatory experiences with the Evaluation Processes.  This individualized evidence would turn an already complex and lengthy trial into an even more complex and longer trial, with deep dives into the experiences of dozens of associates and vice presidents over the nearly 20-year class period.  It would effectively bootstrap the Phase II individual trials into Phase I.  At minimum, this individualized evidence should be excluded under Rule 403 because it would generate a "multi-ringed sideshow of mini-trials on collateral issues."  *City of Almaty, Kazakhstan* v. *Ablyazov*, 2022 WL 16901995, at *6 (S.D.N.Y. Nov. 11, 2022) (Koeltl, J.) (citation omitted).

*First*, Goldman Sachs would be entitled to contest directly each Named Plaintiff's claims about how the Evaluation Processes supposedly affected her.  If, in context, each Named Plaintiff's employment decisions were fair and justifiable, then her experiences do not suggest that the Evaluation Processes "affect[ed] women differently than men" (Ex. B at 2):

- In response to Ms. Chen-Oster's claim that her supervisor unfairly added European colleagues to her 360 reviewer list, Goldman Sachs would show, among other things, that Ms. Chen-Oster initially proposed several of her friends as reviewers even though they did not work closely with her, and that her manager added reviewers who she *did* work closely with, including those in London due to her role selling international bonds.

- If Ms. De Luis testifies that certain of her 360 reviews contained "gendered" comments from individual colleagues about her strong personality and lack of patience, Goldman Sachs would show, among other things, that the comments were not "gendered" and were based on her job performance.

- Similarly, if Ms. Orlich testifies that her 360 review warranted a third quartile placement in 2008, among other things, Goldman Sachs would present evidence justifying her fifth quartile rating, such as repeated critical mistakes made by Ms. Orlich.

- Finally, if Ms. Gamba testifies that she was not promoted in 2010 after returning from maternity leave because of discrimination, Goldman Sachs would show, among other things, that her business unit was in crisis at the time and did not nominate or promote anyone to managing director in 2010 or thereafter.

*Second*, in response to Named Plaintiffs' individualized experiences with the Evaluation Processes, Goldman Sachs would be entitled to present evidence from other individuals—former class members and managers, for example—about *their* personal experiences with the Evaluation Processes that tell different stories about how the Processes "operate[d] in real life" and "affect[ed]" women.  Ex. B at 2; *see ICN/Viratek*, 1996 WL 34448146, at 4 (if one party

were permitted to present class member testimony, "it would be reasonable" for the other party to present rebuttal testimony).  Plaintiffs could then try to rebut that evidence.

All of this would waste tremendous amounts of time, confuse the jury, blur the line between Phases I and II, and severely prejudice Goldman Sachs, both failing Rule 403's balancing test and rendering the Phase I trial unmanageable under Rule 23.   Courts regularly exclude evidence under Rule 403 for waste of time.  *Ablyazov*, 2022 WL 16901995, at *6; *Republic of Turkey* v. *Christie's Inc.*, 527 F. Supp. 3d 518, 525 (S.D.N.Y. 2021) (Nathan, J.) (excluding evidence as "wasting time" where it would "result in multiple side-show trials").   And jury confusion and prejudice would be inevitable:  here, as in *Haskell* v. *Kaman Corp.*, "even the strongest jury instructions could not [] dull[] the impact of a parade of witnesses, each recounting" unrepresentative allegations of discrimination.  743 F.2d 113, 121 (2d Cir. 1984).

## II.   THE COURT SHOULD EXCLUDE IRRELEVANT "INTENT" EVIDENCE AND ARGUMENT.

To prove their disparate treatment claim, Plaintiffs must establish both that the Evaluation Processes caused an unlawful disparate impact and that the senior decisionmakers who implemented and maintained those processes were "aware[] of the discriminatory impact" and "continued [to] use" them to intentionally discriminate against women.  Class Cert. Order at 45 n.16 (citing Pls.' Obj. to Class Cert. R&R (ECF No. 511) at 52); *see United States* v. *City of New York*, 717 F.3d 72, 94 (2d Cir. 2013) (decisionmakers must have been "aware[] of the disparate impact" and "undertook a course of action *because of* that impact," and not "merely in spite of" it (emphasis added)).  Yet again, however, Plaintiffs refuse to honor this Court's rulings or settled law.  *First*, Plaintiffs incorrectly contend that they can prevail on their disparate treatment claim by establishing statistical disparities alone.  *Second*, perhaps because they think they can prevail by relying on bare statistics, Plaintiffs have refused to identify the senior decisionmakers who

allegedly were "aware[] of the discriminatory impact" and intentionally kept the Evaluation Processes in place to discriminate against women.  *Third*, because they have obfuscated on who they believe to be the bad actor here, Plaintiffs' witness list continues to name officials like Goldman Sachs's current CEO, who this Court twice concluded could not be deposed.  The Court should reject all three of Plaintiffs' efforts to avoid actually proving the disparate treatment claim that the Court certified and to distract from the purpose of the Phase I trial.

A.   **The Court Should Exclude Any Argument That Plaintiffs' Statistical Disparities Alone Raise an Inference of Discriminatory Intent.**

In multiple decisions, the Court has affirmed what logic already makes clear: disparate impact is generally insufficient to show disparate treatment.  Rather, Plaintiffs must show *both* that the Evaluation Processes had a disparate impact *and* that the senior decisionmakers who maintained and implemented the processes were aware of the disparity and kept the processes in place to intentionally discriminate against women.  Even Plaintiffs previously acknowledged that more than statistical disparities were required, arguing that their disparate treatment claim turned on "Goldman Sachs' 'awareness of the discriminatory impact of its employment practices and continued use' of the practices."  (Cert. Order at 45 n.16 (citing Pls.' Obj. to Class Cert. R&R at 52).)  This Court should not permit Plaintiffs to reverse course to advance a new theory, on the eve of trial, that the Court never certified.  *See Andrus* v. *Juniper Grp., Inc.*, 2011 WL 4532694, at *4 (E.D.N.Y. Sept. 26, 2011) (Seybert, J.) ("Permitting Plaintiff to raise this new theory of liability at this [late] stage in the litigation would unduly prejudice Defendants.").

Settled law requires the formulation that Plaintiffs originally embraced and that the Court certified.  A disparate treatment claim, at bottom, is about *purposeful* discrimination.  *See Lewis* v. *City of Chicago*, 560 U.S. 205, 214–15 (2010) ("disparate-treatment claims" require "discriminatory intent"); Cert. Order at 24 n.10 ("Disparate treatment claims concern 'allegations

of widespread acts of intentional discrimination.'" (citation omitted)). To have a discriminatory purpose, a decisionmaker must have known that discrimination was occurring and wanted it to continue. Here, that means that the relevant Goldman Sachs senior decisionmakers must have been aware that the neutral Evaluation Processes had an unlawful disparate impact against class members and must have continued to use the Evaluation Processes because of their unlawful disparate impact—*i.e.*, with the intent of discriminating based on gender.

Plaintiffs cannot demonstrate intent simply by pointing to the disparities their expert has identified in statistics developed for this litigation. Those disparities are neither glaring nor self-evident. *See Bailey* v. *City of New York*, 2003 WL 21031972, at *9 (S.D.N.Y. May 2, 2003) (Gorenstein, J.) (disparate impact statistics "standing alone" are "no[t] evidence of purposeful discrimination"); *Boyle* v. *City of Philadelphia*, 476 F. Supp. 3d 101, 112 (E.D. Pa. 2020) (granting summary judgment for defendants on Title VII disparate treatment claims where "primary evidence" was statistical disparate impact from qualifying exams for promotion, which "d[id] not 'directly reflect' a discriminatory attitude'"); *see also infra* p. 14 (Evaluation Processes producing results for women at 89% to 99% of expected rates). To the extent Plaintiffs seek to rely on their own expert's statistical analysis, nobody at Goldman Sachs could have been aware of Plaintiffs' litigation-developed statistics at the time they implemented the Evaluation Processes.[3]

In arguing that statistical disparities alone are sufficient, Plaintiffs rely on *Hazelwood School District* v. *United States*, 433 U.S. 299, 307–08 (1977), but that decision does not help them. (Ex. B at 2.) To be sure, the Supreme Court in *Hazelwood* suggested that, in a

---

[3]     To the extent other data about the Evaluation Processes *was* available to as-yet-unnamed senior decisionmakers, that data was uncontrolled or poorly matched with the class, and was presented in the context of trying to increase opportunities for women, rather than to perpetuate discrimination.

"proper case," "gross" statistical disparities might support an inference of disparate treatment.  433 U.S. at 307; *see Burgis* v. *N.Y. City Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015) (explaining in analogous context that "to show discriminatory intent . . . based on statistics alone, the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely").  But the Court did not find that *Hazelwood* itself presented such a "proper case"; rather, the Court vacated a finding of discrimination and remanded for further analysis.  433 U.S. at 311–13.  Tellingly, Plaintiffs have not cited a *single decision* in the 45 years since *Hazelwood* finding statistical disparities that resulted from a neutral process so extreme that intent can be inferred from those disparities alone.

Nor is this the "proper case" that justifies inferring intent from statistical disparities alone.  Any disparities here are small—much smaller than in *Hazelwood* itself—and difficult to measure.  In *Hazelwood*, the Supreme Court suggested that it might matter if a school district had hired its 3.7% black teachers from a labor market that was 5.7% black, versus a labor market that was 15.4% black.  433 U.S. at 311.  That is, if black teachers had been hired at 65% of the expected rate, the Court suggested that such a disparate impact would not present a "proper case" for inferring discriminatory intent; but if black teachers had been hired at only 24% of the expected rate, the answer might be different.  Here, the disparities that Plaintiffs have identified do not come close to even the 65% disparity that the Court suggested would be insufficient.  According to Plaintiffs' own expert's models:  (i) the average 360 review score for women was approximately *99%* of the male score; (ii) women were placed in the top quartile at *91.5% to 92.9%* of the rate of men; and (iii) women were promoted at *89%* of the predicted rate, and were *favored* in 5 of 14 promotion cycles.  (Farber Rbtl. Rpt. (ECF No. 1188-12) tbls. 14, 20 & App. A tbls. 5, 6, 9, 10.)  Thus, Plaintiffs' own statistics do not support the unprecedented inference that intentional

discrimination against women was Goldman Sachs's "standard operating procedure," and this Court should not invite the jury to draw such an inference from those statistics alone. *Hazelwood*, 433 U.S. at 307 (citing *Int'l Bhd. of Teamsters* v. *United States*, 431 U.S. 324, 336 (1977)); *see* Defs.' MSJ (ECF No. 1243) at 32–36.

> **B.**     **The Court Should Order Plaintiffs To Identify the Goldman Sachs Decisionmakers Whose Intent Matters.**

Plaintiffs years ago acknowledged that they must "present evidence probative of intentional discrimination by *key decision makers in senior management*" who "implement[ed] and maintain[ed]" each of the Evaluation Processes. (Pls.' Dec. 30, 2019 Br. (ECF No. 922) at 1–2 (emphasis added).) But, after extensive discovery, Plaintiffs still refuse to identify who those senior decisionmakers are. That is fundamentally unfair to Defendants. Goldman Sachs cannot adequately develop its defense—that senior decisionmakers were not aware of a disparate impact or did not continue the Evaluation Processes because of that impact—*unless it knows who the supposedly biased decisionmakers were*. That information is also critical to a host of relevance determinations that this Court will be called to make in the Phase I trial. This Court should order Plaintiffs to identify the decisionmakers who purportedly acted with discriminatory intent.

1.     Nearly five years after the class was certified, it remains unclear who Plaintiffs' asserted "key decisionmakers" are. Plaintiffs have ignored Goldman Sachs's repeated requests to identify who Plaintiffs contend implemented and maintained the Evaluation Processes—again, the individuals whose discriminatory intent must be proved at trial. (*E.g.*, Ex. A at 1–3; Ex. C at 1–3.) Plaintiffs have never updated their response to Defendants' interrogatory asking who they claim "intentionally discriminated against Class Members with respect to the"

Evaluation Processes, which listed 91 individuals and three open-ended "catch-all" categories.[4] Even Plaintiffs' current witness list, which identifies nine Human Capital Management professionals and Management Committee members who Plaintiffs say can testify about "knowledge of bias and gender disparities" in the Evaluation Processes (JPTO at 10–13), does not clarify whose intent Plaintiffs claim must be established.

The identification of this basic element of Plaintiffs' disparate treatment claim is critical to Goldman Sachs's defense. "The purpose of discovery rules is to avoid 'surprise' or 'trial by ambush.'" *Pruter* v. *Local 210, Int'l. Bhd. of Teamsters*, 2020 WL 6729406, at *1 (S.D.N.Y. Nov. 16, 2020) (Torres, J.) (citing *Am. Stock Exch., LLC* v. *Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002) (Scheindlin, J.)). That is just what will happen if Plaintiffs do not identify the senior decisionmakers whose intent they claim is relevant before the Phase I trial. Goldman Sachs cannot prepare to respond to this critical evidence unless it knows whose supposedly unlawful discriminatory intent is at issue. *See Handwerker* v. *AT&T Corp.*, 211 F.R.D. 203, 210 (S.D.N.Y. 2002) (Marrero, J.) ("[Plaintiff's] self-serving refusal to provide certain information prejudices [Defendant] in the preparation of a [trial] defense" against Title VII discrimination claims). Nor can it move to exclude as irrelevant any evidence of unlawful intent of individuals or groups whose intent is irrelevant.

2.     At this point in the case, it is unclear whom Plaintiffs' targeted decisionmakers *could* be. Plaintiffs have tried and failed at multiple attempts to identify someone with the requisite authority and bias. Earlier in this litigation, they suggested that the senior decisionmakers were the members of Goldman Sachs's Management Committee. But after

---

[4]     The "catch-all" categories are:  (i) any head of the class-relevant Divisions; (ii) any member of the Firm's Management Committee; and (iii) any member of the Firm's Diversity Task force or other diversity-related committees.  (Ex. D, App. A at 3.)

discovery, the Court ruled that Management Committee members were *not* the ones who "made decisions with respect to the three processes at issue, let alone in the context of considering their application and effect on gender disparity." (Nov. 5, 2020 Order (ECF No. 1100) at 3; *see* Sept. 15, 2021 Order (ECF No. 1264) at 11 ("Plaintiffs have not shown that the senior executives [on the Management Committee] directly controlled the three contested processes.").) Even after the Court invited Plaintiffs to come forward with evidence "that would support a different outcome" (Nov. 5, 2020 Order at 3), Plaintiffs failed to do so.

Nor can the senior decisionmakers be the hundreds or thousands of individual Goldman Sachs managers who implemented the Evaluation Processes during the almost 20-year class period. An exploration of individual managers' intent would require extensive individualized proof and, post-*Wal-Mart*, would require decertification of the class. In addition, individual managers had no power to decide to "continue using" the Processes, whether with discriminatory intent or otherwise, and so cannot be the relevant decisionmakers. *City of New York*, 717 F.3d at 94. Perhaps recognizing those deficiencies, Plaintiffs have now acknowledged that evidence of "individual manager bias" is inadmissible at the Phase I trial (Ex. B at 2), and have not identified any individual managers who they seek to call at trial (JPTO at 10–13).

Because Plaintiffs should not be allowed to continue to sow confusion at trial, the Court should order Plaintiffs to immediately identify the individuals who they believe are the "key decision makers in senior management" who "implement[ed] and maintain[ed]" each of the Evaluation Processes (Pls.' Dec. 30, 2019 Br. at 1–2), and whose intent is on trial.

## C. The Court Should Bar Plaintiffs from Calling Goldman Sachs's CEO at Trial.

In yet another transparent effort to garner media attention—and in yet another glaring example of refusing to honor this Court's orders—Plaintiffs have included Goldman Sachs's current CEO, David Solomon, on their trial witness list. According to Plaintiffs, they will

call Mr. Solomon to testify about: (i) "Goldman Sachs's [purported] knowledge of bias and gender disparities" in the Evaluation Processes, and (ii) a supposed "climate of gender bias at the corporate level of Goldman Sachs." (JPTO at 13.) But Plaintiffs have no justification for calling Mr. Solomon to testify about either topic, and the Court should reject Plaintiffs' latest ploy to harass Mr. Solomon and sensationalize this case.

As a general matter, "[c]ourts must be mindful of the potential for harassment and disruption to business affairs when highly-placed executives are forced to testify." *Plew* v. *Ltd. Brands, Inc.*, 2012 WL 379933, at *3 (S.D.N.Y. Feb. 6, 2012) (Swain, J.) (precluding trial testimony of Victoria's Secret CEO); *see also Reddy* v. *Nuance Commc'ns, Inc.*, 2015 WL 4648008, at *4 (N.D. Cal. Aug. 5, 2015) (precluding trial testimony of "apex witness" as "harassment"). Those concerns are only heightened here.

*First*, the Court's prior rulings foreclose Plaintiffs from asking Mr. Solomon about either of the topics they wish to inquire about. With respect to the first topic—Mr. Solomon's supposed knowledge of bias and gender disparities in the Evaluation Processes—the Court has twice ruled that Plaintiffs have failed to demonstrate that Mr. Solomon has any relevant testimony to give. That is why the Court has refused to let Plaintiffs depose Mr. Solomon, initially foreclosing Plaintiffs from taking his deposition (Oct. 20, 2020 Order (ECF No. 1090) at 1), and more recently finding that Plaintiffs failed to "demonstrate the nexus" between Mr. Solomon's "role in approving, revising, implementing, or ignoring disparities linked to the three processes," rendering "proof of [Mr. Solomon's alleged] animus . . . *tangential at best* to the specific issues being tried in Phase I." (Dec. 12, 2022 Order at 5 (emphasis added) (citing Nov. 5, 2020 Order at 3).) If Plaintiffs lacked justification to depose Mr. Solomon, they certainly do not have any justification to call him as a witness at trial. With respect to the second topic—Goldman's

supposed "climate of bias and gender disparities"—this Court has repeatedly held that general allegations of culture are off limits, and neither Mr. Solomon nor anyone else should be called to testify about this alleged issue.  (*See infra* pp. 20–23.)

> *Second*, even if Mr. Solomon had relevant testimony to offer, Plaintiffs cannot show—as they must—that he has information that could not otherwise be obtained from other witnesses.  Absent "some unique knowledge of the issues in the case," courts frequently "preclude a redundant examination of a highly-placed executive."  *Plew*, 2012 WL 379933, at *3 (citation omitted).  Plaintiffs have no basis to claim that Mr. Solomon's personal intent is relevant, as they have presented no evidence that he controlled the Evaluation Processes.  Even if some nebulous company-wide "knowledge of bias and gender disparities in" the Processes or "climate of gender bias" were relevant, Plaintiffs listed *nine* other witnesses to testify about one or both.  (JPTO at 10–13.)  Because Plaintiffs cannot show that Mr. Solomon has any firsthand, non-duplicative knowledge about a relevant topic, they should not be permitted to call him as a trial witness.

## III.    THE COURT SHOULD PRECLUDE ANY EVIDENCE OF PLAINTIFFS' REJECTED "BOY'S CLUB" CLAIM.

> This Court has repeatedly rejected Plaintiffs' efforts to make this case about a supposed "boy's club" culture at Goldman Sachs.  The Court rejected that effort when Plaintiffs requested "record[s] of gender discrimination or harassment" that did not relate to the Evaluation Processes.  (Pls.' Dec. 10, 2018 Ltr. (ECF No. 651) at 1–2; Dec. 21, 2018 Order (ECF No. 657) ¶ 1.)  It rejected that effort when Plaintiffs sought discovery sanctions and further depositions about a complaint of gender discrimination outside the class Divisions.  (Dec. 12, 2022 Order at 2.)  And to allow the parties to plan their trial strategy, the Court reaffirmed in no uncertain terms that "Phase 1 will not include . . . any 'boy's club' claims or anecdotes."  (Nov. 25, 2019 Order at 3.)

Undeterred by the Court's clear rulings, Plaintiffs insist that they will present testimony about "a climate" or "culture" of "gender bias at the corporate level of Goldman Sachs, including evidence that corporate leaders who had oversight over the challenged processes made decisions based on gender stereotypes." (JPTO at 10–13.) They also insist that they will call an expert to testify about whether Goldman Sachs's "climate is tolerant of gender bias and harassment," even though the Court has already excluded affirmative testimony from that expert. (Goldberg Rpt. (ECF No. 1188-4) ¶ 1; *see* JPTO at 12.) And they insist that they will introduce dozens of trial exhibits relevant only to their non-certified "boy's club" claims. (*See*, *e.g.*, PX 871 (list of internal complaints of gender discrimination, including numerous complaints unrelated to the Evaluation Processes); PX 265 (email from Orlich about "bidding on how many push-ups Joe can do"); PX 281 (message from Orlich concerning alleged exclusion from golf event).)

Once again, the Court should reject Plaintiffs' plan to "put [Goldman Sachs's] culture on trial." (Apr. 30, 2019 Conf. Tr. (ECF No. 732) at 62:18–63:6.) It should also make clear that Plaintiffs may not introduce "boy's club" evidence in the form of other litigation and that Goldman Sachs's rebuttal intent evidence will not open the door to trial-by-culture.

### A.    The Court Should Preclude Plaintiffs' "Boy's Club" Evidence.

1.    This Court has held again and again that Phase I will concern only the Evaluation Processes and not any supposed "boy's club" culture at Goldman Sachs. In its Certification Order, the Court squarely rejected Plaintiffs' effort to certify a class action based on a so-called "'boy's club' culture that discriminates against women," correctly holding that "individualized inquiries" into alleged incidents of misconduct would "overwhelm the common issues." (Cert. Order at 4, 47.) Since then, Plaintiffs have tried to reinsert that rejected claim into the case by way of "culture" or "climate" evidence—efforts the Court has rejected at every turn:

- In December 2018, the Court denied discovery into whether general "record[s] of gender

discrimination or harassment" would "show . . . that bias permeated the [Firm's] culture." (Dec. 21, 2018 Order ¶ 1; *see* Pls.' Dec. 10, 2018 Ltr. at 1.)

- In April 2019, Plaintiffs asserted that they would "put [Goldman Sachs's] culture on trial . . . to show that there were managers that did things that were bad" because "[i]f we can't put on the culture evidence, then we basically are being told you are not going to be able to [prove] disparate treatment." (Apr. 30, 2019 Conf. Tr. at 54:11–13, 62:18–63:10.) The Court rejected this approach. (*Id.* at 63:11–12.)

- In March and August 2022, the Court reaffirmed that it "did not certify the disparate treatment 'boy's club' claim, which would have used anecdotal evidence of a 'boy's club' *culture* to demonstrate disparate treatment." (Mar. 17, 2022 Order at 5 n.4 (citing Cert. Order at 47–49) (emphasis added); *see* Aug. 22, 2022 Order at 3 n.3 (same).)

- Also in March 2022, the Court specifically excluded Plaintiffs' proposed testimony from Ms. Goldberg unless Goldman Sachs opens the door to it. (Mar. 17, 2022 Order at 8–9.)

- And in December 2022, the Court denied discovery into alleged "'Bros' Club' behavior" because "[d]iscriminatory treatment grounded in the so-called boys-club allegations . . . *has been excluded from the defined class*." (Dec. 12, 2022 Order at 2–3 (emphasis added).)

This Court's repeated decisions make clear that Plaintiffs cannot turn Phase I into a trial over "boy's club" evidence, including about Goldman Sachs's "culture" or "climate," or individuals' supposed use of "gender stereotypes." Those unambiguous decisions should be enforced.

        2.      Even putting the Court's orders to the side, evidence of a supposed "climate" or "culture of gender bias" should be excluded from the Phase I trial under Federal Rules of Evidence 401, 402, and 403 as irrelevant and unduly prejudicial.

        *First*, this kind of "climate" or "culture" evidence has no probative value in Phase I. Plaintiffs' exhibit list makes clear that their supposed evidence of a "boy's club culture" will include allegations of purported individual misconduct and survey results concerning Goldman Sachs's "work environment." (*See*, *e.g.*, PX 17 at -192 (survey results, from before the class

period, concerning "the current work environment" and "perceptions about awareness, importance and effectiveness of current diversity efforts"); PX 826 at -.002 (presentation on "[d]isciplinary [t]rends" and "[s]exual [h]arassment").). This kind of "boy's club" evidence is irrelevant to the certified class claims here: whether the Evaluation Processes had a disparate impact on women and whether senior decisionmakers responsible for implementing and maintaining those Processes knew of that discriminatory impact and continued to use the Processes for discriminatory purposes. *See* Cert. Order at 45 n.16; *City of New* York, 717 F.3d at 94. Courts in employment discrimination cases consistently exclude extraneous evidence where, as here, it does not relate to the specific claims at issue. *See*, *e.g.*, *Hart* v. *RCI Hosp. Holdings, Inc*., 90 F. Supp. 3d 250, 259–60 (S.D.N.Y. 2015) (Englemayer, J.) (excluding "circumstances relating to individual" plaintiffs as irrelevant to collective action issues of "minimum-wage damages and defendants' state of mind").

*Second*, even if evidence of a "boy's club culture" or a "culture of gender bias" had some relevance, its probative value would be substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403; *EEOC* v. *Bloomberg L.P.*, 2010 WL 3466370, at *13, *18 (S.D.N.Y. Aug. 31, 2010) (Preska, J.) (excluding evidence about "practices[] and culture that may lead to stereotyping" that "would serve merely to distract the jury's attention" from the discrimination claims before it). Cherry-picked "boy's club" or "culture" evidence from an expansive class (covering three Divisions over almost 20 years) has no probative value. As the Supreme Court recognized in *Wal-Mart*, "when the claim is that a company operates under a general policy of discrimination, a few anecdotes selected from literally [thousands] of employment decisions prove nothing at all." 564 U.S. at 358 n.9.

"Culture" and "climate" evidence would further prejudice Goldman Sachs by presenting the jury with testimony on which it cannot permissibly rely under the Court's orders.

*See Levitant* v. *City of New York Hum. Res. Admin.*, 914 F. Supp. 2d 281, 312 (E.D.N.Y. 2012) (Matsumoto, J.) (granting new trial where references to alleged misconduct "that was not at issue" "caused unfair prejudice to the defendant, inflamed the jurors, and aroused their sympathy"), *aff'd*, 558 F. App'x 26 (2d Cir. 2014). "Boy's club" evidence would confuse the issues at trial by suggesting to the jury that liability depends on whether specific employment decisions were caused by gender stereotyping or whether particular individuals faced a hostile work environment for reasons unrelated to the Evaluation Processes.

The Court should exclude all such evidence as irrelevant and unfairly prejudicial under Rules 401, 402, and 403.

## B.    The Court Should Preclude Any Supposed "Bad Acts" Evidence.

Plaintiffs also seek to offer evidence of prior Goldman Sachs employment settlements, litigation, and other alleged "bad acts" that are closely related to their "boy's club" theory. In particular, Plaintiffs have indicated that they intend to refer to Goldman Sachs's litigation history to establish something about the Firm's "notice" or "knowledge" in the current case. (Ex. B at 5; *see also* PX 583 (summarizing individual gender-discrimination claims against Goldman Sachs, including claims unrelated to the Evaluation Processes).) All such evidence must be excluded under Federal Rules of Evidence 401, 402, 403, 404(b), and 408.

*First*, evidence of other litigations, settlements or settlement offers is irrelevant to the certified claims. *See Corr. Officers Benevolent Ass'n of Rockland Cnty.* v. *Kralik*, 226 F.R.D. 175, 177 (S.D.N.Y. 2005) (Robinson, J.) (in gender discrimination case, "[p]rior settlement agreements, no matter how similar the litigation, are irrelevant"). Individual employment suits—whatever they are about—could not possibly support or disprove Plaintiffs' class claims about how the Evaluation Processes operate across the Firm. Nor would evidence of prior settlements establish "notice" or "knowledge" relevant to this case (Ex. B at 5), a gambit that courts regularly

reject.  *See Moore* v. *Rubin*, 2020 WL 13573582, at *1 (E.D.N.Y. Jan. 31, 2020) (Cogan, J.) (excluding evidence of prior settlements to prove "notice of the wrongfulness of similar illicit activity" because "prior settlements with other women are not relevant under Rule 401"); *Hart*, 90 F. Supp. 3d at 286–87 (finding other settlement offers irrelevant to "motivation" or "knowledge" and holding them "categorically[] off limits at trial").  No other lawsuit involves the firmwide operation of the Evaluation Processes and whether senior decisionmakers who implemented and maintained those Processes knew of purported disparities and continued using the Processes because of those disparities.  This is simply culture evidence by another name.

*Second*, the Court should exclude evidence of other employment litigation or settlements under Federal Rule of Evidence 403 because any probative value would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.  *See MF Glob. Holdings Ltd.* v. *PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 568 (S.D.N.Y. 2017) (Marrero, J.) (evidence of prior litigation inadmissible under Rule 403 because "[t]he jury could easily confuse any evidence regarding the merits of [those prior litigations] with the merits" of the case at issue).  Even the most well-instructed jury would be unable fairly to decide the complex yet circumscribed claims at issue here after hearing that Goldman Sachs settled other claims of employment discrimination.

## C.   The Court Should Clarify That Ordinary Rebuttal Evidence Will Not "Open the Door" to Culture Evidence.

This Court has explained that evidence relating to Goldman Sachs's culture would be permitted in only one narrow circumstance:  if Goldman Sachs chooses to open the door by putting its "good culture" on trial.  (*See* Mar. 17, 2022 Order at 8 (if "Defendants [] seek to present evidence related to their policies, practices, and procedures with respect to diversity and inclusion to rebut Plaintiffs' disparate treatment claims," then they "will put these, and other related policies,

-24-

at issue").)  Because Goldman Sachs has no intention of doing so, there is no reason to believe that Plaintiffs' "boy's club" evidence will ever become relevant.  That said, Goldman Sachs has every right to rebut any evidence of a senior decisionmaker's supposedly discriminatory intent by introducing specific evidence that the decisionmaker harbored no such intent.  That tailored evidence—which is plainly distinguishable from a general "good culture" defense—should not open the door to an avalanche of "boy's club" evidence, and this Court should make that clear.

If and when Plaintiffs identify any "key decisionmakers" who implemented and maintained the Evaluation Processes, they presumably will try to show that those individuals were aware of alleged disparities in the outcomes of the Evaluation Processes and intended to perpetuate them.  In response, Goldman Sachs has the right to rebut this evidence by showing that those decisionmakers made efforts to bolster the performance of women at Goldman Sachs and to enhance their opportunities for advancement.  Indeed, the Court has recognized that Goldman Sachs may in rebuttal "produce non-statistical evidence to show that it lacked [discriminatory] intent."  (Cert. Order at 46.)  As the Second Court has explained, an "employer facing [a] serious accusation [of intentional discrimination] must have a broad opportunity to present in rebuttal any relevant evidence that shows that it lacked such an intent," and "[n]o plaintiff can limit the type of evidence that a defendant must produce to rebut a prima facie case."  *City of New York*, 717 F.3d at 85, 87; *see also Adorno* v. *Port Auth. of N.Y. & N.J.*, 258 F.R.D. 217, 231 (S.D.N.Y. 2009) (Chin, J.) (in a disparate treatment case, "defendant may present its own statistics and/or present anecdotal and other non-statistical evidence to rebut the inference of discrimination").

Depending on the decisionmakers that Plaintiffs identify, Goldman Sachs is likely to have significant rebuttal evidence here.  For example, Goldman Sachs has the right to present reports in which the senior decisionmakers whose intent is at issue lauded *improved* outcomes for

women on the Evaluation Processes.  Goldman Sachs also is entitled to point to programs whose purpose was to improve women's 360 review scores and quartiling metrics and to increase the rates at which they were promoted—including in direct response to, or included within, reports showing small raw, aggregate differences in men's and women's performance.  This type of evidence would rebut any inference that the relevant executive, if among the "key decisionmakers" Plaintiffs identify, intended to use the Evaluation Processes to discriminate against women.

To allow for appropriate trial preparation, the Court should make clear that this kind of direct rebuttal to Plaintiffs' "discriminatory intent" theories will not open the door to irrelevant, wide-ranging, and prejudicial "boy's club" or "culture of discrimination" evidence.  Tailored rebuttal evidence of actions by relevant decisionmakers to improve women's performance and promotion prospects is *not* evidence about Goldman Sachs's general culture or its diversity and inclusion policies writ large, and would not put that culture or those policies at issue.  *See SEC* v. *Genovese*, 2022 WL 16748779, at *2 (S.D.N.Y. Nov. 7, 2022) (Schofield, J.) (introduction of evidence "about specific compliance-related actions" did not open the door to "other bad acts" evidence).  Any other rule would effectively deprive Goldman Sachs of its right to "produce any evidence that is relevant to rebutting the inference of discrimination." *City of New York*, 717 F.3d at 85, 87.  Goldman Sachs would be forced to choose between forgoing highly relevant rebuttal evidence to defend against a discriminatory treatment claim and putting its entire workplace culture on trial.  This Court should make clear that Goldman Sachs need not make that choice.

IV.     **THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT RELATED TO DAMAGES OR OTHER REMEDIES.**

At least eight times, this Court has ruled that the Phase I trial will not address "damages" of any kind.[5]  In the nearly five years since certification of a damages class, the Court has repeatedly confirmed that any class member's potential entitlement to punitive damages or backpay is an "individualized issue[]" (Oct. 24, 2018 Order at 1–2), that will be determined in Phase II (Mar. 23, 2022 Order at 1).  As the Phase I trial approaches, however, Plaintiffs have disregarded this fundamental premise of the Court's two-phase structure.  They now propose to introduce improper evidence and argument about remedies in several ways.  *First*, they plan to present compensation-related models, including alleged aggregate damages models that the Court has already excluded.  *Second*, they plan to expressly request that the jury find that punitive damages are appropriate.  And *third*, they plan to seek classwide injunctive and declaratory relief that is no longer in the case.  (Ex. A (Defs.' Dec. 22, 2022 Ltr.) at 5–6, Ex. B at 3.)  The Court should exclude all three categories of evidence and argument.

A.     **The Court Should Preclude Plaintiffs' Aggregate Backpay Damages Models.**

Notwithstanding this Court's repeated orders precluding damages evidence and argument in Phase I, Plaintiffs have indicated that they intend to introduce damages models,

---

[5]     *See* Oct. 24, 2018 Order at 1–2 ("individualized issues (*e.g.,* damages)" will not be addressed at Phase I); Dec. 21, 2018 Order ¶ 1 ("Phase [II] . . . will focus on individualized issues and damages."); June 25, 2019 Order at 2 ("[S]pecific factors affecting an individual class member's compensation would be addressed in Phase II."); Oct. 7, 2019 Order at 2 ("individualized issues, such as damages, would later be separately considered" at Phase II); Nov. 25, 2019 Order at 3 ("Phase [I] of the trial . . . will not include . . . damages (including back pay)."); Mar. 26, 2020 Order at 6 ("Phase II will focus on individualized Class Member issues and damages."); Mar. 17, 2022 Order at 20, 40 ("damages are beyond the scope of the Phase I trial"); Mar. 23, 2022 Order at 1 (if Plaintiffs prevail at Phase I, "whether and to what extent any individual class member is entitled to damages will need to be determined in separate trials").

relabeled as "compensation loss."  To be clear, compensation processes are not at issue in Phase I:
the Certification Order approved class treatment *only* for claims arising out of the three Evaluation
Processes (Cert. Order at 25–30), and the Court has since clarified three times that it did *not* certify
a claim that Goldman Sachs's compensation processes discriminated against class members.[6]  At
most, the Court has indicated that it will allow some evidence about "compensation generally . . .
to ascertain how the processes at issue affected compensation."  (Mar. 17, 2022 Order at 20.)
Goldman Sachs does not dispute that the parties may present *qualitative* evidence about how the
Evaluation Processes may impact compensation—for example, evidence describing that 360
reviews or manager quartiles may be one of a number of factors a manager considers in reaching
compensation decisions.

      What "compensation" cannot mean, however, is that Plaintiffs' *quantitative*
damages models are admissible by another name.  Specifically, Plaintiffs seek to introduce Dr.
Farber's aggregate damages models purporting to show classwide, average gender-based pay gaps,
to demonstrate the purported "impact" that the Evaluation Processes have on compensation.
(Ex. A at 5.)  But this Court should exclude those quantitative models for several reasons.

      *First*, permitting Dr. Farber's models as explaining how the Evaluation Processes
affected compensation would merely allow through the back door what this Court has prohibited
through the front.  In addition to the Court's eight orders that the Phase I trial will not address

---

[6]    *See* June 25, 2019 Order at 2 ("[C]ompensation may be a topic addressed in Phase I insofar
as it is connected to one or more of the three challenged practices."); Aug. 8, 2019 Order (ECF
No. 804) at 8 (denying motion to reconsider June 25, 2019 Order, confirming that "the
Certification Order certifies a class that alleges discrimination with respect to compensation as
well as evaluation and promotion 'via Goldman's use of'" the Evaluation Processes (quoting Cert.
Order at 28)); Oct. 7, 2019 Order at 5 (overruling objections to June 25 and August 8, 2019 orders
and reaffirming that "Rule 23 requirements were [not] met . . . with respect to Plaintiffs' general
compensation claims," and that evidence about such claims would not be admitted).

"damages" of any kind, the Court excluded Dr. Farber's models purporting to show "general pay disparities for damages purposes." (Mar. 17, 2022 Order at 20.) That ruling is the law of the case and cannot be reconsidered absent a "cogent and compelling" justification, which Plaintiffs have never offered. *Vaughn* v. *Phoenix House N.Y. Inc.*, 957 F.3d 141, 146–47 (2d Cir. 2020).

   *Second*, Dr. Farber's models are irrelevant, and have only gotten more ill-fitting over time. For starters, Dr. Farber's aggregate damages models have nothing to do with any compensation issue at any phase of this case. His approach admittedly "doesn't attach . . . damages to any particular woman" and could not determine "the damages suffered by any particular woman in the class" (Farber Tr. (ECF No. 1225-59) at 345:14–346:6), which is the *only* way damages can ever be proved under Title VII and the NYCHR. *See Wal-Mart*, 564 U.S. at 366 (a defendant "is entitled to individualized determinations of each employee's eligibility for backpay"); *Reynolds* v. *Barrett*, 685 F.3d 193, 203 (2d Cir. 2012) ("back pay" is "individualized relief"); *Moore* v. *Publicis Grp. SA*, 2014 WL 11199094, at *8 (S.D.N.Y. May 15, 2014) (Carter, J.) (emphasizing "need [for] individualized calculation of damages").

   Even if Dr. Farber's aggregate damages models were relevant at some point, they no longer usefully capture the current class. In fact, his most bloated model includes purported damages for approximately *2,000 individuals* who opted out or were excluded from the class.[7] Even in his most conservative model, around one-third of included individuals (approximately 700 out of 2,100) are no longer in the class.[8]

---

[7] *See* Farber Rbtl. Rpt. ¶¶ 111–114, tbls. 16 & 17 [Model 2, Full Sample], ¶¶ 118–119, tbls. 21 & 22 [Damages, Full Sample].

[8] Dr. Farber's most narrow conception of the class excludes "women who signed a Severance Agreement, MD, or PWA Agreement at any point in time" (Farber Rbtl. Rpt. tbl. 17), but still includes multiple groups that are no longer class members.

*Third*, Dr. Farber's models should be excluded for the independent reason that they would be unfairly prejudicial under Federal Rule of Evidence 403. Dr. Farber's most conservative methodology purports to find a pay gap of *$93 million to $179 million* from the 360 review and quartiling processes, and a pay shortfall of *$142 million* from the promotions process.[9] Evidence of aggregate damages anywhere close to these numbers would confuse and mislead even diligent, well-instructed jurors, who are unlikely to grasp that supposed evidence of a gender pay gap in the hundreds of millions of dollars has no bearing on whether the Evaluation Processes caused unlawful disparate impact in 360 performance scores, quartiling, or rates of promotion. Courts routinely exclude damages evidence to avoid precisely this type of prejudice. *See, e.g., Hopkins* v. *Nat'l R.R. Passenger Corp.*, 2016 WL 8711718, at *26 (E.D.N.Y. Apr. 29, 2016) (Garaufis, J.) (excluding evidence of damages to avoid "prejudice").[10] The Court should do the same here.

## B. The Court Should Reject Plaintiffs' Request for a Punitive Damages Finding.

Both this Court's rulings and settled caselaw make clear that Plaintiffs cannot recover punitive damages in Phase I; damages are an issue solely for Phase II. Yet Plaintiffs seek just that: a punitive damages finding by the Phase I jury. (JPTO at 4.) Their sole justification for disregarding this Court's orders is that they are seeking a finding of "entitlement" to damages, rather than an actual damages "award." (*Id.*) That purported distinction makes no difference, and the Court should preclude any consideration or mention of punitive damages at Phase I.

---

[9]    *See* Farber Rbtl. Rpt. at ¶¶ 111–114, tbls. 17 [Model 2], 21.

[10]    *See also Mineo* v. *City of New York*, 2013 WL 1334322, at *2 (E.D.N.Y. Mar. 29, 2013) (Mauskopf, J.) (bifurcating trial because "evidence related to damages will only heighten the prejudice to defendant [] and may result in a jury verdict that is based on considerations wholly separate and apart from issues of liability"); *Buscemi* v. *Pepsico, Inc.*, 736 F. Supp. 1267, 1272 (S.D.N.Y. 1990) (Carter, J.) (bifurcating trial because "evidence of harm to a plaintiff, regardless of the cause, may result in sympathetic jurors more concerned with compensating plaintiff for his injury than whether or not defendant is at fault").

*First*, as proposed by the parties, the Phase I jury will not be asked to determine whether individual class members are entitled to punitive damages. Instead, the jury will be charged with deciding only whether senior decisionmakers responsible for implementing and maintaining the Evaluation Processes used the Processes to discriminate against women; and, if so, whether they acted with malice or reckless indifference towards the rights of class members generally. But as this Court has explained, there will be no determination of whether any class member "suffered" any "specific harm" until Phase II. (Mar. 17, 2022 Order at 20, 40.)

Because the jury will not (and cannot) reach the predicate question of whether any individual was harmed, it cannot make any decision about punitive damages. Under both Title VII and the NYCHRL, an individual must prove that she was harmed *before* punitive damages are available. 42 U.S.C. § 1981a(b)(1) (punitive damages available only to an "aggrieved individual"); N.Y.C. Admin. Code § 8-502(a) (punitive damages available only to "a person aggrieved"). The Supreme Court and Second Circuit require the same: "conduct relevant to the reprehensibility analysis [for punitive damages] must have a nexus to the specific harm suffered by the plaintiff." *In re Simon II Litig.*, 407 F.3d 125, 138–39 (2d Cir. 2005) (citing *State Farm Mut. Auto. Ins. Co.* v. *Campbell*, 538 U.S. 408, 422–23 (2003)).[11] Only after harm has been established and quantified can a jury decide whether punitive damages are warranted, which depends on whether they would be "reasonable and proportionate to the amount of harm to the plaintiff." *EEOC* v. *Mavis Discount Tire, Inc.*, 129 F. Supp. 3d 90, 119 (S.D.N.Y. 2015) (Failla, J.) (citing *State Farm*, 538 U.S. at 420). Allowing punitive damages determinations to leapfrog questions of individual harm cannot be squared with due process or its "fundamental . . . concern[]"

---

[11]     *State Farm* announced a general rule about the imposition of punitive damages that courts apply in Title VII and NYCHRL cases. *See, e.g.*, *Qorroli* v. *Metro. Dental Assocs., D.D.S. – 225 Broadway, P.C.*, 2022 WL 17689836, at *10–11 (S.D.N.Y. Dec. 15, 2022) (Cote, J.).

with preventing "arbitrariness" and "unfairness."  *Philip Morris USA* v. *Williams*, 549 U.S. 346, 354–55 (2007).

In *EEOC* v. *Performance Food Group, Inc.*, another court rejected Plaintiffs' precise approach proposed here—that the Phase I jury "determine[] class-wide entitlement—but not a class-wide amount—to punitive damages" in a gender discrimination case.  16 F. Supp. 3d 576, 580, 582 (D. Md. 2014).  That court explained that a Phase I jury makes findings (*e.g.*, malice or reckless indifference) that are "a prerequisite for a *possible* punitive damages award," but those findings do not "*entitle* a claimant to punitive damages."  *Id.* at 582.  That determination happens at Phase II, when the jury decides whether each plaintiff was harmed and whether the defendant acted with malice or recklessness toward each individual—and even then "the [Phase II] jury must decide to exercise its discretion to make an award of an amount determined appropriate *for that individual*."  *Id.*  A Phase I "entitlement" finding would skip all these required steps.

*Second*, it would be highly prejudicial to put the concept of "punishment" or "punitive" damages before the Phase I jury.  Those concepts are "inherently prejudicial because [they] improperly urge[] the jury to decide the case based on 'passion and prejudice.'"  *Fox* v. *Gen. Motors LLC*, 2019 WL 13060148, at *6 (N.D. Ga. Oct. 31, 2019); *see Munafo* v. *Metro. Transp. Auth.*, 2003 WL 21799913, at *23 (E.D.N.Y. Jan. 22, 2003) (Korman, J.) (precluding evidence relevant to punitive damages before verdict "[b]ecause of the danger of unfair prejudice"); *Asmus* v. *Metro-North R.R. Co.*, 2019 WL 2603532, at *9 (D. Conn. June 25, 2019) (explaining that plaintiffs cannot urge a jury "to 'send a message,' 'punish,' 'penalize,' [or] 'discipline'").

### C.   The Court Should Preclude Any Evidence or Argument Relevant To Injunctive or Declaratory Relief.

Finally, the Court should reject Plaintiffs efforts to introduce evidence concerning "injunctive and declaratory relief" into the Phase I trial.  (JPTO at 8, 19.)  Over four years ago, in

the middle of discovery, Plaintiffs strategically withdrew their motion to certify class injunctive and declaratory relief claims under Rule 23(b)(2).  There is no basis in the Court's rulings, the law, or the current record for Plaintiffs to pursue injunctive relief now.

       *First*, by dropping their bid to certify claims for classwide injunctive and declaratory relief in 2018, Plaintiffs have forfeited those claims.  After Plaintiffs initially moved to certify claims "seeking injunctive relief" and "declaratory relief" under Rule 23(b)(2) and claims seeking "backpay and punitive damages" under Rule 23(b)(3) (Pls.' Class Cert. Br. (ECF No. 247) at 42–45), Judge Lehrburger set the injunctive and declaratory relief claims on a separate track. As he explained, because "injunctive relief should not be determined based on a stale record," additional discovery into Goldman Sachs's "current policies and practice[s]" was needed before considering "class certification for purposes of injunctive relief."  (Dec. 13, 2017 Tr. (ECF No. 560) at 6, 57–58.)  For this reason, the Court's 2018 Certification Order did not address the "claims for injunctive and declaratory relief under Rule 23(b)(2)," which were "being pursued on a separate track."  (Cert. Order at 12–13.)

       Plaintiffs elected not to pursue that separate track and to complete discovery in support of their injunctive and declaratory claims.  Instead, after the Second Circuit denied Goldman Sachs's Rule 23(f) petition seeking to appeal certification of the damages claims, Plaintiffs affirmatively "withdr[e]w their [then-]currently pending motion for class certification pursuant to Fed. R. Civ. P. 23(b)(2)" and requested that this Court "vacate all remaining deadlines related to Fed. R. Civ. P. 23(b)(2) class certification."  (Sept. 27, 2018 Ltr. (ECF No. 625) at 1–2.) The Court did so.  (Oct. 3, 2018 Order (ECF No. 627).)  More than four years later, Plaintiffs cannot revisit that litigation strategy.

*Second*, because "Rule 23(b)(2) governs class-wide injunctive relief," Plaintiffs cannot cram that remedy into their damages claims that were certified under Rule 23(b)(3). *All Star Carts & Vehicles, Inc.* v. *BFI Canada Income Fund*, 280 F.R.D. 78, 83 (E.D.N.Y. 2012) (Wexler, J.); *see Wal-Mart*, 564 U.S at 360 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief" to the class). "[D]amages[] must be sought under Rule 23(b)(3), while injunctive and declaratory relief are both available under Rule 23(b)(2)." *Adkins* v. *Morgan Stanley*, 307 F.R.D. 119, 141 (S.D.N.Y. 2015) (Caproni, J.) *aff'd*, 656 F. App'x 655 (2d Cir. 2016).[12]  Plaintiffs recognized as much in seeking certification of their injunctive and declaratory relief claims under Rule 23(b)(2) in the first place.

*Third*, there is no evidence that Goldman Sachs's current practices would support classwide injunctive or declaratory relief. As to the 360 review or manager quartiling processes, the Court granted summary judgment to Goldman Sachs for *2016 and beyond*, because Plaintiffs' expert "has not put forward evidence of statistically significant differences based on gender after 2015." (Mar. 17, 2022 Order at 57.) And when it comes to promotions, even after the Court warned in 2017 that "a stale record may not provide sufficient basis to certify a class for purposes

---

[12]    *See also In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 827 F.3d 223, 229 (2d Cir. 2016) ("Because of the difference between Rule 23(b)(3) and Rule 23(b)(2), members of the [Rule 23(b)(3)] class . . . receive[] money damages" while "members of the [Rule 23(b)(2)] class . . . receive[] only injunctive relief"); *Garcia De León* v. *N.y. Univ.*, 2022 WL 2237452, at *8–9 (S.D.N.Y. June 22, 2022) (McMahon, J.) ("Rule 23(b)(3)" is used "[t]o certify a class for damages," whereas "Rule 23(b)(2)" is used "[t]o certify a class for injunctive or declaratory relief"); *Wedra* v. *Cree, Inc.*, 2022 WL 2116760, at *5 (S.D.N.Y. June 13, 2022) (Briccetti, J.) ("[P]laintiff seeks certification of a class under Rule 23(b)(2) to pursue injunctive relief and a class under Rule 23(b)(3) to seek money damages."); *Westchester Indep. Living Ctr., Inc.* v. *State Univ. of N.Y., Purchase Coll.*, 331 F.R.D. 279, 288 (S.D.N.Y. 2019) (Seibel, J.) ("[T]he putative class seeks injunctive and declaratory relief pursuant to Rule 23(b)(2), as opposed to monetary relief under Rule 23(b)(3).") (internal quotations and citations omitted)).

of seeking injunctive relief" (Dec. 13, 2017 Tr. at 57), Plaintiffs elected not to take additional discovery into Goldman Sachs's promotions practices after 2018.

For any one of these three independent reasons, the Court should exclude all references, evidence, or arguments related to injunctive or declaratory relief at the upcoming Phase I trial, including evidence or argument about Goldman Sachs's current Evaluation Processes.

## CONCLUSION

For the foregoing reasons, Goldman Sachs respectfully requests that the Court enter the following orders in connection with the upcoming Phase I trial:

1. Evidence or testimony about individualized experiences, including those of the Named Plaintiffs, with the Evaluation Processes is excluded.

2. Plaintiffs may not argue that their statistics about discriminatory impact alone support an inference of discriminatory intent.

3. The only admissible evidence of discriminatory intent is the intent of the senior decisionmakers who implemented or maintained the Evaluation Processes throughout the class period, whom Plaintiffs must promptly identify.

4. For similar reasons, Plaintiffs may not call Goldman Sachs's current CEO, David Solomon, as a witness at trial.

5. All argument and evidence of a supposed "boy's club culture," including evidence of a "climate" or "culture of bias," or that individuals allegedly used "gender stereotypes," is excluded.

6. Argument or evidence of Goldman Sachs's prior litigation, settlements, or alleged "bad acts" is excluded.

7. Goldman Sachs will not "open the door" to "culture" evidence by exercising its right to rebut evidence of supposed discriminatory intent held by senior decisionmakers who implemented or maintained the Evaluation Processes.

8. Argument or evidence concerning damages or other remedies, including backpay, punitive damages, and classwide injunctive and declaratory relief, is excluded.

Respectfully submitted,

/s/ Robert J. Giuffra, Jr.

Lynne C. Hermle (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE
LLP
1000 Marsh Road
Menlo Park, CA  94025
Office: (650) 614-7400
Fax: (650) 614-7401

Erin M. Connell (admitted *pro hac vice*)
Kathryn G. Mantoan (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE
LLP
405 Howard Street
San Francisco, CA  94105
Office: (415) 773-5700
Fax: (415) 773-5759

Marc Shapiro
ORRICK, HERRINGTON & SUTCLIFFE
LLP
51 West 52nd Street
New York, NY 10019
Office: (212) 506-5000
Fax: (212) 506-5151

Robert J. Giuffra, Jr.
Sharon L. Nelles
Ann-Elizabeth Ostrager
Hilary M. Williams
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

Amanda Flug Davidoff
Jeffrey B. Wall (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006
(202) 956-7500

*Attorneys for Defendants*
*Goldman, Sachs & Co. and*
*The Goldman Sachs Group, Inc.*

February 1, 2023